IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| WESLEY LYNN RUIZ, | |
| Petitioner, | |
| VS. | Cause No. 3:12-cv-05112-N |
| WILLIAM STEPHENS,<br>Director, Texas Department of Criminal<br>Justice, Institutional Division, | Death Penalty Case |
| Respondent | |

## AMENDED PETITION FOR HABEAS CORPUS

COMES NOW Wesley Lynn Ruiz, Petitioner in the above captioned cause and

pursuant to 28 U.S.C. § 2254 and this Court's Order dated November 21, 2014 (ECF

No.22) submits to this Court his Amended Petition for Habeas Corpus.

## PROCEDURAL HISTORY

By indictment filed on April 2, 2007, Mr. Ruiz was charged in trial court cause

number F07-50318 with capital murder, that on the 23rd day of March, 2007, he did:

> unlawfully then and there intentionally and knowingly cause the death of Mark
> Nix, an individual, hereinafter called deceased, by shooting the deceased with a
> firearm, a deadly weapon, and the said deceased was a peace officer, namely:
> a Dallas Police Officer then and there acting in the lawful discharge of an official
> duty, and the said defendant then and there knew the said deceased to be a peace
> officer.
>
> (CR 1:2).

Defense counsel were Paul Brauchle, lead counsel, and co-counsel William "Karo"

Johnson and Douglas Parks. The guilt/innocence phase of the trial was held before the Honorable Ernest White, III beginning on June 3, 2008.  The jurors returned a verdict of guilty on June 5, 2008 with a deadly weapon finding (firearm).  (CR 2:545). The punishment phase began on July 7, 2008. On July 11, 2008, the jurors answered "yes" to the future dangerousness special issue No. 1, and "no" to the mitigation special issue No. 2. (CR 2:663, 664). On July 11, 2008, the trial judge sentenced Mr. Ruiz to death.  A Motion for New Trial was denied.  (CR 2:676).

Mr. Ruiz appealed his conviction and sentence to the Court of Criminal Appeals, and on March 2, 2011 the Court issued an opinion denying the appeal and affirming the judgment of the trial court.  *Ruiz v. State*, No.  AP-75,968 (Tex. Crim. App. 2011)(unpublished).

On December 6, 2010 counsel for Mr. Ruiz filed an application for habeas corpus in the state trial court. *Ex parte Wesley Lynn Ruiz,* No. W07-50318-M(A), 194th Dist. Ct., Collin County, TX . After an evidentiary hearing the parties submitted proposed findings of fact and conclusions of law, and on May 21, 2012 the trial court issued its findings of Fact, Conclusions of Law and  Order , recommending that the Court of Criminal Appeals deny the application for habeas corpus. *Id.* (May21, 2012).

On September 26, 2012 the Court of Criminal Appeals issued an Order adopting the trial court's findings of fact and dismissing Mr. Ruiz's application for habeas corpus. *Ex Parte Wesley Lynn Ruiz*, Nos.  WR-78, 129-01 and WR-78,129-02 (Tex. Crim. App.

2012) (unpublished) *cert. denied, Ruiz v. Texas*, 133 S.Ct. 1725 (2013).

On September 11, 2013 counsel for the Petitioner filed an Application for Habeas Corpus in the Dallas County trial court alleging, *inter alia,* that the prosecution failed to disclose and/or correct false testimony given at the punishment phase of Mr. Ruiz's trial.[1]

On November 19, 2014, without addressing the merits of the Petitioner's claim, the Court of Criminal Appeals entered an order dismissing the Petitioner's application for habeas corpus as an abuse of the writ for failing to satisfy the requirements of Article 11.071, § 5(a). *Ex Parte Wesley Lynn Ruiz*, No 78,129-03 (Tex. Crim. App. 2014) (unpublished).

## STATEMENT OF FACTS

The facts of the offense resulting in Mr. Ruiz being charged with capital murder were set forth at length by the Court of Criminal Appeals in its decision denying Mr. Ruiz's appeal:

> On March 21, 2007, the homicide division of the Dallas Police Department issued a bulletin to its officers to be on the lookout for a 1996 four-door Chevy Caprice with dark tinted windows and chrome wheels, red and gray in color, that was suspected to have some involvement in a capital murder. Two days later, on March 23rd, two plainclothes officers in an unmarked police vehicle spotted a car matching this description on Stemmons Freeway. They summoned marked patrol cars to stop the suspect vehicle and followed it as it exited the freeway at Mockingbird Lane and drove into West Dallas. Corporal Mark Nix arrived, positioning his patrol car directly behind the Caprice and activating

---

[1] This issue is more fully discussed in the Petitioner's brief filed contemporaneously herewith.

his overhead lights and video camera. The Caprice momentarily braked as if to pull over, but then suddenly raced off at high speed down the winding road, followed by Nix and at least one other patrol car in hot pursuit. The ensuing events were recorded by Nix's video camera and that of the patrol car directly behind him, both of which recordings are in evidence.

Apparently taking a curve too fast, the Caprice hit the left-hand curb and spun out of control. It barreled backwards down a slight incline on the right side of the street and came to rest facing the roadway, its back-end apparently blocked by a fence. Nix followed the Caprice down the incline and pulled to a stop, directly hood to hood. The patrol car behind Nix also pulled off the road and came to a halt on the passenger side of the Caprice, a short way off but close enough to effectively hem it in. Corporal Nix jumped out of his patrol car and rushed to the front passenger side of the Caprice. There he began to swing his baton with his left hand, smashing it against the tinted front passenger window.6 He paused momentarily to place his pistol on the ground so that he could use both hands to wield the baton and continued striking the window, punching a small hole through it. A second later, a single gun shot shattered the rear passenger window, the bullet striking Nix's badge and splintering. A fragment entered Nix's chest at the level of his clavicle, severing his left common carotid artery. The other officers responded with a hail of gunfire, then dragged Nix to cover and summoned the SWAT team. The appellant was eventually pulled from behind the wheel of the Caprice, wounded and unconscious, the pistol with which Nix had been shot found in his lap. Nobody else was in the car. Nix was pronounced dead at the hospital, but the appellant was able to survive his multiple wounds.

*Ruiz v. State*, No. AP-75,968 (Tex. Crim. App. 2011)(unpublished) at 2 (footnotes

omitted).

As noted above, Paul Brauchle was appointed lead counsel, and  William "Karo"

Johnson and Douglas Parks were appointed co-counsel. The guilt/innocence phase of the

trial was held before the Honorable Ernest White, III beginning on June 3, 2008.  At the

guilt phase the State offered testimony from a total  twenty-two (22) witnesses in support

of its case.  Counsel for the Petitioner put on two witnesses, one who allegedly witnessed the police firing on Mr. Ruiz's vehicle immediately after it was stopped and before officer Nix was shot, 46 RR at70-71, and the Petitioner, who testified, *inter alia*  that he was in fear of his life and fired a shot to protect himself after the police fired first and  officer Nix told Mr. Ruiz he was going to kill him while he was beating on the car window with his baton. *See* 47 RR at 9-25.

The jurors returned a verdict of guilty of capital murder on June 5, 2008 with a deadly weapon finding (firearm).  (CR 2:545). The punishment phase began on July 7, 2008.

Among the witnesses at the punishment phase  the State called A.P. Merrilat as an expert witness to testify on the issues of future dangerousness and prison violence. *See* 51 RR 147, 149. In addition to his alleged expertise on the issue of prison violence, Mr. Merrilat testified that he was an expert on the classification system in the Texas prison system. *Id.* at 154, l. 13-15, p. 157,  l. 5-10.

After explaining the various levels of classification from G-1, being the least restrictive, to G-5, being the most restrictive in terms of an inmate's being placed in the general population at the prison, Mr. Merrilat testified that any inmate with a sentence of 50 years or greater, including life without parole, which Mr. Ruiz was facing if not given the death penalty, would be classified as G-3 upon his reception into the prison and this classification could be changed to a lower, less restrictive level afer ten years. *See id.* at

160.

Mr. Merrilat further testified that :

> 1     A.   That's correct.  He will automatically go to G-3 and
>
> 2   then he will be able to promote out of G-3 to a better
>
> 3   classification or demote down to even ad seg depending on his
>
> 4   behavior.  Now, with the 50-year -- with the life without
>
> 5   parole, he will have to stay at G-3 for ten years before he
>
> 6   can be considered for that promotion; but he is still living
>
> 7   in that general population.

*Id.*

This testimony was further elaborated upon on cross examination:

> 5      Q.   Anybody that is found guilty of capital murder and
>
> 6   sentenced to life without parole is going to be a G-3 and
>
> 7   never anything lower than that?
>
> 8      A.   No, sir, that is not even what I said a while ago.
>
> 9   He is going to come in as a G-3, yes, he is.  He will have an
>
> 10   opportunity to promote above that to a lesser classification
>
> 11   or downgraded based upon his behavior.  The promotion won't
>
> 12   occur for ten years at least.  The demotion can occur at any
>
> 13   time, depends on his behavior.

*Id.*  at 180.

In its redirect examination the prosecution made it a point for the jury to hear testimony about the opportunities and freedom  Mr. Ruiz might have if he were to be classified below a G-3.

16     Q.   You spoke about parole being an incentive; is that

17   the only incentive in prison?

18     A.   No, sir.  As a matter of fact, being able to work in

19   a craft shop and make wallets or paint or do things like that

20   is an incentive.  Not all inmates can do that you have to earn

21   those privileges, and they can be taken away if you mess up.

 .   .   .

5     Q.   There is other incentives also, are there not?

6     A.   I am sure there are.  I can't think of them right

7   now, I probably will as we go along.

8     Q.   Job classification would be one?

9     A.   The type of jobs.  The inmates don't work to work out

10   in those fields hoeing weeds, they would rather work inside,

11   that's an incentive.

12     Q.   And all those things are used to motivate behavior

13   inside prison; is that correct?

14     A.   Yes, sir.

15     Q.   So the lack of not having parole, doesn't mean that

16   you are not going to follow the rules, does it?

17       A.   No, it doesn't mean that.

18       Q.   You talk about SSI inmates, what are those again?

19       A.   Those are the orderlies that we talk about that sweep

20   the floor, mop the floor, empty trash, such as that.

21       Q.   An inmate convicted of capital murder and life

22   without parole, would never make that?

23       A.   Yes, sir, he can be that.

24       Q.   Pardon?

25       A.   He can.  I didn't say trustee, I said orderly, he can

 1   be an orderly.

 2       Q.   How would that ever come about?

 3       A.   The decision of whoever gives out the jobs, **there is**

 **4   no restriction from it in the classification plan.**[2]

*Id.* at 187-189 (emphasis supplied).

The remainder of Mr. Merrilat's testimony consisted of a virtual catalogue of

offenses which inmates have committed while in custody, including but not limited to

murder, assault, gang affiliation and the access to knives and other weapons while

working in lower than G-3 classification jobs

In its closing argument the prosecution placed great emphasis on the possibility of

---

[2] The foregoing testimony was patently false and incorrect, as will be further discussed
below.

Mr. Ruiz receiving a lesser classification than a G-3:

> 7      He is not going to be in there all by himself.  You know
>
> 8   that.  He is going to be G-3, he could be in here with a DWI
>
> 9   guy, a burglar, check writer, with a 18-year-old boy the next
>
> 10   five, ten years, as long as he is good, not getting caught
>
> 11   down there, watching TV, working in the kitchen.  Y'all know
>
> 12   what the evidence is in this case.  If anybody, once you get
>
> 13   back there, and believe me I am the last one you are going to
>
> 14   hear, I promise you, anybody want to swim out and try to help
>
> 15   this fellow, I want you to remember his mind-set.  His
>
> 16   mind-set about authority, who he is going to be around the
>
> 17   rest of his life unless he escapes.  Then he will be back here
>
> 18   on the streets of Irving, out in West Dallas on the west side.
>
> 19   Remember his mind-set, how he feels about guards, those
>
> 20   bitches and whoes, how he feels about the police, I am not
>
> 21   going to use the term it has something to do with suckers.

55 RR at 53.

The Petitioner called 10 witnesses in his punishment case in chief, one of whom was Larry Fitzgerald, a former TDCJ prison official who also testified on the issue of prison violence. When questioned by defense counsel Mr. Fitzgerald stated that his testimony would be along the same lines as that of Mr. Merrilat. *See* 43 RR at 9

On July 11, 2008, the jurors answered "yes" to the future dangerousness special issue No. 1, and "no" to the mitigation special issue No. 2. (CR 2:663, 664). On July 11, 2008, the trial judge sentenced Mr. Ruiz to death.

On June 16, 2010 the Court of Criminal Appeals  issued its decision in *Estrada v. State*,  313 S.W.3d 274 (Tex. Crim. App.  2013) holding *inter alia* that the presentation of false testimony by A.P. Merrilat regarding Mr. Estrada's eligibility for a classification lower than G-3, notwithstanding the fact that he was sentenced to life without parole, created "a fair probability that appellant's death sentence was based upon Merrilat's incorrect testimony."[3] *Id* at 287. The Court granted relief notwithstanding defense counsel's failure to object, stating that "[a]ppellant had no duty to object because he could not reasonably be expected to have known that the testimony was false at the time that it was made." *Id.* at 288.

The Court further held that "[t]his case also not only involves the erroneous admission of evidence, as in *Saldano*, but, unlike *Saldano*, it also involves the State's duty to correct "false" testimony whenever it comes to the State's attention. *See Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)* ." *Id.* Unlike Mr. Ruiz's case, however, the State confessed error and notified the court of its presentation of the false testimony. *Id.*

---

[3] The regulation in question was issued in July of 2005, almost two years prior to Mr. Ruiz's offense and three years prior to his trial and stated that "[e]ffective 9/1/05, offenders convicted of Capital Murder and sentenced to 'life without parole' will not be classified  to a custody less restrictive than G3 throughout their incarceration" 313 S.W. 3d at 287

As noted above, on December 6, 2010 Mr. Ruiz's state habeas counsel filed an Application for Habeas Corpus setting forth eight claims for relief , three of which claimed "actual innocence" based upon the actions of Officer Nix as an alleged aggressor because he did not follow proper protocol in conduct in the stop and the Court refused to allow previous incidents of his alleged brutality while dealing with suspects. The remaining claims were for ineffective assistance of counsel at various stages of the trial and of trial in a prejudicial atmosphere based upon the presence of a number of uniformed officers in the courtroom during the trial.

Notwithstanding the fact that the *Estrada* decision had come down six months before state habeas counsel filed the application for habeas corpus and approximately six weeks before Mr. Ruiz's appellate counsel filed his opening brief on appeal, neither trial or appellate counsel raised the issue of the falsity of the Merrilat testimony at trial, in the appeal brief or the application for habeas corpus. Further, as will be shown below, the Respondent was aware and had actual knowledge of the issue of false testimony on the matter of classification as early as August of 2009, but took no steps to confess the error either in its appeal brief or in its response to the state petition for habeas corpus.

Based upon he foregoing facts and the record Mr. Ruiz sets forth the following claims for relief.

<u>**FIRST CLAIM FOR RELIEF**</u>

**THE KNOWING FAILURE OF THE STATE OF TEXAS TO CORRECT THE PRESENTATION OF FALSE TESTIMONY BY A.P. MERRILAT[4] GIVEN AT MR. RUIZ'S TRIAL, VIOLATED MR. RUIZ'S CONSTITUTIONAL RIGHTS**

Due to the negligence of Mr. Ruiz's appellate attorney and his state habeas counsel this issue was not initially presented to and /or exhausted in  state court. This issue will be more fully discussed in the Petitioner's brief filed contemporaneously herewith.

By Order of this Court dated October 1, 3013 the Petitioner the instant case was stayed and the Petitioner was given permission to return to state court to exhaust this claim. D.C. Docket No. 16.

On November 19, 2014, without addressing the merits of the Petitioner's claim, the Court of Criminal Appeals entered an order dismissing the Petitioner's application for habeas corpus as an abuse of the writ for failing to satisfy the requirements of Article 11.071, § 5(a). *Ex Parte Wesley Lynn Ruiz*, No 78,129-03 (Tex. Crim. App. 2014) (unpublished).

**A.  Mr. Ruiz's conviction, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.**

Mr. Ruiz's conviction, confinement, and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and comparable state law,

---

[4] Mr. Merrilat is erroneously referred to as A.P. Merrilott in the court record.

because the State of Texas knowingly violated its duty to correct false testimony given by

A.P. Merrilat which directly reflected upon and addressed the First Special Issue, *i.e.*,

whether Mr. Ruiz presented a future danger in prison society. This allowed the

prosecution to give a false impression of the evidence to the jury during the punishment

stage of Mr. Ruiz's trial and allowed false evidence to go uncorrected.

 If Respondent disputes any of the facts alleged below, Mr. Ruiz requests an

evidentiary hearing so that the factual disputes may be resolved.  The declarations and

other exhibits accompanying this Application, as well as the allegations and facts set forth

elsewhere in this Application, are hereby incorporated by reference into this claim as

though set forth in full.

 The facts in support of this claim, among others to be presented after full

investigation, discovery, access to this Court's subpoena power, and an evidentiary

hearing, include the following.

 At the punishment phase of Mr. Ruiz's trial the State called A.P. Merrilat as an

expert witness to testify on the issues of future dangerousness and prison violence. *See* 51

RR 147, 149. In addition to his alleged expertise on the issue of prison violence, Mr.

Merrilat testified that he was an expert on the classification system in the Texas prison

system. *Id.* at 154, l. 13-15, p. 157,  l. 5-10.

 After explaining the various levels of classification from G-1, being the least

restrictive, to G-5, being the most restrictive in terms of an inmate's being placed in the

general population at the prison, Mr. Merrilat testified that any inmate with a sentence of 50 years or greater, including life without parole, which Mr. Ruiz was facing if not given the death penalty, would be classified as G-3 upon his reception into the prison and this classification could be changed to a lower, less restrictive level afer ten years. *See id.* at 160.

Mr. Merrilat further testified that :

1    A.   That's correct.  He will automatically go to G-3 and

2    then he will be able to promote out of G-3 to a better

3    classification or demote down to even ad seg depending on his

4    behavior.  Now, with the 50-year -- with the life without

5    parole, he will have to stay at G-3 for ten years before he

6    can be considered for that promotion; but he is still living

7    in that general population.

*Id.*

This testimony was further elaborated upon on cross examination:

5    Q.   Anybody that is found guilty of capital murder and

6    sentenced to life without parole is going to be a G-3 and

7    never anything lower than that?

8    A.   No, sir, that is not even what I said a while ago.

9    He is going to come in as a G-3, yes, he is.  He will have an

10   opportunity to promote above that to a lesser classification

-14-

11   or downgraded based upon his behavior.  The promotion won't

12   occur for ten years at least.  The demotion can occur at any

  13   time, depends on his behavior.

*Id.*  at 180.

In its redirect examination the prosecution made it a point for the jury to hear

testimony about the opportunities and freedom  Mr. Ruiz might have if he were to be

classified below a G-3.

16    Q.  You spoke about parole being an incentive; is that

17   the only incentive in prison?

18    A.  No, sir.  As a matter of fact, being able to work in

19   a craft shop and make wallets or paint or do things like that

20   is an incentive.  Not all inmates can do that you have to earn

21   those privileges, and they can be taken away if you mess up.

  .   .   .

 5    Q.  There is other incentives also, are there not?

 6    A.  I am sure there are.  I can't think of them right

 7   now, I probably will as we go along.

 8    Q.  Job classification would be one?

 9    A.  The type of jobs.  The inmates don't work to work out

10   in those fields hoeing weeds, they would rather work inside,

11   that's an incentive.

-15-

12    Q.   And all those things are used to motivate behavior

13   inside prison; is that correct?

14    A.   Yes, sir.

15    Q.   So the lack of not having parole, doesn't mean that

16   you are not going to follow the rules, does it?

17    A.   No, it doesn't mean that.

18    Q.   You talk about SSI inmates, what are those again?

19    A.   Those are the orderlies that we talk about that sweep

20   the floor, mop the floor, empty trash, such as that.

21    Q.   An inmate convicted of capital murder and life

22   without parole, would never make that?

23    A.   Yes, sir, he can be that.

24    Q.   Pardon?

25    A.   He can.  I didn't say trustee, I said orderly, he can

 1   be an orderly.

 2    Q.   How would that ever come about?

 3    A.   The decision of whoever gives out the jobs, **there is**

 4   **no restriction from it in the classification plan.**

*Id.* at 187-189 (emphasis supplied).

The remainder of Mr. Merrilat's testimony consisted of a virtual catalogue of

offenses which inmates have committed while in custody, including but not limited to

murder, assault, gang affiliation and the access to knives and other weapons while

-16-

working in lower than G-3 classification jobs.

In its closing argument the prosecution placed great emphasis on the possibility of

Mr. Ruiz receiving a lesser classification than a G-3:

> 7     He is not going to be in there all by himself.  You know
>
> 8   that.  He is going to be G-3, he could be in here with a DWI
>
> 9   guy, a burglar, check writer, with a 18-year-old boy the next
>
> 10   five, ten years, as long as he is good, not getting caught
>
> 11   down there, watching TV, working in the kitchen.  Y'all know
>
> 12   what the evidence is in this case.  If anybody, once you get
>
> 13   back there, and believe me I am the last one you are going to
>
> 14   hear, I promise you, anybody want to swim out and try to help
>
> 15   this fellow, I want you to remember his mind-set.  His
>
> 16   mind-set about authority, who he is going to be around the
>
> 17   rest of his life unless he escapes.  Then he will be back here
>
> 18   on the streets of Irving, out in West Dallas on the west side.
>
> 19   Remember his mind-set, how he feels about guards, those
>
> 20   bitches and whoes, how he feels about the police, I am not
>
> 21   going to use the term it has something to do with suckers.

55 RR at 53.

As noted above, not only was the testimony of Mr. Merrilat, the State's so-called

"expert," false in that the classification rules had been changed to forbid an inmate

sentenced to life without parole from achieving a classification status lower than G-3, but

the State of Texas was fully aware of this issue prior to filing its brief in Mr. Ruiz's

appeal and prior to the oral argument.

### B.     Relevant Legal Authority

#### 1.     *Brady v. Maryland*

"[T]he suppression by the prosecution of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to

punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v.

Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *accord Banks v.

Dretke*, 540 U.S. 668, 691 (2004); *Mahler v. Kaylo*, 537 F. 3d 494, 499 (5th Cir. 2008);

*Dickson v. Quarterman*, 462 F.3d 470, 477 (5th Cir. 2005).  In order to prevail on a *Brady*

claim, a petitioner must demonstrate that:  (1) The evidence at issue must be favorable to

the accused, either because it is exculpatory, or because it is impeaching; (2) that

evidence must have been suppressed by the State either willfully or inadvertently; and (3)

prejudice must have ensued.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *accord

Mahler*, 537 F.3d at 500; *Tassin v. Cain*, 517 F. 3d 770, 780 (5th Cir. 2008); *Dickson*, 462

F. 3d at 477; *Thomas v. State*, 841 S.W.2d 399, 402-04 (Tex. Crim. App. 1992).

For prejudice to ensue, the suppressed, favorable evidence must be "material."

*Brady*, 373 U.S. at 87.  Evidence is material under *Brady* if a reasonable probability exists

that, had the evidence been disclosed to the defense, the result of the proceeding would

have been different.  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  A reasonable

probability is one that sufficiently undermines confidence in the outcome of the trial.  *Id*.;

*Mahler*, 537 F. 3d at 500.  "The question is not whether the defendant would more likely

than not have received a different verdict with the evidence, but whether in its absence he

received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  When determining whether the *Brady*

information was material and therefore prejudicial, the evidence must be considered in

light of the evidence available for trial that supports the petitioner's conviction.  *See*

*Towns v. Smith*, 395 F. 3d 251, 260 (6th Cir. 2005); *United States v. Bencs*, 28 F. 3d 555,

560 (6th Cir. 1994) ("[m]ateriality pertains to the issue of guilt or innocence, and not to

the defendant's ability to prepare for trial") (citing *United States v. Agurs*, 427 U.S. 97,

112 n.20 (1976)).

### 2.    *Napue v. Illinois*

A conviction obtained using knowingly false testimony violates due process.

*Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957)

(due process violated when prosecution allows jury to be presented with a materially false

impression).  A state denies a criminal defendant due process when it knowingly uses

perjured testimony at trial or allows untrue testimony to go uncorrected.  *Faulder v.*

*Johnson*, 81 F.3d 515, 519 (5th Cir. 1996) (*citing Giglio v. United States*, 405 U.S. 150,

-19-

92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)); *United States v. Barnham*. 595 F.2d 231, 240-41 (5th Cir. 1979).

The prohibition against the use of false testimony applies even when the testimony in question was relevant only to the witness's credibility. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). When this happens, reversal of the defendant's conviction is a near certainty because courts do not employ a strict materiality test or a harmless-error analysis. *See Alcorta*, 355 U.S. 28 (reversing conviction and death sentence where sole eyewitness lied about his romantic involvement with the victim -- lies the government condoned and covered up).

The presentation of false evidence is intolerable because it perpetrates a fraud on the judge and the jury and undermines the "rudimentary demands of justice." *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791 (1935). The fraud is also insupportable because of its corrosive effect on the judicial process and because the instrument of deceit is a prosecutor, "whose obligation . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). To prevail on a claim based on *Napue*, the petitioner must show "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007); *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998).

-20-

"False evidence is 'material' only if there is any reasonable likelihood that [it] could have affected the jury's verdict." *Goodwin v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997).

### 3. *Johnson v. Mississippi*

In *Johnson v. Mississippi*, 486 U.S. 578 (1988) the Petitioner was convicted and sentenced to death based partly upon a New York conviction for assault that had subsequently been reversed prior to the Petitioner's trial on the murder charge.

On certiorari, Court reversed and remanded, holding that under the cruel and unusual punishment clause of the Federal Constitution's Eighth Amendment, the reversal of the New York conviction required a re-examination of the Mississippi death sentence because (1) the reversal of the conviction made evidence thereof irrelevant to the Mississippi sentencing decision, and the fact that the accused had served time in prison did not change this; (2) the use of the New York conviction in the Mississippi sentencing hearing was prejudicial, **especially given the Mississippi prosecutor's comments**. *See Id.* at 590 n.8.

In reversing the lower court decision, the Court held that:

> The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special "'need for reliability in the determination that death is the appropriate punishment'" in any capital case. [*citation omitted*] Although we have acknowledged that "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death,'" we have also made it clear that such

> decisions cannot be predicated on mere "caprice" or on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process."

486 U.S. at 584-585 (*citations omitted*).

As in *Johnson*, the prosecution in Mr. Ruiz's case placed heavy emphasis on the false evidence of the possibility of his achieving a lower classification , which had a substantial and injurious effect on the jury's punishment phase verdict.  *See Brecht v. Abrahamson,* 507 U.S. 619, 631(1993) , *citing   Kotteakos v. United States,* 328 U.S. 750, 776 (19460.

### B.    Because the State failed to disclose and correct the false testimony of its witness A.P. Merrilat, Mr.  Ruiz's Petition  should be granted

With regard to the elements of the *Brady* claim, first, the evidence in question was favorable to Mr.  Ruiz because without this evidence the prosecution had a  weak case against Mr. Ruiz on the issue of future dangerousness, given the lack of any violence in his criminal history.

With respect to the second prong of *Brady*, the State had full knowledge of the falsity of Mr. Merrilat's testimony and the decision of the Court of Criminal Appeals in *Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App.  2010).

On June 16, 2010 the Court of Criminal Appeals  issued its decision in *Estrada v. State*, *supra*, holding *inter alia* that the presentation of false testimony by A.P. Merrilat regarding Mr. Estrada's eligibility for a classification lower than G-3, notwithstanding the fact that he was sentenced to life without parole, created "a fair probability that

-22-

appellant's death sentence was based upon Merrilat's incorrect testimony." *Id* at 287. The Court granted relief notwithstanding defense counsel's failure to object, stating that "[a]ppellant had no duty to object because he could not reasonably be expected to have known that the testimony was false at the time that it was made." *Id.* at 288.

The Court further held that "[t]his case also not only involves the erroneous admission of evidence, as in *Saldano*, but, unlike *Saldano*, it also involves the State's duty to correct "false" testimony whenever it comes to the State's attention. *See Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)* ." *Id.* Unlike Mr. Ruiz's case, however, the State confessed error and notified the court of its presentation of the false testimony. *Id.*

What is of particular significance in the instant case is the timing surrounding Mr. Ruiz's appeal. Counsel for Mr. Ruiz filed his opening brief on appeal on February 16, 2010.[5] As noted above, the Court of Criminal Appeals  issued its decision in *Estrada* on June 16, 2010.  Attached hereto as Exhibit A  and by this reference made a part hereof is a copy of transcript pages dated August 28, 2009 which indicate actual knowledge on the part of the office of the Dallas County District Attorney of the fact that a life without parole sentence will not allow an inmate to be classified below a G-3. Thus, the Dallas County District Attorney's office had actual notice of this regulation prior to filing its

---

[5]  Point of Error 6 of the Appellant's brief directly challenged the legal sufficiency of the evidence of future dangerousness.

brief in Mr. Ruiz's appeal on July 26, 2010 and prior to oral argument on October 20, 2010.

With respect to the third prong of *Brady*, as was noted above, the prosecution's heavy reliance on the opportunity for committing violent acts while in a lower classification in both its punishment case in chief and its final argument was extremely prejudicial to Mr. Ruiz's case. It was clear that the State wanted the jury to believe that Mr. Ruiz was a highly dangerous individual who would commits acts of violence even in a prison environment.

Relief should also be granted on Mr. Ruiz's *Napue* claim -- that Mr. Ruiz's death sentence was based upon the use of knowingly false testimony presented by Mr. Merrilat, i.e., that Mr. Ruiz could be classified as low as a G-1 afer 10 years. Mr. Ruiz's sentence of death was based upon this false testimony. Accordingly, Mr. Ruiz's sentence of death is not "worthy of confidence." *Kyles*, 514 U.S. at 434. Moreover, the disclosure of this evidence would have painted the State's punishment case against Mr. Ruiz in "such a different light as to undermine confidence in the verdict." *Id*. at 435.

Finally, there is little question that the prosecution's use of the false evidence in the punishment phase of Mr. Ruiz's trial substantially undermined the jury's verdict, thus rendering it completely unreliable and invalid under *Johnson v. Mississippi, supra.* Mr. Ruiz's prior convictions were for non-violent misdemeanors or state jail felonies, with the exception of the offenses alleging possession of controlled substances and a Class C

misdemeanor assault.[6] Evidence further reflected that Mr. Ruiz had no disciplinary

infractions while incarcerated awaiting trial. 54 RR at 34–36. Moreover, although the

facts of the underlying offense also have relevance to future dangerousness, the crime for

which Mr. Ruiz was convicted was neither calculated nor heinous. Rather, it was

spontaneous and reactionary.

In the instant case the State should have corrected Mr. Merrilat's testimony at trial,

or at the very least in its brief and argument on appeal. Instead, the State chose to

knowingly remain quiet in the face of this falsity in the hope that the reviewing courts

would  overlook the error in testimony.  Mr. Ruiz should be afforded relief in this case.

---

[6] Specifically, evidence reflected that Mr. Ruiz had previously been adjudicated a delinquent child with a finding that he had been convicted of theft, for which he received probation. SX117. The evidence also showed prior misdemeanor convictions for: (1) burglary of a vehicle, a Class A misdemeanor, SX118; (2) theft, a Class B misdemeanor, SX119; (3) burglary of a vehicle, a Class A misdemeanor, SX120; (4) escape, a Class A misdemeanor, SX121; (5) assault, family violence, a Class C misdemeanor, SX122; and UCW Handgun, SX124. The evidence also reflected prior felony convictions for: (1) evading arrest, a state jail felony, reduced to misdemeanor punishment, SX123; (2) possession of a controlled substance, a state jail felony, reduced to misdemeanor punishment, SX126; and (3) possession of a controlled substance, with intent to deliver, a first degree felony, SX127. Finally, Mr. Ruiz entered a plea of guilty to the offense of possession of a controlled substance, with intent to deliver, a first degree felony, and was placed on 10 years deferred adjudication probation. SX125. Hearsay evidence was also presented alleging Mr. Ruiz's involvement in the shooting of a home.

## SECOND CLAIM FOR RELIEF

**MR. RUIZ'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE FALSE TESTIMONY OF MR. MERRILAT AT THE PETITIONER'S SENTENCING.**

This claim was not presented to or adjudicated in state court due to the negligence of state habeas counsel.  This issue will be more fully discussed in the Petitioner's brief filed contemporaneously herewith.

If the State's failure to comply with its duty to correct false testimony is not responsible for the timing of Mr. Ruiz's false testimony claim, then neither should it be responsible for trial counsel's failure to object to the incorrect testimony. Trial counsel could have had no strategic basis for failing to object, and given that the State gave notice that Merillat would testify for it as an expert and that counsel would have known the testimony concerned prison classification, counsel had a duty to prepare for the testimony, including any misrepresentations of TDCJ classification policy. Counsel's failure to object prejudiced Mr. Ruiz for the same reasons as described *supra*.

Although the *Estrada* court held that "[a]ppellant had no duty to object because he could not reasonably be expected to have known that the testimony was false at the time that it was made," 313 S.W.3d at 288, Petitioner's trial counsel employed his own expert on classification who claimed knowledge of the classification procedure and should have known that Merrilat's testimony was false.  *See, e.g.,* 55 RR at 8.

-26-

In claims regarding the a violation of a Petitioner's Sixth Amendment right to counsel, the governing standard by which the performance of trial and appellate counsel are judged is set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). To demonstrate a violation of this right petitioner must prove: 1) counsel's representation fell below professional norms; and 2) a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. 466 U.S. at 687, 694.

It is respectfully submitted that particularly in a death penalty case, counsel or his expert's failure properly to prepare for the sentencing by familiarizing them selves with current sentencing law and regulations falls within the penumbra of *Strickland's* holding, given the emphasis that the State put on Mr. Ruiz's potential prison.

## THIRD CLAIM FOR RELIEF

### MR. RUIZ'S APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE ISSUE OF THE FALSE TESTIMONY OF MR. MERRILAT BY REPLY BRIEF OR AT THE ORAL ARGUMENT OF HIS APPEAL.

This claim was not presented to or adjudicated in state court due to the negligence of state habeas counsel. This issue will be more fully discussed in the Petitioner's brief filed contemporaneously herewith.

Douglas Parks was appointed as appellate counsel prior to Mr. Ruiz's trial and prepared and as noted above, filed his opening brief on appeal on February 16, 2010. As was also noted above, the Court of Criminal Appeals issued its decision in *Estrada* on

June 16, 2010 and the State filed its brief on July 26, 2010. Thus, Mr. Parks had almost

three months prior to the oral argument either to prepare and file a reply brief in order to

bring the *Estrada* case to the attention of the Court of Criminal Appeals, or at the very

least raise the issue at oral argument in support of his claim of legal insufficiency of the

evidence of future dangerousness, which he included in his opening brief.

    As noted above, in claims regarding the a violation of a Petitioner's Sixth

Amendment right to counsel, the governing standard by which the performance of trial

and appellate counsel are  judged is set forth in *Strickland v. Washington,* 466 U.S. 668

(1984). To demonstrate a violation of this  right petitioner must prove: 1)  counsel's

representation fell below professional norms; and 2)  a reasonable probability that, but for

counsel's deficiency, the result of the trial would have been different.  466 U.S. at 687,

694.

    Although the *Estrada* court excused trial counsel's performance and failure to

object to the false testimony based upon the fact that he could not have known about the

change in regulations, 313 S.W.3d at 288, it is respectfully submitted that a failure of an

appellate lawyer to take notice of a grant of relief in a capital case  by the Court of

Criminal Appeals, of which there are few, relating to a punishment issue involving a

witness who gave similar testimony in a case in which appellate counsel was involved at

-28-

both the trial and appeal level[7], should no doubt give rise to the duty on the part of counsel to investigate, if only to read the *Estrada* decision, particularly in light of the fact that one of the issues raised by appellate counsel was the sufficiency of the evidence at punishment regarding future dangerousness.

Further, and as noted above, Mr. Parks was instrumental in the preparation of the testimony of Larry Fitzgerald, Petitioner's counsel's classification expert and in fact conducted Fitzgerald's direct testimony at the sentencing.

With respect to the issue of *Strickland* prejudice, as noted above, the prosecution's heavy reliance on the opportunity for committing violent acts while in a lower classification in both its punishment case in chief and its final argument was extremely prejudicial to Mr. Ruiz's case, given the complete absence of violence in Mr. Ruiz's criminal history.

### FOURTH CLAIM FOR RELIEF

**MR. RUIZ WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A FAIR AND IMPARTIAL TRIAL BECAUSE OF THE OVERWHELMING PRESENCE OF LAW ENFORCEMENT IN THE COURTROOM DURING THE PUNISHMENT PHASE OF THE TRIAL.**

This claim was presented to and adjudicated by the state court and denied by the Court of Criminal Appeals and is therefore exhausted.

---

[7] Mr. Parks was appointed and attended Mr Ruiz's trial and was intimately involved with the defense of the case, and also presented the testimony of defence counsel's classification expert.

Mr. Ruiz was denied his Sixth and Fourteenth amendment rights to a fair and

impartial trial because of the overwhelming presence of law enforcement in the

courtroom in the punishment phase of the trial. In combination with the installation of a

metal detector, the hostile and disparate treatment of the family of Mr. Ruiz who were not

allowed to sit in close proximity to their son, this  presence of an overwhelming number

of uniformed officers who lined the walls, and sat in the galley of the courtroom, resulted

in an inherently unfair trial process,  and violated the fundamental due process rights of

Mr. Ruiz to a fair trial.  U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Holbrook*

*v. Flynn*, 475 U.S. 560, 570 (1986).

Mr. Ruiz was convicted of killing Mark Nix, a City of Dallas police officer,

and sentenced to death. (CR 1:2). Witnesses uniformly testified to the overwhelming

presence of uniformed police officers, who packed the courtroom, but only immediately

before the jury retired to deliberate in each phase of the single-defendant trial. Paul

Brauchle, trial counsel for Mr. Ruiz, told the jury "they are down here for one reason and

one reason only, that's to intimate you, ...." (48 RR at 26).

At the state habeas hearing, Mr. Brauchle testified that in the closing arguments at

the punishment phase there were fifty (50) uniformed police officers in the courtroom.

(Evid. Hg. 2:107)."There were as many of them in here that they can get without

trampling the civilians." (Evid. Hg.2:107). So many, in fact, that "[t]here wasn't an empty

seat." (Evid. Hg. 2:107). During the rest of the trial, "there was almost nobody in here except for the D.A.s and relatives ....." (Evid. Hg. 2:105).

Kevin Brooks, who had been one of the Ruiz prosecutors, testified at the state habeas hearing that these officers traveled to the Dallas County courtroom from several jurisdictions. They traveled from the City of Dallas, and also from the cities of Irving, Mesquite and Richardson. (Evid. Hg.2:36). Mr. Brooks testified that he identified the cities these police officers came from by their uniforms. (Evid. Hg. 2:37). Former prosecutor Brooks recalled seeing fifteen (15) to twenty (20)police officers in the courtroom. (Evid. Hg. 2:39, 40). Mr. Brooks testified that they were not thereto provide courtroom security, and distinguished them from the bailiffs, who were with the Dallas county Sheriff's Office that were in the courtroom for security purposes. (Evid. Hg. 2:37, 39).

The Ruiz family members testified they too saw police officers in the courtroom. Richard Ziegenhain, Mr. Ruiz's grandfather, remembered seeing fifteen (15) to twenty (20) police officers.(Evid. Hg. 2:39, 40). He knew they were police officers because of their uniforms, the badges on their uniforms, the patches with an insignia on their uniformed sleeves, and because they were carrying weapons. (Evid. Hg. 2:11). Mr. Ziegenhain testified that these police officers were in the courtroom as spectators, not for security purposes, and were there as a show of force. (Evid. Hg.2:18). Their presence

swelled during the closing arguments before the jury retired to deliberate on its verdict. (Evid. Hg. 2:13, 29, 31).

Sue Ziegenhain, Mr. Ruiz's grandmother, testified that she saw police officers from the Dallas police Department and the Dallas County Sheriff's Office in the courtroom. (Evid. Hg. 2:20, 21). She knew they were police officers because she could see their badges, uniforms, weapons and handcuffs.(Evid. Hg. 2:20). Mrs. Ziegenhain testified that she saw twenty (20) in the courtroom. (Evid. Hg.2:22). Mrs. Ziegenhain testified that she believed that they were present because they wanted to send a message to the jury by their presence. (Evid. Hg. 2:25).

Barbara Ruiz, Mr. Ruiz's mother, testified that on the last day of the trial "there were a lot of police officers in the room" and she knew they were police officers because they had guns, badges, and were in uniform. (Evid. Hg. 2:27). Mrs. Ruiz testified that she "would say more [than 25], but I would say 25 for sure." (Evid. Hg. 2:27). Mrs. Ruiz believed that police officers were present in the courtroom to send a message to the jury to "choose the death penalty." (Evid. Hg. 2:32).

Paul Brauchle, lead defense counsel, testified that he recalled seeing at one time at least 30police officers in the courtroom during the closing arguments in the guilt/innocence phase. "[T]here was almost nobody in here except for the D.A.s [district attorney's] and relatives during the trial."(Evid. Hg. 2:105). Mr. Brauchle testified that "they [police officers ] didn't show up until they thought it was important." (Evid. Hg.

2:109). Mr Brauchle testified about the various ranks of police officers who appeared, but only before the jury retired to deliberate in each phase of the trial. Those police officers included: the chief of police from the City of Dallas, who was in the courtroom for most of the punishment phase; the captains and lieutenants came as well; even the patrol officers working the cities' streets appeared in the courtroom. (Evid. Hg. 2:106, 107). Mr. Brauchle estimated that during the closing arguments in the punishment phase the number of police officers had swelled to fifty (50). (Evid. Hg. 2:107). "There were as many of them in here that they can get without trampling the civilians." (Evid. Hg. 2:107). There were so many officers present in the courtroom, that "[t]here wasn't an empty seat." (Evid. Hg. 2:107).

These uniformed officers, with their holstered guns and handcuffs, (Evid. Hg. 2:20, 27), stood in the first aisle along the full length of the side-wall of the gallery in the courtroom. (Evid. Hg. 2:11,27). They stood along the back wall of the courtroom as well. (Evid. Hg. 2:12, 28).

There was a second aisle with pews to the left and to the right in the gallery of the courtroom. The family of the victim was seated in the first pew to the right of the second aisle that was closest to the jury box. Police officers sat in that pew with the family of the victim. (Evid. Hg. 2:11, 37).More police officers sat in the pews behind the family. (Evid. Hg. 2:12, 21, 27). In the pews to the left of the second aisle, police officers sat behind and around the Ruiz family. (Evid. Hg. 2:40). These police officers were close enough that

former prosecutor Brooks, whose counsel table was adjacent to the jury box, was able to

identify the officers by their uniforms, which announced the jurisdictions of their

respective cities: Irving, Dallas, Mesquite and Richardson. (Evid. Hg. 2:26). "Their

presence was quite evident." (Evid. Hg. 2:24).

At the trial, Mr. Brauchle warned the jury in closing arguments in the punishment

phase:

> You know, it's unfortunate that in some instances we have
> open court, because these officers have come down here, they
> are not part and parcel of this case, **they are down here for
> one reason and one reason only, that's to intimidate you,**
> ....

 48 RR at 26. (emphasis supplied)

Mr. Parks, Ruiz' direct appeal attorney who was present to help with appellate

issues that arose at the trial, testified at the state habeas evidentiary hearing. Parks

asserted that there were"probably more than 20 [police officers] in the courtroom," and

even then "there were a lot more at punishment than at guilt/innocence, .... They mostly

all came in for final argument." (Evid. Hg.2:171). He estimated that there were more than

thirty (30) but less than forty (40) police officers present during punishment phase closing

arguments. (Evid. Hg. 2:173).

Asked what the significance of their presence at final argument was, Mr. Parks

responded:

> Parks: In my experience and I have tried more capital murders
> cases with  dead police officers than I would like to say,

-34-

particularly since my niece just passed her sergeant's exam today. *I have a great deal of respect for police officers. But in my experience, they do that* to show both solidarity with the family of the deceased and *to be a presence for the jury to see and feel.*
Q. So essentially they are trying to influence – their presence, just the fact of their presence, if they do nothing else, *the fact of their presence is something that they are doing to influence the outcome of the case?*
Parks: *Sure.* And that's why our courts have indicated that it is inappropriate.

(Evid. Hg. 2:172) (emphasis supplied)

However, the judge took no action during the trial to exercise control over the courtroom and eliminate the hostile and coercive atmosphere. *See Sheppard v. Maxwell*, 384 U.S. 333, 358 (1966) ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

The Texas court denied the Petitioner relief based on a ruling that "the United States Supreme Court's jurisprudence on a defendant's right to a fair trial currently extends only to state-sponsored courtroom practices," citing *Carey v. Musladin*, 549 U.S. 70 (2006), *Estelle v. Williams*, 425 U.S. 501 (1976),and *Holbrook v. Flynn,* 475 U.S. 560 (1986).

However, the *Musladin* Court held that "[i]n contrast to state-sponsored courtroom practices, the effect on a defendant's fair-trial rights of the spectator conduct to which [the defendant] objects is an open question in our jurisprudence." 549 U.S. at 76

-35-

It is therefore respectfully submitted that the lower court's finding that the presence of  as many as 50 uniformed police officers in the courtroom were only "mere spectators" and not state agents, notwithstanding that they were employed by the State, testified for the State and assisted in the arrest and prosecution of Mr. Ruiz, the holding of the lower court is both an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and an unreasonable application of the clearly established law set forth in *Holbrook and Musladin, supra*, and relief should therefore be granted.

## FIFTH CLAIM FOR RELIEF

**THE TEXAS COURT REFUSED TO ALLOW THE SENTENCING JURY TO FULLY CONSIDER AND GIVE EFFECT TO THE MITIGATING EVIDENCE BY PROHIBITING THE ATTORNEYS REPRESENTING THE STATE, THE DEFENDANT, AND THE DEFENDANT'S COUNSEL FROM INFORMING THE JURORS OR THE PROSPECTIVE JURORS OF THE EFFECT OF THE FAILURE OF A JURY TO AGREE ON THE ISSUES SUBMITTED IN VIOLATION OF THE 6TH, 8TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The following facts support this claim:

Texas refuses to tell its capital sentencing jurors the whole truth about how to give life. In the same manner as in his claims about the 10-12 rule, *See* Claim No. 5, *infra,* Mr. Ruiz's complaint addresses here another way that Texas interferes with the full consideration of  mitigating circumstances. The Texas prohibition against revealing the fact that a single holdout juror could cause the prosecution to result in a life sentence,

rather than a mistrial followed by a new sentencing hearing, is clearly intended to prevent a minority of life giving jurors, or even a single juror,  from actually exercising a veto of the majority's decision  for death.

*Penry I*, *Tennard  v. Dretke*, and  *Smith v. Texas* clearly establish that the Texas capital sentencing system must: 1) afford full jury consideration, not just some consideration, of mitigating circumstances; and 2) provide any life giving jurors an adequate vehicle to actually give effect to the defendant's mitigation case. It is respectfully submitted that the Texas statutory prohibition interfered with his jury's ability to give effect to his mitigation case in a substantial enough way to undermine confidence in the outcome of his trial. Thus, the writ must issue under  *Boyde v. California, supra.*

Although the Court of Criminal Appeals has previously rejected this argument in its decisions, those decisions are not controlling because they directly conflicts with the U.S. Supreme Court's decisions in *Penry I*, *Tennard v. Dretke*, and  *Smith v. Texas*. Therefore,  the state court's decision on this claim "was contrary to, [and] involved an unreasonable application of,  clearly established Federal law,  as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The foregoing violation of Mr. Ruiz's constitutional rights constitutes  structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  However, even

assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Mr. Ruiz's rights had a substantial and injurious effect or influence on Mr. Ruiz's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Ruiz's convictions and sentence.

In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## SIXTH CLAIM FOR RELIEF

**MR. RUIZ'S   CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE PUNISHMENT CHARGE WHICH REQUIRED AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE FIRST SPECIAL ISSUE AND AT LEAST TEN "YES" VOTES FOR THE JURY TO RETURN AN AFFIRMATIVE ANSWER TO THE MITIGATION SPECIAL ISSUE.**

The following facts support this claim:

-38-

Mr. Ruiz's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the punishment charge, required at least ten "no" votes for the jury to return a negative answer to the first special issue and at least ten "yes" votes for the jury to return an affirmative answer to the mitigation special issue. *See California v. Brown*, 479 U.S.538, 541(1985).

Article 37.071 violates the constitution, in that it requires that in order to answer Special Issue One "yes" the jury must unanimously agree, and to answer the issue "no" ten jurors must agree. Further, in order to answer Special Issue Two "no" the jury must unanimously agree, and to answer "yes" ten jurors must agree. It is respectfully submitted that this scheme is unconstitutional because this "12-10 rule" creates an irrational process which is death-weighted and death-driven.

Texas law requires that neither the court, the state, nor counsel for the defense may inform a juror or prospective juror of the effect of the jury's failure to agree on special issues at punishment. TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(a)(Vernon Supp. 2002). All parties in this case acted in compliance with this statute. *See* Claim No. 8, *supra*.

Texas law also requires that the capital sentencing jury be instructed that it may not answer the first special issue "yes" or the second special issue "no" unless 10 or more

-39-

jurors agree.  *See* TEX. CODE CRIM. PROC. ANN.art. 37.071 §§ 2(d)(2) & 2(f)(2)(Vernon Supp. 2002).

The "10-12 rule" contained in TEX. CODE CRIM. PROC. ANN. art 37.071[8] violates the constitutional principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North Carolina*, 494 U.S. 294 (1990).  The "10-12 provision" requires that, in order for the jury to return answers to the special issues that would result in a life sentence, (I) at least ten jurors must vote "no" in answering the first special issue, (ii) at least ten jurors must vote "no" in answering the second special issue, *or* (iii) at least ten jurors must vote "yes" in answering the third special issue.  This "10-12 provision" violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special issues, the jury could not return a life sentence.  Such a "majority rules" mentality could lead jurors to change their potential holdout votes for life to a vote for the death penalty.

As an illustration, consider the following hypothetical circumstance: at trial, four of the twelve jurors conclude that, as consequence of a capital defendant's positive

---

[8] *See* Robert J. Clary, *Voting for Death: Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure*, 19 ST. MARY'S L. J. 353, 358-59 (1987).

character traits, he would not pose a future threat to society; thus, those jurors individually vote to answer the first special issue negatively.[9]

Assume that those four jurors also believe, however, that the defendant possessed the requisite *mens rea* under the second special issue (the "parties" special issue) and that there is insufficient mitigating evidence as a whole to result in an affirmative answer to the third special issue (the "*Penry*" special issue).

Further suppose that four other jurors believe that the same capital defendant did not possess the requisite *mens rea* under the second special issue and, thus, those four jurors individually vote to answer the parties special issue negatively.[10]  Assume, however, that those four jurors believe that the capital defendant does pose a future danger to society and that those four jurors also believe that the defendant's mitigating evidence, as a whole, is insufficient to result in a "no" vote to the statutory "*Penry*" special issue.

Finally, suppose that the four remaining members of the jury conclude, as a result of the capital defendant's mitigating evidence of a troubled childhood,[11] that the statutory

---

[9] Of course, a "no" answer to the "future dangerousness" special issue -- a finding that a capital defendant does not pose a future threat to society -- is a constitutionally recognized mitigating factor.  *See Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

[10] A capital defendant's lack of such a mens rea is, of course, a constitutionally relevant circumstance.  *Cf. Tison v. Arizona*, 481 U.S. 137 (1987).

[11] Of course, the third ("*Penry*") special issue also implicates a potentially limitless range of mitigating factors, including "troubled background" evidence.  *See Penry v.*

*Penry* special issue should be answered affirmatively.  However, for whatever reason,

assume that those four jurors also believe that the capital defendant would pose a future

threat to society and also that the defendant possessed the requisite *mens rea* under the

"parties" special issue.  Thus, those four remaining jurors only vote in the defendant's

favor on the third special issue.

Such a breakdown can be graphically illustrated:


| | *1st SPECIAL ISSUE* | *2nd SPECIAL ISSUE* | *3rd SPECIAL ISSUE* |
|---|---|---|---|
| Juror 1: | **NO (life)** | YES (death) | NO (death) |
| Juror 2: | **NO (life)** | YES (death) | NO (death) |
| Juror 3: | **NO (life)** | YES (death) | NO (death) |
| Juror 4: | **NO (life)** | YES (death) | NO (death) |
| Juror 5: | YES (death) | **NO (life)** | NO (death) |
| Juror 6: | YES (death) | **NO (life)** | NO (death) |
| Juror 7: | YES (death) | **NO (life)** | NO (death) |
| Juror 8: | YES (death) | **NO (life)** | NO (death) |
| Juror 9: | YES (death) | YES (death) | **YES (life)** |
| Juror 10: | YES (death) | YES (death) | **YES (life)** |
| Juror 11: | YES (death) | YES (death) | **YES (life)** |

*Lynaugh*, 492 U.S. 302 (1989).

Juror 12:      YES (death)          YES (death)          **YES (life)**

Hypothetically speaking, all twelve members of the jury in such a case individually agree that *one of the three statutory mitigating factors* has been established and that, under state law, a life sentence is appropriate.  That is, all twelve jurors could have believed that a mitigating factor exists which, under state law, should have caused the capital defendant to be sentenced to life.  However, jurors are given the impression that Texas law forbids the imposition of a death sentence *only if* ten members of a capital sentencing jury agree collectively as to *which* statutory mitigating factor has been established; because such jurors could disagree about which of the three factors has been established, however, they are left without guidance as to how to proceed.  In the absence of such guidance, there is a constitutionally unacceptable risk that Texas capital sentencing juries may feel coerced by a "majority rules" mentality into returning answers to the special issues that would result in a death sentence.  A death sentence imposed by a jury so instructed is too likely a product of arbitrary decision-making for the Constitution to tolerate.  *See McKoy v. North Carolina, supra; Mills v. Maryland, supra.*

Accordingly, Mr. Ruiz's sentence of death must be vacated and the cause remanded for a new trial.

The foregoing violation of Mr. Ruiz's constitutional rights constitutes  structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson,*

-43-

507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violation of Mr. Ruiz's rights had a substantial and injurious effect or influence on Mr. Ruiz's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence. However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition. Cumulatively, these errors mandate relief from Mr. Ruiz's convictions and sentence.

In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668. Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

Respectfully submitted this 17th day of January, 2015.

/s/   Donald vernay _____
Donald Vernay
1604 Golf Course Road SE
Rio Rancho, NM 87124
(505) 892 2766
Texas State Bar No. 24035581
minimal243@yahoo.com

Counsel for Wesley Lynn Ruiz

## STATEMENT OF COUNSEL

My name is Donald Vernay. I am an attorney licensed by the State of Texas and in this Court.  I am the attorney for the Petitioner. Because of the time limitations imposed on filing this amended petition for writ of habeas corpus, I am unable to transmit this petition to Petitioner for his signature before filing.  I  have reviewed the Petitioner's state court file and done as much investigation as time has allowed since my  appointment, and have  read the foregoing Amended Petition for Writ of Habeas Corpus and based upon my investigation of this case said petition is true and correct, to the best of my knowledge and belief.

 /s/    Donald Vernay _____
Donald Vernay

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing document was filed electronically and also was mailed to the Petitioner at the following address:

Wesley Ruiz
Polunsky Unit
3872 Fm. 350 South
Livingston, TX 77351

/s/   Donald Vernay _____
Donald Vernay

-45-