**75,968**

*Oral Argument Requested*

NO. 75,968

IN THE

**COURT OF CRIMINAL APPEALS**

**OF TEXAS**

**AUSTIN, TEXAS**

---

**WESLEY LYNN RUIZ,**
**APPELLANT**

VS.

**THE STATE OF TEXAS,**
**APPELLEE**

**ORIGINAL**

---

*On Appeal in Cause No. F07-50318-M*
*From the 194th Judicial District Court*
*of Dallas County, Texas*

---

**BRIEF FOR THE APPELLANT**

FILED IN
COURT OF CRIMINAL APPEALS

FEB 16 2010

Louise Pearson, Clerk

**DOUGLAS H. PARKS**
**ATTORNEY AT LAW**
**321 CALM WATER LANE**
**HOLLY LAKE RANCH, TEXAS 75765**

**TELEPHONE: (903) 769-3120**
**TELEFAX: (903) 769-3465**
**DougHParks @ AOL.COM**
**STATE BAR NO. 15520000**

**ATTORNEY FOR APPELLANT**

*Oral Argument Requested*

## NO. 75,968

## IN THE

## COURT OF CRIMINAL APPEALS

## OF TEXAS

## AUSTIN, TEXAS

---

### WESLEY LYNN RUIZ,
### APPELLANT

### VS.

### THE STATE OF TEXAS,
### APPELLEE

---

*On Appeal in Cause No. F07-50318-M*
*From the 194th Judicial District Court*
*of Dallas County, Texas*

---

### BRIEF FOR THE APPELLANT

---

**DOUGLAS H. PARKS**
**ATTORNEY AT LAW**
**321 CALM WATER LANE**
**HOLLY LAKE RANCH, TEXAS 75765**

**TELEPHONE: (903) 769-3120**
**TELEFAX: (903) 769-3465**
**DougHParks @ AOL.COM**
**STATE BAR NO. 15520000**

**ATTORNEY FOR APPELLANT**

## IDENTITY OF PARTIES AND COUNSEL

Since this case is an appeal from a criminal conviction, the only parties are the Appellant, WESLEY LYNN RUIZ, by and through his attorneys of record in the trial court, PAUL BRAUCHLE, 6500 Greenville Avenue, Suite 700, Dallas, Texas 75206, WILLIAM "KARO" JOHNSON, 3300 Oak Lawn, Suite 600, Dallas, Texas 75219 and his attorney on appeal, DOUGLAS H. PARKS, 321 Calm Water Lane, Holly Lake Ranch, Texas 75765; and THE STATE OF TEXAS, by and through CRAIG WATKINS, Criminal District Attorney of Dallas County, Texas, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB-19, Dallas, Texas 75207-4313, along with Assistant District Attorneys ANDY BEACH, KEVIN BROOKS, ANDREA HANDLEY, MARSHALL MCCALLUM, GRACE SHIN, LISA SMITH and JULIUS WHITTIER.

i.

## **TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL.........................................................................i

TABLE OF CONTENTS.................................................................................................ii

INDEX OF AUTHORITIES.........................................................................................viii

REQUEST FOR ORAL ARGUMENT............................................................................1

STATEMENT OF THE CASE.........................................................................................2

POINTS PRESENTED.....................................................................................................3

### POINT OF ERROR NO. 1

THE TRIAL COURT ABUSED ITS DISCRETION AND DEPRIVED DEFENDANT OF DUE PROCESS IN VIOLATION OF THE UNITED STATES CONSTITUTION BY EXCLUDING EVIDENCE OF THE COMPLAINANT'S STATE OF MIND AND THAT THE COMPLAINANT WAS THE FIRST AGGRESSOR, WHERE SELF DEFENSE WAS RAISED BY THE EVIDENCE.

### POINT OF ERROR NO. 2

THE GUILT PHASE AGGRAVATOR THAT ELEVATED THE CHARGE FROM MURDER TO CAPITAL MURDER WAS UNCONSTITUTIONALLY VAGUE, BOTH ON ITS FACE AND AS APPLIED.

### POINT OF ERROR NO. 3

THE EVIDENCE WAS FACTUALLY INSUFFICIENT TO JUSTIFY A FINDING OF GUILTY OF THE OFFENSE OF CAPITAL MURDER BEYOND A REASONABLE DOUBT.

### POINT OF ERROR NO. 4

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO JUSTIFY A FINDING OF GUILTY OF THE OFFENSE OF CAPITAL MURDER, AS CHARGED IN THE INDICTMENT.

### POINT OF ERROR NO. 5

APPELLANT'S WAS DENIED DUE PROCESS WHEN THE PROSECUTOR ASSERTED THAT APPELLANT COULD BECOME ELIGIBLE FOR PAROLE, CONTRARY TO THE LAW AND THE COURT'S CHARGE.

### POINT OF ERROR NO. 6

THE EVIDENCE IS LEGALLY INSUFFICIENT TO PROVE, BEYOND A REASONABLE DOUBT, A PROBABILITY THAT APPELLANT WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY, AS THE JURY FOUND IN AFFIRMATIVELY ANSWERING SPECIAL ISSUE NO. 1.

### POINT OF ERROR NO. 7

THE EVIDENCE IS FACTUALLY INSUFFICIENT TO PROVE, BEYOND A REASONABLE DOUBT, A PROBABILITY THAT APPELLANT WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY, AS THE JURY FOUND IN AFFIRMATIVELY ANSWERING SPECIAL ISSUE NO. 1 AND FAILURE TO DETERMINE FACTUAL SUFFICIENCY OF A FINDING OF FUTURE DANGEROUSNESS VIOLATES THE FIFTH, EIGHTH AND FOURTEENTH

AMENDMENTS OF THE UNITED STATES CONSTITUTION.

## POINT OF ERROR NO. 8

ARTICLE 37.071 § 2(f)(4) IS UNCONSTITUTIONAL BECAUSE IT NARROWS THE JURY'S CONSIDERATION OF MITIGATING EVIDENCE TO THAT WHICH REDUCES THE ACCUSED'S MORAL BLAMEWORTHINESS, TO THE EXCLUSION OF THAT EVIDENCE WHICH MIGHT SERVE AS A BASIS FOR A SENTENCE LESS THAN DEATH, BUT WHICH DOES NOT REDUCE THE ACCUSED'S MORAL BLAMEWORTHINESS.

## POINT OF ERROR NO. 9

THE APPELLANT WAS DEPRIVED OF A FAIR PUNISHMENT HEARING WHEN THE TRIAL COURT DENIED HIS REQUEST THAT THE JURY BE INSTRUCTED TO CONSIDER ANY EVIDENCE THAT WOULD JUSTIFY A SENTENCE OF LIFE WITHOUT PAROLE, IN ADDITION TO EVIDENCE THAT REDUCED MORAL BLAMEWORTHINESS.

## POINT OF ERROR NO. 10

THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT ISSUES.

POINT OF ERROR NO. 11

THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT, AN IMPARTIAL JURY AND DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF VAGUE, UNDEFINED TERMS IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF THE TRIAL THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE IMPOSITION OF THE DEATH PENALTY.

POINT OF ERROR NO. 12

THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY.

POINT OF ERROR NO. 13

THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE

JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.

## POINT OF ERROR NO. 14

THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I, §§ 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.

STATEMENT OF FACTS....................................................................7

SUMMARY OF THE ARGUMENTS.........................................................9

POINT OF ERROR NO. 1, RESTATED....................................................19

POINT OF ERROR NO. 2, RESTATED....................................................26

POINT OF ERROR NO. 3, RESTATED....................................................36

POINT OF ERROR NO. 4, RESTATED....................................................40

POINT OF ERROR NO. 5, RESTATED....................................................42

POINT OF ERROR NO. 6, RESTATED....................................................47

POINT OF ERROR NO. 7, RESTATED....................................................55

POINT OF ERROR NO. 8, RESTATED....................................................63

# INDEX OF AUTHORITIES

## CASES

*Almanza v. State,*
    686 S.W.2d 157 (Tex. Crim. App. 1984).................................................................69

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000)..............................................................................................81,82

*Arave v. Creech,*
    507 U.S. ___, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993)..........................................87

*Bigby v. State,*
    892 S.W.2d 864, 870-75 (Tex. Crim. App. 1994).....................................................57

*Boyde v. California,*
    494 U.S. 370, 380 (1990).........................................................................................74

*Boyd v. State,*
    811 S.W.2d 105, 118 n.12 (Tex. Crim. App.1991)...................................................45

*Brasfield v. United States,*
    272 U.S. 448, 450 (1926).........................................................................................72

*Burns v. State,*
    761 S.W.2d 353, 356 (Tex. Crim. App. 1988)..........................................................54

*Callins v. Collins,*
    510 U.S. 1141 (1994) ..........................................................................................84,87

*Cantu v. State,*
    939 S.W.2d 627 (Tex. Crim. App. 1997)..............................................................66,69

*Clayton v. State,*
    235 S.W.3d 772, 778 (Tex. Crim. App. 2007)..........................................................40

*Clemons v. Mississippi,*
    494 U.S. 738, 758 (1990) ........................................................................................27

*Clewis v. State,*
    922 S.W.2d 126, 129 (Tex. Crim. App. 1996)...........................................................56

*Collins v. Harker Heights,*
    503 U.S. 115, 126 (1992)..........................................................................................31

*County of Sacramento v. Lewis,*
    523 U.S. 833 (1998)..................................................................................................31

*Davidson v. Cannon,*
    474 U.S. 344, 348 (1986)..........................................................................................31

*DeShaney v. Winnebago County Dept. Of Social Servs.,*
    489 U.S. 189, 196 (1989)..........................................................................................31

*Dickerson v. Latessa,*
    872 F.2d 1116, 1120, (1st Cir. 1989).......................................................................62

*Dinkins v. State,*
    894 S.W.2d 330 at 358 (Tex. Crim. App. 1995)......................................................51

*Eddings v. Oklahoma,*
    455 U.S. 104 (1982)..................................................................................................85

*Ellason v. State,*
    815 S.W.2d 656, 658-59 (Tex. Crim. App. 1991).......................................49,51,52,54

*Estelle v. Dorrough,*
    420 U.S. 534, 538 (1975)..........................................................................................61

*Ex parte Smith,*
    132 S.W.3d 407 (Tex. Crim. App. 2004)..................................................................65

*Flores v. State,*
    871 S.W.2d 714, 716 (Tex. Crim. App. 1993)..........................................................50

*Franklin v. Lynaugh,*
    487 U.S. 164, 179 n. 9 (1988)...................................................................................52

*Furman v. Georgia,*
    408 U.S. 238 (1972)...............................................................................................27,85

ix

*Garcia v. State*,
    887 S.W.2d 846, 859 (Tex. Crim. App. 1994)........................................................41

*Garcia v. State*,
    201 S.W.3d 695, 702-03 (Tex. Crim. App. 2006)...................................................24

*Godfrey v. Georgia*,
    446 U.S. 420 (1980) .........................................................................................28,76,78

*Gollihar v. State*,
    46 S.W.3d 243, 255-56 (Tex. Crim. App. 2001)...................................................40

*Griffin v. Illinois*,
    351 U.S. 12, 18, (1956)..........................................................................................61

*Guerra v. State*,
    771 S.W.2d 453 (Tex. Crim. App. 1988).......................................................29,32,41

*Hall v. State*,
    158 S.W.3d 470 (Tex. Crim. App. 2005)......................................................35,39,41

*Harris v. United States*,
    122 S.Ct. 2406, 2410 (2002)..................................................................................82

*Hughes v. State*,
    897 S.W.2d 285 (Tex. Crim. App. 1994)..................................................29,32,41,54

*Jackson v. Virginia*,
    443 U.S. 307, 319 (1979) ..................................................................................40,49

*Johnson v. State*,
    23 S.W.3d 1, 11 (Tex. Crim. App. 2000).................................................................56

*Johnson v. Texas*,
    509 U.S. ___, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).........................................87

*Jones v. State*,
    944 S.W.2d 642, 647-48 (Tex. Crim. App. 1996)...................................................57

*Jones v. United States*,
    526 U.S. 227 (1999) ...........................................................................................,8281

x

*Jurek v. Texas,*
    428 U.S. 262, 272 (1976)........................................................................79

*Keeton v. State,*
    724 S.W.2d 58, 64 (Tex. Crim. App. 1987)....................................50,51,52

*King v. State,*
    953 S.W.2d 266, 274 (Tex. Crim. App.1997).....................................66,69

*Knox v. State,*
    744 S.W.2d 53, 63-64 (Tex. Crim. App. 1987)........................................44

*Kubat v. Thierot,*
    867 F.2d 351, 369-73 (7th Cir.), *cert. denied,* 493 U.S. 874 (1989).......................74

*Kunkle v. State,*
    771 S.W.2d 435, 449 (Tex. Crim. App. 1986)........................................50

*Lane v. State,*
    743 S.W.2d 617, 630 (Tex. Crim. App. 1987).......................................51

*Lewis v. Jeffers,*
    497 U.S. 764, 774 (1990)...................................................................27,77

*Lockett v. Ohio,*
    455 U.S. 605 (1978)..............................................................................85

*Lowenfield v. Phelps,*
    484 U.S. 231, 239-40 (1988)................................................................72

*Malik v. State,*
    953 S.W.2d 234, 240 (Tex. Crim. App. 1997)........................................40

*Martinez v. State,*
    924 S.W.2d 693, 698 (Tex. Crim. App. 1996)........................................41

*Maryland v. Cartwright,*
    486 U.S. 356 (1988)...........................................................................77,78

*Massachusetts Bd. of Retirement v. Murgia,*
    427 U.S. 307, 312, (1976)....................................................................60

*Maynard v. Cartwright,*
    486 U.S. 356 (1988) ...................................................................................27,28,35,39

*McLeskey v. Kemp,*
    481 U.S. 279, 313 n 37 (1987).................................................................................86

*McGinn v. State,*
    961 S.W.2d 161, 166-169 (Tex. Crim. App. 1998)..............................................56,57

*Miller v. Florida,*
    373 So.2d 882, 885-886 (Fla.1979)........................................................................28

*Mills v. Maryland,*
    486 U.S. 367, 383 (1988)..................................................................................71,73

*Montoya v. State,*
    744 S.W.2d 15 (Tex. Crim. App. 1987)...............................................................29,32,41

*Nobles v. State,*
    843 S.W.2d 503 (Tex. Crim. App. 1992) ..................................................................52

*Ovalle v. State,*
    13 S.W.3d 774 (Tex. Crim. App. 2000)....................................................................70

*Pennell v. City of San Jose,*
    485 U.S. 1, 14 (1988)...............................................................................................62

*Penry v. Lynaugh,*
    492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989)....................................65,88

*Raby v. State,*
    970 S.W.2d 1, (Tex. Crim. App. 1998)..................................................................66,69

*Renteria v. State,*
    206 S.W.3d 689, 707 (Tex. Crim. App. 2006)..........................................................56

*Richmond v. Lewis,*
    506 U.S. 40, 46 (1992)...........................................................................................27

*Ring v. Arizona,*
    536 U.S. 584 (2002)...........................................................................................81,83

*Roberts v. State*,
  220 S.W.3d 521, 526 (Tex. Crim. App. 2007......................................................56

*Roney v. State*,
  632 S.W.2d 598, 603 (Tex. Crim. App. 1982)......................................................78

*Ross v. Moffit*,
  417 U.S. 600, 606, (1974)..................................................................................61

*Rougeau v. State*,
  738 S.W.2d 651, 660 (Tex. Crim. App. 1987)......................................................52

*Royster Guano Co. v. Virginia*,
  253 U.S. 412 (1925). ..........................................................................................60

*Russeau v. State*,
  171 S.W.3d 871, 878 n.1 (Tex. Crim. App. 2005)................................................56

*Shannon v. State*,
  942 S.W.2d 591, 597 (Tex. Crim. App. 1996)..................................................66,69

*Simmons v. South Carolina*,
  512 U.S. 154 (1994)........................................................................................44,46

*Sims v. State*,
 99 S.W.3d 600, 603 (Tex. Crim. App. 2003)......................................................38

*Smith v. State*,
  779 S.W.2d 417, 419 (Tex. Crim. App. 1988)......................................................78

*Smith v. State,*
  898 S.W.2d 838, 846 (Tex. Crim. App. 1994)..................................................44,45

*State v. Williams*,
  392 So.2d 619, 631 (La.1980)..............................................................................72

*Tate v. State*,
  981 S.W.2d 189, 191-92 (Tex. Crim. App. 1998)............................................22,25

*Tennard v. Dretke*,
  542 U.S. 274, 124 S. Ct. 2562 (2004)...............................................................64,67

*Tennessee v. Garner,*
    471 U.S. 1 (1985)...........................................................................31,32

*Tibbs v. Florida,*
    457 U.S. 31, 32 (1982)........................................................................56

*Torres v. State,*
    71 S.W.3d 758, 760-62 (Tex. Crim. App. 2002) .....................................23

*Torres v. State,*
    117 S.W.3d 891 (Tex. Crim. App. 2003) ...........................................23,24

*United States v. Blankenship,*
    923 F.2d 1110, 1118 (5th Cir.), *cert. denied,* 500 U.S. 954, (1991).......................60

*United States v. Cavada,*
    821 F.2d 1046, 1047-48 (5th Cir.), *cert. denied,* 484 U.S. 932 (1987)...................60

*United States v. MacCollom,*
    426 U.S. 317, 323-28 (1976).......................................................................61

*United States v. McClure,*
    546 F.2d 670, 673 (5th Cir. 1977) ............................................................25

*Vance v. Bradley,*
    440 U.S. 93, 97 (1979)..............................................................................61

*Vodochodsky v. State,*
    158 S.W.3d 502, 510 (Tex. Crim. App. 2005).........................................38

*Vuong v. State,*
    830 S.W.2d 929, 935 (Tex. Crim. App.(1992)..........................................50

*Walton v. Arizona,*
    497 U.S. 639 (1990)..........................................................................28,77

*Warner v. State,*
    245 S.W.3d 458, 464 (Tex. Crim. App. 2008).........................................69

*Wilkerson v. State,*
    881 S.W.2d 321, 330 (Tex. Crim. App. 1994).........................................51

*Williams v. Lynaugh*,
   814 F.2d 205, 208 (5th Cir.), *cert. denied*, 484 U.S. 935 (1987)..............................61

*Williams v. State*,
   273 S.W.3d 200, 213 (Tex. Crim. App. 2008)..........................................................49

*Williams v. State*,
   2009 Tex. Crim. App. Lexis 1751......................................................................66,69

*Willingham v. State*,
   897 S.W.2d 351, 359 (Tex. Crim. App. 1994) ........................................................45

*Woodson v. North Carolina*,
   428 U.S. 280 (1976)......................................................................................................50

*Wortham v. State*,
   2004 WL 2192189,*2 (Tex. App.-Tyler Sep. 30, 2004) (Unpublished Mem. Op.) 24

*Young v. State*,
   283 S.W.3d 854 (Tex. Crim. App. 2009).................................................................40

*Zant v. Stephens*,
   462 U.S. 862, 877 (1983).................................................................26,28,30,39,41,77

*Zuniga v. State*,
   144 S.W.3d 477, 484 (Tex. Crim. App. 2004)........................................................38

## CONSTITUTIONS

U.S. CONST. amend. XIV...............................................................................................60,83

## STATUTES

TEX CODE CRIM. PROC. art. 36.14................................................................38,69

TEX. CODE CRIM. PROC. art. 37.07, § (4)(a)....................................................44

TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1)..................................................45

TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(2)(e).................................................2

TEX. CODE CRIM. PROC. art. 37.071 § 2(d)(1)................................................59,60

TEX. CODE CRIM. PROC. art. 37.071 § 2(d)(2).....................................................71

TEX. CODE CRIM. PROC. art. 37.071 § 2(f)(2)....................................................71

TEX. CODE CRIM. PROC. art. 37.071 § 2(f)(4).................................................63,69

TEX. CODE CRIM. PROC. art. 37.071 § 3(b)(1)....................................................75

TEX. CODE CRIM. PROC. art. 37.071 § 3(b)(2)(e)................................................75

TEX. CODE CRIM. PROC. art. 37.071 § (g).........................................................71

TEX. CODE CRIM. PROC. art. 38.36 (a)............................................................24

TEX. PENAL CODE § 12.31 (b)....................................................................46

TEX. PENAL CODE § 19.03 (a)(1).............................................................2,26,29

## RULES

TEX. R. APP. P. 44.2 (a)..........................................................................47

TEX. R. APP. P. 71.3...............................................................................1

TEX. R. EVID. 404 (b)........................................................................22,24,25

TEX. R. EVID. 405 (a)............................................................................22

NO. AP-75,968
IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS
AUSTIN, TEXAS

---

WESLEY LYNN RUIZ,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

---

## TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Wesley Lynn Ruiz, Appellant herein, respectfully submits this Brief in the above-styled and numbered cause.  Appellant presently stands convicted in Cause No. F07-50318-M for the offense of capital murder, a capital felony, in the 194th Judicial District Court of Dallas County, Texas, the Honorable Ernest B. White, III, presiding.

### REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 71.3, TEX. R. APP. PROC., Appellant requests oral argument and states that it would be helpful to the Court to hear argument, especially on the issue of the continuing development of the constitutional need for a burden of proof on the mitigation special issue.

## STATEMENT OF THE CASE

Appellant was charged by indictment with capital murder in violation of TEX. PENAL CODE §19.03(a)(1). The indictment alleged that Appellant, on or about March 23, 2007, in Dallas County, Texas, did unlawfully then and there intentionally and knowingly cause the death of MARK NIX, an individual, deceased, by shooting the said deceased with a firearm, a deadly weapon, and the said deceased was a peace officer, namely, a Dallas Police Officer then and there acting in the lawful discharge of an official duty, and the defendant then and there knew the deceased to be a peace officer. (CR - 02)[1] Appellant entered a plea of not guilty. (RR42 - 26) He was afforded a trial on the merits, in the presence of a jury who found him guilty of the offense as charged. (CR2 - 545; RR48 - 65) At the punishment phase of trial, the jury affirmatively answered, without a finding of mitigating circumstances, the special issues prescribed by TEX. CODE CRIM. PROC., art. 37.071, § 2(b)(2) (e). (CR2 - 663-64) On July 11, 2008, the trial court entered a judgment imposing the death penalty. (CR2 - 673)

---

[1] As used in this Brief, the record citation CR1 and CR2 refers to the clerk's record. RR1 through RR59 designates, in chronological order, volumes one through fifty-nine of the court reporter's record and exhibits.

## POINTS PRESENTED

### POINT OF ERROR NO. 1

THE TRIAL COURT ABUSED ITS DISCRETION AND DEPRIVED DEFENDANT OF DUE PROCESS IN VIOLATION OF THE UNITED STATES CONSTITUTION BY EXCLUDING EVIDENCE OF THE COMPLAINANT'S STATE OF MIND AND THAT THE COMPLAINANT WAS THE FIRST AGGRESSOR, WHERE SELF DEFENSE WAS RAISED BY THE EVIDENCE.

### POINT OF ERROR NO. 2

THE GUILT PHASE AGGRAVATOR THAT ELEVATED THE CHARGE FROM MURDER TO CAPITAL MURDER WAS UNCONSTITUTIONALLY VAGUE, BOTH ON ITS FACE AND AS APPLIED.

### POINT OF ERROR NO. 3

THE EVIDENCE WAS FACTUALLY INSUFFICIENT TO JUSTIFY A FINDING OF GUILTY OF THE OFFENSE OF CAPITAL MURDER BEYOND A REASONABLE DOUBT.

### POINT OF ERROR NO. 4

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO JUSTIFY A FINDING OF GUILTY OF THE OFFENSE OF CAPITAL MURDER, AS CHARGED IN THE INDICTMENT.

### POINT OF ERROR NO. 5

APPELLANT'S WAS DENIED DUE PROCESS WHEN THE PROSECUTOR ASSERTED THAT

3

APPELLANT COULD BECOME ELIGIBLE FOR PAROLE, CONTRARY TO THE LAW AND THE COURT'S CHARGE.

### POINT OF ERROR NO. 6

THE EVIDENCE IS LEGALLY INSUFFICIENT TO PROVE, BEYOND A REASONABLE DOUBT, A PROBABILITY THAT APPELLANT WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY, AS THE JURY FOUND IN AFFIRMATIVELY ANSWERING SPECIAL ISSUE NO. 1

### POINT OF ERROR NO. 7

THE EVIDENCE IS FACTUALLY INSUFFICIENT TO PROVE, BEYOND A REASONABLE DOUBT, A PROBABILITY THAT APPELLANT WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY, AS THE JURY FOUND IN AFFIRMATIVELY ANSWERING SPECIAL ISSUE NO. 1 AND FAILURE TO DETERMINE FACTUAL SUFFICIENCY OF A FINDING OF FUTURE DANGEROUSNESS VIOLATES THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

### POINT OF ERROR NO. 8

ARTICLE 37.071 § 2(f)(4) IS UNCONSTITUTIONAL BECAUSE IT NARROWS THE JURY'S CONSIDERATION OF MITIGATING EVIDENCE TO THAT WHICH REDUCES THE ACCUSED'S MORAL

4

OF THE TRIAL THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE IMPOSITION OF THE DEATH PENALTY.

### POINT OF ERROR NO. 12

THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY.

### POINT OF ERROR NO. 13

THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.

### POINT OF ERROR NO. 14

THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I,

6

§§ 13 AND 19, OF THE TEXAS CONSTITUTION
BECAUSE OF THE IMPOSSIBILITY OF
SIMULTANEOUSLY RESTRICTING THE
JURY'S DISCRETION TO IMPOSE THE DEATH
PENALTY WHILE ALSO ALLOWING THE
JURY UNLIMITED DISCRETION TO CONSIDER
ALL EVIDENCE MILITATING AGAINST
IMPOSITION OF THE DEATH PENALTY.

## STATEMENT OF FACTS

On March 23, 2007, the Dallas police were looking for a murder suspect who was known to drive a red and grey Chevrolet Caprice. Officer Jeremy Borchardt and Senior Corporal Mark Nix responded to a dispatch that other officers were following just such a vehicle. (RR42 - 44-48) Knowing the direction the suspect vehicle was headed, Officer Borchardt sat and waited until it passed his location, being followed by Cpl. Nix. After falling in behind Cpl. Nix, a decision was made to initiate a traffic stop. After the overhead lights were turned on the suspect vehicle slowed and moved to the right, then sped up an a chase began. (RR42 - 49-50)

After reaching speeds up to 80 miles per hour down Bernal Street, the suspect vehicle spun out into the yard of a residence and came to a stop facing Bernal. Corporal Nix then placed his squad car "nose to nose" with the suspect vehicle. (RR42 - 54)

Corporal Nix immediately left his vehicle and ran to the passenger side of the suspect vehicle and began beating on the window with his asp with his left hand, while holding his pistol in his right hand. When this proved ineffective, Cpt. Nix placed his weapon on the

7

ground and began using both hands to swing the asp into the passenger window. (RR42 - 54-58) Officer Borchardt then saw a flash of light from inside the vehicle and saw Cpl. Nix immediately fall to the ground. All the officers present began to shoot into the suspect vehicle. Officer Borchardt himself fired 12 rounds into the car. (RR42 - 58-60)

Officers Jason Jarc and Todd Haecker ran to the vehicle and pulled Cpl. Nix to safety while Officers Borchardt and Patrick Starr supplied covering fire. Corporal Nix was put into a squad car and driven to the hospital, without waiting for an ambulance. (RR42 - 62) Officer Borchardt waited at Parkland Memorial Hospital until he learned that Cpl. Nix had died. (RR42 - 65) Corporal Nix died of a single gunshot which perforated the left common carotid artery. (RR46 - 19)

The physician for the Dallas SWAT team, Dr. Jeffry Metzger, was on the scene when Mr. Ruiz was extricated from his vehicle. Mr. Ruiz was unresponsive when he was pulled from the car. Dr. Metzger put a breathing tube into Mr. Ruiz's throat and turned him over to the paramedics, who transported him to the hospital. (RR45 - 45-52)

The jury learned that Hector Martinez had traded marijuana for the red and grey Chevy Caprice shortly before March 23, 2007, and he had loaned the car to Mr. Ruiz the afternoon of March 23, 2007. (RR42 - 125-29)

Mr. Ruiz testified that he left Hector Martinez's car the afternoon of March 23, 2007, and that he had never driven the car before. When he saw the police turn their light on, he decided to run. (RR47 - 9-12) Mr. Ruiz lost control of his car coming down Bernal Street

and went backward into what he thought was a driveway. The police car pulled in front of his car and the officer came running from his car with his gun in his hand, yelling that he was going to kill him if he ran. (RR47 - 14-16) Mr. Ruiz saw glass flying in his car and was in fear for his life. He also heard what he thought were gunshots. He reached into the backseat, into a bag, got a gun and fired it one time in the direction of Corporal Nix. Mr. Ruiz was then shot in the face and he was knocked unconscious. (RR47 - 18-20)

## SUMMARY OF THE ARGUMENTS

1.   THE TRIAL COURT ABUSED ITS DISCRETION AND DEPRIVED DEFENDANT OF DUE PROCESS IN VIOLATION OF THE UNITED STATES CONSTITUTION BY EXCLUDING EVIDENCE OF THE COMPLAINANT'S STATE OF MIND AND THAT THE COMPLAINANT WAS THE FIRST AGGRESSOR, WHERE SELF DEFENSE WAS RAISED BY THE EVIDENCE: Dallas Police Corporal Mark Nix had a low tolerance for suspects evading, or avoiding him and his reaction was to use violence. He shot and killed one fleeing suspect, Jesus Ortiz. He used his taser on a Marine, Karlous Lake, who was trying to walk away from him. He physically abused a juvenile, Anthony Williams, who Nix thought was a fleeing suspect, but who was running down the street, minding his own business. His fellow officers reported him for his abuse of Williams. It was error for the trial court to rule that Rule 404(b), TEX. R. EVID., prohibited admission of those specific acts of violence by the complainant where there was evidence of self-

9

defense and the state of mind and intent of the complainant was in issue. The excluded evidence was relevant to show both the reasonableness of Appellant's apprehension of danger and to show that the deceased was the first aggressor at the time of the killing.

2. THE GUILT PHASE AGGRAVATOR THAT ELEVATED THE CHARGE FROM MURDER TO CAPITAL MURDER WAS UNCONSTITUTIONALLY VAGUE, BOTH ON ITS FACE AND AS APPLIED: The failure of this Court to define "lawful" in the context of Texas Penal Code 19.03 (a)(1) in such a way as to constitutionally narrow its scope runs contrary to Supreme Court jurisprudence requiring that aggravators not be impermissibly vague and overbroad. The Court should revisit its holdings in previous cases that so long as a police officer is acting in his capacity as a peace officer, he is acting in the discharge of his lawful duties and adopt a definition that would allow a jury to consider the officer's violation of policy, negligence, recklessness and other misconduct in assessing the death penalty.

3. THE EVIDENCE WAS FACTUALLY INSUFFICIENT TO JUSTIFY A FINDING OF GUILTY OF THE OFFENSE OF CAPITAL MURDER BEYOND A REASONABLE DOUBT: Officer Nix's actions in rushing Appellant's vehicle and beating on the passenger window with his asp was in violation of the Dallas Police Department's manual of standard operating procedures. The fundamental principles of safety, caution and patience set forth in DX 1 were breached. Officer Nix acted with recklessness and negligence and his actions were not lawful, which was demonstrated by SX 10, videotapes

10

of the event. It is Appellant's position that this Court, in *Hall v. State*, has suggested that tortious conduct can qualify as "unlawful" and that under constitutional principles set out by the Supreme Court the term "lawful" must be no broader than the core meaning given the term in *Hall*. Appellant must be given an opportunity to have a jury decide with proper, constitutional instructions regarding the definition of lawful discharge of an official duty.

4. THE EVIDENCE WAS LEGALLY INSUFFICIENT TO JUSTIFY A FINDING OF GUILTY OF THE OFFENSE OF CAPITAL MURDER, AS CHARGED IN THE INDICTMENT: Appellant submits that the common and ordinary meaning of "lawful" excludes more than criminal conduct. It also excludes negligent and reckless conduct. Even when viewed in the light most favorable to the verdict, the evidence is clear that Officer Nix acted recklessly and negligently and in violation of Dallas Police Department standard operating procedures. If the Court decides that "lawful", as used in TPC 19.03, has its common and ordinary meaning, then the evidence is not legally sufficient to support a conviction for capital murder. Only if the Court determines, as it has in the past, that "lawful" means nothing in the context of TPC 19.03 does Appellant fail to demonstrate a failure to prove an element requiring proof beyond a reasonable doubt.

5. APPELLANT'S WAS DENIED DUE PROCESS WHEN THE PROSECUTOR ASSERTED THAT APPELLANT COULD BECOME ELIGIBLE FOR PAROLE, CONTRARY TO THE LAW AND THE COURT'S CHARGE: The trial court committed constitutional error when it overruled Appellant's objections to the prosecutor suggesting to

11

the jury, through his questions to A. P. Merrilott, a witness on "violence in the penitentiary", that the law requiring one convicted of capital murder to serve life without parole was subject to change.

6. THE EVIDENCE IS LEGALLY INSUFFICIENT TO PROVE, BEYOND A REASONABLE DOUBT, A PROBABILITY THAT APPELLANT WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY, AS THE JURY FOUND IN AFFIRMATIVELY ANSWERING SPECIAL ISSUE NO 1: Appellant disputes the legal sufficiency of the evidence in this case to sustain the jury's affirmative answer to the statutory first punishment issue that Appellant probably "would commit criminal acts of violence that would constitute a continuing threat to society". While the State offered evidence of extraneous offenses committed by Appellant, the State was unable to show any acts of violence committed by Appellant while he was in custody for those offenses or the instant offense. It did not offer evidence of bad character or reputation, outside of possible membership in a street gang, outside the implications of the extraneous offenses. The circumstances of the crime show that Appellant reacted to the aggression of the deceased and that there was no foresight or deliberateness exhibited by Mr. Ruiz. Under these circumstances, the evidence does not enable a rational trier-of-fact to conclude, beyond a reasonable doubt, a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. The evidence is thus insufficient to support the jury's answer to the first punishment special issue.

12

This Court should commute Appellant's death sentence to life imprisonment.

7. THE EVIDENCE IS FACTUALLY INSUFFICIENT TO PROVE, BEYOND A REASONABLE DOUBT, A PROBABILITY THAT APPELLANT WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY, AS THE JURY FOUND IN AFFIRMATIVELY ANSWERING SPECIAL ISSUE NO. 1 AND FAILURE TO DETERMINE FACTUAL SUFFICIENCY OF A FINDING OF FUTURE DANGEROUSNESS VIOLATES THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION: Appellant disputes the legal sufficiency of the evidence in this case to sustain the jury's affirmative answer to the statutory first punishment issue that Appellant probably "would commit criminal acts of violence that would constitute a continuing threat to society". Appellant recognizes this Court has declined to review the factual sufficiency of the evidence for special issue one. Appellant argues that it is not necessary for the Court to reassess mitigation in order to make a sufficiency determination of future dangerousness.

8. ARTICLE 37.071 § 2(f)(4) IS UNCONSTITUTIONAL BECAUSE IT NARROWS THE JURY'S CONSIDERATION OF MITIGATING EVIDENCE TO THAT WHICH REDUCES THE ACCUSED'S MORAL BLAMEWORTHINESS, TO THE EXCLUSION OF THAT EVIDENCE WHICH MIGHT SERVE AS A BASIS FOR A SENTENCE LESS THAN DEATH, BUT WHICH DOES NOT REDUCE THE ACCUSED'S MORAL BLAMEWORTHINESS: Art. 37.071 § 2(f)(4) requires that the trial

13

court instruct the jury that mitigating evidence, in the context of Special Issue No. 2, means "evidence that a juror might regard as reducing the defendant's moral blameworthiness". That definition is unconstitutionally restrictive because it requires a "nexus" between the proffered evidence and "moral blameworthiness", contrary to the teaching of the United States Supreme Court. This Court should reconsider its previous opinions holding that the consideration and weighing of mitigating evidence is an open-ended, subjective determination of each individual juror and, thus, in accord with the constitution. The problem with that position is that the jury is not told what this Court has divined. Rather, they are told something far different in the court's charge, which they have taken an oath to obey. The truth of the matter is that the consideration and weighing of mitigating evidence is open-ended and subjective within the parameters of the legal definition given them. That definition is impermissibly restrictive and unconstitutional.

9. THE APPELLANT WAS DEPRIVED OF A FAIR PUNISHMENT HEARING WHEN THE TRIAL COURT DENIED HIS REQUEST THAT THE JURY BE INSTRUCTED TO CONSIDER ANY EVIDENCE THAT WOULD JUSTIFY A SENTENCE OF LIFE WITHOUT PAROLE, IN ADDITION TO EVIDENCE THAT REDUCED MORAL BLAMEWORTHINESS: Mr. Ruiz made a timely request that the jury be instructed that, in answering the mitigation special issue, they could consider any evidence that could serve as a basis for a sentence less than death, in addition to evidence which reduced his "moral blameworthiness". That request was denied by the trial court, although

14

it was "the law applicable to the case", and would have been a proper instruction. Mr. Ruiz was harmed by the trial court's failure and his judgment of death be reformed to life imprisonment, or the case remanded for a new punishment hearing.

10.   THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT ISSUES: All twelve jurors must answer the future dangerousness issue affirmatively before the trial court may impose the death penalty; a life sentence, on the other hand, requires that at least ten jurors answer a special issue negatively. Unanimity must also exist for the jury to enter a negative finding on the mitigation issue, while only ten jurors must vote to grant leniency. Neither the trial court, parties, nor counsel may disclose to the jury members that their failure to agree on an answer to any special issue results in a life sentence. A constitutional violation would occur under the Texas scheme if these instructions led reasonable jurors to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless nine other jurors joined them. Reasonable jurors in this case could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life. Because of the reasonable likelihood that the jury applied these instructions in a way that prevented the consideration

15

of constitutionally relevant mitigating evidence, Appellant was sentenced to death in an unconstitutional manner. The judgement of the trial court should be reversed and the cause remanded for a new trial.

11. THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT, AN IMPARTIAL JURY AND DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF VAGUE, UNDEFINED TERMS IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF THE TRIAL THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE IMPOSITION OF THE DEATH PENALTY:

12. THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY: Here, Appellant argues that Texas' death penalty scheme violates federal due process protections due to the absence of a requirement that the State prove the absence of mitigation beyond a reasonable doubt. In Texas, a capital jury's verdict of guilty results in imposition of a life sentence unless the State can prove the other applicable special issues to all jurors beyond a reasonable doubt. Only then does a capital defendant become

16

"death eligible." Pursuant to *Apprendi* and its progeny, the Texas special issues constitute death-eligibility factors which are the functional equivalents of elements, and must therefore be proven to a jury beyond a reasonable doubt. Because the mitigation special issue fails to require that the State prove lack of sufficient mitigation beyond a reasonable doubt, the Texas death penalty scheme violates the Due Process Clause of the United States Constitution. The trial court imposition of the death sentence should be reversed.

13.   THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY: The inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the federal constitution. The consistency and rationality required by due process are inversely related to the fairness owed the individual when considering a death sentence. A step toward consistency is a step away from fairness. The federal constitution, by requiring a heightened degree of fairness to the individual, and also a greater degree of equality and rationality in the administration of death,

demands sentencer discretion that is both generously expanded and severely restricted.. The federal constitution prohibits the imposition of the death penalty until someone designs a scheme capable of eliminating the sentencer's unbridled discretion to inflict death while simultaneously permitting unrestricted consideration of mitigating evidence. Consequently, this Court should commute Appellant's death sentence to imprisonment for life in the Institutional Division of the Texas Department of Criminal Justice.

14. THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I, §§ 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY: For the same reasons discussed in Point of Error No. 13, this Court should hold that the Texas constitution prohibits the imposition of the death penalty until someone designs a scheme capable of eliminating the sentencer's unbridled discretion to inflict death while simultaneously permitting unrestricted consideration of mitigating evidence. This Court, as a result, should commute Appellant's death sentence to imprisonment for life.

18

Mr. Oritz, Officer Nix came out of the tunnel and began firing at Mr. Ortiz. Mr. Ortiz turned and ran. (RR46: 97-105) After speaking with police officers, Ms. Sosa was taken to the ambulance in which Mr. Ortiz had been placed. (RR46: 107)

The defense proffered Defense Exhibit No. 20, an autopsy report showing that Mr. Ortiz died of a single gun shot wound to the upper left buttock. (RR46: 123)

Karlous Lake encountered Officer Nix on March 13, 2005, as he came out of a club in the Deep Ellum area of Dallas. He was confronted by a group of officers who told him to hurry and go home before his curfew. Mr. Lake was in the Marine Corps at the time and asked what time curfew was because he did not want to get into trouble. (RR46: 126-29) One of the officers responded that it was his curfew whenever he was told to go home. Mr. Lake responded that he did not have a curfew, as he was walking away. He then heard footsteps behind him and when he turned around Officer Nix shot him with a taser. (RR46: 130) Mr. Lake denied resisting or provoking Officer Nix and testified that his arms were up in a "surrender" position when he was tased. (RR46: 131-33)

Mr. Lake was loaded into a paddy wagon, taken to jail and charged with public intoxication. Those charges were dismissed when he appeared before a magistrate. (RR46: 136-37)

Anthony Williams was 14 years old on August 23. 2006. About 3:00 or 4:00 p.m. on that date, Anthony was running down the street when Officer Nix told him to stop. Anthony obeyed Officer Nix and got down on the ground and was handcuffed by Nix

20

behind the back.  Officer Nix then picked him up by the handcuffs, told him to shut up or

he would knock his teeth out and threw him into the police car.  (RR48: 66-68) Officer Nix

told Anthony if he told anyone he would "need a new grill", meaning he would knock his

teeth out.  (RR48: 69) Anthony did not file a complaint against Officer Nix because another

officer at the scene did.  (RR48: 68) Officer Nix was appealing a sustained finding by the

disciplinary board at the time of his death.  (RR48: 73)

Appellant testified in his own behalf.  He stated that after he lost control of his car

he saw the police car pull in front of his car, blocking him in.  Officer Nix jumped from the

police and ran toward Appellant's car yelling, "you try to run from me, mother fucker" and

"I'm going to shoot you".  He testified he was in fear for his life when he fired in Officer

Nix' direction.  (RR47: 14-20)

On cross-examination, Officer Jeremy Borchardt testified that Officer Nix rushed

Appellant's vehicle while acknowledging that the police training manual emphasized that

officers should not rush a vehicle during a felony stop.  (RR42: 98) The training manual

referred to was admitted as Defense Exhibit No. 1.  (RR42: 109)

On direct examination, Officer Patrick Starr testified that Officer Nix was acting as

a hero when he rushed Appellant's vehicle and began beating on the window with his asp.

(RR45: 35)

The trial court instructed the jury on the law of self-defense.  (CR2: 539-41)

21

*Analysis and Argument*

It is clear that the jury had before it conflicting testimony regarding Officer Nix'

intent when he rushed Appellant's vehicle and began beating on the passenger window with

a club.

The State objected to the admission of the testimony of Ms. Sosa, Mr. Lake and

Anthony Williams under the provisions of Rule 404(b), TEX. R. EVID.

> Ms. Smith: Under 404(b), specific instances of
> conduct are generally inadmissible and they only
> come in in very limited circumstances, and those
> circumstances do not exist here.  There is no
> evidence that Mr. Ruiz had any knowledge of any of
> his prior acts committed by the officer.  They have
> no bearing on his state of mind whatsoever.  And the
> prior acts committed by the officer have no bearing
> on this particular offense, because it is in no way
> related factually to this offense.  It is not contextual
> in any way.  It is being offered  purely to show
> character conformity.

(RR46: 80)

In *Tate v. State*, 981 S.W.2d 189, 191-92 (Tex. Crim. App. 1998), the Court of

Criminal Appeals considered whether evidence proffered by the defendant that the deceased

had made a threat against the defendant, even if not communicated to the defendant, was

admissible under the Rules of Evidence to prove that the deceased was the first aggressor.

As the *Tate* court noted, the Rules specifically allow the admission of evidence concerning

the pertinent character traits of the deceased, if only through the use of general reputation and

opinion testimony.  *Id.* at 192; *see* Rule 404(a)(2), Rule 405(a).  But the evidence was

specific act evidence, disallowed by Rules 404 and 405 to show character conformity. *Id.* at 192. As the court held, however, "[p]roving who was the aggressor in a claim of self-defense is not dependent exclusively upon the character of the victim." *Id.* at 192-93. And Rule 404(b) permits the admission of evidence of specific acts for purposes other than to show character so long as the evidence has relevance *apart from* its tendency to prove character conformity. *Id.* at 193. Thus, evidence of the deceased's uncommunicated threat to the defendant was offered, not to prove the deceased's character and conformity therewith, but to prove the deceased's intent or motive at the time of the killing and thus that the deceased was the first aggressor. The court held that the evidence was admissible under Rule 404(b) and that the trial court had abused its discretion by excluding it. *Id.* at 193.

In *Torres v. State*, the court ruled upon Rule 404(b) to reverse a trial court's exclusion of evidence relating to the deceased's prior violent acts against individuals other than the defendant (of which the defendant was unaware) to show that the deceased was the first aggressor. 71 S.W.3d 758, 760-62 (Tex. Crim. App. 2002) (*"Torres II"*); *see also Torres v. State*, 117 S.W.3d 891 (Tex. Crim. App. 2003) (*"Torres III"*). As in *Tate*, the court concluded that the proffered evidence was relevant, apart from showing character conformity, in that it demonstrated the deceased's intent, motive, or state of mind. *Torres II*, 71 S.W.3d at 760.

> For purposes of proving that the deceased was the first aggressor, the key is that the proffered evidence explains the deceased's conduct. As long as the proffered violent acts explain the outward aggressive conduct of the deceased at the

23

> time of the killing, and in a manner other than demonstrating
> character conformity only, prior specific acts of violence may be
> admitted.

*Torres II*, 71 S.W.3d at 762 (internal citations omitted). "The proper predicate for the

specific violent prior act by the deceased is some act of aggression that *tends* to raise the

issue of self-defense, which the violent act may then help to clarify." *Torres III*, 117 S.W.3d

at 895 (emphasis in original). *See also Wortham v. State*, 2004 WL 2192189,*2 (Tex. App. -

Tyler Sep. 30, 2004) (Unpublished Mem. Op.) (holding in dicta that specific acts of violence

may be introduced to demonstrate reasonableness of defendant's fear of danger or that

deceased was first aggressor, where self-defense is raised).

Therefore, it appears clear that specific acts of violence, even if unknown to the

defendant at the time of the alleged offense, whether directed at the defendant or other

individuals, is admissible under Rule 404(b) as proof of the deceased's motive, intent, state

of mind, or absence of mistake.[2]

---

[2] Additionally, article 38.36(a) of the Texas Code of Criminal Procedure provides:

> In all prosecutions for murder, the state or the defendant shall be permitted to
> offer testimony as to all relevant facts and circumstances surrounding the killing
> and the previous relationship existing between the accused and the deceased,
> together with all relevant facts and circumstances going to show the condition of
> the mind of the accused at the time of the offense.

The Court of Criminal Appeals has held that such evidence must still meet the
requirements of the Rules of Evidence to be admissible. *Garcia v. State*, 201 S.W.3d
695, 702-03 (Tex. Crim. App. 2006). Nevertheless, the above provision counsels in
favor of its admission, particularly in a case where self-defense is an issue.

24

The State often relies on Rule 404(b) to introduce evidence of prior similar offenses committed by the defendant. And "[n]othing in the language of the rule would lead one to believe that it is a rule intended solely as a benefit for the State to be applied against the defendant...." *Tate v. State*, 981 S.W.2d at 913. Indeed, where the defendant seeks to introduce such evidence, "[h]is right to present a vigorous defense require[s] the admission of the proffered evidence. *United States v. McClure*, 546 F.2d 670, 673 (5th Cir. 1977) (holding that systematic campaign of threats and intimidation against other persons was admissible under Rule 404(b) to show lack of criminal intent of defendant). The Texas Rules of Evidence permit admission of the Defendant's proffered evidence. Due process and the Defendant's right to present a defense compel it.

## Harm Analysis

While the possibility that Officer Nix was shot by one of the other officers at the scene was explored by the defense, it was obvious that Appellant's only defense in the case was self-defense. Since the entire episode, after Appellant wrecked out on Bernal Street, was captured on videotape there was no mystery what happened. The only issue for the jury to decide was why. What was Officer Nix' intent when he rushed up to the car and began beating on the window with a club? Was he acting as a hero, as Officer Starr would have it? Was he acting in violation of protocol, as the police training manual suggests? Was he intent upon shooting, or otherwise harming Appellant as evidenced by Appellant's testimony?

Conveniently, no police officer at the scene heard Officer Nix say anything as he

25

rushed toward Appellant's car and began beating on it, according to their testimony. Therefore, the testimony of Ms. Sosa, Mr. Lake and Anthony Williams was critical to Appellant's defense to shed light on his claim that Officer Nix was threatening him with death or serious bodily injury and that his actions were reasonable under the circumstances.

The failure of the trial court to allow this admissible evidence before the jury deprived Appellant of his right to present a compelling defense and his right to a fair trial.

### POINT OF ERROR NO. 2, RESTATED

**THE GUILT PHASE AGGRAVATOR THAT ELEVATED THE CHARGE FROM MURDER TO CAPITAL MURDER WAS UNCONSTITUTIONALLY VAGUE, BOTH ON ITS FACE AND AS APPLIED.**

### ARGUMENT AND AUTHORITIES

The guilt phase aggravator that elevated the charge from murder to capital murder was taken from Texas Penal Code 19.03 (a) (1).[3]

Aggravating factors must "genuinely narrow the class of death-eligible persons" in a way that reasonably "justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. *Zant v. Stephens*, 462 U.S. 862, 877 (1983). On

---

[3] As submitted to the jury, the charge read as follows: "...and that Mark Nix was a peace officer, to-wit: a Dallas police officer, acting in the lawful discharge of an official duty, and the defendant knew Mark Nix to be a peace officer, then you will find the defendant guilty of capital murder." CR2-539

26

their face, and as applied, aggravating circumstances must permit the sentencer to make a "principled distinction between those who deserve the death penalty and those who do not."[4]

In *Maynard v. Cartwright*, supra, the Supreme Court unanimously set out the legal principles which control vagueness claims directed at an aggravator. In addressing the validity of a death sentence based solely on the statutory aggravating circumstance that the murder was "especially heinous, atrocious and cruel," the *Maynard* court reasoned that an Eighth Amendment vagueness challenge to an aggravating factor in a capital case may not be analyzed under the "as applied" approach used in vagueness challenges to criminal statutes under the Due Process Clause. 486 U.S. at 361.

An Eighth Amendment challenge requires the reviewing court to conduct its review in several steps. First, the reviewing court must evaluate the challenged aggravating circumstance on its face, entirely apart from the facts of the particular case in which it was applied. An overbroad aggravating circumstance vests in sentencing courts the "open-ended discretion" to impose the death penalty which the Supreme Court condemned in *Furman v. Georgia*, 408 U.S. 238 (1972). Where a death sentence is imposed under a system that

---

[4] *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990); see also *Richmond v. Lewis*, 506 U.S. 40, 46 (1992)("a statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty"); *Clemons v. Mississippi*, 494 U.S. 738, 758 (1990) ("invalid aggravating circumstances provided 'no principled way to distinguish the case in which the death penalty is imposed, from the many cases in which it was not'"); *Maynard v. Cartwright*, 486 U.S. 356 (1988) ("[t]he construction or application of an aggravating circumstance is unconstitutionally broad or vague if it does not channel or limit the sentencer's discretion in imposing the death penalty").

27

permits unbridled discretion, the state may not save the sentence by demonstrating that the outcome would have been the same even if the sentencer's discretion had been properly narrowed and guided. *Maynard*, 486 U.S. at 361-363.

Secondly, even if the text of a statutory aggravating circumstance does not provide meaningful guidance to a capital sentencing jury, such an aggravating circumstance can nevertheless support a death sentence if the state courts have narrowed its scope to a constitutionally sufficient degree. Finally, the reviewing court must determine whether such a narrowing construction actually guided the sentencing jury in the case under review.[5] The Court has also recognized that aggravating circumstances cannot encompass factors "that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness."[6] If the aggravating circumstance at issue is invalid for reasons such as these, due process of law requires that the jury's decision to impose death be set aside. Id.

The decisions in *Maynard* and *Zant*, supra, assume that a state reviewing court will interpret an arguably vague aggravator so as to clarify its meaning and narrow its scope in such a way that the statutory scheme will meet the demands of the Supreme Court's Eighth Amendment jurisprudence. What has occurred here is beyond what was contemplated in these two Supreme Court cases. In this segment of Texas capital sentencing practice, the

---

[5] *Godfrey v. Georgia*, 446 U.S. 420 (1980); see also *Walton v. Arizona*, 497 U.S. 639 (1990) (recognizing the authority of a state reviewing court to supply a limiting definition of a facially overbroad or vague aggravating circumstance).

[6] *Zant v. Stephens*, 462 U.S. at 885, citing *Miller v. Florida*, 373 So.2d 882, 885-886 (Fla.1979).

modifier "lawful" has been judicially removed as an element of the offense that the state must prove.[7] In this series of capital cases, *Montoya, Guerra* and *Hughes*, supra, the Court of Criminal Appeals has refused to define and narrow the quoted statutory language. Instead, by judicial fiat, deleting the word "lawful," this Court has enlarged the breadth of this aggravator and rendered it more vague than did the legislature.   The effect of this interpretation of Texas Penal Code 19.03 § (a)(1) is that no amount of abuse of office, departure from accepted professional norms, recklessness, negligence, or outright criminality on the part of a peace officer will serve to prevent the state from seeking and obtaining a death verdict in a Texas capital trial for the murder of an officer.

Appellant's position is that this aggravator is unconstitutionally vague and otherwise improper on its face, and should not have been submitted to the jury at all.  Appellant argues that Texas Penal Code 19.03 § (a)(1), as interpreted by this Court, is facially unconstitutional for failure to limit the scope of the aggravator to the ordinary and commonly accepted core meaning of "lawful".  Further, Appellant contends that a rational juror might well deem the officer's decision and efforts to arrest and detain Appellant reckless or negligent rather than "lawful" under the facts and circumstances of this case, such that this subsection of the Texas Penal Code 19.03, if not facially invalid, was unconstitutional as it was applied to Appellant.

---

[7] *Montoya v. State*, 744 S.W.2d 15 (Tex. Crim. App. 1987)["...as long as the officer was acting within his capacity as a peace officer, he was acting within the lawful discharge of his official duties ..."], accord, *Guerra v. State*, 771 S.W.2d 453 (Tex. Crim. App. 1988); *Hughes v. State*, 897 S.W.2d 285 (Tex. Crim. App. 1994).

29

Appellant argues that the refusal of this Court to give the word "lawful" its core meaning fails, on its face, to pass constitutional muster. An aggravator must genuinely narrow the class of death-eligible persons in a way that reasonably "justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Put simply, this subsection, as interpreted by this Court, exposes the killer of a rogue cop engaging in the worst on-the-job conduct imaginable to the death penalty, whereas the killer of the very best performing and most ethical soldier, cab driver, journalist, paramedic, nurse, doctor, teacher, engineer or accountant cannot receive death as a penalty by reason of the status of his victim. Without a requirement that the peace officer act within the core meaning of the word "lawfully", it is simply irrational to afford to just anyone working as a peace officer whatever extra protection is afforded by extending the death penalty to his or her killer.

Applying the *Maynard/Zant* analysis to this Court's interpretation of this subsection, one finds an impermissibly vague and therefore harmful statutory aggravator. The use of the word "lawful" in this context begs for explanation. Unlawful could mean anything from the tiniest infraction in the rules of engagement with a suspect to the murder, rape, robbery or kidnap of the suspect. Appellant argues that is too broad and too controversial a concept to use in an effort that is supposed to reduce arbitrariness to a constitutional minimum.

The Supreme Court has given a very broad meaning to the word lawful as it applies

30

to police conduct.[8]  In the context of civil rights litigation, where money damages and injunctive relief are sought, much deference is properly given to the judgments of the cop on the beat.  Nonetheless, the high court continues to recognize that law officers can abuse their positions and oppress citizens.  In short, peace officers can act unlawfully in the discharge of their official duties.[9]

The *Lewis* decision demonstrates that the notion of lawfulness as regards police conduct has such a broad connotational range that it renders the aggravator at issue here unconstitutional.

The core meaning of lawfulness of police conduct in a crisis situation was settled among lawyers and judges in *Tennessee v. Garner*, 471 U.S. 1 (1985), the Memphis case that was the genesis of the development of modern police guidelines for crisis intervention.  In rejecting the state's contention that the ancient common law rule should still apply, the high court also deferred to the " ... rules adopted by those who must actually administer them ...," citing to the policy statements of the FBI, several police departments, and the Commission on Accreditation for Law Enforcement Agencies, Inc., Standards for Law Enforcement Agencies 1-2 (1983). Id at 18.

---

[8] *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)

[9] Cf.*Collins v. Harker Heights*, 503 U.S. 115, 126 (1992) (noting that the Due Process Clause was intended to prevent government officials "'from abusing [their] power, or employing it as an instrument of oppression'")(quoting *DeShaney v. Winnebago County Dept. Of Social Servs.,* 489 U.S. 189, 196 (1989)(quoting *Davidson v. Cannon,* 474 U.S. 344, 348 (1986)).

31

The Texas rule permits an impermissibly broad range of police misconduct to serve as an aggravator in capital cases.  This offends the principles governing police conduct of *Tennessee v. Garner*, supra.  Compare the Supreme Court rule to that in *Montoya, Guerra* and *Hughes,* supra.  As in any capital trial under this subsection of TPC 19.03, this Texas rule afforded the prosecution a great and unfair advantage at Ruiz's trial.  The prosecutor could argue, as she did, with all the force and prestige of her office and position, that Officer Nix was acting in the lawful discharge of his official duties when he charged Appellant's vehicle, in violation of Dallas Police Department protocol,[10] and began beating on the passenger window with his asp in an attempt to break the window.  (RR48 - 16-17).

Mr. Ruiz calls attention to the following cross-examination of Officer Jeremy Borchardt regarding policies and procedures:

> [Defense Counsel]: What is the other thing that (sic) training manual tell you, don't rush the vehicle, have you ever heard that before?
>
> [Officer Borchardt]: Yes, sir.
>
> [Q]: In fact that is emphasized at almost every step of a felony stop, isn't it, don't rush the vehicle?
>
> [A]: Yes, sir.
>
> [Q]: Now, then, did Oficer Nix in fact rush the vehicle?

---

[10] See Defense Exhibit No. 1, which admonishes: "DO NOT RUSH THE SUSPECT" and sets out procedures for extracting a suspect from a vehicle even when a vehicle wrecks after a chase, which procedures Officer Nix did not honor.

32

[A]: Yes, sir, he did.

[Q]: Now, the next step - - or one of the next steps in regard to felony stops is that you are supposed to talk to the person that you are trying to arrest through your public address system, isn't that correct?

[A]: Yes, sir.

[Q]: You are supposed to give that person commands and see if that person follow (sic) any of the commands you give; is that correct?

[A]: Yes, sir.

[Q]: Did anybody turn on their public address system and give Mr. Ruiz any commands?

[A]: No, sir.

[Q]: So generally the commands would be to roll down the windows and put both hands where they can be seen. Would that be basically the first step?

[A]: Basically.

[Q]: The next one would be to take your left hand and take the keys out of the ignition, would that generally be the next step?

[A]: Yes, sir.

[Q]: And after they take the keys out of the ignition they are supposed to throw the keys out of the car; is that correct?

[A]: Yes, sir.

[Q]: And then they are supposed to take their left hand and open the car door; is that correct?

[A]: Yes, sir.

33

[Q]: And at that point they are supposed to come out with their hands up?

[A]: Yes, sir.

[Q]: They are supposed to get away from the car and get on the ground?

[A]: Basically, yes, sir.

[Q]: And then back up checks the car to see if there are any other people in the car?

[A]: Yes, sir.

[Q]: Once it is found out that the person is outside and on the ground, it is the only person in the vehicle then and only then do you approach that person, is that correct?

[A]: Yes, sir.

[Q]: That's after you have made him put his hands in a certain position and cross his legs and do certain things as to where he would be fairly immobile; is that correct?

[A]: Yes, sir.

[Q]: And you approach him only for the purpose of handcuffing at that particular time; is that correct?

[A]: Yes, sir.

[Q]: Now, once he is handcuffed and only then, you get him up off the ground; is that correct?

[A]: Yes, sir.

[Q]: I think, though, you probably removed any weapons or patted him down while he is on the ground; is that correct?

[A]: Yes, sir, there is a search there.

34

[Q]: So there is a search before you even get him on his feet or get him up from being handcuffed?

[A]: Yes, sir.

[Q]: Now, then, I think it is a pretty obvious question, but none of those things were followed in this stop, were they?

[A]: No, sir.

(RR42 - 98-100)

When we move to the second *Maynard* step, an examination of the state court's efforts to save the aggravator with a narrowing interpretation of it, we find no such effort. This Court declines to clarify or narrow the meaning of "lawful" as used in this subsection, in a way that will reduce arbitariness in the imposition of death as a penalty. Appellant submits that the mere status of a murder victim as a peace officer on duty, without more, cannot serve to elevate the crime to a capital offense.

Accordingly, Appellant asks this Court to revisit its jurisprudence with respect to this subsection, and to adopt its interpretation of this phrase found in a recent assault case, *Hall v. State*, 158 S.W.3d 470 (Tex. Crim. App. 2005). In *Hall*, this Court defined the phrase this way: " ... the 'lawful discharge' of official duties in this context means that the public servant is not criminally or tortiously abusing his office as a public servant by acts of, for example, 'official oppression' or 'violations of the civil rights of a person in custody' or by the use of unlawful, unjustified force ...'". Id. Appellant argues that this language captures the core meaning of the phrase in question, and should be applied to this subsection of our capital

35

murder statute.

Failure to properly narrow the meaning of "lawful" in the context of the subsection renders in unconstitutional and, because of this failure, this Court must either set aside the conviction of capital murder by reason of the use of this unlawful aggravator, and render judgment of conviction for the lesser included offense of murder, or, reverse this case for a new trial under a proper interpretation of this subsection.

## POINT OF ERROR NO. 3, RESTATED

**THE EVIDENCE WAS FACTUALLY INSUFFICIENT TO JUSTIFY A FINDING OF GUILTY OF THE OFFENSE OF CAPITAL MURDER BEYOND A REASONABLE DOUBT.**

## ARGUMENT AND AUTHORITIES

Appellant argues that two factors coalesce to require a new trial for factually insufficient evidence: 1) the prosecutors told the jury that the Dallas Police Department regulations admitted as DX1 ceased to apply once the Appellant decided to flee, turning a felony stop into something else, and 2) the great weight and preponderance of the evidence is in favor of Appellant on this issue.

Nix's decision to rush Appellant's vehicle and begin beating on the passenger window must be judged against the standards of performance of his profession. The fundamental principles of safety, caution, patience, and understanding set forth in the manual of standard

operating procedures are in evidence as DX 1 & 3.  When the pattern of conduct of Officer Nix is closely examined, there are many instances of serious breaches of the procedures mandated by the manual.  Appellant suggests that this Court's best source of primary evidence on this point is SX 10, a copy of the videotapes that captured the events as they unfolded during the chase and at the scene.

A review of the exhibit shows Nix's tragic decision to rush the vehicle and begin to beat on the passenger window with his asp, when it would appear that Appellant's vehicle was securely contained between a fence and the front of Nix's patrol car.  It demonstrates the recklessness and negligence that ultimately resulted in the loss of his life.  Officer Nix did exactly what the manual of standard operating procedures set out in DX 1 instructed him not to do.  He was taught not to rush the suspect vehicle, yet he did anyway.  He did not give his fellow officers the time or opportunity to: 1) use the Public Address System in their vehicles to "use loud, clear, specific verbal directions/commands to occupants of the vehicle"; 2) use the Public Address System to direct Appellant to make his hands visible to the officers; or 3) do the other things directed by the manual to effect a safe extraction and arrest.

Appellant argues that the manual of standard operating procedures served to inform the jurors of the prevailing professional norms with respect to situations such as was presented to them.  These materials demonstrate that Officer Nix failed to apply the fundamental principles of caution, safety, and patience that Dallas police officers must embrace in order to lawfully discharge their official duties.

37

In light of the high standards Dallas has set for officers confronting situations such as this, and the gravity of the situation at hand, a reasonable juror, properly instructed, might well conclude that just a little more caution and patience was required under the circumstances and that the conduct of Officer Nix was reckless or negligent, rather than lawful. This is especially true if the trial court had allowed Appellant's proffered evidence that Officer Nix was disposed to assaulting those who he perceived were running from him.

In sum, this Court must reverse and remand for a new trial to be conducted under an interpretation of the phrase "lawful discharge of an official duty" that honors both the Texas tradition and practice of distinctly setting forth the law that applies in the case[11] and the mandate of our federal constitution.

When evaluating factual sufficiency, this Court considers all the evidence in a neutral light to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). In conducting such a review, Texas reviewing courts consider all of the evidence weighed by the jury, comparing the evidence that tends to prove the existence of the elemental fact in dispute to the evidence that tends to disprove it. *Vodochodsky v. State*, 158 S.W.3d 502, 510 (Tex. Crim. App. 2005). A reviewing court is authorized to disagree with the jury's determination even if probative evidence exists to support the verdict, but a court should not substitute its judgment for that of the fact-finder. Id. In conducting a factual sufficiency

---

[11] Texas Code of Criminal Procedure, Art. 36.14.

38

review, this Court will generally consider the most important evidence that the appellant claims undermines the jury's verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

This record firmly supports the finding that Officer Nix was not *lawfully* discharging an official duty at the time of the shooting. His failure to adhere to the teachings of the manual of standard operating procedures to not rush the suspect and his beating on the passenger window with his asp demonstrate that he was acting recklessly or negligently, not lawfully.

This Court, in *Hall v. State*, supra, has suggested that tortious conduct would qualify as "unlawful" in the context of an assault upon a public servant. Appellant argues here, as he does in support of his facial attack on this subsection of TPC 19.03 that, under the principles of *Maynard* and *Zant*, supra, the term "lawful" must be no broader than the core meaning given the term in *Hall*, supra.

Appellant submits that the facts of this case require that this Court set aside the capital murder conviction for factual insufficiency of the evidence of lawful discharge of an official duty, defined as the Sixth and Eighth Amendments require, and remand the case for a new trial.

## POINT OF ERROR NO. 4, RESTATED

## THE EVIDENCE WAS LEGALLY INSUFFICIENT TO JUSTIFY A FINDING OF GUILTY OF THE OFFENSE OF CAPITAL MURDER, AS CHARGED IN THE INDICTMENT.

## ARGUMENT AND AUTHORITIES

In reviewing a claim that evidence is legally insufficient to support a judgment, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Therefore, in analyzing the legal sufficiency, this Court will determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence, both direct and circumstantial, when viewed in the light most favorable to the verdict.[12] This Court measures evidentiary sufficiency against the "elements of the offense as defined by the hypothetically correct jury charge for the case."[13] For this charge to be hypothetically correct, the word "lawful" must be given its core

---

[12] *Young v. State*, 283 S.W.3d 854 (Tex. Crim. App. 2009), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) and *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

[13] See *Gollihar v. State*, 46 S.W.3d 243, 255-56 (Tex. Crim. App. 2001; *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

meaning.

In this case, whether the evidence is sufficient to support the conviction hinges on what elements this Court decides must be proved under this subsection of TPC 19.03. In other words, if this Court decides that "lawful" has its common and ordinary meaning, the evidence is not sufficient. On the other hand, if "lawful" means nothing, or nothing short of felony criminal conduct in the discharge of duty, then Appellant cannot demonstrate a failure to prove an element requiring proof beyond a reasonable doubt.

The Texas Legislature did not define the term "lawful discharge of an official duty." The usual Texas rule is that words which are not statutorily defined are to be given their usual meanings, and that no specific jury instructions are required.[14] The word lawful has such a wide connotational range. This permits jurors to use irrational factors to expose a capital defendant to the death penalty. Without a narrowing definition, the bloody crime scene photos, the descriptions of how the bullet caused the officer to bleed to death, and the autopsy photos may well have contributed to the jury finding of the lawful discharge of an official duty. Thus, the question before this Court becomes whether Texas should continue the policies advanced by *Montoya, Guerra* and *Hughes*, supra, in the face of the constitutional mandate of *Maynard* and *Zant*, supra, that would require a formulation similar to that this Court adopted in *Hall*, supra.

---

[14] *Martinez v. State*, 924 S.W.2d 693, 698 (Tex. Crim. App. 1996); *Garcia v. State*, 887 S.W.2d 846, 859 (Tex. Crim. App. 1994).

41

Appellant argues that the common and ordinary meaning of "lawful" excludes more than criminal conduct. It also excludes negligent and reckless conduct. The serious departures from Dallas Police Department standard operating procedures, described above, and depicted in SX 10, can only be described as reckless and negligent, rather than lawful. For failure to prove beyond a reasonable doubt that Officer Nix acted lawfully, this case must be reversed and the conviction for capital murder set aside.

## POINT OF ERROR NO. 5, RESTATED

**APPELLANT'S WAS DENIED DUE PROCESS WHEN THE PROSECUTOR ASSERTED THAT APPELLANT COULD BECOME ELIGIBLE FOR PAROLE, CONTRARY TO THE LAW AND THE COURT'S CHARGE.**

## ARGUMENT AND AUTHORITIES

*Facts*

During direct examination of A. P. Merrilott, a witness for the State, the prosecutor engaged the witness in the following exchange:

> [Prosecutor]: Recently Mr. Merrilott, the law has changed here in Texas to where if one is convicted of capital murder by a jury and sentenced to life, that defendant no longer has the option of parole, is that correct?
>
> [A]: That's correct.
>
> [Q]: So Mr. Ruiz is sentenced to life in this case based on the answers to the two special issues, he has no possibility or

42

potential for parole?

[A]: That's correct.

[Q]: Unless the laws change sometime in the future?

[A]: Right.

[Defense Attorney]: Your Honor, we would object to that as being improper. There is no evidence that the law is ever going to change and for him to imply that it may at some point in time is incorrect.

[Trial Court]: I will overrule that objection.

[Defense Attorney]: May we have a running objection to that?

[Trial Court]: You may.

[Defense Attorney]: To sit here and make these jurors think that somehow something is going to change in what they are sentencing him to -

[Prosecutor]: That's why I said unless, Judge, unless. I am not saying it is going to happen. I said unless.

[Defense Attorney]: Well, that is making the matter worse, he is saying maybe it will happen and everybody in this room has to work on the premise that nothing is ever going to change about what we are (sic) told them in voir dire and what the law says now. So to imply that is it (sic) somehow, some way this is a wink-and-a-nod process down here is certainly improper.

[Trial Court]: Overrule your objection, Mr. Brauchle.

[Prosecutor]: That's the law right now, is that correct?

[Witness]: That's correct.

[Defense Counsel]: Once again, Your Honor, we would object

43

to him going back to it by saying, "That's the law right now," once again imply (sic) that somehow there is something in the works that will change what we all know is for the going to (sic).

[Trial Court]: Overruled.

(RR51 - 170-71)

*Analysis*

Appellant argues that the purpose of this line of questioning was to put in the minds of the jurors that, despite the fact that the automatic punishment for one convicted of capital murder is life confinement, without the possibility of parole, that law was subject to change in the future and could not be depended upon.

This Court has historically held that the jury may not consider any aspect of parole in answering the special issues in capital prosecutions. *See, e.g., Knox v. State,* 744 S.W.2d 53, 63-64 (Tex. Crim. App. 1987), *cert. denied,* 486 U.S. 1061 (1988); TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (Vernon Supp. 1999). However, in 1994, the Supreme Court declared in *Simmons v. South Carolina,* 512 U.S. 154, 168-69, 114 S.Ct. 2187, 2196, 129 L.Ed.2d 133 (1994):

> [I]f the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to

44

the jury's attention by way of argument by defense counsel or an instruction from the court.

The Supreme Court further concluded that due process affords a capital defendant the right to answer future dangerousness allegations with information regarding their parole ineligibility. *Id.* at 171, 114 S.Ct. at 2198.

In Texas, of course, the State necessarily relies on future dangerousness in every death penalty case. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, §2(b)(1). Within the meaning of the special issue on future dangerousness, the term "society" includes the population both in and out of prison. *Smith v. State,* 898 S.W.2d 838, 846 (Tex. Crim. App. 1994) *cert. denied,* 516 U.S. 843 (1995); *Boyd v. State,* 811 S.W.2d 105, 118 n.12 (Tex. Crim. App.), *cert. denied*, 502 U.S. 843 (1991). Accordingly, this Court has traditionally determined that juries need not even learn about minimum parole eligibility because the defendant constitutes a threat, either to his fellow inmates or the general public, regardless of the amount of time spent in prison. *See e.g., Willingham v. State,* 897 S.W.2d 351, 359 (Tex. Crim. App. 1994), *cert. denied,* 516 U.S. 946 (1995); *Smith v. State,* 898 S.W.2d at 848-53. This rationale, however, ignored the fact that incarcerated felons reside in a highly structured environment, under close supervision by authorities and the strict enforcement of institutional regulations.

All that changed effective September 1, 2005, when the law was amended to mandate that a sentence of life without parole, or death, be imposed for one convicted of capital

45

murder and that the jury be so informed. TEX. PENAL CODE, §12.31(b). What did not

change was the jury's power to decide whether a defendant presents a future threat in either

society. To constitutionally exercise this power, the jury must know in which "society" the

defendant will have to operate. In assessing future dangerousness, a jury is now instructed

to consider that a defendant will not be eligible for parole. The Supreme Court declared in

*Simmons*:

> In assessing future dangerousness, the actual duration of the
> defendant's prison sentence is indisputably relevant. Holding all
> other factors constant, it is entirely reasonable for a sentencing
> jury to view a defendant who is eligible for parole as a greater
> threat to society than a defendant who is not. Indeed, there may
> be no greater assurance of a defendant's future
> nondangerousness to the public than the fact that he never will
> be released on parole. The trial court's refusal to apprise the jury
> of information so crucial to its sentencing determination,
> particularly when the prosecution alluded to the defendant's
> future dangerousness in its argument to the jury, cannot be
> reconciled without well-established precedents interpreting the
> Due Process Clause.

*Simmons v. South Carolina,* 512 U.S. at 163-64, 114 S.Ct. at 2194, 129 L.Ed.2d at 142-43.

The length of a capital inmate's incarceration is thus "indisputably relevant" to the issue of

future dangerousness, and a prosecutor should not be allowed to circumvent both the

statutory law and due process, as set out in *Simmons*, by suggesting the law upon which

Appellant had a constitutional right to rely upon, might change in the future. The trial court

erred by overruling Appellant's objections and allowing this impermissible "evidence" to be

considered.

46

*Harm Analysis*

Appellant argues this was constitutional error and the conviction must be reversed

unless this Court determines, beyond a reasonable doubt, that did not contribute to his

punishment. See TEX. R. APP. PROC. 44.2(a).


## POINT OF ERROR, NO. 6, RESTATED

**THE EVIDENCE IS LEGALLY INSUFFICIENT TO PROVE, BEYOND A REASONABLE DOUBT, A PROBABILITY THAT APPELLANT WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY, AS THE JURY FOUND IN AFFIRMATIVELY ANSWERING SPECIAL ISSUE NO. 1.**

### ARGUMENT AND AUTHORITIES

*Facts*

Appellant disputes the legal sufficiency of the evidence in this case to sustain the

jury's affirmative answer to the statutory first punishment issue that Appellant probably

"would commit criminal acts of violence that would constitute a continuing threat to society."

(CR2: 663)   The State offered prior conviction and extraneous offense evidence in the

punishment phase of trial regarding the issue of future dangerousness.

That evidence indicated that Appellant had previously been adjudicated a delinquent

child with a finding that he had been convicted of theft. He was placed on probation for one

47

year on June 13, 1996. (SX117) The evidence also showed prior misdemeanor convictions

for: burglary of a vehicle, a Class A misdemeanor, on September 2, 1997, for which he

received 100 days confinement in the Dallas County jail (SX118); theft, a Class B

misdemeanor, on September 2, 1997, for which he received 100 days confinement in the

Dallas County jail (SX119); burglary of a vehicle, a Class A misdemeanor, on August 3,

1997, for which he received 75 days in the Dallas County jail (SX120); escape, a Class A

misdemeanor, on February 17, 1998, for which he received 90 days confinement in the Dallas

County jail (SX121)[15] ; assault, family violence, a Class C misdemeanor, on October 23,

2007, for which he paid a fine and court costs (SX122)[16]; and UCW Handgun, on November

18, 2005, for which he received 60 days confinement in the Dallas County jail (SX124).

The evidence also showed prior felony convictions for: evading arrest, a state jail

felony, reduced to misdemeanor punishment, on November 10, 2005, for which he received

one year confinement in the Dallas County jail (SX123); possession of a controlled

substance, a state jail felony, reduced to misdemeanor punishment, on November 10, 2005,

for which he received one year confinement in the Dallas County jail (SX126); and

possession of a controlled substance, with intent to deliver, a first degree felony, on May 23,

---

[15] The Information in that case alleged he did "then and there intentionally and
knowingly escape from custody, to-wit: did fail to return to custody following temporary
leave for a specific purpose and limited period, while under arrest for and convicted of,
the penal offense of BURGLARY OF VEHICLE". (SX121)

[16] The complaint in that case alleges that, on June 1, 2004, Mr. Ruiz "did then and
there cause physical contact with ... Erica Rivera ... by pushing [her] with the actor's
hand ..." (SX122)

2006, for which he received 10 years confinement, probated for 8 years (SX127). Finally, Mr. Ruiz entered a plea of guilty to the offense of possession of a controlled substance, with intent to deliver, a first degree felony, on April 24, 2006, and was placed on 10 years deferred adjudication probation (SX125).

Raul Toledo identified Appellant as a member of an Irving street gang, the Midnight Dreamers and as a participant in an incident on March 8, 1997, in which the home of a gang rival, Joe Ramos, was shot up. (RR51: 92-93)

Neither the circumstances of these extraneous offenses, nor the facts of the instant offense, justify the death sentence. Appellant's punishment should be commuted to life imprisonment.

*Applicable Law and Relevant Facts*

The minimum constitutional standard for reviewing the sufficiency of the evidence on appeal is to determine whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008). The Court frequently applies the same test to the statutory death penalty questions, but the State must prove more than a bare chance of future dangerousness to sustain an affirmative response to the first special issue. *See Ellason v. State*, 815 S.W.2d 656, 658-59 (Tex. Crim. App. 1991).

In deliberating on future dangerousness, the jury may consider all the evidence admitted during both the guilt/innocence and punishment phases of trial. *Vuong v. State*, 830 S.W.2d 929, 935 (Tex. Crim. App.), cert. denied , 506 U.S. 977 (1992). The circumstances of the offense alone, if severe enough, may support an affirmative answer to the first special issue. *Flores v. State*, 871 S.W.2d 714, 716 (Tex. Crim. App. 1993), cert. denied 513 U.S. 926 (1994). If the murder itself does not suffice, then the appellate court reviews the remaining evidence, including: psychiatric evidence, character evidence, prior criminal record, prior extraneous offenses, and the defendant's state of mind at the time of the murder. *Id.; Kunkle v. State*, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986), cert. denied 492 U.S. 937 (1989).

Bearing all this in mind, however, the Court must remember that "death is a punishment different from all other sanctions in kind rather than degree." *Woodson v. North Carolina*, 428 U.S. 280, 303-04, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). Because of the death penalty's uniqueness, the fundamental respect for human life underlying the Eighth Amendment requires consideration of the character and record of the individual offender, together with the particular circumstances of the offense, as a constitutionally indispensable part of the process of inflicting a death sentence. *Id.* at 304, 96 S.Ct. at 2991, 49 L.Ed.2d at ___. The reviewing court must insure that capital punishment is not "wantonly or freakishly" imposed, and that the statutory special issues accomplish this function. *Keeton v. State*, 724 S.W.2d 58, 64 (Tex. Crim. App. 1987).

50

Several non-exclusive factors deserve consideration in determining the sufficiency of the evidence to support the jury's finding that the defendant presents a continuing threat of violence to society: (1) the circumstances of the capital offense, including the condemned man's state of mind and whether he worked alone or in concert with other parties; (2) the calculated nature of his actions; (3) the foresight and deliberateness exhibited in carrying out the crime: (4) the existence of a prior criminal record, as well as the severity of the previous transgressions; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether he acted under duress or the domination of another; (7) expert psychiatric testimony, or the lack thereof, concerning future dangerousness; and (8) any relevant character evidence. *Ellason v. State*, 815 S.W.2d at 660; *Keeton v. State*, 724 S.W.2d at 60. The Court does not treat the *Keeton* factors as prerequisites to an affirmative or negative answer to the future dangerousness special issue or assign fixed weights to them. *Dinkins v. State*, 894 S.W.2d 330 at 358 (Tex. Crim. App. 1995).

A sufficiency review thus necessitates a balancing between the aggravating and mitigating factors reflected in the evidence at trial. *See Lane v. State*, 743 S.W.2d 617, 630 (Tex. Crim. App. 1987), cert. denied, 504 U.S. 920 (1992). Consequently, while the absence of certain aggravating conditions might not render the evidence insufficient to support a death sentence, the overwhelming presence of mitigating evidence may. *See Wilkerson v. State*, 881 S.W.2d 321, 330 (Tex. Crim. App. 1994)(Baird, J., dissenting). In addition, every capital reversal for insufficient punishment evidence forms a legal precedent for future

51

decisions, thus justifying a review of earlier cases in which the State failed to sustain its burden of proof. *Ellason v. State*, 815 S.W.2d at 660; *Keeton v. State*, 724 S.W.2d at 61.

Appellant concedes that some of the *Keeton* factors seem to cut against an argument of insufficiency of the evidence to support an affirmative finding to the future dangerousness special issue. However, viewed from a "prism" of reality, the evidence clearly shows that the Appellant would not, in probability, commit criminal acts of violence that would constitute a continuing threat to society.

The reality is that Appellant will be confined in the penitentiary for the rest of his life if his conviction is affirmed.

The Supreme Court believes that "the question of a defendant's likelihood of injuring others in prison is precisely the question posed by the second[17] Texas Special Issue." *Franklin v. Lynaugh*, 487 U.S. 164, 179 n. 9 (1988). This Honorable Court has also recognized that "it is obvious that in deciding whether to answer the "future dangerousness" special issue in the negative the jury would focus its attention on the 'society' that would exist for the defendant and that 'society' would be the 'society' that is within the Texas Department of Corrections." *Rougeau v. State*, 738 S.W.2d 651, 660 (Tex. Crim. App. 1987). Finally, in *Nobles v. State*, 843 S.W.2d 503 (Tex. Crim. App. 1992) Judge Miller observed that "[t]he 'ultimate penalty' is reserved for those few incorrigibles that pose such a great threat to society that they cannot be incarcerated without fear of further violent

---

[17] Of course, this is now the first, or future danger, special issue.

outbursts toward others."

Society for Appellant is the society of penal confinement, where he has been safely kept since March 23, 2007, and, and before that, where all the believable evidence suggests he can be safely kept so long as he lives.

Unless the fact finder indulges in unrealistic speculation, the Appellant can never be placed in a societal context other than the penitentiary.

In taking into consideration the circumstances of the offense, including Mr. Ruiz's state of mind at the time, the evidence clearly shows that he was reacting to the aggression of Officer Nix when he fired the shot that killed Officer Nix. Mr. Ruiz was reacting to the aggression of Officer Nix and there was nothing calculated or deliberate in his actions. Mr. Ruiz testified he was in fear of his life when he fired. While the jury did not find for him on his claim of self defense, the facts show this was not a planned-out, deliberate, calculated murder.

The State introduce no evidence indicating that Mr. Ruiz had ever been assaultive while incarcerated. His prior convictions were for non- violent misdemeanors or state jail felonies, with the exception of the offenses alleging possession of controlled substances and the Class C misdemeanor assault.

Dr. Gilda Kessner, a psychologist called by the defense, testified to a history of alcohol and drug abuse, primarily by Mr. Ruiz's mother and her family. (RR53 - 153-54) This escalated over time to where both Mr. Ruiz's parents were using and occasionally

53

selling drugs. (RR53 - 156) Ultimately, the family broke apart and Mr. Ruiz's mother lived on the streets for a time.  In 1997 she entered rehab while Wesley continued to live with his father. (RR53 - 158-59) Mr. Ruiz began personal relationships at a relatively early age and was a father a month before turning 17.  He went to truck driving school after that and was a truck driver for a while.  (RR53 - 160-61) It was Dr. Kessner's opinion that the "modeling" Mr. Ruiz received from his parents and his relationship with Erica Rivera were primary causes of his legal troubles.  (RR53 - 161-62)

In reviewing the legal sufficiency of the evidence of future dangerousness, the Court has defined probability as "more than a bare chance." *Ellison v. State*, 815 S.W.2d 656, 659 (Tex. Crim. App. 1991).  It has also said that a probability exists if the defendant "would, more likely than not, commit violent criminal acts in the future, *Hughes v. State*, 878 S.W.2d 142, 146-48 (Tex. Crim. App. 1992) or if "the evidence indicates more likely than not that the defendant represents a continuing threat." *Burns v. State*, 761 S.W.2d 353, 356 (Tex. Crim. App. 1988).

In this case, the jury was qualified using a "more likely than not" standard and each of the jurors indicated they accepted that definition of probability, in the context of the special issue.  Appellant urges the Court to review the sufficiency of the evidence of future dangerousness using a "more likely than not" definition.  Otherwise, the special issue has practically no meaning and would be useless as a way to determine if a particular defendant is "deathworthy".

There is nothing in the facts and circumstances of the principal offense, or the extraneous offenses, that is truly probative of this Appellant's likelihood of future dangerousness in the society in which he would find himself. There was no evidence offered by the State to show any correlation between the manner in which a crime is committed and the likelihood that the perpetrator would be a continuing danger to society. Any suggestion that the way a murder is committed is probative of future dangerousness is pure speculation. There was no evidence offered by the State to show any correlation between the extraneous offenses admitted in this case and the likelihood that Mr. Ruiz would be a continuing threat to the society in which he will live out his life.

Under these circumstances, the evidence does not enable a rational trier-of-fact to conclude, beyond a reasonable doubt, a probability that Appellant would commit criminal acts of violence against society. Accordingly, the evidence is legally insufficient to support the jury's answer to the first special punishment issue. This Court should thus commute Appellant's death sentence to life imprisonment.

## POINT OF ERROR NO. 7, RESTATED

**THE EVIDENCE IS FACTUALLY INSUFFICIENT TO PROVE, BEYOND A REASONABLE DOUBT, A PROBABILITY THAT APPELLANT WOULD COMMIT CRIMINAL ACTS OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO SOCIETY, AS THE JURY FOUND IN AFFIRMATIVELY ANSWERING**

SPECIAL ISSUE NO. 1 AND FAILURE TO
DETERMINE FACTUAL SUFFICIENCY OF A
FINDING OF FUTURE DANGEROUSNESS
VIOLATES THE FIFTH, EIGHTH AND
FOURTEENTH AMENDMENTS OF THE
UNITED STATES CONSTITUTION.

<u>ARGUMENT AND AUTHORITIES</u>

Applicant challenges the factual sufficiency of the evidence to prove his future

dangerousness. Applicant is aware that this Court has consistently declined to conduct a

factual-sufficiency review of future dangerousness.[18]

Applying well-established rules for reviewing civil cases, this Court has concluded

that a criminal defendant may assert a factual sufficiency claim enabling an intermediate

appellate tribunal to: (1) view all the evidence without the prism of "in the light most

favorable to the prosecution," (2) consider defense evidence along with alternative

hypotheses, plus (3) set aside the verdict only if it is so contrary to the overwhelming weight

of the evidence as to be clearly wrong and unjust. *See Clewis v. State*, 922 S.W.2d 126, 129

(Tex. Crim. App. 1996); *see also Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

Factual insufficiency, unlike its legal counterpart, results in a remand for a new trial.

*Clewis*, 922 S.W.2d at 133-34; *see also Tibbs v. Florida*, 457 U.S. 31, 32, 102 S.Ct. 2211,

2213, 72 L.Ed.2d 652, ___ (1982) (Double Jeopardy Clause does not prohibit retrial after

---

[18] *Roberts v. State*, 220 S.W.3d 521, 526 (Tex. Crim. App. 2007; *Renteria v. State*,
206 S.W.3d 689, 707 (Tex. Crim. App. 2006); *Russeau v. State*, 171 S.W.3d 871, 878
n.1 (Tex. Crim. App. 2005), *cert. denied*, 126 S.Ct. 2982, 165 L.Ed.2d 990 (2006);
*McGinn v. State*, 961 S.W.2d 161, 166-169 (Tex. Crim. App. 1998).

reversal for factual insufficiency).

Similarly, the Texas Court of Criminal Appeals may review the factual sufficiency of the evidence in death penalty cases to disprove any affirmative defenses. *Bigby v. State*, 892 S.W.2d 864, 870-75 (Tex. Crim. App. 1994), *cert. denied,* 512 U.S. 1162 (1995). The Texas Court of Criminal Appeals subsequently extended this authority to include the factual sufficiency of the evidence to sustain capital convictions. *See Jones v. State*, 944 S.W.2d 642, 647-48 (Tex. Crim. App. 1996), *cert. denied,* 522 U.S. 832, 118 S.Ct. 100 (1997). The broad language of the *Bigby* opinion suggests that this Court also possesses jurisdiction to consider the factual sufficiency of the evidence introduced to prove future dangerousness. *See Bigby*, 892 S.W.2d at 874-75 (court empowered by both state constitution and statute to review case on direct appeal upon the law and the facts).    The majority held that a factual sufficiency review on the issue of future dangerousness was impossible because of the need to reweigh mitigating evidence. *McGinn*, 961 S.W.2d at 169.

Applicant contends the majority's analysis in *McGinn* is flawed.  If there is factually insufficient evidence to support the finding of future dangerousness, the question of whether there was also mitigating evidence is moot.  Furthermore, in Applicant's case, the jury was not asked to commingle evidence of future dangerousness with mitigating evidence.  In Applicant's case, the jury was asked whether he posed a continuing threat to society.  (CR2-663).  Only if the jury answered that question was it authorized to proceed to the second special issue addressing mitigating circumstances.  (CR2- 663).  The trial court instructed the

57

jury to consider all the evidence when answering the mitigation issue. (CR2- 664). The trial court did not, however, specifically instruct the jury to consider mitigating evidence when answering the continuing-threat-to-society issue. (CR2- 663). Just the contrary, the trial court instructed the jury to consider mitigating evidence only in conjunction with special issue two. (CR2- 664). The trial court presented the issues in a manner consistent with its instruction, because the jury answered the mitigation issue only if it first found that Applicant posed a continuing threat to society. (CR2- 663).

Curiously, when the Texas death penalty scheme had no separate issue on mitigation, there was no provision compelling the jury to consider mitigating evidence when determining the future dangerousness issue. Act of April 16, 1985, 69th Leg.;R.S., ch.44, § 2, 1985 Tex. Gen. Laws 2394, 2395-96. When mitigation was not a special issue, the Legislature did not want mitigating evidence clouding or confusing the jury's mind when answering the special issue on future dangerousness.

Subsequently, in 1991, the Legislature authorized, by virtue of section 2(e) of article 37.071, a special issue on mitigation. Act of May 17, 1991, 72nd Leg., R.S., ch. 838, § 1, 1991 Tex. Gen. Laws 2898, 2898-900. Section 2(d)(1), as we know it, first appeared in the identical senate bill. Act of May 17, 72nd Leg., R.S., ch. 838, § 1, 1991 Tex. Gen. Laws 2898, 2898-900. Ironically, illogically, and inexplicably, by virtue of section 2(d)(1), the Legislature instructed juries to consider mitigating evidence, but not in conjunction with the new mitigation issue; instead, jurors were to consider mitigating evidence in conjunction with

58

the future dangerousness issue. Act of May 17, 1991, 72nd Leg., R.S., ch. § 1, 1991 Tex. Gen. Laws 2898, 2898-900 (current version at TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(d)(1) (Vernon Supp. 2000)). Regardless of what the Legislature wanted, the trial court's jury instructions keep the future dangerousness and the mitigation issues separate. The majority's fear in *McGinn* that the jury commingled future dangerousness evidence with mitigation evidence when determining the future dangerousness issue is not well founded under Applicant's record.

Section 2(d)(1) of article 37.071 anticipates that a jury would be instructed to consider mitigating evidence when determining whether a defendant posed a continuing threat to society. TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(d)(1) (Vernon Supp. 2000). Section 2(d)(1) of article 37.071 is yet another example of how the Texas death penalty scheme deviously muddies the waters to the benefit of the State and to the detriment of defendants. By linking mitigating evidence to the future dangerousness issue, the Legislature was counting on a defendant's future dangerousness to outweigh the mitigating evidence or, at least, to have the jury discount the mitigating evidence in conjunction with the future dangerousness issue precisely because there was a later issue specifically on mitigation. By linking mitigation with future dangerousness, the Legislature effectively forces the juror's hand on the mitigation issue, because once the jury finds "Yes" on the future dangerousness issue notwithstanding the mitigating evidence, to be logically consistent, the jury has to answer the mitigation issue "No." Read literally, section 2(d)(1) makes the second issue

59

regarding mitigating circumstances duplicative, because, if the jury did not find sufficient mitigating circumstances when answering the first issue, it would be irrational for the jury to find mitigating circumstances in the later issue. Section 2(d)(1) effectively renders the mitigation issue moot. Statutes should be read to give effect to all their portions; constructions effectively eliminating certain portions of a statute should be avoided. *See United States v. Cavada*, 821 F.2d 1046, 1047-48 (5th Cir.), *cert. denied*, 484 U.S. 932, 108 S.Ct. 304, 98 L.Ed.2d 263 (1987). If a statute is ambiguous, courts must construe it in a manner favorable to the defendant. *United States v. Blankenship*, 923 F.2d 1110, 1118 (5th Cir.), *cert. denied*, 500 U.S. 954, 111 S.Ct. 2262, 114 L.Ed.2d 714 (1991). Conversely, the method employed by the trial court makes sense: The jury first decides whether the defendant poses a continuing threat to society and then decides whether, notwithstanding that threat, other circumstances mitigate against the imposition of the death penalty. Consequently, a court could address the factual issue of whether Applicant was a continuing threat to society independent of any mitigation issue.

The Fourteenth Amendment guarantees: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Under this clause, absent a classification interfering with the exercise of a fundamental right or operating to the peculiar disadvantage of a suspect class, a state's conduct need only bear a reasonable relationship to some proper object. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520, ____ (1976); *Royster*

60

*Guano Co. v. Virginia*, 253 U.S. 412, 40 S.Ct. 560, 561, 64 L.Ed.2d 989, _____ (1925). Applicant's conviction of capital murder does not categorize him as a member of a suspect class. *See Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir.), *cert. denied*, 484 U.S. 935 (1987). Nor does the limitation on appellate review of his case interfere with the exercise of a fundamental right. The state has no constitutional obligation to provide criminal defendants with the right of appellate review. *Ross v. Moffit*, 417 U.S. 600, 606, 94 S.Ct. 2437, 2441, 41 L.Ed.2d 341, ___ (1974); *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed.2d 891, ___ (1956). The only constitutional requirement dictates that any afforded right to appeal comply with the requisites of due process and equal protection. *See United States v. MacCollom*, 426 U.S. 317, 323-28, 96 S.Ct. 2086, 2090, 48 L.Ed.2d 666, __ (1976).

Consequently, the "rational basis test" seems applicable to Applicant's contention that the denial of an appellate forum to contest factual sufficiency of the evidence deprived him of equal protection. *See Estelle v. Dorrough*, 420 U.S. 534, 538, 95 S.Ct. 1173, 1176, 43 L.Ed.2d 377, __ (1975) ("[T]his Court in dealing with equal protection challenges the state regulation of the right of appeal in criminal cases ha[s] applied the traditional rational-basis test."). Under this standard, appellate tribunals sustain the challenged enactment "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d

61

171, ___ (1979).  This deferential standard requires only that the classification scheme be "rationally related to a legitimate state interest."  *Pennell v. City of San Jose*, 485 U.S. 1, 14, 108 S.Ct. 849, 859, 99 L.Ed.2d 1, ___ (1988).

These guidelines formulate the critical inquiry: Since virtually all persons convicted of a crime may appeal and challenge the factual sufficiency of the evidence, does the exclusion of only those condemned to die rationally relate to the achievement of some legitimate state purpose?  Clearly, the answer is that it does not.

Imposing invidious limitations on death penalty appeals neither promotes a more thorough review of the most serious type of conviction nor conserves judicial resources by avoiding adjudication of waived or frivolous claims.  *Cf. Dickerson v. Latessa*, 872 F.2d 1116, 1120, (1st Cir. 1989) (upholding statute that distinguished treatment of post-conviction motions in capital cases).

Accordingly, any refusal of the Texas Court of Criminal Appeals to hear Applicant's factual insufficiency claim will effectively deprive him of the same benefit enjoyed by every criminal defendant not sentenced to suffer our ultimate punishment.  No rational basis exists to justify this absurd result, this Court should determine Applicant's factual sufficiency claim via his application for habeas corpus relief or grant him a new appeal before a state appellate tribunal empowered to consider "questions of fact."

62

## POINT OF ERROR NO. 8, RESTATED

**ARTICLE 37.071 § 2(f)(4) IS UNCONSTITUTIONAL BECAUSE IT NARROWS THE JURY'S CONSIDERATION OF MITIGATING EVIDENCE TO THAT WHICH REDUCES THE ACCUSED'S MORAL BLAMEWORTHINESS, TO THE EXCLUSION OF THAT EVIDENCE WHICH MIGHT SERVE AS A BASIS FOR A SENTENCE LESS THAN DEATH, BUT WHICH DOES NOT REDUCE THE ACCUSED'S MORAL BLAMEWORTHINESS.**

## ARGUMENT AND AUTHORITIES

*Facts*

Mr. Ruiz filed a motion to hold the statutory definition of mitigation evidence, as contained in Art. 37.071(f)(4), TEX. CODE CRIM. PROC. unconstitutional, which was denied by the trial court. (CR2 - 571-77)

Mr. Ruiz offered evidence at the punishment phase of trial in mitigation of his punishment.. His grandfather, Richard Ziegenhain, described how Mr. Ruiz's parents separated when he was a teenager and how his mother became an alcoholic, living on the streets. (RR53 - 79-81) He described his grandson as a good worker who went to truck driving school and drove a truck over the road until he quit to be with his family more. (RR53 - 82-84)

Mr. Ruiz's grandmother, Sue Ziegenhain, described him as a very good and proud father who loved and was patient with his children. She testified he played with his children

63

and was always there for birthdays and special holidays. (RR53 - 97/101)

Any or all of which a reasonable jury could have considered mitigating evidence which could serve as a basis for a sentence less than death. However, none of it could be reasonably described as evidence which reduced Mr. Ruiz's moral blameworthiness for the commission of the offense.

*Analysis*

The statutory definition of mitigating evidence is applied to impose an unconstitutionally restrictive "nexus" test requiring evidence proffered as mitigating be the type of evidence which reduces the accused's moral blameworthiness for the commission of the offense.

In *Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562 (2004) the Supreme Court rejected the "nexus" test the Fifth Circuit and the Texas Court of Criminal Appeals had been using as a restriction upon independent mitigating evidence in Texas state courts. In the context of deciding that the Texas capital Defendant was entitled to a certificate of appealability (COA) the Court found that the relevance standard applicable to mitigating evidence in capital cases is simply whether the evidence is of such character that it might serve as a basis for a sentence less than death, regardless of whether the defendant is able to establish a nexus between the evidence and his commission of the crime.

In an opinion issued only shortly before *Tennard v. Dretke*, the Texas Court of Criminal Appeals, after a long and confusing series of opinions, took the position in 2004

64

that it is "proper" that the jury instructions impose a "nexus" restriction upon the defendant's evidence offered as mitigation under the mitigation special issue. The Court of Criminal Appeals believed that the statutory definition of mitigating evidence, and the "reduces moral blameworthiness" or "nexus" restrictions were consistent with the Supreme Court's 1989 decision in *Penry I*, and even that such limitation is required by *Penry I*. *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (overruled on other grounds). The Court of Criminal Appeals effectively adopted the very test (including the "nexus" requirement) that the Fifth Circuit employed and the Supreme Court rejected in *Tennard*. *See, Ex parte Smith*, 132 S.W.3d 407 (Tex. Crim. App. 2004) The Supreme Court makes clear in *Tennard* that the nexus limitation is not "proper" and is not required by its *Penry I* decision.

It is of no consequence to Mr. Ruiz that the Court of Criminal Appeals has found in some cases that the Texas statute allows for a broader scope of mitigating evidence, consistent with Supreme Court jurisprudence, when in reality the operation of the statute conflicts with it. Mr. Ruiz urges this Court to revisit this issue and find that the Texas definition of mitigating evidence in Subsection 2(e) is unconstitutionally restrictive as it is being interpreted and applied by the Court.

The Texas statute directs the trial court to instruct capital jurors that in answering the mitigation special issue submitted under Subsection 2(e) of the death penalty statute, they "shall consider mitigating evidence to be evidence that a juror might regard as reducing the

defendant's moral blameworthiness". When those instructions use "nexus" in the form of "moral culpability or moral blameworthiness" as a restriction upon independent mitigating evidence, a capital defendant like Mr. Ruiz is unfairly precluded from gaining the jury's effective consideration of his constitutionally relevant mitigating evidence that may not fit the "nexus" test because it cannot be said to have caused or contributed to his commission of the crime; it does not explain or excuse his commission of the crime. The jury may believe that mitigating evidence, defined as reducing a defendant's moral culpability for committing the crime itself, cannot encompass such evidence as that proffered, and admitted, as described above, including his good behavior in jail after committing the crime, as independent mitigating evidence.    Jurors, by their oaths, must follow the instruction and put aside the Defendant's proffered mitigation, even if they do not think the death penalty is appropriate, because of that very same evidence.

This Court has in the past interpreted the statutory definition of mitigating evidence as allowing "an open-ended, subjective determination engaged in by each juror," so that Art.37.071, Sec.2(f)(4) does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness." See *Williams v. State*, 2009 Tex. Crim. App. Lexis 1751; *Raby v. State*, 970 S.W.2d 1, (Tex. Crim. App. 1998); *Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997), *cert. denied*, 522 U.S. 994 (1997). The Court held similarly in *Shannon v. State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996), and in *King v. State*, 953 S.W.2d 266, 274 (Tex. Crim. App.1997), when defense counsel argued that the

66

statutory definition was unconstitutional on its face because it "limits the jury's consideration to factors that render him less morally blameworthy and thereby narrows the jury's discretion in violation of the Eighth and Fourteenth Amendment to the United States Constitution". As it had in *Cantu, supra*, the Texas court found the statutory definition to be broader in scope than it appeared on its face.

In *Tennard v. Dretke*, *supra*, the Supreme Court rejected the "nexus" test the Fifth Circuit and the Texas Court of Criminal Appeals have been using as a restriction upon independent mitigating evidence, and found that the relevance standard applicable to mitigating evidence in capital cases is simply whether the evidence is of such character that it might serve as a basis for a sentence less than death, regardless of whether the defendant is able to establish a nexus between the evidence and his commission of the crime.

> "As we have explained, the Fifth Circuit's screening test has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context." *Id.* at 2572.

*Harm*

As has been show above, Mr. Ruiz presented compelling mitigating evidence which does not meet the "nexus" of reducing moral blameworthiness. If the jury did as they swore by their oath they would do, and followed the trial court's mandatory instruction, this evidence, although admissible, was useless. The Court cannot, in logic, find beyond a reasonable doubt that the failure of Mr. Ruiz's evidence to meet the "nexus" required by the unconstitutional definition did not contribute to his punishment .

67

## POINT OF ERROR NO. 9, RESTATED

**THE APPELLANT WAS DEPRIVED OF A FAIR PUNISHMENT HEARING WHEN THE TRIAL COURT DENIED HIS REQUEST THAT THE JURY BE INSTRUCTED TO CONSIDER ANY EVIDENCE THAT WOULD JUSTIFY A SENTENCE OF LIFE WITHOUT PAROLE, IN ADDITION TO EVIDENCE THAT REDUCED MORAL BLAMEWORTHINESS.**

## ARGUMENTS AND AUTHORITIES

*Facts*

After the close of evidence at the punishment phase, Appellant objected to the court's

charge as follows:

> [DEFENSE COUNSEL]: May it please the Court? Comes now the defendant and would lodge the following objections to the proposed Court's charge. Beginning on page four of the charge in the second full paragraph from the top beginning "In arriving at your answer." After the period in that sentence that comes after the word blameworthiness, we would purpose (sic) to the Court that the following language be added. "Or any other evidence that would justify a sentence of life without parole." We make this request of the Court based upon our belief that the definition of mitigating evidence as given to us by the State legislature is in violation of the United States Constitution in that it restricts mitigating evidence to that evidence which a juror would consider as reducing the defendant's moral blameworthiness and no other. And we would suggest respectfully to the Court that there is the potential of evidence for a juror to find evidence that has nothing to do with the defendant's moral blameworthiness to be mitigating. And if they follow this definition, that would cause a juror to believe that they do not have a right to answer a mitigation issue in such a way to grant a life sentence on such evidence.

68

(RR54 - 79-80) The State opposed the addition of the proposed language (RR54 - 81) and the Court denied the request. (RR54 - 81)

*Analysis*

If this Honorable Court continues to hold that Art. 37.071 §(f)(4), is facially constitutional (See Point of Error No.8, supra), Appellant argues that he was entitled to the proposed instruction, under the facts of this case, so that the jury could be clearly told what this Court has assumed they understand. If the law is as this Court insists, no harm can come from clearly telling the jury that.

If Appellant understands what the Court is saying in *Williams, Cantu, Raby, Shannon* and *King*, supra, the requested charge does not misstate the law. Therefore, it is "law applicable to the case" as contemplated by Art. 36.14, TEX. CODE CRIM. PROC.

The trial court erred when it denied Mr. Ruiz's timely, specific request that the law applicable to his case be included in the court's charge.

*Harm*

If the error in the charge was the subject of a timely objection, then reversal is required if the error is calculated to injure the rights of the defendant, which means that there must be some harm to the accused from the error. *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984).

This Court has clearly confirmed that there is no burden to prove harm on Appellant by holding that neither party has a burden to show harm in an *Almanza* analysis. *Warner v.*

69

*State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008). In that opinion, the Court quoted *Ovalle v. State*, 13 S.W.3d 774 (Tex. Crim. App. 2000), as follows:

> We do not resolve the issue by asking whether the appellant met a burden of proof to persuade us that he suffered some actual harm, . . . No party should have a burden to prove harm from an error, and there ordinarily is no way to prove "actual" harm. Burdens and requirements of proving actual facts are appropriate in the law of evidence, but they have little meaning for the harmless-error decision.

*Ovalle,* supra, at 787.

Here, Mr. Ruiz introduced evidence that could have been considered by the jury as evidence that could justify a sentence less than death, as detailed in Point of Error No. 8, supra. He has been harmed by the trial court's failure to specifically advise them that the law allowed, and in fact, required just such a consideration. Mr. Ruiz's death sentence should be reformed to life imprisonment or set aside and remanded for a new punishment trial.

## POINT OF ERROR NO. 10, RESTATED

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT ISSUES.**

70

## ARGUMENT AND AUTHORITIES

All twelve jurors must answer the first special issue (future dangerousness) affirmatively before the trial court may impose the death penalty; a life sentence, on the other hand, requires that at least ten jurors answer a special issue negatively. *See* TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(d)(2) (Vernon Supp. 1999). Unanimity must also exist for the jury to enter a negative finding on the mitigation issue, while only ten jurors must vote to grant leniency. *See id.* § 2(f)(2). The trial court here instructed the jury accordingly. (CR2 - 312). The failure of a capital jury to garner the requisite number of votes either way results in a life sentence. *See id.* § 2(g). Neither the trial court, parties, nor counsel may disclose to the jury members that their failure to unanimously agree on an answer to either special issue results in a life sentence. *See id.* § 2(a). This feature of article 37.071 creates the potential for considerable confusion among reasonable jurors.

A. The "Majority Rules" Harm Analysis

Texas' 12/10 Rule generates the danger that confused jurors otherwise predisposed to hold-out on voting for a death sentence will conform to a "majority-rules" mentality. Potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them. If a majority of other jurors are firmly voting "yes", holdouts may feel obligated to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict. *See Mills v. Maryland*, 486 U.S. 367, 383, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384, ___ (1988) ("common sense ...

71

suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so.").

Support for this argument regarding minority juror "coercion" is found in the Supreme Court cases criticizing the practice by trial courts of inquiring into the numerical division of deadlocked juries prior to sending the jury back for further deliberations. *See, e.g. Lowenfield v. Phelps*, 484 U.S. 231, 239-40, 108 S.Ct. 546, 552, 98 L.Ed.2d 568, __ (1988); *Brasfield v. United States*, 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed.2d 345 (1926). In such cases, the Supreme Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear, in some degree, serious although not measurable, an improper influence upon the jury." *Lowenfield v. Phelps*, 484 U.S. at 239, 108 S.Ct. at 552, 98 L.Ed.2d at ____, *citing Brasfield v. United States*, 272 U.S. at 450, 47 S.Ct. at 136, 71 L.Ed.2d at ___.

Put another way, Texas' 12/10 Rule is a built-in impermissible "dynamite charge", which has been recognized as a possible Eighth Amendment violation in the capital sentencing context. *See Lowenfield v. Phelps*, 484 U.S. at 240-41, 108 S.Ct. at 522, 98 L.Ed.2d at _____. In this way, Article 37.071's 12/10 Rule injects arbitrariness into the proceedings and creates the potential for unreliable sentencing determinations - a constitutional violation of the highest order in the capital sentencing context. *See State v. Williams*, 392 So.2d 619, 631 (La.1980) (on rehearing). In *Williams*, the court stated:

72

> In the present case the jurors were not fully informed of the
> consequences of their votes and the penalties which could
> result in each eventuality ... *Instead, the members of the
> sentencing body were left to speculate as to what the outcome
> would be in the event there was no unanimity.* Under these
> circumstances, individual jurors could rationally surmise
> that in the event of a disagreement a new sentencing hearing,
> and perhaps a new trial, before another jury would be
> required. [emphasis added.] *Id.*

Such a risk of speculation and confusion was held to be a constitutional violation by

the Louisiana Supreme Court. *Id.*

B. The *Mills* Principle

The 12/10 Rule also violates the Eighth Amendment principle in *Mills v. Maryland*,

that it is unconstitutional to instruct capital sentencing jurors in a manner leaving reasonable

jurors to believe that their individual vote in favor of returning a life sentence based on

particular mitigating factors is worthless unless some threshold number of jurors agree that

particular mitigating factors exist. That is, a constitutional violation occurs if a reasonable

juror could interpret the jury charge to instruct the jury that there must be a meeting of the

minds among some threshold number of jurors as to whether the mitigating evidence offered

by the capital defendant warrants either a negative answer to the first special or second

special issue, or an affirmative response to the third, thus resulting in the imposition of a life

sentence. *Mills v. Maryland*, 486 U.S. at 373-75, 108 S.Ct. at 1864-65, 100 L.Ed.2d at __.

Unless jurors are informed of the result of a deadlock in such a situation, the risk that one or

more jurors will give into a "majority rules" mentality is too great under the Eighth

73

Amendment.

C. The *Mills* Principle As Applied in Texas

Under *Mills*, a constitutional violation would occur under the Texas scheme if reasonable jurors who were instructed pursuant to Article 37.071 were led to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them. In *Kubat v. Thierot*, 867 F.2d 351, 369-73 (7th Cir.), *cert. denied,* 493 U.S. 874 (1989), while finding a *Mills* violation, the Seventh Circuit was faced with a capital sentencing scheme similar to the one at issue in the present case:

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death ... [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Id.* at 373.

Therefore, reasonable jurors could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life. Because "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence," *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, ___ (1990), Appellant was sentenced to death in an unconstitutional

74

manner.  For these reasons, the judgment of the trial court should be reversed and the cause remanded for a new trial.

## POINT OF ERROR NO. 11, RESTATED

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT, AN IMPARTIAL JURY AND DUE PROCESS OF LAW UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF VAGUE, UNDEFINED TERMS IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF THE TRIAL THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND THE IMPOSITION OF THE DEATH PENALTY.**

## ARGUMENT AND AUTHORITIES

At the conclusion of the punishment phase, the trial court submitted to the jury the three statutory special issues (see TEX. CODE CRIM. PROC. ANN. art. 37.071, §3(b)(1), (b)(2), (e) (Vernon Supp. 1999):

### ISSUE NUMBER ONE

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

ANSWER: Yes.

75

\*\*\*

## ISSUE NUMBER TWO

> Do you find, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a life sentence be imposed?

## ANSWER:  No.

(RR2 - 663-64). The trial court overruled Appellant's objections to the Court's Charge for failing to define certain critical terms appearing in these questions, namely, "probability", "continuing threat to society", and "criminal acts of violence", which terms are so vague and indefinite as to be violative of Appellant's constitutional rights. (RR1 - 141). Consequently, the jury was deprived of any instructions concerning the meaning of these crucial terms in the special issues.

The failure to define the operative words and phrases violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of the death penalty. *See Godfrey v. Georgia*, 466 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Because the trial court failed to charge the jury in a constitutionally adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death penalty upon this Appellant in comparison to other cases in which

other defendants received a life sentence. This failure to properly instruct the jury violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The Texas special issues applied in this case function as aggravating circumstances. An aggravating circumstance is any finding by a capital sentencer which "circumscribe[s] the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 878, 103 S. Ct. 2733, 77 L.Ed.2d 235 (1983). An affirmative finding to the first special issue and a negative finding to the second comprise a finding on an aggravating circumstance as defined by the Supreme Court in *Zant*. When an aggravating circumstance is vague, however, it fails to serve its constitutionally mandated narrowing function. A sentence of death may not be imposed using a vague aggravating factor unless the state court cures such vagueness by applying a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope. *Maryland v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

Because the Texas special issues contain terms that are unconstitutionally vague, any of the special issues are unconstitutional as applied to Appellant. Her death sentence must therefore be vacated. *See Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Lewis v. Jeffers*, 497 U.S. 766, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

In Texas, the Court of Criminal Appeals has held that the special issues perform the function of narrowing the class of death eligible defendants, and thereby comprise

77

aggravating circumstances under the Constitution:

> [T]he function of Article 31.071 [is] to further narrow
> the class of death-eligible offenders to less than all
> those who have been found guilty of (capital murder)
> as defined under § 19.03 (capital murder statute).

*Smith v. State*, 779 S.W.2d 417, 419 (Tex. Crim. App. 1988); *Roney v. State*, 632 S.W.2d

598, 603 (Tex. Crim. App. 1982) (facts of crime alone do not provide death-eligibility,

otherwise every murder in the course of robbery would warrant capital sentence).

However, the Texas special issues cannot suffice as a framework for the imposition

of the death penalty if the special issues themselves contain crucial terms that are undefined

and inherently vague.

The Texas Court of Criminal Appeals has refused to apply any limiting construction

to the unconstitutionally vague terms in the special issues.  Special issues must channel

sentencing discretion by adequately informing jurors "what they must find to impose the

death penalty." *Maryland v. Cartwright*, 486 U.S. at 362, 108 S.Ct. at 1858, 100 L.Ed.2d at

__; *Godfrey v. Georgia*, 466 U.S. at 428, 100 S.Ct. at 1765, 64 L.Ed.2d at __.  Texas allows

its capital juries virtually unfettered discretion in construing the statutory aggravating

circumstances without the aid of specific definitions of crucial terms contained in the special

issues. *Roney v. State*, 632 S.W.2d at 603.  Yet that function is articulated through the use

of the special issue questions, which employ broad terms that result in standard less capital

sentencing determinations.  Such a result runs directly counter to the Eighth Amendment's

requirement that there be a rational process for juries and appellate courts to decide who lives

78

and who dies.

In the first special issue, the word "probability" has no common or uniform meaning. Jurors in the instant case were left to apply any possible interpretations of the word, including: about fifty percent; a substantial likelihood; or, technically, any chance at all. Additionally, jurors were denied any meaning for the phrase "criminal acts of violence" or "continuing threat to society."

The various words and phrases in the special issues, viewed individually or as a whole, did not provide the jury any uniform guidance in how to apply terms crucial to the decision to impose the ultimate sentence.

In *Jurek v. Texas*, 428 U.S. at 272, 96 S.Ct. at 2956, 49 L.Ed.2d at ___, a plurality of the Supreme Court noted that "[t]he Texas Court of Criminal Appeals has yet to define precisely the meanings of such terms as "criminal acts of violence" or "continuing threat to society." Twenty years later, the Court of Criminal Appeals still has not defined the vague terms in the first special issue *i.e.*, "probability," "criminal acts of violence," and "a continuing threat to society."    Such failure has rendered the first special issue unconstitutional.  Appellant's death sentence should be modified to life.

## POINT OF ERROR NO. 12, RESTATED

**THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY.**

## ARGUMENT AND AUTHORITIES

The current "mitigation" special issue in Texas, and the one applied in this case was as follows:

> Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? (RR1 - 664)

Consistent with current Texas law, the jury charge did not impose any burden of proof as to mitigation on either the State or Appellant. Appellant's Motion on the unconstitionality of the burden of proof on this special issue was denied by the trial court. (R:1, 142).

80

*Analysis*

Recently, the United States Supreme Court declared that Arizona's capital sentencing scheme violates the Sixth Amendment's jury trial guarantee because Arizona trial judges determined whether aggravating factors existed which justified imposition of the death penalty. *See Ring v. Arizona,* 536 U.S. ----, ----, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002). Applying the holdings from its previous decisions in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court stated: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Jones, 526 U.S. at 243 n. 6, 119 S.Ct. 1215. "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact--no matter how the State labels it--must be found by a jury beyond a reasonable doubt." *Apprendi,* 530 U.S. at 482-83, 120 S.Ct. 2348. Therefore, that which has the effect of increasing punishment beyond a maximum statutory sentence must be   considered the functional equivalent of an element of an offense greater than the one covered by the jury's guilty verdict. *Id.,* 530 U.S. at 495, 120 S.Ct. 2348.

*Apprendi, supra,* involved a New Jersey "hate crime" statute that provided for a lengthier prison term if the  trial judge found, by a preponderance of the evidence, that a

81

defendant committed a crime with a biased purpose. The Supreme Court held that the Due Process Clause required that such a factual determination be made by a jury on the basis of proof beyond a reasonable doubt. *Id.,* 530 U.S. at 490, 120 S.Ct. 2348.The Court based its holding in the fact that if a "sentencing factor" serves to increase a sentence beyond the maximum sentence otherwise statutorily authorized, "it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense." *Id.* at 494 n. 19, 120 S.Ct. 2348.

*Apprendi* 's "elements rule" was extended to capital prosecutions in *Ring, supra.* In *Ring,* the Supreme Court held that, under *Apprendi,* "[b]ecause Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," the Sixth Amendment requires that they be found by a jury." *Id.,* --- U.S. at ----, 122 S.Ct. at 2443 (citation omitted) (quoting *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348).

The distinction must be drawn between the "elements" of a crime and factors that simply influence a criminal sentence. *Harris v. United States,* --- U.S. ----, ----, 122 S.Ct. 2406, 2410, 153 L.Ed.2d 524 (2002). For example, a finding that only increases a mandatory *minimum* penalty is not an element of a separate offense, and therefore need not be proven beyond a reasonable doubt. *See id.,* 536 U.S. at ----, 122 S.Ct. at 2420. In a portion of the *Harris* opinion, Justice Kennedy, joined by three other justices, wrote, "...those facts setting the outer limits of a sentence, and of the judicial power to impose it, are the elements of the

82

crime for the purposes of the constitutional analysis." *Id.,* 536 U.S. at ----, 122 S.Ct. at 2419.

In the instant case, the jury's guilty verdict would have resulted in a life sentence unless and until the State proved beyond a reasonable doubt that answers to the first two special issues were "yes." This additional requirement of proving the first two special issues, once satisfied, would acted to convert a life sentence to that of death. The State's failure to convince the jury that the first two special issues should be answered "yes,"or failure of jurors to unanimously agree would have resulted in imposition of the life sentence applicable once a finding of guilt occurred.  In that respect, the special issues are factors which are virtually indistinguishable from the aggravating circumstances found to be "the functional equivalent of an element of a greater offense." *Ring,* 536 U.S. at ----, 122 S.Ct. at 2441, quoting *Apprendi,* 530 U.S. at 494 n. 19, 120 S.Ct. 2348 (holding that death-eligibility factors "operate as 'the functional equivalent of an element of a greater offense.'")

The Texas special issues constitute death-eligibility factors which are the functional equivalents of elements, and must therefore be proven to a jury beyond a reasonable doubt. Because the mitigation special issue fails to require that the State prove lack of sufficient mitigation beyond a reasonable doubt, the Texas death penalty scheme violates the Due Process Clause of the United States Constitution. U.S. CONST., amend XIV. The trial court imposition of the death sentence should be reversed.

## POINT OF ERROR NO. 13, RESTATED

**THE TEXAS DEATH PENALTY SCHEME VIOLATES DUE PROCESS PROTECTIONS OF THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT, CONTRARY TO *APPRENDI* AND ITS PROGENY.**

## POINT OF ERROR NO. 14, RESTATED

**THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I, §§ 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.**

## ARGUMENT AND AUTHORITIES

Justice Blackmun of the United States Supreme Court concluded that the death penalty, as currently administered in this country, is unconstitutional. *See Callins v. Collins*, 510 U.S. 1141, ____, 114 S.Ct. 1127, 1129, 127 L.Ed.2d 435, 449 (1994) (Blackmun, J., dissenting). Justice Blackmun summarized his position in the following excerpt:

> ...Twenty years have passed since this Court declared that the

84

death penalty must be imposed fairly, and with reasonable consistency, or not at all, see *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 346 (1972), and, despite the effort of the States and courts to devise legal formulas and procedural rules to meet this daunting challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake. This is not to say that the problems with the death penalty today are identical with those that were present 20 years ago. Rather, the problems that were pursued down one hole with procedural rules and verbal formulas have come to the surface somewhere else, just as virulent and pernicious as they were in their original form. Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the

administration of death, see *Furman v. Georgia*, *supra*, can never be achieved without compromising an equally essential component of fundamental fairness -- individualized sentencing. See *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 ( 1978).

It is tempting, when faced with conflicting constitutional commands, to sacrifice one for the other or to assume that an acceptable balance between them already has been struck. In the context of the death penalty, however, such jurisprudential maneuvers are wholly inappropriate. The death penalty must be imposed "fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S. Ct. 869, 71 L.Ed.2d 1 (1982).

To be fair, a capital sentencing scheme must treat each person convicted of a capital offense with that "degree of respect due to the uniqueness of the individual." *Lockett v. Ohio*, 455 U.S. 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (plurality opinion). That means affording the sentencer the power and discretion to grant mercy in a particular case, and probing avenues for the consideration of any and all relevant mitigating evidence that would justify a sentence less than death. Reasonable consistency, on the other hand, requires that the death penalty be inflicted evenhandedly, in accordance with reason and objective standards, rather than by whim, caprice, or

prejudice. Finally, because human error is inevitable, and because our criminal justice system is less than perfect, searching appellate review of death sentences and their underlying convictions is a prerequisite to a constitutional death penalty scheme.

On their face, these goals of individual fairness, reasonable consistency, and absence of error appear to be attainable. Courts are in the very business of erecting procedural devices from which fair, equitable, and reliable outcomes are presumed to flow. Yet, in the death penalty area, this Court, in my view, has engaged in a futile effort to balance these constitutional demands, and now is retreating not only from the *Furman* promise of consistency and rationality, but from the requirement of individualized sentencing as well. Having virtually conceded that both fairness and rationality cannot be achieved in the administration of the death penalty, see *McLeskey v. Kemp*, 481 U.S. 279, 313 n 37, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Court has chosen to deregulate the entire enterprise, replacing, it would seem, substantive constitutional requirements with mere aesthetics, and abdicating its statutorily and constitutionally imposed duty to provide meaningful judicial oversight to the administration of death by the States.

From this day forward, I no longer shall tinker with the machinery of death. For more than 20 years I have endeavored-- indeed, I have struggled -- along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. [Footnote omitted.] Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed. It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies. The basic question -- does the system accurately and consistently determine which defendants "deserve" to die? -- cannot be answered in the affirmative. It is

86

> not simply that this Court has allowed vague aggravating
> circumstances to be employed, *see, e.g. Arave v. Creech*, 507
> U.S. ___, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993), and relevant
> mitigating evidence to be disregarded, *see, e.g. Johnson v.
> Texas*, 509 U.S. ___, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).
> The problem is that the inevitability of factual, legal, and moral
> error gives us a system that we know must wrongly kill some
> defendants, a system that fails to deliver the fair, consistent, and
> reliable sentences of death required by the Constitution.
> [Footnote omitted].

*Callins v. Collins*, 510 U.S. at ___, 114 S.Ct. at 1129-30, 127 L.Ed.2d at 437-39. Justice

Blackmun then discussed the "narrowing" of death-eligible offenders according to objective,

fact-bound criteria; and the jury's subsequent discretion to consider relevant mitigating

evidence. *Id.* at ___, 114 S.Ct. at 1134, 127 L.Ed.2d at 444. Over time, Justice Blackmun

came to conclude that this procedure simply reduces, rather than eliminates, the number of

people subject to arbitrary sentencing. *Id.* at ___, & n. 4, 114 S.Ct. at 1134, 127 L.Ed.2d at

444 (citing Gillers, *Deciding Who Dies*, 129 U.Pa.L.Rev. 1, 27-28 (1980) (inherent

arbitrariness of death penalty only magnified by post-*Furman* statutes allowing juries to

choose among similarly situated defendants). He concludes the opinion with a lengthy

reference to the role that racism plays in a defendant's chance of being executed, and the

diminished protection now afforded by federal courts exercising habeas corpus jurisdiction.

*Callins v. Collins*, 510 U.S. at ___, 114 S.Ct. at 1135-38, 127 L.Ed.2d at 446-49.

The Texas capital sentencing scheme fails to adhere to principled guidelines in

weighing punishment evidence. The focus upon aggravating circumstances, to the exclusion

of mitigating evidence, clearly violates the constitutional mandate of individualized

87

sentencing. *See Penry v. Lynough*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256, 278-79 (1989). The federal and state constitutions prohibit the imposition of the death penalty until a scheme is employed which eliminates the sentercer's total discretion to inflict death while simultaneously permitting unrestricted consideration of mitigating evidence. Therefore, this Court should commute Appellant's death sentence to imprisonment for life.

PRAYER

WHEREFORE, PREMISES CONSIDERED, there being reversible error appearing in the record of the trial of the case, Appellant prays this Honorable Court reverse the judgment of the trial court and remand for a new trial.

Respectfully submitted,

_____

Douglas H. Parks
Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Appellant's Brief was hand delivered to the Appellate Division, Dallas County District Attorney's Office, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB19, Dallas, Texas on the 12th day of February, 2010.

Douglas H. Parks

## CERTIFICATE OF APPELLATE COUNSEL

I hereby certify that the foregoing Appellant's Brief shipped, via Federal Express, to the Clerk of the Court, Texas Court of Criminal Appeals, Supreme Court Building, 201 West 14th Street, Room 106, Austin, Texas 78701, on the 12th day of February, 2010.

Douglas H. Parks

89