CAUSE NO. F07-50318-M

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| vs. | * | 194TH JUDICIAL DISTRICT |
| WESLEY LYNN RUIZ | * | DALLAS COUNTY, TEXAS |

- - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

VOIR DIRE EXAMINATION

Volume 18 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 6th day of February, A.D, 2008, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

Belinda G. Baraka, Official Court Reporter
214-653-5803

```
1                          A P P E A R A N C E S

2

3    HON. ANDY BEACH
     Assistant District Attorney
4    State Bar No. 01944900

5
     HON. ANDREA HANDLEY
6    Assistant District Attorney
     State Bar No. 08898800
7                                    FOR THE STATE OF TEXAS

8

9

10   HON. PAUL BRAUCHLE
     Attorney at Law
11   State Bar No. 02918000

12

13   HON. WILLIAM "KARO" JOHNSON
     Attorney at Law
14   State Bar No. 10804500

15                                   FOR THE DEFENDANT

16

17

18                          *  *  *  *  *

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

5

**P R O C E E D I N G S**

(February 6, 2008)

(Prospective juror entered the courtroom.)

THE COURT:   You may be seated.

Good morning again, Ms. George?

PROSPECTIVE JUROR:   Good morning.

THE COURT:   You doing all right this morning?

PROSPECTIVE JUROR:   Yes, I am.

THE COURT:   The attorneys have some questions to ask you concerning your service as a juror in this case.

Who will be questioning for the State?

MR. BEACH:   I will, Your Honor.

THE COURT:   You may proceed.

**RACHEL GEORGE**

was called as a prospective juror, and having been previously sworn by the Court, testified under oath as follows:

**VOIR DIRE EXAMINATION**

BY MR. BEACH:

Good morning, Ms. George.   My name is Hamilton Burg -- no, no, Andy Beach.

PROSPECTIVE JUROR:   No you are not with Perry Mason.

MR. BEACH:   I wanted to see if you were awake.

To my left is Andrea Handley.   This is Marshall McCallum. And we are Assistant District Attorneys here in Dallas County.

And we are going to be conducting the jury selection portion of this case on behalf of the State.

Karo Johnson and Paul Brauchle are to your left.   And they are attorneys here in town and they have the responsibility of representing the man at the end of counsel table.   That's Wesley Ruiz.

Ms. George, it has been over two months now, I think, since you came down and filled out this questionnaire.   You have had a chance to look at it this morning while you are waiting to come out here.   Anything in going through your questionnaire since the passage of the two months that you would change because of maybe thinking about things a little bit more?

PROSPECTIVE JUROR:   No, sir.

MR. BEACH:   Ms. George, I am going to tell you right now from looking at your questionnaire, I don't know if this is going to be good news or bad news; but you are kind of right down the middle in terms of what both sides are looking for in this case.   It's a real possibility that you could end up on this jury.

So I don't tell you that to heighten the anxiety that you are feeling already coming down here today.   You are in the range that both sides are looking for.

We got six jurors already.   We have been at this process for about three weeks now.   And we anticipate hopefully

---

6

getting the rest of the jurors here in the next two to three weeks.   We will probably take some time off in terms of getting this case ready for trial.   We think the trial will actually start the first or second week of April, okay.   And our best guesstimate is, once the actual trial actually begins, we are looking at anywhere from five to eight working days to actually try the case.   The thing we cannot predict is how long a jury is going to deliberate once the evidence is over.   The jury could be out ten minutes or two days.   That's the one x-factor that we can't accurately predict.

Obviously, you are a busy lady.   And we are going to talk about that.   Anything about the timing of the trial and/or the five-day commit -- five-to-eight-day commitment right now that would prevent you from devoting your attention to this case?

PROSPECTIVE JUROR:   No.

MR. BEACH:   Tell me, what, I know you have been a principal; is that right?

PROSPECTIVE JUROR:   Yes, sir.

MR. BEACH:   What schools?

PROSPECTIVE JUROR:   Principal at Julia C. Frazier Elementary School in South Dallas for ten years, and assistant principal at Eladio Martinez Learning Center for two years.

MR. BEACH:   Okay.   And now you are the transformation management officer.   Tell me what you do in

---

7

that office.

PROSPECTIVE JUROR:   We are the agent of change. The Dallas Independent School District is undergoing a change. And we are trying to win this prize, The Road to Road.   And we are looking at what we can do differently what we have not done to help our children succeed.   This office was created last year with the Dallas Achieve Commission, and we are trying to implement changes that will help our students succeed.

MR. BEACH:   How many other administrators are in that office with you?

PROSPECTIVE JUROR:   About 11.

MR. BEACH:   I notice from your questionnaire -- well, first of all, it was a joke, obviously introducing myself as Hamilton Burg.   I notice on your questionnaire that you enjoy watching law shows on TV and you enjoy reading books, mysteries and I guess murders and Grisham novels.   You understand, you have been on jury duty before, what happens down here at the courthouse, it doesn't really accurately reflect what you are seeing on TV; you would agree with that?

PROSPECTIVE JUROR:   Yes, sir.

MR. BEACH:   Okay.   And you are an educated lady, and you do understand the difference between fiction and reality.   And this is reality down here at the courthouse; you understand that?

8

1    PROSPECTIVE JUROR:   Yes, sir.

2         MR. BEACH:   What we are talking about is not a

3    fictional character today, but we are talking about this

4    living, breathing human being at the end of counsel table

5    sitting in our midst.

6         You indicated that you believe the death penalty is

7    appropriate depending on the facts; is that correct?

8    PROSPECTIVE JUROR:   Yes, sir.

9         MR. BEACH:   Nothing has changed about that

10   within the last two months?

11   PROSPECTIVE JUROR:   No, sir.

12        MR. BEACH:   Let me tell you what our position

13   is.  Obviously they are going to have a different position.

14   And really what the lawyers' position is in this case isn't

15   going to amount to a hill of beans.  We want to let you know

16   right up front what our position is.  Because if you are asked

17   to be on this jury and you are sitting over here in a couple

18   of with 11 other jurors, we don't want it to come as any

19   surprise to you that those guys were serious about seeking the

20   death penalty, okay.  That's our goal in this case.  It is our

21   focus, unrelenting goal in this case, is to obtain first of

22   all a guilty verdict, prove him guilty of capital murder

23   exactly as charged.  And secondly, to obtain a death sentence

24   as opposed to the only other punishment alternative in this

25   case, and that's life imprisonment without parole.  And it is

9

1    our goal because we believe that we have the type and quality

2    of evidence that would convince the jury beyond any reasonable

3    doubt that he is guilty.  And secondly, that a death penalty

4    based on the facts of the crime, the defendant, the victim,

5    and the community that the death penalty is the appropriate

6    punishment in this case versus life in prison without the

7    possibility of parole.

8         I want you to assume with me that happens.  Let's assume

9    that -- and I know from your questionnaire, you are probably

10   familiar to some extent with what happens when someone gets a

11   death sentence here in Texas.  Let's assume that happens here

12   in this case.  And let's assume that Wesley Ruiz here in court

13   today is found guilty of capital murder and the jury assesses

14   a death penalty and recommends that to Judge White.  He would

15   have no discretion but under the law but to set his punishment

16   at death by lethal injection.  Judge White doesn't have the

17   ability to say, I don't agree with what you did.  If the jury

18   recommends it, he is going to give it.  At some date in the

19   future, Judge White, after that death sentence was assessed,

20   he would set an actual execution date.  Okay.

21        Now, the day before that execution date, they would go

22   and get that man down there at the end of counsel table from

23   the death row facility in Livingston, Texas.  They will take

24   him by a vehicle from Livingston Texas to downtown Huntsville.

25        I don't know if you have ever been to Huntsville, Texas.

10

1    But right in the middle of downtown Huntsville is an old

2    prison unit called the Walls Unit.  And inside the Walls Unit

3    is the actual death chamber.  He will be taken to a holding

4    cell just down the hallway from the death chamber.

5         On the date of the actual execution, he would be given a

6    last meal.  He would be allowed to see his family, if he chose

7    to do so.  He would be allowed to visit with a spiritual

8    adviser, if he chose to do so.

9         But at six o'clock that night, they would come and get

10   him and take him down a narrow hallway into the death chamber.

11   And in the middle of that have room is a hospital bed.  He

12   would be laid down on that hospital bed and strapped to it.

13   I.V. lines would be placed into his arm.

14        Once that process was done, ma'am, two curtains would be

15   drawn back.  Behind one set of curtains, the defendant could

16   have up to five members of his family looking through the

17   glass.  Behind the other curtains, the victim could have up to

18   five members of his family to witness the execution.

19        The warden would ask Mr. Ruiz if you wanted to make a

20   final statement.  Once that was done, the warden would give

21   the go-ahead.  Once that was done, a series of three drugs

22   would begin to be introduced into his body.  The first to

23   sedate him.  The second to knock him out.  And the third to

24   finally stop his heart.  Whether it took three minutes, five

25   minutes or seven minutes, however long it took, at some point

11

1    in time a doctor there in that room would go over and check on

2    him and pronounce him dead.

3         And that's our goal in this case for that to happen some

4    date in the future.

5         I don't tell you that to be morbid.  We try to impress

6    upon every juror setting up there like yourself how serious a

7    business this is.

8         Some jurors say, you know what, I believe in the death

9    penalty, Mr. Beach, when I see it in the paper, watch it on TV

10   under certain cases, I say to myself, I am glad that jury gave

11   that guy the death penalty.  Some folks come down here and

12   when they are confronted with the possibility of having to

13   participate in a process that could lead very well -- very

14   well may lead someday to the execution of another human being,

15   they say, I can't do it.

16        Now, my question to you, ma'am, is if you were asked to

17   be on this jury, are you the type of person who, if convinced

18   by the evidence, if you believe the death penalty was the

19   appropriate punishment in this case, are you the type of

20   person that could and would take pen in hand and basically

21   write death if you believe that was the right thing to do

22   under the evidence?

23        PROSPECTIVE JUROR:   Yes, sir.

24        MR. BEACH:   Any question in your mind

25   whatsoever?

12

13

1        PROSPECTIVE JUROR:   No, sir.

2           MR. BEACH:   All right.  Now, I know you have had

3 a couple of months to think about this, so we will just go on

4 from there, with that representation.  And I appreciate that.

5 You are ahead of the curve a little bit because you have been

6 on a jury before.

7      What kind of case was that, you remember?

8          PROSPECTIVE JUROR:   I think domestic violence

9 may have been one, and several other little cases like that.

10          MR. BEACH:   So you have been on more than one

11 jury?

12        PROSPECTIVE JUROR:   Yes, sir.

13          MR. BEACH:   And have you ever been asked after a

14 defendant has been found guilty in those cases, have you ever

15 been asked to assess punishment?

16        PROSPECTIVE JUROR:   No, sir.

17          MR. BEACH:   Okay.  All right.  Well, let's talk

18 about that.  You probably know this again.  In any criminal

19 case here in Texas, it is what I call a two-act play, okay.  A

20 two-part trial.  At the first part of the trial, the only

21 determination for the jury is whether the defendant is guilty

22 or not guilty, okay.  We are not worried about punishment,

23 whether he gets a death sentence or a life sentence.  The

24 first part of the trial, it's all about did the State meet its

25 burden of proof and prove everything required under the law

beyond a reasonable doubt.  You understand that?

2        PROSPECTIVE JUROR:   Yes, sir.

3          MR. BEACH:   Okay.  What we have to prove is --

4 on that half page piece of paper right there in front of you,

5 take just a second to look at it.  And while you are looking

6 at it, I will paraphrase it for you.  We have to prove that on

7 or about a certain date here in Dallas County, Texas, that

8 this defendant knowingly, intentionally caused the death of

9 that police officer, by shooting him with a firearm; and when

10 he caused that police officer's death, he knew that police

11 officer was acting in the line of duty.  That's a paraphrase

12 of what we have to prove, okay.

13     And again, you having been on a jury before, you

14 understand that we have to prove everything in that indictment

15 beyond a reasonable doubt.  Let me give you kind of a far-out

16 example.  Let's say that after the evidence is finished, that

17 you and 11 other jurors don't have any doubt whatsoever,

18 reasonable or unreasonable that this man knowingly,

19 intentionally caused the death of that police officer.  And

20 knew the police officer was acting in the line of duty.  But

21 the State proved to you that knowing, intentional murder of

22 that police officer happened in Kaufman County.  You can see

23 from that indictment there, one of the things we have to prove

24 is that the murder happened in Dallas County, Texas, okay.

25     Now, it would make you sick to your stomach and the other

14

15

1 11 jurors sick to have to let a murderer go; but if that

2 situation arose, your obligation pursuant to your oath, and

3 Judge White would instruct you, is you would have to fine the

4 defendant not guilty.  Because the State did not prove

5 everything it was required to prove.  If that happened, we all

6 would be looking for a job the next day, because we have had a

7 long time to get this case ready, to investigate it and know

8 what to put in there.  But your corresponding obligation is,

9 if we don't prove it, you have to follow your oath and follow

10 the law and find the defendant not guilty.

11      Could you do that, ma'am?

12        PROSPECTIVE JUROR:   Yes, sir.

13          MR. BEACH:   A lot of people think that because

14 an individual's name appears on a piece of paper like that,

15 and that's part of the indictment in this case.  The

16 indictment is as you know is the instrument that charges,

17 sufficiently charges the defendant with this crime.  A lot of

18 people think you know what, Mr. Beach, the man has been

19 arrested, he has been indicted, now they are sitting in court

20 surrounded by bailiffs, he must have done something wrong,

21 okay.  That's fine to have that first blush natural feeling

22 the guy must have done something wrong, the State wouldn't

23 just yank somebody off the street and charge them with capital

24 murder.  But to be a qualified juror in this and any other

25 criminal case, that can't be your mind-set.  Your mind-set

needs to be that he is presumed innocent until we prove

2 everything in that indictment beyond a reasonable doubt.

3      You understand that law?

4        PROSPECTIVE JUROR:   Yes, sir.

5          MR. BEACH:   And could you follow that law?

6        PROSPECTIVE JUROR:   Yes, sir.

7          MR. BEACH:   And who do you look for -- who do

8 you look to in this case for proof?  Which side of this

9 courtroom do you look to for all the proof in this case, you

10 look to us?

11        PROSPECTIVE JUROR:   Yes.

12          MR. BEACH:   You look to the State.  We have done

13 all the accusing in this case.  And corresponding -- of course

14 the corresponding obligation is, State you have done all the

15 accusing, you have to do all the proving.  They don't have to

16 do anything.  They can sit over there and play crossword

17 puzzles -- not the students that just walked in -- but the

18 Defense.  All they have to do is be here.  They will be here

19 everyday, they will meet their responsibility everyday in the

20 trial.  And that's a far-out example, just to try to

21 illuminate that you have to look to us to do all -- for all

22 the evidence in this case.

23     And we have to prove everything in that indictment beyond

24 a reasonable doubt.  And that's the highest burden of proof in

25 any kind of litigation setting.

16

1    You are talking about a civil case, where you are just
2    talking about money or property, you may have heard this term,
3    the burden is by a preponderance of the evidence. Just a
4    little bit more than the other side has. Okay.
5        If you are talking about terminating someone's parental
6    rights, the burden of proof is clear and convincing evidence.
7    Which is obviously a quite a bit higher than preponderance of
8    the evidence.
9        Then you get to a criminal case and it is even higher.
10   It goes from preponderates to clear and convincing to beyond a
11   reasonable doubt. You are talking about in most criminal
12   cases depriving someone of their liberty. In this case it is
13   literally talking about depriving someone of their life.
14   That's our burden, we accept that burden, and we know they
15   will follow the law in terms of holding us to that burden; is
16   that right?
17       PROSPECTIVE JUROR:  Yes, sir.
18       MR. BEACH:  Now, there is no legal definition
19   for beyond a reasonable doubt. It is going to be whatever you
20   and 11 other jurors take that to mean. But we know it doesn't
21   mean a hundred percent certainty or beyond any absolute
22   certainty. You would almost have to be able to say to yourself, I am a hundred
23   actual crime to be able to say to yourself, I am a hundred
24   percent certain this happened. It is just beyond a reasonable
25   doubt. Again obviously in a case like this, where the stakes

17

1    are pretty high, we know that you will hold us to that burden.
2    It will be a high burden and you will make us prove the case;
3    is that correct?
4        PROSPECTIVE JUROR:  Yes, sir.
5        MR. BEACH:  The last area of law that I want to
6    discuss with you before we move on is, again it is just a
7    corollary of who has to do the proving. He is presumed to be
8    innocent until we bring to you evidence to prove him guilty
9    beyond a reasonable doubt. You have to look to the State for
10   all the evidence in this case. They don't have to do
11   anything.
12       And that also means he doesn't have to testify if he
13   didn't want to. He has got a Fifth Amendment right not to
14   testify. And if he chooses to exercise that right, Judge
15   White will instruct the jury that you can't consider that for
16   any reason, okay. It's his right. It would be your right if
17   you are charged with a criminal trial. That's the way the law
18   is.
19       Can you follow that law and accept that law, ma'am?
20       PROSPECTIVE JUROR:  Yes, sir.
21       MR. BEACH:  Now, first act of the play is over.
22   We brought all the evidence. If we do not meet our burden of
23   proof and the jury has a reasonable doubt, that jury will be
24   required by their oath to find the defendant not guilty. The
25   trial is over, defendant goes home, the jury goes home. The

18

1    trial is over. There is no act two.
2        Let's assume for the purpose of our discussion, ma'am,
3    that we have been successful in proving to you everything in
4    that indictment beyond a reasonable doubt. At that point in
5    time, your oath would require you to find the defendant guilty
6    of capital murder; could you do that?
7        PROSPECTIVE JUROR:  Yes, sir.
8        MR. BEACH:  All right. Once you find the
9    defendant guilty of capital murder, just like going to that
10   play, the curtains come down on act one, the audience goes out
11   into the hall. They are talking about act one, what they have
12   seen. Guess what, they don't know how the play is going to
13   end, do they? Because they have to come back after
14   intermission and see act two, that's the way a criminal trial
15   works.
16       Act one is guilty or not guilty. But once the defendant
17   is found guilty, you go to act two, the second part of the
18   trial. And you will hear additional evidence that will help
19   you to determine whether or not -- or what the appropriate
20   punishment is, okay. And like we talked about, in a capital
21   murder case, once the defendant is found guilty of capital
22   murder, there is only two possible punishments. The best way
23   really, I think to drive it home is, the best a defendant is
24   ever going to do here in Texas once he is found guilty of
25   capital murder is, what, life imprison without the possibility

19

1    of parole. That's the best he is ever going to do. There is
2    no, you know, none of this 20 years or 40 years or 60 years or
3    maybe parole after 30 years. Unless he escapes from the
4    penitentiary, he is in prison for the rest of his natural
5    life. He is going to die in prison, okay. That's the best he
6    is going to do, all right.
7        And a lot of folks call these death-penalty cases.
8    Really, what your mind-set should be going into act two or the
9    punishment phase of a capital murder trial is, these are
10   really death-imprison cases. Okay. Because you are to
11   presume going in to the second part of the trial that life
12   sentence that he is sitting on is the appropriate punishment,
13   okay. Just like you presume that the first part of the trial
14   that he was innocent until we proved him guilty, going into
15   the punishment phase of the trial, you are to presume that a
16   life sentence is the appropriate punishment. And that doesn't
17   change until we bring to you evidence that convinces you and
18   11 other jurors beyond a reasonable doubt that that life
19   sentence should be elevated up to a life sentence.
20       You see how it works, ma'am?
21       PROSPECTIVE JUROR:  Yes, sir.
22       MR. BEACH:  A lot of folks tell us, Ms. George,
23   if I find someone guilty of a knowing intentional capital
24   murder, it is over for me. I mean, it is automatically going
25   to be the death penalty. That person is entitled to their

1  opinion and beliefs, but they are not qualified to be on this
2  case, okay. Your mind-set again just has to be the opposite.
3  It has to be, yes, I understand now, he is guilty of capital
4  murder beyond a reasonable doubt, my mind-set going into the
5  punishment phase is that life sentence that he is sitting on
6  now, that's where he is going to stay until the State prove to
7  me that that life sentence should be elevated up to a death
8  penalty. Okay?
9         PROSPECTIVE JUROR:   Yes, sir.
10         MR. BEACH:   And can you do that in this case?
11         PROSPECTIVE JUROR:   Yes, sir.
12         MR. BEACH:   Follow the law in this case?
13         PROSPECTIVE JUROR:   Yes, sir.
14         MR. BEACH:   How does that happen? We don't just
15  put on evidence and the judge send you back and go life or
16  death. That's not how it works here in Texas. You are asked
17  two questions and those two questions will determine whether
18  or not he stays with the life sentence or that life sentence
19  is elevated up to a death penalty.
20         Take just a second and read that question to your left.
21  Read that to yourself.
22         PROSPECTIVE JUROR:   Okay.
23         MR. BEACH:   Now, most jurors sitting up there
24  like you are right now, they agree with us, all the lawyers,
25  that basically that first question is asking you not only is

1  he convicted of capital murder, because you would have found
2  that at the first part of the trial. You know going into the
3  punishment phase that he is a convicted capital murderer. Now
4  we are asking you, the legislature is asking that first
5  question, is he going to be a future danger to society? Okay.
6  Was this a one-time just aberration in a life-time of peaceful
7  conduct, or you believe that it is that and the individual
8  will not be a future danger. Or is this going to be part of a
9  pattern that has been present since he was a teenager or
10  whatever. Or you just say he was doing business as usual out
11  there that day and this is not going to change and this is
12  going to be a future danger.
13         You agree that that is kind of what that question is
14  asking, ma'am?
15         PROSPECTIVE JUROR:   Yes, it is.
16         MR. BEACH:   Okay. Now, the Dallas County D.A.'s
17  office, we didn't word that question. The Texas Legislature
18  came up with that question. And they could have worded it
19  anyway that they wanted to. Again to be able to take your
20  oath in this case and follow the law in this case, you have to
21  assure us that you will go with this question the way it is
22  worded.
23         Let's kind of break down some of these key words in that
24  first question. And you start off in those first two lines,
25  what, you have to believe beyond a reasonable doubt, okay. We

22

23

1  have to -- again, we have to convince you beyond a reasonable
2  doubt to get a "yes" answer on that question, that the man is
3  going to be a future danger. We have to prove that to you.
4  You have to look to us again, not them. But you have to look
5  to us as to whether or not we have proved to you beyond a
6  reasonable doubt not only is he a convicted capital murderer,
7  he is going to be a future danger to society. So that's the
8  burden of proof in that first question. And what do we have
9  to prove to you. We have to prove to you there is a
10  probability, that first word there, the key word is
11  probability. Again the legislature could have put
12  possibility. They could have put absolutely 100 percent
13  certainty. They settled kind of in the middle there that word
14  probability.
15         We have been asking jurors what that word means to them.
16  Because again there is no legal definition to that word. It
17  is what you take it to mean. Most of them have been telling
18  us more likely than not or the greater chance.
19         How do you see that word in the context of question
20  number one, ma'am, how do you define that word probability?
21         PROSPECTIVE JUROR:   I would say what are the
22  chances of him committing the crime again.
23         MR. BEACH:   Okay. And you watch the weather at
24  night, I would imagine. If David Finfrock tells you it is
25  possible it is going to rain tomorrow, that's not much of a

1  chance, right? But if he says there is a probability it is
2  going to rain tomorrow, you would agree with me that you might
3  think about taking an umbrella, taking precaution, because
4  there is a pretty good chance it is going to rain tomorrow,
5  right?
6         PROSPECTIVE JUROR:   Yes, sir.
7         MR. BEACH:   And most folks, you know, we ask
8  folks -- if they had to put a percentage on that, you know on
9  that word probability. Again in the context of that first
10  question, again we have to prove to you beyond a reasonable
11  doubt. Most people are telling us that it has to be at least
12  over 50 percent.
13         Is that how you see that word in the context of that
14  question?
15         PROSPECTIVE JUROR:   Yes, I could say 50 percent
16  or more.
17         MR. BEACH:   Fifty percent or more. Okay.
18         And what do we have to prove is probable. We have to
19  prove that it is probable, you know, 50 percent or more chance
20  probable that he is going to commit criminal acts of violence,
21  okay. Again it doesn't say here or there that he is going to,
22  you know, vandalize a car or break a window or something like
23  that. We have to prove that it is probable he will commit
24  criminal acts of violence.
25         Would you agree with me, if I balled up my fist right now

1 and just knocked her out cold with one punch, would that be a
2 criminal act of violence to you?
3 　　　　PROSPECTIVE JUROR:  Yes.
4 　　　　MR. BEACH:  And we have to prove that it is
5 probable that he will commit criminal acts of violence that
6 will constitute a future threat or a continuing threat to
7 society.
8 　　And that last word I want to look at is that word
9 society.  When you go to work everyday, especially when you
10 were a principal at the elementary school, your society was at
11 school, teachers, janitors, maintenance, and the students
12 there at that school, teacher aides.  That would be the
13 society of that school.  Keep in mind now that once he is
14 found guilty of capital murder, he is sitting on a life
15 without parole sentence, so what is what his society is going
16 to be?
17 　　　　PROSPECTIVE JUROR:  The surroundings of inside.
18 　　　　MR. BEACH:  In prison?
19 　　　　PROSPECTIVE JUROR:  Uh-huh.
20 　　　　MR. BEACH:  And your definition of society needs
21 to be broaden to include prison society.  Because unless he
22 escapes, that's where he is going to be.  And you would agree
23 with me, prison society would include the inmates, the
24 administration, the guards, the gardener, the medical
25 personnel.  It is a society within a society, people that

1 visit the penitentiary.  And would you be able to have that
2 broad a definition of that word of society when you go to
3 answer that question?
4 　　　　PROSPECTIVE JUROR:  Yes.
5 　　　　MR. BEACH:  Okay.  And would you be able to
6 listen to evidence from experts potentially about what it is
7 like in prison and the opportunities to commit violent acts,
8 and that kind of information be something that you would want
9 to hear about?
10 　　　　PROSPECTIVE JUROR:  Yes.
11 　　　　MR. BEACH:  What other kinds of information,
12 ma'am, would you be looking for to help you determine whether
13 beyond a reasonable doubt was a probability that this
14 defendant would commit criminal acts of violence in the
15 future?  What other kinds of evidence would be helpful to you?
16 　　　　PROSPECTIVE JUROR:  It would be nice from a
17 historical view to see if he had a pass case.  And I would I
18 would need to know about that.
19 　　　　MR. BEACH:  That's the number one answer.  They
20 want to know if it is an isolated incident.  An aberration
21 again or a freak occurrence.  The bottom line is, ma'am, as
22 you go, after you hear whatever additional evidence you hear
23 at the punishment phase of the trial, as you and the other 11
24 jurors go in there, it is just like it is a big "no" spray
25 painted at the bottom of that first question, okay.  No, he is

26

1 not going to be a future danger.  Until the State brings to
2 you evidence that convinces you beyond a reasonable doubt that
3 that "no" should be erased and a "yes" should be put there.
4 Yes, he is going to be a future danger.  You have to look to
5 us to do that, to erase that "no" before you put a "yes"
6 there.
7 　　Can you do that?
8 　　　　PROSPECTIVE JUROR:  Yes, sir.
9 　　　　MR. BEACH:  If we don't, we don't prove to you
10 beyond a reasonable doubt, you answer that question "no," that
11 life sentence remains, the trial is over.  That's the end of
12 it, okay.
13 　　But let's assume again for the purpose of our discussion,
14 we prove to you and 11 others, there should be a "yes" answer
15 there.  Your oath would require you to answer that question
16 "yes", what happens then, okay?  Once that happens, where are
17 we in the trial?  You found him guilty of capital murder in
18 the first part.  And now beyond a reasonable doubt in the
19 second part, you have found that he is going to be a future
20 danger to society beyond a reasonable doubt.
21 　　Now, we are getting close to the end of the play, but we
22 are not at the end of the play yet.  Because the legislature
23 has the second special issue.  And basically we call that kind
24 of a safety net.  The safety net special issue.  And before
25 you ever get to that second one, you know he is a convicted

27

1 capital murderer, now you know beyond a reasonable doubt he is
2 a future danger.  And before -- and what happens is, now once
3 you answer that first question "yes", that life sentence has
4 been elevated up to a death sentence; you understand that?
5 　　　　PROSPECTIVE JUROR:  Uh-huh.
6 　　　　MR. BEACH:  Life sentence has gone away, now he
7 is sitting on a death sentence.  The legislature wants the
8 jury, before that death sentence is absolutely etched in
9 stone, they want the jury to go back one more time to look at
10 all the evidence.  The evidence of the crime itself, his
11 background, his character, how he has been brought up, his
12 criminal history or lack thereof.  His mental abilities.
13 Maybe drug use, alcohol use.  And what that legislature is
14 asking you to do, if you find someone -- something in any of
15 those situations that you believe lessens his moral
16 culpability or lessens his blameworthiness to the point to
17 where you think a life sentence is the appropriate punishment
18 versus a death sentence.  The legislature wants you, even
19 though you are sitting on a death sentence right now, to take
20 it back to a life sentence, because you have found something
21 in his background, in his character, whatever it is, that you
22 believe mitigates or lessens his blameworthiness.
23 　　You have an idea what that second question is asking you
24 to do, ma'am?
25 　　　　PROSPECTIVE JUROR:  Yes, I do.

28

29

1    MR. BEACH:  Okay.  And again kind of a
2    farfetched example is, you have a toddler that has severely
3    abusive parents.  And those abusive parents lock him in the
4    closet from two years old on, they don't feed him.  And they
5    basically raise a monster.  And guess what, he reaches
6    adulthood and there he is a monster.  And there is no question
7    in the jury's mind that he is always going to be a future
8    danger.  And they say you know what, the parents should be on
9    trial because of the way they abused him as a child.  Some
10   jurors tell us that might be one of those mitigating
11   circumstances, even though he is a capital murderer, I think a
12   life sentence just out of mercy, because of the way he was
13   raised, I think a life sentence would be the appropriate
14   punishment.
15       Do you understand what that second question is asking you
16   to do, ma'am?
17       PROSPECTIVE JUROR:  Yes, sir.
18       MR. BEACH:  Would you be able to if you found
19   mitigating circumstances that you believe was sufficient, and
20   that's the kind word, sufficient, in your mind that caused you
21   to believe that a life sentence was the appropriate punishment
22   versus a death sentence, could you take that life sentence
23   back to a life sentence if you felt that was the appropriate
24   thing to do on the evidence?
25       PROSPECTIVE JUROR:  Yes, sir.

1    MR. BEACH:  Some people tell us -- obviously in
2    the United States, we don't execute mentally retarded people,
3    okay.  That was a decision handed down in the early 2000 by
4    the U.S. Supreme Court prohibiting that.  There are some
5    folks, technically they may not be mentally retarded, but they
6    get right up to the line.  And I am sure you have dealt with
7    them from elementary on, kids that are like that.  Because of
8    his mental capabilities, he doesn't see things the way other
9    people do.  That could be a illegal mitigating circumstance.
10   And they want to spare the boy's life.  It can't be a whim, it
11   can't be, you know, he smiled at me during trial.  It needs to
12   be a sufficient mitigating circumstance based on one of those
13   categories up there.  You have the circumstance of the
14   offense, character, his background, something because of one
15   of those deals that has lessens his moral culpability; you
16   understand that?
17       PROSPECTIVE JUROR:  Yes, sir.
18       MR. BEACH:  All right.  I jump ahead, I am about
19   done with you.  I appreciate your patience.  And again you may
20   know this, just because you are interested in law-related
21   shows and books and all that, but you understand in Texas,
22   there are only very few categories of murder that will even
23   allow us, the State to seek the death penalty.
24       If I pulled out a gun right now, blew her brains out,
25   stood over her body and laughed about it, that would be a

30

31

1    horrific, intentional murder.  But guess what, I couldn't get
2    the death penalty for it, okay.  Because she is not one of the
3    those protected classes of individuals that the legislature
4    says you can seek the death penalty.  Very few.  One like we
5    have in this case, if you murder a police officer while in the
6    line of duty.  He is one of those protected folks.  If you
7    murder a prison guard while trying to escape from a
8    penitentiary.  That's potentially a death-penalty case, okay.
9    If you go into a 7-Eleven store to rob it, that's probably the
10   most common example you read about, convenience store, store,
11   murder, robbery, if you murder the clerk while robbing the
12   store, potentially the State would seek the death penalty.
13       Murder a child while under the age of six, legislature
14   says that child is helpless.
15       Murder for hire and serial murders, those are the only
16   types of offenses where we can seek the death penalty, okay.
17       Now, if Rachel George was governor of Texas for the day
18   and you could write the laws anyway you wanted to, would you
19   add, subtract, keep it about the same, how would you have the
20   death penalty crimes here in Texas?
21       PROSPECTIVE JUROR:  I would agree with the
22   State of Texas, my knowledge I think that's the best way to
23   look at it.
24       MR. BEACH:  Okay.  And again, if you were
25   responsible for drafting the laws here in Texas and you

1    weren't going to have any option one way or the other, would
2    you have a death penalty here in Texas?
3        PROSPECTIVE JUROR:  Yes, sir.
4        MR. BEACH:  You know a lot of folks, we ask and
5    talk to them about, now that the only other possible
6    punishment alternative is life without parole, and you know
7    that person is going to be in prison for the rest of their
8    life without the possibility of parole, once they are found
9    guilty of capital murder, why do we need a death penalty?  Do
10   you have any thoughts on that, why we need a death penalty?
11       PROSPECTIVE JUROR:  Well, I think just the
12   thought holding over your head would make you realize that you
13   have committed something drastically, but until we get a
14   ruling on that, that's the only law that we can do at this
15   point.
16       MR. BEACH:  Obviously from your questionnaire,
17   you know right now there is a natural moratorium on the death
18   penalty, until we get all this figured out.  You are way ahead
19   of the curve on what you know about this, compared to most
20   folks sitting up there.  But again, I will conclude with this,
21   if you are asked to be on this jury, before the evidence
22   begin, Judge White is going to ask you and 11 others to raise
23   your right hand and take an oath.  It is a very simple oath, a
24   very powerful oath, and that oath is to render a true verdict
25   according to two things and two things only, the law and the

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1  evidence. Not a John Grisham novel or Perry Mason. But the
2  law that he is going to give you and the evidence he is going
3  to give you from that witness stand, can you take that oath?
4       PROSPECTIVE JUROR:   Yes, sir.
5       MR. BEACH:   The last area I want to talk to you
6  very quickly, if I pull out a gun, again and go to put the gun
7  to Ms. Handley head and say, I am going to kill you, Andrea,
8  and say I don't like you and your time is up. You understand
9  that she would have the right to try and get that gun and turn
10  it around, if she believes that her life was in danger, and
11  kill me. It is called self-defense.
12      Do you believe basically with the law of self-defense?
13      PROSPECTIVE JUROR:   Yes, sir.
14      MR. BEACH:   I don't know what the situation are
15  in schools, but I think the teachers ought to have a greater
16  right to self-defense than they do. But that applies across
17  the board. If a teacher loses her mind and starts whaling on
18  somebody, they have a right to protect themself. The same
19  goes to a police officer. If you get a rogue cop out there
20  and starts intimidating people and he come at you and pulls
21  out a gun and says I am going to blow your brain out, you have
22  a right to protect yourself against that unlawful deadly
23  force.
24      You understand that?
25      PROSPECTIVE JUROR:   Yes, sir.

1       MR. BEACH:   It doesn't matter what your
2  occupation is, if you are using lawful deadly force, the law
3  says if you are under attack, you have a right to defend
4  yourself, okay, even to the point to taking someone's life.
5       You can follow that law?
6       PROSPECTIVE JUROR:   Yes, sir.
7       MR. BEACH:   Don't know if that is going to apply
8  in this case. We talked to every jurors about it to let them
9  know what the law potentially is. And most importantly, just
10  because, and I don't know if you remember this in your
11  previous jury duty, at the end of the trial the Judge would
12  submit a charge. It's a written set of instructions on a
13  piece of paper that you will take back when you deliberate.
14  It contains all the law in this case.
15      Just because something is in the Court's charge doesn't
16  mean that a jury has to go with it, okay. Let me tell you how
17  that could happen very briefly.
18      You see Bailiff Crump over there in uniform, the nice
19  shiny badge, he is a peace officer. I don't like him. I know
20  he is in the lawful discharge of his duty. I go over there
21  right now and blow his brains out. That is capital murder
22  here in Texas?
23      PROSPECTIVE JUROR:   Yes, sir.
24      MR. BEACH:   Everybody saw me commit the capital
25  murder of Bailiff Crump. I got my girlfriend in the back of

1  the courtroom. She is here when that happens. And she comes
2  into trial and says that's not the way it happened at all. I
3  don't care what the other ten people say. What happened was,
4  old Beach was minding his business and Crump came up to him,
5  pulled out his gun, put it to Beach's head, and said I am
6  going it kill you, Beach. And Beach turned it around and got
7  the gun away and killed him. That would be incredible. And
8  unworthy of belief. But if that happened, guess what, Judge
9  White would have to submit the law of self-defense, because
10  one person said Beach was acting in self-defense. That's why
11  we cover that. Again, just because it is in the charge,
12  doesn't mean you have to buy it.
13      You understand?
14      PROSPECTIVE JUROR:   Yes, sir.
15      MR. BEACH:   You just have to assess it along
16  with all the other evidence. And what it all comes back to,
17  have we proven our case beyond a reasonable doubt, all right?
18      PROSPECTIVE JUROR:   Yes, sir.
19      MR. BEACH:   I have been doing a lot of talking.
20  Is there anyway that I have confused you or anything that I
21  should have been asking you that I haven't asked you?
22      PROSPECTIVE JUROR:   I can't think of anything at
23  this time.
24      MR. BEACH:   And again, we have got six jurors at
25  this point in time, none of them are real happy about being on

1  this jury, none of them are really looking forward to it.
2  None of them are relishing the idea to participating in a
3  process that could result some time in the future you turning
4  on your TV at six o'clock at night and there it is on the
5  news, Wesley Ruiz is being taken to the death chamber.
6  Something you will never forget and something that you are
7  going to have to live with. But if you are convinced beyond a
8  reasonable doubt that that's the appropriate punishment in
9  this case, you could do that; is that correct?
10      PROSPECTIVE JUROR:   Yes, sir.
11      MR. BEACH:   I believe you. And I appreciate
12  your patience with me.
13      And Judge I am going to pass this witness?
14      PROSPECTIVE JUROR:   Thank you.
15      THE COURT:   Thank you.
16      MR. BRAUCHLE:   Judge, can we take a break, Your
17  Honor?
18      THE COURT:   Yes. We will take a ten-minute
19  break.
20      (Prospective juror retired from the courtroom.)
21      (Recess taken.)
22      l/@R>;
23      THE COURT:   You may be seated.
24      Ms. George, I believe Mr. Beach has a few more questions
25  of you prior to the Defense questions.

1      MR. BEACH:  I forgot to cover one area that we
2   need to talk about very briefly, Ms. George.  We talked about
3   if I pulled out a gun and shot her and killed her, I would not
4   be subject to the death penalty here in Texas.  That would
5   just be a murder, what is called regular murder versus capital
6   murder.
7        And in a regular murder case, a first-degree murder case,
8   there is a range of punishment.  It goes anywhere all the way
9   down, five years in the penitentiary up to 99 years or life
10   and a $10,000 fine.  And the legislature, they have a very
11   wide range of punishment because they recognize there is all
12   different kinds of murder cases, all the way from coldblooded,
13   intentional killing to mercy killing, where an 85-year-old man
14   has been married to the same lady for 65 years and she is on
15   life support in the hospital in horrible pain and he pulls the
16   plug on the life support.  That's intentional murder.  You
17   would treat that guy differently than one who blew someone's
18   brains out and laughed about it.  That's why they have that
19   range, five years all the way to 99 years or life.  We can't
20   commit you.
21        How that can happen in a capital murder case, let's use
22   that convenience store example, okay.  Let's say someone went
23   into a convenience store and killed the clerk.  Okay.  But
24   they didn't go in there to rob the store.  He just went in
25   there to kill the clerk.  That wouldn't be a capital murder

1   because there is no robbery plus the murder.  That would be a
2   regular murder case.  Okay.  In a case like this, a police
3   officer killing, we could prove that the police officer was
4   knowingly, intentionally killed, but he was in plain clothes
5   and the defendant didn't know he was a police officer.  We
6   have to prove that at the time of the killing, the defendant
7   knew that the man was a police officer, acting in the line of
8   duty.  That would reduce it from a capital murder down to a
9   murder, okay.  We are still talking about, obviously a
10   knowing, intentional murder, not an accident, not
11   self-defense, but you know, I wanted the person dead, whether
12   the guy pulled the plug on his wife in the hospital or me
13   shooting her in the head.  The legislature has that wide range
14   of punishment, all the way from five up to 99 years or life.
15   To cover those different fact situations, who the victim is,
16   who the defendant is, the motives, just everything that might
17   come into play in a murder case.
18        And to be a qualified juror in a murder case, not a
19   capital murder case, let's assume that a defendant has been
20   found guilty of murder, you simply have to be able to assure
21   us that your mind right now before you hear anything is open
22   to that full range of punishment.  Okay.  If after you heard
23   all the evidence in the case, and found the defendant guilty
24   of murder and not capital murder, and you thought a five --
25   something as low as five years was the right thing to do, you

1   could do it.  If you thought 99 years or life was right thing
2   to do, you could give it.
3        As you sit here right now not knowing anything about the
4   facts of the case, if you were confronted to fining the
5   defendant guilty, would your mind be open to the full range of
6   punishment, from five years all the way up to 99 years or
7   life?
8        PROSPECTIVE JUROR:  Yes, sir.
9        MR. BEACH:  You would do whatever based on the
10   evidence, if you thought 30 years, you would give 30 year, or
11   60 years, whatever the evidence convinced you individually,
12   you would do that?
13        PROSPECTIVE JUROR:  Yes, sir.
14        MR. BEACH:  Thank you, Judge, for letting me do
15   that.
16        I appreciate you letting me cover that with you.
17        THE COURT:  The Defense.
18        MR. BRAUCHLE:  Thank you, Your Honor.
19        **VOIR DIRE EXAMINATION**
20   BY MR. BRAUCHLE:
21        Ms. George, my name is Paul Brauchle.  And you don't have
22   to write that down.  And I have got some questions for you,
23   and some things to talk to you about.  I don't think you have
24   to watch TV or have been down here for jury duty a bunch of
25   times to understand that our viewpoint at this table is

1   obviously going to be different than the viewpoint over there.
2   If it weren't, we could just have one person come in and do
3   the whole show, that would be all we needed.  Would save a lot
4   of time and manpower, everything else.  But obviously we don't
5   see things the way they do.  And we think they are a lot more
6   important than they represent them to jurors such as
7   yourself -- or potential jurors such as yourself.
8        Before we get started, though, I had some questions about
9   your questionnaire, and you got that in front of you, right?
10        PROSPECTIVE JUROR:  Yes, sir.
11        MR. BRAUCHLE:  There is a question on page 18,
12   the very last page, and I don't know if you thought that was a
13   statement or whatever, but could you read that over and answer
14   that for us and tell us what your answer is.
15        PROSPECTIVE JUROR:  I have never been
16   convicted --
17        MR. BRAUCHLE:  No, you don't have to read it out
18   loud.  It is not a reading test.
19        PROSPECTIVE JUROR:  (Juror complies.)
20        MR. BRAUCHLE:  Okay, what is your answer to
21   that.
22        PROSPECTIVE JUROR:  My answer is the same as my
23   signature as I can recall, it is correct as I have indicated.
24        MR. BRAUCHLE:  So your answer would be "yes"?
25        PROSPECTIVE JUROR:  Yes.

1    MR. BRAUCHLE:   Thank you, ma'am.

2    Also you stated in your questionnaire that a few years

3    ago, your brother-in-law had a major case; is that correct?

4    PROSPECTIVE JUROR:   Had a major case, my

5    brother-in-law, had a case or a drug problem.  And would you

6    please refer to the page number.

7    MR. BRAUCHLE:   Page nine said my brother-in-law

8    had a serious case many years ago?

9    PROSPECTIVE JUROR:   I was referring to the

10   question, have you or family member or close friend had any

11   involvement with drug usage.  And I said my brother-in-law had

12   a problem with it several years ago.

13   MR. BRAUCHLE:   Was that in Dallas County?

14   PROSPECTIVE JUROR:   No, sir.  He was in Chicago.

15   MR. BRAUCHLE:   What became of the case or what

16   was?

17   PROSPECTIVE JUROR:   He was -- I want to say a

18   cocaine habit.  And he went into rehab.  And when my sister

19   got breast cancer, I think he realized and he was able to

20   break the habit.

21   MR. BRAUCHLE:   Did he ever spend anytime

22   incarcerated?

23   PROSPECTIVE JUROR:   No, sir.

24   MR. BRAUCHLE:   Also right below, look where your

25   nephew was killed in Mississippi.

---

1    PROSPECTIVE JUROR:   Yes, sir.

2    MR. BRAUCHLE:   Was anybody ever apprehended in

3    regard to that?

4    PROSPECTIVE JUROR:   Not that I know.  I just

5    know that the guy that was with my nephew told my brother that

6    two guys had come in and there was an altercation over a drug

7    deal.  And my nephew was killed in that drug deal gone bad.

8    MR. BRAUCHLE:   Do you know -- well, what city

9    did that happen in?

10   PROSPECTIVE JUROR:   Jackson, Mississippi.

11   MR. BRAUCHLE:   And would that be the son of your

12   brother who used to be a police officer?

13   PROSPECTIVE JUROR:   No, sir.  That's the son of

14   my dead brother in Jackson, Mississippi, really his stepson;

15   but he has been with them ever since he was born.

16   MR. BRAUCHLE:   So there wasn't a trial or

17   anything in regard to that?

18   PROSPECTIVE JUROR:   I don't know, sir.  We just

19   never did hear anything else about it.

20   MR. BRAUCHLE:   How long ago was that?

21   PROSPECTIVE JUROR:   I want to say within the

22   last ten years or so.

23   MR. BRAUCHLE:   You ever testify in a criminal

24   case?

25   PROSPECTIVE JUROR:   I'm trying to remember the

---

42

1    cases that I have appeared.  I know there was one, if I can

2    recall, the domestic violence.  There may have been a criminal

3    assault case.

4    MR. BRAUCHLE:   No, have you ever been a witness

5    and testified in a criminal case?

6    PROSPECTIVE JUROR:   No, not the -- a witness,

7    no, sir.

8    MR. BRAUCHLE:   Have you ever witnessed any

9    crimes other than the purse snatching that you talked about?

10   PROSPECTIVE JUROR:   No, sir.

11   MR. BRAUCHLE:   Let me go back and talk to you

12   about what we are doing here today.  You have read the

13   indictment, which is there in front of you.  You understand

14   that the State has to prove each and every element of that

15   indictment beyond a reasonable doubt?

16   PROSPECTIVE JUROR:   Yes.

17   MR. BRAUCHLE:   There is no more of it more

18   important or less important than other portions of it.  And we

19   like to say that there is elements to the indictment.  That's

20   legal mumble jumbo meaning that there are parts to it.  One of

21   the first parts that will jump out at you is -- is the date.

22   The next part may or may not be somebody's name, somebody's --

23   there are a couple of names in there, there is manner and

24   means of death, there are a couple of things; but they have to

25   prove each and every one of those.  It is kind of like in

---

43

1    school like you diagram sentences, you break it down into

2    individual parts, but they are all the same -- or of equal

3    weight.

4    Now, some of them, like Mr. Beach told you the deal about

5    whether it happened in Dallas County or not, a lot of people

6    when they get to the end of the deliberations and they say,

7    well, they got everything right, but we don't know where it

8    happened.  We think it happened in Dallas County.  But there

9    was never anybody that came in and sat right up there where

10   you are and said, yeah, this is where it happened.  And you

11   know, they might have even referred to some intersections that

12   you might know where they are, say Coit and Spring Valley, you

13   know where that is from where you live.  You probably know

14   that is in Dallas County.  But if nobody told you that, if

15   there wasn't any testimony to that one fact, you can't help

16   them out.  You can't say, well, that's ridiculous, I know

17   where that happened.  And I don't care if they didn't say

18   anything about it, they proved that to me.

19   You understand what I am talking about in that regard

20   that you can't give them a leg up, they have to prove

21   everything or not prove everything?

22   PROSPECTIVE JUROR:   Because of a technicality,

23   yes, sir.

24   MR. BRAUCHLE:   Well --

25   PROSPECTIVE JUROR:   Or --

44

1    MR. BRAUCHLE:   We don't call them technicalities

2 down here, because there are thing that one side or the other

3 have to prove.  Actually this side doesn't ever have to prove

4 anything.  But a lot of people -- let's go back to what you

5 said.

6    Let's say that you got down to the end of the trial and

7 they hadn't proven everything they needed to beyond a

8 reasonable doubt.  The Judge's instructions to you, and you

9 have seen this before since you have been a juror, but the

10 Judge's instructions to you would tell you that if they

11 haven't proven each and every element beyond a reasonable

12 doubt, it is your job to acquit the defendant.

13    Some people say, well, if I thought that they had the

14 right person that committed the crime, and he did it the way

15 they say he did, and I was convinced beyond a reasonable doubt

16 of everything except this little inconsequential thing of what

17 county it may or may not have occurred in, I couldn't live

18 with myself if I let a murderer someone I am convinced beyond

19 a reasonable doubt was a murderer, or a capital murderer go.

20    And the effect of that would be if you found the person

21 not guilty, would be that he would theoretically be able to

22 get on the elevator and leave the building with you-all.

23 Because he couldn't be tried again.  And the State only get

24 one shot at people in court.

25    What do you think about that?

45

1    PROSPECTIVE JUROR:   I know those things do

2 happen.  And when the time comes and if that does happen, then

3 I will just have to make the decision that would be

4 accordingly.

5    MR. BRAUCHLE:   What decision would that be?

6    PROSPECTIVE JUROR:   Whether I decide to base my

7 decision on a small technicality or I decide that the Defense

8 has put on enough evidence overwhelmingly to say that the

9 person has committed the crime or is that little small thing

10 going to be so much against the law that it would hindered

11 that person's right, then I would have to decide whether the

12 person is guilty or not guilty.

13    MR. BRAUCHLE:   Well, you understand that if the

14 State doesn't prove each and every element, your oath would

15 advise you and the Judge's instructions would advise you that

16 you will have to find the defendant not guilty; you understand

17 that?

18    PROSPECTIVE JUROR:   Yes, sir.

19    MR. BRAUCHLE:   Could you do that?

20    PROSPECTIVE JUROR:   Yes, sir.

21    MR. BRAUCHLE:   How would you feel about it?

22    PROSPECTIVE JUROR:   My feelings wouldn't matter.

23 I would have to make sure that I am going with the state of

24 the law, what the law states.  What's the intent of the case

25 and whether the case proved itself regardless of how I may

46

1 have felt.

2    MR. BRAUCHLE:   Okay.  You mentioned that the

3 Defense would have to bring certain evidence to you in regard

4 to the case?

5    PROSPECTIVE JUROR:   Well, I think that's the

6 whole point is that they would have to make sure that all

7 jurors hear everything that their case has to present to show

8 that the person is guilty of the event that they are charging

9 that person, it has to be so sound and reasonable to us that

10 we would render a verdict -- guilty verdict, or a nonverdict

11 that is a nonguilty.

12    MR. BRAUCHLE:   And I'm sorry which side would

13 have to do that to you?

14    PROSPECTIVE JUROR:   Well, it is up to the

15 Defense prove to us that the person has committed the crime

16 with all the evidence that they have.  So it is up to us to

17 listen to it and make sure that we listen for the information

18 to show that they have everything they needed to show that the

19 evidence and that the person has committed the crime without

20 any -- without anybody feeling that there might have been

21 something left out.

22    MR. BEACH:   Judge, she is saying the Defense,

23 you are talking about us?

24    PROSPECTIVE JUROR:   Yes.  The State has to

25 prove, whomever has to prove beyond a reasonable doubt that

47

1 their case is so sound that we would believe everything that

2 was done based upon facts before we render a verdict of guilty

3 or not guilty.

4    MR. BRAUCHLE:   Okay.  You understand if they

5 didn't prove each and everything --

6    PROSPECTIVE JUROR:   If they did not.

7    MR. BRAUCHLE:   -- you would have to find the

8 person?

9    PROSPECTIVE JUROR:   Not guilty, yes, sir.

10    MR. BRAUCHLE:   If we go back to the trial

11 setting, and let's say the State is able to prove each and

12 everything on the indictment beyond a reasonable doubt, at

13 that point in time when they come back into the courtroom and

14 the Judge ask if they have rendered a verdict and they say we

15 find the defendant guilty, nothing else happens at that point

16 in time.  The Judge doesn't sentence anybody to anything.  But

17 the finding of guilt in regard to a capital case means that

18 the defendant will never get less of a sentence than life

19 imprison without parole.

20    So the death penalty law is set up that if the State

21 doesn't prove any of these special issues or there is not

22 enough for the jury to go further in regard to special issue

23 number one or two, the defendant always ends up with a life

24 sentence without parole.  In other words, he will die in the

25 penitentiary of old age.  He won't be executed, but he will

1  never get out.

2  Now, then, knowing that somebody that you found guilty of

3  capital murder will never get a sentence less than life

4  without parole, why do you think we need the death penalty?

5  PROSPECTIVE JUROR:  I think sometime we use

6  extreme measures to probably deter other people from doing

7  things.  As I have stated before, it doesn't always work.  But

8  we were using it before it was stopped at a while.  So I would

9  think that the people, the powers-that-be that made that

10  decision to use death penalty thought that that would be

11  something the most extreme case to use.  So you are asking,

12  like a philosophical question about whether I think we should

13  use the death penalty when we already imposing person with

14  life imprisonment.  It is just an extreme measure.  And I

15  think that's what they wanted to do.

16  MR. BRAUCHLE:  What do you want to do?

17  PROSPECTIVE JUROR:  What do I want to do, in

18  which capacity am I serving in, as a witness or an attorney or

19  a judge, or just as --

20  MR. BRAUCHLE:  You say you think we need

21  extreme measures.  Just tell us why you think we need them.

22  PROSPECTIVE JUROR:  Well, there are a lot of

23  crimes that are committed out there.  And sometimes we try to

24  come up with setting examples for what would happen to you if

25  you were to do something that hideous, and if you were to do

1  something like that, this is what you have that would be the

2  result of that.  So you try to use those measurements against

3  those people.  And it just depends on the type of crime, what

4  you would use.  And that's why you have a long range of

5  punishment that you give people based upon the crimes they

6  commit.  So it just depends.

7  MR. BRAUCHLE:  Well, actually we don't have a

8  long range of punishment when we are talking about the death

9  penalty, it is either life or death?

10  PROSPECTIVE JUROR:  Well, the other in terms of

11  other criminal acts.  But in death penalty, I guess when you

12  look at it, you only have what you just stated, life

13  imprisonment or capital punishment; but since that is on hold,

14  I guess really it is just life imprisonment.

15  MR. BRAUCHLE:  You think that we are less safe

16  now that the death penalty is on hold?

17  PROSPECTIVE JUROR:  Are you less what?

18  MR. BRAUCHLE:  Safe.

19  PROSPECTIVE JUROR:  Safe.  It's hard to say with

20  the way the mind acts these days, what makes a person do the

21  things that they do.  So I don't know.  I can't tell you

22  whether we are safe or not.  Whether it being imposed or not.

23  Because criminal acts are still being committed daily.  So I

24  can't tell you that.

25  MR. BRAUCHLE:  Well, would that mean that the

1  death penalty is not frightening anybody?

2  PROSPECTIVE JUROR:  Well, you have some

3  people who are afraid, who are not afraid of anything.  So

4  when you are asking me do I -- it would frighten me.  And I

5  can answer for what it does for me.  For other people, based

6  upon the statistics, apparently it may not, I don't know.  For

7  me, and I can only speak for me, and it would frighten me.

8  MR. BRAUCHLE:  Let me ask you, do you think

9  people that live in states that don't have the death penalty

10  are less safe than people here in Texas?

11  PROSPECTIVE JUROR:  Again, you are asking me

12  a question about whether -- that's just like saying where is a

13  safe neighborhood or a safe place to be.  I can't really tell

14  you whether you are in a different state that does not have

15  the death penalty or capital punishment or anything, whether

16  those people are free -- living in those particular states, I

17  can just say that you would assume and you would have to do

18  research to look at all the 50 states, which states have

19  capital punishment and which do not and whether that crime

20  rate is higher than those other states.  And since I have not

21  been -- I have not done that, I can't tell you that.

22  MR. BRAUCHLE:  Well, I wasn't asking you

23  specifics, but you mentioned that you thought that the death

24  penalty acted as a deterrent to keep people from committing

25  violent crimes?

1  PROSPECTIVE JUROR:  Yes, that is my opinion.

2  MR. BRAUCHLE:  Okay.  And so I asked you if --

3  and you realize that there are a lot of states that don't have

4  the death penalty?

5  PROSPECTIVE JUROR:  Yes, sir.

6  MR. BRAUCHLE:  And to your way of thinking,

7  then, would people that live in states that don't have the

8  death penalty, would they be safer than the people in Texas

9  where we have the death penalty?

10  PROSPECTIVE JUROR:  Again, I am going to have to

11  say based on my opinion -- I am thinking it is used as a

12  deterrent against people committing those types of crimes.

13  Whether it works or not, I can't say.  So whether people

14  living in states without that type, I would like to think that

15  it would be a factor; but I can't tell you whether it is or

16  not.  Cause some people are going to do what they want to do;

17  and based upon so many circumstances, we don't know what cause

18  people to do the things that they do.  And so I can't really

19  say.  But for me, it would be still a deterrent.

20  MR. BRAUCHLE:  Okay.  Now, then, you understand

21  that if the jury comes back with a guilty verdict finding that

22  everything in the indictment has been proven beyond a

23  reasonable doubt, you then have to answer these two special

24  issues over here, and you have read those?

25  PROSPECTIVE JUROR:  Yes, sir.

52

1    MR. BRAUCHLE:   And I believe in talking with
2  Mr. Beach, when he asked you about the first part of special
3  issue number one, said if you find from the evidence beyond a
4  reasonable doubt that there is a probability that the
5  defendant would commit criminal acts of violence.  And I
6  believe -- and I am not trying to put words in your mouth, but
7  my recollection of when you talked to Mr. Beach, you stated
8  that to your way of thinking, the word probability meant
9  chance; is that correct?
10    PROSPECTIVE JUROR:   Yes, sir.
11    MR. BRAUCHLE:   So I guess it would be the same
12  to you if it read, you find from the evidence beyond a
13  reasonable doubt that there is a chance that the defendant
14  would commit criminal acts of violence; would that be a
15  correct way that you would think about it?
16    PROSPECTIVE JUROR:   Yes, sir.
17    MR. BRAUCHLE:   Okay.  Would you admit that there
18  is a chance that almost anybody could commit a criminal act of
19  violence?
20    PROSPECTIVE JUROR:   Yes, sir.
21    MR. BRAUCHLE:   Then what do we need question
22  one for?
23    PROSPECTIVE JUROR:   Well, I would assume in
24  this case you are looking at the defendant and trying to see
25  or prove to us that the defendant has a -- I guess the

53

1  tenacity to perhaps to commit that -- a crime again based upon
2  the deed that was done before.  Because there would be no need
3  to ask do you think he would do it again if something hasn't
4  been done before.  So you can ask innocent people do you think
5  he would do something, chances of committing a crime.  But I
6  think you are looking at someone that perhaps has already done
7  something and you are asking them, you think they would do
8  something else like that again.  Now that's my interpretation.
9    MR. BRAUCHLE:   Okay.  You understand that when
10  you are answering that question, the person you are answering
11  that about, you convicted of capital murder.  He has committed
12  a murder during the course of a robbery, rape, kidnapping,
13  arson, burglary, one of those crimes.  Or has committed the
14  murder of a police officer while the police officer is in the
15  line of duty, killed a fireman while in the line of duty.
16  Killed a child younger than six.  I could go on.  You
17  understand that when you are answering question number one,
18  the person you are dealing with is somebody that you and the
19  other 11 jurors have all been convinced is guilty of capital
20  murder.  And a lot of people tell us, hey, if I thought that
21  this person was guilty of capital murder beyond a reasonable
22  doubt, I would always answer special issue number one "yes",
23  what do you think about that?
24    PROSPECTIVE JUROR:   In my opinion, I would say
25  that if a person has committed the crime as you said, the

54

1  possibility or the chance of doing it again, would probably be
2  a lot greater because you have already done it once.
3    MR. BRAUCHLE:   Okay.  So to you, the answer to
4  special issue number one would always be "yes"?
5    PROSPECTIVE JUROR:   Relating to whatever
6  particular person you are talking about or a particular crime.
7    MR. BRAUCHLE:   Well, the person you are talking
8  about would be the person that was on trial?
9    PROSPECTIVE JUROR:   Yes.
10    MR. BRAUCHLE:   And you don't answer that
11  question until you and the other 11 jurors have gone over all
12  of the evidence in the first part of the case and have decided
13  collectively, each and every one of you are in unanimous
14  agreement that that person is guilty of capital murder.  In
15  other words, he has killed somebody in such a way that he is
16  guilty of capital murder.  And then you go to the second stage
17  of the trial and you may find out more about that person or
18  you may not.  You may just go on the facts of the case.  But
19  some people say, Look, I will be honest with you, the answer
20  to special issue number one is always going to be "yes" if I
21  think that this person is the type of person who would commit
22  capital murder.  Once I am convinced that this person
23  committed capital murder, special issue number one would be
24  "yes", because there would be a probability in my mind that
25  that person would commit criminal acts of violence and would

55

1  be a continuing threat to society.
2    And that's what that question is asking us, isn't it?
3    PROSPECTIVE JUROR:   Yes, sir.
4    MR. BRAUCHLE:   Well, would you agree with me
5  that the answer for Rachel George would always be "yes" if you
6  found someone guilty of capital murder?
7    PROSPECTIVE JUROR:   Again, looking just based
8  upon realizing that the person has already committed the crime
9  once and the chance of whether that person does it again or
10  not, I would say, yes.
11    MR. BRAUCHLE:   Okay, now, then let's go to
12  special issue, the next special issue.  They used to be
13  numbered one and two.  But those aren't.  So in regard to
14  special issue number two, that's asking you a question that
15  asks you if you would change your answer in special issue
16  number one to where the person wouldn't receive the death
17  penalty.  A lot of people when they read that, for one thing
18  it is hard to understand, but then when you explain it what
19  the purpose of special issue number one is, they say, well,
20  look I have to be honest with you, I don't think I could do
21  that in my mind, it may work for some people.  But it wouldn't
22  work for me.  Let's go over how that occurs.
23    First step, you and the other 11 jurors find a person
24  guilty of capital murder.
25    Second step, you stated that when you got to that stage,

56

57

1  your answer to special issue would be "yes". And you
2  understand that that takes the person from life without parole
3  to being executed; you understand that?
4          PROSPECTIVE JUROR:  Yes, sir.
5          MR. BRAUCHLE:  Okay. Now, special issue
6  number -- well the next special issue, says that they are down
7  toward the end of it that there is a sufficient mitigating
8  circumstance or circumstances to warrant the life imprisonment
9  without parole rather than a death sentence being imposed.
10  Now then, so what that is asking you is, if there is -- if you
11  found the person guilty of capital murder, and you found that
12  he is going to be a continuing threat to society. You want to
13  set all of that aside and give him a life sentence instead
14  rather than killing him.
15      Most people say I think that is a pretty stupid
16  situation. I don't care how poorly he was brought up or what
17  was in his past. Once I have decided in my mind that the
18  person is going to be a continuing threat to society, and I
19  have decided that because he is a capital murderer, why would
20  I want to give him a break and put him back in prison for
21  life, when I have already decided that he is going to be a
22  continuing threat in prison.
23      What do you think about that?
24          PROSPECTIVE JUROR:  In looking at special issue
25  number two, I will assume that even though that person is a

1  threat to society, if you have him in isolation unit, then he
2  would be a society of one and he wouldn't bother anybody, if
3  you decide to rule in favor of special issue number two. So
4  that would be something that would be discussed among the
5  jurors.
6          MR. BRAUCHLE:  Well, as to where the person
7  would be in a prison unit, the only thing that we can say with
8  any certainty is that if he gets special issue -- or the first
9  special issue answered "yes", and then the next special issue
10  "no", we know he will be on death row. We know that otherwise
11  he would be doing a life sentence without parole. And whether
12  that would be a sufficient mitigating circumstance or
13  circumstances to warrant a life sentence rather than death
14  sentence, I guess that would be up to you. But see you would
15  also have that same option in answering special issue number
16  one. And you are saying that that would be already answered
17  by you by the facts of the case; is that correct?
18          PROSPECTIVE JUROR:  You are asking me if I am
19  saying for special issue two if we rule in favor of
20  circumstances beyond his control that perhaps made him commit
21  the crime that he did, would he be better off serving a life
22  imprisonment without parole rather than in special issue one
23  where the people would be a continuing threat to society if
24  put in isolation, I am not sure what you are asking me at this
25  point.

58

59

1          MR. BRAUCHLE:  Well, the only way that we know
2  he would be in isolation, we believe is if he is on death row.
3          PROSPECTIVE JUROR:  Okay.
4          MR. BRAUCHLE:  Let me back up. There may be
5  some confusion in that regard. You stated if there were
6  special circumstances or whatever in regard to the way the
7  person committed the crime that might make you want to put him
8  in isolation and not have him receive the death penalty.
9  People think, well, maybe he might have been retarded, or he
10  might have been insane, or he might have been acting in
11  self-defense, or it might have been an accident.
12          MR. BEACH:  Can we approach, Judge.
13          THE COURT:  You may.
14          (The following proceedings were held at the
15          Bench.)
16          MR. BEACH:  I think it is time to end the
17  torture. I don't think she is going to make it, I don't think
18  she has a real understanding of the process. I hate to go
19  this long with her to give up. I don't think she is going to
20  make it. I don't want her to feel bad about it. We
21  appreciate you coming down and whatever you want to say. She
22  is just not going to make it.
23          (End of Bench proceedings.)
24          THE COURT:  Ms. George, thank you for coming
25  down, but you are excused.

1          PROSPECTIVE JUROR:  Thank you.
2          (Prospective juror retired from the courtroom.)
3          (Recess taken.)
4          (Prospective juror entered the courtroom.)
5          THE COURT:  You may be seated.
6  Ms. Grimmett, how are you doing today?
7          PROSPECTIVE JUROR:  I'm okay.
8          THE COURT:  The attorneys from both sides have
9  some questions to ask you.
10      What says the State?
11          MS. HANDLEY:  Thank you, Your Honor.
12      May it please the Court?
13              JACQUELINE GRIMMETT
14  was called as a prospective juror, after having been
15  previously sworn by the Court, testified under oath as
16  follows:
17              VOIR DIRE EXAMINATION
18  BY MS. HANDLEY:
19      Is it Ms. Grimmett? Am I saying that okay?
20          PROSPECTIVE JUROR:  Yes.
21          MS. HANDLEY:  My name is Andrea Handley. And
22  this is Marshall McCallum. And this is Andy Beach. We are
23  all Assistant District Attorneys in this particular office.
24  And we are representing the State of Texas in this case, and
25  it is our duty to select the jury in this particular case.

60

61

1    To my left here is Karo Johnson and Paul Brauchle.  They
2    are attorneys here in town, and they are representing the
3    defendant in this case, Mr. Wesley Ruiz; and he is here at the
4    end of counsel table.
5        Do you know any of us?
6        PROSPECTIVE JUROR:   No.
7        MS. HANDLEY:   You indicated on your
8    questionnaire that you haven't heard anything about the case?
9        PROSPECTIVE JUROR:   No.
10        MS. HANDLEY:   Some jurors said after they came
11    down here in December, went home and looked it up on the
12    internet or goggled information.
13        You didn't do anything like that, did you?
14        PROSPECTIVE JUROR:   Uh-huh.
15        MS. HANDLEY:   Ms. Grimmett, what we are doing
16    here, we are talking to people individually, determining
17    whether or not they are qualified jurors for this particular
18    case.  And as you know by now, I think you have got a pretty
19    good idea what we are talking about is a death-penalty case?
20        PROSPECTIVE JUROR:   Uh-huh.
21        MS. HANDLEY:   We have gone through these
22    questionnaires that everybody has filled out and decided to
23    bring some people down and talk to them one-on-one.
24        Did you have a chance to look at your questionnaire back
25    there and read it again?

1        PROSPECTIVE JUROR:   I did.
2        MS. HANDLEY:   If you were asked to fill it out
3    again today, is there anything that you would change, would
4    you add anything to it?
5        PROSPECTIVE JUROR:   Maybe something to the
6    personal questions and stuff that I forgot, I tried to --
7        MS. HANDLEY:   Personal information about people
8    you know?
9        PROSPECTIVE JUROR:   Yes personal information
10    about people I know.
11        MS. HANDLEY:   Nothing with respect to your
12    opinion on the death penalty or anything like that.  Prior to
13    coming out in December and filling out this questionnaire, had
14    you given the death penalty a lot of thought before that?
15        PROSPECTIVE JUROR:   I mean, occasionally, like
16    throughout years if I like watched TV and things like that.
17    It wasn't like I sat there and I wonder about the death
18    penalty.
19        MS. HANDLEY:   Did you do any studying in school
20    or anything like that?
21        PROSPECTIVE JUROR:   I am a college student, so I
22    took like active classes and psychology classes, things like
23    that, so we would talk about it in class.  But it was never
24    nothing I would go home and --
25        MS. HANDLEY:   Sure.  And not a lot of people do.

62

63

1    And I am sure when you came down in December, you thought what
2    in the world is this.  We have enough information to put you
3    on E-Harmony, to get you a boyfriend.
4        What we want to talk to you a little bit more about, the
5    death penalty and the possibility you have of actually being
6    on this case.  I think you can appreciate that it is one thing
7    to talk about it academically.  You know to have coffee and
8    talk about it, and sit there and something comes on the TV and
9    you hear somebody got the death penalty and you go, yeah, I
10    agree with that.  It is one thing to talk about it
11    academically.  And I think you can appreciate it is an
12    entirely different thing to actually be a part of it and be
13    one of the people who is basically part of the execution of
14    the individual.
15        It is kind of like -- you ever see those people who wash
16    windows on the tall buildings?
17        PROSPECTIVE JUROR:   Yeah.
18        MS. HANDLEY:   If you ask me my thoughts about
19    that, theoretically or academically how do you feel about
20    cleaning windows on the 80th floor on the building, I would
21    say I am a hundred percent for it and somebody ought to do it.
22    Now, if you put the squeegee in my hand and tell me to go up
23    80 floors, I probably fold like a house of cards.  I agree it
24    should be done.  I don't know if I could be doing it myself.
25    If you made me do it, I would go through the motion and try to

1    be brave.  But the fact of the matter is, I probably wouldn't
2    have my full efforts and dedication into the job.  I would be
3    worried about other things.  Sometimes death penalty cases are
4    something like that.  So I want to talk to you a little bit --
5    a little bit more about that.
6        You said you are a student, you currently attend --
7        PROSPECTIVE JUROR:   Not currently, no.
8        MS. HANDLEY:   Right now you are working a
9    nine-to-five job?
10        PROSPECTIVE JUROR:   Yeah.
11        MS. HANDLEY:   We are looking at going to trial
12    in this case probably the second week of April.  We anticipate
13    that it can take anywhere from one to almost maybe two weeks
14    to actually put on the evidence in the case.  There is a
15    possibility that once you begin your deliberations on the
16    case, you might actually be sequestered.
17        Have you ever heard of that?
18        PROSPECTIVE JUROR:   No.
19        MS. HANDLEY:   It is a situation that once you
20    start your deliberations, once you go back to start the issues
21    in the case, sometimes you can be, instead of going home at
22    night, you can be taken to a hotel room with the rest of the
23    jurors in the case.  And you are kept there overnight.  You
24    are not to have contact with any of the outside world, your
25    family, anything like that.  It is for the purpose of making

1  sure there is no outside influences on your deliberations.  So
2  I can't tell you that that would definitely happen, but it
3  might happen.  You might be sequestered for a couple of nights
4  there.
5      Do you anticipate that would cause any kind of problems
6  for you?
7          PROSPECTIVE JUROR:  No.
8          MS. HANDLEY:  Okay.  Then, let's talk then a
9  little bit more specifically about the death penalty and your
10 questions here or your answers to the questionnaire.  And I am
11 probably going to do a lot of lecturing, okay.
12     I will tell you that, you know, what we believe is the
13 stakes should happen in the case, our opinion on the case and
14 their opinion on the case and what should happen are probably
15 entirely different.  Okay.  What really is important right
16 now, Ms. Grimmett, is what you think.  I am going to do a lot
17 of the lecturing and I am going to ask you some questions to,
18 because I really need to know how you feel about these things
19 and if you understand the law and if you can follow the law.
20 If there is something you have a question to, please ask me.
21 Okay.  If you are sitting there going, why doesn't she ask me
22 such-and-such, I think it is important that she know this, by
23 all means tell me.  I think you can appreciate the gravity of
24 what is going on here.  All right.
25     You had put in your questionnaire, Ms. Grimmett, that "I

1  believe the death penalty is appropriate in some cases, not
2  all."  And that's something you still agree with that, you
3  wouldn't change that?
4          PROSPECTIVE JUROR:  No.
5          MS. HANDLEY:  And in fact on page three there,
6  when we asked you for what crimes do you think the death
7  penalty should be availability.  You had children killed by
8  adults, multiple lives taken by one person, officers of the
9  law whose life are taken defending the law.  And I will tell
10 you that you are pretty much on base with pretty much how the
11 death penalty works.  Not all murders, not all people
12 convicted of murders are subject to or eligible for the death
13 penalty.  There is only a select few cases where a person can
14 actually receive the death penalty as punishment for the
15 murder.  And you kind of hitting the highlights here.
16     Intentionally killing an officer in the line of his duty
17 and you know he was an officer, that's a death penalty case.
18     Take the life of a child under six years of age, that's a
19 death penalty.
20     Kill two or more people during the same criminal episode
21 or serial killing.  That's a death penalty.
22     Go into a 7-Eleven, and killing the clerk while robbing
23 it.  That's a death penalty.  Or one in which the death
24 penalty is an option.  It is never automatic.
25     If I for example were to take a gun just right out of my

1  suit coat here, just turned to co-counsel and blew his head
2  off and stood over him and danced around his body and laughed,
3  I think you would agree that is pretty hideous murder?
4          PROSPECTIVE JUROR:  Yeah.
5          MS. HANDLEY:  That is not a case to where the
6  death penalty is an option, it's a case where life imprison is
7  an option.  And not all cases are death penalty.  Look like
8  you kind of got a pretty good appreciation for that with
9  respect to your answers there.
10     Any crimes that you think should be eligible for the
11 death penalty that are not?
12         PROSPECTIVE JUROR:  No.
13         MS. HANDLEY:  No.  If you can change the death
14 penalty law, if you could add something or take away from it
15 at all, would you make any changes to it?
16         PROSPECTIVE JUROR:  No.
17         MS. HANDLEY:  None whatsoever.  Okay.  Let's --
18 as I said before, let me just tell you that -- and I think I
19 can speak for everybody on this side of the State's table over
20 here that we lay our cards on the table and tell you that it
21 is our sole objective, it is our mission in this case to not
22 only get a conviction, verdict of guilty against Wesley Ruiz
23 for capital murder, but also to ultimately see that he is
24 executed for his offense.  I say that, Ms. Grimmett, because I
25 think we have the type and the quality of evidence that will

1  convince 12 people that he is in fact guilty of capital
2  murder.  And I also believe that we have the type and the
3  quality of evidence that will convince 12 people that he
4  should be sentenced to death versus serving life imprison
5  without parole.  Okay.  If that happens, assuming that
6  happens, I would like to explain to you what does happen after
7  that point.
8      Have you ever been to Huntsville, Texas?
9          PROSPECTIVE JUROR:  No.
10         MS. HANDLEY:  Okay.  What will happen, if a jury
11 brings back a verdict of guilty and a sentence of death is
12 that the Judge at that point, Judge Ernest White, he would
13 have no choice other than to basically sign a warrant for his
14 death, a warrant of execution.  He can't come back and second
15 guess you.  He can't say, you know, let me change your verdict
16 for you.  He has got no choice.  He is going to sign a warrant
17 for his death there.
18     And the defendant after that is going to be sent down to
19 that area of Huntsville, Texas, it is southeast Texas.  He is
20 going to be put out there on a place called death row.  Okay.
21 And a date in the future will be set for his execution.  And
22 he will sit there until that date of his execution comes up.
23     Now, on that particular day, they are going to transfer
24 him from death row.  They are going to transfer him from
25 Livingston, Texas.  Where at that point he has lived out

68

1  there.  They are going to take him down to downtown
2  Huntsville.  A town of Huntsville is known primarily for
3  housing prisoners and criminal justice studies and such as
4  that.  And also known for the place where we execute
5  defendants.
6        They are going to transfer him down to Huntsville, Texas.
7  And they are going to put him pretty much in an isolated cell
8  next to what we call the death chamber.  He is going to sit in
9  that isolated cell.  And on the date that his execution is
10  scheduled, he will have an opportunity to visit with members
11  of his family, if he has any.  With a spiritual adviser if he
12  is so inclined.  He will get that last meal that a lot of
13  people hear about.
14        But nevertheless come that time, come six o'clock that
15  night, he is going to be taken out of that isolated cell, and
16  he is going to be transferred over to the death chamber.  Some
17  people go voluntarily, some do not.  Some go picking and
18  screaming.  So fall to the ground and cry like a baby and beg
19  for mercy.  Regardless of how he acts, he will be taken into
20  that death chamber.
21        And that death chamber is a small room.  It is a small
22  kind of gray room.  And in the middle of it is what looks like
23  a hospital bed, it is a gurney.  They put him on that gurney
24  and they will strap him down at this point.  And they will put
25  some I.V. lines into his arm, into his veins there.

69

1        At that point, there is curtains, windows on both sides
2  of the death chamber.  And those curtains will open up.
3        On one side he can have five representatives of whoever
4  he chooses, you know his attorney, his family, whatnot.  On
5  the other side, the curtains open up and there can be five
6  representatives from the victim's family, whoever they so
7  choose.  And they can sit there and they can actually watch
8  the execution.
9        He will be given an opportunity to make a last statement.
10  He doesn't have to if he doesn't want to.  Say anything he
11  wants.  You know, some continue to protest their guilt, some
12  beg for forgiveness, whatever.  Whatever.  He can give that
13  last statement at that point.
14        But after that, the warden is going to nod to an
15  individual who is going to start to press some buttons.  And
16  what happens is when they press those buttons, chemicals and
17  poisons start to get released and they start to come into
18  those intravenous lines, start to go into his body.
19        The first thing it does is paralyze his body or knocks
20  him out.  The second thing that happens, it makes his lungs
21  collapse.  And finally the third thing that happens is that it
22  actually stops his heart.  It may take five minutes, six
23  minutes, eight minutes, regardless of how long it takes, the
24  poisons are going to continue to flow until he is pronounced
25  dead by a doctor there at the death chamber.  Okay.

70

1        I don't tell you that to be morbid, Ms. Grimmett.  I tell
2  you to really impress upon you what is going on here.
3        PROSPECTIVE JUROR:  Uh-huh.
4        MS. HANDLEY:  We are not talking about some
5  theoretical character in the movies -- sorry, I was looking
6  for that --
7        PROSPECTIVE JUROR:  That's okay.
8        MS. HANDLEY:  I don't take you through that
9  death execution scenario just to be a shock or be morbid or
10  something, just to impress upon you what is going on here, we
11  are not talking about something academic or a character in a
12  book or somebody we read about.  We are talking about an
13  individual -- you need to take a good look at him, we are
14  talking about that person at the end of the table.
15        And what I need to know from you Ms. Grimmett, is knowing
16  that, in knowing who we are talking about, is there -- do you
17  think that you are the kind of person that can actually take
18  part or participate in a process that will ultimately end up
19  in the execution or death of the man there at the end of that
20  table?
21        PROSPECTIVE JUROR:  Yeah.
22        MS. HANDLEY:  How do you feel about that?
23        PROSPECTIVE JUROR:  I am not the one killing
24  him.  I am not the one that is going to sit there and actually
25  do that.  I mean --

71

1        MS. HANDLEY:  Some might say that you are.  Some
2  might say by placing your -- returning a verdict calling for
3  the execution of him that you actually are part of causing his
4  death.
5        What is your response to that?
6        PROSPECTIVE JUROR:  That's fine, we will all
7  have our time for judgment.  I don't believe -- I don't
8  personally believe that I am going to be judged based on me
9  making a judgment on somebody else's life.  And with this
10  being the law of our land so...
11        MS. HANDLEY:  All right.  Okay.  Let me ask you
12  a couple of more things.  In your questionnaire, you put
13  down -- I don't want to be mistaken here, on page four?
14        PROSPECTIVE JUROR:  Uh-huh.
15        MS. HANDLEY:  It said do you think that spending
16  a life-time in prison is equivalent to the death penalty and
17  you said, yes.  Okay.  Why do you think that?
18        PROSPECTIVE JUROR:  Personally, I just
19  believe -- I mean sitting there continuously having to think
20  about what their actions were, you know what I am saying, a
21  person can -- a person can basically do as much harm to
22  themselves, I mean not just physically harming themselves, but
23  I mean mentally, you can you know harm yourself by just
24  sitting there thinking about what you have done.
25        MS. HANDLEY:  Uh-huh.

72

1   PROSPECTIVE JUROR:  And I mean, me going and
2   killing -- taking this person's life is the same as them
3   sitting there continuously thinking about it all day long.  I
4   mean, you are just making them -- you are taking them faster
5   to their judgment basically.
6   MS. HANDLEY:  Right, what do you think prison is
7   like?
8   PROSPECTIVE JUROR:  I don't think it is fun, we
9   are fixing to go and play hopscotch -- I don't think prison --
10  I really don't think that it's somewhere where -- I know from
11  just growing up that it used to be somewhere where somebody
12  could be rehabilitated and they can learn and you know
13  actually not -- I'm saying not say enjoy themselves, at least
14  have a state of mentality where they are not looking to just,
15  you know, I am going to kill myself and get out of here.
16  MS. HANDLEY:  Right.
17  PROSPECTIVE JUROR:  But as the years have gone
18  by, it has become a place where you don't want to go there at
19  all.
20  MS. HANDLEY:  All right.
21  PROSPECTIVE JUROR:  You know you can die in
22  there.
23  MS. HANDLEY:  Sure, sure.  Do you base your
24  opinion, is it something that somebody has told you or is it
25  from you watching the TV, on what do you base your opinion?

73

1   PROSPECTIVE JUROR:  Just living life.  Reading
2   papers, newspapers, magazines, books, TV, I mean, we all watch
3   TV.
4   MS. HANDLEY:  Sure?
5   PROSPECTIVE JUROR:  And I mean, just that from
6   family and things of that nature.
7   MS. HANDLEY:  Just -- do you know anybody who
8   has ever been to prison?
9   PROSPECTIVE JUROR:  My brother was in prison.
10  MS. HANDLEY:  For how long?
11  PROSPECTIVE JUROR:  I don't know.  I mean I know
12  about my brother, I have seven of them, so it is kind of hard
13  to, you know, what is this one doing.  I know he has been to
14  jail, I don't know if it is actually prison or whatever, but I
15  know -- well, my uncle has been to prison too as well.
16  MS. HANDLEY:  How long ago was it that your
17  brother went to jail?
18  PROSPECTIVE JUROR:  Actually he is in jail right
19  now.
20  MS. HANDLEY:  Oh, okay.  And how long has he
21  been in jail?
22  PROSPECTIVE JUROR:  I have no idea.
23  MS. HANDLEY:  Had you not had much contact with
24  him?
25  PROSPECTIVE JUROR:  It is kind of on and off.

74

1   He has a drug problem.  When he needs-something, they will
2   call, I need this, and we will get into the sympathy thing and
3   we will see if we are going to do it or not.  So I will hear
4   from him every now and then and.
5   MS. HANDLEY:  And when you say you hear the
6   sympathy thing, how does that work on you?
7   PROSPECTIVE JUROR:  It used to work, I mean
8   when I was younger, it used to work.  But when I got around
9   the age of 17, 16, 17, I just didn't understand it no more.
10  I was just like, I feel as though as a person, you being older
11  than me, I felt as though we grew up in the same household, we
12  grew up in the same neighborhoods, we all had the same options
13  to make the same decisions and you chose to go this way with
14  your life.  Out of eight people, you are the only one that is
15  making these decisions with your life.  So sympathy can no
16  longer, you know, it is something that you decided to do on
17  your own.
18  MS. HANDLEY:  Okay.  All right.  You know,
19  Ms. Grimmett, let's talk specifically about capital murder and
20  how a death-penalty case works.
21  Have you ever done jury duty before?
22  PROSPECTIVE JUROR:  No.
23  MS. HANDLEY:  So, I will kind of -- I will try
24  to walk you threw it and tell you about how the trial process
25  works and talk to you about a few laws that come into place.

75

1   Normally speaking any criminal trial is in two parts, okay.
2   And it is kind of like a two-act play?
3   PROSPECTIVE JUROR:  Uh-huh.
4   MS. HANDLEY:  There is a first act, you know,
5   there is a break between and then there is going to be a
6   second act.  It is a lot like a play.  In any criminal trial,
7   and particularly the death-penalty case, the first part of the
8   trial is dedicated to one thing and one thing only, okay.  And
9   that is the determination as to whether or not the defendant
10  is actually guilty of capital murder.
11  PROSPECTIVE JUROR:  Uh-huh.
12  MS. HANDLEY:  At that point you are not sitting
13  there going, Am I going to give the death sentence, am I going
14  to give life without parole.  The question and the only
15  question is, has the State proved the case to me beyond a
16  reasonable doubt --
17  PROSPECTIVE JUROR:  Right --
18  MS. HANDLEY:  Your Honor, I believe we have an
19  agreement.
20  Ms. Grimmett, thank you for talking to me, we are going
21  to let you go, thank you, ma'am.
22  PROSPECTIVE JUROR:  All right, thanks.
23  (Prospective juror retired from the courtroom.)
24  (Prospective juror entered the courtroom.)
25  THE COURT:  You may be seated.



1    Ms. Blackburn, how are you doing today?
2                PROSPECTIVE JUROR:   Okay.
3            THE COURT:   The attorneys have some questions to
4    ask you concerning your qualifications as a juror in this
5    case.
6                PROSPECTIVE JUROR:   Okay.
7            THE COURT:   What says the State?
8            MR. MCCALLUM:   May it please the Court?
9                    SHARMA BLACKBURN
10   was called as a prospective juror, after having been
11   previously sworn by the Court, testified under oath as
12   follows:
13                   VOIR DIRE EXAMINATION
14   BY MR. MARSHALL MCCALLUM:
15       Good afternoon, Ms. Blackburn, how are you?
16               PROSPECTIVE JUROR:   Okay.
17           THE COURT:   My name is Marshall McCallum.  I am
18   an Assistant District Attorney.  And I work alongside of
19   Andrea Handley, she is also an Assistant District Attorney.
20   We are responsible for selecting the jury trial of this case.
21       When the trial actually begins, there is another
22   prosecutor, his name is Kevin Brooks.  I don't know if you
23   remember back in November when you came and filled out the
24   questionnaire, he was one of the attorneys that was introduced
25   and he will be putting on the case.

1    Over here to my left is Karo Johnson.
2            MR. JOHNSON:   Good afternoon.
3            THE COURT:   And he is representing the man at
4    the end of the table, Wesley Ruiz.  And another man, Paul
5    Brauchle, is not in the questionnaire.
6        Have you had a chance to look over your questionnaire?
7            PROSPECTIVE JUROR:   Yes, sir.
8            MR. MCCALLUM:   Both sides have look at your
9    questionnaire, and you are the type person that we are looking
10   for, you are right down the middle.  Seems like you have an
11   open mind.  And so there is a possibility that you could be on
12   this jury.  And you will know before you leave today whether
13   or not you made it.
14       I wanted, though, to ask you, I looked at the back of
15   your questionnaire, and you said that you might have some work
16   issues?
17           PROSPECTIVE JUROR:   Well, I just started
18   permanently at my job that I was working attempt for six
19   months and my first day was yesterday starting permanently.  I
20   guess if I have to serve on the jury, they will understand.
21           MR. MCCALLUM:   Okay.  Here is what probably will
22   happen.  You will know today like I said, and then the trial
23   we anticipate is going to start in April.
24           PROSPECTIVE JUROR:   Okay.
25           MR. MCCALLUM:   Probably like the first or second

78

79

1    week of April.  And it will probably last five to about eight
2    days.  And there is a possibility that you will be sequestered
3    for two days maybe?
4                PROSPECTIVE JUROR:   Okay.
5            MR. MCCALLUM:   Okay.  We can't predict how long
6    the jury would deliberate, but that's kind of where we are
7    looking, is that okay with you?
8                PROSPECTIVE JUROR:   Yes, I guess it will have to
9    be.
10           MR. MCCALLUM:   That wouldn't affect you in any
11   way?
12               PROSPECTIVE JUROR:   No I would just have to let
13   them know, yeah.
14           MR. MCCALLUM:   Okay, I appreciate it.  All
15   right, since you have looked over your questionnaire, has
16   anything changed since you filled it out?
17               PROSPECTIVE JUROR:   No, not really, no.
18           MR. MCCALLUM:   All those answers are the same?
19               PROSPECTIVE JUROR:   Yeah.
20           MR. MCCALLUM:   You know like I said, we feel
21   like you are pretty down the middle.  And your opinion is on
22   par with what the law is in the State of Texas?
23               PROSPECTIVE JUROR:   Okay.
24           MR. MCCALLUM:   Concerning the death penalty.  I
25   can't get the death penalty in all murder cases.  If I pulled

1    a gun out in shot Ms. Handley in the head and left her for
2    dead and danced around her body, that would be a horrific
3    murder.  But I could not -- I could not get a the death
4    penalty in that type of case.  She is not one of the protected
5    classes.  The type cases in Texas that we have where the death
6    penalty applies, if you murder a police officer.
7            PROSPECTIVE JUROR:   Okay.
8            MR. MCCALLUM:   If you murder a child under the
9    age of six.
10           PROSPECTIVE JUROR:   Okay.
11           MR. MCCALLUM:   The most common scenario, if
12   someone goes in and robs a convenience store and kills the
13   clerk during the commission of a robbery, that's a capital
14   murder and the death penalty is available in that instance.
15       Murder for hire.  If I hire someone to go out and commit
16   a murder, they do it, both me and the person I hired, the hit
17   man, would be tried for capital murder.  So we have just a few
18   instances where the death penalty can be sought.
19           PROSPECTIVE JUROR:   Okay.
20           MR. MCCALLUM:   Are you in agreement with that?
21           PROSPECTIVE JUROR:   The child part, no.  As far
22   as, you said if you kill someone under six --
23           MR. MCCALLUM:   Yeah.
24           PROSPECTIVE JUROR:   -- you can get the death
25   penalty.

1    MR. MCCALLUM:   If you murder a child under the
2  age of six?
3    PROSPECTIVE JUROR:   It should be all children,
4  all ages.
5    MR. MCCALLUM:   All right.  You know in this
6  process, I mean we want to lay out our cards on the table.  We
7  want you to know how serious we are.  It is our goal in this
8  case that that man at the end of the table down there, someday
9  in the future is going to be laying dead on a gurney.  We say
10  that because we done want -- you walk out of here today and
11  you come back in April and you come back and say the State is
12  serious about this death penalty.  We are as serious as we can
13  be and that's our primary objective.  The jury, first off,
14  will find him guilty of capital murder.  And then, secondly,
15  when the jury goes back in the punishment phase, they are
16  going to come back and they are going to find that the death
17  penalty, not life in prison without parole, but the death
18  penalty is the appropriate punishment.  That's what our goal
19  is in this case.
20    Ma'am, do you feel like you are the type person that
21  could take part in deliberations and in a case like that?
22    PROSPECTIVE JUROR:   I don't know.  It is a
23  little different from answering the questionnaire to actually
24  really being here and knowing that I might be the one to say
25  yeah or nay if he is going to die or not.  I don't know if I

1  could, you know, have that on my conscience, I don't know.
2    MR. MCCALLUM:   Okay.  Here is what is going to
3  happen.  If the jury does convict him of capital murder and
4  they find that the death penalty is the appropriate
5  punishment, Judge White will be bound at that point.  I mean
6  he cannot say, you know, I don't agree with the jury's
7  verdict, I am going to give a life sentence, he will be bound
8  to set an execution date.  So what that means is, at some
9  point in the future, he will set an execution date.
10    The defendant will be down at a facility in Livingston,
11  Texas and he will be held there.  And the day before his
12  execution, he will be brought over to a unit in downtown
13  Huntsville.  And that's where the execution occurs.  It is
14  called the Walls Unit.
15    PROSPECTIVE JUROR:   Okay.
16    MR. MCCALLUM:   And he will be taken to the Walls
17  Unit.  And he will have a right to speak with his spiritual
18  adviser, his family, he will be given a last meal, whatever he
19  chooses.  And at some point, six o'clock that night, he is
20  going to be brought into the death chamber and he will be
21  strapped to a gurney and three intravenous lines will be
22  attached to his arm.
23    And at that point, the curtain -- two curtains will be
24  drawn back.  And there will be five members from his family.
25  And there can be five members from the victim's family.  And

82

83

1  he will be given an opportunity to make a last statement.  He
2  doesn't have to make a last statement.
3    But at some point, the warden is going to give the
4  go-ahead to the executioner and the intravenous line is going
5  to start.  The first one is going to knock him out and the
6  second one is going to stop his lungs and the third one is
7  going to stop his heart.  And normally after about five to
8  eight minutes, he is going to be pronounced dead.
9    And we say that to every juror that comes down here.
10  Just to impress upon you how serious this case is.  We ask
11  every person that comes through here, can you, ma'am, take
12  part in a process that could lead to this man at the end of
13  the table laying dead on a gurney?
14    PROSPECTIVE JUROR:   I don't know.  I don't know
15  now that you are explaining everything, I don't know.  I don't
16  have a yes or no answer for that at this point.  When you, you
17  know, lay it all out like that, I don't think I could.
18    MR. MCCALLUM:   You don't think you could?
19    PROSPECTIVE JUROR:   Huh-uh.
20    MR. MCCALLUM:   Judge, I think we have an
21  agreement.
22    THE COURT:   Ma'am, thank you very much, you are
23  free to go.  You are excused.
24    PROSPECTIVE JUROR:   Okay.
25    (Prospective juror retired from the courtroom.)

1    (Pause in the proceedings.)
2    (Prospective juror entered the courtroom.)
3    THE COURT:   You may be seated.
4  Good afternoon, Ms. Pierson.
5    PROSPECTIVE JUROR:   Good afternoon.
6    THE COURT:   How are you doing today, ma'am?
7    PROSPECTIVE JUROR:   Doing fine.
8    THE COURT:   Good.  The attorneys have some
9  questions to ask you concerning your qualifications as a juror
10  in this case?
11    PROSPECTIVE JUROR:   Okay.
12    THE COURT:   What says the State?
13    MS. HANDLEY:   Thank you, Your Honor.
14  May it please the Court?
15    BARBARA PIERSON
16  was called as a prospective juror, after having been
17  previously sworn by the Court, testified under oath as
18  follows:
19    VOIR DIRE EXAMINATION
20  BY MS. HANDLEY:
21    MS. HANDLEY:   How are you?
22    PROSPECTIVE JUROR:   I'm fine.
23    MS. HANDLEY:   Are you comfortable up there?
24    PROSPECTIVE JUROR:   Yeah.
25    MS. HANDLEY:   My name is Andrea Handley.  And

84

1   seated with me is Marshall McCallum and Kim Judin. We are
2   Assistant District Attorneys here in Dallas County. And it is
3   our job to help select the jury in this particular case. And
4   there are other D.A.s involved in this case, gentlemen by the
5   names of Andy Beach and Kevin Brooks. They were all
6   downstairs when you filled out the questionnaire and these
7   Assistant District Attorneys involved in this case.
8        To my left here is Karo Johnson, he is a Defense Attorney
9   here in Dallas County, he represents the defendant in this
10  case, Wesley Ruiz, seated to his left there. And he is also
11  assisted by Paul Brauchle, he will be representing the
12  defendant in this case.
13       Do you think you know any of us?
14           PROSPECTIVE JUROR:   No.
15           MS. HANDLEY:   And it doesn't, I have been
16  looking at your questionnaire, have you ever been called to
17  jury duty before?
18           PROSPECTIVE JUROR:   I have been, but never
19  selected.
20           MS. HANDLEY:   How many times do you think you
21  have been down to Frank Crowley?
22           PROSPECTIVE JUROR:   I think just once before.
23           MS. HANDLEY:   Okay. And did you actually get to
24  sit out in the courtroom and listen to the attorneys do the
25  voir dire, did you get that far?

85

1           PROSPECTIVE JUROR:   Uh-huh.
2           MS. HANDLEY:   Did you ever actually make it on
3   to the actual jury?
4           PROSPECTIVE JUROR:   No.
5           MS. HANDLEY:   Okay. Let me tell you what we are
6   doing here today, Ms. Pierson. We called down hundreds of
7   people back in December when you came down here. And we had
8   everybody fill out this lengthy questionnaire here, this
9   survey. You probably think we know everything there is to
10  know about you at this point. We have gone through those
11  questionnaires and surveys, and we have selected several
12  people to now bring down individually and talk to one-on-one
13  about this particular case.
14           PROSPECTIVE JUROR:   Okay.
15           MS. HANDLEY:   Could be good news or bad news to
16  you, I don't know how you are going to take this. But you
17  might in fact be the kind of person that we believe could be a
18  qualified juror for this case, okay. So that's why we are
19  bringing you down talking to you one-on-one. And it is kind
20  of a twofold purpose. I want to talk to you a little bit more
21  about a death penalty case, capital murder what that is and
22  explain the process to you. And most importantly, also what
23  we both want to know me, we want to know how you feel.
24       I think it is probably safe to say that how we feel about
25  the case as State's attorneys and our objectives are probably

86

1   entirely different than how the Defense Attorney feels about
2   his case and what their objectives are in the case. How we
3   feel in our opinions, that and a quarter will get you a cup of
4   coffee. Doesn't amount to anything at this point. What is
5   important, ma'am, is how you feel, okay?
6           PROSPECTIVE JUROR:   Okay.
7           MS. HANDLEY:   I have read over your
8   questionnaire. If I were to call you down today and give you
9   another one, would you fill it out in any different way?
10  Would you change any answer, add any other information?
11           PROSPECTIVE JUROR:   The only thing in here
12  somewhere it asks if you are planning to move out of Dallas
13  County.
14           MS. HANDLEY:   Okay. Tell me about that, what is
15  going on?
16           PROSPECTIVE JUROR:   My daughter and son
17  inherited a house in Tarrant County.
18           MS. HANDLEY:   Fantastic.
19           PROSPECTIVE JUROR:   And I don't know when it is
20  go to become available, but they wanted me to move there.
21           MS. HANDLEY:   Okay. So you intend on moving out
22  of Dallas County?
23           PROSPECTIVE JUROR:   At this point, I think I am.
24           MS. HANDLEY:   To Tarrant County?
25           PROSPECTIVE JUROR:   Yeah.

87

1           MS. HANDLEY:   Let me tell you what our schedule
2   is and what is going on and we can see if we can't flash out
3   the details and see if it works. This is a lengthy process.
4   It takes several weeks and sometimes months to do. We
5   anticipate that we will actually start the trial probably
6   the -- more likely the second week of April, okay.
7           PROSPECTIVE JUROR:   Okay.
8           MS. HANDLEY:   At this time, it is probably going
9   to take anywhere from maybe five to eight working days to
10  actually put on the case. We generally don't work on weekends
11  so we are looking at maybe two weeks of coming in 9:00 to
12  5:00. The only thing I can't predict is how long it would
13  take a jury to deliberate, once they get the information, all
14  the evidence in front of them. There is a possibility as with
15  some trials as you go into deliberations, you may have to be
16  sequestered.
17       You ever heard of that?
18           PROSPECTIVE JUROR:   Yes.
19           MS. HANDLEY:   We send you to a hotel room and
20  you can't talk to your family or anything, there is always a
21  possibility that that could happen one or to nights. That's
22  the time frame that we are looking at.
23       I know you don't have a crystal ball, I wish you did,
24  what do you think the situation is with you moving?
25           PROSPECTIVE JUROR:   My daughter goes to court

88

89

1  on Monday to find out if anybody is contesting the will.  And
2  we will know at that time whether she is going to be able to
3  sell the house or if someone else is going to intervene.
4  So...
5                  MS. HANDLEY:   Assuming she went to court Monday
6  and said nobody is contesting this will, it is your house, it
7  is good to go, how soon do you think you would be moving?
8                  PROSPECTIVE JUROR:   Probably within a month.
9                  MS. HANDLEY:   Within a month.  Best case
10 scenario, you are out of here in March?
11                 PROSPECTIVE JUROR:   Could be.
12                 MS. HANDLEY:   Okay.  Ma'am, we appreciate you
13 coming down today.  Good luck with that house.
14      Your Honor, we have an agreement.
15                 THE COURT:   You are free to go, thank you.
16                 (Prospective juror retired from the courtroom.)
17                 (Recess taken.)
18                 (Court recessed for the day.)
19
20
21
22
23
24
25

1  THE STATE of TEXAS )
2  COUNTY of DALLAS  )
3                  I, BELINDA G. BARAKA, Official Court Reporter in and
4  for the 194th Judicial District Court of Dallas County, State
5  of Texas, do hereby certify that the foregoing contains a true
6  and accurate transcription of all portions of evidence and
7  other proceedings requested in writing by counsel for the
8  parties, to be included in this volume of the Reporter's
9  Record, in the above-styled and -numbered cause(s), all of
10 which occurred in open court or in chambers and were reported
11 by me.
12                 I further certify that this Reporter's Record of the
13 proceedings truly and correctly reflects the exhibits, if any,
14 admitted by the respective parties.
15                 I further certify that the total cost for the
16 preparation of this Reporter's Record  was paid by the
17 State/Defense.
18                 WITNESS MY OFFICIAL HAND this the 30th day of
19 May            , A.D., 2009.
20
21
22
23                 BELINDA G. BARAKA, CSR #5028
                   Official Court Reporter
24                 133 N. Industrial
                   Dallas County, Texas 75207
25 Certification Expires: 12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*