CAUSE NO. F07-50318-M

THE STATE OF TEXAS * IN THE DISTRICT COURT

vs. * 194TH JUDICIAL DISTRICT

WESLEY LYNN RUIZ * DALLAS COUNTY, TEXAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

VOIR DIRE EXAMINATION

Volume 22 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 13th day of February, A.D, 2008, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

A P P E A R A N C E S

HON. ANDY BEACH
Assistant District Attorney
State Bar No. 01944900

HON. ANDREA HANDLEY
Assistant District Attorney
State Bar No. 08898800

FOR THE STATE OF TEXAS

HON. PAUL BRAUCHLE
Attorney at Law
State Bar No. 02918000

HON. WILLIAM "KARO" JOHNSON
Attorney at Law
State Bar No. 10804500

FOR THE DEFENDANT

* * * * *

# I N D E X

PAGE/VOL.

Proceedings - 02/13/08 .......................... 5/22

**TAMARA JONES**

Voir Dire Examination - Mr. Beach ................ 5

Dismissed by Agreement........................... 10

**ORLIDIA MOLINAR**

Voir Dire Examination - Mr. Beach ................ 11

Dismissed by Agreement .......................... 13

**SUSAN LEMOND**

Voir Dire Examination - Mr. Beach ................ 14

Dismissed by Agreement .......................... 17

**BRADLEY CALDWELL**

Voir Dire Examination - Mr. Beach ................ 18

Voir Dire Examination - Mr. Brauchle ............. 54

State's Acceptance of Juror ...................... 78

Defense's Challenge for Cause .................... 78

Challenge Denied ................................ 78

Defense's Peremptory Strike ...................... 78

**DEBORAH MAXWELL**

Voir Dire Examination - Ms. Handley .............. 79

Dismissed by Agreement .......................... 88

**MARCELLE TRAMMELL**

Voir Dire Examination - Mr. Beach ................ 89

Voir Dire Examination - Mr. Johnson .............. 106

INDEX

PAGE/VOL.

State's Challenge for Cause .................... 117

Reporter's Certificate .......................... 118

**PROCEEDINGS**

(February 13, 2008)

(Prospective juror entered the courtroom.)

THE COURT: You may be seated. Good morning, Ms. Jones?

PROSPECTIVE JUROR: Good morning.

THE COURT: How are you today?

PROSPECTIVE JUROR: Fine, thank you.

THE COURT: The attorneys have some questions to ask you concerning your qualifications as a juror in the case, there aren't any right or wrong answers in this proceeding, they are merely trying to see issues that will be prevalent in this case.

What says is the State?

MR. BEACH: May it please the Court?

**TAMARA JONES**

was called as a prospective juror, after having been previously sworn by the Court, testified under oath as follows:

**VOIR DIRE EXAMINATION**

**BY MR. BEACH:**

Good morning, Ms. Jones. My name is Andy Beach. Along with Andrea Handley and Marshall McCallum, we are Assistant District Attorneys and we are responsible for selecting the jury in this capital murder case.

To my left is Paul Brauchle.

MR. BRAUCHLE: Good morning.

THE COURT: And he has the responsibility, along with another gentleman, Karo Johnson, they represent the man at the end of the counsel table. And that's Wesley Ruiz.

THE DEFENDANT: Good morning.

THE COURT: You have had a chance to go over your questionnaire; is that right?

PROSPECTIVE JUROR: Uh-huh.

MR. BEACH: Let's see, it's been over two months since you came down and filled out that 17-page questionnaire. And I am sure when you came down in late November, you were confronted with this --

PROSPECTIVE JUROR: Overwhelmed.

MR. BEACH: -- what I have gotten into?

PROSPECTIVE JUROR: I was overwhelmed. I couldn't believe, I had never done this before.

MR. BEACH: And I am sure asking you private questions and asking you questions about things that you probably hadn't thought about in your adult life, how you feel about the death penalty, the criminal justice system. So, you know, people tell us that they just kind of did the best they could, you know, answered all the questions or tried to.

Anything after reviewing your questionnaire here this morning that given two to two and a half months to think about

it, anything you would change on that questionnaire?

PROSPECTIVE JUROR: Basically, no, I think I pretty much nailed it. I didn't think I did initially, but I pretty much nailed it. I didn't get to the last two pages. I did want to review that very quickly.

MR. BEACH: There are not much on there other than people you respect and people you least respect.

PROSPECTIVE JUROR: No, I don't think there is anything that would -- that I would change at this point.

MR. BEACH: Let me ask you, when you filled out your questionnaire at this time, apparently at that time you had just been laid off from the job you had for 13 years, any job prospects in the last two months, are you looking, what is the situation?

PROSPECTIVE JUROR: I am still interviewing. It is somewhat of a tough market for someone older; and I am specialized in my field, but I am still looking.

MR. BEACH: We have been doing this for about two weeks talking to people like you up there sitting in that chair. And through that process, we have obtained seven jurors, okay. So we are still five juror short of the 12 that we need. Also we will end up probably getting a couple of alternates in case something happens. So we are looking at another two or three maybe four weeks of going through this process. Because of that, our best guesstimate of when this

case is going to trial and when the evidence is going to start is either the first or second week of April. I wanted to hypothetically pose this to you. If here within the next two months, you do obtain new employment and you have to tell your boss, hey, by the way, I am going to be down here the first week or two of my new job, I am going to be down here for five to eight days on a death-penalty case, it is going to be very strenuous, we talk about that. You see that as being a problem potentially?

PROSPECTIVE JUROR: Not at all.

MR. BEACH: Perfect. You indicated the very last page of your questionnaire on page 17, you believe this is your civic duty to come down here and, you know, participate?

PROSPECTIVE JUROR: Yeah.

MR. BEACH: If selected, perform your function as a citizen here in Dallas County, Texas. Tell me how you feel about that a little bit more, flush that out for me?

PROSPECTIVE JUROR: Sure. I realize that our justice system is set up with the concept of peers judging someone based upon evidence that is presented. And I know a lot of people that may not necessarily think that is an important issue, but because this is our country, and that's one of the very things that it is founded on, it is our civic duty to do so.

MR. BEACH: Okay. I can guarantee you that none of the seven folks that have already been put on this jury volunteered, okay. You understand?

PROSPECTIVE JUROR: Uh-huh.

MR. BEACH: Especially what is at stake in this case. Nobody is going home, skipping home saying I got selected, I got selected. But each of the seven folks did assure both the State and the Defense in this case that if they were selected, they could devote their full energy, concentration, attention, just all their efforts to try to go do the right thing based on the evidence in this case. And are you telling me that you could do that?

PROSPECTIVE JUROR: I would make every effort, yes.

MR. BEACH: The only -- when I told you five to eight days, the only thing we can't predict is how long a jury might deliberate. A jury might deliberate for ten minutes or two days, that's the only x-factor.

And one more thing, there is the possibility that once the evidence is actually completed that the jury may be sequestered, okay. And that would mean that you would go to a hotel with 11 other jurors. And you would not be allowed to have contact with the outside world.

Would you be able to do that for a night or two without any problem?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Okay. All right. Let me just talk to you a little bit about, you know, try to put some meat on some of these answers that are on this cold piece of paper.

PROSPECTIVE JUROR: Okay.

MR. BEACH: We asked you there on page one how you felt about the death penalty. Your answer was, Should a person murder someone with full intent to kill them, not self-defense, and when you say there, it could be proven, so basically what is important to you, ma'am, is full intent, it is not an accident, it is not self-defense. We are not talking about some insane person?

PROSPECTIVE JUROR: Huh-uh.

MR. BEACH: We are talking about meant to do it, wanted to do it, got it done and no justification, no excuse, in those circumstances, you believe the death penalty could be an appropriate punishment?

PROSPECTIVE JUROR: Yes, it could be.

MR. BEACH: Judge, I think we have an agreement.

I appreciate you coming down. We have talked to the lawyers, we have an agreement and we are going to let you go.

PROSPECTIVE JUROR: Okay.

THE COURT: Thank you, Ms. Jones.

(Prospective juror retired from the courtroom.)

(Pause in the proceedings.)

(Prospective juror entered the courtroom.)

THE COURT: You may be seated.

Good morning, Ms. Molinar.

PROSPECTIVE JUROR: Good morning.

THE COURT: You were brought down here today because the lawyers have some questions to ask you about your qualifications as juror in this matter. There aren't any right or wrong answers, they merely attempt to see how you feel about certain issues.

And will you be doing for the State?

MS. HANDLEY: Yes, Your Honor.

THE COURT: You may proceed.

MS. HANDLEY: May it please the Court?

**ORLIDIA MOLINAR**

was called as a prospective juror, after having been previously sworn by the Court, testified under oath as follows:

**VOIR DIRE EXAMINATION**

**BY MS. HANDLEY:**

Good morning, Ms. Molinar. My name is Andrea Handley. And seated to my right is Marshal McCallum and Andy Beach. We are Assistant District Attorneys.

And seated to my left is Paul Brauchle and Karo Johnson. They are defense attorneys here in town. And they represent the man seated at the end of the table, Wesley Ruiz. And we

have called you down here to see whether or not you should be seated as a juror in this death-penalty case.

Have you had an opportunity to look over your questionnaire again?

PROSPECTIVE JUROR: Yes, ma'am.

MS. HANDLEY: You filled that out about two months ago. And probably at this time you were put on the spot and did the best you could to fill it out in that jury room. And having had an opportunity to look at it again, would you change anything or add anything to it?

PROSPECTIVE JUROR: Well, I didn't quite go over all of it. But what little I did.

MS. HANDLEY: Okay. Let me tell you what is going on, Ms. Molinar, and I am sure you already have a good appreciation for how serious this case is and what we are doing here is, we are trying to seat 12 people to sit in this particular case. And this is a death-penalty case. We had y'all come down here and fill out these questionnaires just so we could get kind of a feeling about your feelings about the death penalty and such as that. And we are bringing people in individually to talk to you some more to kind of flesh that out.

You will know today, Ms. Molinar, whether or not you are going to sit on this particular jury. And so what becomes important, very important for both sides and all parties here

is that you just be frank with us and honest with us. Because what we both really need are 12 individuals that can give us is their full concentration, attention and energy to this particular case. So before I talk to you about maybe the specifics of a death-penalty case, the obligations of a jury, I want to kind of flesh out if you can do that. If there is not maybe something else that might be distracting you from sitting as a juror in this death-penalty case.

I see you are already looking like you are pausing.

PROSPECTIVE JUROR: Okay, I am just thinking, okay. I already have some vacation planned and paid for.

MS. HANDLEY: Tell me about that, when is your vacation, what times are you looking at?

PROSPECTIVE JUROR: April, I think it is the 11th.

MS. HANDLEY: Okay. So on April the 11th you have tickets paid for?

PROSPECTIVE JUROR: Paid for.

MS. HANDLEY: Good to go. I think you are going to be heading off on vacation right when we start the trial.

PROSPECTIVE JUROR: It is already paid for.

MS. HANDLEY: Thank you for your time, ma'am, have a good time.

PROSPECTIVE JUROR: Thank you.

(Prospective juror retired from the courtroom.)

(Pause in the proceedings.)

(Prospective juror entered the courtroom.)

THE COURT: You may be seated.

Good morning, Ms. Lemond?

PROSPECTIVE JUROR: Good morning.

THE COURT: How are you today?

PROSPECTIVE JUROR: Fine.

THE COURT: The attorneys have some questions to ask you concerning your qualifications as a juror in this case.

What says the State?

MR. MCCALLUM: May it please Court?

**SUSAN LEMOND**

was called as a prospective juror, after having been previously sworn by the Court, testified under oath as follows:

**VOIR DIRE EXAMINATION**

**BY MR. MCCALLUM:**

Good morning, Ms. Lemond. My name is Marshall McCallum. I am an Assistant District Attorney here in Dallas County. Seated to my left is Andrea Handley. We are both D.A.s. We are responsible for selecting the jury in this capital murder case. There is another gentleman by the name of Kevin Brooks who will be responsible for handling the evidence.

Seated over here to my left, is Karo Johnson.

MR. JOHNSON: Good afternoon.

MR. MCCALLUM: And Paul Brauchle. They are attorneys here in Dallas; and they represent the man accused in this case, Wesley Ruiz. You don't know any of us?

PROSPECTIVE JUROR: No, sir.

MR. MCCALLUM: You remember coming down here November 30th and filling out this extensive questionnaire? We asked you just about every opinion you had and your life history and all of that. Have you had a chance to look over that today?

PROSPECTIVE JUROR: Yes, I have.

MR. MCCALLUM: Anything that has changed since you filled it out?

PROSPECTIVE JUROR: Yes.

MR. MCCALLUM: What would that be?

PROSPECTIVE JUROR: Well, it said just basically the question about do I have any reasons why I could not say whether or not someone should have the death penalty or not. I think that that would be difficult for me to -- to say the fate of someone else's life basically is what I am trying to say.

MR. MCCALLUM: Okay. Ms. Handley uses a great analogy and it is good for me too. She and I both hate heights. And if you asked us about window washing on these high-rise buildings, I am all for it. I think it is great

that people get out there and wash windows on buildings. But if you asked me to do it, I am about the last person you want to get up there. I will do it if I am told to do it. But when I get up there to actually have to do the task of washing windows 40 stories up in the air, I can tell you about the last thing on my mind is doing a good job and focusing on that job. I am going to be worried about getting down and not fall.

Do you feel like that applies to you?

PROSPECTIVE JUROR: Yes, I do.

MR. MCCALLUM: And you feel like it would be difficult and you don't think you could sit and concentrate on the task at hand; is that a fair statement?

PROSPECTIVE JUROR: I would probably have to concentrate on it, yes.

MR. MCCALLUM: I am going to tell you, it is our goal in this case to seek the death penalty. We believe that we have the quality and the type of evidence that, first, is going to convince 12 jurors that he is guilty, the man at the end of the table is guilty of capital murder. And, secondly that a death penalty as opposed to life imprisonment is the proper sentence, that's what we are going for here. I know the -- that's our opinion. The Defense has a completely different view. They think -- you know completely opposite. But we believe that is the type of evidence we have. And it

is our goal that at one day that that man seated at the end of the table is going to be laying dead on a gurney. And my question to you, ma'am, do you feel like you are the type of person that can participate in a process that might one day in the future result in that man laying dead on a gurney?

PROSPECTIVE JUROR: Is that a yes/no, question?

MR. MCCALLUM: Well, we can't really have maybe, we really at this point -- I mean we are going to start this trial probably in early April. And you know we want to impress upon everybody just how serious we are, and you know yourself better than we do. And we really need to know if you can take part in a process like that. There is no right or wrong answers?

PROSPECTIVE JUROR: I think it would be really difficult for me. So I guess my answer would be, no.

MR. MCCALLUM: Judge, we have an agreement. Thank you, Ms. Lemond.

THE COURT: Thank you, you are free to go.

(Prospective juror retired from the courtroom.)

(Recess taken.)

(Lunch recess taken.)

(Prospective juror entered the courtroom.)

THE COURT: You may be seated. Good afternoon, Mr. Caldwell. How are you, sir?

PROSPECTIVE JUROR: Well, thank you.

THE COURT: The attorneys for both sides have some questions to ask you about our qualifications as a juror in this case. There aren't any right or wrong are answers. They are just trying to see what your feelings are on certain issues.

Who will be conducting -- Mr. Beach will be conducting the voir dire for State.

You may proceed, Mr. Breach.

MR. BEACH: May it please the Court?

**BRADLEY CALDWELL**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

**BY MR. CALDWELL:**

Mr. Caldwell, my name is Andy Beach, along with Andrea Handley, along with Marshall McCallum, we are selecting the jury phase of this capital murder trial for the State of Texas.

To my left is Karo Johnson and Paul Brauchle. They are attorneys here in town, and they have the responsibility of representing defendant in this case. He is the man at the end of the counsel table. That's Wesley Ruiz.

It has been over two months since you came down and filled out that questionnaire. I know you slept since then and Christmas and New Year's and Superbowl. Penn State played

in a bowl came this year.

PROSPECTIVE JUROR: If you want to -- it was below our standards. Not to offend any Aggies in here.

MR. BEACH: A lot of things have happened since you filled this out. You had a chance to review it. Anything that you would change now on your questionnaire if given the opportunity?

PROSPECTIVE JUROR: Not materially. I do know I made an error. On one part referring to my wife's birthday, it is corrected. I forgot my wife's birthday.

MR. BEACH: You know what tomorrow is?

PROSPECTIVE JUROR: What, Valentine's Day?

MR. BEACH: Yeah. You are -- let's see, an accountant for AAFS, anything about your job situation -- let me stop and back up. We anticipate this case is actually -- the trial itself is going to start probably the first or second week of April. Okay. We have been going at this jury selection process now for about four weeks, we have a grand total of seven jurors. We need five more, probably a couple of alternates. So it is a lengthy process. So once we start the first or second week of April, we anticipate at that point in time probably a five-to-eight day trial. Okay. The only thing we cannot predict is how long a jury deliberates. But in terms of the evidence itself, five to eight working days. Anything about those perimeters that would keep you from being

able to come down here and devote your full attention to your jury service?

PROSPECTIVE JUROR: No, sir.

MR. BEACH: Have you ever felt differently about the death penalty in your adult life, sir?

PROSPECTIVE JUROR: I have always consistently thought that I have been a proponent for the death-penalty.

MR. BEACH: Let me just ask you this, why do you think we need a death penalty?

PROSPECTIVE JUROR: It is a deterrence if nothing else.

MR. BEACH: And you know, I read so many of these questionnaires, I don't want to make a mistake here. And your wife feels about the same?

PROSPECTIVE JUROR: I have never discussed it with her in 15 years of marriage to be honest.

MR. BEACH: And after you filled out your questionnaire, you didn't go home and talk to her, kind of about what you might be doing?

PROSPECTIVE JUROR: She does not know about this case and my involvement so far.

MR. BEACH: On page three of your questionnaire, you indicated that you remember something about just the outline of the case in the newspapers; is that correct?

PROSPECTIVE JUROR: Yes.

MR. BEACH: What do you remember again, given this happens almost a year ago, any details come to mind about what you remember from reading in this case in the newspapers?

PROSPECTIVE JUROR: Yes, the news reels on it.

MR. BEACH: You saw it on TV as well?

PROSPECTIVE JUROR: Yes. Saw it in the newspapers the next day.

MR. BEACH: I know what a news reel is, some of these younger folks don't know what a news reel is?

PROSPECTIVE JUROR: Well, what I remember specifically is, being on the news, they showed the cars, I guess it was from a helicopter view, face-to-face.

MR. BEACH: Anything -- a lot of people have come down and said, yeah, I remember seeing something on TV about it. Reading something in the newspapers. And that does not disqualify them from being a juror in this case. What would disqualify them is if you told us right now that based on what you saw on TV or read in the newspapers, you have already formed an opinion as to the guilt or innocence of the defendant in this case. That would disqualify you if that was the case?

PROSPECTIVE JUROR: I understand.

MR. BEACH: As you sit here right now, have you formed any kind of opinion about the case?

PROSPECTIVE JUROR: I have not.

MR. BEACH: Very good.

Let me see if there is anything else in here, just preliminarily. You were called for jury duty two years ago; is that right?

PROSPECTIVE JUROR: Yes.

MR. BEACH: But did not end up on a jury?

PROSPECTIVE JUROR: Did not.

MR. BEACH: Okay. You have lived in this area about 17 years. Did you go -- you went to undergrad at Penn State?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Any graduate work?

PROSPECTIVE JUROR: No. Haven't been in school since.

MR. BEACH: I went to the University of Illinois. Back when we were in school, Penn State wasn't part of the Big Ten, that is kind of a recent deal.

PROSPECTIVE JUROR: Right.

MR. BEACH: Who was the quarterback when you were undergrad?

PROSPECTIVE JUROR: Blackledge. You remember him?

MR. BEACH: He has had a pretty the good career broadcasting?

PROSPECTIVE JUROR: Uh-huh, he is pretty good.

MR. BEACH: Since you have not been on a jury, at least here in Dallas, there are a lot of similarities to every criminal case. And if you recall or not, Judge White kind of gave you just a thumbnail sketch of how a criminal trial works back in late November, early December whenever you were down here. Because of what is at stake in this case, there are some things you need -- a capital murder case where the State is seeking the death penalty, we are going to talk about those in just a second.

But with everyone who has been up there in that chair, we have put our cards out on the table. We don't want it to come as a surprise if you are asked to be on this jury. Come April, hey, those guys were really serious about seeking the death penalty in this case. That's our goal in this case.

And we tell each prospective juror like yourself, that is our goal because we believe that we have the type and quality of evidence, first of all, that will convince a jury beyond any reasonable doubt that this defendant is guilty of capital murder. And secondly, that we have the type and quality of evidence that will convince a jury that a death penalty is the appropriate punishment in this case for this crime and for this individual as opposed to the only other punishment alternative available once you are found guilty of capital murder. And that's life imprison without the possibility of parole.

And let's just assume that that happens in this case, sir. You may or may not be familiar with what happens with the defendant once he is given the death penalty here in Texas. But what happens is, if the jury recommends the death penalty to Judge White, he has no discretion under the law other than to assess his punishment at death by lethal injection. At some date in the future, Judge White will set an execution date.

And on the day before that date, they will come and get Mr. Ruiz at the death-row facility in Livingston, Texas. Take him by vehicle to about 40 miles to downtown Huntsville, Texas. It is an old prison unit called the Walls right there in downtown. That's where the actual death chamber is. He will be placed in a holding cell. On the date of the actual execution, he will be given a last meal, allowed to see his family, a spiritual adviser, if he wanted to.

At six o'clock this night, they will come and get Mr. Ruiz and take him down a narrow hallway into the death chamber. Inside the room is a hospital bed, it is called a gurney, it is called a hospital bed. They put him on the gurney, insert intravenous lines into his arms. Once that process is completed two curtains would be drawn back. Behind one window, he can have up to five members of his family there. Behind the other window, the victim could have up to five members of the victim's family there. And they would be

allowed to actually witness the execution. The warden would ask Mr. Ruiz, if he wanted to make a final statement.

Once that was over, the warden would give the go-ahead. And at that time a series of three drugs would begin to be introduced through those I.V. lines into his body. The first to knock him out. The second to collapse his lungs. And the third to stop his heart. Whether it took three minutes, five minutes, or seven minutes, at some point in time the doctor there would go over and pronounce Wesley Ruiz dead by that lethal injection.

I don't tell you that to be morbid. We tell everyone sitting up there because we want to impress upon them in this sterile courtroom what is at stake in this case, literally a life-and-death situation. Some jurors when they fill out the questionnaires when asked theoretically about it, hypothetically about it, yeah, I could give the death penalty. But when they are sitting in that chair and within 25 or 30 feet not some fictional character but the man we are seeking to have the death penalty imposed upon, they say it is a different deal. They say I can't do it.

My question to you is sir, you know yourself better than anybody else, you have had over two months to think through issues that are going to be important in this case, do you believe that you are the type of individual that can participate in a proceeding, if you felt the evidence

compelled you to do so that may very well result at some date in the future this man here in the courtroom laying dead on a gurney in Huntsville Texas?

PROSPECTIVE JUROR: Yes, I do.

MR. BEACH: Any question in your mind about that?

PROSPECTIVE JUROR: No.

MR. BEACH: I will tell you something, Mr. Caldwell, the seven jurors who have already been impaneled on this case, we didn't get any volunteered, okay. We didn't get anybody going to be skipping home, I am going to be on this jury. Everybody is going to take it seriously, nobody is going to relish this experience. They have all told us that it is going to be a memory they will have the rest of their lives. Because again it may very well come to past at some point in the future you turn on the TV at six o'clock, there it is, they are taking Wesley Ruiz down that hallway to the death chamber. This is potentially a very real experience.

Each juror that has been impaneled, they have expressed to us that they will take it seriously, and I know you will do so.

Let's talk about what a potential death-penalty murder case is here in Texas. And what is not a potential death-penalty murder case. Some folks think for instance if I pulled out a gun right now, pointed it to her head and blew

her brains out and danced around her dead body and laughed about it, that would be a horrific murder; wouldn't you agree?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Guess what, in Texas I would not be subjected possibly to the death penalty because she is not one of the protected class of individuals. The legislature here in Texas says if you kill a member of that class, potentially you could be subjected to the death penalty.

Now, if she was in uniform like that fellow back there, if she was a peace officer acting in the line of duty, and I intentionally committed the murder of that individual, like we have here in this case, allegedly, that is a potential death penalty case.

If you go into a 7-Eleven store to rob it and you murder the clerk behind the counter, murder during a robbery, that would elevate what I will just call first degree murder up to capital murder where the death penalty would be potential punishment, okay.

Murder during a rape. Murder when you are breaking into somebody's home, you murder the home owner during the burglary. Murder during kidnapping. You kill two or more individuals in the same criminal transaction. Multiple murders in one transaction. Serial killers, you know Ted Bundies, those kinds of folks that murder pursuant to the same scheme all across the country. Murder for hire.

If I hire Andrea to go out and kill someone, I would be subjected to the death penalty for hiring her. And she could be subjected to the death penalty for actually receiving money and committing the murder. Other than those categories, those are the only fact situations where the State could seek the death penalty.

Are you with me so far?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Some folks have told us that if I were Governor Caldwell for the day and I could either expand the categories of the crime where the death penalty would be a possibility, or decrease that category, we got lots of different answers, okay. And that's fine to have personal opinions. But could you follow the law in regards to the way it is here in Texas, what a death-penalty case potentially is and what a death-penalty case potentially is not?

PROSPECTIVE JUROR: Yes, I could.

MR. BEACH: What we have to prove in this case, on that half page piece of paper right there in front of you. While you are looking at that, let me just paraphrase. We have to prove beyond a reasonable doubt that this defendant here, in Dallas County, Texas, on or about a certain date, knowingly and intentionally caused the death of that police officer by shooting him with a firearm. And when he committed that murder, he knew that police officer was acting in the

line of duty. That kind of course paraphrase what we have to prove in this case, okay.

Now, let me give you kind of an extreme example to highlight a law that is going to apply in this case. Let's say that at the end of all the evidence, you and 11 other jurors, you have no doubt whatsoever that the defendant intentionally murdered a police officer. And when he murdered that police officer, he knew he was murdering a police officer in the line of duty, no doubt about it. But as you see in there, one of the things we have to prove is the murder happened in Dallas County, Texas.

Now, let's say, Mr. Caldwell, that we drop the ball, we being the prosecution in this case, and didn't present any evidence where the murder took place. Or worse yet, the evidence you heard was that the murder took place in Kaufman County.

Now, you are going to take an oath, if you are asked to be on this jury, to render your verdict -- a true verdict according to the law and the evidence. And the law is, we have to prove everything in that indictment beyond a reasonable doubt. Not four out of five, not six out of seven, we got to prove everything. And one of the things we have to prove is the county where the murder took place.

Now, if something like that happened, it would make you sick, make the other 11 jurors sick and you have to let a

murderer go, but their oath would require it. We would be looking for a job the next day, I guarantee you if something like that happened. If you were on this jury, you would have to follow the law.

Could you follow the law in that regard?

PROSPECTIVE JUROR: Yes.

MR. BEACH: That piece of paper is part of the indictment in this case. And you have heard the term indictment. And literally it is a piece of paper. It tells us what we have to prove beyond a reasonable doubt. It tells them what they have to defend against.

I have been doing this off and on for 25 years. And I have never met anybody that volunteered to get indicted. So the corresponding obligation is, we do all the accusing, we have to do all the proving, okay.

A lot of folks think coming into a trial, if someone has been arrested, indicted, and here they are in the courtroom surrounded by bailiffs and people in uniform, they must have done something wrong. That's a natural thing to think. But again to follow your oath in this case, you are going to have to assure everybody in here. The Judge is going to instruct you that the indictment is absolutely no evidence of guilt in this case. It is just a piece of paper that tells us what we have to prove and what they have to defend against.

Can you follow that law, sir?

PROSPECTIVE JUROR: Yes.

MR. BEACH: That analogy, I just related to you that where there is smoke there is fire, he must have done something wrong, your mind-set needs to be the exact opposite if you are to follow your oath in this case. Because as you know, every criminal case starts with what, the presumption of innocence. As he sits here in the courtroom right now, again Judge White will instruct you that you are to presume Mr. Ruiz innocent until we, the State, produces sufficient evidence that convinces you beyond a reasonable doubt everything on that piece of paper; you understand that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: And could you give Mr. Ruiz the presumption of innocence and require the State to prove everything that we are required to prove beyond a reasonable doubt?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Now, where do we go from there, I said three or four times, what is your burden in a criminal case. Our burden is to prove everything we are required to by law beyond a reasonable doubt, you have heard that term before; is that correct?

PROSPECTIVE JUROR: Yes.

MR. BEACH: I am guessing, knowing what is at stake in this case, literally life and death, you are going to

hold us to that burden of proof, aren't you?

PROSPECTIVE JUROR: Yes, I am.

MR. BEACH: If you have ever been on a civil case before, the burden in a civil case where you are talking about money or property is by a preponderance of the evidence.

PROSPECTIVE JUROR: Right.

MR. BEACH: Just the slight tipping of the scale one way or the other, whoever does that prevail. You are talking about a case where you are trying to get someone institutionalized because they are mentally incompetent. Or a case is where you are trying to terminate someone's parental rights, the burden in that case is called clear and convincing evidence. Above preponderance of the evidence, clearly higher burden than in a civil case. Then you come to a case like this in a criminal case is even higher than clear and convincing evidence.

You understand why that burden is higher?

PROSPECTIVE JUROR: Yes.

MR. BEACH: And you would hold us to proving the case beyond a reasonable doubt against Mr. Ruiz?

PROSPECTIVE JUROR: Yes.

MR. BEACH: And I have said this. I don't want to repeat myself, you have to look to us for everything in this case, okay.

The only thing they have to do under the law is to

attend. They are here right now, and they are going to be here everyday of this trial.

Now, these are fine lawyers. And I expect they are going to vigorously and zealously defend their client in this case like they have done for over 40 years -- 30 years -- 20 -- they have been around a long time. They are going to do what they have to do. They don't have to. They can sit over there and do crossword puzzled under the law. You don't look to them for everything in terms of evidence or disproving everything what's in that indictment; you understand that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: A natural corollary to that is, every defendant when they are charged with a crime, have a Fifth Amendment right against self-incrimination. If he wants to testify on his behalf, he can; but if he doesn't, Judge White will instruct you that you can't hold that against him for any reason whatsoever.

Can you follow that law, sir?

PROSPECTIVE JUROR: Yes.

MR. BEACH: All right. That's your civics lecture on the first part of the trial. And we call it -- it is like a two-act play, all right. The first act -- the first part of the criminal trial, the jury's only question is, is he guilty or not guilty. Has the State met its burden of proof. Has the State washed away that presumption of innocence by

proof beyond a reasonable doubt, proved everything they are required to by law. That's the only question the jury has to answer at the first phase, the first act of this trial, okay.

Now, let's assume -- obviously if we don't, and the jury has a reasonable doubt, what do they do? They find him not guilty, right. The trial is over, you go home, they go home, and there is no act two, there is no second part of the trial. But for purposes of our discussion, let's assume that we have met our burden and we have proven Mr. Ruiz guilty beyond a reasonable doubt exactly as he is charged in the indictment. It would be your obligation pursuant to your oath at this time to find him guilty because we have proven it beyond a reasonable doubt.

Could you and would you find him guilty if that was the case?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Once that is done, that ends act one, okay. Just like you would if you went to a play, at the end of act one, the curtain comes down, you go out into the hallway with the rest of the audience. And guess what, you done know how the play is going to end, do you?

PROSPECTIVE JUROR: No.

MR. BEACH: You have got to come back in after the intermission and watch act two before you are going to know how this drama is going to unfold. That's kind of like

it is in a criminal trial. Just simply because you have found someone guilty of a crime, in this case capital murder, there is nothing automatic one way or the other about what punishment that defendant is going to get; you understand that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Okay. Like we talked about, once a defendant is found guilty of capital murder, Mr. Caldwell, his best day ever from that point on is life in prison without even the possibility of parole. That's the best he is looking at, okay. He could bring peace to the Middle East. He could find a cure for cancer in prison, guess what, he is never going to get out unless he escapes. No possible parole, that's the best sentence he is looking at.

A lot of folks tell us that if I find someone guilty of intentional capital murder, remember what capital murder is versus just regular first degree murder. Capital murder is one of those special categories elevated above first degree murder. And they tell us if I find someone guilty of an intentional capital murder, I don't care what you say, Mr. Beach, it is going to be automatic in my mind, he is never going to get a life sentence, he will always get a death sentence. And obviously if that was the case, that juror wouldn't be qualified to be on this case; you understand that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: And just like you presumed him to be innocent at the first part of the trial, you are to have the proper mind-set going into the punishment phase of the trial. You are to presume that a life sentence without parole is the appropriate punishment. Even though he has been found guilty of an intentional capital murder, the mind-set of each juror going into act two or the punishment phase of this criminal trial, is that he stays there at that life sentence, okay. And not until the State proves to me beyond a reasonable doubt that life sentence should be elevated up to a death penalty am I going to change that.

You understand how it is supposed to work?

PROSPECTIVE JUROR: Understood.

MR. BEACH: How do you feel about that?

PROSPECTIVE JUROR: It is something that has to be done, civic duty.

MR. BEACH: It's the law?

PROSPECTIVE JUROR: Yeah.

MR. BEACH: You know, some folks, again, they come down here and fill out these questionnaires, you are doing the best you can to fill it out honestly, I am sure you had no idea when you came down that Friday, you know, what you were getting into, you know. And so you are filling out your questionnaire, people have, you know, they have opinions. But the bottom line is, the seven jurors we have already

impaneled, they have told us that, yeah, I have personal opinions; but I understand the difference between having a personal opinion and what the law is here in this capital murder case. And they have all assured us that I can set aside my personal opinions and do everything within my powers to follow the law that Judge White is going to give in this case.

Can you do that, sir?

PROSPECTIVE JUROR: Yes.

MR. BEACH: So you understand just because you found someone guilty of an intentional capital murder in act one, or the first part, there is nothing automatic? There is nothing determinant about whether he is going to get life or death?

PROSPECTIVE JUROR: I understand.

MR. BEACH: And he stays at that life sentence until we prove to you and 11 other jurors that that life sentence should be elevated up to a death sentence?

PROSPECTIVE JUROR: I understand.

MR. BEACH: How is that done? Obviously at act two, at the second part of this trial, we call it the punishment phase of the trial, each side is entitled to bring additional evidence, okay. Obviously, again just like at the first part of the trial, to get that life sentence elevated up to a death sentence, who are you looking to convince you to do

that beyond a reasonable doubt?

PROSPECTIVE JUROR: The prosecution.

MR. BEACH: Again, they don't have to do anything. You have to look to us to prove to you beyond a reasonable doubt that a death penalty is the appropriate punishment in this case. Now, how do we do that here in Texas? Well, it is not a situation where you hear additional evidence and go back and write life or death, that's not how it works. The way that life sentence is elevated up to a death sentence is how they answer that first question to your left.

Take just a second to look at that. All right. Before the State is entitled to a death penalty, before the State is entitled to have that life sentence elevated up to a death penalty, would you agree that we call that the future danger question?

Here in Texas, the legislative scheme is, before someone is going to get a death penalty, before someone gets the ultimate punishment, not only are they going to be a convicted capital murderer, that same jury that has convicted them of capital murder is going to have to decide beyond a reasonable doubt that he is going to be a future danger to society. And that's what that first question is asking you to do. If you read that in the first line and two words, again we have the burden of proof. We have to prove to a jury beyond a

reasonable doubt that he is going to be a future danger. Okay.

Now, let's look -- break this question down in a little more step by step here. We didn't word this question, again the Dallas D.A.'s office didn't do it, it was the Texas legislature. They could have worded this question anyway they wanted to. Keep in mind they kind of break it down into three parts, the first part is probability. The second key phrase is commit criminal acts of violence. And the third key word, that word are society, okay. And superimposed above all those three subparts is the burden of proof.

We have to prove in all probability that he will commit future acts of violence or be a continuing future threat to society. And our burden is to prove everything in that question there.

Now, the kicker is there is no legal definitions for those terms. So it is going to be what that word probability means to you. In the context of that question and the other 11 juror. We have asked everybody sitting up there in the context of that question, what is it that word probability mean to you?

PROSPECTIVE JUROR: That there is a chance that it would happen again.

MR. BEACH: Now, I know you are an accountant and you have a heavy math background?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Statistically probability means literally a chance?

PROSPECTIVE JUROR: Uh-huh.

MR. BEACH: Would you agree with me, sir, if you ever watch the weather at night, when David Finfrock says it is possible that it is going to rain tomorrow, you might not take that real serious. But if Finfrock says it is probable that it is going to rain tomorrow, that gives you a higher level of certainty that it is going to rain tomorrow; would you agree with me?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Most jurors tell us that that word means more likely than not, greater than 50 percent. I guess anything is possible. I could -- it is possible I guess I could win Olympic Gold at the 2010 hundred meter dash, ain't going to happen; but theoretically it is possible.

Would you agree with me that that word probability is going to be a higher degree of chance than what we are talking about?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Okay. We have to prove beyond a reasonable doubt that in all probability the defendant will commit criminal acts of violence.

Again, the legislature could have said will commit

murders in the future. Would commit rapes in the future or robberies. They could have put that anyway they want to, they got that general phrase in there, okay.

What does that phrase, criminal acts of violence, mean to you?

PROSPECTIVE JUROR: Commit acts against the law.

MR. BEACH: If I balled up my fist right now and just for no reason whatsoever, just cold-cocked her, knocked her out, laughed about it, would you consider that a criminal act of violence?

PROSPECTIVE JUROR: No.

MR. BEACH: You would not consider that a criminal act of violence. You would have a higher threshold?

PROSPECTIVE JUROR: Pull a gun, deadly weapon.

MR. BEACH: Weapon?

PROSPECTIVE JUROR: Something along those lines.

MR. BEACH: You think she would consider it a criminal act?

PROSPECTIVE JUROR: Yes, she would.

MR. BEACH: Now, again, there is no legal definition, so it is going to mean what it means to you and the 11 other jurors, okay.

Now, that last phrase there, probability or commit

criminal acts of violence that would constitute a threat or continuing threat to society.

Now, where is he going to be for the rest of his life if he is found guilty of murder?

PROSPECTIVE JUROR: He is going to be in prison.

MR. BEACH: The legislature contemplates that a jury is going to have a broad enough definition of that word society to include prison society. Okay. Obviously most folks when they first see that word society think about their jobs, going to church, socializing, being with family, whatever. But again in the context where he is going to be, necessarily, that phrase is going to have to include prison society; you understand that?

And -- have you ever been in a prison before?

PROSPECTIVE JUROR: No.

MR. BEACH: Okay. Again, you may or may not hear evidence of what prison society is like. Would you agree with me that there are different classes of individuals in prison society other than the inmates themselves?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Guards?

PROSPECTIVE JUROR: Right.

MR. BEACH: Administration, medical, people visiting, whatever, okay. And again, the law contemplates that we have to prove to you beyond a reasonable doubt that he

will be in all probability, you know, because he will commit criminal acts of violence in the future, wherever he is going to be, a threat to society; you understand that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Now, if we don't prove that to you, guess what, you answer that question "no", okay. We have to prove that question should be answered "yes" to get our death sentence. We have to prove to you that he will be in all probability a future danger to society to get that "yes" answer. It is kind of like going in, you got a big "no" spray painted at the bottom of that page there. For us to erase that "no", to erase that spray paint, we have to bring to you sufficient evidence that convinces you beyond a reasonable doubt that that "no" answer should be replaced by that "yes" answer.

You with me on that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: And would you require us to prove that to you before you would erase that "no" answer?

PROSPECTIVE JUROR: Yes.

MR. BEACH: And if you answer "no", the life sentence remains and there is no other further proceedings.

But let's assume we have proven to you beyond a reasonable doubt that question should be answered "yes", and you believe in all probability that he would commit criminal

acts of violence that would constitute a continuing threat to society. Your oath at that time would require you to answer that question "yes"; do you understand?

PROSPECTIVE JUROR: Yes.

MR. BEACH: What is the effect of a "yes" answer to question number one?

PROSPECTIVE JUROR: Probably leads to the next issue.

MR. BEACH: Absolutely, that's the first thing, it leads to the next issue. But the reality of a "yes" answer to that first question is, what? At the first part of the trial, you have already convicted him of the capital murder of which he has been indicted for. Now you have found beyond a reasonable doubt he is not only guilty of capital murder, but he is going to be a future danger to society. At that point in time in the trial, that does in fact elevate that life sentence up to a death sentence. And he is sitting on a death sentence now. We have erased the presumption that that life sentence is the appropriate punishment and now he is sitting on a death sentence. Not only is he a capital murderer, he is also a future danger to society.

You with me?

PROSPECTIVE JUROR: Uh-huh.

MR. BEACH: Is that the end of the show, though, it is not. Because you have that second question. Take just

a second to read that to yourself.

PROSPECTIVE JUROR: Okay.

MR. BEACH: We call that the safety net question. Or kind of the safety valve question. What that question is asking you to do, sir, is before you ever get to it, you have found him guilty of an intentional capital murder, and that on top of that, now you have found that he is going to be a future danger no matter where he is, no matter what society he is going to be in, he is going to be a future danger to that society. And he is sitting on that death sentence. The legislature want you and the 11 other jurors before you etch that death sentence in stone inevitably for all time, they want the jury to go back and re-assess everything, okay. Is there something that we weren't allowed to consider, something in his background, something about his participation in the offense, the offense itself, something that leads us to believe that, you know what, he is worthy of a death sentence, because of this mitigating circumstance, we believe is sufficient, we are going to change that death sentence back to a life sentence. That's kind of the mental gymnastics that question is asking you to perform; you understand that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: And again, honestly, sir, there have been some folks that tell us, once I have convicted someone of

capital murder and once I have been convinced that he is going to be a future danger to society, there is nothing that is ever going to get me to change that death penalty back to a life sentence. And that's fine for them to think that, but they wouldn't be qualified to be a juror in this case, if that was their belief, if that's how they were going to conduct themselves.

Do you feel like that?

PROSPECTIVE JUROR: No.

MR. BEACH: And again what -- the key -- to me the three key words there are sufficient mitigating circumstance, okay. And this can't be he has got a nice haircut. So he got a nice haircut, so therefore I am going to spare his life and give him life. It has to be --

MR. BRAUCHLE: Your Honor, that is a misstatement of the law.

MR. BEACH: I will withdraw the haircut.

There has to be something sufficiently mitigating in this defendant's background and his upbringing, like it says there, the circumstances of the offense it has to be tied to one of those things that convinces you that a life sentence is the equitable, just, merciful, whatever you want to say, is the just punishment in this case.

Some folks tell us -- obviously we can't execute mentally retarded folks in this country anymore. That was handed down

six or seven years ago. There are some folks that are not technically mentally retarded, but they are right there at the cusp. Some folks say that might be, depending on the circumstances, that might be one of those circumstances to me that mitigates this individual's personal moral culpability that I think he is going to be a future danger. He did this murder, but I think a life sentence, because of this, is the just outcome of this case. That's how it is supposed to work, okay?

PROSPECTIVE JUROR: Okay.

MR. BEACH: Anything come to your mind right now, sir, in terms of what might be a sufficient mitigating circumstance that might cause you to take that death sentence back to a life sentence?

PROSPECTIVE JUROR: I guess being an abused child maybe.

MR. BEACH: Perfect. That's a biggie. Someone who has severely abusive parents, tortures them, don't love them. Basically raised a monster?

PROSPECTIVE JUROR: Right.

MR. BEACH: That's something that that could be a sufficient mitigating circumstance. That's what it is asking you to do. Is that last -- it's that last hurdle before the curtain comes down finally and that death sentence is etched in stone. It is a little -- well, it causes you to

have to have the mind-set, even though I found someone guilty and even though I found that he was going to be a future danger, you know what, whatever it is sufficient mitigating circumstance is, whatever it is, I think a life sentence is the appropriate punishment. And you could go through those hurdles and that -- those exercises, and if you believed after hearing a sufficient mitigating circumstance, you believed that a life sentence was the appropriate sentence, you could and would return a life sentence?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Any question in your mind about that?

PROSPECTIVE JUROR: No.

MR. BEACH: You are not one of those folks that just believe once I find someone guilty, once I find they are going to be a future danger, the curtains is over, the play is over and I am done?

PROSPECTIVE JUROR: No.

MR. BEACH: All right. I am just about done with you, and I appreciate your patience with me.

I want to go back to the first part of the trial and cover something very briefly. Again we can't -- we have a pretty good idea what the evidence is in this case. Obviously, you would hope that we do at this point in time, almost a year out. We can't crystal ball every contingency

and everything that might happen in a case like this. I am going to give you an example.

Obviously he is charged with capital murder, where the only two possible punishments are life and death, okay. Let's assume, and we will use an example involving a police officer, let's go back to the convenience store example where someone goes in and robs a convenience store and murders a clerk. Let's assume you hear evidence like that and you believe after hearing all the evidence and the defendant went in and actually committed the murder, intentional murder, but did not commit any robbery and did not have any intent to commit a robbery. He just walked in for whatever reason, decided to murder the clerk. And you believe that, what would be the outcome in that case? He wouldn't be found completely not guilty, because he would be guilty of the intentional murder. Because a jury did not believe that it was a murder during a robbery, he wouldn't be guilty of capital murder, he would just be guilty for first degree murder.

PROSPECTIVE JUROR: Right.

MR. BEACH: Okay. You understand how that might work in a capital murder case?

PROSPECTIVE JUROR: Uh-huh.

MR. BEACH: Briefly, in the case of a police officer shooting case, you might believe he murdered the police officer, but the police officer did not identify himself or he was in plain clothes and the defendant, you had a reasonable doubt the defendant knew who he was murdering was a police officer, that came about. You would find him guilty of murder but not guilty of capital murder; you understand that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: What happens if you find the defendant guilty of murder here in Texas? Well, unlike capital murder, where there is just two possible punishments, if you are found guilty of murder in Texas, you got a vast wide range of punishment to consider, all the way down from five years in the penitentiary up to life in the penitentiary. And the reason why the legislature has that broad range of punishment in a murder case, not a capital murder case, but a murder case is cause they recognize there are some thousands of possible fact situations.

PROSPECTIVE JUROR: Yeah.

MR. BEACH: Thousands of, you know, levels of culpability, maybe the victim had some culpability. Whatever the case is, the legislature wants that wide range available so a jury can do anything within that range, okay.

Now, to be qualified to be a juror in a murder case, you would have to be able to assure the Court that, you know, I can't commit one way or the other, just like you have been up to this point in time. My mind would be open to the full

range of punishment in a murder case. And right now as I sit here, I might not be able to think of what a possible fact situation could be where as little as five years would be appropriate. You know if I saw that and believed after hearing everything that as little as a five-year sentence would be appropriate for a murder case, I could do it. Just like if I felt a 50-year sentence was the appropriate. Or a 99-year sentence or a life. After I heard everything and I believed in my heart that's what the evidence compelled me to do, I can do it or anywhere in between.

Could you do that, sir?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Last thing. And I don't think I need to spend a whole lot of time on this. But again at the first part of the trial, in any murder case or capital murder case, there may be an issue raised of self-defense, even though there is a police officer involved, okay.

Let me tell you how that might work. I might go over right now, and you see Detective Crump with his eyes almost closed over there, I might go over there and pull my gun out and blow his brains out right now. Guess what, that would be capital murder, he was a peace officer in the line of duty and I intentionally murdered him, that would be capital murder. Everybody in the courtroom saw me do it.

Let's say at trial, though, I had a couple of my running

buddies from back when it happened and my buddies came in and testified and said that's not how it happened at all. Beach was sitting there minding his own business. We saw Crump get up, come over to Beach, pull out his service revolver, and put it to back of Beach's head and said, I am going to kill you. And Beach turned the gun around and defended himself and shot Crump in fear for his life. What would Judge White have to do in a case like that? Well, it would be unbelievable, it would be completely incredible, but Judge White would have to submit to a jury the law of self-defense because my buddies raised the question of self-defense.

You understand how that might possibly work?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Because it is in the charge, you don't have to go with it, okay. You have to go with the credible, believable evidence.

PROSPECTIVE JUROR: Uh-huh.

MR. BEACH: And just because it is raised by the evidence, doesn't mean the jury has to buy it or give any credibility to it; you understand that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Obviously, if it was a situation where Crump hated me for 20 years and decided this is the day he was going to end my life, and came over and pulled his gun out and said, Beach, I am going to kill you, and even though

he was a police officer acting in the line of duty, guess what, I have right to defend myself.

Would you agree with that?

PROSPECTIVE JUROR: Yes.

MR. BEACH: And would you agreė with that law no matters what the individual's occupation, police officer, plumber, pastor whatever, if they are threatening you with unlawful deadly force, the law says you have the right to defend yourself?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Can you follow that law?

PROSPECTIVE JUROR: Yes.

MR. BEACH: Anything as you are sitting up there right now, I have been doing a lot of talking, I apologize, anything that you are confused about that you think I need to know about before I turn you over to Defense lawyers in this case?

PROSPECTIVE JUROR: No, sir.

MR. BEACH: Mr. Caldwell, I appreciate your patience and your candor with me.

And I pass the juror at this time, Your Honor.

MR. BRAUCHLE: Can we have a short break?

THE COURT: Yes, we may.

(Prospective juror retired from the courtroom.)

(Recess taken.)

(Prospective juror entered the courtroom.)

THE COURT: You may be seated.

You may proceed, Mr. Brauchle.

**VOIR DIRE EXAMINATION**

**BY MR. BRAUCHLE:**

Mr. Caldwell, as everybody has told you, my name is Paul Brauchle. And I will be torturing about as long as Mr. Beach did. Unfortunately, it is something that both sides have to impose on people in your unfortunate situation. We are not trying to do it to pry into your affairs or whatever. Obviously as Mr. Beach has pointed out to you, this is literally a life-or-death situation. And your views in regard to what we are going to talk to you about are extremely important to both sides.

You don't have to watch too many TV shows to figure out that the people at this table don't see things the way the other people do, if they did, we could just have you subjected to one interrogation and that would be it. But obviously we think that some of the principles that we are going to talk about, some of the questions we are going to talk about, obviously can be viewed from more than one perspective. And that's what I am going to talk to you about.

You got any questions about anything that Mr. Beach asked you about?

PROSPECTIVE JUROR: No.

MR. BRAUCHLE: In regard to that, I guess the long and short of what I just preambled to you, is we really don't care what you think as long as you tell us what you think. We are not down here thinking that we can reverse 50 years thought process and what have you, but it is important that you share your thoughts with us.

Let's go to the first part of, I guess, where we need to start and that's the crime of murder. As Mr. Beach alluded to and as I will flesh out a little more, the murder is the unlawful taking of a human life without any legal excuse or justification. The legal excuse or justification would be say insanity. If I am in insane, I can't be held accountable for my actions. If I kill somebody in self-defense, that is not against the law. If I reach in here and take a gun out that I bought over the lunch hour and hold it up to show it to you and ask you if you have ever seen one like it, and it goes off and kills the bailiff, that's an accident. It's ranked stupidity and what have you, but it is not really a criminal act. Cause, see, I didn't have any intent to do that. I have intent to kill somebody when I am acting in self-defense quite obviously, but the law justifies self-defense. I can protect Ms. Handley from an attack by Mr. Beach. I have got the right to protect other people from illegal attack. So a certain extent, I have a right to dispatch people protecting property. All those are legal excuses and justifications. I could go

through any number of others, but I think you probably understand what we are talking about.

But a murder is always an intentional act. I want somebody dead and I do what it takes to get them that way. And that's a real coldblooded definition of murder, but that's what we are dealing with down here. It is not anything that happens by accident or mistake or anything. I want somebody dead and I do what it takes to get them there. That's what you are dealing with when you are dealing with the crime of murder.

Capital murder is always an intentional murder plus something else. A protected class of people or whatever situation applies. Children under six, police officers, people over 65, people killed during a robbery, rape, kidnapping, burglary or arson. You know any number of things. We don't need to go into all of them.

Do you have any thoughts of any that you think probably shouldn't be in the capital murder category?

PROSPECTIVE JUROR: No.

MR. BRAUCHLE: Would you add any to it?

PROSPECTIVE JUROR: No.

MR. BRAUCHLE: We sometimes pretend down here, say you are the governor for the day or you are the king for the day, you could write the laws as you see fit and nobody could mess with them. So I take it if you were the governor,

or the king for the day, you wouldn't add any new capital crimes to our list?

PROSPECTIVE JUROR: No.

MR. BRAUCHLE: Think of any that you are not real sure of that you might not view as capital murder?

PROSPECTIVE JUROR: No.

MR. BRAUCHLE: Now, let's go back to the crime of murder. You understand that it carries a punishment range from five years imprison up to 99 years imprison to life? If you were the governor for the day, where do you think you would set the boundaries for the punishment for the crime of murder? As we discussed an intentional act?

PROSPECTIVE JUROR: Within that framework. I don't understand.

MR. BRAUCHLE: You don't have to do it within that framework?

PROSPECTIVE JUROR: Okay.

MR. BRAUCHLE: You got a blank slate. You can walk over to it and say from this day forward, the punishment for the crime of murder is X to Y, or -- or the legislature could have is done this. They could have just passed a law that said anybody convicted of murder in the State of Texas, gets 40 years, 50 years, ten years, they could have sat it at any one number. When a jury came back and found someone guilty, that would be it. So you wouldn't have to go back and

deliberate, do whatever, it would just be one number or one sentence fit everybody. But I am asking you as to what your thoughts are as to what the punishment should be for murder?

PROSPECTIVE JUROR: I think the current perimeters are fine.

MR. BRAUCHLE: You don't have any quarrels?

PROSPECTIVE JUROR: No.

MR. BRAUCHLE: So if you found somebody guilty of an intentional murder, you could consider, and if you thought it was appropriate, give as little as five years in the penitentiary for someone that killed another person without any legal excuse or justification?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: Any thoughts on that other than what you have shared with us?

PROSPECTIVE JUROR: No.

MR. BRAUCHLE: You think there would ever be a situation where you could do that?

PROSPECTIVE JUROR: Probably.

MR. BRAUCHLE: What would you look for in setting that punishment in a case?

PROSPECTIVE JUROR: Extenuating circumstances, the proof provided by the prosecution and whatnot, whatever could be refuted.

MR. BRAUCHLE: Okay. In regard to extenuating

circumstances, would those be on the State's case in chief or Defense of extenuating circumstances?

PROSPECTIVE JUROR: I am not sure what you mean.

MR. BRAUCHLE: Well, see I am not exactly sure what you mean by extenuating circumstances. Would that be something that caused the person to be murdered or?

PROSPECTIVE JUROR: Could be a cause.

MR. BRAUCHLE: Could you share a little more of that as to what you are thinking about would be important to you, extenuating?

PROSPECTIVE JUROR: Well, let's say that the accused was felt threatened in the situation.

MR. BRAUCHLE: So that goes back to self-defense?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: If I feel threatened and it's a legitimate fear of a threat to my life or to my person on my part, I can kill somebody.

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: And it is not murder. Let me kind of skip around on that. Mr. Beach talked to you about self-defense. I have talked to you about it some, it's a legitimate defense. As you can probably see by what you have just talked about, may very well fit into a lot of different

situations. Certain interactions between persons, obviously, one might think that they are acting in defense of themselves. The other person may or may not -- their actions would obviously be important to decide that. But the right to self-defense is always looked to as to what the person claiming self-defense, what their situation was. It is not what -- it is not what this person over here thought, I was thinking when I shot my co-counsel in self-defense.

Now, obviously he can testify to facts that occurred before or after or during the thing. But you look to the person that is on trial, what their position is, because these people over here, they may or may not be threatened. They are not people that have, you know taken somebody's life in self-defense. It is what's my perspective of the situation. Does that make sense?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: You have any quarrels with that?

PROSPECTIVE JUROR: No.

MR. BRAUCHLE: You know you don't come in and ask somebody in the back of the courtroom what was I thinking when I took out a gun and shot somebody, because obviously they don't know.

PROSPECTIVE JUROR: Uh-huh.

MR. BRAUCHLE: Now, we could take everybody in here and put them on the stand where you are and say what

happened right before this happened. And obviously that testimony might very well be instructive as to what the situation was in my regard to shooting someone. But there is more than one way. It is always looked to my perception, okay.

Now, then, I think you have told us that you can make the State prove beyond a reasonable doubt each and every one of those elements in the indictment. We talked about elements. Nobody tell you what those are. But back in high school or junior high when you used to break up sentences, diagram and all that, what you do is, you divide that up into parts basically.

The first one -- pardon me, would be say the date, then you move along to say in Dallas County, Texas, that would be another part. The defendant's name, that's another part. See you break it up into pieces. And the State has to prove each and every one of those pieces beyond a reasonable doubt. It's not nine out of ten, it has got to be ten out of ten. And every one of them has got to be proven beyond a reasonable doubt. There is no one that is more important or less important than the others. Even though it may seem unimportant, they have to prove each and every one of them. You work for the Army and Air Force Exchange; is that off of Walton Walker?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: What is the intersection there, Ledbetter and Walton Walker?

PROSPECTIVE JUROR: Yes, just up the street.

MR. BRAUCHLE: So you know exactly where that is?

PROSPECTIVE JUROR: Uh-huh.

MR. BRAUCHLE: Let's just say that the State brings in testimony, and all the people say, I was there, it happened at Walton Walker and Ledbetter. But nobody ever says that Walton Walker and Ledbetter is in Dallas County. And you are sitting there going, Hey, I know where it is; but you can only act on testimony that you hear from where you are sitting. You can't -- you can't fill in the blanks for the State.

See where I am coming from?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: So I am not saying that that would ever happen, but that's kind of an be extreme example of how high the State's burden of proof is.

PROSPECTIVE JUROR: Okay.

MR. BRAUCHLE: You can't push them over the top, you can't say, well, I know this, that and the other, they just forgot to come in and tell us about it. And we can go ahead and mark that one as being proven beyond a reasonable doubt.

Let me go back to your questionnaire. What kind of shooting do you do?

PROSPECTIVE JUROR: I have a handgun, I go to a range.

MR. BRAUCHLE: You do competition shooting?

PROSPECTIVE JUROR: No. I am not that good a shot.

MR. BRAUCHLE: You just see if you can knock the target over or put it in the block, whatever?

PROSPECTIVE JUROR: I am a little bit better than that.

MR. BRAUCHLE: I will quit judging people by my standard. What kind of pistol do you have?

PROSPECTIVE JUROR: It's a .380 semiautomatic.

MR. BRAUCHLE: Okay. And how often do you do that?

PROSPECTIVE JUROR: Well, I have got an annual membership. And when I prepaid, they said you got to go once a month to get your money's worth, so I go about once a month.

MR. BRAUCHLE: Does your wife shoot also?

PROSPECTIVE JUROR: I tried to get her to shoot, but she won't do it.

MR. BRAUCHLE: What was she in the military?

PROSPECTIVE JUROR: That was another error on my paperwork, I thought I was answering for myself on those

papers, she has never been in the military.

MR. BRAUCHLE: But both of you work for the --

PROSPECTIVE JUROR: Yes. She has been there about 17 years.

MR. BRAUCHLE: All right. In regard to your church affiliation, the -- you attend Nazarene Church in Duncanville?

PROSPECTIVE JUROR: Trinity Nazarene, yes.

MR. BRAUCHLE: And they don't have, as far as you know, any physical position as to capital punishment?

PROSPECTIVE JUROR: I don't think so. I haven't gone to the Nazarene that long.

MR. BRAUCHLE: What, were you a member another religion?

PROSPECTIVE JUROR: Methodist. I was raised a Methodist.

MR. BRAUCHLE: Okay. Let's go back and make you king again for the day. Would you have the death penalty for Texas?

PROSPECTIVE JUROR: Gee, I think so, yeah.

MR. BRAUCHLE: Any reason why?

PROSPECTIVE JUROR: I think it stands as a deterrent.

MR. BRAUCHLE: You have obviously been in other states in the union and you know that I can't give you

percentages one way of the another, but I think Texas quite possibly in the minority in regards to having the death penalty. You think people that live in states that don't have the death penalty are less safe than people who live in states that do have the death penalty?

PROSPECTIVE JUROR: That's a good question. Probably not. It is probably no difference.

MR. BRAUCHLE: Okay. How does that -- how does that figure in then with your statement that you think that it might be a deterrent to crime?

PROSPECTIVE JUROR: Well, those states probably imprisons more than Texas does, I would hope. I don't have the statistics on me.

MR. BRAUCHLE: We don't want to get broken down with statistics. You know I may be wrong to the ratio, but it is a theoretical question.

PROSPECTIVE JUROR: Right.

MR. BRAUCHLE: Pie in the sky, one way or the other. But you think they probably make up for the lack of death penalty by greater incarceration?

PROSPECTIVE JUROR: Yes. Or greater rehab, rehabilitation.

MR. BRAUCHLE: What do you think about rehabilitation?

PROSPECTIVE JUROR: I think it can work.

MR. BRAUCHLE: Do you think that the State owes it to its citizens to attempt to rehabilitate those who have been convicted?

PROSPECTIVE JUROR: I would have to say, yes.

MR. BRAUCHLE: In other words, if we are going to lock you up for five years, we ought to --

PROSPECTIVE JUROR: Try to --

MR. BRAUCHLE: -- do something to where we can make you a viable person when you are released?

PROSPECTIVE JUROR: Yes, sir, yeah.

MR. BRAUCHLE: So if you were governor, you would stress that a little more then a little, right?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: You understand that your views in regard to that and the reality of what the punishment structure is in the case that we have got you down here on are really not very obtainable because the person either gets killed or they never get out of prison.

As Mr. Beach told you, Mr. Ruiz could go to prison, bring peace to the Middle East and cure cancer, you know, reverse global warming or any good aspect to our society, and he is not going to get out of prison or it is not going to keep him from being killed under a death sentence. So our views in regard to that, we have to really set those aside and just address these things right here.

Let's go to special issue number one. If -- and I think you have answered this to a certain extent, but if you answer that yes -- well, let's back up. You understand that that question starts out being answered "no". It is kind of a continuum of the defendant being assumed to be not guilty. He is assumed to be not guilty. And because of that, he never has to present any evidence or rebut any evidence from the State. The State has to prove all the things on the indictment beyond a reasonable doubt. Once they do that, then you could find him guilty.

Now, then, you go into the second phase of the trial, and that issue is assumed to be answered "no". And you know from talking to Mr. Beach and from paying attention that that special issue that if that answer remains "no", the person gets life imprison without parole. So basically the way the legislature has set this sentencing structure up, life imprison without parole is the preferred punishment. Because any failure on the State's part, it always reverts back to life imprison without parole.

Do you have any quarrel with that? Seem like they could do it the opposite. If they answered "yes" -- I guess they could say it is always assumed to be "yes", and then it has to be found "no" for them to get a different result?

PROSPECTIVE JUROR: No, I don't have any problem with that.

MR. BRAUCHLE: Okay. If a person is found guilty of capital murder, some people say, Look, if I am sitting on a jury, and the State brings in evidence to convince me and the 11 other people beyond a reasonable doubt that the person on trial knowingly and intentionally took the life of a police officer, while that police officer was in the line of duty, and he knew that that police officer was in the line of duty, which would be what you would have to find to fine person guilty, when I get to special issue number one, the answer to that has already been figured out from my point of view. Because anybody who would do that, who would do that is always going to be in my mind a continuing threat to society.

See where I am coming from? What do you think in regard to that, would you think that the proper answer on that question would be "yes" because of what you would have found in regard to the first part of the trial?

PROSPECTIVE JUROR: No. I think that is an important consideration, continuing threat to society.

MR. BRAUCHLE: Okay. What do you think constitutes a continuing threat to society?

PROSPECTIVE JUROR: Probability that that offense would be repeated.

MR. BRAUCHLE: The offense that you would have decided in the first part of the trial?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: Okay. Let's -- so you understand -- let me flush this out a little bit. The first part of the trial is to answer the Court's instructions or the Court's charge in regard to everything is going to be defined for you.

The phrases that are in there like in the line of duty or firearm, intentional, everything that you see on that paper just about has some sort of legal definition. So if you get stumped or you have an argument, you go back to the Court's charge.

Unfortunately when you get to these two special issues, which we think are most important, there is no definition. It is whatever you think it should be.

And you stated that to you probability meant chance that it would happen again; is that a correct statement?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: In regard to that, a chance just means just that, a chance that it could happen; would you agree with me?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: If that were the -- let me back up, you understand that probability comes right after reasonable doubt. And that reasonable doubt is a fairly high burden to prove; agree with me?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: So if there has to be at least a reasonable doubt that there is a probability, would that still mean a chance to you?

PROSPECTIVE JUROR: Repeat that.

MR. BRAUCHLE: I thought you might ask me to do that.

PROSPECTIVE JUROR: I would have to say to define it in my eyes, likelihood. There is a good likelihood in layman's terms that it would happen again.

MR. BRAUCHLE: Okay. Keep on.

PROSPECTIVE JUROR: That's all.

MR. BRAUCHLE: Okay. Let me go back again. You understand that reasonable doubt for you to find a person guilty beyond a reasonable doubt there has to be from our way of thinking a pretty high surety that things happen or that the evidence was such as the State would like for you to believe. I think I might have lost myself on that sentence. What I am saying, it is a high threshold. Beyond a reasonable doubt, some people say, Well, I have no reasonable doubt that it didn't happen. In other words, there is no question in my mind. And when we are coupling reasonable doubt with probability, I said you said chance and you said it is a likelihood.

PROSPECTIVE JUROR: Right.

MR. BRAUCHLE: The law does tell us that probability has to mean more than 50 percent. Otherwise they could have just put chance in there.

PROSPECTIVE JUROR: Right.

MR. BRAUCHLE: And it would be -- and I am not trying to get on to you about it, your choice of words, the question would have probably not been very eliminating in that we can say, there is a chance that anybody in this room could possibly commit a criminal act of violence; would you agree with that?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: Okay. To your way of thinking, criminal act of violence, that that issue is inquiring about would be repeating the primary act, the primary crime again?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: Okay. And that would be -- that would then lead to the last part of the question, where it is because of the -- the high likelihood that the person would commit whatever the capital crime was again, that would be what would make him a continuing threat to society, am I putting words in your mouth?

PROSPECTIVE JUROR: No, you are doing good.

MR. BRAUCHLE: Would you mark that -- all right, here is the part from my point of view you really have to put -- this is better than being named king or whatever, what

you ever to do here, let's get to this last special issue. And that says, it doesn't say anything, but you have already found that the person committed the primary offense of capital murder. And you found that the person is going to be a continuing threat to society, and you are fairly certain of that because that has been proven to you beyond a reasonable doubt, and you have answered that question "yes". And you know that at that point in time when you are looking at the next special issue, the person is going to get a death sentence. And some people say, Look, I don't know who wrote this, and of course we didn't write it, somebody in the legislature wrote it. We don't want to take credit for it at all. But you see that they say, look, why would I ever find any evidence or circumstance or anything in the defendant's character, background or moral culpability that would want me to unleash him back on society by giving him life without parole, once I had already determined in my own mind that he is a capital murderer who deserves death?

See, you know, that's about as schizophrenic as you can get to have sat down with 11 other people and decided these first two issues, which result in the death penalty for the person who is on trial, and then you all go back -- well, you don't go back in because you are deciding those two things at the same time. But then you say, hey, time out. Now we got question one answered, let's go back and erase it, let's set

it aside and put the guy back where we could have left him before we answered question one "yes", see what I am saying?

PROSPECTIVE JUROR: (Nods head).

MR. BRAUCHLE: And a lot of people say, I may have kind of lose patterns of thought, but how could I ever see anyway or any reason doing that once I have decided that somebody is going to be a continuing threat to society. And we have already -- we have already known about his character, his background, his personal moral culpability, and any circumstances involving the case, when we decided question number one.

See they are not presented sequentially, we just call them one and two because that's the easy way to distinguish them for people in your situation. But it's a situation to where I guess you can answer them backwards, you could answer two before one or whatever, but they are going to be set out in the court's papers as the shorter one first and the longer one second. Then say, look, a lot of people tell us that doesn't make sense. Why would I ever want to reverse my rational thought process or my rational thought process to go against something that I have already decided and thought was the right thing to do 30 minutes ago or an hour ago or a day ago. See where I am coming from?

PROSPECTIVE JUROR: Uh-huh.

MR. BRAUCHLE: Could you ever do that?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: What would you look for in regard to being able to reverse the process?

PROSPECTIVE JUROR: You reconsider the defendant's background, anything else that may have influenced his actions.

MR. BRAUCHLE: Okay. So met me -- let me see if I am not putting words in your mouth, because I don't want to. But his character and background are things that influenced his actions, would those be things that influenced his actions in the guilt and innocence stage or that may or may not have come to bear in special issue number one?

PROSPECTIVE JUROR: Wouldn't it be both?

MR. BRAUCHLE: I am just asking you what your thought process?

PROSPECTIVE JUROR: I would think in the first phase those would come out.

MR. BRAUCHLE: Possibly?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: See the second part of the trial is called the punishment phase. And you may -- may or may not learn more about the person you are dealing with. That's when you might find things that might be something that would affect his actions as an adult or you may not. These people over here have already told you that they are going to do

everything within their power to produce a death sentence. So it is unlikely that they are going to bring his baby pictures or anything like that down here to try and sway you with regards to special issue number two. We don't have to.

PROSPECTIVE JUROR: Right.

MR. BRAUCHLE: So it's -- it's important to us to see what would be important to you if you could answer that question and what you would look to.

Let me throw another kicker in, you notice that special issue number one doesn't say anything about beyond a reasonable doubt?

PROSPECTIVE JUROR: Right.

MR. BRAUCHLE: It doesn't have an actual burden and it doesn't say the defendant's character, let's just separate that phrase. What may be mitigating to you doesn't have to be mitigating to anybody else in the jury room. It could be Mr. Beach's example of a bad haircut or a good haircut. I mean it could be something that inconsequential or something that might be monumental. It doesn't tell you what it has to be that would get you to change your mind to reverse your process.

You see what I am saying?

PROSPECTIVE JUROR: Uh-huh.

MR. BRAUCHLE: You think you could still do that?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: Would there be any problem with -- obviously there might be some problem or we would hope there would be some problem cause none of these we would like for anybody to take lightly. But you think you would be able to answer that special issue?

PROSPECTIVE JUROR: Yeah.

MR. BRAUCHLE: Is there anything that you would look to answer that in particular if I haven't already asked you that?

PROSPECTIVE JUROR: I can't think off the top of my head anything in particular.

MR. BRAUCHLE: Let me ask you this. Sometimes in regard to special issue number one, it can be divided up, it can start at the back and go forward. It has got a bunch of phrases and whatever there. But I think that the over-all gist is -- and of course this is just my own personal opinion, it is not the law in any way -- but I think that that question is asking the jurors because this guy is going to be a continuing threat to society, because of him committing criminal acts of violence, is killing him the only way that we can keep society safe from what he may do in the future? You see how that could be what they are getting at? Because it is not a deal like where they are asking you, will 30 years in prison be enough, would ten years in prison be enough. We are

talking about in a regular murder case. Because you know that the person is never going to get out of prison. And I guess that what it would ask for or what they might be asking you there, is society going to be safe just from sending this guy to prison, or to insure our safety, will we have to kill this person? Do you see that in any way in there, am I off base or is that what it is asking for?

PROSPECTIVE JUROR: That's what it is asking for.

MR. BRAUCHLE: Have you got any questions for any of my random rambling?

PROSPECTIVE JUROR: No, sir, I don't.

MR. BRAUCHLE: Obviously this isn't the most structured thing you had. Probably if you did have any questions, you wouldn't ask them?

PROSPECTIVE JUROR: I don't have any questions.

MR. BRAUCHLE; Okay. You will be glad to know I don't have anymore either. Thank you very much for your time?

PROSPECTIVE JUROR: Okay, thank you.

THE COURT: Thank you, you may step down.

PROSPECTIVE JUROR: Thank you.

(Prospective juror retired from the courtroom.)

(Recess taken.)

THE COURT: What says the State?

MR. BEACH: The State will accept Juror

Caldwell, No. 2029-B.

THE COURT: Very well.

Mr. Brauchle.

MR. BRAUCHLE: We would submit juror 2029-B in that he would misplace the burden in regard to special issue number one requiring that the defendant be probable in that he would commit the primary offense over again.

THE COURT: What do you mean, can you elaborate on that a little bit.

MR. BEACH: Judge, that is credit to his ingenuity.

THE COURT: I will overrule that.

MR. BRAUCHLE: Because of the court's erroneous rulings, we would have to use peremptory challenge number six I believe it is.

MR. BEACH: I think it is seven.

(Prospective juror entered the courtroom.)

THE COURT: You may be seated.

Mr. Caldwell, you did not make it as a juror on this case. You are excused and you are free to go.

PROSPECTIVE JUROR: Thank you.

THE COURT: Thank you for coming back, sir.

MR. BEACH: Thank you, sir, good luck.

(Prospective juror retired from the courtroom.)

(Pause in the proceedings.)

(Prospective juror entered the courtroom.)

THE COURT: You may be seated.

Good afternoon, Ms. Maxwell, how are you doing today?

PROSPECTIVE JUROR: I'm good.

THE COURT: The attorneys have some additional questions to ask you, I apologize, you were waiting a little longer than we had intended, however, sometimes these interviews go a little longer, sometimes a little swifter.

What says State?

MS. HANDLEY: May it please the Court?

**DEBORAH MAXWELL**

was called as a prospective juror, after having been previously sworn by the Court, testified under oath as follows:

**VOIR DIRE EXAMINATION**

**BY MS. HANDLEY:**

Good afternoon Ms. Maxwell. Really thank you very much for your patience, we appreciate it. And we are very cognizance of your time and your time is important. But as the Judge said, sometimes these kind of go a little longer than anticipated. So I appreciate that up front and tell you that.

My name is Andrea Handley. To my right here is Marshall McCallum and Andy Beach. We are all Assistant District Attorneys here in Dallas County. We are in charge of the jury

selection for this particular case.

To my left here, these two gentlemen are Karo Johnson and Paul Brauchle. They are defense attorneys here in Dallas. And they represent the defendant in this case, that's the individual seated at the end of the table, Mr. Wesley Ruiz.

Do you know any of us?

PROSPECTIVE JUROR: No.

MS. HANDLEY: Okay, you have had quite a bit of time to sit back there and read over the questionnaire?

PROSPECTIVE JUROR: Yes, I have.

MS. HANDLEY: I think it is safe to say that you have had more than most people time to look at your questionnaire and kind of look it over again. I think when you came down on November 30th, you never expected to fill out this 18-page questionnaire?

PROSPECTIVE JUROR: No, I didn't.

MS. HANDLEY: And sometimes we put you on the spot and put you in that little chair with that pen and ask you to do the best you can and tell us what you think about your feelings about the death penalty and crime in general and a lot of personal information. And a lot of people do the best they can to be thorough. If I were to give you this questionnaire again today to ask you to fill it out, is there anything that you would change about that?

PROSPECTIVE JUROR: I put my wrong age on there.

MS. HANDLEY: Well, that is okay, you are allowed to do that.

PROSPECTIVE JUROR: I didn't mean to lie, but I did.

MS. HANDLEY: I think I will be celebrating my fifth annual 40th birthday. So that's okay.

PROSPECTIVE JUROR: Yeah.

MS. HANDLEY: So you wouldn't change anything about the questionnaire there?

PROSPECTIVE JUROR: No.

MS. HANDLEY: Let me tell what you is going on here, Ms. Maxwell. We brought everybody down in that collective group on the 30th and had hundreds of people fill out questionnaires. We have been reading over those questionnaires; and out of those, selecting a certain number of people to come down and talk individually now. A little bit more about this case and to feel out whether or not they are a qualified juror for this particular kind of case. You may be qualified for some other kind, but we are talking about this kind of case now.

And whereas when you filled out the questionnaire, you know it is one thing to talk about the death penalty academically or theoretically, but it is kind of another thing when you find yourself now, it is getting down to it and you might actually be sitting on this jury, okay.

You will know by the end of today whether or not you are going to be seated as a juror in this particular case, okay. It is not going to be, okay, I can say a couple of things here and hold back and maybe they will come back and ask me something again in a couple of weeks. We need to know now, okay. So I am probably going to do a lot of lecturing, what is really important here is what we know about you and your feelings.

What is paramount in all criminal cases and particularly this case, ma'am, is that what we are looking for is 12 people that can come in with a -- with an open mind, fair and unbiased, listen to the evidence in the case, base their verdict on the evidence in the case and really nothing else. Everybody has their biases, everybody has certain prejudices or they feel certain ways. And sometimes what makes you a qualified juror is that you can put those things aside and judge a case just on the facts of the case. Some people can do that and some people can't. And that's fair, there is nothing wrong with that. There is absolutely nothing wrong with that.

But what we need to know is that you can give us your full undivided attention and energy to this case and that you don't have any outside distractions. So I will cover a couple of preliminary things with you.

Are you a loan processer?

PROSPECTIVE JUROR: Yes.

MS. HANDLEY: We are talking about picking the jury right now, this is taking us here -- we have been doing this for four weeks, we are about halfway there. This actual case will probably start the first or second week of April, okay. Once it starts, we anticipate that it could take anywhere from five to eight working days, maybe even a little bit more, maybe less to actually put on the case in chief, okay. What I can't promise you is how long it would take a jury to deliberate, all right. There is a possibility that sometime in there, once you go to deliberations, you ever heard of a jury being sequestered?

PROSPECTIVE JUROR: Yes.

MS. HANDLEY: Okay. Then you would have to go and actually stay in a hotel room during deliberations, that could happen maybe for one or two nights and that means you can't go home to your family or have any contact with the outside world. Given that time frame, that schedule, does that pose any problem with you, with your work or family situation?

PROSPECTIVE JUROR: It would be difficult. I mean it could be achieved. I have three children, twin boys that are 11 that are very active, but I also have a husband who is at home. I do work off of commission some, so it would impact my salary some if it was a long term.

MS. HANDLEY: And I can't promise you how long it would be, I can only say a week maybe up to two weeks. And so the question becomes up to you, Ms. Maxwell, since you are working on a commission basis, is that going to be something that is going to be distracting your attention away from the case?

PROSPECTIVE JUROR: If it lasted for more than two weeks, I think it would start to be a concern.

MS. HANDLEY: Okay.

PROSPECTIVE JUROR: I mean we all work for money.

MS. HANDLEY: Sure, sure. Let me ask you something else here. Going along that line of coming in being fair and unbiased from the get-go. You said in your questionnaire that you have a family friend that is a Dallas Police Officer, I think that was on page eight of the questionnaire?

PROSPECTIVE JUROR: Yes, I do.

MS. HANDLEY: Can you tell us his name?

PROSPECTIVE JUROR: Patrick Welsh. Sergeant Patrick Welsh, it is in the -- it's sexual crimes, but nothing to do with children, I think it is more adult.

MS. HANDLEY: Okay. Okay. How long have you been friends with him?

PROSPECTIVE JUROR: Probably about five years.

MS. HANDLEY: About five years. And he is a sergeant with crimes of violence against sexual offenses?

PROSPECTIVE JUROR: Right, right.

MS. HANDLEY: But not necessarily crimes against children. I believe you put in your questionnaire, that you are not really familiar with the facts of this case, had you talked to him about this case?

PROSPECTIVE JUROR: No. I don't see him -- he has moved away, I made contact through personal friends. He could call and my boys could spend the night over there. We are not on a day-to-day basis anymore.

MS. HANDLEY: All righty. You put down in your questionnaire, when we asked you about credibility of people, would you find an officer I believe that's on -- go with me there to page number five, if you will.

PROSPECTIVE JUROR: Okay.

MS. HANDLEY: We asked on there do you believe police officers are more or less likely to tell the truth than the average person, you put more likely there. Is that based on your friendship with police officers?

PROSPECTIVE JUROR: I also work in a bank and know some police officers long ago. And yeah, I think that's their job. I think they should be more accountable than anybody else, yeah.

MS. HANDLEY: They should be more accountable

than other people?

PROSPECTIVE JUROR: Yeah.

MS. HANDLEY: You said something that is interesting, though?

PROSPECTIVE JUROR: I have contradicted myself?

MS. HANDLEY: No, no. You said something interesting in there. You said the first thing you think of a Police Officer, first see them on the street and hoping I don't get a ticket?

PROSPECTIVE JUROR: Yeah, I think we all do that.

MS. HANDLEY: I do that. Then you said someone who is pretty much just like me. And I think that you make a good point with respect to what I am going to try to explain to you now, is that it is one thing to have a respect for officers or an assumption that when they are talking about their job, they are going to know more than the regular person, right?

PROSPECTIVE JUROR: Uh-huh.

MS. HANDLEY: But when it come down to them as just another individual, they are just like you and me, right?

PROSPECTIVE JUROR: Yeah.

MS. HANDLEY: They make mistakes, right?

PROSPECTIVE JUROR: Uh-huh.

MS. HANDLEY: Unfortunately sometimes some of

them may lie, they are not perfect, they are just like anybody else. And what we need to know in this particular case, because this is an offense dealing with the death of an officer, okay. What we need to know in this case, are you able to come in and start everybody out at the same level and judge their credibility based on what they say from the witness stand versus, you know, just a belief that you have right now. I hope I am explaining that very well.

PROSPECTIVE JUROR: I think I get your question. I know it is not always true, but I do expect the officer to say more truth than lie, you know there is no bell that is going to click on my head and look at him and tell that he is not telling the truth.

MS. HANDLEY: Right.

PROSPECTIVE JUROR: But I do expect in that job title, that they are saying more the truth.

MS. HANDLEY: Sure.

PROSPECTIVE JUROR: Can I look at somebody and tell the difference. I can't look at them. I can listen and judge from listening maybe depending on how long I need to listen to them.

MS. HANDLEY: Okay.

PROSPECTIVE JUROR: But if they are here for five minutes, then I am probably not going to be able to form an opinion about that particular person.

MS. HANDLEY: You think you might give a police officer the benefit of the doubt?

PROSPECTIVE JUROR: Yeah, they would get the benefit of the doubt, but I do -- I might be wrong or right, whatever, but I do expect a higher standard from them, sorry.

MS. HANDLEY: Okay. No that's fine, don't make any apology.

Your Honor, we have an agreement.

Ms. Maxwell, thank you for your time, you haven't said anything wrong, you are free to go.

(Prospective juror retired from the courtroom.)

(Pause in the proceedings.)

(Prospective juror entered the courtroom.)

THE COURT: You may be seated.

Good afternoon, Ms. Trammell. How are you doing?

PROSPECTIVE JUROR: I'm great.

THE COURT: We kept you waiting a little longer. Sometimes we can gauge how long interviews are going to be, sometimes they run a little longer than we expect. We appreciate your patience.

The attorneys have some additional questions concerning your qualifications as a juror in this case. There aren't any right or wrong answers, they are trying to see how you feel about certain things?

PROSPECTIVE JUROR: All right.

THE COURT: And Ms. Handley.

MR. MCCALLUM: May it please the Court?

**MARCELLE TRAMMELL**

was called as a prospective juror, after having been previously sworn by the Court, testified under oath as follows:

**VOIR DIRE EXAMINATION**

**BY MR. MCCALLUM:**

Good afternoon, Ms. Trammell. My name is Marshall McCallum. I am an Assistant District Attorney. And I work along with Andrea Handley, she is also an Assistant District Attorney. We are also responsible for the jury selection in this capital murder case. There are another prosecutor, his name is Kevin Brooks and he is going to be presenting the evidence in this case once it goes it trial. He is not in the courtroom right now.

Over here to my left, Karo Johnson, Paul Brauchle, they are defense attorneys here in Dallas. They represent the man accused, the man at the end of the table, Wesley Ruiz.

You don't know any of us, do you?

PROSPECTIVE JUROR: No.

MR. MCCALLUM: I guess you have had a long chance to look over your questionnaire back there?

PROSPECTIVE JUROR: Uh-huh.

MR. MCCALLUM: Anything you would change about it, other than what you wrote back on November 30th?

PROSPECTIVE JUROR: Yes. A few things, a few things that I forgot to list. How would you like for me to go about that?

MR. MCCALLUM: Go ahead, what is the first thing?

PROSPECTIVE JUROR: I would say the first thing, I hadn't really thought a whole lot about the death penalty prior to filling out this questionnaire. And I guess I have thought more about it and I am probably even -- I would be more hesitant to sentence someone to the death penalty.

MR. MCCALLUM: Okay. Okay. If we -- if we prove the case to you beyond a reasonable doubt, we prove to you that the death penalty is the proper punishment, do you believe that you could if in your mind you said this is the proper case for a death penalty, could you do it?

PROSPECTIVE JUROR: Yes.

MR. MCCALLUM: Okay, if we proved it to you?

PROSPECTIVE JUROR: Yes, but it would...

MR. MCCALLUM: Fair enough. We are talking about life or death here, so it should be the highest standard in the legal system. So that's right on par with where you should be.

Have you since this -- since you came down

November 30th, have you looked anything up on the internet, researched anything about this case?

PROSPECTIVE JUROR: No, I haven't.

MR. MCCALLUM: You haven't. We have had a couple of jurors tell us that they have. But I just want to make sure.

We are looking at this trial date being some time in April, probably the first or second week in April. And it would probably last five to ten days. And there is a possibility that the jury could be sequestered one, possibly two nights. Is that okay with you? Would you be able to work that into your schedule?

PROSPECTIVE JUROR: I just wanted to check my calendar real quickly, yeah, not a problem.

MR. MCCALLUM: Okay. Ms. Trammell we called you down here because basically from your questionnaire, you are kind of middle of the road and that's kind of what we are looking for. We have looked at about a thousand questionnaires, and there are a lot of people who are one extreme or the other. And basically, we decided just to bring down the people who are kind of in the middle, could go either way, that's why you are down here and talking to us today. And your views are kind of on par with what the law is in Texas. You can't get the death penalty in every murder case.

If I pulled a gun out and blew Ms. Handley brains out and

I laughed in the courtroom about what I did, it would be a horrific murder; would you agree with that?

PROSPECTIVE JUROR: I agree.

MR. MCCALLUM: It would not, however, qualify for the death penalty. She is not the type or class that is protected by the legislature. The type cases where the death penalty can be applied are the murder of a police officer while he was acting as a police officer, murder of a child under the age of six. The most common scenario that we see is someone goes in a convenience store to rob the convenience store. While in the course of committing robbery, they commit a murder, that's a capital murder. That's a death penalty.

If I go out and hire a hit man to kill someone, the hit man does the hit, both myself and the hit man can be tried for capital murder. So there is very specific type of cases where you can get the death penalty, and not all of them -- not every murder case obviously qualifies.

I am going to do a lot of talking just to let you know. We are laying our cards out on the table up front. We believe as the State of Texas that we have the type of case that is going to convince a jury that, number one, that Mr. Ruiz is guilty of capital murder; and two, that the appropriate punishment in this case is going to be the death penalty as opposed to life imprisonment. That's what we believe. Now that and a dollar fifty will get you a cup of coffee

downstairs.

Now, the Defense obviously have a totally different view.

We want to lay our cards out on the table. We don't want people coming back -- you will find out today whether or not you are going to be on this jury. We don't want people coming back April 5th or whenever we are going to start the trial saying, Wow, the State really was serious about the death penalty. We are. And I think you have already answered the question, if we prove the case to you beyond a reasonable doubt that that was the appropriate thing to do, you can do that; is that correct?

PROSPECTIVE JUROR: You talk to me a little bit more about if the -- if it is determined to be a capital murder and does the jury have any part in deciding whether it is death penalty or life imprisonment.

MR. MCCALLUM: The jury has all the decision-making power in terms of guilt/innocence and at the punishment phase. The jury and the 12 jurors alone will decide whether or not the defendant receives the death penalty or life imprisonment without parole. So the Judge will have no say -- no outside source will have any say, it will be up to the 12 jurors who are sitting on the case. And you know, we don't -- let me tell you what will happen in this case, basically if we -- have you ever sat on a jury before?

PROSPECTIVE JUROR: No, I haven't.

MR. MCCALLUM: In any case -- okay. Let me just tell you a little bit how it works, okay. Right now, we are doing the first phase and that's called the jury selection, voir dire. And the second part of the trial is guilt/innocence. And basically you look to the State, we have to prove each and every element to you beyond a reasonable doubt in the indictment. And if you look up there, I think there is a half page piece of paper up there?

PROSPECTIVE JUROR: Uh-huh.

MR. MCCALLUM: You just take a minute to read that. Basically what that says is, on or about a certain date, in the County of Dallas, State of Texas, the defendant, Wesley Ruiz, caused the death of a police officer, Mark Nix, while Mark Nix was in his duties as a police officer. Basically that's what we have to prove to you beyond a reasonable doubt. And it is not four out of six, five out of six, we have to prove each and every element to you beyond a reasonable doubt. And let me just by way of example, let me use a hypothetical.

If I prove to you that the defendant did cause the death by shooting the police officer with a firearm while the police officer was acting in his duties as a police officer, but I don't prove to you Dallas County, I prove to you that happened up in Collin County, well, obviously one of the essential elements in the indictment which is Dallas County has not been

proven. In fact I have proven Collin County. And in that case, the Judge would give you instructions, he would instruct you that in that case you would have to fine the defendant not guilty. Could you -- I mean although it would probably make you sick to let a person who murdered a police officer go, it would probably make you sick, but could you follow the law and the Judge's instructions and find the defendant not guilty in that case?

PROSPECTIVE JUROR: Yes.

MR. MCCALLUM: You would have to. I mean we would be looking for jobs the next day. I am sure we would get paraded in the newspaper and we would probably never work as prosecutors again. We just use that as an example. You look to the State for proving, you don't look to the defense for anything. The Defense can sit over there and work crossword puzzled the whole time, they have no burden whatsoever. All the evidence presented in the trial that proves the defendant's guilt come from this table. They don't have to do anything.

You can follow that law?

PROSPECTIVE JUROR: Uh-huh.

MR. MCCALLUM: Another thing quickly, I will go over, the defendant's right not to testify. You have probably heard that before?

PROSPECTIVE JUROR: Yes.

MR. MCCALLUM: Fifth Amendment privilege, you don't have to be a witness in your own criminal defense. There is a myriad of reasons why the defendants don't testify. One, State hasn't met their burden beyond a reasonable doubt. Maybe the person isn't a good speaker. They are going to be cross-examined by a lawyer. Maybe they would hurt themselves more than they would help themselves. There is a myriad of reasons why somebody wouldn't testify. Could you follow that law?

PROSPECTIVE JUROR: Yes.

MR. MCCALLUM: Okay. Basically, I mean, it is like a two-act play, the first part of the trial is guilt innocence part of the trial, if we don't prove to you each and every element beyond a reasonable doubt, then everybody go home. If we do meet our burden, it is like a two-act play. You don't know how it is going to end, there is an intermission. And you come back and that's the punishment phase. And basically the punishment phase, each side is allowed to present further evidence. We can introduce evidence possibly if the person had been to the penitentiary before. We can show the jury that he has been to the penitentiary. If he has committed other violent acts, we can show things such as that that might help the jury in making a determination as to punishment.

Conversely, the Defense can show you that he was a good

person. You know he is a deacon in the church, was always respectful of people, this was just an aberration, a one-time occurrence. They are certainly allowed to do that in the punishment phase. It's much more wide open at that stage.

In the first part of the trial, you are limited a lot in what you can present. In the punishment phase, a lot more things come in that the jury can consider when deciding what sort of punishment to give.

Now, if a person is found guilty of capital murder, okay, the way we elevate it up to a death sentence is by how the jury answers these two questions over there. They don't just, you know, hear the case, find the person guilty and then decide right on the verdict sheet death. There are these special issues and we are going to talk about them here in a minute --

PROSPECTIVE JUROR: Okay.

MR. MCCALLUM: -- that the jury has to consider. Would you just take a moment and read that first special issue to yourself?

PROSPECTIVE JUROR: All right.

MR. MCCALLUM: And basically would you agree with me that that's just asking you whether or not the defendant would be a future danger?

PROSPECTIVE JUROR: Yes.

MR. MCCALLUM: Okay. And if you will notice it

also says beyond a reasonable doubt. And beyond a reasonable doubt is the highest burden in the legal system.

If you are talking about a civil suit, you know you are suing over money in civil court, we are talking about preponderance of the evidence, just the tipping of the scale, 51 percent to 49 percent, 51 percent meet your burden.

Clear and convincing evidence is required to institutionalize someone or take someone's kids away.

It is even a higher burden than preponderance of the evidence. It is up here. Here we are talking about beyond a reasonable doubt. Beyond a reasonable doubt is the highest burden in the legal system. And it applies to all criminal cases.

And the analogy that I like to use is the stakes start out at the bottom of the mountain holding a flag and we have to carry that flag up to the top of the mountain. If we didn't meet our burden to erase reasonable doubt, we didn't get to the top and in your mind, you have to believe that we made it up there.

If you notice in the first part of the trial obviously we have to prove each and every element beyond a reasonable doubt.

In the second part of the trial, the first special issue, we have to prove to you beyond a reasonable doubt that there is a probability. How do you deem probability when you think

about probability, how would you define that?

PROSPECTIVE JUROR: Define probability?

MR. MCCALLUM: Yeah.

PROSPECTIVE JUROR: The likelihood.

MR. MCCALLUM: More likely than not?

PROSPECTIVE JUROR: Yeah.

MR. MCCALLUM: Okay. If you are watching the weather and David Finfrock said there is a possibility of rain tomorrow, well, who knows, that doesn't sound real strong. But if he says there is a probability of rain, you will probably take your umbrella?

PROSPECTIVE JUROR: Yes.

MR. MCCALLUM: Most jurors have been coming down here saying probability means more likely than not, and you agree at what?

PROSPECTIVE JUROR: Yes.

MR. MCCALLUM: Would commit criminal acts of violence, okay. If I balled up my fist and I punch Ms. Handley as hard as I could on the side of the face and knocked her down, would you consider that a criminal act of violence?

PROSPECTIVE JUROR: Yes.

MR. MCCALLUM: Okay. Some people don't. We just talked to a guy a few minutes ago, he was from intercity Pennsylvania, he said, no, I don't think it is a criminal act

of violence. It is what every juror believes these terms to be, there are no definitions.

When you go back in the first part of the trial, the Judge is going to define for you all the terms, deadly weapon, police officer. However, when you get to these special issues, it is -- there are no definitions, it is what each juror believe these terms mean. And if you notice, it doesn't say up there the defendant will commit another capital murder, will commit an aggravated sexual assault. You know it is what every juror believes to be a criminal act, okay.

Continuing threat to society. Would you agree with me that prison society also encompasses our society. I mean they are excluded in that they are locked up. But would you agree with me that people in the penitentiary are a part of society?

PROSPECTIVE JUROR: I hadn't thought about that.

MR. MCCALLUM: Let me ask you this, who works -- who is inside the penitentiary besides the inmates?

PROSPECTIVE JUROR: Well, you have the people that are controlling them.

MR. MCCALLUM: Right.

PROSPECTIVE JUROR: The warden.

MR. MCCALLUM: Doctors, nurses?

PROSPECTIVE JUROR: Yeah.

MR. MCCALLUM: We have all sorts of staff?

PROSPECTIVE JUROR: Yeah.

MR. MCCALLUM: People who are free members of society?

PROSPECTIVE JUROR: Right.

MR. MCCALLUM: That have contact with these prisoners on a day-to-day basis?

PROSPECTIVE JUROR: Uh-huh.

MR. MCCALLUM: And even though it is not defined, I think the legislature contemplates that prison society is part of society. Do you believe that your distinction probably broad enough to include prison society?

PROSPECTIVE JUROR: I think it has just been broadened.

MR. MCCALLUM: I don't want to put words in your mouth, the legislature contemplates that, we just want to know if your definition will be broad enough to include that?

PROSPECTIVE JUROR: Puts an interesting spin to the initial interpretation.

MR. MCCALLUM: Okay. Yeah, it does seem like they are locked up, we are not going to ever see them again, and we won't have any contact. But the legislature does contemplates that.

You assume going into this on the first special issue that the answer is no, that he is not a future danger. And like I had, we have to prove to you beyond a reasonable doubt that he is going to be a continuing threat, a future danger to

society. And that's kind of like at the beginning of the trial in the guilt/innocence phase of the trial, he is presumed innocent. I mean there can be a hundred witnesses to someone committing an offense. We could have it on videotape, we could have it DNA evidence. But the defendant is entitled to plead not guilty and have a jury trial. And we must presume him to be not guilty until we have proven our -- until we have met that burden beyond a reasonable doubt.

And the same thing applies in that special issue. You have to assume that life -- a life sentence is the appropriate punishment in a capital murder case. If and only if the State meets its burden and proves that the defendant is a continuing danger to society, do you answer that question "yes".

Fair enough?

PROSPECTIVE JUROR: All right.

MR. MCCALLUM: Okay. Well, once the jury has -- if they found that special issue one to be "yes", basically at that point the sentence -- the life sentence has been elevated up to a death sentence. Well, first off, you found the defendant guilty of a capital murder.

Now, secondly, you have found that he is a continuing threat to society, okay. However, basically the legislature gives you one last chance. That's what we call special issue number two, it is kind of the safety net. It kind of gives the jury one last chance to commute it back down to a life

sentence. And if you just take a second to read special issue number two.

PROSPECTIVE JUROR: All right.

MR. MCCALLUM: It is very verbose and wordy. I will tell you that we didn't write any of the issues, this is the legislature. But the way we basically look at special issue number two is the person's blameworthiness. How much blame are we going to put on the person? What I mean by that is, you might have a situation where, okay, a person goes out, commits a capital murder and you find that they are a continuing threat to society, that they are dangerous. You have no doubt in your mind that they are going to continue to commit violent acts. However, you hear something, some evidence is presented at trial and some evidence you hear that the defendant was locked in a closet as a child, burned with cigarette butts, mentally abused, sexually abused, and basically the parents raised a monster. And when he became an adult he was an absolute monster and committed a capital murder. And that might mitigate in your mind, you know, he is capital murderer, he is dangerous; but in my mind, his parents should also be on trial with him. You know they are responsible for the way he turned out. That may be something that might mitigate in your mind. You know other things. And there is no burden like in the first issue, we have to prove it beyond a reasonable doubt. I mean it could be anything in

the second special issue, there is no burden. It could just be something that you hear during the trial. It could be something that might be brought up, chronic alcohol and drug abuse, you know, person was high at the time of the crime. Now, that might not be mitigating, it might be aggravating, some jurors may think that is aggravating to me, someone would go ingest chemicals and then go out and commit a capital murder, that is not mitigating. I am just throwing things out there.

We can't execute mentally retarded people. You might find that the person had a very low I.Q. They are very slow, that might be something that was mitigating. So if let's just say for example you find the defendant guilty of capital murder. You find in special issue number one that he is a continuing threat. You still believe he is dangerous to society, even though he is locked up. Yet in your mind, you hear something that is mitigating, you hear about some sort of horrific child abuse, just something in your mind that clicks and says, you know what, he is a horrible person, there is something that mitigates and I don't believe, you know the death penalty would be appropriate punishment. I could take this back down to a life sentence. Do you feel like you could keep an open mind and if that situation presented itself, you could do that?

PROSPECTIVE JUROR: Yes. I have to say, though,

I think I am still more stuck the prison being considered society, I will just be honest.

MR. MCCALLUM: Okay. I mean, they still have contact with these people, correct, these people that are in jail. Who is to say that they are not going to order a hit from inside the prison on a person in the outside world?

PROSPECTIVE JUROR: That's true.

MR. MCCALLUM: It's things like that to consider.

Any other questions that you have?

I saw in your questionnaire, you might have -- what was -- there was something about an I.V.?

PROSPECTIVE JUROR: Oh, my husband's fine now, he had an MRSA.

MR. MCCALLUM: He was getting it twice a day?

PROSPECTIVE JUROR: Yeah, the I.V. was twice a day, he is fine now, no I.V.s, back at work. Do I need to point out any other things on the questionnaire that --

MR. MCCALLUM: I am about to pass you over to the Defense Attorney, I think they could probably clear those up for you at this time.

PROSPECTIVE JUROR: Okay.

MR. MCCALLUM: I will pass the witness at this time.

MR. JOHNSON: May it please the Court?

VOIR DIRE EXAMINATION

BY MR. JOHNSON:

Good afternoon, Ms. Trammell. You want to talk about whatever else is in your questionnaire. We will start there if you like.

PROSPECTIVE JUROR: Oh, I just -- actually I should put on my glasses, but -- well, on page six where it is asking about spouse, family members, or close personal friends that have ever been arrested.

MR. JOHNSON: Yes, ma'am.

PROSPECTIVE JUROR: And since I filled this out, it was like driving home I realized, yeah, I believe my husband was arrested once long before I met him. And I found out later that my father was arrested once my sister told me this at dinner.

MR. JOHNSON: Okay. Was this at dinner when y'all were discussing the death penalty?

PROSPECTIVE JUROR: Yes.

MR. JOHNSON: You discussed the death penalty at candle-light diners?

PROSPECTIVE JUROR: Not at candle-light diner, but it was at the Mercury.

MR. JOHNSON: Let me start over. My name is

Karo Johnson. I represent Mr. Ruiz over here to my far left. Mr. Brauchle and I are on the defense team. Our opinion of this case is completely different from the State's opinion in this case.

Does that surprise you?

PROSPECTIVE JUROR: Not at all.

MR. JOHNSON: And you know I was kidding with you about talking about the death-penalty case at candle-light dinner, you probably have never done that, have you?

PROSPECTIVE JUROR: No. As I said, it was the mercury, the lighting was dim and it was right after I had filled out this questionnaire.

MR. JOHNSON: Prior to coming down here and finding out that you were filling out a questionnaire on a death-penalty case, is this something that you talked about often?

PROSPECTIVE JUROR: No.

MR. JOHNSON: And would it surprise you that most of the people that come down here and go through this interview tell us that it is not something that they talk about at their breakfast table or at dinner, it is not something that most people think about very often?

PROSPECTIVE JUROR: That wouldn't surprise me.

MR. JOHNSON: So this is all new to you, and we understand that. So what I am going to do now is try to

explain a little bit about this process. The prosecutors basically explained most of it. I am going to just kind of go over some of the things that are more from our perspective, just kind of explain some of that to you, okay. I am going to try to do this in a reasonable amount of time. If you will just bear with me.

To start with, all cases that are criminal cases have to be proven like the prosecutor told you by the State. They have the burden of proof in these cases, okay. And in Texas, we use this term proof beyond a reasonable doubt. Have you ever heard that term before you got involved in this?

PROSPECTIVE JUROR: Yes, uh-huh.

MR. JOHNSON: Now, some states, I think, use the term shadow of a doubt, I have heard different things in movies and things like that. In Texas we use beyond a reasonable doubt. We don't have a definition for that term. I am going to try to describe it to you by using some of the other terms that we use in our justice system to try to emphasize what it means.

To start with, if you were to sue somebody in a civil court for money like a car wreck or some business deal that went bad, the person that felt like they had been harmed and brought a lawsuit, they would have to prove their case beyond a preponderance of the evidence. Now, I am going to use my hand here as kind of a scale of justice, okay. A

preponderance of the evidence, the person bringing the case has to tip that case over to their side from the center, just tip it over, and that's what would be required of them and that's the proof.

Now, you have a son, all right. And the reason I say that, is because I want to tell you a different level of proof. And it is called clear and convincing evidence. And the reason I bring up your son is, is that is the type of proof that is required for somebody to take somebody else's children away from them, okay. Now, you understand that there are situations where somebody is trying to get custody of a child or maybe terminate somebody's parental rights; you understand we have courts for those types of issues. Now, in those courts, the person who is trying to accomplish taking somebody's children away from them, have to bring enough evidence and proof to convince the trier of fact, the Judge or jury, they have to convince that judge or jury with evidence that proves, what, clear and convincing evidence that that is what needs to be done, okay.

Now back to my scale, okay. You got preponderance of the evidence and then the next one is clear and convincing evidence.

Now, let me just ask you this, don't you think in some situations where somebody is trying to take somebody's children away from them, that that would -- would you agree

with me that that would take some pretty substantial evidence and proof to do that?

PROSPECTIVE JUROR: Yes.

MR. JOHNSON: Okay. And so my point is, I am trying to distinguish the different levels of proof that we have in our justice system, okay.

Now, the next highest level of proof that we have is proof beyond all reasonable doubt. And that's what the proof is required in a criminal case. As you can see, the scale has gone from being tipped over with preponderance of the evidence, further over for clear and convincing. And then beyond a reasonable doubt the scale is tipped as far as it has to be tipped in our justice system okay.

The example that Marshall gave you about them having a flag, now that's basically what they have got to do. They have got to get that flag up to the top for them to be able to prove their case. The burden is on them, okay. The Defense has no burden of proof at all. We don't have to bring you any evidence on anything in a criminal case. I am not saying that we won't, but we don't have to. I am not saying that we will, okay.

Are you comfortable with that?

PROSPECTIVE JUROR: Uh-huh.

MR. JOHNSON: Now, every element in that indictment that is in front of you, each of those elements,

there may be a definition of each of the things that is involved in that indictment, at the end of the evidence, the Court, the Judge will give you this document, if you are on this jury that y'all will take back in the jury room with you for your deliberations that is called the charge of the Court. And that document will have the law that contains the issues involved in a particular trial, okay. That document will have some definitions in it of some of the terms that are in that indictment, okay. Now, each of those elements has to be proven beyond all reasonable doubt.

If the State fails to prove any element beyond all reasonable doubt, what does the jury do in that situation?

PROSPECTIVE JUROR: Well, if they have proven beyond a reasonable doubt that everything is accurate there, then it would be a conviction of guilty.

MR. JOHNSON: That's right. And my question was if they don't do that?

PROSPECTIVE JUROR: Oh, if they don't do it, it would be not guilty.

MR. JOHNSON: It would be the opposite. All right. Is that something that you think you could do in a case like this, if they don't prove their case?

PROSPECTIVE JUROR: Yes.

MR. JOHNSON: Now, there are -- there are different kinds of homicides, okay. Homicide just means a

death. You know if a death is accidental and there was no mens rea of criminal intent involved, it was just an accident, then that is not a crime, okay. There are also homicides that are excused homicides. An example of that would be if somebody is insane, they didn't know the difference between right or wrong, then they could be found not guilty by reason of insanity; you understand that?

PROSPECTIVE JUROR: Yes.

MR. JOHNSON: That would be an example of what is called an excused homicide, okay.

Now, there is also homicides that can be justified. Okay. Now, a justified homicide is a situation where somebody is killed by somebody who is acting in self-defense.

You have heard the term self-defense?

PROSPECTIVE JUROR: Uh-huh.

MR. JOHNSON: How do you feel about the issue as far as self-defense? Is that something that you think is a legitimate legal issue?

PROSPECTIVE JUROR: Absolutely.

MR. JOHNSON: Let me explain self-defense to you a little bit. In a case like this, even though -- in a case, not particular case, but in any case, a person who thinks that they are being threatened, has the right to defend themselves if that is a reasonable thought on their part. If they have a reasonable belief that somebody is threatening them with some

type of force, they have the right to defend themselves from that force.

You follow me so far?

PROSPECTIVE JUROR: Uh-huh.

MR. JOHNSON: Now, that applies even if the person who is threatening the force is a police officer, okay?

PROSPECTIVE JUROR: I didn't realize that.

MR. JOHNSON: Yeah, a lot of people don't realize that. But if it appears from the person being threatened with this force, if they have the reasonable belief that the force is being used by this police officer is unreasonable and excessive, they have the right to defend themselves from that force, okay. That's the law in Texas. All right.

Now, the law also says that the trier of fact, the person that is trying to decide if this is self-defense, they view the actions from the point of the view -- point of view of the person who is being attacked, the person who is defending themselves.

You understand what I mean by that?

PROSPECTIVE JUROR: Yes.

MR. JOHNSON: Okay. Now, another thing you need to know about self-defense, is if that issue is raised by the evidence, then -- then the State again has the burden of proofing that it was not self-defense. Okay?

PROSPECTIVE JUROR: All right.

MR. JOHNSON: And that again is the law in Texas. And these people would be objecting right now if that wasn't the law in Texas I assure you. That is the law in Texas.

Like some people, you were a little surprised that that would apply to police officers?

PROSPECTIVE JUROR: Uh-huh.

MR. JOHNSON: And that's understandable that you would be surprised, but that is the law in Texas.

Now, that can be raised by the evidence that the State puts on, the issue of self-defense that is, that can actually be raised by their own evidence. And if it is raised, then again, the State would have to prove beyond a reasonable doubt that it wasn't self-defense, okay.

Now, what do you think happens if a person acts in self-defense, what would be the verdict if the Judge or jury decided that the person acting in self-defense, do you know what the verdict would be in a case like that?

PROSPECTIVE JUROR: I guess it would be not guilty.

MR. JOHNSON: That's right. Because that would be, even if it is -- our laws say if you are being threatened with force, that could cause death or serious bodily injury, then you would have the right to respond with what is called

deadly force, which could also cause somebody's death, okay?

PROSPECTIVE JUROR: Uh-huh.

MR. JOHNSON: And in that situation, if the jury decided that the facts supported that, and you are right, the verdict would be not guilty in that case, is that something you think you could do if you were on this jury and you thought that's what the evidence showed?

PROSPECTIVE JUROR: I guess so.

MR. JOHNSON: Well, it is kind of a yes-or-no deal, that's the law, do you think you could follow that law?

PROSPECTIVE JUROR: Yes.

MR. BRAUCHLE: Now, let's go over here to these two issues, okay, we actually refer to them as special issue number one and special issue number two. They are really not numbered. The shorter one we will call special issue number one just for making it easier to talk about, okay. Now, you have already looked at that special issue, you have talked about it some. You understand what it -- you have read it, so you understand what it says; is that right?

PROSPECTIVE JUROR: Yes.

MR. JOHNSON: What you need to know is, is that you get to that issue after you have -- if you get to the point where you have found somebody guilty of capital murder, then the punishment phase is involving these issues, okay.

Now, that first special issue, starts off being answered

"no". I mean our laws says that that starts off answered "no". And the State again has that burden, the burden to proof that issue beyond all reasonable doubt.

You understand that?

PROSPECTIVE JUROR: Yes.

MR. JOHNSON: Now, basically what that is saying is, is that under our scheme, under our law, because that starts off as a "no", if that is answered "no", then that would be the end of the trial, at that point. The person who had been found guilty of this capital murder, who had been sentenced at that point, even though he hadn't been formally sentenced at that point, that person would be already found to have a punishment of life without parole, okay. There would never be a parole, that person would never leave prison.

You understand that?

PROSPECTIVE JUROR: Yes.

MR. JOHNSON: The way our law is set up, with that being answered "no", our law basically favors a life sentence without parole rather than a death sentence. You understand why I am saying that, because that starts off as "no"?

PROSPECTIVE JUROR: Uh-huh.

MR. BRAUCHLE: And again they have the burden of proof to get that from a life sentence without parole if they can bring you evidence that would convince you to answer that

"yes", then that's when it becomes a death penalty, okay?

PROSPECTIVE JUROR: All right.

MR. JOHNSON: Follow that?

PROSPECTIVE JUROR: Uh-huh.

MR. JOHNSON: You have any questions about anything I have talked to you about?

PROSPECTIVE JUROR: No, not at this point.

MR. BRAUCHLE: That's all my questions. Thank you for your time.

THE COURT: You may step down, ma'am.

PROSPECTIVE JUROR: All right.

(Prospective juror retired from the courtroom.)

THE COURT: Is there an agreement.

MR. BRAUCHLE: No, there is not.

MS. HANDLEY: The State would use a peremptory challenge on Marcelle Trammell, Juror No. 2375-B.

(Prospective juror entered the courtroom.)

THE COURT: Ms. Trammell, you have been excused as a juror in this case, so you are free to go. Thank you very much.

PROSPECTIVE JUROR: Thank you.

(Prospective juror retired from the courtroom.)

(Court recessed for the day.)

**THE STATE of TEXAS )**
**COUNTY of DALLAS )**

I, BELINDA G. BARAKA, Official Court Reporter in and for the 194th Judicial District Court of Dallas County, State of Texas, do hereby certify that the foregoing contains a true and accurate transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties, to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause(s), all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record was paid by the State/Defense.

WITNESS MY OFFICIAL HAND this the 30th day of May, A.D., 2009.

BGBaraka

BELINDA G. BARAKA, CSR #5028
Official Court Reporter
133 N. Industrial
Dallas County, Texas 75207

Certification Expires: 12-31-09