CAUSE NO. F07-50318-M

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
|---|---|---|
| vs. | * | 194TH JUDICIAL DISTRICT |
| WESLEY LYNN RUIZ | * | DALLAS COUNTY, TEXAS |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

VOIR DIRE EXAMINATION

Volume 30 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       BE IT REMEMBERED THAT on this the 3rd day of March,
A.D, 2008, the above-styled and -numbered cause(s) came on for
hearing before the HONORABLE ERNEST B. WHITE, III of the 194th
Judicial District Court of Dallas County, State of Texas, the
following is a true and correct transcription of the
proceedings had, to-wit:

   (Proceedings Reported by Computerized Machine Shorthand)

1                          A P P E A R A N C E S

2

3     HON. ANDY BEACH
      Assistant District Attorney
4     State Bar No. 01944900

5

6     HON. ANDREA HANDLEY
      Assistant District Attorney
7     State Bar No. 08898800
                                          FOR THE STATE OF TEXAS

8

9

10    HON. PAUL BRAUCHLE
      Attorney at Law
11    State Bar No. 02918000

12

13    HON. WILLIAM "KARO" JOHNSON
      Attorney at Law
14    State Bar No. 10804500

15                                        FOR THE DEFENDANT

16

17

18                               *  *  *  *  *

19

20

21

22

23

24

25

1                        I N D E X

2                                              PAGE/VOL.

3    Proceedings - 03/03/08 ........................... 4/30

4    TAMARA KRETLOW

5      Voir Dire Examination - Mr. Beach ................    4

6      Dismissed by Agreement ...........................   21

7    ROBERT TURBON

8      Voir Dire Examination - Ms. Handley ..............   22

9      Voir Dire Examination - Mr. Johnson ..............   56

10     Acceptance of the Juror by the State .............  100

11     Acceptance of the Juror by the Defense ...........  100

12   JUNE TEHAN

13     Voir Dire Examination - Mr. McCallum..............  102

14     Dismissed by Agreement ...........................  111

15   CYNTHIA SANTOSCOY

16     Voir Dire Examination - Mr. Beach.................  112

17     Dismissed by Agreement ...........................  114

18   FLOYD GIBBS

19     Voir Dire Examination - Mr. McCallum .............  115

20     Dismissed by Agreement ...........................  125

21   LLOYD MCGINNIS

22     Voir Dire Examination - Mr. Handley ..............  126

23     Dismissed by Agreement ...........................  142

24

25   Reporter's Certificate ...........................  143

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*



4

```
 1                    P R O C E E D I N G S
 2              (March 3, 2008)
 3         THE BAILIFF:   All rise for the juror.
 4         (Prospective juror entered the courtroom.)
 5         THE COURT:   You may be seated.
 6    Good morning, Ms. Kretlow.
 7         PROSPECTIVE JUROR:   Good morning.
 8         THE COURT:   Welcome to the 194th District Court.
 9    The attorneys have viewed your questionnaire and they have
10    some questions concerning issues that may be prevalent in this
11    case.  There aren't any right or wrong responses.
12         PROSPECTIVE JUROR:   Okay.
13         THE COURT:   They just want to see how you feel
14    about certain things.
15         The State may proceed first.
16         What says State?
17         MR. BEACH:   May it please the Court?
18              TAMARA KRETLOW
19    was called as a prospective juror, after having been
20    previously sworn by the Court, testified under oath as
21    follows:
22              VOIR DIRE EXAMINATION
23    BY MR. BEACH:
24         Good morning, Ms. Kretlow.  How are you doing?
25         PROSPECTIVE JUROR:   Fine.  How are you.
```

5

```
 1         MR. BEACH:   I am okay.  I wasn't awake until
 2    Bobby announced your presence in the courtroom.
 3         To my left is Andrea Handley and behind me are Marshall
 4    McCallum.  We are all Assistant District Attorneys and we are
 5    responsible for the jury selection portion of this capital
 6    murder case.
 7         Karo Johnson is the attorney to my left.
 8         MR. JOHNSON:   Good morning.
 9         MR. BEACH:   Paul Brauchle is another attorney,
10    he will be here.  And that's Wesley Ruiz at the end of counsel
11    table?
12         PROSPECTIVE JUROR:   Good morning.
13         MR. BEACH:   Ms. Kretlow I am guessing you are no
14    stranger to the courtroom?
15         PROSPECTIVE JUROR:   That's correct.
16         MR. BEACH:   You were 19 when you went to work
17    for All State?
18         PROSPECTIVE JUROR:   Yes.
19         MR. BEACH:   What was your entry position?
20         PROSPECTIVE JUROR:   Started out in claims
21    support.  Worked for the casualty department and have been in
22    that department the entire time.
23         MR. BEACH:   And you have been in Tarrant County;
24    is that correct?
25         PROSPECTIVE JUROR:   Well, living or working?
```

6

```
 1         MR. BEACH:   Working?
 2         PROSPECTIVE JUROR:   Actually worked in Irving
 3    when I first started.  The office moved to split off, went to
 4    Fort Worth for several years and then I am back in Irving now.
 5         MR. BEACH:   What kinds of cases are you
 6    adjusting right now?
 7         PROSPECTIVE JUROR:   Personal injury.
 8         MR. BEACH:   Car wrecks?
 9         PROSPECTIVE JUROR:   Yes, sir.
10         MR. BEACH:   Most part?
11         PROSPECTIVE JUROR:   Uh-huh.
12         MR. BEACH:   And obviously, you know a bunch of
13    attorneys.  Are some of the cases or are most of the cases now
14    handled in-house?
15         PROSPECTIVE JUROR:   In-house.  Depends on if
16    there is a conflict of interest, then this goes to outside
17    counsel.
18         MR. BEACH:   What Dallas lawyers the most part
19    are you using right now any come to mind?
20         PROSPECTIVE JUROR:   Dallas attorneys that we
21    use?
22         MR. BEACH:   Yes, ma'am.
23         PROSPECTIVE JUROR:   Other than our inside
24    counsel?
25         MR. BEACH:   Yes, ma'am.
```

7

```
 1         PROSPECTIVE JUROR:   We use Mark Stradley's
 2    office, Stacy and Conder, William Brotherton.  Heidi Whitaker
 3    is in that office.  We use Thompson, Coe.
 4         MR. BEACH:   Okay.  You don't use Steve Springer?
 5         PROSPECTIVE JUROR:   No.
 6         MR. BEACH:   He's an old buddy of mind from the
 7    D.A.'s office.  He used to work at Fannin and Harper.
 8         And your husband is a mediator?
 9         PROSPECTIVE JUROR:   Yes.
10         MR. BEACH:   Tell me about his work situation
11    right now?
12         PROSPECTIVE JUROR:   He owns North Texas
13    Mediation and Arbitration.  He mediated civil cases and family
14    cases.  Gets a lot of court appointed mediations through the
15    civil county and district courts.
16         MR. BEACH:   Okay.  There is an outfit called
17    Dispute Resolution Services over in Fort Worth, you used them
18    before.
19         PROSPECTIVE JUROR:   I have used them before.
20         MR. BEACH:   Is your husband in business similar
21    to that?
22         PROSPECTIVE JUROR:   Yes.
23         MR. BEACH:   Okay.  And I see that your husband
24    used to be a police officer at some point in time; is that
25    correct?
```

8

```
1           PROSPECTIVE JUROR:   Yes, that's correct.
2           MR. BEACH:   Before you knew him?
3           PROSPECTIVE JUROR:   Before I knew him.
4           MR. BEACH:   All right.  Obviously they are going
5    to be interested that at one point in time in his life your
6    husband with a police officer, especially because the fact
7    situation that we are involved with in this case, the murder
8    of a peace officer.  Should they have any concerns about the
9    fact that your husband was a peace officer at one time in a
10   case like this?
11          PROSPECTIVE JUROR:   I don't believe so.
12          MR. BEACH:   I guess you know he puts his pants
13   on one leg at a time like anybody else?
14          PROSPECTIVE JUROR:   Yes.
15          MR. BEACH:   Human being?
16          PROSPECTIVE JUROR:   Yes.
17          MR. BEACH:   All right.  All right.  The reason
18   why you are here, we have been at this process, depending on
19   who you ask, six weeks, maybe seven weeks, I am not really
20   sure right now.  We have got nine jurors.  You know we need 12
21   to start a case like this.  It has been a laborious process.
22   And I can -- you can imagine the stakes don't get any higher
23   than what we are talking about in a death-penalty case.  The
24   reason why you are here at least based on your questionnaire,
25   you are pretty much in line with what the law is here in
```

9

```
1    Texas; that is, you believe the death penalty is appropriate
2    in some murder cases?
3           PROSPECTIVE JUROR:   Yes, sir.
4           MR. BEACH:   If you had circled number one there
5    on the front page of your questionnaire, said I believe it is
6    appropriate in all murder cases, well, you wouldn't be here.
7    Because obviously that is not what the law is.  If you circled
8    four, five or six, I don't believe in the death penalty, I
9    could never do it.  You wouldn't be here.  So you are right
10   down the middle.  So you are in line in kind of firing line in
11   terms of potentially being on this jury.
12          PROSPECTIVE JUROR:   Okay.
13          MR. BEACH:   And you are going to know today,
14   ma'am, if you are on this jury or if you are not on this jury.
15   So that will be a done deal when you walk out of the
16   courthouse today.
17          PROSPECTIVE JUROR:   Okay.
18          MR. BEACH:   We anticipate that the trial itself
19   is going to start some time in the middle of April.  And once
20   it actually starts, we are looking at five-to-eight-day
21   working trial, okay?
22          PROSPECTIVE JUROR:   Okay.
23          MR. BEACH:   The only thing we can't predict is,
24   you can imagine is we can't predict how long the jury is going
25   to deliberate.  That is kind of the x-factor, they may be out
```

10

```
1    20 minutes or out two days.  That's why we have the
2    five-to-eight-day window.  There is a possibility that you may
3    be sequestered for a night or two once the deliberation begin.
4    The trial is 9:00 to 5:00 like a civil trial.  Don't work
5    weekends.  Be able to make phone calls, you know, and go home
6    at night except when deliberations actually commence.  With
7    those representations in mind, ma'am, do you believe you could
8    devote your full attention and concentration to the trial,
9    five-to-eight-day working trial?
10          PROSPECTIVE JUROR:   Yes, sir.
11          MR. BEACH:   You have had a chance to review your
12   questionnaire.  And I am guessing that was the last thing that
13   you had in mind when you came down for jury duty a couple of
14   weeks ago, get this 18 page --
15          PROSPECTIVE JUROR:   That's true.
16          MR. BEACH:   -- questionnaire put into your
17   hands.  And anything that you would change after reviewing it
18   here this morning?
19          PROSPECTIVE JUROR:   There were a couple of
20   things on page eight.  The second question:  Have you, your
21   spouse or any family member, close personal friend had any
22   training in law enforcement.  I put no at that point.
23   However, you saw my husband was a police officer.
24          MR. BEACH:   Sure.
25          PROSPECTIVE JUROR:   So I put that my husband
```

11

```
1    was a police officer in Atlanta, I don't know the year.
2           The other one was on page ten, the first question:  Some
3    people feel genetics, circumstances of birth, upbringing and
4    environment should be considered when determining the proper
5    punishment of someone convicted after crime.  What do you
6    think?  And I put I don't think so.  The person's upbringing
7    and environment mold the person, I added but they should still
8    be held accountable for their actions.
9           MR. BEACH:   All right.
10          PROSPECTIVE JUROR:   And nothing else has
11   changed.
12          MR. BEACH:   You indicated on page three that you
13   remember something on TV about an officer being shot; is that
14   correct?
15          PROSPECTIVE JUROR:   Every time a police officer
16   is shot in Dallas, it makes news, but I don't recall anything.
17          MR. BEACH:   Specific about this case?
18          PROSPECTIVE JUROR:   No, sir.
19          MR. BEACH:   So as you sit here right now, your
20   mind is a blank slate, you have not formed any conclusions or
21   opinions --
22          PROSPECTIVE JUROR:   No, sir.
23          MR. BEACH:   -- at this time.  Okay.
24          At the bottom of page three, that last question there:
25   Do you agree with the law in the State of Texas that says an
```

13

1    intentional murder of a police officer should be a potential
2    death-penalty case? And you answered, yes; is that correct?
3                 PROSPECTIVE JUROR:   Yes, sir.
4                 MR. BEACH:   But you understand that there is
5    nothing automatic about a death penalty. If a police officer,
6    no matter what the category is?
7                 PROSPECTIVE JUROR:   Correct.
8                 MR. BEACH:   Sometime death penalty is
9    appropriate and sometimes it isn't?
10                PROSPECTIVE JUROR:   That's correct.
11                MR. BEACH:   All right. We have told every
12   person sitting up there what our position is going into this
13   case. We don't want it to come as a surprise in April when
14   you are sitting over here, hey, these guys were really serious
15   about seeking the death penalty in this case. That's our
16   objective in this case. That's what we are after in this case
17   is to obtain a death penalty for Wesley Ruiz. Not some
18   fictional character; but the man at the end of counsel table.
19   And we tell each juror that because we believe we have the
20   type and quality of evidence, first of all, that will convince
21   a jury beyond any reasonable doubt that he is guilty of
22   capital murder exactly as charged in the indictment. And
23   secondly, that we believe that a death penalty is the
24   appropriate punishment in this case for this man, for the way
25   he has lived his life, for the crime itself versus the only

1    other punishment alternative once found guilty of a capital
2    murder. And that's life imprison without the possibility of
3    parole. That's our position. As you can imagine, they have
4    got a different position, okay. Really what our position is,
5    what the lawyer's position is, is not going to amount to a
6    hill of beans in this case. It is going to be what 12 jurors
7    think about the evidence in this case. But we tell you this
8    because we are actively seeking the death penalty.
9                And let's just -- you probably know this. You may know
10   this. But I want to walk you through just to make sure. If a
11   jury convicts this man of capital murder and then at the
12   punishment phase recommends to Judge White that the death
13   penalty is the appropriate punishment, he would have no
14   alternative under the law but to set this man's sentence at
15   death by lethal injection. And what does that mean?
16               Well, at some date in the future, Judge White would set
17   an actual execution date. And on the day before that
18   execution date, they would come and get Wesley Ruiz from the
19   death-row facility at Livingston, Texas. Take him by vehicle
20   to downtown Huntsville, Texas. I don't know if you ever been
21   to Huntsville or not. Right in the middle of downtown
22   Huntsville is an old prison unit called the Walls Prison Unit.
23   And within that is the actual death chamber. And on the date
24   of his execution, he would be placed in a holding cell, given
25   a last meal, be allowed to see his family, be allowed to see a

14

1    spiritual adviser.
2                At six o'clock that night, they would come and get
3    Mr. Ruiz from that holding cell and take him down a narrow
4    hallway into the actual death chamber. And in the middle of
5    that room is a hospital bed. He will be placed on that
6    hospital bed, strapped to it, and intravenous lines would be
7    run into his arms.
8                At that time, two curtains would be drawn back. Behind
9    one of those curtains, he could have up to five members of his
10   family there. Behind the other curtain, the victim could have
11   up to five members of his family there. He would be given the
12   opportunity to make a last statement.
13               And once that was done, the warden would give the
14   go-ahead for the execution to commence. At that time a series
15   of three drugs would begin to be introduced into his system
16   through those I.V. lines. The first to sedate him. The
17   second to collapse his lungs. And the third to stop his
18   heart. Whether it took three minutes or five minutes, at some
19   point in time there in the death chamber, the doctor would go
20   over, check on him and pronounce him dead.
21               I don't tell you that to be morbid, but we just tell
22   everybody to try to impress upon them as much as we can here
23   in this sterile courtroom what is at stake at trial and what
24   the State is actively seeking.
25               Having gone through all that, ma'am, do you believe that

15

1    you are the type of person -- you may believe in the death
2    penalty, you may think it is appropriate when you see it on TV
3    or talking about it around the coffee pot, but are you the
4    kind of person that could personally participate in a process
5    if you believe the evidence compelled you to do so that may
6    very well result at some date in the future this man laying
7    dead on a gurney in Huntsville, Texas?
8                PROSPECTIVE JUROR:   Yes.
9                MR. BEACH:   As I told you, we have nine jurors
10   up to this point in time. I can guarantee you that none of
11   them have been real thrilled to find out, hey, I am on this
12   jury. We haven't had anybody come down saying, Pick me, pick
13   me. It is obviously a very weighty responsibility. And I
14   know you have handled claims and lots of money was involved
15   and people's lives, you know, at stake in terms of damages and
16   things like this. You could imagine that this is a person, if
17   you are asked to be on this jury, is going to be with you the
18   rest of your life.
19               PROSPECTIVE JUROR:   I understand that.
20               MR. BEACH:   At some date in the future, you may
21   turn on the TV, some date in the future, six o'clock, turn on
22   the evening news and there it is, Wesley Ruiz is being taken
23   to the death chamber, is going to bring it all back to you.
24   You are telling me without hesitation you could participate in
25   this process?

16

1      PROSPECTIVE JUROR:   Yes, sir.
2           MR. BEACH:   All right.  Why do you think we need
3   a death penalty in Texas or why do you think we should have a
4   death penalty, ma'am?
5           PROSPECTIVE JUROR:   Well, I think that we should
6   have a death penalty in Texas to punish those who do horrific
7   crime.  I also think it is a deterrent for other criminals to
8   not do whatever crime it is that the death penalty is
9   warranted.
10          MR. BEACH:   Okay.  Now, again, you may know
11  this, and I apologize if you do.  I just want to make sure, as
12  you checked on the questionnaire, the death penalty in Texas
13  is not even a possibility except in very few murder fact
14  situations, okay?
15          PROSPECTIVE JUROR:   Okay.
16          MR. BEACH:   For instance if I pulled out a gun
17  right now, pointed it to her head and blue her brains out and
18  stood over her dead body and laughed about it, you would agree
19  with me that would be a horrific, intentional murder?
20          PROSPECTIVE JUROR:   Yes.
21          MR. BEACH:   Correct.  But guess what, the most I
22  could get, most I could get is a life sentence without -- a
23  life sentence because she is not one of the protected classes
24  of individuals the legislature has said you kill one of the
25  members of this class, you may get the death penalty.

17

1      What are those classes?  Like what we have in this case,
2   if you murder a police officer while he was in the line of
3   duty.  He is a protected class.  And if you murder someone
4   like that, potentially the State could seek the death penalty.
5       If you murder a child under the age of six, protected
6   class, the State could seek the death penalty.
7       An elderly person over the age of 65 -- well, 65 doesn't
8   sound quite as old as used to, that's a protected class and
9   you could potentially receive the death penalty.
10      A prison guard while you are trying to escape from the
11  penitentiary.
12      And the other category that is probably the most common
13  here in Texas, if you commit a murder while you are in the
14  course of committing another very serious felony.  If I go
15  into a 7-Eleven convenience store to rob it and murder the
16  clerk behind the counter, that's a murder during a robbery.
17  The legislature says you commit a murder in a situation like
18  that, you could potentially be looking at a death penalty.
19      Murder-for-hire.  Murder during a rape or a burglary are
20  kidnapping.  But other than that, ma'am, those really are the
21  only fact situations where the State could even seek the death
22  penalty, okay?
23          PROSPECTIVE JUROR:   Okay.
24          MR. BEACH:   Now, if I made you governor for the
25  day where you could kind of shape the laws anyway that you

18

1   wanted to, would you be okay with that statutory scheme I went
2   to, would you increase the number of cases to seek the death
3   penalty?  Are you okay with it?
4           PROSPECTIVE JUROR:   Uh-huh.
5           MR. BEACH:   And like we talked about, those
6   murder cases, we call capital murder cases.  What I described
7   to you earlier, executing her, that's horrible.  It is just a
8   first-degree, what we call regular murder, okay.  Capital
9   murder is a murder plus.  It is one of those special
10  categories of murder where the State can seek the death
11  penalty.
12          PROSPECTIVE JUROR:   Okay.
13          MR. BEACH:   If I murdered her in coldblood, that
14  would be just regular murder.  The State would not be entitled
15  to seek the death penalty.  And what happens in a case like
16  that, where we are just talking about a murder case.  Well,
17  unlike a capital case where there is only two possible
18  punishments, death or life without parole, if you are
19  convicted of a murder in Texas, just a first-degree murder,
20  there is a wide range of punishment the legislature has put
21  into play that would give the jury many, many, options to
22  assess punishment in just a regular murder case.  Anywhere
23  from as low as five years in the penitentiary all the way up
24  to 99 years or life.
25      Now, the fact situation I just described to you a little

19

1   bit earlier, executing her at point blank range and laughing
2   about it?
3           PROSPECTIVE JUROR:   Uh-huh.
4           MR. BEACH:   I guess most juries would think that
5   would be up at the higher end of the punishment range if the
6   State proved the murder case like that.  We have that wide
7   range because there are all different kinds of murders.  For
8   instance, 85-year-old man who has been married to the same
9   lady for 65 years.  She is --
10          MR. BRAUCHLE:   Your Honor, we would object on
11  the grounds previously stated, we would ask you to recall
12  those.
13          THE COURT:   Overruled.  Mr. Brauchle, you may
14  have a running objection.
15          MR. BRAUCHLE:   The Court is aware of our
16  objections?
17          THE COURT:   The Court is.
18          MR. BEACH:   Been married to the same lady for 65
19  years, has terminal cancer, in horrible pain and he
20  disconnects the life support to her body.  You know what that
21  is called?  That is called murder here in the State of Texas,
22  intentional taking of someone's life.  That would be someone I
23  guess you would treat differently than coldblood execution
24  that I described.  That's why we have that wide range of
25  punishment in the murder case.  And to be a qualified juror in

20

1   a capital murder case, you have to be able to assure both
2   sides that in a murder case, you would have an open mind to
3   that full range of punishment.  Okay.  Of five years all the
4   way up to 99 years or life, because again it is there, but you
5   don't know what the facts are in this case.  And you have to
6   have your mind open to the full range of punishment.
7        Now, we will get back to capital murder here in just a
8   second.  Just assume that you are a juror in a murder case,
9   where the range is anywhere from five years all the way up to
10   99 years or life.  Depending on the facts, if after you heard
11   all the evidence in the case, ma'am, you believed that as low
12   as a five-year sentence was a proper punishment in a murder
13   case, you believe the evidence compelled you to give as low as
14   five years, you felt that was the right thing to do, could you
15   and would you give a five-year sentence?
16        PROSPECTIVE JUROR:   Yes.
17        MR. BEACH:   If it was a 30-year sentence, could
18   you give 30 years?
19        PROSPECTIVE JUROR:   Yes.
20        MR. BEACH:   All the way up to life.  Could you
21   give life if you felt the evidence convinced you to do it?
22        PROSPECTIVE JUROR:   Yes, sir.
23        MR. BEACH:   Really to be a qualified juror in a
24   murder case, you have to tell us going in without knowing the
25   facts, my mind is open to the full range of punishment and I

21

1   will give anywhere within that range if I believe the evidence
2   convinced me that was the right thing to do?
3        PROSPECTIVE JUROR:   Yes.
4        MR. BEACH:   You could do that?
5        PROSPECTIVE JUROR:   Yes.
6        MR. BEACH:   All right.
7        Now, let's go back to capital murder.  How does it work
8   here in Texas.  It is a two-part trial.  We call it a two-act
9   play, okay.  In act one of this play, this criminal trial, the
10   jury has only one question to answer.  Is the defendant guilty
11   or not guilty, okay.
12        You with me so far?
13        PROSPECTIVE JUROR:   Yes.
14        MR. BEACH:   You are not concerned about life
15   sentence or death sentence in the first act of the play, your
16   only focus is on whether or not the State --
17        We have an agreement, Judge.  Thank you, ma'am.
18        THE COURT:   Thank you, ma'am.  You are free to
19   go.
20        PROSPECTIVE JUROR:   Thank you.
21        MR. BEACH:   Appreciate it.
22        (Prospective juror retired from the courtroom.)
23        (Pause in the proceedings.)
24        THE BAILIFF:   All rise for the juror.
25        THE COURT:   Good morning, Mr. Turbon.  How are

22

1   you doing?
2        PROSPECTIVE JUROR:   Fine, Judge.
3        You all right?
4        THE COURT:   Fine, thank you.  The attorney have
5   some questions to ask you regarding your qualifications as a
6   juror in the case.  There are no right or wrong answers they
7   just want to see how you feel.
8        MS. HANDLEY:   Thank you, Your Honor.
9             ROBERT TURBON
10   was called as a prospective juror, after having been
11   previously sworn by the Court, testified under oath as
12   follows:
13            DIRECT EXAMINATION
14   BY MS. HANDLEY:
15        Good morning, Mr. Turbon.  How are you doing today?
16        PROSPECTIVE JUROR:   I am fine.  You all right?
17        MS. HANDLEY:   I am fine.  Just one of the
18   prettiest days in Dallas County, I guess it is supposed to be
19   spring technically.
20        Have you had a chance to look over your questionnaire
21   again back there?
22        PROSPECTIVE JUROR:   I have.
23        MR. BEACH:   First of all my name is Andrea
24   Handley.  And I have two attorneys working with me today.  You
25   just past Mr. Marshall McCallum, and also Andy Beach, who will

23

1   be joining us a little bit later on.  And we are Assistant
2   District Attorneys here in Dallas in charge of selecting this
3   jury in this case.
4        And to my left is Karo Johnson and Paul Brauchle.  They
5   represent the defendant, Wesley Ruiz, seated at the far end of
6   counsel table over there.
7        THE DEFENDANT:   Good morning.
8        MS. HANDLEY:   What we are doing, we have had
9   lots of people come down.  And you remember the Judge talking
10   to you a little bit and filling out some questionnaires and we
11   have gone through each one of those, hundreds of them and
12   pulled out a select few to talk to one-on-one.  We have about
13   nine jurors in this case, we need 12.  We have been doing this
14   for several weeks now.  And I think you can appreciate that
15   the stakes don't get any higher than a case like this.  We are
16   talking about a death-penalty case.  We are talking about life
17   or death.
18        I have noticed from your questionnaire, I don't think you
19   have ever served on a jury before?
20        PROSPECTIVE JUROR:   That's correct.
21        MS. HANDLEY:   And we really want to feel you out
22   about that.  I think it is a lot to ask maybe to have you
23   involved in your first jury case for it to be a death-penalty
24   case.  This is just a world of difference from, you know,
25   sitting on a theft of a bike, theft of a loaf of bread or

24

1   something. We want to talk to you a little bit about that and
2   see if you are a qualified juror for this particular case?
3          PROSPECTIVE JUROR: Okay.
4          MS. HANDLEY: Now, we have read your
5   questionnaire. And I tell you that the reason we brought you
6   down here is for the most part, Mr. Turbon, your answer is
7   somewhat neutral, you are not at one end of the scale and not
8   the other. If you were a person who said I think every case
9   should be a death-penalty case, you wouldn't be here. If you
10  were a person who said under no circumstances could I ever be
11  involved in something like that, you wouldn't be here either.
12  But it is a lot different to fill out a questionnaire and talk
13  about it academically than to maybe sit around the coffee pot
14  and talk about the death penalty to virtually actually be
15  involved in something like that.
16         PROSPECTIVE JUROR: Uh-huh.
17         MS. HANDLEY: Okay. You know just so there are
18  no mistakes about what we are doing here today -- and I will
19  tell you today whether or not you are going to be on or off
20  this jury. So if you have any reservations about it, if you
21  have any questions about it, now is the time to ask. It is
22  not let me let them talk to me a little bit today and then I
23  will come back and ask them some questions later. Today is
24  the day to talk about it. And just out of respect for you and
25  out of fairness to you, what we are doing so there is no

25

1   question in your mind speaking on behalf of the State in this
2   particular case, we have one objective in this case, one sole
3   goal in this case; and that is, to see that man at the end of
4   that table strapped to a gurney someday being executed.
5   That's our position in the case. And I tell you that just so
6   you are not surprised if you end up on the jury and say, hey,
7   wait a minute, they were serious about this.
8          Now, how I feel about this case as a representative of
9   the State, how they feel about it as Defense attorneys is safe
10  to say are entirely different.
11         PROSPECTIVE JUROR: Yeah.
12         MS. HANDLEY: But at this point what I think and
13  what they think and that and a quarter can get you a cup of
14  coffee. What is important, how you feel about the death
15  penalty and particularly whether or not you could be a juror
16  in a case like this.
17         Let me just start out by saying, would it offend you if I
18  thought you were probably young?
19         PROSPECTIVE JUROR: No, I wouldn't be offended.
20  That would be a true statement.
21         MS. HANDLEY: Anybody born after I graduated
22  from high school I say is young. How do you feel being here
23  today, Mr. Turbon, knowing that there is a probability that
24  you may be involved in something like this?
25         PROSPECTIVE JUROR: Personally I am a little

26

1   excited. I understand the nature of the case, it is
2   high-profile, there is a lot of high stakes, and I would be
3   enthusiastic to hear both sides and to make a decision that
4   has one of the greatest consequences I think I would ever be
5   making.
6          MS. HANDLEY: Absolutely. I don't think that
7   could be said greater. Your decision, how you act in this
8   case does have serious consequences. I will tell you just for
9   your benefit in case you don't know, as I have stated, that is
10  our goal to seek an execution in this case.
11         And I believe that we have the type and the quality of
12  evidence that is going to convince 12 people that this
13  defendant is guilty of capital murder. I also feel that we
14  have the type and quality of evidence that will convince 12
15  people that a death sentence versus a life in prison sentence
16  is the appropriate verdict in this case.
17         Assuming that is what happens and is found guilty
18  and sentenced to death. The Judge in this case, Judge Ernest
19  White would have no choice but basically to sign a death
20  warrant. He doesn't second guess you. He doesn't say I don't
21  agree with your decision. He has no choice but to sign the
22  execution for that defendant. He is transferred to
23  Livingston, Texas in East Texas to Huntsville.
24         You ever been there before?
25         PROSPECTIVE JUROR: Yes.

27

1          MS. HANDLEY: For what purpose were you down
2   there?
3          PROSPECTIVE JUROR: We actually stumbled upon
4   the jail on a family trip.
5          MR. BEACH: Did you visit any of the jails?
6          PROSPECTIVE JUROR: No.
7          MS. HANDLEY: It is designated to the study of
8   criminal justice system. And he will, on that particular day,
9   the date before his execution, they are going to transfer him
10  down to downtown Huntsville, Texas. In the middle of downtown
11  Huntsville is a unit called the Walls Unit. It is a very old
12  prison there. And that's where they actually carry out the
13  executions. They will put him in a small isolated cell on
14  that particular day.
15         On the day of his execution, he will sit in that cell by
16  himself. He will however be allowed to visit with a couple of
17  people, maybe some family members, maybe a spiritual adviser
18  if he so incline. He will get that famous last meal that
19  people always hear about. He can order whatever he wants as
20  long as it is on the prison menu.
21         Comes six o'clock, that's when we perform our executions
22  here in Texas, he will be transferred down that narrow hallway
23  to the death chamber. Whether he go willingly or kicking and
24  begging for mercy, he is going to go. There are people who
25  are trained to get him from that chamber down to that death

28

1  chamber.  The death chamber is a small room.  Last time I saw
2  it, it was an industrial green or gray.  It is a sterile
3  environment.  It is basically a hospital bed, kind of like a
4  gurney.  They are going to put him on it and strap him down.
5  Whether he likes it or not, he is going to be strapped down.
6         Prior to his execution, there are two windows in that
7  death chamber, Mr. Turbon, and these curtains will go back.
8  On one side, he can have representatives of his family, his
9  attorneys whoever he is so inclined.  On the other side, the
10  curtains will open, there will be representatives for the
11  victim's family in the particular case.
12         An individual will put an intravenous line into his arm
13  at this time.  He would be given an opportunity to make a last
14  statement.  I am sure you can imagine many things have been
15  said over the course of many years.  Some people may
16  apologize, some may protest their innocence or guilt, and say
17  y'all got it wrong; but regardless, he is going to have that
18  line put into his arm.  Once he is finished saying whatever he
19  is inclined to say, the warden is going to give a nod to an
20  individual who is going to start hitting a series of buttons.
21  These buttons have designed to start releasing chemicals
22  through that intravenous line.  And they do three things.  The
23  first thing they do, they kind of knock him out, sedate him.
24  The second thing that will happen is his lungs will cease up.
25  And the third thing, it will stop his heart.  And whether that

29

1  takes four minutes, six minutes or eight minutes, those
2  chemicals are going to flow long enough for it to take until
3  he is pronounced dead by a doctor.
4         I don't tell you that to be morbid or anything, but just
5  to impress upon you exactly what happens in a case like this.
6  And to also bring you to the forefront that I am not talking
7  about a fictitious character.  I am talking about you being
8  involved in something, that process that would ultimately
9  cause the death of that man seated down there at the end of
10  the table.
11         My question to you, Mr. Turbon, seeking in your heart, do
12  you honestly think that you could be a part of a process that
13  may very well result in the death of that man down there?
14         PROSPECTIVE JUROR:  I have given it some thought
15  between the time I came here to fill this out and with your
16  telling of the process there, I feel that I could return a
17  death penalty verdict, if the evidence so supports.
18         MS. HANDLEY:  Even with you being just -- you
19  are 24 years ever age; is that correct, sir?
20         PROSPECTIVE JUROR:  That's correct.
21         MS. HANDLEY:  Twenty-four years of age, you are
22  in the shank of your life right now, you have a lot of places
23  to go, a lot of things to do still, that's something that you
24  are comfortable being involved in at such a young age?
25         PROSPECTIVE JUROR:  It is.

30

1         MS. HANDLEY:  There may very well come a day,
2  Mr. Turbon, when you are watching the TV somewhere in the
3  future and they are going to say, hey, tonight is the night
4  for the execution of Wesley Ruiz and it is something that a
5  lot of people say and I think is fair to say would stay with
6  you for rest of your life, and you are telling us that you are
7  fine with something like that?
8         PROSPECTIVE JUROR:  Yes.
9         MS. HANDLEY:  Having looked at your
10  questionnaire, is there anything that you would change if you
11  had to fill it out again today?
12         PROSPECTIVE JUROR:  I looked over it and as you
13  know it is pretty exhaustive and I was going through it pretty
14  quick.  All in all I agree with what I wrote the first time
15  around.
16         MS. HANDLEY:  Okay.  Let's talk specifically
17  about your questionnaire, and let's talk to you about a few
18  more preliminary matters.  We will talk about the criminal
19  trial process in general and then more specifically a death
20  penalty case.
21         Let me start out by telling you what our schedule is.  We
22  have nine jurors so far.  I anticipate that this case will
23  actually start around mid-April, okay.  Once it begins, I
24  believe that it would take anywhere from five to eight working
25  days to actually put on the bulk of the case.  We usually work

31

1  9:00 to 5:00.  We don't normally work on weekends.  You
2  usually go home at night and do whatever you have to do.  The
3  only thing I can't anticipate how long it would take is a
4  jury's deliberation.  That can take anywhere from 20 minutes
5  to two days, that I don't know.  That's something we really
6  can't crystal ball.  You usually go home at night.  There is
7  an exception, once you start deliberations, sometimes we have
8  to sequester a jury.  And that basically means we send you and
9  the 11 other folks to a hotel room and stay there for the
10  night.  You don't go home, you don't talk to your family, it
11  is for the purpose of keeping you sequestered so you don't
12  have outside influences.  I don't think you have children or
13  anything to worry about, maybe if you have dog, you may have
14  to get someone to let the dog out.  Knowing that, does that
15  square with your schedule, is that something you could do and
16  give your full attention to the trial in the case?
17         PROSPECTIVE JUROR:  I could.
18         MS. HANDLEY:  Okay.  Fantastic.  I have looked
19  at your questionnaire here, and on page three we asked you
20  about what crimes do you think death penalty should be
21  available.  You put down murder, repeated cases of sex
22  offenders and repeated rape.  I will tell you, Mr. Turbon, in
23  Texas, there actually only is select type of case in which the
24  death penalty is actually an available option.  Okay.  All
25  murder cases, the death penalty is not necessarily an

1  available option. If I were to pull a gun out of my briefcase
2  right now, Mr. McCallum, my co-counsel, is minding his
3  business, if I just blow his brains out right here, laugh
4  about it, dance around his body, shoot him again just for good
5  measures, I think you would agree that is a pretty horrific
6  murder?
7              PROSPECTIVE JUROR:  Yes.
8              MS. HANDLEY:  The most I could get in a case
9  like that, Mr. Turbon, is life in prison. Because it is not
10 one of those select types of cases to which the death penalty
11 applies. You put down that you think it should apply to
12 repeated rape cases, I believe. I will tell you that that
13 doesn't necessarily -- that is not a case where the death
14 penalty would apply to. A serial rapist I think you have in
15 mind.
16             It applies in cases such as what we are here for today,
17 murder of a peace officer in the line of duty. It applies to
18 murder of a child under six years of age or murder of an
19 individual 65 years of age or older. If I were to kill or
20 someone were to kill two or more people in the same criminal
21 transaction or a serial murder that's the kind of case a death
22 penalty could apply.
23             Classic example a person goes into a convenience store
24 with intent of robbing the store and kills the clerk in the
25 process. In other words, a murder committed during a serious

1  felony offense, the death penalty would be an option. A
2  rapist who also kills his victim. It is a very narrowly
3  defined category of cases there. And it does not apply, for
4  example what you have put here, though, are you okay with the
5  statutory scheme as I set it out for you today?
6              PROSPECTIVE JUROR:  Yes.
7              MS. HANDLEY:  If you were Governor Turbon for
8  today, would you expand the category to which death penalty
9  could apply?
10             PROSPECTIVE JUROR:  I don't believe I would, no.
11             MS. HANDLEY:  Very good, then. You have put
12 down also with respect to your answer about the murder of a
13 police officer, demonstrating at least to me that you are
14 neutral on this, and you say it is to be considered on a
15 case-by-case circumstance, and you are absolutely right by
16 that Mr. Turbon. There is nothing automatic about a
17 death-penalty sentence. Some people come in with the
18 misconception, I don't blame them, if you are guilty of
19 capital murder, means you are executed. And it is not that at
20 all. It is determined on a case-by-case basis, going on --
21 and a willingness to keep your mind open and to consider all
22 the particular facts in the case.
23             Let's talk a little bit about the criminal trial. And
24 before we go on, before we start talking about the death
25 penalty, in a death-penalty case, finding someone guilty of

34

1  capital murder, you as a juror have one or two options, and
2  that's either death sentence, the person will be executed or
3  they will receive life imprison without parole. Those are the
4  only two options that will be available to you as a juror in a
5  death-penalty case. In -- for lack of a better word, in a
6  regular murder case, if you would, where I have shot my
7  co-counsel, it is pretty heinous, it is not a capital case, it
8  is a regular murder case, if you will.
9              PROSPECTIVE JUROR:  Uh-huh.
10             MS. HANDLEY:  The options available to a jury in
11 that case is wide open. You could assess a punishment
12 anywhere from as low as five years imprison all the way up to
13 life imprison for a case such as that. The reason that is,
14 Mr. Turbon, because I think you could probably imagine no two
15 defendants are ever alike. No two murder cases are ever
16 alike. I have been doing this over 15 years and I have never
17 seen two defendants alike or a case alike. You have a broad
18 spectrum to choose from because there are so many different
19 options of murder.
20             Me killing my co-counsel and laughing about it is an
21 example of murder. An example of another murder is a couple
22 that has been married over 60 years, they are in their late
23 80s. The wife comes down with horrible cancer.
24             MR. BRAUCHLE:  Your Honor, once again we would
25 renew our options.

35

1              THE COURT:  Overruled.
2              MS. HANDLEY:  She is --
3              MR. BRAUCHLE:  May we have a running option?
4              PROSPECTIVE JUROR:  You may.
5              MS. HANDLEY:  She is suffering and in a great
6  deal of pain and doesn't want to live any longer, so out of
7  loving kindness he pulls the plug. Guess what, Mr. Turbon,
8  that's an intentional murder, that is first degree.
9              MR. BRAUCHLE:  We object to that as the
10 definition of intentional murder.
11             THE COURT:  Overruled.
12             MS. HANDLEY:  That's an example where that could
13 be considered an intentional murder.
14             MR. BRAUCHLE:  Once again we renew our
15 objection.
16             THE COURT:  Overruled.
17             MS. HANDLEY:  You could see then, Mr. Turbon,
18 that the fact situations of those two murder cases are very
19 broadly different perhaps. You might think that. And in a
20 case unlike that, you are given that wide spectrum of
21 punishment to choose from. The question becomes for you,
22 Mr. Turbon, in order to be a qualified juror, you have to
23 agree in a regular murder case, you would look at the fact
24 situation, the circumstances of that particular case, and you
25 would assess the punishment that you felt was appropriate for

36

```
 1   that particular case.  If you felt that life imprison were
 2   appropriate for a particular case, that you would do that.  If
 3   you felt that the facts and the circumstances of a murder case
 4   that five years imprison was the appropriate thing to do, then
 5   you would do what you thought was the proper thing to do and
 6   again five years imprison.  Do you, Mr. Turbon -- could you
 7   follow the law in that and base your verdict on what you
 8   thought was the proper thing to do in a particular case?
 9              PROSPECTIVE JUROR:  In a regular murder case or
10   in a capital case.
11              MS. HANDLEY:  Yes, in a regular murder case?
12              PROSPECTIVE JUROR:  Yeah, yeah.
13              MS. HANDLEY:  If you felt five years imprison
14   was the proper thing to do, could you do that?
15              PROSPECTIVE JUROR:  Yes.
16              MS. HANDLEY:  If you felt 30 years was, could
17   you?
18              PROSPECTIVE JUROR:  Yes.
19              MS. HANDLEY:  And if you felt life was, could
20   you?
21              PROSPECTIVE JUROR:  (Nods head).
22              MS. HANDLEY:  And again that's kind of a theme
23   that prevails through all criminal cases that you always have
24   to do what is right for that particular case, what is the
25   right thing for the circumstances of that particular case,
```

37

```
 1   that's talking about a murder case.
 2              Let's talk about a death-penalty case.  Let's talk about
 3   how we do criminal trial.  I think maybe a good analogy in any
 4   criminal trial is sort of like a two-act play.  There is a
 5   first part where the jury decides whether or not the defendant
 6   is guilty, and then the second part, well, we found the
 7   defendant guilty, what are we going to do about it, okay.
 8              In the first part of any criminal case, be it theft of a
 9   bicycle, in any criminal case, there are certain fundamental
10   propositions of law that apply in every case.  In order for
11   you to be a qualified juror, you have to, first of all, agree
12   to follow the law, okay.  And you have to, second, agree to
13   base your verdict on the evidence in the case and nothing
14   else.  For example you can't say, I will always find a person
15   guilty of this because I promised my father I would or
16   something like that.  So certain fundamental propositions of
17   law apply, laws that you have to be able to follow in any
18   criminal case.
19              As a representative of the State, I will tell you that it
20   is always the State that has to prove this case to you.  The
21   defendant has absolutely no burden in this case whatsoever.
22   We do the charging; therefore, we ought to have to do the
23   proving.  We ought to have to carry that burden, and it always
24   should be our obligation to prove the case to you beyond a
25   reasonable doubt.
```

38

```
 1              I think that you might have before you a copy of the
 2   indictment.  Do you see that up there Mr. Turbon?
 3              PROSPECTIVE JUROR:  Uh-huh.
 4              MS. HANDLEY:  Go ahead and take a look at that,
 5   and I will tell you that -- that that pretty much -- that sets
 6   out, if you will, the elements of the offense, the things that
 7   we have to prove to you beyond a reasonable doubt.  And I will
 8   just paraphrase.  It shows you there that we have to prove to
 9   you that on a particular date or on or about a particular
10   date, in Dallas County, Texas, that this defendant did
11   intentionally or knowingly kill a peace officer, he knew he
12   was a peace officer, he was in the line of duty, and he killed
13   him by shooting him with a firearm.  Those are the elements
14   that we have to prove to you.  We have to prove to you each
15   element, not five out of six, you know, but every single
16   element up there, prove each of those elements to you beyond a
17   reasonable doubt.
18              Let me give you an extreme example right now, that would
19   touch on your qualifications on whether or not you could be a
20   juror.  I have to prove all the elements to you okay.  And one
21   is not more important than the other.  Let's say we put on our
22   entire case to you, but we have failed to bring you any
23   evidence whatsoever of where this offense happened.  We
24   haven't brought you a thread of evidence to show you it
25   happened in Dallas County.  Or worst yet, we show you it
```

39

```
 1   happened in Dallas County.  If we failed to prove to you,
 2   Mr. Turbon, it was Dallas County, the Judge would instruct you
 3   that you must return a verdict of not guilty, because we
 4   failed to prove each and every element of the indictment.
 5   Might make you sick.  We would be looking for a new job, I can
 6   guarantee you, we had long enough time to get ready for this
 7   case, we know that.  But the law would say that you would have
 8   to find the defendant not guilty, and you might in all
 9   likelihood go down the same elevator with the man that you
10   otherwise was convinced of killed a peace officer.
11              Is that a law that you could follow, Mr. Turbon, if it
12   came down to that?
13              PROSPECTIVE JUROR:  Yes, I could.
14              MS. HANDLEY:  And that indictment in front of
15   you Mr. Turbon is just that, it's a piece of paper.  It tells
16   me as a representative of the State what I have to prove
17   beyond a reasonable doubt and it gives the defendant and his
18   attorneys notice of what he has been charged with.  It is just
19   that, it is a piece of paper.  The Judge would instruct you
20   that you could not consider it as a piece of evidence against
21   the defendant.  Some people say we are in a courtroom right
22   now, I see bailiffs, I see attorneys, where there is smoke,
23   there is fire, he must have done something because he has been
24   indicted.  The law says that you may not consider that as a
25   piece of evidence against the defendant.
```

40

1      Is that a law you could follow also?
2                  PROSPECTIVE JUROR:   Yes.
3                  MS. HANDLEY:   The reason that is, Mr. Turbon, as
4      I said before is because we have to prove this case to you by
5      bringing you evidence.  As the defendant sits before you
6      today, you are to presume him innocent.
7           Have I brought you any evidence whatsoever at this point.
8                  PROSPECTIVE JUROR:   No.
9                  MS. HANDLEY:   No, I haven't.  And so at this
10     point, you are to presume him innocent.  Until I start to
11     bring you evidence.  Until I have convinced you beyond a
12     reasonable doubt of the defendant's guilt, he will enjoy that
13     presumption of innocence and you must give him that
14     presumption of innocence until I have proved that to you
15     otherwise.
16          Is that a law that you can also follow?
17                 PROSPECTIVE JUROR:   Yes.
18                 MS. HANDLEY:   I have to prove this case to you,
19     I have to prove the defendant's guilt, that is, to you beyond
20     a reasonable doubt.  I think we hear that all the time on
21     legal programs, there are books called that.  I will tell you
22     that there is no legal definition of beyond a reasonable
23     doubt.  Quite frankly it is whatever you think it is, okay.
24     It is not, I think I can say safely, it is not beyond all
25     doubt whatsoever.  I don't think I could ever prove anything

41

1      to you beyond all doubt whatsoever.  But let me throw that
2      back to you, and ask you, Mr. Turbon, if you had to find
3      someone guilty beyond a reasonable doubt, what do you
4      personally think that that means?
5                  PROSPECTIVE JUROR:   Well, without hearing all
6      the evidence, it is hard to say in this particular case, what
7      a reasonable doubt would be.  But a reasonable doubt -- again
8      hard to say without any evidence for this case.
9                  MS. HANDLEY:   Sure.  Some people say that I need
10     to be convinced?
11                 PROSPECTIVE JUROR:   Yeah.
12                 MS. HANDLEY:   Some people say I got to be
13     absolutely sure.  Some say I got to feel it in my gut.  Really
14     it is whatever you think it is, but it is not beyond all doubt
15     whatsoever.
16          And I will say to you, Mr. Turbon, that it is a very high
17     standard and it should be.  It should be.  It is a very high
18     standard.  It is a high standard for a reason.  We are talking
19     about life and death here.  We are talking about somebody's
20     freedom.  It is a high standard.  And would you continue to
21     hold us to that high standard of proof before you could find
22     the defendant guilty?
23                 PROSPECTIVE JUROR:   Of course.
24                 MR. BEACH:   Along the lines of evidence, as I
25     told you before, it is always our obligation to bring the

42

1      evidence to you.  Always look to this table.  You never look
2      to that side of the courtroom for evidence in a case.  I am
3      sure you have heard of a person's Fifth Amendment.  Your right
4      to remain silent.  That applies in every criminal case.  If
5      the defendant elects to testify in his case, if he wants to
6      take the stand and testify, then you by all means consider his
7      testimony, judge his credibility at that point.  Decide if you
8      think he is telling the truth, what kind of weight you are
9      going to give that if he elects to take the stand.  If the
10     defendant elects not to testify, the Judge will tell you that
11     you cannot hold that as evidence against him.  You cannot use
12     that as evidence against him.
13          Is that a law that you can follow?
14                 PROSPECTIVE JUROR:   Yes.
15                 MS. HANDLEY:   Who do you always look to to prove
16     the case to you?
17                 PROSPECTIVE JUROR:   The prosecution.
18                 MS. HANDLEY:   If I don't prove to you beyond a
19     reasonable doubt and the defendant did not testify, what are
20     you going to do?
21                 PROSPECTIVE JUROR:   Innocent.
22                 MS. HANDLEY:   Absolutely.  You can't use that to
23     get me over that hump.  Very good.  If, Mr. Turbon, we prove
24     the case to you beyond a reasonable doubt that the defendant
25     is in fact guilty of capital murder the intentional and

43

1      knowing murder of a police officer during the line of his
2      duty, then you have an obligation at that point; and that is,
3      to return a verdict of guilty, of finding him guilty of
4      capital murder.  That you know that means we go on to a very
5      serious stage that the point.
6           Are you able and willing to do so?
7                  PROSPECTIVE JUROR:   Yes.
8                  MS. HANDLEY:   At that point we are at the end of
9      the first part of a trial, we are at the two-part play, we are
10     at the end of act one, the curtain has gone down were you
11     going to all go out for intermission and have a Pepsi or
12     something, do you know how the trial is going to end at that
13     point?
14                 PROSPECTIVE JUROR:   Yeah, one of two options.
15                 MS. HANDLEY:   Do you know which one it is going
16     to be?
17                 PROSPECTIVE JUROR:   No.
18                 MS. HANDLEY:   And you don't know because there
19     is a whole 'nother second act to this play, there is a whole
20     bunch of other evidence that may be heard.  It is an entire
21     different part at this point.  The first part was to decide
22     whether he was guilty of the charge of capital murder.  He
23     carried that presumption of innocence until we took that away
24     and proved him guilty.  Going into the second phase now, now
25     you are being confronted with that question of whether or not

44

1 he will receive life imprison or death. And I will repeat
2 again, Mr. Turbon, that there is nothing automatic about it.
3 Just because a person has been found guilty of intentional
4 murder, does not mean that they automatically would receive
5 the death penalty.
6       Is that something that you are okay with and a law that
7 you can agree to follow that just because they are guilty of
8 capital murder, doesn't mean you are automatically going to
9 give them a death sentence?
10          PROSPECTIVE JUROR:  Yes, I can.
11          MS. HANDLEY:  The way we do that, Mr. Turbon, we
12 don't ask you and the other jurors to go in the back and give
13 you a piece of paper and ask you to think about it, should we
14 give him life or death, that is not the way that a death
15 sentence or life imprison sentence is imposed.  The way you do
16 that is by answering a series of questions.  Based upon how
17 you answer those question will determine whether or not they
18 receive death or life imprison.  There is something important
19 for you to understand going into the second phase of the
20 trial.  Okay.  At that point you found him guilty of capital
21 murder.  And as you know there are one of two things that can
22 happen, life or death right.  Going into that second phase of
23 the trial, Mr. Turbon, remember we talked about he enjoyed a
24 presumption of innocence in the first part.  He enjoys another
25 presumption in the capital murder case.

45

1       Going into the second part of the trial, he enjoys the
2 presumption that life imprison is the sentence he deserves.
3 There is nothing automatic about it.  But going in you are to
4 presume that the proper thing to do before you have heard any
5 evidence is to give him a life sentence in prison.  Only until
6 I can convince you beyond a reasonable doubt that it should be
7 a death sentence does that presumption go away.
8       Does that make sense to you?
9          PROSPECTIVE JUROR:  Yeah.
10          MS. HANDLEY:  So going in, the best he will ever
11 do, Mr. Turbon, is a life sentence because it is one of two
12 things.  You go presuming that's the right thing to do.  And
13 you don't change your mind until what?
14          PROSPECTIVE JUROR:  Until you have proven beyond
15 a reasonable doubt that that sentence is appropriate.
16          MS. HANDLEY:  Absolutely.  That is absolutely
17 correct.  We have you go back there and have you answer a
18 couple of questions.  The first question we have you answer is
19 that first special issue there.  Look to your left and read
20 that first one to yourself?
21          PROSPECTIVE JUROR:  Okay.
22          MS. HANDLEY:  Okay.  I think what we sometimes
23 refer to that is the future dangerousness question.  And
24 basically it is asking you to decide whether or not you
25 believe beyond a reasonable doubt that the defendant will

46

1 continue to be a future danger, continue to be a threat to
2 whatever society it is that he lives in, right.  You know it
3 starts off, do you find from the evidence beyond a reasonable
4 doubt.  That reasonable doubt goes to our burden of proof.
5 That's something that you are looking to the State all the
6 time to prove something to you beyond a reasonable doubt.
7 That very high threshold of proof.  It is asking you, did we
8 prove to you beyond a reasonable doubt these propositions
9 right there.  As with the definition of reasonable doubt,
10 Mr. Turbon, they don't really define for you what these words
11 mean.
12       This isn't something we wrote at the D.A.'s office.  We
13 didn't come up with this at court.  This is written by your
14 legislature.  And they have purposely not defined these
15 particular words.  Let's go through them and talk about them
16 one at a time.
17       Do you find beyond a reasonable doubt that there is a
18 probability that the defendant will commit criminal acts of
19 violence?  Probability.  Probability, that word right there,
20 you watch the weather forecast, right?
21          PROSPECTIVE JUROR:  (Nods head).
22          MS. HANDLEY:  Would you agree with me,
23 Mr. Turbon, the weatherman said it could possibly rain versus
24 it will probably rain, which is more likely, which is
25 stronger?

47

1          PROSPECTIVE JUROR:  Probable.
2          MS. HANDLEY:  Anything is possible.  It is
3 possible that I could win Olympic golds in the next summer
4 games.  Anything is possible.  Probable is you have to agree
5 something a lot stronger than a possibility.  Some people
6 define probability as more likely than not.  The greater than
7 a 50 percent chance.
8       Does that sound like how you would define probability,
9 Mr. Turbon?
10          PROSPECTIVE JUROR:  Uh-huh.
11          MS. HANDLEY:  Any different thought on how you
12 would think probability?
13          PROSPECTIVE JUROR:  No.
14          MS. HANDLEY:  More likely than not, greater than
15 a possibility?
16          PROSPECTIVE JUROR:  Right.
17          MS. HANDLEY:  That the defendant would commit
18 criminal acts of violence.  It doesn't say that the defendant
19 will commit another murder.  They didn't say that there is a
20 probability that the defendant will commit a rape.  They
21 didn't specifically set out what criminal act of violence you
22 might would probably believe that he would do.  They left that
23 wide open.
24       If I were to stand up, balled my fist up, walk over to my
25 co-counsel here, Andy Beach, and just clock him in the face;

48

```
1    would you agree with me that that is a criminal act of
2    violence?
3              PROSPECTIVE JUROR:   Yes.
4              MS. HANDLEY:   I am hitting him, it is violent:
5    I am sure he wouldn't appreciate it.  They don't say what
6    criminal act of violence, that's for you to decide, that he
7    would constitute a continuing threat to society.  Now, when I
8    think of society, I think of driving my car on the streets,
9    going to the grocery store, I think of society at large.  But
10   at this point he has been found guilty of capital murder.  So
11   where is he going to be the rest of his life?
12             PROSPECTIVE JUROR:   In prison.
13             MR. BEACH:   So when they say society, what do
14   you think they are talking about there?
15             PROSPECTIVE JUROR:   In this case, it would be
16   prison.
17             MS. HANDLEY:   Prison society.  Perhaps prison
18   society.  You would agree with me, Mr. Turbon, within the
19   prison there are more than just prisoners, aren't there?
20   There are guards, there are educators, there are
21   administrators, medical personnel, people visiting, coming to
22   the prison.  So it is kind of a society in and among itself.
23             And would your definition of prison society include that
24   it's kind of part of the larger society as a whole?
25             PROSPECTIVE JUROR:   Yes.
```

49

```
1              MS. HANDLEY:   We are out here, but it is also a
2    society in and of itself.  And unless he were to escape,
3    that's the society he will be a part of for the rest of his
4    life.  So that first special issue is asking of you, have we
5    proved to you beyond a reasonable doubt that a defendant will
6    probably commit criminal acts of violence in whatever society
7    he is in.  And that those criminal acts of violence would
8    constitute a continuing threat to society.
9              Does that make sense to you, does that make sense what we
10   are saying there?
11             PROSPECTIVE JUROR:   Yes.
12             MS. HANDLEY:   If we prove that to you, because
13   at this point you presume that a life sentence is the
14   appropriate thing to do, right?  If we have proved that to you
15   beyond a reasonable doubt, what does that mean to you at that
16   point?  That means that your answer to that question now is
17   what?
18             PROSPECTIVE JUROR:   If you have proven that,
19   then it is a death penalty.
20             MS. HANDLEY:   The answer to that question is
21   "yes".  Because going in, you assume that the answer to that
22   question is "no"?
23             PROSPECTIVE JUROR:   Right.
24             MS. HANDLEY:   By answering that question "yes",
25   we have now elevated that life imprison sentence, we have now
```

50

```
1    elevated it up to a death penalty sentence.  We are not finish
2    with the play yet.  We don't know how it is going to finish.
3    We have elevated that up to a death sentence.  He has earned a
4    death sentence, but you are not finished yet at that point.
5    You still have to answer one more question.  Go ahead and read
6    that second question to yourself.
7              PROSPECTIVE JUROR:   (Witness complies.)
8              MS. HANDLEY:   Quite a bit to take in, isn't it?
9              PROSPECTIVE JUROR:   Uh-huh.
10             MS. HANDLEY:   What do you think that is asking
11   you?
12             PROSPECTIVE JUROR:   Even if the first one is
13   answered positively, that in this case, he can have the option
14   to go with life imprison without parole because of the
15   circumstances.
16             MS. HANDLEY:   You are absolutely right.  You are
17   dead on right, Mr. Turbon.  We call it a safety-net question.
18   I think it is fair to say that in Texas, criminal justice, our
19   jurors are always given options a plenty.  You are not going
20   to walk out of here going, you know what, he is guilty of
21   capital murder, he is a future threat to society, but there
22   was something else I think was important to consider and I
23   think it should have been weighed into the ultimate decision
24   and that option wasn't available to me.  We are not going to
25   let you leave it like that.  You are going to have that second
```

51

```
1    chance.  It is a safety-net question to go back and consider
2    everything in its entirety.  You see on that second question,
3    Mr. Turbon, there is no burden of proof there.  Okay.  I don't
4    necessarily have to bring you anything, they never have to
5    bring you anything.  There is no burden of proof there.  But
6    what you are looking at, you are looking at the circumstances
7    of the criminal offense.  You are looking at any other
8    evidence that might have been brought to you in the second
9    part of the trial.  You know it speaks to the defendant's
10   character, background and personal moral culpability.  Some
11   might say the blameworthiness of the defendant is what they
12   are looking at.  That maybe we are looking to see if there
13   isn't something there, a reason to show mercy.  You know.
14   Something about his character.  Something about his
15   background.  We don't execute retarded -- mentally retarded
16   people in Texas -- or in the United States, I will tell you
17   that.
18             But some people have said that maybe he is not
19   technically mentally retarded, maybe he is extremely slow.
20   Maybe he is just on that cusp there and he is not like other
21   people.  Maybe look at his circumstances and background, and
22   from the day he was born, he suffered severe physical and
23   sexual abuse.  You know maybe he was a person that was raised
24   to be a monster; and guess what, he is.  And the people who
25   ought to be on trial with him are his parents.  You know, it
```

1   is quite a leap. I think as you can see, because you have
2   found him guilty of capital murder. And you have found that
3   he is a threat to society. But now, you are saying but you
4   know what, I am going to show that mercy and I am going to
5   bring that sentence back down to a life sentence. I can't
6   commit you to what you might think could be a mitigating
7   circumstance, you know, what becomes important, Mr. Turbon, is
8   if you see it, if you think it is sufficiently mitigating,
9   that you would follow your oath as a juror and bring that
10   death sentence back down to a life sentence.
11       Do you think that that's something that you could do and
12   would do if you saw that kind of evidence?
13       PROSPECTIVE JUROR:   Yes.
14       MS. HANDLEY:   Let's back up a little bit, let me
15   ask you about special issue number one, about is there a
16   probability that he would commit criminal acts of violence.
17   In deciding a question like that, what would you be looking
18   for to help you make that determination as to whether or not a
19   defendant would be a continuing threat to society?
20       PROSPECTIVE JUROR:   Probably the circumstance of
21   the murder if he was proven guilty, because we would be there
22   at this point. If the circumstances showed that he
23   intentionally and -- murdered this officer. And if he is an
24   individual that would do it in the future. Specifically, I
25   can't think of anything in particular, but if -- if it was

1   special circumstance where this was a one-time situation,
2   where the act was committed --
3       MS. HANDLEY:   Uh-huh.
4       PROSPECTIVE JUROR:   -- then he would probably
5   not be a continuing threat.
6       MS. HANDLEY:   Now, you spoke that you would be
7   looking to see if it was intentional. I will tell you that
8   before you can find a person guilty of this capital murder,
9   you will have found beyond a reasonable doubt the murder was
10   intentional killing. It was no accident, it was no
11   self-defense. It was an intentional killing, okay.
12       For you to find that special issue number one "yes", you
13   know, and you may properly look at the circumstances of the
14   offense in deciding that question, are you saying that you
15   would automatically answer that question "yes" just because it
16   was an intentional murder?
17       PROSPECTIVE JUROR:   No.
18       MS. HANDLEY:   Okay. And I will kind of jump
19   back a little bit more, even there, we have talked about it is
20   an intentional murder of another individual, it is not an
21   accident, it is not self-defense.
22       If I were to be sitting here right now, you know just
23   minding my business, talking to you, and Officer Crump over
24   here, he is a peace officer as you can see, if he were to walk
25   over just now, You know what, Handley, I have been listening

1   to you six-week now, I am tired of listening to you, I am
2   going to kill you, he took out his handgun and cocked the
3   trigger back. And I thought, my God, this man is going to
4   kill me. And I turned around and we struggled for the gun and
5   I felt if I don't kill him, he is going to kill me, and I shot
6   him dead right here, that would be self-defense. It may very
7   well be self-defense, I have killed a peace officer, right?
8       PROSPECTIVE JUROR:   Yes.
9       MS. HANDLEY:   I have killed a man right now who
10   is acting in the line of his duties, isn't he? Well, the law
11   says if I have a reasonable belief that my life is in jeopardy
12   and the only option I have at that point is to take the life
13   of the other person, the law says that I can do that.
14       Is that a law that you can agree with?
15       PROSPECTIVE JUROR:   Yes.
16       MS. HANDLEY:   Regardless if he is a peace
17   officer, you know, regardless if he is my co-counsel or man on
18   the street. If I have a reasonable belief, if I think he is
19   using excessive force against me. I feel I have no other
20   option than to protect my life. I could take that life and
21   that's self-defense. Then I walk out of here, I don't get
22   probation or five years, I walk out of here as an absolute
23   defense to murder.
24       Is that a law that you can agree with and is that a law
25   that you would be willing to follow?

1       PROSPECTIVE JUROR:   Yes.
2       MS. HANDLEY:   Do you have any questions of me
3   about the entire process, the death-penalty process, anything
4   about these questions here?
5       PROSPECTIVE JUROR:   No. You have articulated
6   the process well and answered all the questions I had.
7       MS. HANDLEY:   Because we both get a chance to
8   talk to you, so if there is anything that you always wanted to
9   know from the prosecution's standpoint, now would be the time
10   to ask us?
11       PROSPECTIVE JUROR:   No.
12       MS. HANDLEY:   Thank you very much for answering
13   my questions.
14       I will pass this juror, Judge.
15       MR. JOHNSON:   May we have a short break?
16       THE COURT:   You may.
17       Mr. Turbon, if you will step down. We will take a short
18   break.
19       (Prospective juror retired from the courtroom.)
20       (Recess taken.)
21       THE BAILIFF:   All rise for the juror.
22       (Prospective juror returned to the courtroom.)
23       THE COURT:   You may be seated.
24       And you may proceed.
25       MR. JOHNSON:   May it please the Court?

56

```
1
2                    VOIR DIRE EXAMINATION
3   BY MR. JOHNSON:
4           MR. JOHNSON:   Good morning, Mr. Turbon.
5           PROSPECTIVE JUROR:   Good morning.
6           MR. JOHNSON:   My name is Karo Johnson.  I am a
7   criminal defense attorney.  Mr. Paul Brauchle is seated with
8   me.  Please, sir, it is our honor to represent Mr. Wesley
9   Ruiz.
10          Let's start with some housekeeping matters.  First off, I
11  am going to talk to you for a little while just like the
12  prosecutors did.  And I will start by telling you that our
13  assessment of this case is completely different than their
14  assessment of the case.  Of course that probably doesn't
15  surprise you does it?
16          PROSPECTIVE JUROR:   No, not at all.
17          MR. JOHNSON:   Let me start by pointing out to
18  you, that you and I are actually neighbors, we actually live
19  in what I call the Wood, Lakewood.  Did you go to Woodrow?
20          PROSPECTIVE JUROR:   I did.
21          MR. JOHNSON:   Believe it or not I did too, a few
22  years before you, did you have Mr. Evett as one of your
23  teachers at Woodrow, was he there?
24          PROSPECTIVE JUROR:   He was there, I did not
25  have him.  I had a similar teacher, couldn't get into Evett's
```

57

```
1   class.
2           MR. BEACH:   My daughter graduated from Woodrow.
3   I don't know if you saw the newspaper today.  Did you see the
4   editorial section of the Dallas Morning News today.
5           PROSPECTIVE JUROR:   I didn't.
6           MR. JOHNSON:   There is actually an editorial
7   about Woodrow.  About how good of a school it was.  And I was
8   listening to your answers, and I was thinking that you may
9   have had Mr. Evett.  But you said you had someone like him; is
10  that right?
11          PROSPECTIVE JUROR:   Yes.
12          MR. JOHNSON:   When I was at Woodrow, I had a
13  teacher named Mr. Stewart.  And he was somebody who was
14  thought-provoking and I think did a great job in getting me
15  ready for college.  And from just listening to you today,
16  sounds like Woodrow did a good job with you too.
17          I also noticed that you went to LSU?
18          PROSPECTIVE JUROR:   Uh-huh.
19          MR. JOHNSON:   And you graduated?
20          PROSPECTIVE JUROR:   Yeah.
21          MR. JOHNSON:   You are one of the few people that
22  actually went to LSU and graduated?
23          PROSPECTIVE JUROR:   I didn't in four years.
24          MR. JOHNSON:   Yeah, I saw you put five.
25          Let me explain some things about the fact that we live
```

58

```
1   close to each other.  Do you go to Lakewood Country Club?
2           PROSPECTIVE JUROR:   Yes.
3           MR. JOHNSON:   My daughter was basically the head
4   lifeguard there for the last couple of years, Alice Simpson.
5   Do you know Alice at all?
6           PROSPECTIVE JUROR:   No, I didn't spend time at
7   the pool area.
8           MR. JOHNSON:   What do you do when you go to the
9   club?
10          PROSPECTIVE JUROR:   Eat and golf.
11          MR. JOHNSON:   One of the things that caught my
12  attention, you put something down there that really kind of
13  warmed my heart actually on page 16, list the one person that
14  you feel most influence your person and why.  And you put your
15  stepfather.  He shaped my upbringing and gave me financial
16  support for college, I think is what you are saying.  Okay.  I
17  am hoping by the time my daughter is your age she would
18  actually put that down as well.  I don't think she would put
19  that down right now, maybe in a few more year?
20          PROSPECTIVE JUROR:   I wouldn't have at her age
21  either, there is still hope.
22          MR. JOHNSON:   Tell me about your stepfather.
23  Who is your stepfather?
24          PROSPECTIVE JUROR:   Doug Nichols.  And he --
25  my dad, although he was successful in his own right, he didn't
```

59

```
1   really support me in my college decision, the school I wanted
2   to go to.  He wanted me to stay in state.  I chose LSU because
3   I really wanted to go there, I was passionate about going
4   there.  Doug, my stepdad, who I am known since I was five
5   years old.  And I spent more time with him than I did my dad,
6   because my Dad moved to Austin.  So I really grew up with my
7   mom and stepdad.  Doug was really like my surrogate father.
8   And so paid for school.  He said he would make up the
9   difference whatever dad wasn't willing to pay for.  He got me
10  a car and paid for school and really supportive throughout
11  choices that I made.
12          MR. JOHNSON:   That's great.  What does your
13  stepfather do?
14          PROSPECTIVE JUROR:   He trade stocks and does
15  some investment banging, the finance side of things.
16          MR. JOHNSON:   Do you still stay in his house?
17          PROSPECTIVE JUROR:   No.
18          MR. JOHNSON:   Who lives on Lakewood is that your
19  place?
20          PROSPECTIVE JUROR:   Yeah, I live there, I rent
21  with two roommates, we rent the house.
22          MR. JOHNSON:   Okay.  It is a nice spot.  When
23  you work out, what kind of workouts do you do?  You said you
24  worked out?
25          PROSPECTIVE JUROR:   Just go to the gym and lift
```

60

```
1   weights.
2           MR. JOHNSON:   Which gym?
3           PROSPECTIVE JUROR:   Lakewood Gym.
4           MR. JOHNSON:   Go to the club?
5           PROSPECTIVE JUROR:   No. Lakewood gym in the
6   Albertson's Shopping Center.
7           MR. BRAUCHLE:   All right. I see you also have
8   some siblings that are at Woodrow as well. And I don't
9   recognize their names. Although your brother Richard is the
10  same age as my son. My son actually goes to Bishop Lynch. So
11  I don't know if they know each other or not. Does Richard go
12  to the Club some?
13          PROSPECTIVE JUROR:   Uh-huh, yeah, and he goes
14  to Woodrow.
15          MR. JOHNSON:   He ever mentioned the name of
16  Farrell Johnson to you?
17          PROSPECTIVE JUROR:   No.
18          MR. JOHNSON:   Okay.
19          PROSPECTIVE JUROR:   No.
20          MR. JOHNSON:   I just wanted to make sure that we
21  don't have any connections that everybody in here would need
22  to be aware of. Doesn't sound like you actually would.
23          Have you seen me before in the neighborhood?
24          PROSPECTIVE JUROR:   No.
25          MR. JOHNSON:   I will admit to you that I didn't
```

61

```
1   recognize you when you came to report to jury duty. I see you
2   work for a meet company.
3           PROSPECTIVE JUROR:   That's correct.
4           MR. JOHNSON:   What do you do for that company?
5           PROSPECTIVE JUROR:   The company, we are a meet
6   supplier, we sell to high-end steakhouses and fine dining
7   restaurants. One of our business segments is sells to Cisco,
8   a food services distributor. And from an optional standpoint,
9   I am responsible for all the Cisco orders getting filled. So
10  coordinating with sales, coordinating with shipping,
11  production, and just really insuring that the Cisco orders get
12  filled.
13          MR. JOHNSON:   What times do you work, are you
14  pretty busy with work, is that something going to interfere
15  with being a juror on this case?
16          PROSPECTIVE JUROR:   I would be able to take off.
17  I work standard days from 6:30 a.m. to 5:00 p.m. usually.
18          MR. JOHNSON:   So it is not going to be a
19  problem?
20          PROSPECTIVE JUROR:   No.
21          MR. JOHNSON:   Would you like some water?
22          PROSPECTIVE JUROR:   No, I had some during the
23  break, thank you.
24          MR. JOHNSON:   Now, at LSU, did I see that you
25  majored in agri business?
```

62

```
1           PROSPECTIVE JUROR:   That's correct.
2           MR. JOHNSON:   You know, I am not familiar with
3   that, what does that mean?
4           PROSPECTIVE JUROR:   That is the study of the
5   business of agricultural and agricultural being the largest
6   industry in the U.S., it is a large field of study. And it
7   involves everything from studies future market to farm
8   budgeting to economics, and it is a broad ranging -- similar
9   to business with a little more emphasis on the commodity side.
10          MR. JOHNSON:   Okay. Did that help you get the
11  job that you have now?
12          PROSPECTIVE JUROR:   I think it did.
13          MR. JOHNSON:   What do you plan to do beyond the
14  job you have now?
15          PROSPECTIVE JUROR:   Actually I am looking at
16  changing entries and getting into investment banking.
17          MR. JOHNSON:   Is that something your stepfather
18  might help you do as well?
19          PROSPECTIVE JUROR:   Uh-huh.
20          MR. BRAUCHLE:   What does your biological father
21  do?
22          PROSPECTIVE JUROR:   He is a real estate broker,
23  residential real estate broker.
24          MR. JOHNSON:   Another thing on your
25  questionnaire that I wanted to ask you about is on page three
```

63

```
1   at the bottom, that last question, can you expand on that
2   answer a little bit and tell me why you feel the way you feel
3   about what you said in that answer?
4           PROSPECTIVE JUROR:   I think -- yeah, I read this
5   earlier, and I miswrote in that last -- the last part of the
6   second sentence, they are not more likely, it is sort of a
7   disincentive, if you will.
8           MR. JOHNSON:   Okay.
9           PROSPECTIVE JUROR:   And if individuals feel
10  there is no chance of being executed for killing a police
11  officer -- okay, no, that's right, if they feel that there is
12  the greatest consequence of murdering a police officer in the
13  line of duty is life imprison, they might be more likely to do
14  so than if the risk is death.
15          MR. JOHNSON:   Okay. Now, the obvious question
16  for me in regards to that is do you feel like if a person is
17  convicted of a capital murder that involved the killing of a
18  peace officer in the line of duty, if that is your answer to
19  that, that almost sounds like you feel like it would be your
20  obligation if you are on a jury that found a person guilty of
21  that offense, it would be your objection to give someone the
22  death penalty?
23          PROSPECTIVE JUROR:   No, I don't agree with that.
24  I believe that the capital punishment is a deterrent. And
25  that as long as that option exists, that it works as a
```

64

1  deterrent. But under no circumstance an automatic sentence.
2          MR. JOHNSON:   Okay. You do understand of course
3  that -- that a capital murder in Texas at this time, that the
4  default sentence for that is life imprison without parole; you
5  understand that?
6          PROSPECTIVE JUROR:   Uh-huh.
7          MR. JOHNSON:   Would you change that if you had
8  the ability, if you were like king of Texas?
9          PROSPECTIVE JUROR:   No.
10         MR. JOHNSON:   You know we get -- we have been
11 doing this for several weeks now, and we have had a lot of
12 people sitting in that chair that you are in, you know they
13 say spice -- variety is the spice of life. You heard that
14 before?
15         PROSPECTIVE JUROR:   Uh-huh.
16         MR. JOHNSON:   We have a lot of spice from the
17 people sitting up there in that chair. We get a lot of
18 variety from there. You notice that nobody is in this room
19 other than you and the lawyer and court personnel. Now the
20 reason that is so, so that the people who sit in that chair
21 can be comfortable about expressing their opinions and views
22 without being worried about somebody hearing something, okay.
23 I will promise you that nobody in this room, especially me is
24 going to try to tell you that whatever you think is wrong.
25 All right. And I recognize that I am certainly not a good

65

1  enough lawyer to get most people to change their opinions
2  about matters of principle, okay. My wife proves that to me
3  everyday. So that is not going to be something that I am
4  going to be trying to do. So if there is something that you
5  feel, you know, that you need to say about any of these
6  issues, please feel free and comfortable in doing so.
7          Now, let's talk about one of the things that you just
8  said in regards to that question at the bottom of page three.
9  You said that you feel like that this would be a deterrent,
10 why do you feel that way?
11         PROSPECTIVE JUROR:   Because if you are in a
12 circumstance where you feel like the murder of a -- an officer
13 is necessary for whatever reason, if you feel that the
14 greatest thing that can happen to you for committing that
15 crime is life imprison, you might be more likely to do so than
16 if you feel like the greatest consequence of committing that
17 is murder of yourself -- or the death penalty.
18         MR. JOHNSON:   Okay. And you think that that's a
19 strong deterrent because they can get the death penalty?
20         PROSPECTIVE JUROR:   Uh-huh.
21         MR. JOHNSON:   Why do you think we should have
22 the death penalty. Is there other reasons besides other than
23 it might be a deterrent?
24         PROSPECTIVE JUROR:   That's my main reason. I
25 think the other reason for the family of the victim. To give

66

1  them some closure or to give them -- to -- to give them the
2  system -- that the system is fair and they should get -- not
3  get something, but I think for the victim also.
4          MR. JOHNSON:   Do you believe in an eye for an
5  eye?
6          PROSPECTIVE JUROR:   Not literally, no. But I
7  think the punishment should be appropriate for the crime.
8          MR. JOHNSON:   You understand that Texas only has
9  capital murder -- the death penalty, and specific offenses;
10 you understand that?
11         PROSPECTIVE JUROR:   (Nods head).
12         MR. JOHNSON:   Not all murder cases are
13 death-penalty cases, it has got to be murder plus something
14 else. You understand that?
15         PROSPECTIVE JUROR:   Uh-huh.
16         MR. JOHNSON:   Now, do you think if somebody was
17 convicted of murder without that extra ingredient, the
18 victims, the family of that victim would not be able to have
19 closure because the person committed that offense couldn't get
20 the death penalty?
21         PROSPECTIVE JUROR:   I think that the family
22 could still have closure, but -- that's a tough one. It
23 depends on the family, of course, and what their idea of
24 closure is. So I would have to look at the case and look at
25 what the family is looking for.

67

1          MR. JOHNSON:   Okay. You may or may not know
2  the answer to that question in deciding between the life
3  sentence -- the life penalty or the death penalty. Would that
4  be a big enough factor in your deliberations that you might
5  decide that you might need to give the death penalty to
6  somebody just for your concerns about the victim's family?
7          PROSPECTIVE JUROR:   No, that wouldn't have great
8  enough weight to be a tipping point in my decision.
9          MR. JOHNSON:   Now, do you feel like the states
10 that don't have the death penalty are less safe than Texas is
11 because we have the death penalty?
12         PROSPECTIVE JUROR:   I bet statistics could
13 reveal that, and I haven't seen them. Personal feeling, I
14 would have to look at probably some data.
15         MR. JOHNSON:   Then why wouldn't those states
16 have the death penalty if that's what the data say?
17         PROSPECTIVE JUROR:   Because the moral beliefs of
18 the majority of the citizen of that state.
19         MR. JOHNSON:   Talk to me about that answer about
20 moral beliefs, what do you mean by that?
21         PROSPECTIVE JUROR:   If morally people can agree
22 with the death penalty or not. They would have to look inside
23 themselves and see whether that's something that they agree
24 with.
25         MR. JOHNSON:   You think states that don't have

68

1   it are less moral or more moral than Texas?
2          PROSPECTIVE JUROR:   I think they might feel that
3   they are on a higher moral level.
4          MR. JOHNSON:   You think Texas is on a lower
5   moral level?
6          PROSPECTIVE JUROR:   No.  But I think the states
7   that don't have it think that they are on a higher level.
8          MR. JOHNSON:   Well, does that kind of go to like
9   we are barbarians and they are not?
10         PROSPECTIVE JUROR:   No.
11         MR. JOHNSON:   Is that?
12         PROSPECTIVE JUROR:   No, I don't think so.
13         MR. JOHNSON:   Now, let's go to page four on your
14  questionnaire, on that -- the question at the very top of the
15  page, and your answer is if the severity is great enough,
16  capital punishment can be called for.  Tell me what you mean
17  in that answer by your use of the word severity?
18         PROSPECTIVE JUROR:   By that response, I was
19  trying to get across the point that, for example, if someone
20  comes in and they are knowingly trying to murder a police
21  officer.  And it is not as in self-defense or it is not as in
22  some other circumstance to where they were accidentally firing
23  at another target and hit the officer.  If they knowingly shot
24  a police officer for themselves in order to get away from the
25  crime or whatever was happening.  If they knowingly committed

69

1   that.
2          MR. JOHNSON:   Okay.  Now, intentional basically
3   just means that you did something to cause the result, that
4   you -- you wanted it done.  That you did whatever it took to
5   cause whatever the result is, okay.  Now, do you ever use the
6   concept of premeditation in regards to your answer about
7   severity?
8          PROSPECTIVE JUROR:   No.
9          MR. JOHNSON:   So premeditation wouldn't factor
10  in into whether it was done intentionally or not?
11         PROSPECTIVE JUROR:   It would, it would factor
12  in.  But it wouldn't -- if it wasn't premeditated, it could
13  still be severe enough to warrant the death penalty.
14         MR. JOHNSON:   Let's talk about some of the other
15  things that you mentioned.  Can you -- I am still not
16  completely clear about what you mean by severity, can you
17  maybe tell me a little bit more about what your concept of
18  that word is, the way you use it?
19         PROSPECTIVE JUROR:   Mainly I feel that if there
20  was intent, if the accused was trying to get away from the
21  scene and they murdered someone for their own benefit.  If
22  they said that if I eliminate this police officer, I have a
23  chance of getting away, that's what I consider a severe case.
24  It is like murdering that person, I benefit myself, then I
25  would say that's pretty heinous.

70

1          MR. JOHNSON:   Give me a circumstance of -- that
2   wouldn't be severe?
3          PROSPECTIVE JUROR:   If they were firing not with
4   the intent to kill, firing maybe to stop the car or something,
5   it was an accidental shot.
6          MR. JOHNSON:   Okay.  Well, let me kind of talk
7   to you about accidental, self-defense, those are a couple of
8   terms that you mentioned in our discussion about that
9   question.  If -- if you have a homicide that just means that
10  some human has died, okay.  That's what the term homicide
11  means, all right.  Now they are dead.
12         Now, there is different ways that they can be dead.
13  Obviously they can just die of natural causes, okay.  It was
14  is not a crime.  Other way they could die is just by accident.
15  In other words, it just be somebody who unintentionally ran
16  over them and killed them.  Or somebody say, cleaning a gun
17  and the gun accidentally goes off and kills them, they are
18  dead.  It is a homicide.  But if that is the circumstances, it
19  is not a crime, okay.  You understand that, I am sure.
20         Now, another way somebody could be killed, it could be an
21  intentional murder that was excused, okay.  It was excused
22  because the person that did the killing, even though they
23  knowingly and intentionally caused that person's death, they
24  were insane at the time they did it.  So it is excused because
25  they didn't know the difference between right and wrong, okay.

71

1          Now, there is also the element of self-defense.  Now, you
2   understand what self-defense is?  What is self-defense to you?
3          PROSPECTIVE JUROR:   If you feel that at that
4   point in time your life depends upon you killing this person.
5   In other words, if that person doesn't get killed, you are
6   going to get killed, then that's what I consider self-defense.
7          MR. JOHNSON:   All right.  And that's exactly
8   what self-defense is.  Now, you think that should apply even
9   if the person is threating you is a police officer?
10         PROSPECTIVE JUROR:   If a police officer is
11  threatening -- threatening your life, I don't think so you can
12  apply self-defense to that.  Because you have to be doing
13  something to instigate that police officer.
14         MR. JOHNSON:   So that wouldn't be something that
15  you would be able to consider as a homicide if it involved a
16  peace officer acting in the line of duty?
17         PROSPECTIVE JUROR:   It could be considered, and
18  I think it would be an extreme case.  But in general, I would
19  say you couldn't apply self-defense.
20         MR. JOHNSON:   And it may be difficult to
21  consider that, but the law does say that you have the right to
22  defend yourself from deadly force, even if the person
23  threatening you with the deadly force is a police officer,
24  okay.  You know when you gave your example of self-defense,
25  you said, well, if you, meaning yourself, if you thought that

72

1  the person that was threatening you might be about to cause
2  you death or serious bodily injury that you would have a right
3  to defend yourself, okay. Now, the key to what you said from
4  my perspective is, is you said if you thought that, then you
5  could use self-defense, okay. And that's exactly what the law
6  says. The law says that when you decide whether somebody
7  acted in self-defense or not, you look at it from the person's
8  perspective that is acting in self-defense, okay. It is just
9  exactly like you said. And the law also says that that can
10  apply in the situation where the person that is threatening is
11  a peace officer. If it appears that they are about to use
12  excessive force to the point that they could be about to cause
13  death or serious bodily injury to you, then you have the right
14  to defend yourself, even if it means using deadly force, okay.
15      What do you think about that being the law?
16          PROSPECTIVE JUROR:   I think that is a fair law.
17          MR. JOHNSON:   Is that something you could
18  follow?
19          PROSPECTIVE JUROR:   Yeah.
20          MR. JOHNSON:   Even though you initially thought
21  that maybe it didn't make a lot of sense that that would ever
22  be the law?
23          PROSPECTIVE JUROR:   And I didn't say that that
24  would never apply, I said generally under some specific cases
25  it could apply.

73

1          MR. JOHNSON:   Let me tell you a little bit more
2  about that issue of self-defense. You have heard us talk
3  about beyond a reasonable doubt, okay. And you were asked
4  what the definition to that is. And it is not exactly the
5  easiest thing to try to define, is it?
6          PROSPECTIVE JUROR:   No.
7          MR. BRAUCHLE:   We used to have a definition for
8  it, but we no longer do have a definition for it. So it is
9  basically left up to each individual what they think that is.
10  Let me give you something that by example may help you
11  understand the burden of beyond a reasonable doubt.
12      Now, we have a couple of different levels of proof in our
13  judicial system in Texas. The first one is called
14  preponderance of the evidence. It is the burden of proof like
15  in a lawsuit involving money. And in that type of case, the
16  person who is doing the suing, has to prove their case beyond
17  the preponderance of the evidence.
18      Have you heard that term before?
19          PROSPECTIVE JUROR:   Yes.
20          MR. JOHNSON:   What that means is that the
21  person, and I am going to use my arm here as an example of a
22  scale, the person bringing the lawsuit has to bring enough
23  evidence to tip the scale over. They have to prove it more
24  than 51 percent. In other words for them to be successful,
25  they have to convince the trier of fact, the jury, that they

74

1  have proven their case by that are margin.
2      You okay with that?
3          PROSPECTIVE JUROR:   Uh-huh.
4          MR. JOHNSON:   The next level of proof in our
5  justice system is clear and convincing evidence. Now, you
6  don't have any kids yet, you can understand that sometimes we
7  have cases where somebody try to take somebody's children from
8  them. You have heard of that?
9          PROSPECTIVE JUROR:   Uh-huh.
10          MR. JOHNSON:   Well, if somebody was trying to
11  take somebody's kids away from them, do you think that would
12  take quite a bit of proof to show that the parents of that
13  child shouldn't have that child?
14          PROSPECTIVE JUROR:   Yes.
15          MR. JOHNSON:   If someone was trying to take you
16  away from your mother, how would your mother feel about that?
17          PROSPECTIVE JUROR:   Pretty strongly, very
18  strongly.
19          MR. JOHNSON:   And if she went to court and
20  somebody was trying to take you away from her, don't you think
21  she would try to fight like hell?
22          PROSPECTIVE JUROR:   Uh-huh.
23          MR. JOHNSON:   Wouldn't you think that she would
24  want to be convinced to some great degree that that was the
25  right thing to do?

75

1          PROSPECTIVE JUROR:   Yes.
2          MR. JOHNSON:   Clear and convincing evidence is
3  the proof involved in child custody cases. That's the next
4  level of proof. In other words, we go from a preponderance of
5  the evidence of over to clear and convincing, which is greater
6  than that, all right. And I think you will agree with me that
7  that would be a pretty significant amount of proof to take
8  somebody's children away?
9          PROSPECTIVE JUROR:   Uh-huh.
10          MR. JOHNSON:   Now, the next level of proof is
11  what we have in criminal cases and that's called reasonable
12  doubt. And that proof is greater than preponderance of the
13  evidence and greater than clear and convincing evidence. It
14  is the greatest burden that anybody could have in any type of
15  case in our justice system. So that's just by example of what
16  the other levels of proof are, give you an idea of what the
17  reasonable doubt means. Would you agree that that's pretty
18  darn excessive burden?
19          PROSPECTIVE JUROR:   Yes.
20          MR. JOHNSON:   And do you think it is fair that
21  the State would have to meet that burden?
22          PROSPECTIVE JUROR:   Yes.
23          MR. BRAUCHLE:   You think it is fair on the State
24  to have to do that?
25          PROSPECTIVE JUROR:   Yes.

76

1   MR. JOHNSON:   Now, back to self-defense, all
2   right. When the issue of self-defense is raised in the case,
3   and the jury is trying to decide if the defendant, the person
4   on trial, the person is claiming self-defense, if that is
5   raised, then the State has the burden to prove beyond all
6   reasonable doubt that they were not acting in self-defense,
7   okay.
8        Now, are you okay with that?
9        PROSPECTIVE JUROR:   Yes.
10       MR. JOHNSON:   So you understand that
11   self-defense is a defense, even though it is a peace officer;
12   you understand that?
13       PROSPECTIVE JUROR:   Uh-huh.
14       MR. JOHNSON:   You understand if that burden is
15   raised, then the burden is on the State to prove that that
16   wasn't the issue. Would you hold them to that burden to prove
17   that?
18       PROSPECTIVE JUROR:   Yes I would.
19       MR. JOHNSON:   Why do you think that is like
20   that?
21       PROSPECTIVE JUROR:   To protect the innocent. If
22   you are brought into court all the burden is to prove that you
23   are guilty not to the prove that you are innocent.
24       MR. JOHNSON:   That's exactly right. And that's
25   basically where our judicial system is set up. You know, when

77

1   I was at Woodrow, do they still -- when you were there, do
2   they have a class called civics?
3        PROSPECTIVE JUROR:   I think it is called
4   government now.
5        MR. JOHNSON:   Government?
6        PROSPECTIVE JUROR:   Yeah.
7        MR. JOHNSON:   When I was there, it was called
8   civics and I remember we had a teacher named Mr. Smith. And
9   we had to do a term paper. And he had people do it every
10   year, keep it in mind, I was there in the 60s, and he gave us
11   the title to the paper. Everybody had the same title to the
12   paper. We had to do the research and write this paper. And
13   the title to the paper was The Freedom of Democracy Versus the
14   Tyranny of Communist, An Unbiased Study. That's where we were
15   taught civics. I'm sure while you were at Woodrow, you were
16   taught civics and you were taught basically our system is set
17   up to protect citizens; is that right?
18       PROSPECTIVE JUROR:   Yes.
19       MR. JOHNSON:   When you were learning that, did
20   you think that made sense to you. Did you think that the
21   State shouldn't have to have such a high burden?
22       PROSPECTIVE JUROR:   I think it is a fair system.
23       MR. JOHNSON:   You think it is appropriate?
24       PROSPECTIVE JUROR:   Yes.
25       MR. JOHNSON:   Now, another thing that you say on

78

1   page four, is that you feel that the death penalty in Texas is
2   used too often relative to other states. How do you feel
3   about that fact? You obviously know you are right?
4        PROSPECTIVE JUROR:   I don't know how I feel,
5   good or bad about it. I think it is just a fact. And I don't
6   want to go so far to say I am indifferent, but I don't have
7   strong feelings either way about it.
8        MR. JOHNSON:   Okay. Have you always been in
9   favor of the death penalty?
10       PROSPECTIVE JUROR:   Yes.
11       MR. JOHNSON:   Why?
12       PROSPECTIVE JUROR:   I go back to the deterrent.
13       MR. JOHNSON:   Okay.
14       PROSPECTIVE JUROR:   I think it is the greatest
15   deterrent.
16       MR. JOHNSON:   All right. If it is such a great
17   deterrent, why do we still have capital murder in Texas?
18       PROSPECTIVE JUROR:   Because sometimes there
19   may be circumstances where people feel that they have a chance
20   to get away. That may be a great. One if they knew that for
21   every murder they committed they were indefinitely going to be
22   murdered themselves, then they wouldn't do it. But because
23   the chance exists that they can get away.
24       MR. JOHNSON:   On page four again, there is a
25   question that says:  Do you think spending a lifetime in

79

1   prison is equivalent to the death penalty? You put, no. Do
2   you think it would be worse to get the death penalty than
3   having to spend the rest of your life in prison?
4        PROSPECTIVE JUROR:   For myself personally?
5        MR. JOHNSON:   Yeah.
6        PROSPECTIVE JUROR:   I hope I never have to be
7   faced with either option.
8        MR. JOHNSON:   None of us want to face that
9   option.
10       PROSPECTIVE JUROR:   I think the death penalty
11   would be worse.
12       MR. JOHNSON:   Why?
13       PROSPECTIVE JUROR:   Well, even in prison, you
14   are still alive, you can still see family, you can still read.
15   Death is the end all. That's the end of it. I want to be on
16   this earth as long as I can.
17       MR. JOHNSON:   Well, you want to because you are
18   outside, you are free. Do you think you would feel different
19   if you were locked up and knew that you were never going to
20   get out -- basically it is, you know, there are both of these
21   penalties are death penalty. One is death in prison, all
22   right. The other one is death by lethal injection. Either
23   way you are going to die in prison. But you think the death
24   penalty is a more severe punishment just because of the
25   deterrent factor?

80

1    PROSPECTIVE JUROR:  Yes.
2         MR. JOHNSON:  Okay.  Now, let's go to the bottom
3    of page four, let's talk about your answer to that last
4    question.  Now, you understand that if you are on the jury and
5    the State has proven its case beyond all reasonable doubt, you
6    don't feel like there are any defenses that they have not just
7    proved.  That you find basically what you wrote down here in
8    your answer that it was proven beyond a reasonable doubt, that
9    the guilty party intended to kill the victim, which is what
10   you would have to have found to have brought back a
11   verdict of guilty, that would be important to you to decide
12   between life and death; is that correct?
13        PROSPECTIVE JUROR:  Well, knowing what I have
14   heard here today, I am a little bit more knowledgeable on the
15   process.  And I think the first special issue would come into
16   play.  It would have to without a choice.  And it would just
17   have to be deliberated upon with my fellow jurors and it would
18   be the circumstances.
19        MR. JOHNSON:  Well, let's talk about those
20   circumstances, obviously at this point, when you are
21   deliberating guilt or innocence, the circumstances have been
22   proven to you that this person beyond all reasonable doubt
23   acted intentionally and intended to cause the victim to be
24   dead, okay.  And that would be the most important factor for
25   you to be able to determine whether or not the person should

81

1    get the death penalty; is that right?
2         PROSPECTIVE JUROR:  Well, the special issue
3    really, that clears it up.  Because in my answer, I didn't
4    break it up into, okay, once they are proven guilty or
5    innocent, then you move on to decide -- deciding whether you
6    assess a death penalty or life imprison.  So in answering this
7    question, I looked at it as one process.
8         MR. BRAUCHLE:  What is that one process?
9         PROSPECTIVE JUROR:  Being that you would take
10   everything into account at the same time.  You have proven
11   guilty then you also determine throughout the same process do
12   they get life imprison or the death sentence.
13        MR. JOHNSON:  All right.  You thought that maybe
14   by at the first part of the trial once you determined
15   guilt/innocence, you would at the same time, you would make
16   the decision between -- once you found them guilty, that would
17   be all there is to it, you determined the death penalty or
18   life imprison?
19        PROSPECTIVE JUROR:  Yes.
20        MR. JOHNSON:  And if that were the case that
21   they were guilty of the offense, that you would be inclined to
22   give death.
23        PROSPECTIVE JUROR:  I couldn't say that, without
24   hearing the case, any of the evidence.
25        MR. JOHNSON:  This is kind of odd, the process

82

1    called the voir dire, the jury selection.  We don't have
2    the -- under the law, we can't tell you the facts of the case,
3    we told you a little bit to see if you know about the case, so
4    if you know so much about the case that you have already make
5    a decision.  We can't tell you the details.  It would be real
6    easy if we could, we could tell you our side of the case and
7    they could tell you their side of the case and you could just
8    tell us the answer.
9         You understand now, especially after talking to Andrea
10   about the process is -- the beginning of it is the
11   guilt/innocence part of it, okay.  And the State has met its
12   burden as far as guilt/innocence, and you found that person
13   guilty, yeah, you still are in the process of deciding in
14   between a life sentence or death sentence.
15        At that stage do you think you would be leaning one way
16   or the other before you got to these two special issues?
17        PROSPECTIVE JUROR:  I can't answer that without,
18   without -- because that decision would be made throughout the
19   process of the trial.  When I come to that stage, I would have
20   enough evidence to sway me toward one direction or another.
21        MR. JOHNSON:  Okay.  Let's go to the next phase,
22   then.  Let's go to the phase that you would be in if in fact
23   you as part of a jury came back with a guilty verdict on
24   capital murder, okay.  You understand at that point that even
25   though the person on trial hadn't been sentenced, they would

83

1    already have a sentence; you understand that?
2         PROSPECTIVE JUROR:  Uh-huh.
3         MR. JOHNSON:  You know what that sentence would
4    be at that point?
5         PROSPECTIVE JUROR:  Death.
6         MR. JOHNSON:  I am talking about at the
7    guilt/innocence phase of the trial, what would that verdict be
8    that the point?
9         PROSPECTIVE JUROR:  One of two options, life
10   sentence or death penalty.
11        MR. JOHNSON:  He would be already sitting on
12   life without parole, that's automatic, once the person is
13   found guilty of capital murder, they are already sentenced to
14   life imprison without parole, even though they are not
15   formally sentenced at that point.  The best now they are going
16   to be able to do is life without parole; you understand that?
17        PROSPECTIVE JUROR:  Uh-huh.
18        MR. JOHNSON:  So it wouldn't be the death
19   penalty at that point.  It is not the death penalty until you
20   actually go a little further?
21        PROSPECTIVE JUROR:  Right.
22        MR. JOHNSON:  What has to happen next?  You
23   understand what has to happen next before you decide life
24   without parole and the death penalty now that you have already
25   found him guilty of capital murder?

84

1    PROSPECTIVE JUROR:  Then we come back in
2  and the prosecution and defense present their cases, the
3  prosecution being for death penalty.  And the burden being on
4  them to prove enough -- I don't know if there is a burden of
5  proof in this case, it is not, but still on the prosecution to
6  convince the jury to determine death penalty.
7    MR. JOHNSON:  Two things.  One, there is never a
8  burden on the Defense, we never have to present any evidence
9  in any phase of the trial, okay.  That's the law.  Okay.  Now,
10  as to the burden of proof, all right, you said you are not
11  sure if they have a burden of proof after that.  Okay.  I want
12  you to go back and read special issue number one again?
13    PROSPECTIVE JUROR:  Okay.
14    MR. JOHNSON:  You want to rethink your answer?
15    PROSPECTIVE JUROR:  The burden would be on
16  the prosecution to convince the jury that he is a continuing
17  threat to the society that he is in.
18    MR. JOHNSON:  And again, how do they have to
19  prove it, what is their burden?
20    PROSPECTIVE JUROR:  Their burden would be
21  proving that he is likely to commit criminal violent acts.
22    MR. JOHNSON:  What -- it even tells you right
23  there, what their burden is, again it goes back to they have
24  to prove it beyond a reasonable doubt, okay.  Back to that
25  standard that they have got in every phase of the trial.  They

85

1  have got to prove it beyond all reasonable doubt, okay.
2    Now, again back to this special issue, you know, we got
3  not only do they have to prove, we got evidence that proves it
4  beyond a reasonable doubt, they have got to prove it beyond
5  reasonable doubt that there is a probability, okay.
6    What does probability mean?
7    PROSPECTIVE JUROR:  High likelihood.
8    MR. JOHNSON:  I will tell you this, just like
9  reasonable doubt, there is no definition to any of those
10  terms, okay.  In the first part of the trial, there will be
11  definitions for some of the issues like everything in that
12  indictment will be defined for you in the Court's charge.  The
13  Court's charge is kind of like some instructions more or less.
14  It is blueprints that the jury is to use in their
15  deliberation.
16    If you get to the punishment phase of the trial, if the
17  person is found guilty of capital murder, then when we get to
18  these special issues, there are no definitions to any of the
19  things to either one of the special issues, okay.  So
20  reasonable doubt won't be defined, probability won't be
21  defined.  Criminal acts of violence won't be defined.
22  Society, you will be able to know at that point will be prison
23  of society because he is already sitting on a
24  life-without-parole sentence, once you get to that first
25  special issue.  So you will know society means prison.

86

1    Now, do you agree with me if you take beyond a reasonable
2  doubt, now that you know the explanation of the different
3  levels of prison and couple that with probability, does that
4  increase the burden on the State?  In other words reasonable
5  doubt, then they have to prove probability too, can you see
6  how that is an even greater burden on the State?
7    PROSPECTIVE JUROR:  Yes, I can.
8    MR. JOHNSON:  You feel that way about that?
9    PROSPECTIVE JUROR:  Yeah, seems like a heavy
10  burden.
11    MR. JOHNSON:  What comes to your mind when
12  you think about that phrase at the end, criminal acts of
13  violence?
14    PROSPECTIVE JUROR:  Death or bodily injury.
15    MR. JOHNSON:  Now, when the prosecutor was
16  talking to you, she gave you an example where she punched the
17  person next to her.  Now, do you think that somebody should
18  get the death penalty because you think they might get into a
19  fist fight in prison?
20    PROSPECTIVE JUROR:  No.
21    MR. JOHNSON:  That's not what you would think of
22  when you are thinking about that criminal acts of violence at
23  that phase of the trial, is it?
24    PROSPECTIVE JUROR:  No.
25    MR. JOHNSON:  Reality is, it wouldn't surprise

87

1  at all that somebody might actually get into a fight?
2    PROSPECTIVE JUROR:  Right.
3    MR. JOHNSON:  You get on the internet, see stuff
4  on the internet.  My son was showing me some little thing on
5  the internet, like a bunch of prisoners, I think it was
6  Philippians doing a drill.  Have you ever seen that?
7    PROSPECTIVE JUROR:  No.
8    MR. JOHNSON:  They were all there dancing next
9  to each other, and I couldn't help but thinking that probably
10  when they were rehearsing that, they probably stepped on each
11  other toes and maybe some other prisoner threw a punch.  I
12  don't think that's what the legislature was thinking about
13  when they came up with that definition.  The state would have
14  to prove to you a little more than the fact that someone threw
15  dust up.
16    Did you get any fist fights at Woodrow?
17    PROSPECTIVE JUROR:  A couple.
18    MR. JOHNSON:  So did I.
19    Let me continue with this on special issue number one.
20  Again to get special issue number one, the jury has decided
21  the defendant, the person on trial, is guilty.  And now they
22  are trying to decide special issue number one.  And if they
23  decide that the State has met its burden as proved to special
24  issue number one, what happens then as far as what the jury
25  does?

88

1    PROSPECTIVE JUROR:   Then they go on to special
2  issue number two.
3    MR. JOHNSON:   That's true.  What I want to make
4  sure you understand about special issue number one, you know
5  how I told you that the jury come back with a verdict of
6  guilty, then that person has more or less got a life in prison
7  without parole.  Then when you get to special issue number
8  one, that actually starts off, even though it is not there,
9  the answer to that question starts off as "no", okay.
10    Now why do you think I would say?
11    PROSPECTIVE JUROR:   Because the burden -- you
12  come in with -- again not at this point presumed innocent but
13  best case scenario.
14    MR. JOHNSON:   And again the State has the burden
15  of proofing that issue should be answered "yes".  So can you
16  see how it really starts off as a "no"?
17    PROSPECTIVE JUROR:   Uh-huh.
18    MR. JOHNSON:   If the State can't prove to you
19  what they are required to prove for that special issue.  That
20  this stays a "no".  And unless they bring you sufficient
21  evidence to convince you, to witeout that "no" and put "yes"
22  in there, that that stays life without parole.  You don't even
23  have to consider special issue number two; you understand
24  that?
25    PROSPECTIVE JUROR:   Yes.

89

1    MR. JOHNSON:   The other thing you need to know
2  is the way the process works as far as the trial, you are
3  going to have -- this is what is called voir dire.  It is
4  supposedly French, which means to speak the truth.  Then we
5  start the trial, which is the evidence.  And once the jury
6  hears the first evidence, which is the guilt/innocence
7  evidence, if they come back with a verdict of guilty, then we
8  go on to the punishment phase of the trial.  That's where we
9  are with these two special issues.  But all the evidence that
10  comes in, in the punishment phase, comes in at the same time.
11  It is not like the State present evidence to special issue
12  number one and then the jury goes out to deliberate.  And if
13  they come back with a "yes", then it is more evidence on
14  special issue number two.  All the punishment phase evidence
15  is introduced at that same phase.  So when you are
16  deliberating these special issues, you are going to have
17  already heard all the evidence you are going to hear in regard
18  to both of those issues.
19    If you are on this jury and you have been convinced
20  beyond all reasonable doubt, number one, the person on trial,
21  the defendant, is guilty of capital murder, and then you heard
22  the evidence on punishment, and you've decided based on all
23  that evidence the State has proven to you beyond all
24  reasonable doubt that this individual is going to be a
25  continuing threat, commit criminal acts of violence in the

90

1  future and he is going to be a continuing threat to society,
2  why at that point would you even consider not giving this
3  person the death penalty?
4    PROSPECTIVE JUROR:   Because of mitigating
5  circumstances.  Because a safety net like the prosecutor said,
6  mentioned, actually just double check, because this is a
7  decision that has huge weight and it deserves another look.
8    MR. JOHNSON:   Would you be surprised some
9  people say that that is kind of a crazy idea that somebody has
10  been guilty of capital murder and now decided that there is
11  nothing that we can do to keep this person from being a
12  continuing threat, why in the world would I want to even have
13  him stay alive anyway?  What do you think about that
14  statement?
15    PROSPECTIVE JUROR:   I can see how people
16  could think maybe that is not necessary or redundant.  But I
17  totally agree that it should be there.  And I like the fact
18  that it is there.
19    MR. JOHNSON:   Well, let's talk some more about
20  special issue number two.  I laugh because it is such -- it is
21  kind of a convoluted concept.  It has got a lot of -- I guess
22  legal mumble jumbo.  Keep in mind none of the people in this
23  room wrote either one of those special issues, that's what we
24  got from the legislature, okay.  Now, what does special issue
25  number two, and it is not even called special issue number

91

1  two, but it is the longer of the two, so just for sake of make
2  it easier to describe which one we are talking about.  We are
3  talking about the longer one on the right.  Tell me what that
4  says to you in regards to what it is asking you to do?
5    PROSPECTIVE JUROR:   It says that if you find the
6  first one to be true, just because he may be a continuing
7  threat, give him a second chance and just talk about it again.
8  Talk about it, make sure that there is nothing that you
9  overlooked and double checking your work.
10    MR. JOHNSON:   What are things you think you can
11  consider in regards to special initial number two?
12    PROSPECTIVE JUROR:   Hard to say here.  Cause it
13  would be -- you would have already been presented a bunch of
14  evidence that would have been considered.  Maybe it is
15  something that jurors know and maybe forgot, and say, oh,
16  because of his upbringing, you know that this guy really --
17  give him a break.
18    MR. JOHNSON:   Okay.  Is that something that you
19  could see yourself considering at that point, you personally
20  something like that?
21    PROSPECTIVE JUROR:   I would consider, yes.
22    MR. JOHNSON:   You know I might consider going
23  and buying, you know, a Rolls Royce this afternoon, okay.  But
24  I couldn't do it.  Because I couldn't afford one.  You know
25  what I mean by that in regard to that issue that I am talking

92

1  about right now?
2              PROSPECTIVE JUROR:   Uh-huh.
3              MR. JOHNSON:   It is not just a matter that you
4  could consider, would you be able to actually to do it?
5              PROSPECTIVE JUROR:   I would if there is
6  sufficient reason to.
7              MR. JOHNSON:   What do you think that information
8  would have to come from for you to decide?
9              PROSPECTIVE JUROR:   The jurors, and someone
10 bringing up a point that someone overlooked.  Or maybe --
11 really, something that would come out in the deliberations.
12             MR. JOHNSON:   Well, you are actually supposed to
13 consider the evidence that has been presented to you, to
14 decide anything in the case, all right.  Everything that you
15 do when you are on the jury is going to be based on the
16 evidence that has been presented to you.  So it is not going
17 to come from the jurors.  Although, like, I agree with you
18 that it may be something that one of the jurors picked up on
19 that the other jurors didn't?
20             PROSPECTIVE JUROR:   That's the point I was
21 getting at.
22             MR. JOHNSON:   You realize that when you read the
23 special issue, it basically says that you can consider all the
24 evidence including the circumstances of the offense itself,
25 the defendant's character and background.  Now, that goes to

93

1  what you were saying, maybe had something to do with his
2  upbringing, something of that regard, is that what that says
3  to you?
4              PROSPECTIVE JUROR:   Uh-huh, his character.
5              MR. JOHNSON:   His personal moral culpability of
6  the defendant.  What does that mean to you?
7              PROSPECTIVE JUROR:   Moral -- moral weaknesses.
8              MR. JOHNSON:   And again, it is not going to be
9  defined, so it could mean anything that you wanted it to.  And
10 whatever it is that each individual juror comes up with in
11 regard to that special issue number two, we talk about this
12 term moral, it also goes to each individual juror's moral or
13 decision as far as their principle, okay.  If they have for
14 some reason, it is just their moral judgment, individually,
15 that this case does not meet what they consider to be a death
16 penalty case, then they have the right to just say, you know,
17 guys, I can't necessarily say exactly what it is, but it is my
18 moral personal opinion about this is, I am not going to sign
19 off on death on this case.
20      You understand that that's what that I shall be talking
21 about?
22             PROSPECTIVE JUROR:   (Nods head).
23             MR. JOHNSON:   Yes, tell me what you think about
24 what I said?
25             PROSPECTIVE JUROR:   You are talking about the

94

1  individual's moral beliefs and not being able to issue a death
2  sentence.
3              MR. JOHNSON:   I'm sorry, I didn't quite hear
4  you?
5              PROSPECTIVE JUROR:   You are talking about an
6  individual's moral belief and how they will not allow
7  themselves to issue a death sentence.
8              MR. JOHNSON:   On this particular fact, all the
9  facts have been presented to them.  They just may say I have
10 heard everything and I have found this guy guilty, I have even
11 found special issue number one to be "yes", but there is just
12 something about these facts, or this case, or anything that
13 they feel about the circumstances that they could just say, my
14 personal moral position.  My personal moral judgment in this
15 regard is that this case doesn't warrant the death sentence.
16      You understand that that's --
17             PROSPECTIVE JUROR:   Yes.
18             MS. HANDLEY:   Your Honor, I am going to object.
19 I believe that is a misstatement of the law.  The jurors are
20 to take into consideration the evidence in the case and if
21 they find that there is sufficient mitigating circumstances,
22 that it should be a life sentence versus death sentence then
23 that's how it works, Your Honor.
24             MR. JOHNSON:   I don't think I said anything
25 differently, that's exactly what I said.

95

1              MS. HANDLEY:   It should be based on the evidence
2  in the case.
3              MR. JOHNSON:   Did I say anything differently,
4  what was I talking about that you consider in the case.
5              MS. HANDLEY:   I don't mean for this to be a
6  battle, Your Honor, that's my objection.
7              THE COURT:   I will sustain the objection, Mr.
8  Johnson.  If you will rephrase the question.
9              MR. JOHNSON:   What is it that I said that you
10 are sustaining the objection.
11             MS. HANDLEY:   My objection, Your Honor, was that
12 the juror's decision should be based on the evidence in the
13 case and with respect to special issue number two if there is
14 sufficient mitigating circumstances, not just I have a feeling
15 or I believe you said a personal moral feeling against the
16 death penalty, speaking specifically it needs to be based on
17 the evidence in the case and whether or not there is
18 sufficient mitigating circumstance.
19             THE COURT:   And I will sustain that objection to
20 that.
21             MR. JOHNSON:   Well, let me say it again because
22 that is not what I said, okay.  Again, each individual juror
23 has a right to look at all the evidence and make a decision
24 about what they think the special issue means to them because
25 they are not defined; you understand that?

96

1             PROSPECTIVE JUROR:  Yes.

2             MR. JOHNSON:  That's what the law is, okay.

3     Now, each individual juror, after they have looked

4 attitude all the evidence in the case and that includes the

5 nature of the offense, and anything else that has been

6 presented to them as evidence during the trial or not

7 presented for that matter, okay.  They have the right under

8 special issue number two to make an individual decision for

9 themselves as the jury in the case, okay.  That's the law,

10 okay.

11     Now, what that means is, is that under our law after each

12 individual juror has considered everything, then they get to

13 determine, number one, what that special issue means to them

14 because it is not defined, okay.  And if it is their own

15 personal moral judgment to say in their opinion based on

16 everything they know about the case that they think this is

17 just not a death penalty case, they have the right to say

18 that, each individual juror; you understand that?

19             PROSPECTIVE JUROR:  I understand that.

20             MR. JOHNSON:  And that's kind of in a way, it is

21 it almost a juror bill of rights, okay.  You understand what I

22 mean by that?

23             PROSPECTIVE JUROR:  Yes.

24             MR. BRAUCHLE:  Each individual juror back there

25 deliberating has a right to have their own opinion about their

97

1 decision, okay.  You okay with that?

2             PROSPECTIVE JUROR:  Yes.

3             MR. JOHNSON:  Now, you know, there are basically

4 lots of issues in our world that people have very strong

5 opinions about, okay.  Like say abortion for instance, okay,

6 you are aware that a lot of people have very different

7 opinions about the issue of abortion; is that right?

8             PROSPECTIVE JUROR:  Yes, yes.

9             MR. JOHNSON:  And I am not going do ask you what

10 your opinion is.  All I am asking you, do you think that each

11 individual should be entitled to whatever their opinion is?

12             PROSPECTIVE JUROR:  Yes.

13             MR. BRAUCHLE:  And you think each individual

14 juror should be entitled to whatever their opinion is?

15             PROSPECTIVE JUROR:  Yes.

16             MR. JOHNSON:  And do you understand that if you

17 are on this jury, your job is going to be to deliberate and

18 consider the facts and evidence that has been presented to you

19 while you are sitting there in that jury box; you understand

20 that?

21             PROSPECTIVE JUROR:  Yes.

22             MR. JOHNSON:  And your job isn't to go back

23 there and debate with each other, your job is to go back there

24 and deliberate amongst each other and not debate you follow

25 me.

98

1             PROSPECTIVE JUROR:  Yes.

2             MR. JOHNSON:  It is not the other jurors job to

3 try to debate with the other jurors and try to convince them

4 what they think the evidence says or what they think you know

5 should happen in this case, each individual juror has the

6 right to decide that themselves; you follow me?

7             PROSPECTIVE JUROR:  Yes.

8             MR. JOHNSON:  Does that sound like the way it

9 should be?

10             PROSPECTIVE JUROR:  It does.

11             MR. JOHNSON:  Do you have any problems with

12 that?

13             PROSPECTIVE JUROR:  Not at all.

14             MR. JOHNSON:  So let me ask you this, if you

15 actually are on this jury and you are back there deliberating,

16 and you made the determination one way, whichever way that is,

17 and you have this personal moral judgment that that's the

18 right thing to do, do you feel that you should be entitled to

19 that?

20             PROSPECTIVE JUROR:  Yes, I do.

21             MR. JOHNSON:  Do you think the other jurors

22 should be entitled to try to force you to try force you to try

23 to change your mind about that?

24             PROSPECTIVE JUROR:  They can try, they can

25 have that option throughout the deliberation process.

99

1             MR. JOHNSON:  Okay.  As far as deliberating,

2 right?  Would you want it try to force -- you want them to

3 force you to change your mind about something?

4             PROSPECTIVE JUROR:  No.

5             MR. JOHNSON:  Would you want to force another

6 juror to change their mind about something?

7             PROSPECTIVE JUROR:  No.

8             MR. JOHNSON:  How would you feel about being on

9 this jury?

10             PROSPECTIVE JUROR:  I would take it very

11 seriously.  And consider all the evidence presented and do my

12 best to make a sound judgment.

13             MR. JOHNSON:  You know one of the first things

14 you said when you came in here, you were kind of excited about

15 this, why is that?

16             PROSPECTIVE JUROR:  Because of the nature of it,

17 the gravity, it's someone's life literally on the line.  And I

18 would have a chance to take part in that process.  It is an

19 exciting prospect.

20             MR. JOHNSON:  Do you feel like you got any

21 leanings one way or the other about the outcome of the case?

22             PROSPECTIVE JUROR:  None.

23             MR. JOHNSON:  That is not part of your

24 excitement about being here?

25             PROSPECTIVE JUROR:  No.

MR. JOHNSON: Pass the juror.
MS. HANDLEY: Nothing further, Your Honor.
THE COURT: Thank you, Mr. Turbon, you may step down?
PROSPECTIVE JUROR: Thank you.
(Prospective juror retired from the courtroom.)
(Recess taken.)
THE COURT: Ms. Handley, what says State with respect to Juror No. 70-C, Robert Turbon?
MS. HANDLEY: Your Honor, Juror Robert Turbon, 70-C, is acceptable to the State.
THE COURT: Mr. Johnson, what says the Defense?
MR. JOHNSON: We will accept Juror 70-C, Mr. Robert Turbon.
THE BAILIFF: All rise for the juror.
(Juror returned to the courtroom.)
THE COURT: You may be seated. Mr. Turbon, let me inform you that you have been accepted as a juror in this matter. You are going to be released today and subject to recall once we commence the trial.
Let me admonish you, don't do any research on the internet. Don't do any research with the Dallas Morning News, anything like that. Additionally if you happen as the trial date gets closer, if you happen to see anything on the news about this matter, change the channel if you will. We will

see you most likely the second week in April.
PROSPECTIVE JUROR: Okay.
THE COURT: Have a good one.
PROSPECTIVE JUROR: Okay, thank you, Judge.
THE COURT: If you change any of your contact information, be certain to let my coordinator know so she can contact you on the trial date?
PROSPECTIVE JUROR: Okay, thank you.
(Prospective juror retired from the courtroom.)
(Lunch recess taken.)
THE BAILIFF: All rise for the juror.
(Prospective juror entered the courtroom.)
THE COURT: You may be seated.
Good afternoon, Ms. Tehan?
PROSPECTIVE JUROR: Hi.
THE COURT: How are you today?
PROSPECTIVE JUROR: Okay.
THE COURT: Apologize for the extended wait that you had. Sometimes these things can last a little longer than we anticipate?
PROSPECTIVE JUROR: That's understandable.
THE COURT: The attorneys on both sides may have some questions to ask you regarding your qualifications as a juror. There are no right or wrong questions. They want to see how you feel about certain issues.

What says the State?

**JUNE TEHAN**

was called as a prospective juror, after having been previously sworn by the Court, testified under oath as follows:

<u>**VOIR DIRE EXAMINATION**</u>

**BY MR. MCCALLUM:**

Good afternoon. My name is Marshall McCallum. I am an Assistant District Attorney. Along with Andrea Handley and Andy Beach, the three of us work for Dallas County. We are responsible for the jury selection in this capital murder case.
To my left is Karo Johnson, he is a Dallas Defense Attorney, and also Paul Johnson Brauchle. They represent the man at the end of table, the accused, Wesley Ruiz?
THE DEFENDANT: Good afternoon.
MR. MCCALLUM: Do you feel like you know any of us?
PROSPECTIVE JUROR: No.
MR. MCCALLUM: And you have had ample time to go back and filled out about two weeks ago.
PROSPECTIVE JUROR: Yes.
MR. MCCALLUM: That was the last thing you probably thought you were going to have to do in filling out the 18-page questionnaire. Anything about your answers you

would change after having about two or three hours to look at it. Anything you would change about your questionnaire if at all?
PROSPECTIVE JUROR: There was one thing, I think I was tired at the end. And I answered -- what was it something -- I have never been on a jury before. And I answered as if I had been on the jury before, a couple of questions, I can't remember the page number on there. But that was the only thing. I think I answered as if I would have been on a jury. It said -- let me see if I can see that, that's the only thing that I saw, that I probably -- I think in being tired or fatigued, I probably answered that incorrectly.
MR. MCCALLUM: Okay. Let me -- we have been going at this process for seven weeks and we have ten people selected so far. We need obviously two more. And we have looked at a lot of questionnaires; and as you can imagine, we are only bringing down certain people that we feel like could be fair, people whose views are kind of down the middle on the death penalty in capital murder. And that's why you are down here today. There is something that I want to jump to real quickly. And I noticed that you have people in your family, you said specifically your sister used to be a police officer?
PROSPECTIVE JUROR: Uh-huh.
MR. MCCALLUM: And your brother-in-law is

104

1    currently a Highland Park Police Officer; is that correct?
2              PROSPECTIVE JUROR:   Yes.
3              MR. MCCALLUM:   I can't get into the facts of
4    this case, I don't know -- did you hear anything about this
5    case on the news?
6              PROSPECTIVE JUROR:   I really when they brought
7    it up a couple of weeks ago, I don't recall this particular
8    incident.  I do read the newspaper not everyday, but I do keep
9    up with the news, but I don't recall particularly this case.
10             MR. MCCALLUM:   Okay.  Here is my question to
11   you, I mean, concerning your sister who used to be a police
12   officer and brother-in-law, he is currently a police officer.
13   In this case we have alleged that the Dallas Police Officer
14   was killed in the line of duty.  Anything about that that is
15   going to sway you one way or the other?  I mean, can you
16   basically sit there as you sit right now, tell the Defense
17   that you can keep an open mind, you know, even knowing it was
18   a police officer, you could give him a fair trial?
19             PROSPECTIVE JUROR:   I believe I could.
20             MR. MCCALLUM:   Okay.  All right.  Let me --
21   another thing I wanted to touch on.  Looks like we are going
22   to start this trial probably middle of April and it is going
23   to go for probably five to eight working days.  And there is a
24   possibility -- we work from 9:00 to 5:00 pretty much everyday,
25   there could be an exception if there -- there is the

105

1    possibility that during deliberations that the jury could be
2    sequestered for one, possibly two nights.  And is there
3    anything about that -- I mean, would you be able to give your
4    full attention to this trial or do you believe that there is
5    going to be other outside matters, family life, work life that
6    would keep you from being able to, you know, give your full
7    attention to this trial?
8              PROSPECTIVE JUROR:   I don't believe so.  Of
9    course we have a couple of obligations.  Work wise I work 8:30
10   to 5:00, Monday through Friday anyways, I think we can get
11   somebody to sub in that time period.
12             MR. MCCALLUM:   With a kind of work do you do?
13             PROSPECTIVE JUROR:   I am a nurse in the health
14   center at SMU.
15             MR. MCCALLUM:   So you believe you could give
16   your full attention to the deliberations of this trial?
17             PROSPECTIVE JUROR:   (Nods head).  I have no
18   children at home, everybody is older.
19             MR. MCCALLUM:   Yeah, I saw that, they look like
20   they are all off to college.
21        Let's talk a little bit about murder and capital murder
22   here in Texas.  You circled two on the first page of the
23   questionnaire, you basically indicated in certain murder cases
24   you felt the death penalty was appropriate.  And if you felt
25   compelled that that was the right verdict that you could

106

1    return a death sentence.  Let me talk a little bit about that.
2    In Texas, you can't get the death penalty for every type of
3    murder.  Let me use an example.  If I pulled out a gun and I
4    put it to Ms. Handley's head and I blow her brains out right
5    here in the middle of the courtroom and I danced around her
6    body, would you agree with me that that is a horrific murder?
7              PROSPECTIVE JUROR:   Yes, that is horrible.
8              MR. MCCALLUM:   Okay.  That is not a case in the
9    State of Texas where I could get the death penalty.  I could
10   get a life sentence, life imprisonment, but she is not one of
11   the protected classes of individuals that the law provides you
12   can get the death penalty.  The type cases where you can get
13   the death penalty obviously, the murder of a police officer
14   while that police officer is in the line of duty as we have
15   alleged here.  If you kill a child under the age of six,
16   elderly person over the age of 65, if you kill more than one
17   person in the same criminal transaction, that's also the death
18   penalty worthy case.  Probably the most common example that we
19   have is person goes in a convenience store, holds up the
20   convenience store and kills the clerk while in the commission
21   of a robbery.  That's a capital murder case and they can also
22   in this case be given the death penalty.
23        Let's just assume that you are governor for a day.  How
24   does that sit with you?  Does that pretty much square with
25   your beliefs or do you think you would expand the death

107

1    penalty if you could be governor for a day and write the laws?
2              PROSPECTIVE JUROR:   I don't know if I would
3    expand it, I think -- that's the law right now at this point.
4    If you are governor, you go by what the law is.
5              MR. MCCALLUM:   Okay.  And as a juror and a
6    citizen, you could follow those laws the way they are set out?
7              PROSPECTIVE JUROR:   Uh-huh.
8              MR. MCCALLUM:   Okay.  Why do you think we need a
9    death penalty?
10             PROSPECTIVE JUROR:   I wish we didn't need a
11   death penalty.  But I think it is to keep society in check to
12   a certain point.  It is not so much an eye-for-an-eye or
13   tooth-for-a-tooth kind of thing, I think that would be too
14   chaotic.  I think it is almost a necessity with our society
15   these days.  If somebody does some of these acts that have
16   already been passed by law, then they are accountable under
17   these laws to be punished in such a way.
18             MR. MCCALLUM:   Okay.  Do you feel like it is
19   necessary as a deterrent?
20             PROSPECTIVE JUROR:   Somewhat.
21             MR. MCCALLUM:   Okay.
22             PROSPECTIVE JUROR:   Yes, yes.  I would think it
23   would be a great deal as a deterrent.  I don't know -- I don't
24   know if it actually helps that much as a deterrent.  But I
25   think it does help somewhat.

108

```
1              MR. MCCALLUM:   To some degree you believe it
2   does work as a deterrent.  Okay.  In your adult life, have you
3   ever felt differently about the death penalty than you do now?
4              PROSPECTIVE JUROR:   I think when I was growing
5   up probably bouncing it back and forth.  I am not sure I
6   really thought about it that much until the last 20 or 30
7   years.  I mean as a younger adult, I am not sure I really
8   thought about it that much.
9              MR. MCCALLUM:   Was there an event or something
10  that happened in your life that caused you to ...
11             PROSPECTIVE JUROR:   Not really.  I think a lot
12  of it just the amount of violence that you see everyday that
13  it is probably a necessary evil that we kind of have to do.
14             MR. MCCALLUM:   Well, we put our cards out on the
15  table.  We want you to know that we are very serious about
16  this death-penalty business.  I mean it is our goal in this
17  case to obtain a death penalty against the man seated at the
18  end of the table down there, not a life sentence but a death
19  sentence.  We try to impress upon every juror that's our goal.
20  Because we don't want any surprises come April -- second week
21  of April that the State really was serious about this
22  death-penalty business.  I mean this is our only chance to
23  talk to you is today.  And you will know today whether or not
24  you have been selected to sit on this jury.  So we need to
25  know your thoughts and your ideas about what is going on here,
```

109

```
1   if you feel like you are the type person that can participate
2   in a process that could lead to that man, that living,
3   breathing human being, not a fictional character, that that
4   man at the end of the table laying dead on a gurney.
5              Let me kind of go through the process with you, if a --
6   first, our goal is to seek a conviction of capital murder in
7   this case.  We believe we have the quality and the type of
8   evidence that we are going to be able to do that.  And
9   secondly, we believe that in the punishment phase that the
10  jury is going to return a death sentence as opposed to a life
11  sentence in this case.  That's our goal in this case.  We
12  believe that we have that type of evidence.
13             Now, that and a dollar fifty can get you a cup of coffee
14  downstairs.  The Defense obviously has a hundred eighty degree
15  difference about what is going to happen in this case.  But
16  that's our goal.  And what does that mean?
17             Well, if you and the 11 other jurors in this case return
18  a verdict of death in this case, Judge White up there his
19  hands will basically be tied.  He will have to assess -- he
20  will have to set an execution date.  And it will be at some
21  point in the future.  And I don't know if you ever heard of
22  Livingston, Texas, but that's the death row facility.  And
23  Mr. Ruiz would be taken down to that facility.  And the day
24  before his execution, there will be people that come and take
25  him from the Livingston unit, the death-row facility, and they
```

110

```
1   will take him down to downtown Huntsville.  I don't know if
2   you ever been to Huntsville, but it is on the way to Houston
3   off I-45, but there is a unit there and it is called the Walls
4   Unit, and that's where the executions take place.  And he will
5   be in the Walls Unit and he will be given a chance to talk to
6   family members, spiritual adviser.  He will be given a last
7   meal.
8              But at 6:00 p.m. on the day of his execution, there is
9   going to be people that come down, guards are going to come
10  into his cell and they are going it take him voluntarily or
11  involuntarily, doesn't matter, but they are going to take him
12  down to the death chamber at 6:00 p.m. that night.  There is a
13  hospital bed there, a gurney, in the death chamber.  And they
14  are going to strap him to that gurney.  When they do that they
15  are going to strap three lines to his arm.  At that point two
16  curtains will be pulled back.  And behind those curtains is
17  Plexiglas.  And on one side there can be five members from the
18  defendant's family.  And on the other side there can be five
19  members from the victim's family.  And he would be given the
20  chance to make a final statement.  He doesn't have to, but at
21  some point the warden is going to give the go-ahead to the
22  executioner.  And at that point, a series of three drugs will
23  be introduced into his system.  The first one is going to
24  knock him out.  The second one is going to collapse his lungs.
25  And the third one is going to stop his heart.  And three, six,
```

111

```
1   nine minutes later, however long it takes for him to die,
2   there will be a doctor in there that will pronounce him dead.
3              And I don't do that to try to be morbid.  We just do that
4   to impress upon you how serious this process is.  It doesn't
5   get any higher in the legal system.  I mean, this is as high
6   as it gets.  And my question to you, Ms. Tehan, are you the
7   type person who was convinced beyond a reasonable doubt that
8   death was the appropriate case -- was the appropriate
9   punishment, you could come back and take pen in hand and write
10  death in essence.  And someday in the future that man at the
11  end of the table would be laying dead on a gurney?
12             PROSPECTIVE JUROR:   It would be a tough
13  decision.
14             MR. MCCALLUM:   Yeah.  Could you -- could you
15  take part in that?
16             PROSPECTIVE JUROR:   I have always said I believe
17  in the death penalty, but when it is you making that choice --
18  I mean, I would give it serious thought, but I really believe
19  I could.  It's something I wouldn't take lightly.
20             MR. MCCALLUM:   I think we have an agreement.
21             THE COURT:   Thank you, Ms. Tehan.  You are
22  excused and free to go.  Thank you.
23             (Prospective juror retired from the courtroom.)
24             (Recess taken.)
25             THE BAILIFF:   All rise for the juror.
```



112

1           (Prospective juror entered the courtroom.)
2           THE COURT:   You may be seated.
3     Ms. Santoscoy, how are you?
4           PROSPECTIVE JUROR:   Good, thank you.
5           THE COURT:   The attorneys have some questions to
6     ask you concerning your qualifications as a juror.  There
7     aren't any right or wrong answers, they just want to see how
8     you feel about certain issues.
9           What says the State?
10          MR. BEACH:   May it please the Court?
11                **CYNTHIA SANTOSCOY**
12    was called as a prospective juror, after having been
13    previously sworn by the Court, testified under oath as
14    follows:
15                **VOIR DIRE EXAMINATION**
16    BY MR. BEACH:
17          Good afternoon Ms. Santoscoy.  How are you doing?
18          PROSPECTIVE JUROR:   Good, thank you.
19          MR. BEACH:   You are not either.  You have been
20    running around here trying to fine the courthouse.
21          PROSPECTIVE JUROR:   Did y'all hear me earlier
22    when I was complaining about that.
23          MR. BEACH:   You have a time issue with the kids?
24          PROSPECTIVE JUROR:   I do.
25          MR. BEACH:   Tell me about that.

113

1           PROSPECTIVE JUROR:   At four o'clock I have to
2     meet my kids in the bus stop because it is raining and they
3     can't walk in the rain in the cold.
4           MR. BEACH:   Anybody told you about Abraham
5     Lincoln, walking through the snow?
6           PROSPECTIVE JUROR:   No.  And swim practice and
7     homework and everything else.
8           MR. BEACH:   And how long does it take you to get
9     from here to the bus stop probably?
10          PROSPECTIVE JUROR:   I would guess, at this time
11    of the day, it would probably take me about 20 to 25 minutes.
12          MR. BEACH:   Okay.  From looking at your
13    questionnaire, obviously, you are very, you know, involved in
14    their lives and your community.  The last -- on page 17 it
15    asks how would you feel about being chosen on this case, and
16    you said, I would hope that my family could be well taken care
17    of while I am away.
18          PROSPECTIVE JUROR:   Yes.
19          MR. BEACH:   Is this going to be an issue in your
20    mind if you are asked to be on this jury, is it going to weigh
21    heavily on your mind about your kids and just your
22    responsibility in terms of you, know, how it is going to
23    impact your family?
24          PROSPECTIVE JUROR:   Well, it would be something
25    that I feel like I could probably manage pretty well for a

114

1     couple of days, but if it went on for weeks, that would be a
2     problem.
3           MR. BEACH:   Right now this trial, we can't
4     crystal ball exactly how long it is going it take but our best
5     guess is anywhere from five to eight working days maybe up to
6     two weeks.  Now, if it was a two-week trial is that something
7     you think you could manage, or is it going to be tough?
8           PROSPECTIVE JUROR:   It would be tough.  My
9     husband works long hours and volunteers a lot in the
10    community.  So I am kind of the one that runs the show at home
11    with the kids.
12          MR. BEACH:   Because of that, Ms. Santoscoy, I
13    think the lawyers have agreed that we are going to let you go
14    and take care of your family.
15          PROSPECTIVE JUROR:   Okay, thank you.
16          THE COURT:   You are free to go, ma'am, thank
17    you.
18          THE BAILIFF:   All rise.
19          (Prospective juror retired from the courtroom.)
20          (Pause in the proceedings.)
21          THE BAILIFF:   All rise.
22          (Prospective juror entered the courtroom.)
23          THE COURT:   You may be seated.  Good afternoon,
24    Mr. Gibbs.  How are you doing today?
25          PROSPECTIVE JUROR:   Just fine.  How about you?

115

1           THE COURT:   I am doing well, thank you.
2           The attorneys have a few questions to ask you concerning
3     issues that may be prevalent in this case.  There aren't any
4     right or wrong responses.  They just want to see how you feel
5     about certain things.
6           PROSPECTIVE JUROR:   Okay.
7           THE COURT:   And says the State.
8           MR. MCCALLUM:   May it please the Court.
9                **FLOYD GIBBS**
10    was called as a prospective juror, after having been
11    previously sworn by the Court, testified under oath as
12    follows:
13                **VOIR DIRE EXAMINATION**
14    BY MR. MCCALLUM:
15          Good afternoon, Mr. Gibbs, how is the weather?
16          PROSPECTIVE JUROR:   A little wet.
17          MR. MCCALLUM:   My name is Marshall McCallum.  I
18    am an Assistant District Attorney.  And I work alongside
19    Andrea Handley, who is an Assistant District Attorney.  There
20    is another gentleman by the name of Andy Beach.  We are all
21    Assistant District Attorneys and we are all responsible for
22    picking the jury in this capital murder case.  To my left, the
23    first gentleman is Karo Johnson, Paul Brauchle.  They are both
24    Dallas Defense Attorneys.  They represent the man at the end
25    of the table.  That's Wesley Ruiz.

116

1      THE DEFENDANT:  Good afternoon.
2            MR. MCCALLUM:  Mr. Gibbs, you probably saw us a
3  couple of weeks ago when you came in to fill out the 18-page
4  questionnaire.  You don't recognize or know any of us do you?
5            PROSPECTIVE JUROR:  No.
6            MR. MCCALLUM:  Let me just talk a little bit
7  about the perimeter of this case, we have been going at it
8  about seven weeks, we have ten jurors, we obviously need two
9  more.  And the reason why we called you down, is because we
10  have read through, we have literally read through hundreds and
11  hundreds of questionnaires.  And we are bringing down the
12  people that, you know, that are kind of in the middle.  That
13  believe that they could return the death penalty in
14  appropriate circumstances.  We are not calling down the people
15  that say they could never give death or the people that
16  believe death is appropriate in all cases, we are only calling
17  down certain individuals that fall within those guidelines.
18  Let me just kind of tell you about the trial.
19      We anticipate starting trial in April, in mid-April.  The
20  trial will probably last five to eight working days.  We will
21  go from about 9:00 in the morning to 4:30, five o'clock in the
22  afternoon.  Is there anything about that -- well, let me also
23  throw in there is a possibility that the jury could be
24  sequestered for about one, one or two days.  It would just be
25  during deliberations and you wouldn't have any contact really

117

1  with the outside world.
2      Is there anything about that, your job or your family
3  life where you wouldn't be able to devote your full attention
4  to the full trial?
5            PROSPECTIVE JUROR:  We have three small girls at
6  home.
7            MR. MCCALLUM:  What is the situation.
8            PROSPECTIVE JUROR:  My wife works also.  And she
9  is a E.R. nurse.  And the shifts that she works requires one
10  or both of us to be there.  When she is not there, myself or
11  my mother has to fill in, so maybe we would have to make
12  arrangement for my mother to be around or something.
13            MR. MCCALLUM:  That probably wouldn't be hard,
14  you think you could make that arrangement?
15            PROSPECTIVE JUROR:  Yeah.
16            MR. MCCALLUM:  You could devote your full
17  attention?
18            PROSPECTIVE JUROR:  I think we have a vacation
19  in there sometime.
20            MR. MCCALLUM:  Is that sometime in April?
21            PROSPECTIVE JUROR:  Probably mid-May.
22            MR. MCCALLUM:  I anticipate we are going to be
23  done well before then.  Have you -- do you know anything about
24  this case?
25            PROSPECTIVE JUROR:  No.

118

1            MR. MCCALLUM:  Just what you read from the
2  questionnaire?
3            PROSPECTIVE JUROR:  Yes.
4            MR. MCCALLUM:  All right.  Let me talk a little
5  bit about murder in the State of Texas.  There is only
6  specific instance where the death penalty of capital murder
7  applies.  If I pulled out a gun and I stuck it to
8  Ms. Handley's head and I blew her brains out right here in the
9  middle of the Court and I danced around her body, you would
10  agree with me that is a horrible and horrific murder?
11            PROSPECTIVE JUROR:  Uh-huh.
12            MR. MCCALLUM:  Well, that is not the type case
13  that the death penalty can be applied to.  She is not one of
14  the protected individuals that -- that, you know where I could
15  receive the death penalty.  I could get life imprisonment, but
16  I couldn't receive the death penalty.  When we are talking
17  death penalty, we are talking police officer that is killed in
18  the line of duty.  Children under the age of six that are
19  murdered, that's potential death penalty.  If I go out and
20  hire a hit man, myself and the hit man both can be tried for
21  the death penalty.  Probably the most common type case that we
22  see down here is capital murder is someone going into
23  like the 7-Eleven and they go in there and rob the store and
24  they kill the clerk.  That is the most common type of capital
25  murder scenario that we have down here.

119

1      Let's pretend that you were governor for a day.  You know
2  knowing what I just told you about our scheme there is select
3  few instances where you could receive the death penalty, you
4  think you could expand that or keep it about like it is?
5  Pretty loaded question?
6            PROSPECTIVE JUROR:  Yeah, pretty loaded
7  question.  Smarter men than me have played with that question
8  for years, I don't know, probably if I had to make a decision
9  right now, probably keep it about like it is.
10            MR. MCCALLUM:  Okay.  Why do you think we have a
11  death penalty?
12            PROSPECTIVE JUROR:  In an attempt to protect our
13  society.
14            MR. MCCALLUM:  Okay.  Do you think it can be a
15  deterrent?
16            PROSPECTIVE JUROR:  I think it can be, I am not
17  sure that it is.
18            MR. MCCALLUM:  Okay.  You don't necessarily
19  think that we are any safer than any sate that doesn't have
20  the death penalty?
21            PROSPECTIVE JUROR:  Probably not.
22            MR. MCCALLUM:  All right.  In your adult life,
23  have you ever felt differently about the death penalty?
24            PROSPECTIVE JUROR:  No.  There have been
25  instances when snap judgment on some kind of a thing on the

120

1  news or something would probably cause me to lean the other
2  way, but over all, no.
3          MR. MCCALLUM:   Okay.  All right.  Well, this is
4  our only chance to talk to you today.  You are going to know
5  before you leave here today whether or not you are selected to
6  be on this jury.  You know we want to get as much out of you
7  in terms of thoughts and ideas in relating to our criminal
8  justice system and the death penalty and capital murder.
9          Let me jump around a little bit, Mr. Gibbs, you have your
10  questionnaire in front of you?
11          PROSPECTIVE JUROR:   Yeah.
12          MR. MCCALLUM:   Why don't we jump over to page
13  five.  You see where you put criminal justice system, please
14  explain why you believe it is happening, talking about the
15  increase or decrease of crime.  And you put plain and simple
16  moral decay, can you flush that out?
17          PROSPECTIVE JUROR:   I think that even compared
18  to when I grew up that parents and teachers, you know the
19  whole, scenario, I guess, don't -- don't have the same grasp
20  on raising the children now that they did then.  Okay.  Even
21  my children, you know, are more spoiled than when I grew up.
22  And the daughters -- my own second generation, we like to call
23  them, the young daughters that we just adopted, I can see
24  already that they are going to be more spoiled than my
25  biological children that I have already raised and gone.

121

1  That's good and bad, I guess.  We are making sure they have
2  more, but how good is that.  In my mind -- in a lot of ways it
3  is not doing the child any good.  So I don't know, I may not
4  be making any sense here.
5          MR. MCCALLUM:   No, you are.  You believe that
6  the way kids are raised nowadays and the way they are brought
7  up in school maybe, the point isn't being made at an early age
8  like it was maybe in the past?
9          PROSPECTIVE JUROR:   Yeah.
10          MR. MCCALLUM:   How many children do you have?
11          PROSPECTIVE JUROR:   Five.
12          MR. MCCALLUM:   You have five and you just
13  adopted two girls?
14          PROSPECTIVE JUROR:   I just adopted three girls.
15          MR. MCCALLUM:   Great.  I mean -- I don't know --
16  have you ever been down on jury duty before?
17          PROSPECTIVE JUROR:   No.
18          MR. MCCALLUM:   We are doing this.  We are being
19  extremely careful because of the stakes here?
20          PROSPECTIVE JUROR:   Right.
21          MR. MCCALLUM:   That man at the end of the table,
22  there is a possibility that he could be laying dead on a
23  gurney?
24          PROSPECTIVE JUROR:   Right.
25          MR. MCCALLUM:   So that's why everybody is

122

1  filling out these 18-page questionnaires.  And we are bringing
2  down people individually.  Just so people won't be scary.  A
3  lot of times people get in front of a hundred people and they
4  are afraid to say what is on their mind, that's why we are
5  bringing everybody down individually and talking to them.  And
6  it has already taken seven weeks.  We want to let you know
7  from the get-go, it is our goal in this case, the State of
8  Texas, it is our goal that that man someday in the future is
9  going to be laying dead on a gurney down in Huntsville, Texas.
10  We say that because we believe we have the type of evidence
11  and quality of evidence that first is going to convince 12
12  jurors that he is guilty beyond a reasonable doubt of capital
13  murder.  And, secondly, that there is only two punishment
14  options at that point, life imprisonment and the death
15  penalty.  And we believe that we are going to convince those
16  same 12 people that the death penalty is the best punishment
17  as opposed to a life imprisonment possibility.  Now, that and
18  a dollar fifty can get you a cup of coffee downstairs.
19  Obviously the people next door -- next to us, they have a
20  completely different idea of what is going to happen in this
21  case.
22          The reason that we tell you that is that we want everyone
23  to know that comes down here in April, you know that we were
24  dead serious about what we were doing in this case.  About the
25  death penalty.  And what does that mean?  Well, that means

123

1  that if the jury first is convinced that he is guilty beyond a
2  reasonable doubt of capital murder and they find that the
3  death penalty as opposed to life imprisonment is the
4  appropriate punishment, that means that Judge White up there
5  will have no other alternative but to set an execution date.
6  And he will do that.  He will set a date somewhere off in the
7  future.  And the defendant will be taken down to Livingston,
8  Texas.  And Livingston is where the death-row facility is.
9  And I don't know if you ever heard of it.  It is down in
10  Livingston.  I think it used to be someplace else.  And he
11  will be kept there.  And the day before his execution, there
12  will be guards that go up to that unit and they get him and
13  they are going to take him down to Huntsville.  And they are
14  going to take him to a unit called the Walls.  And it is an
15  old unit there in Huntsville, and that's where executions
16  carried out.
17          And he will be in a holding cell.  And he will be given a
18  chance to talk to a spiritual adviser.  He can talk to his
19  family members.  He can ask for the last meal, but at some
20  point -- well, it is going to be 6:00 p.m. on the day of the
21  execution, those guards are going to take him from his holding
22  cell and they are going to take him down to the death chamber
23  and they are going to strap him down to a gurney.  And they
24  are going to attach three lines to his arm.
25          And at that point, he will be given a chance to make a

124

1  last statement. And there will be Plexiglas around the
2  gurney. And there can be five members from his family and
3  five members from the victim's family. He will be given a
4  chance to make a last statement, he doesn't have to.
5      At some point the warden is going to give the go-ahead to
6  the executioner. The first one will knock him out, sedate
7  him. The second one is going to collapse his lungs. And the
8  third is going to stop his heart. And at some point, three,
9  five, seven minutes later, he is going to be pronounced dead
10 on that gurney. And we just need to know, sir, are you the
11 type person that could take part in a process that might very
12 well lead someday to this man laying dead -- at the end of the
13 table laying dead on a gurney?
14      PROSPECTIVE JUROR: I don't know.
15      MR. MCCALLUM: Okay. That's a stuff one?
16      PROSPECTIVE JUROR: You got me breaking out
17 in a cold sweat up here.
18      MR. MCCALLUM: There is no right or wrong
19 answer?
20      PROSPECTIVE JUROR: I know. I don't know.
21      MR. MCCALLUM: What are your hesitations, talk
22 me through that?
23      PROSPECTIVE JUROR: Even answering each
24 question, I decided you know that I was more middle of the
25 road. I think that's what you said, than I thought I would be

125

1  concerning a case like this. Because like I said, previously
2  I have made some pretty snap judgments about cases that have
3  been in the news. You know, they ought to take them out back
4  and shoot them right now, that kind of stuff.
5      MR. MCCALLUM: Yeah.
6      PROSPECTIVE JUROR: Getting backed into the
7  corner to make that decision, you know.
8      MR. MCCALLUM: I mean it is an awesome
9  responsibility.
10     I think we have an agreement, Judge.
11     THE COURT: Mr. Gibbs you are free to go, thank
12 you for coming down. If you will leave your questionnaire
13 right there.
14     PROSPECTIVE JUROR: Okay, thank you.
15     (Prospective juror retired from the courtroom.)
16     (Pause in the proceedings.)
17     THE BAILIFF: All rise for the juror.
18     (Prospective juror entered the courtroom.)
19     THE COURT: You may be seated.
20 Mr. McGinnis, how are you today?
21     PROSPECTIVE JUROR: Very well, thank you.
22     THE COURT: The attorneys have some questions to
23 ask you concerning your qualifications as a juror in this
24 case, there aren't any right or wrong responses, they are
25 merely trying to see how you feel about certain issues that

126

1  are pertinent in this case.
2      PROSPECTIVE JUROR: Thank you.
3      THE COURT: What says the State?
4      MS. HANDLEY: May it please the Court?
5              LLOYD MCGINNIS
6  was called as a prospective juror, after having been
7  previously sworn by the Court, testified under oath as
8  follows:
9              VOIR DIRE EXAMINATION
10 BY MS. HANDLEY:
11     Is it getting cold out there?
12     PROSPECTIVE JUROR: Yes, cold and windy.
13     MS. HANDLEY: I suppose we are not going to go
14 home and do some garden, I saw that was your hobby?
15     PROSPECTIVE JUROR: I did that yesterday.
16     MS. HANDLEY: Mr. McGinnis, we brought down
17 panels of people, brought them into the courtroom, we had you
18 fill out these 18-page questionnaire, had an opportunity to
19 let the Judge talk to you just a little bit. Since that time
20 we have gone through and read every one of those
21 questionnaires, we have only pulled out a select number of
22 questionnaires of people to bring down and talk to
23 individually now on one-on-one, try to feel you out a little
24 bit more about the death penalty as a whole, maybe talk to you
25 a little bit more about the process and what we are doing

127

1  today is to see whether or not you are a qualified juror for
2  this particular case?
3      PROSPECTIVE JUROR: Okay.
4      MS. HANDLEY: Suffice to say, my name is Andrea
5  Handley. I am working with Andy Beach and Marshall McCallum.
6  We are all Assistant District Attorneys here for Dallas, we
7  are in charge of selecting the jury for this particular case.
8      To my left is Mr. Karo Johnson and Paul Brauchle. They
9  are defense attorneys here in Dallas and they represent the
10 defendant in this case. And that's the individual seated at
11 the end of the table --
12     THE DEFENDANT: Good afternoon.
13     MS. HANDLEY: -- Wesley Ruiz. What we want to
14 do, Mr. McGinnis, is have an opportunity to talk to you a
15 little bit more to see if you are a qualified juror for this
16 particular case. It is not everybody's real cup of tea when
17 it comes down to it. It is one thing to fill out a
18 questionnaire. It is one thing to talk about the death
19 penalty academically or maybe around a cup of coffee or
20 something, it is an entirely different thing to be a part of
21 it. And mostly for respect for you and respect for us, you
22 know, we just all want to be honest about it and see if you
23 are the right person?
24     PROSPECTIVE JUROR: Uh-huh.
25     MS. HANDLEY: The last thing we need is somebody

128

1   feeling like they need to be compelled to be on the jury
2   telling us they think we want to hear.  That is not it.
3   Suffice to say what we feel at this side of the table with
4   respect to this case and what they feel on that side of the
5   table are probably worlds apart.  We have totally different
6   prospective.  That and 25 cents will get you a cup of coffee.
7   What matters is what Mr. McGinnis thinks, okay?
8           PROSPECTIVE JUROR:  Okay.
9           MS. HANDLEY:  You have had an opportunity to
10  read your questionnaire again, if I were to give this to you
11  again today, ask you to fill it out, would you change
12  anything, add anything, take anything out?
13          PROSPECTIVE JUROR:  No, I wouldn't.
14          MS. HANDLEY:  The reason we brought you down is
15  because for the most part it would appear to us that your
16  answers are somewhat neutral at this point.  If you had said
17  for example I will always give the death penalty in any murder
18  case, you wouldn't be qualified to sit on this murder case.
19  You said I would never do it under any circumstances, you
20  wouldn't be qualified either.  As I just said, it is one thing
21  to fill out a questionnaire and entirely a different thing to
22  be involved.  I always like to use the analogy the window
23  washers on the 80-story high buildings.  Have you ever see
24  those?
25          PROSPECTIVE JUROR:  Yes.

129

1           MS. HANDLEY:  If you ask me how I feel about
2   clean windows on a high-rise building, I will tell you I am a
3   hundred percent for it.  If you were to put the squeegee in my
4   hand and tell me to get on the thing and ride it up, I would
5   tell you that I couldn't do it.  If I was forced to do it, I
6   might be able to suck it up and do it; but my heart wouldn't
7   be in it and it wouldn't be fair to the people that are asking
8   me to do it.  That's where we are going today.
9           Preliminary matters, you are a C.P.A. for Scottish Rite
10  Hospital?
11          PROSPECTIVE JUROR:  Right.
12          MS. HANDLEY:  We anticipate once we have this
13  jury selected, we have been doing this for several weeks now,
14  probably going to take a little bit longer, this case will
15  probably start around mid-April, maybe the second week of
16  April.  It can take anywhere from five to eight working days,
17  we usually work 9:00 to 5:00 a regular working day, we don't
18  work on the weekend, on normal working days you go home at
19  night.  What I can't anticipate is how long it would take a
20  jury to deliberate.  It could take anyway from a day to two
21  days.  One other possibility you might quite possibly be
22  sequestered, which means you and other jurors go to a hotel
23  room, you stay the night, no phones, no family, to keep you
24  away from outside influences that could be one to two nights.
25  You are an accountant and I know this is mid-April, I don't

130

1   know if you being an accountant for a hospital still give you
2   that mid-April tax time crunch.  With that schedule in mind,
3   does that square with what you are doing?  Can you
4   participate?
5           PROSPECTIVE JUROR:  Yeah, we don't have a tax
6   season.
7           MS. HANDLEY:  I didn't think you did.  Anything
8   about that schedule that would keep you from giving your full
9   attention to this case 100 percent?
10          PROSPECTIVE JUROR:  No.
11          MS. HANDLEY:  Okay.  Okay.  Let's talk a little
12  bit then about criminal cases and the death penalty in
13  particular.  You have put down here on your questionnaire,
14  sir, that you think it is appropriate for certain crimes?
15          PROSPECTIVE JUROR:  Uh-huh.
16          MS. HANDLEY:  You have also put that the
17  punishment for extreme cases.  And when asked what you
18  thought -- what crimes should it be available for, you have
19  said murder.  And I will tell you that you are pretty much on
20  the right track right there.  In Texas, the death penalty is
21  not an available option necessarily for all murders, just
22  certain murders and certain categories of murder.
23          For example murder of a peace officer in the line of
24  duty?
25          PROSPECTIVE JUROR:  Uh-huh.

131

1           MS. HANDLEY:  That is an option that may be
2   available to a jury as a death penalty.  Murder of a child of
3   six years of age or younger, murder of an individual of 65
4   years or older, that is an available option.  Murder of more
5   than one person in the same criminal episode.  A serial
6   killer, such as that.
7           Classic example is the individual who go into the
8   convenience store with the intent to robbing the store and
9   kills the clerk while in the course of committing that
10  robbery, that's a death penalty type case.  Any type of murder
11  during a serious felony offense.  If I am sitting here and I
12  have my co-counsel next to me and I pull a gun out of my
13  briefcase and for no reason, he is minding his business, I
14  blew his brains out right here.  Stood up, laughed about it,
15  and kicked his body a couple of time, I think you would agree
16  that is a pretty horrible murder?
17          PROSPECTIVE JUROR:  Yes, it is.
18          MS. HANDLEY:  It is not a murder that a death
19  penalty would be an option for a jury.  The most I can get
20  would be a life imprison sentence.  Not available for all
21  murders.
22          PROSPECTIVE JUROR:  Okay.
23          MS. HANDLEY:  If you were governor for a day, do
24  you think you would expand the death penalty to include any
25  other types of murder?

132

1    PROSPECTIVE JUROR:   No, I don't.

2    MS. HANDLEY:   You would leave it just as it is

3  right now?

4    PROSPECTIVE JUROR:   Yes.

5    MS. HANDLEY:   And does that square with your --

6  do you agree with how the death penalty applies, it does not

7  necessarily apply to all murder cases, you are okay with that?

8    PROSPECTIVE JUROR:   Definitely, yes.

9    MS. HANDLEY:   We are talking about capital

10  murder today.  And there is a difference between, you know,

11  what we call a capital murder, that murder plus, versus just a

12  regular murder.  Back to me talking about what we are doing

13  today and the gravity of the situation, again your feeling on

14  the death penalty, have you always felt this way about the

15  death penalty, have you ever had any different feelings?

16    PROSPECTIVE JUROR:   No, I have always felt this

17  way.

18    MS. HANDLEY:   Was there anything in particular

19  that made you feel that way, any kind of circumstance,

20  anything you could put your finger on?

21    PROSPECTIVE JUROR:   No.  I just think a person

22  need to take responsibility for hair actions.

23    MS. HANDLEY:   Okay.  Why do you think we have

24  the death penalty, what is the necessity for it?

25    PROSPECTIVE JUROR:   I guess I view it as a

133

1  deterrent.  Also as a punishment for doing something wrong.

2    MS. HANDLEY:   Okay.  Sure, sure.  And you will

3  know today, Mr. McGinnis, whether or not you are going to be a

4  juror on this case.  Just so that there is no -- no

5  misunderstanding, I will tell you on behalf of the

6  representatives of the State of Texas and the other attorneys

7  involved in case, we have one objective in this case and one

8  objective.  It is our ultimate goal to eventually see that man

9  seated down there strapped to a gurney and being executed by

10  lethal injection.  I tell you that so there are no surprises

11  so you don't go home and say, gee, maybe they will change

12  their mind and I won't have a responsibility of being a part

13  of this.  I tell you that because I believe we have the type

14  and quality of evidence that will convince 12 people that he

15  is guilty of capital murder.  And I believe we have the type

16  and quality of evidence that will convince 12 people that

17  death is the appropriate sentence for this case.  And let me

18  tell you what that means, assuming that a jury does agree with

19  us, finds him guilty, sentence him to death versus life

20  imprison, what happens at that point is that the Judge in this

21  case, Judge Ernest White, he has no choice in the matter, he

22  doesn't get to come back and say I think you saw it wrong, you

23  am going to do something differently.  His hands are tied,

24  what is done is done at that point and he basically signs a

25  warrant for the death of the defendant.  Okay.  He is at that

134

1  time transferred out to East Texas and he will be housed out

2  at Livingston, Texas, which is out near Huntsville, Texas.

3    Have you ever been there?

4    PROSPECTIVE JUROR:   I have been by there.

5    MS. HANDLEY:   Most people drive right by it.  It

6  is a not a place most people visit.  It is primarily dedicated

7  to criminal justice studies, the defendant would be housed out

8  there until a date set for his execution.

9    The day before his execution, he will be transferred to

10  Livingston, Texas to downtown Huntsville, Texas.  In the

11  middle of downtown Huntsville is an old prison unit called the

12  Walls Unit, and that's where they actually do the execution.

13  They would take him and they would put him first in an

14  isolated cell, just down the hallway from the death chamber.

15  He would stay in that chamber by himself.  He would have the

16  opportunity to visit with some family members on the date of

17  execution and a spiritual adviser, if he so inclined.  He

18  would be given that last meal that people always hear about.

19  He could order anything on the menu as long as it is on the

20  Texas TDC menu there.

21    Come six o'clock, he is going to be transferred from that

22  isolated cell down a narrow hallway to this death chamber.

23  Whether he goes voluntarily or kicking and screaming or

24  begging for his life, regardless, Mr. McGinnis, he is going.

25  And he is going by people who are trained to do that and

135

1  trained to get him down to that death chamber.  He will be

2  taken down there.  It is a small room, very sterile, kind of a

3  gray, green industrial color.  In the middle of that room is a

4  hospital bed, basically a gurney.  And he will be brought in

5  there, and again whether he likes it or not, he will be

6  strapped down to that gurney.

7    Once he is strapped down, there is an individual who will

8  put intravenous lines into his arm.  In that room there are

9  two windows.  And at that point these curtains on these

10  windows are going to opened up.  On one side, he could have

11  five representatives for him, be it his family, his lawyer,

12  whoever he so incline.  On the other side, a curtain opens up,

13  and there are five representatives from the victim's family,

14  whoever chooses to be there so that they can actually watch

15  this happen.

16    At that point, he is given the opportunity to make a last

17  statement.  And I am sure you can imagine that many things

18  have been said over the years.  Some apologize, some people

19  protest their guilt or innocence and say you got it wrong, you

20  are killing an innocent man.  But regardless, once what is

21  said is said, what is done is done, regardless of what he

22  says, the warden is going to give a nod to a person who is

23  going to start to hit a series of button.  These buttons

24  release chemicals and these chemicals will flow through the

25  I.V. and will start to go into his bloodstream.  The first

136

1  chemical is designed to sedate him. The second one is
2  designed to cease his lungs. And the third one is designed to
3  cease his heart. And whether it takes four minutes, six
4  minutes or eight minutes, these chemicals will continue to
5  flow until he is pronounced dead by a medical doctor.
6        Now, I don't tell you that to be morbid. I tell you that
7  out of complete respect to you, and want to give you a very
8  good picture and appreciation for what we are talking about,
9  Mr. McGinnis. We are not talking really hypothetically
10  anymore. We are not talking about a hypothetical character.
11  I am talking about the person who is seated at the end of the
12  table. And so now comes that time where it is all about you
13  and your rank honesty with us. Need you to ask yourself and
14  look in your heart, having described that scenario to you,
15  knowing that you could quite possibly be a person who takes
16  part in the execution of another person, do you think that you
17  are that type of person, can you do that?
18        PROSPECTIVE JUROR:   Yes, I think I would be able
19  to do that.
20        MS. HANDLEY:   Okay. Okay. And I would imagine
21  that you have given this a lot of soul-searching after having
22  read the questionnaire, you have thought a lot about it, it is
23  something that you could certainly do?
24        PROSPECTIVE JUROR:   Yes.
25        MS. HANDLEY:   You wouldn't take it lightly I

137

1  take it?
2        PROSPECTIVE JUROR:   No, definitely not.
3        MS. HANDLEY:   And I will tell you that any of
4  the people that are currently selected so far, nobody has been
5  happy about it. It is a very serious process and one that
6  should not be taken lightly and it seems that you would not do
7  that, then?
8        PROSPECTIVE JUROR:   Right.
9        MS. HANDLEY:   Let's talk a little bit about the
10  criminal justice process, have you ever sat on a jury before,
11  sir?
12        PROSPECTIVE JUROR:   Yes.
13        MS. HANDLEY:   How long ago was that?
14        PROSPECTIVE JUROR:   It's probably ten or 15
15  years ago.
16        MS. HANDLEY:   And was that here in Texas?
17        PROSPECTIVE JUROR:   No San Diego.
18        MS. HANDLEY:   And I am thinking the California
19  system out there is probably different than Texas. In Texas
20  we are one of the last states where the jury actually assess
21  punishment in the case. But what did probably apply out in
22  California, are a lot of fundamental laws, propositions of law
23  that apply in all criminal cases, be it theft of a loaf of
24  bread or be it a death penalty case, we will talk a little bit
25  about that at this point. And some of these you may remember

138

1  from your jury duty in California.
2        First of all, I think you have before you a copy of the
3  indictment in this case, do you see that up there?
4        PROSPECTIVE JUROR:   Yes.
5        MS. HANDLEY:   I will tell you that a criminal
6  trial in Texas is lot like an analogy I can make to a two-act
7  play. Have you been to the theater before? It is like a
8  two-act play, there is an intermission, and there is a
9  second part. On the first part of the play, as with any
10  criminal trial, Mr. McGinnis, you are called upon to do one
11  thing and one thing only at that point, and that is to decide
12  whether or not the defendant is guilty of the charge, whether
13  or not we have proved the case to you beyond a reasonable
14  doubt. At that point we are not thinking about, am I giving
15  death as a sentence. You are not thinking about, am I giving
16  life imprison without parole. That does not factor into the
17  equation, you are focused on one question and one question
18  only, has the State proved the defendant guilty beyond a
19  reasonable doubt? What we have to prove to you is basically
20  what is in that indictment there. I saw you had a chance to
21  read that there.
22        PROSPECTIVE JUROR:   Uh-huh.
23        MS. HANDLEY:   I will paraphrase for you, those
24  are elements that we have to prove. We have to prove that on
25  or about a particular date in Dallas County, Texas, that the

139

1  defendant did intentionally or knowingly take the life of a
2  peace officer, knew he was a peace officer, while he was in
3  the line of the duty. And he did it by shooting him with a
4  firearm. Those are the elements of the indictment, and that
5  is what we have to prove to you. That's all we have to prove
6  to you at that point. I don't have to prove what color shirt
7  he was wearing, but we have to prove all the elements, not
8  five out of six, we have to prove every element.
9        And let me give you an extreme example, it would touch on
10  your qualifications as a juror. Let us say for, Mr. McGinnis,
11  at the conclusion of the testimony, I have proved to you
12  beyond a reasonable doubt that the defendant has murdered a
13  peace officer while he was in the line of duty and he did it
14  by shooting him with a gun, there is no doubt in your mind.
15  But let's say I have neglected to bring you any piece of
16  evidence that it happened in Dallas County, Texas. And as you
17  see each element is as important as the other. Or I fail to
18  prove to you that it happened in Dallas County. Okay. The
19  Judge would instruct you that you are to return a verdict of
20  not guilty because I have not proved to you each and every
21  element beyond a reasonable doubt. It might make you sick to
22  do that. You might end up riding down the elevator with a guy
23  that killed a peace officer. But the Judge would instruct you
24  to follow the law and your oath as a juror, you would
25  have to do that. Is that something that you could do?

140

1    PROSPECTIVE JUROR:  Yes.
2         MS. HANDLEY:   I would be looking for a job the
3    next day, it is a pretty extreme example, but it brings forth
4    that every element must be proved to you.  What you have in
5    front of you, it is an indictment, it is a piece of paper.  It
6    instructs what I have to prove.  It gives them notice what he
7    has been charged with.  The Judge will instruct you that it is
8    not to be considered as evidence in this case.
9         A lot of people say, here we are, we are in a courtroom.
10   I am seeing lawyers, bailiffs, the indictment, I am seeing an
11   indictment, where there is smoke, there is fire.  The law says
12   at this point the indictment is just that, and you cannot
13   consider it as any piece of evidence.  Is that a law you think
14   you could follow?
15        PROSPECTIVE JUROR:  Yes.
16        MR. BRAUCHLE:   There is a prevailing theme
17   coming out through these criminal trials; and that is, you are
18   always looking to the State to do the proving.  It is our
19   obligation, always look to this side of the courtroom for any
20   proof in the case.  They have fulfilled their only
21   obligations, and that is to be here.  And I am assuming they
22   will have everyday.  They have absolutely no obligation, as
23   it should be.
24        As we sit here today, have I brought you any proof
25   whatsoever of the defendant's guilt?

141

1    PROSPECTIVE JUROR:  No.
2         MS. HANDLEY:   As we sit here today the law says
3    that you must presume the defendant innocent and that he will
4    enjoy and hold on to that presumption of innocence until
5    myself and my colleagues have proved to you beyond a
6    reasonable doubt that he is guilty.  Is that a law that you
7    can also follow and uphold?
8         PROSPECTIVE JUROR:  Yes, ma'am.
9         MS. HANDLEY:   The burden that I carry in this
10   case, the burden that I carry throughout this part as well as
11   the punishment phase of the trial, is to bring you evidence
12   that will convince you beyond a reasonable doubt.  I will tell
13   you that there is no definition of what beyond a reasonable
14   doubt means.  It is really entirely up to you.  Some people
15   say my definition, if I am convinced beyond a reasonable
16   doubt, it means that I am absolutely sure.  It means I am
17   convinced.  It means my gut tells me it is good.  It is your
18   definition.  It does not mean, and I think I am safe to say
19   this, that I prove it to you beyond all doubt whatsoever.
20   Because I don't think there is anything I could ever prove to
21   you beyond all doubt whatsoever.  If I were to ask you,
22   though, what do you think beyond a reasonable doubt means?
23        PROSPECTIVE JUROR:  I think it is like you said,
24   that I am confidence in the evidence you presented.
25        MS. HANDLEY:   You are confident?

142

1    PROSPECTIVE JUROR:  I am confident in my
2    decision.
3         MS. HANDLEY:   And again that's a burden I carry,
4    they have no burden.  They don't have to prove anything in
5    this case.  Something that goes along with that, they don't
6    have to prove anything.
7         If a defendant elects to testify, I am sure you heard of
8    your Fifth Amendment right to remain silent.  Basically what
9    at that means is if an individual chooses to testify, a
10   defendant, then you listen to that person's testimony and you
11   assess that person's credibility as you would any other
12   witness in a case.  You could choose to believe all none or
13   some of what they say.  That's fine because they have taken
14   the stand and they put it in issue.  However, if an individual
15   elects to exercise that constitutional right and not testify,
16   the Judge will tell you that you may not use that as evidence
17   against him.  Is that a law you believe you could follow?
18        PROSPECTIVE JUROR:  Yes, ma'am.
19        MS. HANDLEY:   Your Honor, may we have a
20   three-minute break?
21        THE COURT:   You may.
22        You may step down Mr. McGinnis.
23        (Prospective juror retired from the courtroom.)
24        (You may be seated.)
25        (Court recessed for the day.)

143

1    THE STATE of TEXAS )
2    COUNTY of DALLAS  )
3         I, BELINDA G. BARAKA, Official Court Reporter in and
4    for the 194th Judicial District Court of Dallas County, State
5    of Texas, do hereby certify that the foregoing contains a true
6    and accurate transcription of all portions of evidence and
7    other proceedings requested in writing by counsel for the
8    parties, to be included in this volume of the Reporter's
9    Record, in the above-styled and -numbered cause(s), all of
10   which occurred in open court or in chambers and were reported
11   by me.
12        I further certify that this Reporter's Record of the
13   proceedings truly and correctly reflects the exhibits, if any,
14   admitted by the respective parties.
15        I further certify that the total cost for the
16   preparation of this Reporter's Record  was paid by the
17   State/Defense.
18        WITNESS MY OFFICIAL HAND this the 30th day of
19   May      , A.D., 2009.
20
21
22        BELINDA G. BARAKA, CSR #5028
23        Official Court Reporter
24        133 N. Industrial
          Dallas County, Texas 75207
25   Certification Expires:  12-31-09