1          CAUSE NO. F07-50318-M

2    THE STATE OF TEXAS          *     IN THE DISTRICT COURT

3    vs.                         *     194TH JUDICIAL DISTRICT

4    WESLEY LYNN RUIZ            *     DALLAS COUNTY, TEXAS

5

6

7    - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9                       REPORTER'S RECORD

10                  VOIR DIRE EXAMINATION

11                 Volume 36 of 59 Volume(s)

12

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19        BE IT REMEMBERED THAT on this the 12th day of March,

20   A.D, 2008, the above-styled and -numbered cause(s) came on for

21   hearing before the HONORABLE ERNEST B. WHITE, III of the 194th

22   Judicial District Court of Dallas County, State of Texas, the

23   following is a true and correct transcription of the

24   proceedings had, to-wit:

25     (Proceedings Reported by Computerized Machine Shorthand)

_Belinda G. Baraka, Official Court Reporter_
_214-653-5803_

1                    A P P E A R A N C E S

2

3     HON. ANDY BEACH
      Assistant District Attorney
4     State Bar No. 01944900

5

      HON. ANDREA HANDLEY
6     Assistant District Attorney
      State Bar No. 08898800

7

8     HON. MARSHALL MCCALLUM
      Assistant District Attorney
9     State Bar No. 24027485

10                              FOR THE STATE OF TEXAS

11

12    HON. PAUL BRAUCHLE
      Attorney at Law
13    State Bar No. 02918000

14

15    HON. WILLIAM "KARO" JOHNSON
      Attorney at Law
16    State Bar No. 10804500

17                              FOR THE DEFENDANT

18

19

20                         *   *   *   *   *

21

22

23

24

25

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

3

```
 1                      I N D E X
 2                                        PAGE/VOL.
 3   Proceedings - 03/12/08 ......................... 5/36
 4   JAMES GAGE
 5   Voir Dire Examination - Ms. Handley ..............    5
 6   Voir Dire Examination - Mr. Brauchle ..............   48
 7   State's Acceptance of Juror ......................  112
 8   Defense's Challenge ..............................  112
 9   Challenge Denied .................................  112
10   Defense's Request for Additional Strike ...........  112
11   Request Denied ...................................  112
12   Juror Accepted ...................................  113
13   LAURA WORSHAM
14   Voir Dire Examination - Ms. Handley ..............   61
15   Voir Dire Examination - Mr. Brauchle ..............   77
16   State's Acceptance of Juror ......................   84
17   Defense's Challenge ..............................   84
18   Challenge Denied .................................   85
19   Defense's Request for Additional Strike ...........   85
20   Request Granted ..................................   85
21   Defense's Pre-emptory Challenge ..................   85
22   CORINE HARTGRAVE
23   Voir Dire Examination - Mr. Beach ................   86
24   Voir Dire Examination - Mr. Johnson  ..............  103
25   State's Acceptance of Juror ......................  110
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                        I N D E X

 2                                                 PAGE/VOL.

 3   CORINE HARTGRAVE (Cont.)

 4     Defense's Challenge .............................. 110

 5     Challenge Denied ................................. 111

 6     Defense's Request for Additional Strike ........... 111

 7     Request Granted .................................. 111

 8     Defense's Pre-emptory Challenge .................. 111

 9   CURTIS CANNADY

10     Voir Dire Examination - Ms. Handley................ 113

11     Voir Dire Examination - Mr. Brauchle .............. 140

12   MACEY CONRADT

13     Voir Dire Examination - Mr. Beach ................ 157

14     Voir Dire Examination - Mr. Brauchle ............. 183

15

16   Reporter's Certificate ........................... 198
```

```
17

18

19

20

21

22

23

24

25
```

5



6

1    P R O C E E D I N G S
2    (March 12, 2008)
3    THE BAILIFF:   All rise for the juror.
4    (Prospective juror entered the courtroom.)
5    THE COURT:   You may be seated.
6    Good morning Mr. Gauge?
7    PROSPECTIVE JUROR:   Good morning.
8    THE COURT:   How are you doing today?
9    PROSPECTIVE JUROR:   Great.
10    THE COURT:   The attorneys have some questions
11    to ask you concerning your qualifications as a juror in this
12    case.  There aren't any right or wrong responses to the
13    questions.  They are merely trying to see how you feel about
14    certain issues.
15    What says the State?
16    MS. HANDLEY:   The State is ready, Your Honor.
17    May it please the Court.
18    JAMES GAGE
19    was called as a prospective juror, after having been
20    previously sworn by the Court, testified under oath as
21    follows:
22    VOIR DIRECT EXAMINATION
23    BY MS. HANDLEY:
24    Good morning, Mr. Gage, appreciate you being here to talk
25    to us.  My name is Andrea Handley.  I work with Marshall

1    McCallum and Andy Beach.  We are all Assistant District
2    Attorneys, and we are in charge of selecting the jury for this
3    particular case.
4    To my left is Karo Johnson and Paul Brauchle.  They are
5    defense attorneys here in Dallas, and they represent the
6    defendant seated at the end of the table, Wesley Ruiz.
7    THE DEFENDANT:   Good morning.
8    PROSPECTIVE JUROR:   Good morning.
9    MS. HANDLEY:   Mr. Gage, let me tell you what we
10    are doing here.  As you recall we took weeks of bringing down
11    people to come in this courtroom and fill out this 18-page
12    questionnaire in anticipation of selecting a jury.  Since that
13    time, believe it or not, we have read all those
14    questionnaires.  We have gone through and we pulled out a
15    select number of people based on their answers and
16    representation to bring down and talk to now one-on-one about
17    the death penalty.  Feel you out a little bit more about how
18    you feel about it, talk to you about the criminal justice
19    system and specifically how exactly a death-penalty case
20    works.
21    PROSPECTIVE JUROR:   Uh-huh.
22    MS. HANDLEY:   What is important today, Mr. Gage,
23    is your opinion.  I think it is fair to say that I and my
24    colleagues as representatives of the State, how we feel about
25    this case, what we think should happen is entirely different

7

8

1    from their feelings on this side of the courtroom over here.
2    That and a buck fifty will get you a cup of coffee downstairs.
3    What we feel today is not important what Mr. Gage feels today.
4    Obviously there are no right or wrong answers.  We don't want
5    you to tell us something you think we need to hear, okay?
6    PROSPECTIVE JUROR:   Okay.
7    MS. HANDLEY:   And I think you can appreciate the
8    seriousness of this case, it doesn't get anymore serious than
9    life or death?
10    PROSPECTIVE JUROR:   No, it doesn't.
11    MS. HANDLEY:   And I can see that you already
12    look thoughtful about that, and your mind is in the right
13    place.
14    I think you have served before on a jury?
15    PROSPECTIVE JUROR:   Yes, I have.
16    MS. HANDLEY:   You have had an opportunity to
17    read over the questionnaire back there, sir?
18    PROSPECTIVE JUROR:   Yes, I did.
19    MS. HANDLEY:   Would you change anything, if you
20    had to fill it out, would you change anything, expand on
21    anything, I know we put you on the spot, put you in that
22    uncomfortable chair and ask you to fill it out.  Probably not
23    the best environment to really get your feelings on it.
24    Anything you want to add to that or tell us about?
25    PROSPECTIVE JUROR:   Only one thing, I think the

1    questionnaire was very intense, it became quite tedious toward
2    the end.  I reviewed it fairly carefully this morning, I think
3    my general opinion that I put down there has not changed.  I
4    did notice that I was a little harsh toward attorneys.
5    MS. HANDLEY:   That's --
6    PROSPECTIVE JUROR:   And I begin to realize this
7    morning, we are dealing with a criminal case and not a civil
8    case.  And I guess I watch too much Denny Crane.  I apologize
9    to the defense lawyers for my comment there.
10    MS. HANDLEY:   I can assure you that they have
11    been called worse probably by me.  No, that's fine?
12    PROSPECTIVE JUROR:   Other than that, I think I
13    am pretty good with that.
14    MS. HANDLEY:   Okay.  Great then.  And I will
15    tell you, Mr. Gage, reading from your questionnaire, and I
16    appreciate your comments there about attorneys, but reading
17    from your questionnaire, one of the reasons we brought you
18    down is because we think you are kind of middle of the road.
19    If you were a person who said anybody who ever commits a
20    murder ought to be put to death, you wouldn't be sitting here
21    today.  You would be too extreme.  If you were a person who
22    said I could never assess the death penalty, couldn't do it,
23    you wouldn't be here today.  We are looking for individuals
24    who kind of have an appreciation where it is not an easy black
25    or white issue, and that everything needs to be taken into

9

1  account in assessing the evidence in a case like this. And in
2  particular in coming up to your conclusion as to whether or
3  not a life sentence without parole or a death sentence is more
4  appropriate.
5         PROSPECTIVE JUROR:   Absolutely. It is various
6  shades of gray.
7         MS. HANDLEY:   Yes, sir, it is.
8         PROSPECTIVE JUROR:   I am an engineer, and for
9  engineers, I prefer black or white. But certainly in cases
10  like this.
11        MS. HANDLEY:   It won't be like that. I don't
12  know it will be like that for you. It is something that you
13  have to get through those shades of gray.
14        Have you always felt this way about the death penalty.
15  Was there one particular event that shaped your opinion?
16        PROSPECTIVE JUROR:   No. I think I always felt
17  that the death penalty is absolutely justified in certain
18  cases. But so many extenuating circumstances, you really have
19  to judge each case depending, you know on the circumstances.
20        MS. HANDLEY:   And I think it is fair to say that
21  you hit the nail on the head. It is always a case-by-case
22  situation. It never neatly fits into one category or another.
23  Let me just tell you a little bit more just so we can again
24  make sure we are all on the same sheet of music here.
25        I think you get a good feel, you know, we have one goal

10

1  in mind here as representatives of the State, Mr. Gage, so
2  there is no mistake about it, our single goal in this case is
3  not only receive a conviction of finding the defendant guilty
4  of capital murder, but to ultimately see him strapped to a
5  gurney someday in Huntsville, Texas receiving a lethal
6  injection. That's our goal just so you know that we are not
7  going to change our mind and that we are serious about that.
8  That is where we are coming from today and will until the
9  ultimate conclusion of this case.
10        If that happens, Mr. Gage, if we receive that conviction
11  and that assessment of the death penalty, what will happen is
12  the defendant will be transferred out to Livingston, Texas,
13  that's out in East Texas near Huntsville. Have you ever been
14  out there?
15        PROSPECTIVE JUROR:   I was born and raised in
16  East Texas.
17        MS. HANDLEY:   What part?
18        PROSPECTIVE JUROR:   Cartage.
19        MS. HANDLEY:   Did you ever take any kind of tour
20  our walk through Huntsville?
21        PROSPECTIVE JUROR:   No. I have been by.
22        MS. HANDLEY:   And you are probably familiar that
23  Huntsville is a town dedicated to the study of criminal
24  justice and housing of inmates and where we carry out our
25  executions. Given a death penalty for the defendant, that's

11

1  where he is going to be housed there, Livingston, Texas, sits
2  outside of Huntsville, until a date that is set by the Judge.
3  He sits there, the day before actually, he will be transferred
4  from Livingston, Texas to downtown Huntsville, Texas. There
5  is an old prison there called the Walls Unit, that's where
6  they carry out the execution.
7         He will be put in an isolated cell, close proximity to
8  that death chamber on the day before. The day of his
9  execution, he will have one last opportunity to have
10  visitation with family, spiritual advise sore if he so
11  incline. But he will get that one last visit. He will also
12  get that famous last meal that you sometimes hear about on TV
13  and movies. And as long as what he wants, as long as it is on
14  the menu for TDC.
15        He will sit there and wait until six o'clock at night,
16  because that's when we carry out our actual execution. Come
17  that time, Mr. Gage, there are going to be some individuals
18  that are going to take him from that isolated cell down the
19  narrow hallway to the death chamber. Whether he goes
20  voluntarily or kicking and screaming, he is going to go,
21  that's what these people do for a living is to insure the
22  delivery of him into that room. He will be taken into that
23  room. It is a small room, very industrial and cold and
24  sterile. And in the middle of it is a gurney, a hospital bed.
25  And they will strap him down to that gurney, again whether he

12

1  likes it or not.
2         In that room, Mr. Gage, there are also two windows on the
3  side and they have curtains over them. And after he is
4  strapped down, these curtains will open up. And on one side,
5  he can have five representatives from his family or his
6  lawyer, whoever he chooses. On the other side, there are
7  going to be five representatives from the victim's family.
8  And they will be able to sit there and watch the defendant at
9  that time.
10        He will be given a chance to make the last statement that
11  we always hear about. And I am sure you can imagine many
12  thing have been said over the many years that this has been
13  going on. Everything from I'm sorry for what I have done to I
14  want everybody to know that you are killing an innocent man.
15  Anything can be said at that point. But regardless of what he
16  says, it is going to happen.
17        When he is strapped down, there is an individual that
18  will put an intravenous line into his arm and then strap his
19  arm down. After he has finished making that last statement,
20  the warden is going to give a nod to somebody, he is going
21  start to hit a series of buttons, designed to do three things,
22  the first thing -- chemical starts to flow into his arm. The
23  first thing it does is sedates him. Knocks him out so he
24  can't move. The second thing that happens is it collapses his
25  lungs so he can no longer breathe. Finally, the third thing

13

1   is designed to do, it ceases and stops his heart.  These
2   chemicals flow, six, eight seconds, as long as it takes until
3   the doctor pronounces him dead.
4        I don't walk you through that to be morbid.  But we are
5   in a sterile courtroom right now and we are all being
6   relatively friendly to each other, to tell you that to put in
7   your mind the picture of what we are asking you to play a part
8   in?
9             PROSPECTIVE JUROR:   I understand, you painted
10  a very graphic picture.
11            MS. HANDLEY:   Okay.  Good then.  Knowing that,
12  having that graphic picture, sir, and knowing your feelings on
13  the death penalty and what you are and are not capable of, do
14  you believe that you are the kind of person that can take part
15  in a process such as that.  We are not talking about the
16  execution of a fictional character, but a man who is seated
17  about 30 feet away from you?
18            PROSPECTIVE JUROR:   Yes, I can.
19            MS. HANDLEY:   Okay.  And again, I appreciate you
20  being thoughtful about that.  I will tell you of the people
21  who have already been selected, nobody has been entirely
22  comfortable with the thought.  And if you were, I think it
23  would kind of give us all a red flag.  So I appreciate that.
24        Let me go on and talk to you a little bit about the
25  process.  About the laws that apply in this criminal case.

14

1   And then more particularly what applies in a death-penalty
2   case.
3        We had asked your opinion as to what crimes you thought
4   the death penalty should be available as an option.  And you
5   had put down in your questionnaire there, first degree,
6   intentional premeditated, fully cognizance of action.  I will
7   tell you that the death penalty is not an available option for
8   all murder cases.  It is actually a very select number of
9   cases to which the jury has an option.  Again, it is always an
10  option.  It is never automatic.
11       The types of cases where it is an option is for example
12  the murder of a police officer in the line of duty.  The
13  murder of a child six years of age or younger.  The murder of
14  an individual 65 years of age or older.  The murder of two or
15  more people during the same criminal episode.  You hear about
16  serial criminals.
17       The most classic example we often see is a situation
18  where the individual goes into a convenience store with intent
19  of robbing the store and in the process murders the clerk.  So
20  a murder during the commission of a felony offense is also a
21  crime to which the death penalty could be an option.  Robbery,
22  murder during rape, murder during kidnapping, those are the
23  types of crimes, murder of a prison guard during an attempted
24  escape from prison, those are the crimes that would become an
25  option to the jury.

15

1        If I were sitting here right now, Mr. Gage, and I pulled
2   a gun out of my briefcase and I turned to my colleague who is
3   minding his business and just shot him in the head and blew
4   his brains out and stood up and laughed about it and kicked
5   his body a couple of times and danced around, I think you
6   would agree that it is a particularly heinous murder, is it
7   not?
8             PROSPECTIVE JUROR:   I would assume.  He
9   seems like a nice guy.
10            MS. HANDLEY:   And he is a nice guy.  And that
11  would be an intentional murder, Mr. Gage.  But I will tell you
12  what, the death penalty would not be an option available to
13  the jury in my trial.  I could get life imprison, but not the
14  death penalty, because Mr. Beach at this point, he is not one
15  of those protected class, he is not falling within that
16  limited class of cases to which the death penalty can apply.
17       Does that make sense to you?
18            PROSPECTIVE JUROR:   Yes, I think so.
19            MS. HANDLEY:   If you would, let's say you are
20  the legislature for a day and you could change the law, do you
21  think that you would change the laws to which the death
22  penalty is an available option for jurors?
23            PROSPECTIVE JUROR:   As you have explained
24  them, and as I understand them, no.  I think I agree.  I think
25  there should be some knowledgeable group who makes those

16

1   decisions instead of them being made, you know, on a
2   case-by-case, emotional-type basis.
3             MS. HANDLEY:   Okay, very well then.  And before
4   I talk more specifically about the death penalty in a capital
5   murder case, I will back up a little bit and tell you, you
6   know we got our capital murder cases, and then we got for lack
7   of a better word, sir, our regular murder cases.  That being
8   shooting my colleague, a regular murder case, not a capital
9   murder case.  In a capital, a jury is left with one or two
10  choices ultimately on what they are going to do with the
11  defendant.  And that is either give him life imprison without
12  parole or the death penalty.
13            PROSPECTIVE JUROR:   So this will be our option
14  here?
15            MS. HANDLEY:   Yes.  In a capital murder case,
16  one of two things is going to happen, life imprison without
17  parole or the death sentence.  In a regular murder, and again
18  I say regular for lack of a better word, in a regular murder,
19  it is entirely different with respect to the change of the
20  punishment.
21       In your particular case, sir, were you called upon to
22  assess punishment when you sat as a juror?
23            PROSPECTIVE JUROR:   Yes.
24            MS. HANDLEY:   You probably remember that and you
25  did find him guilty and assess a punishment; is that correct?

1      PROSPECTIVE JUROR:   Yes, we did, yeah.
2      MS. HANDLEY:   You are ten steps ahead of the
3  game then.  You remember then after you found him guilty, the
4  Judge gave to you a wide range of punishment to look at in
5  assessing what to do?
6      PROSPECTIVE JUROR:   Nothing personal, but it
7  was a her.
8      MS. HANDLEY:   She did, I'm sorry.
9      PROSPECTIVE JUROR:   I think we had
10  manslaughter, unintentional, we had several options from which
11  to choose and we based that on the evidence given the trial.
12      MS. HANDLEY:   Precisely.  And that not being --
13  manslaughter not being a first-degree murder, your range of
14  punishment did not go all the way to life.
15      PROSPECTIVE JUROR:   No, no.
16      MS. HANDLEY:   I would imagine, because it is not
17  a first-degree intentional murder.  You found that somebody
18  was killed recklessly in that case, I believe?
19      PROSPECTIVE JUROR:   Yes.
20      MS. HANDLEY:   And you understand, and I believe
21  you already have an appreciation, you based your punishment
22  sentence in that case on the evidence of that particular
23  offense?
24      PROSPECTIVE JUROR:   Yes.
25      MS. HANDLEY:   And had you believed based on the

1  evidence, for example, that a minimum sentence was
2  appropriate, I am sure that would have been the thing that you
3  would have done, if you felt that was going to be done.  And
4  had you felt based on the evidence in that case that a maximum
5  sentence was appropriate, that's what you would have done in
6  that case.
7      PROSPECTIVE JUROR:   Uh-huh.
8      MS. HANDLEY:   But ultimately you gave the
9  punishment within that range that you felt appropriate for
10  that case?
11      PROSPECTIVE JUROR:   Yes.
12      MS. HANDLEY:   So I am sure you can already agree
13  that in order to be a qualified juror, you have to base your
14  verdict on the evidence in the case.  And wherever it lands
15  within that range of punishment, that is what you do, be it
16  the minimum sentence or the maximum sentence?
17      PROSPECTIVE JUROR:   (Nods head).  So in this
18  particular trial, will we -- will the jury --
19      MS. HANDLEY:   This is going to be different.
20  And that's just stepping back away to talk to you briefly
21  about a regular murder.  We are not talking about a regular
22  murder in this case.  If for some reason, you know, it is just
23  to test your qualifications if that were the situation there.
24     We are talking about a capital murder, though.  And I am
25  going to go again through briefly with you the fundamental

---

19

1  propositions of law that come to play in any criminal case.
2  And this is probably going to sound very familiar to you.  But
3  again, tests on your qualifications to sit as a juror in this
4  particular case.  Through all criminal cases, be it theft of a
5  loaf of bread up to capital murder, the trial that you sat on,
6  certain rules of law came into play.  I am sure that you took
7  your oath as a juror, you agreed to follow the law, and you
8  agreed to base your sentence on the evidence in the case and
9  nothing else, correct?
10      PROSPECTIVE JUROR:   Sure.
11      MS. HANDLEY:   We as the State of Texas are
12  obligated to find the defendant -- to prove to you the
13  defendant is guilty beyond a reasonable doubt.  We have to
14  prove each and every element of the offense.  It is set out in
15  the indictment.
16     I think you have a copy of it right there in front of
17  you.
18      PROSPECTIVE JUROR:   Uh-huh.
19      MS. HANDLEY:   And I will paraphrase for you.  We
20  are obligated to prove to you that the defendant, on or about
21  a certain date, in Dallas County, Texas, did intentionally and
22  knowingly cause the death of this peace officer, knew he was a
23  peace officer in the line of duty, and he did it by shooting
24  him with a firearm.  No element is more important than the
25  other.  And we have to prove all the elements.  We don't get

20

1  points for five out of six.  We have to prove them all to you.
2  And the Judge would instruct you what is important in
3  recognizing that every element stands on its own and every
4  element is just as important as the other, correct, sir?  So
5  if I fail to prove any one of those elements beyond a
6  reasonable doubt, the Judge would instruct you that you must
7  return a verdict of not guilty.
8     And you understand that law and that's a law that you
9  would agree and follow also?
10      PROSPECTIVE JUROR:   Yes.
11      MS. HANDLEY:   And just for example, completely
12  out there example, let's say I put my case on, I prove to you
13  beyond a reasonable doubt that the defendant did kill and
14  murder a police officer in the line of duty.  But let's say
15  for example I haven't offered a thread of evidence that it
16  happened in Dallas County.  But instead I showed you that it
17  happened in Tarrant County.  You agree with me, sir, that
18  Dallas County is an essential element of the indictment, is it
19  not?
20      PROSPECTIVE JUROR:   Yes.
21      MS. HANDLEY:   If I failed to prove that to you,
22  sir, the Judge would instruct you that you must return a
23  verdict of not guilty.
24      PROSPECTIVE JUROR:   I understand.
25      MS. HANDLEY:   And is that something that you

21

22

1   would and would do you would agree to follow that law?
2          PROSPECTIVE JUROR:   Yes, I would.
3          MS. HANDLEY:   You also recognize, I am sure,
4   that the indictment in this case is merely a piece of paper,
5   it tells me what I have to prove.  It tells the defendant what
6   he is charged with.  The Judge will instruct you that it is in
7   no way to be considered as a piece of evidence against the
8   defendant.  You can't say where there is smoke, there is fire.
9   He was indicted, so I am going to consider that as evidence of
10  his guilt.  Merely a piece of paper.
11         Is that a law that you could also follow and would agree
12  to follow in this case?
13         PROSPECTIVE JUROR:   Yes.
14         MS. HANDLEY:   You recognize also as a
15  representative of the State, I brought the charges, I ought to
16  have to do the proving.  And that is the law.  You always look
17  to this side of the table for your proof.  You never look to
18  that side over there to offer anything.  They could,
19  figuratively speaking, sit there and play cards if they want
20  to.  I don't think they will.  I know these gentleman and they
21  are very talented attorneys.  But figuratively, they wouldn't
22  have to do anything, you always look to the State to bring the
23  evidence.
24         PROSPECTIVE JUROR:   Until proven guilty.  And
25  you have the burden of proof?

1          MS. HANDLEY:   Yes, I do.  And it always stays
2   here, doesn't it?  And the law states that until I prove this
3   case beyond a reasonable doubt, as the defendant sits here
4   today and until I prove to you otherwise, you are to presume
5   him innocent.
6          Is that a law that you would also agree to follow?
7          PROSPECTIVE JUROR:   Yes.
8          MS. HANDLEY:   Proving this case to you beyond a
9   reasonable doubt.  I am sure you can appreciate that's our
10  highest burden of proof in the justice system?  Not shadow of
11  a doubt, not clear and convincing evidence, not preponderance
12  of the evidence, but beyond a reasonable doubt, the highest
13  burden of proof in our system.  There is no definition of
14  reasonable doubt, Mr. Gage.  It is whatever you think it is.
15  Some people say I have to be sure.  Some people have said it
16  has to be a decision that I could sleep with knowing that I
17  have done the right thing, then I would know that you were
18  guilty beyond a reasonable doubt.
19         But let me throw it back at you and ask you what do you
20  think beyond a reasonable doubt, Mr. Gage?
21         PROSPECTIVE JUROR:   You have evidence.  You
22  have physical evidence.  You have eyewitness evidence.  You
23  have recorded evidence.  And you have met all the requirements
24  as you stated earlier.
25         MS. HANDLEY:   And you understand, Mr. Gage, I

23

24

1   could put anybody on that stand and they could say, you know,
2   I was there and I saw it.  But your obligation as a juror as
3   you know is to assess the credibility of that witness.  Just
4   because you are under oath, you know, doesn't mean that you
5   are telling the truth, does it?
6          PROSPECTIVE JUROR:   That's true.
7          MS. HANDLEY:   And you would agree that you are
8   going to assess the credibility of each witness as they take
9   the stand and offer proper testimony.
10         And speaking of testimony, as I am sure you are familiar
11  with, the defendant has a right not to testify in his criminal
12  trial, it's that Fifth Amendment right to remain silent.  The
13  law says that if any defendant, you enjoy the right, I enjoy
14  the right, any defendant elects not to testify in a case
15  against him, that you as a juror may not use that as evidence
16  at his trial.
17         Is that a law --
18         PROSPECTIVE JUROR:   No, that is his choice.
19         MS. HANDLEY:   And you will agree to follow that
20  law and not hold it against him?
21         PROSPECTIVE JUROR:   Uh-huh.
22         MS. HANDLEY:   If I failed to prove it beyond a
23  reasonable doubt, and the defendant didn't testify, you
24  wouldn't use that to get me over my hurdle, would you?
25         PROSPECTIVE JUROR:   No.

1          MS. HANDLEY:   Those are propositions of law,
2   sir, that come into play in any criminal case that you may be
3   called upon to sit in.  Be it theft of bread or capital murder
4   case.
5          If I present all my evidence to you and you believe I
6   have proved my case beyond a reasonable doubt, then you are
7   obligated as a juror so return a verdict of guilty of capital
8   murder.
9          Is that something that you would also do, sir?
10         PROSPECTIVE JUROR:   Yes, I could.
11         MS. HANDLEY:   Let's talk about the second phase
12  of the trial.  Now, in a capital murder case, entirely
13  different from a capital murder case that you sat on or a
14  regular murder, if you will.  A lot of people come in here
15  believing that if an individual is found guilty of capital
16  murder, that means that they will automatically receive a
17  sentence of death, or the death penalty.  And in fact, it does
18  not work that way at all.  We again call upon our jurors to
19  look at the information in the case.  Look at the facts and
20  determine whether or not that is the appropriate thing to do
21  for this particular case.  What you don't do is, is you don't
22  go back there and discuss with the other jurors what do we
23  think is better, life or death.  That is not how you come up
24  with your ultimate verdict.  Instead of what you do is you
25  answer a series of questions.  And then based on the answers

25

1 to the questions, that will determine whether or not he
2 receives the death penalty or whether or not he receives life
3 imprison.
4      You with me so far?
5           PROSPECTIVE JUROR:   How are these question,
6 are we given a form, each juror is --
7           MS. HANDLEY:   You are absolutely given that
8 particular question in writing.  And you sit down collectively
9 and discuss and deliberate on what the answer to that question
10 is?
11           PROSPECTIVE JUROR:   So we do this together as
12 a jury?
13           MS. HANDLEY:   Yes, sir, you do.  You always do
14 your deliberations together.  But you get there by answering
15 questions, and that will ultimately determine what happens.
16      Now, understanding again he is guilty of capital murder.
17 And again there are only two potential verdicts, correct?
18           PROSPECTIVE JUROR:   Okay.
19           MS. HANDLEY:   Life imprison without parole or
20 the death penalty?
21           PROSPECTIVE JUROR:   But we are definitely given
22 the option if we fine the defendant guilty of the charge, then
23 it is up to the jury to make the decision between death
24 sentence and life imprisonment?
25           MS. HANDLEY:   That's correct.  It will only be

26

1 one of two choices what is going to happen.  And the way you
2 get to the decision is by answering questions and I will talk
3 to you about that in a second.
4           PROSPECTIVE JUROR:   Good.
5           MS. HANDLEY:   The best this defendant is ever
6 going to get, sir, is what?
7           PROSPECTIVE JUROR:   Life imprison.
8           MS. HANDLEY:   Correct.  That's the best he is
9 ever going to get.
10           PROSPECTIVE JUROR:   If he is found guilty.
11           MS. HANDLEY:   If he is found guilty, yes, sir.
12 And we are talking under the assumption that he has been found
13 guilty, okay.  The best he is ever going to get is life
14 imprison.  As I said, the way it can be elevated to death is
15 on whether or not we bring you sufficient evidence and whether
16 or not we can prove to you beyond a reasonable doubt that he
17 ought to receive death.  That's our obligation.
18           PROSPECTIVE JUROR:   Good.
19           MS. HANDLEY:   Because as you can fully
20 appreciate we are asking a whole lot of you.
21           PROSPECTIVE JUROR:   I am going to ask a whole
22 lot of you to prove that.
23           MS. HANDLEY:   And you should.  If we are going
24 to ask you to take part in sentencing somebody to death, then
25 we darn well ought to prove to you that it is the right thing

27

1 to do for the particular case, correct?
2           PROSPECTIVE JUROR:   Correct.
3           MS. HANDLEY:   Remember the defendant had a
4 presumption of innocence in the first part of the trial until
5 I proved to you beyond a reasonable doubt that he was guilty.
6 There is another presumption now that goes into play in the
7 second part of the trial, okay.  You are to go into the second
8 part of the trial presuming that the most appropriate thing to
9 do is to give him life imprison.  He has already earned that,
10 right.  And you are to go in presuming that it should stay at
11 life imprison.  And you continue to presume that life is the
12 most appropriate thing to do until I prove to you beyond a
13 reasonable doubt that it is not.
14      You with me so far?
15           PROSPECTIVE JUROR:   Uh-huh.
16           MS. HANDLEY:   The way we do that is by having
17 you answer a question.  And I am going to call your attention
18 up there, see where it says special issue.  Go ahead and read
19 that first one to yourself there.
20           PROSPECTIVE JUROR:   (Juror complies.)
21           MS. HANDLEY:   Okay.  Okay.  Now, we did not
22 write that question here at the Dallas D.A.'s office or the
23 attorneys over here.  That's written by the legislature.  And
24 it is a question that you are called upon to answer as a juror
25 in a capital murder case.  And we refer to that question as

28

1 the future dangerousness question.
2      Would you agree with me that it is essentially asking you
3 do you believe the defendant is going to be a future danger?
4 You think that's basically what it is asking you?
5           PROSPECTIVE JUROR:   Sure.
6           MS. HANDLEY:   Okay.  And keeping in mind at this
7 point, where is he going to be for the rest of his life at
8 this point?
9           PROSPECTIVE JUROR:   Which brings up a question,
10 is he eligible for parole, if we --
11           MS. HANDLEY:   It is life imprison without
12 parole.  If you are found guilty of capital murder, you will
13 either receive live imprison without parole or you will
14 receive the death sentence.
15      Does that answer your question?
16           PROSPECTIVE JUROR:   Okay.
17           MS. HANDLEY:   So going into this question on
18 whether he is going to be a future danger to society, where is
19 he going to be rest of his life?
20           PROSPECTIVE JUROR:   Without parole.
21           MS. HANDLEY:   He is going to be in prison, isn't
22 he.  And they don't give you definitions to these certain
23 terms in these questions, sir, we have already talked about
24 reasonable doubt, do you find from the evidence beyond a
25 reasonable doubt, and we know that goes to my burden of proof,

1  correct?
2          PROSPECTIVE JUROR:  Yeah.
3          MS. HANDLEY:  That I have to prove to you that
4  he is going to be a future danger.  That there is a
5  probability that he will commit criminal acts of violence that
6  will constitute a continuing threat to society.  When I say
7  society, when you say society, what do you think of?
8          PROSPECTIVE JUROR:  I think of you and me and
9  people walking around on the streets, I don't necessarily
10  think of his prison inmates.  I guess one should.
11         MS. HANDLEY:  Absolutely.
12         PROSPECTIVE JUROR:  You should.
13         MS. HANDLEY:  Our society is going to the
14  grocery store and coming here and walking in the streets and
15  such as that.  But the rest of his life is going to be served
16  in prison, correct.  So is it fair to say that, you know, who
17  else is in prison besides prisoners, sir?
18         PROSPECTIVE JUROR:  The guards and the
19  warden.
20         MS. HANDLEY:  Administration, doctors, nurses,
21  educators, people that come for visitation.  Is it fair to say
22  that it is a society in and of itself?
23         PROSPECTIVE JUROR:  I would say it is, yes.
24         MS. HANDLEY:  And would your definition of
25  society as a whole, part of what we are in, would it be broad

1  enough to also encompass that prison could be a society within
2  that society?
3          PROSPECTIVE JUROR:  Certainly.  I see where you
4  are going, obviously it would.
5          MS. HANDLEY:  That's where we are talking about,
6  he is in prison now, that's his society, and we are asking you
7  to answer the question, is there a probability that he will
8  commit criminal acts of violence in that society?
9          They don't define probability for you either, Mr. Gage.
10  I think you will appreciate or agree with me that there is a
11  difference between a possibility and a probability, would you
12  not?  Anything is possible, isn't it?
13         PROSPECTIVE JUROR:  On TV anything is possible
14  and it happens all the time.
15         MS. HANDLEY:  As outlandish as it might sound, I
16  could possibly win an Olympic Gold for a marathon, I can't
17  walk up a flight of stairs without getting winded.  Anything
18  is possible.
19         PROSPECTIVE JUROR:  Sure.
20         MS. HANDLEY:  A lot of people have told us that
21  it is more likely than not.  Or it means to them greater than
22  50 percent chance that that's what probability means to them.
23         What would you say that probability is?
24         PROSPECTIVE JUROR:  Past history would play a
25  big part.

31

32

1          MS. HANDLEY:  In answering that question?
2          PROSPECTIVE JUROR:  Which brings my question,
3  I would think probability would of course being an engineer it
4  is always a mathematical probability which doesn't apply here,
5  so I am a little out of my comfort zone.  So I would be
6  concerned with this defendant's previous history prior to this
7  crime and are we going to have accessibility to that.
8          MS. HANDLEY:  Right.  And you are kind of
9  getting a little bit ahead of me.  And that does come into
10  play and that is important in determining whether or not there
11  is a probability he will do these things.  But with respect to
12  is there a probability, that's what I am filling you outs on.
13  What do you think probability means?
14         PROSPECTIVE JUROR:  It could happen, there is a
15  mathematical chance it could happen.
16         MS. HANDLEY:  Would you agree with me that as
17  we step back that there is a mathematical chance that anything
18  is possible, right?  Possibility is even a chance, isn't it?
19         PROSPECTIVE JUROR:  To some extent.  You
20  might look hard enough to find out that something wasn't
21  possible.
22         MS. HANDLEY:  Sure.
23         PROSPECTIVE JUROR:  Like taxes in April is going
24  it happen.
25         MS. HANDLEY:  Sure.  With respect to something

1  being a possibility versus a probability, would you agree with
2  me that a probability is much higher than a possibility?  I
3  see you nodding your head, yes?
4          PROSPECTIVE JUROR:  Yes.
5          MS. HANDLEY:  Does it square with you, that if I
6  were to define it as more likely than not is what a
7  probability is?
8          PROSPECTIVE JUROR:  No.  I don't agree with
9  that.
10         MS. HANDLEY:  Okay, what would you say?
11         PROSPECTIVE JUROR:  I would say a probability is
12  again some percentage of possibility.  It could be a
13  10 percent probability.
14         MS. HANDLEY:  Okay.
15         PROSPECTIVE JUROR:  That the gate is going to be
16  up when I drive out the parking lot and I won't have to pay,
17  but that is not greater than 50 percent.  To me probability is
18  defined by anything from 1 percent up to 99 percent.  Not
19  greater than 50 percent.
20         MS. HANDLEY:  More than a possibility but in
21  terms of, you know, you putting a number on it, you are saying
22  that you still feel like --
23         PROSPECTIVE JUROR:  If you say probability of
24  flipping a coin heads or tails, then certainly the probability
25  of heads would be greater than 50 percent.  If you say getting

33

34

1    one coin to say out of a million, then that is pretty low.
2             MS. HANDLEY:   Yes. I will tell you, Mr. Gage,
3    the law says that a probability must be considered more than
4    50 percent?
5             PROSPECTIVE JUROR:   Okay.  So it is basically a
6    yes and no it will happen, it will not happen a particular
7    thing.
8             MS. HANDLEY:   The law says that a probability is
9    greater than 50 percent.  Can you -- I mean squaring with
10   yourself, can you follow that law and give the definition --
11   define probability then according to law as greater than
12   50 percent?
13           PROSPECTIVE JUROR:   Yes, I can.
14           MS. HANDLEY:   So you could follow that law and
15   find it greater than 50 percent, okay.  Probability the
16   defendant would commit criminal acts of violence.  They do not
17   define for you, sir, what are criminal acts of violence.  They
18   won't say that he will commit another murder.  They don't say
19   that, do you find that he will probably commit a robbery.  He
20   will probably commit an assault.  He will probably commit a
21   kidnapping.  They don't define that for you, again they leave
22   that for you to decide what is a criminal acts of violence.
23      Let's say for example Mr. McCallum sitting here minding
24   his business, let's say I stand up, cold cocked him in the
25   face and knock him tail over end out of his chair; would you

1    agree with me that that might be considered a criminal act of
2    violence?
3             PROSPECTIVE JUROR:   I suppose so.
4           MS. HANDLEY:   And you are kind of laughing, I
5    suppose so?
6             PROSPECTIVE JUROR:   That's borderline, that
7    happens every night in every bar in Dallas.  And in most cases
8    it is not -- it's not considered a criminal act.
9           MS. HANDLEY:   Would you consider it violent?
10          PROSPECTIVE JUROR:   I consider it very violent,
11  yes.
12          MS. HANDLEY:   Would you consider it an assault?
13         PROSPECTIVE JUROR:   Possibly, like you said,
14  depending on the circumstances.
15         MS. HANDLEY:   Depending on the circumstances.
16  And again he is just sitting there minding his own business.
17  He hasn't started trash talking me in a bar.
18         PROSPECTIVE JUROR:   If it is not your husband,
19  then it is assault.
20         MS. HANDLEY:   Okay.  But you are saying that
21  seems to you that that is not really -- it is kind of iffy
22  maybe for you?
23         PROSPECTIVE JUROR:   You know, I would, I guess
24  looking at pragmatically, you say this particular person is in
25  jail and he gets in a little tussle with one of the other

35

36

1    inmates and knocks him down, I wouldn't consider that to be a
2    criminal act of violence.
3           MS. HANDLEY:   You used the term tussle.  Let me
4    go back to what you did bring up.  In order to answer that
5    question, presumably I am going to be bringing you some
6    evidence that you can consider to make your decision on that
7    question.
8           PROSPECTIVE JUROR:   Uh-huh.
9          MS. HANDLEY:   You know, that's my burden of
10  proof to prove to you that the answer to that question is
11  "yes", because I tell you, Mr. Gage, if you answer that
12  question, "yes", he is a future danger to society, his
13  society, then it will elevate that life sentence up to a death
14  sentence?
15         PROSPECTIVE JUROR:   I understand.
16        MS. HANDLEY:   So that's that question we are
17  talking about here.  And I have to prove to you the answer to
18  that question is "yes", and I have to prove that to you beyond
19  a reasonable doubt.  And I have to be the one who brings you
20  evidence to prove that to you.
21      So let's go back to what you were talking about, what
22  kind of things would you need to see, hear, know in order for
23  you to honestly and fairly answer that question, yes or no?
24  What would you be looking for?
25        PROSPECTIVE JUROR:   I would be looking for the

1    evidence in this particular crime and how this particular
2    crime was committed and in -- you know the violence involved.
3    The things that the accused did, you know, during this violent
4    act. And I would certainly want to know history of previous
5    violent acts, behavior, actions.
6           MS. HANDLEY:   Okay.
7          PROSPECTIVE JUROR:   I would want to understand
8    who is this person and you know what is his history.  And how
9    has he behaved throughout his life.
10        MS. HANDLEY:   Sure.  Is this just a one-time
11  anomaly or is this something that nobody is surprised that it
12  led up to this and culminated in this murder.  A lot of people
13  have said sometimes the best predictor of future behavior
14  might be how you have acted in the past.  So you would like to
15  know a little bit about how he has acted from the time that
16  got him up here until the time we are going to sentence him?
17        PROSPECTIVE JUROR:   Sure.
18        MS. HANDLEY:   In answering that question, you
19  may look at the circumstances of the offense of that capital
20  murder, in addition to any other evidence we might bring you.
21  In the first part of the trial, you are considering
22  circumstances of the offense to answer the question of is he
23  guilty of capital murder, correct?
24        PROSPECTIVE JUROR:   Uh-huh.
25        MS. HANDLEY:   Now you may consider the

1  circumstances of the offense to determine whether or not he is
2  a future danger.  And what is important to understand and, I
3  just need to make sure that you are with us on this, you have
4  already found him guilty of capital murder, so that's
5  presumably an intentional murder, correct?  The law states
6  that you do not then automatically say, well, since he is
7  guilty of a capital murder, then automatically the answer to
8  this question is "yes".  You know, now, you are looking at
9  that circumstance again.  But you are looking at it to decide
10  does that mean that that question should be "yes"?  Or is
11  there any other evidence that helps me?
12       So going into that, you find him guilty of intentional
13  murder, would you automatically find that he is a future
14  danger to society?
15            PROSPECTIVE JUROR:   No, no.
16       MS. HANDLEY:   Okay.
17            PROSPECTIVE JUROR:   I don't think so.
18       MS. HANDLEY:   Okay.  You are wanting to look
19  again, re-assess the crime and any other past evidence about
20  his past in answering that question to you?
21            PROSPECTIVE JUROR:   Well, I was going to
22  comment that there are certainly cases where people's intent
23  or people commit, you know a capital offense one time based on
24  the situation as it exists at that moment.  And it's a
25  one-time thing.

1       MS. HANDLEY:   Okay.
2            PROSPECTIVE JUROR:   They haven't before and they
3  wouldn't again.
4       MS. HANDLEY:   Okay.
5            PROSPECTIVE JUROR:   So we need to understand,
6  you know the entire scenario, I think more than just the
7  incident as it occurred.
8            MS. HANDLEY:   Sure.  Sure.  I need to prove to
9  you that it is not a one-time thing and in all probability
10  there are going to be criminal acts of violence and a threat
11  to somebody in society?
12            PROSPECTIVE JUROR:   (Nods head).
13            MS. HANDLEY:   If I prove that to you, Mr. Gage,
14  if you answer that question "yes", as I told you, that that
15  presumption of life is the appropriate thing to do.  That
16  presumption is gone now and that sentence is elevated up to a
17  death sentence.  Are you with me on that?
18            PROSPECTIVE JUROR:   Okay.
19            MS. HANDLEY:   You are not through answering
20  questions, it is not entirely done.  You still have to answer
21  one more question after that.
22            PROSPECTIVE JUROR:   Let me summarize this,
23  though, what you told me.  You said probability, I have to
24  believe that there is greater than a 50 percent probability.
25       MS. HANDLEY:   Yes.

39

40

1            PROSPECTIVE JUROR:   Fifty percent chance,
2  whatever, that he will commit an act of violence, that I
3  believe to be a criminal act of violence?
4       MS. HANDLEY:   Yes, sir.
5            PROSPECTIVE JUROR:   As we discussed, you
6  know, maybe the punching match in the cafeteria or something?
7       MS. HANDLEY:   Uh-huh.
8            PROSPECTIVE JUROR:   May not constitute in my
9  mind a criminal offense?
10       MS. HANDLEY:   That's correct.
11            PROSPECTIVE JUROR:   Okay.  So you have -- you
12  have to show me evidence that would convince me to believe
13  greater than a 50 percent probability that he will do
14  something pretty violent, you know, he would do a criminal
15  type.
16       MS. HANDLEY:   And pretty violent is your
17  definition.
18            PROSPECTIVE JUROR:   Is my definition.
19       MS. HANDLEY:   Is that what you are saying, you
20  are looking for something that would be pretty violent?
21            PROSPECTIVE JUROR:   Yes.
22       MS. HANDLEY:   What do you think would be pretty
23  violent?
24            PROSPECTIVE JUROR:   Well, back to television,
25  stab an inmate.

1       MS. HANDLEY:   Okay.
2            PROSPECTIVE JUROR:   Doing anything to a guard,
3  warden.
4       MS. HANDLEY:   Okay.
5            PROSPECTIVE JUROR:   Any violence there.
6  Anything worse than you would find in the high school gym.
7       MS. HANDLEY:   Okay.  And that draws a pretty
8  good picture.
9            PROSPECTIVE JUROR:   Young guys get in fights and
10  tussles.  And I used the word tussle again.  And you can be
11  accused of assault for very over-rated reasons.
12       MS. HANDLEY:   And sometimes there are often
13  defenses to assaults too?
14            PROSPECTIVE JUROR:   Uh-huh.
15       MS. HANDLEY:   Okay.
16            PROSPECTIVE JUROR:   Okay.
17       MS. HANDLEY:   All right.  If you answer that
18  question yes, because you presume the answer is "no", right,
19  but we proved it to you beyond a reasonable doubt, and you
20  answered that question "yes", that sentence now goes up to a
21  death sentence, okay.  But you are not finished answering
22  questions.  And it is not the end of the story.  You still
23  have to answer another question.  That's that second special
24  issue.  Go ahead and read that to yourself?
25            PROSPECTIVE JUROR:   Let me read it again.

41

1   MS. HANDLEY:   You get it, sometimes it takes a
2   couple of times to read it.  I think if we can say things as
3   lawyers in 60 words versus six, we will do it, okay.  And
4   again we didn't write that question, but it is quite a
5   mouthful.  I will tell you that we often refer to that second
6   question, Mr. Gage, as the safety-net question.
7        Let me ask you, what do you think it is asking you to
8   decide?
9        PROSPECTIVE JUROR:   I think it falls right in
10   line with my -- my answers on the questionnaire where I really
11   believe that to give the death sentence, it has to be a very
12   heinous crime.  It has to be, you know, not necessarily
13   premeditated, but it has to be done with full awareness of
14   what he was doing and violent intent and -- I don't know, I
15   guess if you look at the circumstances of it and it's a
16   one-time, it is a flash thing.  I made some comments about
17   being under the influence of drugs or alcohol --
18        MS. HANDLEY:   Uh-huh.
19        PROSPECTIVE JUROR:   -- where you really don't
20   know what you are doing.
21        MS. HANDLEY:   Uh-huh.
22        PROSPECTIVE JUROR:   Those things certainly
23   have to be taken into account in my opinion.
24        MS. HANDLEY:   And I think you are headed in the
25   right direction there, is basically what they are asking you

42

1   to do, Mr. Gage, is look at everything.  Look at everything in
2   the case once again.  We call it the safety-net question
3   because it is ensuring that death is really the proper thing
4   to do.  In other words, they want you to look at his
5   character.  Look at his background, look at the circumstances
6   of the offense.
7        PROSPECTIVE JUROR:   I would certainly want to do
8   that.
9        MS. HANDLEY:   Absolutely.  And you must do that.
10   You must look at everything.  And it is basically telling you,
11   sir, that if you find something in all the evidence, maybe it
12   is his character, maybe it is something about his background,
13   maybe it is the circumstance of the offense.  As you said,
14   maybe it is drugs or alcohol.  If you think there is something
15   there that warrants bringing that sentence of death back down
16   to a life sentence, that is an option available to you.  We
17   call it a mitigating circumstance.  And I can't tell you
18   necessarily what would constitute a mitigating circumstance in
19   your mind, but it has to be a sufficient mitigating
20   circumstance.  You know, in other words, you are not going to
21   walk out of the -- this courthouse, I agree he was guilty of
22   capital murder, and I agree he is a future danger to his
23   society, but there was something else there that I think was
24   important to consider.  And I think quite frankly warranted
25   bringing that sentence back down to a life sentence.  And I am

43

1   offended that we didn't have that option.  That is not going
2   to happen.  That option is available to you.
3        Some people say, Are you going to show mercy?  Is there
4   something there?  And as I said, I can't tell you what would
5   constitute a sufficient mitigating circumstance, that is
6   entirely up to you to decide, and for each one of you to
7   decide.  You don't have to agree on what is a sufficient
8   mitigating circumstances, only that there are sufficient
9   mitigating circumstances.
10        We do not execute the mentally retarded, Mr. Gage, you
11   cannot do that.  However, if there were an individual that was
12   maybe on the cusp of mental retardation, and maybe that was
13   something to be taken into consideration. you know, they don't
14   think like you and I do.  They just don't have the same mental
15   appreciation that you and I do.  Maybe there is something
16   about his background, maybe he has been severely abused since
17   the time he was a child.  And quite frankly maybe his parents
18   ought to be on trial and not him.  Maybe there is something
19   like that.
20        The question becomes not what you think is a mitigating
21   circumstance, but if you saw one and you thought it was
22   sufficient to warrant bringing the sentence back down to life,
23   would you do it?
24        PROSPECTIVE JUROR:   Yes, absolutely.  And as a
25   matter of fact on the other side, I would keep it there until

44

1   you showed me good evidence that there were no mitigating
2   circumstances.
3        MS. HANDLEY:   Okay.  And you understand, there
4   is no burden of proof for either side on that one?
5        PROSPECTIVE JUROR:   I understand.
6        MS. HANDLEY:   It is not like I have to come in
7   and go, here is what is or isn't a mitigating circumstance.
8   There is no burden of proof there necessarily?
9        PROSPECTIVE JUROR:   Then what will you show me.
10        MS. HANDLEY:   What I will show you is that he
11   deserves to die.  That is what I will show you.  And I will
12   show you everything about the circumstances of the offense
13   hopefully, you know, and if you look in that and everything
14   that I have shown you, and you gather that there is a
15   sufficient mitigating circumstance of the evidence that is
16   brought to you, and you have that option.  You know, I think
17   it is fair to say that I know that I as a representative of
18   the State of Texas is going to come in and say, Mr. Gage, I
19   believe this is a sufficient mitigating circumstance and would
20   like for you to reduce that back down to life.  Which kind of
21   puts you in a weird situation, because do they have any burden
22   of proof?
23        PROSPECTIVE JUROR:   No.
24        MS. HANDLEY:   No.  And they have absolutely no
25   obligation to bring you anything.  And I think in all

1 fairness, a lot of people go, wouldn't you? But I don't know
2 what is going to happen in trial. You know you have to be
3 careful about demanding which side bring you proof and such as
4 that. You will look at everything, and everything is brought
5 to you, that's what you would make that decision on. You
6 spoke of alcohol or drug use. Talk to me about that, how does
7 that play into?
8         PROSPECTIVE JUROR:   To me, I think people
9 commit acts of violence under the, you know, under the
10 influence of drugs and alcohol. That they under normal
11 circumstances would certainly not do. To me that can
12 constitute a mitigating circumstance in a violent crime. As
13 far as deciding between life imprisonment and capital
14 punishment, again it depends solely on the circumstances and
15 the particular case involved. But it is similar to what you
16 had discussed about, you know, mental retardation, you are
17 temporarily mentally retarded if you are drunk or on drug; and
18 yes, you did it to yourself. But still I don't believe you
19 are in full control of your faculty and you may do things
20 under normal circumstances you wouldn't do. If that was the
21 case here, I would probably look at that as a potential
22 mitigating circumstance.
23         MS. HANDLEY:   Are you envisioning a particular
24 scenario or are you touching on a personal experience or
25 somebody you know or seen?

1         PROSPECTIVE JUROR:   No, I am envisioning it
2 from this questionnaire. It asked a lot of questions about
3 drugs, alcohol and how you feel about that. And that's what I
4 am basing my comments.
5         MS. HANDLEY:   The law states intoxication is not
6 a defense?
7         PROSPECTIVE JUROR:   I understand.
8         MS. HANDLEY:   We are not talking about defense,
9 we are talking about mitigating circumstances. And I guess I
10 wanted to feel you out on that?
11         PROSPECTIVE JUROR:   Defense and mitigating
12 circumstances, it does to me constitute a mitigating
13 circumstance.
14         MS. HANDLEY:   To what extent can I get drugs or
15 use drugs does that excuse me behavior? Not necessarily
16 legally excuse, help me out with that.
17         PROSPECTIVE JUROR:   Yeah, excuse. I guess we
18 all have looked back on our college days and realize that when
19 we got a little too drunk, we did some silly, silly things.
20 We didn't go so far as to commit a capital crime. We probably
21 did some semiviolent things, and certainly some illegal
22 things. But I think it goes all the way up. It goes back to
23 the character, moral personality, credibility of the person
24 involved. If you are under the influence, then you aren't
25 necessarily, you know, thinking the same. You aren't

1 necessarily the same person that you were when you were
2 totally sober. You may do things for whatever reason that you
3 might not do under normal circumstances.
4         MS. HANDLEY:   Okay. Fair enough.
5         PROSPECTIVE JUROR:   And I think we all have
6 some amount of personal evidence of that.
7         MS. HANDLEY:   Sure.
8         PROSPECTIVE JUROR:   We just hadn't -- we didn't
9 go so far as commit a crime, or maybe we did.
10         MS. HANDLEY:   Uh-huh.
11         PROSPECTIVE JUROR:   But I just -- I put that in
12 the same category as mental competence, as severe depression,
13 a divorcee for instance. He may do something really stupid.
14 But normally, normally, he is not that person.
15         MS. HANDLEY:   Sure. Looking towards his
16 motivation.
17         PROSPECTIVE JUROR:   Yeah, so I can't ignore the
18 circumstances around the incident that happened and the
19 particular condition, the mental condition of the accused.
20         MS. HANDLEY:   Would it automatically prevent you
21 from assessing a death sentence if you felt somebody was
22 intoxicated?
23         PROSPECTIVE JUROR:   That's the toughest
24 question you have asked me. Not automatically. It would
25 certainly -- it would certainly affect my decision. Yes, I

1 think it would. I can't say that, no, if a person is
2 intoxicated he can do anything.
3         MS. HANDLEY:   Sure.
4         PROSPECTIVE JUROR:   Of course not. Again it
5 depends on the conditions. But it does when you are weighing
6 the pros and the cons, well, it definitely, it sits on the
7 side.
8         MS. HANDLEY:   Absolutely.
9         PROSPECTIVE JUROR:   It sits on the side of
10 questioning.
11         MS. HANDLEY:   Okay. I appreciate your answering
12 my questions, Mr. Gage. I have talked to you for quite a
13 while here. And I am going to let the defense attorneys have
14 an opportunity to kind of pick your brain some more, sir.
15         PROSPECTIVE JUROR:   Okay.
16         MS. HANDLEY:   Your Honor, I would pass the
17 juror.
18         **VOIR DIRE EXAMINATION**
19 BY MR. BRAUCHLE:
20         MR. BRAUCHLE:   Mr. Gage do you need a break.
21         PROSPECTIVE JUROR:   Pardon?
22         MR. BRAUCHLE:   Do you need a break.
23         PROSPECTIVE JUROR:   No, I am fine, thank you.
24         MR. BRAUCHLE:   You may before I get through with
25 you, but we will see.

1      My name is Paul Brauchle. I have been introduced to you.
2  Myself and Mr. Johnson represent the defendant, Mr. Ruiz.
3      I don't think it would come as any surprise to you that
4  we don't see things the way the people at the other table do?
5      PROSPECTIVE JUROR: I understand.
6      MR. BRAUCHLE: If we did, we could just let one
7  of them batter you around for an hour and then we could all
8  put it all aside. We think these things are a little more
9  complicated than what they make them out to be. And I will
10 discuss some of our views on that here in the next few
11 minutes.
12     What book did you bring down here?
13     PROSPECTIVE JUROR: It is the Michael Crichton,
14 State Fear of the Global Warming.
15     MR. BRAUCHLE: Okay. I think you would rather
16 be reading that than talking to me?
17     PROSPECTIVE JUROR: It is a nice day for golf.
18     MR. BRAUCHLE: Where do you usually play?
19     PROSPECTIVE JUROR: I live out in Richardson,
20 so I play with the Richardson's Senior Group.
21     MR. BRAUCHLE: You got any questions about
22 anything we asked you?
23     PROSPECTIVE JUROR: I had plenty of questions
24 when I came in.
25     MR. BRAUCHLE: Have they been answered?

1      PROSPECTIVE JUROR: I believe the District
2  Attorney answered most of those questions. I feel pretty
3  clear on, you know, what my requirements would be and you know
4  what my responsibility would be. And the eventual outcome of
5  those decisions.
6      MR. BRAUCHLE: Probably if we would have stopped
7  you when you finished filling out your questionnaire, and
8  asked you what happened to you if you are convicted of capital
9  murder, you would have probably said, you will get the death
10 penalty; is that a correct statement, because most people
11 equate guilt of capital murder with the death penalty? They
12 don't think what we have talked to you about, life without
13 parole, mitigating issues, continuing threat to society, guilt
14 equals death. And that is not a bad thing. And I am not
15 trying -- sure as to whether you would or not.
16     But you know after talking to the District Attorney that
17 basically once you are found guilty of capital murder, you get
18 life without parole. And then only if these questions are
19 found against you, do you get death. And also if the State
20 fails on any of these questions, that your punishment defaults
21 back to life without parole. So basically it is life without
22 parole, the possibility of death rather than death the
23 possibility of life without parole?
24     PROSPECTIVE JUROR: Well, I knew -- at least I
25 assumed that capital meant there would be a possibility of

51

1  life imprisonment -- or lesser sentence. And I assumed it to
2  be life imprisonment. And I think the synopses we read here
3  indicated that. So that was my opinion at the time that a
4  capital offense didn't necessarily mean a death sentence. And
5  the jury would be given the decision to make. But I had no
6  idea of these mitigating circumstances issues, which I like.
7      MR. BRAUCHLE: You haven't seen those questions
8  on billboards around town or anything?
9      PROSPECTIVE JUROR: No, no.
10     MR. BRAUCHLE: And as the District Attorney told
11 you, we didn't write those and we don't know who did. It's
12 our job to explain them.
13     Let me go fast forward to the first special issue. I
14 know being an engineer, probability is a decimal point and no
15 matter how many zero come after that, that's a number that's a
16 probability?
17     PROSPECTIVE JUROR: We dealt with the
18 probability of failure in the 1 millionth in the space system.
19     MR. BRAUCHLE: So probability to an engineer is
20 certainly something different than probability to a layperson?
21     PROSPECTIVE JUROR: Yes. But I think it was
22 very carefully explained to me that probability in this case
23 is better than a 50/50 chance, and I can certainly look at
24 that.
25     MR. BRAUCHLE: You understand that the courts

52

1  had to tell use that it had to be more than a 50/50 chance,
2  otherwise the answer to special issue -- to special issue
3  number one would always be yes. As slight as a probability
4  could be. If it is not more than 50/50, the question wouldn't
5  have much meaning, don't you agree with me on that? You know
6  if it could be down to probability?
7      PROSPECTIVE JUROR: Yeah, you are right, you are
8  right. I think you have to draw the line. It's, ah -- in
9  this case, yes it's not a scientific mathematical decision, it
10 is a possibility versus a probability.
11     MR. BRAUCHLE: Well, see, evidently the learned
12 body who drew this up was counting on engineers to come in and
13 be confronted with the question. But you understand --
14     PROSPECTIVE JUROR: Does that mean I am
15 released.
16     MR. BRAUCHLE: If only it were that easy. We
17 got our minutes on you now.
18     If you look at special issue number one, probability
19 comes right behind reasonable doubt. So it says if you find
20 from the evidence beyond a reasonable doubt that there is a
21 probability, and because of the position -- or the flow of
22 that, if there is a flow of that question, we think that it
23 has to mean -- or has to be related to reasonable doubt. You
24 understand if reasonable doubt is more than 50/50 to you, if
25 it gets to probability and probability is only 50 percent, you

53

54

1    are dropping off on the burden of proof?

2                PROSPECTIVE JUROR:   I understand you have two

3    variables here that you have the proof of both or the belief

4    of both.

5                MR. BRAUCHLE:   Now, then, what are we looking

6    for in that question?  If the defendant is going to commit

7    criminal acts of violence and if those criminal acts of

8    violence are going to constitute not just a threat to society,

9    but a continuing threat to society, in other words?

10               PROSPECTIVE JUROR:   Now you have introduced

11   a third variable.

12               MR. BRAUCHLE:   Well, there is all sorts of

13   variables there and they all have to be satisfied going back

14   to the first part beyond a reasonable doubt.  We think that --

15   or my co-counsel and I think that probably what that question

16   is asking you is the shorthand version would be, is this

17   person going to be such a threat to society that the only way

18   that we can control him is to eliminate him from society?

19               PROSPECTIVE JUROR:   I agree with you on that, I

20   believe that's what that question is trying to ask.  Is this

21   person a real threat to the people around him to the extent

22   that he can't be allowed to be there.

23               MR. BRAUCHLE:   Well, that would make -- we think

24   that makes sense in special issue number one.  Now, then,

25   let's go through the mechanics of this.  You find him guilty,

1    you find he is going to be a continuing threat to society, and

2    then we spring special issue number two on you which says that

3    in spite of your being convinced beyond a reasonable doubt

4    that he is guilty, besides being convinced beyond a reasonable

5    doubt we can't control him without killing him, hey, wait a

6    minute, let's go back --

7                PROSPECTIVE JUROR:   I see where you are going,

8    and it takes issue number two off the docket, doesn't it?

9                MR. BRAUCHLE:   Well, it may or may not.  But the

10   thing is, as Ms. Handley told you, they don't have to show any

11   mitigating evidence.  We may or may not.

12               PROSPECTIVE JUROR:   Uh-huh.

13               MR. BRAUCHLE:   And what you need to be able to

14   tell us is, is if any is introduced, is there sufficient

15   mitigating circumstance or circumstances to warrant a life

16   sentence rather than the death sentence?

17               Now, the one thing you have to figure in is I assume is

18   that the prison system to some extent is willing to accept him

19   no matter what the verdict.  We are not saying a jury over

20   here is not just going to send him back out to Dallas County

21   somewhere.  He is going to be imprisoned for life without

22   parole.

23               PROSPECTIVE JUROR:   Uh-huh.

24               MR. BRAUCHLE:   But in any event, what you have

25   to be able to tell us is, if there is a mitigating

55

56

1    circumstance and you think it is sufficient, that you will

2    give meaning to that and go back to the life without parole?

3    And I think from Ms. Handley's talks with you, you indicated

4    that you can do that?

5                PROSPECTIVE JUROR:   I think my position would

6    be that I would have to go all the way to the end the trial,

7    the special issues, everything, and answer yes, yes, yes, yes,

8    yes all the way through before I could, you know, give the

9    death penalty.

10               MR. BRAUCHLE:   Well, that's what the law

11   anticipates.

12               PROSPECTIVE JUROR:   Absolutely.

13               MR. BRAUCHLE:   You answer special issue number

14   one.  Well, actually they visualize the answer a little

15   different.  Special issue number one, if that's "yes", he gets

16   death.  And then you find that there is a sufficient

17   mitigation, if that is found "no" -- it is "yes", "no", then

18   that death results.

19               PROSPECTIVE JUROR:   It goes back.

20               MR. BRAUCHLE:   Because "yes", "yes", it is life

21   without parole.  We are just quivering over which answer to

22   put in.

23               PROSPECTIVE JUROR:   It seems that special issue

24   number one, if you answer, yes, that is reasonable doubt and a

25   probability that you would think, well, you know what

1    mitigating circumstance could reverse that, but there may be.

2                MR. BRAUCHLE:   Well, that's the attitude that

3    you have to take going in.  We can't tell you that there is or

4    isn't.  We are just saying if there is a sufficient one, would

5    you give it weight enough or weigh it enough -- some people

6    sitting where you are sitting, That's the dumbest question

7    that I have ever seen.  I am convinced that he needs to be

8    killed, but you want me to spare his life, how does that work?

9    We are not here saying that that's in any way a logical

10   sequence there.  But what we have to find out is if you have

11   the intellectual integrity that you will be able to separate

12   those two planes in your mind before you can give a factual to

13   the question?

14               PROSPECTIVE JUROR:   I understand.

15               MR. BRAUCHLE:   Let me touch on one other issue

16   with you.  You understand that we talked to you about certain

17   aspects of murder.  And there is one issue that we haven't

18   brought up which may come into play. .

19               We have to sit here and talk to you about all sorts of

20   different things whether they are going to be relevant or not.

21   One of them might be the issue of self-defense.  And I don't

22   know how much you know about self-defense.  But quite frankly,

23   it's a justified homicide.  I could kill everybody at both

24   these counsel tables.  If it is done in self-defense, it is

25   not against the law.

1  And you believe in the right to self-defense?
2          PROSPECTIVE JUROR:   Certainly.
3          MR. BRAUCHLE:   I also have the right to protect
4  other people or property or whatever.  But basically
5  self-defense is self preservation.  Taking somebody's life to
6  protect your own.
7      Let me just say this.  Self-defense is always looked at
8  from the person who is claiming it point of view, okay.  I
9  shoot Ms. Handley, and I say it was self-defense.  It is my
10  perception of my danger and her threat at this time, not what
11  may or may not be what you see.  Because you may not know
12  threats from Ms. Handley.  You may not know of previous
13  relationship between the two of us.  You know there may be --
14  there may be things that are long standing, or whatever, to a
15  witness may not be evident.  I am not saying that my story has
16  to be believed implicitly.  But certainly you look to my point
17  of view and my perception of danger to decide whether my claim
18  of self-defense is legitimate.
19      You have any problem with that?
20          PROSPECTIVE JUROR:   So basically that says that
21  Ms. Handley's associate would have to prove beyond a
22  reasonable doubt that your defense was false?
23          MR. BRAUCHLE:   That's correct.  You took the
24  next part of my spill away from me.  They have to prove just
25  like everything else beyond a reasonable doubt that I didn't

1  act in self-defense or that I didn't have a legitimate view of
2  danger, threat or whatever.  And as with everything down here,
3  I think I am preaching to the choir because I think you are
4  ahead of me on that.  Everything you have to look for is over
5  there.  They have to prove each and everything that has to be
6  proven over there.  They usually tell you that we don't have
7  to do anything but work crossword puzzles and show up.
8  Basically that is true.  I am not saying that we are going to
9  resort to that, but the law really doesn't require us to do
10  anything but show up.  We don't have to ask questions.  We
11  don't have to do all the stuff you see on TV.  But you can't
12  ever look to us for any type of proof.
13      And as Ms. Handley said, when you get to special issue
14  number two, she is going to say that the evidence they are
15  going to bring will be enough -- enough for you to kill him.
16  So don't be looking for childhood pictures or that type if you
17  think that is going to be mitigating.  Because they stated
18  that their dedicated purpose and they stated quite frankly,
19  they want to kill our client.
20      You have any problem with that.  You might be wanting us
21  to do something and it might be something that you think we
22  could do easily and wouldn't be limited in any way?
23          PROSPECTIVE JUROR:   But you are not required to
24  do that.
25          MR. BRAUCHLE:   You will be -- I hope happy -- I

1  don't have any other questions for you.  Thank you, sir.
2          THE COURT:   Thank you, Mr. Gage.  You may step
3  down.
4          THE BAILIFF:   All rise for the juror.
5          (Prospective juror retired from the courtroom.)
6          (Pause in the proceedings.)
7          THE BAILIFF:   All rise for the juror.
8          (Prospective juror entered the courtroom.)
9          THE COURT:   You may be seated.
10      Mr. Gage, there is a possibility of perhaps a probability
11  that you will be selected to be on this jury, what we are
12  going to do is release you today.  And we will let you know in
13  about two perhaps three days at the latest if you have been
14  selected to be on this jury or not.
15      That being the case, I would admonish you not to do any
16  research on this case, anything on the web.  If you see it in
17  the media, just do not pay any attention to it, change the
18  channel and don't read it in the newspaper.  And as soon as we
19  find out, we will let you know whether or not you are a juror.
20  And with that, you are free to go.
21          PROSPECTIVE JUROR:   Can I ask one question?
22          THE COURT:   You may.
23          PROSPECTIVE JUROR:   I have a trip to Pebble
24  Beach planned March 29th through April 3rd.
25          THE COURT:   We anticipate getting started the

1  second, third week, with the actual trial second or third week
2  in April?
3          PROSPECTIVE JUROR:   No problem, then I can
4  maintain my plans.
5          THE COURT:   Certainly.
6      Fifteen-minute recess.
7          (Recess taken.)
8          THE BAILIFF:   All rise for the juror.
9          (Prospective juror entered the courtroom.)
10          THE COURT:   You may be seated.  Ms. Worsham, how
11  are you doing today?
12          PROSPECTIVE JUROR:   Good, thank you.
13          THE COURT:   I apologize for the delay.
14  Sometimes these interviews run a little longer than we
15  anticipate.  So I appreciate your patience.
16      The attorneys have some questions to ask you regarding
17  your qualifications as a juror in this case.  There aren't any
18  right or wrong answers.  They merely wish to see how you feel
19  about certain issues that will be prevalent in this case.
20      State will commence questioning.  I believe Ms. Handley
21  will be doing the questioning.
22      What says the State?
23          MS. HANDLEY:   May it please the Court?
24
25

62

```
1                    LAURA WORSHAM
2    was called as a prospective juror, after having been
3    previously sworn by the Court, testified under oath as
4    follows:
5              VOIR DIRE EXAMINATION
6    BY MS. HANDLEY:
7         Good morning, ma'am.  How are you?  Do you have some
8    legal background.
9              PROSPECTIVE JUROR:  I do.
10             MS. HANDLEY:  What is that?
11             PROSPECTIVE JUROR:  I am a license practicing
12   attorney.
13             MS. HANDLEY:  What kind of law do you do?
14             PROSPECTIVE JUROR:  Mainly bankruptcy from the
15   creditor side.
16             MS. HANDLEY:  How long since you graduated from
17   law school?
18             PROSPECTIVE JUROR:  Twenty-six years.
19             MS. HANDLEY:  Okay.  What we are going to do is
20   probably going to sound very familiar to you, we are going to
21   talk to you about the law.  So this shouldn't take very long?
22             PROSPECTIVE JUROR:  I don't know.
23             MS. HANDLEY:  My name is Andrea Handley.  This
24   is Marshall McCallum.  We are both District Attorneys here in
25   Dallas.  We have been charged with selecting the jury in this
```

```
1    case.
2         To my left is Karo Johnson and Paul Brauchle.  They
3    represent the defendant in this case.  That's the man seated
4    at the end of the table, Wesley Ruiz.
5         You are a lawyer about town, do you know any of us?
6              PROSPECTIVE JUROR:  I do not.
7              MS. HANDLEY:  And this is also Andy Beach.  He
8    works with us.
9         Let me tell it you what we are doing Ms. Worsham.  We
10   brought down a lot of people to fill out the questionnaire,
11   believe it or not we read them all.  A lot of reading and we
12   have all had to get glasses now because of it.  We have only
13   selected a select number of people, though, to bring down now
14   and talk to one-on-one about the law, to test your
15   qualifications on your ability to understand the law and
16   follow the law in any particular case, in any criminal case if
17   you will.
18        We have all had an opportunity to read your questionnaire
19   ma'am.  And I will tell you, now as I was reading along, it
20   appears to me that you have a full appreciation for what is at
21   stake.  The law that applies and particularly in capital
22   murder cases.  You know you do bankruptcy, but it looks to me
23   that you also keep yourself up to speed on criminal law or you
24   really remember the bar really well.  You know that looks like
25   a page -- a day three questionnaire from law school exam.  So
```

63

```
1    I am going to touch basis with you on those things today, ask
2    you some questions.  Let the defense attorneys also talk to
3    you and also just to touch on your qualifications of your
4    understanding and your willingness and ability to follow the
5    law.
6         As you can see, I think you have a good appreciation, we
7    are here on a death-penalty case, not necessarily a theft of a
8    bicycle, but death penalty, which is -- the stakes don't get
9    any higher, do they?  So we need to talk to you now, take it
10   one step further and talk to you about the law and those
11   things.  As I think you can fully appreciate, death penalty is
12   an option to a jury is not available for all murder cases, is
13   it?  It is a select number of cases, murder of a police
14   officer, murder of a child six years of age or younger, murder
15   of an individual during the course of another felony offense.
16   Those are things to which the jury has an option of the death
17   penalty, but it is never automatic.  And I think you already
18   know that and have that appreciation?
19             PROSPECTIVE JUROR:  Yes.
20             MS. HANDLEY:  That we do not send our jury back
21   and ask them, talk about it, whether or not you think this
22   person should get life or death.  Instead you go through a
23   series of questions and answers based on how you answer those
24   questions make that ultimate determination whether or not a
25   person gets life or death in prison.  As you probably fully
```

```
1    know or are aware of and have a good appreciation for, there
2    are fundamental propositions of law that play out in any
3    criminal case.  Be it, like I said, theft of a loaf of bread
4    or capital murder, there are things that always apply.  It has
5    been that way and probably will.  I want to talk to you about
6    that.
7         You know that I am sure that as the State as the body
8    that is bringing the charges in this particular case, in any
9    criminal case, we obviously have the burden of proof in this
10   case, correct?
11             PROSPECTIVE JUROR:  Yes.
12             MS. HANDLEY:  You would never look, for example,
13   to this side of the courtroom.  And I am pointing to the
14   defense bar over there, per defense counsel to prove anything
15   in this case, correct?
16             PROSPECTIVE JUROR:  That's right.
17             MS. HANDLEY:  They have absolutely no burden of
18   proof.  They don't have to come in and prove their client
19   innocent, it is just the opposite.  We have to prove him
20   guilty beyond a reasonable doubt, correct?
21             PROSPECTIVE JUROR:  Yes.
22             MS. HANDLEY:  And the elements of the indictment
23   are basically what we are obligated to prove.  Each and every
24   element of the offense must be proved beyond a reasonable
25   doubt.  We don't get points for five out of six, do we?  We
```

64

65

66

1  got to do them all. And every element of the offense is just
2  as important as the other, is it not?
3          PROSPECTIVE JUROR:   Yes.
4          MS. HANDLEY:   If I failed to prove that he was
5  in fact a peace officer, that carries just as much wait as if
6  I failed to prove that it happened in Dallas County, Texas,
7  correct?
8          PROSPECTIVE JUROR:   Yes.
9          MS. HANDLEY:   And if I for example were
10  incredibly remiss and didn't bring you a shred of evidence
11  that is happen in Dallas County, Texas, I think you will agree
12  with me that I failed to prove my case?
13          PROSPECTIVE JUROR:   Right.
14          MS. HANDLEY:   And His Honor by law will instruct
15  you to find him not guilty by law?
16          PROSPECTIVE JUROR:   Uh-huh.
17          MS. HANDLEY:   And as I said, that is horribly
18  remiss of me and that touches on your qualifications to be a
19  juror. If I failed to prove that, or if worse yet I prove it
20  happened in Tarrant County, Texas, would you then follow the
21  law and return a verdict of not guilty?
22          PROSPECTIVE JUROR:   Yes.
23          MS. HANDLEY:   You understand that the
24  indictment, I believe there is a copy of it in front of you
25  there, but it is basically just words on a piece of paper,

1  isn't it?
2          PROSPECTIVE JUROR:   Yes. Do I need to look at
3  it.
4          MS. HANDLEY:   I will paraphrase for you. You
5  know we have to prove on or about a certain date, that the
6  defendant, in Dallas County, Texas, did intentionally and
7  knowingly take the life of a peace officer while he was in the
8  line of the duty, and that he did that by shooting him with a
9  firearm. That is just a piece of paper. Tells me what I have
10  to prove. And tells the defendant what he has been charged
11  with, correct?
12          PROSPECTIVE JUROR:   Yes.
13          MS. HANDLEY:   And the law provides that you
14  cannot use that as a piece of evidence against him.
15          You understand that law, correct?
16          PROSPECTIVE JUROR:   Yes.
17          MS. HANDLEY:   Again, that's the law that you can
18  and would also follow, can you not?
19          PROSPECTIVE JUROR:   Yes.
20          MS. HANDLEY:   Burden of proof in this case is
21  beyond a reasonable doubt. And I am sure that is just worlds
22  different from the burden of proof that y'all are accustomed
23  to in your civil case, correct?
24          PROSPECTIVE JUROR:   Yes.
25          MS. HANDLEY:   You will agree with me that that

67

68

1  is the highest burden of proof in our system, is it not?
2          PROSPECTIVE JUROR:   Yes.
3          MS. HANDLEY:   And as you may know, it may not
4  necessarily be a definition of reasonable doubt, it is
5  whatever you think it is. Some people say I have to be
6  certain, I have to be able to sleep at night knowing that I
7  did the right thing. So it is whatever you think it is. But
8  you would agree with me, ma'am, that it is an incredibly high
9  burden?
10          PROSPECTIVE JUROR:   Yes.
11          MS. HANDLEY:   And you would continue to hold us
12  to that burden of proof?
13          PROSPECTIVE JUROR:   Yes.
14          MS. HANDLEY:   And obviously you are familiar
15  that the defendant has a right not to testify in a case, and I
16  cannot force a defendant to testify. If an individual elects
17  to exercise that constitutional right and not take the stand,
18  you wouldn't hold that against him or use that as any evidence
19  of his guilt, would you?
20          PROSPECTIVE JUROR:   No.
21          MS. HANDLEY:   And again as we sit here today,
22  because I brought you absolutely no evidence whatsoever, the
23  law states that you are to presume him innocent as he sits
24  here today and to continue to presume him innocent until I
25  prove to you beyond a reasonable doubt otherwise. And that's

1  a law that you understand and agree to follow; is that
2  correct?
3          PROSPECTIVE JUROR:   Yes.
4          MS. HANDLEY:   I think you have a good
5  appreciation for that, ma'am, and can I take your word for it
6  that you would consistently follow the law in this case?
7          PROSPECTIVE JUROR:   Yes.
8          MS. HANDLEY:   And that you would ultimately base
9  where your verdict in this case on the evidence in this case
10  and on nothing else?
11          PROSPECTIVE JUROR:   Yes.
12          MS. HANDLEY:   And your obligation as a juror, as
13  you know, is to not only weigh the testimony and weigh the
14  evidence in the case, but also to assess the credibility of
15  the witnesses, correct?
16          PROSPECTIVE JUROR:   Right.
17          MS. HANDLEY:   And you have probably been called
18  upon from time to time to put witnesses on and -- put
19  witnesses on and you know that a judge or jury, whatever the
20  case may be at that point, assess their credibility?
21          PROSPECTIVE JUROR:   Yes.
22          MS. HANDLEY:   And that it would be improper for
23  them to say, oh, she is calling for a police officer, I am
24  going to automatically believe everything they said?
25          PROSPECTIVE JUROR:   Right.

1  MS. HANDLEY:   You have to make that assessment
2  from the witness stand.
3  I bring that up because in your questionnaire when we
4  asked you, what comes to mind when you hear of certain people
5  and occupation, do you believe that an officer is more likely
6  to tell the truth?  I believe you selected more likely; is
7  that correct?
8  PROSPECTIVE JUROR:   I don't think so.
9  MS. HANDLEY:   Let me double check.
10  PROSPECTIVE JUROR:   I may have, but didn't
11  mean to if I did.
12  MS. HANDLEY:   Oh, I beg your pardon, then on
13  that.  You know what I don't think you did do that.  I got you
14  confused with the 500 other questionnaires I read.  No, you
15  did not.  That is my mistake.  I beg your pardon.  So you
16  obviously right there another full appreciation that
17  credibility is assessed from the witness stand, nothing is
18  automatic, correct?
19  PROSPECTIVE JUROR:   That's correct.
20  MS. HANDLEY:   I feel like I am preaching to a
21  choir right now.  Keeping in mind that I am taking from you
22  that I get your absolute assurance and that you will base your
23  verdict based on the evidence in the case.  If we prove to you
24  beyond a reasonable doubt that the defendant is guilty of
25  capital murder as charged in the indictment, you would return

1  a verdict of guilty; is that correct?
2  PROSPECTIVE JUROR:   If you meet your burden.
3  MS. HANDLEY:   Very good.  As you probably also
4  know, we have had a lot of come in and come in under the
5  assumption that if you find an individual guilty, they are
6  automatically going to get the death penalty.  And I think you
7  understand that is not the way it is, correct?
8  PROSPECTIVE JUROR:   That's correct.
9  MS. HANDLEY:   You do understand that having been
10  found guilty, the best he will get is life imprison without
11  parole?
12  PROSPECTIVE JUROR:   Yes.
13  MS. HANDLEY:   Until we can prove to you beyond a
14  reasonable doubt that the more appropriate sentence in this
15  case is death, that you are to continue to presume that life
16  is the appropriate thing to do, correct?
17  PROSPECTIVE JUROR:   Correct.
18  MS. HANDLEY:   We ask you to do that by going
19  back there with the other 11 jurors, in looking at the
20  evidence in its entirety, instead of having a round table
21  discussion, we ask you to answer a series of questions and
22  based on your answers to those questions, that will make your
23  determination as to whether or not he receives life imprison
24  or a death sentence.
25  The first question we ask you is that special issue

71

1  number one over there to your left.  I don't know how long it
2  has been since you read that or if you ever read that, but go
3  ahead and take a moment to take a look at that?
4  PROSPECTIVE JUROR:   Okay.
5  MS. HANDLEY:   Okay.  As I am sure you can fully
6  appreciate, that at that point, the best the defendant is ever
7  going to do is life imprison, correct?
8  PROSPECTIVE JUROR:   Yes.
9  MS. HANDLEY:   And so when we ask you to take
10  into consideration whether or not he is going to be a future
11  danger to society.  I believe the legislature contemplates
12  that you and me on the road what we consider as society is
13  probably different from what is the defendant's society at
14  that point.  I don't know if you ever toured a prison?
15  PROSPECTIVE JUROR:   No.
16  MS. HANDLEY:   You never had the pleasure of
17  that.  I am sure you understand that there are more people
18  contained within a prison other than inmates?
19  PROSPECTIVE JUROR:   Yes.
20  MS. HANDLEY:   We have prison guards, medical
21  personnel, educators, people coming to visit in and out of
22  there.  And that in and of itself could also be considered a
23  society.  And would your definition, ma'am, of our society at
24  a large be broad enough to also include where the defendant is
25  going to be that he is also in this society?

72

1  PROSPECTIVE JUROR:   Yes.
2  MS. HANDLEY:   That's referred to as the future
3  dangerousness question.  I am sure you have heard of that.
4  When you go into that second phase of the trial there, you go
5  in with the presumption that the right thing to do is to give
6  him life imprison.  That presumption of life is most
7  appropriate, never change until we can prove to you that the
8  answer to that question ought to be "yes".  If the answer to
9  that question is "yes", that's what elevates that sentence of
10  life up to a death sentence.  As you can probably appreciate
11  being a lawyer, yourself, oftentimes we get definitions of
12  terms and sometimes we just don't.  We don't get a whole lot
13  of guidance.
14  Reasonable doubt is not defined anymore.  It is whatever
15  you think it is, as long as you understand it is the highest
16  burden of proof.  They don't define also the word probability.
17  I think it is a fair thing to say that there is a huge
18  difference between something being a possibility and a
19  probability; would you agree with me?
20  PROSPECTIVE JUROR:   Yes.
21  MS. HANDLEY:   And that a probability is in all
22  things, fairly defined is more likely than not or greater than
23  50 percent; would you agree with me on that?
24  PROSPECTIVE JUROR:   Yes.
25  MS. HANDLEY:   They go on further, would you find

73

74

1  the defendant would commit criminal acts of violence. And
2  again, they don't define that. And they specifically don't
3  set out that the defendant would commit another murder, that
4  the defendant would commit a murder or another robbery, or an
5  assault. They just set out it's something for you to decide
6  criminal act of violence.
7      If I balled up my fist and knocked my co-counsel end over
8  end out of his chair, that might constitute a criminal act of
9  violence?
10         PROSPECTIVE JUROR:  It certainly good.
11         MS. HANDLEY:  Certainly a violent act. And I
12  think you would agree with me, a misdemeanor assault, a
13  criminal act?
14         PROSPECTIVE JUROR:  That's correct.
15         MS. HANDLEY:  Again for you to decide what
16  constitutes a criminal act. And then he would do that and it
17  would be a continuing threat to society. We already talked
18  about that. It would be the society in which he is in. And
19  that the prison society can be encompassed within our greater
20  society as a whole. Our obligation to you is to prove that
21  that question should be "yes" versus the immediate assumption
22  that it is "no"?
23         PROSPECTIVE JUROR:  Right.
24         MS. HANDLEY:  What sort of things do you think
25  you have to see here in order to answer that question yes or

1  no?
2         PROSPECTIVE JUROR:  Well, with -- certainly his
3  background, if he had a record, that wouldn't be in and of
4  itself, you know, the end all, be all question.
5         MS. HANDLEY:  Sure.
6         PROSPECTIVE JUROR:  But I think it would be a
7  factor. His testimony about his demeanor, temper, those
8  general types of things.
9         MS. HANDLEY:  Not necessarily his testimony?
10         PROSPECTIVE JUROR:  I understand he doesn't have
11  to testify. Family, teacher, whatever would testify about
12  that issue.
13         MS. HANDLEY:  And just again to touch on your
14  qualifications, personally do you understand what we are
15  talking about there?
16         PROSPECTIVE JUROR:  Yes.
17         MS. HANDLEY:  And before you would ever answer
18  that question "yes", can you assure us that you would not
19  answer that question "yes" until we prove to you beyond a
20  reasonable doubt that it should be "yes"?
21         PROSPECTIVE JUROR:  Yes.
22         MS. HANDLEY:  If you answer that question "yes",
23  ma'am, that presumption that life is the more appropriate
24  sentence is now elevated up to a death sentence. Now he is
25  sitting on a death sentence at that point. Of course we are

75

76

1  not finished. We still have to answer one more question,
2  that's that special issue, that mitigating circumstance issue.
3         PROSPECTIVE JUROR:  Okay.
4         MS. HANDLEY:  I think you can fully appreciate
5  being a Texas lawyer, we are one of the last of the states to
6  allow jurors to actually assess punishment for criminal cases.
7  We are just a select number now. This special issue goes
8  along that team that we have entrusted the jury to decide what
9  is most appropriate. So again we are going to leave open all
10  the options available to you. You may have found him guilty
11  of capital murder. You may in fact believe beyond a
12  reasonable doubt that he is a future danger to society, but we
13  are not going to shut it off there. We are going to give you
14  one more chance to review all the evidence in the case, be it
15  evidence of the offense, be it evidence of his character, his
16  upbringing, consider what kind of moral culpability,
17  blameworthiness did he have in the case. You get to look at
18  everything before we commit you to a decision. And to ask
19  yourself is there a mitigating circumstance in this case and
20  is it sufficient enough mitigating circumstance that you
21  believe brings that death sentence back down to a life
22  sentence? Of course I can't commit you right now to what do
23  you think, you know, what would you have to see in order to be
24  a mitigating circumstance? Sometimes it is just
25  if-you-know-it-you-see-it kind of thing. I can't commit you

1  to a certain set of facts or something. But the question
2  becomes to you as a potential juror, ma'am, if you having
3  found him guilty of capital murder, having found he is a
4  future danger, you reviewed all the evidence again, and you
5  felt that there was sufficient mitigating circumstance or
6  circumstances to bring that sentence back down to a life
7  sentence, would you in fact do that?
8         PROSPECTIVE JUROR:  Yes.
9         MS. HANDLEY:  And you look very emphatic and
10  sure about that. In other words, ma'am, you will agree to
11  follow the law; is that correct?
12         PROSPECTIVE JUROR:  Yes.
13         THE COURT:  And you will base your verdict and
14  the punishment verdict on the evidence in the case?
15         PROSPECTIVE JUROR:  Yes.
16         MS. HANDLEY:  You will assess the credibility of
17  witnesses from the witness stand?
18         PROSPECTIVE JUROR:  Yes.
19         MS. HANDLEY:  Okay. Any questions about the law
20  or anything that pertains to capital murder? I know you are
21  not fully involved in that in your profession, it is hard not
22  to see the other side of the playing field?
23         PROSPECTIVE JUROR:  No, I think I could follow
24  the evidence.
25         MS. HANDLEY:  I think you are probably the

77

78

1  easiest potential juror I have talked to, I appreciate that.
2       I am going to let the defense counsel just also question
3  you a little bit more on your qualifications and your
4  understanding of the law at this point.
5            PROSPECTIVE JUROR:   Okay.
6       MS. HANDLEY:   I will pass the juror, Your Honor.
7       THE COURT:   Thank you, Ms. Handley.
8            VOIR DIRE EXAMINATION
9  BY MR. BRAUCHLE:
10       Good morning, Ms. Worsham?
11            PROSPECTIVE JUROR:   Good morning.
12       MR. BRAUCHLE:   My name is Paul Brauchle, and I
13  got some questions for you. Obviously the people at this
14  table don't see eye to eye with the people at that table. If
15  we did, we would just all sit at the same table and make it
16  easy for people sitting up there where you are. We have
17  read -- I think it is probably more than 500, Ms. Handley said
18  we have read at least 500 questionnaires so you could kind of
19  how they run together at some point in time?
20            PROSPECTIVE JUROR:   Yes.
21       MR. BRAUCHLE:   And we might not be exactly clear
22  on all the pertinent information to you.
23       Is there anything about your questionnaire that you would
24  change or that you made a wrong answer or anything like that?
25            PROSPECTIVE JUROR:   No in reading it back this

1  morning, my answers on who do you most respect and least
2  respect. I had a hard time with that that day, I couldn't
3  even remember what I wrote. Because I generally don't respect
4  people unless I know them. So I am not sure my answer on that
5  question would be the same today, but that was about the only
6  one. I don't know that it would be different.
7            MR. BRAUCHLE:   It is not something that you
8  think about on an everyday basis?
9            PROSPECTIVE JUROR:   Exactly.
10       MR. BRAUCHLE:   And a lot of people, even though
11  the instructions say that they have publicly known, they end
12  up putting all their family members on there.
13            PROSPECTIVE JUROR:   Yeah.
14       MR. BRAUCHLE:   It could kind of be an
15  interesting deal at a family reunion, whatever?
16            PROSPECTIVE JUROR:   Who is missing.
17       MR. BRAUCHLE:   Who is missing, put in the
18  disrespect column. Other than that, that's about all you
19  would change?
20            PROSPECTIVE JUROR:   Yes, sir. And I guess the
21  voting question. I voted since the day I put there, because I
22  voted last week, but other than that.
23       MR. BRAUCHLE:   Okay. Let me just share this
24  with you. If we were to stop you when you filled that
25  questionnaire out and you were going back to whatever business

79

80

1  you had that day, and asked you what the result of getting
2  found guilty of capital murder was, would you have told us
3  that if you are found guilty of capital murder you receive the
4  death penalty?
5            PROSPECTIVE JUROR:   No.
6       MR. BRAUCHLE:   Well, most people -- obviously
7  you being an attorney, you got a little more insight. Most
8  people equate guilt with death.
9            PROSPECTIVE JUROR:   True.
10       MR. BRAUCHLE:   And as you can tell from your
11  training and talking to Ms. Handley, the death penalty, they
12  have to work to get that. Because once you are found guilty,
13  you get life imprison. And only if that first special issue
14  is answered "yes", do you get death. And that first special
15  issue is presumed to be "no", just like we took some spray
16  paint and spray painted all over it, they have to erase that
17  "no" before the defendant can receive death.
18       Then you see even further with special issue number two,
19  if that is answered, yes, then the -- the default is back to
20  life imprison?
21            PROSPECTIVE JUROR:   Right.
22       MR. BRAUCHLE:   So it is set up to whether the
23  State fails on any level that proof, that defendant gets life
24  without parole. But most people would think, well, if he is
25  guilty, it is death. Really it is a life-without-parole

1  situation unless they prove some other things.
2       Now, then, let's go to the special issues. And let me
3  ask you something, as you read that first special issue, you
4  see the word there at the end of the second line, probability,
5  what does that mean to you?
6            PROSPECTIVE JUROR:   It would mean to me
7  certainly more than 50 percent and not as high as a reasonable
8  doubt. But to me, without instruction, it would mean
9  somewhere more than 50 and less than a hundred.
10       MR. BRAUCHLE:   You don't know where then?
11            PROSPECTIVE JUROR:   For me, it would have to be
12  probably the 75, 80 percent. I mean it is hard for me to
13  quantify it. To me it is more probable than not probable. It
14  is more than 51 percent, but I don't have to be a hundred
15  percent sure for probability.
16       MR. BRAUCHLE:   Okay, how about criminal acts of
17  violence? What do you think constitutes criminal acts of
18  violence?
19            PROSPECTIVE JUROR:   Certainly wouldn't be
20  stealing gum or cigarettes from another inmate. I would think
21  it would have to be -- some type of an assault. I don't know
22  if it would have to be an assault with a weapon or not. I
23  haven't really thought about that. But it would certainly --
24  certainly include from the definition of violence some
25  physical altercation.

81

82

1    MR. BRAUCHLE:   Let's look at the second special
2    issue. You realize I don't think they are numbered.  But I
3    think they are going to be presented to you in the order that
4    they are up there.  And you realize that you don't get to that
5    special issue unless you found that the person fills all the
6    attributes of the special -- the first special issue?
7    PROSPECTIVE JUROR:   Correct.
8    MR. BRAUCHLE:   If the State can't prove the
9    first special issue to you, you don't go to the second one,
10   and you don't have to gravel with that.
11   Do you have any idea what would have to be shown or not
12   shown to you before you could answer that first special issue
13   in such a way to -- that we can proceed down?
14   PROSPECTIVE JUROR:   Well, you know I need to
15   hear a little bit about certainly how he was raised, has he
16   been in trouble before, did he go to school, did he beat up
17   little old ladies at the bus stop, good to church.  Not that
18   is all end all, be all and take into consideration the type of
19   crime that resulted in the death and state -- psychiatrist
20   testimony could be persuasive on that fact.  Presuming that
21   the doctor actually saw the patient versus just commenting.
22   Those would be the type of things that -- I would obviously
23   take into consideration anything you put in, but those would
24   be kind of the things -- what his background was, what he has
25   done up to this time.  Those type of things.

1    MR. BRAUCHLE:   Well, I don't want to disappoint
2    you, and I am not trying to lecture to you, those people over
3    there are trying to kill our client.  I don't think they are
4    going to bring baby pictures or somehow are mitigating.
5    PROSPECTIVE JUROR:   Correct.
6    MR. BRAUCHLE:   If there is something out there
7    that shows him to be a bad person or not worthy of being saved
8    from the death penalty, they are going to try to find it.  And
9    unfortunately under our system of jurisprudence as you know,
10   we don't have any duty to bring any evidence to the courtroom?
11   PROSPECTIVE JUROR:   Right.
12   MR. BRAUCHLE:   And being a lawyer, you are one
13   of the few people that I think can appreciate that.  Because
14   generally when we tell people sitting where you are, they kind
15   of gristle and say, Well, why not, you are supposed to defend
16   the person.  That is kind of a TV concept as opposed to real
17   life.  Because once we show up down here, and we are pretty
18   good about showing up, we don't have to do anything.  We got
19   our client here, and we are here.  And we have fulfilled our
20   obligation.  Now, that is not to say that we might not strive
21   mildly to help you through these questions, but we don't have
22   to.  That's an unfortunate situation in life.  And I think you
23   can appreciate our dilemma or lack thereof in regard to
24   evidence one way or the other.  As you know, even in civil
25   law, you still look to the plaintiff or the movant party.

83

84

1    So can you see you might be hamstrung in regard to
2    looking at -- looking at or finding mitigating evidence in
3    regard to that second special issue?
4    PROSPECTIVE JUROR:   I would agree that I doubt
5    they are going to put on any if it gets that far -- I mean if
6    it gets to that stage.
7    MR. BRAUCHLE:   You got any questions of me?
8    PROSPECTIVE JUROR:   No, sir.
9    MR. BRAUCHLE:   Being close to the lunch hour,
10   you probably wouldn't ask them anyway?
11   PROSPECTIVE JUROR:   No, I am down here, I
12   would ask them.
13   MR. BRAUCHLE:   All right. I don't know where
14   that noise comes from, it is not from you?
15   PROSPECTIVE JUROR:   Okay, good.
16   MR. BRAUCHLE:   There have been a lot of suspects
17   that it could be attributed to you, but I don't think it comes
18   from the witness stand.
19   Ms. Worsham, you will be glad to know that at the present
20   time I don't have any further questions of you.  Thank you
21   very much.
22   PROSPECTIVE JUROR:   Thank you.
23   THE COURT:   You may step down, Ms. Worsham.
24   (Jury retired from the courtroom.)
25   THE COURT:   Just so I am on the same page, we

1    are doing the same thing with her?
2    MS. HANDLEY:   No.
3    MR. BRAUCHLE:   Your Honor, as the Court's well
4    aware -- oh, y'all have to accept her.
5    MS. HANDLEY:   Your Honor, we would accept juror
6    78-G, Laura Worsham, we will accept her.
7    THE COURT:   Thank you, Ms. Handley.
8    Now you may proceed, Mr. Brauchle.
9    MR. BRAUCHLE:   As the Court is well aware, we
10   suspended our 15th peremptory strike yesterday due to a
11   great extent to erroneous or improper rulings by the Court, as
12   well as poor jurors.
13   And in regard to this juror, we find her as being totally
14   unacceptable by her questions in regard to this special issue,
15   not acceptable to either us or our client.  And because of the
16   not having any further peremptory challenges, we would ask the
17   Court to grant us an additional peremptory challenge to
18   preserve the rights of our defendant.  We would anticipate
19   that the Court would see that she is not qualified in regard
20   to deciding the special issues set out in special issue number
21   two, which therefore makes her unacceptable under *Morgan*
22   *versus Illinois*.  And we also think that she places an
23   unreasonable burden on the defendant by expectations of us
24   presenting or obtaining evidence to answer the special issues
25   in the event that our client is found guilty.  And we would

85

1   once again ask the Court for an additional challenge.
2           THE COURT:   The Court will grant --
3           MR. BEACH:   May we approach?
4           (Discussion off the record.)
5           THE COURT:   The Court will overrule your
6   request, Mr. Brauchle -- or challenge.
7           MR. BRAUCHLE:   Note our exceptions, Your Honor.
8   Because of the Court's erroneous ruling we would renew
9   our request for an additional peremptory challenge and we
10  would state the reasons for our request as those that have
11  been set out heretofore.
12          THE COURT:   The Court will grant the Defense's
13  request for an additional challenge.
14          MR. BRAUCHLE:   We will now use the additional
15  peremptory challenge to strike Juror No. 78-G Laura Worsham.
16          THE COURT:   Mr. Moorehead, if you will bring
17  Ms. Worsham.
18          THE BAILIFF:   All rise for the juror.
19          (Prospective juror entered the courtroom.)
20          THE COURT:   Ms. Worsham I will have you know
21  that you have been excused as a juror in this case, you are
22  free to go.
23          PROSPECTIVE JUROR:   Thank you very much.
24          THE COURT:   We are recessed until 1:15.
25          (Lunch recess taken.)

86

1           THE BAILIFF:   All rise for the juror.
2           (Prospective juror entered the courtroom.)
3           THE COURT:   You may be seated.  Good afternoon,
4   Ms. Hartgrave.  How are you?
5           PROSPECTIVE JUROR:   Good.
6           THE COURT:   I apologize for the delay.  As I
7   told you earlier, sometimes the interviews go a little longer
8   than we anticipate.  So we appreciate your patience.  The
9   attorneys are going to question you about your qualifications
10  as a juror on this case.  There aren't any right or wrong
11  answers.  They are merely trying to see how you feel about
12  certain issues.
13      The State will proceed.
14      What says the State?
15          MR. BEACH:   May it please the Court?
16                  CORINE HARTGRAVE
17  was called as a prospective juror, after having been
18  previously sworn by the Court, testified under oath as
19  follows:
20                  VOIR DIRE EXAMINATION
21  BY MR. BEACH:
22      Good afternoon, Ms. Hargrove.  How are you doing?  My
23  name is Andy Beach, along with Andrea Handley, we are going to
24  be conducting the jury selection phase of this capital murder
25  case on behalf of the State.

87

1       To our left, Karo Johnson and Paul Brauchle, they are
2   attorneys here in town, and they represent the defendant.  He
3   is the man at the end of the counsel table, that's Wesley
4   Ruiz.
5           THE DEFENDANT:   Good afternoon.
6           MR. BEACH:   Now, is it quieter back there in
7   that jury room than on that school bus that you drive
8   everyday?
9           PROSPECTIVE JUROR:   No, I drive -- it's for
10  Grand Prairie High School, and I drive the juvenile justice
11  detention route.
12          MR. BEACH:   Are there police on the bus?
13          PROSPECTIVE JUROR:   No.
14          MR. BEACH:   Just you?
15          PROSPECTIVE JUROR:   Just me.
16          MR. BEACH:   Any other special precautions,
17  anything like that?
18          PROSPECTIVE JUROR:   No.
19          MS. HANDLEY:   You can handle them?
20          PROSPECTIVE JUROR:   Yes.
21          MR. BEACH:   Listen, while you are down here is
22  because we have looked at your questionnaire, and I bet we
23  have looked at over a thousand of these in the last eight
24  weeks, okay.  And both sides kind of -- we call out the people
25  that we know have no chance of being on this jury, those being

88

1   the ones who believe that the death penalty is appropriate in
2   every murder case.  The ones that believe the death penalty is
3   never appropriate or don't believe in the death penalty.  They
4   would not be qualified jurors under the law, the way the law
5   is here in Texas.  On your questionnaire you circled number
6   two there on the first page; that is, you believe that the
7   death penalty could be appropriate in some murder cases.  And
8   guess what, that's what the law is here in Texas.  And that's
9   why we got you to come back down here today.  I don't think we
10  are going to spend a whole lot of time with you, we want to
11  talk to you a little bit about how a trial like this works.
12  And make sure that you are qualified to be on this jury, okay.
13      Now, have you ever been on jury duty before?
14          PROSPECTIVE JUROR:   I have had jury duty, but I
15  have never actually sat on a jury.
16          MR. BEACH:   Okay.  And you were in the Marines;
17  is that right?
18          PROSPECTIVE JUROR:   Yes.
19          MR. BEACH:   What were you discharged out of?
20          PROSPECTIVE JUROR:   What base?
21          MR. BEACH:   Yes.
22          PROSPECTIVE JUROR:   Camp Lejeune, North
23  Carolina.
24          MR. BEACH:   And did you meet your husband in the
25  Marines?

1      PROSPECTIVE JUROR:   Yes, I did.

2           THE MR. BROOKS:   From your question, looks like

3   married, divorced, marry again?

4      PROSPECTIVE JUROR:   Yes.

5      MR. BEACH:   Is this better this time around?

6      PROSPECTIVE JUROR:   Definitely.

7      MR. BEACH:   Amazing how a few more years of

8   maturity kind of helps on a deal like that.  Who is Jonathan

9   McCullum to you?

10     PROSPECTIVE JUROR:   He used to be a neighbor,

11  but he now lives in Mansfield.  He is still a friend.

12          MR. BEACH:   Still a friend.  Now, you understand

13  the allegation in this case involved the murder of a peace

14  officer, while that peace officer was in the line of duty.  We

15  have had a lot of jurors come down here, and some jurors have

16  brothers that are police officers; and basically again, we

17  can't help your life experience, everybody is going to know

18  police officers.  But to be a qualified juror in this case,

19  you would have to be able to assure us, the Defense and the

20  Judge the fact that you had a former neighbor who was a

21  jailer, this being a peace officer case that would not unduly

22  influence you?

23     PROSPECTIVE JUROR:   It wouldn't.

24     MR. BEACH:   You in good shape on that?

25     PROSPECTIVE JUROR:   I am fine with that.

---

1           MR. BEACH:   You are here because you are in line

2   with what the law is here in Texas; that is, the death penalty

3   is appropriate in some very special limited murder cases.  And

4   one of those being the murder of a peace officer, okay.  If

5   you murder a jailer, a prison guard while you are trying to

6   escape from prison, that potentially could be a death-penalty

7   case.  Okay.  If you murder a child under the age of six,

8   that's a potential death-penalty case.  And the other category

9   of capital murder versus what we just call regular murder

10  involves the most common example, if I go into a convenience

11  store -- if I go into a 7-Eleven to rob the store and I murder

12  the clerk behind the counter, a murder while in the course of

13  committing another serious felony, that is a capital murder

14  case where potentially you could be exposed to the death

15  penalty.  But other than those very few fact situations, those

16  are the only fact situations where the State could even seek

17  the death penalty here in this state.  So the very exclusive

18  limited and not very often used, despite what you read in the

19  media, very seldom used situation here in Texas.

20          Any criminal trial, whether a death penalty trial or DWI

21  simple as that, basically the same.  There are a few

22  difference in a case like this that we are going to talk

23  about.

24          At the first part of the trial every criminal trial is

25  the same.  And it has the same basic laws that you would be

---

1   able to assure me, the Defense, that you would be able to

2   follow.  And I don't know if you remember back three or four

3   weeks ago when you were down here three or four weeks ago,

4   Judge White went over some of the basic ground rules that

5   apply in any criminal case.  And really the only request that

6   you are going to be called upon to answer in the first part of

7   the question, is he guilty or not guilty.  You are not going

8   to be called upon as to whether he gets a life sentence or

9   death penalty, it is guilty or not guilty.

10          What are the rules that you have to be able to follow in

11  the first part of the trial.  Like the Judge told you a few

12  weeks ago, as he sits here right now, Wesley Ruiz, he is

13  presumed to be innocent.  You haven't heard any evidence in

14  this case.  You don't know anything about this case.  It is

15  his right, it would be your right if you were charge with a

16  criminal offense, we do all the accusing in this case, we have

17  to do all the proving.  So you have to look to us to this side

18  of the courtroom for all the evidence in this case.  And we

19  have to convinces you beyond what?

20     PROSPECTIVE JUROR:   A reasonable doubt.

21          MR. BEACH:   Absolutely, that he is guilty

22  exactly as charged in the indictment in this case.  Until we

23  prove that to you beyond a reasonable doubt, that presumption

24  of innocence is in effect.

25     PROSPECTIVE JUROR:   Right.

---

1           MR. BEACH:   He is presumed to be innocent.

2   Can you follow that law?

3      PROSPECTIVE JUROR:   Yes.

4      MR. BEACH:   And can you make us prove everything

5   that we are required to prove to you beyond a reasonable doubt

6   before you would find him guilty?

7      PROSPECTIVE JUROR:   Yes.

8      MR. BEACH:   Now, what do we have to prove in

9   this case?  Well, it is on that half page piece of paper

10  there.  Take just a second to look at it.  While you are doing

11  that, I will paraphrase.

12          We have to prove that on or about a certain date, that

13  Wesley Ruiz, knowingly and intentionally caused the death of

14  that police officer, by shooting him with a firearm, okay.

15  And when he committed that murder, he knew that peace officer

16  that he was murdering was acting in the line of duty.  Okay.

17  We have to prove all those things to you.  Okay.  We can't

18  prove three out of four or four out of five.  Let me use kind

19  of a farfetched example, Ms. Hartgrave.

20          If we prove everything in that indictment, but we fail to

21  bring to you evidence, or worst yet, we prove that the murder

22  took place in Kaufman County.  One of the things we have to

23  prove there in the indictment is that this murder took place

24  in Dallas County, Texas, okay.  We have had almost a year now

25  to investigate this case, to word that piece of paper anyway

93

1   we wanted to.  And the corresponding obligation, ma'am, we
2   have to prove to you everything in there.  Even something as
3   simple sounding as the county where the murder took place.  If
4   we don't, Judge White will instruct you and the other 11
5   jurors, the State dropped the ball, they didn't do what they
6   were supposed to do under the law.  We are sorry, but you
7   would have to find this man not guilty, even though if you
8   knew that this man committed the murder.  It would make you
9   sick.  And we would get fired the next day for doing something
10  that stupid.  But that is to illustrate your mind what your
11  obligation would be in being a juror in this case.
12          Could you follow that law, ma'am?
13              PROSPECTIVE JUROR:   Yes.
14          MS. HANDLEY:   And the last thing.
15              MR. BEACH:   The last thing we want to talk to
16  you about, and again because it is our burden of proof, we are
17  the ones that did the accusing in this case, you have to look
18  to us.  All they have to do is be here.  And they are going to
19  be here everyday.  Okay.  And I know one of the corollaries
20  for that is, I am sure you are aware of is, that every
21  defendant has a Fifth Amendment right to testify if they want
22  to but they don't have to.  And there are all kinds of reasons
23  why defendants don't testify in their own behalf.  But for
24  whatever the case, this defendant, or a defendant in any
25  criminal case chooses not to testify in their own behalf,

94

1   Judge White would instruct you that they have that right and
2   you can't hold that failure to testify against them for any
3   reason whatsoever, you understand that?
4               PROSPECTIVE JUROR:   Yes.
5               MR. BEACH:   And could you follow that law,
6   ma'am?
7               PROSPECTIVE JUROR:   Yes.
8               MR. BEACH:   Now, what happens at the end of the
9   first part of this trial?  Let me kind of analogize it to a
10  two-act play.  Well, the first act is that we prove everything
11  to you beyond a reasonable doubt, is he guilty or not guilty.
12  If we don't do it, whether it is Dallas County, or the way the
13  police officer was murdered, guess what?
14              PROSPECTIVE JUROR:   Not guilty.
15              MR. BEACH:   You find him not guilty, the trial
16  is over, there is no act two, okay.  Now, let's assume,
17  though, so we can go on, that there is going to be an act two
18  and we have proved this case to you beyond a reasonable doubt.
19  It would be your obligation pursuant to your oath at that time
20  to find the defendant guilty because we had done what we were
21  supposed to do, we had proven the case to you beyond a
22  reasonable doubt.
23          You with me?
24              PROSPECTIVE JUROR:   Yes.
25              MR. BEACH:   Could you and would you find him

95

1   guilty if we found him guilty beyond a reasonable doubt?
2               PROSPECTIVE JUROR:   Yes.
3               MR. BEACH:   Now, just like you went to a play,
4   at the end of act one, at the end of guilt/innocence phase of
5   the trial, the curtain comes down, you and the other jurors go
6   out in the hall for intermission; and guess what, you don't
7   know how the play is going to end, do you?
8               PROSPECTIVE JUROR:   No.
9               MR. BEACH:   You have to come back for the second
10  act.  That's where in a capital murder case where the State is
11  seeking death is a little different than any other murder
12  case.  Some folks believe that once a defendant is found
13  guilty of capital murder, it is automatic, automatic he is
14  going to get the death penalty.  There shouldn't be an act
15  two.  If they think like that, they wouldn't be a qualified
16  juror in this case.  Really to be a juror, as a qualified
17  juror need to have the exact opposite mind-set.
18          The mind-set should be just like you presumed him to be
19  innocent at the first part of the trial until we proved to you
20  beyond a reasonable doubt that he was guilty, once you found
21  the defendant guilty at the first part, as we go into the act
22  two of the punishment phase, the law really wants you to
23  presume that a life sentence without parole is the appropriate
24  punishment.  That should be your mind-set going in.  And not
25  until the State brings to you evidence, additional evidence,

96

1   which we are entitled to do, convinces you that that life
2   sentence should be elevated up to a death sentence, not until
3   then would you ever vote for a death sentence.
4          You see how that is supposed to work?
5               PROSPECTIVE JUROR:   Yes.
6               MR. BEACH:   And could you do that, ma'am?
7               PROSPECTIVE JUROR:   Yes.
8               MR. BEACH:   And there is nothing automatic about
9   what penalty someone gets once convicted of capital murder.
10  The best that they will get is a life sentence without the
11  possibility of parole.  Unless he escapes from prison, because
12  he is going to die in prison because he is going to be there
13  for the rest of his natural life.  It doesn't matter in prison
14  if he finds a cure for cancer or brings peace to the Middle
15  East, he is never going to get out of pen.  That's the best
16  that he is looking at if he is found guilty of capital murder.
17          That's why the legislature -- the law here in Texas is as
18  you go in once, that life sentence remains or he gets the
19  death sentence, you have to look to us for additional proof
20  that convinces you and 11 other jurors that life sentence
21  should be elevated up to a death sentence.
22          Can you do that?
23              PROSPECTIVE JUROR:   Yes.
24              MR. BEACH:   So you go in to the punishment phase
25  believing that the life sentence is the appropriate

1   punishment. How are we able to convince a jury to elevate
2   that life sentence up to a death sentence? Well, it has to do
3   with answering these two questions. I want you to take a few
4   seconds to read that first question to yourself, ma'am.
5          PROSPECTIVE JUROR:   (Juror complies.)
6          MR. BEACH:   You get an idea what the legislature
7   is asking you there of that question?
8          PROSPECTIVE JUROR:   Yeah.
9          MR. BEACH:   Here is the deal before someone gets
10   a death sentence here in Texas. The legislature wants the
11   same jury to make two determinations, number one, in act one
12   is he guilty of capital murder. That's got to be the first
13   hurdle we have to overcome before we are even in the ball park
14   of a death penalty, okay. Now, before you get to that
15   question, obviously you have already answered that question in
16   the affirmative in the first part of the trial, yes, he is
17   guilty of capital murder and that's why we are going on to
18   part two, okay?
19          PROSPECTIVE JUROR:   Uh-huh.
20          MR. BEACH:   Now, again, before we -- before we
21   are entitled to a death sentence, the legislature want that
22   same jury not only to be convinced beyond a reasonable doubt
23   that he is a capital murderer, exactly as charged in the
24   indictment, but would you agree with me that question is
25   also asking you to prove to you and the 11 other jurors that

1   that now convicted capital murderer is going to be a future
2   danger to society. That's what that question is basically
3   asking you, right?
4          PROSPECTIVE JUROR:   Yes.
5          MR. BEACH:   So before we are entitled to elevate
6   that life sentence up to a death sentence, we have to convince
7   you and 11 other jurors that the defendant is going to be a
8   continuing threat to society and a future danger, because in
9   all probability he will continue to commit criminal acts of
10   violence. That's what we have to prove to you.
11          You understand at that?
12          PROSPECTIVE JUROR:   Yes.
13          MR. BEACH:   Like we discussed Ms. Hartgrave,
14   going in to answering that question, basically you are to
15   assume that the answer to that question is "no". What is the
16   effect of "no" in special issue number one, he stays at a life
17   sentence.
18          PROSPECTIVE JUROR:   Right.
19          MR. BEACH:   For us to have that "no" erased and
20   a "yes" put in there, we have to convinced you and the 11
21   jurors that he is going to be in all probability a continuing
22   threat to society. How do we do that?
23          What kind of evidence would help You determine if someone
24   was going to be a future threat to society. Anything come to
25   mind?

1          PROSPECTIVE JUROR:   Not off the top of my head,
2   no.
3          MR. BEACH:   A lot of folks tell us, listen, if I
4   had to drive that school bus everyday, if I went down there
5   tomorrow, I wouldn't know the first thing about it. So we
6   know you are a fish out of water right now. And that's fine.
7   A lot of folks tell us to learn about defendant's past. Was
8   this an isolated, one-time incident, everything kind of
9   converged and he committed a capital murder? Or was this a
10   part of pattern behavior that you can have seen coming from a
11   mile off? Has he lived his life continuously consistent to
12   this criminal pattern, it just wasn't a great surprise that
13   what happened on the day of the alleged murder happened, okay.
14          Would that kind of evidence be helpful to you in terms of
15   making that determination?
16          PROSPECTIVE JUROR:   Yes.
17          MR. BEACH:   Okay. And there could be other
18   evidence, but that's kind of primary -- obviously, you know
19   the facts of the offense themselves could, you know, help you
20   determine whether or not someone was going to be a continuing
21   threat to society; is that correct?
22          PROSPECTIVE JUROR:   Yes.
23          MR. BEACH:   But the bottom line, ma'am, is, we
24   have to convince you to erase that "no", that presumed "no",
25   we have to convince you beyond a reasonable doubt that he will

1   be a continuing threat to society and we have to bring to you
2   evidence to prove that to you.
3          And would you require us to do that?
4          PROSPECTIVE JUROR:   Yes.
5          MR. BEACH:   Again, you understand they don't
6   have to prove anything, it is not their burden. It is our
7   burden, we have to prove everything in that question to you
8   beyond a reasonable doubt before we would be entitled to a
9   "yes" answer, okay?
10          PROSPECTIVE JUROR:   Uh-huh.
11          MR. BEACH:   And you would make us do that?
12          PROSPECTIVE JUROR:   Yes.
13          MR. BEACH:   Now, what is the effect of a yes
14   answer to that first question? Well, the effect is now at
15   that point in time in the trial, that life sentence has been
16   elevated up to a death sentence. Because now not only have we
17   proved that he is guilty of capital murder, we have also
18   convinced the jury beyond a reasonable doubt that he is going
19   to be a future danger to society.
20          You with me on that?
21          PROSPECTIVE JUROR:   Yes.
22          MR. BEACH:   That's how we get from a life
23   sentence up to a death sentence, through competent evidence
24   and competent proof in this case.
25          Is the play over, not yet. Even though we have convinced

1   you beyond a reasonable doubt he is a capital murderer and a
2   future danger to society, you still got one more thing to look
3   at.  Take a minute to read that second question to yourself.
4                  PROSPECTIVE JUROR:   (Juror complies.)
5          MR. BEACH:   That's a little tougher one to
6   understand, you with me?
7                  PROSPECTIVE JUROR:   Uh-huh.
8          MR. BEACH:   Especially that personal moral
9   culpability.  Basically what we try to do is simplify for
10  people like you.  Now you know the defendant is sitting on a
11  death sentence, what the legislature want the jury to do
12  before that death sentence is etched in stone forever, that's
13  the way it is going to be, they want that same jury to go back
14  one more time and re-examine everything and try to determine
15  from the evidence, is there something about this defendant,
16  about his background, about the way he was raised, did he have
17  severely abusive parents that kind of tortured him all his
18  life.  Was he almost mentally retarded, very he very slow?  He
19  just that had a very low I.Q. that kept him from seeing things
20  the way other folks do.  They want you to go back to
21  things that would convince that jury that even though he has
22  earned a death sentence, this particular defendant, mercy is
23  the thing and a life sentence is appropriate punishment.  It
24  is a hard hoop to get you to go from life to death back to
25  life.  That's what the legislature wants you to do, to

1   re-examine that one last time.  The legislature wants the
2   jury, if they just feel so compelled by something in the
3   evidence, even though they know the defendant deserves a death
4   sentence, there is something about this defendant that
5   everyone believe we should spare his life and give him a life
6   sentence, something about his background, whatever it is going
7   to be, this question gives the jury the opportunity to do
8   that.
9          You with me on that?
10                 PROSPECTIVE JUROR:   Yes.
11         MR. BEACH:   My question is, if there was
12  something sufficiently mitigating, something that lessens his
13  blameworthiness, something that lessens his moral culpability,
14  the point where you believe, Ms. Hartgrave, that he has earned
15  a death sentence, could you take that death sentence back to a
16  life sentence if you believed the evidence convinced you to do
17  so?
18                 PROSPECTIVE JUROR:   Yes.
19         MR. BEACH:   Do you have any questions of me?
20         I appreciate your patience and I think you could be a
21  good juror in this case and we appreciate I coming down here
22  today.
23         THE COURT:   Thank you, Mr. Beach.
24         MR. JOHNSON:   May it please the Court?
25

103

104

1                  **VOIR DIRE EXAMINATION**
2   BY MR. JOHNSON:
3          Good afternoon.  My name is Karo Johnson.  I have a few
4   questions for you as well.  There are no right or wrong
5   answers to any of these questions.
6          We understand that you don't sit around your dinner table
7   at home talking about the death penalty?
8                  PROSPECTIVE JUROR:   No.
9          MR. JOHNSON:   When you got the questionnaire
10  thrust into your hand and saw the 18-page list of questions,
11  it was probably things you hadn't given a lot of thought to
12  before you had to write answers to; am I right about that?
13                 PROSPECTIVE JUROR:   Yes, sir.
14         MR. JOHNSON:   You got your questionnaire?
15                 PROSPECTIVE JUROR:   Yes, I do.
16         MR. JOHNSON:   You had anything -- you had a
17  chance to go back over it?
18                 PROSPECTIVE JUROR:   I looked at it, yes.
19         MR. JOHNSON:   Anything that you had changed or
20  said it was wrong?
21                 PROSPECTIVE JUROR:   No.
22         MR. JOHNSON:   You told Mr. Beach that one of the
23  things you do in your job, did I hear you say you transport
24  juveniles?
25                 PROSPECTIVE JUROR:   Yes.

1          MR. BRAUCHLE:   Is that from the juvenile
2   detention center?
3                  PROSPECTIVE JUROR:   On I-30 and Hampton.
4          MR. JOHNSON:   Are you picking them up taking
5   them to school?
6                  PROSPECTIVE JUROR:   I do a regular high school
7   run up to 40 students, drop them off at high school.  Then I
8   have 11 students, it was 12 until Friday, one got released on
9   Friday; but I have 11 students now that I pick up at their
10  house every morning, take them to Dallas, and then I pick them
11  up in the afternoon and I take them home.
12         MR. JOHNSON:   Those are juvenile delinquents?
13                 PROSPECTIVE JUROR:   They have been to court, the
14  Judge has said now you have to go here to school.  You can't
15  be trusted at regular school, so you are now going to the
16  juvenile detention center for school.
17         MR. JOHNSON:   But that's something you didn't
18  actually put in your answer?
19                 PROSPECTIVE JUROR:   That is part of my regular
20  job.
21         MR. BRAUCHLE:   You left that out when you filled
22  this thing out?
23                 PROSPECTIVE JUROR:   I am a school bus driver and
24  that's what I do.
25         MR. JOHNSON:   On page 14 where you talk about

1  your military service --
2                PROSPECTIVE JUROR:   Yes.
3                MR. JOHNSON:   -- now, I may be wrong about this,
4  did you leave the Marines with a higher rank than your
5  husband?
6                PROSPECTIVE JUROR:   My husband got out with a
7  medical discharge a year before I did.
8                MR. JOHNSON:   But I am talking about a rank?
9                PROSPECTIVE JUROR:   Yes, I was higher rank
10  when I got out.
11                MR. JOHNSON:   So does he still follow your
12  orders?
13                PROSPECTIVE JUROR:   He never did follow my
14  orders.
15                MR. JOHNSON:   And also on page 14, when it asks
16  about your religious, political and other activity --
17                PROSPECTIVE JUROR:   Uh-huh.
18                MR. JOHNSON:   -- I see what you put down there.
19  And I am not going to -- I am going to respect, except for I
20  do have to ask you a couple of things about it?
21                PROSPECTIVE JUROR:   Okay.
22                MR. JOHNSON:   I kind of need to know if you do
23  have a religious preference, is it something that is kind of
24  considered to be a main extreme type of religious preference,
25  it is not like some cult?

1                PROSPECTIVE JUROR:   I say a Episcopalian and
2  My husband is Pentecostal?  We don't go to church on a regular
3  basis.
4                MR. JOHNSON:   It actually got my curiosity.  Oh,
5  my God, she is in some kind of killer cult?
6                PROSPECTIVE JUROR:   No.
7                MR. JOHNSON:   Something like that, no animal
8  sacrifice.  Now, a few questions on page four of your
9  questionnaire.  It asks you about how strongly you feel about
10  the death penalty on the scale of one to ten, and you put down
11  an eight.
12                PROSPECTIVE JUROR:   Uh-huh.
13                MR. JOHNSON:   And ten being the strongest,
14  right; you understood that?
15                PROSPECTIVE JUROR:   Yes.
16                MR. BRAUCHLE:   So eight, you have a pretty
17  strong feeling about the death penalty?
18                PROSPECTIVE JUROR:   Yes.
19                MR. JOHNSON:   I take it you have a strong
20  feeling in favor of the death penalty; is that correct?
21                PROSPECTIVE JUROR:   In certain situations, yes,
22  if everything is proven, I feel in some situations it is
23  warranted and some it is not.
24                MR. JOHNSON:   All right.  You also put down that
25  you don't think the death penalty is ever misused?

---

1                PROSPECTIVE JUROR:   From what I have read,
2  you know and seen, I don't think so?
3                MR. JOHNSON:   Another thing you put down was, it
4  asked do you think that spending a life time in prison is
5  equivalent to the death penalty?  And you put, no.  Can you
6  explain what you meant by that answer?
7                PROSPECTIVE JUROR:   In my opinion, if it is
8  proven that it was a harsh and it was intentional and the
9  person didn't care what happened to the other person, is life
10  imprison equal to the death penalty, no, it is not.  If he
11  intentional -- if it is proven that he intentionally went out,
12  said you are a police officer, bang, I am going to kill you.
13  Then, yeah, I feel that the death penalty would be probably
14  sufficient.  Until I hear the evidence, I don't know, you know
15  which way I would go.
16                MR. JOHNSON:   Okay, let me ask you this way,
17  between life imprison without parole and the death penalty,
18  which one of those two do you think is the more severe
19  punishment?
20                PROSPECTIVE JUROR:   Life imprison.
21                MR. JOHNSON:   You think life imprison is more
22  severe than the death penalty?
23                PROSPECTIVE JUROR:   Well, yeah, cause they will
24  never -- they will never be out from behind those bars if they
25  get life imprison.  But in death -- I just buried my

1  father-in-law yesterday, they are released.
2                MR. JOHNSON:   Okay.  All right.  I just got a
3  little bit more to talk to you about.
4        And I sympathize with you where you are.
5        One other thing you put down on the next page is asked if
6  you believe police officers are more likely to tell the truth
7  than the average person?  You put more likely?
8                PROSPECTIVE JUROR:   I believe they are more
9  likely to be honest.
10                MR. JOHNSON:   Briefly to these two special
11  issues up here.
12                PROSPECTIVE JUROR:   Yes.
13                MR. JOHNSON:   You understand that if the State
14  proved this case beyond all reasonable doubt, you get to those
15  two issues, correct?
16                PROSPECTIVE JUROR:   Yes.
17                MR. JOHNSON:   And you understand if they prove
18  to you what they have to prove in special issue number one and
19  they prove it beyond all reasonable doubt, then that's how
20  the person gets sentenced to death?
21                PROSPECTIVE JUROR:   Yes.
22                MR. JOHNSON:   So where you find yourself at that
23  point is, if you have convicted somebody of capital murder and
24  you have now decided that they are a future danger and there
25  is nothing that can be done to protect any aspect of society

1  from them, the only thing that can be done is to actually kill
2  them; you understand that's where you would be at that point?
3          PROSPECTIVE JUROR:  Yes.
4          MR. JOHNSON:  Then it asks you to go to the
5  second issue and decide on mitigating, okay.
6      You understand that's what the second issue is?
7          PROSPECTIVE JUROR:  Yes.
8          MR. JOHNSON:  What do you think of about in that
9  question that would be mitigating to you under those
10  circumstances, does anything come to mind?
11          PROSPECTIVE JUROR:  Their background, their
12  history, as a child.  I think in some situations could
13  possibly, you know, change my opinion on whether or not to
14  give the death penalty or to make it life imprison.
15          MR. JOHNSON:  Okay.  But back on page three, you
16  feel like if somebody knowingly killed a police officer, you
17  feel pretty strong that the death penalty would be something
18  you would consider and possibly give this punishment in that
19  type of case?
20          PROSPECTIVE JUROR:  It would be something that
21  I would consider, but you know I would have to see the facts.
22          MR. JOHNSON:  Okay.  All right.  You have any
23  questions?
24          PROSPECTIVE JUROR:  No, sir.
25          MR. JOHNSON:  For any of us?  Okay, well, we

1  thank you for your time?
2          THE COURT:  Thank you, Ms. Hartgrave.  You may
3  step down.
4          (Prospective juror retired from the courtroom.)
5          MR. BEACH:  The State finds Juror No. 69-E,
6  Corine Hartgrave, to be acceptable.
7          THE COURT:  Thank you Mr. Beach.
8          MR. JOHNSON:  Judge, we would submit this juror
9  for cause based on several factors.  The first factor being
10  that she did not tell us in her questionnaire that she
11  actually was involved with law enforcement in regard to
12  transporting juvenile delinquents that are part of -- that she
13  has hidden that from us.  There is no telling what she might
14  have been hiding.
15      We submit her on the fact that she favors police officer
16  testimony over civilian testimony.  That she is very strongly
17  in favor of the death penalty.  That she does not think that
18  the death penalty is ever misused.
19      And under *Morgan v. Illinois*, she is unable to adequately
20  give meaning to the mitigation.  And on the basis of all those
21  factors and the tenor of her testimony here and the
22  questionnaire, we ask that she be struck for cause.
23          THE COURT:  Mr. Beach, any response?
24          MR. BEACH:  Judge, I think she consistently
25  indicated that she could follow the law.  There is nothing to

111
112

1  predetermine that she would have to hear the evidence no
2  matter what the issue was and she can be fair to both sides in
3  this case.
4          THE COURT:  I will deny the Defense's request.
5          MR. JOHNSON:  Well, Judge, based on that
6  erroneous ruling and the erroneous rulings previously to this
7  that we have had to use peremptory challenges on that we
8  should not have, we would respectfully request the Court to
9  give us an additional peremptory challenge to use on this
10  juror, which -- and that's Juror No. 69-E, Ms. Hartgrave.
11          THE COURT:  The Court will grant the Defense a
12  second additional strike.
13          MR. JOHNSON:  We will use that second additional
14  challenge on this juror, Judge.
15          THE COURT:  If you will bring in Ms. Hartgrave.
16          THE BAILIFF:  All rise for the juror.
17          (Prospective juror entered the courtroom.)
18          THE COURT:  You may be seated.
19      Ms. Hartgrave, we appreciate your patience.  You have
20  been excused as a juror in this case.  So you are free to go.
21          PROSPECTIVE JUROR:  Okay.
22          THE COURT:  Thank you very much.
23          (Prospective juror retired from the courtroom.)
24          (Recess taken.)
25          THE COURT:  Back on the record concerning Juror

1  10, Gene Gage.
2      What says the State?
3          MS. HANDLEY:  The State would accept this juror,
4  James D. Gage.
5          THE COURT:  What says the Defense, Mr. Johnson?
6          MR. JOHNSON:  Judge, we would submit Juror No.
7  10-G for cause, based on his answers regarding special issue
8  number one, and his opinion that probability could be as low
9  as 10 percent, which is contrary to the law.  And because of
10  his position on that, we would -- we would submit that juror
11  10-G, Mr. Gage.  We would submit him for cause and ask that he
12  be struck.
13          THE COURT:  Response by State?
14          MS. HANDLEY:  Your Honor, Mr. Gage with respect
15  to the probability after the law was explain to him, he agreed
16  that he would in fact follow the law and hold that to greater
17  than 50 percent.  And he is qualified.
18          THE COURT:  The Court holds that Mr. Gage is
19  qualified and deny the Defense's request.
20          MR. JOHNSON:  Well, Judge, based on that
21  erroneous ruling regarding Juror Gage and previous erroneous
22  rulings regarding our request for strike for cause, we would
23  ask the Court to give us an additional peremptory challenge to
24  be used on this unacceptable juror 10-G, Mr. Gage.
25          THE COURT:  The Court will deny that request.



113

| | |
|---|---|
| 1 | MR. JOHNSON:  Note our exception. |
| 2 | (Pause in the proceedings.) |
| 3 | THE BAILIFF:  All rise for the juror. |
| 4 | (Prospective juror entered the courtroom.) |
| 5 | THE COURT:  You may be seated. |
| 6 | Good afternoon, Mr. Cannady.  How are you? |
| 7 | PROSPECTIVE JUROR:  Fine, thank you. |
| 8 | THE COURT:  Apologize for the little bit of |
| 9 | delay.  Sometimes the interviews run a little longer than we |
| 10 | anticipate. |
| 11 | The attorneys have some questions to ask you regarding |
| 12 | your qualifications as a juror in this case.  There aren't any |
| 13 | right or wrong answers to the questions.  They are merely |
| 14 | trying to see how you feel about certain issues. |
| 15 | The State will proceed first. |
| 16 | And is it Ms. Handley doing voir dire? |
| 17 | MS. HANDLEY:  Yes, Your Honor. |
| 18 | May it please the Court? |
| 19 | **CURTIS CANNADY** |
| 20 | was called as a prospective juror, after having been |
| 21 | previously sworn by the Court, testified under oath as |
| 22 | follows: |
| 23 | **VOIR DIRE EXAMINATION** |
| 24 | BY MS. HANDLEY: |
| 25 | Let me make sure I am pronouncing your name correctly, |

114

| | |
|---|---|
| 1 | Cannady? |
| 2 | PROSPECTIVE JUROR:  Yes. |
| 3 | MS. HANDLEY:  Good afternoon, Mr. Cannady, my |
| 4 | name is Andrea Handley.  These gentlemen are Marshall McCallum |
| 5 | and Andy Beach.  We are Assistant District Attorneys and we |
| 6 | are all responsible for selecting the jury for this particular |
| 7 | case. |
| 8 | And to my left is Mr. Karo Johnson and Paul Brauchle. |
| 9 | They are defense attorneys.  They represent the gentleman |
| 10 | seated at the end of the table down there, Mr. Wesley Ruiz? |
| 11 | THE DEFENDANT:  Good afternoon. |
| 12 | MS. HANDLEY:  Mr. Cannady, let me tell you what |
| 13 | is going on.  We had you come down with a lot of people and |
| 14 | fill out this questionnaire as you recall.  And we did that |
| 15 | several weeks in a row and we accumulated hundreds and |
| 16 | hundreds of questionnaires.  Since that time, believe it or |
| 17 | not, we have read them all.  And we have called out of that |
| 18 | just a select number of individuals to come down here to the |
| 19 | courtroom to talk to on a one-on-one basis with the purpose of |
| 20 | feeling out just a little bit more about your feelings on the |
| 21 | death penalty.  Also talk to you about the criminal law a |
| 22 | little bit.  And in particular on how a capital murder case |
| 23 | works. |
| 24 | You had an opportunity to read your questionnaire, sir? |
| 25 | PROSPECTIVE JUROR:  Yes. |

115

| | |
|---|---|
| 1 | MS. HANDLEY:  Tell me is there anything that you |
| 2 | would change in your questionnaire if called upon to do that |
| 3 | again, would you expand on anything?  I know we get you down |
| 4 | here, we thrust this big survey into your hand, which is |
| 5 | probably the last thing you thought you would do and put you |
| 6 | in those uncomfortable seats out there, a lot of people kind |
| 7 | of race through it and leave some blanks.  Is there anything |
| 8 | you would expand on for us? |
| 9 | PROSPECTIVE JUROR:  There was the law in |
| 10 | Texas, voluntarily intoxication does not constitute a Defense. |
| 11 | MS. HANDLEY:  Yes, sir. |
| 12 | PROSPECTIVE JUROR:  And I checked no.  And I |
| 13 | think I should have checked yes in that one. |
| 14 | MS. HANDLEY:  So you would put that you agree |
| 15 | with that law? |
| 16 | PROSPECTIVE JUROR:  Yes, that's correct. |
| 17 | MS. HANDLEY:  Okay.  And let me just -- let me |
| 18 | narrow your focus then to -- let's go to page four.  And you |
| 19 | know we had asked you, started asking your opinions about the |
| 20 | death penalty.  And I should have put on a scale of one to ten |
| 21 | how strongly you felt about it.  And then we had some |
| 22 | questions about it with respect to Texas and our use of the |
| 23 | death penalty and you left those blank at that point.  Let me |
| 24 | feel you out a little bit about that? |
| 25 | PROSPECTIVE JUROR:  Actually I lost my place |

116

| | |
|---|---|
| 1 | and I went to the next page.  I read that, the three questions |
| 2 | that I left blank, do you feel the penalty in Texas is too |
| 3 | often or too seldom used?  And on that I would say it is -- I |
| 4 | really don't feel that either too often or too seldom. |
| 5 | Because all the cases are on an individual basis and so, you |
| 6 | know it -- if that's the way it works out, that's the way it |
| 7 | is. |
| 8 | MS. HANDLEY:  You are confident for whoever who |
| 9 | may have received the death penalty, it was proper for that |
| 10 | particular case then? |
| 11 | PROSPECTIVE JUROR:  In most -- yes. |
| 12 | MS. HANDLEY:  Okay.  And I will tell you reading |
| 13 | your questionnaire, I get that impression from you, sir, you |
| 14 | recognize and have a good appreciation that in any criminal |
| 15 | case, you always do what is right for that particular case? |
| 16 | PROSPECTIVE JUROR:  Yes, that's right. |
| 17 | MS. HANDLEY:  And in fact, you served on a |
| 18 | criminal jury before? |
| 19 | PROSPECTIVE JUROR:  Yes, I have. |
| 20 | MS. HANDLEY:  And in this case, I am thinking |
| 21 | that you found the defendant guilty of manslaughter, but the |
| 22 | Judge assessed the punishment in this case? |
| 23 | PROSPECTIVE JUROR:  That's the way -- |
| 24 | MS. HANDLEY:  You weren't called upon to assess |
| 25 | punishment? |

117

1          PROSPECTIVE JUROR:   That's correct.

2          MS. HANDLEY:   Okay.  Let me -- let's bring it

3  around to what we are doing here today, just so we are singing

4  off the same sheet of music, so you know where I am coming

5  from.  I feel comfortable speaking for myself and -- also this

6  is Mr. Kevin Brooks, Mr. Cannady, he is going to be

7  offering -- or bringing forth the evidence in the actual case.

8      I will tell you that we have had time to look at this

9  case, and we have a single goal in mind; and that is, to get a

10  conviction of capital murder against the defendant in this

11  case and to go one step further and to secure an assessment of

12  death penalty versus life imprison.  I will tell you that's

13  what we intend to do and that is our goal.  Just to let you

14  know there are no surprises about it.  I tell you that, sir,

15  because I believe we have the type and quality of evidence

16  that will convince 12 people that that is the proper thing to

17  do for this particular case.

18      Not a lot of people are familiar with exactly what the

19  consequences of that are, other than kind of a vague idea.

20  But what would happen, Mr. Cannady, having returned a verdict

21  for a death sentence, at that point Judge White here, he would

22  have really no say in the matter.  He can't come in and second

23  guess you or change your verdict.  At that point he is called

24  upon to essentially sign a death warrant, setting a date in

25  the future for the execution of the defendant in the case.  At

118

1  that point he is transferred out to East Texas.

2      Have you ever been to Huntsville, Texas.

3          PROSPECTIVE JUROR:   I have been through

4  Huntsville, yeah.

5          MS. HANDLEY:   A lot of people have been through

6  Huntsville.  It is a way to get to Houston oftentimes.  And it

7  is a town really dedicated to the study of criminal justice,

8  the housing of inmates, and it is where we carry out our

9  actual executions.  He would be housed in a prison out there

10  in Livingston, Texas, until the day before his execution.  And

11  on that day before, he is going to be transported from

12  Livingston, Texas to downtown Huntsville, Texas.  There is a

13  very old prison system there and they call it the Walls Unit,

14  and it is where we actually carry out our executions.

15      He is going to be put in an isolated cell prior to that

16  time.  And on the day of his execution, they will allow the

17  defendant to have one last visitation.  He can have an

18  opportunity to visit with family if he has it, a spiritual

19  adviser, if he so incline.  Whoever it is, but he has got that

20  opportunity.  He would also have that opportunity for that

21  last meal that people often hear about or read about.  He can

22  order whatever he wants as long as it is on the prison system

23  menu.  But he would be given that last meal, and he would sit

24  there and eat that alone.

25      He would stay in that cell by himself until six o'clock,

119

1  because that's when we do executions in Texas.  And at six

2  o'clock, sir, he is going to be taken from an isolated cell,

3  down a narrow hallway to what we refer to as the death

4  chamber.  And whether he goes voluntarily or kicking and

5  screaming, he is going to go.  Because there are people who

6  are trained to get him from one place to another.

7      He would be brought into that death chamber.  It is a

8  small room.  It is very industrial looking, sterile.  And he

9  would be placed on a hospital bed or a gurney.  And at that

10  time, they would strap him down.  And another individual would

11  actually place an intravenous line into his arm.

12      In that small room on the side, there are two windows

13  there, and they both have curtains on them.  Now, after he is

14  strapped down and secured with the line, these curtains will

15  open up.  And on one side the defendant could have

16  representative of his family, his lawyer if he wants them

17  there, whoever he wants there to -- at that time to watch the

18  actual execution.  The other side of the room when the curtain

19  pulls back, there will be five people there as representatives

20  of the victim's family.

21      Once that is done, he could make that last statement, you

22  know we often hear about that.  And I am sure that you can

23  imagine, sir, over the course of the years, many things have

24  been said.  Anything from I am sorry, and I beg for

25  forgiveness down to people just proclaiming their innocence

120

1  until they take their last breath.  But regardless of what is

2  said, nothing is going to change at that point.  And there is

3  going to come a time then once he is finished or once he is

4  cut off from having his say, that the warden is going to gave

5  a nod to another individual.

6      This person would begin to hit a series of buttons and

7  they are designed to do three things.  It is going to start a

8  flow of chemicals into his vein.  The first thing it does is

9  it sedates his body.  Basically paralyzes him if you will.

10  The second thing that happens, it collapses his lungs.  The

11  third thing that happens is ceases his heart.  Whether it

12  takes four seconds, six seconds or eight seconds, as long as

13  it takes, until a medical doctor walks over and pronounces him

14  dead.

15      I don't walk you through that scenario to be morbid, but

16  to bring to the forefront what we are talking about here.

17      We are in a clean nice courtroom right now, we are all

18  being courteous to one another.  It doesn't get anymore

19  serious than what we are talking about here in life and death.

20      And I paint that picture for you to make sure we are all

21  really focused on the task at hand.  And what we are asking

22  you to potentially play a part in?

23          PROSPECTIVE JUROR:   I understand.

24          MS. HANDLEY:   Pardon me?

25          PROSPECTIVE JUROR:   I understand.

121

122

1    MS. HANDLEY:   And having given you that
2  scenario, knowing in your heart, sir, the question becomes if
3  you believe we proved the case to you beyond a reasonable
4  doubt, if you are convinced by the evidence points toward a
5  sentence of death versus life imprison, are you the type of
6  individual that can take part in a process that would
7  eventually caused the death of not a fictional character but a
8  man seated about 30 feet away from you?
9    PROSPECTIVE JUROR:   Yes, I could make a
10  judgment on that.
11    MS. HANDLEY:   Okay. I notice it seemed like
12  some thoughtful hesitation, and I will tell you that if the
13  people who have been selected of the jury, that's pretty much
14  the reaction that they have. Nobody is a hundred percent
15  comfortable with that. It is not an easy task and we
16  appreciate that you do have that kind of hesitation. And it
17  seems to me that you would take this very seriously. It is
18  not an easy thing to do and needs to be given some serious
19  consideration. Okay.
20    Let me talk to you just a little bit about -- let's talk
21  a little bit more about the death penalty, have your feelings
22  always been the same about the death penalty?
23    PROSPECTIVE JUROR:   Yes. I can't say that I
24  have ever changed my mind one way or the other. I have always
25  been if favor of it.

1    MS. HANDLEY:   Okay.
2    PROSPECTIVE JUROR:   Of the death penalty.
3    MS. HANDLEY:   And if you had an option to do
4  away with the death penalty then, would you not do that, you
5  say you have always been in favor of the death penalty?
6    PROSPECTIVE JUROR:   I wouldn't oppose doing
7  away with it, but -- but I still believe that if, you know the
8  crime is like I said in my questionnaire, is horrific enough
9  and if people in the right, I guess you would say, frame of
10  mind, they should know what they do, if they do a crime that
11  the death penalty is the punishment, then they should
12  understand that's what is going to happen.
13    MS. HANDLEY:   Do you think it is a deterrent to
14  others?
15    PROSPECTIVE JUROR:   It doesn't seem to be, so I
16  guess -- no, I don't.
17    MS. HANDLEY:   And then what purpose do you think
18  it serves then?
19    PROSPECTIVE JUROR:   It -- I guess we are just a
20  violent society and it is just part of our culture to, you
21  know for a person to pay the ultimate price for the ultimate
22  crime I guess you could say.
23    MS. HANDLEY:   Okay. Okay. And you understand,
24  Mr. Cannady, that the death penalty is not necessarily an
25  automatic thing that happens. It is whether or not somebody

123

124

1  receives the death penalty is a question for a jury to decide
2  based on the facts and the circumstances of the case at hand,
3  nothing is ever automatic in a capital murder case. Just
4  because an individual is found guilty of capital murder
5  doesn't mean that they automatically will receive the death
6  sentence. That is a question for the jury to decide.
7    You have been on jury duty before. So I am not really
8  going to belabor the process of how that works. I think you
9  have a real appreciation of how that works already. There are
10  fundamental laws that play into a part in any criminal case.
11  And you probably took those to task, the jury you sat in. In
12  order to be a qualified juror, you had to agree for follow the
13  law and you had to agree to assess your verdict based on the
14  evidence in the case, correct?
15    PROSPECTIVE JUROR:   Yeah.
16    MS. HANDLEY:   So when I say these things to you,
17  until a defendant is proven guilty beyond a reasonable doubt
18  by the State, you are to presume him innocent, that makes
19  sense to you?
20    PROSPECTIVE JUROR:   Yes.
21    MS. HANDLEY:   And it is a law that you would
22  agree to follow?
23    PROSPECTIVE JUROR:   Yes.
24    MS. HANDLEY:   And along that line, you would
25  always look to the State to prove this case. You would never

1  look to the defendant to prove him innocent, you will always
2  look to the State, correct?
3    PROSPECTIVE JUROR:   Yes.
4    MS. HANDLEY:   Something that you would hold to
5  us that burden also?
6    PROSPECTIVE JUROR:   Yes.
7    MS. HANDLEY:   And to prove to us beyond a
8  reasonable doubt. Reasonable doubt being a standard of proof.
9  A burden of proof, it is the highest in our system. It is not
10  preponderance of the evidence, clear and convincing. It is a
11  high burden of proof, and you would agree to hold us to that
12  highest burden of proof, would you not?
13    PROSPECTIVE JUROR:   Yes, I could do it.
14    MS. HANDLEY:   There may not be a definition to
15  beyond a reasonable doubt. Really it is at this point, what
16  you think it is. Some people say I would have to be certain,
17  I would have to be sure, I would have to be able to sleep at
18  night. That's how I know that reasonable doubt is. Suffice
19  it to say, it is the absolutely highest burden of proof.
20    And another fundamental of law is the defendant's right
21  not to testify against himself. Remain silent. If the
22  defendant chooses to exercise that constitutional right and
23  not testify in his case, then the law says you can't hold that
24  against him, you can't use that as evidence against him.
25    Is that a law that you would agree to follow in a

125

126

1 particular case?

2 PROSPECTIVE JUROR: Yes.

3 MR. JOHNSON: I guess it is worth repeating one

4 more time. We have to prove absolutely every element in the

5 indictment to you. Just as they had to prove to you in that

6 manslaughter case I believe it was that you sat on. No

7 element is any less important than another, you know. I have

8 to prove that on or about a particular date, in Dallas County,

9 Texas, the defendant did knowingly or knowingly take the life

10 of a police officer while he was in the line of duty. He knew

11 he was a police officer, and he did it by shooting him with a

12 firearm. Each of those elements I have to prove. I don't get

13 credit for five out of six, but all of them, correct?

14 If I fail to carry my burden, if I fail to prove any one

15 of though offenses, his honor will instruct you that you must

16 return a verdict of not guilty.

17 You understand that also?

18 PROSPECTIVE JUROR: Yes.

19 THE COURT: It is a far-out example, but let's

20 say I fail to bring you any evidence whatsoever to prove that

21 it happened in Dallas County, you would agree with me that it

22 is an essential element of the indictment. I don't think that

23 would happen. We have had a year to get ready for this case,

24 we know our case very well. But if we failed to prove Dallas

25 County, Texas, the Judge would instruct you that you must

1 return a verdict of not guilty.

2 And would you follow that law also?

3 PROSPECTIVE JUROR: Yes, sir.

4 MR. BEACH: Make you sick to your stomach,

5 probably, but it goes to your qualifications as a juror

6 your ability and willingness to follow the law. And so it may

7 be an extreme example, but it goes to that qualification issue

8 will you follow the law, even in a far-out example like that?

9 Did you have any problems that you sat on before, basing

10 your verdict on the facts in those cases?

11 PROSPECTIVE JUROR: No.

12 MS. HANDLEY: And is it your agreement that you

13 would do that in this case?

14 PROSPECTIVE JUROR: Yes.

15 MS. HANDLEY: I will tell you, Mr. Cannady, a

16 lot of people have come in with the assumption if you find an

17 individual guilty of capital murder, that means they will

18 automatically receive the death penalty. In fact it doesn't

19 work that way at all. From most criminal cases. In most

20 criminal cases you find the defendant guilty and you would go

21 back and you consider what the punishment range and things

22 such as that. Death-penalty cases are a little bit different.

23 An individual found guilty of capital murder, you are

24 looking at one or two things going to happen. They are going

25 to received life imprison without parole or the death penalty.

127

128

1 One of two things is going happen, okay, once you are found

2 guilty of capital murder. And what we don't do, is we don't

3 have you good back there and round-table discussion, which

4 sounds better, life or death. Instead what happens is the

5 jury in the second phase of the trial, you are presented with

6 more evidence at that time. And you go back and you answer

7 instead a series of questions. Based on how you answer the

8 questions will determine whether or not a defendant will

9 receive life imprison without parole or death.

10 You with me so far?

11 PROSPECTIVE JUROR: Yes.

12 MS. HANDLEY: There is nothing automatic about a

13 case -- about a capital murder case. Nobody automatically

14 receives the death sentence. It is something that has to be

15 arrived at by a jury after deliberation and by a consideration

16 of evidence in a case. But having said that, assuming that

17 you have found the defendant guilty of capital murder, you are

18 now going into the second phase of the trial, and you decide

19 what punishment is going to be. And at that point what is the

20 best that you could hope for at that point?

21 PROSPECTIVE JUROR: The best he?

22 MS. HANDLEY: What would be the best?

23 PROSPECTIVE JUROR: I guess it would be life

24 imprison, he wants to live as long as possible.

25 MS. HANDLEY: The best he could hope for is life

1 imprison. It's life or death at that point. You recognize

2 that in the first part of the trial, you are to give the

3 defendant a presumption of innocence until I prove to you that

4 he is guilty beyond a reasonable doubt?

5 PROSPECTIVE JUROR: Correct.

6 MS. HANDLEY: Once I prove that to you, that

7 presumption goes away and you may find him guilty.

8 In the second phase of a capital murder trial, there is

9 another presumption that comes into play. Going into the

10 second part of the trial where you decide if it is life versus

11 death, the defendant enjoys a presumption also. And the

12 presumption is this, Mr. Cannady, the law says that at that

13 point you as a juror must presume that life imprison without

14 parole is the proper thing to do, okay. Just because you

15 found him guilty of capital murder, doesn't mean he

16 automatically should get death. You go in presuming that life

17 imprison is the proper thing to do. And it goes to our burden

18 of proof once again, I am sure you could appreciate me asking

19 you to find a death sentence. Before you do that, wouldn't

20 you want to be darn sure that was the absolute thing to do?

21 PROSPECTIVE JUROR: Yes.

22 MS. HANDLEY: And that's the way it should be.

23 And we are asking you to do that, so we ought to have to prove

24 to you that it is right thing to do. Going in your

25 presumption before you heard anything from us, your

129

130

1 presumption is that life is the proper thing to do, right.
2 And it doesn't change until I convince you beyond a reasonable
3 doubt that it ought to be death.
4         PROSPECTIVE JUROR:   Yeah.
5         MS. HANDLEY:   And will you agree to do that,
6 Mr. Cannady, that even though you found him guilty of capital
7 murder, you will go into the second phase assuming that life
8 is the proper thing to do?
9         PROSPECTIVE JUROR:   Yes.
10        MS. HANDLEY:   And you will hold on to that
11 presumption until I prove to you beyond a reasonable doubt
12 that it should be different?
13        PROSPECTIVE JUROR:   Yes.
14        MS. HANDLEY:   As I said, the way you get to that
15 stage, that final conclusion by answering questions.  And the
16 first question we have you answer as a juror is actually that
17 first special issue on there.  Go ahead, if you will, take a
18 look at that and -- take a look at that and read it to
19 yourself.
20        PROSPECTIVE JUROR:   (Juror complies.)
21        MS. HANDLEY:   It is not the greatest question in
22 the world, it is not an easy one.  We often call that question
23 the future dangerousness issue.  And I will tell you this,
24 Mr. Cannady, you have gone in presuming that life is the
25 proper thing to do at this point, right?  Only until that

1 question is answered "yes", does that life sentence become a
2 death sentence.  And basically what they are calling upon
3 there, has the State proved to you beyond a reasonable doubt
4 that this defendant will probably commit criminal acts of
5 violence that would constitute a continuing threat to society.
6 If you and the other jurors answer that question "yes", he is
7 now sitting on a death sentence, that's the way you get from
8 life to death.  In order for you to answer that question
9 "yes", as you can see, evidence beyond a reasonable doubt.  In
10 order for you to answer that "yes", I have to prove to you
11 beyond a reasonable doubt that the answer to that question
12 should be "yes".
13    Does that make sense to you?
14        PROSPECTIVE JUROR:   Yes.
15        MS. HANDLEY:   Now, keeping in mind he is already
16 sitting on a life imprison, isn't it?
17        PROSPECTIVE JUROR:   Yes.
18        MS. HANDLEY:   That's where he is going to be
19 until the day he dies.  What we didn't write there, those are
20 written by the legislature for these particular cases.  And
21 when they wrote that question and they ask you to answer it,
22 what they didn't do for you was to define certain terms in
23 that question.  We already talked about the first part, beyond
24 a reasonable doubt.  That goes to my burden of proof.  And it
25 is whatever you think it is, but it is that high burden of

131

132

1 proof, right?
2    They are asking you to make a determination as to how
3 this defendant is going to act in the future.  Well, what
4 society is he in at that point where is he going to be for the
5 rest of his life?
6         PROSPECTIVE JUROR:   In prison.
7         MS. HANDLEY:   And I am sure you will agree with
8 me, when we first hear of society, I think of where I work,
9 where I go to shop, my neighbors.  That that's a society that
10 you and I live in and move around in.  And I think it is fair
11 to say that what they are contemplating there is that prison
12 could also constitute and be a society of itself, right?
13        PROSPECTIVE JUROR:   Yes.
14        MS. HANDLEY:   That within a prison you have not
15 only do you have inmates, you have a guards, you have wardens,
16 administrative personnel, teachers, doctors, nurses.  You have
17 people coming in to visit.  You got volunteers coming in to
18 put on programs.
19    So would your definition of society, could you also
20 consider that prison can also be considered a society too?
21        PROSPECTIVE JUROR:   Yes.
22        MS. HANDLEY:   Maybe a smaller society within our
23 greater society?
24        PROSPECTIVE JUROR:   Yes.
25        MS. HANDLEY:   So they are requesting you to make

1 a call on how he is going to act within the society that he is
2 in.  They start up by asking you if you think there is a
3 probability.  Well, they don't define probability for you
4 either.  That's another word that is not defined.
5    But would you agree with me that there is a huge
6 difference between something being possible and something
7 being probable?
8         PROSPECTIVE JUROR:   Yes.
9         MS. HANDLEY:   I am sure you heard that
10 expression, "Anything is possible."  No matter how outlandish
11 it would be.  Possibly I could win the lottery tomorrow.  It
12 is possible.  Is it probable, I don't know.  But with respect
13 to whether or not something is a probability, that's for you
14 to decide what that is.  Some people say that in their
15 definition, they consider it more likely than not something is
16 probable.  Or if something is probable, there is greater than
17 a 50 percent chance is what that word means is probable.
18    Do you see any different definition for probable or do
19 you have a different one?
20        PROSPECTIVE JUROR:   No.
21        MS. HANDLEY:   So you wold agree with me then, it
22 is more likely than not or at least a greater than 50 percent
23 chance?
24        PROSPECTIVE JUROR:   Yes.
25        MS. HANDLEY:   Okay.  That the defendant would

133

134

1  commit criminal acts of violence. Once again, Mr. Cannady,
2  they don't provide for you what is the other crimes. So do
3  you think it is proper the defendant would commit a
4  kidnapping? They haven't been very specific about it. They
5  just said he will commit a criminal act of violence. It is
6  for you to decide what criminal act of violence.
7       My co-counsel sitting here just minding him business
8  right now; and if I just popped him in the face and knocked
9  him out of the chair, would you consider that a criminal act
10 violence?
11          PROSPECTIVE JUROR:  Yes.
12          MS. HANDLEY:  Okay. Certainly violent. I would
13 tell you it is certainly an assault, something that I could be
14 held to trial for at this courthouse here. But again what
15 constitutes a criminal acts of violence is for you, Mr.
16 Cannady, to decide, okay. And they are talking about
17 probability that he would do these criminal acts and be a
18 continuing threat to what society?
19          PROSPECTIVE JUROR:  Prison society.
20          MR. BEACH:  In order for you to answer that
21 question "no", presumably we will bring you more evidence.
22 You can consider the circumstances of the offense that you
23 just found him guilty of. And you could consider any other
24 evidence that we brought you that may convince you to answer
25 "yes" versus "no".

1  Let me ask you, what kinds of things do you think that
2  you would have to know or see or hear on whether or not the
3  person was going to be a future danger to society?
4          PROSPECTIVE JUROR:  I would need to know the
5  actions that he has done in the past. I guess in that same
6  society. You look at the way he is acting, you know around
7  the people that he is with.
8          MS. HANDLEY:  Sure. A lot of people have told
9  us at times the best predictor of future activity is how have
10 you acted in the past. Was it a one-time anomaly this crime
11 he committed or has this been a pattern of criminal behavior
12 that culminated into this crime, and who is surprised by it?
13 So they look at past activity.
14      Anything else that you think would be important to you in
15 making that determination?
16          PROSPECTIVE JUROR:  No.
17          MR. BEACH:  And it is hard for me to put you on
18 the spot. And really there are no right or wrong answers
19 here, and I can't commit you to anything in particular. What
20 it comes down to, Mr. Cannady, you are looking to us that he
21 is going to be that future danger. And you are allowed to
22 look at the crime that he committed. And you are allowed to
23 look at any other evidence brought before you to make that
24 determination.
25      You answer that question "no", then that life sentence

135

136

1  that you think is the most proper thing to do, stays a life
2  sentence, okay. And that's it. If, however, you look at the
3  evidence and are convinced beyond a reasonable doubt that the
4  answer to that question is actually "yes", then that life
5  sentence that you presumed was the proper thing to do, has now
6  been elevated up to a death penalty. But you are not done yet.
7  at the death penalty. But you are not done yet. He has now
8  earned a sentence of death, but it is not over yet. You have
9  to answer one more question before we can make that final
10 determination. And that second question is that special
11 second issue there.
12      Go ahead and take a moment to read that to yourself.
13          PROSPECTIVE JUROR:  (Juror complies.)
14          MS. HANDLEY:  What do you think that question is
15 asking you?
16          PROSPECTIVE JUROR:  If based on his past actions
17 that he is, ah, maybe should be spared the death penalty.
18          MS. HANDLEY:  You are right on point. I believe
19 you are right on point, Mr. Cannady. That's basically what it
20 is asking you there. You know, cause keep in mind you found
21 him guilty of capital murder, right? And at this point you
22 found that, yes, he is a future danger to society, correct, so
23 he has earned his death sentence. They are going to let you
24 answer one more question right there. Look at everything now.
25 Look at all the evidence once again. Even though you found

1  him guilty of capital murder, he is a future danger to
2  society, is there something there? Is there something about
3  his character, is there something about his background, is
4  there something about his personal moral culpability or
5  blameworthiness that would warrant bringing that death
6  sentence by down to a life sentence instead. I think another
7  way of looking at it, they are going to make sure that when
8  you leave the courthouse that day you are not going to walk
9  out going, you know what, he was guilty of capital murder, and
10 yeah, he was in future danger, I agree; but there was some
11 more evidence that I thought was very compelling, that I
12 thought warranted consideration and I thought quite frankly
13 sufficient enough, mitigating enough that it should have been
14 brought back down to life. And that's basically what that
15 questions gives you, it gives you that opportunity to show
16 some mercy.
17      What they are looking at there, they are asking you to
18 find are there sufficient mitigating circumstances. I can't
19 tell you what a sufficient mitigating circumstance is. It is
20 whatever you may think it is. And I am not going to put you
21 on the spot and ask you, you know, what you think is a
22 sufficient mitigating circumstance is. You may or may not be
23 able to tell us right now. But what the question asks you,
24 and in order for you to be a qualified juror, the question is
25 this, if you, Mr. Cannady, after having found him guilty, if

137

138

1  you saw something in the case that you felt warranted bringing
2  that death sentence back down to a life sentence, would you in
3  fact do it?
4        PROSPECTIVE JUROR:   No.
5        MS. HANDLEY:   And why do you say no, sir?
6        PROSPECTIVE JUROR:   Because -- I look at, you
7  know the actions, the crime, you know what happened, and then
8  I just can't see, you know, having mercy or being lenient
9  after everything that has happened.
10       MS. HANDLEY:   Is it that you can't at this
11  point, you can't think of what would constitute a sufficient
12  mitigating circumstance?
13       PROSPECTIVE JUROR:   No.
14       MS. HANDLEY:   And at this point you are not
15  called upon to tell us what would be a sufficient mitigating
16  circumstance. You haven't seen anything in the case. We
17  can't tell you to tell us something. It could be anything.
18  The question used to have to do more was a focus on folks with
19  retardation. We cannot execute the mentally retarded in the
20  United States.
21       Let's say for example that you have somebody who may not
22  be academically or technically mental retarded. They don't
23  think like you and I do. They don't have the same mental
24  processes and appreciation for what is going on around them.
25  They are not mentally retarded, but they are pretty darn

1  close. Or maybe there is something about the defendant's
2  background, maybe from the time he was born, Mr. Cannady,
3  maybe his parents abused him from the time he was born. And
4  he was consistently and mentally and physically and sexually
5  abused. And while that is not necessarily an excuse for
6  criminal behavior, but maybe you look at that, and you think
7  you know what, they raised him to act and be this way. And
8  quite frankly his parents ought to be on trial with him. It
9  doesn't mean he is not guilty and it doesn't necessarily
10  excuse it. But it is a circumstance the maybe his personal
11  blameworthiness is not entirely his own. Or maybe there is a
12  circumstance about the particular offense. Maybe he is the
13  guy who stood around and tried to resuscitate the victim and
14  tried to call for help.
15       I can't get you to tell me what would be a sufficient
16  mitigating circumstance. The question becomes this, the
17  question becomes, if you saw it, Mr. Cannady, if you looked at
18  the evidence in the case and you said, you know what, I think
19  that is a sufficient mitigating circumstance that warrants
20  bringing the sentence back down to life, the question becomes,
21  would you do it?
22       PROSPECTIVE JUROR:   I guess I would. I don't
23  mean to sound contradicting to what I am say, but when you
24  mentioned retardation, that would be one of the main concerns.
25       MS. HANDLEY:   And not technically mentally

139

140

1  retarded. There may be --
2        PROSPECTIVE JUROR:   I guess I would. You know,
3  I would.
4        MS. HANDLEY:   Okay. If you saw it, if you
5  thought it was sufficient and you thought it was mitigating,
6  if you saw it, then you could do it and you would do it. But
7  telling me what it is today, is kind of hard for you?
8        PROSPECTIVE JUROR:   Oh, yeah, absolutely.
9        MS. HANDLEY:   Okay. And it is kind of a mental
10  gymnastics what we have done here, because you have found him
11  guilty of capital murder. You believe he is a future danger,
12  you know, but now we are asking you to do kind of a 180, and
13  say let's bring it back down to life. But again, it is there,
14  because if that fact and circumstances exists, where
15  Mr. Cannady thinks in my heart and in my mind, I think it
16  should come back down. And so if you saw it, then you are
17  saying that you would and you could bring that sentence back
18  down to a life sentence?
19       PROSPECTIVE JUROR:   Yes.
20       MS. HANDLEY:   Okay. Are there any questions you
21  have of me about the process or the law. Anything else that
22  you think that we need to know about the death penalty or what
23  we have been talking about?
24       PROSPECTIVE JUROR:   No.
25       MS. HANDLEY:   We both have an opportunity to ask

1  you questions. So I am going to have these gentlemen, let
2  them have a chance to talk to you now. Pass the juror.
3        THE COURT:   Thank you, Ms. Handley.
4  Mr. Johnson or Mr. Brauchle.
5        MR. BRAUCHLE:   Thank you, Your Honor. May we
6  have a brief recess Your Honor?
7        THE COURT:   You may.
8  Mr. Cannady, if you will step down, we will take about a
9  ten-minute break.
10       (Prospective juror retired from the courtroom.)
11       (Recess taken.)
12       (Prospective juror entered the courtroom.)
13       THE COURT:   You may be seated.
14  Welcome back, Mr. Cannady.
15  And the Defense may proceed.
16       MR. BRAUCHLE:   Thank you, Your Honor.
17             **VOIR DIRE EXAMINATION**
18  BY MR. BRAUCHLE:
19       Mr. Cannady, my name is Paul Brauchle. And during your
20  break in the jury room, did you think of any questions or any
21  aspect of what we had talked to you about during the first
22  part of this that you wanted to ask us about?
23       PROSPECTIVE JUROR:   No.
24       MR. BRAUCHLE:   So you think you are pretty clear
25  as to what was gone over with you?

1    PROSPECTIVE JUROR:  Yes.
2         MR. BRAUCHLE:  One thing I wanted to ask you
3    about was on page 18, the last page, that's asking if you have
4    ever been convicted of a felony or any type of theft.  And
5    then it is probably not worded very well.  But it says applied
6    to you, is the above statement true and correct, and you
7    checked, no.  So --
8         PROSPECTIVE JUROR:  It's an oversight on my
9    part.
10        MR. BRAUCHLE:  We have to make sure about that.
11   We are not accusing you of anything.  And a lot of people do,
12   and I think next time we use this form, we will probably
13   change the small print there to where it is a little easier to
14   understand.  As it applies to you, you have -- the answer
15   should be, yes, then?
16        PROSPECTIVE JUROR:  That's correct.
17        MR. BRAUCHLE:  Okay.  Not a problem.
18        In regard to the previous jury trial, it was a
19   manslaughter, I believe; is that correct?
20        PROSPECTIVE JUROR:  Yes, sir, I think it was
21   vehicular manslaughter.  It was a DUI where a man was
22   convicted of driving and he ran -- he had an accident and it
23   killed a passenger in another car.
24        MR. BRAUCHLE:  Okay.  Was there -- did he cross
25   the median or anything like that, do you recall any detail?

1    PROSPECTIVE JUROR:  Yeah.  It was on Seagoville
2    Road, which was under construction at the time.  And he said
3    it was a barricade and a lot of bad weather and he crossed the
4    median and hit a car head on.
5         MR. BRAUCHLE:  See Seagoville is kind of in your
6    part of time, Garland; is that correct?
7         PROSPECTIVE JUROR:  Yes, sir.
8         MR. BRAUCHLE:  Do you know if he had been
9    convicted of anything like that in the past?
10        PROSPECTIVE JUROR:  According to the testimony,
11   he had prior arrests, yes.
12        MR. BRAUCHLE:  Any convictions that you
13   remember?
14        PROSPECTIVE JUROR:  I don't remember
15   convictions.
16        MR. BRAUCHLE:  Okay.  Also you are involved in a
17   lawsuit against TI for time involved with changing of
18   protective clothing; is that correct?
19        PROSPECTIVE JUROR:  Well, yes.  It is not
20   actually protective clothing.  It is just a suit to prevent
21   dust and particles and lint from entering the work area.
22        MR. BRAUCHLE:  The way-through area?
23        PROSPECTIVE JUROR:  Yes, where they produce
24   waivers, that's correct.
25        MR. BRAUCHLE:  Is that a class action?

143

1    PROSPECTIVE JUROR:  I don't know if you consider
2    it a class action.  I got a letter in the mail from some
3    people who had started the suit and they said I could enter
4    the suit, you know, because I work there.  And so I filled out
5    the questionnaire or called the number of the attorneys and
6    they sent me a questionnaire.  I filled out the questionnaire
7    and then I am participating in the lawsuit.
8         MR. BRAUCHLE:  You know how far it has gone or
9    anything?
10        PROSPECTIVE JUROR:  No.  It's for lack -- like
11   20 minutes of pay per day.  And basically it is for putting on
12   your garment before you go to work and after you go to work,
13   you are required to wear the garment; but they didn't pay us
14   to put it on.  So -- so I don't know how far it has gone.  I
15   went about six months ago to the attorneys and gave a
16   deposition in that case, but I haven't heard anymore since
17   then.
18        MR. BRAUCHLE:  Okay.  Let me just back up here
19   and go over a little bit of stuff that the State has gone
20   over.  I think if we would have stopped you after you filled
21   out this questionnaire and asked you what happens to people
22   that are convicted of capital murder in the State of Texas,
23   you would have probably said -- and this may or may not be
24   right, you would probably say those people get the death
25   penalty; would that be a correct statement?

144

1    PROSPECTIVE JUROR:  Yes.
2         MR. BRAUCHLE:  A lot of people think that's
3    true.  But you understand now from talking to Ms. Handley and
4    hearing how the system works, actually what is -- what happens
5    when you are convicted of capital murder, you get life without
6    parole; you understand that.  And only if this first special
7    issue over here is answered "yes", do you get death; you
8    understand that?
9         PROSPECTIVE JUROR:  Yes.
10        MR. BRAUCHLE:  And of course if they don't prove
11   that to you, if they don't prove enough information on that
12   special issue where you answer that "yes", the person still
13   gets life without parole.  In other words life without parole
14   is the default punishment at all stages in the trial.  If they
15   are found guilty, they get life without parole.
16        Let's just say that the Judge looks over and says, okay,
17   present the rest of your evidence in the punishment phase, and
18   they say, We don't have any.  Well, you couldn't answer any of
19   those special questions or those special issues, so the person
20   would still be the same after you found him guilty, he would
21   only get life imprison.  And I take it from your answer and
22   everything, you don't have a quarrel with that being the
23   punishment for somebody found guilty of capital murder; is
24   that a correct statement?
25        PROSPECTIVE JUROR:  Yes.

145

MR. BRAUCHLE:   You understand that capital murder is the intentional taking of a human life without any legal excuse or justification?  In other words, it is an intentional murder.  I want my co-counsel dead.  I decide I want him dead and I do whatever it takes to get him dead.  It is a thumbnail and graphic description of an intentional murder.

Now, then, I could kill him, do all sorts of bad things to him.  Since he is not anything other than a regular citizen, I could never get death.  My punishment would be five years to 99 years or life; you understand that?

PROSPECTIVE JUROR:   Yeah.

MR. BRAUCHLE:   Capital murder is always murder plus something else.  Killing a police officer, a fireman, a child less than six, a person over 65.  It has to be murder plus.  And only then can they be charged with a capital murder.  And only then do these special issues come into play.

Look at special issue number one, you know you don't answer that unless you found that the person has been found guilty of capital murder.  And in regard to that question, we want to ask you about probability.  And I know you have got some accounting background.  And you don't know if accountants have anything to do with statistics or whatever, but some people say that's a probability, just means that there is a chance that it will happen.  I don't know what your definition

146

would be.

You have any ideas to what you think probability should or shouldn't be?

PROSPECTIVE JUROR:   The chance that it might happen is a probability.

MR. BRAUCHLE:   Okay.  That's basically what almost everybody that we talk to said.  However, the courts have said that probably has to mean more than 50 percent.  See because if it doesn't mean more than 50 percent, it could happen or it couldn't happen.  It would just be a chance, you see what I am saying?

PROSPECTIVE JUROR:   Yes.

MR. BRAUCHLE:   You say chance, we are not getting on to you for it, we didn't send this question home to you to think out and analyze.  Can you see that it has got to mean more than 50 percent, or the word they could have used there would have just been chance, and of course anything can happen if there is a chance that anything can happen.  Would you agree with me on that?

PROSPECTIVE JUROR:   Yes.

MR. BRAUCHLE:   Okay.  Now, then, you also see that reasonable doubt is right in front of probability.  So basically we think -- and the people over here don't agree with the people over there.  And we can disagree as to what these means because the courts hadn't ever taken time to tell

147

either side what they do mean.  They just said that probability has to mean more than 50 percent and society can mean prison society.  That's the only guidance we have.  And that's not a lot when you have got all this complicated questions up here?

PROSPECTIVE JUROR:   Right.

MR. BRAUCHLE:   But you understand that our point of view is that reasonable doubt linked with probability, we think would probably, and there we go using probably, to talk about probability, that that would from our point of view mean that probability would have to be higher than 50 percent if it is linked with reasonable doubt.

Are you following me on that?

PROSPECTIVE JUROR:   Yes.

MR. BRAUCHLE:   In other words, if you are finding beyond a reasonable doubt that it is going to happen, we think that it should be more than 50/50 proposition.  Cause see everything in there -- every question in that first issue has to be proven beyond a reasonable doubt.  You know that he is going to be a continuing threat.  That he is going to commit criminal acts of violence.

See what I am talking about?

PROSPECTIVE JUROR:   Yes.

MR. BRAUCHLE:   There is about three questions that you have to answer in that one question.  I don't want to

148

bring back bad memories, but remember high school when we used to diagram sentences and break them up and all that.  Used to be one of my worse nightmares, but I finally got over that.  You can see they are asking you more than one thing in that one question.  And basically we think that the shorthand version of that one question is asking you, is the person that you are dealing with, the person that you just found guilty of capital murder, is this person so dangerous that the only way that we can control him is kill him?  You understand if you answer that question "yes", that's what happens to him.  He gets killed.

I am not miss -- I am not trying to misstate it.  Of course you would have to find "yes" there, and then the next special issue would have to answer "no"; but the result of that would be death.

You understand that?

PROSPECTIVE JUROR:   Yes.

MR. BRAUCHLE:   You think that I am stretching the meaning of that first question or stretching the language there by taking the point of view that is basically it is asking you, is this guy so dangerous that he needs to be killed?  Or can you see that in that question?

PROSPECTIVE JUROR:   I see it in the question, yes.

MR. BRAUCHLE:   Pardon?

1        PROSPECTIVE JUROR:   Yes, I see that, basically.
2        MR. BRAUCHLE:   Now, then, I think Ms. Handley
3   talked to you about special issue number two.  And that -- if
4   people come down here and have questions and problems with
5   special issue number one, special issue two is a real killer.
6   In that -- that might be a poor choice of words, people have a
7   lot of trouble figuring out what they are asking for there.
8   What they are asking, and I think Ms. Handley gave you an
9   example, and it is not the only situation that could apply;
10  but somebody who is slow to learn or whatever, that doesn't
11  have the ability to control their actions or reactions as a
12  normal person would or whatever.  They are not mentally
13  retarded or whatever.  As you know from living this long in
14  life, people have a lot of different abilities to cope with
15  stress, life, what have you.
16       Would you agree with me?
17       PROSPECTIVE JUROR:   Yes.
18       MR. BRAUCHLE:   And that one right there kind of
19  takes into consideration that not everybody that is tried for
20  the death penalty has the same abilities or the same
21  background, or the same intentions.  We know that their
22  intentions have to be such that they know what they were doing
23  at the time.  But it just gives you kind of -- we call it the
24  safety net.  It says if there is some question about this
25  person and it is not addressed by special issue number one,

1   perhaps it is significant enough that we can address it in
2   special issue number two.
3        Would you agree with that?
4        PROSPECTIVE JUROR:   Yes.
5        MR. BRAUCHLE:   You have any problem with that?
6        PROSPECTIVE JUROR:   No.
7        MR. BRAUCHLE:   Some people tell us, Look, you
8   got to be crazy.  I have just decided that somebody deserves
9   to be killed and now you want me to let him off the hook.
10  Well we didn't make up this plan.  We didn't write these
11  questions and this isn't some thing that we are down here and
12  just jerking you around.  This is the system that we have to
13  work under.  And the Court tells us, look, not everything can
14  be addressed by the first question.  And there may be special
15  considerations on that that need to be considered in the
16  second question.
17       Can you do that to give effect to special issue number
18  two?
19       PROSPECTIVE JUROR:   Yes, I could listen to the
20  evidence, I guess, you call it, the evidence, opinions, and --
21  and give it consideration to and see if it would overwhelm the
22  "yes" decision on special issue number one.
23       MR. BRAUCHLE:   Well, see it is asking you a
24  whole bunch of deals.  It says circumstances of the offense.
25  That's how the murder took place.  And there may be something

151

1   about that that might be interesting or not or worthy of some
2   consideration.
3        It says the defendant's character and background.  Not
4   everybody that is tried on a criminal case have the same
5   background.  Some grow up rich, some grow up poor, some have
6   bad character, some may have good character.  You see that.
7   Then that boils down to the personal moral culpability of the
8   defendant, which means that perhaps there are things that
9   would be somewhat out of the ordinary that would apply to the
10  defendant.
11       And then the next thing it says, is there a sufficient
12  mitigating circumstance or circumstances?  See it could be one
13  or more, it doesn't tell you what it is.
14       Let me give you an example.  Let's say that Ms. Handley
15  is on trial today and for whatever reason, you like the way
16  she appeared in court.  Now, that's not, as far as I know, a
17  mitigating circumstance; but let's just say that there is
18  something that the defendant or the person in court conveyed
19  to you that made you feel less inclined to kill that person,
20  mitigating circumstance.
21       See what I am saying?
22       PROSPECTIVE JUROR:   Yes.
23       MR. BRAUCHLE:   And somehow that influenced you
24  enough that you said, yes, I could answer special issue number
25  two "yes", okay.  Let me back up and I am not trying to

152

1   confuse you on this.  You notice up there in that special
2   issue, it doesn't say beyond a reasonable doubt.  There is no
3   real burden on that.  We don't have to prove something beyond
4   a reasonable doubt nor does the State.  It's just that there
5   is something about the defendant that makes you think well, he
6   deserves a break because of this.  You can give it to him.
7   Could you do that?
8        PROSPECTIVE JUROR:   Yes.
9        MR. BRAUCHLE:   Okay.  Let me tell you something
10  else, while we are going through the briar patch of that
11  special issue.  What may change your mind or what may be
12  important to you doesn't have to be important to anybody else.
13  In other words, we don't have to have 12 people that all think
14  that Ms. Handley looked real nice in court today.  See what I
15  am saying.  In other words, one person can say, well, I
16  thought he was a good son.  Another person can say, well, I
17  thought he had a good work history.  Another person could say,
18  you know any number of things.  See where I am coming from.
19  And you don't have to sit back there and all agree, well, we
20  all 12 agree that he had a good work history, because of that,
21  we want to give him a break.  It is just whatever applies to
22  you and if it does or doesn't.  But it doesn't have to be
23  unanimous, and it doesn't have to be beyond a reasonable
24  doubt.
25       Could you put that into effect?

153

154

1    PROSPECTIVE JUROR:  Yes.
2        MR. BRAUCHLE:  Okay.  Have I confused you
3    enough?
4        PROSPECTIVE JUROR:  It is a lot of issues.
5        MR. BRAUCHLE:  Well, see, when you first look at
6    them, they look fairly easy, but if you try and figure that
7    each one of them is asking you about ten or so different
8    things and going more than one direction at the same time,
9    they become pretty complicated.  And certainly we could spend
10   a lot of time talking to people, but their minds go numb after
11   about the first ten minutes and we don't get much past that.
12   So our minds go numb after the first two or three minutes,
13   cause we have to deal with these everyday.
14       Let me talk to you real briefly about one other thing.
15   You ever heard of self-defense?
16       PROSPECTIVE JUROR:  Yes.
17       MR. BRAUCHLE:  You believe in it?
18       PROSPECTIVE JUROR:  Yes.
19       MR. BRAUCHLE:  Basically it is deals with
20   principal that you have the right to defend ourselves against
21   unlawful attack to keep ourselves alive; is that the way you
22   understand it?
23       PROSPECTIVE JUROR:  Yes.
24       MR. BRAUCHLE:  At some point self-defense could
25   or could not be raised in this case, we don't know.  To look

1    at it -- to look at it from the person who is claiming
2    self-defense point of view.  In other words, was I reasonable
3    in believing that I needed to act to protect myself.
4        See where I am coming from?
5        PROSPECTIVE JUROR:  Yes.
6        MR. BRAUCHLE:  It is not go ask the dead
7    person's relatives or whatever like that.  It is personal to
8    me, and it has to be whether I am acting with a reasonable
9    belief that I need to protect myself by killing someone.
10       See where I am coming from?
11       PROSPECTIVE JUROR:  Yes.
12       MR. BRAUCHLE:  And if my belief is reasonable
13   and I did act in a reasonable manner, then anybody that I kill
14   is not -- that's not murder; you understand that?  That is
15   justifiable homicide.
16       PROSPECTIVE JUROR:  Yes.
17       MR. BRAUCHLE:  So I could kill people that I
18   have a reasonable belief are trying to harm me in such a way
19   that they are trying to take my life.
20       You have any quarrel with that?
21       PROSPECTIVE JUROR:  You said you could kill
22   people that you have a -- if you have a reasonable belief that
23   they are going to take your life, I mean, what about
24   surrender, other than kill, there are other alternatives than
25   just killing someone.

---

155

156

1        MR. BRAUCHLE:  I understand that, and the law is
2    a little more complicated.  You used to have to have a duty to
3    retreat.  But I think the legislature has taken that out of
4    the law.  You know in the past if you were coming toward me
5    with a weapon or put me in fear of imminent bodily injury or
6    death, I used to have a duty to back up and retreat.  But some
7    of the changes in the law made it to where I don't have to do
8    that as much.  I don't want to get -- I don't want to spend a
9    whole lot of time on this.  I am just basically trying to see
10   if you understand that it has to be a reasonable belief on my
11   part.  In other words, I can't kill somebody because I think
12   they are a green-eyed Martian, or if they have a zap gun,
13   those would not be reasonable beliefs.  I have to have a
14   belief that I can point to at that particular time I was
15   acting in fear of my life.
16       Would that jive with what you think on self-defense?
17       PROSPECTIVE JUROR:  Yes.
18       MR. BRAUCHLE:  Okay.  Mr. Cannady, you will be
19   glad to know that I don't have any more questions for you.
20       Do you have any questions for me?
21       PROSPECTIVE JUROR:  No.
22       MR. BRAUCHLE:  Okay, thank you.
23       THE COURT:  Thank you, Mr. Brauchle.
24   Mr. Cannady, you may step down.
25       (Prospective juror retired from the courtroom.)

1        THE COURT:  You may be seated.
2        MR. BRAUCHLE:  Your Honor, I think that we want
3    you to tell Mr. Cannady that we will get back with him as to
4    his status.
5        THE COURT:  Put him on hold.
6        MR. JOHNSON:  Put him on ice.
7        MR. BEACH:  Judge, I think it is a real
8    probability that he is going to be on the jury, we will let
9    him know here in the next day or two.
10       (Prospective juror entered the courtroom.)
11       THE COURT:  You may be seated.
12       Mr. Cannady, there is a real probability that you will be
13   one of the jurors on this case, what we are going to do is get
14   back with you in a couple of days, and let you know.  Since
15   there is a chance that you will be on the jury, I will ask
16   that you not research this case.  If you see it on the news,
17   the media or anything like that, just don't pay any attention
18   to it until you get the official word from us.  And we will
19   let you know in about two or three days, by Friday at the
20   latest.
21       PROSPECTIVE JUROR:  Thank you.
22       THE COURT:  Okay, you are free to go today.
23       PROSPECTIVE JUROR:  Thank you.
24       (Prospective juror retired from the courtroom.)
25       (Prospective juror entered the courtroom.)

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

THE COURT: You may be seated.

Good afternoon, Ms. Conradt. How are you?

PROSPECTIVE JUROR: I'm fine.

THE COURT: I understand that you have been waiting quite a little while and we apologize for that. Sometimes these interviews run a little longer than we anticipate. We try to schedule folks where they don't have to wait so long so we appreciate your patience in that regard.

The attorneys for both sides have reviewed their questionnaire and they have some questions with touching based on your qualifications as a juror in this case, there aren't any right or wrong answers, the attorneys are merely trying to see how you feel about certain things.

What says the State?

MR. BEACH: May it please the Court?

**MACEY CONRADT**

was called as a prospective juror, after having been previously sworn by the Court, testified under oath as follows:

**VOIR DIRE EXAMINATION**

BY MR. BEACH:

Ms. Conradt, how are you doing. My name is Andy Beach. This is Andrea Handley. We are Assistant District Attorneys here in Dallas, and we are responsible for selecting the jury selection phase of this capital murder case.

To my left are Karo Johnson and Paul Brauchle. They are attorneys here in town; and they have the responsibility of representing the defendant in this case, and he is the man at the far end of counsel table.

THE DEFENDANT: Good afternoon.

MR. BEACH: That's Wesley Ruiz. Very interesting questionnaire that you have here. Especially the fact that you know two individuals that were murder victims that I can confirm because I know both of the individuals that kill John and Mary, both got the death penalty and have actually been executed. I played basketball with at the Texas Club with John back in the late 1980s, and happened to actually be in the courtroom over in Fort Worth where all this happened four days before it happen. It could have been me just as easily as it could have been John, so very personal connection in that case and saw the article recently in the Morning News about the boys and just an incredible story about how John's wife is raising them.

Did I attend any of the trial over in Fort Worth?

PROSPECTIVE JUROR: No, I did not.

MR. BEACH: How well did you know John?

PROSPECTIVE JUROR: I knew him well. He was my Sunday School teacher. I met him at church with his wife Martha, he was our first newly married Sunday School teacher.

MR. BEACH: Okay. And the Charles Boyd case,

159

160

the Mary Milligan case, my roommate was the prosecutor who actually tried that case back in 1980, whenever that was, 7, somewhere in there.

Did you attend any of that?

PROSPECTIVE JUROR: No.

MR. BEACH: How well did you know her.

PROSPECTIVE JUROR: She was a sorority sister and a roommate of my sister.

MR. BEACH: I am going to try to tie that in, your personal life experience with an answer that you gave here on a questionnaire. And that is, it would be very difficult for you personally to participate in a case where the State was seeking the death penalty. I can guarantee you that it could not have been an easy jury experience for any of the 12 people that served either on the John Edwards case, the Mary Milligan case. Nobody wants to ever involved in a case where the State is seeking the death penalty. It is not an easy thing to do. But we got to find 12 people and we got to find 12 people that even though it is not going to be easy, it is not going to be pleasant, it is going to be something that they are going to remember the absolute rest of their life can do it. If the evidence is such that the evidence compels, you know, a juror -- individual juror to do it.

Now, we -- we have this jury almost filled. So we need a couple more that are going to be able to assure the State and

the Defense and Judge White that even though it is not going to be easy, they could and would be able to participate in a trial where the ultimate result might be not some fictional character, but the man here in the courtroom someday being put to death, okay.

You have had a chance the last two weeks or so, I think probably -- you look like a conscientious human being to think more deeply now about how you feel about the death penalty. And more importantly, if you are the type of individual that could participate in a proceeding such as this. So as you sit here right now, do you believe, ma'am, that you could individually participate in a trial that may very well result at some date in the future the man at the end of counsel table building executed by lethal injection, if the evidence compelled you to do it?

PROSPECTIVE JUROR: A yes or no answer?

MR. BEACH: We are looking for a certain answer on that. Because you know yourself better than anybody else. And I am asking you this because our goal in this case is single-minded and single-focused; and that is, first of all, we believe we have the evidence that will convince 12 people that this man is guilty of capital murder exactly as charged. And secondly, we believe we have the type and quality of evidence that will convince that same jury that a death penalty is the appropriate punishment versus any other

1  possible punishment once you are found guilty of capital

2  murder, and that's life without parole. That's our goal in

3  this case. So we got to make sure going in that we have 12

4  people, it may not be easy, may not be something that they

5  ever thought they would be asked to do, but something now it

6  is a reality and we are asking you could you and would you be

7  able to participate in a proceeding such as this knowing what

8  is at stake?

9  PROSPECTIVE JUROR: Yes.

10  MR. BEACH: I don't know how much you follow

11  the progress of the George Lott case and the Charles Boyd case

12  after the trial. As you know now both of those individuals

13  have been executed. So you probably have a little more --

14  maybe a little more insight about what happens after a death

15  penalty is returned by whether it is a Dallas County jury or a

16  Tarrant County jury.

17  Let me bring it through, I want to make sure you have a

18  real realization what we are talking about in this case. If

19  we are successful in proving that this man is guilty of

20  capital murder and if we are successful in convincing 12

21  jurors that a death penalty is the appropriate punishment and

22  that jury recommends to Judge White that's what they believe

23  the evidence requires him to do, Judge White would have no

24  alternative but to accept the jury's verdict, assess his

25  punishment at death. And at some date in the future, Judge

1  White would set an actual execution date. On the day before

2  that execution day, they would go and get Wesley Ruiz from the

3  death row facility there in Livingston, Texas, and take him by

4  vehicle to downtown Huntsville, Texas.

5  Have you ever been down there?

6  PROSPECTIVE JUROR: No.

7  MR. BEACH: Right in the middle of downtown

8  Huntsville is an old prison unit call the Walls. And that's

9  where the death penalties are actually carried out. On the

10  date of his predetermined execution, he would be allowed to

11  see his family. He would and allowed to see a spiritual

12  adviser, he would be given his last meal.

13  At six o'clock that night, they would come and get him

14  from that holding cell, take him down a hallway into the

15  actual death chamber. And in the middle of that room is a

16  hospital bed. He would be put down on that hospital bed. He

17  would be strapped to it and intravenous lines would be run

18  into his arm.

19  Once that was all done, two curtains would be drawn back:

20  Behind one curtain, he could have up to five members of his

21  family there, and behind the other curtain, the victim could

22  have up to five members of his family there to witness the

23  actual execution.

24  The warden would give Mr. Ruiz a chance to make a final

25  statement. Once that was done, the warden would give the

1  go-ahead. Once that was done, a series of three drugs would

2  be introduced into his body through the I.V. line. The first

3  to sedate him. The second to collapse his lungs. And the

4  third to cease up his heart. Whether it took two or three

5  minutes or five minutes or whatever, at some point in time the

6  doctor there would go over and check on him and pronounce him

7  dead.

8  And I don't tell you that to be morbid. And I know you

9  have had personal, emotional experiences with the capital

10  murder system here in Texas. But I do tell you to try to

11  re-enforce in this sterile courtroom what we are talking about

12  in this case.

13  Going through all that and having said all that, does

14  that change your mine at all whether or not you would be able

15  to participate in a proceeding that could result in this man

16  being executed by lethal injection down at Huntsville down in

17  the future?

18  PROSPECTIVE JUROR: No.

19  MR. BEACH: All right. Now, you are in the tax

20  business; is that correct?

21  PROSPECTIVE JUROR: Yes.

22  MR. BEACH: What are your hours right now?

23  PROSPECTIVE JUROR: I have gone -- just gone

24  back to work after 16 years, so I am working 15 to 20 hours a

25  week.

1  MR. BEACH: We anticipate that this trial, once

2  the jury is finally selected, is going to start, it looks like

3  April the 14th, that would be one day before the 15th,

4  which I don't know anything about that business, but that kind

5  of culmination of the tax season?

6  PROSPECTIVE JUROR: It's one culmination.

7  MR. BEACH: Well, we start April 14th, we are

8  looking at a five-to-eight-day trial, okay. Especially during

9  the first three, four days, 9:00 to 5:00, you could go home at

10  night. You could make phone calls during the day, that kind

11  of thing. The only thing we really can't predict is, how long

12  a jury is going to deliberate. They could be out 20 minutes,

13  they could be out a day in terms of reaching a verdict in this

14  case.

15  Let's say for instance that the evidence is completed,

16  the arguments are over, the jury goes out to deliberate, seven

17  o'clock at night, the jury hasn't reached a verdict in this

18  stage of the trial. In all likelihood at that time a Judge

19  would tell them to cease their deliberations, you would be

20  taken to a hotel, okay with the other jurors. That's a

21  possibility in this case. Maybe one night possibly two at the

22  most. With those representations, especially we are talking

23  about probably April 14th now through, you know 22nd,

24  23rd something like that. Would you be able to devote your

25  full attention to a trial of that length in that time frame?

165
166

1   PROSPECTIVE JUROR:   You can promise it won't
2   start before April 14th.  If it was earlier than
3   April 14th it would really be hard and a burden on other
4   people.
5   MR. BRAUCHLE:   That's what we are looking at
6   right now.  That's almost set in stone, that's what we are
7   looking at right now, April 14th trial date, okay?
8   PROSPECTIVE JUROR:   Okay.
9   MR. BRAUCHLE:   Can you do it?
10  PROSPECTIVE JUROR:   I can, I had a tentative
11  trip that weekend, I haven't bought tickets, so ...
12  MR. BEACH:   Don't do it.  I tell you that
13  because from looking at your questionnaire.  We have looked
14  at -- we have been going through this process for about eight
15  weeks now.  And we have looked at a thousand of these things.
16  And you know if on the first page of your questionnaire you
17  had circled number one there at the bottom, that you believe
18  that the death penalty is appropriate in all murder cases, you
19  wouldn't be qualified to be a juror in this case, because that
20  is not the law here in Texas.  And I think you probably
21  understand that.  If you circled one of these bottom ones,
22  four, five or six that you don't believe in the death penalty,
23  that you could never give it or other, you wouldn't be down
24  here right now.  So I guess it is jury tough luck that your
25  opinion is consistent with what the law is here in Texas.

1   Because you and folks like you are the only people who we have
2   been talking to.  From looking at your questionnaire, your
3   opinions, aren't out in left field, they are not extreme, you
4   are pretty much right down the middle.  That's why we are
5   talking to you.  And why we are talking to you here this
6   afternoon, I am going to try to get done as quick as I can.
7   I want to let you know that there is a very real
8   possibility, probability that you might end up on this jury,
9   just looking at your questionnaire.  So I know that is
10  probably not good news to you.  But I want to really try to
11  impress upon you while I am talking to you and while the
12  Defense is talking to you, you are in the firing line.  You
13  are kind of a real possibility in this case, okay.
14  Have you ever been on a jury before?
15  PROSPECTIVE JUROR:   No.
16  MR. BEACH:   Let me ask you, ma'am, have you ever
17  felt differently about the death penalty in your adult life?
18  PROSPECTIVE JUROR:   No.
19  MR. BEACH:   Probably haven't given it a whole
20  lot of thought.  But why do you think we should have the death
21  penalty?
22  PROSPECTIVE JUROR:   I just believe that if
23  certain violent crimes are committed, that death is
24  justifiable.
25  MR. BEACH:   You answer on page two, the best

167
168

1   argue for the death penalty if a person commits a heinous
2   crime, they deserve the full punishment.  You believe in some
3   cases they deserve the full punishment for the crime
4   committed?
5   PROSPECTIVE JUROR:   Yes.
6   MR. BEACH:   You also agree with the law here in
7   Texas that again depending on the circumstances, if you murder
8   a police officer and you know that you are murdering a police
9   officer while in the line of duty, potentially that's an
10  appropriate fact situation where a death penalty may be
11  appropriate; is that correct?
12  PROSPECTIVE JUROR:   Yes.
13  MR. BEACH:   Let me tell you real quick.  It is
14  only in very limited murder fact situations here in Texas can
15  the State actually seek the death penalty.
16  If I pulled out a gun right now and shot my co-counsel in
17  the head and stood over her dead body and laughed about it,
18  that would be a horrible intentional murder.  The most I could
19  receive here in Texas would be a life sentence, okay.  Because
20  she is not one of the protected classes of individuals that if
21  you murder them, potentially you might be subjected to the
22  death penalty.  Those classes are like what we are dealing
23  with here, peace officers in the line of duty.  You kill a
24  prison guard while trying to escape from prison.  You kill a
25  child under the age of six.  You killed a person over the age

1   of 65, those are the protected classes of individuals if you
2   kill one of them, potentially you might get the death penalty,
3   or like in John's case, two or more individuals were murdered
4   in that same criminal transaction.  That elevated a regular
5   murder up to a capital murder case where the State could seek
6   the death penalty.  Or in Mary's case, she was murdered while
7   the defendant was in the course of raping her.  If you murder
8   someone while in the course of committing another very serious
9   felony, potentially that allows the State to seek the death
10  penalty.  So in your mind do you have a fairly decent
11  understanding what a capital murder is versus what is called a
12  regular murder case?
13  PROSPECTIVE JUROR:   Yes.
14  MR. BEACH:   In a regular murder case, the
15  legislature has a wide range of punishment anywhere as low as
16  five years all the way up to 99 years or life.  And to be
17  qualified in that kind of case, you just have to be able to
18  assure all the parties in the Court that before you hear the
19  evidence, your mind would be open to the full range of
20  punishment.  If you thought five years after you heard
21  everything was appropriate punishment in a murder case, you
22  could give five years all the way up to 99 years or life or
23  anywhere in between; you understand that?
24  PROSPECTIVE JUROR:   (Nods head).
25  MR. BEACH:   In a capital murder case, once you

169

170

1    are found guilty of a capital murder, there are only two
2    possible punishments, life without the possibility of parole
3    or the death penalty.  I am going to guess that you have
4    fairly decent understanding of constitutional rights involved
5    in a criminal case at the first part of the trial.  That is
6    the only question that the jury has to answer, whether the
7    defendant is guilty or not guilty.
8         We are talking about the State's burden of proof.  We
9    have to prove our case beyond a reasonable doubt.  He is
10   presumed to be innocent until we prove everything beyond a
11   reasonable doubt.  If he doesn't want to testify, he doesn't
12   have to, he has a Fifth Amendment right.  Judge White
13   explained those to you when you were down here two or three
14   weeks ago.
15        And do you have any issues with the basic constitutional
16   rights would come into play at the first part of the trial?
17             PROSPECTIVE JUROR:  No.
18             MR. BEACH:  Very quickly, what we have to prove
19   is on that half page piece of paper.  Just take a second to
20   look at it.  What we have to prove is on or about a certain
21   date in Dallas County, Texas, this defendant knowingly or
22   intentionally killed that peace officer by shooting him with a
23   firearm, and he committed that murder.  He knew the peace
24   officer was acting in the line of duty.  That's what we have
25   to prove.  We have to prove everything in there.

1         Let me use kind of a farfetched example, all right.  If
2    after you heard all the evidence, you go back to deliberate.
3    You don't have any questions whatsoever that we have proven to
4    you beyond a reasonable doubt that the defendant committed the
5    murder by shooting him with a firearm and he knew the
6    individual was a peace officer.  But you haven't heard any
7    evidence about where it happened or worse yet, we proved to
8    you this murder happened in Kaufman County Texas.  One the
9    elements we have to prove in that indictment is it happened in
10   Dallas County, Texas.  Seems like a small thing.  We have had
11   a year now to investigate this case, to word that piece of
12   paper anyway that we deem fit and the corresponding obligation
13   in the law is we have to prove everything on that piece of
14   paper, okay.  And if that happens, it would make you and the
15   other 11 jurors sick to your stomach because you knew you were
16   letting a murderer go.  And we would be fired the next day for
17   that negligence for not getting the county right.  But Judge
18   White would instruct you and the other 11 jurors that you
19   would have to find the defendant not guilty because we didn't
20   prove everything that we had to.
21        Could you and would you find the defendant not guilty?
22             PROSPECTIVE JUROR:  Yes.
23             MR. BEACH:  It would be hard for you but you
24   would have to do it?
25             PROSPECTIVE JUROR:  Yes.

171

172

1             MR. BEACH:  At the first part of the trial, we
2    either prove it or we don't.  At the first part of the trial
3    if you say by your verdict not guilty, the trial is over and
4    everybody goes home.  We accept that, we accept the burden of
5    proof in this case.  If we don't get the job done, he is free
6    to go, he is found not guilty.  But if we do prove to you
7    beyond a reasonable doubt everything that we are required to
8    prove in that indictment, then your oath would require you to
9    find him guilty.
10        Could you and would you find this defendant guilty if we
11   proved everything the law requires to you beyond a reasonable
12   doubt?
13             PROSPECTIVE JUROR:  Yes.
14             MR. BEACH:  What is the effect of that?  Well,
15   just like we kind of analogize it to a two-act play, ma'am.
16   At the end of act one, which that would be once you find him
17   guilty, just like that play, the curtain comes down, comes
18   down, you are at an intermission.  And guess what, you don't
19   know how the play is going to end, do you?
20             PROSPECTIVE JUROR:  No.
21             MR. BEACH:  You are going back and watch act
22   two.  That is kind of how a criminal trial is.  You don't know
23   how a criminal trial is going to end just because you have
24   found someone guilty of capital murder.  You have to come back
25   for act two for the punishment phase where we can present to

1    you additional evidence, all right.  That will hopefully
2    convince you and the other 11 jurors that the death penalty is
3    the appropriate punishment.
4         Now, some folks -- and maybe the sum and substance after
5    you got done filing out that questionnaire three or four
6    weeks ago, you may have walked out of the building thinking if
7    I find someone guilty of capital murder, it is just automatic,
8    he gets the death penalty.  Really the exact opposite is what
9    the law is.  Simply because you find someone guilty of capital
10   murder, basically the best they are ever going to do is what,
11   life in the penitentiary without the possibility of parole.
12   It is an automatic life sentence without the possibility of
13   parole, once the jury finds the defendant guilty of capital
14   murder, life without the possibility of parole.
15        It doesn't matter if he brings peace to the Middle East,
16   he is never going to get out.  Once you are found guilty here
17   in Texas, the best you will get is life without parole.  Just
18   like instructed at the first part of the trial, you are to
19   presume him to be innocent.  As you go into the second part of
20   the trial, the punishment part of the trial, the law basically
21   requires of you and the other 11 jurors that you are to
22   presume that a life sentence without the possibility of parole
23   is the appropriate punishment.  And not until we bring to you
24   evidence that convinces you beyond a reasonable doubt that
25   that life sentence should be elevated up to a death sentence

1   are we entitled to a death penalty in this case.
2       You understand kind of the scheme and how this works in
3   that regard?
4       PROSPECTIVE JUROR:  Yes.
5       MR. BEACH:  And you understand there is nothing
6   automatic what punishment somebody is going to get because
7   they have been convicted of capital murder?
8       PROSPECTIVE JUROR:  Yes.
9       MR. BEACH:  How do we do that?  How do we
10  elevate a life sentence that he is presumed to be entitled to,
11  how do we elevate that up to a life sentence?  It come by a
12  jury being confronted with and answering those two questions
13  up there.  Take just a second to read that first question to
14  yourself, okay?
15      PROSPECTIVE JUROR:  (Juror complies.)
16      MR. BEACH:  Okay.
17      PROSPECTIVE JUROR:  Okay.
18      MR. BEACH:  I think you would agree with me,
19  what the legislature has intended by asking a jury that first
20  question there, is before the State is entitled to a death
21  penalty here in Texas, the jury, the same jury is going to
22  have to come to two determinations beyond a reasonable doubt.
23  First of all, that he is guilty of capital murder, and that
24  would have been determined at the first part of trial, okay.
25      The second determination the jury is going to have to

1   make is basically we call it the future dangerousness
2   question.  The jury is going to have to be convinced beyond a
3   reasonable doubt that the defendant is going to be a future
4   danger, no matter what society he is going to be in, okay.
5   And not until then, not until the State proves to that jury
6   beyond a reasonable doubt that the defendant is going to be a
7   future danger, is that life sentence going to change.  The
8   only way we get a death sentence in this case is we convince
9   the jury beyond a reasonable doubt that he is going to be a
10  future danger.
11      Are you with me so far on that?
12      PROSPECTIVE JUROR:  Uh-huh.
13      MR. BEACH:  How do we do that?  We have to prove
14  to you, really there are kind of three questions in one in
15  that first special issue.  I don't know if when you went to
16  high school if they still diagrammed sentences or not.  But
17  that's kind of what you have to do on that first question, we
18  have to prove beyond a reasonable doubt, kind of three
19  subparts.
20      The first subpart is, that word probability.  We have to
21  prove to you beyond a reasonable doubt not a possibility, but
22  a probability, that's the first thing, that he will commit the
23  second thing, criminal acts of violence, and the third that
24  would constitute a continuing threat to society.  There are no
25  legal definitions for those three subparts of that first

---

175

176

1   question.  So it is going to be what you and the other 11
2   jurors determine that the words or phrases mean to you, okay.
3       Most folks tell us probability mean more likely than not.
4   If David Finfrock tells you at night it is probably going
5   to -- possibly going to rain tomorrow, you may take an
6   umbrella.  If he tells you it is a probability, you understand
7   that you will have to do some more things.  The law tells you,
8   ma'am, that the probability means it has got to be greater a
9   than 50 percent chance.  Whether that means 52 percent or
10  55 percent, whatever.  In your mind that word probability
11  would have to mean greater than 50 percent.
12      Could you give it that meaning?
13      PROSPECTIVE JUROR:  I'm sorry.
14      MR. BEACH:  Could you give it at least greater
15  than a 50 percent chance?
16      PROSPECTIVE JUROR:  I don't know why I am not
17  hearing.
18      MR. BEACH:  That word probability, could you
19  give that word probability that meaning that it is at least
20  greater than 50 percent?
21      PROSPECTIVE JUROR:  Yes.
22      MR. BEACH:  More likely than not, for the
23  greater chance, okay.
24      And from there we go to the second part of the sentence
25  diagram, would commit criminal acts of violence.  Again the

1   legislature -- we overword that question.  They could have
2   said commit additional murders or rapes or robberies.  They
3   used that general phrase, criminal acts of violence.  Again
4   there is no legal definition for that phrase, it is going to
5   be what you believe it to mean and what the other 11 jurors
6   believe it to mean.  We have to convince you beyond a
7   reasonable doubt that it is more likely than not that he will
8   continue to commit criminal acts of violence.  That tells you
9   what?  Constitutes continuing threats to society.
10      And that last word, society, I want to talk to you about
11  it.  The legislature again contemplates that the jury's
12  definition of that word society is going to be broad enough to
13  include the society that he is going to be in once he is found
14  guilty of capital murder.  What society is that, where is he
15  going to be the rest of his life once he is convicted of
16  capital murder?
17      PROSPECTIVE JUROR:  In prison.
18      MR. BEACH:  In prison, yeah.  So your definition
19  of that word society, obviously when you first see it, you
20  think your church, your neighborhood, where you go to work,
21  the grocery store, again you have to keep it in context to
22  where he is going to be the rest of his life, unless he
23  escapes, and that's going to be prison society.  And you would
24  be entitled to hear evidence about prison society.  What it
25  encompasses, what it includes.

1    You will agree with me that there are other classes of
2  individuals in prison society than inmates; is that true?  You
3  got the guards, you got the administration, medical personnel,
4  visitors coming in and out of prison, the whole society within
5  itself.  And you would be entitled to hear evidence about what
6  at that society consisted of and the opportunity to be violent
7  in that society.
8    And would you consider that type of evidence, ma'am?
9    PROSPECTIVE JUROR:  Yes.
10    MR. BEACH:  What kind of evidence would be
11  important to you, ma'am, to help you make that determination
12  as to whether or not someone would be a future danger to
13  society, other than the facts of the crime that you found him
14  guilty of?
15    PROSPECTIVE JUROR:  When you were talking
16  about society and that?
17    MR. BEACH:  No, I was talking in general for
18  that question.  What would help you make that determination
19  whether someone in all probability would be a future danger?
20  Most folks tell us they want to hear about how the defendant
21  led his life prior.
22    PROSPECTIVE JUROR:  Yeah, any history.
23    MR. BEACH:  His history, absolutely.  Would that
24  be important to you, would you be able to consider that kind
25  of evidence?

1    PROSPECTIVE JUROR:  For some reason I was
2  thinking you couldn't consider that kind of evidence.  But
3  that's what I would want to know.
4    MR. BEACH:  Once an individual was found guilty
5  of a crime.  At the punishment phase of the crime, you would
6  be able to hear basically how he has lived his entire life.
7  Anything the Judge deemed relevant, you would be able to hear
8  and the State is entitled to bring you that kind of evidence.
9  And you think that would be important to you; is that correct?
10    PROSPECTIVE JUROR:  Yes.
11    MR. BEACH:  You would want to know if this
12  capital murder is obviously as violent and as serious as it
13  was, you would want to know was this just an aberration, was
14  it just some kind of complete break in the way this individual
15  has led his life up until that day, does everything kind of
16  conspire and emerge into that one horrible act, or would it
17  help you to know it was just a part of a pattern in his life,
18  he has been a criminal basically his entire life and this is
19  predictable and no one should have been surprised this
20  happened; is that correct?
21    PROSPECTIVE JUROR:  Yes.
22    MR. BEACH:  The bottom line, ma'am, is we have
23  to prove it to you.  You have to look to us to prove to you
24  question number one should be answered "yes" before you could
25  answer "yes".

1    You understand that?
2    PROSPECTIVE JUROR:  Yes.
3    MR. BEACH:  It is our burden just like at the
4  first phase of the trial, it is our burden to prove everything
5  to you in this indictment.  It is our burden to prove to you
6  that question number one should be answered "yes" before you
7  could answer "yes".
8    You with me?
9    PROSPECTIVE JUROR:  Yes.
10    MR. BEACH:  All right.  Really, like we talked
11  about, as you go into question number one, you are to presume
12  that a life sentence is the appropriate punishment.  Basically
13  like you spray painted a big "no" at the bottom of that
14  question, it is not until we bring to you evidence to prove to
15  you beyond a reasonable doubt that "no" should be erased are
16  we entitled to a "yes", okay.  You got to look to us to do
17  that.
18    What is the effect of a "yes" answer to question number
19  one.  Well, at that point in time, what has happened?  The
20  first part of the trial, the jury has found the defendant
21  guilty of capital murder and now they have been convinced
22  beyond a reasonable doubt this same defendant is going to be a
23  future danger to society.  Once that happens, at that phase of
24  the trial, the State would be entitled to a death penalty.  At
25  that point the State has elevated that life sentence up to a

1  death sentence because you have found not only is he guilty of
2  capital murder, but he is a continuing threat to society.
3    You with me?
4    PROSPECTIVE JUROR:  Yes.
5    MR. BEACH:  Is the play over yet?  Not quite.
6  You got one more question to answer before the final curtain
7  comes down.  And that's that second special issue.  Take just
8  a second to read that to yourself?
9    PROSPECTIVE JUROR:  (Witness complies.)
10    MR. BEACH:  All right.  That one is a little
11  trickier, especially that phrase personal moral culpability,
12  mitigating circumstance.  But like we paraphrased the first
13  question, would be kind of the future dangerousness question.
14  The second question we characterize it as the safety-net
15  question or the safety-valve question.  You have to
16  understand, ma'am, when you get to that question, now the
17  defendant is sitting on a death sentence.  He has earned a
18  death sentence in the mind of the 12 jurors.  But the
19  legislature, I believe, with this question is contemplating
20  before that death sentence is etched in stone for all time,
21  they want that same jury to go back, look at all the evidence
22  in this case.  Look at his background, his character, the way
23  he was brought up, his mental capabilities, the facts of the
24  offense.  And if there is a sufficient mitigating
25  circumstance, if there is something in the evidence that to a

181

1  jury's mind convinces them that there is something
2  sufficiently mitigating that lessens his moral blameworthiness
3  or reduces his personal moral culpability to the point where
4  they believe that even though he has earned a death sentence,
5  a life sentence out of mercy is the appropriate punishment.
6  And this questions gives them the right to do that; you
7  understand that?  That's why we call it the safety-net
8  question.
9       Folks sitting up there where you are sitting have told
10  us, you know, his family background may potentially be a
11  mitigating circumstance, again depending on the facts.  If you
12  hear evidence from the age of two on, you know the defendant
13  was kept in a closet by his parents, tortured, physically and
14  sexually abused, basically had no chance in life, even though
15  he is a convicted capital murderer and even though he is going
16  to be a future dangerousness, that might be one of those
17  sufficient mitigating circumstances that would cause me out of
18  mercy to take that death sentence back to a life sentence.
19       Some folks have told us -- again we can't execute
20  mentally retarded folks in this country, okay.  There are some
21  folks right on the cusp of mental retardation.  Very low I.Q.,
22  mental issues that don't amount to insanity, but have mental
23  issues.  Again that could be a sufficient mitigating
24  circumstance again that could convince that individual juror
25  to take the death sentence back to a life sentence.

182

1       We can't commit you to any mitigating circumstance.  But
2  ma'am, could you, if you were of the mind after you did that
3  review of the evidence one last time, was something
4  sufficiently mitigating in this defendant's background, his
5  character, the facts of the offense, even though you believed
6  the defendant earned a death sentence, could you take that
7  death sentence back to a life sentence if you were convinced
8  that was the appropriate thing to do under the evidence?
9       PROSPECTIVE JUROR:   Yes.
10       MR. BEACH:   It's hard to talk, you know
11  hypotheticals and theoreticals right now.  But you get the
12  gist of what that question is giving you the opportunity to
13  do.  Basically it is giving you the opportunity to show mercy
14  even though you believe the defendant is worthy of a death
15  penalty, they are a convicted capital murderer now, they are a
16  future danger now; but you believe that there is something
17  there that justifies to your way of thinking in this one case
18  life is more appropriate than death, that question there is
19  giving you the opportune to do that.  And could you and would
20  you do that if you were convinced that was the right thing to
21  do?
22       PROSPECTIVE JUROR:   Yes.
23       MR. BEACH:   I have been doing a lot of talking,
24  I appreciate you staying with me.  Is there anything that I
25  confused you on, anything about your responsibility as a juror

183

1  in this case that you think we need to know about or you have
2  any questions?
3       PROSPECTIVE JUROR:   No.
4       MR. BEACH:   I appreciate you coming down here,
5  ma'am.  Thank you very much.
6       THE COURT:   Thank you, Mr. Beach.
7       Ms. Conradt do you need a break first?
8       PROSPECTIVE JUROR:   If I can just get a drink of
9  water real quick.
10       THE COURT:   Let's take a five-minute break.  We
11  will be in recess.
12       (Recess taken.)
13       (Prospective juror entered the courtroom.)
14       THE COURT:   Mr. Johnson or Mr. Brauchle, you may
15  proceed.
16       MR. BRAUCHLE:   Thank you, Your Honor.
17                VOIR DIRE EXAMINATION
18  BY MR. BRAUCHLE:
19       Ms. Conradt, I have been introduced to you.  My name is
20  Paul Brauchle.  And I don't think I am going to take as much
21  of your time as the State did.  Not because we think what we
22  have got to say is less important, but I don't think you want
23  to hear it over and over again.
24       Let me just ask you about a couple of things.  You say
25  that your sister was the roommate of that woman that you knew

184

1  that got killed; is that correct?
2       PROSPECTIVE JUROR:   Not while she was killed, in
3  college, this was after college, but they had been roommates
4  in college.
5       MR. BRAUCHLE:   They had been roommates in
6  college?
7       PROSPECTIVE JUROR:   Not at the time.
8       MR. BRAUCHLE:   When she lived here in Dallas?
9       PROSPECTIVE JUROR:   No.
10       MR. BRAUCHLE:   Have you thought about anything
11  that Mr. Beach talked to you about or any of your answers or
12  anything like that in regard to the questionnaire of what we
13  have talk to you about?
14       PROSPECTIVE JUROR:   Do I have any more
15  questions.
16       MR. BRAUCHLE:   You went back, you got off the
17  stand and went back and got some water, I hope, and we are
18  just wondering if you thought of something you may have
19  answered wrong or you may have a question about or anything
20  like that?
21       PROSPECTIVE JUROR:   There was little thing that
22  I answered wrong, I went back and looked back.  I didn't put
23  my husband's name, things like that.  He has been on a jury
24  before, I didn't know it, when asked him.
25       MR. BRAUCHLE:   You know what kind of jury he was

on?

PROSPECTIVE JUROR:   It was -- I don't know. It was theft or something, it was don't in three hours, I don't know what it was.

MR. BRAUCHLE:   You say he was down here three hours?

PROSPECTIVE JUROR:   The trial was about three hour was what he said.  When I asked him.

MR. BRAUCHLE:   Okay.  So it wasn't such a great period in his life, you didn't need to talk about it?

PROSPECTIVE JUROR:   I didn't even know about it so.

MR. BRAUCHLE:   Let me just ask you, Mr. Beach was talking to you about having to prove all of the elements of the indictment beyond a reasonable doubt.  We used the example of the county, because that's kind of easy for jurors to understand and to get a grip on.  And I know when he asked you if you could find somebody not guilty because the State had proven either the wrong county or had not given you any information as to which county it occurred in, you kind of hesitated.  I was wondering if you had a problem with that concept or if you didn't understand what he was asking you or what?

PROSPECTIVE JUROR:   I guess I am just not used to being in a room with this many people looking at me, and I

just want to make sure and just -- I don't know, it is very intimidating to me.  And I was just thinking about the question and could I do it and --

MR. BRAUCHLE:   Well, basically what the gist of it means is that if you find that the State didn't prove one of the elements of the indictment, whichever one or more of them, basically the person on trial in theory would be getting on the elevate with you and the other jurors because the State would have failed to prove him guilty.  And a lot of people say, Well, something like the county, that's just a technicality, if I knew the guy did what he was charged with, it was just because some prosecutor overlooked something or didn't know how to get it in evidence or whatever, I couldn't in good conscience go back and tell my friends and family in the neighborhood that I let somebody go simply because the people at that table over there weren't smart enough or weren't equipped enough to get in what county it happened in.  And I just wondered -- say you seemed to hesitate, I was just wondering if you had any problem with that.  I know we all have a problem in theory, we wouldn't want to see it happen.  But we also have to be able to say, well, if it did happen, I could follow the Judge's instructions and I could vote the person not guilty, could you do that?

PROSPECTIVE JUROR:   Yes.  I mean I believe the law, you know, comes before human error, I guess.  And you

can't start picking and choosing, so it would be difficult.

MR. BRAUCHLE:   Well, we realize that it would be very difficult.  But it is like you say, we can't say the county is not important but this is important.  It's unfortunately all of them have equal importance.  They may not seem like it, but we have to give they all equal importance whether we like it or not.  But you can live with that, right?

PROSPECTIVE JUROR:   Yes.

MR. BRAUCHLE:   Okay.  You also understand that that kind of goes to the linchpin of everything that State has to prove.  They have to prove each and everything that is in the indictment, in these questions.  Well, in the first question.  And in any other part of the trial beyond a reasonable doubt; you understand that?

PROSPECTIVE JUROR:   Yes.

MR. BRAUCHLE:   And that burden always remains with them, and the people at this table have no burden of proof.  We don't have to prove anything did or didn't happen beyond a reasonable doubt.  They always have to prove that it happened beyond a reasonable doubt.  All right.

You think that's an unfair burden for the State to have to do that?

PROSPECTIVE JUROR:   I mean I guess I don't think it matters, it's the law, and you know, it does seem sort of unfair that one side has to and the other doesn't.  It's the

law, I understand that part of it.

MR. BRAUCHLE:   So it is nothing that would cause you any problems on any level, right?

PROSPECTIVE JUROR:   It is not a problem -- I mean, at any level, yes, I mean emotionally, but in applying the law, no.

MR. BRAUCHLE:   Okay.  Now, then, as Mr. Beach told you, most people that after they fill out the questionnaire, think that the automatic sentence for somebody found guilty of capital murder is death.  And he explained to you that in fact that the automatic sentence is life imprison without parole.  And only if special issue number one is answered "yes" and if special issue number two is answered "no", does death result.

And I think you understood that, said you didn't have any problem with that; is that correct?

PROSPECTIVE JUROR:   Yes.

MR. BRAUCHLE:   You understand that basically the way this system is set up, life without parole is always the default punishment?  In other words, if the State fails at any step of the punishment phase, life without parole is what results.  So it always -- they never get better than life without parole.  It is not like if the State doesn't prove something in either of these two issues, they don't go home like they would in the first part of the trial.  But they

1   could never get better than life without parole.

2       Let me talk to you briefly about special issue number

3   one. The word up there probability, that we have been advised

4   by the Courts has to mean more than 50 percent. And I guess

5   you can see that if it was 50/50, that means it really

6   wouldn't be much of a question, because it could happen or

7   couldn't happen, there is no signing of the eventuality or the

8   chance or whatever that it would happen. We would like to

9   think, though, with the Courts telling us that it is at least

10   50 percent, you notice that right in front of it, is the

11   reasonable doubt, beyond a reasonable doubt that the State has

12   to prove.

13       And we are asking you if in looking at that, when you see

14   that probability in close proximity of reasonable doubt,

15   would that make you think -- or would that make you look to

16   the numerical assignment or the numerical quantification for

17   probability or would that make it higher than 50 percent, and

18   if it does, would it be very much higher, can you follow that?

19       PROSPECTIVE JUROR:   I done know if it is late or

20   what, but not really. Are you saying just a reasonable doubt

21   make it?

22       MR. BRAUCHLE:   Well, you see that they have to

23   prove it beyond a reasonable doubt that there is a

24   probability?

25       PROSPECTIVE JUROR:   Right.

1       MR. BRAUCHLE:   Now, a probability only means

2   50 percent, we would think that most people would think

3   reasonable doubt means more than 50 percent. I would think

4   that if the State had to prove a criminal case to you beyond a

5   reasonable doubt, that it would have to be something more than

6   a 50/50 chance that the person is guilty, would you agree with

7   me on that?

8       PROSPECTIVE JUROR:   Yes, I mean if that -- yeah.

9       MR. BRAUCHLE:   Okay. So I guess what I am

10   asking, and I am not doing it very well, but I am asking if

11   the fact that reasonable doubt is the criteria for that

12   question, does that raise probability in your mind to a level

13   greater than 50 percent?

14       PROSPECTIVE JUROR:   I guess I just wouldn't

15   think of it that way.

16       MR. BRAUCHLE:   How would you think of it?

17       PROSPECTIVE JUROR:   I don't know. I am just

18   looking at is there a reasonable doubt that is greater than

19   50 percent. If it is 51 percent it is still 51 percent and I

20   have already come to the conclusion that I do or don't have a

21   reasonable doubt about that.

22       MR. BRAUCHLE:   Okay. So you could be satisfied

23   beyond a reasonable doubt that there is a probability the

24   defendant would commit criminal acts of violence in the future

25   and it would constitute a continuing threat to society and

---

1   probability in that question could mean as little as

2   51 percent for you?

3       PROSPECTIVE JUROR:   Yes.

4       MR. BRAUCHLE:   Would it ever mean more than

5   51 percent?

6       PROSPECTIVE JUROR:   It could, yes.

7       MR. BRAUCHLE:   Okay. Let me ask you this about

8   question number one. For all the twist and turns and

9   reasonable doubt and probability and continuing threat to

10   society and all the phrases that are involved in there, would

11   you agree that basically what that question is asking you is,

12   is this person so dangerous that the only way that we can

13   control his future behavior is by killing him?

14       PROSPECTIVE JUROR:   I don't want to reword what

15   you said, I look at it like I said that's the law if I

16   determine that's that probability, then the law allows that.

17   So I would guess, yes, I agree with what you said then. He is

18   going to be so dangerous that that would be --

19       MR. BRAUCHLE:   Well, you see that whole question

20   goes on that he is going to commit criminal acts of violence

21   and those criminal acts are going to be such that they will

22   constitute a continuing threat to society. So it is not -- it

23   is not saying, well, it may be to you, we don't know, they are

24   not saying it is an isolated incident because he is going to

25   be a continuing threat to society. So they are asking you to

1   predict what we call that question is the future dangerousness

2   question. Is he going to be a danger in the future? If he

3   is, you answer that "yes". You understand he gets death. If

4   you don't think that he is going to be a danger in the future,

5   he gets life without parole. So I guess that was -- that's

6   the question I have in regard to trying to simplify special

7   issue number one.

8       You see it that way?

9       PROSPECTIVE JUROR:   Would you say again?

10       MR. BRAUCHLE:   I don't think I can, ma'am.

11       PROSPECTIVE JUROR:   Just part -- yes, I agree

12   with that, because they would be a continuing danger -- a

13   continuing threat, then, yes, that's appropriate punishment.

14       MR. BRAUCHLE:   Okay, let me back up and do it

15   real quick. That question is asking you as we say in the

16   shorthand, are they going to be a future danger? It is

17   conceded that they were a danger at the time they committed

18   the act. But we are trying to predict the future. And we are

19   trying to see are these people going to be a danger to society

20   in the future, even if they are going to be imprison. If they

21   are going to be a danger in the future, even if they are

22   imprison, the way we can control that danger is kill them.

23   Otherwise you know that if that is answered "no", they remain

24   in prison under life without parole sentence, is that the way

25   you see that question?



194

1    PROSPECTIVE JUROR:   Yes.
2    MR. BRAUCHLE:   Asking you.  Do you have any
3    quarrel with that concept?
4    PROSPECTIVE JUROR:   I don't have a quarrel with
5    the concept.  It may be hard to apply.  I mean to know how to
6    apply, I guess that's what would be difficult.
7    MR. BRAUCHLE:   Let me just ask you this, you
8    think everybody that is convicted of capital murder would be a
9    danger in the future?
10   PROSPECTIVE JUROR:   If I had to answer, yes or
11   no, I would probably say, yes.
12   MR. BRAUCHLE:   Okay.
13   PROSPECTIVE JUROR:   Knowing there are some
14   different circumstances, I mean you can't apply one answer to
15   everything, but...
16   MR. BRAUCHLE:   Well, it would -- let me make the
17   question that I asked you a little bit more fair.  You
18   understand that there is a lot of different people that would
19   be found guilty of murder and the circumstances of each
20   capital murder would be different; would you agree with me on
21   that?
22   PROSPECTIVE JUROR:   Yes.
23   MR. BRAUCHLE:   And while neither side has to
24   prove the reason that somebody was murdered and the reason
25   somebody committed a capital murder, some of them might be

1    less heinous or less aggravated than others; would you agree
2    on that?
3    PROSPECTIVE JUROR:   Yes.
4    MR. BRAUCHLE:   I don't want you agreeing just
5    because it is getting late and you want to get back to
6    Coppell, but can you see the point that I am trying to make on
7    that?
8    PROSPECTIVE JUROR:   Yes.
9    MR. BRAUCHLE:   Let's go to special issue number
10   two.  I think this one may cause you a little more trouble.
11   You stated that in regard to special issue number one, that
12   that might be hard for you to apply in regard to predicting
13   the future, future danger.  In special issue number two, it is
14   kind of other worldly question.  And it asks you look, you
15   don't answer unless you have already answered special issue
16   number one that they are going to be a danger in the future.
17   Now we want you to look over all the evidence that you have or
18   haven't gotten and find if there is something about that
19   person's personal moral culpability or his character or his
20   background that makes you think that even though you may have
21   answered special issue number one "yes", that sentence of life
22   imprisonment without parole should be imposed.  A lot of
23   people sitting where you are say, That's stupid.  Why would I
24   want to let somebody off the hook if I had already determined
25   beyond a reasonable doubt that he is going to be a future

195

1    danger?  And I think it goes back to what I discussed with you
2    previously.  There is a lot of different circumstances in
3    which a murder can be committed.  There is a lot of different
4    people personality wise, intelligence wise, background wise,
5    other things that you can see may not be answered in regard to
6    special issue number one.
7    Can you see that or do you believe that?
8    PROSPECTIVE JUROR:   I believe that.  I think it
9    would be slim, but I do agree there are some circumstances.
10   MR. BRAUCHLE:   Okay.  We are not saying that
11   there are going to be a multitude of reasons one way or
12   another.
13   Mr. Beach mentioned some people that may be extremely low
14   intelligence, they can't be retarded because they can't be
15   tried if they are retarded.  You understand there are all
16   sorts of mental make up and other personal background that may
17   militate for you answering that to where it would go back.
18   Once again putting them -- answer that no doesn't let them out
19   of prison, it just put them -- it is that default, it just
20   puts them back in with life without parole.
21   You have any quarrel with that concept?
22   PROSPECTIVE JUROR:   No.
23   MR. BRAUCHLE:   If the evidence was there, do you
24   think that you could -- that you could answer that in such a
25   way that a person wouldn't get the death penalty?

196

1    PROSPECTIVE JUROR:   Yes.
2    MR. BRAUCHLE:   I take it, though, that you --
3    that would cause you quite a bit of soul-searching and fact
4    searching to come up with a "no" answer in regard to that?
5    PROSPECTIVE JUROR:   Yes.
6    MR. BRAUCHLE:   Are you telling us and our client
7    if the evidence were there, you could in fact answer that
8    question "no"?
9    PROSPECTIVE JUROR:   If the evidence was there,
10   yes.
11   MR. BRAUCHLE:   Basically that's got to be the
12   way you answer any question all the way through the trial, the
13   evidence has to be there one way or another.
14   Ma'am, I think you will be happy to know that I don't
15   have any more questions for you.  You can rest.
16   THE COURT:   Thank you, Mr. Brauchle.
17   MR. BRAUCHLE:   Thank you, Your Honor.
18   THE COURT:   Ms. Conradt, you can step down
19   again.
20   PROSPECTIVE JUROR:   Okay.
21   (Prospective juror retired from the courtroom.)
22   (Pause in the proceedings.)
23   (Prospective juror entered the courtroom.)
24   THE COURT:   Ms. Conradt, I will let you know
25   that there are no questions to be asked of you.  We are going

1  to let you go today and we will notify you by Friday if you
2  have been selected as a juror in this case. Because there is
3  a probability that you may make it to the jury, I will ask
4  that you not research the case on the internet. If you see it
5  on the media, just change the channel or don't read any
6  articles in the newspaper and we will let you know by Friday.
7            PROSPECTIVE JUROR:  By phone I guess?
8            THE COURT:  Yes, by phone.
9            MR. BEACH:  Unless you want to come back down?
10           PROSPECTIVE JUROR:  No, thank you.
11           THE COURT:  Thank you.
12           (Prospective juror retired from the courtroom.)
13           (Court recessed for the day.)

1  THE STATE of TEXAS )
2  COUNTY of DALLAS  )
3            I, BELINDA G. BARAKA, Official Court Reporter in and
4  for the 194th Judicial District Court of Dallas County, State
5  of Texas, do hereby certify that the foregoing contains a true
6  and accurate transcription of all portions of evidence and
7  other proceedings requested in writing by counsel for the
8  parties, to be included in this volume of the Reporter's
9  Record, in the above-styled and -numbered cause(s), all of
10 which occurred in open court or in chambers and were reported
11 by me.
12           I further certify that this Reporter's Record of the
13 proceedings truly and correctly reflects the exhibits, if any,
14 admitted by the respective parties.
15           I further certify that the total cost for the
16 preparation of this Reporter's Record was paid by the
17 State/Defense.
18           WITNESS MY OFFICIAL HAND this the 30th day of
19 May, A.D., 2009.
20
21
22
23 BELINDA G. BARAKA, CSR #5028
   Official Court Reporter
   133 N. Industrial
24 Dallas County, Texas 75207
25 Certification Expires: 12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*