```
 1                    CAUSE NO. F07-50318-M

 2   THE STATE OF TEXAS          *    IN THE DISTRICT COURT

 3   vs.                         *    194TH JUDICIAL DISTRICT

 4   WESLEY LYNN RUIZ            *    DALLAS COUNTY, TEXAS

 5

 6

 7   - - - - - - - - - - - - - - - - - - - - - - - - - - -

 8

 9                       REPORTER'S RECORD

10                    PRETRIAL PUNISHMENT HEARING

11                     Volume 50 of 59 Volume(s)

12

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19        BE IT REMEMBERED THAT on this the 17th day of June,

20   A.D, 2008, the above-styled and -numbered cause(s) came on for

21   hearing before the HONORABLE ERNEST B. WHITE, III, of the

22   194th Judicial District Court of Dallas County, State of

23   Texas, the following is a true and correct transcription of

24   the proceedings had, to-wit:

25      (Proceedings Reported by Computerized Machine Shorthand)
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                      A P P E A R A N C E S

 2

 3   HON. KEVIN BROOKS
     Assistant District Attorney
 4   State Bar No. 03070735

 5

 6   HON. ANDY BEACH
     Assistant District Attorney
 7   State Bar No.  01944900

 8

 9   HON. JULIUS WHITTIER
     Assistant District Attorney
10   State Bar No. 21397900

11                                   FOR THE STATE OF TEXAS

12

13   HON. PAUL BRAUCHLE
     Attorney at Law
14   State Bar No. 02918000

15

16   HON. WILLIAM JOHNSON
     Attorney at Law
17   State Bar No.  10804500

18                                   FOR THE DEFENDANT

19   Also Present:

20     Doug Parks, Attorney at Law

21

22

23                         *  *  *  *  *

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

1

**INDEX**

2

                                                                  **PAGE/VOL.**

3  Proceedings - 06/17/08 ............................... 5/50

4  STATE'S WITNESS         Direct      Cross

5    RICHARD HAMB           6

6

7  Ruling on Defense's Motions .......................... 11

8

9  Reporter's Certificate ............................... 34

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
                        E X H I B I T   I N D E X

STATE'S EXHIBIT(S):              OFFERED:   ADMITTED:   VOL.
```

| # | Exhibit | Description | Offered | Admitted | Vol. |
|---|---|---|---|---|---|
| 3 | 117 | Blue Back | 10 | 11 | 50 |
| 4 | 118 | Blue Back | 10 | 11 | 50 |
| 5 | 119 | Blue Back | 10 | 11 | 50 |
| 6 | 120 | Blue Back | 10 | 11 | 50 |
| 7 | 121 | Blue Back | 10 | 11 | 50 |
| 8 | 122 | Blue Back | 10 | 11 | 50 |
| 9 | 123 | Blue Back | 10 | 11 | 50 |
| 10 | 124 | Blue Back | 10 | 11 | 50 |
| 11 | 125 | Blue Back | 10 | 11 | 50 |
| 12 | 126 | Blue Back | 10 | 11 | 50 |
| 13 | 127 | Blue Back | 10 | 11 | 50 |
| 14 | 128 | Fingerprint Card | 10 | 10 | 50 |

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

**PROCEEDINGS**

(June 17, 2008)

THE COURT: On the record.

Cause No. F07-50318, styled the State of Texas versus Wesley Ruiz. This matter is set for a pretrial hearing today.

What says the State?

MR. BROOKS: State is ready.

THE COURT: And what says the Defense?

MR. PARKS: The Defense is ready, Your Honor.

THE COURT: And it is my understanding that the Defense is going to have the defendant in the holdover; is that correct.

MR. PARKS: That's correct.

THE COURT: What issues do we have?

MR. BRAUCHLE: Certain pretrial motions in regard to the punishment evidence. I guess they are not pretrial anymore.

THE COURT: I thought about that, when I said that.

MR. BRAUCHLE: They are --

THE COURT: Mid-trial, pre, presentencing motions.

MR. PARKS: I think we counted only about six of them; is that correct?

MS. SMITH: Yes.

MR. PARKS: There are going to be -- if I can approach?

THE COURT: Certainly.

MR. PARKS: This will help you on extraneous offenses.

THE COURT: Okay. These actual motions?

MR. PARKS: They are probably loose, I don't think they were ever put in a binder.

(Pause in the proceedings.)

THE COURT: If you will have Deputy Hamb take the stand.

Raise your right hand.

(Witness was duly sworn.)

THE COURT: You may be seated.

**RICHARD HAMB**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

BY MR. WHITTIER:

Q. Tell us your name?

A. Richard Hamb, H-a-m-b.

Q. And where are you employed?

A. With the Dallas County Sheriff's Department in the intake identification section.

Q. And what you do in that section?

---

7

A. We fingerprint the prisoners that come into the jail. We classify and compare all the fingerprints.

Q. And how long have you been so employed?

A. About 12 years.

Q. Okay. And during that time, have you printed few or many people and compared their prints against known?

A. Many people.

Q. And have you at different times during that period of time been qualified and admitted as an expert on fingerprint comparison in the courts of this county?

A. Yes, sir.

Q. Other counties?

MR. BRAUCHLE: We stipulate he is an expert.

MR. WHITTIER: I'm sorry?

MR. BRAUCHLE: We will stipulate he is an expert.

Q. (By Mr. Whittier) Officer Hamb, have you had a occasion to print the man named in this case, Wesley Lynn Ruiz?

A. Yes.

MR. WHITTIER: We will agree to the stipulation.

THE COURT: Very well.

Q. (By Mr. Whittier) You have?

A. Yes.

Q. When was the last occasion you had to print him?

8

A. On May 9th, I went over to the jail assignment at the North Tower where he was located and fingerprinted Mr. Ruiz.

Q. Okay. Is -- the man that you printed as Wesley Lynn Ruiz enrolled in and named in the log of prisoners that you have in your jail?

A. Yes.

Q. And you know him by sight?

A. Yes.

Q. Is he also identified for you by photographs that you have in your online assistance?

A. Yes.

Q. Okay. And if you saw Wesley Ruiz and he were in the courtroom today, would you recognize him?

A. Yes.

Q. Would you be able to point him out and identify him?

A. Yes.

Q. Okay. At some point around May the 9th you were handed a set of blue backs, summaries of convictions and adjudication in Dallas County by myself, right?

A. Yes, sir, that's correct.

Q. And do you have those before you?

A. Yes.

Q. And in that set of blue backs, do they all contain fingerprints?

9

1  A.  Yes, they do.
2  Q.  Is there one municipal court packet in there that
3  does not contain a fingerprint?
4  A.  Yes, sir.
5  Q.  And you weren't able to compare a print there,
6  correct?
7  A.  That's correct.
8  Q.  Okay.  Did you need to get that card?
9  A.  No.
10 Q.  Officer, you had a chance to compare the knowns that
11 you took from Wesley Ruiz against the prints that show in each
12 of those files?
13 A.  That's correct, yes.
14 Q.  I'm sorry, I didn't count them, but how many are
15 there there?
16 A.  It's State's Exhibit 117 through 127.
17 Q.  Okay.  And in your opinion, have you had an adequate
18 opportunity to observe and examine those prints against the
19 knowns that you took?
20 A.  Yes, I did.
21 Q.  And made a determination as to the person identified
22 in those packets?
23 A.  Yes.
24 Q.  And tell the Court who that person is?
25 A.  Wesley Ruiz, the person that I have looked at the

10

1  book-in mug shots as well as the fingerprints that I took from
2  Wesley Ruiz.
3  Q.  Okay.  And you are comfortable you will be able to
4  identify him facially were he in the courtroom today?
5  A.  Yes.
6           MR. WHITTIER:  Pass the witness.
7           MR. PARKS:  No questions.
8           MR. WHITTIER:  Pass the witness with no further
9  questions.
10          Judge, we would offer into evidence preliminarily and for
11 all purposes I'm sorry, the blue backs identified by Officer
12 Hamb.
13          MR. BRAUCHLE:  Well, we have objections to the
14 blue backs in that we haven't been -- we haven't been able to
15 go through them to see if they are admissible.  We don't have
16 a problem with State's Exhibit 128, that's the print card.
17          THE COURT:  No objection to 128; 128 is
18 admitted.
19          MR. BRAUCHLE:  But simply because his
20 fingerprints may be on these documents doesn't mean that they
21 are admissible.  We will agree to admit them for record
22 purposes only.
23          THE COURT:  And those are exhibit numbers?
24          MR. BRAUCHLE:  I think they said it is 117
25 through 127.

11

1           MR. PARKS:  Some of them are subject to some of
2  our other motions, Judge.
3           THE COURT:  Right.
4  State's Exhibit 117 through 127 are admitted for record
5  purposes.
6           And Mr. Hamb, do you need to leave.
7           MR. BRAUCHLE:  We don't have any questions for
8  him.
9           THE COURT:  You are free to leave, sir.
10          THE WITNESS:  Thank you.
11          THE COURT:  Thank you.
12          (Pause in the proceedings.)
13          MR. PARKS:  This is the situation where the
14 Defense was furnished about 22 individual notices of
15 extraneous offenses, at some point in time.  I know the State
16 has indicated informally that they did not intend to pursue
17 all of these, but I don't believe we have ever put on the
18 record which ones they do not intend to pursue and which they
19 do.  So I think that probably would be a good starting place
20 for us to know which of these 22 extraneous offenses that we
21 are really concerned with.
22          THE COURT:  And, Mr. Parks, just to make sure I
23 have the right motion, motion to exclude evidence of
24 extraneous; is that correct?
25          MR. PARKS:  This is the omnibus motion, that's

12

1  correct.  Look at page two I can tell you for sure.
2           THE COURT:  This is what I have page two.  Mine
3  doesn't say omnibus.
4           MR. PARKS:  There should be one that says
5  omnibus with page two looks like that.  I have just handed it
6  to you, I think I did.
7           THE COURT:  These are the ones you handed to me.
8           MR. PARKS:  Here it is, it was on the bottom.
9           THE COURT:  Okay.  Now it is on the top.  Okay.
10          MS. HANDLEY:  Your Honor, I think I can speak to
11 this.  We did of these 22 offenses here, we provided reports
12 or offense reports generated out of the Irving Police
13 Department with respect to each one of these allegations.  Now
14 what this is, is this is part of a gang file from the Irving
15 Police Department.  During this time frame here, the defendant
16 was listed, identified as a gang member of the gang Midnight
17 Dreamers, Ledbetter 12 or West Side 12.  As a result of that,
18 Irving would generate a report anytime he was listed as a
19 suspect, as a complainant, for example, he complained that
20 gang members were shooting at him.  If he was listed as a
21 witness.  All of these offenses are incorporated into his gang
22 file.  We provided them copies of all of this and notice of
23 this, so that when an officer comes from Irving, Texas, to say
24 he was in fact identified as a gang member, he had a
25 reputation out there, we know him well, this is what they are

### Page 13

1  basing their opinion on are all these reports generated where
2  they have something to do with the defendant in this case.
3  With respect to which ones we are actually going to prove up,
4  we do have certified copies of convictions for some of these
5  offenses. And I know you are looking at those now, some of
6  those are burglary of motor vehicles, some of them are thefts,
7  things such as that. You will see that there are certified
8  copies of that. We don't have a certified copy of the deadly
9  conduct. We did dismissed that in 1997, but we do in fact
10 intend on proving that in our case in the punishment phase.
11      So the ones we have convictions on, the deadly conduct,
12 we do in fact intend on proving that. But this will be
13 understand a basis of the opinion of anybody who comes here
14 from Irving to say he is a gang member, he was a thorn in our
15 side. Every time we turned around, he had his hand in
16 something.
17           MR. PARKS: Okay, so with respect to individual
18 extraneous acts or extraneous offenses of bad acts, only the
19 convictions plus the deadly conduct off this list of things.
20           MS. HANDLEY: The convictions plus the deadly
21 conduct, keeping in mind that an officer Irving, Texas, an
22 officer who, you know, knew him as a gang member had dealings
23 with him, is going to be basing his opinion on each one of
24 these encounters here.
25           MR. PARKS: I understand. But he is not going

### Page 14

1  to talk each one of those individually, unless he is
2  cross-examined about them?
3           MS. HANDLEY: Precisely.
4           MR. PARKS: Okay. I think the record is pretty
5  clear on that.
6           MR. WHITTIER: Conviction of adjudication as a
7  juvenile.
8           MS. HANDLEY: And the juvenile adjudication,
9  yes. And you have copies of all of those right now that
10 Mr. Brauchle has.
11          MR. PARKS: Now, also past that list of things,
12 Judge, and I am doing this in an abundance of caution, there
13 is a laundry list of things that the State gives us notice of,
14 curfew violations, giving wrong names to law enforcement,
15 failure to maintain financial responsibility. All of those I
16 am assuming will not be offered as individual bad acts or
17 extraneous offenses.
18          MS. HANDLEY: Again, Judge, there was a point in
19 Irving, Texas, where the defendant had accumulated several
20 municipal tickets or violations, and he at one point was
21 arrested on all of those outstanding tickets that's what that
22 list is there that I gave you. And then at another point in
23 time he turned himself in to the jail on all those outstanding
24 tickets. And that's all the tickets he was held in jail on,
25 all the outstanding warrants, the curfew violation, no

### Page 15

1  seatbelt, failure to give name, that's what that refers to.
2  But I do not intend on bringing municipal tickets to show
3  that. Just to show you that he was in fact arrested and taken
4  into jail and that was the basis of it and that also again is
5  part of his gang file.
6           MR. PARKS: So again so the record is clear, I
7  understand that none of those things will be offered
8  individually as convictions, extraneous offenses, or bad acts?
9           MS. HANDLEY: All those tickets, no.
10          MR. PARKS: And with respect to -- and I think
11 that pretty much addresses that motion, Your Honor. We will
12 have some individuals here that deal with some of the things
13 that are in that motion.
14     And probably it would be reasonable to go next to the
15 motion to exclude the deadly conduct. That is the one the
16 court recalls the State just advised the Court that while they
17 did not have a conviction on that case, they intended to
18 attempt to prove that deadly conduct as an extraneous bad act;
19 is that right?
20          MS. HANDLEY: Yes. We do intend on offering
21 evidence of that.
22     Judge, in 19 -- that offense occurred in 1997. I am not
23 exactly sure of the date, but our office did dismiss that case
24 against the defendant Wesley Ruiz. We did cite lack of
25 cooperating testimony. One of the codefendants on that case,

### Page 16

1  a man by the name of Raul Toledo was in fact convicted of that
2  offense and sent to prison. We do intend on bringing him to
3  court and having him offer testimony of that offense that the
4  defendant participated in that offense with him, specifically
5  that they both shot up a house, shot up a home of Jose Ramos.
6  With respect to us not having cooperating testimony at the
7  time and dismissing our case then, that's because it was
8  necessary to secure a conviction in the guilt phase and I
9  think you are referring to the witness accomplice rule 38.14
10 necessary to have corroborating testimony from a codefendant.
11 That does not apply necessarily to the punishment phase. And
12 there are several cases on point citing that, that it is not
13 necessary to have that same type of corroborating evidence to
14 show in the punishment phase.
15          MR. PARKS: Of course, our argument there is
16 absolutely no corroboration for this codefendant's testify,
17 none whatsoever, wasn't then, isn't now. He could not be
18 convicted of that offense as a matter of law not then, not
19 now.
20     The Court's charge will require the jury to find that
21 Mr. Ruiz committed this offense beyond a reasonable doubt
22 before they could even consider it in assessing punishment.
23 And it just seems illogical to me that they could hear this
24 evidence in a death-penalty case in the punishment phase when
25 it is absolutely without doubt insufficient to sustain a

1   conviction when they are asked to find it beyond a reasonable
2   doubt. It just seems incongruous, and we would suggest to the
3   Court that it is not admissible on that basis, particularly
4   because it is a death-penalty case and for all the reasons
5   that we set out in the motion in violation of the
6   Constitution.
7       THE COURT:   The Court will deny Defendant's
8   request to exclude the alleged bad act of deadly conduct.
9       MR. PARKS:   And just so the record is clear,
10   Judge, my arguing parts of my motion, we don't intend to waive
11   any of the other parts.
12       THE COURT:   So noted.
13       MR. PARKS:   Okay.
14       MS. SMITH:   What other parts?
15       MR. PARKS:   Whatever parts may be. Make sure
16   that the record is clear, I don't want to read in a brief
17   someday that old Mr. Park waived part of his motion because he
18   didn't argue it in open court.
19       THE COURT:   Understood, Mr. Parks.
20       MR. PARKS:   I guess that probably logically
21   brings us to the motion to suppress the escape. This is a
22   misdemeanor, Judge. And what happened was Mr. Ruiz was placed
23   on probation and was granted work release. And it appears
24   that he did not report to the jail when he was supposed to on
25   work release. And an escape charge was filed. Misdemeanor

1   escape. My problem with that particularly is that just the --
2   firstly, we are not sure that this constituted escape at the
3   time that the offense occurred.
4       Secondly, if it did, argue the prejudicial effect in a
5   capital murder case particularly where the jury is being
6   called upon to answer special issue number one, is far --
7   outweighs any probative value that walking away from work
8   release while on probation could possibly have toward that
9   issue.
10       In fact, I suggest to the Court that it is not in any way
11   relevant to any of the issues that this jury will be called
12   upon to decide in the punishment phase of the Court -- of the
13   trial. So I guess it's -- there are two or three issues here
14   whether in fact it was an escape.
15       Secondly, whether or not the probative value is such that
16   it is not substantially outweighed by the prejudicial effect
17   of it.
18       There is also an issue with the age that would bear upon
19   the probative value. And I suggest to the Court would bear
20   upon relevancy.
21       And certainly if -- if the Court were to admit -- were to
22   deny our motion, we would request that we be able to go behind
23   any conviction to show the jury the true facts of the matter,
24   we are not waiving our motion, please understand.
25       MR. BRAUCHLE:   Your Honor, if I could be heard

19

1   briefly on that. The escape law at the time that this was
2   charged, which is '97, didn't make what they have alleged
3   escape. It is my understanding that he didn't report to work
4   release originally. It is not like he was in work release --
5   am I correct Ms. Handley?
6       MS. HANDLEY:   What is that, sir?
7       MR. BRAUCHLE:   On the escape cases that are
8   charged, he was ordered to report to work release and just
9   never did.
10       MS. HANDLEY:   Essentially, yes. He was ordered
11   to report back to the jail, he did not. The charge was
12   generated then by the sheriff's department that he failed to
13   return.
14       MR. BRAUCHLE:   But he wasn't on work release at
15   the time. It wasn't like he went out to a job and then just
16   didn't come back.
17       MR. WHITTIER:   The Judge on the 2nd of September
18   put him on work release and ordered him to report on 12 --
19   9/12. And he was to report there at 8:00 p.m., he failed to
20   do so.
21       MR. BRAUCHLE:   So -- usually they go to work
22   release and then they go out on their job and they get
23   distracted and don't come back. He never was on work release.
24   And what we are saying is, is that this didn't even constitute
25   a crime at the time that he was convicted of it. What he did

20

1   is he got a case later on and just came in and cleaned up his
2   business. But what we are saying factually, it is in the an
3   escape under the facts that we are relating to you, you tell
4   somebody to report to the probation office next week, I don't
5   think you can charge them with escape or whatever. That's the
6   factual basis regarding this, we would object to it.
7       MS. SMITH:   Your Honor, the State intends only
8   to offer the blue back, however, the Defense has been provided
9   with everything we have. And should they like to go into the
10   facts of this offense, relying on a conviction, they can
11   certainly do so in front of the jury and set the record
12   perfectly clear as to the circumstances of it. The State also
13   like to note that the defendant pled nolo to this. And there
14   is no contention that the conviction itself is not valid.
15   There is no complaint about the sufficiency of the pen packet
16   or it's validity.
17       MR. BRAUCHLE:   Not yet.
18       MS. SMITH:   And this offense is one of a long
19   string of history of offenses which this defendant committed,
20   which is certainly relevant to punishment. His on-going
21   criminal activity over a lengthy period of time. The fact
22   that they are old isn't prejudicial, it is probative of his
23   refusal to comply with the law and living with the law-abiding
24   citizens. It is certainly nor probative than prejudicial.
25       MR. PARKS:   Judge, let me just interject here,

1  again this is a death-penalty case, not a case in which the
2  jury is going to be called upon to set a -- set punishment
3  within a range. It is not to be -- I suggest to the Court
4  relevant to one of the issues. And we just simply suggest
5  that under the facts of this case, not reporting for work
6  release is not relevant to a decision by this jury as to
7  whether or not he will be a future danger to society. And if
8  it has some tiny amount of relevance, it is greatly outweighed
9  by the prejudicial effect. It is just -- it is not whether I
10 suggest to the Court it might possibly have some influence
11 over the jury in punishment generally, it has got to be
12 relevant to the issue. And I just don't believe that it is.
13         MR. BRAUCHLE: For the State to say, well, we
14 can throw an escape charge in and then you can argue whether
15 it was actually an escape charge or not, the jury is in any
16 position to hear our legalese or to decide whether the offense
17 was a righteous case in '97 or not. I mean -- in the
18 obviously, the prejudicial aspect of just even mentioning
19 escape in this context is certainly prejudicial to our client.
20 Of course that's why they are trying to introduce it. But I
21 think that it also in any event it should be something that --
22 that is legally a correct charge and -- how would we -- how
23 would we ever prove that that was the underline facts. We
24 would have to go out and subpoena what, the Judge, the people
25 at work release, God knows who to prove that it wasn't what

1  they are making it out to be, which makes it sound like he
2  climbed over a fence in the dead of night somewhere. And they
3  are placing the burden on the Defendant to prove that their
4  case is bogus, and that is just improper.
5          MS. SMITH: The State is not conceding that we
6  have got some kind of bogus escape issue here. We believe in
7  the validity of it. I was simply suggesting that if you want
8  to set up the circumstances to which it was committed to
9  somehow show that it was less heinous than the jury might
10 infer, then that's up to you. But we are not suggesting that
11 this is an invalid conviction, putting the burden on you to
12 prove it. We think it is valid and that's why we want to
13 offer it.
14         MR. BRAUCHLE: How would we ever set that up,
15 though. I would have to call -- we would have to subpoena
16 work release records, which they haven't seen fit to do and
17 bring half of the judiciary and the sheriff's department down
18 here to prove that instead of escape, he didn't report to
19 something that he was ordered to do.
20         MS. SMITH: That --
21         MR. BRAUCHLE: It is an unfair burden.
22         MS. SMITH: All they have to do is contact the
23 DSO Deputy Rowe, R-o-w-e. It is really not a difficult task
24 to put evidence on regarding this crime.
25         THE COURT: The Court will deny the Defendant's

1  motion to exclude misdemeanor conviction regarding escape.
2          MR. PARKS: Judge, I think probably the next
3  motion, and we are doing -- doing it to some extent now is a
4  motion for pretrial hearing, the admissibility of extraneous
5  offenses. But the second portion of that motion is for
6  appropriate jury instruction. And I think the escape
7  situation is a perfect place to talk about that. And what we
8  are asking by that motion, obviously is for the Court to make
9  an independent decision as to the admissibility of these
10 extraneous offenses and bad acts exercising the Court's
11 gate-keeping function. And that so the record is clear that
12 each one of these -- one of the decisions the Court has got to
13 make, aside from being relevant, is the unfair prejudice
14 issue, which is set out in the paragraph number seven of that
15 motion.
16    But also with respect to paragraph number eight, when
17 these particular extraneous offenses and bad acts are admitted
18 by the Court in the presence of a jury, we are asking for a
19 limiting instruction, instructing the jury as to the purpose
20 for which specifically the purpose for which the Court is
21 admitting those extraneous offenses. Whether it is supposedly
22 to show whatever it is -- it is supposed to be showing. So
23 that the jury can take it for that purpose and not some other
24 purpose. It would be just like any other extraneous offenses
25 in the guilt stage of the trial. If it were intent or

1  identity in guilt/innocence, then we are asking for a limiting
2  instruction in punishment as to the purpose of each bad act or
3  extraneous offense.
4          MS. SMITH: Well, we certainly have no dispute
5  that we have the burden of proofing these extraneouses, or
6  that he committed them. I think it is a little dangerous to
7  try to limit the purpose for which they can be used, because
8  sentencing phase is pretty wide open. And in a sense, if you
9  want to limit to future dangerousness, you are going to be
10 preventing yourself from being able to use them in mitigation
11 in some form or fashion and so would we. I think the
12 instructions that are normally given are adequate to require
13 us to meet our burden and require the jury to find that we met
14 our burden.
15         MR. PARKS: Well, I have a hard time
16 understanding how we would be using extraneous offenses and
17 prior bad acts in our behalf on mitigation issues. I don't
18 foresee that we would be asking the jury to take into
19 mitigation any bad act that Mr. Ruiz -- what I don't want them
20 doing is considering it against Mr. Ruiz on mitigation issue
21 when it has been admitted for the purpose -- if that is the
22 purpose of the admission of showing future dangerousness. And
23 it really isn't a wide open situation in this case, it is two
24 specific issues. And the evidence needs to go to one or the
25 other of those issues, some evidence can go to both issues.

1  But if they are offering the escape to show the defendant will
2  be a future danger, then the jury needs to be instructed that
3  that's the purpose that the Court is allowing that evidence in
4  on and not for any other purpose.
5           MS. SMITH:   Judge, can I direct you to article
6  37.07.1, Section E(1), is the instruction, the mitigation
7  instruction. And it specifically tells the jury to take into
8  consideration all of the evidence. I think if we tried to
9  limit the use of this evidence, this extraneous offense, we
10 are going to be violating the statutory required instruction
11 in mitigation. And while generally speaking, you probably
12 wouldn't be using extraneous offense evidence in mitigation,
13 the perfect example would be the escape. If you are going to
14 put on evidence to show the circumstances under which this
15 escape occurred, you are probably going to be arguing it is
16 less heinous than we are representing, then you would use that
17 mitigation.
18           MR. PARKS:   Not if it didn't come in.
19           THE COURT:   Anything further, Mr. Parks?
20           MR. PARKS:   Not on that motion, no, Your Honor.
21           THE COURT:   The Court will deny that request.
22           MR. PARKS:   Judge, there is a motion -- let's
23 see hear, make sure I am not getting -- the other motions
24 are -- there is no reason why we can't take them up now at
25 this point, if the Court wants to. There is a motion -- there

1  should be two of them actually, that are very much alike.
2  There is a motion requesting the Court find Texas Code of
3  Criminal Procedures, Article 37.07.1 unconstitutional. And it
4  is a companion motion basically to the one with a great long
5  title that includes the word Nexus, ends in italic. And
6  essentially what these motions are, one of them is to ask the
7  Court to find that the entire Article 37.07.1.2(f)(4) is
8  unconstitutional because it limits the definition of
9  mitigation evidence in violation of the United States
10 Constitution and the teachings of the articles are directed,
11 which is why it is a companion motion. And the alternative to
12 holding the -- not the alternative, but in the event Court did
13 not hold that portion of 37.07.1 unconstitutional, the request
14 of the Defendant is that either -- well, I guess, that in the
15 jury charge the jury not be instructed as to the definition of
16 mitigating evidence set out in 37.07.1.2(f)4. And that if
17 they are instructed and the terms of that definition, the jury
18 will be limited in their ability to consider mitigating
19 evidence as that is defined or described in Conard under the
20 Constitution of the United States.
21           THE COURT:   Response.
22           MS. SMITH:   Your Honor, the instruction that he
23 wants you to not give is a statutorily mandated instruction.
24 It is constitutionality has been attacked previously and has
25 been upheld. The quote, limitation, he is talking about, the

1  definition mitigation is not unconstitutional. In fact the
2  Supreme Court has given its stamp of approval on the
3  mitigation instruction. And also the instruction is really
4  not a limitation, because once again in 37.07.1, Section E(1),
5  the instruction requires the jury to consider all of the
6  evidence.
7           MR. PARKS:   Well, that's a little disingenuous
8  to say you are required to consider all of the evidence -- all
9  the mitigating evidence. Mitigating evidence is, and set out
10 a definition, a statutory definition that limits the jury in
11 considering what the Supreme Court says that they are -- it's
12 extremely confusing to begin with to say you are to consider
13 all the evidence in determining these issues. In mitigation
14 issue you are instructed mitigating evidence is that evidence
15 which bears upon, quoting it loosely, the defendant's moral
16 culpability. There may be a great deal of evidence that a
17 jury might find to be mitigating that does have absolutely
18 nothing to do with the defendant's moral culpability. But the
19 definition limits them to only considering that evidence which
20 would fit that definition. And the Supreme Court has clearly
21 said that the jury is entitled and should be allowed to
22 consider any evidence that they believe would justify a
23 sentence less than death. And it is not limited to evidence
24 bearing on the defendant's moral culpability. And that's the
25 problem.

1           MS. SMITH:   But the instruction itself for
2  future argument, the instruction lists a number of types
3  evidence in addition to evidence related to moral culpability.
4  It necessarily tell the jury that moral culpability is one
5  facet of evidence to consider in answering moral culpability.
6           MR. PARKS:   Then why define it? Why tell them
7  what the definition of it is if it is less than what the Court
8  says they can consider. It would be like saying, you know
9  intent is what we say it is, but don't pay any attention to
10 what we say it is because it can be anything you want it to
11 be -- it makes no sense. I believe that it is so intends to
12 so confuse the jury that it deprives the defendant of due
13 process, fair trial according to all of the federal statutes,
14 constitution included in the motion, Your Honor.
15           THE COURT:   Very well.
16      And the Court will deny that motion.
17           MS. SMITH:   Excuse me, both motions?
18           THE COURT:   Yes.
19           MR. PARKS:   There is one other motion, Judge,
20 and it may be a little bit premature, while we are hear we
21 might as well talk about it. Motion to reduce the defendant's
22 statement of allocution free from cross-examination by the
23 State.
24           THE COURT:   I'm sorry, Mr. Parks, what motion
25 was that?

1  MR. PARKS: That may not be one -- we don't have
2  to take it up that the time. It looks like that.
3  THE COURT: You have anything further,
4  Mr. Parks?
5  MR. PARKS: The motion basically speaks for
6  itself, Judge. And as I said, we haven't made a decision
7  obviously about whether or not, but it would help us in making
8  such a decision --
9  THE COURT: Having an insight?
10  MR. PARKS: Yes, sir.
11  THE COURT: Response.
12  MS. SMITH: Your Honor, there is only a
13  statutory right to allocation, that is in Article 42.07 of the
14  Code of Criminal Procedures. There is no constitutional right
15  to one. So any allocution has to fit within the requirements
16  of 42.07. The defendant can't just take the stand to express
17  remorse and be free from cross-examination by claiming he is
18  just allocating. If he want to take the stand, he has to be
19  subject to all cross-examination.
20  MR. PARKS: We think that is inappropriate as we
21  stated in the motion.
22  THE COURT: The Court will deny this request.
23  MR. PARKS: End of the motions.
24  THE COURT: And some of your motions did not
25  have an order attached. What I did, I just put it on the

1  front page.
2  MS. SMITH: And you signed it?
3  THE COURT: I did.
4  MR. PARKS: Thank you, Your Honor.
5  MR. BEACH: Judge, in terms of the blue backs
6  objections, is there a chance that we can get together the
7  Friday before start back up, to put their objections on the
8  record so we are not wasting time once the jury gets hear, it
9  shouldn't be that long of a process, I wouldn't think.
10  THE COURT: Mr. Brauchle, in terms of reviewing
11  all of those, how far have you gotten.
12  MR. BRAUCHLE: I am probably halfway through.
13  But why should I tell them what my objections are so they can
14  go and correct them. They are in evidence now for the record.
15  I don't think my job is to lay down and help them on their bad
16  blue backs. I will rest at that.
17  MR. BEACH: I am not sure how we would correct
18  them, Judge, other than redacting certain objectionable
19  portions, and they are either admissible or not. And you are
20  going to make that call. I am just saying -- I want to
21  represent to the Court these will be our first exhibits, the
22  first thing we do in front of the jury on Monday. So I am
23  trying to avoid --
24  THE COURT: Taking them out.
25  MR. BEACH: Yeah, an hour delay. I don't care

1  if we do it Monday morning at 8:00, just some process in place
2  to save delay.
3  MR. BRAUCHLE: If somebody can advise me as to
4  what this is?
5  MR. WHITTIER: Oh, the note.
6  MR. BRAUCHLE: What does it say.
7  MR. WHITTIER: Matches number one, number one
8  print on a print card.
9  MR. BEACH: On 128.
10  MR. WHITTIER: You are not talking about the
11  document, you are talking about the note.
12  MR. BRAUCHLE: I am wondering what is it
13  referring to, the print?
14  MR. WHITTIER: Yes.
15  MR. BRAUCHLE: Whose note is that.
16  MR. WHITTIER: Dody.
17  MR. BRAUCHLE: Who is Dody?
18  PROSPECTIVE JUROR: Our investigator.
19  MR. BRAUCHLE: So Hamb haven't compared
20  those?
21  MR. WHITTIER: Yes, he has.
22  MR. BRAUCHLE: I am wondering if they are going
23  by this print or...
24  MR. WHITTIER: You would have to ask him. They
25  are both available.

1  MR. BRAUCHLE: All right.
2  MR. BROOKS: Judge, I would just like to put on
3  the record that approximately 38 recorded telephone calls were
4  turned over to the Defendant this morning, two separate DVDs.
5  MR. PARKS: We acknowledge receipt.
6  THE COURT: I'm sorry.
7  MR. PARKS: We acknowledge receipt.
8  THE COURT: Very well. We can -- so
9  Mr. Brauchle does not have to assist the State in correcting
10  their document, we can take those issues up 8:15 Monday
11  morning -- before bringing the jury in.
12  MS. HANDLEY: Also I had turned over to
13  Mr. Brauchle last week, a DVD, it was some news footage
14  showing the defendant. And I personally handed that to Paul
15  last week.
16  MR. BRAUCHLE: Y'all intend to introduce that.
17  MS. HANDLEY: Yes.
18  MR. PARKS: Some of these, Kevin, these
19  recordings will not be introduced; is that right?
20  MR. BROOKS: A large portion of them will not be
21  introduced, Judge. I think they would be under prejudicial.
22  We still have to go through and coal through the specific
23  ones, I can provide them written notice of the specific
24  conversations. I have shown them my notes this morning, what
25  I wrote down possibly coming in, also indicated what I intend

1       THE COURT:  Very well.
2       MR. BROOKS:  Also, Judge, they were turned over
3  today because we just received them last Wednesday and I spent
4  all of last week going through, I spent 38 phone calls, 15
5  minutes, which is the maximum they are allowed to converse
6  through the jail phone calls, and it took that time to go
7  through those phone calls.
8       MR. PARKS:  Just so we can have -- as soon as
9  reasonable possible, have a list of those things that the
10 State intends to offer, we will be happy as clams.
11      THE COURT:  As soon as you have that list of
12 what you tend to introduce, if you will make it available to
13 the Defense.
14      MR. BROOKS:  I will have it this week.
15      (Court recessed for the day.)

1  THE STATE of TEXAS )
2  COUNTY of DALLAS   )
3       I, BELINDA G. BARAKA, Official Court Reporter in and
4  for the 194th Judicial District Court of Dallas County, State
5  of Texas, do hereby certify that the foregoing contains a true
6  and accurate transcription of all portions of evidence and
7  other proceedings requested in writing by counsel for the
8  parties, to be included in this volume of the Reporter's
9  Record, in the above-styled and -numbered cause(s), all of
10 which occurred in open court or in chambers and were reported
11 by me.
12      I further certify that this Reporter's Record of the
13 proceedings truly and correctly reflects the exhibits, if any,
14 admitted by the respective parties.
15      I further certify that the total cost for the
16 preparation of this Reporter's Record was paid by the
17 State/Defense.
18      WITNESS MY OFFICIAL HAND this the 30th day of
19 May, A.D., 2009.

BELINDA G. BARAKA, CSR #5028
Official Court Reporter
133 N. Industrial
Dallas County, Texas 75207

25 Certification Expires: 12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*