

CASE NUMBER AP-75,968
TRIAL COURT NUMBER F-07-50318-M


# BINDER 6 OF 11 BINDERS

*VOLUMES 36 THROUGH VOLUME 45*


STATE OF TEXAS

vs

WESLEY LYNN RUIZ


**FILED IN**
**COURT OF CRIMINAL APPEALS**

JUN 1 5 2009

**Louise Pearson, Clerk**

CAUSE NO. F07-50318-M

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| vs. | * | 194TH JUDICIAL DISTRICT |
| WESLEY LYNN RUIZ | * | DALLAS COUNTY, TEXAS |

- - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

VOIR DIRE EXAMINATION

Volume 36 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 12th day of March, A.D, 2008, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

Belinda G. Baraka, Official Court Reporter
214-653-5803

1                    A P P E A R A N C E S

2

3     HON. ANDY BEACH
      Assistant District Attorney
4     State Bar No. 01944900

5

      HON. ANDREA HANDLEY
6     Assistant District Attorney
      State Bar No. 08898800

7

8     HON. MARSHALL MCCALLUM
      Assistant District Attorney
9     State Bar No. 24027485

10                              FOR THE STATE OF TEXAS

11

12    HON. PAUL BRAUCHLE
      Attorney at Law
13    State Bar No. 02918000

14

15    HON. WILLIAM "KARO" JOHNSON
      Attorney at Law
16    State Bar No. 10804500

17                              FOR THE DEFENDANT

18

19

20                         *   *   *   *   *

21

22

23

24

25

**I N D E X**

PAGE/VOL.

Proceedings - 03/12/08 ............................ 5/36

**JAMES GAGE**

Voir Dire Examination - Ms. Handley .............     5

Voir Dire Examination - Mr. Brauchle .............    48

State's Acceptance of Juror ......................   112

Defense's Challenge ..............................   112

Challenge Denied .................................   112

Defense's Request for Additional Strike ..........   112

Request Denied ...................................   112

Juror Accepted ...................................   113

**LAURA WORSHAM**

Voir Dire Examination - Ms. Handley .............    61

Voir Dire Examination - Mr. Brauchle .............    77

State's Acceptance of Juror ......................    84

Defense's Challenge ..............................    84

Challenge Denied .................................    85

Defense's Request for Additional Strike ..........    85

Request Granted ..................................    85

Defense's Pre-emptory Challenge ..................    85

**CORINE HARTGRAVE**

Voir Dire Examination - Mr. Beach ................    86

Voir Dire Examination - Mr. Johnson  .............   103

State's Acceptance of Juror ......................   110

1                          I N D E X

2                                                    PAGE/VOL.

3    CORINE HARTGRAVE (Cont.)

4    Defense's Challenge ............................... 110

5    Challenge Denied ................................. 111

6    Defense's Request for Additional Strike ........... 111

7    Request Granted .................................. 111

8    Defense's Pre-emptory Challenge .................. 111

9    CURTIS CANNADY

10   Voir Dire Examination - Ms. Handley................ 113

11   Voir Dire Examination - Mr. Brauchle .............. 140

12   MACEY CONRADT

13   Voir Dire Examination - Mr. Beach ................ 157

14   Voir Dire Examination - Mr. Brauchle ............. 183

15

16   Reporter's Certificate ........................... 198

17

18

19

20

21

22

23

24

25

5

6



**P R O C E E D I N G S**

(March 12, 2008)

THE BAILIFF:   All rise for the juror.

(Prospective juror entered the courtroom.)

THE COURT:   You may be seated.

Good morning Mr. Gauge?

PROSPECTIVE JUROR:   Good morning.

THE COURT:   How are you doing today?

PROSPECTIVE JUROR:   Great.

THE COURT:   The attorneys have some questions
to ask you concerning your qualifications as a juror in this
case.  There aren't any right or wrong responses to the
questions.  They are merely trying to see how you feel about
certain issues.

What says the State?

MS. HANDLEY:   The State is ready, Your Honor.
May it please the Court.

**JAMES GAGE**
was called as a prospective juror, after having been
previously sworn by the Court, testified under oath as
follows:

**VOIR DIRECT EXAMINATION**
BY MS. HANDLEY:

Good morning, Mr. Gage, appreciate you being here to talk
to us.  My name is Andrea Handley.  I work with Marshall

---

McCallum and Andy Beach.  We are all Assistant District
Attorneys, and we are in charge of selecting the jury for this
particular case.

To my left is Karo Johnson and Paul Brauchle.  They are
defense attorneys here in Dallas, and they represent the
defendant seated at the end of the table, Wesley Ruiz.

THE DEFENDANT:   Good morning.

PROSPECTIVE JUROR:   Good morning.

MS. HANDLEY:   Mr. Gage, let me tell you what we
are doing here.  As you recall we took weeks of bringing down
people to come in this courtroom and fill out this 18-page
questionnaire in anticipation of selecting a jury.  Since that
time, believe it or not, we have read all those
questionnaires.  We have gone through and we pulled out a
select number of people based on their answers and
representation to bring down and talk to now one-on-one about
the death penalty.  Feel you out a little bit more about how
you feel about it, talk to you about the criminal justice
system and specifically how exactly a death-penalty case
works.

PROSPECTIVE JUROR:   Uh-huh.

MS. HANDLEY:   What is important today, Mr. Gage,
is your opinion.  I think it is fair to say that I and my
colleagues as representatives of the State, how we feel about
this case, what we think should happen is entirely different

---

7

from their feelings on this side of the courtroom over here.
That and a buck fifty will get you a cup of coffee downstairs.
What we feel today is not important what Mr. Gage feels today.
Obviously there are no right or wrong answers.  We don't want
you to tell us something you think we need to hear, okay?

PROSPECTIVE JUROR:   Okay.

MS. HANDLEY:   And I think you can appreciate the
seriousness of this case, it doesn't get anymore serious than
life or death?

PROSPECTIVE JUROR:   No, it doesn't.

MS. HANDLEY:   And I can see that you already
look thoughtful about that, and your mind is in the right
place.

I think you have served before on a jury?

PROSPECTIVE JUROR:   Yes, I have.

MS. HANDLEY:   You have had an opportunity to
read over the questionnaire back there, sir?

PROSPECTIVE JUROR:   Yes, I did.

MS. HANDLEY:   Would you change anything, if you
had to fill it out, would you change anything, expand on
anything, I know we put you on the spot, put you in that
uncomfortable chair and ask you to fill it out.  Probably not
the best environment to really get your feelings on it.
Anything you want to add to that or tell us about?

PROSPECTIVE JUROR:   Only one thing, I think the

---

8

questionnaire was very intense, it became quite tedious toward
the end.  I reviewed it fairly carefully this morning, I think
my general opinion that I put down there has not changed.  I
did notice that I was a little harsh toward attorneys.

MS. HANDLEY:   That's --

PROSPECTIVE JUROR:   And I begin to realize this
morning, we are dealing with a criminal case and not a civil
case.  And I guess I watch too much Denny Crane.  I apologize
to the defense lawyers for my comment there.

MS. HANDLEY:   I can assure you that they have
been called worse probably by me.  No, that's fine?

PROSPECTIVE JUROR:   Other than that, I think I
am pretty good with that.

MS. HANDLEY:   Okay.  Great then.  And I will
tell you, Mr. Gage, reading from your questionnaire, and I
appreciate your comments there about attorneys, but reading
from your questionnaire, one of the reasons we brought you
down is because we think you are kind of middle of the road.
If you were a person who said anybody who ever commits a
murder ought to be put to death, you wouldn't be sitting here
today.  You would be too extreme.  If you were a person who
said I could never assess the death penalty, couldn't do it,
you wouldn't be here today.  We are looking for individuals
who kind of have an appreciation where it is not an easy black
or white issue, and that everything needs to be taken into

---

9

10

1   account in assessing the evidence in a case like this. And in
2   particular in coming up to your conclusion as to whether or
3   not a life sentence without parole or a death sentence is more
4   appropriate.
5             PROSPECTIVE JUROR:   Absolutely. It is various
6   shades of gray.
7             MS. HANDLEY:   Yes, sir, it is.
8             PROSPECTIVE JUROR:   I am an engineer, and for
9   engineers, I prefer black or white. But certainly in cases
10  like this.
11            MS. HANDLEY:   It won't be like that. I don't
12  know it will be like that for you. It is something that you
13  have to get through those shades of gray.
14            Have you always felt this way about the death penalty.
15  Was there one particular event that shaped your opinion?
16            PROSPECTIVE JUROR:   No. I think I always felt
17  that the death penalty is absolutely justified in certain
18  cases. But so many extenuating circumstances, you really have
19  to judge each case depending, you know on the circumstances.
20            MS. HANDLEY:   And I think it is fair to say that
21  you hit the nail on the head. It is always a case-by-case
22  situation. It never neatly fits into one category or another.
23  Let me just tell you a little bit more just so we can again
24  make sure we are all on the same sheet of music here.
25            I think you get a good feel, you know, we have one goal

1   in mind here as representatives of the State, Mr. Gage, so
2   there is no mistake about it, our single goal in this case is
3   not only receive a conviction of finding the defendant guilty
4   of capital murder, but to ultimately see him strapped to a
5   gurney someday in Huntsville, Texas receiving a lethal
6   injection. That's our goal just so you know that we are not
7   going to change our mind and that we are serious about that.
8   That is where we are coming from today and will until the
9   ultimate conclusion of this case.
10            If that happens, Mr. Gage, if we receive that conviction
11  and that assessment of the death penalty, what will happen is
12  the defendant will be transferred out to Livingston, Texas,
13  that's out in East Texas near Huntsville. Have you ever been
14  out there?
15            PROSPECTIVE JUROR:   I was born and raised in
16  East Texas.
17            MS. HANDLEY:   What part?
18            PROSPECTIVE JUROR:   Cartage.
19            MS. HANDLEY:   Did you ever take any kind of tour
20  our walk through Huntsville?
21            PROSPECTIVE JUROR:   No. I have been by.
22            MS. HANDLEY:   And you are probably familiar that
23  Huntsville is a town dedicated to the study of criminal
24  justice and housing of inmates and where we carry out our
25  executions. Given a death penalty for the defendant, that's

11

12

1   where he is going to be housed there, Livingston, Texas, sits
2   outside of Huntsville, until a date that is set by the Judge.
3   He sits there, the day before actually, he will be transferred
4   from Livingston, Texas to downtown Huntsville, Texas. There
5   is an old prison there called the Walls Unit, that's where
6   they carry out the execution.
7             He will be put in an isolated cell, close proximity to
8   that death chamber on the day before. The day of his
9   execution, he will have one last opportunity to have
10  visitation with family, spiritual advise sore if he so
11  incline. But he will get that one last visit. He will also
12  get that famous last meal that you sometimes hear about on TV
13  and movies. And as long as what he wants, as long as it is on
14  the menu for TDC.
15            He will sit there and wait until six o'clock at night,
16  because that's when we carry out our actual execution. Come
17  that time, Mr. Gage, there are going to be some individuals
18  that are going to take him from that isolated cell down the
19  narrow hallway to the death chamber. Whether he goes
20  voluntarily or kicking and screaming, he is going to go,
21  that's what these people do for a living is to insure the
22  delivery of him into that room. He will be taken into that
23  room. It is a small room, very industrial and cold and
24  sterile. And in the middle of it is a gurney, a hospital bed.
25  And they will strap him down to that gurney, again whether he

1   likes it or not.
2             In that room, Mr. Gage, there are also two windows on the
3   side and they have curtains over them. And after he is
4   strapped down, these curtains will open up. And on one side,
5   he can have five representatives from his family or his
6   lawyer, whoever he chooses. On the other side, there are
7   going to be five representatives from the victim's family.
8   And they will be able to sit there and watch the defendant at
9   that time.
10            He will be given a chance to make the last statement that
11  we always hear about. And I am sure you can imagine many
12  thing have been said over the many years that this has been
13  going on. Everything from I'm sorry for what I have done to I
14  want everybody to know that you are killing an innocent man.
15  Anything can be said at that point. But regardless of what he
16  says, it is going to happen.
17            When he is strapped down, there is an individual that
18  will put an intravenous line into his arm and then strap his
19  arm down. After he has finished making that last statement,
20  the warden is going to give a nod to somebody, he is going
21  start to hit a series of buttons, designed to do three things,
22  the first thing -- chemical starts to flow into his arm. The
23  first thing it does is sedates him. Knocks him out so he
24  can't move. The second thing that happens is it collapses his
25  lungs so he can no longer breathe. Finally, the third thing

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1  is designed to do, it ceases and stops his heart. These
2  chemicals flow, six, eight seconds, as long as it takes until
3  the doctor pronounces him dead.
4  I don't walk you through that to be morbid. But we are
5  in a sterile courtroom right now and we are all being
6  relatively friendly to each other, to tell you that to put in
7  your mind the picture of what we are asking you to play a part
8  in?
9  PROSPECTIVE JUROR:  I understand, you painted
10  a very graphic picture.
11  MS. HANDLEY:  Okay. Good then. Knowing that,
12  having that graphic picture, sir, and knowing your feelings on
13  the death penalty and what you are and are not capable of, do
14  you believe that you are the kind of person that can take part
15  in a process such as that. We are not talking about the
16  execution of a fictional character, but a man who is seated
17  about 30 feet away from you?
18  PROSPECTIVE JUROR:  Yes, I can.
19  MS. HANDLEY:  Okay. And again, I appreciate you
20  being thoughtful about that. I will tell you of the people
21  who have already been selected, nobody has been entirely
22  comfortable with the thought. And if you were, I think it
23  would kind of give us all a red flag. So I appreciate that.
24  Let me go on and talk to you a little bit about the
25  process. About the laws that apply in this criminal case.

1  And then more particularly what applies in a death-penalty
2  case.
3  We had asked your opinion as to what crimes you thought
4  the death penalty should be available as an option. And you
5  had put down in your questionnaire there, first degree,
6  intentional premeditated, fully cognizance of action. I will
7  tell you that the death penalty is not an available option for
8  all murder cases. It is actually a very select number of
9  cases to which the jury has an option. Again, it is always an
10  option. It is never automatic.
11  The types of cases where it is an option is for example
12  the murder of a police officer in the line of duty. The
13  murder of a child six years of age or younger. The murder of
14  an individual 65 years of age or older. The murder of two or
15  more people during the same criminal episode. You hear about
16  serial criminals.
17  The most classic example we often see is a situation
18  where the individual goes into a convenience store with intent
19  of robbing the store and in the process murders the clerk. So
20  a murder during the commission of a felony offense is also a
21  crime to which the death penalty could be an option. Robbery,
22  murder during rape, murder during kidnapping, those are the
23  types of crimes, murder of a prison guard during an attempted
24  escape from prison, those are the crimes that would become an
25  option to the jury.

15

16

1  If I were sitting here right now, Mr. Gage, and I pulled
2  a gun out of my briefcase and I turned to my colleague who is
3  minding his business and just shot him in the head and blew
4  his brains out and stood up and laughed about it and kicked
5  his body a couple of times and danced around, I think you
6  would agree that it is a particularly heinous murder, is it
7  not?
8  PROSPECTIVE JUROR:  I would assume. He
9  seems like a nice guy.
10  MS. HANDLEY:  And he is a nice guy. And that
11  would be an intentional murder, Mr. Gage. But I will tell you
12  what, the death penalty would not be an option available to
13  the jury in my trial. I could get life imprison, but not the
14  death penalty, because Mr. Gage, he is not one
15  of those protected class, he is not falling within that
16  limited class of cases to which the death penalty can apply.
17  Does that make sense to you?
18  PROSPECTIVE JUROR:  Yes, I think so.
19  MS. HANDLEY:  If you would, let's say you are
20  the legislature for a day and you could change the law, do you
21  think that you would change the laws to which the death
22  penalty is an available option for jurors?
23  PROSPECTIVE JUROR:  As you have explained
24  them, and as I understand them, no. I think I agree. I think
25  there should be some knowledgeable group who makes those

1  decisions instead of them being made, you know, on a
2  case-by-case, emotional-type basis.
3  MS. HANDLEY:  Okay, very well then. And before
4  I talk more specifically about the death penalty in a capital
5  murder case, I will back up a little bit and tell you, you
6  know we got our capital murder cases, and then we got for lack
7  of a better word, sir, our regular murder cases. That being
8  shooting my colleague, a regular murder case, not a capital
9  murder case. In a capital, a jury is left with one or two
10  choices ultimately on what they are going to do with the
11  defendant. And that is either give him life imprison without
12  parole or the death penalty.
13  PROSPECTIVE JUROR:  So this will be our option
14  here?
15  MS. HANDLEY:  Yes. In a capital murder case,
16  one of two things is going to happen, life imprison without
17  parole or the death sentence. In a regular murder, and again
18  I say regular for lack of a better word, in a regular murder,
19  it is entirely different with respect to the change of the
20  punishment.
21  In your particular case, sir, were you called upon to
22  assess punishment when you sat as a juror?
23  PROSPECTIVE JUROR:  Yes.
24  MS. HANDLEY:  You probably remember that and you
25  did find him guilty and assess a punishment; is that correct?

17

```
1    PROSPECTIVE JUROR:  Yes, we did, yeah.
2         MS. HANDLEY:  You are ten steps ahead of the
3    game then.  You remember then after you found him guilty, the
4    Judge gave to you a wide range of punishment to look at in
5    assessing what to do?
6         PROSPECTIVE JUROR:  Nothing personal, but it
7    was a her.
8         MS. HANDLEY:  She did, I'm sorry.
9         PROSPECTIVE JUROR:  I think we had
10   manslaughter, unintentional, we had several options from which
11   to choose and we based that on the evidence given the trial.
12        MS. HANDLEY:  Precisely.  And that not being --
13   manslaughter not being a first-degree murder, your range of
14   punishment did not go all the way to life.
15        PROSPECTIVE JUROR:  No, no.
16        MS. HANDLEY:  I would imagine, because it is not
17   a first-degree intentional murder.  You found that somebody
18   was killed recklessly in that case, I believe?
19        PROSPECTIVE JUROR:  Yes.
20        MS. HANDLEY:  And you understand, and I believe
21   you already have an appreciation, you based your punishment
22   sentence in that case on the evidence of that particular
23   offense?
24        PROSPECTIVE JUROR:  Yes.
25        MS. HANDLEY:  And had you believed based on the
```

18

```
1    evidence, for example, that a minimum sentence was
2    appropriate, I am sure that would have been the thing that you
3    would have done, if you felt that was going to be done.  And
4    had you felt based on the evidence in that case that a maximum
5    sentence was appropriate, that's what you would have done in
6    that case.
7         PROSPECTIVE JUROR:  Uh-huh.
8         MS. HANDLEY:  But ultimately you gave the
9    punishment within that range that you felt appropriate for
10   that case?
11        PROSPECTIVE JUROR:  Yes.
12        MS. HANDLEY:  So I am sure you can already agree
13   that in order to be a qualified juror, you have to base your
14   verdict on the evidence in the case.  And wherever it lands
15   within that range of punishment, that is what you do, be it
16   the minimum sentence or the maximum sentence?
17        PROSPECTIVE JUROR:  (Nods head).  So in this
18   particular trial, will we -- will the jury --
19        MS. HANDLEY:  This is going to be different.
20   And that's just stepping back away to talk to you briefly
21   about a regular murder.  We are not talking about a regular
22   murder in this case.  If for some reason, you know, it is just
23   to test your qualifications if that were the situation there.
24   We are talking about a capital murder, though.  And I am
25   going to go again through briefly with you the fundamental
```

19

```
1    propositions of law that come to play in any criminal case.
2    And this is probably going to sound very familiar to you.  But
3    again, tests on your qualifications to sit as a juror in this
4    particular case.  Through all criminal cases, be it theft of a
5    loaf of bread up to capital murder, the trial that you sat on,
6    certain rules of law came into play.  I am sure that you took
7    your oath as a juror, you agreed to follow the law, and you
8    agreed to base your sentence on the evidence in the case and
9    nothing else, correct?
10        PROSPECTIVE JUROR:  Sure.
11        MS. HANDLEY:  We as the State of Texas are
12   obligated to find the defendant -- to prove to you the
13   defendant is guilty beyond a reasonable doubt.  We have to
14   prove each and every element of the offense.  It is set out in
15   the indictment.
16        I think you have a copy of it right there in front of
17   you.
18        PROSPECTIVE JUROR:  Uh-huh.
19        MS. HANDLEY:  And I will paraphrase for you.  We
20   are obligated to prove to you that the defendant, on or about
21   a certain date, in Dallas County, Texas, did intentionally and
22   knowingly cause the death of this peace officer, knew he was a
23   peace officer in the line of duty, and he did it by shooting
24   him with a firearm.  No element is more important than the
25   other.  And we have to prove all the elements.  We don't get
```

20

```
1    points for five out of six.  We have to prove them all to you.
2    And the Judge would instruct you what is important in
3    recognizing that every element stands on its own and every
4    element is just as important as the other, correct, sir?  So
5    if I fail to prove any one of those elements beyond a
6    reasonable doubt, the Judge would instruct you that you must
7    return a verdict of not guilty.
8         And you understand that law and that's a law that you
9    would agree and follow also?
10        PROSPECTIVE JUROR:  Yes.
11        MS. HANDLEY:  And just for example, completely
12   out there example, let's say I put my case on, I prove to you
13   beyond a reasonable doubt that the defendant did kill and
14   murder a police officer in the line of duty.  But let's say
15   for example I haven't offered a thread of evidence that it
16   happened in Dallas County.  But instead I showed you that it
17   happened in Tarrant County.  You agree with me, sir, that
18   Dallas County is an essential element of the indictment, is it
19   not?
20        PROSPECTIVE JUROR:  Yes.
21        MS. HANDLEY:  If I failed to prove that to you,
22   sir, the Judge would instruct you that you must return a
23   verdict of not guilty.
24        PROSPECTIVE JUROR:  I understand.
25        MS. HANDLEY:  And is that something that you
```

1  would and would do you would agree to follow that law?
2             PROSPECTIVE JUROR:  Yes, I would.
3             MS. HANDLEY:  You also recognize, I am sure,
4  that the indictment in this case is merely a piece of paper,
5  it tells me what I have to prove.  It tells the defendant what
6  he is charged with.  The Judge will instruct you that it is in
7  no way to be considered as a piece of evidence against the
8  defendant.  You can't say where there is smoke, there is fire.
9  He was indicted, so I am going to consider that as evidence of
10 his guilt.  Merely a piece of paper.
11           Is that a law that you could also follow and would agree
12 to follow in this case?
13            PROSPECTIVE JUROR:  Yes.
14            MS. HANDLEY:  You recognize also as a
15 representative of the State, I brought the charges, I ought to
16 have to do the proving.  And that is the law.  You always look
17 to this side of the table for your proof.  You never look to
18 that side over there to offer anything.  They could,
19 figuratively speaking, sit there and play cards if they want
20 to.  I don't think they will.  I know these gentleman and they
21 are very talented attorneys.  But figuratively, they wouldn't
22 have to do anything, you always look to the State to bring the
23 evidence.
24            PROSPECTIVE JUROR:  Until proven guilty.  And
25 you have the burden of proof?

1             MS. HANDLEY:  Yes, I do.  And it always stays
2  here, doesn't it?  And the law states that until I prove this
3  case beyond a reasonable doubt, as the defendant sits here
4  today and until I prove to you otherwise, you are to presume
5  him innocent.
6             Is that a law that you would also agree to follow?
7             PROSPECTIVE JUROR:  Yes.
8             MS. HANDLEY:  Proving this case to you beyond a
9  reasonable doubt.  I am sure you can appreciate that's our
10 highest burden of proof in the justice system?  Not shadow of
11 a doubt, not clear and convincing evidence, not preponderance
12 of the evidence, but beyond a reasonable doubt, the highest
13 burden of proof in our system.  There is no definition of
14 reasonable doubt, Mr. Gage.  It is whatever you think it is.
15 Some people say I have to be sure.  Some people have said it
16 has to be a decision that I could sleep with knowing that I
17 have done the right thing, then I would know that you were
18 guilty beyond a reasonable doubt.
19            But let me throw it back at you and ask you what do you
20 think beyond a reasonable doubt, Mr. Gage?
21            PROSPECTIVE JUROR:  You have evidence.  You
22 have physical evidence.  You have eyewitness evidence.  You
23 have recorded evidence.  And you have met all the requirements
24 as you stated earlier.
25            MS. HANDLEY:  And you understand, Mr. Gage, I

23

1  could put anybody on that stand and they could say, you know,
2  I was there and I saw it.  But your obligation as a juror as
3  you know is to assess the credibility of that witness.  Just
4  because you are under oath, you know, doesn't mean that you
5  are telling the truth, does it?
6             PROSPECTIVE JUROR:  That's true.
7             MS. HANDLEY:  And you would agree that you are
8  going to assess the credibility of each witness as they take
9  the stand and offer proper testimony.
10            And speaking of testimony, as I am sure you are familiar
11 with, the defendant has a right not to testify in his criminal
12 trial, it's that Fifth Amendment right to remain silent.  The
13 law says that if any defendant, you enjoy the right, I enjoy
14 the right, any defendant elects not to testify in a case
15 against him, that you as a juror may not use that as evidence
16 at his trial.
17            Is that a law --
18            PROSPECTIVE JUROR:  No, that is his choice.
19            MS. HANDLEY:  And you will agree to follow that
20 law and not hold it against him?
21            PROSPECTIVE JUROR:  Uh-huh.
22            MS. HANDLEY:  If I failed to prove it beyond a
23 reasonable doubt, and the defendant didn't testify, you
24 wouldn't use that to get me over my hurdle, would you?
25            PROSPECTIVE JUROR:  No.

24

1             MS. HANDLEY:  Those are propositions of law,
2  sir, that come into play in any criminal case that you may be
3  called upon to sit in.  Be it theft of bread or capital murder
4  case.
5             If I present all my evidence to you and you believe I
6  have proved my case beyond a reasonable doubt, then you are
7  obligated as a juror so return a verdict of guilty of capital
8  murder.
9             Is that something that you would also do, sir?
10            PROSPECTIVE JUROR:  Yes, I could.
11            MS. HANDLEY:  Let's talk about the second phase
12 of the trial.  Now, in a capital murder case, entirely
13 different from a capital murder case that you sat on or a
14 regular murder, if you will.  A lot of people come in here
15 believing that if an individual is found guilty of capital
16 murder, that means that they will automatically receive a
17 sentence of death, or the death penalty.  And in fact, it does
18 not work that way at all.  We again call upon our jurors to
19 look at the information in the case.  Look at the facts and
20 determine whether or not that is the appropriate thing to do
21 for this particular case.  What you don't do is, is you don't
22 go back there and discuss with the other jurors what do we
23 think is better, life or death.  That is not how you come up
24 with your ultimate verdict.  Instead of what you do is you
25 answer a series of questions.  And then based on the answers

25

1　to the questions, that will determine whether or not he

2　receives the death penalty or whether or not he receives life

3　imprison.

4　　　　　You with me so far?

5　　　　　PROSPECTIVE JUROR:   How are these question,

6　are we given a form, each juror is --

7　　　　　MS. HANDLEY:   You are absolutely given that

8　particular question in writing.  And you sit down collectively

9　and discuss and deliberate on what the answer to that question

10　is?

11　　　　　PROSPECTIVE JUROR:   So we do this together as

12　a jury?

13　　　　　MS. HANDLEY:   Yes, sir, you do.  You always do

14　your deliberations together.  But you get there by answering

15　questions, and that will ultimately determine what happens.

16　　　　Now, understanding again he is guilty of capital murder.

17　And again there are only two potential verdicts, correct?

18　　　　　PROSPECTIVE JUROR:   Okay.

19　　　　　MS. HANDLEY:   Life imprison without parole or

20　the death penalty?

21　　　　　PROSPECTIVE JUROR:   But we are definitely given

22　the option if we fine the defendant guilty of the charge, then

23　it is up to the jury to make the decision between death

24　sentence and life imprisonment?

25　　　　　MS. HANDLEY:   That's correct.  It will only be

26

1　one of two choices what is going to happen.  And the way you

2　get to the decision is by answering questions and I will talk

3　to you about that in a second.

4　　　　　PROSPECTIVE JUROR:   Good.

5　　　　　MS. HANDLEY:   The best this defendant is ever

6　going to get, sir, is what?

7　　　　　PROSPECTIVE JUROR:   Life imprison.

8　　　　　MS. HANDLEY:   Correct.  That's the best he is

9　ever going to get.

10　　　　　PROSPECTIVE JUROR:   If he is found guilty.

11　　　　　MS. HANDLEY:   If he is found guilty, yes, sir.

12　And we are talking under the assumption that he has been found

13　guilty, okay.  The best he is ever going to get is life

14　imprison.  As I said, the way it can be elevated to death is

15　on whether or not we bring you sufficient evidence and whether

16　or not we can prove to you beyond a reasonable doubt that he

17　ought to receive death.  That's our obligation.

18　　　　　PROSPECTIVE JUROR:   Good.

19　　　　　MS. HANDLEY:   Because as you can fully

20　appreciate we are asking a whole lot of you.

21　　　　　PROSPECTIVE JUROR:   I am going to ask a whole

22　lot of you to prove that.

23　　　　　MS. HANDLEY:   And you should.  If we are going

24　to ask you to take part in sentencing somebody to death, then

25　we darn well ought to prove to you that it is the right thing

27

1　to do for the particular case, correct?

2　　　　　PROSPECTIVE JUROR:   Correct.

3　　　　　MS. HANDLEY:   Remember the defendant had a

4　presumption of innocence in the first part of the trial until

5　I proved to you beyond a reasonable doubt that he was guilty.

6　There is another presumption now that goes into play in the

7　second part of the trial, okay.  You are to go into the second

8　part of the trial presuming that the most appropriate thing to

9　do is to give him life imprison.  He has already earned that,

10　right.  And you are to go in presuming that it should stay at

11　life imprison.  And you continue to presume that life is the

12　most appropriate thing to do until I prove to you beyond a

13　reasonable doubt that it is not.

14　　　　You with me so far?

15　　　　　PROSPECTIVE JUROR:   Uh-huh.

16　　　　　MS. HANDLEY:   The way we do that is by having

17　you answer a question.  And I am going to call your attention

18　up there, see where it says special issue.  Go ahead and read

19　that first one to yourself there.

20　　　　　PROSPECTIVE JUROR:   (Juror complies.)

21　　　　　MS. HANDLEY:   Okay.  Okay.  Now, we did not

22　write that question here at the Dallas D.A.'s office or the

23　attorneys over here.  That's written by the legislature.  And

24　it is a question that you are called upon to answer as a juror

25　in a capital murder case.  And we refer to that question as

28

1　the future dangerousness question.

2　　　　Would you agree with me that it is essentially asking you

3　do you believe the defendant is going to be a future danger?

4　You think that's basically what it is asking you?

5　　　　　PROSPECTIVE JUROR:   Sure.

6　　　　　MS. HANDLEY:   Okay.  And keeping in mind at this

7　point, where is he going to be for the rest of his life at

8　this point?

9　　　　　PROSPECTIVE JUROR:   Which brings up a question,

10　is he eligible for parole, if we --

11　　　　　MS. HANDLEY:   It is life imprison without

12　parole.  If you are found guilty of capital murder, you will

13　either receive live imprison without parole or you will

14　receive the death sentence.

15　　　　Does that answer your question?

16　　　　　PROSPECTIVE JUROR:   Okay.

17　　　　　MS. HANDLEY:   So going into this question on

18　whether he is going to be a future danger to society, where is

19　he going to be rest of his life?

20　　　　　PROSPECTIVE JUROR:   Without parole.

21　　　　　MS. HANDLEY:   He is going to be in prison, isn't

22　he.  And they don't give you definitions to these certain

23　terms in these questions, sir, we have already talked about

24　reasonable doubt, do you find from the evidence beyond a

25　reasonable doubt, and we know that goes to my burden of proof,

29

30

1  correct?

2          PROSPECTIVE JUROR:   Yeah.

3          MS. HANDLEY:   That I have to prove to you that

4  he is going to be a future danger.  That there is a

5  probability that he will commit criminal acts of violence that

6  will constitute a continuing threat to society.  When I say

7  society, when you say society, what do you think of?

8          PROSPECTIVE JUROR:   I think of you and me and

9  people walking around on the streets, I don't necessarily

10  think of his prison inmates.  I guess one should.

11          MS. HANDLEY:   Absolutely.

12          PROSPECTIVE JUROR:   You should.

13          MS. HANDLEY:   Our society is going to the

14  grocery store and coming here and walking in the streets and

15  such as that.  But the rest of his life is going to be served

16  in prison, correct.  So is it fair to say that, you know, who

17  else is in prison besides prisoners, sir?

18          PROSPECTIVE JUROR:   The guards and the

19  warden.

20          MS. HANDLEY:   Administration, doctors, nurses,

21  educators, people that come for visitation.  Is it fair to say

22  that it is a society in and of itself?

23          PROSPECTIVE JUROR:   I would say it is, yes.

24          MS. HANDLEY:   And would your definition of

25  society as a whole, part of what we are in, would it be broad

1  enough to also encompass that prison could be a society within

2  that society?

3          PROSPECTIVE JUROR:   Certainly.  I see where you

4  are going, obviously it would.

5          MS. HANDLEY:   That's where we are talking about,

6  he is in prison now, that's his society, and we are asking you

7  to answer the question, is there a probability that he will

8  commit criminal acts of violence in that society?

9          They don't define probability for you either, Mr. Gage.

10  I think you will appreciate or agree with me that there is a

11  difference between a possibility and a probability, would you

12  not?  Anything is possible, isn't it?

13          PROSPECTIVE JUROR:   On TV anything is possible

14  and it happens all the time.

15          MS. HANDLEY:   As outlandish as it might sound, I

16  could possibly win an Olympic Gold for a marathon, I can't

17  walk up a flight of stairs without getting winded.  Anything

18  is possible.

19          PROSPECTIVE JUROR:   Sure.

20          MS. HANDLEY:   A lot of people have told us that

21  it is more likely than not.  Or it means to them greater than

22  50 percent chance that that's what probability means to them.

23          What would you say that probability is?

24          PROSPECTIVE JUROR:   Past history would play a

25  big part.

31

32

1          MS. HANDLEY:   In answering that question?

2          PROSPECTIVE JUROR:   Which brings my question,

3  I would think probability would of course being an engineer it

4  is always a mathematical probability which doesn't apply here,

5  so I am a little out of my comfort zone.  So I would be

6  concerned with this defendant's previous history prior to this

7  crime and are we going to have accessibility to that.

8          MS. HANDLEY:   Right.  And you are kind of

9  getting a little bit ahead of me.  And that does come into

10  play and that is important in determining whether or not there

11  is a probability he will do these things.  But with respect to

12  is there a probability, that's what I am filling you outs on.

13  What do you think probability means?

14          PROSPECTIVE JUROR:   It could happen, there is a

15  mathematical chance it could happen.

16          MS. HANDLEY:   Would you agree with me that as

17  we step back that there is a mathematical chance that anything

18  is possible, right?  Possibility is even a chance, isn't it?

19          PROSPECTIVE JUROR:   To some extent.  You

20  might look hard enough to find out that something wasn't

21  possible.

22          MS. HANDLEY:   Sure.

23          PROSPECTIVE JUROR:   Like taxes in April is going

24  it happen.

25          MS. HANDLEY:   Sure.  With respect to something

1  being a possibility versus a probability, would you agree with

2  me that a probability is much higher than a possibility?  I

3  see you nodding your head, yes?

4          PROSPECTIVE JUROR:   Yes.

5          MS. HANDLEY:   Does it square with you, that if I

6  were to define it as more likely than not is what a

7  probability is?

8          PROSPECTIVE JUROR:   No.  I don't agree with

9  that.

10          MS. HANDLEY:   Okay, what would you say?

11          PROSPECTIVE JUROR:   I would say a probability is

12  again some percentage of possibility.  It could be a

13  10 percent probability.

14          MS. HANDLEY:   Okay.

15          PROSPECTIVE JUROR:   That the gate is going to be

16  up when I drive out the parking lot and I won't have to pay,

17  but that is not greater than 50 percent.  To me probability is

18  defined by anything from 1 percent up to 99 percent.  Not

19  greater than 50 percent.

20          MS. HANDLEY:   More than a possibility but in

21  terms of, you know, you putting a number on it, you are saying

22  that you still feel like --

23          PROSPECTIVE JUROR:   If you say probability of

24  flipping a coin heads or tails, then certainly the probability

25  of heads would be greater than 50 percent.  If you say getting

1    one coin to say out of a million, then that is pretty low.
2            MS. HANDLEY:   Yes. I will tell you, Mr. Gage,
3    the law says that a probability must be considered more than
4    50 percent?
5            PROSPECTIVE JUROR:   Okay. So it is basically a
6    yes and no it will happen, it will not happen a particular
7    thing.
8            MS. HANDLEY:   The law says that a probability is
9    greater than 50 percent. Can you -- I mean squaring with
10   yourself, can you follow that law and give the definition --
11   define probability then according to law as greater than
12   50 percent?
13           PROSPECTIVE JUROR:   Yes, I can.
14           MS. HANDLEY:   So you could follow that law and
15   find it greater than 50 percent, okay. Probability the
16   defendant would commit criminal acts of violence. They do not
17   define for you, sir, what are criminal acts of violence. They
18   won't say that he will commit another murder. They don't say
19   that, do you find that he will probably commit a robbery. He
20   will probably commit an assault. He will probably commit a
21   kidnapping. They don't define that for you, again they leave
22   that for you to decide what is a criminal acts of violence.
23       Let's say for example Mr. McCallum sitting here minding
24   his business, let's say I stand up, cold cocked him in the
25   face and knock him tail over end out of his chair; would you

1    agree with me that that might be considered a criminal act of
2    violence?
3            PROSPECTIVE JUROR:   I suppose so.
4            MS. HANDLEY:   And you are kind of laughing, I
5    suppose so?
6            PROSPECTIVE JUROR:   That's borderline, that
7    happens every night in every bar in Dallas. And in most cases
8    it is not -- it's not considered a criminal act.
9            MS. HANDLEY:   Would you consider it violent?
10           PROSPECTIVE JUROR:   I consider it very violent,
11   yes.
12           MS. HANDLEY:   Would you consider it an assault?
13           PROSPECTIVE JUROR:   Possibly, like you said,
14   depending on the circumstances.
15           MS. HANDLEY:   Depending on the circumstances.
16   And again he is just sitting there minding his own business.
17   He hasn't started trash talking me in a bar.
18           PROSPECTIVE JUROR:   If it is not your husband,
19   then it is assault.
20           MS. HANDLEY:   Okay. But you are saying that
21   seems to you that that is not really -- it is kind of iffy
22   maybe for you?
23           PROSPECTIVE JUROR:   You know, I would, I guess
24   looking at pragmatically, you say this particular person is in
25   jail and he gets in a little tussle with one of the other

35

1    inmates and knocks him down, I wouldn't consider that to be a
2    criminal act of violence.
3            MS. HANDLEY:   You used the term tussle. Let me
4    go back to what you did bring up. In order to answer that
5    question, presumably I am going to be bringing you some
6    evidence that you can consider to make your decision on that
7    question.
8            PROSPECTIVE JUROR:   Uh-huh.
9            MS. HANDLEY:   You know, that's my burden of
10   proof to prove to you that the answer to that question is
11   "yes", because I tell you, Mr. Gage, if you answer that
12   question, "yes", he is a future danger to society, his
13   society, then it will elevate that life sentence up to a death
14   sentence?
15           PROSPECTIVE JUROR:   I understand.
16           MS. HANDLEY:   So that's that question we are
17   talking about here. And I have to prove to you the answer to
18   that question is "yes", and I have to prove that to you beyond
19   a reasonable doubt. And I have to be the one who brings you
20   evidence to prove that to you.
21       So let's go back to what you were talking about, what
22   kind of things would you need to see, hear, know in order for
23   you to honestly and fairly answer that question, yes or no?
24   What would you be looking for?
25           PROSPECTIVE JUROR:   I would be looking for the

36

1    evidence in this particular crime and how this particular
2    crime was committed and in -- you know the violence involved.
3    The things that the accused did, you know, during this violent
4    act. And I would certainly want to know history of previous
5    violent acts, behavior, actions.
6            MS. HANDLEY:   Okay.
7            PROSPECTIVE JUROR:   I would want to understand
8    who is this person and you know what is his history. And how
9    has he behaved throughout his life.
10           MS. HANDLEY:   Sure. Is this just a one-time
11   anomaly or is this something that nobody is surprised that it
12   led up to this and culminated in this murder. A lot of people
13   have said sometimes the best predictor of future behavior
14   might be how you have acted in the past. So you would like to
15   know a little bit about how he has acted from the time that
16   got him up here until the time we are going to sentence him?
17           PROSPECTIVE JUROR:   Sure.
18           MS. HANDLEY:   In answering that question, you
19   may look at the circumstances of the offense of that capital
20   murder, in addition to any other evidence we might bring you.
21   In the first part of the trial, you are considering
22   circumstances of the offense to answer the question of is he
23   guilty of capital murder, correct?
24           PROSPECTIVE JUROR:   Uh-huh.
25           MS. HANDLEY:   Now you may consider the

37

1  circumstances of the offense to determine whether or not he is
2  a future danger.  And what is important to understand and, I
3  just need to make sure that you are with us on this, you have
4  already found him guilty of capital murder, so that's
5  presumably an intentional murder, correct?  The law states
6  that you do not then automatically say, well, since he is
7  guilty of a capital murder, then automatically the answer to
8  this question is "yes".  You know, now, you are looking at
9  that circumstance again.  But you are looking at it to decide
10 does that mean that that question should be "yes"?  Or is
11 there any other evidence that helps me?
12      So going into that, you find him guilty of intentional
13 murder, would you automatically find that he is a future
14 danger to society?
15         PROSPECTIVE JUROR:   No, no.
16      MS. HANDLEY:   Okay.
17         PROSPECTIVE JUROR:   I don't think so.
18      MS. HANDLEY:   Okay.  You are wanting to look
19 again, re-assess the crime and any other past evidence about
20 his past in answering that question to you?
21         PROSPECTIVE JUROR:   Well, I was going to
22 comment that there are certainly cases where people's intent
23 or people commit, you know a capital offense one time based on
24 the situation as it exists at that moment.  And it's a
25 one-time thing.

38

1      MS. HANDLEY:   Okay.
2         PROSPECTIVE JUROR:   They haven't before and they
3  wouldn't again.
4      MS. HANDLEY:   Okay.
5         PROSPECTIVE JUROR:   So we need to understand,
6  you know the entire scenario, I think more than just the
7  incident as it occurred.
8      MS. HANDLEY:   Sure.  Sure.  I need to prove to
9  you that it is not a one-time thing and in all probability
10 there are going to be criminal acts of violence and a threat
11 to somebody in society?
12         PROSPECTIVE JUROR:   (Nods head).
13      MS. HANDLEY:   If I prove that to you, Mr. Gage,
14 if you answer that question "yes", as I told you, that that
15 presumption of life is the appropriate thing to do.  That
16 presumption is gone now and that sentence is elevated up to a
17 death sentence.  Are you with me on that?
18         PROSPECTIVE JUROR:   Okay.
19      MS. HANDLEY:   You are not through answering
20 questions, it is not entirely done.  You still have to answer
21 one more question after that.
22         PROSPECTIVE JUROR:   Let me summarize this,
23 though, what you told me.  You said probability, I have to
24 believe that there is greater than a 50 percent probability.
25      MS. HANDLEY:   Yes.

39

1         PROSPECTIVE JUROR:   Fifty percent chance,
2  whatever, that he will commit an act of violence, that I
3  believe to be a criminal act of violence?
4      MS. HANDLEY:   Yes, sir.
5         PROSPECTIVE JUROR:   As we discussed, you
6  know, maybe the punching match in the cafeteria or something?
7      MS. HANDLEY:   Uh-huh.
8         PROSPECTIVE JUROR:   May not constitute in my
9  mind a criminal offense?
10      MS. HANDLEY:   That's correct.
11         PROSPECTIVE JUROR:   Okay.  So you have -- you
12 have to show me evidence that would convince me to believe
13 greater than a 50 percent probability that he will do
14 something pretty violent, you know, he would do a criminal
15 type.
16      MS. HANDLEY:   And pretty violent is your
17 definition.
18         PROSPECTIVE JUROR:   Is my definition.
19      MS. HANDLEY:   Is that what you are saying, you
20 are looking for something that would be pretty violent?
21         PROSPECTIVE JUROR:   Yes.
22      MS. HANDLEY:   What do you think would be pretty
23 violent?
24         PROSPECTIVE JUROR:   Well, back to television,
25 stab an inmate.

40

1      MS. HANDLEY:   Okay.
2         PROSPECTIVE JUROR:   Doing anything to a guard,
3  warden.
4      MS. HANDLEY:   Okay.
5         PROSPECTIVE JUROR:   Any violence there.
6  Anything worse than you would find in the high school gym.
7      MS. HANDLEY:   Okay.  And that draws a pretty
8  good picture.
9         PROSPECTIVE JUROR:   Young guys get in fights and
10 tussles.  And I used the word tussle again.  And you can be
11 accused of assault for very over-rated reasons.
12      MS. HANDLEY:   And sometimes there are often
13 defenses to assaults too?
14         PROSPECTIVE JUROR:   Uh-huh.
15      MS. HANDLEY:   Okay.
16         PROSPECTIVE JUROR:   Okay.
17      MS. HANDLEY:   All right.  If you answer that
18 question yes, because you presume the answer is "no", right,
19 but we proved it to you beyond a reasonable doubt, and you
20 answered that question "yes", that sentence now goes up to a
21 death sentence, okay.  But you are not finished answering
22 questions.  And it is not the end of the story.  You still
23 have to answer another question.  That's that second special
24 issue.  Go ahead and read that to yourself?
25         PROSPECTIVE JUROR:   Let me read it again.

1    MS. HANDLEY:   You get it, sometimes it takes a
2  couple of times to read it.  I think if we can say things as
3  lawyers in 60 words versus six, we will do it, okay.  And
4  again we didn't write that question, but it is quite a
5  mouthful.  I will tell you that we often refer to that second
6  question, Mr. Gage, as the safety-net question.
7    Let me ask you, what do you think it is asking you to
8  decide?
9    PROSPECTIVE JUROR:   I think it falls right in
10 line with my -- my answers on the questionnaire where I really
11 believe that to give the death sentence, it has to be a very
12 heinous crime.  It has to be, you know, not necessarily
13 premeditated, but it has to be done with full awareness of
14 what he was doing and violent intent and -- I don't know, I
15 guess if you look at the circumstances of it and it's a
16 one-time, it is a flash thing.  I made some comments about
17 being under the influence of drugs or alcohol --
18    MS. HANDLEY:   Uh-huh.
19    PROSPECTIVE JUROR:   -- where you really don't
20 know what you are doing.
21    MS. HANDLEY:   Uh-huh.
22    PROSPECTIVE JUROR:   Those things certainly
23 have to be taken into account in my opinion.
24    MS. HANDLEY:   And I think you are headed in the
25 right direction there, is basically what they are asking you

1  to do, Mr. Gage, is look at everything.  Look at everything in
2  the case once again.  We call it the safety-net question
3  because it is ensuring that death is really the proper thing
4  to do.  In other words, they want you to look at his
5  character.  Look at his background, look at the circumstances
6  of the offense.
7    PROSPECTIVE JUROR:   I would certainly want to do
8  that.
9    MS. HANDLEY:   Absolutely.  And you must do that.
10 You must look at everything.  And it is basically telling you,
11 sir, that if you find something in all the evidence, maybe it
12 is his character, maybe it is something about his background,
13 maybe it is the circumstance of the offense.  As you said,
14 maybe it is drugs or alcohol.  If you think there is something
15 there that warrants bringing that sentence of death back down
16 to a life sentence, that is an option available to you.  We
17 call it a mitigating circumstance.  And I can't tell you
18 necessarily what would constitute a mitigating circumstance in
19 your mind, but it has to be a sufficient mitigating
20 circumstance.  You know, in other words, you are not going to
21 walk out of the -- this courthouse, I agree he was guilty of
22 capital murder, and I agree he is a future danger to his
23 society, but there was something else there that I think was
24 important to consider.  And I think quite frankly warranted
25 bringing that sentence back down to a life sentence.  And I am

43

1  offended that we didn't have that option.  That is not going
2  to happen.  That option is available to you.
3    Some people say, Are you going to show mercy?  Is there
4  something there?  And as I said, I can't tell you what would
5  constitute a sufficient mitigating circumstance, that is
6  entirely up to you to decide, and for each one of you to
7  decide.  You don't have to agree on what is a sufficient
8  mitigating circumstances, only that there are sufficient
9  mitigating circumstances.
10   We do not execute the mentally retarded, Mr. Gage, you
11 cannot do that.  However, if there were an individual that was
12 maybe on the cusp of mental retardation, and maybe that was
13 something to be taken into consideration, you know, they don't
14 think like you and I do.  They just don't have the same mental
15 appreciation that you and I do.  Maybe there is something
16 about his background, maybe he has been severely abused since
17 the time he was a child.  And quite frankly maybe his parents
18 ought to be on trial and not him.  Maybe there is something
19 like that.
20   The question becomes not what you think is a mitigating
21 circumstance, but if you saw one and you thought it was
22 sufficient to warrant bringing the sentence back down to life,
23 would you do it?
24    PROSPECTIVE JUROR:   Yes, absolutely.  And as a
25 matter of fact on the other side, I would keep it there until

44

1  you showed me good evidence that there were no mitigating
2  circumstances.
3    MS. HANDLEY:   Okay.  And you understand, there
4  is no burden of proof for either side on that one?
5    PROSPECTIVE JUROR:   I understand.
6    MS. HANDLEY:   It is not like I have to come in
7  and go, here is what is or isn't a mitigating circumstance.
8  There is no burden of proof there necessarily?
9    PROSPECTIVE JUROR:   Then what will you show me.
10    MS. HANDLEY:   What I will show you is that he
11 deserves to die.  That is what I will show you.  And I will
12 show you everything about the circumstances of the offense
13 hopefully, you know, and if you look in that and everything
14 that I have shown you, and you gather that there is a
15 sufficient mitigating circumstance of the evidence that is
16 brought to you, and you have that option.  You know, I think
17 it is fair to say that I know that I as a representative of
18 the State of Texas is going to come in and say, Mr. Gage, I
19 believe this is a sufficient mitigating circumstance and would
20 like for you to reduce that back down to life.  Which kind of
21 puts you in a weird situation, because do they have any burden
22 of proof?
23    PROSPECTIVE JUROR:   No.
24    MS. HANDLEY:   No.  And they have absolutely no
25 obligation to bring you anything.  And I think in all

45

46

1 fairness, a lot of people go, wouldn't you?  But I don't know
2 what is going to happen in trial.  You know you have to be
3 careful about demanding which side bring you proof and such as
4 that.  You will look at everything, and everything is brought
5 to you, that's what you would make that decision on.  You
6 spoke of alcohol or drug use.  Talk to me about that, how does
7 that play into?
8           PROSPECTIVE JUROR:  To me, I think people
9 commit acts of violence under the, you know, under the
10 influence of drugs and alcohol.  That they under normal
11 circumstances would certainly not do.  To me that can
12 constitute a mitigating circumstance in a violent crime.  As
13 far as deciding between life imprisonment and capital
14 punishment, again it depends solely on the circumstances and
15 the particular case involved.  But it is similar to what you
16 had discussed about, you know, mental retardation, you are
17 temporarily mentally retarded if you are drunk or on drug; and
18 yes, you did it to yourself.  But still I don't believe you
19 are in full control of your faculty and you may do things
20 under normal circumstances you wouldn't do.  If that was the
21 case here, I would probably look at that as a potential
22 mitigating circumstance.
23           MS. HANDLEY:  Are you envisioning a particular
24 scenario or are you touching on a personal experience or
25 somebody you know or seen?

1           PROSPECTIVE JUROR:  No, I am envisioning it
2 from this questionnaire.  It asked a lot of questions about
3 drugs, alcohol and how you feel about that.  And that's what I
4 am basing my comments.
5           MS. HANDLEY:  The law states intoxication is not
6 a defense?
7           PROSPECTIVE JUROR:  I understand.
8           MS. HANDLEY:  We are not talking about defense,
9 we are talking about mitigating circumstances.  And I guess I
10 wanted to feel you out on that?
11           PROSPECTIVE JUROR:  Defense and mitigating
12 circumstances, it does to me constitute a mitigating
13 circumstance.
14           MS. HANDLEY:  To what extent can I get drugs or
15 use drugs does that excuse me behavior?  Not necessarily
16 legally excuse, help me out with that.
17           PROSPECTIVE JUROR:  Yeah, excuse.  I guess we
18 all have looked back on our college days and realize that when
19 we got a little too drunk, we did some silly, silly things.
20 We didn't go so far as to commit a capital crime.  We probably
21 did some semiviolent things, and certainly some illegal
22 things.  But I think it goes all the way up.  It goes back to
23 the character, moral personality, credibility of the person
24 involved.  If you are under the influence, then you aren't
25 necessarily, you know, thinking the same.  You aren't

47

48

1 necessarily the same person that you were when you were
2 totally sober.  You may do things for whatever reason that you
3 might not do under normal circumstances.
4           MS. HANDLEY:  Okay.  Fair enough.
5           PROSPECTIVE JUROR:  And I think we all have
6 some amount of personal evidence of that.
7           MS. HANDLEY:  Sure.
8           PROSPECTIVE JUROR:  We just hadn't -- we didn't
9 go so far as commit a crime, or maybe we did.
10           MS. HANDLEY:  Uh-huh.
11           PROSPECTIVE JUROR:  But I just -- I put that in
12 the same category as mental competence, as severe depression,
13 a divorcee for instance.  He may do something really stupid.
14 But normally, normally, he is not that person.
15           MS. HANDLEY:  Sure.  Looking towards his
16 motivation.
17           PROSPECTIVE JUROR:  Yeah, so I can't ignore the
18 circumstances around the incident that happened and the
19 particular condition, the mental condition of the accused.
20           MS. HANDLEY:  Would it automatically prevent you
21 from assessing a death sentence if you felt somebody was
22 intoxicated?
23           PROSPECTIVE JUROR:  That's the toughest
24 question you have asked me.  Not automatically.  It would
25 certainly -- it would certainly affect my decision.  Yes, I

1 think it would.  I can't say that, no, if a person is
2 intoxicated he can do anything.
3           MS. HANDLEY:  Sure.
4           PROSPECTIVE JUROR:  Of course not.  Again it
5 depends on the conditions.  But it does when you are weighing
6 the pros and the cons, well, it definitely, it sits on the
7 side.
8           MS. HANDLEY:  Absolutely.
9           PROSPECTIVE JUROR:  It sits on the side of
10 questioning.
11           MS. HANDLEY:  Okay.  I appreciate your answering
12 my questions, Mr. Gage.  I have talked to you for quite a
13 while here.  And I am going to let the defense attorneys have
14 an opportunity to kind of pick your brain some more, sir.
15           PROSPECTIVE JUROR:  Okay.
16           MS. HANDLEY:  Your Honor, I would pass the
17 juror.
18           **VOIR DIRE EXAMINATION**
19 BY MR. BRAUCHLE:
20           MR. BRAUCHLE:  Mr. Gage do you need a break.
21           PROSPECTIVE JUROR:  Pardon?
22           MR. BRAUCHLE:  Do you need a break.
23           PROSPECTIVE JUROR:  No, I am fine, thank you.
24           MR. BRAUCHLE:  You may before I get through with
25 you, but we will see.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1      My name is Paul Brauchle.  I have been introduced to you.
2  Myself and Mr. Johnson represent the defendant, Mr. Ruiz.
3      I don't think it would come as any surprise to you that
4  we don't see things the way the people at the other table do?
5          PROSPECTIVE JUROR:  I understand.
6          MR. BRAUCHLE:  If we did, we could just let one
7  of them batter you around for an hour and then we could all
8  put it all aside.  We think these things are a little more
9  complicated than what they make them out to be.  And I will
10  discuss some of our views on that here in the next few
11  minutes.
12      What book did you bring down here?
13          PROSPECTIVE JUROR:  It is the Michael Crichton,
14  State Fear of the Global Warming.
15          MR. BRAUCHLE:  Okay.  I think you would rather
16  be reading that than talking to me?
17          PROSPECTIVE JUROR:  It is a nice day for golf.
18          MR. BRAUCHLE:  Where do you usually play?
19          PROSPECTIVE JUROR:  I live out in Richardson,
20  so I play with the Richardson's Senior Group.
21          MR. BRAUCHLE:  You got any questions about
22  anything we asked you?
23          PROSPECTIVE JUROR:  I had plenty of questions
24  when I came in.
25          MR. BRAUCHLE:  Have they been answered?

1          PROSPECTIVE JUROR:  I believe the District
2  Attorney answered most of those questions.  I feel pretty
3  clear on, you know, what my requirements would be and you know
4  what my responsibility would be.  And the eventual outcome of
5  those decisions.
6          MR. BRAUCHLE:  Probably if we would have stopped
7  you when you finished filling out your questionnaire, and
8  asked you what happened to you if you are convicted of capital
9  murder, you would have probably said, you will get the death
10  penalty; is that a correct statement, because most people
11  equate guilt of capital murder with the death penalty?  They
12  don't think what we have talked to you about, life without
13  parole, mitigating issues, continuing threat to society, guilt
14  equals death.  And that is not a bad thing.  And I am not
15  trying -- sure as to whether you would or not.
16      But you know after talking to the District Attorney that
17  basically once you are found guilty of capital murder, you get
18  life without parole.  And then only if these questions are
19  found against you, do you get death.  And also if the State
20  fails on any of these questions, that your punishment defaults
21  back to life without parole.  So basically it is life without
22  parole, the possibility of death rather than death the
23  possibility of life without parole?
24          PROSPECTIVE JUROR:  Well, I knew -- at least I
25  assumed that capital meant there would be a possibility of

51

1  life imprisonment -- or lesser sentence.  And I assumed it to
2  be life imprisonment.  And I think the synopses we read here
3  indicated that.  So that was my opinion at the time that a
4  capital offense didn't necessarily mean a death sentence.  And
5  the jury would be given the decision to make.  But I had no
6  idea of these mitigating circumstances issues, which I like.
7          MR. BRAUCHLE:  You haven't seen those questions
8  on billboards around town or anything?
9          PROSPECTIVE JUROR:  No, no.
10          MR. BRAUCHLE:  And as the District Attorney told
11  you, we didn't write those and we don't know who did.  It's
12  our job to explain them.
13      Let me go fast forward to the first special issue.  I
14  know being an engineer, probability is a decimal point and no
15  matter how many zero come after that, that's a number that's a
16  probability?
17          PROSPECTIVE JUROR:  We dealt with the
18  probability of failure in the 1 millionth in the space system.
19          MR. BRAUCHLE:  So probability to an engineer is
20  certainly something different than probability to a layperson?
21          PROSPECTIVE JUROR:  Yes.  But I think it was
22  very carefully explained to me that probability in this case
23  is better than a 50/50 chance, and I can certainly look at
24  that.
25          MR. BRAUCHLE:  You understand that the courts

52

1  had to tell use that it had to be more than a 50/50 chance,
2  otherwise the answer to special issue -- to special issue
3  number one would always be yes.  As slight as a probability
4  could be.  If it is not more than 50/50, the question wouldn't
5  have much meaning, don't you agree with me on that?  You know
6  if it could be down to probability?
7          PROSPECTIVE JUROR:  Yeah, you are right, you are
8  right.  I think you have to draw the line.  It's, ah -- in
9  this case, yes it's not a scientific mathematical decision, it
10  is a possibility versus a probability.
11          MR. BRAUCHLE:  Well, see, evidently the learned
12  body who drew this up was counting on engineers to come in and
13  be confronted with the question.  But you understand --
14          PROSPECTIVE JUROR:  Does that mean I am
15  released.
16          MR. BRAUCHLE:  If only it were that easy.  We
17  got our minutes on you now.
18      If you look at special issue number one, probability
19  comes right behind reasonable doubt.  So it says if you find
20  from the evidence beyond a reasonable doubt that there is a
21  probability, and because of the position -- or the flow of
22  that, if there is a flow of that question, we think that it
23  has to mean -- or has to be related to reasonable doubt.  You
24  understand if reasonable doubt is more than 50/50 to you, if
25  it gets to probability and probability is only 50 percent, you

1   are dropping off on the burden of proof?

2              PROSPECTIVE JUROR:   I understand you have two

3   variables here that you have the proof of both or the belief

4   of both.

5              MR. BRAUCHLE:   Now, then, what are we looking

6   for in that question?  If the defendant is going to commit

7   criminal acts of violence and if those criminal acts of

8   violence are going to constitute not just a threat to society,

9   but a continuing threat to society, in other words?

10             PROSPECTIVE JUROR:   Now you have introduced

11  a third variable.

12             MR. BRAUCHLE:   Well, there is all sorts of

13  variables there and they all have to be satisfied going back

14  to the first part beyond a reasonable doubt.  We think that --

15  or my co-counsel and I think that probably what that question

16  is asking you is the shorthand version would be, is this

17  person going to be such a threat to society that the only way

18  that we can control him is to eliminate him from society?

19             PROSPECTIVE JUROR:   I agree with you on that, I

20  believe that's what that question is trying to ask.  Is this

21  person a real threat to the people around him to the extent

22  that he can't be allowed to be there.

23             MR. BRAUCHLE:   Well, that would make -- we think

24  that makes sense in special issue number one.  Now, then,

25  let's go through the mechanics of this.  You find him guilty,

1   you find he is going to be a continuing threat to society, and

2   then we spring special issue number two on you which says that

3   in spite of your being convinced beyond a reasonable doubt

4   that he is guilty, besides being convinced beyond a reasonable

5   doubt we can't control him without killing him, hey, wait a

6   minute, let's go back --

7              PROSPECTIVE JUROR:   I see where you are going,

8   and it takes issue number two off the docket, doesn't it?

9              MR. BRAUCHLE:   Well, it may or may not.  But the

10  thing is, as Ms. Handley told you, they don't have to show any

11  mitigating evidence.  We may or may not.

12             PROSPECTIVE JUROR:   Uh-huh.

13             MR. BRAUCHLE:   And what you need to be able to

14  tell us is, is if any is introduced, is there sufficient

15  mitigating circumstance or circumstances to warrant a life

16  sentence rather than the death sentence?

17             Now, the one thing you have to figure in is I assume is

18  that the prison system to some extent is willing to accept him

19  no matter what the verdict.  We are not saying a jury over

20  here is not just going to send him back out to Dallas County

21  somewhere.  He is going to be imprisoned for life without

22  parole.

23             PROSPECTIVE JUROR:   Uh-huh.

24             MR. BRAUCHLE:   But in any event, what you have

25  to be able to tell us is, if there is a mitigating

55

56

1   circumstance and you think it is sufficient, that you will

2   give meaning to that and go back to the life without parole?

3   And I think from Ms. Handley's talks with you, you indicated

4   that you can do that?

5              PROSPECTIVE JUROR:   I think my position would

6   be that I would have to go all the way to the end the trial,

7   the special issues, everything, and answer yes, yes, yes, yes,

8   yes all the way through before I could, you know, give the

9   death penalty.

10             MR. BRAUCHLE:   Well, that's what the law

11  anticipates.

12             PROSPECTIVE JUROR:   Absolutely.

13             MR. BRAUCHLE:   You answer special issue number

14  one.  Well, actually they visualize the answer a little

15  different.  Special issue number one, if that's "yes", he gets

16  death.  And then you find that there is a sufficient

17  mitigation, if that is found "no" -- it is "yes", "no", then

18  that death results.

19             PROSPECTIVE JUROR:   It goes back.

20             MR. BRAUCHLE:   Because "yes", "yes", it is life

21  without parole.  We are just quivering over which answer to

22  put in.

23             PROSPECTIVE JUROR:   It seems that special issue

24  number one, if you answer, yes, that is reasonable doubt and a

25  probability that you would think, well, you know what

1   mitigating circumstance could reverse that, but there may be.

2              MR. BRAUCHLE:   Well, that's the attitude that

3   you have to take going in.  We can't tell you that there is or

4   isn't.  We are just saying if there is a sufficient one, would

5   you give it weight enough or weigh it enough -- some people

6   sitting where you are sitting, That's the dumbest question

7   that I have ever seen.  I am convinced that he needs to be

8   killed, but you want me to spare his life, how does that work?

9   We are not here saying that that's in any way a logical

10  sequence there.  But what we have to find out is if you have

11  the intellectual integrity that you will be able to separate

12  those two planes in your mind before you can give a factual to

13  the question?

14             PROSPECTIVE JUROR:   I understand.

15             MR. BRAUCHLE:   Let me touch on one other issue

16  with you.  You understand that we talked to you about certain

17  aspects of murder.  And there is one issue that we haven't

18  brought up which may come into play. .

19             We have to sit here and talk to you about all sorts of

20  different things whether they are going to be relevant or not.

21  One of them might be the issue of self-defense.  And I don't

22  know how much you know about self-defense.  But quite frankly,

23  it's a justified homicide.  I could kill everybody at both

24  these counsel tables.  If it is done in self-defense, it is

25  not against the law.

57

1     And you believe in the right to self-defense?
2              PROSPECTIVE JUROR:   Certainly.
3              MR. BRAUCHLE:   I also have the right to protect
4   other people or property or whatever.  But basically
5   self-defense is self preservation.  Taking somebody's life to
6   protect your own.
7       Let me just say this.  Self-defense is always looked at
8   from the person who is claiming it point of view, okay.  I
9   shoot Ms. Handley, and I say it was self-defense.  It is my
10  perception of my danger and her threat at this time, not what
11  may or may not be what you see.  Because you may not know
12  threats from Ms. Handley.  You may not know of previous
13  relationship between the two of us.  You know there may be --
14  there may be things that are long standing, or whatever, to a
15  witness may not be evident.  I am not saying that my story has
16  to be believed implicitly.  But certainly you look to my point
17  of view and my perception of danger to decide whether my claim
18  of self-defense is legitimate.
19      You have any problem with that?
20             PROSPECTIVE JUROR:   So basically that says that
21  Ms. Handley's associate would have to prove beyond a
22  reasonable doubt that your defense was false?
23             MR. BRAUCHLE:   That's correct.  You took the
24  next part of my spill away from me.  They have to prove just
25  like everything else beyond a reasonable doubt that I didn't

58

1   act in self-defense or that I didn't have a legitimate view of
2   danger, threat or whatever.  And as with everything down here,
3   I think I am preaching to the choir because I think you are
4   ahead of me on that.  Everything you have to look for is over
5   there.  They have to prove each and everything that has to be
6   proven over there.  They usually tell you that we don't have
7   to do anything but work crossword puzzles and show up.
8   Basically that is true.  I am not saying that we are going to
9   resort to that, but the law really doesn't require us to do
10  anything but show up.  We don't have to ask questions.  We
11  don't have to do all the stuff you see on TV.  But you can't
12  ever look to us for any type of proof.
13      And as Ms. Handley said, when you get to special issue
14  number two, she is going to say that the evidence they are
15  going to bring will be enough -- enough for you to kill him.
16  So don't be looking for childhood pictures or that type if you
17  think that is going to be mitigating.  Because they stated
18  that their dedicated purpose and they stated quite frankly,
19  they want to kill our client.
20      You have any problem with that.  You might be wanting us
21  to do something and it might be something that you think we
22  could do easily and wouldn't be limited in any way?
23             PROSPECTIVE JUROR:   But you are not required to
24  do that.
25             MR. BRAUCHLE:   You will be -- I hope happy -- I

59

1   don't have any other questions for you.  Thank you, sir.
2              THE COURT:   Thank you, Mr. Gage.  You may step
3   down.
4              THE BAILIFF:   All rise for the juror.
5              (Prospective juror retired from the courtroom.)
6              (Pause in the proceedings.)
7              THE BAILIFF:   All rise for the juror.
8              (Prospective juror entered the courtroom.)
9              THE COURT:   You may be seated.
10      Mr. Gage, there is a possibility of perhaps a probability
11  that you will be selected to be on this jury, what we are
12  going to do is release you today.  And we will let you know in
13  about two perhaps three days at the latest if you have been
14  selected to be on this jury or not.
15      That being the case, I would admonish you not to do any
16  research on this case, anything on the web.  If you see it in
17  the media, just do not pay any attention to it, change the
18  channel and don't read it in the newspaper.  And as soon as we
19  find out, we will let you know whether or not you are a juror.
20  And with that, you are free to go.
21             PROSPECTIVE JUROR:   Can I ask one question?
22             THE COURT:   You may.
23             PROSPECTIVE JUROR:   I have a trip to Pebble
24  Beach planned March 29th through April 3rd.
25             THE COURT:   We anticipate getting started the

60

1   second, third week, with the actual trial second or third week
2   in April?
3              PROSPECTIVE JUROR:   No problem, then I can
4   maintain my plans.
5              THE COURT:   Certainly.
6       Fifteen-minute recess.
7              (Recess taken.)
8              THE BAILIFF:   All rise for the juror.
9              (Prospective juror entered the courtroom.)
10             THE COURT:   You may be seated.  Ms. Worsham, how
11  are you doing today?
12             PROSPECTIVE JUROR:   Good, thank you.
13             THE COURT:   I apologize for the delay.
14  Sometimes these interviews run a little longer than we
15  anticipate.  So I appreciate your patience.
16      The attorneys have some questions to ask you regarding
17  your qualifications as a juror in this case.  There aren't any
18  right or wrong answers.  They merely wish to see how you feel
19  about certain issues that will be prevalent in this case.
20      State will commence questioning.  I believe Ms. Handley
21  will be doing the questioning.
22      What says the State?
23             MS. HANDLEY:   May it please the Court?
24
25



61

62

1                 LAURA WORSHAM
2  was called as a prospective juror, after having been
3  previously sworn by the Court, testified under oath as
4  follows:
5              VOIR DIRE EXAMINATION
6  BY MS. HANDLEY:
7      Good morning, ma'am.  How are you?  Do you have some
8  legal background.
9            PROSPECTIVE JUROR:  I do.
10           MS. HANDLEY:  What is that?
11           PROSPECTIVE JUROR:  I am a license practicing
12  attorney.
13           MS. HANDLEY:  What kind of law do you do?
14           PROSPECTIVE JUROR:  Mainly bankruptcy from the
15  creditor side.
16           MS. HANDLEY:  How long since you graduated from
17  law school?
18           PROSPECTIVE JUROR:  Twenty-six years.
19           MS. HANDLEY:  Okay.  What we are going to do is
20  probably going to sound very familiar to you, we are going to
21  talk to you about the law.  So this shouldn't take very long?
22           PROSPECTIVE JUROR:  I don't know.
23           MS. HANDLEY:  My name is Andrea Handley.  This
24  is Marshall McCallum.  We are both District Attorneys here in
25  Dallas.  We have been charged with selecting the jury in this

1  case.
2      To my left is Karo Johnson and Paul Brauchle.  They
3  represent the defendant in this case.  That's the man seated
4  at the end of the table, Wesley Ruiz.
5      You are a lawyer about town, do you know any of us?
6           PROSPECTIVE JUROR:  I do not.
7           MS. HANDLEY:  And this is also Andy Beach.  He
8  works with us.
9      Let me tell it you what we are doing Ms. Worsham.  We
10  brought down a lot of people to fill out the questionnaire,
11  believe it or not we read them all.  A lot of reading and we
12  have all had to get glasses now because of it.  We have only
13  selected a select number of people, though, to bring down now
14  and talk to one-on-one about the law, to test your
15  qualifications on your ability to understand the law and
16  follow the law in any particular case, in any criminal case if
17  you will.
18      We have all had an opportunity to read your questionnaire
19  ma'am.  And I will tell you, now as I was reading along, it
20  appears to me that you have a full appreciation for what is at
21  stake.  The law that applies and particularly in capital
22  murder cases.  You know you do bankruptcy, but it looks to me
23  that you also keep yourself up to speed on criminal law or you
24  really remember the bar really well.  You know that looks like
25  a page -- a day three questionnaire from law school exam.  So

63

1  I am going to touch basis with you on those things today, ask
2  you some questions.  Let the defense attorneys also talk to
3  you and also just to touch on your qualifications of your
4  understanding and your willingness and ability to follow the
5  law.
6      As you can see, I think you have a good appreciation, we
7  are here on a death-penalty case, not necessarily a theft of a
8  bicycle, but death penalty, which is -- the stakes don't get
9  any higher, do they?  So we need to talk to you now, take it
10  one step further and talk to you about the law and those
11  things.  As I think you can fully appreciate, death penalty is
12  an option to a jury is not available for all murder cases, is
13  it?  It is a select number of cases, murder of a police
14  officer, murder of a child six years of age or younger, murder
15  of an individual during the course of another felony offense.
16  Those are things to which the jury has an option of the death
17  penalty, but it is never automatic.  And I think you already
18  know that and have that appreciation?
19           PROSPECTIVE JUROR:  Yes.
20           MS. HANDLEY:  That we do not send our jury back
21  and ask them, talk about it, whether or not you think this
22  person should get life or death.  Instead you go through a
23  series of questions and answers based on how you answer those
24  questions make that ultimate determination whether or not a
25  person gets life or death in prison.  As you probably fully

64

1  know or are aware of and have a good appreciation for, there
2  are fundamental propositions of law that play out in any
3  criminal case.  Be it, like I said, theft of a loaf of bread
4  or capital murder, there are things that always apply.  It has
5  been that way and probably will.  I want to talk to you about
6  that.
7      You know that I am sure that as the State as the body
8  that is bringing the charges in this particular case, in any
9  criminal case, we obviously have the burden of proof in this
10  case, correct?
11           PROSPECTIVE JUROR:  Yes.
12           MS. HANDLEY:  You would never look, for example,
13  to this side of the courtroom.  And I am pointing to the
14  defense bar over there, per defense counsel to prove anything
15  in this case, correct?
16           PROSPECTIVE JUROR:  That's right.
17           MS. HANDLEY:  They have absolutely no burden of
18  proof.  They don't have to come in and prove their client
19  innocent, it is just the opposite.  We have to prove him
20  guilty beyond a reasonable doubt, correct?
21           PROSPECTIVE JUROR:  Yes.
22           MS. HANDLEY:  And the elements of the indictment
23  are basically what we are obligated to prove.  Each and every
24  element of the offense must be proved beyond a reasonable
25  doubt.  We don't get points for five out of six, do we?  We

65

66

1   got to do them all.  And every element of the offense is just
2   as important as the other, is it not?
3           PROSPECTIVE JUROR:  Yes.
4           MS. HANDLEY:   If I failed to prove that he was
5   in fact a peace officer, that carries just as much wait as if
6   I failed to prove that it happened in Dallas County, Texas,
7   correct?
8           PROSPECTIVE JUROR:  Yes.
9           MS. HANDLEY:   And if I for example were
10  incredibly remiss and didn't bring you a shred of evidence
11  that is happen in Dallas County, Texas, I think you will agree
12  with me that I failed to prove my case?
13          PROSPECTIVE JUROR:  Right.
14          MS. HANDLEY:   And His Honor by law will instruct
15  you to find him not guilty by law?
16          PROSPECTIVE JUROR:  Uh-huh.
17          MS. HANDLEY:   And as I said, that is horribly
18  remiss of me and that touches on your qualifications to be a
19  juror.  If I failed to prove that, or if worse yet I prove it
20  happened in Tarrant County, Texas, would you then follow the
21  law and return a verdict of not guilty?
22          PROSPECTIVE JUROR:  Yes.
23          MS. HANDLEY:   You understand that the
24  indictment, I believe there is a copy of it in front of you
25  there, but it is basically just words on a piece of paper,

1   isn't it?
2           PROSPECTIVE JUROR:  Yes.  Do I need to look at
3   it.
4           MS. HANDLEY:   I will paraphrase for you.  You
5   know we have to prove on or about a certain date, that the
6   defendant, in Dallas County, Texas, did intentionally and
7   knowingly take the life of a peace officer while he was in the
8   line of the duty, and that he did that by shooting him with a
9   firearm.  That is just a piece of paper.  Tells me what I have
10  to prove.  And tells the defendant what he has been charged
11  with, correct?
12          PROSPECTIVE JUROR:  Yes.
13          MS. HANDLEY:   And the law provides that you
14  cannot use that as a piece of evidence against him.
15          You understand that law, correct?
16          PROSPECTIVE JUROR:  Yes.
17          MS. HANDLEY:   Again, that's the law that you can
18  and would also follow, can you not?
19          PROSPECTIVE JUROR:  Yes.
20          MS. HANDLEY:   Burden of proof in this case is
21  beyond a reasonable doubt.  And I am sure that is just worlds
22  different from the burden of proof that y'all are accustomed
23  to in your civil case, correct?
24          PROSPECTIVE JUROR:  Yes.
25          MS. HANDLEY:   You will agree with me that that

67

68

1   is the highest burden of proof in our system, is it not?
2           PROSPECTIVE JUROR:  Yes.
3           MS. HANDLEY:   And as you may know, it may not
4   necessarily be a definition of reasonable doubt, it is
5   whatever you think it is.  Some people say I have to be
6   certain, I have to be able to sleep at night knowing that I
7   did the right thing.  So it is whatever you think it is.  But
8   you would agree with me, ma'am, that it is an incredibly high
9   burden?
10          PROSPECTIVE JUROR:  Yes.
11          MS. HANDLEY:   And you would continue to hold us
12  to that burden of proof?
13          PROSPECTIVE JUROR:  Yes.
14          MS. HANDLEY:   And obviously you are familiar
15  that the defendant has a right not to testify in a case, and I
16  cannot force a defendant to testify.  If an individual elects
17  to exercise that constitutional right and not take the stand,
18  you wouldn't hold that against him or use that as any evidence
19  of his guilt, would you?
20          PROSPECTIVE JUROR:  No.
21          MS. HANDLEY:   And again as we sit here today,
22  because I brought you absolutely no evidence whatsoever, the
23  law states that you are to presume him innocent as he sits
24  here today and to continue to presume him innocent until I
25  prove to you beyond a reasonable doubt otherwise.  And that's

1   a law that you understand and agree to follow; is that
2   correct?
3           PROSPECTIVE JUROR:  Yes.
4           MS. HANDLEY:   I think you have a good
5   appreciation for that, ma'am, and can I take your word for it
6   that you would consistently follow the law in this case?
7           PROSPECTIVE JUROR:  Yes.
8           MS. HANDLEY:   And that you would ultimately base
9   where your verdict in this case on the evidence in this case
10  and on nothing else?
11          PROSPECTIVE JUROR:  Yes.
12          MS. HANDLEY:   And your obligation as a juror, as
13  you know, is to not only weigh the testimony and weigh the
14  evidence in the case, but also to assess the credibility of
15  the witnesses, correct?
16          PROSPECTIVE JUROR:  Right.
17          MS. HANDLEY:   And you have probably been called
18  upon from time to time to put witnesses on and -- put
19  witnesses on and you know that a judge or jury, whatever the
20  case may be at that point, assess their credibility?
21          PROSPECTIVE JUROR:  Yes.
22          MS. HANDLEY:   And that it would be improper for
23  them to say, oh, she is calling for a police officer, I am
24  going to automatically believe everything they said?
25          PROSPECTIVE JUROR:  Right.

69

70

1    MS. HANDLEY:   You have to make that assessment
2  from the witness stand.
3      I bring that up because in your questionnaire when we
4  asked you, what comes to mind when you hear of certain people
5  and occupation, do you believe that an officer is more likely
6  to tell the truth?  I believe you selected more likely; is
7  that correct?
8    PROSPECTIVE JUROR:   I don't think so.
9    MS. HANDLEY:   Let me double check.
10    PROSPECTIVE JUROR:   I may have, but didn't
11  mean to if I did.
12    MS. HANDLEY:   Oh, I beg your pardon, then on
13  that.  You know what I don't think you did do that.  I got you
14  confused with the 500 other questionnaires I read.  No, you
15  did not.  That is my mistake.  I beg your pardon.  So you
16  obviously right there another full appreciation that
17  credibility is assessed from the witness stand, nothing is
18  automatic, correct?
19    PROSPECTIVE JUROR:   That's correct.
20    MS. HANDLEY:   I feel like I am preaching to a
21  choir right now.  Keeping in mind that I am taking from you
22  that I get your absolute assurance and that you will base your
23  verdict based on the evidence in the case.  If we prove to you
24  beyond a reasonable doubt that the defendant is guilty of
25  capital murder as charged in the indictment, you would return

1  a verdict of guilty; is that correct?
2    PROSPECTIVE JUROR:   If you meet your burden.
3    MS. HANDLEY:   Very good.  As you probably also
4  know, we have had a lot of come in and come in under the
5  assumption that if you find an individual guilty, they are
6  automatically going to get the death penalty.  And I think you
7  understand that is not the way it is, correct?
8    PROSPECTIVE JUROR:   That's correct.
9    MS. HANDLEY:   You do understand that having been
10  found guilty, the best he will get is life imprison without
11  parole?
12    PROSPECTIVE JUROR:   Yes.
13    MS. HANDLEY:   Until we can prove to you beyond a
14  reasonable doubt that the more appropriate sentence in this
15  case is death, that you are to continue to presume that life
16  is the appropriate thing to do, correct?
17    PROSPECTIVE JUROR:   Correct.
18    MS. HANDLEY:   We ask you to do that by going
19  back there with the other 11 jurors, in looking at the
20  evidence in its entirety, instead of having a round table
21  discussion, we ask you to answer a series of questions and
22  based on your answers to those questions, that will make your
23  determination as to whether or not he receives life imprison
24  or a death sentence.
25      The first question we ask you is that special issue

---

71

72

1  number one over there to your left.  I don't know how long it
2  has been since you read that or if you ever read that, but go
3  ahead and take a moment to take a look at that?
4    PROSPECTIVE JUROR:   Okay.
5    MS. HANDLEY:   Okay.  As I am sure you can fully
6  appreciate, that at that point, the best the defendant is ever
7  going to do is life imprison, correct?
8    PROSPECTIVE JUROR:   Yes.
9    MS. HANDLEY:   And so when we ask you to take
10  into consideration whether or not he is going to be a future
11  danger to society.  I believe the legislature contemplates
12  that you and me on the road what we consider as society is
13  probably different from what is the defendant's society at
14  that point.  I don't know if you ever toured a prison?
15    PROSPECTIVE JUROR:   No.
16    MS. HANDLEY:   You never had the pleasure of
17  that.  I am sure you understand that there are more people
18  contained within a prison other than inmates?
19    PROSPECTIVE JUROR:   Yes.
20    MS. HANDLEY:   We have prison guards, medical
21  personnel, educators, people coming to visit in and out of
22  there.  And that in and of itself could also be considered a
23  society.  And would your definition, ma'am, of our society at
24  a large be broad enough to also include where the defendant is
25  going to be that he is also in this society?

1    PROSPECTIVE JUROR:   Yes.
2    MS. HANDLEY:   That's referred to as the future
3  dangerousness question.  I am sure you have heard of that.
4  When you go into that second phase of the trial there, you go
5  in with the presumption that the right thing to do is to give
6  him life imprison.  That presumption of life is most
7  appropriate, never change until we can prove to you that the
8  answer to that question ought to be "yes".  If the answer to
9  that question is "yes", that's what elevates that sentence of
10  life up to a death sentence.  As you can probably appreciate
11  being a lawyer, yourself, oftentimes we get definitions of
12  terms and sometimes we just don't.  We don't get a whole lot
13  of guidance.
14      Reasonable doubt is not defined anymore.  It is whatever
15  you think it is, as long as you understand it is the highest
16  burden of proof.  They don't define also the word probability.
17  I think it is a fair thing to say that there is a huge
18  difference between something being a possibility and a
19  probability; would you agree with me?
20    PROSPECTIVE JUROR:   Yes.
21    MS. HANDLEY:   And that a probability is in all
22  things, fairly defined is more likely than not or greater than
23  50 percent; would you agree with me on that?
24    PROSPECTIVE JUROR:   Yes.
25    MS. HANDLEY:   They go on further, would you find

73

1  the defendant would commit criminal acts of violence.  And
2  again, they don't define that.  And they specifically don't
3  set out that the defendant would commit another murder, that
4  the defendant would commit a murder or another robbery, or an
5  assault.  They just set out it's something for you to decide
6  criminal act of violence.
7      If I balled up my fist and knocked my co-counsel end over
8  end out of his chair, that might constitute a criminal act of
9  violence?
10          PROSPECTIVE JUROR:  It certainly good.
11          MS. HANDLEY:  Certainly a violent act.  And I
12  think you would agree with me, a misdemeanor assault, a
13  criminal act?
14          PROSPECTIVE JUROR:  That's correct.
15          MS. HANDLEY:  Again for you to decide what
16  constitutes a criminal act.  And then he would do that and it
17  would be a continuing threat to society.  We already talked
18  about that.  It would be the society in which he is in.  And
19  that the prison society can be encompassed within our greater
20  society as a whole.  Our obligation to you is to prove that
21  that question should be "yes" versus the immediate assumption
22  that it is "no"?
23          PROSPECTIVE JUROR:  Right.
24          MS. HANDLEY:  What sort of things do you think
25  you have to see here in order to answer that question yes or

74

1  no?
2          PROSPECTIVE JUROR:  Well, with -- certainly his
3  background, if he had a record, that wouldn't be in and of
4  itself, you know, the end all, be all question.
5          MS. HANDLEY:  Sure.
6          PROSPECTIVE JUROR:  But I think it would be a
7  factor.  His testimony about his demeanor, temper, those
8  general types of things.
9          MS. HANDLEY:  Not necessarily his testimony?
10          PROSPECTIVE JUROR:  I understand he doesn't have
11  to testify.  Family, teacher, whatever would testify about
12  that issue.
13          MS. HANDLEY:  And just again to touch on your
14  qualifications, personally do you understand what we are
15  talking about there?
16          PROSPECTIVE JUROR:  Yes.
17          MS. HANDLEY:  And before you would ever answer
18  that question "yes", can you assure us that you would not
19  answer that question "yes" until we prove to you beyond a
20  reasonable doubt that it should be "yes"?
21          PROSPECTIVE JUROR:  Yes.
22          MS. HANDLEY:  If you answer that question "yes",
23  ma'am, that presumption that life is the more appropriate
24  sentence is now elevated up to a death sentence.  Now he is
25  sitting on a death sentence at that point.  Of course we are

75

1  not finished.  We still have to answer one more question,
2  that's that special issue, that mitigating circumstance issue.
3          PROSPECTIVE JUROR:  Okay.
4          MS. HANDLEY:  I think you can fully appreciate
5  being a Texas lawyer, we are one of the last of the states to
6  allow jurors to actually assess punishment for criminal cases.
7  We are just a select number now.  This special issue goes
8  along that team that we have entrusted the jury to decide what
9  is most appropriate.  So again we are going to leave open all
10  the options available to you.  You may have found him guilty
11  of capital murder.  You may in fact believe beyond a
12  reasonable doubt that he is a future danger to society, but we
13  are not going to shut it off there.  We are going to give you
14  one more chance to review all the evidence in the case, be it
15  evidence of the offense, be it evidence of his character, his
16  upbringing, consider what kind of moral culpability,
17  blameworthiness did he have in the case.  You get to look at
18  everything before we commit you to a decision.  And to ask
19  yourself is there a mitigating circumstance in this case and
20  is it sufficient enough mitigating circumstance that you
21  believe brings that death sentence back down to a life
22  sentence?  Of course I can't commit you right now to what do
23  you think, you know, what would you have to see in order to be
24  a mitigating circumstance?  Sometimes it is just
25  if-you-know-it-you-see-it kind of thing.  I can't commit you

76

1  to a certain set of facts or something.  But the question
2  becomes to you as a potential juror, ma'am, if you having
3  found him guilty of capital murder, having found he is a
4  future danger, you reviewed all the evidence again, and you
5  felt that there was sufficient mitigating circumstance or
6  circumstances to bring that sentence back down to a life
7  sentence, would you in fact do that?
8          PROSPECTIVE JUROR:  Yes.
9          MS. HANDLEY:  And you look very emphatic and
10  sure about that.  In other words, ma'am, you will agree to
11  follow the law; is that correct?
12          PROSPECTIVE JUROR:  Yes.
13          THE COURT:  And you will base your verdict and
14  the punishment verdict on the evidence in the case?
15          PROSPECTIVE JUROR:  Yes.
16          MS. HANDLEY:  You will assess the credibility of
17  witnesses from the witness stand?
18          PROSPECTIVE JUROR:  Yes.
19          MS. HANDLEY:  Okay.  Any questions about the law
20  or anything that pertains to capital murder?  I know you are
21  not fully involved in that in your profession, it is hard not
22  to see the other side of the playing field?
23          PROSPECTIVE JUROR:  No, I think I could follow
24  the evidence.
25          MS. HANDLEY:  I think you are probably the

77

1 easiest potential juror I have talked to, I appreciate that.
2     I am going to let the defense counsel just also question
3 you a little bit more on your qualifications and your
4 understanding of the law at this point.
5           PROSPECTIVE JUROR:  Okay.
6           MS. HANDLEY:  I will pass the juror, Your Honor.
7           THE COURT:  Thank you, Ms. Handley.
8               VOIR DIRE EXAMINATION
9 BY MR. BRAUCHLE:
10     Good morning, Ms. Worsham?
11           PROSPECTIVE JUROR:  Good morning.
12           MR. BRAUCHLE:  My name is Paul Brauchle, and I
13 got some questions for you. Obviously the people at this
14 table don't see eye to eye with the people at that table. If
15 we did, we would just all sit at the same table and make it
16 easy for people sitting up there where you are. We have
17 read -- I think it is probably more than 500, Ms. Handley said
18 we have read at least 500 questionnaires so you could kind of
19 how they run together at some point in time?
20           PROSPECTIVE JUROR:  Yes.
21           MR. BRAUCHLE:  And we might not be exactly clear
22 on all the pertinent information to you.
23     Is there anything about your questionnaire that you would
24 change or that you made a wrong answer or anything like that?
25           PROSPECTIVE JUROR:  No in reading it back this

78

1 morning, my answers on who do you most respect and least
2 respect. I had a hard time with that that day, I couldn't
3 even remember what I wrote. Because I generally don't respect
4 people unless I know them. So I am not sure my answer on that
5 question would be the same today, but that was about the only
6 one. I don't know that it would be different.
7           MR. BRAUCHLE:  It is not something that you
8 think about on an everyday basis?
9           PROSPECTIVE JUROR:  Exactly.
10           MR. BRAUCHLE:  And a lot of people, even though
11 the instructions say that they have publicly known, they end
12 up putting all their family members on there.
13           PROSPECTIVE JUROR:  Yeah.
14           MR. BRAUCHLE:  It could kind of be an
15 interesting deal at a family reunion, whatever?
16           PROSPECTIVE JUROR:  Who is missing.
17           MR. BRAUCHLE:  Who is missing, put in the
18 disrespect column. Other than that, that's about all you
19 would change?
20           PROSPECTIVE JUROR:  Yes, sir. And I guess the
21 voting question. I voted since the day I put there, because I
22 voted last week, but other than that.
23           MR. BRAUCHLE:  Okay. Let me just share this
24 with you. If we were to stop you when you filled that
25 questionnaire out and you were going back to whatever business

79

1 you had that day, and asked you what the result of getting
2 found guilty of capital murder was, would you have told us
3 that if you are found guilty of capital murder you receive the
4 death penalty?
5           PROSPECTIVE JUROR:  No.
6           MR. BRAUCHLE:  Well, most people -- obviously
7 you being an attorney, you got a little more insight. Most
8 people equate guilt with death.
9           PROSPECTIVE JUROR:  True.
10           MR. BRAUCHLE:  And as you can tell from your
11 training and talking to Ms. Handley, the death penalty, they
12 have to work to get that. Because once you are found guilty,
13 you get life imprison. And only if that first special issue
14 is answered "yes", do you get death. And that first special
15 issue is presumed to be "no", just like we took some spray
16 paint and spray painted all over it, they have to erase that
17 "no" before the defendant can receive death.
18     Then you see even further with special issue number two,
19 if that is answered, yes, then the -- the default is back to
20 life imprison?
21           PROSPECTIVE JUROR:  Right.
22           MR. BRAUCHLE:  So it is set up to whether the
23 State fails on any level that proof, that defendant gets life
24 without parole. But most people would think, well, if he is
25 guilty, it is death. Really it is a life-without-parole

80

1 situation unless they prove some other things.
2     Now, then, let's go to the special issues. And let me
3 ask you something, as you read that first special issue, you
4 see the word there at the end of the second line, probability,
5 what does that mean to you?
6           PROSPECTIVE JUROR:  It would mean to me
7 certainly more than 50 percent and not as high as a reasonable
8 doubt. But to me, without instruction, it would mean
9 somewhere more than 50 and less than a hundred.
10           MR. BRAUCHLE:  You don't know where then?
11           PROSPECTIVE JUROR:  For me, it would have to be
12 probably in the 75, 80 percent. I mean it is hard for me to
13 quantify it. To me it is more probable than not probable. It
14 is more than 51 percent, but I don't have to be a hundred
15 percent sure for probability.
16           MR. BRAUCHLE:  Okay, how about criminal acts of
17 violence? What do you think constitutes criminal acts of
18 violence?
19           PROSPECTIVE JUROR:  Certainly wouldn't be
20 stealing gum or cigarettes from another inmate. I would think
21 it would have to be -- some type of an assault. I don't know
22 if it would have to be an assault with a weapon or not. I
23 haven't really thought about that. But it would certainly --
24 certainly include from the definition of violence some
25 physical altercation.

81

1    MR. BRAUCHLE:   Let's look at the second special
2  issue.  You realize I don't think they are numbered.  But I
3  think they are going to be presented to you in the order that
4  they are up there.  And you realize that you don't get to that
5  special issue unless you found that the person fills all the
6  attributes of the special -- the first special issue?
7    PROSPECTIVE JUROR:   Correct.
8    MR. BRAUCHLE:   If the State can't prove the
9  first special issue to you, you don't go to the second one,
10  and you don't have to gravel with that.
11    Do you have any idea what would have to be shown or not
12  shown to you before you could answer that first special issue
13  in such a way to -- that we can proceed down?
14    PROSPECTIVE JUROR:   Well, you know I need to
15  hear a little bit about certainly how he was raised, has he
16  been in trouble before, did he go to school, did he beat up
17  little old ladies at the bus stop, good to church.  Not that
18  is all end all, be all and take into consideration the type of
19  crime that resulted in the death and state -- psychiatrist
20  testimony could be persuasive on that fact.  Presuming that
21  the doctor actually saw the patient versus just commenting.
22  Those would be the type of things that -- I would obviously
23  take into consideration anything you put in, but those would
24  be kind of the things -- what his background was, what he has
25  done up to this time.  Those type of things.

82

1    MR. BRAUCHLE:   Well, I don't want to disappoint
2  you, and I am not trying to lecture to you, those people over
3  there are trying to kill our client.  I don't think they are
4  going to bring baby pictures or somehow being mitigating.
5    PROSPECTIVE JUROR:   Correct.
6    MR. BRAUCHLE:   If there is something out there
7  that shows him to be a bad person or not worthy of being saved
8  from the death penalty, they are going to try to find it.  And
9  unfortunately under our system of jurisprudence as you know,
10  we don't have any duty to bring any evidence to the courtroom?
11    PROSPECTIVE JUROR:   Right.
12    MR. BRAUCHLE:   And being a lawyer, you are one
13  of the few people that I think can appreciate that.  Because
14  generally when we tell people sitting where you are, they kind
15  of gristle and say, Well, why not, you are supposed to defend
16  the person.  That is kind of a TV concept as opposed to real
17  life.  Because once we show up down here, and we are pretty
18  good about showing up, we don't have to do anything.  We got
19  our client here, and we are here.  And we have fulfilled our
20  obligation.  Now, that is not to say that we might not strive
21  mildly to help you through these questions, but we don't have
22  to.  That's an unfortunate situation in life.  And I think you
23  can appreciate our dilemma or lack thereof in regard to
24  evidence one way or the other.  As you know, even in civil
25  law, you still look to the plaintiff or the movant party.

83

1    So can you see you might be hamstrung in regard to
2  looking at -- looking at or finding mitigating evidence in
3  regard to that second special issue?
4    PROSPECTIVE JUROR:   I would agree that I doubt
5  they are going to put on any if it gets that far -- I mean if
6  it gets to that stage.
7    MR. BRAUCHLE:   You got any questions of me?
8    PROSPECTIVE JUROR:   No, sir.
9    MR. BRAUCHLE:   Being close to the lunch hour,
10  you probably wouldn't ask them anyway?
11    PROSPECTIVE JUROR:   No, I am down here, I
12  would ask them.
13    MR. BRAUCHLE:   All right.  I don't know where
14  that noise comes from, it is not from you?
15    PROSPECTIVE JUROR:   Okay, good.
16    MR. BRAUCHLE:   There have been a lot of suspects
17  that it could be attributed to you, but I don't think it comes
18  from the witness stand.
19    Ms. Worsham, you will be glad to know that at the present
20  time I don't have any further questions of you.  Thank you
21  very much.
22    PROSPECTIVE JUROR:   Thank you.
23    THE COURT:   You may step down, Ms. Worsham.
24    (Jury retired from the courtroom.)
25    THE COURT:   Just so I am on the same page, we

84

1  are doing the same thing with her?
2    MS. HANDLEY:   No.
3    MR. BRAUCHLE:   Your Honor, as the Court's well
4  aware -- oh, y'all have to accept her.
5    MS. HANDLEY:   Your Honor, we would accept juror
6  78-G, Laura Worsham, we will accept her.
7    THE COURT:   Thank you, Ms. Handley.
8    Now you may proceed, Mr. Brauchle.
9    MR. BRAUCHLE:   As the Court is well aware, we
10  suspended our 15th peremptory strike yesterday due to a
11  great extent to erroneous or improper rulings by the Court, as
12  well as poor jurors.
13    And in regard to this juror, we find her as being totally
14  unacceptable by her questions in regard to this special issue,
15  not acceptable to either us or our client.  And because of the
16  not having any further peremptory challenges, we would ask the
17  Court to grant us an additional peremptory challenge to
18  preserve the rights of our defendant.  We would anticipate
19  that the Court would see that she is not qualified in regard
20  to deciding the special issues set out in special issue number
21  two, which therefore makes her unacceptable under *Morgan*
22  *versus Illinois*.  And we also think that she places an
23  unreasonable burden on the defendant by expectations of us
24  presenting or obtaining evidence to answer the special issues
25  in the event that our client is found guilty.  And we would

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

85

1 once again ask the Court for an additional challenge.
2          THE COURT:  The Court will grant --
3          MR. BEACH:  May we approach?
4          (Discussion off the record.)
5          THE COURT:  The Court will overrule your
6 request, Mr. Brauchle -- or challenge.
7          MR. BRAUCHLE:  Note our exceptions, Your Honor.
8 Because of the Court's erroneous ruling we would renew
9 our request for an additional peremptory challenge and we
10 would state the reasons for our request as those that have
11 been set out heretofore.
12          THE COURT:  The Court will grant the Defense's
13 request for an additional challenge.
14          MR. BRAUCHLE:  We will now use the additional
15 peremptory challenge to strike Juror No. 78-G Laura Worsham.
16          THE COURT:  Mr. Moorehead, if you will bring
17 Ms. Worsham.
18          THE BAILIFF:  All rise for the juror.
19          (Prospective juror entered the courtroom.)
20          THE COURT:  Ms. Worsham I will have you know
21 that you have been excused as a juror in this case, you are
22 free to go.
23          PROSPECTIVE JUROR:  Thank you very much.
24          THE COURT:  We are recessed until 1:15.
25          (Lunch recess taken.)

86

1          THE BAILIFF:  All rise for the juror.
2          (Prospective juror entered the courtroom.)
3          THE COURT:  You may be seated.  Good afternoon,
4 Ms. Hartgrave.  How are you?
5          PROSPECTIVE JUROR:  Good.
6          THE COURT:  I apologize for the delay.  As I
7 told you earlier, sometimes the interviews go a little longer
8 than we anticipate.  So we appreciate your patience.  The
9 attorneys are going to question you about your qualifications
10 as a juror on this case.  There aren't any right or wrong
11 answers.  They are merely trying to see how you feel about
12 certain issues.
13     The State will proceed.
14     What says the State?
15          MR. BEACH:  May it please the Court?
16          **CORINE HARTGRAVE**
17 was called as a prospective juror, after having been
18 previously sworn by the Court, testified under oath as
19 follows:
20          **VOIR DIRE EXAMINATION**
21 BY MR. BEACH:
22     Good afternoon, Ms. Hargrove.  How are you doing?  My
23 name is Andy Beach, along with Andrea Handley, we are going to
24 be conducting the jury selection phase of this capital murder
25 case on behalf of the State.

87

1     To our left, Karo Johnson and Paul Brauchle, they are
2 attorneys here in town, and they represent the defendant.  He
3 is the man at the end of the counsel table, that's Wesley
4 Ruiz.
5          THE DEFENDANT:  Good afternoon.
6          MR. BEACH:  Now, is it quieter back there in·
7 that jury room than on that school bus that you drive
8 everyday?
9          PROSPECTIVE JUROR:  No, I drive -- it's for
10 Grand Prairie High School, and I drive the juvenile justice
11 detention route.
12          MR. BEACH:  Are there police on the bus?
13          PROSPECTIVE JUROR:  No.
14          MR. BEACH:  Just you?
15          PROSPECTIVE JUROR:  Just me.
16          MR. BEACH:  Any other special precautions,
17 anything like that?
18          PROSPECTIVE JUROR:  No.
19          MS. HANDLEY:  You can handle them?
20          PROSPECTIVE JUROR:  Yes.
21          MR. BEACH:  Listen, while you are down here is
22 because we have looked at your questionnaire, and I bet we
23 have looked at over a thousand of these in the last eight
24 weeks, okay.  And both sides kind of -- we call out the people
25 that we know have no chance of being on this jury, those being

88

1 the ones who believe that the death penalty is appropriate in
2 every murder case.  The ones that believe the death penalty is
3 never appropriate or don't believe in the death penalty.  They
4 would not be qualified jurors under the law, the way the law
5 is here in Texas.  On your questionnaire you circled number
6 two there on the first page; that is, you believe that the
7 death penalty could be appropriate in some murder cases.  And
8 guess what, that's what the law is here in Texas.  And that's
9 why we got you to come back down here today.  I don't think we
10 are going to spend a whole lot of time with you, we want to
11 talk to you a little bit about how a trial like this works.
12 And make sure that you are qualified to be on this jury, okay.
13     Now, have you ever been on jury duty before?
14          PROSPECTIVE JUROR:  I have had jury duty, but I
15 have never actually sat on a jury.
16          MR. BEACH:  Okay.  And you were in the Marines;
17 is that right?
18          PROSPECTIVE JUROR:  Yes.
19          MR. BEACH:  What were you discharged out of?
20          PROSPECTIVE JUROR:  What base?
21          MR. BEACH:  Yes.
22          PROSPECTIVE JUROR:  Camp Lejeune, North
23 Carolina.
24          MR. BEACH:  And did you meet your husband in the
25 Marines?

1    PROSPECTIVE JUROR:   Yes, I did.
2        THE MR. BROOKS:   From your question, looks like
3    married, divorced, marry again?
4        PROSPECTIVE JUROR:   Yes.
5        MR. BEACH:   Is this better this time around?
6        PROSPECTIVE JUROR:   Definitely.
7        MR. BEACH:   Amazing how a few more years of
8    maturity kind of helps on a deal like that.  Who is Jonathan
9    McCullum to you?
10       PROSPECTIVE JUROR:   He used to be a neighbor,
11   but he now lives in Mansfield.  He is still a friend.
12       MR. BEACH:   Still a friend.  Now, you understand
13   the allegation in this case involved the murder of a peace
14   officer, while that peace officer was in the line of duty.  We
15   have had a lot of jurors come down here, and some jurors have
16   brothers that are police officers; and basically again, we
17   can't help your life experience, everybody is going to know
18   police officers.  But to be a qualified juror in this case,
19   you would have to be able to assure us, the Defense and the
20   Judge the fact that you had a former neighbor who was a
21   jailer, this being a peace officer case that would not unduly
22   influence you?
23       PROSPECTIVE JUROR:   It wouldn't.
24       MR. BEACH:   You in good shape on that?
25       PROSPECTIVE JUROR:   I am fine with that.

1        MR. BEACH:   You are here because you are in line
2    with what the law is here in Texas; that is, the death penalty
3    is appropriate in some very special limited murder cases.  And
4    one of those being the murder of a peace officer, okay.  If
5    you murder a jailer, a prison guard while you are trying to
6    escape from prison, that potentially could be a death-penalty
7    case.  Okay.  If you murder a child under the age of six,
8    that's a potential death-penalty case.  And the other category
9    of capital murder versus what we just call regular murder
10   involves the most common example, if I go into a convenience
11   store -- if I go into a 7-Eleven to rob the store and I murder
12   the clerk behind the counter, a murder while in the course of
13   committing another serious felony, that is a capital murder
14   case where potentially you could be exposed to the death
15   penalty.  But other than those very few fact situations, those
16   are the only fact situations where the State could even seek
17   the death penalty here in this state.  So the very exclusive
18   limited and not very often used, despite what you read in the
19   media, very seldom used situation here in Texas.
20       Any criminal trial, whether a death penalty trial or DWI
21   simple as that, basically the same.  There are a few
22   difference in a case like this that we are going to talk
23   about.
24       At the first part of the trial every criminal trial is
25   the same.  And it has the same basic laws that you would be

1    able to assure me, the Defense, that you would be able to
2    follow.  And I don't know if you remember back three or four
3    weeks ago when you were down here three or four weeks ago,
4    Judge White went over some of the basic ground rules that
5    apply in any criminal case.  And really the only request that
6    you are going to be called upon to answer in the first part of
7    the question, is he guilty or not guilty.  You are not going
8    to be called upon as to whether he gets a life sentence or
9    death penalty, it is guilty or not guilty.
10       What are the rules that you have to be able to follow in
11   the first part of the trial.  Like the Judge told you a few
12   weeks ago, as he sits here right now, Wesley Ruiz, he is
13   presumed to be innocent.  You haven't heard any evidence in
14   this case.  You don't know anything about this case.  It is
15   his right, it would be your right if you were charge with a
16   criminal offense, we do all the accusing in this case, we have
17   to do all the proving.  So you have to look to us to this side
18   of the courtroom for all the evidence in this case.  And we
19   have to convinces you beyond what?
20       PROSPECTIVE JUROR:   A reasonable doubt.
21       MR. BEACH:   Absolutely, that he is guilty
22   exactly as charged in the indictment in this case.  Until we
23   prove that to you beyond a reasonable doubt, that presumption
24   of innocence is in effect.
25       PROSPECTIVE JUROR:   Right.

1        MR. BEACH:   He is presumed to be innocent.
2    Can you follow that law?
3        PROSPECTIVE JUROR:   Yes.
4        MR. BEACH:   And can you make us prove everything
5    that we are required to prove to you beyond a reasonable doubt
6    before you would find him guilty?
7        PROSPECTIVE JUROR:   Yes.
8        MR. BEACH:   Now, what do we have to prove in
9    this case?  Well, it is on that half page piece of paper
10   there.  Take just a second to look at it.  While you are doing
11   that, I will paraphrase.
12       We have to prove that on or about a certain date, that
13   Wesley Ruiz, knowingly and intentionally caused the death of
14   that police officer, by shooting him with a firearm, okay.
15   And when he committed that murder, he knew that peace officer
16   that he was murdering was acting in the line of duty.  Okay.
17   We have to prove all those things to you.  Okay.  We can't
18   prove three out of four or four out of five.  Let me use kind
19   of a farfetched example, Ms. Hartgrave.
20       If we prove everything in that indictment, but we fail to
21   bring to you evidence, or worst yet, we prove that the murder
22   took place in Kaufman County.  One of the things we have to
23   prove there in the indictment is that this murder took place
24   in Dallas County, Texas, okay.  We have had almost a year now
25   to investigate this case, to word that piece of paper anyway

93

1  we wanted to. And the corresponding obligation, ma'am, we
2  have to prove to you everything in there. Even something as
3  simple sounding as the county where the murder took place. If
4  we don't, Judge White will instruct you and the other 11
5  jurors, the State dropped the ball, they didn't do what they
6  were supposed to do under the law. We are sorry, but you
7  would have to find this man not guilty, even though if you
8  knew that this man committed the murder. It would make you
9  sick. And we would get fired the next day for doing something
10  that stupid. But that is to illustrate your mind what your
11  obligation would be in being a juror in this case.
12         Could you follow that law, ma'am?
13              PROSPECTIVE JUROR:   Yes.
14         MS. HANDLEY:   And the last thing.
15              MR. BEACH:   The last thing we want to talk to
16  you about, and again because it is our burden of proof, we are
17  the ones that did the accusing in this case, you have to look
18  to us. All they have to do is be here. And they are going to
19  be here everyday. Okay. And I know one of the corollaries
20  for that is, I am sure you are aware of is, that every
21  defendant has a Fifth Amendment right to testify if they want
22  to but they don't have to. And there are all kinds of reasons
23  why defendants don't testify in their own behalf. But for
24  whatever the case, this defendant, or a defendant in any
25  criminal case chooses not to testify in their own behalf,

94

1  Judge White would instruct you that they have that right and
2  you can't hold that failure to testify against them for any
3  reason whatsoever, you understand that?
4              PROSPECTIVE JUROR:   Yes.
5              MR. BEACH:   And could you follow that law,
6  ma'am?
7              PROSPECTIVE JUROR:   Yes.
8              MR. BEACH:   Now, what happens at the end of the
9  first part of this trial? Let me kind of analogize it to a
10  two-act play. Well, the first act is that we prove everything
11  to you beyond a reasonable doubt, is he guilty or not guilty.
12  If we don't do it, whether it is Dallas County, or the way the
13  police officer was murdered, guess what?
14              PROSPECTIVE JUROR:   Not guilty.
15              MR. BEACH:   You find him not guilty, the trial
16  is over, there is no act two, okay. Now, let's assume,
17  though, so we can go on, that there is going to be an act two
18  and we have proved this case to you beyond a reasonable doubt.
19  It would be your obligation pursuant to your oath at that time
20  to find the defendant guilty because we had done what we were
21  supposed to do, we had proven the case to you beyond a
22  reasonable doubt.
23         You with me?
24              PROSPECTIVE JUROR:   Yes.
25              MR. BEACH:   Could you and would you find him

95

1  guilty if we found him guilty beyond a reasonable doubt?
2              PROSPECTIVE JUROR:   Yes.
3              MR. BEACH:   Now, just like you went to a play,
4  at the end of act one, at the end of guilt/innocence phase of
5  the trial, the curtain comes down, you and the other jurors go
6  out in the hall for intermission; and guess what, you don't
7  know how the play is going to end, do you?
8              PROSPECTIVE JUROR:   No.
9              MR. BEACH:   You have to come back for the second
10  act. That's where in a capital murder case where the State is
11  seeking death is a little different than any other murder
12  case. Some folks believe that once a defendant is found
13  guilty of capital murder, it is automatic, automatic he is
14  going to get the death penalty. There shouldn't be an act
15  two. If they think like that, they wouldn't be a qualified
16  juror in this case. Really to be a juror, as a qualified
17  juror need to have the exact opposite mind-set.
18         The mind-set should be just like you presumed him to be
19  innocent at the first part of the trial until we proved to you
20  beyond a reasonable doubt that he was guilty, once you found
21  the defendant guilty at the first part, as we go into the act
22  two of the punishment phase, the law really wants you to
23  presume that a life sentence without parole is the appropriate
24  punishment. That should be your mind-set going in. And not
25  until the State brings to you evidence, additional evidence,

96

1  which we are entitled to do, convinces you that that life
2  sentence should be elevated up to a death sentence, not until
3  then would you ever vote for a death sentence.
4         You see how that is supposed to work?
5              PROSPECTIVE JUROR:   Yes.
6              MR. BEACH:   And could you do that, ma'am?
7              PROSPECTIVE JUROR:   Yes.
8              MR. BEACH:   And there is nothing automatic about
9  what penalty someone gets once convicted of capital murder.
10  The best that they will get is a life sentence without the
11  possibility of parole. Unless he escapes from prison, because
12  he is going to die in prison because he is going to be there
13  for the rest of his natural life. It doesn't matter in prison
14  if he finds a cure for cancer or brings peace to the Middle
15  East, he is never going to get out of pen. That's the best
16  that he is looking at if he is found guilty of capital murder.
17         That's why the legislature -- the law here in Texas is as
18  you go in once, that life sentence remains or he gets the
19  death sentence, you have to look to us for additional proof
20  that convinces you and 11 other jurors that life sentence
21  should be elevated up to a death sentence.
22         Can you do that?
23              PROSPECTIVE JUROR:   Yes.
24              MR. BEACH:   So you go in to the punishment phase
25  believing that the life sentence is the appropriate

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1      punishment. How are we able to convince a jury to elevate
2      that life sentence up to a death sentence? Well, it has to do
3      with answering these two questions. I want you to take a few
4      seconds to read that first question to yourself, ma'am.
5               PROSPECTIVE JUROR:    (Juror complies.)
6               MR. BEACH:    You get an idea what the legislature
7      is asking you there of that question?
8               PROSPECTIVE JUROR:    Yeah.
9               MR. BEACH:    Here is the deal before someone gets
10     a death sentence here in Texas. The legislature wants the
11     same jury to make two determinations, number one, in act one
12     is he guilty of capital murder. That's got to be the first
13     hurdle we have to overcome before we are even in the ball park
14     of a death penalty, okay. Now, before you get to that
15     question, obviously you have already answered that question in
16     the affirmative in the first part of the trial, yes, he is
17     guilty of capital murder and that's why we are going on to
18     part two, okay?
19              PROSPECTIVE JUROR:    Uh-huh.
20             MR. BEACH:    Now, again, before we -- before we
21     are entitled to a death sentence, the legislature want that
22     same jury not only to be convinced beyond a reasonable doubt
23     that he is a capital murderer, exactly as charged in the
24     indictment, but would you agree with me that that question is
25     also asking you to prove to you and the 11 other jurors that

1      that now convicted capital murderer is going to be a future
2      danger to society. That's what that question is basically
3      asking you, right?
4               PROSPECTIVE JUROR:    Yes.
5             MR. BEACH:    So before we are entitled to elevate
6      that life sentence up to a death sentence, we have to convince
7      you and 11 other jurors that the defendant is going to be a
8      continuing threat to society and a future danger, because in
9      all probability he will continue to commit criminal acts of
10     violence. That's what we have to prove to you.
11        You understand at that?
12               PROSPECTIVE JUROR:    Yes.
13             MR. BEACH:    Like we discussed Ms. Hartgrave,
14     going in to answering that question, basically you are to
15     assume that the answer to that question is "no". What is the
16     effect of "no" in special issue number one, he stays at a life
17     sentence.
18               PROSPECTIVE JUROR:    Right.
19             MR. BEACH:    For us to have that "no" erased and
20     a "yes" put in there, we have to convinced you and the 11
21     jurors that he is going to be in all probability a continuing
22     threat to society. How do we do that?
23        What kind of evidence would help You determine if someone
24     was going to be a future threat to society. Anything come to
25     mind?

1               PROSPECTIVE JUROR:    Not off the top of my head,
2     no.
3             MR. BEACH:    A lot of folks tell us, listen, if I
4     had to drive that school bus everyday, if I went down there
5     tomorrow, I wouldn't know the first thing about it. So we
6     know you are a fish out of water right now. And that's fine.
7     A lot of folks tell us to learn about defendant's past. Was
8     this an isolated, one-time incident, everything kind of
9     converged and he committed a capital murder? Or was this a
10    part of pattern behavior that you can have seen coming from a
11    mile off? Has he lived his life continuously consistent to
12    this criminal pattern, it just wasn't a great surprise that
13    what happened on the day of the alleged murder happened, okay.
14       Would that kind of evidence be helpful to you in terms of
15    making that determination?
16             PROSPECTIVE JUROR:    Yes.
17           MR. BEACH:    Okay. And there could be other
18    evidence, but that's kind of primary -- obviously, you know
19    the facts of the offense themselves could, you know, help you
20    determine whether or not someone was going to be a continuing
21    threat to society; is that correct?
22             PROSPECTIVE JUROR:    Yes.
23          MR. BEACH:    But the bottom line, ma'am, is, we
24    have to convince you to erase that "no", that presumed "no",
25    we have to convince you beyond a reasonable doubt that he will

1      be a continuing threat to society and we have to bring to you
2      evidence to prove that to you.
3        And would you require us to do that?
4               PROSPECTIVE JUROR:    Yes.
5             MR. BEACH:    Again, you understand they don't
6      have to prove anything, it is not their burden. It is our
7      burden, we have to prove everything in that question to you
8      beyond a reasonable doubt before we would be entitled to a
9      "yes" answer, okay?
10            PROSPECTIVE JUROR:    Uh-huh.
11          MR. BEACH:    And you would make us do that?
12            PROSPECTIVE JUROR:    Yes.
13         MR. BEACH:    Now, what is the effect of a yes
14    answer to that first question? Well, the effect is now at
15    that point in time in the trial, that life sentence has been
16    elevated up to a death sentence. Because now not only have we
17    proved that he is guilty of capital murder, we have also
18    convinced the jury beyond a reasonable doubt that he is going
19    to be a future danger to society.
20       You with me on that?
21            PROSPECTIVE JUROR:    Yes.
22         MR. BEACH:    That's how we get from a life
23    sentence up to a death sentence, through competent evidence
24    and competent proof in this case.
25      Is the play over, not yet. Even though we have convinced

1  you beyond a reasonable doubt he is a capital murderer and a
2  future danger to society, you still got one more thing to look
3  at. Take a minute to read that second question to yourself.
4           PROSPECTIVE JUROR:   (Juror complies.)
5           MR. BEACH:   That's a little tougher one to
6  understand, you with me?
7           PROSPECTIVE JUROR:   Uh-huh.
8           MR. BEACH:   Especially that personal moral
9  culpability. Basically what we try to do is simplify for
10 people like you. Now you know the defendant is sitting on a
11 death sentence, what the legislature want the jury to do
12 before that death sentence is etched in stone forever, that's
13 the way it is going to be, they want that same jury to go back
14 one more time and re-examine everything and try to determine
15 from the evidence, is there something about this defendant,
16 about his background, about the way he was raised, did he have
17 severely abusive parents that kind of tortured him all his
18 life. Was he almost mentally retarded, very he very slow? He
19 just that had a very low I.Q. that kept him from seeing things
20 the way other folks do. They want you to go back to see
21 things that would convince that jury that even though he has
22 earned a death sentence, this particular defendant, mercy is
23 the thing and a life sentence is appropriate punishment. It
24 is a hard hoop to get you to go from life to death back to
25 life. That's what the legislature wants you to do, to

1  re-examine that one last time. The legislature wants the
2  jury, if they just feel so compelled by something in the
3  evidence, even though they know the defendant deserves a death
4  sentence, there is something about this defendant that
5  everyone believe we should spare his life and give him a life
6  sentence, something about his background, whatever it is going
7  to be, this question gives the jury the opportunity to do
8  that.
9           You with me on that?
10          PROSPECTIVE JUROR:   Yes.
11          MR. BEACH:   My question is, if there was
12 something sufficiently mitigating, something that lessens his
13 blameworthiness, something that lessens his moral culpability,
14 the point where you believe, Ms. Hartgrave, that he has earned
15 a death sentence, could you take that death sentence back to a
16 life sentence if you believed the evidence convinced you to do
17 so?
18          PROSPECTIVE JUROR:   Yes.
19          MR. BEACH:   Do you have any questions of me?
20       I appreciate your patience and I think you could be a
21 good juror in this case and we appreciate I coming down here
22 today.
23          THE COURT:   Thank you, Mr. Beach.
24          MR. JOHNSON:   May it please the Court?
25

---

1                **VOIR DIRE EXAMINATION**
2  BY MR. JOHNSON:
3       Good afternoon. My name is Karo Johnson. I have a few
4  questions for you as well. There are no right or wrong
5  answers to any of these questions.
6       We understand that you don't sit around your dinner table
7  at home talking about the death penalty?
8           PROSPECTIVE JUROR:   No.
9           MR. JOHNSON:   When you got the questionnaire
10 thrust into your hand and saw the 18-page list of questions,
11 it was probably things you hadn't given a lot of thought to
12 before you had to write answers to; am I right about that?
13          PROSPECTIVE JUROR:   Yes, sir.
14          MR. JOHNSON:   You got your questionnaire?
15          PROSPECTIVE JUROR:   Yes, I do.
16          MR. JOHNSON:   You had anything -- you had a
17 chance to go back over it?
18          PROSPECTIVE JUROR:   I looked at it, yes.
19          MR. JOHNSON:   Anything that you had changed or
20 said it was wrong?
21          PROSPECTIVE JUROR:   No.
22          MR. JOHNSON:   You told Mr. Beach that one of the
23 things you do in your job, did I hear you say you transport
24 juveniles?
25          PROSPECTIVE JUROR:   Yes.

1           MR. BRAUCHLE:   Is that from the juvenile
2  detention center?
3           PROSPECTIVE JUROR:   On I-30 and Hampton.
4           MR. JOHNSON:   Are you picking them up taking
5  them to school?
6           PROSPECTIVE JUROR:   I do a regular high school
7  run up to 40 students, drop them off at high school. Then I
8  have 11 students, it was 12 until Friday, one got released on
9  Friday; but I have 11 students now that I pick up at their
10 house every morning, take them to Dallas, and then I pick them
11 up in the afternoon and I take them home.
12          MR. JOHNSON:   Those are juvenile delinquents?
13          PROSPECTIVE JUROR:   They have been to court, the
14 Judge has said now you have to go here to school. You can't
15 be trusted at regular school, so you are now going to the
16 juvenile detention center for school.
17          MR. JOHNSON:   But that's something you didn't
18 actually put in your answer?
19          PROSPECTIVE JUROR:   That is part of my regular
20 job.
21          MR. BRAUCHLE:   You left that out when you filled
22 this thing out?
23          PROSPECTIVE JUROR:   I am a school bus driver and
24 that's what I do.
25          MR. JOHNSON:   On page 14 where you talk about

105

1   your military service --
2           PROSPECTIVE JUROR:   Yes.
3           MR. JOHNSON:    -- now, I may be wrong about this,
4   did you leave the Marines with a higher rank than your
5   husband?
6           PROSPECTIVE JUROR:   My husband got out with a
7   medical discharge a year before I did.
8           MR. JOHNSON:    But I am talking about a rank?
9           PROSPECTIVE JUROR:   Yes, I was higher rank
10  when I got out.
11          MR. JOHNSON:    So does he still follow your
12  orders?
13          PROSPECTIVE JUROR:   He never did follow my
14  orders.
15          MR. JOHNSON:    And also on page 14, when it asks
16  about your religious, political and other activity --
17          PROSPECTIVE JUROR:   Uh-huh.
18          MR. JOHNSON:    -- I see what you put down there.
19  And I am not going to -- I am going to respect, except for I
20  do have to ask you a couple of things about it?
21          PROSPECTIVE JUROR:   Okay.
22          MR. JOHNSON:    I kind of need to know if you do
23  have a religious preference, is it something that is kind of
24  considered to be a main extreme type of religious preference,
25  it is not like some cult?

106

1           PROSPECTIVE JUROR:   I say a Episcopalian and
2   My husband is Pentecostal?  We don't go to church on a regular
3   basis.
4           MR. JOHNSON:    It actually got my curiosity.  Oh,
5   my God, she is in some kind of killer cult?
6           PROSPECTIVE JUROR:   No.
7           MR. JOHNSON:    Something like that, no animal
8   sacrifice.  Now, a few questions on page four of your
9   questionnaire.  It asks you about how strongly you feel about
10  the death penalty on the scale of one to ten, and you put down
11  an eight.
12          PROSPECTIVE JUROR:   Uh-huh.
13          MR. JOHNSON:    And ten being the strongest,
14  right; you understood that?
15          PROSPECTIVE JUROR:   Yes.
16          MR. BRAUCHLE:    So eight, you have a pretty
17  strong feeling about the death penalty?
18          PROSPECTIVE JUROR:   Yes.
19          MR. JOHNSON:    I take it you have a strong
20  feeling in favor of the death penalty; is that correct?
21          PROSPECTIVE JUROR:   In certain situations, yes,
22  if everything is proven, I feel in some situations it is
23  warranted and some it is not.
24          MR. JOHNSON:    All right.  You also put down that
25  you don't think the death penalty is ever misused?

107

1           PROSPECTIVE JUROR:   From what I have read,
2   you know and seen, I don't think so?
3           MR. JOHNSON:    Another thing you put down was, it
4   asked do you think that spending a life time in prison is
5   equivalent to the death penalty?  And you put, no.  Can you
6   explain what you meant by that answer?
7           PROSPECTIVE JUROR:   In my opinion, if it is
8   proven that it was a harsh and it was intentional and the
9   person didn't care what happened to the other person, is life
10  imprison equal to the death penalty, no, it is not.  If he
11  intentional -- if it is proven that he intentionally went out,
12  said you are a police officer, bang, I am going to kill you.
13  Then, yeah, I feel that the death penalty would be probably
14  sufficient.  Until I hear the evidence, I don't know, you know
15  which way I would go.
16          MR. JOHNSON:    Okay, let me ask you this way,
17  between life imprison without parole and the death penalty,
18  which one of those two do you think is the more severe
19  punishment?
20          PROSPECTIVE JUROR:   Life imprison.
21          MR. JOHNSON:    You think life imprison is more
22  severe than the death penalty?
23          PROSPECTIVE JUROR:   Well, yeah, cause they will
24  never -- they will never be out from behind those bars if they
25  get life imprison.  But in death -- I just buried my

108

1   father-in-law yesterday, they are released.
2           MR. JOHNSON:    Okay.  All right.  I just got a
3   little bit more to talk to you about.
4           And I sympathize with you where you are.
5           One other thing you put down on the next page is asked if
6   you believe police officers are more likely to tell the truth
7   than the average person?  You put more likely?
8           PROSPECTIVE JUROR:   I believe they are more
9   likely to be honest.
10          MR. JOHNSON:    Briefly to these two special
11  issues up here.
12          PROSPECTIVE JUROR:   Yes.
13          MR. JOHNSON:    You understand that if the State
14  proved this case beyond all reasonable doubt, you get to those
15  two issues, correct?
16          PROSPECTIVE JUROR:   Yes.
17          MR. JOHNSON:    And you understand if they prove
18  to you what they have to prove in special issue number one and
19  they prove it beyond all reasonable doubt, then that's how
20  the person gets sentenced to death?
21          PROSPECTIVE JUROR:   Yes.
22          MR. JOHNSON:    So where you find yourself at that
23  point is, if you have convicted somebody of capital murder and
24  you have now decided that they are a future danger and there
25  is nothing that can be done to protect any aspect of society

109

110

1  from them, the only thing that can be done is to actually kill

2  them; you understand that's where you would be at that point?

3              PROSPECTIVE JUROR:  Yes.

4              MR. JOHNSON:  Then it asks you to go to the

5  second issue and decide on mitigating, okay.

6       You understand that's what the second issue is?

7              PROSPECTIVE JUROR:  Yes.

8              MR. JOHNSON:  What do you think of about in that

9  question that would be mitigating to you under those

10  circumstances, does anything come to mind?

11              PROSPECTIVE JUROR:  Their background, their

12  history, as a child.  I think in some situations could

13  possibly, you know, change my opinion on whether or not to

14  give the death penalty or to make it life imprison.

15              MR. JOHNSON:  Okay.  But back on page three, you

16  feel like if somebody knowingly killed a police officer, you

17  feel pretty strong that the death penalty would be something

18  you would consider and possibly give this punishment in that

19  type of case?

20              PROSPECTIVE JUROR:  It would be something that

21  I would consider, but you know I would have to see the facts.

22              MR. JOHNSON:  Okay.  All right.  You have any

23  questions?

24              PROSPECTIVE JUROR:  No, sir.

25              MR. JOHNSON:  For any of us?  Okay, well, we

1  thank you for your time?

2              THE COURT:  Thank you, Ms. Hartgrave.  You may

3  step down.

4              (Prospective juror retired from the courtroom.)

5              MR. BEACH:  The State finds Juror No. 69-E,

6  Corine Hartgrave, to be not acceptable.

7              THE COURT:  Thank you Mr. Beach.

8              MR. JOHNSON:  Judge, we would submit this juror

9  for cause based on several factors.  The first factor being

10  that she did not tell us in her questionnaire that she

11  actually was involved with law enforcement in regard to

12  transporting juvenile delinquents that are part of -- that she

13  has hidden that from us.  There is no telling what she might

14  have been hiding.

15       We submit her on the fact that she favors police officer

16  testimony over civilian testimony.  That she is very strongly

17  in favor of the death penalty.  That she does not think that

18  the death penalty is ever misused.

19       And under _Morgan v. Illinois_, she is unable to adequately

20  give meaning to the mitigation.  And on the basis of all those

21  factors and the tenor of her testimony here and the

22  questionnaire, we ask that she be struck for cause.

23              THE COURT:  Mr. Beach, any response?

24              MR. BEACH:  Judge, I think she consistently

25  indicated that she could follow the law.  There is nothing to

111

112

1  predetermine that she would have to hear the evidence no

2  matter what the issue was and she can be fair to both sides in

3  this case.

4              THE COURT:  I will deny the Defense's request.

5              MR. JOHNSON:  Well, Judge, based on that

6  erroneous ruling and the erroneous rulings previously to this

7  that we have had to use peremptory challenges on that we

8  should not have, we would respectfully request the Court to

9  give us an additional peremptory challenge to use on this

10  juror, which -- and that's Juror No. 69-E, Ms. Hartgrave.

11              THE COURT:  The Court will grant the Defense a

12  second additional strike.

13              MR. JOHNSON:  We will use that second additional

14  challenge on this juror, Judge.

15              THE COURT:  If you will bring in Ms. Hartgrave.

16              THE BAILIFF:  All rise for the juror.

17              (Prospective juror entered the courtroom.)

18              THE COURT:  You may be seated.

19       Ms. Hartgrave, we appreciate your patience.  You have

20  been excused as a juror in this case.  So you are free to go.

21              PROSPECTIVE JUROR:  Okay.

22              THE COURT:  Thank you very much.

23              (Prospective juror retired from the courtroom.)

24              (Recess taken.)

25              THE COURT:  Back on the record concerning Juror

1  10, Gene Gage.

2       What says the State?

3              MS. HANDLEY:  The State would accept this juror,

4  James D. Gage.

5              THE COURT:  What says the Defense, Mr. Johnson?

6              MR. JOHNSON:  Judge, we would submit Juror No.

7  10-G for cause, based on his answers regarding special issue

8  number one, and his opinion that probability could be as low

9  as 10 percent, which is contrary to the law.  And because of

10  his position on that, we would -- we would submit that juror

11  10-G, Mr. Gage.  We would submit him for cause and ask that he

12  be struck.

13              THE COURT:  Response by State?

14              MS. HANDLEY:  Your Honor, Mr. Gage with respect

15  to the probability after the law we explain to him, he agreed

16  that he would in fact follow the law and hold that to greater

17  than 50 percent.  And he is qualified.

18              THE COURT:  The Court holds that Mr. Gage is

19  qualified and deny the Defense's request.

20              MR. JOHNSON:  Well, Judge, based on that

21  erroneous ruling regarding Juror Gage and previous erroneous

22  rulings regarding our request for strike for cause, we would

23  ask the Court to give us an additional peremptory challenge to

24  be used on this unacceptable juror 10-G, Mr. Gage.

25              THE COURT:  The Court will deny that request.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*



1    MR. JOHNSON:   Note our exception.

2        (Pause in the proceedings.)

3        THE BAILIFF:   All rise for the juror.

4        (Prospective juror entered the courtroom.)

5        THE COURT:   You may be seated.

6    Good afternoon, Mr. Cannady.   How are do you?

7        PROSPECTIVE JUROR:   Fine, thank you.

8        THE COURT:   Apologize for the little bit of

9    delay.  Sometimes the interviews run a little longer than we

10   anticipate.

11       The attorneys have some questions to ask you regarding

12   your qualifications as a juror in this case.  There aren't any

13   right or wrong answers to the questions.  They are merely

14   trying to see how you feel about certain issues.

15       The State will proceed first.

16       And is it Ms. Handley doing voir dire?

17       MS. HANDLEY:   Yes, Your Honor.

18       May it please the Court?

19                      CURTIS CANNADY

20   was called as a prospective juror, after having been

21   previously sworn by the Court, testified under oath as

22   follows:

23                   VOIR DIRE EXAMINATION

24   BY MS. HANDLEY:

25       Let me make sure I am pronouncing your name correctly,

---

1    Cannady?

2        PROSPECTIVE JUROR:   Yes.

3        MS. HANDLEY:   Mr. Cannady, let me tell you my

4    name is Andrea Handley.  These gentlemen are Marshall McCallum

5    and Andy Beach.  We are Assistant District Attorneys and we

6    are all responsible for selecting the jury for this particular

7    case.

8        And to my left is Mr. Karo Johnson and Paul Brauchle.

9    They are defense attorneys.  They represent the gentleman

10   seated at the end of the table down there, Mr. Wesley Ruiz?

11       THE DEFENDANT:   Good afternoon.

12       MS. HANDLEY:   Mr. Cannady, let me tell what you

13   is going on.  We had you come down with a lot of people and

14   fill out this questionnaire as you recall.  And we did that

15   several weeks in a row and we accumulated hundreds and

16   hundreds of questionnaires.  Since that time, believe it or

17   not, we have read them all.  And we have called out of that

18   just a select number of individuals to come down here to the

19   courtroom to talk to on a one-on-one basis with the purpose of

20   feeling out just a little bit more about your feelings on the

21   death penalty.  Also talk to you about the criminal law a

22   little bit.  And in particular on how a capital murder case

23   works.

24       You had an opportunity to read your questionnaire, sir?

25       PROSPECTIVE JUROR:   Yes.

---

115

1        MS. HANDLEY:   Tell me is there anything that you

2    would change in your questionnaire if called upon to do that

3    again, would you expand on anything?  I know we get you down

4    here, we thrust this big survey into your hand, which is

5    probably the last thing you thought you would do and put you

6    in those uncomfortable seats out there, a lot of people kind

7    of race through it and leave some blanks.  Is there anything

8    you would expand on for us?

9        PROSPECTIVE JUROR:   There was the law in

10   Texas, voluntarily intoxication does not constitute a Defense.

11       MS. HANDLEY:   Yes, sir.

12       PROSPECTIVE JUROR:   And I checked no.  And I

13   think I should have checked yes in that one.

14       MS. HANDLEY:   So you would put that you agree

15   with that law?

16       PROSPECTIVE JUROR:   Yes, that's correct.

17       MS. HANDLEY:   Okay.  And let me just -- let me

18   narrow your focus then to -- let's go to page four.  And you

19   know we had asked you, started asking your opinions about the

20   death penalty.  And I should have put on a scale of one to ten

21   how strongly you felt about it.  And then we had some

22   questions about it with respect to Texas and our use of the

23   death penalty and you left those blank at that point.  Let me

24   feel you out a little bit about that?

25       PROSPECTIVE JUROR:   Actually I lost my place

---

116

1    and I went to the next page.  I read that, the three questions

2    that I left blank, do you feel the penalty in Texas is too

3    often or too seldom used?  And on that I would say it is -- I

4    really don't feel that either too often or too seldom.

5    Because all the cases are on an individual basis and so, you

6    know it is -- if that's the way it works out, that's the way it

7    is.

8        MS. HANDLEY:   You are confident for whoever who

9    may have received the death penalty, it was proper for that

10   particular case then?

11       PROSPECTIVE JUROR:   In most -- yes.

12       MS. HANDLEY:   Okay.  And I will tell you reading

13   your questionnaire, I get that impression from you, sir, you

14   recognize and have a good appreciation that in any criminal

15   case, you always do what is right for that particular case?

16       PROSPECTIVE JUROR:   Yes, that's right.

17       MS. HANDLEY:   And in fact, you served on a

18   criminal jury before?

19       PROSPECTIVE JUROR:   Yes, I have.

20       MS. HANDLEY:   And in this case, I am thinking

21   that you found the defendant guilty of manslaughter, but the

22   Judge assessed the punishment in this case?

23       PROSPECTIVE JUROR:   That's the way --

24       MS. HANDLEY:   You weren't called upon to assess

25   punishment?

---

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

117

1 PROSPECTIVE JUROR: That's correct.
2 MS. HANDLEY: Okay. Let me -- let's bring it
3 around to what we are doing here today, just so we are singing
4 off the same sheet of music, so you know where I am coming
5 from. I feel comfortable speaking for myself and -- also this
6 is Mr. Kevin Brooks, Mr. Cannady, he is going to be
7 offering -- or bringing forth the evidence in the actual case.
8 I will tell you that we have had time to look at this
9 case, and we have a single goal in mind; and that is, to get a
10 conviction of capital murder against the defendant in this
11 case and to go one step further and to secure an assessment of
12 death penalty versus life imprison. I will tell you that's
13 what we intend to do and that is our goal. Just to let you
14 know there are no surprises about it. I tell you that, sir,
15 because I believe we have the type and quality of evidence
16 that will convince 12 people that that is the proper thing to
17 do for this particular case.
18 Not a lot of people are familiar with exactly what the
19 consequences of that are, other than kind of a vague idea.
20 But what would happen, Mr. Cannady, having returned a verdict
21 for a death sentence, at that point Judge White here, he would
22 have really no say in the matter. He can't come in and second
23 guess you or change your verdict. At that point he is called
24 upon to essentially sign a death warrant, setting a date in
25 the future for the execution of the defendant in the case. At

118

1 that point he is transferred out to East Texas.
2 Have you ever been to Huntsville, Texas.
3 PROSPECTIVE JUROR: I have been through
4 Huntsville, yeah.
5 MS. HANDLEY: A lot of people have been through
6 Huntsville. It is a way to get to Houston oftentimes. And it
7 is a town really dedicated to the study of criminal justice,
8 the housing of inmates, and it is where we carry out our
9 actual executions. He would be housed in a prison out there
10 in Livingston, Texas, until the day before his execution. And
11 on that day before, he is going to be transported from
12 Livingston, Texas to downtown Huntsville, Texas. There is a
13 very old prison system there and they call it the Walls Unit,
14 and it is where we actually carry out our executions.
15 He is going to be put in an isolated cell prior to that
16 time. And on the day of his execution, they will allow the
17 defendant to have one last visitation. He can have an
18 opportunity to visit with family if he has it, a spiritual
19 adviser, if he so incline. Whoever it is, but he has got that
20 opportunity. He would also have that opportunity for that
21 last meal that people often hear about or read about. He can
22 order whatever he wants as long as it is on the prison system
23 menu. But he would be given that last meal, and he would sit
24 there and eat that alone.
25 He would stay in that cell by himself until six o'clock,

119

1 because that's when we do executions in Texas. And at six
2 o'clock, sir, he is going to be taken from an isolated cell,
3 down a narrow hallway to what we refer to as the death
4 chamber. And whether he goes voluntarily or kicking and
5 screaming, he is going to go. Because there are people who
6 are trained to get him from one place to another.
7 He would be brought into that death chamber. It is a
8 small room. It is very industrial looking, sterile. And he
9 would be placed on a hospital bed or a gurney. And at that
10 time, they would strap him down. And another individual would
11 actually place an intravenous line into his arm.
12 In that small room on the side, there are two windows
13 there, and they both have curtains on them. Now, after he is
14 strapped down and secured with the line, these curtains will
15 open up. And on one side the defendant could have
16 representative of his family, his lawyer if he wants them
17 there, whoever he wants there to -- at that time to watch the
18 actual execution. The other side of the room when the curtain
19 pulls back, there will be five people there as representatives
20 of the victim's family.
21 Once that is done, he could make that last statement, you
22 know we often hear about that. And I am sure that you can
23 imagine, sir, over the course of the years, many things have
24 been said. Anything from I am sorry, and I beg for
25 forgiveness down to people just proclaiming their innocence

120

1 until they take their last breath. But regardless of what is
2 said, nothing is going to change at that point. And there is
3 going to come a time then once he is finished or once he is
4 cut off from having his say, that the warden is going to gave
5 a nod to another individual.
6 This person would begin to hit a series of buttons and
7 they are designed to do three things. It is going to start a
8 flow of chemicals into his vein. The first thing it does is
9 it sedates his body. Basically paralyzes him if you will.
10 The second thing that happens, it collapses his lungs. The
11 third thing that happens is ceases his heart. Whether it
12 takes four seconds, six seconds or eight seconds, as long as
13 it takes, until a medical doctor walks over and pronounces him
14 dead.
15 I don't walk you through that scenario to be morbid, but
16 to bring to the forefront what we are talking about here.
17 We are in a clean nice courtroom right now, we are all
18 being courteous to one another. It doesn't get anymore
19 serious than what we are talking about here in life and death.
20 And I paint that picture for you to make sure we are all
21 really focused on the task at hand. And what we are asking
22 you to potentially play a part in?
23 PROSPECTIVE JUROR: I understand.
24 MS. HANDLEY: Pardon me?
25 PROSPECTIVE JUROR: I understand.

121

122

1   MS. HANDLEY:   And having given you that
2   scenario, knowing in your heart, sir, the question becomes if
3   you believe we proved the case to you beyond a reasonable
4   doubt, if you are convinced the evidence points toward a
5   sentence of death versus life imprison, are you the type of
6   individual that can take part in a process that would
7   eventually caused the death of not a fictional character but a
8   man seated about 30 feet away from you?
9   PROSPECTIVE JUROR:   Yes, I could make a
10   judgment on that.
11   MS. HANDLEY:   Okay. I notice it seemed like
12   some thoughtful hesitation, and I will tell you that of the
13   people who have been selected of the jury, that's pretty much
14   the reaction that they have. Nobody is a hundred percent
15   comfortable with that. It is not an easy task and we
16   appreciate that you do have that kind of hesitation. And it
17   seems to me that you would take this very seriously. It is
18   not an easy thing to do and needs to be given some serious
19   consideration. Okay.
20   Let me talk to you just a little bit about -- let's talk
21   a little bit more about the death penalty, have your feelings
22   always been the same about the death penalty?
23   PROSPECTIVE JUROR:   Yes. I can't say that I
24   have ever changed my mind one way or the other. I have always
25   been if favor of it.

1   MS. HANDLEY:   Okay.
2   PROSPECTIVE JUROR:   Of the death penalty.
3   MS. HANDLEY:   And if you had an option to do
4   away with the death penalty then, would you not do that, you
5   say you have always been in favor of the death penalty?
6   PROSPECTIVE JUROR:   I wouldn't oppose doing
7   away with it, but -- but I still believe that if, you know the
8   crime is like I said in my questionnaire, is horrific enough
9   and if people in the right, I guess you would say, frame of
10   mind, they should know what they do, if they do a crime that
11   the death penalty is the punishment, then they should
12   understand that's what is going to happen.
13   MS. HANDLEY:   Do you think it is a deterrent to
14   others?
15   PROSPECTIVE JUROR:   It doesn't seem to be, so I
16   guess -- no, I don't.
17   MS. HANDLEY:   And then what purpose do you think
18   it serves then?
19   PROSPECTIVE JUROR:   It -- I guess we are just a
20   violent society and it is just part of our culture to, you
21   know for a person to pay the ultimate price for the ultimate
22   crime I guess you could say.
23   MS. HANDLEY:   Okay. Okay. And you understand,
24   Mr. Cannady, that the death penalty is not necessarily an
25   automatic thing that happens. It is whether or not somebody

123

124

1   receives the death penalty is a question for a jury to decide
2   based on the facts and the circumstances of the case at hand,
3   nothing is ever automatic in a capital murder case. Just
4   because an individual is found guilty of capital murder
5   doesn't mean that they automatically will receive the death
6   sentence. That is a question for the jury to decide.
7   You have been on jury duty before. So I am not really
8   going to belabor the process of how that works. I think you
9   have a real appreciation of how that works today. There are
10   fundamental laws that play into a part in any criminal case.
11   And you probably took those to task, the jury you sat in. In
12   order to be a qualified juror, you had to agree for follow the
13   law and you had to agree to assess your verdict based on the
14   evidence in the case, correct?
15   PROSPECTIVE JUROR:   Yeah.
16   MS. HANDLEY:   So when I say these things to you,
17   until a defendant is proven guilty beyond a reasonable doubt
18   by the State, you are to presume him innocent, that makes
19   sense to you?
20   PROSPECTIVE JUROR:   Yes.
21   MS. HANDLEY:   And it is a law that you would
22   agree to follow?
23   PROSPECTIVE JUROR:   Yes.
24   MS. HANDLEY:   And along that line, you would
25   always look to the State to prove this case. You would never

1   look to the defendant to prove him innocent, you will always
2   look to the State, correct?
3   PROSPECTIVE JUROR:   Yes.
4   MS. HANDLEY:   Something that you would hold to
5   us that burden also?
6   PROSPECTIVE JUROR:   Yes.
7   MS. HANDLEY:   And to prove to us beyond a
8   reasonable doubt. Reasonable doubt being a standard of proof.
9   A burden of proof, it is the highest in our system. It is not
10   preponderance of the evidence, clear and convincing. It is a
11   high burden of proof, and you would agree to hold us to that
12   highest burden of proof, would you not?
13   PROSPECTIVE JUROR:   Yes, I could do it.
14   MS. HANDLEY:   There may not be a definition to
15   beyond a reasonable doubt. Really it is at this point, what
16   you think it is. Some people say I would have to be certain,
17   I would have to be sure, I would have to be able to sleep at
18   night. That's how I know that reasonable doubt is. Suffice
19   it to say, it is the absolutely highest burden of proof.
20   And another fundamental of law is the defendant's right
21   not to testify against himself. Remain silent. If the
22   defendant chooses to exercise that constitutional right and
23   not testify in his case, then the law says you can't hold that
24   against him, you can't use that as evidence against him.
25   Is that a law that you would agree to follow in a

125

1  particular case?

2  PROSPECTIVE JUROR:  Yes.

3  MR. JOHNSON:  I guess it is worth repeating one

4  more time.  We have to prove absolutely every element in the

5  indictment to you.  Just as they had to prove to you in that

6  manslaughter case I believe it was that you sat on.  No

7  element is any less important than another, you know.  I have

8  to prove that on or about a particular date, in Dallas County,

9  Texas, the defendant did knowingly or knowingly take the life

10  of a police officer while he was in the line of duty.  He knew

11  he was a police officer, and he did it by shooting him with a

12  firearm.  Each of those elements I have to prove.  I don't get

13  credit for five out of six, but all of them, correct?

14  If I fail to carry my burden, if I fail to prove any one

15  of though offenses, his honor will instruct you that you must

16  return a verdict of not guilty.

17  You understand that also?

18  PROSPECTIVE JUROR:  Yes.

19  THE COURT:  It is a far-out example, but let's

20  say I fail to bring you any evidence whatsoever to prove that

21  it happened in Dallas County, you would agree with me that it

22  is an essential element of the indictment.  I don't think that

23  would happen.  We have had a year to get ready for this case,

24  we know our case very well.  But if we failed to prove Dallas

25  County, Texas, the Judge would instruct you that you must

1  return a verdict of not guilty.

2  And would you follow that law also?

3  PROSPECTIVE JUROR:  Yes, sir.

4  MR. BEACH:  Make you sick to your stomach,

5  probably, but it goes to your qualifications as a juror

6  your ability and willingness to follow the law.  And so it may

7  be an extreme example, but it goes to that qualification issue

8  will you follow the law, even in a far-out example like that?

9  Did you have any problems that you sat on before, basing

10  your verdict on the facts in those cases?

11  PROSPECTIVE JUROR:  No.

12  MS. HANDLEY:  And is it your agreement that you

13  would do that in this case?

14  PROSPECTIVE JUROR:  Yes.

15  MS. HANDLEY:  I will tell you, Mr. Cannady, a

16  lot of people have come in with the assumption if you find an

17  individual guilty of capital murder, that means they will

18  automatically receive the death penalty.  In fact it doesn't

19  work that way at all.  From most criminal cases.  In most

20  criminal cases you find the defendant guilty and you would go

21  back and you consider what the punishment range and things

22  such as that.  Death-penalty cases are a little bit different.

23  An individual found guilty of capital murder, they are

24  looking at one or two things going to happen.  They are going

25  to received life imprison without parole or the death penalty.

127

1  One of two things is going happen, okay, once you are found

2  guilty of capital murder.  And what we don't do, is we don't

3  have you good back there and round-table discussion, which

4  sounds better, life or death.  Instead what happens is the

5  jury in the second phase of the trial, you are presented with

6  more evidence at that time.  And you go back and you answer

7  instead a series of questions.  Based on how you answer the

8  questions will determine whether or not a defendant will

9  receive life.imprison without parole or death.

10  You with me so far?

11  PROSPECTIVE JUROR:  Yes.

12  MS. HANDLEY:  There is nothing automatic about a

13  case -- about a capital murder case.  Nobody automatically

14  receives the death sentence.  It is something that has to be

15  arrived at by a jury after deliberation and by a consideration

16  of evidence in a case.  But having said that, assuming that

17  you have found the defendant guilty of capital murder, you are

18  now going into the second phase of the trial, and you decide

19  what punishment is going to be.  And at that point what is the

20  best that you could hope for at that point?

21  PROSPECTIVE JUROR:  The best he?

22  MS. HANDLEY:  What would be the best?

23  PROSPECTIVE JUROR:  I guess it would be life

24  imprison, he wants to live as long as possible.

25  MS. HANDLEY:  The best he could hope for is life

128

1  imprison.  It's life or death at that point.  You recognize

2  that in the first part of the trial, you are to give the

3  defendant a presumption of innocence until I prove to you that

4  he is guilty beyond a reasonable doubt?

5  PROSPECTIVE JUROR:  Correct.

6  MS. HANDLEY:  Once I prove that to you, that

7  presumption goes away and you may find him guilty.

8  In the second phase of a capital murder trial, there is

9  another presumption that comes into play.  Going into the

10  second part of the trial where you decide if it is life versus

11  death, the defendant enjoys a presumption also.  And the

12  presumption is this, Mr. Cannady, the law says that at that

13  point you as a juror must presume that life imprison without

14  parole is the proper thing to do, okay.  Just because you

15  found him guilty of capital murder, doesn't mean he

16  automatically should get death.  You go in presuming that life

17  imprison is the proper thing to do.  And it goes to our burden

18  of proof once again, I am sure you could appreciate me asking

19  you to find a death sentence.  Before you do that, wouldn't

20  you want to be darn sure that was the absolute thing to do?

21  PROSPECTIVE JUROR:  Yes.

22  MS. HANDLEY:  And that's the way it should be.

23  And we are asking you to do that, so we ought to have to prove

24  to you that it is right thing to do.  Going in your

25  presumption before you heard anything from us, your

129

130

1  presumption is that life is the proper thing to do, right.
2  And it doesn't change until I convince you beyond a reasonable
3  doubt that it ought to be death.
4          PROSPECTIVE JUROR:  Yeah.
5          MS. HANDLEY:  And will you agree to do that,
6  Mr. Cannady, that even though you found him guilty of capital
7  murder, you will go into the second phase assuming that life
8  is the proper thing to do?
9          PROSPECTIVE JUROR:  Yes.
10         MS. HANDLEY:  And you will hold on to that
11 presumption until I prove to you beyond a reasonable doubt
12 that it should be different?
13         PROSPECTIVE JUROR:  Yes.
14         MS. HANDLEY:  As I said, the way you get to that
15 stage, that final conclusion by answering questions.  And the
16 first question we have you answer as a juror is actually that
17 first special issue on there.  Go ahead, if you will, take a
18 look at that and -- take a look at that and read it to
19 yourself.
20         PROSPECTIVE JUROR:  (Juror complies.)
21         MS. HANDLEY:  It is not the greatest question in
22 the world, it is not an easy one.  We often call that question
23 the future dangerousness issue.  And I will tell you this,
24 Mr. Cannady, you have gone in presuming that life is the
25 proper thing to do at this point, right?  Only until that

1  question is answered "yes", does that life sentence become a
2  death sentence.  And basically what they are calling upon
3  there, has the State proved to you beyond a reasonable doubt
4  that this defendant will probably commit criminal acts of
5  violence that would constitute a continuing threat to society.
6  If you and the other jurors answer that question "yes", he is
7  now sitting on a death sentence, that's the way you get from
8  life to death.  In order for you to answer that question
9  "yes", as you can see, evidence beyond a reasonable doubt.  In
10 order for you to answer that "yes", I have to prove to you
11 beyond a reasonable doubt that the answer to that question
12 should be "yes".
13     Does that make sense to you?
14         PROSPECTIVE JUROR:  Yes.
15         MS. HANDLEY:  Now, keeping in mind he is already
16 sitting on a life imprison, isn't it?
17         PROSPECTIVE JUROR:  Yes.
18         MS. HANDLEY:  That's where he is going to be
19 until the day he dies.  What we didn't write there, those are
20 written by the legislature for these particular cases.  And
21 when they wrote that question and they ask you to answer it,
22 what they didn't do for you was to define certain terms in
23 that question.  We already talked about the first part, beyond
24 a reasonable doubt.  That goes to my burden of proof.  And it
25 is whatever you think it is, but it is that high burden of

131

132

1  proof, right?
2      They are asking you to make a determination as to how
3  this defendant is going to act in the future.  Well, what
4  society is he in at that point where is he going to be for the
5  rest of his life?
6          PROSPECTIVE JUROR:  In prison.
7          MS. HANDLEY:  And I am sure you will agree with
8  me, when we first hear of society, I think of where I work,
9  where I go to shop, my neighbors.  That that's a society that
10 you and I live in and move around in.  And I think it is fair
11 to say that what they are contemplating there is that prison
12 could also constitute and be a society of itself, right?
13         PROSPECTIVE JUROR:  Yes.
14         MS. HANDLEY:  That within a prison you have not
15 only do you have inmates, you have a guards, you have wardens,
16 administrative personnel, teachers, doctors, nurses.  You have
17 people coming in to visit.  You got volunteers coming in to
18 put on programs.
19     So would your definition of society, could you also
20 consider that prison can also be considered a society too?
21         PROSPECTIVE JUROR:  Yes.
22         MS. HANDLEY:  Maybe a smaller society within our
23 greater society?
24         PROSPECTIVE JUROR:  Yes.
25         MS. HANDLEY:  So they are requesting you to make

1  a call on how he is going to act within the society that he is
2  in.  They start up by asking you if you think there is a
3  probability.  Well, they don't define probability for you
4  either.  That's another word that is not defined.
5      But would you agree with me that there is a huge
6  difference between something being possible and something
7  being probable?
8          PROSPECTIVE JUROR:  Yes.
9          MS. HANDLEY:  I am sure you heard that
10 expression, "Anything is possible."  No matter how outlandish
11 it would be.  Possibly I could win the lottery tomorrow.  It
12 is possible.  Is it probable, I don't know.  But with respect
13 to whether or not something is a probability, that's for you
14 to decide what that is.  Some people say that in their
15 definition, they consider it more likely than not something is
16 probable.  Or if something is probable, there is greater than
17 a 50 percent chance is what that word means is probable.
18     Do you see any different definition for probable or do
19 you have a different one?
20         PROSPECTIVE JUROR:  No.
21         MS. HANDLEY:  So you wold agree with me then, it
22 is more likely than not or at least a greater than 50 percent
23 chance?
24         PROSPECTIVE JUROR:  Yes.
25         MS. HANDLEY:  Okay.  That the defendant would

1  commit criminal acts of violence. Once again, Mr. Cannady,
2  they don't provide for you what is the other crimes. So do
3  you think it is proper the defendant would commit a
4  kidnapping? They haven't been very specific about it. They
5  just said he will commit a criminal act of violence. It is
6  for you to decide what criminal act of violence.
7      My co-counsel sitting here just minding him business
8  right now; and if I just popped him in the face and knocked
9  him out of the chair, would you consider that a criminal act
10  violence?
11      PROSPECTIVE JUROR: Yes.
12      MS. HANDLEY: Okay. Certainly violent. I would
13  tell you it is certainly an assault, something that I could be
14  held to trial for at this courthouse here. But again what
15  constitutes a criminal acts of violence is for you, Mr.
16  Cannady, to decide, okay. And they are talking about
17  probability that he would do these criminal acts and be a
18  continuing threat to what society?
19      PROSPECTIVE JUROR: Prison society.
20      MR. BEACH: In order for you to answer that
21  question "no", presumably we will bring you more evidence.
22  You can consider the circumstances of the offense that you
23  just found him guilty of. And you could consider any other
24  evidence that we brought you that may convince you to answer
25  "yes" versus "no".

1      Let me ask you, what kinds of things do you think that
2  you would have to know or see or hear on whether or not the
3  person was going to be a future danger to society?
4      PROSPECTIVE JUROR: I would need to know the
5  actions that he has done in the past. I guess in that same
6  society. You look at the way he is acting, you know around
7  the people that he is with.
8      MS. HANDLEY: Sure. A lot of people have told
9  us at times the best predictor of future activity is how have
10  you acted in the past. Was it a one-time anomaly this crime
11  he committed or has this been a pattern of criminal behavior
12  that culminated into this crime, and who is surprised by it?
13  So they look at past activity.
14      Anything else that you think would be important to you in
15  making that determination?
16      PROSPECTIVE JUROR: No.
17      MR. BEACH: And it is hard for me to put you on
18  the spot. And really there are no right or wrong answers
19  here, and I can't commit you to anything in particular. What
20  it comes down to, Mr. Cannady, you are looking to us that he
21  is going to be that future danger. And you are allowed to
22  look at the crime that he committed. And you are allowed to
23  look at any other evidence brought before you to make that
24  determination.
25      You answer that question "no", then that life sentence

1  that you think is the most proper thing to do, stays a life
2  sentence, okay. And that's it. If, however, you look at the
3  evidence and are convinced beyond a reasonable doubt that the
4  answer to that question is actually "yes", then that life
5  sentence that you presumed was the proper thing to do, has now
6  been elevated up to a death penalty. But you are not done yet.
7  at the death penalty. But you are not done yet. He has now
8  earned a sentence of death, but it is not over yet. You have
9  to answer one more question before we can make that final
10  determination. And that second question is that special
11  second issue there.
12      Go ahead and take a moment to read that to yourself.
13      PROSPECTIVE JUROR: (Juror complies.)
14      MS. HANDLEY: What do you think that question is
15  asking you?
16      PROSPECTIVE JUROR: If based on his past actions
17  that he is, ah, maybe should be spared the death penalty.
18      MS. HANDLEY: You are right on point. I believe
19  you are right on point, Mr. Cannady. That's basically what it
20  is asking you there. You know, cause keep in mind you found
21  him guilty of capital murder, right? And at this point you
22  found that, yes, he is a future danger to society, correct, so
23  he has earned his death sentence. They are going to let you
24  answer one more question right there. Look at everything now.
25  Look at all the evidence once again. Even though you found

1  him guilty of capital murder, he is a future danger to
2  society, is there something there? Is there something about
3  his character, is there something about his background, is
4  there something about his personal moral culpability or
5  blameworthiness that would warrant bringing that death
6  sentence by down to a life sentence instead. I think another
7  way of looking at it, they are going to make sure that when
8  you leave the courthouse that day you are not going to walk
9  out going, you know what, he was guilty of capital murder, and
10  yeah, he was in future danger, I agree; but there was some
11  more evidence that I thought was very compelling, that I
12  thought warranted consideration and I thought quite frankly
13  sufficient enough, mitigating enough that it should have been
14  brought back down to life. And that's basically what that
15  questions gives you, it gives you that opportunity to show
16  some mercy.
17      What they are looking at there, they are asking you to
18  find are there sufficient mitigating circumstances. I can't
19  tell you what a sufficient mitigating circumstance is. It is
20  whatever you may think it is. And I am not going to put you
21  on the spot and ask you, you know, what you think is a
22  sufficient mitigating circumstance is. You may or may not be
23  able to tell us right now. But what the question asks you,
24  and in order for you to be a qualified juror, the question is
25  this, if you, Mr. Cannady, after having found him guilty, if

137

1   you saw something in the case that you felt warranted bringing
2   that death sentence back down to a life sentence, would you in
3   fact do it?
4               PROSPECTIVE JUROR:   No.
5               MS. HANDLEY:   And why do you say no, sir?
6               PROSPECTIVE JUROR:   Because -- I look at, you
7   know the actions, the crime, you know what happened, and then
8   I just can't see, you know, having mercy or being lenient
9   after everything that has happened.
10              MS. HANDLEY:   Is it that you can't at this
11  point, you can't think of what would constitute a sufficient
12  mitigating circumstance?
13              PROSPECTIVE JUROR:   No.
14              MS. HANDLEY:   And at this point you are not
15  called upon to tell us what would be a sufficient mitigating
16  circumstance.  You haven't seen anything in the case.  We
17  can't tell you to tell us something.  It could be anything.
18  The question used to have to do more was a focus on folks with
19  retardation.  We cannot execute the mentally retarded in the
20  United States.
21      Let's say for example that you have somebody who may not
22  be academically or technically mental retarded.  They don't
23  think like you and I do.  They don't have the same mental
24  processes and appreciation for what is going on around them.
25  They are not mentally retarded, but they are pretty darn

138

1   close.  Or maybe there is something about the defendant's
2   background, maybe from the time he was born, Mr. Cannady,
3   maybe his parents abused him from the time he was born.  And
4   he was consistently and mentally and physically and sexually
5   abused.  And while that is not necessarily an excuse for
6   criminal behavior, but maybe you look at that, and you think
7   you know what, they raised him to act and be this way.  And
8   quite frankly his parents ought to be on trial with him.  It
9   doesn't mean he is not guilty and it doesn't necessarily
10  excuse it.  But it is a circumstance the maybe his personal
11  blameworthiness is not entirely his own.  Or maybe there is a
12  circumstance about the particular offense.  Maybe he is the
13  guy who stood around and tried to resuscitate the victim and
14  tried to call for help.
15      I can't get you to tell me what would be a sufficient
16  mitigating circumstance.  The question becomes this, the
17  question becomes, if you saw it, Mr. Cannady, if you looked at
18  the evidence in the case and you said, you know what, I think
19  that is a sufficient mitigating circumstance that warrants
20  bringing the sentence back down to life, the question becomes,
21  would you do it?
22              PROSPECTIVE JUROR:   I guess I would.  I don't
23  mean to sound contradicting to what I am say, but when you
24  mentioned retardation, that would be one of the main concerns.
25              MS. HANDLEY:   And not technically mentally

139

1   retarded.  There may be --
2               PROSPECTIVE JUROR:   I guess I would.  You know,
3   I would.
4               MS. HANDLEY:   Okay.  If you saw it, if you
5   thought it was sufficient and you thought it was mitigating,
6   if you saw it, then you could do it and you would do it.  But
7   telling me what it is today, is kind of hard for you?
8               PROSPECTIVE JUROR:   Oh, yeah, absolutely.
9               MS. HANDLEY:   Okay.  And it is kind of a mental
10  gymnastics what we have done here, because you have found him
11  guilty of capital murder.  You believe he is a future danger,
12  you know, but now we are asking you to do kind of a 180, and
13  say let's bring it back down to life.  But again, it is there,
14  because if that fact and circumstances exists, where
15  Mr. Cannady thinks in my heart and in my mind, I think it
16  should come back down.  And so if you saw it, then you are
17  saying that you would and you could bring that sentence back
18  down to a life sentence?
19              PROSPECTIVE JUROR:   Yes.
20              MS. HANDLEY:   Okay.  Are there any questions you
21  have of me about the process or the law.  Anything else that
22  you think that we need to know about the death penalty or what
23  we have been talking about?
24              PROSPECTIVE JUROR:   No.
25              MS. HANDLEY:   We both have an opportunity to ask

140

1   you questions.  So I am going to have these gentlemen, let
2   them have a chance to talk to you now.  Pass the juror.
3               THE COURT:   Thank you, Ms. Handley.
4       Mr. Johnson or Mr. Brauchle.
5               MR. BRAUCHLE:   Thank you, Your Honor.  May we
6   have a brief recess Your Honor?
7               THE COURT:   You may.
8       Mr. Cannady, if you will step down, we will take about a
9   ten-minute break.
10              (Prospective juror retired from the courtroom.)
11              (Recess taken.)
12              (Prospective juror entered the courtroom.)
13              THE COURT:   You may be seated.
14      Welcome back, Mr. Cannady.
15      And the Defense may proceed.
16              MR. BRAUCHLE:   Thank you, Your Honor.
17                  VOIR DIRE EXAMINATION
18  BY MR. BRAUCHLE:
19      Mr. Cannady, my name is Paul Brauchle.  And during your
20  break in the jury room, did you think of any questions or any
21  aspect of what we had talked to you about during the first
22  part of this that you wanted to ask us about?
23              PROSPECTIVE JUROR:   No.
24              MR. BRAUCHLE:   So you think you are pretty clear
25  as to what was gone over with you?

1               PROSPECTIVE JUROR:   Yes.

2               MR. BRAUCHLE:   One thing I wanted to ask you

3 about was on page 18, the last page, that's asking if you have

4 ever been convicted of a felony or any type of theft.  And

5 then it is probably not worded very well.  But it says applied

6 to you, is the above statement true and correct, and you

7 checked, no.  So --

8               PROSPECTIVE JUROR:   It's an oversight on my

9 part.

10              MR. BRAUCHLE:   We have to make sure about that.

11 We are not accusing you of anything.  And a lot of people do,

12 and I think next time we use this form, we will probably

13 change the small print there to where it is a little easier to

14 understand.  As it applies to you, you have -- the answer

15 should be, yes, then?

16              PROSPECTIVE JUROR:   That's correct.

17              MR. BRAUCHLE:   Okay.  Not a problem.

18    In regard to the previous jury trial, it was a

19 manslaughter, I believe; is that correct?

20              PROSPECTIVE JUROR:   Yes, sir, I think it was

21 vehicular manslaughter.  It was a DUI where a man was

22 convicted of driving and he ran -- he had an accident and it

23 killed a passenger in another car.

24              MR. BRAUCHLE:   Okay.  Was there -- did he cross

25 the median or anything like that, do you recall any detail?

---

1               PROSPECTIVE JUROR:   Yeah.  It was on Seagoville

2 Road, which was under construction at the time.  And he said

3 it was a barricade and a lot of bad weather and he crossed the

4 median and hit a car head on.

5              MR. BRAUCHLE:   See Seagoville is kind of in your

6 part of time, Garland; is that correct?

7              PROSPECTIVE JUROR:   Yes, sir.

8              MR. BRAUCHLE:   Do you know if he had been

9 convicted of anything like that in the past?

10              PROSPECTIVE JUROR:   According to the testimony,

11 he had prior arrests, yes.

12              MR. BRAUCHLE:   Any convictions that you

13 remember?

14              PROSPECTIVE JUROR:   I don't remember

15 convictions.

16              MR. BRAUCHLE:   Okay.  Also you are involved in a

17 lawsuit against TI for time involved with changing of

18 protective clothing; is that correct?

19              PROSPECTIVE JUROR:   Well, yes.  It is not

20 actually protective clothing.  It is just a suit to prevent

21 dust and particles and lint from entering the work area.

22              MR. BRAUCHLE:   The way-through area?

23              PROSPECTIVE JUROR:   Yes, where they produce

24 waivers, that's correct.

25              MR. BRAUCHLE:   Is that a class action?

---

143

---

1               PROSPECTIVE JUROR:   I don't know if you consider

2 it a class action.  I got a letter in the mail from some

3 people who had started the suit and they said I could enter

4 the suit, you know, because I work there.  And so I filled out

5 the questionnaire or called the number of the attorneys and

6 they sent me a questionnaire.  I filled out the questionnaire

7 and then I am participating in the lawsuit.

8              MR. BRAUCHLE:   You know how far it has gone or

9 anything?

10              PROSPECTIVE JUROR:   No.  It's for lack -- like

11 20 minutes of pay per day.  And basically it is for putting on

12 your garment before you go to work and after you go to work,

13 you are required to wear the garment; but they didn't pay us

14 to put it on.  So -- so I don't know how far it has gone.  I

15 went about six months ago to the attorneys and gave a

16 deposition in that case, but I haven't heard anymore since

17 then.

18              MR. BRAUCHLE:   Okay.  Let me just back up here

19 and go over a little bit of stuff that the State has gone

20 over.  I think if we would have stopped you after you filled

21 out this questionnaire and asked you what happens to people

22 that are convicted of capital murder in the State of Texas,

23 you would have probably said -- and this may or may not be

24 right, you would probably say those people get the death

25 penalty; would that be a correct statement?

---

144

---

1               PROSPECTIVE JUROR:   Yes.

2              MR. BRAUCHLE:   A lot of people think that's

3 true.  But you understand now from talking to Ms. Handley and

4 hearing how the system works, actually what is -- what happens

5 when you are convicted of capital murder, you get life without

6 parole; you understand that.  And only if this first special

7 issue over here is answered "yes", do you get death; you

8 understand that?

9              PROSPECTIVE JUROR:   Yes.

10              MR. BRAUCHLE:   And of course if they don't prove

11 that to you, if they don't prove enough information on that

12 special issue where you answer that "yes", the person still

13 gets life without parole.  In other words life without parole

14 is the default punishment at all stages in the trial.  If they

15 are found guilty, they get life without parole.

16    Let's just say that the Judge looks over and says, okay,

17 present the rest of your evidence in the punishment phase, and

18 they say, We don't have any.  Well, you couldn't answer any of

19 those special questions or those special issues, so the person

20 would still be the same after you found him guilty, he would

21 only get life imprison.  And I take it from your answer and

22 everything, you don't have a quarrel with that being the

23 punishment for somebody found guilty of capital murder; is

24 that a correct statement?

25              PROSPECTIVE JUROR:   Yes.

---

145
146

1    MR. BRAUCHLE:   You understand that capital
2    murder is the intentional taking of a human life without any
3    legal excuse or justification?  In other words, it is an
4    intentional murder.  I want my co-counsel dead.  I decide I
5    want him dead and I do whatever it takes to get him dead.  It
6    is a thumbnail and graphic description of an intentional
7    murder.
8        Now, then, I could kill him, do all sorts of bad things
9    to him.  Since he is not anything other than a regular
10   citizen, I could never get death.  My punishment would be five
11   years to 99 years or life; you understand that?
12       PROSPECTIVE JUROR:   Yeah.
13       MR. BRAUCHLE:   Capital murder is always murder
14   plus something else.  Killing a police officer, a fireman, a
15   child less than six, a person over 65.  It has to be murder
16   plus.  And only then can they be charged with a capital
17   murder.  And only then do these special issues come into play.
18       Look at special issue number one, you know you don't
19   answer that unless you found that the person has been found
20   guilty of capital murder.  And in regard to that question, we
21   want to ask you about probability.  And I know you have got
22   some accounting background.  And you don't know if accountants
23   have anything to do with statistics or whatever, but some
24   people say that's a probability, just means that there is a
25   chance that it will happen.  I don't know what your definition

1    would be.
2        You have any ideas to what you think probability should
3    or shouldn't be?
4        PROSPECTIVE JUROR:   The chance that it might
5    happen is a probability.
6        MR. BRAUCHLE:   Okay.  That's basically what
7    almost everybody that we talk to said.  However, the courts
8    have said that probably has to mean more than 50 percent.  See
9    because if it doesn't mean more than 50 percent, it could
10   happen or it couldn't happen.  It would just be a chance, you
11   see what I am saying?
12       PROSPECTIVE JUROR:   Yes.
13       MR. BRAUCHLE:   You say chance, we are not
14   getting on to you for it, we didn't send this question home to
15   you to think out and analyze.  Can you see that it has got to
16   mean more than 50 percent, or the word they could have used
17   there would have just been chance, and of course anything can
18   happen if there is a chance that anything can happen.  Would
19   you agree with me on that?
20       PROSPECTIVE JUROR:   Yes.
21       MR. BRAUCHLE:   Okay.  Now, then, you also see
22   that reasonable doubt is right in front of probability.  So
23   basically we think -- and the people over here don't agree
24   with the people over there.  And we can disagree as to what
25   these means because the courts hadn't ever taken time to tell

147

1    either side what they do mean.  They just said that
2    probability has to mean more than 50 percent and society can
3    mean prison society.  That's the only guidance we have.  And
4    that's not a lot when you have got all this complicated
5    questions up here?
6        PROSPECTIVE JUROR:   Right.
7        MR. BRAUCHLE:   But you understand that our point
8    of view is that reasonable doubt linked with probability, we
9    think would probably, and there we go using probably, to talk
10   about probability, that that would from our point of view mean
11   that probability would have to be higher than 50 percent if it
12   is linked with reasonable doubt.
13       Are you following me on that?
14       PROSPECTIVE JUROR:   Yes.
15       MR. BRAUCHLE:   In other words, if you are
16   finding beyond a reasonable doubt that it is going to happen,
17   we think that it should be more than 50/50 proposition.  Cause
18   see everything in there -- every question in that first issue
19   has to be proven beyond a reasonable doubt.  You know that he
20   is going to be a continuing threat.  That he is going to
21   commit criminal acts of violence.
22       See what I am talking about?
23       PROSPECTIVE JUROR:   Yes.
24       MR. BRAUCHLE:   There is about three questions
25   that you have to answer in that one question.  I don't want to

148

1    bring back bad memories, but remember high school when we used
2    to diagram sentences and break them up and all that.  Used to
3    be one of my worse nightmares, but I finally got over that.
4    You can see they are asking you more than one thing in that
5    one question.  And basically we think that the shorthand
6    version of that one question is asking you, is the person that
7    you are dealing with, the person that you just found guilty of
8    capital murder, is this person so dangerous that the only way
9    that we can control him is kill him?  You understand if you
10   answer that question "yes", that's what happens to him.  He
11   gets killed.
12       I am not miss -- I am not trying to misstate it.  Of
13   course you would have to find "yes" there, and then the next
14   special issue you would have to answer "no"; but the result of
15   that would be death.
16       You understand that?
17       PROSPECTIVE JUROR:   Yes.
18       MR. BRAUCHLE:   You think that I am stretching
19   the meaning of that first question or stretching the language
20   there by taking the point of view that is basically it is
21   asking you, is this guy so dangerous that he needs to be
22   killed?  Or can you see that in that question?
23       PROSPECTIVE JUROR:   I see it in the question,
24   yes.
25       MR. BRAUCHLE:   Pardon?

1   PROSPECTIVE JUROR:  Yes, I see that, basically.
2   MR. BRAUCHLE:  Now, then, I think Ms. Handley
3   talked to you about special issue number two.  And that -- if
4   people come down here and have questions and problems with
5   special issue number one, special issue two is a real killer.
6   In that -- that might be a poor choice of words, people have a
7   lot of trouble figuring out what they are asking for there.
8   What they are asking, and I think Ms. Handley gave you an
9   example, and it is not the only situation that could apply;
10   but somebody who is slow to learn or whatever, that doesn't
11   have the ability to control their actions or reactions as a
12   normal person would or whatever.  They are not mentally
13   retarded or whatever.  As you know from living this long in
14   life, people have a lot of different abilities to cope with
15   stress, life, what have you.
16   Would you agree with me?
17   PROSPECTIVE JUROR:  Yes.
18   MR. BRAUCHLE:  And that one right there kind of
19   takes into consideration that not everybody that is tried for
20   the death penalty has the same abilities or the same
21   background, or the same intentions.  We know that their
22   intentions have to be such that they know what they were doing
23   at the time.  But it just gives you kind of -- we call it the
24   safety net.  It says if there is some question about this
25   person and it is not addressed by special issue number one,

1   perhaps it is significant enough that we can address it in
2   special issue number two.
3   Would you agree with that?
4   PROSPECTIVE JUROR:  Yes.
5   MR. BRAUCHLE:  You have any problem with that?
6   PROSPECTIVE JUROR:  No.
7   MR. BRAUCHLE:  Some people tell us, Look, you
8   got to be crazy.  I have just decided that somebody deserves
9   to be killed and now you want me to let him off the hook.
10   Well we didn't make up this plan.  We didn't write these
11   questions and this isn't some thing that we are down here and
12   just jerking you around.  This is the system that we have to
13   work under.  And the Court tells us, look, not everything can
14   be addressed by the first question.  And there may be special
15   considerations on that that need to be considered in the
16   second question.
17   Can you do that to give effect to special issue number
18   two?
19   PROSPECTIVE JUROR:  Yes, I could listen to the
20   evidence, I guess, you call it, the evidence, opinions, and --
21   and give it consideration to and see if it would overwhelm the
22   "yes" decision on special issue number one.
23   MR. BRAUCHLE:  Well, see it is asking you a
24   whole bunch of deals.  It says circumstances of the offense.
25   That's how the murder took place.  And there may be something

151

1   about that that might be interesting or not or worthy of some
2   consideration.
3   It says the defendant's character and background.  Not
4   everybody that is tried on a criminal case have the same
5   background.  Some grow up rich, some grow up poor, some have
6   bad character, some may have good character.  You see that.
7   Then that boils down to the personal moral culpability of the
8   defendant, which means that perhaps there are things that
9   would be somewhat out of the ordinary that would apply to the
10   defendant.
11   And then the next thing it says, is there a sufficient
12   mitigating circumstance or circumstances?  See it could be one
13   or more, it doesn't tell you what it is.
14   Let me give you an example.  Let's say that Ms. Handley
15   is on trial today and for whatever reason, you like the way
16   she appeared in court.  Now, that's not, as far as I know, a
17   mitigating circumstance; but let's just say that there is
18   something that the defendant or the person in court conveyed
19   to you that made you feel less inclined to kill that person,
20   mitigating circumstance.
21   See what I am saying?
22   PROSPECTIVE JUROR:  Yes.
23   MR. BRAUCHLE:  And somehow that influenced you
24   enough that you said, yes, I could answer special issue number
25   two "yes", okay.  Let me back up and I am not trying to

152

1   confuse you on this.  You notice up there in that special
2   issue, it doesn't say beyond a reasonable doubt.  There is no
3   real burden on that.  We don't have to prove something beyond
4   a reasonable doubt nor does the State.  It's just that there
5   is something about the defendant that makes you think well, he
6   deserves a break because of this.  You can give it to him.
7   Could you do that?
8   PROSPECTIVE JUROR:  Yes.
9   MR. BRAUCHLE:  Okay.  Let me tell you something
10   else, while we are going through the briar patch of that
11   special issue.  What may change your mind or what may be
12   important to you doesn't have to be important to anybody else.
13   In other words, we don't have to have 12 people that all think
14   that Ms. Handley looked real nice in court today.  See what I
15   am saying.  In other words, one person can say, well, I
16   thought he was a good son.  Another person can say, well, I
17   thought he had a good work history.  Another person could say,
18   you know any number of things.  See where I am coming from.
19   And you don't have to sit back there and all agree, well, we
20   all 12 agree that he had a good work history, because of that,
21   we want to give him a break.  It is just whatever applies to
22   you and if it does or doesn't.  But it doesn't have to be
23   unanimous, and it doesn't have to be beyond a reasonable
24   doubt.
25   Could you put that into effect?

153

154

1            PROSPECTIVE JUROR:   Yes.

2            MR. BRAUCHLE:   Okay.  Have I confused you

3  enough?

4            PROSPECTIVE JUROR:   It is a lot of issues.

5            MR. BRAUCHLE:   Well, see, when you first look at

6  them, they look fairly easy, but if you try and figure that

7  each one of them is asking you about ten or so different

8  things and going more than one direction at the same time,

9  they become pretty complicated.  And certainly we could spend

10  a lot of time talking to people, but their minds go numb after

11  about the first ten minutes and we don't get much past that.

12  So our minds go numb after the first two or three minutes,

13  cause we have to deal with these everyday.

14        Let me talk to you real briefly about one other thing.

15  You ever heard of self-defense?

16            PROSPECTIVE JUROR:   Yes.

17            MR. BRAUCHLE:   You believe in it?

18            PROSPECTIVE JUROR:   Yes.

19            MR. BRAUCHLE:   Basically it is deals with

20  principal that you have the right to defend ourselves against

21  unlawful attack to keep ourselves alive; is that the way you

22  understand it?

23            PROSPECTIVE JUROR:   Yes.

24            MR. BRAUCHLE:   At some point self-defense could

25  or could not be raised in this case, we don't know.  To look

---

1  at it -- to look at it from the person who is claiming

2  self-defense point of view.  In other words, was I reasonable

3  in believing that I needed to act to protect myself.

4        See where I am coming from?

5            PROSPECTIVE JUROR:   Yes.

6            MR. BRAUCHLE:   It is not go ask the dead

7  person's relatives or whatever like that.  It is personal to

8  me, and it has to be whether I am acting with a reasonable

9  belief that I need to protect myself by killing someone.

10        See where I am coming from?

11            PROSPECTIVE JUROR:   Yes.

12            MR. BRAUCHLE:   And if my belief is reasonable

13  and I did act in a reasonable manner, then anybody that I kill

14  is not -- that's not murder; you understand that?  That is

15  justifiable homicide.

16            PROSPECTIVE JUROR:   Yes.

17            MR. BRAUCHLE:   So I could kill people that I

18  have a reasonable belief are trying to harm me in such a way

19  that they are trying to take my life.

20        You have any quarrel with that?

21            PROSPECTIVE JUROR:   You said you could kill

22  people that you have a -- if you have a reasonable belief that

23  they are going to take your life, I mean, what about

24  surrender, other than kill, there are other alternatives than

25  just killing someone.

---

155

156

1            MR. BRAUCHLE:   I understand that, and the law is

2  a little more complicated.  You used to have to have a duty to

3  retreat.  But I think the legislature has taken that out of

4  the law.  You know in the past if you were coming toward me

5  with a weapon or put me in fear of imminent bodily injury or

6  death, I used to have a duty to back up and retreat.  But some

7  of the changes in the law made it to where I don't have to do

8  that as much.  I don't want to get -- I don't want to spend a

9  whole lot of time on this.  I am just basically trying to see

10  if you understand that it has to be a reasonable belief on my

11  part.  In other words, I can't kill somebody because I think

12  they are a green-eyed Martian, or if they have a zap gun,

13  those would not be reasonable beliefs.  I have to have a

14  belief that I can point to at that particular time I was

15  acting in fear of my life.

16        Would that jive with what you think on self-defense?

17            PROSPECTIVE JUROR:   Yes.

18            MR. BRAUCHLE:   Okay.  Mr. Cannady, you will be

19  glad to know that I don't have any more questions for you.

20        Do you have any questions for me?

21            PROSPECTIVE JUROR:   No.

22           MR. BRAUCHLE:   Okay, thank you.

23            THE COURT:   Thank you, Mr. Brauchle.

24  Mr. Cannady, you may step down.

25          (Prospective juror retired from the courtroom.)

---

1            THE COURT:   You may be seated.

2            MR. BRAUCHLE:   Your Honor, I think that we want

3  you to tell Mr. Cannady that we will get back with him as to

4  his status.

5            THE COURT:   Put him on hold.

6            MR. JOHNSON:   Put him on ice.

7            MR. BEACH:   Judge, I think it is a real

8  probability that he is going to be on the jury, we will let

9  him know here in the next day or two.

10         (Prospective juror entered the courtroom.)

11            THE COURT:   You may be seated.

12      Mr. Cannady, there is a real probability that you will be

13  one of the jurors on this case, what we are going to do is get

14  back with you in a couple of days, and let you know.  Since

15  there is a chance that you will be on the jury, I will ask

16  that you not research this case.  If you see it on the news,

17  the media or anything like that, just don't pay any attention

18  to it until you get the official word from us.  And we will

19  let you know in about two or three days, by Friday at the

20  latest.

21            PROSPECTIVE JUROR:   Thank you.

22           THE COURT:   Okay, you are free to go today.

23           PROSPECTIVE JUROR:   Thank you.

24          (Prospective juror retired from the courtroom.)

25          (Prospective juror entered the courtroom.)

---

1      THE COURT: You may be seated.
2    Good afternoon, Ms. Conradt. How are you?
3      PROSPECTIVE JUROR: I'm fine.
4      THE COURT: I understand that you have been
5    waiting quite a little while and we apologize for that.
6    Sometimes these interviews run a little longer than we
7    anticipate. We try to schedule folks where they don't have to
8    wait so long so we appreciate your patience in that regard.
9      The attorneys for both sides have reviewed their
10   questionnaire and they have some questions with touching based
11   on your qualifications as a juror in this case, there aren't
12   any right or wrong answers, the attorneys are merely trying to
13   see how you feel about certain things.
14     What says the State?
15     MR. BEACH: May it please the Court?
16            MACEY CONRADT
17   was called as a prospective juror, after having been
18   previously sworn by the Court, testified under oath as
19   follows:
20          VOIR DIRE EXAMINATION
21   BY MR. BEACH:
22     Ms. Conradt, how are you doing. My name is Andy Beach.
23   This is Andrea Handley. We are Assistant District Attorneys
24   here in Dallas, and we are responsible for selecting the jury
25   selection phase of this capital murder case.

1      To my left are Karo Johnson and Paul Brauchle. They are
2    attorneys here in town; and they have the responsibility of
3    representing the defendant in this case, and he is the man at
4    the far end of counsel table.
5      THE DEFENDANT: Good afternoon.
6      MR. BEACH: That's Wesley Ruiz. Very
7    interesting questionnaire that you have here. Especially the
8    fact that you know two individuals that were murder victims
9    that I can confirm because I know both of the individuals that
10   kill John and Mary, both got the death penalty and have
11   actually been executed. I played basketball with at the Texas
12   Club with John back in the late 1980s, and happened to
13   actually be in the courtroom over in Fort Worth where all this
14   happened four days before it happen. It could have been me
15   just as easily as it could have been John, so very personal
16   connection in that case and saw the article recently in the
17   Morning News about the boys and just an incredible story about
18   how John's wife is raising them.
19     Did I attend any of the trial over in Fort Worth?
20     PROSPECTIVE JUROR: No, I did not.
21     MR. BEACH: How well did you know John?
22     PROSPECTIVE JUROR: I knew him well. He was my
23   Sunday School teacher. I met him at church with his wife
24   Martha, he was our first newly married Sunday School teacher.
25     MR. BEACH: Okay. And the Charles Boyd case,

159

1    the Mary Milligan case, my roommate was the prosecutor who
2    actually tried that case back in 1980, whenever that was, 7,
3    somewhere in there.
4      Did you attend any of that?
5      PROSPECTIVE JUROR: No.
6      MR. BEACH: How well did you know her.
7      PROSPECTIVE JUROR: She was a sorority sister
8    and a roommate of my sister.
9      MR. BEACH: I am going to try to tie that in,
10   your personal life experience with an answer that you gave
11   here on a questionnaire. And that is, it would be very
12   difficult for you personally to participate in a case where
13   the State was seeking the death penalty. I can guarantee you
14   that it could not have been an easy jury experience for any of
15   the 12 people that served either on the John Edwards case, the
16   Mary Milligan case. Nobody wants to ever involved in a case
17   where the State is seeking the death penalty. It is not an
18   easy thing to do. But we got to find 12 people and we got to
19   find 12 people that even though it is not going to be easy, it
20   is not going to be pleasant, it is going to be something that
21   they are going to remember the absolute rest of their life can
22   do it. If the evidence is such that the evidence compels, you
23   know, a juror -- individual juror to do it.
24     Now, we -- we have this jury almost filled. So we need a
25   couple more that are going to be able to assure the State and

160

1    the Defense and Judge White that even though it is not going
2    to be easy, they could and would be able to participate in a
3    trial where the ultimate result might be not some fictional
4    character, but the man here in the courtroom someday being put
5    to death, okay.
6      You have had a chance the last two weeks or so, I think
7    probably -- you look like a conscientious human being to think
8    more deeply now about how you feel about the death penalty.
9    And more importantly, if you are the type of individual that
10   could participate in a proceeding such as this. So as you sit
11   here right now, do you believe, ma'am, that you could
12   individually participate in a trial that may very well result
13   at some date in the future the man at the end of counsel table
14   building executed by lethal injection, if the evidence
15   compelled you to do it?
16     PROSPECTIVE JUROR: A yes or no answer?
17     MR. BEACH: We are looking for a certain answer
18   on that. Because you know yourself better than anybody else.
19   And I am asking you this because our goal in this case is
20   single-minded and single-focused; and that is, first of all,
21   we believe we have the evidence that will convince 12 people
22   that this man is guilty of capital murder exactly as charged.
23   And secondly, we believe we have the type and quality of
24   evidence that will convince that same jury that a death
25   penalty is the appropriate punishment versus any other

1    possible punishment once you are found guilty of capital
2    murder, and that's life without parole.  That's our goal in
3    this case.  So we got to make sure going in that we have 12
4    people, it may not be easy, may not be something that they
5    ever thought they would be asked to do, but something now it
6    is a reality and we are asking you could you and would you be
7    able to participate in a proceeding such as this knowing what
8    is at stake?
9            PROSPECTIVE JUROR:  Yes.
10           MR. BEACH:  I don't know how much you follow
11   the progress of the George Lott case and the Charles Boyd case
12   after the trial.  As you know now both of those individuals
13   have been executed.  So you probably have a little more --
14   maybe a little more insight about what happens after a death
15   penalty is returned by whether it is a Dallas County jury or a
16   Tarrant County jury.
17           Let me bring it through, I want to make sure you have a
18   real realization what we are talking about in this case.  If
19   we are successful in proving that this man is guilty of
20   capital murder and if we are successful in convincing 12
21   jurors that a death penalty is the appropriate punishment and
22   that jury recommends to Judge White that's what they believe
23   the evidence requires him to do, Judge White would have no
24   alternative but to accept the jury's verdict, assess his
25   punishment at death.  And at some date in the future, Judge

1    White would set an actual execution date.  On the day before
2    that execution day, they would go and get Wesley Ruiz from the
3    death row facility there in Livingston, Texas, and take him by
4    vehicle to downtown Huntsville, Texas.
5            Have you ever been down there?
6            PROSPECTIVE JUROR:  No.
7            MR. BEACH:  Right in the middle of downtown
8    Huntsville is an old prison unit call the Walls.  And that's
9    where the death penalties are actually carried out.  On the
10   date of his predetermined execution, he would be allowed to
11   see his family.  He would and allowed to see a spiritual
12   adviser, he would be given his last meal.
13           At six o'clock that night, they would come and get him
14   from that holding cell, take him down a hallway into the
15   actual death chamber.  And in the middle of that room is a
16   hospital bed.  He would be put down on that hospital bed.  He
17   would be strapped to it and intravenous lines would be run
18   into his arm.
19           Once that was all done, two curtains would be drawn back.
20   Behind one curtain, he could have up to five members of his
21   family there, and behind the other curtain, the victim could
22   have up to five members of his family there to witness the
23   actual execution.
24           The warden would give Mr. Ruiz a chance to make a final
25   statement.  Once that was done, the warden would give the

163

164

1    go-ahead.  Once that was done, a series of three drugs would
2    be introduced into his body through the I.V. line.  The first
3    to sedate him.  The second to collapse his lungs.  And the
4    third to cease up his heart.  Whether it took two or three
5    minutes or five minutes or whatever, at some point in time the
6    doctor there would go over and check on him and pronounce him
7    dead.
8            And I don't tell you that to be morbid.  And I know you
9    have had personal, emotional experiences with the capital
10   murder system here in Texas.  But I do tell you to try to
11   re-enforce in this sterile courtroom what we are talking about
12   in this case.
13           Going through all that and having said all that, does
14   that change your mine at all whether or not you would be able
15   to participate in a proceeding that could result in this man
16   being executed by lethal injection down at Huntsville down in
17   the future?
18           PROSPECTIVE JUROR:  No.
19           MR. BEACH:  All right.  Now, you are in the tax
20   business; is that correct?
21           PROSPECTIVE JUROR:  Yes.
22           MR. BEACH:  What are your hours right now?
23           PROSPECTIVE JUROR:  I have gone -- just gone
24   back to work after 16 years, so I am working 15 to 20 hours a
25   week.

1            MR. BEACH:  We anticipate that this trial, once
2    the jury is finally selected, is going to start, it looks like
3    April the 14th, that would be one day before the 15th,
4    which I don't know anything about that business, but that kind
5    of culmination of the tax season?
6            PROSPECTIVE JUROR:  It's one culmination.
7            MR. BEACH:  Well, we start April 14th, we are
8    looking at a five-to-eight-day trial, okay.  Especially during
9    the first three, four days, 9:00 to 5:00, you could go home at
10   night.  You could make phone calls during the day, that kind
11   of thing.  The only thing we really can't predict is, how long
12   a jury is going to deliberate.  They could be out 20 minutes,
13   they could be out a day in terms of reaching a verdict in this
14   case.
15           Let's say for instance that the evidence is completed,
16   the arguments are over, the jury goes out to deliberate, seven
17   o'clock at night, the jury hasn't reached a verdict in this
18   stage of the trial.  In all likelihood at that time a Judge
19   would tell them to cease their deliberations, you would be
20   taken to a hotel, okay with the other jurors.  That's a
21   possibility in this case.  Maybe one night possibly two at the
22   most.  With those representations, especially we are talking
23   about probably April 14th now through, you know 22nd,
24   23rd something like that.  Would you be able to devote your
25   full attention to a trial of that length in that time frame?

165

166

1    PROSPECTIVE JUROR:   You can promise it won't
2  start before April 14th.  If it was earlier than
3  April 14th it would really be hard and a burden on other
4  people.
5    MR. BRAUCHLE:   That's what we are looking at
6  right now.  That's almost set in stone, that's what we are
7  looking at right now, April 14th trial date, okay?
8    PROSPECTIVE JUROR:   Okay.
9    MR. BRAUCHLE:   Can you do it?
10   PROSPECTIVE JUROR:   I can, I had a tentative
11  trip that weekend, I haven't bought tickets, so ...
12    MR. BEACH:   Don't do it.  I tell you that
13  because from looking at your questionnaire.  We have looked
14  at -- we have been going through this process for about eight
15  weeks now.  And we have looked at a thousand of these things.
16  And you know if on the first page of your questionnaire you
17  had circled number one there at the bottom, that you believe
18  that the death penalty is appropriate in all murder cases, you
19  wouldn't be qualified to be a juror in this case, because that
20  is not the law here in Texas.  And I think you probably
21  understand that.  If you circled one of these bottom ones,
22  four, five or six that you don't believe in the death penalty,
23  that you could never give it or other, you wouldn't be down
24  here right now.  So I guess it is jury tough luck that your
25  opinion is consistent with what the law is here in Texas.

1  Because you and folks like you are the only people who we have
2  been talking to.  From looking at your questionnaire, your
3  opinions, aren't out in left field, they are not extreme, they
4  are pretty much right down the middle.  That's why we are
5  talking to you.  And why we are talking to you here this
6  afternoon, I am going to try to get done as quick as I can.
7    I want to let you know that there is a very real
8  possibility, probability that you might end up on this jury,
9  just looking at your questionnaire.  So I know that is
10  probably not good news to you.  But I want to really try to
11  impress upon you while I am talking to you and while the
12  Defense is talking to you, you are in the firing line.  You
13  are kind of a real possibility in this case, okay.
14    Have you ever been on a jury before?
15    PROSPECTIVE JUROR:   No.
16    MR. BEACH:   Let me ask you, ma'am, have you ever
17  felt differently about the death penalty in your adult life?
18    PROSPECTIVE JUROR:   No.
19    MR. BEACH:   Probably haven't given it a whole
20  lot of thought.  But why do you think we should have the death
21  penalty?
22    PROSPECTIVE JUROR:   I just believe that if
23  certain violent crimes are committed, that death is
24  justifiable.
25    MR. BEACH:   You answer on page two, the best

167

168

1  argue for the death penalty if a person commits a heinous
2  crime, they deserve the full punishment.  You believe in some
3  cases they deserve the full punishment for the crime
4  committed?
5    PROSPECTIVE JUROR:   Yes.
6    MR. BEACH:   You also agree with the law here in
7  Texas that again depending on the circumstances, if you murder
8  a police officer and you know that you are murdering a police
9  officer while in the line of duty, potentially that's an
10  appropriate fact situation where a death penalty may be
11  appropriate; is that correct?
12    PROSPECTIVE JUROR:   Yes.
13    MR. BEACH:   Let me tell you real quick.  It is
14  only in very limited murder fact situations here in Texas can
15  the State actually seek the death penalty.
16    If I pulled out a gun right now and shot my co-counsel
17  in the head and stood over her dead body and laughed about it,
18  that would be a horrible intentional murder.  The most I could
19  receive here in Texas would be a life sentence, okay.  Because
20  she is not one of the protected classes of individuals that if
21  you murder them, potentially you might be subjected to the
22  death penalty.  Those classes are like what we are dealing
23  with here, peace officers in the line of duty.  You kill a
24  prison guard while trying to escape from prison.  You kill a
25  child under the age of six.  You killed a person over the age

1  of 65, those are the protected classes of individuals if you
2  kill one of them, potentially you might get the death penalty,
3  or like in John's case, two or more individuals were murdered
4  in that same criminal transaction.  That elevated a regular
5  murder up to a capital murder case where the State could seek
6  the death penalty.  Or in Mary's case, she was murdered while
7  the defendant was in the course of raping her.  If you murder
8  someone while in the course of committing another very serious
9  felony, potentially that allows the State to seek the death
10  penalty.  So in your mind do you have a fairly decent
11  understanding what a capital murder is versus what is called a
12  regular murder case?
13    PROSPECTIVE JUROR:   Yes.
14    MR. BEACH:   In a regular murder case, the
15  legislature has a wide range of punishment anywhere as low as
16  five years all the way up to 99 years or life.  And to be
17  qualified in that kind of case, you just have to be able to
18  assure all the parties in the Court that before you hear the
19  evidence, your mind would be open to the full range of
20  punishment.  If you thought five years after you heard
21  everything was appropriate punishment in a murder case, you
22  could give five years all the way up to 99 years or life or
23  anywhere in between; you understand that?
24    PROSPECTIVE JUROR:   (Nods head).
25    MR. BEACH:   In a capital murder case, once you

1  are found guilty of a capital murder, there are only two
2  possible punishments, life without the possibility of parole
3  or the death penalty. I am going to guess that you have
4  fairly decent understanding of constitutional rights involved
5  in a criminal case at the first part of the trial. That is
6  the only question that the jury has to answer, whether the
7  defendant is guilty or not guilty.
8      We are talking about the State's burden of proof. We
9  have to prove our case beyond a reasonable doubt. He is
10  presumed to be innocent until we prove everything beyond a
11  reasonable doubt. If he doesn't want to testify, he doesn't
12  have to, he has a Fifth Amendment right. Judge White
13  explained those to you when you were down here two or three
14  weeks ago.
15     And do you have any issues with the basic constitutional
16  rights would come into play at the first part of the trial?
17          PROSPECTIVE JUROR: No.
18          MR. BEACH: Very quickly, what we have to prove
19  is on that half page piece of paper. Just take a second to
20  look at it. What we have to prove is on or about a certain
21  date in Dallas County, Texas, this defendant knowingly or
22  intentionally killed that peace officer by shooting him with a
23  firearm, and he committed that murder. He knew the peace
24  officer was acting in the line of duty. That's what we have
25  to prove. We have to prove everything in there.

1      Let me use kind of a farfetched example, all right. If
2  after you heard all the evidence, you go back to deliberate.
3  You don't have any questions whatsoever that we have proven to
4  you beyond a reasonable doubt that the defendant committed the
5  murder by shooting him with a firearm and he knew the
6  individual was a peace officer. But you haven't heard any
7  evidence about where it happened or worse yet, we proved to
8  you this murder happened in Kaufman County Texas. One the
9  elements we have to prove in that indictment is it happened in
10  Dallas County, Texas. Seems like a small thing. We have had
11  a year now to investigate this case, to word that piece of
12  paper anyway that we deem fit and the corresponding obligation
13  in the law is we have to prove everything on that piece of
14  paper, okay. And if that happens, it would make you and the
15  other 11 jurors sick to your stomach because you knew you were
16  letting a murderer go. And we would be fired the next day for
17  that negligence for not getting the county right. But Judge
18  White would instruct you and the other 11 jurors that you
19  would have to find the defendant not guilty because we didn't
20  prove everything that we had to.
21     Could you and would you find the defendant not guilty?
22          PROSPECTIVE JUROR: Yes.
23          MR. BEACH: It would be hard for you but you
24  would have to do it?
25          PROSPECTIVE JUROR: Yes.

171

1          MR. BEACH: At the first part of the trial, we
2  either prove it or we don't. At the first part of the trial
3  if you say by your verdict not guilty, the trial is over and
4  everybody goes home. We accept that, we accept the burden of
5  proof in this case. If we don't get the job done, he is free
6  to go, he is found not guilty. But if we do prove to you
7  beyond a reasonable doubt everything that we are required to
8  prove in that indictment, then your oath would require you to
9  find him guilty.
10     Could you and would you find this defendant guilty if we
11  proved everything the law requires to you beyond a reasonable
12  doubt?
13          PROSPECTIVE JUROR: Yes.
14          MR. BEACH: What is the effect of that? Well,
15  just like we kind of analogize it to a two-act play, ma'am.
16  At the end of act one, which that would be once you find him
17  guilty, just like that play, the curtain comes down, comes
18  down, you are at an intermission. And guess what, you don't
19  know how the play is going to end, do you?
20          PROSPECTIVE JUROR: No.
21          MR. BEACH: You are going back and watch act
22  two. That is kind of how a criminal trial is. You don't know
23  how a criminal trial is going to end just because you have
24  found someone guilty of capital murder. You have to come back
25  for act two for the punishment phase where we can present to

172

1  you additional evidence, all right. That will hopefully
2  convince you and the other 11 jurors that the death penalty is
3  the appropriate punishment.
4      Now, some folks -- and maybe the sum and substance after
5  you got done filling out that questionnaire three or four
6  weeks ago, you may have walked out of the building thinking if
7  I find someone guilty of capital murder, it is just automatic,
8  he gets the death penalty. Really the exact opposite is what
9  the law is. Simply because you find someone guilty of capital
10  murder, basically the best they are ever going to do is what,
11  life in the penitentiary without the possibility of parole.
12  It is an automatic life sentence without the possibility of
13  parole, once the jury finds the defendant guilty of capital
14  murder, life without the possibility of parole.
15     It doesn't matter if he brings peace to the Middle East,
16  he is never going to get out. Once you are found guilty here
17  in Texas, the best you will get is life without parole. Just
18  like instructed at the first part of the trial, you are to
19  presume him to be innocent. As you go into the second part of
20  the trial, the punishment part of the trial, the law basically
21  requires of you and the other 11 jurors that you are to
22  presume that a life sentence without the possibility of parole
23  is the appropriate punishment. And not until we bring to you
24  evidence that convinces you beyond a reasonable doubt that
25  that life sentence should be elevated up to a death sentence

1   are we entitled to a death penalty in this case.

2       You understand kind of the scheme and how this works in

3   that regard?

4           PROSPECTIVE JUROR:   Yes.

5           MR. BEACH:   And you understand there is nothing

6   automatic what punishment somebody is going to get because

7   they have been convicted of capital murder?

8           PROSPECTIVE JUROR:   Yes.

9           MR. BEACH:   How do we that?  How do we

10  elevate a life sentence that he is presumed to be entitled to,

11  how do we elevate that up to a life sentence?  It come by a

12  jury being confronted with and answering those two questions

13  up there.  Take just a second to read that first question to

14  yourself, okay?

15          PROSPECTIVE JUROR:   (Juror complies.)

16          MR. BEACH:   Okay.

17          PROSPECTIVE JUROR:   Okay.

18          MR. BEACH:   I think you would agree with me,

19  what the legislature has intended by asking a jury that first

20  question there, is before the State is entitled to a death

21  penalty here in Texas, the jury, the same jury is going to

22  have to come to two determinations beyond a reasonable doubt.

23  First of all, that he is guilty of capital murder, and that

24  would have been determined at the first part of trial, okay.

25      The second determination the jury is going to have to

---

1   make is basically we call it the future dangerousness

2   question.  The jury is going to have to be convinced beyond a

3   reasonable doubt that the defendant is going to be a future

4   danger, no matter what society he is going to be in, okay.

5   And not until then, not until the State proves to that jury

6   beyond a reasonable doubt that the defendant is going to be a

7   future danger, is that life sentence going to change.  The

8   only way we get a death sentence in this case is we convince

9   the jury beyond a reasonable doubt that he is going to be a

10  future danger.

11      Are you with me so far on that?

12          PROSPECTIVE JUROR:   Uh-huh.

13          MR. BEACH:   How do we do that?  We have to prove

14  to you, really there are kind of three questions in one in

15  that first special issue.  I don't know if when you went to

16  high school if they still diagrammed sentences or not.  But

17  that's kind of what you have to do on that first question, we

18  have to prove beyond a reasonable doubt, kind of three

19  subparts.

20      The first subpart is, that word probability.  We have to

21  prove to you beyond a reasonable doubt not a possibility, but

22  a probability, that's the first thing, that he will commit the

23  second thing, criminal acts of violence, and the third that

24  would constitute a continuing threat to society.  There are no

25  legal definitions for those three subparts of that first

---

1   question.  So it is going to be what you and the other 11

2   jurors determine that the words or phrases mean to you, okay.

3       Most folks tell us probability mean more likely than not.

4   If David Finfrock tells you at night it is probably going

5   to -- possibly going to rain tomorrow, you may take an

6   umbrella.  If he tells you it is a probability, you understand

7   that you will have to do some more things.  The law tells you,

8   ma'am, that the probability means it has got to be greater a

9   than 50 percent chance.  Whether that means 52 percent or

10  55 percent, whatever.  In your mind that word probability

11  would have to mean greater than 50 percent.

12      Could you give it that meaning?

13          PROSPECTIVE JUROR:   I'm sorry.

14          MR. BEACH:   Could you give it at least greater

15  than a 50 percent chance?

16          PROSPECTIVE JUROR:   I don't know why I am not

17  hearing.

18          MR. BEACH:   That word probability, could you

19  give that word probability that meaning that it is at least

20  greater than 50 percent?

21          PROSPECTIVE JUROR:   Yes.

22          MR. BEACH:   More likely than not, for the

23  greater chance, okay.

24      And from there we go to the second part of the sentence

25  diagram, would commit criminal acts of violence.  Again the

---

1   legislature -- we overword that question.  They could have

2   said commit additional murders or rapes or robberies.  They

3   used that general phrase, criminal acts of violence.  Again

4   there is no legal definition for that phrase, it is going to

5   be what you believe it to mean and what the other 11 jurors

6   believe it to mean.  We have to convince you beyond a

7   reasonable doubt that it is more likely than not that he will

8   continue to commit criminal acts of violence.  That tells you

9   what?  Constitutes continuing threats to society.

10      And that last word, society, I want to talk to you about

11  it.  The legislature again contemplates that the jury's

12  definition of that word society is going to be broad enough to

13  include the society that he is going to be in once he is found

14  guilty of capital murder.  What society is that, where is he

15  going to be the rest of his life once he is convicted of

16  capital murder?

17          PROSPECTIVE JUROR:   In prison.

18          MR. BEACH:   In prison, yeah.  So your definition

19  of that word society, obviously when you first see it, you

20  think your church, your neighborhood, where you go to work,

21  the grocery store, again you have to keep it in context to

22  where he is going to be the rest of his life, unless he

23  escapes, and that's going to be prison society.  And you would

24  be entitled to hear evidence about prison society.  What it

25  encompasses, what it includes.

---

1  You will agree with me that there are other classes of
2  individuals in prison society than inmates; is that true? You
3  got the guards, you got the administration, medical personnel,
4  visitors coming in and out of prison, the whole society within
5  itself. And you would be entitled to hear evidence about what
6  at that society consisted of and the opportunity to be violent
7  in that society.
8      And would you consider that type of evidence, ma'am?
9          PROSPECTIVE JUROR:  Yes.
10         MR. BEACH:  What kind of evidence would be
11 important to you, ma'am, to help you make that determination
12 as to whether or not someone would be a future danger to
13 society, other than the facts of the crime that you found him
14 guilty of?
15         PROSPECTIVE JUROR:  When you were talking
16 about society and that?
17         MR. BEACH:  No, I was talking in general for
18 that question. What would help you make that determination
19 whether someone in all probability would be a future danger?
20 Most folks tell us they want to hear about how the defendant
21 led his life prior.
22         PROSPECTIVE JUROR:  Yeah, any history.
23         MR. BEACH:  His history, absolutely. Would that
24 be important to you, would you be able to consider that kind
25 of evidence?

1          PROSPECTIVE JUROR:  For some reason I was
2  thinking you couldn't consider that kind of evidence. But
3  that's what I would want to know.
4          MR. BEACH:  Once an individual was found guilty
5  of a crime. At the punishment phase of the crime, you would
6  be able to hear basically how he has lived his entire life.
7  Anything the Judge deemed relevant, you would be able to hear
8  and the State is entitled to bring you that kind of evidence.
9  And you think that would be important to you; is that correct?
10         PROSPECTIVE JUROR:  Yes.
11         MR. BEACH:  You would want to know if this
12 capital murder is obviously as violent and as serious as it
13 was, you would want to know was this just an aberration, was
14 it just some kind of complete break in the way this individual
15 has led his life up until that day, does everything kind of
16 conspire and emerge into that one horrible act, or would it
17 help you to know it was just a part of a pattern in his life,
18 he has been a criminal basically his entire life and this is
19 predictable and no one should have been surprised this
20 happened; is that correct?
21         PROSPECTIVE JUROR:  Yes.
22         MR. BEACH:  The bottom line, ma'am, is we have
23 to prove it to you. You have to look to us to prove to you
24 question number one should be answered "yes" before you could
25 answer "yes".

1  You understand that?
2          PROSPECTIVE JUROR:  Yes.
3          MR. BEACH:  It is our burden just like at the
4  first phase of the trial, it is our burden to prove everything
5  to you in this indictment. It is our burden to prove to you
6  that question number one should be answered "yes" before you
7  could answer "yes".
8      You with me?
9          PROSPECTIVE JUROR:  Yes.
10         MR. BEACH:  All right. Really, like we talked
11 about, as you go into question number one, you are to presume
12 that a life sentence is the appropriate punishment. Basically
13 like you spray painted a big "no" at the bottom of that
14 question, it is not until we bring to you evidence to prove to
15 you beyond a reasonable doubt that "no" should be erased are
16 we entitled to a "yes", okay. You got to look to us to do
17 that.
18     What is the effect of a "yes" answer to question number
19 one. Well, at that point in time, what has happened? The
20 first part of the trial, the jury has found the defendant
21 guilty of capital murder and now they have been convinced
22 beyond a reasonable doubt this same defendant is going to be a
23 future danger to society. Once that happens, at that phase of
24 the trial, the State would be entitled to a death penalty. At
25 that point the State has elevated that life sentence up to a

1  death sentence because you have found not only is he guilty of
2  capital murder, but he is a continuing threat to society.
3      You with me?
4          PROSPECTIVE JUROR:  Yes.
5          MR. BEACH:  Is the play over yet? Not quite.
6  You got one more question to answer before the final curtain
7  comes down. And that's that second special issue. Take just
8  a second to read that to yourself?
9          PROSPECTIVE JUROR:  (Witness complies.)
10         MR. BEACH:  All right. That one is a little
11 trickier, especially that phrase personal moral culpability,
12 mitigating circumstance. But like we paraphrased the first
13 question, would be kind of the future dangerousness question.
14 The second question we characterize it as the safety-net
15 question or the safety-valve question. You have to
16 understand, ma'am, when you get to that question, now the
17 defendant is sitting on a death sentence. He has earned a
18 death sentence in the mind of the 12 jurors. But the
19 legislature, I believe, with this question is contemplating
20 before that death sentence is etched in stone for all time,
21 they want that same jury to go back, look at all the evidence
22 in this case. Look at his background, his character, the way
23 he was brought up, his mental capabilities, the facts of the
24 offense. And if there is a sufficient mitigating
25 circumstance, if there is something in the evidence that to a

181

182

1 jury's mind convinces them that there is something
2 sufficiently mitigating that lessens his moral blameworthiness
3 or reduces his personal moral culpability to the point where
4 they believe that even though he has earned a death sentence,
5 a life sentence out of mercy is the appropriate punishment.
6 And this questions gives them the right to do that; you
7 understand that?  That's why we call it the safety-net
8 question.
9       Folks sitting up there where you are sitting have told
10 us, you know, his family background may potentially be a
11 mitigating circumstance, again depending on the facts.  If you
12 hear evidence from the age of two on, you know the defendant
13 was kept in a closet by his parents, tortured, physically and
14 sexually abused, basically had no chance in life, even though
15 he is a convicted capital murderer and even though he is going
16 to be a future dangerousness, that might be one of those
17 sufficient mitigating circumstances that would cause me out of
18 mercy to take that death sentence back to a life sentence.
19       Some folks have told us -- again we can't execute
20 mentally retarded folks in this country, okay.  There are some
21 folks right on the cusp of mental retardation.  Very low I.Q.,
22 mental issues that don't amount to insanity, but have mental
23 issues.  Again that could be a sufficient mitigating
24 circumstance again that could convince that individual juror
25 to take the death sentence back to a life sentence.

1       We can't commit you to any mitigating circumstance.  But
2 ma'am, could you, if you were of the mind after you did that
3 review of the evidence one last time, was something
4 sufficiently mitigating in this defendant's background, his
5 character, the facts of the offense, even though you believed
6 the defendant earned a death sentence, could you take that
7 death sentence back to a life sentence if you were convinced
8 that was the appropriate thing to do under the evidence?
9       PROSPECTIVE JUROR:   Yes.
10       MR. BEACH:   It's hard to talk, you know
11 hypotheticals and theoreticals right now.  But you get the
12 gist of what that question is giving you the opportunity to
13 do.  Basically it is giving you the opportunity to show mercy
14 even though you believe the defendant is worthy of a death
15 penalty, they are a convicted capital murderer now, they are a
16 future danger now; but you believe that there is something
17 there that justifies to your way of thinking in this one case
18 life is more appropriate than death, that question there is
19 giving you the opportune to do that.  And could you and would
20 you do that if you were convinced that was the right thing to
21 do?
22       PROSPECTIVE JUROR:   Yes.
23       MR. BEACH:   I have been doing a lot of talking,
24 I appreciate you staying with me.  Is there anything that I
25 confused you on, anything about your responsibility as a juror

183

184

1 in this case that you think we need to know about or you have
2 any questions?
3       PROSPECTIVE JUROR:   No.
4       MR. BEACH:   I appreciate you coming down here,
5 ma'am.  Thank you very much.
6       THE COURT:   Thank you, Mr. Beach.
7 Ms. Conradt do you need a break first?
8       PROSPECTIVE JUROR:   If I can just get a drink of
9 water real quick.
10       THE COURT:   Let's take a five-minute break.  We
11 will be in recess.
12       (Recess taken.)
13       (Prospective juror entered the courtroom.)
14       THE COURT:   Mr. Johnson or Mr. Brauchle, you may
15 proceed.
16       MR. BRAUCHLE:   Thank you, Your Honor.
17       **VOIR DIRE EXAMINATION**
18 BY MR. BRAUCHLE:
19       Ms. Conradt, I have been introduced to you.  My name is
20 Paul Brauchle.  And I don't think I am going to take as much
21 of your time as the State did.  Not because we think what we
22 have got to say is less important, but I don't think you want
23 to hear it over and over again.
24       Let me just ask you about a couple of things.  You say
25 that your sister was the roommate of that woman that you knew

1 that got killed; is that correct?
2       PROSPECTIVE JUROR:   Not while she was killed, in
3 college, this was after college, but they had been roommates
4 in college.
5       MR. BRAUCHLE:   They had been roommates in
6 college?
7       PROSPECTIVE JUROR:   Not at the time.
8       MR. BRAUCHLE:   When she lived here in Dallas?
9       PROSPECTIVE JUROR:   No.
10       MR. BRAUCHLE:   Have you thought about anything
11 that Mr. Beach talked to you about or any of your answers or
12 anything like that in regard to the questionnaire of what we
13 have talk to you about?
14       PROSPECTIVE JUROR:   Do I have any more
15 questions.
16       MR. BRAUCHLE:   You went back, you got off the
17 stand and went back and got some water, I hope, and I was
18 just wondering if you thought of something you may have
19 answered wrong or you may have a question about or anything
20 like that?
21       PROSPECTIVE JUROR:   There was little thing that
22 I answered wrong, I went back and looked back.  I didn't put
23 my husband's name, things like that.  He has been on a jury
24 before, I didn't know it, when asked him.
25       MR. BRAUCHLE:   You know what kind of jury he was

185

186

1    on?
2                PROSPECTIVE JUROR:   It was -- I don't know.   It
3    was theft or something, it was don't in three hours, I don't
4    know what it was.
5                MR. BRAUCHLE:   You say he was down here three
6    hours?
7                PROSPECTIVE JUROR:   The trial was about three
8    hour was what he said.   When I asked him.
9                MR. BRAUCHLE:   Okay.   So it wasn't such a great
10   period in his life, you didn't need to talk about it?
11               PROSPECTIVE JUROR:   I didn't even know about it
12   so.
13               MR. BRAUCHLE:   Let me just ask you, Mr. Beach
14   was talking to you about having to prove all of the elements
15   of the indictment beyond a reasonable doubt.   We used the
16   example of the county, because that's kind of easy for jurors
17   to understand and to get a grip on.   And I know when he asked
18   you if you could find somebody not guilty because the State
19   had proven either the wrong county or had not given you any
20   information as to which county it occurred in, you kind of
21   hesitated.   I was wondering if you had a problem with that
22   concept or if you didn't understand what he was asking you or
23   what?
24               PROSPECTIVE JUROR:   I guess I am just not used
25   to being in a room with this many people looking at me, and I

1    just want to make sure I understand and just -- I don't know,
2    it is very intimidating to me.   And I was just thinking about
3    the question and could I do it and --
4                MR. BRAUCHLE:   Well, basically what the gist of
5    it means is that if you find that the State didn't prove one
6    of the elements of the indictment, whichever one or more of
7    them, basically the person on trial in theory would be getting
8    on the elevate with you and the other jurors because the State
9    would have failed to prove him guilty.   And a lot of people
10   say, Well, something like the county, that's just a
11   technicality, if I knew the guy did what he was charged with,
12   it was just because some prosecutor overlooked something or
13   didn't know how to get it in evidence or whatever, I couldn't
14   in good conscience go back and tell my friends and family in
15   the neighborhood that I let somebody go simply because the
16   people at that table over there weren't smart enough or
17   weren't equipped enough to get in what county it happened in.
18   And I just wondered -- say you seemed to hesitate, I was just
19   wondering if you had any problem with that.   I know we all
20   have a problem in theory, we wouldn't want to see it happen.
21   But we also have to be able to say, well, if it did happen, I
22   could follow the Judge's instructions and I could vote the
23   person not guilty, could you do that?
24               PROSPECTIVE JUROR:   Yes.   I mean I believe the
25   law, you know, comes before human error, I guess.   And you

187

188

1    can't start picking and choosing, so it would be difficult.
2                MR. BRAUCHLE:   Well, we realize that it would be
3    very difficult.   But it is like you say, we can't say the
4    county is not important but this is important.   It's
5    unfortunately all of them have equal importance.   They may not
6    seem like it, but we have to give they all equal importance
7    whether we like it or not.   But you can live with that, right?
8                PROSPECTIVE JUROR:   Yes.
9                MR. BRAUCHLE:   Okay.   You also understand that
10   that kind of goes to the linchpin of everything that State has
11   to prove.   They have to prove each and everything that is in
12   the indictment, in these questions.   Well, in the first
13   question.   And in any other part of the trial beyond a
14   reasonable doubt; you understand that?
15               PROSPECTIVE JUROR:   Yes.
16               MR. BRAUCHLE:   And that burden always remains
17   with them, and the people at this table have no burden of
18   proof.   We don't have to prove anything did or didn't happen
19   beyond a reasonable doubt.   They always have to prove that it
20   happened beyond a reasonable doubt.   All right.
21          You think that's an unfair burden for the State to have
22   to do that?
23               PROSPECTIVE JUROR:   I mean I guess I don't think
24   it matters, it's the law, and you know, it does seem sort of
25   unfair that one side has to and the other doesn't.   It's the

1    law, I understand that part of it.
2                MR. BRAUCHLE:   So it is nothing that would cause
3    you any problems on any level, right?
4                PROSPECTIVE JUROR:   It is not a problem -- I
5    mean, at any level, yes, I mean emotionally, but in applying
6    the law, no.
7                MR. BRAUCHLE:   Okay.   Now, then, as Mr. Beach
8    told you, most people think that after they fill out the
9    questionnaire, think that the automatic sentence for somebody
10   found guilty of capital murder is death.   And he explained to
11   you in fact that the automatic sentence is life imprison
12   without parole.   And only if special issue number one is
13   answered "yes" and if special issue number two is answered
14   "no", does death result.
15          And I think you understood that, said you didn't have any
16   problem with that; is that correct?
17               PROSPECTIVE JUROR:   Yes.
18               MR. BRAUCHLE:   You understand that basically the
19   way this system is set up, life without parole is always the
20   default punishment?   In other words, if the State fails at any
21   step of the punishment phase, life without parole is what
22   results.   So it always -- they never get better than life
23   without parole.   It is not like if the State doesn't prove
24   something in either of these two issues, they don't go home
25   like they would in the first part of the trial.   But they

189

1 could never get better than life without parole.

2 Let me talk to you briefly about special issue number

3 one. The word up there probability, that we have been advised

4 by the Courts has to mean more than 50 percent. And I guess

5 you can see that if it was 50/50, that means it really

6 wouldn't be much of a question, because it could happen or

7 couldn't happen, there is no signing of the eventuality or the

8 chance or whatever that it would happen. We would like to

9 think, though, with the Courts telling us that it is at least

10 50 percent, you notice that right in front of it, is the

11 reasonable doubt, beyond a reasonable doubt that the State has

12 to prove.

13 And we are asking you if in looking at that, when you see

14 that probability is in close proximity of reasonable doubt,

15 would that make you think -- or would that make you look to

16 the numerical assignment or the numerical quantification for

17 probability or would that make it higher than 50 percent, and

18 if it does, would it be very much higher, can you follow that?

19 PROSPECTIVE JUROR:  I done know if it is late or

20 what, but not really.  Are you saying just a reasonable doubt

21 make it?

22 MR. BRAUCHLE:  Well, you see that they have to

23 prove it beyond a reasonable doubt that there is a

24 probability?

25 PROSPECTIVE JUROR:  Right.

190

1 MR. BRAUCHLE:  Now, a probability only means

2 50 percent, we would think that most people would think

3 reasonable doubt means more than 50 percent.  I would think

4 that if the State had to prove a criminal case to you beyond a

5 reasonable doubt, that it would have to be something more than

6 a 50/50 chance that the person is guilty, would you agree with

7 me on that?

8 PROSPECTIVE JUROR:  Yes, I mean if that -- yeah.

9 MR. BRAUCHLE:  Okay.  So I guess what I am

10 asking, and I am not doing it very well, but I am asking if

11 the fact that reasonable doubt is the criteria for that

12 question, does that raise probability in your mind to a level

13 greater than 50 percent?

14 PROSPECTIVE JUROR:  I guess I just wouldn't

15 think of it that way.

16 MR. BRAUCHLE:  How would you think of it?

17 PROSPECTIVE JUROR:  I don't know.  I am just

18 looking at is there a reasonable doubt that is greater than

19 50 percent.  If it is 51 percent it is still 51 percent and I

20 have already come to the conclusion that I do or don't have a

21 reasonable doubt about that.

22 MR. BRAUCHLE:  Okay.  So you could be satisfied

23 beyond a reasonable doubt that there is a probability the

24 defendant would commit criminal acts of violence in the future

25 and it would constitute a continuing threat to society and

191

1 probability in that question could mean as little as

2 51 percent for you?

3 PROSPECTIVE JUROR:  Yes.

4 MR. BRAUCHLE:  Would it ever mean more than

5 51 percent?

6 PROSPECTIVE JUROR:  It could, yes.

7 MR. BRAUCHLE:  Okay.  Let me ask you this about

8 question number one.  For all the twist and turns and

9 reasonable doubt and probability and continuing threat to

10 society and all the phrases that are involved in there, would

11 you agree that basically what that question is asking you is,

12 is this person so dangerous that the only way that we can

13 control his future behavior is by killing him?

14 PROSPECTIVE JUROR:  I don't want to reword what

15 you said, I look at it like I said that's the law if I

16 determine that's that probability, then the law allows that.

17 So I would guess, yes, I agree with what you said then.  He is

18 going to be so dangerous that that would be --

19 MR. BRAUCHLE:  Well, you see that whole question

20 goes on that he is going to commit criminal acts of violence

21 and those criminal acts are going to be such that they will

22 constitute a continuing threat to society.  So it is not -- it

23 is not saying, well, it may be to you, we don't know, they are

24 not saying it is an isolated incident because he is going to

25 be a continuing threat to society.  So they are asking you to

192

1 predict what we call that question is the future dangerousness

2 question.  Is he going to be a danger in the future?  If he

3 is, you answer that "yes".  You understand he gets death.  If

4 you don't think that he is going to be a danger in the future,

5 he gets life without parole.  So I guess that was -- that's

6 the question I have in regard to trying to simplify special

7 issue number one.

8 You see it that way?

9 PROSPECTIVE JUROR:  Would you say again?

10 MR. BRAUCHLE:  I don't think I can, ma'am.

11 PROSPECTIVE JUROR:  Just part -- yes, I agree

12 with that, because they would be a continuing danger -- a

13 continuing threat, then, yes, that's appropriate punishment.

14 MR. BRAUCHLE:  Okay, let me back up and do it

15 real quick.  That question is asking you as we say in the

16 shorthand, are they going to be a future danger?  It is

17 conceded that they were a danger at the time they committed

18 the act.  But we are trying to predict the future.  And we are

19 trying to see are these people going to be a danger to society

20 in the future, even if they are going to be imprison.  If they

21 are going to be a danger in the future, even if they are

22 imprison, the way we can control that danger is kill them.

23 Otherwise you know that if that is answered "no", they remain

24 in prison under life without parole sentence, is that the way

25 you see that question?

1  PROSPECTIVE JUROR:  Yes.
2  MR. BRAUCHLE:  Asking you.  Do you have any
3  quarrel with that concept?
4  PROSPECTIVE JUROR:  I don't have a quarrel with
5  the concept.  It may be hard to apply.  I mean to know how to
6  apply, I guess that's what would be difficult.
7  MR. BRAUCHLE:  Let me just ask you this, you
8  think everybody that is convicted of capital murder would be a
9  danger in the future?
10  PROSPECTIVE JUROR:  If I had to answer, yes or
11  no, I would probably say, yes.
12  MR. BRAUCHLE:  Okay.
13  PROSPECTIVE JUROR:  Knowing there are some
14  different circumstances, I mean you can't apply one answer to
15  everything, but...
16  MR. BRAUCHLE:  Well, it would -- let me make the
17  question that I asked you a little bit more fair.  You
18  understand that there is a lot of different people that would
19  be found guilty of murder and the circumstances of each
20  capital murder would be different; would you agree with me on
21  that?
22  PROSPECTIVE JUROR:  Yes.
23  MR. BRAUCHLE:  And while neither side has to
24  prove the reason that somebody was murdered and the reason
25  somebody committed a capital murder, some of them might be

1  less heinous or less aggravated than others; would you agree
2  on that?
3  PROSPECTIVE JUROR:  Yes.
4  MR. BRAUCHLE:  I don't want you agreeing just
5  because it is getting late and you want to get back to
6  Coppell, but can you see the point that I am trying to make on
7  that?
8  PROSPECTIVE JUROR:  Yes.
9  MR. BRAUCHLE:  Let's go to special issue number
10  two.  I think this one may cause you a little more trouble.
11  You stated that in regard to special issue number one, that
12  that might be hard for you to apply in regard to predicting
13  the future, future danger.  In special issue number two, it is
14  kind of other worldly question.  And it asks you look, you
15  don't answer unless you have already answered special issue
16  number one that they are going to be a danger in the future.
17  Now we want you to look over all the evidence that you have or
18  haven't gotten and find if there is something about that
19  person's personal moral culpability or his character or his
20  background that makes you think that even though you may have
21  answered special issue number one "yes", that sentence of life
22  imprisonment without parole should be imposed.  A lot of
23  people sitting where you are say, That's stupid.  Why would I
24  want to let somebody off the hook if I had already determined
25  beyond a reasonable doubt that he is going to be a future

195

1  danger?  And I think it goes back to what I discussed with you
2  previously.  There is a lot of different circumstances in
3  which a murder can be committed.  There is a lot of different
4  people personality wise, intelligence wise, background wise,
5  other things that you can see may not be answered in regard to
6  special issue number one.
7  Can you see that or do you believe that?
8  PROSPECTIVE JUROR:  I believe that.  I think it
9  would be slim, but I do agree there are some circumstances.
10  MR. BRAUCHLE:  Okay.  We are not saying that
11  there are going to be a multitude of reasons one way or
12  another.
13  Mr. Beach mentioned some people that may be extremely low
14  intelligence, they can't be retarded because they can't be
15  tried if they are retarded.  You understand there are all
16  sorts of mental make up and other personal background that may
17  militate for you answering that to where it would go back.
18  Once again putting them -- answer that no doesn't let them out
19  of prison, it just put them -- it is that default, it just
20  puts them back in with life without parole.
21  You have any quarrel with that concept?
22  PROSPECTIVE JUROR:  No.
23  MR. BRAUCHLE:  If the evidence was there, do you
24  think that you could -- that you could answer that in such a
25  way that a person wouldn't get the death penalty?

196

1  PROSPECTIVE JUROR:  Yes.
2  MR. BRAUCHLE:  I take it, though, that you --
3  that would cause you quite a bit of soul-searching and fact
4  searching to come up with a "no" answer in regard to that?
5  PROSPECTIVE JUROR:  Yes.
6  MR. BRAUCHLE:  Are you telling us and our client
7  if the evidence were there, you could in fact answer that
8  question "no"?
9  PROSPECTIVE JUROR:  If the evidence was there,
10  yes.
11  MR. BRAUCHLE:  Basically that's got to be the
12  way you answer any question all the way through the trial, the
13  evidence has to be there one way or another.
14  Ma'am, I think you will be happy to know that I don't
15  have any more questions for you.  You can rest.
16  THE COURT:  Thank you, Mr. Brauchle.
17  MR. BRAUCHLE:  Thank you, Your Honor.
18  THE COURT:  Ms. Conradt, you can step down
19  again.
20  PROSPECTIVE JUROR:  Okay.
21  (Prospective juror retired from the courtroom.)
22  (Pause in the proceedings.)
23  (Prospective juror entered the courtroom.)
24  THE COURT:  Ms. Conradt, I will let you know
25  that there are no questions to be asked of you.  We are going

1  to let you go today and we will notify you by Friday if you
2  have been selected as a juror in this case.  Because there is
3  a probability that you may make it to the jury, I will ask
4  that you not research the case on the internet.  If you see it
5  on the media, just change the channel or don't read any
6  articles in the newspaper and we will let you know by Friday.
7      PROSPECTIVE JUROR:   By phone I guess?
8      THE COURT:   Yes, by phone.
9      MR. BEACH:   Unless you want to come back down?
10      PROSPECTIVE JUROR:   No, thank you.
11      THE COURT:   Thank you.
12      (Prospective juror retired from the courtroom.)
13      (Court recessed for the day.)

THE STATE of TEXAS )
COUNTY of DALLAS  )
    I, BELINDA G. BARAKA, Official Court Reporter in and
for the 194th Judicial District Court of Dallas County, State
of Texas, do hereby certify that the foregoing contains a true
and accurate transcription of all portions of evidence and
other proceedings requested in writing by counsel for the
parties, to be included in this volume of the Reporter's
Record, in the above-styled and -numbered cause(s), all of
which occurred in open court or in chambers and were reported
by me.
    I further certify that this Reporter's Record of the
proceedings truly and correctly reflects the exhibits, if any,
admitted by the respective parties.
    I further certify that the total cost for the
preparation of this Reporter's Record  was paid by the
State/Defense.
    WITNESS MY OFFICIAL HAND this the 30th day of
may , A.D., 2009.

BELINDA G. BARAKA, CSR #5028
Official Court Reporter
133 N. Industrial
Dallas County, Texas 75207

Certification Expires: 12-31-09

```
 1                    REPORTER'S RECORD

 2                    VOLUME 37 OF 59

 3               CAUSE NO(s). F07-50318-N

 4
    THE STATE OF TEXAS        )   IN THE 194TH
 5                            )
                             )
 6  VS.                       )   JUDICIAL DISTRICT COURT
                             )
 7                            )
    WESLEY LYNN RUIZ          )   OF DALLAS COUNTY, TEXAS
 8

 9

10

11       * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

12

13                    PRETRIAL HEARING

14

15       * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

16

17

18

19            On the 27th day of March, 2008, the

20  following proceedings came on to be heard in the

21  above-entitled and numbered cause before the Honorable

22  Ernest White, Judge presiding, held in Dallas County,

23  Texas:

24

25  Proceedings reported by machine shorthand method.
```

CRYSTAL R. JONES, CSR
DEPUTY OFFICIAL COURT REPORTER

```
 1              A P P E A R A N C E S

 2  Honorable Kevin M. Brooks
    ASSISTANT DISTRICT ATTORNEY
 3  SBOT NO. 03070735
    133 North Industrial Boulevard
 4  Dallas, Texas 75207
    (214) 653-3600
 5  FOR THE STATE OF TEXAS

 6  Honorable Paul Brauchle
    ATTORNEY AT LAW
 7  SBOT NO. 0291800
    4131 North Central Expressway, Suite 680
 8  (214) 742-2332
    FOR THE DEFENSE

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

CHRONOLOGICAL INDEX - VOLUME 37
PRETRIAL HEARING

MARCH 27, 2008

| | PAGE | VOL |
|---|---|---|
| Appearances........................... | 02 | 37 |
| Proceedings........................... | 04 | 37 |
| Proceedings concluded................. | 09 | 37 |

CRYSTAL R. JONES, CSR
DEPUTY OFFICIAL COURT REPORTER

1       P R O C E E D I N G S :

2       (March 27, 2008; 9:53 a.m.)

3       (Open court, defendant present, no jury)

4       THE COURT: On the record, Cause Number

5 F07-51003, State of Texas versus Wesley Ruiz. This matter

6 is set for a jury trial on April 14th. It's set today for

7 a pretrial.

8       Is there anything that either side needs to

9 address at this time?.

10      MR. BROOKS: Yes, Your Honor. The State

11 has turned over as part of the discovery to the Defense

12 today, copies of the autopsy photographs, as well as

13 statements made by this Defendant to a potential witness.

14 They have a copy of that.

15      We've also turned over amended DNA reports

16 that we received this week, as well as amended DPS

17 forensic reports that the officer received on Monday, as

18 well as a copy of the telephone call made by the Defendant

19 to another potential witness, and as well as the enhanced

20 video of the crime as it took place. It's enhanced and it

21 shows a side-by-side camera -- the view of the camera is a

22 side-by-side depiction of the offense as it took place.

23      THE COURT: Mr. Brooks, as far as items

24 that are discoverable, is there anything else that needs

25 to be turned over to the State?

---

1       MR. BROOKS: We have nothing that needs to

2 be turned over that has not been turned over, Your Honor.

3 We have another witness that we plan to interview on

4 Friday. Depending on what that witness tells us, there

5 may be other statements or evidence to be turned over.

6 But I would like the record to also show, Judge, that we

7 anticipate our investigation on this case could

8 potentially continue all the way up until the day before

9 we start trial. So potentially, there could be other

10 items that, yes, we develop as they are developed to turn

11 over.

12      THE COURT: Thank you, Mr. Brooks.

13      Any response from the Defendant or

14 questions?

15      MR. JOHNSON: Well, we'd like the record to

16 reflect that the autopsy pictures were released to us

17 today, which is about two weeks before trial. They have

18 never been released at any time before today. We had to

19 come to them hat in hand and get them this time.

20      You know, the Court put in discovery orders

21 and deadlines for a purpose. We just now hear that we're

22 going to be getting discovery dribbled up to us until

23 the date of trial. It's keeping us from being effective

24 in regard to representing our client.

25      We'd state that we would anticipate that

---

6

1 the Court order the State that anything produced from this

2 day forward not to be admissible, because they are

3 obviously in noncompliance with the Court's order, and

4 they just told the Court that they are going to continue.

5 The deadline was put in there for a purpose, and it

6 doesn't seem to have worked. We're asking that the Court

7 sanction any further exhibits or anything that they may

8 generate, discover or remember from today only.

9       THE COURT: Mr. Brooks, response?

10      MR. BROOKS: Yes, Your Honor. The State

11 has no control over when witnesses are going to come

12 forward, Your Honor. Obviously, there are some

13 individuals who know the Defendant and have been engaged

14 in activity with the Defendant, and through their

15 attorneys contact us. And the most recent person we're

16 going to talk to on Friday, that was just brought -- that

17 individual was just handed to us certain of days ago. So

18 we have no way of controlling when somebody's going to

19 come forward and say, hey, I have somebody you need to

20 talk to about this defendant. It's out of our hands.

21      MR. JOHNSON: Well, the DNA report was

22 amended, and it's file-stamped March 19th. Today, I think

23 it's the 27th, we're just now getting that. We've got

24 other things that we haven't been able to even figure out

25 what they are. They've known about the dreaded two dollar

---

7

1 bill incident for months; we're just now getting the

2 information on that. You know, and then we're getting

3 other CD's which we -- which we may or may not be able to

4 view. We've had a lot of problems with the quality and

5 the formats that the discovery has been put on. It's just

6 more of the same. And we would ask that the Court

7 sanction, do what it said it was going to do.

8       THE COURT: I will deny that request.

9       Any further?

10      MR. JOHNSON: Well, if I might be heard.

11      THE COURT: You can.

12      MR. JOHNSON: Here's a notice of a phone

13 call that was made February 17th, which is obviously over

14 a month ago.

15      And then we've got some statements that

16 were supposedly made to Carmen Delgadilio. And we don't

17 know when those were supposedly made or in what context or

18 where. You know, these -- if this person visited with him

19 or was -- made a phone call to him, they should know when

20 and where it was made. They don't give us notice of that.

21 They don't give us any notice of who the person is. And

22 why are we getting them today?

23      THE COURT: Response?

24      MR. BROOKS: Judge, the statements were

25 made pursuant to the visitations. Now, do we have

1 knowledge of the statements at the same time of the
2 visitation? No, we did not have that. The statements and
3 information was turned over once we completed our
4 investigation talking to this potential witness. And it
5 has not been since -- for example, the phone call was made
6 on February 17th. We did not have that phone call on
7 February 17th in our possession for recording. We made
8 the copies and we turned these over to Defense counsel in
9 a timely manner. And our knowledge of this evidence came
10 in after the discovery deadline. And back during the
11 hearing when that deadline was set, the State specifically
12 asked the Court for leave to continually turn over items
13 as they developed throughout the course of our
14 investigation. It's my understanding we were given the
15 leave to do so.
16            THE COURT:  We'll deny the Defendant's
17 request.
18            Anything further from either side?
19            MR. JOHNSON:  Are the recordings of the
20 conversations part of our new discovery package?
21            MR. BROOKS:  Well, Kevin, the CD that says,
22 "Louise phone calls," that's somebody else's name.  It
23 says it's from -- that's the investigator that requested
24 the copy.
25            MR. JOHNSON:  So it's just a phone call

1 from Wesley Ruiz.
2            MR. BROOKS:  There are 8 tracks on that --
3 15 tracks on that CD.  The phone call that we intend to
4 offer is on Track 8.
5            MR. JOHNSON:  I guess --
6            Do you want us to submit a written list of
7 complaints or will this suffice?
8            THE COURT:  This will suffice.
9            Okay.  And we'll address the other matter
10 next Friday.
11            MR. BRAUCHLE:  All right.
12            (Proceedings adjourned.)
13
14
15
16
17
18
19
20
21
22
23
24
25

1  THE STATE OF TEXAS   )

2  COUNTY OF DALLAS     )

3           I, Crystal R. Jones, Deputy Official Court

4  Reporter in and for the 194th Judicial District Court of

5  Dallas County, State of Texas, do hereby certify that the

6  above and foregoing contains a true and correct

7  transcription of all portions of evidence and other

8  proceedings requested by counsel for the parties to be

9  included in this volume of the Reporter's Record, in the

10 above-styled and numbered cause, all of which occurred in

11 open court or in chambers and were reported by me.

12          I further certify that this Reporter's

13 Record of the proceedings truly and correctly reflects the

14 exhibits, if any, offered by the respective parties.

15          I further certify that the total cost for

16 the preparation of this volume of the Reporter's Record is

17 included in the total cost of the transcript shown in the

18 last volume.

19          WITNESS MY OFFICIAL HAND this the 16th day

20 of February, 2008.

21

22                    _____
                      Crystal R. Jones, Texas CSR 8040
                      DEPUTY OFFICIAL COURT REPORTER
23                    Expiration Date: 12-31-10
                      P.O. Box 398381
24                    Dallas, Texas 75339

25

1                          CAUSE NO. F07-50318-M

2    THE STATE OF TEXAS              *     IN THE DISTRICT COURT

3    vs.                            *     194TH JUDICIAL DISTRICT

4    WESLEY LYNN RUIZ               *     DALLAS COUNTY, TEXAS

5

6

7    - - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9                          REPORTER'S RECORD

10                          PRETRIAL HEARING

11                      Volume 38 of 59 Volume(s)

12

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19          BE IT REMEMBERED THAT on this the 8th day of April,

20   A.D, 2008, the above-styled and -numbered cause(s) came on for

21   hearing before the HONORABLE ERNEST B. WHITE, III, of the

22   194th Judicial District Court of Dallas County, State of

23   Texas, the following is a true and correct transcription of

24   the proceedings had, to-wit:

25      (Proceedings Reported by Computerized Machine Shorthand)

_Belinda G. Baraka, Official Court Reporter_
_214-653-5803_

```
 1                      A P P E A R A N C E S

 2

 3    HON. KEVIN BROOKS
      Assistant District Attorney
 4    State Bar No. 03070735

 5

 6    HON. ANDY BEACH
      Assistant District Attorney
 7    State Bar No.  01944900

 8                              FOR THE STATE OF TEXAS

 9

10    HON. PAUL BRAUCHLE
      Attorney at Law
11    State Bar No. 02918000

12

13    HON. WILLIAM JOHNSON
      Attorney at Law
14    State Bar No.  10804500

15                              FOR THE DEFENDANT

16

17

18                              *  *  *  *  *

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
1                              I N D E X

2                                                  PAGE/VOL.

3     Proceedings - 04/08/08 ........................... 4/38

4     Reporter's Certificate ...........................   24

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

5

**P R O C E E D I N G S**

(April 8, 2008)

1  THE COURT:   This is Cause No. F07-50318, styled
2  the State of Texas versus Wesley Lynn Ruiz.  This matter is
3  set for jury trial on Monday, April 14th.  This is pretrial
4  setting to have rulings made on all the motions and address
5  any issues that need to be addressed.
6  What says the State?
7  MR. BROOKS:   State is ready, Your Honor.
8  THE COURT:   What says the Defense, Mr. Brauchle?
9  MR. BRAUCHLE:   The Defendant is ready.
10  THE COURT:   Are there any motions that need to
11  be addressed at this time?
12  MR. BRAUCHLE:   Well, I think first and foremost
13  our motion for discovery needs to be revisited.  At the time
14  that that was heard, the Court set a discovery deadline of
15  February 14th, which was -- was approaching two months ago.
16  The State has not followed in any form or fashion the Court's
17  orders in regard to providing discovery to the Defendant.  And
18  it is still dribbling in discovery.
19  Yesterday for example, they gave us 190 or a 160-some-odd
20  pages of previously unknown juvenile stuff.  That was given to
21  us yesterday, the 7th, exactly seven days before the start of
22  trial.
23  Friday, after kicking and screaming, they gave us, I

1  think, 1,600 pages of Nix's Internal Affair.  Feeling that they
2  only needed to give us one sustained Internal Affair incident
3  with Officer Nix, well, as it turns out, I have read at least
4  three that were sustained, I think it is two that were
5  sustained.  So there is -- I don't know how many.
6  We also find -- my co-counsel discovered yesterday that
7  one of the incidents in regard to Officer Nix is a car chase
8  in which the person driving the car is killed by Officer Nix.
9  Now, this is a week before the trial.  These people over
10  here talk about being kinder, gentler, open file,
11  do-what's-right-type people, and they are not any better, in
12  fact they are worse than any of their predecessors.  For us to
13  be having this hearing right now is ludicrous.  They knew
14  about Nix killing somebody when they put the tag on his toe.
15  They knew it then.  That has been well over a year.  We are
16  just now finding out about it after the Court has to order
17  that we get the discovery.  And they say, Well, we have been
18  complying.  How the hell have they been complying with
19  anything?  You know they should have given us all of this
20  stuff a long, long time ago.
21  We have got juvenile stuff we need to track down.  And I
22  think we might need to talk to some of the people in regard to
23  the killing by the officer.  I think somewhere, somewhere down
24  the line that might be relevant to this trial.  Whether it is
25  other not, we are certainly under an obligation to Mr. Ruiz to

6

7

1  have that information in a timely enough fashion that we can
2  do something with it.  And these people say, Well, we have
3  been trying to comply.  Well, you know, we have got a statute
4  that says that we don't have to give you Nix's Internal
5  Affair's stuff.  Well, I think _Brady versus Maryland_ damn sure
6  says they have to give it to us.  This is a death-penalty
7  case.  And I think that trumps any law that the police
8  association got the legislature to pass in regard to us
9  knowing what the hell is happening in our client's case.  And
10  you know for them to say, Well, we are doing what is needed.
11  We are complying with this, that and the other, it's rank
12  hypocrisy.  It is mendacity and almost anything else you want
13  to call it.  And for -- you know like I say, we shouldn't even
14  be here today.  We should be fat and happy that we can tell
15  Mr. Ruiz here that we know everything there is to know about
16  your case.  We can say with a great deal of certainty that the
17  State hasn't hid anything from us.  We couldn't say that under
18  any circumstances.  They have proven themselves to be
19  duplicitous in every turn of the wheel.  And we are down here
20  asking the Court to make that right.  They are not willing to
21  make it right, but you can.  You can give Wesley Ruiz a fair
22  trial and we are asking for a continuance.  And I don't think
23  that that should come as a surprise to anybody.
24  And if the State can look at you with a straight face and
25  tell you that they haven't done the stuff I have told you

1  about, that's fine.
2  We have another deal.  We all got together and went to
3  the crime lab a week ago today.  We were all there with Vicki
4  Hall, who assured us -- who assured us that she would have her
5  report ready for us.  We still ain't got the report.  We still
6  ain't got it.  We don't know what it says or doesn't say.
7  Now, is that our fault?  Is that our fault?  You know and when
8  we went out there, when we went out there, and this would have
9  been well over a year since the occurrence, when we went out
10  there, Vicki Hall hadn't even started testing the clothing.
11  She hadn't run test one yet.  And as far as we know, we don't
12  know what any of her tests said.
13  Now, you know, when we are trying to get stuff from them,
14  and it is kind of like a blind man on the elevator, we don't
15  know what they have got.  They should tell us what they have
16  got and give it to us; but we are having to scramble around
17  and beg and plead and then they dribble out information.  What
18  the hell was the reason for them to give us the juvenile stuff
19  yesterday, yesterday.  A week from the trial date.  What was
20  their excuse for that.  What was the excuse to fight us tooth
21  and nail over Nix's Internal Affair.  They might be
22  confidential as hell.  But it's ultimately you decide whether
23  they are relevant.  We are not trying to put them in the
24  Observer, but we need to know if they are relevant to our
25  defense of our client.  This man's life is on the line.  They

1  don't seem to care.  Other than to kill him.
2      Now, if they can speak up and rebut anything I have said,
3  power to them.  But I don't think they can.  And I think we
4  are entitled to a continuance.  And I realize that that
5  inconveniences and is an extraordinary situation, but I think
6  this case is an extraordinary situation.  I think what the
7  Court has to think about -- and I am not lecturing to the
8  Court, but I think you have to do the sniff test, is this
9  fair.  Have we been treated fairly in this case?  And I think
10  you will see that we haven't.
11      I mean, you saw the pile of stuff that we got on Friday.
12  It was sitting on top of your desk breaking down the top.  I
13  mean it was, what, over a foot tall stack of paper.  You know
14  what they unloaded, and they fought us all the way until last
15  Friday until they decided that they might comply with anything
16  in that regard.  We had to subpoena it once we figured out it
17  wasn't forthcoming from them.  You know there are other
18  things.
19      I sat up in the D.A.'s office last week with the first
20  assistant and the chief investigator and told them the false
21  that we had discovered in their -- their discovery, which of
22  course we had to go back to them about five times before we
23  ever got anything close to what we know is out there.  And
24  they promised, yeah, we will go back and we will fill in the
25  gaps.  We will find the missing audiotapes, the missing

1  channels.  Here is what their problem is.  The discovery that
2  we have got has been cleaned by someone.  And I think that
3  would have to be laid at the police department's feet.  But
4  there is no audio, we just see cars going around.  What the
5  people are saying, what is happening, it is not there.  We
6  know that it is somewhere there, though, because each and
7  every channel of police broadcast is recorded.  And you can
8  hear the dispatcher telling the officers to go to channel
9  such-and-such.  She is sitting there at City Hall or whenever
10  she has got her job and she says, Go to channel five, go to
11  channel five, go to channel 44, go to such-and-such.  That's
12  where they talked to each other.  That's where what happened
13  out there is recorded.  We don't have any of that.  We were
14  promised that.  We still haven't gotten that.  That's just one
15  of the things that, you know, that they promised and they
16  don't delivered.  I don't even know if that is set out in the
17  motion.  You know we don't have -- we don't have a complete
18  and accurate discovery as to this initial event.  And
19  that's -- how can that -- you know that is unconscionable.
20  They have had it all along.  We finally went and we said,
21  Look, we need recordings of these things.  They bring us
22  tapes.  You know when the tape starts, after the event, each
23  and every one of them starts at 5:37 on the afternoon of the
24  event.  It was over then.  It was over then.  You know, and --
25  you know, they are still not -- they are still not upping this

10

11

1  stuff.
2      Now, if the first assistant and the chief investigator
3  can't get us the discovery that we ask for and they tell us
4  that they are going to give it to us, who can, other than you.
5  You can order them.  It might get them off their dead asses to
6  do something on their cases.  I think I have said plenty, but
7  I have got a lot more to say if anybody would want to hear.
8  Thank you, Your Honor.
9      THE COURT:  Mr. Brauchle, let me warn you, I can
10  understand you being infuriated with what is transpiring, this
11  is a court of law, and I will order you to watch your
12  language.
13      Listen to the Court, cause I just noticed the motion for
14  continuance here, so if you will itemize for the Court, since
15  I haven't had time to read your motion, those items that you
16  feel that State has failed to comply with with respect to
17  discovery.
18      What are you lacking -- what have you been given late,
19  what is incomplete at this time?
20      MR. BRAUCHLE:  Well, a lot of it is set out on
21  the bottom of page one and page two in regard to the audio
22  recordings.
23      THE COURT:  So you do not have an audio?
24      MR. BRAUCHLE:  Well, we have bits and pieces.
25  It would be kind of like somebody came in and played the last

1  30 seconds of what I just said and you know that I said a
2  bunch more before that.  And you know that it was all recorded
3  somewhere, but we haven't been provided with it.
4      THE COURT:  Mr. Brooks, is there a complete copy
5  of the video having -- containing all of the audio?
6      MR. BROOKS:  Judge, I am confused as to what
7  portions counsel is referring to.  We have turned over the
8  audios that were provided to us.  My understanding what they
9  seem to believe that there are audio recording of the officers
10  once they leave their car, are engaged in the shooting.  It is
11  my understanding that the equipment does not function that
12  way.  That there are no audio recordings of the officers
13  talking to themselves during the course of the shooting.
14      MR. BRAUCHLE:  Well, there is audio recordings
15  of the officers in the chase that led up to the shooting, and
16  those are conveniently stopped when everybody goes down Bernal
17  Street.  You can't tell me that four police vehicles are
18  chasing the suspect and being totally silent about it.  And it
19  is especially convenient when the recordings all stop at the
20  same place.
21      Now, you are telling me that the police department is
22  synchronized enough to turn off all the switches at exactly
23  the same time or to start all the recordings at 5:37, I don't
24  think so.
25      THE COURT:  Mr. Brooks, your response?

12

13

1    MR. BROOKS:   Judge, the only response I can give
2  you, that's what we have.  I have repeatedly asked DPD are
3  there any more recordings, and I have been told, no.  So they
4  have what I have.
5    MR. BRAUCHLE:   On response to that, it is his
6  client.  If he can't get it out of the police department,
7  we -- you know, who can?  I can't.  They won't give us
8  anything even when we subpoena.  They come down here with
9  motions to quash.
10    Now, if he wants us to go to DPD with them and show them
11 where their recordings is bogus, that's fine, we will sit
12 there and run them all day.  We need what is on there and we
13 know they have got it.
14    If you and I are talking just like we are and then all of
15 a sudden it is put on a different channel on the court
16 reporter's recording, and she does take an audio recording, we
17 know it is recorded somewhere, all we have got to do is -- is
18 come back to her machine and figure out where it is.  That's
19 what happened on this.  The police recorded it, but they are
20 not turning it over.  If Mr. Brooks is right, they are not
21 turning it over to him, what are they hiding?  You know if
22 there is nothing there that would help us, and would help
23 them, why don't -- they would have upped it a year ago.  They
24 haven't done it, and they still haven't.  You know if he and
25 Tony Robinson don't understand what it is that we are wanting,

1  and I sat up in their office about 30, 45 minutes telling them
2  what it was, if they still don't understand, hey, I will go to
3  South Lamar and tell the police department what we want.  But
4  I don't think that's my duty.  I think that's under the motion
5  to discover.  And, you know, they haven't shown any
6  inclination to comply with that in any form or fashion, and I
7  don't see it coming now.
8    THE COURT:   Response, Mr. Brooks.
9    MR. BROOKS:   Judge for the record, in the
10 Court's file, there is filed discover notices by the State.
11 And I have -- just want to read them into the record what we
12 have provided Defense Counsel:  Irving Police offense reports
13 with a number; Garland Police offense reports with a file
14 number; Dallas Police offense report with a file number;
15 witness statements from the seven civilian witnesses to this
16 offense; the DPD investigative notes on this defendant's
17 girlfriend; his juvenile records; the P.E.S. records that we
18 had at the time; blue backs that we intend to offer during the
19 punishment phase; his school records; the examining trial
20 transcript; misdemeanor offense reports; Dallas Morning News
21 articles; his criminal history; the autopsy and hospital
22 record; as well as a separate discovery; affidavits of each of
23 the officers involved in the shooting; the grand jury
24 transcript of this defendant's mother and father; the hospital
25 records of this defendant as well as Officer Nix; the criminal

14

15

1  history again of this defendant; Dallas offense reports
2  reflecting four aggravated assault deadly weapon offenses, as
3  well as possession of a controlled substance offense; Dallas
4  Police Department crime scene report; the police diagram we
5  intend to offer in the trial; Texas Department Public Safety
6  Forensic report; correspondence by this defendant; the DNA
7  report from Southwest Institute of Forensic Sciences; five
8  Southwest Institute of Forensic Science lab reports; a photo
9  CD of this defendant's tattoos; four broadcast DVDs; seven
10 Dallas Fire Department dispatch DVDs; three Dallas Department
11 in-car DVDs; and two DVDs of the Dallas mobile data
12 transmissions; as well as other photographs of this defendant,
13 and the broadcast recordings from channel eight.
14    Additionally, Judge, in the Court's file is a file notice
15 of extraneous offenses that we intend to introduce in the
16 punishment phase of this trial.  And that notice was filed
17 back in February.
18    With respect to Ms. Hall's report, we did go out there
19 last week, Judge.  Defense Counsel had an opportunity to ask
20 her any pertinent questions he wanted to ask her about her
21 report.  And she hadn't started testing at this time.  She did
22 assure us that she would have a copy of it ready that Friday.
23 Obviously we didn't get it.  Mr. Beach talked to her this
24 morning, she is telling him that she should have it ready
25 today.

1    THE COURT:   What specifically for the record,
2  what testing are you referring to?
3    MR. BROOKS:   It's a testing of Officer Nix's
4  shirt to show whether or not metal or glass fragment on the
5  collar of his shirt.
6    THE COURT:   And what was the reason for the
7  delay in this testing?  Given the fact that this incident
8  happened roughly a year or so ago.
9    MR. BROOKS:   Judge, to be honest, it was an
10 oversight no one bothered to ask her to check to see if she --
11 if it had been submitted for testing.
12    THE COURT:   Mr. Brauchle, let me ask you --
13    MR. BRAUCHLE:   Let me say this --
14    THE COURT:   Let me ask you something first that
15 may necessitate you not asking that question.  But when you
16 get those results, what is the estimation of how much time you
17 feel you need?
18    MR. BRAUCHLE:   Once again, we don't know.  I
19 mean, if what he is saying that Vicki Hall is testing for is
20 not all of what we would want.  You know, there is a couple of
21 tests that show if there is lead presence on these articles.
22 And if they are not checking for lead presence and if they are
23 not checking the holes in the shirt for lead presence and if
24 they are not checking the bulletproof vest for the presence of
25 lead, they are not doing the full report.  So once again we

16

```
 1   might get Vicki Hall's report today and it will still be
 2   worthless.
 3           You know, how can you in any shooting case, how can you
 4   wait until the week before the trial and remember, hey, hey,
 5   we didn't have this tested. We have had Nix's clothes since
 6   they were cut off of him at the scene, but we just now
 7   remembered that that might be tested. And you know something,
 8   the reason they started testing is cause I asked them for
 9   Vicki Hall's report. And that's when they snapped that they
10   have never requested it. I had to ask them for it. They
11   didn't come to us and say, hey, I guess you noticed in going
12   through our voluminous discovery, we didn't have a Vicki Hall
13   report. Well, here is the reason, I had to go ask them for
14   it. And now they are scrambling around trying to make it up.
15           And let me ask you this, what case is Vicki Hall working
16   on that would be bigger than this? Speaking of dead asses,
17   what one would she have that she could get up off of and do
18   something that's on a bigger case than this one. This is a
19   capital murder and it has a trial date and she is now
20   starting. She told us last week, a week from today that she
21   would have the report out. And we still don't have it. And
22   we might get it today. And when we do get it, we are going to
23   find that it is going to be not a complete report.
24                   MR. BROOKS:  Judge, when I said metal fragments,
25   anything metallic, we are talking about semantics, he says
```

17

```
 1   lead and I say metal.
 2                   THE COURT:  And you still have no idea when that
 3   result -- that test result would be?
 4                   MR. BROOKS:  All I can tell you is Mr. Beach
 5   talked to her this morning, and she said she should have it
 6   today. I apologize, that's all I can tell you.
 7                   THE COURT:  And, Mr. Brooks, with respect to
 8   turning over to the Defense the juvenile records of Mr. Ruiz.
 9                   MR. BROOKS:  Judge, those were extraneous
10   offenses that were noted, the juvenile records are previously
11   turned over -- or the notice of juvenile -- strike that. The
12   juvenile records were previously turned over back in February
13   with respect to Mr. Ruiz, they have that.
14                   THE COURT:  That met the February 15th
15   deadline.
16                   MR. BROOKS:  Yes, Judge.
17                   MR. BRAUCHLE:  Well, the juvenile records
18   weren't turned over -- or some of the juvenile records weren't
19   turned over until yesterday. I think it was, 178 pages were
20   turned over yesterday.
21                   THE COURT:  Mr. Brooks, response.
22                   MR. BROOKS:  No, Your Honor, if some of those
23   records are after the February 15th date.
24                   MR. BRAUCHLE:  I note that they all are.
25                   THE COURT:  What was the reason for that not
```

18

```
 1   being turned over to the Defense by February 15th.
 2                   MR. BROOKS:  They are records that went back
 3   through the Irving Police Department to -- double checked
 4   Mr. Ruiz's file and they turned that over to me.
 5                   THE COURT:  Anything else, Mr. Brauchle?
 6                   MR. BRAUCHLE:  I'm sorry, Your Honor, but I
 7   forgot the question, I think you were asking when -- how much
 8   time would we need?
 9                   THE COURT:  That is correct.
10           I heard Mr. Read say a month.
11                   MR. BRAUCHLE:  I would agree, I think that
12   May 19th would be an excellent day, or June 2nd, we don't
13   have to -- since we have already got our jury, it doesn't make
14   any difference whether that week in May is a jury week or not.
15                   THE COURT:  Mr. Brooks.
16                   MR. BROOKS:  Judge, the State is not going to
17   oppose their motion for continuance if the Court is so
18   inclined to grant it. Since they believe that they have been
19   treated so unjustly, we have no problem with agreeing for a
20   continuance.
21                   THE COURT:  Mr. Brauchle, I guess the specific
22   amount of time you need depends on when you get the report
23   from Ms. Hall and what it contains; is that correct or --
24                   MR. BRAUCHLE:  The lynch pin of this problem is
25   not Ms. Hall's report, that is just the symptom of it. We
```

19

```
 1   still think, of course it is the State's job to think
 2   otherwise, that the recently discovered murder by Corporal Nix
 3   might somehow play into --
 4                   MR. BROOKS:  Judge, I am going to have to object
 5   to that. What he is referencing, I know the court has viewed
 6   it, Officer Nix was no billed. It was also ruled a
 7   justifiable use of deadly force. So I am going object to any
 8   mention on the record of a murder by Officer Nix. It is not
 9   pertinent to this hearing.
10                   THE COURT:  Sustained.
11                   MR. BRAUCHLE:  Well, I will call it a homicide.
12                   MR. BROOKS:  I will still object, Your Honor.
13   It was no billed and it was ruled a justifiable use of deadly
14   force.
15                   MR. BRAUCHLE:  Well, no bill doesn't mean it
16   didn't happen. That is just standard procedure for police
17   officer cases presented to the grand jury.
18           But in any event, side bars aside, we don't know what
19   that may lead to. And we certainly think that that at some
20   point might just have a certain degree of relevancy since the
21   facts are hauntingly familiar to the case on trial.
22           Now, that will be something for the Court to decide at a
23   later time. But when it was given to us Friday by some people
24   that have known about it since the date of the event, you know
25   it is hard for them to say that we weren't provided with that
```

1   in good faith.

2            MR. BROOKS:   The record needs to clear, Judge,

3   that material was turned over pursuant to Court's Order after

4   an in camera inspection.

5            MR. BRAUCHLE:   I want it to be abundantly clear

6   that that was when it was turned over only kicking and

7   screaming, after the Court ordered them to was it turned over.

8   I don't want this record to reflect -- in any way reflect that

9   they graciously gave at that up.

10           THE COURT:   The record will reflect that the

11   Court received that information from the City Attorney --

12   Dallas Attorney last week.  The Court reviewed it along with

13   the staff attorneys and made its decision and tendered it to

14   the State (sic) -- the original redacted copy.

15           MR. BRAUCHLE:   Well, once again, we state that

16   we should have been provided that all along under our

17   discovery motion in that it is Brady material.  Brady

18   specifically goes to that.  It is not that it is admissible,

19   but that it may somehow be admissible.  It doesn't have to

20   already have an exhibit stamp on it to come under Brady.  We

21   have to be given it.  If there is even the remotest

22   possibility that it may somewhere go to Mr. Ruiz's benefit.

23           THE COURT:   Mr. Brauchle, getting back to the

24   issue of the tapes that you feel that you have not received a

25   complete copy, the audio.

---

1           MR. BRAUCHLE:   You know, that encompasses two or

2   three parts of the tapes.  They claim to not be able to

3   communicate with the police department in regard to being able

4   to provide us with them.  And like I say, I will be glad to go

5   down and take what little bit we got and show them where the

6   gaps are.  They know where the gaps are.  They are the ones

7   that created them.  It is just up to them to pony up and put

8   the gaps back where they belong.

9           THE COURT:   The Court will order that a complete

10   copy of the tapes in question be turned over to the

11   State (sic) -- I don't know what steps, Mr. Brooks, you need

12   to take to insure that is carried out; but they are entitled

13   to a complete set of the tapes, containing all of the audio.

14           MR. BROOKS:   Yes, sir.

15           THE COURT:   I will grant the request for

16   continuance.  As far as a reset date, Mr. Brauchle,

17   Mr. Brooks.

18           MR. BRAUCHLE:   Your Honor, the schedules of both

19   sides, I think we need to get together, I think we can -- it

20   looks like right now we are looking at May 19th or

21   June 9th.

22         I see a big red number on the 19th, you know what day

23   that is -- the 19th says something up here -- let's just say

24   that -- it's probably going to be one of those two dates and

25   we will get back as soon as possible.

---

22

---

1           MR. BEACH:   Judge, we have to call those jurors

2   to make sure they are going to be available one or both of

3   those weeks.

4           MR. BRAUCHLE:   If we give them two options they

5   may figure out which may be better for them.  We don't want to

6   do it with less than 12.

7           THE COURT:   I understand.

8         Ms. Fleming will get to work on contacting the jurors and

9   ascertaining that information.

10         Just a few more things, a volume on the motions that were

11   filed previously.  Volume one, I think was conducted on

12   December 19th, several orders or motions I didn't make an

13   order on.

14         Motion 11, and volume one, motion to instruct witnesses

15   for State, I will grant that motion.

16         Seventeen, motion to instruct counsel for State

17   concerning voir dire examination, it has already been

18   completed; but argument before the jury, the Court will grant

19   that motion.

20         Mr. Johnson, you filed a volume three that we have not

21   ruled -- made any rulings on.

22           MR. BRAUCHLE:   I will surrender the floor to the

23   proponents of volumes, sir.

24           THE COURT:   You need to see the volume?  Just so

25   the record will reflect, motion to suppress legal

---

1   identification of the defendant, Number 27 in volume one, the

2   State has informed that that was not applicable.  The Court

3   will grant that motion.

4         And, Mr. Johnson, with respect to the motions in volume

5   three.

6           MR. JOHNSON:   The only one that is still

7   relevant is the second one, Judge.  The rest are moot because

8   they actually apply to the voir dire, jury selection process.

9   So the one we need to take up is second motion regarding to

10   testimony of family and friends of Mr. Ruiz.

11           THE COURT:   And, Mr. Brooks, does the State have

12   a response?  Do you need to see -- I have got it.

13           MR. BROOKS:   Judge, we need to take a look at

14   that.

15           THE COURT:   Certainly.

16         (Pause in the proceedings.)

17           MR. BROOKS:   Judge, the State is not opposed to

18   that motion, the only thing that we would ask is if it is

19   possible for the Court to preview the testimony before it goes

20   in front of the jury just to make sure it doesn't go into

21   inadmissible areas in front of the jury.

22           MR. JOHNSON:   We have no objection to that

23   request, Judge.

24           THE COURT:   The Court will grant the motion and

25   grant State's request to review the testimony prior to it

---

23

---

1   being presented.

2       Mr. Johnson, the other motions contained in volume three,

3   are you withdrawing from them?

4       MR. JOHNSON:   We are, Your Honor.

5       THE COURT:   Anything else?

6       MR. JOHNSON:   That's all we got.

7       THE COURT:   We are through with this hearing.

8       MR. JOHNSON:   Thank you, Judge.

9       (Court recessed for the day.)

---

1   THE STATE of TEXAS )

2   COUNTY of DALLAS  )

3       I, BELINDA G. BARAKA, Official Court Reporter in and

4   for the 194th Judicial District Court of Dallas County, State

5   of Texas, do hereby certify that the foregoing contains a true

6   and accurate transcription of all portions of evidence and

7   other proceedings requested in writing by counsel for the

8   parties, to be included in this volume of the Reporter's

9   Record, in the above-styled and -numbered cause(s), all of

10   which occurred in open court or in chambers and were reported

11   by me.

12       I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15       I further certify that the total cost for the

16   preparation of this Reporter's Record  was paid by the

17   State/Defense.

18       WITNESS MY OFFICIAL HAND this the 30th day of

19   May____, A.D., 2009.

20

21

22       BGBaraka

23       BELINDA G. BARAKA, CSR #5028
       Official Court Reporter

24       133 N. Industrial
       Dallas County, Texas 75207

25   Certification Expires: 12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

CAUSE NO. F07-50318-M

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| vs. | * | 194TH JUDICIAL DISTRICT |
| WESLEY LYNN RUIZ | * | DALLAS COUNTY, TEXAS |

- - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

PRETRIAL HEARING

Volume 39 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 8th day of May, A.D, 2008, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III, of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

Belinda G. Baraka, Official Court Reporter
214-653-5803

```
 1                        A P P E A R A N C E S

 2

 3      HON. KEVIN BROOKS
        Assistant District Attorney
 4      State Bar No. 03070735

 5

 6      HON. ANDY BEACH
        Assistant District Attorney
 7      State Bar No.  01944900

 8                                   FOR THE STATE OF TEXAS

 9

10      HON. PAUL BRAUCHLE
        Attorney at Law
11      State Bar No. 02918000

12

13      HON. WILLIAM JOHNSON
        Attorney at Law
14      State Bar No.  10804500

15                                   FOR THE DEFENDANT

16      Also Present:

17        Doug Parks, Attorney at Law

18

19                            *  *  *  *  *

20

21

22

23

24

25
```

```
 1                          I N D E X

 2                                             PAGE/VOL.

 3    Proceedings - 05/08/08 ........................... 4/39

 4    Reporter's Certificate ...........................   23

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

**P R O C E E D I N G S**

(May 8, 2008)

1  THE COURT:   This is Cause No. F07-50318, styled
2  the State of Texas versus Wesley Lynn Ruiz, this matter is set
3  for a pretrial, with a scheduled trial date for May 27th.
4  What says the State?
5  MR. BROOKS:   State is ready, Your Honor.
6  THE COURT:   And what says the Defense?
7  MR. JOHNSON:   We are ready for pretrial, Judge.
8  THE COURT:   Mr. Johnson, was there an additional
9  matter that you wished to address with the Court?
10  MR. JOHNSON:   Well, actually not necessarily an
11  additional matter, continuing matter, Judge.
12  In regard to trace evidence.  We still have not got what
13  we have been asking for from SWIFS, specifically Vicki Hall
14  from SWIFS.  On April the 1st, we went to SWIFS.  We, being
15  the D.A.s and Mr. Brauchle and I, and we actually visited with
16  Ms. Hall.  And Mr. Brauchle and I told Vicki Hall specifically
17  what we wanted her to do in regard to trace evidence.  She
18  said that she would do that.  Sometime thereafter, she
19  forwarded a report to the D.A.'s office, and they gave us a
20  copy of that report.  And it did not have what we asked to do
21  as far as trace evidence.  As far as looking at the uniform
22  shirt, the undershirt, and the ballistic vest.  Her report,
23  all it did was say there were defects on that item.  We knew

6

1  there is more important case than this.  She said, I will get
2  to it as soon as I can.  Well, I still haven't heard back from
3  her.
4  On May the 2nd, I called again.  All I got was her voice
5  mail, I left another message, still no answer that day.
6  May the 5th, May the 6th, May the 7th, I have tried calling
7  her.  And all I have gotten is the voice mail, and left a
8  message on all those days.  We still haven't gotten the trace
9  evidence report specific to what the Defense is asking to be
10  done in regards to the trace evidence.  So that is -- that has
11  not changed.  We still have not gotten it.  And quite frankly,
12  I don't know -- I have informed Mr. Brooks -- I think
13  Mr. Brooks he actually indicated to me that he has tried to
14  call Ms. Hall as well.  And as of this moment here in court
15  today, we still don't have the report.  We don't have the
16  analysis that we have been asking for, okay.
17  There is another issue, Judge, separate issue, and that
18  is on recordings from the police radio broadcast.  Now, I did
19  get a CD, an audio recording of a police broadcast.  In
20  fact I got this last week.  And when I played it, it does have
21  recordings prior to the shooting.  And this particular audio
22  appears to be the recording of the undercover officer calling
23  in and saying that they have seen this suspect vehicle and
24  they are talking about having it pulled over.  This is all
25  again prior to the police getting behind Mr. Ruiz's vehicle.

7

1  there were defects.  We wanted to know what caused those
2  defeats.  And we wanted her to do the test to tell us what
3  caused those defeats.  And that was not in that report.
4  On April the 22nd, I called Vicki Hall and left her a
5  voice mail message.  On April 23rd, I actually have a
6  telephone conversation with her and pointed out to her that
7  she still had not done what Mr. Brauchle and I asked her to do
8  with regard to the trace evidence.  And she said that she
9  understood and that she would go ahead and get that done and
10  she would have it done as soon as she can get it done.  So at
11  that time on April the 23rd, she told us that she would do
12  the test we asked for.
13  On April 25th I left another message, voice mail
14  message with her and also left a voice mail message with
15  Mr. Brooks.  And at that time I also informed the Court that
16  we still had not received that information.  And Court asked
17  me for -- who it was that we were dealing with.  And I told
18  the Court that it was Vicki Hall at SWIFS.
19  On April the 29th, I again was able to get Ms. Hall on
20  the telephone and talked to her regarding the test.  She
21  informed me that she still hadn't done them.  That she had
22  some other cases that she was working on.  And I tried to
23  explain to her that I don't think she has any other cases that
24  is more significant than not only a murder case but a capital
25  murder case and a capital murder where the State seeks death,

Now, in this recording, there are references made on the
1  recording about other channels supplying information to this
2  dispatch.  Now, we still don't have the recordings from those
3  other channels that occurred prior to the time of the offense.
4  The recordings that we have been supplied from those other
5  channels, we do have recordings from the other channels.  We
6  have recordings from channel five, channel four and channel
7  eight and another one that is not identified.  But all of
8  these, the beginning of the recordings, there is actually like
9  an announcer saying this is such-and-such channel and it is on
10  March 23rd, 2007, from 5:37 to 6:40 p.m.
11  Now, these are the recordings that were supplied by the
12  law enforcement individuals.  This is actually recorded by the
13  fire department, Dallas Fire Department.  And why they chose
14  to start these recordings at the time that they chose to start
15  them, is unknown to me.  Because what we need is, we need the
16  recordings of the period prior to 5:37.  And I told Mr. Brooks
17  about this.  And maybe he can tell us what he has been able to
18  find out about whether or not we are going to be able to get
19  the recordings for the time period that we need them on these
20  other channels that are actually referenced to on the
21  recordings that he gave me.
22  The recordings that he gave me are the time periods that
23  we want.  The ones that have the undercover officers that kind
24  of started this sequence.  So obviously, these recordings

1 exist. Because we know from listening to this one recording
2 that has information prior to the officers calling in to get
3 marked elements behind the suspect vehicle. That's the
4 recordings we need.
5       One of the other things that we needed and that we wanted
6 was the underline documents for the extraneous offenses. And
7 actually I met with Julius Whitlier of the D.A.'s office
8 yesterday and those were given to me. I did pick these
9 documents up from him yesterday. And in fact, not only did I
10 get though documents that we needed, but there are quite a few
11 other documents that were given to me yesterday, yesterday
12 afternoon. I have not finished going through them to see what
13 is there. At this point, I don't know if there is going to be
14 anything else in the documents that I got yesterday as a
15 supplemental discovery that is going to need to be
16 investigated. So I don't really know where we are in regards
17 to those items that we just received yesterday.
18       And back to the SWIFS report, until we actually get that
19 report, I can't tell the Court what we are going to have to do
20 in response to what is contained in that report. So until we
21 see it, I can't tell the Court where we are in terms of being
22 ready to go to trial.
23       THE COURT: And when you mention or refer to the
24 SWIFS report, you are referring to the report with Vicki Hall.
25       MR. JOHNSON: The trace evidence report of Vicki

1 Hall, yes, yes, Your Honor.
2       THE COURT: Mr. Brooks, can you shed any light
3 on --
4       MR. BROOKS: Yes, I can, Judge. I have tried to
5 reach Ms. Hall myself, she has not returned any of my phone
6 calls. I can tell the Court that from our previous
7 conversation with Ms. Hall, it is her belief that because of
8 the way the clothing material was handled, part of this
9 officer's treatment at the hospital and subsequent to that,
10 she can't determine specifically those defects, what caused
11 those defects. And also a report that reflects that,
12 Defense's contention is that she should be able to tell
13 whether it is glass fragments or bullet fragments. She has
14 told us and told them the same thing. The report she said she
15 will try to put together is the report that says it cannot be
16 determined. And that's basically what my understanding from
17 talking previous conversations with her, this report that she
18 is working on is going to reveal.
19       Now, she hasn't called me back either, I have left
20 several messages with her as well on that issue.
21       With respect to the communications, Judge, we have given
22 them everything that we got. They have a copy of every
23 communication that we have got.
24       Now, the reference to other channels, they say Channel
25 four, channel six, those are the channels that DPD uses. The

1 Defense is asking you that they want the recordings prior to
2 the time of the shooting. Are they asking for the entire day
3 for channel four, which is shared by DPD, which is the entire
4 day. DPD copied the time frame relevant to the shooting.
5 They have told us repeatedly the other tapes that the Defense
6 is asking for don't exist because they are kept for 30 days,
7 and then they are erased and reused. I don't know what else
8 we can do. We have asked them and they say they don't exist.
9 The bulk of the material turned over yesterday is the bulk of
10 the material that the Defense has previously had. And the
11 outline of that material are items marked in bold indicate
12 material that we may not have shown them before. The majority
13 of that is incidental items, like photographs from the gang
14 unit, a DVD from an interview at some period of time. I don't
15 have it in front of me, it outlines the items that were not
16 previously turned over to the Defense. The bulk of it is
17 items and reports and evidence that have been turned over and
18 in previous discovery.
19       THE COURT: Mr. Brooks, if I may, what was the
20 delay in turning over the items that were turned over
21 yesterday.
22       MR. BROOKS: Basically, Judge, what we did after
23 the last pretrial hearing, we went back through and reordered
24 every single file from DPD and from the sheriff's department
25 and just scanned every single file to make sure there were

1 things in there they should have had that we didn't give them.
2 And that's the reason.
3       THE COURT: And as far as Ms. Hall providing
4 this report that is -- essentially to say that she can't make
5 a determination as to the defects, you have no idea when she
6 is going to ...
7       MR. BROOKS: No, Judge, I can't tell you I know
8 exactly when she is going to give me that report. Again, she
9 hasn't returned my phone calls either.
10       MR. BEACH: Can I address that briefly?
11       THE COURT: Sure.
12       MR. BEACH: You have seen the videotape of the
13 shooting. Okay. What they are concerned -- I guess they have
14 an expert that is telling them that there should be glass
15 and/or led wipe on the defects in Officer Nix's shirt, vest,
16 whatever, okay. You can see on the videotape the bullet
17 coming out of the window, the glass spray coming up hitting
18 Nix in the face, okay. We got the medical examiner and the
19 autopsy picking glass particulate and let out of his face,
20 okay. that has been tested by trace evidence. They have the
21 report saying, yes in fact that particulate matter is glass
22 and copper, from his face. What they are saying is, they are
23 not going to be ready somehow because they don't know what the
24 defects of the shirt, the uniform shirt, and the vest are
25 going to be consistent with. I am sure they have got a theory

1  on this, Judge, but I really don't understand what it is,
2  okay. And that's fine, what Beach doesn't understand.
3  I tried calling Vicki Hall yesterday. She hasn't called
4  me back. In her original report it says in her opinion
5  further testing on these defects would not be beneficial
6  because there was an interposed target, i.e., the window.
7  Okay. So we will keep calling, we will keep trying to work on
8  it. But that's that.
9  THE COURT: So her original report makes that
10  reference.
11  MR. BEACH: It does make that reference, it is
12  in the report. They are asking her to go back, even though
13  she doesn't think she is going to get anything, to go back and
14  see if she can get something. That's what she is trying to do
15  something right now. I know she was down here testifying day
16  before yesterday in a murder case. I know she is very busy,
17  this isn't the only case she has. We will keep trying to get
18  it, that's what I know about it.
19  THE COURT: Mr. Johnson.
20  MR. JOHNSON: Let me respond to some of these
21  things, Judge. First off as to SWIFS, Mr. Beach is correct in
22  his assumption that we have a different theory than the State
23  does. And I assure you that we do --
24  THE COURT: I would presume that. I will go out
25  on a limb and take that presumption, Mr. Johnson.

1  MR. JOHNSON: And I have spoken to another
2  forensic expert about Vicki Hall 's position that because
3  whatever it is on the shirt may have gone through a transposed
4  object, possibly the car window, that that doesn't change what
5  hit the shirt. In other words, the bullet didn't change from
6  being a bullet to something else. It didn't like change it
7  from led to water. He said that there is absolutely -- that
8  her idea because it went through another object means that she
9  can't test these defects is incredulous. It is ridiculous.
10  It can be tested, it can be. She has chosen whatever reason
11  not to do it. We want it done.
12  Obviously, Mr. Brooks says that, well, these objects, the
13  uniform, the shirt, the T-shirt, the ballistic vest, because
14  of the way they were treated during the period of time
15  Mr. Nix -- Officer Nix was being taken to be treated at the
16  hospital are for some reason that keeps her from testing this,
17  that also is incorrect. When we looked at these objects at
18  SWIFS, she did note to us that they had cut the uniform off
19  and may have cut through the area that some of these defects
20  actually originally occurred. But her report points out that
21  she can find the defects. So it is not like they are not
22  there anymore. Those defects are still there, that's the area
23  we want tested. And that's what we are asking her to do. And
24  again it still hadn't been done.
25  Now, as to the recordings, as to specifically what time

14
15

1  we want, well, the recording that we have does have the
2  original call about the suspect vehicle. Does not have the
3  time that that call came in. This recording doesn't tell us
4  specifically what time that happened. All right. But
5  obviously it is on the tape that we have that it does talk
6  about that. It is the recording of that event. And that's
7  the point from that point on is the time period that we want
8  all these other channels recordings. If that is like five or
9  ten minutes before 5:37 p.m. on March the 23rd of '07, then
10  that's what we want. Why don't we say we want the recordings
11  of those channels from 30 minutes before that. So let's make
12  it 5:07 p.m. on March the 23rd of '07, that we want those
13  recordings starting at that time from those channels that they
14  have that we know of channel four, channel five, channel
15  eight, and there is another channel that I will have to go
16  back -- when these things start, there is actually a narrator
17  that announces what they are, and there is another channel
18  that they got recorded that has information on it. So that --
19  you know, the State wants to know specifically what time we
20  want started, let's start it at 5:07 or five o'clock p.m. that
21  day and go forward.
22  Now, I will also tell the Court this in regards to the
23  documents that we just got yesterday. Two days after our
24  motion for continuance on -- motion to continuance was April
25  the 8th. On April the 10th, Mr. Parks got a phone call from

1  Mr. Brooks saying that they had just found another document
2  that might be important. That document was a statement of
3  Mr. Ruiz that he gave a law enforcement officer that he put
4  into a narrative in a report, okay. Now, that's on April the
5  10th, which was actually, you know just four days before we
6  were actually supposed to start this trial that they all of a
7  sudden find that document, okay.
8  Now, I don't know what else is in what I got yesterday, I
9  don't know if there is going to be anything as significant as
10  that when I go through those things, I hope there is not.
11  But I am just basically pointing out to the Court that we have
12  been having some difficulty in getting the discovery, we being
13  the Defense, okay. And that applies to the SWIFS report, it
14  applies to the recordings of the dispatch and it applies to
15  all the different documents that the State has that we need.
16  So it is continuing and on-going problem, Judge.
17  THE COURT: Mr. Brooks, to your knowledge, is
18  there anything on the -- the tapes -- Mr. Johnson gave a 30
19  minute advance of the actual recordings. To your knowledge is
20  there anything in existence on the tapes or do you need to
21  inquire.
22  MR. BROOKS: Judge, to my knowledge, each time
23  the Defense has made this request, we have inquired with DPD
24  for previous recordings, recordings previous to the time of
25  the shooting.

16

1    THE COURT:   Right.
2    MR. BROOKS:   And every single time we have been
3    told they don't exist.  After the last pretrial, we went back
4    and asked them again and we received the same answer -- I
5    believe Investigator Spurger contacted DPD and asked for
6    recordings and received the same answer, that there are no
7    other recordings.
8    MR. BEACH:   Judge, can I further elaborate?
9    THE COURT:   Yes.
10    MR. BEACH:   I think they are going to be -- I
11    don't know if Mr. Johnson, I think they are going to be
12    pleased with the explanation of trial as to what recordings
13    they do have.  We have had the police officers that were down
14    here that were involved in the chase behind Mr. Ruiz, they
15    have identified all the voices on channel five.  Any reference
16    to channel four during the chase of Mr. Ruiz before he shot --
17    or the shooting of Officer Nix is telling people to get off
18    channel five and go to channel four because they don't want
19    people blocking up communication during the chase.  There is
20    nothing that is going to be relevant on channel four before
21    the shooting as to this chase.  The voices on channel five
22    they have is everybody involved in the chase of Mr. Ruiz,
23    anything else on channel four over there on Westmoreland and
24    Hampton 3 miles away is going to have nothing to do with them
25    chasing Wesley Ruiz.  So they have got everything, all the

17

1    voices, everybody involved in the chase starting on the
2    bridge, going across the Westmoreland bridge, you know going
3    to Westmoreland, going to Bernal, the shooting, they have got
4    every police communication that was made that day prior to the
5    shooting.
6    The only other deal that Mr. Johnson is talking about is
7    the voice coming on saying at 5:37 there was one of the
8    officers that got out of the car during the actual shoot-out
9    with Mr. Ruiz, had his hand radio switched to channel four.
10    You can hear him say, Officer down.  That's the only other
11    relevant communication on any other channel besides channel
12    five involved in these case.  Now, they can cross-examination
13    these folks and have this conspiracy theory, but there ain't
14    any.  There is going to be a reasonable explanation why they
15    had what they had.  They have got, everything, everything.
16    THE COURT:   Mr. Beach, Mr. Brooks, do you know
17    the length of time.  If Ms. Hall was to do this additional
18    test, how long that takes?
19    MR. BEACH:   It shouldn't take more than two
20    hours, but you know, we can go out there, I can talk to David
21    Smith today, just to see if we can get a voice to call us
22    back, it shouldn't take long at all.  Once she actually has
23    time to do it.
24    THE COURT:   Mr. Johnson.
25    MR. JOHNSON:   Well, back to the tapes, Judge.

18

1    The State's explanation that these recordings don't exist, I
2    just find to be a little hard to believe.  Now, I am not
3    saying that I think that the D.A.'s office has these
4    recordings and they are not just giving them to us.  And I am
5    not saying that I think the D.A.'s office called DPD and the
6    Dallas Fire Department dispatch people and said, hey, we don't
7    want those recordings to start until the time of the shooting.
8    We don't want anything before that on all of those channels
9    that start at 5:37, I am not saying that the all.  I don't
10    know who made the decision to make the recordings to start at
11    5:37.  But I sure think that maybe the Court could consider
12    maybe having somebody come down here and testify about why
13    they started those recordings then and why they are telling
14    the D.A.'s office that the recordings prior to don't exist.
15    Because I just don't think that is actually believable.
16    And I don't know, you know, I don't know what else to do,
17    besides have the Court inquire about that.  Cause evidently
18    the D.A.'s office haven't said something to get any copies of
19    these tapes.
20    THE COURT:   Have you subpoenaed the custodian of
21    record for those?
22    MR. JOHNSON:   I think we have, Judge.  I would
23    have to talk to Rex to find out.  I don't know why we should
24    be doing that.  Obviously we can.  We have asked the State and
25    I think the State have an obligation when we ask for a

19

1    specific thing.
2    THE COURT:   I understand, and their response is
3    that there is nothing on the tapes.  Now I would suggest this,
4    subpoena the custodian of records, we can meet again next
5    Friday.
6    MR. JOHNSON:   Okay.
7    THE COURT:   Also if you need be subpoena Vicki
8    Hall and this Court will order her to do that test.
9    MR. JOHNSON:   All right.  We will do that.
10    MR. BROOKS:   Judge, may I address another issue?
11    THE COURT:   Certainly.
12    MR. BROOKS:   As of today's date, State has not
13    received any notice of expert witness or expert testimony by
14    the Defense.  Previous conversations with Mr. Johnson, I was
15    told that they did not have any testifying experts, this was
16    several months ago.  If that position has changed, I think we
17    need to know that.  We need to be provided with those expert
18    reports.
19    MR. JOHNSON:   Well, in response to that, Judge,
20    one of the experts that we probably want to consider using is
21    a forensic expert.  And we kind of need to see the trace
22    evidence report that we have been asking for before we decide
23    whether or not we are going to need that expert witness or
24    not.  I have obviously talked to one, all right.  But as far
25    as whether or not he is going to testify or not, at this point

1  I can't tell the Court whether he is or not.
2         THE COURT:   Because you are waiting on the
3  result.
4         MR. BROOKS:   But that wouldn't be the only type
5  of expert testimony that I would anticipate that the expert
6  would call, Judge particularly for punishment.
7         MR. JOHNSON:   Well, as the Court knows,
8  Mr. Brauchle is not here today and will not be back until next
9  week, when he gets back, we will -- Mr. Brauchle and I and
10 Mr. Parks will talk about any experts that we anticipate.  And
11 at that time we will give the State a list.
12        MR. BEACH:   Judge, the statute gives us 21 days
13 before trial at a minimum.  This case is set to start the
14 27th, we are already within 21 days.  It is not really an
15 optional deal, when Mr. Brauchle gets back, then they will
16 talk to us.  They have a responsibility under Statute 39.14 to
17 provide us the names 21 days before trial.
18        THE COURT:   The Court will order the Defense to
19 provide the State with the names of their expert witnesses or
20 anticipated expert witnesses, understanding that you are
21 waiting on test results.  But given the fact that the Court
22 date -- the trial date is on the 27th and this Court does
23 not anticipate a reset of this trial date, Defense ordered to
24 submit those names to the Defense -- I mean to the State.
25        MR. JOHNSON:   We will get them to them, Judge.

1  I do want to point out to the Court that the reason that we
2  haven't already tried this case is not the fault of the
3  Defense.  You know we are still working on discovery that
4  there was a deadline for that discovery that was not honored
5  or enforced.  I assure the Court that we will get any experts
6  that we anticipate using, we will get that information to the
7  State, okay.
8         THE COURT:   Okay.  The Court will set a time
9  frame for ten o'clock a.m. tomorrow morning -- on the 10th,
10 May 10th.
11        MR. JOHNSON:   Okay.  Are you going to give the
12 State any deadlines as far as their discovery, any new
13 deadlines?
14        THE COURT:   In reference to what, Mr. Johnson?
15        MR. JOHNSON:   Everything.  These recordings from
16 the police dispatch, the trace evidence report that we have
17 been asking for for over a month, anything else that they
18 might have that they are going to give us, I mean, they have
19 never -- I don't know.
20        THE COURT:   The Court, Mr. Johnson, has
21 suggested that if you feel as the State is saying that there
22 is nothing existing on the tapes and you seem to feel that
23 there is, the Court is suggesting that you subpoena the
24 custodian of records to this court next Friday for a hearing.
25 We will put that witness on the stand and the Court will

22

1  address the existence or nonexistence of any conversations or
2  anything on those recordings at that time.  And the same for
3  Ms. Hall.  I will subpoena her, have her down here to explain
4  to the Court why she has not conducted that test.  And the
5  Court will address that issue on the 16th --
6         MR. JOHNSON:   On the 15th or the 16th.
7         THE COURT:   Friday.
8         MR. JOHNSON:   Can we have until the 16th to give
9  you our expert.
10        THE COURT:   The Court is going to deny that
11 request and keep the same date as the 9th same time.
12        MR. JOHNSON:   Okay.
13 I think that's it from I say, Judge.
14        THE COURT:   Okay, anything further from the
15 State?
16        MR. BROOKS:   We have amended witness list that
17 we are filing also today, Judge.
18        THE COURT:   Very well.
19        (Court recessed for the day.)
20
21
22
23
24
25

23

1  THE STATE of TEXAS )
2  COUNTY of DALLAS )
3         I, BELINDA G. BARAKA, Official Court Reporter in and
4  for the 194th Judicial District Court of Dallas County, State
5  of Texas, do hereby certify that the foregoing contains a true
6  and accurate transcription of all portions of evidence and
7  other proceedings requested in writing by counsel for the
8  parties, to be included in this volume of the Reporter's
9  Record, in the above-styled and -numbered cause(s), all of
10 which occurred in open court or in chambers and were reported
11 by me.
12        I further certify that this Reporter's Record of the
13 proceedings truly and correctly reflects the exhibits, if any,
14 admitted by the respective parties.
15        I further certify that the total cost for the
16 preparation of this Reporter's Record was paid by the
17 State/Defense.
18        WITNESS MY OFFICIAL HAND this the 30th day of
19 May      , A.D., 2009.
20
21
22        BELINDA G. BARAKA
23        BELINDA G. BARAKA, CSR #5028
          Official Court Reporter
24        133 N. Industrial
          Dallas County, Texas 75207
25 Certification Expires: 12-31-09

CAUSE NO. F07-50318-M

THE STATE OF TEXAS          *     IN THE DISTRICT COURT

VS.                         *     194TH JUDICIAL DISTRICT

WESLEY LYNN RUIZ            *     DALLAS COUNTY, TEXAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

PRETRIAL HEARING

Volume 40 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

          BE IT REMEMBERED THAT on this the 16th day of May,

A.D, 2008, the above-styled and -numbered cause(s) came on for

hearing before the HONORABLE ERNEST B. WHITE, III, of the

194th Judicial District Court of Dallas County, State of

Texas, the following is a true and correct transcription of

the proceedings had, to-wit:

   (Proceedings Reported by Computerized Machine Shorthand)

Belinda G. Baraka, Official Court Reporter
214-653-5803

```
 1                    A P P E A R A N C E S

 2

 3    HON. KEVIN BROOKS
      Assistant District Attorney
 4    State Bar No. 03070735

 5

 6    HON. ANDY BEACH
      Assistant District Attorney
 7    State Bar No.  01944900

 8                              FOR THE STATE OF TEXAS

 9

10    HON. PAUL BRAUCHLE
      Attorney at Law
11    State Bar No. 02918000

12

13    HON. WILLIAM JOHNSON
      Attorney at Law
14    State Bar No.  10804500

15                              FOR THE DEFENDANT

16    Also Present:

17     Doug Parks, Attorney at Law

18

19

20                         *  *  *  *  *

21

22

23

24

25
```

```
 1                          I N D E X

 2                                             PAGE/VOL.

 3   Proceedings - 05/16/08 ............................ 4/40

 4   DEFENSE'S WITNESS    Direct    Cross    V.Dire

 5    J.S. BRISENO           8

 6    ROCK RICHARDSON        37

 7    BRIAN COODY            53

 8    VICKI HALL             60

 9    WESLEY RUIZ            85

10

11   Reporter's Certificate ............................   88

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                    E X H I B I T   I N D E X

 2    DEFENSE'S EXHIBIT(S):        OFFERED:   ADMITTED:  VOL

 3     A Laboratory Report          62         62         40

 4     B Notice to Supplement       76         77         40

 5     C Supplement to Notice       76         77         40

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



5

**PROCEEDINGS**

1  (May 16, 2008)

2  THE COURT:  Both sides ready on the Ruiz matter?

3  MR. BROOKS:  Yes, Your Honor, the State is

4  ready.

5  THE COURT:  Cause No. F07-50318, styled the

6  State of Texas versus Wesley Ruiz.

7  What says State?

8  MR. BROOKS:  Ready.

9  THE COURT:  And what says the Defense?

10  MR. BRAUCHLE:  We are ready.

11  THE COURT:  This matter is set for a pretrial

12  today.  What issues and motions?

13  MR. BRAUCHLE:  Can we have a moment, Your Honor?

14  THE COURT:  Certainly, you may.

15  MR. BRAUCHLE:  We are going to file stamp the

16  motions we will be referring to.

17  (Pause in the proceedings.)

18  THE COURT:  Off the record.

19  (Discussion off the record.)

20  THE COURT:  Back on the record.

21  The Court has been presented with three pretrial motions

22  by the Defense.

23  Motion to excluded evidence of extraneous offenses and

24  related bad acts, gang-related allegations.

---

6

1  Motion for a pretrial hearing as to the admissibility the

2  extraneous offenses or bad acts.

3  Appropriate jury instructions.

4  And amendment motion to exclude alleged extraneous

5  offenses and bad acts as to bad acts of future dangerousness.

6  What says the State -- State received a copy of this?

7  MR. BROOKS:  Yes, sir.  We just now have

8  received copies and we are still trying to...

9  MR. JOHNSON:  Can I make a comment to the Court

10  briefly?

11  THE COURT:  You may.

12  MR. JOHNSON:  There are a couple of issues that

13  we want to put on the record today.  We have got, we have

14  subpoenaed a few witnesses that we would like to ask some

15  questions of.  One of those witnesses is Vicki Hall who is the

16  SWIFS trace evidence expert.  We have been given a copy of her

17  latest report.  And it still doesn't have everything in it

18  that we asked her to do.  So we want to inquire about that.

19  THE COURT:  Okay.

20  MR. JOHNSON:  We also have some witnesses down

21  here regarding the dispatch tapes to try to determine some

22  answers regarding the times that are on the tapes we have been

23  given, why they started when they started, why they didn't

24  start prior to when they started.  So that's one of things we

25  want to talk about on the record today too, Judge.  And then

---

7

1  we also want to talk about the motions that I just filed this

2  morning.

3  MR. BROOKS:  Judge, may I suggest that we go

4  ahead and have the testimony from the witnesses, get that over

5  with.

6  THE COURT:  Certainly.

7  MR. BRAUCHLE:  Can we have those witnesses

8  called in and put under the Rule?

9  THE COURT:  You may.

10  (Witnesses entered the courtroom.)

11  THE COURT:  I am going have each of you raise

12  your right hand.

13  (Witnesses were duly sworn.)

14  THE COURT:  And if each of you may give your

15  name to the court reporter.

16  THE WITNESS:  Rock Richardson, Dallas Fire Open

17  Records.

18  THE WITNESS:  J.S. Briseno, B-r-i-s-e-n-o, DPD

19  CAPERS.

20  THE WITNESS:  Wilma Banner, 911 Assistance

21  Operator.

22  THE WITNESS:  Brian Coody, C-o-o-d-y, Dallas

23  Police Communication.

24  THE WITNESS:  Randy Hooper, H-o-o-p-e-r, Dallas

25  Police Open Records.

---

8

1  THE WITNESS:  Vicki Hall, Crime Lab.

2  THE COURT:  Each of you are witnesses placed

3  under the Rule.  Which simply means that you must, one, be

4  outside of the courtroom while all other witnesses are

5  testifying; and two, you may not discuss your testimony with

6  the other witnesses.

7  Which witness will the Defense call first.

8  MR. BRAUCHLE:  Briseno.

9  THE COURT:  Okay.

10  You may proceed, Mr. Brauchle.

11  **J.S. BRISENO**

12  was called as a witness, and having been duly sworn by the

13  Court, testified under oath as follows:

14  **DIRECT EXAMINATION**

15  BY MR. BRAUCHLE:

16  Q.  Sir, state your name and how you are employed.

17  A.  J.S. Briseno of the Dallas Police Department as a

18  homicide detective.

19  Q.  You are the lead detective or the lead officer in

20  regard to Mr. Ruiz's case?

21  A.  That's correct.

22  Q.  And have been since that occurrence; is that correct?

23  A.  Yes.

24  Q.  Now, then, early on in the investigation, you were

25  made aware that there were certain police broadcasts and

---

9

1   certain police tapes that involved this case; is that correct?
2       A.   Yes, that's correct.
3       Q.   Did you personally gather or in any way collect that
4   evidence?
5       A.   No, I did not.
6       Q.   Did you delegate to someone else?
7       A.   Communications people.
8       Q.   Okay.  Who did you delegate that to?
9       A.   I did not personally delegate it myself, the
10  communications people took it upon themselves to go ahead and
11  do the recordings.
12      Q.   And who would that have been?
13      A.   I believe it was a person named -- I just know him by
14  last name or nickname of Rock.  He was one of the guys who was
15  here just a few minutes ago.
16      Q.   Would that be Rock Richardson?
17      A.   Yes.
18      Q.   And he is in the communications department?
19      A.   Yes.
20      Q.   Have you talked to him since the event concerning
21  Mr. Ruiz?
22      A.   No.
23      Q.   How is it that you have knowledge that Mr. Richardson
24  was involved in collecting the communications tape?
25      A.   Cause he turned the tapes to, ah, Detective Crumb.

10

1       Q.   To detective who?
2       A.   Crumb.
3       Q.   And when did that occur?
4       A.   I don't know if it was that same someday -- I believe
5   it was the following day.  I am not for sure exactly when he
6   turned the tapes over to Detective Crumb.
7       Q.   So it is your -- it is your testimony that Rock
8   Richardson collected all of the tapes regarding Officer Nix's
9   shooting and turned those over to Officer Crumb; is that
10  correct?
11      A.   Yes.
12      Q.   But you have not talked with officer -- excuse me, is
13  he a police officer or just a civilian employee?
14      A.   Civilian employee.
15      Q.   So you haven't talked to Mr. Richardson since this
16  event and you don't really know what he did at all; is that
17  correct?
18      A.   Well, I know he taped the recordings.
19      Q.   He downloaded the recordings; is that correct?
20      A.   Yes.
21      Q.   And gave them to Crumb?
22      A.   Yes.
23      Q.   And that's -- have you talked to Crumb about those
24  since this occurred?
25      A.   No.

11

1       Q.   What was the purpose of giving those to Crumb?
2       A.   So she would turn them over to me.
3       Q.   Has she done that?
4       A.   Yes.
5       Q.   When did that occur?
6       A.   That was -- again I don't know if it was the second
7   day after this happened or the first day, but I believe it was
8   the second day.
9       Q.   All right.  So they have been under your care,
10  custody, control since two days after this event happened?
11      A.   Yes.
12      Q.   And you have them personally in your possession?
13      A.   Well, not in my possession, in a folder, yes, in a
14  folder.
15      Q.   They are in the investigation folder?
16      A.   Yes.
17      Q.   All of the tapes that Rock Richardson would have
18  downloaded?
19      A.   Yes.
20      Q.   Is that correct?  Is there anybody else involved in
21  the gathering of that communication information?
22      A.   Not to my knowledge.
23      Q.   No one else?
24      A.   Not as far as the audio recordings, no.
25      Q.   How about video recording?

12

1       A.   The video was -- again, that's a different, I guess,
2   unit.  They have been downloaded at -- I don't know if they
3   were downloaded at the station and then the people in the
4   police technology are the ones who actually make the
5   recordings or the tapes.
6       Q.   Who are the people that downloaded that?
7       A.   I think it was Sergeant Guzman.
8       Q.   Guzman.  You know for sure?
9       A.   Yes.
10      Q.   So Sergeant Guzman is the person that downloaded the
11  video information in regard to Officer Nix's shooting?
12      A.   Yes.
13      Q.   And you have the information that -- is it Sergeant
14  Guzman?
15      A.   Yes.
16      Q.   You have the information that Sergeant Guzman
17  downloaded?
18      A.   Yes.
19      Q.   And that is all personally in your investigation
20  file?
21      A.   Yes.
22      Q.   Is there anybody else involved in the downloading of
23  either audio or video information?
24      A.   Not to my knowledge, no.
25      Q.   You know anything about -- you saw Sergeant Hooper

13

```
 1   down here today, didn't you?
 2      A.   Yes.
 3      Q.   You know if he was in any way involved in this?
 4      A.   No, I don't.
 5      Q.   You don't at all?
 6      A.   No, I don't know.
 7      Q.   Okay.  So within, what, a two-day period, you had
 8   received all of the audio and video information that existed
 9   in regard to Officer Nix's shooting; would that be a correct
10   statement?
11      A.   It might be maybe two or three days.
12      Q.   Okay.  Within two or three days people had downloaded
13   the video information and downloaded all the audio information
14   and you had all of that in your file; is that correct?
15      A.   That's correct.
16      Q.   And you still have it all in your file?
17      A.   Ah, yes, to the best of my knowledge everything is
18   still in there.  The only thing that might not be in there may
19   be one of the videotapes that is in the D.A.'s custody.
20      Q.   What videotape would that be?
21      A.   The one I believe in Officer Nix's car.
22      Q.   The one in Officer Nix's car?
23      A.   Yes.
24      Q.   So that one might be in the D.A.'s possession?
25      A.   Yes.
```

14

```
 1      Q.   Now, in regard to the videos, the recorder in each of
 2   these police vehicles is somewhat like a DVD recorder, a DVR
 3   recorder; is that correct?
 4      A.   Yes, I guess so.
 5      Q.   Somebody has to go out and download them?
 6      A.   Yes.
 7      Q.   So that -- and that's done by putting in a disc and
 8   then downloading the stuff that is recorded there; is that
 9   correct?
10      A.   I don't know exactly all the procedures involved in
11   that.
12      Q.   Well, would that be a simplified version of what
13   happened?
14      A.   Yeah, I guess you could say that.
15      Q.   I'm sorry, I don't know what happens either, but I am
16   just asking would that be a synopsis of what you believe
17   happened?
18      A.   Yes, more or less.
19      Q.   And that's the same technology that records DWI
20   stops, any other routine police matters; is that correct?
21      A.   Yes.
22      Q.   And so it is your belief that you have in your
23   position all of the audiotapes and all of the videotapes
24   concerning Officer Nix's shooting, the one exception being
25   perhaps the District Attorney's office has the information out
```

15

```
 1   of Officer Nix's vehicle; is that a correct statement?
 2      A.   Yes.
 3      Q.   Is there anything that you would add to that or
 4   supplement that to make it more correct?
 5      A.   No, not at this point.
 6      Q.   I am not in any way distorting what happened or where
 7   these items are; is that correct?
 8      A.   That's correct.
 9      Q.   And basically the information that you have was
10   brought to you by Rock Richardson and Sergeant Guzman; is that
11   correct?
12      A.   That's correct.
13      Q.   And is there anybody else that was involved in that
14   process?
15      A.   Not to my knowledge, no.
16      Q.   What department is Sergeant Crumb in, or is she a
17   civilian?
18      A.   She is a police officer.  She is in my unit,
19   homicide.
20      Q.   And what was her capacity?
21      A.   She was helping, assisting.
22      Q.   So is it your testimony that Rock Richardson gave
23   Officer Crumb the matters that he downloaded and then she gave
24   them to you?
25      A.   That's correct.
```

16

```
 1      Q.   Would that be the chain of custody on that?
 2      A.   Yes.
 3      Q.   When you first took over the investigation, did you
 4   set up in your mind or set up in your investigative process
 5   any particular time period to -- to focus in on or any
 6   particular time period that you weren't interested in events
 7   that occurred after that time?
 8      A.   No.
 9      Q.   So would it be a fair statement to say that you
10   downloaded all the information that was available?
11      A.   That was relevant to the case.
12      Q.   Well, no, I didn't say relevant, I am saying all the
13   information that was available in the police vehicles; would
14   that be a fair statement?
15      A.   Yes.
16      Q.   These vehicles, wouldn't have had information from
17   the day before or whatever, would they?
18      A.   I don't know, I don't know how long they keep those
19   recordings.
20      Q.   Okay.
21      A.   I think they download them everyday, I don't know
22   that.
23      Q.   Okay, I guess what I am asking you is, is that the
24   focus of what you were trying to retrieve from the vehicle was
25   from the time the officers came in contact with Mr. Ruiz till
```

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

17

1   everybody left the scene out there; would that be a correct
2   statement?
3      A.   It would be.
4      Q.   So as far as you know -- have you ever looked at
5   these videos?
6      A.   Yes.
7      Q.   So you have watched them from start to finish?
8      A.   Yes.
9      Q.   And to your knowledge, everything that occurred from
10  the officer's first contact with Mr. Ruiz until they turned
11  the lights out there on Bernal Street, you have got a copy
12  of it; is that correct?
13     A.   That's correct.
14     Q.   And that would be, what, about seven hours or more of
15  video?
16     A.   No, it would be a lot less than that.
17     Q.   How long would it take until the crime scene people
18  and everybody finished up out there?
19     A.   I am going to say probably maybe about three hours,
20  three to four hours.
21     Q.   So from about 5:00 to 8:00?
22     A.   Somewhere around there, yes.
23     Q.   Give or take an hour or so?
24     A.   Yes.
25     Q.   And you got a copy of all of that information that

18

1   was taken from at least two patrol vehicles; is that correct?
2      A.   That's correct.
3      Q.   One of them would be Nix's, and the other would be
4   the second officer in the pursuit; would that be a correct
5   statement?
6      A.   Yes.
7      Q.   Now, then, Detective Briseno, are there any other
8   police vehicles out there that were regarding any of the
9   events that occurred that day?
10     A.   Not to my knowledge.
11     Q.   Were there just the two original patrol cars that
12  started that were involved in the pursuit; is that correct?
13     A.   That's correct.
14     Q.   Now, then, after a certain point in the video, there
15  is no sound, are you aware of that?
16     A.   There is no what, excuse me?
17     Q.   Sound.  In other words, there is no audio.  I think
18  right after the police officers are talking to each other and
19  they try to effect the traffic stop, Mr. Ruiz doesn't comply
20  and basically at that point in time, there is no audio
21  contained in the video, are you aware of that?
22     A.   Yes.
23     Q.   You have any reason as to why that's what happened?
24     A.   No, I don't.
25     Q.   Was anybody instructed to make any alterations or

19

1   deletions in regard to those videos?
2      A.   No.
3      Q.   If anybody did make any alterations or deletions, do
4   you know who that might have been or what department that
5   might have been?
6      A.   Well, there were no orders to do that, so no, I
7   couldn't tell you.
8      Q.   Well, I didn't say that there had to be any orders, I
9   am just asking you if somebody -- if somebody took it upon
10  themselves to do that, would it have been done before these
11  were brought to you?
12     A.   Well they weren't done to begin with, I don't --
13     Q.   I am just asking you that as a hypothetical question,
14  I am not saying that they were altered, but if they were
15  altered, it wouldn't have been after they were put in your
16  possession; would that be a correct statement?
17     A.   Well yeah, that would be a correct statement.
18     Q.   So it would have been done by somebody who came in
19  contact with that information before it was brought to you?
20          MR. BROOKS:  Excuse me.  Judge, I need to object
21  to that question.  The form of the question assumes facts not
22  in evidence in this hearing.
23          MR. BRAUCHLE:  Well, it is a hypothetical
24  question, Your Honor.
25          MR. BROOKS:  As long as it is phased

20

1   hypothetical, that's fine:  The way the question was just
2   asked, it was not a hypothetical.
3          THE COURT:  I will sustain the objection.
4          If you will rephrase the question, Mr. Brauchle.
5      Q.  (By Mr. Brauchle)  Okay.  Mr. Briseno, you
6   say the videos are not in any way altered?
7      A.   No.
8      Q.   Okay.  Now, then, hypothetically if there was
9   anything that was altered or left out or deleted, it would
10  have had to be done by somebody that came in contact with that
11  information before it was brought to you; would that be a
12  correct statement?
13     A.   Yes, it would be correct.
14     Q.   Because you are saying that from the point in time
15  that they were brought to you and came into your possession,
16  nothing was altered or changed; is that correct?
17     A.   That's correct.
18     Q.   You ever asked anybody in the police department why
19  there is no sound from the time that the chase started till
20  the time that the video ends?
21     A.   No, I did not.
22     Q.   But you are aware of that; is that correct?
23     A.   Yes.
24     Q.   And that -- I think that time starts about 3:57 in
25  the afternoon; is that correct -- I'm sorry, 5:37?

1     A.   Yes.
2     Q.   You are aware of that?
3     A.   Yes.
4     Q.   And that's in regard to both of the vehicle recording
5 devices; is that correct?
6     A.   Yes.
7     Q.   And of course you have watched these on one or more
8 occasions and you agree that from 5:37 on on both vehicles,
9 there is no recording -- there is no sound in regard to the
10 videotape or video recording; is that correct?
11     A.   That's correct.
12     Q.   Well, let me back up, if the shooting occurs at 5:37,
13 the chase started let's say for purposes of this question,
14 three or four minutes prior to that; is that correct?
15     A.   More or less, yes.
16     Q.   And so basically if you are watching the video, at or
17 about the time that Mr. Ruiz tries to speed off is when the
18 sound goes away or there is no more conversation or any other
19 sound in regard to those videos; is that correct?
20     A.   Yes.
21     Q.   And you have no idea how or why that happened?
22     A.   No, I do not.
23     Q.   Officer -- or Detective Briseno, going back to my
24 last question, would you expect that there would be some sort
25 of sound from the time the chase started till all of the

1 activity ended out there?
2     A.   Well, like I said, I don't know, I am not a
3 communication expert, so I really can't answer you that.
4     Q.   Well, let's just liken it to a DWI arrest. Officer
5 pulls up, makes a stop, starts talking to the suspect, you
6 think that there would be sound from start to finish, wouldn't
7 you?
8     A.   Well, yes, I guess.
9     Q.   Okay. These things aren't any different than what
10 would be recording regular police --
11     A.   Like I said, I am not a communications expert, so I
12 really can't answer that.
13     Q.   Okay. But the question was, not that there should
14 be, but I just said wouldn't you expect that there would be
15 sound throughout the videotape?
16     A.   Hypothetically, yes.
17     Q.   I think everything was framed hypothetically?
18     A.   Okay.
19     Q.   So -- hypothetically it should be there, in actuality
20 it is not; is that a fair statement?
21     A.   Yes.
22     Q.   Okay. Let's go to another factor. The dispatch
23 tapes in the inter-car communications between the officers and
24 the agencies involved in this situation, there were any number
25 of police units that were either dispatched or showed up out

1 there on Bernal Street, and then there was also fire
2 department personnel involved with the ambulance; would that
3 be a fair statement?
4     A.   Yes.
5     Q.   You don't know of any other agencies or persons that
6 would have been out there, do you?
7     A.   No, not to my knowledge.
8     Q.   Well, that's a rather broad question. I am talking
9 about any other law enforcements that would have been out
10 there?
11     A.   I do not know about that, no.
12     Q.   Okay. So basically we have got DPD and DFD; would
13 that be a correct statement?
14     A.   Yes.
15     Q.   Okay. Did you request the dispatch tapes and the
16 communications involving this event, did you request those
17 from DPD?
18     A.   Yes.
19     Q.   And who would have been in charge of procuring those?
20     A.   It was Richardson.
21     Q.   We go back to Rock Richardson?
22     A.   Yes.
23     Q.   And he brought those to you at what time
24 approximately?
25     A.   Like I said, I don't remember if it was the second

1 day or the third day?
2     Q.   Okay. But within three days?
3     A.   Yes.
4     Q.   In all likelihood. Do you know where he would have
5 had to have gone to procure those?
6     A.   Again, I don't know if -- I believe that Detective
7 Crumb might have gone to communications and picked the tapes
8 up from Richardson. I don't think that Richardson brought
9 them himself to our office.
10     Q.   Okay. Let's go back to that once again. Once you
11 decided that you wanted the video and the audio evidence in
12 regard to this case, you contacted Richardson?
13     A.   No, I did not.
14     Q.   Who contacted Richardson?
15     A.   I think, I told you before, they took it upon
16 themselves, they knew that we were going it request that
17 information, and they took it upon themselves to do the tapes.
18     Q.   Okay. Without any instructions or requests from
19 anybody in DPD?
20     A.   That's correct.
21     Q.   And then once they downloaded or accessed whatever it
22 was that they went after, they gave it to Crumb?
23     A.   That's correct.
24     Q.   And Crumb gave it to you?
25     A.   Yes.

25

```
1    Q.    And as far as ever discussing what you wanted or what
2    you expected with Richardson, that never occurred?
3    A.    Repeat that.
4    Q.    In other words, you didn't say, Mr. Richardson, go
5    out and get blah, blah, blah, because they just did it on
6    their own initiative; is that correct?
7    A.    That's correct.
8    Q.    They were never instructed as to go get this or don't
9    bring this in or anything else.  There were no perimeters
10   given to them?
11   A.    Not to my knowledge, no.
12   Q.    And you expected them to bring in all of the
13   evidence; is that correct?
14   A.    Yes, relevant to the particular case.
15   Q.    And that would have been turned over to Crumb and
16   Crumb would have given it to you?
17   A.    That's correct.
18   Q.    Have you ever watched her listen to this with anybody
19   other than yourself?
20   A.    No, I listened to them by myself.
21   Q.    Pardon?
22   A.    I listened to them by myself.
23   Q.    Okay.  So you didn't listen to them with anyone other
24   DPD officers, you didn't listen to them or watch them with
25   Crumb and you haven't listened to them or watched them with
```

26

```
1    the D.A.'s office; is that correct?
2    A.    That's correct.
3    Q.    So once -- once you listened and watched them
4    yourself, that was it for you, you didn't participate in any
5    debriefing or group watching or anything of that nature; would
6    that be a correct statement?
7    A.    Yes.
8    Q.    Now, then, have you discussed with anybody why there
9    would be lapses or areas in the dispatch tape in which there
10   is no communication going on whatsoever, are you aware of
11   that?
12   A.    Yes.
13   Q.    See once again we go back to at or about 5:37 in
14   regard to the dispatch tapes in the inter-department
15   communications, and all you hear is basically a dispatcher or
16   people calling in and the dispatcher directing them to certain
17   channels; would that be a correct statement?
18   A.    Yes, sir.
19   Q.    And then did you know if there is recordings of what
20   was said on the various channels that the dispatcher referred
21   the officers to?
22   A.    Repeat that.
23   Q.    Okay.  This is kind of a synopsis and it is not
24   actual testimony.  But you have heard things where the
25   officers would come in and the dispatch would say go to
```

27

```
1    channel 44?
2    A.    Yes.
3    Q.    I am not sure that would be the right channel.  But
4    she directs them to another channel to communicate over; would
5    that be a correct statement?
6    A.    Yes.
7    Q.    Now, then, those alternate channels that the officers
8    were directed to, have you ever received the audio information
9    that was on those channels?
10   A.    No, all the information we got was what I have got on
11   those tapes.
12   Q.    That main channel for want of a better name?
13   A.    Yes.
14   Q.    Would that have been channel five or whatever?
15   A.    Yeah, I believe so.
16   Q.    So the only information you ever got was what was on
17   the original channel if that was channel five, that's what you
18   have?
19   A.    Yes.
20   Q.    And so as far as what occurred or what was said on
21   the alternate channels that the officers were directed to, you
22   don't have any recordings of those and you don't know what was
23   on there?
24   A.    That's correct.
25   Q.    Whose duty would it have been to be gathered up that
```

28

```
1    information, would that have been Richardson?
2    A.    Yes, and his communication people.
3    Q.    And whether they did that or not, you don't know?
4    A.    I don't know.
5    Q.    Well, they must not have, if you don't have it?
6    A.    Right.
7    Q.    Would that be a correct statement?
8    A.    That's correct.
9    Q.    You think that still exists?
10   A.    If it did, they would have provided that information,
11   the recordings.
12   Q.    And once again, that's information that they gathered
13   up and brought to you within approximately a three-day period;
14   is that correct?
15   A.    That's correct.
16         MR. BRAUCHLE:   May I approach the witness, Your
17   Honor?
18         THE COURT:   You may.
19         MR. BRAUCHLE:   At this point I am not going to
20   have this tagged as evidence.
21   Q.    (By Mr. Brauchle)  Detective Briseno, I am
22   going to show you some discs that have writing and I
23   guess Marks-A-Lot, I guess, on the surface of them.
24   A.    Yeah.
25   Q.    Did you make those or do you know where they came
```

1  from or anything like that?

2      A.   No, I did not make them.  Is this the audio?

3      Q.   Yes, audio?

4      A.   If it is the audio, as I said, would have been made

5  by Rock or Mr. Richardson.

6      Q.   Are you the one -- would he have been the one that

7  written this detonating information on them?

8      A.   Yes.

9      Q.   So -- so when you have copies that would probably

10 look like these; is that correct?

11     A.   That's correct.

12     Q.   So do you know who would have made copies of what we

13 will call for purposes of this hearing the originals?

14     A.   Who made the originals?

15     Q.   Well, let's for purposes of this hearing, when they

16 went out and gathered up the audio or video evidence, let's

17 say that the discs that they did that on would be call the

18 originals.

19     A.   Okay.

20     Q.   They would -- would be one of each, I guess.  And

21 then after that copies would have been made?

22     A.   That's correct.

23     Q.   Were those made by Richardson?

24          MR. BROOKS:  Your Honor, excuse me, Judge, I

25 need to object because the process in which he is describing

1  that the evidence is downloaded, that is incorrect.  And I

2  have had previous conversations with Defense Counsel and told

3  them how it is done.  So the idea that there is an original

4  disc taken from the squad car, that is incorrect, that is not

5  how it is done.

6          MR. BRAUCHLE:  I am not saying that there is a

7  disc inside the squad car, but the information that is taken

8  out of the recording device is put on a disc.

9          MR. BROOKS:  No, it is not.

10         MR. BRAUCHLE:  Where does it go.

11         MR. BROOKS:  The information is downloaded to a

12 laptop.  It was downloaded at the crime scene.  That laptop is

13 taken to DPD and downloaded on a server, and that server is

14 printed out.  And I have given that information previously how

15 that process is done.

16     Q.   (By Mr. Brauchle)  Are you familiar with

17 the process just outlined by the State

18     A.   Yes.  That has to do with the video, I thought we

19 were talking about the audio.

20     Q.   Okay.  What process is done in regard to the audio?

21     A.   The audio, the tapes or the information is downloaded

22 from the communications tapes, which is done by Richardson.

23     Q.   And what type of tapes are those?  I mean how is that

24 information stored?

25     A.   Well, they got recorders down in communications.  And

1  again you would have to get all of those procedures from

2  Richardson.  I am not that familiar with all the

3  communications procedures.

4      Q.   Okay.  So you don't know what media the information

5  is stored on at communications?

6      A.   At this time they are stored in digital tapes --

7  digital system.  I think prior to this, they were the old

8  system, I am not sure when the transition took place.  And

9  again you would have to get that information from the

10 communications people.

11     Q.   In addition to Richardson, are there any other

12 communication people, to your knowledge, that would have ever

13 been involved in the retrieval of any of this information?

14     A.   No, I am not.  Again, you have to talk to Richardson.

15     Q.   Okay, Richardson is just the person that just showed

16 up and gave this stuff to Crumb; would that be a correct

17 statement?

18     A.   Yes.

19     Q.   Went out and did whatever he did, brought it to

20 Crumb, Crumb brought it to you; is that correct?

21     A.   Yes.

22     Q.   So if -- if there is anybody else involved, we need

23 to get that information from Richardson?

24     A.   That's correct.

25     Q.   Now, did those civilian employees make any type of

1  reports?

2      A.   That I don't know.

3      Q.   They are not like police officers, they don't have to

4  fill out --

5      A.   Well, they probably do, but that is something that I

6  am not familiar with.

7      Q.   Okay.  Detective Briseno, you understand that the

8  shooting occurred at or about 5:37 for purposes of our

9  questioning?

10     A.   Okay.

11     Q.   Would that be a correct statement?

12     A.   Yes.

13     Q.   Okay.  And you don't have on some of the audio

14 recordings, you don't have audio transmissions that occurred

15 before 5:37; is that correct?

16     A.   Yes.

17     Q.   And basically on some of them it leads up to 5:37 and

18 you don't have any transmissions after that; would that be a

19 fair statement?

20     A.   Yes.

21     Q.   Did you ever in any way inquire or wonder why some of

22 them stopped at -- at or about the time of the shooting and

23 some of them started at or about the time of the shooting?

24     A.   No, I did not.

25     Q.   You didn't ever discuss that with anybody?

33

1     A.    No.
2     Q.    That didn't seem in any way curious circumstance to
3  you?
4     A.    Not at the time.
5     Q.    Does it now seem like curious situation?
6     A.    No, it wouldn't.
7     Q.    You got any explanation why there would be no
8  recording up to a certain point then obviously audio
9  transmissions?
10    A.    Again, like I said, I am not a communication expert,
11 I cannot even answer on that.
12    Q.    So no matter what the situation is, if there is audio
13 up to a certain point in time and after that or no audio up to
14 a certain point in time or no audio after that, either one of
15 those situations, you don't know why that would happen?
16    A.    That's correct.
17    Q.    The tapes -- the evidence that was gathered and
18 brought to you, you would say that you are aware of both of
19 those situations; is that correct?
20    A.    Yes.
21    Q.    And how or why that may exist, you don't know; is
22 that correct?
23    A.    That's correct.
24    Q.    Let me go to a completely different subject.  Have
25 you discussed or shown the video of Officer Nix being shot,

34

1  have you discussed that with anybody in regard to DPD
2  training?
3                MR. BROOKS:   Judge, I am going to object to that
4  question, that's outside the scope of this hearing.  My
5  understanding at the hearing last week, he was being
6  subpoenaed to testify to the existence of audio and
7  videotapes.  He wasn't being subpoenaed regarding policy or
8  training.
9                THE COURT:   Sustained.
10               MR. BRAUCHLE:   I don't think the subpoena states
11 that he is only going to be questioned in regard to certain
12 subject matter.  If he knows, he can answer the question.  I
13 would --
14               MR. BRAUCHLE:   Can I rephrase, Judge.  The purpose
15 of this hearing was to establish the existence or nonexistence
16 of audio tapes or videotapes at that request from last week.
17 It wasn't with respect to training and policy.
18               THE COURT:   The Court will sustain the
19 objection.
20               MR. BRAUCHLE:   Well, we would like to make a
21 bill in regard to that proceeding in regard to that question.
22               THE COURT:   Very well.
23    Q.    (By Mr. Brauchle)   Do you recall what the
24 question is Detective Briseno?
25    A.    Yes.

35

1     Q.    Have you done that?
2     A.    No, I have not.
3     Q.    So you haven't shown it to anybody that would be in
4  any way connected to officer training?
5     A.    I have not.
6     Q.    You know of anybody that has?
7     A.    I don't know, I couldn't tell you.
8     Q.    Well --
9     A.    Somebody else might have, but not to my knowledge.
10    Q.    So as far as -- is the incident being shown or
11 disseminated or inquired about as to technique or training,
12 whatever, you haven't done anything of that nature?
13    A.    Not myself, no.
14    Q.    Well, anybody at your direction?
15    A.    At my direction?
16    Q.    Yeah.
17    A.    I am not a supervisor, no.
18    Q.    Well, you answered the question saying not -- you
19 didn't yourself?
20    A.    That's correct.
21    Q.    That's what you said.  I didn't myself, and that kind
22 of implied that there might have been somebody else?
23    A.    I am saying, there may have, but I didn't do it.
24    Q.    And if there is somebody that did it, you don't know
25 about it?

36

1     A.    No.
2     Q.    Do you know what section of the department would have
3  information in regard to this kind of training?
4     A.    Well, the question you are asking about should be the
5  training people.
6     Q.    You know what -- you know if it is at the academy or
7  some place else?
8     A.    It would be at the academy, yes.
9     Q.    And that would be where policy and training in regard
10 to felony stops or felony arrests would take place; is that
11 correct?
12    A.    Yes.
13    Q.    But you don't know anybody out there that would be
14 directly responsible or be able to testify to that?
15    A.    No, I don't.
16               MR. BRAUCHLE:   That would conclude the bill,
17 Your Honor.
18               THE COURT:   Anything further, Mr. Brauchle of
19 this witness?
20               MR. BRAUCHLE:   I don't believe so, Your Honor.
21               THE COURT:   State have any questions?
22               MR. BROOKS:   No, Your Honor.
23               THE COURT:   Thank you, sir.  You may step down.
24               (Witness complies.)
25               MR. BROOKS:   Is he excused?



37

```
 1          MR. JOHNSON:   We have no objections to him being
 2   excused, sir.
 3          THE COURT:   You are excused, sir.
 4          MR. JOHNSON:   Thank you.
 5          MR. BRAUCHLE:   We will call Rock Richardson.
 6          (Witness entered the courtroom.)
 7          THE COURT:   You may proceed, Mr. Brauchle.
 8                    ROCK RICHARDSON
 9   was called as a witness, and having been duly sworn by the
10   Court, testified under oath as follows:
11                  DIRECT EXAMINATION
12   BY MR. BRAUCHLE:
13   Q.   State your name, please.
14   A.   Rock Richardson.
15   Q.   How are you employed.
16   A.   Dallas Fire Communication, 911.
17   Q.   Dallas fire communication?
18   A.   Dallas Fire Rescue Communication.
19   Q.   So your employer is the fire department; is that
20   correct?
21   A.   That's correct.
22   Q.   Now, then, are you aware of a police shooting
23   involving Officer Nix that occurred spring of last year?
24   A.   Yes, sir.
25   Q.   Okay.  Were you in any way involved in the retrieval
```

38

```
 1   of audio or video information in regard to that?
 2   A.   Audio, yes, sir.
 3   Q.   Audio?
 4   A.   Yes, sir.
 5   Q.   And where did you make the recordings in regard to --
 6   well, let me back up.  Did you make any downloads of any
 7   police communications that occurred on the date of the
 8   shooting?
 9   A.   Yes, sir.
10   Q.   And at whose direction did you do that?
11   A.   Lieutenant Crawford.
12   Q.   Lieutenant Crawford.
13   A.   Police communication.
14   Q.   And when did he contact you?
15   A.   The morning after the shooting, Saturday morning
16   after the shooting.  He called me on my cell phone and asked
17   me some questions about the system we had.  We had some
18   problems with the system and throughout our communication he
19   asked me if I could come in and help retrieve the information
20   off of our system, and I agreed to it, I came to work.
21   Q.   Somebody had already tried to retrieve information
22   off of their system?
23   A.   They had looked on their side.  Each one of us, both
24   police and fire have access to all the communications that
25   come on the 911 and radio for police.
```

39

```
 1   Q.   So there are duel recording systems that record the
 2   same thing?
 3   A.   It's a -- one main server that record all of it, both
 4   of us have access to it.
 5   Q.   And where is that located?
 6   A.   The server, in City Hall.
 7   Q.   So at City Hall?
 8   A.   At City Hall.  That's where police communication and
 9   911 communications are located.
10   Q.   Okay.  And so all fire communications, all police
11   communications, all 911 communications all go through the same
12   server; is that correct?
13   A.   That's correct.
14   Q.   Now, then, Lieutenant Crawford contacted you the next
15   day and told you that they had had some problems with
16   retrieving communications?
17   A.   Retrieving the information, the 911 calls and the
18   radio traffic off the NICE, which is a new recording system
19   which we had just put in, had been installed a month earlier.
20   Q.   And so that implied to you that somebody had already
21   tried to download that information; is that correct?
22   A.   He had tried to find it, yes, sir.
23   Q.   Now, would that be Lieutenant Crawford that tried to
24   find it?
25   A.   Lieutenant Crawford and someone with him, I am not
```

40

```
 1   sure who the other person was, someone in his office.
 2   Q.   And they are from police communication?
 3   A.   That's correct.
 4   Q.   Now, then, what position you hold in the fire
 5   department communications department?
 6   A.   I'm the open records custodian.  I make all the 911
 7   calls for media, attorneys, police officers and other citizens
 8   that request them.
 9   Q.   Okay, but you are an actual fire department employee?
10   A.   That's correct.
11   Q.   And were you able to recover the transmissions in
12   regard to the events that occurred the day before, you were
13   summoned to City Hall?
14   A.   I believe we were able to retrieve everything that
15   was applicable to this situation that happened the night
16   before, yes.
17   Q.   What does that mean?
18   A.   We were able to pull all the information both radio
19   traffic and the communication between officers on the radio
20   off of the system that -- we had had a problem with the NICE
21   system, so we had to pull it over the older system they were
22   still both recording at the same time.  We had not turned the
23   old system off yet.
24   Q.   And that would have occurred on what date, do you
25   know?
```

41

1    A.    That Saturday after the shooting.
2    Q.    Do you have any notes or records or anything what you
3 did on that day?
4    A.    The notes and records that I had are in a file that's
5 in my office locked up and is not to be released per the
6 attorney general.
7    Q.    And what statute would that be under?
8    A.    Open records act. It was withheld from public
9 consumption.
10   Q.    Are you talking about the notes that you personally
11 made as to what you did on that Saturday, those are locked up
12 somewhere?
13   A.    I made no personal notes that of what I did. I just
14 made notations where calls were located and transmissions
15 times. And those times were then put on the disc that I made
16 or the tape that I made.
17   Q.    Okay, did you ever listen to the information that you
18 retrieved?
19   A.    Yes, sir.
20   Q.    You might recall, but I think that for purposes of
21 this question, all the parties were originally on what we will
22 say was channel five; would that be a correct statement?
23   A.    Yes, I think so.
24   Q.    And then at a certain point in time, the operator or
25 dispatcher started directing the officer to other channels

42

1 works that be a correct statement?
2    A.    I think that is correct sir.
3    Q.    I think one of them was channel 44 for purposes of
4 this questioning. Were you able to get the auxiliary channels
5 that the officers were directed to.
6    A.    Not -- the channel -- there is no channel 44 that I
7 know of.
8    Q.    For purposes of this conversation, you understand
9 that the officers were calling in on channel five, were
10 communicating on channel five?
11   A.    Okay.
12   Q.    And the dispatcher started directing them to other
13 channels?
14   A.    That's correct. And I was not able to retrieve off
15 of the other channels. It was not recording at the time.
16   Q.    Those channels weren't being recorded?
17   A.    Not on the new NICE system. The other system that
18 was there was malfunctioning. That's one of the reasons we
19 had gotten the new system is because the old system had
20 started to fail. And the new system had some kind of a short
21 in it that caused those channels that they had directed those
22 officers to not to record. It has since been repaired.
23   Q.    Okay. So the old channel, the old device, whatever
24 it was, would have recorded them?
25   A.    It would have had it been working, that's correct.

43

1    Q.    Just follow along with me?
2    A.    Okay.
3    Q.    It would have recorded them?
4    A.    Yes, sir.
5    Q.    But it wasn't working?
6    A.    That's correct.
7    Q.    And the new system, the NICE system, was installed
8 because of the defects that were occurring in the old system?
9    A.    That's correct.
10   Q.    And it didn't work either?
11   A.    That's correct.
12   Q.    Basically all the NICE system were recording are main
13 channel conversation?
14   A.    It was recording part of them, there were a couple of
15 channels that were not recording, that's correct.
16   Q.    Okay. So have you listened to what you retrieved?
17   A.    Then, I have not listened to it since.
18   Q.    You have some basic recollection of what you --
19   A.    Yes, sir.
20   Q.    And basically that was people that were all on, from
21 want of a better descriptor, all were on a main channel; is
22 that correct?
23   A.    Yes, sir.
24   Q.    And I think that was channel five; is that correct?
25   A.    Yes, sir, I think that's correct.

44

1    Q.    And that would be normal police procedure?
2    A.    That's correct.
3    Q.    Now, then, at some point in time there was a decision
4 made for all of the communications in regard to Officer Nix's
5 shooting or the conversations in regard to that, all of those
6 be moved to another channel; is that correct?
7    A.    I am not aware of that, sir.
8    Q.    Well, the dispatcher was directing the officers to
9 alternate channels; is that correct?
10   A.    That is correct.
11   Q.    And that decision had to be made by somebody, I would
12 assume, or they wouldn't have done that, would they?
13   A.    That's correct.
14   Q.    You just don't know?
15   A.    Don't know who.
16   Q.    You don't know who or how that occurred, right?
17   A.    That is correct.
18   Q.    And so you are saying that the only audio
19 transmissions that you were able to retrieve were basically on
20 the main channel?
21   A.    That's correct.
22   Q.    And you attempted to retrieve them from the alternate
23 channels and they didn't exist?
24   A.    That's correct. I was able to retrieve some
25 information off of the old system that -- both systems were

45

1 working on channel five and I was able to retrieve all of the
2 information off both channels to make sure that it all was
3 correct and both of them had all of the information that took
4 place during that time frame. It was a long period, I mean,
5 we recorded a lot of information.
6     Q.    Okay. So you did download, want of a better phrase,
7 all of the channel five information from the old system and
8 the new system and then listened to them to compare?
9     A.    That's correct.
10     Q.    And then you satisfied yourself that you had all
11 the -- all the information off of channel five; is that
12 correct?
13     A.    That's correct.
14     Q.    But you weren't able to on either system to get
15 anything on alternate channels?
16     A.    That's correct.
17     Q.    Now, then, if some of the sound started or ended at
18 5:37, are you aware of that?
19     A.    I can't remember what time, sir.
20     Q.    Well, at or about 5:37.
21     A.    Somewhere around there.
22     Q.    Okay. You have any idea as to why the audio would
23 stop or start at that time period?
24     A.    I have no idea. Except I recorded up to the point
25 where they had -- all -- things that had occurred that were

46

1 pertinent to the case ended. And what else was happening was
2 on that other channel that we are able to retrieve. Because
3 they had moved everybody else to that channel, that was the
4 one we could not record. So I recorded everything that was on
5 channel five that was pertinent to the shooting.
6     Q.    Up to?
7     A.    Up to where that stopped.
8     Q.    Up to a time approximately 5:37?
9     A.    Approximately 5:30, 5:40 somewhere in there.
10     Q.    Okay. And then basically you stopped recording or
11 stopped trying to retrieve information from that?
12     A.    I listened for another 40 to 45 minutes of all of the
13 conversations on that channel. But none of that conversation
14 was pertinent to this situation, so it was not retrieved and
15 put on the tape.
16     Q.    So are you saying that basically the information that
17 was on that channel was basically the dispatcher directing
18 people to the alternate channel?
19     A.    Before that they had directed a bunch of people and
20 after that point, everything else was on that alternate
21 channel, that's correct.
22     Q.    Do you recall if there was more than one alternate
23 channel?
24     A.    I only recall that I think they went to channel
25 eight. That's all I can remember is that they went to one

47

1 channel, eight.
2     Q.    Now, then, was Lieutenant Crawford present when you
3 were retrieving this information?
4     A.    Part of the time. He was in and out of my office
5 several times during the five or six hours we listened to
6 the -- all the information.
7     Q.    And where did that take place, again, at City Hall?
8     A.    At City Hall in my office in the basement.
9     Q.    And did you have anybody present when -- when you
10 were retrieving this information?
11     A.    My boss was present also.
12     Q.    Who would that have been?
13     A.    Kim Cole. Kimberly Cole.
14     Q.    And would she have been present while you were
15 downloading the information?
16     A.    She was in the office. She wasn't over watching what
17 I was doing, if that's what you are asking.
18     Q.    Well, both of y'all were down there on a Saturday,
19 right?
20     A.    That's correct.
21     Q.    That is not a normal working day I take it?
22     A.    That is not a normal working day for me.
23     Q.    Now, then, after you retrieved what you are saying
24 that you were able to retrieve, what did you do with that
25 information?

48

1     A.    It was put on to a tape. I did -- as my normal
2 procedure, I make headings for each one of them, which is the
3 time, the date, and what channel or what position they were
4 recorded at. And then the recording is made after that. And
5 then for each segment there is a time, date, header that goes
6 in front of that that I add on, and I mix all that together
7 and put it on a tape.
8     Q.    Now, when you say you put it on a tape, is that?
9     A.    Eight track -- I mean a cassette tape.
10     Q.    Did anybody give you a time frame to look for or to
11 home in on in regard to your attempt to retrieve this
12 information?
13     A.    Well, Lieutenant Crawford gave me the time that the
14 shooting started and the time that the unit started following
15 the suspect's car. And we started recording and looking for
16 information from that point. That was earlier than 5:30. It
17 was somewhere around five o'clock is when we started taping
18 information of the two officers that started following the
19 suspect's vehicle.
20     Q.    And then their subsequent calls to other officers,
21 right?
22     A.    And all their radio transmissions were on that same
23 tape or disc. I think I made some on tape and some on disc.
24     Q.    And so all of the channel eight conversations among
25 the officers that were involved with the initial chase, you

49

1  made those?
2      A.   Channel eight wasn't recording, channel five.
3      Q.   I'm sorry, channel five?
4      A.   Channel five.
5      Q.   So you got down all of the transmissions on channel
6  five?
7      A.   All of the transmissions from the time that the two
8  officers started following the vehicle, that's correct.
9      Q.   Now, then, if the recordings don't show anything
10 after the approximate time of the shooting, would that be
11 because we were on a different channel or would that be
12 because of a malfunction?
13     A.   At the time of the shooting, channel five was
14 working.  What conversations came across, we got all of that,
15 that is all on the disc.  Now, if some other officers were on
16 other channels, I don't have that, because it was not
17 recording.  Everything that was on channel five, during the
18 time of the shooting before and after, is on the disc or the
19 tape.
20     Q.   And you are certain of that?
21     A.   That's correct.
22     Q.   And you would have downloaded that on the date
23 following the incident?
24     A.   The morning following the incident, I got there about
25 ten o'clock in the morning and I stayed to about 4:00 or 4:30,

50

1  I left in the afternoon.
2          MR. BRAUCHLE:   May I approach, Your Honor?
3          THE COURT:   You may.
4      Q.   (By Mr. Brauchle)  Mr. Richardson, I will
5  show you a CD, are you the person that made the
6  notations on these or have you ever seen this
7  before?
8      A.   No, sir.  That is not my handwriting.
9      Q.   Okay.  So whoever made this notation on this CD, it
10 would not be you, right?
11     A.   It was not me, that's correct.
12     Q.   How -- do you make notations on the CD similar to
13 that?
14     A.   No.  I do not write on the CD itself, I have a label,
15 I make a label that goes on the CD and then it is written on
16 it in red ink.
17     Q.   And you did that on all things that you retrieved?
18     A.   That's correct.  It has a label that says Dallas Fire
19 Rescue 911.
20     Q.   Okay.  Now, when you took down or retrieved this
21 information, who did you give it to?
22     A.   Lieutenant Crawford.  I made several copies.  I kept
23 one for myself, made one for Lieutenant Crawford, and I made
24 one for Detective Crumb.
25     Q.   I take it he was there also?

51

1      A.   It's a she, and she was not there.  She was the
2  detective in charge of officer involved shootings.  She had
3  requested a copy.
4      Q.   And how did she request that?
5      A.   She asked Lieutenant Crawford to give her a copy.
6      Q.   Okay.  So Crawford told you that Crumb needed a copy?
7      A.   That's correct.
8      Q.   So you made one for yourself, one for Crawford, and
9  one for Crumb?
10     A.   That's correct.
11     Q.   And you still retain the original?
12     A.   I still retain the original.
13     Q.   As well as any notes that were generated in regard to
14 making the original?
15     A.   That's correct.
16     Q.   Did you ever dub in over -- did you make any
17 introductions at the start or the end of the tape?
18     A.   Yes, sir.  I make an introduction at the beginning of
19 every tape and at the end of every tape.
20     Q.   So the voice that we hear would have been yours?
21     A.   That's correct.
22     Q.   The audio information that you retrieved that day,
23 before or after the time of the shooting, does any of that
24 information still exist?
25     A.   No, sir.  We only keep that information for 30 days,

52

1  then it is erased.
2      Q.   So the only -- the only recollection or recording of
3  that would be, for want of a better phrase, your original?
4      A.   That's correct.  I don't know where the others are,
5  that one has never left my custody.
6      Q.   Okay.  But you have an original -- or, quote,
7  original, end quote, that you made for your own records and
8  that still exists?
9      A.   That's correct.
10     Q.   And as far as anything else in either of the two,
11 either the NICE system or the previous system, that
12 information has been deleted?
13     A.   That's correct.
14     Q.   So any information that was there would now be either
15 on your recording or just gone; is that correct?
16     A.   That's correct.
17     Q.   You know of anybody else that ever made any
18 recordings of this incident?
19     A.   No, sir.  I make all the recordings.  I am the only
20 one in my department that makes the recordings.
21         MR. BRAUCHLE:   We will pass the witness.
22         MR. BROOKS:   No questions, Your Honor.
23     May this witness be excused?
24         THE COURT:   You are excused, Officer.
25         MR. BRAUCHLE:   May we have a brief recess?

53

1  THE COURT: Let's take ten minutes.
2  (Recess taken.)
3  MR. BRAUCHLE: Judge, we have agreed to send
4  Ms. Banner and Sergeant Hooper home, and the State has agreed
5  too.
6  THE COURT: You may proceed, Mr. Brauchle.
7  MR. BRAUCHLE: Thank you, Your Honor.
8  **BRIAN COODY**
9  was called as a witness, and having been duly sworn by the
10  Court, testified under oath as follows:
11  **DIRECT EXAMINATION**
12  BY MR. BRAUCHLE:
13  Q.  State your name for the record, please.
14  A.  Brian Coody, C-o-o-d-y.
15  Q.  And you are the public information officer for DPD;
16  is that correct?
17  A.  No. I handle open records.
18  Q.  Oh, I'm sorry?
19  A.  Requests for Dallas Police Communications Division.
20  Q.  All right. I knew that, but didn't express it. In
21  regard to the situation in which Officer Nix was shot or
22  allegedly shot, you are familiar with that occurrence; is that
23  correct?
24  A.  Yes, sir.
25  Q.  And we discussed some aspects of the reporting system

54

1  that was in place with the DPD at that point in time with you
2  outside the courtroom; is that correct?
3  A.  Yes, sir.
4  Q.  Y'all had what would be called an older recording
5  system and then a recording system which I think is referred
6  to as the NICE system; would that be correct?
7  A.  Yes, sir.
8  Q.  And as a practical matter, those work 24/7 recording
9  all police radio traffic; is that correct?
10  A.  That's correct.
11  Q.  Radio traffic is assigned to various channels. Each
12  division or subdivision has their own channel; is that
13  correct?
14  A.  Yes, sir, that's correct.
15  Q.  So like Northeast would have one channel, Northwest
16  would have another channel?
17  A.  That's correct.
18  Q.  And that's so the officers in that subdivision can
19  communicate with each other; is that correct?
20  A.  Yes, sir.
21  Q.  Now, then, in the event of a major incident like a
22  police shooting or chase or barricade or something like that,
23  the officers in that area of town would be directed to an off
24  channel; is that correct?
25  A.  Depending on the amount of time -- how long it is

55

1  taking and, you know, the call. The calls started to back up,
2  they could directed to another channel.
3  Q.  And that is done simply so the regular police audio
4  communications aren't distorted by long delays and things of
5  that nature. And also so that the officers involved in
6  whatever is going on can talk to each other; is that correct?
7  A.  It is more for the regular calls for service so that
8  they can be dispatched. If you have a major indent on a
9  channel, it is tying up air traffic. And in order to, you
10  know, alleviate that and allow the dispatcher to get back to
11  her regular duties, they could probably direct it to another
12  channel.
13  Q.  Now, then, the incident involving Officer Nix, the
14  officers were diverted to another channel; is that correct?
15  A.  I don't have any knowledge of that. I have not
16  listened to all the radio transmissions.
17  Q.  Well, you know that the dispatcher directed the
18  officers to an alternate channel?
19  A.  No, I do not, only what y'all told me.
20  Q.  Well, let me just ask you this, what we discussed in
21  regard to traffic being diverted to alternate channels, that's
22  a normal course of business; is that a correct statement?
23  A.  Yes, sir.
24  Q.  And in regard to the incident involving Officer Nix,
25  if the communications were diverted to other channels, they --

56

1  you don't know if those other channels were recorded or not,
2  do you, or downloaded?
3  A.  I don't know if they were preserved, no.
4  Q.  Now, then, in regard to checking your records, did
5  you ever get a request to preserve the audio?
6  A.  No, I did not.
7  Q.  And you have checked those recently; is that correct?
8  A.  Within a week or two, yes.
9  Q.  Okay. Now, if somebody in the D.A.'s office or
10  whatever wanted a certain incident to be preserved, they have
11  to send your office a request to preserve that information; is
12  that correct?
13  A.  That's correct.
14  Q.  And that didn't occur in this case?
15  A.  I don't believe so, I could not find a motion to
16  preserve.
17  Q.  So as far as you know, any other alternate channels
18  or any conversations that took place between officers or
19  firemen or whatever on alternate channels to the regular
20  police radio traffic, would have been destroyed after 30 days;
21  is that correct?
22  A.  That's correct.
23  Q.  As well as the primary channel; is that correct?
24  A.  That's correct.
25  Q.  And that's what occurred in this case; is that

57

1    correct?
2        A.    As far as I am aware, yes.
3        Q.    So the only record of what occurred that day would
4    have been what Mr. Richardson and Lieutenant Crawford and
5    Kimberly Cole would have recorded on the day following the
6    incident, which would have been Saturday; is that correct?
7        A.    Yes, sir.
8        Q.    That was your day off?
9        A.    Yes, sir.
10       Q.    Normally you would have been involved in that
11   activity; is that correct?
12       A.    Yes.
13       Q.    But you weren't, and therefore, you have no personal
14   knowledge of what was recorded; is that correct?
15       A.    That's correct.
16       Q.    But it is your testimony that in things that would
17   appear to take a long period of time such as chases,
18   stand-offs, things like that, it is normal practice for all
19   that traffic to be transferred to other channels; is that
20   correct?
21       A.    Yes, sir.
22       Q.    And unless somebody request those other channels,
23   those would never be downloaded?
24       A.    Yes, sir.
25       Q.    And there is a tack channel; is that correct?

58

1        A.    Yes, sir.
2        Q.    Deployment, what channel is the tack channel?
3        A.    Channel eight.
4        Q.    And what is deployment channel?
5        A.    The deployment, undercover, they use channel nine and
6    channel 11.
7        Q.    And what channel between police cars?
8        A.    Channel ten.
9        Q.    And then there is also training channels too, I
10   believe you said?
11       A.    Training usually uses channel 12.
12       Q.    And what channel would officers use to talk to
13   themselves when they are away from the car?
14       A.    Channel ten is for conversation.
15       Q.    I think you mentioned in talking to us outside the
16   courtroom something about "A" and "B", somebody being on the
17   "B" side, what does that mean?
18       A.    I am not real familiar with the technology, but we
19   call it an "A" side and a "B" side. It is basically they
20   switch their radios to over where it does not go through the
21   repeater. It is a hand-held to hand-held or car-to-car
22   transmission only. Therefore, we don't get any of the
23   transmissions and we are unable to record that.
24       Q.    So if I am in a patrol car and I want to talk to
25   somebody else, there is a way that I can get that conversation

59

1    routed to where it cannot be recorded?
2        A.    If they are not close to the repeater, and they have
3    to be within a certain distance of each other to actually hear
4    each other.
5        Q.    What is a repeater?
6        A.    The transmitter.
7        Q.    Now, when you say transmitter, is that a tower or is
8    that something that is involved that is carried in the
9    individual vehicle?
10       A.    It would be with a tower.
11       Q.    If you are a certain distance from that tower and you
12   switch to a "B" channel, you can talk one patrol car to
13   another patrol car and that wouldn't be picked up.
14       A.    And we may not hear that downtown, that's correct.
15             MR. BRAUCHLE:   We will pass the witness.
16             MR. BROOKS:   No questions.
17             THE COURT:   Thank you, sir. You may step down.
18             MR. BRAUCHLE:   We will ask that this witness be
19   excused.
20             THE COURT:   And you are free to go, sir.
21             THE WITNESS:   Thank you.
22             THE COURT:   Next witness, Mr. Brauchle.
23             MR. BRAUCHLE:   We will call Vicki Hall.
24             (Witness entered the courtroom.)
25             THE COURT:   You may proceed, Mr. Brauchle.

60

1                          VICKI HALL
2    was called as a witness, and having been duly sworn by the
3    Court, testified under oath as follows:
4                       DIRECT EXAMINATION
5    BY MR. BRAUCHLE:
6        Q.    State your name and how you are employed, please.
7        A.    My name is Vicki Hall. I am a trace evidence
8    examiner at Southwestern Institute of Forensic Sciences, also
9    known as SWIFS.
10       Q.    Are you familiar with the case involving Officer Mark
11   Nix?
12       A.    Yes, sir, I am.
13       Q.    And were you assigned certain duties in regard to
14   analyzing certain evidence in that case?
15       A.    Yes, sir.
16       Q.    In regard to that evidence, do you recall myself and
17   my co-counsel and persons from the District Attorney's office
18   personally coming out to SWIFS on -- on or about April 1st?
19       A.    Yes, sir, I do remember that visit.
20       Q.    And I believe you had the clothing and other articles
21   that were pertinent to what you were running tests on there at
22   SWIFS on that day; is that correct?
23       A.    Yes. I had Officer Nix's clothing as well as
24   different pieces of his uniform as well.
25       Q.    Okay. And at that point in time we were there

61

```
 1   because you had not submitted a written report in regard to
 2   any test that you may or may not have run on those items; is
 3   that correct?
 4       A.   That is correct.
 5       Q.   And myself and co-counsel and the District Attorney's
 6   representatives were able to ask you questions as to what you
 7   had uncovered or discovered up to that point in time in regard
 8   to Officer Nix's clothes; is that correct?
 9       A.   Yes.
10       Q.   And myself and co-counsel for the Defense advised you
11   that we wanted you to test for presence of lead, both in the
12   form of actual pieces of lead as well as lead wipe and any
13   other evidence of lead being involved with Officer Nix's
14   clothing or any defects in Officer Nix's clothing and on
15   Officer Nix's bulletproof vest; is that correct?
16       A.   I recall a conversation and discussion about testing,
17   what could be done, that lead could be tested for on the shirt
18   and the other articles of Officer Nix's clothing.  I also
19   advised both yourself, co-counsel and District Attorney's
20   office that in most cases I would not test for lead because of
21   the evidence of an interposed target.
22       Q.   Okay.  But we asked you to do that specifically?
23       A.   All I recall was the conversation about y'all had
24   said that you were interested in that type of testing, and I
25   said that I don't do that type of testing on cases with
```

62

```
 1   interposed target.
 2       Q.   But you agreed to do that test.  Right?
 3       A.   Honestly I don't know if I said I would do it, but I
 4   know I did not perform it at that time.
 5       Q.   See, I have --
 6            MR. BRAUCHLE:   May I approach, Your Honor?
 7            THE COURT:   You may.
 8       Q.  (By Mr. Brauchle)  I will show you what is
 9   marked as Defendant's Exhibit A, and ask if you can
10   identify that
11       A.   Yes, sir.
12            MR. BROOKS:   No objection.
13       Q.  (By Mr. Brauchle)  Ms. Hall, can you tell
14   the Court what that is
15       A.   Defendant's Exhibit A is a two-page copy of a report
16   that I generated involving the analysis for lead on Officer
17   Nix's uniform shirt.
18       Q.   And when did you perform those tests?
19       A.   That test was performed on May the 12$^{th}$, 2008, with
20   the report generated on May 13$^{th}$.
21       Q.   Okay.  So the request was made on April 1$^{st}$ and the
22   test was done on May 12$^{th}$; is that correct?
23       A.   Once again that conversation that we had while y'all
24   were at the office in there -- in the laboratory, I don't
25   recall a specific request to do that.  I know we talked about
```

63

```
 1   it, I explained my reasoning for not doing the lead testing
 2   because of the presence of an interposed target and my
 3   understanding that that was left at that.
 4       Q.   Then why did you perform a test looking for lead?
 5       A.   Later conversations with Mr. Johnson, he told me over
 6   the phone that he did want the lead testing done.  I once
 7   again explained my reasons for not initially doing it, he
 8   insisted that I do it.  I conceded to the fact that he wanted
 9   it done so I performed the test on the outer uniform shirt.
10       Q.   And did he also tell you, as we did tell you at SWIFS
11   on April 1$^{st}$ that we wanted the bulletproof vest tested for
12   lead?
13       A.   My phone conversation with Mr. Johnson that he did
14   explain that he wanted not only the uniform shirt done, but
15   the undershirt and vest.  I informed him at that time that my
16   protocol there is no reason to do underline layers, I don't do
17   that on a regular basis and I did not see the need to do it in
18   this case.  At the end of that phone conversation I thought we
19   were in agreement that that would not be done.  So I only
20   performed the test on the outer layer uniform shirt.
21       Q.   Are you telling this Court that the only person that
22   you discussed the need for further testing was with my
23   co-counsel, Mr. Johnson?
24       A.   I have had conversations with the District Attorney's
25   office, Mr. Beach, about this case.  But the conversations
```

64

```
 1   about whether -- what I was going to do and the request came
 2   from Mr. Johnson.
 3       Q.   So Mr. Beach or no one else from the D.A.'s office
 4   requested any further testing from you?
 5       A.   Like I said, Mr. Beach, I have had conversations with
 6   him.  There have been some communications with Mr. Brooks as
 7   well.  They have been informed of Mr. Johnson's request, but
 8   as far as them specifically saying do this test and do that
 9   test, no.
10       Q.   Okay.  So you didn't do the testing of the
11   bulletproof vest because you didn't think it was needed; is
12   that correct?
13       A.   It's not a question of whether I think it is needed,
14   I don't believe that it is going to have any probative
15   evidence or evidentiary value.  There is no reason in my
16   experience to test underline layers of clothing in a
17   gunshot-related event.
18       Q.   Okay.  Well, you didn't think there was going to be
19   any lead on the shirt, did you?
20       A.   I had explained that there is not going to be lead
21   from the initial discharge of the weapon.  You might have lead
22   from the break up of the bullet as it passes through the
23   interposed target, but it does not give you any idea of a
24   range of fire which is usually why we do gunshot residue
25   analysis.
```

1     Q.    Well, gunshot residue analysis and testing for
2 presence of lead or lead wipes are two different tests, aren't
3 they?
4     A.    They are the same type of tests. They show similar
5 result. Range determination is just that. You are trying to
6 determine how far away the gun was when it was discharged into
7 a garment or into a target. We can also look for lead wipe to
8 help determine exist versus entrance deep X.
9     Q.    And you were specifically requested on more than one
10 occasion to test for lead wipe, weren't you?
11     A.    Once again, on the outer layer is what -- is the test
12 that I performed. Led wipe on an underline layer is just not
13 a test that I would normally perform.
14     Q.    Okay. We -- but it was made known to you on more
15 than one occasions that we wanted both the outer shirt and the
16 bulletproof vest to be tested for the presence of lead and/or
17 lead wipe; is that a correct statement?
18     A.    Yes, that request was made.
19     Q.    And you didn't perform test either for presence of
20 lead or lead wipe on the bulletproof vest, did you?
21     A.    That is correct.
22     Q.    And that was made -- that was a decision that you
23 made yourself because you had reason to believe that that
24 wouldn't be a test that would have any probable value; is that
25 correct?

1     A.    That is partly the truth. Like I said, the
2 conversation that I had with Mr. Johnson, I thought we were in
3 agreement after I explained my position that I would only test
4 the outer layer. I must have misunderstood his intentions.
5 But I believed that at the end of that phone conversation that
6 I would just test the outer layer and that that was
7 acceptable.
8     Q.    And when did that conversation take place?
9     A.    I did not make a notation of the exact date, but it
10 was somewhere around the middle part of April.
11     Q.    So from -- let's just say -- for purposes of this
12 question, from April 15th to May 13th, it took you that
13 long to perform your test?
14     A.    Unfortunately this is not the only case that I have
15 pending in my laboratory. I have had numerous other cases
16 going to court. I have had pending trial dates and other
17 rushed cases that I have been trying to juggle as well.
18     Q.    Are any of those capital murders?
19     A.    I don't believe that there were any capital murders,
20 but they were pending murder trials, yes.
21     Q.    How long would it take you to test the vest for lead
22 and lead wipe?
23     A.    The test itself is fairly simple, not very long. It
24 does not take very long to do the testify. But I have to set
25 up the area. When y'all were out at the laboratory, you

1 noticed the whole area has to be prepared, we have to cover
2 the walls with paper, the countertops with paper. It is a
3 very hazardous situation. And not to mention unpackaging
4 everything, if it is packaged for court, and then to reseal
5 everything to prepare it for court. So it would take at least
6 a half a day just to work that simple evidence.
7     Q.    When could we be provided with the report as to what
8 your test would be?
9     A.    Soon after, as soon as I have had the opportunity to
10 sit down at the computer and type the report and have it
11 reviewed.
12     Q.    You conducted a test, I think, on May 12th; is that
13 correct?
14     A.    Yes, this past Monday was when I performed the test
15 on the uniform shirt.
16     Q.    And then I assume that you sent the clothing back to
17 the property room?
18     A.    It is currently in our evidence vault at the
19 laboratory.
20     Q.    So you still have it there?
21     A.    Yes, sir, it is still at the laboratory.
22     Q.    Including the bulletproof vest?
23     A.    Yes, sir.
24     Q.    Now, the question is how long would it take to
25 fulfill our request of testing the bulletproof vest and

1 providing us with a report as to what your test revealed?
2     A.    As I mentioned, it probably would take half a day at
3 least to prepare the area, analyze the evidence, and then
4 another piece of time frame to write the report and have it
5 reviewed.
6     Q.    Can you give us a date as to when that might occur,
7 today being the 16th as I recall?
8     A.    Yes, sir. I could do it one day next week if the
9 Court insist that I do that type of evidence -- or do that
10 type of testing.
11     Q.    Well, you recall back on April 1st, there were at
12 least two representatives in the D.A.'s office, myself and
13 Mr. Johnson and we -- both sides tried to impart to you to
14 comply with the request of providing reports; is that a
15 correct statement?
16     A.    Yes.
17     Q.    And we advised you as to what we wanted and we were
18 especially interested in the test for lead; is that a correct
19 statement?
20     A.    You did make mention that you were interested in lead
21 testing.
22     Q.    And so we have got half of the lead testing on
23 May 13th, and we still don't have anything in regard to the
24 bulletproof vest; is that correct?
25     A.    That's correct for reasons I have already explained.

1    Q.    Okay.  And it is your statement that if the Court
2    orders you to, that you could sometime in the near future
3    perform that test?
4    A.    That is correct.
5    Q.    You have your file there in front of you?
6    A.    Yes, sir, I do.
7    Q.    Do you know what the date of the first report that
8    was prepared?
9    A.    The first report was generated on April 8th.
10   Q.    So that would have been seven days after you were
11   visited at SWIFS by the contingent of attorneys?
12   A.    Yes, sir.
13   Q.    And I think that that report basically just advised
14   that there were defects in the fabric, in the bulletproof
15   vest; would that be correct?
16   A.    It details what defects I found in the uniform shirt,
17   the undershirt, the bulletproof vest, also in the badge,
18   Officer Nix's Dallas Police Department badge, and other
19   fragments and attachments to the shirt.
20   Q.    But basically it is just an examination of things
21   that were shown to both sides at SWIFS; is that correct?
22   A.    That is correct.
23   Q.    And so a month later we have a report stating what
24   lead it may or may not be present in regard to the shirt, but
25   still no report in regard to the bulletproof vest; is that

1    correct?
2    A.    Correct, you have a second report that details the
3    testing of led on the uniform shirt.
4           MR. BRAUCHLE:   May I have a moment, Your Honor.
5           THE COURT:   You may.
6           (Pause in the proceedings.)
7           MR. BRAUCHLE:   We will pass this witness.
8           THE COURT:   Mr. Brooks.
9           MR. BROOKS:   No questions, Your Honor.
10          THE COURT:   Ma'am, what is the date that you can
11   have the test performed and report that the Defense is
12   requesting?
13          THE WITNESS:   I should be -- I will make a point
14   of doing it first thing Monday morning and could have a report
15   generated on Tuesday.
16          THE COURT:   The Court will order you to do that.
17          THE WITNESS:   All right.
18          THE COURT:   Anything further from either side?
19          MR. BROOKS:   No, Your Honor.
20          THE COURT:   Thank you, ma'am, you may step down.
21          MR. BRAUCHLE:   We will call co-counsel.
22          MR. JOHNSON:   I will make a proffer to Court.
23          THE COURT:   You may.
24          MR. JOHNSON:   Is that okay with you?
25   I would like the Court to know that in fact Mr. Brauchle

71

1    and I, along with Mr. Brooks and Mr. Beach and Tony the
2    investigator, we went to SWIFS on April the 1st.  We talked to
3    her about what we wanted.  Our discussion with her was
4    succinct and specific in regards to what we wanted tested.  On
5    or about April the 8th evidently she made a report in that
6    regard.  When we finally got a copy of it all that report said
7    what the defects in those materials were, which are things
8    visible to the naked eye.  So I started calling Vicki Hall to
9    say that's not what we wanted.  And I talked to
10   Mr. Brooks about that.  And I think he also started calling
11   Ms. Hall.  I left a message for her on April 22nd, a voice
12   mail message.
13          On April 23rd, I actually spoke with her.  I was
14   specific about what we wanted.  There was never any reason for
15   her to think based on our conversation that I only wanted the
16   shirt tested and not the bulletproof vest and not the
17   undershirt.  I still didn't get anything back from her.  She
18   told me on the 23rd that she would get those tests done.
19          On April 25th I called her again and left a voice mail
20   and also left messages with Mr. Brooks and also told the Court
21   that we were still trying to get though tests results back
22   from Ms. Hall.
23          I had had another conversation with Vicki Hall on
24   April 29th, and again she told me that she hadn't done the
25   test, but she was going to get on them at that time.  She told

72

1    me she had other cases ahead of it.  I appointed out to her
2    that this wasn't just a murder case, but a capital murder case
3    and not just a capital murder case, but a death-penalty case.
4    And we needed this immediately, there is no case she has that
5    is more important.  Very clear with her that we wanted the
6    test done on the shirt, the ballistic vest and the undershirt.
7    There is no reason for her to come to court today and said we
8    have some agreement that she was only going to do the shirt.
9    It is incredulous to me and very upsetting to me that should
10   come in here and tell this Court that.  There is no reason for
11   her to ever have assumed that we had an agreement to do
12   anything other than what he we asked for from the beginning.
13          Called her begin on May the 2nd, left voice mail message,
14   got no apply.
15          May the 5th, voice mail message, no apply.
16          May the 6th, voice mail message, no apply.
17          May the 7th, voice mail message, no reply.  She never
18   called me back.
19          Finally we get this report that we were given this week,
20   and lo and behold she still hasn't done everything that we
21   asked her to do.
22          If you have any questions, I will be glad to respond.
23          MR. BROOKS:   No questions.
24          MR. JOHNSON:   How about the Court?
25          THE COURT:   No questions.

1    MR. JOHNSON:  Okay, thank you, Judge.
2         MR. BRAUCHLE:  I will pass the witness.
3    I think that's all we have got in regard to live
4    witnesses.  We have some other matters in regard to paperwork
5    which seems to be a continually worrisome part of this case.
6         May I may approach the reporter again?
7         THE COURT:  You may.
8         MR. BRAUCHLE:  I am not sure if it is in the
9    court's file, but I will tender to the Court what has been
10   marked as Defendant's Exhibit B.  That was given to us
11   yesterday as a notice of an extraneous conversation or offense
12   or whatever the Court wants to make known to characterize it.
13   I guess that would have been yesterday, would have been
14   approximately ten days before trial date.
15        THE COURT:  And I do -- not to interrupt you,
16   Mr. Brauchle, there is a copy in the Court's file.
17        MR. BRAUCHLE:  So you are aware of what the
18   complaint is about?
19        THE COURT:  Yes, sir.
20        MR. BRAUCHLE:  There is also some motions in
21   regard to that have been filed by the Defense today pointing
22   out to the Court that these -- that notice is after the
23   discovery deadline and it is something as the Court can tell
24   by just looking at the body of the motion itself something
25   that the State would have had to have known about or would

---

1    have had to developed that evidence long before yesterday.
2    And -- it was just now being imparted to us yesterday.
3    Needless to say that we have had no time to in any way
4    investigate or to corroborate or otherwise come to grips with
5    the evidence.  And as requested in our motions, we would ask
6    that the Court deny the State the use or the presentation of
7    any of the information that is set out in the notice to
8    Defense Counsel.  We state that it has to be something that
9    they have known about and have been sitting on for quite
10   sometime.  And to give it to us approximately ten days before
11   the date of trial, obviously in noncompliance with the Court's
12   discovery motion.  We state that if the discovery deadline has
13   any meaning for anybody, that the Court should impose it and
14   keep the State from being able to admit any of the information
15   that is set in that notice to counsel.
16        There is also going back to I think our previous motion,
17   there is still some more extraneous offenses that have been
18   given to us in regard to Mr. Ruiz.  We would state once again
19   that those are untimely filed.  Both of the notices go to
20   things that obviously create surprise on the part of the
21   Defense Counsel.  They are untimely, do not afford us ample
22   opportunity to investigate or to in any way evaluate or
23   anything else in regard to going into the allegations or the
24   information that once again has been given to you.  And we
25   think the only equitable and realistic thing for the Court to

---

75

1    do is finally put its foot down and tell the State the
2    deadline is a deadline and you are too late.
3         Failing in that, we would once again come to the Court
4    and ask for a continuance if the Court doesn't see fit to keep
5    the State from constantly dribbling in all these new and
6    different things that we have no reason to believe that they
7    haven't known about for quite some time.
8         You know once they find out, I don't see what the reason
9    is that they can't immediately notify us, rather than wait
10   around and give us notice.  If you look at the allegations or
11   the information in the notice that was given to us yesterday
12   in regard to test -- testimony or purported testimony of a
13   Hector Martinez, that in and of itself is going to take
14   tremendous amount of time to track down and try to defend
15   against or to in any way react or -- for once I am at a loss
16   for words -- but in any way come to grips with -- to defend
17   our defendant against these accusations.  So we would
18   reiterate -- pardon me, Your Honor.
19        We would also refer the Court -- you have a document that
20   appears somewhat like this, it's supplement to notice to
21   extraneous offenses.
22        THE COURT:  I do.  Filed on April 11th, I
23   believe.
24        MR. BRAUCHLE:  No, if you look at the bottom of
25   that, you will see what is file stamped April 11th.

---

76

1         THE COURT:  That's what it appears to be.  The
2    stamp is on some of the text of the supplement.  From what I
3    can gather, it appears to be file stamped April 11th.
4         You can look at this copy.
5         MR. BRAUCHLE:  Well, the reason that that is
6    germane, and it goes to our -- our motion, is that we got a
7    copy of it on May 8th that was delivered by Mr. Brooks to
8    Mr. Parks.  And that was done on May 8th, which would have
9    been approximately a month after they put a copy in the
10   Court's file.  So we have no idea why they would file it with
11   the Court then not give it to us until a month later.  But
12   once again that's -- if you look -- if you look through them,
13   there is probably 25 extraneous offenses or incidents that
14   were given to us seven days ago, eight days ago.  In which
15   evidently had been known to them from at least April 11th if
16   not earlier.  And we were just not notified once again.  I
17   think also even if everything was done as it should have been
18   done on April 11th, that would once again have been outside
19   the time deadlines in regard to the discovery.
20        So we would ask that the State be barred from presenting
21   any of the testimony included in supplemental notice to
22   extraneous offenses for purposes -- off the record.
23        (Discussion off the record.)
24        MR. BRAUCHLE:  But for purposes of our objection
25   is the Court familiar with Exhibits B and C that we are

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1  complaining about untimely notice at this point in time?

2            THE COURT:  Yes.

3            MR. JOHNSON:  Can I make a proffer in regard to

4  the dates in question regarding that document, what is it

5  marked as?

6            MR. BRAUCHLE:  C.

7            THE COURT:  You are referring to the supplement?

8            MR. JOHNSON:  Yes, Your Honor.  Defendant's

9  Exhibit C.

10           After our pretrial last Thursday, May the 8th, after it

11  was over, Mr. Parks and I went into the Defense workroom and

12  Mr. Parks came into the workroom and said I was just handed a

13  copy of Defendant's Exhibit C by Mr. Brook.  He showed it to

14  me and I had never seen it before.  We went -- Mr. Parks and I

15  went to your clerks and asked them to get all of Mr. Ruiz's

16  file because our copy doesn't have a file copy on it.  So we

17  had your chief clerk as we stood there go through all of the

18  court's file.  And there was no copy of that Defendant's

19  Exhibit C in the file at that time.

20           And if the Court will recall, Mr. Parks and I actually

21  came out and stood in front of your Bench that the time and

22  said, Look what we just got.

23           Does the Court recall that?

24           And I pointed out to you the fact that we had just been

25  given last Thursday on May the 8th this notice of over 25

---

1  supplemental extraneous offenses.  And I want the record to

2  report that.  And I would like to know if this thing has a

3  certificate of -- from the prosecutor of the 11th of April,

4  2008, I want an explanation why they didn't give it to us

5  until May the 8th.  It says April the 11th is when they did

6  the certificate of service, but we were not given it until

7  May.

8            THE COURT:  And for the record, the Court does

9  recall that conversation with Defense counsel.

10           MR. JOHNSON:  Thank you, Your Honor.

11           THE COURT:  Mr. Brooks.

12           MR. BROOKS:  Yes, Judge.  With respect to, first

13  of all, the supplement that is in, I guess, in evidence as

14  Exhibit C, Judge, this information is approximately 23

15  extraneous offenses.  If you recall, at the first hearing

16  where they asked for a motion for continuance, part of the

17  reason that that continuance was agreed to by the State, which

18  was granted by the Court, because they had come into

19  possession of all of this information the week prior.  This is

20  just a formalized notice of all the information that they

21  received the week prior to the first court date and we agreed

22  to the continuance because I believe it was approximately 117

23  pages of documents from this defendant's gang file.  The

24  State, I can put it on the record, Judge, we have no intention

25  of trying to go into 23 extraneous offenses during the

---

1  guilt/innocence phase -- during the punishment phase of the

2  trial.  We are just basically trying to make sure that we have

3  got everything out there, give them everything that they are

4  entitled to.

5            Now, with respect to my recollection is that this was

6  turned on on April the 11th.  I asked my secretary who was

7  responsible for getting that out, do we have a copy of the fax

8  conformation sheet.  We could not find a copy of the fax

9  conformation sheet.  She then, she called Mr. Brauchle and

10  asked if he received it.  And her recollection to me is that

11  he said, yes.  The reason she recalls this specific document

12  is because it's the only one that she did not type herself.

13  Every other document or motion filed in this case has been

14  typed by my assistance, so that's why she recall this specific

15  document.  But again, every single thing in here, Judge, is in

16  a file that was turned over to them the week prior to the

17  first court date, which I believe was set for April.

18           THE COURT:  April 14th.

19           MR. BROOKS:  April 14th.  So they have had

20  this.  Now --

21           THE COURT:  So, Mr. Brooks, if I am following

22  you correctly, everything contained on the supplement,

23  Defendant's Exhibit C, that was tendered to the Defense on

24  April 11th.

25           MR. BROOKS:  Actually prior to April 11th,

---

1  Judge.  The information that they were given this week, that

2  information came into our position on the date stated in the

3  notice that was filed, which was the 14th of this month.

4  That individual is represented by counsel, we will bring

5  Mr. Humphreys in here, we can put it on the record when that

6  meeting took place between he and Mr. Beach and this agreement

7  was made between that person testifying.  No, we have not sat

8  on that.  And that information is no different than if

9  perchance the date before we start trial this defendant makes

10  statements to a jail inmate and that inmate relates those

11  statements to us, we are still entitled to put that before a

12  jury.  We do not have a duty to stop investigating this

13  individual, the things that he is participating in inside of

14  the jail or outside of the jail.

15           MR. BRAUCHLE:  Well, all that sounds well and

16  good, Hector Martinez has been charged with the offenses that

17  are set out there since last year, the two pending felony

18  cases.  If the Court is familiar with the designation system,

19  you see that those are 2007 cases.  So if they are telling the

20  Court that Charlie Humphreys didn't approach them and proffer

21  his client to them until May 14th, that's one thing.  I

22  don't think -- I don't think that Mr. Humphreys will come

23  forward and say that this marriage was consummated on

24  May 14th.  I think there had to be something that preceded

25  it, otherwise how would they even know that they wanted to

---

1  talk to him, Mr. Humphreys' client.
2            MR. BROOKS:   Judge, I don't think that we are
3  under obligation to give them information of every individual
4  that we are talking to or every individual who may possibly be
5  a witness. I think we are supposed to provide them notice of
6  extraneous offenses that we intend to, but we can't do that
7  until that is firmed up.
8            MR. BRAUCHLE:   Well, they started -- they
9  started this courtship long before May 14th. I think both
10  sides are well aware of that, as well as the Court. And just
11  cause the deal was consummated the day before yesterday,
12  doesn't mean that we are not entitled to know about it
13  before -- I guess what has happened is, they are saying, well,
14  we got all this information and we just decided here at the
15  last minute to reward the guy for telling us about it. Once
16  again we are being blindsided by the State's delay.
17        And once again we are asking the Court for a relief that
18  is fair and equitable.
19            THE COURT:   The Court will deny the motion to
20  exclude evidence of extraneous offenses, and in the
21  alternative also deny a second continuance.
22            MR. BRAUCHLE:   What does that do what is marked
23  as Defendant's Exhibit B.
24            THE COURT:   In reference to the witness Hector
25  Martinez, is that --

1            MR. BRAUCHLE:   Yes.
2            THE COURT:   Court will allow that witness to
3  testify and his information to be submitted to the jury.
4            MR. PARKS:   Your Honor, may I speak to that
5  briefly.
6            THE COURT:   You may.
7            MR. PARKS:   I guess my main concern was this
8  notice is the very nebulous nature of it. I guess what I am
9  concerned with is whether or not Mr. Martinez will testify
10  simply as is stated here. As nebulously as the notice would
11  indicate would be giving or about being able to give any
12  details. For instance in item one where it says during the
13  nine months proceeding, that there was -- the defendant
14  admitted jacking individuals at gunpoint. If he is not going
15  to be anymore specific than that or he can't be anymore
16  specific than that. I guess there isn't anything that we can
17  investigate. If he hits the stand and starts talking about
18  specific areas, not that we have not been noticed, then we are
19  going to have to be deprived the opportunity to investigate
20  the truthfulness of that. You see the problem. And the same
21  would be about this Club Stream, the shooting. If all the
22  information he has is the information that we have been given
23  notice of, it's going to be almost impossible to check that
24  out. But if he comes to testify at trial when it is too late
25  for us to try to find out whether or not what he is saying is

---

1  true, then we are going to be greatly harmed by that. So I
2  guess what I am saying is this, is that if State has got more
3  specific information than they have given us notice of, then
4  we need to be given that so that we can have an
5  opportunity to do our due diligence of investigation rather
6  than just be surprised by at trial.
7            THE COURT:   Mr. Brooks, response.
8            MR. BROOKS:   Judge, Mr. Martinez is an associate
9  of this defendant. All the incidents related in that
10  statement are things that he has personal knowledge of.
11  Things that he has personally seen or heard committed by this
12  defendant.
13        As far as more specificity, I am going to be honest, I am
14  not the person that sat down with Mr. Martinez, Mr. Beach is,
15  and he is having blood work done today. So I don't know if I
16  can fully answer counsel's question, I am just going to be
17  honest about that.
18            MR. PARKS:   Obviously -- and I am not doing a
19  very good job of saying anything, but the statute on
20  extraneous offenses gives us at least some notice of where it
21  was -- the extraneous offenses was supposed to have been
22  committed to whom it was committed and when it was committed
23  so far as can be determined. And obviously the purpose of
24  that is so we can do our investigation. This notice does none
25  of that. And that's basically my complaint.

---

1            THE COURT:   Mr. Brooks, when do you anticipate
2  conferring with Mr. Beach.
3            MR. BROOKS:   I can do it. He told me that he is
4  available by cell phone, I can call him as soon as we finish
5  this hearing. Whatever specific questions they have about
6  this notice, I can ask him.
7            THE COURT:   The Court will instruct you to do
8  that.
9            MR. BRAUCHLE:   I think I inquired earlier, is
10  there a copy of what has been marked as Defendant's Exhibit B
11  in the Court's file?
12            THE COURT:   "B" is the notice; is that correct.
13  I want to make sure. "B" is the notice to supplement
14  extraneous offenses and to reveal the deal.
15            MR. BRAUCHLE:   Uh-huh.
16            THE COURT:   Yes there is. There is a copy of
17  both "B" and "C" in the Court's file.
18        And prior to breaking, one other issue is that concerns
19  two jurors. One juror, Tamara Fuentes, has indicated that she
20  has moved out of Dallas County on February -- May 2nd and no
21  longer resides in Dallas County. Concerning her, I forget
22  which number she is, but she is one of the jurors that has
23  been picked.
24        Regarding her status on the jury, is there any objection
25  from the State?

1    MR. BROOKS:   To her continuing as a juror?
2    THE COURT:   Yes, sir.
3    MR. BROOKS:   No are Your Honor.
4    THE COURT:   Any objection from the Defense?
5    MR. BRAUCHLE:   No Your Honor.  And we would also
6    call the defendant for this specific purpose of him replying
7    to the Court's inquiring.
8         THE COURT:   Certainly.
9    (Defendant was duly sworn.)
10        THE COURT:   You may put your hand down.
11   You may proceed.
12                    **WESLEY RUIZ**
13   was called as a witness, and having been duly sworn by the
14   Court, testified under oath as follows:
15                **DIRECT EXAMINATION**
16   BY MR. BRAUCHLE:
17   Q.    State your name, please.
18   A.    Wesley Ruiz.
19   Q.    Mr. Ruiz, you just heard the judge recite that one of
20   the jurors picked in the first 12 has -- is no longer a
21   resident of Dallas County, that she has moved to Denton
22   County; did you understand that?
23   A.    Yes.
24   Q.    And you also understand that that could be used as a
25   disqualification of that juror; you understand that?

1    A.    Yes.
2    Q.    And the State has indicated that they have no
3    objection to her being continued as a juror and you heard them
4    make that statement here in open court; is that correct?
5    A.    Yes.
6    Q.    And this matter has been discussed with you previous
7    to today, as well as today, and you have been made aware of
8    that situation and you have advised Mr. Johnson and I that you
9    have no objection to that juror, Ms. Fuentes?
10   A.    Yes, sir.
11   Q.    Ms. Fuentes as being a juror in your case, even
12   though she could be disqualified; is that correct?
13   A.    Yes.
14   Q.    So you understand what we are talking about?
15   A.    (Nods head).
16   Q.    And you are not in any way objecting to her being a
17   juror?
18   A.    No.
19        MR. BRAUCHLE:   Nothing further.
20        THE COURT:   Additionally, there is a juror Simon
21   Rodriguez has indicated that his boss has been diagnosed with
22   cancer.  And as a result, he has taken over a number of his
23   employer's duties and is requesting to be relieved from the
24   jury.  Court's opinion at this time is that he is not to be
25   released as a juror.  And I am just bringing it up.  I don't



87

1    know if the attorneys have knowledge of that fact or not.  But
2    I wanted to bring that up to the attorneys.
3         MR. BROOKS:   Judge, do we need to make, I guess, I
4    before we start with that particular juror, make a separate
5    inquiry with him as to how this -- how this is going to affect
6    his --
7         THE COURT:   Affect his ability.  We can do that.
8    To insure that he will remain focused on this case.
9    That will conclude this hearing.
10        (Court recessed for the day.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

88

1    THE STATE of TEXAS )
2    COUNTY of DALLAS   )
3         I, BELINDA G. BARAKA, Official Court Reporter in and
4    for the 194th Judicial District Court of Dallas County, State
5    of Texas, do hereby certify that the foregoing contains a true
6    and accurate transcription of all portions of evidence and
7    other proceedings requested in writing by counsel for the
8    parties, to be included in this volume of the Reporter's
9    Record, in the above-styled and -numbered cause(s), all of
10   which occurred in open court or in chambers and were reported
11   by me.
12        I further certify that this Reporter's Record of the
13   proceedings truly and correctly reflects the exhibits, if any,
14   admitted by the respective parties.
15        I further certify that the total cost for the
16   preparation of this Reporter's Record  was paid by the
17   State/Defense.
18        WITNESS MY OFFICIAL HAND this the 30th day of
19   May        , A.D., 2009.
20
21
22
23        BELINDA G. BARAKA, CSR #5028
         Official Court Reporter
24        133 N. Industrial
         Dallas County, Texas 75207
25   Certification Expires:  12-31-09

CAUSE NO. F07-50318-M

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| vs. | * | 194TH JUDICIAL DISTRICT |
| WESLEY LYNN RUIZ | * | DALLAS COUNTY, TEXAS |

- - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

HEARING

Volume 41 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - -

          BE IT REMEMBERED THAT on this the 23rd day of May,
A.D, 2008, the above-styled and -numbered cause(s) came on for
hearing before the HONORABLE ERNEST B. WHITE, III, of the
194th Judicial District Court of Dallas County, State of
Texas, the following is a true and correct transcription of
the proceedings had, to-wit:

     (Proceedings Reported by Computerized Machine Shorthand)

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

1                         A P P E A R A N C E S

2

3      HON. KEVIN BROOKS
       Assistant District Attorney
4      State Bar No. 03070735

5

6      HON. ANDY BEACH
       Assistant District Attorney
7      State Bar No.  01944900

8                                    FOR THE STATE OF TEXAS

9

10     HON. PAUL BRAUCHLE
       Attorney at Law
11     State Bar No. 02918000

12

13     HON. WILLIAM JOHNSON
       Attorney at Law
14     State Bar No.  10804500

15                                   FOR THE DEFENDANT

16     Also Present:

17       Doug Parks, Attorney at Law

18

19                          *  *  *  *  *

20

21

22

23

24

25

3

1                           I N D E X

2                                                    PAGE/VOL.

3    Proceedings - 05/23/08 ........................... 4/41

4    Reporter's Certificate ...........................   10

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

(May 23, 2008)

1    THE COURT:   Mr. Aven, go get our juror.

2    (Juror entered the courtroom.)

3    THE COURT:   You may be seated.

4  Good morning, Mr. Rodriguez.

5    JUROR:   Good morning.

6    THE COURT:   We brought you in today because it

7  has come to the Court's attention that there are some issues

8  concerning your job.

9    JUROR:   Right.

10    THE COURT:   And we wanted to address these

11  issues with you.  If you will for the record, state what those

12  issues are.

13    JUROR:   The issue is that my boss has been

14  diagnosed with cancer.  And they are having to go to Houston

15  to M.D. Anderson Hospital for about 12 weeks, because they are

16  going to start doing radiation and chemo therapy and all that

17  stuff.  The issue comes where I am the only person that has

18  access to financial information and stuff like that and handle

19  payroll -- aside from the boss.  And so it kind of puts us in

20  a bind me not being there and them not being there.  You know

21  getting employees paid, you know, the other stuff that needs

22  to be done.  So...

23    THE COURT:   Okay.  And what impact, if any,

---

1  would that have on you?  Obviously we are scheduled to start

2  this trial next Tuesday?

3    JUROR:   Uh-huh.

4    THE COURT:   And looking at possibly two weeks,

5  possibly a little longer than two weeks.  What impact if any

6  would that have on you if you are hearing this case?

7    JUROR:   Well, I guess that I am just not going

8  to be there, and I also supervise three persons myself.  Just

9  not being there, I guess, and doing payroll.  That's kind of

10  the biggest -- the biggest one, getting the employees paid.

11    THE COURT:   What impact would it have on you

12  hearing the evidence or listening to the testimony?

13    JUROR:   Oh, not much, I don't think.

14    THE COURT:   Okay, now that's one of those words

15  when you say not much, what do you mean by that?

16    JUROR:   I guess, maybe I am not understanding

17  the question correctly.

18    THE COURT:   Okay.  Would it affect you hearing,

19  listening to the testimony?

20    JUROR:   No.  Just the fact if I need to be here,

21  then it affects me that I am not going to be able to do my

22  job, to get payroll done, yeah.

23    THE COURT:   But it wouldn't have any effect on

24  you listening to the evidence or concentrating?

25    JUROR:   Probably not, because it is two

---

6

1  different things.

2    THE COURT:   And that's one of those little

3  answers, probably not, would it affect your concentration on

4  your hearing?

5    JUROR:   No.

6    THE COURT:   Okay.  It would not have any impact?

7    JUROR:   Meaning if I am here?

8    THE COURT:   If you are here, would you be able

9  to focus on the testimony at hand and the trial and not

10  concentrate on --

11    JUROR:   Well, it would -- it would because I

12  would also be thinking about what is going on at the office.

13  So in that instance, yes, it would.

14    THE COURT:   Any questions from the State.

15    MR. BEACH:   Just for record purposes, state your

16  name for the record.

17    JUROR:   Simon Rodriguez.

18    MR. BEACH:   Mr. Rodriguez, as we presented about

19  four months ago when you were down here --

20    JUROR:   Uh-huh.

21    MR. BEACH:   -- we anticipated normal work hours

22  during the week, Tuesday through Friday, nine o'clock to five

23  o'clock, where you would be free to leave, free during breaks

24  during the day to make phone calls, check e-mails, things like

25  that.  Would it be a situation where if you had to do payroll,

---

7

1  could you maybe go in for a couple of hours at night and maybe

2  get it done or on the weekends, would that be a possibility or

3  not?

4    JUROR:   Yeah, I would have to put in extra

5  hours.

6    MR. BEACH:   Put in extra hours.  I was turned

7  around, I didn't hear the answer to the last question that the

8  Judge just asked you, basically for you to be disqualified at

9  this point in time, you would have to tell us under oath, on

10  the record that you simply because of your work situation and

11  the goings on there and the problems with your boss, that it

12  would be such, you know, an imposition in terms of your

13  thinking and disorder your thinking, when sitting over there

14  in the jury box, you could not pay attention and following the

15  evidence in this case; is that a situation?

16    JUROR:   Well, no, I could listen.  The thing is

17  that I also supervise three individuals, and when I am not

18  there, my boss is the one that is there.  But none of us two

19  being there, you know, you know situations do come up and

20  somebody has to be there.

21    MR. BEACH:   Obviously, there is no question you

22  probably need to be at work right now, that's what you are

23  telling us, we believe you on that.

24    JUROR:   Right.

25    MR. BEACH:   But everybody is going to have work

---

1  issues that come down here next week, you know it is going to
2  be an imposition to them and that is not enough to disqualify
3  you to be a juror, it is not our position or their position,
4  it is what the law is here in the state.
5      The Judge would not be allowed to tell you that you don't
6  have to come down here, unless, you know, unless your
7  situation rises to the level where you simply would not be
8  able to listen to the evidence, hear it clearly, devote your
9  attention to it, that's what would keep you from being a juror
10 in this case?
11             JUROR:  No, that is not the case.
12             MR. BEACH:  You are not there.  It is just going
13 to be a difficult situation?
14             JUROR:  Right, yeah.
15             MR. BEACH:  And you are not going to hold it
16 against the State, you are not going to hold it against the
17 Defense or Mr. Ruiz, if you have to come down and serve on
18 this jury.
19             JUROR:  Oh, no.
20             MR. BEACH:  You are going to do your duty just
21 like you promised us before?
22             JUROR:  That's correct.
23             MR. BEACH:  That's all I have.
24             MR. BRAUCHLE:  No questions.
25             THE COURT:  Thank you, Mr. Rodriguez.  You may

1  step down.
2             JUROR:  Thanks.
3             (Juror complies.)
4             THE COURT:  You may be seated.
5      Anything for the record from the State?
6             MR. BEACH:  No, Your Honor.
7             THE COURT:  And anything from the Defense?
8             MR. BRAUCHLE:  He didn't answer anything that
9  would get him off of the jury that I could hear.
10             THE COURT:  I understand.
11             MR. BRAUCHLE:  Even when you led him right to
12 water.
13             THE COURT:  Sometimes it doesn't keep you from
14 trying, Mr. Brauchle, I would afford you that opportunity.
15             MR. BRAUCHLE:  I think he is perfectly
16 qualified.
17             THE COURT:  You can tell Mr. Rodriguez, that he
18 is free to go and he needs to be here Tuesday.
19             (Court recessed for the day.)
20
21
22
23
24
25

10

1  THE STATE of TEXAS )
2  COUNTY of DALLAS  )
3             I, BELINDA G. BARAKA, Official Court Reporter in and
4  for the 194th Judicial District Court of Dallas County, State
5  of Texas, do hereby certify that the foregoing contains a true
6  and accurate transcription of all portions of evidence and
7  other proceedings requested in writing by counsel for the
8  parties, to be included in this volume of the Reporter's
9  Record, in the above-styled and -numbered cause(s), all of
10 which occurred in open court or in chambers and were reported
11 by me.
12             I further certify that this Reporter's Record of the
13 proceedings truly and correctly reflects the exhibits, if any,
14 admitted by the respective parties.
15             I further certify that the total cost for the
16 preparation of this Reporter's Record  was paid by the
17 State/Defense.
18             WITNESS MY OFFICIAL HAND this the 30th day of
19 may , A.D., 2009.
20
21
22
23             BELINDA G. BARAKA, CSR #5028
                Official Court Reporter
                133 N. Industrial
24              Dallas County, Texas 75207
25 Certification Expires:  12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

CAUSE NO. F07-50318-M

THE STATE OF TEXAS       *    IN THE DISTRICT COURT

VS.                   *    194TH JUDICIAL DISTRICT

WESLEY LYNN RUIZ       *    DALLAS COUNTY, TEXAS

- - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

JURY TRIAL

Volume 42 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 27th day of May, A.D, 2008, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III, of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

Belinda G. Baraka, Official Court Reporter
214-653-5803

```
 1                         A P P E A R A N C E S

 2

 3       HON. KEVIN BROOKS
         Assistant District Attorney
 4       State Bar No. 03070735

 5

 6       HON. ANDY BEACH
         Assistant District Attorney
 7       State Bar No.  01944900

 8                              FOR THE STATE OF TEXAS

 9

10       HON. PAUL BRAUCHLE
         Attorney at Law
11       State Bar No. 02918000

12

13       HON. WILLIAM JOHNSON
         Attorney at Law
14       State Bar No.  10804500

15                              FOR THE DEFENDANT

16       Also Present:

17        Doug Parks, Attorney at Law
          Charles Humphreys, Attorney at Law
18        Shawn Storey, Attorney at Law

19

20                              *  *  *  *  *

21

22

23

24

25
```

```
 1                        I N D E X

 2                                         PAGE/VOL.

 3  Proceedings - 05/27/08 ........................... 6/42

 4  In Camera Hearing ................................   6

 5  Jury Sworn .......................................  24

 6  Jury Instructions ................................  24

 7  Presentment of Indictment ........................  25

 8  Opening Statement - by Mr. Brooks ................  26

 9

10  STATE'S WITNESS       Direct     Cross

11   EDUARDO IBARRA        33          37

12   JEREMY BORCHARDT      42          88

13   HECTOR MARTINEZ      121, 141   135, 145

14   CARMEN DELGADILLO    147         156

15

16  Reporter's Certificate ........................... 171

17

18

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
                            I N D E X

                                              PAGE/VOL.

Proceedings - 05/27/08 ........................... 6/42

In Camera Hearing ................................   6

Conclusion of In Camera Hearing ..................  23

Jury Sworn .......................................  24

Jury Instructions ................................  24

Presentment of Indictment ........................  25

Opening Statement - by Mr. Brooks ................  26


STATE'S WITNESS        Direct      Cross

  EDUARDO IBARRA         33          37

  JEREMY BORCHARDT       42          88

  HECTOR MARTINEZ      121, 141   135, 145

  CARMEN DELGADILLO    147          156


Reporter's Certificate ........................... 171
```

```
 1                    E X H I B I T   I N D E X

 2      STATE'S EXHIBIT(S):           OFFERED:   ADMITTED:  VOL.

 3       1    Bulletin                  35          35        42

 4       4    Diagram                   67          47        42

 5       5    Photograph                69          69        42

 6       6    Photograph                69          69        42

 7       7    Photograph                69          69        42

 8       8    Photograph                69          69        42

 9       9    Photograph                69          69        42

10      10    Video                     73          74        42

11      27    Photograph               128         128        42

12      28-A  Photograph               130         130        42

13      29    Photograph               131         132        42

14      87    Photograph                75          75        42

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T   I N D E X

 2  DEFENSE'S EXHIBIT(S):        OFFERED:   ADMITTED: VOL

 3   1    Procedures            109        109        42

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

(May 27, 2008)

(The following proceedings heard in camera.)

THE COURT:   Mr. Avenn, if you will bring her in -- before we bring her in, I will put it on the record and also have Mr. Brauchle -- on the record, and it's been brought to the Court's attention that a juror, Juror No. 1, Vivian Moore, has raised issues about being able to serve on this jury.  And we are going to question her outside of the courtroom in chambers and the Defendant is not present.

Mr. Brauchle, is there anything you wish to put on the record in that regard?

MR. BRAUCHLE:   I talked with my client, Wesley Ruiz, and explained to him that we were going to have an in camera hearing in regard to the juror.  That we can secure his appearance here in chambers, but we were willing to waive his appearance; and asked him if he was willing to waive it and he expressed that he was willing to waive his appearance for this in camera hearing.

Can we go off the record.

(Discussion off the record.)

THE COURT:   Bring her in.

(Juror entered the courtroom.)

THE COURT:   Good morning, Ms. Moore.  How are you doing today?

JUROR:   I am good.  I am so sorry about this, I am just sick about it.

THE COURT:   Explain to us what the situation is, and I am sure the attorneys will have some questions.

JUROR:   Well, I first was summoned in November and I was chosen in early January and I was told the trial was in April; and in good faith, you know I had no problems.  But the first change was moving it to June and I have two school age children.  My oldest son has autism.  And he is actually out of private school now, he finished school last Thursday.  And my younger one will be out of school next week.  And I just don't have a really whole lot of recourse once the kids are out of school.  And I told Ms. Fleming that when she first called me months ago, I told her once school is out, I just don't have a whole lot of recourse.  It just happened my mom is in town this week and that's why -- it was easy for me to come down.  Apart from that, I don't have a whole lot of recourse, the daytime.  When they were both in school, I could drop them off and you know they were taken care of during the day, so that's kind of the situation I am in.

THE COURT:   And you said that your other child is through with school next week?

JUROR:   June 5th, Thursday, early dismissal.

THE COURT:   And you have no other alternative, your mother is here.

JUROR:   My mother is here until Sunday.

THE COURT:   Okay.

JUROR:   So...

THE COURT:   And outside of that once she leaves?

JUROR:   Yeah, I don't have, you know, we don't have any family here.

THE COURT:   So you are unable to make any arrangements?

JUROR:   The difficulty is that my older son is the one with the autism.  And it's just more difficult in terms of finding someone who knows how to meet his needs and things like that.  So, you know, as opposed to dropping him with a different friend everyday kind-of-thing.

THE COURT:   Let me ask you this, if you were to serve on this jury, knowing this trial may run into next week, what impact, if any, would that have on you hearing the evidence and making a decision?

JUROR:   Can you ask me the question again, I am not sure I understand what you are --

THE COURT:   Sure.  If you were to serve on this case, given your situation, what impact would that have on you hearing the evidence, how would it affect you, if it would?

JUROR:   I don't know if this is what you are asking, I am incredibly anxious right now.

THE COURT:   Relax.

JUROR:   This whole situation -- I mean.  I am not sure I know what the answer is, I mean --

THE COURT:   Okay, would you be able to listen to the evidence objectively and --

JUROR:   Like I said, I am just really anxious right now.  I hate that I have put the Court in this situation.  And I just feel a lot of personal pressure because I am not sure -- how I would make that all work and be here.

MR. BEACH:   Luckily we have two alienates.  If she can't find supervision for them, I don't see what choice we have legally.  She wants to claim it.  It's a changed situation than it was back in January, even in April.

Let the record reflect that she is very emotional.  She is crying.  And I know she is a strong lady and this is really painfully, you know, got ahold of her right now.

THE COURT:   Any questions from the Defense?

MR. JOHNSON:   Do you have people that cake care of your kids occasionally, I would think that you and your husband have babysitters occasionally?

PROSPECTIVE JUROR:   Actually, we had two wonderful girls that lived next door, but they have both left for college.  The reason my mom is here is because my husband and I needed a weekend, and we haven't had a day like a year because those girls have left.  It is just -- I mean he is not really severely affected, it is just we are real careful.  In

1  picking the people who would understand how to meet his needs.
2  And we really don't -- and even if we had high school kids,
3  they are still in school until next Thursday. So in terms of
4  like either an adult or someone who wasn't in school, that
5  would be free, all day long to keep him, superlimited. I mean
6  we don't have anybody like that.
7          THE COURT: Anything further.
8          MR. BRAUCHLE: In regard to this situation, did
9  you inform anybody before today about it?
10         PROSPECTIVE JUROR: Adamantly over and over
11 again.
12         MR. BRAUCHLE: Who did you talk to?
13         PROSPECTIVE JUROR: Ms. Fleming every time she
14 called me. And --
15         MR. BRAUCHLE: Did you ever ask to talk to the
16 Judge or anybody else?
17         PROSPECTIVE JUROR: I didn't feel like that
18 was -- I know I asked her if the Judge knew. I mean to be --
19 I don't think I was treated very well, after I told her my
20 situation. And I was just told repeatedly, you just need to
21 be there, you know, Tuesday morning at nine.
22         MR. BRAUCHLE: We are not in any way blaming
23 you, I guess it was a breakdown in communications because we
24 could have had this, you know a long time ago. It's something
25 that needs to be address at this end, not at your end?

---

1          JUROR: Well, I cannot tell you how adamant I
2  have been with Ms. Fleming about this situation.
3          MR. BRAUCHLE: I know. I don't doubt you
4  haven't. It wasn't been conveyed, because this is kind of a
5  surprise to all of us.
6          JUROR: I am shocked that it is a surprise to
7  you-all, because seriously, this time has been changed like
8  three times. And she has called me at least once for each of
9  those times. And again and again I told her that John is out
10 of school May 22nd, and -- but the response I got repeatedly
11 was, you need to be there. She said all I can tell you is you
12 need to be there that morning. And I know I have asked her if
13 the Judge knew. And she said there is nothing they could do
14 about it until the day of.
15         MR. BEACH: But in fairness to Reann, you would
16 have to come down and gotten on the record to establish all of
17 this.
18         JUROR: If any she had told me to did that, I
19 would have done that. Because this has been a -- like a long
20 wait at the principal's office. I know this is horrible. I
21 was shocked that the bailiff didn't just pull me out. I had
22 to tell him. And he was, like, oh, really. And I don't
23 understand. I mean this could have been addressed at least a
24 few months ago when the dates first started changing.
25         THE COURT: Anything further?

---

12

1          Ms. Moore, if you will step outside, thank you.
2          MR. BRAUCHLE: We had the hearing on the other
3  guy, why wasn't she told?
4          MR. BEACH: We could have done it Friday or
5  something, yeah.
6          MR. BRAUCHLE: I am wondering why he got the
7  attention and she didn't.
8          MR. BEACH: Because his name is Simon.
9          MR. JOHNSON: Now, we got an additional problem
10 from my perspective. Andy has basically indicated to this
11 woman that there is a way out to her. We have now got the
12 prosecutors, you know, putting the Defense in a position that
13 if she gets in the jury, that she is probably going to feel
14 like we are the ones responsible for that.
15         MR. BRAUCHLE: Well, she didn't really claim the
16 exemption.
17         MR. BEACH: I think the Court has more than
18 enough, number one, I think the Court can ask the juror if she
19 wants to claim the exemption. She is entitled to do that.
20 And, number two, he has more than enough evidence to observe
21 her, how absolutely, you know, just emotional she is unable to
22 think. I thought it was obvious to everybody. Y'all can
23 obviously make an objection outside of her presence, and Judge
24 is going to do what he has got to do. I got to make a record
25 too. You are probably right I shouldn't have done it in front

---

13

1  of her. She has got an automatic exemption.
2          MR. BRAUCHLE: Once again she didn't claim it.
3  She didn't claim it at the time she was picked. She didn't
4  claim it today.
5          MR. BEACH: Because the schedule changes.
6          MR. BRAUCHLE: Well, as Karo said, you put us in
7  a -- if we oppose it, we are the automatic blue meanies in the
8  deal because she will know who is opposing her release. So
9  she is -- she is damaged goods for everybody.
10         THE COURT: She won't necessarily know that, it
11 could just be the big mean judge not letting her go.
12         MR. BRAUCHLE: Did Andy have a change of heart
13 after he outreached for her, I don't know that's going to
14 happen.
15         MR. BEACH: She is not able to serve, it's
16 abundantly clear to everybody in here. I know you want her on
17 the jury, but she is not a fit juror right now, pure and
18 simply. You know that. You have never seen anybody
19 emotional, discombobulate. She is mad at everybody.
20         MR. BRAUCHLE: I see somebody that is emotional,
21 discombobulated every time I wake up in the morning.
22         MR. BEACH: Simon Rodriguez is the perfect
23 example he rehabilitated himself.
24         MR. BROOKS: I think she has articulated her
25 claim to exemption. She said she has child conditions, she

1  has no one to take care of a kid. She knows how to phrase it.

2         MR. BEACH: You can put it on the record if she

3  wants to claim it.

4         THE COURT: I am going to release her, given the

5  fact that she was tearing up and became real emotional while

6  testifying, while speaking with us. And I am going to give

7  her a parent exemption.

8         MR. JOHNSON: Is that like something that is

9  going to happen with every juror during testimony, we are

10  going to let her go, there is nothing unusual about a case

11  like this, I mean this is an emotional case. They are all

12  going to be emotional. If -- you mean if us setting a

13  precedent about how jurors are going to be released, we are

14  probably going to wound up with losing all our jurors.

15         THE COURT: That combined with the fact she has

16  the child care issues.

17         MR. PARKS: I guess just for the record, Judge,

18  we would object to the Court's decision in the matter and

19  state that we believe that she has not adequately claimed an

20  exemption and that the Court's decision is a use of

21  discretion.

22         THE COURT: Anything else?

23         MR. JOHNSON: Yeah, let's talk about what we do

24  now. In regards to the offense, you know we kind of had a

25  loose agreement that we would maybe make a decision about what

1  order we are going to do the alternate in.

2         MS. HANDLEY: In the order that we picked of

3  them.

4         MR. JOHNSON: I don't remember the order we

5  picked them in.

6         MR. BEACH: I don't remember any loose

7  agreement. It has always been 13 and 14. I mean they are

8  both -- we didn't spend anytime on either one of them. They

9  are loose cannons for both sides.

10         MR. JOHNSON: Yeah, you are. We just gave them

11  the discontinue and took them.

12         MR. BRAUCHLE: What about the motion to

13  consolidate?

14         THE COURT: The State?

15         MR. BEACH: We will object to this. We are

16  going to try a capital case. Whatever happens on that, I am

17  sure will take care of others. Unless you somehow convince

18  the folks that he is not guilty and we will have to revisit

19  it. Well, if he is not guilty of capital murder, he is not

20  going to be guilty of agg assault either. There is no need

21  not to try them all at the same time.

22         I think we have the ability to. Discretion to choose

23  what case we are going to try.

24         MR. BRAUCHLE: So that's -- so y'all will oppose

25  it?

---

16

1         MR. BEACH: Yes.

2         MR. BRAUCHLE: Anything else?

3         THE COURT: The Court will deny that motion.

4  End of in camera hearing --

5         MR. BRAUCHLE: We may ask leave to make a

6  certain bill if that results in certain evidence being

7  excluded. Let's see what happens.

8         MR. BROOKS: Since we are all in here, Judge,

9  I'm sorry, I am not trying to delay. We intend to offer

10  several extraneous offenses during guilt/innocence phase. I

11  think the Court had given us leave to offer a proffer, rather

12  than give a separate hearing. And what we intend to offer is

13  evidence that this defendant was given a large quantity of

14  drugs for sale, he was given that by way of advance.

15         We also intend to offer into evidence possession of a

16  firearm after he was arrested and taken from the vehicle, as

17  well as possession of a large amount of narcotics and other

18  contraband found in the vehicle after he was removed from it.

19         THE COURT: Any response?

20         MR. PARKS: Well, they want to present it,

21  but they don't want to try the case. It's part and parcel of

22  the indictment for possession with the intent to deliver.

23         MR. BROOKS: But it is also being offered

24  because it is contextual with his arrest in this offense. It

25  goes to motive for the chase, it goes to motive for the

17

1  shooting, it is all contextual with this primary offense.

2         THE COURT: I will allow them to go into that.

3         MR. BRAUCHLE: So we are going to have a hearing

4  before we go into it.

5         MR. BROOKS: My understanding is that rather

6  than have a hearing, the Court makes the ruling on by way of

7  proffer. I can put the Court, as well as Defense, what we are

8  going to offer extraneous, you can make your objections, and

9  Court would make its ruling rather than have a separate

10  hearing on the record of each extraneous prior to starting

11  trial.

12         MR. BRAUCHLE: Well, how are you going to do the

13  proffer.

14         MR. BEACH: He just did.

15         MR. BRAUCHLE: Well, that is not much notice. I

16  think -- who are the witnesses that are going to put this

17  extraneous on.

18         MR. BEACH: The main one isn't here right now,

19  so you may not be hearing about the drugs.

20         MR. PARKS: It seems to me that we have got a

21  come indication if we are not going to be actually trying the

22  cases so that the jury can make a decision as to whether or

23  not Mr. Ruiz is guilty and they are offering extraneous

24  offenses for the purposes that have been stated. Then the

25  Court is going to need to narrow those purposes as much as

18

1  possible and instruct the jury at the time that these offenses
2  are let in.
3          MR. BEACH:   They are entitled to a limiting
4  instruction why it is being offered.
5          MR. BRAUCHLE:   We are also entitled to something
6  more than a proffer as to what -- what y'all are going to put
7  on.  Where is it in our discovery.
8          MR. BEACH:   It's in the offense report.  I mean
9  it's the drugs in the car, it's the gun in the car.
10         MR. BRAUCHLE:   There is nothing in the offense
11 report about him being given a large quantity of drugs for
12 sale.  And there is nothing in there that he had the gun for
13 any purpose.  Where is that going to come in?
14         MR. PARKS:   Who is going to testify that he was
15 given these drugs for sale.
16         MR. BEACH:   Tito.  Hector Martinez.
17         MR. BRAUCHLE:   And where is he.
18         MR. BEACH:   Right now he is not in the building,
19 he may be in the Trinity River.  So if he is not here, you
20 won't hear it.  You will hear how the police discover the
21 drugs and the gun in the car.  Wesley goes over to Tito's
22 house an hour before the shooting, pays him $3500 out of the
23 12,000 that he owed him for the pound that Tito had sold him
24 before.
25         MR. BRAUCHLE:   See that is not admissible with

19

1  regard to owing him a pound and other stuff.
2          MR. BEACH:   It is admissible in terms of showing
3  that those drugs in the car is all likelihood Wesley Ruiz is
4  not some stranger, because he had a pound of pure
5  methamphetamine the week before and this is cut
6  methamphetamine.  He gave Tito $3500 to pay for the drugs.
7          MR. BRAUCHLE:   That is certainly not admissible.
8          MR. PARKS:   If it was the drugs that was in the
9  car I can see, but drugs that he had prior to this.
10         MR. BEACH:   These are the drugs that he had.
11         MR. PARKS:   So what.
12         MR. BEACH:   It connects up why the drugs are in
13 the car, they didn't just appear that day, that's why he is
14 running, he had a first-degree felony in the car.
15         MR. PARKS:   What difference does it make why he
16 is running, running is running.
17         MR. BEACH:   We are entitled to prove motive.
18         MR. BRAUCHLE:   You are going to say that our guy
19 had a pound of pure methamphetamine a week before.  Now how is
20 that relevant to how much -- how much methamphetamine he had
21 on the day he was arrested.
22         MR. BEACH:   Because to me that is probative, the
23 fact that those drugs in the backseat of the car, Wesley Ruiz
24 versus somebody else's.
25         MR. BRAUCHLE:   It doesn't matter if they are

20

1  fronted to him.
2          THE COURT:   When do you anticipate getting to
3  that?
4          MR. BEACH:   He is supposed to be the second
5  witness, he is not here right now.  It may be a completely
6  moot point.  If you want to have a, you know, time to think
7  about that?
8          THE COURT:   Yeah.
9          MR. BRAUCHLE:   So you are saying that -- you
10 know, how far back -- he might have had two pounds six months
11 ago, are we going to go into that.  The relevancy of it has to
12 be, you know --
13         THE COURT:   How much was in the vehicle when --
14         MR. BEACH:   Half a pound cut, two to two-quarter
15 pound bags.
16         MR. PARKS:   That kind of supposes that there is
17 some cut off that you have to have to run.
18         MR. BRAUCHLE:   Uh-huh.  He could have run with
19 no dope.
20         MR. BEACH:   I agree.
21         THE COURT:   Half a pound comes in, we will have
22 it talk about the other.
23         MR. BEACH:   All right.
24         MR. JOHNSON:   What do you want to do with the
25 juror --

21

1          THE COURT:   Off the record.
2          (Discussion off the record.)
3          (Juror entered the courtroom.)
4          THE COURT:   Back on the record.
5          Ms. Moore, you have an exemption with respect to not
6  having anyone to take care of your children if you were to
7  serve on this jury during the day, do you wish to claim that
8  exemption?
9          PROSPECTIVE JUROR:   Yes, sir.
10         THE COURT:   Okay, we will dismiss you from the
11 jury.
12         PROSPECTIVE JUROR:   Thank you.
13         THE COURT:   You are free to go.
14         MR. BROOKS:   You want to put anything on the
15 record with respect to No 13, bringing them in, informing
16 them.
17         MS. HANDLEY:   He doesn't know he is an alternate
18 anyway.
19         THE COURT:   Let me check with the bailiff.
20         (Discussion off the record.)
21         THE COURT:   It has been brought to the Court's
22 attention that the alternates at some point were informed that
23 they were alternates by the bailiff.  The bailiff later
24 changed that and told them that anyone could be alternates.
25 Having informed the attorneys on both sides of that aspect,

22

23

1   does either side wish to bring the alternate number one,
2   Mr. Cannady, in to put anything on the record?
3          MR. BRAUCHLE:   No.
4          MR. BROOKS:   I think, Judge, by doing that, we
5   are just -- pretty much highlight the mistake that was made by
6   the bailiff.
7          THE COURT:   The Defense feels the same in
8   response from the Defense?
9          MR. BRAUCHLE:   Well, I am not sure what has been
10  told him, but he is going to be a juror whether he was told he
11  was an alternate or not.  It is kind of moot at this point in
12  time.  I don't see anything that we can do remedial at this
13  point in time since he is going to be a juror.
14         THE COURT:   Mr. Parks.
15         MR. PARKS:   I was just playing through my mind
16  whether it would be appropriate to tell the entire panel, the
17  whole bunch not single anybody out.  Just tell them all that
18  they have been sworn as jurors on the case, that they are
19  jurors and that they need to pay attention like jurors,
20  something like that.  That's just a --
21         THE COURT:   Okay.
22         MR. BROOKS:   I don't have any objection to that.
23         MR. BRAUCHLE:   Well, they are still -- they are
24  going to get some hint at some time because someone is going
25  to be sitting in the mister chair.

1          MS. HANDLEY:   Tell them to sit where you are
2   comfortable.
3          THE COURT:   I will have the bailiff to take --
4   to bring them in and take the first available seat.
5          MR. BRAUCHLE:   Don't have them do that, they
6   will all jam up -- tell them to go down to the end of the row.
7          THE COURT:   I will tell the bailiff not to put
8   them in any certain order, just to lead them in.
9          MR. BRAUCHLE:   Whatever, let's not have fights
10  over chairs.
11         We will need to look at the court's file when we go back
12  in to the courtroom.  Look at it briefly.
13         THE COURT:   Okay.
14  Anything further?
15         MR. BROOKS:   I don't think so, Judge.
16         THE COURT:   Okay.
17         (End of proceedings in camera.)
18         THE COURT:   Cause No. F07-50318, styled the
19  State of Texas versus Wesley Lynn Ruiz.
20         What says the State?
21         MR. BROOKS:   Ready, Your Honor.
22         THE COURT:   What says the Defense?
23         MR. BRAUCHLE:   The Defense is ready.
24         THE COURT:   Sheriff, bring the jury in.
25         THE BAILIFF:   All rise.

24

25

1          (Jury entered the courtroom.)
2          THE COURT:   You may be seated.
3          And if the jury would remain standing briefly.  There is
4   an oath that I must administer to you.
5          (Jury was duly sworn.)
6          THE COURT:   You may be seated.
7          Good morning, ladies and gentlemen.  Before we begin
8   today, there are several things that I must discuss with you,
9   then I will turn it over to the attorneys.
10         First and foremost, each and every one of you are jurors
11  in this case today.  So it is, therefore, very important that
12  you hear everything that is being said from the witness stand.
13  If at any time you are unable to hear any of the testimony
14  that is being taken place, raise your hand and less us know,
15  we will have the witness repeat that part of their testimony.
16         Additionally, there are -- the attorneys are not to have
17  any communication with you.  They know this because of the
18  Rules of Criminal Procedures.
19         If at any time anyone attempts to discuss this case with
20  you, bring that to the sheriff's attention and they will
21  inform the Court and we will address it at this time.
22         As jurors, your evidence -- or your testimony --
23  everything you hear, rather, that you will need to make your
24  decision will come in the form of testimony or evidence from
25  the witness stand.  Do not do any outside investigation.  Do

1   not visit any crime scenes.  As I said, everything you will
2   need to know to make your decision will come from the witness
3   stand.
4          That being said, we are allowing you -- some of you had
5   requested can you hang on or hold on to your laptops so that
6   you may be do work during breaks and things of that nature.
7   We will allow you to do that.  However, if you have wireless
8   capabilities, do not do any research or anything along this
9   case.  Do not attempt to contact the media or access the media
10  stations to find out anything about this case.  It is very
11  important that you do reframe from doing that.
12         Additionally, while during breaks you-all -- and lunch
13  periods, you are -- all are able to lunch together if you
14  choose to do so.  Do not discuss any of the testimony until
15  the testimony has -- both sides have rested and you heard
16  argument.  Then you deliberate.  But do not discuss any of the
17  testimony when you break into groups.
18         What says the State?
19         MR. BROOKS:   The State is ready, Your Honor.
20         THE COURT:   And what says the Defense?
21         MR. BRAUCHLE:   The Defendant is ready, Your
22  Honor.
23         THE COURT:   You may present the indictment.
24         (Indictment read to the jury.)
25         THE COURT:   Thank you, Mr. Brooks.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1  Mr. Brauchle, to this charge, how does your client plead?
2  MR. BRAUCHLE:   Not guilty, Your Honor.
3  THE COURT:   You may be seated.
4  State have an opening statement?
5  MR. BROOKS:   Yes, we do, Your Honor.
6  OPENING STATEMENT
7  BY MR. BROOKS:
8  Good morning, ladies and gentlemen.  My name is Kevin
9  Brooks.  I along with some of the other District Attorney's
10  you met during the jury selection process will be presenting
11  the evidence to this case to you.  The Law allows at this
12  portion of the trial each side is allowed to give you a brief
13  summation of what evidence they expect you to hear and see.
14  It is not a closing argument but it is a brief reasonable
15  expectation of what you will be presented.
16  On March the 21st, 2007, it was a capital murder
17  offense committed in the city of Dallas.  Detective Eddie
18  Ibarra was assigned that investigation.  As part of his job,
19  he identified suspects for that offense.  The suspects that he
20  identified, one of them was known to either drive or be seen
21  in a 1996 Chevy Caprice vehicle, red over gray color tone,
22  22-inch wheels, chrome wheels, dark tinted windows.
23  Approximately two days later, the evidence will show that
24  Dallas Officers Jason Jarc and Patrick Starr were on patrol.
25  Those officers are on patrol in what is called an unmarked or

1  a covert -- an unmarked black pickup truck.  Late that
2  afternoon on the 23rd of March, those officers were
3  traveling south on Interstate 35.  We will show that while
4  they were on patrol at that section of the highway, they
5  noticed a vehicle.  And the reason they noticed that vehicle,
6  Chevy Caprice, red over gray, 22-inch wheels, chrome wheels.
7  The exact description put out in a memo the Dallas Police call
8  a bulletin by Detective Ibarra several days prior.
9  Because they are in that covert vehicle, they are able to
10  follow that Chevy Caprice without raising suspicion.  They
11  follow that vehicle and follow it as it takes the Mockingbird
12  exist off I-35.
13  The evidence will show that while they are following this
14  vehicle, they are on with the radio dispatch.  They are
15  requesting a marked police unit to join them and pull over
16  that vehicle so the driver can at least be identified.
17  The evidence will show that at that same time Dallas
18  Officers Jeremy Borchardt and Todd Haecker are also on with
19  dispatch.  They notify Jarc and Starr and tell them we are in
20  the vicinity of Colorado and Westmoreland, we will wait here.
21  About the same time Senior Corporal Mark Nix also radios
22  in, he too is in the vicinity of Colorado and Westmoreland.
23  He lets them know he is going to wait there.  They wait there
24  and they wait for that suspect vehicle to get close to them.
25  As officers Jarc and Starr approach the intersection of

1  Colorado and Westmoreland, they fall back.  The evidence will
2  show that they fall back to allow Corporal Nix to pull his
3  vehicle directly in behind that suspect vehicle.  Officer Nix
4  does so with Borchardt and Haecker directly behind him.  This
5  caravan is now traveling west on Westmoreland.
6  We will show that as they near that intersection of
7  Colorado and Westmoreland, the decision is made to initiate a
8  traffic stop.  And as soon as they cross that intersection
9  traffic way, Corporal Nix will activate his overhead traffic
10  light.  The flashing read and blue lights, that's the signal
11  to stop and pull over.  And for a brief moment it looks as if
12  that vehicle is actually going to stop and pull over.
13  However, the evidence will show you that the driver of
14  that vehicle doesn't pull over.  It takes off at a high speed.
15  The officers follow at a high speed.  The chase is on.  We
16  will show that that part of the chase goes on for
17  approximately a quarter of a mile at a high rate of speed.
18  But as that suspect vehicle gets to the corner of Westmoreland
19  and Bernal, it makes a right turn.  And it continues at a high
20  rate of speed with Officers Nix, Borchardt, and Haecker
21  directly behind him.
22  Now, this part of the chase, Officers Jarc and Starr
23  having falling back earlier, they are now trying to catch up.
24  We will show that this portion of Bernal is not just a
25  straight two lane roadway.  But rather a long twisting

1  roadway, deep curves left and right.  Traffic coming and going
2  in both directions.  This high speed chase continues for about
3  approximately a mile.  And as they get near the intersection
4  of Westmoreland -- strike that, Bernal and Market, that
5  suspect vehicle loses control.  It loses control in a fashion
6  that calls it to spin out and roll into the front yard of a
7  house on Bernal.
8  We will show that because of the way that vehicle spun
9  out, the front of that vehicle is now facing directly toward
10  Bernal.  Officer Nix immediately blocks that vehicle in with
11  his car.  These two cars are now facing each other
12  nose-to-nose, face-to-face, touching.
13  The evidence will show that officers Borchardt and
14  Haecker immediately pull their vehicle to the left of Officer
15  Nix.  And because of the way the driver of that vehicle was
16  acting and because of the description matching that of someone
17  that Detective Ibarra was looking for, all of the officers
18  exited their vehicles with their weapons drawn.
19  We will show that Corporal Nix immediately ran to the
20  passenger's side of that suspect vehicle.  And with his metal
21  baton begin to strike at the window of that passenger vehicle.
22  We will show that he hits that vehicle one time, two times and
23  then Corporal Nix bends over, places his gun on the ground,
24  stands back up and using both arms, hits that window five more
25  times.  Before he can hit it a sixth time, a gunshot rings out

1  from inside that vehicle. We will show that that bullet hits
2  Corporal Nix directly in his badge, breaking, causing pieces
3  of metal to go up into his neck, slicing through his carotid
4  artery and jugular vein. He is immediately incapacitated. He
5  falls to the ground. The other officers hearing the gunshot,
6  seeing Corporal Nix fall to the ground, they return fire.
7      We will show that Officer Jarc runs to the side of that
8  suspect vehicle and drags Corporal Nix away. That he and
9  Officer Borchardt carry Officer Nix across the street to try
10  to administer treatment to contain the bleeding. They make
11  the decision because of the heavy bleeding, they can't afford
12  to wait for the ambulance. They load him in the squad car and
13  take off for Parkland Hospital emergency room.
14      We will show that while they are doing that, the suspect
15  driver is still inside that vehicle. And that by this time,
16  Dallas SWAT has arrived. We will show that the SWAT team is
17  unable to determine whether or not the driver of that vehicle
18  is alive or dead, due to the darkness of the tinted windows.
19  But nonetheless they device a plan. And using two armed
20  personnel carriers, they approach that vehicle and manage to
21  break the window.
22      We will show that at this time they can see the suspect.
23  They can see that the driver is not moving. They can also see
24  that there is a gun in the car.
25      Nonetheless not knowing whether or not that person is

1  alive or dead, they breach that vehicle and drag that driver
2  out.
3      The evidence will show the person they pulled out of that
4  vehicle is this defendant, Wesley Ruiz.
5      The evidence will also show that after they pulled him
6  out of that vehicle, they find a high caliber pistol.
7  Semi-automatic pistol loaded with high velocity rounds. The
8  pistol's configured to look like a rifle.
9      Pistol, the evidence will show you, is designed to at
10  full load carry 30 rounds of ammunition. Ammunition capable
11  of piercing a bulletproof vest.
12      The evidence will show that there are 29 rounds in that
13  pistol. And that one spent shell casing was found inside the
14  vehicle. And after forensic testing, it was determined that
15  that shell casing was fired by that pistol.
16      We will also show you that also found in that car is
17  large quantity of methamphetamine and other drugs and other
18  contraband consistent with the use and sell of illegal
19  narcotics.
20      All of the events that I have laid out for you, you will
21  hear and you will see that the majority of this offense was
22  captured on video.
23          THE COURT:   Does the Defense wish to make an
24  opening statement?
25          MR. BRAUCHLE:   We will waive making an opening

32

1  statement at this time and reserve the right to make one at
2  the appropriate time.
3          THE COURT:   Very well, Mr. Brauchle.
4          MR. BROOKS:   Judge, can we go ahead and get all
5  the officers sworn at this time?
6          THE COURT:   Certainly.
7          (Witnesses entered the courtroom.)
8          THE COURT:   If each of you will raise your right
9  hand.
10          (Witnesses were duly sworn.)
11          THE COURT:   Does each side wish to invoke the
12  Rule?
13          MR. BRAUCHLE:   We do, Your Honor.
14          THE COURT:   The Rule has been invoked. That
15  means that you must remain outside the courtroom when you are
16  not testifying and you may not discuss your testimony with any
17  other witnesses. You may however discuss it with the
18  attorneys outside the presence of other witnesses.
19      Who shall be your first witness.
20          MR. BROOKS:   Detective Ibarra, Your Honor.
21          THE COURT:   You may proceed, Mr. Brooks.
22              EDUARDO IBARRA
23  was called as a witness, and having been duly sworn by the
24  Court, testified under oath as follows:
25

33

1          DIRECT EXAMINATION
2  BY MR. BROOKS:
3      Q.   Sir, would you introduce yourself to the jury,
4  please?
5      A.   Yes. I am Detective Eduardo A. Ibarra.
6      Q.   And how are you employed?
7      A.   I'm a detective with the homicide unit with the
8  Dallas Police Department.
9      Q.   Just for background, Detective, can you tell the jury
10  how long you have been a Dallas Police Officer and how long
11  you have been working in the homicide section?
12      A.   I have got a little over 16 years. And I have been
13  assigned to homicide for the past three and a half.
14      Q.   And I want to take your attention back to March of
15  2007, were you assigned to investigate a capital murder that
16  took place on Southerland Avenue?
17      A.   I was.
18      Q.   What was the date of that offense?
19      A.   March 21st, 2007.
20      Q.   And just so the jury understands, how are you
21  homicide officers assigned murder investigations?
22      A.   Okay. In our unit, what we do is there is 12
23  detectives assigned to a detail, each will take a homicide
24  case as they come in and you will rotate. That particular
25  week I was assigned that particular case on Southerland.

1  Patrol officers had responded to a shooting call on
2  Southerland and that's where they learned and began the
3  investigation of the death of that individual.
4      Q.   And as part of what the Patrol officers pass on to
5  you, were you able to identify any particular suspects?
6      A.   Based on the information we had obtained through the
7  witnesses out there, we got general information on possible
8  suspects that could be connected to this criminal offense.
9      Q.   When you say general information, are you referring
10 to generalities such as physical description, known locations,
11 things of that nature?
12     A.   Yes.
13     Q.   Would that description also include vehicles that
14 these suspects are known to either possess or be seen in?
15     A.   Yes.
16     Q.   And with respect to the offense that took place on
17 Southerland, were you able to identify a physical description
18 as well as locations that the person of interest might be
19 found at?
20     A.   Yes, physical location and vehicle.
21     Q.   And you were also able to identify a certain type of
22 vehicle that this person may have been seen in the past
23 driving or may have been seen in; is that a fair statement?
24     A.   Correct.
25     Q.   And what do you do with that information once you

1  develop it?
2      A.   Because we are in the gathering mode of gathering
3  information, what we do is we have a unit that we contact and
4  we ask them to draft a bulletin, basically what you guys would
5  understand as be on the lookout.  This bulletin will request
6  from our Patrol officers to be on the lookout for this
7  particular vehicle; and if they come in contact with the car,
8  identify the occupants of it for the investigation that is
9  being generated.
10          MR. BROOKS:  May I approach the witness, Your
11 Honor?
12          THE COURT:  You may.
13     Q.   (By Mr. Brooks)  Detective, I want to show
14 you a document that is marked as State's Exhibit No.
15 1, and ask you if you recognize that?
16     A.   Yes.
17     Q.   And is this -- is this a copy of the bulletin that
18 you issued with respect to the shooting on Southerland?
19     A.   Yes.  I had our fusion center draft this.  And before
20 it was disseminated, I preapproved the information, and this
21 is what was sent out to our uniform Patrol officers.
22          MR. BROOKS:  Your Honor, at this time we would
23 offer State's Exhibit No. 1.
24          MR. BRAUCHLE:  No objections.
25          THE COURT:  State's 1 is admitted.

1      Q.   (By Mr. Brooks)  Detective, off of State's
2  Exhibit No. 1, can you tell the jury what was the
3  vehicle description that you put on there.
4      A.   The vehicle description is a '96 Chevy Caprice,
5  four-door, didn't have a license place, but the car was very
6  distinctive.  It was red over gray in color, with 22-inch
7  chrome wheels, dark tinted windows.
8      Q.   You said very distinctive.  With that distinctive
9  description?
10     A.   Yes, sir.
11     Q.   Now, just so that we are clear, you are familiar with
12 some of the facts of this offense?
13     A.   Yes.
14     Q.   And you were able to determine that the car that you
15 were looking for for the Southerland offense is not the same
16 vehicle that was involved in this offense?
17     A.   Correct.
18     Q.   And the offense that took place on Southerland, was
19 that offense ever solved?
20     A.   It was.
21     Q.   And when was that offense solved?
22     A.   February of '08, this year.
23     Q.   And the person that was convicted of that offense --
24 well, strike that.  This defendant, Wesley Ruiz, was not
25 involved in that offense on Southerland?

1      A.   Correct.
2      Q.   Just happen to be driving the same car that matched
3  the description of the car that you were looking for?
4      A.   Correct.
5          MR. BROOKS:  Pass the witness.
6          THE COURT:  Cross-examination.
7                    CROSS-EXAMINATION
8  BY MR. BRAUCHLE:
9      Q.   Detective Ibarra, did you bring your file in regard
10 to this Southerland murder?
11     A.   I have it, yes.
12          MR. BRAUCHLE:  Can we be provided with that,
13 Your Honor?
14          THE COURT:  You may.
15          THE WITNESS:  Can I get it from my --
16          MR. BRAUCHLE:  You can't reach from there, you
17 will have to.
18          (Pause in the proceedings.)
19          MR. BROOKS:  May we approach, Your Honor?
20          THE COURT:  You may.
21          (Discussion off the record.)
22          MR. BRAUCHLE:  May I approach, Your Honor.
23          THE COURT:  You may.
24     Q.   (By Mr. Brauchle)  Detective Ibarra, I will
25 show you what has been marked as State's Exhibit No.

38

1    1, in regard to that, you state in there that at
2    that time the suspects that you thought might be
3    driving that vehicle were two black males; is that
4    correct
5         A.    Yes, they were black males.  But they weren't driving
6    the car, that wasn't the suspect vehicle.  The information
7    that we received from our witnesses was that one of the
8    witnesses recognized one of the suspects as either possibly
9    owning the car similar to that or being in the car in a prior
10   occasion.  But that wasn't the car that was seen leaving from
11   the Southerland case.
12        Q.    Okay.  Is it this time the only suspect information
13   is two black males?
14        A.    Correct.
15        Q.    So you are saying that you weren't looking for black
16   males driving that car?
17        A.    Yes, we were looking for black males, that if any of
18   our Patrol officers came in contact with a car similar to that
19   with African-American males, they were to identify these
20   individuals.
21        Q.    All right.  It also says that the car supposed to
22   hang around Club One, Nairobi and Rhythm City; is that
23   correct?
24        A.    Correct.
25        Q.    And this car was not seen at any of those three

39

1    places on the day of this offense; is that correct?
2         A.    And that information --
3         Q.    And I am not talking about the March 21st one, I am
4    talking about the one we are here on today?
5         A.    No, not at that location.
6         Q.    Also down here at the bottom it says this bulletin is
7    not probable cause for an arrest; is that correct?
8         A.    Correct.
9         Q.    So in and of itself, that bulletin plus being seen in
10   that car would not have been enough for the officers to arrest
11   the person driving that car; is that correct?
12        A.    Correct.
13        Q.    And once again there is no reason to believe that the
14   car that Mr. Ruiz was driving is in any way involved in the
15   Southerland murder case; is that correct?
16        A.    The only connection was the same make and model and
17   the color scheme.
18        Q.    That wasn't the question.  There is no reason to
19   believe that Mr. Ruiz had anything to do with the murder on
20   Southerland Street?
21        A.    That's correct, no reason to believe that.
22        Q.    The only thing that would in any way be similar is
23   that his car looked somewhat like the car that someone saw
24   leaving that location; would that be a true statement?
25        A.    No, sir, it would not.

40

1         Q.    Well, what would the true statement be?
2         A.    That car was not seen leaving the Southerland case.
3    Again that car was identified as possibly belonging to one of
4    the suspects or possibly being -- or one of the suspects being
5    in the car at some point in time, but not the night of the
6    Southerland case.
7         Q.    But in any event, Mr. Ruiz is not in any way involved
8    with those events; is that correct?
9         A.    That's correct, he is not involved.
10        Q.    And that happened on March 21st of 2007?
11        A.    Correct.
12        Q.    And the similarity of the cars is the only -- the
13   only aspect that would be in any way similar to this case; is
14   that correct?
15        A.    Yes, sir.
16        Q.    Have you seen the car that Mr. Ruiz was driving?
17        A.    Yes.
18        Q.    Have you seen the car that y'all were actually
19   looking for?
20        A.    No.
21        Q.    But you know that the car Mr. Ruiz was driving, once
22   again is not the car that y'all were looking for?
23        A.    Correct.
24             MR. BRAUCHLE:  May I approach once again, Your
25   Honor?

41

1              THE COURT:  You may.
2              MR. BRAUCHLE:  We would like to publish this to
3    the jury, Your Honor.
4              THE COURT:  You may.
5              MR. BRAUCHLE:  We will pass the witness.
6              MR. BROOKS:  No other questions from this
7    witness, Your Honor.
8              THE COURT:  You may step down, sir.
9              THE WITNESS:  Can I get my case file back,
10   please.
11             THE COURT:  You may.
12             MR. BROOKS:  May this witness be excused, Your
13   Honor.
14             THE COURT:  Any objections?
15             MR. BRAUCHLE:  No, Your Honor.
16             THE COURT:  Sir, you can go.
17             THE WITNESS:  Thank you, sir.
18             THE COURT:  You may call your next witness,
19   Mr. Brooks.
20             MR. BROOKS:  Yes, sir.
21             (Witness entered the courtroom.)
22             MR. BROOKS:  May I proceed, Your Honor?
23             THE COURT:  You may.
24
25

42

43

JEREMY BORCHARDT

1   was called as a witness, and having been duly sworn by the
2   Court, testified under oath as follows:
3
4                   **DIRECT EXAMINATION**
5   BY MR. BROOKS:
6       Q.   Sir, would you introduce yourself to the jury.
7       A.   My name is Jeremy Borchardt. I am a Dallas Senior
8   Corporal. I have been on the department nine years.
9       Q.   You have been on the department nine years. What
10  section are you currently assigned to?
11      A.   Currently assigned to the training section at the
12  firearms training center.
13      Q.   And how long have you been with that section?
14      A.   Just a little over a year.
15      Q.   And just so the jury has a little bit of a
16  background, what other parts -- what other departments within
17  the Dallas Police Department have you worked in?
18      A.   I was initially assigned to Northwest Patrol, that
19  was at Love Field, the airport unit for a little while. Went
20  back to Northwest. And after I was injured on duty and I came
21  back I went to Operation Disruption.
22      Q.   And what exactly is Operation Disruption?
23      A.   Operation Disruption is a unit that focuses on
24  high-crime areas of the city. Just -- we didn't answer calls,
25  just mainly arresting people that needed to go to jail.

1       Q.   And how many officers are assigned to Operation
2   Description at a given time?
3       A.   It has changed now. When I was there, it was two
4   shifts, we had day shift and a night shift. And probably 14
5   to 20 officers on each shift.
6       Q.   And the officers that are part of Operation
7   Disruption, are they, I guess, periodically moved to different
8   parts of town, wherever the current hot spots are?
9       A.   Yeah, they kind of follow the crime trend. Whenever
10  they are having a problem with high crime in a certain area,
11  they will move that squad in.
12      Q.   And going back, Officer, going back to March of 2007,
13  were you assigned to Operation Disruption?
14      A.   Yes, sir, I was.
15      Q.   And when the officer -- when you are assigned to that
16  section, do you work alone or do you have a partner?
17      A.   At that time we were two-man squads, I was with a
18  partner.
19      Q.   And who is the officer assigned to work with you?
20      A.   Todd Haecker.
21      Q.   And as far as that assignment, are either one of you
22  senior to the other one in charge, how does that work?
23      A.   I am a little bit senior to him maybe -- maybe a
24  year, I got a year on him. We are both senior corporals. So
25  it just kind of -- we just kind of work together.

44

45

1       Q.   I am going to kind of turn your attention back to
2   that day, Officer Borchardt, you recall what time you went on
3   duty that day?
4       A.   Yeah. We started -- I was on days then, so we were
5   working from, I believe, it was 9:00 to 5:00.
6       Q.   And on March the 23rd of 2007, were you on duty as
7   part of Operation Disruption?
8       A.   Yes, sir, I was.
9       Q.   And the part of town that you were patrolling is
10  where?
11      A.   West Dallas in the area of Westmoreland, Singleton,
12  Hampton.
13      Q.   And is that part of Dallas contained within the city
14  of Dallas?
15      A.   Yes, sir, it is.
16      Q.   Dallas County?
17      A.   Yes, sir.
18      Q.   State of Texas?
19      A.   Yes, sir.
20      Q.   And going back to that day, can you tell the jury
21  initially how you were aware -- well, strike that, do you know
22  Officers Patrick Starr and Jason Jarc?
23      A.   Yes, sir, I do.
24      Q.   Are they part of Operation Disruption as well?
25      A.   No, sir, they are not.

1       Q.   Do you recall hearing radio traffic from either
2   Officer Jarc or Officer Starr late that afternoon, the 23rd
3   of March 2007?
4       A.   Yes, sir, I do.
5       Q.   And what was the content of that radio traffic?
6       A.   They stated that they were --
7            MR. BRAUCHLE:   Your Honor we would object to
8   hearsay.
9            THE COURT:   Sustained.
10      Q.   (By Mr. Brooks)   While you and Officer
11  Haecker were on patrol, were you contacted by the
12  Dallas Police Department dispatch?
13      A.   Yes, sir.
14      Q.   And did you notify dispatch of your current location
15  at that time?
16      A.   Yes, sir.
17      Q.   And what was your location at that time?
18      A.   We were in West Dallas just about to end our shift,
19  so we started to head back. We were starting to head back to
20  headquarters, we were probably about Singleton and Hampton at
21  that time.
22      Q.   And you recall what response you gave to dispatch?
23      A.   We told them that based on the radio traffic and that
24  Officers Jarc and Starr had put out, that we would head in
25  their direction to help them out.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

46

47

1    Q.    And what is your understanding of Officers Jarc and
2  Starr, what is your understanding of the direction that they
3  were traveling in at that time?
4    A.    They were heading south on 35. And exiting at
5  Mockingbird Lane.
6    Q.    And did they give you a description of the type of
7  vehicle they were in?
8    A.    That they were in?
9    Q.    Yes, sir.
10    A.    Yes, sir. They told us that they were driving a dark
11  extended cab pickup.
12    Q.    What about the vehicle they were following, did they
13  give you a description of that vehicle as well?
14    A.    Yes, sir, they did.
15    Q.    And what description do you recall?
16    A.    They advised us it was a red and gray Chevy Caprice
17  with large rims on it.
18    Q.    Now, what is the time span between you hearing from
19  dispatch that there is a call for a marked unit and your
20  response to dispatch and actually seeing that suspect vehicle?
21    A.    Traffic was pretty heavy at that time, we then --
22  probably took us in order to get over there where they were
23  at, no more than five minutes.
24    Q.    And you recall whether yourself or your partner first
25  spotted the vehicle?

1    A.    I don't remember who first spotted it. We were
2  sitting there together in the car, so...
3    Q.    When you saw the vehicle, did it match the
4  description?
5    A.    Yes, sir, it did.
6    Q.    Now, do you recall at any point before that day
7  seeing a department wide bulletin for a particular suspect and
8  particular vehicle?
9    A.    Yes, sir, I do.
10    Q.    And do you recall, and it's fine if you don't, do you
11  recall what the description on that bulletin was with respect
12  to the vehicle?
13    A.    The bulletin went out for a vehicle matching that
14  description that had been used or was wanted in connection
15  with a murder that had occurred earlier at, I believe, it was
16  Southeast Division.
17    Q.    And at some point, did Senior Corporal Mark Nix also
18  respond to that radio dispatch?
19    A.    Yes, sir.
20    Q.    And do you recall where he was at the time he
21  responded to the radio dispatch?
22    A.    No, I have no idea where he was coming from.
23    Q.    Was there any game plan that was developed between
24  yourself and Officers Jarc and Starr on what you or any other
25  Patrol officer was to do when you saw that vehicle, the

48

49

1  suspect vehicle?
2    A.    We just kind of decided whoever got there first would
3  get behind it and the rest of us would fill in as we arrived.
4  It was just kind of a fluid situation based on the traffic.
5    Q.    What type of vehicle were you in?
6    A.    I was in an Impala.
7    Q.    Marked Patrol unit?
8    A.    Yes, sir.
9    Q.    Clearly a Dallas Police car?
10    A.    Yes, sir, clearly marked.
11    Q.    Overhead lights?
12    A.    Yes, sir.
13    Q.    And what type of vehicle was Corporal Nix in?
14    A.    I believe he was in the same, I believe it was
15  another Dallas Police marked Impala.
16    Q.    Describe for the jury, Officer Borchardt, once you --
17  well, who was driving as far as your car, were you driving?
18    A.    I was driving our car, yes, sir.
19    Q.    Describe for the jury once you saw the Impala, tell
20  them what happened next.
21    A.    We were waiting -- we actually set up on Mockingbird
22  just before it turns into Westmoreland on the Westmoreland
23  bridge, we got there ahead of them, they were stuck in
24  traffic. We sat there and waited. When we spotted the
25  vehicle, Officer Nix had already gotten behind it, so he was

1  already there behind the car. And so when it past us, we
2  pulled out behind him. So he was the first car and then we
3  were the second car. The unmarked deployment vehicle was
4  behind us.
5    Q.    So if we had to describe the scene as you just said
6  it, the suspect vehicle would be car number one and then car
7  number two would be?
8    A.    Nix's car.
9    Q.    Car number three?
10    A.    Would be us.
11    Q.    And four or five or six would be Officers Jarc and
12  Starr?
13    A.    Yes, sir.
14    Q.    And what direction are these vehicles traveling at
15  that point?
16    A.    We were heading south on Westmoreland just going over
17  the Westmoreland bridge, southbound from Mockingbird.
18    Q.    And at some point was a decision made to initiate a
19  traffic stop?
20    A.    Yeah, we kind of discussed it that we needed to wait
21  till we got on the other side of the bridge, based on the
22  amount of traffic that was there. It was just so congested on
23  the bridge. And because of the reason that we were following
24  the car in the first place, being possible murder suspect, we
25  decided that we needed to have as few a chance of all these

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

50
51

1 other innocent people being involved with it as possible.  So
2 we decided that we would let it go over the bridge and try to
3 get to a less congested area.
4     Q.   And do you know how far past the bridge there was an
5 attempt made to stop this vehicle?
6     A.   It wasn't very far.  There is a red light on the
7 south end of the bridge; and once we got through that, we
8 decided that we said that we would light him out -- light him
9 up.
10    Q.   And just walk the jury through what happened once you
11 got through the other side of the bridge?
12    A.   Okay.  We, ah, turned on the overhead lights --
13             MR. BRAUCHLE:  Judge, we would object to
14 narrative.
15             THE COURT:  Overruled.
16    A.   We turned on the overhead lights and we were in the
17 center lane at that time.  The suspect vehicle made a move
18 over to the right-hand lane and started to slow way down.  And
19 we thought he was just going to stop there on Westmoreland.
20 Speed got real low almost to a crawl; and a few seconds after
21 that, the car just took off.  He just gunned it and took off
22 down the road so we were in chase.
23    Q.   (By Mr. Brooks)   Let me stop you there,
24 Officer Borchardt.  You just described this vehicle
25 as slowing down to a crawl, at that time did you

1 believe that the vehicle was going to stop and pull
2 over -- pull over and stop
3     A.   Yes, sir, at that point I did.
4     Q.   And as you told this jury, that didn't happen?
5     A.   No, sir.
6     Q.   When the vehicle takes off, what is the first thing
7 that is going through your mind at this time?
8     A.   That we probably got the right guy here.  It's the
9 first thing that went through my mind is probably actually the
10 suspect that we are looking for.
11    Q.   And are you still on Westmoreland when the chase
12 begins?
13    A.   Yes, sir, still southbound Westmoreland.
14    Q.   When you say the vehicle took off, were you able to
15 try to gauge the rate of speed?
16    A.   Just accelerated at a fast right.  During the whole
17 chase got up probably 70, 80 miles per hour.  But initially it
18 was, you know a high acceleration before we turned on to
19 Bernal.
20    Q.   And from the point where the vehicle takes off to
21 that turn on Bernal, about how far was that?
22    A.   It's about a block and a half.
23    Q.   And when it makes that turn, is it making a regular
24 traffic turn or high rate of speed?
25    A.   It was a high rate of speed, sir.

52

1     Q.   Who was behind him at that point?
2     A.   Mark Nix was in the first car and we are still in the
3 second car.
4     Q.   Are you aware of where Officers Jarc and Starr, where
5 they are at that point?
6     A.   No, no, sir.
7     Q.   So at this point, there are two police cars involved
8 in the chase?
9     A.   Yes, sir.
10    Q.   And are you familiar with Bernal?
11    A.   Yes, sir, pretty familiar with it.
12    Q.   How would you describe that roadway?
13    A.   It's a winding street.  Residential area, nothing,
14 cars parked on each side, usually on each side of the road.
15 Just kind of a winding area.
16    Q.   And when that vehicle turns and takes off on Bernal,
17 is it still going at a high rate of speed?
18    A.   Yes, sir.
19    Q.   And is there traffic during this chase coming and
20 going in both directions?
21    A.   Yes, sir.
22    Q.   Do you recall seeing any action that the vehicle took
23 during this chase?
24    A.   I do remember crossing the center line and driving in
25 the opposite lane, driving into on-coming traffic.

53

1     Q.   In your opinion was during this part of the chase,
2 was this vehicle a threat to others?
3     A.   Yes, sir, it was.
4     Q.   And about how long does this portion of the chase go
5 on?
6     A.   Doesn't last very long.  Maybe minute and a half, two
7 minutes.
8     Q.   Now, when something like this is going on, what is
9 the talk between you and let's say Haecker in the car, what
10 are y'all talking about?
11            MR. BRAUCHLE:  Your Honor, once again we would
12 object to hearsay.
13            THE COURT:  Overruled.
14    A.   We were really just kind of focused on the chase at
15 that point.  I am concentrating mostly on the driving, because
16 of the high speeds, the danger, of the driving.  And Haecker
17 was on the radio, since we were a two-man squad, he was
18 calling the chase.  Because Nix being in a one-man squad car,
19 needed to focus on his driving.  So us as a two-person
20 element, we can take over that part of it.  So there wasn't
21 all that much chatter between the two of us, it was just more
22 routine chase business that we have to handle.
23    Q.   (By Mr. Brooks)   Okay.  What about
24 between your car and Corporal Nix, is there any
25 chatter between y'all's two vehicles?

55

1      A.    Nothing -- nothing other than just the usual stuff.
2 Just you know, people get kind of excited and talk on the
3 radio, you know telling people we are calling it and just
4 that.
5      Q.    Now, Officer, you said this chase doesn't go on for
6 too long, is there a period in time where it looks like the
7 vehicle you are chasing clearly is accelerating and might be
8 making and gaining some ground away from you and Officer Nix?
9      A.    Yes, sir. He was getting a little bit cause he was
10 driving so recklessly. We try not to drive in the other lanes
11 of traffic, so he was gaining ground just by cutting corners
12 and getting ahead of us a bit.
13      Q.    And as you get near the intersection of Bernal and
14 Mart Mall, describe what you see happen with that suspect
15 vehicle?
16      A.    He was driving so far in the other lane of traffic,
17 that when we are going around a curb to the left, he clipped
18 the curb on the side of the road and lost control of the car.
19 The car spun around and started to actually travel reverse in
20 a reverse direction across a driveway and into a yard.
21      Q.    And the yard that he ended up in, was that house on
22 Bernal?
23      A.    Yes, sir.
24      Q.    So the direction that his car ended up in was the
25 front of his car facing Bernal?

1      A.    Yes, sir. It was kind of at an angle facing the way
2 we had come from.
3      Q.    What did you see Officer -- Corporal Nix do in
4 response to that?
5      A.    Mark pulled his car straight into the driveway and
6 straight towards the suspect vehicle and actually pulled up
7 nose-to-nose with him.
8      Q.    Now, right when this happens, when Officer Nix pulls
9 his vehicle in front of the suspect vehicle, is there anything
10 that the suspect vehicle does at that time that you noticed?
11      A.    He started to pull forward a little bit and actually
12 bumped into the front of Mark's squad car.
13      Q.    And after Corporal Nix has blocked the car in, where
14 do you and your partner go?
15      A.    I tried to -- there was another driveway just a
16 little bit past the one that Mark pulled into, and I pulled
17 into that next driveway just so we could have a little bit
18 more of an angle on him. We weren't both facing into the
19 front windshield of his car.
20      Q.    And you recall if that address is 4023 Bernal?
21      A.    I couldn't tell you.
22      Q.    You do know it was on Bernal?
23      A.    Yes, sir.
24      Q.    And so if we could stage the scene at that point, you
25 have the suspect vehicle facing Bernal; is that a fair

56

1 statement?
2      A.    Yes, sir.
3      Q.    And Corporal Nix has blocked that vehicle in with his
4 car?
5      A.    Yes, sir.
6      Q.    Were there vehicles facing each other front-to-front?
7      A.    Yes, sir.
8      Q.    And then you had placed your vehicle where?
9      A.    It would have been off to the passenger's side front
10 passenger's side door, just kind of facing directly into the
11 side of the suspect vehicle.
12      Q.    And at this point, were you -- you and your partner
13 and Corporal Nix, were y'all the only officers there
14 surrounding the suspect vehicle?
15      A.    Yes, sir.
16      Q.    What do you recall seeing happen after you had the
17 suspect vehicle blocked in?
18      A.    I just remember Mark jumping out of his car and
19 running up to the passenger's side of the suspect vehicle.
20      Q.    Let me stop you there. When Corporal Nix exits his
21 vehicle, what do you and Officer Haecker do?
22      A.    I am trying to get my car stopped at that point and
23 then we also exit our car. I stayed right by my door frame.
24      Q.    Do you have your weapons drawn?
25      A.    Yes, sir.

57

1      Q.    Why is that?
2      A.    It's a possible murder suspect that just ran from us.
3      Q.    What do you recall seeing Corporal Nix do initially
4 when he gets out of his vehicle?
5      A.    He approached the passenger's side door, front
6 passenger's side door. And he was issuing verbal commands,
7 yelling at whoever was inside to exit the vehicle. At that
8 point he pulled out his asp baton and begin to strike on the
9 front passenger's window.
10      Q.    Now, this vehicle that you officers had been chasing,
11 did it have heavily tinted windows?
12      A.    Yes, sir, it was extremely dark.
13      Q.    At this point, are you able to see who was inside
14 that Chevy Caprice?
15      A.    No, sir.
16      Q.    Did it ever appear that that driver responded to
17 Corporal Nix's commands to exit the vehicle?
18      A.    No, sir, it did not.
19      Q.    What do you see Corporal Nix do next -- well, strike
20 that. How many times did you initially see him hit the
21 passenger's window?
22      A.    Just a few times.
23      Q.    And is the window breaking, is it chattering, is it
24 doing anything?
25      A.    No, it wasn't chattering. It was just kind of -- his

1    strikes were just making a thin kind of a shape of a baton in
2    the window just due to all the heavy sheeting on the inside of
3    the tint.
4         Q.    How is he hitting, if you recall, how is he hitting?
5    Is he two armed with a baton, is he one armed with a baton,
6    show us how he was hitting that window.
7         A.    Initially he started off with his left hand.  With
8    his offhand.  Because he had his gun in this hand.  So he was
9    striking at it one handed.  I guess he didn't feel that he was
10   making any progress on it, so he actually set his gun down and
11   started to hit on it with two hands.
12        Q.    When you say he set his gun down, where did he place
13   his gun?
14        A.    He placed it on the ground.
15        Q.    And is he bent over at the time he places it on the
16   ground?
17        A.    Yes, sir, he did.
18        Q.    In other words, I just want to make sure it is clear
19   to the jury, does he make a motion to put it on the ground
20   versus just dropping it?
21        A.    Yes, sir, he bent down, set it down on the ground.
22        Q.    And what happens after that?
23        A.    When he starts to hit again with two hands, that's
24   when a shot came from inside the vehicle and he fell right by
25   the side of the car.

1         Q.    Now, when that shot comes from the vehicle, how far
2    are you from Corporal Nix?
3         A.    Maybe 15, 20 feet.
4         Q.    Were you clearly able to determine that that shot
5    came from inside the vehicle?
6         A.    Yes, sir.
7         Q.    How is that?
8         A.    There was a flash from inside and you could see the
9    back passenger -- the rear passenger's window glass
10   splattering out.
11        Q.    Now, prior to seeing that flash, would that have been
12   similar to a muzzle flash?
13        A.    Yes, sir.
14        Q.    Prior to seeing that flash, had any other Dallas
15   Officers discharged their weapon?
16        A.    No, sir.
17        Q.    When that flash -- that muzzle flash happens, did you
18   say you see glass breaking?
19        A.    Just little spalling glass, just pieces of glass,
20   kind of looks like it poops out.
21        Q.    What does Corporal Nix do?
22        A.    He puts his hand up and then puts his hand up to his
23   face and then just falls to the ground.
24        Q.    Now, when that happens, is anyone on dispatch, is
25   there any communication with respect to barricade, officer

60

1    down, anything like that?
2         A.    No, sir, not at that point.
3         Q.    What do you do when you see that happen?
4         A.    I begin to fire my weapon into the suspect vehicle.
5         Q.    Do you recall approximately how many shots you fired?
6         A.    I fired 12 rounds.
7         Q.    And Officer Haecker, where is he at this time?
8         A.    When we are exiting our vehicle, he actually came
9    from the passenger's side, went in front of me and got
10   positioned towards the rear of the suspect vehicle towards the
11   rear, kind of the trunk area.
12        Q.    Do you know whether or not he in response to the
13   gunshot, he discharged his weapon?
14        A.    Yes, sir, he did.
15        Q.    Now, at that point, have any other Dallas Officers
16   arrived at this crime scene?
17        A.    I couldn't be for certain at what exact point, but
18   another element did arrive.
19        Q.    What about Officers Jarc and Starr, do you recall
20   when they arrived?
21        A.    Yes, sir.  They were pretty much right behind us when
22   the chase ended, when the suspect vehicle wrecked out.  So
23   they kind of held position a little bit further back being
24   they were in -- not in a marked vehicle.
25        Q.    And describe what happens after Corporal Nix falls to

61

1    the ground.
2         A.    We all open fire on the vehicle.  And Officer Jarc,
3    who is in just plain clothes ran up besides me and yelled that
4    we had to go get Mark.  And he ran around the driver's side of
5    my car and grabbed Mark by the arm and begin pulling him away
6    from the car, the suspect car.
7         Q.    Now, at this point, Officer, does anyone have
8    knowledge as to whether or not the driver of that vehicle is
9    dead or alive?
10        A.    No, sir, we just -- still can't tell.
11        Q.    And does Officer Jarc have any assistance in dragging
12   Mark Nix away from that vehicle.  Or do you see him do it by
13   himself?
14        A.    He starts to pull him away by himself and then
15   Haecker -- Officer Haecker runs up and begin to help him drag
16   him away.  Myself and Officer Starr were still putting the
17   covering fire into the car just so they wouldn't get shot at
18   while they were trying to extract him.  Once they got him a
19   little bit away from the vehicle, they were struggling with
20   him so I ran over and assisted also in pulling him away.
21        Q.    And where did you-all take Officer Nix at this time?
22        A.    At that time we are trying to get him as far away
23   from the danger area there as we could.  So we just pulled him
24   across the street to the other curb.
25        Q.    Describe, Officer Borchardt, as best you can how

1   Corporal Nix appeared to you at that time.
2     A.   He was unresponsive.  He wouldn't -- we got no
3   verbal, no -- there was just no movement at all from him.  So
4   we couldn't -- we kept on yelling at him to keep fighting, and
5   just never got a response.
6     Q.   Are you able to locate any sign of an injury?
7     A.   Yes, sir, when we got him across the street, we
8   removed his police shirt and his vest and his undershirt and
9   found a small bleeding hole up in the left upper chest area.
10     Q.   And what decision did y'all make at that time?
11     A.   We tried to get the bleeding stopped.  I yelled at
12   Officer Jarc that we needed something to stop the bleeding, so
13   ran back and actually got I think it was a T-shirt and brought
14   it back up to us just so we could put some pressure on the
15   wound, just to try to stop the bleeding.  There was a little
16   amount of blood coming from the hole.  And we couldn't really
17   get it stopped.
18     Q.   Do you have any first aid training as part of your
19   training as a police officer?
20     A.   Yes, sir, just basic.
21     Q.   And based upon the training that you had, were you
22   successful in stanching that bleeding?
23     A.   No, sir, we were not.
24     Q.   At some point, do either you -- you or Officer Jarc
25   make a decision as to Corporal Nix and what you are going to

1   do next?
2     A.   Yeah.  We had -- we had already called in for an
3   ambulance.  But just based on the amount of blood we had and
4   our inability to get it stopped, we decided that we couldn't
5   wait for an ambulance to come, based on the time of day and
6   the traffic that we had already encountered ourselves, we knew
7   that the ambulance would be delayed for a while.  So I kind of
8   made the decision that we needed to go to Parkland.
9     Q.   And in whose vehicle were you going to use to do
10   that, if you remember?
11     A.   Officer Crawford and Officer Hogan had arrived at
12   that point.  And Officer Hogan drove their squad car in
13   between us and the suspect vehicle and kind of giving us some
14   cover while we were trying to do first aid on Mark.  So since
15   that was the closest vehicle, we just picked him up and loaded
16   him into the backseat.
17     Q.   And you say we picked him up, who would that be?
18     A.   Myself, Haecker, Jarc and Hogan.
19     Q.   And how many of you officers, I guess left in that
20   squad car to the hospital?
21     A.   There were three of us, Jarc -- Officer Jarc was
22   driving the vehicle and Hogan was in the front passenger's
23   seat on the radio giving dispatch information about what we
24   were doing.  And I was actually in the backseat with Mark kind
25   of crouched over the top of him trying to keep pressure on the

---

64

1   wound.
2     Q.   Were you using any particular clothing item to do
3   that?
4     A.   Yeah.  The T-shirt that Officer Jarc had brought us.
5     Q.   Do you recall the route that y'all took to get to
6   Parkland Hospital?
7     A.   We went back eastbound on Bernal and then took north
8   Westmoreland northbound, crossed over the bridge on to
9   Mockingbird.  And then took Mockingbird to 35, 35 south to
10   Inwood, and then Inwood to Medical Center.
11     Q.   Was there still heavy traffic?
12     A.   Yes, sir.
13     Q.   All of this takes place basically in the middle of
14   rush hour?
15     A.   Yes, sir.
16     Q.   When Corporal Nix, when you were in the backseat on
17   the ride from the hospital with him, was he responsive in any
18   way?
19     A.   No, sir.
20     Q.   Did you continue to administer treatment all the way
21   to the hospital?
22     A.   Yes, sir.  Tried to keep pressure on the wound and
23   just what little else I could do, some chest compressions; but
24   there was just no response.
25     Q.   And when you got to Parkland Hospital, was there an

65

1   emergency team waiting?
2     A.   Yes, sir, they were outside waiting for us.
3     Q.   Now, at this point, you are at Parkland Hospital, do
4   you stay at Parkland Hospital?
5     A.   Yes, sir, for -- they kept us there for a few hours.
6     Q.   And how did you find out Corporal Nix had passed from
7   his injuries?
8     A.   Actually one of the surgeons at Parkland who treated
9   me when I got shot, actually treated Mark also.  And he came
10   and told me what -- that he had passed away.
11        MR. BROOKS:  May we approach, Your Honor.
12        THE COURT:  You may.
13        (Discussion off the record.)
14        THE COURT:  Ladies and gentlemen, we will take a
15   ten-minute recess.
16        THE BAILIFF:  All rise.
17        (Jury retired from the courtroom.)
18        THE COURT:  You may be seated.
19        (Recess taken.)
20        THE BAILIFF:  All rise.
21        (Jury returned to the courtroom.)
22        THE COURT:  You may be seated.
23   You may continue, Mr. Brooks.
24        MR. BROOKS:  May I proceed, Your Honor?
25        THE COURT:  You may.

1        MR. BROOKS:  May I approach?

2        THE COURT:  You may.

3    Q.   (By Mr. Brooks)  Mr. Borchardt, I want to

4 show you what is marked as State's Exhibit No. 4; do

5 you recognize what that is?

6    A.   Yes, sir.

7    Q.   And is that a diagram?

8    A.   Yes, sir.

9    Q.   Does this diagram have for lack of a better word,

10 cars depicted on it?

11    A.   Yes, sir, it does.

12    Q.   And does it appear to be a fair and accurate

13 recreation of how the vehicles were parked at the scene at the

14 time of this offense?

15    A.   Yes, sir, it does.

16    Q.   Are you able to look at this diagram, Officer, and

17 tell us where your car was parked?

18    A.   Yes, sir.

19    Q.   The defendant's car?

20    A.   Yes, sir.

21    Q.   As well as Corporal Nix's car?

22    A.   Yes, sir.

23    Q.   Are there other cars also on this diagram also

24 parked?

25    A.   Yes, sir.

---

1    Q.   Are you able to look at this diagram and tell the

2 jury where Officers Jarc and Starr parked their pickup truck?

3    A.   Yes, sir.

4        MR. BROOKS:   We would offer State's Exhibit 4 at

5 this time.

6        MR. BRAUCHLE:  No objections.

7        THE COURT:  State's 4 is admitted.

8        MR. BROOKS:   May this officer step down, Your

9 Honor?

10        THE COURT:  He may.

11    Q.   (By Mr. Brooks)  Officer Borchardt, point

12 out to the jury the vehicles that I just asked you

13 about, show them where your vehicle was parked

14    A.   This was my vehicle (indicating.)

15    Q.   And where would Corporal Nix's vehicle be?

16    A.   Right here (indicating).

17    Q.   And the defendant's vehicle, the car he was driving?

18    A.   Right here (indicating).

19    Q.   And it is not on the diagram, but if you were to look

20 for Bernal, where would it be on this diagram, the

21 intersection of Bernal and Mart?

22    A.   Right over here (indicating).

23    Q.   And what about Jarc and Starr?

24    A.   This would be their pickup truck right here, sir

25 (indicating).

---

1    Q.   And you have had a chance to look at that before?

2    A.   Yes, sir.

3    Q.   And does this diagram also depict the various

4 locations that you fired your weapon from?

5    A.   Yes, sir.

6    Q.   What kind of?

7    A.   Sig Saur 9 millimeter.

8    Q.   And what type of ammunition were you using?

9    A.   Nine millimeter.

10    Q.   And as part of this investigation, were all the shell

11 casings that you fired at that scene, were they matched up to

12 your weapon?

13    A.   Yes, sir.

14    Q.   And show the jury where you were when you initially

15 started firing.

16    A.   Initially I was here (indicating) by my car door,

17 exited here and begin firing here into this area.  Then moved

18 toward the rear of my vehicle.

19    Q.   And when you say you moved toward the rear, show them

20 where toward the rear?

21    A.   In around to this point here (indicating), so I could

22 have a view into the front window.

23    Q.   And were those the only locations at that crime scene

24 that you discharged a weapon?

25    A.   Yes, sir.

---

1    Q.   You may have a seat.

2    A.   (Witness complies.)

3        MR. BROOKS:   May I approach again, Your Honor?

4        THE COURT:  You may.

5    Q.   (By Mr. Brooks)  I want to show you what is

6 also marked as State's Exhibits 5, 6, 7, 8 and 9; do

7 you recognize what is in each of those photographs?

8    A.   Yes, sir.

9    Q.   And do each of these photographs fairly and

10 accurately represent the position of your vehicle and where

11 you were at the time you fired -- well specifically State's

12 Exhibits 5 and 6?

13    A.   Yes, sir.

14    Q.   And State's Exhibit 7, does that photograph fairly

15 and accurately show where you initially attempted treatment on

16 Corporal Nix?

17    A.   Yes, sir, that's it.

18    Q.   And then State's Exhibits 8 and 9, is that a fair

19 depiction of the vehicle that you transported Corporal Nix in?

20    A.   Yes, sir.

21        MR. BROOKS:   Your Honor, we would offer at this

22 time State's Exhibits 5, 6, 7, 8 and 9.

23        MR. BRAUCHLE:  No objections.

24        THE COURT:  State's 5, 6, 7, 8 and 9 are

25 admitted.

---

1    MR. BROOKS:   May he step down again, Your
2  Honor?
3    THE COURT:   He may.
4    Q.   (By Mr. Brooks)   Officer, do you mind just
5  making a notation on here where -- the
6  intersection -- where Bernal would be and where
7  Westmoreland would be -- I mean marked.
8    A.   Bernal runs down this way, just right on the side.
9    Q.   Sure.
10    A.   (Witness complies.)
11    Q.   Thank you, sir, you may take your seat. State's
12  Exhibit 5 --
13    MR. BROOKS:   Judge, may we have the lights.
14    Q.   (By Mr. Brooks)   Tell the jury what they
15  are seeing on State's Exhibit 5, Officer.
16    A.   This would have been the left side of my Patrol
17  vehicle with my door open.
18    Q.   And those numbers that they see on there, what
19  do those numbers represent?
20    A.   Those are marks that the evidence unit uses to mark
21  evidence and those are marking shell casings.
22    Q.   And the left side of your vehicle, is this a part of
23  your vehicle, is this a part of the crime scene where you had
24  discharged a weapon?
25    A.   Yes, sir.

---

1    Q.   State's Exhibit 6, what does that show?
2    A.   That's the right side of our vehicle with the door
3  open, there being Haecker's door on the right side.  Again
4  those are marking more shell casings.
5    Q.   And would that be a location that you had discharged
6  your weapon?
7    A.   Yes, sir.
8    Q.   On your particular weapon, do those shell casings
9  eject to the left or to right?
10    A.   To the right, sir.
11    Q.   So you would have been standing to the left of where
12  those markings are?
13    A.   Yes, sir.
14    MR. BROOKS:   Turn the lights back on, Judge.
15    Q.   (By Mr. Brooks)   Now, the type of vehicles
16  that the Dallas Police Department uses, do those
17  vehicles have recording capabilities?
18    A.   Yes, sir, many of them do.
19    Q.   The vehicle that you were driving, does it have
20  recording capabilities?
21    A.   Yes, sir.
22    Q.   And the vehicle that Corporal Nix was in, did it also
23  have recording capabilities?
24    A.   Yes, sir.
25    Q.   How are those cameras activated?

---

72

1    A.   As soon as the red lights and the siren go on, the
2  camera is activated automatically.
3    Q.   So whenever you activate your siren and lights to do
4  a traffic stop or any other kind of police activity, it is
5  activated?
6    A.   Yes, sir.
7    Q.   And how does it get turned off?
8    A.   It has to be turned off by one of us inside on the
9  computer on the display computer actually.
10    Q.   And if you know, these recordings from those
11  vehicles, is it a tape recording or a digital recording?
12    A.   I believe these new ones are all digital.
13    Q.   So that would be a computer inside the police car?
14    A.   Yes, sir.
15    Q.   And have you had an opportunity to view the videotape
16  from inside Corporal Nix's car?
17    A.   Yes, sir.
18    Q.   And after reviewing that video, does that video
19  fairly and accurately represent the events as they took place
20  on March the 23rd, 2007?
21    A.   Yes, sir, it does.
22    Q.   With respect to the video from your car, the one that
23  you were driving, have you had an opportunity to review that
24  video?
25    A.   Yes, sir, I have.

---

73

1    Q.   And does that video fairly and accurately represent
2  the events of March the 23rd, 2007?
3    A.   Yes, sir, it does.
4    Q.   There was another video, an enhanced video, have you
5  had an opportunity to review that video?
6    A.   Yes, sir.
7    Q.   And the same question, does it fairly and accurately
8  represent the events of March the 23rd of 2007?
9    A.   Yes, sir, it does.
10    MR. BROOKS:   May I approach, Your Honor?
11    THE COURT:   You may.
12    Q.   (By Mr. Brooks)   Officer, I want to show
13  you State's Exhibit No. 10; do you recognize what
14  that is?
15    A.   It says DVD.
16    Q.   And is this the DVD that you have reviewed on
17  previous occasions that contains the videos we just talked
18  about?
19    A.   Yes, sir, it is.
20    MR. BROOKS:   Your Honor, at this point we would
21  offer State's Exhibit No. 10.
22    A copy has previously been tendered to Defense.
23    May we approach, Your Honor?
24    THE COURT:   You may.
25    (Following proceedings had at the Bench.)

1  MR. BROOKS:  I wasn't paying attention to the
2  time, Judge.  We have three portions of the video to show.  I
3  don't know if you want to give them a lunch break now or go
4  through the whole three portions.
5  MR. BRAUCHLE:  It might upset their lunch to see
6  Nix get shot.
7  THE COURT:  You are at the point of introducing
8  all three.  We will introduce and then break for lunch.
9  MR. BROOKS:  You mean introduce and not publish?
10  THE COURT:  Right.  Is there anything that you
11  can do prior to publishing that.  Then we can just break for
12  lunch.
13  (End of bench discussion.)
14  MR. BRAUCHLE:  We have no objections.
15  THE COURT:  State's 10 is admitted.
16  MR. BROOKS:  We will publish after lunch.
17  THE COURT:  Ladies and gentlemen, we are going
18  to break for lunch at this time.  It is 12:10 and we will give
19  you to 1:15 for lunch.
20  If you will remember my earlier admonishments, do not
21  discuss this case.  Have a good lunch.
22  THE BAILIFF:  All rise.
23  (Jury retired from the courtroom.)
24  (Lunch recess taken.)
25  THE COURT:  Bring in our jury, Sheriff.

1  THE BAILIFF:  All rise.
2  (Jury returned to the courtroom.)
3  THE COURT:  You may be seated.
4  You may proceed, Mr. Brooks.
5  Q.  (By Mr. Brooks)  Officer, would you state your name,
6  please.
7  A.  My name is Jeremy Borchardt.
8  Q.  And, Officer Borchardt, you are the same Officer
9  Borchardt who was testifying previously in this trial?
10  A.  Yes, sir.
11  MR. BROOKS:  May I approach, Your Honor?
12  THE COURT:  You may.
13  Q.  (By Mr. Brooks)  Officer, let me show you
14  what is marked as State's Exhibit No. 87, and can
15  you tell me who is depicted in that photograph?
16  A.  That is Mark Nix, sir.
17  Q.  Is he in uniform in this photograph?
18  A.  Yes, sir.
19  Q.  What event do you know this photograph was taken in?
20  A.  That is probably academy graduation photo.
21  MR. BROOKS:  Your Honor, we would offer State's
22  Exhibit 87.
23  MR. BRAUCHLE:  No objections.
24  THE COURT:  State's 87 is admitted.
25  MR. BROOKS:  May we publish, Your Honor?

76

1  THE COURT:  You may.
2  Q.  (By Mr. Brooks)  The diagram that you were shown
3  earlier, depicting -- showing where your car was and the
4  defendant's car and Corporal Nix's car, you were asked a
5  question about a specific address; do you recall that
6  question?
7  A.  Yes, sir.
8  Q.  Do you know what block of Bernal this crime scene is
9  located in?
10  A.  Yes, sir.  It is approximately the 4000 block of
11  Bernal.
12  Q.  Is that in the city of Dallas?
13  A.  Yes, sir.
14  Q.  Dallas County?
15  A.  Yes, sir.
16  Q.  The State of Texas?
17  A.  Yes, sir.
18  Q.  And again these events took place on March 23rd of
19  2007?
20  A.  Yes, sir.
21  Q.  Now, prior to the lunch break, you were asked
22  questions about the video from your car, the video from
23  Corporal Nix's car?
24  A.  Yes, sir.
25  Q.  And you identified a recording that you have seen?

77

1  A.  Yes, sir.
2  MR. BROOKS:  At this time we would like to
3  publish State's Exhibit No. 10?
4  THE COURT:  You may.
5  (Video played to the jury.)
6  Q.  (By Mr. Brooks)  What is that being
7  depicted right there, Officer Borchardt
8  A.  That is a camera from Officer Nix's car showing the
9  suspect vehicle.
10  Q.  And what is taking place at that particular moment?
11  A.  We just turned the lights on, the lights are flashing
12  over there on the left-hand side of the screen, that means the
13  overhead lights have been turned on.
14  Q.  And is the speed indicated anywhere on there?
15  A.  Yes, sir.  It shows 18 miles per hour, it is two
16  lines up from that flashing light.
17  Q.  What has just happened here, Officer?
18  A.  That's where we thought he was going to pull over,
19  and now he is accelerating away from us at a high rate of
20  speed.
21  Q.  Now, the speed that is showing on Corporal Nix's car,
22  what does that read as?
23  A.  Says 58 right now, sir.
24  Q.  And what street are they on now?
25  A.  Just turned on to Bernal.

1   Q.   Okay.  Now, these recordings, are there any audio
2   that was part of these recordings?
3   A.   It depends on if the microphone in the car is turned
4   on or if it is off.  Usually I believe on this one the
5   microphones were off inside the car.
6   Q.   And, again, what speed do you see showing on Corporal
7   Nix's car?
8   A.   Sixty-four right now, sir.
9   Q.   And the other vehicle is significantly in front of
10  him?
11  A.   Yes, sir.
12  Q.   Would it be a fair state that he is traveling at a
13  high rate of speed than what is showing on Corporal Nix's
14  vehicle?
15  A.   Yes, sir, seems he is pulling away from us.
16  Q.   What is the jury seeing now?
17  A.   He just hit the curb on the south side of the road
18  and the vehicle spun out there across the driveway and came to
19  rest there in the yard.
20  Q.   Are you able to see Corporal Nix at that point?
21  A.   Yes, sir.  You can see him off to the left side.
22  Q.   Are you able to tell who that was?
23  A.   I believe that was Officer Haecker right there.  It's
24  hard to tell from this angle since the camera zooms in
25  automatically.

1   Q.   Where is Corporal Nix?
2   A.   He is down on the -- it would be on the left side of
3   the screen, the right side of that vehicle.  There is Officer
4   Jarc there just came up and is pulling him away.
5   Q.   Is there any other -- as far as on this camera,
6   Officer, is there any other gunshots or anything else that
7   take place from this point forward?
8   A.   No, sir.
9   Q.   Do you recall the portion on this video, Officer,
10  where the camera seems like something goes off camera?
11  A.   Yes, sir.  The camera system that we have has an
12  automatic function on it where you do a traffic stop, it zooms
13  in to catch a license plate.  It is an automatic feature.  No
14  matter what you do, after a certain set amount of time, it
15  zooms in trying to catch a license plate, and that's what it
16  did there, that's why it zoomed in on the car.
17  Q.   Would it be that because of these vehicles so close
18  to each other, nose-to-nose that's why it looks like something
19  goes out of camera?
20  A.   Yes, sir.
21  Q.   Now, what are we looking at?
22  A.   This would be from our dash cam looking at the rear
23  of Mark's car.  Here again looks like he is going to slow
24  down, going to pull over.
25  Q.   What street are you on?

80

1   A.   This is North Westmoreland right here, about the 4000
2   block.
3   Q.   And is your vehicle slowing down because you think,
4   like Corporal Nix, the car is going to stop?
5   A.   Yes, sir.
6   Q.   What is going through your mind at that point,
7   Officer Borchardt?
8   A.   Just that probably this is probably the right guy
9   that we are looking for.  You don't often get a vehicle
10  description like we got and then when they start to run, it
11  kind of make you really think that you have got the right guy.
12  Q.   And this portion of Bernal that you guys are on, does
13  this video show how Bernal twists and turns?
14  A.   Yes, sir.
15  Q.   What lane of traffic is Corporal Nix in right there?
16  A.   He was in the on-coming lane.
17  Q.   What lane of traffic this defendant's car would have
18  been in?
19  A.   The same one.
20  Q.   Can you kind of point out -- give a heads up to the
21  jury where the vehicle spins out?
22  A.   Should be right coming up here just a minute past
23  these trees here.  There is that puff of smoke where he hit
24  the side and started to spin.
25  Q.   What happened right there, Officer?

81

1   A.   That was the shot coming from the back glass, the
2   back passenger's window of -- that hit Mark.
3   Q.   Who was that firing?
4   A.   That's Todd Haecker, Officer Haecker.
5   Q.   Now, we see Officer Nix, we see some movement.  Do
6   you know if he is saying anything to anyone?
7   A.   No, I don't remember anything coming out of his
8   mouth.  That's Officer Jarc and Officer Haecker there.
9   Q.   Now, earlier, Borchardt, I had asked you a question
10  as to whether or not any Dallas officer had fired their weapon
11  prior to the gunshot coming from inside the vehicle?
12  A.   Yes, sir.
13  Q.   And I believe you said, no?
14  A.   Yes, sir, I said, no.
15  Q.   This side-by-side screening, have you seen this also?
16  A.   Yes, sir, I have.
17  Q.   Is this Corporal Nix's camera on the left side of the
18  screen and your camera on the right side of the screen?
19  A.   Yes, sir, that's correct.
20  Q.   And, again, Officer, if we could focus on the camera
21  angle from Officer Nix's car, if you could give the jury a
22  heads up as to when the suspect car is going to spin out?
23  A.   Yes, sir.  It should be coming up right after this
24  next set of trees.
25  Q.   You ever see where the camera on Officer Nix's car