1   went down?
2       A.   Yes, sir.
3       Q.   Do you see looking at the camera angle from your car,
4   down by the wheel of the defendant's vehicle, do you see
5   anything that resembles blood, for lack of a better word?
6       A.   Yes, sir.
7       Q.   You had previously testified, Officer, about another
8   viewing of the video, an enhanced viewing, you have seen that?
9       A.   Yes, sir, I have.
10      Q.   And is that viewing -- that recording clearly show
11  the first shot of this offense?
12      A.   Yes, sir, it does.
13      Q.   And how are you able to make that determination?
14      A.   It's coming out of the back right passenger's window,
15  you can see the glass splatter out right there.
16      Q.   You see anything else depicted besides the out spray
17  of the glass?
18      A.   No, sir.
19      Q.   Let's go back.  Looking at the camera angle from
20  Corporal Nix's vehicle, tell me if you see anything that
21  catches your attention while he is striking that window?
22      A.   Yes, sir.  There is a flash from inside, muzzle
23  flash.
24      Q.   And that was while he was in the process of striking
25  at the window?

1       A.   Yes, sir.
2       Q.   What is Corporal Nix doing at this point?
3       A.   He is striking the glass with his asp baton, he is
4   also giving verbal commands.
5       Q.   Now, right here, what do we see him doing?
6       A.   He set his gun down on the ground in order to get a
7   better hold of his baton.
8       Q.   And, again, do we see the glass spraying outward from
9   inside of that vehicle?
10      A.   Yes, sir.
11      Q.   Obviously we see his reaction?
12      A.   Yes, sir.
13      Q.   Had any officer fired, discharged their weapon prior
14  to that glass, that first shot?
15      A.   No, sir.
16      Q.   And what do you do in response to seeing that first
17  shot?
18      A.   That's is when we begin to lay down some suppressive
19  fire inside the car.
20      Q.   He hits the window one time; would that be a fair
21  statement?
22      A.   Yes, sir.
23      Q.   And is he giving verbal commands?
24      A.   Yes, sir.
25      Q.   And is there any indication that that driver is

84

1   trying to respond to those verbal commands?
2       A.   No, sir, there was no movement from inside the
3   vehicle that I could see from where I was.
4       Q.   And is that Officer Haecker covering Corporal Nix?
5       A.   Yes, sir, it is.
6       Q.   Is there an immediate reaction to that spray of glass
7   by Corporal Nix?
8       A.   Yes, sir.
9       Q.   Now, are you able to tell if Corporal Nix is trying
10  to communicate with anybody?
11      A.   Just based on his arm movements, it's hard to tell.
12  I am not sure if it is an involuntary movement or if he is
13  trying to say something to us, it is hard to tell.
14      Q.   How many defects do you see in that window at this
15  point?
16      A.   Which one, sir?
17      Q.   The passenger -- the back passenger's window.
18      A.   I can only make out one, there is another one now.
19      Q.   And at this portion of the video, where do you
20  believe you were stationed and firing from?
21      A.   I was -- moved from the rear of my car over to the
22  right corner.
23      Q.   And what were you shooting at?
24      A.   The front windshield.
25      Q.   Are y'all able to make any shapes or figures at this

85

1   point inside that car?
2       A.   Only -- only vague shapes through the front
3   windshield is the one we could see through at all.
4       Q.   Did it appear to be any type of movement at all
5   inside that car?
6       A.   At this point, no.
7       Q.   How many officers are firing at this time, if you
8   know?
9       A.   It could be all four of us that were still there,
10  myself, Officer Haecker, Officer Jarc, and Officer Starr.
11      Q.   So hypothetically if someone sitting in a car, that
12  has got gunfire coming into it from various angles, you would
13  expect them to be hunkered down somewhere?
14      A.   That's what I would do, I am sure.
15      Q.   Again the officer that is back there by the tree, who
16  is that?
17      A.   That's Officer Haecker.
18      Q.   Now, have Officers Starr and Jarc, have they arrived
19  at this point?
20      A.   Yes, sir.
21      Q.   The yard where this car, defendant's car ends up, is
22  that a residential neighborhood?
23      A.   Yes, sir.
24      Q.   Were there civilians at home at the time of this
25  shooting, if you know?

1     A.    Yes, sir.  There was actually a car parked to the
2  left of this one that was actually occupied.
3     Q.    I believe you told us this, this is Officer Jarc?
4     A.    Yes, sir, it is.
5     Q.    And did he make that decision on his own to rush in
6  there and grab Corporal Nix?
7     A.    Yes, sir.  There was nothing planned.  He yelled at
8  me that we had to get him.  And then he ran in there.
9     Q.    And who is -- is that providing cover to Officer
10 Jarc?
11    A.    That's Officer Haecker again.
12    Q.    Do you know where you are stationed?
13    A.    Yeah.  I am moving over toward the left side of my
14 car still trying to provide some fire in there.  Just to keep
15 anyone inside, keep their head down so they won't -- so we
16 won't be taking any more fire.
17    Q.    And even at this late portion of this video, are you
18 able to see anyone -- see whether or not anyone is moving
19 around inside that car?
20    A.    No, sir.
21          MR. BROOKS:   If we could have the lights, Your
22 Honor -- I'm sorry, I want to show something else.
23    Q.    (By Mr. Brooks)  You told the jury after Officer Jarc
24 had pulled Corporal Nix, he carried him to the side of the
25 road and y'all attempt to administer treatment.

1     A.    Yes, sir.
2     Q.    State's Exhibit 7, tell the jury what that is.
3     A.    That's the sidewalk, kind of the edge of the road
4  where we pulled Mark to.  That's his blood there and that
5  article of clothing is his shirt and ballistic vest.
6     Q.    And the vehicle that you-all loaded him to for
7  Parkland Hospital, was it located alongside this road also?
8     A.    Yes, sir.
9     Q.    And during that ride to Parkland Hospital, were you
10 the one in the backseat still trying to administer treatment
11 to him?
12    A.    Yes, sir, I was.
13    Q.    And State's Exhibit No. 8, is that a picture of the
14 backseat of that squad car?
15    A.    Yes, it is.
16    Q.    And whose blood is that?
17    A.    That's Mark's blood, sir.
18    Q.    And State's Exhibit No. 9, that's a picture of the
19 vehicle after Corporal Nix was taken out of it?
20    A.    Yes, sir.
21    Q.    And, again, is that his blood?
22    A.    Yes, sir, it is.
23    Q.    Now, you had mentioned earlier that you had been
24 injured on the job, how long --
25          MR. BRAUCHLE:   Your Honor, we would object to

88

1  that as being irrelevant.
2          THE COURT:   Overruled.
3     Q.    (By Mr. Brooks)  How long had you been --
4          MR. BRAUCHLE:   May we have a running objection?
5          THE COURT:   You may.
6     Q.    (By Mr. Brooks)  How long had you been back
7  on duty at the time of this offense?
8     A.    About a month.
9          MR. BROOKS:   Pass the witness.
10                    CROSS-EXAMINATION
11 BY MR. BRAUCHLE:
12    Q.    Is it Borchardt?
13    A.    Borchardt.
14    A.    Borchardt.
15    A.    Kind of or shard with a "B" on the front.
16    Q.    Okay.  Officer Borchardt, my name is Paul Brauchle,
17 and I have some questions that I would like to ask you.
18    A.    Yes, sir.
19    Q.    In regard to this incident that happened out there,
20 after it was over, did all the officers involve go down to
21 police headquarters?
22    A.    Yes, sir.
23    Q.    Okay.  Were y'all debriefed down there as to what had
24 happened?
25    A.    I don't understand.

89

1     Q.    Well, did officers senior to yourselves or detectives
2  interview you as to what happened out there?
3     A.    Yes, sir.  We wrote statements as to what had
4  occurred when we arrived.
5     Q.    Okay.  So you talked to people as to what happened at
6  the scene; is that correct?
7     A.    Yes, sir.
8     Q.    Were y'all all in the same room when that happened?
9     A.    No, sir.
10    Q.    Do you know who you were talking to?
11    A.    I don't recall the detective's name, sir.
12    Q.    Okay.  At some point after that, y'all also had some
13 hearings as to what happened; is that correct?
14    A.    Hearings?
15    Q.    Where you had your attorney down there and you made
16 statements to a panel or to an investigator?
17    A.    The shooting team investigator, yes, sir, we made
18 statements to Internal Affairs also.
19    Q.    Okay.  And at least on one of those you had an
20 attorney present; is that correct?
21    A.    Yes, sir.
22    Q.    And then after that, you-all went out for what is
23 called a walk-through; is that correct?
24    A.    We did the walk-through before we were taken down to
25 headquarters to make our statements.

1    Q.    That night?

2    A.    Yes, sir.

3    Q.    And you already had your attorney at that point; is

4 that correct?

5    A.    Yes, sir.

6    Q.    You know what time that was?

7    A.    Ah, I don't know the exact time, sir, it was pretty

8 late. It was probably around 10:00 p.m. or so.

9    Q.    Now, then, in regard to your statement, you made that

10 under oath; is that correct?

11    A.    Yes, sir.

12    Q.    And in that statement you stated that you could see

13 movement inside the vehicle; is that right?

14    A.    Yes, sir, just shapes as I stated.

15    Q.    I believe you went a little further than that, you

16 stated that you could see metal objects; is that correct?

17    A.    It appeared to be.

18    Q.    Did you ever point those out to the District Attorney

19 at any point in time?

20    A.    Yes, sir.

21    Q.    Did you point them out to the jury today?

22    A.    I don't believe so, sir.

23    Q.    What did these metal shapes look like?

24    A.    It was hard to determine at that time. It just

25 was -- looked like some sort of metal object.

1    Q.    What part of the car were those in?

2    A.    I could just see it through the front window, just

3 vague shapes.

4    Q.    Well, is it more than one shape?

5    A.    Well, all the shapes inside the car were vague

6 shapes.

7    Q.    Okay. And I believe you stated that you couldn't see

8 the driver; is that correct?

9    A.    Yes, sir.

10    Q.    You couldn't see the driver but you could see vague

11 metal shapes; is that correct?

12    A.    Yes, sir.

13    Q.    Now, then, you have viewed the film on how many

14 occasions?

15    A.    Multiple occasions.

16    Q.    Sitting down with an investigators and the Assistant

17 District Attorney, what have you, how many times do you think

18 you have seen the film?

19    A.    Maybe five or six times.

20    Q.    Only five or six?

21    A.    I would say so.

22    Q.    Now, then, are you familiar with Cause No.

23 F07-50319-LM in which you are a complainant?

24    A.    Not with that case number, sir, I couldn't tell you

25 on a case number.

1    Q.    You don't recognize that as being the case in which

2 you are the complainant for aggravated assault against

3 Mr. Ruiz here?

4    A.    I don't recognize it by that case number, no, sir,

5 don't remember case numbers.

6    Q.    Well, you do know that you are a complainant in an

7 aggravated assault case against Mr. Ruiz; is that correct?

8    A.    Yes, sir.

9    Q.    And in that case, you have alleged that Mr. Ruiz shot

10 at you?

11    A.    Yes, sir.

12    Q.    Could you point out on the video which shots were

13 aimed at you?

14    A.    No, I cannot, sir.

15         MR. BROOKS:   Your Honor, we are going to object

16 to the form of the question. It is misleading. Those

17 cases -- this officer didn't file those charges.

18         MR. BRAUCHLE:   Well, he is the complainant and

19 has sworn in various affidavits that these events happened.

20         THE COURT:   I will overrule the objection.

21    Q.   (By Mr. Brauchle)   Now, in your affidavit,

22 you swore that Mr. Ruiz fired several shots out of

23 the car, didn't you?

24    A.    Yes, sir, I believe I did.

25    Q.    You still think that's a true statement?

1    A.    Judging by the video, it appears only one came out,

2 sir.

3    Q.    So you are saying there might be more, but you just

4 saw one come out?

5    A.    At the time when you are under fire it's a little

6 hard to tell what is coming at you, what is going the other

7 direction.

8    Q.    Well, you weren't under fire when you made the

9 statements, were you?

10    A.    No, sir.

11    Q.    And you weren't under fire when you became a

12 complainant in an aggravated assault case against Mr. Ruiz,

13 were you?

14    A.    Yes.

15    Q.    You were?

16    A.    I was out there on the scene, sir. That's when I

17 became the complainant.

18    Q.    So you are telling us that you were out there, filed

19 an affidavit at the scene of the offense?

20    A.    No, sir. But that's where the offense occurred, sir.

21 And at that moment, that's when you are the complainant of an

22 offense when it happens to you.

23    Q.    Well, you know that there was one shot and one shot

24 only fired by Mr. Ruiz, don't you?

25    A.    I do know, sir.

1    Q.    But you previously swore that he was out there firing
2  multiple shots and that they were aimed at you, right?
3    A.    Yes, sir.
4    Q.    And are you still sticking to that story?
5    A.    That was my statement, my understanding of the
6  situation at the time.
7    Q.    That he fired multiple shots and that he fired them
8  at you?
9    A.    Yes, sir.
10   Q.    Now, then, as we looked at the video earlier, it
11  doesn't appear that you ever approached the vehicle, does it?
12   A.    Not right up to the side, no, sir.
13   Q.    Well, is there any reference point that you can show
14  us where you did approach the vehicle?
15   A.    Not from the video, sir.
16   Q.    Now, then, you stated that Officer Haecker, when he
17  got out of the vehicle, went to the back right-hand side of
18  your vehicle; is that correct?
19   A.    When Officer Haecker got out of our vehicle?
20   Q.    Yes.
21   A.    No, sir.  He went around the front of our car, our
22  squad car and went to the back of the suspect vehicle.
23   Q.    Well, I believe your testimony previous to today was
24  that Officer Haecker stayed behind your car; is that not
25  correct?

1    A.    I am not sure.
2    Q.    You are not sure that Officer Haecker stayed behind
3  your car?  You are not sure that you previously stated that
4  today?
5    A.    I don't recall making that statement.
6    Q.    Let me ask you this, you also stated that you stayed
7  behind the door on your car; is that correct or not?
8    A.    That's where you started, sir.
9    Q.    It's my understanding I think from your testimony
10  that you are currently working at the range; is that correct?
11   A.    Yes, sir, it is.
12   Q.    And that's in regard to people just aspiring to be
13  police officers where they first learn shooting and shooting
14  tactics; is that correct?
15   A.    You mean that place?  I don't understand the
16  question.
17   Q.    The range?
18   A.    Yes, sir.
19   Q.    Shooting range?
20   A.    We teach recruits and in-service comes back to
21  qualify.
22   Q.    The recruits all go there and you teach them the
23  proper techniques on how to handle guns, how to fire guns?
24   A.    Yes, sir.
25   Q.    How to be accurate with guns?

1    A.    Yes, sir.
2    Q.    And then from time to time, police officers have to
3  requalify to make sure that they still know how to do those
4  things; is that correct?
5    A.    Yes, sir.
6    Q.    How often do your regular officers have to do that?
7    A.    They have to come back once a year to qualify with a
8  pistol and once a year to qualify with a shotgun.
9    Q.    And you have anything to do with any of the other
10  training of young recruits.
11   A.    I don't spend too much time with recruits.  My main
12  responsibility is with the rifle program.
13   Q.    Going back to that, I think you previously stated
14  that Officer Jarc was using the A.R. 15 at the scene of this
15  incident; is that correct?
16   A.    Yes, sir, that was a misprint by me.
17   Q.    A misprint?
18   A.    Yes, sir.  Well, I misspoke on that, it should have
19  been Starr.
20   Q.    And I take it from your testimony so far that that's
21  the only mistake you made in regard to what happened out
22  there; is that correct?
23   A.    I hope so.
24   Q.    Okay.  Now, then, let's go back to where you and
25  Officer Haecker were.  I believe you stated that you stayed by

1  the door frame and Haecker went behind the car?
2    A.    Yes, sir, he went behind the suspect vehicle.
3    Q.    He went behind the suspect vehicle, not behind your
4  car?
5    A.    No, not behind our car.
6    Q.    Okay.  All right.  Now, then, are you familiar with
7  what is called a felony stop?
8    A.    Yes, sir, I am.
9    Q.    You know what procedures are outlined in regard to a
10  felony stop?
11   A.    Yes, sir, I do.
12   Q.    When Mr. Ruiz's vehicle came to a halt out there,
13  wouldn't that be a felony stop?
14   A.    It depends on the circumstances, it really does.
15   Q.    Actually the training manuals and the instructions in
16  regard to how -- how to make the felony stop are all the same,
17  aren't they?
18   A.    I don't recall if it gives a certain procedure for
19  that exact situation, where you come nose-to-nose with
20  anybody.  Usually the times when we work on felony stops, it's
21  an ideal, you are behind them, you got some room and you can
22  take your time.
23   Q.    Well, they give you instructions if you are
24  nose-to-nose with somebody.  The instructions say if you can
25  read the license -- if you can't read the license, you are too

1 close. Isn't that what they teach you in training?
2     A.   I don't believe I have ever received training on
3 nose-to-nose, how you tell you are too close.
4     Q.   All the instructions says if you can't read the
5 license, you are too close. Have you ever seen that?
6     A.   I have seen it.
7     Q.   What is the other thing that training manual tells
8 you, don't rush the vehicle, have you ever heard that before?
9     A.   Yes, sir.
10     Q.   In fact that is emphasized at almost every step of a
11 felony stop, isn't it, don't rush the vehicle?
12     A.   Yes, sir.
13     Q.   Now, then, did Officer Nix in fact rush the vehicle?
14     A.   Yes, sir, he did.
15     Q.   Now, the next step -- or one of the next steps in
16 regard to felony stops is that you are supposed to talk to the
17 person that you are trying to arrest through your public
18 address system; isn't that correct?
19     A.   Yes, sir.
20     Q.   You are supposed to give that person commands and see
21 if that person follow any of the commands you give; is that
22 correct?
23     A.   Yes, sir.
24     Q.   Did anybody turn on their public address system and
25 give Mr. Ruiz any commands?

1     A.   No, sir.
2     Q.   So generally the commands would be to roll down the
3 windows and put both hands where they can be seen. Would
4 that be basically the first step?
5     A.   Basically.
6     Q.   The next one would be to take your left hand and take
7 the keys out of the ignition, would that generally be the next
8 step?
9     A.   Yes, sir.
10     Q.   And after they take the keys out of the ignition they
11 are supposed to throw the keys out of the car; is that
12 correct?
13     A.   Yes, sir.
14     Q.   And then they are supposed to take their left hand
15 and open the car door; is that correct?
16     A.   Yes, sir.
17     Q.   And at that point they are supposed to come out with
18 their hands up?
19     A.   Yes, sir.
20     Q.   They are supposed to get away from the car and get on
21 the ground?
22     A.   Basically, yes, sir.
23     Q.   And then back up checks the car to see if there are
24 any other people in the car?
25     A.   Yes, sir.

1     Q.   Once it is found out that the person is outside and
2 on the ground, it is the only person in the vehicle then and
3 only then do you approach that person; is that correct?
4     A.   Yes, sir.
5     Q.   That's after you have made him put his hands in a
6 certain position and cross his legs and do certain things as
7 to where he would be fairly immobile; is that correct?
8     A.   Yes, sir.
9     Q.   And you approach him only for the purpose of
10 handcuffing at that particular time; is that correct?
11     A.   Yes, sir.
12     Q.   Now, once he is handcuffed and only then, you get him
13 up off of the ground; is that correct?
14     A.   Yes, sir.
15     Q.   I think, though, you probably removed any weapons or
16 patted him down while he is on the ground; is that correct?
17     A.   Yes, sir, there is a search there.
18     Q.   So there is a search before you even get him on his
19 feet or get him up from being handcuffed?
20     A.   Yes, sir.
21     Q.   Now, then, I think it is a pretty obvious question,
22 but none of those things were followed in this stop, were
23 they?
24     A.   No, sir.
25     Q.   Let's go back to another part of this situation. You

1 stated that when y'all -- when you fell in behind the vehicle
2 and the people were -- your car and Officer Nix's car, and I
3 guess the covert vehicle were all following, you were able to
4 talk to each other; is that correct?
5     A.   Just basic information.
6     Q.   But you also stated in those situations, people get
7 pretty excited and you-all are back and forth with each other;
8 is that correct?
9     A.   Sometimes.
10     Q.   You listened to the tape of what y'all were yelling
11 back and forth to each other?
12     A.   Yes, sir.
13     Q.   When was the last time you listened to those?
14     A.   It has only been one time, it has been a few weeks.
15     Q.   So it is just a few weeks ago?
16     A.   Yes, sir.
17     Q.   So you were able to listen to the in-car radio that
18 y'all were -- you and Nix, and who would have be in the covert
19 vehicle, Jarc or Starr?
20     A.   I believe Jarc was driving so it would be Starr.
21     Q.   So it would be Haecker, Nix and Jarc talking on the
22 radio?
23     A.   Yes, sir.
24     Q.   Do you recall what y'all were saying in your
25 excitement?

1    A.    I don't recall exactly, no, sir.

2    Q.    And you -- where was it that you heard those tapes?

3    A.    In the D.A.'s office.

4    Q.    And who were you with when you heard those tapes?

5    A.    Let's see, Haecker, I think Starr was there, ah, I

6  think Jarc was out of town, I am not sure if he was there.  I

7  don't recall who was all there other than that.

8    Q.    And who is the D.A. that you were listening to them

9  with?

10    A.    The D.A.s that are over here on the table.

11    Q.    Mr. Brooks?

12    A.    Yes, sir.

13    Q.    What channels were you listening to, do you recall?

14    A.    Channel five would have been the one we were on.

15    Q.    Did you ever switch to any other channels, did you

16  listen to any other channel?

17    A.    No, sir.

18    Q.    Now, then, what is the closest that you ever got to

19  Mr. Ruiz's car?

20    A.    It's hard to say distance, probably there where we

21  stopped and I got out on the passenger -- on the driver's

22  side, probably 15, 20 feet.

23    Q.    Okay.  Let's go back to that.  When you got out of

24  the car, I think you told Mr. Brooks that you originally

25  stayed by the door frame?

1    A.    Yes, sir.  That's where I started, sir.

2    Q.    Now, that goes back to your training in regard to a

3  felony stop, doesn't it?

4    A.    Yes, sir.  Since Mark was already up at the car,

5  there was nowhere for me to go.

6    Q.    What I am saying is, that's things that they teach

7  you in regard to a felony stop is to stay inside your vehicle

8  or behind the door at all times that you are dealing with the

9  suspect; is that correct?

10    A.    Yes, sir.

11    Q.    You don't even leave the car until the part where he

12  is brought out in somebody's handcuffs.

13    A.    Ideally, yes, sir.

14    Q.    That is only one person that does that, and the

15  others all stay in their vehicle, and of course this is done

16  in a back-up situation, isn't it?

17    A.    Yes, sir.

18    Q.    So in the rules in regard to the back-up car on a

19  felony stop, isn't they supposed to stop behind the primary

20  vehicle and off to the left; is that correct?

21    A.    Yes, sir.

22    Q.    And that's where you stopped, isn't it?

23    A.    Well, not really behind, I was -- actually I was in

24  front.

25    Q.    The diagram shows you behind Nix's car.

104

1    A.    Behind it?  More off exactly like 45 degrees off of

2  him.  Not really behind, kind of side to side.

3    Q.    But you are to the left?

4    A.    Yes, sir, to the left.

5    Q.    Now, can you recall what verbal commands Officer Nix

6  was giving to Mr. Ruiz while he was banging on his window?

7    A.    I don't recall exactly, sir.

8    Q.    You don't think he was asking for his insurance,

9  driver's license?

10    A.    No, sir.

11    Q.    In regard to the asp what does asp stand for?

12    A.    It is an actual brand name, it is a company name.

13    Q.    It is a brand name of a metal club like device?

14    A.    It is an expandable baton.

15    Q.    Isn't a baton a club?

16    A.    Yeah, yes, sir.

17    Q.    The purpose of it is to hit people?

18    A.    Well, it has a lot of things that you can use it for.

19    Q.    It was used in this case to try and gain access to a

20  vehicle; is that correct?

21    A.    Yes, sir.

22    Q.    In that case, are you ever given instructions on how

23  to use an asp or how to use it to maximum effectiveness when

24  you are trying to break into car windows or anything like

25  that?

105

1    A.    I don't recall any specific training on breaking

2  windows.

3    Q.    Well, specific training would be that you are not

4  supposed to do it, wouldn't it?

5    A.    Uh, I don't -- I don't --

6    Q.    Let's go back to this case.  Nobody did it at the

7  scene until SWAT got there and SWAT was called specifically to

8  get Mr. Ruiz out of the car, weren't they?

9    A.    Yes, sir.

10    Q.    And they had to knock the windows out to see if

11  Mr. Ruiz was alive or dead; is that correct?

12    A.    I guess they did.  I was at the hospital at that

13  time.

14    Q.    Going back to the asp a second, that could cause

15  somebody that was struck by it serious bodily injury, couldn't

16  it?

17    A.    Yes, sir, it could.

18    Q.    Are y'all trained on how to use it as a defensive or

19  offensive weapon?

20    A.    Yes, sir, we are.

21    Q.    And that's in the academy, I guess and from time to

22  time come back and have a refresher course?

23    A.    Yes, sir.

24    Q.    Now, then, you have seen the pictures of Officer Nix

25  up next to the vehicle, and you see the glass come out of the

1  back passenger's window, right?
2  A.   Yes, sir.
3  Q.   Now, when the camera is focused at the position that
4  you can see the back passenger's window when that glass comes
5  out from there, you can't see the back window at that time,
6  can you?
7  A.   No, sir.
8  Q.   When the camera goes back and you can see both
9  windows, there is a bullet hole in the front window, isn't
10  there?
11  A.   Yes, sir.
12  Q.   And that's -- the appearance in the back and the
13  appearance from the front, from the time period that we know
14  that the film was made, would be almost simultaneous, wouldn't
15  it?
16  A.   Not quiet, there was some lag time there.
17  Q.   Have you ever timed the whole event?
18  A.   This whole event or when the cameras went in?
19  Q.   Well, either one?
20  A.   No, I have not, sir.
21  Q.   You also realize that is in slow motion, don't you.
22  A.   Yes, sir.
23  Q.   Now, in the video as we see it, Officer Haecker moves
24  around and is in, I guess, three or four different positions
25  just from what we could see; is that correct?

1  A.   Yes, sir, he was moving behind there.
2  Q.   Now, in one of the films that we saw, Officer Haecker
3  appears to be doing, something that would be -- I assume that
4  would be somebody that is directed his way, such as bullet
5  fire. Have you seen that?
6  A.   I can't tell. He appears to be making some sort of
7  movement, looking for cover is what it looked like for me.
8  Q.   Now, who would have been behind him that would have
9  been shooting, would that be Starr?
10  A.   Yes.
11  Q.   And star was using an A.R. 15; is that correct?
12  A.   Yes, sir.
13  Q.   And the A.R. 15 fires the same cartridge that
14  Mr. Ruiz's weapon fired; is that correct, .223?
15  A.   It's the same caliber, yes, sir.
16  Q.   It's the same cartridge, isn't it?
17  A.   No, sir. We have a different type of round, we have
18  a ballistic tip on it.
19  Q.   It is the same caliber?
20  A.   The same caliber.
21  Q.   While the tips may not be the same, it is the same
22  cartridge; is that a correct statement?
23  A.   The caliber is the same. It is a completely
24  different round.
25  Q.   Okay.

108

1  A.   The ballistics of it are completely different.
2  Q.   Well, what are the ballistics of the ammunition you
3  use.
4  A.   Well, we have a ballistic tip round, it is not
5  designed to penetrate as far as a full metal jacketed round.
6  Q.   Now, then, Officer Starr had full metal round
7  cartridges out there, didn't he?
8  A.   Not that I am aware of, I am not sure.
9  Q.   Have you seen the pictures of various weapons and
10  cartridges attributed to them?
11  A.   I haven't seen those, no, no, sir.
12       MR. BRAUCHLE:   May I have a moment, Your Honor.
13       THE COURT:   You may.
14       (Pause in the proceedings.)
15       THE COURT:   Ladies and gentlemen, we have been
16  going roughly about an hour, let's take a 15-minute break.
17       THE BAILIFF:   All rise.
18       (Jury retired from the courtroom.)
19       (Recess taken.)
20       THE BAILIFF:   All rise.
21       (Jury returned to the courtroom.)
22       THE COURT:   You may be seated.
23       And you may proceed, Mr. Brauchle.
24       MR. BRAUCHLE:   May I approach, Your Honor?
25       THE COURT:   You may.

109

1  Q.   (By Mr. Brauchle)   Officer, before the
2  break, I think we were talking about traffic stops
3  and felony stops; is that correct?
4  A.   Yes, sir.
5  Q.   I will show you -- what has been marked as
6  Defendant's Exhibit 1, and I will ask you if this appears to
7  be a police department printing of the procedures in regard to
8  traffic and felony stops?
9  A.   Sir, it would appear to be.
10  Q.   So that would be what officers would be instructed
11  from; is that correct?
12  A.   Yes, sir.
13       MR. BRAUCHLE:   We will offer this into evidence.
14       MR. BROOKS:   No objections.
15       THE COURT:   Is that Defense 1.
16       MR. BRAUCHLE:   Yes, Your Honor.
17       THE COURT:   Defendant's Exhibit 1 is admitted.
18  Q.   (By Mr. Brauchle)   And I will ask you,
19  turning over to page five about the middle of the
20  page in all caps, says, Do not rush the suspect; is
21  that correct?
22  A.   Yes, sir, it does.
23  Q.   That was also what we talked about previously that
24  that's one of the things that you are taught not to do in
25  regard to traffic stops; is that correct?

1    A.    Yes, sir. If you read further on there it says in
2  most circumstances this works.
3    Q.    Says you can do it if the car is on fire or something
4  like that, right?
5    A.    Yes, sir.
6    Q.    You didn't have that situation here, did you?
7    A.    Oh, no, sir, that's a different circumstance.
8    Q.    Now, then, going back to the ammunition out there,
9  all of the Dallas Police Officers were firing Winchester
10  ammunition; is that correct?
11    A.    From the rifle, sir?
12    Q.    From everything out there?
13    A.    I am not sure -- I don't even remember the specific
14  brand that we have, I believe it is Winchester.
15    Q.    Well, if the physical evidence report attributes all
16  of the ammunition fired by police officers out there to be
17  Winchester, you wouldn't have a quarrel with that?
18    A.    No, sir.
19    Q.    You know that the whole department uses a certain
20  brand of ammunition, right?
21    A.    Yes, sir.
22    Q.    And if the ammunition -- or the cartridge shells or
23  everything else out there identified as Winchester that were
24  fired by police officers, that wouldn't surprise you?
25    A.    No, sir.

1    Q.    And you would agree that it's department policy that
2  all officers use the same brand of ammunition?
3    A.    There are certain brands that we can use, but we are
4  issued a certain brand.
5    Q.    Going back to the ammunition that you were talking
6  about was being fired through the A.R. 15 by Starr --
7    A.    Yes, sir.
8    Q.    -- what you described to the jury was, I think, you
9  called it a ballistic -- what were your words in regard to
10  that?
11    A.    It's a ballistic tip round.
12    Q.    A ballistic tip?
13    A.    Yes, sir.
14    Q.    And that tip basically when it strikes something that
15  is harder than a piece of paper, whatever, that causes the tip
16  of that bullet or that projectile to basically disintegrate;
17  is that correct -- not to disintegrate, but to break up into
18  fragments; is that correct?
19    A.    No, sir, it just expands.
20    Q.    Is the reason behind that so if that bullet goes down
21  range, that it won't harm civilians, or is the reason behind
22  that so that it will have greater crippling power?
23    A.    It is so it doesn't have as much penetration as an
24  actual full metal jacketed round, it doesn't travel as far
25  through things.

1    Q.    Well, what is the purpose is that to make civilians
2  safer or to just do greater injury to whoever gets shot by
3  one?
4    A.    Mostly for that, so it doesn't go through someone and
5  keep going, go through several houses.  A full metal jacketed
6  round can keep on going for a long ways.
7    Q.    Okay.  Now, then, going back to your previous
8  testimony, you stated that your car you thought was about 15
9  to 20 feet from Officer Nix's car; is that correct?
10    A.    From Officer Nix's car, roughly, I would guess.
11    Q.    Well, it is just an estimate.  I don't think that
12  diagram is to scale or at least I haven't seen anything that
13  would make me think it is?
14    A.    No, sir.
15    Q.    But your recollection is that you are between 15 and
16  20 feet from Officer Nix's car; is that correct?
17    A.    Roughly, yes, sir.
18    Q.    And your other testimony, I believe was, is that
19  Starr and Jarc came late; is that correct?
20    A.    Just -- I really don't know exactly at what point
21  they stopped their vehicle and got out.  I am not sure, I was
22  focused on the suspect vehicle.
23    Q.    But they would have been the covert vehicle behind
24  you?
25    A.    Yes, sir.

1    Q.    And it's your recollection that they arrived some
2  time after you and Haecker stopped your vehicle; is that
3  correct?
4    A.    Since they were behind us, yeah, that's all I can
5  assume, is that they were behind us.
6    Q.    Well, we can look at the videos and see that you and
7  Nix got there about the same time, right?
8    A.    Roughly, yes, sir.
9    Q.    And they are somewhere behind you?
10    A.    Yes, sir.
11    Q.    They don't have lights and siren or anything to get
12  traffic out of the way?
13    A.    No, sir.
14    Q.    So that's basically why you say that they arrived
15  some time after you?
16    A.    Yes, sir.
17    Q.    And your testimony is also that you stayed back by
18  your door frame and that you didn't -- you didn't come out
19  from that position until some -- sometime after Officer Nix
20  had been shot; is that correct?
21    A.    Yes, sir.
22    Q.    Okay, when -- when Officer Nix got shot, would it be
23  your recollection that the people closest to the defendant's
24  vehicle would have been you, Haecker, Jarc -- no, you,
25  Haecker, Nix and -- you are the three people that would be up

1   next to the car?

2      A.   Probably the closest three, yes, sir.

3      Q.   Okay.  So at the time that Officer Nix was shot, you

4   and Haecker would have already been out of your car.  And we

5   see Haecker actually approaching the car in some of the film,

6   right?

7      A.   Yes, sir.

8      Q.   So he at that point in time, he had left the area

9   where your car was parked and had approached the vehicle, it

10  looks like from behind; would that be a fair statement?

11     A.   Yes, sir.  He went in front of our car and then went

12  to the rear of the suspect vehicle.

13     Q.   And then he is seen moving about and he basically

14  comes it, appears back to your car -- not back to your car.

15  but he is moving back and forth behind the suspect's car; is

16  that correct?

17     A.   Yes, sir.

18     Q.   All right.  I will have you to look at the video that

19  has been previously shown to you, I have a question in that

20  regard.

21          (Video played to the jury.)

22     Q.  (By Mr. Brauchle)  Can you stop it at that

23  point.

24       Now, at that point, there is no bullet holes on that

25  side of the car; is that correct?

1      A.   Yes, sir.

2      Q.   All right.  We can't tell about the whole car, but

3  looking at the two windows that we can see, there don't appear

4  to be any bullet defects in the car?

5      A.   No, sir.

6      Q.   At that point in time, do they?

7      A.   No, sir.

8      Q.   Now, then, Officer Nix has already struck the window

9  and is now setting down his firearm; is that correct?

10     A.   Yes, sir.

11     Q.   Okay.  Now, this person in the foreground here

12  (indicating), who is that?

13     A.   The closest one to the camera?

14     Q.   The one who is ducking down?

15     A.   That's Officer Haecker.

16     Q.   That's your partner; is that correct?

17     A.   Yes, sir.

18     Q.   Now, he appears to be ducking perhaps to avoid

19  gunfire; is that correct?

20     A.   No, sir.  Since I was positioned right there at the

21  left side of my squad car, that's my muzzle that you can see

22  in the stop left hand corner, and so he didn't get in front of

23  me, he ducked under my muzzle.

24     Q.   So this is your muzzle of your pistol right up here?

25     A.   Yes, sir.

116

1      Q.   And you are aiming obviously at the vehicle there in

2  the film, right?

3      A.   Yes, sir.

4      Q.   Now, then, he is just ducking down not because you

5  are firing, but just for general purposes; is that correct?

6      A.   Yes, sir.  As a general rule, you don't ever want to

7  stand in front of a muzzle that is pointed down range.  So he

8  was trying to avoid that whole lasering effect.

9      Q.   Now, then, that is not behind your door frame.  Is

10  it?

11     A.   Yes, sir.

12     Q.   That's your door frame right there?

13     A.   That's my muzzle sticking out with my arm extended

14  from the "V" of my door.

15     Q.   The black thing in the -- the foreground of that

16  picture is the bumper on the front of your car, right?

17     A.   Yes, sir.

18     Q.   And you are stating that you are still behind the

19  door, but your arm is extended over here where the pistol was,

20  right?

21     A.   Yes, sir.

22     Q.   Now, then, and you are also stating that Haecker is

23  not ducking down to escape fire from your weapon; is that

24  correct?

25     A.   Yes, sir.

117

1      Q.   How many rounds did you fire out there?

2      A.   I fired 12 rounds, sir.

3      Q.   Would that have emptied your magazine?

4      A.   No, sir.

5      Q.   How many shots did you have left?

6      A.   We carry magazines with 15, so if we have one in the

7  chamber, we have 16 in our weapon in the holster, so firing 12

8  I would have had four left.

9      Q.   Now, at that point Officer Nix has broken or caused a

10  hole in the window; is that correct?

11     A.   Yes, sir.

12     Q.   Now, at that point, there is still no bullet holes;

13  is that correct?

14     A.   No, sir.

15     Q.   So it is not correct?

16     A.   Yeah, that is correct, there are none, sir.

17     Q.   Okay.  Now, as far as we are looking at the windows

18  anyways?

19     A.   Yes, sir.

20     Q.   Now, that's where Officer Nix gets shot from the back

21  passenger's window; is that correct?

22     A.   Yes, sir, that is correct.

23     Q.   And that's the glass and the other things that came

24  out of the -- that window as a result of a gunshot; is that

25  correct?

1     A.    Yes, sir.

2     Q.    And this is all from your in-car camera?

3     A.    Yes, sir.

4     Q.    And this is where the camera pans forward to get the

5     license plate on the vehicle?

6     A.    Yes, sir, yes, sir.

7     Q.    Now, when we come back from that, there is the bullet

8     in the back, there is a bullet in the front window; is that

9     correct?

10    A.    Yes, sir.  There are also a couple in that vent

11    window looks like too, sir.

12    Q.    So from the time the camera pans back from Officer

13    Nix being shot, there is at least three bullets in the car?

14    A.    From what I can tell from that picture, yes, sir.

15    Q.    And there could be others that wouldn't be visible in

16    this part of the car; would that be a correct statement?

17    A.    I couldn't say correctly, sir.

18    Q.    Well, we know that other officers are out there,

19    right?

20    A.    Yes, sir.

21    Q.    But we know this right here is a bullet?

22    A.    Uh-huh, yes, sir.

23    Q.    This one we have already talked about?

24    A.    Yes, sir.

25    Q.    And there are some here (indicating), right?

---

1     A.    Yes, sir.

2     Q.    This is the back part.  And as far as any that may be

3     in the body, they are just not visible -- not as visible as

4     these right here; is that correct?

5     A.    Yes, sir.

6     Q.    We can't say one way or the other whether they are or

7     aren't shots to the body of the car or what is happening on

8     the front or the back from that picture, right?

9     A.    Not from that picture, no, sir.

10    MR. BRAUCHLE:   I will pass the witness in regard

11    to that.

12    MR. BROOKS:   No other questions from this

13    witness, Your Honor.

14    THE COURT:   You may step down, sir.

15    THE WITNESS:   Thank you, sir.

16    MR. BROOKS:   Is he subject to recall?

17    MR. BRAUCHLE:   Yeah.

18    MR. BEACH:   The State would call Hector

19    Martinez.

20    (Witness entered the courtroom.)

21    MR. BRAUCHLE:   Your Honor, may we approach?

22    THE COURT:   You may.

23    (Following proceedings had at the Bench.)

24    MR. BRAUCHLE:   I think we need to have a hearing

25    before he testifies.

---

120

1     THE COURT:   Is this the witness?

2     MR. BEACH:   This guy is a fact witness I am not

3     going into any extraneous offenses.  He just puts them in the

4     car, that's our proffer, puts them in the car.

5     MR. BRAUCHLE:   We will stipulate they are in the

6     car.

7     MR. BEACH:   We can do it with witnesses.

8     THE COURT:   If you go into any extraneous,

9     approach and let me know.

10    MR. BEACH:   The only extraneous, that's the

11    murder witness, he knows it is his gun, it is contextual, it

12    is not an extraneous offense.

13    THE COURT:   Other than the gun, approach.

14    MR. BEACH:   The codeine was found in the car, he

15    gave them the codeine bottle.

16    MR. BRAUCHLE:   Well --

17    MR. BEACH:   It is all contextual, it is not an

18    outside occurrence, it is just that day.  Within 30 minutes of

19    the murder.  I am not going to get into anything that happened

20    in the past.  I don't know if he is going to answer any

21    questions at the moment.

22    MR. BRAUCHLE:   We will object before his

23    testimony starts.

24    THE COURT:   He hasn't been sworn in yet.

25    (End of Bench conference.)

---

121

1     THE COURT:   Raise your right hand, sir.

2     (Witness was duly sworn.)

3     THE COURT:   Put your hand down.

4     You may proceed.

5     MR. BRAUCHLE:   Your Honor, as previously stated,

6     we will object to any testimony from this witness under Rules

7     404, 403, 402 and 401.

8     THE COURT:   Overruled.

9     MR. BRAUCHLE:   Can we have a running objection?

10    THE COURT:   You may.

11    **HECTOR MARTINEZ**

12    was called as a witness, and having been duly sworn by the

13    Court, testified under oath as follows:

14    **DIRECT EXAMINATION**

15    BY MR. BEACH:

16    Q.    State your full name, please.

17    A.    Hector Martinez.

18    Q.    Hector, I am going to ask you, you are kind of soft

19    spoken, to scoot up in your chair and try to speak into that

20    microphone.  Hector how old are you?

21    A.    Twenty.

22    Q.    And to your left is your lawyer, Charlie Humphreys;

23    is that right?

24    A.    Yes, sir.

25    Q.    And Mr. Humphreys is representing you in three felony

123

| | | |
|---|---|---|
| 1 | | cases you currently have pending; is that correct? |
| 2 | A. | Yes, sir. |
| 3 | Q. | And specifically, those are all first-degree |
| 4 | | felonies. And because of drugs amounts alleged in your cases, |
| 5 | | the minimum, if you are found guilty, for one case is ten |
| 6 | | years in the penitentiary and for the other is 15; is that |
| 7 | | correct? |
| 8 | A. | Yes, sir. |
| 9 | Q. | So you are looking at significant penitentiary time |
| 10 | | in those cases; is that correct, if you are found guilty? |
| 11 | A. | (Nods head). |
| 12 | Q. | Back in March of 2007, March 23rd specifically, where |
| 13 | | were you and your wife living? |
| 14 | A. | In North Dallas. |
| 15 | Q. | Okay. On a street called Calculus? |
| 16 | A. | Yes, sir. |
| 17 | Q. | And was that a house or an apartment that you were |
| 18 | | living in? |
| 19 | A. | A house, sir. |
| 20 | Q. | And besides your wife who was living in the house on |
| 21 | | Calculus with you and your wife? |
| 22 | A. | Nobody else. |
| 23 | Q. | Do you have kids? |
| 24 | A. | Yeah. |
| 25 | Q. | Were they staying there? |

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | How old are they? |
| 3 | A. | Now one is finda be four, the other one is two. |
| 4 | Q. | Two girls? |
| 5 | A. | Yes, sir. |
| 6 | Q. | You know Wesley Ruiz; is that correct? |
| 7 | A. | Yes, sir. |
| 8 | Q. | You see Wesley here in court? |
| 9 | A. | Yes, sir. |
| 10 | Q. | And is Wesley the man at the end of counsel table in |
| 11 | | the blue suit? |
| 12 | A. | Yes, sir. |
| 13 | Q. | You have been knowing Wesley since you were, what, |
| 14 | | 11, 12 years old? |
| 15 | A. | I would say since like 13. |
| 16 | Q. | Thirteen. And Wesley grew up with your older |
| 17 | | brothers; is that right? |
| 18 | A. | Yeah. |
| 19 | Q. | And you and Wesley are good friends, aren't you? |
| 20 | A. | Yes, sir. |
| 21 | Q. | I mean he is one of your favorites, I mean he is one |
| 22 | | of your homeboys, isn't he? |
| 23 | A. | Yeah, we are close. |
| 24 | Q. | Very close. Because of your close relationship with |
| 25 | | Wesley, I mean, you are so close that he has called you from |

124

| | | |
|---|---|---|
| 1 | | jail, hasn't he, since he got arrested? |
| 2 | A. | No, not direct to me, sir, yeah, I have talked to |
| 3 | | him. |
| 4 | Q. | Because of your close relationship of Wesley Ruiz, |
| 5 | | you really don't want to be down here, do you? |
| 6 | A. | Nah, not really, I wouldn't even be down here if |
| 7 | | y'all didn't subpoena me. |
| 8 | Q. | We laid a subpoena in your hand requiring you to come |
| 9 | | testify to what you knew about that day in March; is that |
| 10 | | correct? |
| 11 | A. | Yes, sir. |
| 12 | Q. | You know Wesley's family. You know his brother, |
| 13 | | Jason, don't you? |
| 14 | A. | Yes, sir. |
| 15 | Q. | Jason is here in the courtroom today? |
| 16 | A. | Yes, sir. |
| 17 | Q. | He is the guy back there, he has got a distinctive |
| 18 | | feet on his head; is that right? |
| 19 | A. | Yes, sir. |
| 20 | Q. | He lost half of an ear recently. You have been |
| 21 | | knowing him a long time? |
| 22 | A. | Mm, about the same amount of time. |
| 23 | Q. | You and Jason talked -- |
| 24 | | MR. BRAUCHLE:   We will object to this being |
| 25 | | extraneous and irrelevant. |

125

| | | |
|---|---|---|
| 1 | | MR. BEACH:   I will move along, Judge. |
| 2 | Q. | (By Mr. Beach) To get you to come down here to |
| 3 | | testify, we made a deal, the State has with you and your |
| 4 | | lawyer; is that correct? |
| 5 | A. | Yes, sir. |
| 6 | Q. | And basically in exchange for you testifying |
| 7 | | truthfully in this case, we have agreed, the State has, not to |
| 8 | | send you to the penitentiary on your cases; is that correct? |
| 9 | A. | Yes, sir. |
| 10 | Q. | And also as part of that agreement as to any case, |
| 11 | | the criminal case you might testify to today on the witness |
| 12 | | stand under oath, we have given you immunity for any exposure |
| 13 | | you might have in those criminal cases; is that correct? |
| 14 | A. | Yes, sir. |
| 15 | Q. | That's your understanding of the deal. That's a |
| 16 | | pretty good deal when you are looking at ten, 15 minimum on |
| 17 | | your cases? |
| 18 | A. | Yes, sir. |
| 19 | Q. | Did you see Wesley Ruiz on the afternoon of |
| 20 | | March 23rd of 2007? |
| 21 | A. | Yes, sir. |
| 22 | Q. | Just shortly prior to March 23rd of 2007, had you |
| 23 | | come into possession of a certain automobile? |
| 24 | A. | Yes, sir. |
| 25 | Q. | What kind of automobile was that? |

1    A.    It was a Caprice, two color, two tone.
2    Q.    Red and gray Caprice?
3    A.    Yes, sir.
4          MR. BEACH:   May I approach, Judge?
5          THE COURT:   You may.
6    Q.   (By The Mr. Brooks)  Hector, I am going to
7    show you what has been marked for identification
8    State's Exhibit No. 3, and ask if that is the man
9    that you bought the two tone Chevy Caprice from a
10   few days before Officer Nix was murdered?
11   A.    Yes, sir, that's him.
12   Q.    Is that him?  This is a man that you knew his street
13   name; is that right?
14   A.    Yeah.
15   Q.    And the man you have come to know as Samuel Sauls?
16   A.    Yeah, we call him Sam Cone.
17   Q.    Y'all called him what?
18   A.    Sam Cone.
19   Q.    Sam Cone.  That's the man that you actually bought
20   the car, red and gray Chevy Caprice from a few days earlier;
21   is that correct?
22   A.    Yes, sir.
23   Q.    Did you pay him cash or in check, how did you pay
24   him?
25   A.    I had gave him --

1    Q.    Do what?
2    A.    We had exchanged for some marijuana, sir.
3    Q.    Okay.  Kind of the old barter system, Sam needed some
4    marijuana and you wanted a car and you got a pretty good deal
5    on the car; is that right?
6    A.    Yes, sir.
7    Q.    The fact of the matter is, Hector, back in March,
8    2007, you were in the drug business; is that correct?
9    A.    Yes, sir.
10   Q.    Now, specifically, you see the pointer there, that's
11   pointing to the street that you lived on Calculus; is that
12   correct?
13   A.    Yes, sir.
14   Q.    And that's just west of Midway and just south of 635;
15   is that correct?
16   A.    Yes, sir.
17   Q.    And that's a pretty good ways from Mockingbird and
18   35; is that right?
19   A.    Yes, sir.
20   Q.    At least, what, four or five miles, something like
21   that?
22   A.    Yes, sir.
23   Q.    Now, when you saw Wesley Ruiz the afternoon of
24   March 23rd of 2007, was he on foot or was he in a car, where
25   did you first see him?

128

1    A.    Yeah, he showed up at my house.
2    Q.    Okay.  And did he ask to borrow something that
3    afternoon?
4    A.    Yes, sir.  I let him borrow that car.
5    Q.    Okay.
6          MR. BEACH:   May I approach, Judge?
7          THE COURT:   You may.
8    Q.   (By Mr. Beach)  I will show you again, you have seen
9    this photograph before, I will show you State's Exhibit 27,
10   you see the red and gray car in State's Exhibit 27, Hector?
11   A.    Yes, sir.
12   Q.    And is that the car that you purchased from Sam Cone,
13   is that what you call him?
14   A.    Yes, sir.
15   Q.    A few days before all this?
16   A.    (Nods head).
17   Q.    And is that the car that you allowed Wesley Ruiz to
18   borrow the afternoon of March 23rd, 2007?
19   A.    Yes, sir.
20         MR. BEACH:   At this time we would offer State's
21   27 into evidence.
22         MR. BRAUCHLE:   No objections.
23         THE COURT:   State's 27 is admitted.
24   Q.   (By The Mr. Brooks)  So the jury is clear,
25   the red and gray Chevy Caprice in the background

129

1    State's 27, that was your car on March 23rd, 2007?
2    A.    Yes, sir.
3    Q.    How was Wesley Ruiz, how was he acting that afternoon
4    just -- what was his demeanor like, his personality like that
5    afternoon?
6    A.    He was pretty much normal -- he was a little in a
7    hurry, like, I mean, I tried to -- tried to get him to smoke a
8    blunt with me, but he was so in a hurry, he just took off.  He
9    was acting kind of -- he was a little jumpy, that's it.
10   Q.    A little jumpy?
11   A.    Uh-huh.  Other than that, he was regular.
12   Q.    Could you talk to him?
13   A.    Yeah.
14   Q.    Did you understand what he was saying when you talked
15   to him?
16   A.    Yeah.
17   Q.    He understand what you were saying?
18   A.    Yes, sir.
19   Q.    And you gave Wesley Ruiz the keys to that Chevy
20   Caprice that afternoon?
21   A.    Yes, sir.
22   Q.    Did Wesley have anything -- was he carrying anything
23   that day when he came up to your house there on Calculus?
24   A.    He had a bag.
25         MR. BEACH:   May I approach again, Judge?

1    THE COURT:   You may.

2    Q.   (By Mr. Beach)  I am going to show you what has been

3    marked for identification, Hector, is State's Exhibit 28-A,

4    this blue gym bag, does that appear consistent with the bag

5    Mr. Ruiz had that day when he approached your house on

6    Calculus that day?

7    A.   Yes, sir.

8         MR. BEACH:   At this time we would offer into

9    evidence State's Exhibit 28-A.

10        MR. BRAUCHLE:   We object to 28-A at this time in

11   that there has been no proper predicate.

12        MR. BEACH:   Judge, under Rule 10(b), we will

13   connect up at a later time through another witness.

14        THE COURT:   May I see 28-A.

15        Overruled, 28-A is admitted.

16        MR. BRAUCHLE:   Conditionally or for all

17   purposes.

18        THE COURT:   For all purposes.

19        MR. BRAUCHLE:   Once again can we have a running

20   objection until it has been proven up?

21        THE COURT:   You may.

22   Q.   (By The Mr. Brooks)  I am going to show you

23   State's Exhibit 29, and turn this around, Hector; do

24   you recognize the firearm in State's Exhibit 29?

25   A.   Yes, sir.

---

1    Q.   Have you seen the assault pistol in State's 29 prior

2    to March 23rd, 2007?

3    A.   Excuse me?

4    Q.   Have you seen that -- had you seen that assault

5    pistol before?

6    A.   Oh, before, yeah, yes, sir.

7    Q.   And who owned the assault pistol in State's Exhibit

8    29?

9    A.   Before?

10   Q.   No.  Who owned it that day?

11   A.   I didn't see it that day.

12   Q.   I understand, but who own the gun, Wesley?

13   A.   Yes, sir.

14   Q.   And who had Wesley bought the assault pistol from in

15   State's 29?

16   A.   He had got it from one of my cousins.

17   Q.   Did he pay cash for it?

18   A.   Yes, sir.

19   Q.   How much?

20   A.   I wasn't there, sir.

21        MR. BEACH:   We would offer State's 29 at this

22   time, Your Honor under the same representation under Rule

23   104(b), we will connect it up at a later time.

24        MR. BRAUCHLE:   104 or 401.

25        MR. BEACH:   104(b).

---

132

1         MR. BRAUCHLE:   Your Honor, once again there has

2    been no proper predicate in regard to the admission of this

3    exhibit.  The witness just testified on direct that he didn't

4    see what is purported to be in this photograph on that day.

5    He hasn't been asked anything or in any way shown that he has

6    any ability to identify what is in this photograph.  And

7    because of that, we would state that neither the proper

8    predicate has been laid nor the relevancy of this exhibit has

9    been shown.

10        THE COURT:   Will overrule the objection.  And 29

11   is admitted.

12        MR. BRAUCHLE:   Once again we would ask for a

13   running objection?

14        THE COURT:   You may have a running objection,

15   Mr. Brauchle.

16   Q.   (By Mr. Beach)  You liked that gun didn't you,

17   Hector?

18   A.   Yes, sir, I did.

19   Q.   You wanted to buy it yourself, didn't you?

20   A.   Yes, sir.

21   Q.   It has got a clip in there, right?

22   A.   Yeah.

23   Q.   You know how many rounds that clip held?

24   A.   No, sir.

25   Q.   You said you didn't see the assault pistol that day,

---

133

1    did you look inside the blue bag that Wesley Ruiz was

2    carrying?

3    A.   No, sir.

4    Q.   Is that the kind of gun that you can carry in baggie

5    jeans with a shirt over it?

6         MR. BRAUCHLE:   Your Honor, we would object to

7    this as being irrelevant.  There has been no predicate laid.

8    We would object to it under 404, 403, 402 and 401.

9         THE COURT:   Overruled.

10   Q.   (By Mr. Beach)  Hypothetically, could you conceal

11   that gun?

12        MR. BRAUCHLE:   Your Honor, once again we would

13   object to hypothetical questions.  There has been no proper

14   predicate like that.  This isn't a guess and suppose.  I mean

15   if the witness knows, he knows, if he doesn't, he doesn't.

16   They can't ask him hypothetical questions that go outside the

17   scope of the trial.  Baggie jeans haven't been mentioned one

18   time.

19        THE COURT:   I overrule the objection.

20        MR. BRAUCHLE:   Note our exception.

21   Q.   (By Mr. Beach)  If you know, Hector?

22   A.   Excuse me?

23   Q.   Could you conceal that gun if you wanted to?

24        MR. BRAUCHLE:   We would renew our objection.

25        THE COURT:   Overruled.

---

*Belinda G. Baraka, Official Court Reporter*

*214.653.5803*

1    A.    Yes.  Pretty little -- you can pretty much put it
2  somewhere.  If you were trying to hide it.
3    Q.    (By Mr. Beach)  I am going to ask about 30 to 45
4  minutes after Wesley left your house there on Calculus that
5  day, you were watching television?
6    A.    I wasn't -- yeah, I got to a television.
7    Q.    Something -- you get a phone call?
8    A.    Yes, yes, sir.
9    Q.    About your car?
10   A.    Yes, sir.
11   Q.    You turn on the television because of that?
12   A.    Yes, sir.
13   Q.    And did you see your car down there in West Dallas on
14  the news?
15   A.    Yes, sir.
16   Q.    Was there any question in your mind what you were
17  seeing on TV involved your car that you had just given Wesley
18  Ruiz?
19   A.    Was I surprised?
20   Q.    That was your car, wasn't it?
21   A.    Yes, sir.
22         MR. BEACH:  I will pass the witness.
23         THE COURT:   Cross-examination, Mr. Brauchle.
24
25         (No omissions.)

---

1              CROSS-EXAMINATION
2  BY MR. BRAUCHLE:
3    Q.    Mr. Martinez, on March 23rd of '07, had you picked
4  up your cases yet.
5    A.    No, sir.
6    Q.    Okay.  So you didn't have the two felony cases that
7  you got now, did you?
8    A.    No, sir.
9    Q.    Now, let me see if I got this right.  One of your
10  cases carries a minimum punishment of 15 years in the
11  penitentiary and a maximum punishment of life; is that
12  correct?
13   A.    Yes, sir.
14   Q.    So the very best case you could get or best case
15  scenario would be 15 years imprison; is that correct?
16         MR. HUMPHREYS:   Objection, Your Honor, calls for
17  the legal conclusion of the witness.  He is not familiar with
18  all the rules of deferred adjudication as such?
19         THE COURT:   Overrule the objection.
20   Q.    (By Mr. Brauchle)  Now, then, so you got
21  one case that carries 15 years  in the penitentiary
22  up to life in the penitentiary; is that correct?
23   A.    Yes, sir.
24   Q.    And you got another case that the minimum sentence is
25  ten years in the penitentiary and the top sentence on that is

---

1  life in the penitentiary; is that correct?
2    A.    Yes, sir.
3    Q.    Now, then, did you get these two cases at the same
4  time?
5    A.    No, sir.
6    Q.    Okay.  So you went out and you got one 15 to 99 or
7  life case and then you came back and you got another ten years
8  to 99 or life case?
9    A.    Yes, sir.
10   Q.    And you did those at separate times, right?
11   A.    Yes, sir.
12   Q.    All right.  And that happened at two different times
13  after March 23rd of '07; is that correct?
14   A.    Yes, sir.
15   Q.    Now, then, you didn't remember or tell anybody what
16  you had told this jury about until what, May of 2008?
17   A.    I didn't understand the question, sir.
18   Q.    Well, what you just got through testifying about, you
19  hadn't told anybody about that until less than a month ago; is
20  that right?
21   A.    No, sir.
22   Q.    When did you first tell anybody about that?
23   A.    About what, it being my car and all that?
24   Q.    Yeah.
25   A.    Everybody knew the first day it happened.

---

1    Q.    No, what I am talking about, when is the first day
2  that you picked up the phone and called the police or you
3  picked up the phone and called the District Attorney or you
4  picked up the phone and in any way had contact with law
5  enforcement and said, Hey, you know that car that was on TV
6  back in March of 07, that was my car, when was the first time
7  you did that?
8    A.    I never did that, sir.
9    Q.    You never did that?
10   A.    Huh-uh.
11   Q.    These people brought you into the courtroom and they
12  had no idea what you were going to say?
13   A.    No, sir.
14   Q.    You never talked to the man that just cross-examined
15  you?
16   A.    I don't know how they got to me, sir, they just came
17  and got me out of my court.  I was in my court and they came
18  to me.
19   Q.    Okay.  Was your court drug court down on the fifth
20  floor?
21   A.    Yes, sir.
22   Q.    So this man right here before he started talking to
23  you about 15 minutes ago, had never talked to you in his life?
24   A.    No, sir.
25   Q.    Who from the District Attorney's office did talk to

---

1  you?
2      A.   I had talk to this man before, sir, but I had never
3  contacted them, he contacted me.
4      Q.   Okay. Which is it, you never talked to him before or
5  you have talked to him?
6      A.   Yeah, I have.
7      Q.   Okay. Now, then, when was the first time that you
8  talked to him?
9      A.   It was on one of my court dates.
10      Q.   When would that have been?
11      A.   I don't know.
12      Q.   You don't get a lifeline on this?
13      A.   I'm sorry, sir, I don't remember the exact date.
14      Q.   Well, would it have been less than a month ago?
15      A.   Yeah, I think so.
16      Q.   Pardon?
17      A.   I think so, yes, sir.
18      Q.   So it would have been less than 30 days ago that you
19  talked to Mr. Beach over here about your purported testimony?
20      A.   Yes, sir.
21      Q.   Is that correct?
22      A.   Yes, sir.
23      Q.   All right. Now, then, what did you talk about first,
24  what a sweet deal you were going to get or what you were going
25  it testify to?

1      A.   No, sir, he had -- he say -- he came to me and said
2  that he knew some stuff, this and that, and he knew that the
3  car was mine.
4      Q.   Okay. But he also told you, Hey, we got you down
5  here in drug court, we got a minimum of 15 and a minimum of
6  ten, both of those being prison sentences. And you just said,
7  Well, hey, that doesn't make any difference, I want to talk to
8  you; is that how it went down?
9      A.   No, sir.
10      Q.   Okay. So they had to tell you what they were going
11  to do for you in return for you testifying, didn't they?
12      A.   Yes, sir.
13      Q.   Okay. And that is, that you will not be sent to
14  prison on any of the pending cases?
15      A.   Yes, sir.
16      Q.   That you are being promised immunity from prosecution
17  for any and all criminal offenses touched upon during your
18  testimony in the trial; is that correct?
19      A.   Yes, sir.
20      Q.   And I would assume by the way that is worded, that
21  means instead of going to prison, they are going to give you a
22  deferred adjudication probation, aren't they?
23      MR. HUMPHREYS:   I would object. It would assume
24  that he would go to prison, he is presumed innocent until the
25  time of trial. He does have the pending trial. But we would

---

140

1  object to the form of the question?
2      THE COURT:   Overruled.
3      Q.   (By Mr. Brauchle)  Answer the question.
4      A.   They said if I would testify truthfully, they would
5  help me with my cases. They didn't say nothing about
6  probation. I really don't know what I will get for my cases
7  yet.
8      Q.   Well, you don't go to prison if you are on probation,
9  do you?
10      A.   No, sir.
11      Q.   And they are promising to not send you to prison,
12  aren't they?
13      A.   That's what they said, sir.
14      Q.   And you got that in writing, don't you?
15      A.   Yes, sir.
16      Q.   So they are saying, hey, we are not going to send you
17  to prison, just come on down and testify?
18      A.   Yes, sir.
19      Q.   Now, then, did you ever write any of this stuff down
20  before you came in here?
21      A.   No, sir.
22      Q.   You ever go to a police station and fill out an
23  affidavit or anything like that?
24      A.   No, sir.
25      Q.   And did you ever sit around and tell anybody what you

1  have told us here today?
2      A.   No, sir.
3      Q.   So there is nobody here that knows whether you are
4  testifying truthfully or not, is there?
5      A.   No, sir.
6      Q.   Is there?
7      A.   No, sir.
8      Q.   Now, then, Wesley being a good friend of yours, you
9  know enough about him to concoct almost any story about him,
10  don't you?
11      A.   Yes, sir.
12      MR. BRAUCHLE:   We will pass the witness.
13      THE COURT:   Redirect, Mr. Beach.
14         REDIRECT EXAMINATION
15  BY MR. BEACH:
16      Q.   Hector, after Wesley got arrested, you said through
17  his dad, you talked to him when he was in jail; is that
18  correct?
19      A.   Yes, sir.
20      Q.   And did he apologize to you for something when he
21  called to talk to you that day?
22      A.   Yes, sir.
23      Q.   What was Wesley sorry about when he talked to you
24  from jail?
25      MR. BRAUCHLE:   Your Honor, we would object to

1  this as being outside the scope of his testimony.  We would
2  object to it under 404, 403, 402 and 401.  It also goes to
3  extraneous acts that we have not had any previous notice
4  about.  And it is totally irrelevant and prejudicial under the
5  forestated rules of evidence.
6              THE COURT:  We will sustain the objection.
7          MR. BRAUCHLE:  We would ask that the jury be
8  instructed to disregard.
9              THE COURT:  Ladies and gentlemen, you will
10  disregard the question that was asked.
11          MR. BRAUCHLE:  And we would further move for a
12  mistrial.
13              THE COURT:  Denied.
14  Q.  (By The Mr. Brooks)  After Wesley got
15  arrested, you were still his friend; is that right?
16  A.      Yes, sir.
17  Q.      To this very day, you are still his friend at least
18  in your mind; is that correct?
19  A.      Yes, sir.
20  Q.      As of about two and a half hours ago, you still
21  hadn't made up your mind whether you wanted to risk 15 years
22  in the penitentiary or come into the same courtroom with
23  Wesley and testify; is that correct?
24  A.      Yes, sir.
25  Q.      Your lawyer basically had to just convince you that

1  was the thing that you needed to do?
2          MR. BRAUCHLE:  Your Honor, once again we would
3  object to this as being improper and irrelevant.
4              THE COURT:  Overruled.
5  A.      Yes, sir.
6  Q.      (By Mr. Beach)  You were so supportive of Wesley Ruiz
7  after he was arrested, you had T-shirts made up in support of
8  Wesley Ruiz?
9          MR. BRAUCHLE:  Your Honor, once again we would
10  object to this as being irrelevant and not proper under 404,
11  403 and 402, as well as 401.
12              THE COURT:  Overruled.
13  A.      Yes, sir.
14  Q.      (By Mr. Beach)  Are you wearing one of those today,
15  did you bring one of those down today?
16  A.      No, sir.
17  Q.      What did one of the T-shirts say?
18  A.      Say --
19          MR. BRAUCHLE:  We would object to this whole
20  line of questioning and ask that we would have a running
21  objection to it.
22              THE COURT:  Overruled.  And you may have a
23  running objection.
24  Q.      (By Mr. Beach)  What did it say?
25  A.      Free Slow.

144

1  Q.      Who is Slow?
2  A.      That's what we call Wesley.
3  Q.      You call Wesley Slow.  You were wearing a T-shirt
4  around saying, Free Slow; is that right?
5  A.      Yes, sir.
6  Q.      And there was somebody else at your house that day
7  back March 23rd, 2007, wasn't there?
8  A.      Yes, sir.
9  Q.      And that's how we were able to run you down --
10          MR. BRAUCHLE:  Your Honor, once again we would
11  object to this under 404, 403, 402, 401, and it is actually
12  the District Attorney's testifying rather than
13  cross-examination -- or direct examination.
14          MR. BEACH:  I will rephrase the question, Judge.
15              THE COURT:  Rephrase the question.
16          MR. BRAUCHLE:  Was my objection sustained.
17              THE COURT:  Sustained.
18          MR. BRAUCHLE:  We would ask that the jury be
19  instructed to disregard.
20              THE COURT:  Ladies and gentlemen, you will
21  disregard the question that was asked.
22          MR. BRAUCHLE:  And once again we would move for
23  mistrial.
24              THE COURT:  Denied.
25  Q.      (By Mr. Beach)  Was there somebody else at your house

145

1  that day?
2  A.      Yes, sir.
3  Q.      And was that a fellow by the name of Jose Santillo?
4          MR. BRAUCHLE:  Your Honor, he has gone back into
5  something that court has already sustained an objection.  It
6  is improper and we would object to this line of questioning.
7          MR. BEACH:  He asked the question on cross,
8  there wouldn't be anybody else that would know about his
9  story.  I am trying to establish that we didn't pick him out
10  of thin air with information.
11          MR. BRAUCHLE:  We will object to the form of the
12  answer to the objection.  It is not a talking objection or
13  talking answer in that regard, he is testifying.
14              THE COURT:  The objection is overruled.
15          MR. BRAUCHLE:  May we have a running objection
16  once again to this line of questioning?
17              THE COURT:  You may.
18  Q.      (By Mr. Beach)  Did you answer that by a man by the
19  name of Jose Santillo at your house that day?
20  A.      Yes, sir.
21          MR. BEACH:  That's all the questions I have.
22              THE COURT:  Recross, Mr. Brauchle.
23                    RECROSS-EXAMINATION
24  BY MR. BRAUCHLE:
25  Q.      Have you seen Mr. Santillo down here today?

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1   A.   No, sir.
2   Q.   Now, then, in your two cases, the State has alleged
3   that you got prior felony convictions, haven't they?
4            MR. HUMPHREYS:   Objection, Your Honor.
5            THE COURT:   Overruled.
6   Q.   (By Mr. Brauchle)   Isn't that correct?
7   A.   Do I got -- have I been convicted?
8   Q.   Yes.
9   A.   Of anything?
10  Q.   Yes.
11  A.   No, sir.
12  Q.   You have never been convicted of anything?
13  A.   No, sir.
14  Q.   You know a Carmen Delgadillo?
15  A.   No, sir.  I know of her but I don't know her, sir.
16  Q.   So you don't have any idea why she is getting a sweet
17  deal in this for you testifying, right?
18  A.   No, no, sir.
19           MR. BRAUCHLE:   I will pass the witness.
20           MR. BEACH:   Nothing further, Judge.
21           THE COURT:   You may step down.
22           MR. HUMPHREYS:   Your Honor, may this witness be
23  released from his subpoena?
24           MR. BEACH:   Not yet.
25           THE COURT:   Ladies and gentlemen, we will take a

1   15-minute break.
2            THE BAILIFF:   All rise.
3            (Jury retired from the courtroom.)
4            (Recess taken.)
5            THE BAILIFF:   All rise.
6            (Jury returned to the courtroom.)
7            THE COURT:   You may be seated.
8            MR. BRAUCHLE:   Your Honor, I would ask
9   permission to publish Defendant's Exhibit 1 to the jury.
10           THE COURT:   You may.
11       Mr. Brooks, your next witness.
12           (Witness entered the courtroom.)
13           THE COURT:   If you will raise your right hand,
14  ma'am.
15           (Witness was duly sworn.)
16           THE COURT:   Put your hand down.
17       You may proceed.
18           MR. BROOKS:   Thank you, Your Honor.
19               CARMEN DELGADILLO
20  was called as a witness, and having been duly sworn by the
21  Court, testified under oath as follows:
22               DIRECT EXAMINATION
23  BY MR. BROOKS:
24   Q.   Ma'am, would you state your name for the record.
25   A.   Carmen Delgadillo.

---

148

1   Q.   Ms. Delgadillo, you are soft spoken, can you lean
2   forward and speak into the mike?
3   A.   Carmen Delgadillo.
4   Q.   And how old are you?
5   A.   Twenty-one.
6   Q.   Ms. Delgadillo, do you know the defendant in this
7   case, Wesley Ruiz?
8   A.   Yes.
9   Q.   In fact, back in March of 2007, had you been in a
10  relationship with Mr. Ruiz?
11  A.   Yes.
12  Q.   How long would you say the two of y'all had dated?
13  A.   Not too long, maybe February.
14  Q.   You started around February?
15  A.   Yes.
16  Q.   And that would be February 2007?
17  A.   Yes.
18  Q.   Did the relationship quickly become a pretty intense
19  relationship?
20  A.   Yes.
21  Q.   Okay.  In fact at one point were the two of y'all
22  living together?
23  A.   Yes.
24  Q.   And even though it had been a short period of time,
25  things were moving rather fast?

149

1   A.   Yes.
2   Q.   And did you have occasions after Mr. Ruiz was
3   arrested for this offense to visit him in jail?
4   A.   Yes.
5   Q.   Now, before we go into those statements, just so that
6   we are clear with the jury, you have three felony charges that
7   are pending at this time?
8   A.   Yes.
9   Q.   And you have an agreement between the District
10  Attorney's office and yourself in exchange for your truthful
11  testimony, that those cases are going to be dismissed?
12  A.   Yes.
13  Q.   And your attorney is present in the courtroom with
14  you today?
15  A.   Yes, sir.
16  Q.   Do you know approximately -- well, strike that.
17           MR. BROOKS:   May I approach, Your Honor?
18           THE COURT:   You may.
19   Q.   (By Mr. Brooks)   Ms. Delgadillo, let me
20  show you what is marked as State's Exhibit 29 and
21  ask you if you have seen that before?
22  A.   Yes.
23  Q.   Okay.
24           MR. BROOKS:   May we have the lights, Your Honor.
25   Q.   (By Mr. Brooks)   Before I ask you questions

1   about that weapon, Ms. Delgadillo, do you see Wesley
2   Ruiz in the courtroom today?
3       A.   Yes, sir.
4       Q.   And if I am seated in chair number one, Mr. Beach is
5   chair number two, so on and so forth, what chair is he sitting
6   in?
7       A.   Chair number six.
8               MR. BROOKS:   Your Honor, we would ask that the
9   record reflect that this witness has identified the defendant.
10      Q.   (By Mr. Brooks)  What type of clothing does he have
11  on also?
12      A.   A suit and tie.
13              MR. BROOKS:   We would ask that the record
14  reflect that this witness has identified the defendant in open
15  court.
16      Q.   (By Mr. Brooks)  The gun that you see
17  depicted in State's Exhibit 29, where have you seen
18  that gun before?
19      A.   He usually had it, that was his gun.
20      Q.   Okay.  When you say he usually had it or it's his
21  gun, who are you referring to?
22      A.   Wesley.
23      Q.   Wesley Ruiz, the defendant?
24      A.   Yes, sir.
25      Q.   And when you say he usually had it, I mean, what do

1   you mean by he usually had it?
2       A.   He usually had it with him in the car, whatever or,
3   you know, whatever he was driving, usually.
4       Q.   Are you telling this jury whenever he traveled, he
5   was carrying that gun?
6       A.   Most of the time.
7       Q.   Where would he keep that gun if he was in a vehicle?
8       A.   In the backseat or under something.  Not in plain
9   sight.  Around him, you know.
10      Q.   I'm sorry?
11      A.   Like around him.  It wasn't in plain sight, not on
12  the passenger's seat, anything like that.
13      Q.   When you say around him, would he keep it in such a
14  way if he wanted to get to it quickly and easily, he could do
15  so?
16      A.   Yes.
17      Q.   And did he have a nickname for that gun?
18      A.   Chopper.
19      Q.   Chopper?
20      A.   Uh-huh.
21      Q.   As in C-h-o-p-p-e-r?
22      A.   Yes.
23      Q.   How would he refer to it as a chopper?
24      A.   That's just what they call those kinds of guns.
25      Q.   And that's how he referred to it?

152

.1      A.   Yeah.
2       Q.   Back in March of 2007, particularly March 23rd,
3   2007, did you see any of the news report about this offense?
4       A.   Yeah -- yes.
5       Q.   And the vehicle that was on the news report, do you
6   know if you had ever seen that vehicle before?
7       A.   I had seen it before, the car, he said he was going
8   to buy it.
9       Q.   You had seen the car around before?
10      A.   I have seen it parked at a house before.
11      Q.   And he told you that he was going to buy it?
12      A.   Yes.
13      Q.   After he was arrested for this offense, did you have
14  occasions to visit him in Dallas County jail?
15      A.   Yes.
16      Q.   And when you visited him in the Dallas County jail,
17  did you ask him what happened?
18      A.   Yes.
19      Q.   Did you ask him if he shot the officer?
20              MR. BRAUCHLE:   Your Honor, we would object to
21  this as being improper.  There has been no proper predicate
22  laid, we have been given no notice of it.  And we would
23  request a hearing outside the presence of the jury.
24              MR. BROOKS:   Judge I am going to have to object
25  to that, because there has been notice of this statement that

153

1   this witness is going to testify to has been specific notice
2   of what exactly she is going to say.  And that was provided
3   and it is in the Court's file.  That was provided back in
4   March.
5               MR. JOHNSON:   Judge, can we have the jury
6   excused for a minute to discuss this.
7               THE BAILIFF:   All rise.
8               (Jury retired from the courtroom.)
9               (Recess taken.)
10              (Jury returned to the courtroom.)
11              THE COURT:   You may be seated.
12      You --
13              MR. BROOKS:   May I proceed, Your Honor?
14              THE COURT:   You may.
15      Q.   (By Mr. Brooks)  Ms. Delgadillo, we are back on the
16  record, can you hear me okay.  I think before the break, I
17  asked you whether or not you had visited Mr. Ruiz inside the
18  county jail, you recall that question?
19      A.   Yes.
20      Q.   I think I also asked you if during that visit at the
21  county jail, if you had conversation with him about the
22  shooting?
23      A.   Yes.
24      Q.   Did he talk to you about the shooting?
25      A.   He told me a little bit.

1    Q.   What did he tell you about the shooting?
2    A.   I asked him why and --
3    Q.   Speak up into the mike, ma'am?
4    A.   He told me that he didn't kill the officer.  That he
5    was afraid for his life to how the officer came up to the car
6    and that he pulled the trigger, but the gun jammed.  And from
7    what he saw, he hit the officer in the chest, and the officer
8    died from a gunshot to the neck.
9    Q.   Let me stop you there, back up.  He told you that he
10   pulled the trigger?
11   A.   Yes.
12   Q.   And did he also indicate that the gun did fire?
13   A.   Yes.
14   Q.   And where did he tell you that bullet hit the
15   officer?
16   A.   From what he could tell, the chest.
17   Q.   The chest area?
18   A.   Yes.
19   Q.   And during that conversation, did he indicate to you
20   that he did not think he was responsible for the officer's
21   death?
22   A.   Yes.
23   Q.   And why did he not believe he was the cause of that
24   officer's death?
25   A.   Because --

1              MR. BRAUCHLE:   Your Honor, once again we would
2    object to this being outside the scope of notice.
3              THE COURT:   Overruled.
4    A.   Because he didn't --
5              MR. BRAUCHLE:   May we have a running objection?
6              THE COURT:   You may.
7    You can answer.
8    A.   He didn't shoot the officer in the neck.  And from
9    what he said, the officer was shot three times.
10   Q.   (By Mr. Brooks)   He told you the officer
11   was shot three times?
12   A.   Yes.
13   Q.   Did he tell you anything else regarding the shooting?
14   A.   No.
15   Q.   Now, during the times that, a couple of months that
16   you were hanging out with Mr. Ruiz, do you recall any other
17   statements he had made to you?
18   A.   About?
19   Q.   Well, did he indicate to you -- make statements to
20   you about what he would do -- if he got -- had a run-in with
21   the police, did he indicate how he would respond to that?
22   A.   He would just say stuff like he wasn't going to go
23   down without a fight, you know.  He wasn't going to make it
24   easy, like --
25             MR. BRAUCHLE:   Your Honor, we would object to

---

156

1    this as being nonresponsive.
2              THE COURT:   Overruled.
3    A.   He just said he wasn't going to go down without a
4    fight, pretty much.
5    Q.   (By Mr. Brooks)   Did he ever make any
6    reference to the letter "G".
7    A.   Well, he was gonna go out like a "G".
8    Q.   And when he told you that he was going to go out like
9    a "G", what did you take that to mean?
10   A.   That he wasn't going to go down without a fight.
11             MR. BROOKS:   Pass the witness.
12             THE COURT:   Cross-examination.
13                   CROSS-EXAMINATION
14   BY MR. BRAUCHLE:
15   Q.   Ma'am, when did -- when did you have this
16   conversation?
17   A.   The first time I visited him at the jail.  I am not
18   sure when it was exactly.  I know it was the very first time
19   that I visited him.
20   Q.   The very first time you visited?
21   A.   Yes, sir.
22   Q.   And how long after he got arrested would that be?
23   A.   Maybe two weeks.
24   Q.   Two weeks?
25   A.   I think, but I am not sure.

---

157

1    Q.   And what name did you visit him under?
2    A.   My name, Carmen Delgadillo, I had to use my license.
3    Q.   Well, you had cases pending at that time, didn't you?
4    A.   Yes.
5    Q.   How did you get in with cases pending?
6    A.   They let me in.
7    Q.   Now, then, that was two or three weeks after he was
8    arrested?
9    A.   Yes, sir.
10   Q.   Now, then, was anybody with you?
11   A.   No, sir.
12   Q.   Weren't any other visitors when you went up to see
13   him?
14   A.   No, sir.
15   Q.   And how long were you with him?
16   A.   I am not sure how long they give you.
17   Q.   Pardon?
18   A.   What do you mean, I'm sorry?
19   Q.   How long were you up in jail visiting him?
20   A.   As long as they let you visit.  I am not sure how
21   long it is.
22   Q.   And what floor did you go to visit him?
23   A.   I am not sure what floor it is, either.
24   Q.   So you are not sure how long you were there, where
25   you went to visit him, or when it was that you did visit him;

---

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1  is that right?
2      A.    That's right.
3      Q.    Okay. Now, then, did you make any record of any of
4  this conversation that you supposedly had with him?
5      A.    No.
6      Q.    When is the first time that all of this came back to
7  you and you shared it with somebody?
8      A.    When I visited the D.A.
9      Q.    When you visited the D.A.?
10     A.    Yeah, when my lawyer told me that we need to go speak
11  with the D.A., I guess.
12     Q.    And when would that have been?
13     A.    I am not sure.
14     Q.    You have to answer the question?
15     A.    I am not sure when it was.
16     Q.    Was it years ago, months ago, days ago?
17     A.    Months.
18     Q.    Months ago?
19     A.    Yes.
20     Q.    And who was it that you visited with?
21     A.    I am very bad with names. So I can't give you a
22  name, cause I am really bad with names.
23     Q.    Okay. Do you see the person you might have talked to
24  at the table over there?
25     A.    Yes.

1      Q.    Which one is it?
2      A.    The first gentleman.
3      Q.    The person that just talked to you?
4      A.    Yes, I met with him, yes.
5      Q.    And that was your first visit?
6      A.    From what I recall, yes.
7      Q.    Okay, now, you went up there with your lawyer; is
8  that right?
9      A.    Yes.
10     Q.    And how did you know to go talk to the District
11  Attorney? Did they call you?
12     A.    Yeah, they got in contact with my lawyer.
13     Q.    They got in contact with your lawyer?
14     A.    Yes.
15     Q.    And did they tell you what they were going to do for
16  you if you came down and testified the way they wanted you to
17  against Wesley?
18     A.    Not at first, it wasn't -- they weren't telling me
19  you are going to get a deal or anything at first, no. I knew
20  it was a possibility. But they didn't tell me that's what was
21  going to happen.
22     Q.    Okay. So you hadn't written anything down or told
23  anybody what Wesley told you before you went to see the
24  District Attorney; is that right?
25     A.    That's right.

160

1      Q.    So basically the slate was pretty much clean as to
2  what you could tell them one way or another because no one
3  else would know what you had said before or after, right?
4      A.    I'm sorry, sir, could you repeat that one more time.
5      Q.    Okay. You hadn't made any record of what Wesley is
6  supposed to have told you, you didn't tell anybody what Wesley
7  was supposed to have told you, so nobody knew what you were
8  saying that Wesley told you except yourself, right?
9      A.    Right.
10     Q.    So it was pretty much a clean slate as to what you
11  could tell the District Attorney as to what Wesley was
12  supposed to have said, right?
13     A.    Yeah, yes.
14     Q.    Wasn't it?
15     A.    Yes.
16     Q.    Now, then, in regard to the weapon that you have
17  seen, you state that you saw Wesley with that?
18     A.    Yes.
19     Q.    And how many months or years or decades had Wesley
20  owned that?
21     A.    I am not sure how long he owned it. Like I said
22  before, we weren't together for that long.
23     Q.    Okay, so how long were you together?
24     A.    From February till --
25     Q.    March?

161

1      A.    Yeah. He got locked up.
2      Q.    So you were together less than a month?
3      A.    Felt like a lot longer, but pretty much.
4      Q.    All right. Now, then, from what you have said here
5  today and your statement, Wesley told you that at the time
6  that he was stopped by the police or was in the situation with
7  the police, that he thought he was going to get shot?
8      A.    Yes.
9      Q.    And he said that the police had shot at him; is that
10  correct?
11     A.    No.
12     Q.    He didn't say that the police had shot at him?
13     A.    Not at first, no.
14     Q.    Did he explain how he had the gunshot wounds if he
15  hadn't got shot by the police?
16     A.    Well, after he shot first, then a spray of gunshots
17  came into the car.
18     Q.    Well, he didn't tell you that he shot first, did he?
19  He didn't tell --
20     A.    He didn't tell me like that, no.
21     Q.    He didn't tell you that he shot first, did he?
22     A.    He didn't tell me that he shot first, no.
23     Q.    So the answer to that is no?
24     A.    Right, that's not what he told me. He didn't tell me
25  like that.

1 Q. No, the question was -- the answer to that is no; is
2 that correct?
3 A. Yeah that's correct.
4 Q. All right. Now, then, were the statements that you
5 have made to the District Attorney all the statements that
6 were made in one visit?
7 A. Was it in one visit?
8 Q. Yeah.
9 A. No.
10 Q. Okay, so you had to go back on more than one occasion
11 to get these little snippets which you have shared with the
12 jury and the District Attorney; is that correct?
13 A. Yes.
14 Q. When did you have the -- If I go out, I am going to
15 go out like a "G", whatever that is, when did you-all have
16 that discussion?
17 A. The first time I visited with him.
18 Q. The first time that you visited him?
19 A. Yes.
20 Q. Okay. But he had already not gone out like anything,
21 right?
22 A. I'm sorry, I don't understand.
23 Q. He hadn't gone out like a "G" at that point in time,
24 had he?
25 A. Ah --

1 Q. Well, you were talking to him, weren't you?
2 A. Was I talking to him?
3 Q. Yeah.
4 A. When?
5 Q. Whenever you went to jail and visited with him and he
6 made this statement to you?
7 A. Nah, he didn't tell me he was going to go out like a
8 "G" in jail, he didn't say that while he was in jail, no.
9 Q. So that's something y'all talked about when you were
10 together for the month or so that seemed longer; is that
11 correct?
12 A. Yes.
13 Q. And how would that have come up in your
14 conversations?
15 A. They asked me about my relationship with Wesley.
16 Q. Okay. But I am asking you, how did it come up when
17 you and Wesley are talking, not when the D.A. told you that
18 they wanted to know about things about what Wesley might do if
19 he were confronted by police?
20 A. So while me and Wesley were talking, how did that
21 come up is what you are asking me?
22 Q. Well, if it did, did it even come up or did the
23 D.A.'s just ask you about it?
24 A. Yes, it came up. It was just something he said.
25 Q. And what was that in regard to?

164

1 A. I am guessing whenever the law caught up to him.
2 Q. No, we don't want you to guess?
3 A. Well, whenever the law caught up to him, he wasn't
4 going to go without a fight. Hence, I am going to go out like
5 a "G".
6 Q. And what is a "G"?
7 A. I guess he was referring --
8 Q. No, once again, do you know what a "G" is or not?
9 A. Well, yeah, like a gangster.
10 Q. All right. But you don't know when or how that came
11 up in a conversation, do you?
12 A. Uh --
13 Q. Don't know when that came up or how that came up, do
14 you?
15 A. No I can't say exactly when that came up.
16 Q. Now, then, Wesley also told that you when he was
17 confronted out there on Bernal that he thought he was going to
18 get shot, didn't he.
19 A. Yes.
20 Q. And he also told you that he thought that he was
21 going to be killed by the police, didn't he?
22 A. Yes.
23 Q. Now, then, let's go back to your interest in this
24 case, you currently have criminal cases pending against you,
25 right?

165

1 A. Yes.
2 Q. You have a first-degree possession with intent to
3 deliver methamphetamine case pending against you, don't you?
4 A. Yes.
5 Q. That carries a punishment range of five years to 99
6 years or life and a fine of up to $10,000, doesn't it?
7 A. Yes.
8 Q. And it could carry more than that under certain
9 conditions, right?
10 A. Yes.
11 Q. Now, then, your case is getting dismissed entirely;
12 is that correct?
13 A. Yes, sir.
14 Q. You are not going to have to be on probation, you are
15 not going to have to be do anything, cause when you leave
16 here, your cases are being dismissed; is that correct?
17 A. Yes, sir.
18 Q. Now, then, your cases are being dismissed contingent
19 on Mr. Martinez testifying; is that correct?
20 MR. BROOKS: Your Honor, excuse me, we need --
21 we are going to object to that question, that is outside --
22 that is outside the offer, it is outside her firm of
23 knowledge. There is no -- he has laid no groundwork implies
24 that she has any knowledge of Mr. Martinez and his
25 arrangements and his agreement. It is an improper question.

1        THE COURT:   I will overrule it.
2        Ma'am, you may answer the question if you know the
3    answer.
4        A.   No.
5            MR. BRAUCHLE:   May I approach the witness, Your
6    Honor?
7            THE COURT:   You may.
8        Q.   (By Mr. Brauchle)   Has your lawyer shown
9    you a document drawn up by the State in regard to
10   the dismissal of your cases?
11       A.   Yes, sir.
12       Q.   Now, how many cases do you have right now?
13       A.   Three.
14       Q.   Three?
15       A.   Yes.
16       Q.   And all of those are going to be dismissed for you
17   coming in and testifying against Mr. Ruiz; is that correct?
18       A.   Testifying truthfully against Mr. Ruiz, yes.
19       Q.   Well, since there is no prior history as to what your
20   conversations were with Mr. Ruiz, we really don't know whether
21   you are testifying truthfully or not, do we?
22       A.   No, you don't.
23       Q.   Now, in regard to your conversations, you stated that
24   you went to see Mr. Ruiz on more than one occasion; is that
25   correct?

1        A.   Yes.
2        Q.   And you are stating that he told you that on the day
3    in question, he thought he was going to be killed by the
4    police?
5        A.   Yes.
6        Q.   And that they were shooting at him; is that correct?
7        A.   He told me that they were shooting at him.
8        Q.   Well, I will ask you the same question that I asked
9    you before.  How did you explain the gunshot wounds, he didn't
10   get those in jail, did he?
11       A.   No, he didn't get those in jail.
12       Q.   Okay.  So the police must have been shooting at him,
13   right?
14       A.   Well, yeah.
15       Q.   Would that be a logical deduction?
16       A.   Yes.
17            MR. BRAUCHLE:   I will pass the witness.
18            THE COURT:   Ladies and gentlemen, we are going
19   to recess today, we will reconvene tomorrow.  And I will ask
20   that you keep in mind my prior admonishments, do not discuss
21   this case with your family members or friends when you go
22   home.  And if you happen to come across it in the media, do
23   not read or watch anything on the news.  Have a good evening,
24   we will see you tomorrow.
25            THE BAILIFF:   All rise.

---

168

1            (Jury retired from the courtroom.)
2            MR. BROOKS:   Judge, we have something we need to
3    address.
4            THE COURT:   Okay.  You may be seated.
5            MR. BROOKS:   Judge, Defense Counsel I believe by
6    a series of questions they have asked of this witness has
7    opened the door for us to proceed in some matters that would
8    be extraneous matters during this portion of the trial.
9    Specifically the line of questioning about how the
10   conversation came up about him going out like a "G".  This
11   witness has acknowledged that at that time Mr. Ruiz was on
12   probation and had not been reporting, and that is the context
13   in which those conversations came up.
14           Additionally, again when they are asking about why
15   they were talking about going out like a "G", again it goes back to
16   her knowledge that he was on felony probation and had not
17   reported for several months, if six months or longer, I
18   think that clearly opened the door for us to go into that.
19           Additionally, asking her the line of questioning, we
20   don't know if you are testifying truthfully, we have pending
21   cases against you, all three of those cases come out of the
22   same transaction in Garland, Texas.  She is in Mr. Ruiz's
23   vehicle, he is hiding in the backyard of that resident.  And
24   those cases were put on her because he was not in the vehicle
25   at that time.  I think they have opened the door clearly for

1    us to explain fully to the jury those stories and the
2    explanations behind the testimony given today.  Not giving
3    them a chance to hear that testimony leaves a false impression
4    what her knowledge and background with Mr. Ruiz is.
5            THE COURT:   Response?
6            MR. BRAUCHLE:   She said she didn't know what the
7    background was.  They can't help themselves by making up some
8    background for a conversation.  She was asked directly how or
9    why that would come up, and she said I don't know.  So now
10   then they come up with another reason saying, well, it has to
11   be blah, blah, blah, because he hadn't reported or he hadn't
12   done this or that or the other.  That may very well be, she
13   didn't show that she knew anything about it.  And she
14   certainly didn't say as to why or why not this conversation
15   existed for anything.
16           MR. BROOKS:   Judge, I think you -- Mr. Brauchle
17   is an excellent attorney and you can ascertain from the way he
18   asked her those questions, you could clearly see her hesitancy
19   in giving what we believe the testimony would be if she is
20   allowed to talk about those extraneous offenses.  And again I
21   think they have clearly opened the door to go into those
22   offenses.
23           MR. BRAUCHLE:   By asking questions and getting
24   answers that say she doesn't know how they come up, now they
25   can go places we have never been, that's preposterous.  They

169

1  have come up with another theory that she is sitting in a car
2  that belonged to Mr. Ruiz, and that has never been proven in
3  any way or intimated.
4          MR. BROOKS:   Judge, these facts are contained in
5  the offense report that have been previously tendered to the
6  Defense. They have those offense reports from the Garland
7  offense.  And the narrative that I gave as to where Mr. Ruiz
8  was and where the drugs were found is clearly outlined in
9  those offense reports.
10         THE COURT:   The Court will deny that request.
11     Anything further?
12         MR. BROOKS:   No, Your Honor.
13         MR. BRAUCHLE:   No, Your Honor.
14         (Court recessed for the day.)
15
16
17
18
19
20
21
22
23
24
25

1  THE STATE of TEXAS )
2  COUNTY of DALLAS  )
3          I, BELINDA G. BARAKA, Official Court Reporter in and
4  for the 194th Judicial District Court of Dallas County, State
5  of Texas, do hereby certify that the foregoing contains a true
6  and accurate transcription of all portions of evidence and
7  other proceedings requested in writing by counsel for the
8  parties, to be included in this volume of the Reporter's
9  Record, in the above-styled and -numbered cause(s), all of
10  which occurred in open court or in chambers and were reported
11  by me.
12          I further certify that this Reporter's Record of the
13  proceedings truly and correctly reflects the exhibits, if any,
14  admitted by the respective parties.
15          I further certify that the total cost for the
16  preparation of this Reporter's Record  was paid by the
17  State/Defense.
18          WITNESS MY OFFICIAL HAND this the 30th day of
19  May          , A.D., 2009.
20
21
22          BELINDA G. BARAKA, CSR #5028
23          Official Court Reporter
            133 N. Industrial
24          Dallas County, Texas 75207
25  Certification Expires:  12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1              CAUSE NO. F07-50318-M

2   THE STATE OF TEXAS           *    IN THE DISTRICT COURT

3   vs.                          *    194TH JUDICIAL DISTRICT

4   WESLEY LYNN RUIZ             *    DALLAS COUNTY, TEXAS

5

6

7   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9                      REPORTER'S RECORD

10                        JURY TRIAL

11               Volume 43 of 59 Volume(s)

12

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19          BE IT REMEMBERED THAT on this the 28th day of May,

20   A.D, 2008, the above-styled and -numbered cause(s) came on for

21   hearing before the HONORABLE ERNEST B. WHITE, III, of the

22   194th Judicial District Court of Dallas County, State of

23   Texas, the following is a true and correct transcription of

24   the proceedings had, to-wit:

25     (Proceedings Reported by Computerized Machine Shorthand)

---

*Belinda G. Baraka, Official Court Reporter*
214-653-5803

```
 1                  A P P E A R A N C E S

 2

 3     HON. KEVIN BROOKS
       Assistant District Attorney
 4     State Bar No. 03070735

 5

 6     HON. ANDY BEACH
       Assistant District Attorney
 7     State Bar No.  01944900

 8                           FOR THE STATE OF TEXAS

 9

10     HON. PAUL BRAUCHLE
       Attorney at Law
11     State Bar No. 02918000

12

13     HON. WILLIAM JOHNSON
       Attorney at Law
14     State Bar No.  10804500

15                           FOR THE DEFENDANT

16     Also Present:

17      Doug Parks, Attorney at Law

18

19

20                        *  *  *  *  *

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                         I N D E X

 2                                         PAGE/VOL.

 3   Proceedings - 05/28/08 ............................ 8/43

 4   STATE'S WITNESS        Direct     Cross      V.Dire

 5    CARMEN DELGADILLO       8          12

 6    JASON JARC             13, 47     36, 53

 7    TODD HAECKER           68         87

 8    DANIEL KRIETER         123, 132   153, 162   131

 9                           161

10   In-Camera Hearing ................................. 143

11   Conclusion of In-Camera Hearing ................... 152

12   STATE'S WITNESS        Direct     Cross

13    VERONICA MORALES       167        174

14

15   Reporter's Certificate ............................ 177

16

17

18

19

20

21

22

23

24

25
```

```
1                    E X H I B I T   I N D E X

2   STATE'S EXHIBIT(S):        OFFERED:   ADMITTED:  VOL.

3   11    Photograph           128        128        43

4   12    Photograph           128        128        43

5   13    Photograph           128        128        43

6   14    Audio Tape            32         32         43

7   14-A  Transcript           175        175        43

8   15    Photograph            85         85         43

9   16    Photograph           128        128        43

10  16-A  Photograph           128        128        43

11  16-B  Photograph           128        128        43

12  17    Photograph           128        128        43

13  19    Photograph           129        129        43

14  20    Photograph           129        129        43

15  21    Photograph           129        129        43

16  28    Photograph           129        129        43

17  33    Photograph           129        129        43

18  34    Photograph           129        129        43

19  35    Photograph           129        129        43

20  36    Photograph           129        129        43

21  37    Photograph           129        129        43

22  38    Photograph           129        129        43

23  39    Photograph           129        129        43

24  40    Photograph           129        129        43

25  41    Photograph           129        129        43
```

```
 1                  E X H I B I T   I N D E X

 2     STATE'S EXHIBIT(S):        OFFERED:  ADMITTED:  VOL.

 3      42    Photograph          129        129        43

 4      43    Photograph          129        129        43

 5      44    Photograph          129        129        43

 6      45    Photograph          129        129        43

 7      46    Photograph          129        129        43

 8      47    Photograph          129        129        43

 9      48    Photograph          129        129        43

10      49    Photograph          129        129        43

11      50    Photograph          129        129        43

12      51    Photograph          129        129        43

13      52    Photograph          129        129        43

14      53    Photograph          129        129        43

15      54    Photograph          129        129        43

16      55    Photograph          129        129        43

17      56    Photograph          129        129        43

18      57    Photograph          129        129        43

19      58    Photograph          129        129        43

20      59    Photograph          129        129        43

21      60    Photograph          129        129        43

22      61    Photograph          128        128        43

23      62    Photograph          128        128        43

24      63    Assault Pistol      137        137        43

25      64    Cartridge Casing    138        139        43
```

```
1                    E X H I B I T   I N D E X

2    STATE'S EXHIBIT(S):          OFFERED:   ADMITTED:   VOL.

3    66    Bullets                139        139         43

4    82    T-Shirt                140        140         43

5    83    Protective Vest        141        141         43

6    84    Uniform Shirt          141        141         43

7    85    Insignia Pin           142        142         43

8    86    Badge                  140        140         43

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

1                       E X H I B I T   I N D E X

2    DEFENSE'S EXHIBIT(S):        OFFERED:   ADMITTED:   VOL

3    2    Document                107        107         43

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Belinda G. Baraka, Official Court Reporter
214-653-5803

<u>P R O C E E D I N G S</u>

(May 28, 2008)

1 THE COURT: We are ready.

2 THE BAILIFF: All rise.

3 (Jury entered the courtroom.)

4 THE COURT: You may be seated.

5 You may proceed, Mr. Brooks.

6 **CARMEN DELGADILLO**

7 was called as a witness, and having been duly sworn by the

8 Court, testified under oath as follows:

9 <u>REDIRECT EXAMINATION</u>

10 BY MR. BROOKS:

11 Q. Ma'am, would you state your name for the record,

12 please.

13 A. Carmen Delgadillo.

14 Q. You are one and the same Carmen Delgadillo who

15 testified in this trial?

16 A. Yes, sir.

17 Q. And I know I asked you this question yesterday, how

18 old you?

19 A. Twenty-one.

20 Q. And have you ever testified in any kind of criminal

21 trial or civil trial before yesterday?

22 A. No.

23 Q. Would it be a fair statement that you were a little

---

1 bit nervous yesterday?

2 A. Yes.

3 Q. Now, you were asked some questions about -- the

4 Defense Attorney, was he asking you questions -- was he asking

5 you questions that I guess basically reflected how this

6 defendant told you the offense happened?

7 A. Yes.

8 Q. In other words, did he ask you -- was he trying to

9 twist your words?

10 MR. BRAUCHLE: Your Honor, we would object to

11 this, this is attacking the defendant over the shoulder of his

12 attorney.

13 THE COURT: Sustained.

14 MR. BRAUCHLE: We would ask that the jury be

15 instructed to disregard.

16 THE COURT: Ladies and gentlemen, you will

17 disregard the question that was asked.

18 MR. BRAUCHLE: We would further move for a

19 mistrial.

20 THE COURT: Denied.

21 Q. (By Mr. Brooks) Tell the jury,

22 Ms. Delgadillo exactly how the conversation with

23 Mr. Ruiz, exactly how that conversation was?

24 MR. BRAUCHLE: Your Honor, it has been asked and

25 answered.

---

10

1 THE COURT: Overruled.

2 MR. BRAUCHLE: We would also state that there is

3 no specificity as to what conversation he is asking her about.

4 THE COURT: Overruled.

5 A. I asked him why. And he just -- he told me that he

6 didn't kill the officer. That when the officer came up on the

7 car, he was frightened for his life.

8 MR. BRAUCHLE: Your Honor, we would object to

9 narrative.

10 THE COURT: Sustained.

11 Q. (By Mr. Brooks) Then what did he say?

12 A. That he shot -- pulled the trigger, and from what he

13 saw, he hit the officer in the chest. And that the officer --

14 MR. BRAUCHLE: Your Honor, once again we would

15 object to narrative.

16 THE COURT: Sustained.

17 Make it question and answer.

18 MR. BROOKS: Yes, Your Honor.

19 Q. (By Mr. Brooks) So he told you that the

20 officer ran up to the car?

21 A. Yes.

22 Q. And that he got scared?

23 A. Yes.

24 Q. And then he told you that he shot?

25 A. Yes.

---

11

1 MR. BRAUCHLE: Your Honor, this is leading, we

2 would object to that.

3 THE COURT: Do not lead the witness.

4 Q. (By Mr. Brooks) Did he tell you that he

5 shot the officer in the chest?

6 MR. BRAUCHLE: Your Honor, once again we would

7 object to leading.

8 THE COURT: If you will rephrase the question,

9 sir.

10 Q. (By Mr. Brooks) Where did he tell you that

11 he shot the officer?

12 A. In the chest.

13 Q. And did he tell you whether or not he was responsible

14 for killing the police officer?

15 A. He told me that he wasn't responsible for killing the

16 officer.

17 Q. And did he tell you what happened to his gun after he

18 shot?

19 A. Yes.

20 Q. What did he tell you happened to his gun?

21 A. That it jammed.

22 Q. And did he tell you what the other police officers

23 started to do?

24 A. No, he didn't tell me what the police officers did.

25 Q. Did he describe what happened after his gun jammed?

---

1    A.    He actually describe it to me.
2    Q.    Did he say anything to you after his gun jammed?
3    A.    No.
4          MR. BROOKS:   Pass the witness.
5          RECROSS-EXAMINATION
6  BY MR. BRAUCHLE:
7    Q.    Ma'am, if you don't understand any questions I ask
8  you, just let me know, okay?
9    A.    Okay.
10   Q.    Now, is it a fact as you testified yesterday that
11 Mr. Ruiz told you that he thought that the police officers
12 were trying to kill him?
13   A.    Yes.
14   Q.    And that he acted in self-defense?
15         MR. BROOKS:   Objection, Your Honor, to the form
16 of the question.  I don't believe that's how she answered
17 defense counsel's question yesterday, specifically that he
18 acted in self-defense.
19         THE COURT:   Overrule the objection.
20   Q.    (By Mr. Brauchle)  You can answer the
21 question, ma'am.
22   A.    He told me that he was scared for his life, so I take
23 that as being, he thought they were going to shoot first.
24   Q.    Well, he was scared for his life?
25   A.    That's what he told me.

1    Q.    And thought they were going to harm him; is that
2  correct?
3    A.    Yes.
4          MR. BRAUCHLE:   We will pass the witness.
5          MR. BROOKS:   No other questions for this witness
6  at this time, Your Honor.
7          THE COURT:   You may step down, ma'am.
8          MR. BROOKS:   Call Officer Jarc.
9          (Witness entered the courtroom.)
10         THE COURT:   Has this witness been previously
11 sworn?
12         MR. BROOKS:   I believe he was sworn in
13 yesterday, Your Honor.
14         THE COURT:   You may proceed, Mr. Brooks.
15         JASON CHRISTOPHER JARC
16 was called as a witness, and having been duly sworn by the
17 Court, testified under oath as follows:
18         DIRECT EXAMINATION
19 BY MR. BROOKS:
20   Q.    Sir, would you introduce yourself to the jury.
21   A.    My name is Jason Christopher Jarc.
22   Q.    While you are in uniform, we can tell you are a
23 Dallas Police Officer?
24   A.    Yes, I am.
25   Q.    And how long have you been about with the Dallas

14

1  Police Department?
2    A.    Eight and a half years.
3    Q.    Tell the jury what sections within the Dallas Police
4  Department you serve?
5    A.    I work in the Northwest sector.  I work plain clothes
6  deployment, 8:00 a.m. to 4:00 p.m. currently.
7    Q.    What other sectors?
8    A.    I worked in the Southeast, Oak Cliff and the
9  Northwest.
10   Q.    And back on March the 23rd of 2007, where were you
11 assigned?
12   A.    To the Northwest Division.
13   Q.    What capacity?
14   A.    Plain clothes deployment.
15   Q.    Tell the jury what is the purpose of plain clothes
16 deployment?
17   A.    There is roughly between five or six of us, we go out
18 to high-crime areas, hot spots, wherever we need to go to
19 address the crime problems in the division.  It is kind of
20 utilitarian position, you just go wherever you are needed.  So
21 depending on what is going on in the division.
22   Q.    Okay.  And so basically, are you patrolling whatever
23 the current hot spot as far as crime is?
24   A.    Yes, sir.
25   Q.    And how are you guys outfitted?

15

1    A.    We are in plain clothes.  We just go out, we try to
2  get eyes and ears on different areas, anything from
3  residential burglaries to people, warrants that need to be
4  served.  We just go out and we try -- since we are in plain
5  clothes, we can sit up a lot easier in the neighborhood, watch
6  houses, addresses, any type of need that the division needs.
7    Q.    And what kind of vehicle are you in?
8    A.    I was in a black extended cab Chevrolet pickup truck.
9    Q.    Is that a department vehicle?
10   A.    Yes, it is a seized vehicle.
11   Q.    Is it equipped with communication?
12   A.    No, it is not.  We use all our own, our small hand
13 radios.  There are generally two of us per vehicle.  We have
14 at least two radios in the vehicle in case one goes dead.
15   Q.    What about the flashing lights?
16   A.    No, we do not.  We don't pull people over, we call
17 Patrol element to pull people over.  This is all done by
18 radio.  We try to be discrete in the area, wherever they need
19 us and we go from there.
20   Q.    Back on March the 23rd, 2007, were you working --
21 excuse me -- were you working alongside another officer?
22   A.    Yes, sir, I was.
23   Q.    And who is that?
24   A.    Officer Patrick Starr.
25   Q.    And he also obviously was in plain clothes?

1    A.    Plain clothes as well.

2    Q.    Late that afternoon, do you recall what section of

3    town you guys were patrolling?

4    A.    We were -- we were actually up in the north part,

5    Northwest Highway and 35 area.

6    Q.    At some point did you find yourself traveling south

7    on I-35?

8    A.    Yeah.  We were going to jail on a different deal.

9    And we were following the element to jail to do the report

10   when we were southbound on 35 and we were in the far left

11   lane.  And we are in traffic and I looked over and I saw a

12   vehicle that I taught fitted a description of a bulletin they

13   had put out earlier in the week.

14   Q.    Why did you think that vehicle fit the description?

15   A.    Red over gray Caprice, 22-inch chrome wheels.

16   Q.    Would it be that it was a pretty much exact

17   description to the vehicle on the bulletin?

18   A.    Yes, it was.

19   Q.    Do you recall if you saw the vehicle first or Officer

20   Starr?

21   A.    I saw the car first.

22   Q.    In response to seeing the vehicle what did you do

23   next?

24   A.    That's when Officer Starr got on the radio and stated

25   what we had seen and so I get over a couple of lanes and we

---

1    start following the car.  And he is trying to get Patrol

2    elements to stop and identify the occupant.

3    Q.    And when you say you are trying to follow the car,

4    were you directly behind the car or two or three cars back?

5    A.    We are a couple of cars back.  He was far right lane

6    and we were far left lane.  We were starting to get a lot of

7    traffic, we are just working our way over.  Like I said we are

8    in a plain car and we just blend in like anybody else.

9    Q.    And do you recall how long or how far you followed

10   that vehicle before it existed off of Stemmons Freeway?

11   A.    Approximately half a mile.

12   Q.    Did you ever have the sense that that vehicle was

13   getting off the highway because it was a suspicious of your

14   vehicle?

15   A.    No, no, no, we were just following it, like I said,

16   we are in a everyday pickup truck so...

17   Q.    And when it existed Stemmons Freeway, what direction

18   did it take?

19   A.    It went into West Dallas, so it went westbound.

20   Q.    And what exist did it take?

21   A.    On Mockingbird.

22   Q.    When it is taking this exion on Mockingbird, what are

23   you and Officer Starr doing, obviously you are following the

24   vehicle?

25   A.    I am following the vehicle, just pretty much how it

---

18

1    goes down, he does all the talking on the radio, he is putting

2    out wherever we are at and which way the car is going.  Try to

3    give as much information to he can to the uniform officers

4    that are coming out.

5    Q.    And at some point did you -- or Officer Starr request

6    a Patrol unit?

7    A.    Yes, we did.

8    Q.    Now, when y'all request a Patrol unit, are you able

9    to ask for a specific Patrol unit or you are just asking for

10   whoever is available?

11   A.    No, we just ask for a cover element.  We tell them

12   what we got, you know, a car fitting the description and

13   anybody close by can come stop the car for us.

14   Q.    Do you recall who responded to that request?

15   A.    I think Payne and Mark Nix did.

16   Q.    Any other officers respond to that request?

17   A.    Haecker -- I mean all of that is going on, there is a

18   lot of radio traffic, nobody knows who is closer.  We don't

19   know where everybody else is at.  So there is multiple people

20   getting on the radio, Hey, I will start that way, I will go

21   that way, I am close, this, that.  Nobody really knows where

22   the other people is at.  People just generally start going

23   that direction, and the first one there, third one there, and

24   so on.

25   Q.    And what street are you on at this point?

---

19

1    A.    Well, when we asked for the car to be pulled over, we

2    are still southbound 35.

3    Q.    Okay.

4    A.    We are going real slow, and we are telling now we are

5    taking the Mockingbird exit.  Officer Payne gets on the radio,

6    says he is on Mockingbird starting our way.

7    Q.    When you get on Mockingbird and take a right, what

8    does Mockingbird turn into?

9    A.    Westmoreland.

10   Q.    And was there any radio traffic about developing a

11   plan on Westmoreland about who was going to pull the vehicle

12   over?

13   A.    No.  As we pull off on to Mockingbird and take a

14   right, that's when Mark comes from wherever he was at and then

15   pulls in behind the vehicle.  So, I mean, that's before the

16   180 -- right there -- right around the 183.  And like I said,

17   we didn't hear Mark on the radio.  But he just pulls in behind

18   it because he knows what our car looks like it.  We obviously

19   are right behind the car that we all know about.  He just

20   actually just pulled in; and we said, okay, we have somebody

21   with us.

22   Q.    And did y'all basically stay on Corporal Nix's tail,

23   describe what actions.

24   A.    We stayed right behind Corporal Nix until other

25   elements could get in behind him.  Generally you want more

---

1    than one person there.  And there were other people waiting at
2    various points for us to pass.  So we just stayed with him.
3        Q.    And were you in the vicinity of Westmoreland and
4    Canada when they tried to pull over?
5        A.    Yes, we were.
6        Q.    Were you able to see what that suspect vehicle was
7    doing when they tried to pull it over?
8        A.    Yes.  Well, prior to that, Officer Haecker had pulled
9    in behind right at Irving Boulevard there, waiting at Irving.
10   So they jumped in behind Mark and we fall back.  And there are
11   some officers on the other side of the bridge at Canada that
12   were waiting.  And so they get in and we just fall back one
13   more.  Like I said, we don't have any lights or siren, we let
14   everybody else get in front of us.
15       Q.    Describe for the jury what you saw happen when
16   Corporal Nix tried to initiate a traffic stop?
17       A.    The car pulled -- the car pulled over, slowed down
18   and then it took off.
19       Q.    Now, when this car takes off, what is going through
20   your mind?
21       A.    Well, it fits the description of a possible murder
22   suspect, that's what Officer Starr said we were looking at.
23   We say, hey, maybe this is a good deal.  So -- I mean
24   everything, you know, hit and miss out there, but you try and
25   try and try.  When it takes off, we think maybe this is the

1    murder suspect from a couple days earlier.
2        Q.    I guess obviously you see the other Patrol officers
3    take off?
4        A.    Right.  Right.  They are in a line in front of us,
5    and we are the last car.
6        Q.    Do y'all have to make a decision as to whether or not
7    you want to join that chase because you are in this covert
8    vehicle you are supposed to back off and stay away?
9        A.    You are in a covert vehicle, we are trying to stay
10   with them, but we can only do, you know, the speed limit a
11   little over as safe as you can try to stay behind them because
12   you know other people, you know, nobody knows that we are in
13   that car, they don't know we are police in that car, we are
14   just trying to stay with them as safely as possible.
15       Q.    Were you able to keep these other vehicles, I am
16   talking about the vehicles that were -- the vehicle that was
17   being chased and the two marked units that were doing the
18   chasing, were you able to keep those vehicles in sight?
19       A.    No, not the entire time.
20       Q.    Were you able to tell that they made a right turn on
21   to Bernal?
22       A.    Yes, yes.  I mean, he had picked up -- he wasn't
23   going so fast that we couldn't see him on Bernal.
24   Westmoreland is a pretty straight road.  When they hooked a
25   right, we saw them.  We weren't that far, right, we just

---

22

1    followed them on Bernal.
2        Q.    Once you got on to Bernal, were you still able to see
3    the chase vehicles?
4        A.    Maybe the first eighth of a mile.  And we sped up,
5    that we were trying to catch up.
6        Q.    Once you get on Bernal, you are trying to catch up
7    with these vehicles?
8        A.    Yes, we are.
9        Q.    Do you eventually catch up to them?
10       A.    Yes, we do.
11       Q.    When you caught up to the vehicles, had the suspect
12   vehicle already spun out and ended up in that front yard?
13       A.    Yes, it had.
14       Q.    And the other officers' vehicles already in place?
15       A.    Yes, they were.
16               MR. BROOKS:  May I approach the witness, Your
17   Honor?
18               THE COURT:  You may.
19       Q.    (By Mr. Brooks)  Mr. Jarc, I am going show
20   you what is mark as State's Exhibit No. 4 -- if you
21   could step down, please.
22       A.    (Witness complies.)
23       Q.    Have you seen this diagram before?
24       A.    Yes, sir.
25       Q.    Can you show the jury where your vehicle was parked

23

1    when you guys caught up to them?
2        A.    Well, I pulled over -- over right here (indicating).
3    So we are like one driveway, this is one driveway, then there
4    is like maybe a smaller driveway here, so I just pulled into
5    this driveway kind of in front of this island right here
6    (indicating).
7        Q.    And if these other vehicles down here, those
8    drawings, if they depict other police vehicles, were those
9    vehicles there at the time?
10       A.    No, they were not.
11       Q.    Just so we are clear, the only vehicles when you
12   pulled up, the only vehicles that were present were the
13   defendant's vehicle, Borchardt, Nix?
14       A.    Kim's vehicle, she was the third car waiting at
15   Canada.  They were all in front of us and we pulled up pretty
16   much last.
17       Q.    You can take a seat, sir.
18       A.    (Witness complies.)
19       Q.    Is there any particular reason, Officer Jarc, that
20   you didn't pull your pickup truck basically up to where
21   Corporal Nix's vehicle was?
22       A.    That drawing makes it likes it is a lot of distance,
23   but it is actually pretty tight, that was the best place for
24   me to park I thought at the time.
25       Q.    When you pulled up to where these other cars were,

1  you recall what was taking place?

2      A.   I saw Mark at the side window; and as I am existing

3  the car, I see a puff of glass and Mark goes down.

4      Q.   You see the glass and you see Officer Nix fall?

5      A.   Yes.

6      Q.   What is your response to seeing that, how do you

7  respond to seeing that, what do you do?

8      A.   My response is that, I run around -- I run around to

9  the back of this squad car, to the other squad car and I come

10  up and that's -- shots being -- then shots are being fired and

11  I am just trying to assess the situation.  I go up to the

12  passenger's window and he has knocked a hole in the window and

13  probably ten, 15 feet away.  And I am trying to look at Mark

14  and figure out, you know, how bad he is hurt.  And I am also

15  looking -- I am looking dead in this punched hole in the

16  window.

17      Q.   And you -- when you looked in the punched hole in the

18  window, were you able to see anybody?

19      A.   I saw a silhouette in the driver's seat holding a

20  rifle.  What I saw was the barrel of a long gun.  It happened

21  so fast, you know you just got to make sure, Mark is moving on

22  the ground, you got shots being fire.  When I looked through

23  that window, I see the silhouette, I see a barrel, and -- I

24  see the barrel.  You know, if I am in the driver's seat and I

25  am right there, I am looking through like this, then I see the

1  barrel come at me like that and that's when I discharged my

2  weapon.

3      Q.   Had you already had your weapon drawn when you ran up

4  to where Corporal Nix was?

5      A.   Yes.

6      Q.   And the barrel, do you recall specifically that

7  barrel being pointed at you?

8      A.   Yes.

9      Q.   Now, let's be clear, when you run up to that window,

10  is that barrel pointing in your direction at that time?

11      A.   No.  To be the barrel, the barrel -- the barrel is

12  straight up.  Something was going on with the -- inside like I

13  said, I see the silhouette.  He is doing something with the

14  gun.  You know you are trying to process all of this

15  information and it is going down in a split second.  And then

16  I see the barrel just come towards my way and that's when I

17  discharged my weapon.

18      Q.   Are you able to look at that diagram, Officer Jarc,

19  and show the jury where you were standing when you discharged

20  your weapon --

21          MR. BROOKS:   May I approach, Your Honor?

22          THE COURT:   You may.

23      A.   I remember being -- being right here at the front

24  (indicating) at the front corner just staring straight through

25  the window.

---

                                                              26

1      Q.   (By Mr. Brooks)   That would be the front

2  corner?

3      A.   Haecker's squad car -- Officers Borchardt and

4  Haecker's squad car.  I bailed from the truck and I exited

5  this way, I came around this came and came in through here,

6  right here (indicating).

7      Q.   And what type of weapon were you firing?

8      A.   A small Glock, .357 automatic.

9      Q.   And when those rounds discharge, how do they go up,

10  what is the pattern?

11      A.   The pattern is up and to the right.

12      Q.   Up and to right.  And have you had a chance to look

13  at any of the reports that would show where your shell casings

14  were?

15      A.   Yes.

16      Q.   And do you see where your shell casings were?

17      A.   I believe they are in this area right here

18  (indicating) or -- I really don't recall.

19      Q.   You can have a seat, Officer?

20      A.   (Witness complies.)

21      Q.   After you fired -- after you fired your gun, what is

22  the next thing you remember doing?

23      A.   I just -- the whole time -- the whole time I felt

24  just got to get Mark out of there, got to get Mark out of

25  there.  I just remember running up grabbing him and pulling

                                                              27

1  him away.  It was -- I mean, I don't even think you think at

2  that time.  You just go ahead and do it.

3          MR. BROOKS:   May I approach, Your Honor?

4          THE COURT:   You may.

5      Q.   (By Mr. Brooks)  Corporal Nix, he is a fairly big

6  guy, wasn't he?

7      A.   Yes, sir.

8      Q.   And did you have any assistance in pulling him away

9  from that car?

10      A.   No, sir.

11      Q.   After you pulled him away from the car, did you -- I

12  mean, were you still in the front yard of that house on Bernal

13  or where were you?

14      A.   Yes, I pulled him back maybe 15 feet, and look over

15  and Pat and Borchardt are still behind the trunk of the car,

16  and Pat is yelling at me to pull him further, pull him

17  further.  And that's when I yelled back at him, Give me some

18  help.  And that's when Officer Borchardt comes over and grabs

19  an arm and we are able to pull him across the street.

20      Q.   And once you got him across the street, what do you

21  do?

22      A.   We rip his shirt off, pull his vest off.  It is

23  massive amount of blood.  We see one small wound here

24  (indicating), but the amount of blood is -- it is incredible.

25  It has already soaked his vest, his shirt.  My arms are

1  covered in it.  We pull that up.  The next thing you try to do
2  is try to apply pressure, we don't have any bandages.  So I
3  was -- generally in plain clothes, when you get out, we are
4  not undercover, so we get all the time.  We wear a raid jacket
5  that says Dallas Police.  My raid jacket at that time had a
6  cotton lining in it.  It was a winter raid jacket, but I still
7  wore it.  And the only thing I could think of was to run back
8  to the truck and grabbed the raid jacket with the liner and
9  grabbed it.  And I was also wearing a T-shirt.  I was wearing
10  a long-sleeve thermal shirt and T-shirt.  So as I was running
11  back, I leave my vest back at the truck or somewhere around
12  there and pull off my T-shirt and my raid jacket, which like I
13  said, it has a cotton liner in it, that's what we are trying
14  to use to apply pressure.
15        MR. BROOKS:   Judge, can we have the lights for
16  just a minute.
17    Q.  (By Mr. Brooks)  Mr. Jarc, what we have on
18  the screen is State's Exhibit No. 7, you recognize
19  it?
20    A.   Yes.
21    Q.   And what is that right there?
22    A.   That might be my raid jacket, I don't recall -- I
23  don't think we pulled his shirt all the way off.  And I left
24  my raid jacket behind.
25        MR. BROOKS:   You can turn the lights on.

---

1      May I approach?
2        THE COURT:   You may.
3    Q.  (By Mr. Brooks)  Are you able to tell if
4  that is your raid jacket?
5    A.   Yes, that's my raid jacket.
6    Q.   And that would be the spot where y'all initially were
7  trying to stop this bleeding?
8    A.   Yes, it was.
9    Q.   Now, during this time that you are trying to stop the
10  bleeding, are you getting any type of response from Corporal
11  Nix?
12    A.   No.
13    Q.   Was he conscious at all?
14    A.   No, I don't think so.
15    Q.   Nothing being said by him to you?
16    A.   No, we were yelling at him to just hold on, wait,
17  wait, wait.
18    Q.   Now, at some point, does someone make a decision to
19  take him out of there?
20    A.   Yes.  I think -- we were waiting on the ambulance,
21  waiting on the ambulance, the ambulance isn't coming.  Another
22  officer pulled the squad car in between ourselves and the
23  suspect vehicle just to give us some cover.  I scrambled over
24  there, I got on the radio, I was like, Where is the ambulance,
25  come on, let's go.  Something to that effect.  And we are

---

1  not -- we are not getting any -- you know positive feedback on
2  that end.  And I think we just looked at each other and said
3  let's go.  I don't know, one person said it, all three of us
4  said it at the same time.  We were just like we were getting
5  out of here.
6    Q.   Who is the we.?
7    A.   Myself, Borchardt and Hogan.
8    Q.   And who ends up driving?
9    A.   I do.
10    Q.   Do you recall the route you took to get to the
11  hospital?
12    A.   I backed up, and my point -- my train of thought at
13  that time was, I will meet the ambulance halfway, so I will
14  stay on the main street.  So I backed up 30 feet or so and go
15  down Bernal and go down Westmoreland the whole time.
16    Q.   What was the traffic like?
17    A.   Was fairly light.
18    Q.   Were there any other police officers trying to assist
19  you?
20    A.   Yes, there was -- I don't know who it was.  But I
21  mean we are going along at a pretty good clip and cross the
22  bridge, and I don't know who got out in front of us to stop
23  traffic at Irving and so we go through the Irving intersection
24  and proceed to go southbound on 35.
25    Q.   How would you describe, if you had to, Corporal how

---

1  would you describe that drive?
2    A.   That drive?
3    Q.   Yes, sir.
4    A.   Just frantic.  I was in the far left shoulder passing
5  cars, by then.  Now we get back on 35 and you know, I am going
6  to exit Motor Street to get to Parkland.  So I am in the far
7  left shoulder.  We cut across -- we cut across median.  We
8  take Inwood exist.  Backed up traffic, I jumped across the
9  frontage road grass over there trying to get up on the curb.
10  It was just trying to get there as fast as you can doing
11  anything you need to do.
12    Q.   And was there a medical team waiting for you guys
13  when you got to the hospital?
14    A.   Yes, there was.  When I made the corner to pull up
15  into the emergency room entrance there, there was a stretcher
16  and several people out there.
17        MR. BROOKS:   May I approach the witness again,
18  Your Honor?
19        THE COURT:   You may.
20    Q.  (By Mr. Brooks)  Corporal Jarc, you had
21  testified about the radio transmission between your
22  vehicle and dispatch when you first saw the suspect
23  vehicle?
24    A.   Yes, sir.
25    Q.   Have you had a chance to listen to those radio

1  transmissions?

2  A.  Yes, I have.

3  Q.  And are you able to identify the voices on that radio

4  transmission?

5  A.  Yes.

6  Q.  You have had a chance to listen to this copy?

7  A.  Yes.

8  Q.  And what you listened to, did it fairly and

9  accurately depict the transmissions and the events that took

10  place that day?

11  A.  Yes, sir.

12       MR. BROOKS:   Your Honor, at this time we will

13  offer State's Exhibit 14.

14       MR. BRAUCHLE:   No objections.

15       THE COURT:   State's 14 is admitted.

16       MR. BROOKS:   Your Honor, we would like to

17  publish State's 14, but we also have copies of the transcript

18  of the conversation, we would like to give a copy to the court

19  and to the members of the jury so they can follow.

20       THE COURT:   You may.

21       MR. BROOKS:   May we publish, Your Honor?

22       THE COURT:   You may.

23       (Audio published to the jury.)

24  Q.  (By Mr. Brooks)   Who is that?

25  A.  That's Officer Starr.

---

1  Q.  You know who that is?

2  A.  That's Officer Payne.

3  Q.  Is that still Officer Payne?

4  A.  Yes, sir, it is.

5  Q.  Who is that?

6  A.  That's Borchardt and Haecker.

7  Q.  That's?

8  A.  Borchardt and Haecker.

9  Q.  Who is that?

10  A.  That's -- that's Pat telling Haecker -- telling

11  Haecker that we are slow in traffic just to wait there, we

12  will pass him.

13  Q.  Who is that, you know -- do you know whose voice that

14  was, that says, "Do I do it before the bridge?"

15  A.  No, no, I don't.  It could possibly be Haecker or

16  Mark.

17  Q.  That's kind of where we have stopped and paused,

18  Officer, that could be either Officer Haecker or --

19  A.  Mark Nix.  There is so much static there, I recognize

20  all the voices.  Sometimes when it comes across real quick,

21  you just can't tell.

22  Q.  You know who that is?

23  A.  Ah, Haecker.

24  Q.  What is air one?

25  A.  Air one is a helicopter.

---

34

1  Q.  Now, Officer Jarc, do you know whose voice it is that

2  says, "Wrecked out looks like right here at Westmoreland

3  and --"

4  A.  Haecker.

5  Q.  And what is taking place at that time?

6  A.  At that time, we were still -- at that time we were

7  still coming up on the scene, like I said, we didn't see the

8  wreck or anything.  So we are coming up on the scene at that

9  time.

10  Q.  And on this tape -- on this recording, is there a

11  long period where you don't hear any radio traffic?

12  A.  Yes.

13  Q.  And what is taking place during this portion?

14  A.  That's when Mark gets out of the car and gets shot,

15  all hell breaks loose and you can't get on your radio at that

16  time.  I mean the hand-held radio.  You are concentrating on

17  what is going on in front of you.  That's why we are not

18  saying anything to anybody, we are yelling at each other right

19  out there because we were right in the middle of it.  We don't

20  have any contact with the dispatcher, just don't have enough

21  time to do it.

22       (Audio played to the jury.)

23  Q.  What is taking place here, Officer Jarc, all these

24  officers saying they are en route, what does that mean?

25  A.  They put out that an officer has been shot.  So

---

35

1  everybody in the area is going that way, and they are just

2  getting on the radio, saying, Hey I am going that way, I am

3  going that way, so they can try to keep a log of who is going

4  that way.

5  Q.  Is that just the officers in the vicinity or does

6  that go out city wide?

7  A.  It won't go out city wide.  The city is divided up

8  into seven areas, and we are called channel five or the

9  northwestern district.  And our radio just work on the

10  northwestern district.  Everybody, when they go in, they tune

11  their radio to channel five, channel one, you know is closer

12  to downtown.  All these guys talk on channel one.  Channel

13  four is western part of Oak Cliff.  All channel four talk on

14  channel four.  We are five.  All this radio traffic is being

15  heard by the people who are on channel five that work out of

16  the channel five station, the northwest subdivision, or people

17  on the other -- working on other things and listening to the

18  radio.  So it is not city wide, it is just who is on channel

19  five listening to channel five at the time.

20       (Audio played to the jury.)

21  Q.  You know what is taking place at that point, Officer

22  Jarc, the reference to the child and mother in the floorboard?

23  A.  Later, I learned that somebody either just got home

24  or they were out of their car in the driveway that he wrecked

25  out in, and so they kind of find out that they were laying in

1  the floorboard of their own car.
2      Q.   While the shooting was taking place?
3      A.   I didn't see them.  I didn't find that out until
4  afterwards.
5      Q.   And how long did you remain at the hospital after you
6  got there with Corporal Nix?
7      A.   Several hours.  You know probably three to four
8  hours.
9          MR. BROOKS:   Pass the witness.
10         THE COURT:   Cross-examination.
11                  **CROSS-EXAMINATION**
12  BY MR. BRAUCHLE:
13     Q.   Officer Jarc, my name is Paul Brauchle.
14     A.   Yes, sir.
15     Q.   And if I ask you any questions that you don't
16  understand or that you are not clear as to what I am asking
17  you about, just ask me to repeat it so we don't have any
18  do-overs, okay?
19     A.   Yes, sir.
20     Q.   Are you -- you are in your uniform today, are you
21  still working plain clothes or are you --
22     A.   No, I still work plain clothes.
23     Q.   You still work in plain clothes?
24     A.   Yes, sir.
25     Q.   All right.  Now, then, after this incident was over,

1  you went down to South Lamar to the police station; is that
2  correct?
3      A.   Yes, sir.
4      Q.   And did you talk with any investigators at the scene
5  before you went to South Lamar?
6      A.   Yes.
7      Q.   Who did you talk to out there?
8      A.   I don't recall the names.  They send a lot of people
9  out there, the shooting team and they just ask you -- they ask
10  you to walk your part through the incident.
11     Q.   Okay.  So this is the walk-through part?
12     A.   Yes, sir.
13     Q.   Was your attorney there for the walk-through?
14     A.   Yes, he was.
15     Q.   Okay, so you had an attorney there and they have what
16  is called the shooting team; is that correct?
17     A.   Yes, sir.
18     Q.   Now, does the shooting team talk to you before the
19  walk-through take place?
20     A.   No -- I mean they just give you the basic outline,
21  you walk them your part in the incident.
22     Q.   Okay.  I guess I am not clear on that, did they ask
23  you what happened when they first get there?
24     A.   They ask me to tell them what happened, yes.
25     Q.   So they get that part down?

38

39

1      A.   Yes, sir.
2      Q.   And your lawyer is there with you?
3      A.   Yes, sir.
4      Q.   And then after you have told them what you recollect,
5  then they do a walk-through?
6      A.   Well, as we are -- it is simultaneously, we are
7  walking, I say -- I mean, we are just describing what
8  happened -- a walk-through slash talk-through, I guess might
9  be a better term for it.  We are telling them what our part
10  was when we were out there.
11     Q.   Okay.  So if you are in different positions, you say
12  I was standing here and then I went over here and --
13     A.   Right.
14     Q.   They walk with you.  Now, is this filmed or anything?
15     A.   I do not know.
16     Q.   All right.  Now, then, when did you make your sworn
17  statements and your sworn affidavits?
18     A.   That was later on back at headquarters at South
19  Lamar.
20     Q.   Now, then, going back to the shooting team that comes
21  out there and the walk-through, were all of you walking
22  through at the same time?
23     A.   No.  We were separated at the hospital.  Directly
24  after this happened.  I mean they put us -- they called our
25  lawyers, I didn't see anybody else until the next day almost.

1      Q.   So they broke y'all up from your group?
2      A.   Yes, yes.
3      Q.   Now, then, you have testified -- or -- not testified,
4  but you previously, I guess, in your affidavits stated that
5  you identified yourself as a police officer before you fired
6  at Mr. Ruiz; is that correct?
7      A.   Yes.
8      Q.   Where would that have been?
9      A.   I'm yelling police just directly at the side of the
10  car.
11     Q.   And where were you standing when you yelled, Police?
12     A.   I am standing at the front corner of the other squad
13  car.
14     Q.   Okay.  When that happened, the car was already being
15  shot at, wasn't it?
16     A.   Yes.
17     Q.   But you felt the need to identify yourself as a
18  police officer nevertheless?
19     A.   Yeah, it comes out naturally.  You know, after so
20  many times, you just identify yourself at all times.  It's
21  just a reaction.
22     Q.   It's your testimony here today that you were able to
23  see Mr. Ruiz in the car?
24     A.   I was able to see the silhouette in the car, I saw a
25  person in the car.  I did not know it was Mr. Ruiz at the

1   time.
2       Q.    Where would you have been standing when you could see
3   the silhouette?
4       A.    The entire time I run around, I am staring into the
5   hole that has been made by Mark.
6       Q.    How big is the hole?
7       A.    Say a little bit bigger than a pie plate.
8       Q.    Did you know it had been made by Mark?
9       A.    Yes.
10      Q.    Did you see it making it?
11      A.    I saw -- I saw him -- I didn't see him lay his gun
12  down.  I saw him make one strike at it and then he was shot.
13      Q.    Well, then you really didn't know what had caused the
14  hole, did you?
15      A.    Well -- if you are hitting something with -- a glass
16  with a hard object, I assume that the asp or the baton had
17  made the hole.
18      Q.    All right.  It is designed to do that, right?
19      A.    Yes, it is.
20      Q.    Now, did you recall also stating that you saw the
21  barrel of a long gun while you are looking into the car?
22      A.    Yes.
23      Q.    Have you seen a picture or seen the weapon that was
24  taken out of the car?
25      A.    Yes, I have.

1       Q.    And would you describe that as a long barreled rifle?
2       A.    It's the upper receiver of an A.R. 15, M-16, you
3   know, there are several variations of it.
4       Q.    No, I am just asking you, is that what you would
5   describe as a long barreled rifle?
6       A.    Yes.
7       Q.    Now, then, in your affidavit you state that you
8   observed Mr. Ruiz sitting in the driver's seat and moving
9   around.  And you are saying that you saw all of this through a
10  hole in the window?
11      A.    Yes, sir.
12      Q.    But it was only a silhouette?
13      A.    Yes.
14      Q.    You know how many times you fired?
15      A.    Fired seven times.
16      Q.    Seven times?
17      A.    Yes, sir.
18      Q.    You believe that you fired -- you stated at the time
19  that you believe that you had fired 14 times?
20      A.    Yes, sir.
21      Q.    But you now state that you had only fired seven?
22      A.    Right.
23      Q.    On the transmissions you kept identifying a voice as
24  Payne?
25      A.    Yes, sir.

42

1       Q.    Is that former Senior Corporal Payne?
2       A.    He is Senior Corporal Payne.
3       Q.    What is his first name?
4       A.    Brian.
5       Q.    Was he present at the scene?
6       A.    I don't know when he got there.  Like I said, by the
7   time we had pulled Nix across the street and I was running
8   back to the truck, there were other officers there that were
9   not there when it began.  I mean, you get so focused in, I
10  didn't see other officers coming.
11      Q.    All right.  You -- you have heard the transcript and
12  you read along with it?
13      A.    Yes, sir.
14      Q.    The officers there keep referring to the fact that
15  they are going to institute a felony stop?
16      A.    Yes.
17      Q.    Are you familiar with how a felony stop is carried
18  out?
19      A.    Yes, sir.
20      Q.    Have you seen recently the procedures that is set out
21  by the Dallas Police Department as to how to conduct a felony
22  stop?
23      A.    I went over it in the academy.  I am pretty familiar
24  with it, yes.
25      Q.    They kind of drill it into your head at the academy,

43

1   don't they, the procedures that you have to go through?
2       A.    Yes, sir.
3       Q.    They tell you that you are supposed to pull up within
4   a certain distance or not?
5       A.    That's during -- they give you a felony stop, which
6   doesn't really apply to all the situations.  Our felony stops
7   are when you get in behind a person, you turn your lights and
8   siren on, that person pulls over to the side of the road and
9   you are able to use your microphone to get the people out of
10  the car.
11      Q.    Okay.
12      A.    I mean --
13      Q.    So you are saying all those rules go out the window?
14      A.    Yes.  I mean, we have no training for when people
15  take off running into a high-speed chase.
16      Q.    They do tell you to never rush the vehicle, don't
17  they?
18      A.    No, they never tell you that.
19            MR. BRAUCHLE:    May I approach the witness, Your
20  Honor?
21            THE COURT:    You may.
22      Q.    (By Mr. Brauchle)  I will show you what has
23  been marked as Defendant's Exhibit 1; can you see
24  that?
25      A.    Yes, sir.

1      Q.    And on the middle of page five in all caps, what does
2   that say?
3      A.    It says do not rush the suspect.
4      Q.    So they never tell you that?
5      A.    I don't recall.  I mean I am reading it now, it is
6   definitely one of our training orders.
7      Q.    Would you like to look it over to see that it is what
8   it is purported to be?
9      A.    No, it is exactly what you say it is.
10     Q.    Now, you are not testifying that Mr. Ruiz in any way
11  fired at you, right?
12     A.    I did not know at the time if he fired at me.
13     Q.    Are you a complainant in an aggravated assault case
14  against Mr. Ruiz?
15     A.    Yes, I am.
16     Q.    Did you not testify -- did you not state in regard to
17  that that he had fired at you?
18     A.    I didn't recall if he had fired at me or not.
19     Q.    Well, the allegations in the indictment are that he
20  fired at you?
21     A.    I have not even read the report.
22     Q.    You haven't?
23     A.    No, I haven't.
24     Q.    Did you testify in front of the grand jury?
25     A.    No, I did not.

1      Q.    So there is an aggravated assault case in which you
2   are the complainant and you don't know any of the details?
3      A.    No.  Those are filed on on our behave by the
4   department.  I give my statement and whoever makes the
5   decision, they file those charges, so ...
6      Q.    But you are not stating that you were ever fired at
7   today by Mr. Ruiz, are you, you are not stating.today that at
8   the time of this offense you were ever fired upon by Mr. Ruiz;
9   is that correct?
10     A.    I don't understand what you are saying, my statement
11  then or what I know today.
12     Q.    Either one?
13     A.    Then I didn't know if I was fired at.  I saw the
14  weapon being pointed at me.  Today I know that only one, you
15  know bullet was fired.  So he shot Mark, only one bullet was
16  fired, he couldn't have shot at me.
17     Q.    Now, then, in your affidavit, have you gone over that
18  recently?
19     A.    A couple of months ago, no, not recently.
20     Q.    In regard to that, you put in that all of your
21  actions that you took out there that day were done in
22  self-defense, do you recall that?
23     A.    Yes.
24     Q.    And that's what you swore to and that was the truth;
25  is that correct?

46

1      A.    Out of fear for my life, yes.
2      Q.    Now, if you pulled up behind somebody and they
3   approached you with an asp and a gun in their hand and started
4   beating on your window, you think you would be in fear for
5   your life?
6      A.    I have never run from the police.
7      Q.    No, that's not the question?
8      A.    If I had run from the police.
9           MR. BROOKS:  I will object to the form of the
10  question -- excuse me, Mr. Brauchle.  I will object to the
11  form of the question, it is an improper hypothetical.
12          THE COURT:  Sustained.
13          MR. BRAUCHLE:  I will pass the witness.
14          THE COURT:  Ladies and gentlemen, we will take a
15  15-minute break.
16          THE BAILIFF:  All rise.
17          (Jury retired from the courtroom.)
18          (Recess taken.)
19          THE BAILIFF:  All rise.
20          (Jury returned to the courtroom.)
21          THE COURT:  You may be seated.
22  You may proceed, Mr. Brooks.
23          MR. BROOKS:  Thank you, Judge.
24
25

47

1              REDIRECT EXAMINATION
2   BY MR. BROOKS:
3      Q.    Corporal Jarc, you have been asked some questions
4   with respect to training and felony traffic stop.
5      A.    Yes, sir.
6      Q.    Where is that training conducted?
7      A.    At the academy.
8      Q.    Basically inside a classroom?
9      A.    It's inside a classroom and then we go outside.  You
10  do a practical exercise of it.
11     Q.    And you do that one time?
12     A.    You do it -- you do it several times.  I mean you are
13  a brand new person, you have to observe everything.  Teach you
14  to be a police officer in eight months, so it is a lot to take
15  it.  So you do several practice run-throughs.
16     Q.    And is that basically done in what you might call a
17  sterile environment?
18     A.    Yes.  It is done out at the academy.
19     Q.    Now, the training that you receive at the police
20  academy, do they train you to do with every possible
21  circumstance?
22     A.    They don't.
23     Q.    Every possible scenario?
24     A.    No, they don't.
25     Q.    The scenario as to how this offense took place, was

1 there ever training as to how to deal with this type of
2 scenario?
3    A.    No, there is not.
4    Q.    Are you-all taught to look out for the welfare of
5 civilians involving police activity?
6    A.    Yes.  We go through the academy, they teach you to be
7 a police officer.  They can't cover everything.  You just go
8 out there and you try to do your job to best of your ability.
9 That's all you can do.
10    Q.    Is there any specific training on how to apprehend a
11 possible murder suspect?
12    A.    No.  You have your basic felony stop, which is, you
13 know, is done out there on the track and there is somebody
14 sitting in a car, the squad car is there, you know get on the
15 P.A. system, tell them put their hands out the window, unlock
16 the door, have them walk back towards you.  It's -- you know,
17 but it is done out on a driving track, the bad guys, an
18 instructor or classmate.  I mean that's our felony stop
19 training.
20    Q.    And is all that done on the premise that that bad guy
21 is going to follow those officers' commands and instructions?
22    A.    Yes, it is.
23    Q.    Now, going back to March the 23rd when this event
24 took place, what was the plan as far as what you and Officer
25 Starr wanted to do when you first saw that car, what purpose

1 was that car going to be pulled over for?
2    A.    We were going to stop and identify the occupants and
3 you know generally, there is a lot -- probably a lot of cars
4 that look like that.  Or when there are cars, you say black
5 condo with a "P" in the license plate.  We will go around and
6 look for a black condo.  Whatever car it is, you stop and you
7 identify it.  And you know our whole plan like Officer Starr
8 said, stop the car, let's get the person identified.  We can
9 take a plate number down, take who was driving it.  And send
10 it back to whoever is working whatever case we get the little
11 bulletin on.  There are several bulletins that come out in a
12 week.  So you know, we just information gatherers.  We are
13 trying to figure out, you know, if this will help them.  If it
14 does, maybe it will, and if it doesn't, maybe, we tried and
15 that's what we did.
16    Q.    And in fact on dispatch tapes that we heard, is there
17 reference to see if we can identify some of the people?
18    A.    Yes, sir.  That's the first words out of Officer
19 Starr's mouth, I believe, within the first minute of it.
20    Q.    Was there ever any discussion between you and Officer
21 Starr as to pull over the car so we can arrest the people in
22 the car?
23    A.    No, no.
24    Q.    Now, if I take a handgun and I point it at you, don't
25 fire it but I point it at you?

50

51

1    A.    Yes.
2    Q.    Have I committed a criminal offense?
3    A.    Yes, you have.
4    Q.    What offense have I committed?
5    A.    Aggravated assault on a public servant.
6    Q.    Not necessary for me to fire that gun for me to
7 commit that offense, is it?
8    A.    No.  You just can't point guns at the police.
9    Q.    The other thing I would like to clear up, Officer, is
10 made reference to, you were asked about your attorney being
11 present with you?
12    A.    Yes.
13    Q.    You recall those questions?
14    A.    Yes.
15    Q.    Is there a policy or protocol within the Dallas
16 Police Department that anytime officers is involved in a
17 shooting that is in the line of duty, tell the jury what
18 happens?
19    A.    They notify -- they notify your attorney and they
20 come down and meet you, mine met me at the hospital.  And then
21 I was with him for rest of the night.  Just, I mean, at that
22 point, you are under a magnifying glass.  They have you to
23 have legal representation just so everything goes smoothly
24 from that point on.
25    Q.    Is that anytime an officer discharge his weapons in

1 the line of duty, was that just specific to this offense?
2    A.    You know, if you have to shoot a dog that is
3 attacking you, maybe not so much so.  But on a case like this
4 and it's magnitude, then yes, they are going to want your
5 lawyer with you.
6    Q.    You know, back on March the 23rd of 2007, was Mark
7 Nix a Dallas Police Officer?
8    A.    Yes, he was.
9    Q.    And when he is trying to get that suspect out of that
10 vehicle, is he authorized to do that?
11    A.    Yes, he is.
12    Q.    And was he acting in the lawful discharge and
13 official duty in doing so?
14    A.    Yes, he is.  You have to take into account the
15 situation, he can't see inside the car.
16         MR. BRAUCHLE:  Your Honor we would object to
17 this as being nonresponsive.
18         THE COURT:  Sustained.
19         MR. BRAUCHLE:  We would ask that the jury be
20 instructed to disregard.
21         THE COURT:  Ladies and gentlemen, you will
22 disregard the response.
23         MR. BRAUCHLE:  And we would further move for a
24 mistrial.
25         THE COURT:  Denied.

1    Q.   (By Mr. Brooks)   What was Corporal Nix
2    doing when he approached that suspect vehicle?
3                MR. BRAUCHLE:   Your Honor, we will object to
4    this as there hasn't been a proper predicate laid in regard to
5    that.  This witness has not stated that he saw all of the
6    actions of Corporal Nix and further described to the jury that
7    he got there at or about the time that he saw a shot fired,
8    but he knows nothing before that.
9                THE COURT:   Overruled.
10   Q.   (By Mr. Brooks)   What was Corporal Nix
11   trying to do, Officer, you can answer the question.
12   A.   He was trying to break out the side window.
13   Q.   And what do you believe his purpose in doing that?
14   A.   His purpose that the time, he made a decision he was
15   going to go up and he was going --
16               MR. BRAUCHLE:   Your Honor, we would object to
17   this in that it calls for speculation.
18               THE COURT:   Sustained.
19               MR. BRAUCHLE:   We ask that the jury be
20   instructed to disregard.
21               THE COURT:   Ladies and gentlemen, you will
22   disregard the response made by the witness.
23               MR. BRAUCHLE:   We would further move for a
24   mistrial.
25               THE COURT:   Denied.

1    Q.   (By Mr. Brooks)   Last question, Officer, as
2    a Dallas Police Officer, is part of your job
3    apprehending bad guys?
4    A.   Yes, it is.
5    Q.   That's what you are paid for?
6    A.   That's what we do, yes.
7                MR. BROOKS:   Pass the witness.
8                MR. BRAUCHLE:   May I approach, Your Honor?
9                THE COURT:   You may.
10                    RECROSS-EXAMINATION
11   BY MR. BRAUCHLE:
12   Q.   Officer Jarc, I will show you what has been marked as
13   State's Exhibit No. 1, and ask you if you can identify that?
14   A.   It's a -- it's one of our -- a wanted bulletin, an
15   information bulletin.
16   Q.   You ever seen that before?
17   A.   Yes, I have.
18   Q.   Okay.  That's the notice in regard to the blue
19   over -- or the red over gray Chevrolet; is that correct?
20   A.   Yes.
21   Q.   You notice down here at the bottom it says this
22   bulletin is not probable cause for an arrest?
23   A.   Yes.
24   Q.   You know that at the time?
25   A.   Yes.

1    Q.   So your purpose then was to stop whoever was in the
2    car on some purported traffic violation to identify the
3    person?
4    A.   Yes, was to stop and identify the occupants.
5    Q.   Pardon?
6    A.   Stop and identify the occupants, get the information
7    that match the description.
8    Q.   You have to do that under some sort of cover of
9    violation of the law, don't you?
10   A.   Say again.
11   Q.   Can you just stop and identify people without having
12   some legal reason to do it?
13   A.   I don't understand what you are saying.
14   Q.   Can you just stop?
15   A.   We have to wait on a traffic violation.
16   Q.   You have to make up some sort of traffic violation
17   before you can figure out?
18   A.   Generally don't make it up, you just wait for one to
19   happen and then we pull them over on that violation.
20   Q.   Okay.  So what do you do if the people don't violate
21   traffic regulation, how do you ever identify on that way?
22   A.   I have never run across that.
23   Q.   So if you just follow them long enough, they will
24   mess up then you can figure out who they are and also give
25   them a ticket, right?

1    A.   No, we were just there to identify the people.  I
2    mean we follow people that make so many traffic violations
3    that could be made, that they can be stopped and I.D.'d.
4    Q.   What was the traffic violation y'all were going to
5    stop Mr. Ruiz on?
6    A.   I don't recall.
7    Q.   Now, then, going back to Defendant's Exhibit No. 1,
8    have you had a chance to revisit that since I talked to you
9    about it?
10   A.   What is Exhibit No. 1.
11   Q.   Defendant's Exhibit 1, the felony stop procedures
12   from the police department?
13   A.   Yes.
14   Q.   Have you looked at that since?
15   A.   Since you last showed me that?
16   Q.   Yes.
17   A.   No, I haven't.
18   Q.   All right.  Now, then, doesn't it emphasize or when
19   you were in the academy, didn't they emphasize that all the
20   things that they were teaching you was done for officer
21   safety?
22   A.   Yes.
23   Q.   That's the foremost consideration in all of the
24   things that you learn or that you are taught in the academy;
25   is that correct?

1    A.    You can say so.
2    Q.    What do you mean if I say so, don't your instruction
3    say so?
4    A.    Well, we are taught so many things.
5    Q.    Did they ever teach you anything that they taught was
6    going to endanger you?
7    A.    No.
8    Q.    Well, let's just go through some of the things you
9    learn, they teach you how to shoot?
10   A.    Say again.
11   Q.    They teach you how to shoot, don't they?
12   A.    Ye,s they do.
13   Q.    They make sure you know how to operate your weapon
14   efficiently?
15   A.    Yes, sir.
16   Q.    So you don't shoot people that you are not intending
17   to, don't they?
18   A.    Yes, sir.
19   Q.    It is for your safety?
20   A.    Yes, it is.
21   Q.    And for the safety of other people?
22   A.    Yes, it is.
23   Q.    They teach you how to arrest people --
24   A.    Yes, they do.
25   Q.    -- don't they?  There are certain procedures you go

1    through on that?
2    A.    Yes.
3    Q.    And that's done for your safety and the person's
4    safety --
5    A.    Yes.
6    Q.    -- isn't it?
7    A.    There is a basic set of guidelines, yes, it is.
8    Q.    And that is taught to you over and over at the
9    academy, isn't it?
10   A.    Yes, it is.
11   Q.    And then when you are out in training with your
12   partner, your partner shows you how to do it, don't they?
13   A.    Yes, they do.
14   Q.    You make it sound when the State was talking to you
15   that you just go to the academy and then you are dumped in the
16   car and put on the street.  But you go out with veteran
17   officers?
18   A.    Yes.  You train and learn it is a lot to absorb in
19   the amount of time that is there.
20   Q.    Are you saying that it was too much for you?
21   A.    No.  I am just saying that's why they put you out
22   there, there is a lot to absorb, you know.
23   Q.    Now, when we go back to the felony stop, which in the
24   broadcast that we listened to and you followed along, there is
25   a couple of times where everybody is talking about making a

1    felony stop, aren't there?
2    A.    I would have to go back over the transcript.  I think
3    Haecker said we are doing a felony stop one time.  Everything
4    else was traffic stop.
5    Q.    That's at least one, that's Haecker says felony stop.
6    Are you sure there are not any other?
7    A.    No, I am not sure; but that's one that I know of.
8    Q.    All right.  So -- and that was toward the end, it
9    started out as a traffic stop and then went to a felony stop,
10   didn't it?
11   A.    Yes, it did.
12   Q.    Now, then, you stated that one of the reasons that
13   Officer Nix was able to approach the car, engage in the
14   actions that he did, is because Mr. Ruiz wasn't following his
15   commands and instructions; is that correct?
16   A.    Through commands and instructions through being in a
17   marked squad car with the lights and sirens on behind you, I
18   am not sure what verbally was said, I don't know.
19   Q.    What commands and instructions were given to Mr. Ruiz
20   once his car came to a stop?
21   A.    I do not know what Officer Nix said.
22   Q.    Well, you have talked with the other officers that
23   were involved out there, haven't you.
24   A.    Yes.
25   Q.    And you know that none of them turned on their

1    speakers, did they?
2    A.    The speaker that your sirens are going, so -- I mean,
3    to turn off, you would have to turn off your P.A., from siren
4    to P.A., back and forth.
5    Q.    Is that impossible to do?
6    A.    No, it is not impossible.
7    Q.    It is pretty easy, isn't it?
8    A.    Given the circumstances, I wasn't in a squad car,
9    so -- you know, I am not going to say -- it is easy as the
10   flip of a switch, but when you are in the situation, is it
11   that easy, I don't know.
12   Q.    If that's what you are supposed to do, it would be
13   pretty easy, right?
14   A.    I am not real sure.  Are you asking me the operation
15   of the equipment in the car?
16   Q.    Yeah.
17   A.    Yeah, I mean, you have lights and sirens.
18   Q.    Okay.  So when you stop, you turn on the public
19   address system and start talking to the arrestee, don't you?
20   A.    You can, yes.
21   Q.    Or you can run up and start bashing in his window,
22   right?
23   A.    At that point, you know I don't know what Officer Nix
24   taught at that point.  If there is really -- I don't see any
25   problem with it, we get paid to go out there catch bad guys.

1 He has run from us.

2 Q. That wasn't the question, was it?

3 A. I am not sure, you are asking me what was going

4 through Officer Nix's mind.

5 Q. No, I didn't ask you what was going through Officer

6 Nix --

7   MR. BROOKS: Your Honor, I am going to object.

8 We ask that counsel allow this witness to finish answering the

9 question he propounded.

10   MR. BRAUCHLE: Well, if he is being

11 nonresponsive.

12   MR. BROOKS: He needs to make that objection.

13   THE COURT: Sir, if you don't understand the

14 question that is being asked, ask the attorney and he will

15 rephrase the question.

16   THE WITNESS: Okay.

17   THE COURT: You may proceed.

18   MR. BRAUCHLE: May I have a moment, Your Honor?

19   THE COURT: You may.

20   (Pause in the proceedings.)

21   MR. BRAUCHLE: May I approach, Your Honor?

22   THE COURT: You may.

23 Q. (By Mr. Brauchle) Officer Jarc, could you

24 tell us where Borchard was -- Borchardt was, I'm

25 sorry.  You need to step down?

---

1 A. Yeah.  Officer Borchardt was in this area right here

2 (indicating), I don't recall actually where, but he said he

3 was in the jam of his door.

4 Q. So he was behind the open door of his squad car right

5 here (indicating)?

6 A. Yes.

7 Q. And that's a prude thing to do in a felony stop,

8 right?

9 A. Yes.

10 Q. In fact that's what they teach you?

11 A. Keeping cover behind his door, right.

12 Q. Keep cover behind the vehicle, don't get out of the

13 vehicle, don't approach the victim, arrestee, right?

14 A. Right.

15 Q. So he was doing what he said he was, staying right

16 back here; is that correct?

17 A. Correct.

18 Q. Did you ever see him leave that position?

19 A. No -- I mean I remember him in that general vicinity.

20 But I don't remember what he did when he did it.

21 Q. Do you remember where Haecker was?

22 A. Yes.

23 Q. Where was Haecker?

24 A. Haecker, when I came up on scene, in the video you

25 see Haecker running back toward this way, we literally touched

---

1 elbows and he peeled back around and he was out of my sight at

2 that time.

3 Q. Okay.  Where was it that y'all touched elbows?

4 A. Somewhere in this vicinity right around here

5 (indicating).

6 Q. In front of Haecker's car?

7 A. Right in front.

8 Q. Somewhere in here?

9 A. Driver side, right in there.

10 Q. Where was Starr, your partner?

11 A. That -- he was -- he got out of the -- he got out of

12 the car and went to the right, and I got out and came around

13 to left.  I never saw him.

14 Q. By going to the right, where did he go?

15 A. I don't know.

16 Q. You never saw him in any of the videos?

17 A. I didn't see him in any of the videos no.  And then

18 as I drug Mark back, he was somewhere in this area over here

19 (indicating) behind that squad car.

20 Q. The only squad car over here would have been

21 Haecker's, right?

22 A. Haecker's and Borchardt's right.

23 Q. You are saying Borchardt is here by the door, Haecker

24 is somewhere roaming back and forth in this area; is that

25 correct?

---

1 A. Yes.

2 Q. And you are where again?

3 A. I am right -- right over here (indicating).

4 Q. And this is basically where you and Haecker ran into

5 each other over in this area?

6 A. I mean approximately, that's what I recall.

7 Q. And you approached Officer Nix and then you went back

8 over here?

9 A. Went back and across, yes.

10 Q. In this direction (indicating)?

11 A. I mean, when I pulled him back, it felt like we went

12 straight out this way (indicating) and then at a diagonal

13 across the street maybe.

14 Q. You are not really sure because there are no markings

15 on here?

16 A. No, I am not really sure because it happened so fast.

17 You pull him.  I know I pulled him back, and I know I yelled

18 for help.  And Officer Borchardt came up and helped me and we

19 started pulling.  As to the exact course, no, I don't.

20 Q. Okay.  Was Starr over here?

21 A. No.

22 Q. You sure of that?

23 A. No, because when I was over here, I am kind of --

24 somehow I get caught out in front of everybody and I know

25 Haecker is off to my left.  But I don't see anybody else, I

---

1    also don't see anybody over here (indicating).
2    Q.    You can retake your seat?
3    A.    (Witness complies.)
4    Q.    Now, in your previous testimony, you stated that you
5    weren't going to arrest the persons in the Chevrolet; is that
6    correct?
7    A.    Our initial thought was just stop and identify.
8    Q.    Now, then, how many people were in that car?
9    A.    One person that I could see.
10    Q.    And what was the race of that person?
11    A.    I don't know, like I said, it was a silhouette.
12    Q.    Pardon?
13    A.    It was a silhouette, you know I could see the person,
14    but you really couldn't tell the race.
15    Q.    Okay.  So now, this is before Nix knocked a hole in
16    the window, you could still see a silhouette?
17    A.    No, you cannot see into the car at all.  Before I got
18    up to the side, I didn't know who or how many people were in
19    the car.
20    Q.    How about on Stemmons?
21    A.    On Stemmons, no.
22    Q.    How about on Westmoreland?
23    A.    No.
24    Q.    Did you know why you were referring to the person in
25    the masculine, you kept referring to him, whatever?

1    A.    Probably just out of nature.
2    Q.    But you had no earthly idea how many people were in
3    the car, what their sex was, what their race was, nothing of
4    that nature?
5    A.    No, no.  Any reference to gender is just a habit.
6    Q.    And you followed the car at least a half a mile on
7    Stemmons and were clueless as to who or what was in it; is
8    that correct?
9    A.    That's correct.
10    Q.    And how far on Mockingbird?
11    A.    How far, Mocking -- we were behind the car from
12    Mockingbird -- I mean essentially to Bernal.  So --
13    Q.    Well, you were directly behind him on Mockingbird?
14    A.    We were a couple of cars back on Mockingbird.  Same
15    lane, he was far right lane, we were far left lane.  Made our
16    way over.  Mark picked him up before we got to the 183
17    overpass on Mockingbird, so ...
18    Q.    Okay, so we go from stop to identify and you weren't
19    going to arrest.  And then by the time you get to Bernal and
20    Mart the person in your mind is a murderer; is that correct?
21    A.    Possibility, he took off running, you know when the
22    police were trying to stop him and it fits the car.
23    Q.    So that makes him a murderer?
24    A.    It fits the information we have to go on, there is a
25    good likelihood as a good possibility.

---

66

1    Q.    The information you have to go on is there in front
2    of you, and it says that that information not even probable
3    cause to arrest somebody, doesn't it?
4    A.    Right.
5    Q.    It also tells you that you are looking for two black
6    males?
7    A.    Right.
8    Q.    And so you are telling me that between Stemmons and
9    Bernal and Mart that you gained enough information that the
10    person in the car suddenly became a murderer?
11    A.    No.  When he ran from the police cars --
12    Q.    That made him a murderer?
13    A.    It gives likelihood.
14            MR. BROOKS:  Excuse me.  Your Honor, I am going
15    to object to the form of the question, he is continuing to
16    misstate this witness' testimony.
17            THE COURT:  Sustained.
18    Q.    (By Mr. Brauchle)  Officer Jarc, on the
19    transmissions that we listened to, at what point did
20    y'all switch to another channel?
21    A.    I think one of the radios got bumped over and he was
22    talking on channel four for a while, but there was no switch
23    to another channel.
24    Q.    Who was on channel four?
25    A.    I believe -- I can't say, I believe Haecker was.

---

67

1    Q.    Have you listened to all of the radio transmissions
2    in regard to this?
3    A.    No, I haven't.  I have listened to the channel five
4    radio transmissions.
5    Q.    So there are other channels, you just haven't
6    listened to them.
7    A.    I have not heard the channel four transmission.
8    Q.    Are you aware that the dispatcher was diverting
9    traffic to other channels.
10    A.    Yes, she tells one element to go to channel seven,
11    which is a traffic channel, which is a traffic enforcement
12    channel which, is a light channel.  Other than occasional
13    traffic mark out, that is just a manned channel that anybody
14    can go to to get something done.
15    Q.    What other channels does she direct people to?
16    A.    That I don't recall.  I remember her saying take it
17    to channel seven which is pretty standard, take it to a slower
18    channel something is going on.
19            MR. BRAUCHLE:  We will pass the witness.
20            THE COURT:  Mr. Brooks.
21            MR. BROOKS:  No other questions at this time,
22    Your Honor.
23            THE COURT:  You may step down.
24            (Witness complies.)
25            (Witness entered the courtroom.)

1   THE COURT:   This witness has been sworn.
2   MR. BROOKS:   Yes, sir.
3   THE COURT:   You may proceed, Mr. Brooks.
4   TODD HAECKER
5   was called as a witness, and having been duly sworn by the
6   Court, testified under oath as follows:
7   DIRECT EXAMINATION
8   BY MR. BROOKS:
9   Q.   Sir, would you introduce yourself to the jury,
10  please.
11  A.   My name is Todd Haecker.  I am a police officer with
12  the City of Dallas.
13  Q.   And how long have you been employed with the Dallas
14  Police Department?
15  A.   Approximately seven and a half years.
16  Q.   Currently where are you assigned?
17  A.   Currently assigned to Fusion Center.
18  Q.   Back in March of 2007, where were you assigned?
19  A.   I was assigned to Operation Disruption.
20  Q.   And were you partnered with anyone back in March
21  2007?
22  A.   Yes, I was.  I was riding with Senior Corporal Jeremy
23  Borchardt.
24  Q.   And what part of town were y'all assigned to Patrol
25  as part of Operation Disruption.

1   A.   That day we were assigned to the West Dallas area.
2   Q.   Were you assigned for just that particular day or had
3   you been assigned to that part of town for a period of time.
4   A.   To be honest with you, I don't recall.  We had gone
5   back and forth several times.  There was a point in time where
6   we went there everyday for a couple of days in a row.  But I
7   don't know if we had a break in between those days or not.
8   Q.   Are you able to recall what time you got on duty that
9   day?
10  A.   Ten o'clock in the morning.
11  Q.   And your shift would have ended at what time?
12  A.   Six o'clock.
13  Q.   Officer, I want to take you to late that afternoon,
14  you recall being on patrol and getting a radio dispatch or
15  hearing a radio dispatch from Officer Starr?
16  A.   Yes, sir, I do.
17  Q.   What was that -- strike that.  What was that dispatch
18  regarding?
19  A.   It was regarding they were behind a possible -- a
20  vehicle that was linked possibly to a murder that had happened
21  I want to say a couple of days or a week earlier in a
22  different part of town.
23  Q.   Just so we are clear had there been a memo issued
24  previously?
25  A.   Yes, sir, there had.  There had been a bulletin with

---

70

1   the picture of the car put up there, a bulletin that describe
2   the car.
3   MR. BROOKS:   May I approach, Your Honor?
4   THE COURT:   You may.
5   Q.   (By Mr. Brooks)   And looking at State's
6   Exhibit No. 1, do you recognize that
7   A.   Yes, sir, I do.
8   Q.   Okay.  Gives you a description of a vehicle to be on
9   the look out for?
10  A.   Yes, sir.
11  Q.   Doesn't say anything in there as to whether or not
12  that vehicle was seen leaving the scene of the murder, does
13  it?
14  A.   Yes, sir.
15  Q.   Just says be on the look out for this vehicle?
16  A.   Yes, sir.
17  Q.   Now, do you recall what part of town you and Officer
18  Borchardt were in when you got the dispatch?
19  A.   We were still in West Dallas, sir.
20  Q.   And after receiving that dispatch, tell the jury what
21  you and Officer Borchardt, what is the next thing y'all do?
22  A.   We had received the dispatch that they were
23  traveling, they had just exited Mockingbird from I-35 and
24  that they were headed back to the west, which all indications
25  led that they were possibly coming into West Dallas.  So at

1   that time myself and Officer Borchardt decided to travel over
2   to Westmoreland, to the Westmoreland bridge, which Mockingbird
3   turns into Westmoreland, in efforts to possibly intercept if
4   they came into West Dallas.
5   Q.   Are you able to recall, Officer, about how long it
6   took you to get from where you started to that intersection of
7   Westmoreland?
8   A.   It was a pretty short time.  Cause I think we were
9   right around Hampton when we got the call, which is basically
10  Inwood.  Hampton turns into Inwood.  So you take Canada
11  over -- it is a straight shot from Canada over there, so a few
12  minutes maybe, tops.
13  Q.   And was there any game plan being talked about as to
14  who was going to do what once these groups --
15  A.   We talked about just getting behind the vehicle and
16  possibly trying to attempt to do a felony stop to I.D. any
17  suspects that may be inside the vehicle.
18  Q.   And were you able to hear when Corporal Nix radioed
19  in that he was in the vicinity also?
20  A.   Yes, sir.  I actually heard when he said he was
21  actually in behind the suspect vehicle.  That he had actually
22  pulled in behind the suspect vehicle.
23  Q.   So he arrived at the suspect vehicle before you did?
24  A.   Yes, sir, he did.
25  Q.   And do you know where Officers Starr and Jarc were at

---

71

1   that time?

2      A.   I want to say they were either directly behind them

3   or maybe a car -- maybe a car length or two behind them. But

4   they were still within eye shot of the suspect vehicle. And

5   Officer Nix.

6      Q.   So -- just so we can portray the scene as it was when

7   you and Officer Borchardt got there, Corporal Nix was already

8   behind the suspect vehicle?

9      A.   Yes, sir, he was.

10      Q.   And Officers Starr and Jarc were in one --

11      A.   As a matter of fact, they past us as we were pulling

12   out because we had met them on the other side of the bridge on

13   the actual Mockingbird side. So we actually had to pass them

14   going to get in behind Nix. So they were that close to Nix

15   that they were close enough that we had to pass and cut in

16   between them.

17      Q.   At some point you and Officer Borchardt, you get in

18   behind Corporal Nix?

19      A.   Yes we did.

20      Q.   Who makes the decision to conduct the traffic stop,

21   the starting traffic stop?

22      A.   To be honest with you, I don't remember who actually

23   made the decision. What had happened was, he started to slow

24   down as if he was going stop anyway and make a turn; and since

25   he started to slow down, at that point it kind of forces your

---

1   hand, because if he is going to stop anyway, because he knows

2   that you are behind him or for whatever reason, then you got

3   to kind of -- you either got to stop behind him and turn on

4   your lights or let him drive off or whatever. So i don't

5   remember whoever said to light him up, which means to turn on

6   your overheads and perform the traffic stop. But I remember

7   when -- as he was slowing down, that we decided to go ahead

8   and perform the traffic stop.

9      Q.   When you are behind a vehicle and you decide to light

10   him, as to turn on your traffic lights, is that a command --

11   is that a police command to that vehicle?

12      A.   Oh, it should be. They should recognize that at the

13   very least if they don't think they are getting pulled over,

14   to at least pull over to the side and let us around them.

15   That's what it states in the penal code and actually in the

16   traffic law.

17      Q.   Now, when Corporal Nix lights him up, does the

18   vehicle follow that traffic command, that pullover command?

19      A.   It actually -- it starts like it is going to, it

20   starts to veer off to the right like he is going to pull down

21   Angelina, and then at the very last second does a real hard

22   turn and in a real overt action and guns his ignition

23   continuing down Westmoreland.

24      Q.   What is going through your mind when you see the

25   vehicle take off?

---

74

1      A.   I am thinking that whoever is in this car, to be

2   honest with you, I thought we had the capital murder suspect.

3   Because we had a vehicle that matched the description of the

4   capital murder vehicle, and now I have this guy that is

5   running from the police, to me, the average everyday person

6   you get behind to perform a traffic stop on --

7         MR. BRAUCHLE:   Your Honor, we will object to

8   this as being nonresponsive.

9         THE COURT:   Sustained.

10         MR. BRAUCHLE:   We would ask that the jury be

11   instructed to disregard.

12         MR. BROOKS:   Your Honor, I think he is

13   testifying to his state of mind at the time the vehicle takes

14   off. We would ask that be given leeway to give the jury his

15   state of mind.

16         MR. BRAUCHLE:   It may have started out there,

17   but he is not there now.

18         THE COURT:   I sustain the objection.

19         MR. BRAUCHLE:   We ask that the jury be

20   instructed to disregard.

21         THE COURT:   Ladies and gentlemen, you are

22   instructed to disregard.

23         MR. BRAUCHLE:   Further move for a mistrial.

24         THE COURT:   Denied.

25      Q.   (By Mr. Brooks)  So at this point, Officer,

---

75

1   you have a vehicle that has taken off?

2      A.   Yes.

3      Q.   Do you have a vehicle that matches a description that

4   is put out on a bulletin?

5      A.   Yes, sir, I do.

6      Q.   And is that vehicle description -- is that vehicle

7   description tied in to capital murder?

8      A.   Yes, sir, it does.

9      Q.   And when that vehicle takes off, do you and Officer

10   Borchardt join the chase?

11      A.   Yes, sir, we do.

12      Q.   Now, the jury have had the benefit of seeing the

13   video, have you had an opportunity to review the video?

14      A.   Yes, sir, I have.

15      Q.   During the chase, after the vehicle makes that right

16   turn on to Bernal, about how far are you behind Corporal Nix's

17   vehicle?

18      A.   Not even -- less than an eighth of a mile -- behind

19   Nix's vehicle?

20      Q.   Yes, sir.

21      A.   We are directly behind Nix's vehicle, directly behind

22   it.

23      Q.   And the suspect vehicle, about how far in front of

24   you?

25      A.   Not even an eighth of a mile, we never lot visual

1 contact with him.

2     Q. You have a recollection about how fast your vehicle

3 was moving?

4     A. My vehicle, I want to say approximately from 50 to

5 70, somewhere in that speed.

6     Q. Do you have an opinion as to whether or not that was

7 a safe speed for any vehicle to be traveling on that portion

8 of Bernal?

9     A. It -- you know there is straight parts and there is

10 curving parts, so at times it was safe and other times

11 probably not so safe.

12     Q. I mean, are those speeds above the speed limits on

13 Bernal?

14     A. Oh, no, I don't know what the speed limit is, I would

15 say it wouldn't be more than 40.

16     Q. So those speeds would be?

17     A. Absolutely.

18     Q. Did you yourself actually see the vehicle spin out,

19 the suspect vehicle?

20     A. Yes, sir, I did.

21     Q. What are you doing during the times that this chase

22 is going on, what are you actually doing inside that car?

23     A. I believe at this point in time, I believe I was the

24 one calling the chase, actually putting out the description,

25 putting out the speeds, but I am not a hundred percent sure

---

1 what -- what I was exactly doing, I am pretty sure, since I

2 was passenger in the second car, I am pretty sure that I was

3 the one putting out the chase.

4     Q. And what happens after that vehicle spins out?

5     A. He spins out, in a yard, in a residential yard.

6 Officer Nix, you know, followed him down into that yard,

7 unable to break that fast in order to, ah, so he followed him

8 down the yard. Myself and Officer Borchardt kind of pie out

9 and follow, trying to triangulate since Nix was head on, we

10 try to pie out just to get move of an angle on the suspect

11 vehicle.

12     Q. As soon as you pie out, what is the next thing you

13 recall doing?

14     A. I recall stepping out of my vehicle and trying to get

15 to the rear of the vehicle in order to maintain a more

16 tactical position.

17     Q. So you got out of your vehicle to get behind the rear

18 of which vehicle?

19     A. The rear of the suspect vehicle.

20     Q. Had any shots been fired at this point?

21     A. No, sir, they had not.

22     Q. Are you able to see inside that suspect vehicle?

23     A. No, sir, I cannot.

24     Q. How long do you think you had been outside of your

25 vehicle before a shot is fired?

---

78

1     A. Somewhere in the area of five to ten seconds,

2 somewhere around in that area.

3     Q. And did you see the shot or did you hear the shot?

4     A. I heard the shot and I saw a puff of smoke come from

5 inside the vehicle.

6     Q. And what is the next thing you recall seeing after

7 that puff of smoke?

8     A. I recall seeing Officer Nix kind of fall to the

9 ground. At that point -- at that point it took me maybe one

10 or two seconds for my mind to catch up with what was really

11 happening, then I begin to return fire.

12     Q. Do you recall -- what type of weapon were you

13 carrying that day?

14     A. I was using a 9 millimeter. A Sig 9 millimeter.

15     Q. Do you recall how many rounds you fired?

16     A. Approximately 19, I guess, around that area.

17     Q. And did you fire from the same spot or did you move

18 from one spot to a different spot?

19     A. Oh, no, I was moving, sir, I moved.

20     Q. Do you know where you were when you first started

21 firing?

22     A. I was at the back rear portion of the car towards the

23 back rear vent window.

24     MR. BROOKS: May I approach the witness, Your

25 Honor?

---

79

1     THE COURT: You may.

2     Q. (By Mr. Brooks) Officer, can you step down

3 and take a look at this exhibit, State's Exhibit No.

4 4. You have seen this diagram before?

5     A. Yes, sir, I have.

6     Q. Show the jury where you were when you initially

7 started firing?

8     A. Approximately right here (indicating) toward the back

9 rear passenger.

10     Q. And again what was the reason you had moved to that

11 part of the suspect vehicle?

12     A. When I existed my vehicle right here (indicating), I

13 didn't feel -- when I exited my vehicle from the passenger's

14 side, I felt that since Nix had run up to the driver's side

15 that I wanted to be toward the rear for two reasons, number

16 one, if he were to get out and run, his really only avenue to

17 escape was toward the house you see or back toward the street,

18 so I would already have a jump on him being on the back of the

19 car. If he was to fire, if he were to get out of his car and

20 start firing a weapon, he would actually have to get out and

21 turn around and giving myself a second or two seconds of time,

22 response time to be able to check myself and make a decision.

23     Q. As a police officer, did you have a concern as to the

24 actions of this person if he had jumped out of the car?

25     A. Absolutely.

---

1  Q.   And what was that concern?
2  A.   You don't know who is in that car, you don't know
3  what they have or what their intentions are.  He has already
4  shown an intention that he doesn't want us to talk to him or
5  detain us for whatever reason.
6           MR. BRAUCHLE:   Your Honor, we would object to
7  that as being speculative and nonresponsive.
8           THE COURT:   Overruled.
9  A.   He has already shown an intention by not pulling over
10 his vehicle that he didn't want to stop and talk to us.  At
11 that point you don't know what type of person you are dealing
12 with.  You don't know who is in the car.  And at that time --
13          MR. BRAUCHLE:   I will object to narrative, Your
14 Honor.
15          MR. BROOKS:   We will rephrase Your Honor.
16 Q.   (By Mr. Brooks)  Again what would be the
17 primary concern if that person had jumped out of the
18 car?
19 A.   Primary concern would be our lives being taken.
20 Secondary concern are going to be that he may run into a house
21 and take somebody hostage.
22 Q.   And are you able to show this jury any other
23 locations on the diagram that you recall discharging your
24 weapon from?
25 A.   I discharged from this rear right here (indicating)

1  and then there is a little fence that was right here
2  (indicating) I ran to the back side of that fence, there was a
3  tree standing right about here (indicating) and I fired from
4  behind the fence and from behind the tree, just trying to find
5  whatever cover may be out there.
6  Q.   Have a seat, Officer.
7  A.   (Witness complies.)
8  Q.   Now, you just told this jury a concern as to what
9  this individual might do if he had jumped out of that car,
10 hypothetically, Officer, if that suspect had jumped out of
11 that car and ran towards a house --
12          MR. BRAUCHLE:   Your Honor, we would object to
13 this as calling for speculation.  It didn't happen and it is
14 not --
15          MR. BROOKS:   That's why it is hypothetical,
16 Judge.
17          THE COURT:   I will allow -- finish the question
18 if you will Mr. Brooks.
19 Q.   (By Mr. Brooks)  Hypothetically, if that
20 suspect had bailed out of that car and ran towards a
21 house, would you have the authority -- would you
22 have been authorized to use deadly force based on
23 those simple facts?
24          THE COURT:   Overrule the objection.
25 A.   On the simple facts if he had just jumped out of the

82

1  car and just ran.  Then, no, we do not have right to shoot him
2  as he is fleeing the vehicle.  We have the right to pursue
3  him.  But until he makes an actual overt act or threatens the
4  lives of citizens or police officers, we do not have the right
5  to use deadly force.  We have the right to pursue him, but not
6  the right to use deadly force.
7  Q.   (By Mr. Brooks)  Now, did you actually see Corporal
8  Nix fall to the ground.
9  A.   I saw him go down to the ground, yes, sir.
10 Q.   And you recall -- I think you said that's when you
11 opened fire?
12 A.   Yes, sir.
13 Q.   What happens after you stop discharging your weapon?
14 A.   Basically -- I don't stop discharging my weapon until
15 Jarc has already pulled Corporal Nix to a safe spot.  While I
16 was discharging my weapon, however, I happened to look down,
17 Officer Jarc was saying, Officer down, officer down, that's
18 when I glanced over, saw that Officer Nix was down and there
19 was blood around him.  At that point Officer Jarc rushed to
20 Officer Nix, I rushed --
21 Q.   Let me stop you there?
22 A.   Okay, go ahead.
23 Q.   At that point he rushed to Officer Nix?
24 A.   Yes, sir.
25 Q.   Do you recall where -- where were you at the time he

83

1  rushed to Officer Nix?
2  A.   I was still in the back portion by the little white
3  fence that was back there.
4  Q.   And did you do anything to try and protect Officer
5  Jarc while he was rushing to Corporal Nix?
6  A.   Yes, sir, I did.
7  Q.   And what is that?
8  A.   I continued to fire my weapon and approached kind of
9  trying to use myself as a shield.  Since Officer Jarc had to
10 put down his gun or -- in order to use both hands to grab Nix,
11 I knew he was going to be unarmed.  And at this time, like I
12 said, I just used myself kind of like a shield and kept
13 firing.
14 Q.   Now, did you ever see -- or were you able to see
15 anyone inside the suspect vehicle?
16 A.   At this time, no, I still was not able to see at this
17 time.
18 Q.   Was there a time that you were able to see?
19 A.   Yes, sir, there was.
20 Q.   And how did that come about?
21 A.   That came about -- we were trying to after we had
22 already loaded up Nix and got him, you know on the way to the
23 hospital, we were trying to attempt to ascertain if the
24 suspect was breathing, if he wasn't breathing, if he was still
25 a threat, so myself and Officer Starr broke cover with a pair

1  of binoculars and tried to veer into the window to see what
2  was in the window.  At that time, I saw a silhouette of a
3  figure slumped over a steering wheel.
4      Q.    Now, have you had an opportunity to listen to the
5  radio transmissions from that day?
6      A.    Briefly, yes, sir.
7      Q.    And do you recall what channels you were on?
8      A.    I was on channel five.  However, apparently from my
9  understanding my radio inadvertently got put on channel four
10 when I was putting an officer down assist.  I was not aware of
11 that until I had a chance to listen to the radio
12 transmissions.
13             MR. BROOKS:   May I approach Your Honor?
14             THE COURT:   You may.
15     Q.    (By Mr. Brooks)   Let me show you what is
16 marked as State's Exhibit No. 15; do you recall
17 seeing this?
18     A.    I don't recall seeing the disc.  But I recall
19 listening to a disc that was on a lab top.
20     Q.    And did that disc accurately reflect recordings from
21 that day?
22     A.    Yes, sir, it did.
23             MR. BROOKS:   Your Honor we would offer State's
24 15.
25             MR. BRAUCHLE:   Your Honor, he just testified

1  that he can't identify it.
2             THE COURT:   Is that your objection to 15, sir?
3             MR. BRAUCHLE:   Well, there has been no proper
4  predicate laid to this admission.  The witness has said he
5  doesn't know what the exhibit has on it or --
6             MR. BROOKS:   Judge, we can represent to the
7  Court that this is a recording of channel four, his voice on
8  it.  Additionally it is a recording that the Defense has a
9  copy of.
10             MR. BRAUCHLE:   May I have a moment, Your Honor?
11             THE COURT:   You may.
12             (Pause in the proceedings.)
13             MR. BRAUCHLE:   Once again we would renew our
14 objection in that the proper predicate hasn't been laid,
15 introduction to this exhibit.
16             THE COURT:   Overruled.
17     Q.    (By Mr. Brooks)  Officer Haecker, after Corporal Nix
18 has been pulled away, did you have an opportunity to witness
19 the treatment that was being attempted?
20     A.    Yes, sir, I did.
21     Q.    And how would you describe Corporal Nix at that
22 point?
23     A.    He was not -- he wasn't doing good, sir, he wasn't
24 doing good at all.  As I said, Officer Jarc had pulled him to
25 the middle of the street.  At that time I came -- myself and

---

86

1  Officer Borchardt joined Officer Jarc to pull him the way rest
2  across the street.  There wasn't much cover out there at all,
3  we at least wanted to get some cover between us and the
4  suspect.
5      Q.    Is Officer Nix trying to communicate with you.
6      A.    He is spitting out a lot of saliva and a lot of blood
7  and his eyes kept flipping to the back of his head.  At that
8  point in time he had no verbal communications, very, very,
9  limited physical -- he is basically, he is basically hanging
10 on by a thread.
11     Q.    And you stayed at the scene while the other officers
12 rushed him to the hospital?
13     A.    Yes, sir, I did.
14             MR. BROOKS:   Pass the witness.
15             THE COURT:   Ladies and gentlemen, we will take
16 our lunch break at this time.  It is ten minutes to noon, we
17 will break till 1:15.
18             THE BAILIFF:   All rise.
19             THE COURT:   If you will keep in mind my prior
20 admonishments.
21             (Jury retired from the courtroom.)
22             (Lunch recess taken.)
23             THE BAILIFF:   All rise.
24             (Jury returned to the courtroom.)
25             THE COURT:   You may be seated.

87

1      Mr. Brauchle, your witness.
2             MR. JOHNSON:   May it please the Court?
3             THE COURT:   Certainly.
4                   CROSS-EXAMINATION
5  BY MR. JOHNSON:
6      Q.    Tell me your name again, please.
7      A.    My name is Officer Todd Haecker.
8      Q.    Haecker?
9      A.    Yes, sir.
10     Q.    Todd?
11     A.    Yes, sir.
12     Q.    My name is Karo Johnson?
13     A.    Nice to meet you.
14     Q.    You okay with me calling you Todd?
15     A.    Absolutely.
16     Q.    I got a few questions for you this afternoon.  It is
17 not my goal to confuse you, but sometimes I confess myself.
18 If I confuse you, if I do, let me know and we will straighten
19 it out, okay?
20     A.    Yes, sir.
21     Q.    You said some things in your testimony today that I
22 have some questions about, before we get to those questions, I
23 need to cover some other ground first.  How long have you been
24 a police officer?
25     A.    Approximately seven and a half years.

1    Q.    Seven and a half years?

2    A.    Roughly.

3    Q.    I noticed from your badge number, you can kind of

4    tell how long an officer has been a police officer by their

5    badge number?

6    A.    Yes, sir, roughly.

7    Q.    And some of the people that you were out there with

8    on this particular day had similar badge numbers, same zeros;

9    is that correct?

10    A.    Roughly, give or take.

11    Q.    You knew some of these people out in the academy?

12    A.    I was actually not in the academy with any of the

13    people -- any of the four officers, including me -- actually

14    all five, I was not in the academy with any of them.

15    Q.    You did go to the academy?

16    A.    Yes, sir.

17    Q.    And what academy are you talking about?

18    A.    The Dallas Police academy.

19    Q.    And when did you go to the police academy?

20    A.    January of 2001 is when I started.

21    Q.    How long does that last.

22    A.    Eight months approximately, give or take.

23    Q.    And what had you been doing prior to that?

24    A.    Going to college and working as -- at the Y.M.C.A.

25    Q.    No police training prior to that?

1    A.    No, sir.

2    Q.    So you say the police academy lasts about eight

3    months?

4    A.    Approximately.

5    Q.    And I assume they teach you all sorts of things at

6    the academy; is that right?

7    A.    Yes, sir.

8    Q.    They teach you how to write traffic tickets or any

9    kind of ticket for that matter?

10    A.    Yes, sir.

11    Q.    Teach you how to fill out the form to do that?

12    A.    Yes, sir.

13    Q.    A lot of what you could is paperwork, isn't it?

14    A.    Absolutely.

15    Q.    And they teach you how to do that paperwork?

16    A.    Absolutely.

17    Q.    They teach you what paperwork you need to do; is that

18    right?

19    A.    Yes, sir.

20    Q.    That include reports that you do for just about

21    everything that you are involved in on a daily basis as a

22    police officer; is that right?

23    A.    Yes, sir.

24    Q.    Okay. Todd, did they train you in the use of police

25    tactics?

90

1    A.    Yes, sir.

2    Q.    Do they train you in the use of your equipment?

3    A.    Yes, sir.

4    Q.    Now, when they train you in the use of that

5    equipment, I assume that they are teaching you how to use

6    weapons?

7    A.    Yes, sir.

8    Q.    What weapons did that include?

9    A.    Everything from open hand to intermediate, which

10    would be like your asp baton, even handcuffing is considered

11    use of force, all the way up to force and deadly force.

12    Q.    You mentioned an asp, is that one of the things they

13    train with?

14    A.    Yes, sir.

15    Q.    And that is part of your weapons training; is that

16    correct?

17    A.    Yes, sir.

18    Q.    In fact an asp -- do you know what that stands for by

19    the way?

20    A.    To be honest with you, I don't.

21    Q.    If I told you stood for armament systems procedure,

22    have you heard that before.

23    A.    I have never heard it, but if you say so, sure.

24    Q.    Well, that what it says when I researched it. So it

25    an armament, in other words it is a weapon. And you are

91

1    taught how to use it; is that correct?

2    A.    Yes, sir.

3    Q.    Are you taught what it can be used for, what

4    different things that it can be used for?

5    A.    They give you a basic -- a basic application of what

6    it can be used for.

7    Q.    And what would that cover?

8    A.    Mostly intermediate strikes like to the major, like

9    the leg, or you know, the shin or something like that. Mostly

10    used for crowd control and for people that are actively

11    resisting.

12    Q.    And it is basically something in effect to try to

13    disable that person in the appropriate circumstances.

14    A.    Yeah, yes, sir.

15    Q.    In fact, it is something that if it were used and it

16    could be used to actually cause some serious injuries to

17    someone?

18    A.    It could be, sure.

19    Q.    In fact, if somebody took an asp to another

20    individual and wanted to, they could probably break a bone?

21    A.    Just like a fist, they sure could.

22    Q.    Actually probably more effective than a fist?

23    A.    If used in an improper way, yes, sir.

24    Q.    In fact using a fist, you could probably, if you made

25    the right hit with a fist, you could actually break somebody's

1   nose?

2      A.   I am sure you could probably even kill them.

3      Q.   You could probably kill them with an asp?

4      A.   Yes, sir, you could if you hit them the right way.

5      Q.   Do you carry one?

6      A.   Yes, sir, I do.

7      Q.   Now, in your training do they -- when they train you

8   things, do they test you on the things -- like is it like

9   school where you take a quiz or a test at any time after you

10  have gone throw a certain section of the course?

11     A.   On most things, they do.  Most things it is mandated

12  through the State, yes, sir.

13     Q.   State has requirements what need to be taught to the

14  police officers?

15     A.   Yes.  The TCLEOSE have certain requirements and

16  guidelines that you must follow.

17     Q.   Say that again, what do you call it, the governing

18  body?

19     A.   TCLEOSE.

20     Q.   You know what that stands for?

21     A.   Texas Commission of Law Enforcement Officer.

22     Q.   So it is standardized?

23     A.   That's the minimum standard that you have to pass in

24  order to go on.

25     Q.   To be a certified peace officer?

---

1      A.   Yes, sir.

2      Q.   And obviously you are wearing that uniform, you got

3   that badge, you have passed that, haven't you?

4      A.   Yes, sir, I have.

5      Q.   And that's because you passed all the courses that

6   they gave you in the academy?

7      A.   Yes, sir.

8      Q.   In fact you probably take more than the minimum

9   classes in the Dallas Police Academy?

10     A.   They actually require that you take a continuing

11  education, like you have to update every two years, every

12  cycle, which is every two years.

13     Q.   Probably don't surprise you that lawyers, judges,

14  prosecutors, all of us have to do that as well?

15     A.   I would hope so.

16     Q.   We are glad y'all do that also.  Now, when you are at

17  the academy, how many people are in a class?

18     A.   It can range anywhere from 20 on up to 60, it just

19  depends on how many people they hired for that class and how

20  many people recycled and failed out.  It is going to be a

21  pretty wide range.

22     Q.   What does it mean to be recycled?

23     A.   Recycle means if you don't pass one of the

24  classifications, they will retrain you or bump you up to the

25  next class coming up.  If they fail you, whatever class that

---

94

1   you fail, they will ultimately terminate you.

2      Q.   How many were in your class?

3      A.   Maybe starting out with around 40, maybe 50.

4      Q.   They didn't all make it?

5      A.   No.

6      Q.   How many made it?

7      A.   If I had to guess, like around 30.

8      Q.   All right.  Now, one of the things that they teach

9   you, one of the many things they teach you is how to perform

10  felony stops; is that correct?

11     A.   Yes, sir, it is.

12     Q.   Do you remember taking those classes?

13     A.   Yes, sir, I do.

14     Q.   Now, how did they teach you that?

15     A.   They teach you that when you are attempting to

16  perform a traffic stop on someone that you know is a felon or

17  possibly --

18     Q.   Sorry to interrupt you, actually the question is, how

19  did they teach you, what is the process --

20     A.   Oh, I'm sorry, I misunderstood.  They teach you

21  through classroom and then through a practical exercise.

22     Q.   When you say classroom, what happens there?

23     A.   They give you instructions on how you are to perform;

24  and after the instruction portion, you go out and do like a

25  practical -- a practical-type version, where you actually go

---

95

1   out and perform a felony traffic stop.  Like a mock situation.

2      Q.   Who teaches the classroom part?

3      A.   That would be instructors, sometimes senior

4   corporals, sometimes other supervisors.  Whoever the academy

5   deem at that time is going to be certified to do it.

6      Q.   That instructor has to be certified to give you the

7   course?

8      A.   There has to be a certified instructor that oversees

9   the course, there could be other people out there, like role

10  players, actors that don't have to be certified like them.

11  The person who designed the course has to be certified and

12  overseeing the course.

13     Q.   And that's certified in that particular area that he

14  is teaching?

15     A.   Yes, sir.

16     Q.   The instructor for felony stop, let's say, that

17  instructor is someone certified in that particular course?

18     A.   To be honest with you, I don't know what

19  certifications they have to go through, that's the academy,

20  and I don't deal with much with the academy, I know they have

21  to have some kind of certification to get TCLEOSE credit.

22     Q.   Do you take like a written test after the course?

23     A.   I can't remember if it is a written test -- you have

24  to perform like the mock situation, they deem like did you do

25  it right or didn't do it right.  As far as the written test,

1  that was seven years, six and a half years ago, I don't
2  remember.
3      Q.   This part where you are talking about whether you did
4  it right or wrong, what are you talking about there?
5      A.   In the academy, you are constantly being evaluated,
6  to see if you are progressing or not progressing, so you are
7  not a danger to yourself or anybody on the street.
8      Q.   Are you talking about the classroom part or where you
9  go afterwards?
10     A.   The entire process.
11     Q.   In both situations?
12     A.   Yes, sir.
13     Q.   Now, do you recall what you were taught in the
14  courtroom regarding felony stops?
15     A.   I am sure it was probably just the general orders,
16  the guidelines, the general basic guidelines that the academy
17  writes out.
18     Q.   Does the academy and the Dallas Police Department
19  have a manual that you use for particulars?
20     A.   They have general orders and Patrol SOP, which are
21  standard operating procedures.
22     Q.   Did they have an SOP for felony stops?
23     A.   Absolutely, yes, sir.
24     Q.   After you go through the written part of it, you say
25  that then you go out in the field and do you do some more,

1  what do you do out in the field?
2      A.   I say field, I mean literally a field.  You go
3  outside the academy in a gated secure environment.  The people
4  are told to cooperate with all the commands that you give
5  them.  So there is absolutely no -- they don't run, they don't
6  fight.  They are told to cooperate and obey the recruit's
7  instructions.
8      Q.   Who is they, who is told they?
9      A.   The actors, the actors that go out and play the
10  roles.
11     Q.   The role playing actors that are playing the
12  suspects?
13     A.   Yes.
14     Q.   Are they also officers?
15     A.   Yes.
16     Q.   Now, do you -- you know, I have been told that some
17  academies use like paint ball guns to do some of these
18  training, did y'all do that?
19     A.   When I went through the academy, no, I didn't.
20     Q.   Are they doing that now?
21     A.   I wouldn't be able to tell you.  I know we have a
22  simunition program.  What you are talking about is called
23  simunitions.
24     Q.   Okay.
25     A.   It's basically a mild form of a gun, it is real shell

---

98

1  casings with real gunpowder, it has a paint bush tip on it.
2  They have a simunition program.  What all it encompasses, I
3  wouldn't be able to tell you.
4      Q.   That's not something you have done.
5      A.   I have done simunitions, I have not done with a
6  felony stop.
7      Q.   Do they do that with felony traffic stops?
8      A.   I am sure they might, I have no idea.
9      Q.   Have you done that in the form of paint ball?
10     A.   Yes, I guess you could put it that way.
11     Q.   Now, when you are talking about the training after
12  the classroom, you are talking about going out and basically
13  going through scenarios; is that what you are talking about?
14     A.   Yeah, there is mock scenarios to set up to show you
15  once again the very basic things that can happen out in the
16  field is what they show you.
17     Q.   Do you ever go paint balling?
18     A.   I have been one time in my entire life.
19     Q.   Okay.  Well, when you did it that time, did they gave
20  you like scenarios when you go out paint balling?
21     A.   It was basically capture the flag type stuff, blue
22  team, red team type stuff, no scenarios, no, nothing like
23  that.
24     Q.   I go out there with my son, and they are talking
25  about doing scenarios?

1      A.   Maybe the more advance people do, I have been only
2  one time in my life, I know this much about scenarios, the
3  paint balls, stuff like that.
4      Q.   Let's talk about what you have, regarding your
5  training in felony and traffic stops.  Describe what would
6  happen after the classroom, talk about what you did what you
7  call the field?
8      A.   What would happen after the field?
9      Q.   What happened in the field when you were doing these
10  practice felony stops?
11     A.   Basically, they would set up a traffic stop scenario.
12  Most of the time it had to do with a stolen vehicle.
13     Q.   Okay.
14     A.   You would come up, you do a traffic stop in a stolen
15  vehicle.
16     Q.   Describe what you are talking about, in other words
17  you are following a traffic --
18     A.   Everything they teach you in the academy is very,
19  very basic.  So you would pull up behind a car, and you would,
20  you know, simulate doing a vehicle check, running the license
21  plate.
22     Q.   Let me stop you there.  So you got a suspect vehicle
23  that is -- you think maybe a stolen vehicle; is that what you
24  are saying?
25     A.   No, no.  I am saying that they tell you that you are

---

99

1  doing a traffic stop.  They tell you are doing a traffic
2  stop, you have done the traffic stop.  Before you even do the
3  traffic stop, you run the license plate.  If you are able to,
4  run the license plate before you get out of your car, run the
5  license plate.  The mock dispatcher will come over the radio
6  and say whatever element number you are, that car is reported
7  stolen.  From there you perform the felony traffic stop.
8      Q.    Now, do you have you have training in different
9  levels of risk in regard to felony traffic stops?
10     A.    I am not sure I understand what you mean with that
11 question.
12     Q.    Well, you understand that some felony traffic stops
13 have lower risks assigned to them.  And some have higher risk
14 assigned to them?
15     A.    They don't really teach you anything like that.  They
16 just teach you that if you are doing a felony traffic stop,
17 that's exactly what it is, it is a felony traffic stop, which
18 means there is a potential felon in the act or a potential
19 danger inside the car.
20     Q.    Okay.  Now, you remember --
21          MR. JOHNSON:  May I approach, Your Honor?
22          THE COURT:  You may.
23     Q.    (By Mr. Johnson)  I am going to show you
24 what is marked the Defendant's Exhibit No. 1, will
25 you take a look at that for me, please?

---

1      A.    Okay.
2      Q.    Do you recognize what that is?
3      A.    It looks like something out of our Patrol SOP.
4      Q.    And SOP being standard operating procedures?
5      A.    Yes, sir.
6      Q.    And what does this look like this particular SOP is
7  regarding?
8      A.    Says 18.34 traffic stop felony.
9      Q.    This is basically the Dallas traffic?
10     A.    It is the basic protocol, yes, sir.
11     Q.    And when you are talking about what they teach you in
12 the academy, this is what they are probably going through with
13 you prior to going through in the field?
14     A.    Yes, sir.
15     Q.    And does it tell you in that SOP, basically how to do
16 all these things the correct way?
17     A.    It gives you a basic format of how to do it.
18     Q.    And again you mentioned earlier that part of this
19 training is to protect different people in regards to doing it
20 in an appropriate way.  Who is it designed to protect?
21     A.    It is designed to protect just about everybody.
22     Q.    When you say everybody, the officers themselves?
23     A.    The officers themselves.
24     Q.    The other officers?
25     A.    The civilians not involved, even up to the suspects.

---

102

1      Q.    And the public?
2      A.    Yes.
3      Q.    Like you said, it covers everybody.
4      A.    Yes.
5      Q.    Now, if you go through this, it tells you how to do
6  it with one vehicle; and if you have two vehicles, it tells
7  you how to do that as well.  Does that help refresh your
8  memory about what you are talking about?
9      A.    It says you are supposed to approach from the back,
10 but it doesn't say anything about face-to-face to the vehicle,
11 they don't teach you that.
12     Q.    They teach you how to do with a vehicle?
13     A.    With a vehicle, yes, but not face-to-face with a
14 vehicle.
15     Q.    Ah --
16     A.    Unfortunately they can't teach you every situation
17 you are going to face out there.
18     Q.    They can't teach you every situation out there?
19     A.    No, sir.  They try to give you a foundation to build
20 on.
21     Q.    When you have two police vehicles and you got a
22 situation where you have got a suspect that you are trying to,
23 you know, arrest, whatever, and you are doing a felony traffic
24 stop, do they tell you how to position your vehicles?
25     A.    You are supposed to kind of in the way we did

---

103

1  position, try to triangulate with them.  Try to get as many
2  tactical angles on them as you can get.  If you can take a
3  picture of how we were positioned, and rotate it around how we
4  were at the rear of the vehicle, that's what they basically
5  want you to do.
6      Q.    And that's basically what you did?
7      A.    Basically.
8      Q.    And who was driving your vehicle?
9      A.    Officer Borchardt.
10     Q.    And when he was driving his vehicle, he did actually
11 textbook?
12     A.    I wouldn't say textbook.  What is in here it is not
13 word-for-word.
14     Q.    I understand that.  What you said, if there are two
15 vehicles, you triangulate?
16     A.    Yes.
17     Q.    Why do you do that?
18     A.    If somebody were to exit, it gives you a tactical
19 advantage.  You don't ever want to put everybody in one spot
20 cause then they are easier track.
21     Q.    The other thing they teach you to do is how to
22 position yourself after you stop your vehicle; is that
23 correct?
24     A.    Yes, sir.
25     Q.    Do they teach you to use your vehicle as cover?

A. Yes.

Q. And what do they teach you to do in regard to using your vehicle as cover.

A. To use the doorjamb as a cover or the rear of the vehicle.

Q. When you say the doorjamb, you are talking about the open part; is that correct?

A. Yes.

Q. And you positioned yourself behind that door for cover when you make the stop?

A. Yes, sir.

Q. And Borchardt did that, didn't he?

A. Yes, sir.

Q. And another thing that they have in here, one of the things that they tell you in regard to this felony traffic stop. If you will notice in here, Defendant's Exhibit No. 1, what do they have in capital letters is (a) under removing suspect from the vehicle, what do they say?

A. Says do not rush the vehicle.

Q. And that is in capital letters?

A. Yes.

Q. And they emphasize not rush the vehicle?

A. Yes, they do.

Q. And do they do it for officer safety?

A. Yes, sir, I would say for officer safety.

Q. And when they tell you to use the vehicle for cover, they tell you to open your doors; is that right?

A. Yes, sir.

Q. And do they tell you that the person driving the vehicle, he has got certain things that he is supposed to do in regards to how he does the felony vehicle stop; is that correct?

A. Yes, sir.

Q. And what they tell you the driver is supposed to do, he is supposed to open his door and he is supposed to use his handgun and put it between the crack in the door and the car and turn it on the suspect vehicle; is that correct?

A. Yes, sir.

Q. And the passenger, if there is a passenger, if there is a shotgun or a rifle, they are basically supposed to do the same thing on the other side; is that correct?

A. Yes, sir.

Q. And when you do this, you actually put your foot against the doorjamb, you mentioned the doorjamb earlier; is that where you put your foot?

A. You can.

Q. Or you put it against the door itself to make sure it stays open; is that right?

A. You can, yes, sir.

Q. And they tell you not to put your foot on the ground;

---

106

is that correct?

A. Yeah, I would guess so.

Q. Yeah, I am not sure why they do that.

A. I could only imagine in case rounds are fired, they won't skid off the ground and hit you in the shin is the only thing I can imagine.

Q. That must be it. Now, in this particular incident, when you came up, you ah -- when y'all came up, you triangulated your vehicle; is that correct?

A. Yes, sir.

Q. And --

MR. JOHNSON: May I approach again, Your Honor?

THE COURT: You may.

Q. (By Mr. Johnson) I am going to show you something that is marked as Defendant's Exhibit No. 2; can you look at that for a minute, please?

A. Okay.

Q. You recognize that?

A. No, I do not.

Q. Okay. Well, can you look at it?

A. I see it, and I see what it says, but it is the first time I have ever seen it.

Q. All right. You have never seen one of these?

A. Never had to fill one out, sir.

Q. All right. Well, what does it say it is?

---

107

A. It says it is a felony module evaluation report, felony traffic stop.

Q. If I told you that's part of the DPD training manual and reports from DPD, would you ever any reason to suspect that I was fooling you?

A. No, looks like something we would use, sir.

Q. All right.

MR. JOHNSON: I am going to offer Defendant's Exhibit No. 2.

MR. BROOKS: No objections.

THE COURT: Defendant's Exhibit 2 is admitted.

Q. (By Mr. Johnson) Will you take a minute to read those questions. Okay. Let's go through them.

A. Okay.

Q. Okay, number one, what does number one say?

A. Did the officer use correct radio procedure when marking out on a felony traffic stop.

Q. And what would be your answer to that question?

A. Yes.

Q. You did that, didn't you?

A. Yes.

Q. In fact you were the one that was on the radio for your car; is that correct?

A. Yes.

Q. And did you testify earlier that you were on channel

1 four?

2    A.   I wasn't aware that I was on channel four until this

3 court trial, when I was putting out the chase -- marking out

4 on felony, I was using the big radio or the hand-held radio

5 inside, the radio, and I was on five.  I guess it was after I

6 got out of the car, I inadvertently hit the dial on my radio,

7 which switched it over to four.

8    Q.   When you are outside the car, you are still able to

9 radio things in to dispatch?

10    A.   You have a hand-held radio.

11    Q.   Did the other officers have that as well?

12    A.   No, they did not.  They had their handhelds maybe,

13 but they did not have a big radio in their car.

14    Q.   As you were following the suspect vehicle, there was

15 talk between the different vehicles that were involved in

16 this; is that correct?

17    A.   I believe up until the point we attempted to perform

18 a traffic stop, I believe there was.

19    Q.   And all of that happened prior to the traffic stop;

20 is that correct?

21    A.   Yes, sir.

22    Q.   And y'all were talking on different channels?

23    A.   No, sir.  We were only talking on channel five that I

24 recall.

25    Q.   But sometimes y'all do talk on other channels?

1    A.   There were other channels that we can talk on.  In

2 this instance, we were talking on channel five.

3    Q.   Now, number two, did you use your emergency equipment

4 lights, you did that?

5    A.   Yes.

6    Q.   That's a yes.  Did the officers technically position

7 their vehicle?  That would be yes.  Your vehicle followed that

8 procedure correctly as to your vehicle; that would be right?

9    A.   Yes.

10    Q.   All right.  Four is not applicable.  Did you use your

11 high beam, obviously you didn't need to do that on this day;

12 is that correct?

13    A.   That's correct.

14    Q.   That doesn't apply.

15        Five, did the driver offset the vehicle to create a

16 safety zone, and your driver did that?

17    A.   Yes.

18    Q.   Now, six, did the officers remain in their vehicle

19 and utilize cover, your partner did that, didn't he?

20    A.   Yes, he did.

21    Q.   You, however, left cover, didn't you?

22    A.   Yes, I did.

23    Q.   Now, did you cover the suspect with your pistol or

24 your shotgun for cover, did you do that for cover?

25    A.   From the rear of the vehicle, I was not undercover,

1 no.

2    Q.   When you say the rear of the vehicle, you mean the

3 suspect vehicle?

4    A.   Rear of the suspect vehicle.

5    Q.   Number eight, did you utilize the P.A. system

6 effectively?

7    A.   Did not have time to, no, we did not.

8    Q.   Didn't have time?

9    A.   Didn't have time to.

10    Q.   Well you didn't, but I mean --

11    A.   Did not have time.

12    Q.   There was no reason not to use the P.A. system, was

13 there?

14    A.   Actually in this situation there was.

15    Q.   Why?

16    A.   Because like I said, we thought we were chasing a

17 capital murder suspect, he ran, he wrecked out, he was

18 nose-to-nose with us.  At that time we were --

19    Q.   Let me ask you something --

20    A.   -- we were tactically at a disadvantage.

21        MR. BROOKS:   Judge, excuse me.  We need to

22 object, to allow him to finish his answer, allow him to answer

23 his question.  He may not like the answer, but allow him to

24 finish the answer.

25        THE COURT:   Sustained.

1    Q.   (By Mr. Johnson)   Did your P.A. system

2 work?

3    A.   My P.A. system, I am sure.

4    Q.   There was no reason in that regard not to use it, was

5 there?

6    A.   Equipment, no, no reason.

7    Q.   Did -- did anybody use clear and concise commands?

8    A.   We gave clear and concise, loud verbal commands,

9 we --

10    Q.   Who is that?

11    A.   Everybody out there, telling the suspect to exit the

12 car.

13    Q.   Were you using that with the P.A. system?

14    A.   No, sir, we were not.

15    Q.   When are you doing it?

16    A.   As soon as I exited the vehicle.

17    Q.   Okay.  Now, when you exited the vehicle, are you

18 doing that as you are running past the vehicle?

19    A.   I take that back, I was probably doing that when I

20 was at the rear of the vehicle so...

21    Q.   And that's later on?

22    A.   That's approximately three seconds after I exited the

23 vehicle.

24    Q.   Okay.  Did you have the driver in suspect vehicle to

25 put his hands where they could be seen?

1    A.   No, sir.
2    Q.   Okay.  Basically -- and that's all the things that
3  they ask you to do in your training; is that correct?
4    A.   In the perfect scenario they give you at the academy,
5  yes, it is.
6    Q.   You are supposed to have the suspect open the door
7  and step away from the vehicle after they get these commands?
8    A.   In the sterile environment, yes, it is.
9    Q.   You are supposed to try to do that, that's what you
10 are supposed to do?
11   A.   You are supposed to give commands to exist the
12 vehicle, yes, sir.
13   Q.   Now, is there anything in that list that you couldn't
14 do just because the suspect vehicle was facing you?
15   A.   Tactically there is a bunch of stuff on this list
16 that we couldn't do, tactically.
17   Q.   Well --
18   A.   Tactically there is a bunch of stuff that we couldn't
19 do, tactically.
20   Q.   Tactically you could have done everything that you
21 were trained to do under your procedure?
22   A.   Tactically, had we not done what we did, there is a
23 number of different ways this thing could have ended up.  One
24 of them could have been, he could have ran out and held people
25 hostage.  The other one could have been, he could have got out

1  and shot all of us --
2    Q.   We are not talking about all those things that could
3  have happened I am just asking you anything in that list that
4  couldn't have been done just because the suspect vehicle was
5  facing a different direction, yes or no?
6    A.   In the academy sterile environment, no.
7    Q.   So the answer is no?
8    A.   At the academy, no.
9    Q.   The answer is no?
10   A.   At the academy, no.
11   Q.   Now, when you were following this suspect vehicle,
12 there were multiple law enforcement vehicles involved in
13 following this vehicle to begin with; is that correct?
14   A.   I am only aware of the covert vehicle, myself and
15 Officer Nix.
16   Q.   There was a third vehicle behind you?
17   A.   There may have been, I wasn't looking in my rearview
18 mirror.
19   Q.   Did you see any other marked squad cars along
20 Westmoreland -- were you even looking?
21   A.   In front of us, there was no other marked squad cars
22 in front of us, there may have been some behind us; but there
23 wasn't any in front of us.
24   Q.   All right.  Now, at the time -- at some time you
25 testified that when this vehicle accelerated, that you thought

114

1  that you had a capital murder suspect; is that correct?
2    A.   I believed that we had a capital murder suspect
3  vehicle and the actions led me to reasonably believe that he
4  may be inside that vehicle.
5    Q.   Now, wouldn't that make this a higher risk felony
6  stop thinking that?
7    A.   All felony stops are high risk.  As a matter of fact
8  all traffic stops are high risk.  Doesn't matter it is a
9  normal everyday citizen you are pulling over, or physician, a
10 violent felon, you don't know what people are going to do, I
11 can't train for that.
12          MR. JOHNSON:   I object, that is being
13 nonresponsive.
14          THE COURT:   Overruled.
15   Q.   (By Mr. Johnson)  Now, you have also
16 testified that -- that you couldn't see inside the
17 suspect vehicle, is that still your testimony?
18   A.   That is still my testimony, yes, sir.
19   Q.   You -- you testified that you made a decision to
20 leave the cover of the door of your vehicle since Nix had run
21 up to the suspect vehicle, isn't that what your testimony was?
22   A.   Nix ran up -- yes, sir.
23   Q.   And that's when you made the decision to leave cover
24 and go behind Nix and go behind the suspect vehicle?
25   A.   As I saw him running toward the vehicle, that's when

115

1  I made the decision to run up after him, behind him.
2    Q.   And that was basically a reaction to what Nix did,
3  isn't that what you are saying?
4    A.   It was an effort to better assist him and cover him,
5  yes, sir.
6    Q.   Now, and that was the reason that you left your cover
7  and ran back there, that's your testimony?
8    A.   Yes, sir.
9    Q.   Now, you testified that you ran behind the vehicle.
10 And I believe that you have in some of your statements that
11 you make, you say that you heard a gunshot?
12   A.   I heard a shot, yes, sir.
13   Q.   And nowhere in any of your statements do you say that
14 you saw the gunshot from; is that correct?
15   A.   I saw a puff of dust come from inside the car.
16   Q.   That is nowhere in any of the statements that you
17 have given?
18   A.   Just because I didn't put it in there, doesn't mean I
19 didn't see it sir.
20   Q.   Have you ever heard that a short pencil is better
21 than a long memory?
22   A.   I have not.
23   Q.   Do you know what that means?
24   A.   I sure don't.
25          MR. JOHNSON:   It means --

1    MR. BROOKS:   Your Honor, I am going to object to
2  counsel testifying.
3    THE COURT:   Sustained.
4    Q.   (By Mr. Johnson)   One of the things they
5  teach you back at the academy is to make reports,
6  don't they?
7    A.   Yes, sir.
8    Q.   And those reports one of the purposes of the reports
9  is to be able to, you know, refresh your memory about the
10  things that you observe; is that correct?
11    A.   Yes, sir.
12    Q.   And they teach you to make pretty accurate reports,
13  don't they?
14    A.   Yes, sir.
15    Q.   So wouldn't it be important to put that in one of
16  your reports?
17    A.   Just depends on at the time, sir, I don't know.
18    Q.   Where were you at the moment that you saw what you
19  have testified to as you said a cloud of --
20    A.   A puff of smoke, like a puff of dust.
21    Q.   Where were you when you saw?
22    A.   Immediately behind Officer Nix, probably no less than
23  2 feet, maybe 3 tops.
24    Q.   Directly behind him?
25    A.   I will show you on this chart.

1    Q.   Sure.
2    MR. JOHNSON:   May I?
3    THE COURT:   You may.
4    A.   Officer Nix was at the front passenger door --
5    MR. BEACH:   Todd, they can't see.
6    A.   Oh.   See this little doorjamb right there, Officer
7  Nix was standing by the doorjamb toward the back of the door
8  and I was standing directly behind him at the doorjamb right
9  here (indicating) where basically the hinge is, so that's how
10  close I was to him.
11    Q.   (By Mr. Johnson)   Okay.   When you left
12  your vehicle, you ran behind Nix; is that correct?
13    A.   Ran behind Nix, yes.
14    Q.   And as you are running behind him, you duck down?
15    A.   Yes, sir.
16    Q.   Okay.   Now, that's because there is somebody standing
17  off to your left with a weapon trained on the suspect vehicle;
18  is that correct?
19    A.   Yes, sir.
20    Q.   So you were ducking because of that weapon to get out
21  of the line of fire from that weapon?
22    A.   I was ducking because I don't like being at the end
23  of any barrel of a gun, yes, sir.
24    Q.   The barrel of the gun you are talking about is the
25  barrel of the gun that is to your left?

118

1    A.   That Officer Borchardt had out, yes, sir.
2    Q.   Now, one of the things that -- that you did as you
3  informed your sergeant, would that be Almen?
4    A.   Yes, sir.
5    Q.   You were in contact with him during this, because you
6  were on the radio; is that correct?
7    A.   Yes, sir.
8    Q.   And in fact at some point, Almen instructed y'all to
9  basically go to cover and treat this as a barricaded persons
10  situation; is that right?
11    A.   After Nix had already been transported away from the
12  scene, yes, sir.
13    Q.   But that was the instructions from your sergeant?
14    A.   After the situation had already been covered off and
15  Nix had been transported from the scene and the shooting had
16  occurred, yes, sir.
17    Q.   A barricaded person situation, you are trained in
18  regards to that at the academy too, aren't you?
19    A.   Yes.
20    Q.   And basically the training is that when you have a
21  barricaded situation, it is similar to a felony stop in that
22  you take cover positions and wait for the tact team or SWAT
23  team; is that right?
24    A.   No.   A felony stop is after you have already
25  basically when someone barricades themselves, you develop a

119

1  perimeter and you let tact come and do that.   That's because
2  that time is afforded.   A felony stop only becomes a
3  barricaded person after the person refuses to leave the
4  vehicle.
5    Q.   But one of the things that you do in a barricaded
6  person situation that is the same as a felony stop is that you
7  don't rush the building or the barricaded person; isn't that
8  part of the training for?
9    A.   When applicable, yes.
10    Q.   Now, you have --
11    MR. JOHNSON:   May I have a moment, Your Honor?
12    THE COURT:   You may.
13    (Pause in the proceedings.)
14    Q.   (By Mr. Johnson)   In your sworn affidavit,
15  you have stated in there that you heard more
16  gunshots and you thought they were coming from the
17  suspect vehicle; is that correct?
18    A.   Yes, sir.
19    Q.   So you thought that the person in that vehicle was
20  still firing?
21    A.   At the time the shooting was occurring, yes, sir.
22    Q.   And it turns out that that wasn't correct, was it?
23    A.   Turns out only one shot was fired inside the vehicle,
24  sir.
25    Q.   But because that's what you thought was happening,

1 you started firing into the suspect vehicle; is that correct?

2     A.   No, sir, I started firing into the suspect vehicle

3 after I heard the first shot. The other shots were in

4 consequential, they were -- I had already started firing by

5 that point.

6     Q.   Your sworn statement says that you didn't know where

7 that first shot came from, but you assumed it came from the

8 suspect vehicle?

9     A.   I have already told you I remember seeing a puff of

10 smoke coming from inside of the vehicle. It may not be in

11 there, but that's what I saw.

12     Q.   Well, in your sworn statement, you said you heard a

13 gunshot, it sounded like it came from inside the suspect

14 vehicle?

15     A.   Yes, it sounded like it came from inside the suspect

16 vehicle; and with the puff of smoke coming from the

17 passenger's window, I reasonably assumed that it did come from

18 inside of the vehicle.

19     Q.   Now, there were other officers out there that had

20 weapons drawn at the time all this was going on; isn't that

21 correct?

22     A.   Yes, sir.

23     Q.   And those other officers were firing shots as well?

24     A.   Yes, sir, they were.

25     Q.   Now, you have said in your affidavit, sworn affidavit

---

1 that -- that you were in fear for your life and the life of

2 your fellow officers; is that correct?

3     A.   Yes, sir, I was.

4     Q.   Now, does -- would that give a person, whether it is

5 an officer or civilian, the right to act in self-defense at

6 that time?

7     A.   Yes, sir.

8     Q.   Now, if -- I mean you are trained as police officers,

9 right?

10     A.   Yes, sir.

11     Q.   And you know like you just testified to, you know

12 that there are appropriate times that a person can act in

13 self-defense; is that correct?

14     A.   Yes, sir.

15     Q.   Part of your training is that you learn -- you learn

16 the laws like that; is that right?

17     A.   Yes, sir.

18     Q.   Now, hypothetically if -- if you pulled me over in

19 your marked squad car, and I jumped out of my car and started

20 running at you with an asp in one hand and a gun in my other

21 hand, I would be coming at you with what would be considered a

22 deadly weapon; is that correct?

23     A.   Yes.

24     Q.   And if you thought that I was going to cause serious

25 bodily injury or death as I was coming at you, you would be

---

122

---

1 able to act in self-defense; is that correct?

2     A.   As a reasonable person making a reasonable

3 assumption, yes.

4     Q.   And that's basically what self-defense is?

5     A.   Yes, it is.

6     Q.   Okay. Todd, thank you.

7     A.   You are welcome, sir.

8             MR. BROOKS:   No other questions of this witness,

9 Your Honor.

10             THE COURT:   You may step down.

11             THE WITNESS:   Thank you.

12             MR. BROOKS:   Mr. Beach is going to get the next

13 witness, Your Honor.

14             MR. JOHNSON:   Judge, may I publish Defendant's

15 Exhibit No. 2 to the jury?

16             THE COURT:   You may.

17              (Witness entered the courtroom.)

18             MR. BEACH:   State will call Daniel Krieter.

19 He has not been sworn in, Judge.

20             THE COURT:   Raise your right hand, sir.

21             (Witness was duly sworn.)

22             THE COURT:   You may proceed.

23               DANIEL KRIETER

24 was called as a witness, and having been duly sworn by the

25 Court, testified under oath as follows:

---

123

---

1                 DIRECT EXAMINATION

2 BY MR. BEACH:

3     Q.   State your name for the jury, please.

4     A.   Daniel F. Krieter, K-r-i-e-t-e-r.

5     Q.   And until last year you were a Dallas Police Officer?

6     A.   Yes, sir. I retired in January.

7     Q.   When did you first come on the force?

8     A.   October 2nd, 1980.

9     Q.   You and me go way back to Lester Earl back in 1981?

10     A.   Yes, sir.

11     Q.   Dan, we are taking you out of turn, your son was

12 involved in a rodeo accident up in Oklahoma City; is that

13 correct?

14     A.   Yes, sir.

15     Q.   He is in hospital right now?

16     A.   Yes, sir.

17     Q.   You were nice enough to come down and get your

18 testimony over with?

19     A.   If that is acceptable to everybody, that would be

20 great.

21     Q.   Back on March the 23rd of 2007, Dan, you were a

22 Dallas Police Officer assigned to the crime scene search

23 section; is that correct?

24     A.   Yes, sir, I was.

25     Q.   And about 6:15 that night, did you receive a phone

---

1    call?

2        A.    Yes, sir. I was on the call back list for the police

3    shooting team.

4        Q.    And did you respond out to 4023 Bernal here in the

5    city of Dallas, Dallas County, Texas?

6        A.    Yes, sir, I did.

7        Q.    And was that the scene of where Mark Nix was shot?

8        A.    Yes, it was.

9        Q.    Just run through as briefly as you can, as succinctly

10    as you can what your procedure is when you go to any crime

11    scene and specifically that night?

12        A.    The first time you do is determine the parameters of

13    the crime scene, is the scene secured, do we have enough tape,

14    are there enough people to guard it. Then you list all the

15    names of the officers who were there. In a police shooting,

16    you list all the names of all the officers involved in the

17    shooting. You gather up all the names of all the officers and

18    then you go through -- you walk through the scene with each

19    individual officer, the shooting team, the CAPERS detectives

20    and special investigator unit detectives, their individual

21    lawyers, and I.A.D., Internal Affairs. All of you go through

22    the scene. First you listen to them describe what happened,

23    then you go through a walk-through. So I went through four

24    walk-throughs that night. And that tells you where everything

25    happened from their point of view.

---

1        Q.    And -- I'm sorry. Go ahead.

2        A.    Then what I do, I will do a survey to make sure that

3    I didn't find any additional. There aren't other areas that

4    need to be included. And see if we need any additional

5    personnel, lighting or anything like that. Then photographs.

6    You photograph the entire scene. I contacted the traffic

7    division in order for them to do what we call a sokia mapping

8    which is a laser mapping, and it maps the scene pretty

9    accurately. And contacted another detective to handle that.

10        We photograph the officers, the weapons, the

11    location, the suspect, that was the next day, all the

12    clothing, all the property, all the items, evidence we are

13    going to collect before we put placards and after we put

14    placards down. Numbered placards.

15        Everything is brought back to the office down at 1400

16    South Lamar, which is where the crime scene lab, our

17    fingerprint lab is at. Some of the clothing is bloody. It

18    has to be hung up in a special drying chamber. Other stuff we

19    place into storage racks, which are in a secure location, only

20    people that can get into them have I.D. badges specifically

21    for that unit.

22        Then we -- well, in my case, it had been a long day,

23    so I went home and got a few hours sleep and came back, then

24    we processed the evidence. Processing means we fingerprint

25    what need to be fingerprinted. Fill out the paperwork for the

---

                                              126

1    items that need to go to different locations. Some items need

2    to go to the Southwest Institute of Forensic Sciences for

3    forensic testing and ballistic testing. The weapons need to

4    go, bullet casings and the clothes. All of that had to go to

5    the crime lab. Some items were just sent to the property

6    room. Some items had been released at the scene, like the

7    narcotics, to go to the property room at Baylor. There is a

8    drug box there. Then everything is collected, packaged,

9    tagged, chain of custody are put on it. If it is going to

10    Southwestern Forensic Sciences, so I put in a log, then I do a

11    report. And that's about what I did.

12        Q.    Dan, that wasn't brief, it was very succinct, we are

13    going to break it down step by step. You too photographs out

14    at 4023 Bernal; is that correct?

15        A.    I did and other detectives.

16        Q.    And after you took photographs, did you collect the

17    items significant of evidence that you observed of photographs

18    out at the crime scene?

19        A.    Yes, sir, I did.

20        MR. BEACH:    May I approach, Judge?

21        THE COURT:    You may.

22        Q.    (By Mr. Beach)    I am going to show you what

23    has already been introduced into evidence, these

24    State's Exhibits 5, 6, 7, 8, 9, 27, 28-A and 29, and

25    these photographs that you would have taken out at

---

                                              127

1    4023 Bernal the night of March 23rd, 2007?

2        A.    Yes, sir. If I could peel back, I have on the back

3    of them should be the number saying who took them. I believe

4    I took this one, this one, this one, yes, I took this one,

5    yes, I believe I took all these photographs.

6        Q.    Okay. And all these photographs accurately depict

7    what you saw when you were taking the photographs that night;

8    is that correct?

9        A.    Yes. In addition to the numbered placard.

10        Q.    Now, showing you State's Exhibit 11 through -- we got

11    two, 12s here, that is not going to work, is it -- that's

12    where the problem was, let's go 11 through 17, again are those

13    photographs that you took out at the scene of 4023 Bernal back

14    on March 23rd of 2007?

15        A.    Yes, sir.

16        Q.    And do they fairly and accurately depict the scene as

17    you describe it?

18        A.    Yes, sir.

19        Q.    Let me remark these last two here, I am showing you

20    State's 61 and 62, these two additional photographs accurately

21    depict what you saw out there that night?

22        A.    Yes, sir.

23        Q.    And do these photographs depict some of the shell

24    casings with the evidence markers with your designated numbers

25    that you use to highlight where these different pieces of

---

1   evidence were?
2       A.   Yes, sir, they do.
3                MR. BEACH:   That the time, Judge, we would offer
4   into evidence State's Exhibits 11 through 17 inclusive and
5   State's Exhibits 61 and 62?
6       Let me remark 14 and 15, we have other exhibits, 16-A and
7   16-B.
8       Any objections?
9                MR. BRAUCHLE:   No.
10               MR. BEACH:   So it is 11, 12, 13, 16, 16-A, 16-B,
11  17, 61 and 62 Your Honor.  I apologize for the confusion.
12               THE COURT:   Any objections?
13               MR. BRAUCHLE:   No, Your Honor.
14               THE COURT:   State's 11, 12, 13, 16, 16-A and
15  16-B are admitted.
16      Q.   (By Mr. Beach)   Let me show you some
17  additional photographs, Mr. Krieter.  Showing you
18  State's Exhibit 28, showing you photograph of
19  apparent drug and drug paraphernalia that you seized
20  from the back of that red and gray Chevy that night.
21      A.   Yes, sir, it is.
22      Q.   Now, showing you State's Exhibit 33 through 60, and
23  just briefly go through these and let me know if they fairly
24  and accurately depict what is in these photographs?
25      A.   Yes, sir.  I did not take No. 33.

---

1       Q.   Forty-three?
2       A.   Thirty-three.
3       Q.   The one you peeled out here?
4       A.   I believe I took that one.
5       Q.   Okay.
6       A.   Thirty-three I am in.
7       Q.   Tripod, no, okay.  All right.  But do they -- again
8   they all fairly and accurately depict what is in those
9   photographs?
10      A.   Yes, sir.
11               MR. BEACH:   At this time, Your Honor, we would
12  offer State's Exhibit 28, 33 through 60 inclusive.
13               MR. BRAUCHLE:   No objections.
14               THE COURT:   State's Exhibits 28, 33 through 60
15  are admitted.
16      Q.   (By Mr. Beach)  Hopefully these aren't mismarked.  I
17  will show you three more, State's Exhibits 19, 20 and 21,
18  these are three more photographs you would have taken.
19      A.   Yes, sir.
20               MR. BEACH:   We will offer State's Exhibit 19, 20
21  and 21, Your Honor.
22               MR. BRAUCHLE:   No objections.
23               THE COURT:   State's 19, 20 and 21 are admitted.
24      Q.   (By Mr. Beach)   We aren't going to go
25  through all of these in the interest of time,

---

130

1   Detective, just to give the jury some idea of your
2   methods out there that night, you see in State's 19
3   two yellow evidence markers; is that correct?
4       A.   Yes, sir.
5       Q.   And they have numbers assigned; is that right?
6       A.   Yes, they do.
7       Q.   And what is your thinking on that?
8       A.   If I could refer to my notes I can tell you what I
9   wrote down.
10      Q.   All right.
11      A.   Item number 40 is a cartridge casing, Winchester .223
12  and Remington; 41 is also a Winchester Remington .221.
13      Q.   You find a casing on the ground, you assign an
14  evidence marker to it, an evidence marker to your report?
15      A.   That's correct.
16      Q.   And those DPD numbers they are affixed and that's the
17  number that goes with that particular item of evidence that
18  you photographed and eventually collected that night; is that
19  correct?
20      A.   That's correct.  The bag you put in would also have
21  this number.
22      Q.   You took photographs at the scene, the cars involved;
23  is that correct?
24      A.   That's correct.
25      Q.   We will let the jury look at those later.  Photograph

---

131

1   here, State's Exhibit 42, you have a photograph of an apparent
2   bullet defect in the door frame; is that correct?
3       A.   Yes, sir.
4       Q.   And again that is just to show the collateral damage
5   seen as you saw it out there that night?
6       A.   That's correct.
7       Q.   Item 44?
8                MR. BRAUCHLE:   Mr. Beach.
9                **VOIR DIRE EXAMINATION**
10  BY MR. BRAUCHLE:
11      Q.   Officer, in regard to what you just identified as 41
12  and 42.
13      A.   Forty and 41?
14      Q.   Those show to be Winchester, right?
15      A.   Isn't that what I said, sir?
16      Q.   No, you said Remington.
17      A.   Well, Winchester, 22 Remington, that's what it says
18  on the head stamp.
19      Q.   It's a Winchester?
20      A.   I just wrote down what is on the head stamp.  I
21  think -- I am not a firearm expert, but I do believe there is
22  a brand that the company make and then there is a type.
23      Q.   Okay, Winchester can make a bullet that is called a
24  Remington something or another?
25      A.   I guess so.  That's what it has on the head stamp.

1  Q.  I was looking at your evidence list.

2  A.  Yes, sir, I was too.  And I just wrote down what was

3  on the head stamp, sir.

4  MR. BRAUCHLE:  All right.  Go ahead.

5  DIRECT EXAMINATION RESUMED

6  BY MR. BEACH:

7  Q.  Showing you State's 44, you found some scales in a

8  shoe box; is that correct?

9  A.  That's correct.

10  Q.  And did you ever work Narcotics?

11  A.  No, sir.  I was in Patrol, then I went to crime

12  scenes.

13  Q.  You have enough general information to know what

14  individuals why they would carry scales like that around with

15  them?

16  A.  Generally, yes, sir.

17  Q.  I'm sorry?

18  A.  Yes, sir.

19  Q.  What is the reason?

20  A.  To weigh them, to weigh the little baggies for sale I

21  would imagine.

22  Q.  I am going to show you State's 45 now, and what is

23  depicted in State's 45?

24  A.  That's item number 66, and if you will allow me to

25  refer to my notes.  That is a semiautomatic pistol,

---

1  professional ordinance, and its caliber is .223.

2  Q.  And there is a clip attached to it; is that correct?

3  A.  Yes, sir.

4  Q.  And I will show you now State's Exhibit 46,

5  Detective, where was that photograph taken?

6  A.  That was taken at the fingerprint lab in our office,

7  1400 South Lamar.  After the weapon had been unloaded, the

8  magazine removed, and the life bullets or cartridge had been

9  taken out of the magazine.

10  Q.  Okay, how many live rounds did you extract from the

11  magazine?

12  A.  Twenty-nine.

13  Q.  We will get back to that photograph in just a second.

14  Showing you now State's 47, did you find a casing in the

15  suspect vehicle, sir?

16  A.  Yes, sir.

17  Q.  And that's item number 68?

18  A.  Yes, sir.  Creased between the driver's seat and the

19  console.

20  Q.  Right there, is that the casing with the red dot?

21  A.  Yes, sir.

22  Q.  And where was that found in the car?

23  A.  Right at the edge of the driver's seat towards the

24  passenger's side next to the console, center console.

25  Q.  And what was the caliber of that casing?

---

134

1  A.  That casing -- let me check my notes make sure I got

2  it.  It's an R.P. Remington Peter .223 Remington, or R.E.M.

3  Q.  Is that the only casing that you found in the red and

4  gray Chevy car that night, sir?

5  A.  Yes, sir.

6  Q.  Going back to State's 46, did you examine the clip in

7  that pistol and the live rounds in that clip before you

8  extracted all 29 rounds?

9  A.  Yes, sir, I did.

10  Q.  What did you notice about the next live round in line

11  in top of that clip?

12  A.  The very next round, the top round was askew, the

13  best way to describe it.  It was not even straight.  It was

14  angulated.  And it apparently would not feed.

15  Q.  Is that consistent when you see something like that,

16  the next round is not seated properly, could that lead to a

17  firearm like that not functioning properly or jamming?

18  A.  It certainly could, yes, sir, in my opinion.

19  Q.  Now --

20  MR. BEACH:  If we could have the lights for a

21  second, Judge, thank you.

22  Q.  (By Mr. Beach)  Were DPD numbers assigned

23  to each of the firearms that was fired by the Dallas

24  Police Officers out at the scene that night?

25  A.  Tag numbers were.

---

135

1  Q.  And item numbers; is that correct?

2  A.  Yes, sir, and item numbers.

3  Q.  Let's start with your item number 73, was that the

4  A.R. 15 rifle that Pat Starr was firing out there at the scene

5  that afternoon?

6  A.  Yes, sir, that's correct.

7  Q.  Your item number 74 was that the Glock that Officer

8  Jarc was firing that night?

9  A.  That's correct.

10  Q.  Item -- your item 75, was that the Sig Saur 9

11  millimeter that Borchardt was firing?

12  A.  Yes, sir.

13  Q.  And item number 76, was that the 9 millimeter Sig

14  Saur that he was firing?

15  A.  That's correct, yes, sir.

16  Q.  Once again so the record is clear, your item 66 was

17  the assault pistol that was found inside the defendant's

18  vehicle on the driver's seat; is that correct?

19  A.  That's correct.

20  Q.  Item 68 -- your item 68 was the one fired cartridge

21  casing that you found again on the driver's seat?

22  A.  That's correct, yes, sir.

23  Q.  I am showing you State's 56, what is that a

24  photograph of?

25  A.  That's Corporal Nix's eyeglasses.

---

1    Q.    They appear to be laying in blood; is that correct?
2    A.    That's correct.
3    Q.    That's your item 67?
4    A.    Yes, sir.
5    Q.    And that was taken there at the scene at 4023 Bernal?
6    A.    Yes, sir, it was.
7    Q.    You took photographs of Officer Nix's uniform; is
8    that correct?
9    A.    Yes, sir.  At the crime lab or the fingerprint lab.
10   Q.    I show you State's 53, Detective Krieter, and does
11   that depict Officer Nix's uniform shirt, badge that he would
12   have been wearing on March 23rd of 2007?
13   A.    Yes, sir, it does.
14   Q.    Okay.  When you were examining Officer Nix's badge,
15   Detective, did you notice anything in the left upper center of
16   that badge?
17   A.    Yes.  It was a bullet embedded into the badge itself.
18   Q.    A bullet fragment embedded in Nix's badge?
19   A.    Yes, sir, bullet itself.
20   Q.    Showing you State's 54, is that the backside of
21   Officer Nix's badge?
22   A.    Yes, sir, it is.
23   Q.    Showing the indentation going through the badge that
24   bullet or bullet fragment made; is that correct?
25   A.    That's correct.

1    Q.    Now, okay --
2          MR. BEACH:  Judge, thank you.
3    Q.    (By Mr. Beach)  After photographing the
4    items at the scene, photographing the clothes down
5    at your office, again, you had to do something with
6    Nix's uniform clothes; is that correct?
7    A.    We had to let the blood dry.
8    Q.    Then you were able to photograph them?
9    A.    Yes, sir.
10   Q.    And after all that was done and processed, did you
11   then go ahead and tag certain items and send them to the
12   respective locations that you needed to send them to, whether
13   it was SWIFS, firearms, whatever?
14   A.    Yes, sir.
15   Q.    I am showing you what has been marked for
16   identification as State's Exhibit 63; you recognize this
17   firearm?
18   A.    Yes, sir, I do.
19   Q.    And is that the assault pistol that you seized out of
20   the suspect vehicle back on March 23rd of 2007?
21   A.    Yes, sir, it is.
22         MR. BEACH:  At this time we will offer into
23   evidence State's Exhibit 63, Your Honor.
24         MR. BRAUCHLE:  No objections.
25         THE COURT:  State's 63 is admitted.

138

1    Q.    (By Mr. Beach)  The clip that goes to State's 63, you
2    examined that clip.
3    A.    Yes, sir.
4    Q.    March 23rd, March 24th; is that correct?
5    A.    That's correct.
6    Q.    There were 29 live rounds in the clip?
7    A.    That's correct.
8    Q.    And can you demonstrate how you observed the next
9    round in line just where that would have been?
10   A.    Would have been at the top, but it was angled, it
11   wasn't straight with the others.
12   Q.    I am going to show you what has been marked for
13   identification as State's Exhibit 64, and ask you if you can
14   identify the contents of State's 64?
15   A.    Yes, sir.  This is my item number 68, .223 R.E.M.
16   fired cartridge casing.
17   Q.    Is that the cartridge that you found -- you found it
18   in the front driver's seat?
19   A.    Yes, sir.
20   Q.    Of the suspect of the read and gray Chevy out at the
21   scene that night?
22   A.    Yes, sir.
23         MR. BEACH:  At this time, Judge, we would offer
24   State's 64 into evidence.
25         MR. BRAUCHLE:  No objections.

139

1          THE COURT:  State's 64 is admitted.
2    Q.    (By Mr. Beach)  Detective, I would ask that
3    you examine the contents of State's 66, and tell us
4    if you can identify what that envelope contains
5    A.    This is property tag for item 66, the automatic
6    pistol.  The seal is broken.  These are the bullets that have
7    been removed from this bag and been repackaged by the SWIFS
8    personnel including one, I guess, that is.
9    Q.    They dissected one of them, I guess?
10   A.    Looks like it, yes, sir.
11   Q.    Those are the 29 live rounds that you had removed
12   from your item number 66, the assault pistol; is that correct?
13   A.    Yes, sir.
14         MR. BEACH:  Judge, we would offer just the
15   contents of State's Exhibit 66 into evidence at this time.
16         MR. JOHNSON:  No objections.
17         THE COURT:  That Exhibit 66?
18         MR. BEACH:  Yes, Your Honor.
19         THE COURT:  State's 66 is admitted.
20   Q.    (By Mr. Beach)  And just while I am here, Detective,
21   showing you what has been admitted as State's 4, the diagram.
22   Again is this the laser diagram that you ordered to have done
23   as part of your investigation?
24   A.    Yes, sir.
25   Q.    I am showing you what has been marked for

1  identification as State's Exhibit No. 86, ask if you can
2  recognize what is contained in that envelope?
3       A.  Officer -- Senior Corporal Nix's badge, his breast
4  badge.
5       Q.  Now, if the bullet fragment would have been removed
6  from the badge you would have observed on March 24th, 2007?
7       A.  Yes, sir.
8       Q.  That is Nix's badge?
9       A.  Yes, sir, it is.
10           MR. BEACH:  We will offer State's 86 into
11 evidence at this time.
12           MR. BRAUCHLE:  No objections.
13           THE COURT:  State's 86 is admitted.
14           MR. BEACH:  Publish to the jury.
15      Q.  (By Mr. Beach)  I will show you State's 82
16 at this time, and ask if this is Detective Nix's
17 T-shirt that you would have photographed back on
18 March 24th, 2007
19      A.  Yes, that's his bloody T-shirt.
20      Q.  And what was your item number for?
21      A.  81-D.
22           MR. BEACH:  We offer State's 82 at this time,
23 Your Honor.
24           MR. JOHNSON:  No objections.
25           THE COURT:  State's 82 is admitted.

1       Q.  (By Mr. Beach)  Showing you State's 83 and
2  84, Detective; you recognize 83 as Officer Nix's
3  protective vest and 84 is his uniform shirt?
4       A.  Yes, sir, I do.
5           MR. BEACH:  Would offer State's 83 and 84 into
6  evidence at this time, Your Honor.
7           MR. JOHNSON:  No objections.
8           THE COURT:  State's 83 and 84 are admitted.
9       Q.  (By Mr. Beach)  Finally, Detective, I am
10 going to show you State's 85, and ask you if you
11 could recognize the contents of DPD insignia pin?
12      A.  Yes, sir.  That's my item number 72.
13      Q.  Where did you find State's Exhibit No. 85 on March
14 the 23rd, 2007?
15      A.  I found it under the armored personnel carrier --
16 wait a minute, I will tell you exactly which one -- I'm sorry,
17 it was on the passenger's side of the suspect vehicle.
18      Q.  And that would have been based on your investigation
19 in close proximity to where Mark Nix was shot that afternoon?
20      A.  Yes.  It was on the ground next to where he would
21 have been lying.
22           MR. BEACH:  Can I get one of these police
23 officers, one of those DPD insignia pins go on the uniform?
24           THE COURT:  You may.
25      Q.  (By Mr. Beach)  This is Officer Wyde.

142

1       You got a goal DPD pin on the left and right collar;
2  is that correct?
3       A.  That's correct.
4       Q.  You found one of these existed literally to be blown
5  off his left collar that afternoon?
6       A.  Yes, sir, I did.
7           MR. BEACH:  We will offer State's Exhibit 85
8  into evidence, Your Honor.
9           MR. JOHNSON:  No objections.
10          THE COURT:  State's 85 is admitted.
11      Q.  (By Mr. Beach)  Based on everything that
12 you know, Detective, back on March the 23rd of
13 2007, was Mark Nix a Dallas police officer
14      A.  Yes, sir, he was?
15      Q.  And was he a certified peace officer?
16      A.  Yes, sir, he would have been.
17      Q.  I appreciate you coming down taking time from your
18 son.  I wish you well and him well.
19          MR. BEACH:  I pass the witness.
20          THE WITNESS:  Thank you, sir.
21          THE COURT:  Ladies and gentlemen, we will take a
22 15-minute break.
23          THE BAILIFF:  All rise.
24          (Jury retired from the courtroom.)
25          (Recess taken.)

143

1           (The following proceedings heard in camera.)
2           THE COURT:  On the record, in chambers, outside
3  the presence of the jury in the courtroom, press and
4  everything else and also outside the presence of the
5  defendant.
6           MR. BRAUCHLE:  After Krieter testified and the
7  recess was declared, I went up to talk to him so I could see
8  his notes to perhaps pair down the time that it would take for
9  cross-examination.  After we came back to order.  And found
10 that his notes state that another pistol was found on Officer
11 Nix that we have never been informed of before today.  And
12 that was some handwritten note.  And, now, then, he is stating
13 that there was a supplement in with the papers that he showed
14 me during the inspection during the recess.  I don't think
15 that there was.  But in any event, we obviously haven't been
16 told before now that Officer Nix had two weapons on him.  And
17 we still haven't been provided with the purported supplement
18 that would have shown that he did have two weapons on him.
19 Obviously that's something of a surprise to us.  To say
20 something of a surprise, is kind of an under statement.  We
21 are into the second day of trial and we find out that
22 situation exists, and quite frankly we are surprised and we
23 would ask the Court for a continuance until we can look into
24 this matter further.  And we would state that we were in no
25 way expecting anything like this.  It is my understanding and

1  I don't -- I don't want to talk for the State, but I think
2  they were unaware of it before a few minutes ago also. So --
3  is that correct?
4          MR. BEACH:  It's correct. That the State, as
5  far as I know, had no knowledge that Nix had a second gun in
6  his ballistic vest that they found after he died at the
7  hospital.
8          Judge, our position is, we have requested over and over
9  again from DPD, and I don't know what the situation is even
10  last week, I got Spurger, my investigator to get someone who
11  apparently has access printing online all DPD supplement. The
12  supplement that Krieter has with him today, I have never seen
13  it. There is an entry in his original portion that says all
14  of Officer Nix's personal items were, you know, kept because
15  they were too bloody or something like that. This gun is one
16  of those personal items.
17          The second gun, I am sure they are going to have a theory
18  on it, has nothing to did with this case. The video is clear
19  the only gun he had out, he put on the ground. The fact that
20  he had -- have a second gun in underneath his uniform shirt
21  has got absolutely no relevance. But we don't care now if
22  they go into it with Detective Krieter that he had another
23  gun, if they want to do that. But in terms of harm, in terms
24  of surprise, yes, it surprised everybody that there is another
25  supplement out there; but it has nothing to do with the

1  elements of the indictment in this case, the facts of this
2  case.
3          I apologize to the Defense as to why there is this
4  communication gap, but it has been remedied here. You can ask
5  him about it. He has seen the supplement. You know we aren't
6  hiding anything. If we were hiding something, I wouldn't have
7  told Detective Krieter to tell you now, the first time, about
8  the supplement with him today. Obviously he thought we had it
9  or he wouldn't have brought it, if he thought it was some kind
10  of big conspiracy.
11          MR. BRAUCHLE:  Well there is another aspect in
12  that Krieter is the person that took the photographs. And we
13  don't know if -- since the weapon isn't in the custody of the
14  State nor the Court, we don't know if the -- if there is any
15  photographs of it. We -- obviously we think that some
16  demonstrative evidence of this -- of the existence of this we
17  should be able to know that one way or another, and Krieter
18  can't tell us that either.
19          MR. BEACH:  He can tell you if the -- 9
20  millimeter Sig Saur, just like Haecker was shooting. We can
21  get a photograph -- we don't have a photograph of that Sig
22  Saur. We got another one, you want to show the dimensions of
23  the gun. There is nothing that would justify a ten-minute
24  continuance, we can look for the photograph and try to find
25  one. We need to get a photograph whatever he was carrying, we

---

146

1  can do that. He can bring out through Krieter there was a
2  second gun in his vest. There was, you know, that was found
3  at the hospital after he died if they think that is important
4  to the jury that they know about.
5          THE COURT:  And where is this gun now.
6          MR. BRAUCHLE:  I don't know.
7          THE COURT:  Returned to the family or --
8          MR. BEACH:  What they did, everything was too
9  bloody. He felt like he didn't want to return it to the
10  family at that point in time. I don't know if they dried it
11  out and cleaned it up and finally gave it back, we don't know.
12          MR. BRAUCHLE:  We don't know. It is obviously
13  something that we think could be probative, we don't know. I
14  mean, it is like we don't have it, we haven't seen it, we
15  didn't know about it until a few minutes ago. And we have no
16  idea where to go with it. That's why we are asking for a
17  continuance to --
18          MR. BROOKS:  What is the probative of --
19          MR. BRAUCHLE:  Pardon.
20          MR. BROOKS:  In what way is it probative?
21          MR. BRAUCHLE:  Well, I think it speaks volume on
22  Nix's character, which I think is the crux of the Defense.
23          MR. BROOKS:  Yes, sir, understanding that, as
24  Mr. Beach pointed out. The information you have it now, you
25  can question the detective about the existence of where he

1  found it and when he found it.
2          MR. BEACH:  And argue it, if you want to argue
3  it, if you think it is a real relevance in this case you know,
4  Paul, carries an extra gun or 80 percent of them. Most D. A.
5  investigators carry two guns. You want to argue that, as you
6  know in any form or fashion, feel free to do it, it is going
7  to be in evidence. It is not going to get any better for you
8  tomorrow or the next day, it is what it is, he carried a
9  second freaking gun.
10          MR. BRAUCHLE:  Well, I am saying whether it is
11  going to get better or worse, I don't think it can get worse
12  than being blind-sided in the middle of a trial. But I think
13  we are at least entitled to a copy of the supplement that we
14  now know exists, which we still don't have. And we need to be
15  able to be enlightened as to whether there are photographs of
16  this evidence is no longer available.
17          MR. BEACH:  He could have Krieter's copy. I am
18  sure Dan Krieter would be glad to give him a copy he brought
19  to court today, and you could put it in your file.
20          THE COURT:  I am not going to grant a
21  continuance that the time.
22          MR. BRAUCHLE:  With all due respect, at some
23  other time isn't going to do us any good because we still got
24  the witness here that we need to cross-examine in regard to
25  this situation. And if -- if it is not granted now, and he

---

147

1    goes back to Oklahoma City or wherever, then we are even in
2    worse shape than we are now.
3          MR. BEACH:  I think you can see through that,
4    there is no basis for it.  He has got no relevance.
5          MR. BRAUCHLE:  He is striking at the --
6          MR. BEACH:  We can look for a photograph, we can
7    look for a photograph.  If that is important to you, we will
8    try to find it between now and tomorrow morning and let you
9    have it and we will stipulate that that's a photograph of the
10    second gun.  Maybe we can even run down the second gun, I
11    don't know.
12          MR. JOHNSON:  Can I say something.  We -- have
13    all the lawyers in this case have spent a great deal of time
14    preparing for trial.  Untold number of hours on both sides.
15    And it is all designed to be prepared on all the factors
16    involved in the case.  This is something that none of us knew
17    about.  Everything that we have talked -- at least as Defense
18    team, everything we have looked at, we have looked at in terms
19    of how we are going to use it in trial strategy.  This is
20    something that we need to be able to get together and talk
21    about and try to make some determination about how we want to
22    approach this in regards to our trial strategy.  And that's
23    what we need a little bit of time for to do that.
24          MR. BEACH:  I got another detective down here
25    who worked with Krieter, I can get him working on it, you can

1    call him back, he was with Krieter every step of the way.  And
2    if you want to make some other bill or even introduce evidence
3    on him, you can do it.  He was with him, he helped him log in
4    all the stuff.  And he is available.  I need to get him out of
5    here today like quickly to get back to his son.
6          If there was no videotape of this, Karo, and everything
7    was up in the air about how that shooting happened, it would
8    be one thing.  It is right there in living color and Mark Nix
9    did not pull out a second gun, did not have two guns, he did
10    not have a machine gun, he set it down and hit the window with
11    the asp.  I understand what you are saying to cover the
12    record, that's great.  It has no bearing on this case, you can
13    question him right now about it.  He had a second gun and make
14    whatever points you want to make.  I mean it is right there on
15    the video.
16          MR. JOHNSON:  But I don't know that we want to
17    do that.  You know that's why I am saying we need time to make
18    those decisions.  So that's what surprises is about, that's
19    why you get continuances when you get surprises like this.
20          MR. BRAUCHLE:  I concur.
21          THE COURT:  I am going to deny the continuance
22    request.
23          MR. BEACH:  Can we proceed.
24          MR. BRAUCHLE:  Well, I still want some time to
25    talk with co-counsels in regard to before we do proceed.

---

1          MR. BEACH:  And I just -- you know I can't tell
2    these guys what to do, I respect them and hopefully they have
3    a little respect for me.  But I am representing to them there
4    is no more honorable police officers.  I have known Dan
5    Krieter for 25 years.  He brought this with him today and
6    turned it over to Paul.  Paul has got questions about that.
7    He is as honest and ethical not just a police officer but
8    human being.  And if this is going to turn into some personal,
9    you didn't show me that, yes, I did, you didn't show me that,
10    yes, I did, I am just telling you, Dan wouldn't do it.  That's
11    why he brought everything with him today because he had it, he
12    assumed rightfully so that we had turned over evidence to you.
13          MR. JOHNSON:  That doesn't have anything to do
14    with what we need --
15          MR. BEACH:  They got into it.
16          MR. JOHNSON:  I don't think we feel that way
17    about it at all.  But we do need some time for us to get
18    together to figure out how we are going to handle this
19    surprise.  That's what we are asking for a little time right
20    now so we can go talk about it right now and decide where we
21    are.
22          MR. BROOKS:  We have one other witness situation
23    that we need to bring up.  We have a civilian witness that is
24    here today.
25          THE COURT:  Is that the one that doesn't want to

1    be --
2          MR. BEACH:  She has a new baby.  Two days out
3    postpartum, she is here and has to get on and off today, she
4    is a short witness.
5          MS. HANDLEY:  Physically she needs to get on.
6          MR. JOHNSON:  Let's go back there and see.
7          (End of proceedings in chambers.)
8          (Recess taken.)
9          (The following proceedings heard in camera.)
10          MR. BRAUCHLE:  Your Honor, after consulting with
11    my co-counsels in regard to various aspects of this -- this
12    weapon, we would state that once again we would ask for a
13    continuance in regard to this as it relates to Officer Nix, in
14    that we know that Officer Jarc had a weapon that he was not
15    certified or qualified to carry out there at the scene.  And
16    we would ask for time to look at Nix's records to see if in
17    fact he was authorized to carry a weapon at the scene such
18    as -- as has been made known to us at this time.
19          We also think that we should be allowed additional time
20    to decide which of the previous witnesses should be called
21    back.  I realize that the Court is anxious to get this over
22    with, as are we; but we have a duty to our client to make
23    certain in regard to the exact status of this situation before
24    we go further.  We don't think that this would take more than
25    say noon tomorrow.  We have already got a deal in regard to

1  substitution of Krieter with another witness after we cross
2  him today.  They have now come up that the weapon has been
3  found and it's in property and supposedly will be produced
4  some time tomorrow.  And -- we would still ask for a
5  continuance because of the surprise created by this situation.
6          THE COURT:   And you are requesting a continuance
7  prior to cross-examining Officer Krieter, is it?
8          MR. BRAUCHLE:   No, I think I can -- I think I
9  can ask Krieter almost everything I want to.  The thing is --
10 is that there is aspects like I say of the qualification with
11 this weapon, whether he is authorized to use it, what the
12 departmental policies are in regard to carrying weapons that
13 you may or may not be qualified to carry or qualified to -- to
14 use.  We -- you know it is the whole aspect of Nix's life that
15 we haven't known that we might have to be getting ready for, I
16 mean we can't check out everything.  But certainly had we been
17 advised of this before the middle of the trial, we would have
18 certainly been able to have made some inquiry.
19         THE COURT:   Off the record.
20         (Discussion off the record.)
21         (End of proceedings in camera.)
22         THE BAILIFF:   All rise.
23         (Jury returned to the courtroom.)
24         THE COURT:   You may be seated.
25     You may proceed, Mr. Brauchle.

1          MR. BRAUCHLE:   Thank you, Your Honor.
2  May I approach?
3          THE COURT:   You may.
4                CROSS-EXAMINATION
5  BY MR. BRAUCHLE:
6     Q.     Officer Krieter, is that your correct title at this
7  time?
8     A.     I guess it would be Mister, sir.
9     Q.     So you are?
10    A.     Retired.
11    Q.     You are a physical evidence officer; is that correct?
12    A.     I was a detective with the Dallas Police Department,
13 yes, sir.
14    Q.     Are you employed by them in any capacity at this
15 point in time?
16    A.     No, sir, I am retired.
17    Q.     All right.  Let me ask you, you produced
18 investigative notes in regard to all of the items that you
19 found; is that correct?
20    A.     Yes, sir.
21    Q.     You numbered them?
22    A.     Yes, sir.
23    Q.     You took pictures of them --
24    A.     Yes, sir.
25    Q.     -- is that correct?  And in regard to the photographs

154

1  of the weapon found in the Chevrolet driven by the defendant,
2  you took weapons both at the scene and then back at DPD; is
3  that correct?
4     A.     Did I collect weapons at the scene?
5     Q.     Well --
6     A.     Yes, sir.
7     Q.     You found a weapon in the defendant's car; is that
8  correct?
9     A.     That's correct, sir.
10    Q.     You took photographs of it at the scene?
11    A.     Yes, sir.
12    Q.     And then you went back to what location to take
13 further pictures of it?
14    A.     1400 South Lamar.
15    Q.     Which is the police station; is that correct?
16    A.     Yes, sir.
17    Q.     Now, then, in all of your copious notes that you have
18 made in regard to the items that you found, in those notes
19 include things like what location they were found in, what
20 relationship they were found in relation to other exhibits?
21    A.     Yes, sir, they do.
22    Q.     Is that correct?  Such as item three being next to
23 item four or whatever, and then so that people that come after
24 you can figure out the relationship of all of these items; is
25 that correct?

155

1     A.     Yes, sir, I try to do my best.
2     Q.     And you marked and made diagrams and maps, and part
3  of the exhibit in front of you that you are looking over has
4  where the bulk of your items were found; is that correct?
5     A.     Yes, sir, I believe so.
6     Q.     And that's done by the numbers that you -- that you
7  have shown the jury or have been shown to the jury that were
8  placed on top of items that you found out at the scene; is
9  that correct?
10    A.     Yes, sir.
11    Q.     Now, then, did anybody help you with that?
12    A.     Yes, sir.
13    Q.     Who is that?
14    A.     Well, there were numerous detectives.  Detective Joe
15 Allen helped me with the scene.
16    Q.     Would he be a P.E.S. officer?
17    A.     Yes, sir, he was a detective.  The other crime scene
18 detectives were Detective Mike Gonzales, he took photographs
19 of the scene on the outside.  Detective Kate Zimmer went to
20 the hospital, collected the clothing and came back and
21 assisted me at the scene.  Detective Richard Dodd work with
22 the traffic unit, who did the sokia map.  And my sergeant was
23 Sergeant Garcia.  And a supervisor was Lieutenant Bulk.
24    Q.     Now, then, it has come to light after you testified
25 before the break that there were certain property that neither

1    the State nor the Defense had been advised of; is that
2    correct?
3        A.    Well, sir, I showed you the paperwork. I didn't know
4    at the time if you had been advised or not.
5        Q.    Well, as it turns out from consulting with myself, as
6    well as the attorneys from the State, evidently the addendum
7    or whatever that you would have filed after your original
8    report was made was not forwarded; is that a correct
9    statement?
10       A.    I guess so, sir.
11       Q.    That would be what is called a supplement?
12       A.    Yes, sir, that is a supplement.
13       Q.    And that supplement concerned the fact that Officer
14   Nix had a second weapon on his body; is that correct?
15       A.    Yes, sir.
16       Q.    And what was that?
17       A.    That was a Sig Saur .357 automatic pistol.
18       Q.    And where was that located?
19       A.    That was with his clothing in his vest.
20       Q.    On the vest that has already been admitted into
21   evidence?
22       A.    It wasn't with it at the time. It all came in a bag.
23       Q.    Okay. So it was found in his vest at the hospital;
24   would that be a fair statement?
25       A.    I believe so, sir.

1        Q.    All right. And that was what again?
2        A.    It was a Sig Saur .357 automatic pistol.
3        Q.    Do you know what model?
4        A.    .357, I don't know the model of Sigs that well.
5        Q.    The .357 is the caliber, but you don't know the
6    model?
7        A.    Not off the top of my head, no, sir.
8        Q.    Is it reflected -- so it is not reflected in your
9    notes?
10       A.    It is not in those notes, no, sir.
11       Q.    Now, then, you also testified -- well, let me back
12   up, you recovered the weapon attributed to the defendant at
13   the scene, took pictures of it at the scene and then took it
14   to 1400 South Lamar for further photographing; is that
15   correct?
16       A.    That's correct, sir.
17       Q.    And we have seen those pictures that were made there;
18   is that correct?
19       A.    That's correct, sir.
20       Q.    And you made, what, two pictures of the weapon as
21   well as the bullets taken out of it at that location.
22       A.    I have only one photograph that I could find of the
23   weapon with the bullets removed at our office. The other
24   photographs of the weapons where -- there are many others of
25   them in the car.

158

1        Q.    Okay. But the ones in the car don't show the
2    condition that you call askew round in the clip, do they?
3        A.    No, sir, they do not. I do not have a photograph of
4    that.
5        Q.    There is no photograph of that anywhere?
6        A.    No, sir, I cannot find one.
7        Q.    Now, then, when you are at 1400 Lamar, you have
8    access to any amount of photographic equipment you want; is
9    that correct?
10       A.    That is correct.
11       Q.    And you also told the jury you are not a ballistic
12   expert; is that correct?
13       A.    That is correct, sir.
14       Q.    Now, this condition that you have told us about
15   today, you didn't take your photograph of that condition that
16   you stated existed on the night of this offense; is that
17   correct.
18       A.    To best of my recollection, I attempted to take a
19   photograph, but the photograph did not come out.
20       Q.    Would you have any photographic proof of that such as
21   a blurry negative?
22       A.    There is a whole bunch of pictures that did not come
23   out. Poor workman blames his tools; however, in this case,
24   the flash was not working that well.
25       Q.    Did you ever think perhaps to take it out to the

159

1    firearm examiner and show him what condition existed?
2        A.    I did send it to the firearm examiner.
3        Q.    But not in the original condition, did you?
4        A.    They couldn't take it that way. They have to have
5    you unload it.
6        Q.    Let's go back to that situation. Is there any note
7    anywhere that you made all of these copious records that that
8    condition existed?
9        A.    No, sir, just my memory, and that of Detective Allen
10   and Sergeant Garcia, who was standing there looking at it with
11   me.
12       Q.    Did they make any notes?
13       A.    Not to my knowledge, sir.
14       Q.    So did anybody make any notes whatsoever about this
15   askew round which you are now blaming the supposed misfire on,
16   nobody made any notes of that at all, right?
17       A.    No, sir.
18       Q.    Didn't think it was important at the time?
19       A.    It was probably important, maybe I overlooked it,
20   sir, I apologize.
21       Q.    So you and four other people overlooked it, you
22   didn't take a picture of it and didn't put it in any report;
23   is that correct?
24       A.    That would be correct, sir.
25       Q.    And you are basically just now remembering it in

1  front of this jury?
2      A.  No, I remembered it.
3      Q.  Well, you didn't share it with anybody such as this
4  jury until right now, right?
5      A.  They didn't ask me about it until right now, sir.
6      Q.  All right.  You know how somebody would know enough
7  to ask you about it if it is not recorded anywhere?
8      A.  I am not sure I understand the question, sir.
9      Q.  Well, if they don't know the condition exist or
10  existed, how would they know to even ask you about it?
11      A.  I don't know, sir, you knew to ask me.
12      Q.  Well, I knew to ask you after you testified about it
13  because up till this point, which is over a year after this
14  event, nobody but you has ever said anything about it; isn't
15  that correct?
16      A.  This is the second day of trial, Mr. Beach asked me
17  about it during my earlier testimony.
18      Q.  What, about an hour ago?
19      A.  I guess so, yes, sir.
20      Q.  Okay.  The fact remains that it is nowhere in your
21  records, is it?
22      A.  That is a fact.
23          MR. BRAUCHLE:  We will pass the witness.
24
25          (No omissions.)

1          REDIRECT EXAMINATION
2  BY MR. BEACH:
3      Q.  Briefly, Mr. Krieter, do police officers carry a
4  second gun when they are on duty?
5      A.  I did.  I think most of my colleagues did.
6      Q.  How long were you a Patrol officer?
7      A.  Twelve years.
8      Q.  From time to time would you carry a second gun?
9      A.  Nearly everyday.
10      Q.  And actually --
11          MR. BRAUCHLE:  Your Honor, we would object to
12  this.  What Mr. Krieter might have done is not relevant to
13  this case.  Is what Mr. Nix was in fact doing.  Something like
14  comparative testimony.
15          MR. BEACH:  Judge, I think I am entitled to ask
16  is it unusual for police to carry a second gun, he is training
17  and experience.
18          MR. BRAUCHLE:  Proper predicate hasn't been
19  made.
20          THE COURT:  Overrule the objection.
21          MR. BEACH:  May I approach, Judge?
22          THE COURT:  You may.
23      Q.  (By Mr. Beach)  Showing you what has been
24  admitted as State's 57, Detective, the clothes
25  depicted in State's 57, who do they belong to?

162

1      A.  They are the suspect's clothes, I believe sir.
2      Q.  Wesley Ruiz?
3      A.  Yes, sir.
4      Q.  Blue jeans, shirt, got some money off of him.  About
5  $90 depicted up here in the upper corner?
6      A.  Yes, sir.
7      Q.  Furthermore, I am going to show you State's 73, and
8  ask you if you recognize the contents of State's 73?
9      A.  Yes.  This is the drugs that were given to the Patrol
10  officer at the scene to place in the narcotics drop box.
11      Q.  The drugs, the scales, marijuana?
12      A.  Yes.
13      Q.  And you personally gave these to Officer McCarter; is
14  that correct?
15      A.  Yes, sir.
16      Q.  And he would have been in charge of depositing
17  State's 73 into the property drop box?
18      A.  That's correct.
19          MR. BEACH:  That's all I have.
20          RECROSS-EXAMINATION
21  BY MR. BRAUCHLE:
22      Q.  Officer Krieter, you are not as you said at least
23  twice today, you are not a ballistics expert; is that correct?
24      A.  That is correct, sir.
25      Q.  And this askew bullet, you don't know if that would

163

1  have kept the gun from firing again or not, do you.?
2      A.  Well, I can only state from my own experience with my
3  own automatic weapon that a bullet that is not in the
4  magazine.
5      Q.  Which automatic weapon?
6      A.  I used to carry a 9 millimeter Beretta.
7      Q.  You haven't carried this same weapon as we are
8  talking about, have you?
9      A.  No, sir.  Still an automatic, though.
10      Q.  Pardon?
11      A.  It's an automatic, though, they are both automatic
12  weapons.
13      Q.  They have had automatic weapons for years.  You can't
14  talk about one on the history of other automatic weapons, can
15  you?
16      A.  I am not a ballistics expert, sir.
17      Q.  I will show you again what has been marked as State's
18  38?
19      A.  Yes, sir.
20      Q.  In regard to -- that's already in evidence; is that
21  correct?
22      A.  I believe so.
23      Q.  All right.  And that shows the passenger's side
24  window on that Chevrolet; is that correct?
25      A.  Yes, sir.

1    Q.    Did you make any attempts to preserve that window for
2    posterity or for evidence?
3    A.    The vehicle was towed to the pound and kept in a
4    secure location, all the contents also.
5    Q.    Well, you removed certain items that you thought were
6    evidence from the car; is that correct?
7    A.    That's correct, sir.
8    Q.    I am asking you, though, did you make any effort to
9    preserve the right passenger's window or the left passenger's
10   window as part of the evidence in this case?
11   A.    Yes, sir, as I answered, the vehicle was towed to the
12   pound and placed in our building which is secure, that's as
13   preserving as I can get.
14   Q.    Okay, so if those items are no longer there, you
15   wouldn't know why they wouldn't be, right?
16   A.    Sir, the vehicle has been removed from that building.
17   I had no part in that decision, I don't know where the vehicle
18   is to this day.
19   Q.    How do you know the vehicle has been removed from the
20   building?
21   A.    Cause I have been in the building and it is not
22   there.
23   Q.    There were certain rounds that were removed from
24   the -- the car; is that correct?
25   A.    Fired bullets.

1    Q.    Yeah.
2    A.    Yes, sir.
3    Q.    Did you take place in recovering those?
4    A.    I believe most of them were recovered by Detective
5    McLemore, the following day.
6    Q.    So any questions in regard to projectiles filed into
7    the car would be better directed toward him?
8    A.    Absolutely, sir.
9    Q.    Is he also the person who puts the dowls in the holes
10   of the car.
11   A.    Would have been me, sir.
12   Q.    Pardon.
13   A.    That was me, sir.
14   Q.    And when did you do that?
15   A.    On a later date. I don't know if I wrote that down
16   in my report.
17   Q.    Let me ask you, you put the dowls in the holes in the
18   car at a later date after this event; is that correct?
19   A.    That is correct.
20   Q.    And between the time that you put the dowls in and
21   the time of the events, McLemore would have been the person
22   that went into the walls of the car and the doors and whatever
23   trying to recover projectiles; is that correct?
24   A.    He recovered some projectiles, and also at a later
25   date Detective Dodge recovered some from the interior of the

---

166

1    door.
2    Q.    So if we have questions about projectiles fired into
3    the vehicle, it would be McLemore and Dodge?
4    A.    Yes, sir.
5    Q.    And they are still Dallas Police Officers?
6    A.    Yes, sir.
7    Q.    Officers, right?
8    A.    Yes, sir, they are.
9         MR. BRAUCHLE:  I will pass the witness.
10        MR. BEACH:  Nothing further.
11   Can he be excused?
12        MR. JOHNSON:  No objections.
13        THE COURT:  You are free to go, sir.
14        THE WITNESS:  Thank you, sir.
15        MR. BROOKS:  May we approach, Judge.
16        (Discussion off the record.)
17        (Witness entered the courtroom.)
18        THE COURT:  Has this witness been sworn?
19        MR. BROOKS:  No, Your Honor.
20        THE COURT:  If you will raise your right hand,
21   ma'am.
22        (Witness was duly sworn.)
23        THE COURT:  You may put your hand down.
24   And you may proceed.
25

167

1              VERONICA MORALES
2    was called as a witness, and having been duly sworn by the
3    Court, testified under oath as follows:
4              DIRECT EXAMINATION
5    BY MR. BROOKS:
6    Q.    Introduce yourself to the jury, please?
7    A.    My name is Veronica Morales.
8    Q.    Ms. Morales, you are a little bit soft spoken.
9    A.    My name is Veronica Morales.
10   Q.    And, Ms. Morales, you had something really very
11   significant take place within the last couple of days, haven't
12   you?
13   A.    Yes.
14   Q.    And you had a baby?
15   A.    Yes.
16   Q.    And when did you have that baby?
17   A.    Sunday.
18   Q.    And you came down here this afternoon about 1:30
19   two o'clock; is that correct?
20   A.    1:30.
21   Q.    And you are under some discomfort right now; is that
22   a fair statement?
23   A.    Yes.
24   Q.    And you need to get back to your child as soon as you
25   can?

1     A.   Yes.
2     Q.   How many children do you have?
3     A.   Six.
4     Q.   And was it a boy or girl?
5     A.   A boy.
6     Q.   I want to turn your attention, Ms. Morales, back to
7   March of 2007, specifically March the 23rd of 2007; do you
8   recall that day?
9     A.   Yes.
10    Q.   And do you recall being in the city of Dallas on
11   Bernal sometime that afternoon?
12    A.   Yes.
13    Q.   And for what reason were you on Bernal that
14   afternoon?
15    A.   I was actually heading to my mother-in-law's house to
16   drop off my children.
17    Q.   And where on Bernal did your mother-in-law live?
18    A.   She lives on the corner of Leesberg and Bernal, which
19   is the street over from Mart.
20    Q.   Is that one block over from Mart?
21    A.   Uh-huh, it is a few houses down.
22    Q.   And what took place that immediately caught your
23   attention that afternoon when you were driving on Bernal?
24    A.   The police cars coming at my direction.
25    Q.   What about the police cars -- you have seen police

1   cars before?
2     A.   Yes.
3     Q.   What about these particular police cars, what was it
4   that caught your attention?
5     A.   Well, when you are on Bernal, there is a curb, so I
6   saw the police cars coming with their lights on, and they were
7   coming in my direction and I scooted over to get out of the
8   way.  And as I scooted over, I saw there was a car in front of
9   them.
10    Q.   And what did the car in front of them appear to be
11   doing?
12    A.   Well, at first I didn't realize that it was going so
13   fast until it had turned the opposite direction.
14    Q.   But based upon what you saw, the two police cars and
15   this other vehicle, did it appear to you that those police
16   cars were pursuing that other vehicle?
17    A.   Yes.
18    Q.   And what did you see that other vehicle do?
19    A.   Well, on the curb, it is a pretty bad curb that a lot
20   of cars have hit.  I wasn't sure if the car tried to U-turn
21   for it hit the curb and lost control, but it ended up facing
22   the opposite direction.
23    Q.   Did you watch that car as it spun out of control?
24    A.   Yes.
25    Q.   And when it came to a rest, what direction was the

---

170

1   car facing?
2     A.   It was facing toward -- going backward where it was
3   coming from.
4     Q.   So would the front end of that car be facing toward
5   Bernal?
6     A.   Yes.
7     Q.   What did you see happen after that?
8     A.   The car went in reverse and went over the curb and up
9   the little hill toward the yard.
10    Q.   And where were the police cars at that point?
11    A.   In front of it.
12    Q.   How many police cars were in front of it?
13    A.   Two.
14    Q.   Did you actually see one of the police cars pull in
15   front of that vehicle?
16    A.   Actually when it came up the hill from what I recall,
17   they both came up in front of the car.
18    Q.   About the same time?
19    A.   Uh-huh.
20    Q.   Now, after this car they were chasing spun around and
21   ended up in that front yard, did you notice that car do
22   anything else that caught your attention?
23    A.   Yes.  When they pulled up and they was right in front
24   of the tree, it seemed it wanted to go forward; but the two
25   police cars were in the way, and it wasn't able to go forward.

1     Q.   It appeared to you at that time that that car they
2   were chasing tried to move forward or perhaps get past those
3   police cars?
4     A.   Yes.
5     Q.   And based on the way you recall that scene, was that
6   car pretty well blocked in?
7     A.   Yes.
8     Q.   After you see those cars get blocked in, tell this
9   jury what you recall seeing happening next?
10    A.   After the vehicles all block in, I saw the police
11   officers get out of their vehicle and come around, one or two
12   came around the left-hand side of the car.  And another one
13   through the other side.
14    Q.   And what happened?
15    A.   And then from there, the glass kind of shattered, and
16   it shattered outward, but I wasn't sure if it was from --
17   where it had actually started, then I saw the police officers
18   going toward the car -- sorry, I am a little nervous.  And
19   then I don't really -- I saw someone come down toward the back
20   tire on the left-hand side after all the shooting.
21    Q.   Okay.  Let's back up for a minute.  Now, you have
22   told us that you saw this car spin out of control and end up
23   in the front yard.  And I believe you told the jury that you
24   saw the police cars block that car in?
25    A.   Yes.

171

1    MR. BROOKS:   May I approach the witness, Your
2  Honor?
3            THE COURT:   You may.
4    Q.   (By Mr. Brooks)  Let me show you a diagram,
5  Ms. Morales -- can you see this?
6    A.   Yes.
7    Q.   And if I represent to you that this is the car that
8  you saw the police chasing --
9    A.   Yes.
10    Q.   -- and these are the two police officers that blocked
11  it in, is that how it would appear to you at that time?
12    A.   But since I was on the other side right there, it
13  seems like the cars were more directly in front of it rather
14  than that one off to the side.
15    Q.   And if this is Bernal, you would have been coming
16  from this direction (indicating)?
17    A.   Yes (indicating.
18    Q.   So you would have had a clear, basically a clear view
19  of this side of that suspect car?
20    A.   Yes.
21    Q.   And after they have blocked that car in, again what
22  did you see any of the police officers do?
23    A.   Come around one side -- I believe one officer came
24  around this other side on the far side that I wouldn't have
25  been able to see, but there were two officers on the other

1  side.
2    Q.   And when those officers came around on the other
3  side, are you referring to the passenger's side?
4    A.   Yes.
5    Q.   Now, when they came around to the passenger's side,
6  did you hear or see anything at that time?
7    A.   I saw the glass starting to shatter.
8    Q.   The glass of what shatter?
9    A.   The windshield.
10    Q.   Of the suspect vehicle?
11    A.   Yes.  And that's when the shooting started.  And at
12  that moment once everything started, the glass started
13  breaking.  And then right after that, I saw who I believe was
14  a police officer fall towards the back passenger's side tire.
15    Q.   Do you recall giving a statement to the Dallas Police
16  Officers, Ms. Morales?
17    A.   Yes.
18    Q.   And when is the last time you had a chance to review
19  your statement?
20    A.   I am not sure, it was a few months ago.
21    Q.   Do you think if you had an opportunity to review your
22  statement, it would refresh your memory as to what you
23  remember seeing back then?
24    A.   No, well, I believe it is the same thing, I saw the
25  vehicle come up on the hill, I saw the police cars in front of

---

174

1  it, I saw the police officers walk out, approach the car then
2  glass started chattering, that's basically all I saw.
3    Q.   Okay.  Now, let's talk about the first -- the glass
4  chattering, the first glass you saw shatter that you described
5  as coming outward?
6    A.   Yes, it kind of like popped like that, but I don't
7  know -- I assume from inside.
8    Q.   Which vehicle was that?
9    A.   From the one that was blocked in.
10    Q.   The one the police was chasing?
11    A.   Yes.
12    Q.   Thank you, ma'am.
13            MR. BROOKS:   Pass the witness.
14            **CROSS-EXAMINATION**
15  BY MR. BRAUCHLE:
16    Q.   Ms. Morales, you stick by your testimony today; is
17  that correct?
18    A.   Yes.
19            MR. BRAUCHLE:   We will pass the witness.
20            MR. BROOKS:   Nothing further, Your Honor.
21            THE COURT:   You may step down, ma'am.
22            THE WITNESS:   Thank you.
23            MR. BROOKS:   May she be excused?
24            MR. BRAUCHLE:   Yes.
25            THE COURT:   You are free to go, ma'am?

175

1            THE WITNESS:   Thank you.
2            THE COURT:   May I see the attorneys.
3            (Discussion off the record.)
4            MR. BROOKS:   The next witness is going to be
5  another officer involved in the shooting, so he can be fairly
6  long.
7            THE COURT:   More than a half an hour you think?
8            MR. BRAUCHLE:   Oh, yeah.
9            THE COURT:   How long you think your part will
10  be, just an estimate.
11            MR. BROOKS:   How long you think sergeant?
12            THE COURT:   On direct.
13            MR. BEACH:   An hour probably.
14            THE COURT:   For direct.
15            Ladies and gentlemen, we are going to recess for the day,
16  we will reconvene tomorrow at nine o'clock.  Keep in mind my
17  prior admonitions regarding discussing this case.  We will see
18  you tomorrow.  Have a good evening.
19            THE BAILIFF:   All rise.
20            (Jury retired from the courtroom.)
21            MR. BROOKS:   Your Honor, at this time we offer
22  State's 14-A, which is the transcription of the radio dispatch
23  tape, which was State's 14-B.  We will enter this as 14-A.
24            MR. JOHNSON:   No objections.
25            MR. BROOKS:   For record purposes.

```
 1              THE COURT:   14-A is admitted for record
 2   purposes.
 3              (Court recessed for the day.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   THE STATE of TEXAS )
 2   COUNTY of DALLAS  )
 3            I, BELINDA G. BARAKA, Official Court Reporter in and
 4   for the 194th Judicial District Court of Dallas County, State
 5   of Texas, do hereby certify that the foregoing contains a true
 6   and accurate transcription of all portions of evidence and
 7   other proceedings requested in writing by counsel for the
 8   parties, to be included in this volume of the Reporter's
 9   Record, in the above-styled and -numbered cause(s), all of
10   which occurred in open court or in chambers and were reported
11   by me.
12            I further certify that this Reporter's Record of the
13   proceedings truly and correctly reflects the exhibits, if any,
14   admitted by the respective parties.
15            I further certify that the total cost for the
16   preparation of this Reporter's Record  was paid by the
17   State/Defense.
18            WITNESS MY OFFICIAL HAND this the 30th day of
19   May          , A.D., 2009.
20
21
22                        BG Baraka
22                        BELINDA G. BARAKA, CSR #5028
23                        Official Court Reporter
                          133 N. Industrial
24                        Dallas County,  Texas  75207
25   Certification Expires:  12-31-09
```

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

CAUSE NO. F07-50318-M

THE STATE OF TEXAS          *     IN THE DISTRICT COURT

vs.                         *     194TH JUDICIAL DISTRICT

WESLEY LYNN RUIZ            *     DALLAS COUNTY, TEXAS

- - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

JURY TRIAL

Volume 44 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 29th day of May,
A.D, 2008, the above-styled and -numbered cause(s) came on for
hearing before the HONORABLE ERNEST B. WHITE, III, of the
194th Judicial District Court of Dallas County, State of
Texas, the following is a true and correct transcription of
the proceedings had, to-wit:

    (Proceedings Reported by Computerized Machine Shorthand)

*Belinda G. Baraka, Official Court Reporter*
214-653-5803

1                          A P P E A R A N C E S

2

3       HON. KEVIN BROOKS
        Assistant District Attorney
4       State Bar No. 03070735

5

6       HON. ANDY BEACH
        Assistant District Attorney
7       State Bar No.  01944900

8                                     FOR THE STATE OF TEXAS

9

10      HON. PAUL BRAUCHLE
        Attorney at Law
11      State Bar No. 02918000

12

13      HON. WILLIAM JOHNSON
        Attorney at Law
14      State Bar No.  10804500

15                                    FOR THE DEFENDANT

16      Also Present:

17       Doug Parks, Attorney at Law

18

19

20                            *  *  *  *  *

21

22

23

24

25

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                        I N D E X

 2                                              PAGE/VOL.

 3     Proceedings - 05/29/08 ........................... 4/44

 4

 5     Reporter's Certificate ...........................   10

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

(May 29, 2008)

1     THE COURT: Cause No. F07-50318, styled the
2 State of Texas versus Wesley Lynn Ruiz.
3     Juror No. 11, Ms. Propper, scheduled to come in the
4 courtroom. She is ill and indicated that she will be
5 unavailable.
6     This hearing is being held without the defendant present.
7 Attorneys for both sides are present.
8     Mr. Johnson, do you have any objection to proceeding
9 without the Defendant.
10     MR. JOHNSON: Without Mr. Ruiz, no, we have no
11 objections at least for right now. For what we are doing
12 right now, it is kind of exploratory inquest. We are happy to
13 proceed and have no objection to proceeding in this matter.
14     THE BAILIFF: All rise.
15     (Juror entered the courtroom.)
16     THE COURT: You may be seated.
17     Good afternoon, Ms. Propper.
18     JUROR: Good afternoon, Judge White. I
19 apologize again for the inconvenience.
20     THE COURT: Certainly not at all. We appreciate
21 you coming back. I was informed that you will not be
22 available tomorrow?
23     JUROR: They did give me an excuse, I was

---

**Page 5 (right column)**

1 diagnosed with a stomach flu. And they told me that I may or
2 may not be contagious, and they told me to come home to get
3 some rest. And they gave me documentation saying that I could
4 return on the 2nd. So that's why I thought I should come by
5 and give y'all whatever documentation or whatever that you
6 needed.
7     THE COURT: Okay. And given that circumstance,
8 we do appreciate you coming to the court. You will -- you are
9 scheduled to be released for the 2nd, which is Monday?
10     JUROR: Yes, sir.
11     THE COURT: Any questions from the State?
12     MR. BROOKS: Prior to you getting sick,
13 Ms. Propper, these first couple of days of trial, had you been
14 able to listen and listen to the evidence?
15     JUROR: Yes, sir.
16     MR. BROOKS: Focus on the facts of the case?
17     JUROR: Yes. It was only until yesterday
18 afternoon that I started feeling bad. But I believe I have
19 had full attention.
20     MR. BROOKS: And how do you feel at this moment?
21 How are you feeling?
22     JUROR: At this moment I am still nauseated and
23 I am still not feeling very well. I haven't gotten my
24 prescriptions. I left from the hospital and came right here.
25 They have given me some prescriptions for nausea and some

---

6

1 antibiotics to be on.
2     MR. BROOKS: When you know say you brought from
3 hospital, is that basically doctors orders to stay home
4 till --
5     JUROR: Yes, sir. Just a -- I brought all the
6 paperwork from the hospital showing my diagnosis, my
7 prescription and just a piece of paper, you are welcome to
8 look at it.
9     MR. BROOKS: I think you said possibly
10 contagious.
11     JUROR: Exactly. That's why I was concerned
12 about coming tomorrow.
13     MR. BROOKS: Pass the witness.
14     MR. PARKS: Ms. Proffer based on your
15 conversation with the doctor, do you feel that it is a
16 reasonable assessment that once you get your medication, get
17 your rest between now and then, that you would be able to
18 return.
19     JUROR: I believe so and I sincerely hope so,
20 yes, sir. I did not -- I did have surgery a week ago, but I
21 spoke to my doctor originally and he is the one that sent me
22 to the E.R. Because he said he did not think it was related
23 to my surgery. At the E.R., they did do a CAT scan and they
24 did show that the CAT scan came back normal. And that's when
25 they said that they believe it was just a stomach flu.

---

7

1     MR. PARKS: And your doctor felt pretty
2 comfortable that you will be able to return and ready to go on
3 Monday?
4     JUROR: I believe so. He changed the
5 antibiotics. I was already on antibiotics. And he have given
6 me these Phenegren for nausea. And really truly, if I get the
7 nausea under control I think I will be okay.
8     MR. PARKS: Thank you, ma'am.
9     JUROR: Sure.
10     THE COURT: All right --
11     MR. JOHNSON: One more question.
12     MR. PARKS: Doctor releasing you to come back to
13 your duties on Monday?
14     JUROR: Yes, sir. I did explain to them that I
15 was a juror and that this was important and that's why I
16 needed documentation.
17     MR. PARKS: Thank you, ma'am.
18     JUROR: Sure.
19     THE COURT: Ma'am if, you will step down.
20     JUROR: Thank you.
21     THE COURT: Thank you.
22     (Juror complies.)
23     THE COURT: Anything from the State?
24     MR. BROOKS: Well, Judge, I need some time to
25 talk to appellate and figure out if we want to try to continue

---

1 or wait till Monday.  There is concerns about waiting until
2 Monday, there are a lot of witnesses that we have told to be
3 back here at 830 in the morning.  I need a moment.  If you are
4 asking me whether or not...
5           THE COURT:   Right.
6       Let me just say, at this point, my inclination, given the
7 situation that we have with the jury is to recess and
8 reconvene on Monday, given the shortage of alternates, that
9 situation we are in.  As well as I forget what juror number it
10 is, but the one that can't go beyond Friday as well.  So
11 that's the Court's inclination at this time.
12               MR. BROOKS:   And we are only doing a half day
13 yesterday anyway.
14           THE COURT:   Tomorrow, right, right.
15           MR. BROOKS:   Assume that we do start Monday, we
16 had mentioned earlier, 8:00 to 6:00 whatever.
17           THE COURT:   I anticipate getting started 8:30
18 and working till about 6:00 so ...
19           MR. BROOKS:   Okay.
20           THE COURT:   And I don't know if the Defense had
21 anything they wish to put on the record.
22           MR. JOHNSON:   Well, we have told these jurors
23 from the very beginning during the jury selection and they
24 have never been told anything different, we have always told
25 them that we would work 9:00 to 5:00.  And some of these

1 jurors may have commitments that they have set up based on
2 that.  So I think that's -- obviously, the Defense lawyers
3 still have other things to do outside of being here in trial.
4 We still got other preparation to do.  We actually, believe it
5 or not, have other cases that we have to work on, other
6 clients we have to meet with.  So all those factors, I would
7 like to ask all those things to be considered.  And let's just
8 see where we are as with the Court's indulgence.  That's my
9 only comment in regards to that.
10               (Court recessed for the day.)

10

1   THE STATE of TEXAS )
2   COUNTY of DALLAS  )
3           I, BELINDA G. BARAKA, Official Court Reporter in and
4   for the 194th Judicial District Court of Dallas County, State
5   of Texas, do hereby certify that the foregoing contains a true
6   and accurate transcription of all portions of evidence and
7   other proceedings requested in writing by counsel for the
8   parties, to be included in this volume of the Reporter's
9   Record, in the above-styled and -numbered cause(s), all of
10  which occurred in open court or in chambers and were reported
11  by me.
12          I further certify that this Reporter's Record of the
13  proceedings truly and correctly reflects the exhibits, if any,
14  admitted by the respective parties.
15          I further certify that the total cost for the
16  preparation of this Reporter's Record  was paid by the
17  State/Defense.
18          WITNESS MY OFFICIAL HAND this the 30th day of
19  May , A.D., 2008.
20
21
22                    BELINDA G. BARAKA, CSR #5028
23                    Official Court Reporter
                      133 N. Industrial
24                    Dallas County, Texas 75207
25  Certification Expires:  12-31-09

CAUSE NO. F07-50318-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| vs. | * | 194TH JUDICIAL DISTRICT |
| WESLEY LYNN RUIZ | * | DALLAS COUNTY, TEXAS |

- - - - - - - - - - - - - - - - -

REPORTER'S RECORD

JURY TRIAL

Volume 45 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 2nd day of June, A.D, 2008, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III, of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                  A P P E A R A N C E S

 2

 3    HON. KEVIN BROOKS
      Assistant District Attorney
 4    State Bar No. 03070735

 5

 6    HON. ANDY BEACH
      Assistant District Attorney
 7    State Bar No.  01944900

 8                                FOR THE STATE OF TEXAS

 9

10    HON. PAUL BRAUCHLE
      Attorney at Law
11    State Bar No. 02918000

12

13    HON. WILLIAM JOHNSON
      Attorney at Law
14    State Bar No.  10804500

15                                FOR THE DEFENDANT

16    Also Present:

17     Doug Parks, Attorney at Law

18

19

20                        *  *  *  *  *

21

22

23

24

25
```

1                        I N D E X

2                                          PAGE/VOL.

3   Proceedings - 06/02/08 ............................ 6/45

4   STATE'S WITNESS      Direct     Cross     V.Dire

5    PATRICK STARR       6, 32      21, 35

6    JEFF METZGER        45, 54     57         53

7    LARRY GORDON        63, 79     74

8    STEVEN OSBORN       81         86

9   RAYMOND COOPER       106, 151   126, 154

10                       156        157

11  DEREK MCCARTER       158        161

12  MONICA LOPEZ         163, 171   169

13  VICKI HALL           173        193

14

15  Reporter's Certificate ............................ 200

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T   I N D E X

 2    STATE'S EXHIBIT(S):          OFFERED:  ADMITTED:  VOL.

 3    18    Bullet                    40        41       45

 4    22    Poster                    17        17       45

 5    26    News Video                19        19       45

 6    32    Ruiz's Medical Records    53        54       45

 7    32-A  Photograph                51        51       45

 8    64    Shell Casing             110       110       45

 9    68    Laboratory Report        113       113       45

10    68-A  Report                   114       114       45

11    69    Photograph - Badge       153       153       45

12    70    Laboratory Report        165       165       45

13    73    Drug Evidence            168       168       45

14    74    Laboratory Report        179       179       45

15    74-A  Report                   176       176       45

16    75    Laboratory Report        184       185       45

17    76    Laboratory Report        192       192       45

18    77    Laboratory Report        192       192       45

19    81    Nix's T-Shirt            185       192       45

20    96    Fragment                 115       115       45

21    97    Fragment                 117       117       45

22    98    Fragment                 120       121       45

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

|  |  | **E X H I B I T   I N D E X** |  |  |  |
|---|---|---|---|---|---|
| **DEFENSE'S EXHIBIT(S):** |  |  | **OFFERED:** | **ADMITTED:** | **VOL** |
| 3 | Document |  | 94 | 94 | 45 |
| 4 | Casings |  | 140 | 140 | 45 |
| 5 | Casings |  | 140 | 141 | 45 |
| 6 | Casings |  | 141 | 141 | 45 |
| 7 | Casings |  | 142 | 142 | 45 |
| 8 | Spent/Fragments |  | 147 | 147 | 45 |
| 9 | Casings |  | 149 | 149 | 45 |
| 10 | Asp |  | 162 | 162 | 45 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1             **P R O C E E D I N G S**

2               (June 2, 2008)

3          THE COURT:   Mr. Aven, bring in our jury.

4          THE BAILIFF:   All rise.

5          (Jury entered the courtroom.)

6          THE COURT:   You may be seated.

7   Good morning, ladies and gentlemen.

8          THE JURY:   Good morning.

9          THE COURT:   You may call your next witness.

10         MR. BEACH:   State will call Pat Starr, Your

11 Honor.

12         THE COURT:   Has this witness been sworn.

13         MR. BEACH:   Yes, Your Honor.

14         (Witness entered the courtroom.)

15         THE COURT:   You may proceed.

16            **PATRICK STARR**

17 was called as a witness, and having been duly sworn by the

18 Court, testified under oath as follows:

19           **DIRECT EXAMINATION**

20 BY MR. BEACH:

21   Q.    Tell us your name, please.

22   A.    Officer Patrick Starr.

23         MR. BEACH:   And let the record reflect that you

24 have previously been sworn.

25   Q.    (By Mr. Beach)  Is that correct, sir?



1   A.    Yes, sir, I have.

2   Q.    How long have you been a Dallas Police Officer?

3   A.    Approximately 12 years.

4   Q.    And back on March 23rd, 2007, you were riding

5 passenger in the black pickup being driven by Jason Jarc; is

6 that correct?

7   A.    That's correct.

8   Q.    You were Northwest Deployment at the time; is that

9 correct?

10   A.    I was.

11   Q.    You and Jarc were the two officers that initially

12 spotted the red over gray Chevy Caprice driving on I-35; is

13 that correct?

14   A.    Yes, sir, that is correct.

15   Q.    And the jury has heard the radio transmission

16 concerning spotting the vehicle and chase down Bernal and your

17 voice on that tape; is that correct?

18   A.    Yes, sir, it is.

19   Q.    What is your rank, sir?

20   A.    Senior corporal.

21   Q.    I am going to call you Pat?

22   A.    Yes, sir.

23   Q.    Pat, it has been a while for the jury, four or five

24 days since they heard about this, just take us through going

25 over the bridge there on Westmoreland and take us through what

---

8

1 happened leading up to where the car wrecked out on Bernal?

2   A.    Officer Jarc and myself initially spotted the car,

3 broadcasted on the radio --

4         MR. BRAUCHLE:   We object to narrative.

5   Q.    (By Mr. Beach)  Okay, let's just get

6 straight to it.  You are driving down Bernal at a

7 high right of speed; is that correct?

8   A.    Moderate, yes, sir.

9   Q.    Did the red and gray Chevy eventually wreck out there

10 at 4023 Bernal?

11   A.    Yes, sir, it did.

12   Q.    Where were you when the red and gray Chevy wrecked

13 out?

14   A.    We were actually probably a little less than a

15 quarter of a mile behind.  We didn't see the car wreck.  As we

16 rounded the corner, we looked, the car was nose to nose back

17 up against the tree with Officer Nix's vehicle, almost

18 touching it.

19   Q.    And where did Jarc pull your black Chevy pickup?

20   A.    I believe we stopped about 30 to 40 yards away from

21 the wrecked scene, the red Caprice.

22   Q.    And as you come to a stop, tell the jury what you see

23 when you come to a stop there?

24   A.    As I am getting out of the passenger side of the

25 vehicle, I was getting my equipment ready.  We believed it to

---

9

1 be a murder suspect.  I was, you know, getting my vest on,

2 getting my rifle out, I saw Officer Nix at the passenger's

3 side of the window.  I then heard -- saw a flash, heard the

4 gunshot and saw Mark fall down.

5   Q.    And when you heard the gunshot and saw the flash and

6 saw Mark Nix fall to the ground, where exactly -- where were

7 you at that time?

8   A.    I was about 30 yards directly in front of the

9 vehicle, facing the windshield.

10   Q.    And again the jury has seen the videotape shot from

11 Mark Nix's patrol vehicle shooting into the front windshield

12 of the suspect vehicle.  At some point in time -- and you have

13 seen that videotape; is that correct?

14   A.    Yes, sir I have.

15   Q.    At some point in time do you start shooting toward

16 the front windshield of that Chevy Caprice?

17   A.    Yes, sir, I did.

18   Q.    And was that immediately after Officer Mark went down

19 or some time elapse?

20   A.    There was actually a little bit of a time lapse.  I

21 saw Officers Jeremy Borchardt and Todd Haecker begin firing.

22 But Todd moved around to the back of the car and he was in my

23 direct line of fire.  And I was yelling at Todd to move

24 because I had a rifle; and once he moved, I opened up on the

25 windshield.

1    Q.    And where were you when you fired your initial round
2    of shots?
3    A.    Initially I was right at 30 yards away and I was
4    directly in front of the driver's side of the windshield.
5    Q.    And in relation to your truck, where were you?
6    A.    Just outside the passenger's side door.
7    Q.    And what weapon were you firing at that time?
8    A.    An A.R. 15, which is basically what the military use.
9    Q.    And approximately how many shots did you initially
10   fire right there at your pickup truck?
11   A.    I believe it was four or five initially from that
12   position.
13   Q.    And what was your target at that time?
14   A.    The defendant.
15   Q.    And specifically what were you aiming at?
16   A.    His head.
17   Q.    Through the front driver windshield; is that correct?
18   A.    Yes, that's correct.
19   Q.    After you fired those initial four or five rounds,
20   what did you do at that time?
21   A.    I initially started to move to the right and I
22   realize that I put myself in a bad position, we would be in a
23   cross-fire position. So I moved back to the left where
24   Officer Nix's car was and Officer Borchardt's car, in between
25   the two cars.

1    Q.    As you got up to that second location, did you see
2    Officer Jarc do something in relation to Mark Nix?
3    A.    Yes, sir, I did.
4    Q.    What was that?
5    A.    Officer Jarc was moving toward Mark Nix to pull him
6    out. Mark was bleeding pretty severely. I then saw the
7    defendant continue to manipulate his weapon inside. I believe
8    he was still firing, and I opened up on the windshield again.
9    Q.    Where were in relation to his car at that time?
10   A.    I was probably at no more than ten yards away and at
11   a diagonal position kind of off the passenger's side of the
12   vehicle.
13   Now, the point in time on I-35 when you first saw the
14   red and gray Chevy, were you able to identify -- first of all,
15   how many people were inside the car?
16   A.    We had no idea.
17   Q.    Why was that?
18   A.    The windows were extremely dark.
19   Q.    You didn't know if it was a white male,
20   African-American male, female, you didn't have any idea?
21   A.    No idea.
22   Q.    As you are out in front, when you fire your initial
23   body of shots, Pat, do you know how many people are inside the
24   car at that time?
25   A.    I did not.

---

12

1    Q.    Can you see movement from inside the car from where
2    you were?
3    A.    Yes, sir, I could.
4    Q.    What could you see?
5    A.    I could see a silhouette. And I specifically
6    remember the gun, I thought the gun was a Tec 9 millimeter.
7    Something like an Uzi, I specifically saw that gun.
8    Q.    What position were you in when you saw the gun?
9    A.    Directly in front of it when I initially saw it.
10   Q.    About how many shots did you fire the second time
11   around after Jason Jarc pulled Officer Nix out of there?
12   A.    I believe it was about eight or nine.
13   Q.    And once they got Mark Nix out of harms way there and
14   across the street, what did you do at this time?
15   A.    At that time, I mean we couldn't see in the vehicle.
16   And I looked up, they were loading Mark into a police car and
17   they got him out of there, took off to the hospital. We were
18   extremely close and I was the only one with a rifle. So I
19   backed the rest of the group off. Got them to take position
20   of a cover, a good distance away, probably 30 yards away, and
21   I just sat on the hood of the car with my sight trained on the
22   windshield, looking for movement, looking for additional
23   gunfire; and that's when we started -- Tact out there, our
24   SWAT team, as far as barricaded persons go. We couldn't go up
25   and enter the vehicle, the side windows was still so dark. I

13

1    could see a little bit through one of the windows where there
2    was a relatively big whole busted in the passenger's side
3    window. I could see the defendant slumped over, no movement.
4    But I didn't know if there was other people inside.
5    Q.    Were you there when the SWAT team eventually
6    extricated the man behind the steering wheel of that red and
7    gray Chevy?
8    A.    Yes, sir, I was.
9    Q.    Did you get a look at the man once he was taken out
10   of the vehicle?
11   A.    No, sir, I did not.
12   Q.    At any time while Mark Nix was still on his feet
13   there at the passenger's side of that red and gray Chevy
14   Caprice, anytime while he was on his feet doing what he was
15   doing there, did you fire a round at any point in time during
16   that time frame?
17   A.    No, I did not.
18   Q.    It was well after he was on the ground, Haecker had
19   moved back behind the car did you start to shoot your rounds;
20   is that correct?
21   A.    That's correct, sir, yes.
22   Q.    Now, you remained out there until SWAT got out there,
23   till the individual in the red and gray Chevy was taken out of
24   the car; is that correct?
25   A.    Yes.

1    Q.    At some point in time did you become aware that a
2  woman and child were trapped inside one of the vehicles there
3  in the yard?
4    A.    Yes, I did.
5    Q.    And did you see them eventually get removed from the
6  vehicle?
7    A.    Yes, I did.
8    Q.    For the record, Pat Starr, you are a Dallas Police
9  Officer, peace officer acting in the lawful discharge of your
10  official duty back on March 23rd, 2007?
11    A.    That's correct.
12    Q.    All the events you testified to, the chase, the
13  shooting of Mark Nix, did they occur in Dallas County, Texas?
14    A.    Yes, sir.
15    Q.    I want to talk to you, you told us what kind of gun
16  you were shooting that day, the A.R. 15, specifically,
17  describe the round that was coming out of your gun that day?
18    A.    We shoot 223, which is the caliber of the round.  We
19  shoot a ballistic tip round out of our rifles.
20    Q.    And for the folks on the jury that don't know what a
21  ballistic tip round is, be more specific.
22    A.    Ballistic tip bullet does not allow for over
23  penetration of the round.  The typical military round will go
24  through basically anything.  It will shoot through a wall, a
25  car door windshield.  Go in the front and out the back.  The

1  ballistic tip has a plastic tip in front of it that slows down
2  the velocity of the bullet.  If it hits a human body, it
3  causes a very large wound cavity, probably a 6-inch hole in
4  the body.  But if it hits a wall, it slows the velocity down,
5  prevents it from going through multiple walls and killing an
6  innocent person.  We have to be accountable for every round
7  that come out of the our guns.  And so we got to do every
8  thing we can to slow them down.  And you know like I said,
9  prevent the innocent person from being shot.
10          MR. BEACH:    May I approach, Judge?
11          THE COURT:    You may.
12    Q.    (By Mr. Beach)   Pat, I am going to show you
13  a round of ammunition, can you identify what that
14  is.
15    A.    It's a Winchester ballistic tip 223 round.
16    Q.    Is it similar to the round that you were firing back
17  on March 23rd, 2007?
18    A.    Yes, sir, it is.
19    Q.    And this black coating around the actual bullet, is
20  that the type of round that you would have been firing that
21  day?
22    A.    Yes, sir.
23          MR. BEACH:    May I publish to the jury?
24          THE COURT:    You may.
25          MR. BRAUCHLE:    It is not in evidence.

16

1          MR. BEACH:    I am not offering it.
2          MR. BRAUCHLE:    Well, then don't publish.
3          MR. BEACH:    I just asked the Judge if I could
4  and he said I might.
5          MR. BRAUCHLE:    We would object to publishing
6  evidence that is not in evidence.
7          MR. BEACH:    Just for demonstrative purposes,
8  Your Honor.
9          THE COURT:    You may publish to the jury.
10          MR. BEACH:    May I approach again, Your Honor?
11          THE COURT:    You may.
12    Q.    (By Mr. Beach)   I will show you what has
13  already been admitted into evidence as State's
14  Exhibit No. 4, Pat, you being the blue rounds, do
15  these blue rounds, the two groupings closely
16  approximate where you would have been, where you
17  would have fired first of all the first round of
18  four shots?
19    A.    Yes, sir.
20    Q.    And then once you approached the vehicles and provide
21  cover fire for Officer Jarc?
22    A.    Yes, sir.
23    Q.    And can you point out to the jury where you would
24  have been in relation to your pickup when you fired these
25  first four rounds.

17

1    A.    This being the passenger's side door here
2  (indicating) I was standing roughly right here (indicating).
3    Q.    I am going to show you what has been marked for
4  identification as State's Exhibit No. 22, I am going to ask if
5  that is a fair and accurate representation of an aerial view
6  of the scene after Mark Nix was shot on March 23rd, 2007?
7    A.    Yes, sir, it is.
8    Q.    Do you see your vehicle in State's 22?
9    A.    Yes, sir, I do.
10    Q.    And is your vehicle the same vehicle in State's 22
11  where it would have been when you fired your initial rounds?
12    A.    Yes, sir, it is.
13          MR. BEACH:    We would offer State's 22 into
14  evidence at this time, Your Honor.
15          MR. BRAUCHLE:    No objections.
16          THE COURT:    State's 22 is admitted.
17    Q.    (By Mr. Beach)   Can you point out on
18  State's 22, Pat, your pickup truck.
19    A.    It's going to be right here (indicating).
20    Q.    And where would you have been when you fired off
21  those first four shots?
22    A.    Initially I was standing right in this area just
23  outside the passenger's door (indicating).
24    Q.    Was your passenger's door open at this time or
25  closed?

18

1    A.    You know honestly I don't know, I don't remember.
2    Q.    Okay.  On State's 22, you get an accurate view of
3  your line of sight and line of fire for those first four
4  shots?
5    A.    Yes, sir, do you.
6    Q.    And could you clearly see the driver's side of the
7  red and gray Chevy where you were when you fired those first
8  four shots?
9    A.    Yes, sir.
10    Q.    At any time did anybody get out of that Chevy?
11    A.    No, sir, nobody did.
12    Q.    At any time while you were out there until the man
13  was actually pulled out, did anybody get out of the driver's
14  side or the passenger's side of that car?
15    A.    No, they did not.
16          MR. BEACH:   May I approach again, Judge?
17          THE COURT:   You may.
18    Q.  (By Mr. Beach)  Now, I am going to show you
19  what has been marked for identification as State's
20  Exhibit 26, and ask have you viewed portions, clips
21  of the TV aerial video coverage that was taken on
22  March 23rd of 2007
23    A.    Yes, I have.
24    Q.    And the clips that you viewed, they fairly and
25  accurately depict the scene as it was after Mark Nix was shot

1  back on March 23rd, 2007?
2    A.    Yes, sir, they do.
3          MR. BEACH:   At this time, Judge, we would offer
4  into evidence State's 26, three clips from the aerial video.
5          MR. BRAUCHLE:   No objections.
6          THE COURT:   State's 26 is admitted.
7    Q.  (By Mr. Beach)  We go through this, Pat, we
8  describe what we are seeing here.  That's
9  approximately where you would have been firing from
10  right in that area right there (indicating)
11    A.    Yes, sir, somewhere in that area.
12    Q.    This is Borchardt's car right here (indicating)?
13    A.    Yes, sir.
14    Q.    Approximately in this area (indicating), is that
15  where you fired the second round of shots?
16    A.    That's correct.
17    Q.    This is Bernal Street here; is that correct?
18    A.    Yes, sir.
19    Q.    And Mart Street is down here (indicating)?
20    A.    Correct.
21    Q.    See the blood, that Mark Nix's blood right there?
22    A.    Yes, sir, it is.
23    Q.    And this blood swath going across, is that Mark's
24  again?
25    A.    Yes, sir.

20

1    Q.    And they pulled him over on the other side of Mart
2  Street?
3    A.    That's correct.
4    Q.    Okay.  Another look at the pool of blood; is that
5  correct?
6    A.    Yes, sir.
7    Q.    And the path where Jason Jarc pulled Mark out of his
8  lying position there?
9    A.    Yes.
10    Q.    Does that accurately reflect exactly how Mark Nix's
11  car pulled up to the gray and red Chevy?
12    A.    Yes, sir.
13    Q.    And Borchardt's car?
14    A.    Yes, sir.
15    Q.    You see yourself here in this video?
16    A.    Yes, sir.  I am wearing blue jeans and on me knees
17  right there.
18    Q.    Right here (indicating)?
19    A.    Yes, sir.
20    Q.    These first two clips before SWAT would have gotten
21  out to the location?
22    A.    That's correct.
23          MR. BEACH:   Pass the witness, Judge.
24          THE COURT:   Cross-examination.
25

21

1
2          CROSS-EXAMINATION
3  BY MR. BRAUCHLE:
4    Q.    Officer Starr, in the two clips you just saw, that
5  was after what you initially testified to; is that correct?
6    A.    Initially testified to.
7    Q.    The aerial views that we just saw?
8    A.    Was after the shooting, is that what you are asking?
9    Q.    Yes.
10    A.    Yes, sir.
11    Q.    It had stopped at that time; is that correct?
12    A.    That's correct.
13    Q.    And the people depicted in that picture, the police
14  officers were taking cover behind their vehicles, right?
15    A.    Correct.
16    Q.    That's what they were taught to do at the academy,
17  right?
18    A.    Correct.
19    Q.    And I am not sure if I heard -- heard correctly or
20  not, but the first shots you fired over from your pickup, I
21  believe you stated those were fired from behind the
22  passenger's door; is that correct?
23    A.    That is not correct.
24    Q.    Where were they fired?
25    A.    I was to the right of the passenger's door.

22 / 23

1   Q.   So you didn't take any cover when you got out; is
2   that correct?
3       A.   That's correct.
4       Q.   Now, why did you think the defendant was still
5   shooting at you?
6       A.   I can see him manipulating the gun and I am hearing
7   gunshots, I believed he would still be firing his weapon.
8       Q.   Where could you see that?
9       A.   Where could I see it, I could see it threw the
10  windshield, sir.
11      Q.   So you are claiming today that you could see from
12  where your pickup was?
13      A.   Yes, I could.
14      Q.   Over to the red Chevrolet and you can see through the
15  windshield?
16      A.   Yes, sir.
17      Q.   You know why the other officers out there couldn't
18  see through the windshield?
19      A.   I do not know, sir.
20      Q.   But you had the ability to look with ease into the
21  vehicle?
22      A.   With ease, no, sir, not at all.
23      Q.   Oh.
24      A.   The windows on the car were dark.
25      Q.   Well, but that evidently didn't inhibit your vision,

1   right?
2       A.   Correct, I could see inside, yes.
3       Q.   If you can see inside, why did you not know that
4   there were no other people in there?
5       A.   I was focused primarily on the driver, sir.
6       Q.   So it wasn't -- wasn't important to you to look into
7   other parts of the vehicle?
8       A.   Well, I am -- again you can't walk up to a vehicle
9   and look through the windows, from our position, there could
10  be people hiding in the floorboard, hiding behind the seats.
11  You know we are not going to walk up to the vehicle and peer
12  in.
13      Q.   But in the previous video, you-all but walked up
14  shooting at it, didn't you?
15      A.   Did I walk up, yes, I did, I walked up shooting at
16  it.
17      Q.   How long was it before you noticed the defendant
18  slumped over in the vehicle?
19      A.   Probably no more than -- I wouldn't think the whole
20  shooting lasted more than 20 seconds, so probably no more than
21  a minute before we got in a position where we could see.
22      Q.   You mean over by your pickup when you first got out?
23      A.   No.
24      Q.   You said you could see there?
25      A.   Right.  But he wasn't slumped over at that time.

24 / 25

1       Q.   So you could follow that he was supposedly shooting
2   at you, that he was slumped over, all of these things, but I
3   take it your time sequence is kind of convenient, though.  I
4   am asking you --
5            MR. BEACH:   I am going to object to the form of
6   the question, sidebar.
7            THE COURT:   Sustained.
8       Q.   (By Mr. Brauchle)  I will ask you once
9   again, when was it that you thought defendant was
10  slumped over?
11      A.   When I had moved from the passenger's side of my
12  vehicle, I moved over by Officer Jeremy Borchardt in between
13  his and Mark Nix's vehicle, I then again fired my rile.  At
14  that point Mark Nix was pulled from the vehicle, loaded into
15  a car and driven to the hospital.  We then backed all the -- I
16  begin backing officer off --
17      Q.   I just asked you at what point.
18      A.   I am trying to describe to you at what point, sir.
19  After that occurred, I was at the back of Jeremy Borchardt's
20  car.  Myself and Todd Haecker moved around the car a little
21  bit, I could see through the passenger's window where the hole
22  had been broken out and the tint was removed.  I could then
23  see the defendant slumped over the steering wheel.
24      Q.   Well, why didn't you just walk around to the front of
25  the car if you could see in the car so well?

1       A.   It is not tactically correct for me to do so.  I am
2   doing everything I can to maintain a position of cover.
3       Q.   Where was Hector when you first started firing?
4       A.   He had moved from the back of the vehicle around to
5   the passenger's side back toward his vehicle.
6       Q.   And was he already firing?
7       A.   Yes, he was.
8       Q.   And he was in your line of fire?
9       A.   No, he was not.
10      Q.   Well, when was it that he was in your line of fire?
11      A.   When the initial -- initially when-- he started
12  shooting, he was in my line of fire, but I was not firing.
13      Q.   And how many rounds did you fire out there?
14      A.   I believe 13 or 14 total.
15      Q.   Have you looked at the reports in regard to that?
16      A.   Yes, I have.
17      Q.   Well, how many was it?
18      A.   I don't recall specifically how many rounds, sir.
19      Q.   Let me ask you, you have seen the aerial videos and
20  that exhibit there of a still from one of those; is that
21  correct?
22      A.   I believe so, yes.
23      Q.   And in that exhibit everybody is in a defensive
24  position; is that correct?
25      A.   Correct.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1   Q.   Now, then, were you ever in a defensive or
2   felony-stop position?
3   A.   I don't know if I understand your question, sir, I
4   mean that to a point is a felony stop.
5   Q.   Okay.  Had you ever assumed that before that time?
6   A.   Had I assumed that we were going to conduct a felony
7   stop, is that what you are asking?
8   Q.   No.  I take it your testimony is, is that when you
9   pulled up out there at the scene, that you immediately got out
10  of your car and started firing; is that correct?
11  A.   That is not correct.
12  Q.   How long was it before you started firing?
13  A.   Probably ten to 15 seconds.
14  Q.   And I think you are saying this whole episode only
15  lasted about 20 seconds?
16  A.   The firing part of this episode only lasted probably
17  20 seconds.
18  Q.   So from that point in time that you got over there,
19  got out of the car, when you got out of the car, did you
20  assume a felony-stop position?
21  A.   You can't assume a felony-stop position with the way
22  that is set up.
23  Q.   You can't take cover behind your vehicle the way that
24  is set up?
25  A.   You can take cover behind your vehicle, that again is

1   not a felony stop.
2   Q.   Well, you didn't have the ability to conduct a felony
3   stop anyway since you didn't have a P.A. system or what have
4   you, did you?
5   A.   I did not in my truck, no.
6   Q.   Now, then, why did -- why is the truck not in a
7   position to take part in a felony stop?
8   A.   It is not a marked police vehicle, sir.
9   Q.   So that just automatically excludes it from ever
10  being used to your benefit?
11  A.   No, it can be used to our benefit.  But policy wise,
12  we can't use an unmarked pickup in a felony stop.
13  Q.   Where is that policy?
14  A.   I honestly can't tell you, I don't have it on me.
15  Q.   Have you seen the felony-stop regulations that is in
16  evidence?
17  A.   No, I have not.
18  Q.   Did you say that, ah, you are a corporal now?
19  A.   Yes.
20  Q.   And you are not in any type of training position; is
21  that correct?
22  A.   No, I am not anymore, no, sir.
23  Q.   Were you ever?
24  A.   Yes, I was.
25  Q.   Where did you work?

28

1   A.   Northwest Patrol.
2   Q.   And what kind of training did you render out there?
3   A.   I was a field training officer.
4   Q.   Okay.  So you trained recruits in regard to felony
5   stops; is that correct?
6   A.   No, sir, I did not.
7   Q.   What did you train them in?
8   A.   We tried basic patrol activity.  Felony training --
9   the felony traffic stops are trained in the Dallas Police
10  academy.
11  Q.   That's the only place?
12  A.   Primarily, yes, until it is used in the field.
13  Q.   Well, y'all used it in the field when you were
14  training, didn't you?
15  A.   No, never with a rookie, no, sir, I did not.
16  Q.   Never once, made a felony stop?
17  A.   Never once.
18  Q.   Did you just avoid them or you didn't have
19  opportunity to make them?
20  A.   I trained very view rookies.
21  Q.   But you were in training?
22  A.   Correct.
23  Q.   Well, aren't rookies the people that are generally
24  trained?
25  A.   Yes.  At the time I was a trainer, I was also in

29

1   deployment.  So I worked plainclothes.  So I did very limited
2   amounts of training.  I was primarily assigned to a
3   plainclothes assignment.  And you don't take a brand new
4   rookie and put them in plainclothes.  So most of the time if
5   there was relief, someone needed help, I took their recruit
6   and trained them.
7   Q.   And how long did you do that?
8   A.   No more than a year.
9   Q.   Now, then, basically the basic skills that you
10  learned and use on a daily basis, are taught to you by
11  repetition; is that a correct statement?
12  A.   Yes, sir.
13  Q.   So you -- you are made familiar with the techniques
14  and then you repeat them until you grasp them; would that be a
15  fair statement?
16  A.   Yes, it would.
17  Q.   And the principles behind felony stops, barricaded
18  persons, all of those are taught to you at the academy; is
19  that correct?
20  A.   Correct.
21  Q.   And there is written guidelines as to how to conduct
22  them; is that correct?
23  A.   Guidelines, yes, sir.
24  Q.   Now, then, how long did y'all remain in the position
25  shown in that exhibit up there?

1    A.    Approximately an hour.

2    Q.    What was the reason for the delay?

3    A.    Takes our SWAT team time to assemble, formulate a

4    plan, get to the location.

5    Q.    Wouldn't they formulate a plan at the scene?

6    A.    I am not sure exactly how they do it, sir.

7    Q.    Where did they come from?

8    A.    I have no idea.

9    Q.    So y'all were out there crouched down behind your car

10   for an hour?

11   A.    Probably a little more, but somewhere in that area,

12   yes.

13   Q.    Now, was anybody using an observation techniques to

14   see what kind of activity Mr. Ruiz was involved in?

15   A.    As far -- what kind of observation techniques, I am

16   not sure I understand your question.

17   Q.    You told the jury that you were able to go over and

18   look inside the car not only from the front windshield but

19   that you can see in through the side?

20   A.    Correct.

21   Q.    You could see him?

22   A.    Correct.

23   Q.    · Evidently you said you could see him almost the whole

24   time you were out there, right?

25   A.    That is not what I said, sir.

1    Q.    Well, you were seeing him enough to fire at him,

2    weren't you.

3    A.    Correct.

4    Q.    And that lasted for how long?

5    A.    Approximately 20 seconds.

6    Q.    So you could see him that whole time?

7    A.    I could see my target when I was firing, yes, sir.

8    Q.    And then you and Haecker went over and you were able

9    to see him slumped over correct?

10   A.    Correct.

11   Q.    Did you tell anybody that they could go over and

12   observe him slumped over?

13   A.    No, I did not.

14   Q.    The way you had seen him?

15   A.    No, sir.

16   Q.    Who was in charge out there?

17   A.    At the time the shooting occurred, I was probably the

18   senior officer.  We then had to call supervisors to the

19   location.  Our lieutenant responded to the scene.

20   Q.    So was it your plan out there basically just to watch

21   the driver of the car, whoever it was, be slumped over until

22   SWAT came?

23   A.    Correct.

24   Q.    Why did y'all stop firing?

25   A.    Why?  We had gotten Mark Nix out there.  I believe we

32

1    incapacitated the driver from where I could see, there were no

2    more shots being fired at us, so we took a position of cover.

3    Q.    How many people fired at the Chevrolet, do you know?

4    A.    I believe four of us total.

5    Q.    That would have been, Jarc, Haecker, yourself and who

6    else?

7    A.    Jeremy Borchardt, sir.

8    Q.    Borchardt.  But as far as you know, no one else did?

9    A.    Correct.

10         MR. BRAUCHLE:    We will pass the witness.

11         THE COURT:    Redirect.

12              REDIRECT EXAMINATION

13   BY MR. BEACH:

14   Q.    Pat, I am going to show you a portion of Mark Nix's

15   in-car video, it has already been admitted into evidence as

16   State's Exhibit No. 8.  At the time that we are going to start

17   at right here is 17:38:25; you see that?

18   A.    Yes, sir.

19   Q.    And this is as Mark was pulling into his final

20   position, bumper to bumper; is that right?

21   A.    Yes, sir.

22   Q.    Okay.  The shot just came out of the flames 17:38:37;

23   is that correct?

24   A.    Correct.

25   Q.    At this point in time you have not started to fire;

33

1    is that correct?

2    A.    That's correct, sir.

3    Q.    Mark just going down?

4    A.    Yes.

5    Q.    Okay, 17:38:37.  Now the in-car trans in for a

6    second?

7    A.    Yes.

8    Q.    That's your first shot there at 17:38:47?

9    A.    Correct.

10   Q.    About ten seconds after Mark Nix is shot; is that

11   correct?

12   A.    Yes, sir.

13   Q.    Does that square with your recollection?

14   A.    Yes.

15         MR. BEACH:    That's good, Judge.

16   Q.    (By Mr. Beach)  That's 5:30, that's

17   military time --

18   A.    Yes, sir.

19   Q.    -- 17:38 would be 5:38?

20   A.    Yes, sir.

21   Q.    You were asked on cross if you got a good look at the

22   driver and you tried -- what could you see, Pat?

23   A.    I could see a silhouette.  As you can see, you can

24   see the video, you could hear the gunshot.  I could actually

25   see -- because I specifically remember the weapon, thinking it

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1   was a Tec .9 millimeter. I could see the weapon being
2   manipulated.
3       Q.   The outline of the weapon?
4       A.   Yes.
5       Q.   And I guess you weren't following strictly the Dallas
6   Police Department policy or guidelines when you stepped away
7   from the cover of your vehicle and started shoot; is that
8   correct?
9       A.   That's correct.
10      Q.   And because you were not strictly following policy,
11  did that give that man the right at counsel table to start
12  shooting at you if you weren't following policy?
13              MR. BRAUCHLE:   Your Honor, we will object to
14  that, that's calling for a legal conclusion.
15              THE COURT:   Overruled.
16      A.   It did not give him the right, sir.
17      Q.   Were you acting in a criminal fashion when you
18  stepped away from your vehicle and started not following
19  policy and started returning fire?
20      A.   At no time was I acting like a criminal, sir.
21              MR. BRAUCHLE:   I'm sorry, I didn't hear that.
22              THE COURT:   You may repeat your response, sir.
23      A.   I said at no time was I acting like a criminal.
24      Q.   (By Mr. Beach)  Was Jeremy Borchardt, when
25  he was returning the fire, was he acting like a

1   criminal?
2               MR. BRAUCHLE:   Your Honor we would object that
3   there has been no proper predicate.
4               THE COURT:   Overruled.
5       A.   No, he was not, sir.
6       Q.   (By Mr. Beach)  How about Officer Haecker,
7   was he acting like a criminal?
8       A.   He was not either, sir.
9       Q.   Mark Nix, was he acting like a criminal when he
10  approached the car and tried to get the man out of the car
11  that day?
12      A.   No, sir, Mark Nix was a hero that day.
13              MR. BEACH:   I will pass the witness.
14              THE COURT:   Recross.
15              MR. BRAUCHLE:   Yeah, can we see the video again.
16  Can you back that up.
17              RECROSS-EXAMINATION
18  BY MR. BRAUCHLE:
19      Q.   Officer Nix is over here on the side of the vehicle
20  at this point in time; is that correct?
21      A.   Yes, sir.
22      Q.   Can you see this bullet hole right here?
23      A.   No, sir.
24      Q.   Well, if you can see the defendant in the car, and
25  all the other things you claim, why can you not see that?

36

1       A.   I don't believe that is a bullet hole, sir.
2       Q.   What would that be?
3       A.   I don't know.
4       Q.   So this wouldn't be a bullet hole?
5       A.   I don't believe so, no, sir.
6       Q.   Have you gone over and looked at the vehicle?
7       A.   Looked at the video.
8       Q.   No, the vehicle.?
9       A.   No, I have not.
10      Q.   Let's go on -- now at this point in time that this
11  hole is in the windshield, Officer Nix is still standing
12  beating on the car; is that correct?
13      A.   Yes.
14              MR. BRAUCHLE:   Roll it.
15      Q.   (By Mr. Brauchle)  Now, then, this wouldn't
16  be a bullet hole either, I take it?
17      A.   There is a bullet hole right there, sir.
18      Q.   Well, we can tell that, because we can see it coming
19  in, but you are saying that this, this and this are not bullet
20  holes (indicating)?
21      A.   Just the one is a bullet hole.  There are not other
22  bullet holes in the windshield.
23      Q.   But you have never examined the windshield, right?
24      A.   Just from being here, sir.
25      Q.   No, I am talking about walking up, looking --

37

1       A.   No, I have not, not since the shooting.
2       Q.   You don't have any personal knowledge what this could
3   be?
4       A.   From what I saw that day, there war no bullet holes
5   in the windshield until I put them there.
6       Q.   Are you telling the jury there were no bullets --
7   bullet holes in the car until you punt them there?
8       A.   No.  All my bullets came from the windshield.
9       Q.   How about the ones over here in the rear view mirror
10  and on the front windshield frame?
11      A.   I don't know about those, sir.
12      Q.   Kind of like you don't know about this one?
13      A.   No, again I never saw a bullet hole there, sir.
14      Q.   Well, you didn't walk up and look, did you?
15      A.   At some point that day, yes, I did look at the
16  windshield.
17      Q.   For that particular purpose, correct?
18      A.   For what particular purpose?
19      Q.   Of examining the windshield to see how many bullet
20  holes were in it?
21      A.   No, I did not.
22      Q.   And what was the bullet hole and what wasn't a bullet
23  hole?
24      A.   No, I know what was a bullet hole, sir, and that was
25  not one.

1    Q.    How do you know that if you never saw it?
2    A.    I looked at it that time that day, sir.
3    Q.    You just said you didn't?
4    A.    No I did.  When I got out of my vehicle, there were
5    no bullet holes in the windshield.
6    Q.    That doesn't mean that the other officers out there
7    didn't put that there, does it?
8    A.    Before I began firing.  No one fired on that
9    windshield until I started firing.
10   Q.    How do you know that?
11   A.    I was there.
12   Q.    Well, Haecker, Borchardt and Jarc were already
13   firing, weren't they?
14   A.    Not into the windshield.
15   Q.    How do you know that?
16   A.    Again I was there.
17   Q.    So you are saying photographic evidence is trumped by
18   your recollection?
19   A.    No, sir.  If you look at the video, Officer Haecker
20   was at the side of car and the back of windshield firing in.
21   He was not firing into the windshield.  Officer Jarc was at
22   passenger's side of the vehicle firing his weapon.  Officer
23   Borchardt was at passenger's side of the vehicle firing his
24   weapon.  I was the only one in front of the car firing a
25   rifle.

1    Q.    Well, that's a true statement, you were the only one
2    anyway firing a rifle?
3    A.    I was the only one at the front of the car firing a
4    weapon.  Everyone else was on the passenger's side of the car
5    or the back of the car.  None of the other officers fired into
6    the windshield.
7    Q.    Well, you got there, so you really don't know.
8    A.    Actually I didn't get there late.
9    Q.    So you are changing your testimony now?
10   A.    No, not at all.
11   Q.    Well, I thought you got there ten seconds after the
12   other people did?
13   A.    I did, correct.  Officer Nix had just exited his
14   vehicle and approached the passenger's side as we were pulling
15   up.  Officer Borchardt and Haecker hadn't even got out of
16   their cars as we pulled up.
17   Q.    So your testimony is that Officer Nix didn't exit his
18   car for at least ten seconds that it took you to get up there,
19   right?
20   A.    That is not correct, sir.  As we pulled up, Officer
21   Nix was getting out of his vehicle.  We were approximately
22   30 yards back.  As we were driving up, I can see him getting
23   out of his vehicle.
24   Q.    Could you hear Officer -- what Officer Nix was saying
25   as he was beating on the passenger's side of the passenger's

40

1    side window?
2    A.    No, I could not, sir.
3    Q.    Why not?
4    A.    There are sirens on on the squad cars.
5    Q.    Did you give the defendant any demands while you were
6    out there?
7    A.    No, I did not.
8    Q.    Know anybody else that did?
9    A.    I do not know, sir.
10         MR. BRAUCHLE:  We will pass the witness.
11         MR. BEACH:  Judge, we will go ahead and offer
12   State's Exhibit 18 for demonstrative purposes only.
13         MR. BRAUCHLE:  May we approach?
14         THE COURT:  You may.
15         (Following proceedings had at the Bench.)
16         MR. BRAUCHLE:  What the hell does that mean?
17         MR. BEACH:  They won't take it back with them.
18         MR. BRAUCHLE:  Well, if you are going to keep
19   showing it.  I would think that you would put it in for record
20   purposes.  I don't know what the proper deal is if you are
21   going to keep showing it to them.  Introduce it.  But you are
22   saying that you don't want to introduce it, because you don't
23   want them to have it in the jury room.
24         MR. BEACH:  No, no.
25         MR. BRAUCHLE:  You got a reason?

41

1          MR. BEACH:  There is no reason, just didn't want
2    to have an extra bullet laying around back there.
3          MR. BRAUCHLE:  You have already shown it to them
4    for demonstrative purposes.  And now you just want to
5    designate it, is that what this is?
6          MR. BEACH:  For demonstrative purposes.
7          MR. BRAUCHLE:  You are going to show it to --
8          MR. BEACH:  Other witnesses.
9          MR. BRAUCHLE:  To the firearms person?
10         MR. BEACH:  Yes, sir.
11         MR. BRAUCHLE:  Is it going to be introduced
12   through him?  I am not trying to tell you how to run your
13   case.
14   I am not familiar with demonstrative exhibits.
15         MR. BEACH:  They don't take them back to the
16   jury room.  That's why I am doing it for that reason.
17         MR. BRAUCHLE:  Well, you want to offer it for
18   all purposes.  I am not down here trying to --
19         MR. BEACH:  I know.
20         MR. BRAUCHLE:  I think what if.
21         MR. BEACH:  Okay.
22         (End of Bench Conference.)
23         THE COURT:  State's Exhibit 18 is admitted for
24   demonstrative purposes only.
25         MR. BEACH:  Pass the witness.

1    MR. BRAUCHLE:   Can we approach again?
2    THE COURT:   You may.
3    (Discussion off the record.)
4    THE COURT:   Mr. Brauchle, any additional cross
5  of this witness.
6    MR. BRAUCHLE:   May I have a moment, please?
7    THE COURT:   You may.
8    (Pause in the proceedings.)
9    RECROSS-EXAMINATION RESUMED
10  BY MR. BRAUCHLE:
11    Q.    Officer Starr, let me ask you this, since you have --
12  or since you last response, did anybody at any time out there
13  give Mr. Ruiz the opportunity to surrender peacefully?
14    A.    Yes.
15    Q.    When was that?
16    A.    When Mr. Ruiz -- when the officer initially turned
17  their lights and siren on, before Mr. Ruiz fled from his
18  vehicle and us.
19    Q.    I think his vehicle was moving then, wasn't it?
20    A.    He had the opportunity to pull over and surrender,
21  sir.
22    Q.    How about when he gets over on Bernal and his car
23  wrecks out, where was his opportunity then?
24    A.    Prior to shooting Mark Nix.
25    Q.    When was it?

1    A.    When Officer Nix approached the vehicle, he could
2  have easily surrendered.
3    Q.    You recall what Officer Nix asked him to do at that
4  point in time?
5    A.    Again I do not, sir.
6    Q.    So you don't know what transpired up next to the
7  passenger's side door, do you?
8    A.    I know March Nix was shot next to the passenger's
9  side door.
10    Q.    I asked what transpired between Officer Nix and
11  Mr. Ruiz?
12    A.    Well, I know what I saw transpire.
13    Q.    Did any of that indicate that it was an opportunity
14  for Mr. Ruiz to surrender peacefully?
15    A.    Yes.
16    Q.    Which part of trying to break the window out
17  indicated that to you?
18    A.    The entire time Mr. Ruiz could have surrendered.
19    Q.    With all the officers approaching his car with guns
20  drawn?
21    A.    Correct.
22    Q.    You have any idea how he would have affected that?
23    A.    Put his hands up -- it would not have involved a
24  weapon.
25    Q.    You couldn't see his hands remember?

---

44

1    A.    I could see a weapon in his hand.
2    Q.    How do you know his hands weren't up in surrender?
3    A.    With a gun pointing at a police officer.
4    Q.    Which police officer?
5    A.    Mark Nix.
6    Q.    So his weapon was pointed -- it's your testimony that
7  his weapon was pointed at Mark Nix from the time Nix
8  approached the car until the shot was fired?
9    A.    No. I saw him point his weapon at Mark Nix and shoot
10  Mark Nix, sir.
11    Q.    You haven't testified to that before, have you?
12    A.    Have I -- just now, yes.
13    Q.    Well, you didn't put it in your affidavit, did you?
14    A.    I believe so, yes, we saw -- I believe I put in there
15  a shot was fired and Mark Nix fell to the ground.
16    Q.    There is a difference between that and you seeing it,
17  isn't there?
18    A.    I am not sure I am understanding what you are saying,
19  sir.
20    Q.    What part do you not understand?
21    A.    The entire thing, from my statement reads I saw Mark
22  Nix get shot.
23    Q.    You just stated, though, to the jury that you saw
24  Mr. Ruiz pointing a gun at him and shooting him, there is
25  quite a bit of difference between those two statements, isn't

---

45

1  there?
2    A.    I don't believe so, no, sir.
3    MR. BRAUCHLE:   I will pass the witness.
4    MR. BEACH:   Nothing further, Judge.
5    THE COURT:   Thank you, sir, you may step down.
6    MR. BEACH:   May he be excused, subject to
7  recall.
8    THE COURT:   He may.
9    (Witness entered the courtroom.)
10    THE COURT:   You may proceed, sir.
11    JEFFERY METZGER
12  was called as a witness, and having been duly sworn by the
13  Court, testified under oath as follows:
14    DIRECT EXAMINATION
15  BY MR. BEACH:
16    Q.    State your name, please.
17    A.    Jeffery Metzger.
18    Q.    And how are you employed?
19    A.    I'm an assistant professor at the University of Texas
20  Southwestern Medical Center.
21    Q.    So why in the heck are down here today?
22    A.    As part of my role there, I also serve as medical
23  director for the police department and a physician with the
24  Dallas SWAT team.
25    Q.    The SWAT team is called out to a hostile situation,

47

1  you or another doctor are trained as yourself accompanies the
2  SWAT team; is that correct?
3      A.    That's correct.
4      Q.    How long have you been doing that?
5      A.    Coming up on three years.
6      Q.    And just briefly, Doctor, tell the jury your
7  educational, professional qualifications that entitles you to
8  be a SWAT doctor, teacher out there at the medical school?
9      A.    Starting with my medical education, I went to, got my
10  undergrad degree at U.C. Riverside in California. Did medical
11  school at UCLA. And then did my emergency medical training at
12  Duke University medical center at North Carolina.
13      Q.    Dr. Metzger, on March 23rd, 2007, did you accompany
14  a Dallas Police Department SWAT team to a location 4023 Bernal
15  here in Dallas County, Texas?
16      A.    Yes, sir, I did.
17      Q.    And just tell the folks again your training, what
18  your role is in a scene like this?
19      A.    So part of the training that we go through to be able
20  to operate with a SWAT team is to do a lot of the basic
21  training that they do a lot of, we go through the basic SWAT
22  class. And then their specialized schools where we learn to
23  actually take the medical skills that we use in the emergency
24  room or we also do this with paramedics as well, so skills
25  that are used kind of on the streets or emergency room and

1  kind of apply it to this sort of law enforcement environment.
2  So attended several federal courses that -- that teach this
3  kind of specialized medicine.
4      Q.    Doctor, you are dressed in operating room scrubs out
5  there, how are you dressed in a scene like this?
6      A.    Just like the rest of the SWAT team.
7      Q.    Bulletproof vest?
8      A.    Exactly.
9      Q.    Helmet?
10      A.    Yes, sir.
11      Q.    Whole deal. Did a SWAT team pull an individual
12  eventually out of a red and gray Chevy Caprice that you
13  eventually ended up treating, Doctor?
14      A.    Yes, sir, they did.
15              MR. BEACH:   May I approach?
16              THE COURT:   You may.
17      Q.    (By Mr. Beach)  I tell you what, we are
18  going to play about a three-minute clip here,
19  Doctor, of the SWAT team in action that day.  In
20  this third clip of State's 22, kind of set the scene
21  here, what are these two dark armored vehicles on
22  either side of the red and gray Chevy?
23      A.    They are what we call A.P.C. or armored personnel
24  carriers.
25      Q.    And down here, behind the one on the left, are those

48

1  members of SWAT team?
2      A.    That's correct.
3      Q.    And where do you post up prior to the suspect being
4  removed from the car?
5      A.    So typically in a situation like this, I will be in
6  the inside the A.P.C.
7      Q.    Okay.  Go ahead.
8      A.    Let me shut this off.
9      Q.    Are you on call right now?
10      A.    Sort of, we have a SWAT operation undergoing right
11  now.
12      Q.    Do you need to take a break?
13      A.    No, I just want to get this turned off.  I apologize.
14      Q.    We will go through this in more detail when the
15  actual SWAT team member testifies. There was a flash there to
16  the left. And they set off some kind of stun grenade or a
17  flash bang device?
18      A.    Yes, it was a flash bang. That is me climbing out of
19  the back.
20      Q.    This case here. You one of these individuals back
21  here now?
22      A.    I believe so, I can't actually -- no, I don't think
23  so.
24      Q.    Are there members here at the driver's side?
25      A.    Yes.

49

1      Q.    We see them actually beginning to pull the individual
2  out; is that correct?
3      A.    Yes.
4      Q.    You see the individual right there?
5      A.    That's me climbing out right now.
6      Q.    Right there (indicating)?
7      A.    Yes.
8      Q.    And why are you waiting at that point in time?
9      A.    Because we wait until it is reasonably safe for me to
10  approach the suspect. So they look through the vehicle to
11  make sure that there are no other suspects within the vehicle.
12      Q.    You see the blue jeans of the individual; is that
13  correct -- you missed it there?
14      A.    Yeah.
15      Q.    These rods here, SWAT broke out the windows; is that
16  correct?
17      A.    That's right.
18      Q.    Why did they do that?
19      A.    They were very darkly tinted and it was difficult to
20  see through them.
21      Q.    I think we are going to see here in a minute you
22  actually beginning to treat the individual. Is that you right
23  there over him, you see?
24      A.    I could not tell, I know I was up towards his head.
25      Q.    Right there; is that correct?

1   A.   Yes.
2   Q.   That's the man on the ground, that's you treating him
3 right there?
4   A.   That's correct.
5   Q.   All right.  And you are treating that individual just
6 like you would treat any other citizen that was wounded; is
7 that correct?
8   A.   Exactly.
9   Q.   Doing everything that you can as a medical doctor to
10 provide assistance to that individual?
11   A.   That's correct.
12   MR. BEACH:   That's good, Judge.
13   Q.   (By Mr. Beach)   The individual they pulled
14 out of that red and gray Chevy Caprice, you provided
15 medical care to back on March 23rd 2007, do you
16 see him in court today
17   A.   Yes, I do.
18   Q.   Would you identify him to the jury?
19   A.   The young man in the dark suit and striped tie.
20   MR. BEACH:   Let the record reflect that the
21 doctor has identified the defendant as Wesley Ruiz in court.
22   Q.   (By Mr. Beach)   Is that the man you came to
23 know later that day as Wesley Ruiz?
24   A.   That's correct.
25   MR. BEACH:   May I approach?

1   THE COURT:   You may.
2   Q.   (By Mr. Beach)  I will show you what has
3 been marked as marked for identification, State's
4 32-A; does this fairly and accurately depict the
5 head and face of Wesley Ruiz shortly after you would
6 have treated him back on March 23rd, 2007?
7   A.   Yes, sir, it does.
8   MR. BEACH:   Offer 32-A into evidence at this
9 time, Your Honor.
10   MR. BRAUCHLE:   No objections.
11   THE COURT:   State's 32-A is admitted.
12   Q.   (By Mr. Beach)  Briefly, Doctor, what
13 medical treatment did you provide to the defendant
14 at the scene
15   A.   So the initial treatment because he was unresponsive
16 when he was pulled out of the car, one of the big things we
17 had concern about is airway.  Mr. Ruiz wasn't really breathing
18 very well on his own.  So I went to incubate him, which is
19 basically put a breathing tube into his throat.  To do that,
20 we put a blade in, lift the tongue up.  When I did that, he
21 started breathing on his own, actually started coming to a
22 little bit.
23   Q.   Okay.
24   A.   And so I pulled the blade out and basically put a
25 tube through his nose that went around his tongue so his

---

52

53

1 tongue was obstructing the airway.
2   Q.   Okay.
3   A.   Did a survey to make sure that there wasn't other --
4 any big wounds from which he was losing a lot of blood.
5   Q.   Was he bloody at that time?
6   A.   He had some blood on him but not...
7   Q.   Anything -- anything open in terms of every time his
8 heart beat there was blood gushing out?
9   A.   No, there was no arterial bleeding, no massive
10 hemorrhage.
11   Q.   And you would have checked for that; is that correct?
12   A.   Exactly.
13   Q.   What else do you recall your treatment of the
14 defendant until the paramedics arrived?
15   A.   I was probably in the middle of that secondary survey
16 when paramedics were finally allowed to come up to the scene.
17   Q.   Once the paramedics get there with the stretcher,
18 what happens at that point in time.
19   A.   Generally because we don't know exactly where the
20 injuries are, what is injured, we do what is called spinal
21 precautions.  So we log roll him, keeping his spine in line,
22 log roll him, put him on a back board, roll him on to the back
23 board, use that to lift him on to a stretcher and go into the
24 back of the ambulance.
25   Q.   And did you accompany the defendant into the back of

1 the ambulance?
2   A.   I did.
3   Q.   And did you ride in the ambulance to the hospital?
4   A.   I did not.  We did some care in the back of the
5 ambulance just to kind of make sure everything was stabled, so
6 that I didn't have to go to the hospital with them.
7   MR. BEACH:   May I approach again?
8   THE COURT:   You may.
9   Q.   (By Mr. Beach)   Doctor, I am going to show
10 you what has been marked for identification State's
11 Exhibit 32, ask if you can identify State's 32?
12   A.   Yes, sir.
13   Q.   You have reviewed Parkland Hospital's 67 pages or so
14 of medical records concerning hospital treatment of the
15 defendant back between March 23rd and March 27 of 2007; is
16 that correct?
17   A.   That's correct.
18   MR. BEACH:   We would offer State's 32 into
19 evidence at this time, Your Honor, as redacted and agreed to
20 by the parties.
21   VOIR DIRE EXAMINATION
22 BY MR. BRAUCHLE:
23   Q.   Doctor, in regards to State's Exhibit 32, are any of
24 your treatment notes in there?
25   A.   No.

1    Q.    (By Mr. Beach)    Where would those be

2    A.    This is all from Parkland Hospital.  Our notes are

3    continued -- considered part of the medical record from the

4    fire department.  Our notes for what we have done on the

5    scene.

6    Q.    Did you bring those with you today?

7    A.    I do not have those notes.

8    Q.    Do you know where they would be?

9    A.    The fire department would have access to their

10   treatment notes.

11   Q.    So these are all the --

12   A.    This is the care from the emergency room and his

13   entire stay within Parkland Memorial Hospital.

14         MR. BRAUCHLE:    No objections.

15         THE COURT:    State's 32 is admitted.

16         __DIRECT EXAMINATION RESUMED__

17   BY MR. BEACH:

18   Q.    You have reviewed State's 32; is that correct?

19   A.    That's correct.

20   Q.    Generally what was the defendant's condition when he

21   got to the emergency room at Parkland Hospital in terms of his

22   vitals?

23   A.    So he had a borderline blood pressure and his heart

24   right I believe was about 130, which is fairly quick and

25   suggestive of early signs of shock.

1    Q.    Okay.  His blood pressure issue, he was slightly

2    hypertensive; is that correct?

3    A.    Yes.

4    Q.    Low blood pressure?

5    A.    That's correct.

6    Q.    Is that consistent with early signs of shock?

7    A.    Yes.

8    Q.    You have reviewed the operative report; is that

9    correct?

10   A.    Yes.

11   Q.    And the x-rays, just generally can you tell the folks

12   of the jury the extent of the injuries to Wesley Ruiz?

13   A.    So as far as the severe injuries that he sustained,

14   he had broken both arms, one bone in each arm, as well as

15   broke one of the bones in his hand.

16   Q.    And those were the most severe of his injuries?

17   A.    Yes.  Now, as part of his treatment, he had chest

18   tubes placed in both chests because he had wounds that

19   appeared like they could have gone through his chest.  And

20   sometimes with those types of wounds, you don't have time to

21   fully evaluate that before you decide to make the treatment.

22   So in an effort to kind of give him the best chance of

23   survival, they assume the worse, treated those injuries, and

24   then kind of went from there.

25   Q.    So the surgeons did exploratory laparotomy to see if

56

1    there was internal bleeding?

2    A.    Exactly.

3    Q.    Was there any evidence that you saw in the medical

4    records that any of Mr. Ruiz's arteries, veins, organs had

5    been injured?

6    A.    There were no internal organs that were injured.

7    Q.    How long did the defendant stay at Parkland?

8    A.    I believe he stayed there four days.

9    Q.    After a couple of days, he was eating, passing gas

10   normally, all those kinds of things; is that correct?

11   A.    Yes.

12   Q.    Is fair to describe that most of the quote, unquote,

13   bullet wounds were just fragments of what penetrated the skin;

14   is that correct?

15   A.    It's hard for me to say exactly what actually

16   penetrated his skin, he did have some small lacerations like

17   pieces of glass from the window or some more part of the

18   jackets of the bullets.

19   Q.    Consistent with State's Exhibit 32-A on his face; is

20   that correct?

21   A.    Exactly.  He did have other wounds that look more

22   like typical bullet wounds, but just because of where they

23   past, they appeared to pass through soft tissue, not any vital

24   organs.

25   Q.    Those wooden dowls or those rods were introduced into

57

1    his car, could they have caused the fractures of the arms or

2    do you think those were more from bullet fragments or portions

3    of jackets --

4    A.    Could the dowls themselves --

5    Q.    If they hit in Ruiz arm, are they significant enough

6    to cause a injury like that?

7    A.    The things we used to take out the windows?

8    Q.    Yes, sir.

9    A.    They are generally not put in with enough force -- it

10   is possible if the arm was up against the window that it could

11   have -- Mr. Ruiz was seen in the driver's seat kind of slumped

12   over, and at least the window that we broke out on our side

13   was on the passenger's side.  So unlikely to have been a cause

14   of any of his broken arms.

15         MR. BEACH:    I will pass the witness, Judge.

16         __CROSS-EXAMINATION__

17   BY MR. BRAUCHLE:

18   Q.    Doctor, do you know what time you got to the scene

19   out there?

20   A.    I do not recall exactly what time it was.

21   Q.    Did you review your notes before you came down here?

22   A.    I have -- no, I don't have my specific notes.  Like I

23   said, our notes are part of the fire department medical

24   records.

25   Q.    So you have no idea what time you began treating

1 Mr. Ruiz?

2    A.   That's correct.

3    Q.   Have you looked at the hospital records for Mr. Ruiz?

4    A.   I have.

5    Q.   Could you tell the jury how many gunshot wounds he

6 had?

7    A.   May I look at these?

8    Q.   Sure.

9    A.   So based on these records, there is one diagram in

10 particular --

11          MR. BRAUCHLE:  May I approach, Your Honor?

12          THE COURT:  You may.

13    A.   That seems to identify his wounds on this page, which

14 is not marked. Marked two wounds to his knee.

15    Q.   (By Mr. Brauchle)  Right there.

16    A.   So on this one, they marked two wounds to his right

17 upper chest and appears two wounds to his right lateral chest.

18 And what appears to be three wounds to his arm, I am not sure

19 if that is a three wounds or four wounds.

20    Q.   Okay. So how many wounds is that?

21    A.   So this is one, two, three, four, five, six, seven,

22 eight, nine to his body.

23    Q.   How many to his head?

24    A.   So he has several lacerations. The one particularly

25 over his eye, which to me at first glance appeared to be a

---

1 bullet wound, but on further evaluation at the hospital looks

2 like it probably was not a bullet wound.

3    Q.   What would it have been?

4    A.   Again wound from shrapnel, from either broken glass

5 or from a piece of the bullet.

6    Q.   Isn't getting hit by a piece of the bullet a gunshot

7 wound?

8    A.   Yes, it would be a gunshot wound.

9    Q.   Did you read the records as to how many projectiles

10 are still in him?

11    A.   I did not see anything that quantified how many

12 projectiles are still in him.

13    Q.   Does it show what time he got to Parkland?

14    A.   This does, yes, approximately 19:30.

15    Q.   Which would be?

16    A.   7:30 p.m.

17    Q.   So if the shooting was around 5:30, he would have

18 gotten to Parkland two hours later; is that right?

19    A.   If the shooting was at 5:30, that's correct.

20    Q.   Are you looking at the original Parkland admission

21 slip there, the first notes that Parkland --

22    A.   Well, this is a copy of the notes from when he was in

23 the emergency department.

24    Q.   Okay.

25    A.   Yes.

---

60

1    Q.   And what was his original condition described as?

2    A.   I believe it was described as critical. I can try to

3 find exactly where they wrote that.

4    Q.   Well, let me -- let me back up.

5    A.   Yes.

6    Q.   In regard to Mr. Beach's question about could his

7 arms have been broken by the SWAT team knocking out the

8 windows, I think you said that any action from y'all's side of

9 the car, you didn't see how that could have happen; is that a

10 correct statement?

11    A.   Yes.

12    Q.   And I think that the action as you can see from the

13 film from the other side was about the same as what y'all did,

14 right?

15    A.   Actually I did not get a good look at what they did

16 to that window.

17    Q.   Well, he had both arms broken?

18    A.   That's correct.

19    Q.   Now, also when you went out there, and the SWAT

20 vehicle pulled up next to Mr. Ruiz's vehicle, you stated that

21 you could see into the vehicle or you could see him?

22    A.   We could see through an area that Officer Nix had

23 kind of opened up through the window, he had made a small

24 portal in the window.

25    Q.   You know that from watching video?

---

61

1    A.   No, I could see that from my vantage point within the

2 A.P.C.

3    Q.   Well, you didn't know who or how the portal had been

4 made, right?

5    A.   Correct, yes.

6    Q.   So you learned that after the fact?

7    A.   Yes.

8    Q.   Now, did the -- would the medical records reflect as

9 to how he got the broken arms?

10    A.   Sir, if I remember correctly, there is one mention of

11 bullet fragments around the area of the fracture suggest that

12 it was -- I think they may have mentioned that they suggested

13 it was from a bullet wound.

14    Q.   So that is at least one of the broken arms?

15    A.   Exactly.

16    Q.   Now, then, let's go back from what you know since --

17    A.   Yes.

18    Q.   You don't think the SWAT team broke his arms by

19 sticking the holes into the car?

20    A.   I don't believe so.

21    Q.   They didn't break his arms by pulling him out of the

22 car?

23    A.   I don't believe so.

24    Q.   Well, you were there when they removed him from the

25 car, and you were there when they -- when they put him on the

1   ground, weren't you?
2       A.    Yes.
3       Q.    Did they in any way abuse him at that point?
4       A.    No.
5       Q.    Your treatment didn't cause him to get a broken arm,
6   did you?
7       A.    That's correct.
8       Q.    And you wouldn't think that anything between Bernal
9   Street and Parkland would have caused him to get a broken arm?
10      A.    No.
11      Q.    So about the only -- unless he had broken arms when
12  this thing started out there, it would be a safe bet to say
13  that he got the broken arms from being shot, would you not say
14  that?
15      A.    Yes, absolutely.
16      Q.    And if you poured over the 67 pages of Parkland
17  report, you could probably affirm that that would be a true
18  statement; is that correct?
19      A.    Yes.
20      Q.    In the interest of time, we will ask you not to do
21  that?
22            MR. BRAUCHLE:   We will pass the witness.
23            MR. BEACH:   Nothing further, Judge.
24      Can he be excused?
25            THE COURT:   Any objections.

1             MR. BRAUCHLE:   No.
2             THE COURT:   You are free to go, sir.
3             THE WITNESS:   Thank you.
4             THE COURT:   Ladies and gentlemen, let's take a
5   ten-minute break.
6             THE BAILIFF:   All rise.
7             (Jury retired from the courtroom.)
8             (Recess taken.)
9             THE COURT:   Bring them in.
10            (Jury returned to the courtroom.)
11            THE COURT:   You may be seated.
12      And State may call its next witness.
13            MR. BROOKS:   Call Officer Gordon.
14            THE COURT:   Has this witness been sworn?
15            MR. BROOKS:   Yes, sir.
16            **LARRY GORDAN**
17  was called as a witness, and having been duly sworn by the
18  Court, testified under oath as follows:
19            **DIRECT EXAMINATION**
20  BY MR. BROOKS:
21      Q.    Sir, would you state your name for the record.
22      A.    Larry Gordon, G-o-r-d-o-n.
23      Q.    And you are an officer with the Dallas Police
24  Department?
25      A.    Yes, sir.

64

1       Q.    Typically, are you assigned to the SWAT unit?
2       A.    Yes, sir.
3       Q.    And in fact was there an operation that you were
4   involved in this morning?
5       A.    Yes, sir, it was.
6       Q.    And that's why you are dressed in the outfit that you
7   are dressed in now?
8       A.    Yes, sir.
9       Q.    Were you present last week when this trial started,
10  were you present here at the courthouse?
11      A.    Yes, sir, I was.
12      Q.    And you had your regular dressed blues on?
13      A.    Yes, sir.
14      Q.    Officer Gordon, how long have you been with the
15  Dallas Police Department?
16      A.    Almost 14 years.
17      Q.    And what other assignments beside SWAT have you had
18  in those 14 year?
19      A.    First, I was, of course, in Patrol. Secondly, I was
20  in specialized crime unit where what we call deployment. You
21  work plain clothes. I worked in an undercover capacity in
22  Narcotics. And then I came to SWAT.
23      Q.    How long have you been with SWAT?
24      A.    Almost four years.
25      Q.    I want to turn your attention back to March 23rd.

65

1   2007, do you recall that day?
2       A.    Yes, sir, I do.
3       Q.    Do you recall how the SWAT team was notified, I
4   guess, at that point a standoff between that suspect vehicle
5   and the other officers?
6       A.    Yes, sir, I do.
7       Q.    And how were you notified?
8       A.    We were basically notified -- we were executing a
9   search warrant. The dispatcher came over the radio and
10  advised the SWAT supervisor to call down to the
11  communications, of course they didn't want to broadcast
12  whatever was going on over the radio. At that point we loaded
13  back into our vans. Our supervisor gave us information that
14  an officer had been shot. We loaded our vans, got an escort
15  code three over to Bernal Street I believe it was.
16      Q.    And you said you loaded up into your van, you have
17  seen the video?
18      A.    Yes, sir.
19      Q.    The A.P.C.s, is that what you were getting into at
20  that time?
21      A.    No, sir. It was the van, just the white van, we
22  routinely use white van in case the suspect. We turn on the
23  street they won't readily recognize who we are. We just use
24  plain white vans.
25      Q.    And I believe you told this jury that you were

1   notified and then you proceeded directly to Bernal?

2       A.   Yes, sir.

3       Q.   How many officers were with you at that time?

4       A.   Roughly -- I am not sure exactly, roughly at least

5   20, roughly.

6       Q.   And those 20 officers, were those all SWAT officers?

7       A.   Yes, sir.

8       Q.   Describe for the jury the scene as it appeared to you

9   when the 20 SWAT officers arrived?

10      A.   Basically, of course, when we arrive, we could see

11  the suspect's vehicle nose to nose with a squad car. We were

12  kind of at a stand-off distance to establish what we call a

13  command post. A make-shift command post. At that point the

14  command post was probably the trunk of a car. We established

15  the man post and we established how we were going to get a

16  perimeter around the suspect's vehicle and try to either talk

17  him out or get him out anyway we see fit.

18      Q.   Is there any kind of, for lack of a better word,

19  textbook design for extracting a barricaded individual in that

20  sort of situation?

21      A.   Textbook, I wouldn't say textbook, initially when we

22  first got there, I considered -- myself an active shooter.

23  What I did, I told my sergeant we need to shoot gas, as soon

24  as we get a perimeter, which is C.S. gas or C.N. gas to

25  minimize the suspect. We know he just shot an officer, he is

1   an active shooter, we can't see in the car, we need to do is

2   put tear gas on him right there at that point. It never

3   happened.

4       Q.   And why couldn't you see in the car?

5       A.   Tinted windows, it was like the sun was going down

6   and the shadow, just could not see in the car at all.

7       Q.   Eventually was some sort of plan developed to try and

8   get ability to see into that car?

9       A.   Yes, sir.

10      Q.   And what was that?

11      A.   Basically that plan was when the A.P.C. which is the

12  armored personnel carrier, arrived, we went -- I was on the

13  team which was on the driver's side of the suspect's vehicle.

14  The armored personnel carrier went to the passenger's side of

15  the suspect vehicle to block the suspect in case he tried to

16  exit the vehicle. So our plan was to shoot less lethal round

17  which is a round you would shoot with a person with a knife.

18  It is not a lethal round, it is a less lethal round try to

19  separate a person from a knife or some way to not readily

20  injure a person. So we started shooting less lethal rounds in

21  the window so we can get eyes in the window.

22      Q.   And the less lethal rods, are those the wooden dowl

23  rounds that you see in the vehicle?

24      A.   Yes, some of them. Some of them are wooden rounds

25  and sponge rounds. It just depends on what you put in your

68.

1   gun.

2       Q.   How successful are you able to get a better view of

3   the suspect?

4       A.   Very successful. We can see he was still breathing.

5       Q.   Once that plan was carried out as far as breaking the

6   window so you could see, what was the further plan that was

7   developed?

8       A.   The next plan at that point was -- my cell or my team

9   was considered the entry team. The other A.P.C. on the

10  passenger's side was considered the perimeter team. And my

11  team was going to actually assault the vehicle, assault

12  meaning get the suspect out. So we came up with a plan that

13  we were going to first deploy a diversionary device and go up

14  and assault the vehicle. At that point when we assault the

15  vehicle, someone from the passenger's side had cover on the

16  suspect, so if the suspect presented a threat, at that point

17  that person would have taken the threat as we were approaching

18  the vehicle.

19      Q.   Now, prior to actually assaulting the vehicle, did

20  you yourself have an opportunity to see anything inside that

21  vehicle or see anyone?

22      A.   No, we couldn't see in it. We were on the driver's

23  side. The less lethal round came from the passenger's side.

24  We couldn't see. We had to rely on the perimeter team to tell

25  us what they had.

69

1       Q.   Did you ever, prior to assaulting the vehicle, did

2   you ever get close enough where you could see inside at any

3   point?

4       A.   No, sir.

5       Q.   And who made the decision to, I guess, begin the

6   assault?

7       A.   It was actually made our sergeant who was at the

8   command post. Any decision made or anything we have to do has

9   to go through the command post, so he actually -- the

10  sergeants on the ground would relay information to the

11  sergeant at the command post, and at that point he would tell

12  us okay, you can now assault the vehicle.

13      Q.   And when that command was given, the okay, tell the

14  jury what happened?

15      A.   The command was given to assault the vehicle. We

16  kind of hash our plan out, what we were going to do what we

17  call a column assault driver's side. That is basically --

18  this is the vehicle, we go next to the vehicle in column.

19  Each person in the lineup has a certain responsibility. If

20  you are the number one guy you go to the windshield. If you

21  are the number two guy, you stop at what would be the driver's

22  side window. If you are number three, you got the back

23  window. If you are number four, you have the back. Everybody

24  has a position.

25      Q.   Let me stop you there. Do you recall what position

1  you had?

2      A.   Yes, I was in two, I went to the driver.

3      Q.   And that command is then given to assault the

4  vehicle. What happened?

5      A.   The command was given. We deployed a device at the

6  rear of the vehicle. At that point as I was going around the

7  A.P.C. on the driver's side, as I rounded the A.P.C. going to

8  my designated position, which is the driver's window,

9  basically, you couldn't see in it. And my wing man had to

10  breach that window so I could see in the window.

11      Q.   And how did he breach the window?

12      A.   He breached it with a tool, maybe a crow bar or

13  something, anything to breach the window.

14      Q.   And after he breaches the window, what is the next

15  thing you recall?

16      A.   He breaches the window, I saw the defendant flinch

17  when the window came open. I looked at the defendant, I saw

18  the rifle in the lap. I could tell the stock was open. Maybe

19  it was jammed, maybe it was open, I wasn't sure. I could see

20  him laying, not necessarily on the window, but on the side of

21  the door. I could see his hands, I could see his rifle, I

22  then backed up so I could see in the rest of the vehicle. So

23  if anybody else was in the vehicle.

24      Q.   Let me ask you this, Officer, you said at that point

25  the window is broken, you could see the defendant, you could

---

1  see the assault weapon?

2      A.   Yes.

3      Q.   What is it about that weapon that -- what is the

4  first thing that you noticed about that weapon?

5      A.   The first thing I noticed that the bolt was open.

6  What that is -- his weapon was actually the weapon we carry.

7  It was considered an A.R. 15 -- the bolt was back, halfway it

8  was open as if it jammed or if it was empty. Found out later

9  it wasn't empty.

10      Q.   So the --

11           MR. BROOKS:  May I approach, Your Honor?

12           THE COURT:  You may.

13      Q.  (By Mr. Brooks)  What you were looking at

14  at that time, the weapon was consistent with either

15  being emptied or jammed; is that a fair statement?

16      A.   Yes, sir.

17      Q.   Now, looking at State's Exhibit 29, is there -- is

18  this the weapon that you saw across the defendant's lap?

19      A.   Yes, sir.

20      Q.   And looking at State's Exhibit 29, what do you see in

21  that picture that would indicate that the bolt is open or

22  jammed?

23      A.   The charge rod is back. Is all the way down, which

24  was -- lead you to believe that the bolt is open.

25           MR. BROOKS:  Can we have the lights, Your Honor.

---

72

1      Q.  (By Mr. Brooks)  What is that I am pointing

2  at officer?

3      A.   That's the charge rod where you charge the weapon.

4      Q.   And what position is that charging rod in at this

5  point?

6      A.   It is all the way back, which would lead you to

7  believe that it was empty, the bolt being back.

8           MR. BROOKS:  Thank you, Judge.

9      Q.  (By Mr. Brooks)  And you later came to find

10  that that weapon had 29 rounds in it?

11      A.   That's what we were told.

12      Q.   The person -- strike that. After the window is

13  broken out, what is the next thing that you do?

14      A.   The window was broken out, I gave voice commands to

15  the driver not to move, let me see your hands, just trying to

16  get a response out of him.

17      Q.   Did he respond in any way?

18      A.   No, he didn't. And at that point, when he didn't

19  respond, we then opened the vehicle and extracted him out.

20      Q.   Who actually physically pull the defendant from the

21  vehicle?

22      A.   I believe it was Officer Ed McChalka (phonetic).

23      Q.   And did you have -- did you assist in any way in

24  pulling him out of the vehicle?

25      A.   No. I may have pushed him to the side as I tried to

---

73

1  do a cursory search of the vehicle, I don't think I pulled him

2  to the tree.

3      Q.   Where would you be stationed in this portion of the

4  video?

5      A.   We are on the driver's side of the vehicle. Those

6  are the two A.P.C.s. Of course the driver's side of the

7  vehicle is the top and the passenger's side of the vehicle is

8  the bottom.

9           MR. BROOKS:  Judge can we have the lights again,

10  please.

11      Q.  (By Mr. Brooks)  And which A.P.C. are you

12  in?

13      A.   I am in the other one that is not being shown. We

14  are coming around the vehicle, I am the second person right

15  there (indicating).

16      Q.   Right there (indicating). And we see someone --

17      A.   Breaching the window.

18      Q.   What are we seeing here?

19      A.   Basically, we just making sure no one is there, we

20  are opening the door and we are going to pull the defendant

21  out and pull him to the tree just so we can clear the vehicle

22  and get him away from the rifle.

23      Q.   Now, when that door opened up, did you see any type

24  of response from the defendant?

25      A.   No, not at this point.

---

75

1    Q.    And where is the defendant at this point?
2    A.    He is almost at the top of the video. I think he is
3    going to the tree there, taking him to the tree to let our
4    SWAT doctor see if he can work on him.
5    Q.    Is that what we see here?
6    A.    Yes.
7    Q.    And at this point, the vehicle has been, I guess,
8    deemed clear?
9    A.    Yes, sir.
10        MR. BROOKS:  Thank you, Judge.
11   Q.    (By Mr. Brooks)  Officer, do you see the
12   person who was taken out of that vehicle in the
13   courtroom?
14   A.    Yes, I do.
15   Q.    Would you describe an article of clothing that he is
16   wearing?
17   A.    Maybe a navy blue jacket, white shirt, with a striped
18   color tie.
19        MR. BROOKS:  Your Honor, may the record reflect
20   that this witness has identified the defendant in open court.
21        Pass the witness.
22        THE COURT:  Cross-examination.
23            CROSS-EXAMINATION
24   BY MR. BRAUCHLE:
25   Q.    Officer Gordon, did you make any kind of report out

---

1    there?
2    A.    No, we don't, we didn't.
3    Q.    So there is no independent recollection of what you
4    did out there that day?
5    A.    In what way?
6    Q.    Well, preparing a report?
7    A.    No, we don't do the report.  We will do maybe an
8    after-active report, but that's the supervisor's job.
9    Q.    And your supervisor that day was that Sergeant
10   Newton?
11   A.    No, Sergeant Newton was actually on the command post,
12   which he later moved to the A.P.C. on the passenger's side of
13   the vehicle.  My sergeant was actually Daniel Avalos.
14   Q.    So have you seen his report from out there?
15   A.    No, sir.
16   Q.    So you are telling the jury that y'all did this SWAT
17   action out there and there is no report of what y'all did in
18   regard to it; is that correct?
19   A.    I am sure it is an after-accident report.
20   Q.    But you haven't seen it?
21   A.    No, sir.
22   Q.    And you don't know who would have prepared it?
23   A.    It is either one of our supervisors.
24   Q.    Okay.  You told the District Attorney that in these
25   barricaded or stand-off situations, your first option is to

---

76

1    talk the person out of the -- wherever they are barricaded; is
2    that correct?
3    A.    No, that is not our first option.  Our first option
4    is to stop the person's aggression.  If the person is sitting
5    in a car with a weapon, you probably want to shoot gas in the
6    car to stop his aggression, because you consider that an
7    active shooter.
8    Q.    Well, did you ever try and talk this person out?
9    A.    No, we didn't -- no, not at that point.
10   Q.    Did you ever?
11   A.    No, not at that point, I didn't.
12   Q.    Okay.  When you shot the gas in the car, that didn't
13   have much effect at all, did it?
14   A.    We didn't shoot gas.
15   Q.    So I thought you said you were going to try and do
16   that cause you considered him aggressive?
17   A.    Yes, that's what I wanted to do.
18   Q.    That's what you wanted to do?
19   A.    Yes, sir.
20   Q.    But they didn't agree with you?
21   A.    They actually did agree with me but we just never
22   did.
23   Q.    Now, then, are you the person that opened the
24   driver's side door?
25   A.    No, sir.

---

77

1    Q.    Who did?
2    A.    I believe it was Officer Todd Stratman.
3    Q.    Didn't you learn when you opened it, that it wasn't
4    even locked?
5    A.    I am not sure, I didn't.
6    Q.    And of course there wouldn't be any report telling us
7    whether it was or wouldn't, would there?
8    A.    Probably not.  Because it is really not that
9    important.
10   Q.    Well, if you are out there breaking out the windows
11   cause, you can't get in and you could have opened the door
12   which you could have cause it wasn't locked?
13   A.    That wouldn't be technically sound to open the door
14   because you still have the windows to look through to see
15   whatever you are trying to see.  So it wouldn't be tactically
16   sound to just open the door.
17   Q.    Okay.  At what point could you look through the
18   window?
19   A.    When the window was broken.
20   Q.    Now, when you did open the door, I guess it was
21   tactically sound when you did that; is that correct?
22   A.    I'm sorry, say that again.
23   Q.    I guess when you did open the door, you had already
24   determined that it was tactically sound; is that correct?
25   A.    Yes, sir.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

78

1    Q.   When you did, you found out that Mr. Ruiz was not
2  conscious; is that correct?
3    A.   We didn't think he was conscious at that point.
4    Q.   You didn't have anything that showed he was, did you?
5    A.   Well, we didn't think he was conscious, but later
6  found out that he was conscious afterwards.
7    Q.   You mean he was alive?
8    A.   Yes he was conscious, he was talking.
9    Q.   When was that?
10   A.   After we brought him to the tree.
11   Q.   Well, have you talked to the doctor as to what his
12  finds were when he was brought to the tree?
13   A.   No, I have not.
14   Q.   Would you think a medical doctor would be better able
15  to assess his physical condition than yourself?
16   A.   I would imagine so.
17   Q.   Now, then, the action that we saw out there that day,
18  was how you operate on a barricaded person; is that correct?
19   A.   Yes, sir.
20   Q.   And are you familiar with the Dallas Police
21  Department guidelines in regard to that?
22   A.   Yes, sir.
23   Q.   And I take it that y'all all followed those while you
24  were out there?
25   A.   Yes, sir, I am pretty sure we did.

1          MR. BRAUCHLE:   We will pass the witness.
2                REDIRECT EXAMINATION
3  BY MR. BROOKS:
4    Q.   Mr. Gordon, I am going to show you what is marked as
5  State's Exhibit 63, and ask you if you recognize this weapon?
6    A.   Yes, sir.  That's the weapon that was laying in his
7  lap when we breached the window.
8          MR. BROOKS:   May the officer step down, Your
9  Honor?
10         THE COURT:   He may.
11   Q.   (By Mr. Brooks)   As safely as you can, can
12  you show the jury the position that this was in at
13  the time it was pulled back in this fashion.
14   A.   As if the bolt was open, as if the weapon had jammed
15  or if the magazine was empty.
16   Q.   And this again is the charging handle?
17   A.   Yes.
18   Q.   You can take your seat, Officer?
19   A.   (Witness complies.)
20   Q.   And you were asked a question about the Dallas Police
21  Department guidelines, you remember that question?
22   A.   Yes, sir.
23   Q.   And guidelines are just that, they are guidelines?
24   A.   Yes, sir.
25   Q.   Those guidelines lead you as an officer to adapt to

80

1  the specific situation, don't they?
2    A.   Yes, sir, you have to.
3          MR. BROOKS:   Pass the witness.
4          MR. BRAUCHLE:   No questions.
5          MR. BROOKS:   May this witness be excused, Your
6  Honor?
7          MR. BRAUCHLE:   Yes, Your Honor.
8          THE COURT:   You may step down, sir.  And you are
9  free to go.
10         MR. BEACH:   May we approach, Judge?
11         THE COURT:   You may.
12         (Discussion off the record.)
13         THE COURT:   You may call your next witness.
14         MR. BEACH:   May we have about a five-minute
15  recess before we call that witness?
16         THE COURT:   Yes, you may.
17  Ladies and gentlemen, we will take about a five-minute
18  recess.
19         THE BAILIFF:   All rise.
20         (Jury retired from the courtroom.)
21         (Recess taken.)
22         THE BAILIFF:   All rise.
23         (Jury returned to the courtroom.)
24         THE COURT:   You may be seated.
25  Mr. Brooks, call your next witness.

81

1          MR. BROOKS:   This witness has not been sworn in.
2          (Witness entered the courtroom.)
3          THE COURT:   Thank you.
4  If you will raise your right hand, sir.
5          (Witness was duly sworn.)
6          THE COURT:   You may proceed.
7                STEVEN OSBORN
8  was called as a witness, and having been duly sworn by the
9  Court, testified under oath as follows:
10              DIRECT EXAMINATION
11  BY MR. BROOKS:
12   Q.   Introduce yourself to the jury, please.
13   A.   I'm Sergeant Steven Osborn of the Dallas Police
14  Department.
15   Q.   And, Officer, how long have you been with the Dallas
16  Police Department?
17   A.   Since July of 1990, which would be 18 years as of
18  next month.
19   Q.   And how long have you been a sergeant?
20   A.   That will be eight years in August.
21   Q.   And by virtue of being a Sergeant, does that place
22  you in a supervisory capacity?
23   A.   It does.  It is the first line supervisory position.
24   Q.   And what section, what division are you signed to
25  currently?

82

83

1    A.    I am currently assigned to the Northwest Division in
2    Patrol.
3    Q.    Back in March 23rd, 2007, where were you assigned?
4    A.    The northwest Division.
5    Q.    And was Senior Corporal Mark Nix assigned to that
6    division?
7    A.    He was.
8    Q.    And were you his direct supervisor?
9    A.    I was.
10   Q.    Back on March 23rd, 2007, was Senior Corporal Mark
11   Nix a licensed peace officer?
12   A.    Yes, he was.
13   Q.    And was he working that day in his official capacity
14   as a Dallas Police Officer?
15   A.    Yes, he was.
16   Q.    You yourself have had an opportunity to see the video
17   that -- the video of the shooting, haven't you?
18   A.    Yes, I did.
19   Q.    You have seen it more than once, I take it?
20   A.    I think I have seen it twice.
21   Q.    And the actions that we see Corporal Nix take on that
22   day, was he authorized to proceed in that fashion?
23   A.    Yes, he was.
24   Q.    And was he carrying out the lawful discharge of
25   official duty, he was trying to break open a window of that

1    car?
2    A.    Yes, he was.
3    Q.    Sergeant Osborn, there has been testimony in this
4    courtroom regarding the felony traffic stop policy of the
5    Dallas Police Department, you familiar with that policy?
6    A.    I am.
7          MR. BROOKS:    May I approach, Your Honor?
8          THE COURT:    You may.
9    Q.    (By Mr. Brooks)    Let me show you what has
10   been marked and entered as Defendant's Exhibit 1;
11   you recognize what that is?
12   A.    It's the Patrol SOP for the felony traffic stop,
13   Procedure 18.34, which is our current guidelines for the
14   traffic stops regarding felony stops.
15   Q.    In your opinion, based upon your viewing of the
16   video, was this actually the scenario that involves a felony
17   traffic stop?
18   A.    No.
19   Q.    Why is that your opinion?
20   A.    Well, it is not my opinion.  I can just read it out
21   of the felony traffic stop.  It says basically after you turn
22   the red lights on in order to stop the person, given the
23   number here, 2(d), it says, if the vehicle stops, give the
24   location to the dispatcher.  But in 2(c) it says if the
25   vehicle flees, go to vehicle pursuit procedure 1904.

84

85

1    Q.    Let me stop you there.  If the vehicle flees, what
2    does that indicate to the officer?
3    A.    That says the felony traffic stops no longer applies
4    and you go to the pursuit policy.
5    Q.    The line that says if the vehicle flees, could you
6    highlight that, let me get another color?
7    A.    (Witness complies.)
8    Q.    So in that scenario, what you are saying -- or are
9    you saying in that scenario, there is no felony traffic
10   policy for the officer to follow?
11   A.    In this scenario, as soon as the vehicle flees, the
12   traffic stop or the felony stop no longer applies.  We now go
13   to our pursuit which is found in SOP 19.04.
14   Q.    And with respect to, I guess, going up to the vehicle
15   after it comes to a stop at whatever point that happens,
16   reading again in Defendant's Exhibit No. 1, you see this line
17   that says do not rush the suspect?
18   A.    Yes.
19   Q.    What is the next sentence?
20   A.    It says do not rush the suspect, this is true for
21   most type of felony stops.  Whether end of chase or any other
22   high-risk chase, remember most circumstances of specific
23   scenes require different tactics.
24   Q.    Do you mind highlighting those sentences also.
25   A.    (Witness complies.)

1          MR. BROOKS:    Can we have the lights, Your Honor.
2    Q.    (By Mr. Brooks)   And again that highlighted portion
3    that is on the screen, that is the sentence that you referred
4    to if the vehicle flees, go to vehicle pursuit policy?
5    A.    That's correct.
6    Q.    And then the next highlighted portion says this is
7    true for most types of felony stops, but circumstances that
8    specific scenes require different takes?
9    A.    That is correct.  But again that only applies to the
10   felony traffic stop in the SOP.  You could say it may apply to
11   others, but that's in the SOP for the felony traffic stop.
12   Q.    So corporal Nix then was not violating any Dallas
13   Police Officer department policy at the time he was trying to
14   go remove that suspect?
15         MR. BRAUCHLE:    Your Honor, we would object to
16   that in that there has been no proper predicate laid.  It also
17   calls for a legal opinion, which this person is also not
18   qualified to give.
19         THE COURT:    Overruled.
20   Q.    (By Mr. Brooks)   You can --
21         MR. BRAUCHLE:    May we have a running objection?
22         THE COURT:    You may.
23   Q.    (By Mr. Brooks)   I believe your answer was
24   he was not in violation of any Dallas Police
25   Department policy?

86

1   A.   He was not.
2           MR. BROOKS:   Can we have the lights, Your Honor.
3       Pass the witness.
4               CROSS-EXAMINATION
5   BY MR. BRAUCHLE:
6       Q.   Sergeant Osborn, did you bring 19.04 down here for
7   our been.
8       A.   No, sir.
9       Q.   Why not?
10      A.   Well, sir, that's not really my job to bring that
11  down here to the courtroom.
12      Q.   Well, you feel free to quote it, but you don't bring
13  it so anybody can look at it?
14      A.   I didn't quote it, I read it out of the felony stop
15  where it said go to 19.04.
16      Q.   Okay.  Now, then, you have watched the video of what
17  occurred that day; is that correct?
18      A.   Yes, sir.
19      Q.   Can you tell me what lawful commands were being
20  communicated to Mr. Ruiz by Officer Nix?
21      A.   Well, lawful commands?
22      Q.   Uh-huh.
23  .   A.   Well, the first one would be the initiation of the
24  traffic stop.
25      Q.   No, I am talking about while he was standing there

1   next to the passenger's window, what lawful commands was he
2   giving Mr. Ruiz?
3       A.   I do not know, sir, I wasn't there at the time to
4   hear the commands.
5       Q.   Have you talked to anybody else as to what he was
6   saying?
7       A.   No, sir.
8       Q.   Were you on duty during this same shift as when this
9   happened?
10      A.   Yes, sir.
11      Q.   Which car up there is your car?
12      A.   Which car is my car, sir?
13      Q.   Uh-huh.
14      A.   Well, assuming that's the crime scene, none of those
15  cars is my car, sir.
16      Q.   So you didn't go to the crime scene?
17      A.   No, sir.  I went to the hospital.
18      Q.   Now, then, what authorized Officer Nix to do what he
19  was doing out there?
20      A.   You need to be more specific, sir, are you saying at
21  the initiation of the traffic stop, what are we talking?
22      Q.   We are long past the traffic stop when Officer Nix
23  rushes the vehicle, aren't we?
24      A.   Well, if that's what we are talking about, yes, sir.
25      Q.   Now, then, do you even know what Officer Nix was

88

1   attempting to do out there?
2       A.   Well, he was trying to detain a suspect that was
3   fleeing from the police.
4       Q.   Do you know how taking an asp and beating in a
5   passenger's side vehicle would do that?
6       A.   Yes.  If you have got to get into the vehicle, that's
7   one way to get into the vehicle, we have done it before.
8       Q.   Wouldn't you think that going to the side that the
9   driver was on would be a little more effective?
10      A.   No, sir, I think that would be putting yourself in
11  harms way.
12      Q.   So one side of the vehicle is harmless, the other
13  harms way?
14      A.   To get to the other side, you would have to either
15  walk in front of the car or behind the car, that way you are
16  putting yourself in harms way, doesn't make sense to me.
17      Q.   Have you ever taught at the academy?
18      A.   No, sir.
19      Q.   You ever prepared any of the standard manuals for the
20  Dallas Police Department?
21      A.   No, sir.
22      Q.   You ever spoken at any type of seminar or schooling
23  which basic apprehension methods were discussed?
24      A.   No, sir.
25      Q.   Now, 19.04 that you referred to only goes to felony

89

1   stops -- I mean felony pursuits, right?
2       A.   That's the felony pursuit SOP, correct.
3       Q.   Now then, once a felony pursuit ends, you have a
4   felony stop, don't you?
5       A.   No, sir.  You may have a felony stop, but it can go
6   anything from after pursuit ends, the individual that we are
7   pursuing gets away, or bail out of the car and runs away, very
8   few actually pull over after a felony stop, there is no reason
9   for them.  Most of them either crash or run away.
10      Q.   I didn't ask you that, did I?
11      A.   You asked me if it was a felony stop, and in most
12  cases it is not.  There is a rare thing that someone pulls
13  over after being chased.
14      Q.   Have you got anymore unanswered question that you
15  want to answer?
16          MR. BROOKS:   Excuse me.  Judge, I will object to
17  the sidebar.
18          THE COURT:   Sustained.
19      Q.   (By Mr. Brauchle)  In the video that you
20  saw the person being pursued didn't return away, did
21  you?
22      A.   The person being pursued ran away via vehicle.
23      Q.   I am talking about after he was stopped out there on
24  Bernal?
25      A.   No, he did not.

90

91

1    Q.    So that didn't apply?
2    A.    Is that a question, sir?
3    Q.    Yes.
4    A.    No, not in that case, that didn't apply.  As far as I
5    recalling the vehicle, they pretty much -- cars came in
6    contact with each other, face-to-face.
7    Q.    That would keep the person from opening a door and
8    fleeing, would it?
9    A.    No, sir.
10   Q.    That's what you also talked about, right?
11   A.    Yes, that's another option that can happen.
12   Q.    That didn't happen though, did it?
13   A.    In this case, no, sir.
14   Q.    Do you know of any inability on anybody's part out
15   there to give the defendant a chance to peacefully surrender?
16   A.    I wasn't out there, sir, so the only thing that I
17   have seen is what is on the video.
18   Q.    Okay.  Let's go to that, did you see anything on the
19   video that would have kept the officers at the scene from
20   giving the defendant a chance to surrender peacefully?
21   A.    He had a chance by either raising his hand or
22   stepping out of the vehicle and putting his hands up.
23   Q.    While people are shooting at him?
24   A.    That didn't occur until after the fact --
25   Q.    You don't know that, do you?

1    A.    I was watching the video.
2    Q.    Did you see the video introduced earlier today where
3.   there is a gunshot in the front windshield --
4         MR. BROOKS:  Your Honor, I am going to object to
5    that question.  It assume facts not in evidence.
6         THE COURT:  Sustained.
7         MR. BRAUCHLE:  Well, we will introduce the
8    video.
9         MR. BROOKS:  It is already in evidence.  There
10   is no evidence whatever he is pointing to is a gunshot.
11        THE COURT:  Mr. Brauchle.
12        MR. BRAUCHLE:  The video is in evidence, it
13   speaks for itself.  We maintain that it is quite obviously a
14   gunshot.  If they want --
15        MR. BROOKS:  Well, Judge --
16        MR. BRAUCHLE:  The burden shifted to them to
17   show that it is not.
18        MR. BROOKS:  Absent some evidence that that is a
19   gunshot, I am going to object to him characterize that is a
20   gunshot.  Every other witness identified where they were.
21        MR. BRAUCHLE:  We would object to a speaking
22   objection.
23        THE COURT:  Sustain the State's objection.
24   Q.    (By Mr. Brauchle)  Have you reviewed
25   procedure 19.04 recently?

92

93

1    A.    Not recently, sir, no, that's just something that we
2    oversee in the field as supervisors.
3    Q.    Okay, and what is the text of 19.04 if it is not out
4    to pursue somebody?
5    A.    Basically 19.04 gives the outline for when we can
6    pursue.  The responsibility of the officer that is in pursuit.
7    The information that they need to give out during the pursuit.
8    The responsibility of the supervisor over the pursuit.  The
9    responsibility of the helicopter unit over the pursuit.  The
10   responsibility of the dispatch over the pursuit.  And the
11   follow-up responsibility of the paperwork, either by the
12   officer involved or the supervisor in the pursuit.
13   Q.    Did you complete any paperwork in regard to the
14   pursuit that took place that day?
15   A.    No, sir.
16   Q.    Didn't you just say that was your responsibility?
17   A.    I said it was the responsibility of the supervisor
18   that was over the pursuit, that was not me.
19   Q.    I thought that you said you were the supervisor that
20   day?
21   A.    I was his supervisor that day.  I did not say, sir,
22   that I was the supervisor over the vehicle pursuit.
23   Q.    How long have you known Officer Nix?
24   A.    Well, prior to being at Northwest Division during the
25   time he was there.  I worked as supervisor at Southwest

1    Division while he was there.  Probably maybe six years off and
2    on.
3    Q.    Were you on his paintball team?
4    A.    No, sir.
5    Q.    Okay.  I will show you what is -- I will show you
6    what has been marked as Defendant's Exhibit 3, and ask you if
7    you can identify that --
8         MR. BROOKS:  May we approach, Your Honor?
9         THE COURT:  You may.
10        (The following proceedings were had at the
11        Bench.)
12        MR. BROOKS:  I have no idea what that is, but if
13   it is the Internal Affairs records of Officer Nix's internal
14   affairs --
15        MR. BRAUCHLE:  No, this is 19.04.  I just asked
16   if he could identify it, then I was going to give it to you
17   before I admitted it.
18        MR. BROOKS:  Okay.
19        (End of Bench conference.)
20   Q.    (By Mr. Brauchle)  Once again, I will hand
21   you what has been marked as Defendant's Exhibit No.
22   3, and ask you if you can identify that?
23   A.    It's the emergency vehicle operation procedure 19.04
24   SOP.
25   Q.    What you referred to previously; is that correct?

1   A.   This is correct.
2        MR. BRAUCHLE:   Your Honor we would offer
3   Defendant's Exhibit No. 3.
4        MR. BROOKS:   No objections.
5        THE COURT:   Defendant's Exhibit 3 is admitted.
6   Q.   (By Mr. Brauchle)   Now, do you recall some
7   of the requirements in regard to the emergency
8   vehicle operation of 19.04?
9   A.   Yes, sir.
10  Q.   Recall the boldfaced instruction saying that no more
11  than three following vehicles will be involved?
12  A.   There is that.   But there is also more after that, a
13  supervisor can authorize more vehicles involved in a chase
14  depending on the type of chase, how many people are in the
15  vehicle, what their chasing for:
16  Q.   Do you remember where that would be?
17  A.   I would have to look and show it to you, sir, I don't
18  have memorized in order.
19  Q.   Okay. I will bring it up there in a minute.  Do you
20  also recall what practices are prohibited during a pursuit?
21  A.   There are several.  One of which is we don't ram or
22  we don't force anybody off the road.  We don't drive down the
23  wrong side of the road.
24  Q.   Don't shoot at a moving vehicle?
25  A.   Unless we are being shot at, then we can.

---

1   Q.   Now, then, it is your testimony here today that once
2   a pursuit ends, that the rules in regard to a felony stop do
3   not apply; is that correct?
4   A.   Do not apply unless you can actually set up a felony
5   traffic stop.  And in this case, you couldn't.
6   Q.   Why couldn't you?
7   A.   Because the first part of the felony traffic stop
8   when they pull over is to park back 15 to 20 feet back behind
9   the vehicle, position your vehicle in a tactfully sound way.
10  Be able to get out, get on the megaphone.  Give instructions,
11  you can't do that when the car is right up against the other
12  vehicle.
13  Q.   Now, then, who put Officer Nix's car right up against
14  the other vehicle?
15  A.   I don't know, sir, I wasn't there.  According to the
16  video, it looked like they both came in contact with each
17  other.
18  Q.   Well, Officer Nix is the one that drove right up in
19  front of Mr. Ruiz's vehicle, isn't he?
20  A.   Looked like Mr. Ruiz was changing direction in the
21  vehicle at the time.  It has been about two months since I
22  seen the video.  I would have to see it again for particular,
23  I mean...
24  Q.   Okay.  Let's back up.  So you state that Officer
25  Nix's car was too close to Mr. Ruiz's car; is that correct?

---

96

1   A.   Yes.  You could not do it tactically.  Tactically you
2   could not do --
3   Q.   I just asked you was he too close?
4   A.   Too close for felony traffic stop.
5   Q.   Now, then, I think the standard rule of thumb is that
6   you have to be far enough from the car to read the license
7   plate; is that correct?
8   A.   To make a traffic stop or --
9   Q.   No.  One of the rules of thumb is to how you can tell
10  when you are far enough back from the vehicle is, it says if
11  you can't see the license plate, you are too close, doesn't
12  it?
13  A.   I have never seen that, sir, I go by rule of thumb if
14  you can't see the bottom of the tires, but that's in a general
15  thing if you are going to pull somebody over to keep a safe
16  distance.
17       MR. BRAUCHLE:   May I approach again, Your Honor?
18       THE COURT:   You may.
19  Q.   (By Mr. Brauchle)   See what's marked as
20  4-B-1?
21  A.   Yes, sir.
22  Q.   What does that say?
23  A.   Says if you cannot see the license plate of the
24  suspect vehicle, you are seated in the police vehicle, you are
25  too close.

---

97

1   Q.   You are too close is underline, isn't it?
2   A.   Yes, it is.
3   Q.   Now, then, Officer Nix put his vehicle where it was,
4   didn't he?
5   A.   He was driving the vehicle.
6   Q.   Okay.  And if he was too close, he could have backed
7   it up, couldn't he?
8   A.   At that point in time, that would not have been a
9   tactically sound thing to make.  Theoretically, he could have,
10  he would have put himself in harms way or could have.
11  Q.   So getting back away from the vehicle would have put
12  him in more harms way than being directly in front of it?
13  A.   It could have, he had three choices.
14  Q.   I asked you that as to what your opinion is.  Being
15  further away from the vehicle would have put him in more harms
16  way than right up to it.
17  A.   Taking the time to put it in reverse.
18  Q.   How long does that take?
19  A.   I don't know sir.  Depends on how far you want to
20  back up.  But you are dealing with someone that is right in
21  front of you that can see you.  He made the choice to engage
22  versus disengage.
23  Q.   Well, the fact that the person that you are trying to
24  get out of the vehicle can see you, certainly isn't a down
25  side, is it, you can see them is the flip side of that coin,

**98**

1    isn't it?
2        A.    It is a down side if they can see you, we try to come
3    from a point of strength, not a point of weakness.
4        Q.    How is them being able to see you a point of
5    weakness?
6        A.    Well, they can see you, therefore they can target
7    you.  They can see what you are doing and what movement and
8    actions you are taking.
9        Q.    Isn't the thing that they would see if they can see
10   you, is you pointing a weapon at them?
11       A.    They should be able to see that if they can see.
12       Q.    That's a point of weakness, seeing an officer --
13       A.    I didn't say that was a point of weakness.  I said
14   having them see you face on is a point of weakness.  I didn't
15   say them -- having them see you with a gun in the hand.
16       Q.    Does it say that in the felony stop that them being
17   able to see you is a point of weakness and poor tactical
18   position?
19       A.    It talks about tactical positions as you saw,
20   starting with 15 to 20 feet back from the vehicle, position
21   your car in a correct tactical way.  It talks about --
22       Q.    Let's go to that, did Officer Nix do that?
23       A.    No.  The vehicle pursuit didn't apply at that time.
24   Vehicle pursuit kicked in.  We have covered that.
25       Q.    The vehicle pursuit kicked in when Mr. Ruiz's car

**99**

1    stopped?
2        A.    No, we read that.  As soon as the vehicle chase was
3    initiated, the felony traffic stop did not apply.  The vehicle
4    pursuit policy applied.  Felony traffic top --
5        Q.    And what is the vehicle pursuit?
6        Q.    What is a vehicle pursuit?
7        Q.    No, what is the vehicle pursuit procedure when you
8    finally get the car stopped?
9        A.    It depends on what they do.
10       Q.    Well, is that what it says in here, it just depends
11   on what happens?
12       A.    Yes.  Bring it to me, let me show you, sir.  You have
13   the felony stop one also.
14       Q.    Yes.
15       A.    Can I have that one too, please.  Start with this one
16   since we are talking about the traffic stop.  In this one
17   here, it says -- let me find here -- okay, in all probability
18   an officer will not been able to pick an ideal location for a
19   high-risk stop.  Officers must use circumstances to their
20   advantage maintain flexibility.  There is no rigid rule here.
21   And be able to adapt the tactics necessary to match the level
22   of threat being faced.  The officer must be able to react
23   quickly and correctly regarding these situations.  Once you
24   have got a vehicle chase, felony traffic stop doesn't apply
25   unless --

**100**

1        Q.    You are not reading there, right?
2        A.    I read this one here, number four.
3        Q.    And that doesn't say what you took off into, right?
4        A.    No.  What I said was there is no hard fast rule when
5    it comes to that point.  You have to be able to come up and
6    use your tactics the best way you see fit.  It doesn't say
7    after a vehicle chase you have to use a felony traffic stop,
8    because most of the time that is not going to apply.
9        Q.    Okay.  How does that apply to don't rush the suspect?
10       A.    Well, again, don't rush the suspect is under the
11   felony traffic stop SOP; and therefore, since we are not
12   making a felony traffic stop SOP, it doesn't apply.  However,
13   it does say this is true for most types, not all types.
14       Q.    Well, the exceptions are when the car is wrecked or
15   burning, right?
16       A.    For a felony traffic stop.  But this was not a felony
17   traffic stop.  It doesn't apply.
18       Q.    Now, your testimony is that somehow it was tactically
19   advantageous to rush the vehicle and start beating it with an
20   asp; is that correct?
21       A.    I think you are putting words in my mouth, sir, I
22   didn't say that.  Or if you are asking my opinion, I would be
23   more than happy to share it with you, but I didn't say that.
24       Q.    That's what occurred out there, isn't it?
25       A.    That's what occurred out there, but I didn't say

**101**

1    that, you did.
2        Q.    Well, you are stating -- or at least my recollection
3    is, that you are stating that what happened out there was a
4    tactical decision?
5        A.    Yes, he made a tactical decision.
6        Q.    What does engage mean?
7        A.    Engage, it's the opposite of disengage.  It means to
8    confront or go forth toward whatever we are dealing with,
9    versus retreating or disengaging.
10       Q.    And you stated that Officer Nix made the choice to
11   engage out there; is that correct?
12       A.    That's correct.
13       Q.    You have any idea as to whom he may have consulted or
14   what the other officers advised him or didn't advise him in
15   that regard?
16       A.    I don't think there was anytime for him to consult
17   with anybody, so I would say, no, I don't know of anybody else
18   he talked with at the time before he engaged.
19       Q.    What time constraint was there?
20       A.    By looking at the video, there was not -- if you are
21   asking about how much time constraint getting out of the car,
22   going up to the window.
23       Q.    No, what time constraint was pressing on Officer Nix
24   that would have kept him from trying to talk the defendant out
25   of the car, let's just --

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1    A.    It's a safety issue, sir, we don't sit in front that
2  close to another car and wait for action to be taken upon us,
3  we either engage or disengage, we don't put ourself, our
4  safety in the hands of somebody we have been chasing.
5    Q.    Okay.  We have already discussed that Officer Nix is
6  the one that put his car that close to the defendant's car,
7  right?
8    A.    This is correct, that's where it ended up.
9    Q.    Was he forced to do that by anybody?
10   A.    By looking at the video, that's just sort of how
11 everything stopped.  I think they would have continued to kept
12 moving if the vehicle didn't stop.  It is just where it ended.
13 I don't think it was a choice made by anybody, that's just how
14 it happened.
15   Q.    You didn't see the red Chevrolet appear to be placed
16 in park?
17   A.    I would have to look at it, sir, I can honestly say
18 that I didn't see that the red Chevrolet was placed in park,
19 it may very well have been.
20   Q.    How else do you attribute the abrupt stop it came to
21 if it wasn't something on the driver's part?
22   A.    I don't attribute -- or have thought about
23 attributing the quick stop to anything.  That could be done by
24 anybody hitting on a break to hitting something.
25   Q.    Well, it still had to be done by something that

---

1  occurred to the red car, right?
2    A.    For the red car to stop?
3    Q.    Abruptly as it did in the video?
4    A.    For the red car to stop, something has to cause the
5  car to stop, whether it hits a car, steps on a break, puts it
6  in park, something has to.
7    Q.    Now, then, back to my original question, what time
8  constraint was involved in that stop?
9    A.    Are you saying how much time did he have before he
10 had to make a decision?
11   Q.    You didn't have a fleeing suspect, did you?
12   A.    You still have is a suspect that has not been
13 detained, therefore, he is at large until you detain him.  If
14 you are saying he is not fleeing in a vehicle, no, he is not
15 fleeing in a vehicle.
16   Q.    He is not fleeing on foot?
17   A.    But he can be.  Or he can start his car back up and
18 try to.  He has not been detained.
19   Q.    Do you know what beating on the window contributed to
20 detaining him?
21   A.    Well I think the purpose of trying to break in the
22 window was the purpose of trying to get your hands on the
23 subject and detaining him.
24   Q.    Okay, let's say he succeeded in breaking out the
25 window, he is going to have to crawl into the car to get his

---

104

1  hands on the subject, isn't he?
2    A.    No, that's not necessarily the case.
3    Q.    Are you saying that the subject would come to him
4  some way?
5    A.    I am saying the subject could come to him by order of
6  having some type of order given to him.  He could be placed --
7  there where Officer Nix can hold him at gunpoint until someone
8  comes around the other side and extrapolate him from the other
9  side.  The officer does not have to crawl in there.  The
10 officer can detain him there until somebody else comes to the
11 other door.  It can play out anyway.  We don't know which
12 because it didn't happen.
13   Q.    You have to have your gun to hold somebody at
14 gunpoint, don't you?
15   A.    That helps, otherwise you wouldn't be holding him at
16 gunpoint.
17   Q.    Now, then, going back to that, you know what -- what
18 commands Officer Nix was giving to Mr. Ruiz?
19   A.    No, sir, I don't.
20   Q.    Have you interviewed the other officers out there to
21 fine out?
22   A.    Sir, no, I am not in charge of the crime scene.
23           MR. BRAUCHLE:    We will pass the witness.
24           MR. BROOKS:    No other questions for this
25 witness, Your Honor.

---

105

1            THE COURT:  You may step down, sir.
2            THE WITNESS:   Thank you.
3            MR. BROOKS:   May he be excused?
4            MR. BRAUCHLE:   Subject to recall.
5            THE COURT:   You are free to go, sir, subject to
6  being recalled.
7          Ladies and gentlemen, it is 12:00 noon.  We will break
8  for lunch until 1:15.
9            THE BAILIFF:   All rise.
10           (Jury retired from the courtroom.)
11           (Lunch recess taken.)
12           THE COURT:   Bring them in, Sheriff.
13           THE BAILIFF:   All rise.
14           (Jury returned to the courtroom.)
15           THE COURT:   You may be seated.
16       You may proceed.
17           MR. BEACH:   He has not been sworn, Judge.
18           THE COURT:   If you will raise your hand, sir.
19           (Witness was duly sworn.)
20           THE COURT:   You may be seated.
21       You may proceed.
22               RAYMOND COOPER
23 was called as a witness, and having been duly sworn by the
24 Court, testified under oath as follows:
25

106                                                                                                    107

**DIRECT EXAMINATION**

BY MR. BEACH:

1    Q.    Tell us your name, please?

2    A.    My name is Raymond Cooper.

3    Q.    How are you employed?

4    A.    I'm a firearm and tool mark examiner at the
Southwestern Institute of Forensic Sciences located here in
Dallas.

5    Q.    And so I won't keep saying Southwest Institute of
forensic sciences, it goes by SWIFS; is that correct?

6    A.    That is correct.

7    Q.    How long have you been out at SWIFS?

8    A.    This August will be 21 years.

9    Q.    And what are your duties out there as a firearm
examiner?

10   A.    Typically the majority of the work that we do is the
comparison of fire components of ammunition to various weapons
that may be submitted to see if we are able to identify them
as having been fired by that particular weapon.  However,
sometimes we don't have a weapon submitted.  We may have just
bullets or cartridge cases submitted to us.

        And what we can do then is with the cartridge cases
and bullets, we will do an intricate comparison.  Basically
that is where we take all of the evidence cartridge cases
and/or bullets and compare them to each other to try to

---

determine if they were fired by one or multiple firearms.  If
we have situation where it is just a bullet submitted, we can
identify it as to caliber, depending on the condition of the
bullet.  Caliber, we can do land and groove measurements.  And
then using a data base that we get from the FBI updated
yearly, we can give a list of possible weapons that could have
fired that particular bullet.

        We also do tool mark identification.  Basically
firearms identification is just a specialized tool mark case.
We are looking at stride that is imparted on the softer
material by harder object.  In the case of firearm, we are
talking about bullets and cartridge causes when they are fired
in the weapon.  And tool mark cases we are talking about screw
drivers, pliers or cutters that would leave trademarks
imparted either on the door frame or various items like window
frames and things like that.

Q.    Mr. Cooper, is it possible to determine if a bullet
came from a particular gun?

A.    Yes.

Q.    Is it possible to determine if a casing was fired by
a particular gun?

A.    Yes.

Q.    Before we get into that just briefly give us your
educational and professional qualifications which entitle you
to be a firearm examiner?

---

108                                                                                                    109

A.    I have both a Bachelor of Science and Master of
Science degree from Louisiana Tech University.  I have
attended classes put on by the FBI in the firearms
identification and also in gunshot and prime residue analysis.
I have attended many schools that were put on by various
weapons manufacturers, and they have basically are classes
that teach you how to assemble and disassemble weapons.  And
in the process of doing that, determine if there are any
missing or broken parts.  Because in order for us to get test
fires, we have to physically test fire the gun.  And we
certainly don't want to do it if it is not a safe weapon to
fire.  I have been in the area of firearm and tool mark
identification for approximately 35 and a half years.  I am a
member of the association of firearm and tool mark examiners,
which has international membership.

Q.    Have you testified in court as in the area of
firearm, tool mark examiner today?

A.    Yes, sir, I have.

Q.    On few or many occasion?

A.    Many occasions.

Q.    Now, were you called upon to examine a number of
items that were submitted out to your laboratory regarding a
complainant by the name of Mark Nix?

A.    Yes, sir.

Q.    For the folks on the jury, whether it is you, firearm

---

examiner, whether it is Vicki Hall as a trace evidence
examiner, DNA, whatever the case might be, does SWIFS assign a
unique laboratory number to all the evidence pertaining to
that particular case?

A.    When the evidence is submitted to the laboratory, it
is basically received by our evidence registrars.  And at that
time it will be assigned a specific number for that particular
case.  And that is a unique number that stays with that case
only.

Q.    And in the case where the complaining witness or the
complainant was Mark Nix, was the unique lab number 07P0471?

A.    Yes, it was.

Q.    And again, you examined -- examined numerous casings
and bullet fragments in this particular case; is that correct?

A.    I did.

Q.    And a number of firearms; is that correct?

A.    That is correct.

        MR. BEACH:    May I approach, Judge?

        THE COURT:    You may.

Q.    (By Mr. Beach)  First of all I am going to
show you what has been marked for identification,
Mr. Cooper as State's Exhibit 64, and ask if you can
identify what State's 64 is?

A.    This is one of the cartridge cases that I did an
examination on.  It is in an envelope that has a seal on it

110

111

1  that has my initials on it and the date that I sealed it. On
2  the individual -- on the actual cartridge case itself, I have
3  my initial -- the case number and the item number pertaining
4  to it.
5  Q.   And State's 64, does it also have the unique
6  laboratory number we talked about?
7  A.   Yes, it does.
8  Q.   And what did you do specifically in regard to State's
9  Exhibit No. 64?
10  A.   Did a comparison to test rounds from a weapon that
11  was submitted.
12          MR. BEACH:   At this time we will offer State's
13  64 into evidence, Your Honor.
14          MR. BRAUCHLE:   No objections.
15          THE COURT:   State's 64 is admitted.
16  Q.   (By Mr. Beach)   Mr. Cooper, I am going to
17  show you what has already been admitted into
18  evidence, State's Exhibit 63, and ask you if you can
19  identify State's 63?
20  A.   Yes, sir.
21  Q.   And what is State's 63?
22  A.   This is the firearm that I compared to State's
23  Exhibit 64.
24  Q.   And tell us, first of all, how you did that
25  comparison?

1  A.   Like I stated earlier, in order to do a comparison,
2  especially if we have a firearm that has been submitted, I
3  will do a mechanic evaluation of the gun just to see if the
4  weapon is in fact a safe gun to fire. Once I have determined
5  that, then I will test fire the firearm. And then by the use
6  of a bullet comparison microscope, I will do the side-by-side
7  comparison of the evidence round to the test fires that I did.
8  Q.   After conducting the examination, Mr. Cooper, did you
9  reach an opinion as to whether or not State's Exhibit No. 64
10  was fired from the firearm that you are holding there, State's
11  Exhibit No. 63?
12  A.   Yes, sir, I did.
13  Q.   And what is your opinion, sir?
14  A.   That the State's Exhibit 64 was in fact fired by
15  State's Exhibit 63.
16  Q.   That the 223 Remington round, State's Exhibit 64, was
17  found in the front seat of the suspect vehicle was fired by
18  the firearm that you are holding in State's Exhibit 63?
19  A.   That is correct.
20  Q.   Any question in your mind about that?
21  A.   No, sir.
22  Q.   How are you able to make that determination to reach
23  that conclusion, sir?
24  A.   During the manufacture of weapons, there are parts of
25  that gun that will come in contact with either some other type

112

113

1  of tooling device, whether it is the breech face, the barrel,
2  ejector, extractor, all of these will accept the tool marks
3  that are imparted on to it by the opposing tool during that
4  particular manufacture. When the cartridge is fired in the
5  weapon, as the bullet goes down the barrel, of course it
6  accepts microscopic tool mark, they were left there during the
7  rifling process and the bore manufacturing part, as well as
8  marks being transferred to the side of the cartridge case
9  known as chamber marks. You have firing pin impression, marks
10  that will be imparted when the firing pin struck the primer
11  extractor and ejector marks.
12  Q.   And tell me if it is worth going into, but what are
13  individual characteristics, class characteristics?
14  A.   Well, a real simple way to put it would be to say
15  that the individual characteristics are those unintentionally
16  marks that happened in the firearm during the manufacture.
17  The class characteristics would be things like caliber, like
18  that, I mean that is an intentional characteristic of that
19  particular round.
20  Q.   Mr. Cooper, there was sufficient individual
21  characteristic markings on State's 64, the 223 casing that you
22  compared, the test fired rounds to be able to tell these folks
23  on the jury State's 64 was fired by State's 63?
24  A.   That is correct.
25  Q.   You can set that gun down for a second.

1          MR. BEACH:   May I approach, Judge?
2          THE COURT:   You may.
3  Q.   (By Mr. Beach)   And, Mr. Cooper, is it your
4  procedure to generate a report once you have
5  completed your analysis and examination of a
6  particular case?
7  A.   That is right.
8  Q.   I will show you what has been marked State's 68 and
9  ask you if that is a true and accurate copy of your full
10  report that you prepared concerning your efforts in regards to
11  this laboratory number and complaining witness, Mark Nix?
12  A.   Yes, it is.
13          MR. BEACH:   At this time, Your Honor, we would
14  offer into evidence State's Exhibit No. 68.
15          MR. BRAUCHLE:   No objections.
16          THE COURT:   State's 68 is admitted.
17  Q.   (By Mr. Beach)   Because of the number of
18  exhibits that were submitted by DPD, Mr. Cooper, on
19  State's 68, your report, did you convert the DPD
20  evidence item numbers and compare those to the
21  number you assigned to each individual exhibit?
22  A.   Yes.
23  Q.   And that's going to be included in your report, for
24  instance, your item number 23, one fired Winchester brand 9
25  millimeter caliber cartridge case, that correspond to DPD item

114

115

1 number 20; is that correct?

2     A. That is correct.

3         MR. BEACH: May I approach?

4         THE COURT: You may.

5     Q. (By Mr. Beach) The folks on the jury for

6 the last several days have been viewing a color

7 coded chart. I am going to show you State's Exhibit

8 68-A, and you have reviewed that chart prior to

9 today; is that correct?

10     A. That is correct.

11     Q. With the exception of one duplication, is State's

12 Exhibit 68-A a fair and accurate summary of the corresponding

13 item numbers between DPD and the numbers that you assigned out

14 at SWIFS?

15     A. Yes.

16     Q. And particularly these involve the -- primarily the

17 cartridge cases that were fired by the Dallas Police Officers

18 out at the scene back on March 23rd, 2007?

19     A. Correct.

20         MR. BEACH: We will offer State's Exhibit 68-A

21 into evidence at this time.

22         MR. BRAUCHLE: No objections.

23         THE COURT: Sixty-eight A is admitted.

24     Q. (By Mr. Beach) And just briefly,

25 Mr. Cooper, you were able to determine that these

1 various color-coded groupings of casings were fired

2 by a particular police officer; is that correct?

3     A. That is correct.

4     Q. And the jury will have this and they have seen the

5 big diagram color codings, representing where each officer

6 would have fired their shots. Now, I am going to ask you if

7 you were also called upon to examine certain bullet fragments

8 that you were submitted?

9     A. Yes.

10         MR. BEACH: May I approach, Judge?

11         THE COURT: You may.

12     Q. (By Mr. Beach) Mr. Cooper, I am going to

13 show you what has been marked for identification as

14 State's 96, and ask if you can identify State's 96?

15     A. This correspond to the fragment that was recovered

16 from the shirt collar.

17     Q. The left shirt collar of Officer Nix?

18     A. I just have shirt collar. I don't know where it

19 actually came from.

20     Q. All right.

21         MR. BEACH: We will offer at this time, Your

22 Honor, State's Exhibit No. 96.

23         MR. BRAUCHLE: No objections.

24         THE COURT: State's 96 is admitted.

25     Q. (By Mr. Beach) Now, I am going to show

116

1 you, Mr. Cooper, what has already been admitted into

2 evidence as State's Exhibit No. 86, and ask if you

3 can identify State's 86?

4     A. Yes.

5     Q. And what is State's Exhibit No. 86?

6     A. It was a DPD badge.

7     Q. And when you examined State's 86 initially back in

8 March and April of 2007, did you notice something of

9 significance embedded in the badge?

10     A. Yes.

11     Q. What was that?

12     A. It was a bullet fragment.

13     Q. And did you eventually -- first of all, did you

14 photograph the badge as is with the bullet fragment still

15 embedded in the badge?

16     A. Yes, I did.

17     Q. And eventually did you remove the observed bullet

18 fragment from the badge?

19     A. Yes, I did.

20     Q. And did you photograph the badge after you removed

21 the bullet fragment and the bullet fragment?

22     A. I know that I photographed the fragment, yes.

23     Q. And did you also photograph State's 96, the bullet

24 fragment from the collar of the shirt?

25     A. Yes.

117

1     Q. Now, I am going to show you what has been marked as

2 State's 97, and ask if you can identify what is in that

3 package?

4     A. It's the bullet fragment that I removed from the

5 badge. It's in a sealed envelope, has my initials and the

6 date that I sealed it. And again it has identification on the

7 base part of the jacket fire.

8     Q. And that's your item number 214-D; is that correct?

9     A. That is correct.

10         MR. BEACH: We will offer State's Exhibit No. 97

11 into evidence that time, Your Honor.

12         MR. BRAUCHLE: No objections.

13         THE COURT: State's 97 is admitted.

14     Q. (By Mr. Beach) Did you examine State's

15 Exhibit 97 for class characteristics, Mr. Cooper?

16     A. Yes, sir, I did.

17     Q. What were you able to tell about State's Exhibit No.

18 97?

19     A. The bullet was consistent with a .223 caliber and we

20 was able to determine that it would be consistent with six

21 right land and groove impressions.

22     Q. So the bullet fragment in Officer Nix's badge was a

23 .223 caliber bullet; is that correct?

24     A. It is consistent with that, yes.

25     Q. The fragment contained that is State's Exhibit No.

1  96, describe what that is, what it consisted of?
2      A.   Basically this was just a jacket fragment, State's
3  Exhibit 96, had no identifying mark that would transfer.  So
4  there was really nothing to do, it was of no value for
5  comparison.
6              MR. BEACH:   May I approach, Judge?
7              THE COURT:   You may.
8      Q.   (By Mr. Beach)   When you say a jacket
9  fragment, what are we talking about, Mr. Cooper?
10     A.   Well, if you have a cartridge that the bullet is
11  either a full metal jacket or a jacket hollow point, you
12  got -- it's a copper-based jacket fragment -- or jacket that
13  encompasses a lead core.  And a lot of times we see --
14     Q.   I tell you what, let me stop you.  Let's just go
15  through this twice.  Won't you step down.  I am going to
16  remove one of the live rounds which consists of your item
17  numbers 80 through 108.  If you will step down and give the
18  jury just a brief lesson on the makeup of one of those .223
19  rounds?
20     A.   What we have here is a cartridge.  In other words we
21  got the bullet on the end, cartridge case that is housing the
22  powder and the primer.  So the entire unit as an unfired unit
23  is a cartridge.  When you load it and fire it, you wound up
24  eventually being able to see the bullet and then the cartridge
25  case.

1      If it is a semiautomatic weapon, it will typically be
2  automatic extracted from the firearm and found in some close
3  proximity of where it was fired, provided nobody kicks it,
4  picks it up, throws it away.  Then the bullet you will find
5  down range where it hit the target.
6      In these particular caliber rounds, you have a
7  tendency of these fragmented, they don't stay together real
8  well.  So when you -- when you find -- you can possibly find
9  fragments of the bullet itself, which would be -- this is the
10  copper jacket that houses the lead core.  So when it
11  separates, you can have just the copper jacket fragment.  And
12  then somewhere else you may find pieces of the lead core,
13  which is inside.  Lead core typically is really of no
14  comparison.  Importance because being on the inside of the
15  jacket, it is not going to receive any of the individual marks
16  as it goes down the barrel of the gun.  The jacket however
17  may, even though you may have a small piece of it, you may
18  still have sufficient parts and impressions that would allow
19  you to compare and match up to a particular firearm.
20     Q.   So one of your item numbers 80 through 108, the
21  bullet itself, this copper jacket, the tip at the end of the
22  casing, it consisted of the outer copper jacket; is that
23  correct?
24     A.   That's correct.
25     Q.   Enclosed in the copper jacket is the lead core of the

---

120

1  bullet?
2      A.   That's correct.
3      Q.   And the fragment that you removed from Mark Nix's
4  badge was the inter lead core?
5      A.   The part that was taken from the collar was the base
6  of the bullet.  Probably up around the nose area, cause it had
7  no rifling on it at all.
8      Q.   And everything -- specifically -- you can take your
9  seat now.  In regards to State's 96, the fragment, that is
10  consistent with a portion of the copper jacket; is that
11  correct?
12     A.   Well, it is -- yeah, it is consistent with copper
13  jacket bullet.
14     Q.   Finally, I am going to show you, Mr. Cooper, what has
15  been marked for identification State's Exhibit 98, and ask
16  if you can identify what State's 98 is?
17     A.   These are the led fragments that was submitted to the
18  laboratory from the medical examiner's office.
19     Q.   Doctor Townsend-Parchman recovered some bullet
20  fragments during her autopsy of Mark Nix and submitted them
21  for your analysis?
22     A.   They were submitted, yes.
23     Q.   And what item number would be on your report?
24     A.   Item two.
25             MR. BEACH:   At this time we offer State's 98 at

121

1  this time.
2              MR. BRAUCHLE:   No objections.
3              THE COURT:   State's 98 is admitted.
4      Q.   (By Mr. Beach)   Was your item two State's
5  98 of any value evidentiary wise?
6      A.   No, the fragments that were submitted by the medical
7  examiner were determined to be led fragments from a jacketed
8  bullet.
9      Q.   Again, consistent with the live round that you just
10  described, led fragments from a jacketed bullet?
11     A.   Yes.
12     Q.   For the record, State's Exhibit No. 63, the assault
13  pistol that I guess you placed there in front of you, is
14  State's 63 a firearm?
15     A.   Yes, it is.
16     Q.   And is State's 63 a deadly weapon?
17     A.   Yes, sir.
18     Q.   Were you also called upon to examine ammunition that
19  was submitted to you concerning A.R. 15 that was fired by one
20  of the Dallas Police Officers by the name of Patrick Starr?
21     A.   There were -- there are both live rounds and fired
22  cartridge cases that were submitted.
23             MR. BEACH:   May I approach, Judge?
24             THE COURT:   You may.
25     Q.   (By Mr. Beach)   I will show you what has

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

123

1 been introduced into evidence for demonstrative
2 purposes as State's Exhibit No. 18, and ask if you
3 can tell us what that is?
4     A.   This is a .223 caliber rifle cartridge.  It is a
5 Winchester manufacturer known as the Ranger ballistic tip.
6 The ballistic tip would be this portion on the end that houses
7 this kind of -- this kind of off-white plastic tip.  And then the
8 bullet, which in this case has a black coating on it, it is
9 manufactured by Winchester.
10     Q.   And is that State's Exhibit 18, been introduced for
11 demonstrative purposes, Mr. Cooper, is that identical to the
12 type of ammunition that was submitted to you concerning
13 Officer Starr?
14     A.   That is correct.
15     Q.   What is the purpose for ballistic tips?
16     A.   Well, typically, you would like to have this type of
17 round if you are doing hunting.  Of course this is not very
18 good for your large game, because once it enters the larger
19 animals, it breaks up to rapidly to really be of any benefit
20 for large game.  You see this used a lot for foreign hunting,
21 but the ballistic tip helps -- the design of the bullet to
22 fragment upon impact.
23     Q.   To cut down penetration rate in terms of going
24 through walls or houses, whatever?
25     A.   Well, I don't know that it specifically is designed

1 for that, but it is designed to break up and it does so
2 quickly because it is a smaller caliber bullet traveling at a
3 pretty fast of rate.
4     Q.   The bullet fragments that you have described that are
5 now in evidence as State's Exhibit No. 97, that you observed
6 and photographed and then removed from the badge of Mark Nix,
7 did you see any evidence of that black coating anywhere on
8 that bullet fragment?
9     A.   No, sir, I didn't.
10     Q.   The .223 that you removed from Mark Nix's badge
11 didn't have any black coating that you have there on State's
12 Exhibit No. 18?
13     A.   No, sir.
14     Q.   If you would hold up State's 63 and just show the
15 folks on the jury where the charging rod is -- if you want to
16 step down, that would be more effective, you could do that?
17     A.   I think, this would be the charging rod here
18 (indicating).
19     Q.   And what is the function of a charging rod?
20     A.   Well, if the weapon isn't empty and you have loaded
21 the firearm with a magazine, it has cartridges in it, in order
22 to get a round into the chamber, you would have to pull this
23 charging arm back, in order to strip a cartridge from the
24 magazine into the chamber.
25     Q.   Okay.  And you test fired State's Exhibit No. 63 to

124

1 make sure it was able to function properly; is that correct?
2     A.   That is correct.
3     Q.   And when you would fire a round from State's Exhibit
4 No. 63, and you completed the firing of that round, what
5 position would the charging rod be in after you discharged the
6 round?
7     A.   The -- once I would fire and then reloaded it, the
8 charging rod would be down.
9     Q.   Be what?
10     A.   Down.
11     Q.   Down.  And before I keep on going there --
12         MR. BEACH:  May I approach, Judge?
13         THE COURT:  You may.
14     Q.   (By Mr. Beach)  Let me show you what has
15 already been admitted into evidence, Mr. Cooper,
16 State's Exhibit No. 29.  I have shown you this
17 photograph; is that correct
18     A.   That is correct.
19     Q.   Although we can't put it as proper line up because of
20 the limitations of the presenter, you can see the charging rod
21 in State's Exhibit 29?
22     A.   Yes.
23     Q.   At what position is the charging rod as depicted in
24 the photograph there in the front seat of the suspect's
25 vehicle?

125

1     A.   It is partially to the rear.
2     Q.   And does that position, the charging rod, partially
3 to the rear, is that consistent with that weapon having jam in
4 operation out there at the scene?
5     A.   It would appear that there has been some malfunction
6 in that the charging rod has not returned to its normal
7 position.
8     Q.   When you got down firing at your lab, the charging
9 rod would be closer to this position here (indicating) locked
10 and closed; is that correct?
11     A.   Correct.
12     Q.   Finally, did you conduct an analysis of the trigger
13 of State's Exhibit No. 63?
14     A.   Yes, I did.
15     Q.   And what is trigger pull?
16     A.   Well, basically it is just -- we have a device that
17 we use to -- you would cock the weapon and put a force on the
18 trigger itself to see how much force is required to disengage
19 the sear and allow the weapon to fire.
20     Q.   What is -- we have heard the term hair trigger, what
21 is the term hair trigger?
22     A.   Well, first off there is no true term called hair
23 trigger.  In its true form, it would be referred to as a light
24 trigger pull.  A light trigger pull kind of depends on what
25 area you have a variance.  I always, through my years of

1  experience, have found that anything less than a pound trigger
2  pull force would be considered a light -- light trigger pull.
3       Q.   Mr. Cooper, what was the results of your analysis
4  concerning the trigger pull concerning State's Exhibit No. 63?
5       A.   It was determined to have approximately 6.7 pounds of
6  trigger pull force.
7       Q.   I mean when you test fired State's Exhibit No. 63,
8  did you have to exert force to pull the trigger?
9       A.   Yes.
10      Q.   Anyway to quantify or analogize to the folks of the
11  jury what 6.7 pounds of trigger pull means to demonstrate it?
12      A.   It's kind of hard to -- to come up with something
13  that you could really visualize.
14      Q.   And just for the record, so the record is clear,
15  State's Exhibit No. 63, that firearm, is a deadly weapon; is
16  that correct?
17      A.   Correct.
18      Q.   And it's capable of causing -- State's 63 is capable
19  of causing death or serious bodily injury; is that correct?
20      A.   Correct.
21           MR. BEACH:   I will pass the witness.
22           THE COURT:   Cross-examination.
23                    CROSS-EXAMINATION
24  BY MR. BRAUCHLE:
25      Q.   Mr. Cooper, did you determine that all of the

1  ammunition fired by the police officers out there was
2  Winchester ammunition?
3       A.   In .223 caliber?
4       Q.   Well, in all of their weapons?
5       A.   They all appeared to be Winchester manufacturer,
6  except one; and there was one cartridge that had Lake City
7  stamp head on it.
8       Q.   Okay, would that be the item in -- one of the items
9  in front of you?
10      A.   No, sir.  It would be my item number 74, would have
11  been item 62 on the Dallas Police Department.
12      Q.   Okay.  That was unfired; is that correct?
13      A.   That is correct.
14      Q.   So you can't link that up to any particular weapon or
15  anything else cause it hadn't been fired; is that correct?
16      A.   Correct.
17      Q.   Now, then, other than that one Lake City, and you
18  know if that came from DPD or not?
19      A.   I don't know, sir.  I mean, it was submitted by DPD,
20  but I don't know where it was found.
21      Q.   All right.  But out of how many cartridge cases and
22  fragments were submitted to you that you were able to
23  determine if they were Winchesters?
24      A.   There were quite a number of them.
25      Q.   Okay.  Basically all of them except one; would that

128

1  be a correct statement?
2       A.   Yes, the one Lake City.
3       Q.   Well, there was one Remington?
4       A.   One Remington .223, but that one was identified to
5  this weapon.
6       Q.   All right.  Now, then, the only Remington that was
7  fired out there is the one that you have in front of you; is
8  that correct?
9       A.   That's correct.
10      Q.   And you have stated that in your opinion that
11  cartridge case was fired by the weapon you have in front of
12  you; is that correct?
13      A.   That's correct.
14      Q.   Now, then, how many fragments did you find out there
15  that would have been comparable or identifiable to the weapons
16  that you tested?
17      A.   Are we talking about all of the firearms that were
18  submitted.
19      Q.   Well --
20      A.   Or --
21      Q.   Let me just go back to your report.  For example, see
22  on the first page of the results there?
23      A.   Yes.
24      Q.   Where the second paragraph where you show all of
25  those fragments that you set out, what is it, about ten of

129

1  them.  And you state that none of those had been fired by the
2  number 47 pistol; is that correct?
3       A.   That is correct.
4       Q.   Now, which pistol would that have been?
5       A.   Number 47 was, it was a .357 Sig.
6       Q.   Okay.  And then you go down and you have various
7  other places where you found like in the third paragraph of
8  the top of page five, you have got 214 and 230 bullet
9  fragments; is that correct?
10      A.   That is correct.
11      Q.   And were you able to determine what caliber those
12  were?
13      A.   They were consistent with .223.
14      Q.   Now, then, were you able to match those up with the
15  weapon in front of you?
16      A.   I was -- I could never identify nor eliminate those
17  two fragments to either weapon.
18      Q.   Did you ever compare them with the other .223 you had
19  out there?
20      A.   Yes, sir, I did.
21      Q.   And what was the result of that?
22      A.   Again I could neither identify nor eliminate.
23      Q.   So it wasn't inclusive one way or the other, about
24  the best you could do is say that the fragments that you were
25  testing in that portion of the report were .223s?

1    A.    Yes, sir.
2    Q.    Now, then, in regard to the weapon in front of you,
3    you stated that the -- the loading rod -- is that the correct
4    terminology?
5    A.    I think it would be referred to as the charging
6    handle.
7    Q.    Charging rod.  That was not all the way back as it
8    should be in your opinion; is that correct?
9    A.    From the photograph, it did not appear to be all the
10   way forward.
11   Q.    Okay.  That doesn't -- that situation could have been
12   created by something other than jamming, could it not?
13   A.    Ah --
14   Q.    Let me just --
15   A.    -- I would think something had to be retarding the
16   bolt.
17   Q.    But you examined it when it got to your laboratory
18   and it was a functional firearm; is that correct?
19   A.    That is correct.
20   Q.    In fact you yourself have fired it, have you not?
21   A.    Yes.
22   Q.    So you don't know what would explain what you are
23   seeing in the picture, but it is a mechanically functional
24   firearm; is that correct?
25   A.    That is correct.

1    Q.    So if somebody were to put shells in this right now,
2    it would fire them; is that correct?
3    A.    It will fire them.
4    Q.    Not with all of the plastic?
5    A.    Well, no, but it is capable of firing live rounds.
6    Q.    And you were able to test the trigger pull?
7    A.    Correct.
8    Q.    And the other item that you put out in your report.
9    Now, then, we know that all of the fired ammunition by the
10   police department was Winchester and there is only one
11   Remington shell; is that correct?
12   A.    The cartridge cases, correct.
13   Q.    Now, then, in regard to the left fragments that were
14   submitted to you in item number two, the autopsy fragments,
15   what -- how are you able to determine that that's from a
16   jacketed bullet?
17   A.    Well, the -- there was a portion of the base that
18   was -- that was left.  And the led did not have any markings
19   that would have indicated that it came in contact with the
20   rifling in the barrel.
21   Q.    Okay.  But what we are talking about are led
22   fragments; is that correct?
23   A.    That is correct.
24   Q.    And -- so you are saying that it had not been a
25   jacketed round, there would have been some comparison for you?

132

1    A.    There very well could have been some of the class
2    characteristic, the rifling that would have been left on --
3    close to the base of that.
4    Q.    All right.  You tested -- Mr. Beach brought you the
5    weapon up there with the black -- no, I'm sorry, the cartridge
6    of the bullet, that one right there, you found some .223
7    fragments up there; is that correct?  Or they were submitted
8    to you?
9    A.    Yes.
10   Q.    That were removed from the car and from other places
11   at the scene; is that correct?
12   A.    That is correct.
13   Q.    Did you ever find any that still had the indications
14   of the black cutting that Mr. Beach talked to you about?
15   A.    Yes, sir.
16   Q.    How many of those were there?
17   A.    Item 230.
18   Q.    And that's the only one?
19   A.    Yes, sir.
20   Q.    So the -- with the one that you found Item 230, did
21   you find other .223 fragments?
22   A.    The only other fragments that were consistent with
23   .223 was the one I removed from the badge.
24   Q.    I thought you said the item two was consistent with
25   the .223?

133

1    A.    I said that the base of the led fragment was
2    consistent with .223.
3    Q.    Is that because of the size?
4    A.    Yes.
5    Q.    Now, what has been marked as State's Exhibit 96, you
6    stated that -- can you see that up there, do you have it?
7    A.    Yes.  It is my item number 214-C.
8    Q.    And you stated that has lands and groves; is that
9    correct?
10   A.    Ah --
11   Q.    Or the fragments there from has lands and groves?
12   A.    I will have to check this to be sure.
13   Q.    Okay.
14   A.    Okay, there were no class characteristics seen on
15   that fragment.
16   Q.    What class would determine -- would be like
17   determining the caliber, would it not?
18   A.    Well, the rifling itself is also considered a class
19   characteristic, in other words, a six right is a class
20   characteristic.
21   Q.    So -- what has been marked as State's 96 doesn't have
22   any characteristics that can be matched to any weapon?
23   A.    It is just strictly a -- it's a fragment of a
24   jacketed bullet.
25   Q.    All right.  Did you take any pictures of the weapon

1  that you have in front of you when it -- when you first
2  started your test or whatever?
3      A.   I took photographs prior to shooting the gun, yes,
4  sir.
5      Q.   Okay.  Do those photographs show the situation that
6  is in the photograph of that weapon in the car?
7      A.   I believe that -- no, the gun actually had apparently
8  been cleared, if there was anything in it, there was no
9  magazine attached to it.  And the -- it was in a forward
10 position.
11     Q.   Okay, so when it -- when it arrived where you were,
12 there wasn't any evidence that would lead you to believe that
13 it jammed or anything like that?
14     A.   No, sir.
15     Q.   And you did take photographs of it?
16     A.   Yes, I did.
17     Q.   As it came to you?
18     A.   Yes.
19     Q.   Now, then, you have stated your qualifications and
20 your experience and everything else, and I guess you are the
21 senior firearms examiner at SWIFS lab; is that correct?
22     A.   Yes.
23     Q.   Now, then, if somebody found a weapon in the field
24 that they had some firearms question about, or needed expert
25 advise such as you can give, could they bring that weapon to

1  the crime lab and show it to you?
2      A.   Yes, sir.  We will -- the laboratory will accept
3  evidence from any person -- I mean we are a fee-per-service
4  laboratory, of course you would have to pay for the service to
5  be done.  But we accept evidence from anyone that would bring
6  it to us.
7      Q.   Okay.  Well, basically what I am asking you, and I
8  will give you an example, if some officer found a weapon while
9  he is on duty and it is somehow germane to the case or what
10 have you, he can bring that weapon to you, present it to you
11 and ask you to explain or, whatever, the condition of the gun
12 or the cartridges in it; is that correct?
13     A.   That is correct.
14     Q.   And y'all could -- I am not sure y'all work much past
15 5:00, but y'all could do it basically during business hours
16 everyday that y'all are open, right?
17     A.   That's correct.
18     Q.   Now, then, if somebody had a clip with cartridges in
19 it, and they thought that somehow there was some malfunction
20 or something wrong with the clip, could they bring it to you
21 and show it to you and have you render an opinion as to what
22 the condition of the bullets in that or the clip itself was?
23     A.   The examination could be done, yes.
24     Q.   Now, then, if somebody brought a clip that they
25 stated the cartridges skewed, is skewed a firearm term anyway?

136

1      A.   I think it is just a common term.
2      Q.   So it has no relevance as far as firearm
3  nomenclature; is that correct?
4      A.   I am not sure if that is actually in our glossary of
5  terms.  But one understands what probably has happened, you
6  know as far as the positioning.
7      Q.   Basically the question is, though, if somebody had a
8  clip that they had a question about that obviously related to
9  a firearm, they could bring it to you, you could photograph it
10 and what have you and give them an opinion as to what you are
11 looking at being a firearm examiner; is that correct?
12     A.   That is correct.
13              MR. BRAUCHLE:   May I have a second, Your Honor?
14              THE COURT:   You may.
15              (Pause in the proceedings.)
16     Q.   (By Mr. Brauchle)  You wouldn't require
17 people to clean and unload things before they
18 brought them out there to you if they had some
19 question about the firearm or the clip or what have
20 you, would they?
21     A.   The policy of the laboratory is that no loaded
22 firearms will be submitted.
23     Q.   Well, if you had -- if you had a weapon and the clip
24 and they were separated, would they be able to bring those
25 out?

137

1      A.   Yes.  That is an unloaded weapon, that is correct.
2      Q.   They don't have to clean them up or do anything
3  special to bring them out there and present them to you, do
4  they?
5      A.   Other than just be sure that they are unloaded.
6      Q.   Well, that weapon there, after the clip would have
7  been taken out of it, it would be unloaded, would it not?
8      A.   You can remove the magazine and still have a round in
9  the chamber.
10     Q.   In the chamber.  But I am saying if they took the
11 round out of the chamber, if one were in there and took the
12 magazine out, it would be considered an unloaded weapon for
13 your purposes; is that correct?
14     A.   Basically unload the magazine, take the magazine out,
15 then check to be sure that there is not a round in there.
16 Because sometimes that happens, and when you let go of the
17 bolt, then it picks back up out of the magazine, so you
18 need to be sure that you got the magazine out first.
19     Q.   But you don't have to take the cartridges out of the
20 magazine if you have a question about the magazine, do you?
21     A.   No, sir.
22              MR. BRAUCHLE:   May we approach the Bench?
23              THE COURT:   You may.
24              (Following proceedings had at the Bench.)
25              MR. BRAUCHLE:   My co-counsel and I do wish to

1  put all the bullets into evidence and I don't know how long
2  that will take or how long it would take to match them up or
3  to get them presentment mode.
4           MR. BEACH:   You talking about for each gun?
5           MR. BRAUCHLE:   Well, just match -- does he have
6  them divided out in the bag as to --
7           MR. BEACH:   I don't know, I haven't looked in
8  there.
9        You want to send them out?
10          MR. BRAUCHLE:   I was thinking we can figure out
11  the easiest way, the less painless way to put it in.  Send the
12  jury out and talking to him.  We can figure it out.  They may
13  be in bags.
14          THE COURT:   How long you think?
15          MR. BRAUCHLE:   Not more than ten minutes.
16          MR. BEACH:   I was thinking 15.
17          (End of Bench Conference.)
18          THE COURT:   Ladies and gentlemen, we are going
19  to take a 15-minute break.
20          THE BAILIFF:   All rise.
21          (Jury retired from the courtroom.)
22          THE COURT:   You may be seated.
23          (Recess taken.)
24          THE BAILIFF:   All rise.
25          (Jury returned to the courtroom.)

---

1           THE COURT:   You may be seated.
2           MR. BRAUCHLE:   May I approach, Your Honor?
3           THE COURT:   You may.
4        Q.   (By Mr. Brauchle)   Mr. Cooper, can you come
5  down here.
6        A.   (Witness complies.)
7        Q.   Now, while the jury was out, we broke all of these
8  exhibits into, what, about five groups?
9        A.   There is five groups of cartridges.
10       Q.   And then projectiles, further down that way?
11       A.   Right.
12       Q.   Looking at these exhibits here, which would be eight,
13  nine, ten, 11, 12, 13, 14, 15, 16, 18, 19, 20, 62, 63, 64, 68,
14  77 and 76, can you tell us what all of those are?
15       A.   These are would be 18 fired 9 millimeter cartridge
16  cases.
17       Q.   And are those all attributed to one weapon?
18       A.   Yes.  These were identified as having been fired by
19  my Item 175.
20       Q.   Which would be what?
21       A.   Which would be a -- 175 is a 9 millimeter Sigarms
22  Model P226 pistol.
23       Q.   You know which officer goes with that?
24       A.   I have that it belonged to a Haecker.
25       Q.   Haecker?

---

140

1           MR. BRAUCHLE:   We would offer into evidence the
2  previously mentioned exhibit.
3           MR. BEACH:   No objection.
4        Q.   (By Mr. Brauchle)   Seventy-seven was the
5  last item in that group?
6        A.   That is correct.
7        Q.   We will put all of those in this one evidence bag?
8           THE COURT:   Mr. Brauchle, is that Defense 4?
9           MR. BRAUCHLE:   It will be Defense 4.
10          THE COURT:   Defense 4 is admitted.
11          MR. BRAUCHLE:   And we will offer Defense 4.
12          MR. BEACH:   No objections.
13       Q.   (By Mr. Brauchle)   Now, then, Mr. Cooper,
14  what is the next set?
15       A.   All right.  The next set are 12 fired 9 millimeter
16  caliber cartridge cases.  And that would be 23, 25, 27, 28,
17  33, 34, 39, 40, 41, 42, 69 and 72, and those were identified
18  as being been fired by my item number 137, which was also a
19  Sigarms 9 millimeter caliber P226 pistol.
20       Q.   Do you know which officer those linked to?
21       A.   That Officer --
22       Q.   Borchardt?
23       A.   That's him.
24          MR. BRAUCHLE:   Okay, we will offer into evidence
25  the aforementioned items.

---

141

1           MR. BEACH:   No objections.
2           THE COURT:   Admitted.
3           MR. BRAUCHLE:   Those in Defendant's Exhibit 5,
4  which we would offer.
5           MR. BEACH:   No objections.
6           THE COURT:   Defense 5 is admitted.
7        Q.   (By Mr. Brauchle)   Now, then, what is the
8  next group?
9        A.   The next group would be items 17, 22, 24, 26, 29, 30
10  and 75.  Those were seven .357C caliber cartridge cases.  And
11  they were identified to Item 135, which was a Glock .357 Sig
12  caliber Model 33 pistol, belonging to Officer Jarc.
13          MR. BRAUCHLE:   We would offer those exhibits.
14          MR. BEACH:   No objections.
15          MR. BRAUCHLE:   And we will put them in
16  Defendant's Exhibit 6.  Any objection to that?
17          MR. BEACH:   No objection.
18          THE COURT:   Defendant's 6 is admitted.
19       Q.   (By Mr. Brauchle)   Mr. Cooper, what is the
20  next set?
21       A.   Okay, the next set is items 31, 32, 35, 36, 37, 38,
22  43, 44, 45 and 46, those are .223 caliber cartridge cases.
23  They were identified as having been fired by Item 117, which
24  was the Rock River Arms .223 caliber Model L.A.R. 15 rifle.
25  And that was Officer Starr.

1    MR. BRAUCHLE:   We would offer into evidence

2   those exhibits.

3    MR. BEACH:   As?

4    MR. BRAUCHLE:   Defendant's Exhibit 7.

5    MR. BEACH:   No objections.

6    THE COURT:   Defendant's 7 is admitted.

7   Q.   (By Mr. Brauchle)   Do you know how many of

8   the .223 there were?

9   A.   Ten.

10   Q.   Okay, what is the next?

11   A.   The next one is Item 109. It was one .223 caliber

12   case. It was identified as having been fired by Item 78.  And

13   item 78 is one Professional Ordinance .223 caliber Model

14   Carbonn 15 pistol, although it is a .223 caliber.

15   Q.   This is the Remington?

16   A.   Yes.

17   Q.   That shows to have been found inside of the vehicle?

18   A.   I believe that's correct.

19   Q.   That's State's Exhibit No. 64?

20   A.   That's correct.  I didn't write that, so I don't

21   know.

22   Q.   So this goes back up here?

23   A.   Correct.

24   Q.   And then what are the numbers 65, it looks like 67,

25   ten, 111, 114, 205, 213, 223 through 227, what are those

---

items?

2   A.   These are all either, although this appears to be a

3   fairly intact bullet, we still consider it a bullet fragment

4   cause it is not an intact bullet.  This would be considered a

5   led fragment; which is consistent with a lead core from a

6   jacketed bullet.

7   Q.   Were you able to match any of these exhibits to

8   specific firearm?

9   A.   Okay, Item 2, which was the leg fragments removed by

10   the medical examiner, they were no value in that they were

11   consistent with a lead core and there is no individual or

12   class characteristics that we can tell anything from. Item

13   65, was identified to Item 137. Item 137 is the pistol that

14   belonged to Officer Borchardt.

15   Q.   He says the last part is like arrest SHARD tore it is

16   Borchardt, I think?

17   A.   Okay, that's 65. Sixty-six was neither nor two items

18   137 and 175; 137 and 175 were both 9 millimeter calibers.

19   They belonged to Borchardt and Haecker.

20   Q.   So that's two different fragments?

21   A.   No, Item 66 was compared to those two.

22   Q.   So it is either Borchardt or Haecker's bullet?

23   A.   It could have been.  There is no way --

24   Q.   Sixty-seven, who does that match up to?

25   A.   Sixty-seven was identified to Item 137, pistol, which

---

1   again Borchardt.

2   Q.   Okay.  That's 67?

3   A.   110 was a lead core fragment, 111 is neither nor,

4   137, 175 again that's Borchardt and Haecker.

5   Q.   And 114?

6   A.   114 is a lead core, damaged lead core, no value.

7   Q.   205?

8   A.   Okay, 214-C, which is this we have already talked

9   about earlier was -- it was a jacketed fragment, no value.

10   And 214-D was also a bullet jacket fragment, and it could

11   neither be identified nor eliminated as being fired from the

12   Item 78 firearm, which is this one or the Item 117, which was

13   the .223 that belonged to Officer Starr.  And 205 is a damaged

14   lead core, no value.

15   Q.   213?

16   A.   213 was a neither nor again to items 137, 175, which

17   is Borchardt and Haecker.

18   Q.   Let me show you what has been marked as Exhibit 213,

19   that appears to have lands and groves on it?

20   A.   That is correct.

21   Q.   And those are the kinds of things that you need to

22   identify which fragment or projectile came from a weapon; is

23   that correct?

24   A.   Well, the individual marks, which what you are seeing

25   is the rifling, which is considered to be class

---

1   characteristics, it just simply tells you how many lands and

2   groves.  The only way you can use class characteristic to

3   eliminate anything is a gun that is firing right hand twist

4   and you have a gun that is left hand twist, and you can say

5   there is no way that bullet came from that gun.  Other than

6   that, you need class characteristics to determine that.

7   Q.   Okay.  To the people here on the jury, if they looked

8   at that, they would see --

9   A.   Class characteristics.

10   Q.   -- the rifling.  But you are saying that that is not

11   enough, that you need something --

12   A.   No.

13   Q.   -- other than that to determine which weapon may have

14   fired?

15   A.   That's correct.

16   Q.   Is that correct?

17   A.   That's correct.

18   Q.   So this is worthless?

19   A.   Right.  Well, it is neither/nor.

20   Q.   Okay.  223, I think that is 223?

21   A.   223 through 227, 223 was identified to the Item 137

22   pistol. Item number 137 was Haecker.

23   Q.   These show that they were taken out of the front door

24   of the --

25   A.   That's what is on the package, on this one.

1    Q.   All right.

2    A.   And then 224 was neither/nor to Item 135. And it was

3  eliminated to items 137, 175, neither/nor; 135 which was a

4  .357 Sig, Jarc's pistol.

5    325 was neither/nor, eliminated, 137, 175. 226 still

6  in there is led fragment. It is no value. 227 is led

7  fragment, no value.

8    And 228, that is a damaged bullet fragment. It was

9  neither/nor to Items 137 to 175. Those are the 9 millimeter

10  pistols belonging to Borchardt and Haecker

11    Q.   229 to 231.

12    A.   229 again was neither/nor to 137, 175.

13    230 was neither/nor to 178.

14    And 117 was eliminated from 135, 175, 157. So that

15  takes care of those three exhibits.

16    231 was actually a small piece of glass. I have a

17  question mark beside that because I didn't personally, it just

18  had the appearance of being a piece of glass.

19    Q.   All right?

20    A.   232 again is a damaged lead core fragment, no value.

21  And 233 was a damaged bullet fragment neither/nor, 137, 175.

22    Q.   So are we up to?

23    A.   234. 234 is a damaged bullet fragment. It was

24  I.D.'d to 137. Again that was Borchardt.

25    Q.   What about?

---

1    A.   235 was neither/nor 137 or 175.

2    236 was identified as 175, and that was a 9

3  millimeter pistol also.

4    Q.   I think 237 may be linked to something up there.

5    And then you got 239 through 241; is that correct?

6    A.   239 is neither/nor to 137 or 175.

7    240 is the lead core fragment that is no value.

8    And 241 again appears to be a piece of glass, no

9  analysis was performed.

10    242 is a damaged bullet fragment identified to 137,

11  and that's Haecker's 9 millimeter.

12    Q.   243?

13    A.   243 is a damaged bullet jacket fragment that leads to

14  137.

15    This one, 244, was a damaged bullet jacket fragment,

16  neither/nor to 137 or 175.

17    235 is a damaged lead core fragment, no value.

18    MR. BRAUCHLE:  We would offer those exhibits.

19    MR. BEACH:  As?

20    MR. BRAUCHLE:  It would be Defendant's Exhibit

21  8.

22    MR. BEACH:  No objections.

23    THE COURT:  Defendant's 8 is admitted.

24    MR. BRAUCHLE:  We would offer Defendant's

25  Exhibit 8.

---

148

1    THE COURT:  Defendant's 8 is admitted.

2    Q.   (By Mr. Brauchle)  For you there are

3  certain items down here at the end of the table, I

4  guess for lack of a better word miscellaneous; is

5  that correct?

6    A.   They were Items 70 -- 70 and 71 were two --

7  originally two cartridges, but they were not fired.

8  Winchester brand .223 caliber. I took Item 70 and broke it

9  down so that I could see what the base of the bullet looked

10  like in the actual round. Placed it back into the bag with

11  the bullet, cartridge case, the unfired cartridge case, and

12  powder. So that's 70 and 71.

13    Seventy-three is unfired Winchester .223 caliber

14  cartridge.

15    And 74 was the unfired Lake City round .223

16  cartridge. I broke it down also. And inside the packet is

17  the cartridge -- the unfired cartridge case and the bullet and

18  powder.

19    Q.   And then 115?

20    A.   115 is one fired Winchester brand 9 millimeter

21  cartridge case that was -- I believe that was not identified.

22  There is no difference in class characteristic, the Item 115

23  cartridge case and the Items 224 and 225 and 230 bullet jacket

24  fragments were eliminated as having been fired by the 175

25  pistol.

---

149

1    Q.   Okay. So the only pistol that you could rule out on

2  that would be which one?

3    A.   The 175, the 173 I didn't have it in that, but it was

4  115 was eliminated from item 137 and 175. Those were the two

5  9 millimeter pistols.

6    Q.   So it is a shell casing for a Winchester 9 millimeter

7  Luger?

8    A.   Correct.

9    Q.   It was found out there but you don't show it to be

10  shot by either of the two guns in question?

11    A.   That is correct.

12    Q.   So we don't know where this came from?

13    A.   No, sir.

14    MR. BRAUCHLE:  We would offer previously

15  mentioned exhibit.

16    MR. BEACH:  As 9?

17    MR. BRAUCHLE:  As Defendant's Exhibit 9.

18    MR. BEACH:  No objections.

19    THE COURT:  Defense 9 is admitted.

20    Q.   (By Mr. Brauchle)  Mr. Cooper, let me ask

21  you something, I alluded to this before, all of the

22  police were shooting Winchester ammunition; is that

23  correct

24    A.   Yes.

25    Q.   And the weapon and the clip -- or the clip to the

---

1  weapon that you got in front of you, was Remington ammunition;
2  is that correct?
3      A.    That is correct.
4      Q.    And you have got the spent cartridge case that was
5  found in the defendant's vehicle, and that's a Remington; is
6  that correct?
7      A.    That is correct.
8      Q.    Now, Remington and Winchester are not the same gun,
9  are they?
10     A.    That's kind of hard to say anymore.  They certainly
11 produce separate head stamps.  There are a lot of
12 combinations -- buyouts that are going on.
13     Q.    For the time being, they are not the same company,
14 are they?
15     A.    I don't think so.
16     Q.    Now, what has been admitted in evidence by the State
17 that is on your sheet as item number two, the one lead core
18 fragment and three lead fragments?
19     A.    Correct.
20     Q.    Did you ever do any methodological test on those
21 fragments to determine if that was from a Winchester or from a
22 Remington?
23     A.    No, sir.
24     Q.    Did you want do it?
25     A.    No, sir.

1              MR. BRAUCHLE:   We will pass the witness.
2                    REDIRECT EXAMINATION
3  BY MR. BEACH:
4      Q.    Mr. Cooper --
5              MR. BEACH:   May I approach, Judge?
6              THE COURT:   You may.
7      Q.    (By Mr. Beach)  Just so the jury is
8  absolutely clear after the last hour or so, the
9  copper jacketed cartridge that I am holding up right
10 now is one of the 29 live rounds that came from
11 State's Exhibit No. 63; is that correct?
12     A.    Correct.
13     Q.    The .223 caliber?
14     A.    That is correct.
15     Q.    State's 18 is also for demonstrative purposes, the ballistic
16 tip is also a .223 caliber; is that correct?
17     A.    That is correct.
18     Q.    Only two weapons submitted to you were .223 caliber?
19     A.    That is correct.
20     Q.    The defendant's chopper, State's Exhibit 63, there
21 the assault pistol; is that correct?
22     A.    It's considered a pistol, yes.
23     Q.    It's a .223 caliber?
24     A.    Correct.
25     Q.    And Officer Starr's A.R. 15 that fired .223?

152

1      A.    That's correct.
2      Q.    You were asked if you were able to identify any
3  fragments of this multitude of fragments that just got
4  admitted into evidence as coming from one of those ballistic
5  tips .223; is that correct?
6      A.    That's correct.
7      Q.    And you were able to find one?
8      A.    I found one fragment I believe it was Item 230 that
9  was certainly consistent with that of a Winchester Ranger in
10 that it still had some of the black material that you see on
11 the bullet here on the fragment itself.
12     Q.    You also to ascertain whether or not that black
13 material would adhere or stay on once fired, you testified
14 fired some of those Ranger .223; is that correct?
15     A.    I used I think one round of the evidence ammo when I
16 was testing for comparison purposes.
17     Q.    And did the black material adhere to the test fire
18 material that you fired out?
19     A.    Yes, it did.
20             MR. BEACH:   May I approach, Judge?
21             THE COURT:   You may.
22     Q.    (By Mr. Beach)  Let me show you what has
23 been marked for identification, State's 69.  Let me
24 show you, you took photographs of the badge, and
25 State's Exhibits 96 and 97; is that correct?

153

1      A.    Correct.
2      Q.    Are these two-page photographs that you would have
3  taken of Mark Nix's badge in State's Exhibits 96 and 97?
4      A.    Yes, it is.
5      Q.    And do they fairly and accurately depict how you saw
6  the badge with the bullet fragment with the bag and the
7  fragment submitted to you by Vicki Hall?
8      A.    Yes.
9              MR. BEACH:   Offer State's 69 into evidence.
10             MR. BRAUCHLE:   No objections.
11             THE COURT:   State's 69 is admitted.
12     Q.    (By Mr. Beach)  The upper left photograph,
13 the badge, the one with the red dot there, is the
14 bullet fragment that has been introduced in State's
15 97?
16     A.    Yes, it is.
17     Q.    And after removed, in this condition right here?
18     A.    That is correct.
19     Q.    The upper left photograph of State's 69 is a closeup
20 here of the bullet fragment?
21     A.    That is correct.
22     Q.    That's State's 97 again a photograph of Mark Nix's
23 badge; is that correct?
24     A.    That is correct.
25     Q.    And you did not see any of that black material of the

1  .223 round that you extracted from Mark Nix's badge; is that
2  correct?
3      A.   That is correct.
4      Q.   Or on the bullet fragment from the collar or the back
5  of the fragment from the badge?
6      A.   That is correct.
7      Q.   So everyone is abundantly clear, the fragment, the
8  large fragment that you removed from Mark Nix's badge was
9  consistent with being fired from a .223 caliber firearm?
10      A.   Yes.
11          MR. BEACH:   Pass the witness.
12               RECROSS-EXAMINATION
13  BY MR. BRAUCHLE:
14      Q.   Mr. Cooper, in regard to what you were just asked by
15  Mr. Beach, the fragments that were found on the badge other
16  than being from a .223, does it match to anything else?
17      A.   I could not positively identify it to either weapon.
18      Q.   So you don't know if -- you don't know anything about
19  it other than it was from a .223; is that a correct statement?
20      A.   Correct.
21      Q.   And as far as the Item 2 on your report, there
22  weren't any type of test to match those up with any of the
23  .223 ammunition that you had; is that correct?
24      A.   Well, I mean there is really -- there is not any
25  reliable testing to be able to do that.  The FBI many years

1  ago did some, what they did what they call bullet led
2  analysis, but they have since discontinued doing that because
3  they found it to be unreliable.
4      Q.   So they don't do it by any type of gas analysis or
5  anything like that?
6      A.   Not that I am aware of.
7      Q.   And in any event, you didn't attempt it in this case?
8      A.   That is correct.
9          MR. BEACH:   I will pass the witness.
10          MR. BEACH:   Nothing further.
11      May he be excused?
12          THE COURT:   Do you have any objection to him
13  being excused?
14          MR. BRAUCHLE:   I have one more question.
15      Q.   (By Mr. Brauchle)  Can you tell from a
16  spent cartridge whether that cartridge had a
17  jacketed or unjacketed projectile?
18      A.   Well, just based on, you know, the knowledge of
19  through experience, I am not aware of any .223 that are all
20  led projectiles.  But -- I am not aware of any test -- it is a
21  possibility that you may could run some S.C.M. work on it, but
22  I really don't know if you could.
23      Q.   So what you are saying is, is that all .223s then
24  have some form of jacketing?
25      A.   The .223s that I am familiar with, do.

1      Q.   So it is some form -- whether it is ballistic tip or
2  regular copper jacketing or whatever; is that correct?
3      A.   Correct.
4          MR. BRAUCHLE:   We will pass the witness.
5               FURTHER REDIRECT EXAMINATION
6  BY MR. BEACH:
7      Q.   I hate to bring you back, I think what Mr. Brauchle
8  is referring to, in the autopsy, are you more qualified in the
9  firearm analysis than the medical examiner?
10      A.   Well, I certainly do more comparison of bullets and
11  cartridge cases to weapons than the medical examiner does.
12      Q.   Medical examiner does autopsies and you take bullets
13  and casings and put them under the microscope; is that
14  correct?
15      A.   That's correct.
16      Q.   The autopsy talk about a fragment being nonjacketed,
17  you wouldn't know one way or the other what she was talking
18  about, correct?
19      A.   I mean in reading something like that, might -- the
20  inference is that you are talking about a lead core.
21      Q.   A little sliver of led, is that consistent with being
22  a nonjacket?
23      A.   Well, I mean, you don't know without looking at that
24  fragment under the scope whether it was originally a
25  nonjacketed or not.

1          MR. BEACH:   That's all.
2               FURTHER RECROSS-EXAMINATION
3  BY MR. BRAUCHLE:
4      Q.   I take it you did look at that under the scope?
5      A.   Yes, sir, I did.
6      Q.   And your conclusion was it was jacketed; is that
7  correct?
8      A.   It had all the appearances of a jacketed lead core,
9  in that there was no -- part of the baring surface that had
10  any rifling on it.
11      Q.   Which leads you to believe that it was jacketed; is
12  that correct?
13      A.   Correct.
14      Q.   But you don't know what kind of jacketing it would
15  be?
16      A.   No, sir.
17      Q.   And as you said all .223 have some sort of jacketing;
18  is that correct?
19      A.   To my knowledge the .223 is going to have a jacketed
20  bullet in it, whether it is a full metal jacketing or hollow
21  point or soft point ballistic tip.
22          MR. BRAUCHLE:   We will pass the witness.
23          MR. BEACH:   That's all.
24          THE COURT:   You may step down, sir.
25          MR. BEACH:   May he be excused?

158

1    THE COURT:   Any objections to this witness be
2  excused?
3    MR. BRAUCHLE:   No.
4    THE COURT:   You are free to go, sir.
5    THE WITNESS:   Thank you.
6    MR. MCCALLUM:   Judge, we will call Officer
7  McCarter.
8    THE COURT:   Has this witness been sworn?
9    MR. MCCALLUM:   I am not sure Your Honor.  He has
10  not.
11    (Witness entered the courtroom.)
12    THE COURT:
13    (Witness was duly sworn.)
14    THE COURT:   You may proceed.
15    **DEREK MCCARTER**
16  was called as a witness, after having been duly sworn by the
17  Court, testified under oath as follows:
18    **DIRECT EXAMINATION**
19  BY MR. MCCALLUM:
20    Q.    State your name for the record.
21    A.    My name is Senior Corporal Derek McCarter, D-e-r-e-k,
22  M-c-c-a-r-t-e-r.
23    Q.    And how are you employed?
24    A.    With the Dallas Police Department.
25    Q.    How long have you been a Dallas Police Officer?

159

1    A.    Four years.
2    Q.    Okay.
3    MR. MCCALLUM:   May I approach?
4    THE COURT:   You may.
5    Q.    (By Mr. McCallum)  Real quickly, Officer McCarter, I
6  am showing you State's Exhibit No. 73, will you take a minute
7  to see if you recognize this?
8    A.    Yes, I do.
9    Q.    And what is that?
10    A.    This is drug evidence tag that I booked into the
11  Baylor Street Property Room.
12    Q.    Who asked you to do that?
13    A.    Detective Krieter from the Physical Evidence Section.
14    Q.    Did you actually respond to the crime scene in this
15  case.
16    A.    No, I did not.  I came on to work that night eight
17  o'clock, about nine o'clock.  I went out to the location for
18  relief for the officers that were out there from the
19  beginning.
20    Q.    Okay.  And Krieter gave these to you?
21    A.    Yes, sir.
22    Q.    Is his name on there?
23    A.    No, it is not.
24    Q.    Right there?
25    A.    Yes, sir.

160

1    Q.    What does that say?
2    A.    Says ceased by.  That means he took it from the
3  scene.  Deliver means he gave it to me and I put it into the
4  evidence room.
5    Q.    Your name is also on there?
6    A.    Yes, sir.
7    Q.    Did you actually seal this bag?
8    A.    Yes, I did.
9    Q.    What is the evidence tag number?
10    A.    Evidence tag number is right here at the top, it's
11  143871.
12    Q.    Okay.  Is that preassigned?
13    A.    Yes, sir, it is.
14    Q.    Okay.  Did you also weigh this?
15    A.    Yes, sir, I did.
16    Q.    Okay, and what is the weight of the item?
17    A.    The total weight?
18    Q.    Yes.
19    A.    The total weight is 722.2 grams.
20    Q.    Okay.  And what are the contents of this exhibit?
21    A.    The contents are two bags of methamphetamine, one bag
22  of marijuana, and a digital scale.
23    Q.    Okay.  And where are these left.  You seal the bag
24  and where do you submit this?
25    A.    Down in the Baylor Street Property Room.  It's our

161

1  evidence room.  And there is a box designated for drug
2  evidence.  That once we seal it, we drop it into it.
3    Q.    Okay.  And it is left there if SWIFS wants to go and
4  conduct further testing on these items, correct?
5    A.    Yes, sir.
6    Q.    Okay.
7    MR. MCCALLUM:   We pass the witness.
8    **CROSS-EXAMINATION**
9  BY MR. BRAUCHLE:
10    Q.    Sir, with regard to the exhibit you have been shown,
11  you don't know the origin of that other than Officer Krieter;
12  is that correct?
13    A.    That's correct, sir.
14    Q.    He gave it to you to take to the Baylor Property
15  Room; is that correct?
16    A.    Yes, sir.
17    Q.    And that's where most evidence here in Dallas County
18  is booked into; is that correct?
19    A.    Yes, sir.
20    Q.    Officer McCarter, I will show you what has been
21  marked as Defendant's Exhibit 10; do you recognize what is in
22  that tube?
23    A.    Yes, sir.  It is a collapsible baton.
24    Q.    Also known as an asp?
25    A.    Yes, sir.

162

1   Q.   Does that have any numbers in regard to P.E.S. on it?
2   A.   Not that I can see.  No, sir, not that I can see.
3        MR. BRAUCHLE:   We would offer into evidence what
4   has been marked as Defendant's Exhibit 10.
5        MR. MCCALLUM:   We have no objection.
6        THE COURT:   Defense 10 is admitted.
7   Q.   (By Mr. Brauchle)   Officer McCarter, how
8   far out does that asp extend?
9   A.   There are two different types, you can have a 22-inch
10  or a 24-inch.
11  Q.   Can you tell by looking at it in the tube which size
12  that would be?
13  A.   No, sir.
14  Q.   Now, then, were you instructed on the use of that
15  weapon while you were in training?
16  A.   Yes, sir.
17  Q.   That can be used as an offensive or a defensive
18  weapon; is that correct?
19  A.   That is correct.
20  Q.   But mostly it is used as an offensive weapon; is that
21  correct, to subdue someone?
22  A.   As an offensive and defensive weapon, it depends on
23  the threat at the time, sir.
24  Q.   Okay.
25  A.   I can't say whether or not which it is used more for,

163

1   it depends on what type of threat is coming at you.
2        MR. BRAUCHLE:   We will pass the witness.
3        MR. MCCALLUM:   We have no further questions.
4        THE COURT:   You may step down, sir.
5        MR. MCCALLUM:   Can he be excused?
6        THE COURT:   Any objections?
7        MR. BRAUCHLE:   No.
8        THE COURT:   You are free to go, sir.
9        MR. MCCALLUM:   We call Monica Lopez.  She has
10  not been sworn, Judge.
11        (Witness entered the courtroom.)
12        (Witness was duly sworn.)
13        THE COURT:   You may proceed.
14           MONICA LOPEZ
15  was called as a witness, after having been duly sworn by the
16  Court, testified under oath as follows:
17           DIRECT EXAMINATION
18  BY MR. MCCALLUM:
19  Q.   State your name for the record.
20  A.   Monica Lopez, L-o-p-e-z.
21  Q.   How are you employed?
22  A.   I'm employed as the supervisor of the drug laboratory
23  at the Southwestern Institute of Forensic Sciences.
24  Q.   Okay.  What are your qualifications and educational
25  background that allows you to do that?

164

1   A.   I have a Bachelor of Science in biology, a master of
2   science in chemistry, as well as having attended many courses
3   and workshops and seminars throughout the course of my
4   employment.
5   Q.   Have you testified in court before?
6   A.   I have.
7   Q.   On few or many occasions?
8   A.   Many.
9   Q.   Ms. Lopez, is it possible to take an unknown
10  substance and test that substance to determine what it is?
11  A.   It is.
12  Q.   And is that what you do at the laboratory?
13  A.   Yes, it is.
14  Q.   Do you also review work that other chemists do at the
15  laboratory?
16  A.   I do.
17        MR. MCCALLUM:   May I approach?
18        THE COURT:   You may.
19  Q.   (By Mr. Brauchle)   Ms. Lopez, I am
20  showing you State's Exhibit No. 70, will you take a
21  minute and see if you recognize that?
22  A.   Yes, I do recognize this as a copy of the report that
23  was generated by our laboratory, with the exception of the
24  State's identifying sticker and some writing up at the right
25  hand top.

165

1   Q.   Okay.  Is that a true and accurate copy of what you
2   have in your file?
3   A.   Yes, it is.
4   Q.   Okay.  And is your name at the bottom as the
5   reviewer?
6   A.   Yes, it is.
7   Q.   Who is the actual analyzer in this case?
8   A.   Andrew Moore.
9   Q.   Was a forensic laboratory number assigned to this
10  case?
11  A.   Yes, it was.
12  Q.   And what is that number?
13  A.   07C2104.
14  Q.   Okay.  Case of Wesley Ruiz?
15  A.   Yes, sir, that is correct.
16        MR. MCCALLUM:   At this time I will offer State's
17  Exhibit No. 70.
18        MR. BRAUCHLE:   No objections.
19        THE COURT:   State's 70 is permitted.
20        MR. MCCALLUM:   Permission to publish.
21        THE COURT:   You may.
22  Q.   (By Mr. McCallum)  Ms. Lopez, I am now showing you
23  State's Exhibit No. 73, take a minute and see if you recognize
24  that.
25  A.   Yes.  I do recognize this as evidence being received

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1    by our laboratory.  And I recognize it by the unique
2    identifying number 07C2104 as well as the analyst's initials.
3    Q.    And who is the analyst?
4    A.    Andrew Moore.
5    Q.    And you said you are the reviewer?
6    A.    Yes.
7    Q.    What point will you sign off on this person's work,
8    what is the procedure?
9    A.    What I do is look at all the notes that the analyst
10   generated, the instrument output; and if the results -- if the
11   results match all of the notes in the case, then I will sign
12   the report.
13   Q.    Okay.  It all matched in this case?
14   A.    Yes, it did.
15   Q.    And looking at the report, is this number -- tag
16   number correspond with the tag number at the top, DPD tag
17   number?
18   A.    Yes, it does.
19   Q.    Okay, what is that tag number?
20   A.    143871.
21   Q.    Okay.  And can you tell the jury what the conclusion
22   or the analysis that concluded in this case?
23   A.    Exhibit 1-A, the content of one clear Ziploc bag was
24   used for the analysis.  The white crystalline material
25   contained dimethyl sulfone.  The total weight of the material

1    was 171 grams.
2    Exhibit 1-B, the content of one clear Ziploc bag was
3    used for the analysis.  The off-white crystalline material
4    contained methamphetamine and dimethyl sulfone.  The amount of
5    methamphetamine found was 16.8 grams, which was 31 percent of
6    the total weight.  The total weight of the material including
7    adulterants or dilutants was 55 grams.
8    Exhibit 1-C, the contents of one clear Ziploc bag was
9    used for the analysis.  The plant material was identified as
10   marijuana.  The gross weight of the marijuana was 0.93 ounces.
11   Q.    What are the tests that you utilize to test these
12   substances?
13   A.    We use a combination of analytical tests.  The first
14   test is a color test.  This test is a presumptive test.  It
15   gives us an -- identify what type of substance we are dealing
16   with.
17   The second test is a qualitative test using a mass
18   spectrometer.  This inclusively identifies the type of
19   substance that we are dealing with.
20   The third test is a quantitative test using a gas
21   chromatograph.  This instrument allows us to measure the
22   purity of the substance.
23   Q.    Okay.  And all of these tests are recognized in the
24   scientific community as being valid?
25   A.    Yes, they are.

1    Q.    I want to ask you about Exhibit No. 1-A, what is that
2    item, would you tell the jury what that is?
3    A.    Dimethyl sulfone, it is a common dilutant or cutting
4    agent.
5    Q.    Okay.  That is added to substances?
6    A.    Yes.  To increase its bulk or quantity.
7    Q.    And I think in Exhibit 1-B, it has 31 percent, is
8    that the purity of the drugs?
9    A.    Yes, it is.
10   Q.    Okay.  Is that common to see that type of purity in
11   methamphetamine?
12   A.    Yes, it is.
13   Q.    Is there a wide range of purity?
14   A.    Yes.  We see anywhere from 2 to 3 percent all the way
15   up to greater than 80 percent.
16   MR. MCCALLUM:   At this time, Your Honor, we will
17   offer State's 73 for all purposes.
18   MR. BRAUCHLE:   May we approach the Bench.
19   (Discussion off the record.)
20   THE COURT:   Any objections from the Defense.
21   MR. BRAUCHLE:   We would object to it that the
22   proper predicate hadn't been laid.
23   THE COURT:   Overruled.
24   State's 73 is admitted for all purposes.
25   Q.    (By Mr. Brauchle)   And real quickly,

1    Ms. Lopez, everybody that comes in contact, open
2    this bag, is their name and initial, date and time,
3    is that on the bag?
4    A.    That is only true for the submitting agency, as well
5    as our evidence registrar.  When we handle it, we use a
6    different chain of custody.
7    Q.    And other than just taking drugs out to test them,
8    nothing else is destroyed; would that be a fair statement?
9    A.    Yes, that's correct.
10   Q.    Okay.
11   MR. MCCALLUM:   We will pass the witness.
12   CROSS-EXAMINATION
13   BY MR. BRAUCHLE:
14   Q.    Ms. Lopez, Exhibit 1-A, didn't contain any controlled
15   substances, did it?
16   A.    It did not.
17   Q.    So -- and that's the heaviest bag of the three bags;
18   is that correct?
19   A.    Yes, that's correct.
20   Q.    And for the jury's knowledge, how much would
21   171 grams be in ounces?
22   A.    Well, there is 28 grams in an ounce.
23   Q.    I was hoping you were more mathematical than I was,
24   so we are looking at basically about 5 ounces?
25   A.    Roughly 5 ounces, yes.

170

1     Q.   And then in the other exhibit, Exhibit 1-B, the total
2  weight of that was 55 grams, which would be just over
3  2 ounces; is that correct or right at 2 ounces?
4     A.   Right around 2 ounces.
5     Q.   Fifty-six would be 2 ounces exactly, right?
6     A.   Yes.
7     Q.   Now, then, of the 2 ounces, you are stating that it's
8  31 percent of the total weight is methamphetamine or that's
9  the concentration of the methamphetamine?
10    A.   That's correct. It's 31 percent of the total weight
11  of the material. So 31 percent is 16.8 grams which is actual
12  methamphetamine.
13    Q.   And once again that would be roughly half an ounce?
14    A.   It is less than an ounce, yes.
15    Q.   No, that would be about half ounce roughly?
16    A.   Roughly, yes.
17    Q.   Okay. And then the third bag contained some
18  marijuana; is that correct?
19    A.   Yes, it is.
20    Q.   And that's right at an ounce?
21    A.   Less than an ounce, yes.
22    Q.   You measured that in ounces?
23    A.   Yes.
24    Q.   Okay.
25         MR. BRAUCHLE:  I will pass the witness.

171

1              REDIRECT EXAMINATION
2  BY MR. MCCALLUM:
3     Q.   Ms. Lopez, real quickly, is it common to see a
4  cutting agent when drugs are seized?
5         MR. BRAUCHLE:   Your Honor, we would object.
6  There has been no proper predicate laid.
7         THE COURT:   Overruled.
8         MR. BRAUCHLE:   May we have a running objection?
9         THE COURT:   You may.
10    Q.   (By Mr. McCallum) You can answer.
11    A.   Yes, that is very common to see a cutting agent.
12    Q.   Is it rare to see drugs that are a hundred percent
13  pure?
14    A.   It is not uncommon, but it is rare.
15    Q.   Ms. Lopez, are you familiar with the penalty ranges
16  in the degree offense that this would be this amount of drugs?
17         MR. BRAUCHLE:   Your Honor, we would object to
18  this as being improper.
19         MR. MCCALLUM:    Just asking if she knows, if she
20  has knowledge of it.
21         MR. BRAUCHLE:   No proper predicate.
22         THE COURT:   You can answer if you know what it
23  is.
24    A.   Are you talking about the methamphetamine?
25    Q.   (By Mr. McCallum) One B, yes.

172

1     A.   Yes, I am.
2     Q.   Tell the jury what degree felony that would be?
3     A.   As far as the degree felony, I am not familiar with
4  that; but I do know it is more than 4 grams less than 200.
5         MR. MCCALLUM:   That's all I have. I will pass
6  the witness.
7         MR. BRAUCHLE:   No questions.
8         THE COURT:   You may step down, ma'am.
9         THE WITNESS:   Thank you.
10        MR. MCCALLUM:   Can she be excused?
11        THE COURT:   Any objections?
12        MR. BRAUCHLE:   No.
13        THE COURT:   You are excused, ma'am.
14        MR. BRAUCHLE:   I will assume that she is subject
15  to recall.
16        THE COURT:   Subject to recall.
17        THE WITNESS:   Okay.
18        (Witness entered the courtroom.)
19        (Witness was duly sworn.)
20        THE COURT:   Thank you, you may be seated.
21  You may proceed.
22        MR. BEACH:   May I approach, Judge?
23        THE COURT:   You may.
24
25

173

1              VICKI HALL
2  was called as a witness, and having been duly sworn by the
3  Court, testified under oath as follows:
4              DIRECT EXAMINATION
5  BY MR. BEACH:
6     Q.   Tell us your name, please.
7     A.   My name is Vicki Hall. Last name, H-a-l-l.
8     Q.   And how are you employed?
9     A.   I'm employed as a trace evidence examiner at the
10  Southwestern Institute of Forensic Sciences also known as
11  SWIFS here in Dallas.
12    Q.   How long have you been out at SWIFS?
13    A.   Seventeen years.
14    Q.   Could you tell us your educational professional
15  background and training that qualifies you to be a trace
16  evidence examiner out at SWIFS?
17    A.   I am a Bachelor of Science degree in chemistry, as
18  well as a masters degree in analytical chemistry. I have
19  attended numerous workshops and training seminars in forensic
20  sciences, including training courses at the FBI academy. I am
21  a member of the Southwest Association of Forensic Scientists.
22  I have been accepted as an expert witness in eight states, the
23  District of Columbia, Puerto Rico, Virgin Islands, and U.S.
24  Military Court Marshals.
25    Q.   Is that the first time you have been through that.

1   We will move on. As a trace evidence examiner, just tell us
2   generally what are your duties on a day-to-day basis?
3       A.   My general duties evolve around processing evidence
4   that is submitted by the Dallas County medical examiner or
5   local and state police agencies. I specifically deal with
6   evidence that pertains to gunshot residue on clothing or other
7   articles for distance determination, as well as gunshot
8   residue analysis on samples collected from the person's hand
9   to are determine if they possibly fired a firearm. And I also
10  analyze fire debris for ignitible liquids.
11      Q.   And who do you work with out there in the trace
12  evidence section?
13      A.   Currently the other employee in the trace evidence
14  section is David Spence.
15      Q.   And is David Spence your supervisor?
16      A.   Yes, he is.
17      Q.   And obviously as your supervisor he is similarly
18  educated and trained to be a trace evidence examiner; is that
19  correct?
20      A.   That is correct.
21      Q.   You told us that from time to time the medical
22  examiners will submit materials to y'all to see if you can
23  determine composition and other things; is that correct?
24      A.   That is one of our duties, yes.
25      Q.   And we have heard from Ray Cooper that a unique

1   identifying lab number is assigned to each case, corresponding
2   to individual complainants that come out to y'all at SWIFS; is
3   that correct?
4       A.   That is correct.
5       Q.   And would your unique number be the same for
6   firearms, for DNA, for all the sections out there at SWIFS?
7       A.   The forensic laboratory or F.L. number would be the
8   same for the trace evidence unit, firearms, forensic biology,
9   which would include the DNA unit.
10      Q.   And the medical examiner have their separate
11  identifying number; is that correct?
12      A.   That's correct.
13      Q.   Now, back on April the 10th of 2007, did your
14  supervisor, David Spence, examine some particulate matter
15  taken from the face of Mark Timothy Nix and submitted by
16  Doctor Townsend-Parchman on March 26th, 2007?
17      A.   Yes, I believe he did.
18          MR. BEACH:   May I approach, Judge?
19          THE COURT:   You may.
20      Q.  (By Mr. Beach)   I will show you what has
21  been marked for identification Ms. Hall 74-A, and
22  ask if you are familiar with 74-A?
23      A.   Yes, I am familiar with the report generated by Mr.
24  Spence as State's Exhibit 74-A.
25      Q.   And does 74-A have the unique F.L. or laboratory

176

1   number that you just discussed?
2       A.   Yes. In this case it is 07P0471.
3       Q.   And that's concerning Mark Timothy Nix?
4       A.   That is correct.
5          MR. BEACH:   And we will offer Mr. Spence's
6   report, 74-A, at this time?
7          MR. BRAUCHLE:   No objections.
8          THE COURT:   State's 74-A is admitted.
9       Q.  (By Mr. Beach)   David Spence
10  microscopically examined the particulate matter that
11  was presented by the assistant medical examiner in
12  this case?
13      A.   That is correct.
14      Q.   Will you inform the jury of the results of Mr.
15  plaintiff Spence's microscopic examination?
16      A.   The particulate matter that was submitted was
17  examined like Mr. Beach said microscopically. It tested for
18  the presence of led and copper. There were four dull gray
19  materials and also three copper gray colored material found in
20  the debris. The gray colored material contained led and the
21  copper also contained led -- the copper colored particles
22  contained copper. And these appeared to be consistent with
23  bullet fragments. There was also crushed glass and blue
24  synthetic fibers that was found as well as in the debris.
25      Q.   This particulate matter that was removed from the

177

1   face area of Mark Nix; is that correct?
2       A.   That's what was submitted from the medical examiner,
3   and information provided.
4       Q.   Now, did you also examine gunshot residue stubs to
5   determine if Mark Nix had fired a weapon?
6       A.   Yes, I examined sample stubs collected from the back
7   of Officer Nix's hand that was submitted by the medical
8   examiner.
9       Q.   So at the time of autopsy, Dr. Townsend-Parchman or
10  someone under her control would have stubbed the hands of Mark
11  Nix to see if there was gunshot residue on the hands?
12      A.   That is correct.
13      Q.   And those were submitted to you or Mr. Spence for
14  your examination?
15      A.   That is correct.
16      Q.   And did you examine the gunshot residue collection
17  kit containing the sample stubs from the hands of Mark Nix?
18      A.   Yes, sir, I did.
19      Q.   And is that on May 8th, 2007?
20      A.   That's when the report was generated on those
21  results, yes.
22      Q.   What are you looking for when you are looking for
23  examination of the gunshot residue kit?
24      A.   The kit contains sample stubs. Like I said, they
25  were collected from the backs of a person's hand. I look at

178
179

1    these sample stubs using scan electron microscope looking for
2    any particles that might contain the elements antimony,
3    barium, and lead. These three elements are the major
4    components of the ammunition primer.
5        During the process this primer mixture explode which
6    starts the burning process. This primer mixture that has
7    exploded will escape out the gun in any openings, whether it
8    is out the end of the barrel, around ejection ports or opening
9    gaps and can be deposited on anything thereby. When I look at
10   these stubs for these particles, a particle is located, I then
11   can use an x-ray detector to determine the chemical
12   composition of that particle.
13       So I am looking for a particle, like I said, that
14   contains antimony, barium, and lead. If I find such a
15   particle, then I can say that that particle was present on the
16   person's hand.
17   Q.    You have to have all three particles?
18   A.    That is correct.
19   Q.    One of three or two of three, you are not going to be
20   able to get a positive result?
21   A.    That is correct.
22   Q.    What was the result of your electron microscopic
23   examination of the residue kit from the hands of Mark Nix?
24   A.    On the sample stubs from Officer Nix's hand, I did
25   not find three components or particles that contained antimony

1    barium and lead. There were a large amount of particles on
2    the left hand that contained lead, but none that contained all
3    three elements.
4    Q.    And what does that mean to you as a trace evidence
5    examiner?
6    A.    The lack of three component particles or particles
7    that have the antimony, barium, or lead means that the person
8    did not fire a weapon or they somehow had their hands wiped or
9    washed or the gun does not leave high amounts of these three
10   common particles. The high presence of lead just indicates
11   that the person had their hands in the environment of a
12   high-lead source.
13       MR. BEACH:  May I approach, Judge?
14       THE COURT:  You may.
15   Q.    (By Mr. Beach)  I will show you now what
16   has been marked for identification as State's
17   Exhibit 74, and ask if you can identify what State's
18   74 is Ms. Hall?
19   A.    Yes. State's Exhibit 74 is a copy of my report on
20   the gunshot residue kit from the hands of Mark Nix.
21       MR. BEACH:  At this time we will offer State's
22   74 into evidence.
23       MR. BRAUCHLE:  No objections.
24       THE COURT:  State's 74 is admitted.
25   Q.    (By Mr. Beach)  Ms. Hall, you have seen the

180
181

1    videotape of Mark Nix being shot; is that correct?
2    A.    Yes, sir, I have.
3    Q.    It's -- I guess depends on who is watching, it is
4    relatively clear a shot comes from inside the car; is that
5    correct?
6    A.    Yes. My opinion there was a shot fired from inside
7    the vehicle out through the glass window.
8    Q.    And you see the mussel flash from inside the car.
9    You see the window blown out from inside to outside and glass
10   whatever goes up into Mark Nix's face?
11   A.    Yes, sir. And Officer Nix falling to the ground,
12   yes.
13   Q.    When you are looking for those three elements,
14   barium, antimony, and lead, okay, are you also concerned about
15   interposed targets when you are doing an examination for these
16   three gunshot residue elements?
17   A.    Yes. Interposed targets usually will block residue
18   from traveling from the gun to the target or to the object in
19   the interest. If it is a car window like in this case,
20   another person, a wall, a door, anything that can block the
21   residue from the end of the barrel or from the gun to the
22   garment or the hand in question is considered an interposed
23   target.
24   Q.    And is it consistent, based on your view of the
25   video, that the discharge coming from inside the car through

1    the interposed target of a window is that a consistent
2    explanation as to why you will not expect to find all three of
3    those elements on the hands of Mark Nix?
4    A.    Absolutely.
5    Q.    And also it is clear that he didn't fire his weapon;
6    is that correct?
7    A.    That is correct.
8    Q.    Now, directing your attention then forward for about
9    a year to April, 2008, did you do some additional work on the
10   clothes of Mark Nix, his uniform shirt, his bulletproof vest,
11   and the T-shirt that he was wearing?
12   A.    Yes, that is also correct.
13   Q.    And what specifically were you looking for during
14   your initial examination of the items of clothing that Officer
15   Nix would have been wearing back on March 23rd, 2007?
16   A.    My examination revolved around looking for holes or
17   defects or any other visible residue on Officer Nix's
18   clothing. I was looking for, like I said, any holes or
19   defects that might correspond to bullet wounds or bullet
20   defects. In this case I also found some bullet fragments as
21   well.
22   Q.    And specifically in regard to his uniform shirt, what
23   did you find in the way of defects to Officer Nix's uniform
24   shirt?
25   A.    In Officer Nix's uniform shirt, there were several

182

183

1    defects found in the lower portion of the left sleeve and then
2    also there was along the left collar where a pin, a DPD
3    insignia pin had once been, there was a copper jacket fragment
4    from a copper jacketing bullet embedded in the collar. There
5    was also medical personnel cuts, what appeared to be medical
6    personal cuts where his shirt had been cut off. There were
7    pieces of that DPD insignia pin embedded -- or left on the
8    collar. There were also two small holes around the plaque
9    around where the buttons of the shirt, there were two small
10   holes there.
11       Q.   And that would have been outermost layer of the
12   clothes that Officer Nix had on back on March 23rd, 2007; is
13   that correct?
14       A.   That is correct.
15       Q.   And if you continue outside in then to his ballistic
16   vest?
17       A.   There was in the left shoulder strap of the vest,
18   there was a partial thickness tear or rip across, it didn't go
19   all the way through, just the outer portion of that vest.
20   There were also two very small holes there as well. But there
21   was an elongated defect, like I said, through the outer layer
22   of that vest.
23       Q.   And again to continue from the vest inward to the
24   white T-shirt that Officer Nix would have been wearing that
25   day?

1        A.   The white T-shirt also contained medical personnel
2    cuts or just a cut along the sleeve through the chest. There
3    was a series of holes once again in the front of the left
4    sleeve that corresponded to the same ones in the outer uniform
5    shirt. Here in the chest area, there was a series of four
6    small holes in the actual chest area of the T-shirt.
7        Q.   And going back to these copper jacket fragments or
8    bullet fragments that you observed, you did observe the badge
9    of Officer Nix; is that correct?
10       A.   Yes.
11       Q.   And you did see the same good size bullet fragment
12   that Mr. Cooper has already told us about embedded in the
13   badge?
14       A.   Yes. There was a large bullet fragment embedded in
15   the badge that was removed -- transferred to Mr. Cooper for
16   him to remove from the badge. There was also a notch cut out
17   of -- knocked out of the top of the badge, which was also
18   documented in the photograph.
19       Q.   And you have also told us that you actually observed
20   a copper fragment in the left collar of Officer Nix's uniform
21   shirt; is that correct?
22       A.   That is correct. Which I removed and transferred to
23   Mr. Cooper.
24            MR. BEACH:   May I approach, Judge?
25            THE COURT:   You may.

184

1        Q.   (By Mr. Beach)  I am showing you what has
2    been admitted into evidence, Ms. Hall, as State's
3    Exhibit No. 96; is this going to be the copper
4    fragment that you observed and removed from the left
5    collar of Officer Nix's uniform shirt?
6        A.   Yes, yes, sir, it is.
7        Q.   This was sent on to Ray Cooper; is that correct?
8        A.   That is correct.
9        Q.   The copper fragment, State's 97. I am showing you a
10   photograph in the bottom right-hand corner, would that be the
11   same fragment that you observed and removed from the left
12   collar of Officer Nix's uniform shirt?
13       A.   Yes, sir.
14       Q.   And did you generate a report back in April of 2008
15   concerning your examination of the shirt, vest and the
16   T-shirt?
17       A.   Yes. It was a report covering my initial examination
18   of Officer Nix's uniform shirt, undershirt and vest, as well
19   as the other articles that he was wearing at the time.
20       Q.   Showing you what has been marked for identification
21   as State's Exhibit 75, is this a true and correct copy of your
22   April 8, 2008, report that we have been discussing?
23       A.   Yes, it is.
24            MR. BEACH:   We would offer State's 75 into
25   evidence at this time, Your Honor.

185

1            MR. BRAUCHLE:   No objections.
2            THE COURT:   State's 75 is admitted.
3        Q.   (By Mr. Beach)  Did you generate a diagram
4    of the defects that you have told us about and the
5    various layers of clothing that you examined
6    belonging to Mark Nix?
7        A.   Yes. As part of my notes, I made drawings of Officer
8    Nix's uniform shirt, the vest and the T-shirt that he was
9    wearing.
10       Q.   I will show you what has been marked for
11   identification as State's Exhibit No. 81; and ask if this is a
12   fair and accurate copy of the diagrams concerning his uniform
13   shirt, the vest and the white T-shirt?
14       A.   Yes, sir, it is.
15            MR. BEACH:   We would offer State's 81 into
16   evidence at this time.
17       Q.   (By Mr. Beach)  Ms. Hall, I would ask you
18   to step down -- and you got some Wite Out there with
19   you?
20       A.   Yes, sir.
21       Q.   Can you indicate on the exhibit bar DPD shirt first
22   of all where you observed defects back in March and April of
23   2008?
24       A.   Okay, just for the record this is a long sleeve
25   shirt, Officer Nix was wearing a short sleeve shirt.

186

187

1    Q.   Yes, ma'am?

2    A.   Here on the left sleeve, I found several defects,

3    this will be an approximation, but... So there were several

4    holes in the front of the left sleeve. There was here on the

5    collar, there was actually a DPD pin still there, there were

6    only portions of that remained. At the time of my

7    examination, one of the clasp from the pin, the majority of

8    the pin was not present. But I did find a copper jacket

9    fragment was found right in this area here (indicating), in

10   this area of the insignia pin.

11        MR. BEACH:   Let the record reflect that Ms. Hall

12   is marking a point to the left collar of the uniform shirt?

13   A.   There was also here in the center of the chest, there

14   was a couple of small holes just to the right of several of

15   the buttons, there were just two small holes.

16   Q.   (By Mr. Beach)   Let me just stop you for

17   a second, if your hand, finger, whatever, could you

18   demonstrate to the folk on the jury where the

19   approximate, where the surgical cut was in the

20   uniform shirt

21   A.   The surgical cut mainly went along the pressed seam

22   in the sleeve. Through the middle of the badge, the Dallas

23   Police badge, and right above the DPD metal badge and

24   underneath the collar and crossed the button?

25   Q.   Kind of tracking right down the left collar bone area

1    of the Officer Nix?

2    A.   Correct. And there was also another set of medical

3    personnel cuts on the right side.

4    Q.   Turn the right collar bone cut, were you able to

5    definitively identify any bullet defects, glass defect in that

6    surgical cut?

7    A.   No. Unfortunately the way the shirt was cut, it is a

8    real irregular cut, some of it is foreign, some of it is cut.

9    If there were bullet defects, any other type of defects were

10   there, do have possibly been cut through and there was no way

11   to tell.

12   Q.   And just to the uniform shirt subsequently to your

13   April 8th uniform shirt, you went back on May 13th and

14   performed some additional testing to the uniform shirt; is

15   that correct?

16   A.   That is correct.

17   Q.   Specifically what were you looking for at that later

18   date in terms of uniform shirt?

19   A.   The later exam was to do a chemical test for the

20   presence of lead. I used several different chemicals and

21   sprayed it on the area on the front of the left sleeve and the

22   whole entire chest area and collar looking -- scan for

23   vaporous lead or any lead particulate residue.

24   Q.   What did you fine?

25   A.   I found a large concentration of lead on the left

188

189

1    sleeve. And a very large concentration in the left chest on

2    the collar, somewhat of a break of the lead residue in the

3    shoulder seam area. Kind of in the crook of the shoulder,

4    might have had a protected fabric. There wasn't a lot of lead

5    in the shoulder seam area. There was lead on the sleeve and

6    very heavy concentration of lead on the collar and upper

7    portion of the chest.

8    Q.   You have seen the video, Officer Nix on the

9    passenger's side of that car, in a position where he is trying

10   to strike the window with his asp, would that be consistent

11   why there would be an absent there in that one area that you

12   are talking about?

13   A.   Correct. If the arm is up and bent, that area is

14   protected. The fabric may be folded on top of it and that

15   would be very much consistent with him having his arm raised.

16   Q.   Okay. Take the shirt off. And while Mr. Spurger is

17   doing this. Everybody has been out to your work area out at

18   SWIFS, myself, Mr. Brooks, the defense lawyers and actually

19   viewed Officer Nix's uniform shirt, his ballistic vest and his

20   bloody white T-shirt; is that correct?

21   A.   That's correct.

22   Q.   And you have put these various exhibits in plastic

23   bags, why did you do that?

24   A.   They were extremely coated with blood. There was a

25   heavy amount of blood, it is dried; but it is still considered

1    a biohazardous material. It also has an offensive odor to it,

2    so I sealed it in plastic for biohazard.

3    Q.   And we agreed to get the exemplar clothing and have

4    you mark on it versus taking the original items out of their

5    protection; is that correct?

6    A.   That is correct.

7    Q.   On the invest, the exemplar vest can you show us the

8    defect in the left shoulder strap you were talking about?

9    A.   Would you like for me to mark --

10   Q.   Sure?

11   A.   There was elongated defect across the strap itself.

12   Q.   Is it through and through?

13   A.   No. It didn't even penetrate the entire strap. It

14   is more of an abraded area. There were two couple of small

15   little holes just below the strap. And once again, they just

16   went through the outer fabric, it didn't penetrate into the

17   collar lining.

18   Q.   Again based on your review of the video, Ms. Hall,

19   consistent with a large bullet fragment impacting the badge of

20   Officer Nix fragmenting splintering up toward the collar bone

21   area?

22   A.   That is correct. Some type of projectile, a bullet

23   fragment or metal piece of some sort skidded along the outer

24   portion of this strap. It was also found in the pocket there

25   was a piece of the DPD insignia pin that was inside the

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1   pocket.

2      Q.   And about seven days after you conducted the test of

3   the presence of lead on the uniform shirt, did you then go

4   back and conduct the same type of analysis on Officer Nix's

5   bulletproof vest and the white T-shirt?

6      A.   That is correct.  At a later date went back and

7   tested T-shirt and vest for the lead -- vaporous lead material

8   using the same chemical test that I did on the outer uniform

9   shirt.  And I found out once again a heavy concentration of

10   lead on the upper portion of the vest on the strap area.  And

11   then I found some lead here on the sleeve of the T-shirt and

12   then a heavy concentration of lead here where the collar area

13   of the T-shirt.

14      Q.   Without -- can we avoid having to remove the

15   bulletproof vest and show the folk on the jury the defects in

16   the white T-shirt?

17      A.   The defects in the T-shirt there were three holes,

18   several holes here (indicating) in the front of the T-shirt.

19   Then here along the collar area, there was four small holes

20   here as well (indicating).

21      Q.   And could you tell, especially in the collar area,

22   could you tell if those were bullet, metal, glass?

23      A.   I couldn't.  There was no bullet wipe.  Bullet wipe

24   is usually a lead ring around the edges of the hole and it is

25   where a bullet or projectile has passed through.  There really

---

1   wasn't anything distinctive like that.  There was just lead in

2   the entire area.

3      Q.   And again on the T-shirt about May the 20th, you

4   did your report, but did you conduct that presence of lead

5   analysis on the white T-shirt?

6      A.   Yes, I did.

7      Q.   And again what was the results of that analysis?

8      A.   There was a light amount of vaporous lead material on

9   the sleeve and the outer portion of the left chest.  There was

10   a heavy concentration of lead on the left medial side or

11   interportion of the chest and collar area.

12      Q.   And that heavy presence of lead would have

13   encompassed an area of the small defects on the white T-shirt

14   that you talked about around the collar?

15      A.   Yes.

16           MR. BEACH:   May I approach, Judge.?

17           THE COURT:   You may.

18      Q.  (By Mr. Beach)  Ms. Hall, I want to show

19   you what has been marked for identification as

20   State's Exhibits 76 and 77, and ask if those are the

21   two subsequent reports, the May 13th and

22   May 20th report, that you generated concerning the

23   presence of lead analysis on both the uniform shirt

24   and then subsequently the shirt and white T-shirt?

25      A.   Yes, State's Exhibit 76 is a copy of the report, lead

---

192

1   analysis, on the uniform shirt, and State's Exhibit 77 is a

2   copy of the report on the lead analysis of the vest and on the

3   T-shirt.

4           MR. BEACH:   At this time we will offer State's

5   Exhibits 76 and 77.

6           MR. BRAUCHLE:   No objections.

7           THE COURT:   State's 76 and 77 are admitted.

8           (Discussion off the record.)

9           MR. BEACH:   At this time, Judge, we would offer

10   again for all purposes State's Exhibit 81.

11           THE COURT:   Any objections?

12           MR. BRAUCHLE:   No, Your Honor.

13           THE COURT:   State's 81 is admitted.

14      Q.  (By Mr. Beach)  Again State's 81 is three

15   pages of your efforts to be an artist and diagram

16   defects, you have already told us about the uniform

17   shirt, the vest, and the white T-shirt; is that

18   correct?

19      A.   That is correct.

20           MR. BEACH:   Pass the witness.

21           THE COURT:   Cross-examination.

22           MR. BRAUCHLE:   May I approach, Your Honor?

23           THE COURT:   You may.

24

25

---

193

1                <u>CROSS-EXAMINATION</u>

2   BY MR. BRAUCHLE:

3      Q.   Ms. Hall, do you have another copy what has been

4   marked as State's 81?

5      A.   I have my originals, I done have a copy.

6      Q.   Well, let me do it this way.  Can you see that?

7      A.   I can see that.

8      Q.   I believe when the mannequin was in here, you

9   indicated these were two defects (indicating) on the shirt; is

10   that correct?

11      A.   There were several defects.  I have got them notated

12   there as three, four little small holes in the front of the

13   left sleeve.

14      Q.   So this indicates three or four small holes on the

15   front of the sleeve?

16      A.   Right.  I have notated four holes on the front of the

17   left sleeve.

18      Q.   This right here (indicating), what is that?

19      A.   The squiggly lines indicate where the medical

20   personnel or supposedly medical personnels were.

21      Q.   That indicates where the shirt was cut?

22      A.   That is correct.

23      Q.   Now, then, in regard to defects, and by defects for

24   these people's information, that simply is a hole in the

25   shirt, right?

1    A.    That is correct.

2    Q.    No matter how it is formed, if it is cut from a

3  bullet from acid, where, whatever?

4    A.    That is correct. I will usually indicate a defect,

5  circle, straight line, whether it is a true hole, abraded

6  area, you know, an unusual area.

7    Q.    Okay. In regard to that, though, are there any other

8  defects?

9    A.    There was -- once again the holes, there was also a

10 defect in the left collar area.

11   Q.    Right up here (indicating)?

12   A.    Yes, where the DPD insignia pin had been.

13   Q.    Now, in regard to that, did you learn that that pin

14 that was there was recovered?

15   A.    Yes. I also examined that pin, portions of it that

16 was pin. The DPD part of the pin was submitted. I later

17 found part of the clasp on the back found in the vest.

18   Q.    All right. And what did you ascertain about this

19 area right here (indicating) where the...

20   A.    It appeared that the pin had been torn off of the

21 collar cause there was a tear corresponding to an area where

22 the post had been of the pin -- the post of the pin, there was

23 a tear in the collar.

24   Q.    Okay. And in regard to any lead, did you find any on

25 the outer shirt?

1    A.    Yes. There was a significant amount of lead residue

2  on the front of the left sleeve, as well as the chest area.

3    Q.    Let me stop you there. In front of the left sleeve

4  which would be down in here; is that correct (indicating).

5    A.    Correct. Over the entire portion not just around the

6  holes.

7    Q.    So it covered this sleeve?

8    A.    Correct. And then there was a small -- one called

9  barren area, a area of lesser residue around the sleeve seam,

10 the shoulder seam.

11   Q.    Right here (indicating)?

12   A.    Correct. And there was more across the chest area on

13 top of where the badge was.

14   Q.    Right over here (indicating)?

15   A.    And heavy concentration on the left collar and the

16 area of the collar underneath the collar.

17   Q.    You are saying here was a heavy concentration

18 (indicating)?

19   A.    Correct.

20   Q.    And in this area you found what?

21   A.    There was a significant amount of led residue there

22 as well.

23   Q.    Now, you don't know how to quantify that; is that

24 correct?

25   A.    No, it is all.

---

196

1    Q.    Is that from vaporous lead?

2    A.    It is from vaporous lead. In this case I believe

3  from the break up of the bullet. The bullet as it passes

4  through the interposed target will not only physically break

5  up, but small amounts of the lead will shave off into almost a

6  mist and this mist can be deposited and looks like a vaporous

7  material.

8    Q.    When you say interposed target, you are talking about

9  the car window?

10   A.    The car window and also the badge in this case can

11 act as an interposed target. We know the fragments struck the

12 badge. There was one still embedded. At that impact more

13 lead could shaved off and come like a mist and deposit. And I

14 think that is why there was so much lead on the collar and the

15 area of the badge, because of the impact with the badge.

16   Q.    Now, on the vest, you found two holes right here

17 (indicating); is that correct?

18   A.    That's correct. They were very small holes. But I

19 still notated them and then also cut through the outer fabric

20 to make sure there was no fabric under the fabric layer of the

21 inside vest itself.

22   Q.    Those were not through-and-through holes?

23   A.    No, they were just through outer fabric layer.

24   Q.    So there wouldn't have been any defect below those

25 two holes on the T-shirt; is that correct?

197

1    A.    No. Cause the area below those two holes were

2  actually the kevlar material.

3    Q.    So what I am saying is, those holes would have been

4  basically on the outer surface of the vest?

5    A.    That's correct.

6    Q.    And they wouldn't have gone below that into the

7  T-shirt or anything like?

8    A.    Correct.

9    Q.    All right. Now, then you stated that, I believe it's

10 here (indicating) there is some sort of a diagonal pattern; is

11 that correct or diagonal defect?

12   A.    There is a diagonal defect that goes from up toward

13 the left neck.

14   Q.    Right here (indicating)?

15   A.    Yes. And it was just a defect to the outer layer of

16 the strap only.

17   Q.    Okay. And that comes from left to right and

18 basically upward; is that correct?

19   A.    Yes, that is correct.

20   Q.    And by defect on that, we are saying that it's a tear

21 in the fabric that goes diagonally across the left shoulder

22 strap?

23   A.    Yes.

24   Q.    How about concentrations of lead on that?

25   A.    There was a dense area of vaporous led material on

1    the strap of the shirt as well -- or strap of the vest.

2    Q.   Up here (indicating)?

3    A.   Yes. In the area of the two small holes as well as

4    the diagonal abraded area.

5    Q.   And then on the T-shirt, you stated that there were

6    four holes up here by the neck (indicating)?

7    A.   That's correct. They were very close to the collar,

8    the round collar of the T-shirt. And then also several

9    holes -- three holes in the front of the left sleeve.

10    Q.   When you tested for lead on that, was there lead up

11    here (indicating)?

12    A.   There wasn't lead around the holes near the collar in

13    the chest area. There was only a few little particulate

14    reaction in the front sleeve area, small amount of lead on the

15    sleeve.

16    Q.   Right here (indicating)?

17    A.   Yes. Just kind of throughout the whole sleeve.

18    MR. BRAUCHLE:  I have no questions.

19    MR. BEACH:  Nothing further, Judge.

20    THE COURT:  You may step down, ma'am.

21    Any objections to this witness being excused?

22    MR. BEACH:  No objections from State.

23    MR. BRAUCHLE:  Subject to recall.

24    THE COURT:  Ma'am, you are free to go, subject

25    to being recalled.

1    Can I see the attorneys.

2    (Discussion off the record.)

3    THE COURT:  Ladies and gentlemen, we will recess

4    for today and reconvene tomorrow at 8:30.

5    THE BAILIFF:  All rise.

6    (Jury retired from the courtroom.)

7    THE COURT:  You may be seated.

8    (Court recessed for the day.)

---

200

1    THE STATE of TEXAS )

2    COUNTY of DALLAS  )

3    I, BELINDA G. BARAKA, Official Court Reporter in and

4    for the 194th Judicial District Court of Dallas County, State

5    of Texas, do hereby certify that the foregoing contains a true

6    and accurate transcription of all portions of evidence and

7    other proceedings requested in writing by counsel for the

8    parties, to be included in this volume of the Reporter's

9    Record, in the above-styled and -numbered cause(s), all of

10    which occurred in open court or in chambers and were reported

11    by me.

12    I further certify that this Reporter's Record of the

13    proceedings truly and correctly reflects the exhibits, if any,

14    admitted by the respective parties.

15    I further certify that the total cost for the

16    preparation of this Reporter's Record was paid by the

17    State/Defense.

18    WITNESS MY OFFICIAL HAND this the 30th day of

19    may , A.D., 2009.

20

21

22

23    BELINDA G. BARAKA, CSR #5028

23    Official Court Reporter

     133 N. Industrial

24    Dallas County, Texas  75207

25    Certification Expires: 12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*