

CASE NUMBER AP-75,968
TRIAL COURT NUMBER F-07-50318-M

# BINDER 7 OF 11 BINDERS

*VOLUMES 46 THROUGH VOLUME 55*

STATE OF TEXAS

VS

WESLEY LYNN RUIZ

FILED IN
COURT OF CRIMINAL APPEAL
JUN 1 5 2009
Louise Pearson, Clerk

CAUSE NO. F07-50318-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| vs. | * | 194TH JUDICIAL DISTRICT |
| WESLEY LYNN RUIZ | * | DALLAS COUNTY, TEXAS |

- - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

JURY TRIAL

Volume 46 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 3rd day of June, A.D, 2008, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III, of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

    (Proceedings Reported by Computerized Machine Shorthand)

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

1                    A P P E A R A N C E S

2

3    HON. KEVIN BROOKS
     Assistant District Attorney
4    State Bar No. 03070735

5

6    HON. ANDY BEACH
     Assistant District Attorney
7    State Bar No.  01944900

8                         FOR THE STATE OF TEXAS

9

10   HON. PAUL BRAUCHLE
     Attorney at Law
11   State Bar No. 02918000

12

13   HON. WILLIAM JOHNSON
     Attorney at Law
14   State Bar No.  10804500

15                        FOR THE DEFENDANT

16   Also Present:

17    Doug Parks, Attorney at Law

18    Susana Fernandez, Interpreter

19

20                      *  *  *  *  *

21

22

23

24

25

1                          I N D E X

2                                              PAGE/VOL.

3    Proceedings - 06/03/08 ............................ 6/46

4    STATE'S WITNESS       Direct     Cross

5     JANICE PARCHMAN      9, 40     31, 42

6     BRIAN PAYNE          44

7     PATRICK STARR        45         56

8    State rests its Case in Chief ..................... 61

9    DEFENSE'S WITNESS     Direct     Cross

10    MARIA CORREA         62, 76     72

11   In-Camera Hearing ................................. 78

12   End of In-Camera Hearing .......................... 87

13   DEFENSE'S WITNESS     Direct     Cross     S.Rosa

14    RAQUEL SOSA                              89, 110

15                                            120

16    KARLOUS LAKE                            126, 137

17

18   Reporter's Certificate ............................ 143

19

20

21

22

23

24

25

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
1                    E X H I B I T   I N D E X

2    STATE'S EXHIBIT(S):          OFFERED:   ADMITTED:   VOL.

3     88   Medical Records           6          6         46

4     90   Photograph               26         27         46

5     91   Photograph               26         27         46

6     92   Autopsy Photograph       25         25         46

7     93   Photograph               26         27         46

8     94   Photograph               26         27         46

9     95   Photograph               26         27         46

10    95-A Photograph               29         30         46

11    99   Particulate Matter       18         18         46

12   100   Photograph               46         46         46

13   101   Photograph              119        120         46

14   102   Photograph              119        120         46

15   103   Photograph              119        120         46

16

17

18

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                    E X H I B I T   I N D E X

 2   DEFENSE'S EXHIBIT(S):           OFFERED:   ADMITTED:   VOL

 3    11   Death Certificate            38          38         46

 4    12   Photograph                   64          65         46

 5    13   Photograph                   64          65         46

 6    14   Photograph                   64          65         46

 7    15   Photograph                   64          65         46

 8    16   Photograph                   64          65         46

 9    17   Photograph                   64          65         46

10    18   Photograph                   64          65         46

11    19   Diagram                      64          65         46

12    20   Autopsy - Jesus Ortiz       123         124         46

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

6

**PROCEEDINGS**

(June 3, 2008)

1. THE BAILIFF:   All rise.
2. (Jury entered the courtroom.)
3. THE COURT:   You may be seated.
4. And you may proceed.
5. MR. BEACH:   At this time Your Honor, the State
6. would offer into evidence State's Exhibit 88, 46 pages of
7. Parkland Hospital medical records.
8. MR. BRAUCHLE:   No objections.
9. THE COURT:   State's 88 is admitted.
10. MR. BEACH:   Permission to publish certain
11. portions of 88, Your Honor?
12. THE COURT:   You may.
13. MR. BEACH:   State's 88 are medical records
14. pertaining to treatment of Mark Nix at Parkland Hospital.  I
15. am going to read to you the operative report.
16. Findings:  Gunshot wound to the left neck with active
17. extravasation.  Bleeding as slowed with insertion of digital
18. pressure into the hole; however, it was never slowed
19. completely.  The anatomical injuries included transection of
20. the left internal jugular vein and significant injury to the
21. left common carotid artery.
22. Complications:  Cardiac arrest and death.
23. Statement of medical necessity:  This patient was

7

1. approximately a 35-year-old man presented with a gunshot wound
2. to the base of his left neck superior to the clavicle.  He is
3. a Dallas Police Officer who was shot in the line of duty.  On
4. arrival to trauma bay, the patient had lost vital signs and
5. CPR was being performed.  This had been going on for
6. approximately ten minutes.  Once resuscitation was begun with
7. ACLS protocol, the patient developed a pulse and was taken
8. immediately to the operating room for further life-saving
9. efforts.
10. Only digital pressure from the neck wound itself seemed
11. to slow it down significantly.  The patient's heart ceased
12. beating around this time; however, with some internal massage
13. and fluid resuscitative efforts by anesthesia, it started
14. beating again.  A decision was made to proceed with median
15. sternotomy, which was performed to try and obtain better
16. access to the injured area.  Exposure, however, was not
17. adequate to obtain visualization or access to the injury.
18. Given the patient was still actively exsanguinating, and
19. that no control was able to be obtained outside the field, the
20. decision was made to dissect out the medial third of the
21. clavicle, incise the sternoclavicular joint and resect the
22. medial third of the clavicle itself.  This was done using
23. sharp dissection with Metzenbaum scissors and bone elevator.
24. Bone cutters were applied to cut the clavicle and it was
25. circumferentially dissected free and passed off the table.

8

1. This maneuver brought the field of injury into the direct view
2. and also decompressed the area.  Exsanguination continued and
3. the patient expired again.  It was determined that given the
4. length of time the resuscitation had been carried out, the
5. extreme acidosis and also the difficulty finding this injury
6. that further efforts would be futile and not in the interest
7. of patient and his family.  The injuries identified in the
8. field of view were a left internal jugular vein transection
9. and a left a common carotid artery, although further
10. dissection for other injuries were not carried out.
11. The patient's time of death was called the 1916 by Erwin
12. Thal, M.D. staff physician.
13. Right here it states left clavicle medial gunshot
14. entrance wound.  Right there, okay.  Diagram crossed out
15. error, error gunshot wound is focused there on the left
16. clavicle.  Over here gunshot wound entrance wound to the left
17. neck.
18. This witness has not been sworn, Your Honor.
19. (Witness entered the courtroom.)
20. (Witness was duly sworn.)
21. **JANICE TOWNSEND-PARCHMAN**
22. was called as a witness, and having been duly sworn by the
23. Court, testified under oath as follows:
24.
25.

9

1. **DIRECT EXAMINATION**
2. BY MR. BEACH:
3. Q.   Tell us your name, please.
4. A.   Janice Townsend-Parchman.
5. Q.   And how are you employed?
6. A.   I am a forensic pathologist employed as a medical
7. examiner by Dallas County.
8. Q.   And how long have you been a medical examiner for
9. Dallas County?
10. A.   Over 15 years.
11. Q.   Can you tell us your educational and professional
12. training, qualifications that entitles you to be a medical
13. examiner?
14. A.   I have a bachelor of Arts degree in biology with
15. honors from Princeton University.
16. MR. BRAUCHLE:   We will stipulate.
17. MR. BEACH:   They want to hear it, Judge.
18. THE COURT:   You may proceed.
19. A.   I have a Master of Arts degree in zoology from
20. Indiana University at Bloomington.  I have a Doctorate of
21. Medicine degree from the University of Texas Heath Science
22. Center of San Antonio.  I then did a one year general surgery
23. internship at teaching hospitals of the University of Texas
24. Heath Science Center of San Antonio.  I then did the first
25. year of a four-year combined anatomic and clinical pathology

10

1 residency program, also teaching hospitals of University of
2 Texas Heath Science Center San Antonio. I then transferred my
3 pathology program to Medical City of Dallas and completed it.
4 I am licensed to practice medicine in the State of Texas. I
5 am certified by the American Board of Pathology and Anatomic
6 Clinical and Forensic Pathology. I have done over 5,000
7 forensic autopsy.
8      Q.   (By Mr. Beach)    What is the field of
9 forensic pathology?
10     A.    Well, I think the easiest way to understand about
11 forensic pathology is to contrast it, if you will, with
12 general pathology. Most pathologists work in a community
13 hospital and they do both anatomic and clinical pathology.
14 They will do a few autopsies. They will do autopsies on
15 people who die a natural disease death in hospital. Who has
16 been admitted to the hospital for over 24 hours, where the
17 cause of death has not been established before they die and
18 where both their next of kin and the attending physician want
19 an autopsy to be done.  They spent most of their time on what
20 we call surgical pathology, looking grossly and
21 microscopically anything that comes off or out of the body,
22 biopsies, organs removed at surgery, and what have you and
23 rendering diagnosis. They run the hospital laboratories. The
24 blood bank, the clinical chemistry laboratory, the hematology
25 laboratory, and the micro-biology laboratory.  So that's what

11

1 most pathologist do on day in and day out basis.
2      Forensic pathologists by contrast largely limit their
3 practice to doing autopsies.  And we do autopsies on different
4 classes of patients. We do do autopsies on people who die
5 natural disease death. But they usually are people who die
6 suddenly and unexpectedly of natural disease. And then we do
7 autopsies on people who die violent deaths, accidents,
8 suicides and homicides. In conjunction with this, we interact
9 with families, law enforcement, attorneys, and of course we
10 testify in court.
11     Q.    Doctor, were you called upon to perform an autopsy on
12 the body of Mark Nix?
13     A.    Yes.
14     Q.    And was that done back on 7:00 a.m. on March 24th
15 of 2007?
16     A.    Yes.
17     Q.    And when you and the other medical examiners,
18 assistant medical examiners, chief medical examiner perform an
19 autopsy, is an unique identifying number assigned to each
20 autopsy performed out there at SWIFS?
21     A.    Yes.
22     Q.    And was there a unique identifying number assigned to
23 the autopsy, your autopsy concerning Mark Nix?
24     A.    Oh, yes.
25     Q.    And what was that?

12

1      A.    It was 1022-07.
2      Q.    Doctor how, did the body present?
3      A.    Well, when I first saw the body, the body was nude.
4      Q.    Any clothes accompany the body?
5      A.    No clothing accompanying the body, no are personal
6 effects no jewelry.
7      Q.    Did you observe evidence of medical treatment on the
8 body of Mark Nix?
9      A.    Yes.
10     Q.    Can you tell us about that.
11     A.    Well, there was quite a lot of it. There was an oral
12 endotracheal tube, a breathing tube in his mouth. There was
13 an orogastric tube, which is a tube in his mouth that goes
14 down to his stomach. The eyes were taped closed, that's to
15 prevents the cornea from drying out. There were EKG pads on
16 the body to monitor, to of course monitor his heart rate and
17 rhythm. There was a 16-inch sutured incision in the base of
18 the left-side neck, which extended into the midline of the
19 chest. And when I performed the autopsy, subsequent internal
20 examination revealed evidence of surgical exploration of the
21 neck and a median sternotomy. A median sternotomy, is when
22 they split the breast bone, the sternum, longitudinally in
23 half. And there was a 10-inch sutured left thoracotomy
24 incision.  A left thoracotomy incision is an incision they
25 make in the left side of the chest and go between ribs so that

13

1 they can do -- well, explore the heart if they need to, and so
2 that they can perform internal manual heart compressions for
3 resuscitation.
4      In the right arm near the antecubital fossa, which is
5 your elbow pit, there was a sutured incision, which appeared
6 to be a cutdown site. This is something that surgeons do,
7 they will do a cutdown to a larger vein so that they can put
8 in a larger intravenous catheter, so that they can put more
9 fluid in quickly. There was also intravenous catheter in each
10 antecubital fossa, in the right ankle and in the right
11 inguinal area, which is the right groin.
12     There was a left chest tube in place. Left chest tube
13 is a tube put in again between ribs so they can drain any
14 fluid, blood or air for that matter, if need be, from the left
15 cavity.
16     There was a sutured incision in the right side of the
17 chest, which appeared to be for a chest tube, but that had a
18 gauze bandage over it and there was not a chest tube in place.
19     There were puncture marks in both anterolateral
20 wrists and the anterior lateral ankle. There was disposable
21 blood pressure cuff around the right calf. There was a Foley
22 catheter in place and -- in the urethra. And subsequent
23 examination which revealed tube burn spots of pinkness in the
24 bladder mucosa, which is in the slang term is called tube
25 burn.

14

1    There was an identification band around the right
2    ankle and there was an identification band unsecured at the
3    left wrist.
4        Q.    And, Doctor, you have reviewed the Parkland Hospital
5    records concerning the doctor out there treatment of Mark Nix;
6    is that correct?
7        A.    Yes.
8        Q.    And in combination with the evidence of treatment
9    that you observed on his body, is it fair to say that they did
10   everything they could do try to save Mark Nix's life?
11       A.    Oh, yeah, it was a heroic effort.
12       Q.    Now, did you -- part of your autopsy, Doctor,
13   visualize and performed external examination on the body of
14   Mark Nix?
15       A.    Yes.
16       Q.    And other than the medical treatment that you have
17   just told us about, was there evidence of injury that you saw
18   on your external examination of Mark Nix?
19       A.    Yes.
20       Q.    Can you tell us about that.
21       A.    Well, there was a gunshot wound.  The gunshot wound
22   had an entrance in the left upper chest just below the
23   clavicle.  It had been incorporated into -- remember I talked
24   about that incision in the left side of the base of the neck
25   and then the middle of the chest.  It is not at all uncommon

15

1    for surgeons to incorporate gunshot wounds into incisions when
2    they are try to go save people's lives.  At any rate, so the
3    gunshot wound of entrance had been cut through and
4    incorporated into the surgical incision.  And we can talk
5    about that more if you want to.
6        Q.    Well, you learned from the records that the doctors
7    at Parkland removed a portion of Mark Nix's clavicle to try to
8    gain better visualization of the wound; is that correct?
9        A.    That's correct.
10       Q.    And that is consistent with the surgical incision
11   that you saw there when the entrance wound was incorporated
12   into?
13       A.    Yes, it is.
14       Q.    In spite of the fact that the wound was incorporated
15   into that surgical incision, could you visualize what you
16   believed to be the entrance wound?
17       A.    Oh, yes.
18       Q.    And how were you able to do that?
19       A.    Well, by looking at it.
20       Q.    I knew you were going say that?
21       A.    Yes, yes, I have seen thousands of gunshot wounds, I
22   have seen dozen if not hundreds of gunshot wounds, entrance
23   wounds that have been incorporated into surgical incisions.
24       Q.    And from what you saw, you believed -- what you saw
25   to be the entrance wound even how it was incorporated; is that

16

1    correct?
2        A.    That's correct.
3        Q.    Let's go on with your external examination, what
4    evidence of injury did you also observe?
5        A.    Well, okay, he had a lot of what we call
6    pseudostippling, when a bullet goes through an, what we call
7    an interposed target, in other words when a bullet goes
8    through something before it actually strikes the body, there
9    are times when -- well, the bullet -- little pieces of the
10   bullet can be broken off and continued toward the body and
11   strike the body and you can have particles of interposed
12   target continued toward -- start and continue toward the body
13   and strike the body.  And these cause little abrasions scrapes
14   in the body which we call pseudostippling.  At any rate, he
15   had those on the left frontal and temporal scalp.  His hair
16   was very short.  So we could see that.  On the left side of
17   the face including the forehead, the eyelids, the nose, the
18   lips, the cheek, the pinna, which is the internal ear, and the
19   jawline, under the chin on both sides, on the left side of the
20   neck, on the left upper chest, on the right cheek near the
21   corner of the mouth, on the anterior right and left arms, and
22   on the dorsum of the right forearm near the elbow.
23       Q.    Now, as part of your practice when you are performing
24   autopsies, Doctor, do you remove samples or particles of the
25   pseudostippling and do something with those particles?

17

1        A.    Okay, the pseudostipples are the actual little
2    abrasions, scrapes, digs in the body caused by the particles.
3    What I recover is the particles themselves.  And, yes, if I
4    can see in any of the pseudostipples, particles, the fragments
5    that caused the pseudostipples, I do my best to remove some of
6    those and preserve them.
7              MR. BEACH:    May I approach, Judge.
8        A.    Which I did in this case.
9              THE COURT:    You may.
10       Q.    (By Mr. Beach)  Doctor, I am going to show
11   you what has been marked for identification State's
12   Exhibit 99, and ask if you can identify what State's
13   99 is?
14       A.    Well, what I am seeing is the envelope, or subsequent
15   been opened.  But this envelope was fill out by me at the time
16   of the autopsy, with his name and the case number and I signed
17   it.  And it says particulate matter taped to glass slide,
18   removed from the face.
19       Q.    And the contents of the State's 99 would be the
20   actual particles that you removed from the face, the chin area
21   of Mark Nix, placed on the slide and sent to some place else
22   at SWIFS; is that correct?
23       A.    Right, up to trace evidence.
24       Q.    They got a microscope up there?
25       A.    Yes, they do.

18

1    Q.    They know how to use it?
2    A.    Yes.
3              MR. BEACH:   We would offer State's 99 into
4    evidence that the time, Your Honor.
5              MR. BRAUCHLE:   No objections.
6              THE COURT:   State's 99 is admitted.
7    Q.   (By Mr. Beach)   Let's get back to the
8    gunshot -- gunshot entrance wound, and again can you
9    demonstrate on your body where you saw the entrance
10   wound.
11   A.    About here (indicating).
12   Q.    And you described it in your report as in the left
13   upper chest; is that correct?
14   A.    Yes.
15   Q.    And after you observed the entrance wound, you were
16   able to actually track that wound as it traversed through the
17   body of Mark nix?
18   A.    Yes.
19   Q.    Can you describe that, of course, please.
20   A.    Well, it perforated the left clavicle, causing a
21   fracture of the left clavicle.  And it went through the
22   musculature of soft tissue of the left side of the base of the
23   neck.  It went through the left internal jugular vein and the
24   left common carotid artery and then penetrated and lodged in
25   the body of T1, which is the first thoracic vertebrae, which

19

1    is the vertebrae which both of your first ribs come off of.
2    Q.    And obviously the most significant injury that Mark
3    Nix sustained was the perforation of the left common carotid
4    artery and the left jugular vein?
5    A.    Correct.
6    Q.    Could you indicate where on your body the left common
7    carotid artery is?
8    A.    Well, it is deep to right about here (indicating).
9    Q.    And if I remember from college physiology, artery is
10   what is taking the oxygenated blood away from the heart?
11   A.    Correct.  You know you got your heart and your chest.
12   And you remember the aorta is the biggest artery in the body.
13   So it is taking the blood from the left ventricle, main
14   pumping chamber of the oxygenated blood.  It is it taking the
15   blood -- first it goes up, that's called the ascending aorta.
16   And then you have the aorta arch where the aorta arches over
17   and you got three big arteries coming off of the arch.  You
18   got the brachiocephalic artery, which takes all the blood to
19   the right side of the head and the neck, right shoulder and
20   right arm.  Then you got the middle one is the one we are
21   interested in, that's the left common carotid.  That takes all
22   the oxygenated blood to the left side of the neck and head and
23   then you got the left subclavian artery, which takes the
24   oxygenated blood to the left shoulder and arm.
25   Q.    This is a major blood artery; is that correct?

20

1    A.    Yes.  It supplies the whole left side of the neck and
2    head.  It's at least as big around in a grown man as my little
3    finger.
4    Q.    And it was perforated?
5    A.    Yes.
6    Q.    And perforated mean?
7    A.    A hole in it.
8    Q.    And the internal jugular vein also sustained damage;
9    is that correct?
10   A.    Yes.
11   Q.    And where on your body is your left internal jugular
12   vein?
13   A.    Okay, on me, as this bullet would be coming in, it is
14   going to go through the clavicle.  It did not damage the left
15   clavian artery and vein.  It went through the clavicle and it
16   went through muscle.  This big muscle here (indicating), big
17   for your neck, is the sternocleidomastoid muscle, it is going
18   through that.  About the time it gets through that, is where
19   it goes through some muscle, which is the left internal
20   jugular.  And then just deep to that, is the common carotid.
21   And then it keeps going and very quickly, of course, wounds up
22   in T1.
23   Q.    We got an illustration of the spine, and could you --
24   can you see, is that T1 right there?
25   A.    Yes that's T1 right there.  It is a little tricky

21

1    because it doesn't have the ribs.
2    Q.    Okay.  And you recovered a bullet fragment from T1;
3    is that correct?
4    A.    Correct.
5    Q.    And we are looking on the left side of this
6    illustration, the anteriora view of the vertebra column; is
7    that correct?
8    A.    Yes.
9    Q.    Front view?
10   A.    Yes.
11   Q.    Where did you recover the bullet from?
12   A.    The left front of the body.
13   Q.    In this area right here (indicating)?
14   A.    Yes.
15   Q.    And did you --
16            MR. BEACH:   That's good, Judge.
17   Q.   (By Mr. Beach)   What did you do when you
18   recovered bullet fragment?
19   A.    Well, we -- routinely what we do, we take the bullet
20   fragment or fragments and we clean them up because people
21   subsequently to us may not have gloves on, so we clean them up
22   in water with soap and bleach, because bleach cleans basically
23   every germ on the planet, with very few exceptions, and then
24   dry them off.  The largest one I labeled 1022 over 07 over
25   T-P.  And then I put all a of them into an appropriately

22

1   labeled envelope. And, of course, it got submitted to the
2   investigation laboratory just like the articulate matter did.
3         MR. BEACH: May I approach, Judge?
4         THE COURT: You may.
5     Q. (By Mr. Beach) Let me show you has already
6   been admitted into evidence, Doctor, State's Exhibit
7   98, and ask if you can identify what State's 's 98
8   is?
9     A. That's that envelope I was talking about.
10     Q. You are not a firearm examiner, are you, Doctor?
11     A. No, no. I am a medical doctor.
12     Q. That's why when you recover a bullet fragment, you
13   ship it on to firearm to see what they can do with it under
14   their technology and their microscope; is that right?
15     A. That's right. I give you what it looks like at
16   autopsy. But we send it to the firearm examiners for more
17   detailed examination.
18     Q. How did you describe the fragments that you recovered
19   from the first thoracic vertebrae of Mark Nix?
20     A. They appeared to be fragments of a nonjacketed small
21   caliber bullet.
22     Q. And what does that appear?
23     A. Means I didn't see any jacket. For me to say small
24   caliber, I must have seen a base that was small caliber in
25   diameter.

23

1     Q. Can you describe for our members of the jury the path
2   that the gunshot wound took upon entering the body of Mark
3   Nix?
4     A. Yes. Let me explain that when medical examiners do
5   paths through bodies, we are talking as though the person had
6   been in what doctors call anatomic position. Anatomic
7   position is somebody standing up in front of you face forward,
8   feet slightly apart, arms down to the side, palms forward. So
9   that's anatomic position. And we are describing in terms of
10   from the patient's point of view, their left, their right,
11   their front, their back, their top, their bottom. So if he
12   had been in anatomic position, it would have been left to
13   right, slightly front to back and without significant
14   deviation upward or downward.
15     Q. Now, let's go on briefly, did you make note of any
16   other injuries to the body of Mark nix?
17     A. Yes.
18     Q. Can you tell us about those.
19     A. On the right there is a two and three eighth
20   inch red abrasion. Abrasions are scrapes. On the right
21   forearm and the dorsum of the right hand, there is up to three
22   eighth inch scabbed superficial abrasion. On the pad of the
23   distal phalanx, or the right thumb, there were a few up to
24   three quarter inch linear to curvilinear superficial
25   abrasions, again scrapes. On the dorsum of the left hand,

24

1   there is a two and a half inch abraded pale blue contusion,
2   that's a scraped bruise. And a few up to one quarter inch
3   abrasions. On the right knee there was a one quarter inch red
4   abrasion. And on the left knee there was a one inch red
5   abrasion.
6     Q. Doctor, do you have an opinion first of all as to the
7   manner of death as to Mark Nix?
8     A. Yes.
9     Q. And what is that?
10     A. Homicide.
11     Q. And, Doctor, do you have a medical opinion as to the
12   cause of Mark Nix's death?
13     A. Yes.
14     Q. And what is that?
15     A. Gunshot wound.
16     Q. And is a gunshot wound the type of gunshot wound that
17   you observed back on March 24th of 2007 that you told us
18   about today that you documented in your report, is that
19   consistent with being caused by a firearm?
20     A. Yes.
21     Q. Is a firearm a deadly weapon?
22     A. Yes.
23         MR. BEACH: May I approach, Judge?
24         THE COURT: You may.
25     Q. (By Mr. Beach) Doctor, I am going to show

25

1   you now what has been marked for identification
2   State's Exhibit 92, and ask if that is a true and
3   correct copy of the autopsy report that you prepared
4   in this case concerning your autopsy of Mark Nix?
5     A. Yes, it is.
6         MR. BEACH: The State would offer into evidence
7   at this time State's Exhibit 92.
8         MR. BRAUCHLE: No objections.
9         THE COURT: State's 92 is admitted.
10     Q. (By Mr. Beach) State's 92 your autopsy
11   report, Doctor, contains the unique identifying
12   number 1022-07; is that correct?
13     A. Yes, on every page.
14     Q. Any significance to the 1022?
15     A. It means it's the 1,022nd body processed at our
16   facility in the year 2007.
17     Q. In the course of your autopsy examination, Doctor, do
18   you paragraph the body that you perform the autopsy on?
19     A. Yes.
20     Q. And did you do so in this case?
21     A. Yes.
22     Q. And I have been out to visit you out there at SWIFS
23   and we have gone over the autopsy photograph and we pulled out
24   the ones that we didn't need and just left the ones that you
25   thought you needed to explain your testimony to the jury; is

26

1    that correct?

2        A.    Yes, it is.

3              MR. BEACH:   May I approach, Judge?

4              THE COURT:   You may.

5    Q.   (By Mr. Beach)  I am going to show you,

6    Doctor, what has been marked for identification

7    State's Exhibits 73, 74, 75, 76, 77, and 78, and ask

8    if you can identify those photographs?

9        A.    Yes.  These are some of the photographs taken through

10   the course of this autopsy.

11       Q.    And do they each contain the unique identifying

12   number that we have already discussed?

13       A.    Yes.

14       Q.    And are they fair and accurate representation of Mark

15   Nix's body as they appeared to you back on March 24th of

16   2007?

17       A.    Yes.

18             MR. BEACH:   We offer State's 73 through 78 at

19   this time inclusive.

20             Apparently, Judge, we have already had those numbers

21   admitted.  After they object, we will reoffer.

22             At this time, Judge, we would offer State's Exhibit 90

23   for record purposes only.  State's Exhibit 91, 93, 94, 95, and

24   96 for all purposes.

25             MR. BRAUCHLE:   We have no objections.

27

1              THE COURT:   State's Exhibit 90 is admitted for

2    record purposes only; 91, 93 and 94 and 95 and 96 are admitted

3    for all purposes.

4    Q.   (By Mr. Beach)  State's 91, is this the

5    area right here, Doctor, that you saw what you

6    believed to be an entrance wound?

7        A.    Go to your left just a touch there.

8        Q.    Right there (indicating)?

9        A.    Yes, that's it.

10       Q.    This area right here (indicating); is that correct?

11       A.    Yes, where it is almost stalely with the irregular

12   marginal abrasion.

13       Q.    And this line here is a surgical incision over the

14   left clavicle of Mark Nix; is that correct?

15       A.    Yes.

16       Q.    And that's what you were talking about when you told

17   us the entrance wound incorporated into the surgical incision?

18       A.    Yes.

19       Q.    This pseudostippling that I described that you were

20   talking about on the left side of the face, the eyelids, the

21   chin?

22       A.    Yes, all those puncture injuries.

23       Q.    Doctor, you have seen the video of the shooting of

24   Mark Nix; is that correct?

25       A.    Yes.

28

1        Q.    You saw it in slow motion?

2        A.    Yes.

3        Q.    The injuries that you observed back on March 24th

4    of 2007, and told us about today, Doctor, are they entirely

5    consistent with what you saw take place with your own eyes on

6    the video regarding the shooting of Mark Nix?

7        A.    Yes.

8        Q.    Bullet coming from inside the car and through the

9    window, glass spray, coming up hitting Mark Nix and the

10   entrance wound there just about the left clavicle; is that

11   correct?

12       A.    Well, just below the left clavicle, yes.

13       Q.    Just below the left clavicle.  I am showing you

14   State's 93, is this a close-up of the entrance wound area?

15       A.    Yes.

16       Q.    Pointing to it right there (indicating)?

17       A.    Yes.

18       Q.    And that's where you were able to track back once you

19   identified the entrance wound through the skin, the muscle,

20   the left common carotid artery, the left jugular vein and into

21   the first thoracic vertebrae?

22       A.    Yes.

23       Q.    You were able to track the path of that wound?

24       A.    Yes.

25       Q.    Can you tell us what State's 93 is?

29

1        A.    That's a photograph after some of the sutures, the

2    ones in the left side of the base of the neck were removed.

3        Q.    And again this would have been the incision in the

4    area where the Parkland surgeons would have been trying to

5    explore the wound area and taken out a portion of Mark Nix's

6    left clavicle; is that correct?

7        A.    Yes.

8        Q.    State's 95, what are we seeing here?

9        A.    Well, again you have got more pseudostippling.  You

10   notice there are varying sizes, which is characteristics of

11   pseudostippling.  That's his left arm and left side of the

12   chest.

13       Q.    And where it came from led fragments, glass

14   fragments, you don't know, that's why you submitted the chin

15   particle to trace?

16       A.    Chin and face, yes.

17       Q.    This incision down here, is that part of the left

18   thoracotomy that you described?

19       A.    Yes.

20       Q.    That would have provided access to the surgeons to do

21   heart massage?

22       A.    Yes.

23             MR. BEACH:   For the record, Judge, we have

24   remarked State's 96 has apparently already been admitted, now

25   is 95-A.  Is 95-A admitted?

30

1      THE COURT:   Ninety-five-A, objections?
2      MR. BRAUCHLE:   Well we didn't object to the old
3  numbers.
4      THE COURT:   Ninety-five-A is admitted.
5      MR. BEACH:   Thank you.
6      Q.   (By Mr. Beach)  What are we seeing on the 95-A.
7      A.   That is the abrasion.  He had an abrasion on his
8  right elbow.
9      Q.   We see the chin area and the face of Mark Nix in the
10  upper right of 95-A?
11      A.   Yes.
12      Q.   And you saw Officer Nix being dragged out of the
13  location where he was wounded or shot, is this abrasion
14  consistent with being drug out of an area like that?
15      A.   It is a brush-burned type of abrasion consistent with
16  that, yes.
17      MR. BEACH:   That's good, Judge.
18      Q.   (By Mr. Beach)  Was a toxicology analysis
19  perform on the body fluid of Mark Nix?
20      A.   Yes.
21      Q.   First of all, tell us what a toxicology analysis is?
22      A.   Well, during to course of the autopsy, we collect
23  samples of body fluids.  We collect vitreous, which is the eye
24  fluid.  We collect blood samples.  If bowel and urine is
25  available, we collect those.  And we send those to the

31

1  toxicology lab which is on the second floor of SWIFS.  And
2  toxicologist do the actual analysis.  This is routinely done
3  for virtually every autopsy.  At any rate, they do the
4  analysis and the final results are sent back to the medical
5  examiner and they are routinely incorporated into the autopsy
6  report as was done in this case.
7      Q.   Can I tell us the result of the toxicology analysis
8  performed on the fluid of Mark Nix?
9      A.   The alcohol and acetone screen done on both the blood
10  and the vitreous was negative.  The cannabinoid screen done on
11  the blood was negative.  The blood screen revealed 0.18
12  lidocaine and 0.03 milligram per liter of atropine.  Both
13  lidocaine and atropine are preroutinely given during
14  resuscitated efforts such as Officer Nix went through.  The
15  drug screen also detected ibuprofen and naproxen.  Those are
16  both what we call nonsteroidal anti-inflammatory agent.
17  Ibuprofen is usually marketed under the trade name of Motrin
18  Advil.
19      Q.   Thank you for coming down, Doctor.
20      MR. BEACH:   I will pass the witness.
21      THE COURT:   Cross-examination.
22      CROSS-EXAMINATION
23  BY MR. BRAUCHLE:
24      Q.   Doctor, how are you today?
25      A.   I'm okay.  How are you?

32

1      Q.   Pretty well.  Can you explain to the jury what the
2  word homicide means?
3      A.   Well, homicide to a medical examiner is one of our
4  five manners of death.  We have five manners of death.  We
5  have natural, which is somebody dies of natural causes.  We
6  have accident, which is just what it sounds like.  We have
7  suicide, where somebody takes their own life.  We have
8  homicide, which is death at the hands of another person.  And
9  we have undetermined, which is when even though we do a
10  complete autopsy and get all the records and background
11  information, we can do the toxicology and usually with
12  microscopic slides, we still don't have enough information to
13  really decide on one of the other four.  So we just admit that
14  we can't figure it out and call it undetermined.
15      Q.   Homicide, though, does not denote illegal behavior,
16  does it?
17      A.   We don't get into that.
18      Q.   It just means that someone died at the hands of
19  another person; is that right?
20      A.   That's what it means to us.
21      Q.   So y'all don't -- y'all don't take sides as to any
22  blame that might be attached to that death; is that correct?
23      A.   That's correct.
24      Q.   So that homicide does not mean murder?
25      A.   It doesn't have to.

33

1      Q.   Now, then, your cause of death was homicide; is that
2  correct?
3      A.   No, my manner of death is homicide, my cause of death
4  is gunshot wound.
5      Q.   I'm sorry, I got those backward.  In regard to -- in
6  regard to the drawing that you use, this is just a standard
7  drawing, it wasn't anything made up for this autopsy report,
8  was it?
9      A.   Correct.  What we have in the morgue is standard body
10  diagrams.  And when a case is either a sharp-force-injury case
11  or a firearm case, we routinely schematically diagram the
12  locations of the wounds on one of our body diagrams and that
13  becomes part of the autopsy report.
14      Q.   Okay.  So this is out of your autopsy report?
15      A.   Yes.
16      Q.   And this was -- the markings on here were done by
17  you; is that correct?
18      A.   The dot, the little squiggle and the G.S.W. are done
19  by me on the standard body diagram, yes.
20      Q.   In this case, the G.S.W. stands for gunshot wound,
21  right?
22      A.   Yes.
23      Q.   And that's where you placed it on the body, which
24  would be consistent with your examination, right?
25      A.   Yes.

34

1    Q.   And the gunshot wound right here (indicating) you
2  describe in the autopsy report as the direction of travel, is
3  from left to right, front to back, and did you say slightly
4  downward is that --
5    A.   No, I said without significant deviation upward or
6  downward.
7    Q.   So that means it would be on a level plain basically?
8    A.   Yes.
9    Q.   And it is from left to right, which obviously would
10 be over here toward that direction (indicating)?
11   A.   Yes, his left to his right.  His front to his back.
12   Q.   And this is his left arm obviously?
13   A.   Yes.
14   Q.   So it would be -- and then it travel scene to the
15 back of the body?
16   A.   Yes, front to back.
17   Q.   Now, you went in to the spine right about in here
18 (indicating) I believe; is that correct?
19   A.   No, T1.
20   Q.   Up here (indicating)?
21   A.   Yes.
22   Q.   Okay.  So you found the gunshot particles right in
23 this area (indicating)?
24   A.   The bullet fragments were in the body of T1.
25   Q.   Okay.  Would that be about where I am pointing now

35

1  (indicating)?
2    A.   No.
3    Q.   Higher?
4    A.   It's more a matter of -- I am not trying to be
5  difficult, it is really hard to describe to people how
6  substantial the vertebral column really is.
7    Q.   Well, I am probably an example of that?
8    A.   Substantiality?
9    Q.   No.
10   A.   Substantially is good.
11   Q.   I am an example of it being hard to describe to is
12 what I am saying?
13   A.   It is hard to describe to medical students.
14   Q.   Okay.
15   A.   I mean it is really hard to conceptualize, and I
16 don't know why, but it is.  The vertebral column, cause you
17 got your vertebral bodies, which are the real structural part,
18 they are the support part.  But then you have bony processes
19 that come off the back of the vertebral body and they kind of
20 make a lattice work in back and your spinal cord runs down
21 inside that protective columna latticework.  So when you start
22 pointing at the back of that diagram, to me, maybe cause I am
23 a medical examiner, it makes me -- and this just may be me,
24 but it makes me think that you are suggesting like injury to
25 the cord and that it is way back here (indicating) and it is

36

1. not.  Because the whole thing is, as I say, bigger than people
2  think.  And of course back here you got muscle and
3  subcutaneous tissue and skin.  You are really -- you are more
4  anteriora than you think, even when you are talking about T1,
5  which is why my description of the path is left right slightly
6  front to back.  It is not as front to back as you would think.
7  It really isn't.  You are not going that it much front to
8  back.  The vertebral column is more forward than you would
9  think.
10   Q.   At the point of entrance and the path of this bullet,
11 it is not back here (indicating) on his back, is it?
12   A.   Nothing is going on back here seriously.
13   Q.   So it is basically --
14   A.   Your entrance is here (indicating).
15   Q.   Would you say probably in the middle of his body?
16   A.   Yes, in terms of over-all dimensions, yeah, you are
17 probably just about halfway.
18   Q.   All right.
19   A.   So the bullet is really going significantly more left
20 to right than front to back.
21   Q.   And when you went into that area, you recovered one
22 or three particles?
23   A.   I recovered fragments, so it is at least two.  We
24 don't count them.
25   Q.   Okay.

37

1    A.   Once we become plural, I don't count bullet
2  fragments.  If it says fragments, there is more than one.
3    Q.   And you described that as a small caliber unjacketed
4  bullet is what it appeared to be.  A fragment from a small --
5    A.   Fragments, yes.  So I didn't see any jacketing.  And
6  for me to say small caliber, I must have seen a base, a pretty
7  distinct base or I wouldn't have said small caliber, and it
8  must have been of small caliber.  Sometimes the fragments are
9  so fragmented that they you can't tell caliber.  And then I
10 would have just said fragments of the bullet.  But here since
11 there was no jacket fragment, I said nonjacketed, because
12 that's what it looked like at autopsy.  And since I saw that
13 small caliber base, I said small caliber bullet.
14   Q.   Having done 5,000 autopsies, you have seen lots of
15 bullet fragments or whole bullets; is that correct?
16   A.   Oh, yes.
17   Q.   So you have a basis as to how you can describe what
18 you find as either being large or small caliber; is that
19 correct?
20   A.   Or medium, yes.
21   Q.   And you also have plenty of experience in jacketed
22 and unjacketed bullets; is that correct?
23   A.   Yes.
24   Q.   All right.
25        MR. BRAUCHLE:   May I approach, Your Honor?

38

1    THE COURT:   You may.

2    Q.   (By Mr. Brauchle)   I will show you with a

3    has been marked as Defendant's Exhibit 11, and ask

4    you if you can identify that?

5    A.   This appears to be a copy of our -- and incomplete

6    copy of the death certificate which would have been fill out

7    shortly after I performed the autopsy.

8    Q.   Okay.

9    A.   On this particular case.

10   Q.   Thank you.

11          MR. BRAUCHLE:   We would offer Defendant's

12   Exhibit 11.

13          MR. BEACH:   No objections.

14          THE COURT:   Defendant's 11 is admitted.

15   Q.   (By Mr. Brauchle)   Doctor referring back to

16   that document, this line right here that I am

17   pointing at, can you see that?

18   A.   Where it said shot by another person, parenthesis

19   "S", end parenthesis.

20   Q.   That doesn't denote whether Officer Nix was shot by

21   one person or more persons; is that correct?

22   A.   Correct.

23   Q.   And that was -- that was your finding and that was

24   what you put on the death certificate; is that correct?

25   A.   I put -- this death certificate is typed out by a

39

1    clerical person based on a form that we fill out.   We the

2    medical examiner.   What I actually put on the form was shot by

3    another.   And if you want to know my intention it would have

4    been for them since it was a single gunshot wound, shot by

5    another person, singular, but they put the "S", parenthesis.

6    Q.   But that is a copy of the death certificate; is that

7    correct?

8    A.   Incomplete copy.

9    Q.   You signed it, though didn't you?

10   A.   Back then, the procedure was we sign them before they

11   were filled out.

12   Q.   Is there another death certificate?

13   A.   No not to the best of my knowledge.   It is

14   conceivable that this could be correct.   I mean, it is

15   conceivable that they can have two people with their finger on

16   the trigger.

17   Q.   Well, could it be conceivable that he was shot by

18   more than one bullet?

19   A.   Not based on my autopsy, no.

20   Q.   Well, have you seen the materials that were turned

21   over to Mr. Cooper of your office?

22   A.   No.

23   Q.   You have not?

24   A.   No.

25   Q.   Okay.   So those items didn't play in any

40

1    consideration in your finding; is that correct?

2    A.   Correct.

3    Q.   And of course as you have told us, ballistics and

4    stuff is not what you are hired for; is that correct?

5    A.   No, I am hired to perform autopsies.

6    Q.   So you don't perform ballistic tests or anything like

7    that, like Mr. Cooper does?

8    A.   No.   And he doesn't perform autopsies.   It seems to

9    work out real well this way.

10   Q.   I am sure both of you are happy that that's the way

11   it works?

12   A.   We have been over the years.

13   Q.   In regard to that, what we have just discussed, your

14   findings and conclusions were made with just what was brought

15   to you, and that was the body of Officer Nix; is that correct?

16   A.   That is correct.

17          MR. BRAUCHLE:   We will pass the witness.

18          REDIRECT EXAMINATION

19   BY MR. BEACH:

20   Q.   Very quickly, Doctor, again you have seen the same

21   videotape these 13 people have seen concerning the shooting of

22   Mark Nix?

23   A.   Well, I wasn't here when I saw it.

24   Q.   I know.

25   A.   That videotape, I can't imagine there is more than

41

1    one.

2    Q.   Trust me, okay?

3    A.   Happy to.

4    Q.   Officer Nix is at the window as you recall?

5    A.   Yes.

6    Q.   And you told us that the track of the bullet was

7    obviously left to right, front to back, with no significant

8    deviation; is that correct?

9    A.   Yes, with him in anatomic position.

10   Q.   He was standing straight up?

11   A.   Yeah.

12   Q.   That's what you are talking about?

13   A.   That's I am talking about.

14   Q.   If he is bent forward and the gunshot wound is coming

15   slightly upward, again would that be consistent with a very

16   insignificant deviation upward or downward?

17   A.   As you bend over -- the thing you got to remember is,

18   basically most gunshot wounds, by in large, the path of the

19   body is in line with the barrel of the gun, so you can rotate

20   though two things in space as long as you keep them in direct

21   line.   So if he bends over, the barrel of the gun becomes

22   pointing upward to keep an level path of the body in anatomic

23   position.

24          MR. BEACH:   That's all I have, Judge.

25          THE COURT:   Anything further from the Defense?

RECROSS-EXAMINATION

BY MR. BRAUCHLE:

Q.    You didn't make any determinations as to what his position was at the time that he may have been shot?

A.    No.  We really can't, that's why we use anatomic position routinely.

Q.    In regard to the path of the bullet, though, if you are leaning forward, as in your example, it is still going to be front to back; is that what you are saying?

A.    Yes.  I was just talking about the upward/downward deflection.  You still got front to back and you still got left to right.

Q.    So the entry and the path of the bullet are the same obviously no matter what position somebody is in; is that correct?

A.    Well, I can think of some odd cases, but they don't involve the area of the body that we are talking about. Basically for the base of the neck, this path is left to right and somewhat front to back.  There is no upward/downward as long as he is in anatomic position.

MR. BRAUCHLE:    We will pass the witness.

MR. BEACH:    Nothing further.

May she be excused?

THE COURT:    Any objections?

MR. BRAUCHLE:    No.

THE COURT:    You are free to go, ma'am.  Thank you.

MR. BROOKS:    May we approach, Judge?

THE COURT:    You may.

(Following proceedings had at the Bench.)

MR. BROOKS:    I just want to know if this would be a good spot to take our morning break.  We have one more witness and he is probably going to take some time.  Because we have to go through the video with him.

(End of Bench conscience.)

THE COURT:    Ladies and gentlemen, we will take about a ten-minute break.

THE BAILIFF:    All rise.

(Jury retired from the courtroom.)

(Recess taken.)

THE BAILIFF:    All rise.

(Jury returned to the courtroom.)

THE COURT:    You may be seated.

MR. BROOKS:    This witness has been sworn.

THE COURT:    Very well.

Sir, if you will take the stand.

THE WITNESS:    Thank you, Your Honor.

THE COURT:    You may proceed.

---

44

45

BRIAN PAYNE

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BROOKS:

Q.    Would you introduce yourself to the jury, please.

A.    My name is Senior Corporal Brian Payne.

Q.    And you are a Dallas Police Officer?

A.    Yes, I am.

Q.    And how long have you been with the Dallas Police Department, Corporal?

A.    Eleven years.

Q.    Is there a difference between corporal and senior corporal?

A.    No, there is not.

Q.    And how long have you been a corporal?

A.    Since 2002.

Q.    What section or division within the Dallas Police Department are you assigned to at this time?

A.    In Patrol.  And I work the Northwest Division.

Q.    What other sections or divisions have you been assigned to?

A.    I have worked Southwest and C.B.D., which is the central business district downtown.

Q.    And what type of shift do you work?

A.    Three to 11:00, the evening shift, 3:00 p.m. to 11:00.

Q.    Did you know an individual --

MR. BRAUCHLE:    May we approach the Bench.

(Discussion off the record.)

THE COURT:    Ladies and gentlemen, we are going to take another ten-minute break.

THE BAILIFF:    All rise.

(Jury retired from the courtroom.)

(Recess taken.)

THE BAILIFF:    All rise.

(Jury returned to the courtroom.)

THE COURT:    You may be seated.

The State may call its next witness.

(Witness entered the courtroom.)

THE COURT:    Has this witness been sworn?

MR. BROOKS:    This witness has previously been sworn.

THE COURT:    Very well, you may proceed.

PATRICK STARR

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BROOKS:

Q.    Sir, would you reintroduce yourself to the jury,

46

1    please.
2         A.    I am Senior Corporal Patrick Starr.
3         Q.    And you are the same Senior Corporal Patrick Starr
4    who testified previously in this case?
5         A.    Yes, sir, that's correct.
6               MR. BROOKS:    May I approach?
7               THE COURT:    You may.
8         Q.    (By Mr. Brooks) Mr. Starr, I want to show you what
9    is marked for identification, State's Exhibit 90, for record
10   purposes; you know who that is?
11        A.    Yes, sir, I do.
12        Q.    And who is that?
13        A.    That's Mark Nix.
14        Q.    And also on State's Exhibit 100, who is that?
15        A.    That again is Mark Nix, sir.
16        Q.    And what occasion was this?
17        A.    It was taken at Officer Brian Payne's wedding.  He
18   was the best man.
19              MR. BROOKS:    Offer State's Exhibit 100.
20        Q.    (By Mr. Brooks) Now Officer Starr, you had
21   previously testified about your --
22              THE COURT:    Any objections to 100.
23              MR. BRAUCHLE:    No.
24              THE COURT:    State's 100 is admitted.
25        Q.    (By Mr. Brooks) You previously testified about your

47

1    role in the apprehension of this defendant, you recall that
2    testimony?
3         A.    Yes, sir, I do.
4         Q.    I want to go back to State's Exhibit 10, the video of
5    the -- of the offense and we want to go to the specific
6    portion and ask you to take a look at it.
7               (Video played to the jury.)
8         Q.    Now, do you recognize this to be a view from Corporal
9    Mark Nix's squad car?
10        A.    Yes, sir, I do.
11        Q.    And this portion right here (indicating), you recall
12   being asked questions about that being a earlier gunshot?
13        A.    Yes, sir, I do.
14        Q.    And as we view that right here, what does it appear
15   to be?
16        A.    It appears to be a shadow, sir.
17        Q.    And if we go through this frame by frame, the fact
18   that that's a shadow, does it play itself out?
19        A.    Yes, it does.  It actually moves and changes
20   position.
21        Q.    Stop right there.  Again is this initially where you
22   were being questioned about the area of the front window where
23   you were being questioned about a previous gunshot?
24        A.    No, sir.  The previous frame show the shadow to be
25   higher and smaller, it again increases in size and moves as it

48

1    goes down on the windshield.
2         Q.    Is that what you are referring to as it goes down on
3    the windshield?
4         A.    Yes, sir.
5         Q.    Now, this section right here (indicating), again when
6    we started looking at this portion of the video, what they
7    were trying to claim was a gunshot, was it basically in this
8    area?
9               MR. BRAUCHLE:    Your Honor, we would object to
10   that as attacking the defendant over the shoulders of his
11   attorney.
12              THE COURT:    I will sustain that objection.
13              MR. BRAUCHLE:    We would ask that the jury be
14   instructed to disregard.
15              THE COURT:    Ladies and gentlemen, you will
16   disregard the question that was asked.
17              MR. BRAUCHLE:    And we would further move for a
18   mistrial.
19              THE COURT:    Denied.
20              MR. BROOKS:    I will rephrase the question.
21        Q.    (By Mr. Brooks) This portion, previously
22   were you asked if there was evidence of a bullet
23   defect in that portion of the vehicle?
24        A.    Yes, sir, I was.
25        Q.    And as we look at it in this frame, do you see any

49

1    evidence of a bullet defect in that window?
2         A.    No, sir, I do not.
3         Q.    The reflection that you believe to be on there, where
4    is it now?
5         A.    It is at the lower portion of the windshield.
6         Q.    Right here (indicating)?
7         A.    Yes.
8         Q.    Is that the same reflection, Corporal?
9         A.    Yes, sir, it is.
10        Q.    Now, as we view this windshield in this frame, do you
11   see any indication of a defect?
12        A.    No, sir, I do not.
13        Q.    And that is at approximately 17:38:30?
14        A.    Correct, sir.
15        Q.    Do you see Corporal Nix anywhere in this video?
16        A.    No, sir, I do not.
17        Q.    Would it be a fair statement at this portion of the
18   video, that he has not left his squad car?
19        A.    Correct.
20        Q.    Viewing the video, do you see Corporal Nix?
21        A.    Yes, sir, I do.
22        Q.    And is he approximately right -- right here
23   (indicating)?
24        A.    Yes, sir.
25        Q.    Looking at that windshield again, do you see any

1    signs of a defect, bullet defect in that window?
2        A.    No, sir. I just see the reflection.
3        Q.    What does that appear to be?
4        A.    Again the reflection, sir.
5        Q.    Is that a canopy of trees that was basically hanging
6    over that vehicle?
7        A.    Yes, sir, there was.
8        Q.    And again we are going frame by frame, so this is the
9    portion where the camera has kind of panned in?
10       A.    Yes, sir.
11       Q.    And it is panning back out; is that a fair statement?
12       A.    Yes, sir.
13       Q.    And that same reflection, does it appear to be on the
14   move?
15       A.    Yes, it does.
16       Q.    And who is this right here?
17       A.    That's Officer Todd Haecker, sir.
18       Q.    Right there, what is that, Officer?
19       A.    That is my first gunshot.
20       Q.    And how can you -- or can you distinctly tell that
21   that's a gunshot?
22       A.    Yes.
23       Q.    And how is that?
24       A.    Well, you can see the glass -- I guess glass dust,
25   glass smoke coming off of the windshield.

1        Q.    And is there a distinct difference between the way
2    this defect looks and this reflection?
3        A.    Yes, sir, there is.
4        Q.    And where is Corporal Nix at this time?
5        A.    Corporal Nix is on the passenger's side on the car,
6    he has already been shot, and he is on the ground.
7        Q.    In fact, Corporal, if we look at that first bullet
8    shot, do you see the markings of a hole?
9        A.    Yes, sir, I do.
10       Q.    What has just happened here?
11       A.    That's the second bullet hole, sir.
12       Q.    And is that second bullet hole accompanied by the
13   spray or powder, just like the first one?
14       A.    Yes, sir.
15       Q.    Again, what does that represent?
16       A.    Another bullet hole, sir.
17       Q.    And do we see the same spray or powder with that
18   bullet hole?
19       A.    Yes, sir.
20       Q.    And again, Officer, what have we just seen here?
21       A.    A fourth shot.
22       Q.    Again, the same spray and powder reflected something
23   has just struck that window?
24       A.    Yes, sir.
25       Q.    And do you recall how many rounds you put in that

1    front windshield?
2        A.    I believe 13 or 14.
3        Q.    Again, we see another round right here; is that a
4    fair statement?
5        A.    Yes, sir.
6        Q.    And right here?
7        A.    Yes.
8        Q.    Was that just another round right there, Corporal?
9        A.    Yes, sir. I believe I had changed positions by then.
10       Q.    Again the same spray?
11       A.    Yes, sir.
12       Q.    We have the spray here again; is that correct?
13       A.    Yes, sir.
14             MR. BROOKS:    That's good, Judge.
15       May I approach, Your Honor?
16             THE COURT:    You may.
17       Q.    (By Mr. Brooks)  Officer Starr, you are
18   familiar with the Penal Code here in the State of
19   Texas?
20       A.    Yes, sir.
21       Q.    Is that part of your training as a Dallas Police
22   Officer?
23       A.    Yes, sir, it is.
24       Q.    I am going to show you with a is marked and what has
25   been entered --

1              MR. BRAUCHLE:    Your Honor, we will object to
2    this, that is no proper predicate.
3              THE COURT:    Response.
4              MR. BROOKS:    I believe he said he is familiar
5    with the Penal Code, Judge, I can ask him -- intend to ask him
6    what level of felony this --
7              MR. BRAUCHLE:    May we approach the Bench, Your
8    Honor?
9              THE COURT:    You may.
10             Following proceedings had at the Bench.)
11             THE COURT:    What are you intending to ask him?
12             MR. BROOKS:    Sixteen grams of methamphetamine,
13   what level of felony that would be, as well as possession of
14   the deadly weapon. It is contextual.
15             MR. BRAUCHLE:    It has already been asked and
16   answered.
17             MR. BROOKS:    Not by this witness.
18             MR. BRAUCHLE:    How many times does it have to be
19   asked and answered.
20             MR. BROOKS:    I think I am entitled to ask a
21   witness.
22             MR. BRAUCHLE:    It was asked yesterday.
23             MR. BROOKS:    She did not --
24             MR. BRAUCHLE:    Under this theory, though, you
25   could get somebody sitting out in the hall to come in and

54

1    testify as to the criminal code.
2              MS. HANDLEY:   He is an expert.
3              MR. BROOKS:   Police officers, they are trained.
4              MR. BRAUCHLE:   That doesn't make them any
5    different than somebody sitting out there waiting for their
6    case to be called.  He doesn't have any legal background.  And
7    you are asking him about questions in the Penal Code that
8    75 percent of lawyers out there don't know, maybe higher.
9    Just because he went to the academy doesn't make him a legal
10   expert.
11             MR. BROOKS:   I believe that he would have
12   knowledge of the Penal Code to file a charge on somebody.  He
13   knows this particular offense from the Penal Code.
14             MR. BRAUCHLE:   Did he file the charges?
15             MR. BROOKS:   I don't believe he filed the
16   charges.
17             THE COURT:   What do you want to ask?
18             MR. BROOKS:   Sixteen grams of cocaine (sic), the
19   penalty group.  Possession of a deadly weapon --
20             MR. BRAUCHLE:   He is not charged with that.
21             THE COURT:   Object to that?
22             MR. BRAUCHLE:   We think that -- we will waive
23   our objection to both of those.
24             THE COURT:   You may proceed.
25             (End of Bench proceedings.)

55

1         Q.    (By Mr. Brooks)   Mr. Starr, again I am going to show
2    you what is marked and admitted as State's Exhibit 70, and ask
3    you -- let me ask you this question, 16 grams of
4    methamphetamine, is that a violation in the State of Texas.
5         A.    Yes, sir, it is.
6         Q.    Possession of?
7         A.    Yes, sir.
8         Q.    And what degree of felony would that be?
9         A.    It's a first-degree felony.
10        Q.    Which carries a penalty range of what?
11        A.    Five to 99 years imprison.
12        Q.    And then if a deadly weapon is also included with
13   that possession, what is the impact of that?
14        A.    It aggravates the charge and you must serve half of
15   the time that you are sentenced to in prison.
16        Q.    Now, during your training at the Dallas Police
17   Academy, do you-all receive training on effectiveness of
18   bulletproof vests?
19        A.    Yes, sir, we do.
20        Q.    And you specifically receive training what types of
21   rounds that vest will protect you from and what types of
22   rounds that vest will not protect you from?
23        A.    Yes, sir, we do.
24        Q.    And what is that training?
25        A.    Our bulletproof vests protects primarily from

56

1    pistols --
2              MR. BRAUCHLE:   Your Honor, we will object to
3    this, there has been no proper predicate laid.
4              THE COURT:   Overruled.
5         A.    Our vest -- there is almost no rifle round that our
6    vest will stop.
7         Q.    (By Mr. Brooks)   And is .223 caliber
8    bullet, is that a rifle round?
9         A.    Yes, sir.
10             MR. BROOKS:   Pass the witness.
11             THE COURT:   Cross-examination.
12             CROSS-EXAMINATION
13   BY MR. BRAUCHLE:
14        Q.    Now, then, Officer Starr, you can see that on the
15   screen there; is that correct?
16        A.    Yes, sir.
17        Q.    And you are telling the jury the pattern on the
18   right-hand side of that picture is not a bullet hole?
19        A.    Yes, sir, I am.
20        Q.    You still see the same area on that window?
21        A.    Yes, sir, the same -- yes.
22        Q.    Still there?
23        A.    Yes, sir.
24        Q.    Now, then, in regard to what you are saying are
25   bullet holes, when the bullet hits, spray comes back?

57

1         A.    Correct.
2         Q.    From the direction of fire; is that correct?
3         A.    Correct, sir.
4         Q.    And the object you say is not a bullet hole is still
5    in the same place, right?
6         A.    Yes, the reflection is still there.
7         Q.    Still there?
8         A.    Yes, sir.
9         Q.    Still there?
10        A.    Yes.
11        Q.    Still there?
12        A.    Yes.
13        Q.    Still there?
14        A.    Yes.
15        Q.    It's not moving down toward the hood is it?
16        A.    No, it is not.
17        Q.    Still in the same place, isn't it?
18        A.    Yes, sir.
19        Q.    Now, then, have you seen any crime scene photos of
20   the windshield on that car out there?
21        A.    No, sir, I have not.
22        Q.    Have you gone to the auto pound and viewed the window
23   on the car?
24        A.    No, sir.
25        Q.    So as far as going back and making certain that there

58

1   is no defect in the windshield in that area, you haven't done
2   that, right?
3        A.   No, sir, just from memory, what I remember.
4        Q.   Well, so you are telling the jury you can remember
5   where all the shots fired at the car were?
6        A.   I can remember where my shots were, yes, sir.
7        Q.   Well, I don't believe anybody said that that was a
8   shot that you fired, did they?
9        A.   No, you have not.
10       Q.   In fact we said there was a shot there before you
11  started firing, didn't we?
12       A.   Yes, you did.
13       Q.   And you haven't gone out and looked and seen if there
14  is in fact a shot to the windshield in that area; is that
15  correct?
16       A.   That's correct.
17       Q.   Have you had occasion to go to the auto pound since
18  this event?
19       A.   I don't believe so, no, sir.
20       Q.   But you could readily gain access to it?
21       A.   I don't believe we can, no, sir. It is controlled
22  relatively strictly I believe.
23       Q.   Against police officers?
24       A.   No, sir. But you have to have good reasons to go out
25  there and I believe you have to have a supervisor with you.

59

1        Q.   You just believe that?
2        A.   Yeah -- I don't know policy, sir, I am not a hundred
3   percent sure on that.
4        Q.   In regard to your answer to Mr. Brooks' question as
5   to the penalty range for methamphetamine that he asked you
6   about --
7        A.   Yes, sir.
8        Q.   -- the full range of punishment is five years to 99
9   years or life; is that correct?
10       A.   Correct.
11       Q.   I don't believe you mentioned a life sentence did
12  you?
13       A.   No, I did not.
14       Q.   And in regard to your previous testimony, you talked
15  in regard to the things involved in a chase, the simple fact
16  that somebody may flee from police officers doesn't give them
17  the right to shoot at that person, does it?
18       A.   No, it does not.
19       Q.   And doesn't give officers the right to inflict any
20  type of bodily injury on that person, does it?
21       A.   That is correct.
22       Q.   So the simple act of fleeing from a police officer
23  does not give the officer the legal right to shoot or attack
24  or in any way injure the person just because that person fled
25  from the officer, does it?

60

1        A.   That is correct.
2        Q.   So as far as shooting at Mr. Ruiz before any shots
3   were fired on his part would not be a correct police protocol;
4   is that correct?
5        A.   That is correct.
6        Q.   Now, then, you had the A.R. 15 out there; is that
7   your service weapon?
8        A.   Yes, it is, sir.
9        Q.   And why is that?
10       A.   Certain individuals on the department are issued A.R.
11  15s.
12       Q.   And you were issued one because of, what, your
13  marksmanship?
14       A.   No, sir. We have a rifle school. You submit your
15  name and go through the rifle school. Once you pass it, you
16  are qualified to carry one.
17       Q.   Now, then, you were trying to shoot Mr. Ruiz in the
18  head; is that correct?
19       A.   Correct.
20       Q.   As far as you know you never did; is that correct?
21       A.   That's correct.
22       Q.   Now, then, if you were able to see him in the vehicle
23  the way you said you could, why didn't that happen?
24       A.   I can't answer that question, sir.
25            MR. BRAUCHLE:   We will pass the witness.

61

1            MR. BROOKS:   No other questions for this
2   witness, Your Honor.
3            THE COURT:   I may step down, sir.
4            MR. BROOKS:   May it please the Court?
5   Members of the jury, the State rests.
6            THE COURT:   Ladies and gentlemen, let's take a
7   ten-minute break.
8            THE BAILIFF:   All rise.
9            (Jury retired from the courtroom.)
10           THE COURT:   You may be seated.
11           (Recess taken.)
12           THE COURT:   We will be at lunch until one
13  o'clock.
14           (Lunch recess taken.)
15           THE BAILIFF:   All rise.
16           (Jury returned to the courtroom.)
17           THE COURT:   You may be seated.
18  What says the Defendant?
19           MR. BRAUCHLE:   We will call Maria Correa.
20           (Witness entered the courtroom.)
21           (Interpreter Susana Fernandez was previously
22           sworn.)
23           THE COURT:   You may take a seat, ma'am.
24  And let the record reflect that this witness has
25  previously been sworn.

62

```
 1               MARIA CORREA
 2  was called as a witness, and having been duly sworn by the
 3  Court, testified under oath through an interpreter as follows:
 4               DIRECT EXAMINATION
 5  BY MR. BRAUCHLE:
 6     Q.   State your name please.
 7     A.   Maria Correa.
 8     Q.   And where do you live?
 9     A.   In West Dallas.
10     Q.   And how old a woman are you?
11     A.   Thirty-eight.
12     Q.   Now, were you living in West Dallas back on
13  March 23rd of 2007?
14     A.   Yes.
15     Q.   And what would be the street address where you live?
16     A.   4111 Bernal.
17     Q.   So you live on Bernal Street in West Dallas; is that
18  correct?
19     A.   Yes.
20     Q.   Now, were you at home at that address on the
21  afternoon of March 23rd of 2007?
22     A.   Yes.
23     Q.   Was your attention drawn to some police activity that
24  you heard in the neighborhood?
25     A.   Yes.
```

63

```
 1     Q.   Did you hear some police cars with their sirens on?
 2     A.   Yes.
 3     Q.   And were those police cars coming toward you?
 4     A.   No.
 5     Q.   Were they coming down Bernal?
 6     A.   Yes.
 7     Q.   Now, then, did they -- when they got closer to where
 8  you live, did you see that the police were chasing somebody?
 9     A.   The car.
10     Q.   And I will ask you did you see the car spin out and
11  turn going the opposite direction that it had been coming?
12     A.   Yes.
13     Q.   Did you see that happen?
14     A.   Yes.
15     Q.   Where were you standing when you saw that happen?
16     A.   Outside of my house.
17     Q.   Were you on your back porch?
18     A.   Yes.
19     Q.   And you were standing on your back porch when you saw
20  the car the police were chasing spin out?
21     A.   Yes.
22     Q.   When the car span out, did the police car chasing it
23  stop?
24          THE INTERPRETER:   Could you repeat the question
25  for the interpreter.
```

64

```
 1     Q.   (By Mr. Brauchle)  When the car spun out, did the
 2  police car chasing it stop?
 3     A.   Yes.
 4     Q.   Did the -- scratch that.  Were you able to see all of
 5  the police cars and the car they were chasing from where you
 6  were standing?
 7     A.   Yes.
 8          MR. BRAUCHLE:   May I approach the witness, Your
 9  Honor?
10          THE COURT:   You may.
11     Q.   (By Mr. Brauchle)  I will show you what has
12  been marked as Defendant's Exhibits 12 through 18,
13  and I will ask you if you can identify what those
14  pictures are showing?
15     A.   Yes.
16     Q.   And I will also show you what has been marked as
17  Defendant's Exhibit 19?
18     A.   Uh-huh.
19     Q.   And is that a diagram of how the police cars and the
20  car that spun out were positioned on the day that you saw
21  this?
22     A.   Yes.
23     Q.   All right.  In Defendant's Exhibit 16 --
24          MR. BRAUCHLE:   We will offer these exhibits.
25          MR. BEACH:   No objections, Your Honor.
```

65

```
 1          THE COURT:   Defendant's Exhibit 12 through 19
 2  are admitted.
 3     Q.   (By Mr. Brauchle)  Ma'am, I will show you
 4  what has been marked as Defendant's Exhibit 16; is
 5  that a picture taken from where you were standing
 6  when you saw these events?
 7     A.   Yes.
 8     Q.   Is that -- was that picture taken from your back
 9  porch?
10     A.   Yes.
11     Q.   And does that picture show where the car spun out?
12     A.   Yes.
13     Q.   I will show you what has been marked as 15 -- 14 and
14  15, and I will ask you if these two pictures show basically
15  the same view?
16     A.   Yes.
17     Q.   And do all three of those -- were all three of these
18  pictures taken from your back porch?
19     A.   Yes.
20     Q.   Viewing toward where the car spun out?
21     A.   Yes.
22     Q.   And from that viewpoint, you could see the car that
23  spun out and the police cars that chased the car that spun
24  out; is that correct?
25     A.   Yes.
```

66

1    Q.    Now, then, are exhibits 12, 13, 17 and 18, are those
2    pictures that were taken over by where the car spun out
3    looking back to your house?
4    A.    Yes.
5    Q.    All right, I have shown you this before, and this is
6    a picture taken from your back porch?
7    A.    Yes.
8    Q.    Looking toward where the car spun out; is that
9    correct?
10   A.    Yes.
11   Q.    Now, then, where the car spun out, would be right
12   over here (indicating); is that correct?
13   A.    Yes.
14   Q.    And the car, when it spun out, was facing this
15   direction over here (indicating); is that correct?
16   A.    Yes.
17   Q.    Now, then, I will show you what has been marked as
18   Defendant's Exhibit 18; and can you see the fence here at the
19   bottom of the picture?
20   A.    Yes.
21   Q.    When the car spun around, did it come to rest back up
22   against this fence?
23   A.    Yes.
24   Q.    Now, then, where I am pointing over here, is that
25   where you were standing?

67

1    A.    Yes.
2    Q.    So this would be from the car looking back to your
3    vantage point; is that correct?
4    A.    Yes.
5    Q.    Now, then, all of the other pictures show basically
6    this same image, or a variation of these two images; is that
7    correct?
8    A.    Yes.
9    Q.    Now, then, you have seen the photographs that were
10   taken, did those duplicate the view that you had on that day?
11   A.    Yes.
12              MR. BRAUCHLE:   May I approach again, Your Honor?
13              THE COURT:   You may.
14   Q.    (By Mr. Brauchle)   Now, then, do you
15   understand the diagram that you have identified?
16   A.    Yes.
17   Q.    Can you mark on here where your house would be.  If
18   this is Bernal Street, you stated that your address was what?
19   A.    4111.
20   Q.    4111, so would that be right about here (indicating)?
21   A.    Yes.
22   Q.    Is that correct?
23   A.    Yes.
24   Q.    Could you put an X where your house would be.
25   A.    (Witness complies.)

68

1    Q.    And that would be the position that is shown in these
2    photographs; is that correct?
3    A.    Yes.
4    Q.    All right.  I will show you once again what has been
5    marked as Defendant's Exhibit 19, and I believe that you
6    stated that this diagram depicted the -- how the cars were
7    parked or how the car stopped out there on that date; is that
8    correct?
9    A.    Yes.
10   Q.    Now, then, this is the car that spun out?
11   A.    Yes.
12   Q.    And this is where you live?
13   A.    Yes.
14              MR. BRAUCHLE:   May I approach, again, Your
15   Honor?
16              THE COURT:   You may.
17   Q.    (By Mr. Brauchle)   If -- if this is Mart
18   Street and this is Bernal and the car was here, is
19   your house not over here?  You are looking from here
20   to there (indicating)?
21   A.    Yes.
22   Q.    Did you make a mistake by making the mark over here?
23   A.    Yes.
24   Q.    Okay.  But you are certain that you live over here,
25   if this is Mart Street, right?

69

1    A.    Yes, they are together.
2    Q.    Okay.  But your house is over here, not over here
3    (indicating)?
4    A.    Uh-huh.
5    Q.    Mark where your house is on the diagram.  Would it be
6    over here (indicating)?
7    A.    (Witness complies.)
8    Q.    Okay, now, this is not right; is that correct?
9    A.    Yes.
10   Q.    Okay.  Okay, your house is up here (indicating),
11   right?
12   A.    Yes.
13   Q.    And so your view is from here over to here
14   (indicating) and this shows how the cars were aligned that
15   day; is that correct?
16   A.    Yes.
17   Q.    Okay, when the cars came up there, and this car here,
18   I think you testified that it spun around; is that correct?
19   A.    Yes.
20   Q.    And then the cars got in this position; is that
21   correct?
22   A.    Yes.
23   Q.    Now, then, Ms. Correa, when those cars stopped in
24   that position, did the police start firing at the car that
25   spun out?

70

1     A.   Yes.
2     Q.   And did they start firing almost as soon as the car
3   spun out?
4              MR. BEACH:   Objection, leading.
5              THE COURT:   Sustained.
6     Q.   (By Mr. Brauchle)   When did they start
7   firing?
8     A.   When?
9     Q.   When did they start firing?
10    A.   I don't remember.
11    Q.   Well, I am not asking -- ma'am, I am not asking you
12   time, I am asking you if the police started firing right after
13   the car stopped or a long time after the car stopped?
14    A.   No, when the police officers got out.
15    Q.   Okay.  As soon as they got out of the cars?
16             MR. BEACH:   Objection, leading.
17             THE COURT:   Sustained.
18    Q.   (By Mr. Brauchle)   You stated that they
19   fired when the police officers got out; is that
20   correct?
21    A.   Yes.
22    Q.   Now, then, after the firing started, did you see one
23   of the officers approach the car?
24    A.   Yes.
25    Q.   And this -- was this after the officers had started

71

1   firing or before?
2     A.   Afterwards.
3     Q.   So the officers had already started firing when he
4   approached the car; is that correct?
5     A.   Yes.
6     Q.   Now, then, when he was up at the car, did you see him
7   fall down?
8     A.   Yes.
9     Q.   Did you see somebody come up to him?
10    A.   No.
11    Q.   Did you see him get moved from where he fell down?
12    A.   No.
13    Q.   So you don't know what happened after he fell down?
14    A.   No.
15    Q.   Did the police -- could you see the police still
16   firing after he fell down?
17    A.   Yes.
18    Q.   And are you certain that the police started firing
19   before the officer went up to the car?
20    A.   Yes.
21    Q.   Has anyone from the police department ever talked to
22   you about what happened?
23    A.   No.
24    Q.   No one has ever come by and taken your statement or
25   in any way asked you if you saw anything that day?

72

1     A.   No.
2     Q.   The first people to talk to you about what happened
3   in March of last year, were people from our office; is that
4   correct?
5     A.   Yes.
6              MR. BRAUCHLE:   We will pass the witness.
7                   CROSS-EXAMINATION
8   BY MR. BEACH:
9     Q.   Ms. Correa, you seem like a very nice lady.
10    A.   Thank you.
11    Q.   What had you been doing that day before all the
12   commotion started?
13    A.   I was cooking.
14    Q.   Okay.  And you took a break from cooking and went out
15   in your backyard?
16    A.   Yes.
17    Q.   Nice day?
18    A.   Yes.
19    Q.   And you hear all these sirens coming your way; is
20   that correct?
21    A.   Yes.
22    Q.   How many police cars do you remember seeing coming
23   down Bernal that day?
24    A.   There were many, I don't remember; but there were
25   many.

73

1     Q.   And you saw them all coming down Bernal; is that
2   correct?
3     A.   They were coming straight on Bernal.
4     Q.   And a couple of police cars ended up in the yard
5   across the street, didn't they?
6     A.   Yes.
7     Q.   And others parked out on the street; is that right?
8     A.   Yes.
9     Q.   And you watched all these cars whether they pulled
10   into the yard or parked on the street, you watched them all
11   come up, didn't you?
12    A.   Yes.
13    Q.   So you had your attention fixed on a lot of police
14   cars, didn't you?
15    A.   Yes.
16    Q.   What does no me acuerdo, mean?  No me acuerdo, right?
17    A.   I don't remember.
18    Q.   I don't remember.
19             MR. BEACH:   Are those photographs up there,
20   Suzanne?
21             MR. BRAUCHLE:   Yes.
22    Q.   (By Mr. Beach)   You ever see the movie, My
23   Cousin Vinnie?
24    A.   No.
25    Q.   What is that thing called right there, Ms. Correa,

74

1    got the leaves on it, is trunk, the branches?
2        A.    I don't know what it is called.
3        Q.    Called a tree, right?
4        A.    Yes.
5        Q.    That's a tree, right?
6        A.    Yes.
7        Q.    That's in your backyard?
8        A.    Yes.
9        Q.    Okay.  And this wooden thing right here, what do you
10   call that, is that a fence?
11       A.    Yes.
12       Q.    How tall is your fence?
13       A.    A wooden fence.
14       Q.    How tall is your wooden fence.  Are you taller than
15   that fence or is the fence taller than you?
16       A.    No, it is taller.
17       Q.    How tall are you, Ms. Correa?
18       A.    I don't remember, I don't know.
19       Q.    And looking from the other way, this is the same tree
20   that we just saw; is that right?
21       A.    Yes.
22       Q.    That's a tree in your backyard?
23       A.    Yes.
24       Q.    And this thing over here way across the street where
25   the car pulled up, that's also a tree, right?

75

1        A.    Yes.
2        Q.    And that's about, what, you are probably not very
3    good at judging feet, are you?
4        A.    Yes.
5        Q.    You got to go across this -- you got this vacant lot
6    here; is that right?
7        A.    Yes.  They have already covered it up.
8        Q.    Back then it was just a vacant lot, right?
9        A.    Yes.
10       Q.    You got Mart Street, what is that, it probably
11   12 feet, 15 feet something like that?
12       A.    Yes.
13       Q.    Then you have to go across into the yard to cross
14   this other tree to where the cars were; is that right?
15       A.    Yes.
16       Q.    And you are watching all the police cars coming down
17   Bernal Street; is that correct?
18       A.    Yes.
19       Q.    Not just the ones that come into the yard but all the
20   ones that eventually come down Bernal, right?
21       A.    Yes.
22       Q.    And this is going to sound like a silly question,
23   Ms. Correa, you weren't as close as 4 or 5 feet away, were
24   you?
25       A.    No.

76

1        Q.    You don't have a -- you weren't -- you didn't have a
2    movie camera out there that day, videotaping everything that
3    happened, did you?
4        A.    No.
5              MR. BEACH:    That's all I have, Judge.
6        Thank you.
7                    REDIRECT EXAMINATION
8    BY MR. BRAUCHLE:
9        Q.    Ms. Correa, back in March of 2007, was this fence
10   there?
11       A.    Yes.
12       Q.    It was?
13       A.    Yes.
14       Q.    When was that put in?
15       A.    It was already there.
16       Q.    All right.  Thank you, ma'am.  But these photographs
17   fairly and accurately depict your view as well as the scene
18   out there that day; is that correct?
19       A.    Yes.
20       Q.    And you are sure of that?
21       A.    Yes.
22             MR. BRAUCHLE:    Your Honor, we would ask
23   permission to publish Defendant's Exhibits.
24             THE COURT:    You may.
25       Mr. Brauchle, do you pass the witness?

77

1              MR. BRAUCHLE:    Yes, we will pass the witness.
2              MR. BEACH:    No objections, and no objections to
3    her being excused.
4              THE COURT:    You may step down, ma'am.  And you
5    are free to go.
6              MR. BRAUCHLE:    May we approach?
7              THE COURT:    You may.
8              (Following proceedings had at the Bench.)
9              MR. BRAUCHLE:    That's all of our witnesses for
10   right now.  The rest of them are continuing after the hearing.
11             THE COURT:    Let's have the hearing.
12             (End of Bench proceedings.)
13             THE COURT:    Ladies and gentlemen, there are some
14   issues that we have to address outside your presence, so we
15   are going to give but a 15-minute break.
16             THE BAILIFF:    All rise.
17             (Jury retired from the courtroom.)
18             THE COURT:    You may be seated.
19       Your first witness, Mr. Brauchle.
20             MR. BRAUCHLE:    Can we approach again?
21             THE COURT:    You need to approach again.
22             (Following proceedings had at the Bench.)
23             MR. BRAUCHLE:    You want us to bring them in and
24   put them on and then you are going to decide whether we can
25   put them on live -- I am not sure because if they are not

1  allowed to testify, we are going to have to make a bill.  But
2  I don't know if the proffer is going to be considered the bill
3  or not.
4              THE COURT:  How long is it going to last?
5              MR. BRAUCHLE:  I am looking for guidance, I mean
6  some of these people I guess condense what they are going to
7  say in 25 words or less, but certainly we don't want to be
8  held to that as to -- as to the bill that we would develop.
9              MR. BROOKS:  Some of our concerns that the
10 information they want to go into is privileged information.
11 So if it is offered by proffer, I would -- because it is
12 privileged information.
13             MR. BRAUCHLE:  All I am up here for is to figure
14 out what the Court wants to do mechanically, and then we will
15 do what you want.
16             MR. BROOKS:  In terms of the motion it is
17 privileged.
18             (End of Bench proceedings.)
19             (Following proceedings had in camera.)
20             THE COURT:  In chambers, this is a hearing
21 concerning certain evidence that the Defense wishes to go
22 into.
23     Mr. Brauchle.
24             MR. BRAUCHLE:  Pardon?
25             THE COURT:  If you will state what it is that --

1  if you will make a proffer.
2              MR. BRAUCHLE:  We have at least two witnesses,
3  one Karlous Lake and the other Raquel Sosa, who will testify
4  as to previous acts of misconduct in regard to Officer Nix.
5      Mr. Lake was the victim of an arrest by Officer Nix in
6  which excessive force was used.  He filed an Internal Affairs
7  complaint with the Dallas Police Department.  He is here to
8  testify as to what events occurred.
9      Ms. Sosa was present when her boyfriend was gunned down
10 by Officer Nix.  And she is here to testify as to the events
11 that night.  We think that both of these are relevant under
12 the law set out in our memorandum, which states that the --
13 once the first aggressor is determined, which I think is
14 pretty clear, that we can go into the prior violent acts of
15 the person, being Officer Nix.
16     State's argument that it is privileged might well be true
17 if we were only trying to introduce documents.  We are not
18 trying to do this by documents.  We have got two live people
19 that were live witnesses to what they will testify to.  And
20 those are the only two that we have at the present time.  We
21 anticipate that there may be two or three more who would also
22 come down and testify as to prior violent acts by Officer Nix.
23 And we think that we are entitled to do that under the current
24 case law.  And those are the two witnesses that we would call.
25             MR. BROOKS:  Judge, I think the objection is two

1  part.  Yes, we object to release of privileged information;
2  but also what Defense is trying to do is make an end run to go
3  through this officer's Internal Affairs file.  They are trying
4  to show evidence of character that is not applicable to the
5  facts of this case.  Doesn't meet 404(b).  It is not
6  applicable.  We have case law here that I understand
7  distinguish what it is they want to do versus the facts that
8  we have in this case.
9              MS. SMITH:  Under 404(b), specific instances of
10 conduct are generally inadmissible and they only come in in
11 very limited circumstances, and those circumstances don't
12 exist here.  There is no evidence that Mr. Ruiz had any
13 knowledge of any of his prior acts committed by the officer.
14 They have no bearing on his state of mind whatsoever.  And the
15 prior acts committed by the officer have no bearing on this
16 particular offense, because it is no way in any way related
17 factually to this offense.  It is not contextual in any way.
18 It is being offered purely to show character conformity.
19 Trying to beat up this officer for using force in the past.  I
20 will try to find an officer who has not tried to use some
21 force down the line.  It is barred by 404(b) but also
22 prejudicial to the State.
23             MR. BROOKS:  And with one other caveat, Judge,
24 the allegation that they want to go into, none of these
25 involve sustained complaints of excessive force.

1              MR. PARKS:  Privileged, not nothing to do with
2  privileged, this is public record.  I mean if you want to go
3  down and see that he arrested Mr. Lake, you can find out that
4  he did arrest Mr. Lake, charged Mr. Lake.  Find out what
5  happened to that case.  He is doing no more than testifying to
6  public record.  So privileged, I don't see is an issue at all.
7      With respect to first aggressor cases, those are set out
8  in the memo.  The exception to 404(b) is in the situation of
9  self-defense where that is raised one can show by extraneous
10 aggression that the deceased was the first aggressor, and
11 there is no requirement that the defendant know about those
12 other stated -- I can bring you the cases if you want.  So
13 knowledge has nothing to do with it, fact specific has nothing
14 to do with it.  The cases don't say anything about fact
15 specific.  What the cases say is where it is a self-defense
16 case and before the defendant does anything to the deceased,
17 the deceased is the first aggressor, then it is admissible.
18 It is not showing character.  That's why it is distinguished
19 from 404(b).  It is not showing character, it is showing
20 specific acts where he was the first aggressor to show his
21 state of mind at the time.  The case law is clear.
22             MS. SMITH:  Can I speak to the cases that you
23 are talking about, that doesn't require him to have knowledge.
24 Those were cases that the extraneous offenses was contextually
25 related to the offense.  They went to show the state of mind

82

1  of the deceased as to this particular defendant. That's why
2  it didn't matter if the defendant knew about it or not. So I
3  agree there are some instances when it doesn't matter if he
4  knows, but it is still related contextually.
5       As to the privilege, my understanding is, we had two
6  files, we had one that we agreed that could be released and
7  one that objected as confidential. And I am not sure how you
8  found these people, but I am assuming that you kind of got a
9  tip from the file that was disclosed. So that's where our
10  privilege objection comes from. But for them reading that
11  privileged file, we done know that this evidence would have
12  ever been discovered by y'all. If you are going to look into
13  every single arrest he ever made maybe.
14       MR. BRAUCHLE: We are still working on that.
15       MS. SMITH: Okay.
16       MR. PARKS: I guess you could say if it is
17  relevant and admissible, it is Brady, so it is not, the
18  Constitution trumps Brady.
19       MS. SMITH: Constitution is not because it is
20  Brady, Brady is materiality not relevance.
21       MR. BRAUCHLE: Judge, as we all know I have a
22  rather simplistic view to thing. I don't see it is much
23  different since we have been able to ask since 1836 whether
24  somebody is peace and law abiding, we have been able to ask
25  that since jump street. And all of a sudden he is none

83

1  peaceable -- side created an Internal Affairs investigation;
2  therefore, we can't go into it.
3       MS. SMITH: I am not saying that you can't put
4  witnesses up to testify as to their opinion or reputation.
5  You can't get into specifics.
6       MR. BRAUCHLE: Who would have a better...
7       MR. PARKS: The best evidence that seems to me
8  to show this jury what state of mind of Nix was when he came
9  rushing out of his squad car and began to beat on that car is
10  to show that this was his usual reaction to people running
11  from him, grabbing something up and either beating them or
12  taking them and dragging them down to the police station and
13  charging them with something that they weren't guilty of.
14       MS. SMITH: I think you are trying to extend the
15  law beyond where it is at. I do not think the law allows
16  that. We have a couple of cases we will give you to show you
17  in support of our position. One of them is Evans.
18       THE COURT: Let me do this, let me read these
19  cases, give me about ten minutes or so.
20       (Recess taken.)
21       (Proceedings continued in camera.)
22       THE COURT: Y'all are back.
23       MR. PARKS: I just wanted to -- I didn't mean to
24  interrupt your reading, but I wanted to put an alternate
25  theory of admissibility on the record while I am thinking

84

1  about it. And that is that we are also offering this evidence
2  in rebuttal of the State's witness, I believe it was Officer
3  Starr who opened the door to this rebuttal by proclaiming that
4  Officer Nix was a hero, and so we are offering that in
5  rebuttal of that.
6       MR. BRAUCHLE: We are attempting to show that
7  the idol has a feet of clay.
8       MR. BROOKS: I think they want to be careful
9  about doors opening, Judge, we are going to argue that. I
10  won't revisit some other door openings. I think it goes
11  directly to Wesley's state of mind and motive for running and
12  shooting at a police officer.
13       MR. JOHNSON: Say that again.
14       MR. PARKS: You lost me, Kevin.
15       MR. BROOKS: It is my position that the door has
16  been opened to go into Wesley's state of mind and his motive
17  for running and shooting at the police officer. Allowing to
18  establish that he was on probation and not reported for what,
19  six, seven months.
20       MR. JOHNSON: What opened the door to that?
21       MR. BROOKS: Mr. Brauchle previous question to
22  Carmen Delgadillo, about why they were having a conversation
23  why -- about I am going to go out like a "G". He specifically
24  asked her why -- how did that conversation come up between the
25  two of y'all. Why would y'all be talking about that.

85

1       MR. BRAUCHLE: When are you going to put this
2  on.
3       MR. BROOKS: I'm sorry?
4       MR. BRAUCHLE: In rebuttal to our rebuttal?
5       MR. JOHNSON: And you are taking the position
6  that -- that asking her about a statement she made to y'all.
7       MR. BROOKS: A statement that he made to her.
8       MR. JOHNSON: That's the statement that she made
9  to y'all that she attributed to him, okay. And another thing,
10  we didn't ask this, but is there anything in writing regarding
11  those statements? Did she give a written statement regarding
12  that?
13       MR. BROOKS: No.
14       MR. JOHNSON: Okay.
15       MR. BROOKS: I think Mr. Brauchle asked her if
16  she gave any written statement. But the testimony was that he
17  stated to her that I am going to go out like a "G". And the
18  cross-examination was fairly specific on why -- why was that
19  conversation taking place between the two of y'all. How did
20  that conversation come up.
21       MR. JOHNSON: But if you will recall, you
22  actually made this argument to the Court earlier and it was
23  denied, so this isn't anything new. This has already been --
24  this is ground that has already been covered. You have
25  already requested that and it has been denied.

86

1         MS. SMITH:  By putting on extraneous about the
2 officer's state of mind, you make our need to delve into
3 Ruiz's mind even greater.  Which makes any evidence related to
4 it even -- the more evidence you put on about our officers,
5 the more we need to put on evidence about your client.  So
6 that makes --
7         MR. JOHNSON:  That doesn't mean you can or
8 either --
9         MS. SMITH:  What I am saying, it is much more
10 probative every time you put on evidence about the officer.
11         MR. JOHNSON:  They are not related.
12         MS. SMITH:  State of mind issues are related.
13         MR. JOHNSON:  Not to each other, we are talking
14 about two different minds.
15         MR. BROOKS:  No, you said the state of mind for
16 this officer to engage in aggressive behavior after a chase.
17 We are saying the State of mind of Ruiz.
18         MR. JOHNSON:  Those are two different minds I am
19 pretty sure.
20         MR. BROOKS:  Yes, two different minds.
21         MS. SMITH:  They are the two minds that matter.
22         MR. JOHNSON:  I agree with that.  They are not
23 related in the context that you are trying to make them
24 related.
25         THE COURT:  Okay, let me finish reading these

---

87

1 and y'all take y'all minds out.
2         (End of in-camera hearing.)
3         (Recess taken.)
4         THE COURT:  Back record.
5      The Court will deny the Defense's request to have
6 witnesses Karlous Lake and Raquel Sosa testify before the jury
7 with respect to specific instances of the decedent's conduct.
8 And the Court will deny that under 404(b) and 405.
9      What says the Defense?
10         MR. BRAUCHLE:  We object.  And we will present
11 testimony in regard to those people's proffer had --
12         THE COURT:  Very well.
13         MR. BRAUCHLE:  In addition we will also proffer
14 statements from some other people that we think would be
15 relevant.
16         THE COURT:  Very well.
17      May I see the attorneys for one second.
18         (Discussion off the record.)
19         THE COURT:  Mr. Brauchle, you may call your
20 first witness.
21         MR. BRAUCHLE:  We will call Raquel Sosa.
22         MR. BROOKS:  May we approach, Judge?
23         THE COURT:  Yes.
24         (Following proceedings had at the Bench.)
25         MR. BROOKS:  So I understand for purposes of the

---

88

1 record, after they have made their bill, I have to make a
2 proffer how we would respond if this has been admitted.  And
3 my question is, do you want me to do cross-examination or do
4 you want me to just make a proffer for that witness.
5         MR. BRAUCHLE:  I am not sure if y'all are
6 required to do that.  Since the burden is on us.
7         MR. BROOKS:  My people are telling me that we
8 need to put testimony on the record in response to that
9 testimony.
10         THE COURT:  However you want to do whatever.
11         MR. BROOKS:  I guess my concern is if I am
12 cross-examining and we are getting into a trial -- fact of
13 trial.
14         MR. BRAUCHLE:  We are not now, if we had brought
15 them in in front of the jury, obviously.
16         MR. BEACH:  Could we just mark -- state
17 specifically.
18         THE COURT:  However you feel you need to best do
19 that.
20         (End of Bench conference.)
21         (Witness entered the courtroom.)
22         THE COURT:  The record will reflect that this
23 witness has previously been sworn.
24     You may proceed, Mr. Brauchle.
25

---

89

1                 RAQUEL SOSA
2 was called as a witness, after having been duly sworn by the
3 Court, testified under oath as follows:
4              SUB ROSA EXAMINATION
5 BY MR. BRAUCHLE:
6    Q.   State your name please.
7    A.   My name is Raquel Sosa.
8    Q.   What is your date of birth?
9    A.   7/6/86.
10    Q.   All right.  And we brought you down here today to
11 testify in regard to some event that occurred on June 21st
12 of 2002; are you familiar with those events?
13    A.   Yes.
14    Q.   Now, then, on that night around 10:30, where were
15 you?
16    A.   Around 10:30, I was -- I had got dropped off at my
17 mom's house and Jesus Ortiz also known as Chewy.
18    Q.   Where did your mom live?
19    A.   Lived in Balch Springs.
20    Q.   Do you recall the address.
21    A.   11808 Crumpton.
22    Q.   So that's where your mother lived?
23    A.   Yes.
24    Q.   And you stated that you had just gotten dropped off?
25    A.   Early that day I got dropped off.  But I had gotten

90

1 picked up around that time.
2     Q.    Okay. So did somebody that you knew by the name of
3 Jesus Ortiz come by the Crumpton address?
4     A.    Yes.
5     Q.    What time would that have been?
6     A.    It was around maybe 9:00, about nine o'clock or
7 10:00.
8     Q.    All right. Did you-all -- at some point in time
9 leave that address?
10     A.    Yes.
11     Q.    What time would that have been?
12     A.    About 9:00 or 10:00 at night.
13     Q.    Nine or 10:00?
14     A.    Yes.
15     Q.    You are not sure?
16     A.    More around 10:00 o'clock at night.
17     Q.    Okay.
18     A.    Yeah.
19     Q.    And how did you leave that address?
20     A.    Jesus. Like I said, I know him as Chewy, Chewy
21 picked me up from my mom's house in his car.
22     Q.    Okay. What kind of car did he have, do you remember?
23     A.    A green Grand Marquis.
24     Q.    A green Grand Marquis?
25     A.    Yes.

91

1     Q.    And where did y'all go in the green Grand Marquis?
2     A.    We were actually on our way to -- at the time
3 Eckerd's, we were on our way to the store.
4     Q.    Okay. So you left your mom's house headed toward a
5 store, toward an Eckerd's store?
6     A.    Yes.
7     Q.    And where would that have been?
8     A.    In Oak Cliff on 12th Street.
9     Q.    Now, then, do you recall what you were going to
10 Eckerd's for?
11     A.    Yes, he had -- he had a cut on his arm and it was
12 bleeding, we were just going to get peroxide and the gauze,
13 you know, for to fix it up, you know.
14     Q.    Did y'all in fact go to the Eckerd's on 12th?
15     A.    No, we didn't make it.
16     Q.    What happened in regard to going to the Eckerd's on
17 12th?
18     A.    Well, we exited 12th Street and we came up to a
19 light and the light turns, so you know we drove up. We kept
20 on driving on 12th Street. We seen -- well, I seen the police
21 car at the stoplight also. It turned behind us when -- I was
22 driving at the time, it turned behind us when we drove off.
23     Q.    All right. So you are driving and a police car pulls
24 up behind you while you are on 12th Street; is that right?
25     A.    Yes -- not exactly behind me at the time but in the

92

1 lane next to me, yeah.
2     Q.    And would that have been somewhere around 12th and
3 Hampton?
4     A.    It was before 12th and Hampton. It was actually
5 about 12th and Polk.
6     Q.    Okay. Did you and Chewy have a conversation in
7 regard to that?
8     A.    Yes.
9     Q.    All right. Now, when we talk about Chewy, that's a
10 person whose full name would be Jesus Ortiz; is that correct?
11     A.    Yes.
12     Q.    And he would have been born around June 22nd, 2002;
13 is that right?
14     A.    Born?
15     Q.    Yes.
16     A.    June 22nd.
17     Q.    I'm sorry?
18     A.    He was born April 22nd 1980.
19     Q.    April 22nd?
20     A.    Yes, 1980.
21     Q.    1980, okay. But you called him Chewy?
22     A.    Yes.
23     Q.    So the person that we are referring to throughout
24 this, when you say Chewy, that's Jesus Ortiz; is that correct?
25     A.    Yes.

93

1     Q.    Now, then, when you reach Hampton, do you continue
2 down Hampton?
3     A.    Okay, we were going on 12th Street and the streets
4 splits and ah, came up to a stop sign and, ah, you know, I
5 stopped at the stop sign and I was coming up to a light. I am
6 not sure what the street was, but, ah, when light was red, I
7 got all the way to my right lane. And the cop stopped at the
8 stop sign.
9     Q.    All right, let me stop you there. That would be --
10 are you talking about Hampton splitting or 12th Street
11 splitting?
12     A.    12th Street splitting.
13     Q.    And so what direction are you heading, are you
14 heading east or west on 12th Street?
15     A.    West.
16     Q.    Okay. Toward Grand Prairie?
17     A.    Well, actually --
18     Q.    Were you heading toward Westmoreland?
19     A.    Yes, more -- yeah.
20     Q.    Grand Prairie is a little too far to orient you. So
21 you were heading toward Westmoreland if that is to the west of
22 where you were; is that correct?
23     A.    Yes.
24     Q.    Okay, now, then, the police officer is still either
25 following behind you or following to the side of you; is that

94
95

1  correct?
2      A.   Well, yes.  At that time I stopped at the stop sign.
3  And then at the light I got all the way to the right lane.
4      Q.   Were you stopping at a stop sign or a stoplight?
5      A.   A stop sign.  And then I came up to the red light,
6  yes.
7      Q.   So those were -- there is a stop sign, then you stop
8  for that, proceeded further and then you stopped at a red
9  light; is that correct?
10     A.   Uh-huh.
11     Q.   Do you know what street that would have been on?
12     A.   I don't know the street name.
13     Q.   Okay.  Now, when you pull up at the stoplight did
14  anything unusual happen?
15     A.   When I -- yeah when I was at the stoplight, the
16  officer was at the stop sign for a few seconds, you know,
17  stopped a little longer than usual.  And when he was, you
18  know, when he drove up, he turned on the lights and got behind
19  us and --
20     Q.   Is this at the stoplight?
21     A.   Yeah, yes.  So at the stoplight I made a right and
22  his, you know he had already turned on his lights.
23     Q.   When you made a right, did you accelerate the car?
24     A.   I asked Chewy if I should stop or go.  So we decided,
25  you know, to go.

1      Q.   So I take it that you attempted to outrun the police;
2  is that correct?
3      A.   Uh-huh.
4      Q.   I take it that you attempted to outrun the police; is
5  that correct?
6      A.   Yes.
7      Q.   You know what street you were on when you did that?
8      A.   Like I said, I don't know the name of the street.
9      Q.   Now then did you get out in front of the police
10  officer?
11     A.   Excuse me.
12     Q.   Did you outrun the police officer for a while?
13     A.   Well, I was driving for a few minutes and then Chewy
14  asked me -- you know to trade seats with him.  So we came up
15  to a stop sign, you know, we just switched seats and he
16  started driving.
17     Q.   Okay.  So even though you are running from the
18  police, y'all stopped at a stop sign and y'all switched
19  places?
20     A.   Yes.
21     Q.   Is that correct?
22     A.   Yes.
23     Q.   Now, then, you know how far Chewy drove after y'all
24  traded places?
25     A.   Maybe another -- maybe like five, six minutes total,

96
97

1  I mean, we weren't driving for a long time.
2      Q.   Okay.  Now, then, was this in a neighborhood that you
3  were somewhat familiar with?
4      A.   Um, somewhat, but not like real, real, you know.
5      Q.   Did you know it had a park in it?
6      A.   Yeah, I had seen that park before.
7      Q.   So there was a park in this neighborhood and you are
8  not sure what street it is on?
9      A.   Yeah, the park is on Polk and Delaware.
10     Q.   Polk and Delaware?
11     A.   Yes.
12     Q.   So I take it that's in Dallas County?
13     A.   Yes.  It was in Oak Cliff, the park was in Oak Cliff,
14  yes, in Dallas County.
15     Q.   All right.  And when you got to the park there on
16  Polk and Delaware, did y'all stop the car?
17     A.   Yes.
18     Q.   And did y'all jump out of the car and run from the
19  car?
20     A.   Yes.
21     Q.   And as you ran from the car, was there -- when you
22  got out of the car and into the park, was the terrain going
23  down hill, up hill, level or what?
24     A.   We, ah, got out of the car and we ran down hill.
25     Q.   Okay.  Did you have some trouble running once you got

1  out of the car?
2      A.   Yes, ah.
3      Q.   What was causing that?
4      A.   Well, I had on heels, so I, ah, wasn't able to run in
5  them.  So, you know, I ran barefooted.
6      Q.   So you didn't have any shoes on when you are trying
7  to run; is that correct?
8      A.   No.
9      Q.   Okay.  Now, then, at some point in time in the park,
10  did you come to a drain passage?
11     A.   It was a tunnel, yes.
12     Q.   Okay.  And the tunnel in the park, was that for the
13  purposes of draining water or diverting the creek or
14  something?
15     A.   Yeah, I believe it leads into a creek.
16     Q.   Okay.  Did it have water in the bottom of the tunnel?
17     A.   Yes.
18     Q.   Okay.  You and Chewy run through the tunnel?
19     A.   Yes.
20     Q.   Now, then, could you hear or see police officers
21  coming behind you?
22     A.   I mean -- no.  When I -- when we ran from the car,
23  out the car, there were police officers behind us then.  But
24  as far as running down the hill and through the tunnel, I
25  didn't hear or see anybody behind me.

98

99

1    Q.  Okay.  So you knew that there were police officers
2  when you jumped out of the car, but in the tunnel, you didn't
3  know if there were any police officers or not?
4    A.  I mean -- I knew they were there, yeah, when we were
5  in the tunnel, it was just, you know, they weren't in the
6  tunnel with us at the same time, that's what I mean.
7    Q.  Look around the courtroom and tell us about how far
8  the tunnel would extend from where you are sitting.  You have
9  any idea how long the tunnel was?
10   A.  It wasn't -- it's maybe --
11   Q.  Would it be longer from where you are sitting to the
12  back of the room?
13   A.  Maybe about that -- that long, it wasn't too long.
14  It wasn't real short either.  It was about, yeah.
15   Q.  So you think the tunnel would be about as long as
16  from where you are sitting to the back of the courtroom?
17   A.  Yes.
18   Q.  I realize that is just an estimate?
19   A.  Uh-huh.
20   Q.  But that's ... now, then, when you were running
21  through this tunnel and running in the park, were you having
22  trouble standing up or running, anything like that?
23   A.  Yes.  When I was in the tunnel, like I said, it was
24  slippery in there, and like I said, I was barefoot so I did
25  fall in there three times.

1    Q.  Now then --
2    A.  And got back up.
3    Q.  When you got out on the other side of the tunnel,
4  what kind of terrain was around the end of the tunnel?
5    A.  Okay, then, the tunnel it was just like one step and
6  then it was like, you know, like rocks and little bit of
7  water, a little stream of water.
8    Q.  Were you back in a park or were you --
9    A.  Like I said a it leaded to, I guess, a creek or woods
10  or something, I am not sure.  I had never been through that
11  tunnel.
12   Q.  Well, did the tunnel empty you out into a creek or to
13  another part of the park, where were you?
14   A.  It was more like a creek.
15   Q.  Okay.  Now, then, when you came out of the tunnel,
16  you stated that there was something like a step down?
17   A.  Yes.
18   Q.  It also had water on it.  And then the water ran down
19  what you have described as perhaps a creek, you are not sure
20  as to what it was?
21   A.  Yes.
22   Q.  Is that correct?
23   A.  Yes.
24   Q.  Now, then, after you and Chewy came out of that
25  tunnel, were you approached by police officers?

100

101

1    A.  Yes, after -- after we came out of the tunnel, I had
2  fell one more time on that step.  And like seconds after I
3  fell, the cop came up.
4    Q.  Okay.  What did -- by cop, you are talking about a
5  male police officer; is that correct?
6    A.  Yes.
7    Q.  And did you later learn that that police officer's
8  name was Mark Nix?
9    A.  Yes.
10   Q.  Now, then, when you came out you and Chewy had just
11  come from the tunnel, you had fallen on the step and then what
12  happened next?
13   A.  Okay, like I said, we came out of the tunnel, and you
14  know, and I step on the step and Chewy, you know he was
15  turning me up.  And the next thing you know the cop came out
16  the tunnel.  And I had fell on my knees and I was facing
17  toward Chewy and Chewy was facing toward me, and as soon as
18  the cop came out, I was on the floor and I mean, all I heard
19  was that gunshots.
20   Q.  Okay?
21       MR. BRAUCHLE:  May I approach, Your Honor?
22       THE COURT:  You may.
23   Q.  (By Mr. Brauchle)  Now, then, when you came
24  out of the tunnel, you stated that when the police
25  officer came out, you were down on your knees; is

1  that correct?
2    A.  Yes.
3    Q.  Now, then, if -- and you are also facing Chewy who
4  would be over here (indicating); is that correct?
5    A.  Correct.
6    Q.  Now, then, how far -- if I am Chewy, how far would I
7  be from you, you just tell me to back up or come forward to
8  where I would be about the distance that Chewy was from you?
9    A.  Maybe a step forward.
10   Q.  A step closer to you?
11   A.  Yes.
12   Q.  So you and Chewy were about this far apart
13  (demonstrating)?
14   A.  Yeah.  Like I said, I had fell and he was reaching
15  like holding hands, he was reaching trying to help me up.
16   Q.  He is reaching out for you to pull you up; is that
17  right?
18   A.  Yes.
19   Q.  And if this is about four, four and a half feet, this
20  would be how close Chewy was to you; is that correct?
21   A.  Yes.
22   Q.  And you and Chewy were facing each other just as you
23  and I are?
24   A.  Yes.
25   Q.  We were not in the same positions as y'all were, but

102

1 we are facing each other; is that correct?
2    A.   Yes.
3    Q.   Now, then, the police officer that came out of the
4 tunnel behind y'all, where would he have been in relation to
5 you? Would he have been in front of you, behind you?
6    A.   He was behind me.
7    Q.   He was behind you?
8    A.   Yes.
9    Q.   Now, then, can you step down just a second?
10    A.   (Witness complies.)
11    Q.   Turn and face that way. Now then, if you are in the
12 position that you previously described as being down on the
13 ground, how far behind you would the police officer have been,
14 do you know? In other words, step away from me to you are
15 about the distance -- come toward me till you are about the
16 distance that the police officer was behind you.
17    A.   I was maybe right here -- Chewy was right here
18 (indicating).
19    Q.   So if I am about 3 feet behind you, that would be the
20 distance behind you that the police officer was; is that
21 correct?
22    A.   Yes.
23    Q.   And Chewy would -- I think you have indicated would
24 be about four or four and a half feet from you; is that
25 correct?

103

1    A.   Yes.
2    Q.   Okay. So I guess -- you can take your seat again?
3    A.   (Witness complies.)
4    Q.   If this is where the police officer is, right here
5 (indicating), would Chewy have been about this far from him?
6    A.   Yes.
7    Q.   You think that's a good estimate as to the distance
8 from the officer to you?
9    A.   Uh-huh.
10    Q.   And then you to Chewy?
11    A.   Yeah. It is like the officer and I were just right
12 in the middle, Chewy was standing up.
13    Q.   That's approximately 8 or 9 feet away, you think?
14    A.   Yeah about 9 feet, maybe 10.
15    Q.   All right, now, then, did the officer do something
16 after he came out of the tunnel?
17    A.   As soon as the officer came out of the tunnel, all I
18 heard was gunshots, he never -- he didn't say anything, not
19 one word, he just started shooting.
20    Q.   And who is he shooting at?
21    A.   Shooting toward Chewy.
22    Q.   So he is standing behind you, facing Chewy and Chewy
23 is facing him?
24    A.   Yes.
25    Q.   And the officer starts firing at Chewy, is that with

104

1 a pistol or rifle or do you know?
2    A.   I just heard gunshots.
3    Q.   Do you know how many you heard?
4    A.   Eight.
5    Q.   Do you remember hearing eight?
6    A.   Yes.
7    Q.   Now, then, prior to that during the evening that you
8 had been with Chewy, had you ever seen him with a pistol?
9    A.   No.
10    Q.   Had you ever seen him with any type of weapon?
11    A.   Any type of pistol is that what you are asking?
12    Q.   On that night had you ever seen him with any type of
13 weapon on that night?
14    A.   No.
15    Q.   All right. All right. So if Chewy didn't have a
16 weapon that night, there wouldn't have been anyway that he
17 could have pointed a weapon at the officer or been seen with
18 one in his hand or anything like that; is that correct?
19    A.   That's correct. I was looking straight up at him.
20    Q.   All right. Now then, the officer was shooting his
21 pistol at Chewy and did Chewy at some point turn his back to
22 the officer and try and escape?
23    A.   Yes. After -- after I heard the gunshots, I was
24 just -- I was looking at him, you know, he just -- he just
25 took two steps back, two steps back and he just turned around

105

1 and he kept running.
2    Q.   Okay. Did you ever see Chewy fall down at any point?
3    A.   No. It was dark outside. I mean that's the last
4 that I saw.
5    Q.   How was Chewy dressed that night?
6    A.   He had on a black T-shirt.
7    Q.   A black T-shirt?
8    A.   Yes.
9    Q.   Anything else?
10    A.   Blue jean pants.
11    Q.   Pardon?
12    A.   Blue jean pants.
13    Q.   Okay. And --
14    A.   And a black hat.
15    Q.   You said he had black hat, black T-shirt, blue jeans?
16    A.   Yes.
17    Q.   And what kind of shoes, do you remember?
18    A.   Black polo boots.
19    Q.   Now, then, after the shooting occurred, did you have
20 occasion to come in contact with another officer?
21    A.   Yes. After the shooting occurred, Chewy ran and the
22 officer that shot the gun he, ah -- he ah, actually he asked
23 me if I was okay, and you know, I told him, Yes. And he
24 waited there with me till the female officer came through the
25 tunnel.

106

1    Q.    Okay.  So the officer who had fired what you recall
2    to be eight shots --
3    A.    Yes.
4    Q.    -- at Chewy is standing there behind you and he comes
5    up and asks you if you are okay?
6    A.    Yeah.  He asked if I was hurt or anything.
7    Q.    Okay.  And then shortly after that inquiry, you
8    stated that a female police officer came up to you; is that
9    correct?
10   A.    Yes.
11   Q.    Now, did she come up to you through the tunnel?
12   A.    Yes.
13   Q.    And did she tell you anything or take you anywhere?
14   A.    Yes.  She escorted me back through the tunnel and she
15   said not to try to run and pretty much that was it.
16   Q.    Okay.  Where did she take you after she got you back
17   through the tunnel?
18   A.    Through the tunnel back up the hill and into the
19   police car.
20   Q.    All right.  Did you -- did you -- how long did you
21   stay in that police car at that location, do you recall?
22   A.    I would say 15 or 20 minutes.
23   Q.    And then did the police car go to some other
24   location?
25   A.    Yes.  It went to -- where the ambulance was -- the

107

1    ambulance, Chewy was already in the ambulance.
2    Q.    Okay.  So from where you were in the police car that
3    the female officer put you into, they moved that police car
4    over to where the ambulance was?
5    A.    Yes.
6    Q.    Now, then, did you see somebody that you knew over
7    there at the ambulance?
8    A.    His brother Joe.
9    Q.    So Chewy's brother Joe was over at the ambulance that
10   evening; is that right?
11   A.    Yes.
12   Q.    And then at some point after you got over to where
13   the ambulance was, did the ambulance leave and take Chewy to
14   the hospital?
15   A.    Actually I -- the cop car had left before the
16   ambulance had left.
17   Q.    Okay.  So -- so the ambulance was still there when
18   the police officers drove you off in the cop car?
19   A.    Yes.
20   Q.    Now, then, did they take you down to Main and Harwood
21   to the old police station?
22   A.    Yes.
23   Q.    And did -- did a woman police officer take a
24   statement?
25   A.    Yes.

108

1    Q.    Now, then, this would have been early in the morning
2    hours of June 22nd; is that correct?
3    A.    Yes.
4    Q.    And did the woman -- well, let me back up, on your
5    statement, did you write it out yourself?
6    A.    No.
7    Q.    Now, you have seen your statement, have you not?
8    A.    Yes.
9    Q.    Had you seen it before our investigator got in
10   contact with you?
11   A.    No, I had never read it, about two weeks ago was the
12   first time.
13   Q.    Okay.  So since 2002 you had never read the
14   statement?
15   A.    No.
16   Q.    That's six years ago almost?
17   A.    Yes.
18   Q.    And you had never read it?
19   A.    No.
20   Q.    And did you find -- well, let me back up again.  The
21   woman officer wrote it out; is that correct?
22   A.    Yes.
23   Q.    And then at the end of the time that you were there
24   at police headquarters, she just gave you the statement and
25   what did she -- did she ever show you the statement?

109

1    A.    Pretty much all she said is, you know, she wrote down
2    just what I was saying.  She was writing it as I was talking
3    and just basically hand me, had me sign my signature.
4    Q.    Now, then, when you saw the statement a couple of
5    week ago and read it, were there any things that you didn't
6    say or that were incorrect in it?
7    A.    Pretty much everything that happened up to the part
8    where we ran like through the tunnel, yeah, it was switched
9    up.
10   Q.    Okay.  Did -- I think your statement states that you
11   didn't see the shooting; is that correct?
12   A.    It stated that.
13   Q.    And that's wrong?
14   A.    That's incorrect, I was there.
15   Q.    Then the statement also says in that same sentence, I
16   don't know who shot first, that's wrong also; is that correct?
17   A.    That's right.
18   Q.    Now, then, that's wrong because do you recall Chewy
19   shooting at all?
20   A.    No.
21   Q.    Did he have the ability to shoot anybody that night?
22   A.    No.
23   Q.    Now, you -- are there any other parts of the
24   statement that you have read that are incorrect?
25   A.    That's pretty much that was it, if I am not mistaken.

**110**

1 the statement said that the female cop took me through the
2 tunnel and then that's when the officer fired.
3    Q.   Okay.
4    A.   Yeah, that was the only thing that was incorrect, the
5 shooting.
6    Q.   So basically they had the female officer taking you
7 away from the shooting scene before the shooting happened?
8    A.   That's what was written on the statement.
9    Q.   But that's not what in fact happened?
10   A.   No.
11   Q.   In fact you were there throughout the shooting and
12 then the female officer took you away after the shooting; is
13 that correct?
14   A.   Yes.
15   Q.   And the female officer wasn't there when Officer Nix
16 was shooting at Chewy; is that right?
17   A.   That's right, she wasn't.
18           MR. BRAUCHLE:   We will pass the witness.
19           THE COURT:   Cross-examination, Mr. Brooks.
20           MR. BROOKS:   Thank you, Judge.
21              **SUB ROSA EXAMINATION**
22 BY MR. BROOKS:
23   Q.   Ms. Sosa, can you hear me okay?
24   A.   Yes.
25   Q.   My name is Kevin Brooks.  I have some questions for

**111**

1 you.  If ask you a question that you don't understand, or I
2 need to rephrase, please let me know and I will do that; is
3 that fair?
4    A.   Yes.
5    Q.   Would it be a fair statement that the testimony you
6 are giving here today is almost six years later to the day
7 almost?
8    A.   Yes.
9    Q.   This took place back in June of 2002?
10   A.   Yes.
11   Q.   Back in June of 2002, were you aware that Jesus was a
12 suspect in two aggravated robberies?
13   A.   I was aware of that.
14   Q.   Were you aware that in one of those aggravated
15 robberies, a pistol grip pump shotgun was used?
16   A.   No.
17   Q.   Were you aware that in one of the other robberies,
18 upon fleeing the scene, they actually fired shots in the air?
19   A.   No.
20   Q.   But you were aware that he was a suspect in at least
21 one aggravated robbery?
22   A.   Yes.
23   Q.   Now, any part of your testimony that you have just
24 given here in this courtroom, is there any part of it, having
25 the time to reflect and think back over these events, is there

**112**

1 any part of what you have said today that you wish to change?
2    A.   No.
3           MR. BROOKS:   May I approach the witness, Your
4 Honor?
5           THE COURT:   You may.
6    Q.   (By Mr. Brooks)  Let me show you, is that
7 you?
8    A.   Yes.
9    Q.   And is that you?
10   A.   Yes.
11   Q.   Okay.  Now, you just told this court and put it on
12 the record that you had never seen Jesus carrying a gun?
13   A.   I said that day, I had never seen him.  The day of
14 the shooting.
15   Q.   You recall the statement I had never seen him with a
16 weapon?
17   A.   He asked me that day.
18           MR. BRAUCHLE:   Your Honor, we would object.
19 That is a misstatement of testimony.
20           THE COURT:   Overruled.
21   A.   I never said I have never seen him with a gun.
22   Q.   (By Mr. Brooks)  And would you agree with
23 me in this photograph here, the two of y'all are
24 laying in bed together, he is holding a gun and
25 pointing it at the camera?

**113**

1    A.   Uh-huh.
2    Q.   So you had seen him with a weapon before?
3    A.   I had just -- I never said that.
4    Q.   In fact you know that he is known to carry weapons,
5 don't you?
6    A.   I have seen him with a gun before, yes.
7    Q.   You know that he is known to carry a weapon?
8           MR. BRAUCHLE:   We would object to the State
9 using the presence tense, Your Honor.
10           THE COURT:   Overruled.
11   Q.   (By Mr. Brooks)  Now, in your statement actually
12 today, you testified that -- well, let's back up a minute, let
13 me make sure I understand correctly what you are telling this
14 Court, what you are putting on the record.  Is it your
15 testimony that Officer Nix just runs up to this tunnel, pulls
16 out his gun, and starts shooting, is that your testimony.
17   A.   Like I said, yes.
18   Q.   That's your testimony?
19   A.   Yes.
20   Q.   And in your statement, I will admit that -- this
21 statement you gave under oath, you said, I don't know who
22 started shooting first?
23   A.   Like I said, I did not write that.  And I have
24 never -- I had never read it.
25   Q.   Make sure you understand my question, in your

1   statement that you gave under oath, you said you don't know
2   who started shooting first?
3            MR. BRAUCHLE:   Your Honor, we would object to
4   this, she has already disavowed the statement.
5            THE COURT:   Overruled.
6            MR. BRAUCHLE:   If they want to impeach her with
7   it, put it into evidence.  But she has disavowed the portions
8   of the statement that they are talking about.
9            THE COURT:   Overruled.
10   Q.  (By Mr. Brooks)   You see that sentence,
11  Ms. Sosa?
12   A.   Uh-huh.
13   Q.   And that's your signature, isn't it?
14   A.   That's my signature.
15   Q.   And you signed this?
16   A.   Yes, that's my handwriting.
17   Q.   No, ma'am, my question was and you signed this?
18   A.   Yes.
19   Q.   You also testified -- at least for the record you
20  testified that I believe Jesus was standing by you after you
21  had fallen down?
22   A.   Yes.
23   Q.   In fact Mr. Brauchle had you demonstrate using him as
24  an extra body how close Jesus was from you?
25   A.   Yes.

1   Q.   When the shooting started?
2   A.   Yes.
3   Q.   You recall in your statement where you said that I
4   fell down -- I tried to keep up with him and I fell down
5   again; you recall that?
6   A.   Yes.
7   Q.   You recall that it was actually a female officer that
8   came up to you in the tunnel, not a male officer?
9   A.   It was a male officer who approached us first.
10   Q.   So I guess if the inference is that this officer that
11  it wrote this statement for you, made that up, she has some
12  reason to say that a male officer came up to you first?
13   A.   That's correct.
14   Q.   Now, you also said that he ran off?
15   A.   Yes.
16   Q.   So in your statement he is not right by you when the
17  shooting starts?
18   A.   The shooting is right over me.
19   Q.   No, ma'am, in your statement, going by your sworn
20  statement from six years ago, in your statement, he is not
21  right by you when the shooting starts?
22   A.   I never wrote that statement.
23   Q.   Ma'am, that's not my question?
24   A.   There's stuff that's mixed up --
25            THE COURT:   Ma'am, ma'am, if you will answer the

1   question that you are asked.
2   Q.   (By Mr. Brooks)   In your statement, he is not right
3   by you when the shooting starts, yes or no.
4   A.   In that statement --
5            MR. BRAUCHLE:   Your Honor, if he is going to ask
6   her about facts of the statement, show her the statement.
7            MR. BROOKS:   May I approach, Your Honor?
8            THE COURT:   You may.
9   Q.  (By Mr. Brooks)   Starting here
10  (indicating), we ran through a small tunnel and came
11  out and I fell again, I heard the cop coming and
12  Chewy ran off.
13   A.   That's not how it happened.
14   Q.   Ma'am, that is not my question.  My question was, is
15  that what is in your statement?
16   A.   Yes.
17   Q.   Okay.
18   A.   That's the statement, yes.
19   Q.   And this was a statement you signed under oath six
20  years ago?
21   A.   Yes.
22   Q.   Now, were you also aware that Jesus gave a dying
23  declaration that night?
24   A.   What do you mean?
25            MR. BRAUCHLE:   Your Honor, if he is going to go

1   into any dying declaration, we would want the person that made
2   the declaration too.  And I am fairly certainly it is not her.
3            THE COURT:   Overruled.
4   Q.   (By Mr. Brooks)   Were you aware --
5            MR. BRAUCHLE:   May I be heard further.  If it is
6   a dying declaration, you have to have the person that it is
7   declared to to testify about it.  He can't get in to it by
8   quizzing her about something that she is not a party to.
9            THE COURT:   Overruled.
10   You may, proceed, Mr. Brooks.
11            MR. BRAUCHLE:   May we have a running objection?
12            THE COURT:   You may.
13   Q.  (By Mr. Brooks)   Were you aware that at the
14  scene where he was shot, he told a police officer
15  where he had thrown his weapon
16   A.   He told -- no.
17   Q.   In fact you wouldn't be aware of that because
18  according to your statement you didn't know whether or not he
19  had a gun?
20   A.   I didn't just understand what you said.  You said was
21  I aware of him telling an officer that -- where he threw his
22  gun?
23   Q.   Yes, ma'am.
24   A.   No.  And like I said, from what I know he didn't have
25  a gun.

118

1   Q.   And that would be --
2   A.   So I couldn't be aware of that.
3   Q.   And that would be consistent with part of your
4   statement where you say, You didn't know if he had a gun?
5   A.   He didn't have a gun.
6   Q.   And are you aware that a weapon, a 9 millimeter
7   handgun was found in the vicinity that he told them to find it
8   or look for it?
9            MR. BRAUCHLE:   Your Honor, we would object to
10  that is a misstatement of facts.
11  A.   I have no idea what him talking about.
12           THE COURT:   Overruled.
13           MR. BRAUCHLE:   Where is the -- it is not coming
14  from her statement, so where is the testimony that Mr. Brooks
15  is coming from.
16           MR. BROOKS:   Your Honor, what my understanding
17  what we are doing here, we are making a record of what we
18  would have proffered if we were before the jury.
19           MR. BRAUCHLE:   Going that far off the record, he
20  didn't need this woman.  Just proffer it.  If he is talking
21  about where the weapon was found and where it was described
22  and all this stuff, this woman said that he didn't have a
23  weapon as being consistent with that.  And going into dying
24  declarations and instructions as to where the weapon was
25  found, even if this is not in front of the jury, it certainly

119

1   can't be proffered through the attorneys, as the Court well
2   aware what we say is not evidence.
3            THE COURT:   Overruled.
4        You may continue, Mr. Brooks.
5            MR. BRAUCHLE:   May we have a running objection
6   to the rest of Mr. Brooks' testimony.
7            THE COURT:   You may.
8            MR. BRAUCHLE:   Thank you.
9   Q.   (By Mr. Brooks)   Now the photographers that
10  I showed you, Ms. Sosa, would it surprise you to
11  learn those photographs were found in the vehicle
12  that you and Jesus were in that night
13  A.   No.  I did have pictures in the trunk.
14  Q.   In fact, in some of these photographs, you and
15  Mr. Ortiz are throwing gang signs, aren't you?
16  A.   I am not gang-related.
17           MR. BROOKS:   May I have a moment, Your Honor?
18  Q.   (By Mr. Brooks)   Let me show you what is
19  marked as State's Exhibit 103, Ms. Sosa, and it is a
20  photograph that you have already described as being
21  a photograph of you.  Are you making a wear motion
22  with your hand in this photograph
23  A.   I was throwing up my middle finger on that one.
24           MR. BROOKS:   We offer State's 103, Your Honor,
25  as well as State's 102 and State's 101.

120

1            MR. BRAUCHLE:   We would object under 404, 403,
2   402 and 401.
3            THE COURT:   Overruled.
4        State's 103, 102 and 101 are admitted.
5   Q.   (By Mr. Brooks)   Ma'am, how old were you when those
6   pictures were taken?
7   A.   Fifteen.
8            MR. BROOKS:   Pass the witness.
9            MR. BRAUCHLE:   May I approach, Your Honor.?
10           THE COURT:   You may.
11           SUB ROSA EXAMINATION
12  BY MR. BRAUCHLE:
13  Q.   Ms. Sosa, I will show you what has been marked as
14  State's Exhibit No. 101, and this is the document that
15  Mr. Brooks was showing you remember that?
16  A.   Yes.
17  Q.   Now, then, I want you to read through here and when
18  you get to a part that is incorrect -- that you didn't tell
19  the officer, I want you to mark it with this Marks-A-Lot,
20  okay?
21  A.   Okay.  This part, it is true, it didn't happen in
22  that order, so I still -- I mean --
23  Q.   It's something that you disagree with, or is not
24  correct.  I guess just mark through that.  We will go back
25  through those things after you finish marking it?

121

1   A.   (Witness complies.)
2   Q.   Are you through?
3   A.   Yes.
4   Q.   Okay, on -- okay, in regard to what I asked you to
5   do, on page three, you marked this part of the statement
6   saying I heard the cop coming and Chewy ran off.  That's
7   marked because of what?
8   A.   Because Chewy didn't run off and -- so until the
9   shots were fired.
10  Q.   So Chewy didn't run off until after he was shot is
11  that the way it should have been?
12  A.   Well, I mean the I heard the gunshots, I didn't know
13  if he had gotten shot or not.  I was looking straight at him,
14  he took steps back and he turned around and ran.  So I mean, I
15  didn't know if he was shot or not.
16  Q.   But let's go back to that sentence, he didn't run off
17  just because you -- you heard the cop?
18  A.   No.
19  Q.   Okay.  Now, then, the next sentence says a female
20  officer came up to me -- or up on me and told me to get up and
21  go back through the tunnel and told me not to try and run.
22  Now why is that marked?
23  A.   Because of the order that they put it in.
24  Q.   Okay, that did happen?
25  A.   Yes.

122

1    Q.    But it didn't happen right when the male officer came
2  through the tunnel; is that correct?
3    A.    It happened after.
4    Q.    Okay.  So the female officer came after the shooting
5  had been done; is that correct?
6    A.    Yes.
7    Q.    Okay.  Now, then the next sentence that you marked
8  was, I didn't see the shooting, and I don't know who shot
9  first.  Now that is marked because of what?
10    A.    Because the cop was shooting right over me.
11    Q.    So you did see the shooting?
12    A.    Yes.
13    Q.    See the shooting?
14    A.    Yes.
15    Q.    In regard to who shot first, I believe it was your
16  testimony that Chewy didn't have a gun and he didn't shoot; is
17  that right?
18    A.    Yes.
19    Q.    So except for the places that you have -- that you
20  have marked the statement is correct as you remember it, but
21  you are disavowing those other parts; is that correct?
22    A.    Yes.
23    Q.    Now, then, in regard to that statement, it is your
24  testimony that you didn't read it before it was signed; is
25  that correct?

123

1    A.    Yes.
2    Q.    And that you didn't write that?
3    A.    That's correct.
4    Q.    You found out later that Chewy had in fact been taken
5  to the hospital and that he died of his injuries; is that
6  correct?
7    A.    Yes.
8    Q.    Now, then, on June 22nd of 2002, would Chewy have
9  been about 22 years old?
10    A.    Yes.
11    Q.    And his name was Jesus Ortiz?
12    A.    Yes.
13    Q.    And he would have been about five, five; is that
14  correct?
15    A.    Yes, about five, five.
16    Q.    Pardon?
17    A.    Yes.
18    Q.    Okay?
19          MR. BRAUCHLE:    Your Honor, we would proffer
20  Defendant's Exhibit 20, which is the autopsy report for Jesus
21  Ortiz.  We would also proffer to the Court that we would have
22  recalled Dr. Townsend-Parchman who performed the autopsy on
23  June 22nd of 2002.  And that she would have testified that
24  Jesus Ortiz was killed by a single gunshot wound to the upper
25  left buttock.  And that her opinion was that Jesus Ortiz, a

124

1  22-year-old Latin male died as a result of a gunshot wound to
2  the trunk and that death was a homicide.
3          MR. BROOKS:    No objection.
4          THE COURT:    Defendant's Exhibit 20 is admitted
5  as well as the additional proffer made by the Defense.
6          MR. BRAUCHLE:    And we would pass the witness
7  once again.
8          MR. BROOKS:    No other questions from this
9  witness, Your Honor.
10          THE COURT:    You may step down, ma'am.
11          MR. JOHNSON:    May she be excused?
12          MR. BROOKS:    No objections.
13          THE COURT:    You are free to go, you are excused.
14  You may call your next witness, Mr. Brauchle.
15          MR. JOHNSON:    Karlous Lake.
16          MR. BRAUCHLE:    Before they go into the next
17  witness, I need to put a proffer.
18          Judge, I would like to offer the following proffer that
19  the State would have introduced through Officer Jason Johnston
20  that he was present at the scene when the deceased in this
21  case made the statement -- or when asked, Where is your gun?
22  And he stated that he had a 9 millimeter and he had dropped it
23  back where he had run from.  We would have then called
24  Sergeant Steven Bishop, who would have stated that he asked
25  the suspect what kind of gun he had?  And the suspect stated,

125

1  and the suspect being Mr. Ortiz, the suspect stated he had a 9
2  millimeter.  We would have also offered testimony of either
3  Detective Blank or Detective Vineyard that the following
4  morning at that crime scene a 9 millimeter handgun was
5  recovered with a round stove piped in the chamber.  We would
6  also establish that the rounds fired by Officer Nix matched up
7  to his gun.  And the round fired from that handgun, the
8  cartridge from that handgun, matched up as being fired from
9  that handgun being found in the creek bed.
10          We would also establish, Judge, that after investigation,
11  this use of deadly force was ruled as a justifiable use of
12  deadly force by Senor Corporal Mark Nix.
13          And we would have also by way of proffer, we would have
14  also have called Officer Maria Barker to testify as to the
15  circumstances under which this statement was given.  And that
16  this particular witness, Ms. Sosa was shown the statement,
17  read the statement and signed the statement after so reading
18  it.
19          MR. BRAUCHLE:    Your Honor, we are not clear as
20  to what the offer is in regard to bullets matching up.
21          MR. BROOKS:    Simply, Judge, the rounds fired by
22  Corporal Nix that evening were matched to his weapon.  As well
23  as there was a single cartridge that was found that matched up
24  to the empty casing that matched up to the 9 millimeter found
25  in the creek.

126

1     MR. JOHNSON:   Do you have a report that says
2  somewhere that they found that 9 millimeter?  Do you have a
3  report that says they found a cartridge?
4     MR. BROOKS:   I do.
5     MR. JOHNSON:   I have never seen it.
6     THE COURT:   Next witness.
7     MR. BRAUCHLE:   Karlous Lake.
8     (Witness entered the courtroom.)
9     THE COURT:   Let the record reflect that this
10 witness has previously been sworn.
11                    KARLOUS LAKE
12 was called as a witness, and having been duly sworn by the
13 Court, testified under oath as follows:
14                 SUB ROSA EXAMINATION
15 BY MR. JOHNSON:
16    Q.    State your name again for the record, please?
17    A.    Karlous Lake.
18    Q.    And, Mr. lake, how old are you today?
19    A.    Twenty-four.
20    Q.    You recall an indent that occurred back on March 13th
21 of 2005?
22    A.    Yes, sir.
23    Q.    Now, earlier today, I showed you a copy of a
24 statement that you gave regarding that incident, you had a
25 chance to review that?

127

1     A.    Yes, sir.
2     Q.    Now, after reviewing that, does it actually set out
3  what happened on that day in this event?
4     A.    Yes, sir.
5     Q.    Okay.  And on this date, March the 13th, 2005, were
6  you in Dallas County, Texas?
7     A.    Yes, sir.
8     Q.    And where were you that day?
9     A.    In Deep Ellum.
10    Q.    And did you have an occasion to encounter a police
11 officer, a Dallas Police Officer that you later found out was
12 Mark Nix?
13    A.    Yes, sir.
14    Q.    And what were the circumstances of that encounter?
15    A.    Basically I was with two friends Justin and Darius,
16 and we was coming out of a club called Majors in Deep Ellum.
17    Q.    What time was it?
18    A.    Probably about -- anywhere from 2:15, about 2:45
19 somewhere between there, clubs close at 2:00.
20    Q.    Back on March 15th 2005, how were you employed?
21    A.    U.S. Marine Corps.
22    Q.    And your two friends, how were they employed?
23    A.    U.S. Navy and U.S. Army.
24    Q.    As y'all leave this club and as you said it is about
25 two o'clock, what do y'all do when you leave the club?

128

1     A.    Essentially just walking back to the car trying to
2  figure out whether or not we are going to go get something to
3  eat or we are going to meet up with some friends later on.
4     Q.    Were there other individuals, other people, even
5  strangers to you that were out there on the streets as well?
6     A.    Yes, sir.
7     Q.    Now, at some point did you have some intersection
8  with some Dallas Police Officers?
9     A.    Yes, sir.
10    Q.    And how did that happen?
11    A.    Basically I was walking, heading back to my car or
12 heading -- or heading back to see what was going on with my
13 friends, cause they stopped briefly.
14    Q.    Okay, why had they stopped?
15    A.    They was talking on the cell phones trying to figure
16 out if they were going to get up with some girls or not.
17    Q.    Okay.  So they had stopped?
18    A.    And once they stopped.  I was talking and I didn't
19 notice they stopped until I actually turned around.  So when I
20 turned around, I saw about six Dallas Police Officers standing
21 in like a huddle and they was like let's go, hurry up, get
22 home before your curfew.
23    Q.    Who was saying that?
24    A.    It was a cop I don't -- I can't remember his name.
25    Q.    It was one of the Dallas Police Officers saying that?

129

1     A.    Yes, yes, sir.
2     Q.    Were they saying that to anybody in particular?
3     A.    No.  I guess they were talking to the general public,
4  I guess.  I am not from here, so I asked the question and the
5  question was, What time is curfew?
6     Q.    And you were in the military?
7     A.    Yes, sir.
8     Q.    Does curfew mean something to somebody in the
9  military?
10    A.    Yeah.  If you get caught doing something you don't
11 have no business doing, it does.  But other than that, not
12 really.
13    Q.    So what was the question you asked?
14    A.    I asked them what time was curfew.
15    Q.    And why did you ask them that question?
16    A.    Cause I just wanted to always keep myself in a
17 position where I -- I have my nose clean while I was in
18 service.
19    Q.    So it was a legitimate question in your mine?
20    A.    Yes, sir.
21    Q.    And it wasn't a smart question?
22    A.    Oh, no sir.
23    Q.    You just wanted to know what specifically they were
24 talking about?
25    A.    Yes, sir.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

130

1   Q.   And what was the response?

2   A.   His -- one of the officers response was, your curfew

3   is whenever I tell you to go home.

4   Q.   Okay.

5   A.   And --

6   Q.   And then what did you do after you were told that?

7   A.   During this time I am still walking back to my car,

8   while I am talking back to the officer.  And I turned around,

9   Well, I don't have a curfew.  And I kept on walking.

10   Q.   All right.  And then what happened?

11   A.   And then I heard some footsteps coming up from behind

12   me and I turned around and Officer Nix shot me with a taser.

13   And I threw my hand up and he shot me with a taser.

14   Q.   You say your hands are up?

15   A.   Yes, sir.

16   Q.   You hear footsteps and you turn?

17   A.   Yes.

18   Q.   And what do you see?

19   A.   I see an officer with his taser out.

20   Q.   And did you say that you raised your hands?

21   A.   Yes.

22   Q.   Why did you raise your hands?

23   A.   Just to show that I wasn't resisting, I wasn't trying

24   to cause any problems.

25   Q.   You basically put your hands up like, almost like a

131

1   surrender; is that right?

2   A.   Yes.

3   Q.   I don't want any trouble, I don't want any problems?

4   A.   Basically.

5   Q.   And what happened then?

6   A.   And I asked him, I say, are you going to tase me, and

7   he tased me and that's when I fell to the ground and then --

8   Q.   Let me stop you there.  So you asked him, you asked

9   this individual, of course at that time you didn't know his

10   name?

11   A.   No.

12   Q.   You asked him, Are you going to tase me; is that

13   correct?

14   A.   Yes.

15   Q.   All right.  And in response to that, what did he do?

16   A.   He shot me.

17   Q.   He shot you?

18   A.   Yes, sir.

19   Q.   With the taser?

20   A.   Yes, sir.

21   Q.   Did it hit you?

22   A.   Yes, sir.

23   Q.   And what happened when it hit you?

24   A.   I really just fell to the ground and was, you know

25   dropping like a fish out of water so to speak.

132

1   Q.   Prior to you being tasered by this officer, had you

2   done anything to provoke this?

3   A.   No.

4   Q.   Had you done anything that might have been taken as

5   being threatening?

6   A.   Not to my knowledge.

7   Q.   You didn't make any aggressive moves toward him?

8   A.   No, sir.

9   Q.   In fact, you were walking away; is that correct?

10   A.   Yes, sir.

11   Q.   Now, to you was this basically an unprovoked attack?

12   A.   Yes.

13   Q.   Now, after you fall to the ground, what happens next?

14   A.   They turn me over and they zip tie me so to speak.

15   And then they bring me up and they put me against the fence.

16   And officer by the name of Sims, last name Sims, I asked him,

17   once he put me against the fence, I asked him, I asked him,

18   basically why you shot me, why you tasered me in so many

19   words.  Then he said because you wouldn't stop.  And then I

20   asked him, I was like, When did you tell me to stop.  And then

21   he said, I told you to stop and you refused to stop.  And I

22   said, Well, I didn't hear you, because being in Deep Ellum, it

23   is clubs.

24   Q.   Let me stop you for a minute, when he says that you

25   didn't stop, were you -- were you running away?

133

1   A.   No.

2   Q.   I mean you were actually just walking away from him;

3   is that correct?

4   A.   Yes.

5   Q.   And as far as you know, nobody asked you to stop, did

6   they?

7   A.   Right, to my knowledge.

8   Q.   You hadn't done anything that you would have thought

9   they might have --

10   A.   No, sir.

11   Q.   Had any lethal or lawful reason to ask you to stop?

12   A.   No, sir.

13   Q.   You were just minding your own business, walking

14   away; is that correct?

15   A.   Yes, sir.

16   Q.   So -- so after -- after Sims tells you that, what do

17   you say to him?

18   A.   I asked him why did he shoot me.  And then I asked

19   him why he shot me, and he told me cause you didn't stop.  You

20   refused to stop.  Then I asked him, how many volts -- voltage

21   was in the taser?  And he told me 50,000.  And I told him, I

22   say, I asked him, you shot me with 50,000 volts.  He said,

23   Yeah, because you wouldn't stop.  And then I proceeded to ask

24   him, why did he taser me.  And like I said, he said that I

25   didn't stop.  So I injected that he tased me because of my

1   skin color.
2      Q.   Let me back you up a little bit.  Did they at some
3   point check your pockets?
4      A.   Yes.
5      Q.   And what did they take out of your pocket?
6      A.   They found my military I.D.
7      Q.   That would be -- you are in the Marines, correct?
8      A.   Yes.
9      Q.   So this is your I.D. that shows you are in the U.S.
10  Marines; is that correct?
11     A.   Yes.
12     Q.   Was anything said about that?
13     A.   Yes.  He told me that -- he say, you are a Marines,
14  huh?  I said, Yes I am.  And he say, Well, we don't need your
15  kind in the Marine Corps.  I said, What's my kind.  Then he
16  said, We don't need your kind in the Marine Corps.  I was like
17  what is my kind, being black.  And he didn't respond.  He said
18  No, basically just -- it kind of -- it kind of hurt me in a
19  way, because I did my service to this country.
20     Q.   For the record, you have an African-American, right?
21     A.   Yes.
22     Q.   And that's what you meant by being black?
23     A.   Yes.
24     Q.   So you were offended by the fact that he would say
25  they didn't need your kind in the Marines; is that right?

135

1      A.   Yes.
2      Q.   Did you have any difficulties after you got tasered,
3   physical difficulties that evening as a result of that being
4   tasered?
5      A.   Yes, I actually have marks -- I took pictures
6   whatever reasons, I don't know, I still have the pictures, I
7   don't --
8      Q.   You still have some scars from this; is that correct?
9      A.   Yes.
10     Q.   What I am talking about as far as other difficulties
11  that night, did the effects of the taser actually cause you to
12  have problems as far as your ability to stand?
13     A.   Oh, yes.
14     Q.   And other things that evening?
15     A.   Yes.  It was hard -- you know after you get tasered
16  with 50,000 volts, it is kind of hard to pop back up and
17  regain standing, I was kind of weak, yeah, I would say.
18     Q.   Were the officers trying to demand that you stand up?
19     A.   Yes.
20     Q.   And were you able to do that?
21     A.   No.
22     Q.   What happened as a result of your inability to get up
23  as in the condition that you were in as a result of that
24  taser, how did they treat you at that time?
25     A.   Well, when I was on the ground, it was officers

136

1   around me, Officer Nix, he didn't kick me, but the other
2   officers did.  And he was standing around allowing it to
3   happen.  And they told me that I deserved an Oscar.  And I
4   should be in Hollywood because I was faking it pretty much.
5      Q.   Did you eventually fall down, black out?
6      A.   Yes.
7      Q.   And that was a result of this tasering attack; is
8   that correct?
9      A.   Yes.
10     Q.   Did they tell you if you didn't get up, they were
11  going to drag you?
12     A.   Yes.
13     Q.   And did they do that?
14     A.   Yes, sir.
15     Q.   Did you -- what did they do, what did they drag you
16  to?
17     A.   To the van, the van that they take you -- I don't
18  know the name of it.
19     Q.   Paddy wagon?
20     A.   Yeah.
21     Q.   Something they take you to jail in?
22     A.   Yes.
23     Q.   Did they throw you in the jail?
24     A.   Yes.
25     Q.   What happened to your two friends, what happened to

137

1   them?
2      A.   They went to jail with me as well.  Darius, he went
3   to jail with me, as well as Justin.  But Justin, he was
4   alcohol free, he wasn't drinking or anything, but they charged
5   him to my knowledge.  They charged Darius and Justin with the
6   same charge.
7      Q.   With public intoxication?
8      A.   Yes, sir.
9      Q.   Were you intoxicated?
10     A.   No, sir.
11     Q.   You actually went to court over that public
12  intoxication charge; is that correct?
13     A.   Yes, sir.
14     Q.   And you were not convicted of that, were you?
15     A.   No, sir.
16     Q.   In fact the charges were dropped?
17     A.   Yes, sir, it was dismissed.
18          MR. JOHNSON:  Pass the witness.
19          THE COURT:  Cross-examination, Mr. Brooks.
20              SUB ROSA EXAMINATION
21  BY MR. BROOKS:
22     Q.   Mr. Lake, if I understand correctly, you had been in
23  a club that night?
24     A.   Yes, sir.
25     Q.   And how long had you been out clubbing that night?

138

1   A.   Probably got there about 12:15, 12:30.
2   Q.   And approximately 2:45 you were outside when all
3   these events allegedly take place?
4   A.   Approximately, yes.
5   Q.   And while you were in the club, you consumed alcohol?
6   A.   One beer.
7   Q.   One beer over two hour?
8   A.   Yes.  I am not a drinker.
9   Q.   And nonetheless you were placed under arrest for
10  public intoxication?
11  A.   Yes, sir.
12  Q.   Is that a fair statement?  Now you have given
13  testimony about the events of that night, specifically, you
14  made reference to the taser being 50,000 volts; you recall
15  that?
16  A.   Yes, sir.
17  Q.   And do you recall making the statement that I am a
18  marine, I can take 50,000 volts?
19  A.   No, sir, I don't recall making that statement.
20  Q.   You are not denying that you made that statement?
21  A.   I am not denying that I made that statement but I
22  can't recall it.
23  Q.   And you also after you filed your complaint, you
24  recall receiving a letter may March of 2006 from the city of
25  Dallas?

139

1   A.   No, sir.
2        MR. BROOKS:   May I approach, Your Honor.
3   Q.  (By Mr. Brooks)   What was your address in
4   Texas back then?
5   A.   Ah, ah, I was in Fort Worth, Bianca Circle, I can't
6   remember the first digits, the digits.
7   Q.   6100 sounds familiar?
8   A.   Yes, 6100.
9   Q.   Bianca Circle?
10  A.   Yes.
11  Q.   Apartment 177?
12  A.   Yes.
13  Q.   Did you ever see this letter?
14  A.   No, sir, I don't recall receiving that letter.
15  Q.   And when you listed this address, is this your
16  hometown address, is this just where you were staying while
17  you were stationed here in metroplex?
18  A.   This is where I was staying while I was stationed
19  here.
20  Q.   And you would when you deployed somewhere else, you
21  would give a forwarding address, wouldn't you?
22  A.   If you were deploying permanently, yes.
23  Q.   I am talking about to the post office, so the mail
24  you were receiving in Fort Worth, you would have left a
25  forwarding address so that mail would catch up with you,

140

1   wouldn't you?
2   A.   Yeah, you could say I would.
3   Q.   And at any point in time, did you contact the city of
4   Dallas to find out the status of your complaint?
5   A.   No, I didn't.
6   Q.   And even though you have as you testified to today
7   these injuries, these permanent injuries and you still vividly
8   front of these events, you never took the time to find out what
9   happened to the complaint that you filed?
10  A.   I spoke to a lawyer.  After speaking to a lawyer, he
11  told me that my injuries were not severe enough to file a
12  lawsuit against the city of Dallas.  And that's what I was
13  trying to do because I fell like me use excessive force with
14  me.
15  Q.   My question was, you never took the time to contact
16  the city of Dallas and find out what happened -- or what was
17  the status of your complaint, did you?
18  A.   No, due to the not receiving that letter, not at all.
19       MR. BROOKS:   Thank you, sir, pass the witness.
20       MR. JOHNSON:   Nothing further.
21       THE COURT:   You may step down, sir.
22       MR. JOHNSON:   May he be excused Your Honor?
23       MR. BROOKS:   No objections.
24       THE COURT:   You are free to go, sir.
25       MR. JOHNSON:   Mr. Lake, thank you.

141

1        THE WITNESS:   Thank you.
2        MR. BROOKS:   Judge, I would like to add my
3   proffer what the State would have had in response to his
4   testimony.
5        THE COURT:   You may.
6        MR. BROOKS:   We would have called Officer
7   Sims -- hold on one second, Judge, I just had the statement in
8   front of me -- I'm sorry, Judge.  We would have had Sergeant
9   William Sims, who would have testified that he was working in
10  Deep Ellum on bike patrol on March the 14th 2005.  As he
11  rode past Mr. Lake, Mr. Lake shouted at them I am a grown man
12  I ain't got no curfew.  He would have also testified that
13  Mr. Lake through his words and actions indicated that he would
14  not apply with verbal directions.  That Officer Nix told
15  Mr. Lake he was under arrest for public intoxication, lie down
16  on the ground, Mr. Lake then faced Officer Nix, raised his
17  arms out to the side and yelled, You can't hurt me with a
18  taser, I am a Marine.  Officer Nix again ordered Mr. Lakes to
19  get on the ground and he respond by bringing his arms in front
20  of his body and he approached Officer Nix.  And at which point
21  Officer Nix fired his taser.
22       We would have also offered by proffer, we would offer the
23  testimony of Jim Broyal, he would have testified that he was
24  part of the ambulance team that was called to the scene.  And
25  that when they arrived, they noticed Mr. Lake being very

1   verbally abusive to the officers and that they recalled
2   Mr. Lake saying -- or he recall specifically Mr. Lake saying,
3   I am a Marine and I can take 50,000 volts.  And that the
4   arresting officers were very well-mannered and professional
5   the way they conducted their business with Mr. Lake.
6       Again had Defense evidence been presented to a jury, this
7   is the evidence we would offered to impeach their witnesses.
8           THE COURT:   Very well, Mr. Brooks.
9       Anything further from either side?
10          MR. BRAUCHLE:   Mr. Lake -- on Mr. Lake?
11          THE COURT:   Anything.
12          MR. BRAUCHLE:   Well, we have about I think five
13  more proffers, but it is five o'clock in the afternoon.  We
14  would ask leave to present them in the morning.
15          THE COURT:   Through witnesses or.
16          MR. BRAUCHLE:   No, there is not going to be any
17  live witnesses that we know of.  We still got subpoenas out,
18  we are still endeavoring to bring the live witnesses in, but
19  failing in that, we will proffer --
20          THE COURT:   Well, we can proceed with the
21  proffers now.
22          (Recess taken.)
23          (Court recessed for the day.)
24
25

1   THE STATE of TEXAS )
2   COUNTY of DALLAS  )
3           I, BELINDA G. BARAKA, Official Court Reporter in and
4   for the 194th Judicial District Court of Dallas County, State
5   of Texas, do hereby certify that the foregoing contains a true
6   and accurate transcription of all portions of evidence and
7   other proceedings requested in writing by counsel for the
8   parties, to be included in this volume of the Reporter's
9   Record, in the above-styled and -numbered cause(s), all of
10  which occurred in open court or in chambers and were reported
11  by me.
12          I further certify that this Reporter's Record of the
13  proceedings truly and correctly reflects the exhibits, if any,
14  admitted by the respective parties.
15          I further certify that the total cost for the
16  preparation of this Reporter's Record  was paid by the
17  State/Defense.
18          WITNESS MY OFFICIAL HAND this the 30th day of
19  May, A.D., 2009.
20
21
22
23
BELINDA G. BARAKA, CSR #5028
Official Court Reporter
133 N. Industrial
24
Dallas County, Texas 75207
25  Certification Expires:  12-31-09

CAUSE NO. F07-50318-M

THE STATE OF TEXAS                *     IN THE DISTRICT COURT

vs.                               *     194TH JUDICIAL DISTRICT

WESLEY LYNN RUIZ                  *     DALLAS COUNTY, TEXAS


- - - - - - - - - - - - - - - - - - - - - - - - - -


REPORTER'S RECORD

JURY TRIAL

Volume 47 of 59 Volume(s)


- - - - - - - - - - - - - - - - - - - - - - - - - -


        BE IT REMEMBERED THAT on this the 4th day of June,
A.D, 2008, the above-styled and -numbered cause(s) came on for
hearing before the HONORABLE ERNEST B. WHITE, III, of the
194th Judicial District Court of Dallas County, State of
Texas, the following is a true and correct transcription of
the proceedings had, to-wit:

   (Proceedings Reported by Computerized Machine Shorthand)

Belinda G. Baraka, Official Court Reporter
214-653-5803

```
1                        A P P E A R A N C E S

2

3    HON. KEVIN BROOKS
     Assistant District Attorney
4    State Bar No. 03070735

5

6    HON. ANDY BEACH
     Assistant District Attorney
7    State Bar No.  01944900

8                              FOR THE STATE OF TEXAS

9

10   HON. PAUL BRAUCHLE
     Attorney at Law
11   State Bar No. 02918000

12

13   HON. WILLIAM JOHNSON
     Attorney at Law
14   State Bar No.  10804500

15                              FOR THE DEFENDANT

16   Also Present:

17    Doug Parks, Attorney at Law

18

19

20                      *  *  *  *  *

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                        I N D E X

 2                                              PAGE/VOL.

 3    Proceedings - 06/04/08 ........................... 6/47

 4    DEFENSE'S WITNESS    Direct    Cross     S.Rosa

 5     WESLEY RUIZ          9, 57    25, 60    7

 6    Defense Rests Case In Chief ......................    62

 7    STATE'S WITNESS      Direct    Cross     S.Rosa

 8     HOWARD JOHNSON       62

 9    Hearing ..........................................    65

10    STATE'S WITNESS                          S.Rosa

11     HOWARD JOHNSON                          65, 67

12    Argument by - Mr. Beach ..........................    76

13    Argument by - Mr. Brauchle .......................    76

14    Argument by - Mr. Johnson ........................    79

15    Argument by - Mr. Parks ..........................    79

16    Ruling ...........................................   '80

17    STATE'S WITNESS      Direct    Cross

18     HOWARD JOHNSON       81, 87    86

19     PATRICK STARR        88

20    State Rests on Rebuttal ..........................    90

21    Jury Charge Requests .............................    90

22

23    Reporter's Certificate ...........................   105

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                    E X H I B I T   I N D E X
 2    STATE'S EXHIBIT(S):        OFFERED:   ADMITTED:  VOL.
 3    104   Letter                  32         33        47
 4    105   Letter                  32         33        47
 5    106   Letter                  32         33        47
 6    107   Letter                  32         33        47
 7    108   Letter                  32         33        47
 8    109   Letter                  32         33        47
 9    110   Letter                  32         33        47
10    111   Letter                  32         33        47
11    113   Letter                  32         33        47
12    114   Photograph              50         50        47
13    115   Photograph              50         50        47
14    116   Photograph              89         89        47
15
16
17
18
19
20
21
22
23
24
25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

1                            E X H I B I T     I N D E X

2    DEFENSE'S EXHIBIT(S):              OFFERED:    ADMITTED:  VOL

3      21    Ofr's Typewritten Notes    77           77         47

4      22    Purposed Charge             93                     47

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

PROCEEDINGS

(June 4, 2008)

1
2
3    THE BAILIFF:   All rise, please.
4    (Jury entered the courtroom.)
5    THE COURT:   You may be seated.
6    Mr. Brauchle, your next witness.
7    MR. BRAUCHLE:   May we approach, Your Honor.
8    (Following proceedings had at the Bench.)
9    MR. BRAUCHLE:   The defendant is going to
10   testify, I think we need to get certain waivers on the record
11   before he does.
12   THE COURT:   And we didn't do that before the
13   jury came in because?
14   MR. BRAUCHLE:   I didn't know the jury was coming
15   in.
16   THE COURT:   Ladies and gentlemen, we are going
17   to take about a ten-minute break.
18   (End of bench conference.)
19   THE BAILIFF:   All rise, please.
20   THE COURT:   You may be seated.
21   Outside the presence of the jury and on the record.
22   MR. BRAUCHLE:   We will call Wesley Ruiz.
23   THE COURT:   Take the stand, sir.
24   (Defendant complies.)
25   THE COURT:   If you will raise your right hand.

7

1    (Defendant was duly sworn.)
2    WESLEY LYNN RUIZ
3    was called as a witness, and having been duly sworn by the
4    Court, testified under oath as follows:
5    SUB ROSA EXAMINATION
6    BY MR. BRAUCHLE:
7    Q.    State your name, please.
8    A.    Wesley Lynn Ruiz.
9    Q.    You are the defendant in this cause; is that correct?
10   A.    Yes, sir.
11   Q.    And we have discussed with you, your attorneys, that
12   you have an absolute right under all the laws that are
13   applicable to not testifying, to remain silent; are you aware
14   of that?
15   A.    Yes, sir.
16   Q.    And we have discussed with you whether you should
17   invoke your right to remain silent or to testify on your own
18   behalf, have we talked with you in that regard?
19   A.    Yes, sir.
20   Q.    You understand the -- for want of a better adjective,
21   the perils and pitfalls of you testifying in your own behalf
22   as well as the advantages of testifying in your own behalf?
23   A.    Yes, sir.
24   Q.    Have you weighed those in your own mind?
25   A.    Yes, sir.

8

1    Q.    And have you made an independent determination that
2    you wish to testify in your own behalf?
3    A.    Yes, sir.
4    Q.    Nobody has forced you or jowled you or told you in
5    any way that you have to or in fact we have told you that you
6    don't have to and we have left the decision entirely up to
7    you; is that correct?
8    A.    Yes, sir.
9    Q.    So if you waive your right to remain silent, that is
10   a decision made entirely by you; is that correct?
11   A.    Yes, sir.
12   Q.    Any questions or anything you would like to say at
13   this point in time?
14   A.    No, sir.
15   MR. BRAUCHLE:   That's it, Your Honor.
16   THE COURT:   Thank you, Mr. Brauchle.
17   Let's have the jury.
18   THE BAILIFF:   All rise, please.
19   (Jury returned to the courtroom.)
20   THE COURT:   You may be seated.
21   You may proceed, Mr. Brauchle.
22   MR. BRAUCHLE:   Thank you, Your Honor.
23   WESLEY LYNN RUIZ
24   was called as a witness, and having been duly sworn by the
25   Court, testified under oath as follows:

9

1    DIRECT EXAMINATION
2    BY MR. BRAUCHLE:
3    Q.    State your name, please, for the jury.
4    A.    Wesley Lynn Ruiz.
5    Q.    How old a man are you?
6    A.    I'm 28.
7    Q.    You have been sitting through this trial obviously
8    for a little over a week, and you understand that what you are
9    charged with and what the State's accusations against you are;
10   is that correct?
11   A.    Yes, sir.
12   Q.    Now, then, back on March 23rd of 2007, you recall
13   how it was that you ended up over on Bernal Street?
14   A.    Yes, sir.
15   Q.    Where was it that led you to be going southbound on
16   Stemmons Street, where were you coming from, Stemmons
17   Expressway?
18   A.    I was coming from a friend's house in North Dallas.
19   Q.    And who would that have been?
20   A.    Hector Martinez.
21   Q.    Now, then, you have heard testimony of you driving a
22   gray and red Chevrolet that day; is that correct?
23   A.    Yes, sir.
24   Q.    Where and how did you obtain that car?
25   A.    I picked it up from Hector, Hector's house.

10

1    Q.    When?
2    A.    That afternoon.
3    Q.    So the day of the offense?
4    A.    Yes, sir.
5    Q.    Now, had you ever driven that car before that day?
6    A.    No, sir.
7    Q.    You proceeded from Hector's house -- let me ask you
8    this, where did Hector live?
9    A.    He lived in North Dallas, off of 635 and Marsh Lane.
10   Q.    Do you recall the street?
11   A.    I don't remember the street.
12   Q.    And what time would you have left his house?
13   A.    I don't recall the time.
14   Q.    Can you give us an approximation?
15   A.    I guess probably 5:15, five o'clock.
16   Q.    Okay.  And so you headed southbound down Stemmons?
17   A.    Yes, sir.
18   Q.    How did you get to Stemmons, by going down 635?
19   A.    Yeah, jumped on 635 and went down to 35 and went
20   south.
21   Q.    All right.  And where did you exit if you did off of
22   Stemmons?
23   A.    I exited Mockingbird.
24   Q.    And when was the first time that you ever saw any
25   police that might be following you or interested in you?

11

1    A.    I didn't see any police until after I went under the
2    183 bridge.
3    Q.    And what police did you see then?
4    A.    Well, I saw a police pull in behind me a little after
5    I went under the 183 bridge.
6    Q.    And that would be going toward West Dallas?
7    A.    Going toward West Dallas, yes.
8    Q.    And what street would that have been on?
9    A.    Mockingbird Lane.
10   Q.    Now, you say you saw police, did you see one, two,
11   three, four, how many cars did you see?
12   A.    I saw one at first.
13   Q.    And did that car in any way turn on its lights or
14   siren or anyway try to intercept you?
15   A.    No, sir.
16   Q.    How far did you go before you saw any other police
17   cars?
18   A.    Um, kept going a little further, I think another one
19   pulled in before I went over the bridge, I believe before I
20   went over the bridge to go into West Dallas.  And then when I
21   came over the bridge, there was a light right there, and then
22   there is another police officer at the corner.  And I seen
23   another one coming my way from the opposite way and there was
24   another one coming off a street.
25   Q.    Okay.  Where would that light be, do you know?

12

1    A.    Canada Drive and Mockingbird, it turns into
2    Westmoreland right there, I think.
3    Q.    So how many police cars did you just testify to?
4    A.    At least five of them.
5    Q.    All right.  And when the light changed, what did you
6    do next?
7    A.    I proceeded through the light.  And I was in the left
8    lane at the time.  And when I went to the light I had -- I
9    kind of felt something was wrong so I got over in the right
10   lane just to see, because the cop was behind me, I was going
11   to see if he past me.
12   Q.    Did he past you?
13   A.    No, he pulled in behind me.
14   Q.    Is this the original police officer that you had seen
15   on the other side of 183?
16   A.    Yes, sir.
17   Q.    So that's the officer that first fell in behind you?
18   A.    Yes, sir.
19   Q.    At the point that you pulled over into the right-hand
20   lane on Westmoreland, were there any other police cars behind
21   you?
22   A.    Yes.  There was -- I believe there was one behind the
23   one behind and I saw the one coming -- that was parked on the
24   corner right there, he had pulled out too.  I could see him
25   pulling out as I was getting in the right lane.

13

1    Q.    Okay.  So at that point in time you know how many
2    parked cars would have been behind you?
3    A.    No.
4    Q.    More than one, though?
5    A.    Yes.
6    Q.    What happened next?
7    A.    Next the cop hit his lights.
8    Q.    This is the one behind you?
9    A.    Yes, sir.
10   Q.    What did you do when that happened?
11   A.    Well, I was going to pull over, but decided not to,
12   so I ran.
13   Q.    Did you do anything when the police officer first
14   turned on its lights?
15   A.    Kind of braked a little bit.
16   Q.    And where would that have been?
17   A.    I was still on, I guess, Westmoreland now, not that
18   far from the light, a couple of blocks maybe.
19   Q.    Okay.  And you slowed down?
20   A.    Yes, sir.
21   Q.    And then sped up?
22   A.    Yes, sir.
23   Q.    What did you do or where did you go then?
24   A.    I sped up, and I was going straight; and when I seen
25   Bernal, I took a right on Bernal.

14

1    Q.   Was that your planned designation in any way?

2    A.   Yeah.  I was going to try to -- I was going to try to

3  get away, and I knew that on the other side of West Dallas, I

4  knew they had like levy and stuff, tree areas, I was going to

5  try to get away.

6    Q.   Okay, you are familiar with that part of town?

7    A.   Yes, sir.

8    Q.   So in regard to getting away, what did you mean by

9  that with the trees and levy?

10    A.   I mean I was just going to try to get in a wooded

11  area or a place where I could run and hide, you know, get

12  away.

13    Q.   Jump out of the car and do that?

14    A.   Jump out of the car and run.

15    Q.   When you are driving down Bernal, did anything happen

16  in regard to you trying to flee from the police?

17    A.   Yeah, I ended up losing control of the car.

18    Q.   You have any idea why?

19    A.   Well, had some big rims on it, and the steering

20  wasn't that good.  I was going kind of fast, so I think it

21  just -- you know the car kind of rocked a little bit cause it

22  was a winding street and hit the tire and when it hit the tire

23  kind of lost control, the wheel wobble is what I mean.

24    Q.   Did you have any understanding that it had that

25  mechanical condition?

15

1    A.   No, I didn't.

2    Q.   Now, then, once the car spun out of control, what

3  happened next?

4    A.   When the car spun out of control, it like turned

5  around and it went backward up into like a driveway.

6    Q.   And then what happened?

7    A.   And then I hit -- I was trying to hit the brakes, you

8  know stop the car, and then I stopped and then I put it in

9  park, put the car in park.

10    Q.   Okay.  At that point in time, what did you think

11  would happen?

12    A.   I really didn't know what was going to happen.  I

13  just --

14    Q.   Well, you thought you would be arrested?

15    A.   I knew I would be arrested.

16    Q.   All right.  So -- so you are sitting there in the

17  car; is that correct?

18    A.   Yes, sir.

19    Q.   You know how long you sat there before the police did

20  anything?

21    A.   Seconds, not long at all.

22    Q.   And then what was the first thing you saw the police

23  do?

24    A.   I saw the cop car pull up in front of my car.

25    Q.   And what happened next?

16

1    A.   He jumped out of his car and, ah, had his gun pulled

2  out and started running at my car.

3    Q.   And what happened next?

4    A.   He started yelling at me, threatening me.

5    Q.   What did he yell?

6    A.   He said, ah, first he said -- he said, Freeze.  Then

7  he said, ah, he said, You try to run from me, mother fucker, I

8  am going to shoot you.  He said, You hear me.  He said, I am

9  going to kill you if you try to run.

10    Q.   At that point in time, had any of the other police

11  officers done anything?

12    A.   I believe another car -- another car pulled up beside

13  that car.  They were just -- had their guns drawn on me.

14    Q.   Do you know where those officers were at the time

15  that the officer was next to your car?

16    A.   I don't really remember all that good.  I just saw --

17  I mostly was looking at Mark Nix cause he was right there.

18  But I saw the other car beside him.  And I saw, you know one

19  of them behind his door with the gun drawn.  And the other

20  one, I don't remember where he was at the time.

21    Q.   What did Officer Nix do other than yell at you?

22    A.   He ran at my car with his gun and then -- and then I

23  heard gunshots.

24    Q.   Did you know where they came from?

25    A.   I figured they come from him or one of the other

17

1  cops.  I don't know, I just -- I just saw -- I saw glass

2  flying in my car.

3    Q.   And would this have been at or about the time that

4  Officer Nix was next to your car?

5    A.   Yes.

6    Q.   What did Officer Nix do next?

7    A.   After the glass came in the car?

8    Q.   Well, you don't know where the glass came from other

9  than gunshots; is that correct?

10    A.   Right.

11    Q.   Okay.  I was talking and you have seen the film

12  obviously, you know what the video camera show, I am wondering

13  in relation to him giving you these orders or saying what he

14  did to you, what did he do next?

15    A.   He, ah, fell down.

16    Q.   Well, was he ever beating on your window?

17    A.   In the video he was, yes.

18    Q.   Well, let's back up, then, what -- did he say what he

19  said before he was beating on the window, during the beating

20  on the window?

21    A.   Before he beat on the window.

22    Q.   Okay.  Did he say anything more to you while he was

23  beating on the window?

24    A.   I don't really remember at that point.

25    Q.   All right.  Was there -- but you say there were

18

1    gunshots coming in your car?
2        A.    Yes.
3        Q.    While he was beating on the window?
4        A.    Yes.
5        Q.    At that point in time, are you in fear for your life?
6        A.    Yes, sir.
7        Q.    Other than -- scratch that. Now, then, you had a
8    weapon in the car with you; is that correct?
9        A.    Yes, sir.
10       Q.    Where was that weapon?
11       A.    It was in the backseat of my car.
12       Q.    And where was it in the backseat of your car?
13       A.    It was behind -- it was behind the passenger's seat.
14       Q.    Was it on the floorboard or in the --
15       A.    It was in the seat.
16       Q.    And was it open -- out in the open or what?
17       A.    It was inside of the bag.
18       Q.    What kind of bag?
19       A.    Like a big gym bag.
20       Q.    All right. Now, then, in regard to the passenger's
21   seat, was the back of that seat up or slightly back or what
22   position was it in?
23       A.    It was kind of leaned back like somebody would sit
24   far back in the seat, you know (demonstrating).
25       Q.    Could you -- did you have any difficulty obtaining

19

1    access to the bag?
2        A.    A little bit, I had to reach behind the seat.
3        Q.    All right. And you took the gun out of the bag?
4        A.    Yes, I took the gun out of the bag.
5        Q.    Why did you have the gun with you that day?
6        A.    I was going to sell it to -- well, Hector -- I had
7    been trying to sell the gun, and Hector told me that they had
8    somebody who wanted to buy it from me. So I had took it to
9    him -- I had took it with me to his house.
10       Q.    And what happened about the sale?
11       A.    Well the guy wasn't there, the one that wanted to buy
12   it. He wasn't at the house.
13       Q.    So you took it back with you?
14       A.    I kept it with me.
15       Q.    Pardon?
16       A.    I kept it with me.
17       Q.    Now, then, when Officer Nix is there at the side of
18   your window, when the beating on the window first started, did
19   you know what that was?
20       A.    No.
21       Q.    Did you think that was gunshots also?
22       A.    Yes.
23       Q.    And during the time that beating on the window is
24   going on, you said you didn't remember if Officer Nix was
25   yelling at you further or not?

20

1        A.    I don't remember.
2        Q.    Okay, were you in fear for your life with this
3    over-all situation of him beating on the window or whatever he
4    was doing in the window in yelling at you that he is going to
5    kill you and the bullets coming into your car?
6        A.    Yes, sir.
7        Q.    What did you do next?
8        A.    I reached and grabbed the backseat for the gun. And
9    I pulled the gun over the seat. And I pointed it in his
10   direction and I fired the gun.
11       Q.    And that's the shot that came out of the rear
12   passenger's side window?
13       A.    Yes, sir.
14       Q.    What happened next?
15       A.    After that, another bullet came in the car and hit me
16   in the face, you know.
17       Q.    And what affect did that bullet have?
18       A.    It knocked me out.
19       Q.    So immediately after you fired the shot where were
20   you hit?
21       A.    I was hit in the face.
22       Q.    Can you show where?
23       A.    Right here in the face (indicating).
24       Q.    And that shot knocked you out?
25       A.    Yes, sir.

21

1        Q.    And when you remember anything next?
2        A.    The next thing I remember I had woke up and I heard
3    another officer yelling, he yelled, Mother fucker, you killed
4    a cop and he kept shooting me.
5        Q.    You have looked at the film, do you know who that
6    might have been or when that was?
7        A.    No, sir. I didn't really -- I didn't really just
8    look in that direction, I was kind of slammed over on my side
9    of the car (demonstrating). And I just kind of heard, you
10   know.
11       Q.    Did -- do you know how many times you got shot?
12       A.    I don't remember how many times exactly, at least
13   nine or ten times.
14       Q.    And did you ever move out of the driver's seat in
15   that car?
16       A.    No, sir.
17       Q.    You heard testimony about the SWAT team coming and
18   the doctor that administered to you out there, do you remember
19   any of that?
20       A.    No, not really. I remember -- I remember them
21   sticking something in my nose.
22       Q.    Is this the doctor?
23       A.    I believe so. I couldn't -- I wasn't really all
24   there, I couldn't really see nothing. I could hear some a
25   little bit. I could hear just a little bit.

1  Q.   Do you remember anything about being taken to

2  Parkland?

3  A.   No, sir.

4  Q.   And how many days were you in Parkland before

5  basically you, I guess for want of a better term, came back to

6  your senses?

7  A.   I don't even remember how many days I was there, sir,

8  I was out of it.  All I remember is them coming to get me to

9  take me to Lew Sterrett.  I woke up a couple of times, but I

10  never really kept track of how many days I was there.

11  Q.   Now, at the time that you shot at Officer Nix, was

12  there any question in your mind that your life was in danger?

13  A.   No, sir.

14  Q.   And it may be redundant, but did you shoot Officer

15  Nix for any other reason than your self-defense?

16  A.   No, sir.

17  Q.   Now, in regard to the situation out there on Bernal

18  Street, you were fairly well surrounded by police officers; is

19  that correct?

20  A.   Yes, sir.

21  Q.   Did you think that getting out of your car at any

22  time out there would be in your best interest?

23  A.   No, sir.

24  Q.   So basically you had nowhere to go outside your car

25  in this confrontation; is that correct?

1  A.   No, sir.

2  MR. BRAUCHLE:   We will pass the witness.

3  THE COURT:   Cross-examination.

4  MR. BROOKS:   May we approach, Your Honor.

5  THE COURT:   You may.

6  (Following proceedings had at the Bench.)

7  MR. BROOKS:   Judge, I -- on cross-examination

8  want to go into the fact that he was on probation out of this

9  court.  Additionally, he was on probation out of Tarrant

10  County.  He was on deferred probation, he was looking at five

11  years to 99 years.  I also intend to go into the fact that

12  seven days prior to this offense, he was pulled over by the

13  police and he ran and got away.  He has clearly opened the

14  door for all of that testimony with respect to his state of

15  mind and his motives that day.  By his testimony in front of

16  this jury right know, specifically, he was trying to get away

17  and run and hide.  He has successfully done that seven days

18  prior.

19  THE COURT:   You have time to read this?

20  MR. PARKS:   No, Your Honor.

21  MR. BROOKS:   I think it is relevant because in

22  his state of mind, he was successful in getting away once

23  before and he was trying the same exact thing in this

24  situation.

25  THE COURT:   I think my question is, and I

24

1  haven't read the case, he admitted, so what is the relevance

2  of it.

3  MR. BROOKS:   It goes to his stated of mind

4  because he was successful in getting away once before and he

5  was trying to get away again.

6  MR. BEACH:   Last question Paul asked him was if

7  you fired that shot for any other reason than self-defense.

8  And that opens up our ability to question his motive.  He

9  fired that shot because you were going to do whatever you

10  could to get away.

11  (End of Bench conference.)

12  THE COURT:   Ladies and gentlemen, let's take a

13  ten-minute break.

14  (Jury retired from the courtroom.)

15  (Recess taken.)

16  THE COURT:   You may be seated.

17  (Recess taken.)

18  THE COURT:   On the record.  The Court is going

19  to deny the request by the State.

20  Bring the jury in.

21  MR. BROOKS:   Before we do that, Judge, am I

22  allowed to discuss his Dallas County probation that he was on.

23  THE COURT:   Yes, you can do that.

24  MR. BRAUCHLE:   In light of that ruling, may we

25  reopen.

25

1  MR. BEACH:   No, you passed.

2  We will object to them reopening, Judge.

3  THE COURT:   You passed witness, Mr. Brauchle.

4  MR. BRAUCHLE:   All cards laid are played.

5  THE COURT:   I'm sorry?

6  MR. BRAUCHLE:   Never mind.

7  THE BAILIFF:   All rise, please.

8  (Jury returned to the courtroom.)

9  THE COURT:   You may be seated.

10  Cross-examination, Mr. Brooks.

11  MR. BROOKS:   Thank you, Judge.

12  **CROSS-EXAMINATION**

13  BY MR. BROOKS:

14  Q.   Mr. Ruiz, can you hear me okay?

15  A.   Yes, sir.

16  Q.   And you know who I am, don't you?

17  A.   Yes, sir.

18  Q.   And the people that know you outside of this building

19  call you Slow?

20  A.   Yes, sir.

21  Q.   And that's what you go by, that's your street name?

22  A.   It's a nickname I was given a long time ago.

23  Q.   And just so the record is clear, you have just

24  confessed to shooting and killing a Dallas Police Officer in

25  front of this jury, haven't you?

26

```
1      A.   I confessed in self-defense.
2      Q.   You confessed to shooting and killing a Dallas Police
3  Officer, Slow?
4      A.   No, sir.
5      Q.   So you did not shoot and kill that Dallas Police
6  Officer?
7      A.   I don't know if I killed him sir.
8      Q.   Don't know if you killed him?
9      A.   No, sir.
10     Q.   Now, also so that we are clear, you knew that those
11  were Dallas Police Officers behind your vehicle?
12     A.   Yes, sir.
13     Q.   Those were marked vehicles?
14     A.   Yes, sir.
15     Q.   You knew when Corporal Nix got out of his vehicle, he
16  was a Dallas Police Officer?
17     A.   Yes, sir.
18     Q.   You knew that when you pulled that trigger, you were
19  shooting at a uniformed peace officer?
20     A.   Yes, sir.
21     Q.   You also knew that -- going back to Westmoreland when
22  they hit those lights, that was a command for you to pull
23  over, you knew that?
24     A.   Yes, sir.
25     Q.   And you confessed to this jury that you made the
```

27

```
1  conscience decision to ignore that lawful command?
2      A.   Yes, sir.
3      Q.   And you also knew that when they ran up to the car
4  and were telling you to get out, that you made the decision to
5  stay in that car, didn't you?
6      A.   They never told me to get out of the car.
7      Q.   Sir, you made the decision to reach in that backseat
8  and pick up that weapon.
9      A.   Yes, sir, I made that decision.
10     Q.   And you made that decision to pick up that weapon,
11  you had the foresight of mind with bullets flying around you
12  to reach in the backseat and pick up that weapon?
13     A.   Yes, sir.
14     Q.   Now, let's be honest with this jury, Slow, you were
15  on the run that day?
16     A.   No, I wasn't, sir.
17     Q.   You were on probation out of this court for a felony
18  offense.
19     A.   Yes, sir.
20     Q.   You had not reported to probation since August of
21  2006?
22     A.   That's correct.
23     Q.   You knew that the probation department was looking
24  for you?
25     A.   No, sir.
```

28

```
1      Q.   You also knew that having a previous felony
2  conviction, you were in violation for having that gun in the
3  car?
4      A.   Yes, I knew that.
5      Q.   You also knew that by having those drugs in that car,
6  you were looking at a whole lot of time if you got revoked on
7  your probation?
8      A.   Yes, sir.
9      Q.   In fact, the conversation with Carmen Delgadillo,
10  with respect to, I am going to go out like a "G", that's how
11  those conversations came about?
12          MR. BRAUCHLE:   We will object to that as
13  being --
14          THE COURT:   Overruled.  This is
15  cross-examination.
16     Q.   (By Mr. Brooks)   Isn't that how the
17  conversation came about?
18     A.   No, sir.
19     Q.   Carmen knew you were on probation?
20     A.   No, she didn't, sir.
21     Q.   You never talked to her about probation?
22     A.   No, sir?
23     Q.   You never said I am going to go out like a "G".
24     A.   No, sir.
25     Q.   Would you ever use that type of language?
```

29

```
1      A.   No, sir.
2      Q.   Never.  Let me ask you, Slow.  Do you know a Richard
3  Ziegenhain?
4      A.   Yes, sir.
5      Q.   Lives at 1803 Bradford?
6      A.   Yes, sir.
7      Q.   Irving, Texas?
8      A.   Yes, sir.
9      Q.   And your book-in number is 07022486?
10     A.   Yes, sir.
11     Q.   Tank 3WSC113?
12     A.   Yes, sir.
13     Q.   500 Commerce Dallas, Texas, 75202?
14     A.   Yes, sir.
15     Q.   Do you know a Krystel Pacheco, 5888 Stretch Drive in
16  Dallas, Texas, 75211?
17     A.   Yes, sir.
18     Q.   Do you know a Jae Arr Jones?
19     A.   Yes, sir.
20     Q.   What is her address?
21     A.   I don't recall.
22     Q.   1121 Beachview, Apartment 6112 sound familiar?
23     A.   Yes, sir.
24     Q.   In Dallas, Texas, 75218?
25     A.   Yes, sir.
```

30

1    Q.   Do you know a Bernice Marquez?
2    A.   Yes, sir.
3    Q.   And where does she live?
4    A.   She lives somewhere in Arlington.
5    Q.   Arlington Texas?
6    A.   Yes, sir.
7    Q.   And when you write Bernice, do you send it to a home
8    address or to a P.O. box?
9    A.   A P.O. box.
10   Q.   Do you know a Violet Nieto?
11   A.   Yes, sir.
12   Q.   Where does she live?
13   A.   He she lives in West Dallas.
14   Q.   Chalk Hill Road?
15   A.   Yes, sir.
16   Q.   Do you know a Carmen Ruiz?
17   A.   No, sir.
18   Q.   You don't know Carmen Ruiz?
19   A.   No, sir.
20   Q.   On Ferguson Road, Apartment 104?
21   A.   No, sir.
22   Q.   Do you know a Christine Montes?
23   A.   Yes, sir.
24   Q.   Where does she live?
25   A.   She lives in Irving.

31

1    Q.   Did she formally live in Hutchins?
2    A.   Oh, yes, sir.
3    Q.   Any of the individuals that I just asked you if you
4    know, are they present in the courtroom today?
5    A.   Yes, sir.
6    Q.   Tell us who is present?
7    A.   Bernice Marquez.
8    Q.   That's the only one?
9.   A.   Yes, sir.
10         MR. BROOKS:   May I approach the witness, Your
11   Honor?
12         THE COURT:   You may.
13   Q.  (By Mr. Brooks)   And you certainly won't
14   deny that you have written those individuals while
15   you have been incarcerated?
16   A.   No, sir.
17   Q.   You do a lot of writing from your cell, don't you?
18   A.   Yes, sir.
19   Q.   Take a look at State's Exhibits 104, 105, 106, 107,
20   108, 109, 110, 111, and 113, are these letters that you have
21   written to those individuals from inside the Dallas County
22   jail?
23   A.   Yes, sir.
24   Q.   You recognize these letters?
25   A.   Yes, sir.

32

1    Q.   And these are letters that you wrote, Mr. Ruiz, this
2    is your handwriting?
3    A.   Yes, sir.
4          MR. BROOKS:   Your Honor with the exceptions of
5    State's 112 at this time, we will offer State's 104 through
6    113 inclusive.
7          MR. BRAUCHLE:   May we have a few minutes, Your
8    Honor?
9          THE COURT:   How many minutes do you need, Mr.
10   Brauchle.
11         MR. BRAUCHLE:   Probably about 15.
12         THE COURT:   Ladies and gentlemen, we will take a
13   15-minute recess.
14         THE BAILIFF:   All rise.
15         (Jury retired from the courtroom.)
16         (Recess taken.)
17         MR. BRAUCHLE:   Your Honor, we would object to
18   admission under obviously Rule 401 in that they are not
19   relevant as defined therein.  And they certainly should be
20   excluded under 403, if they are irrelevant.  And we would also
21   invoke Rules 402 and 404.  They certainly are not relevant
22   even under any of those rules.
23       I know that people think that since it is in the record
24   and the jury didn't see it, it is okay.  But we would object
25   to it being offered even in the record.

33

1          THE COURT:   Are they being offered?
2          MR. BROOKS:   Being offered for record purposes
3    at this time, Your Honor.  He has already identified them.
4          THE COURT:   We will overrule the objection.
5          MR. BRAUCHLE:   How does him identifying them
6    make them relevant?
7          THE COURT:   Overruled.  They will be admitted
8    for record purposes.
9          MR. BROOKS:   If I may be heard further?
10         THE COURT:   You may.
11         MR. BRAUCHLE:   Mr. Brooks went to the crux of
12   the problem, he approached him with a bundle of letters, they
13   were identified by the defendant.  And now that he is not
14   going to pursue them further and the taint is already before
15   the jury and admitting them for record purposes doesn't cure
16   that.  We would ask the Court for a definitive ruling.
17   Obviously by the State not even trying to put them in
18   evidence, they have conceded quite frankly we might be right.
19   And what the effect of that is, is that we are denied a ruling
20   to where the jury is instructed to disregard them.  And we are
21   hurt both ways.  They were put in, which we know they are not
22   relevant.  We would be hurt.  And by this action by the State,
23   we are hurt in that there is a false impression left with the
24   jury.  So...
25         THE COURT:   Response by the State?

**Page 34**

1    MR. BROOKS:   Yes, Judge.  The jury hasn't heard
2  anything with respect to these letters that would warrant an
3  instruction to disregard.  All they know that he has
4  identified the letters that he has written.  And now those
5  letters are being offered for record purposes.  And we will be
6  going into specific admissions by this defendant that are
7  contained within these letters.  Statements against interest.
8    MR. BRAUCHLE:   When?  If they intend to do that,
9  let it be known to the Court and let's find out if those
10  specific statements are relevant.  But, you know, the
11  procedure we are going through would be confusing for many
12  attorneys, let alone the jury over here.  Now you see it, now
13  you don't.  It is kind of a wink-and-a-nod deal.  And
14  obviously Mr. Ruiz is hurt by the implications and wrong
15  impression that it conveys to the jury.
16    MR. BROOKS:   Judge, it is no different than any
17  other evidence that has been offered for record purposes in
18  front of this jury that they have not seen.  It may be offered
19  at a later portion in trial.
20    MR. BRAUCHLE:   The only thing that has been
21  offered for record purposes that we know of is the autopsy
22  photo.  And we know the reason for that.  But this hocus
23  pocus, we want to put it in the record.  What else are they
24  going to trot in in front of the jury and then say, oh, no, we
25  really didn't mean that, we just going to put it in the

**Page 35**

1  record.  What is the record for?  They didn't ask for it to be
2  admitted and denied and that's usually the remedy for the
3  Court keeping evidence out against a party.  It is like if the
4  Court had ruled correctly, this would have been in evidence.
5  This deal hamstrings us in that there is -- there is not a
6  ruling from the Court.  And that is not your fault because
7  they seemed to have abandoned the intent.  There is no ruling
8  that says, yes, these are admissible or, no, it is not
9  admissible.  And so because of that quite frankly, the jury
10  has seen, I don't know how many letters, 12 or 14 I think, but
11  they have seen a bunch of letters and then suddenly they don't
12  see the letters anymore.  And that's prejudicial against our
13  client.  And quite frankly, I am not sure there is a good
14  remedy.  But we think there should be some instruction to the
15  jury in regard to the fact that they are not seeing them at
16  this point in time.
17    MR. BEACH:   Judge, this is not rocket science.
18  We have to get the defendant to authenticate that he is the
19  one that wrote these letters before we can get an admission by
20  a party opponent into evidence.  That's why we offered the
21  whole letter for record purposes and ask him about specific
22  admissions that he has now authenticated and admitted that he
23  wrote.  That's all we are talking about here.
24    MR. BRAUCHLE:   Well, speaking of rocket science,
25  all these letters have been sent to some scientist at the

**Page 36**

1  Department of Public Safety who I thought had authenticated
2  them as coming from my client.  As far as rocket scientist, I
3  think they have got his book-in number, et cetera, on the
4  envelopes.  So once again it is some sham pretext to prejudice
5  this defendant in front of the jury there.  Everything we saw
6  at best, and this is giving them a lot of credit, ideally it
7  might be relevant punishment evidence.  But it certainly is
8  not anything that should be trotted out at this stage.
9    THE COURT:   The Court will allow the exhibits to
10  be introduced for record purposes only at this time.  The
11  defendant may take the stand.
12    MR. BRAUCHLE:   I assume the Court notes our
13  exception.
14    THE COURT:   So noted Mr. Brauchle.
15    MR. BEACH:   Judge are you allowing us to ask him
16  about specific statements he made in those letters.
17    THE COURT:   You may.
18    MR. BRAUCHLE:   Wait a second, they are for
19  record purposes.  That doesn't mean that they can cross him
20  from them.  That's what I am saying.  If they are abandoning,
21  the scrutiny of the Court to look at what they are trying to
22  go to and see if, yes, that's relevant or, no, it is not
23  relevant, putting them in the record doesn't get around that.
24  You are still the gate keeper as to whether evidence is
25  relevant or not.  And whatever this mumbo-jumbo is, skirts

**Page 37**

1  you.  No one has brought a letter to you and said, hey, can we
2  put this in evidence.  And that's the purpose of -- objections
3  to evidence and then you ruling on them.  And I just I think I
4  talked about that.  They are skirting you.  And we don't get a
5  ruling as to whether they are in fact admissible.  You don't
6  even see them.
7    MR. BROOKS:   Judge, I believe we can ask him
8  about prior inconsistent statements or statements against
9  interest without having to make reference to the letter.
10    MR. BRAUCHLE:   How does that work?  There is no
11  basis for --
12    MR. BROOKS:   Did you ever say to so-and-so, yes
13  or no you said it.  You do it everyday down here.
14    MR. BRAUCHLE:   That implies a conversation that
15  didn't happen.  A letter is not did you say.
16    MR. BEACH:   Did you write to so-and-so, how
17  about that?
18    MR. BRAUCHLE:   I'm sorry, I gave them the help
19  on that.  Once again, by this process of not putting the
20  letters up to scrutiny by yourself, we think each and every
21  one of them is irrelevant.  They go to matters that are not
22  inconsistent.  And you know, you need to be able to --
23  presented with them and be able to rule on them, each one,
24  instead of this process of ploying back into them and saying,
25  well, these are just in for record purposes.  It just makes a

38

1   mockery out of the evidentiary system.
2                   THE COURT:   I will allow them -- the State to
3   question the defendant regarding statements made.  And I note
4   for the record your exception -- your objection.
5               MR. BRAUCHLE:   Well -- see -- are they copies
6   that we got in any way marked so that we will even know what
7   pseudoexhibit they are cross-examining our client from?
8               THE COURT:   Have you provided a copy to Defense
9   a marked copy.
10              MR. BROOKS:   We provided the Defense a --
11              THE COURT:   Do they have a marked --
12              MR. BROOKS:   No.  And actually they are not
13  marked, they are tabbed with specific references that we
14  intend to go to at some point during this trial.
15              THE COURT:   When you go into those references,
16  can you somehow let the Defense know which exhibit you are
17  referring to.
18              MR. BROOKS:   Yes, sir.
19              MR. BRAUCHLE:   Well, how about providing us with
20  a copy so that when they are referring to a certain exhibit,
21  which is not in evidence, it is in the record, we can look at
22  our copy and see if we want to object or not.  You know that
23  makes the problem even worse.  They ask the question from an
24  exhibit that we are not tendered at this point in time.
25              MR. JOHNSON:   And how are they going -- how is

39

1   the defendant going to know, if he doesn't have the letter?
2   Which is now not being introduced.  So it is a letter that is
3   not in evidence.  So how are we going to address that issue?
4               THE COURT:   Mr. Brooks, is there anyway that you
5   can label the exhibits so the Defense will know --
6               MR. JOHNSON:   I mean basically right now we have
7   a situation where they are not in evidence, but they are in
8   evidence.  And I don't know if you can have it both ways.
9               MR. BRAUCHLE:   They are eliciting testimony from
10  items not in evidence, which the Court is well aware that is
11  not allowed.  So...
12              MR. BEACH:   We can't go into statements by the
13  defendant, is that what you are saying, Paul, on the record?
14  He had a conversation with Carmen Delgadillo, we can't go into
15  that now?
16              MR. BRAUCHLE:   Well, that is not in the letter.
17              MR. BEACH:   What's a letter got to do with it if
18  he has authenticated he wrote the statement.  Whether it is a
19  conversation or written statement, he has authenticated it.
20              MR. BRAUCHLE:   Well, there is --
21              THE COURT:   Mr. Brauchle.
22              Is there anyway that the State can label the exhibits you
23  intend on cross-examining the defendant on?
24              MR. BEACH:   We can say, Judge, State's 104, the
25  letter to Richard Ziegenhain, written on 5-8-07, on page one

40

1   and take the letter to Wesley Ruiz and say, did you state this
2   in the letter.
3               MR. PARKS:   Judge, that doesn't address the
4   ultimate issue here, which is bootstrapping.  It's an attempt
5   to get or can be used as an attempt to get otherwise totally
6   inadmissible evidence before the jury by way of example.  I
7   don't suppose that they have such a thing.  But if they had a
8   letter that Mr. Ruiz had written someone saying he was the
9   Green River Killer, that would not in any way be admissible.
10  But if you allow them to say, did you ever write anybody, that
11  you are the Green River Killer, and he is either going to have
12  to say, yes or no.  And there is information extremely
13  prejudicial that is not in any other way admissible.  So
14  bootstrapping is a serious issue in testimony of this kind.
15              MR. BROOKS:   There is nothing that I intend to
16  ask him, Judge, at this portion of the trial that would be an
17  extraneous offense reflected in these letters.
18              MR. BEACH:   Well, they go to his credibility and
19  to his state of mind, period, that's why we are not offering
20  the letter.  Because there are punishment issues in the letter
21  that are not appropriate at this point in the trial.  That's
22  why we are not offering the letters in total, just specific
23  particular statements against interest that goes to his
24  credibility and goes to his state of mind at the time of the
25  shooting.

41

1               MR. PARKS:   And going to his credibility and
2   state of mind is going to require the jury to speculate as to
3   what the meaning of the statements are.  That's another level
4   of issue.
5               MR. BEACH:   That's why we are here.
6               THE COURT:   Mr. Brooks, when do you intend on
7   going into those issues?
8               MR. BROOKS:   I intend to do it while he is on
9   the stand this morning, Judge.
10              THE COURT:   And what issues do you intend on
11  questioning the defendant?
12              MR. BROOKS:   Judge, there is a letter to Krystel
13  Pacheo.
14              MR. BRAUCHLE:   May I interrupt you, does the
15  county have a budget enough to provide us with a copy of the
16  exhibit.
17              THE COURT:   We will get you a copy, let me see
18  what the state intend to elicit from the defendant.
19              MR. BROOKS:   A letter dated 5/9/2007 on page --
20  page six of the exhibit, the last paragraph, I miss you, girl,
21  so what's up with you.  Damn, it is hard to be a "G".  He
22  specifically denied ever calling himself or referring to
23  himself as a "G" in his testimony today.  That's one letter.
24              MR. PARKS:   What does that mean?
25              MR. BROOKS:   And there is another letter to

42

1    Richard Ziegenhain.  On the second page, I believe it will be
2    the third paragraph, where he references, And I do honestly
3    regret all of these bad decisions I have made, and God knows
4    that.
5                    THE COURT:   Those are the only two?
6                    MR. BROOKS:   Those are the only two, Judge.
7                    THE COURT:   Defense objections to that?
8                    MR. BRAUCHLE:   Well, once again we would still
9    like to be provided with copies of the exhibit.  And in regard
10   to the first purported excerpt, we would state that the proper
11   predicate obviously hasn't been laid in regard to that.  And
12   then once again, It is it hard being a "G", there is no
13   showing that that's in any way relevant to the issues here at
14   trial.
15                   MR. BROOKS:   Judge, his testimony from Carmen
16   Delgadillo, that it's hard to be a "G", "G" meaning that he
17   was going to shoot his way out of situations.  Reference to
18   "G" are clearly in evidence through Ms. Delgadillo.
19                   MR. BRAUCHLE:   I don't recall that at all.  And
20   was it on her redo or on her original --
21                   THE COURT:   I will allow the State to ask those
22   two questions that they refer to.
23              And, Mr. Brooks, if you will provide the Defense with a
24   copy of those letters so we can proceed.
25                   MR. JOHNSON:   For the record, the name Ziegen --

43

1    what is that name?
2                    MR. BEACH:   Ziegenhain.
3                    MR. JOHNSON:   There is nothing that we have been
4    given that has that name.  So that is certainly something we
5    have never seen before.  And I am not sure what that other
6    name was.  But I guess when we see them, we will be able to
7    look at them.
8                    THE COURT:   Those of you standing in the back of
9    the courtroom, you will either have to find a seat or come
10   back in when someone leaves.
11                   (Pause in the proceedings.)
12                   THE COURT:   Exhibits 104, 105, 106, 107, 108,
13   109, 110, 111, and 113 are admitted for record purposes only.
14                   MR. BRAUCHLE:   Is the Court aware of our
15   objection?
16                   THE COURT:   Court is aware.
17                   MR. BRAUCHLE:   I am not certain that we
18   indicated each and every one of them by name.  The numbers
19   that you just called out, you are aware that we are objecting
20   to each and every one of those under the same reasons that has
21   been propounded to the Court; is that correct?
22                   THE COURT:   Correct.
23                   MR. BRAUCHLE:   And your ruling is they will be
24   admitted for record purposes only; is that correct?
25                   THE COURT:   Yes, sir, at this time.

44

1                    THE BAILIFF:   All rise, please.
2                    (Jury returned to the courtroom.)
3                    THE COURT:   You may be seated.
4         You may proceed, Mr. Brooks.
5         Q.   (By Mr. Brooks)  Just so we get some of these other
6    matters on the record, Mr. Ruiz, you were placed on probation
7    in Cause No. F05- 56472 for the offense of possession of a
8    controlled substance, specifically methamphetamines with the
9    intent to deliver, and you pled guilty to that back May the
10   23rd of 2006; you recall that?
11        A.   Yes, sir.
12        Q.   And you were placed on probation, ten-year suspended
13   sentence probated for eight years?
14        A.   Yes, sir.
15        Q.   And at the time that you received that probation, you
16   stood in this courtroom before a judge and made certain
17   promises?
18        A.   Yes, sir.
19        Q.   You promised them that you were going to report as
20   ordered?
21        A.   Yes, sir.
22        Q.   And you were supposed to report monthly as ordered?
23        A.   Yes, sir.
24        Q.   You promised that you would not commit any new
25   criminal offenses?

45

1         A.   Yes, sir.
2         Q.   You promised that you would pay a fee each month?
3         A.   Yes, sir.
4         Q.   You promised that you would make restitution payments
5    each month?
6         A.   Yes, sir.
7         Q.   And less than six months later, you stopped following
8    through on those promises that you made to this Court?
9         A.   Yes, sir.
10        Q.   And whose decision was that to stop reporting back in
11   August of '06, that was your decision, wasn't it?
12        A.   Yes, sir.
13        Q.   Whose decision was it to ignore the orders of this
14   Court?
15        A.   Mine, sir.
16        Q.   Whose decision was it back on March the 23rd of
17   2007 to be in possession of a handgun?
18        A.   Mine, sir.
19        Q.   And whose decision was it to, knowing you are on
20   probation to nonetheless be in possession of that large
21   quantity of methamphetamine?
22                   MR. BRAUCHLE:   Your Honor, we would object to
23   the form of the question, in that it assumes facts not in
24   evidence.
25                   THE COURT:   Overruled.

1    Q.  (By Mr. Brooks)  Whose decision?

2    A.   Mine, sir.

3    Q.   Whose decision was it to ignore that lawful command

4  to pull over and stop the vehicle?

5          MR. BRAUCHLE:  Your Honor, once again we would

6  renew the previous objection, it assumes facts not in

7  evidence.

8          THE COURT:  Overruled.

9    Q.   (By Mr. Brooks)  In fact, Mr. Ruiz, you told this

10  jury, during questions by your attorney, that you decided not

11  to stop, you decided to run?

12    A.   Yes, sir.

13    Q.   You recall telling them that?

14    A.   Yes, sir.

15    Q.   Whose decision was it to hit that corner at Bernal at

16  that high speed and continue down?

17    A.   Mine, sir.

18    Q.   Now, at any point in time, you could have stopped

19  that vehicle and stopped any further thing that took place

20  that day, correct?

21    A.   Could have stopped the vehicle, yes, sir.

22    Q.   You could have stopped right there on Westmoreland,

23  correct?

24    A.   Yes, sir.

25    Q.   You could have stopped there at the corner of

---

1  Westmoreland and Bernal?

2    A.   Yes, sir.

3    Q.   You could have pulled over anywhere on any stretch of

4  Bernal and stopped?

5    A.   Yes, sir.

6    Q.   But as you told this jury, your decision was I am

7  going to try and get away?

8    A.   Yes, sir.

9    Q.   And why were you going to try and get away, Mr. Ruiz?

10    A.   Cause I had drugs with me.

11    Q.   And also because you knew certain levy and trees and

12  wooded areas that if you are able to get there, you would have

13  the opportunity to bail out and get away; isn't that what you

14  told this jury earlier today?

15    A.   Yes, sir.

16    Q.   You also knew that because of the drugs and the

17  weapon, that if you were arrested, you were certainly going to

18  prison, you knew that?

19    A.   Yes, sir.

20    Q.   Now, you told Carmen Delgadillo.  First of all, let

21  me ask you this, you don't deny that Carmen Delgadillo visited

22  you here in the Dallas County jail, do you?

23    A.   No, sir.

24    Q.   And you don't deny having conversations with Carmen

25  Delgadillo about what happened?

---

1    A.   Yes, sir.

2    Q.   You do deny that?

3    A.   Yes, sir.

4    Q.   So you deny telling Carmen Delgadillo that you

5  thought you were going to get shot?

6    A.   No, sir.

7    Q.   You deny telling Carmen Delgadillo that when the

8  officers ran up to the car, they scared you?

9    A.   No, sir, I told her that.

10    Q.   You told her that?

11    A.   I'm sorry, I just mean I didn't really discuss the

12  whole everything with her.

13    Q.   And you told Carmen Delgadillo that you shot him in

14  the chest?

15    A.   I told her I shot in the direction, I didn't know if

16  I shot in the chest or not.

17    Q.   You told the jury you shot in the chest?

18    A.   I shot in the direction.

19    Q.   And you told Carmen the gun jammed?

20    A.   No, I didn't tell her that.

21    Q.   When you told her that they ran up to you and you

22  were scared, that's a true statement on her part?

23    A.   Yes, it is.

24    Q.   Any other statement that doesn't help you, isn't a

25  truthful statement?

---

1    A.   I believe I saw a statement that I was sipping on

2  some lean, that was true.

3    Q.   That was true too?

4    A.   Yes, sir.

5    Q.   That statement that helps you is truthful, but none

6  of the other statements that hurt you are truthful?

7    A.   I am just telling you what I know, sir.

8    Q.   And in fact you were sipping on lean at that time?

9    A.   Yes, sir, I was.

10    Q.   And in fact you had other drugs in your pocket?

11    A.   Yes, sir, I did.

12    Q.   And tell the jury what lean is?

13    A.   It's codeine for sickness.

14    Q.   But you weren't sick that day, were you?

15    A.   No, sir.

16    Q.   Tell the jury why you were sipping on lean?

17    A.   Just to, I guess, to get high, I guess.

18    Q.   So we have got you traveling at a high rate of speed,

19  high-speed chase, intoxicated?

20    A.   Yes, sir.

21    Q.   And when you sip on lean, how do you do it?

22    A.   Um, you can mix it with like a soda, Sprite.

23    Q.   Like Sprite?

24    A.   Yes.

25    Q.   And you put it in a baby bottle?

50



| | |
|---|---|
| 1 | A.   Yeah. |
| 2 | Q.   And sip on it? |
| 3 | A.   Yeah. |
| 4 | MR. BROOKS:   May I approach, Your Honor? |
| 5 | THE COURT:   You may. |
| 6 | Q.   (By Mr. Brooks)   Slow, let me show you what is marked |
| 7 | as State's Exhibits 114 and 115; you recognize those items? |
| 8 | A.   Yes, sir, I do. |
| 9 | Q.   And these are items that were in your possession that |
| 10 | day? |
| 11 | A.   Yes, sir. |
| 12 | Q.   And these are items that not only were found in your |
| 13 | possession but also found inside that vehicle? |
| 14 | A.   Yes, sir. |
| 15 | MR. BROOKS:   Your Honor, at this time we will |
| 16 | offer State's 114 and State's 115. |
| 17 | MR. JOHNSON:   No objections. |
| 18 | THE COURT:   State's 114 and 115 are admitted. |
| 19 | Q.   (By Mr. Brooks)   State's 114, what is that? |
| 20 | A.   It's a receipt, lighter and some drugs. |
| 21 | Q.   Specifically methamphetamine? |
| 22 | A.   Yes, sir. |
| 23 | Q.   And State's 115? |
| 24 | A.   It's a baby bottle with the codeine. |
| 25 | Q.   With the lean? |

51

| | |
|---|---|
| 1 | A.   Yes, sir. |
| 2 | Q.   And that's what you were sipping on at that time? |
| 3 | A.   Yes, sir. |
| 4 | MR. BROOKS:   Permission to publish to the jury, |
| 5 | Your Honor. |
| 6 | THE COURT:   You may. |
| 7 | Q.   (By Mr. Brooks)   Now, at the time that that |
| 8 | vehicle -- your vehicle specifically spins out, |
| 9 | Corporal Nix runs up to that vehicle, you testified |
| 10 | that he had a begin in his hand? |
| 11 | A.   Yes, sir. |
| 12 | Q.   And you have seen this video? |
| 13 | A.   Yes, sir. |
| 14 | Q.   Several times, as well as this jury? |
| 15 | A.   Yes, sir. |
| 16 | Q.   And it was clear to you that day that Corporal Nix |
| 17 | put that gun down on the ground? |
| 18 | A.   No, it wasn't, sir. |
| 19 | Q.   It was clear to you that day that that was your |
| 20 | opportunity to pull the trigger and shoot him in the chest? |
| 21 | A.   No, sir. |
| 22 | Q.   Now, if the jury is to believe you Slow, somehow you |
| 23 | are justified in killing a police officer cause you were |
| 24 | scared; is that what you are telling them? |
| 25 | A.   Yes, sir -- I don't -- |

52

| | |
|---|---|
| 1 | Q.   And if -- |
| 2 | MR. BRAUCHLE:   Your Honor, may he finish his |
| 3 | statement. |
| 4 | MR. BROOKS:   I believe he had. |
| 5 | A.   No, I don't believe -- I didn't try to kill the |
| 6 | officer. I just tried to stop him. |
| 7 | Q.   (By Mr. Brooks)   You recognize this? |
| 8 | A.   Yes, sir. |
| 9 | Q.   What is it? |
| 10 | A.   It's a bullet. |
| 11 | Q.   And just what in the world do you think will happen |
| 12 | if you take a handgun and fire one of these rounds directly at |
| 13 | a human being, are you telling this jury that you do not |
| 14 | expect to either seriously injure that person or kill them, is |
| 15 | that what you want them to believe? |
| 16 | A.   I just wanted to stop him sir. |
| 17 | Q.   No, sir, is that what you want them to believe? |
| 18 | A.   Yes, sir. |
| 19 | Q.   And that weapon, that chopper, your chopper that you |
| 20 | carry everyday had a full loaded magazine? |
| 21 | A.   Yes, it had a full loaded magazine. |
| 22 | Q.   And you were aware that it was fully loaded? |
| 23 | A.   Yes, sir. |
| 24 | Q.   In fact it already had a round in the chamber? |
| 25 | A.   I didn't know that at the time. |

53

| | |
|---|---|
| 1 | Q.   So you were traveling with that weapon ready-to-fire |
| 2 | at a moment's notice? |
| 3 | A.   Yes, sir. |
| 4 | Q.   And you carried that weapon every single day? |
| 5 | A.   No, sir, I didn't. |
| 6 | Q.   So I guess if the jury is to believe what you are |
| 7 | telling them, Slow, if you had -- |
| 8 | MR. BRAUCHLE:   Your Honor, we would object to |
| 9 | calling the defendant anything other than his given name. |
| 10 | THE COURT:   Please refer to the defendant as |
| 11 | Mr. Ruiz. |
| 12 | MR. BRAUCHLE:   We would ask that the jury be |
| 13 | instructed to disregard. |
| 14 | THE COURT:   Ladies and gentlemen, you will |
| 15 | disregard the comment made by the prosecutor. |
| 16 | MR. BRAUCHLE:   And we would further move for a |
| 17 | mistrial. |
| 18 | THE COURT:   Denied. |
| 19 | Q.   (By Mr. Brooks)   If you would have bailed |
| 20 | out of that vehicle, Mr. Ruiz, and ran into one of |
| 21 | those homes and barricaded yourself and the officer |
| 22 | tried to get in and get you, are you telling this |
| 23 | jury that you would have been okay for shooting him |
| 24 | at that point? |
| 25 | A.   No, sir, I would never have done that. |

54

1   Q.   But you will shoot an officer who tries to pull you
2   out of a vehicle that you just led them on a high-speed chase?
3   A.   No, sir, I was being shot at.
4   Q.   And in spite of the fact that the video as seen by
5   this jury does not support your position, you insist that you
6   were being shot at?
7   A.   Yes, sir.
8   MR. BRAUCHLE:   Your Honor, the question involves
9   testimony by the District Attorney about his opinion.  And we
10   would object to the form of the question.
11   THE COURT:   Overruled.
12   MR. BROOKS:   Is there a ruling, sorry, Judge?
13   THE COURT:   It was overruled.
14   Q.   (By Mr. Brooks)   You see those rounds in
15   front of you, Mr. Ruiz?
16   A.   Yes, sir.
17   MR. BROOKS:   May I approach, Your Honor?
18   THE COURT:   You may.
19   Q.   (By Mr. Brooks)   And I represent to you
20   that those rounds came out of that magazine of your
21   chopper, but for that gun jamming, there would have
22   been a lot more shooting on your part, wouldn't
23   there?
24   A.   I wouldn't know what would have happened, I wasn't
25   planning anything.

55

1   Q.   But for your gun jamming, you would kept on shooting?
2   A.   I don't know sir, I didn't have a plan.  I don't know
3   what was going to happen.
4   Q.   You didn't have a plan?
5   A.   I didn't plan for none of this to happen.
6   Q.   You had the foresight as you say to reach in the
7   backseat and pull out the chopper and make the decision to
8   pull the trigger, but now you are trying to tell this jury
9   that you didn't have a plan?
10   A.   Right.
11   Q.   And because you were on the run, that's also why you
12   told your good friend Hector, the only way I am going back to
13   jail is in a box?
14   A.   No, sir, I never told him that.
15   Q.   You never said that.
16   And you know Krystel Pacheco?
17   A.   Yes, sir.
18   Q.   What is a "G", Mr. Ruiz?
19   A.   A "G"?
20   Q.   Yes, sir.
21   A.   That's a nickname.
22   Q.   What is a "G"?
23   A.   I don't know, a girl.
24   Q.   So when you make the statement, I am a "G", I am
25   talking about you specifically, you don't know what that mean?

56

1   A.   I never made that statement.
2   MR. BROOKS:   May I approach, Your Honor?
3   THE COURT:   You may.
4   Q.   (By Mr. Brooks)   Show you what is mark as
5   State's Exhibit 106 for record purposes, and this is
6   a letter that you have already admitted that you
7   wrote?
8   A.   Yes, sir.
9   Q.   And just read it to yourself?
10   A.   Uh-huh.
11   Q.   Starting here (indicating)?
12   A.   Can I see the letter, though, sir.
13   Q.   Certainly.
14   A.   You notice right here, her name is right here in the
15   beginning.
16   Q.   Mr. Ruiz, again, this is your letter?
17   A.   Yes, sir.
18   Q.   This is what you wrote?
19   A.   Yes, sir.  You want me to read what I wrote?
20   Q.   Sure.
21   A.   Sure -- it says, I miss you girl.  So what's up with
22   you.  Damn, it is hard to be a "G".  All these folks don't
23   understand me.  Hey, I loved your letters by the way.
24   But I meant that -- see her name right here, her
25   nickname is Baby G.  And it is an inside joke.  She always

57

1   says, Damn it is hard to be a "G".  Her nickname is Baby Girl.
2   You know, but she always like dresses up and she says like,
3   you know, she is fly or something.  She always says, Damn, it
4   is hard to be a "G".  It is an inside joke.  I am not saying
5   that I am a "G", that's her name, Baby G.
6   Q.   That's what you want these folks to believe?
7   A.   Yes, sir.
8   Q.   And I guess when you make reference to you being a
9   soldier, that's an inside joke also?
10   A.   Yes, sir, it is.
11   MR. BRAUCHLE:   Your Honor, we would object to
12   that, there is no evidence that he has ever done that.
13   THE COURT:   Overruled.
14   A.   Can I make one more statement.?
15   Q.   (By Mr. Brooks)   No, sir.  Your attorney
16   will have plenty of opportunity to ask you whatever
17   he wants to ask you.
18   A.   That's fine.
19   MR. BROOKS:   Pass the witness.
20   REDIRECT EXAMINATION
21   BY MR. BRAUCHLE:
22   Q.   Mr. Ruiz, in regard to the letter that was just shown
23   you, your contention is and just as you pointed out to the
24   District Attorney, the letter starts out Baby "G", right?
25   A.   Yes, sir, it does.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

58

1   Q.   And Krystel Pacheco, that's her nickname; is that
2   right?
3   A.   Yes, sir.
4   Q.   And the reference was to her rather than you; is that
5   correct?
6   A.   Yes, sir.
7   Q.   And in that letter and in your nomenclature, "G"
8   stands for a girl?
9   A.   That's correct, sir.
10  Q.   Now, then, in regard to what Mr. Brooks refers to, he
11  assumes that your gun in fact jammed out there, do you know
12  whether your gun jammed or not?
13  A.   No, sir, I do not.
14  Q.   You told this jury over here that after you fired the
15  one shot that you fired, you were knocked unconscious; is that
16  a correct statement still?
17  A.   Yes, sir, it is.
18  Q.   So speculation as to whether you would have shot
19  further and all that, which is what the District Attorney's
20  office is trying to get into, it just never happened in that
21  you were knocked unconscious; is that correct?
22  A.   Yes, sir.
23  Q.   Now, you did fire your weapon after you woke up and
24  these bits of coming in and out of conscienceness, did you?
25  A.   No, sir, I didn't.

1   Q.   I assume that as long as you were out there, you were
2   out there well over an hour, almost two hours, that if you had
3   had an inclination to have used your weapon further, you could
4   have, but you didn't want to do that, did you?
5   A.   No, sir.
6   Q.   Now, then, as far as -- as you being able to see
7   Mr. Nix -- or Officer Nix put his gun down, you never saw that
8   happen until the film; is that correct?
9   A.   That's correct, sir.
10  Q.   Your view of Officer Nix was pretty well obscured by
11  your passenger's side window; is that correct?
12          MR. BROOKS:   Judge, I am going to object to the
13  form of the question, it is leading, suggest an answer by this
14  witness.
15          THE COURT:   I will overrule the objection.
16          MR. BRAUCHLE:   Pardon.
17          THE COURT:   Overruled.   You can ask the
18  question.
19  Q.   (By Mr. Brauchle)   You can answer that
20  question
21  A.   Yes, sir.
22  Q.   Now, on -- after your car spun out, did any of the
23  police officers out there ever tell you to get out of your
24  car?
25  A.   No, sir, they didn't.

60

1   Q.   Did Officer Nix ever tell you to get out of your car?
2   A.   No, sir, he didn't.
3          MR. BRAUCHLE:   We will pass the witness.
4          RECROSS-EXAMINATION
5   BY MR. BROOKS:
6   Q.   No one told you to get out of the car, is that your
7   testimony, Mr. Ruiz?
8   A.   Yes, sir.
9   Q.   Now, you were also previously convicted in Cause No.
10  04 --
11          MR. BRAUCHLE:   Your Honor, we would object to
12  this as being improper impeachment.
13          May we approach?
14          THE COURT:   May I see the attorneys?
15          (Following proceedings had at the Bench.)
16          THE COURT:   What are you going into?
17          MR. BROOKS:   The connection.   He did a year in
18  state jail.
19          MR. BEACH:   12.44(a), conviction misdemeanor.
20          THE COURT:   Yeah, you can go into that.
21          I will let you do your objection.   I am going to let him
22  go into it, but you can get your objection on the record.
23          (End of Bench conference.)
24          MR. BROOKS:   May I proceed?
25          THE COURT:   You may.

61

1   Q.   (By Mr. Brooks)   Mr. Ruiz, you were previously
2   convicted in Cause No. 04-58624 of the felony offense evading
3   arrest in a motor vehicle?
4   A.   Yes, sir.
5   Q.   And that was November the 10th, 2005?
6   A.   Yes, sir.
7   Q.   And in that offense, by way of what's called a 12.44,
8   you actually received misdemeanor punishment?
9   A.   Yes, sir.
10  Q.   You recall that?
11  A.   Yes, sir.
12  Q.   County jail time?
13  A.   Yes, sir.
14  Q.   It was a felony conviction?
15  A.   Yes, sir.
16  Q.   Six months later, you are again standing before a
17  judge getting a second opportunity on the felony offense of
18  possession of a controlled substance with intent to deliver?
19  A.   Yes, sir.
20  Q.   The offense that you were on probation for at the
21  time that you shot and killed Mark Nix; is that correct?
22  A.   Yes, I was on probation when this incident happened.
23  Q.   But if the jury is to believe you and your testimony
24  today, none of this would have happened, despite your actions,
25  none of this is your fault?

62

1     A.    No, sir, I didn't say that.
2           MR. BROOKS:   Pass the witness.
3           MR. BRAUCHLE:   No further questions.
4           THE COURT:   You may step down, sir.
5           (Witness complies.)
6           THE COURT:   You may call your next witness,
7     Mr. Brauchle.
8           MR. BRAUCHLE:   Your Honor, ladies and gentlemen
9     of the jury the Defense rests.
10          THE COURT:   What says the State?
11          MR. BEACH:   The State would call Howard Johnson,
12    Your Honor. I am not trying to be funny, Howard Johnson.
13          (Witness entered the courtroom.)
14          MR. BEACH:   This witness has not been sworn.
15          THE COURT:   Thank you.
16          (Witness was duly sworn.)
17          THE COURT:   You may take the stand.
18    You may proceed.
19                  HOWARD JOHNSON
20    was called as a witness, and having been duly sworn by the
21    Court, testified under oath as follows:
22                  DIRECT EXAMINATION
23    BY MR. BEACH:
24    Q.    State your name, please.
25    A.    Howard Johnson.

63

1     Q.    And how are you employed?
2     A.    By the Dallas Police Department.
3     Q.    Is this your second or third year on the force?
4     A.    Going over 35.
5     Q.    Thirty-five. I have known you for about 26 of them,
6     right?
7     A.    Yes, sir.
8     Q.    How are you currently assigned?
9     A.    I'm assigned to the Homicide Division, Crimes Against
10    Persons.
11    Q.    How long have you been a homicide detective?
12    A.    Thirty-two years.
13    Q.    Howard, I am going to direct your attention back to
14    March the 25th?
15          MR. BRAUCHLE:   May we approach, Your Honor?
16          (Following proceedings had at the Bench.)
17          MR. BRAUCHLE:   This witness --
18          MR. BEACH:   It is rebuttal.
19          MR. BRAUCHLE:   Never mind, Your Honor.
20          (End of Bench Conference.)
21    Q.    (By Mr. Beach)   Direct your attention,
22    Detective, back to March 25th, 2007, and ask if
23    you went out to Parkland Hospital that morning?
24    A.    I did.
25          MR. BRAUCHLE:   Your Honor, may we approach, Your

64

1     Honor?
2           THE COURT:   You may.
3           (Following proceedings had at the Bench.)
4           MR. JOHNSON:   We are going to need to have a
5     hearing outside the jury.
6           MR. BRAUCHLE:   Statements made by the defendant
7     at Parkland, after an attorney had been appointed. An
8     attorney had been appointed by the time Johnson went out
9     there.
10          MR. BEACH:   Yeah. Offer the defendant's
11    testimony to impeach him, 38.22, Section 5.
12          MR. BRAUCHLE:   He obtained evidence, you can't
13    obtain evidence to impeach.
14          MR. BEACH:   You want cases?
15          MR. BRAUCHLE:   I don't want them. It is illegal
16    to send him out there knowing he had an attorney appointed.
17    It is illegal to take evidence from him. Under those
18    circumstances -- and I think it is illegal for them it trot
19    this guy in. What is he going to impeach him for?
20          MR. BEACH:   He told the police two days later he
21    didn't shoot. It is impeachment. It has been admitted
22    hundreds of time when a defendant testifies. It is used to
23    impeach his credibility.
24          THE COURT:   Y'all are requesting a hearing, let
25    me see the cases and we will send the jury out of the.

65

1           MR. BRAUCHLE:   Yeah, we are requesting a
2     hearing.
3           THE COURT:   Let me see the cases.
4           (End of Bench Conference.)
5           THE COURT:   Ladies and gentlemen, you are going
6     to get another 15-minute break.
7           THE BAILIFF:   All rise, please.
8           (Jury retired from the courtroom.)
9           THE COURT:   You may be seated.
10          (Recess taken.)
11          THE COURT:   Mr. Beach, you ready to proceed.
12          MR. BEACH:   I am ready.
13          THE COURT:   On the record and outside the
14    presence of the jury.
15          You may proceed, Mr. Beach.
16                  SUB ROSA EXAMINATION
17    BY MR. BEACH:
18    Q.    When you got to the hospital that morning, Detective
19    Johnson, did you have an interview with a man that you came to
20    know as Wesley Ruiz?
21    A.    Yes, sir.
22    Q.    You see Wesley Ruiz in court today?
23    A.    Sitting over to my right with the dark blue suit on.
24          MR. BEACH:   Let the record reflect that the
25    witness has identified the defendant in open court.

66

1  Q.  (By Mr. Beach)  Prior to having any
2  conversation with the defendant, did you read his
3  Miranda Warnings?
4    A.  I did.
5    Q.  And after you read him the Miranda Warnings, did he
6  indicate that he understood his Miranda rights?
7    A.  He did.
8    Q.  And did you-all have an oral conversation?
9    A.  Yes.
10   Q.  Did you ask Mr. Ruiz what happened that day?
11   A.  Yes.
12   Q.  And in the interest of time, did Mr. Ruiz state to
13 you that he started trying to get away from the officers and
14 wrecked out and -- got to West Dallas, he stated that his
15 vehicle hit a curb and the officers ran up to his vehicle and
16 begin firing and Ruiz denied firing and said his weapon was in
17 the backseat in a sack.  He told you all those things?
18   A.  Yes, sir.
19   Q.  He also told you that he was en route to West Dallas
20 to sell the gun and the vehicle?
21   A.  Correct.
22   Q.  And did you take notes of your conversation with
23 Mr. Ruiz that morning?
24   A.  I did.
25   Q.  And once you got back to your office, did you reduce

67

1  those notes into a written investigative note?
2    A.  I did.
3    Q.  Even though the defendant was at Parkland Hospital,
4  Detective, and had obvious evidence of medical treatment, did
5  the defendant appear coherent to you that morning?
6    A.  He did.
7    Q.  Did he understand who you were and why you were
8  there?
9    A.  Yes.
10   Q.  Did you have any trouble having a conversation with
11 the defendant that day?
12   A.  No, sir.
13   Q.  And after you had your oral conversation with the
14 defendant, did the defendant then invoke his right to have an
15 attorney present?
16   A.  That's correct?
17        MR. BEACH:  I will pass the witness.
18        SUB ROSA EXAMINATION
19 BY MR. BRAUCHLE:
20   Q.  Officer Johnson, how many years have you been a
21 police officer.
22   A.  Over 35 years.
23   Q.  Now, then have you got the notes that you made out
24 there at Parkland?
25   A.  No, sir.

68

1  Q.  Why not?
2    A.  Because I produced -- I typed the notes once I got
3  back to the office.
4    Q.  So the notes fairly and accurately depict what did
5  and didn't happen out there?
6    A.  The notes are accurate.  I didn't change anything
7  or -- those notes are accurate.
8    Q.  Okay, in your statement here, you stated that you
9  read him the Miranda Warnings, but it doesn't say anything
10 about you asked him if he understood them, does it?
11   A.  I did ask him that.
12   Q.  No, I am talking about your notes?
13   A.  No, it is not in the notes.  But I did ask him.
14   Q.  That's something you left out, right?
15   A.  Yes, sir.
16   Q.  Now, then, does it say anything about him waiving
17 those rights either, does it?
18   A.  Yes, at the end of the statement, end of that note he
19 waived his rights.
20   Q.  Where does it say that?
21   A.  Could I see the notes.  Could you read it.
22        THE COURT:  You may.
23 Q.  (By Mr. Brauchle)  Yeah.
24   A.  When I asked Mr. Ruiz for a written statement, he
25 requested to speak to an attorney.

69

1  Q.  Well, that's invoking your rights, not waiving them,
2  isn't it?
3    A.  Yeah -- say what now?
4    Q.  That's invoking his right to have an attorney, not
5  waiving it, isn't it?
6    A.  Yes, sir.  So when he requested an attorney, I ceased
7  to interview.
8    Q.  Yeah, but you didn't put that he ever waived them or
9  understood them or anything else in this memorandum, which you
10 say accurately depicts what happened out there?
11   A.  I did not put them.  I asked him if he understood.
12   Q.  Well, you knew this was a capital murder case before
13 you got in your car that day, didn't you?
14   A.  Yes, sir.
15   Q.  Who sent you out there?
16   A.  Detective Briseno.
17   Q.  Briseno sent you out there?
18   A.  Yes, sir.
19   Q.  Briseno knew he already had an attorney appointed
20 didn't he?
21   A.  He asked me to go out there and interview the suspect
22 and that's what I did.
23   Q.  You knew he did, didn't you?
24   A.  No, I didn't.
25   Q.  Jessie Briseno, did you ask why he didn't get in the

70

1    car and go out and talk to him?

2        A.    He asked me to go out there, it was on his day off.

3    Was he capable of the interview?

4        Q.    Let's go back to another factor.  You knew this was a

5    capital murder, right?

6        A.    Yes.

7        Q.    Yet, here only a year later, you don't have the notes

8    that you took out there at the scene, right?

9        A.    This is the note that I took out there at the scene.

10       Q.    Well, hardly.

11              MR. BEACH:  Judge, this is outside the scope of

12   this hearing.  This is for cross in front of a jury whether he

13   has the notes or not, it has nothing to do with 38.22(5).

14              THE COURT:  I will allow him to continue.

15       Q.    (By Mr. Brauchle)  Your so-called rendition

16   of what happened out there, doesn't go into things

17   that you have now gone into in front of -- from

18   direct with Mr. Beach, does it?

19       A.    Repeat the question again.

20       Q.    Sure.  Your so-called rendition of what happened out

21   there doesn't go into what you have talked about with

22   Mr. Beach on direct, does it?

23       A.    Yes, sir, this is what happened out there.

24       Q.    Okay.  So as far as him telling you that he

25   understood his Miranda rights, that is not in there, so that

71

1    didn't happen, right?

2        A.    I asked him if he understood his rights.  That did

3    happen.

4        Q.    Which sentence says that?

5        A.    It is not in that note, but I did ask him.

6        Q.    Now, then, the thing that comes after that is, is if

7    he did understand them, did you ask him if he wanted to give

8    them up and talk to you?

9        A.    During that conversation, I asked him if he

10   understood his rights.  He said, yes.  I asked him if he -- he

11   didn't have to talk to me if he didn't want to.  And he agreed

12   to discuss what is in this note.

13       Q.    Wait, that's another thing.

14       A.    Yeah.

15       Q.    It doesn't say anything about telling him that he

16   didn't have to talk to you if he didn't want to either, does

17   it?

18       A.    After I read any suspect their rights, I always go

19   into the spill that they don't have to -- I ask them if they

20   understand the right.  I say you don't have to talk to me if

21   you don't want to.  If they tell me they don't want to talk, I

22   cease.  But I make sure, I read the rights, real slow to him.

23       Q.    Okay.  Does that say that in your --

24       A.    No, no.  I have been doing this for years, and that's

25   the way I read my Miranda card.  I make sure it is read slowly

72

1    and clearly.

2        Q.    Now, then, did you ask him if he had an attorney?

3        A.    No.

4        Q.    Why not?

5        A.    If he had told me that he had an attorney when I read

6    him his rights, I would have ceased.  I wouldn't have even

7    talked to him.

8        Q.    Well, you didn't ask him if he had an attorney, so

9    that would ever come into effect?

10       A.    I did not ask him.  I asked him if he wanted to talk

11   to me.  I read him his rights.  He said he did.

12       Q.    But you didn't ask him if he had an attorney?

13       A.    No, sir.

14       Q.    Were you aware that an attorney had already been

15   appointed?

16       A.    No.

17       Q.    You know how to work the county computer to find out

18   if there has been one appointed?

19              MR. BEACH:  I am going to object to that, that

20   is outside the scope of this hearing.

21              THE COURT:  Sustained.

22       Q.    (By Mr. Brauchle)  Let me ask you this, you

23   don't know of anyway to ascertain whether a

24   defendant has been appointed an attorney or not?

25       A.    Well, when I went out there, he agreed to talk to me.

73

1    If he had said he had an attorney, he didn't want to talk to

2    me, I would have said -- I would have walked out of the room.

3        Q.    How can you -- how can he tell you he has got an

4    attorney if you don't ask him about it?

5        A.    When I read him his rights and explained him his

6    rights, he could have said, I don't want to talk to you, I

7    have an attorney, and I would have left the room.

8        Q.    Well, he did tell you that, after you had chatted him

9    up, doesn't you?

10       A.    When I asked for a written statement, that's when he

11   said he wanted to speak to an attorney.  He didn't say he had

12   one, he said he wanted to speak to an attorney.

13       Q.    Mr. Ruiz, when you viewed him out there, how many

14   I.V.s did he have in him?

15       A.    I don't recall any I.V.s.  I recall some bandages on

16   his arm and stomach.

17       Q.    No I.V.s?

18       A.    I don't recall any.

19       Q.    Did you check his medical charts to see what

20   medication was being administered to him?

21       A.    No.  When I interviewed him, he seemed coherent.  He

22   understood what I was saying.

23       Q.    How did he seem coherent?

24       A.    When I was talking to him, he understood everything I

25   was saying.

74

1   Q.   How do you know that?

2   A.   From being there talking to him.

3   Q.   Now, did you ever have him initial a Miranda card?

4   A.   No.

5   Q.   Showing that he in fact understood those rights?

6   A.   No.

7   Q.   Did you have a written statement for him out there?

8   A.   I had some written forms with me.  When he requested

9   an attorney, I didn't use those forms.

10   Q.   And your testimony here today is the narrative that

11   you have got in front of you is the complete and accurate

12   record of everything that transpired at Parkland Hospital on

13   the date in question?

14   A.   Correct.

15   Q.   Let me ask you this, though, Officer Johnson, when

16   you went out to Parkland, how many police officers were out

17   there?

18   A.   I don't recall.

19           MR. BEACH:   Judge, we will stipulate he was in

20   custody.

21   Q.   (By Mr. Brauchle)   You were aware he was in

22   custody?

23   A.   Correct.

24   Q.   And you weren't summoned out there by the defendant,

25   were you?

75

1   A.   No.

2   Q.   You were told to go out there by Briseno, the lead

3   detective on this case; is that correct?

4   A.   That's correct.

5   Q.   Was there any question as to what he had been charged

6   with at the time you went out there?

7   A.   I knew what he had been charged with, yes, sir.

8   Q.   And what was that?

9   A.   Capital murder.

10   Q.   Did you make any effort whatsoever to determine if

11   Mr. Ruiz was represented by an attorney?

12   A.   No, sir.

13   Q.   None whatsoever?

14   A.   None whatsoever, no, sir.

15   Q.   In regard to his medical records, which are in

16   evidence, are you aware that he was on pain medication and

17   other medications at the time cause he was being treated for

18   ten or more gunshot wounds?

19   A.   I knew he was being treated for gunshot wounds, yes,

20   sir, I don't know what medication he was on.

21   Q.   Do you think he would have been on painkillers,

22   anything like that?

23           MR. BEACH:   Objection, Judge, he is not a

24   doctor, calls for speculation?

25           THE COURT:   Sustained.

76

1           MR. BRAUCHLE:   We will pass the witness.

2           MR. BEACH:   Nothing further.

3           THE COURT:   You may step down, sir.

4   Argument.

5                   **ARGUMENT**

6   BY MR. BEACH:

7       Judge, defendant has testified in this case.  Pursuant to

8   38.22, Section 5, the State is entitled to impeach the

9   defendant's testimony with prior oral statements voluntarily

10   given in custody, not in custody and that's what we are

11   planning to do with this witness.  And the proffer would be

12   what Mr. Ruiz told Detective Johnson after being mirandized

13   voluntarily back on March 25th, 2007.

14                   **ARGUMENT**

15   BY MR. BRAUCHLE:

16       Let's go back to 38.22, Section 5, which is there

17   alleged, ah, says nothing precludes in the admission of a

18   statement made by the accused in open court at his trial, we

19   don't have that.  Before a grand jury, we don't have that.  Or

20   an examining trial, we don't have that.  We go on or if the

21   statement is res gestae of the offense, which this certainly

22   isn't.  Or the statement that does not stem from custodial

23   interrogation or voluntary statements whether or not the

24   result of the custodial interrogation, it has a bearing on the

25   credibility of the case.  None of that we think applies in any

77

1   way.  The person has a right once a -- an attorney is

2   appointed to him, the burden shifts to the investigative

3   agency to determine whether that defendant is represented by

4   an attorney.  It shifts to them.  They have a burden of due

5   diligence to find out that fact.  And going out there while he

6   is represented by an attorney is clearly illegal.  Which make

7   the fruits of that interrogation by Officer Johnson illegal.

8       Now, the other part of it is, is that Officer Johnson

9   says that what is in his investigative information, which we

10   would tender for record purposes, I don't know if it is front

11   of you or not -- do you have a copy of it?

12           THE COURT:   Of the statement?

13           MR. BRAUCHLE:   It --

14           THE COURT:   No.

15           MR. BRAUCHLE:   Let me have that marked.  We will

16   show the Court what has been marked as Defendant's Exhibit 21,

17   we will ask to put this in for record purposes.

18           MR. BEACH:   Record purposes -- oh.

19           MR. BRAUCHLE:   We saw y'all do it.

20           THE COURT:   Anything further, Mr. Brauchle?

21           MR. BRAUCHLE:   That was just a pause in the

22   action here to provide the Court with what Officer Johnson

23   stated.

24       And my last question to him is that that is a complete

25   record of everything that transpired out there that day.  And

78

79

1   you notice that there is no showing that Mr. Ruiz was asked if
2   he understood his rights, or if he waived his rights.  Which
3   we don't think really matters because what -- well, we think
4   it does matter.  But I think that the more important issue is,
5   is that they violated his Fifth and Fourteenth Amendment
6   rights, in addition to his state rights by going out and
7   asking him questions while they know that he is represented by
8   an attorney and in custody.  This is a custodial
9   interrogation.  It is not a knock-and-talk or all the other
10  ruses that we have come to accept.  It is a police officer
11  being sent out by the lead detective to talk to the one and
12  only suspect.
13          MR. BEACH:   And if Mr. Ruiz had not testified,
14  Howard Johnson would never have hit the witness stand, Judge,
15  and that's why we have that exception, it goes to his
16  credibility.  As long as Howard didn't beat it out of him,
17  which he didn't, it is a voluntary statement being offered to
18  impeach his credibility.
19          MR. BRAUCHLE:   I don't think we have to resort
20  to violence.  Illegality can be on any number of levels.  And
21  this is just an illegal act on their part and shouldn't be
22  rewarded by some cloak of relevancy and being admitted against
23  the defendant at this time.
24
25          (No Omissions.)

---

1                          ARGUMENT
2   BY MR. JOHNSON:
3          Judge, before you rule, I would like the record to
4   reflect -- I would like to ask the State to stipulate that
5   Mr. Brauchle had been appointed to Mr. Ruiz prior to this
6   happening.  And if they won't stipulate to it, then I am going
7   ask the Court to take judicial notice of it, because the
8   records will reflect that Mr. Brauchle had been appointed
9   prior to the date that this interview took place.
10          And also I would like to point out to the Court that
11  Mr. Ruiz's medical records are in evidence, and they reflect
12  that on the date that this interview took place, Mr. Ruiz was
13  under the influence of narcotic pain medication.
14          MR. BEACH:   Codeine.
15          MR. JOHNSON:   Y'all had taken that away from
16  him.
17          THE COURT:   Anything further from the Defense?
18          MR. PARKS:   Yeah, I always have to add mine.
19          THE COURT:   You are on the State's side now.
20          MR. PARKS:   No, as an afterthought.
21          THE COURT:   You may proceed.
22                          ARGUMENT
23  BY MR. PARKS:
24          Just ask the Court in response to the State's argument
25  about a State's evidentiary statute, that these are

---

80

1   constitutional issues which trumps State statutes and we would
2   invoke all of the protections afforded by Andrew versus
3   Arizona.
4          MR. BRAUCHLE:   As well as the Fourteenth and
5   Fifth Amendment.
6          THE COURT:   Anything further by the State?
7          MR. BEACH:   No, Judge.
8                          RULING
9          THE COURT:   I will allow the statement to -- the
10  witness to be questioned pursuant to 38.22, Section 5.
11  Additionally the Court finds that the statement was made
12  voluntarily.
13          MR. JOHNSON:   Judge, there is another issue is
14  that in the statement there is some talk about an extraneous
15  offense, that --
16          MR. BEACH:   I have instructed him not to go into
17  that.  We are not going into that.
18          MR. JOHNSON:   Okay.
19          (Witness entered the courtroom.)
20          THE BAILIFF:   All rise, please.
21          (Jury returned to the courtroom.)
22          THE COURT:   You may be seated.
23  State may proceed.
24          MR. BEACH:   Thank you, Judge.
25

---

81

1                  DIRECT EXAMINATION RESUMED
2   BY MR. BEACH:
3          Q.   You are the same Howard Johnson that was testifying
4   before the break; is that correct, sir.
5          A.   That's correct.
6          Q.   I think --
7                  MR. JOHNSON:   May we approach the Bench?
8                  THE COURT:   You may.
9                  (Following proceedings had at the Bench.)
10                 MR. BRAUCHLE:   Why is this Dallas Police
11  Department Officer sitting inside the bar.  Okay, they just
12  moved him.
13                 (End of bench conference.)
14                 THE COURT:   You may proceed.
15          Q.   (By Mr. Beach)  I don't remember where we were,
16  Detective.  Had you gotten to the Parkland Hospital yet?
17          A.   Yes.
18          Q.   You were out there that Sunday morning; is that
19  correct?
20          A.   Yes.
21          Q.   And that would have been March the 25th of 2007.
22  Did the lead detective in this case, Jesse Briseno ask you to
23  go out and talk to Wesley Ruiz?
24          A.   That's correct.
25          Q.   And you have been doing this for 32 years now; is

---

82

1  that correct?
2      A.    That's correct.                          .
3      Q.    When you went in to Wesley Ruiz's hospital room, just
4  generally what was the defendant's condition at that time?
5      A.    He was in bed.  He was bandaged on arms and across
6  the stomach.
7      Q.    And do you see Wesley Ruiz here in court today, sir?
8      A.    Yes, sir.
9      Q.    And would you identify him for the jury?
10     A.    To my far right with a blue suit on.
11             MR. BEACH:   Let the record reflect that the
12  witness has identified the defendant in open court.
13     Q.    (By Mr. Beach)    Did you have a
14  conversation with Wesley Ruiz that day?
15     A.    Yes.
16     Q.    And prior to having the conversation with the
17  defendant, did you read him his Miranda rights?
18     A.    Correct.
19     Q.    And you have done that a few times in your life; is
20  that correct?
21     A.    Correct.
22     Q.    Do you have a Miranda card with you today?
23     A.    Yes.
24     Q.    And would you go ahead for the jury's benefit read
25  exactly what you would have informed Mr. Ruiz of?

83

1      A.    (Reading)  You have the right to remain silent and
2  not make any statement at all.  And any statement you make may
3  be used against you at your trial.  Any statement you make may
4  be used as evidence against you in court.  You have the right
5  to have a lawyer present to advise you prior to and during the
6  any questioning.  If you are unable to employ a lawyer, you
7  have a right to have a lawyer appointed to advise you prior to
8  and during any questioning.  You have the right to terminate
9  the interview at any time.
10     Q.    Now, even, though, Detective, the defendant had these
11  bandages on, was in a hospital bed, obviously had been
12  injured, were you of the opinion as you read him his Miranda
13  Warnings, first of all, that he was coherent?
14     A.    That's correct.
15     Q.    And he understood who you were?
16     A.    Yes.
17     Q.    And what you were doing there?
18     A.    That's correct.
19     Q.    And did he understand each of these constitutional
20  rights that you read to him as you read them to him?
21     A.    That's correct.
22     Q.    If you had any question in your mind as to whether or
23  not the defendant was in his right mind or if he was
24  incoherent, would you have stopped the interview?
25             MR. BRAUCHLE:   Your Honor, we would object to

84

1  leading.
2             THE COURT:   If you will rephrase your question,
3  sir.
4      Q.    (By Mr. Beach)    Was there any indication,
5  Detective, that Mr. Ruiz did not understand what you
6  were saying?
7      A.    No indication, no, sir.
8      Q.    And after you read him his Miranda Warnings, did
9  Mr. Ruiz indicate to you that he understood them?
10     A.    That's correct.
11     Q.    If he had not indicated that to you, what would you
12  have done.
13     A.    I would have terminated the interview and left.
14     Q.    Did he agree to talk to you?
15     A.    Yes.
16     Q.    If Mr. Ruiz had told you, Detective Johnson, that he
17  didn't want to talk to you, what would you have done?
18     A.    I would have left.
19     Q.    And did you have a conversation with the defendant
20  about what happened out there that Friday afternoon?
21     A.    I did.
22     Q.    And did the defendant tell you that the officers got
23  behind him with their lights on when he was on Mockingbird?
24     A.    That's correct.
25     Q.    Did he tell you that he started to try to get away

85

1  from the officers and he wreck out when he got to West Dallas?
2      A.    That's correct.
3      Q.    Did the defendant tell you that his vehicle hit a
4  curb, the officers ran up to his vehicle and begin firing at
5  him?
6      A.    That's correct.
7      Q.    And did the defendant deny that Sunday morning in his
8  hospital bed that Mr. Ruiz denied firing at the officers and
9  stated that his gun was in the backseat in a sack?
10     A.    That's correct.
11     Q.    So less than 48 hours after the murder of Mark Nix,
12  Wesley Ruiz is telling you that he didn't fire his gun?
13     A.    Correct.
14     Q.    It was in the backseat in some kind of sack?
15     A.    Yes.
16     Q.    Did he also tell you that he was en route to West
17  Dallas to sell the gun and the vehicle?
18     A.    Correct.
19     Q.    Now, as you are having your conversation with the
20  defendant there in that hospital room, Detective, are you
21  making handwritten notes of what he is telling you?
22     A.    That's correct.
23     Q.    Why do you do that?
24     A.    I make a -- handwritten notes so when I get back to
25  the office, I would type them up.

86

1    Q.   Is your memory getting better with age?

2    A.   No, I have to write everything down.

3    Q.   All right. And what do you do with those handwritten

4    notes when you get back to your office?

5    A.   I just destroy them.

6    Q.   And what do you use them for once you get back?

7    A.   To make -- do my typed written notes.

8    Q.   And you actually -- from your handwritten notes, you

9    generated a typed version of your conversation with the

10   defendant?

11   A.   That's correct.

12   Q.   Is everything in the type version, is that true and

13   correct?

14   A.   That's true, yeah.

15        MR. BEACH:   I will pass the witness.

16        THE COURT:   Cross-examination.

17            CROSS-EXAMINATION

18   BY MR. BRAUCHLE:

19   Q.   As the Judge just said, this is time for

20   cross-examination, it is kind of hard to cross-examine you on

21   destroyed notes, isn't it?

22   A.   Yes, sir.

23   Q.   That's one thing 35 years has taught you, isn't it?

24   A.   No, sir. Everything in that typewritten is correct.

25   Q.   No, that wasn't the question. You have are learned

87

1    to destroy your notes so you can't be cross-examined on them,

2    haven't you?

3    A.   No, sir, like I said, everything in those typewritten

4    notes is correct.

5    Q.   That's not the question.

6        MR. BRAUCHLE:   We will pass the witness.

7            REDIRECT EXAMINATION

8    BY MR. BEACH:

9    Q.   Well, Detective, if you wanted to, you could have

10   come up with a lot juicer version than we have here?

11   A.   Is sure could have.

12        MR. BRAUCHLE:   Your Honor, I would object to

13   that as an improper question.

14        THE COURT:   Overruled.

15   Q.   (By Mr. Beach)   You could have put in here

16   that Ruiz told you that I was glad I killed that

17   stinking cop?

18   A.   No, sir.

19   Q.   You didn't do that?

20   A.   I put the truth down on that piece of paper.

21        MR. BEACH:   That's all I have.

22        MR. BRAUCHLE:   Your Honor, we would object to

23   the last answer as being self-serving and improper.

24        THE COURT:   Overruled.

25        MR. BEACH:   Pass the witness.

88

1        MR. BRAUCHLE:   No questions.

2        MR. BEACH:   May he be excused?

3        THE COURT:   You may step down, sir.

4    Any objections?

5    You are free to go, sir. Thank you.

6        (Witness entered the courtroom.)

7        MR. BEACH:   We would recall Patrick Starr, Your

8    Honor.

9            PATRICK STARR

10   was called as a witness, and having been duly sworn by the

11   Court and having previously testified, testified under oath as

12   follows:

13            DIRECT EXAMINATION

14   BY MR. BEACH:

15   Q.   State your name for the record, please.

16   A.   Officer Patrick Starr.

17   Q.   And you have previously testified on two occasions;

18   is that correct?

19   A.   That's correct, sir.

20        MR. BEACH:   May I approach?

21        THE COURT:   You may.

22   Q.   (By Mr. Beach)   I am showing you what is

23   marked for identification as State's Exhibit 116,

24   Corporal, can you tell us -- identify what that is?

25   A.   That's a picture of the scene with Mr. Ruiz's car,

89

1    Mark Nix's car.

2    Q.   Does that fairly -- State's 116 depict the scene as

3    it was back on March 23rd 2007?

4    A.   Yes, sir, it does.

5        MR. BEACH:   We will offer State's 116 at this

6    time, Your Honor.

7        MR. JOHNSON:   No objections.

8        THE COURT:   State's 116 is admitted.

9        MR. BEACH:   May we have the lights, Judge.

10   Q.   (By Mr. Beach)   We are zooming in on the --

11   our right, the left side of the defendant's

12   windshield; is that correct?

13   A.   Yes, sir.

14   Q.   And these clearly show where the bullet defects were

15   on the windshield?

16   A.   Yes, sir.

17   Q.   And we will just leave it up for the jury to

18   determine --

19        MR. BRAUCHLE:   Your Honor, we would object to --

20        MR. BEACH:   I will withdraw, Judge.

21   I will pass the witness.

22        MR. BRAUCHLE:   We will pass the witness.

23        THE COURT:   You may step down, sir.

24        THE WITNESS:   Thank you, sir.

25        MR. BROOKS:   May it please Court?

90

1    Members of the jury, State rests.
2                MR. BRAUCHLE:   We will rest.
3                MR. BROOKS:   State closes, Your Honor.  We will
4    rest and close.
5                THE COURT:   Ladies and gentlemen, both sides
6    having rested and closed, that is the end of the testimony
7    that you will hear.
8                Now the Court will prepare the Court's charge, which I
9    have a feeling will take a little bit longer than I
10   anticipate.  So we will recess for today.  Reconvene tomorrow
11   morning at 8:30 for arguments.  If you will remember my
12   earlier admonishments.
13               (Jury retired from the courtroom.)
14               (Recess taken.)
15               THE COURT:   On the record on the issue of the
16   charge.
17        What says State?
18               MS. SMITH:   The State has tendered a proposed
19   charge to the Court and the parties.  The Defense has some
20   objections and additions they would like to make to it.
21               THE COURT:   You may proceed.
22               MR. PARKS:   May it please court?
23        Your Honor, we would, first, just because it is by way of
24   the -- the way it is set out on page two of the State's
25   proposed charge, there is a charge on voluntary intoxication

91

1    to which we object.  I am not sure that the evidence has
2    raised voluntary intoxication.
3                We also would object to the next paragraph down in
4    causation.  And our objection with causation is that it just
5    sort of jumps out the page at us and can be I believe
6    reasonably taken by a jury to mean that so long as Mr. Ruiz
7    caused the death of Officer Nix, however that might have
8    happened, that he is criminally responsible for that result.
9    That essentially what that sentence says.  And I think it is
10   at the very least confusing or would be confusing for the jury
11   for the Court to say right out front that a person is
12   criminally responsible if the result had not occurred but for
13   his conduct.  Basically at a norm and then we go on.  So we
14   would object to it that it is not needed, that it doesn't
15   apply to the facts of the case, that it is confusing and
16   contradicts other parts of the charge.
17               MS. SMITH:   Could I respond to each one as you
18   go?
19               MR. PARKS:   Sure.
20               MS. SMITH:   On the voluntary intoxication there
21   is some evidence in the record that he ingested something,
22   drugs, we believe that the issue may be before the jury and
23   that's why it is in there.  We object to it being taken out.
24               Causation is a proper instruction.  There is really
25   nowhere else I know to put it.  It doesn't improperly instruct

92

1    the jury, it is right out of the statute.  And the application
2    paragraph properly requires the jury to fine the requisite
3    intent, the other elements of the offense.  There is no way
4    that instruction is going to somehow let the jury improperly
5    convict him without us meeting our burden of proof.
6                MR. PARKS:   I guess my response, I don't see how
7    it is needed.  The application page sets out what the State
8    has got to prove in the case, and I just don't think that
9    instruction adds anything other than the potential confusing
10   of the jury.
11               MS. SMITH:   I don't see how it confuses them.
12   It is right out of the statute, it is the proper law.  As long
13   as it is the law, we are not improperly instructing them on
14   that.  It is not error.
15               MR. PARKS:   Co-counsel asked me to go back to
16   the voluntary intoxication issue just briefly, Judge, to
17   remind the Court that it was the State who put that evidence
18   to the extent that it exists in voluntary intoxication.
19               MS. SMITH:   But it is out there.  And we don't
20   want the jury thinking they can acquit just because he had
21   drugs in his system.  It doesn't matter who put the evidence
22   on.  The fact is they can't acquit him based on intoxication
23   and we want them to know that.
24               MR. PARKS:   Do you want us to stop after each
25   one and let you make a decision.

93

1                THE COURT:   I am taking notes.  Actually I am
2    going to overrule both of your objections with respect to the
3    voluntary intoxication as well as the causation.
4                MR. PARKS:   Next, Your Honor, I believe that we
5    have reached an agreement to change the application page to
6    add other police officers and that will be done.  In
7    conjunction with that, the Defense would ask that there be a
8    charge on self-defense where there is more than one assailant.
9    And we --
10               MS. SMITH:   The State's agreed that it will
11   incorporate the are boiler plate law on self-defense and also
12   add the language on second paragraph on page four, attempted
13   use of unlawful deadly force by Mark Nix and/or other police
14   officers.  We will add and/or other police officers to the
15   charge.
16               MR. PARKS:   That is all of the specific
17   objections to the charge.  But in conjunction with that, I
18   want to offer as the Defense's purposed charge, with respect
19   to at least to the law of self-defense and the application of
20   the law of self-defense from the charge that was originally
21   purposed by the Court.  I am going to put the entire proposed
22   charge in the record.  However, the only portion that we are
23   offering as our proposed charge in that regard is beginning at
24   page four at the bottom where it begins under the law of
25   self-defense, we would ask that that be incorporated as our

94

1   purposed Court's charge on those issues running through page
2   five, page six and to the end of page seven with the
3   understanding that we would in the application page add the
4   language where appropriate that would read deadly force by
5   Mark Nix and/or other parties, officers.
6              MS. SMITH:   What we agreed to?
7              MR. PARKS:   What we agreed to.  And would also
8   incorporate the language on more than one assailant of
9   self-defense.
10             MS. SMITH:   The State does object to the
11  Defense's request of order to charging the jury.  We think
12  that the jury should first receive the application paragraph
13  on capital murder and then the application of the law of
14  self-defense.
15             MR. PARKS:   And so the Court will know what our
16  objection is what it is that we are talking about here and the
17  difference between the two charges is the one that we are
18  purposing is the one that was originally purposed by the
19  Court, charges the jury first to find that the defendant did
20  not act in self-defense before going forward with the issue of
21  whether or not he is guilty of capital murder.  The one that
22  the State is purposed actually requires the jury to find
23  Mr. Ruiz guilty of capital murder before ever considering
24  whether he acted in self-defense.  And it is our position that
25  the way that that states -- the order in which the jury is to

95

1   make a decision shifts the burden of proof, certainly tend to
2   shift the burden of proof from the State to the Defense.  That
3   the charge purposed by the State puts us in the position of
4   having to convince a jury that he acted in self-defense after
5   they have already found him guilty of capital murder, rather
6   than requiring that they believe beyond a reasonable doubt
7   that he did not act in self-defense, which is essentially the
8   flip of what the law requires.  And we believe it places an
9   unlawful burden on the Defense.
10             THE COURT:   That request is denied, but noted
11  for the record.
12             MR. PARKS:   And finally, Your Honor, I will
13  stand aside for Mr. Brauchle to object to the Court's charge
14  failure to include various...
15             MR. BRAUCHLE:   We would request that the Court,
16  in addition to capital murder, charge the jury on the offense
17  of attempted capital murder, murder under Penal Code Section
18  19.02, murder under Penal Code Section 19.02(d), manslaughter
19  under Penal Code Section 19.04, aggravated assault under Penal
20  Code 22.02, criminally negligent homicide under Penal
21  Code Section 19.05, deadly conduct under Penal Code Section 22.05,
22  and Class C assault -- or misdemeanor assault also.
23             MS. SMITH:   I'm sorry, are you done?
24             MR. BRAUCHLE:   Pardon?
25             MS. SMITH:   I thought I was interrupting you.

96

1              MR. BRAUCHLE:   It wasn't important.
2              MR. BEACH:   Did you say Class C assault.
3              MR. BRAUCHLE:   That skipped over Class A
4   misdemeanor assault, we would also want that one.
5              MS. SMITH:   The State will not oppose murder as
6   a lesser, I am assuming that you want murder just because
7   absence of evidence that -- how do we get from capital to
8   murder, is my question.
9              MR. BRAUCHLE:   Well, I think there might be more
10  than one way.  And obviously one would be if the jury finds
11  that Officer Nix was not acting in the lawful discharge of his
12  duty.  I think also they can find the converse of that that
13  perhaps Mr. Ruiz didn't know that he was a police officer at
14  the time acting in the course of his duty.  I think the key in
15  regard to the capital charge is him acting in the course of
16  duty or being recognized as being in the course of his duty as
17  a police officer.  I think, though, the -- the one that would
18  be more applicable, though, is it attempted capital murder?
19  In that his intent has not been shown to -- to -- or they may
20  take it that his intent not shown to cause Officer Nix's
21  death, but rather to extract himself from the danger that
22  Officer Nix placed him in or he perceives that Officer Nix is
23  placing him in.  And that he fired at Officer Nix in that
24  regard, not intending to kill him.
25             MS. SMITH:   There is no evidence that he

97

1   intended but failed to effect the offense, so we are going to
2   object to the attempted capital murder.  But I am not opposed
3   if you want to have an instruction on the lesser of murder
4   based on some evidence of not acting in the lawful discharge.
5              You guys want to confer?
6              (Discussion off the record.)
7              THE COURT:   Back on the record.
8   Mr. Brauchle.
9              MR. BRAUCHLE:   The State has indicated that they
10  would join in our request for the lesser included of murder,
11  and we will not oppose that.
12             MS. SMITH:   We are not joining the request, but
13  we won't object to the request.
14             MR. BRAUCHLE:   Whichever way we get there, we
15  will take murder.
16             MS. SMITH:   Okay.  I will make the additions to
17  the charge tonight.
18             THE COURT:   And your request, the additional
19  laundry list.
20             MR. BRAUCHLE:   You want me to revisit that.  You
21  want me to go through that again?
22             THE COURT:   No.  If you are still requesting it,
23  which is my question.
24             MR. BRAUCHLE:   Well, yes, we are requesting the
25  attempted capital murder.

98

1       THE COURT:   The Court will deny that.
2       MR. BRAUCHLE:   Murder under Penal Code Section
3   19.02(d), that's second degree.
4       MR. BEACH:   Voluntary manslaughter.
5       MS. SMITH:   Sudden passion.
6       THE COURT:   I presume the State's position is.
7       MS. SMITH:   We are opposed to all other lessers
8   except for the one.
9       THE COURT:   All right, murder under Section
10  19.02(d) is denied.
11      MR. BRAUCHLE:   Manslaughter under Section 19.04.
12      THE COURT:   Denied.
13      MR. BRAUCHLE:   Aggravated assault under 22.02.
14      THE COURT:   Denied.
15      MR. BRAUCHLE:   Criminally negligent homicide
16  under 19.05.
17      THE COURT:   Denied.
18      MR. BRAUCHLE:   Deadly conduct under 22.05.
19      THE COURT:   Denied.
20      MR. BRAUCHLE:   Then Class A misdemeanor assault.
21      THE COURT:   Denied.
22      MR. BRAUCHLE:   And Class C misdemeanor assault.
23      THE COURT:   Denied.
24      MR. BRAUCHLE:   Okay.
25      (Pause in the proceedings.)

99

1       THE COURT:   On the record.  The Defense had an
2   issue?
3       MR. JOHNSON:   Judge, we are prepared to go
4   forward with punishment if -- if that's what happens.  So we
5   are not asking for a continuance.  And we suggest that prior
6   to argument a decision be made in regards to the juror that
7   is -- has some travel issues.  And -- and obviously we can't
8   go to the alternate after we argue and the case goes to the
9   jury.  So I think a decision needs to be made about that juror
10  being replaced with the alternate if he is going to be
11  unavailable for us to continue the trial.  So we need to
12  address that.
13      THE COURT:   The State.
14      MR. BEACH:   Nothing to address, you had a
15  discretion, there is nobody disqualified tomorrow in the first
16  12, the code says that you can excuse the alternate once --
17  before the charge is read -- after the charge is read; is that
18  right.
19      THE COURT:   After.
20      MR. BEACH:   After the charge is read.  We
21  deliberate, you have the discretion after that to set your own
22  timetable.  Just like Judge Chatham did, if there are jury
23  issues, if there are Judge issues, a two-, three-week break is
24  not going to inconvenience anybody.  Just like we didn't
25  inconvenience the jury last week that was ill.  We took a

100

1   two-day break until she got well.  We would obviously object,
2   oppose, any tampering with the original 12.
3       MR. BRAUCHLE:   That has already been tampered
4   with.
5       MR. BEACH:   That's our position.
6       MR. JOHNSON:   Well, in response to that.  I
7   certainly don't agree that it is going to not be an
8   inconvenience for anybody else what is being suggested.  It is
9   going to be an inconvenience for everybody.  And that is
10  exactly the problem, is that the inconvenience to the Court
11  but the lawyers, but especially the jurors.
12      MR. BEACH:   That should have been addressed, you
13  know to some extent, it was not -- well, strike that.
14      MR. JOHNSON:   Judge, just so the record
15  reflects, we are not saying that the juror who in request, is
16  Juror No. 2, Mr. Sepulveda, and that's the juror that has the
17  travel commitments that are going to interfere with continuing
18  this case at this time.  And what we are asking the Court to
19  do is basically inquire of that juror whether or not he wants
20  to stay on the jury and giver him the option of passing or
21  playing, understanding, you know how it is going to affect the
22  court's proceedings.  And I think you give him the option of
23  that, Judge.  And if he says, well, I choose to go, then --
24  that's why we have alternates, has been pointed out to a
25  sitting juror before.  And I think that, if he says that he

101

1   would prefer to go about his business, that his preplan paid
2   trip, whatever it is, we replace him with the alternate.  It
3   is real simple, we talk to the juror about it.  If he says he
4   wants to stay, well, then there is not a problem.  So and
5   that's basically what we are saying to Court.  We think that's
6   what we should do.
7       THE COURT:   Anything further from the State on
8   that?
9       MR. BEACH:   No, Your Honor.
10      MR. BRAUCHLE:   I think the other thing that
11  hasn't been gone into, it has been alluded to, is that once we
12  take this ten days or whatever it is that Sepulveda is going
13  to need, then it is kind of the domino effect, because then we
14  don't know how it is going to affect the other jurors.  You
15  know if they have timetable in their own mind saying, well,
16  when we came back the day after Memorial Day and we had a
17  two-week time estimate and they made plans or whatever, just
18  like Sepulveda has, thinking that that was the correct
19  timetable, now they they are getting pushed back ten days on
20  their plans.  So what we have got is just an 11-person domino
21  effect just because of one person.  And it may take all
22  morning to figure out the ramifications of moving the whole
23  trial back ten days.  We may never get the 12 people back
24  together again.  I am sure we will at some point, but we don't
25  know when it would be.

**102**

1   MR. BEACH:   As we have heard so many times from
2   our learned opponents, there is no rush in a death-penalty
3   case. Make sure we take it slowly and consistent with justice
4   and the State is not in any hurry right now. We are where we
5   are because of a number of different factors, but we are not
6   in a bad position, we are not in a, you know, any kind of
7   appellate quandary. This is something that has been done
8   before, there is precedent for it. If we are talking about
9   four or five months, that's one thing, we are talking about a
10  couple of weeks.
11  MR. BRAUCHLE:   We don't know if we are talking
12  about four or five months.
13  THE COURT:   The Court at this time will deny the
14  request made by the Defense.
15  MR. PARKS:   On that -- I know we had abandoned
16  about some dates, but let's assume -- I will ask the same
17  question again, let's assume we don't get finished, that we
18  have to take the break that the Court has indicated that we
19  are going to take, do we have an estimated -- assuming that a
20  juror -- that we don't have problem with jurors, just talking
21  about us here, do I recall that we were talking about the 24th
22  to start back.
23  THE COURT:   I thought it was the 23rd.
24  MR. PARKS:   Karo is not coming back from --
25  MR. JOHNSON:   I don't get back until the 23rd.

**103**

1   THE COURT:   So the 24th. But that also
2   depended on another issue that the Defense had raised.
3   MR. PARKS:   Yes, I understand.
4   THE COURT:   Right.
5   MR. PARKS:   All other things being equal, that
6   would probably be the first opportunity that we would have to
7   start back?
8   THE COURT:   Correct. And once again an inquiry
9   would have to be made as to the jurors --
10  MR. PARKS:   Yeah, the jurors.
11  THE COURT:   -- availability.
12  MR. PARKS:   I say that, Judge, simply because
13  the attorney general is trying to schedule a deposition for me
14  in Arizona that week and I don't want to buy tickets at the
15  expense of Wood County.
16  THE COURT:   Exactly. Have y'all made a decision
17  with the other issue you have regarding the expert witness.
18  Because that was actually going to be the starting point if
19  y'all had an idea how much time, if any, you needed.
20  MR. PARKS:   We may have to consult --
21  MR. JOHNSON:   Well, we haven't made a decision.
22  Obviously this may help us make that decision what we are
23  doing. Let me ask one more question in regard to that.
24  Andy, are y'all thinking that in the event we do get
25  tomorrow, that y'all would not start your punishment evidence

**104**

1   until we return?
2   MR. BEACH:   Right.
3   THE COURT:   Right, it would be a break.
4   MR. JOHNSON:   That may take care of it.
5   THE COURT:   And if y'all will let us know
6   tomorrow morning about the other issue, how much time you
7   need.
8   MR. JOHNSON:   Thank you.
9   (Court recessed for the day.)

**105**

1   THE STATE of TEXAS )
2   COUNTY of DALLAS  )
3   I, BELINDA G. BARAKA, Official Court Reporter in and
4   for the 194th Judicial District Court of Dallas County, State
5   of Texas, do hereby certify that the foregoing contains a true
6   and accurate transcription of all portions of evidence and
7   other proceedings requested in writing by counsel for the
8   parties, to be included in this volume of the Reporter's
9   Record, in the above-styled and -numbered cause(s), all of
10  which occurred in open court or in chambers and were reported
11  by me.
12  I further certify that this Reporter's Record of the
13  proceedings truly and correctly reflects the exhibits, if any,
14  admitted by the respective parties.
15  I further certify that the total cost for the
16  preparation of this Reporter's Record  was paid by the
17  State/Defense.
18  WITNESS MY OFFICIAL HAND this the 30th day of
19  May , A.D., 2009.

BELINDA G. BARAKA, CSR #5028
Official Court Reporter
133 N. Industrial
Dallas County, Texas  75207
25  Certification Expires:  12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1                    CAUSE NO. F07-50318-M

2  THE STATE OF TEXAS          *    IN THE DISTRICT COURT

3  vs.                         *    194TH JUDICIAL DISTRICT

4  WESLEY LYNN RUIZ            *    DALLAS COUNTY, TEXAS

5

6

7  - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9                      REPORTER'S RECORD

10                         JURY TRIAL

11                  Volume 48 of 59 Volume(s)

12

13

14 - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19        BE IT REMEMBERED THAT on this the 5th day of June,

20  A.D, 2008, the above-styled and -numbered cause(s) came on for

21  hearing before the HONORABLE ERNEST B. WHITE, III, of the

22  194th Judicial District Court of Dallas County, State of

23  Texas, the following is a true and correct transcription of

24  the proceedings had, to-wit:

25    (Proceedings Reported by Computerized Machine Shorthand)

```
 1                              A P P E A R A N C E S

 2

 3      HON. KEVIN BROOKS
        Assistant District Attorney
 4      State Bar No. 03070735

 5

 6      HON. ANDY BEACH
        Assistant District Attorney
 7      State Bar No.  01944900

 8                                      FOR THE STATE OF TEXAS

 9

10      HON. PAUL BRAUCHLE
        Attorney at Law
11      State Bar No. 02918000

12

13      HON. WILLIAM JOHNSON
        Attorney at Law
14      State Bar No.  10804500

15                                      FOR THE DEFENDANT

16      Also Present:

17        Doug Parks, Attorney at Law

18

19                              *  *  *  *  *

20

21

22

23

24

25
```

**I N D E X**

PAGE/VOL.

Proceedings – 06/5/08 .............................. 5/48

Acceptance of Charge .............................. 5

Defense Reopens ................................... 6

Defense Rest and Close............................. 7

Charge of the Court .............................. 7

Argument by – Mr. Handley ......................... 7

Argument by – Mr. Brauchle ........................ 23

Argument by – Mr. Brooks .......................... 49

Jury Deliberations ................................ 60

Verdict .......................................... 65

<u>Defense Witness</u>      Direct     Cross      S.Rosa

 ANTHONY WILLIAMS                        66, 70

                                        71, 72

Reporter's Certificate ............................ 75

```
 1                    E X H I B I T   I N D E X

 2   DEFENSE'S EXHIBIT(S):        OFFERED:   ADMITTED:   VOL

 3    23    Handgun                  6          7         48

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

PROCEEDINGS

1   PROCEEDINGS
2   (June 5, 2008)
3   THE COURT:   Has the sides had an opportunity to
4   review the Court's charge?
5   MR. BROOKS:   Yes, Your Honor.
6   MR. PARKS:   Yes, Your Honor.
7   THE COURT:   Any objections or requests from the
8   State?
9   MR. BROOKS:   No objections from the State.
10  MR. PARKS:   Judge, there has been one paragraph
11  added since yesterday's conference by agreement, I believe,
12  and there are no additional.
13  THE COURT:   I'm sorry?
14  MR. PARKS:   There are no additional objections
15  from the Defense besides what was stated yesterday.
16  THE COURT:   And how much time are the attorneys
17  requesting for argument?
18  MR. BROOKS:   Just to be safe, Judge, the State
19  would ask for one hour.  I am not pledging that we are going
20  to use the entire hour, better be safe than sorry.
21  THE COURT:   And is that sufficient for the
22  Defense?
23  MR. JOHNSON:   I think we were thinking of less
24  than that.  I don't know why we would need that long.
25  MR. BEACH:   Ten minutes.

6

1   MR. JOHNSON:   Ten minutes might be okay.
2   THE COURT:   I will overrule that.
3   MR. JOHNSON:   We were thinking 30, 45 minutes.
4   THE COURT:   I will allow an hour.  The State
5   gives me change back, I would appreciate it.
6   (Pause in the proceedings.)
7   THE COURT:   Both sides ready for the jury?
8   MR. BROOKS:   State's ready.
9   MR. BRAUCHLE:   Defense is ready.
10  THE COURT:   Bring them in.
11  THE BAILIFF:   All rise, please.
12  (Jury entered the courtroom.)
13  THE COURT:   You be may be seated.
14  You may proceed, Mr. Brauchle.
15  MR. BRAUCHLE:   Your Honor we would introduce
16  into evidence, Defendant's Exhibit 23, which are the items
17  contained in this bag marked Defendant's Exhibit 23.
18  Are there any objections?
19  MR. BROOKS:   No objections.
20  MR. BRAUCHLE:   And we would also read the
21  stipulation that says that if Daniel Krieter were to be
22  recalled to testify, he would state that he was the Dallas
23  Police Department crime scene officer in this case and that
24  Defendant's Exhibit No. 23, which is what was just introduced
25  was Mark Nix's second weapon, a Sig Saur .357 loaded with

7

1   eight rounds with two additional 12-round clips.  And Defense
2   Exhibit 23 was recovered from State's Exhibit No. 83, Mark
3   Nix's ballistic vest at Parkland Hospital on March 23rd of
4   2007.
5   THE COURT:   And the record will reflect
6   Defendant's Exhibit 23 is admitted.
7   MR. BRAUCHLE:   Thank you, Your Honor.
8   THE COURT:   Anything further, Mr. Brauchle?
9   MR. BRAUCHLE:   Nothing, Your Honor, we will rest
10  and close again.
11  THE COURT:   Ladies and gentlemen, both sides
12  having rested and closed, I will read you the Court's.
13  (Court's charge read to the jury.)
14  THE COURT:   What says the State?
15  MS. HANDLEY:   May it please the Court?
16  Co-counselor.
17  Counsel.
18  ARGUMENT
19  BY MS. HANDLEY:
20  Good morning, ladies and gentlemen of the jury.  When we
21  met, I guess it was the beginning of this year, last year,
22  each and every one of you made a promise to us; and that was,
23  you agreed to follow the law in this case.  And that you
24  agreed that you would base your verdict on the evidence in
25  this case.  You also promised to us that if we proved to you

8

1   beyond a reasonable doubt the defendant was guilty of capital
2   murder, that you would return that verdict of guilty.
3   Your obligation as a juror is not only that, that you
4   follow the law, that you apply the evidence to the facts in
5   the case to render your verdict, but what we also trust upon
6   you that in doing, that you will use your good common sense.
7   That's why we felt comfortable putting each and every one of
8   you on this jury here.  Because we trust that what you bring
9   in here is not only that you are reasonable and smart and have
10  life experience, but that you have good common sense.  Because
11  what you also do as a jury, is you are called upon to test the
12  credibility of the evidence in the case, as well as the
13  witnesses in this case.
14  You have received a lot of evidence in this case.  We
15  don't just tell you what time it is, we tell you how to build
16  the clock.  And the reason we do that is evidenced by
17  Officer -- pardon me, by Dr. Townsend-Parchman.  She gave you
18  a very educational reasoning as to the cause of death of
19  Officer Mark Nix.  So that you can come to the conclusion a
20  hundred percent confident that he did in fact die from a
21  gunshot wound.
22  We bring you all this evidence.
23  You also received evidence from the defense counsel here,
24  they offered into evidence certain documents.  They also
25  cross-examined witnesses.  You also consider that.  You

9

10

1  consider that, for example their Defense Exhibit No. 1, the
2  protocol on the felony stop, that they offered into evidence.
3  And when you consider that, you can make the decision, does
4  that really apply to the factual situation in this case?  Is
5  that something that was quite possibly taken out of context in
6  the hopes to fit the Defensive theory, but actually fell
7  really flat on its face.  You make that decision with respect
8  to the evidence in the case.  You separate the wheat from the
9  chaff.  You decide what is fact and you also decide what is
10  fiction; or in this case, what are merely shadows on the
11  windshield of a car.
12      You are also called upon to judge the credibility of the
13  witnesses in the case.  That's why we have humans deciding
14  cases.  That's why we don't just put facts in a computer and
15  spit out a verdict.  Because we need you to use that common
16  sense, to use that life experience, to listen to people, to
17  put it together with the evidence in the case, and to decide
18  the credibility of each and every one of these witnesses.
19      With respect to these officers that testified before you
20  in this case, did they have the training and experience and
21  qualifications to do their job?  Did their testimony and their
22  recitation of what happened out there that day, did it square
23  with the physical evidence.  Did it square with what you saw
24  with your own two eyes.
25      You judge the credibility of civilian witnesses.  And

1  respect that they brought you Ms. Correa.  And bless her
2  heart, folks, and I say that with all due respect to that
3  woman, she seems like a fine woman.  But was she really in a
4  vantage point to really see what was going on?  Did she -- did
5  she not maybe just see a lot of confusion and hear a lot of
6  chaos?  Did she really know exactly what happened and what
7  sequence it happened?  Or was she just kind of confused and
8  scared when they brought her down here.  You decide that.  I
9  am not calling her a liar.  I am just saying she wasn't in the
10  right place to see what really happened.
11      And you also judge the credibility of the defendant.  We
12  talked about in voir dire that if a defendant doesn't take the
13  stand, you can't hold that against him.  But when he does, you
14  absolutely can take that into consideration.  And while this
15  defendant may be presumed innocent, he is not presumed
16  truthful, ladies and gentlemen.
17      And you may, in assessing his credibility, take into
18  consideration the fact that he is a convicted felon.  You may
19  take into consideration in assessing his credibility and the
20  testimony that he proffered, his motivations for testifying
21  the way he did.
22      I will submit to you the question is not was Wesley Lynn
23  Ruiz lying to you yesterday on the stand.  The question is,
24  why wouldn't he?  This individual has absolutely nothing to
25  gain and everything to lose by being honest with you.

11

12

1      His motivations on March 23rd of 2007 weren't very
2  different from his motivations when he took this stand
3  yesterday.  His motivations on that day when he murdered that
4  officer were to never be taken into custody and to never spend
5  a day in prison.  His motivations on that stand are absolutely
6  the same.  And be it, killing an officer or be it lying to a
7  jury, he is going to do whatever he can do to keep himself out
8  on the street, continuing the life style that he so enjoys.
9      When this individual takes the stand, listens to the same
10  evidence that you heard, sees the same things that you saw and
11  then says, Well, I don't know that I actually killed that
12  officer, is absolutely disingenuous.  It is a nice way of
13  saying lie.  When he tells you, "I was knocked unconscious,"
14  he is lying.  Don't kid an old kidder, Wesley Ruiz.  You can't
15  stand here and say the things that you think are going to help
16  you, and then I don't remember or I was knocked out to the
17  things that you know are going to convict you in this case.
18      You may assess his credibility.  I submit to you, he is
19  lying.
20      Now, in this case, ladies and gentlemen, in the charge as
21  the Judge read it to you, you heard him talk about
22  self-defense.  And you heard him talk about this, well, lesser
23  included offense of murder.  And you may recall way back when
24  we did voir dire, we briefly touched on that.  And as we
25  explained to you in voir dire and as it says in the charge, if

1  there is any evidence, no matter how slight, no matter how
2  incredulous, no matter how absurd, if there is any evidence of
3  self-defense or a lesser, well, the Judge is bound by the law
4  to include it in the charge.  And you are bound to consider
5  it.  That is why it is there.
6      The charge on self-defense is there because this
7  individual took the stand yesterday and told you, I killed the
8  officer in self-defense.  So it is there.  As absurd as that
9  is, that's why it is there.  This charge on considering
10  whether or not he is guilty or not of capital murder but of that
11  simple murder that we talked about, it's there because he
12  wants you to believe that Officer Mark Nix or the other
13  officers in the case were not acting in the lawful discharge
14  of their official duty.  He wants you to believe they opened
15  fire on him first.  He wants you to believe he is not in fact
16  the individual that started that gun fight.  That's why that
17  is in there, folks.
18      Now, you don't ever even get to this lesser included
19  murder unless you find that he is not guilty of capital
20  murder.  And I submit to you that we have proved that to you
21  beyond a reasonable doubt that that's a verdict that you can
22  return 100 percent confidently.
23      Our obligation to you is to prove to you beyond a
24  reasonable doubt that the defendant, on or about March 23rd,
25  2007, in Dallas County, Texas, did intentionally or knowingly

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

13

```
 1   cause the death of Mark Nix, a Dallas Peace Officer.  That he
 2   killed him by shooting him with a firearm.  That he knew he
 3   was a peace officer when he murdered him.  And that Mark Nix
 4   was a peace officer in the lawful discharge of his official
 5   duties.  I don't think it is very highly contested that this
 6   happened on March 23rd of 2007, or that this happened in
 7   Dallas County, Texas, in the residential yard of a family that
 8   lives there at the intersection of Bernal and Mart in Dallas
 9   County, Texas.  Not really contested in this case.
10        Did he kill him with intent, did he kill him with
11   knowledge.  That goes to say, did he kill him with intent, did
12   he mean to kill him.  Or even did he kill him with knowledge.
13   Which means that did he know that when you take a weapon,
14   fully loaded with military grade ammunition, point it at the
15   chest of a man and open fire, did he know that that could
16   cause somebody's death?  Well, it defies common sense to say
17   that you don't.  Even he had to admit that.
18        Did he kill Mark Nix?  We have to prove to you the
19   identity of the individual that he killed.  Did he kill Mark
20   Nix?  Did he kill Brian Payne's best man?  Did he kill the
21   colleague of Officers Borchardt, Haecker, Starr, Jarc and
22   every other law enforcement officer in this city?  Did he kill
23   the public servant that got on the street everyday and put his
24   life on the line to keep us safe, that Mark Nix?  Did he kill
25   Mark Nix, the son of Cheryl and David Nix, the big brother to
```

14

```
 1   Rene?  Did he kill Mark Nix, the hero?  Yeah, that's the Mark
 2   Nix he killed, ladies and gentlemen.  And sadly, because of
 3   Wesley Lynn Ruiz, Mark Nix is and will always be those things.
 4   But because of Wesley Ruiz, he killed Mark Nix, who is now a
 5   State's Exhibit.  Mark Nix, State's Exhibit No. 87.
 6        Did he know he was a peace officer when he killed him?
 7   Again, it would be disingenuous to say he didn't.  Marked
 8   squad cars, lights, this uniform.  Did he know he was a peace
 9   officer?  This badge.
10        Ladies and gentlemen, before this badge was State's
11   Exhibit No. 86, I will submit to you it was so much more to
12   Officer Nix.  I will submit to you that State's Exhibit 86 was
13   the symbol of pride, integrity, honor, public service,
14   justice, order, and heroism.
15        And I will submit to you, it represented the same thing
16   to the defendant.  It represented all that and it represented
17   what was going to keep him from the pursuit of his life style.
18   And it ought not to come as any coincidence with respect to
19   his intent to kill a peace officer.  That when he shot at him,
20   folks, he didn't just willie nilly shoot.  He shot at the one
21   thing that represents him most as a peace officer.  He shot at
22   his badge.
23        Was Mark Nix in the lawful discharge of his official
24   duties when he murdered him?  Did he shoot him with a firearm?
25   Well, I think that also goes without saying, folks, that
```

15

```
 1   State's Exhibit here No. 98, are the fragments taken from the
 2   body that came from State's Exhibit No. 64, that held the
 3   bullet that is now the casing that was fired from State's
 4   Exhibit 63, the defendant's firearm.  It ought to go without
 5   saying that State's Exhibit here -- and I will turn it this
 6   way out of respect -- is a deadly weapon and is capable of
 7   causing bodily injury and deadly; and unfortunately, the facts
 8   speak for itself.  Did he murder Officer Mark Nix while he was
 9   in the official line of his official duties as a peace
10   officer.  And therein lies the rug, folks.
11        Because in order for you to find the defendant guilty of
12   this lesser or this simple murder, you must find that Mark
13   Nix, or now we see any one of those officers out there, was
14   not in the lawful discharge of their official duties.  You
15   must find that.
16        I will submit to you on March 23rd of 2007, when Mark
17   Nix got up that morning, as did all those other fine officers,
18   put on their uniforms, and either got in their Patrol cars or
19   got into their covert vehicles and took to the streets to
20   Patrol for your safety or took to their assignments to
21   actually go into the worst neighborhoods in our city to
22   prevent crime, I will submit to you that they were in fact in
23   the lawful discharge of their official duties.
24        I will submit to you that when Mark Nix was on that
25   street and he heard that call from assistance from his fellow
```

16

```
 1   officers and colleagues that they needed assistance in pulling
 2   over a possible murder suspect or a car used in a murder, when
 3   he didn't hesitate, when he didn't stand down, when he stepped
 4   up and said, I am on my way, that he was in the lawful
 5   discharge of his official duties.
 6        I will submit to you that when he pulled in behind the
 7   car driven by the defendant in this case, he turned on his
 8   lights and attempted to pull over that murder suspect, and
 9   make no mistake about it, he as did any officer out there had
10   every legal justification for pulling him over that day.  And
11   when he attempted to pull him over, he was acting in the
12   lawful discharge of his official duties.  And when the
13   defendant turned it into something else, when the defendant
14   decided to flee, when the defendant decided to drive
15   recklessly and dangerously down your streets and through your
16   neighborhoods, clipping corners, driving into on coming
17   traffic, when Mark Nix and as the other officers, pursued him
18   and attempt to stop him and detain him and to put an end to
19   this dangerous violence, they were acting in the official line
20   of duty.  And when that defendant wrecked out, and when
21   Officer Mark Nix ran up to that car in an effort to extract
22   him from that car, from that car that he had already
23   demonstrated he would voluntarily use as a weapon on the
24   streets, when he ran up to that car, he was acting in the
25   official discharge of his duties.
```

17

1        And when he started beating on that window in an attempt
2   to break the window to extract the defendant from the car, and
3   that is what he was doing, that is the lawful discharge of his
4   official duties, folks.
5        And when Officer Jarc ran in there to pull Officer Nix
6   out of there in an attempt to save his life, in a heroic
7   attempt safe his life, he was acting in the lawful discharge
8   of his official duties.  When Officer Borchardt, Haecker,
9   Starr, gave Jarc cover to do that, to pull their colleague out
10  of there in an attempt to save his life, they also were acting
11  in the lawful discharge of their official duties.  As they
12  rode with that officer in the back of that squad car, putting
13  pressure on his wounds, and telling him, Buddy, hold on, just
14  hold on, they were in the lawful discharge of their official
15  duties.
16       I will submit to you until Officer Mark Nix took his
17  dying breath, he was in the lawful discharge of his official
18  duties.
19       He need you to believe that they weren't.  And it
20  shouldn't have gotten passed you folks, that of all the people
21  they could have called to take the stand, because they have
22  the same subpoena power as we do, of all the people they could
23  have called to take the stand and say neither Officer Mark Nix
24  or any other officer out there was acting lawfully, of all the
25  people that they could have got to take the stand, of all the

18

1   officers in this city, in this state, in this country, of all
2   the sergeants, of all the trainers, of all the people that
3   they could have got to take the stand and say their actions
4   were not lawful, that Mark Nix was some kind of a criminal,
5   that Mark Nix or these other officers are rogue cops, that
6   they weren't heroes.  Of all the people that they could have
7   got to tell you that, who did they pick, the defendant.  I
8   submit to you that they couldn't find anybody else to say such
9   nonsense.
10       They want you to believe that he didn't fire the first
11  round.  They desperately want you to believe that.  Here is
12  where your common sense comes into play, folks.  Do you think
13  Jarc and Starr and Borchardt and Haecker would have opened
14  fire on a car with their comrade, with their colleague
15  standing right next to it?  It makes no sense.  And
16  particularly defies what you can see with your own two eyes,
17  folks.  No reasonable person can find that Officer Mark Nix or
18  any of those other officers were not acting in the official
19  line of duty.  The official discharge of their duties.  No
20  reasonable person can say that.  The defendant might, but no
21  reasonable person can say that.  They want you to believe that
22  he was some kind of an Average Joe out there with no
23  authority.  They don't want you to believe that he was a hero.
24       Which also leads us now to this proposition of
25  self-defense.  And we know why it is in the charge, because

19

1   the defendant took the stand yesterday and said, "I shot him
2   in self-defense."  It's absurd.  And as nonsensical as that
3   is, it is there because he said it.  And the law of
4   self-defense in that charge that you will receive from the
5   Court.  Very wordy and there is a lot of law to it.  But the
6   fact of the matter is, don't get caught up in the minutia,
7   step back, folks, when you think about self-defense.  Step
8   back, because believe it or not, a lot of our law is actually
9   based in good common sense.
10       And the law of self-defense in pertinent parts reads as
11  follows:  Before you can use deadly force against another,
12  that is to say before you can murder someone, before you can
13  take a modified pistol such as this and shoot a man in the
14  chest, before you can do that, you must reasonably believe the
15  force is immediately necessary to protect yourself against the
16  other's use of unlawful deadly force.  We all know that he was
17  acting lawfully out there, there is no question about that.
18       You need to find in order to find self-defense in part
19  that Mark Nix was using deadly force.  Let's not put the cart
20  before the horse here.  Was Mark Nix actually using deadly
21  force.  What was he doing out there that day, folks, right
22  before he murdered him?  He was breaking a window.  He was
23  breaking a window to extract him from the car.  Breaking a
24  window is not deadly force.  Breaking a window to get a person
25  out of a car under these particular circumstances, that's not

20

1   even deadly force.  Well, he had a gun on him.  Well, he could
2   have -- that's not where we are, don't put the cart before the
3   horse.  This deadly force that they want you to subscribe to
4   is breaking a window.  He never laid a hand on him.
5            MR. BRAUCHLE:  Your Honor, we would object to
6   that as being outside the testimony.
7            THE COURT:  Overruled.
8            MS. HANDLEY:  You have to have to find that the deadly
9   force used by the defendant in this case was immediately
10  necessary.  Was it?  He is breaking a window.  Wasn't even
11  near him.  Didn't have a hand on him.  And most importantly
12  what you have to find is, and I submit to you the biggest
13  problem for the defendant, is that you have to find that his
14  actions were reasonable.  And this is important, and again
15  this is common sense.  Don't lose the forest for the trees,
16  folks.
17       A reasonable belief, and this is in your charge, is a
18  belief that would be held by an ordinary and prudent person in
19  the same circumstances as the actor.  Ordinary and prudent
20  person.  I will submit to you that the defendant in this case
21  was neither, ordinary nor prudent.
22       When a police officer gets behind you, and turns on his
23  lights, what do you as an ordinary and prudent person do, you
24  pull over, don't you?  You stop your car, don't you?  You put
25  it in park, don't you?  And then you do what the ordinary and

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

21

22

**Page 21**

1   prudent person does, you start looking for your driver's
2   license and proof of insurance, don't you?  He did neither of
3   those.
4           The ordinary and prudent person doesn't flee from the
5   police officers.  The ordinary and prudent person doesn't race
6   through residential streets, hitting curbs, clipping street
7   curbs, running into on-coming traffic, driving recklessly and
8   dangerously, that is not the ordinary and prudent person, is
9   it?  The ordinary and prudent person, folks, doesn't carry
10  around a fully loaded modified pistol.  Fully loaded with
11  military grade ammunition.
12          MR. BRAUCHLE:   Your Honor, once again we would
13  object to that as being outside the record.
14          THE COURT:   Overruled.
15          MS. HANDLEY:   The ordinary and prudent person
16  doesn't carry around enough crystal methamphetamine that it
17  could land them in prison for the rest of their lives.  The
18  ordinary and prudent person doesn't have the motivations of
19  the defendant that day and now.  And an ordinary and prudent
20  person, folks, when asked, so what are you going to do,
21  Wesley, when the law catches up to you, doesn't say, I am
22  going to go out like a "G."  You know what that is.  It's
23  gangster.  Or as the defendant --
24          MR. BRAUCHLE:   Your Honor, once again we would
25  object to this as being outside the evidence.

**Page 22**

1           THE COURT:   Overruled.
2           MR. BRAUCHLE:   May we have a running objection?
3           THE COURT:   You may.
4           MS. HANDLEY:   Or if you believe the defendant,
5   he intended to go out like a girl.  He was neither ordinary,
6   he was neither prudent.
7           You cannot consider self-defense in a vacuum, folks.  You
8   can't say, well, he said he was scared, so it must be
9   legitimate self-defense.  You have to consider all the
10  surrounding circumstances, all of it.  And you have to
11  consider the defendant.  And you have to consider his
12  motivations in the case.
13          You cannot just put somebody on the stand and say as with
14  the officers, well, if I just ran up to you as a police
15  officer with an asp in my hand, wouldn't you be in fear for
16  your life.  And not leave out the rest of the equation.  You
17  can't look at it in a vacuum.  There isn't a reasonable person
18  here that could find the defendant legitimately acted in
19  self-defense.  That he was justified in pulling out that gun
20  and killing that officer because he was breaking a window in
21  an attempt to get him out.  In an attempt to stop him from a
22  lifestyle for which he enjoyed up until this point.
23          You will never even get to the issue of lesser included
24  murder unless you find that we have not proved to you beyond a
25  reasonable doubt that the defendant is guilty of capital

**Page 23**

1   murder.
2           We trust that you will follow the law in this case.  And
3   we trust that you will base your verdict on the evidence in
4   this case and not on speculation, not on blame shifting, not
5   on shadows on windshields.  That you will base your verdict on
6   the truth in this case and the evidence in this case.  And we
7   trust that you will do that by using your good common sense.
8           And I will thank you in advance, ladies and gentlemen,
9   not only for your time and attention that you have paid in
10  your commitment to this process, but your -- for your verdict
11  of guilty of capital murder.
12          Thank you.
13          MR. BRAUCHLE:   May it please the Court?
14                          ARGUMENT
15  BY MR. BRAUCHLE:
16          Ladies and gentlemen of the jury, I am quite a
17  disadvantage following a wordsmith such as Ms. Handley.  But
18  there is a couple of things that she talked about that I need
19  to address I think while they are still ringing in your ears.
20  And one of those is that she is talking about whether Officer
21  Nix was in the lawful discharge of his duty.
22          Well, I don't think that anybody has tried to tell you
23  that he wasn't a police officer out there.  I don't think
24  anybody told you that.  And when you read the charge -- and
25  let me just tell you something, when judges read these charges

**Page 24**

1   to juries, it sounds like an insurance policy.  It is read
2   rather rapidly, he uses terms that you are not familiar with,
3   and what you need to do is to go back and sit down and
4   patiently read it and see what it is telling you to do.  This
5   is the road map for your verdict, okay.
6           But it says that self-defense is immediately necessary to
7   protect himself against what the defendant -- what the
8   defendant from his perception reasonably believes is the use
9   or attempted use.  The use or attempted use of deadly force by
10  Officer Nix.  We will stipulate that he is a peace officer.
11  There has never been a question about that.  So you have to --
12  you have to address both of those things.  It is from
13  Mr. Ruiz's point of view whether it was reasonable to him, not
14  to Ms. Handley.  We know that it is always going to come down
15  that way.  Whether it was reasonable to him to do what did he
16  to resist unreasonable deadly force or the attempted use of
17  deadly force against Mr. Ruiz.  That's the crux of the case.
18          Well, let's go back.  I think I would be obviously not
19  doing my job if I didn't thank each and every one of you for
20  what you have been doing down here.  I have been watching you,
21  you have been watching the evidence, you have been looking at
22  the evidence, you have been listening to the witnesses and
23  that's your job.  Right about now, it is probably the worst
24  job you could ever have.  Y'all didn't come down here in
25  answer for a want ad and sign on for this.  You were somewhat

25

1   pressed into service.  But I want to thank you for your
2   service.  Without juries, the system would never work.
3           Let's go back to the start of the trial, when the first
4   showing of the video came up, I would imagine the impression
5   of each and every one of you was there is no excuse for that,
6   there is no excuse for that.  And I think that's not an
7   uncommon thing to have probably thought at that point in time.
8   And you know, if that's all they would have shown you, if they
9   would have just shown you the first video, there is no
10  question that you would have voted the way Ms. Handley wants
11  you to.  There is no question about that.  But then you
12  remember that they started bringing the officers down, and
13  Ms. Handley thinks that that's to the State's advantage.  I
14  somehow think otherwise.  You know the more the officers came
15  down and the more they told their story, it kind of became
16  obvious to you that it wasn't the first time they had told
17  that story.  And it wasn't the first time that they had
18  compared notes or that they had come up with the script that
19  you finally got.
20          You know -- and when you talk to the officers -- when you
21  talk to the officers, they were -- reluctantly tell you, well,
22  this, that and the other.  You ask them -- they all say, well
23  Mr. Ruiz was disobeying a lawful command from a peace officer.
24  And then you say, what was that lawful command?  Well, I
25  couldn't hear it for the siren.  What was Officer Nix saying,

26

1   he was commanding the -- well, I don't know, I don't know,
2   whatever he was doing, whatever he was doing was right.  And
3   they keep coming back to that, then when you ask them things
4   like could you see in the car?  No, I couldn't see in the car,
5   it had this heavy tint, you couldn't see anything.  You would
6   think that Mr. Ruiz was driving a portable cave out there.
7   Then you know what, when it came to their advantage to see in
8   the car, we suddenly started seeing long barrel rifles
9   pointing at you.  We have gunshots fired from the car.  And we
10  know that didn't happen, because everybody agrees that there
11  was only one shot fired by Mr. Ruiz.
12          You know, it's unfortunate that in some instances we have
13  open court, because these officers have come down here, they
14  are not part and parcel of this case, they are down here for
15  one reason and one reason only, that's to intimidate you,
16  trying to --
17          MR. BROOKS:  Your·Honor, I am going to object,
18  this argument is outside of the record.
19          THE COURT:  Sustained.
20          MR. BRAUCHLE:  I think all of you have common
21  sense, just like Ms. Handley told you.  I think you will use
22  it.  I think you will use it.  And I would like to think that
23  you will make your decision from your own personal thoughts
24  and evaluation of the evidence as you heard it.  You know when
25  you go back there, you are supposed to work as a unit, but you

27

1   still are entitled to your individual beliefs and to do what
2   you decide in your own mind rather than collectively.  If all
3   12 minds agree, so be it.  If they don't, so be it.  But I am
4   asking you to not be pressured, to not be congealed into doing
5   something that you know could be wrong.
6           And let's get back to what else I have got to share with
7   you.  Let's go back, I know this is -- this is going to be
8   painful, but let's go back to voir dire, that was probably the
9   worst two hours of some of you spent, and I apologize if we
10  made it that way.  But you know something, we were trying
11  to -- to analyze and break down somebody that we had never
12  seen before in an hour per side.  Now, you know, you·all might
13  have been married for quite sometime and you are still being
14  surprised by your spouse.  But we had to come down here and
15  talk to you and try to analyze how you would act on this case.
16  And we had to give you certain hypotheticals.  We had to give
17  you certain situations.  And we asked you about those.  And
18  you know when you came in, each and every one of you knew that
19  this case was about the death of a police officer.  Each and
20  every one of you knew that.  Nobody hid that ball from you.
21  So if each and every one of you knew that that's what you were
22  down here for.  And we asked each and every one of you could
23  you sat that fact aside and judge the evidence on itself and
24  not be swayed by the fact that the deceased was a police
25  officer.  And each and every one of you said, yes, I can.

28

1   Each and every one of you said, yes, I can.  If you hadn't,
2   you know that was the key to getting out of here, if you
3   hadn't said that, you wouldn't be down here today.  But we
4   believed you.  We talked to you, we were able to assess you as
5   best we can.  And we believed that you could do what you told
6   us.
7           Now, then, what is the next thing we asked you?  What is
8   the next thing we asked you?  We said, Do you believe in
9   self-defense?  Each and every one of you said, Yes, I believe
10  it self-defense.  That was another way to go home.  Each and
11  every one of you said, Yes, I believe in self-defense.  And
12  then we asked each and every one of you, You believe that
13  somebody has the right to resist unlawful force from a police
14  officer with self-defense?  We asked you that.  We didn't hide
15  that ball from you, either.  Each and every one of you said,
16  Yes.  Yes, I can do that.  I can do that, I believe in
17  self-defense.  I can sit on a jury where a police officer is
18  killed and where the defendant is going to raise self-defense.
19  There weren't any secrets about which direction this trial was
20  going.
21          Now, then, you know, when it comes down to what they are
22  saying, Ms. Handley, as best she could, somehow misplaced the
23  burden.  Somehow misplaced the burden.  We told you in voir
24  dire that they have to prove each and every element of the
25  case.  We gave you the example of what if it happened in a

29

1  different county.  And that was the only thing wrong.  Each
2  one of you said you could find the defendant not guilty.  Now,
3  that's a real elementary quiz and each one of you passed that.
4  But the other thing we asked you about and that Ms. Handley
5  tried to slough off is that once self-defense is raised, once
6  self-defense is raised, they have to disprove.  They have to
7  disprove each and every element of that beyond a reasonable
8  doubt.  They have to disprove to you that Wesley Ruiz did not
9  act in self-defense out there.  They have to disprove that.
10      And I will share with you my thoughts.  I don't think
11  they have done anything to disprove it.
12      You know, going back to the officers, as I have told you,
13  they have told their story, they will repeat the story to
14  anyone who wants to listen, they will go to their grave
15  telling the story.  One of the things, though, that Officer
16  Jarc told you out there, and it kind of went by fairly
17  rapidly, I don't know.  But he told you that on that day in
18  question, all hell broke loose.  All hell broke loose.  And I
19  agree with him.  All hell did break loose.  But why did it
20  break loose?  Why did it break loose?
21      It broke loose because the officers out there didn't
22  follow their training.  They didn't do what they had been
23  instructed to do, advised to do, shown to do when a situation
24  like this came up.
25      Now, we brought you -- you noticed that the State didn't,

30

1  we brought you the directives.  And they specifically tell
2  you -- and it is big capital letters, and we have pointed it
3  out before, but it says to not rush the vehicle.  Do not rush
4  the suspect.  And each and every one of the officers when they
5  were confronted with that said, well, that doesn't apply.
6  That is not in there, that's trumped by 19.04.  Each and every
7  one of them, each and every one of them said, well, that
8  didn't apply in this situation.  The car was facing us, so
9  everything goes out of the window.
10      Well, another officer said, I think it was Haecker, said
11  that Officer Nix decided to engage the defendant.  Now, that's
12  a euphemism basically for attacking him.  And I submit to you
13  that that's what he did.  That's what he did.  He comes up and
14  he starts beating on the window with his asp, with his gun in
15  his hand telling Mr. Ruiz, I am going to kill you mother
16  fucker.
17      Now, then, the State would have you believe that that's a
18  normal day at the office.  The State would have you believe
19  that that's commendable behavior.  I don't think so.  I don't
20  think so.
21      You know, Officer Nix was in such a state of mind that he
22  completely, completely disregarded his training to the extent
23  that he disarmed himself.  You-all saw that.  He put his gun
24  down.  No one came down here and told you that was proper.  No
25  one told you that.  But his state of mind was so -- so

31

1  incensed, so hyper, that he is out there beating on windows,
2  putting his gun on the ground, and you have seen it all.  I
3  don't have to keep reiterating, you saw what was happening out
4  there.  You saw what was happening.
5      Now, then, you know, when you go from an arrest mode,
6  which is what they obviously were trying to do into capturing
7  a supposedly capital murder suspect, there is no asterisk that
8  says, hey, you can do whatever it takes.  There are still
9  directives.  There are still directives.
10      And when all hell broke loose, what happened to the
11  officers that were out there.  They had to chunk the script
12  and do whatever they could to protect Officer Nix, their
13  fellow officer.  And you see them in the video scrambling
14  around, scrambling around trying to gain some sort of, as they
15  say, tactical advantage in a situation that should have never
16  happened.  They are scrambling around trying to figure out how
17  they can get close to Nix to protect him.  They are scrambling
18  around trying to keep from shooting each other.  And all hell
19  did break loose.  All hell did break loose.  But you have to
20  figure out that unfortunately, the blame is on them.  The
21  blame is on them.  They are the ones that ultimately created
22  the lawful use of deadly force.  And Mr. Ruiz reacted to it.
23  He thought his actions were reasonable.  I think you will too.
24      Now, then, you know within, probably less than an hour
25  before the smoke cleared out there, the officers had their

32

1  lawyers out there.  They were going through a walk-through or
2  recreation.  Basically they were getting their story straight.
3  They came down here, and their story makes sense.  Were they
4  that straight?  Well, they couldn't explain a lot of things.
5  And you know, we talk about little nibbling pieces of things
6  that we might have a doubt about, and we say, well, you know,
7  what about such-and-such and such-and-such.  You have to
8  figure -- you have to figure is that what I am supposed to
9  find in the charge.
10      As we told you in voir dire, and y'all probably thought,
11  this is real stupid, you know we told you stuff like they
12  don't have to prove whether it was sunny or cloudy, they don't
13  have to prove the temperature out there.  They don't have to
14  prove how somebody was dressed.  But you see oftentimes,
15  oftentimes one side or the other will try and do what are
16  called rabbit trails.
17      Ms. Handley set up quite a few rabbit trails.  The ploy
18  is that you get your -- our counsel to run down these rabbit
19  trails, which don't make any sense or unimportant, and then we
20  can't talk about the important things.  I am going to give you
21  an example of a rabbit trail so that you won't fall into that
22  trap and you won't run into it.
23      Let's just look at one of the things.  You had Officer
24  Krieter come down here.  He was the P.E.S. officer, he is the
25  person that gathered up all of this, took over 200 photographs

33

1  out there that night and all of the stuff there.  He is the
2  one that brought it down here.  And he said, Hey, I am not a
3  gunsmith, I don't have any training in ballistic.  But in my
4  opinion, the gun jammed.  In my opinion the gun jammed.  Well,
5  see, that's pretty convenient.  We see, well, Officer Krieter,
6  you took 200 pictures out there, did you take any pictures of
7  the skewed clip, the bullets of the skewed clip?  "I couldn't
8  get my flash to work.  I couldn't get my flash to work."  He
9  is at police headquarters and he can't take a picture of the
10  skewed clip.
11       You know the other convenient thing about that is, is
12  that he never wrote it in his notes.  Over a year later, he
13  can remember vividly a skewed clip.  But something that
14  important, something the State has been bringing up
15  continuously, he couldn't find three seconds to write it down.
16  But he comes down here and says, Yes, I remember.
17       You know when we talked to him about the skewed clip, he
18  tells us that Detectives Allen and Garcia were out there at
19  the police headquarters, and they saw it.  They were standing
20  next to him and they saw the skewed clip.  Did he bring them
21  down here to back himself up since he hadn't written anything
22  down or anything else, no.  We asked him, well, if that skewed
23  clip was so important, and you think it made the gun jam, you
24  think it made the gun jam, why didn't you take it out to SWIFS
25  and show it to the firearms expert?  "Oh, we can't do that.

34

1  We can't do that.  We can't take weapons and ammunitions and
2  stuff out to the firearm examiner."  And then when Cooper
3  comes down be here, when Cooper comes down here, he said that
4  is P.E.S.  They can bring them out there.
5       MR. BROOKS:  Your Honor, I am going to object,
6  that is a misstatement of the facts, a misstatement of
7  testimony.
8       THE COURT:  Ladies and gentlemen, the arguments
9  of counsel are not evidence.  You heard the evidence.
10       You may proceed, Mr. Brauchle.
11       MR. BRAUCHLE:  You know, and we asked him,
12  that's your job, isn't it, looking at guns and ammunition that
13  people bring you.  He said, Yes, yeah.  It could have been
14  brought to me.  But you know, when you boil it all down, when
15  you boil it all down, that's a rabbit trail.  That's a rabbit
16  trail.  I will tell you why.  Whether the gun jammed or not,
17  is not important.  Whether the gun jammed or not is not
18  important.  See their theory is, if the gun hadn't jammed,
19  Wesley Ruiz would still be sitting in West Dallas shooting at
20  people.  See that's the implication they want you to get.  And
21  to counteract that, they have to hang their hat on a jammed
22  gun.  They have to hang their hat on a jammed gun.
23       They have to get you to believe that but for a jammed
24  gun, this would be day 400 of Wesley Ruiz shooting at people
25  in West Dallas.  That didn't happen.

35

1       You know the officers out there, the officers out there
2  shot all of this ammunition (indicating).  And what did they
3  tell you that they were doing when they shot all of this.
4  They said they were shooting in self-defense.  They said they
5  were shooting in self-defense.
6       Now, then, you see they said, Yes, I was shooting in
7  self-defense.  It was reasonable to me to think that my life
8  was in danger and I shot in self-defense.  They shot all of
9  this ammunition until the apparent danger went away.  Mr. Ruiz
10  shot one shot in self-defense and the apparent danger went
11  away.
12       You know, they have a right to self-defense, he doesn't
13  have a right to self-defense.  There is no asterisk in the
14  Penal Code that says, hey, hey, if you are driving a car that
15  some bulletin says isn't even probable cause to stop the car.
16  If you are driving some car, the asterisk says, you don't get
17  the right to self-defense.  You know he does, because it is in
18  the charge.  I know that, and you know that.  It is not
19  something that I made up.
20       Now, Judge White gives you the law, he gives you the law,
21  and you have to follow it under your oath.  You are saying
22  what oath.  Well, that's kind of like the reading of the jury
23  charge, when you first came in here the first day.  The Judge
24  asked you to stand and raise your right hand and y'all did all
25  that.  And he gave you an oath that you probably don't

36

1  remember, but you might.  And that oath was to a true verdict
2  render according to the law and the evidence so help you God.
3  That was the oath you took.  You took an oath to tell the
4  truth in voir dire, but it switched over now.  You are fact
5  finders, and you are supposed to go by the law that Judge
6  White gives you and the evidence that the attorneys give you.
7       Now, Ms. Handley says, Hey, Wesley Ruiz, Wesley Ruiz is
8  the person that got up here and raised self-defense.  Wesley
9  Ruiz is the person that got up here and raised self-defense.
10  Well, you would be dealing with self-defense no matter what.
11  Because their own witness -- their own witness came in and
12  raised self-defense.
13       Remember Carmen?  Carmen, the woman that they dismissed
14  all sorts of felony cases for so she would come down here and
15  testify.  Remember her?  She was their witness.  She got up
16  here and raised her right hand and she said that Wesley was
17  scared for his life.  Wesley was scared for his life and
18  thought he was going to be harmed.  Now, those two statements
19  alone from their own witness, which you might recall,
20  Ms. Handley didn't go to that well.  She didn't talk about
21  Carmen who they thought enough of her testimony to dismiss her
22  cases.  But then all they wanted was the deal about "G",
23  whatever that means.  They want to -- they want to frighten
24  you, they want to intimidate you, they want to make you think
25  that somehow, because the word "G" may mean whatever they try

1   to make it mean, that somehow that trumps self-defense.
2   That's not in the charge.
3       You know we each and everyone have a right to
4   self-defense.
5       If you are stopped, somebody comes up and starts beating
6   on your window with an asp, with a gun in his hand, and starts
7   saying, I am going to kill you mother fucker, you think you
8   wouldn't have the right to shoot him?  You think you wouldn't
9   have right to shoot him?
10      You know, if it wasn't for the uniform he was wearing,
11  you would have never even got handcuffed.  They would have
12  never taken you to jail.  Would that have been reasonable?
13  Would your actions out there to defend yourself been
14  reasonable?  You know they would have.
15      But somehow the State wants to rabbit trail you.  Have
16  you look the other way and say, hey, it doesn't apply to
17  Mr. Ruiz.  It doesn't apply to Mr. Ruiz because he is a
18  convicted criminal.  There is no asterisk in the Penal Code to
19  that says that either.  There is nothing that says, hey, what
20  the State thinks are important trumps the laws of our state.
21  The "G", the jammed gun, all of these somehow get your
22  attention over there, your attention won't be on Mr. Ruiz's
23  right to self-defense.  Don't go down the rabbit trail.
24      Now, then, let's go back to some other things.  They
25  alluded to the fact that we are trying to make what they call

1   shadows in the bullet holes.  You know, that's something that
2   you are going to have to decide.  You know that at or about
3   the time -- and I say instantaneously, and the officer say
4   before Mr. Ruiz shot, you know that there is a bullet hole in
5   the front passenger's window.  You know that there are bullet
6   holes in the back of the car on the passenger's side.  And
7   there is a bullet hole or maybe not, we don't know on the
8   windshield.  And you know that those were there at or about
9   the time -- at or about the time that Officer Nix got shot.
10  Now, you are going to have to decide that on your own.  And I
11  don't know how you will resolve those situations.  But, you --
12  you have ultimately, ultimately you have got some other
13  evidence to go by.
14      You have got their own witness, their own witness.  You
15  know, Ms. Handley conveniently, conveniently ignored the fact
16  that they bought a witness down here named Veronica.  She got
17  up here took the stand, raised her right hand and said the
18  police shot first out there.  I was out there, I could see it.
19  I was there that day, and the police shot first.  Now, once
20  again, that's their witness.  That's two witnesses that they
21  have brought down here that they brought down here that would
22  raise self-defense, either one of them would.  Either one of
23  them would.  And they have to disprove what those witnesses
24  told you.  Have they done that?  They don't even talk about
25  it.  They act like she didn't happen.  They don't want you to

1   remember her.  Hey, she came down and blew up on them big
2   time.  And she told you -- she told you that the police fired
3   first.  The police fired first.
4       Now, then, let's go back to one other thing that Ms.
5   Handley talked about.  And I don't think -- well, I think it
6   is important, in fact I think it is critical to what you are
7   having to decide here today.  Of course she wanted us to do
8   it.  Once again she is shifting the burden to us.  She says
9   that we should have brought somebody from the academy, we
10  should have brought somebody from the academy to tell you that
11  what went down there was a righteous deal.  You know she is
12  right.  We have the right to subpoena anybody from the
13  president on down.  But you know they do too.  They have
14  access to the whole police department, the whole police
15  department.  And you have seen that by the policemen they have
16  brought down here.
17      And you know you heard all this talk about the academy,
18  you heard all this talk about the academy, but did they -- did
19  they bring anybody down here from the academy.  And I think
20  they owe it to you and to you the Nix family to have somebody
21  come down here and say, look, what happened out there was
22  the -- exactly what should have happened out there.  They
23  didn't bring anybody.  You would think -- you would think with
24  the academy, they could either get a current instructor or a
25  former instructor to say, hey, I looked at the video, I looked

1   at the video, that's the way it should have gone down.  That's
2   their burden, that's their burden.  You know they have to show
3   that.
4       You know they drove right around that, they put that on
5   us.  You think with all their access to the police department
6   they can't find somebody to come down here and sit in this
7   chair and raise his right hand and turn around and look you in
8   the eye and say, that's exactly the way it should have gone
9   down.  Nobody on the police department did anything wrong that
10  day.  Where is that guy.  You know they could have brought a
11  hundred of them down here.  What do they do?  They bring down
12  their sergeant.
13      You know it is kind of like a four-legged stool, each one
14  of them is covering for the other.  But then they bring Osborn
15  down here, he wasn't there.  He argues with the guidelines
16  that are in evidence.  And he's their official.  He is their
17  person that they want you to rely on to say, hey, hey, this
18  was an okay deal.  This was an okay deal.  You know and so
19  maybe all the people at the academy have been killed or
20  stricken mute, I don't know.  But you know, they could have
21  brought somebody higher than Osborn, he is just a sergeant.
22  Didn't even have the respect for you and the Nix family to
23  bring a lieutenant down here.  I am a lieutenant, I got a
24  million years of service, looked at the video.  Did they bring
25  a captain down here, deputy commander, deputy chief, the

41

1  chief. Did any of them come up here, take this stand, look
2  you in the eye, and do what the State has failed to do. Say
3  it was a righteous deal on every level, that was what should
4  have happened. Did they, no. I say they owe it to you, they
5  want you to deliver a verdict with not sufficient evidence,
6  that's not fair. It is not fair to you, and it is not fair to
7  Wesley Ruiz. It is not fair.
8       Now, then, let's go back to somewhere I have been before,
9  but obviously this is important. It has to do with how they
10  are trying to shift the burden, trying to shift the burden to
11  where we have to -- we have to do it all and then they don't
12  have to do anything. They can come down and talk about a "G"
13  and jam slide and things like that. Peripheral matters. But
14  when Veronica Morales came down here and told you that the
15  officers fired first, what dog did she have in this fight?
16  She is not a police officer. She is somebody that was out
17  there minding her own business, minding her own business and
18  saw what she came down here and told you she saw. They
19  brought her down here. She told you the officers fired first.
20       Now, then, let's go to Maria Correa. What dog did she
21  have in this fight? What dog did she have in this fight? You
22  know they try and say, well, you know, first of all, they try
23  and ridicule her by making some My-Cousin-Vinnie remark. And
24  then she try and say today that she couldn't see what she
25  testified she could see. We brought you pictures. We brought

42

1  you pictures that show where she was and where the automobile
2  was. Once again if it wasn't like that, if it wasn't like
3  that, they could have brought in pictures that showed you that
4  was some bogus deal. You know it is not, you know it wasn't.
5  You know they didn't come in and trump the pictures that Maria
6  Correa sat there and looked at and identified by their own
7  pictures. How is that important? How is that important? You
8  know she told you that the officers fired first. And they
9  have to disprove that beyond a reasonable doubt. They have to
10  disprove that Wesley Ruiz didn't have the right to
11  self-defense beyond a reasonable doubt. But see it's smoking
12  mirrors. They keep pushing everything to our table. They
13  push everything to our table. And you remember -- I hate to
14  keep going back to this, but that shouldn't be -- that
15  shouldn't be a surprise. But we told each and every one of
16  you that on everything that comes up, they have the burden.
17  We don't have to prove anything. But we brought you Maria
18  Correa. They didn't even care enough to go out and interview
19  her or talk to her, I guess because she speaks Spanish, I
20  guess that would be inconvenient to do that. But you know
21  those two witnesses and the other witnesses that they brought
22  you down here, any of them raise self-defense. And they
23  would raise self-defense because of what they testified to.
24  It is not what Wesley Ruiz testified to that raises
25  self-defense. It is at least those three witnesses, two of

43

1  whom were brought by the State. Two of whom were brought by
2  State.
3       Now, then, going back to Veronica Morales and Maria
4  Correa. You know when you watch those people, like I say,
5  what dog do they have in this fight? You have in this fight a
6  shooting happening in frontal of one of y'all's houses, you
7  would be subpoenaed down here and tell what you saw. They
8  certainly don't have any interest in the outcome of this
9  trial. They don't know anybody involved in it. And you know
10  in their heart of hearts their testimony rang as true as could
11  be. You know that they were telling the truth. They have no
12  reason to tell anything else. They have no reason to tell
13  anything else. They are not covering up a botched arrest,
14  they are not doing anything other than coming down and saying
15  this is what I saw.
16       Now, let's just say one of them came down, they can kick
17  that under the rug. She came down and told us that the police
18  fired first. But what are the odds that two people that don't
19  know each other, that are independent of each other, coming
20  down here and telling us that's how it happen. What are the
21  odds. What are the odds. And other than the police officers,
22  who came down and contradicted their testimony. Who
23  contradicted their testimony? You know if it -- Maria Correa
24  was the first witness we put on. And I think the trial went
25  at least a day after that, and if they could have gone out

44

1  there and hit the neighborhood and found anybody to come down
2  here and say, oh, you mean the blind lady testified. Hey, I
3  live closer than she does, and I saw the officer go down and
4  then the shooting started. Did they bring you that, did they?
5  You know they didn't. You know they are trying to forget
6  about at least one of those witnesses. But you know, they
7  can -- they have got the investigative force, they have got
8  everything to go and rebut everything we put in evidence. If
9  there was one person in Dallas or anywhere else in the world
10  that would have said something different than those two
11  people, where are they? Where are they? They are not here.
12  They weren't brought here, there is no evidence that in any
13  way contradicts what both of those people said.
14       Now, then, if you read Judge White's charge, and if
15  you -- you read and figure out that it's not whether Officer
16  Nix was on duty that day, but whether Officer Nix was using
17  unlawful deadly force or was perceived that he was using
18  lawful deadly force, is what you will read in the charge. How
19  can you drive around those two women, you can't.
20       The video, once again, there weren't police officers
21  involved, that would have been a no brainer. You could have
22  finished your drive home after killing whoever came up and
23  tried to do that to you.
24       Now, then, let's talk about Ms. Handley's favorite
25  subject, Mr. Ruiz, Mr. Ruiz. He didn't have to testify. You

45

1  know that from fifth grade government.  He has an absolute
2  right under the Fifth Amendment to not testify.  He could
3  still be sitting there as he is now and never have come up
4  here and sat and testified.
5      Now, then, what did he testify to?  He testified that the
6  asp was breaking the window, it sounded like gunfire.  He
7  knows there is somebody standing next to his window with a gun
8  in his hand.  And then on top of that, he says that there is
9  other shots that he is fairly certain is gunfire.  And we know
10  from the two women that's a true observation.  And you have
11  seen pictures of the car and you have seen all of this right
12  here, they came in and shot him.
13      Ms. Handley is saying, hey he wasn't knocked out like he
14  told you he was, he is just malingering, he is faking that.
15  That's not what happened.
16      Well, you have got the medical records.  You have got the
17  medical records and if you want to plow through those, which
18  you really don't need to do, they will verify that he still
19  got the slug he told you about in his cheek, the one that
20  knocked him out.  And it is not the police officers's fault
21  that he is not dead.  God knows they tried out there.  Look
22  how much they tried.  So you know, if they would have been
23  successful, obviously we wouldn't be down here.  They weren't.
24  And because of the circumstances, you have the hard job -- the
25  hard job of deciding who to believe, who to not believe.

46

1      You know, did they bring you anything to disprove
2  Mr. Ruiz's testimony?  You know they can sit up here and
3  ridicule and they can sit up here and talk down about him.  I
4  suspect that they will probably come over and shake their
5  finger at him and other things that Ms. Handley tried to do.
6  But the bottom line -- the bottom line is, was it reasonable
7  for him to think that he needed to protect himself from
8  Officer Nix?  That's the bottom line.  And you have to look at
9  it from his point of view, not Ms. Handley's point of view,
10  not from my point of view, not from anyone else's point of
11  view, but his point of view.  You put yourself where Mr. Ruiz
12  was, in that red car, and then you say, hey, was that
13  reasonable on his part?
14      You know where would he have -- let's just say that
15  somebody actually was saying, Mr. Ruiz, please surrender,
16  Mr. Ruiz, you know, we have got you covered, please come out
17  of the car peacefully.  Let's just say somebody would have
18  done that, are you supposed to get out of the car when they
19  are shooting at him.  Is he supposed to step out so the
20  marksman out there can really get a good shot at him.  You
21  know he can't retreat, there is noplace for him to go.  He is
22  in there.  And as Jarc said, all hell is breaking loose.  All
23  hell is breaking loose.  And then they want you to say, well,
24  you know, he didn't act -- he had no reason to act that way.
25  That wasn't a normal reaction.  That wasn't reasonable from

47

1  his point of view.  Well, what would be reasonable?  What
2  would be reasonable?
3      You know have they brought anything that would show that
4  he didn't act in self-defense?  You know and that's -- that in
5  my opinion is the only verdict we can bring back.
6      Now, then, let's talk about that.  If you do what I think
7  is right and I think what your conscience and your heart of
8  hearts will tell you to do in regard to this case and find
9  Mr. Ruiz not guilty by reason of self-defense, he is not going
10  to go home.  He is not going to go out and get on the elevator
11  with you-all.  He still, as you know as the police came down
12  here and told you, he still has a drug case that carries up to
13  a life sentence.  And half of that case would have to be done
14  flat time.  That means day for day.  So he has got
15  incarceration in his future forever almost.  So you are not --
16  you are not giving him a break.  You are not sending him home
17  by doing the right thing.  You are not cutting him loose from
18  the criminal justice system by doing what you know that the
19  charge and the evidence is telling you you have to do.  He is
20  not getting a break.  He is taking a charge that he is not
21  good for.  But he still has got one obviously that he is good
22  for.  Self-defense doesn't apply to having first-degree drugs.
23  He is not stopped for that.  You are not giving him any kind
24  of break by doing the right thing, by doing the right thing.
25      I think that I have probably taken up enough of your time

48

1  goading you to do what I think is the right thing.  I know
2  that fire and brimstone may be the thin blue-line argument.
3  Who knows what's coming behind.  What I say is not evidence,
4  what's coming behind me is not evidence.  But I want you to go
5  back in there, when you talk about this case, hours, weeks,
6  days from now, you can look whoever you are talking to right
7  in the eye and say I did the right thing.  I know I might have
8  done the unpopular thing, but I did the right thing.  And
9  there is a big difference between those.  And it is just
10  having to reach down inside of you in a place you probably
11  never have had to go and do something right for somebody who
12  might not as a person deserves it, but who legally deserves
13  it.
14      Thank you.
15          MR. BROOKS:   May we approach, Your Honor?
16          THE COURT:   You may.
17          (Discussion off the record.)
18          THE COURT:   Ladies and gentlemen, we have been
19  going for about an hour and a half, and we will take a
20  ten-minute break and then reassume.
21          THE BAILIFF:   All rise, please.
22          (Jury retired from the courtroom.)
23          (Recess taken.)
24          THE BAILIFF:   All rise, please.
25          (Jury returned to the courtroom.)

49

```
1        THE COURT:  You may be seated.
2   You may proceed, Mr. Brooks.
3        MR. BROOKS:  Thank you, Judge.
4   May it please the Court?
5   Counsel.
6                    ARGUMENT
7   BY MR. BROOKS:
8        Ladies and gentlemen, I think you would have to have been
9   living underneath a rock if you have not witnessed to some of
10  the things that have taken place over in Dallas County over
11  the last year and a half.  And the primary reason most of
12  those individuals falsely accused, eyewitness testimony.
13  That's because human beings --
14       MR. BRAUCHLE:  We would object to this as being
15  outside of the evidence.
16       THE COURT:  Overruled.
17       MR. BROOKS:  That's because human beings were
18  fallible.  We perceive things in different ways --
19       MR. BRAUCHLE:  May we have a running objection?
20       THE COURT:  You may.
21       MR. BRAUCHLE:  When he talk about eyewitness
22  testimony or people being released from custody?
23       THE COURT:  You may.
24       MR. BROOKS:  We perceive things in different
25  ways, and sometimes those perceptions are wrong.  Science has
```

50

```
1   led us to know that certain things are infallible.  DNA is
2   infallible.  Video recorded events are infallible.
3        MR. BRAUCHLE:  Your Honor, we would object to
4   this as being outside the evidence.
5        THE COURT:  Overruled.
6        MR. BROOKS:  Audio recorded events, accurate.
7        MR. BRAUCHLE:  We would especially object to
8   that.
9        THE COURT:  Overruled.
10       MR. BROOKS:  Now, I do have to spend some of my
11  time to try to refute some of the impressions that may have
12  been left with you by the previous argument.  And part of that
13  misperceptions is the idea that certain things could or could
14  not have been done by Detective Krieter and the people at
15  SWIFS.
16       And the Judge has correctly informed you that what I say
17  and what Defense Counsel says is not evidence.  Precisely
18  because what they tell you from the witness stand is what you
19  are supposed to rule about.  And if you recall the testimony
20  of Detective Krieter, when asked about that magazine, he
21  correctly told you Southwest Institute of Forensic Sciences
22  will not accept loaded weapons.  Didn't say that I couldn't
23  take the gun out there.
24       Raymond Cooper, from Southwest Institute of Forensic
25  Sciences correctly told you, our policy is, we do not accept
```

51

```
1   loaded weapons.  So the contention that they could have taken
2   that magazine as is as removed from that vehicle and turned it
3   over to SWIFS, that contention is false.
4        MR. BRAUCHLE:  Your Honor, we would object to
5   this as being outside the evidence.
6        THE COURT:  Overruled.
7        MR. BROOKS:  Folks, you don't have to take my
8   word for it, it is part of the testimony.  If you have any
9   dispute or any doubt as to what those two witnesses testified
10  to, you can ask for it.  Because what I say is not evidence
11  and what he says is not evidence.
12       State's Exhibit 15, officer down, officer down -- may we
13  have the lights, Your Honor -- if you have a loved one or
14  family member who works in law enforcement, I can't imagine
15  two words that are more terrifying to you than hearing,
16  officer down.
17       Unfortunately on March the 23rd, 2007, Dallas Officers
18  listening to challenges four and five had to hear those words.
19  And even more unfortunately since March the 23rd of 2007,
20  the family of Corporal Mark Nix has had to live with the
21  aftermath of those words.
22       Over the past few days, you 13 individuals have had the
23  opportunity to have a window, as it will, into the war on
24  crime in this community, because that's actually what you have
25  done.
```

52

```
1        Think about Officers Patrick Starr and Jason Jarc
2   patrolling the city of Dallas in an unmarked black pickup
3   truck.  It is unmarked so they can travel throughout the city,
4   look for signs of criminal activity before those criminal know
5   they are being watched.
6        Officers Jason Jarc -- strike that.  Officers Jeremy
7   Borchardt, Todd Haecker, assigned to operation disruption.
8   And as they testified, when crime spikes in certain parts of
9   time, operation disruption is sent there to get things under
10  control.  Officer Mark Nix, patrolling our city, ready to
11  serve whenever and wherever called.  If you take nothing else
12  from this trial, I am going to ask you that you take this
13  home, cause you folks have seen for yourself just how
14  dangerous police work is.  Jeremy Borchardt, as he testified,
15  had been back on the job 30 days when this happened after
16  being shot on the job.  You have seen that these police
17  officers had a matter of seconds to make a decision.  And when
18  they make that decision, that decision is made with one thing
19  in mind, and that's the safety of this community.  And for
20  anyone, anyone to armchair quarterback, Monday morning
21  quarterback decisions they make in the line of duty and while
22  they are under fire, is insulting.
23       Now, these defense attorneys, I have known all of these
24  gentlemen for many years, and I don't begrudge the fact that
25  they have a job to do, and I don't begrudge their
```

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

53

1 responsibilities. But the facts remain that their client has
2 dealt them a bad hand. Their client has left them nothing to
3 work with because the evidence in this case is overwhelming.
4      MR. BRAUCHLE: Your Honor, we would object to
5 this as striking at the defendant over the shoulders of his
6 attorney.
7      THE COURT: Overruled.
8      MR. BRAUCHLE: May we have a running objection?
9      THE COURT: You may.
10      MR. BROOKS: They are forced to deal from a
11 position of it is untenable.
12     Imagine the scenario, you have a slew of Dallas Police
13 Officers chasing a suspect vehicle that by vehicle description
14 and more importantly the driver's actions lead them to believe
15 that this is a capital murder suspect. Imagine that scenario.
16     Now, they began from the position that there is some
17 violation of Dallas Police Officer policy, as if that would be
18 a justification for that officer being shot and killed. But
19 nonetheless, you recall how each police officer that took this
20 stand was grilled and grilled with respect to the felony
21 traffic stop policy. Well, what did we find out? We found
22 out based on their evidence, their exhibit, third page, if the
23 vehicle flees, if the vehicle flees, go to vehicle pursuit,
24 procedure 19.04. Once that car takes off, there is no felony
25 traffic stop policy.

54

1      MR. BRAUCHLE: We would object to this as being
2 outside of the evidence.
3      THE COURT: Overruled.
4      MR. BROOKS: Sergeant Osborn came in and told
5 you that, specifically, his words, once that vehicle takes
6 off, felony traffic stop policy is out the window. They want
7 to criticize him because he is just a sergeant. Do you really
8 believe anybody put on that witness stand by the State,
9 regardless of their rank, do you really believe that they
10 would have acquiesce and disagreed with them that those
11 officers did nothing wrong. You know they wouldn't have. The
12 fact remains, there is not a single witness who has taken that
13 stand and stood before you or sat before you and told you that
14 any officer on March the 23rd, 2007 did anything wrong. But
15 more specifically, there is no one that has tried to tell you
16 that Mark Nix did anything wrong.
17     So when that blows up in their face, they are left with
18 the silly proposition, that it is self-defense. And it is
19 self-defense as evidenced by this defect in the upper left
20 corner of the windshield. Well, we know that is not true,
21 because once the video was replayed, this alleged defect, you
22 can see how this alleged defect moves. And you can see that
23 it is merely a reflection from the canopy of trees over that
24 car. But even more specifically, State's Exhibit 116, taken
25 that night, and this is in evidence, you can take it back in

55

1 the jury room and view it yourself, you can see every single
2 shot fired by Patrick star into that windshield. More
3 importantly, you can tell, upper left corner of that vehicle,
4 is not a single defect. So what are they left with now, no
5 violation of policy, no defect in the window indicating
6 shooting prior to that first shot coming from inside that car.
7 What you are left with now is this silly notion that somehow
8 this defendant can lead these officers on a high-speed chase,
9 ignoring commands to pull over and stop, and then when
10 surrounded and nowhere to go, that it is okay for him to shoot
11 and kill a police officer. That's what you are left with.
12     Now, the truth of the matter this defendant is driving
13 through our city, he wants to make it seem that he is just
14 driving around minding his own business, day-to-day, carefree
15 day. The truth of the matter is, he is driving with almost a
16 half a pound, cut-up methamphetamine. He is driving, sipping
17 on liquid codeine. He is driving with a loaded semiautomatic
18 assault pistol, one round in the chamber, 29 rounds in the
19 magazine, fully loaded, loaded for bear. Don't know about
20 you, but to me, that's somebody driving around prepared for a
21 fight. And we know he is prepared for a fight, because what
22 did he tell Carmen Delgadillo, I am going to go out like a
23 "G". What did he tell Hector Martinez, The only way I am
24 going back to jail is in a box. And when he is doing all this
25 driving around, with that gun, with that drugs, with that

56

1 liquid codeine that he is ingesting while he is driving, he is
2 also doing it knowing that he hadn't reported to probation in
3 six months. And this isn't his first rodeo, he knows what is
4 going to happen to him when he gets picked up.
5     And, folks, if anybody believes that silly explanation
6 for "G", that it means girl or that it means it is an inside
7 joke between she and I, well, as the saying goes, when we are
8 done here, come see me because I have got some ocean front
9 property in Arizona, I want to talk to you about. You know
10 what "G" means. And you know what he means when he says he is
11 going to go out like a gangster.
12     This defendant has no regard for your community, he has
13 no regard for the safety of our community.
14     The idea, and even by his own notion, he pulls that
15 trigger, he pulled it one time, he admits, he pointed it and
16 pulled it. But then he wants us to believe he doesn't know
17 what happened next because a bullet hits him in the head and
18 knocks him out. Now, think about that, a bullet hits him in
19 the head with enough velocity and force to knock him
20 unconscious. And two days later he is talking to Detective
21 Howard Johnson. Does that make sense, of course it doesn't.
22 It doesn't make sense because it is backed up by the medical
23 records which point out that his injuries were all -- the
24 injuries to the face were all superficial.
25      MR. BRAUCHLE: Your Honor, this is a

1  misstatement of the facts and we would object to it.
2          THE COURT:  Overruled.
3          MR. BROOKS:  The evidence in this case is
4  overwhelming, the official evidence in this case shows one
5  single entry wound, upper left chest of Corporal Mark Nix.  It
6  shows that that carotid artery, jugular vein was perforated.
7  It shows the fragment was recovered from inside of his neck
8  cavity and other parts of his body.  The medical examiner has
9  viewed the videotape and she has told you her findings in that
10  autopsy are consistent with what you see on that videotape.
11          Now, if you look at the actions of Jason Jarc, Patrick
12  Starr, Jeremy Borchardt, and Todd Haecker, if you look at the
13  way they put themselves in harms way to get Mark Nix away from
14  that vehicle, if you do all that, and then you buy into this
15  idea that I was defending myself, they shot first, I am
16  entitled to shoot them, find me not guilty, if you buy into
17  that, what you are doing is you are taking this badge and you
18  are turning it into a target for every violent offender that
19  is walking the streets today.
20          (Video played to the jury.)
21      The evidence in this case, ladies and gentlemen, is
22  overwhelming, the video clearly shows the first shot came from
23  inside that vehicle.
24          MR. BRAUCHLE:  Your Honor, once again we would
25  object to this as being a misstatement of the facts.

1          THE COURT:  Overruled.
2          MR. BROOKS:  We know that the defendant only
3  fired one time, cause as Jason Jarc told you, when he is
4  looking through that hole created by Mark Nix, he sees this
5  man manipulating that weapon, trying to get it unjammed and he
6  doesn't know how to do it.
7          MR. BRAUCHLE:  Your Honor, once again we would
8  object to that as being a misstatement of the facts.  It is
9  outside of the evidence.
10          THE COURT:  Overruled.
11      Ladies and gentlemen, I will remind you that argument of
12  counsel are not evidence.
13          MR. BROOKS:  We know that after the SWAT team
14  arrives and breaches that window, SWAT Officer Larry Gordon
15  told you that he looked inside and he saw that gun laying
16  across his lap and he saw the bolt halfway open and the first
17  thing that he thought of, it's jammed.  We know that when
18  Detective Krieter photographed that gun and saw that gun, it
19  was jammed.  We know --
20          MR. BRAUCHLE:  Your Honor, once again that is
21  outside of the evidence.
22          THE COURT:  Overruled.
23          MR. BROOKS:  State's Exhibit 29, testimony that
24  charging rod pulled all the way back indicated one of two
25  things, either that weapon was empty or it jammed.  And you

59

1  know it wasn't empty.  And Detective Krieter told you that
2  when he unloaded that weapon and this magazine, the very next
3  bullet in line was skewed.  If they want to suggest that
4  Detective Krieter, a retired Dallas Police Officer, left his
5  son's hospital bed in Oklahoma City to fly down here to
6  concoct some story against this man, I don't know what to tell
7  you, other than that's absurd.
8      Last Tuesday, I stood before the 13 of you and I made a
9  pledge to you on how the State of Texas was going to prove
10  this case.  We have proven this case beyond a reasonable
11  doubt.  We have also proven a couple of other things.
12      We have proven that that man right there is a coward.
13  Because when the police gave him that first lawful command to
14  pull over, he did what cowards do, he ran.  And when
15  surrounded by police officers, nowhere to go, he waits until
16  Corporal Nix puts his gun down on the ground and then he
17  shoots and kills him.  And this man who boasts of going out
18  like a "G", who boasts of going back to jail like in a box,
19  when those officers lawfully open up on his car, what does he
20  do?  I think it is more than evidence -- a reasonable
21  deduction from the evidence, he honkers down under that
22  dashboard because he doesn't want to get shot.
23          MR. BRAUCHLE:  Your Honor, we would object to
24  this as being outside the evidence also.
25          THE COURT:  Overruled.

60

1          MR. BROOKS:  And lastly, folks, when we talk
2  about this ridiculous idea of self-defense, in the Court's
3  charge, page four, the very first sentence says, the use of
4  force to resist an arrest or search is justified if, is
5  justified if before the defendant offers any resistance.  Is
6  there anyone in this room who really believes that when they
7  gave him that command on Westmoreland to pull over and he
8  takes off on a high-speed, does anyone really believe that he
9  is not resisting at that point.
10      We have proven this case.  We have proven it beyond a
11  reasonable doubt.  Justice requires, for Corporal Mark Nix,
12  justice requires a verdict of guilty for the offense of
13  capital murder.
14      Thank you.
15          THE BAILIFF:  All rise.
16          (Jury retired from the courtroom to deliberate.)
17          (Recess taken.)
18          (Lunch recess taken.)
19          THE COURT:  Mr. Crump, if you will bring them
20  in.
21          THE BAILIFF:  Judge.
22          (Discussion off the record.)
23          THE COURT:  Everyone is going to have to step
24  outside the courtroom for a few minutes.
25      I will mention before I leave their request on Veronica

61

1   Morales.

2       You may proceed, Mr. Brauchle.

3           MR. BRAUCHLE:   Mr. Ruiz, we originally brought

4   you in because the note that the jury sent out they requested

5   as I told you certain video clips.  The video clips are

6   embedded in the hard drive of this computer.  And the person

7   that, Mr. Spurger, that you have seen throughout the trial

8   knows how to work that.  If we bring the jury out to work it

9   themselves, they can go to things that they haven't requested,

10  they can change the channel simply put.  So what we have

11  purposed is for Rex to sit in here, and Spurger to operate the

12  computer and make sure that the only things they see during

13  their deliberations are what they have requested.

14      You have any problem with that?

15          THE DEFENDANT:   No.

16          MR. BRAUCHLE:   So you consent to that?

17          THE DEFENDANT:   Yes.

18          MR. BRAUCHLE:   And the other thing is, there is

19  not going to be anybody in the jury -- I mean in this

20  courtroom except for their investigator and our investigator,

21  in other words the deliberation room will become the

22  courtroom.

23          THE DEFENDANT:   All right.

24          MR. BRAUCHLE:   Any question to that?

25          THE DEFENDANT:   No.

62

1           MR. BRAUCHLE:   So you consent to what we are

2   purposing?

3           THE DEFENDANT:   Yes.

4           MR. BRAUCHLE:   You understand that you don't

5   have to, but you are?

6           THE DEFENDANT:   Yes.

7           MR. BRAUCHLE:   All right.

8           THE COURT:   And just for the record, I will

9   admonish both of the investigators that are present while the

10  jury is in here not to divulge any of the comments made by the

11  jury while watching the video.

12          THE INVESTIGATOR:   And if they ask to see the

13  video again, we are allowed to show it?

14          THE COURT:   No problem with that.

15          THE INVESTIGATOR:   Make sure that I am clear, I

16  am to show them the two side-by-side video and the chopper

17  aerial footage when the Tac Team --

18          MR. BRAUCHLE:   Takes him out of the car.

19          MR. PARKS:   That's right.

20          MR. BRAUCHLE:   That's all the note.

21          THE COURT:   Yes, that's what the note said.

22          MR. BRAUCHLE:   One was a picture and the other

23  was a diagram and the other one is testimony that they are

24  going to get a note on.

25          THE COURT:   Item four, cruiser film side by

63

1   side, two helicopter swat footage are the only footage they

2   requested.

3           MR. JOHNSON:   Okay.  One more thing.  If they

4   ask for something different than that note while we are in

5   here, what are your instructions with regard to that.

6           MR. BRAUCHLE:   Submit another note.

7           THE COURT:   Submit another note.

8           MR. JOHNSON:   Can he tell them that.

9           THE COURT:   I will tell them that prior to

10  leaving the bailiff is outside the door, to let him know when

11  they are finished.

12          THE INVESTIGATOR:   They are basically not to

13  communicate with us?

14          THE COURT:   Exactly.

15          MR. BRAUCHLE:   They can communicate with you

16  when it runs over.

17          THE BAILIFF:   Are you ready?

18          THE COURT:   Bring them in.

19      And does either side have any objections to me

20  admonishing the alternate juror in the courtroom where she is

21  at, rather than have her wait until all this is through?

22          MR. BROOKS:   No objections by the State.

23          MR. BRAUCHLE:   We don't have any objections.

24          THE COURT:   And neither side has an objection to

25  her leaving after being admonished?

64

1           MR. BROOKS:   No, not by the State.

2           THE COURT:   Mr. Brauchle, you didn't have any

3   objection to her?

4           MR. BRAUCHLE:   Not to that, we have an objection

5   to the law.

6           THE COURT:   Yeah.  You know where to respond to

7   that, send that to.  I have to follow the law, I can't ...

8           MR. BRAUCHLE:   I know.

9           THE COURT:   You may come in and take any seat,

10  there are some instructions that I must give you prior to

11  viewing the footage.

12      Technology being what it is, we have to have someone

13  operate the equipment for you.  It's my understanding that you

14  wish to perhaps make some comments while the video -- some

15  form of deliberations while the video is running, so we will

16  have two gentlemen in here who will work the video equipment

17  for you.  It is essentially as if they are not here.  They

18  have been sworn not to divulge any of your comments made while

19  the video is running.  Additionally, you may not ask them any

20  questions or speak with them unless you need to see a segment

21  repeated.

22      If you need to see additional footage, you have to

23  communicate with the Court in the form of a note.  Everyone

24  else involved in the case will be outside.

25          (Recess taken.)

1    THE COURT:   Bring in the jury, please, Mr. Aven.
2    THE BAILIFF:   All rise, please.
3    (Jury returned to the courtroom.)
4    THE COURT:   You may be seated.
5    Has the jury reached a verdict, Mr. Gage?
6    PRESIDING JUROR:   We have, Your Honor.
7    THE COURT:   You are the foreperson of the jury?
8    PRESIDING JUROR:   Yes, sir.
9    THE COURT:   And has the jury reached a verdict?
10   PRESIDING JUROR:   Yes, sir, we have.
11                    **VERDICT**
12   THE COURT:   And is the verdict, "We, the jury,
13   find the defendant guilty of capital murder as charged in the
14   indictment?"
15   PRESIDING JUROR:   Correct.
16   THE COURT:   If that is the verdict of each
17   juror, can you indicate by raising your hand.
18   (Jurors comply.)
19   THE COURT:   Very well.
20   Sheriff, if you will take the jury to the jury room.
21   THE BAILIFF:   All rise.
22   (Jury retired from the courtroom.)
23   THE COURT:   You may be seated.
24   The Court is in recess.
25   (Recess taken.)

---

1    THE COURT:   Mr. Johnson, you or Mr. Brauchle
2    will do this.
3    MR. BRAUCHLE:   I will proceed.
4    THE COURT:   Okay.
5    MR. BRAUCHLE:   We will call Anthony Williams.
6    THE COURT:   If you will raise your right hand,
7    sir.
8    (Witness was duly sworn.)
9    THE COURT:   You may be seated.
10   You may proceed -- just so the record will reflect, this
11   is an offer outside the presence of the jury.
12   You may proceed, Mr. Brauchle.
13                **ANTHONY WILLIAMS**
14   was called as a witness, and having been duly sworn by the
15   Court, testified under oath as follows:
16              **SUB ROSA EXAMINATION**
17   BY MR. BRAUCHLE:
18   Q.   State your name, please.
19   A.   Anthony Williams.
20   Q.   How old are you, Anthony?
21   A.   Fifteen.
22   Q.   How old?
23   A.   Fifteen.
24   Q.   Do you recall some events that occurred out by where
25   you live on August 23rd, 2006?

---

1    A.   Yes, sir.
2    Q.   Now, then, when you first encountered the police that
3    day, about what time was it?
4    A.   About 3:00 or 4:00.
5    Q.   Three or 4:00 in the afternoon?
6    A.   Yes, sir.
7    Q.   Now, then, you were running down the street and a
8    person that you found out later was Mark Nix, told you to
9    stop; is that correct?
10   A.   Yes, sir.
11   Q.   Now, when the police officer told you to stop, what
12   did you do?
13   A.   I got to the ground.
14   Q.   You laid down on the ground?
15   A.   Yes, sir.
16   Q.   And then the same person that had told you to stop,
17   came over and put handcuffs on you as you were lying on your
18   stomach on the ground?
19   A.   Yes, sir.
20   Q.   Now, then, did the person that you know now to be
21   Mark Nix, what did he do next after he handcuffed you?
22   A.   He picked me up by the handcuffs.
23   Q.   So you have got your handcuffs behind your back and
24   Officer Nix picks you up by the handcuffs?
25   A.   Yes, sir.

---

1    Q.   Was that pretty uncomfortable?
2    A.   Yes, sir.
3    Q.   Now, then, what did he do after he picked you up by
4    the handcuffs?
5    A.   We like -- he threw me in the car.
6    Q.   He threw you in the car?
7    A.   Yes, sir.
8    Q.   Is that the police car?
9    A.   Yes, sir.
10   Q.   And did he give you any instructions once he threw
11   you in the police car?
12   A.   Yes.  He said shut up or I am going to knock all your
13   teeth out.
14   Q.   He said shut up or I will knock all your teeth out?
15   A.   Yes, sir.
16   Q.   Now, then, you yourself didn't file a complaint with
17   the police department; is that correct?
18   A.   No, sir.
19   Q.   What happened was, is that officers there at the
20   scene saw what Officer Nix did to you and how he treated you
21   and they filed a complaint; is that correct?
22   A.   Yes, sir.
23   Q.   How old would you have been on August 23rd of 2006?
24   A.   Fourteen.
25   Q.   Fourteen.  About how much did you weigh at that time?

---

69

```
1    A.   About 115, 110 -- 110, 115.
2    Q.   110 or 115.
3    A.   Yes, sir.
4    Q.   What do you weigh now?
5    A.   138.
6    Q.   And let the record reflect that Mr. Williams is a
7  black male; is that correct?
8    A.   Yes, sir.
9    Q.   And your date of birth is 7/6/92?
10   A.   Yes, sir.
11   Q.   Now, then, was Officer Nix a lot bigger than you
12 were?
13   A.   Yes, sir.
14   Q.   Did he ever attempt to make good on his threat to
15 knock all your teeth out?
16   A.   Yes, sir.
17   Q.   And you know when that would have been?
18   A.   Sir?
19   Q.   Told you that night that if you told anybody you
20 would need a new grill; is that right?
21   A.   Yeah, he told me that.
22   Q.   And he told you that you would need the grill because
23 he would knock all your teeth out; is that right?
24   A.   Yes, sir.
25   Q.   Did he ever come back around and threaten you after
```

70

```
1  that?
2    A.   No, sir.
3    Q.   All right.
4           MR. BRAUCHLE:   We will pass the witness.
5           THE COURT:   Cross-examination, Mr. Brooks?
6           MR. BROOKS:   Yes, Your Honor.
7                SUB ROSA EXAMINATION
8  BY MR. BROOKS:
9    Q.   Mr. Williams, can you hear me okay?
10   A.   Yes, sir.
11   Q.   When Officer Nix makes this alleged threat to knock
12 all your teeth out and get you a new grill, who else was
13 around?
14   A.   A couple of other cops.
15   Q.   Do you know their names?
16   A.   No, sir.
17   Q.   And would it surprise you that none of that is
18 reflected in any of their statements?
19   A.   I don't think so.
20   Q.   Would it also surprise that other officers basically
21 said that he picked you up too hard, not that he threw you
22 into the car?
23   A.   I don't know.
24   Q.   Including the officer who filed a complaint, would it
25 surprise you he just alleged that he picked you up too hard?
```

71

```
1    A.   Yes, he picked me up.
2    Q.   Now, this other officer that is filing a complaint
3  against Officer Nix on your behalf, would it surprise you that
4  he doesn't make any allegations of you being thrown into the
5  car?
6    A.   No, sir.
7           MR. BROOKS:   That's all I have, Judge.
8                SUB ROSA EXAMINATION
9  BY MR. BRAUCHLE:
10   Q.   Anthony, were you ever charged with anything out
11 there at the scene?
12   A.   No, sir.
13   Q.   And so eventually, the police officers unhandcuffed
14 you and let you go; is that right.
15   A.   Yes, sir.
16   Q.   About how long did that take?
17   A.   Thirty minutes to an hour.
18   Q.   Now, then, that happened here in Dallas County; is
19 that correct?
20   A.   Yes, sir.
21   Q.   And it happened in a part of town called North Park
22 Ellum Thicket?
23   A.   Yes, sir.
24   Q.   And that's around Inwood and Lovers; is that correct?
25   A.   Yes, sir.
```

72

```
1    Q.   Now, then, when Officer Nix did pick you up by the
2  handcuffs, did he proceed toward the car that you later got
3  put in fairly rapidly?
4    A.   Yes, sir.
5    Q.   Did he have you running up on your tiptoes?
6    A.   Yes, sir.
7    Q.   And did other officers out there start yelling at
8  Officer Nix to not slam you into the car?
9    A.   I don't remember.
10   Q.   You don't remember that?
11   A.   (No audible response.)
12   Q.   But you didn't get charged with anything by any of
13 the police officers, they didn't write you a ticket or take
14 you to juvenile, they didn't do anything?
15   A.   No, sir.
16   Q.   And after a while they figured out that you were the
17 wrong person that they were looking for, right?
18   A.   Yes, sir.
19           MR. BRAUCHLE:   No further questions.
20                SUB ROSA EXAMINATION
21 BY MR. BROOKS:
22   Q.   Just so the record is clear, Mr. Williams, while you
23 were still at that scene in the squad car is when the police
24 realized that he weren't the person they were looking for; is
25 that a fair statement?
```

73

1    A.    Yes, sir.
2    Q.    And after they realized that you weren't the person
3  they were looking for, they took you to your grandmother's
4  house?
5    A.    Yes, sir.
6              MR. BROOKS:   No other questions, Your Honor.
7              MR. BRAUCHLE:   Nothing further.
8              THE COURT:   You may step down, sir.   Thank you.
9              (Witness complies.)
10             MR. BRAUCHLE:   May this witness be excused?
11             MR. BROOKS:   No objections.
12             THE COURT:   You are free to go, sir.
13             MR. BRAUCHLE:   Thank you, Your Honor.
14             THE COURT:   Certainly.
15             MR. BROOKS:   I just need to put something on the
16  record with respect to this proffer, Judge.  Disciplinarian
17  actions from this incident was being appealed by Corporal Nix
18  at the time of his death, that appeal was pending.  We have
19  offered that at least for record purposes.
20             MR. BRAUCHLE:   Well, he was appealing a
21  sustained finding by the disciplinarian board.  In other
22  words, they found that the complaint should have been
23  sustained.  And as Mr. Brooks said, Nix put that on appeal.
24  So I guess the final word would have been it was sustained at
25  the time of this offense.

74

1              THE COURT:   Very well.
2              (Court recessed for the day.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

75

1    THE STATE of TEXAS )
2    COUNTY of DALLAS  )
3              I, BELINDA G. BARAKA, Official Court Reporter in and
4  for the 194th Judicial District Court of Dallas County, State
5  of Texas, do hereby certify that the foregoing contains a true
6  and accurate transcription of all portions of evidence and
7  other proceedings requested in writing by counsel for the
8  parties, to be included in this volume of the Reporter's
9  Record, in the above-styled and -numbered cause(s), all of
10  which occurred in open court or in chambers and were reported
11  by me.
12             I further certify that this Reporter's Record of the
13  proceedings truly and correctly reflects the exhibits, if any,
14  admitted by the respective parties.
15             I further certify that the total cost for the
16  preparation of this Reporter's Record  was paid by the
17  State/Defense.
18             WITNESS MY OFFICIAL HAND this the 30th day of
19  _May_ , A.D., 2009.
20
21
22             PGBaraka
23             BELINDA G. BARAKA, CSR #5028
               Official Court Reporter
24             133 N. Industrial
               Dallas County, Texas  75207
25  Certification Expires:  12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1          CAUSE NO. F07-50318-M

2   THE STATE OF TEXAS          *    IN THE DISTRICT COURT

3   VS.                         *    194TH JUDICIAL DISTRICT

4   WESLEY LYNN RUIZ            *    DALLAS COUNTY, TEXAS

5

6

7   - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9              REPORTER'S RECORD

10              IN CAMERA HEARING

11          Volume 49 of 59 Volume(s)

12

13

14  - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19          BE IT REMEMBERED THAT on this the 9th day of June,

20  A.D, 2008, the above-styled and -numbered cause(s) came on for

21  hearing before the HONORABLE ERNEST B. WHITE, III, of the

22  194th Judicial District Court of Dallas County, State of

23  Texas, the following is a true and correct transcription of

24  the proceedings had, to-wit:

25      (Proceedings Reported by Computerized Machine Shorthand)

*Belinda G. Baraka, Official Court Reporter*
214-653-5803

```
 1                    A P P E A R A N C E S

 2

 3    HON. KEVIN BROOKS
      Assistant District Attorney
 4    State Bar No. 03070735

 5

 6    HON. ANDY BEACH
      Assistant District Attorney
 7    State Bar No.  01944900

 8                              FOR THE STATE OF TEXAS

 9

10    HON. PAUL BRAUCHLE
      Attorney at Law
11    State Bar No. 02918000

12                              FOR THE DEFENDANT

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    I N D E X
2                                      PAGE/VOL.
```

3   Proceedings - 06/09/08 ............................. 4/49
4   In-Camera Hearing .................................   4
5   End of In-Camera Hearing ..........................   7
6   Reporter's Certificate ............................   8

```
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

P R O C E E D I N G S

(June 9, 2008)

(Following proceedings held in camera on a phone conference.)

THE COURT:   Mr. Turbo, I have the court reporter in chamber and attorneys for both sides.  It is my understanding that you have some conflicts regarding the week of the 24th?

JUROR:   Yeah, the 24th and 25th, Tuesday Wednesday.  And at the time we were given the dates, after the completion of deliberations, I had mentioned that I wasn't sure whether I could do that or not.  And everyone assumed okay, fine, we could default to the back-up date.  This is a conference that is very important for work, it has been scheduled for three or four months; and by me not being there, would look very detrimental upon the company and myself.  I don't know if you guys are fine on starting the 26th.

THE COURT:   That may be an option.  Let me ask you, and I am sure the attorneys may have some questions to ask you, if you were to participate as a juror and miss that conference, would your thoughts possibly be concerning the conference and missing it, is that a possibility.

JUROR:   Judge, can you rephrase that, please.

THE COURT:   Certainly, if you were to come to trial on the 24th and miss the conference, would your

---

thought processes or your thoughts be on the conference and possibly not able to concentrate on the trial?

JUROR:   Well, I don't think that would be a case, no.

THE COURT:   Let me see if the attorneys have any questions.

JUROR:   I don't think my thoughts would be affected if I did in fact miss it, it wouldn't be too much to think about.

THE COURT:   Just an important conference that you would prefer not to miss.

JUROR:   Yes, it is.  It has been scheduled for months and months and we are trying to grow this new division and it is a very important platform to get the growth of this division growing.

THE COURT:   And is it a one-time conference or is it something that is scheduled periodically that you can attend in a few months or so.

JUROR:   Well, it is once a year and it is in Chicago.

THE COURT:   Okay.

JUROR:   And -- yeah, it's once a year.

THE COURT:   Okay, let me see if the attorneys have some questions to ask you.

JUROR:   Okay.

---

6

THE COURT:   Mr. -- any questions, Mr. Brauchle or...

MR. BEACH:   We are going to accommodate him and start on the default date, the 7th or the 8th.

THE COURT:   Mr. Turbo, we will accommodate you, and we will either start the trial on Monday the 7th or Tuesday the 8th.  Reann will let you know.

JUROR:   Thank you very much, Judge, I really appreciate this.

THE COURT:   Certainly.

JUROR:   Thank you.

THE COURT:   Okay, then, what is the consensus, Monday the 7th -- if we start on Tuesday, will we end that week?

MR. BEACH:   The only concern I have is if we have a juror, tell her I am leaving the 12th, 13th, something like that.  If that's the case, we need to start bright and early Monday and just do the best we can.

MR. BRAUCHLE:   Well, the only reason I said Tuesday is because you realize that's a vacation weekend and people have flights delayed or screwed up or car trouble and not everybody is in place to jump into the fray, nine o'clock Monday morning.  So if we give ourselves a day of leeway, which is not an extravagance, I don't think.

MR. BEACH:   I have no problem with it as long as

---

7

it is not going to be a conflict at the tail end of that week, if anybody says they are good through the 17th, the 18th of July, I don't care.

THE COURT:   I would rather shoot for that Monday.

MR. BRAUCHLE:   As I said, I would rather err on the side of caution.

MR. BEACH:   When can you do the pretrial.

MR. BRAUCHLE:   If it is going to be July, I don't see it is that important.

MR. BEACH:   What is your preference on that.

THE COURT:   I am free this week.  Doesn't look like we are going to be in trial next week, Monday, Tuesday.  I am trying not to come in Wednesday.

MR. BEACH:   Let's do it Monday, we think if there is something leftover, we can take up.  Surely the accomplice witness thing, we can get that knocked out.  Whatever additional motions Doug is coming up with.

MR. BRAUCHLE:   Tuesday.

THE COURT:   Next Tuesday, that will work.  What is the issue -- what issues do you-all have.

MR. BEACH:   Well, they filed a motion objecting -- we have one of our bad acts punishment is a drive-by shooting that Ruiz was involved in back in '97 and we --

---

1        THE COURT:   You don't want that in.

2        MR. BRAUCHLE:   It was such a strong case that

3  they dismissed it.

4        MR. BEACH:   Well, because basically all we have

5  is the accomplice who pled to it.  We have case law that says

6  in punishment all you need is accomplice, we need you to look

7  at that in advance, so that is decided beforehand.

8        MR. BRAUCHLE:   How many cases is the accomplice

9  going to get dismissed?

10        MR. BROOKS:   He went to the pen.

11        MR. BEACH:   In guilt you would be in good shape,

12  in punishment they are a little more forgiving.  The big

13  court, the big Austin court.

14        MR. BROOKS:   I can't see the big Austin court

15  being forgiving on anything other than that.

16        MR. BEACH:   I would like to have Hamb down here

17  to fingerprint him again on Tuesday to get the blue backs all

18  squared away so there won't be any delay on that.  So we need

19  to get Ruiz ordered for next Tuesday, get that done, whatever

20  else they are going to be coming up with in terms of -- I am

21  sure...

22        (Court recessed for the day.)

23

24

25

---

1  THE STATE of TEXAS )

2  COUNTY of DALLAS  )

3        I, BELINDA G. BARAKA, Official Court Reporter in and

4  for the 194th Judicial District Court of Dallas County, State

5  of Texas, do hereby certify that the foregoing contains a true

6  and accurate transcription of all portions of evidence and

7  other proceedings requested in writing by counsel for the

8  parties, to be included in this volume of the Reporter's

9  Record, in the above-styled and -numbered cause(s), all of

10  which occurred in open court or in chambers and were reported

11  by me.

12        I further certify that this Reporter's Record of the

13  proceedings truly and correctly reflects the exhibits, if any,

14  admitted by the respective parties.

15        I further certify that the total cost for the

16  preparation of this Reporter's Record  was paid by the

17  State/Defense.

18        WITNESS MY OFFICIAL HAND this the 30th day of

19  May , A.D., 2009.

20

21

22

23  BELINDA G. BARAKA, CSR #5028

      Official Court Reporter

      133 N. Industrial

24  Dallas County, Texas 75207

25  Certification Expires: 12-31-09

---

*Belinda G. Baraka, Official Court Reporter*

*214.653.5803*

1              CAUSE NO. F07-50318-M

2    THE STATE OF TEXAS          *      IN THE DISTRICT COURT

3    vs.                         *      194TH JUDICIAL DISTRICT

4    WESLEY LYNN RUIZ            *      DALLAS COUNTY, TEXAS

5

6

7    - - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9                      REPORTER'S RECORD

10               PRETRIAL PUNISHMENT HEARING

11                 Volume 50 of 59 Volume(s)

12

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19          BE IT REMEMBERED THAT on this the 17th day of June,

20   A.D, 2008, the above-styled and -numbered cause(s) came on for

21   hearing before the HONORABLE ERNEST B. WHITE, III, of the

22   194th Judicial District Court of Dallas County, State of

23   Texas, the following is a true and correct transcription of

24   the proceedings had, to-wit:

25      (Proceedings Reported by Computerized Machine Shorthand)

Belinda G. Baraka, Official Court Reporter
214-653-5803

```
 1                    A P P E A R A N C E S

 2

 3     HON. KEVIN BROOKS
       Assistant District Attorney
 4     State Bar No. 03070735

 5

 6     HON. ANDY BEACH
       Assistant District Attorney
 7     State Bar No.  01944900

 8

 9     HON. JULIUS WHITTIER
       Assistant District Attorney
10     State Bar No. 21397900

11                                 FOR THE STATE OF TEXAS

12

13     HON. PAUL BRAUCHLE
       Attorney at Law
14     State Bar No. 02918000

15

16     HON. WILLIAM JOHNSON
       Attorney at Law
17     State Bar No.  10804500

18                                 FOR THE DEFENDANT

19     Also Present:

20       Doug Parks, Attorney at Law

21

22

23                         *  *  *  *  *

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
1                          I N D E X

2                                              PAGE/VOL.

3    Proceedings - 06/17/08 .......................... 5/50

4    STATE'S WITNESS        Direct    Cross

5     RICHARD HAMB           6

6

7    Ruling on Defense's Motions ......................   11

8

9    Reporter's Certificate ...........................   34

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                    E X H I B I T   I N D E X

 2   STATE'S EXHIBIT(S):          OFFERED:   ADMITTED:   VOL.

 3   117    Blue Back                 10        11        50

 4   118    Blue Back                 10        11        50

 5   119    Blue Back                 10        11        50

 6   120    Blue Back                 10        11        50

 7   121    Blue Back                 10        11        50

 8   122    Blue Back                 10        11        50

 9   123    Blue Back                 10        11        50

10   124    Blue Back                 10        11        50

11   125    Blue Back                 10        11        50

12   126    Blue Back                 10        11        50

13   127    Blue Back                 10        11        50

14   128    Fingerprint Card          10        10        50

15

16

17

18

19

20

21

22

23

24

25
```

5

1                  P R O C E E D I N G S
2                      (June 17, 2008)
3              THE COURT:   On the record.
4        Cause No. F07-50318, styled the State of Texas versus
5    Wesley Ruiz.  This matter is set for a pretrial hearing today.
6        What says the State?
7              MR. BROOKS:   State is ready.
8              THE COURT:   And what says the Defense?
9              MR. PARKS:   The Defense is ready, Your Honor.
10             THE COURT:   And it is my understanding that the
11   Defense is going to have the defendant in the holdover; is
12   that correct.
13             MR. PARKS:   That's correct.
14             THE COURT:   What issues do we have?
15             MR. BRAUCHLE:   Certain pretrial motions in
16   regard to the punishment evidence.  I guess they are not
17   pretrial anymore.
18             THE COURT:   I thought about that, when I said
19   that.
20             MR. BRAUCHLE:   They are --
21             THE COURT:   Mid-trial, pre, presentencing
22   motions.
23             MR. PARKS:   I think we counted only about six of
24   them; is that correct?
25             MS. SMITH:   Yes.

6

1              MR. PARKS:   There are going to be -- if I can
2    approach?
3              THE COURT:   Certainly.
4              MR. PARKS:   This will help you on extraneous
5    offenses.
6              THE COURT:   Okay.  These actual motions?
7              MR. PARKS:   They are probably loose, I don't
8    think they were ever put in a binder.
9              (Pause in the proceedings.)
10             THE COURT:   If you will have Deputy Hamb take
11   the stand.
12        Raise your right hand.
13             (Witness was duly sworn.)
14             THE COURT:   You may be seated.
15                  RICHARD HAMB
16   was called as a witness, and having been duly sworn by the
17   Court, testified under oath as follows:
18                DIRECT EXAMINATION
19   BY MR. WHITTIER:
20        Q.   Tell us your name?
21        A.   Richard Hamb, H-a-m-b.
22        Q.   And where are you employed?
23        A.   With the Dallas County Sheriff's Department in the
24   intake identification section.
25        Q.   And what you do in that section?

7

1        A.   We fingerprint the prisoners that come into the jail.
2    We classify and compare all the fingerprints.
3        Q.   And how long have you been so employed?
4        A.   About 12 years.
5        Q.   Okay.  And during that time, have you printed few or
6    many people and compared their prints against known?
7        A.   Many people.
8        Q.   And have you at different times during that period of
9    time been qualified and admitted as an expert on fingerprint
10   comparison in the courts of this county?
11       A.   Yes, sir.
12       Q.   Other counties?
13             MR. BRAUCHLE:   We stipulate he is an expert.
14             MR. WHITTIER:   I'm sorry?
15             MR. BRAUCHLE:   We will stipulate he is an
16   expert.
17       Q.   (By Mr. Whittier)  Officer Hamb, have you
18   had a occasion to print the man named in this case,
19   Wesley Lynn Ruiz?
20       A.   Yes.
21             MR. WHITTIER:   We will agree to the stipulation.
22             THE COURT:   Very well.
23       Q.   (By Mr. Whittier)  You have?
24       A.   Yes.
25       Q.   When was the last occasion you had to print him?

8

1        A.   On May 9th, I went over to the jail assignment at
2    the North Tower where he was located and fingerprinted
3    Mr. Ruiz.
4        Q.   Okay.  Is -- the man that you printed as Wesley Lynn
5    Ruiz enrolled in and named in the log of prisoners that you
6    have in your jail?
7        A.   Yes.
8        Q.   And you know him by sight?
9        A.   Yes.
10       Q.   Is he also identified for you by photographs that you
11   have in your online assistance?
12       A.   Yes.
13       Q.   Okay.  And if you saw Wesley Ruiz and he were in the
14   courtroom today, would you recognize him?
15       A.   Yes.
16       Q.   Would you be able to point him out and identify him?
17       A.   Yes.
18       Q.   Okay.  At some point around May the 9th you were
19   handed a set of blue backs, summaries of convictions and
20   adjudication in Dallas County by myself, right?
21       A.   Yes, sir, that's correct.
22       Q.   And do you have those before you?
23       A.   Yes.
24       Q.   And in that set of blue backs, do they all contain
25   fingerprints?

9

1    A.    Yes, they do.

2    Q.    Is there one municipal court packet in there that

3    does not contain a fingerprint?

4    A.    Yes, sir.

5    Q.    And you weren't able to compare a print there,

6    correct?

7    A.    That's correct.

8    Q.    Okay.  Did you need to get that card?

9    A.    No.

10   Q.    Officer, you had a chance to compare the knowns that

11   you took from Wesley Ruiz against the prints that show in each

12   of those files?

13   A.    That's correct, yes.

14   Q.    I'm sorry, I didn't count them, but how many are

15   there there?

16   A.    It's State's Exhibit 117 through 127.

17   Q.    Okay.  And in your opinion, have you had an adequate

18   opportunity to observe and examine those prints against the

19   knowns that you took?

20   A.    Yes, I did.

21   Q.    And made a determination as to the person identified

22   in those packets?

23   A.    Yes.

24   Q.    And tell the Court who that person is?

25   A.    Wesley Ruiz, the person that I have looked at the

10

1    book-in mug shots as well as the fingerprints that I took from

2    Wesley Ruiz.

3    Q.    Okay.  And you are comfortable you will be able to

4    identify him facially were he in the courtroom today?

5    A.    Yes.

6              MR. WHITTIER:   Pass the witness.

7              MR. PARKS:   No questions.

8              MR. WHITTIER:   Pass the witness with no further

9    questions.

10        Judge, we would offer into evidence preliminarily and for

11   all purposes I'm sorry, the blue backs identified by Officer

12   Hamb.

13             MR. BRAUCHLE:   Well, we have objections to the

14   blue backs in that we haven't been -- we haven't been able to

15   go through them to see if they are admissible.  We don't have

16   a problem with State's Exhibit 128, that's the print card.

17             THE COURT:   No objection to 128; 128 is

18   admitted.

19             MR. BRAUCHLE:   But simply because his

20   fingerprints may be on these documents doesn't mean that they

21   are admissible.  We will agree to admit them for record

22   purposes only.

23             THE COURT:   And those are exhibit numbers?

24             MR. BRAUCHLE:   I think they said it is 117

25   through 127.

11

1              MR. PARKS:   Some of them are subject to some of

2    our other motions, Judge.

3              THE COURT:   Right.

4         State's Exhibit 117 through 127 are admitted for record

5    purposes.

6         And Mr. Hamb, do you need to leave.

7              MR. BRAUCHLE:   We don't have any questions for

8    him.

9              THE COURT:   You are free to leave, sir.

10             THE WITNESS:   Thank you.

11             THE COURT:   Thank you.

12             (Pause in the proceedings.)

13             MR. PARKS:   This is the situation where the

14   Defense was furnished about 22 individual notices of

15   extraneous offenses, at some point in time.  I know the State

16   has indicated informally that they did not intend to pursue

17   all of these, but I don't believe we have ever put on the

18   record which ones they do not intend to pursue and which they

19   do.  So I think that probably would be a good starting place

20   for us to know which of these 22 extraneous offenses that we

21   are really concerned with.

22             THE COURT:   And, Mr. Parks, just to make sure I

23   have the right motion, motion to exclude evidence of

24   extraneous; is that correct?

25             MR. PARKS:   This is the omnibus motion, that's

12

1    correct.  Look at page two I can tell you for sure.

2              THE COURT:   This is what I have page two.  Mine

3    doesn't say omnibus.

4              MR. PARKS:   There should be one that says

5    omnibus with page two looks like that.  I have just handed it

6    to you, I think I did.

7              THE COURT:   These are the ones you handed to me.

8              MR. PARKS:   Here it is, it was on the bottom.

9              THE COURT:   Okay.  Now it is on the top.  Okay.

10             MS. HANDLEY:   Your Honor, I think I can speak to

11   this.  We did of these 22 offenses here, we provided reports

12   or offense reports generated out of the Irving Police

13   Department with respect to each one of these allegations.  Now

14   what this is, is this is part of a gang file from the Irving

15   Police Department.  During this time frame here, the defendant

16   was listed, identified as a gang member of the gang Midnight

17   Dreamers, Ledbetter 12 or West Side 12.  As a result of that,

18   Irving would generate a report whenever he was listed as a

19   suspect, as a complainant, for example, he complained that

20   gang members were shooting at him.  If he was listed as a

21   witness.  All of these offenses are incorporated into his gang

22   file.  We provided them copies of all of this and notice of

23   this, so that when an officer comes from Irving, Texas, to say

24   he was in fact identified as a gang member, he had a

25   reputation out there, we know him well, this is what they are

13

1  basing their opinion on are all these reports generated where
2  they have something to do with the defendant in this case.
3  With respect to which ones we are actually going to prove up,
4  we do have certified copies of convictions for some of these
5  offenses. And I know you are looking at those now, some of
6  those are burglary of motor vehicles, some of them are thefts,
7  things such as that. You will see that there are certified
8  copies of that. We don't have a certified copy of the deadly
9  conduct. We did dismissed that in 1997, but we do in fact
10  intend on proving that in our case in the punishment phase.
11      So the ones we have convictions on, the deadly conduct,
12  we do in fact intend on proving that. But this will be
13  understand a basis of the opinion of anybody who comes here
14  from Irving to say he is a gang member, he was a thorn in our
15  side. Every time we turned around, he had his hand in
16  something.
17      MR. PARKS:  Okay, so with respect to individual
18  extraneous acts or extraneous offenses of bad acts, only the
19  convictions plus the deadly conduct off this list of things.
20      MS. HANDLEY:  The convictions plus the deadly
21  conduct, keeping in mind that an officer Irving, Texas, an
22  officer who, you know, knew him as a gang member had dealings
23  with him, is going to be basing his opinion on each one of
24  these encounters here.
25      MR. PARKS:  I understand. But he is not going

14

1  to talk each one of those individually, unless he is
2  cross-examined about them?
3      MS. HANDLEY:  Precisely.
4      MR. PARKS:  Okay. I think the record is pretty
5  clear on that.
6      MR. WHITTIER:  Conviction of adjudication as a
7  juvenile.
8      MS. HANDLEY:  And the juvenile adjudication,
9  yes. And you have copies of all of those right now that
10  Mr. Brauchle has.
11      MR. PARKS:  Now, also past that list of things,
12  Judge, and I am doing this in an abundance of caution, there
13  is a laundry list of things that the State gives us notice of,
14  curfew violations, giving wrong names to law enforcement,
15  failure to maintain financial responsibility. All of those I
16  am assuming will not be offered as individual bad acts or
17  extraneous offenses.
18      MS. HANDLEY:  Again, Judge, there was a point in
19  Irving, Texas, where the defendant had accumulated several
20  municipal tickets or violations, and he at one point was
21  arrested on all of those outstanding tickets that's what that
22  list is there that I gave you. And then at another point in
23  time he turned himself in to the jail on all those outstanding
24  tickets. And that's all the tickets he was held in jail on,
25  all the outstanding warrants, the curfew violation, no

15

1  seatbelt, failure to give name, that's what that refers to.
2  But I do not intend on bringing municipal tickets to show
3  that. Just to show you that he was in fact arrested and taken
4  into jail and that was the basis of it and that also again is
5  part of his gang file.
6      MR. PARKS:  So again so the record is clear, I
7  understand that none of those things will be offered
8  individually as convictions, extraneous offenses, or bad acts?
9      MS. HANDLEY:  All those tickets, no.
10      MR. PARKS:  And with respect to -- and I think
11  that pretty much addresses that motion, Your Honor. We will
12  have some individuals here that deal with some of the things
13  that are in that motion.
14      And probably it would be reasonable to go next to the
15  motion to exclude the deadly conduct. That is the one the
16  court recalls the State just advised the Court while they
17  did not have a conviction on that case, they intended to
18  attempt to prove that deadly conduct as an extraneous bad act;
19  is that right?
20      MS. HANDLEY:  Yes. We do intend on offering
21  evidence of that.
22      Judge, in 19 -- that offense occurred in 1997. I am not
23  exactly sure of the date, but our office did dismiss that case
24  against the defendant Wesley Ruiz. We did cite lack of
25  cooperating testimony. One of the codefendants on that case,

16

1  a man by the name of Raul Toledo was in fact convicted of that
2  offense and sent to prison. So we do intend on bringing him to
3  court and having him offer testimony of that offense that the
4  defendant participated in that offense with him, specifically
5  that they both shot up a house, shot up a home of Jose Ramos.
6  With respect to us not having cooperating testimony at the
7  time and dismissing our case then, that's because it was
8  necessary to secure a conviction in the guilt phase and I
9  think you are referring to the witness accomplice rule 38.14
10  necessary to have corroborating testimony from a codefendant.
11  That does not apply necessarily to the punishment phase. And
12  there are several cases on point citing that, that it is not
13  necessary to have that same type of corroborating evidence to
14  show in the punishment phase.
15      MR. PARKS:  Of course, our argument there is
16  absolutely no corroboration for this codefendant's testify,
17  none whatsoever, wasn't then, isn't now. He could not be
18  convicted of that offense as a matter of law not then, not
19  now.
20      The Court's charge will require the jury to find that
21  Mr. Ruiz committed this offense beyond a reasonable doubt
22  before they could even consider it in assessing punishment.
23  And it just seems illogical to me that they could hear this
24  evidence in a death-penalty case in the punishment phase when
25  it is absolutely without doubt insufficient to sustain a

17

1  conviction when they are asked to find it beyond a reasonable
2  doubt. It just seems incongruous, and we would suggest to the
3  Court that it is not admissible on that basis, particularly
4  because it is a death-penalty case and for all the reasons
5  that we set out in the motion in violation of the
6  Constitution.
7        THE COURT:  The Court will deny Defendant's
8  request to exclude the alleged bad act of deadly conduct.
9        MR. PARKS:  And just so the record is clear,
10  Judge, my arguing parts of my motion, we don't intend to waive
11  any of the other parts.
12        THE COURT:  So noted.
13        MR. PARKS:  Okay.
14        MS. SMITH:  What other parts?
15        MR. PARKS:  Whatever parts may be. Make sure
16  that the record is clear, I don't want to read in a brief
17  someday that old Mr. Park waived part of his motion because he
18  didn't argue it in open court.
19        THE COURT:  Understood, Mr. Parks.
20        MR. PARKS:  I guess that probably logically
21  brings us to the motion to suppress the escape. This is a
22  misdemeanor, Judge. And what happened was Mr. Ruiz was placed
23  on probation and was granted work release. And it appears
24  that he did not report to the jail when he was supposed to on
25  work release. And an escape charge was filed. Misdemeanor

18

1  escape. My problem with that particularly is that just the --
2  firstly, we are not sure that this constituted escape at the
3  time that the offense occurred.
4        Secondly, if it did, argue the prejudicial effect in a
5  capital murder case particularly where the jury is being
6  called upon to answer special issue number one, is far --
7  outweighs any probative value that walking away from work
8  release while on probation could possibly have toward that
9  issue.
10        In fact, I suggest to the Court that it is not in any way
11  relevant to any of the issues that this jury will be called
12  upon to decide in the punishment phase of the Court -- of the
13  trial. So I guess it's -- there are two or three issues here
14  whether in fact it was an escape.
15        Secondly, whether or not the probative value is such that
16  it is not substantially outweighed by the prejudicial value
17  of it.
18        There is also an issue with the age that would bear upon
19  the probative value. And I suggest to the Court would bear
20  upon relevancy.
21        And certainly if -- if the Court were to admit -- were to
22  deny our motion, we would request that we be able to go behind
23  any conviction to show the jury the true facts of the matter,
24  we are not waiving our motion, please understand.
25        MR. BRAUCHLE:  Your Honor, if I could be heard

19

1  briefly on that. The escape law at the time that this was
2  charged, which is '97, didn't make what they have alleged
3  escape. It is my understanding that he didn't report to work
4  release originally. It is not like he was in work release --
5  am I correct Ms. Handley?
6        MS. HANDLEY:  What is that, sir?
7        MR. BRAUCHLE:  On the escape cases that are
8  charged, he was ordered to report to work release and just
9  never did.
10        MS. HANDLEY:  Essentially, yes. He was ordered
11  to report back to the jail, he did not. The charge was
12  generated then by the sheriff's department that he failed to
13  return.
14        MR. BRAUCHLE:  But he wasn't on work release at
15  the time. It wasn't like he went out to a job and then just
16  didn't come back.
17        MR. WHITTIER:  The Judge on the 2nd of September
18  put him on work release and ordered him to report on 12 --
19  9/12. And he was to report there at 8:00 p.m., he failed to
20  do so.
21        MR. BRAUCHLE:  So -- usually they go to work
22  release and then they go out on their job and they get
23  distracted and don't come back. He never was on work release.
24  And what we are saying is, is that this didn't even constitute
25  a crime at the time that he was convicted of it. What he did

20

1  is he got a case later on and just came in and cleaned up his
2  business. But what we are saying factually, it is in the an
3  escape under the facts that we are relating to you, you tell
4  somebody to report to the probation office next week, I don't
5  think you can charge them with escape or whatever. That's the
6  factual basis regarding this, we would object to it.
7        MS. SMITH:  Your Honor, the State intends only
8  to offer the blue back, however, the Defense has been provided
9  with everything we have. And should they like to go into the
10  facts of this offense, relying on a conviction, they can
11  certainly do so in front of the jury and set the record
12  perfectly clear as to the circumstances of it. The State also
13  like to note that the defendant pled nolo to this. And there
14  is no contention that the conviction itself is not valid.
15  There is no complaint about the sufficiency of the pen packet
16  or it's validity.
17        MR. BRAUCHLE:  Not yet.
18        MS. SMITH:  And this offense is one of a long
19  string of history of offenses which this defendant committed,
20  which is certainly relevant to punishment. His on-going
21  criminal activity over a lengthy period of time. The fact
22  that they are old isn't prejudicial, it is probative of his
23  refusal to comply with the law and living with the law-abiding
24  citizens. It is certainly nor probative than prejudicial.
25        MR. PARKS:  Judge, let me just interject here,

1  again this is a death-penalty case, not a case in which the
2  jury is going to be called upon to set a -- set punishment
3  within a range.  It is not to be -- I suggest to the Court
4  relevant to one of the issues.  And we just simply suggest
5  that under the facts of this case, not reporting for work
6  release is not relevant to a decision by this jury as to
7  whether or not he will be a future danger to society.  And if
8  it has some tiny amount of relevance, it is greatly outweighed
9  by the prejudicial effect.  It is just -- it is not whether I
10  suggest to the Court it might possibly have some influence
11  over the jury in punishment generally, it has got to be
12  relevant to the issue.  And I just don't believe that it is.
13            MR. BRAUCHLE:  For the State to say, well, we
14  can throw an escape charge in and then you can argue whether
15  it was actually an escape charge or not, the jury is in any
16  position to hear our legalese or to decide whether the offense
17  was a righteous case in '97 or not.  I mean -- in the
18  obviously, the prejudicial aspect of just even mentioning
19  escape in this context is certainly prejudicial to our client.
20  Of course that's why they are trying to introduce it.  But I
21  think that it also in any event it should be something that --
22  that is legally a correct charge and -- how would we -- how
23  would we ever prove that that was the underline facts.  We
24  would have to go out and subpoena what, the Judge, the people
25  at work release, God knows who to prove that it wasn't what

1  they are making it out to be, which makes it sound like he
2  climbed over a fence in the dead of night somewhere.  And they
3  are placing the burden on the Defendant to prove that their
4  case is bogus, and that is just improper.
5            MS. SMITH:  The State is not conceding that we
6  have got some kind of bogus escape issue here.  We believe in
7  the validity of it.  I was simply suggesting that if you want
8  to set up the circumstances to which it was committed to
9  somehow show that it was less heinous than the jury might
10  infer, then that's up to you.  But we are not suggesting that
11  this is an invalid conviction, putting the burden on you to
12  prove it.  We think it is valid and that's why we want to
13  offer it.
14            MR. BRAUCHLE:  How would we ever set that up,
15  though.  I would have to call -- we would have to subpoena
16  work release records, which they haven't seen fit to do and
17  bring half of the judiciary and the sheriff's department down
18  here to prove that instead of escape, he didn't report to
19  something that he was ordered to do.
20            MS. SMITH:  That --
21            MR. BRAUCHLE:  It is an unfair burden.
22            MS. SMITH:  All they have to do is contact the
23  DSO Deputy Rowe, R-o-w-e.  It is really not a difficult task
24  to put evidence on regarding this crime.
25            THE COURT:  The Court will deny the Defendant's

23                                                                24

1  motion to exclude misdemeanor conviction regarding escape.
2            MR. PARKS:  Judge, I think probably the next
3  motion, and we are doing -- doing it to some extent now is a
4  motion for pretrial hearing, the admissibility of extraneous
5  offenses.  But the second portion of that motion is for
6  appropriate jury instruction.  And I think the escape
7  situation is a perfect place to talk about that.  And what we
8  are asking by that motion, obviously is for the Court to make
9  an independent decision as-to the admissibility of these
10  extraneous offenses and bad acts exercising the Court's
11  gate-keeping function.  And that so the record is clear that
12  each one of these -- one of the decisions the Court has got to
13  make, aside from being relevant, is the unfair prejudice
14  issue, which is set out in the paragraph number seven of that
15  motion.
16       But also with respect to paragraph number eight, when
17  these particular extraneous offenses and bad acts are admitted
18  by the Court in the presence of a jury, we are asking for a
19  limiting instruction, instructing the jury as to the purpose
20  for which specifically the purpose for which the Court is
21  admitting those extraneous offenses.  Whether it is supposedly
22  to show whatever it is -- it is supposed to be showing.  So
23  that the jury can take it for that purpose and not some other
24  purpose.  It would be just like any other extraneous offenses
25  in the guilt stage of the trial.  If it were intent or

1  identity in guilt/innocence, then we are asking for a limiting
2  instruction in punishment as to the purpose of each bad act or
3  extraneous offense.
4            MS. SMITH:  Well, we certainly have no dispute
5  that we have the burden of proofing these extraneouses, or
6  that he committed them.  I think it is a little dangerous to
7  try to limit the purpose for which they can be used, because
8  sentencing phase is pretty wide open.  And in a sense, if you
9  want to limit future dangerousness, you are going to be
10  preventing yourself from being able to use them in mitigation
11  in some form or fashion and so would we.  I think the
12  instructions that are normally given are adequate to require
13  us to meet our burden and require the jury to find that we met
14  our burden.
15            MR. PARKS:  Well, I have a hard time
16  understanding how we would be using extraneous offenses and
17  prior bad acts in our behalf on mitigation issues.  I don't
18  foresee that we would be asking the jury to take into
19  mitigation any bad act that Mr. Ruiz -- what I don't want them
20  doing is considering it against Mr. Ruiz on mitigation issue
21  when it has been admitted for the purpose -- if that is the
22  purpose of the admission of showing future dangerousness.  And
23  it really isn't a wide open situation in this case, it is two
24  specific issues.  And the evidence needs to go to one or the
25  other of those issues, some evidence can go to both issues.

25

1    But if they are offering the escape to show the defendant will
2    be a future danger, then the jury needs to be instructed that
3    that's the purpose that the Court is allowing that evidence in
4    on and not for any other purpose.
5           MS. SMITH:   Judge, can I direct you to article
6    37.07.1, Section E(1), is the instruction, the mitigation
7    instruction.  And it specifically tells the jury to take into
8    consideration all of the evidence.  I think if we tried to
9    limit the use of this evidence, this extraneous offense, we
10   are going to be violating the statutory required instruction
11   in mitigation.  And while generally speaking, you probably
12   wouldn't be using extraneous offense evidence in mitigation,
13   the perfect example would be the escape.  If you are going to
14   put on evidence to show the circumstances under which this
15   escape occurred, you are probably going to be arguing it is
16   less heinous than we are representing, then you would use that
17   mitigation.
18          MR. PARKS:   Not if it didn't come in.
19          THE COURT:   Anything further, Mr. Parks?
20          MR. PARKS:   Not on that motion, no, Your Honor.
21          THE COURT:   The Court will deny that request.
22          MR. PARKS:   Judge, there is a motion -- let's
23   see hear, make sure I am not getting -- the other motions
24   are -- there is no reason why we can't take them up now at
25   this point, if the Court wants to.  There is a motion -- there

26

1    should be two of them actually, that are very much alike.
2    There is a motion requesting the Court find Texas Code of
3    Criminal Procedures, Article 37.07.1 unconstitutional.  And it
4    is a companion motion basically to the one with a great long
5    title that includes the word Nexus, ends in italic.  And
6    essentially what these motions are, one of them is to ask the
7    Court to find that the entire Article 37.07.1.2(f)(4) is
8    unconstitutional because it limits the definition of
9    mitigation evidence in violation of the United States
10   Constitution and the teachings of the articles are directed,
11   which is why it is a companion motion.  And the alternative to
12   holding the -- not the alternative, but in the event Court did
13   not hold that portion of 37.07.1 unconstitutional, the request
14   of the Defendant is that either -- well, I guess, that in the
15   jury charge the jury not be instructed as to the definition of
16   mitigating evidence set out in 37.07.1.2(f)4.  And that if
17   they are instructed and the terms of that definition, the jury
18   will be limited in their ability to consider mitigating
19   evidence as that is defined or described in Conard under the
20   Constitution of the United States.
21          THE COURT:   Response.
22          MS. SMITH:   Your Honor, the instruction that he
23   wants you to not give is a statutorily mandated instruction.
24   It is constitutionality has been attacked previously and has
25   been upheld.  The quote, limitation, he is talking about, the

27

1    definition mitigation is not unconstitutional.  In fact the
2    Supreme Court has given its stamp of approval on the
3    mitigation instruction.  And also the instruction is really
4    not a limitation, because once again in 37.07.1, Section E(1),
5    the instruction requires the jury to consider all of the
6    evidence.
7           MR. PARKS:   Well, that's a little disingenuous
8    to say you are required to consider all of the evidence -- all
9    the mitigating evidence.  Mitigating evidence is, and set out
10   a definition, a statutory definition that limits the jury in
11   considering what the Supreme Court says that they are -- it's
12   extremely confusing to begin with to say you are to consider
13   all the evidence in determining these issues.  In mitigation
14   issue you are instructed mitigating evidence is that evidence
15   which bears upon, quoting it loosely, the defendant's moral
16   culpability.  There may be a great deal of evidence that a
17   jury might find to be mitigating that does have absolutely
18   nothing to do with the defendant's moral culpability.  But the
19   definition limits them to only considering that evidence which
20   would fit that definition.  And the Supreme Court has clearly
21   said that the jury is entitled and should be allowed to
22   consider any evidence that they believe would justify a
23   sentence less than death.  And it is not limited to evidence
24   bearing on the defendant's moral culpability.  And that's the
25   problem.

28

1           MS. SMITH:   But the instruction itself for
2    future argument, the instruction lists a number of types
3    evidence in addition to evidence related to moral culpability.
4    It necessarily tell the jury that moral culpability is one
5    facet of evidence to consider in answering moral culpability.
6           MR. PARKS:   Then why define it?  Why tell them
7    what the definition of it is if it is less than what the Court
8    says they can consider.  It would be like saying, you know
9    intent is what we say it is, but don't pay any attention to
10   what we say it is because it can be anything you want it to
11   be -- it makes no sense.  I believe that it is so intends to
12   so confuse the jury that it deprives the defendant of due
13   process, fair trial according to all of the federal statutes,
14   constitution included in the motion, Your Honor.
15          THE COURT:   Very well.
16          And the Court will deny that motion.
17          MS. SMITH:   Excuse me, both motions?
18          THE COURT:   Yes.
19          MR. PARKS:   There is one other motion, Judge,
20   and it may be a little bit premature, while we are hear we
21   might as well talk about it.  Motion to reduce the defendant's
22   statement of allocution free from cross-examination by the
23   State.
24          THE COURT:   I'm sorry, Mr. Parks, what motion
25   was that?

MR. PARKS: That may not be one -- we don't have to take it up that the time. It looks like that.

THE COURT: You have anything further, Mr. Parks?

MR. PARKS: The motion basically speaks for itself, Judge. And as I said, we haven't made a decision obviously about whether or not, but it would help us in making such a decision --

THE COURT: Having an insight?

MR. PARKS: Yes, sir.

THE COURT: Response.

MS. SMITH: Your Honor, there is only a statutory right to allocation, that is in Article 42.07 of the Code of Criminal Procedures. There is no constitutional right to one. So any allocution has to fit within the requirements of 42.07. The defendant can't just take the stand to express remorse and be free from cross-examination by claiming he is just allocating. If he want to take the stand, he has to be subject to all cross-examination.

MR. PARKS: We think that is inappropriate as we stated in the motion.

THE COURT: The Court will deny this request.

MR. PARKS: End of the motions.

THE COURT: And some of your motions did not have an order attached. What I did, I just put it on the

front page.

MS. SMITH: And you signed it?

THE COURT: I did.

MR. PARKS: Thank you, Your Honor.

MR. BEACH: Judge, in terms of the blue backs objections, is there a chance that we can get together the Friday before start back up, to put their objections on the record so we are not wasting time once the jury gets hear, it shouldn't be that long of a process, I wouldn't think.

THE COURT: Mr. Brauchle, in terms of reviewing all of those, how far have you gotten.

MR. BRAUCHLE: I am probably halfway through. But why should I tell them what my objections are so they can go and correct them. They are in evidence now for the record. I don't think my job is to lay down and help them on their bad blue backs. I will rest at that.

MR. BEACH: I am not sure how we would correct them, Judge, other than redacting certain objectionable portions, and they are either admissible or not. And you are going to make that call. I am just saying -- I want to represent to the Court these will be our first exhibits, the first thing we do in front of the jury on Monday. So I am trying to avoid --

THE COURT: Taking them out.

MR. BEACH: Yeah, an hour delay. I don't care

if we do it Monday morning at 8:00, just some process in place to save delay.

MR. BRAUCHLE: If somebody can advise me as to what this is?

MR. WHITTIER: Oh, the note.

MR. BRAUCHLE: What does it say.

MR. WHITTIER: Matches number one, number one print on a print card.

MR. BEACH: On 128.

MR. WHITTIER: You are not talking about the document, you are talking about the note.

MR. BRAUCHLE: I am wondering what is it referring to, the print?

MR. WHITTIER: Yes.

MR. BRAUCHLE: Whose note is that.

MR. WHITTIER: Dody.

MR. BRAUCHLE: Who is Dody?

PROSPECTIVE JUROR: Our investigator.

MR. BRAUCHLE: So Hamb haven't compared those?

MR. WHITTIER: Yes, he has.

MR. BRAUCHLE: I am wondering if they are going by this print or...

MR. WHITTIER: You would have to ask him. They are both available.

MR. BRAUCHLE: All right.

MR. BROOKS: Judge, I would just like to put on the record that approximately 38 recorded telephone calls were turned over to the Defendant this morning, two separate DVDs.

MR. PARKS: We acknowledge receipt.

THE COURT: I'm sorry.

MR. PARKS: We acknowledge receipt.

THE COURT: Very well. We can -- so Mr. Brauchle does not have to assist the State in correcting their document, we can take those issues up 8:15 Monday morning -- before bringing the jury in.

MS. HANDLEY: Also I had turned over to Mr. Brauchle last week, a DVD, it was some news footage showing the defendant. And I personally handed that to Paul last week.

MR. BRAUCHLE: Y'all intend to introduce that.

MS. HANDLEY: Yes.

MR. PARKS: Some of these, Kevin, these recordings will not be introduced; is that right?

MR. BROOKS: A large portion of them will not be introduced, Judge. I think they would be under prejudicial. We still have to go through and coal through the specific ones, I can provide them written notice of the specific conversations. I have shown them my notes this morning, what I wrote down possibly coming in, also indicated what I intend

33

1    THE COURT:   Very well.

2         MR. BROOKS:   Also, Judge, they were turned over

3    today because we just received them last Wednesday and I spent

4    all of last week going through, I spent 38 phone calls, 15

5    minutes, which is the maximum they are allowed to converse

6    through the jail phone calls, and it took that time to go

7    through those phone calls.

8         MR. PARKS:   Just so we can have -- as soon as

9    reasonable possible, have a list of those things that the

10   State intends to offer, we will be happy as clams.

11        THE COURT:   As soon as you have that list of

12   what you tend to introduce, if you will make it available to

13   the Defense.

14        MR. BROOKS:   I will have it this week.

15        (Court recessed for the day.)

16

17

18

19

20

21

22

23

24

25

34

1    THE STATE of TEXAS )

2    COUNTY of DALLAS  )

3         I, BELINDA G. BARAKA, Official Court Reporter in and

4    for the 194th Judicial District Court of Dallas County, State

5    of Texas, do hereby certify that the foregoing contains a true

6    and accurate transcription of all portions of evidence and

7    other proceedings requested in writing by counsel for the

8    parties, to be included in this volume of the Reporter's

9    Record, in the above-styled and -numbered cause(s), all of

10   which occurred in open court or in chambers and were reported

11   by me.

12        I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15        I further certify that the total cost for the

16   preparation of this Reporter's Record  was paid by the

17   State/Defense.

18        WITNESS MY OFFICIAL HAND this the 30th day of

19   May , A.D., 2009.

20

21

22

23                  BELINDA G. BARAKA, CSR #5028
                    Official Court Reporter
24                  133 N. Industrial
                    Dallas County, Texas 75207
25   Certification Expires: 12-31-09

1                    CAUSE NO. F07-50318-M

2    THE STATE OF TEXAS          *    IN THE DISTRICT COURT

3    vs.                         *    194TH JUDICIAL DISTRICT

4    WESLEY LYNN RUIZ            *    DALLAS COUNTY, TEXAS

5

6

7    - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9                    REPORTER'S RECORD

10                   PUNISHMENT HEARING

11              Volume 51 of 59 Volume(s)

12

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19          BE IT REMEMBERED THAT on this the 7th day of July,

20   A.D, 2008, the above-styled and -numbered cause(s) came on for

21   hearing before the HONORABLE ERNEST B. WHITE, III, of the

22   194th Judicial District Court of Dallas County, State of

23   Texas, the following is a true and correct transcription of

24   the proceedings had, to-wit:

25      (Proceedings Reported by Computerized Machine Shorthand)

Belinda G. Baraka, Official Court Reporter
214-653-5803

1                           A P P E A R A N C E S

2


3      HON. KEVIN BROOKS
       Assistant District Attorney
4      State Bar No. 03070735

5


6      HON. ANDY BEACH
       Assistant District Attorney
7      State Bar No.  01944900

8                                      FOR THE STATE OF TEXAS

9


10     HON. PAUL BRAUCHLE
       Attorney at Law
11     State Bar No. 02918000

12


13     HON. WILLIAM JOHNSON
       Attorney at Law
14     State Bar No.  10804500

15                                      FOR THE DEFENDANT

16     Also Present:

17      Doug Parks, Attorney at Law

18

19

20                              *  *  *  *  *

21

22

23

24

25

```
1                        I N D E X

2                                              PAGE/VOL.

3    Proceedings - 07/07/08 ...........................  5/51

4    STATE'S WITNESS      Direct    Cross    V.Dire/S.Rosa

5     RICHARD HAMB        6, 17    20, 34    10

6                         22

7     HAROLD RENFRO       49, 74    76              55, 68

8                                                   69

9     RAUL TOLEDO         77, 108  104, 109

10                        110

11    JOSE RAMOS          113       126

12    A.P. MERRILOTT      149, 189  176, 191    136, 140

13                        193, 198  196

14

15   Reporter's Certificate ...........................  200

16

17

18

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                    E X H I B I T    I N D E X

 2    STATE'S EXHIBIT(S):         OFFERED:   ADMITTED:  VOL.

 3    117   Blue Back                10        16        51

 4    118   Blue Back                10        12        51

 5    119   Blue Back                10        13        51

 6    120   Blue Back                10        16        51

 7    121   Blue Back                10        16        51

 8    122   Blue Back                10        15        51

 9    123   Blue Back                10        16        51

10    124   Blue Back                10        16        51

11    125   Blue Back                10        16        51

12    126   Blue Back                10        16        51

13    127   Blue Back                10        16        51

14    128   Fingerprint Card         12                  51

15    32-A  Photograph               32        33        51

16    154   Photograph             32/103     103        51

17    155   Photograph               32        33        51

18    156   Photograph               32        33        51

19    157   Photograph               32        33        51

20    158   Photograph               32        33        51

21    159   Photograph              101       101        51

22    160   Cir. Vitae              152       153        51

23

24

25
```

Belinda G. Baraka, Official Court Reporter
214-653-5803

5

**P R O C E E D I N G S**

(July 7, 2008)

1 THE COURT:  On the record on the Ruiz matter.

4 What says State?

5 MR. BROOKS:   State is ready, Your Honor.

6 THE COURT:   What says the Defense?

7 MR. JOHNSON:   Ready, Your Honor.

8 THE COURT:  I have a motion to suppress cell

9 phone recordings.  What says the Defense on that motion?

10 MR. BROOKS:   Judge, I didn't realize we were

11 addressing that at this time.  We just got that this morning,

12 and appellate is looking at it as we speak.

13 MR. JOHNSON:   You want to take it up before the

14 recordings are presented?

15 THE COURT:  We can do that.

16 MR. PARKS:  I understand that probably won't be

17 until this afternoon, so ...

18 THE COURT:  Mr. Aven, bring them in.

19 THE BAILIFF:  Yes, sir.  All rise.

20 (Jury entered the courtroom.)

21 THE COURT:  You may be seated.

22 What says the State?

23 MR. WHITTIER:   The State is ready, Your Honor.

24 THE COURT:  You may call your first witness.

25 MR. WHITTIER:   We call Deputy Hamb.

---

6

1 (Witness is duly sworn.)

2 THE COURT:   Thank you, sir, you may be seated.

3 You may proceed.

4 **RICHARD HAMB**

5 was called as a witness, and having been duly sworn by the

6 Court, testified under oath as follows:

7 **DIRECT EXAMINATION**

8 BY MR. WHITTIER:

9 Q.    Tell us your name, sir.

10 A.    Deputy Richard Hamb.

11 Q.    And how are you employed?

12 A.    I work with the Dallas Sheriff's Office in the intake

13 identification section.

14 Q.    And can you briefly describe for the jury what your

15 duties are.

16 A.    We fingerprint and photograph prisoners booked in.

17 We classify and compare all the fingerprints.

18 Q.    And so you essentially try to nail down the

19 identification of people coming and going in the judicial

20 system here in Dallas County?

21 A.    That's correct.

22 Q.    How long have you been doing this?

23 A.    About 12 years.

24 Q.    And where did you begin your work as a fingerprint

25 specialist?

---

7

1 A.    In the intake identification section.  When I got

2 transferred in there, I received my training at the Dallas

3 County Sheriff's Academy.  It was taught out the FBI

4 curriculum.  And I have had both the basic and advanced

5 courses.

6 Q.    And do you do on-going training and any updates in

7 that field?

8 A.    I have not recently.

9 Q.    Have there been any new developments that change the

10 fundamental of what you do?

11 A.    Not really.

12 Q.    You have been provided with certain unknown specimen

13 of fingerprint identification in this case, have you not?

14 A.    Yes, I have.

15 Q.    And have you had an opportunity to compare that

16 against print materials that you know are authentic?

17 A.    Yes.

18 Q.    Tell us how that works.

19 A.    You had my fingerprint the defendant in this case,

20 that is the known set of fingerprints that I use for a

21 standard to compare against the other fingerprints to

22 determine.

23 MR. WHITTIER:   May I approach, Your Honor?

24 THE COURT:  You may.

25 Q.  (By Mr. Whittier)  I am going to hand

---

8

1 you what has been marked previously as State's

2 Exhibits 1 17 through 128, ask you to take a moment

3 to look at those and tell us if you recognize each

4 of those items.

5 A.    Yes, sir.

6 Q.    You are familiar with those?

7 A.    Yes.

8 Q.    And basically what do they appear to be?

9 A.    They are certified copies of judgment and sentences

10 against Wesley Lynn Ruiz.

11 Q.    And are they all primarily out of courts in Dallas

12 County, Texas?

13 A.    Yes.

14 Q.    And do they have identification material in them?

15 A.    Yes.  They list the defendant's name, race, sex, date

16 of birth, and also contains fingerprint at the time of

17 conviction or the sentence, judgment.

18 Q.    Do all of those items you just identified, do they

19 perform some part in your conformation of an identity?

20 A.    Yes.

21 Q.    And what is the known set that you have there?

22 A.    State's Exhibit 128, that you had me take about a

23 month ago.

24 Q.    And who did you take those from?

25 A.    I personally took the defendant's fingerprints.

---

9

1    Q.    Okay.  And he is the gentleman seated to the far left
2  at counsel table?
3    A.    Yes.
4    Q.    Okay.  And how do you know him, what is his name?
5    A.    Wesley Lynn Ruiz.  I had him sign the card.  And I
6  also signed and dated the card showing that I took the
7  fingerprints from him.
8    Q.    Perchance do you know his most recent book in date in
9  the Dallas County jail, month and year?
10    A.    No, I don't recall.
11    Q.    Okay.  We have in our indictment a date of
12  March 23rd of 2007, is your information that he was checked
13  in sometime around that date?
14    A.    Yes, that sounds about correct.
15    Q.    Okay.  You had a chance to compare those that you
16  took from him against the ones in the judgments and sentences,
17  correct?
18    A.    Yes, I have.
19    Q.    And have you drawn a professional conclusion about
20  the identity of the person identified in those 11 judgments
21  and sentences?
22    A.    Yes.
23    Q.    And what is your opinion?
24    A.    All the judgments and sentences pertain to the same
25  Wesley Lynn Ruiz, the defendant.

10

1    Q.    So they reflect that he is the person that was
2  charged and adjudicated in various ways in those judgments and
3  sentences?
4    A.    That's correct, they contain his fingerprint.
5        MR. WHITTIER:  Your Honor, at this time we would
6  offer into evidence State's Exhibits 117 through -- 117
7  through 127, tender same to Defense Counsel.
8        THE COURT:  117 through 127?
9        MR. WHITTIER:  Yes, sir.
10        MR. BRAUCHLE:  May I approach, Your Honor?
11            VOIR DIRE EXAMINATION
12  BY MR. BRAUCHLE:
13    Q.    Officer Hamb, I will show you what has been marked as
14  State's Exhibit 118.
15    A.    Yes, sir.
16    Q.    Officer Hamb, in regard to this document, there is a
17  only one fingerprint included in that document; is that
18  correct?
19    A.    What has been marked as page H, yes, there is a right
20  thumbprint of the defendant.
21    Q.    Now, then is that linked up to any case number?
22    A.    It is contained.
23    Q.    No, I asked you is that linked up to any case number?
24    A.    I am assuming it is M97-31043, it contained in
25  State's document.

11

1    Q.    You might assume that, but when you look at where --
2    A.    I see it is a fingerprint certification page, there
3  is a cause number blank at the top that is not filled in.
4    Q.    So there is no cause number to link it up to that
5  exhibit, is it?
6    A.    Not on that particular page, no.
7    Q.    Well, that's the only page that you can use to in any
8  way link anybody to that pile of papers, isn't it?
9    A.    These would be certified copies of the court's file I
10  would have to look at the original court's file to see if this
11  was a fingerprint page contained in that court's file.
12    Q.    But here today you can't say that Mr. Ruiz was the
13  person convicted in that case, can you by your fingerprint
14  identification?
15    A.    I can just testify that this fingerprint is that of
16  the defendant.
17    Q.    But you don't know what case that goes to, do you?
18    A.    I would hope that it is what it is stapled with, that
19  is what I was presented with.
20    Q.    You might hope it does, but you can't tell this jury
21  over here that he is the person that was convicted in that
22  case, going by his fingerprints, can you?
23    A.    I really can't answer that, being that it is
24  certified by the county clerk's office and it is stapled, I
25  would assume it is a certified copy.

12

1    Q.    You don't know who stapled it do you?
2    A.    No.
3    Q.    You don't know how it was assembled before it came to
4  you, do you?
5    A.    No.
6    Q.    Nobody has provided you with the original court
7  jacket; is that correct?
8    A.    I don't recall if I actually looked at the original
9  court's jacket on this case.
10        MR. BRAUCHLE:  Your Honor, we would object to
11  the admission of that document.
12        THE COURT:  May I see the document?
13  Objection to State's Exhibit 118 is overruled.
14  Mr. Brauchle, what about the other exhibits.
15        MR. BRAUCHLE:  May we have a continuing
16  objection to that?
17        THE COURT:  You may.
18        MR. WHITTIER:  Judge, I may have misspoken my
19  tender to the Court.  We offer into evidence additionally the
20  fingerprint card, if I haven't said it already, State's
21  Exhibit No. 128 as well.
22        MR. BRAUCHLE:  May we approach once again, Your
23  Honor?
24        THE COURT:  You may.
25    Q.    (By Mr. Brauchle)  Officer Hamb, in

13

1    regards to State's Exhibit No. 119 I will direct
2    your attention to page C, can you see that?
3        A.    Yes, sir.
4        Q.    Did anybody certify to that fingerprint?
5        A.    You referring to the deputy bailiff line where the
6    signature?
7        Q.    Let's back up.  When somebody is convicted in a
8    courtroom, the general practice is for that person to be
9    fingerprinted immediately after sentence is pronounced; is
10   that correct?
11       A.    That's correct.
12       Q.    Okay.  And that's done by a bailiff or deputy over
13   here that is in the courtroom when that occurs; is that
14   correct?
15       A.    That's correct.
16       Q.    And they sign that sheet saying that they certify
17   that that's the person that was convicted on that date in that
18   case; is that correct?
19       A.    Yes.
20       Q.    And that's on -- nobody did that?
21       A.    No, there is not a signature.
22             MR. BRAUCHLE:    On those grounds, we would
23   object to Exhibit 119.
24             THE COURT:    May I see 119.
25       State's Exhibit 119 is admitted.

14

1              Your objection is overruled.
2              MR. BRAUCHLE:    May we have a continuing
3    objection to the Court's ruling?
4              THE COURT:    You may.
5              MR. BRAUCHLE:    May I approach once again, Your
6    Honor?
7              THE COURT:    You may.
8        Q.    (By Mr. Brauchle)  I will show you what
9    has been marked as State's Exhibit 122, is there any
10   certification of a conviction in that document?
11       A.    No, there is not.
12       Q.    Is there a fingerprint?
13       A.    No, there is not.
14       Q.    Is there any physical evidence that would in any way
15   link the defendant in this case with that document other than
16   his name?
17       A.    Name, race, sex, date of birth, complainants name
18   and --
19       Q.    Well --
20       A.    Family violence assault.
21       Q.    That doesn't have anything to do with being convicted
22   of anything now, does it?
23       A.    It goes to the identity of the defendant in the case.
24       Q.    Officer Hamb, you know that you can't identify
25   somebody by name or date of birth, can you?

15

1        A.    Yes, you can.
2        Q.    You can testify that someone is convicted simply by
3    their name?
4        A.    In the totality of the information provided on the
5    document with the date of birth, address and complainants's
6    name.
7        Q.    Okay.  Well, let's go that way then, what is the
8    totality of the document that says that anybody was ever
9    convicted in that case?
10       A.    I don't see a judgment on a class C ticket for family
11   violence assault.
12       Q.    So you can't say that anybody of any name or date of
13   birth was ever convicted in what you got in front of you, can
14   you?
15       A.    That's what 122 is, is an information.
16       Q.    It is a business record, it is not a conviction, read
17   the front of the affidavit?
18       A.    Affidavit for business record, that's correct.
19             MR. BRAUCHLE:    Court is aware of that objection,
20   we would make that objection to 122.
21             THE COURT:    May I see 122.
22       Overruled, 122 is admitted.
23             MR. BRAUCHLE:    May we have a continuing
24   objection to that?
25             THE COURT:    You may.

16

1              MR. BRAUCHLE:    For record purposes, what does
2    122 represent?  Since it has been admitted, how will we refer
3    to that?
4              THE COURT:    Exhibit 122 will present a judgment
5    where the defendant entered a plea of no contest to the
6    offense of assault family violence.
7              MR. BRAUCHLE:    With all due respect, the witness
8    said there is no judgment present.
9              THE COURT:    That's what it will represent.
10             MR. BRAUCHLE:    Note our exception.
11             THE COURT:    Certainly.
12             MR. BRAUCHLE:    In regard to items 124, 125, 126,
13   127, 117, 121, 120, 123, we would object to those in that they
14   deny the defendant's right to confrontation.
15       And we would also renew our objection to the documents
16   previously made.
17             THE COURT:    Very well.  State's Exhibits 124,
18   125, 126, 127, 117, 121, 120, 125, 123, are admitted.
19             Your objection is overruled.
20             MR. WHITTIER:    May I have a moment, Judge?
21             THE COURT:    You may.
22             MR. WHITTIER:    You still have 122, Mr. Brauchle?
23             THE COURT:    122 is here.
24
25       (No omissions.)

17

DIRECT EXAMINATION RESUMED

BY MR. WHITTIER:

Q.   Deputy Hamb, will you describe what each of those represent to the jury in terms of the offense, the date of conviction as you can discern it from those records.

A.   State's Exhibit 117 is a conviction out of 304 Judicial District Court against Wesley Lynn Ruiz.

Q.   Does it show a disposition date of 13, June, 1996?

A.   June 13th, 1996.  This is juvenile adjudication.

Q.   For the offense of theft?

A.   Probation.  It is.

Q.   Okay.  That's a juvenile adjudication?

A.   That's correct, it is.

State's Exhibit No. 118, Cause No. M97-31043, against Wesley Ruiz for the offense of burglary of a vehicle.

Q.   Does it show the offense date?

A.   January 2nd of 1997, date of judgment is 2/24 of '97.

Q.   Okay.

A.   State's Exhibit No. 119 is M97-32834, a theft 50. The date of offense of July 19th, 1997.  Date of judgment is 9/2 of '97.

Q.   Yes, sir.

A.   State's Exhibit No. 120, M97-29803, for another burglary of a vehicle.  The date of offense is August the 3rd

18

of '97, with a date of judgment of February 17th of 1998.

Q.   Ninety-eight?

A.   That's correct.

Q.   Okay.

A.   Cause No. M97-19802 against Wesley Lynn Ruiz, for an escape.  Date of offense would be September the 12th of 1997, with a judgment daytime of February 17th of 1998.

State's Exhibit No. 123, Cause No. F04-58624, out of the 194th Judicial District Court against Wesley Lynn Ruiz for the offense of evading arrest in a motor vehicle.  Date of offense was 11/25 of 2004, with a judgment date of November 10th of 2005.

Q.   That's out of a district court, correct?

A.   That's correct.

Q.   That's a felony offense?

A.   Yes.

Q.   Okay.

A.   State's Exhibit No. 124, Cause No. M04-63325, for unlawful carrying of a weapon, a handgun.  Offense date, November 25th of 2004.

Q.   That's the same date as the previous offense you just described?

A.   It is.

Q.   Do they appear to be companion cases?

A.   Yes.

19

Q.   That is, they occurred out of the same transaction?

A.   That's correct.

Q.   Okay.

A.   Date of the judgment is 11/18 of 2005.

Q.   What exhibit are you on now?

A.   State's Exhibit No. 125 is a judgment out of Tarrant County, Cause No. 09-72916-D, the State of Texas versus Wesley Lynn Ruiz.  For the offense of possession with intent to deliver a controlled substance, 4 grams or more but less than 200 grams of methamphetamine.  Date of judgment is April 24th of 2006.

Q.   Do you see the grade of offense?

A.   The date of offense?

Q.   The grade of offense?

A.   First-degree felony.

Q.   Okay.  And is that out of a district court in Tarrant County?

A.   It is.  The 396 District Court in Tarrant County, Texas.

Cause -- State's Exhibit No. 126 is Cause No. F05-51476, out of the 194th Judicial District Court against Wesley Lynn Ruiz, for the offense of unlawful possession of a controlled substance, methamphetamine.  Date of judgment is November 10th of 2005.

Q.   That's a felony as well?

20

A.   It is.

Q.   And that's out of a district court?

A.   It is.

State's Exhibit No. 127, Cause No. F05-56492, out of the 194th Judicial District Court also.  Against Wesley Lynn Ruiz for the offense of unlawful position with intent to deliver controlled substance, methamphetamine.  The date of judgment is 5/23 of '06.

Q.   And as with the others, the last couple that you read, this is out of a district court?

A.   They are.

Q.   For a felony offense?

A.   Yes, sir.

Q.   And that offense in that 56472, that's a first-degree felony as well?

A.   It is.

MR. WHITTIER:   Your Honor, at this point we would request permission to publish these documents to the jury.

THE COURT:   You may.

MR. WHITTIER:   We pass the witness, Your Honor.

THE COURT:   Cross-examination, Mr. Brauchle.

CROSS-EXAMINATION

BY MR. BRAUCHLE:

Q.   Officer Hamb, in the documents that have been

1  admitted, is there anyway to tell what the underline facts
2  that led to those charges are?
3      A.    I didn't see any information except the indictment or
4  the information.
5      Q.    That's just the legal document that charges them in
6  accordance with whatever the statute is; is that correct?
7      A.    That's correct.
8      Q.    So as far as having any information as to how those
9  charges in any way arose or how Mr. Ruiz might have been
10 charged with any of those things, you really can't tell this
11 jury any facts about that, can you?
12     A.    No.
13     Q.    Now, then, how many allegedly convictions are there
14 in that pile of documents?
15     A.    I can't recall how many.  I didn't keep count.
16     Q.    And out of those, how many would be felonies?
17     A.    Again, I didn't keep count.  I couldn't tell you
18 without looking at the documents again.
19     Q.    Would it be two?
20     A.    If that's what I just testified to, yes.
21     Q.    All right.  The rest of them would be misdemeanors;
22 is that correct?
23     A.    That's correct.
24     Q.    And as far as what dispositions were given out in
25 regard to any of those cases, you couldn't testify to that,

1  although it is contained in the documents, right?
2      A.    It's what is contained in the documents, yes, sir.
3      Q.    Now, then, from looking at those documents that you
4  saw, were there any final convictions that resulted in
5  Mr. Ruiz ever being incarcerated in prison?
6      A.    I don't know without looking at the documents.
7      Q.    Okay.  And you don't know --
8      A.    No.
9      Q.    -- you don't know how much time, if any, he may have
10 been sentenced to in regard to the misdemeanors; is that
11 correct?
12     A.    It's listed on the judgments, I would have to look at
13 the documents again.
14           MR. BRAUCHLE:   We will pass the witness.
15                  REDIRECT EXAMINATION
16 BY MR. WHITTIER:
17     Q.    Deputy Hamb, it's true, is it not, that in 1997 that
18 burglary of a motor vehicle was a misdemeanor, correct?
19     A.    In '97.
20     Q.    As best you remember?
21     A.    Yes.
22     Q.    And theft under $50 was a misdemeanor?
23     A.    That's correct.
24     Q.    In 1997?
25     A.    Yes.

1      Q.    1997 another burglary of a vehicle would be another
2  misdemeanor?
3      A.    Yes.
4      Q.    As well as the escape charge that you read us in
5  19802, that was a misdemeanor?
6      A.    Misdemeanor, yes.
7      Q.    The Class C charge that you talked about earlier with
8  Defense Counsel, that's a misdemeanor?
9      A.    Yes.
10     Q.    Then in 2004 in November, that changed into first
11 rung felony, F04-58624 that you read?
12     A.    On the possession case, yes.
13     Q.    Evading arrest?
14     A.    Evading in a motor vehicle, that would be a felony.
15     Q.    So that's his first felony?
16     A.    Yes.
17     Q.    So that's a change in character of this record,
18 correct?
19     A.    It's a higher degree offense, yes.
20     Q.    So it is --
21           MR. BRAUCHLE:   Your Honor, we object to that in
22 that document speaks for themselves.  I believe that case was
23 not convicted as a felony, and this is not the witness to
24 prove those things -- those items up anyway.
25           THE COURT:   Overruled.

1      Q.    (By Mr. Whittier)  So with that evading
2  arrest in November of 2004, he starts a string of
3  felonies where the last three offenses he is charged
4  with, as shown in these records, were all felonies?
5      A.    That's correct.
6      Q.    That's the 09-72916-D out of Tarrant County.  That's
7  F05-51476, possession of meth out of Dallas County.
8  F05-56472, possession with intent to deliver, also out of
9  Dallas County?
10     A.    Those were all felony offenses, yes, sir.
11           MR. WHITTIER:   May we approach, Your Honor?
12           THE COURT:   You may.
13           (Discussion off the record.)
14           THE COURT:   Ladies and gentlemen, we are going
15 to take a 15-minute break.
16           THE BAILIFF:   All rise.
17           (Jury retired from the courtroom.)
18           THE COURT:   You may be seated.
19           (Recess taken.)
20           THE COURT:   Mr. Brauchle, was there an issue you
21 wish to address outside the presence of the jury.
22           MR. BRAUCHLE:   There are quite a few.  One of
23 them would be that we would object to the metal detectors and
24 the increased security in this it militates against our
25 client's presumption that the State has the burden of proofing

1 the punishment phase. I think to put a mental detector
2 outside the courtroom, which didn't exist during the guilt or
3 innocence stage now put it up in the guilt stage, somehow
4 tells the jury if not the world that somehow our man is now
5 more dangerous than he was before. And we would object to
6 that, as well as the increased deputies in the courtroom.
7        The other thing we would object to is that the State
8 seems to this that this is their courtroom and they can
9 designate who sits where and we are kind of tired of the
10 little signs directing everybody as to where they can sit and
11 what they can and can't do. I think the Court ought to figure
12 out what the rules are and go from there.
13        I especially object to the fact that Mr. Ruiz's family is
14 not able to sit on the front row as are other families
15 represented here. I don't see any distinction between the
16 two. I certainly don't think that Mr. Ruiz's family is
17 inherently dangerous by any means. And we would ask that we
18 can get a fair shake in the courtroom and in the security in
19 the courtroom, because all of these things are obviously
20 prejudicial to our client and it doesn't need to exist. We
21 can start with a level playing field and we would object to
22 those matters.
23        THE COURT:   Both of those matters are overruled.
24 The security of the courtroom is left up to the sheriff's
25 department, the bailiffs. And overrule both of those

1 requests.
2        MR. BRAUCHLE:   So is the Court saying that
3 anything the bailiffs can dream up is okay.
4        THE COURT:   Court is not saying that. But at
5 this time the precautions that the sheriff's department have
6 been accurate and will remain in effect.
7        MR. BRAUCHLE:   Where did these come from. We
8 just come down here and the place is taken over by people that
9 we don't know that don't even have anything to do with the
10 case.
11        THE COURT:   They will remain in effect,
12 Mr. Brauchle.
13        MR. BRAUCHLE:   Also we had some motions in
14 limine that were supposed to have been heard this morning at
15 eight o'clock. And I don't think those have been heard, we
16 need to do that at some time.
17        THE COURT:   What motions were they,
18 Mr. Brauchle?
19        MR. BRAUCHLE:   I have no idea. The Court told
20 us to come back at eight this morning, and we would take the
21 matters up. I came at 8:00, but I didn't take anything up.
22        THE COURT:   I'm sorry?
23        MR. BRAUCHLE:   I came at 8:00, but we didn't
24 take anything up. I don't know what they are.
25        THE COURT:   Do you wish to --

1        MR. BRAUCHLE:   I think we need to have some in
2 regard to some up-coming witnesses. Cause we filed --
3        THE COURT:   I don't know which motions you are
4 referring to. So Mr. Parks if you would...
5        MR. PARKS:   Judge, I found this folder, it looks
6 like these are already been denied, motions on the extraneous
7 offenses. So I guess the only thing that we have left
8 recently pending will be a motion to -- in limine on A.P.
9 Merrilott, however you say his name. And the motion to
10 suppress that was filed this morning on the telephone. I
11 think that's the only thing -- those are the only things
12 pressing, if any.
13        THE COURT:   What says the State in response to
14 the motion in limine, motion to suppress?
15        MR. BROOKS:   Judge, appellate is still looking
16 at that motion with respect to the motion in limine. We
17 aren't prepared to address that. And it is my understanding
18 with respect to A.P. Merrilott, that will be addressed prior
19 to his testimony this afternoon.
20        MR. BEACH:   And the right hand didn't know what
21 the left hand was doing, Judge. We have cases in response to
22 their motion to suppress. I just got here, that Kevin didn't
23 know about it. There is not expectation to privacy according
24 to any of the cases in jail cell phone calls, I have got cases
25 that you can look at. Those phone calls are going to be

1 introduced later on in testimony. I don't think we need to
2 take time right now to look at them. But before we introduce
3 anything, we will show you the cases and make additional
4 arguments.
5        THE COURT:   Very well.
6        Both sides ready to bring the jury in?
7        MR. PARKS:   I guess we will hear that before he
8 testifies?
9        MR. BEACH:   Yeah.
10        THE COURT:   Both sides ready for the jury?
11        MR. WHITTIER:   Yes, Your Honor.
12        MR. BRAUCHLE:   I guess.
13        THE BAILIFF:   All rise.
14        THE COURT:   You may be seated.
15        You may proceed, Mr. Whittier.
16        Q.  (By Mr. Whittier)   Tell us your name,
17 sir.
18        A.   Deputy Richard Hamb.
19        Q.   And are the same Deputy Hamb who testified earlier in
20 this hearing today?
21        A.   Yes.
22        Q.   I wanted to go back to one of the blue backs that
23 were admitted, my 56472 --
24        MR. WHITTIER:   May I borrow that, please?
25        MR. JOHNSON:   Sure.



1    MR. WHITTIER:   May I approach, Your Honor?
2    THE COURT:   You may.
3    Q.   (By Mr. Whittier)   So State's Exhibit
4    No. 127, you recognize -- remember that one?
5    A.   Yes, sir.
6    Q.   Now, the name on that case is not the defendant's
7    name, is it?
8    A.   It reads the State of Texas versus Jason Martinez
9    Ruiz.
10    Q.   Okay.   And tell the jury what an alias name is as far
11    as the sheriff's department is concerned?
12    A.   When a person is booked in, we compare book-in
13    fingerprints to that of known fingerprints on file.   From time
14    to time, people come to jail under other people's identity or
15    under false names.
16    Q.   Okay.   And that false name or the identity of the
17    other person that someone might use is chalked up in your
18    record as an alias name?
19    A.   That's correct.
20    Q.   Do you have any alias names for Wesley Lynn Ruiz in
21    your system?
22    A.   Yes.
23    Q.   And is Jason one of them?
24    A.   Yes.
25    Q.   Do you-all identify people solely by name?

1    A.   Typically when they are booked in, we go by name,
2    race, sex, date of birth to pull up a record, and then we will
3    compare fingerprints to the known prints to the book-in sheet
4    to make a determination of the identity.
5    Q.   And the Dallas County Sheriff's department the
6    baseline for identity is actually going to be the fingerprint
7    comparison?
8    A.   Yes.
9    Q.   And the other accouterments, names, address, an alias
10    is other elements of that identity?
11    A.   That's correct.
12    Q.   But the baseline is the fingerprint?
13    A.   Yes.
14    Q.   And in that cause number, though it is Jason's name
15    on it, your records reflect that in fact it was who that was
16    convicted in that charge?
17    A.   Wesley Ruiz.
18    Q.   Okay.  Okay.  During the time -- period of Mr. Ruiz's
19    career that where he was booked in to the Dallas County jail,
20    you-all maintain records of the book-in photos, do you not?
21    A.   Yes, we do.
22    Q.   And have you had a chance to look at the book-in
23    photos for him with his record with the Dallas County jail?
24    A.   Yes.
25    Q.   Would you recognize them if you saw them?

31
32

1    A.   Yes.
2    MR. WHITTIER:   May I approach, Your Honor?
3    THE COURT:   You may.
4    Q.   (By Mr. Whittier)   I am going to hand
5    you what has previously been admitted as State's
6    Exhibit 32-A, as well as Exhibits marked as State's
7    Exhibits 154, 155, 156, 157, and 158, I would ask
8    you to take a moment to look at each of these items
9    and tell the Court and jury if you recognize what
10    they are?
11    A.   Yes, sir.
12    Q.   And what are they?
13    A.   They are all book-in photographs of this defendant.
14    Q.   Okay.
15    A.   Dating all the way back to 1997, the first time we
16    handled him.
17    Q.   Okay.  Do you take a photo -- or has it been a policy
18    of the Dallas County Sheriff's department to take a photo of
19    the defendant every time they come into jail?
20    A.   After the year 2000, we started taking photographs
21    every time somebody was booked in.  Prior to 2000, it was
22    every two years.
23    Q.   So if you had a man that booked in and had a photo as
24    recent a year ago, you wouldn't bother to take another
25    picture?

1    A.   Not before 2000, no.
2    Q.   Okay.  Those items I just offered you there to
3    examine, they reflect the book-in photos of Mr. Ruiz over the
4    various periods in which he spent time in the Dallas County
5    jail?
6    A.   That's correct.
7    Q.   And they truly and accurately reflect the periods
8    after the time of those photos and the time of those book-ins?
9    A.   Yes.
10    Q.   Are these part of a permanent record of the Dallas
11    County Sheriff's department?
12    A.   Yes, they are.
13    MR. WHITTIER:   We tender same and offer into
14    evidence -- well, we would reoffer 32-A, as well as 154
15    through number 158.  Tender to Defense Counsel for any
16    objections.
17    MR. BRAUCHLE:   We would object to Exhibits 54
18    through -- 154 through 158 in that there has been no proper
19    predicate laid for the introduction of those exhibits.  We
20    would also object to them under Rules 404, 403, 402 and 401.
21    Then in regard to Exhibit 154, that's in no way related to a
22    charge represented in the previous exhibits.  And we would
23    state that that is especially relevant under 404, 403, 402,
24    401, and we would object to all of them for rules stated
25    therein.

33

1     THE COURT:   Objection is overruled.
2  Mr. Brauchle, on exhibit -- was it --
3     MR. BRAUCHLE:   154.
4     THE COURT:   Yes, sir.
5  May I see the attorneys.
6     (Following procedures had at the Bench.)
7     MR. BRAUCHLE:   You are offering this now for.
8     MR. WHITTIER:   His appearance on this day.
9     (End of Bench Conference.)
10     THE COURT:   Your objection is overruled.
11  Your 155, 156, 157, and 158, those exhibits are admitted.
12  And 154, I sustain at this time.
13     MR. BRAUCHLE:   We would also incorporate the
14  previous objections into 32-A.
15     THE COURT:   That is overruled, 32-A is admitted.
16     MR. BRAUCHLE:   Note our objection.
17     MR. WHITTIER:   These have been admitted; is that
18  correct, Judge?
19     THE COURT:   With the exception of 154.
20     MR. WHITTIER:   154?
21     THE COURT:   Yes, sir.
22     MR. WHITTIER:   We will pass the witness and
23  request permission to tender these to the jury.
24     THE COURT:   You may.
25     MR. WHITTIER:   Pass the witness.

34

1     THE COURT:   Cross-examination, Mr. Brauchle.
2     RECROSS-EXAMINATION
3  BY MR. BRAUCHLE:
4     Q.   Officer Hamb, I will show you what has been marked as
5  Exhibit 117, and I will ask you if you can identify that once
6  again?
7     A.   It's a juvenile adjudication, probation.
8     Q.   Okay.  You show that there was ever any incarceration
9  in regard to that offense?
10     A.   No.
11     Q.   Okay, so he was placed on juvenile probation for what
12  offense?
13     A.   A theft case.
14     Q.   Theft of how much?
15     A.   Theft 20.
16     Q.   Theft of more than $20?
17     A.   It really doesn't indicate.  It is just a theft --
18     Q.   Theft somewhere around $20?
19     A.   Yes.
20     Q.   Okay.  And there is no jail sentence or anything like
21  that, right?
22     A.   No.
23     Q.   Okay.  In regard to State's Exhibit 118, can you tell
24  what that charge was and what the outcome was?
25     A.   It's a Misdemeanor A, burglary of a building.  The

35

1  judgment was February 24th of '97.  It looks like 12 months
2  probation.
3     Q.   So there is no incarceration in regard to that that
4  you know of?
5     A.   It reads 100 days confinement in Dallas County jail.
6     Q.   But that was probated?
7     A.   That was probated for 12 months.
8     Q.   So there is no jail time in regard to that, correct?
9     A.   Correct.
10     Q.   All right.  How about Exhibit 119?
11     A.   It's a Misdemeanor B for a theft 50.
12     Q.   Okay.
13     A.   Date sentence imposed was 9/2 of '97.  One hundred
14  days confinement, Dallas County jail.
15     Q.   Is that probated?
16     A.   No.
17     Q.   Okay.  And that hundred days in the county jail,
18  would that have been run concurrently with State's Exhibit
19  118?
20     A.   Yes, sir.
21     Q.   So on, what, September 9th of 1997 in two
22  misdemeanor cases, he received a hundred days in the county
23  jail?
24     A.   Yes.
25     Q.   Okay.  I will show you what has been marked as

36

1  State's Exhibit 120, and ask you what that was?
2     A.   Misdemeanor A, burglary of a building, date of
3  sentence, February 17th, '98, where the defendant received
4  75 days in the county jail.
5     Q.   Was that probated or straight time?
6     A.   Seventy-five days in jail.
7     Q.   I will show you what has been, marked as State's
8  Exhibit 121?
9     A.   For a Misdemeanor A offense for escape.
10  February 17th of '98, the same date of judgment as the
11  previous, 90 days in the county jail.
12     Q.   Okay, would -- would that case have been run
13  concurrent with State's Exhibit No. 120?
14     A.   Yes, it would.
15     Q.   So that's two cases in which he went to jail and
16  those cases ran concurrently; is that correct?
17     A.   Yes.
18     Q.   Tell the jury what concurrently means?
19     A.   He is serving both sentences at the same time.
20     Q.   All right.  Is that an unusual situation?
21     A.   No.
22     Q.   Now, then, I will show you what has been marked as
23  State's Exhibit 122, and I will ask you once again if you can
24  find any kind of judgment or sentence in regard to that
25  exhibit?

37

1     A.     For the Class C offense for family violence assault,
2   entered a plea of no contest on 6/13 of '05.
3     Q.     Is there anybody -- is there any record that anybody
4   actually appeared on that day?
5     A.     It doesn't indicate.
6     Q.     Okay.  Thank you.  On State's Exhibit 123, can you
7   tell the jury what that is?
8     A.     It's a felony offense, F04-58624, for the evading
9   arrest, detention using motor vehicle.
10    Q.     Okay.  That started out as a felony, right?
11    A.     Yes.
12    Q.     And what did it end up as, Class A misdemeanor?
13    A.     Degree of punishment reduced to Class A misdemeanor.
14    Q.     All right.  What was the sentence on that?
15    A.     One year confinement.
16    Q.     All right.  And then I will show you what has been
17   marked as State's Exhibit 124, and I will ask you what that
18   is?
19    A.     Misdemeanor A, offense for UCW of a handgun.
20    Q.     And what was the sentence on that?
21    A.     November 18th of '05, received 60 days in the
22   county jail.
23    Q.     Would that -- was that of '05 or '04?
24    A.     2005.
25    Q.     All right.  And that was what sentence?

38

1     A.     Sixty days in the county jail.
2     Q.     Thank you.  Then in regard to State's Exhibit 125,
3   what does that represent?
4     A.     It's a judgment out of Tarrant County.
5     Q.     All right.  And what did the defendant receive on
6   that case?
7     A.     Ten years deferred probation.
8     Q.     And that would be, what date did he receive that?
9     A.     April 24th of 2006.
10    Q.     And there wasn't any confinement with that; is that
11   correct?
12    A.     No, it doesn't indicate that.
13    Q.     Now, then, I will show you what has been marked as
14   State's Exhibit 126?
15    A.     Conviction for unlawful possession of a controlled
16   substance, methamphetamines, out of Dallas County, Cause
17   F05-51476.
18    Q.     And which court was that in?
19    A.     Out of the 194th.
20    Q.     Is that the one we were in today?
21    A.     It is.
22    Q.     And what was the outcome of that case?
23    A.     Pled guilty and got one year in the Dallas County
24   jail.
25    Q.     What day would that -- what time period would that

39

1   have been?
2     A.     November 10th of 2005.
3     Q.     And would that have run concurrently with the evading
4   arrest?
5     A.     Yes.
6     Q.     And that occurred after April 24th of '06; is that
7   correct?
8     A.     Offense date of November 25th, 2004.
9     Q.     No, I am talking about the sentence in regard to
10   Exhibits 126 and 123, those occurred after the sentence in
11   125; is that correct?
12    A.     That's correct.
13    Q.     All right.  So he was placed on probation
14   April 24th of '06, and then was sentenced to a year in the
15   county in regard to the judgments in 123 and 125; would that
16   be a correct statement?
17    A.     Yes.
18    Q.     Now, then, I will show you what is marked as State's
19   Exhibit 127, and ask you what that is?
20    A.     Cause No. F05-56472, it is out of the 194th Judicial
21   District Court, also, for the unlawful possession of a
22   controlled substance, methamphetamine.
23    Q.     And what was that sentence?
24    A.     Ten years in the pen, probated for eight years.
25    Q.     And when was that?

40

1     A.     5/23 of '06.
2     Q.     5/23 of '06?
3     A.     That's correct.
4            MR. BRAUCHLE:   May I approach, again, Your
5   Honor?
6            THE COURT:   You may.
7     Q.     (By Mr. Brauchle)  Officer Hamb, I am
8   showing you what has been admitted as State's 121,
9   and you have stated previously that that's an escape
10   case; is that correct?
11    A.     Yes.
12    Q.     Can you read the indictment -- or the affidavit
13   information in regard to that?
14    A.     On the 12th day of September of '97, the defendant
15   then and there intentionally and knowingly escape from
16   custody, did fail to return from custody -- to custody
17   following temporary leave for specific purpose while under
18   arrest for and convicted of the penal offense of burglary of a
19   vehicle.
20    Q.     So in your experience, would that be somebody who
21   failed to report or failed to return to work release?
22    A.     It was either from a weekend status or work release
23   status, yes.
24    Q.     So that's somebody that didn't climb over a prison
25   wall in the dark of night, but somebody who was released from

41

1    custody and then for whatever reason didn't return as they
2    were directed?
3        A.    He failed to follow the orders to return --
4                MR. WHITTIER:   Judge, we are going to object.
5    Counsel is not allowed to go into the underline facts of the
6    conviction.
7                MR. BRAUCHLE:   I think both sides are allowed to
8    do that.
9                THE COURT:   I will overrule the objection.
10       Q.    (By Mr. Brauchle)   So was that all of
11   your answer?
12       A.    He failed to follow the orders to return from either
13   work release or weekender status.
14       Q.    All right.  And although that is called escape, it
15   doesn't mean that he actually escaped from custody like I say?
16       A.    It falls under the Penal Code of escape.
17       Q.    Now then, in regard to the -- I think it is 122, 122
18   represents a Class C misdemeanor city ticket; is that correct?
19       A.    That's correct.
20       Q.    That's the same status, the same level offense as if
21   a police officer pulled you over on your way home today; is
22   that correct?
23       A.    It's a Class C offense, yes, sir.
24       Q.    Okay.  And the only thing that can be -- the only
25   punishment in regard to Class C offenses is fine; is that

42

1    correct?
2        A.    I am not sure.
3        Q.    You wouldn't be sure on that because we don't really
4    have them down here; is that correct?
5        A.    I am not familiar with Class C offenses too much.
6        Q.    Okay, let's go back over these cases.  In regard to
7    the conviction in No. 117, that's the juvenile theft; is that
8    correct?
9        A.    I would have to look at the document.
10       Q.    Let's assume for purposes of this question, that's
11   the juvenile theft, all right?
12       A.    Okay.
13       Q.    Do you have any idea what the range of punishment for
14   a juvenile conviction for theft would be?
15       A.    No.
16       Q.    So we know that it ended up being probated, but we
17   don't know what the possible consequences could have been?
18       A.    I am not familiar with juvenile law, no.
19       Q.    How about a Class A misdemeanor, what range of
20   punishment does that carry, do you know?
21       A.    Up to a year in the county jail.
22       Q.    All right.  And how about a Class B misdemeanor?
23       A.    180 days in the county jail.
24       Q.    And in regard to what we discussed in Exhibits 125
25   and 127, those were first-degree felonies; is that correct?

43

1        A.    The two methamphetamine convictions, yes,
2    first-degree felonies.
3        Q.    And those carried ranges of punishment from five
4    years to 99 years or life; is that correct?
5        A.    I believe so, yes.
6        Q.    Now, then, in regard to the state jail felony, which
7    is represented by the conviction in 126, state jail felonies
8    carries punishment range of confinement in the state jail up
9    to two years; is that correct?
10       A.    Yes, sir.
11       Q.    And not less than 180 days; is that correct?
12       A.    Correct.
13       Q.    And that time is day for day, isn't it?
14       A.    Yes.
15       Q.    Now, then, the possession case, which is represented
16   in 125, was reduced from a state jail felony to a Class A
17   misdemeanor; is that correct?
18       A.    Yes.
19                MR. BRAUCHLE:   May I have a moment, Your Honor?
20                THE COURT:   You may.
21                (Pause in the proceedings.)
22                MR. BRAUCHLE:   May I approach again, Your Honor?
23                THE COURT:   You may.
24       Q.    (By Mr. Brauchle)   Okay, I will show you
25   what has been marked as State's Exhibit 127, and I

44

1    will direct your attention to pages F and G; you see
2    those?
3        A.    Yes.
4        Q.    Is that the front and back of a document?
5        A.    Yes, it is.
6        Q.    And what document is that?
7        A.    It's a plea agreement from the defendant with the
8    State.
9        Q.    It's a plea bargain agreement between the State, the
10   Defense attorney and the defendant; is that correct?
11       A.    That's correct.
12       Q.    And it is signed by the Judge?
13       A.    Yes, it is.
14       Q.    Then up at the top, I believe, on the first page, it
15   says agreed plea or plea bargain agreement; is that correct?
16       A.    It does.
17       Q.    I think one of the lines there is checked as to what
18   the agreed plea is; is that correct?
19       A.    Yes.
20       Q.    So that agreement was entered into by all parties and
21   was not the result of a trial or open plea or anything like
22   that; is that correct?
23       A.    That's correct.
24       Q.    Now, then, in regard to Exhibit 127, which is also
25   before you, there is not a plea bargain agreement in that; is

1  that correct?
2      A.    The conviction out of Tarrant County?
3      Q.    Yes.
4      A.    That would be 125.
5      Q.    I'm sorry, 125?
6      A.    No.
7      Q.    But if you look on the first page of 125, does that
8  show to be an agreed plea?
9      A.    He entered a guilty plea, yes.
10     Q.    Okay.  Does it say anything about the Court following
11 Court's recommendation?
12     A.    No.
13     Q.    Does it say anything that -- anything about it that
14 would show you that it is anything other than an agreed plea
15 between the State and the Defense?
16     A.    No.
17     Q.    So that's a result of a plea bargain entered into by
18 the State of Texas and the defendant; is that correct?
19     A.    The defendant pled guilty, yes.
20     Q.    And in that case, he was -- he pled guilty, was given
21 ten years deferred adjudication probation?
22     A.    Yes.
23     Q.    Now, then, let me ask you this, if you know it, in
24 regard to deferred adjudication probation, you are placed on
25 probation for a certain length of time; is that correct?

1      A.    In this case, it is ten years.
2      Q.    Okay.  But since that is a first-degree felony, if
3  that probation were revoked, you could receive up to a life
4  sentence; is that correct?
5      A.    Yes.
6      Q.    So on deferred adjudication probations, the whole
7  range of punishment is open to the Judge in sentencing the
8  defendant, if he violates the terms and conditions of
9  probation?
10     A.    If the probation is revoked, yes.
11     Q.    Now, then, in regard to -- and I am sure you have
12 testified in these before, in regard to probation revocation
13 hearings, the defendant is not entitled to a jury trial; is
14 that correct?
15     A.    No, he is not.
16     Q.    And the Court can revoke a defendant's probation upon
17 filing a motion to revoke by the probation department; is that
18 correct?
19     A.    That's correct.
20     Q.    And those are filed by the District Attorney asking
21 the Court to issue a warrant for the defendant's arrest; is
22 that correct?
23     A.    That's the way I understand it, yes.
24     Q.    Now, then, in regard to 125 or 127, is there any
25 indication that there was any motions to revoke filed in

1  either of those cases?
2      A.    No.
3      Q.    And those two cases, one was received -- or one was
4  delivered on April 24th of '06; is that correct?
5      A.    That's the Tarrant County conviction.
6      Q.    And the Dallas County one was on May 23rd of '06?
7      A.    That's correct.
8      Q.    So they are about a month apart?
9      A.    Yes, sir.
10     Q.    I will show you what has been marked as 123, the
11 evading arrest.  And that was a state jail felony that was
12 reduced to a Class A misdemeanor; is that correct?
13     A.    Yes, sir.
14     Q.    Now, then, to do that, the State has to -- I believe
15 it says on the judgment that the punishment was reduced.  And
16 that has to be done by the State; is that correct?
17     A.    Reduced to a Class A misdemeanor, yes, sir.
18     Q.    All right.
19     A.    It's agreed by the State.
20     Q.    And that has a plea bargain agreement that is
21 signed -- just like the felonies, is signed by all parties; is
22 that correct?
23     A.    It is.
24     Q.    And it shows that that is an agreed plea in which
25 State agreed to that sentence; is that correct?

1      A.    Yes.
2      Q.    And I will show you what has been marked as State's
3  126, which is also a state jail felony; is that correct?
4      A.    It is.
5      Q.    And was that also reduced under 12.44(a) to a Class A
6  misdemeanor?
7      A.    It is.
8      Q.    Now, then, I believe that we -- so both of those
9  cases, the defendant received a year in the county jail; is
10 that correct?
11     A.    Yes, he did.
12     Q.    In all of the documents that you have seen, and I
13 realize that you don't have them in front of you at this point
14 in time, but did you have any indication that any of those
15 sentences were the results of trials before the Court or jury
16 trials or any type of contested situation?
17     A.    No.
18     Q.    So they were all agreed to and the pleas were
19 accepted by the defendant, and they are what are called plea
20 bargains, in which the State and the Defense agreed to the
21 punishment and the judge gives the punishment agreed upon; is
22 that correct?
23     A.    Yes, sir.
24         MR. BRAUCHLE:   We will pass the witness.
25         MR. WHITTIER:   No questions, Your Honor.



1    THE COURT:   You may step down, sir.
2    (Witness complies.)
3    (Witness entered the courtroom.)
4    MS. HANDLEY:   Your Honor, this witness has not
5  been sworn.
6    (Witness was duly sworn.)
7    THE COURT:   You may take the seat to my left.
8  You may proceed, Ms. Handley.
9    MS. HANDLEY:   Thank you, Your Honor.
10    HAROLD RENFRO
11  was called as a witness, and having been duly sworn by the
12  Court, testified under oath as follows:
13    DIRECT EXAMINATION
14  BY MS. HANDLEY:
15    Q.    Would I please introduce yourself to the jury.
16    A.    Harold Renfro.
17    Q.    Are you currently working now?
18    A.    No, I am not.
19    Q.    You are retired?
20    A.    Yes, I am.
21    Q.    Give us a short portion of your career?
22    A.    I retired after 31 and a half years in law
23  enforcement.  Worked for the University Park Police Department
24  for five years, and the rest of that time was spent at the
25  Irving Police Department.

1    Q.    When did you retire, sir?
2    A.    February of this year.
3    Q.    February of this year.  How is that working out for
4  you so far?
5    A.    Pretty good.
6    Q.    Okay.  Sir, I want to ask you some questions about
7  your time with Irving Police Department, and specifically I
8  would like to narrow our focus to the early '90s or mid- '90s
9  at this time.  In Irving at that time, what position did you
10  hold with the department?
11    A.    I was a detective in the criminal investigation
12  division.
13    Q.    And was there in Irving around that time, the early
14  '90s, did you start to see a problem with criminal street
15  gangs?
16    A.    Yes, sir, I did.
17    Q.    And did the department take any proactive efforts in
18  order to combat this?
19    A.    Yes.  They appointed a three-man team, gang.
20    Q.    Three man team to do what?
21    A.    Enforce gang activity and identify gang members and
22  keep up with gang crimes and the gang violence offense
23  reports.
24    Q.    Tell us if you will, what kind of problems were you
25  having in Irving in that early to mid- '90s period with gang

51

52

1  activity?
2    A.    A lot of gang assaults, gang member on gang member, a
3  lot of drive-by shootings, some murders, like drug activity.
4    Q.    And when you say that you -- you put in to place an
5  effort to identify persons as gang members?
6    A.    Yes.
7    Q.    Tell the jury if you will, what kind of protocol or
8  what is it indicators that you would look for in an individual
9  in order to classify him as a gang member or a member of a
10  particular gang?
11    A.    We would -- the easiest way we would talk to them.
12  We would know them from talking to them on the street.  And
13  they would readily identify themselves as a gang member.  Some
14  we associated by associating with known gang members.  Some of
15  them we identify them by tattoos that they would have on their
16  arms and haircuts sometimes.
17    Q.    They sometimes have gang signs, things that they do
18  with their hands, gang gestures?
19    A.    Yes.
20    Q.    Anytime you have one of these contacts with a person,
21  let's say they were self-admitting to being a member of a gang
22  or let's say that you saw them associating with other gang
23  members, or let's say that you saw them writing gang graffiti,
24  would you then put that intel with respect to that person in a
25  particular file?

1    A.    Yeah.  There would be -- there is a gang file that is
2  produced on each gang member we identify.
3    Q.    So each individual could then boast having their own
4  criminal gang file?
5    A.    Yes.
6    Q.    And that would be information that reflects
7  specifically on that particular person?
8    A.    That's true.
9    Q.    What type of gangs were you having a problem with
10  there in the early to mid- '90?
11    A.    Several Hispanic gang, black gangs, a few Asian
12  gangs.
13    Q.    Any particular gang that stands out in your memory
14  being particularly bad there in Irving?
15    A.    Midnight Dreamers, Latin Violence.
16    Q.    And during that time, sir, that you were working in
17  the gang unit did you become associated or come to know an
18  individual by the name of Wesley Lynn Ruiz?
19    A.    Yes.
20    Q.    And do you see that individual in the courtroom here
21  today, sir?
22    A.    Yes, I do.
23    Q.    Could you please point him out.
24    A.    Sitting to the far end of the second table.
25    Q.    All of these things that you told the jury about

53

1    earlier, about finding indicators on certain individuals and
2    being able to classify them as a gang member, is that a
3    protocol, is that something that you went through with the
4    defendant may this case?
5        A.    I didn't myself, but other gang officers did.
6        Q.    Other gang officers did.  Was there in fact and did
7    you have an opportunity to review a gang file with respect to
8    Defendant Wesley Ruiz that was gathered by the Irving Police
9    Department?
10       A.    Yes, ma'am.
11       Q.    And the things that you spoke of earlier, the
12   self-admissions, the gang signs, the association with other
13   criminal street gang members, the criminal activity, were
14   these all indicators that the defendant also had on him?
15       A.    Yes.
16       Q.    And based on the intel that was gathered on the
17   defendant, did you form an opinion, did you classify him as a
18   member of a certain gang?
19       A.    Yes, we did.
20       Q.    What gang was that?
21       A.    Midnight Dreamers.
22       Q.    Tell the jury, if you will, a little bit about from
23   the standpoint of law enforcement officer at this time, tell
24   us about Midnight Dreamers?
25       A.    As a local gang there was a lot of gang members from

54

1    the Irving area involved in that gang.
2             MR. BRAUCHLE:   Your Honor, we would object to
3    that, assuming there has been no proper predicate laid.  He
4    stated that his information came from a file that was
5    developed by other people.  Unless there is a proper
6    predicate, we don't think this witness is competent to
7    testify.
8             THE COURT:   Response.
9             MS. HANDLEY:   May I ask some additional
10   questions, Your Honor?
11            THE COURT:   You may.
12            MS. HANDLEY:   May I approach?
13            THE COURT:   You may.
14       Q.   (By Ms. Handley)   Sir, let me show you
15   something here, I will ask you if you recognize this
16   particular file here, go ahead and open that if you
17   will.
18       A.   Yes.
19       Q.   Do you recognize the contents of that file?
20       A.   Yes, ma'am.
21       Q.   What is that file, sir?
22       A.   That's the gang file for the defendant.
23       Q.   Okay.  For the defendant in this case, Wesley Ruiz?
24       A.   Yes, ma'am.
25       Q.   Is that a file that was compiled by the Irving Police

55

1    Department?
2        A.    Yes, it was.
3        Q.    And an individual such as yourself being involved in
4    the gang unit there would compile together, put the
5    information in there, that you would read that, study that,
6    familiarize yourself with it in order to know better what was
7    going on with the defendant?
8        A.    Yes.
9             MR. BRAUCHLE:   Your Honor, we would object to
10   this under Crawford.
11            THE COURT:   Overruled.
12            MR. BRAUCHLE:   It denies our defendant the right
13   to confront the persons allegedly or supposedly may have made
14   any statements or otherwise.
15            THE COURT:   Overruled.
16            MR. BRAUCHLE:   Can we have a hearing.
17            THE COURT:   Ladies and gentlemen -- Sheriff.
18   Let's take a ten-minute break.
19            THE BAILIFF:   All rise.
20            (Jury retired from the courtroom.)
21            THE COURT:   You may be seated.
22            SUB ROSA EXAMINATION
23   BY MR. BRAUCHLE:
24       Q.   Is your name Renfro?
25       A.   Yes.

56

1        Q.    You got a first name?
2        A.    Harold.
3        Q.    You are no longer with the Irving Police Department;
4    is that correct?
5        A.    That's correct.
6        Q.    And I believe your testimony was is that -- I believe
7    your testimony was that you made certain entries in regard to
8    gang activities; is that correct?
9        A.    Yes.
10       Q.    There wasn't a formal gang unit, though; is that
11   correct?
12       A.    Not at first.
13       Q.    Now, then, the file that you have been shown, how
14   many of the reports, if those are reports, since we haven't
15   been tendered it, how many of the reports that are in there
16   that were made by you?
17            MS. HANDLEY:   Actually Your Honor, if I may,
18   they have been tendered a copy of that entire file.
19       Q.   (By Mr. Brauchle)   You can answer the
20   question
21       A.    None that I see here on this exact file, no.
22       Q.    So in that file that is setting in front of you, that
23   Ms. Handley brought up, you didn't make a one of the reports?
24       A.    Not on this defendant, no.
25       Q.    Pardon?

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

57

1    A.    Not on this defendant, no.

2    Q.    So you are down here to testify from a file that is

3    supposedly the defendant's Irving Police Department gang file

4    and you have no personal knowledge of any of the documents

5    contained therein; is that correct?

6    A.    I have knowledge, yes.

7    Q.    Well, you gain that knowledge when Ms. Handley showed

8    you the file, right?

9    A.    I gained that from being involved in the

10   investigations.

11   Q.    Well, what investigations were you involved in that

12   are in that file?

13   A.    Midnight Dreamers offenses that were committed by

14   members of Midnight Dreamers.

15   Q.    That sounds pretty good, but which ones?

16   A.    Several.

17   Q.    But none of them were in that file, right?

18   A.    No, cause -- each individual member has their own

19   file.

20   Q.    Okay.  So any Midnight Dreamer investigations that

21   you did are not in Wesley Ruiz's file; is that true?

22   A.    I assume so, yeah.

23   Q.    And you don't know who the officers were that may

24   have made the entries that are in that file in front of you;

25   is that correct?

58

1    A.    Their names are noted on some of the field interview

2    cards.

3    Q.    You know where any of them are?

4    A.    Where the officers, I have no idea.

5    Q.    Do you even know who the officers are some of them?

6    A.    I know the names, yes, sir, I know the officers.

7    Q.    So as far as the people that made those entries, you

8    haven't seen any of them down here?

9    A.    Not yet, no.

10   Q.    And you haven't talked to any of them?

11   A.    No.

12   Q.    Pardon?

13   A.    No, sir.

14   Q.    When were you shown that file?

15   A.    I have known about these files since I was there --

16   Q.    When were you shown that file?

17   A.    Monday, last Monday.

18   Q.    Last Monday, okay.  And that was shown to you by

19   Ms. Handley?

20   A.    Yes.

21   Q.    So the knowledge that you know from -- about that

22   file, came forth last Monday when you were shown that file by

23   Ms. Handley, the person who just put you on the stand; is that

24   correct?

25   A.    I have seen the actual file before, but yeah, that's

59

1    the first time in a while.

2    Q.    How long ago would it have been that you may have

3    seen that file?

4    A.    Probably '98, '99, 1999.

5    Q.    Okay.  Now, as far as seeing that file, you don't

6    mean that you picked it up and you perused it, it was just

7    there in the office and you would have seen that way, right?

8    A.    I looked through it.

9    Q.    When with?

10   A.    Well, I was an intelligence officer for a while and

11   we kept up with all criminal activity like that.

12   Q.    When did you look at that file?

13   A.    Probably '99, 2000, something like that.

14   Q.    And what evidence is there that you in fact looked at

15   at that point in time?

16   A.    Well, the entries, trying to find a report number.

17   Q.    Did you make any entries?

18   A.    No.  I was just looking for a report number off of

19   the records.

20   Q.    That someone else may have done?

21   A.    That was an offense report, yes.

22   Q.    And this was when?

23   A.    Ninety-nine, 2000, something like that.

24   Q.    And what would that have been in regard to?

25   A.    I don't recall, I know it was an offense report that

60

1    I was investigating on another guy.

2    Q.    Well, if you don't recall how do you know that you

3    actually picked that file up and even looked at it, you didn't

4    make any notations, you didn't make any entries in regard to

5    any of that; is that correct?

6    A.    That's correct.

7    Q.    Now, then, does any of the file include written

8    statements from the defendant?

9    A.    This file here?

10   Q.    Yeah?

11   A.    No, sir.

12   Q.    Does it have anything that he wrote in his own hand

13   or anything that is verbatim wrote from him?

14   A.    Not in this file, no.

15   Q.    We don't know where the officers are that may have at

16   one time had direct or personal knowledge to the contents of

17   that file; is that correct?

18   A.    Some are still working for the police department,

19   some are retired, I have no idea.

20   Q.    So some of the people that would have knowledge are

21   still out there working for Irving; is that right?

22   A.    Yes.

23   Q.    And others are like yourself, they are retired?

24   A.    Yes.

25         MR. BRAUCHLE:   May I have a moment, Your Honor.

61

1    THE COURT:   You may.

2    (Pause in the proceedings.)

3    MR. BRAUCHLE:   Your Honor, we would ask the

4  State to designate Mr. Renfro as either being a fact witness

5  or an expert witness at this time in that -- that -- we don't

6  know how to question him further unless they tell us what he

7  is -- supposedly is.

8    THE COURT:   Response.

9    MS. HANDLEY:   Call Mr. Renfro as an expert

10  witness on the Midnight Dreamers.

11    MR. BRAUCHLE:   We want to have a Daubert

12  hearing as to his qualifications.

13    MS. HANDLEY:   We have already stated his

14  qualifications, Your Honor.  And I will state for the record

15  that we did give you a copy of the gang intel file on him as

16  well as every particular offense report coming out of Irving

17  Texas in fact were provided by Mr. Renfro that lists the

18  defendant's activity or association with any criminal activity

19  there in Irving.  I think he has already listed his

20  qualifications, Your Honor.  Help to initiate the gang unit

21  out there who is familiar with the Midnight Dreamers.  Worked

22  to combat that gang.  Worked to gather gang intelligence on

23  the Midnight Dreamers and in particular this defendant, Your

24  Honor.

25    MR. BRAUCHLE:   Well, his own testimony would

62

1  show the conclusion, if it rises to that level, that Mr. Ruiz

2  is a member of the Midnight Dreamers is based on hearsay, and

3  we would object to that.

4    And we would also object under Crawford that any and all

5  of these reports are such that they deny our defendant the

6  ability to confront his accusers or people that would in any

7  way have some personal knowledge, which this defendant has

8  already admitted that he has no personal knowledge.  You know,

9  if what he -- what the State is trying to do is acceptable, we

10  could just try cases from offense reports.  And it is not --

11  it is not admissible under the applicable work cases.  It is

12  also improper under Rules 404, 403, 402 and 401.

13    He is not -- this witness is also not designated on their

14  expert list and we would ask that his testimony be excluded

15  under that grounds also.  We are not even sure that he is

16  listed on the witness list, but he might be.

17    MR. PARKS:   There is a revised witness list

18  identified only as Renfro, not as an expert.

19    THE COURT:   Response.

20    MS. HANDLEY:   Your Honor, under 104, we do

21  intend calling a witness after Mr. Renfro here who will tie up

22  the defendant's affiliation with the membership of the

23  Midnight Dreamers.  With respect to him basing his opinion on

24  the defendant's membership, he can in fact, if he qualifies as

25  an expert on the Midnight Dreamers in the particularly the

63

1  Dreamers at that time, he can base that opinion on hearsay.

2  He can base that on the reports of other officers.  He can

3  base that on looking at a gang file intel collected by the

4  defendant.  He can base his opinion on hearsay, Judge.

5    MR. PARKS:   Two other things, Judge, we haven't

6  heard yet and I think we are entitled to know what his

7  opinions are going to be, so that the Court can make a ruling

8  on whether or not his opinions are relevant to the issues

9  before the jury, whether or not those to the extent that they

10  might be relevant are more probative than prejudicial and also

11  the Court needs to consider, depending upon what he says about

12  the Midnight Dreamers and Mr. Ruiz's connection with the

13  Midnight Dreamers, whether or not that testimony is in

14  violation of Woodson because it is not individualized to this

15  particular defendant.  It is an attempt to punish him for what

16  others have done.

17    THE COURT:   Ms. Handley.

18    MS. HANDLEY:   Actually there is not a necessity

19  for us to prove the defendant having committed each and every

20  element -- or each and every offense committed by the Midnight

21  Dreamers, that is not necessary, and we are not under an

22  obligation to prove that.  But by showing his affiliation with

23  them and his association with Midnight Dreamers, we are

24  showing his reputation, which is absolutely relevant in this

25  particular case.

64

1    MR. PARKS:   Then call a reputation witness, the

2  statute provides for that.  But you know judge that's kind of

3  like saying, that Mr. Brauchle and myself and Mr. Johnson

4  associate with persons who are convicted or accused of having

5  committed crimes, air go our representation in the community

6  is somehow tainted.  That may be, but if it is, then they need

7  to call reputation witnesses not just paint us with a brush

8  based on alleged affiliations.

9    MS. HANDLEY:   I don't know what to tell you,

10  Judge.  The Courts have consistently held that gang membership

11  is relevant in the punishment phase of a trial, particularly a

12  death-penalty case.  Pretty fundamental it has been held time

13  and time again, I will provide you case law on that.  I will

14  submit that the witness is entitled to testify based on his

15  knowledge, and his experience who the Midnight Dreamers are

16  and what their reputation was in the Irving community.  We

17  will call a subsequent witness who will say he was a member

18  with this particular defendant, we will tie it up together.

19    MR. BRAUCHLE:   If I may.

20    Q.   (By Mr. Brauchle)  Are you saying that that's the

21  entire Midnight Dreamers file in front of you?

22    A.   No, sir.  Each individual member that we identify as

23  a gang member has their own file, this is the defendant's

24  file.

25    Q.   But you did not make any entries or have no personal

65

1 knowledge or any of items in Mr. Ruiz's alleged file?
2    A.    I have heard of some of the cases, yes.
3             MR. BRAUCHLE:   Does the Court have the revised
4 witness list -- Your Honor, may the defendant be excused
5 momentarily.
6             THE COURT:   He may.
7             (Defendant excused from the courtroom.)
8             THE COURT:   I have reviewed -- Ms. Handley, what
9 date do you have for --
10            MS. HANDLEY:   I'm sorry?
11            THE COURT:   -- for the revised order witness
12 list?
13            Amended on May 8th?
14            MS. HANDLEY:   Yes, sir.
15            MR. JOHNSON:   We got May 8th.  And under the
16 Irving Police Department, it shows that somebody designated
17 named Renfro, that's all the information they gave us.  And
18 this witness has already testified that he is not with the
19 Irving Police Department.
20            MR. BEACH:   Judge, for 25 years we have been
21 listing the last name of police officer.  We went the extra
22 step and said the Irving Police Department, they want
23 additional information which Renfro it is, they could have
24 asked.  We put them on notice that we would be calling an
25 Officer Renfro with the Irving Police Department.

66

1             MR. JOHNSON:   Well, there is two problems with
2 that, Judge.  Number one, he is not with the Irving Police
3 Department.  They only give us the one name.  And the other
4 thing is, they are telling the Court that they are presenting
5 him as an expert witness, but they don't give us notice of
6 being an expert witness, and that's under the court's own
7 order in regard to expert witnesses, they are supposed to
8 designate them and give us notice of anybody that is going to
9 be testifying as an expert; and they haven't done that.
10            MR. PARKS:   And interestingly he is the only
11 person that has no first initial or no first name.  Everybody
12 else I mean in response to listing people by their last name.
13 Everybody else has a first name.
14            MS. HANDLEY:   Judge, we can just call him as a
15 fact witness and ask him based on his experience at that time
16 with the department what is his opinion of the Midnight
17 Dreamers.
18            MR. PARKS:   That is not a fact witness.  If his
19 purpose is to testify as to the reputation as you indicated,
20 then it ought to be simple and quick.  It ought to be do you
21 know the reputation of the Midnight Dreamers being peaceful
22 and law abiding, yes or no?  Yes.  Is it good or bad?  It
23 was bad.  Do you have information that he was a member of the
24 Midnight Dreamers at the time?  Yes.  Thank you, Good bye.  If
25 that's the purpose of it, that's it.  What they want to do is

67

1 try to imply that there has been a lot of other offenses that
2 they can't prove against him, committed by other people with
3 whom he associated, and so obviously he committed them too.
4 That's the purpose of this testimony.  Not to show a
5 reputation, but to try to paint him with something they can't
6 prove.
7             MR. BRAUCHLE:   If he is also going back to -- if
8 he is an expert witness, we need to hear what his expert
9 opinions are, and those haven't been proffered yet.
10            THE COURT:   Ms. Handley.
11            MS. HANDLEY:   We intend on calling him as a fact
12 witness, Your Honor, to testify as to the Midnight Dreamers
13 based on his experience as a peace officer at this time about
14 who they were, what their reputations were.  He has had
15 personal dealing with Midnight Dreamers, working with the
16 gangs at that time.
17            MR. BRAUCHLE:   That sounds well and good, how is
18 it relevant against our person.
19            MS. HANDLEY:   And also as Mr. Parks suggested
20 there, gathered information that -- gathered information
21 against the defendant, showing that he is in fact a member of
22 the Midnight Dreamers.
23            MR. PARKS:   Let me make sure I am not conceding
24 that he was a member of the Midnight Dreamers.  I am just
25 saying that at best, that's what they are going to be able to

68

1 show.  As of now, I don't have any reason to believe that he
2 knows that he is a member of Midnight Dreamers other than
3 through hearsay.
4             MR. BEACH:   Judge, before we started this
5 several months ago, if the witness was asked and he answered
6 if the defendant was a member of Midnight Dreamers, that was
7 unobjected to.  And then there was two or more questions read
8 and then we had this hearing.  It is in evidence that this
9 defendant was a member of the Midnight Dreamers.
10            THE COURT:   I will allow the witness to testify
11 as a fact witness with respect to the Midnight Dreamers.
12            MR. BRAUCHLE:   So he is not an expert any more.
13            THE COURT:   The State has proffered him as a
14 fact witness; is that correct?
15            MS. HANDLEY:   Yes, sir.
16            MR. BRAUCHLE:   He doesn't have any personal
17 knowledge of any facts regarding Mr. Ruiz.
18            MS. HANDLEY:   We are talking about the Midnight
19 Dreamers.
20
21            (No omissions.)
22            <u>SUB ROSA EXAMINATION</u>
23 BY MS. HANDLEY:
24    Q.    Mr. Renfro, do you have personal knowledge of the
25 Midnight Dreamers, of their activity in Irving, Texas?

69

1    A.    Yes, I do.

2    Q.    Is that from working as a detective?

3    A.    And Crime Against Persons detective.

4                    SUB ROSA EXAMINATION

5    BY MR. BRAUCHLE:

6    Q.    Officer Renfro, do you have any personal knowledge,

7    you yourself, that the person to my left is or ever was a

8    member of the Midnight Dreamers?

9    A.    Through the gang file.

10   Q.    No, I said personal knowledge?

11   A.    He never said to me that he is a member, if that's

12   what you are asking.

13   Q.    So as far as your own knowledge, you don't have any

14   information as to his membership or affiliation?

15   A.    Not as far as him telling me that he is a Midnight

16   Dreamer, no.  Just other than reports and interviewing people

17   and the gang file.

18   Q.    Other people's reports?

19   A.    Yes.  And other people that I have interviewed.

20   Q.    In any event, all of your information would be

21   hearsay?

22   A.    That's how I gathered my information, yes, sir.

23   Q.    What was that?

24   A.    I said that's how I gathered all my information was

25   talking to people in jail, talking to other officers.

70

1                    MR. BRAUCHLE:   Your Honor, may we have a running

2    objection for the constitutional, the Rules of Procedures and

3    Evidence?

4                    THE COURT:   You may.

5                    MR. BRAUCHLE:   And all the other objections that

6    have been lodged against this testimony to run from this point

7    forward?

8                    THE COURT:   You may.

9                    MR. BRAUCHLE:   And we would also ask that under

10   our present objections, we would ask that his previous

11   testimony be stricken.

12                   THE COURT:   That will be denied.

13                   MR. PARKS:   I guess one other thing, Judge, if

14   you don't mind, I am still a little bit confused about whether

15   or not he is going to testify about offenses that have been

16   allegedly committed by other people, not Mr. Ruiz, but by

17   other people and whether those offenses were committed by

18   persons who for argument sake were Midnight Dreamers, or were

19   they offenses committed on behalf of Midnight Dreamers, I

20   think there is a difference here.  If he is going to be

21   talking about someone who committed offenses and they were

22   Midnight Dreamers, that's different from the Midnight Dreamers

23   committing offenses.

24                   THE COURT:   Ms. Handley.

25                   MS. HANDLEY:   I don't really understand.  If

71

1    this is what you are asking before Mr. Park, it is not

2    necessary for us to show that the defendant participated in or

3    committed every criminal offense committed by the Midnight

4    Dreamers or members of the Midnight Dreamers gang in Irving,

5    that is not necessary.  If I could finish, if shown that he

6    has been shown to be a member of the Midnight Dreamers, it is

7    proper to show membership in Midnight Dreamers.  We don't have

8    to show that he committed all those offenses committed by the

9    Midnight Dreamers, it goes to his character, which is

10   relevant.  We are not saying that he committed every offense

11   committed by the Midnight Dreamers, it is not necessary.

12                   MR. PARKS:   I understand, Ms. Handley, and I

13   understand what the Courts have said.  Frankly, the Courts are

14   plain wrong about that.  And I want to make sure that the

15   record is clear so if I have to argue to the Court that they

16   are flat wrong about admitting this kind of evidence.  The

17   issue is, it is my position that you need to show that he knew

18   that these other offenses were being committed.  Otherwise how

19   dies that reflect upon his character.  And I don't believe

20   that you could show that.

21                   MS. HANDLEY:   Okay, we can get to that with the

22   next witness.

23                   MR. BRAUCHLE:   So are you withdrawing this

24   witness.

25                   MS. HANDLEY:   I believe I can ask this witness

72

1    based on his experience and his time out there to come into

2    contact with and work on cases involving Midnight Dreamers

3    what was the reputation of the gang, what were they involved

4    in.

5                    MR. BRAUCHLE:   Not what they were involved in.

6                    MS. HANDLEY:   What type of activities were they

7    involved in.

8                    MR. BRAUCHLE:   Once again that implies that

9    Mr. Ruiz was involved in those activities.

10                   MS. HANDLEY:   He has established that he is a

11   member of the Midnight Dreamers, he can talk about who the

12   Midnight Dreamers were, their reputation, what kind of

13   activity they were involved in.

14                   THE COURT:   I will allow them to ask what the

15   gang's reputation was -- reputation was and the activities.

16                   MR. PARKS:   Judge, if we weren't talking about

17   gang, if we were just talking about regular reputation

18   witnesses and the State called someone down to testify as to a

19   person's reputation in the community for being peaceful and

20   law abiding, the Court would allow that person to say, yes, I

21   do know that reputation.  And you would allow the State to

22   say, is that reputation good or bad?  And they would say it is

23   bad.  But you wouldn't allow the State to say tell us the

24   facts and circumstances around which you have based that

25   opinion, only if we are dumb enough as Defense lawyers to ask

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1  that question, does that come in.

2       What they are asking us to do is to be able to do just that

3  very thing. Only covering it in the guys of gang activity.

4  But it is the same thing. Reputation he can testify about,

5  but it should end there.

6            MR. BRAUCHLE:   We are all members of the bar

7  association, does that mean that we are -- can bring in what

8  other bar members have done, we don't know what they are

9  doing, we are not responsible for, we are not affiliated with,

10  that is the same implication of this. Unless he can show

11  personalized activity of Mr. Ruiz or knowledge of activity

12  that were engaged in by the Midnight Dreamers, it is improper.

13            THE COURT:   Anything further, Ms. Handley?

14            MS. HANDLEY:   No, Your Honor. It could be just

15  a housekeeping matter. This witness probably won't take too

16  long, could we go into the second witness or what is our

17  schedule?

18            THE COURT:   You mean for break time?

19            MS. HANDLEY:   I am ready to go with my next

20  witness.

21            THE COURT:   I anticipated, I don't know how long

22  the cross-examination will be, but I anticipate taking a break

23  after direct of this witness.

24            MR. JOHNSON:   Prior to bringing the jury in, can

25  I look at this file to see if it is something that we have

1  actually been given?

2            THE COURT:   You may.

3            MR. JOHNSON:   Thanks.

4            THE COURT:   Mr. Aven, if you bring the jury back

5  in.

6            THE BAILIFF:   Yes, sir.

7       All rise.

8            (Jury returned to the courtroom.)

9            THE COURT:   You may be seated.

10            MR. BRAUCHLE:   Your Honor, at this point, we

11  would renew the objections previously made outside the

12  presence of the jury.

13            THE COURT:   So noted. And your objection is

14  overruled.

15       You may proceed.

16            MS. HANDLEY:   Thank you, Your Honor.

17            **DIRECT EXAMINATION RESUMED**

18  **BY MS. HANDLEY:**

19       Q.   Mr. Renfro, when we took our break we were talking

20  about the Midnight Dreamers and particularly them being a

21  criminal street gang in Irving, Texas. If you would tell us

22  what the reputation of the gang of Midnight Dreamers were?

23       A.   Bad.

24       Q.   And can you tell us what type of misconduct, what

25  kind of things were they generally engaged in?

1            MR. BRAUCHLE:   Your Honor, we would object to

2  that specifically in that it is an improper question.

3            THE COURT:   Overruled.

4       Q.   (By Ms. Handley)   What kind of offenses,

5  what kind of misconduct were the Midnight Dreamers

6  engaged in?

7       A.   They were involved in assaults, aggravated assaults,

8  drive-bys, drug activities, murders.

9       Q.   Thank you, sir.

10            MS. HANDLEY:   I will pass the witness.

11            THE COURT:   Ladies and gentlemen, it is just

12  about the noon hour, we are going to break for lunch till

13  1:15. Remember the admonishments that I gave a while back, do

14  not discuss the facts of the case, and surely do not discuss

15  anything among yourselves. Have a good lunch.

16            THE BAILIFF:   All rise.

17            (Jury retired from the courtroom.)

18            THE COURT:   The Court is at recess until 1:15.

19            (Lunch recess taken.)

20            THE COURT:   Both sides ready for the jury?

21            MS. HANDLEY:   We are ready.

22            THE COURT:   Bring them in, Sheriff.

23            THE BAILIFF:   All rise.

24            (Jury returned to the courtroom.)

25            THE COURT:   You may be seated.

1       You may proceed, Mr. Brauchle.

2            MR. BRAUCHLE:   I thought State still had the

3  witness.

4            THE COURT:   No. They passed the witness with my

5  understanding.

6            **CROSS-EXAMINATION**

7  **BY MR. BRAUCHLE:**

8       Q.   Officer Renfro, the last notation in the file that

9  you had in regard to Mr. Ruiz was made in 1997; is that right?

10       A.   I believe so, yes.

11            MR. BRAUCHLE:   Pass the witness.

12            MS. HANDLEY:   Nothing further, Your Honor.

13            THE COURT:   You may step down, sir.

14            MS. HANDLEY:   Call Raul Toledo.

15       May this witness be excused, sir?

16            THE COURT:   Any objections.

17            MR. BRAUCHLE:   No.

18            THE COURT:   You are free to go, sir.

19            (Witness entered the courtroom.)

20            MS. HANDLEY:   This witness has not been sworn,

21  Your Honor.

22            THE COURT:   If you will raise your right hand,

23  sir.

24            (Witness was duly sworn.)

25            THE COURT:   You may put your hand down and you

77

1    may be seated in the chair to my left.
2        And you may proceed.
3        MS. HANDLEY:   Thank you, Your Honor.
4                    RAUL TOLEDO
5    was called as a witness, and having been duly sworn by the
6    Court, testified under oath as follows:
7                    DIRECT EXAMINATION
8    BY MS. HANDLEY:
9    Q.    Would you please tell us your name, sir.
10   A.    Raul Toledo.
11   Q.    How old are you?
12   A.    Twenty-nine.
13   Q.    What do you do for a living?
14   A.    Truck driver.
15   Q.    How long have you been doing that?
16   A.    Since '99.
17   Q.    And are you married?
18   A.    Yes, I am.
19   Q.    How long have you been married?
20   A.    It will be seven years this year.
21   Q.    Do you have children?
22   A.    Yes, I do.  I have two.
23   Q.    Okay.  Can you tell us anything else about yourself,
24   tell us a little bit about you?
25   A.    I don't know.

78

1    Q.    You active in your church?
2    A.    Yes, I am, right now.
3        MR. BRAUCHLE:   Your Honor we would object to
4    leading.
5        THE COURT:   Sustained.
6        Rephrase the question, ma'am.
7        MS. HANDLEY:   To the question, are you active in
8    your church.
9        THE COURT:   Yes.
10   Q.  (By Ms. Handley)   Do you belong to a
11   church?
12   A.    Yes, I do.
13   Q.    Which church is that?
14   A.    Redeem Community in Oak Cliff.
15   Q.    Are you active in that particular church?
16   A.    Yes, I am.
17   Q.    What types of activities, sir?
18   A.    Right now, we basically try to help out the youth.
19   Q.    Helping out the youth?
20   A.    Uh-huh.
21   Q.    Mr. Toledo, you said you are 29?
22   A.    Yes.
23   Q.    You are married, you have children, you are working.
24   Are you also a convicted felon?
25   A.    Yes, ma'am, I am.

79

1    Q.    As a matter of fact were you convicted --
2        MR. BRAUCHLE:   May we approach, Your Honor.
3        THE COURT:   You may.
4        (Following proceedings had at the Bench.)
5        MS. HANDLEY:   This is the individual, we had a
6    hearing on this before.  So in terms of surprise, this is the
7    hearing about whether or not we could show the deadly conduct
8    that he was never convicted of before.  But we can show it in
9    punishment.  We have provided them with a copy of the offense
10   report with this individual's statement with respect to
11   their -- copy of his criminal history.  We have been talking
12   from the get-go about our intentions of putting this guy on.
13       MR. BRAUCHLE:   The criminal history didn't come
14   in until this morning.
15       MS. HANDLEY:   You had the offense report.  The
16   State, we --
17       MR. BRAUCHLE:   Who had the offense report?
18       MS. HANDLEY:   We had the hearing about this.
19       MR. BRAUCHLE:   Is the hearing as to whether you
20   could put it on?
21       MS. HANDLEY:   By bringing the guy that was
22   actually -- we talked about --
23       MR. BRAUCHLE:   Which isn't this guy.
24       MS. HANDLEY:   Yeah, this guy, stayed there and
25   shot with him.  We talked about this, by bringing an

80

1    individual up here to testify who was out there shooting at
2    the house with him.
3        MR. BRAUCHLE:   Is Raul Reynaldo going to be
4    here.
5        MS. HANDLEY:   No, I am not going to call
6    Reynaldo.  I am not calling him.
7        MR. BRAUCHLE:   Why not?  We would like for him
8    to be here.
9        MS. HANDLEY:   He is in the pen or something.
10       MR. BRAUCHLE:   Well, wasn't this the guy?
11       MS. HANDLEY:   He is not now.
12       MR. BRAUCHLE:   Well, obviously, Your Honor, he
13   wasn't on the witness list, we think we should exclude him.
14   We are shocked and amazed by his mere presence here.
15       MS. HANDLEY:   It is duly noted that you are
16   being facetious.
17       You can take a couple of minutes if you want to talk to
18   this guy.  It is the report that you have had since the
19   beginning.  You have had the statement in your possession.
20   You have this.  This is part of the disorderly conduct.  The
21   gang something is something entirely different.  They have had
22   this disorderly conduct.
23       MR. BRAUCHLE:   It was deadly conduct.
24       MS. HANDLEY:   You know you got it.  No, I just
25   know my Penal Code.  You know what I am talking about then

81

1  because you got the report. Cause we talked about it in a
2  hearing about putting on this offense.
3          MR. BRAUCHLE:  There is really no way to support
4  this, to investigate. So that's the point we have had no
5  witness list to find that out so we haven't had a chance to
6  look and see what we might want to do. And he is not on the
7  list. What's the point of having it if it doesn't mean
8  anything.
9          MS. HANDLEY:  We are at the point that we had
10  the deadly conduct.
11          MR. BEACH:  They had a hearing about this, they
12  filed a motion to keep this guy's testimony out.
13          MR. BRAUCHLE:  Not his specifically, but
14  testimony of the act itself, because this was the case that
15  was dismissed.
16          MR. BEACH:  With his name.
17          MR. BRAUCHLE:  His name.
18          MR. BEACH:  There is no surprise on this guy.
19          MR. BRAUCHLE:  He might have been included as a
20  codefendant, but he was never convicted.
21          MS. HANDLEY:  Yeah, we was.
22          MR. BRAUCHLE:  That's right.
23          MR. BEACH:  There is no surprised, he is going
24  to come in rebuttal anyway.
25          MR. BRAUCHLE:  How is he going to come in

82

1  rebuttal?
2          MR. BEACH:  When Gilda testifies.
3          MR. BRAUCHLE:  How do you know what Gilda is
4  going to testify?
5          MR. BEACH:  Anyway there is no case law, this is
6  not some kind of technicality game. They have known about
7  this guy.
8          MS. HANDLEY:  We have been talking about this
9  for a long time.
10          THE COURT:  I will note your objection. And
11  rule that there was no surprise in allowing him to testify.
12          MR. BRAUCHLE:  Well, our objection would not
13  only go to him not being on the list, is this being picked
14  up -- go to him not only being not on the list; and therefore,
15  we are surprised, but also the situation of if the
16  uncorroborated but for the codefendant, since he was a
17  codefendant, the Court is well aware that that would not be
18  admissible in a direct trial, but the Court has ruled that it
19  is admissible in a death penalty; is that a correct statement?
20          MS. HANDLEY:  In the punishment phase of the
21  trial and has been before in a death penalty case.
22          MR. PARKS:  Here is the odd that the jury is
23  going to be instructed that they cannot consider these
24  extraneous offenses unless they believe beyond a reasonable
25  doubt that they were committed; however, the other flip side

83

1  of that is, that the law says that a person cannot be
2  convicted of an offense on the evidence of uncorroborated
3  testimony of a codefendant.
4          MS. HANDLEY:  He has already been convicted of
5  capital murder and that's what the code speaks of. When he
6  says conviction -- when it says conviction, they are speaking
7  of the case he has already been convicted of capital murder.
8          MR. PARKS:  What you are saying is, is the
9  fact -- it doesn't change the fact that they have got to
10  believe it beyond a reasonable doubt.
11          MS. HANDLEY:  Sure, okay.
12          MR. PARKS:  And the law says that that is not
13  believable beyond a reasonable doubt as a matter of law.
14          MS. HANDLEY:  No, I think that is a
15  misstatement.
16          MR. BRAUCHLE:  We have to do it over in front of
17  jury.
18          MS. HANDLEY:  We already had a hearing on this
19  and you ruled that it is testimony is entirely appropriate.
20          THE COURT:  You may proceed, Ms. Handley.
21          (End of Bench Conference.)
22  Q.  (By Ms. Handley) Mr. Toledo, are you also in fact a
23  convicted felon?
24  A.     Yes.
25  Q.     In fact, sir, was it on July -- July 3rd of 1997,

84

1  were you convicted of a felony offense of deadly conduct?
2  A.     Yes, I was.
3  Q.     And as a result of that conviction, were you
4  sentenced to the Texas Department of Criminal Justice?
5  A.     Yes, ma'am.
6  Q.     Were you sentenced to a two-year term, sir?
7  A.     Yes.
8  Q.     And did you, sir, in fact, serve two years either in
9  the jail or awaiting transfer or in the Texas penitentiary for
10  that particular offense?
11  A.     Yes, ma'am, I did.
12  Q.     And once you served that term, sir, got out of the
13  penitentiary, is that then when you started -- got your job
14  and married and have a family now and such as that?
15  A.     Yes, it was to a certain point. I mean I did get in
16  point one more time, but that's when I realized that it is not
17  worth me losing my life over something stupid. And you know.
18          MR. BRAUCHLE:  Your Honor, we would object to
19  narrative.
20  Q.  (By Ms. Handley)  What was not worth
21  losing your life?
22  A.     Just going out, getting in trouble, over and over.
23  Q.     Okay. I would like to talk to you then about what
24  brought you to that point of being convicted of that felony
25  offense and ultimately finding yourself in the penitentiary.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

85

1  Where did you grow up, Mr. Toledo?
2      A.   I grew up around Oak Cliff area.
3      Q.   Okay.  Did you also live around the Irving area?
4      A.   Yes, I lived in Irving area as well.
5      Q.   When did you live in Irving, during what times?
6      A.   I believe it was '93, '94 when I first moved out
7  there.
8      Q.   When you moved out to Irving, Texas, Mr. Toledo, did
9  you join a member -- did you join a street gang?
10     A.   Yes, I did.
11     Q.   And what was the name of that gang?
12     A.   Midnight Dreamers.
13     Q.   Were you familiar with an individual by the name of
14  Wesley Lynn Ruiz?
15     A.   Yes, ma'am.
16     Q.   Do you see that individual in the courtroom today?
17     A.   Yes, ma'am, I do.
18     Q.   Would you point him out for us?
19     A.   The gentleman sitting at the end of the table.
20          MS. HANDLEY:   Let the record reflect that the
21  witness has identified the defendant.
22     Q.   (By Ms. Handley)  Did he have a nickname at that
23  time?
24     A.   Yes.  He went by Slow Poke.
25     Q.   Why was he called Slow Poke?

86

1      A.   I was told basically --
2          MR. BRAUCHLE:   Your Honor, we would object to
3  hearsay.
4      Q.   (By Ms. Handley)  Do you have any
5  personal knowledge as to why they called him Slow
6  Poke?
7      A.   Not really.  Just stuff that I heard.
8      Q.   Just stuff that you heard?
9      A.   Uh-huh.
10     Q.   When did you first meet the defendant?
11     A.   I want to say probably about a year, maybe a year and
12  a half after I moved to Irving.
13     Q.   How did you meet him, where?
14     A.   Just as soon as I joined the gang, people associated
15  with, you know, we kind of introduced people at the time
16  everybody that was in Midnight in Irving, we all got together,
17  you know, that we would know who is who at the time, who is
18  all there.
19     Q.   So the defendant was a member of the gang Midnight
20  Dreamers also?
21     A.   Yes, ma'am.
22     Q.   And when you first joined the gang, was he already a
23  member?
24     A.   I believe he was.
25     Q.   Tell us if you will, Mr. Toledo, you say the name of

87

1  the gang was Midnight Dreamers, correct?
2      A.   Yes, ma'am.
3      Q.   And you joined about approximately what year would
4  you say?
5      A.   I want to say about '94, '95.
6      Q.   Ninety-four or '95, about how old were you then?
7      A.   Thirteen, 14, maybe.
8      Q.   Okay.  What brought you into joining a gang in the
9  first place?
10     A.   There were a couple of people that I knew that were
11  already in the gang, and back when I lived in Oak Cliff and a
12  couple of guys that I used it hang around with over there in
13  West Dallas.
14     Q.   What was the appeal of joining the Midnight Dreamers?
15     A.   Well, just people that I hung around with a lot.
16  People that I already knew, you know I was there with them,
17  you know most of the time, so little by little, you know we
18  just kind of got pulled in.  You know when wanted to get
19  initiated in so I got initiated in.
20     Q.   How do you get initiated in?
21     A.   Well, if you are a male, basically you are going to
22  have to fight.  I mean, when I joined it was, you know, five
23  or six gentlemen that jump me in.  And this female, you know,
24  how that goes, some fight.
25     Q.   So you would have to fight your way into the gang?

88

1      A.   Well, when you first get initiated in, you do.
2      Q.   And tell us if you can, I mean what is the benefit
3  then of being a member of this gang now?
4      A.   Basically just you know people that have your back,
5  you know, supposedly, family-oriented type.  I mean you have
6  friends that are supposed to be there for you when you need
7  them.  That and, I guess, as well as for protection against
8  other people, other gangs that are basically out to get you or
9  you are out to get them, vice versa.
10     Q.   In Irving, Texas, at that time, Mr. Toledo, what
11  other gangs were out there that you might need protection
12  from?
13     A.   Not so much protection, but basically we were just
14  fighting.  We were fighting, there was another gang called
15  L.V., Latin Violence.
16     Q.   Latin violence?
17     A.   Yeah.  And it was back and forth with us.
18     Q.   Tell the jury what you mean by back and forth, what
19  is it that these different gangs --
20     A.   Well -- well, at the time, we got into a big fight
21  and it all started back in high school and we fought one of
22  their guys, they fought one of our guys.  And the next thing
23  you know it kind of grew.  And every time we saw each other,
24  wherever we be at, we wound up fighting or shooting at each
25  other.

1    Q.    When you say fighting, is it fair to say that you
2    would go to fist-a-cuffs sometimes?
3    A.    Yes, ma'am.
4    Q.    Would you also resort to other kinds of weapons?
5    A.    Yes, ma'am, basically, yeah, either guns, bats,
6    chains, sticks, whatever available at the time.
7    Q.    I'm sorry?
8    A.    I said whatever we had available at the time, you
9    know, when stuff pops up.
10   Q.    Whatever was available at the time?
11   A.    Yes, ma'am.
12   Q.    And just to make sure that things are straight now,
13   Mr. Toledo, you are not a member of the Midnight Dreamers at
14   this time, are you?
15   A.    No, ma'am.
16   Q.    When did you make the decision to put that behind
17   you?
18   A.    When I first got arrested, I knew I was going to do
19   some time, I mean, I never seen my dad cry before in my life
20   and when I seen him cry, I think that's what got me right
21   there.
22            MR. BRAUCHLE:    Your Honor, nonresponsive.
23            THE COURT:    Overruled.
24            MS. HANDLEY:    I believe he is answering the
25   question what made him to decide --

1             THE COURT:    It is overruled.
2    Q.    (By Ms. Handley)    Go ahead, Mr. Toledo.
3    A.    And that hurt me when I first saw my dad cry for the
4    first time.  And I am like, I guess to me it wasn't worth it.
5    After that happened, it is like, man, you know I am here
6    hurting my real family and the guys that are supposed to be my
7    homeboys or friends, you know they are there when you need
8    them, but to a certain point, not like your family.  Your
9    family is always going to be there for you, no matter what.
10   So it was then, you know, hey, it is not worth it.  I got
11   locked up, I did my time, I came out, I goofed up one more
12   time, after that, that's when I it really hit me.  And ever
13   since then I have been straight.
14   Q.    (By Ms. Handley)    Have you been
15   confronted with many opportunities to join the gang
16   again?
17   A.    I do see old friends here and there every once in a
18   while, I will say hi, bye, but I don't hang around with the
19   people I used to hang around with back then.
20   Q.    Can you explain to us a little bit more about the
21   Midnight Dreamers, how are they composed out there out in
22   Irving, were there different parts to them, describe to us as
23   best you can?
24   A.    Well, we had -- I guess different neighborhoods had
25   or different areas of town have different representatives at

91

1    the time.  And basically, you have a representative and then
2    you have everybody else -- the person that is the
3    representative of Midnight is in charge of -- or you know if
4    anything happens, they go to him.  And you know whatever the
5    situation is, we will get together, talk about it, discuss it,
6    whatever, and you know, from there we just go do, you know.
7    Q.    Did you hold any kind of position within your area
8    there?
9    A.    Yes, ma'am.  At the time I was representative for
10   Irving.
11   Q.    And what about the defendant in this case?
12   A.    He was -- I was a representative at the time when I
13   known him.  And then him, his brother, you know, me, cousin of
14   mine, friends and stuff, they were members.  And basically
15   when like I said, when something came up or popped up, we will
16   get together and discuss, you know what happened and from
17   there we just wound up going out there and either taking care
18   of it right there and then or we just plan it out later on.
19   Q.    Take care of it then, or plan it out and go out and
20   di it together?
21   A.    Yes, ma'am.
22   Q.    And with respect to the defendant's participation in
23   Midnight Dreamers, was he a full participant in the gang?
24   A.    Yes, he was.
25   Q.    Mr. Toledo, where did you get these weapons and such

92

1    as that?
2    A.    From friends, friends that we knew or they wound up
3    either getting, you know steal them or, you know, get somebody
4    to buy them or whatever, off the streets.
5    Q.    Would everybody pretty much have their own weapon?
6    A.    Not -- well, it depends.  I mean when it came to
7    firearms, only certain people had firearms.  And you know,
8    when it came to that point, you know, we either used them or
9    we just -- try to buy them off the street like I said before,
10   basically, I mean, we use bats or knives, whatever, you know.
11   Q.    Let's talk about now what brought you to that
12   conviction for deadly conduct that got you sent to the
13   penitentiary.  I would like to talk to you about that
14   particular episode.  And particularly the evening of
15   March 8th of 1997; is that when you committed that
16   particular offense, sir?
17   A.    Yes, ma'am.
18   Q.    Okay.  Tell the jury if you will, what was going on
19   that day, what brought this about?
20   A.    Well, the whole situation I guess came about Joe
21   Ramos, me and him, you know we had I guess what they call --
22   we had a beef against each other.  You know, we didn't really
23   like each other.  Well, of course he was part of L.V.  And
24   basically whoever he hung around with, you know, we mostly,
25   you know, try to attack 'em.  And it just so happened that my

93

1  house was shot up. We found out who it was. The gentleman
2  was thrown in jail, but then later released because as soon as
3  witness found out that the whole thing was, you know
4  gang-related, they didn't want to testify, they didn't want to
5  be involved. So that right there got me upset. So I
6  retaliated, and I got a couple of friends, and I went and find
7  out where these guys lived at and I wanted to take care of it
8  now.
9      Q.   Let's back up for a minute. Now, Joe Ramos, was he a
10  member of Latin Violence?
11     A.   Yes, ma'am.
12     Q.   And another member of Latin Violence had shot up your
13  home, is that what you are saying?
14     A.   Yes, ma'am.
15     Q.   Would it matter that you were retaliating, could you
16  retaliate against any member of Latin Violence?
17     A.   At the time it didn't matter.
18     Q.   It didn't matter?
19     A.   It didn't matter. We just retaliated against them.
20     Q.   That he was a member of the gang was fine, was
21  sufficient at that point?
22     A.   At that time, yes.
23     Q.   So you said that there had been a beef between Latin
24  Violence and yourself and you were looking to even the score?
25     A.   Yeah, I was looking to retaliate against them after

94

1  that happened to me. So we find out where he live.
2      Q.   And who is we, who were you with that night?
3      A.   At the time it was me, ah, a friend of mine named
4  Julio Reynaldo, it was Wes, it was George, who was known as
5  Poo Bear.
6      Q.   When you say Wes, you mean the defendant in this
7  case?
8      A.   Yes, ma'am.
9      Q.   And --
10     A.   And there were two other gentlemen from California at
11  the time, well, I didn't know. And so we had got together,
12  like I say, we find out where he live so we had decided that
13  we were going to get together and shoot up his house.
14     Q.   When you say we got together, do you actually sit
15  down and plan this out?
16     A.   Sometimes we do, sometimes we don't. It just
17  depends.
18     Q.   What about that particular night?
19     A.   At the time, it was more like a little get-together.
20  And George was the one who knew where Joe Ramos lived at. So
21  we had got together, it was a get-together, we discussed, you
22  know, when he came in, we discussed that you know he find out
23  where he lived and that, hey, it will be the perfect time to
24  go in and go after him. So we did, you know we got our guns
25  and stuff, we got everything ready and we went out there and

95

1  sure enough we shot up his house.
2      Q.   Now, you say, "we got our guns," did everybody have a
3  gun, a firearm?
4      A.   That I can recall, not everyone had a firearm.
5      Q.   Who all had a firearm -- did you?
6      A.   I myself had a firearm.
7      Q.   Did the defendant, Wesley Ruiz, have a firearm?
8      A.   Yes, he did.
9      Q.   Anybody else that you recall?
10     A.   Joe -- not Joe, excuse me, George, he had a firearm
11  as well.
12     Q.   What type of firearm did you have?
13     A.   I had a 12-gauge shotgun.
14     Q.   What about Wesley Ruiz?
15     A.   He had a .380.
16     Q.   And what about the other individuals?
17     A.   The other gentleman I believe he had a .25.
18     Q.   Did you -- about what time was this, was this during
19  the day, during the night?
20     A.   No, it was at night, it was close to midnight, I
21  believe, or a little bit after midnight.
22     Q.   Did you guys go -- how did you get there?
23     A.   We drove in two different vehicles.
24     Q.   And tell us how that progressed, what happened?
25     A.   Basically we just hop in the cars and drove straight

96

1  to his house and you know, as soon as we fine out what house
2  it was, everybody just got out of their car and just opened
3  fire.
4      Q.   You say everybody, did you open fire on the house?
5      A.   Yes, ma'am, I did.
6      Q.   Did the defendant, Wesley Ruiz, open fire on the
7  house?
8      A.   That I know of, I didn't see him exactly open fire,
9  but he was behind me and shots were fired toward the house
10  from behind me.
11     Q.   Where was he standing behind you?
12     A.   I was standing in front of -- beside the passenger
13  door and he was standing behind the backseat of the left-hand
14  side of the vehicle.
15     Q.   Uh-huh?
16     A.   And Julio, of course he was driving. And the other
17  people, well, they are -- I don't know where they were at.
18     Q.   What made you lead to believe that the defendant was
19  firing a gun?
20     A.   Well, cause it was only -- I was shooting forward and
21  shots were coming from behind me and he was the only one
22  standing behind me.
23     Q.   Did he also talk to you about having fired that gun
24  tell you anything about that gun later on?
25     A.   He had fired a couple of shots and then all of a

97

1 sudden we heard, It got jammed, it got jammed or something.
2    Q.   He said his gun got jammed?
3    A.   Yes.
4    Q.   Mr. Toledo, you are standing in front of the house of
5 Jose Ramos doing this?
6    A.   Yes, ma'am.
7    Q.   Is it fair to say that you are uncomfortable talking
8 about this?
9    A.   Yeah, it is not something I particularly like to talk
10 about.
11    Q.   You are not proud of this, are you?
12    A.   No, ma'am, I am not.
13    Q.   When you were doing it then back then in 1997, did
14 you know if there was anybody in the house?
15    A.   No, at the time we didn't know.  It really didn't
16 matter if somebody was there or not.
17    Q.   Well, tell the ladies and gentlemen of the jury about
18 that.  When you say it didn't matter, I mean what was the
19 mind-set of the Midnight Dreamers when you are standing out
20 there shooting into a house?
21    A.   Well, to me, it didn't matter because I was -- I was
22 mad, I was retaliating against him because he almost shot my
23 little brother, so it really didn't matter to me if somebody
24 was at the house or not.  I was just, you know, returning the
25 favor.

98

1    Q.   And as with other members of the gang, I mean they
2 were there to just back you up or do it matter to them?
3    A.   No, apparently not, because they were there helping
4 me out.
5    Q.   So as far as you knew there could be an entire family
6 in that house and it didn't matter?
7    A.   Yes, ma'am.
8    Q.   Okay.  After y'all shot into the house, what happened
9 then?
10    A.   From there we went back to Joe and Dome's apartment,
11 I know I left my shotgun there at the house, I mean at his
12 apartment.  And from there we kind of talked about it a little
13 bit, hung around for a little bit more and just left.
14    Q.   You eventually got caught, arrested for this
15 particular offense?
16    A.   Yes, ma'am.
17    Q.   Tell us about that, how did that come about?
18    A.   Well, at the time the firearm, the shotgun that I
19 had, I had bought.  And I needed, I needed money at the time
20 so I went and pawned it.  And of course the record went to the
21 police department.  And the gang unit went by and they
22 confiscated it.  The only reason I know that is because when I
23 went to go pick it up.  The gentleman asked me, Hey, man, are
24 you in a gang or something, the gang unit just came by and
25 picked up your gun.  That's when I knew that I was going to

99

1 get time.
2    Q.   You realized that you had been caught and you are
3 probably going to prison?
4    A.   Yes, ma'am.
5    Q.   Did you sit down with a detective, an officer and
6 talk to him about your participation in this?
7    A.   At that time -- the first time we got together, I
8 really didn't.  But then as they started investigating, you
9 know, they had -- they had my shells, they had the shotgun,
10 and they had an affidavit from George, from who they call Poo
11 Bear, and he had wrote down that, yeah, that I was involve
12 with the shooting.  So when they presented that to me, then I
13 did tell them, yes, I was involved.
14    Q.   And in fact did you sit down and give them a written
15 statement telling them basically what you have told the jury
16 today?
17    A.   Yes, ma'am.
18    Q.   That you, the defendant, these other people that you
19 spoke of, that you got together, went in your cars, got out
20 and shot into the house of Joe Ramos?
21    A.   Yes, ma'am.
22    Q.   And as we stated earlier, you were convicted of that
23 offense and sent to the penitentiary?
24    A.   Yes, ma'am.
25    Q.   Mr. Toledo, I mean we have talked about opening fire

100

1 into a home, is that basically the reputation, the actions of
2 the Midnight Dreamers at that time?
3    A.   Yes, and worse.
4    Q.   What do you mean and worse?
5    A.   Just when it came down -- when it came time to take
6 care of business, we always found a way to do it.
7    Q.   And if that meant using weapons, if that meant
8 shooting into people's homes?
9    A.   Weapon, shootings, whatever.
10    Q.   And during this time, Mr. Toledo, you are telling us
11 that the defendant in this case, Wesley Ruiz, he was a member
12 of Midnight Dreamers with you?
13    A.   Yes, ma'am.
14    Q.   And he was a full participant in Midnight Dreamers
15 with you?
16    A.   Yes, ma'am.
17    Q.   And in these kinds of activities?
18    A.   Yes, ma'am.
19         MS. HANDLEY:   May I approach, Your Honor?
20         THE COURT:   You may.
21    Q.  (By Ms. Handley)  Mr. Toledo, let me
22 show you a picture here that I have marked as
23 State's Exhibit No. 159; do you recognize who is in
24 that photograph there?
25    A.   Yes, I do.

1  Q.  And who is that in that photograph?
2  A.  Wesley Ruiz.
3  Q.  Would you say that that is taken about the time that
4  you have been talking about in the mid-'90s?
5  A.  Yes.
6  Q.  You recognize what he is doing in that photograph?
7  A.  Yes.  Throwing up midnight.
8  MS. HANDLEY:  At this time we will offer into
9  evidence State's Exhibit No. 159.
10  MR. BRAUCHLE:  Your Honor, we would object to
11  159 in that it is not relevant to this line of questioning or
12  what this witness is testifying about.  There is no showing of
13  connection between his testimony and what is being proffered
14  by the State.  Also we would object to the self-serving
15  comments that are put on 159, they are certainly inadmissible.
16  MS. HANDLEY:  If I may show the picture to the
17  Court, Your Honor.  We would be happy to redact the
18  handwriting on the bottom with respect to the defendant
19  throwing up Midnight Dreamers' hand sign.
20  THE COURT:  Okay, I will overrule the objection.
21  But will request that the State redact the writing on the
22  bottom.
23  MS. HANDLEY:  Yes, sir.
24  THE COURT:  And admit State's Exhibit No. 159.
25  MR. BRAUCHLE:  May we have a running objection?

1  THE COURT:  You may.
2  Q.  (By Ms. Handley)  Mr. Toledo, you said
3  that -- what did you describe him as doing in this
4  picture here?
5  A.  Throwing up Midnight.
6  Q.  Throwing out Midnight, what does that mean?
7  A.  Throwing up Midnight, the gang sign.
8  Q.  Is that necessarily uncommon if you were stopped at
9  that time -- let me ask you, were you ever stopped by law
10  enforcement during that time?
11  A.  Yes, I was.
12  Q.  And did they ever question you, the gang unit that
13  you referred to earlier, asking you about your affiliation?
14  A.  Yes, they did.
15  Q.  And was it necessarily uncommon for you to admit that
16  you were a member of a particular gang?
17  A.  At first I never admitted to it.  But then later on
18  as we started getting in trouble, it kind of -- yeah, you are
19  with Midnight, you are with Midnight, the word around the
20  street.
21  Q.  So they knew you were Midnight and you would just
22  admit to it?
23  A.  Yeah.
24  Q.  A Midnight?
25  A.  Yes, ma'am.

1  Q.  To your knowledge, Mr. Toledo, was the defendant also
2  arrested for this offense, deadly conduct?
3  A.  Yes, ma'am.
4  Q.  Let me show you State's Exhibit No. 154; do you
5  recognize the individual in this picture here?
6  A.  Yes, ma'am.
7  Q.  Who is that?
8  A.  That's Wesley Ruiz.
9  Q.  And with respect to the date on here, does this
10  correspond with the date, the time that y'all were arrested
11  for this particular offense?
12  A.  Yes, ma'am.
13  MS. HANDLEY:  At this time Your Honor we would
14  offer into evidence State's Exhibit No. 154.
15  MR. BRAUCHLE:  We would renew our prior
16  objections, which were sustained by the Court, especially
17  object to the notations on the back.
18  MS. HANDLEY:  I have no objections to removing
19  the back, Your Honor.
20  THE COURT:  I will overrule the objection,
21  State's 154 is admitted.  And also request that the writing on
22  the back be redacted.
23  MS. HANDLEY:  Yes, sir, we will do that.
24  MR. BRAUCHLE:  The Court is aware of the
25  previously objections made to the exhibit?

1  THE COURT:  Yes.
2  Q.  (By Ms. Handley)  You and the defendant
3  were then arrested around the same time?
4  A.  Yes, ma'am.
5  Q.  Thank you, sir.
6  MS. HANDLEY:  We will pass the witness.
7  THE COURT:  Cross-examination.
8  MR. BRAUCHLE:  Could I be provided with his
9  previous statement.
10  MS. HANDLEY:  For the record, Your Honor, I am
11  tendering them a copy of the statement given by Raul Toledo,
12  that copy that we have tendered previous to them -- or the
13  same statement.
14  **CROSS-EXAMINATION**
15  BY MR. BRAUCHLE:
16  Q.  (By Mr. Brauchle)  Mr. Toledo, my name
17  is Paul Brauchle, and I have got some questions for
18  you.
19  A.  Yes, sir.
20  Q.  When were you sentenced to two years in prison?
21  A.  Back in '97.
22  Q.  When did you get out?
23  A.  In '99.  It was May of '99.
24  Q.  And you say you have been back since then?
25  A.  Excuse me?

105

1    Q.    Did you say that you have been back?

2    A.    No, sir.  I said that once I got out, I got in

3    trouble one more time.

4    Q.    What was that for?

5    A.    It was for aggravated assault.

6    Q.    And when did you pick that up?

7    A.    Maybe six months after I got out.

8    Q.    And was that in Dallas County?

9    A.    Yes, sir.

10   Q.    Is that under the name of Raul Toledo?

11   A.    Yes, sir.

12   Q.    What company do you drive -- didn't you say you drove

13   these days?

14   A.    Yeah.  I started driving after I got out.  I started

15   driving for a company called P.S.S.

16   Q.    Okay.  Do you still drive for them?

17   A.    No, sir.

18   Q.    Who do you drive for now?

19   A.    I drive for Southco.

20   Q.    And where is it that you say that you go to church?

21   A.    I go to Redeem Community in Oak Cliff.

22   Q.    You go where?

23   A.    To Redeem Community.

24   Q.    And where is that?

25   A.    In Oak Cliff.

---

106

1    Q.    Where?

2    A.    Off of Brooklyn and Bernal -- not Bernal, what is it

3    called -- it is off of Brooklyn area and street Hampton, I

4    can't recall the side street that it is on.

5    Q.    Okay.  And what is the youth group that you lead?

6    A.    I don't lead a youth group.  What I do, it's a -- we

7    do have a youth, and whenever they need someone to talk to

8    them about gangs or prison life, I am usually the one that

9    they get.  Because some of the people in my church, the

10   congregation that I am in, they know about my background.

11   Q.    When is last time you gave one of these talks?

12   A.    Ah, the last time, I want to say it has been a couple

13   of months.

14   Q.    What was the occasion?

15   A.    We were trying to reach out to a couple of kids from

16   East Dallas that were getting in trouble, you know, basically

17   they were trying to help 'em out, stay out of trouble, so we

18   had a little get-together at a little park right there in Oak

19   Cliff area.  And the lady that is over the youth, she wanted

20   to know if I could help her out, you know, just talk to the

21   guys and I did go -- I talked to a couple of guys that went,

22   but mostly I was just there to just kind of help out over, you

23   know, give a hand basically, you know, with the food and the

24   drinks and stuff.

25   Q.    And you say that was two or three months ago?

---

107

1    A.    Ah, yes, it was about three months ago or so.

2    Q.    Now, then, when Ms. Handley asked you about the

3    shooting at Mr. Ramos house, I believe you stated that you

4    don't have any personal knowledge that Mr. Ruiz shot at the

5    house; is that correct?

6    A.    No, I said that I didn't see him shoot the house, but

7    he was behind me and there was gunshots coming from behind me.

8    Q.    There were how many people out there, five?

9    A.    It was about six of us.

10   Q.    Okay.

11   A.    And it was me, Julio and Wesley there, we rode

12   together.

13   Q.    You stated that somebody fired from behind you, but

14   you don't know who it is, though, right?

15   A.    Well, the only person that was behind me was Wes.

16   Q.    Where are the other three?

17   A.    The other three were next to me.  As you are facing

18   the house, you guys lined up, and they were behind us; but when

19   we came out of the vehicles, Wes was, I guess you could say on

20   my side on my left-hand side.  But when I was facing the

21   house, he was behind me.

22   Q.    How many shots did you fire?

23   A.    I shot -- I fired six rounds.

24   Q.    You were shooting a 12-gauge shotgun, right?

25   A.    Yes.

---

108

1    Q.    And you were shooting right at the house; is that

2    correct?

3    A.    Yes, that is correct.

4    Q.    You know if anybody hit the house other than you?

5    A.    Well, according to Officer Beaumont who is in charge

6    of gang unit --

7    Q.    No, do you know yourself?

8    A.    Do I know myself, well, it is kind of hard to miss.

9    Q.    Well, I have seen people miss things bigger than a

10   house, to your knowledge, do you know of anybody other than

11   yourself that actually shot into the house?

12   A.    That shot into the house, yes, it was -- I shot --

13   shot into the house, Wes shot into the house and George shot

14   into the house.

15   Q.    Well, I think you said that you are not even sure

16   that -- it is only circumstantial to you that Wesley even

17   shot, now you are saying that you know that he shot into the

18   house?

19   A.    Well, if you want to get technical.

20   Q.    Well, this is kind of a technical process?

21   A.    Did I see Wes shoot at the house, no, I did not.

22        MR. BRAUCHLE:    We will pass the witness.

23             REDIRECT EXAMINATION

24   BY MS. HANDLEY:

25   Q.    Mr. Toledo, you have a felony conviction, is it hard

---

109

1   to get a job?
2       A.   It is hard to get a job, but I don't use that as an
3   excuse. I just, I tell them straight up, up front, hey, when
4   I was young I did some dumb stuff, I am a convicted felon,
5   sometimes they -- sometimes they look at that and they say,
6   no, we can't help you or sometimes they can. But I mean, you
7   still got to eat and still got to, you know, put clothes on
8   your back.
9       Q.   So it's possible, you just got to get out there and
10  make it happen?
11      A.   Yes, ma'am.
12      Q.   Thank you, sir.
13           MS. HANDLEY:  Pass the witness.
14              **RECROSS-EXAMINATION**
15  BY MR. BRAUCHLE:
16      Q.   Mr. Toledo, what happened on the most recent
17  aggravated assault?
18      A.   It was dismissed. It was dismissed because when --
19      Q.   When was it dismissed?
20      A.   I don't know, maybe three or four months later, after
21  I got arrested.
22      Q.   So are you on any kind of paper these days?
23      A.   No, sir, I am not.
24      Q.   When did you get off?
25      A.   Back in 2001, I believe.

110

1       Q.   And what were you on for then?
2       A.   I was charged with aggravated assault deadly weapon
3   on a police officer and on a family member.
4       Q.   And were you on parole or probation?
5       A.   No, I was on probation. When I got convicted of the
6   deadly conduct, I was on probation. And when I went to
7   sentencing phase they gave me two years for the new charge and
8   they reinstated me on my probation.
9       Q.   When were you first contacted by the State in regard
10  to testifying about this case?
11      A.   I don't know, about a month ago, month and a half
12  ago.
13      Q.   And what did they offer you, if anything, to testify?
14      A.   They didn't offer me anything.
15      Q.   They offer any of your relatives anything?
16      A.   No, sir.
17           MR. BRAUCHLE:  We will pass the witness.
18           MS. HANDLEY:  Nothing further.
19      Thank you, Mr. Toledo -- actually just briefly.
20              **REDIRECT EXAMINATION**
21  BY MS. HANDLEY:
22      Q.   When you went to the penitentiary on the deadly
23  conduct, were you on probation at that time?
24      A.   Yes, ma'am. It was running concurrent with my new
25  sentence.

111

1       Q.   And was that for what you spoke of earlier, assault
2   on a peace officer?
3       A.   I'm sorry.
4       Q.   You were on probation for assault on a peace officer?
5       A.   I was on probation for assault on a peace officer,
6   family member first. And then --
7       Q.   You did this?
8       A.   I did the drive-by shooting. I was convicted for the
9   drive-by shooting, they gave me two years for that charge and
10  they reinstated me on my probation at the same time.
11      Q.   So when you came out of prison, were you still on
12  probation?
13      A.   Yes, ma'am.
14      Q.   And so you continued to report and do all those
15  things?
16      A.   Yes, ma'am.
17      Q.   Lived out that probation and was discharged from
18  those probations?
19      A.   Yes, ma'am.
20      Q.   And the assault on a family member and police
21  officer, was that something that came out of the same criminal
22  episode?
23      A.   Yes, ma'am.
24      Q.   Okay. And who was this police officer?
25      A.   At the time I don't know who it was.

112

1       Q.   Did you know that he was a police officer, what was
2   the circumstances there?
3       A.   I was living with an ex-girlfriend at the time and I
4   just kind of flipped out and they had called -- they called
5   the police. And that I remember, it was a gentleman --
6           MR. BRAUCHLE:  Your Honor, we would object to
7   the relevance.
8           MS. HANDLEY:  I think he can explain the
9   circumstances, Your Honor.
10          THE COURT:  Overruled.
11      Q. (By Ms. Handley)  Go ahead, sir.
12      A.   At the time, when all that happened, I just saw a car
13  pull up, it was at night, I didn't see if it was a police
14  officer or not, I just attacked them.
15      Q.   So you were placed on probation for that?
16      A.   Yes. That was my first time actually being in
17  trouble, well, getting caught being in trouble.
18      Q.   All right. Thank you, sir.
19          MS. HANDLEY:  I will pass the witness.
20          MR. BRAUCHLE:  No questions.
21          THE COURT:  You may step down, sir.
22          MS. HANDLEY:  Thank you, Mr. Toledo.
23      Call Jose Ramos.
24      Your Honor, may this witness be excused.
25          THE COURT:  Any objections?

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

113

1    MR. BRAUCHLE:   No.
2    THE COURT:   You are free to go, sir.
3    (Witness entered the courtroom.)
4    MS. HANDLEY:   This witness has not been sworn,
5  Your Honor.
6    (Witness was duly sworn.)
7    THE COURT:   You may take the seat to my left.
8    (Witness complies.)
9    THE COURT:   You may proceed.
10              JOSE RAMOS
11  was called as a witness, and having been duly sworn by the
12  Court, testified under oath as follows:
13              DIRECT EXAMINATION
14  BY MS. HANDLEY:
15    Q.    Would you please tell us your name, sir.
16    A.    Jose Ramos.
17    Q.    How old are you?
18    A.    Twenty-eight.
19    Q.    Twenty-eight years of age.  Can you tell us a little
20  bit about yourself, who are you, what do you do for a living?
21    A.    My name is Jose Ramos.  I am a tattoo art activity.
22  I have a small business.  I got four kids, one on the way.
23  Live with my girl.  From Irving, born and raised.
24    Q.    You have four kids, one on the way?
25    A.    Uh-huh.

114

1    Q.    You say you are a tattoo artist.  Do you own your own
2  business or you work for a business?
3    A.    No, I own my own business.
4    Q.    How long have you owned that business?
5    A.    Two years.
6    Q.    Two years now.  You say you also grew up in Irving,
7  Texas?
8    A.    Yes, ma'am.
9    Q.    And in addition to -- you have described just a
10  little bit about yourself, is it safe to say, Mr. Ramos, that
11  you are currently on felony probation?
12    A.    Yes, ma'am.
13    Q.    And is that for an offense that occurred back in the
14  year of -- well, you tell us, what year was that?
15    A.    Ninety-nine.  I got if trouble for possession of
16  cocaine with intent to deliver.
17    Q.    In 1999, possession of controlled substance with
18  intent to deliver, you were placed on probation for that
19  offense?
20    A.    Probation.
21    Q.    For how long, sir?
22    A.    Ten years, they gave me six months, ten years
23  probation.
24    Q.    Ten years probation, six months in jail as a
25  condition of that?

115

1    A.    Uh-huh.
2    Q.    And when you started to serve that six months in
3  jail, were you are later given work release then?
4    A.    Yes, I was.  Three months into it I was.
5    Q.    You have been on felony probation for quite a time
6  now?
7    A.    Ah, yeah.
8    Q.    Have you abided by the terms and conditions of your
9  probation?
10    A.    Yeah, everything is straight, I am good on
11  everything.
12    Q.    You haven't been into any trouble?
13    A.    No.
14    Q.    You have abided by all the orders of the court,
15  everything they have asked you to do?
16    A.    Yes, ma'am.
17    Q.    Okay.  I would like it talk to you then a little bit
18  about your -- what brought you to that point and particularly
19  your younger days in Irving, Texas, okay?
20    A.    Uh-huh.
21    Q.    You say you grew up in Irving, when you were a young
22  man out there, did you find yourself in any kind of a gang?
23    A.    Yes, I did.
24    Q.    What gang did you join?
25    A.    I was an L.V.

116

1    Q.    L.V., what does that stand for?
2    A.    Latin Violence.
3    Q.    How old were you when you joined Latin Violence?
4    A.    Fifteen.
5    Q.    What brought you to join Latin Violence in the first
6  place?
7    A.    Really it was just a group of guys I hung out with.
8    Q.    A group of guys you hung out with.  Was there
9  anything in particular, kind of a catalyst that happened in
10  your life that made you think that you needed to join these
11  guys, any particular event?
12    A.    No.  Like I said it was just a group of guys that
13  hung out, and it was what it became, you know.
14    Q.    And are you a member of Latin Violence now,
15  Mr. Ramos?
16    A.    Oh, no.
17    Q.    In fact, since the time that you found yourself in
18  trouble back in -- back --
19    A.    I quit the whole ordeal when I was 16.
20    Q.    Sixteen?
21    A.    Yeah.  I was still mutual friends with all of 'em, by
22  it wasn't -- my affiliation wasn't banging or anything like
23  that.
24    Q.    So you walked away at a pretty young age?
25    A.    Yes.

1    Q.    Tell us about Latin Violence at the time, what were

2    they like, what did they stand for?

3    A.    Latin Violence really was a group of guys having fun.

4    The only time we ever had problems was with another group

5    called, Midnight, Midnight Dreamers.  Usually it was just

6    fighting back and forth, you know, see each other, we just got

7    into fights.

8    Q.    Was it just fist fights?

9    A.    No.  Now you had your shootouts, your jumping, all

10   that kind of stuff.

11   Q.    Where did all of this go on, the shootouts and

12   jumping?

13   A.    Throughout Irving, South Irving, North Irving.

14   Q.    Let me talk to you about an incident that happened at

15   yours house in March of 1997; you remember that?

16   A.    Yeah.

17   Q.    Now, previous to that, were you familiar with an

18   individual by the name of Wesley Lynn Ruiz?

19   A.    Yes.

20   Q.    And do you see that individual in the courtroom

21   today?

22   A.    Yes, I do.

23   Q.    Could you point him out to us?

24   A.    Right there in the black tuxedo.

25   Q.    Seated at the end of the table over here?

1    A.    Yeah, with the tie pokey-dots.

2         MS. HANDLEY:    Let the record reflect that the

3    witness has identified the defendant in open court.

4    Q.    (By Ms. Handley)  How did you first meet the

5    defendant?

6    A.    When I first met him, I believe a friend of mine were

7    to go drop off my girlfriend and her friend at David Echols

8    Driving School.  And apparently they started problems with

9    him, him and his brother.  They threw a piece of jack inside

10   the car, tried to hit 'em, whatever.  And he came back to my

11   house, picked me up, told me he was having problems.  When I

12   jumped in the car, we went back to David Echols.  When we

13   pulled up to David Echols, I jumped out of the car, and that's

14   when I met him.  And he was running backwards saying he didn't

15   want no problems, he didn't want nothing with me, he had

16   problems with my home boy.  And then I guess his brother

17   having a confrontation with the guy I was with, my friend

18   ended up putting the car in drive, hit his brother with the

19   car.  His brother bounced off.  He put it in reverse, got

20   in the car and made the girls get in the car and went to the

21   Irving Police Station.  And there I talked to Joe Seton and

22   there I told 'em everything that happened.  Said they would

23   look into it, and nothing never came of it.

24   Q.    You drove actually immediately to the police station

25   to tell them about?

1    A.    Yeah.

2    Q.    And were you aware at that time that he was a member

3    of the Midnight Dreamers?

4    A.    Yes, I was.

5    Q.    Was that a large part of the problem with what was

6    going on with him and your friend and such as that?

7    A.    Yeah.

8    Q.    Going into March of 1997, talk about an incident when

9    your house was shot up one evening; you remember that?

10   A.    Uh-huh.

11   Q.    Prior to that, say approximately a week prior to

12   that?

13   A.    Monday.

14   Q.    Monday, you had some contact with the defendant?

15   A.    Not so much contact, confrontation.  We were in a

16   school.  We were going to Mega.  We talked every time he

17   walked by the hallway, all you could hear was Midnight, him

18   trying to instigate something, he was trying to get going.  By

19   the end of his class nothing happen.  We walk outside, he goes

20   to his car, comes around his car.  As I am walking to my car,

21   he wants to imitate that he is going to try to hit me with his

22   car and just takes off and starts running down the road in his

23   car.  We jumped in our vehicle and tried to chase him down and

24   he got off on 183.

25   Q.    And you said that was on -- how many days prior to

1    the shooting at your house did that take place?

2    A.    Four days.  This was on a Monday, they shot my house

3    up, I believe, on a Friday.

4    Q.    So that day at school, he is yelling at you Midnight,

5    Midnight Dreamers such as that?

6    A.    Yeah.

7    Q.    In other words, representing his gang and throwing

8    that out to you?

9    A.    Yes.

10   Q.    Tell us about what happened on that night of March,

11   1997?

12   A.    Man, I went out the movies with my girl.  We got back

13   probably around 2:30 in the morning, about 2:30 in the

14   morning.  I end up getting out of the car, we were walking up

15   to the house, you know, normal night, you are done.  When I

16   walk into my room, I close my door, it wasn't but like five

17   minutes and I hear a bash.  So the first thing in my head,

18   somebody hit my car.  You know, I go to the door.  By the time

19   I hit the hallway of the house, the next thing you know, you

20   see a whole bunch of chalk just flying through the house,

21   bullets going through, you can hear the gunshots firing.  At

22   the same time, came to the front door, by the time we got out

23   of the door, the car was already gone.  My father-in-law came

24   out -- my stepdad, he came out with a shotgun, my mom woke up.

25   I had two of my nephews there and my girl so...

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

121

```
1    Q.   Let's back up.  Was this your mother's house that you
2   were staying at?
3    A.   Yes, it was.
4    Q.   And in the house that evening, you have testified
5   that you came home after seeing a movie with your girlfriend?
6    A.   Uh-huh.
7    Q.   So you had just got home at that time, you were going
8   stay the night there?
9    A.   Yeah.  It wasn't like five minutes we were home.
10    Q.   Who was in the house when these bullets started
11   flying?
12    A.   At this time it was my mother, my stepdad, I want to
13   say he was about three years old -- three- or four-year-old
14   nephew and then a little one-year-old nephew.
15    Q.   So you had your two little nephews, and where were
16   they staying?
17    A.   They were in the master bedroom.  Technically, say
18   this is my doorway right here, you go to the living room the
19   first wall to a next restroom, the next restroom, which is the
20   restroom to the master bedroom.  The master bedroom was a
21   little bit to the left.  All the bullets grazed everything
22   from the front door, the hallway, went to the two restrooms.
23   They even found slugs by one of our big trees in the backyard.
24   So I mean, the bullets cleared the whole distance to the
25   house.
```

122

```
1    Q.   With respect to how close they were with respect to
2   where your mother was in bed with the two little ones?
3    A.   This is my restroom and that could have been my mom's
4   bed right there.
5    Q.   Was anybody hurt that night?
6    A.   That night luckily, no.
7    Q.   And did you have any idea at that time who had done
8   it?
9    A.   Yeah, I knew.  I already knew.  I had no problems --
10   like I said, by this time, I had no personal problems with
11   anybody.  The only problem I had was with Wes Ruiz.  And it
12   was from the instigation on Monday, so it wasn't too hard to
13   point the cops.  And as soon as we told them, apparently all
14   of them, they started snitching on each other telling who did
15   what.
16        MR. BRAUCHLE:   Your Honor, we will object.
17    Q.   (By Ms. Handley)  Didn't surprised to hear that this
18   individual was involved, the defendant?
19    A.   No.
20    Q.   Did you retaliate?
21    A.   No.
22    Q.   Okay.  Let me ask you, why not?
23    A.   To be honest, that night it got hectic at my house
24   and I had a lot of friends show up, basically, like I said, we
25   were a lot of friend out of the mutual feelings.  We talked to
```

123

```
1   with a lot of the cops in the gang unit that night.  They
2   basically told them, you know, put justice down where it
3   deserves it and nothing happens.  No, there is not going to be
4   no street fight, nothing like that.  The cops were pretty cool
5   with us.  They said give them a chance and they will get them.
6   Within 48 hours they got them, you know.
7    Q.   And you say that it wasn't long after that that you
8   walked away from the gangs?
9    A.   It was honestly a lot bit before that, I had already
10   been clear.  My only mutual feeling was with a friend of mine
11   named Eric Watson.  We were already out of MacArthur.  We were
12   going to Mega to try to graduate early.  We had already been
13   in trouble, couldn't do no more.  Mega was our last choice for
14   school.
15    Q.   So getting out of the gang had something to do with
16   kind of a last choice, a last option with you?
17    A.   Nah, I didn't find too much importance of affiliation
18   with it in the end.  You go to help a lot of friends for what,
19   to go to jail, you know, they don't help you get out.  You got
20   your parents, your family is the ones worrying about you
21   getting out of jail.  You realize those guys ain't there for
22   nothing.  Besides when they are in trouble, they want you to
23   go fight your fights for you.  You know it just ain't worth
24   you, you know.
25    Q.   Mr. Ramos, a few years later, though, you found
```

124

```
1   yourself in some pretty serious trouble --
2    A.   Yeah.
3    Q.   -- as you told us for possession with intent to
4   deliver?
5    A.   Uh-huh.
6    Q.   And what brought you to that point, why did you make
7   that choice?
8    A.   To sell?
9    Q.   Yes, sir.
10    A.   You know, life, the fashion, you see it and sometimes
11   you want it, you know, sometimes working the hard life, it
12   wasn't good enough.  You know, I don't know.  Just something I
13   wanted to do so I did it.
14    Q.   It was easy money?
15    A.   Yeah, easy money.
16    Q.   Maybe there was a little glamour to it or something,
17   the fast life?
18    A.   There wasn't so much of life that I knew about
19   anyway, it was working with jobs I never got along with
20   working people, I guess, that's why you can say I own my own
21   business now.  You know, after I got busted, it is almost the
22   next best thing to dope money.  It is not as much but it is
23   fun doing it, it is money.
24    Q.   It is honest living?
25    A.   Yeah.  I don't have to worry about who is doing what,
```

1   or what cops is watching me.  If I can walk a straight life
2   and do what I love doing, is more for me.
3       Q.    And since that day, you pretty much left that life
4   behind?
5       A.    Yes.
6       Q.    And you are still on probation?
7       A.    Yes.
8       Q.    You appeared before a district judge, correct?
9       A.    Yes.
10      Q.    And you were ordered by that district judge to follow
11  certain conditions, correct?
12      A.    Yes, ma'am.
13      Q.    To report, to not commit criminal offenses?
14      A.    Yes, ma'am.
15      Q.    To not use drugs, to get a job?
16      A.    Uh-huh.
17      Q.    To support your family, are these all orders that the
18  Court put on you?
19      A.    Everything was basically in line by the time I went
20  to court.  You know, I started tattooing right after I got in
21  trouble.  I found tattooing and I got an opportunity for it
22  and I went with it.  And I have been walking straight.  I have
23  been there ever since then.  Even with probation, I check in
24  every other month.  I do a mail-in now, so I haven't been in
25  any trouble to probation or anything like that.

1       Q.    You have made certain promises to the Court and you
2   kept those promises?
3       A.    Yeah.
4       Q.    Has it been that hard, Mr. Ramos?
5       A.    No, it is really not.  Stick to yourself, take care
6   of your family and do what you are supposed to do.
7             MS. HANDLEY:   Pass the witness.
8             THE COURT:   Cross-examination.
9             MR. BRAUCHLE:   Can we be provided with any
10  statements by this witness.
11            MS. HANDLEY:   We have previously tendered a copy
12  of his statement.  Just saying to be expedient, you would like
13  to see another copy?
14            MR. BRAUCHLE:   Yes.
15            MS. HANDLEY:   This is another copy that you have
16  been given.
17                    CROSS-EXAMINATION
18  BY MR. BRAUCHLE:
19      Q.    Mr. Ramos, you made a statement on March 8th 1997;
20  is that correct?
21      A.    Yes, I did.
22      Q.    And have you seen that statement recently?
23      A.    No, I haven't seen the statement probably about --
24  last time I saw it was probably about a year ago.
25      Q.    Do you remember the fact that nowhere in the

127

128

1   statement did you mention Wesley Ruiz?
2       A.    Yeah, I know.  That night, that's the night I met Joe
3   Seton, and I carried on a lot of one-on-one conversation with
4   him when he came to me personally asking me, do you know who
5   might have done this, who done this?  Yeah, I told him who in
6   my head I would have thought it was.
7       Q.    That was a person by the name of Leo Bonio
8   (phonetic)?
9       A.    Leo Bonio was another guy from MS, Mara Salvatrucha,
10  that was a whole 'nother case.  The gang I was in, they were
11  having a lot of problems with that guy, that's why he had
12  brought across that name.
13      Q.    So he just put this in, you didn't?
14      A.    No, when he asked me about the statement, yes, I did
15  put in Leo Bonio, but he was from a totally different gang.
16  And his problem was not with me, his problems was with the
17  gang in general.
18      Q.    But he is the only person -- he is the person you
19  say, I have been having problems with him since October of
20  '96.  You go on and you mention him four or five times in this
21  statement, don't you?
22      A.    Not that I recall.  I do recall talking about Leo
23  Bonio, because at the same time the cases were with him and
24  Leo Bonio.  My personal problems were not with Leo Bonio.  Leo
25  Bonio's case had started before that, getting into a fight at

1   school with him.
2       Q.    All right.  And you didn't tell the police anything
3   about having any type of problem with Mr. Ruiz, did you?
4       A.    Not on my statement, but to Joe Seton, the detective,
5   yes.
6       Q.    Well, there is no record of you ever telling anybody
7   other than your statement, is there?
8       A.    No.
9       Q.    Now, then, you got any idea how Raul Toledo's house
10  got shot up the week before?
11      A.    No.  Which I do know from, like I say, he say/she
12  say, down the grapevine that was the reason for retaliating on
13  me was supposedly some guy shot up their house, which had
14  nothing to do with me.
15      Q.    Well -- so you don't know why anybody would think
16  that you had shot up their house the week before your house
17  got shot up?
18      A.    No.
19      Q.    Just that would just be a preposterous thing for
20  somebody to think that you would be involved in something like
21  that?
22      A.    Yeah.  And at that time of age to be growing up, I
23  had no reason to carry a gun or shoot anybody.  I always
24  fought.
25      Q.    So you are telling this jury that the whole time you

129

1 were in Latin Violence you never carried a gun at all?
2     A.  Yes.  I got in trouble one time.  I would say
3 probably '97 or '98 I was having some family problems with an
4 uncle of mine, I got pulled over in a vehicle and a friend of
5 mine had a sawed-off shotgun, I was arrested and also released
6 30 minutes later.
7     Q.  Where was the friend?
8     A.  The friend was in the driver's seat, he was the
9 driver of the seat.
10     Q.  Is that the only weapon you have ever been around?
11     A.  No.
12     Q.  What is the name of the detective that you supposedly
13 gave Wesley's name too?
14     A.  Joe Seton.
15     Q.  If you recall, your affidavit was taken down by Joe
16 Seton, wasn't it?
17     A.  Yes, it was.
18     Q.  But you can't explain as to why he just completely
19 left all this information that you supposedly gave him about
20 Mr. Ruiz out of the statement?
21     A.  Like I said, when I went in and gave that information
22 that was at the moment.  Joe kept in contact with me the next
23 day.  That night is when this statement was talked about.  The
24 next day when we talked, he told me to think about it, think
25 of anybody and everybody I could have problems with.  The only

130

1 problem problems reported that I knew of was that Monday at
2 school, principals knew about, teachers knew about everything.
3 And I said I had no personal problems with anybody.
4     Q.  And of course you are telling the jury here that you
5 are just not the type of guy who would ever be involved in
6 shooting up Mr. Toledo's house; is that correct?
7     A.  I am correct.
8     Q.  So depending on his testimony, at least five or six
9 people were just totally wrong about your involvement with
10 anything that occurred toward him; is that correct?
11     A.  Most definitely, if I was involved I would have got
12 arrested for it or I would have been asked about it.
13     Q.  How do you know you would have been arrested for it?
14     A.  They shot my house and they all got picked up and
15 questioned real quick, didn't they.
16     Q.  Not particularly?
17     A.  They all got questioned and they all got asked and
18 they all started snitching each other out.
19     Q.  How do you know that?
20     A.  I just know.
21     Q.  You were told that by the D.A.; is that right?
22     A.  No.  I have talked to a couple of them, I ran across
23 Raul one time outside probation.
24     Q.  That wasn't the question?
25     A.  What was your question again?

131

1     Q.  I said did the D.A. tell you that?
2     A.  No.  I said.  No.  To let you know, I also talked to
3 George Cruz.
4     Q.  Sir, I didn't ask you a question.  When were you
5 arrested for the case that you are now on probation for?
6     A.  I want to say it had to have been October 17th of
7 '99 or 2000, I honestly don't recall, but I know it was
8 October 17th.
9     Q.  You ever had any other charges filed against you?
10     A.  Yeah, I have a lot misdemeanors.
11     Q.  Any felonies?
12     A.  No.
13     Q.  How about as a juvenile?
14     A.  As a juvenile, yes, I was.
15     Q.  Were you --
16     A.  I got in trouble when I was 14 years old.
17         MS. HANDLEY:  Your Honor, I am going to object
18 to improper impeachment.  The question is have you ever been
19 convicted of a felony offense or crime of moral turpitude.
20         THE COURT:  Sustained.
21         MR. BRAUCHLE:  He said he was convicted.
22     Q.  (By Mr. Brauchle)  Did you say that you
23 had been convicted of a felony as a juvenile
24     A.  No.  I got in trouble, I did a year of probation.  As
25 a conviction on my record or anything like that, no, from what

132

1 I have been told, no.
2     Q.  Mr. Ramos, let me ask you, in your statement to
3 Officer Seton, you mentioned B.N.S.; is that correct?
4     A.  Body on North Side?
5     Q.  And then you also mentioned M.S.; is that correct?
6     A.  That's Mara Salvatrucha.
7     Q.  So those are two different gangs?
8     A.  Those are two gangs that were affiliated with Leo
9 Bonio.  Leo Bonio is a guy that this many problems with Irving
10 and that's why they were trying to tie him into the case.
11     Q.  And neither one of those are Midnight Dreamers,
12 right?
13     A.  Correct.
14     Q.  So as far as you telling the detective the night this
15 happened that to your knowledge there were no Midnight
16 Dreamers involved; is that correct?
17     A.  At the night when all the cops were at my house,
18 everything in that letter is what I told him.  The next day
19 like I told you when he came back to talk to me more
20 personally, that's when we brought it up.
21         MR. BRAUCHLE:  In that's not what I asked you.
22         MS. HANDLEY:  Your Honor, I believe that he is
23 attempting to answer your question, I ask that he be allowed
24 to do that.
25         MR. BRAUCHLE:  I asked him about his statement.

MS. HANDLEY: And that's what he is answering the substance of the statement what was or was not in there.

THE COURT: I will allow the witness to answer.

A. So like I said, that night, I talked to Joe Seton is the first time I met him. Gave him my statement with him and what was off the top of my head. The next day -- the night he told me, you know what, think about it, Joe, sleep on it, who could you have problems with. The next day he came to talk to me again at my house. We talked more and got a little bit more personal, and that's when I told him the on problem I had was with Wesley Ruiz on that Monday when we were going to get into it at school. That's the only person that I would know.

Q. (By Mr. Brauchle) And you left out anything in regard to Mr. Toledo?

A. Like I told you, I had nothing to do with Mr. Toledo's shooting or anything like that.

Q. And of course anything that you told him after the night of the incident wasn't written down, right?

A. No, it wasn't.

Q. There is no record of what you may or may not have told him 11 years ago?

A. There may not be. You know, when you talk with cops eventually you gain a friendship bond that I felt like I could talk to Joe Seton.

Q. Sir, I just asked you a question about what happened

in 1997?

A. I am trying to answer you properly.

THE COURT: Sir, if you will just answer any questions that you are asked.

Q. (By Mr. Brauchle) Now, was anything promised you to testify?

A. No.

Q. How about any relatives of yours?

A. No.

Q. When you get off probation?

A. Do I get off?

Q. Uh-huh.

A. In 2012.

Q. And at the present time, you are on mail-in?

A. Yes, both and both. One month and then the other month is mail-in. Every other month is mail-in.

Q. Which office do you report to?

A. The one off of Fred Settlement, Singleton.

MR. BRAUCHLE: We will pass the witness.

MS. HANDLEY: Nothing further, Your Honor.

THE COURT: You may step down, sir.

MS. HANDLEY: May this witness be excused, Your Honor?

THE COURT: Any objections.

MR. BRAUCHLE: Subject to recall.

THE COURT: Sir, you are free to go, subject to being recalled.

Ladies and gentlemen, we have been going for a while, let's take a 15-minute break.

THE BAILIFF: All rise.

(Jury retired from the courtroom.)

(Recess taken.)

THE COURT: Next witness.

MR. BEACH: We call A.P. Merrilott in response to the Defense request to have a 705 hearing as well as expert testimony as well as they filed a motion in limine asking the State to approach the Bench before we intend to offer any evidence of specific inmate specific incidents of violence in the penitentiary. That's what we are doing at this time.

THE COURT: Fifteen minutes.

You may call your witness.

MR. BEACH: State would call A.P. Merrilott.

He has not been sworn, Judge.

(Witness was duly sworn.)

THE COURT: You may be seated to my left.

**A.P. MERRILOT**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**SUB ROSA EXAMINATION**

**BY MR. BEACH:**

Q. State your name.

A. A.P. Merrilott.

Q. And how are you employed, sir?

A. I am a criminal investigator with the special prosecution unit out of Huntsville, Texas.

Q. And could you briefly detail your law enforcement background, sir?

A. Yes, sir. I am a certified peace officer here in the state. I have been for 31 years. I started in the Houston Police Department, worked there for about 10 years, moved on to the Huntsville Police Department. And then went over to the special prosecutors office about 19 and a half years ago.

Q. You are currently assigned to the special prosecution unit?

A. Yes, sir.

Q. When was that unit formed, sir?

A. In 1984.

Q. And just tell us what the original purpose for the special prosecution unit was.

A. We prosecute where we are invited by local District Attorneys in the state who have prison units within their jurisdiction. We don't prosecute all counties where prisons are necessary, we have to be invited in. Our prosecutors act

137

1    as Assistant District Attorney for those counties. Myself and
2    the people in the job such as I am, investigators, are D.A.
3    investigators for those counties. We prosecute crimes
4    primarily involving the prison system. But also conspiracies
5    in what we call free world to commit crimes within the prison
6    or vice versa. So our office was formed to combat so to speak
7    prison violence.
8         Q.   Mr. Merrilott, have you been qualified by district
9    courts here in the State of Texas as an expert witness on the
10   subject matter of Texas prison violence, the Texas prison
11   classification system, and also as the request for future
12   dangerousness in capital murder trials?
13        A.   Yes, I have.
14        Q.   Has that been on few or many occasions?
15        A.   Many times.
16        Q.   Have you ever been exposed to the idea or suggest
17   that all we have to do is throw a defendant in the prison and
18   give them a life sentence and that will solve the problem from
19   ever hurting anyone or being involved in criminal activity
20   again?
21        A.   I have heard that it for many times, yes, sir.
22        Q.   And have you heard that as an alternative to impose
23   the death penalty?
24        A.   Yes, I have.
25        Q.   And is that notion true or false?

138

1         A.   That is not correct.
2         Q.   Are you familiar, Mr. Merrilott --
3              MR. PARKS:   Based on what -- I'm sorry.
4         Q.   (By Mr. Beach)  Are you familiar with how inmates are
5    housed in the Texas prison system?
6         A.   Yes, I am.
7              MR. BEACH:   May I approach, Judge?
8              THE COURT:   You may.
9         Q.   (By Mr. Beach)  I will show you what has been marked
10   for identification as State's Exhibit 160 and ask if that is
11   an accurate copy of your curriculum vitae?
12        A.   Yes, sir.
13        Q.   Does it document your education, your law enforcement
14   experience, your continuing education, and other
15   accomplishments in your professional life?
16        A.   Yes, sir.
17             MR. BEACH:   We would offer State's 160 at this
18   time for the purpose of this hearing.
19             Judge, while Mr. Brauchle is looking at the C.V., that's
20   our proffer through this witness. We intend to introduce
21   through Mr. Merrilott his opinions concerning the
22   opportunities to commit violence within the Texas prison
23   system, general statistics on felonies committed in the
24   general population in the Texas prison system, the opportunity
25   to commit those. The classifications system, how it works.

139

1    And how this defendant will be classified if he is sentenced
2    to life without parole. And that would be our proffer through
3    this witness.
4              Pursuant to the motion in limine, we are going to be
5    staying away from antidotal evidence of particular specific
6    inmates committing certain crimes. Just the statistics in
7    terms of what inmates have done in the general population.
8    Where this defendant is going to be specific to the context of
9    where he is going to be living rest of his life if he is given
10   life without parole.
11             MR. PARKS:   That -- I have no problem with that,
12   as long as we stay away from the antidotal stuff, we stick to
13   the statistics, everybody can pull down pretty much off of
14   T.D.C.J. website.
15             I am concerned about whether or not this opinion that
16   came flying out of nowhere is -- was that an exercise in just
17   seeing what he would say or do you intend to offer his opinion
18   about the death penalty.
19             MR. BEACH:   I thought it was piffle.
20             MR. PARKS:   Piffle is a good word.
21             MR. BEACH:   I will not be doing that in front of
22   a jury.
23             MR. PARKS:   You just did that to raise my blood
24   pressure.
25             MR. BEACH:   Yes.

140

1              MR. PARKS:   It worked.
2              MR. BRAUCHLE:   May we have a minute to consult
3    with Mr. Beach?
4              THE COURT:   You may.
5              (Pause in the proceedings.)
6                      SUB ROSA EXAMINATION
7    BY MR. BRAUCHLE:
8         Q.   Mr. Merrilott, if I could go over your C.V., you
9    never graduated from college; is that correct?
10        A.   That's correct.
11        Q.   You went approximately two years to Sam Houston
12   State?
13        A.   Yes, sir.
14        Q.   Where were you trained in blood pattern
15   interpretation?
16        A.   In San Francisco.
17        Q.   Where?
18        A.   Where?
19        Q.   Uh-huh.
20        A.   The actual town is Rohnert Park, R-o-h-n-e-r-t, Park.
21   And it was a school put on by Judith Bunker and Associates.
22        Q.   And when was that?
23             MR. BEACH:   Judge, I promise you you are not
24   going into blood stain interpretation opinions.
25        A.   I believe it was 1990, I am not sure of the date.

141

1    Q.  (By Mr. Brauchle)   What was the reason
2    for you leaving the Houston Police Department
3         A.    I started with the Huntsville Police Department, just
4    a change in location, no problems with being at HPD or
5    anything like that.  I just decided to change, move up to
6    Huntsville.  One thing I started classes there at Sam and also
7    I began raising a family and I wanted to do that in a smaller
8    town environment.
9         Q.    All of your lectures and seminars have been to
10   prosecution oriented groups; is that correct?
11        A.    No, sir.  Some of them have been to college classes.
12        Q.    At Sam Houston State?
13        A.    Yes, sir.
14        Q.    So it would be to criminal justice majors?
15        A.    That's correct, yes, sir.
16        Q.    Let me ask you this, you are not here to express an
17   opinion as to whether this defendant will pose a future danger
18   to society; is that correct?
19        A.    That is absolutely correct, I will not say that.
20        Q.    And you know anything about the facts of this case?
21        A.    No, sir.
22        Q.    You know anything about the background of the
23   defendant in this case?
24        A.    No, sir.
25        Q.    And is this the first time that you and I have met?

142

1         A.    Yes, sir, it is.
2         Q.    Now, we requested certain items to be brought by way
3    of subpoena, you state that you don't have any research or
4    studies that might be utilized in formulating opinions that
5    you would testify to; is that correct?
6         A.    That's correct.
7         Q.    You don't have any literature that supports or
8    rejects any underline scientific theory in regard to what you
9    might testify?
10        A.    That's correct.
11        Q.    And you did provide us with some names of people that
12   have been charged and possibly prosecuted by your special
13   investigation unit; is that correct?
14        A.    Yes, sir, I did.
15        Q.    And that -- you recall about how many people that
16   was?
17        A.    In response to the first question, there is 3,800 and
18   some, I don't remember exactly.
19        Q.    Are those the case numbers you gave us?
20        A.    Yes, sir.  And then that second stack of papers is
21   600 and something cases of inmates prosecuted for weapons
22   possession in the last five years.
23        Q.    Is that only by your unit or by all units?
24        A.    That's only our unit.  That doesn't count D.A.'s who
25   prosecuted their own cases.  That's just our office.

143

1         Q.    Were most of these prosecutions in Walker County?
2         A.    No, sir.
3         Q.    Which county were they in?
4         A.    They are from all over the State.
5         Q.    And you were also subpoenaed to bring any study
6    performed by or in possession of yourself of disciplinary
7    records of the people against whom you might have testified?
8         A.    That's correct.
9         Q.    Do you have any of those?
10        A.    No, I don't have any of those.
11        Q.    Are those -- you have access to those, though, don't
12   you?
13        A.    No, sir.  If I understand the question correctly, it
14   is disciplinary records against defendants that I have
15   testified -- disciplinary records for defendants that I have
16   testified against?
17        Q.    That's correct?
18        A.    No, sir, I don't have access to that.  I don't even
19   know the names of the people that I have testified against.
20   Such as this case, I don't keep records of the people I
21   testify against.
22        Q.    Well, you have invoices or things of that nature,
23   don't you?
24        A.    No, sir, I do not.
25        Q.    How do you keep track of your comings and goings

144

1    without those?
2         A.    Usually I just sign out from my office that I am
3    going to be in a capital case.  And I also testify in other
4    types of cases around the state, not just capital cases.  So
5    when I go into the office and I have to be gone that day, I
6    will just sign out on the board that I am in such-and-such
7    county.  That's how the office knows where I am.  As far as
8    myself tracking individuals, I don't do that.
9         Q.    Now, you were subpoenaed to bring a list of any
10   interviews, research or studies about anything that you
11   created while working in the field; do you have anything?
12        A.    That's right, I don't have anything like that.
13        Q.    And you perform any statistical research?
14        A.    I don't do that.
15        Q.    I believe, though, you do keep statistics in regard
16   to inmate death; is that correct?
17        A.    Yes, sir.  I keep records of inmates that are killed
18   inside of the penitentiary because our office prosecutes them
19   and I happen to know who they are.
20        Q.    Okay.  So -- and I believe that you also have
21   something of a quarrel from year to year with TDC records as
22   opposed to yours?
23        A.    Yes, sir.
24             MR. BEACH:   Judge, I think this is outside the
25   scope of the Daubert hearing what his opinions would be, this

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1  is more cross.

2        THE COURT:  Sustained.

3        Q.  (By Mr. Brauchle)  You were also

4  subpoenaed to bring any statistical research that

5  you may have relied upon; do you have any of that?

6        A.  No, sir, I don't.  There is none.

7        Q.  And in regard to the inmate serving life sentences

8  for capital murder, did you bring that?

9        A.  I have no access to that.

10       Q.  And you have no access to those people's disciplinary

11  records?

12       A.  Not unless I know who they are, which I don't know

13  who they are.

14       Q.  Is that -- is that information not available?

15       A.  No.  As I said, if I know who the inmate is, I can

16  access his disciplinary records.  But I don't know out of the

17  157,000 inmates in the system who was convicted of capital

18  murder.

19       Q.  Are you going to testify about any sharp or blunt

20  objects taken from inmates?

21       A.  Taken from inmates in general, if I am asked to, I

22  will.

23       Q.  Did you bring any statistical records that you were

24  subpoenaed in regard to those?

25       A.  What I showed you, the list of inmates that we

---

1  prosecuted for deadly weapons.

2        Q.  Other than that, you don't know?

3        A.  I don't know how many weapons were confiscated over

4  the years in prison, no, sir, I don't know that.

5        Q.  Do you have any records or studies that show that

6  inmates are manipulated in the prison system?

7        A.  I don't have any studies or records of that, no, sir.

8        Q.  How about certain inmates using their convictions to

9  manipulate and intimidate others?

10       A.  I don't have studies about those things.

11       Q.  Have you got any studies indicating the record -- I'm

12  sorry, any records indicating the amount and type of drugs

13  introduced into prison system?

14       A.  No, sir.  Once again when we prosecute drug cases,

15  our office does not say what type of drug it is.  We call it

16  possession of a controlled substance, you know, in prison.  So

17  we do prosecute drug crimes, but nobody in our office knows

18  exactly what drugs -- in other words, there is no way of

19  knowing which drugs, how many drugs, of what type we

20  prosecute.  We know we prosecute many drug cases.  Now when we

21  go to court on a marijuana case, we know that that particular

22  defendant had marijuana in prison or heroin or

23  methamphetamine.  But I can't access the types and numbers of

24  drugs that are found in the prison system.

25       Q.  And I believe the last thing subpoenaed was a list of

---

1  all offenses that y'all had prosecuted and you did provide us

2  with that?

3        A.  Yes, sir, I provided that, yes, sir.

4        Q.  That's by?

5        A.  For five years, I believe it says.

6        Q.  And that's by inmate name; is that correct?

7        A.  I think that list is categorized by type of crime.

8        MR. BRAUCHLE:  We will pass the witness.

9        MR. BEACH:  That's all, Judge.

10       THE COURT:  Both sides ready for the jury.

11       MR. BEACH:  Yes, sir.

12       MR. BRAUCHLE:  Your Honor, before we bring in

13  the jury, is this testimony being presented by way of him

14  being an expert or just someone with knowledge.

15       MR. BEACH:  What difference does it make?

16       MR. BRAUCHLE:  Well, I don't think we want to

17  concede that he is an expert.

18       MR. BEACH:  Go ahead and make your objection,

19  then.  If that C.V. is not enough, make your objection.  I am

20  presenting him as an expert based on his day-to-day, hands on

21  work in the penitentiary system.  He has specialized knowledge

22  because of what his job duties entail on a day-to-day basis.

23       MR. BRAUCHLE:  Well, his job duties entail

24  prosecuting crime.  They are not into keeping statistics or

25  anything that would enable him to testify as an expert on

---

1  crime in the penitentiary in general.

2        MR. BEACH:  That's what his job is to prosecute

3  crimes in the penitentiary.  He has been doing it for 19 and a

4  half years, that's why he is here.

5        MR. BRAUCHLE:  Well, actually rather than

6  prosecuting, he is an investigator for a prosecutor.

7        MR. BEACH:  They wouldn't be prosecuted without

8  him.

9        MR. BRAUCHLE:  Pardon me a second.

10       (Pause in the proceedings.)

11       MR. BRAUCHLE:  We would incorporate the previous

12  questions asked of Mr. Merriott and state that the State has

13  not proven that he is an expert in regard to the area that he

14  is going to be testifying about.

15       THE COURT:  Mr. Beach, response.

16       MR. BEACH:  I'm sorry, Judge, did he make an

17  objection?

18       MR. BRAUCHLE:  Yes.

19       THE COURT:  Mr. Brauchle, if you will repeat

20  your objection.

21       MR. BRAUCHLE:  Could the reporter read it back?

22       MR. BEACH:  Whatever he said is -- no.

23       I would just say, Judge, that obviously this witness has

24  been qualified as an expert in district courts throughout the

25  State of Texas in the last 20 years.  He qualified by virtue

1 of his education. You got his C.V. or you look at his C.V.,
2 he is imminently qualified to testify, I asked him specialized
3 knowledge and education and skills and he has acquired as an
4 investigator for the special prosecution unit in terms of
5 prison violence, classification systems, the opportunity to
6 commit violence in the Texas prison system.
7          THE COURT:  I will deny the objection and allow
8 the witness to testify as an expert witness.
9          THE BAILIFF:  All rise.
10          (Jury returned to the courtroom.)
11          THE COURT:  You may be seated.
12    You may proceed, Mr. Beach.
13          MR. BEACH:  Thank you, Judge.
14                 A.P. MERRILOTT
15 was called as a witness, and having been duly sworn by the
16 Court, testified under oath as follows:
17              DIRECT EXAMINATION
18 BY MR. BEACH:
19    Q.    Tell us your name, please.
20    A.    A.P. Merrilott.
21    Q.    And how are you employed, sir?
22    A.    I'm a criminal investigator with the special
23 prosecution unit out of Huntsville, Texas.
24    Q.    Is that Walker County?
25    A.    Yes, sir, it is.

1    Q.    And how long have you been employed with the special
2 prosecution unit?
3    A.    Nineteen years and a few months.
4    Q.    Just tell us what are your day-to-day duties as an
5 investigator for that unit?
6    A.    I'm a District Attorney's investigator.  I prepare
7 cases for grand jury presentation.  I make presentation to the
8 jury across the state for our office.  I do search warrants
9 and subpoenas and court orders for various us types of crimes.
10 I prepare the cases for trial.  And I sit in a trial with our
11 prosecutors and coordinate witnesses, work with evidence.  I
12 testify in the area of fingerprints and blood stains
13 interpretation when it is needed in our trials.  Pretty much
14 everything that the D.A.'s investigator does, like here in
15 Dallas County, I do statewide.
16    Q.    And was the original purpose of the special
17 prosecution unit to investigate and to prosecute violent
18 crimes within the Texas prison systems?
19    A.    Yes, sir.  We were formed in '84 before I got there
20 to prosecute for local D.A.s who had prisons in the
21 jurisdiction.  At the time it was a very small system and
22 there were only a few counties involved.  But they couldn't
23 handle the amount of crimes that were occurring in the
24 penitentiary on their dockets, so they Governor Mark White
25 formed our small unit of three prosecutors and two

151

152

1 investigators to take those prison crimes primarily and take
2 them from grand jury all the way through the appellate process
3 so the local D.A.s wouldn't have to do that.  And in the 24
4 years since, of course, the prison system has exploded.  And
5 our office grew a little bit but not a lot.  And we continue
6 that.  We work on a grant.  Every two years our grant comes
7 through.  So we work throughout the state in 60-plus counties.
8 I have lost track, over 60 counties, where D.A.s invite us in
9 to prosecute.  In other words, we have to be invited in, we
10 can't just go into a county and say we are here to take the
11 case.  We have to be invited in.  They swear in our
12 prosecutors as Assistant D.A.s.  And then people like me, we
13 act as D.A. investigators to get the case ready.
14    Q.    Mr. Merrilott, you investigate and prosecute
15 inmate-on-inmate crimes committed within the Texas prison
16 system; is that right?
17    A.    That's a part of what we do, yes, sir.
18    Q.    You prosecute violent crimes involving inmates on
19 staff; is that correct?
20    A.    Yes, we do.
21    Q.    You also prosecute crimes that are committed in the
22 free world that may originate with inmates incarcerated in the
23 Texas prison system?
24    A.    Yes, sir.  We prosecute conspiracies that begin
25 within the prison that are to be carried out in the free world

1 or vise versa, people in the free world conspiring to commit
2 crime in the penitentiary.  We prosecute those as well.  We
3 prosecute employees, visitors, nurses, nobody involved with
4 the prison system.
5    Q.    And you in this special prosecution unit also handle
6 crimes committed by -- I call it TDC, I'm old school -- but
7 Texas Department of Criminal Justice personnel?
8    A.    Yes, sir.  We prosecute wardens, all the way down,
9 employees, yes, sir.
10    Q.    Sometimes based on your 19 and a half years
11 experience, Mr. Merrilott, are the guards ever bit as bad as
12 the inmates that guard them?
13    A.    Yes, sir, they have.
14    Q.    Now, I will show you what has been marked for
15 identification as State's Exhibit 160, and is this a true and
16 accurate copy of your curriculum vitae that you provided in
17 this case?
18    A.    Yes, sir.
19          MR. BEACH:  At the time, Judge, we will offer
20 State's 160 into evidence.
21          MR. BRAUCHLE:  We have no objections for record
22 purposes.
23          MR. BEACH:  All purposes.
24          MR. BRAUCHLE:  But we would state that it is
25 improper to be admitted for all purposes.  In that he can ask

1   and answer those questions, but it is improper otherwise.

2          THE COURT:   I will overrule the objection.

3   State's 160 is admitted for all purposes.

4          MR. BEACH:   May I publish for the jury?

5          THE COURT:   You may.

6       Q.   (By Mr. Beach)   So they don't have to

7   look at your lengthy C.V. in detail right now,

8   Mr. Merriott, you have previous law enforcement

9   training, experience prior to becoming an

10  investigator for the special prosecution unit.

11      A.   Yes, sir.  I am a certified peace officer, I have

12  been for 35 year.  And I have been through numerous types of

13  training, everything that deals with law enforcement, criminal

14  investigations.  I spent most of my career as a criminal

15  investigator.  I have work sex crimes and homicides, all types

16  of personal violence.

17      Q.   Can you just give us a general idea of the categories

18  of crimes that you investigate and special prosecution unit

19  prosecute, sir?

20      A.   We investigate and prosecute murders, briberies,

21  arsons, extortion, sexual assaults, thefts, of course,

22  physical assaults between inmates and inmates on guards and

23  vice versa, escapes, facilitating escapes, introduction of

24  weapons in an institution, possession of weapons, possession

25  of drugs inside the penitentiary, bringing drugs in, just

1   about every crime you commit in the free world happens in the

2   penitentiary -- oh, it is primary felonies.  We don't

3   prosecute misdemeanors, no punishment we can give and inmate

4   for misdemeanor.  Now we will prosecute guards for

5   misdemeanors sometimes.

6       Q.   And have you been qualified to testify as an expert

7   witness in district court here in this state, first of all in

8   the area of the opportunities inmates have in the general

9   population to commit violent crimes while incarcerated in the

10  Texas prison system?

11      A.   Yes, sir, I have testified many times all over the

12  state in that area.

13      Q.   Have you testified as an expert witness based on your

14  19 and a half years as an investigator with the special

15  prosecution unit as to the Texas prison classification system

16  works?

17      A.   Yes, sir.

18      Q.   And how inmates are classified?

19      A.   Yes, sir.

20      Q.   And are you familiar also with the disciplinary

21  procedures here in the Texas prison system?

22      A.   Yes, sir, I am.

23      Q.   And finally have you from time to time been qualified

24  to testify as an expert witness in prison gang violence?

25      A.   Yes, I have.

1       Q.   Now, Mr. Merriott, you make your salary down there

2   as an investigator for the special prosecution unit; is that

3   right?

4       A.   Yes, sir.

5       Q.   Are you getting paid today for coming up here as an

6   expert witness to come up here and testify in this case?

7       A.   No, sir, I am not.

8       Q.   Are you a psychiatrist or psychologist?

9       A.   No, sir.

10      Q.   And you are not here to give an opinion as to whether

11  or not this defendant is going to be a continuing threat to

12  society; is that correct?

13      A.   No, sir, I never have done that and I never will do

14  that.

15      Q.   Not qualified in terms of education to do that; is

16  that correct?

17      A.   That's correct.

18      Q.   You are simply here to inform this jury based on your

19  experience as to the opportunities to commit violent crimes

20  and how inmates are classified and what that is going to mean,

21  again depending on how this jury answers these two questions

22  in the punishment phase of this trial?

23      A.   Yes, sir, I am here to inform you folks of that and

24  if it helps in your decision-making, that's what I am here

25  for.

1       Q.   Now, there are retired Texas Department of Criminal

2   Justice employees that have kind of made a living in terms of

3   testifying --

4          MR. BRAUCHLE:   Your Honor we would object to

5   this as being outside the record and improper.

6          THE COURT:   Overruled.

7       A.   Yes, sir, usually I rebut those witnesses.  I sit in

8   a courtroom in these kinds of cases and listen to them testify

9   and I know who they are and I know they make a lot of money

10  and I know what they say.

11      Q.   (By Mr. Beach)   And you are here today

12  in our case in chief because you are fixin to get

13  married here pretty quick

14      A.   Yes, sir.

15      Q.   And you basically told me that you got me until

16  Tuesday at noon if you don't get done with me by then I am

17  done?

18      A.   The sheriff will have to pick me up.

19      Q.   We will try to do our best to get you out of here

20  then.  How many prison units do we have here in Texas?

21      A.   I think we are approaching a hundred, I really don't

22  know the exact number.

23      Q.   And when you say the Texas prison population has

24  exploded, can you give me some idea in last 20 years what we

25  are talking about statistical?

157

1    A.   Yes, sir. When I came on in 1989 there were about
2  34,000 convicts inside the penitentiary. As of today, there
3  is about a hundred fifty-seven thousand.t, six hundred,
4  something like that. Over a hundred fifty-seven thousand.
5    Q.   And again you are familiar with the classification
6  system and how inmates are classified once they are convicted
7  of a crime, whether by a plea bargain agreement or by a jury
8  here in Texas; is that correct?
9    A.   Yes, sir, I am familiar with it, I have written about
10  it, I have lectured on it, I know it well.
11    Q.   When you say you have written about it, you have
12  written a book entitled "Future Danger for the Texas District
13  and County Attorney Association"; is that correct?
14    A.   Yes, sir, I have.
15    Q.   Tell us how that came about?
16    A.   Came about much like this testimony has. I was going
17  to trials and hearing Defense so-called experts testify
18  erroneously. I won't say they are lying, but they weren't
19  telling all the truths about what happens to prison inmates
20  who have been convicted of capital murder and spared the death
21  penality. They would say things like they are going to be
22  locked in a certain part of the prison system that only those
23  types --
24            MR. BRAUCHLE:   Your Honor, we would object to
25  this as being nonresponsive. The question is how did the book

158

1  come about, not what we have been led to believe he is not
2  going to testify to.
3            MR. PARKS:   Plus, Judge, we would object to any
4  ad hominem on people who have not yet testified, it is
5  improper.
6            THE COURT:   Any response, Mr. Beach?
7            MR. BEACH:   How many lawyers get to object to a
8  side, all three of them two of them or one? Just one lawyer,
9  one witness -- I will go on, Judge.
10            MR. BRAUCHLE:   We would object to sidebar.
11            MR. BEACH:   No, Judge, procedurally it is one
12  lawyer, one witness, I am just asking what the rules are going
13  to be. If Mr. Brooks --
14            MR. PARKS:   Your Honor, I will reframe from
15  making any further objections.
16            THE COURT:   If you will proceed, Mr. Beach.
17            MR. BRAUCHLE:   We would renew our objections to
18  sidebar.
19    Q.   (By Mr. Beach)  Now --
20            MR. BRAUCHLE:   Can we have a ruling?
21            THE COURT:   Overruled.
22    Q.   (By Mr. Beach)  Depending on how the
23  jury answers the two special issues in the second
24  phase of this trial, obviously, will determine where
25  Mr. Ruiz is housed within the Texas prison system;

159

1  is that correct
2    A.   Yes, sir.
3    Q.   If they answer the two questions in such a way that
4  Judge White sentences the defendant to life without parole,
5  are you familiar, Mr. Merrilott, as to how Mr. Ruiz will be
6  classified?
7    A.   Yes, sir.
8    Q.   And first of all, tell us for an inmate coming into
9  Texas prison sentence not sentenced to death, how the
10  classification system works?
11    A.   Yes, sir. The classification system briefly is the
12  way that prison inmates will spend their entire
13  incarcerations. It is according to how they are classified,
14  there are different levels of classification. And those
15  levels let the prison system how much so-called freedom that
16  inmate can have within the penitentiary. In other words,
17  where he can work, what areas of the prison he has access to,
18  where he can live, such as that, it is a very complicated
19  system. But inmate convicted of capital murder and given a
20  life sentence will go in the prison system and automatically
21  be classified as a level G-3, there is G-1, G-2, G-3, G-4,
22  G-5, so G-3 is a middle of the road classification that is
23  given to new inmates that have 50 years or more sentences. So
24  it doesn't mean capital murders with a life without parole
25  sentence, it can be any newly arrived inmate who has 50 year

160

1  or more sentence. You can have a burglar that has been found
2  as an individual with a life sentence, that's a 50 year or
3  more, so he is going to be as G-3 also. But you will have a
4  convicted capitol murderer doing life come in as a G-3. G-3
5  does not mean he has to be housed in a solitary sell. It
6  doesn't mean that he is a capital murderer, the guards won't
7  know that. The classification system is designed such that
8  that G-3, that middle of the road classification will keep him
9  from working outside the fences without supervision. It
10  can --
11    Q.   Let me stop you there before we get into the
12  date-to-day living conditions of someone classified. You are
13  talking about then the classification system G-1, through G-5;
14  is that correct?
15    A.   Yes, sir.
16    Q.   And if this defendant is sentenced to life without
17  parole, he is going to come in in the middle as a G-3; is that
18  correct?
19    A.   That's correct.
20    Q.   Okay. And the G-1 through G-5 that is going to
21  describe the five levels of that G classifications for inmates
22  that are placed into the general population?
23    A.   Yes, sir. It is called custody levels, and the G is
24  for general population; but it is the level of his custody.
25    Q.   Is there another level, a more restrictive level that

161

1  an inmate can be classified in to?
2     A.   Yes.
3     Q.   And what is that?
4     A.   It is ad seg, administrative segregation.
5     Q.   So we have ad seg over here, and that's going to be
6  more restrictive in term of an inmate's to commit violence,
7  day-to-day activities; is that correct?
8     A.   Right.  There are six levels of ad seg.
9     Q.   Are they denominated somehow?
10    A.   Yes, 1-A, 2-A, 3-A, all the way down to 6-A.
11    Q.   Okay.  And this is going to be -- G-1 is going to be
12 the least restrictive; is that correct?
13    A.   Yes.  That's the trustee.
14    Q.   That's the trustee, down to most restrictive down
15 here (indicating); is that correct?
16    A.   Most restrictive inside the general population, yes,
17 sir.
18    Q.   One-A is going to be down to 6-A.  One-A is going to
19 be the least restrictive?
20    A.   Yes, sir.
21    Q.   Down to the most; is that correct?
22    A.   Yes, sir.
23    Q.   All right.  So Mr. Ruiz, if he is sentenced to life
24 without parole will not automatically be placed into 1-A, 2-A,
25 3-A, 4-A, 5-A, 6-A; is that correct?

162

1     A.   That's correct.  He will automatically go to G-3 and
2  then he will be able to promote out of G-3 to a better
3  classification or demote down to even ad seg depending on his
4  behavior.  Now, with the 50-year -- with the life without
5  parole, he will have to stay at G-3 for ten years before he
6  can be considered for that promotion; but he is still living
7  in that general population.
8     Q.   Let's talk about what a G-3 50-year plus inmate is
9  going to be looking at in terms of his day-to-day existence in
10 the Texas prison system?
11    A.   Yes, sir.
12    Q.   I think you mentioned this, do they wear distinctive
13 clothing saying I am a capital murderer?
14    A.   No, sir.
15    Q.   A guard don't know if a defendant is down there for
16 capital murder or habitual burglary?
17    A.   That's right.  A guard working sell block, unless a
18 defendant tells him, won't no.
19    Q.   A G-3 inmates, whether it is a capital murderer or
20 burglar, they live with other inmates; is that correct?
21    A.   That's correct.
22    Q.   And is a G-3 50-plus guy, someone has a 50-year
23 sentence or greater, what happens with Mr. Ruiz are they
24 necessarily housed with other G-3 50-plus inmates?
25    A.   No, they are not.

163

1     Q.   Tell us about.
2     A.   It depends on the availability of beds and where he
3  ends up whatever unit he ends up at.  Nobody knows what unit
4  he would be at.  He could be housed with a forejuror, a
5  burglar, a hi-jacker, a child molester.  It is just a -- the
6  G-3 simply tells them not to let out him outside the prison
7  unsupervised and it restricts some of his movement around the
8  prison where he is at.  It doesn't mean that he is a capital
9  murderer.
10    Q.   If Mr. Ruiz is sentenced to life without parole, will
11 he be able to recreate with other inmates.
12    A.   Yes, sir.
13    Q.   Tell us about.
14    A.   As a G-3, living in general population, general being
15 the key word there, he can come and go from his sell without
16 supervision.  He is not going to be handcuffed shackled or
17 brought out by guards.  They will have doors open and he can
18 come and go from his sell.  He can go to work if he chooses.
19 Have some kind of job within the penitentiary.  As a matter of
20 fact according to the classification plan as a G-3 or worse
21 inmate, he will start off in the field force, which is working
22 out in the yards, hoeing, weeding, chopping cotton, something
23 like that.  If he has special kills, they will give him a
24 better job if he can type or something like that.  But he can
25 if he chooses to work.  He can have access to vocational

164

1  programs, if the warden allows it.  He can go to visitation.
2  He can have contact visits.  He can go to church.  He can go
3  to the library.  He can go to medical, all of these things,
4  chow, eating.  He can go to and from without escort or without
5  handcuffs anything like that.  He is just another inmate in
6  that general population, going through his daily routine.
7     Q.   The guards, the duty guards, are they armed, do they
8  have weapons?
9     A.   No, sir.  Some of them carry pepper spray.  But they
10 don't even carry riot baton unless they are working in ad seg,
11 some of them will; but there are no offensive weapons inside
12 the penitentiary.
13    Q.   Let's talk more about the work opportunities, the job
14 opportunities available to a G-3 classified inmate.  You
15 talked about going out in the yard and working, is that just
16 hoeing weeds and whatever?
17    A.   Yes, sir.
18    Q.   A G-3 capital murderer, doing life without parole,
19 can they be allowed to go outside the walls and work?
20    A.   Only if they are under direct armed supervision.
21    Q.   Okay.  So --
22    A.   Did you say outside the walls?
23    Q.   Yes.
24    A.   Yes, in that case.  He can work outside the building.
25         MR. BRAUCHLE:   What was the answer?

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

165

1      MR. BEACH:  He can go outside the building,
2  right?
3      A.   He cannot work outside the walls unless he is under
4  direct arms supervision.
5      Q.  (By Mr. Beach)   He can do it if he is
6  under direct arms supervision?
7      A.   Yes, sir.
8      Q.   And give us an example of working outside the walls,
9  what do they do?
10     A.   It would be doing some kind of landscape type work,
11  picking up trash or chopping weeds down -- you understand the
12  prison units are on huge acreage.  So outside the wall,
13  doesn't mean he is downtown.  It means out surrounding areas
14  around his prison unit.
15     Q.   Okay.  The G-3 50-plus inmates, are they allowed to
16  work in the kitchen area?
17     A.   Yes, sir.
18     Q.   And what kind of job would they be doing in the
19  kitchen area?
20     A.   They could be bakers or cooks or dishwashers,
21  servers.
22     Q.   And do they have access to knives?
23     A.   Yes, sir.
24     Q.   Are they allowed to work as orderlies?
25     A.   Yes, they can.

166

1      Q.   And tell us about that.
2      A.   They can work what is called SSI, means state support
3  inmates or support services inmates.  And that's a guy who
4  mops or sweeps the sell block floors, does general
5  housekeeping for lack of a better word around the sell block.
6  Not necessarily in his own sell block, usually the orderly
7  will be assigned to a different sell block so he is not
8  familiar with the people he is working around.  So he could be
9  living in one building and working in another building or in
10  the offices of the administration.
11     Q.   And based on your 19 and a half years experience as
12  an investigator with the special prosecution unit, has G-3,
13  50-plus year sentence inmates, as well as G-3 inmates in
14  general have they been found to be in possession of a homemade
15  weapon?
16     A.   Yes, sir.
17     Q.   What is a shank?
18     A.   It is a homemade stabbing device.
19     Q.   I guess you have seen shanks fashioned out of
20  incredibly ingenious; is that correct?
21     A.   Yes, sir.
22     Q.   And can you give us some examples.
23     MR. BRAUCHLE:  Your Honor, we would object to
24  this as being outside the scope of this presentation.
25     THE COURT:  Any response, Mr. Beach?

167

1      MR. BEACH:  I will go on, Judge.
2      Q.  (By Mr. Beach)  Have G-3 inmates been prosecuted for
3  using these homemade weapons to assault other inmates?
4      A.   Yes, sir.
5      Q.   Have these G-3 inmates been prosecuted for using
6  these homemade weapons to assault staff?
7      A.   Yes, sir.
8      Q.   Is it fair to say, Mr. Merrilott, that G-3 inmates
9  used to be violent, will have the opportunity to commit
10  violent crimes in the Texas prison system?
11     A.   There will be numerous opportunities, yes, sir.
12     Q.   And the converse is also true, if they have the
13  opportunity to be peaceful, or if they choose to make that
14  choice, they have the opportunity to be peaceful; is that
15  right?
16     A.   Absolutely.  I know capital murderers who are good
17  inmates and I know burglars who are good inmates.
18     Q.   Victims include inmates, guards, staff, and visitors;
19  is that correct, is based on your experience?
20     A.   There are many sometimes of victims, medical staffs,
21  teachers, guards.
22     MR. BRAUCHLE:  Your Honor, we would object to
23  this as being outside the scope.
24     MR. BEACH:  General information, I am not going
25  into specific crimes committed by a specific inmate, just

168

1  general categories.
2      MR. BRAUCHLE:  He is still pretty far field from
3  what he is being presented for.
4      THE COURT:  I will overrule the objection.  I
5  will allow him to testify to general information.
6      A.   The point is, there are many potential victims other
7  than guards.  We all think of guards being hurt, but there are
8  many potential victims inside the prison system.  On any given
9  day there are venders that come in and service the Coke
10  machines, for example, they have been victimized.  There is
11  me.  There are a lot of potential people that can be harmed or
12  victimized inside the prison.
13     Q.  (By Mr. Beach)  In response to the
14  Defense subpoena, and you received a subpoena from
15  Mr. Ruiz's defense team; is that correct?
16     A.   Yes, sir, I did, a couple of months ago.
17     Q.   And did they ask you to produce statistics in terms
18  of how many cases the special prosecution unit -- felony cases
19  special prosecution unit prosecuted in the last five year?
20     A.   Yes, sir, they asked for that, yes, sir.
21     Q.   And were you able to access that data base and
22  produce that information?
23     A.   Yes, sir.  As a matter of fact it is a brand new data
24  base, and I am the first one to ask for that information.  It
25  was 3800 plus.