169

1    Q.   Felony cases prosecuted by your last unit in the last
2  five years.
3    A.   Four and a half, because I had to -- I went June the
4  25th is when I pulled it.  So from June 25th on, I don't
5  know.
6    Q.   Did you also pull the number of cases that sharp
7  objects had been possession of sharp objects had been
8  prosecuted by your unit?
9    A.   Yes, sir, for the time period, 600 about 18 or so.
10  And that's only the prosecution, that is not the total number
11  of incidents.
12    Q.   Total murders committed since 1984 prosecuted by your
13  unit, your call?
14    A.   The total homicide since 1984, even the ones we have
15  not prosecuted, there have been a hundred fifty-three murders
16  since 19 --
17          MR. BRAUCHLE:   Your Honor, we would object to
18  this as being improper.
19          THE COURT:   Overruled.
20    Q.  (By Mr. Beach)   A hundred fifty-three
21  murders committed, and is that going to be in the
22  general population, ad seg and even on death row
23    A.   That has happened from death row, high security ad
24  seg, to the chapel, chow hall, virtually everywhere within the
25  penitentiary we have had murders.

170

1    Q.   Recently Mr. Merrilott, the law has changed here in
2  Texas to where if one is convicted of capital murder by a jury
3  and sentenced to life, that defendant no longer has the option
4  of parole; is that correct?
5    A.   That's correct.
6    Q.   So Mr. Ruiz is sentenced to life in this case based
7  on the answers to the two special issues, he has no
8  possibility or potential for parole?
9    A.   That's correct.
10    Q.   Unless the laws change sometime in the future?
11    A.   Right.
12          MR. BRAUCHLE:   Your Honor, we would object to
13  that as being improper.  There is no evidence that the law is
14  ever going to change and for him to imply that it may at some
15  point in time is incorrect.
16          THE COURT:   I will overrule that objection.
17          MR. BRAUCHLE:   May we have a running objection
18  to that?
19          THE COURT:   You may.
20          MR. BRAUCHLE:   To sit here and make these jurors
21  think that somehow something is going to change in what they
22  are sentencing him to --
23          MR. BEACH:   That's why I said unless, Judge,
24  unless.  I am not saying it is going to happen.  I said
25  unless.

171

1          MR. BRAUCHLE:   Well, this is making the matter
2  worse, he is saying that maybe it will happen and everybody in
3  this room has to work on the premise that nothing is ever
4  going to change about what we are told them in voir dire and
5  what the law says now.  So to imply that is it somehow, some
6  way this is just a wink-and-a-nod process down here, is
7  certainly improper.
8          THE COURT:   Overrule your objection,
9  Mr. Brauchle.
10    Q.  (By Mr. Beach)   That's the law right
11  now; is that correct?
12    A.   That's correct.
13          MR. BRAUCHLE:   Once again, Your Honor, we would
14  object to him going back to it by saying "That's the law right
15  now," once again imply that somehow there is something in the
16  works that will change what we all know is for the going to.
17          THE COURT:   Overruled.
18    Q.  (By Mr. Beach)   Parole serves many
19  purposes; is that correct?
20          MR. BRAUCHLE:   We would object to talking about
21  to parole because it is not available in this case.
22          MR. BEACH:   That's what I am getting to, Judge.
23    Q.  (By Mr. Beach)   What purpose does
24  parole serve?
25          MR. BRAUCHLE:   Your Honor, once again we would

172

1  object to this.  It is not a factor in a case that's life
2  without parole.
3          THE COURT:   May I see the attorneys.
4          (Following proceedings had at Bench Conference.)
5          THE COURT:   I presume you are going to tie
6  parole up?
7          MR. BEACH:   Parole is for good behavior and the
8  defendant will not have access to that.  That's all I am going
9  into it.
10          MR. BRAUCHLE:   That's not the only incentive for
11  good behavior.
12          MR. BEACH:   It is an accurate statement.
13          THE COURT:   I will overrule the objection.
14          (End of Bench Conference.)
15          THE COURT:   Overruled.
16    You may proceed, Mr. Beach.
17    Q.  (By Mr. Beach)   The availability of
18  parole for most of the general population inmates,
19  that help to maintain order and security?
20    A.   Yes, sir, it gives an inmate a reason to behave.
21    Q.   And a capital murder life without parole, obviously
22  parole is unavailable, does he have that incentive?
23    A.   That incentive is not there for him.  I don't know
24  what it would take, the incentive is not there.
25    Q.   We have talked a lot about, Mr. Merrilott, we will

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

173

1  get to the end of it here, about the G-1 through G-5 and what
2  would happen to Mr. Ruiz was sentenced to life without parole.
3  Now I want to tell the jury based on your experience what will
4  happen if he is sentenced to death based on your answer to
5  those two questions?
6      A.    He will of course go to death row.  Death row is at
7  the Polunsky Unit in Livingston.  And death row used to be the
8  ad seg or administrative segregation wing of that unit, so
9  death row is administrative segregation.  Death row is the
10  most secure housing they have in the Texas prison system.  We
11  have a lot of crimes happening at death row, but at this time
12  it is most secure, the most restrictive environment for a
13  prison inmate we have at the time.  Death row inmate is single
14  sell, it is ad seg, they are single sell.  They eat in their
15  sell, they recreate at lone.  If they happen to be at
16  recreation when it is time to eat, they will eat there the
17  small rec yard that are in.  They can't work.  They don't --
18  they can't be out on the sell block with another death row
19  inmate.  They are not supposed to mingle in other words, it is
20  supposed to be one person out of a sell at a time.  One person
21  in his sell.  That makes sense?
22      Q.    Much more restrictive -- much more restrictive
23  environment, ad seg death row than a G-3 life without parole?
24      A.    Yes, sir.  As a matter of fact, they would fall into
25  that 1-A through 6-A category, they wouldn't be in the G

174

1  category, because they are ad seg.
2      Q.    When an inmate in ad seg, let's say down to the 6-A,
3  to most restrictive category is transferred, based on your
4  experience, how does that simple process, how does that take
5  place?
6      A.    When an ad seg inmate is transferred?
7      Q.    Yes, sir.
8      A.    He is probably not going to be transferred while he
9  is ad seg, unless something comes up they need his bed and
10  there is another bed available in another part of the state
11  for him to go to.  So if he -- unless you mean transfer, walks
12  around --
13      Q.    Just move from the sell, down the hall?
14      A.    Okay.  If he leaves his sell, he has to come out with
15  handcuffs on.  He puts his arms through the slot in the sell
16  door where they put the tray of food, it is called bean slot.
17  He puts his arms through there and he is handcuffed, so he
18  doesn't -- the door doesn't have to be opened for him to be
19  opened in other words.  So he is handcuffed, the door is open,
20  he comes out.  He is supposed to come out with a guard on each
21  side of him with his handcuffs on, and the way the staffing
22  shortage is now, there is a lot of times there is only one
23  guard on an inmate like that.  But he will come out.  All the
24  other inmates have to be within their sells or lock up in some
25  place before that inmate can come out.  In other words, there

175

1  can't be two inmates out in that area in the same time.  If an
2  inmate comes out of that sell, there is a restriction on who
3  can even be if that area, I am talking about ad seg right now,
4  those are the worst inmates we have.  So -- am I addressing
5  what you were asking.
6      Q.    Perfect.  Last area, are there prison gangs?
7      A.    Yes, sir.
8      Q.    And are there prison gangs that have issues with
9  other prison gangs?
10      A.    Yes, as far as enemies, yes, sir, they are enemies of
11  each other.
12      Q.    If you are a documented gang member coming into the
13  Texas prison system, are you automatically classified into one
14  of the ad seg levels.
15      A.    No, sir.  There is only a very limited number of
16  prison gangs that are put into ad seg.  Because there are so
17  many gang members in the prison system, they have identified a
18  select few very particular violent gangs, Texas Syndicate,
19  Mexican Mafia, Arian Brotherhood, such as that, who will, if
20  they are confirmed, they will automatically go to ad seg.
21  However, they still have a chance to go into the most
22  restrictive ad seg or the least restrictive based upon their
23  behavior.
24      Q.    Are you familiar with a prison gang named Tango
25  Blast?

176

1      A.    I know it is a gang, not necessarily a prison gang
2  but I know it ass gang or click, yes, sir.
3      Q.    And they have members housed within the Texas prison
4  system?
5      A.    Yes, sir, we have prosecuted members of that gang.
6              MR. BEACH:  I pass the witness.
7              THE COURT:  Cross-examination.
8                      CROSS-EXAMINATION
9  BY MR. BRAUCHLE:
10      Q.    Mr. Merrilott, while we are on it, do you know what
11  Tango Blast stands for?
12      A.    No, sir.
13      Q.    You have no idea?
14      A.    No, sir.
15      Q.    Now, you stated that Tango Blast isn't a unit --
16  isn't a group that are put in ad seg, right?
17      A.    They are not a security threat group, no, sir.
18      Q.    And in regard to security threat groups, those are
19  people that time and experience have shown that no matter
20  their age, their classification or whatever, that they are
21  going to be a security threat to the prison unit; is that
22  correct?
23      A.    That's a fair statement, yes, sir.
24      Q.    So if you come in and you are a member of the Arian
25  Brotherhood, it doesn't matter what you are there for, you are

177

```
1    going to go to ad seg, right?
2        A.    That's right.
3        Q.    If you come in and you are a member of the Mexican
4    Mafia, it doesn't matter whether you are in there for forgery
5    or murder, you are going to go to ad seg no matter what?
6        A.    That's correct.
7        Q.    And I think there are six gang units that are
8    basically classified that way, right?
9        A.    I thought there was eight.
10       Q.    Okay.  So they have added two more.
11       A.    Well, it has been eight for several years.
12       Q.    Okay.  But those are -- you know the names of them?
13       A.    I used to.
14       Q.    Well, are the Cripts and Bloods two of them?
15       A.    Not the Bloods, but the Cripts.
16       Q.    All right.  And Mexican Mafia, is that one?
17       A.    Yes.
18       Q.    La Raza.
19       A.    Raza Unida, yes.
20       Q.    And what other Hispanic gang?
21       A.    Texas Syndicate, Hermono Pistolara Latino, HPL.
22       Q.    So that's four Hispanics?
23       A.    Yes, sir.
24       Q.    We have got the Cripts, which makes five?
25       A.    Yes, sir.  Arian Circle.
```

178

```
1        Q.    That's a white gang?
2        A.    Sir?
3        Q.    That's a white gang?
4        A.    Yes, sir.
5        Q.    And we have got the Arian Brotherhood?
6        A.    Yes, sir.  I thought we had said that, but Arian
7    Brotherhood is one of those.  The white Knights, which is a
8    white gang.
9        Q.    So that's the eight?
10       A.    Sir?
11       Q.    That's the eight?
12       A.    I lost track, it could be.
13       Q.    So -- and those are called disruptive forces or
14   disruptive organizations, right?
15       A.    Those are called security threat groups.  The
16   disruptive groups are the other gangs like Tango Blast or the
17   Mcheclave, such as that, who are not automatically ad seg,
18   those are disruptive.
19       Q.    Now being a member of Tango Blast doesn't mean that
20   you are going to be disruptive, does it?
21       A.    It doesn't.
22       Q.    Because people are classified on an individual basis,
23   right?
24       A.    That's correct.
25       Q.    The members of the eight groups that we talked about
```

179

```
1    at first, it doesn't matter if they are first-time offenders
2    or not, they are going to straight to administrative
3    segregation, right?
4        A.    Right.  They have to be confirmed, it cannot be
5    suspected only.
6        Q.    Let me ask you, have you ever worked as a prison
7    employee?
8        A.    I was attached to the prison Internal Affairs
9    division, but didn't get paid by them, I was still being paid
10   by my office; but I worked at Internal Affairs for about a
11   year.
12       Q.    But as far as being an employee as such as a guard or
13   anything like that, you have never been --
14       A.    No, sir, I have never been a prison guard, no, sir.
15       Q.    Now, then, have you ever worked in any way with the
16   classification committee at the prison?
17       A.    Other than advising with them or consulting with
18   them, I haven't worked as employee with the classification
19   system.
20       Q.    They don't rely on you to classify prisoners, do
21   they?
22       A.    That's right.
23       Q.    Mr. Merrilott, let me ask you this, are you telling
24   this jury that no matter what the offense that someone is
25   convicted of, or what their prior criminal history is, they
```

180

```
1    are going to come in as a G-3 prisoner?
2        A.    No, sir.  I am saying if they are convicted of
3    50-year or more sentence including life without parole, they
4    are going to come in as a G-3.
5        Q.    Anybody that is found guilty of capital murder and
6    sentenced to life without parole is going to be a G-3 and
7    never anything lower than that?
8        A.    No, sir, that is not even what I said a while ago.
9    He is going to come in as a G-3, yes, he is.  He will have an
10   opportunity to promote above that to a lesser classification
11   or downgraded based upon his behavior.  The promotion won't
12   occur for ten years at least.  The demotion can occur at any
13   time, depends on his behavior.
14       Q.    Well, let me ask you the same question for the third
15   time, you are telling these people that if somebody comes in
16   and has been there four or five times previously, is convicted
17   of capital murder, and has bad conduct in the county that he
18   came from or in prison before, is that guy automatically going
19   to be a G-3 no matter what?
20       A.    He is going to be to the perception process as a G-3.
21   Now they can do investigations after he gets there and
22   classify him differently, but that's where he is going to
23   start.
24       Q.    Okay, let's just back up.  Everybody starts out as a
25   convict and everybody starts out as a G-3, but after the
```

181

1  classification process, there is no guarantee that he is going
2  to be anywhere close to G-3, is there?
3      A.   I don't even understand what you are asking me.
4      Q.   Okay.  You are telling this jury that you come down
5  there charged with capital murder and the classification
6  committee doesn't look into the facts of the crime itself,
7  they do, don't they?
8      A.   Oh, they do, they look at his criminal history, they
9  look at the offense for which he has been convicted.  However,
10  the decision of classification -- the decisions that are made
11  upon that upon looking at his criminal history, the
12  heinousness of his crime will affect where he is housed.  In
13  other words, what type of building he can be housed in.  It
14  doesn't mean that he is going to go to ad seg or he is going
15  to be a G-5 or anything like that, they look at the total
16  circumstance around his convictions and even some of his
17  previous behavior.  In other words, if he is an escape risk or
18  if he has a history of assaulting guards if he had another
19  trip to the prison previously, they will look at that.  But
20  the decision is made by looking at that are the unit and the
21  sell block that he is housed at.
22      Q.   Let's go to that.  As you know, there is an inter
23  fence in each unit, is there not?
24      A.   There is a what now?
25      Q.   There is an inter fence inside the stationary

182

1  buildings in every unit; is that correct?
2      A.   No, sir, that is not correct.
3      Q.   Okay.  Where are people that are not work eligible
4  kept?
5      A.   The people who are not work eligible are in ad seg.
6  The people who refuse to work aren't necessarily in ad seg,
7  they can be in general population.  The buildings are set up
8  that the better inmate that you are, determines which building
9  you live in inside a prison unit.  In other words, when I am
10  investigating a crime and talking to an inmate, if he says I
11  live in seven building I know he is a bad inmate.  Because
12  seven building is the beginning of were bad inmates live.
13  Eight buildings is worse, then ad seg.  If he say I live in
14  three building, I know he is a good prisoner with a pretty
15  good disciplinarian record.  So there can be non-work eligible
16  inmates live in three building because there is some
17  restriction on their work.  They may have one leg or no legs
18  or hepatitis or something they can't go to work.  So work
19  eligible is kind of a misnomer.  That used to apply to death
20  row, work eligible, so I am not trying to evasive, that's what
21  I know as work eligible.
22      Q.   Well, let's back up, if you are charged with and
23  convicted of murder, you can never live in certain parts of
24  any prison, right?
25      A.   If you charged with and convicted of murder, you can

183

1  live in any part of the prison unit within a maximum facility.
2      Q.   Okay.  Now, how are the maximum facilities
3  differentiate from the rest of the prison?
4      A.   A maximum facility is what we call a 2500 man unit.
5  That means they started off being capable of housing 2500 men,
6  women.  Now they house about 3200, but they are called 2500.
7  The maximum units have a perimeter fence.  I don't think that
8  what you meant a little while ago, but they also have a little
9  gap called dead-man land.  And there is another fence, so
10  there are two fences.  One of them is not inside the unit.
11  There is an outer fence, a small gap, and then the middle
12  fence and then the warden offices, and then wings, buildings.
13  As I said three building, four, five, six, seven, eight.  And
14  the type of inmate that is at that unit determines what
15  building he lives in, that is totally confusing.
16      Q.   Now, is there an inside perimeter fence inside the
17  prison itself?
18      A.   No, sir.  I wish I knew what you were talking about.
19  There are places where there are chain links put up from the
20  ground to the ceiling.  But they are not fences, some of them
21  are just barriers.  But inside the prison unit, inside that
22  second fence I just told you about, there is not another
23  fenced in compound.  Now ad seg has its own little fences for
24  recreation.  But I think I explained that earlier where a guy
25  recreates by himself.  So he is fenced in so nobody else can

184

1  get to them.
2      Q.   You are saying that all of the buildings have equal
3  access to each other, being?
4      A.   To each other, no, sir --
5      Q.   Building side by side, there is no restriction to
6  keep prisoners from going from one building to the other
7  building?
8      A.   Yes, there are restrictions.  There are gates, and
9  there are guards, hopefully there are guards at each of those
10  gates; but the fences are a misrepresentation of what that is.
11  There are gates that separate different buildings from common
12  areas.
13      Q.   Your answer was there are fences?
14      A.   I call them gates.  I think fences is misrepresenting
15  that.
16      Q.   How would that misrepresent something?
17      A.   When I think of a fence, I think of say chain link
18  with barb wire, constantine wire on top of it surrounding an
19  area, that is not what is inside the central area of the
20  prison unit.  There are gates that are chain linked and locked
21  that keep an inmate from going from four building to seven
22  building or an inmate living on "A" side of the prison going
23  to "B". side of the prison.  If y'all want to call that a
24  fence, it is a fence; but it is not, it is a gate.
25      Q.   In any event inmates can't go from one building to

1    another without --

2         A.    They are not supposed to, they are do it all the

3    time.

4         Q.    You are certain of that?

5         A.    I know that to be a fact, yes, sir.

6         Q.    Now, you are saying that somebody that would come

7    into prison convicted of capital murder is going to end up in

8    the same sell as a burglar?

9         A.    He could.  There is no guarantee which sell he is

10   going to end up in, but he could.

11        Q.    How would that happen?

12        A.    Depends on, he needs a bed and there is an available

13   bed in that sell block.  Under that classification, G-3, he

14   could go right into that sell.

15        Q.    Well, I think you are trying to dumb down the

16   classification board in that they are going to be classifying

17   capital murderers as G-3.  Can you ever conceive of a capital

18   murderer that would be so innoxious that the classification

19   board would classify a capital murderer --

20             MR. BEACH:   I would object to the dumb down

21   portion of whatever that was, statement.

22             THE COURT:   Overruled.

23        A.    Can I answer that?

24             THE COURT:   Yes, you can answer.

25        A.    Yes, sir.  I am not dumbing down anything.  As a

---

1    matter of fact I have the classification plan with me in this

2    courtroom and it will show in black and white --

3             MR. BRAUCHLE:   Your Honor, we would object to

4    him testifying --

5         A.    You asked me if I was somehow dumbing down the

6    system, no, I am not.  I am telling you what the system is.  I

7    am telling you the truth.

8             MR. BRAUCHLE:   Your Honor, we would object to

9    this as being argumentative.

10             THE COURT:   Overruled.

11        A.    The classification system is exactly what I said it

12   was.  And if it is not, they can bring in a person that works

13   there and tell you differently.

14        Q.    (By Mr. Brauchle)    You know how many

15   years S.O. Wood worked in classification?

16        A.    I sure do.  I sure do.

17        Q.    About how many?

18        A.    Twenty-six.

19        Q.    Now, then you are telling the jury once again that

20   somebody -- I guess your testimony is that classification and

21   restriction of prisoners is just entirely random due to the

22   way that these people can be classified in a G-3 position?

23        A.    It's not random, if a man has a 50-year or more

24   sentence, he is going to be classified as G-3, that is not

25   random.  That is set in stone, and there are reasons for that,

---

1    so that is not random.

2         Q.    What does a G-3 restrict somebody to?

3         A.    What does it what?

4         Q.    What does it restrict somebody to?

5         A.    Like I said, it keeps you from working outside the

6    fences unless you are under direct or supervision.  You

7    cannot -- well, you can't be what they call a maintenance man

8    with free roam of the prison system if you are a G-3 if you

9    are convicted of a capital murder or an escape risk.  You can

10   still be a maintenance man if you are a G-3 it says you have

11   to live at a maximum unit, but you can still live in general

12   population.  The G-3, the G system is a fairly new system.

13        Q.    You have any statistics to show how many rules,

14   violations are caused by G-3 prisoners?

15        A.    No, sir.

16        Q.    You spoke about parole being an incentive; is that

17   the only incentive in prison?

18        A.    No, sir.  As a matter of fact, being able to work in

19   a craft shop and make wallets or paint or do things like that

20   is an incentive.  Not all inmates can do that you have to earn

21   those privileges, and they can be taken away if you mess up.

22   Also the opportunities to visit with loved ones is an

23   incentive as well, they can take that from you temporarily.

24   To go to the commissary to purchase things, snacks, things

25   that they can't get without commissary privileges, that is an

---

1    incentive that can be taken away.  Good time is an incentive.

2    Phone calls are fixing to happen, we have all read about in

3    the paper.  They are fixing to give phone call opportunities

4    to prison inmates.  That's an incentive as well.

5         Q.    There is other incentives also, are there not?

6         A.    I am sure there are.  I can't think of them right

7    now, I probably will as we go along.

8         Q.    Job classification would be one?

9         A.    The type of jobs.  The inmates don't work to work out

10   in those fields hoeing weeds, they would rather work inside,

11   that's an incentive.

12        Q.    And all those things are used to motivate behavior

13   inside prison; is that correct?

14        A.    Yes, sir.

15        Q.    So the lack of not having parole, doesn't mean that

16   you are not going to follow the rules, does it?

17        A.    No, it doesn't mean that.

18        Q.    You talk about SSI inmates, what are those again?

19        A.    Those are the orderlies that we talk about sweep

20   the floor, mop the floor, empty trash, such as that.

21        Q.    An inmate convicted of capital murder and life

22   without parole, would never make that?

23        A.    Yes, sir, he can be that.

24        Q.    Pardon?

25        A.    He can.  I didn't say trustee, I said orderly, he can

189

1    be an orderly.
2        Q.    How would that ever come about?
3        A.    The decision of whoever gives out the jobs, there is
4    no restriction from it in the classification plan.
5        Q.    You have any figures on how many vendors were tacked
6    last year?
7        A.    Vendors or offenders.
8        Q.    Vendors?
9        A.    Yes, I know a female vendor.
10       Q.    No, I asked you how many?
11       A.    I know one last year.
12       Q.    How many visitors?
13       A.    I know one particular case a few years ago.
14       Q.    I just asked for last year?
15       A.    Oh, I don't know of any last year.
16       Q.    How about people on field trips?
17       A.    I don't know of any last year.
18       Q.    How about investigators?
19       A.    Don't know of any last year.
20           MR. BRAUCHLE:    We will pass the witness.
21                    REDIRECT EXAMINATION
22    BY MR. BEACH:
23       Q.    Mr. Merrilott, you do know one thing about Wesley
24    Ruiz, and that's he has been convicted by this jury of the
25    capital murder of Mark Nix, a Dallas Police Officer; is that

190

1    correct?
2        A.    Yes, sir, I know that.
3        Q.    In the Texas prison system, hierarchy or cast system,
4    where does a cop killer fit in coming into the penitentiary?
5        A.    The inmates call guards cops, they call them the law,
6    the call the pol-lice, although they are not police officers
7    of course.  So the inmates have a hatred.
8            MR. BRAUCHLE:    Your Honor, we will object to
9    this unless there can be some individualized relevance to our
10    client.
11           THE COURT:    Overruled.
12       A.    The inmates have a particular hatred for their
13    keepers, the guards, who are preventing them from doing bad
14    things.  They associate that with law enforcement.  So for an
15    inmate to come to the penitentiary with the history of doing
16    bad things to particularly a police officer, the reputation
17    will proceed him.  I am sure it is going to be in the paper
18    and on TV, which they have access to.  He will be looked upon
19    as, I hate to use the word as a good convict in their eyes, I
20    hope y'all understand what I am saying, not in my eyes; but he
21    will have this certain perverted respect by the other inmates
22    for what he has done.
23           MR. BEACH:    I will pass the witness.
24
25           (No omissions.)

191

1                    CROSS-EXAMINATION
2    BY MR. BRAUCHLE:
3        Q.    I thought you said nobody knew what inmates was
4    charged with?
5        A.    That's exactly right.  If they can see it on the TV
6    or if he decides to tell them.  Because like I just said, he
7    is going to be somebody among other inmates, so why not go
8    tell them what he is there for, or if he go to death row.
9        Q.    Is there any correlation between that and being a
10    future danger?
11       A.    I have an opinion about that.
12       Q.    That wasn't what I asked you, was it.
13       A.    Yes, there is a correlation.
14       Q.    Do you have any statistics that would show that?
15       A.    No, sir.
16       Q.    What size is an ad seg sell?
17       A.    It's about four by eight, I think, I am not sure, it
18    is about four by eight, it could be six by eight.
19       Q.    All the fixtures are built into it; is that correct?
20       A.    In the newer ones, they have fixtures built in.  In
21    the older ad seg, they do not, in other words, they have to go
22    outside to go to the bathroom to a bathroom down the hall.  In
23    some of the newer units, they have everything self-contained
24    inside that sell.
25       Q.    Going out to the bathroom down the hall would be

192

1    handcuffed with a guard?
2        A.    Yeah.  And bathroom by that I mean shower, take a
3    shower, take a bath, they have to be handcuffed, escorted,
4    yes.
5        Q.    What is contained inside an ad seg sell?
6        A.    What is what?
7        Q.    Contained inside this sell, what things are built in?
8        A.    In generally speaking, there is a stainless steel
9    toilet.  It is stainless steel.  There is toilet, and on top
10    of the toilet there is a bowl like a sink with a little spigot
11    where you can push and get water out.  There is shelf built
12    into the wall called writing shelf.  But it is nothing more
13    than a writing shelf.  And then a round metal stool below the
14    shelf where you can sit and write, draw, whatever.  And then
15    there is a bunk.  Under the bunk there are two drawers -- not
16    drawers, but shelf -- shelf doors.  You open the doors and put
17    your stuff inside those, that's about it.
18       Q.    Any air conditioning?
19       A.    No, sir.
20       Q.    Where are the TV that you mentioned located?
21       A.    In generally speaking they are in the day rooms which
22    is the common room where the inmates congregate and play
23    dominoes and visit, such as that.  In ad seg they don't
24    congregate, but they do have day rooms and TVs are mounted up
25    on the wall.  It is not convenient, but you can look from your

193

```
1    sell at the TV.
2        Q.   If ad seg prisoners aren't allowed to go outside
3    their sells except to recreate, how would they utilize the day
4    room?
5        A.   That's right, they go outside their sells to recreate
6    in the day room by themselves.
7        Q.   The areas that they recreate, though, generally has a
8    basketball goal or a handball wall, right?
9        A.   That's in the exterior recreation area.  There is an
10   interior recreation that has a chin bar or mat on the floor so
11   they can do exercises, that's about it.  It is very meager in
12   there.
13       Q.   Now, how big is a regular prison sell?
14       A.   I am not sure, it is not much bigger, if it is even
15   bigger than an ad seg sell, the difference being two inmates.
16       Q.   The difference being that there are two in one of
17   those sells?
18       A.   In a general population sell, yes, sir.
19            THE MR. BRAUCHLE:   We will pass the witness.
20                     REDIRECT EXAMINATION
21   BY MR. BEACH:
22       Q.   Mr. Brauchle asked you if there was a correlation
23   between killing a cop in the free world, how you come into the
24   penitentiary and the -- whether or not you were going to be a
25   future danger; is that correct?
```

194

```
1        A.   Yes.
2        Q.   You said there is correlation?
3        A.   Yes.
4        Q.   What is it?
5            MR. BRAUCHLE:   Your Honor, I asked him if he had
6    any statistics that gave a correlation.
7            MR. BEACH:   That was later, Judge.
8            THE COURT:   Overruled.
9        A.   I told you that there are many numerous opportunities
10   to prisoners to break the law or be violent or act badly in
11   the prison system.  I also told you that prisoners have a
12   particular hatred for authority to guards, police officers.
13           MR. BRAUCHLE:   Your Honor, we would object to
14   this as being outside his previous testimony.  And it is also
15   outside of his expertise and it is not what he is being
16   offered for.
17           THE COURT:   Overruled.
18           MR. BRAUCHLE:   May we have a running objection?
19           THE COURT:   You may.
20       A.   So an inmate comes to the penitentiary, having
21   committed a crime against, particularly murder, against the
22   very symbol that convicts hates so much --
23           MR. BRAUCHLE:   Your Honor, once again we would
24   object to this being outside the scope of the question.
25           THE COURT:   Objection is overruled,
```

195

```
1    Mr. Brauchle.
2        A.   Committing a crime against somebody they hate so
3    badly.  Among the prisoner society, of course he is going to
4    have status as a particularly tough or better convict than his
5    peers who might be there for burglary.  He has done something
6    against that very symbol.  Because prison life is so
7    restrictive and you can't have a lot of things you had in the
8    free world, you have to get them on the black market for
9    example --
10           MR. BRAUCHLE:   Your Honor, once again we would
11   object to this as being outside the scope of his expertise, as
12   well as his what he is being presented for.  How does the
13   black market have anything to do with being convicted of
14   capital murder?
15           THE COURT:   Overruled.
16       A.   He can choose to, if he desires, make his life more
17   agreeable and easier to do day by day by having certain
18   benefits say drugs or -- not that he will, but anything that
19   will make his existence easier, he will have access to.  And
20   one way that he will be able to get that is by his reputation.
21   His reputation will already be somewhat elevated because of
22   what he has done that he has been convicted of here.  So as a
23   result of that, he will have opportunities to either be
24   violent because he will have opportunities to get weapons or
25   to further his reputation among the prison people that he is
```

196

```
1    not just a one-time cop killer, he is capable of doing
2    something else, just watch this, he will have that
3    opportunity.  Not that he particularly --
4            MR. BRAUCHLE:   Your Honor, we would object to
5    the narrative.
6            THE COURT:   Overruled.
7        A.   I have tried to boil it down, that is pretty much how
8    I feel about it.
9            MR. BEACH:   I appreciate it.  That's all I have,
10   Judge.
11                 FURTHER RECROSS-EXAMINATION
12   BY MR. BRAUCHLE:
13       Q.   Mr. Merrilott, did I mishear you a while ago, did you
14   say that you knew capital murderer inmates that were fine
15   people?
16       A.   That were what, good people, good convicts, yes, sir,
17   I do.
18       Q.   But somehow it seems that you particularized this
19   defendant as going to be a bad inmate; is that correct?
20       A.   I thought I made it clear to you folks, I am not
21   saying anything about that man.  I don't know anything about
22   him, and I will not tell you that he is going to go to prison
23   and be a future danger.  I will tell you that he has numerous
24   opportunities.  But what he does with those opportunities is
25   not mine or anybody else.  And I will never say that he is
```

197

1  going to go to prison and kill somebody or be dangerous or
2  even be good, because I don't know that. He will have
3  opportunity to do both.
4      Q.   Let me ask you something that Mr. Beach alluded to,
5  you have written the same book three times; is that correct?
6      A.   I have written three additions, it has been updated
7  and changed somewhat, yes, sir.
8      Q.   And in that book you tell the readers the same thing
9  you tell the jurors over here, and that is you can't predict
10  who will be a future danger in prison; is that a fair
11  statement?
12     A.   That's right, I cannot predict that.
13     Q.   Now, you come in here you got 19 and a half years in
14  law enforcement; is that correct?
15     A.   Thirty-one years in law enforcement.
16     Q.   I'm sorry, what is it?
17     A.   Nineteen years in my current job.
18     Q.   So 31 total years law enforcement, 19 working in and
19  around the prisons; is that correct?
20     A.   Yes, sir.
21     Q.   And you can't predict future danger, right?
22     A.   I cannot.
23          MR. BRAUCHLE:  I will pass the witness.
24
25          (No omissions.)

198

1          FURTHER REDIRECT EXAMINATION
2  BY MR. BEACH:
3      Q.   That's these 12 folks job in this case; is that
4  right?
5      A.   Absolutely, yes, sir.
6      Q.   They have been sitting here off and on the last month
7  or so hearing evidence about this man that you haven't heard?
8      A.   That's right. Our society dictated that's who should
9  make that decision.
10     Q.   They are the authority in this case, right?
11     A.   Yes, sir.
12          MR. BEACH:  That's all I have, Judge.
13          MR. BRAUCHLE:  Nothing further.
14          THE COURT:  You may step down, sir.
15          MR. BEACH:  Can he be excused, Judge?
16          THE COURT:  Any objections?
17          MR. BRAUCHLE:  No.
18          THE COURT:  You are free to go, sir.
19     Ladies and gentlemen, we are going to recess for the day,
20  we will reconvene at 9:00 tomorrow. If you will remember my
21  admonishments, do not discuss this case or the facts of this
22  case with friends or family members. And if you happen by
23  chance to come across it in the media in any form, disregard
24  that, see you tomorrow, have a good drive home.
25          THE BAILIFF:  All rise.

199

1          (Jury retired from the courtroom.)
2          THE COURT:  On the record, with respect to the
3  additional security that is taking place regarding this
4  hearing, let the record reflect that if the defendant has
5  shackled on, that there is a block in front of the counsel
6  table and the jury is not able to view that if they are indeed
7  on his legs. That the additional security is in response
8  increased threats or perceived threats based on communications
9  stemming from the defendant in the jail. The Court is aware
10  of them and all steps have been taken to keep additional
11  security out of the view of the jury. That's it.
12          (Court recessed for the day.)
13
14
15
16
17
18
19
20
21
22
23
24
25

200

1  THE STATE of TEXAS )
2  COUNTY of DALLAS  )
3          I, BELINDA G. BARAKA, Official Court Reporter in and
4  for the 194th Judicial District Court of Dallas County, State
5  of Texas, do hereby certify that the foregoing contains a true
6  and accurate transcription of all portions of evidence and
7  other proceedings requested in writing by counsel for the
8  parties, to be included in this volume of the Reporter's
9  Record, in the above-styled and -numbered cause(s), all of
10  which occurred in open court or in chambers and were reported
11  by me.
12          I further certify that this Reporter's Record of the
13  proceedings truly and correctly reflects the exhibits, if any,
14  admitted by the respective parties.
15          I further certify that the total cost for the
16  preparation of this Reporter's Record  was paid by the
17  State/Defense.
18          WITNESS MY OFFICIAL HAND this the 30th day of
19  May , A.D., 2009.
20
21
22          BELINDA G. BARAKA, CSR #5028
23          Official Court Reporter
24          133 N. Industrial
25          Dallas County, Texas 75207
25  Certification Expires: 12-31-09

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

CAUSE NO. F07-50318-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | 194TH JUDICIAL DISTRICT |
| WESLEY LYNN RUIZ | * | DALLAS COUNTY, TEXAS |

- - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

PUNISHMENT HEARING

Volume 52 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 8th day of July, A.D, 2008, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III, of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

Belinda G. Baraka, Official Court Reporter
214-653-5803

1                               A P P E A R A N C E S

2


3      HON. KEVIN BROOKS
       Assistant District Attorney
4      State Bar No. 03070735


5


6      HON. ANDY BEACH
       Assistant District Attorney
7      State Bar No. 01944900


8                                           FOR THE STATE OF TEXAS


9


10     HON. PAUL BRAUCHLE
       Attorney at Law
11     State Bar No. 02918000


12


13     HON. WILLIAM JOHNSON
       Attorney at Law
14     State Bar No. 10804500


15                                          FOR THE DEFENDANT


16     Also Present:


17       Doug Parks, Attorney at Law


18


19


20                              *  *  *  *  *


21


22


23


24


25


*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

I N D E X

PAGE/VOL.

Proceedings - 07/08/08 ........................... 7/52

| STATE'S WITNESS | Direct | Cross | S.Rosa |
|---|---|---|---|
| JERRY POSTON | 7 | | |
| JOHN CHEUNG | 14 | | |
| DARRELL DOTY | 17 | 20 | |
| ROBERT MUNOZ | 22, 31 | 45 | 29, 35 |
| | 41 | | |
| KATHY KESLER | 56, 70 | 63 | |
| HECTOR MARTINEZ | 74, 89 | 80, 90 | |
| DANIEL TORRES | 91, 104 | 98 | |

Motion to Suppress ................................ 105

| STATE'S WITNESS | Direct | Cross |
|---|---|---|
| SCOTT SEACAT | 105 | 109 |

Argument by - Mr. Parks ........................... 124

Ruling ........................................... 125

| STATE'S WITNESS | Direct |
|---|---|
| SCOTT SEACAT | 126 |
| CHERYL NIX | 142 |

State Rest in Punishment ......................... 158

Reporter's Certificate ........................... 161

4

```
1                      E X H I B I T   I N D E X

2    STATE'S EXHIBIT(S):          OFFERED:   ADMITTED:  VOL.

3    129    Photograph               19        20       52

4    130    Photograph               19        20       52

5    131    Photograph               19        20       52

6    132    Photograph               19        20       52

7    133    Photograph               19        20       52

8    135    Photograph               19        20       52

9    136    Photograph               19        20       52

10   137    Photograph               19        20       52

11   138    Photograph               19        20       52

12   139    Photograph               19        20       52

13   140    Photograph               19        20       52

14   141    Photograph               19        20       52

15   142    Photograph               19        20       52

16   143    Photograph               19        20       52

17   144    Photograph               19        20       52

18   145    Photograph               19        20       52

19   146    Photograph               19        20       52

20   147    Photograph               19        20       52

21   148    Photograph               19        20       52

22   149    Photograph               19        20       52

23   150    Photograph               19        20       52

24   151    Photograph               19        20       52

25   152    Photograph               19        20       52
```

| | | | EXHIBIT INDEX | | |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | **STATE'S EXHIBIT(S):** | | **OFFERED:** | **ADMITTED:** | **VOL.** |
| 3 | 153 | Photograph | 19 | 20 | 52 |
| 4 | 161 | Handgun | 15 | 15 | 52 |
| 5 | 162 | Photograph | 32 | | 52 |
| 6 | 163 | Photograph | 32 | | 52 |
| 7 | 164 | Photograph | 32 | | 52 |
| 8 | 165 | Photograph | 32 | | 52 |
| 9 | 166 | Photograph | 32 | | 52 |
| 10 | 167 | Photograph | 32 | | 52 |
| 11 | 168 | CD | 109/128 | 109/128 | 52 |
| 12 | 169 | CD | 109/128 | 109/129 | 52 |
| 13 | 174 | Transcript | 135 | 137 | 52 |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

```
 1                    E X H I B I T   I N D E X

 2    DEFENSE'S EXHIBIT(S):        OFFERED:   ADMITTED:  VOL

 3    24    12.44 Motion Form         65         66        52

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

8

PROCEEDINGS

(July 8, 2008)

THE COURT:  Are there any matters to address while they are bringing the jury in?

MR. PARKS:  I think the only thing we have pending is the motion to suppress, but we are not there yet.

THE COURT:  Bring them in.

THE BAILIFF:  All rise.

(Jury entered the courtroom.)

THE COURT:  You may be seated.

Okay, the State may call its next witness.

MR. MCCALLUM:  Call Officer Poston.

THE COURT:  Raise your right hand.

(Witness was duly sworn.)

THE COURT:  You may proceed.

**JERRY POSTON**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

BY MR. MCCALLUM:

Q.   State your name for the record, please.

A.   Jerry Poston.

Q.   Are you the same Jerry Poston that suffered two shotgun blasts out on I-35 last year?

A.   Yes, sir.

---

Q.   Are you back on duty now?

A.   Yes, sir.

Q.   Where are you assigned?

A.   Fusion Intelligence down at headquarters.

Q.   I want to take you back all the way to November of 2004, where were you working at that time?

A.   At that time I was working at an overtime assignment in the Deep Ellum area downtown.

Q.   And specifically November 25th of that year, did you respond to a call about 2:00 a.m.?

A.   Yes, sir, I did.

Q.   What was that in reference to?

A.   In reference to shots fired, would say covert element that was in a covert car had observed a vehicle fire several shots in the air.

Q.   You didn't see that, did you?

A.   No, sir, I did not.

Q.   That came out of your radio?

A.   That was broadcast over the police radio, yes, sir.

Q.   Okay. And did you see a suspect vehicle or a vehicle matching the description that was broadcast over the radio?

A.   Yes, sir, I did.

Q.   And what was that vehicle description?

A.   Gold Dodge Intrepid.

Q.   And you eventually saw that car?

---

9

A.   I first saw it at the intersection of Elm and Malcolm X.

Q.   So we are talking about downtown?

A.   In Deep Ellum.

Q.   Deep Ellum. And you got in behind the car, and what did you do?

A.   I got in behind the car. Another officer had actually past the car. The covert element, who we could not see, was yelling over the radio that you just past the car. At that time he screamed over the radio, it is the gold Intrepid. The gold Intrepid had stopped. And then maybe for a minute, in that 30 seconds, then when we turned on the lights, the Intrepid accelerated southbound on Malcolm X.

Q.   Who turned on the lights?

A.   I turned on my lights. I don't know if the other officer turned his lights on at that time. I know he was backing up to get behind that vehicle.

Q.   Was that the covert vehicle?

A.   No, that was another squad car.

Q.   Okay. Tell the jury what happened when you turned on the lights?

A.   He -- the gold Intrepid again accelerated southbound on Malcolm X. I believe he made a left turn on to Main Street going eastbound. Main Street goes another three blocks, then turns into Columbia. And then he accelerated eastbound on

---

10

Columbia at a high rate of speed.

Q.   What was traffic like at 2:00 in the morning out there?

A.   Traffic was light. It wasn't a lot of cross traffic. You may see one or two cars at an intersection every now and then, but not a lot of traffic.

Q.   How many intersections do you estimate you went through?

A.   At least seven.

Q.   What did the car do when it approached the intersections?

A.   I was pretty good ways behind the car, the car was just accelerating, continually accelerating. All I really saw was taillights for a long time, and the car just continued to accelerate at a high rate of speed eastbound.

Q.   Did you see any brake lights ever from this car?

A.   I didn't. I just saw taillights.

Q.   Can you estimate or approximate how fast that car was going?

A.   I can only base on how fast I was going. I was going approximately 70, 70, 80 miles and hour trying to catch up.

Q.   Was that car leaving you?

A.   Yes, it was pulling away, sir.

Q.   Tell the jury what eventually happened?

A.   Eventually Columbia, as you get out further east

---

1   toward Beacon and Munger, there was a curb, I thought he was
2   going to pull away from me and he would be gone. And at that
3   time the car attempted to make a right turn on to Beacon, I
4   believe it was, or Munger, I am not sure of the street. At
5   that time the car hit a light fixture, a light pole, which was
6   on Ruby Island, and the car kind of rose up in the air and
7   then it T-boned a large vehicle in that intersection and
8   pushed it across in the sidewalk and then the car spun around.
9   And at that time I thought we had a fatality accident.
10   Q.   The car that he hit was occupied?
11   A.   It was occupied by a male and female.
12   Q.   Did you check on their status?
13   A.   We checked on their status. They were both okay,
14   after we settled the whole scene down.
15   Q.   Do you think that that pole acted probably as a
16   bumper?
17   A.   I think the pole probably took the brunt of the
18   impact and slowed the car down not to kill or seriously injure
19   the driver at least.
20   Q.   All right. After that happened, what did the driver
21   of that car do?
22   A.   The driver of the Intrepid, after the car came to a
23   stop, the driver of the Intrepid jumped out of the car and
24   begin running southbound about maybe 20 yards, through a
25   little grass hill. And then at that, time I drove over the

1   curb toward him and then he started running up the hill and he
2   didn't have anything left in him to run and he stopped and I
3   took him into custody.
4   Q.   Do you see that person in the courtroom today?
5   A.   Yes, sir.
6   Q.   Could you identify him?
7   A.   Seated to your left in a black jacket, sport coat.
8       MR. MCCALLUM:   Let the record reflect this
9   witness has identified the defendant in open court.
10   Q.   (By Mr. McCallum)   What was his condition when you
11   finally apprehended him?
12   A.   I believe he was slightly intoxicated, maybe under
13   the influence of some unknown drugs, just very -- just drained
14   from the entire experience.
15   Q.   You didn't have any conversation or words with him?
16   A.   No.
17   Q.   Okay. Was there a passenger in his car?
18   A.   His girlfriend Erica, I am not sure of her last name,
19   I believe it was Erica.
20   Q.   You do a report on this case?
21   A.   I did a report, an arrest report.
22   Q.   Would it refresh your memory to look at it?
23   A.   Yes.
24       MR. MCCALLUM:   May I approach?
25       THE COURT:   You may --

13

1   A.   Erica Rivera, listed as the passenger in the
2   defendant's car.
3   Q.   (By Mr. McCallum)   You identified her that night?
4   A.   Yes, sir.
5   Q.   What happened to her?
6   A.   She had an asthma attack, some medical condition, she
7   was transported to the hospital by DFD at the scene?
8   Q.   Otherwise would you have arrested her?
9   A.   I probably would have arrested her, yes, sir.
10   Q.   For what?
11   A.   Public intoxication.
12   Q.   Now, did you search the suspect's car?
13   A.   I did not search it. An Officer Cheung searched the
14   car at my request.
15   Q.   You checked on -- I think you already said you
16   checked on the people in the pickup truck?
17   A.   In the car -- you mean the vehicle that was struck?
18   Q.   Right.
19   A.   When I got back over toward that vehicle, Officer
20   Cheung had already had him step out of the car and they were
21   both -- they didn't need any medical assistance, they were
22   okay.
23   Q.   Okay, they seemed fine?
24   A.   Yes, sir.
25       MR. MCCALLUM:   I will pass the witness.

14

1       MR. BRAUCHLE:   We will pass the witness.
2       MR. MCCALLUM:   No further questions. Can he be
3   excused?
4       THE COURT:   You may step down. You are free to
5   go, sir.
6       (Witness entered the courtroom.)
7       THE COURT:   If you will raise your right hand,
8   sir.
9       (Witness was duly sworn.)
10       THE COURT:   You may be seated. You may proceed.
11       JOHN CHEUNG
12   was called as a witness, and having been duly sworn by the
13   Court, testified under oath as follows:
14       DIRECT EXAMINATION
15   BY MR. MCCALLUM:
16   Q.   State your name for the record.
17   A.   My first name is John, J-o-h-n, last name is
18   C-h-e-u-n-g, Cheung.
19   Q.   Just briefly I want to take you back to
20   November 25th of 2004, you were working as a Dallas Police
21   Officer that morning?
22   A.   Yes, sir.
23   Q.   Did you respond out to the scene of an accident and
24   search a Dodge Intrepid?
25   A.   Yes, sir.

15

16

1   Q.   Sir, I am showing you State's 161, take a minimum to
2   see if you recognize that gun?
3   A.   Yes, I do.
4   Q.   Okay.  Is this the gun that you found in that car?
5   A.   In the glove compartment.
6           MR. McCALLUM:   We will offer State's 161.
7           MR. BRAUCHLE:   No objections.
8           THE COURT:   State's 161 is admitted.
9   Q.   (By Mr. McCallum)  You searched the Dodge Intrepid
10  and you found that in the glove box?
11  A.   Yes, sir.
12  Q.   And what was the condition of the gun?
13  A.   I remember it was in good condition, it had seven
14  rounds, one in chamber.
15  Q.   What does it mean, one in the chamber?
16  A.   There was one in the chamber, ready to be operated
17  and used.
18  Q.   Ready to fire?
19  A.   Yes.
20  Q.   What caliber gun is that?
21  A.   A .25 caliber.
22  Q.   .25 caliber.
23          MR. McCALLUM:   I will pass the witness?
24          MR. BRAUCHLE:   No questions.
25          MR. McCALLUM:   May he be excused?

1           THE COURT:   Any objections?
2           MR. BRAUCHLE:   No.
3           THE COURT:   You are free to go, sir.  Thank you.
4           (Witness complies.)
5           MR. BROOKS:   May I approach the court reporter,
6   Your Honor?
7           THE COURT:   You may.
8           MR. BROOKS:   May we approach, Your Honor?
9           THE COURT:   You may.
10          (Following proceedings had at the Bench.)
11          MR. BROOKS:   My next witness is Investigator
12  Doty, who went downstairs.  He took the photographs.  He is on
13  his way up.
14          THE COURT:   Do you know when he will be back up.
15          MR. BROOKS:   He is supposed to be back up.  I
16  thought he was in the back.
17          (End of Bench Conference.)
18          THE COURT:   Ladies and gentlemen, we are going
19  to take a ten-minute break.
20          (Jury retired from the courtroom.)
21          THE COURT:   You may be seated.
22          (Recess taken.)
23          THE BAILIFF:   All rise.
24          (Jury returned to the courtroom.)
25          THE COURT:   You may be seated.

17

18

1       The State may call its next witness.
2           MR. BROOKS:   Call Investigator Doty.
3           THE COURT:   Raise your right hand, sir.
4           (Witness was duly sworn.)
5           THE COURT:   You may proceed.
6                   DARRELL DOTY
7   was called as a witness, and having been duly sworn by the
8   Court, testified under oath as follows:
9                DIRECT EXAMINATION
10  BY MR. BROOKS:
11  Q.   Sir, would you introduce yourself to the jury,
12  please.
13  A.   Darrell Doty, D-o-t-y.
14  Q.   And, Mr. Doty, how are you employed?
15  A.   I am an investigator with the Dallas County District
16  Attorney's office.
17          MR. BRAUCHLE:   Your Honor, we would renew our
18  previous objection in regard to this.  Objection made at the
19  time of this incident.
20          THE COURT:   I'm sorry, I didn't hear that.
21          MR. BRAUCHLE:   The objection made at the time of
22  the incident.
23          THE COURT:   Overruled.
24  Q.   (By Mr. Brooks)  Again, how long have you been
25  employed with the Dallas County District Attorney's office?

1   A.   About a year and a half.
2   Q.   And prior to coming to work for the District
3   Attorney's office, how were you employed?
4   A.   I was employed as a deputy with the Dallas Sheriff's
5   Department for almost 20 years.
6   Q.   And in your capacity as Dallas District Attorney's
7   investigator, are you assigned to the 194th District Court?
8   A.   Yes, I am.
9   Q.   The court that this case is presently being tried in?
10  A.   Yes.
11  Q.   I am going to turn your attention back to May the
12  17th or approximately May the 17th of 2007, did you have
13  an occasion to go to the Dallas County jail and take some
14  photographs?
15  A.   Yes.
16  Q.   And you recall what section of the jail you were in?
17  A.   I believe it was like the third floor of the medical
18  tank.
19  Q.   And for -- strike that.  Who were you to take
20  photographs of?
21  A.   Mr. Ruiz.
22  Q.   The defendant in this case?
23  A.   Yes.
24  Q.   And was anyone present with you while those
25  photographs were being taken?

19                                                                                    20

1    A.   Yes.
2    Q.   And who was present?
3    A.   My chief, Tony Robinson, and Mr. Brauchle.
4    Q.   Paul Brauchle?
5    A.   Yes.
6    Q.   And what were you specifically taking photographs of?
7    A.   His tattoos, the defendant's tattoos.
8           MR. BROOKS:   May I approach, Your Honor?
9           THE COURT:   You may.
10   Q.   (By Mr. Brooks)  Investigator Doty, I want to show
11   you what is marked as State's Exhibits 129 through 153
12   inclusive, take a look at those photographs and let me know if
13   you recognize those.
14   A.   Those are the photos that I took.
15   Q.   And State's 129 through 153 inclusive, do they fairly
16   and accurately represent the way the defendant's photographs
17   looked at that time?
18   A.   Yes.
19   Q.   And the photographs that you have here, do they
20   appear to be altered or deleted or tampered with in any
21   manner?
22   A.   No.
23          MR. BROOKS:   Your Honor, at this time the State
24   would offer State's 129 through 153 inclusive.
25          MR. BRAUCHLE:   We would object to 133 and 134

1    as being duplicitous, and we would also object to all of the
2    exhibits under 404, 403, 402 and 401.
3           THE COURT:   May I see the exhibits.
4    I will sustain the objection to 134 and 135.
5    Overrule the objections -- Mr. Brooks, let me see those.
6    State's 129, 130, 131, 132, 133, 135, 136, 137, 138, 139,
7    140, 141, 142, 143, 144, and 146 through 153 are admitted.
8    Here you go, sir.
9           MR. BROOKS:   Thank you, Judge.
10   Pass the witness.
11          THE COURT:   Cross-examination.
12                    CROSS-EXAMINATION
13   BY MR. BRAUCHLE:
14   Q.   Officer Doty, do you recall what day this was again?
15   A.   May 17th 2007.
16   Q.   And you say these were taken in the medical ward of
17   the county jail?
18   A.   Well, there are some single sells inside the medical
19   floor of the Dallas County, jail, yes.
20   Q.   And in the photographs that you took are tattoos, as
21   well as gunshot wounds, both are visible?
22   A.   I don't know about gunshot wounds, but there are
23   tattoos.
24   Q.   So you didn't see any residual gunshot wounds from
25   his arrest?

21                                                                                    22

1    A.   I saw some defect from his skin, but I didn't ask him
2    what they were or where they were from.
3    Q.   In regard to taking these tattoos, did you have any
4    trouble doing it?
5    A.   No.
6    Q.   Do you know what they are pictures of other than
7    tattoos?
8    A.   Of Mr. Ruiz.
9    Q.   I guess I should rephrase that.  Do you know what any
10   of the tattoos stand for?
11   A.   No, I don't.
12   Q.   Do you know if they stand for anything?
13   A.   Not that I know of.  I was just asked to take the
14   photographs.
15          MR. BRAUCHLE:   We will pass the witness.
16          MR. BROOKS:   No other questions of this witness,
17   Your Honor.
18          THE COURT:   You may step down, sir.
19          MR. BROOKS:   Call Officer Munoz.
20   (Witness entered the courtroom.)
21          THE COURT:   Raise your right hand, sir.
22   (Witness was duly sworn.)
23          THE COURT:   You may be seated.
24   And you may proceed.
25

1                      ROBERT MUNOZ
2    was called as a witness, and having been duly sworn by the
3    Court, testified under oath as follows:
4                    DIRECT EXAMINATION
5    BY MR. BROOKS:
6    Q.   Officer, would you introduce yourself to the jury,
7    please.
8    A.   My name is Senior Corporal Robert Munoz.
9    Q.   And you are with the Dallas Police Department?
10   A.   That's correct.
11   Q.   How long have you been employed by the Dallas Police
12   Department?
13   A.   Approximately 18 years.
14   Q.   And in those 18 years, what sections of the police
15   department have you worked in?
16   A.   The last 14 years I have been assigned to the gang
17   unit division and currently with recruitment unit.
18   Q.   So prior to this past year, you had spent 14 years
19   with the gang unit?
20   A.   Yes, sir.
21   Q.   And when was the Dallas Police Department gang unit
22   first started, if you recall?
23   A.   Well, I originally started back in early '93.
24   Q.   So from 1993 up to what year were you working with
25   the gain unit?

23

1 A. Since January -- February, take it back, February.

2 Q. And do you know why the Dallas Police Department

3 started gang unit?

4 MR. BRAUCHLE: Your Honor, we would object to

5 this as calling for speculation.

6 THE COURT: The witness may answer if he knows.

7 A. Well, I mean, there was a rise in gang activity,

8 youth gang activity, they established gang task force, which I

9 believe it was almost 50 officers for the streets at that

10 point.

11 Q. (By Mr. Brooks) And part of your duties with the

12 gang unit within DPD, are you tasked with documenting known

13 gangs and known gang members?

14 A. That's correct.

15 Q. And are you also tasked with documenting associates

16 of known gangs and gang members?

17 A. Yes, sir.

18 Q. And is there a distinct difference between being

19 identified as a gang member versus being identified as an

20 associate?

21 A. That's correct.

22 Q. And what is the difference?

23 A. Well, the difference between the -- meeting criteria.

24 If you are going to be -- meet the criteria as a gang member,

25 you got to meet three criteria. You got to be engaged in

24

1 criminal activity, be associate with known gang members or

2 self-admission.

3 Q. And based upon your experience, individuals that

4 belongs to -- that belong to these gangs, are there certain

5 things that they do to identify themselves as gang members?

6 A. Yes, sir, they do.

7 MR. BROOKS: May I approach the witness?

8 THE COURT: You may.

9 Q. (By Mr. Brooks) Certain items of clothing that they

10 may wear perhaps?

11 A. That's one of them.

12 Q. And are there certain gestures or things of that

13 nature that they may also make?

14 A. Yes, sir.

15 Q. Out in public?

16 A. Yes, sir.

17 Q. Is that what they call flashing?

18 A. Flashing, throwing up gang signs.

19 Q. Let me show what you is marked as State's Exhibit

20 159, would that be an example of what is known as flashing?

21 A. Yes, sir.

22 Q. Now, I want to turn your attention back to April the

23 12th of 2005, and I am going to ask you if you had on that

24 day come in contact with the defendant in this case?

25 A. Yes, sir.

25

1 Q. And do you see that person in the courtroom today?

2 A. Yes, sir, I do.

3 Q. And would you describe an article of clothing that he

4 is wearing?

5 A. He is wearing a dark suit with white shirt and black

6 and white -- spotted tie, I'm sorry.

7 Q. And if I am number one, Mr. Beach is chair number

8 two, what chair would he be sitting in?

9 A. Six.

10 Q. And this is the individual that you came in contact

11 with on April the 12th, 2005?

12 A. Yes, sir.

13 MR. BROOKS: Your Honor, ask that the record

14 reflect that this witness has identified the defendant in open

15 court.

16 Q. (By Mr. Brooks) Now, back on that date, Officer,

17 were you accompanied by any other Dallas Officers?

18 A. Yes, sir, I was.

19 Q. And who else was present?

20 A. I believe it was Officer Carcon, Carrasco, myself,

21 Sergeant Marshall, Officer Grajeda and I believe Officer

22 Inman.

23 Q. And were you guys out there to conduct what is known

24 as a knock-and-talk?

25 A. Yes, sir.

26

1 Q. What is a knock-and-talk?

2 A. That is pretty much when we get information that it

3 might be gang or drug activity complaints. We need to pretty

4 much act on it, follow up, make contact at that apartment to

5 see who is living there. What kind of individuals are living

6 there, do subject checks, see if there is any narcotics or

7 gang activity taking place there.

8 Q. And do you recall the address you went to on that

9 day?

10 A. If I am correct, it was 7414 East Grand.

11 Q. And describe for the jury what happened when y'all

12 went to that apartment -- it was an apartment?

13 A. Yes, it was. We -- like I said, we had received

14 original information that there was possible --

15 MR. BRAUCHLE: Your Honor, we would object to

16 hearsay.

17 THE COURT: Overruled.

18 A. We had received information that there is possible

19 drug and gang activity taking place at the Camden Apartments,

20 7414 East Grand, Apartment 434. Myself and the other officers

21 went up there. I believe Officer Carcon, Officer Carrasco,

22 went to the front door, along with the other officers. I

23 stationed myself downstairs, because I believe it was like --

24 there were four floors of it. I stationed myself in case we

25 have guys jumping out or throw evidence out.

28

1      MR. BRAUCHLE:   Your Honor, we would object to
2  this line of testimony, narrative.
3           THE COURT:   Okay, if you will make it question
4  and answer.
5      Q.   (By Mr. Brooks)  Can you tell the jury why you had
6  stationed yourself in a separate location from Officer Carcon
7  and other officers?
8      A.   We have to secure the exterior.  A lot of times we
9  may have people that jump out of the -- of patio windows.
10          MR. BRAUCHLE:   Once again we object it
11  narrative.
12          THE COURT:   Overruled.
13     A.   Like I said, most cases when we secure exterior
14  perimeter, most cases they will jump out of the window, they
15  know the police might show up.  In my case, when they knocked
16  on the door, there was one guy attempted to jump out over the
17  patio balcony, four flights of stairs.
18     Q.   (By Mr. Brooks)  At that point someone else was
19  trying to basically get out of the back way.
20     A.   That's correct.
21     Q.   And do you know whether or not the defendant in this
22  case, Wesley Ruiz, was placed into custody from that incident?
23     A.   Yes, he was.
24     Q.   And did Officer Carcon, was he the officer that
25  actually placed him into custody?

1      A.   Yes, sir.
2      Q.   Even though Officer Carcon had placed him into
3  custody, did you have contact with the defendant on that day?
4      A.   I did.  What I did, is when I pretty much after we
5  place them in custody, we will debrief them.  We will ask them
6  information -- let me start over.  I got a blue uniform.  It's
7  a gang unit uniform.
8           MR. BRAUCHLE:   Your Honor, may we approach?
9           THE COURT:   You may.
10          (Following proceedings had at the Bench.)
11          MR. BRAUCHLE:   Any custodial interview or
12  debriefing as he likes to call it of our client, unless he can
13  show that he was mirandized and waived his Miranda rights...
14          THE COURT:   Mr. Brooks, response.
15          MR. BROOKS:   I need to ask him, Judge, how he
16  was mirandized.
17          MR. BRAUCHLE:   It is not in the offense report
18  that he is.  There is no written statement, going out there, I
19  know he thinks that it is his duty to ask people if they are
20  gang members, but that's certainly postarrest, custodial
21  interrogation.  And it is certainly more than harmless since
22  it is coming back to him at this point.
23          MR. BROOKS:   It is a question regarding the
24  offense.
25          MR. BRAUCHLE:   Well, it doesn't matter what it

29

1  is about.  If he is the target of any type of criminal
2  investigation, which obviously, this guy is making him that,
3  he has got a right to be mirandized and advised that he
4  doesn't have to answer any of his gang questions.
5           MR. BEACH:   We can have a hearing on that, I
6  guess.
7           (End of Bench Conference.)
8           THE COURT:   Ladies and gentlemen, there is a
9  matter we have to take up outside the presence of the jury.  I
10  will give you a 15-minute break.
11          THE BAILIFF:   All rise.
12          (Jury retired from the courtroom.)
13          THE COURT:   You may be seated.
14     You may proceed, Mr. Brooks.
15             **SUB ROSA EXAMINATION**
16  BY MR. BROOKS:
17     Q.   Officer, at the time that you came in contact with
18  the defendant, Mr. Ruiz, had he -- was he -- he been arrested
19  at that point.
20     A.   Yes, sir.
21     Q.   And you know whether or not he was mirandized, given
22  his statutory warnings prior to any questioning?
23     A.   I am not sure if he was or not, sir.
24     Q.   And you know who the first officer would have
25  questioned him?

30

1      A.   I believe that would have been Officer Carcon.
2      Q.   And he is not available?
3      A.   Yes, sir.
4           MR. BROOKS:   Pass the witness.
5           MR. BRAUCHLE:   No questions.
6      So the record is clear, we are objecting to any testimony
7  that -- that this officer may have in regard to post-arrest
8  statements elicited from him by this officer or any other
9  police officer, unless it is shown that he was mirandized,
10  advised of his rights to remain silent.  It is quite obvious
11  since he was under arrest that he was the scope of a criminal
12  investigation.  And this officer to interview him or as he
13  says debriefing, which is just a euphemism extracting
14  information from him, would be in violation of his rights
15  under Miranda, as well as any other of the constitutional
16  cases.  To follow that, as well as the Fifth Amendment and the
17  Constitution of the State of Texas.
18      So we would object to the State going into anything that
19  may have been elicited from our client on April 12th of
20  2005.
21          THE COURT:   Any response, Mr. Brooks?
22          MR. BROOKS:   No, Your Honor.
23          THE COURT:   The Court will be at recess for ten
24  minutes.
25          (Recess taken.)

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

31

1    THE COURT:  Okay, back on the record, I will
2  sustain the objection made by the Defense Attorney.
3        Both sides ready for the jury.
4        MR. BROOKS:  Ready, Your Honor.
5        THE BAILIFF:  All rise.
6        (Jury returned to the courtroom.)
7        THE COURT:  You may be seated.
8  You may proceed, Mr. Brooks.
9        MR. BROOKS:  Thank you, Judge.
10       **DIRECT EXAMINATION RESUMED**
11  BY MR. BROOKS:
12       Q.   Officer Munoz, without going into any conversation
13  you had with the defendant back on April the 12th of 2005,
14  was he arrested on that date?
15       A.   Yes, sir.
16       Q.   And for what offense was he placed under arrest?
17       A.   I believe it was possession of methamphetamine.
18       Q.   And were there also guns and drugs seized at that
19  apartment?
20       MR. BRAUCHLE:  Your Honor, we will object to
21  that as being extraneous to this defendant.
22       THE COURT:  Overruled.
23       A.   Yes.
24       Q.   (By Mr. Brooks)  And were photographs taken of those
25  guns and drugs?

32

1       A.   I believe so.
2       MR. BROOKS:  May I approach the witness, Your
3  Honor?
4       THE COURT:  You may.
5       Q.   (By Mr. Brooks)  I will show you what is marked as
6  State's Exhibits 162, 163, and 164, 165, 166, and 167. I will
7  ask you, Officer, if you recognize those photographs?
8       A.   Yes.
9       Q.   In fact, these photographs fairly and accurately
10  represent the items that were seized that day, back on April
11  the 12th, 2005?
12       A.   Yes, sir.
13       Q.   Do these photographs look to be altered, deleted or
14  tampered with in any manner?
15       A.   No, sir.
16       Q.   In fact, Officer, were you the one who actually took
17  those photographs?
18       A.   Not those.
19       Q.   But you recall seeing those items that day?
20       A.   Yes, sir.
21       MR. BROOKS:  At this time, Your Honor, we would
22  offer State's Exhibits 162 through 167.
23       MR. BRAUCHLE:  May we approach?
24       THE COURT:  You may.
25       (Following proceedings had at the bench.)

33

1       MR. BRAUCHLE:  As I said, these are extraneous
2  to him. It is not an extraneous offense that he committed.
3  These guns and drugs are not his, someone else were charged
4  with them. There is not going to be any evidence that he
5  had anything to do with them. When he got arrested, he gets
6  arrested for less than a gram in his pants pocket. And they
7  arrested him for an outstanding warrant. And when they are
8  doing that, they see some other drugs in this apartment, which
9  is not registered to him, it is not his house, that is going
10  to be what the evidence is. And this is what they find on the
11  owner's -- in the owner's possession. And he was charged with
12  it and convicted of it. But this is not an extraneous offense
13  that our guy committed. It is an extraneous by somebody else.
14  And to put this on him is...
15       MR. BROOKS:  It is contextual with his arrest
16  that day. He is there at the apartment, and also goes to the
17  character -- his character and the individuals that he is
18  associating with. Which I believe is relevant.
19       MR. BRAUCHLE:  How do you know he is associating
20  with this guy, he was out there, he answers the door, he gets
21  arrested. And they go back and get a search warrant to find
22  this stuff. Nothing that they can show that he know about it.
23       MR. BROOKS:  I believe it is three individuals,
24  he is one of three individuals in the apartment. To say he is
25  not associated with him --

34

1       MR. BRAUCHLE:  Is there anything to show that he
2  knew this was in the apartment?
3       MR. BROOKS:  I don't have to show he lived in
4  the apartment. It is contextual.
5       MR. BRAUCHLE:  Unless he knows it is there, how
6  is it contextual with his arrest? How does it have anything
7  to do with -- that's like Karo has got drugs on him, I don't
8  know about it, how does that go to me. It is the same --
9       MR. JOHNSON:  I am in my backyard. He answers
10  the door.
11       MR. BRAUCHLE:  It is not his extraneous offense.
12  You know if it was something like they went out to arrest him
13  and had a warrant for him and they found this, even though
14  they didn't -- even though they didn't charge him with it,
15  yeah, that's in a house that he is in charge of, that's where,
16  you know, but this deal, it's this guy.
17       MR. BROOKS:  They were investigating drug
18  activity. It --
19       MR. BRAUCHLE:  I am real glad they did that.
20  Let me just ask this, what is the gang unit doing out there
21  investigating?
22       MR. BROOKS:  Drugs.
23       THE COURT:  It's coming in.
24       MR. BRAUCHLE:  All right. May I have a running?
25       THE COURT:  Certainly.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

35

1  End of Bench Conference.)
2       MR. JOHNSON:   Come back here for a second.
3       (Discussion off the record.)
4       THE COURT:   Ladies and gentlemen, there is
5  another matter we have to take up outside your presence, we
6  will take another 15-minute recess.
7       THE BAILIFF:   All rise.
8       (Jury retired from the courtroom.)
9       THE COURT:   You may be seated.
10      Outside the presence of the jury.
11      MR. BROOKS:   Judge, I believe during the Bench
12  Conference, we proffered our reasons for this evidence, if
13  they want to take the witness on voir dire for the purpose of
14  the hearing...
15                **SUB ROSA EXAMINATION**
16  BY MR. BRAUCHLE:
17      Q.   State your name again, sir.
18      A.   Robert Munoz.
19      Q.   And you were present on April 12th of '05; is that
20  correct?
21      A.   Yes, sir.
22      Q.   And I believe you stated that Officer Cercon (sic)?
23      A.   Carcon.
24      Q.   Carcon?
25      A.   Yes, sir.

36

1      Q.   He instigated a knock-and-talk; is that correct?
2      A.   That's correct.
3      Q.   And when he knocked on the door, the door was
4  answered by Mr. Ruiz; is that correct?
5      A.   Yes, sir.
6      Q.   And he -- he ascertained who Mr. Ruiz was and found
7  that he had a warrant; is that correct?
8      A.   Yes, sir.
9      Q.   And he arrested him on an outstanding warrant?
10     A.   Yes, sir.
11     Q.   Now, then, at some point during Mr. Ruiz's arrest,
12  supposedly -- was it one of the officers supposedly saw other
13  drugs there at the location; is that correct?
14     A.   Yes, sir.
15     Q.   Was this during the sweep that they made of the
16  apartment?
17     A.   I believe so.
18     Q.   So they swept through the apartment and saw some
19  other drugs and then -- who was the officer that got the
20  warrant?
21     A.   Who confirmed the warrant or...
22     Q.   Well, the affiant is something that looks like Mark
23  something?
24     A.   Sergeant Marshall.
25     Q.   Looks like badge number 6247, Mark -- I can't tell,

37

1  who else was out there?
2      A.   Originally it was me, Officer Carcon, Officer
3  Carrasco, Officer Inman, and I believe Officer Grajeda.
4      Q.   So is it Mark Rangel, was he out there?
5      A.   Not at the time.
6      Q.   He is the one that went and obtained a search warrant
7  for that location, right?
8      A.   I believe so.
9      Q.   And he described in the warrant that the location was
10  at 7414 East Grand, Apartment 434; is that right?
11     A.   Yes, sir.
12     Q.   Now, then, in regard to the pictures that have been
13  offered in evidence, who took those pictures?
14     A.   I am not sure exactly who took the pictures, sir.
15     Q.   Do you know what room those pictures were made in?
16     A.   I'm sorry, can you repeat the question.
17     Q.   Do you know what room those pictures were made in?
18     A.   No, sir.  I mean they were scattered -- you are
19  asking about the apartment itself?
20     Q.   Yeah.
21     A.   Where they are located at?
22     Q.   Yeah.
23     A.   I am not specifically -- they were scattered in
24  different sections, I believe.
25     Q.   What was scattered?

38

1      A.   Weapons and drugs.
2      Q.   Where was the safe?
3      A.   I'm sorry.
4      Q.   Where was the safe.
5      A.   Where was the safe.  I am not sure exactly what room
6  it was, sir.
7      Q.   What were you doing when they found the safe?
8      A.   What was I doing?  I was with the prisoners and the
9  other individuals were outside that we had detained
10  originally.
11     Q.   So basically you don't know where any of the things
12  that are in the pictures were even photographed; is that what
13  you are saying?
14     A.   That's what I am saying, yes.
15     Q.   So you can't really identify those purported exhibits
16  because you don't know if those were actually taken there on
17  East Grand that day; is that what you are telling us?
18     A.   I do remember some of the pictures, but I don't
19  remember exactly where they were positioned, were located at,
20  sir.
21     Q.   Well, when do you remember the pictures.  You weren't
22  there when they were taken, you don't know where any of the
23  objects pictured in the pictures were, so you basically have
24  no personal knowledge of what is depicted in the exhibits that
25  were tendered to you, do you?

39

1    A.   No, sir.

2    Q.   In regard to --

3           MR. BEACH:   Paul, that's enough, just go on.

4           MR. BRAUCHLE:   Y'all withdrawing him.

5           MR. BEACH:   Yes.

6           MR. BRAUCHLE:   All right, State's withdrawing

7 the exhibits.

8           THE COURT:   Bring the jury in.

9           MR. BRAUCHLE:   We would also object to any

10 testimony that may have been elicited prior to this hearing in

11 regard to what the pictures depict.

12          MR. BROOKS:   Judge, we would object to that.

13 The testimony was offered, it was not objected to at that

14 time.  The jury already knows that there are guns and drugs

15 found inside that apartment.  To object to it at the time the

16 question was elicited of this witness, they didn't do it, it

17 is in evidence.

18          MR. BRAUCHLE:   Well, we objected at the first

19 opportunity that we had in regard to it because until the

20 exhibits were tendered to us, in theory, we didn't know what

21 was in the exhibits.

22          MR. BROOKS:   Judge, that's incorrect, they have

23 had copies of every single photograph that has been admitted

24 in this trial.

25          MR. BRAUCHLE:   I am not saying we didn't.

40

1           THE COURT:   I will overrule the objection.

2 Bring the jury in.

3           MR. BRAUCHLE:   May I be heard?

4           THE COURT:   You may be heard.

5           MR. BRAUCHLE:   The way that we are supposed to

6 object is not when he is walking up to the witness to see if

7 the witness can identify the exhibits.  It is when they are

8 tendered to us.  And we made a timely objection at the time

9 the exhibits were tendered to us.  Now, once they withdraw

10 those exhibits, I believe that we are entitled for the

11 testimony up to the time that we made that objection in regard

12 to those exhibits, we have a right to have it stricken.  You

13 know it is like saying, well, I am giving you 73 pictures of

14 guns, drugs and money, then they withdraw it.  But how are you

15 going to withdraw the 73 pictures of guns, drugs and money.

16 We made a timely objection at the time that we were supposed

17 to according to the rules of the court.  Now, then, to say

18 we -- you had pictures of those months ago, so therefore any

19 objection is no good, that is just not right.  We objected

20 timely.  And we would ask that the Court to instruct the jury

21 to disregard the testimony of that.

22          MR. BEACH:   About the photographs?

23          MR. BRAUCHLE:   When they were identified by the

24 witness -- yeah, you could do that all day, you could take up

25 photographs that you know are inadmissible, have him identify

41

1 them and then you get the same effect in front of the jury

2 whether the pictures come in or not.

3           THE COURT:   The Court will deny that request.

4 Bring the jury in.

5           MR. BRAUCHLE:   May we have a running objection

6 as to any testimony as to these drugs or money or whatever

7 else?

8           THE COURT:   You may.

9           THE BAILIFF:   All rise.

10          (Jury retired from the courtroom.)

11           THE COURT:   You may be seated.

12 You may proceed, Mr. Brooks.

13        **DIRECT EXAMINATION RESUMED**

14 BY MR. BROOKS.:

15    Q.   Officer Munoz, and again, how many years had you

16 worked with the Dallas gang unit?

17    A.   Fourteen years.

18    Q.   And in those 14 years, did the Dallas Police

19 Department identify known gangs throughout the city of Dallas?

20    A.   Yes, sir.

21    Q.   And was Ledbetter 12 identified as a gang within the

22 city of Dallas?

23    A.   Yes, sir.

24    Q.   Now you previously testified that these gangs have

25 different things that might be identifiers, like haircuts or

42

1 clothing; do you recall that question?

2    A.   Yes, sir.

3    Q.   Are tattoos another way that these gang members

4 identify themselves?

5    A.   That's correct.

6    Q.   And are you familiar with the identifiers as far as

7 tattoos that the various gangs use to identify themselves?

8    A.   Yes, sir.

9          MR. BROOKS:   May I approach the witness, Your

10 Honor?

11          THE COURT:   You may.

12    Q.   (By Mr. Brooks)  Let me show you what is marked as

13 State's Exhibit -- and has been entered as State's Exhibit

14 132, do you see anything in that photograph that might be --

15 or that would be a gang identifier?

16    A.   Yes, sir.  He's bearing the initials W.S. 12, it is a

17 good identifier, for Westside Ledbetter 12, a known criminal

18 gang in Dallas.

19    Q.   A known street gang in Dallas?

20    A.   A known street gang in Dallas.

21    Q.   We have lost our pointer, but as best you can, show

22 the jury what on this photograph depicts Westside Ledbetter

23 12?

24    A.   It depicts W.S. 12, Westside Ledbetter 12, that's

25 pretty much how they are identified.  Ledbetter 12 is

43

1  identified as one of the streets in the West Dallas Area of
2  Dallas. There is Loop 12, Singleton and Hampton, that's is
3  pretty much the Westside Ledbetter 12 area of known criminal
4  street gangs.
5      Q.   And are you familiar of the activity of that known
6  criminal street gang?
7      A.   Yes, sir, I am.
8      Q.   Is that the "W" that you made reference to?
9      A.   Yes, sir.
10     Q.   And then this "S" stands for?
11     A.   Side, Westside, side.
12     Q.   And then that's --
13     A.   Twelve, yes, sir.
14          MR. BROOKS:   We can have the lights, Judge.
15     Q.   (By Mr. Brooks)  Do you know if Ledbetter 12,
16 Westside Ledbetter 12 is affiliated with midnight dreamers?
17     A.   Yes, sir, they are.
18     Q.   And explain to the jury how that is.
19     A.   Well, they have affiliation, they are allies, they go
20 back since the early '90s in regards to the drugs and criminal
21 activity.
22     Q.   What about the enterprise known as Tango Blast, have
23 you heard of that phrase?
24     A.   Yes, sir, I have.
25     Q.   And is Tango Blast a known criminal gang?

44

1      A.   We categorize it as a known criminal street gang in
2  Dallas, yes, sir.
3      Q.   And does Tango Blast have any known identifiers?
4      A.   Yes, sir they do.
5      Q.   And what would that be?
6      A.   Typically they have a Dallas star.  They might have
7  the area code 214.  They might also have the Dallas skyline
8  printed whether it be in their mid-section, the back, in the
9  arms.  Or they might have a -- barrel of a handgun with a
10 smoking gun.
11          MR. BROOKS:   May I approach the witness, Your
12 Honor?
13          THE COURT:   You may.
14     Q.   (By Mr. Brooks)  Let me show you State's Exhibits
15 135, 139 and 147, take a look at these and tell me if you see
16 any of the Tango Blast indicators.
17     A.   The Dallas skyline in the mid-section of the stomach
18 is a good identifier.
19     Q.   Okay.
20     A.   The smoking gun right below the clown is a good
21 indicators as well.
22     Q.   We are going to have an opportunity to place on the
23 viewpoint so you can see?
24     A.   I'm sorry, okay.  And again the smoking gun.
25     Q.   On this exhibit, what is the jury trial looking at?

45

1      A.   The Dallas skyline, the city of Dallas.
2      Q.   Reunion Arena?
3      A.   Yes, sir, Reunion Arena.
4      Q.   I forget the name of that building?
5      A.   Yes, sir, it is the Green Tower, something like that.
6      Q.   And I believe you said another indicator is a smoking
7  gun?
8      A.   That's correct.
9      Q.   Using this pointer, can you show the jury exactly
10 where on that tattoo -- that's a good angle?
11          MR. BROOKS:   May he step down Your Honor.
12          THE COURT:   He may --
13     A.   You see right there (indicating), the barrel, there
14 is a hole and there is -- the barrel is there and the smoke is
15 going up.
16     Q.   (By Mr. Brooks)  Thank you, sir.
17          MR. BROOKS:   That's all, Judge.
18          Pass the witness.
19          THE COURT:   Cross-examination.
20          **CROSS-EXAMINATION**
21 BY MR. BRAUCHLE:
22     Q.   Officer Munoz, you ever written down any of these
23 characteristics of the gangs that you are down here to testify
24 about?
25     A.   Have I written down the characteristics?

46

1      Q.   Yes.
2      A.   Identifiers, you mean?
3      Q.   Yeah.
4      A.   We have them in intel and --
5      Q.   Where are they written down?
6      A.   In our data base.
7      Q.   So that's on a computer, right?
8      A.   That's correct.
9      Q.   Have you got anything in print that you could show
10 the jury so that any of these things you have testified today
11 would have existed before today?
12     A.   Not with me, I don't, sir.
13     Q.   Huh?
14     A.   I don't have them with me at this point.
15     Q.   They don't exist, do they?
16     A.   No, I don't have them with me right now.
17     Q.   Well, could you get them over the lunch hour?
18     A.   To the jury?
19     Q.   Sir?
20     A.   It's up to the jury -- it's up to the prosecutor.
21     Q.   What I am asking you, it is some place that you can
22 go and pull up Tango Blast and show that somehow, some way
23 that stands for the skyline, a smoking gun, a star and 214?
24     A.   That's how we identify the criminal street gang, by
25 interviewing and debriefing.

47

1    Q.   No, that is not what I asked you.  Is there some
2    place where that is written down so that we know it existed
3    before today and those were known identifiers for something
4    called Tango Blast?
5    A.   Yeah, we have notes on them.
6    Q.   Where is it?
7    A.   It's at our office.
8    Q.   And where would it be in your office?
9    A.   Headquarters.
10   Q.   Now where would it be in your office?
11   A.   On the gang data base.
12   Q.   So it is in a computer, right?
13   A.   Yes, sir.
14   Q.   You go back and put it in over the lunch hour, we
15   don't know if it existed before eleven o'clock today or not,
16   do we, do we?
17   A.   No, sir.
18   Q.   Now, then, so you come down here and you tell this
19   jury that a skyline, a smoking gun, and you are sure of what
20   you saw in that tattoo was a smoking gun?
21   A.   Yes.
22   Q.   It couldn't have been a smoking marijuana cigarette
23   or it couldn't have been anything else, it had to be a smoking
24   gun, right?
25   A.   That's correct.

48

1    Q.   And where was the star?
2    A.   I didn't see the star.
3    Q.   How about the 214?
4    A.   I didn't see a 214 either.  That's some other
5    identifiers.
6    Q.   Does that mean that Mr. Ruiz is partially a Tango
7    Blast member?
8    A.   That might be a possibility.
9    Q.   Okay.  So you can be a half member or a quarter
10   member or whatever you want to get tattooed up for?
11   A.   Maybe he is not a full-fledged Tango Blast, I am not
12   sure, sir.
13   Q.   Or maybe he is not.  And of course anybody with the
14   skyline of Dallas, I guess they would always be suspect as
15   being a Tango Blast member; is that correct?
16   A.   No.  I mean typically, we interview them and we make
17   that assessments after interviewing or debriefing the
18   individual.
19   Q.   So somebody who might have some civic pride or just
20   be proud of the Dallas skyline, they better watch out for the
21   Dallas gang unit?
22   A.   No, sir.
23   Q.   All right.  Now, then, the Ledbetter 12 gang sign
24   that you pointed out, you started out saying that he had a
25   tattoo that showed him to be a member of Ledbetter 12, and

49

1    then when it came up that it wasn't Ledbetter 12, and was
2    something called W.S. 12, Ledbetter 12 became Ledbetter
3    Westside gang; is that correct?
4    A.   Westside Ledbetter 12, it pretty much identifies the
5    section that he grew up with, or that he grew up in that area.
6    Q.   And where would that be?
7    A.   Or identifies as a gang.
8    Q.   And where would that be?
9    A.   What, Westside?
10   Q.   No.  Where would the Westside Ledbetter area be?
11   A.   In West Dallas.
12   Q.   Where?
13   A.   West Dallas, just Singleton, Hampton and West Dallas
14   on the west side of Dallas.
15   Q.   Okay, so you are saying that could stand for Westside
16   Ledbetter or it could just stand for Westside?
17   A.   It can be.
18   Q.   Or it could just stand for his neighborhood too,
19   though, right?
20   A.   He's identified himself as the neighborhood.
21   Q.   So it might not even be a gang side?
22   A.   To me, in my opinion being in the gang unit, it is
23   identified as a criminal street gang, Westside.  After
24   interviewing the individual and he admits to that.
25   Q.   I thought your testimony was that it could just be

50

1    the neighborhood that he grew up in?
2    A.   Well, he has identified the neighborhood as a gang.
3    Q.   So everybody who lives out there by Ledbetter and
4    Singleton is a gang member?
5    A.   No, sir, not everybody.
6    Q.   Now, then, let's go back to your first testimony, you
7    said that there is gang members and there is associates of
8    gang members; is that correct?
9    A.   That's correct.
10   Q.   And gang members have to be involved in criminal
11   activity; is that right?
12   A.   That's correct.
13   Q.   And they have to be associated with known gang
14   members?
15   A.   That's correct.
16   Q.   And then somehow, someway they have to admit to being
17   a gang member; is that right?
18   A.   It can be an admission or admission from other
19   persons.
20   Q.   Oh, okay, so other people can make them gang members,
21   whether they are or not; is that correct?
22   A.   If the individual say that he is not with a gang, in
23   most cases this has happened before.
24   Q.   Pardon?
25   A.   In most cases they have been identified by their

1   associates as being in a gang.
2       Q.    So you can just tell whoever someone is in a gang,
3   whether they are or not, and that would be enough for y'all?
4       A.    No, like I said, I have to debrief him and ask him
5   specific questions about his affiliation.
6       Q.    All right. Now, in regard to associates of gang
7   members, I guess they would be just people that associate with
8   known gang members, is that how they get that name?
9       A.    They don't meet the full criteria in regard to being
10  a full-fledged criminal street gang member.
11      Q.    Okay. So -- so are you familiar with the phrase
12  prospectus?
13      A.    I'm sorry?
14      Q.    Are you familiar with the phrase prospectus?
15      A.    Prospect, is that what you are saying?
16      Q.    Prospectus?
17      A.    No.
18      Q.    So an associate gang member could just be criminal
19  activity, but not associated with gang members and not
20  self-admitting, would that be enough?
21      A.    He has to meet our criteria, like I said, he has got
22  to be engaged in criminal activity or self-admission.
23      Q.    What if it is only one out of the three, he can still
24  be an associate gang member?
25      A.    Yes, sir.

1       Q.    Now, then, is having your wife's or your loved ones'
2   names tattooed on you, is that any kind of a sign of gang
3   membership?
4       A.    No.
5       Q.    Is having tattoos with your children's names or
6   birthdays or anything like that, is that indicative of gang
7   membership?
8       A.    No, sir.
9       Q.    You looked at pictures that were introduced in regard
10  to Mr. Ruiz's body, you are testifying as to the W.S. 12 and
11  the Dallas skyline; is that correct?
12      A.    Yes, sir.
13      Q.    And then the supposed smoking gun?
14      A.    Yes, sir.
15      Q.    How many tattoos does Mr. Ruiz have?
16      A.    I couldn't tell you. Not unless I am looking at his
17  tattoos again, full body or something, I can't make that
18  assessment at this point.
19      Q.    Officer, in regard to the incident on April 12th of
20  2005, Mr. Ruiz was charged with possession of less than a gram
21  of methamphetamine; is that correct?
22      A.    I believe so.
23            MR. BRAUCHLE:   We will pass the witness.
24            MR. BROOKS:   Nothing further, Your Honor.
25            THE COURT:   You may step down, sir.

1       Any objections to this witness being excused?
2             MR. BRAUCHLE:   No, Your Honor.
3             MR. BROOKS:   Judge, may we approach, timing
4   issue.
5             (Following proceedings had at the Bench.)
6             MR. BROOKS:   I have been told that my next
7   witness took the initiative to go down to get those gang
8   indicators at the P.D.
9             MR. BRAUCHLE:   That's convenient. They are on
10  the computer, if they aren't on now, they will be by the time
11  they will get through with them.
12            MR. BROOKS:   We can call Kathy Kesler about the
13  probation violations.
14            MR. BRAUCHLE:   There is no motion to revoke.
15            MR. BROOKS:   Yes, there is a motion.
16            MR. BRAUCHLE:   Where is it?
17            MR. BROOKS:   It should be in the file.
18            THE COURT:   You want to call Kathy Kesler?
19            MR. BRAUCHLE:   There is obviously motions that
20  involve offenses that the State has either abandoned or
21  extraneouses which haven't been let in. And because of that,
22  we would object to a probation officer giving carte blanche
23  that a regular witness wouldn't testify to, because a
24  probation officer would --
25            MR. BROOKS:   Counselor opened the door yesterday

1   for a lot of this, Judge. About this defendant being on
2   probation and nothing happened to him and nothing was done to
3   him.
4             MR. BRAUCHLE:   I don't think I asked that. When
5   did I ask that?
6             MR. BROOKS:   We can find it, but you asked those
7   questions.
8             MR. BRAUCHLE:   I don't think so.
9             MR. BROOKS:   Who was the person that was
10  testifying to the blue backs, yeah, Deputy Hamb.
11            MR. BRAUCHLE:   I asked if he was given
12  probation.
13            MR. BROOKS:   You also asked him questions about
14  being on probation, anything happened to him about being on
15  probation.
16            MR. BRAUCHLE:   You will have to find that,
17  because I don't think I asked him that. Why would I ask that?
18  There is never going to be a motion to revoke in the blue
19  back, that is what is committed the day he gets probation.
20            MR. BROOKS:   Don't take this personally.
21            THE COURT:   What do you want to ask Kesler?
22            MR. BROOKS:   There is a capias issue at the time
23  of this offense that the file has been set back the officer
24  probation violation.
25            THE COURT:   She is going to testify about the

55

**Page 55**

1    violations.

2              MR. BROOKS:   Yes, sir.  I believe we are

3    entitled to go into the violations because it goes into his

4    motive for running.

5              MR. BRAUCHLE:   Which violations.

6              MR. BROOKS:   March 14th evading arrest and

7    detention, did not report for the months of December 2006

8    through February 2007.

9              MR. BRAUCHLE:   She can do that, but the officer

10   would be the one to testify about the evading arrest, you have

11   already put on the evading arrest.

12             MR. BROOKS:   She can testify to that as well,

13   she is -- probation officers can testify to that.

14             THE COURT:   You may proceed, Mr. Brooks.

15             (End of Bench Conference.)

16             MR. WHITTIER:   We call Kathy Kesler, probation

17   officer.

18             (Witness entered the courtroom.)

19             (Witness was duly sworn.)

20             THE COURT:   You may sit down.  And you may

21   proceed.

22                   **KATHY KESLER**

23   was called as a witness, and having been duly sworn by the

24   Court, testified under oath as follows:

25

56

**Page 56**

1                   DIRECT EXAMINATION

2    BY MR. WHITTIER:

3         Q.   Tell us your name, ma'am.

4         A.   Kathy Kesler.

5         Q.   And where do you reside, ma'am, Dallas County?

6         A.   Yes.

7         Q.   Okay.  What is your profession?

8         A.   I'm a probation officer.

9         Q.   Okay.  And is that a probation officer in Dallas

10   County?

11        A.   Yes, sir.

12        Q.   Okay.  And you are a supervisory officer, are you

13   not?

14        A.   Yes, sir.

15        Q.   How many courts do you supervise?

16        A.   Three.

17        Q.   Are you familiar with the recordkeeping methods and

18   the business records of your office?

19        A.   Yes, sir.

20        Q.   Okay.  If you need to look up a file or look up

21   information on a file, you know how to do that?

22        A.   Yes, sir.

23        Q.   And are these files made on a regular basis and

24   maintained by officers who have knowledge of those entries of

25   those records?

57

**Page 57**

1         A.   Yes, sir.

2         Q.   And you were asked, were you not, to examine the file

3    of a Wesley Lynn Ruiz?

4         A.   Yes, sir.

5         Q.   Do you know him when you see him?

6         A.   From photograph, sir.

7         Q.   And he is here in the courtroom today?

8         A.   Yes, sir.

9         Q.   And where do you see him now?

10        A.   Sitting over on my far right.

11        Q.   Okay.  Ma'am, he was on probation in Dallas County,

12   was he not?

13        A.   Yes, sir.

14        Q.   In Cause No. F05-56472?

15        A.   Yes, sir.

16        Q.   Were you aware that at the same time he was on that

17   probation, had gotten that probation, he was on probation in

18   Tarrant County as well?

19        A.   Yes, sir.

20        Q.   And their Cause No. was 09-72916-D?  I am not

21   familiar with that -- what the cause number .

22        Q.   But you were just aware that he was on probation

23   there?

24        A.   Yes, sir.

25             MR. WHITTIER:   May I approach, Your Honor?

58

**Page 58**

1              THE COURT:   You may.

2              MR. WHITTIER:   Approach the witness, Your Honor?

3              THE COURT:   You may.

4         Q.   (By Mr. Whittier)  I am going to hand you what are

5    commonly called blue backs, one from Dallas County, and one

6    from Tarrant County.  You have had a chance to look at those,

7    have you not?

8         A.   Yes, sir.

9         Q.   Those are basically the summaries of the probation

10   files and the findings from those files when he was placed on

11   probation by the two judges there?

12        A.   Yes, sir.

13        Q.   Okay.  And at the time that he was placed on

14   probation in the Dallas County case, he was placed on

15   probation out of this court, was he not?

16        A.   Yes, sir.

17        Q.   And it was by a previous judge?

18        A.   It was in drug court.

19        Q.   Drug court?

20        A.   Uh-huh.

21        Q.   And he was placed on probation there for the offense

22   committed in Dallas County?

23        A.   Yes, sir.

24        Q.   What is the offense in Tarrant County that he was on

25   probation for?

59

1    A.    Possession of a controlled substance with intent to
2    deliver, methamphetamine.
3    Q.    And that was a first-degree felony, is it not?
4    A.    Yes.
5    Q.    And what were the primary conditions regarding his
6    possession of guns and possession of additional drugs, was
7    that a condition of his probation or was that addressed in his
8    probation conditions?
9    A.    It's Condition A that they can't break the law or
10   possession of a firearm during the term of probation.
11   Q.    Do you see those conditions in there?
12   A.    In the Tarrant County?
13   Q.    Yes, ma'am.
14   A.    Yes, sir.
15   Q.    Okay.
16   A.    Condition A says commit no offense against the laws
17   of this state or any other state of the United States.
18   Q.    And from that understanding of that file and that
19   probation, that probation was in effect on March 23rd of
20   2007?
21   A.    Yes, sir.
22   Q.    Okay.  So that was a stricter that he was obligated
23   under at that point?
24   A.    Yes, sir.
25   Q.    That includes the idea of possessing controlled

60

1    substances?
2    A.    Yes.
3    Q.    The probation that he was on out of Dallas County,
4    does it have similar stricters?
5    A.    Yes, sir, it does.
6    Q.    Can you read those to the jury, please.
7    A.    Condition A states commit no offense against the laws
8    of this or any other state of the United States and do not
9    possess a firearm during the term of community supervision.
10   Q.    Okay.  And that was in effect as well on March 23rd
11   of 2007?
12   A.    Yes, sir.
13   Q.    And that was one of his obligations under the law?
14   A.    Yes, sir.
15   Q.    Okay.  Let me ask you this, Ms. Kesler, do you know
16   what the status was of his probation -- or can you read from
17   your file, the status of his probation on the 20th of March
18   of 2007, three days prior to Officer Nix's shooting?
19   A.    Mr. Ruiz was considered in violation of his probation
20   as he absconded supervision.
21   Q.    Tell the jury what absconded supervision means?
22   A.    Absconded means that he was not reporting as directed
23   and we were not aware of his whereabouts.
24   Q.    How long had it been since he last reported?
25   A.    Since August of 2006.

61

1    Q.    So that was like five months prior to March of 2007,
2    August, September, October, November --
3    A.    Seven.
4    Q.    Seven months, that y'all hasn't seen or heard of him?
5    A.    No, sir.
6    Q.    Would he have been in similar violation in Tarrant
7    County had that been true in Tarrant County?
8    A.    Yes, sir.
9    Q.    In fact they were supervising him -- had you-all
10   established a courtesy supervision with them on our probation
11   yet?
12   A.    No, sir.
13   Q.    Was that in the works?
14   A.    Not that I am aware, no.
15   Q.    So your probation -- your office was totally unaware
16   of the Tarrant County probation?
17   A.    Yes, sir.
18   Q.    At the time of March of 2,007?
19   A.    Yes.
20   Q.    So that courtesy supervision for our case or theirs
21   for your case had not been established?
22   A.    No, sir.
23   Q.    Would that have routinely been worked out, had you
24   had time?
25   A.    Probably, probably.

62

1    Q.    Okay.  You had a chance to read the blue backs, the
2    documents there regarding the conditions of probation and the
3    nature of the probation out of Tarrant County, correct?
4    A.    Yes, sir.
5    Q.    Okay.  And the Tarrant County probation was in fact a
6    first-degree felony, was it not?
7    A.    Yes, sir.
8    Q.    And there was in fact also a -- let me look at that
9    real quick?
10             MR. WHITTIER:   May I approach, Your Honor?
11             THE COURT:   You may.
12   Q.    (By Mr. Whittier)  Yes, there was an allegation in
13   the indictment that a deadly weapon was a feature of that
14   offense, was it not?
15   A.    Yes, sir.
16   Q.    In fact this record reflects that he pled true to
17   that?
18   A.    Yes, sir.
19   Q.    And pleading true to a deadly weapon finding in a
20   felony drug case, changes the nature of the punishment or the
21   sentencing in that case, does it not?
22   A.    Yes, sir.
23   Q.    And it makes it an aggravated offense, correct?
24   A.    Yes, sir.
25   Q.    Does it also change the kind of parole status that he

63

1   has or possibly can get, as you understand it?
2       A.   It changes when he would be eligible for parole, yes,
3   sir.
4       Q.   Okay.  And with that kind of finding in the record on
5   a revocation, he would be facing a possibility of serving half
6   of his sentence before he is eligible?
7       A.   Yes, sir.
8       Q.   The offense in Dallas County was a second-degree
9   felony?
10      A.   Yes, sir.
11              MR. WHITTIER:   That's all we have, Judge.  We
12  will pass Ms. Kesler.
13              THE COURT:   Cross-examination, Mr. Brauchle.
14              CROSS-EXAMINATION
15  BY MR. BRAUCHLE:
16      Q.   Ms. Kesler, I think you stated that y'all filed a
17  motion to revoke on what day, now?
18      A.   The original -- the original motion was filed it
19  looks like on March 20th 2007 -- actually, hang on, we got
20  one, Mr. Brauchle, from March 20th, 2007.
21      Q.   Okay, there was a motion to withdraw the motion to
22  revoke filed on March 19th?
23      A.   We had filed one in -- and I don't have a record of
24  it here, but we had filed one I think in February under the
25  name of Jason Ruiz, because that's the name that he was

64

1   originally arrested under.
2       Q.   That's not the name that received probation under,
3   though, is it?
4       A.   Yes, sir, it is.  His original probation was under
5   Jason Ruiz.
6       Q.   Well, if you look at the plea bargain agreement, see
7   down there where it says name change, it's right underneath?
8       A.   Yes, sir, I see it.
9       Q.   So his name was changed on the day that he pled out
10  to Wesley Ruiz, wasn't it?
11      A.   Sir, no probation officer was in court the day he was
12  given probation.
13      Q.   How did get his terms and conditions of probation if
14  there was no probation officer there?
15      A.   He was given them the next day when we were aware of
16  the probation.
17      Q.   Now, then, each and every one of the plea papers is
18  signed Wesley Ruiz; is that correct?
19      A.   Yes, sir, it looks that way.
20      Q.   All right.  Now, then, let me ask you another
21  question since we are somewhat far field here, some of the
22  documents or the blue backs that are in evidence are cases in
23  which 12.44(a) motions were filed; are you familiar with
24  those?
25      A.   Minimally.

65

1       Q.   Okay.  You understand that that's a motion that is
2   filed by the State asking the Court to reduce a state jail
3   felony to a misdemeanor?
4       A.   Yes, sir.
5       Q.   And that's the State's motion to reduce; is that
6   correct?
7       A.   As far as I know.
8               MR. BRAUCHLE:   May I approach, Your Honor?
9               THE COURT:   You may.
10      Q.   (By Mr. Brauchle)  I will hand you what has been
11  marked as Defense Exhibit 24, and I will ask you if you can
12  identify that?
13      A.   It's a State's motion to find the defendant guilty of
14  a state felony and impose sentence for a Class A misdemeanor
15  as provided in section 12.44(a) of the Texas Penal Code.
16      Q.   Thank you.
17              MR. BRAUCHLE:   We will offer Defendant's Exhibit
18  24.
19              MR. WHITTIER:   May I see it.
20              THE COURT:   Is there an objection to Defendant's
21  Exhibit 24.
22              MR. WHITTIER:   Judge, we are not clear of the
23  relevancy of this document.  It is an unfilled out form from
24  one of the courts.  And I am not sure of the evidentiary
25  purpose of this, him offering this document.  It is not clear

66

1   at all.
2               THE COURT:   May I see the exhibit.
3          May I see the attorneys?
4               (Discussion off the record.)
5               THE COURT:   Defendant's Exhibit 24 is admitted.
6       Q.   (By Mr. Brauchle)  Ms. Kesler, I will hand you what
7   has been marked as Defendant's Exhibit 24 and what has already
8   been admitted as State's Exhibit State's Exhibits 123 and 126,
9   now, then, 124 -- I mean 24, which you just viewed and has
10  just been admitted, that is a blank State's motion to find
11  defendant guilty of a state jail felony, but reduce the
12  punishment under 12.44(a) to a Class A misdemeanor; is that
13  correct?
14      A.   Yes, sir.
15      Q.   Now, then, in the two files that I gave you, the 123
16  and 126, can you look at those and see if those were 12.44(a)
17  reductions.  They would say in the judgment there on the front
18  page I believe?
19      A.   123 indicates that it was reduced to a Class A
20  misdemeanor under 12.44(a) and 126 also indicates that.  That
21  it was reduced to a Class A misdemeanor under Article 12.44 A.
22      Q.   Now, going back to Exhibit 24, that's State's motion
23  and that has to be signed by a District Attorney; is that
24  correct?
25      A.   Yes, sir.

67

1    Q.   In fact their signature is the top one, I believe; is
2 that correct?
3    A.   Yes, sir.
4    Q.   And it says that it is submitted by the District
5 Attorney's office; is that correct?
6    A.   Yes, sir.
7    Q.   So -- now you find either of those in 123 or 126, can
8 you look through those and see if those documents contain
9 records of a 12.44 having been filed with them?
10    A.   I do not see one in 126 and do not see that actual
11 form in 123 either.
12    Q.   However, the judgment and sentence reflects that at
13 some point in time one had to be filed by the State to affect
14 the result that was achieved; is that correct?
15    A.   I would think so.
16    Q.   Now, I was unclear as to what your testimony was.
17 The defendant's probation was in the process of being moved to
18 Tarrant County or the Tarrant County was in the process of
19 being moved to Dallas County?
20    A.   Since we have no record of receiving paperwork from
21 Tarrant County, I can only assume that theirs is coming here.
22 Since last address we had for Mr. Ruiz was in Dallas County.
23    Q.   And you don't have any record of whether he was
24 reporting in Tarrant County or not, do you?
25    A.   No, sir.

68

1    Q.   I believe that your testimony was that is that y'all
2 filed a motion to revoke in February of '07; is that correct?
3    A.   Yes, sir.
4    Q.   And that was withdrawn on April 19th; is that
5 correct, or is it March?
6    A.   March 19th.
7    Q.   Okay. And then you filed one the next day?
8    A.   Yes, sir, under the correct name.
9    Q.   Now, that was -- as was pointed out, the name was
10 changed at the time of the plea, the plea papers were all
11 signed in the name of Wesley Ruiz; is that correct?
12    A.   Yes, sir.
13    Q.   So it just been a mix up on y'all's part; is that
14 correct?
15    A.   Yes, sir.
16    Q.   Now, is there any indication that Mr. Ruiz had
17 personal knowledge that a motion to revoke his probation had
18 been filed back in February?
19    A.   No, sir.
20    Q.   So because of his noncontact with your office, he
21 wouldn't have known whether there was a warrant issued for him
22 or not, would he?
23    A.   He wouldn't have known in fact. He could probably
24 assume that there was one.
25    Q.   But as far as him actually having notice or being in

69

1 any way advised of that, he wasn't?
2    A.   No, he was not.
3    Q.   Okay, the same would hold forth on March 20th also;
4 is that correct?
5    A.   Yes, sir.
6    Q.   So they were filed -- I think he was finally served
7 with the motion in regard to the March 20th one sometime in
8 April; would that be a correct statement?
9    A.   My records reflect that he was actually served -- the
10 only records I have right here indicate that he was served in
11 December of 2007.
12    Q.   December of 2007?
13    A.   Uh-huh.
14    Q.   So as far as him having any actual notice that a
15 motion to revoke his probation had been filed, that wouldn't
16 have occurred until December of 2007?
17    A.   When an amended motion to revoke was filed.
18    Q.   So he wasn't even served the original motion to
19 revoke; is that correct?
20    A.   It doesn't appear so.
21    Q.   And so December of 2007 would be the first time that
22 he had any direct knowledge of there being any motion to
23 revoke his probation; would that be a correct statement?
24    A.   It appears so.
25    Q.   And that would be made known to him by somebody

70

1 actually handing him a copy of that, correct?
2    A.   Yes, sir.
3    Q.   These aren't mailed out or phoned in or anything?
4    A.   No.
5    Q.   And the process is, is that when a motion to revoke
6 is issued, there may or may not be a warrant issued by the
7 sheriff's department; is that correct?
8    A.   Yes. I suppose we could issue a motion without a
9 warrant.
10          MR. BRAUCHLE:   We will pass the witness.
11               REDIRECT EXAMINATION
12 BY MR. WHITTIER:
13    Q.   Ms. Kesler, the questions that counselor raised
14 regarding the convictions in 123 and 124; you have those there
15 still, correct?
16    A.   Yes, sir.
17    Q.   He mentioned fairly frequently the reduction to a
18 misdemeanor for the sentencing, correct?
19    A.   Yes, sir.
20    Q.   In fact, they remained felonies, they were just
21 simply sentenced as misdemeanors; is that correct?
22    A.   Yes, sir.
23    Q.   And that's in both cases?
24    A.   Yes, sir.
25    Q.   When a defendant is placed on probation, the terms of

1   and conditions are gone over in detail with them one by one,
2   correct?
3       A.    Yes, sir.
4       Q.    And there are some standard conditions of probation,
5   are there not?
6       A.    Yes, sir.
7       Q.    And they comprise the first portion of the terms and
8   conditions of the probation sheet?
9       A.    Yes, sir.
10      Q.    Which might also include additionally special
11  conditions the Judge gives?
12      A.    Yes.
13      Q.    And isn't it true, Ms. Kesler, that they are advised
14  of the consequences for failing to comply with those
15  conditions?
16      A.    Yes.
17      Q.    One of the prime conditions in supervising somebody
18  on probation is that you have regular routine contact with
19  them, correct?
20      A.    Yes.
21      Q.    And that's the reporting required?
22      A.    Yes.
23      Q.    Where they are required under court order to appear
24  and make -- establish contact and maintain contact with your
25  office?

1       A.    Yes, sir.
2       Q.    On regular basis; is that correct?
3       A.    Yes.
4       Q.    Is that typically one of the main conditions you
5   discuss with them, if we can't see you or hear from you, we
6   can't supervise you?
7       A.    Yes.
8       Q.    That kind of idea; is that correct?
9       A.    Yes.
10      Q.    And what are they routinely told by your office about
11  failing to report?
12      A.    If they fail to report and we cannot get them in to
13  report, that we will ultimately file a violation report with
14  the court and request a warrant.
15      Q.    And a warrant is a warrant for arrest?
16      A.    Yes.
17      Q.    So then long before December of 2007 as counselor
18  asked, he was aware that failing to report will result in the
19  issuance of a warrant?
20           MR. BRAUCHLE:   Your Honor, we would object to
21  this, there is no showing that she knows what the defendant
22  knew or did not know.
23           THE COURT:   Sustained.
24           MR. WHITTIER:   Judge, may I be heard.
25           THE COURT:   I sustained the objection.

73

1            MR. WHITTIER:   Yes, sir.
2       Q.   (By Mr. Whittier)  Ms. Kesler, do you have any direct
3   knowledge that he was unaware that there being a possibility
4   of a warrant?
5       A.    I don't.
6            MR. WHITTIER:   That's all we have, Judge.  We
7   pass Ms. Kesler.
8            MR. BRAUCHLE:   Nothing further.
9            THE COURT:   You may step down ma'am.
10  May this witness be excused?
11           MR. BRAUCHLE:   Yes.
12           THE COURT:   You are free to go, ma'am.
13           Ladies and gentlemen, we will break for noon break and we
14  will resume at 1:15.
15           THE BAILIFF:   All rise.
16           (Jury retired from the courtroom.)
17           THE COURT:   You may be seated.
18  Court is at recess.
19           (Lunch recess taken.)
20           THE COURT:   Both sides ready for the jury?
21           MR. BEACH:   Yes, Your Honor.
22           THE BAILIFF:   All rise.
23           (Jury returned to the courtroom.)
24           THE COURT:   You may be seated.
25           MR. BEACH:   The State would recall Hector

74

1   Martinez.
2            (Witness entered the courtroom.)
3            THE COURT:   This witness has been previously
4   sworn; is that correct?
5            You may proceed.
6                    HECTOR MARTINEZ
7   was called as a witness, and having been duly sworn by the
8   Court, testified under oath as follows:
9                    DIRECT EXAMINATION
10  BY MR. BEACH:
11      Q.    State your name, please.
12      A.    Hector Martinez.
13      Q.    Hector, you know the drill by now, you need to scoot
14  up, kind of get that microphone up close to you, act like you
15  want to be here.
16      You are the same Hector Martinez that testified about
17  a month ago; is that correct?
18      A.    Yes, sir.
19      Q.    And you were friends and were associates of the
20  defendant, Wesley Ruiz, when he was out in the free world; is
21  that correct?
22      A.    Yes, sir.
23      Q.    And for the record, Mr. Ruiz is at the end of counsel
24  table in the dark coat; is that correct?
25      A.    Yes, sir.

75

1     Q.    You got to know the defendant through your older
2     brothers; is that correct?
3     A.    Yes, sir.
4     Q.    And how did your older brothers know Wesley Ruiz back
5     in the 1990s, were they in the same gang?
6     A.    Yes.  We went to school together.  They all met in
7     school.
8     Q.    What gang were they in?
9     A.    Midnight.
10          MR. BRAUCHLE:    Your Honor we would object to
11    that, assumes facts not in evidence.  It is also leading the
12    witness.
13          MR. BEACH:    What gang was he in?
14    A.    Midnight Dreamers --
15          MR. BRAUCHLE:    He didn't say they were in a
16    gang.
17    Q.    (By Mr. Beach)  Was Wesley Ruiz in a street gang back
18    in the 1990s?
19    A.    Yes, sir.
20    Q.    And that was Midnight?
21    A.    Yes, sir.
22    Q.    And that was out in Irving; is that correct?
23    A.    Yes, sir.
24    Q.    And are you familiar with throwing up Midnight, the
25    gang sign?

76

1     A.    Yes, sir.
2          MR. BEACH:    May I approach, Judge?
3          THE COURT:    You may.
4     Q.    (By Mr. Beach)  Let me show you and has been admitted
5     into evidence State's 159, that's your friend, Wesley Ruiz,
6     back in the day; is that right?
7     A.    Yes, sir.
8     Q.    What is Wes doing in State's 159?
9     A.    Throwing a gang sign.
10    Q.    What gang sign is that?
11    A.    Midnight.
12    Q.    Enunciate, Hector.  What was it?
13    A.    Midnight Dreamers.
14    Q.    Midnight.  I will show you now what has been admitted
15    into evidence, State's 132, looks like the left hand of your
16    friend, Wes Ruiz, are you familiar with this gang sign.
17    W.S.L.R. -- W.S. 12, excuse me?
18    A.    Yes, sir.
19    Q.    What is that?
20    A.    It's, I guess, it is Westside.
21    Q.    Westside what?
22    A.    Twelve.
23    Q.    Is that a street gang?
24    A.    No.  It's just a neighborhood.
25    Q.    You got a tattoo on your right arm; is that correct?

77

1     A.    Yes, sir.
2     Q.    And left arm?
3     A.    Yes, sir.
4     Q.    What are they, hold them up?
5     A.    Dallas, Texas.
6     Q.    Okay, I showed you the tattoo on Wesley Ruiz's
7     stomach; is that correct?
8     A.    Yes, sir.
9     Q.    Have you heard of the gang Tango Blast before?
10    A.    Yes, sir.
11    Q.    Is that a prison gang?
12    A.    Yes, sir.
13    Q.    Now, as you testified about a month ago, you and
14    Wesley Ruiz started hanging out together quite a bit after he
15    got out of Tarrant County jail in 2006; is that correct?
16    A.    Yes, sir.
17    Q.    And you would see Wesley Ruiz, the nine months from
18    the time he got out of Tarrant County jail until the time he
19    murdered Mark Nix, you would see him on and a weekly basis?
20    A.    I guess that would be it.
21    Q.    And you were splitting time between your house in Oak
22    Cliff and the house on Calculus; is that right?
23    A.    Yes, sir.
24    Q.    And you would see him both in the North Dallas house
25    and the Oak Cliff house?

78

1     A.    Yes, sir.
2     Q.    And was there a time, Mr. Martinez, that you had
3     conversation with Wes Ruiz about what he had been doing?
4     A.    Yes, sir.
5     Q.    And did Wes Ruiz ever admit to you that he had jacked
6     people?
7          MR. BRAUCHLE:    Your Honor, we would object to
8     this.
9     A.    He told --
10          THE COURT:    Sir, one second.
11          MR. BRAUCHLE:    It's a violation of our pretrial
12    motions and we would object to it under 404, 403 and 402 and
13    401 --
14          THE COURT:    Overruled.
15    Q.    (By Mr. Beach)  Did he tell you that he jacked
16    somebody?
17    A.    Yeah, we would talk about, but I ain't never really
18    seen him.  Everybody just come through and brag, you know what
19    I am saying.
20    Q.    You weren't there when he did it, but he talked to
21    you about it?
22    A.    I mean, he was just come through, everybody --
23    everybody around the neighborhood just jacks everybody, not
24    just jacking.
25    Q.    Steal from them?

79

1    A.    Yeah, put in a quick move.

2    Q.    He ever talk to you about shooting at somebody at

3    Club Extreme?

4    A.    No.  He told me one time that he had got into some

5    trouble with some guys at a club.

6    Q.    And what did he do, once he got in trouble with them?

7    A.    He said that had blocked them in.  That they wanted

8    to get him or something like that.  He had -- he started

9    shooting, I guess, they had blocked him in with the cars and

10   all that, and he had to get out of there.  So he started

11   shooting toward their direction.

12   Q.    Did he know if he had hit them or not?

13   A.    I don't know.

14   Q.    And you knew Wes Ruiz to carry guns; is that correct?

15   A.    Yes, sir.

16   Q.    Not just the assault pistol he used to murder the

17   police officer, but you had seen him with other guns; is that

18   correct?

19   A.    Yes, sir.

20   Q.    Did he ever -- did Wesley ever tell you about not

21   going back to jail?

22   A.    Yeah.

23   Q.    What did he tell you?

24   A.    He said, I mean, he said that he wasn't ever going

25   back.  I mean we all say that.  Once we go to jail, we come

80

1    back out of jail and say we ain't ever going back to jail.

2    Q.    Did he ever say specifically the only way he would go

3    back was in a box?

4    A.    Yeah, he said that one time.

5    Q.    The day that he murdered that Dallas Police Officer,

6    he had been over to your house that day; is that correct?

7    A.    Yes, sir.

8    Q.    Did he pay you some money that day?

9    A.    Yes, sir.

10   Q.    About how much money did Wes Ruiz pay you?

11   A.    It was about anywhere from like 3,000 -- 3500

12   something like that.

13   Q.    Dollars?

14   A.    Yeah.

15         MR. BEACH:  I will pass the witness, Judge.

16         THE COURT:  Cross-examination.

17                    CROSS-EXAMINATION

18   BY MR. BRAUCHLE:

19   Q.    Mr. Martinez --

20   A.    Yes, sir.

21   Q.    Were you a member of Midnight Dreamers?

22   A.    No, sir.

23   Q.    And how old were you in 1997?

24   A.    See I am 20 now, how many years ago was that, about

25   ten, nine years ago.

81

1    Q.    That would have been 11 years.

2    A.    I was nine years old.

3    Q.    So you don't know anything about the Midnight

4    Dreamers in 1997; do you?

5    A.    No, sir.

6    Q.    Now, then, in regard to Tango, do you know what Tango

7    stands for?

8    A.    It's a prison gang.

9    Q.    Do you know what the letters T-a-n-g-o Stand for?

10   A.    No, sir.

11   Q.    You ever heard of Tejanos Against Native Gang

12   Organizations?

13   A.    No, sir.

14   Q.    Tejanos Against Negative Gang Organizations, you have

15   never heard of that?

16   A.    Huh-uh.

17   Q.    You ever known anybody that was in Tango Blast?

18   A.    Yes, sir.

19   Q.    You never asked them what the name stood for?

20   A.    No, sir.

21   Q.    I believe you stated that you don't belong to a gang?

22   A.    Yes, sir.

23   Q.    What gang do you belong to?

24   A.    No, I don't belong to no gang, sir.

25   Q.    What part of town did you grow up in?

82

1    A.    Oak Cliff.

2    Q.    Now, the phase "jack" somebody, could that be taking

3    their money on drugs that have been fronted them?

4    A.    Um, yes, sir.

5    Q.    So it doesn't mean hi-jack somebody in particular,

6    does it?

7    A.    No, sir.

8    Q.    It could be just talking about ripping somebody off?

9    A.    Yes, sir.

10   Q.    Of their money, right?

11   A.    Yes, sir.

12   Q.    Including not paying somebody that had fronted you

13   drugs; is that correct?

14   A.    Yes, sir.

15   Q.    Tell the jury what "fronting" somebody drugs mean?

16   A.    Like somebody hands you the drugs without paying,

17   let's you pay them later.

18   Q.    Well, basically giving somebody some drugs to sell

19   and they are supposed to bring you back the money that they

20   made, right?

21   A.    Yes, sir.

22   Q.    So jacking somebody would be not bringing the money

23   back, but taking the drugs, wouldn't it?

24   A.    Yes, sir.

25   Q.    You weren't around at Club Extreme at any time that

83

1    Wesley Ruiz was, were you?
2       A.   No, sir.
3       Q.   So you don't know about anything that may or may not
4    have happened at Club Extreme; is that correct?
5       A.   Yes, sir.
6       Q.   Pardon?
7       A.   No, sir.
8       Q.   But it is your understanding that somebody may have
9    cut off some people that night?
10      A.   Yes, sir.
11      Q.   What would cutting somebody off be?
12      A.   Like blocking them in or like in their car, cutting
13   somebody off.
14      Q.   I didn't hear the last part?
15      A.   Like cutting somebody off in a car or blocking
16   somebody in, that's cutting somebody off.
17      Q.   Did you have the impression that the people that may
18   have done that intended to do Mr. Ruiz some harm?
19      A.   Yes, sir.
20      Q.   Now, then, is this part of your agreement with the
21   State to come down here and testify today?
22      A.   Yes, sir.
23      Q.   Was this part of the deal the last time that you
24   testified?
25      A.   I don't understand that question, sir.

84

1       Q.   Well, did you know that you were going to come back
2    again when we talked to you last time?
3       A.   Yeah, they told me they might use me again, they
4    might need me again.
5       Q.   Did they tell you what for?
6       A.   No, just come testify.
7       Q.   Well, you didn't mention it last time we met and I
8    was just wondering if you knew about it at that time?
9       A.   Knew about what, sir.
10      Q.   Coming back here today?
11      A.   Yeah, because my lawyer had asked if I can be
12   released from the subpoena and they said, no, so I knew I was
13   going to have to come back.
14      Q.   So you knew that when I asked you what the deal was
15   in regard to you testifying?
16      A.   Excuse me?
17      Q.   You knew that you would have to come back again when
18   I asked you what it was that you had to do to fulfill your
19   deal with the State; is that correct?
20      A.   Yes, sir.
21      Q.   Now, then, have you pled out on your cases?
22      A.   No, sir.
23      Q.   So they are still holding that over your head, right?
24      A.   Yes, sir.
25      Q.   You are supposed to get deferred adjudication

85

1    probation; is that right?
2       A.   I have no idea, sir.
3       Q.   You don't?
4       A.   No, sir.
5       Q.   You haven't talked to your lawyer as to what you are
6    supposed to get?
7       A.   He said we are still going to go to trial and try to
8    beat that case because it is like a weak case, so we are still
9    going to trial for that case.
10      Q.   So what is your advantage of coming down here and
11   testifying if you are going to go to trial and try to beat the
12   case?
13      A.   I don't know, sir, huh-uh.  They told me that I
14   wasn't going to go to prison if I came down here and testify
15   truthfully or whatever.
16      Q.   Wait a second, I can't hear you.  They told you that
17   you weren't going to go to prison if you came down here and
18   testify?
19      A.   Yes, sir.
20      Q.   And that was before you testified last time?
21      A.   Yes, sir.
22      Q.   Now, what did Mr. Beach tell you was going to happen
23   today?
24      A.   Nothing, sir.  Just come up here and testify, he was
25   going to ask me some questions.

86

1       Q.   When did you get down here today?
2       A.   Like around 11:30.
3       Q.   And so you have been talking with the District
4    Attorney since 11:30 today?
5       A.   No, sir.  Me and my lawyer went and go eat.
6            MR. BRAUCHLE:   May I have a moment, Your Honor?
7            THE COURT:   You may.
8            (Pause in the proceedings.)
9       Q.   (By Mr. Brauchle) Mr. Martinez, let me get this
10   straight, that's your lawyer right there?
11      A.   Yes, sir.
12      Q.   Charlie Humphreys.  And you are telling this jury
13   that you have never discussed deferred adjudication probation
14   with him?
15      A.   No, sir.
16      Q.   Never ever?
17      A.   No, sir.  He said that there might be a chance that I
18   am going to get probation for my case, because he still wants
19   to go to trial and fight because he still has a chance to beat
20   it.
21      Q.   So you have two cases?
22      A.   So if I were to get convicted for my cases, then
23   that's where the deal comes in.
24      Q.   So you get like two bites at the apple, so if you do get
25   convicted, they will still give you probation; is that what is

1  going to happen?
2      A.   Yes, sir.
3      Q.   That's a sweet deal?
4      A.   Yes, sir.
5      Q.   You get to go to court and fight the case; then if
6  you lose, you still get probation?
7      A.   Yes, sir.
8      Q.   And that's what you have been told by your lawyer?
9      A.   Yes, sir.
10     Q.   You understand that if you -- if you are found guilty,
11  in a trial, that you can't get probation, the least you can
12  get is 25 years?
13              MR. HUMPHREYS:   Objection.  That is not an
14  accurate statement of the law, Judge?
15              THE COURT:   Overruled.
16     Q.   (By Mr. Brauchle)  Were you aware of that?
17              MR. HUMPHREYS:   Objection, same objection.
18              THE COURT:   Overruled.
19     Q.   (By Mr. Brauchle)  You were charged with possession
20  over 400 grams; is that correct?
21     A.   Yes, sir.
22              MR. HUMPHREYS:   Objection.  Doesn't specify as
23  to which case, Your Honor.
24              THE COURT:   Overruled.
25     Q.   (By Mr. Brauchle)  Well, you got a case in where you

1  are charged with possession of methamphetamine in an amount
2  over 400 grams with intent to deliver; is that correct?
3      A.   Yes, sir.
4      Q.   And the minimum sentence for that case without any
5  enhancements is ten years in the penitentiary, isn't it?
6      A.   I think it is 15 to 99 sir.
7      Q.   Fifteen to 99?
8      A.   Yes, sir.
9      Q.   And then you have got -- are there any enhancement
10  paragraphs on those cases?
11     A.   I don't know what that is, sir.
12     Q.   Prior felony convictions?
13     A.   Have I ever been convicted of anything else, no, sir.
14     Q.   All right.  Mr. Martinez, have you got the Dallas
15  skyline on the inside of your arm?
16     A.   Yes, sir.
17     Q.   Could you show that to the jury?
18     A.   It's inside the letters.
19     Q.   So according to the State, that's the symbol for
20  Tango Blast?
21     A.   I don't know, sir.  I am from Dallas, that's where I
22  got it.  You got to go to prison to be in Tango, you can't get
23  in Tango out here.  It's a prison gang.
24     Q.   So if you have never been to prison, you couldn't be
25  a member of Tango Blast?

---

89

1      A.   Correct.
2      Q.   And the picture of the Dallas skyline that you have
3  got, is just a show of civic pride then; is that what you are
4  telling the jury?
5      A.   Yes, sir, I am from Dallas, that's why I got it.
6              MR. BRAUCHLE:   We have no further questions.
7              REDIRECT EXAMINATION
8  BY MR. BEACH:
9      Q.   Last thing, Mr. Martinez, back on March the 14th,
10  nine days before your friend murdered that Dallas Police
11  Officer, his father's car ended up in the alley behind your
12  house; is that right?
13     A.   Yes, sir.
14     Q.   And did you see Wesley Ruiz after his car ended up in
15  the alley behind your house?
16     A.   Yes, sir.  I seen him like the next day or something.
17     Q.   What did he tell you what happened?
18     A.   He said he had got pulled over and took off.
19     Q.   Got away?
20     A.   Got away.
21     Q.   Did your friend like running from the police?
22     A.   I mean, I don't know, sometimes.
23              MR. BRAUCHLE:   Your Honor, we would object to
24  that in that the proper predicate hasn't been laid.
25              THE COURT:   Overruled.

90

1      Q.   (By Mr. Beach)  And I agreed, Mr. Martinez, you are
2  getting the sweet deal, you have the good fortunate of being
3  friends with a capital murderer; you understand that's why you
4  are getting a good deal?  It is like manner from heaven just
5  like you happen to know Wesley Ruiz and that's why you are
6  getting this sweet deal; you understand that?
7      A.   Yes, sir.
8      Q.   Not because of anything that you have done or how you
9  have lived your life, you just happen to know Wesley Ruiz.
10              MR. BEACH:   That's all I have, Judge.
11              RECROSS-EXAMINATION
12  BY MR. BRAUCHLE:
13     Q.   Mr. Martinez, going back to Club Extreme, did you see
14  the car that Mr. Ruiz was driving that night?
15     A.   No, sir.
16     Q.   You never saw it?
17     A.   No, sir.  I mean, I probably seen the car, but I don't
18  even remember.
19     Q.   Did you see it with the bullet holes in it?
20     A.   No, sir.
21     Q.   Don't recall that?
22     A.   No, sir, I don't remember.
23     Q.   You are sure?
24     A.   I am not sure, I don't remember, sir.
25     Q.   All right.

91

```
 1          MR. BRAUCHLE:   We will pass the witness.
 2          MR. BEACH:   Nothing further, Judge.
 3          THE COURT:   You may step down.
 4          MR. BEACH:   May he be excused?
 5          THE COURT:   Any objections?
 6          MR. BRAUCHLE:   No, Your Honor.
 7          THE COURT:   You are free to go, sir.
 8          (Witness entered the courtroom.)
 9          THE COURT:   Raise your right hand, sir.
10          (Witness was duly sworn.)
11          THE COURT:   You may proceed.
12                  DANIEL TORRES
13  was called as a witness, and having been duly sworn by the
14  Court, testified under oath as follows:
15                  DIRECT EXAMINATION
16  BY MR. BROOKS:
17      Q.    Tell the jury your name, please.
18      A.    Daniel Torres, T-o-r-r-e-s.
19      Q.    And Officer Torres, how long have you been with the
20  Dallas Police Officer?
21      A.    About eight years and nine months.
22      Q.    And in those eight years and nine months, what
23  section to the Dallas Police Department or what divisions have
24  you been assigned to?
25      A.    I was assigned to the Northwest Patrol Bureau working
```

92

```
 1  Patrol, also assigned to the Northwest Deployment Unit.  And
 2  my current assignment is with the Dallas Police Department
 3  Gang Unit.
 4      Q.    And how long have you been assigned to the gang unit?
 5      A.    Four and a half years.
 6      Q.    And is part of your duties with the Dallas Police
 7  Department gang unit, are you tasked with making notations or
 8  keeping track of known street gangs?
 9      A.    Yes, I am.
10      Q.    Are you able to give this jury a number of how many
11  known street gangs potentially are in the city of Dallas?
12      A.    There are approximately 87 street -- documented
13  street gangs in the city of Dallas.
14      Q.    And Westside Ledbetter 12, is that a known documented
15  street gang?
16      A.    Yes, sir, it is.
17      Q.    And what particular indicators does a member of
18  Westside 12, how would they make that known or how would they
19  display that?
20      A.    Well, Ledbetter 12, Westside Ledbetter 12 is a
21  Hispanic gang.  They have different indicators.  They don't
22  necessarily have to be, but usually they are from a certain
23  area of town, the West Dallas Area of town, around the
24  Singleton, Bernal area.  And they are Latin males like I said
25  the age of 14 on up, and they associate with the number 12 for
```

93

```
 1  Loop 12, actually, and the Ledbetter area.
 2      Q.    And specifically the initials W., W.S., would that be
 3  a potential gang indicator?
 4      A.    Yes, it would, for the west side of town.
 5          MR. BROOKS:   May I approach the witness, Your
 6  Honor?
 7          THE COURT:   You may.   .
 8      Q.    (By Mr. Brooks) Officer, I want to show you what is
 9  marked as State's Exhibit 132, and ask you to take a look at
10  that tattoo.
11      A.    Okay.
12      Q.    And what do you see on State's Exhibit 132?
13      A.    I see a hand.  And inside the crook of the hand
14  between the thumb and the first finger, I see the letters W.S.
15  and the number 12.
16      Q.    And are tattoos another known indicator for criminal
17  street gangs?
18      A.    Yes, sir.  They are the best known for criminal
19  street gangs.
20      Q.    Is there any one specific indicator or a number of
21  indicators that you add together?
22      A.    There are a number of indicators that would make a
23  person, make us able to document an individual as a criminal
24  street gang member.
25      Q.    And are you also familiar with a street gang called
```

94

```
 1  Tango Blast, a prison gang?
 2      A.    Yes, sir, I am.
 3      Q.    And in fact have you recently attend a seminar on
 4  tango blasts?
 5          MR. BRAUCHLE:   Your Honor, we would object to
 6  this as being outside the scope of this examination.
 7          THE COURT:   Overruled.
 8      A.    I recently was an instructor at the Texas Gang
 9  Investigator's Association State Conference, teaching Tango
10  Blast to law enforcement personnel, as well as probation and
11  District Attorneys throughout the state, and the conference
12  was held in Houston.
13      Q.    (By Mr. Brooks) Tell the jury in respect to Tango
14  Blast is it a prison bang that is confined strictly to Dallas,
15  Texas?
16      A.    No, it is not.
17      Q.    How far reaching is Tango Blast?
18      A.    Statewide.
19      Q.    Are there major cities associated with Tango Blast?
20      A.    Yes, sir.  Tango Blast is a gang that was formed
21  inside the Texas prison system.  Basically what happened is,
22  individuals that would go to the Texas prison system got tired
23  of being picked on by the larger more established prison
24  gangs, such as the Texas Syndicate, Mexican Mafia, so people
25  that would go to prison from a certain town, let's say like
```

1   Dallas or Fort Worth or Houston, they started grouping
2   together for protection initially.  Well, at some point in
3   time --
4            MR. BRAUCHLE:   Your Honor, we would object to
5   the narrative.
6            THE COURT:   Sustained.
7       Q.   (By Mr. Brooks)  Let me ask you this question,
8   Officer.  And individual from Dallas, Texas, who is part of
9   Tango Blast, would a tattoo of the Dallas skyline be a
10  possible indicator?
11      A.   Yes, it would be an indicator.
12      Q.   Let's say an individual from the city of Houston,
13  what would be the possible tattoo indicator from someone from
14  Houston?
15      A.   It would be the Houston skyline or the Houston astro
16  star or the Houston area code.
17      Q.   Is there a known indicator for the city of San
18  Antonio.
19      A.   San Antonio is kind of off by themselves in their
20  own --they are not part of Puro Tango Blast, but their Tango
21  indicator to be for ears for orejas.
22      Q.   Has there been an evolution with respect to Tango
23  Blast?
24      A.   Yes, sir, there has been.
25      Q.   Are there individuals in Tango Blast who have yet to

1   hit the prison system?
2       A.   Yes.  There are some discussion right now among
3   individuals who have already become members of Tango Blast by
4   going to prison and individuals who are outside on the streets
5   not in the Texas prison system.
6            MR. BRAUCHLE:   Your Honor, we would object to
7   that as being a violation of Crawford.
8            THE COURT:   Overruled.
9            MR. BROOKS:   May I have just a moment, Your
10  Honor?
11           THE COURT:   You may.
12      Q.   (By Mr. Brooks)  Officer, I am showing you what is
13  marked as State's Exhibit 135; are you able to make out what
14  that is?
15      A.   That's a skyline of the city of Dallas.
16      Q.   Now, the skyline of the city of Dallas, that by
17  itself is that an indicator, just by itself of Tango Blast?
18      A.   That's an indicator, but that wouldn't make a person
19  a member just on that indicator alone.
20      Q.   State's Exhibit 147, are you able to make out what is
21  a depicted in this exhibit?
22      A.   Yes, sir.
23      Q.   And what is that?
24      A.   That's a smoking pistol.

1       Q.   And what is that an indicator of?
2       A.   That is also an indicator of Tango Blast or blast,
3   gun smoking.
4       Q.   Now, when we talk --
5            MR. BROOKS:   You can turn the lights on, Judge,
6   thank you.
7       Q.   (By Mr. Brooks)  When we talk about these tattoo
8   indicators, are all these tattoos exactly the same or is it --
9   is there a variety?
10      A.   No, needless to say no tattoo artist is going to put
11  the exact same tattoo on every single time, it is going to
12  vary.  It is going to vary from one individual to the other,
13  and the tattoo artist to that.  But what they mean, obviously
14  they may have a similar meaning.
15           MR. BROOKS:   I'm sorry, Judge, I have one more.
16      Q.   (By Mr. Brooks)  State's Exhibit 150, are you able to
17  see that tattoo?
18      A.   Yes, sir, I am.
19      Q.   And that looks like MOB?
20      A.   Yes, sir.
21      Q.   And what does that stand for?
22      A.   The current intelligence we have gathered, it stand
23  for money over bitches.  It could also mean member of blood;
24  but most people say it stands for money over bitches, pardon
25  me.

1            MR. BROOKS:   I believe that's all I need that
2   the time, Your Honor.
3       Q.   (By Mr. Brooks)  Now the, information that the Dallas
4   Police Department has on Tango Blast, do y'all keep had a in a
5   file or --
6       A.   Yes, sir, we have a data base where anytime an
7   individual is contacted that is associated or claims to be a
8   member of Tango Blast, we document that and place that in that
9   data base.
10      Q.   And over the lunch break did you have an opportunity
11  to go back to the Dallas Police Department and obtain
12  photographs of other tattoo indicators of Tango Blast?
13      A.   Yes,I did.
14      Q.   And do you have those here in the courtroom?
15      A.   Yes, I do.
16           MR. BROOKS:   Pass the witness.
17                   CROSS-EXAMINATION
18  BY MR. BRAUCHLE:
19      Q.   Officer Torres, did you see the Dallas skyline tattoo
20  on the last witness, Hector Martinez?
21      A.   I have seen it.
22      Q.   So does that make him a member of Tango Blast?
23      A.   I would have to ask him further questions to fine
24  out, but that would be an indicator, yes.
25      Q.   Mr. Martinez testified that you can't be a member of

99

1  Tango Blast unless you have been to the penitentiary?
2           MR. BROOKS:  Your Honor, I am going to object to
3  the form of the question.  It is asking for comparative
4  testimony.
5           THE COURT:  Sustained.
6      Q.  (By Mr. Brauchle) Mr. Martinez testified that you
7  can't go -- you can't belong to Tango Blast --
8           MR. BROOKS:  Renew my objection.  That's a
9  question that calls for comparative testimony.
10          THE COURT:  Sustained.
11      If you will rephrase the question, sir.
12      Q.  (By Mr. Brauchle) It has been stated by Hector
13  Martinez that you can't be a member of Tango Blast unless you
14  have been to prison; is that correct?
15          MR. BROOKS:  I will renew my objections.
16          THE COURT:  Sustained.
17      Q.  (By Mr. Brauchle) You have to go to prison to be a
18  member of Tango Blast?
19      A.  The intelligence on that is changing everyday, sir.
20  Some members will tell you, yes, you have to absolutely go to
21  prison.  Some members will tell you have to go to state
22  jail.  Another member will tell you that you have to hit a
23  unit or prison system.  Other members will tell you, because
24  we have contacted individuals who are claiming Tango Blast,
25  they are in high school, who have not been in TYC or Texas

100

1  Youth Commission or prison a the all, so it is fluctuating.
2  It is changing everyday.
3      Q.  Let me ask you something, there is no limit as to
4  what somebody could go in and request as far as a tattoo on
5  their body, is there?
6      A.  I am not a tattoo artist, but I figure you can ask
7  for anything you want.
8      Q.  Okay.  Let's just say if I wanted to leave here today
9  and get the Dallas skyline, a smoking car and star, 214
10  tattooed on my body, I could get that done pretty quickly,
11  couldn't you?
12      A.  I would imagine so.
13      Q.  Would that make me a member of Tango Blast?
14      A.  You would have some very significant indicators on
15  your body after you get your tattoos.
16      Q.  Significant tattoo on my body doesn't mean I have
17  been to prison or state jail or prison unit, does it?
18      A.  No, sir.
19      Q.  It doesn't have any indication that I am in any way
20  involved in criminal activity, does it?
21      A.  I would say that would be an indicator that would
22  lead me to ask more questions of that individual or you, if
23  you had those tattoos on your body.
24      Q.  How do tattoos make somebody a street criminal?
25      A.  Tattoos don't, sir.  But their history, as well as an

101

1  interview, talking to the individual would -- again I would
2  have to interview the individual, those are indicators.  One
3  indicator by itself isn't going to make a person a gang member
4  or part of a gang, the State of Texas dictates that you have
5  to have other identifier fires as well.
6      Q.  I didn't ask you about the State of Texas?
7      A.  Okay.
8      Q.  I asked you about the four indicators that have been
9  brought here to court?
10      A.  Okay.
11      Q.  And you are saying that if I have those, I could be a
12  street gang member just on the tattoos alone; is that correct?
13      A.  You would have to -- I would have to interview and
14  those are possible indicators to lead you to it -- me to
15  believe that you are probably involved in a gang, but I would
16  have to interview as well, those are indicators.
17      Q.  So tattoos alone are enough to fill in the gap of
18  criminal behavior and hanging around known gang associates and
19  all the others, I could be lumped in with anybody that has a
20  Tango Blast or a city of Dallas skyline tattooed on them?
21      A.  Well, the criteria of the State of Texas dictates
22  that if you have two or more identifiers, you can document
23  that person as a member of a criminal street gang.  The
24  identifiers, which one would be like the tattoo, criminal
25  activity, and also hanging with known persons -- known gang

102

1  members of the same gang or a different gang, also self
2  admissions.
3      Q.  Let me see if I got this right.  You are saying that
4  all you need is two possible gang-related tattoos to make
5  yourself --
6      A.  No, I didn't say that.
7      Q.  What did you say?
8      A.  What I -- I just said what I said.  I said the State
9  of Texas --
10      Q.  Let's stop right there.
11      A.  Okay.
12      Q.  What are you referring to when you say the State of
13  Texas?
14      A.  The State of Texas have criteria that must met.
15      Q.  What part of the State of Texas?
16      A.  It's in the Code of Criminal procedures for an
17  individual to be documented as a criminal street gang
18  member --
19      Q.  What number is it?
20      A.  I don't have the exact number, but I could look it up
21  for you, sir, but the State of Texas mandates for an
22  individual to be placed in the gang file or documented as a
23  criminal street gang member, he must meet certain criteria,
24  two or more criteria.  Okay.  The way the Dallas Police
25  Department documents is on a gang card.  Okay.  Where through

103

1    that gang card, it gives you different criteria that must be
2    met.  Some of the criteria that is included, tattoos, criminal
3    offenses, associates, known gang location or area where an
4    individual was contacted, as well as self-admissions.  And
5    also reliable information from a credible source.  Those are
6    indicators.  One indicator by itself such as tattoos, plural,
7    is not going to be an indicator, but that is one indicator
8    that can lead -- for you to meet the further criteria to
9    document this individual as a member of a street gang.
10   Q.      What constitutes reliable information from a credible
11   source?
12   A.      Like a parent who knows their child.  Also, I don't
13   know, let's say a principal, sometimes an individual are
14   involved in gangs as a juvenile.  Probation officer that the
15   person has made a self-admission to, stuff like that.
16   Q.      Do you know Robert Munoz?
17   A.      Yes, I do.
18   Q.      Did you discuss his testimony with him today?
19   A.      No.
20   Q.      Who was it that asked you to go to police
21   headquarters?
22   A.      One of the District Attorneys.
23   Q.      Do you know which one?
24   A.      I believe it was Andrea -- I'm sorry your last name
25   escapes me, I apologize.

104

1               MR. BRAUCHLE:   We will pass the witness.
2                     REDIRECT EXAMINATION
3    BY MR. BROOKS:
4    Q.      Officer is there a growing concern among law
5    enforcement with respect to Tango Blast?
6    A.      Yes, sir, there is.
7               MR. BRAUCHLE:   Your Honor, we would object to
8    this as being improper, there is no proper predicate laid.
9               THE COURT:   Sustained.
10              MR. BROOKS:   Pass the witness.
11              MR. BRAUCHLE:   We will pass the witness.
12              MR. BROOKS:   No further questions.
13              THE COURT:   You may step down, sir.
14              THE WITNESS:   Thank you, sir.
15              MR. BROOKS:   May he be excused?
16              THE COURT:   Any objections?
17              MR. BRAUCHLE:   Subject to recall.
18              THE COURT:   Sir, you are free to go, subject to
19   being recalled.
20              THE WITNESS:   Thank you, sir.
21              MR. BROOKS:   Approach, Judge?
22              THE COURT:   You may.
23              (Following proceedings had at the Bench.)
24              MR. BROOKS:   We are at the point where the
25   hearing on the phone calls need to be conducted.

105

1               THE COURT:   Okay.
2               (End of Bench Conference.)
3               THE COURT:   Okay, ladies and gentlemen, there
4    are some issues we have to address outside the presence of the
5    jury's presence.  So we will take a 15-minute break.
6               THE BAILIFF:   All rise.
7               (Jury retired from the courtroom.)
8                     MOTION TO SUPPRESS
9               THE COURT:   You may be seated.
10              (Witness entered the courtroom.)
11              THE COURT:   Sir, if you will raise your hand.
12              (Witness was duly sworn.)
13                     SCOTT SEACAT
14   was called as a witness, and having been duly sworn by the
15   Court, testified under oath as follows:
16                     DIRECT EXAMINATION
17   BY MR. BROOKS:
18   Q.      Again just for purposes of the record, would you
19   state your name.
20   A.      Scott Seacat.
21   Q.      And, Mr. Seacat, how are you employed?
22   A.      I am employed with Securus Technologies.  We are the
23   subcontractor that install and operates inmate phone equipment
24   for Dallas County.
25   Q.      And the phone equipment that you are referring to, is

106

1    that the phone equipment for the Dallas County jail?
2    A.      Yes, sir.
3    Q.      Particularly Lew Sterrett?
4    A.      Yes, sir.
5    Q.      And as part of your job responsibilities with that
6    company, are you actually housed inside the Dallas County
7    jail?
8    A.      What do you mean by housed?
9    Q.      I mean do you work over at the jail facility?
10   A.      Yes, sir, I do.  I have an office there.
11   Q.      And your company has a contract with Dallas County to
12   monitor or maintain the inmate phone system?
13   A.      Yes, sir, we do.
14   Q.      And how long have you been working in that job?
15   A.      Thirteen years.
16   Q.      And the phone calls that inmates place from inside
17   the jail, are those phone calls captured?
18   A.      Yes, sir, they are.
19   Q.      You have the capacity to capture those phone calls?
20   A.      Yes, sir, the computer system captures them.
21   Q.      Does it do it automatically or is it done only upon
22   request?
23   A.      Automatically.
24   Q.      And then if someone wants to retrieve certain phone
25   calls or phone calls of an inmate, do you have the ability to

107

1   do that?
2       A.   Yes, sir, I do.
3       Q.   And are you able to -- are those audio recorded or
4   digitally recorded?
5       A.   They are digitally recorded.
6       Q.   There is a system in place to capture those phone
7   calls?
8       A.   Yes, sir, there is.
9       Q.   Now, on these phone calls, are there any types of
10  warnings at the beginning of each call when an inmate places
11  it?
12      A.   Yes, sir, there is.
13      Q.   And have you personally listened and heard to those
14  warnings?
15      A.   Yes, sir, I have.
16      Q.   Are they admonished that these phone calls of such to
17  being recorded?
18      A.   Yes, sir.  They are told that this call may be
19  monitored or recorded.
20           MR. BROOKS:   May I approach the witness, Your
21  Honor?
22           THE COURT:   You may.
23      Q.   (By Mr. Brooks)  And having been told that, the phone
24  calls are being subject to being monitored or recorded, does
25  the inmate placing the call at that point, does he have the

108

1   ability to terminate the call?
2       A.   Yes, sir, he can.  He can hang up the phone.
3       Q.   Okay.
4       A.   If he wishes.
5       Q.   So knowing that he is subject to being recorded if he
6   didn't want to be recorded, he could end the call at that
7   point?
8       A.   Correct.
9       Q.   And I want to show you what is marked as State's
10  Exhibits 168 and 169, when you record these calls, are they
11  recorded on CD discs?
12      A.   No.  They are recorded on the computer system.  What
13  I would do is I would fix the calls out, save them to the hard
14  drive and then put them on to CD.
15      Q.   And is that what I am holding here, CDs?
16      A.   Yes, sir.
17      Q.   And you and I have looked at these CDs before?
18      A.   Yes, sir.
19      Q.   And do these CDs actually reflect phone calls that
20  were recorded from the Dallas County jail?
21      A.   Yes, sir.
22      Q.   Mr. Seacat, we are going to play just the beginning.
23           (Audio played.)
24      Q.   And is that how when an inmate from inside the jail,
25  are those calls always collect calls?

109

1       A.   Yes, sir, they are.
2       Q.   And did -- were you able hear the warning or the
3   start of the warning a few minutes ago?
4       A.   Yes, sir.
5       Q.   Just to be safe, let's start it all over from the
6   beginning.
7            (Audio played.)
8       Q.   And that audio warning, is that present on every
9   phone call that an inmate makes from inside the Dallas County
10  jail?
11      A.   Yes, sir, it is.
12      Q.   Regardless of who that inmate is?
13      A.   Yes, sir.
14           MR. BROOKS:   Your Honor, we would offer State's
15  168 and 169 and copies have been previously tendered to
16  Defense Counsel.  For record purposes.
17           MR. PARKS:   No objections for record purposes.
18           THE COURT:   168 and 169 are admitted for record
19  purposes only.
20           MR. BROOKS:   Pass the witness.
21                      CROSS-EXAMINATION
22  BY MR. PARKS:
23      Q.   Mr. Seacat, do I understand that each and every phone
24  conversation that is placed on the Dallas County jail is
25  recorded by the computer system?

110

1       A.   Yes, sir, it is.
2       Q.   If an inmate is calling his lawyer, it would record
3   that too?
4       A.   Yes, sir.
5       Q.   No matter that it is privileged, y'all record it?
6       A.   Yes, sir, the computer does.  I mean I don't listen
7   to them, but they do.  And the computer will hold them for a
8   month and then they are erased.
9       Q.   You could listen to them, if you wanted to?
10      A.   Yes, sir.
11      Q.   If the District Attorney's office for instance wanted
12  to have copies of conversations between a defendant and his
13  lawyer, he could come over to you and y'all could get that
14  done if you wanted to?
15      A.   Um, yes, sir, that is possible.
16      Q.   Now, are there any signs up -- well, scratch that for
17  a second.  Where are the phones located in the jail?
18      A.   Well, the physical phones are located in each of the
19  cells.  The equipment is located in the circuit room.
20      Q.   So if an inmate wants to make a phone call, he has a
21  telephone available to him there in the cell?
22      A.   In the cell area, yes, sir.
23      Q.   And about how many inmates would be subject to using
24  one phone, if you know?
25      A.   Um, you have three phones and you have about 15 to 20

111

1   inmates.

2      Q.   Are there any signs where these phones are located

3   advising inmates that their telephone calls are going to be

4   recorded?

5      A.   Um, I am not familiar, I work on the equipment.  The

6   AT&T tech works on the physical phones.

7      Q.   So as far as you know, the only notice that an inmate

8   would get that his phone call is subject to being recorded is

9   in that voice that we just heard buried in among all of the

10  advise about how much it is going to cost and not to use star

11  61 and all of that stuff?

12     A.   Forgive me for cracking you, it would be star 72.

13  And to my knowledge that is correct.

14     Q.   So the only thing that you are going to get is what

15  you heard right there in that litany that we just heard in the

16  courtroom; is that correct?

17     A.   To my knowledge, yes, sir.

18     Q.   To your knowledge.  Do you know of any reason why

19  written notice by way of signs or other written communication

20  couldn't be posted where the telephone are?

21     A.   I am not familiar.  Again, you would need to talk to

22  the guards who work in the cell area or an AT&T tech.  I do

23  not visit the cell areas.  Only the circuit rooms.

24     Q.   So is that a, no, you don't know of any reasons why

25  that couldn't be done?

112

1     A.   Correct.

2     Q.   When did this program begin recording all the

3  telephone conversations?

4     A.   We got that ability in 2004.  And it was installed in

5  November -- the new equipment was installed in November and

6  December in all the five jails.

7     Q.   Do you realize that it is against the law to tap

8  people's telephone conversations?

9         MR. BROOKS:   Your Honor, I am going to object to

10  the form of that question.

11         THE COURT:   Sustained.

12     Q.   (By Mr. Parks)  Are you familiar with Section 16.02

13  of the Texas Penal Code?

14     A.   No, sir.

15     Q.   Has anybody at the sheriff's department advised you

16  of what the Penal Code says about recording other people's

17  telephone conversations?

18     A.   I am not sure how the legal things were worked out.

19  I was not informed.

20     Q.   Okay.  Who actually -- are you the person who

21  oversees all of this?

22     A.   Well, I work on the equipment and I do get the

23  recordings.  But I would assume the legal department of my

24  company and the sheriff's department would have worked that

25  out.

113

1     Q.   Who do you work for?

2     A.   Securus Technologies, S-e-c-u-r-u-s.

3     Q.   And they have a contract with the sheriff?

4     A.   Yes.  We are a subcontractor.  AT&T holds the

5  contract.

6     Q.   Who actually installed the equipment, do you know?

7     A.   My company did, Securus Technologies.

8     Q.   And is there someway -- does that equipment have to

9  be serviced?

10     A.   Yes.

11     Q.   What happens if it break down?

12     A.   I fix it.

13     Q.   How often does that happen?

14     A.   Actually it is good equipment, it rarely happens.

15     Q.   How do we know that it is recording things

16  accurately?

17     A.   It does as well as it can.  If it -- the only thing

18  you would get would be like static, say like the phone cord is

19  lose, stuff like that, where you couldn't hear it very well.

20  But then again that would be up to the D.A.'s office to

21  determine if that is a good call.  If they can't hear it very

22  well, or can't hear it at all, then I would assume that they

23  would discard it.  I really don't listen to the calls.  I

24  mainly just get the recordings for them to listen to.

25     Q.   Do you have to do something to take the sound

114

1  impulses off the computer hard drive and put them on some

2  other media for them, don't you?

3     A.   Well, how the program is set up, for example, north

4  jail tower, you have five different computers that operate the

5  systems.

6     Q.   Mr. Seacat, I don't mean to interrupt you, I think

7  that is either yes or no?

8     A.   Well, I'm sorry, I am not understanding the question,

9  then.

10     Q.   The computer records telephone conversations --

11     A.   Yes.

12     Q.   -- you told us?  But if the D.A. wants you, you don't

13  drag the computer over here, you have got to take what was

14  recorded off the hard drive?

15     A.   Yes.

16     Q.   The computer and put it somewhere else?

17     A.   Yes, I do.

18     Q.   And are you the only person who does that?

19     A.   Yes, sir.

20     Q.   So does anybody supervise you doing that?

21     A.   No, sir.  They are welcome to come and see.

22     Q.   These discs here, you just brought them over and you

23  and you alone say that they are what they purport to be?

24     A.   Yes, sir.  They give me the phone numbers they want

25  recorded and I get those phone numbers.

115

1  Q.  Do you have a way of -- does the system have a way of
2  identifying who is being called?
3  A.  You have the voice mail, if they say their name; but
4  again, they have to determine themselves if that is the
5  person.
6  Q.  Does the computer record the telephone number that is
7  being called?
8  A.  Yes, it does.
9  Q.  Okay.  So that's one way?
10  A.  Yes, sir.
11  Q.  Have you made any determination in these
12  circumstances as to who was called?
13  A.  The person that was called?
14  Q.  Uh-huh.
15  A.  It would be the person at that phone number, the
16  caller has the phone number.
17  Q.  Yeah, I kind of figured that out, Mr. Seacat, who
18  those people are, has that been any determination made?
19  A.  Unless they say their names in the phone
20  conversation, I have -- I can't determine it.
21  Q.  So as far as you know, the person to whom the calls
22  were made, these particular discs have not been identified?
23  A.  To me, no.
24  Q.  What is the process of the District Attorney's
25  office, for instance, getting a copy of the telephone

116

1  conversation, do they issue a subpoena for them or just phone
2  you or phone somebody who phones you, how does that happen?
3  A.  They phone me and asks, you know, asks the
4  information or they fax me the information that they need.
5  Q.  So they will just send you a fax or call you on the
6  phone and say, listen, we want all the telephone conversations
7  made to 214, whatever, whatever on a certain day or just all
8  of them or?
9  A.  All of them.  It depends on their needs.
10  Q.  Well, how many telephone conversations -- I mean --
11  let me just -- I am trying to understand this.
12  A.  Okay.
13  Q.  Let's say I am the District Attorney?
14  A.  Okay.
15  Q.  And I call you up, and I say I want all of the
16  telephone recordings off of a certain telephone number for the
17  last 90 days?
18  A.  Okay.
19  Q.  So you go back and just copy all of those?
20  A.  Yes, sir.
21  Q.  Do you listen to them?
22  A.  No.  Just pretty much the introduction.  And then I
23  save it to the hard drive, the workstation of the computer.
24  Q.  Do they identify I want all of the telephone
25  conversations made by a certain person in that -- at that

117

1  number or just the number?
2  A.  They give me the person, the person's cell and the
3  phone number.
4  Q.  Okay.  So you are just listening long enough to know
5  whether or not it is one of the conversations that they want?
6  A.  Correct.
7  Q.  Now, how did it happen in this case, did you get a
8  fax or did you get a phone call?
9  A.  I am trying to remember.  I believe I was called
10  about it.  And -- but -- I believe she had sent me the --
11  faxed me the phone numbers.  Usually that's what happens.
12  They give me a call and it is like, you know more than one
13  number, you know -- I give my fax number and they fax it to
14  me.
15  Q.  Do you know when that happened in this particular
16  case?
17  A.  It has been a while ago, I would say probably earlier
18  this year.
19  Q.  Have you gotten any recent requests for this
20  information in this case?
21  A.  I get it for them until they tell me to stop.
22  Q.  So once the request is made, it is ongoing?
23  A.  Yes.  Unless they say -- unless they specify it's
24  just for this time period.
25  Q.  So since some time last year, everyday you go in and

118

1  check to see whether or not a phone call has been made at this
2  number by Wesley Ruiz?
3  A.  Yes, sir.
4  Q.  And your company pays you to do that?
5  A.  Yes, sir, it is one of my jobs.  I mean I pretty much
6  wear several hats.
7  Q.  Does your company get reimbursed by the county or
8  District Attorney's office in spending your time this way?
9  MR. BROOKS:  Your Honor, that question is
10  outside the scope of this hearing.
11  THE COURT:  Sustained.
12  Q.  (By Mr. Parks)  Is this a service that you provide
13  only to law enforcement?  I mean if I called you up and said I
14  have got a client up in the jail, I would like to hear all of
15  his phone conversations, would you do that for me?
16  A.  Well, we do it with the law enforcement.  There have
17  been things arranged where both the attorneys, prosecuting and
18  Defense have gotten together and I have got a disc for both of
19  them.
20  Q.  So I guess the answer is no you would not do it for
21  me unless the District Attorney joined in?
22  A.  Yes, sir.  I would look into that, see what I can do,
23  being customer services is part of my job as well.
24  Q.  Several people have access to these same phones; is
25  that right?

1    A.    Yes, sir, it's estimated 15 or 20.

2    Q.    So the only way that we have a determining who is on

3    the telephone making phone calls is how they identify

4    themselves in the recording; is that correct?

5    A.    Yes, sir.

6    Q.    How do we know that the recording hasn't been

7    altered?

8    A.    I have no way to alter them.  I don't have that

9    knowledge.  And it is set up to be -- to record them.  No

10   one -- it is not set up to be altered.  I am not a computer

11   programmer.

12   Q.    You take them off the machine and put them on what, a

13   DVD?

14   A.    A CD.

15   Q.    A CD.  And then you turn them over to whoever has

16   requested it?

17   A.    Correct.

18   Q.    That's the last you see of them?

19   A.    Yes.

20   Q.    Mr. Seacat, do I understand that after 30 days, these

21   recordings are erased?

22   A.    Yes, sir, on the computer that do capture the calls.

23   Q.    Okay.  Now, is there a way to preserve those

24   recordings that you have copied so that we would have a way of

25   comparing what the computer has on its hard drive with the CD

1    that we have in court today?

2    A.    Yes, sir, that's what I do, I save them to a hard

3    drive, the workstation.

4    Q.    So if we went over to where the computer is, we would

5    be able to recreate exactly what is on these CDs, even today?

6    A.    Yes, sir.

7    Q.    How do you do that?

8    A.    Okay, there is a program called the digital recording

9    system, and that saves the calls from the operating

10   computers.  And then I save them to the hard drive or I.C.

11   storage drive.  And then once I do that, I you put them on CD.

12   Q.    Who did you deliver the CDs to?

13   A.    Tonia Silva, she is investigator.

14   Q.    And is that the last you saw of them?

15   A.    Yes.

16   Q.    Is that a D.A. investigator?

17   A.    Yes, she is.

18   Q.    She.  And do you remember when that was

19   approximately?

20   A.    I get recordings every other week -- or I put them on

21   a CD every other week and I bring them up to her, to the

22   11th floor.

23   Q.    And last time you would have made that delivery,

24   would have been when?

25   A.    It would have been two weeks from today.

121

1    Q.    Two weeks ago?

2    A.    Yes, sir.

3    Q.    What she does with them, you have no idea?

4    A.    No, sir.

5    Q.    Do you keep a copy of them yourself on the CD or you

6    make the one copy?

7    A.    No, I do not keep the CD copies.  I have the main

8    storage drive where the copies are held.

9    Q.    How do you mark the CDs to be able to identify them

10   later on?

11   A.    Okay, what I do is I write on the sleeve of the CD,

12   and I write down the name of the person it goes to, the floor,

13   and their office number or a contact number.  Then I write

14   down the name of the inmate, the cell number, the date that I

15   copy the CD, and I also let them know how many calls are on

16   the CD.

17   Q.    And do you keep a log of that in your office?

18   A.    No.  All I have is the checklist, and I update that.

19   Q.    You write all of this information on a sleeve?

20   A.    Yes, sir.

21   Q.    And hand it over?

22   A.    Yes, sir.

23   Q.    On the disc itself on the CD, do you write anything

24   on it?

25   A.    No, sir.

122

1    Q.    I am unclear about how you keep up with how many CDs

2    you have delivered when you deliver them and who you deliver

3    them to, you don't keep a log of that in your office in any

4    way?

5    A.    No, sir, I don't.

6    Q.    Do you always deliver them to the same person?

7    A.    Yes, sir.

8    Q.    It will be Tonia Silva?

9    A.    Yes, sir, unless -- unless the investigator has

10   changed for the case, which --

11   Q.    Has that happened in this case?

12   A.    I do not believe so, cause it has been her.

13   Q.    Do you give the CDs to whoever the investigator is

14   for the individual court or do you always deliver all of them

15   to Tonia Silva?

16   A.    No, sir, all those -- in this case, this particular

17   case, that is her.  If it is another detective, it goes to

18   that person.

19   Q.    Okay.  So she is not a central receiving point for

20   these CDs, it goes to different investigators in different

21   courts?

22   A.    That is correct.

23   Q.    But in this case, she is the one who got all of the

24   CDs?

25   A.    Yes, sir.

123

1    Q.   Does she sign anything to show that she has received
2    these CDs?
3    A.   No, sir.
4    Q.   You don't have any receipts showing that you
5    delivered them?
6    A.   No, sir.
7    Q.   Did you always give them to her in person or do you
8    sometimes leave them in the office if she is not at her desk?
9    A.   At times I will leave them with Pat Garner who is a
10   receptionist on the 11 forth.
11   Q.   Pat Connor?
12   A.   Garner.
13   Q.   Garner.  How many times did you leave these off with
14   Pat?
15        MR. BROOKS:  Excuse me, Judge, I am going to
16   have to object to this line of questioning, it is getting past
17   the scope of the hearing, which is my understanding had to do
18   with the motion to suppress, the admissibility.
19        THE COURT:  Sustained.
20        MR. PARKS:  That's all the questions I have.
21        MR. BROOKS:  I have no other questions of this
22   witness, Your Honor.
23        THE COURT:  Argument, Mr. Parks.
24
25        (No Omissions.)

124

1                        ARGUMENT
2    BY MR. PARKS:
3         Judge, we would basically allow the motion I'm asking
4    Court to overlook paragraphs three and four.  However, our
5    objections more specifically are set out that the recordings
6    have in violation of 16.02 of the Texas Penal Code, article --
7    the recordings are inadmissible of the provisions of 18.20 of
8    the Texas Code of Criminal Procedures, cause the receptions is
9    a violation of the law under section 16.02 of the Texas Penal
10   Code.
11        Recognizing that 16.02 has affirmative defenses to the
12   criminal -- it is a criminal violation for which there are
13   affirmative defenses, so somebody is violating the law by
14   recording these conversations.
15        Now, whether or not they have affirmative defenses that
16   they could assert if they go to trial is another matter.  But
17   somebody in the sheriff's office or in this company or this
18   witness is in violation of the Penal Code, Section 16.02, they
19   can defend themselves if they want to if they are ever
20   prosecuted.  Only if they are operating under the color of
21   law, and the statute sets out what the color of law means in
22   these conditions.  And that is that a magistrate has
23   authorized them to make these recordings.  And there has been
24   no showing of any magistrate authorizing the recording of
25   these telephone conversations.

125

1         Now, I anticipate that the State is going to argue that
2    there is some case law that indicates that there has been a
3    waiver.  The statute does not speak to any kind of a waiver.
4    The statute says what the law is, sets it out very plainly,
5    and it has very plainly been violated in this case.  And we
6    rely upon the Code of Criminal Procedure which says that no
7    evidence which has been obtained in violation of the law is
8    admissible in a court of law.  And that's the gist of our
9    argument there.
10        We certainly rely, Rule 401, 02, and 03, 04.  Also
11   suggest to the Court that we have no way of determining
12   whether or not these are accurate recordings, the chain of
13   custody has not been shown -- and I am sure I will have some
14   suggestions shortly -- and that we should suggest that he
15   cannot even identify the discs that are being offered.
16                         RULING
17        THE COURT:  The Court will deny the motion.
18   Let's take a 15-minute break and we will bring the jury
19   in.
20        (Recess taken.)
21        THE BAILIFF:  All rise.
22        (Jury returned to the courtroom.)
23        THE COURT:  You may be seated.
24        MR. BROOKS:  We call Mr. Seacat.
25        THE COURT:  You may take the stand, sir.

126

1         And you may proceed Mr. Brooks.
2
3                       SCOTT SEACAT
4    was called as a witness, and having been duly sworn by the
5    Court, testified under oath as follows:
6                    DIRECT EXAMINATION
7    BY MY MR. BROOKS:
8    Q.   Sir, tell the jury your name, please.
9    A.   My name is Scott Seacat.
10   Q.   And are you the same Scott Seacat who has testified
11   previously in a hearing outside the jury's presence?
12   A.   Yes, sir, I am.
13   Q.   Mr. Seacat, how are you employed?
14   A.   Employed with Securus Technologies.  We are a
15   subcontractor in Dallas County that maintain and operate the
16   telephone.
17   Q.   And as part of your duties with that company, do you
18   maintain and monitor the telephone equipment used by inmates
19   inside the Dallas County jail?
20   A.   Yes, sir.
21   Q.   Whenever an inmate want to make a phone call to
22   someone outside the jail, how do they go about doing that?
23   A.   They dial zero and the number.
24   Q.   And are those phone calls basically collect calls?
25   A.   Yes, sir, they are.

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

127

1    Q.    Now, you are not an employee of the sheriff's
2    department, are you?
3    A.    No, sir.
4    Q.    You work for a company that has a contract with
5    Dallas County to monitor, maintain and basically manage the
6    phone system that the inmates use?
7    A.    Yes, sir.
8    Q.    And how long have you been doing that?
9    A.    Thirteen years.
10   Q.    When an inmate makes one of those calls, at the start
11   of each call is there a warning that is given to them with
12   respect to the phone might be recorded?
13   A.    Yes, sir, there is.
14   Q.    Okay.  Does it basically tell them that this phone
15   call may or may not be recorded?
16   A.    Yes, sir.
17   Q.    If that inmate does not want that call recorded, is
18   he able to terminate the call at that point?
19   A.    Yes, sir, he can.
20   Q.    So if he proceeds with the phone call, he proceeds
21   with the phone call after that warning has been given to him?
22   A.    Yes, sir.
23   Q.    Now, is that warning given to every inmate that makes
24   a phone call or just any particular inmate?
25   A.    Every inmate.

128

1    Q.    And are those -- do you have the ability with your
2    equipment to monitor and capture phone calls that inmates have
3    made?
4    A.    Yes, sir.
5    Q.    And when you monitor, capture those phone calls, are
6    you able to copy them for distribution?
7    A.    Yes, sir.
8    Q.    And what are those copied to?
9    A.    They are copied on a CD and given to the D.A. or law
10   enforcement agencies making the request.
11   Q.    And with respect to the defendant, Wesley Ruiz, did
12   you receive a request to capture phone calls that he made from
13   inside the Dallas County jail?
14   A.    Yes, I did.
15   Q.    And did you put those phone calls on to a CD?
16   A.    Yes, sir.
17   Q.    And you and I have looked at those CDs?
18   A.    Yes, sir.
19   Q.    And --
20        MR. BROOKS:  Your Honor, at this point we would
21   offer for all purposes State's Exhibits 168 and 169?
22        MR. BRAUCHLE:  We would reiterate the objections
23   made previously.  Is the court aware of those?
24        THE COURT:  Overruled.
25        MR. BRAUCHLE:  We would ask for a running

129

1    objection in regard to this exhibit -- these exhibits.
2        THE COURT:  Your objections to the admission of
3    the exhibits are overruled.  Your objection -- your request
4    for a running objection is granted.
5        MR. BRAUCHLE:  Thank you.
6        MR. BROOKS:  May I publish, Your Honor?
7        THE COURT:  You may:
8        (Audio played to the jury.)
9    Q.    (By Mr. Brooks) Mr. Seacat, were you able to hear
10   that portion of the call of that recording?
11   A.    Yes, sir.
12   Q.    And is that the warning that is at the beginning of
13   every phone call placed by an inmate to someone outside the
14   Dallas County jail?
15   A.    Yes, sir.
16   Q.    Now, I will like to turn the jury's attention to a
17   conversation that was captured May the 6th of 2008.
18        (Audio played to the jury.)
19   Q.    And I would like to turn the jury's attention to a
20   phone call on the following day, the May 7th 2008.
21        (Audio played to the jury.)
22   Q.    Were you able to make out that portion of the
23   conversation, Mr. Seacat?
24   A.    No, sir, I didn't.
25        MR. BROOKS:  May I have just a moment, Your

130

1    Honor?
2        THE COURT:  You may.
3        MR. BROOKS:  Your Honor, at this time the State
4    would offer for demonstrative purpose, transcripts of the
5    recordings that are being offered for purposes of the jury, we
6    would like to display the specific transcript on the screen so
7    they can follow along with what they are hearing.
8        MR. BRAUCHLE:  May we approach, Your Honor?
9        THE COURT:  You may.
10        (Following proceedings had at the Bench.)
11        MR. BRAUCHLE:  Look, the witness can either hear
12   it and testify as to what it is or he can't.  We might as well
13   not have a witness up there if we are going to go through
14   transcripts that we have no idea where they came from, who
15   made them, where they were made, how they were made.  I mean,
16   play the tape, if the jury can understand them, that's fine.
17   If they can't, that's fine.  But you can't -- I can't
18   bootstrap your way, you play one then you say, well, you
19   couldn't understand this, so we are going to provide tapes of
20   all this scrap, that's bullshit.  You know what theory does
21   that come under.  We could do that, we could just -- we could
22   just prerecord people's testimony and then introduce them.
23        MR. BROOKS:  This is no difference from the
24   transcript from the phone calls -- or the radio transcriptions
25   during the guilt/innocence phase of the trial.

1  MR. BRAUCHLE:   They weren't introduced.
2  MR. BROOKS:   They were offered for demonstrative
3  purposes and the jury had copies following them during the
4  course of the conversation.  After the conversation was done,
5  they are recovered from the jury, they didn't take them back
6  to the jury room.
7  MR. JOHNSON:   If you want to do that, then
8  transcribe everything, not just the stuff you want.
9  MR. BROOKS:   This is the whole thing.
10  MR. BRAUCHLE:   When were we going to be supplied
11  with this.
12  THE COURT:   That's the entire --
13  MR. BROOKS:   Yes, sir.
14  MR. JOHNSON:   This one call, all these calls?
15  MR. BROOKS:   Calls that I am offering in this
16  phase of the trial.
17  MR. BRAUCHLE:   Okay, who is this to?
18  MR. BROOKS:   You got the calls.
19  MR. BRAUCHLE:   I know we do.  We have the calls
20  and they have to be compared to this.  We haven't ever seen
21  this.
22  MR. JOHNSON:   The standard is all you want.
23  MR. BEACH:   You have notice as to what is on
24  those phone calls.
25  MR. BRAUCHLE:   Evidently there must be

1  something, since y'all want to hand the guy a script.  So this
2  is going to be supplied to the jurors?
3  MR. BROOKS:   It is on screen.
4  MR. JOHNSON:   Here is the thing, if they had
5  given this to us in advance so we can take this while we are
6  listening to the tapes so we can see if this is accurate.
7  MR. BRAUCHLE:   Which they did on the others.  On
8  the police broadcast, those were previously transcribed.  When
9  did you get them to us?
10  MR. BEACH:   So --
11  MR. BRAUCHLE:   What do you mean so.
12  MR. BEACH:   We are offering this, you have
13  had --
14  MR. BRAUCHLE:   I know.  Why is this coming --
15  MR. JOHNSON:   Why are you giving us --
16  MR. BRAUCHLE:   Why don't you give them the whole
17  God-damn conversation.
18  THE COURT:   These are going to go into -- do you
19  have a --
20  MR. BROOKS:   Yes.  I have highlighted those
21  specific -- specific parts of those transcript.  I can take
22  that offer and offer for them to go along with that specific
23  part.
24  MR. BRAUCHLE:   There must be some showing that
25  they need this, that the jury need this, not your witness to

1  understand what is being brought out.  You know, there is no
2  showing that this is --
3  THE COURT:   Do you have any more questions of
4  this witness?
5  Okay, why don't you pass him.  And you can ask whatever
6  they ask them.  And in the interim, you can just get this and
7  we will give the jury this when you publish that tape.
8  MR. BROOKS:   Okay.
9  THE COURT:   Pass the witness.  You can
10  cross-examine the witness, give the jury -- since this is all
11  they are going into, give them --
12  MR. BRAUCHLE:   We are not even agreeing that
13  those are accurate.
14  THE COURT:   Well, then, you will get your
15  objections.
16  MR. PARKS:   The premise of bringing all of this
17  in, they can't understand what is being said, so we are going
18  to tell them what is being said.  The thing speaks for itself,
19  they can either understand it or not.
20  MR. BEACH:   They get it back in the jury room,
21  they can't understand it in the jury room.
22  MR. BRAUCHLE:   How do you know that.
23  THE COURT:   If you will pass the witness.
24  (End of Bench Conference.)
25  MR. BROOKS:   Pass the witness.

1  MR. BRAUCHLE:   Pass the witness.
2  MR. BROOKS:   No further questions for this
3  witness.
4  Your Honor, may he be excused?
5  THE COURT:   Any objections.
6  MR. BRAUCHLE:   Subject to recall.
7  THE COURT:   Sir, you are free to go, subject to
8  being recalled.
9  THE WITNESS:   Thank you.
10  MR. BROOKS:   The State at this point, the State
11  would like to continue publishing State's Exhibit No. 168.
12  THE COURT:   You may.
13  Do you need a moment?
14  MR. BROOKS:   No, Your Honor, we have.
15  MR. BRAUCHLE:   Your Honor, once again we would
16  object to this, this isn't an exhibit.  This isn't what we
17  discussed at the Bench.  It is not what was portrayed to the
18  Court as to what was going to be done with this.
19  THE COURT:   Not being able to see the screen,
20  Mr. Brooks, what is...
21  MR. BROOKS:   The discovery document that is part
22  of the court's file that we discussed.
23  THE COURT:   Overruled.
24  MR. JOHNSON:   This document is not in evidence.
25  MR. BRAUCHLE:   It is not in evidence.  There has

135

1    been no predicate laid as to where it came from, who in fact
2    came up with this, alleged quotes, there has been no predicate
3    laid for the introduction of this, the fact that it may be
4    sent to somebody doesn't make it admissible.
5              THE COURT:  Mr. Brooks.
6              MR. BROOKS:  Judge, the State is prepared to
7    offer for demonstrative purposes State's Exhibit 174, a copy
8    of which was given to Defense Counsel back on June 27th,
9    2008.
10             MR. BRAUCHLE:  That's fine, but it doesn't go to
11   the underline problem as to how this was extracted from
12   whatever.  Who is it that is vouching for this as being
13   accurate in any way.  And how it is admissible.  There is at
14   least three hurdles that they haven't gotten over.  And just
15   putting an exhibit stamp on it, doesn't get any of those
16   problems out of the way.  We have got a situation to where we
17   are saying we don't know if what is being proffered is a
18   complete or an exact copy of what is supposedly on the
19   exhibit.  And there has been no background laid by the State
20   to cure that defect with the Court and the jury.  They need to
21   bring somebody in here who says this is what is on there and
22   be able to swear to the jury that that is what is on there.
23   We don't have that.  Sending something either from to us them
24   or the other way around doesn't cure those problems.  We
25   would -- we would ask that the Court deny their request to

136

1    publish.  Once again we would state that that wasn't even part
2    and parcel of the conversation at Bench side.  We didn't know
3    this was what was going to be proffered.  Otherwise we would
4    obviously made a different objections.
5              MR. BROOKS:  Well, respectfully, Judge, the
6    State disagrees, that this exact procedure was proffered at
7    Bench side.  More importantly, these specific statements have
8    been provided to Defense Counsel, as well as copies of the
9    oral statements.  If there is any disagreement as to whether
10   or not these statements purport to the recordings, they have
11   had more than ample opportunity to review that in likes of the
12   disagreements.
13             MR. BRAUCHLE:  We don't have to prove that they
14   are accurate.  They do.  They can't shift the burden by that.
15   They have got a burden and they have to prove up to us and to
16   the jury that what is being heard or what is being proffered
17   is a true and accurate copy.  We don't have to prove that it
18   is not.  They have to prove that it is.  This is a -- simply
19   an attempt to shift the burden to the defendant.
20             MR. BROOKS:  Actually, Judge, I believe the law
21   says that it is the jury's province to decide whether or not
22   what whoever is saying that this is, is actually what they are
23   hearing and that's their province.  It is not mine it is not
24   theirs.
25             MR. BRAUCHLE:  What statute would that be?

137

1              THE COURT:  The objection is overruled.
2    The exhibit is admitted for demonstrative purposes only.
3              MR. BRAUCHLE:  Your Honor, may we remind the
4    Court that their own witness couldn't identify or state to
5    anybody what the conversation was being had.
6              THE COURT:  So noted.
7              MR. BRAUCHLE:  Well -- so I guess we are at the
8    point to where if a witness suddenly says I can't understand
9    something, they can we can resort to this?
10             THE COURT:  Mr. Brauchle, I made my ruling.
11             MR. BRAUCHLE:  We would renew all of our
12   objections previously made.
13             THE COURT:  Overruled.  So noted for the record.
14             MR. BRAUCHLE:  May we ask for a running
15   objection?
16             THE COURT:  You may.
17             (Audio played to the jury.)
18             MR. BRAUCHLE:  Your Honor, may we approach?
19             THE COURT:  You may.
20             (Following proceedings had at the Bench.)
21             MR. BRAUCHLE:  It is obvious from the first
22   playing, it is not a true and accurate copy of the
23   conversation.  There is a hell of lot of stuff left out of it.
24   How do you account for that?  I don't know who fished out
25   these snippet, but they are not true and accurate.  You know,

138

1    that's what our objection was.  They have to come in and lay
2    the groundwork to show that what they are going to show the
3    jury is a true and accurate copy of what the recording says.
4    And on this very first one that they show, you can hear them
5    talking about stuff that is not in what is being displayed to
6    the jury on the screen.  You know, like I say it is their
7    burden to prove that it is admissible, not ours to prove that
8    it is inadmissible.  You know when you got stuff up there and
9    people are saying, "No shit, what the fuck, blah, blah, blah,"
10   it is not on the screen, and there is other matters that they
11   are talking about.  How do we cure that problem?  Everybody is
12   looking at us to cure their accuracy problem.
13             MR. BROOKS:  These are statements that you hear
14   him make.  And it is up to the jury to decide whether or not
15   they believe those are true and accurate statements or if the
16   evidence is what it purports to be or what we purported it to
17   be.
18             MR. BRAUCHLE:  Well, under that theory, we can
19   just bring in any type of hearsay, anything that no one could
20   vouch for under any circumstance.  And just let the jury sort
21   it out.
22             MR. BROOKS:  This isn't hearsay.  This is the
23   defendant's statements.
24             MR. BRAUCHLE:  Taken your example, you have to
25   at some point -- are you just saying that you can just put up

139

1  anything and whether it is accurate or not that we let the
2  jury decide if this stuff that is left out or if there is
3  deletions or additions; is that what we are doing?
4          MR. BROOKS:   That's the jury's province.
5          MR. BRAUCHLE:   What case says that. You cited
6  that the Code of Criminal Procedures allows that procedure,
7  which I have never heard of. And now you are talking about
8  case law, where is the case law. I would like to see it. You
9  know I would hope the Judge would like to see it. But this
10  is -- you know, it is high tech, when it is what it is. You
11  know who made the transcriptions that y'all have got there,
12  who did that?
13          MR. BROOKS:   The transcription?
14          MR. BRAUCHLE:   No, who made that?
15          MR. BROOKS:   The transcriptions or the snippet.
16          MR. BRAUCHLE:   Who transcribed the
17  transcriptions or snippet?
18          MR. BROOKS:   The transcriptions was done by my
19  secretary.
20          MR. BRAUCHLE:   What is her qualifications for
21  doing that?
22          MR. BROOKS:   And all I am offering are those
23  specific statements.
24          MR. BRAUCHLE:   But the specific statements you
25  are putting on anybody that's listens to them, such as

140

1  ourselves, know that it is inaccurate because it is not a full
2  and complete recording.
3          MR. BROOKS:   That doesn't make it inaccurate as
4  far as his statements. The fact that he doesn't transpire
5  what his brother says doesn't make the defendant's statements
6  inaccurate.
7          THE COURT:   I will allow it so you can make your
8  objections.
9          MR. BRAUCHLE:   Obviously it is a 404, 403, 402,
10  401. And all the others.
11          THE COURT:   I will overrule.
12          (End of bench conference.)
13          (Audio played to the jury.)
14          MR. BRAUCHLE:   Your Honor, this has already been
15  played once.
16          THE COURT:   Overruled.
17          MR. BROOKS:   Not all the way because of his
18  objection.
19          THE COURT:   You can continue, Mr. Brooks.
20          (Audio played to the jury.)
21          MR. BRAUCHLE:   Your Honor, may we approach
22  again?
23          THE COURT:   You may.
24          (Following proceeding had at the Bench.)
25          MR. BRAUCHLE:   They have two and a half lines

141

1  snippet, and we get about a four minute conversation coming
2  in. Now, either -- you know either they do what they said
3  they were going to do and put the recordings that match the
4  snippet or, you know, it is just a license to steal from their
5  point of view. There is about a minute's worth of stuff that
6  was talked about that is nowhere reflected in what is being
7  shown to the jury. You know like they say, it is their duty
8  to do what they have told the Court and the State -- I mean
9  the Court and the Defense that they are going to do and they
10  are not.
11          MR. BROOKS:   There is some complications, Judge.
12          MR. BRAUCHLE:   That doesn't make what you just
13  got through doing any better. You put up a two and a half
14  line snippet and then play two minutes of B.S. And that's not
15  fair and it is not what you purported to the Court that you
16  were going to present.
17          MR. BROOKS:   I disagree.
18          MR. BRAUCHLE:   Well, what you disagree with, you
19  know -- you know what I said is not accurate. Two and a
20  half lines and then you got to listen to two to three minutes
21  of conversation.
22          MR. BROOKS:   I disagree.
23          MR. BRAUCHLE:   How long was it.
24          MR. BROOKS:   I didn't count, it wasn't two to
25  three minutes of conversation.

142

1          MR. BRAUCHLE:   You don't agree that there was
2  obviously matters that was not purported.
3          (End of Bench Conference.)
4          MR. BROOKS:   That is the end of State's
5  publication, Your Honor.
6          Call Cheryl Nix.
7          THE COURT:   If you will raise your right hand.
8          (Witness was duly sworn.)
9          CHERYL NIX
10  was called as a witness, and having been duly sworn by the
11  Court, testified under oath as follows:
12          DIRECT EXAMINATION
13  BY MR. BROOKS:
14      Q.   Good afternoon, Ms. Nix. Can you introduce yourself
15  no the jury, please.
16      A.   My name is Cheryl nix.
17      Q.   And, Ms. Nix, you are the mother of Senior Corporal
18  Mark Nix?
19      A.   Yes, sir.
20      Q.   How old was your son at the time of his death.
21      A.   Thirty-three.
22      Q.   And where was he born?
23      A.   He was born in Forest Lake, Minnesota.
24      Q.   Does he have any brothers or sisters?
25      A.   He has one sister that is about two and a half years

Case 3:12-cv-05112-N   Document 31-24   Filed 04/17/15   Page 49 of 155   PageID 5048

1  younger than he is.
2      Q.   Was she born in Minnesota as well?
3      A.   Yes.  But she was born in a hospital in Minneapolis,
4  which is not that far from Forest Lake.
5      Q.   And how old was your son mark when the family moved
6  to Texas?
7      A.   He was six.
8      Q.   And did you move to Arlington, Texas?
9      A.   Yes.  He had just finished first grade.
10     Q.   And where did he go to school in Texas?
11     A.   When we first moved here, he went to a Christian
12 school -- I don't remember the name of it, but it was in
13 Arlington, just kind of -- just close to where we lived.
14     Q.   Would it be a fair statement that for the bulk of his
15 primary and secondary school, it was home school or private
16 Christian schools?
17     A.   Yes.
18     Q.   And as a result of getting his education in that
19 fashion, was he able to go after a high school diploma or did
20 he have to do something else?
21     A.   No, he ended up taking a GED.
22     Q.   And even though he took a GED, how well did he score
23 in terms of?
24     A.   I don't remember the exact scores, but I do know that
25 there were at least two colleges that offered him

1  scholarships.  One of them offered him to forego the first
2  year of the English class because his scores were so high.
3      Q.   He did not enroll in those colleges?
4      A.   No, sir, he did not.
5      Q.   When he was 18 years of age, what did he start doing?
6      A.   He -- joined the Navy Reserves.  We had told him --
7  he was working -- he was working two part time jobs and we
8  finally told him that he really either needed to go to college
9  or he needed to move out of the house, not because he was
10 doing anything bad, but just he needed to grow up.
11     Q.   Let's back up a little before joining the Navy
12 reserves, had he joined any or types of organizations?
13     A.   When he was 16, he began working at a volunteer fire
14 department in Bono, Texas.  He could not actually go on the
15 runs because of his age, but he did go in and clean the trucks
16 and the hoses and stuff after -- after they did a run and just
17 generally cleaning up in the station.
18     Q.   Okay.  And then at 18, you and your husband told him
19 that he needed to make a decision with respect to his future?
20     A.   Yes.  He already had -- when he was 17, he went to
21 school -- he did go to school to become an EMT and he could
22 not take that test until after he turned 18.  So the day after
23 he turned 18, he took the EMT test.
24     Q.   And is that what most people would know as a
25 paramedic?

1      A.   Yes.
2      Q.   Now, what did he do after he finished training --
3  well, actually he went to the Navy Reserves?
4      A.   He went into Navy Reserves.  He was -- he was either
5  18 or 19 when he went into the Navy Reserves, I don't remember
6  his exact age.  When he finished boot camp he went to what
7  they call A-School, which is corpsman, which is a medical
8  personnel in the Navy.
9      Q.   And when he finished his training to become a
10 corpsman, did he come back home?
11     A.   Yes, he was still in the reserves but he came back to
12 Texas for a while and then spent that following summer at a
13 summer camp as a cook before he went to school in Chicago.
14     Q.   Now, he went to school in Chicago, what school did he
15 initially start in?
16     A.   He started at Moody Bible Institute.  He originally
17 thought he wanted to be a youth pastor and he went to Moody
18 Bible Institute for about two and a half years.
19     Q.   Do you have any family members that had attended
20 Moody Bible?
21     A.   Yes, his grandfather.  My husband's father graduated
22 from Moody Bible Institute.
23     Q.   Now, did he subsequently graduate from Moody Bible
24 Institute?
25     A.   No, sir, he did not.  He was having some financial

1  problems and so choose to go to work full time instead of
2  school so he can pay off some of his debt to the school.  And
3  then -- then decided to change schools.
4      Q.   And he changed to another university in the city of
5  Chicago?
6      A.   Yes.
7      Q.   Did he eventually graduate from that university?
8      A.   Yes, he did.
9      Q.   And what type of degree did he receive.
10     A.   Philosophy degree.
11     Q.   And after graduating from college, where did he seek
12 employment?
13     A.   He applied at the Chicago Fire Department and then he
14 also applied at the Dallas Police Department.  The fire
15 department in Chicago, he passed all the tests and everything,
16 but then he was on a waiting list and the waiting list was
17 fairly long.  And Dallas, after he took the test here, they
18 hired him before the fire department did up there.
19     Q.   Dallas Police Department got to him before the
20 Chicago Fire Department?
21     A.   Yes, sir.
22     Q.   And were you surprised that your son had joined the
23 police department, is that something that he talked to you
24 about prior to doing so?
25     A.   He really didn't.  He didn't tell me for sure that

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

147

1    that's what he wanted to do. But it did not surprise me
2    completely. He loved to help people. I mean that was just --
3    he loved doing for people and trying to make their lives
4    better.
5        Q.    Now, while he was with the Dallas -- initially with
6    the Dallas Police Department, was he still part of the Navy
7    Reserves?
8        A.    Yes, sir, he was.
9        Q.    And sometime after finishing the academy and starting
10   his job with the Dallas Fire Department, was that job -- I
11   mean Dallas Police Department, was that employment
12   interrupted?
13       A.    Yes, it was. He was called to active duty in '03
14   when the Iraq war started.
15       Q.    And what kind of unit was he assigned to?
16       A.    He was assigned to a Marine unit as a medic, as
17   corpsman.
18       Q.    And as a parent, did that cause you any concern at
19   that time?
20       A.    Yes. Other than the fact -- other than his death,
21   that was one of the worst times knowing that he was over there
22   and at war.
23       Q.    And did he actually participate in the invasion of
24   Iraq?
25       A.    Yes. He started in Kuwait. Before the war started,

148

1    he was in Kuwait. Once the war started, his Marine unit went
2    all the way to Baghdad.
3        Q.    And do you recall about how long he was in Iraq?
4        A.    Not very long. As soon as the occupation was
5    completed, they sent him back home. He was active duty
6    about -- not quite six months.
7        Q.    So he was gone about six months?
8        A.    About six months, yes.
9        Q.    And when he came back, he went back to the Dallas
10   Police Department?
11       A.    Yes. He took about a month or a month and a half off
12   for kind of decomposing, sort of speak, the stress of being at
13   war was quite a bit.
14       Q.    Once he was back on duty with the Dallas Police
15   Department, did he -- would he often talk with you about his
16   job as a Dallas Police Officer?
17       A.    The majority of the things that he talked about were
18   some -- you know, some of the things that he did, like when he
19   could help someone, when he could make, you know, be aid to
20   someone, and then some of the comical things that would
21   happen, you know, happen.
22       Q.    So enjoyed his work?
23       A.    He loved his job.
24       Q.    Ms. Nix, I want to turn your attention back to March
25   the 23rd of 2007, do you recall where you were at that time

149

1    in March of 2007?
2        A.    Yes, sir. I was visiting my mother in Minnesota. We
3    were -- I come from a family of seven children and we were
4    going to have a mini-family reunion for the first time since
5    my father had died two and a half years earlier.
6        Q.    And how long had you been in Minnesota when you got
7    the word that something terribly wrong had happened back here
8    in Dallas?
9        A.    Just a couple of days. I went up -- I can't
10   remember, either Tuesday or Wednesday of that week. I don't
11   remember which day I went up there.
12       Q.    And how did you first learn that something --
13   something bad had happened with your son?
14       A.    Some of my brothers and sisters and I were going to
15   go out for pizza and my daughter called when we were at the --
16   we had just arrived at the restaurant and told me that the
17   Dallas Police Department was trying to get ahold of me, but
18   they would not tell her why. I had one of the officers phone
19   numbers in my cell -- programmed into my cell phone leftover
20   from when he had gone to Iraq.
21       Q.    Let me stop you there, Ms. Nix. The officer's cell
22   phone that you had programmed, this was a colleague of his
23   son?
24       A.    Yes, sir. His name was Sergeant Sims. He had been
25   Mark's sergeant at one time.

150

1        Q.    And after you got the information from your daughter
2    that they were trying to reach you, did you call Sergeant
3    Sims?
4        A.    Yes, sir. I called Sergeant Sims and asked him if he
5    was the one that was trying to call me. My assumption at that
6    time was that Mark had hurt himself and that something had
7    happened and that he had got hurt. And Sergeant Sims informed
8    me that he had been shot. And that it was very serious and
9    that he was in surgery.
10       Q.    After receiving that terrible news, you were at a
11   restaurant if I understand correct?
12       A.    Yes, sir.
13       Q.    What steps did you start to take to get back to
14   Dallas?
15       A.    I went back to the table and informed my family that
16   I was going to have to leave immediately because I had to get
17   back home because Mark had been shot. So I got on the -- got
18   on the phone with airlines and tried to change my ticket. And
19   could not get -- it just was -- because I was on a cell phone
20   and we were traveling trying to go back to my brother's house,
21   was having trouble keeping connected with the airlines.
22       Q.    You eventually did get back to your brother's home?
23       A.    Yes.
24       Q.    Was there anyone there waiting for you when you got
25   back to your brother's home?

1    A.    Not immediately; but shortly thereafter, a
2  Minneapolis Police Chaplain came to the house.  And so
3  evidently the Dallas Police Department had contacted
4  Minneapolis to let them know that we were having problems and
5  that I was needing to get back home.
6    Q.    And that chaplain stayed at your brother's house
7  until you left for the airport?
8    A.    No, he didn't stay the whole time.  Because it turned
9  out that I couldn't get out until the next morning.  But he
10  did stay for quite a few hours until about the time we decided
11  that we were at least going to try to get a little bit of
12  sleep.
13    Q.    Was he still there, Ms. Nix, when you received some
14  more bad news?
15    A.    Yes.  The police department had finally gotten ahold
16  of my husband, he had been at work.  And so they -- actually
17  the Cleburne Police Department, we were living in Cleburne at
18  the time, took my husband to Dallas to the hospital; and
19  shortly after he arrived at the hospital, he called me and
20  told me that Mark had died.
21    Q.    Is your husband in the courtroom today?
22    A.    Yes, sir.
23    Q.    Can you point him out?
24    A.    He is sitting next to the officer.
25    Q.    Now, you received this terrible news and you are at

1  your brother's house?
2    A.    Yes, sir.
3    Q.    Was anyone there to help you make arrangements to get
4  back to Dallas?
5    A.    Not there in Minneapolis.  But I was in contact with
6  the Dallas -- sergeant -- I don't know if he is a sergeant,
7  Reed Higgins works for personnel in Dallas.  And I was trying
8  to talk to him on and off, while they were trying to locate a
9  flight for me to get back.
10    Q.    When were you finally able to get on a plane?
11    A.    Not until the next morning, the first flight out the
12  next morning.  And I don't remember exactly what time the
13  flight was.  I do remember that Minneapolis Officers came and
14  picked me up at four o'clock in the morning to get me to the
15  airport.
16    Q.    And did those officers stay with you the entire time
17  at the airport?
18    A.    Yes, sir, they stayed with me until I actually
19  boarded the plane.
20    Q.    And when your flight got back here to Dallas, you
21  flew into D/FW?
22    A.    Yes, sir.
23    Q.    And who was waiting for you when you got to D/FW?
24    A.    The first person that I saw as soon as I got off the
25  plane, I mean he was standing at the door of the plane was

153 154

1  Reed Higgins.  And there were two other officers, my husband,
2  and our pastor were there.
3    Q.    And once you were at home, you started making funeral
4  arrangements?
5    A.    Yes, sir.
6    Q.    Now, Ms. Nix, a few minutes ago, there was a portion
7  of a conversation played for the jury, were you in the
8  courtroom?
9    A.    Yes.
10    Q.    And you had heard that portion before?
11    A.    Yes.
12    Q.    What was taking place the week of May the 14th in
13  Washington, D.C.?
14        MR. BRAUCHLE:    Your Honor, we would object to
15  under 404, 403, 402 and 401.
16        THE COURT:    Overruled.
17    A.    There is an organization called COPS, Concerned
18  Police Survivors, what they call police week.  And there is
19  also an organization up there that has a -- what they call
20  police wall, where all the names of officers who have been
21  killed in the line of duty.  And then there is also a -- a,
22  ah, presentation at the White House where they call all the
23  names of the officers who have been killed in the line of duty
24  in the previous year.
25    Q.    (By Mr. Brooks) And who in your family was planning

1  to be in attendance for that week and those ceremonies?
2    A.    Myself and my husband, our daughter, her husband and
3  our two grandchildren.
4    Q.    Did y'all actually fly out to D.C. and attend those
5  ceremonies?
6    A.    Yes, sir, we did.
7    Q.    After hearing the comment made by this defendant, is
8  it clear to you that he was making reference to the ceremony
9  that y'all were attending?
10        MR. BRAUCHLE:    Your Honor, we would object to
11  that, there is no proper predicate laid.
12        THE COURT:    Overruled.
13    A.    Yes, it was very clear that that's what he was
14  referring to.
15    Q.    (By Mr. Brooks) These events have been very
16  troubling for you and your family; is that a fair statement?
17    A.    Yes, very.
18    Q.    Can you tell the jury what impact your son's death
19  has had on you and your family?
20    A.    Well, we no longer have a son on this side of
21  eternity, I mean he is not here.  He is not here for me to
22  talk to, he was -- he was a very caring young man.  And showed
23  me in many, many ways that he cared about what happened to me,
24  about how I felt.  I mean -- he just showed his love.  Not
25  only to me, but to rest of the family.  He loved children, he

155

1    loved people in general and just...
2    Q.    Did he have any children of his own?
3    A.    No, he did not.
4    Q.    Had he ever been marry?
5    A.    No, sir. He wanted to be married. And was in the
6    process of dating a young woman that they were discussing
7    marriage, yes.
8    Q.    And has she been present throughout portions of this
9    trial?
10   A.    Yes, sir.
11   Q.    Thank you, ma'am?
12          MR. BROOKS:   Pass the witness.
13          THE COURT:   Cross-examination.
14          MR. BRAUCHLE:   We would ask to approach?
15          THE COURT:   You may.
16          (Following procedures had at the Bench.)
17          MR. BRAUCHLE:   We think that this witness has
18   opened the area we went into in regard to the killing of Jose
19   Torres (sic), tasing of the other people, the testimony that
20   we proffered previous to today. Which I am sure the Court is
21   well aware of. And her statements under examination by the
22   State, we think clearly opened that up and we should be able
23   to present it to --
24          THE COURT:   How so? What statements?
25          MR. BRAUCHLE:   That he cared for people and that

156

1    he tried to help people. I think killing someone is pretty
2    much in direct contradiction to that statement. She said it
3    early on in her testimony. And we think -- we think that it
4    obviously presents a false impression, her son's gracious
5    nature, what they are trying to show.
6          MR. PARKS:   I think the Court of Criminal
7    Appeals issued an appeal that the Defense was able to present
8    mitigation issues and that the State would not be allowed to
9    offer impact evidence clearly hold or went to the mitigation
10   specialization went to that point. We suggest to the Court
11   that having opened that up with victim impact, then again,
12   toward the mitigation issue, we should be able to rebut.
13          THE COURT:   Response.
14          MR. BROOKS:   Judge, we respectfully disagree.
15   That the deceased was a caring person has not opened the door
16   as to the conduct of this officer. Specifically it was a
17   rule.
18          Their contention that he engaged in some unlawful act,
19   that has made -- had a ruling for that finding. It is just
20   their suggestion, and the evidence before in these files
21   indicate otherwise about the defendant was a caring person --
22   deceased was a caring person.
23          MR. BEACH:   The fact that she said he joined the
24   Dallas Police Department -- joined the Dallas Police
25   Department no way opens the door.

157

1          MR. BRAUCHLE:   That's not what she said.
2          MR. BEACH:   That's exactly what she said.
3          MR. PARKS:   Whether or not she has opened that
4    up, I believe that she did. But aside from that, I think that
5    William versus State makes this admissible evidence that goes
6    toward the mitigation issue, regardless of whether or not she
7    opened it up. In response.
8          THE COURT:   I am going to deny the objection on
9    both grounds.
10          MR. BRAUCHLE:   In light of the court's ruling we
11   would proffer the testimony that we have previously presented
12   in regard to Jose Torres and the other victims of Mark Nix. I
13   am sure the Court's aware of that, allow us to put it on
14   previously. And we would like to be able to proffer that, we
15   would proffer that.
16          And I assume by the Court's ruling, you are going to deny
17   us the proffering of that testimony.
18          MR. PARKS:   We just ask the Court to take notice
19   of the previous proffer and we would reproffer that same
20   evidence again at this stage. If that makes it easier.
21          MR. BRAUCHLE:   Just so the record is clear, you
22   know what we are trying to do?
23          THE COURT:   Right, right. And you are right
24   about I am going to deny that.
25          MR. BRAUCHLE:   Okay. Note our exceptions.

158

1          THE COURT:   Yes, sir.
2          (End of Bench Conference.)
3          THE COURT:   Your witness, Mr. Brauchle.
4          MR. BRAUCHLE:   No questions.
5          THE COURT:   You may step down, ma'am.
6          MR. BROOKS:   May it please the Court?
7    Members of the jury, the State rests.
8          THE COURT:   May I see the attorneys.
9          (Following proceedings here had at the Bench.)
10          THE COURT:   Any witnesses to go ahead.
11          MR. BRAUCHLE:   We need the transcript. I think
12   this will be a good time to break for the day so we can have
13   the court reporter.
14          THE COURT:   Okay.
15          MR. JOHNSON:   We have the witness to testify on
16   the same issues, he is available, we need to get that.
17          THE COURT:   We will break now and give you time
18   to get that.
19          MR. BRAUCHLE:   She will have it in the morning.
20   The reason we were asking, if it is not ready till in the
21   morning, we need sometime for him to read it, I will assume it
22   will take an hour or so, I don't know, but perhaps maybe start
23   at ten will be better than nine. I am just throwing that out
24   there.
25          THE COURT:   Let me do this, let me have the

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1    bailiff just take them to the jury room and find out from her.
2            (End of Bench Conference.)
3            THE COURT:  Ladies and gentlemen, there are some
4    issues we have to take outside your presence, so if you
5    will -- if you will go to the jury room.
6            (Jury retired from the courtroom.)
7            THE COURT:  You may be seated.
8        Mr. Brauchle, Mr. Baraka said she can have that around
9    5:00 if someone is willing to stick around.  We are going to
10   stick around.
11           MR. JOHNSON:  Today?
12           THE COURT:  Today.
13           MR. JOHNSON:  Cool.
14           THE COURT:  And this case will resume.
15           MR. BRAUCHLE:  I don't know the travel plans of
16   our witness, so, you need to ask them to talk to him.
17           MR. PARKS:  Mr. Johnson and I have made
18   arrangements for him to come in this afternoon and he is to
19   call me when he gets here.  And I will meet him with the
20   transcript.
21           MR. BEACH:  Judge, we are going to need to have
22   a 705 hearing on him anyway, which shouldn't take longer than
23   probably 20 minutes.
24       Is he going to be the first witness tomorrow?
25           MR. BRAUCHLE:  Yes.

1            MR. BEACH:  So.
2            THE COURT:  We can do that at 830 and have the
3    jury in at 9:00.
4        And if there is no objections I will go and release them
5    and admonish them or I can bring them in here.
6            MR. BRAUCHLE:  Whatever the court desires.
7            (Court recessed for the day.)

---

161

1    THE STATE of TEXAS )
2    COUNTY of DALLAS  )
3            I, BELINDA G. BARAKA, Official Court Reporter in and
4    for the 194th Judicial District Court of Dallas County, State
5    of Texas, do hereby certify that the foregoing contains a true
6    and accurate transcription of all portions of evidence and
7    other proceedings requested in writing by counsel for the
8    parties, to be included in this volume of the Reporter's
9    Record, in the above-styled and -numbered cause(s), all of
10   which occurred in open court or in chambers and were reported
11   by me.
12           I further certify that this Reporter's Record of the
13   proceedings truly and correctly reflects the exhibits, if any,
14   admitted by the respective parties.
15           I further certify that the total cost for the
16   preparation of this Reporter's Record  was paid by the
17   State/Defense.
18           WITNESS MY OFFICIAL HAND this the 30th day of
19   May        , A.D., 2009.
20
21
22                    BGBaraka
23                    BELINDA G. BARAKA, CSR #5028
                      Official Court Reporter
                      133 N. Industrial
24                    Dallas County, Texas 75207
25   Certification Expires:  12-31-09

CAUSE NO. F07-50318-M

| THE STATE OF TEXAS | * | IN THE DISTRICT COURT |
| vs. | * | 194TH JUDICIAL DISTRICT |
| WESLEY LYNN RUIZ | * | DALLAS COUNTY, TEXAS |

- - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

PUNISHMENT HEARING

Volume 53 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 9th day of July, A.D, 2008, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III, of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

1                    A P P E A R A N C E S

2

3    HON. KEVIN BROOKS
     Assistant District Attorney
4    State Bar No. 03070735

5

6    HON. ANDY BEACH
     Assistant District Attorney
7    State Bar No.  01944900

8                              FOR THE STATE OF TEXAS

9

10   HON. PAUL BRAUCHLE
     Attorney at Law
11   State Bar No. 02918000

12

13   HON. WILLIAM JOHNSON
     Attorney at Law
14   State Bar No.  10804500

15                              FOR THE DEFENDANT

16   Also Present:

17    Doug Parks, Attorney at Law

18

19

20                         *  *  *  *  *

21

22

23

24

25

**I N D E X**

PAGE/VOL.

Proceedings - 07/09/08 ............................ 7/53

DEFENSE'S WITNESS      Direct      Cross      S.Rosa

 LARRY FITZGERALD      16, 60      37, 66    7, 9

                                   72

 RICHARD ZIEGENHAIN    76          86

 SUE ZIEGENHAIN        95          112

 BARBARA RUIZ          114         135

 GILDA KESSNER         151, 173    166, 175  145

 KATHERINE DRAKE       179

 DAVID RIVERA          186         194

Daubert Hearing ..................................... 197

STATE'S WITNESS       Direct      Cross      S.Rosa

 KENNETH CRAWFORD                            197, 202

                                             211

Argument by - Mr. Brauchle.......................... 207

Reporter's Certificate ............................. 213

| | | | |
|---|---|---|---|
1

| | E X H I B I T   I N D E X | | |

2    STATE'S EXHIBIT(S):          OFFERED:   ADMITTED:  VOL.

3    104    Letter                    93          93        53

4    175    Murders/Capt. Murderers   75          75        53

5    176    Letters                  142         149        53

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    E X H I B I T    I N D E X

 2      DEFENSE'S EXHIBIT(S):         OFFERED:   ADMITTED:  VOL

 3        26    Photograph           104        104        53

 4        27    Photograph           104        104        53

 5        28    Photograph           104        104        53

 6        29    Photograph           104        104        53

 7        30    Photograph           104        104        53

 8        31    Photograph           104        104        53

 9        32    Photograph           104        104        53

10        33    Photograph           104        104        53

11        34    Photograph           104        104        53

12        35    Photograph           104        104        53

13        36    Photograph           104        104        53

14        37    Photograph           104        104        53

15        38    Photograph           104        104        53

16        40    Photograph           104        104        53

17        41    Photograph           104        104        53

18        42    Photograph           104        104        53

19        43    Photograph           104        104        53

20        44    Photograph           104        104        53

21        45    Photograph           104        104        53

22        46    Photograph           104        104        53

23        53    Photograph           104        104        53

24        54    Photograph           104        104        53

25        55    Photograph           104        104        53
```

```
 1                    E X H I B I T   I N D E X

 2   DEFENSE'S EXHIBIT(S):        OFFERED:   ADMITTED:  VOL

 3     56    Photograph           104        104        53

 4     57    Photograph           104        104        53

 5     58    Photograph           104        104        53

 6     59    Photograph           104        104        53

 7     60    Photograph           104        104        53

 8     61    Photograph           104        104        53

 9     62    Photograph           104        104        53

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

(July 9, 2008)

THE COURT:   Let the record reflect that this hearing is outside the presence of the jury.  If you will raise your right hand, sir.

(Witness was duly sworn.)

THE COURT:   You may put your hand down.  And you may be seated.

**LARRY FITZGERALD**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**SUB ROSA EXAMINATION**

BY MR. PARKS:

Q.    State your name for the record please.

A.    My name is Larry Fitzgerald.

Q.    Mr. Fitzgerald, where do you live, what city?

A.    I'm sorry.

Q.    What city do you live in.

A.    I live in Austin, Texas, Travis County.

Q.    How are you employed?

A.    I am retired, sir.

Q.    Have you previously been employed by the Texas Department of Criminal Justice?

A.    Yes, sir, I retired from them.

Q.    When were you employed with them?

---

A.    From January 1995 to August 2003.

Q.    And in what capacity?

A.    Public information officer for the system.

Q.    And as public information officer for the system, for TDCJ system, were you familiar with day-to-day operations of the prison system?

A.    Yes, sir.

Q.    And were you familiar also with the classification of the system?

A.    Yes, sir.

Q.    And was that because part of your job and duties was to explain classification to the media or to whoever needed that information and you spoke on behalf of the system; is that correct?

A.    Yes, sir.

Q.    You have been employed by the Defense to speak to the issue of classification here today; is that correct?

A.    That is correct, sir.

Q.    And you are able to do that based upon your prior experience with the system; is that correct?

A.    Yes, sir.

Q.    And have you testified as an expert witness in that capacity previously?

A.    Yes, sir, I have.

Q.    On one or more than one occasion?

---

9

A.    A couple thousand, sir.

Q.    So you have been qualified by different courts across the State of Texas in this area.

A.    Yes, sir.

Q.    You have read the testimony of A.P. Merrilott, who testified yesterday; is that correct, or the date before?

A.    Yes, sir, I have.

Q.    And your testimony is going to be basically along the same lines as the State's witness; would that be a fair statement?

A.    Yes, sir, that's fair.

MR. PARKS:   Your Honor, we would pass the witness and suggest he is qualified.

**SUB ROSA EXAMINATION**

BY MS. HANDLEY:

Q.    Mr. Fitzgerald, my name is Andrea Handley --

A.    Yes, ma'am.

Q.    -- a few questions for you.  You have read Mr. Merrilott's testimony from yesterday, what if anything do you take issue with that he talked about?

A.    Generally I agree with what he testified to.

Q.    Okay, so you generally agree with everything that he said?

A.    As far as the transcript yesterday, yes, ma'am.

Q.    Yes, sir.  Okay.  And when you worked for Austin as

---

10

the public information officer, you are the gentleman that we would see that would come out and tell the press what the guy asked for his last meal and what his last words were, things such as that?

A.    With the executions, yes, ma'am.  And I was not in Austin, I was in Huntsville.

Q.    Huntsville.  And you have been retired since 2003, did you ever actually work in classification, did you make the policies or anything like that?

A.    No, ma'am, I did not, that was not my job.

Q.    Okay.  So your job then was to basically, they would give you information that you could then tell the press or tell the public?

A.    Yes, ma'am.

Q.    Did you have an office inside the penitentiary?

A.    I was directly across the street from the Huntsville unit in a prison building, yes, ma'am.

Q.    Okay.  Okay.  So you weren't necessarily working in and amongst the inmates?

A.    I was freakily on the units, but I did not have my office there.

Q.    Okay.  So you were on the unit.  Okay.  You never investigated in kind of prison violence or anything like that?

A.    No, ma'am.  I'd explain it, after we got the information back from the warden, from the various people

---

1  investigated, then it would be my duty to explain to the media
2  what happened on the unit.
3      Q.   Okay. So you are not actually investigating it, you
4  are not hands on. They are telling you what they want you to
5  filter out to the public then?
6      A.   They are telling me what to say is the truth.
7      Q.   So you are having to rely strictly on what they tell
8  you?
9      A.   Yes, ma'am.
10     Q.   Do you feel that you are also qualified then to talk
11 about prison violence?
12     A.   I have witnessed it, yes, ma'am.
13     Q.   When did you witness it, what have you sign?
14     A.   I have seen fights and scuffles, that type of thing.
15     Q.   Okay. How often?
16     A.   Not very often.
17     Q.   You have never investigated, for example, any of the
18 murders that were committed in the penitentiary?
19     A.   Well, yes -- not investigated, but I have been there
20 after the fact and witnessed the crime scene.
21     Q.   Okay. Have you -- have you compiled for the juries
22 education any kind of statistics or anything like that about
23 prison violence or disciplinarian action?
24     A.   Not for the jury, I rely on information supplied in
25 the Emergency Action Center's statistical report.

1      Q.   The Emergency Action Center's statistical report?
2      A.   Yes, ma'am. As part of the executive arm of the
3  prison system, they compile information that is gathered from
4  throughout the system regarding prison violence. Any type of
5  thing that occurs in the unit, they will report it, put it --
6  compile it and put it in a report.
7      Q.   Specifically for you or is that for general
8  dissemination?
9      A.   It is for general dissemination.
10     Q.   Okay. Is it somebody we can access on the web or
11 where do you get this?
12     A.   Yes, ma'am, you can.
13     Q.   For example, in the year 2000, can you tell us how
14 many disciplinary convictions there were for assault by
15 inmates on inmates?
16     A.   I'm sorry, the question again.
17     Q.   For the year 2000, how many disciplinary convictions
18 for assault by inmates on inmates were there?
19     A.   Year 2000?
20     Q.   Yes.
21     A.   Serious offender assault?
22     Q.   Sure.
23     A.   There are no figures for 2000.
24     Q.   Well, sir, would it surprise you that according to
25 the prison system's executive statistics report for the year

13

1  2000, there were over 1600 disciplinary convictions for
2  assault by inmates on inmates, and over 2,000 disciplinaries
3  for assault by inmates on staff.
4      A.   I don't show that for the year 2000. The yearly
5  total that we start with on serious offender assault starts in
6  2001, and it's 673.
7      Q.   How do you define serious offender assault?
8      A.   That's assault that result in injury that requires
9  treatment above first aid in the unit level.
10     Q.   So your statistics then don't include any kind of
11 assaults that didn't require a transfer to the hospital or
12 something beyond triage?
13     A.   Not prior to 2000.
14     Q.   What about 2006, the prisons executive statistics
15 report reports there are over 5,000 disciplinary convictions
16 for assault by inmates against staff?
17     A.   Yes, ma'am.
18     Q.   And there were over 14,000 disciplinary convictions
19 for assault of inmates against other inmates, would you take
20 issue with that statistic?
21     A.   I don't take issue with it, no, ma'am.
22     Q.   You have a different opinion?
23     A.   No.
24     Q.   Or different statistic?
25     A.   I am going by here what they put down here what say

14

1  are the record and that's 5,129 for disciplinary convictions
2  on staff assaults. And 14,645 on disciplinary convictions for
3  offender assaults.
4      Q.   Okay. And I guess it is fair to say then that you
5  feel you have the finger on the pulse of what's going on in
6  the prison and violence and offenses committed in the prison
7  system?
8      A.   When I was there, certainly I tried to.
9      Q.   Well, do you feel that you do now?
10     A.   Yes, ma'am. I get this report monthly and I look at
11 it and just go through it, yes, ma'am. It is the same
12 information that I'd had if I was inside the prison system, I
13 would still use this report.
14     Q.   Is there any other data or statistics that you are
15 relying on today for your testimony?
16     A.   No, ma'am.
17     Q.   What have you brought with you, sir, what have you
18 relied upon to prepare for your testimony today?
19     A.   Again, it is the report, the Emergency Action
20 Statistics Report for May 2008, that's the last set of figures
21 that are available.
22          MS. HANDLEY:   May I approach Your Honor?
23          THE COURT:   You may.
24     Q.   (By Ms. Handley) Sir, would you mind if I take a
25 look at that?

1    A.   Certainly, ma'am.

2    Q.   Okay.  Anything else besides this report here?

3    A.   No, ma'am.

4    Q.   Thank you?

5    A.   You are welcome.

6         MS. HANDLEY:   Nothing further, Your Honor.

7         MR. PARKS:   That's all we have for this hearing,

8    Your Honor.

9         THE COURT:   Anything further from either side?

10        MS. HANDLEY:   Nothing, Your Honor.

11        THE COURT:   Both sides ready to bring the jury

12   in?

13        MR. PARKS:   Yes, sir.

14        MR. BEACH:   We would like Mr. Brauchle to

15   conduct the questioning -- go ahead.

16        THE BAILIFF:   All rise.

17        (Jury entered the courtroom.)

18        THE COURT:   You may be seated.

19   Mr. Parks, you may proceed.

20        MR. PARKS:   Thank you, Your Honor.

21        **LARRY FITZGERALD**

22   was called as a witness, and having been duly sworn by the

23   Court, testified under oath as follows:

24

25

---

1              DIRECT EXAMINATION

2    BY MR. PARKS:

3    Q.   State your name for the members of the jury, please.

4    A.   My name is Larry Fitzgerald.

5    Q.   In what city do you reside?

6    A.   I reside in Austin, Texas, Travis County.

7    Q.   And how are you employed?

8    A.   I am retired.

9    Q.   And what did you do prior to your retirement?

10   A.   I worked for the Texas Department of Criminal

11   Justice, I was stationed in Huntsville.

12   Q.   And what was your job with them?

13   A.   I was a public information officer for the

14   institutional division of TDCJ.

15   Q.   And can you give the members of the jury some idea

16   what that job entailed, please.

17   A.   It entailed dealing with the media, reporting on

18   everything that went on inside the prison system.  Our policy

19   was that if something bad happened inside the prison system,

20   we would contact the media, even though the story had warts on

21   it, we would get it out there first, rather than having the

22   media find out that something occurred in the prison system.

23   Instead of trying to explain it, we wanted to get out and be

24   aggressive and proactive.

25   Q.   So if there was an escape for instance or some act by

---

17

1    inmates or whatever that was going to be made public, you were

2    the face of the penitentiary to the media, to the public; is

3    that fair to say?

4    A.   Yes, sir.  Our policy was when anything bad happened

5    like that, we first contact Associated Press, and then contact

6    Texas State Network, which has a network -- gee, I don't know

7    how many radio stations across the State of Texas.  The

8    purpose was to get that information out.

9    Q.   And in that job, did you have occasion to be in

10   contact with personnel at the penitentiary, guards,

11   administrators, and even inmates?

12   A.   Yes, sir.  I actually lived on prison property,

13   resided I should say.

14   Q.   It was not an uncommon thing for you to be among the

15   inmates there at the penitentiary?

16   A.   No, sir, on a daily basis.

17   Q.   Did you also have duties that involved death row?

18   A.   Yes, sir, I did.  I was the sportsman for death row.

19   There are two death row visitation days as far as the media is

20   concerned, one is at the Gatesville unit, which houses female

21   death row, and the other -- or the Mountain View Unit in

22   Gatesville, and the other is at the death row in Livingston,

23   Texas, which is now the Polunsky Unit.

24   Q.   When you first went to work for TDCJ -- when you

25   first went to work, it was TDC?

---

18

1    A.   No, sir, it had already changed to TDCJ.

2    Q.   Was death row at Livingston when you first went to

3    work?

4    A.   No, sir.  It was in the Ellis Unit, which is north of

5    Huntsville near Trinity, Texas near that area.

6    Q.   And death row moved to Livingston, what, about 1999?

7    A.   1999 when the transition was made, yes, sir.

8    Q.   Now, Mr. Fitzgerald, you have been engaged by the --

9    the Defense for your testimony here today, have you not?

10   A.   Yes, sir, I have.

11   Q.   And are you being paid?

12   A.   Yes, sir, I am.

13   Q.   Is it an unusual thing for expert witnesses to be

14   paid, whether they testify for the Defense or the State?

15   A.   No, sir.

16   Q.   Now, do you make your living testifying as an expert

17   witness?

18   A.   No, sir, I don't.

19   Q.   How do you make a living?

20   A.   Well, I am retired, I get social security and I get

21   state retirement.  I work on a contract basis for the

22   Governor's office for the emergency management, which deals

23   with all the hurricanes, fires and things that we have in

24   state.  My job here primarily again is to assist.  And I also

25   work during the legislative session for the secretary of the

---

1    Senate.

2    Q.    Have you ever testified as an expert witness for the
3    State?

4    A.    No, sir, I haven't. I haven't been asked.

5    Q.    Would you if you were asked?

6    A.    Certainly.

7    Q.    Would it be fair to say that your testimony is
8    essentially fact based, it is what it is, whether you testify
9    for the State or the Defense?

10   A.    It is what it is.

11   Q.    Now, let's talk a little bit about death row as it
12   used to be and death row as it is now. We have heard a term
13   during the course of the trial of work eligible, was there a
14   time when people on death row were work eligible?

15   A.    Yes, sir. That was at the Ellis unit. There was a
16   garment factory, the offenders would work in the garment
17   factory. They made the trousers that the correctional
18   officers wear. They only made the trousers, because obviously
19   for security reasons, they could not make the blouses, they
20   didn't want anybody to put the uniform together. So they made
21   the pants that all the correctional officers used. And they
22   also made various other items, such as cloth computer cases,
23   that type of thing.

24   Q.    And these were death row inmates, persons who had
25   been sent, convicted by a jury, assessed the death penalty and

1    sent to the penitentiary to await execution; is that correct?

2    A.    That is correct, they were only death row inmates.

3    Q.    In order to work in the garment factory, were they
4    furnished tools?

5    A.    Yes, sir.

6    Q.    What kind of things were they given to do their work?

7    A.    Well, they worked around sawing machines, they had
8    knives, they had scissors, sharp objects.

9    Q.    Have you ever gone to death row to the garment
10   factory where death row inmates were working, has all of those
11   items?

12   A.    Regularly, we would take media groups to there on
13   many occasions just to show the media here is how the system
14   work and here is what the garment factory is.

15   Q.    And so you and the group that you were with would
16   walk among the inmates in the garment factory; is that fair to
17   say?

18   A.    That is fair to say, sir.

19   Q.    I believe on one occasion, you sort of lagged behind
20   the group, did you not?

21   A.    Yes -- I was escorting media group through, I kind of
22   fail behind, and one of the inmates started talking to me and
23   we got engaged in a conversation and I sensed to more presence
24   around me. And I looked around to my left and it was Henry
25   Lee Lucus, who was at that time considered to be the biggest

21

1    serial killer in the world. And the other one was Kenneth
2    Allen McDuff, who was executed. So I am standing there
3    between two of these death row murderers and they both got
4    knives in their hands and I thought this is a situation that I
5    didn't want to be in.

6    Q.    What happened?

7    A.    They talked to me, we left -- I left.

8    Q.    Part of your duties of course were to actually attend
9    executions; is that correct?

10   A.    Yes, sir. In the State of Texas, it is mandated that
11   five media witnesses attend every execution. And I very much
12   favor that simply because it is the public's eye on the
13   execution process. That's why the reporters are there. And
14   it was my duty to escort the media in there, and to witness
15   all the executions.

16   Q.    How many have you witnessed, Mr. Fitzgerald, if you
17   remember?

18   A.    Over 200, 219 to be specific.

19   Q.    Now, when death row was moved to the Polunsky unit
20   over in Livingston, it was originally the Terrell Unit, is it
21   not?

22   A.    Yes, sir.

23   Q.    It is named for Charles Terrell, a person who lives,
24   I guess here in Dallas, if that is correct?

25   A.    That's my understanding, yes, sir.

22

1    Q.    He asked that his name be removed?

2    A.    He did.

3    Q.    After they removed his named, they named it the
4    Polunsky Unit.

5    A.    The L.V. Polunsky Unit.

6    Q.    When death row moved to the Huntsville Unit, did the
7    work eligible program ultimately cease to exist?

8    A.    At that point it ceased to exist.

9    Q.    Is it fair to say that presently death row it is an
10   ad seg portion of the penitentiary system?

11   A.    Anybody on that is on death row is considered an ad
12   seg prisoner, an administrative segregation prisoner.

13   Q.    And of course that is not the only administrative
14   segregation there is, but they are considered ad seg?

15   A.    All those prisoners are ad seg prisoner; and yes,
16   there are ad seg sells in the other penitentiaries.

17   Q.    And just to kind of refresh for the jury, ad seg
18   offenders are in their cells 23 hours a day; is that correct?

19   A.    Yes, sir, 23 in and an hour out for recreation.

20   Q.    Alone?

21   A.    Alone.

22   Q.    They recreate alone?

23   A.    They recreate alone.

24   Q.    Do you -- do you know about what the dimensions of an
25   ad seg sell is, Mr. Fitzgerald?

1    A.    On death row it is six by ten, 60 square feet.
2    Q.    And are the units different in different units, do
3  you know?
4    A.    Well, some of the units are older, so the sells would
5  be configuratively differently.  But as far as ad seg on death
6  row, that is the size of the cell.
7    Q.    And it would be pretty much the same size wherever ad
8  seg is; would that be fair to say?
9    A.    That would be fair to say, yeah, it's small.
10   Q.    Now, when you first went to work for TDCJ, persons
11  who received sentences of life rather than death where
12  eligible for parole; is that correct?
13   A.    That is correct.
14   Q.    Many times, it was many, many years later, but there
15  was some eligibility there?
16   A.    Was some, yes, sir.
17   Q.    That's not true any longer; is that fair to say?
18   A.    No, sir.
19   Q.    Legislature changed the law and now we have life
20  without parole.  What we lawyers have sometimes shortened to
21  LWOP, but it is the same thing?
22   A.    That's correct.
23   Q.    Now, there has been some talk about that change in
24  the law decreasing any incentive that offender might have to
25  comply with the rules of the TDC.  Are there other things from

1  your experience and observations with which offenders can be
2  rewarded other than parole that would give them an incentive
3  to comply with the rules?
4    A.    Certainly it is a system of carrots and sticks.  If
5  you exhibit good behavior, you are rewarded better visitation,
6  by more time or more money you spend in the commissary, more
7  recreation time, that sort of thing.
8    Q.    I guess that sort of beg the question why would a
9  person like Henry Lee Lucus, I guess, or any of the other
10  persons who was sentenced to death were eligible, why
11  would they work if they were under a death sentence?
12   A.    Air conditioning.
13   Q.    Simple as that?
14   A.    Well, and they have association.  Freedom of moving
15  inside the garment factory.  But the main thing was, that it
16  was air conditioning.  The other system is on the Trinity
17  River bottom, it gets very hot in the summer.  And so to be in
18  the work program is a very good thing for the convict.
19   Q.    As a general rule when you were among the inmates at
20  TDCJ, did you feel safe?
21   A.    Yeah.
22   Q.    Were you ever assaulted?
23   A.    No.
24   Q.    Anybody in any of the groups that you ever toured
25  through the TDCJ was ever assaulted by an inmate?

1    A.    No.  But we also, when we brought them through, we
2  warned them about certain things they could do and they
3  couldn't do for their own protection, obviously.
4    Q.    Incentive still exists with work programs on death
5  row inmates, I guess; but there are work programs for
6  non-death row, non-ad seg offenders, are there not?
7    A.    Yes, sir.  Generally speaking any offender inside the
8  system, unless they are medically incapable of doing it or if
9  they are in ad seg, will have some type of job that they do
10  inside the prison system.
11   Q.    Would it be fair to say that typically they start out
12  with the more menial harder jobs?
13   A.    Yeah, that's true.  And also when they go through the
14  diagnostic process, part of the purpose of diagnostic is to
15  find out if a person has a job history, if they might be a
16  mechanic or have some type of a skill that the prison system
17  can utilize once they are incarcerated.
18   Q.    Are offenders able to work up in the system?
19   A.    Yes, sir.
20   Q.    Get better jobs?
21   A.    Yes, sir.
22   Q.    Under some circumstances even get back to where they
23  are working in air conditioning?
24   A.    Yeah, there would be some circumstances such as that,
25  yeah.  It would be rare, but it could happen.

1    Q.    For the most part, the entire system for inmates is
2  not air conditioned; is that true to say?
3    A.    That's safe to say.  The administrative officers are
4  air conditioned, the officers dining rooms are air
5  conditioned, obviously the infirmary areas are air
6  conditioned, by enlarge that is it.
7    Q.    Now, were you from time to time called upon with your
8  work with TDCJ to explain classification procedures for the
9  system?
10   A.    Yes, sir.
11   Q.    And are you familiar with the classification system
12  that TDCJ has now?
13   A.    Yes, sir.
14   Q.    If you would, explain to the members of the jury what
15  happens when a person is sentenced to the TDCJ, doesn't matter
16  from where or necessarily for how long or for what, just got a
17  TDC sentence to serve, what happens to them?
18   A.    What typically happens, some person coming into the
19  penitentiary system, not under a death penalty, will go what
20  they call the intake process or the diagnostic process.  And
21  the purpose of diagnostic is to really learn more about that
22  offender than the offender really knows about him.  Get his
23  family history, medical history, any type of psychological
24  problems he might have.  They study everything about that
25  offender they possibly can.  And once they have gathered all

27

28

1   that information, that information then goes to a group called
2   the state classification committee. And the state
3   classification committee makes a determination at that time as
4   to where that offender will be housed, that means what
5   penitentiary they will go to, and what the classification of
6   the offender will be. So they take all that into
7   consideration as they make that determination of what the
8   future holds for that offender.
9       Q.   You have read the testimony of A.P. Merrilott, have
10  you not?
11      A.   I have.
12      Q.   You did that last evening?
13      A.   Yes, sir.
14      Q.   Do you know A.P.?
15      A.   Yes, sir, I do.
16      Q.   About how long have you known A.P.?
17      A.   Safe to say probably 2002, 2003, somewhere in there.
18      Q.   Did you find anything in Mr. Merrilott's testimony
19  with respect to classification that you had any serious
20  disagreement with?
21      A.   No, sir, I did not.
22      Q.   Do you agree that the person is sentenced to life for
23  capital murder, they would be sent to diagnostic and for
24  classification just as you described?
25      A.   Yes, sir.

1       Q.   And would they be a G-3?
2       A.   Could be a G-3, yes, sir.
3       Q.   Tell the jurors how -- how the classification --
4   let's say that a person is presumed to be a G-3 when they go
5   into classification --
6       A.   Uh-huh.
7       Q.   -- does that mean they will come out of
8   classification as a G-3?
9       A.   Not necessarily.
10      Q.   Why would that not be?
11      A.   Well, because they look at the past record of the
12  offender, is the offender violent, how has he behaved in a
13  county lock up, has he ever been in penitentiary before.
14  Those are the things they consider. If there is a violence
15  attempted by the defendant, that would bump him up from a G-3.
16      Q.   Does a person also undergo some kind of psychological
17  testing at diagnostic, do you know?
18      A.   Yes, sir.
19      Q.   Would they take that into consideration also?
20      A.   Certainly.
21      Q.   They review, would it be fair to say, all of the
22  material that is sent with that prisoner by law enforcement?
23      A.   Yes, sir.
24      Q.   So that if there were things in that record, perhaps
25  allegations which a person had not been convicted or

29

30

1   allegations of gang membership or association, or affiliation,
2   are those things also matters that that committee would look
3   at and consider?
4       A.   Absolutely. It is called -- in the prison system
5   they call it the inmate being paper ready. And they will not
6   pick up the -- the State will not pick up the offender until
7   all the paperwork is gathered and then they take the offender
8   and the paperwork through the diagnostic process.
9       Q.   So essentially any of the paperwork associated with
10  the case, that would bear upon a person's background, facts
11  and circumstances surrounding the offense and the other past
12  records, allegations, whether or not necessarily proven, could
13  all -- would all go with that person and be considered by
14  classification?
15      A.   Yes, sir, it would.
16      Q.   And taking into consideration all of those things,
17  classification could continue a person as a G-3 or move them
18  into ad seg if they wish to?
19      A.   That is correct.
20      Q.   And in your experience, Mr. Fitzgerald, are the
21  people at the Texas Department of Criminal Justice competent
22  people?
23      A.   Oh, yes, very much so.
24      Q.   Do you believe that people in classification are
25  competent?

1       A.   Yes, sir. They do thousands of them a year.
2       Q.   Professionals at their jobs?
3       A.   Yes, sir.
4       Q.   You indicated to me last evening that there was --
5   well first let me ask you whether or not statistics are kept
6   by the Texas Department of Criminal Justice?
7       A.   Yes, sir.
8       Q.   And they keep up with such things as how many people
9   are assaulted, how many people -- how many homicides there
10  are, how many -- well, just several categories, you have
11  brought those figures with you?
12      A.   Yes, sir, I did.
13      Q.   What are those called?
14      A.   It's the Emergency Action Center Statistic, Select
15  Statistic Report. And the current one out is the May 2008
16  edition. They usually run about 40 days after the month that
17  is surveyed.
18      Q.   Now, you indicated that there was one figure on -- in
19  these statistics that spoke to you at least with respect to
20  how competent those folks are, and that was the suicide rate?
21      A.   Yes, sir.
22      Q.   Would you explain to the members of the jury what
23  significance you place on the suicide rate?
24      A.   Well, in the year 2007, there was 736 attempted
25  suicides. There were only 32 successful suicides, which tells

1   me that the correctional officer is doing a good job.  Now,
2   the year-to-date, there was 326 attempted suicides and nine
3   successful ones.
4      Q.   And that tells you that guards down there, people who
5   assess and evaluate persons are doing a pretty good job of
6   identifying those situations and successfully.
7      A.   Yes, sir.  And it also tell me that it is a very
8   tough place to be.
9      Q.   You indicated that there was kind of a continuing
10  classification system in the TDC, explain how that works.
11     A.   Well, there is a unit classification committee that
12  works that constantly reevaluate and assess the inmates.  And
13  quite honestly, every time the correctional officer swings a
14  door on an offender, subconsciously they are making an
15  assessment of that offender at that time.  When I swing this
16  door, how is the offender going to react.  That is
17  constant, that is ongoing.
18     Q.   If a person who -- once a person is classified, they
19  don't necessarily continue on that classification, they could
20  improve their classification with good behavior?
21     A.   Yes, sir.
22     Q.   They could cause their classification to be lowered
23  or even find themselves in administration segregation?
24     A.   Yes, sir.  You can earn your way into administrative
25  segregation and you can earn your way out.

---

1      Q.   Now, the statistics that you brought with you today,
2   Mr. Fitzgerald, show such things as serious offenders
3   assaults?
4      A.   Yes, sir.
5      Q.   Can you tell the members of the jury for the
6   year-to-date in TDCJ, how many serious offender assaults have
7   been recorded?
8      A.   Year-to-date 439.
9      Q.   Four hundred thirty-nine?
10     A.   Yes, sir.
11     Q.   Through -- from January through May?
12     A.   Yes, sir.
13     Q.   Can you tell the members of the jury what a serious
14  offender assault is, what would qualify?
15     A.   That's an assault where treatment, medical treatment
16  requires something above medical treatment that can be
17  acquired at the unit level.  So it's like a step up into the
18  hospital.
19     Q.   So if it requires more than first aid?
20     A.   Yes, sir.
21     Q.   On premises?
22     A.   Uh-huh.
23     Q.   It is qualified as a serious offender assault?
24     A.   Yes, sir.
25     Q.   It might be something that is -- could be life

---

33

1   threatening, it could be something relatively minor but just
2   need more than first aid?
3      A.   Yes, sir, that's correct.
4      Q.   Now, do you know about what the present population of
5   TDCJ is?
6      A.   It's 157,000 and some change.
7      Q.   And has that been fairly constant over the last three
8   or four years?
9      A.   Yes, sir.
10     Q.   That would what equate to the city about the size of
11  Waco?
12     A.   Yeah, about a hundred fifty thousand or so.
13     Q.   Of course in the TDCJ as opposed to a city the size
14  of Waco, we don't have any women and children -- well, we have
15  some women, no children.  These are all felony offenders down
16  there --
17     A.   Yes, sir.
18     Q.   -- is that fair to say?  So among the 157,000, give
19  or take, felony offenders at the TDC justice year-to-date,
20  there has been 439 offender assaults that required treatment
21  over the level of first aid?
22     A.   Yes, sir.
23     Q.   How many homicides year-to-date of those 157,000?
24     A.   One.
25     Q.   How many escapes?

---

34

1      A.   One.
2      Q.   Now, as TDCJ for purposes of these statistics define
3   an escape, that does not necessarily mean that someone going
4   over the wall, does it?
5      A.   That's correct.  It could be someone that might run
6   away from a host squad, something of that nature.
7      Q.   I see down here that there are disciplinary
8   convictions for staff assaults.  For the year-to-date, how
9   many would that have been?
10     A.   Twenty-four.
11     Q.   I'm sorry, I believe you are looking at the serious
12  staff assaults?
13     A.   Oh, I'm sorry.
14     Q.   And I am going to ask you about that, there have been
15  24?
16     A.   Staff assaults.
17     Q.   Let's talk about serious staff assaults at this
18  point?
19     A.   Okay.
20     Q.   A serious staff assault would be the same thing as
21  the serious offender assault except against staff rather than
22  offender?
23     A.   That's correct.
24     Q.   So out of 157,000 prisoners, over a period of five
25  months, there have been 24 assaults on guards that require

35                                                                                    36

1    treatment above the level of first aid?
2        A.   Yes, sir.
3        Q.   Now, dropping on down to disciplinary convictions for
4    staff assaults, what is that figure?
5        A.   Two thousand one hundred nine.
6        Q.   So I suppose that mathematically, assuming that all
7    of the 24 serious staff assaults were also convicted of having
8    disciplinary convictions for that, there would have been
9    something in the neighborhood of almost 2100 nonserious staff
10   assaults?
11       A.   Yes, sir.
12       Q.   And that could be what?
13       A.   True.
14       Q.   What kind of thing could be a nonserious staff
15   assault?
16       A.   I really don't know how they would classify that, I
17   really don't.
18       Q.   All right.  But that would be something that either
19   required no treatment or some treatment that could be done by
20   first aid?
21       A.   Yeah.
22       Q.   And disciplinary convictions for offender assaults
23   same thing, about how many year-to-date?
24       A.   We show 5,817.
25       Q.   When offenders get in a fight, would it be fair to

1    say that typically both offenders are disciplined for an
2    offender assault regardless of who started it and regardless
3    of whether or not there was any damage done?
4        A.   I have seen that happen, yes, sir.
5        Q.   Mr. Fitzgerald, is there anything else that we have
6    not talked about or reflected on this statistics here that you
7    believe is of significance?
8        A.   No, sir.
9        Q.   Would it be fair to say that -- in the first place,
10   you have not heard any of the testimony in this case?
11       A.   No, sir, I have not.
12       Q.   You have never met the defendant in this case?
13       A.   No, sir.
14       Q.   You know very little or almost nothing about the
15   facts in the case, other than just bare bones; would that be
16   fair to say?
17       A.   That is fair to say.
18       Q.   And you are not making any predictions particularly
19   as to what classification will or will not do with respect to
20   Mr. Ruiz if he is assessed a life sentence in this case?
21       A.   No, sir, I am not.
22       Q.   Would it be fair to say that based upon your
23   experience with TDCJ and your knowledge of the classification
24   system, that the professionals down at the TDCJ that do the
25   classification in this case, they will do that classification

37                                                                                    38

1    they believe is proper and appropriate, whether it is G-3, G
2    whatever, or administration segregation?
3        A.   Yes, sir.
4        Q.   They will base that on the facts and circumstances of
5    the case that the papers that follow with it?
6        A.   Very much so, yes, sir.
7        Q.   Thank you, Mr. Fitzgerald.
8            MR. PARKS:   I will pass the witness.
9                    CROSS-EXAMINATION
10   BY MS. HANDLEY:
11       Q.   Good morning, Mr. Fitzgerald.  We have never met
12   before except for a previous hearing today?
13       A.   Yes, ma'am.
14       Q.   A few questions for you today, sir.  And to touch
15   back again on your experience, you were employed by TDC from
16   1995 to 2003 as an public information officer; is that
17   correct?
18       A.   Yes, ma'am.
19       Q.   And is it fair to say, sir, that you might be the
20   gentleman that we would see on the TV, if there had been an
21   actual execution, you would come out and tell the media and
22   the public if he had any last words or what his last meal was
23   such as that?
24       A.   Yes, ma'am.
25       Q.   And this was information that we reported to you by

1    prison officials, you would then go out and be the response
2    person for that information?
3        A.   No, not necessarily so.  I would be there to witness
4    the execution and I would record -- I say record, I would
5    write down the final statement.  I would also visit with the
6    offender prior to the execution and report back to the media
7    anything that the offender said, that type of thing, so it was
8    not gathered from second-hand information.
9        Q.   You also said that you were there to report when
10   anything bad happened?
11       A.   Yes, ma'am.
12       Q.   That they wanted to alert the public about?
13       A.   Yes, ma'am.
14       Q.   And fair to say you didn't actually investigate those
15   bad things that happened, you weren't hands on investigating
16   it, but you were certainly there to tell the public about
17   anything -- bad things that were happening?
18       A.   Yes, ma'am.
19       Q.   Okay.  And it's safe to say, Mr. Fitzgerald, that a
20   lot of bad things were happening in the prison system?
21       A.   It is a prison system.
22       Q.   Back then as well as today, correct?
23       A.   Yes, ma'am.
24       Q.   And incidentally, you have been retired since 2003,
25   you currently reside in Austin, Texas?

39                                                                                          40

1    A.   Yes, ma'am.
2    Q.   So you are not really in the environment in
3  Huntsville, you used to live there at the time, did you not?
4    A.   Quite honestly I like Huntsville.  I go back and
5  forth a lot, I have got a lot of friends there that work in
6  the system.
7    Q.   With respect to things of reporting anything bad, is
8  it fair to say that the offenses that we might see in the free
9  world, murders, capital murders, rapes, assaults with a deadly
10  weapon, those are the same types of offenses that are
11  occurring in our prison systems also, aren't there?
12    A.   Well, prison is a violent place.  But as you pointed
13  out earlier, you only had one homicide in the prison system
14  so...
15    Q.   And we will get back to your statistics.  But fair to
16  say that every type of violent offense that we might see in
17  the free world that is also happening in the prison system?
18    A.   Certainly.
19    Q.   And there are things happening also that might not be
20  necessarily violent, but might be procedural violations or
21  maybe misdemeanor crimes, there is contraband being brought
22  into the prisons, isn't there?
23    A.   Yes, ma'am.
24    Q.   I mean there are offenders who have managed to get
25  their hands on drugs?

1    A.   Yes.
2    Q.   Tobacco?
3    A.   Yes.
4    Q.   Cell phones?
5    A.   Yes.
6    Q.   Okay.  There are offenders who have managed to get
7  their hands on weapons?
8    A.   Yes.
9    Q.   There are offenders who are inmates who have managed
10  to actually fashion weapon while inside the penitentiary,
11  correct?
12    A.   Correct.
13    Q.   What is a shank?
14    A.   What is a shank?
15    Q.   Yes, sir.
16    A.   It is a homemade knife, it can be made out of almost
17  anything.
18    Q.   Out of almost anything, correct?
19    A.   There is a saying in the prison system, anything in
20  the system can be made into a weapon.
21    Q.   I am sure you have heard the inmate who fashioned a
22  shank out of a pork chop bone?
23    A.   Yes, sir.
24    Q.   There are all kinds of things, you aren't reporting
25  everything, you were reporting what they wanted you to tell

41                                                                                          42

1  the public, what they thought was important at that time?
2    A.   Well, what we thought that the public would want to
3  know about.  Obviously, if it is something of bad nature, we
4  take the initiative to inform the media this had indeed gone
5  on.
6    Q.   Something that quite possibly might elevated to an
7  escape risk, a violent offender has escaped the penitentiary?
8    A.   Yes, ma'am.
9    Q.   And you want to lock your doors and bring your kids
10  in and be on the alert, right?
11    A.   Yes.
12    Q.   You are not necessarily telling the penitentiary
13  (sic) about how other many inmates are violently raped?
14    A.   No.
15    Q.   Or how many inmates might have been shanked within
16  the prison system?
17    A.   Well, that resulted in a homicide certainly we would.
18    Q.   If it resulted in a homicide.  But not necessarily
19  what you spoke about, about the serious injury that you talked
20  about earlier?
21    A.   Right.
22    Q.   Something that doesn't result in a homicide?
23    A.   Right.
24    Q.   We are not hearing everything?
25    A.   Right.

1    Q.   Now, you are retired, you do get paid for your
2  testimony here today, though, do you not?
3    A.   Yes, ma'am.
4    Q.   And you are paid for I would assume the research, the
5  statistics that you brought with you here, your preparation
6  outside of court as well as your testimony in court?
7    A.   Preparation outside of court, yes, ma'am.
8    Q.   How much are you being paid for your testimony in
9  this case here?
10    A.   Two hundred dollars an hour.
11    Q.   How many hours would you say you have put into this
12  case?
13    A.   I haven't figured it out yet.  I recorded it on my
14  calendar, but I haven't gone back and figured it out.  It is
15  not that much.
16    Q.   Can you approximate for us, sir?
17    A.   Maybe a thousand dollars.
18    Q.   I'm sorry?
19    A.   Maybe a thousand dollars.
20    A.   Maybe a thousand dollars.  Okay.  And the clock is
21  ticking because you get paid by the hour?
22    A.   Yes, ma'am.
23    Q.   Now, you are familiar with A.P. Merrilott?
24    A.   Yes, ma'am, I am.
25    Q.   You said you met him probably around 2002 or 2003?

44

1    A.    I believe so, yes somewhere back in there.
2    Q.    And you have read his -- the transcript of his
3    testimony yesterday?
4    A.    Yes, ma'am.
5    Q.    And do you take issue with anything that he said,
6    sir?
7    A.    I really don't.
8    Q.    Okay.  Okay.  And you would then agree, as I am sure
9    you know that he is a senior criminal investigator with the
10   special prosecution unit?
11   A.    Yes, ma'am.
12   Q.    That he is in the unit that is sole purpose is to
13   investigate and prosecute inmates who have committed crimes
14   within the penitentiary system?
15   A.    Yes, ma'am.
16   Q.    That he has been doing that for 19 years?
17   A.    Yes, ma'am.
18   Q.    Approximately 60 counties throughout the State of
19   Texas?
20   A.    I'm sorry?
21   Q.    That he is working in 60 counties throughout the
22   State of Texas.
23   A.    Oh, I am sure he has, yes, ma'am.
24   Q.    Okay.  That he is in and amongst the prison
25   population and quite frankly a darn good authority on prison

1    violence, would you say?
2    A.    I would say he is in and out of the prison all the
3    time, yes, ma'am.
4    Q.    And knows what he is talking about when it comes to
5    prison violence?
6    A.    Pretty much so.
7    Q.    He doesn't get paid for his testimony?
8    A.    Well, he is salaried is what he is.  His money comes
9    from a grant from the Criminal Justice Foundation, whatever it
10   is, passed through the governor's office administered by the
11   Walker County District Attorney.
12   Q.    He doesn't get paid anything extra for coming to
13   court, though, does he?
14   A.    I think that's his job.
15   Q.    Part of his job description?
16   A.    Yes, sir.
17   Q.    Are you sure about that, sir?
18   A.    I am not, I said I think it is.
19   Q.    Let's talk a little bit about classification.  You
20   have talked a lot about people who have been sentenced to
21   death row and you are telling us that they are committed to an
22   ad seg classification; is that what you are saying?
23   A.    Yes, ma'am.
24   Q.    Okay.  And --
25         MS. HANDLEY:  May I approach, Your Honor?

45

1         THE COURT:  You may.
2    Q.    (By Ms. Handley)  And we had a kind of description
3    from A.P. yesterday about the different categories, everybody
4    who is coming in with a 50-year plus sentence, they come in --
5    they come in a G-3, don't they?
6    A.    Yes.
7    Q.    And "G" stands for general population?
8    A.    That's correct.
9    Q.    And in general population, you have freedom of
10   movement, do you not?
11   A.    Correct.
12   Q.    You can walk in and amongst with other inmates?
13   A.    That's correct.
14   Q.    And guards?
15   A.    Uh-huh.
16   Q.    You have access to things such as the TV, a radio?
17   A.    Correct.
18   Q.    You can sit and play card games or dominoes with
19   other inmates?
20   A.    Correct.
21   Q.    You can enjoy commissary?
22   A.    Yes.
23   Q.    You may have visitation?
24   A.    Correct.
25   Q.    And some people even have contact visitation?

46

1    A.    That is correct.
2    Q.    Barbershop out there?
3    A.    Right.
4    Q.    So this is a G-3, general population, and you know,
5    sir, there are currently people serving capital murder life
6    sentence that have a G-3 population classification?
7    A.    Yes, sir.
8    Q.    And even as heinous as the crime may sound, they are
9    G-3 classification?
10   A.    Yes, ma'am.
11   Q.    Now, you are telling us that based on what perhaps
12   the inmate has done or maybe his history or maybe a personal
13   interview with him, that that category might go up or it might
14   go down?
15   A.    Yeah -- well, it could go up.  The higher the number
16   the worst situation is.
17   Q.    Okay.  And so it could actually go up, he could find
18   himself coming out of a G-3 into maybe a more restrictive
19   environment?
20   A.    Certainly.
21   Q.    Okay.  Now, you have also -- so in terms of ad seg,
22   that is not automatic, is it?
23   A.    No, ma'am.
24   Q.    Unless you have been sentenced to death?
25   A.    Yes.

47
48

1    Q.   You would go into ad seg?
2    A.   Yes, ma'am.
3    Q.   That would be automatic, sir, correct?
4    A.   Yes.
5    Q.   Outside of being sentenced to death, ad seg is not
6    automatic?
7    A.   No, that's true, that is correct.
8    Q.   It is something that you may work your way to it?
9    A.   You may work your way to it, yes, ma'am.
10   Q.   And it is something that in fact you can work your
11   way out of also?
12   A.   Absolutely.
13   Q.   And people have done that, haven't they?
14   A.   Yes, ma'am.
15   Q.   There are some of the worst of the worst offenders,
16   worst crimes out there have actually worked themselves to a
17   tremendous amount of freedom within the system, haven't they?
18   A.   Yes, ma'am.
19   Q.   The incentives that you talked about, you know
20   parole, no longer really an incentive, is it?
21   A.   No, ma'am.
22   Q.   You are saying that maybe one of the incentive for
23   acting right might be air conditioning?
24   A.   No, ma'am.
25   Q.   What was it you said about air conditioning?

1    A.   I just said that when they had a work program at the
2    Ellis Unit for death row inmates that they would try to
3    qualify to go into the work programs so they could be in air
4    conditioning during the working hours.
5    Q.   Okay.  Parole necessarily not an incentive
6    necessarily, is it?
7    A.   Not on capital life.
8    Q.   Okay.  These are men who have nothing but time on
9    their hands?
10   A.   That's correct.
11   Q.   Okay.  And just -- I don't -- just to reiterate, just
12   so this is clear, we have got G-1 through G-5?
13   A.   Yes, ma'am.
14   Q.   We have ad seg 1-A through 6-A, correct?
15   A.   We always just use it as ag seg-1, 2 and 3.
16   Q.   One, two and three.  And these offenses that we
17   talked about earlier, murders occurring within the
18   penitentiary, rapes occurring, stabbings occurring, assaults,
19   all these things, these have been committed by inmates through
20   all these categories, are they not, sir?
21   A.   All those categories, yes, man.
22   Q.   We have had people who have been designated in the
23   general population categories who have admitted murders and
24   capital murders while in the penitentiary?
25   A.   Absolutely.

49
50

1    Q.   Okay.  Classification that you say they earned?
2    A.   Yes.
3    Q.   And then put them in a position where they could
4    commit this offense?
5    A.   Yes, ma'am.
6    Q.   Okay.  In my understanding from your testimony, I
7    want to make sure that this -- that an inmate will have
8    incentive to act right and to get in one of these freedom
9    positions with less restrictions, correct?
10   A.   Yes, ma'am.
11   Q.   And presumably you say that the classification
12   committee looks at this and they make a decision that because
13   he has not been a disciplinary problem, he is probably a good
14   risk to put in a general population category?
15   A.   Yes, ma'am.
16   Q.   Okay.  You are familiar with -- and you believe that
17   they are competent and that that would be a good decision?
18   A.   Well, they certainly do a number of cases every year,
19   so...
20   Q.   You familiar with the Texas Seven?
21   A.   Yes, ma'am.
22   Q.   Those are seven inmates that were housed in the Texas
23   penitentiary for various horrendous crimes, correct?
24   A.   That is correct.
25   Q.   And as a matter of fact were you not employed with

1    the Texas penitentiary system at that time?
2    A.   Yes, ma'am.
3    Q.   Okay.  And just so that it is clear, the Texas seven,
4    that would have been George Rivas, correct?
5    A.   Yes.
6    Q.   He was serving 18 life sentences, one of those
7    stacked on top of a life sentence, correct?
8    A.   I know they all had very long sentences.  I am not
9    familiar individually each one of them.
10   Q.   So you may or may not know that George Rivas was
11   serving 18 life sentences for aggravated robbery with a deadly
12   weapon, aggravated kidnapping and burglary?
13   A.   I know that he was considered to be the gang leader.
14   Q.   Michael Rodriguez, he was one of the Texas
15   Seven, wasn't he?
16   A.   Yes, ma'am.
17   Q.   He was serving a life sentence for capital murder
18   where he and his brother hired somebody to kill his wife --
19   A.   Right.
20   Q.   -- correct?  And Patrick Murphy, he was serving a
21   50-year sentence for aggravated sexual assault where he had
22   forced his way into a woman's house and raped her at night; is
23   that correct?
24   A.   I am just saying I don't know individually what they
25   were all charged with, I know they are bad crimes and they

51

52

1     were serving a lot of time.

2         Q.    Randy Halprin --

3              MR. PARKS:   Judge, I am going to object. If she

4     needs to testify, I ask that she be sworn in. He already said

5     he does not know the individual charges and convictions of

6     these people.

7              MS. HANDLEY:   He said he may or may not know.

8              MR. PARKS:   She is taking this opportunity to

9     try to testify from the counsel table.

10             THE COURT:   Overruled.

11        Q.    (By Ms. Handley)  Randy Halprin, are you aware that

12    he was serving 30 years for injury to a child where he was

13    throwing a child down some stairs and broke his legs?

14        A.    No, ma'am.

15        Q.    Donald Newbury, were you aware that he was serving a

16    99-year sentence for aggravated robbery?

17        A.    No, ma'am.

18        Q.    Joseph Garcia was serving 50 years murder out of

19    Bexar County?

20        A.    No, ma'am.

21        Q.    And Larry Harper was serving 50 years for aggravated

22    sexual assault?

23        A.    No, ma'am.

24        Q.    So you are familiar with them as collective Texas

25    Seven, but not necessarily as the separate offenses?

1     A.    Yes, ma'am.

2         Q.    But you would agree with me, sir, when you look at

3     their particular offenses, that is pretty darn heinous, isn't

4     it?

5         A.    Certainly.

6         Q.    And yet these individuals. these seven individuals at

7     the time -- and just so we are on the same page here -- these

8     seven individuals got together within the prison unit,

9     correct?

10        A.    Correct.

11        Q.    Conspired to commit an escape, correct?

12        A.    Correct.

13        Q.    Basically took their time and sat back and watched

14    how the guards operated and watched how the prison system

15    worked and most importantly was able to pinpoint the

16    weaknesses in the system so that they could take advantage of

17    it, correct?

18        A.    That's correct.

19        Q.    And when they saw that the time was right, they

20    struck, and they managed to break out of prison, didn't they?

21        A.    Yes, ma'am, they did.

22        Q.    And it wasn't -- of course it was at the expense of

23    guards, you know, being assaulted, a lot of people being put

24    in danger and being assaulted, wasn't it?

25        A.    That is correct, yes, ma'am.

53

54

1         Q.    They were later able to get their hands on a cache of

2     weapons, weren't they?

3         A.    Correct.

4         Q.    And went on to commit other offense such as robberies

5     and burglaries?

6         A.    Yes, sir.

7         Q.    And finally found themselves here in Dallas County,

8     and while attempting to burglarize a sporting good store,

9     executed an Irving officer who was responding to that call?

10        A.    That's correct.

11        Q.    Later alluded police again and went to Colorado where

12    they were finally apprehended?

13        A.    That's correct.

14        Q.    A pretty bad group of guys?

15        A.    Yes, ma'am.

16        Q.    And, sir, each one of those Texas Seven, at the time

17    of their escape, had no disciplinary action on their records,

18    did they?

19        A.    That I am not aware of.

20        Q.    You are not aware of that?

21        A.    No, ma'am.

22        Q.    Well, would you not agree that by virtue of them

23    having been given the freedom of working in the maintenance

24    shop they were enjoying a very -- certainly not a very

25    restrictive status within the penitentiary?

1         A.    I would say that after the escape, the Texas

2     Department of Criminal Justice changed their classification

3     program entirely in how prisoners were handled at that point.

4         Q.    It did?

5         A.    So the system broke down.

6         Q.    And it breaks down quite a bit, doesn't it?

7         A.    Anytime something bad happens, something broke down

8     in the system, yes, ma'am.

9         Q.    And the consequences of the Texas Seven is that now

10    that people of their status can't work in the maintenance

11    department; is that correct?

12        A.    That's correct. They are restricted where they can

13    work inside the penitentiary. And they cannot work outside

14    the penitentiary and they can't go outside the walls of the

15    penitentiary without armed guards.

16        Q.    There is always going to be flaws in the system,

17    aren't there, Mr. Fitzgerald?

18        A.    They haven't made a prison system yet that hasn't had

19    some flaws.

20        Q.    And we keep trying to build a better mouse trap,

21    don't we?

22        A.    Yes, ma'am.

23        Q.    Because the mouse keep watching and they are trying

24    to get the cheese, don't they?

25        A.    They are in prison 24 hours a day and the guards are

55

1   on duty eight hours a day.
2       Q.   They have nothing but time on their hands?
3       A.   That's right.
4       Q.   And with that time, they can sit back and they can
5   watch and they can plot and they can conspire, can't they?
6       A.   Certainly.
7       Q.   And even your statistics would certainly support
8   that.  That that system isn't perfect, it is built by humans,
9   it is made by humans and it can be taken advantage of?
10      A.   Certainly.
11      Q.   Okay.  And with respect to the highs and lows in any
12  kind of statistic, I mean, that's not unusual that something
13  major happens and you might see an ebb in the tied, correct?
14      A.   Right.
15      Q.   And then they sit back and they try to circumvent it
16  again and we see another rise?
17      A.   It happens.
18      Q.   So with respect to an individual and the type of
19  crime they may have committed, regardless of how heinous it
20  may be, the point is, they can fly under the radar, they can
21  have that clean disciplinary record, but we see that that is
22  not necessarily a guarantee that they are not going to commit
23  some heinous violent escape and subsequent execution of an
24  officer?
25      A.   Well, there is always a possibility, but the

56

1   probability as well.
2       Q.   I will ask you just a few more things, sir.  You
3   would certainly agree, wouldn't you, that that classification
4   you say takes an inmate offense into consideration, correct?
5       A.   Yes, ma'am.
6       Q.   Okay.  Fair to say that other inmates also take in
7   offenders' offense into account, don't they?
8       A.   Everybody come into the classification system is
9   examined the same way.
10      Q.   But with respect to the other inmates, when an inmate
11  comes into the penitentiary system, they too are going to look
12  at the offense that he has committed, aren't they?
13      A.   Well, they have not had any direct knowledge, perhaps
14  . what the inmate tells them he has done.
15      Q.   They have access to newspapers?
16      A.   They have access to newspapers.
17      Q.   And they can watch the television?
18      A.   Uh-huh.
19      Q.   And gossip and words can spread through TDC like hot
20  water through snow, doesn't it?
21      A.   Oh, yeah.
22      Q.   You want to get something to the other end of the
23  yard, just tell one guy and time how fast it takes?
24      A.   Called sending a kite.
25      Q.   That's right.  That's right.  So an inmate coming in,

57

1   fair to say they are going to look at his offense too and they
2   are going to take it into consideration also?
3       A.   I don't know, you are asking me to speculate, I don't
4   know.
5       Q.   Well, let me ask you this, the offenders, they don't
6   like the guards, do they?
7       A.   I have seen some pretty close friendships with some
8   of the guards, quite honestly.
9       Q.   The guards are considered police, aren't they?
10      A.   Certainly.
11      Q.   They are considered law enforcement?
12      A.   Absolutely.
13      Q.   They are what stands between the inmate and him
14  getting to do what he wants to do, aren't they?
15      A.   Well, if they behave themselves, they wouldn't have
16  any problems with the correctional officers.
17      Q.   That isn't the situation, though, is it, behaving
18  themselves?
19      A.   Well, it is a penitentiary, ma'am.
20      Q.   Right.  It is the guards that stand between them and
21  that misbehaving?
22      A.   Right.
23      Q.   And fair to say, Mr. Fitzgerald, that they are the
24  object of hatred or discontent?
25      A.   I won't disagree with that, absolutely.

58

1       Q.   Would it be fair to say then that an offender seeing
2   someone coming in with the offense of killing a cop, might
3   actually have a perverted respect from the other inmates?
4       A.   I can't agree with that.  I won't agree with that.
5       Q.   You won't agree with that?
6       A.   No, ma'am.
7       Q.   You won't agree then that quite frankly killing a cop
8   is possibly the Heisman Trophy of all offenses?
9       A.   Is he a hero?
10      Q.   Yeah.
11      A.   I don't think so.
12      Q.   Your opinion and A.P. Merrilott's opinion could be
13  totally different on that one?
14      A.   Could be.
15      Q.   The staff that you talked about, the classification
16  staff, you said that, you feel they are competent and you
17  trust in their abilities.  They do make mistakes?
18      A.   Sure.
19      Q.   And I do want to go back briefly because I said I
20  would on these statistics that you reported.  We talked about
21  this earlier, you don't take issue with the report coming from
22  the Executive Statistics Report, this is a prison system
23  Executive statistic Report that said in 2006 there were over
24  500 disciplinary convictions for assaults by inmates against
25  staff -- 5,000, I'm sorry?

1    A.    What is the -- I'm sorry.
2    Q.    In 2006, there were over 5,000 disciplinary
3  convictions for assault by inmates against staff?
4    A.    Yes.
5    Q.    And there were over 14,000 disciplinary convictions
6  for assault by inmates against another inmates?
7    A.    Fourteen thousand six forty-five.
8    Q.    Your statistics that you have brought today, though,
9  you were narrowing that down to what you refer to as a serious
10 offender assault?
11   A.    I don't understand the question.
12   Q.    The number that you gave us earlier?
13   A.    The 14,752.
14   Q.    You spoke of serious offender assaults, did you not?
15 You spoke --
16   A.    Oh, okay, for 2007?
17   Q.    Yes, sir.
18   A.    One thousand ninety-five?
19   Q.    Yes.
20   A.    Yes.
21   Q.    So you are limiting your statistics there to the
22 situation where somebody actually had to receive some type of
23 medical treatment?
24   A.    Yes.
25   Q.    Due to the assault?

1    A.    Yes.
2    Q.    Thank you, Mr. Fitzgerald.
3    A.    Thank you.
4        MS. HANDLEY:    Pass the witness.
5        REDIRECT EXAMINATION
6  BY MR. PARKS:
7    Q.    Mr. Fitzgerald, we will start where we ended, you are
8  not limiting the definition of serious assault, this is the
9  definition of TDCJ?
10   A.    That's the definition of TDCJ.
11   Q.    And in fact they define serious offender assault as
12 an assault to an offender resulting in injury that requires
13 beyond first aid?
14   A.    Yes, sir.
15   Q.    And that's the same for staff?
16   A.    Yes, sir.
17   Q.    It is not you making a determination?
18   A.    No, it is not I.
19   Q.    You are interpreting their interpretation; is that
20 fair to say?
21   A.    Yes, sir.
22   Q.    Now, in your experience, Mr. Fitzgerald, does the --
23 do the offenders that you are talking about -- that we are
24 talking about here who commit offender assault or staff
25 assault or serious offender assaults or serious staff

1  assaults, cover the entire range of persons in the
2  penitentiary; that is to say, people there for theft, people
3  there for drug offenses, it is not just limited to persons
4  convicted of murder or assaultive offenses?
5    A.    No, definitely not.
6    Q.    You have seen people, just as you told Ms. Handley
7  charged, convicted of capital murder who were in general
8  population, moving through the system the same as the person
9  convicted of theft?
10   A.    Yes, sir.
11   Q.    Doing so peacefully and doing his time according to
12 the rules and regulation?
13   A.    Yes, sir.
14   Q.    Would it be fair to say that there is very little if
15 any correlation between what a person is convicted of and
16 their likelihood to commit offenses in the penitentiary?
17   A.    Repeat the question?
18   Q.    Yeah. Would it be fair to say, answer it if you know
19 or not, tell me whether or not it would be fair to say that
20 what a person has been convicted of has very little if any
21 correlation to whether or not he will commit assaultive
22 offenses in prison?
23   A.    No.
24   Q.    Are you aware of statistics that show that as a
25 matter of fact a person convicted of murder are less likely

1  than any of the other offenses to commit assaultive violent
2  offenses in the penitentiary?
3    A.    You talking about a capital murder?
4    Q.    No, just murder?
5    A.    Just murder. No, oftentimes there is -- well, there
6  is an old adage in the prison system that the murderers make
7  the best convicts.
8    Q.    They have to adjust, make a life for themselves?
9    A.    Oftentimes it is the only crime they have ever
10 committed.
11   Q.    Looking at your statistics, and I am not going to ask
12 you, Mr. Fitzgerald, to do the math except just roughly; but
13 looking at offender death by homicides since the year 1999,
14 would you disagree with me that there have been 44 offenders
15 killed in the penitentiary and/or death by homicide since 1999
16 through May 2008?
17   A.    What are the years again, sir?
18   Q.    For all the years, '99 through year-to-date just
19 going across offender death by homicide?
20   A.    Offender death by homicide in '99 was seven; in 2000,
21 there were eight; 2001, there were four; 2002, there were six;
22 2003, there was one homicide; 2004, there were three; 2005,
23 there were three; 2006, there were seven; 2007, there were
24 four; and year-to-date there is one.
25   Q.    Something over 40 in that period of time from '99 to

1   present. I am not going to ask you to add them up?
2   A.   Thank you.
3   Q.   But have there been in excess of 250 executions
4   during that period of time?
5   A.   Yes, sir.
6   Q.   Over 200 suicides in that period of time?
7   A.   I haven't figured that one up, no, sir.
8   Q.   Now, is there anyway that the penitentiary system in
9   Texas or anywhere else can absolutely prevent random acts of
10  violence?
11  A.   No.
12  Q.   Could the penitentiary even do better than these
13  figures show if they put every single prisoner that went to
14  the Texas Department of Criminal Justice in ad seg when they
15  got there and executed them as soon as they could?  That would
16  pretty much solve the problem, wouldn't it?
17  A.   Yes, sir, it would.
18  Q.   It is not practical, is it?
19  A.   No, sir.
20  Q.   Do you believe that the people down at TDCJ do the
21  best that they could do?
22  A.   Yes, sir, I do.
23  Q.   They will never be able to totally prevent things
24  like the Texas Seven?
25  A.   We would hope to, but, no, sir.

1   Q.   When something like that happens, there are results
2   of that.  They try their best to fix it?
3   A.   That's correct.
4   Q.   What the Texas Seven did has impacted on practically
5   every inmate in Texas Department of Criminal Justice since
6   that time?
7   A.   Absolutely.
8   Q.   Remember we talked about Mr. McDuff.  Mr. McDuff was
9   paroled, was he not?
10  A.   He was.
11  Q.   And after he was paroled, he committed other
12  offenses?
13  A.   Yes, sir, he did.
14  Q.   That has had an effect, has it not?
15  A.   Yes, sir.
16  Q.   What has been the effect of Kenneth McDuff?
17  A.   It completely restructured the parole system in
18  Texas.
19  Q.   Since Kenneth McDuff's parole, after being convicted
20  for the offense of capital murder, are you aware of any other
21  person in the State of Texas since that time charged with
22  capital murder who was paroled, whether or not the law allowed
23  it?
24  A.   No, sir.
25  Q.   Is something like the Texas Seven a common thing or a

65

1   rare thing?
2   A.   Is it a what, sir?
3   Q.   Common or rare for escapes.
4   A.   Rare.
5   Q.   Almost never happens; is it fair to say?
6   A.   Escape is almost an anomaly.
7   Q.   With respect to prisoners who wish to do well, they
8   can work themselves out of ad seg if they wish to, can they
9   not, you have testified to that?
10  A.   Yes, sir.
11  Q.   But they have to earn their way out?
12  A.   Yes, sir.
13  Q.   And they do that by complying with the rules and not
14  assaulting staff and not assaulting other prisoners, among
15  other things?
16  A.   That's true.  And they make an announcement to the
17  correctional officers that this is what they are trying to do.
18  Q.   If a prisoner wishes not to comply with the rules, if
19  a prisoner wishes to be assaultive or a person held at TDCJ
20  capable of protecting themselves and other people from those
21  prisoners?
22  A.   Yes, sir.
23  Q.   The penitentiary system in the State of Texas is not
24  comprised of 157,000 prisoners foaming at the mouth to get at
25  guards because they are the police, it is not that, is it?

66

1   A.   No, no, that is not true.
2   Q.   So if the jury has an impression that that is true,
3   that is just an error?
4   A.   That is correct.
5   Q.   Would it be fair to say that the very vast majority
6   of those 157,000 prisoners are living their lives day-to-day,
7   trying to do their time, serve their sentence and go home?
8   A.   Yes, sir.
9   Q.   Some of them will, some of them will never leave; is
10  that a fact?
11  A.   That is correct.
12  Q.   And of course being convicted of capital murder in
13  this day and time, assessed a life sentence will never leave,
14  and that's a fact, isn't it?
15  A.   Yes, sir.
16  Q.   And as a matter of fact, that has been true ever
17  sense Kenneth McDuff did what he did?
18  A.   Yes, sir.
19  Q.   Thank you, Mr. Fitzgerald.
20              RECROSS-EXAMINATION
21  BY MS. HANDLEY:
22  Q.   Mr. Fitzgerald, are you familiar with Pancho
23  Wilkinson?
24  A.   Yes, ma'am.
25  Q.   He is an inmate that escaped from the penitentiary

1  system?
2    A.   No, not that I am aware of.  He was on death row.
3    Q.   He didn't make it out.  He certainly attempted?
4    A.   No, he was executed, yeah.
5    Q.   He attempted before his execution to escape, did you
6  not?
7    A.   I'm sorry.
8    Q.   Prior to his execution, obviously he attempted to
9  escape?
10   A.   Yeah.  Well, yeah, he spit out a handcuff key.
11   Q.   Exactly.  He had made an escape attempt, it was not
12  successful?
13   A.   It was an attempt, yes.
14   Q.   And then while on the execution table, he actually
15  spit a key out his mouth.
16   A.   He did.
17   Q.   Spit a key out of his mouth?
18   A.   He did.
19   Q.   And that was a man on death row?
20   A.   That's correct.
21   Q.   Total mystery to TDC?
22   A.   Still is today.
23   Q.   Still is today.  Let's narrow it down a little bit
24  more with respect to all these people.
25        MS. HANDLEY:   May I approach, Your Honor?

1        THE COURT:   You may.
2    Q.   (By Ms. Handley)  And talk about inmates that are
3  serving time for capital murder life sentence or a murder
4  sentence.  I am going to show you a list, and this was
5  compiled by A.P. Merrilott.  And he was subpoenaed by the
6  Defense, not this Defense team, but the Defense in 2006 in
7  Collin County capital murder case, to compile a list of all
8  capital murder inmates serving life that had committed new
9  violent felony offenses while in the prison system.  He
10  compiled a list not only of capital murder -- capital murder
11  lifers, but also individuals serving murder, this is within
12  the last five years that committed new violent offenses; have
13  you seen that list?
14   A.   I have not seen this list.
15   Q.   I will let you take a quick glance at it.  Is it fair
16  to say that there is a list of 225 names of on there of
17  inmates serving capital murder life or murder life sentences?
18        MR. PARKS:   Judge, I have no objection if she
19  amends that question to purported by Mr. Merrilott to have
20  done so.  We have not heard Mr. Merrilott testify to any of
21  that.
22   Q.   (By Ms. Handley)  Purported by Mr. Merrilott, the
23  individual -- the chief criminal investigator for the special
24  prosecution unit, the person who prosecute these types of
25  crimes, are you familiar with that document?

69

1    A.   No, ma'am, I am not.
2    Q.   So you are not then familiar with, for example --
3  perhaps you are, sir, having your finger on the pulse of TDC,
4  Rojilio Cannaday, serving a capital murder life sentence, you
5  familiar with him?
6    A.   No, ma'am.
7    Q.   Or the fact that while serving that sentence, he
8  committed another capital murder?
9    A.   No, ma'am.
10   Q.   Are you familiar with Freddie de Leon serving a
11  capital murder life sentence and while serving that sentence
12  committed another murder --
13        MR. PARKS:   Judge --
14   A.   No, ma'am.
15        MR. PARKS:   -- again she is testifying.
16  Mr. Merrilott hasn't testified to any of this.  We don't have
17  a clue whether or not any of this is accurate.
18        MS. HANDLEY:   This is in good faith, Your Honor.
19  And it also goes to his testimony about these people serving a
20  life sentence on murder in just behaving and -- it goes
21  directly to his testimony.
22        MR. PARKS:   The statistics speak for themselves.
23        MS. HANDLEY:   So do the names of individuals who
24  committed murder while on death row.
25        MR. PARKS:   We don't know that they have done

70

1  that.
2        THE COURT:   Mr. Parks, I will overrule the
3  objection.
4    Q.   (By Ms. Handley)  Mr. Fitzgerald, are you familiar
5  with Arthur Medina serving a capital murder life sentence
6  committing another felony life offense?
7    A.   No, ma'am.
8    Q.   Are you familiar with a Noe Beltran while serving
9  that sentence committed another capital murder?
10        MR. PARKS:   Judge, we are going to object at
11  this point on the point of _Crawford versus Washington_ in that
12  we are being deprived of the right to confront and
13  cross-examination the witnesses in this case with regard to
14  this, specifically Ms. Handley and Mr. Merrilott.
15        THE COURT:   Overruled.
16   Q.   (By Ms. Handley)  Ricky Meadows is serving a capital
17  murder life sentence, prosecuted for murder, are you familiar
18  with an inmate?
19   A.   No, ma'am.
20   Q.   How about John Quinones?
21        MR. PARKS:   May we have a running objection?
22        THE COURT:   You may, sir.
23   Q.   (By Ms. Handley)  Alfred Shuette?
24   A.   No, ma'am.
25   Q.   William Speer?

1    A.    No, ma'am.
2    Q.    Jesse Barnes?
3    A.    No, ma'am.
4    Q.    Shane Jaggars?
5    A.    No, ma'am.
6    Q.    Terry McFarland?
7    A.    No.
8    Q.    Carey Money?
9    A.    No.
10   Q.    Arnulfo Cortez?
11   A.    No.
12   Q.    Raul Garcia?
13   A.    No, ma'am.
14   Q.    Not familiar with any of these individuals serving
15   either capital life or murder life having committed another
16   murder?
17   A.    No, ma'am.
18   Q.    Okay.  But ultimately, Mr. Fitzgerald, you are for
19   the going to deny that this is continuous to go on in the
20   penitentiary?
21   A.    I am telling that the penitentiary is a violent
22   place.
23   Q.    Okay.
24   A.    But I have never seen that list before.
25   Q.    And even people on death row committing murders?

1    A.    I know of one case that happened.
2    Q.    Which one was that?
3    A.    I'm trying to think of his name.
4    Q.    Jermarr Arnold?
5    A.    Jermarr Arnold, yes.
6    Q.    Not David Gibbs?
7    A.    No.  I am familiar with Jermarr Arnold.
8    Q.    Thank you, sir.
9          MS. HANDLEY:   Pass the witness.
10         FURTHER REDIRECT EXAMINATION
11   BY MR. PARKS:
12   Q.    Mr. Fitzgerald, during your time with the Texas
13   Department of Criminal Justice, do you get to know a
14   considerable number of inmates on death row who had been
15   sentenced to death?
16   A.    Yes, sir.
17   Q.    Can you give us some estimate of how many that might
18   have been?
19   A.    I have no idea.  We did death row media interviews
20   every week.  About 50 weeks out of the year, we brought
21   different inmates down to be interviewed by the media.  Some
22   came down more often than not to be interviewed.  So as far as
23   giving you a specific number, no.  But there were a number of
24   them that I did get to know.
25   Q.    If I had asked you to draw up a list of all of the

73

1    persons that you either personally knew or had met or knew of
2    because of your work on death row, who had not committed one
3    single act of violence the whole time they were in the
4    penitentiary, could you have done that?
5    A.    No.
6    Q.    Given the time?
7    A.    No.
8    Q.    Could you have tried to do that and given me at least
9    a partial list?
10   A.    No, really.
11   Q.    Let's talk about Thomas Miller-El.  You know him?
12   A.    Yes, sir.
13   Q.    He was the person on death row for many, many years?
14   A.    Yes, sir.
15   Q.    Sentenced to death by a Dallas County jury?
16   A.    Yes, sir.
17   Q.    You knew him?
18   A.    Yes, sir.
19   Q.    You knew him well or not so well?
20   A.    Pretty well.
21   Q.    So as far as you know, did Thomas Miller-El ever
22   commit one single act of violence the whole time he was on
23   death row or in the penitentiary?
24   A.    I believe there was an incident that he was involved
25   in before I got there to the penitentiary system, and I think

74

1    it was generally regarded as self-defense.
2    Q.    One sort of fight without weapons sort of thing?
3    A.    Yeah, I am vague on that.  I know there was something
4    there in his history, but like I said, it was before I was
5    employed with TDCJ.
6    Q.    The point is, is that persons --
7          MS. HANDLEY:   Object to leading, Your Honor, the
8    point is.  Object to leading.
9          THE COURT:   I will overrule the objection.
10   Q.    (By Mr. Parks)  Acts of violence cannot be totally
11   eradicated in the penitentiary unless we totally eradicate the
12   prisoners in the penitentiary?
13   A.    That's correct.
14   Q.    And examples both ways, could be given of prisoners
15   who have committed offenses, prisoners who have not committed
16   offenses over the years and through time?
17   A.    Correct.
18   Q.    Is that fair to say?
19   A.    That's fair to say.
20         MR. PARKS:   I believe that's all I have.
21         MS. HANDLEY:   Nothing further, Your Honor.
22         THE COURT:   Thank you, sir.  You may step down.
23         THE WITNESS:   Thank you.
24         THE COURT:   Ladies and gentlemen, we have been
25   going a little over an hour or so, we will take a 15-minute

1  break.
2       MR. PARKS:   May he be excused, Your Honor?
3       THE COURT:   Any objections from the State?
4       MS. HANDLEY:   No objections.
5       THE BAILIFF:   All rise.
6       (Jury retired from the courtroom.)
7       (Recess taken.)
8       MS. HANDLEY:   Your Honor, I will offer State's
9  Exhibit No. 175 for record purposes.  This is the document I
10  was referring to compiled by A.P. Merrilott when I was
11  questioning Mr. Fitzgerald about his knowledge and impeaching
12  him. I have shown this to Defense Counsel.
13       MR. BRAUCHLE:   And we have advised the State
14  that we would object to it being in evidence in regard to the
15  record and that it was not properly identified during the
16  State's cross nor was it tendered or any of the things that
17  will make it a proper record exhibit.
18       THE COURT:   I will overrule the objection and
19  admit it for record purposes.
20       THE BAILIFF:   All rise.
21       (Jury returned to the courtroom.)
22       THE COURT:   You may be seated.
23       The Defense may call its next witness.
24       MR. BRAUCHLE:   We would call Richard Ziegenhain.
25  This witness has not been sworn.

1       THE COURT:   Thank you, Mr. Brauchle.
2       (Witness was duly sworn.)
3       THE COURT:   You may take the seat to my left.
4  You may proceed, Mr. Brauchle.
5       RICHARD ZIEGENHAIN
6  was called as a witness, and having been duly sworn by the
7  Court, testified under oath as follows:
8       DIRECT EXAMINATION
9  BY MR. BRAUCHLE:
10  Q.   State your name for the jury, sir.
11  A.   Richard Ziegenhain, Z-i-e-g-e-n-h-a-i-n.
12  Q.   How old a man are you, sir?
13  A.   Seventy.
14  Q.   And where do you live?
15  A.   Irving, Texas.
16  Q.   How long have you lived in Irving?
17  A.   Since 1954.
18  Q.   And are you still employed?
19  A.   I'm self-employed, yes, sir.
20  Q.   And basically how long have you been self-employed?
21  A.   Since 1982.
22  Q.   And what type of business are you in, sir?
23  A.   I am a machinist.
24  Q.   Now, how did you get into being a machinist?
25  A.   Well, back when I was even in grade school, my

77

78

1  brother-in-law and his father had a machine shop.  And during
2  the summers I would work for them, sweeping floors, deburr
3  parts, whatever.  I just down through the years; and then
4  after I graduated from school, I worked for them full time.
5  And then I eventually worked for other companies and I started
6  my own.
7  Q.   Okay.  Before -- or during the time that you have
8  been -- let me just put it this way, basically when you first
9  started in being a machinist, the items were basically for the
10  aeronautic industry; would that be a fair statement?
11  A.   Yes, sir.
12  Q.   Would you name some of the companies that y'all were
13  doing machine work for?
14  A.   Tempco, Chance Vault, General Dynamics.
15  Q.   Now, then, in regard to being a machinist, basically
16  the companies that want you to make something for them or
17  design something, send you basically the blueprints or the
18  actual item for y'all to duplicate; is that correct?
19  A.   Yes, sir, that's correct.
20  Q.   And you have to -- you have to machine the item out
21  of billets, whatever, until you have the product to their
22  specifications; is that correct?
23  A.   Yes, sir.
24  Q.   Then once it is -- now, these are not mass-produced
25  items, I take it?

1  A.   No, sir.  They are very small quantities.
2  Q.   And they are -- are they for very specialized uses?
3  A.   Yes, sir.
4  Q.   Now, then, at the present time, who do you do most of
5  your work for?
6  A.   It's a company called Corp Laboratories down in
7  Houston, Texas.
8  Q.   And they are in the oil and gas business; is that
9  correct?
10  A.   Yes, sir.
11  Q.   And basically they send you specifications,
12  blueprints, what have you, of what they need, you produce it
13  and send it back to them; is that correct?
14  A.   Yes, sir.
15  Q.   Now, then, for the jury's information, what kin are
16  you to Wesley Ruiz?
17  A.   I am his grandfather.
18  Q.   So you have known him all his life?
19  A.   Yes, sir.
20  Q.   Now, then, his mother is your daughter; is that
21  correct?
22  A.   Yes, sir.
23  Q.   And what is her name?
24  A.   Barbara Ann Ruiz.
25  Q.   And she is here in courtroom today, just as you are?

1    A.    Yes, sir.

2    Q.    Now, then, Barbara basically lived with you and her

3  mother there in Irving up until about the age of 19; is that

4  correct?

5    A.    Yes, sir.

6    Q.    And at that point in time, what did she do?

7    A.    She got married.

8    Q.    All right.  And who would that have been to?

9    A.    Mr. Thomas Ruiz, R-u-i-z.

10    Q.    And that is Wesley's father; is that correct?

11    A.    Yes, sir.

12    Q.    Now, then, did both of them live in Irving?

13    A.    Yes, sir.

14    Q.    And did Barbara have any children?

15    A.    Yes, sir.

16    Q.    What would their names be?

17    A.    The first one is Jason; the middle one, Wesley; and

18  the youngest, Richard.

19    Q.    And they were all born and raised in Irving; is that

20  correct?

21    A.    Yes, sir.

22    Q.    Now, then, Wesley's mother and father were together

23  during the birth and younger ages of these children; is that

24  correct?

25    A.    Yes, sir.

---

1    Q.    But at some point about -- well, during Wesley's

2  teenage years, Wesley's father and mother separated; would

3  that be a fair statement?

4    A.    Yes, sir.

5    Q.    And at that point in time during the divorce

6  proceedings and what have you, the three boys went to stay

7  with their father, Tommy; is that correct?

8    A.    Most of the time.

9    Q.    Well, they would alternate back and forth between

10  your house and their father's house; is that correct?

11    A.    Yes, sir.

12    Q.    And then once their mother left her husband, she

13  would live at your house from time to time; is that correct?

14    A.    Yes, sir.

15    Q.    Now, then, after the divorce between Wesley's mother

16  and father, I know you have just testified that the boys

17  alternated back and forth between your house and their

18  father's house, but was there a -- did y'all basically sort of

19  lose contact with your daughter, Barbara?

20    A.    Yes, sir.

21    Q.    What happened -- where did she go when y'all lost

22  contact with her?

23    A.    She would stay with friends of hers or she stayed

24  over on Harry Hines for various periods of time.

25    Q.    Did she basically become what people in the jury box

---

1  would know as a street person?

2    A.    Yes, yes.

3    Q.    Well, when she was staying over on Harry Hines, she

4  wasn't staying in an expensive motel or at somebody's home,

5  was she?

6    A.    No, sir.

7    Q.    In fact you have seen her yourself over on Harry

8  Hines living on the streets; is that correct?

9    A.    Yes, sir.

10    Q.    You knew that she was?

11    A.    Yes.

12    Q.    Now, then, at that point in time, was she basically a

13  confirmed alcoholic?

14    A.    Yes, sir.

15    Q.    And before that period, had she had drug problems?

16    A.    As far as we knew, yes.

17    Q.    Okay, now in regard to her condition, basically she

18  had a drug problem up to and including the time of the

19  divorce, but then after that period, her vice seemed to have

20  turned to alcohol; would that be a fair statement?

21    A.    Yes, sir.

22    Q.    Now, then, you knew Wes throughout his childhood, his

23  teenage years and into his adult life; is that correct?

24    A.    Yes, sir.

25    Q.    And how would you characterize Wes as a worker?

---

1    A.    He was a very hardworker.

2    Q.    Did he ever work for anybody that you are kin to or

3  that you knew?

4    A.    He worked for my son one summer when my son had an

5  auto upholstery shop and he would do work for my son around

6  the shop there, whatever he was asked to do.  My son commented

7  several times, you know what a good worker he was.

8    Q.    All right.  And that was -- that would have been at

9  about what age, if you know?

10    A.    Well, our son passed away in '95, so it was about a

11  year before that, about 16, 15, 16.

12    Q.    All right.  Now, then, at some point Wesley, after he

13  got out of the school -- and where did he go to school, if you

14  know?

15    A.    He went to Irving High School.

16    Q.    All right.

17    A.    And also to Winfrey Academy.

18    Q.    And once he got out of --

19    A.    I'm sorry, I'm thinking on the wrong grandson, Irving

20  High School, I apologize.

21    Q.    Well, none of us caught you at it, so no harm I don't

22  guess.  Now, then, once Wesley got out of high school, he

23  became a truck driver; is that correct?

24    A.    Yes, sir.  When he turned 21.

25    Q.    Okay.  And how did he become a truck driver to your

83

84

1 knowledge?

2    A.   He went to a truck driving school in -- I believe it

3 was Waxahachie, I am not real sure.

4    Q.   All right.  And once he went to the truck driving

5 school, did he get jobs as a truck driver?

6    A.   Yes, sir.  As soon as he graduated, he was hired.

7    Q.   Okay, do you know of any of the companies that he

8 worked for?

9    A.   The first company that hired him right out of school

10 was a company called Rail.  I believe they were up in Michigan

11 or Minnesota, some place up north.

12    Q.   Okay, they weren't headquartered here locally?

13    A.   No, sir.

14    Q.   Now, then, would he have been a long-haul driver for

15 them?

16    A.   Yes, sir.

17    Q.   And do you know about how long he worked as a

18 long-haul truck driver with them?

19    A.   For those people.?

20    Q.   Yes.

21    A.   I believe it was about two years, I am not sure.

22    Q.   Okay.  At that point in time, did he have a wife and

23 children?

24    A.   Yes, sir.

25    Q.   And was his wife's name Erica?

1    A.   Yes, sir.

2    Q.   And how many children, if you know, did he have that

3 lived with him at that time?

4    A.   Two.

5    Q.   Now, then, did he eventually quit working for Rail

6 Trucking?

7    A.   Yes, sir.

8    Q.   And was there a reason that you know of as to why he

9 quit working for Rail Trucking?

10    A.   He wanted to be with his family more.  He was out on

11 the road all the time, so he wanted to be able to be with his

12 family and try to -- get a job where he would be closer to

13 home.

14    Q.   Were his children a factor at that point in time?

15    A.   Oh, yes, sir.

16    Q.   Now, then, did he get a job with any other trucking

17 company?

18    A.   Yes, sir.

19    Q.   Do you know what their names were by any chance?

20    A.   One of them's name was Choctaw, I believe, J.B. Hunt,

21 and there is another one, but I can't recall the name.

22    Q.   All right.  Now, then, at some point in time, did he

23 get out of truck driving all together?

24    A.   Yes, sir.

25    Q.   Do you know if there was a problem with he and his

85

86

1 wife Erica over the money that he was making as a truck

2 driver?

3    A.   That was my opinion, yes, sir.

4    Q.   And what, was she satisfied with what he was making

5 or did she want him to make more?

6    A.   Just didn't seem like he could ever make enough money

7 to support the life style.

8    Q.   Of Erica?

9    A.   Yes, yes, sir.

10    Q.   Now, I take it that you have been around he and his

11 children before?

12    A.   Yes, sir.

13    Q.   What would you say in regard to his ability -- be

14 around his children and his fathering skills?

15    A.   I would say he is very good.  He loved his children,

16 his brother's children, he is good around children.

17    Q.   Now, then, I take it that you have been around Wesley

18 and Erica enough to characterize their relationship, would

19 tumultuous be a good adjective, whatever their relationship

20 was, and volatile?

21    A.   At times, yes, sir.

22    Q.   Did you ever see Wesley and Erica in a physical

23 fight?

24    A.   Yes, yes.

25    Q.   And who was the aggressor in those situations?

1    A.   At that time, Erica was.  She slapped him.

2    Q.   Whenever that happened, what would Wesley do?

3    A.   Every time I saw, he stood there and took it or he

4 would try to get away to keep from escalating it.

5    Q.   And that's your -- that was your experience in that

6 phase of his life throughout; is that correct?

7    A.   Yes, sir.

8    Q.   Sir, I realize that in your 70 years, you probably

9 never thought you would end up where you are doing what you

10 are doing now, is there anything that you would like to tell

11 this jury about Wesley that I haven't asked you in the brief

12 amount of time that I have been talking to you about him?

13    A.   It's just that I have known him all his life.  And he

14 has been a good young man.  He made some mistakes, serious

15 mistakes.  I think he is basically a very good young man.  He

16 loves his children, he cares for them and I don't know what

17 else to say.

18             MR. BRAUCHLE:   We will pass the witness.

19             THE COURT:   Cross-examination, Mr. Brooks.

20             MR. BROOKS:   Yes, Your Honor.

21                  CROSS-EXAMINATION

22 BY MR. BROOKS:

23    Q.   Good morning Mr. Ziegenhain -- Ziegenhain.  Can you

24 hear me okay?

25    A.   Yes.

1    Q.   I am going to have a couple of questions for you.
2    You live in Irving, Texas?
3    A.   Yes, sir.
4    Q.   And you have lived there since 1950s?
5    A.   Yes, '54.
6    Q.   And you and your wife have been together the entire
7    time that you have lived in Irving, Texas?
8    A.   No, sir, we got married in 1960.
9    Q.   But since the time that y'all got married, you have
10   lived in Irving the most part?
11   A.   Yes, sir.
12   Q.   And you have raised a family?
13   A.   Yes, sir.
14   Q.   And how many children do you have?
15   A.   We had two children, our son passed away in '95.
16   Q.   And in the years that you were raising your children
17   would it be a fair statement, sir, that you and your wife did
18   the best that you could to raise them in a proper manner?
19   A.   Yes, felt like it, yes, sir.
20   Q.   You tried to teach your children the difference
21   between right and wrong?
22   A.   Yes, sir.
23   Q.   Were y'all church-going family?
24   A.   Occasionally, not every Sunday.
25   Q.   And some of us aren't everyday-church people, but we

---

1    try to go to church as best we can?
2    A.   That's right.
3    Q.   And follow what the guidelines from the church, what
4    they give us on Sunday; is that a fair statement?
5    A.   Yes, sir.
6    Q.   And you raised your children as best you could under
7    those same types of circumstances?
8    A.   Yes, sir.
9    Q.   Now, you mentioned that you have been self-employed
10   since 1982 and that you work as a machinist?
11   A.   Yes, sir.
12   Q.   Are you a self-taught machinist?
13   A.   Yes, sir.
14   Q.   Trade I think you said that I think you learned from
15   your father and his brother?
16   A.   My brother-in-law and his father, that's where I
17   started out.
18   Q.   And how old were you when you first I guess started
19   getting that training?
20   A.   Roughly about in the sixth grade, whenever that would
21   be.
22   Q.   So --
23   A.   Ten.
24   Q.   Ten, 11 years of age?
25   A.   Yes, sir.

---

1    Q.   You started learning a trade?
2    A.   Yes, sir.
3    Q.   And you basically the last 50, 60 years worked in
4    that trade?
5    A.   Yes, sir.
6    Q.   And in your 70 years, you have been a law-abiding
7    citizen; would that be fair to say?
8    A.   Yes, sir.
9    Q.   And you have encouraged your children when you were
10   raising them to be law-abiding children?
11   A.   Yes, sir.
12   Q.   You encouraged them to be respectful of their elders?
13   A.   Yes, sir.
14   Q.   You encouraged them to be respectful of what most of
15   us know as authority figures?
16   A.   Yes, sir.
17   Q.   School teachers doctors, police officers; would that
18   be a fair statement?
19   A.   Yes, sir.
20   Q.   And you yourself, you and your wife, you are not
21   responsible for any bad choices that either your children or
22   other offsprings have made, are you?
23   A.   We don't feel like we are.
24   Q.   No, because you have tried to teach them and take
25   them down the right path?

---

1    A.   Right, yes, sir.
2    Q.   And if they veered off that path, that would be
3    because of decisions and choices that they made; would you
4    agree with that?
5    A.   Yes, sir.
6    Q.   Now, you mentioned that after your daughter left home
7    and married the defendant's father, they were married for a
8    period of time and then there was -- the marriage broke up?
9    A.   Yes, sir.
10   Q.   And after the marriage broke up, the three boys,
11   including Wesley, they would come spend time at your home and
12   at their father's home?
13   A.   Yes, sir.
14   Q.   Did that continue all the way up until the point
15   where Wesley left home on his own as an adult?
16   A.   Yes, sir.
17   Q.   So from the time that he was basically, would you say
18   ten years of age to 17 or 18, he spent a lot of time at your
19   home, he spent a lot of time at his father's home?
20   A.   Yes, sir. I only know he was at our home, I am
21   assuming he was at his father's.
22   Q.   And when he was at your home, you and your wife did
23   the best that y'all could to teach him, make him follow the
24   difference between right and wrong?
25   A.   Yes, sir.

1    Q.    And you stressed that with him just as you stressed
2    it with your own offsprings?
3    A.    That's right.
4    Q.    And any wrong decisions that your grandson has made,
5    you don't believe that you are responsible for that, do you?
6    A.    As a parent I think -- you feel responsibility, you
7    know no matter what.  Now, I did not make him make those
8    decisions, no.
9    Q.    Okay.  In other words, you know your son has been in
10   trouble before?
11   A.    Grandson.
12   Q.    I'm sorry, sir, grandson has been in trouble before?
13   A.    Yes.
14   Q.    And you have told this jury that you have been a
15   law-abiding citizen during your lifetime, correct?
16   A.    Yes, sir.
17   Q.    You are also aware that, however, your grandson has
18   not?
19   A.    Yes, sir.
20   Q.    And my question is, you are not responsible for those
21   decisions he made to break the law, are you?
22   A.    No.
23   Q.    When he made the decision that he wanted to sell
24   drugs, that's not your fault, is it?
25   A.    No, sir.

1    Q.    When he made the decision to carry guns, that's not
2    your fault, is it?
3    A.    No, sir.
4    Q.    You live at 1803 Bradford, Mr. Ziegenhain?
5    A.    Yes, sir.
6          MR. BROOKS:    May I approach the witness, Your
7    Honor --
8          THE COURT:    You may.
9    Q.    (By Mr. Brooks)  Have you had an opportunity since
10   your grandson has been in jail, have you had an opportunity to
11   visit him in jail?
12   A.    No, sir.
13   Q.    Have you written him or received letters from him?
14   A.    Yes, sir.
15   Q.    And you recognize his handwriting?
16   A.    Yes, sir.
17   Q.    I show you what is marked for record purposes as
18   State's Exhibit 104, is that your address, sir?
19   A.    Yes, sir.
20   Q.    And is that Wesley's name, tank number, address from
21   inside the Dallas County jail?
22   A.    It's his name, I really don't know the number.
23   Q.    Have you received letters like this from him?
24   A.    Yes, sir.
25   Q.    Addressed in this manner?

1    A.    Yes.
2    Q.    And in fact, sir, is this his handwriting?
3    A.    Looks like it, yes.
4    Q.    How does Wesley refer to you, does he call you
5    grandpa?
6    A.    Paw-paw.
7    Q.    Is this letter in fact addressed to you, does it
8    start with Paw-paw?
9    A.    Yes, sir.
10   Q.    And is it signed Wesley Ruiz, Jr?
11   A.    Yes.
12         MR. BROOKS:    Your Honor, at this time we would
13   offer for all purposes State's Exhibit 104.
14         MR. BRAUCHLE:    No objections.
15         THE COURT:    State's 104 is admitted.
16   Q.    (By Mr. Brooks)  Mr. Ziegenhain, you mentioned that
17   you have been self-taught and self-employed in 1982?
18   A.    Yes, sir.
19   Q.    And you talked about your grandson's relationship
20   with Erica and how he never seemed to make enough money for
21   her; you remember that?
22   A.    Well, yes, yes.
23   Q.    Wesley would have had an opportunity if he had wanted
24   it to learn how to be a machinist through you, if he had
25   wanted to do so?

1    A.    Well, he asked me at one time, he wanted to.  And I
2    really didn't have the facilities to train him and pay him so
3    that he could make a living.
4    Q.    You could have, working in that industry, you know
5    other individuals you could have sent him to or turned him to
6    to get that type of training, though?
7    A.    It's possible, if they were hiring; but a lot of
8    places aren't willing to try to train somebody.
9    Q.    And --
10         MR. BROOKS:    May I approach, Your Honor?
11         THE COURT:    You may.
12   Q.    (By Mr. Brooks)  In State's Exhibit 104, starting
13   with right here where it says, I appreciate, would you read
14   from there through here, please.
15   A.    I appreciate the support that you and granny have
16         given me, and I do honestly regret all of these bad
17         decisions I have made.
18   Q.    So he acknowledges, doesn't he, that y'all basically
19   tried to teach him right way?
20   A.    Yes, sir.
21   Q.    And he then goes on to acknowledge that the bad
22   decisions that he made, the things are things he made on his
23   own?
24   A.    Yes, sir.
25         MR. BROOKS:    Pass the witness.



95

1    MR. BRAUCHLE:   No questions.
2    THE COURT:   You may step down, sir.
3    (Witness complies.)
4    THE COURT:   Your next witness, Mr. Brauchle.
5    MR. BRAUCHLE:   We would call Sue Ziegenhain.
6    THE COURT:   If you will raise your right hand,
7  ma'am.
8    (Witness was duly sworn.)
9    THE COURT:   You may take the seat.  Thank you.
10    (Witness complies.)
11    THE COURT:   You may proceed, Mr. Brauchle.
12                  SUE ZIEGENHAIN
13  was called as a witness, and having been duly sworn by the
14  Court, testified under oath as follows:
15                DIRECT EXAMINATION
16  BY MR. BRAUCHLE:
17    Q.   State your name, please.
18    A.   Sue Ann Ziegenhain.
19    Q.   And where do you live, ma'am?
20    A.   In Irving.
21    Q.   And the person that just testified is your husband;
22  is that correct?
23    A.   Yes.
24    Q.   How many years have y'all been married?
25    A.   Forty-eight years and counting.

1    Q.   And the person to my left is your grandson; would
2  that be correct?
3    A.   Yes.
4    Q.   And I take it that you have known him all his life?
5    A.   Yes, sir.
6    Q.   Now, then, you visited with all of the defense
7  attorneys in this case; is that correct?
8    A.   Yes, sir.
9    Q.   And you brought us some photographs that you showed
10  us and that we have gone over with you; is that correct?
11    A.   Yes, sir.
12    Q.   And I will get to those in a minute.  In regard to
13  Wesley, you and your husband and the other family members were
14  around Wesley from like I say birth up until young adulthood;
15  is that correct?
16    A.   Yes.
17    Q.   And how would you characterize him as a worker?
18    A.   Intent.
19    Q.   Okay.  Did you ever have any -- I take it -- did you
20  ever have any examples as to where he did work for you or your
21  husband during his life?
22    A.   Yeah.
23    Q.   Any one incident come to mind?
24    A.   Yes.  He would come over mow our yard for us, help
25  clean up around our place when we asked.  Sometimes we didn't

97

1  even have to ask, he would volunteer.
2    Q.   Okay.  And this would have been when he was how old?
3    A.   Teenager mostly.
4    Q.   That's not what most teenagers want to do, is it,
5  come mow yards?
6    A.   No.
7    Q.   But he would do for you?
8    A.   Yes.
9    Q.   Did he do a good job?
10    A.   Yes.
11    Q.   Now, then, you have also were around him when he was
12  with his children later on; is that correct?
13    A.   Yes.
14    Q.   How would you characterize him around his children?
15    A.   A very proud dad.
16    Q.   Did he have any attributes one way or another that
17  you would want to tell the jury about in regard to his father
18  hood?
19    A.   He was always very patient with the boys.  As a
20  matter of fact, I don't ever remember him even spanking the
21  boys.  He would correct them.  He would play with them,
22  roughhouse with them.  He was always there for their birthday
23  parties and special holidays.  He would even dress up in
24  costume.
25    Q.   In regard to the children that we are talking about,

98

1  two of those were by his wife Erica; is that correct?
2    A.   Yes.
3    Q.   Do you know their names?
4    A.   My great grandchildren's names?
5    Q.   Yes.
6    A.   Wesley Lynn Ruiz, Jr., and Eric, I can't remember his
7  middle name, I can't think of it right now.
8    Q.   But you have been around them all their lives, right?
9    A.   Yes.
10    Q.   And is Wesley, Jr. and Eric, their mother -- their
11  mother is a woman named Erica; is that correct?
12    A.   Yes.
13    Q.   And that was Wesley's wife?
14    A.   Yes.
15    Q.   And was the marriage between Wesley and Erica all
16  happy sailing?
17    A.   I wouldn't say always happy sailing.
18    Q.   Were there -- was it at some time confrontational?
19    A.   Yes.
20    Q.   Was it ever violent that you know of?
21    A.   Only one time.
22    Q.   That's the only time that you have any personal
23  knowledge?
24    A.   Yes.
25    Q.   Was that some sort of altercation between Wesley and

99

100

1    Erica?

2    A.    May I go back and correct that?

3    Q.    Sure.

4    A.    I am not sure they were married at the time that this

5    happened.

6    Q.    Okay?

7    A.    But I do know that during their marriage there

8    were -- there were arguments, yes.

9    Q.    Okay.  So what you were going to testify to, you are

10    not exactly sure as to whether they are married or not at that

11    time?

12    A.    Yes.

13    Q.    Okay, what were you going to tell the jury about at

14    that time?

15    A.    There was an argument about, what, I do not know, but

16    I saw Erica just hall off and slap the fire out of him.  And

17    preceded -- he was trying to argue with her, talk to her.  She

18    started swinging again, and he grabbed her arm and prevented

19    her from hitting him again.  And the argument I believe just

20    sort of calmed down after that.  But I have never seen him hit

21    her, never.  I have always been -- seem like verbal.

22    Q.    Could he be -- how would you characterize him,

23    confrontational or how?

24    A.    More nonconfrontational.

25    Q.    Okay.  So -- would this be in his relationship with

1    Erica?

2    A.    Yes.

3    Q.    Or with -- how about with other people?

4    A.    With other people, I would say he was just

5    fun-loving, great sense of humor, almost passive.

6    Q.    Now, then, in regard to his family, he had a son by

7    another woman by the name of Joseph; is that correct?

8    A.    Yes, that's grandson Joseph.

9    Q.    And did --

10    A.    Great grandson.

11    Q.    And did he ever try to get court ordered visitation

12    or custody of that son?

13    A.    Yes.

14    Q.    And what did he do, if anything, to try to obtain

15    that?

16    A.    He went to, I believe it is called Father's rights in

17    Dallas, an organization in Dallas to get visitation or custody

18    of Joseph.

19    Q.    And was he able to in fact do that?

20    A.    No, it didn't turn out unfortunately.

21    Q.    Why didn't it turn out?

22    A.    Erica got into a confrontation with the boy's mother

23    and I do not know the details of that but she pretty well

24    squelched the opportunity that he had to have any relationship

25    at all with that child.

101

1    Q.    Ma'am, I will ask you basically the same question I

2    asked your husband, I know you have lived a long time and I

3    know that you never expected to be where you are today, is

4    there anything that you would like to tell this jury about

5    your grandson that I haven't asked you about or that you think

6    that they should know about Wesley?

7    A.    I don't know if there is enough time.  But I will

8    give it a try.  Wesley is a loving person.  He loves his

9    children, and he has tried to do everything that he can to

10    raise his boys.  He has been a good father to them.  Things

11    haven't worked out so much with female relations, but he -- he

12    is a good person.  He has made some terrible choices in his

13    life, and I just pray that you will be merciful.

14    Q.    Thank you, ma'am?

15          MR. BRAUCHLE:    May we approach, Your Honor.

16          THE COURT:    You may.

17          (Following proceedings had at the Bench.)

18          MR. BRAUCHLE:    I intend to introduce about 30

19    photographs through her, and for her to identify them and

20    blah, blah, blah, obviously it is going to be time

21    consideration.

22          THE COURT:    So you are going to be merciful on

23    us and only offer about five.

24          MR. BRAUCHLE:    I was going to say do you want to

25    send the jury to lunch?

102

1          THE COURT:    We can break for lunch now.

2          MR. BRAUCHLE:    I didn't want to get between his

3    third and fourth birthday and break.

4          THE COURT:    No, we can break for lunch.

5          (End of Bench Conference.)

6          THE COURT:    Ladies and gentlemen, we will break

7    for lunch at this time, we will reconvene at 1:15.

8          THE BAILIFF:    All rise.

9          (Jury retired from the courtroom.)

10          THE COURT:    You may be seated.

11          (Lunch recess taken.)

12          THE BAILIFF:    All rise.

13          (Jury returned to the courtroom.)

14          THE COURT:    You may be seated.

15          MR. BRAUCHLE:    We would recall our last witness.

16          THE COURT:    Ma'am, if you will come back to the

17    stand, please.

18          (Witness complies.)

19          MR. BRAUCHLE:    May I approach, Your Honor?

20          THE COURT:    You may.

21    Q.    (By Mr. Brauchle) Ma'am, restate your name for the

22    jury, please?

23    A.    Sue Ann Ziegenhain.

24    Q.    Ms. Ziegenhain, you brought some pictures that you

25    wanted to share with the jurors today; is that correct?

1    A.    Yes, sir.

2    Q.    And I will hand you what has been marked as
3    Defendant's Exhibits 36 through -- 26 through 38, and just
4    look at those first and tell me if you can identify them, not
5    tell me what they are about, but just if you have seen them
6    before and can identify them?

7    A.    Yes, sir. You want me to --

8    Q.    No, just look through them one by one and see if you
9    can identify them?

10   A.    Okay, yes, sir.

11   Q.    I will show you what has been marked as Defendant's
12   Exhibit 40 through 47, I will ask you if you can identify
13   those?

14   A.    Yes, sir.

15   Q.    And then I will show you what has been marked 53
16   through 62, and I will ask you if you can identify those?

17   A.    Yes, sir.

18   Q.    All right. Are all of these exhibits that I have
19   asked you about, are they basically pictures of your family,
20   Wesley's family at various stages of their lives?

21   A.    Yes, sir.

22   Q.    And you can identify all of these. I will ask you in
23   a little bit to tell us what they are about, but you can
24   identify these?

25   A.    Yes, sir.

---

1           MR. BRAUCHLE:    We will offer Defendant's Exhibit
2    26 through 62 with the missing numbers that have been noted.

3           MR. BROOKS:    No objection.

4           THE COURT:    Defendant's Exhibits 26 through 62.

5           MR. BRAUCHLE:    Yes, but it is not -- there are
6    certain sets that are -- or numbers that are represented, I
7    think it goes from 26 to 38, and then it goes from 40 to 43 --
8    no, continuing on to 47, and then there is a skip, from 53 to
9    62, I mean we go from 47 to 53, and then it goes from 53 to
10   62, I think I misstated that.

11          THE COURT:    Very well, Defendant's Exhibit 26
12   through 38, 40 through 43, 47 to 53 and 53 to 62 are admitted.

13          MR. BRAUCHLE:    Thank you, Your Honor.

14   Q.    (By Mr. Brauchle) Ma'am, can you look at these and
15   briefly tell me what Defendant's Exhibit 26 is.

16   A.    Wesley is in like a -- which is, he was a child in
17   a -- what would you call that.

18   Q.    Wash tub or something?

19   A.    Yeah, it was on a farm.

20   Q.    Watering tub?

21   A.    Watering tub, yeah, a bunch of the kids in the
22   watering tub.

23   Q.    All right. That's 26. Can you tell us briefly what
24   27 is?

25   A.    Yes. This is when Wesley was driving for Rail. He

---

105

1    brought his rig over to our house to show it to us. And we
2    were so proud of him for doing that.

3    Q.    All right. Twenty-eight, is that basically the same
4    picture?

5    A.    Yeah, watering tub again. The same kids playing in
6    it.

7    Q.    And what is 29?

8    A.    This is kind a little bit difficult, I'm thinking it
9    was Wesley when he was born, but it also -- it may also be his
10   son Wesley, Jr. when he was born. Cause they look identical.

11   Q.    All right. And Defendant's Exhibit 30, what would
12   that be?

13   A.    This was immediate family get-together for -- we call
14   him Baby Wes, Wes, Jr., for his first birthday, family
15   get-together.

16   Q.    What is 31?

17   A.    This is Wesley and Erica on Halloween with -- the
18   kids are dressed up in Halloween costumes, they went out
19   trick- or-treating.

20          MR. BRAUCHLE:    May I publish these, Your Honor?

21          THE COURT:    You may.

22   Q.    (By Mr. Brauchle) Okay, in regard to Defendant's
23   Exhibit 32, who would that be?

24   A.    This is Wes as he was a teenager. Probably one of
25   his birthdays, we went to Poncho's for dinner.

---

106

1    Q.    All right. Thirty-three?

2    A.    This is also a picture of Wesley and Erica and
3    Wesley, Jr. when Wes was going through the process of trying
4    to get communication -- or father's rights, working on that
5    case.

6    Q.    All right. Defendant's Exhibit 34, it's a birthday
7    party appear?

8    A.    Yes, for Little Wes, Wes Jr.

9    Q.    And 35?

10   A.    These are the combined families, the Ruizes and
11   Riveras having a family get-together. I am sure it was
12   probably the same birthday party. You want me to identify
13   anyone in there, I mean.

14   Q.    I think the large group speaks for itself?

15   A.    Okay.

16   Q.    That's Wesley's and Erica's family?

17   A.    Yes.

18   Q.    And the occasion was a birthday party for one of the
19   youngsters; is that correct?

20   A.    Yeah.

21   Q.    How about 36 and 37, can you tell us what that is?

22   A.    Yeah, this is when we had ice on the ground and
23   Wesley put the boys in a laundry basket and took them out in
24   the parking lot and was scooting them around on the ice.

25   Q.    All right. What is 38 a picture of?

1     A.    This is a picture of Barbara, which would be Barbara
2  and Tommy.
3     Q.    Wesley's parents?
4     A.    Yes.  His parents with his brother Jason and that may
5  be -- his youngest brother.
6     Q.    All right.  And 40 and 41?
7     A.    Forty is Wes, Jr. in a bubble-bath.
8     Q.    And 41?
9     A.    Forty-one is a picture of Wes, Jr. -- Wes, Jr.,
10 Wesley's mother and me.
11    Q.    And 42 and 43?
12    A.    Forty-two is Wes, Jr.'s birthday party, his fourth
13 birthday party.  Daddy is watching him blow out candle.  And
14 43 is little Wes with Wes -- Wes, Jr. with his cousins on
15 Halloween.
16    Q.    All right.
17          MR. BRAUCHLE:  Your Honor, we will withdraw 47
18 in that I think that is another duplicate, we will withdraw
19 with permission of the State, Exhibit 47.
20          MR. BROOKS:  No objections.
21          THE COURT:  Exhibit 47 is withdrawn.
22    Q.    (By Mr. Brauchle)  Now, then, who is pictured in 44?
23    A.    Forty-four is my daughter Barbara with her three
24 sons.
25    Q.    And 45?

1     A.    This is a duplicate you have already shown me this
2  one.
3     Q.    And 46?
4     A.    Forty-six is the kids, Wesley and the other kids
5  playing in a watering tub.
6     Q.    Fifty-three?
7     A.    Wesley, Sr.  I am sure it is probably Halloween, he
8  has partial costume on his head.
9     Q.    Okay, 54?
10    A.    Wes, Jr.'s fourth birthday with his dad and his
11 cousins.
12    Q.    Do you know how old Wes, Jr. is now?
13    A.    He just turned seven.
14    Q.    I will show you 55 and 56, and ask you who those
15 people are?
16    A.    This is another birthday party for Wes, Jr. and his
17 dad is sitting him up at his birthday cake.
18    Q.    Fifty-six?
19    A.    And 56 is Wes, Sr. in the parking lot with his son,
20 Wes, Jr., and a toy car.
21    Q.    How about 57, who is in that picture?
22    A.    Fifty-seven is a picture of, again, my daughter and
23 her, I think, probably then teenage boys.
24    Q.    Fifty-eight?
25    A.    Fifty-eight is Wesley, Sr. hugging his boys, Wes, Jr.

109

1  and Eric Daimen laying down on the bed.
2     Q.    And 60?
3     A.    This is the backside of Wes, Sr. as he was scraping
4  our house to get it ready for painting.
5     Q.    Who is that in the picture with him?
6     A.    His son, Wes, Jr., he wanted to help daddy, so daddy
7  gave him a scraper or a paint bush to work with.
8     Q.    How old do you think Wes, Jr. was then?
9     A.    He was probably three, maybe four by that time.
10    Q.    Okay.  And Wesley was helping y'all paint or do some
11 repairs to your house; is that right?
12    A.    Yes.  He was scraping the house preparing it to be
13 painted.
14    Q.    And do you know when that would have been?
15    A.    I guess probably 2002 or 3.
16    Q.    Okay.  All right.  Like I say, this isn't a quiz, but
17 it could have been some time around that point?
18    A.    Yes.
19    Q.    And then 61 and 62?
20    A.    Sixty-one -- excuse me, 61, Wes is cutting up either
21 a Thanksgiving or Christmas turkey.
22    Q.    And do you know where that would have been taking
23 place?
24    A.    At his mother's apartment.
25    Q.    Okay.  And then 62?

110

1     A.    Sixty-two is my daughter Barbara and the boys in a
2  swimming pool.
3     Q.    All right.  Now, then, ma'am, do those pictures
4  accurately portray the people that you have identified in each
5  of those pictures?
6     A.    Yes.
7     Q.    And as I told the jury or as I asked you when we
8  identified them, those are family photos that you gathered
9  over the years and you brought them here to try and give the
10 jury here some insight as to your family life, as well as
11 Mr. Ruiz's family life; is that correct?
12    A.    Yes, sir.
13    Q.    I assume those are not the only pictures that you
14 have that you could bring down here to show the jury, I am
15 sure you have more at home; is that correct?
16    A.    Absolutely, yes.
17    Q.    All right.  Now, then, I have talked with you about
18 some of Wesley's growing up and some of his family life and
19 then you have shared the experiences of the pictures.  And I
20 know that probably that at no point in your lifetime would you
21 ever think that you would be on a witness stand, let alone be
22 on a witness stand for what you are up there for now.  Is
23 there anything that I haven't asked you or that you wanted to
24 tell the jury in regard to Mr. Ruiz?
25          MR. BROOKS:  Your Honor, excuse me, we would

1  object to this question has already been asked and answered
2  prior to the break.
3              THE COURT:  I will overrule your objection.  You
4  may answer the question.
5              THE WITNESS:  I may.?
6              THE COURT:  Yes, you may.
7      A.    Those pictures bring back a great deal of memories.
8  I love Wesley, I will always love him deeply.  And no I never
9  in my worst nightmare would have ever thought that I would
10  ever have to stand up for his character.  He is a good person,
11  and that day, that fatal day, he honestly believed that his
12  life was in danger.  I cannot imagine the fear that he must
13  have felt.  I know if had I been in my car and police stopped
14  me and came up to my passenger's side window and started
15  trying to break the window, I cannot honestly say that I would
16  have had no fear for my life.  I love Wesley, I always have
17  and I always will and I believe in him.  I believe in him 100
18  percent.  I am terribly, terribly deepen in my soul and sorry
19  that Officer Mark nix is not here.  I have lost a son not in
20  the same way that Mr. and Mrs. Nix did.  I regret that, but I
21  do know what it is like to lose a son.  And I don't want to
22  lose a grandson either.
23      Q.    (By Mr. Brauchle)  Thank you ma'am.
24      A.    He is a part of me, just as Mark Nix was a part of
25  you.

1      Q.    Thank you, ma'am.
2              MR. BRAUCHLE:  You may take your seat.  Unless
3  the State has some cross-examination.
4              THE WITNESS:  I'm sorry, what?
5              MR. BROOKS:  Ms. Ziegenhain, you need a moment?
6              THE WITNESS:  I will be all right.  Just let me
7  get my breath.
8              MR. BROOKS:  Yes, ma'am.  You can let me know
9  when you are ready.
10             THE WITNESS:  I am ready, sir.
11                    CROSS-EXAMINATION
12  BY MR. BROOKS:
13      Q.    You were present in the courtroom when your husband
14  was testifying?
15      A.    Yes.
16      Q.    And you heard the questions that I asked him about
17  the things the two of y'all did about raising them and about
18  knowing the difference between right and wrong?
19      A.    Yes, sir.
20      Q.    And you heard the questions that I asked him about
21  the things you and your husband did with your grandchildren in
22  terms of teaching them the difference between right and wrong?
23      A.    You do what you can do.
24      Q.    So if I ask you basically the same questions that I
25  asked your husband, would your answers be the same as his?

---

113

1      A.    Yeah, yeah, you do what you can do, you help when you
2  can.
3      Q.    And you are not responsible for the bad decisions
4  that any of your other family members may make?
5      A.    No, I am not.
6      Q.    You have had the -- you would agree with me that you
7  have had the pleasure, cause your daughter Barbara had three
8  sons, you had the pleasure of watching those three boys grow
9  up?
10     A.    Yes.
11     Q.    And you have had the added pleasure of at least
12  having great grandkids?
13     A.    I have ten great grandchildren.
14             MR. BROOKS:  Thank you, ma'am, pass the witness.
15             MR. BRAUCHLE:  Nothing further, Your Honor.
16             THE COURT:  Thank you, ma'am.  You may step
17  down.
18             MR. BRAUCHLE:  We would call Barbara Ruiz.
19             THE COURT:  Raise your right hand.
20             (Witness was duly sworn.)
21             THE COURT:  You may take the seat on the witness
22  stand.
23             (Witness complies.)
24             THE COURT:  And you may proceed, Mr. Brauchle.
25             MR. BRAUCHLE:  Thank you, Your Honor.

114

1                    BARBARA ANN RUIZ
2  was called as a witness, and having been duly sworn by the
3  Court, testified under oath as follows:
4                    DIRECT EXAMINATION
5  BY MR. BRAUCHLE:
6      Q.    State your name, please.
7      A.    Barbara Ann Ruiz.
8      Q.    And I usually don't ask this of females or witnesses,
9  how old a woman are you, ma'am?
10     A.    Fifty-one.
11     Q.    And I will ask you what is your relationship to
12  Wesley Ruiz?
13     A.    His mother.
14     Q.    Now, then, both of your parents have testified
15  previously, you were in the courtroom when they testified; is
16  that correct?
17     A.    Yes.
18     Q.    And in regard to what they have testified to, I take
19  it that you grew up in Irving; would that be a correct
20  statement?
21     A.    Yes, sir.
22     Q.    And started going to school in Irving?
23     A.    Yes, sir.
24     Q.    And at some point about the tenth grade, did you drop
25  out of school?

1    A.    Yes, sir.
2    Q.    And why did you drop out of school?
3    A.    I was not doing well and decided that I could do
4    better just going to work.
5    Q.    Okay. Did you in fact go to work?
6    A.    Yes, I did.
7    Q.    And where did you work?
8    A.    First job was at Dairy Queen.
9    Q.    And where did you work after that?
10   A.    A nursing home, as a nurses aide. And then went to a
11   medication course and became a medication lady, gave out
12   medication at a nursing home.
13   Q.    Where did you go to that course?
14   A.    El Centro.
15   Q.    Pardon?
16   A.    El Centro College.
17   Q.    And they gave you a certificate so that you could do
18   the job in a nursing home?
19   A.    Yes, sir.
20   Q.    You know how long that course took?
21   A.    About a month.
22   Q.    Now, then, at some point in time, did you get
23   married?
24   A.    Yes, sir.
25   Q.    How old were you when you got married?

1    A.    Nineteen.
2    Q.    And who was it that you married?
3    A.    Thomas Ruiz.
4    Q.    You call him Tommy?
5    A.    Yeah.
6    Q.    All right. And after y'all were married, how long
7    was it before you had a child?
8    A.    We got married in '76, Jason was born in '77.
9    Q.    Would that be about a year and a half later, over a
10   year later?
11   A.    (Nods head).
12   Q.    Now, then, where was Tommy working at that point in
13   time?
14   A.    When Jay was born?
15   Q.    Pardon?
16   A.    When Jason was born?
17   Q.    Well, when y'all got married, just tell us where he
18   was working?
19   A.    When we first got married, he didn't have a job, I
20   was working. But he got a job shortly after that. But I
21   honestly couldn't tell you where it was, it was probably
22   construction.
23   Q.    Did he later get a job working for, I think you said
24   Warner Brothers?
25   A.    W.E.A., Warner Electric, Atlantic Records.

---

1    Q.    Do you know when that might have been?
2    A.    After Wesley was born.
3    Q.    Okay. Wesley was born how many years after Jason?
4    A.    Two, Wes was born in '79.
5    Q.    So it would have been approximately four years after
6    y'all got married he got that job?
7    A.    Right.
8    Q.    And then did you have any other children?
9    A.    Five years later.
10   Q.    And who would that have been?
11   A.    Richard.
12   Q.    So you have three sons, Jason, Wesley and Richard?
13   A.    Correct.
14   Q.    They were all born during your marriage to Tommy
15   Ruiz; is that correct?
16   A.    Correct.
17   Q.    Now, do you have any idea how long Tommy worked at
18   Warner Brothers?
19   A.    Shortly -- I mean Wes was still -- Wes was little and
20   Richard was already here, so five, six -- five, six years he
21   worked there.
22   Q.    So he worked there five or six, years?
23   A.    Uh-huh.
24   Q.    Now, then, did you continue working after you had
25   your children?

1    A.    I stopped -- I quit working in the nursing home when
2    I was getting ready to have Jason. And then I went back to
3    work, and I believe I was working at Gibson Discount Store.
4    Before I got pregnant with Wes, I stopped working again and I
5    started baby-sitting in the house, in my home for friends.
6    Q.    Okay. So you worked at the nursing home, then you
7    worked at Gibson's, Gibson is kind of a predecessor to
8    Wal-Mart, whatever, it was a discount store?
9    A.    Yes, sir, a lot smaller.
10   Q.    And then you started baby-sitting for people?
11   A.    Right.
12   Q.    And that was where, in your home?
13   A.    In my apartment.
14   Q.    Your apartment?
15   A.    Yeah, we had a two bedroom apartment.
16   Q.    Now, then, how many children were you baby-sitting on
17   a daily basis?
18   A.    Before Wes was born or after?
19   Q.    Well, just give us kind of a general summary as to
20   how many people -- how many children you were baby-sitting?
21   A.    In the summertime it was probably five or six. And
22   in school time, it was probably three besides my own children,
23   which was Jay, so that was four kids during school and in the
24   summertime I had quite a bit more. So I would say close to
25   ten kids including mine.

1    Q.    So about -- well, part of the time your workload went
2    up to ten children; is that correct?
3    A.    Yes, sir.
4    Q.    That you were baby-sitting.  Now, were these -- what
5    were the ages of these children?
6    A.    I would say two to seven years old.
7    Q.    Two years to seven years old?
8    A.    Yes, sir.
9    Q.    Sometimes as many as ten kids?
10   A.    Yes, sir.
11   Q.    All in a two bedroom apartment in Irving; is that
12   right?
13   A.    Yes, sir.
14   Q.    Needless to say that was -- well, was that hectic or
15   not?
16   A.    Yes.
17   Q.    Now, then, at some point during your marriage to
18   Tommy, did you and Tommy begin to use drugs?
19   A.    Yes, sir.
20   Q.    And this was yourself using them and him using them;
21   is that correct?
22   A.    Yes, sir.
23   Q.    Were y'all using the same drug?
24   A.    I don't smoke weed, but he does, but he did.
25   Q.    All right.  So smoked weed and what were you taking

---

1    at that point?
2    A.    After Richard was born, started doing crank which is
3    "P".
4    Q.    So after your last child was born, you started doing
5    crank?
6    A.    Yes, sir.
7    Q.    Now, at first I take it that you did it socially?
8    A.    Yes, sir.  On the weekends, whatever, and it
9    progressed.
10   Q.    And would that have been somewhere around 19, what,
11   84?
12   A.    Yeah.  Richard was born in November of '84.  The
13   first time I ever did it was New Year's Eve in '84.
14   Q.    So in '84 basically, you started using
15   methamphetamine and your husband was using methamphetamine; is
16   that correct?
17   A.    If that's what it is called.
18   Q.    Well, you just called it crank, it was not a drug
19   that you can buy at Walgreen, was it?
20   A.    No, it wasn't legal.
21   Q.    And how did you use that drug?
22   A.    Snorted it.
23   Q.    You snorted it?
24   A.    Yes, sir.
25   Q.    You didn't inject it?

---

121

1    A.    No.
2    Q.    Now, then, I take it that -- well, I don't know if
3    you did or not, did your use become progressively more, or did
4    you start out as a large user?
5    A.    Started out on the weekends, progressed quickly to
6    daily.  I used a lot more than he did.
7    Q.    Okay, so at some point in time after 1984, you --
8    would it be fair to say that you were a full-time drug user at
9    some point?
10   A.    After '84?
11   Q.    Well, you started you said in '84?
12   A.    Right.
13   Q.    And that progressed upward; is that correct?
14   A.    Yes, sir.
15   Q.    You know how many years it would have been, if it was
16   years, before you became a full-time drug user?
17   A.    Totally honest, it was probably like a year and a
18   half, two years, when I was using it daily, several times a
19   day.
20   Q.    Now, then, I take it that -- well, just tell me in
21   your own words, did that have anything to do with -- or did
22   that in any way affect your marriage to Tommy?
23   A.    I believe so.
24   Q.    Okay.  At some point in time did you-all separate?
25   A.    Yes, we did, 1992.

---

122

1    Q.    And when you separated in 1992, did he take the
2    children with him?
3    A.    I would not say that is an accurate statement.  I
4    would have to say I gave -- not gave up, but they were better
5    off with him, so I thought.
6    Q.    So your -- around 1992, your involvement with
7    the children was greatly lessened because they were staying
8    with their father; would that be a correct statement?
9    A.    Yes.  There were other extenuating circumstances,
10   though.
11   Q.    What were those?
12   A.    My abuse of alcohol.  My inability to be able to care
13   for them, control them.
14   Q.    Okay.  Those -- those were factors that you took into
15   consideration in just not being their caregiver for a period
16   of time; is that correct?
17   A.    Yes, sir.
18   Q.    Now, you mentioned alcohol and we were just talking
19   about using crank?
20   A.    Right.
21   Q.    Now, was there some reason that -- well, let me ask
22   you this, at some point around '92, did your drug of choice
23   change?
24   A.    I had to, I couldn't afford it.
25   Q.    The question was, did your drug of choice change?

1    A.    Yes, sir.

2    Q.    What did it change to?

3    A.    From crank to alcohol.

4    Q.    And I think you have already told us the answer, but

5  what was the reason for that?

6    A.    I couldn't afford it.

7    Q.    So it was much cheaper to abuse alcohol than it was

8  to abuse --

9    A.    Instead of being up -- I was medicating to deal,

10  depressed.

11    Q.    Okay.  The crank that you were on was a stimulant?

12    A.    Yes, sir.

13    Q.    The alcohol was a depressant; is that correct?

14    A.    Yes.

15    Q.    And that -- that was your drug of choice after you

16  separated and the children went to live with their dad; is

17  that correct?

18    A.    Yes.

19    Q.    Now, then, at the time that you-all separated and the

20  children went with Tommy, where did you live at that point in

21  time?

22    A.    With my mom.

23    Q.    Now, were you a full-time resident at your mom's

24  house?

25    A.    No.

---

1    Q.    And you have heard your father testify?

2    A.    Uh-huh.

3    Q.    Did you at some point in time basically become what

4  would be known as a street person?

5    A.    I did.

6    Q.    Now, was that a cycle of going out and living on the

7  streets and then coming back to your parents's house and

8  trying to dry out?

9    A.    Yes, sir.

10    Q.    And was that a recurring thing?

11    A.    Yes, sir.

12    Q.    And all during this time, you were battling alcohol

13  addiction; is that correct?

14    A.    Yes, sir.

15    Q.    You had gotten yourself off crank and ended up

16  abusing alcohol to such an extent that you were basically an

17  alcoholic and a street person; is that correct?

18    A.    Yes, sir, correct.

19    Q.    Now, then, you are not down here to glorify or in any

20  way tell people that being a street person is any cup of tea,

21  are you?

22    A.    No, sir.

23    Q.    Now, then, I think you have told me this, sometime

24  during 1995 that you were tested on one of your trips to the

25  public health facility and you were diagnosed as having

---

125

1  syphilis; is that correct?

2    A.    Yes, sir.

3    Q.    You were also diagnosed as being positive for HIV?

4    A.    Yes.

5    Q.    And as well as herpes; is that correct?

6    A.    Yes.

7    Q.    Now, obviously -- maybe it is not obvious, but during

8  the period of time from '92 to say '95 or; 96, you were not in

9  any shape or position to be a mother to your three sons, were

10  you?

11    A.    No, sir.

12    Q.    And at some point, I believe it is '96 or '97 on one

13  of your trips back to your parent's house, somebody put their

14  foot down; would that be a correct statement?

15    A.    Yes, sir.

16    Q.    And who would that have been?

17    A.    My mother.

18    Q.    And what did she tell you?

19    A.    She said I need to go to treatment or pack my stuff

20  and get out of her house.  The best thing she ever could have

21  done for me.

22    Q.    So at some point she just said, look, there is no

23  coming back to this place unless you get yourself together; is

24  that right?

25    A.    Yes, sir.

---

126

1    Q.    And where did you go after your mother gave you that

2  ultimatum?

3    A.    The first place I went was called Magdalene House, it

4  is an AA based facility.

5    Q.    That's the Magdalene House?

6    A.    Yes, sir.

7    Q.    And how long were you there at the Magdalene House?

8    A.    Two weeks.

9    Q.    And basically what was the purpose of going to the

10  Magdalene House?

11    A.    To dry out.

12    Q.    And did you do that in two weeks?

13    A.    Yes, sir.

14    Q.    Now, then, after you left the Magdalene House, where

15  did you go?

16    A.    I went to Welcome House in South Dallas.

17    Q.    Welcome House?

18    A.    Yeah.  It is also an AA based organization,

19  non-profit.

20    Q.    All right.  And how long did you stay at Welcome

21  House?

22    A.    Probably about a year and a half.  They had a house

23  for HIV positive women to stay in, and I lived there till '98,

24  the end of '97, yeah, the end of '97.

25    Q.    All right.  And in that regard, basically from '97 or

1  '96 when your mother told you you couldn't come back home
2  anymore, then after a year and a half of Magdalene House and
3  Welcome House, you finally left Welcome House; is that
4  correct?
5     A.   Yes, sir.
6     Q.   You left there because you got situated in an
7  apartment; is that correct?
8     A.   Yes, sir.
9     Q.   Basically do you still live in that same apartment
10  that you lived in?
11    A.   Yes, sir.
12    Q.   And you have lived there since 1998; is that correct?
13    A.   Right.
14    Q.   Now, at some point during your time at Welcome House,
15  did you have a one year anniversary?
16    A.   Yes, I did.
17    Q.   And that would be a one year anniversary from what?
18    A.   Alcohol.
19    Q.   So you celebrated a year of abstinence there at
20  Welcome House?
21    A.   Yes, sir.
22    Q.   Did anybody make a speech for you?
23    A.   Yes, sir.
24    Q.   And who would that have been?
25    A.   Wesley.

---

1     Q.   And what did he tell the people there at Welcome
2  House?
3     A.   He got up on the podium and he told them, "Thank you
4  for giving my mom back to me."
5     Q.   Now, then, after you left Welcome House, we have
6  discussed that you got an apartment?
7     A.   Yes, sir.
8     Q.   And at that point in time or some point after that,
9  did Wesley and Erica move in with you?
10    A.   Yes, they did.
11    Q.   For how long did they live there?
12    A.   For a few months, then they moved on.
13    Q.   So they stayed at your house basically a month or
14  two?
15    A.   No.
16    Q.   Pardon?
17    A.   Probably more like three or four months.
18    Q.   All right.  And would that have been in '98?
19    A.   Yeah, yes, sir.
20    Q.   You think so?
21    A.   Yes.
22    Q.   All right.  Now, going back to this timetable from
23  basically about '92 when you and Tommy separated, you didn't
24  have much of any contact with your three boys until you went
25  to Magdalene House and Welcome House; would that be a fair

---

129

1  statement?
2     A.   Right.
3     Q.   Now, then, during the time that Wesley and Erica
4  lived with you, did you ever see them have arguments and
5  fights?
6     A.   Yes.
7     Q.   Was it both or -- both arguments and fights or what
8  did they have?
9     A.   Both arguments and fights.
10    Q.   Did you ever see one or the other assault the other?
11    A.   Yes.
12    Q.   And who would that have been?
13    A.   Erica hitting Wes.
14    Q.   Do you know on how many occasions that might have
15  happened say during the 23 months they might have lived with
16  you.
17    A.   Okay, two or three months they lived with me, that
18  would have to be one.
19    Q.   How many times had you seen that action during the
20  time that they were together?
21    A.   Quite a bit, quite a few times.
22    Q.   Could you quantify that?
23    A.   Five, five or so times.
24    Q.   And was Erica always the aggressor.
25    A.   Yes, sir.

---

130

1     Q.   What would Wesley do when these situations occurred?
2     A.   He would try to get away from her.  One time he body
3  slammed her to the floor just to get on top of her to stop
4  her.
5     Q.   Was she pretty violent during these episodes?
6     A.   Yes.  She fights like a man.
7     Q.   Now, then, at some point during the time that -- or
8  shortly after I guess it would be, after you and Tommy
9  separated, did basically Tommy leave Jason and Wesley living
10  in a trailer?
11    A.   Yes.
12    Q.   Do you know about how -- or what year that would have
13  happened?
14    A.   Wes was 17, Jay was 18 -- 19.
15    Q.   And --
16    A.   I am not good on years.  I can tell you how old they
17  were, a year.
18    Q.   But basically that would be about the time that adult
19  supervision over them ceased, if it had not already ceased
20  before then; would that be a correct statement?
21    A.   They were left to fend for themselves.  They both had
22  a job, but...
23    Q.   They didn't have a safety net?
24    A.   No.
25    Q.   Now, then, have you had occasion to visit with Wesley

131

```
1   in the jail?
2       A.  Yes, sir.
3       Q.  How many times have you visited with him, can you
4   tell us?
5       A.  I have lost count, second day he was in infirmary on.
6       Q.  And in regard to your visits with Wesley and the
7   jail, did you come away with an impression of his state of
8   mind?
9       A.  Yes.
10      Q.  And in regard to his state of mind over --
11          MR. BROOKS:  Judge, in an abundance of caution,
12  I am going to object to any speculation from this witness on
13  respect to his state of mind.
14          THE COURT:  Sustained.
15      Q.  (By Mr. Brauchle) Let me ask you this, has he told
16  you anything about that?
17          MR. BROOKS:  Judge, I will object to the form of
18  that questions, calls for hearsay on the part of this witness.
19          THE COURT:  Sustained.
20          MR. BRAUCHLE:  May I have a moment, Your Honor?
21          THE COURT:  You may.
22          (Pause in the proceedings.)
23      Q.  (By Mr. Brauchle) Ms. Ruiz, you stated that you lost
24  count on how many times you visited with Wesley in jail?
25      A.  Yes, sir.
```

132

```
1       Q.  Do you have an opinion as to what his state of mind
2   is or what his feelings are in regard to the crime that he is
3   in jail for?
4           MR. BROOKS:  Excuse me, ma'am. Judge, I renew
5   my objection. That opinion would be based on speculation with
6   respect to --
7           MR. BRAUCHLE:  She can testify as to what her
8   opinion.
9           MR. BROOKS:  And the opinion would also be based
10  on whatever he told her and it would be hearsay.
11          MR. BRAUCHLE:  We didn't ask her about what he
12  told her. But she can testify as to what her opinion is from
13  whatever source, I didn't ask her to specify or to pinpoint
14  how she formed that opinion.
15          MR. BROOKS:  And again the State's position,
16  anything she testifies with regard to her opinion is based
17  solely on conversations or statements made by this defendant
18  to her. It is hearsay and based on speculation.
19          MR. BRAUCHLE:  Well, that is not necessarily
20  true. And I guess the State could take her on voir dire as to
21  how she formed the opinion. But certainly she is -- under
22  701, the rules of evidence state that lay witnesses are
23  entitled to testify as to their opinion. And I think that
24  certainly this question is within the purview of Rule 701 of
25  the Texas Rules of Evidence.
```

133

```
1           MR. BROOKS:  Judge, we have no objection to
2   opinions as long as it is not based on comments made by this
3   defendant.
4           THE COURT:  I will allow the witness to testify
5   as to what she observed, not based on any opinion from what
6   she was told by the defendant.
7           MR. BRAUCHLE:  And I realize we are probably a
8   couple of pages passed where I asked the question, but I think
9   the question was, if the reporter can read it back.
10          (Reporter reads back requested proceedings.).
11          THE COURT:  Ma'am you may answer the question,
12  not based on what you were told but based on what you
13  observed.
14      Q.  (By Mr. Brauchle) You understand the question?
15          THE COURT:  You cannot say what he told you?
16          THE WITNESS:  Can I tell you what I told him?
17          THE COURT:  No, that is not what you are being
18  asked?
19          THE WITNESS:  Okay.
20      A.  I don't --
21      Q.  (By Mr. Brauchle) Okay, the question is this, you
22  stated that you visited him. And then the question is: Did
23  you form an opinion as to how he feels about the offense
24  from -- not from what he told you, but just an over-all
25  opinion that may have been based on the totality of the
```

134

```
1   circumstances I suppose?
2       A.  Very remorseful.
3       Q.  And was that -- did you form that opinion early on
4   or...
5       A.  First time I saw him.
6       Q.  Ms. Ruiz, I know that you have been in the courtroom
7   where I have asked the two other people this question, but I
8   have discussed some things I am sure you didn't want to get up
9   in front of a group of people and talk about, and I apologize
10  for that; but I think that we needed -- people to know a
11  little bit about Wesley's family history. Is there anything
12  that you want to tell this jury that you haven't told them
13  about this situation -- or that I haven't asked you about this
14  situation?
15      A.  Of how they grew up?
16      Q.  No. You are up there testifying as a witness for
17  Wesley. I have asked you about Irving and things like that,
18  is there anything that you want to tell the jury in regard to
19  your son?
20      A.  He has a big heart. He will do anything for anybody.
21  He got hooked up with the wrong people. He was looking for
22  somewhere to belong, his parents weren't there. Led him to
23  the street, to the gang and bad things happen. He pulled
24  himself out for a while. Money became an object, I have a lot
25  of guilt with that. He won't say it, but I will, he wasn't
```

1    given what he needed for his upbringing and this is what can
2    happen.  He has two beautiful boys, one of them knows that his
3    daddy killed a police officer, he says he wants to be a cop,
4    he knows his daddy did that.  He still wants to be a cop.  He
5    is five years old, they need to be able to see their dad,
6    that's all.
7        Q.    Thank you, ma'am.
8              MR. BRAUCHLE:   We will pass the witness.
9                        CROSS-EXAMINATION
10   BY MR. BROOKS:
11       Q.    Ms. Ruiz, can you hear me okay?
12       A.    Yes, sir.
13       Q.    Do you need a moment?
14       A.    I am fine.
15       Q.    You need a glass of water or anything of that nature?
16       A.    I am fine.
17       Q.    You have gone to great pain to tell this jury about
18   the struggle you had in your life, particularly your drug and
19   alcohol abuse.  And I believe in fact you said that you became
20   clean and sober in 1998, somewhere around that time?
21       A.    Yes, sir.
22       Q.    In fact the defendant in this case, Wesley, made a
23   speech on your behalf and thanked the individuals at the
24   Welcome House for giving his mom back to him; you recall that?
25       A.    Yes, sir.

1        Q.    Do you recall also years later having conversations
2    with your son Wesley about his drug use?
3        A.    Yes, sir.
4        Q.    And you recall talking to him about the fact that he
5    was selling methamphetamines, what you call crank?
6        A.    I believe it is ice, it is called ice now, it is
7    different.
8        Q.    It is an amphetamine, speed-type drug?
9        A.    Yes.
10       Q.    You recall talking to him about that?
11       A.    Yes.
12       Q.    You were aware that he was selling drugs?
13       A.    At a certain point, yes, sir.
14       Q.    But at the point that you became aware that your son
15   was selling drugs, you talked to him about that?
16       A.    Yes.
17       Q.    And in fact you told him you are selling the kind of
18   stuff that kills people like me?
19       A.    Yes.
20       Q.    And that didn't stop him, did it?
21       A.    No, sir.
22       Q.    And this is years after he stood up before those
23   folks at the Welcome House and thanked them for giving his mom
24   back?
25       A.    Yes, sir.

137

1        Q.    You are aware of the times that your son has been in
2    and out of jail here in Dallas County, in Tarrant County as
3    well?
4        A.    Yes, sir.
5        Q.    And you talked to him about those events?
6        A.    Yes, sir.
7        Q.    And, in fact, I believe you told him that it is not
8    too late, you can get your life turned around?
9        A.    Yes, sir.
10       Q.    So you would agree with me that even though you
11   weren't there during an early part of his life, during a later
12   part of his life, you tried to help him and give him advise?
13       A.    Yes, sir.
14       Q.    And when you found out he was doing things wrong, you
15   tried to talk him out of doing things wrong?
16       A.    Yes, sir.
17       Q.    When you found out he was selling drugs, the very
18   thing that you are addicted to, you confronted him about that?
19       A.    Yes, sir.
20       Q.    And his response was what, he continued to do it;
21   would that be a fair statement, ma'am?
22       A.    Yes.
23       Q.    In spite of your advice and your guidance?
24       A.    Yes, sir.
25       Q.    I believe a minute ago, and correct me if I am wrong,

138

1    because I don't want to put words in your mouth, I believe a
2    minute ago you told the jury that you don't think he had
3    anyone that he could turn to, did you say something to that
4    effect?
5        A.    He was looking for somewhere to belong.
6        Q.    You heard your mother and father testify that they
7    were there in his life?
8        A.    Uh-huh.
9        Q.    In fact he would spend quite a bit of time at their
10   home, you heard them say that, didn't you?
11       A.    Yes, I did.
12       Q.    And his father was still there in his life; is that a
13   fair statement?
14       A.    I don't believe so.
15       Q.    But there were people there who cared about him who
16   were there for him, even though you may not have been, there
17   were others there for him; would that be a fair statement?
18       A.    Yes, sir.
19             MR. BROOKS:   May he approach the witness, Your
20   Honor?
21             THE COURT:   You may.
22       Q.    (By Mr. Brooks)  I think you have also testified that
23   you have visited your son inside the Dallas County jail?
24       A.    Yes, sir.
25       Q.    Outside of visitations, y'all have talked on the

| | |
|---|---|
| 1 | phone? |
| 2 | A. Yes, sir. |
| 3 | Q. Y'all have exchanged letters? |
| 4 | A. Yes, sir. |
| 5 | Q. You recognize your son's handwriting? |
| 6 | A. Yes, sir. |
| 7 | Q. As part of going to see him in the Dallas County |
| 8 | jail, would you have to know what his book-in number and thing |
| 9 | of that nature are to fill out a visitation card? |
| 10 | A. Yes, sir. |
| 11 | Q. And looking at State's Exhibit 176, a document |
| 12 | containing six letters, I want to ask you, is that your son's |
| 13 | book-in number? |
| 14 | A. Yes, sir. |
| 15 | Q. Is that his name? |
| 16 | A. Yes, sir. |
| 17 | Q. Is that the tank that he was housed in? |
| 18 | A. Okay, yeah, yes. |
| 19 | Q. And that's the address, you recognize this |
| 20 | information? |
| 21 | A. Yes. |
| 22 | Q. Do you know this individual? |
| 23 | A. Yes, not very well. |
| 24 | Q. Okay. But this is someone that you know your son |
| 25 | knows and would correspond with? |

| | |
|---|---|
| 1 | A. Yes. I don't know who that is. |
| 2 | Q. Okay, but as far as the book-in number, the tank? |
| 3 | A. Yes. |
| 4 | Q. Jail address? |
| 5 | A. Yes. |
| 6 | Q. Is that your son's handwriting? |
| 7 | A. Yes. |
| 8 | Q. You don't know this lady, but you do know that that's |
| 9 | his handwriting; is that a fair statement? |
| 10 | A. Yes. |
| 11 | Q. And in fact are these pictures of his children? |
| 12 | A. Yes. |
| 13 | Q. In fact is that one of the photographs that is |
| 14 | already in evidence? |
| 15 | A. It may very well be. |
| 16 | Q. Is that you in the photograph? |
| 17 | A. Yes. |
| 18 | Q. And the three -- three people standing behind you are |
| 19 | those your sons? |
| 20 | A. Yes, sir. |
| 21 | Q. And is that his handwriting? |
| 22 | A. Yes, sir. |
| 23 | Q. You have a son by the name of Richard Ruiz? |
| 24 | A. Yes. |
| 25 | Q. And Richard lives with you? |

141

| | |
|---|---|
| 1 | A. He is now. |
| 2 | Q. This Garden Oaks address, was that his father's |
| 3 | address at the time? |
| 4 | A. Grandfather. |
| 5 | Q. Grandfather's address. Again same question, with |
| 6 | respect to this letter? |
| 7 | A. Right. |
| 8 | Q. And the same question, that's Wesley's handwriting, |
| 9 | isn't it? |
| 10 | A. Yes. |
| 11 | Q. Do you know this young lady? |
| 12 | A. Yes, sir. |
| 13 | Q. And does this have the same information as far as the |
| 14 | book-in number? |
| 15 | A. Yes, sir. |
| 16 | Q. And is that your son's handwriting? |
| 17 | A. Yes, sir. |
| 18 | Q. Same question, do you know this young lady? |
| 19 | A. Not with that last name. |
| 20 | Q. Okay. Do you know who that is? |
| 21 | A. Yes. |
| 22 | Q. And is that his book-in number and his handwriting? |
| 23 | A. Yes. |
| 24 | Q. And is that his handwriting in this letter? |
| 25 | A. It is. |

142

| | |
|---|---|
| 1 | Q. And last portion of this exhibit, ma'am, do you know |
| 2 | this young lady? |
| 3 | A. Yes. |
| 4 | Q. And does this letter have the same other identifying |
| 5 | information, as far as his book-in number, his tank? |
| 6 | A. Yes, sir. |
| 7 | Q. And again is that his handwriting? |
| 8 | A. Yes, sir. |
| 9 | MR. BROOKS: Judge, at this time State will |
| 10 | offer State's Exhibit 176, which is a single exhibit |
| 11 | comprising six letters written by this defendant. |
| 12 | MR. BRAUCHLE: May we approach, Your Honor. |
| 13 | THE COURT: You may. |
| 14 | (Following proceedings had at the Bench.) |
| 15 | MR. BRAUCHLE: We need time to look and see what |
| 16 | we are objecting to. I am not saying we have never seen them |
| 17 | before. |
| 18 | THE COURT: You want a few minutes? |
| 19 | MR. BRAUCHLE: We want to see which ones these |
| 20 | are. |
| 21 | THE COURT: We can take a break now, give you |
| 22 | time to look at these particular ones, we have been going |
| 23 | about an hour. |
| 24 | MR. BRAUCHLE: Are you nearly through with her? |
| 25 | MR. BROOKS: I just got two more questions. |

143

1    MR. BRAUCHLE:   Why don't you ask her one or two
2  questions and then we can break and come back to this.
3    THE COURT:   Okay.
4    (End of Bench Conference.)
5    Q.   (By Mr. Brooks)  Ma'am, you told this jury that it is
6  your opinion that your son is remorseful for this offense; you
7  recall that?
8    A.   Yes, sir.
9    Q.   Was he remorseful before the jury found him guilty or
10  was -- that remorse become evidence after they found him
11  guilty?
12    A.   Before.
13    Q.   Before they found him guilty.  Were you present in
14  the courtroom yesterday?
15    A.   Yes, I was.
16    Q.   Do you recall the telephone call from May the 7th --
17    A.   Yes, sir.
18    Q.   -- 2008, and you recall your son saying that he was
19  going to Washington D.C., they are going to transfer him to
20  get his award?
21    A.   Yes, sir.
22    Q.   In fact you are the person that he is talking to in
23  that conversation, aren't you?
24    A.   Yes, sir.
25    Q.   And you recall what your response was?

144

1    A.   Not right offhand, no.
2    Q.   You don't recall --
3    A.   No.
4    Q.   -- a little giggle and telling your son that he is
5  funny?
6    A.   Okay.
7    Q.   You recall that?
8    A.   Okay.
9    Q.   You recall that, ma'am?
10    A.   Yes, sir.
11    Q.   And is that an example of the type of remorse that
12  your son has shown prior to being convicted?
13    A.   No.
14    Q.   You recall the statement that he made that the
15  officer should have been charged with attempted murder for
16  trying to kill him, you recall that statement yesterday?
17    A.   Yes, sir.
18    Q.   And he called them a bunch of dick suckers?
19    A.   Yes, sir.
20    Q.   Is that an example of remorse in your mind?
21    A.   No, sir, it is not.
22    Q.   Thank you, ma'am.
23    MR. BROOKS:   Pass the witness.
24    THE COURT:   Ladies and gentlemen, we will
25  take -- we have been going for sometime, we will take a

145

1  15-minute break.
2    THE BAILIFF:   All rise.
3    (Jury retired from the courtroom.)
4    (Recess taken.)
5    THE COURT:   If you will raise your right hand,
6  ma'am.
7    (Witness was duly sworn.)
8    GILDA KESSNER
9  was called as a witness, and having been duly sworn by the
10  Court, testified under oath as follows:
11    SUB ROSA EXAMINATION
12  BY MR. BEACH:
13    Q.   State your name.
14    A.   Gilda Kessner.
15    Q.   And you are a psychologist; is that correct?
16    A.   Yes.
17    Q.   You have been retained by the Defense to render
18  certain opinions in this death-penalty punishment phase; is
19  that correct?
20    A.   That's correct.
21    Q.   When were you retained by Mr. Brauchle?
22    A.   I think it has been about a month ago.
23    Q.   One month ago?
24    A.   Approximately.
25    Q.   Okay.  And you are going to render certain opinions

146

1  here today, Doctor?
2    A.   Yes.
3    Q.   Are you going to render opinions having to do with
4  this defendant's -- the probability of him being violent in
5  the penitentiary?
6    A.   No.
7    Q.   Are you going to be rendering opinions based on
8  having to do with his moral blameworthiness i. e. mitigation
9  question?
10    A.   Regarding mitigation, yes.
11    Q.   Just tell me in a nutshell what your opinions are?
12    A.   From his birth, he was raised in a family that had a
13  lot of conflict as well as open substance abuse and addiction.
14  And that escalated among the parents -- or between the parents
15  as he grew older.  To the point that the mother was quite
16  incapacitated.  And so that they modeled substance abuse and
17  buying and selling of drugs for him.  And that as a young
18  person, he started a family early, the relationships broke up.
19  There according to his arrest record that I have, there was a
20  block of time, I think, from around '98 to 2004 where there
21  were no arrests on record.  And so that appears to be a period
22  of some stability until his relationship with Erica ended,
23  then he was in a downward spiral himself.
24    Q.   And who have you talked to in the last month to help
25  you form these opinions?

1    A.   His mother.

2    Q.   Okay.

3    A.   Grandmother, step grandfather.

4    Q.   His mother, his grandmother, his step grandfather?

5    A.   Yes.

6    Q.   And what is his name?

7    A.   Mr. Ziegenhain.

8    Q.   Okay.

9    A.   And Erica's father.

10   Q.   Anybody else?

11   A.   I don't think there was anybody else.

12   Q.   Have you reviewed any records?

13   A.   Yes.  Records supplied to me by the Defense include

14   arrest records, police records, school records, medical

15   records, including medical records of his mother.  I ever them

16   all with me here, I am trying to think what else there might

17   be.  Some records from the jail, but that all involves the

18   medical records, employment records.

19   Q.   In terms of the defendant's medical records other

20   than jail medical records, any other records that you have

21   reviewed having to do with his medical history?

22   A.   I don't believe so.

23        MR. BEACH:   That's all I have, Judge.

24        THE COURT:   Anything further of this witness?

25   You may step down, ma'am.

---

1        MR. BRAUCHLE:   Actually she is going to be our

2    next witness.

3        MR. BEACH:   We have to have a ruling on the

4    letters first, you want to do that with her on the witness

5    stand.

6        MR. BRAUCHLE:   We were.  But I was led to

7    believe that they weren't going to be tendered until the

8    expert took the stand in y'all's rebuttal.

9        MR. BROOKS:   I don't know where that came from.

10       MR. BRAUCHLE:   Who is the sponsor of the letters

11   at this point?

12       MR. BEACH:   Self-admitted, self-authenticated at

13   this point in time, admissions by the defendant.

14       MR. BRAUCHLE:   I don't have the letters at this

15   point, Julius have the letters.

16       THE COURT:   Who has the letters?

17       MR. BRAUCHLE:   Julius.

18       MR. BROOKS:   Judge, they have copies of the

19   letters, the DPS letters that were turned over.

20       MR. BRAUCHLE:   I'm talking about the exhibit

21   letters.

22       MR. BEACH:   The six excerpts.

23       MR. BRAUCHLE:   I don't have what y'all tendered

24   as exhibits.  He asked me where they were, I laid them on the

25   desk.  He took them.  Thank you, sir.

---

149

1        Your Honor, we would object to the admission of -- have

2    they got exhibit numbers.

3        MR. JOHNSON:   They are all one exhibit --

4        MR. BRAUCHLE:   Exhibit 176 in that it is not in

5    compliance with 38.27 of the Rules of Criminal Procedures.

6    And we would state that at this time they have not been

7    properly authenticated in that the proper predicate was not

8    laid with Barbara Ruiz in her ability to identify the six

9    items contained in State's Exhibit 176.

10       We would also object to them under 404, 403, 402 and 401.

11   And under the Fifth Amendment, the Fourteenth Amendment of the

12   United States Constitution.

13       THE COURT:   Your objection is overruled on all

14   grounds.

15       We ready to bring the jury in?

16       MR. BRAUCHLE:   Yes.

17       Who is the sponsor of those letters?

18       MR. BEACH:   They will come in depending on

19   circumstances.  You know a human being, it may be the DPS guy,

20   it might be somebody else, it will be a sponsor.  They are

21   self-authenticated at that point in time -- or authenticated.

22   Whether the erased portions come in is going to depend on the

23   Daubert hearing or the DPS guy.

24       MR. WHITTIER:   It is not Daubert material.

25       MR. BEACH:   My co-counsel objects to my...

---

150

1        MR. PARKS:   I am just curious as to when we

2    rested.

3        MR. BRAUCHLE:   I join in my co-counsel, when did

4    we rest and how did these, you know, suddenly become

5    admissible at this point?  It has to be some sponsor and

6    certainly it is not his mother.

7        THE COURT:   They offered it when the mother was

8    on the stand, I withheld a ruling so you could view them.

9        MR. BRAUCHLE:   Which I --

10       THE COURT:   You made your objection.  I

11   overruled it.

12       MR. BRAUCHLE:   Okay.  Unfortunately due to what

13   we have alluded to just a few minutes ago, I still haven't

14   been able to read them, so that's neither here nor there.

15       MR. BEACH:   They are what they are.

16       THE COURT:   Are we ready to bring the jury in?

17       MR. BEACH:   Yes, sir.

18       THE BAILIFF:   All rise.

19       (Jury returned to the courtroom.)

20       THE COURT:   You may be seated.

21   You may call your next witness.

22       MR. BRAUCHLE:   Call Gilda Kessner.

23       THE COURT:   This witness has been sworn.

24   You may proceed, Mr. Brauchle.

25

GILDA KESSNER

was called as a witness, and having been duly sworn by the

Court, testified under oath as follows:

DIRECT EXAMINATION

BY MR. BRAUCHLE:

Q.   State your name please, and how you are employed.

A.   Gilda Kessner. I am a psychologist licensed in Texas

to practice psychology.

Q.   What are your qualifications to -- that led to your

licensing in psychology?

A.   I have a doctor degree in clinical psychology from

Baylor University in 1996. And I completed an approved

internship as part of that, which was done in Arkansas. And

then for the year following my graduation, I worked for the

Texas Youth Commission. Prior to being licensed that is a

requirement you have to have so many hours before you can be

licensed. I worked at two of their prison facilities for

adolescence. Then I came to Dallas after that.

Q.   Now, then, in talking with you about the family and

social history of Mr. Ruiz, I think that you advised me that

professionally, you thought that his life could be divided up

into about three different periods; is that a correct

statement?

A.   Yes, you can do it that way.

Q.   And one would be from birth to about age five?

---

A.   Yes.

Q.   From age five to 13; is that correct?

A.   Yes.

Q.   And then 13 to where he is today, would that...

A.   Yes.

Q.   Without being overly simplistic, would that be an

adequate division of his life so that the jury can have some

understanding of what brings all of us here today?

A.   Yes, I think doing a breakdown in some fashion like

that helps to understand the different periods of his life.

Q.   Okay. Obviously at zero, he was born and I guess at

or about age five, when you would be approaching school age,

that would be the other perimeter on the first set. What

about his family life or social life were most important

factors, if any, during that period of time?

A.   Well, he already had an older brother who was a

couple of years older than him, and his parents had been

married, I think about three or four years when he was born.

And the -- his mother had already had a problem with alcohol,

drinking to intoxication, approximately once a week on the

weekend. And there was some use of marijuana in the couple.

And then when he was -- sometime after he was born, when he

was a toddler, before his younger brother was born, his mother

also started using over-the-counter medication, you might call

them uppers, like a No-Dose kind of medication, because she

---

153

started baby-sitting other children when -- after he was born.

And at some point she would have as many as ten children,

including her own children in a two-bedroom apartment to take

care of. So she started taking these over-the-counter

medication to keep herself up through the day. And so

initially that's -- that's kind of a span there. And then

about the time shortly after his younger brother was born, she

had her first introduction to crank, which was provided to her

by her husband at a party, a New Year's Eve party. And after

having access to that, she no longer used the over-the-counter

medication because this was available to her in the form of

the crank. And it was about the time that he was five when

his younger brother was born that the marriage really started

a steep decline, the parents's marriage started a steep

decline.

Q.   Except for the things that you have mentioned in

regard to uppers, I guess for want of a better word and

alcohol, the first five years of his life could possibly be

considered somewhat normal or is that too generous?

A.   I think on the surface there was an appearance of

normality, father working, mother staying at home, normal kind

of activities family would do, going out to eat, maybe taking

a vacation; but behind that, you have substance abuse,

impaired -- at least one impaired parent, and that was the

mother. And then the father also involved in activities

---

154

related to substance abuse. So that kind of belies the

outward appearance of normality.

Q.   Okay. Now, in regard to those first five years, his

primary caregiver would have been his mother who just

testified; would that be correct?

A.   That's correct.

Q.   And she is the one that basically showed the first

signs of addiction or drug use that would later lead to

problems in the next section that we blocked out; is that

correct?

A.   That's correct. She began to evidence her problems

even more, but she also has a family history. Her biological

father, I believe her maternal grandfather both that -- had

problems with alcohol. And she has a half brother who is

deceased who has drug and alcohol problem. So she had this in

her own personal history. And then with caring for her

children and becoming involved with the alcohol that made her

impaired.

Q.   Okay. Now, then, after age five, I think that we

have at the start of that, Wesley still having something of an

appearance of normalcy as far as his original -- or his early

years in school and his interaction with his siblings, would

that be a correct statement?

A.   Yes. He had some good grades in school and some

outside activities that he participated in.

---

1     Q.   Now, then, what was occurring in his family, though,
2 between his father and mother, if anything, at say between
3 five and eight, was there any real situations there that
4 raised its head say during those first three years?
5     A.   That was when his mother first tried crank at a
6 party, a New Year's Eve party they had with some friends.  And
7 her drinking went from one weekend night evening to two
8 weekend evenings.  Then overtime she escalated to having the
9 crank a couple of times a day, and eventually daily.  And this
10 was supplied to her by her husband.  And they at some point in
11 that time frame had some affairs or swinger kinds of
12 relationships with other individuals and the marriage was
13 essentially falling apart at that point.
14     Q.   Okay.  So once again that would be about age what,
15 can you tell the jury?
16     A.   That was again around age -- well -- he was five when
17 she first tried crank, so over the next few year, things
18 escalated in the drug use and in the marital infidelity and
19 the problems in the marriage and she continued to babysit
20 during this time.
21     Q.   Okay.  So we are up to about eight or nine years old;
22 would that be a fair number?
23     A.   Yeah, in that range, he is still managing to do
24 fairly well in school.
25     Q.   And basically he was attending school in Irving; is

1 that correct?
2     A.   Correct.
3     Q.   And both his parents were still ostensibly together;
4 is that correct?
5     A.   Yes, they are all living under the same roof.
6     Q.   Now then, progress then from age eight to 13, what
7 started happening, if anything, between those two years?
8     A.   Well, around that time, his mother then started using
9 alcohol in the evening to kind of relax and come down from the
10 crank that she was using during the day.  And so essentially
11 her drinking had gone to being just on the weekend to being
12 daily, although she was apparently not get drunk are during
13 the week.  The father was using marijuana on a regular basis
14 and selling marijuana and crank or marijuana to provide enough
15 money to buy enough for themselves, so they were selling to
16 get enough for their personal use.
17     Q.   Okay, now, this would have been up to about age 13?
18     A.   Yes.
19     Q.   And the three children were still under the same roof
20 and they would -- they would have been privy to the drug and
21 alcohol abuse as well as probably some in the remanents of the
22 sale of these drugs; is that correct?
23     A.   Well, as far as being able to observe their parents
24 impaired, people coming and going, disappearing into the back
25 of the house and then leaving, that sort of activity, they

1 certainly were old enough to be aware of that.  So as the
2 substance abuse increased and the problem escalated, it also
3 tracks along the time when the children are getting older and
4 they are more curious and more aware of what is going on
5 around them.
6     Q.   Also in regard to going to school and having good
7 grades, as Wesley got older, did the grades somewhat come
8 down?
9     A.   Yes.
10     Q.   And was that something of a steady decline?
11     A.   Well, his records indicate sixth and seventh grade he
12 was retained.
13     Q.   Okay, that means he didn't pass; is that correct?
14     A.   Right -- actually he was placed I think is the phrase
15 they used, I have to check and see, I think actually he was
16 placed, which means he didn't pass and they didn't him.  Which
17 the following year he flunked, so twice he was placed and once
18 retained.
19     Q.   Would place be the old social promotion, whatever it
20 is called?
21     A.   Yes.
22     Q.   And how far does that take us to on the chronology,
23 to about 13?
24     A.   Close in time to that, that's about the right age
25 bracket and that's also a very vulnerable time to boys, sixth,

1 seventh and eighth boys thinking that they are a lot bigger
2 and they want to be out later, and they want to be out with
3 their friends, and so they are more susceptible to being
4 victimized and getting into trouble.
5     Q.   Did you see evidence of him getting into trouble at
6 about that?
7     A.   No.  His records indicate that that happened -- the
8 records that I have reviewed indicate that that happened a
9 little bit later, a couple of years later.
10     Q.   Okay.  So in regard to his grades deteriorating,
11 would there be anything other than his family situation that
12 you could put a finger on that could lead to that?
13     A.   No.
14     Q.   And then the number 13, when he turned 13, what
15 happened in his family situation, at or about that time?
16     A.   His parents separated during that time.
17     Q.   And what occurred with his mother at or about that
18 time?
19     A.   She moved out of the house, originally she took the
20 youngest boy with her and couldn't maintain a household for
21 him and so he went back with his father and brothers and she
22 was in and out with her parents.  And initially was receiving
23 crank from her husband but then he stopped providing that for
24 her, she couldn't afford to buy it.  So the boys saw this
25 collapse of their mother, then their father, you know kind of

159                                                                                    160

1   going on with his own life.
2        Q.   Did they -- is age 13 about the time that his mother
3   started living on the streets?
4        A.   Yes. I know she lived some with the parents and then
5   would be gone for several days or whatever length of time so
6   she was on the streets, and that's when she would do most of
7   her drinking. And then she would go back to her parents for a
8   brief period of time. So that when she had the boys, she
9   brought them to her parents' house.
10       Q.   Do you know how long that continued?
11       A.   I believe she -- it continued until 1997, I think
12   that's about the time she went into rehab. So for several
13   years.
14       Q.   And that would be basically when she went into
15   Welcome House and that program?
16       A.   Yes.
17       Q.   Now, then, what was -- all three of the siblings were
18   living with their father at that point in time?
19       A.   Yes.
20       Q.   And what kind of care was he providing?
21       A.   Well, he was involved in his own relationship. The
22   boys, the father, the new relationship, they were all sharing
23   the same household. There was limited supervision during that
24   time. And it was also during that time that the boys started
25   having their own families, started having children.

1        Q.   About when would that have been?
2        A.   Wesley was 16 when -- it was a month before he turned
3   17 when his oldest son was born.
4        Q.   And is that Joseph?
5        A.   That's Joseph. And a week after Joseph was born, he
6   dropped out of high school.
7        Q.   Okay, so anything else that would have been
8   particularly formative, say between 13 and 17?
9        A.   Well, I know that's also, as I said when he started
10   developing his own relationships and became involved in a
11   relationship with Crystal. And I believe at one point there
12   he and crystal moved in with her mother for a while.
13       Q.   Okay, Crystal is a person and not a drug?
14       A.   Yes, Crystal is the mother of his first child.
15       Q.   And in regard to that situation, do you know how long
16   he stayed basically at -- in that relationship and it -- let
17   me back up, how long did the relationship between Mr. Ruiz and
18   Crystal last?
19       A.   I don't know that I have that information.
20       Q.   Could you approximate?
21       A.   Well, let's see, he -- I am not sure I can.
22       Q.   All right. Do you know -- do you know when Wes
23   started working full time, if he did?
24       A.   Initially there was some fast food kind of work and
25   then eventually I know he went to a truck driving school and

161                                                                                    162

1   started doing that.
2        Q.   You know about how old he was when that happened?
3        A.   I believe he was about 18 to 20 when he went to truck
4   driving school.
5        Q.   And do you know how long he worked as a truck driver?
6        A.   I believe by 2003, 2004 that was -- he wasn't doing
7   that anymore. I would have to look at my notes, the time line
8   that I have for that. But I know he started having
9   problems -- by that time he was already with Erica and there
10   was a lot of stress in that relationship.
11       Q.   Now, then, if you could give us a short recap in
12   regard to some of the things we have touched on to this point,
13   how is it important in regard to the divorce of his parents,
14   the substance abuse by his mother, the lack of education, and
15   his, I guess for want of a better word, inability to provide
16   adequately for his spouse and child. Are those major points
17   that have affected him up to say year 21?
18       A.   Yes. And then there is the -- I believe his -- one
19   of his first arrest he was with Crystal, they were involved
20   together in a theft or something like that. And then
21   eventually there was a big block of time, '96 to 2004 before
22   there a record of another arrest, and that involved Erica,
23   apparently a fight. So there was a family violence, domestic
24   violence kind of incident there. So he was born into a family
25   that had a long history of alcohol abuse. And the family

1   system collapsed around him as he went to elementary and to
2   junior high school. Started his own family as a very young
3   person, dropping out of high school after his son was born.
4   And then during the time that he met -- began his relationship
5   with Erica, there was one point in there where she was
6   arrested for DWI. So even during the calm person when he
7   wasn't being arrested, there was something going on in the
8   family, his own new family that he was trying to maintain that
9   was, there is some chaos, there is some disfunction going
10   there. And in the meantime his mother -- by this time I think
11   his mother had been to rehab, I believe by 2001, after his
12   relationship with Erica went down hill, that's when his main
13   arrests record begin. And his family, his parents had modeled
14   substance abuse, as well as dealing substances. And that when
15   things are chaotic, that that is more apparent. Because the
16   more chaotic it became with his parents, it become more
17   obvious to him and his brothers that's what going on with
18   his parents. So it is like a modeling that they provided to
19   their sons.
20       Q.   And the modeling in this situation was of alcohol and
21   drug abuse; would that be correct?
22       A.   Alcohol and drug abuse, problematic family
23   relationships, very often tied to the same alcohol and drug
24   abuse.
25       Q.   Okay, this is to -- about 2004, you say that -- or

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1    2004 is when the second set of arrests began; is that correct?
2        A.    According to the records that I have, yes.
3        Q.    And that would be almost contemporaneous with his
4    association with Erica; is that correct?
5        A.    Yes.  That was certainly during their relationship.
6    They had been involved, I think, for a few years before that.
7    And I am not sure if that's when the relationship ended or a
8    long drawn-out leaving or ending of the relationship or not.
9    But the idea here is that, you know, there is an obvious
10   incident that is related to her that then precedes a string of
11   other arrests.
12       Q.    And how many years or months did that string of
13   arrests carry through?
14       A.    Through 2007.
15       Q.    Which would bring us to this case; is that correct?
16       A.    Correct.
17       Q.    Now, then, all of these factors that we have
18   discussed, are basically imposed or -- well, I guess they are
19   imposed by the family unit or the people around him that were
20   acting as a family unit; is that correct?
21       A.    Well, yes, children are embedded in their family
22   unit, that provides the context for them.
23       Q.    None of these arose from a first grade teacher or bad
24   football coach or anything like that?
25       A.    I don't have any information that would suggest

1    anything like that.
2        Q.    That would be rather farfetched, but we are trying to
3    show that some of the factors that are involved with his
4    family -- with him today, obviously came from his family
5    history; is that correct?
6        A.    Correct.
7        Q.    And that's the same with each and every one of the
8    people in this courtroom; is that correct?
9        A.    Correct.
10       Q.    So in some rare instances, they might be molded or
11   whatever by some influence or force other than their family,
12   that is very seldom the case.  And in this case, all of the
13   factors that have come to play to this point in time are
14   family related?
15       A.    Yes.
16       Q.    Is that in any way misstate his situation?
17       A.    No, I mean I think his -- especially with his
18   relationship with Erica wanting to hang on to that
19   relationship and picking a woman who was so dominant in the
20   relationship, that he kind of put himself under her power and
21   stay even though the relationship was chaotic, that just sort
22   of speaks to what he is exposed to with his family of origin,
23   with his parents.  That the relationships are painful, they
24   are chaotic, they are scary, it can be unsafe, and people
25   become emotionally tied in.  And where their brain tell them

---

165

1    they may need to it leave, emotionally they don't leave.
2        Q.    Do you have any -- I will withdraw that question.
3    Would the fact that perhaps one or more of his parents were
4    not only involved in drug use but drug distribution, would
5    that lead to his -- perhaps his involvement in that?
6        A.    Well, they are modeling that type of behavior for
7    him.  His parents are modeling self-destruction, involved in
8    things that are against the law.  Those are two primary
9    negative things that they modeled for him that in a period of
10   crisis he followed that path.
11       Q.    So if you saw all of these factors as they developed
12   to -- to some extent his being involved in drug use and
13   perhaps distribution of drugs would not come as a surprise if
14   you knew the background of his family; would that be a correct
15   statement?
16       A.    That's correct.  Because the strongest protective
17   factor for young people to not become involved in those things
18   is the family.  And so the family is actively opposed to it
19   and they express that, that's the -- statistics show that and
20   the Department of Justice has done studies of that on juvenile
21   and they show they -- the juveniles who transition into young
22   adulthood and continue to use drugs, that the family influence
23   has been identified as one of the greatest.  So if your family
24   is embedded in that and you have a parent who is
25   self-destructing before your very eyes because of substance

166

1    abuse, then potentially you are under much greater risk.
2        Q.    Thank you, Doctor.
3              MR. BRAUCHLE:   We pass the witness.
4                          CROSS-EXAMINATION
5    BY MR. BEACH:
6        Q.    Dr. Kessner, when were you first retained by the
7    Defense in this case, by Mr. Brauchle to come and review this
8    case and potentially testify in this case?
9        A.    I was contacted about a month ago.
10       Q.    Thirty days ago?
11       A.    Approximately, I can look it up and give you the
12   date.
13       Q.    This is July the 9th, 2008; is that correct?
14       A.    Approximately.
15       Q.    And the jury found this defendant guilty I believe on
16   June the 4th; is that right, were you contacted before or
17   after this jury found the defendant guilty?
18       A.    Let me see if I have anything that indicates that
19   date, right about that time, but I couldn't tell you if it was
20   the day before or the day after.
21       Q.    And you have testified many times in these
22   death-penalty punishment phase cases in Dallas County and
23   other counties in the State of Texas; is that correct?
24       A.    Yes.
25       Q.    Testified many times for these lawyers, Mr. Parks and

1   on occasion Mr. Brauchle; is that correct?
2      A.   Yes, a couple of times each, probably.
3      Q.   It is not the usual practice to be called in on a
4   case after a defendant has been found guilty of capital murder
5   based on your experience, is it?
6      A.   It is not typical, but it has happened on
7   occasionally.
8      Q.   You would much rather had been called in on this case
9   March 23rd, 2007, the day after Mark Nix was murdered to
10   fully investigate this case and sufficient time to talk to
11   whoever you could talk to, right?
12      A.   That's the preferred way.
13      Q.   Were you kind of -- are you kind of a pinch hitter in
14   this case, was somebody before you involved in this case that
15   came out of it?
16      A.   I have no idea.
17      Q.   You never talk to Dr. Edward Nase on this case about
18   his investigation?
19      A.   No, I did not.
20      Q.   Let's talk about what we can agree on, Dr. Kessner,
21   this defendant, Wesley Ruiz, he is not mentally retarded, is
22   he?
23      A.   No -- well, I have not evaluated him.  But the
24   information that I have indicates to me that he is not.
25      Q.   He does know the difference between right and wrong;

1   is that correct?
2      A.   Again, I haven't evaluated him, so the Court would
3   make that determination.
4      Q.   Well, you are not aware of any notice of insanity in
5   this case where the defendant was claiming insanity?
6      A.   I am not aware of any such thing.
7      Q.   And you have found no evidence that Wesley Ruiz was
8   physically abused at nighttime in his life growing up?
9      A.   I have not found anything that would speak to that.
10      Q.   You have not found any evidence, Doctor, that Wesley
11   Ruiz was sexually abused?
12      A.   I don't have any information on that; but, no, I
13   haven't heard anything about that.
14      Q.   And in the 30 days or so that you had to get up to
15   speed to testify in this death-penalty case, who did you have
16   time or find time to talk to?
17      A.   I spoke with his mother, Barbara Ruiz.  I spoke with
18   his grandmother, Susan -- Sue Ziegenhain; his step
19   grandfather, Mr. Ziegenhain; and Erica's father, I think his
20   name is David Rivera, I have to look and see, I think that's
21   his name, yes.
22      Q.   Barbara Ruiz, Barbara's parents, Sue and Richard
23   Ziegenhain, and Erica's father?
24      A.   Yes.
25      Q.   Anybody else?

169

1      A.   And the defense team.
2      Q.   The Defense team being lawyers?
3      A.   And their investigators.
4      Q.   How much time have you spent with the defendant in
5   this case?
6      A.   I have never met him.
7      Q.   Do you know who he is here in the courtroom?
8      A.   Sitting over here next to Mr. Brauchle.
9      Q.   By process of elimination?
10      A.   I have seen his photograph.
11      Q.   How much time have you spent reviewing letters
12   Mr. Ruiz would have written to various girlfriends, family
13   members from jail?
14      A.   Well, I have reviewed a considerable amount of
15   records, and there were some letters included in that.  But
16   how much time on the letters themselves?
17      Q.   Yes, ma'am.
18      A.   I couldn't say how much time on the letters
19   themselves.
20      Q.   How about audio recordings of phone calls made by
21   Mr. Ruiz from jail?
22      A.   I have not been given those.
23      Q.   They were not provided?
24      A.   Right.
25      Q.   What about the in-car video tape of the chase, you

170

1   looked at that?
2      A.   I have seen that.
3      Q.   Have you talked to Raul Toledo?
4      A.   No.
5      Q.   Joe Ramos?
6      A.   No.
7      Q.   Hector Martinez?
8      A.   No.
9      Q.   In the numerous cases that you have testified in in
10   penalty phase of death-penalty cases, there have been many
11   times that you have been asked to address the defendant's --
12   the probability of capital defendant who has been convicted by
13   a jury being a continuing threat to society; is that correct?
14      A.   In past in some cases, yes.
15      Q.   You were not asked to do so in this case?
16      A.   Correct.
17      Q.   You are not here to tell this jury or shed any expert
18   opinions, any suggestions or give them any guidance at all as
19   to question number one in this case whether or not this
20   defendant is going to be a continuing threat no matter where
21   he is in society?
22      A.   That's correct.
23      Q.   And you have done that before; is that correct?
24      A.   In other cases.
25      Q.   You have always testified for the Defense; is that

1    correct?
2        A.    I believe so, yes.
3        Q.    Would you agree with me, Doctor, since you have not
4    spent a single second in the presence of Wesley Ruiz that
5    these 13 people over here who off and on for about three weeks
6    now have had a chance to observe him, to listen to him
7    testify, to hear evidence about him, are in much better
8    position to make the determination as to whether or not there
9    is sufficient mitigating circumstances to spare him; would you
10   agree with me?
11       A.    I would agree that that is their decision to make.
12       Q.    They are in much better position than you, because
13   you have never spent two seconds in his presence, have you?
14   You have never talked to him, you have never observed him,
15   observed his demeanor; is that right?
16       A.    That's correct, I have never observed him.
17       Q.    Well, you saw his car speeding down Bernal and you
18   saw the mussel flash coming from inside that car, but other
19   than that, you have never observed Wesley Ruiz in action, have
20   you?
21       A.    No. It was on the news, but I don't think just
22   sitting in the courtroom while he was on the news.
23       Q.    The jury --
24              MR. BEACH:   May I approach, Judge?
25              THE COURT:   You may.

1        Q.    (By Mr. Beach)  For considerable length of time, the
2    jury got to look at all these photographs of Wesley Ruiz's
3    horrible upbringing.  Have you seen these photographs?
4        A.    Yes, I have.
5        Q.    Obviously there were some moments and Ms. Ziegenhain
6    testified she could have brought boxes of happy photographs of
7    some moments in this man's upbringing that were pleasant; is
8    that correct?
9        A.    Correct.
10       Q.    We are all made up -- as individuals, we are made up
11   of various parts; is that correct?
12       A.    That's one way to put it.
13       Q.    Kind of like instruments in a band, right we have an
14   intellect, we have our emotions, we have our physical body and
15   we have our heart, don't we?
16       A.    Yes.
17       Q.    And depending on who the conductor of those
18   instruments are, depending on who is directing those
19   instruments, we have an opportunity everyday to use those
20   instruments for good or for evil, don't we?
21       A.    Everyone has choices to make.
22       Q.    Lightness, darkness, we have those choices, we have
23   those abilities, don't we, it is that stark a contrast.
24   Everyday we have that opportunity to offer ourselves up in
25   that way?

173

1        A.    I would say sometimes the choices to the individual
2    may not be so apparent, but to outsiders they may seem
3    apparent.
4        Q.    And as Wesley Ruiz wrote to his grandfather, he
5    understood that his bad decisions had landed him where he was,
6    and those grandparents were always there for him?
7        A.    That's a reasonable statement.
8              MR. BEACH:   That's all I have, Judge.
9                   REDIRECT EXAMINATION
10   BY MR. BRAUCHLE:
11       Q.    Doctor, I want to clear up a misimpression that has
12   been left by Mr. Beach's cross-examination.  First off, I am
13   not the person that hired you, it was one of the other people
14   on the defense team.  But at the time that you were hired, all
15   of the research in regard to his school records, medical
16   records, family chronology, all of the things that you have
17   come down here and talked about today had already been
18   provided to you; is that correct?
19       A.    Yes, it had all been completed and was provided to
20   me.
21       Q.    And those were the records that you went from to
22   reach the conclusions that you have testified here today; is
23   that correct?
24       A.    Yes.
25       Q.    And then you supplemented that to some extent by

174

1    going out further and talking to the people you told Mr. Beach
2    about; is that correct?
3        A.    Correct.
4        Q.    So you were aware of his school history, his criminal
5    history, his family history, the history of his parents, his
6    grandparents, his siblings, all of the things that you
7    normally have to start off from square one and go out and
8    develop on your own, those were all provided for you hours or
9    minutes after you agreed to come on board; is that correct?
10       A.    Correct.
11       Q.    And in your own mind, do you have more than enough
12   information about Mr. Ruiz and his family background as well
13   as his social background to make -- form and to give the
14   opinions that you have given here today; is that correct?
15       A.    Correct.
16       Q.    In other words there is no nagging doubt about, well,
17   I didn't get to talk to so-and-so or nobody talked to
18   so-and-so, or this, that and the other, you were provided all
19   the information that you needed or felt that you needed to
20   come into court and testify to these people; is that correct?
21       A.    That's correct.  I don't see any reason to qualify my
22   opinion.  I feel like I had the information that I needed.  If
23   I didn't have the information, I would have to qualify my
24   opinion.
25       Q.    Well, there were areas that you thought that you

1  needed some slight additional information and in fact you went
2  out and got that, didn't you?
3      A.   Yes, I interviewed some individuals.
4           MR. BRAUCHLE:   We will pass the witness.
5                    RECROSS-EXAMINATION
6  BY MR. BEACH:
7      Q.   Doctor, there is quite a documented record of --
8  obviously of transcripts from trials you have previously
9  testified in, you are aware of that; is that correct?
10     A.   Yes.
11     Q.   You still have a cap in terms of how much you can
12 charge in a case?
13     A.   A cap.
14     Q.   You know a maximum amount that you can charge out?
15     A.   No.
16     Q.   Previous cases you have like $7400 cap?
17     A.   No, there has been --
18          MR. BRAUCHLE:   Your Honor, we would object to
19 this on relevance.
20          THE COURT:   Overruled.
21     Q.   (By Mr. Beach)  How much have you been paid in this
22 case?
23     A.   I haven't been paid anything yet.
24     Q.   How many hours have you billed in this case?
25     A.   I have given one intern billing for -- let me see if

1  I can find it 2,691 and 62 cents.
2      Q.   Okay.  And what is that up to, week ago, two week
3  ago?
4      A.   630 a week.
5      Q.   I'm sorry?
6      A.   June 30th, '08.
7      Q.   And how much are you charging an hour now?
8      A.   Two hundred.
9           MR. BEACH:   That's all, Judge.
10          MR. BRAUCHLE:   We will pass the witness.
11          THE COURT:   You may step down, ma'am.
12          MR. BRAUCHLE:   May she be excused?
13          MR. BEACH:   No objections.
14          THE COURT:   You are free to go, ma'am?
15          THE WITNESS:   Uh-huh.
16          THE COURT:   Your next witness, Mr. Brauchle.
17          MR. BRAUCHLE:   I have to go check on the
18 availability of that witness with the leave of the Court.
19          (Pause in the proceedings.)
20          MR. BRAUCHLE:   May we approach Your Honor?
21          THE COURT:   You may.
22          (Following proceedings were had at the Bench.)
23          MR. BRAUCHLE:   We have two more witnesses, one
24 of which I have interviewed that person before today and again
25 today.

---

1       The witness that I anticipate putting on right now, I
2  have never laid eyes on and I haven't talked to her.  She just
3  got here for some reason, there has been some breakdown there,
4  if I could talk to her for about ten or 15 minutes, we will be
5  ready to proceed, produce all of our witnesses.  And we would
6  also be able to determine whether we are going to rest and
7  close today.
8           THE COURT:   Okay, do you want to do them in that
9  order, the one you haven't spoken with.
10          MR. BRAUCHLE:   From all information that was
11 given to me that we thought that that woman would be better in
12 that position, I am just asking for about 15 minutes.
13          MR. BEACH:   Judge, if at all possible we have
14 these guys here from Austin that we need to get on today.  I
15 don't care if we have to go to six in the evening.
16          MR. BRAUCHLE:   Unless Wesley testifies, he
17 hasn't decided.
18          THE COURT:   Okay, we will take a recess.
19          MR. BRAUCHLE:   They are both going to be shorter
20 than anybody that has come along.
21          THE COURT:   Okay.
22          MR. BRAUCHLE:   One of them is going to be the
23 father-in-law.  The other person I need to talk to.
24          (End of Bench Conference.)
25          THE COURT:   Ladies and gentlemen, we are going

---

1  to take about a 15-minute break.
2           THE BAILIFF:   All rise.
3           (Jury retired from the courtroom.)
4           THE COURT:   You may be seated.
5           (Recess taken.)
6           MR. BRAUCHLE:   Your Honor, we will call
7  Katherine Drake.
8           THE COURT:   Is this outside the jury's presence?
9           MR. BRAUCHLE:   This is their witness, they are
10 evidently abandoning their plan, in the interest of progress
11 we are going to go forward.
12          THE COURT:   That will work.
13      If you will raise your right hand, ma'am.
14          (Witness was duly sworn.)
15          THE COURT:   You may be seated.
16          (Witness complies.)
17          THE BAILIFF:   All rise.
18          (Jury returned to the courtroom.)
19          THE COURT:   You may be seated.
20     Mr. Brauchle, you may call your next witness.
21          MR. BRAUCHLE:   We would call Katherine Drake.
22 This witness has already been sworn.
23                    KATHERINE DRAKE
24 was called as a witness, and having been duly sworn by the
25 Court, testified under oath as follows:

**DIRECT EXAMINATION**

BY MR. BRAUCHLE:

1  Q.  State your name, please.
2  A.  Katherine Drake.
3  Q.  How are you employed?
4  A.  I'm a manager at Park Highland Townhomes on Ferguson Road.
5  Q.  And that's on Ferguson Road?
6  A.  Yes, it is.
7  Q.  That's in East Dallas; is that correct?
8  A.  Yes.
9  Q.  How long have you been apartment manager out there?
10  A.  Fourteen years.
11  Q.  Now, did you know the person seated to my left?
12  A.  Yes.
13  Q.  And who would that be?
14  A.  Wesley Ruiz.
15  Q.  Now, did you meet him through your job as an apartment manager?
16  A.  Yes.
17  Q.  Was he a tenant of those apartments at some point in time?
18  A.  Three different times, I think starting in 2000.
19  Q.  Okay.  So starting in 2000, he was a resident of the apartments that you managed three different times?

1  A.  Yes.
2  Q.  Is that correct?
3  A.  Yes.
4  Q.  And that was three one year leases?
5  A.  Yes.
6  Q.  Now, each of the times that he stayed there, was he with Erica?
7  A.  Yes.
8  Q.  And they had either a common-law or a civil marriage; is that correct?
9  A.  Yes.
10  Q.  Now, then, the first time that they stayed there, you think would have been about 2000 to 2001?
11  A.  Yes.
12  Q.  And did they have any children at that point in time?
13  A.  I think they had one son at that time.
14  Q.  And was that Wesley, Jr.?
15  A.  Yes.
16  Q.  Now, then, so they were residents there from 2000 to 2001, was there any problem with Wesley and Erica during that one year period?
17  A.  No, none.
18  Q.  Would they probably be classified as ideal tenants?
19  A.  Yes.
20  Q.  Now, then there is another Ruiz that lives there and

---

1  has lived there for quite sometime; is that correct?
2  A.  Barbara, his mother.
3  Q.  And she is here in the courtroom today, right?
4  A.  Yes, she is.
5  Q.  But she has lived there continuously?
6  A.  Yes.  She has been there almost as long as I have -- I guess about five or six years.
7  Q.  All right.  Now, Wesley and Erica came back and lived at the apartments in 2003 to 2004; would that be correct?
8  A.  Approximately, yes.
9  Q.  And they had two sons then?
10  A.  Yes.
11  Q.  And the Ruizes at that point in time, meaning Wesley and Erica were not quite as ideal tenants as they were previously; is that a correct statement?
12  A.  The second time they came, they were having some problems, I believe.  And, ah, but they weren't just what you call bad tenants either.
13  Q.  The problems that they had were basically some altercations between Erica and Wesley; would that be correct?
14  A.  It was just marital problems like anybody else.
15  Q.  And those marital problems were loud arguments that may or may not have resulted in physical violence; is that correct?
16  A.  I never saw any physical violence.

1  Q.  You had reason to believe that there had been some from time to time?
2  A.  Well, not the second time that they stayed there.
3  Q.  Okay.  Now, then, in each -- the third time then that they stayed there was 2005 to 2006?
4  A.  Yes, somewhere along in there.
5  Q.  They still had two sons?
6  A.  Yes.
7  Q.  And Erica and Wesley were getting along worse than before; is that correct?
8  A.  Yes, yes.
9  Q.  Now, then, how would you characterize Wesley, both as a tenant and as a person?
10  A.  All three times I would characterize him as a very mannerable young man.
11  Q.  Mannerable?
12  A.  Yes, very nice.
13  Q.  Did he give you respect?
14  A.  Yes, he did.  And he gave the other tenants respect.
15  Q.  How about the property?
16  A.  I have a low tolerance.  I have no drinking, no drugs, no hanging out, no sitting on the stairs or breezeways, and no loud music when you come in.
17  Q.  I bet you don't enforce that, do you?
18  A.  Yes, I do.

1   Q.   Okay.

2   A.   Because I live there. And he understood that, that's

3   the way it was. So when his visitors would come, he would

4   make them respect that as well. I never had any problems with

5   him, hanging out, drinking out, no drugs, no -- he just -- he

6   was very respectful, yes, he was.

7   Q.   Now, then, in regard to his relationship with Erica,

8   did he seem to be the passive or the nonaggressive one in

9   that?

10   A.   The passive.

11   Q.   And was he also nonaggressive?

12   A.   As far as I knew, he was.

13   Q.   Well, you don't have any reason to think that he was

14   the one that was causing the trouble between them, do you?

15   A.   No.

16   Q.   Now, then, you also know that at some point in time

17   after he was arrested, Erica came over there and attacked

18   Barbara; is that correct?

19   A.   Yes.

20   Q.   And she did that with her sister?

21   A.   Yes.

22   Q.   And that was some squabble over the Ruiz children?

23   A.   Yes.

24   Q.   You are a witness to that, there was a window broken

25   out; is that correct?

---

1   A.   Yes, yes. They came over and she was keeping the

2   children during that time. Babysit. And they came over and

3   just argued and physically pushed upstairs in the doorway.

4   And threw something up and broke the window.

5   Q.   Okay. The person that pushed Barbara, would have

6   been Erica; is that correct?

7   A.   I believe it was.

8   Q.   Okay. They came over there because Barbara had

9   Wesley's kids at that time?

10   A.   She was keeping them, she always babysat for them.

11   Q.   Is there anything that you would like to tell this

12   jury in regard to your relationship with Mr. Ruiz or whatever

13   you think about Mr. Ruiz?

14   A.   Was hard to believe when I saw it on television,

15   cause he was a nice young -- I just couldn't believe it, and

16   the rest of the tenants couldn't either. One of my

17   maintenance man saw it, he came over --

18        MR. BROOKS:   Objection, hearsay.

19        THE COURT:   Sustained.

20        THE WITNESS:   Okay.

21   A.   But it was just hard to believe, even when I saw his

22   picture. Because he was the type of young man that would do

23   anything that you asked him to do, even for the neighbors.

24   And there was this one night one of his neighbor's car was

25   about to be towed in and he went over and knocked on the door

---

185

1   and said come out, your car is about to be towed in. I just

2   couldn't -- I couldn't believe it.

3   Q.   (By Mr. Brauchle)  You obviously had opportunity to

4   see him around his children; is that correct?

5   A.   Yes.

6   Q.   Did you -- what would you say -- how was he as a

7   father?

8   A.   He babysat a lot. And he is good with his children.

9   Q.   Okay, the last altercation you observed between

10   Wesley and Erica was one in which he was trying to keep her

11   from driving off; is that correct?

12   A.   Yes. And they were out in the parking lot, and I

13   came out to see what the noise was, because it is a small

14   complex. And when I came out, she was in the car. And I came

15   out and said, "Wesley, you know I don't allow this." And he

16   said, All right, Ms. Katherine, he said we will stop. And she

17   took off. And when she took off, he ran behind her -- behind

18   that car across the yard calling, "Erica, I love you, Erica I

19   love you, Erica I love you." And he was running all the way

20   down the road behind her.

21   Q.   What did you think of that?

22   A.   I wish I had a man that would love me like that. I

23   thought, you know, he was just -- he was just in love with

24   her.

25        MR. BRAUCHLE:   We will pass the witness.

---

186

1        THE COURT:   Cross-examination.

2        MR. BROOKS:   No questions, Your Honor.

3        THE COURT:   Thank you, ma'am. You may step

4   down.

5        THE WITNESS:   Okay.

6        MR. BRAUCHLE:   May she be excused, Your Honor?

7        MR. BROOKS:   No objection.

8        THE COURT:   You are free to go, ma'am.

9        MR. BRAUCHLE:   We will call David Rivera.

10        (Witness entered the courtroom.)

11        THE COURT:   If you will raise your right hand,

12   sir.

13        (Witness was duly sworn.)

14        THE COURT:   You may put your hand down.

15   You may proceed, Mr. Brauchle.

16        DAVID RIVERA

17   was called as a witness, and having been duly sworn by the

18   Court, testified under oath as follows:

19        DIRECT EXAMINATION

20   BY MR. BRAUCHLE:

21   Q.   State your name, sir.

22   A.   Willie David Rivera.

23   Q.   How old are you?

24   A.   Excuse me?

25   Q.   How old a man are you?

---

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*

1    A.    Fifty-two.
2    Q.    And where do you live?
3    A.    2527 Pine Bluff.
4    Q.    And what part of town is that in?
5    A.    That's in East Dallas.
6    Q.    East Dallas?
7    A.    Yes.
8    Q.    All right.  I will ask you if you have had occasion
9    to become acquainted with the person seated to my left?
10   A.    Yes.
11   Q.    And what is he to you?
12   A.    He is the father of my grandchildren.
13   Q.    I guess, would he be considered your son-in-law?
14   A.    I consider him more as a son.
15   Q.    Now, then, the Erica that this jury has heard about
16   is your daughter; is that correct?
17   A.    That is correct.
18   Q.    So you are Erica Rivera's father, David Rivera; is
19   that correct?
20   A.    That's correct.
21   Q.    How long have you known Wesley Ruiz?
22   A.    Approximately ten years.
23   Q.    And do you have a business?
24   A.    Yes.
25   Q.    What is the name of that?

---

1    A.    David Rivera Services.
2    Q.    And what kind of work do you do at David Rivera
3    services?
4    A.    Commercial construction.
5    Q.    And what does that basically consist of?
6    A.    Demolition, painting, tape bedding, bill back, dry
7    wall.
8    Q.    So putting in and taking out offices and things like
9    that?
10   A.    Correct.
11   Q.    Now, then, when you first met Wesley, what did you
12   think of him?
13   A.    Well, he was quiet, and I didn't like him.
14   Q.    Why didn't you like him?
15   A.    Cause I didn't think he was good enough for my
16   daughter.
17   Q.    Fathers are kind of like that, aren't they?
18   A.    Yeah.
19   Q.    Now, then, did he ever start working for you?
20   A.    Yes, he did.
21   Q.    How long ago or how long after you met him would that
22   have been?
23   A.    Oh, gosh, after him and my daughter got together, she
24   came to me and asked me if -- had any work for him, and I told
25   him I would give him a try.

---

189

1    Q.    So would that have been say within a year after you
2    met him or --
3    A.    Yes.
4    Q.    -- six months?
5    A.    About six months.
6    Q.    So if you have known him ten years, that would be a
7    little over nine years ago, right?
8    A.    That's correct.
9    Q.    Now, then, did he catch on pretty quick?
10   A.    Yeah, he is pretty intelligent I think.
11   Q.    And did he learn your trade or what you were doing in
12   regard to working these buildings?
13   A.    Yes, sir.
14   Q.    How quickly did he do that?
15   A.    He learned pretty fast.  And I would say within six
16   months.
17   Q.    Okay, did you -- so he was able to tape and bed and
18   do whatever was needed within six months?
19   A.    Yes.  I even put him running a crew.
20   Q.    Okay, how many people would be in a crew, usually?
21   A.    Well, we would split the crews up, usually about
22   four.
23   Q.    Okay, and he would be in charge of the people that
24   were out there doing whatever was being done that day?
25   A.    What was required to be done, yes.

---

190

1    Q.    And you trusted him enough to not only give him a
2    job, leave him alone, but also put him in charge of a crew?
3    A.    Yes.
4    Q.    Now, within the last three years, were there -- were
5    you still around Wesley?
6    A.    Yeah, just not as much.
7    Q.    And did you have some feeling as to what -- pardon --
8    what was happening between Wesley and Erica?
9    A.    Yeah.  You could tell they were starting to have
10   problems.
11   Q.    And did you know what to attribute those problems to?
12   A.    Not necessarily at the time I didn't, but I believe I
13   do now.
14   Q.    What do you believe was the problem?
15   A.    I believe it was the drugs now that caused the
16   problems.
17   Q.    Okay.  Now, that as far as you seeing Wesley, over
18   the past three years -- pardon me again -- they have had
19   problems, how did that affect Wesley coming around or Wesley
20   seeing you?
21   A.    Well, it didn't really affect him coming around
22   because he was always welcome at my house and they do have the
23   two kids together.  And I just, you know, I didn't want to
24   cause any problems with him and the kids, because I know what
25   it is like to grow up without parents.

1    Q.   Okay, let's go back.  At one time Wesley and Erica
2  lived next door to you; is that correct?
3    A.   That's correct.
4    Q.   And that would have been -- would that have been over
5  on Pine Bluff?
6    A.   No.  That was on Saint Charles.
7    Q.   Okay.  And how long did they live next door to y'all?
8    A.   I am going to say probably a couple of years.
9    Q.   Okay, obviously from being around him in family
10  situations, children situations and somebody actually living
11  next door to you for that period of time, you -- would you say
12  you got to know him fairly well?
13    A.   I felt like I knew him pretty well.
14    Q.   How would you characterize him?
15    A.   He was a hardworker.  He took care of his family.  It
16  is not to say they didn't have problems, but he worked hard
17  and he took care of his family.  He never missed work cause he
18  didn't want to go to work because that was something seemed
19  like he knew he had to do.
20    Q.   Now, Erica and their children are living with you
21  now; is that correct?
22    A.   That's correct.
23    Q.   In regard to Erica and Wesley, did you ever see
24  arguments or altercations between them?
25    A.   Yeah, I have seen them argue, but physically, I never

1  saw anything physically.
2    Q.   Did your daughter Erica seem to be the instigator of
3  most of these things or could you tell?
4    A.   Yeah, she has got a short temper.  She goes off
5  pretty fast.  I mean, I have had to tell her, you know, you
6  can't do this out here, you need to stop, cause she would
7  chase him down the street.  Cause he would actually leave if
8  it got too strong, because -- not only that, he would know --
9  he knew that I wouldn't put up with him being physical towards
10  her.
11    Q.   So would he just walk away?
12    A.   He would walk or take off running or leave in the
13  car.
14    Q.   However fast he needed to get away from her?
15    A.   From her.
16    Q.   Would you characterize him as being nonviolent?
17    A.   I have never seen him violent or heard of him being
18  violent until this incident with Officer Nix.
19    Q.   I would assume that you probably never in a million
20  years thought you would end up where you are now.  Is there
21  anything that you would want to tell this jury that you think
22  they should know about Wesley?
23    A.   Well, he was a good father.  He loved his kids, and
24  he still loves them.  My grandsons are the ones that have to
25  live through this right now, and it is hard on them,

---

193

1  especially the oldest one.  He wrote a letter about two months
2  ago saying --
3        MR. BROOKS:   Your Honor, I am going to object to
4  any hearsay testimony by this witness.
5        THE COURT:   Sustained.
6    Q.   (By Mr. Brauchle)  You can't tell what the letter
7  said.  You can tell what your son -- your -- pardon me, your
8  grandson did in writing the letter.  But you can't tell what
9  he said -- I am sure I confused you with that, but go ahead.
10    A.   Yeah.  My grandson brought me the letter and he was
11  going to mail it to his dad.  I don't know if I can say this,
12  but he thinks his dad is getting out.  And you see these boys,
13  you wouldn't know how precious they are, because the oldest
14  one looks just like his dad and he's kind of put everything
15  inside of him and he won't let it outright now.  It is very
16  hard on him.  But if anything, you know these boys need their
17  dad, even if he has to spend the rest of his life in the
18  penitentiary, they need to know what their dad has done and to
19  be there so they won't make the same mistakes.  He can tell
20  them, Look, you see what happens when you do something wrong.
21  I mean, I will do anything for these kids.
22    Q.   Thank you, sir.
23        MR. BRAUCHLE:   We will pass the witness.
24
25        (No omissions.)

---

194

1                   CROSS-EXAMINATION
2  BY MR. BROOKS:
3    Q.   Mr. Rivera, was -- strike that.  Wesley Ruiz wasn't
4  working for you back on March the 23rd when he shot and
5  killed Mark Nix, was he?
6    A.   No, sir.
7    Q.   And back in the year 2004, you are aware of the
8  situation where he is going over 70 miles an hour down regular
9  two-way streets, running red lights, running stop signs with
10  your daughter in the car?
11    A.   I recall them having a wreck, yes.
12    Q.   Did you know the details of that wreck?
13    A.   Not everything, no.
14    Q.   Did you know the police were responding to a call
15  about shots fired and was following his car?
16    A.   No.
17    Q.   And he took off at over 70 miles an hour, wouldn't
18  stop?
19    A.   I didn't know that.
20    Q.   Flashing lights behind him?
21    A.   I didn't know that.
22    Q.   He ran into another car, people minding their own
23  business?
24    A.   I understand they had a wreck involved with another
25  car, yes.

1    Q.   Did you know that he -- and your daughter was in the
2    car?
3    A.   Yes.
4    Q.   He got out of the car, took off running, did you know
5    that he jumped out of the car, took off running?
6    A.   No.
7    Q.   He didn't stop, check to make sure that your daughter
8    was okay or not hurt?
9    A.   I was not there.
10   Q.   Isn't that the type of thing you would have expected
11   him to do, though?
12   A.   Yes.
13   Q.   State's Exhibit No. 161, is this your daughter's gun?
14   A.   I have never seen that gun before.
15   Q.   Were you aware that gun was found in the car?
16   A.   No.
17   Q.   After that wreck. State's Exhibit 63, is this your
18   daughter's?
19   A.   I have never seen this before either.
20   Q.   It is kind of a scary looking gun, isn't it?
21   A.   It looks like a paint gun to me.
22   Q.   Rest assured it is not?
23   A.   Okay.
24   Q.   This is what was used to kill Mark Nix. But it is
25   your testimony that this man is not a violent person?

---

1    A.   I have never seen no violence out of him except what
2    I heard on the news.
3         MR. BROOKS:   Thank you, sir.   I pass the
4    witness.
5         MR. BRAUCHLE:   We have nothing further.
6         THE COURT:   You may step down, sir.   Thank you.
7         MR. BRAUCHLE:   May this witness be excused?
8         MR. BROOKS:   No objections.
9         THE COURT:   You are free to leave, sir.
10        MR. BROOKS:   Judge we have a witness that is
11   going to be put on out of order.
12        MR. BRAUCHLE:   What we previously talked to the
13   court about putting a witness out of order has now rolled back
14   around.
15        THE COURT:   Very well.
16        (Witness entered the courtroom.)
17        MR. WHITTIER:   This witness has not been sworn,
18   Judge.   We call Ken Crawford.
19        THE COURT:   Raise your right hand, sir.
20        (Witness was duly sworn.)
21        THE COURT:   You may take the stand.
22   You may proceed, Mr. Whittier --
23        MR. BRAUCHLE:   Your Honor, we have advised the
24   Court that we would request a hearing outside the presence of
25   the jury.

197

---

1         THE COURT:   Sheriff if you will take the jury
2    outside for about --
3         THE BAILIFF:   Yes, sir.
4    All rise.
5         (Jury retired from the courtroom.)
6         THE COURT:   You may be seated.
7    You may proceed.
8              KENNETH CRAWFORD
9    was called as a witness, and having been duly sworn by the
10   Court, testified under oath as follows:
11             SUB ROSA EXAMINATION
12   BY MR. WHITTIER:
13   Q.   Tell us your name, sir.
14   A.   Kenneth Crawford.
15   Q.   And how old are you, Mr. Crawford?
16   A.   Fifty-seven.
17   Q.   And you were born and raised in Texas?
18   A.   Yes.
19   Q.   What do you do for a living?
20   A.   I'm a forensic document examiner for the Texas
21   Department of Public Safety Crime Laboratory in Austin.
22   Q.   Okay.   And are you new or are you a veteran in that
23   area?
24   A.   I have been in the field 31 years.
25   Q.   And what training or education do you have that

---

198

1    qualifies you for what you do?
2    A.   My formal education is undergraduate degrees in
3    zoology and biology from the University of Texas at Austin.
4    In the field of forensic document examination, most of our
5    education and training is conducted in the laboratory under
6    the -- under the senior examiners in that department.   And
7    this is supplemented by various seminars and schools that are
8    conducted around the country by forensic science
9    organizations.
10   Q.   Okay.   And do you -- in your -- this area in which
11   you work question documents, do you engage in continuing
12   education in that area?
13   A.   Yes, sir, I do.
14   Q.   And is that lab accredited according to the Texas
15   Government Code?
16   A.   Yes, sir, it is.
17   Q.   And who is accredited by?
18   A.   The American Society of Crime Laboratory Directors.
19   Q.   Okay.   Describe generally what the question document
20   section of the DPS. does?
21   A.   The question document section of the crime laboratory
22   examines any type of document that is involved in a crime for
23   such things as identification or elimination of a writer of
24   questioned handwriting or any of a number of other types of
25   analysis of documents which may involve, for instance,

1   analysis and comparison of inks examination and restoration of
2   obliterations, restoration of any type of altered document,
3   such as a charred document or one that has been erased or
4   otherwise altered. And generally any type of examination or
5   analysis that may provide information to an investigator in a
6   criminal matter.
7       Q.   Okay. You were contacted by -- your office was
8   contacted by myself regarding the examination of obliterations
9   in certain letters that we provided to you; is that correct?
10      A.   That is correct.
11      Q.   And you went about that task or your lab went about
12  that task in several different ways; is that correct?
13      A.   Yes.
14      Q.   Okay. And describe the various ways in which you-all
15  examined these documents?
16      A.   We examined those documents for purposes of
17  handwriting comparison and restoration of obliterations. The
18  restoration of obliterations use standard instrumentation that
19  we use for examining under writing by illumination and
20  filtering of light sources to determine the wavelengths that
21  would permit transmittance through the obliteration.
22              MR. BRAUCHLE:  I'm sorry, could you state the
23  last part of your last statement.
24      A.   If I remember correctly, I was stating that we use
25  instrumentation that is designed specifically for examination

1   of obliteration with the use of different light sources and
2   filtration devices that permit transmittance through
3   obliterating ink.
4       Q.   (By Mr. Whittier)  The methods that you-all use in
5   this lab, are they established science in the community of
6   scientist that do what you do?
7       A.   Yes, these are standard procedures in the field.
8       Q.   Okay. The procedures that you-all perform have been
9   established over the course of how many years that you are
10  aware of?
11      A.   The instrumentation we use has been in the --
12  available in some form for at least 30 years.
13      Q.   Okay. Have you been qualified as a person trained
14  and skilled in the use of that instrument in other counties in
15  this state?
16      A.   Yes, I have.
17      Q.   On few or many occasions?
18      A.   Many occasions.
19      Q.   Okay. And you have testified in district court in
20  various kinds of trials regarding your findings with that kind
21  of instrumentation?
22      A.   Yes.
23      Q.   Besides the lab at the Department of Public Safety,
24  does the FBI or other law enforcement use this type of
25  instrumentation?

1       A.   Yes, they do.
2       Q.   And have you received training at various times
3   through the years that -- from people from the FBI and other
4   agencies around the country and around the world?
5       A.   Yes, I have trained at FBI.
6       Q.   In fact it is true, is it not, that other law
7   enforcement agencies in Europe, as well as Canada, use this
8   type of instrumentation?
9       A.   Yes.
10      Q.   In answer to the same types of questions?
11      A.   Yes.
12      Q.   And those documents and those examiners have been
13  permitted to reveal their results in courts of law in those
14  countries as well?
15      A.   I believe they have.
16      Q.   Have you ever been called to testify for the purposes
17  of the Daubert hearing?
18      A.   No I have not.
19      Q.   And other courts have not required you to engage
20  in --
21              MR. BRAUCHLE:  Your Honor, we would object to
22  what other courts may or may not.
23              THE COURT:  Sustained.
24      Q.   (By Mr. Whittier)  And you have been called as an
25  expert in this field in other cases?

1       A.   Yes, I have.
2       Q.   And how many different times have you done that?
3       A.   I have testified in the field of document examination
4   over a hundred times over my career. Many of those times have
5   involved eco-analysis or other uses of this instrumentation.
6       Q.   Okay.
7              MR. WHITTIER:  We will pass the witness.
8              SUB ROSA EXAMINATION
9   BY MR. BRAUCHLE:
10      Q.   Mr. Crawford, you talked about use of this
11  instrumentation and instrument and what have you, what is this
12  instrument?
13      A.   It is called a video spectral comparator.
14      Q.   Who makes it?
15      A.   It is made by a company called Foster and Freeman, it
16  is a British company.
17      Q.   And you have never testified before in regard to
18  obliteration of document; is that correct?
19      A.   I have testified about obliterated documents, yes.
20      Q.   How many times?
21      A.   Not many times on that specific application.
22      Q.   And you stated that people in other states you only
23  believe that they have been able to testify, you don't know of
24  any states or any other courts that have ever allowed this
25  type of testimony?

1    A.    Well, I read the manufactures newsletter on a regular
2  basis, they would have reported such an incident if it had
3  occurred.
4    Q.    They are kind of -- so you think the fact that no
5  instances of their instrument not being able to be used would
6  be sent out in their newsletter; is that what you are going
7  by?
8    A.    I believe they would disclose that if that was a
9  problem.
10   Q.    But you have no idea whether they would or wouldn't?
11   A.    Well, my experience with the company is that they are
12 pretty forthcoming about the use of their instrument.
13   Q.    Basically we are kind of getting away from the
14 original question, you don't know of any other state that has
15 allowed the testimony that you are getting ready to proffer;
16 is that what you are telling me?
17   A.    I couldn't name you a state that has or has not, no.
18   Q.    That has allowed what you are about to testify to?
19   A.    I just know that the instrument is commonly used in
20 the field.  And I have never heard of any problem.
21   Q.    Okay.  So we can't say that this testimony is widely
22 accepted because you can't tell the Judge, Judge White, of any
23 state that has ever seen fit to allow it in court; is that a
24 correct statement?
25   A.    I could look this up, but the instrument is standard

1  in the field and it has been for 30 years.
2    Q.    Well, it is standard in the field for certain
3  forms -- we are not talking about the instrument itself, we
4  are talking about how you purport to have used the instrument.
5  And whether that is an acceptable use for the instrument, and
6  if so widely accepted, that you would be able to come in and
7  assure the Court that it is accurate and all of the things
8  that the Daubert decision entails; you understand that?
9    A.    Yes.
10   Q.    And you stated in your direct that you have only used
11 it a few times in your own experience and you have been a
12 questioned document examiner for 31 years.  And you have only
13 used it a few times in regard to what you are attempting to
14 testify here today; is that correct?
15   A.    No, that is not correct.  I said I have only
16 testified a few times.  I use it almost daily.
17   Q.    You use it almost daily to figure out scribbled out
18 portions of letters?
19   A.    Well, with one function or another, it does many
20 different thing, but that is probably the most common used
21 function of the instrument.
22   Q.    Which -- may I have a minute, Your Honor?
23        THE COURT:   You may.
24        (Pause in the proceedings.)
25        MR. BRAUCHLE:   Approach the witness, Your Honor?

205

1        THE COURT:   You may.
2        MR. BRAUCHLE:   Thank you, Your Honor.
3    Q.    (By Mr. Brauchle)  Are you the person that operates
4  this instrument?
5    A.    I am one of the people in the lab section that
6  operates it, yes.
7    Q.    Testimony you are about to give, were you the person
8  that operated it?
9    A.    Yes.
10   Q.    Are you certified in the operation of that
11 instrument?
12   A.    There is not a certification on the instrument.
13   Q.    And I guess then that you wouldn't have any
14 certificate or anything like that obviously, then.  How do you
15 test the instrument to see if it is working properly?
16   A.    We have standards that we keep in the laboratory to
17 insert in the instrument to see that it gives the known
18 response and we keep a log on this.
19   Q.    You have -- you have documents that you put into or
20 subject the instrument to and you know what is on there and
21 you see if it comes out; is that what you are saying?
22   A.    Yes.
23   Q.    You ever do it with something that wasn't provided to
24 you by the people that made the instrument?
25   A.    Yes.  We have ink libraries that we examine with the

206

1  instrument to check the responses of different inks.
2    Q.    That's comparing ink, right?
3    A.    It can be comparing inks to determine their different
4  responses or it can be to determine their individual
5  accessibility when they are used for obliterations.
6    Q.    Okay, when you run a test and you say you ran this
7  test.  Why is it that certifies, I guess for want of a better
8  word, that you properly diagnosed or tested what it is that
9  you have tested?
10   A.    In this case what I did was not really a test.  What
11 it amend to was infrared photography, so I created an image
12 and I just read the image.
13   Q.    You created an image and you read the image?
14   A.    I placed a document in the instrument.
15   Q.    Okay.
16   A.    And it displayed an image of the document.
17   Q.    Uh-huh.
18   A.    And read that image.  Then I produced a printout
19 of that image.
20   Q.    Okay, was that inspected or approved or in any way
21 given a seal of approval by anyone other than yourself?
22   A.    The instrument was approved by the person that
23 delivered it from the company to see that it was working
24 properly.
25   Q.    How long ago was that?

1    A.   This has been about, I believe, about five years ago
2  it was delivered.
3    Q.   Well, I guess I go back to the question I asked you a
4  few minute ago, has anybody come out and checked the
5  calibration, the operation or anything on this -- the reason I
6  am asking this, it is kind of like an intoxilyzer, whatever,
7  they have to clean, check, calibrate and all this other stuff.
8  You are telling us that you have got some instrument that no
9  one has heard of that is five years old and no one can verify
10  your results one way or another other than yourself.  As far
11  as you can tell us there is no other states that have accepted
12  the testimony that you are going to give today.  Can you tell
13  us even a county in this state that has ever accepted?
14    A.   I believe I have this in the files, but I couldn't
15  tell you right off the top of my head.
16         MR. BRAUCHLE:   We will pass the witness.
17         MR. WHITTIER:   We rest, Your Honor, on the
18  proffer.
19         THE COURT:   Argument.
20              **ARGUMENT**
21  BY MR. BRAUCHLE:
22    Well, obviously the Court is aware of what we are talking
23  about, when we are talking about Daubert.  And basically that
24  goes to scientific or whatever type of test that the Court has
25  to be satisfied that it is widely enough used or that there is

1  a degree of acceptance within the field using the prude
2  example, the breathalyzer.  The first people didn't think that
3  it did what it was supposed to, people had to accept it,
4  operate it for a period of time, show that it was made
5  reliable or was reliable.  It is an acceptance of the people
6  who may or may not use an activity or a procedure just like
7  DNA examination and blood and other fluids.  They had to prove
8  that that was reliable, that it was widely accepted.  That it,
9  first of all, that it is accepted among the scientific
10  community or whoever it is, in that way.  And we don't have
11  any of these indicious of -- of reliability or acceptance or
12  anything else.
13    Mr. Crawford, in all due respect, he can't point us to
14  another state that has ever accepted this testimony.  And even
15  closer to home, he can't even point us to a county in the
16  State of Texas who has ever allowed this testimony.
17    And so bringing the Court up to speed, I think you are
18  well aware of what we are arguing about.  But it is something
19  that was there and then it has been written over.  And -- it
20  is one thing, I guess, to test handwriting or signatures, but
21  that is not what we are here to do.  He is not saying that
22  Wesley Ruiz wrote the letter or didn't write the letter.  He
23  is trying to tell us what Wesley Ruiz wrote and then scratched
24  out.  And I am sorry, but --
25         MR. WHITTIER:   Excuse me, Judge, I believe we

209

1  are being misapprehended by counsel.  Mr. Crawford will be
2  testifying to the comparison of the handwriting in the letters
3  that have been offered against known samples from Mr. Ruiz's
4  writing.  He will be testifying about the comparison of
5  handwriting.
6         MR. BRAUCHLE:   Well, that's not what we are
7  objecting to.  And if it is, you know, I think there has to be
8  some foundation for that, because the Code of Criminal
9  Procedures has such little faith in it, that they say that
10  under 38.27 that proof by comparison shall -- proof by
11  comparison only shall not be sufficient to establish
12  handwriting if a witness denies his signature.  And certainly
13  by our client entering a not guilty plea, that puts all phases
14  of the trial at issue.  And so we think -- we think that that
15  goes to what they have said that they are going to bring him
16  on for now.  But certainly this arcane science, if it is that,
17  which I say it is not, reading scribbles, I don't think there
18  has been the proper predicate.  And I certainly don't think
19  they have gotten over the threshold that would make it
20  acceptable.
21    Let me -- if you can give me about 30 seconds, I need to
22  confer with co-counsel in regard to this.
23         (Pause in the proceedings.)
24         MR. BRAUCHLE:   We would object to it under 701
25  through 705 of the Texas Rules of Evidence also, and 706 if

210

1  need be.  And then -- then of course we would also bring in a
2  1001 through a 1009, which I think might also go especially to
3  the question we have got before us.
4         MR. WHITTIER:   Your Honor, we attempted to offer
5  testimony from Mr. Crawford regarding the acceptance question.
6  And it certainly acceptance is an element in the scientific
7  community in which he is operating, but it is also acceptance
8  by the courts.  And we attempted to offer that and he is
9  objecting to it, the fact that this witness has testified in
10  other counties in the state and district courts regarding the
11  same matter.
12    I don't think authentication is an issue.  The letters
13  have already been admitted into evidence.  And we are talking
14  right now about portions that have been obliterated out of
15  those letters.  So I don't think authentication is really an
16  issue at this point.
17    There are answers that he can provide that they have
18  objected to and I think -- you honorably sustained those
19  objections as to this science being accepted not only in the
20  State of Texas but in the country as a whole and in other
21  countries and jurisdictions around the world.  This science
22  has been around for 31 years.  This instrument has been around
23  for 30-plus years.  And they are simply taking a document,
24  putting it under the light and using as he said filtration
25  devices to look through their various spectrum of light to see

1 the writing that is behind the obliteration. It is a real
2 simple process. It is really not science, it is actually just
3 a skill that you use with natural phenomenon, light and
4 filtration.
5         I am not sure what science he is talking about, other
6 than the idea that there is infrared spectrum and an
7 ultraviolet spectrum of light and you use various filters to
8 look at these documents under white light to determine what
9 various layers of ink show.
10         Correct me if I am wrong, Mr. Crawford.
11                 MR. BRAUCHLE:   Well, if it is so widely
12 accepted, why can't their own expert tell us one county that
13 it has been accepted. I asked him that. There wasn't any
14 objection to that on either table.
15                 MR. WHITTIER:   Just by way of example, Your
16 Honor, obliterations is not a frequently occurring phenomenon.
17 It does occur and they do testify about it. But ah --
18                 **SUB ROSA EXAMINATION**
19 BY MR. WHITTIER:
20         Q.   Do you remember the last time you testified,
21 Mr. Crawford, regarding obliterations?
22         A.   No, it would be some time ago.
23         Q.   Okay. That doesn't change the fact that this
24 science -- that this instrument and the skill that you use to
25 use it has been around for 30-plus years?

1         A.   Well, the technique in general has been around for
2 about a hundred years.
3         Q.   Infrared photography?
4         A.   Yes.
5                 THE COURT:   May I see the attorneys.
6                 (Discussion off the record.)
7                 MR. WHITTIER:   Judge, if you want I can tender
8 preliminary the photographs that Mr. Crawford has talked about
9 and we can provide the Court with the evidence of other
10 jurisdictions permitting this testimony before jurors.
11                 THE COURT:   Okay. Are you prepared to do that
12 now?
13                 MR. WHITTIER:   We have the photographs here that
14 he spoke of. So we will offer these preliminarily for the
15 Court's inspection.
16                 THE COURT:   We are going to reconvene tomorrow
17 at 9:00.
18                 (Court recessed for the day.)
19
20
21
22
23
24
25

213

1   **THE STATE of TEXAS )**
2   **COUNTY of DALLAS  )**
3          **I, BELINDA G. BARAKA, Official Court Reporter in and**
4   **for the 194th Judicial District Court of Dallas County, State**
5   **of Texas, do hereby certify that the foregoing contains a true**
6   **and accurate transcription of all portions of evidence and**
7   **other proceedings requested in writing by counsel for the**
8   **parties, to be included in this volume of the Reporter's**
9   **Record, in the above-styled and -numbered cause(s), all of**
10  **which occurred in open court or in chambers and were reported**
11  **by me.**
12          **I further certify that this Reporter's Record of the**
13  **proceedings truly and correctly reflects the exhibits, if any,**
14  **admitted by the respective parties.**
15          **I further certify that the total cost for the**
16  **preparation of this Reporter's Record  was paid by the**
17  **State/Defense.**
18          **WITNESS MY OFFICIAL HAND this the 30th day of**
19  **May  , A.D., 2009.**
20
21
22                          **BELINDA G. BARAKA, CSR #5028**
23                          **Official Court Reporter**
                            **133 N. Industrial**
24                          **Dallas County, Texas 75207**
25  **Certification Expires: 12-31-09**

1                     CAUSE NO. F07-50318-M

2   THE STATE OF TEXAS              *    IN THE DISTRICT COURT

3   vs.                            *    194TH JUDICIAL DISTRICT

4   WESLEY LYNN RUIZ               *    DALLAS COUNTY, TEXAS

5

6

7   - - - - - - - - - - - - - - - - - - - - - - - - - - -

8

9                      REPORTER'S RECORD

10                     PUNISHMENT HEARING

11                   Volume 54 of 59 Volume(s)

12

13

14  - - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16

17

18

19          BE IT REMEMBERED THAT on this the 10th day of July,

20  A.D, 2008, the above-styled and -numbered cause(s) came on for

21  hearing before the HONORABLE ERNEST B. WHITE, III, of the

22  194th Judicial District Court of Dallas County, State of

23  Texas, the following is a true and correct transcription of

24  the proceedings had, to-wit:

25     (Proceedings Reported by Computerized Machine Shorthand)

_Belinda G. Baraka, Official Court Reporter_
_214-653-5803_

```
 1                    A P P E A R A N C E S

 2

 3    HON. KEVIN BROOKS
      Assistant District Attorney
 4    State Bar No. 03070735

 5

 6    HON. ANDY BEACH
      Assistant District Attorney
 7    State Bar No.  01944900

 8                                FOR THE STATE OF TEXAS

 9

10    HON. PAUL BRAUCHLE
      Attorney at Law
11    State Bar No. 02918000

12

13    HON. WILLIAM JOHNSON
      Attorney at Law
14    State Bar No.  10804500

15                                FOR THE DEFENDANT

16    Also Present:

17     Doug Parks, Attorney at Law

18

19                         *  *  *  *  *

20

21

22

23

24

25
```

```
1                        I N D E X

2                                            PAGE/VOL.

3    Proceedings - 07/10/08 ........................... 6/54

4    STATE'S WITNESS      Direct    Cross     S.Rosa/V.Dire

5     KENNETH CRAWFORD                          7, 15    9

6                                              20

7    Argument by - Mr. Whittier ....................    23

8    Argument by - Mr. Brauchle ....................    23

9    Argument by - Mr. Whittier ....................    24

10   Ruling ........................................    26

11

12   DEFENSE'S WITNESS    Direct    Cross     S.Rosa

13    CYNTHIA BAILEY      27, 33    32

14    LESLIE SWEET        34, 43    37

15    WESLEY RUIZ                              44

16

17   Defense Rests in Punishment ...................    46

18   State's Rebuttal in Punishment ................    46

19   STATE'S WITNESS      Direct    Cross

20    KENNETH CRAWFORD    46        70

21   State Rests and Closes in Punishment ..........    74

22   Defense Rests and Closes in Punishment ........    74

23   Reporter's Certificate ........................    83

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1              E X H I B I T   I N D E X

 2   STATE'S EXHIBIT(S):          OFFERED:  ADMITTED:  VOL.

 3   105   Letter                    73        74        54

 4   106   Letter                    73        74        54

 5   107   Letter                    73        74        54

 6   108   Letter                    73        74        54

 7   109   Letter                    73        74        54

 8   110   Letter                    73        74        54

 9   184   List of Known Users        9        13        54

10   185   Article                    9                  54

11   186   Brochure                   9                  54

12   187   Cert. of Accreditation  17/49     19/50       54

13   188   Scope of Accreditation  17/49     19/50       54

14   189   Incident Report           40        41        54

15   190   Letter                    64        64        54

16   191   Letter                    64        64        54

17   192   Letter                    64        64        54

18   193   Letter                    64        64        54

19   194   Letter                    64        64        54

20   195   Letter                    64        64        54

21   196   Letter                    64        64        54

22   198   Report                    69        70        54

23

24

25
```

```
 1                    E X H I B I T   I N D E X

 2    DEFENSE'S EXHIBIT(S):        OFFERED:   ADMITTED:  VOL

 3    63    12.44 Motion             30         30        54

 4    64    12.44 Motion             30         30        54

 5    65    E-Mail                              36        54

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



6

**P R O C E E D I N G S**

(July 10, 2008)

THE COURT:   Outside the jury's presence, Mr. Whittier, you may call your witness.

MR. WHITTIER:   Mr. Crawford.

**KENNETH CRAWFORD**

was called as a witness, after having been previously sworn by the Court and having previously testified, testified under oath as follows:

**SUB ROSA EXAMINATION**

**BY MR. WHITTIER:**

Q.   State your name for the record, please.

A.   Kenneth Crawford.

MR. WHITTIER:   We may proceed?

THE COURT:   Yes.

Q.   (By Mr. Whittier)  And you are the same Kenneth Crawford that testified at the end of the day yesterday?

A.   Yes.

Q.   Overnight we have done the best we could to try to research the background of the instrument and the technique and skill that you testified to yesterday; is that correct?

A.   Yes.

Q.   And we have come up with information that is available on the internet, as well as y'all's memory of various professionals in the questioned document business that

7

you-all have professional contact with?

A.   Yes.

Q.   Okay.

MR. WHITTIER:   May I approach briefly, Your Honor?

THE COURT:   You may.

Q.   (By Mr. Whittier)  Mr. Crawford, I will hand you what has been marked as State's Exhibits 184, 185 and 186, ask you to take a moment to look at them and tell us if you recognize what they are, if you are familiar with their contents?

A.   Yes, I am.

Q.   Okay.  Tell the Court what we have there?

A.   State's Exhibit 184 is a list of some of the people in our profession of forensic document examination that own and use the instrument that we have been discussing, the video spectral comparator.

State's Exhibit 186 is an article written by an FBI examiner in the forensic document field describing the experience he has had using the video spectral comparator.

And State's Exhibit 185 is a brochure published by the manufacturer of this instrument describing some of its capabilities.

Q.   You-all publish, do you not, procedures by which you will operate with this machine -- or this instrument?

A.   Yes.

8

Q.   Okay.  And they are regularly updated, if there are changes needed?

A.   If there are changes to the instrumentation, yes.

Q.   And you-all publish these procedures by which the instrument is to be used?

A.   These are available in our laboratory for our own reference.

Q.   Okay.  Okay.  This instrument has the brochure there describes the methodology and the technology by which this instrument is able to see behind obliterations?

A.   Yes.

Q.   Just for clarification purposes, have you testified in civil and criminal courts or criminal matters regarding the use of this instrument?

A.   I believe I testified in criminal, but not civil.

Q.   Not done any civil testimony yet?

A.   No.

Q.   And you have been in state court as well as federal court?

A.   Yes.

Q.   Okay.  Have you testified in jury and bench trials, trials to the Judge?

A.   Yes, I have.

Q.   And your testimony in these experiences we are discussing here has been about revealing obliterations as we

9

have in this case?

A.   Regard to obliterations, I can't say that I have testified in both bench and jury, I have testified in jury trials.

Q.   Okay.  About obliterations?

A.   Yes.

Q.   Okay, okay.  Just to -- for reiteration regarding the process, and if you will bear with me in using the lay terms that I use, we have got a photograph of the instrument -- what exhibit is that that has the picture?

A.   185.

Q.   In 185, and that instrument has in it --

MR. WHITTIER:   Well, let me just go ahead and offer those into evidence, Your Honor, if I might.

I don't think Defense Counsel has seen these.

**VOIR DIRE EXAMINATION**

**BY MR. BRAUCHLE:**

Q.   Mr. Crawford, this is a brochure for 2008 model; is that correct?

A.   Yes.

Q.   You didn't perform your work on that, did you?

A.   No.  I have a VSC 5000.

Q.   And this purports to be information on the VSC 6000, right?

A.   Yes.  It is much the same, though.

10

11

1    MR. BRAUCHLE:   Your Honor, may I have a few
2  minutes to, ah --
3    THE COURT:   You may.
4    MR. BRAUCHLE:   -- review this?
5    (Pause in the proceedings.)
6  Q.   (By Mr. Brauchle)  Okay, the article that was written
7  in 1999 is talking about VSC 2000; is that correct?
8  A.   I believe so, yes.
9  Q.   So that would have been three models before the one
10  you were using and the other flyer is on the model that you
11  didn't use because it is the new one; is that correct?
12  A.   Yes.
13  Q.   Now, then, what has been marked as State's 184, where
14  did you obtain the information on that?
15  A.   Excuse me, what is that?
16  Q.   It is a list of purported users?
17  A.   These are just some of the people we could think of
18  without checking our notes in the office that have and used
19  that instrument.
20  Q.   All right.  Now, then, you state that your prior
21  experience in testifying as to your test and their results,
22  none of it was in regard to obliterated documents?
23  A.   What I just said was, I was clarifying a point about
24  jury trials.  I have testified only before juries regarding
25  that instrumentation.

1  Q.   Well -- I think the question was, have you ever
2  testified about the use of the -- is it a video spector
3  comparator?
4  A.   Video spectral comparator.
5  Q.   Did you ever testify about the use of the video
6  spectral comparator in a courtroom anywhere testifying about
7  obliterated documents?
8  A.   Yes, I have.  With the video spectral comparator.
9  Q.   And you know when and where that was?
10  A.   No, I could not tell you that.
11  Q.   But -- so we can't be pointed in any direction as to
12  where you may have given obliterated document testimony in the
13  past; is that correct?
14  A.   No, I didn't come compared with that information.
15  Q.   So we couldn't pick up the phone and check if your
16  testimony was accepted or rejected by the Court or allowed or
17  disallowed by the Court; is that correct?
18  A.   In most such cases, I don't know, I simply testify
19  and then leave.
20  Q.   Let me -- well --
21    MR. BRAUCHLE:   Your Honor, because of the
22  nonrelevancy in regard to State's Exhibits 185 and 186, we
23  would object to them.  They are talking -- if they are talking
24  about anything, about an instrument other than the one in
25  question.

12

13

1  And State's Exhibit 184, we really have no idea what it
2  purports to do.
3  So we would object to 184, 185 and 186.
4    MR. WHITTIER:   Judge, you need silence to review
5  that.
6    THE COURT:   Yes, I do.
7    MR. BRAUCHLE:   You will be quiet.
8    THE COURT:   You have a response, Mr. Whittier?
9    MR. WHITTIER:   Yes, sir, Your Honor, the witness
10  has testified that the instruments is essentially the same
11  instrument as the one that they are currently using.  And this
12  was simply a brochure that they had available without going
13  back to Austin to provide for the Court's perusal in making a
14  judgment into preliminary admissibility of this evidence.
15  The list of names there, are simply as Mr. Crawford
16  stated, people that they have collaborated with over the years
17  and are familiar with who use this instruments in various
18  jurisdictions for the same purposes that they are testifying
19  to here.  And this list of professionals in this area, Your
20  Honor, was provided off the top of their head in collaboration
21  with his colleagues who are here over the last evening.  With
22  access to their office files and stuff like that, they could
23  have come up with a more complete list.
24    MR. BEACH:   Judge, apparently the manual that
25  this witness used is setting in the black notebook in his lab.

1  The manual, not just a brochure, but the manual to the model
2  he use to address this -- this tangential issue.
3    MR. BRAUCHLE:   We will object to sidebar, Your
4  Honor.
5    THE COURT:   I will sustain --
6    MR. BRAUCHLE:   Well, I will sit down -- I was
7  going to rebut hopefully Mr. Whittier's statements.
8  We are not saying they built this themselves, obviously
9  somebody bought it somewhere, but the brochure doesn't say
10  anything about it's purported use or anything that would make
11  it applicable to what they are trying to prove.  Or the
12  article is self-serving at best and doesn't really explain
13  anything about the science or how the science is accepted.
14  And that of course is what we are down here for.
15  The list of names is just people that might own one.  We
16  don't know what they may do with them or why they bought them.
17  It is kind of like they are trying to sell the Court this
18  instrument.  I don't think we need that.  The Court is aware
19  of from yesterday doesn't pass mustard as being accepted and
20  used science.  We can't see that they have proven that.
21    THE COURT:   I will sustain the objections to
22  State's Exhibits 185 and 186.  And overrule the objection to
23  State's Exhibit 184.
24    MR. WHITTIER:   Judge, we would ask the Court to
25  judicially notice and peruse the manual which we have here in

14

15

1  the courtroom, which describes is the manner and use of the
2  actual instrument that they use. We have that as well.
3          MR. BRAUCHLE:   We would object to study, perusal
4  of object not in evidence.
5          MR. WHITTIER:   I'm sorry I didn't hear you,
6  Counsel.
7          MR. BRAUCHLE:   We would object to any study or
8  perusal not in evidence.
9          THE COURT:   Mr. Whittier, are you using that, or
10  is he going to testify, is the witness going to testify from
11  it? And --
12          MR. WHITTIER:   We would offer for in chamber
13  review, Judge, portions or all of this instrument -- this
14  manual. We will offer all of it for a chamber review by the
15  Court regarding the testimony -- to test against the testimony
16  given by Mr. Crawford, as well as the further details in the
17  method of use of this technology.
18          THE COURT:   For what purpose, I guess is my...
19          MR. WHITTIER:   My perception is and what I am
20  trying to clarify for the Court is, number one, the clarity of
21  how this instrument is used. That it is merely a photograph
22  of an instrument that has been lighted up by lights and they
23  take a picture of it with filters that filter out certain
24  ranges of light. Until you are able to see the writing
25  underneath the obliterations. And they take a photograph of

1  it. And that's what we have and we are prepared to offer into
2  evidence.
3          MR. BRAUCHLE:   Your Honor, I am really not sure
4  what this is --
5          MR. WHITTIER:   I am trying to answer Court's
6  question.
7          MR. BRAUCHLE:   If he wants to put the manual or
8  whatever in evidence, that's fine, put a tag on it. But I
9  think the person that should be testifying if he can about the
10  machine is on the witness stand, not Mr. Whittier.
11          MR. WHITTIER:   If I may, Your Honor?
12          THE COURT:   You may.
13          **SUB ROSA EXAMINATION RESUMED**
14  BY MR. WHITTIER:
15      Q.   Mr. Crawford, have I essentially summarized the
16  process by which you go about looking at these obliterations.
17  You put the material in the instrument, correct?
18      A.   Yes. I insert the document under the instrument.
19  And for the purpose that was used here, we are applying the
20  simplest use of this instrument which is basically
21  photography. We turn on the camera, we select the appropriate
22  filter, which in this case was an infrared filter, and then we
23  take a picture of it. The system then outputs a hard copy or
24  print.
25      Q.   Is that what these are?

16

17

1      A.   That's a reproduction of it there, yes.
2      Q.   And from there you read it to determine what there is
3  that you might be able to make out of what was obliterated?
4      A.   Yes. It is a combination of examining as it is
5  displayed on the monitor and the printout in addition to other
6  types of examinations such as microscopic examination which
7  complements the examination that we are able to obtain by the
8  use of this instrument.
9      Q.   Y-all's lab and set up and procedure that you use
10  have been accredited by the American Society of Crime
11  Laboratories Directors, has it not?
12      A.   Yes.
13      Q.   Including this operation?
14      A.   Yes.
15      Q.   Okay.
16          MR. WHITTIER:   Approach, Your Honor?
17          THE COURT:   You may.
18      Q.   (By Mr. Whittier) Mr. Crawford, I am going to hand
19  you State's Exhibit 187 and 188, ask you to take a moment to
20  look at it and tell us does that reflect your current
21  accreditation by that organization?
22      A.   Yes, it does.
23      Q.   And this accreditation is required by government code
24  of the State of Texas, correct?
25      A.   Yes.

1          MR. WHITTIER:   Tender same to Defense Counsel
2  and offer, Your Honor.
3          Judge, 186 is in?
4          MR. BRAUCHLE:   What is 186, the laundry list
5  of --
6          MR. WHITTIER:   No. It is the description by the
7  FBI of their use of the instrument.
8          THE COURT:   Is that on the instrument that was
9  not used by this witness?
10          MR. WHITTIER:   This is the video spectral
11  comparator 2000.
12          MR. PARK:   186 was sustained.
13          MR. WHITTIER:   Is that right?
14          THE COURT:   That was sustained.
15          MR. BRAUCHLE:   I thought the list of people that
16  bought the thing was admitted.
17          MR. WHITTIER:   184, that's 184, the list of
18  other users?
19          THE COURT:   Yes.
20          MR. BRAUCHLE:   Your Honor, with all due respect
21  to State's Exhibits 187 and 188, they forgot to accredit the
22  video spectral comparator in that add-a-boy list, so we would
23  object to the introduction of 187 and 188 in that it doesn't
24  prove anything about their proficiency with the video spectral
25  comparator.

1       MR. WHITTIER:   Judge, while artfully stated,
2    that accredits the entire lab.
3       MR. BRAUCHLE:   Somehow I doubt that.  They have
4    got categories of testing, they list --
5       MR. WHITTIER:   Question documents is one of
6    them.
7       MR. BRAUCHLE:   Over here, but it says categories
8    of testing, it doesn't say anything about the use of the
9    atom's smasher, or whatever it is we are talking about over
10   here.  You know it gives an explicit list of things that they
11   are accredited to operate or to test with or what have you,
12   and somehow they just left that one off, maybe it was too long
13   to put on the certificate.
14      THE COURT:   Response, Mr. Whittier?
15      MR. WHITTIER:   No, that's the accreditation they
16   are required to display and make available to users of the
17   lab.
18      MR. BRAUCHLE:   Your Honor, once again the
19   instrument we have got at issue here is the video spectral
20   comparator, I believe.  And they set out what appears to be
21   about 20 different things that this lab is accredited to
22   operate or to use and that ain't one of them.  And I think if
23   anything, it cuts against the State in that it shows, yeah, we
24   are qualified to operate everything but this thing.  It might
25   possibly be due to the fact that it is something of an archaic

1    science.
2       THE COURT:   I will overrule the objections to
3    State's 187 and 188.
4       Q.   (By Mr. Whittier)  Mr. Crawford, what are the
5    agencies that you are aware of that use this instrument?
6       A.   Well, this is probably the most commonly used
7    instrument in forensic document examination next to a
8    microscope.  I believe every major crime laboratory around the
9    world has this instrument.  And this is the principal
10   manufacturer of such instrument, Foster and Freeman of
11   England.  It is very commonly used by any border authorities
12   to check credentials of persons trying to pass borders and or
13   evidence of counterfeiting that in addition to use of the
14   question documents.  It is also used in other areas of the
15   crime laboratory, such as gunshot residue.  Our laboratory has
16   one of those in that section as well.  So it is a very widely
17   used instrument in crime laboratories.  Anyone who is familiar
18   with forensic science will be familiar with this type of
19   instrumentation.
20      Q.   Are you essentially telling us that if the crime lab
21   is accredited by this organization, then that they are very
22   likely to be using a video spectral comparator?
23      A.   Yes, they are.
24      MR. WHITTIER:   That's all we have, Judge.
25      THE COURT:   Any questions, Mr. Brauchle?

20

1              SUB ROSA EXAMINATION
2    BY MR. BRAUCHLE:
3       Q.   Mr. Crawford, you say you believe that it is used by
4    numerous agencies, but none come to mind at this point in
5    time; is that correct?
6       A.   Well, I never heard of a major crime lab that did not
7    own one.  I have been to the FBI, they use these things
8    extensively.  I have been to the Secret Services, they have
9    used these things extensively.  Every meeting that I have
10   attended of the American Academy of Forensic Sciences has
11   discussions of these.  And as I have said, it is a very
12   commonly used instrument in this field.
13      Q.   Okay, let me go over some questions with you.  You
14   are testifying as an expert, I take it or attempting to
15   testify, to scientific knowledge that will assess the trier of
16   fact and ability to understand or determine the fact at issue;
17   is that correct?
18      A.   I believe so, yes.
19      Q.   And you don't have any percentages or any documents
20   that you can point to to show what the reliability factor
21   would be in the use of this instrument; is that correct?
22      A.   Well, this particular use is not analytical, so there
23   is not really a reliability factor -- just like any camera, it
24   either works or it doesn't.
25      Q.   Okay, so we don't know what the reliability factor

21

1    would be or what the percentage of completions would be; would
2    that be a correct statement?
3       A.   I couldn't give you a percentile.  But the instrument
4    rarely fails to function.  If it does, it is a fuse and we
5    replace the fuse and it is up and running again.
6       Q.   So there is a potential of error?
7       A.   That is not an error.  It is simply a major
8    instrument shutdown, but it doesn't cause an error.  As anyone
9    who has used an electronic instrument knows that if for some
10   reason it fails because of a fuse, you simply replace the fuse
11   and then you continue on.  Or the same thing with a lamp, a
12   light bulb within the instrument, if it fails, it is an
13   obvious failure, but you simply repair it and you continue on.
14      Q.   Is there a subcategory among questioned documents
15   examiners that are people that are specialized or use the
16   video spectral comparator exclusively?
17      A.   I am not aware of any.  Most document examiners
18   perform a number of functions and this is just one of them.
19      Q.   So there is not any certification or anything that
20   would make a person an expert in the use of this instrument;
21   is that correct?
22      A.   The use of this instrument is instructed by the
23   people that sell it, that's part of the package.  They send
24   someone from the home office to set it up and see that it is
25   working properly and instruct the purchaser on it's use.  And

1  the we also receive a manual for its use.
2      Q.    Is there any secondary inspection or whatever to show
3  that the installer in fact installed it correctly and that it
4  would be working properly?
5      A.    They do not send a second person to check the first
6  person's work because the first person is a factory
7  technician. They set it up and if it doesn't work, I assume
8  they recall the machine. But I have never heard of such an
9  event.
10     Q.    Okay, well, what I am getting at is, almost any
11 scientific instrument from something as crude as a pair of
12 scales all the way up to nuclear-related items, has some way
13 test to see if it is functioning properly and is capable of
14 doing what it was prepared to do. I think I have asked you
15 yesterday and I am asking you again today. You don't have any
16 testing technique to see if the machine is working reliably,
17 do you?
18     A.    We do for other functions of the machine that we
19 didn't use in this case. The instrument has capabilities of
20 distinguishing and analyzing ink for instance. And we are
21 required to test it to see that it is working properly for
22 that. But for simple photography, it is either going to work
23 or it is not going to work and that's rather obvious.
24     Q.    So the answer I guess is, no, you don't have a
25 checklist?

1      A.    No, it is not relevant is what I would say.
2          MR. BRAUCHLE:  I have no further questions at
3  this point in time.
4              ARGUMENT
5  BY MR. WHITTIER:
6      Judge, we would resubmit Mr. Crawford's testimony as to
7  what he has photographed as a result of examining the evidence
8  in this case.
9          THE COURT:  Mr. Brauchle.
10             ARGUMENT
11 BY MR. BRAUCHLE:
12     Well, we would object as we told the Court yesterday
13 under Section 7. As well as Section 4 of the Texas Rules of
14 Evidence, I believe we even brought in Section 10. We -- I am
15 not sure if the Court has a copy of _Daubert versus Merrell_,
16 which we all know is a Supreme Court case, it talks about
17 acceptance of scientific evidence. I would think somewhere if
18 this was used, that somebody would put this technique to a
19 test such as we are doing here today and the State could
20 readily find some courtroom somewhere, some appellate court
21 somewhere which would say, look, it is a valid scientific
22 process. They can't point us to that.
23     You know we -- it eventually took the Courts to prove
24 simple things that we see on a day-to-day basis such as
25 intoxilyzers and radar guns. They had to be shown that they

24

1  were scientifically accurate, that they could be relied upon
2  on a day-to-day basis. Back in the old days, they used to
3  have to use tuning forks to make sure radar guns worked
4  properly. It is a bit of evolutions of techniques and
5  advances whatever. But there is nobody that can come in and
6  say, hey, this is an exact science, this does exactly what we
7  are trying to tell you it does. And that's where it just
8  doesn't pass the test that the Supreme Court sets out in
9  Daubert. And where the rules of evidence would make this
10 inadmissible especially under 702. And -- as well as the
11 other rules of evidence from 700 through -- 701 through 706.
12 We think that the prejudicial value of this far exceed the
13 probative value in that the Court should rule that it is not
14 admissible.
15         THE COURT:  Any response, Mr. Whittier?
16         MR. WHITTIER:  Yes, sir, Judge.
17             ARGUMENT
18 BY MR. WHITTIER:
19     We believe this is the case for the Court to permit this
20 testimony to come in. It is not the only case in Dallas
21 County. We have just this morning been able to locate a case
22 in the 116th District Court where it has been admitted in
23 Judge Bruce Priddy's court. This technology is technology
24 that has been around for quite a while. It is clear, I think,
25 by the unimpeached testimony of this witness that this

25

1  technology is used by professionals around the country, in
2  fact, internationally for the same purposes. It is a part of
3  a accredited certified lab in the State of Texas, probably one
4  of the best we have in the State of Texas. It is a routine
5  procedure by which they examine question documents. He has
6  testified about the other uses for this in identifying
7  forgeries and various kinds of passport documents.
8      We would submit to the Court that adequate foundation has
9  been laid for, number one, the relevancy of these questions;
10 that is, writings by defendant which have significant
11 obliterations in them that were generated while he is
12 incarcerated pending this case. You have in evidence thus far
13 phone calls that reflect the mind of the defendant. We
14 suggest to the Court that the contents of these documents and
15 the obliterations also reflect the mind of the defendant,
16 which would go to the jury's ability to make a determination
17 about the various issues in sentencing.
18     And we would submit to the Court that the insights that
19 these obliterations and the ability by this witness to read
20 those obliterations will be the insight that can help this
21 jury make that determination. We feel like it would be
22 useful, it is relevant, and we have a witness who is well able
23 to use that instrument to reveal those obliterations.
24     And so we would ask the Court to admit this evidence for
25 those purposes.



26

27

1   MR. BRAUCHLE:   Could we be provided with this
2   case that he referred to.
3        Does the Court have a copy?
4        MR. WHITTIER:   We only located the style of it
5   so far, Judge.
6        MR. BRAUCHLE:   So we don't know if it was used
7   or not?
8        MR. WHITTIER:   We do know it was used.  We don't
9   know what the results were or what the objections were or how
10  it was admitted, we don't know that yet.
11            **RULING**
12        THE COURT:   I will overrule the Defense's
13  objection and allow the witness to testify.
14        MR. BRAUCHLE:   Can we have our obligatory
15  running objection to this testimony?
16        THE COURT:   You may.
17        MR. BEACH:   Can we approach.
18        (Discussion off the record.)
19        THE COURT:   You may step down, sir.  Thank you.
20        (Witness complies.)
21        THE BAILIFF:   All rise.
22        (Jury entered the courtroom.)
23        THE COURT:   You may be seated.
24  Mr. Brauchle, you may call your next witness.
25        MR. BRAUCHLE:   We will call Cynthia Bailey.

1   That's today's clerk, my co-counsel went to get her.
2        THE COURT:   Okay.
3        (Witness entered the courtroom.)
4        THE COURT:   If you will raise your right hand,
5   ma'am.
6        (Witness was duly sworn.)
7            **CYNTHIA BAILEY**
8   was called as a witness, and having been duly sworn by the
9   Court, testified under oath as follows:
10           **DIRECT EXAMINATION**
11  BY MR. BRAUCHLE:
12   Q.   Ms. Bailey, did you bring the two court's file that
13  we discussed.
14   A.   I didn't come that way, he came and got me from
15  somewhere else.
16   Q.   Will you state your name and how you are employed?
17   A.   Cynthia Bailey.  And I work for the district clerk's
18  office.
19   Q.   And what is your position with the district clerk's
20  office.
21   A.   Trainer.
22   Q.   So that means that you are the person that train
23  people who come to work for the district clerk; is that
24  correct?
25   A.   Correct.

28

1   Q.   And you have to show them -- so you are the person
2   that train new employees to do the job of district clerk; is
3   that correct?
4   A.   Yes.
5   Q.   Ms. Bailey, I think -- well, I know I discussed this
6   with you earlier?
7   A.   Yes.
8   Q.   I am going to show you some documents after the court
9   reporter has them marked.  Now, then, I will show you a file
10  entitled F04-58624-IM and F05-51476-UM, and I will ask you are
11  those records of the Dallas County District Clerk's Office?
12   A.   Yes.
13   Q.   Are those what are known as a court's jacket?
14   A.   Yes, sir.
15   Q.   Now, when somebody is arrested for a felony case and
16  if that person is indicted, those would be the jackets -- or
17  the documents that would follow that person's charges from
18  start to finish; is that correct?
19   A.   That's correct.
20   Q.   Now, then, who is the defendant in both of these
21  documents, would that be Wesley Lynn Ruiz?
22   A.   Yes.
23   Q.   Okay.  And we have looked at these previous to your
24  testifying at this point in time.  Can you tell by looking at
25  these documents if they were felonies that were reduced under

29

1   provision 12.44(a) of the Penal Code?
2   A.   Yes, they were.
3   Q.   So --
4        MR. BROOKS:   Excuse me.  Judge, we are going to
5   object, that is a misstatement of the law with regard to
6   12.44.  He is not telling what the whole issue with 12.44.  He
7   keeps saying it is reduced, that is partially correct, but it
8   is basically inaccurate.
9   A.   A 12.44 --
10       THE COURT:   I will overrule the objection.
11   Q.   (By Mr. Brauchle)  Okay.
12   A.   A 12.44 is a punishment stage.
13   Q.   We will get into that.
14   A.   Okay.
15   Q.   But both of these documents, one was a possession of
16  methamphetamine, a state jail felony, and the other was
17  evading arrest, a state jail felony; is that correct?
18   A.   Correct.
19   Q.   And by looking at the court's jackets and the papers
20  filed therein, you can tell that the punishment phase of the
21  trial, it was reduced to where the defendant served a sentence
22  under Class A Misdemeanor range; is that correct?
23   A.   It's where he serves a 12.44 punishment range, yes.
24   Q.   Okay.  Now, then, I will show you what has been
25  marked as State's (sic) Exhibits 63 and 64, and ask you if you

30

1  can identify what those documents are?
2      A.    It's a State's motion to find the defendant guilty
3  under state jail and then it is punished under 12.44(a).
4              MR. BRAUCHLE:   We would offer Exhibits 63 and
5  64.
6              MR. BROOKS:   No objections.
7              THE COURT:   Defendant's Exhibit 63 and 64 are
8  admitted.
9      Q.    (By Mr. Brauchle)  I will ask you to look inside the
10  documents and see if 64 and 65 are -- 63 and 64 are true and
11  correct copies of documents that are contained in the original
12  jacket?
13     A.    Yes.
14     Q.    That's in both cases?
15     A.    Yes.
16     Q.    Now, then, I will show you what has been marked as
17  State's Exhibit 123, and ask you if this comports to a blue
18  back in regard to Cause No. F04-58624, is that one of the
19  cases in front of you?
20     A.    Yes.
21     Q.    Can you look through there.  And is there a 12.44
22  motion contained in that packet?
23     A.    No.
24     Q.    However, in the court's jacket there was an original
25  12.44 motion; is that correct?

31

1      A.    Yes.
2      Q.    I will also show you what purports to be a blue back
3  in cause F05-51476, that would be State's Exhibit 126, and ask
4  you if that contains a 12.44(a) motion?
5      A.    No.
6      Q.    Okay, so these blue backs leave out a motion by the
7  State that would complete these documents; is that correct?
8      A.    That's correct.
9              MR. BRAUCHLE:   May we publish Defendant's
10  Exhibits 63 and 64, Your Honor.
11             THE COURT:   You may.
12     Q.    (By Mr. Brauchle) Ms. Bailey, let me ask you this,
13  you started to get into it, but that's a State's motion to
14  have a state jail felony punished as a Class A Misdemeanor; is
15  that correct?
16     A.    It's a state jail to punish under 12.44, not a actual
17  Class A Misdemeanor.
18     Q.    Okay, let's back up.  The person still stands
19  convicted of a state jail felony; is that correct?
20     A.    That's correct.
21     Q.    But instead of going to a state jail, their
22  punishment is done as a Class A Misdemeanor.  And what they do
23  is, they serve it in the county jail; is that correct?
24     A.    In the county jail, yes.
25     Q.    So I think in both of those cases, the sentence was

32

1  one year in the county jail; is that correct?
2      A.    Yes.
3      Q.    Okay.  And if you go to the county jail, how do you
4  serve your time over there?
5      A.    You get three for one.
6      Q.    Okay.  If you go to the state jail, what do you get?
7      A.    You get day for day.
8      Q.    So if you get a year in the state jail, you spend a
9  year?
10     A.    Yes.
11     Q.    If you get a year in the county you spend about a
12  hundred days in jail?
13     A.    Something like that.
14             MR. BRAUCHLE:   We will pass the witness.
15             CROSS-EXAMINATION
16  BY MR. BROOKS:
17     Q.    Ms. Bailey, the court's records that Defense Counsel
18  showed you, state jail felony, it's a felony conviction?
19     A.    Yes.
20     Q.    So he presented you with two felony convictions
21  against this defendant?
22     A.    Yes.
23     Q.    For whatever reason, this defendant got lucky, and he
24  only had to sit in county jail on his felony convictions?
25     A.    Yes.

33

1              MR. BROOKS:   Pass the witness.
2              REDIRECT EXAMINATION
3  BY MR. BRAUCHLE:
4      Q.    Ms. Bailey, those 12.44(a) motions say that they are
5  the State's motion, don't they?
6      A.    Yes.
7      Q.    The defendant can't file a --
8      A.    No.
9      Q.    -- a 12.44(a).  The only person that can agree to
10  reduce the defendant's sentence is the people at that table,
11  right?
12     A.    Yes.
13     Q.    Even a judge can't do it on his own motion, can he?
14     A.    Not that I know of.
15     Q.    All right.
16             MR. BRAUCHLE:   We will pass the witness.
17             MR. BROOKS:   No other questions, Your Honor.
18             THE COURT:   You may step down.  Thank you.
19             THE WITNESS:   Thank you.
20             MR. BRAUCHLE:   May she be excused?
21             MR. BROOKS:   No objections.
22             THE COURT:   You are free to go.
23             MR. BRAUCHLE:   We will call Leslie Sweet.
24             (Witness entered the courtroom.)
25             THE COURT:   Raise your right hand.



1         (Witness was duly sworn.)

2        THE COURT:   You may be seated.

3               LESLIE SWEET

4  was called as a witness, and having been duly sworn by the

5  Court, testified under oath as follows:

6           DIRECT EXAMINATION

7  BY MR. BRAUCHLE:

8    Q.   State your name, sir.

9    A.   Leslie Sweet.

10   Q.   How are you employed?

11   A.   I'm in-house counsel for the Dallas Sheriff's

12  Department.

13   Q.   So you are an attorney that works for the sheriff's

14  department; is that correct?

15   A.   True.

16   Q.   You would be considered, I guess, a legal adviser?

17   A.   True.

18   Q.   Now, do you have access to the records at the Dallas

19  County Sheriff's Department?

20   A.   Yes.

21   Q.   And are those records kept on a day-to-day,

22  week-to-week, month-to-month basis?

23   A.   Yes.

24   Q.   And are the people that make those records people who

25  have personal knowledge of the events that they are recording

1  and that personal knowledge comes from being there at the time

2  that the event took place; would that be a fair statement?

3   A.   Yes.

4   Q.   I know it was a little elongated, but that's how they

5  keep their records, right?

6   A.   Yes.

7   Q.   Were you asked to -- well, first up, you were

8  subpoenaed here; is that correct?

9   A.   That's correct.

10   Q.   And the subpoena asked you to bring certain documents

11  in the possession of the sheriff's department; is that

12  correct?

13   A.   Yes.

14   Q.   And did you in fact comply with that subpoena?

15   A.   Come to fine out there was no records.

16   Q.   Okay.  So -- well, what were the records that we

17  subpoenaed you to bring to the jury over here?

18   A.   Disciplinary records of Wesley Ruiz.

19   Q.   So we subpoenaed the sheriff's department to bring

20  the disciplinary records for Wesley Lynn Ruiz for anytime that

21  he has been in jail; is that correct, or more specifically

22  this last time in jail?

23   A.   This last time in jail, correct.

24   Q.   You have a document that would show that there are or

25  are not?

---

36

1   A.   Yes.  I have an e-mail from the disciplinary record

2  keeper.

3   Q.   This would be an interoffice e-mail?

4   A.   True.

5   Q.   And this would also be from somebody who would have

6  personal knowledge of any disciplinary records; is that

7  correct?

8   A.   That's correct.

9        MR. BROOKS:   No objections.

10       THE COURT:   Defendant's Exhibit 65 is admitted.

11   Q.   (By Mr. Brauchle)  And I will ask you, Mr. Sweet,

12  that -- that document was generated yesterday or today, it was

13  generated yesterday?

14   A.   The question was posed to the record keeper yesterday

15  and she answered this morning.

16   Q.   Okay.  So that would be his updated -- up to date as

17  we could get in regard to those documents; would that be true?

18   A.   True.

19   Q.   And this what has been marked as State's (sic)

20  Exhibit 65 says that there is no disciplinary record or no

21  history of discipline incidents with this inmate; is that

22  correct?

23   A.   True, there has been no formal discipline filed,

24  true.

25       MR. BRAUCHLE:   May we publish Exhibit 65, Your

---

37

1  Honor?

2        THE COURT:   You may.

3        MR. BRAUCHLE:   Pass the witness.

4           CROSS-EXAMINATION

5  BY MR. BROOKS:

6   Q.   Mr. Sweet, you were subpoenaed to bring disciplinary

7  records or you received a subpoena regarding disciplinary

8  records?

9   A.   True.

10   Q.   Was that the only thing asked for in the subpoena as

11  best you recall?

12   A.   That's what I recall.

13   Q.   Okay.  You recall being subpoenaed for incident

14  reports regarding Wesley Ruiz in his latest stint in the

15  Dallas County jail?

16   A.   Recently.

17   Q.   As part of the subpoena you received from the

18  Defense, did they also ask you to bring incident reports?

19   A.   I don't remember that being on there no, and I don't

20  have that anymore.

21   Q.   You understand what I mean when I say incident

22  report?

23   A.   I do understand.

24   Q.   Can you tell the jury what an incident report is?

25       MR. BRAUCHLE:   Your Honor, we would object to

38

39

1   this on relevancy.  There has been no showing that there are
2   any or that they would in any way be relevant.
3         MR. BROOKS:  I can connect it, Judge --
4         THE COURT:  Overruled.
5   Q.   (Mr. Brooks) Mr. Sweet, you are custodian of records
6   with the Dallas County Sheriff's Department?
7   A.   That's true.
8   Q.   And you are familiar with what an incident report is?
9   A.   I am.
10  Q.   Let me show you what is marked as State's Exhibit
11  189, and ask you if you have ever seen that document before?
12  A.   Yes.
13  Q.   And in fact is that an incident report with respect
14  to this defendant, Wesley Ruiz?
15  A.   Yes.
16  Q.   Now, are you familiar with where Mr. Ruiz is housed
17  in the Dallas County jail as a capital murder suspect, where
18  would he be housed?
19  A.   I don't think there is any one place, but it will say
20  on that incident report.
21        MR. BROOKS:  May we approach, Your Honor?
22        THE COURT:  You may.
23  Q.   (By Mr. Brooks) He is not in general population in
24  the jail as a capital murder suspect?
25  A.   No, he is not.

1   Q.   Is he basically in solitary confinement?
2   A.   Yes, that would be my assumption, yes, under very
3   close guard if not solitary.
4   Q.   Solitary?
5   A.   Yes.
6   Q.   And is that single cell?
7   A.   Single cell.
8   Q.   And is he heavily monitored inside the Dallas County
9   jail?
10  A.   Yes.
11  Q.   By more than one guard?
12  A.   Yes.
13  Q.   When he is moved from one part of the jail to
14  another, is he accompanied by more than one guard?
15  A.   Undoubtedly, yes.
16  Q.   When he goes to visitation, would that be the same
17  process, he would be accompanied by more than one guard taking
18  him to the visitation booth?
19  A.   Yes.
20  Q.   And then taking him back to his cell?
21  A.   Yes.
22  Q.   And State's Exhibit 189 is an incident report from
23  June 7th of 2007; is that correct?
24  A.   Yes.
25  Q.   And does it state -- give you an indication of where

40

1   this defendant was housed inside the Dallas County jail?
2   A.   Yes.  He was 3MSC13.
3   Q.   Does it also contain his book-in number?
4   A.   Yes, it does.
5   Q.   Does it also contain other identifiers for him --
6   strike that.  It does have his book-in number?
7   A.   Yes.
8         MR. BROOKS:  Your Honor, we would offer State's
9   Exhibit 189.
10        MR. BRAUCHLE:  May we approach, Your Honor.?
11        THE COURT:  You may.
12        (Following proceedings were had at the Bench.)
13        MR. BRAUCHLE:  The problem is that it is not a
14  complete report.
15        MR. BROOKS:  What do you mean it is not a
16  complete report.
17        MR. BRAUCHLE:  Well, Ruiz on the whatever that
18  word is.  It carries over to here, somehow it wasn't copied.
19  I don't think we have an objection if we had the complete
20  report.
21        MR. BROOKS:  We will try to run it again, Judge.
22        MR. BRAUCHLE:  Do you have the original?  If you
23  have the original, put it in evidence and we will substitute a
24  copy for the original later.  It is just that --
25        MR. BROOKS:  My copy I think is a copy.

41

1         THE COURT:  So you mean your copy may be --
2         MR. BROOKS:  Cut off like this.
3         MR. BRAUCHLE:  I will substitute one that
4   doesn't have words marked off.  It is a legal objection, but
5   for accuracy purposes...
6         MR. BROOKS:  I don't want to say something that
7   we are going to do it and say that is as good as it gets.
8         MR. BRAUCHLE:  I would think that there is going
9   to be something that goes margin to margin, that we can make a
10  copy of it somehow.  We can do that.
11        MR. BROOKS:  We can send somebody over to the
12  court file and get a copy of this and substitute it.
13        MR. BRAUCHLE:  Let's back up then.  It comes in
14  without objection, but an agreement as to what we are going
15  to do in regard to getting a good copy?
16        MR. BROOKS:  Yes.
17        MR. BRAUCHLE:  What are you going to do with
18  this witness.  Now, are you going to let him go or are you
19  going to have him testify from this.
20        MR. BROOKS:  I tend to have him testify, we
21  got the officer, so are you going to object to him testifying,
22  we will just call the officer.
23        MR. BRAUCHLE:  I don't see why would I.  I am
24  saying ask him what you need to ask him.  Don't publish the
25  exhibit.  Is that fair enough?



42

43

1      MR. BROOKS:   Yes.
2      MR. BRAUCHLE:   Okay.
3      MR. BROOKS:   So I am going to ask him what is
4  reflected on here.  I am not going to offer it into evidence.
5      MR. BRAUCHLE:   Until we get a good copy.
6      MR. BROOKS:   Okay.
7      (End of Bench Conference.)
8      MR. BROOKS:   May I proceed Your Honor?
9      THE COURT:   You may.
10     Q.   (By Mr. Brooks)  Mr. Sweet, this exhibit reflects
11  contraband that was found on the person of Wesley Ruiz inside
12  the Dallas County jail, does it not.
13     A.   It does.
14     Q.   In fact, it was a two-dollar bill that was found
15  shown inside his underwear?
16     A.   Yes.
17     Q.   And that would have to have been some alteration to
18  his underwear to create that space or that opportunity to put
19  that $2 bill in there?
20     A.   True.
21     Q.   And in spite of the fact that he is heavily monitored
22  to and from his visitations, he still is somehow able to get
23  around measures inside the Dallas County jail to get
24  contraband?
25     A.   True.

1      MR. BROOKS:   Pass the witness.
2                **REDIRECT EXAMINATION**
3  BY MR. BRAUCHLE:
4      Q.   Mr. Sweet, what you have got in front of you, I
5  believe, is a report that reflects that some visitor at some
6  point in time gave him a $2 bill with good luck wishes written
7  on it; would that be a fair statement?
8      A.   Luck, yes.
9      Q.   Pardon?
10     A.   It does say luck.
11     Q.   From my reading of it, doesn't it say something about
12  good luck or whatever and it is a $2 bill?
13     A.   Giving you luck.  Two-dollar bill, yes.
14     Q.   You know of any people that -- or is it somehow
15  commonly thought that $2 bills would be lucky?
16     A.   I don't know the answer to that.
17     Q.   Evidently the person that gave it to him thought it
18  might be; is that correct?
19     A.   I can't answer that either.
20     Q.   Okay.  You can answer the question, though, that even
21  the incident report that is there in front of you didn't
22  produce any discipline actions; is that correct?
23     A.   No.  The only action taken is that we barred that
24  particular visitor from ever coming to visit him again.
25     Q.   So there wasn't any disciplinary records generated

44

45

1  from that; is that correct?
2      A.   That's correct.
3      MR. BRAUCHLE:   We will pass the witness.
4      MR. BROOKS:   No questions -- no other questions,
5  Judge.
6      THE COURT:   Thank you, sir.  You may step down.
7      THE WITNESS:   May I be excused, Your Honor.
8      MR. BRAUCHLE:   Yes.
9      MR. BROOKS:   No objections.
10     THE COURT:   You are free to go, sir.
11     MR. BRAUCHLE:   Your Honor, may we have a brief
12  hearing?
13     THE COURT:   You may.
14     THE BAILIFF:   All rise.
15     (Jury retired from the courtroom.)
16     THE COURT:   You may be seated.
17  You may proceed, Mr. Brauchle.
18     MR. BRAUCHLE:   We would call Wesley Lynn Ruiz.
19     THE COURT:   You want to do it from there?
20     MR. BRAUCHLE:   That would be fine.
21               **SUB ROSA EXAMINATION**
22  BY MR. BRAUCHLE:
23     Q.   State your name please, sir.
24     A.   Wesley Ruiz.
25     Q.   Mr. Ruiz, the last witness, Mr. Sweet, was the last

1  witness that we intend to present in your behalf in the
2  punishment stage or rest of the trial for that matter.  And we
3  have discussed with you, all three of the attorneys have
4  discussed with you your right to testify or not to testify; is
5  that correct?
6      A.   Yes, sir.
7      Q.   And you did testify at the guilt or innocence stage.
8  You knew that you had a right at that point in time to testify
9  or not testify; is that correct?
10     A.   Yes, sir.
11     Q.   And you understand that none of your attorneys or
12  anybody else for that matter can keep you from testifying or
13  can make you testify, do you understand that?
14     A.   Yes, sir.
15     Q.   And we have discussed this as early as this morning
16  between you, myself and Mr. Parks; is that correct?
17     A.   Yes, sir.
18     Q.   And we explained to you the pitfalls as well as any
19  advantages that might be out there for you testifying or not
20  testifying; is that correct?
21     A.   Yes, sir.
22     Q.   And at this point in time, do you want to testify or
23  not testify?
24     A.   I don't want to testify, sir.
25     Q.   You understand that you can't be forced to or in any

46
47



1   way coerced to?
2       A.   Yes, sir.
3           MR. BRAUCHLE:   That will be all the evidence we
4   intend to present.
5           THE COURT:   Okay.
6       Bring them in.
7           THE BAILIFF:   All rise.
8           (Jury returned to the courtroom.)
9           THE COURT:   You may be seated.
10      What says the Defense.
11          MR. BRAUCHLE:   Your Honor, ladies and gentlemen
12  of the jury, at this point in time the Defense rests.
13          THE COURT:   Mr. Beach, what says the State?
14          MR. BEACH:   May we approach, Judge.
15          (Discussion off the record.)
16          THE COURT:   The State may proceed, Mr. Whittier.
17          MR. WHITTIER:   We will call Ken Crawford,
18  Department of Public Safety.
19          THE COURT:   This witness has been sworn.
20              **KENNETH CRAWFORD**
21  was called as a witness, and having been duly sworn by the
22  Court, testified under oath as follows:
23              <u>DIRECT EXAMINATION</u>
24  BY MR. WHITTIER:
25      Q.   Tell us your name, sir.

1       A.   Kenneth Crawford.
2       Q.   How are you employed?
3       A.   I'm employed as a forensic document examiner for the
4   Texas Department of Public Safety Crime Laboratory in Austin,
5   Texas.
6       Q.   Okay.  And what training, education or experience do
7   you have that qualifies you to do that work?
8       A.   My formal education is a Bachelor of Science in
9   zoology and biology at the university of Texas at Austin.
10  Most of the training if forensic document examination is
11  conducted in the laboratory by the senior examiners in that
12  department.  And went through that training.  I entered the
13  department in 1977 in that section.  And since then, I have
14  received additional training at various government agencies
15  such as FBI and various other seminars and schools put on for
16  forensic schools across the country.
17      Q.   What are the various areas of inquiries for question
18  document examination?
19      A.   In question documents, we examine any type of
20  document that is involved in a crime or any litigation to
21  answer any of a number of questions about the physical
22  document itself.  This may involve such things as
23  identification of writer by handwriting comparison or it may
24  involve other types of physical examinations of the documents,
25  such as chemical comparisons of inks, papers or physical

48
49

1   matches or decipherment of obliterations or alterations of a
2   document.  Any type of examination that is requested by an
3   investigator that may provide information in a case.
4       Q.   You and I met through that process of providing you
5   with stuff that we had questions about?
6       A.   Yes.
7       Q.   Okay.  The idea of question documents then is to
8   answer questions that will aid in the litigation process in
9   criminal and civil court?
10      A.   Yes.
11      Q.   Okay.  The procedures that you use for the various
12  processes that you engage in that question document process,
13  are they standardized?
14      A.   Yes.
15      Q.   Okay.  Are there times when you will get into the
16  examination of a document where you may have to improvise
17  procedures in order to answer the questions or do it as
18  appropriately as you can?
19      A.   You use whatever technique is relevant to the case in
20  question.  But most of the techniques have standard
21  methodology applied to for whatever type of examination.
22      Q.   Okay.  Some of the jurors may be familiar with the
23  idea of accreditation by agencies that attempt to establish a
24  certain level of excellence in different fields.  Are your
25  activities and is your laboratory accredited?

1       A.   Yes, it is accredited by the American Society of
2   Crime Laboratory Directors.
3       Q.   Okay.  And in fact the State of Texas mandates that
4   by law, do they not?
5       A.   For testimony in criminal cases, yes.
6       Q.   Okay.  And that is a part of the Texas Government
7   Code of Statute which actually orders our -- the Texas
8   Department of Public Safety Laboratory be accredited by
9   appropriate accrediting agencies?
10      A.   Yes.
11      Q.   And your lab is accredited?
12      A.   Yes, it is.
13          MR. WHITTIER:   May I approach, Your Honor?
14          THE COURT:   You may.
15      Q.   (By Mr. Whittier) State's Exhibits 187 and 188, they
16  reflect a current status of your accreditation?
17      A.   Yes, they do.
18      Q.   Okay.  And do they accredit -- reflect the
19  accreditation for question document?
20      A.   Yes.
21      Q.   Okay.
22          MR. WHITTIER:   We offer into evidence State's
23  Exhibits 187 and 188.
24      Tender same to Defense Counsel.
25          MR. BRAUCHLE:   I think the objections have been

1  previously made.
2              THE COURT:  Very well.  And those objections are
3  overruled.
4     State's 187 and 188 are admitted.
5              MR. BRAUCHLE:  I think the Court gave us a
6  running objection to all of this testimony and all of the
7  objections previous; is that correct?
8              THE COURT:  You may, that is correct, you may
9  have a running objection.
10             MR. BRAUCHLE:  We asked for it before outside
11 the presence of the jury and you granted that at that time; is
12 that correct?
13             THE COURT:  That is correct.
14             MR. BRAUCHLE:  Okay.
15             MR. WHITTIER:  Permission to publish, Your
16 Honor?
17             THE COURT:  You may.
18    Q.   (By Mr. Whittier)  Mr. Crawford, with the material
19 that we provided you, there was a question about
20 obliterations; is that correct?
21    A.   Yes, that's correct.
22    Q.   And the standardized procedures and methodology that
23 you stated earlier, you applied to those documents?
24    A.   Yes, I did.
25    Q.   Mr. Crawford for --

1              MR. WHITTIER:  Permission to approach Your
2  Honor?
3              THE COURT:  You may.
4     Q.   (By Mr. Whittier)  I am going to hand you what has
5  previously been marked as State's Exhibit 176, ask you to take
6  a moment to look at that, and tell the Court and the jury if
7  you recognize the material in that exhibit?
8     A.   Yes, I recognize this.
9     Q.   Okay.  In fact those are the letters that our office
10 submitted to your lab?
11    A.   These are reproductions of those letters, yes.
12    Q.   Okay.  And the originals are here in court, are they
13 not?
14    A.   Yes.  This folder contains the originals of those
15 reproductions.
16    Q.   These originals are contained in a way that minimize
17 the contact of the material with skin, correct?
18    A.   Yes.
19    Q.   And they are available if needed?
20    A.   Yes.
21    Q.   Can we for discussion purposes proceed with those and
22 maintain the same effectiveness?
23    A.   Yes.
24    Q.   Mr. Crawford, your lab engaged in several different
25 processes with this beyond what you do, correct, with these

52

1  documents?
2     A.   Yes.  Other lab sections were involved.
3     Q.   But your document -- your examination of these
4  require that they come to you as close to original as
5  possible?
6     A.   Yes, that's right.
7     Q.   Okay.  And that's what you have made photographs of
8  that are depicted in that exhibit?
9     A.   Yes.
10    Q.   Tell the jury what you did to go about -- let me ask
11 you this, let me preference this.  You found obliterations in
12 those letters, did you not?
13    A.   Yes.
14    Q.   And in several of the letters, there are a number of
15 obliterations?
16    A.   Yes.
17    Q.   At different times we discussed what those were and
18 agreed to talk about six of them -- seven of them; is that
19 correct?
20    A.   Yes, that's right.
21    Q.   And you engaged the methodology you use in the
22 regular course of your lab work to discern what those
23 obliterations covered?
24    A.   Yes.
25    Q.   Would you describe for the jury briefly what it is

53

1  that you did to reveal the writing underneath those
2  obliterations?
3     A.   The procedure for discerning what lies under an
4  obliteration involves combination of microscopic examination
5  of the obliterations to reveal what marks underneath may not
6  be totally obliterated.  And that is combined with the use of
7  an infrared imaging device and a photographic system in which
8  the light penetrates the obliteration to permit viewing and
9  assessment of the underline writing.  And then a printout is
10 made from that to further assess that underline writing.
11    Q.   Okay.  Obliterations, forgive me, Mr. Crawford, but
12 obliterations kind of sound like a $64 word, we are basically
13 talking about scratch out.  Somebody writes something on a
14 letter and then goes back and scratches it out with a pen?
15    A.   It means taking a pen or some kind of writing
16 instrument and marking over writing in order to make it
17 unreadable.
18    Q.   To hide it?
19    A.   Yes.
20    Q.   Okay.  Okay.  And let me ask you this, describe for
21 the jury if you would, please, the -- the actual -- you
22 described an instrument, correct?
23    A.   Yes.
24    Q.   Okay.  And that is basically an instrument that
25 has -- that provides light on the questioned document?

1    A.    Yes.

2    Q.    And you are able to do lensing with that, I think

3  you. Described it as -- not lensing, but looking at the

4  document through methodology -- I mean the machinery of the

5  instrument?

6    A.    Yes. The instrument that we use is called a video

7  spectral comparator. It is one piece of instrument that does

8  multiple functions, but for this purpose we were using a

9  system that illuminates the document with high tensity visible

10  light and then filters the reflective image and display it on

11  a monitor so we can look at it with other wavelengths of

12  light, in this case infrared. By using that, we can basically

13  see through an obliteration.

14    Q.    And you did that in this case?

15    A.    Yes, I did.

16    Q.    And with the documents that you have there, the

17  exhibit?

18    A.    Yes.

19    Q.    Okay. And you examined six of those with the

20  methodology you just described in those letters, correct?

21    A.    Yes.

22    Q.    And once you found the right light and the right

23  filter to see, you basically then engaged the process of

24  reading, correct?

25    A.    Yes. Once we get an image, then it is just a matter

---

1  of attempting to read what is under the obliteration.

2    Q.    All of these obliterations are in the body of the

3  letter surrounded on both sides by writing; is that correct?

4    A.    Yes.

5    Q.    There is writing that we can see, there is writing

6  that is scratched out. And the writing we are talking about

7  is the scratched out writing?

8    A.    Yes.

9    Q.    Okay.

10         MR. WHITTIER:   ?May I approach, Your Honor.

11         THE COURT:   You may.

12    Q.    (By Mr. Whittier)  Would you please go through these

13  documents, and if you have to remove paper clips feel free,

14  and locate the first letter obliteration. And in Q5.1a I

15  think is the way you have it numbered, but it is the first

16  exhibit in State's Exhibit 176, the first letter in that

17  exhibit. And tell us where your -- the first obliteration you

18  read occurs.

19    A.    The first obliteration occurs -- or the first

20  obliteration that I examined was on what I have marked as

21  Q5.1f.

22    Q.    I'm sorry, you told us a page?

23    A.    It is the page that I have marked 5.1f or Q5.1f.

24    Q.    And you are able to see on that page the writing

25  behind the obliteration?

---

56

1    A.    Yes.

2    Q.    Tell the jury what you read once you saw the

3  obliterated writing?

4    A.    Well, as my report says, what I was able to read is

5  stated as a qualified assessment. That is, I am not stating

6  definitely what it says, I am only stating what I believe that

7  it reads by my best assessment, and the reason for that is

8  that the infrared image is a very faint image. In other

9  words, it is not like reading the original writing.

10         MR. BRAUCHLE:   Your Honor, on that basis we

11  would renew our previous objection.

12         THE COURT:   Mr. Whittier.

13         MR. WHITTIER:   Your Honor, the witness is, I

14  guess lay the foundation for his background in examining

15  writing in terms of comparing handwritings. But these letters

16  have been admitted into evidence and the obliterations are

17  what we are trying to make clear to the jury so they can make

18  their own assessment about how it applies to the issues they

19  have this consider.

20         THE COURT:   May I see the attorneys.

21         (Following proceedings were had at the Bench.)

22         THE COURT:   If your scientific can't say what is

23  on there, I am not going to let him testify what he thinks is

24  on there. I am going to sustain this objection. Not what he

25  thinks, it has to be on there. I am not going to let this

---

57

1  jury take back into the jury room on something that this guy

2  can't even vouch for. I mean he said what he thinks it is.

3         MR. WHITTIER:   Judge, when you obliterate a

4  writing in circumstances in which Mr. Ruiz did, he did the

5  same which renders visual difficulties, you can read the

6  words, we got copies in here. We can offer in evidence. And

7  you can see how a person with the experience that he has,

8  training he has in identifying handwritings how he discerned

9  the features of the letters behind the obliterations. What he

10  is essentially saying is for the untrained eye, it would be

11  extremely difficult.

12         THE COURT:   But what he said, he thinks.

13         MR. BRAUCHLE:   He still can't tell what it says.

14         MR. WHITTIER:   He has got an opinion about what

15  he saw.

16         THE COURT:   I will tell you what I am going to

17  do, I am going to sustain Mr. Brauchle's objection. And if

18  your witness cleans it up, then I will consider it at that

19  point. But I am not going to let him testify to what he

20  thinks is on there. Cause he may be wrong. You see what I am

21  saying. That would be the same in my opinion a medical

22  examiner saying, well, I think he is dead.

23         MR. WHITTIER:   Well, the document is clearly

24  relevant.

25         THE COURT:   I understand that. But my problem

---

1   is, is that your expert isn't able to testify with any degree

2   of certainty. He is saying what he thinks it is. Hell, I

3   think I got $20 in my wallet, I may only have 5. I am not

4   going to let that go to the jury.

5           MR. WHITTIER:  They have had that report. The

6   report does give a qualifying --

7           THE COURT:  What I am saying at this point, I am

8   sustaining Mr. Brauchle's objection.

9           Now, if you can clean it up, then we will consider it at

10   that point. But I am not going to let him testify to what he

11   thinks is on there. If he is an expert, he better know.

12           MR. PARK:  His whole impression.

13           THE COURT:  I am not going to let the jury go

14   back with a false impression based on what he thinks.

15           MR. JOHNSON:  How -- it can't be clean up at

16   this point. Before the jury.

17           THE COURT:  What do you mean before the jury.

18           MR. WHITTIER:  I guess basically I am going to

19   have to have a come-to-Jesus out in the hallway about what is

20   not, is that the best he is going to be able to offer in terms

21   of -- and so if not we are shutting down, I guess, because

22   that is probably going to be his characterization of all

23   the --

24           MR. BEACH:  It is just like the voice recording.

25   I mean, we get it to the jury, if they don't believe that's

---

1   what it says, they have the right to say, don't say maybe

2   there, they can disregard that. I think he is entitled to

3   talk them through this is what --

4           MR. WHITTIER:  These the -- photographs.

5           THE COURT:  Well, what I said was, I am

6   sustaining Mr. Brauchle's objection at this point. If he can

7   clean it up, then I will reconsider it. But based on what the

8   witness just said, that he thinks -- you see what I am saying?

9           MR. BEACH:  Yeah, I know. He doesn't know

10   Wesley Ruiz's handwriting, he can say this is what it appears

11   to be.

12           MR. WHITTIER:  To qualify that, he does say the

13   writing above and below, it is written by Mr. Ruiz.

14           MR. JOHNSON:  So you are going --

15           MR. BEACH:  To prohibit us from showing these

16   photographs to the jury at this time?

17           THE COURT:  Unless it is cleaned up. That's

18   what I am saying, I am not going to let them take it back on a

19   maybe.

20           Mr. Whittier can continue questioning.

21           MR. BEACH:  What percentage of probability of

22   what you are telling the jury, for instance the word maybe,

23   how sure, you say.

24           (End of Bench Conference.)

25           THE COURT:  I sustain the objection.

---

60

---

1           MR. BRAUCHLE:  We would ask that the jury be

2   instructed to disregard.

3           THE COURT:  I will sustain that.

4           You may proceed, Mr. Whittier.

5           MR. WHITTIER:  Sir?

6           THE COURT:  You may proceed.

7           MR. WHITTIER:  May I approach, Your Honor?

8           THE COURT:  You may.

9   Q.  (By Mr. Whittier) Mr. Crawford, I am going hand you

10   what has been marked as State's Exhibit No. 190 through 196,

11   ask you to take a moment to look at these and tell the jury if

12   you recognize them?

13   A.  Yes, I do.

14   Q.  And are those the photographs of the obliterated

15   writings that you just testified to?

16   A.  Yes.

17   Q.  Okay. And they are also contained below the items

18   that you identified -- or read from a typed written statement

19   of what you say that the writing above it says?

20           MR. BRAUCHLE:  Your Honor, we would object to

21   testimony by Mr. Whittier. And we would also object to what

22   the document may or may not say. We haven't been proffered

23   them yet, we think that it is incorrect to be testifying from

24   them or about them at this point in time until they are

25   admitted into evidence under this statute.

---

61

---

1           MR. WHITTIER:  Judge, I haven't asked him

2   specifically what has been said. I have asked him simply the

3   form that you have the obliterated writing on one line and

4   below that based on the enlarged image, he has taped in his

5   read of what the word above it says.

6           THE COURT:  Overruled.

7   Q.  (By Mr. Whittier) Mr. Crawford, with -- with your

8   years of experience, can you say that with reasonable

9   scientific accuracy that the words above what you typed into

10   the images of those documents, the words are what they appear?

11           MR. BRAUCHLE:  That is still an opinion, Your

12   Honor, and we would object to it.

13           THE COURT:  I will overrule the objection.

14   Q.  (By Mr. Whittier) Based on your experience and

15   training in handwriting comparison and so forth, can you tell

16   the jury with reasonable scientific certainty that those

17   letters below the writing, the handwriting are what you

18   determined are written above?

19   A.  The process of reading what is there is not so much

20   scientific undertaking, and I would not characterize my

21   interpretation of these images as being reasonable scientific

22   certainty. In my report I stated that the obliterated writing

23   on the question letters appear to read as follows. And that's

24   how I would characterize my reading of the obliterated

25   writing.

63

1    Q.   Okay.

2         MR. BRAUCHLE:   Your Honor we would once again

3    renew our objection.

4         THE COURT:   Overruled.

5    Q.   (By Mr. Whittier)  So, Mr. Crawford, you are saying

6    that the jury can assess for themselves what is written above

7    the letters you have typed in based on your determination of

8    what the letters above say?

9    A.   Yes, anyone who can read can look at this image and

10   make their own assessment of what it says.

11   Q.   Okay.  And if you have written in there maybe or can

12   or he said, the jury can look at the image above and make

13   their own determination as to whether or not you got it right

14   or got it close or just totally off base?

15   A.   Yes, that's correct.

16   Q.   But based on your ability to use that video spectral

17   comparator, the instrument, you have illuminated that to its

18   best possible illumination so that they can see it and you

19   took that picture of it?

20   A.   Yes, I produced the best possible image I could of

21   the under writing.

22   Q.   Okay.  And did your own read and wrote in what

23   thought it was what the word say in typed write?

24   A.   Yes.

25        MR. WHITTIER:   Judge, we again resubmit his --

---

1    we offer the photographic copies of what he was able to see

2    for the jury's assessment.  The documents clearly are relevant

3    and we believe that the reading of that writing again gives

4    them insight into Mr. Ruiz's thinking as he wrote these

5    letters.  And as Mr. Crawford said, they can read the writing

6    above and in their own -- that is certainly a part of

7    tradition of Texas law that jurors make certain assessments on

8    their own, and this is one of them.  We believe that given

9    what we, you know, can tender to Defense Counsel as well as

10   yourself and you can see the same photograph and see how a

11   jury can make a reasonable assessment.

12        MR. BRAUCHLE:   It is all well and good but they

13   haven't been tendered to defense counsel.

14        MR. WHITTIER:   Pardon me, Counsel.

15        THE COURT:   And, Mr. Whittier, may the Court, if

16   you will provide the court a copy?

17        MR. WHITTIER:   Yes, sir.  They are numbered in

18   order.

19        MR. BRAUCHLE:   Your Honor, I don't -- I don't

20   know what exhibits these are, because we weren't proffered the

21   originals.  But we would object to them in that this witness'

22   interpretation is typed on to what I would assume is the

23   exhibit itself and because of that, we would object to

24   imposing his interpretation or whatever on something that is

25   up to the province of the jury; and that is, to determine what

---

64

1    in fact is or is not presently in these documents.

2         Once again this witness keeps reminding the Court that

3    even his certainty is less than a scientific accuracy.  He

4    states in his report that it appears to read as follows.  That

5    is not the level of scientific certainty in that Daubert

6    dictates to the Court.  And we would state that we would once

7    again renew all the foregoing objections that have been lodged

8    both in front of the jury and outside the presence of the jury

9    in regard to the admission of these exhibits.

10        THE COURT:   Mr. Whittier, what number are these

11   exhibits.

12        MR. WHITTIER:   The photographic exhibits?

13        THE COURT:   Yes, sir.

14        MR. WHITTIER:   They are 190 through 196.

15        THE COURT:   I don't recall them being offered.

16   But I will overrule your objection, Mr. Brauchle.

17        MR. WHITTIER:   They are in.

18   May we proceed?

19        THE COURT:   You may.

20   My records don't reflect them being offered.

21        MR. WHITTIER:   We do offer them at this time.

22        THE COURT:   Mr. Brauchle, your objection is

23   noted and overruled.

24   You may proceed.

25   Q.   (By Mr. Whittier)  Mr. Crawford, just for the jury's

---

65

1    speedy examination of these documents, I would ask you to

2    indulge me the technical identification of where in each of

3    these documents, if we can, let's try to keep this clip on

4    them, since they are one exhibit.  For each exhibit, could you

5    locate in each of these tabbed documents they appear.  And the

6    documents may be out of sequential order based on your

7    numbering system.  I think we have taken them apart and put

8    them back together.

9         (Pause in the proceedings.)

10        MR. BROOKS:   May we approach, Your Honor?

11        THE COURT:   You may.

12   Do you have the music that you can play.

13        MR. BROOKS:   Might this be a good opportunity to

14   start our lunch break.

15        THE COURT:   How long y'all going to be.

16        MR. WHITTIER:   Judge, apparently this packet is

17   taking a while to put together, taken a while over yesterday.

18        THE COURT:   How long is it going to take.

19        MR. WHITTIER:   He is making progress and I can't

20   pinpoint, Judge, I'm sorry.

21        THE COURT:   You think 10, 15 minutes.

22        MR. WHITTIER:   Fifteen.

23        THE COURT:   Let's take a break.

24        MR. JOHNSON:   Take lunch now instead of 15

25   minutes.

---

66

1    MR. BROOKS:   Once he gets it together, it is not
2    going to be long.
3    THE COURT:   I am afraid of those words.
4    MR. BROOKS:   I suspect after he gets it
5    together, come back, we will go straight to it.
6    THE COURT:   See the problem is, I got court at
7    1:30.  I would rather finish this.
8    MR. BROOKS:   Start at 1:30.
9    THE COURT:   I would rather finish this and let
10   y'all be working on the charge while I am doing that.
11       It is in order.
12       (End of Bench Conference.)
13   Q.   (By Mr. Whittier)  Mr. Crawford, you have your report
14   with you there, do you not?
15   A.   Yes.
16   Q.   And the exhibit that you -- that is listed as Q5.1a,
17   which is -- I am not sure, which is -- is the first exhibit in
18   the packet that we handed you, could you show us where the
19   obliteration is in that one on -- what page it is on.  Do you
20   have the first one, the first obliteration that you
21   determined?
22   A.   I have it here, yes.
23   Q.   Okay.  And tell the jury where that is in those
24   exhibits.
25   A.   This is the page labeled Q5.1f.

1    Q.   Okay.
2    A.   It is the lower obliteration on that page.
3    Q.   Okay.  And you can see the original copy you have
4    there?
5    A.   Yes.  I have the restoration page laying over the --
6    Q.   The sentencing that obliteration begins with maybe,
7    correct?
8    A.   Yes.
9    Q.   Would you read the sentence below that in the exhibit
10   itself, the sentence that appears in advance of that maybe?
11   A.   The sentence begins or reads:  I will stomp a nigga's
12   bitch-ass for touching you, I am still looking for Chappa's
13   bitch-ass.
14   Q.   Okay.  And then the obliterations says what?
15   A.   My reading of the obliteration says:  Maybe I will
16   catch him in here, O.N. with a blank space, day.  I feel sorry
17   for him, nowhere to run, huh, huh, exclamation mark.
18   Q.   Okay.  The next obliteration?
19   A.   The next obliteration is the page -- it is the back
20   of the page that is marked Q5.4c, it is the lower
21   obliteration.
22   Q.   Okay.  It reads.
23   A.   The visible portion reads:  What do you think, quote,
24   B, do you really feel I have a chance?
25   Q.   Then the obliteration reads?

68

1    A.   Portion I can read says:  Been getting aggravated
2    lately.  I'm tired of being nice to those whoe-ass guards.  I
3    can be mean too, these whoes have no idea, I guarantee you
4    they can't hold me for real, I am real.
5    Q.   And who is that letter addressed to?
6    A.   Addressed to a Bernice Marquez.
7    Q.   Okay.  And the next one.  Is that Q5.5b?
8    A.   The next one will be Q5.5b.
9    Q.   Who is that addressed to?
10   A.   Francis Ruiz.
11   Q.   Just the sentence before and then the obliteration?
12   A.   The sentence before reads:  I be feeling so helpless
13   which I really am.
14   Q.   The obliteration?
15   A.   My reading of the obliteration is:  Damn, girl,
16   sometimes I just feel like losing my cool, these whoe-ass
17   guards think they are so fucking hard on the real, they some
18   whoes but just keep all of this shit inside of me.  One day I
19   am going to lose my fucking cool.
20   Q.   The next one, 5.-- Q5.5d.
21   A.   Preceding sentence says:  Keep it real.
22   Q.   Obliteration?
23   A.   My reading of the obliteration is:  Baby, these whoes
24   tripping at three o'clock a.m. and them come to fuck wit me.
25   They a new rule, no pictures on wall, damn these whoes

69

1    desperate.  That shit made me laugh that them off even more.
2    Q.   Did you take a stab at what was after that?
3    A.   That may include some blank spaces.
4    Q.   Okay, okay.  Then let's go to the one in 5.6d is the
5    last one -- I'm sorry, Mr. Crawford, I misread, we don't need
6    to do that one.  They are in your report, right?
7    A.   Yes.
8    Q.   Okay.  I will hand you State's 197, and ask you to
9    take a look at it, and ask you if that is a true and accurate
10   copy of the findings which you just read?
11   A.   This is the second page of the obliteration readings.
12   The first page is a different report.
13   Q.   I'm sorry, which one is it?
14   A.   The second page goes to that cover page.
15   Q.   This is accurate, that's your report?
16   A.   This is my -- this is a copy of my March 14 -- or my
17   March 17 report.
18   Q.   Let's mark that then, that's the one I just read?
19   A.   Yes.
20   Q.   And this is a true and accurate copy of your report?
21   A.   Yes.
22   MR. WHITTIER:   We offer 198 into evidence.
23   And tender same to Defense Counsel.
24   MR. BRAUCHLE:   We would lodge the same
25   objections previously made to the testimony, the documents and

1  State's Exhibit 198.
2         THE COURT:  Overruled.
3    State's 198 is admitted.
4         MR. BRAUCHLE:  The Court is wear of the previous
5  objections; is that correct?
6         THE COURT:  That is correct.
7         MR. WHITTIER:  We pass the witness, Your Honor.
8         THE COURT:  Cross-examination, Mr. Brauchle.
9             CROSS-EXAMINATION
10  BY MR. BRAUCHLE:
11    Q.    Mr. Crawford, what is the stuff in front of you
12  there, that y'all been going through and stapling?
13    A.    These materials are the -- the copies of the evidence
14  that was submitted and they have inserted the I.R. photographs
15  that I provided.
16    Q.    Was the documents that you just attached to those in
17  evidence?
18    A.    Everything here has a State's Exhibit Number on it,
19  yes.
20    Q.    Okay. What about the stuff to your right there --
21  well pass that?
22    A.    This is my case fold folder.
23    Q.    Your case folder?
24    A.    Yes.
25    Q.    And that's got all of your notes in regard to

1  preparing what has been marked as various State's exhibits?
2    A.    Yes.
3    Q.    Now, then, your testimony to the jury was that it
4  was -- what you have put out in your reports is that certain
5  things appear to read as follows; is that correct?
6    A.    That's correct.
7    Q.    You are not -- you are not saying that that is what
8  they actually say; is that correct?
9    A.    That's correct, I am not certain of it.
10    Q.    Okay. And as I understand it, the present status of
11  those court's documents is, is that it is going to become the
12  province of these 12 people over here to look at the
13  obliterated writings to see if you are right or wrong; is that
14  the present status of what those exhibits are doing?
15    A.    I believe that is, yes.
16    Q.    Okay. And let me just ask you a question that hasn't
17  been asked, what is the purpose in obliterating something in a
18  letter or any document?
19    A.    Well, generally you would think that the purpose
20  would be just so that the person receiving the document would
21  not read that part.
22    Q.    Okay. Would you think that those would be words or
23  thoughts or feelings that a person had withdrawn from the
24  document, that he didn't want anybody to read?
25    A.    That's a possibility, yes.

72

1    Q.    So basically what you have gone back and supposedly
2  resurrected, never went out and was read by anybody; would
3  that be a fair statement?
4    A.    Not until I processed the documents as far as I know.
5    Q.    Okay. I write a letter, I put something in it, then
6  I change my mind and I retract that language
7  in the letter by obliterating it, then I send the letter out.
8  That person never knows what I wrote or what I changed my mind
9  on, do they?
10    A.    No, you would not think so.
11    Q.    In fact you are not even certain as to what was
12  marked out on the exhibits that are in evidence, right?
13    A.    No, as my report says, this is what I believe it
14  appears to read.
15    Q.    But the question still remains that by obliterating
16  something, that is most people's way of abandoning or
17  otherwise distancing themselves from something that they may
18  have written and they are trying to retract and not
19  disseminate; would that be fair statement?
20    A.    That's a possibility, yes.
21    Q.    Well, you are not saying any of this is code or
22  anything like that, are you?
23    A.    Well, I have not been provided with any means by
24  which to interpret it as code, no.
25    Q.    Well, for these to be messages that were intent to be

73

1  read or intended to be taken in by somebody, that person would
2  have to have the same or better skills than you got to
3  decipher what has been scratched out; is that correct?
4    A.    At the point that it was obliterated, I assume that
5  the person doing the obliterating, intended no one ever to
6  read it again, yes.
7         MR. BRAUCHLE:  We will pass the witness.
8         MR. WHITTIER:  No further questions.
9         THE COURT:  You may step down, sir.
10         MR. WHITTIER:  He can be excused. We have no
11  objections.
12         THE COURT:  You are free to go, sir.
13    Your next witness.
14         MR. BROOKS:  Judge, that was our last witness.
15    At this time the State would like to offer into evidence
16  for all purposes State's Exhibits 105, 106, 107, 108, 109, and
17  110, these exhibits are in evidence for record purposes, we
18  would offer them into evidence for all purposes at this time.
19         MR. BRAUCHLE:  Is the court aware of all the
20  objections previously made?
21         THE COURT:  I am.
22         MR. BRAUCHLE:  Will those objections be carried
23  forward as if they were made hat this point in time?
24         THE COURT:  They will.
25         MR. BRAUCHLE:  We would renew those objections.

1       THE COURT:   So noted.  Those objections are
2   overruled.
3       State's 105, 106, 107, 108, 109 and 110 are admitted for
4   all purposes.
5       MR. BROOKS:   May it please the Court?
6   Members of the jury State rests.
7       MR. BRAUCHLE:   We will rest and close.
8       MR. BROOKS:   The State closes.
9       THE COURT:   Ladies and gentlemen, both sides
10  having rested and closed, the next step is preparing the
11  Court's charge and argument.  I anticipate argument -- giving
12  you a nice afternoon off so we can work on the charge and
13  commencing with argument tomorrow morning at 8:30.
14      If you will remember my prior admonishments, do not
15  discuss this case, the facts of this case with anyone and do
16  not observe it in any form in the media, have a good
17  afternoon.
18      THE BAILIFF:   All rise.
19      (Jury retired from the courtroom.)
20      THE COURT:   On the record and outside the
21  presence of the jury, we have Juror No. -- I'm sorry, sir,
22  your name is.
23      JUROR:   Robert Turbon.
24      THE COURT:   Who has informed the jury that he
25  has a trip to Peru tomorrow; is that correct, sir?

1       JUROR:   That is correct.
2       THE COURT:   What time is your flight.
3       JUROR:   It departs at 6:50 p.m.
4       THE COURT:   How long are you going to Peru for?
5       JUROR:   Ten days.
6       THE COURT:   Questions by any attorneys?
7       MR. BEACH:   Who wants to be the bad guy?
8       MR. BRAUCHLE:   Are your tickets refundable?
9       JUROR:   They probably are, I could -- the trip
10  has been in the works for five months now.  The rest of my
11  family is already going to be down there.  I am sure they are
12  refundable, it is not a monetary issue, it is more going down
13  with the family.
14      MR. BRAUCHLE:   So you have known about the trip
15  tomorrow for at least five months; is that correct?
16      JUROR:   (Nods head).
17      MR. BEACH:   And they are down there right now?
18      JUROR:   My sister and grandfather are already
19  there.  My uncles are leaving tonight and I was going to work
20  today and leave after work when the trip was originally
21  scheduled.
22      MR. BEACH:   If you had to go Saturday, would
23  that be a tremendous inconvenience or Sunday, would you still
24  be able to enjoy the trip or not?
25      JUROR:   Saturday could be done.  I don't know

1   how much the flight change would cost.  Could be a couple of
2   hundred dollars.
3       MR. BEACH:   Brauchle will pay that.
4       JUROR:   If the Defense wants to pick it up.
5       MR. BEACH:   Like we told you back in -- I don't
6   know if you were here in January or February, the only thing
7   we can't predict is how long the jury is going to deliberate.
8   And you are going to have the case by eleven o'clock tomorrow
9   morning.
10      JUROR:   Right.
11      MR. BEACH:   You might be back at one o'clock or
12  Saturday or next week, we don't know that.
13      JUROR:   Right.
14      MR. BRAUCHLE:   Mr. Turbon, with the immediacy of
15  this trip be an influence on your deliberations?
16      JUROR:   That was one of my concerns and I spoke
17  with the alternate, I said I wouldn't want to be affected in
18  any way during the deliberation process by imposing my urgency
19  on the group.
20      MR. BROOKS:   If you made arrangements to -- with
21  respect to your flight for Monday, would that alleviate any of
22  your concerns about your situation influencing deliberations?
23      JUROR:   That would alleviate the deliberation
24  concerns.  But at that point, the trip would be -- I don't
25  know where in the country they would be.  And then a ten-day

1   trip comes down to seven days, with two days on each side for
2   travel.
3       MR. BRAUCHLE:   I don't have any other questions
4   at this point in time.
5       MR. BEACH:   Saturday, right now if you had -- if
6   your deliberations went into Saturday and you were able to
7   leave say Saturday night, that would be a doable deal?
8       JUROR:   That would be.
9       MR. BEACH:   But you understand there is no
10  guarantee and we would all hope that the jury would have a
11  verdict hopefully by Friday but no later than Saturday noon
12  something like that, we can't guarantee that.  So knowing
13  that, are you strong enough mentally to understand that you
14  got a duty to do down here and do it regardless of when that
15  jury comes back?
16      JUROR:   Yes.
17      MR. BEACH:   You can do that?
18      JUROR:   Yes.
19      MR. BEACH:   Obviously great personal sacrifice,
20  could you do it if you had to?
21      JUROR:   Yes.
22      MR. BEACH:   That's all I have.
23      THE COURT:   Mr. Turbon, let me ask you, would
24  your trip impact your decision or cause you to hasten to your
25  decision one way or the other or have any effect on your

**79**

1  decision?

2          JUROR:  Well, Mr. Beach asked that indirectly.

3          THE COURT:  That's why I asked it directly.

4          JUROR:  Yeah, and in a more direct fashion.

5          THE COURT:  He beats around the bush a little

6  bit.

7          JUROR:  Yeah.  Speaking honestly as a human

8  looking out for my interest, if it came down to 4:30 and we

9  were getting close but not quite there, I don't think I could

10  sway the group, but I may honestly have a slight urgency or

11  desire to move forward.

12          MR. BEACH:  I think everybody at this point in

13  time, six weeks after starting this case, probably has some

14  urgency to move this case forward.  But you are not going to

15  violate your conscience or impose your will on any of the

16  other jurors if it came down to it?

17          JUROR:  No, no.

18          MR. BRAUCHLE:  Could we either go in chamber or

19  have Mr. Turbon go back into the jury room.

20          THE COURT:  Mr. Turbon, if you will go back into

21  the jury room.

22          (Juror complies.)

23          THE COURT:  We can go in chambers.

24          (Discussion off the record.)

25          (Recess taken.)

**80**

1  evidence that would justify a sentence of life without

2  parole."  We make this request of the Court based upon our

3  belief that the definition of mitigating evidence as given to

4  us by the State legislature is in violation of the United

5  States Constitution in that it restricts mitigating evidence

6  to that evidence which a juror would consider as reducing the

7  defendant's moral blameworthiness and no other.  And we

8  suggest respectfully to the Court that there is the potential

9  of evidence for a juror to find evidence that has nothing to

10  do with the defendant's moral blameworthiness to be

11  mitigating.  And if they follow this definition, that would

12  cause a juror to believe that they did not have a right to

13  answer a mitigation issue in such a way to grant a life

14  sentence on such evidence.  And we object to it for that

15  reason and we oppose this language for that reason.

16          MS. SMITH:  We want me to respond now or wait to

17  the other.

18          MR. PARK:  I can do the other one too.

19          On page two beginning at the second full paragraph, we

20  would pose that rather than the way it presently reads, which

21  is: "In arriving at the answer to the special issues, it

22  would not be proper for you to fix the same by lot or chance

23  or any other method other than by a full fair exchange of the

24  opinion of each individual juror."  We purpose that in the

25  context of the death-penalty capital murder case and only in

**81**

1          THE COURT:  Back on the record and outside the

2  presence of the jury, and also let the record reflect that the

3  defendant is not present in the courtroom at this time.

4          With respect to the charge of the Court, is it my

5  understanding that we will make the objections today and

6  tomorrow before argument put the same on the record in the

7  presence of the defendant; is that correct?

8          MR. PARK:  That is fine.

9          MS. SMITH:  That's fine.

10          THE COURT:  Have both sides received a copy of

11  the Court's proposed charge?

12          MS. SMITH:  State has, Your Honor.

13          MR. PARK:  The Defense has, Your Honor.

14          THE COURT:  Any objections to that charge?

15          MS. SMITH:  No, Your Honor.  We made some

16  clerical corrections and they have been put in the charge and

17  we are happy with it now.

18          THE COURT:  From the Defense?

19          MR. PARK:  May it please the Court?  Comes now

20  the defendant and would lodge the following objections to the

21  purposed Court's charge.  Beginning on page four of the charge

22  in the second full paragraph from the top beginning: "In

23  arriving at your answer."  After the period in that sentence

24  that comes after the word blameworthiness, we would purpose to

25  the Court that the following language be added: "Or any other

1  that context, would it be proper for the following language to

2  be used and we ask that the following language be used: "In

3  arriving at the answers to the special issues, it will not be

4  proper for you to answer the same by any method other than the

5  determination of each individual juror based upon the law and

6  the evidence."  And we respectfully request the Court put that

7  language in and we object if the Court does not.

8          MS. SMITH:  The State opposes both the requests.

9  The first one because it deviate from the statutorily required

10  instruction somewhat concerning to the State that we shouldn't

11  be deviating from them.  Plus the special second issue set out

12  in page nine I think takes care of any concerns the Defense

13  may have about whether the jury will be able to consider all

14  the evidence in answering the mitigation special issue.

15          And on the second requested instruction, we feel that the

16  instruction the Court has given is adequate to insure that the

17  jury properly arrives at their verdict.

18          THE COURT:  The State -- the Court will deny

19  both requests.

20          MR. PARK:  May it please the Court?  While we

21  are still on the record, the Defendant has filed and has

22  before the Court, I believe, a motion for instructed verdict.

23  We will ask the Court to rule on that motion.  That's a motion

24  essentially alleging that the State has not proven beyond a

25  reasonable doubt that the answer to special issue number one

1  is yes, that if they answer that question it would be based on
2  insufficient evidence.  No reasonable juror can answer that
3  question "yes" based on this evidence without abandoning any
4  other language.
5             THE COURT:   Is there any response from the
6  State?
7             MS. SMITH:   I'm sorry, was he speaking about the
8  proposed charge or was he speaking about his instructed
9  verdict?
10            THE COURT:   He went to his instructed verdict.
11            MS. SMITH:   The State opposes the motion for
12  instructed verdict.
13            MR. PARK:   I understand.
14            THE COURT:   The Court denies that.
15            MR. PARK:   Finally, Judge, the Defense has in a
16  separate request for purposed Court's charge.  We would ask
17  that the Court rule on our purposed charge in its entirety.
18            MS. SMITH:   The State objects to the purposed
19  charge because of it deviation from the required instruction.
20            THE COURT:   The Court will deny that request by
21  the Defense to the purposed charge.
22            MR. PARK:   That's it.
23            THE COURT:   8:30 tomorrow.
24            (Court recessed for the day.)
25

1   THE STATE of TEXAS )
2   COUNTY of DALLAS  )
3             I, BELINDA G. BARAKA, Official Court Reporter in and
4   for the 194th Judicial District Court of Dallas County, State
5   of Texas, do hereby certify that the foregoing contains a true
6   and accurate transcription of all portions of evidence and
7   other proceedings requested in writing by counsel for the
8   parties, to be included in this volume of the Reporter's
9   Record, in the above-styled and -numbered cause(s), all of
10  which occurred in open court or in chambers and were reported
11  by me.
12            I further certify that this Reporter's Record of the
13  proceedings truly and correctly reflects the exhibits, if any,
14  admitted by the respective parties.
15            I further certify that the total cost for the
16  preparation of this Reporter's Record  was paid by the
17  State/Defense.
18            WITNESS MY OFFICIAL HAND this the ___ day of
19  _____, A.D., 2009.
20
21
22
23            BELINDA G. BARAKA, CSR #5028
             Official Court Reporter
             133 N. Industrial
24            Dallas County, Texas 75207
25  Certification Expires: 12-31-09

CAUSE NO. F07-50318-M

THE STATE OF TEXAS              *    IN THE DISTRICT COURT

vs.                            *    194TH JUDICIAL DISTRICT

WESLEY LYNN RUIZ               *    DALLAS COUNTY, TEXAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

PUNISHMENT HEARING

Volume 55 of 59 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 11th day of July,
A.D, 2008, the above-styled and -numbered cause(s) came on for
hearing before the HONORABLE ERNEST B. WHITE, III, of the
194th Judicial District Court of Dallas County, State of
Texas, the following is a true and correct transcription of
the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

*Belinda G. Baraka, Official Court Reporter*
214-653-5803

```
 1                      A P P E A R A N C E S

 2

 3    HON. KEVIN BROOKS
      Assistant District Attorney
 4    State Bar No. 03070735

 5

 6    HON. ANDY BEACH
      Assistant District Attorney
 7    State Bar No.  01944900

 8                            FOR THE STATE OF TEXAS

 9

10    HON. PAUL BRAUCHLE
      Attorney at Law
11    State Bar No. 02918000

12

13    HON. WILLIAM JOHNSON
      Attorney at Law
14    State Bar No.  10804500

15                            FOR THE DEFENDANT

16    Also Present:

17     Doug Parks, Attorney at Law

18

19

20                       *  *  *  *  *

21

22

23

24

25
```

*Belinda G. Baraka, Official Court Reporter*
*214-653-5803*

```
 1                            I N D E X

 2                                              PAGE/VOL.

 3      Proceedings - 07/11/08 ........................... 4/55

 4      Acceptance of Court's Charge .......................   4

 5      Charge of the Court ................................   5

 6      Argument by - Mr. Brooks ...........................   5

 7      Argument by - Mr. Brauchle ........................   11

 8      Argument by - Mr. Beach ...........................   29

 9      Argument by - Mr. Johnson .........................   43

10      Argument by - Mr. Beach ...........................   53

11      Jury Deliberations ................................   54

12      STATE'S WITNESS       S.Rosa

13       KELVIN CRUMP        55, 56

14

15      Verdict ...........................................   60

16      Jury Polled .......................................   62

17      Sentencing ........................................   64

18      Adjournment .......................................   65

19      Reporter's Certificate ............................   66

20      Disclosure ........................................   67

21

22

23

24

25
```

**P R O C E E D I N G S**

(July 11, 2008)

1 THE COURT:   On the record.

2 Have both sides had an opportunity to read the Court's

3 charge?

4 MR. PARKS:   The Defense has, Your Honor.

5 THE COURT:   And are there any objections?

6 MR. BROOKS:   No objections by the State.

7 MR. PARKS:   We just renew the objections and

8 requests previously made outside the presence of the jury

9 yesterday afternoon.

10 THE COURT:   And those objections are denied.

11 How much time per side?

12 MR. BROOKS:   I think we had talked about 45

13 minutes, Judge.

14 THE COURT:   Mr. Brauchle.

15 MR. BRAUCHLE:   That will be adequate, Your

16 Honor.

17 THE COURT:   Okay, 45 minutes per side.

18 During argument there will be no entering or leaving the

19 courtroom.  So if you have to leave you need to do so now.

20 THE BAILIFF:   All rise.

21 (Jury entered the courtroom.)

22 THE COURT:   You may be seated.

23 Members of the jury, I will now read the Court's charge.

---

(Court's charge read to the jury.)

THE COURT:   What says the State?

MR. BROOKS:   The State is ready, Your Honor.

May it please the Court?

Counsel.

**ARGUMENT**

BY MR. BROOKS:

Ladies and gentlemen, all of us that do this type of law,
criminal work for a living, all of us at this point after
trial usually start our remarks with a thanks to you for your
time, your service and your dedication.  And a lot of times it
can come across as a tired cliche.

You good people throughout the course of this trial have
probably had your patience tested more than anyone could
imagine.  So when I say thank you for your time, when I say
thank you for your attention, you probably deserve more, but
unfortunately that's all we can do at this point.

Now, many months ago, each one of you filled out a
questionnaire.  And in that questionnaire, you told us what
you thought and how you felt about the law and about the
criminal justice system.  More importantly, you told us that
each one of you believed in the death penalty.  And that if we
proved our case beyond a reasonable doubt, and if the facts
and circumstances warranted and in the appropriate case, you
can return a verdict and assess the death penalty.  And we are

---

going to ask is that you hold yourself to that promise.

By your verdict of guilty in this case, you have told us
that we have proven our case beyond a reasonable doubt.  You
also told this man that back in March of 2007, when he shot
and killed Mark Nix, a peace officer who was only trying to do
his job, you told him by your verdict that he was not acting
in self-defense.

During closing arguments a few weeks ago, I stood before
you like I stand now and I ask that if you take nothing else
from your experience with this trial, you take home with the
knowledge that you have heard and seen with your own eyes and
ears how really dangerous the job is that these officers do on
a daily basis.  You have seen and heard how dangerous police
work is.  You had a reminder of that this week, Jerry Poston.

MR. BRAUCHLE:   Your Honor, we would object to
this being outside the evidence.

THE COURT:   Overruled.

MR. BROOKS:   Officer Jerry Poston just this
week --

MR. BRAUCHLE:   May we have a running objection?

THE COURT:   You may.

MR. BROOKS:   Another Dallas officer, who came in
contact with this man, described to you how he himself had
taken two gunshot blasts.

MR. BRAUCHLE:   Your Honor, again we would

---

renew our objections.

THE COURT:   Overruled.

MR. BROOKS:   What needs to be known is that in
Dallas County, if you take the life of a law enforcement
officer, then you have forfeited yours.  You have forfeited
your right to live in this world.

Now, anything other than that really makes the ultimate
sacrifice that Mark Nix gave and other officers have given in
the past, it really makes that sacrifice meaningless.

Now, is Wesley Ruiz a continuing threat to society, is he
a continuing danger?  If we go back and we look at the facts
of this case and you look at the events that causes you to be
here today, the answer to that question is really
self-evident.

This is a man who when the Dallas Police Officers are
trying to pull him over simply to identify -- the identity of
the driver of that car, the car connected to a capital murder
suspect, takes off and gives them every reason to believe that
the driver of that vehicle is a capital murderer.  This is a
man who by his own testimony has told us that he was trying to
get away that day.  And this week you learned something else
that you didn't know during the guilt phase of this trial, you
learned that basically ten days before, he killed Mark Nix,
Dallas Police Officers had tried to pull him over; and at that
time, he was successful and he got away.  It doesn't take a

---

8

9

1  whole lot of imagination to know what was going on through his
2  mind.
3           MR. BRAUCHLE:   Your Honor, we would object to
4  that argument in that it is outside the evidence.
5           THE COURT:   Overruled.
6           MR. BROOKS:   It doesn't take a whole lot of
7  imagination to know that what was going through his mind on
8  March 23rd is that, I got away ten days ago, I am going to
9  get away now.  But when he gets trapped and surrounded, he
10  makes the conscious decision to try to shoot his way out.  And
11  for all we know, he may have been successful except for the
12  fact that this cheap old gun jams.
13       This is the same man who as a teenager joins a criminal
14  street gang.  He is not a kid anymore.  He is still out there
15  engaging in that gang banging activity.  And when you look at
16  his criminal career, starts with theft, burglary of a motor
17  vehicle, possession of a controlled substance, escape, evading
18  in a vehicle, delivery of a controlled substance.  And let's
19  not forget when he is riding around in that car back on that
20  day, he is riding around sipping on liquid codeine, carrying a
21  large quantity of methamphetamine that he is going to sell,
22  and carrying a loaded weapon, bullet in the chamber, loaded
23  for bear.  He has been on probation before.  He hasn't
24  reported for months.  He knows that in Dallas County, he is
25  looking at five years to 99 years or life.  And he also knows

1  in Tarrant County, he is looking at doing aggravated time.  He
2  is going to have to do half his time before he has a chance to
3  come up for parole.  He gets 25 years in Tarrant County, he is
4  sitting for 12, if he gets 50 years in Tarrant County, he is
5  sitting for 25, and he knows that.  This was not his first
6  rodeo.
7       Now, when he goes down there, let's talk about what he is
8  looking at in TDC.  You see you heard the testimony from his
9  grandparents, and I have no reason to not believe that his
10  grandparents are decent people, no reason whatsoever.  You saw
11  them.  But do you really believe that his grandparents call
12  him Slow or do they call him Wesley.  You see that's what
13  makes him dangerous, because he has the ability to show two
14  different sides of himself.  When he goes down to TDC, are the
15  folks going to be dealing with Wesley, are they going to be
16  dealing with Slow?  That staff in TDC, are they going to be
17  dealing with Wesley, or are they going to be dealing with
18  Slow?  Those other inmates, the ones that Larry Fitzgerald
19  talked about who are just down there trying to do their time,
20  are they going to be dealing with Wesley, or are they going to
21  be dealing with Slow?
22       I think it is pretty self-evident, who they are going to
23  be dealing with.
24       Has he had an opportunity to change his life?  Has he had
25  an opportunity to change the bath path that he went on?  Of

10

11

1  course, he has.  You heard testimony from Raul Torres and Jose
2  Ramos, two individuals on two different sides of his drive-by
3  shooting.  And they told you how they came to the realization
4  that it ain't worth it.  This lifestyle isn't worth it.  And
5  they changed their life.
6       You heard testimony, you have evidence that -- that
7  despite the problems in his parent's marriage and the break up
8  of that family, despite all of that, he still received love,
9  guidance and support.
10       Now, what have you heard that will cause you to consider
11  anything other than the death sentence?  What have you heard
12  that will cause you to consider a life sentence for Wesley
13  Ruiz?
14           MR. BRAUCHLE:   Your Honor, we will object to
15  that in that it shifts the burden.
16           THE COURT:   Overruled.
17           MR. BROOKS:   Let's talk about what we know.  We
18  know that he is not mentally retarded.  We know he is not
19  addicted to drugs.  We know he wasn't physically abused as a
20  child.  We know he wasn't sexually abused as a child.  We know
21  he had love and support from his family.  In fact, these 30
22  photographs that they introduced, these 30 photographs, I
23  suppose were to represent what a good person he is.  It is
24  supposed to represent the kind of people he has behind him and
25  the support has.  What these 30 photographs really

1  represent, folks, the 30 opportunities that Cheryl Nix won't
2  have with her son Mark.  No family gatherings, no birthday
3  parties, no Christmases with Mark's children, that's what
4  these pictures represent.  The evidence in this case is
5  overwhelming that this man is a continuing threat to society.
6       When I sit down, Mr. Brauchle, one of the other defense
7  attorneys will have an opportunity to stand up and argument
8  for this man's life.  You may hear reference to the 12 of you
9  being killers, you may hear reference to having blood on your
10  hand.  The fact of the matter is the only person in this
11  courtroom today that has blood on their hands is sitting right
12  there.

## ARGUMENT

BY MR. BRAUCHLE:
15       Ladies and gentlemen, I would be remiss in not joining
16  the District Attorney's office in thanking you for your time
17  and effort.
18       Let me just say something, I didn't start coming down
19  here yesterday or the day before.  But I think y'all have been
20  on one of the most negative trials and snake-bitten trials in
21  Dallas County.  Every time we thought we had it lined up,
22  something else went wrong, so you have done the ominous duty
23  in regard to this case.  And we certainly appreciate it.  And
24  I think that you are probably very glad that it is over and
25  there is an end in sight.  Like I say y'all have encountered a

12

13

**Page 12**

1  situation that I have never encountered before, and I thank
2  you.
3      I have watched you, I have watched y'all and you were
4  paying attention. You listened to the witnesses, you looked
5  at the evidence, and now it is time to make another important
6  decision.
7      Quite, frankly, I didn't think we would get this far, I
8  thought we presented enough evidence that y'all would have
9  found Mr. Ruiz acted in self-defense; but y'all made your
10  decision and I can't quarrel with that. I am not going to get
11  up here and try to argue that. And if you get mad over me
12  saying anything about that, take it out on me, don't take it
13  out on my client, okay.
14      Now, then, I am going to talk to you basically about what
15  we talked to you about in voir dire. And for some of you that
16  was over six months ago, so you thought you had gotten that
17  out of your memory, but here it comes back again.
18      Special issue number one, where you are asking to decide
19  if Mr. Ruiz is going to be a continuing danger for society and
20  is it going to be such that it is going to constitute a
21  continuing threat to society. We all told you that was the
22  future danger issue, is he going to be a danger in the future?
23  You now know that he is going to be in prison for the rest of
24  his life without parole or according to your decision today he
25  may receive the death penalty. But we have told you and we

**Page 13**

1  told you at the voir dire that he could never do better than
2  life without parole. Y'all said you accepted that.
3      Let's -- let me go back to a part of the court's charge
4  that was read to you and says you are not to be swayed by mere
5  sentiment, conjecture, sympathy, passion, prejudices, public
6  opinion or public feeling in considering all the evidence
7  before you and in answering the special issues. I think you
8  can do that. I know you can.
9      You are supposed to be something that we certainly don't
10  want, but I think the State would. We want you to be
11  analytical. We want you to look at the evidence, we want you
12  to go where the evidence takes you. We think the evidence
13  will take you to answering this question "no".
14      Y'all remember when we were talking about this question
15  in voir dire, we told you that this question starts out "no"
16  and stays "no" until the State erases the "no". That they
17  have a burden of proving to you beyond a reasonable doubt that
18  the "no" that this is automatically answered "no" has to be
19  changed to a "yes".
20      We gave you an example that it is kind of like it is
21  spray painted. That there is a "no" that is spray painted on
22  that, then the State has to erase every trace of that "no".
23  They have to prove beyond a reasonable doubt that the answer
24  to this should be "yes", that you know it is assumed to be
25  "no".

14

15

**Page 14**

1      How do get there? What do we know about them? Well, you
2  know it is days like today that you write out -- write out
3  your speech and you think you are brilliant and then you get
4  up here and you wonder if you are even talking to anybody.
5  Let's try to get through this question and see what we know.
6      During the voir dire, we asked you -- or we referred to
7  this question as future danger. Future danger, because you
8  see down there at the bottom we are talking about continuing,
9  continuing. So the danger has to go into the future. It
10  doesn't mean that he was dangerous on the day of the event or
11  that he was dangerous before that. You have to figure out of
12  all you know about this person, convinces you that he is going
13  to be a continuing threat, no matter where he is. And you
14  know that he is going to be in Huntsville.
15      Now, then, what do we know about this. Well, in this
16  phase of the trial, they brought you some more evidence that
17  may or may not have been known to you in the first part. And
18  they taught you things like -- well, one of them was, he had a
19  fleeing case that has been alluded to here this morning. And
20  that's something that they think will help you in deciding
21  future danger. They know that the police officers came out to
22  a call that said that there had been shots fired. They go
23  over there and they see a car leaving at high speed. The car
24  wrecks out and they find this gun in the car.
25      Now, then, that sounds pretty good when you first hear

**Page 15**

1  about it. But let's analyze it. Did they ever talk to
2  anybody that told them shots had been fired, no. Did they
3  ever go over there and find out who, if there was a witness,
4  thought had fired the shots, no.
5      Now, then, they want you to guess and suppose that
6  Mr. Ruiz was over there firing at people in Deep Ellum. But
7  they didn't bring you any proof of that. Now, then, they said
8  well, he fled. Well that is consistent with being shot at,
9  that is as consistent as being shot at as fleeing danger as it
10  is fleeing from the police.
11      Now, then, they say, well, here is the gun. Did anybody
12  come in and say, yeah, this gun was recently fired. That gun
13  was out there and was fired on the day in question, no. They
14  could have done that. You have all seen firearm examiner. He
15  came in here and told you that there is all sorts of tests
16  that he can perform. And you know from his testimony too,
17  that all the police have to do is take it out there to see if
18  it has been fired.
19      They told you about a shooting that Mr. Ruiz was involved
20  in when he was 17 years old. The people came in and said,
21  yes, the house was shot at. And then, they didn't show you
22  anything else until about ten years later, when these
23  documents over here that I am going to talk about. You know
24  one thing they didn't show you, though, is whatever happened
25  on the shooting at the house. Where is the paperwork, where

1  is the conviction, where is whatever is in here in regard to
2  that? What did the State do in regard to that, they dismissed
3  the case. There is not a case over here. Don't bother to
4  look for that one, okay. But they make a big deal of it, hey,
5  to show this guy is going to be such a danger that you need to
6  answer this "yes".
7       Now, then, what we are talking about, and you will hear
8  it a lot of times is quite obviously, future danger. Well,
9  how do we assess that? What do we know that would tell us
10 that? We use a phrase down here, ascending scale of violence.
11 Ascending scale of violence. And in a lot of people you can
12 look at that. You see they are arrested for a simple assault.
13 You see that they are arrested for an aggravated assault. You
14 see that they are arrested for shooting at someone. You see
15 that they are arrested for some other type of violence. You
16 can look and see the pattern of violence growing. And most
17 people would be able to look at that and say, look, he went
18 from here to here to here to here, I think he will be a danger
19 in the future. You got this pattern.
20      Well, Mr. Ruiz's violence, if you want to use that word
21 and I don't, because it doesn't show any violence, but
22 Mr. Ruiz's criminal acts have already been evaluated for you
23 to some extent. Let's look over here at the convictions that
24 they introduced. And you know what the sentences are in most
25 of them.

---

1       The District Attorney's office evaluated his criminal
2  history and then decided how much it was worth. The
3  professionals did that for you to a certain extent. You know
4  that out of all of these, all of these brushes with the law,
5  that most he ever got was 120 days in the county jail. Now
6  they knew about every act in his past. They knew about
7  everything that he had done up till the day that they
8  evaluated his case. And what did they do? The State's motion
9  to reduce and send him to the county jail rather than prison.
10      Now, if they would have thought that he was a danger to
11 society, that he didn't need to be out there on the street,
12 they could have done that at this time. They could have done
13 that at this time. They didn't have to fill out State's
14 motion to find the defendant guilty of a lesser included
15 offense. They didn't have to do this.
16      You know what is really interesting about this, when they
17 came in and they got these documents in evidence, they
18 conveniently left out the fact that they had filed not one,
19 but two motions to reduce his punishment. You know, is that
20 the above board and honest and forthright bunch of people that
21 you would like to see. You know it is kind of like trust us.
22 We are the State, we are here to kill, just trust us. But you
23 know when they pull something like that, when they leave
24 out -- and you heard the clerk come in here, and said, Yeah,
25 it was there, it was there, but they left it out. They didn't

---

1  put it in. You know cutting little corners like that, I think
2  should give you some reason to think, hey, hey, what else are
3  they not telling us, what else are they not telling us? We
4  want to kill this man but, just then just on something like
5  this, we won't even show you the complete record.
6       Let's look at what else happens. He gets arrested for
7  drug possession in Dallas County, it is a first-degree felony.
8  Carried up to 99 years or life in the penitentiary. What do
9  they do on that? They give him probation. They give him
10 probation. He gets a second -- he gets a second case in
11 Tarrant County, that's a completely different organization,
12 they could have taken a stronger stance or weaker stance as
13 they wanted to. But once begin with his history here, they
14 evaluated it and put him on probation, just like these people
15 here did. Just like these people here did.
16      Now, if he was a future danger at any time that these
17 people want you to believe, why didn't somebody put their foot
18 down? Why didn't somebody say, we are not going to give
19 Wesley Ruiz probation, he has already got one. We are not
20 going to reduce this sentence to staying in the county jail,
21 we are tired of him. I will tell you what, because in the
22 over-all scheme of things, it certainly isn't something that
23 would answer this question, "yes".
24      Now, it may seem like something to you people who don't
25 come down here on a daily basis, but see they can make -- they

---

1  can make this stack of documents overly important to you. And
2  unfortunately, unfortunately -- actually fortunately, y'all
3  don't have the experience to do anything but believe them.
4  Hey, we are for the State, we want to kill Mr. Ruiz, trust us,
5  trust us. They evaluated it, they didn't find it are worth
6  their while to incarcerate Mr. Ruiz anywhere but the county
7  jail.
8       Now, then, what else did they bring you? Well, they
9  brought you -- they brought you tattoos, they showed you
10 tattoos. And they tried to explain how -- what the tattoos
11 stood for or what have you. But they didn't show you how
12 those tattoos melt in with future danger.
13      You know if tattoos qualified you for the death penalty,
14 there wouldn't be a rock band in the United States. We would
15 all be on death row. Some of your children, some of your
16 relatives have tattoos. You think they are going to be a
17 future danger because they have tattoos, I don't think so,
18 these people want to tell you this.
19      Let's look at one of the tattoos that he has, Tango
20 Blast. Nobody can quite tell you what that means or where
21 they are or what they do. And they are going to stand up here
22 and tell you that that constitutes a future danger. But, hey,
23 hey, one of Mr. Beach's -- one of Mr. Beach's witnesses, a man
24 that he use not once but twice, a man that he used not once
25 but twice, somehow just has the city of Dallas skyline on his

20

21

1  arm.
2      Now, Tango Blast is as bad and as corrupt or whatever
3  Mr. Beach wants to characterize it when he is talking about
4  Mr. Ruiz. What is Mr. Beach getting in bed with one of their
5  members for to come down here and bring you evidence, what is
6  he doing that for. Well, they can't be good on one hand and
7  bad on the other, you can't have it both ways. You can't have
8  it both ways.
9      What else do we have? Well, we have got letters, we have
10  got phone calls. And I will talk about those. The letters --
11  the letters were written basically, I think, when he got in
12  jail to start with. And I think those show frustration or
13  whatever of him adjusting to as you found out in solitary
14  confinement. In solitary confinement. The phone calls, the
15  phone calls were made basically after he was convicted and his
16  frustration in regard to that.
17      Now, if you think that those -- if you think that those
18  two things are enough to kill him, surely I can't stop you.
19  But I don't think that special issue number one is asking
20  about phone calls or letters.
21      Now, then, they brought you somebody that made a big
22  issue about stuff that was marked out. Well, you know usually
23  when I mark something out, it means that it was spelled wrong,
24  that I changed my mind, that I didn't mean it or what have
25  you. You know, the people that these letters were sent to

1  never saw what it was, they don't have whatever it was that
2  the man from Austin operates to go beneath whatever somebody
3  scratches out to try and figure out what thoughts he has
4  abandoned, they don't have that. So if that's important to
5  you, that's something that obviously he doesn't represent
6  himself to have on paper.
7      Now, then, they also talked to you -- or they brought you
8  Mr. Merrilott. And he said, look -- well, basically, he told
9  you what anybody over ten years old knows, that prison isn't a
10  good place to be. That there is violence there. And that
11  there is a lot of people there.
12      Then Mr. Fitzgerald came in and he told you basically the
13  same thing. He told you, and I think this is some kind of a
14  benchmark, but he told you that the prison system is about as
15  big as Waco or a town of that size, 157,000 people, but the
16  prison is safer than Waco. And you know you think, well,
17  that's nice. But what does it really mean, let's analyze it.
18  Each and every person in prison is a convicted felon. They
19  are not speeders or check writers or anything like that, they
20  are all convicted felons. And where they are, is safer than
21  the people of Waco. And I know that Waco isn't all convicted
22  felons. I know that Waco certainly is not 157,000 convicted
23  felons. So it seems like the people at TDC know what they are
24  doing in handling violence.
25      You know, let's also go back to the gangs. Mr. Merrilott

22

23

1  told you that out of all the people that come into TDC, they
2  only consider eight gangs as being violent. And those people
3  when they come in the door, walk right through to their
4  administration segregation cell. That's the size of an ad seg
5  cell. And you are in that cell 23 hours a day. And if you
6  get out of it, you come over to the door, you stick your hands
7  out through the door, they handcuff you, and then they open
8  the door and there is a guard on each side and you are like
9  this (demonstrating). They take you where you need to go and
10  bring you back just like that.
11      Now, then, you have to have a pretty vivid imagination or
12  pretty big determination to commit violence, to be violent in
13  that instance.
14      Now, Mr. Merrilott made it sound like every prisoner in
15  the Texas Department of Corrections is out there waiting to be
16  violent. That they are all violent and they just want to be
17  violent when given an opportunity.
18      Well, you know when we make decisions in our lives, we
19  generally we look at past history, we look at past history.
20  How did this person do on their last job? How did this person
21  do in school? Did this guy have any problems paying off his
22  car? You know you assess these things in making loans, loan
23  someone, you make these assessments on a day-to-day basis.
24      Well, let's look, Mr. Ruiz has been in something just
25  about like this for over a year, over a year. You know that

1  yesterday, yesterday people came down from the jail and said,
2  he had no disciplinary problems for over a year. And the one
3  thing they had was some how somebody had given him a $2 bill
4  wishing him good luck. Now, if you think that constitutes a
5  continuing threat to society, I can't stand between you and
6  going that way. You know you have to believe that the 14 or
7  15 months he has been in jail, he has been up there everyday
8  wanting to go to TDC to be violent. You have to believe that
9  to answer this question, "yes". You don't have -- you don't
10  have a history of violence. Now, if he was going to do that
11  in TDC, why wouldn't he be doing that in Dallas County? Why
12  wouldn't he be doing it in Dallas County? You know they want
13  you to believe that he is going to go to prison, a place that
14  is more restricted, better trained and better equipped to
15  handle violent prisoners and suddenly is going to go on a
16  rampage. Right here in Dallas County, would be where it would
17  be easier for him to go on a rampage. Did he do it, no. Did
18  he do it, no.
19      Now, then, you have to use the information you have now,
20  you can't crystal ball or guess and suppose that at some point
21  in time, hey, it is going to happen. You can't guess and
22  suppose Mr. Ruiz up on to the gurney. You have to know in
23  your heart of hearts that you have answered question number
24  one after thoroughly considered it and giving it the weight
25  that it is entitled to. We told you and you know from voir

1  dire that with this presumption of "no" on this, that the
2  death penalty scheme favors life imprison.
3      What else did Merrilott tell you?  What else did
4  Merrilott tell you.  He told you that with 31 years of law
5  enforcement experience, 19 of which investigating crimes in
6  the TDC system, he is not a highway patrolman, he goes to work
7  in the TDC system.  He has been doing that for 19 years, he
8  told you that after 31 years of law enforcement, he did not
9  feel confident to say if someone was going to be a future
10  danger or not.  He said, "I do not feel confident to make an
11  assessment as to whether someone is going to be a future
12  danger or not."  Now, then, if he can't do it, if he can't do
13  it, and none of you are in law enforcement, how can you
14  suddenly become experts in that regard?
15      You know, what else did he tell you.  "I know convicted
16  capital murderers that are excellent prisoners."  He said you
17  have a day-to-day opportunity to be a good prisoner or bad
18  prisoner and the majority of them are good prisoner, more than
19  the majority.  But you know he came up here and was truthful
20  in that regard.  "I know good convicted capital murderers, who
21  are prisoners."  Now, he didn't have to say that.  He didn't
22  have to say that.  But it was the truth.  And I think you
23  people need to operate from that, from that perspective.
24      Let's go back to the phone calls.  I think I -- I think I
25  addressed them and I told you that they were made out of

1  frustration.  If you look at what you got, once again you are
2  going to see that it is a bunch of cheap trash talk.  And you
3  know, you hear that if you watch a basketball or football
4  game, it is not against the law and it certainly doesn't
5  represent future danger.  Once again I say if you want to be
6  deciding question one on the tangent like that, certainly I
7  can't do anything to stop you.
8      Some of you people said, well, I would like to know if
9  Mr. Ruiz showed remorse or contrition?  I will direct you to
10  State's Exhibit 104, which is just one of the many letters in
11  which he did tell people that he was regretful of what had
12  happened.  That goes more to special issue number two, but I
13  am just pointing that out to you at this point in time.
14      Let's also talk about some of the things that you didn't
15  hear.  You know Dallas County is the second most populous
16  county in Texas, employs these people right here.  They have
17  the ability to subpoena anyone in the world and to fly them
18  here to testify for you, even Huntsville.  They brought
19  Mr. Merrilott from Huntsville, got him up here.  But you know
20  what they didn't bring you, they didn't bring you someone who
21  could come into the courtroom, raise his right hand, come
22  right up here and sit down and look you people in the eye and
23  say, hey, I am a present guard on death row.  I am a prison
24  guard in such-and-such unit.  I am a warden for one of the
25  prison units.  I am a classification officer at the prison,

---

26

1  any of those jobs.  Any of those jobs.  And I have got
2  X-number of years in TDC.  And you know what I have done, I
3  have read Mr. Ruiz's criminal history.  I have read the
4  offense report in this case.  I have looked at his record
5  since he has been in the county jail.  I have looked at his
6  record since he has been in the county jail.  I have evaluated
7  everything that you people have given me.  And in my opinion,
8  he is going to be a continuing threat to society.  We can't
9  handle him, don't send him down there for us to sit on the
10  rest of his life because we won't be able to handle him.  Now,
11  if there was that person on God's green earth, they would have
12  brought him to you.  They would have brought him to you.  And
13  if there was more than one of those people anywhere on earth,
14  they would have had them lined up out in the hall to come in
15  and tell you just the testimony that I say that they owe you
16  to be heard.  They owe you that testimony.  They want you to
17  guess and suppose Mr. Ruiz on to death row.  We are from the
18  State, we want to kill him, trust us, trust us.
19      Well, you know, just the little deal here you know that
20  you can't trust them too much.  But they want you to guess and
21  suppose Mr. Ruiz on to death row.  It is just that simple.
22  Just that simple.
23      You think that out of however many thousand of employees
24  that Texas Department of Corrections has, that they can't
25  bring somebody up here.  They could say, these kinds of people

27

1  are always going to be a threat.  These kinds of people are
2  going to give us hell from dust to dawn and vice versa.  You
3  think there is not somebody that even Merrilott might know.
4  Hey, he is down there, you think he couldn't find somebody.
5  He can't do it.  He can do it.  But don't you think he could
6  tell them, hey, go over and talk to warden so-and-so.  Hey, go
7  over and talk to Joe, he knows about it, he will come up here
8  and set them straight.  He will come up here and let that jury
9  know where and how -- where and how and how long Mr. Ruiz is
10  going to be a continuing threat.  He will set them straight
11  because he has got the experience, he has got the knowledge,
12  and all you got to do is get him at this number right here.
13  You think these people done have phone service.  They owe that
14  to you.  They want you to make one of the most -- one of the
15  most far-reaching decisions that you will make in your life.
16  They want to you make one of the most far-reaching decisions
17  that you will make in your life without all the cards.  And
18  you know they are the ones that shuffle them up and deal them.
19      And you know if you vote for death for Mr. Ruiz, at some
20  point in time, you will be sitting in the kitchen, having your
21  morning coffee, and you will look at the paper and it will say
22  that Wesley Ruiz was executed last night sometime between 6:00
23  and midnight.  And you will go, that was the case that I was
24  on.  And you know you have to look at yourself or look into
25  your inner self and say, you know, I made the State prove to

1  me each and everything that they had to to get me to erase the
2  "no" on question one to answer that "yes". I know in my heart
3  of hearts, I know in my heart of hearts that I did the right
4  thing. Then of course when you finish the paper and read the
5  article, you are going to get up, probably go to the bathroom,
6  shave, put on your makeup, you got to look yourself in the
7  eye, you got to look yourself in the eye. And you have got to
8  be able to once again say, look, I made the State prove to me
9  beyond a reasonable doubt just what this question ask. Just
10  what this question ask. And I didn't cut any corners. I
11  didn't make any compromises. I didn't do anything other than
12  follow my oath to render a true verdict according to the law
13  and the evidence. And I don't have a cross to bear over the
14  way I voted. I can walk down the street and look everybody in
15  the eye. If y'all can do that, I certainly can't quarrel with
16  you. But it is not me to talk to you about that, you have to
17  talk to yourself. And don't give up just because you think
18  you have to go along to get along. If you are disagreeing one
19  way or the other from the other members of the jury, stand up
20  for what you believe, because a compromise isn't something for
21  you to just go along at work or go along at home, a compromise
22  is this man's life.
23      Now, this is a real person that we are here on. And your
24  "no" vote is the most precious thing on earth for Mr. Ruiz.
25  And I ask you not to throw that away. Thank you.

1      MR. BEACH:  May it please the Court?
2  Counsel.
3                    ARGUMENT
4  BY MR. BEACH:
5      And may it please you, members of the jury.
6      It is written that when justice is done, two things are
7  accomplished. First, it brings joy to the righteous. When
8  justice is done it brings joy to the righteous. And that word
9  righteous comes from the Greek word dikaios. It simply means
10  to be in the right. Whether it is in the right relationship,
11  right thinking or right conduct. To be righteous means to be
12  in the right.
13      Unless there be any confusion in this case, I want to
14  talk about who you are going to bring joy to today when you do
15  justice in this case. And I want to start with these two
16  people right here, Cheryl and David Nix. You see they were in
17  the right nearly 40 years ago when they fell in love and got
18  married. They were in the right when they had their two
19  children, first Mark and then Rene. They were in the right
20  when they raised those kids to respect authority, to have
21  values, to want to make a difference in life. And when they
22  sent Mark off to seminary and sent Mark off to college, and
23  when he joined the Navy Reserves, and that day when he became
24  a Dallas Police Officer, they were so proud. You will bring
25  joy to them when you do justice today.

30

1      Who else are you going to bring joy to. Well, back on
2  March the 23rd of 2007, Jeremy Borchardt, Todd Haecker,
3  Patrick Starr, Jason Jarc, they were in the right. They are
4  out protecting the law-abiding citizens of this county. And
5  nobody knew better than Jeremy Borchardt how quickly and
6  irrevocably the life of a police officer could change.
7  Because just six months before, he had been shot and he had
8  been taken to Parkland Hospital and his wounds were treated
9  and he had just been back on active duty a couple of weeks as
10  he wound down his shift on March the 23rd that bright sunny
11  Friday afternoon of 2007.
12      They were in the right when they saw that red and gray
13  Chevy Caprice and got in behind it and gave chase. They were
14  in the right when they backed up and covered that American
15  hero as he approached the passenger's side of that car. And
16  they were in the right at great risk to themselves when this
17  man right here blew holes in that hero's carotid artery and
18  jugular vein and grabbed Mark by the arm and drug him out of
19  the violent zone: The violent zone who epicenter was this
20  man, that gun and 29 more chances to kill a police officer.
21      And they were in the right when they got Mark in that
22  squad car. And you heard Jeremy Borchardt screaming at Mark
23  to hang in there, pressing down on that T-shirt to try to
24  staunch the bleeding. No matter what he did, no matter what
25  he did, there was just too much blood, there was just too much

31

1  blood. And the same surgeon that had treated his wounds six
2  months before, came out that night and told Borchardt, "In
3  spite of what you did, Mark is dead. Mark is dead."
4      And don't you know that that young man had to be thinking
5  at that time, What am I doing? Why am I doing this. Is this
6  really worth it? And by your verdict today, when you do
7  justice in this case, you are going to reaffirm to Jeremy
8  Borchardt and all the other police officers of this city that
9  what they do is worth it. That it does matter, when you do
10  justice today.
11      You will bring joy to one other person. I will submit to
12  you that Mark's entire 33 years here on this earth, and I will
13  guarantee to you Cheryl could have brought a few photographs
14  herself showing little Marky in the bath tub, Marky playing
15  with his nieces. His entire 33 years here on this earth
16  prepared him for March the 23rd of 2007.
17      You see Mark wanted to make a difference, he loved his
18  country, he loved his city, and he had his faith. And
19  everything that comprised that man had prepared him to be the
20  first one in behind that red and gray Chevy Caprice back on
21  March the 23rd of 2007.
22      You see, Mark Nix and this fellow right here, they had
23  nothing in common. Their lives were on parallel tracks. You
24  know while Mark Nix was going to Moody Bible Institute, Slow
25  was running around with Raul Toledo and rest of the Midnight

1  Dreamers tearing up the city of Irving.  When Mark Nix was
2  marching into the city of Baghdad, slow and his girlfriend
3  were running 90 miles per hour from the Dallas Police with
4  that handgun.  And they had never nothing in common.  And the
5  only thing that was ever going to bring those tracks together
6  was this piece of metal right here that symbolize everything
7  that Mark Nix stood for and believed in and everything this
8  man loathe.
9          This piece of metal was the crown of Mark's young life.
10  This piece of metal to this man was a bulls eye.  And if you
11  had asked Mark Nix as he gave chase down Bernal Street that
12  Friday afternoon, if you had asked him that question right
13  there, "Mark, do you think this man is probably going to
14  commit criminal acts of violence?"  Mark probably would have
15  answered, no.  He probably would have thought there is no way
16  that anyone could be as brazen and as bold when they are
17  trapped, when they are surrounded by uniformed Dallas Police
18  Officers, no way that man is going to start shooting.
19          Well, you know, Mark, if you would have said, no, he
20  would have been dead wrong.  Because Mark was at a
21  disadvantage.  He didn't have the information that you 13
22  people had.  He didn't understand fully how harden this man's
23  heart was.  But in his last conscious act, maybe you will
24  remember this before his life's blood trained out to where the
25  oxygen was deprived from the brain long enough to where he

1  lost consciousness.  His last conscious act, Mark Nix was
2  telling Jason Jarc get away, get back, protect yourself --
3          MR. BEACH:  Can I have the lights, Judge.
4  And he could have been telling you folk the same thing.
5          (Video played to the jury.)
6          MR. BEACH:  He is telling you folks, protect
7  yourself.
8          Thanks, Judge.
9          Protect yourself from anybody that is going to come in
10  contact with this man right here.
11          The second thing that happens when justice is done, it
12  brings terror to the evildoer.  And you just heard the voice
13  of the only evildoer here in this courtroom.
14          In spite of their efforts to have you believe that it is
15  really Barbara Ruiz's fault, it is Barbara Ruiz's fault that
16  poor Wesley is sitting in this chair today.  That poor fallen
17  broken woman who has resurrected herself these last ten years,
18  who is now sober and that before March of 2007 had told her
19  son, you are selling this poison to people like me and it is
20  going to kill them.  Why are you doing this, Wes?  They would
21  have you believe it is her fault.
22          They would have you believe that it is Erica Rivera's
23  fault that Wesley is sitting where he is today.  Like Erica
24  Rivera is the only hot-blooded, 20-year-old girl who has ever
25  lived in Dallas County, Texas.

34

1          Folks, there is only one evildoer here in this courtroom
2  today.  And he is sitting right over here, smart, decisive
3  Wesley Ruiz.
4          And like Mr. Brooks told you, Wesley knows right from
5  wrong.  His grandparents told you he was raised to know the
6  difference between right and wrong.
7          You heard from Ms. Drake out at that apartment complex.
8  She told you that Wesley knew the difference between right and
9  wrong and could be mannerable and respectful when he chose to.
10  But smart, decisive Wesley time and time again in his life
11  time has made the conscious choices and decisions to offer up
12  the various parts of his body to do evil, to pursue darkness
13  and to commit crimes.
14          There is only one evildoer here in this courtroom that we
15  are talking to today; and when you do justice today, that you
16  will bring terror to.  But there are others who that aren't in
17  this courtroom today, that when you do justice today, the
18  repercussions will be felt.  You know all the Midnight
19  Dreamers, all the Ledbetter 12s, all the Tango Blast boys out
20  there in the hood, they are going to hear about what happens
21  down here today.  All the Wesley Ruiz wannabes.  The
22  gang-banging, drug-dealing, gun-toting cop killers, they are
23  going to hear about what happens down here today.  And when
24  you do justice today, you will bring terror to them as well.
25          How are you going to do justice, folks, how are you going

35

1  to do justice here in this courtroom today?  You are going to
2  do justice by following your oath and answering these two
3  questions based on the overwhelming evidence that was
4  presented to you.
5          And Mr. Brauchle talks about why the State didn't bring
6  some $200 an hour expert to come up here and testify after
7  reviewing some documents and giving you his opinion at $200 an
8  hour.  Well, folks, I would always rather trust 13 law-abiding
9  citizens of this county with common sense and life experience
10  who have had the opportunity to be in this man's presence for
11  two and a half weeks to observe him, to listen to him, to hear
12  about him.  I would much rather trust you than a $200-an-hour
13  expert.
14          And when you are considering question number two, you can
15  consider what you heard, and you can consider what you didn't
16  hear.  And my jaw dropped when Gilda Kessner, their
17  $200-an-hour expert got up on the witness stand a couple of
18  days ago and told you folks that she was not here to offer any
19  opinion as to question number one.  And she has done it many
20  times in the past, folks, and always for the Defendant.  And
21  you can draw the reasonable deduction from that that even
22  Gilda Kessner understands how dangerous this fellow is right
23  here.
24          And how do you know that?  Well, you know that he will
25  shoot at you even if your two-year-old nephew is in the

1  bedroom right next door. You know that from Raul Toledo. You
2  know he will shoot at you, if you block his car in at a club
3  here in Dallas. You know that from the guy I got in bed with
4  Tito. And believe me, folks, Hector Martinez, he will be
5  back, he will be back. He got lucky this time, but he will be
6  back, and he will be down there -- if you give this man a life
7  sentence, he will be down there dancing with Wesley and all
8  the other Tango Blast boys watching TV and playing softball.
9  But Hector will be back, he got lucky this time.
10      But more important -- or equally as important as to what
11 he has done in his life, you know, who he shot at, including
12 shooting and murdering a Dallas Police Officer in broad
13 daylight because he didn't want to go to the penitentiary.
14 How can you get anymore dangerous than that. What better
15 indicator do you have of how he is going to do down in the
16 penitentiary if he has the gall, the audacity to execute a
17 uniformed Dallas Police Officer in broad daylight. They want
18 you to believe that he is not going to be dangerous. That he
19 is not going to commit some criminal acts of violence in the
20 future. That Wesley Ruiz is not going to commit any kind of
21 violence the rest of his life. He is 28 years old, they want
22 you to believe that.
23      What is equally as important, equally as important to his
24 actions here in his 28 years in the free world is his
25 mind-set. Wesley Ruiz despises authority, absolutely despises

1  authority.
2      You know in these letters Mr. Brauchle talks about a
3  frustrated Wesley, these letters are written way before he was
4  found guilty, you know.
5      "I am tired of being nice to these whooe-ass guards.
6      I can be mean too. These whooes have no idea, I
7      guarantee you, they can't hold me for real. I am
8      real."
9  He will tell you that is just braggadocio. Braggadocio
10 about a guy that has already executed a Dallas Police Officer
11 in broad daylight, you folks, just don't worry about that,
12 that's just Wesley being Wesley. Go ahead and run him back
13 down to the penitentiary now. Put him in the general
14 population, G-3. Put him in there with his Tango Blast
15 buddies. What does Wesley say about the kind of respect he is
16 looking at.
17      "I am chillin right here everyday, I can't even
18      leave my cell unless I have about ten guards around
19      me. They all scared of me."
20 Mr. Brauchle talks about where the disciplinary incident
21 in the Dallas County jail. He got ten guards around him
22 everyday, what kind of opportunity does Wesley Ruiz have in a
23 single cell one hour a day of rec with ten guards around him,
24 by his own admission, to do anything other than stick his
25 hands out and get the handcuffs on. They scared of me,

1  but all the inmates got a lot of love for me, I get a lot of
2  respect, which I always had.
3      You heard that A.P. Merrilott testified to the other day,
4  you kill a cop in the free world -- Mr. Brauchle talks about
5  rock stars and their tattoos, this fellow is going to be a
6  rock star, he is going to go down to the penitentiary and he
7  is going to have status. He is going in as a boss, because he
8  killed a cop and they don't like cops. He is going to have
9  his respect. His opportunities.
10     Wesley writes about to one of his girlfriends about some
11 guy named Joey, again this is before the verdict?
12      "If I was out there, they wouldn't be doing this
13      whooe-shit. I guess they think I am gone forever.
14      Not Slow, hell, nah, Joey is a trifling ass nigga
15      and if I see that nigga again, I will smash his
16      bitch-ass. Put that on my hood W.S."
17 The Westside, you know that's just, if you believe Tito,
18 that is just kind of a neighborhood club.
19      "I am going to slap his bitch-ass."
20 And how does he view guards? Well, you have heard him.
21      "And that shit pissed me off. I said, bitch, they
22      tried and talk's cheap beats bitch being one of the
23      guards, and talk's cheap whooe. And I said I am from
24      that Show Me State. And that whooe-ass guard got so
25      mad."

1      Even though he has ten guards around him, he's saying I
2  am from that Show Me State. He is talking back to them. He
3  will wait for his opportunities down at the penitentiary. And
4  he will have the status and he will have the connections. It
5  is absolutely a reasonable deduction from the evidence that
6  someone who would gun down a Dallas Police Officer in broad
7  daylight, someone with the status and the mind-set of a Wesley
8  Ruiz is going to commit criminal acts of violence that would
9  constitute a criminal threat of whatever society he is in and
10 that doesn't say prison society, folks.
11     And I will guarantee you as long as he has life he has
12 hope. And as long as he has hope, just like he said, I will
13 be back someday. Wesley Ruiz will never give up the hope of
14 being back someday, never give that up. And I can tell you
15 one thing, this Picasso here, this modern art, at least it is
16 above ground, at least it is above ground. He will always
17 have hope.
18     And the only way to make sure that you can guarantee and
19 protect everybody down there at that prison system for as long
20 as this man is alive is to put him there on death row like A.
21 P. Merrilott told you, the most restrictive, closely guarded
22 situation in the penitentiary. Don't put him out there in the
23 day room watching TV, playing softball, working out in the
24 fields with his buddies, with his home boys, with his Tango
25 Blast brothers, it is a recipe for disaster.

I am going to ask you based on the evidence, folks, based on the way he has lived his life, and based particularly on the mind-set that none of you 13 people could ever begin to understand, what has made him so different and so unique that has earned him that chair that he is sitting in today, I am asking you based on that evidence to answer "yes" to question number one.

As to question number two, I would submit to you that it should take you about as long to answer question number two as the time that Gilda Kessner spent with Wesley Ruiz, if you remember, that was no time.  Their $200-an-hour expert came in here and rambled on for 30 minutes, 45 minutes.  When I asked her how long she had ever spent with Wesley Ruiz?  She goes, Well, I see him here in court today and I have seen a photograph of him.  And somehow they want you to believe that what she has to tell you is something you don't already know.

Wesley Ruiz is smart, he is decisive, he is not retarded, he is not insane.  He has had family support.  He was not sexually abused or physically abused.  He has simply made choices like he told his grandfather, he has simply made those bad decisions that has landed him where he is today.  But he did it, he did it for a reason.  He did it to promote his business, his business of drug dealing.  He had that gun to protect his business.  And it didn't matter if a Dallas Police Officer in uniform was trying to interrupt his business,

Wesley was going to do his business.  There is nothing sufficiently mitigating through the facts of this case -- under the facts of this case to justify anything about a "no" answer to question number two.  I am about done.

Last lawyer that you are ever going to have to listen to on this deal and that should be good news.

But if you didn't know it when you came down here on May the 27th, we are living in a broken world.  And it is not going to get fixed until he returns and it is not going to get any better until then.

You know in my lifetime we have gone from Andy Griffith to Desperate Housewives.  And my concern is that one or more of you folks so desensitized by the evil of this world that you are going to think to yourself -- does she need some water -- that you are going to think to yourselves what is the big deal, I mean, he just killed one cop, you know, how am I going to make any difference in this dark evil world by dealing with just one cop killer.  And I will beg you don't do that, don't do that.  It does make a difference.  It makes a tremendous difference what you are going to do down here today.  Because this man has spent his life running from, disrespecting and eventually murdering one of our authorities.  You know and our authorities are in place to deter evil and to punish those who commit it.  And we know how Wesley Ruiz views the authorities in place.  He has no fear, absolutely no fear

---

42

whatsoever.

But today here in this courtroom, you are the authorities.  You are the authorities that can place fear into his heart by the way you answer these questions.  And the way that you do that is by taking a pen and put it in the hand of the foreman and answering "yes" to question number one and "no" to question number two.

As long as he is alive, he will have hope.

Justice in this case to bring terror to this man requires you to answer the questions consistent with the evidence in this case.  And when you do that, you will do justice in this case.

Patience being one of the fruits of the spirit.  I know that one or more of you have had to question security of your salvation in the last few weeks, I know I have.  And like Mr. Brooks and Mr. Brauchle, I absolutely thank you on behalf of Cheryl and David Nix for your patience, for your perseverance and for your service in this case.

But somebody else has been patient too.  Since this lady right here, heard those three words, "Mark is dead," she has had to be patient.  She has been patient for 15 months.  She will be patient today.  And she will be waiting for when you come back.

MR. JOHNSON:  Your Honor, under 36.08 I will make our second argument now.

---

43

THE COURT:  Denied.

MR. JOHNSON:  Your Honor, under 36.08, we have a right to make a second argument.

THE COURT:  That request is denied.

MR. JOHNSON:  Your Honor, will you at least look at the law.

THE COURT:  That request is denied.

THE BAILIFF:  All rise.

(Jury retired from the courtroom.)

THE COURT:  You may be seated.

May I see the attorneys.

(Discussion off the record.)

THE BAILIFF:  All rise.

(Jury returned to the courtroom.)

THE COURT:  You may be seated.

You may proceed, Mr. Johnson.

MR. JOHNSON:  May it please the Court?

ARGUMENT

BY MR. JOHNSON:

Let's talk about special issue number two.  Let's start talking about certain circumstances of the offense, okay, that is part of special issue number two.  That's the first part of special issue number two is looking at the circumstance of this offense, okay.

Now when I first looked at the video of this, we have a

video of this, so we know what the elements of the offense are. The first thing that came to my mind when I looked at that video, and I was asking what is he thinking, and I was talking about the officer who ran up to the window of that car and did what he did. Ran up with the gun in his hand and the asp in the other hand. Put his gun down and went Louieville Slugger and started smashing that window in. What do you think that sounded like? What do you think that sounded like inside that car.

Now, I guess only guess what that officer was thinking. And it appeared to me that what he was thinking was, he was going to bust that window out. He was going to grab whoever was in that car and he was going to do some things to him that weren't going to be nice. Now, whether or not he was going to kill him or not I don't know. But he was certainly going to attack him.

Now, we do know what the person inside the car was thinking because he testified. He told you what he thought was happening. He told you that he thought that he was about to get killed by this man. Well, guess what, he was right, they sure as hell did try to kill him. They didn't accomplish it.

Now, you don't only know that that's what he was thinking, you don't only know that that's what Wes was thinking by his testimony in this courtroom, but the State has

even brought you in evidence this phase of the trial that proves it to you, proves what he was thinking. They brought you letters where he wrote to people and he told them, I thought they were going to kill me. They brought you recordings of his telephone conversations where he said that to the people he talked to on the phone. So we know what Mr. Ruiz thought was about to happen. He thought he was going to be killed. That's one of the circumstances of this offense.

And now, folks, I am not going to argue with you about your verdict in the guilt/innocence phase of this trial. I am not going to tell you that I will ever agree with it, cause I don't, and I never will; but that was your business. That was the decision you made. Now you have got another decision to make, okay.

Now, when we were in voir dire, we talked about many issues. We talked about what capital murder was. That it was murder plus some other circumstance. Now most of the capital murders that we handle down here are murders in the course of a robbery. It is like somebody goes into a 7-Eleven or rob somebody on the street or whatever and wounds up killing them while they are trying to take their money. That is not what this case is. Other capital murders, kidnapping, rape, a murder doing those offenses, that is not what this is either. This isn't a murder for hire, all right. This isn't a murder

46

of an elderly person and it is not the killing of a child. Okay. Those are the things that this is not, all right.

Now, what we have here and, you know we have never argued the fact that this is a capital murder, that this is a killing of a police officer acting in the line of duty. You know that -- we have never disputed that, all right. One of the things that y'all told us in voir dire, each one of y'all told us this, that even though that's what the kind of case this was and even if you found that person guilty of that offense, that y'all could still consider and give a life-without-parole sentence. Y'all could give a life penalty and not the death penalty. Each one of y'all told these lawyers in there room that.

Now, one of the issues that you have got to decide, the first issue Mr. Brauchle talked about, okay. It is kind of ironic to me that the State, in my opinion, proved the answer to that issue too by what they have done with Wes prior to this event, okay. You know, they brought you the evidence that said, you know all this time, we didn't think he was a continuing threat, all right. Now, with this event, you know that has all change. They now want you to take all the information that they had before, they placed him on probation or gave him a hundred days in the jail and they want you to take that same information and they want you to kill him, all right. Now the only thing that they have got to hang their

47

hat on to get y'all to bring this man a death sentence is the circumstances of the offense. The fact that this is the killing of a police officer in the line of duty.

Well, let's talk about some of the other factors involved in that. Besides you know our claim of self-defense. Let's talk about the other things that this is not. This is not an ambush. This wasn't where Wesley set up, you know, had some reason to hide, you know, sniper, a police officer. It is not an ambush, it is nothing like that at all, okay. It is not even premeditated, all right. This was one shot in the heat of the moment. You know what else it isn't, it isn't this officer following the standard operating procedure in this circumstance.

Now, we brought you -- we brought you the rules regarding the standard operating procedure for a felony stop and that's what this is. And I would ask y'all because -- you are looking at this issue differently now, okay. This isn't about self-defense anymore. It is about what are the complete and total circumstances of this offense. I would ask you to take those documents that we brought you, look at what it says about what you do in this circumstance and it will tell you that this was not done properly.

I am going to tell you one thing that proves it to you, if you don't even look at those documents. And that is when Officer Nix takes his firearm, takes his weapon and sets it on

1  the ground, I mean if nothing else shows you that he wasn't
2  doing what he had been trained to do, that should show it to
3  you. But look at those documents.
4       Now, the other thing that they made a point of is that
5  there is some other SOP that trumps the felony stop SOP. They
6  said, well, this became a vehicle pursuit and so everything
7  was off. Well, we brought you that SOP too, nothing in that
8  says that it overrides the felony stop procedures, okay.
9       Let's look at this offense a little further too, okay.
10 Again, what we have is one shot that was fired by Wesley.
11 Now, that one shot tragically hit the officer's badge. The
12 officer had a ballistic vest on. State's own theory is, is
13 that when that bullet hits that badge, it fragments.
14 Fragments go up and hit Officer Nix in the neck cutting those
15 arteries, okay. It is a tragedy, there is no question about
16 that. If that bullet hadn't hit that badge and this argument
17 that that was the target that that's what he was aiming for,
18 that is just absurd, truthfully. I mean, it happened. I
19 don't think that's what he was aiming for. If it doesn't hit
20 his badge, doesn't fragment like it did because of it, none of
21 us would be here today. If it hits -- if it goes through that
22 window and hits that vest, you know, it might knock him back,
23 it might do something else, but it probably doesn't kill you.
24      Now, when you look at all the circumstances of this
25 offense, I think you have to say that after y'all told us all

1  that y'all could consider and give the life penality for this
2  type of offense, this is one where you should do it. This was
3  not handled properly by the police. I am not saying -- I am
4  not trying to tell you that what happened, that it was a good
5  thing by any means. I mean you have got Wesley's letter to
6  his grandfather where he says I regret all of this, okay. You
7  also got his letters and phone conversations where he says,
8  "You know I thought they were trying to kill me." That part
9  is not really at issue. And that's still part of the
10 circumstances of the offense that y'all look at in this part
11 of the trial, okay.
12      Now, the rest of what you look at in this part of the
13 trial is whatever else that you want to look at. We brought
14 you some other evidence. And we brought his family in here,
15 you know, they came and testified. Y'all, I think felt like I
16 did, that they were being honest and sincere about everything
17 they told you, yeah.
18      I don't know that -- I can tell you that I have never
19 seen -- don't know that I have ever seen a father-in-law that
20 come in and say that initially he didn't like the guy that
21 started seeing hi daughter, but after spending some time with
22 him, seeing what kind of a man he was, what kind of a person
23 he was, and then what kind of a father he became, that I
24 actually in effect he came in and chose Wesley over his own
25 daughter. I have never seen that, and I doubt if I ever will

---

50

1  see it again.
2       You also have the landlady who came in and testified that
3  she had actually seen Wesley many times over many years and
4  you heard her testimony. One of the most touching things to
5  me that she testified to was when she told about the time that
6  Wesley actually ran after Erica saying, "I love you, I love
7  you, I love you," as she drove off. What did she say about
8  that, she said I wish I had a man that loved me that much,
9  okay.
10      Now, what you do with that testimony is your business,
11 okay. Whatever you choose about that testimony is your
12 business, all right.
13      Now, the prosecution interestingly to me makes all these
14 comments about us bringing you $200-an-hour experts, okay.
15 Well, you know interestingly enough, we don't have the type
16 of -- point of the round that they have got. What they have
17 got to get witnesses is freedom. They brought you people in
18 here that they had made deals with the devil to get up on the
19 stand and say what they wanted them to say.
20      You had one witness that got up on the stand and told you
21 that her cases were being dismissed completely. You have
22 Hector, who got up on that stand, when they showed him that
23 weapon, he got excited about it. He told you how much he
24 liked that weapon, how much he would like to have that weapon,
25 okay. Well, they made a deal with him, he is not even going

51

1  to go to the penitentiary, oh we will get him later. Oh,
2  maybe they will. They are able to pay for their witnesses in
3  ways that we never can, okay.
4       Now, when you -- the other thing that you need to
5  realize, and you are aware of this, based on the testimony of
6  their witness, Mr. Merrilott, however you say his name. What
7  this represents, you probably figured this out, this is six by
8  eight, okay. No matter what y'all decide today, whichever
9  verdict you come back with, this is where Wesley Ruiz will
10 spend the rest of his life, 23 hours a day. Part of this is
11 taken up by the bed. There is a little part over here where
12 there is a fixture, this combination urinal toilet, sink is
13 also where you wash your hands and brush your teeth and that's
14 all he has got if there, that's where he is going to be.
15      You know another thing that you found out from the
16 evidence that the State brought you at this phase of the
17 trial, Wesley made some comments on those telephone
18 conversations that he wasn't sure if a life sentence was
19 better than the death sentence. I don't know if y'all ever
20 thought about that. Unfortunately, I have had to think of it
21 some because I have handled this guy's cases. You know that's
22 a personal, moral judgment for each person. I don't know
23 which is worse. I really don't, I really don't. I mean it
24 would be a pretty horrible life to spend the rest of your life
25 in a basically what amounts to be a cage this small. Everyday

**53**

1  for however long you live a natural life.  It could be 50
2  years, it could be more than that.  I don't know.  So is that
3  better than just having the State put you to sleep, which is
4  what the State is asking you to do, okay.  Again that's your
5  decision.
6      Each one of you have the right to a personal, moral
7  decision about what to do in this case.  We talked about that
8  in voir dire, okay.  We talked about the fact that each one of
9  you individually has the right to make that decision yourself.
10  And you should respect and all of y'all told us that you would
11  respect the other juror's opinion as well.
12      And I ask you to continue that pledge and do that in your
13  deliberations.
14      We also told you that issue number two is what sometimes
15  is referred to as the safety valve, okay.  If there is
16  anything about this case, whatever it is, and it is up to you
17  each individually that tells you, you know what, all right,
18  yes, I think that he committed the offense that we have found
19  him guilty of, but you know what, I just don't think when I
20  look at everything in total, that this is a situation where I
21  feel like the death penalty is warranted.  I think the
22  life-without-parole penalty is the proper verdict.
23      Folks, it's in your hands now.  God bless you and help
24  you in your decision.
25              THE COURT:   Thank you, Mr. Johnson.

**54**

1              MR. BRAUCHLE:   Your Honor, we would object to
2  that as being outside the record.
3              THE COURT:   Overruled.
4              MR. BEACH:   He doesn't give an "F" about
5  anything or anybody except Wesley Lynn Ruiz.
6              THE BAILIFF:   All rise.
7      (Jury retired from the courtroom to deliberate.)
8              THE COURT:   You may be seated.
9      (Pause in the proceedings.)
10              THE COURT:   Outside the presence of the jury.
11  Let the record reflect that upon the jury retiring to the jury
12  room after the first set of arguments that the Court
13  instructed the bailiff to retrieve the charge and order the
14  jurors not to deliberate.
15      Is there anything else that either side wishes to put on
16  the record?
17              MR. BROOKS:   Yes, Your Honor.
18              MS. SMITH:   We just wanted to document that the
19  jury was only out for a few minutes, there was not a big lag
20  time between them going out and coming back in.  And they have
21  only just now requested copies of the charge.  They have had
22  no opportunity to begin deliberating before Mr. Johnson was
23  allowed to make his argument.
24              THE COURT:   That is correct.  The jurors did ask
25  for individual charges, which those copies are being made at

**55**

1  this time.
2      Either side wish to call any witness?
3              MR. BROOKS:   We would like to call Sheriff
4  Crump.
5              THE COURT:   If you will raise your right hand.
6      (Witness was duly sworn.)
7              **KELVIN CRUMP**
8  was called as a witness, after having been duly sworn by the
9  Court, testified under oath as follows:
10              **SUB ROSA EXAMINATION**
11  BY MR. BROOKS:
12      Q.   And can you tell the Court what time you originally
13  retired the jury.
14      A.   Officer Avenn actually took them back to the jury
15  room, but I retrieved the charge at approximately 10:40.
16      Q.   And they had been instructed not to begin
17  deliberation?
18      A.   Yes and I was informed they were not deliberating at
19  the time.
20              MR. BROOKS:   Pass the witness.
21              MR. PARKS:   We have no questions of the witness,
22  Your Honor.
23      I would, however, for the record like to state that I was
24  keeping time and that I made a notation that Mr. Beach's
25  argument began at 10:01 and ended at 10:30 and that the jury

*Column 2 (page 53):*

1      The Defense exceeded the time limit by nine minutes and I
2  will afford the State the same amount of time of 14 minutes.
3              **ARGUMENT**
4  BY MR. BEACH:
5      I lied to you again, I thought I was going to be the last
6  lawyer to talk to you.
7      He is not going to be in there all by himself.  You know
8  that.  He is going to be G-3, he could be in here with a DWI
9  guy, a burglar, check writer, with a 18-year-old boy the next
10  five, ten years, as long as he is good, not getting caught
11  down there, watching TV, working in the kitchen.  Y'all know
12  what the evidence is in this case.  If anybody, once you get
13  back there, and believe me I am the last one you are going to
14  hear, I promise you, anybody want to swim out and try to help
15  this fellow, I want you to remember his mind-set.  His
16  mind-set about authority, who he is going to be around the
17  rest of his life unless he escapes.  Then he will be back here
18  on the streets of Irving, out in West Dallas on the west side.
19  Remember his mind-set, how he feels about guards, those
20  bitches and whoes, how he feels about the police, I am not
21  going to use the term it has something to do with suckers.
22  And how he feels about you.
23      (Audio played to the jury.)
24              MR. BEACH:   "Fuck them people, fuck them people,
25  that jury is full of shit, fuck them too."

56

57

1    was removed immediately thereafter, at about 10:31 or 10:32.
2    When they came back into the courtroom it was 10:55, and 10:55
3    when Mr. Johnson began his argument.  So just for purposes of
4    time, that was the time that I had marked.
5                THE COURT:  Anything further?
6                    **SUB ROSA EXAMINATION**
7    BY MR. BROOKS:
8         Q.    Just need a clarification what time Deputy Crump
9    retrieved the charge?
10        A.    I retrieved it at 10:40.
11        Q.    And you instructed not to deliberate?
12        A.    Yes.  And I was informed that they had not started
13   yet.
14               THE COURT:  Anything further?
15               MR. BROOKS:  Only one other thing, Judge, with
16   respect to this situation, obviously the Defense is not
17   required to notify the State of their strategy or how they
18   intend to proceed with trial.  I have been a practicing
19   attorney for 18 years, specifically in criminal law, and in my
20   experience this is the first time this type of dealing with
21   closing argument has ever been presented, and that's why the
22   jury found themselves in this situation.  I just want that on
23   the record, Judge.
24               MR. JOHNSON:  Thanks.
25               THE COURT:  Anything further?

1                (Recess taken.)
2                THE COURT:  Outside the presence of the jury,
3    the jury sent the third note indicating that they would like
4    to see the video, dash-cam video from Officer Nix's car frame
5    by frame and they did have a request that the courtroom be
6    empty of spectators.
7         Due to the equipment that needs to be operated by a third
8    person, both sides have agreed to have an investigator from
9    each side present.  The investigators have been admonished not
10   to converse with the jurors outside of their desire to see
11   more footage or different video.  And not to -- they have been
12   admonished not to disclose any of the comments made by the
13   individual members of the jury during this process.
14        Both sides in agreement with that -- State is in
15   agreement?
16               MR. BROOKS:  State is in agreement?
17               THE COURT:  Is the Defense in agreement?
18               MR. BRAUCHLE:  Yes, Your Honor.
19               THE COURT:  Very well.  I will bring the jury in
20   and I will admonish them to that and we will allow them to do
21   their thing.
22               (Jury returned to the courtroom.)
23               THE COURT:  Members of the jury, we will have
24   the same procedure that we had during the trial.  There will
25   be an investigator from each office, the Defense team as well

58

59

1    as State's investigator, due to the fact that it take someone,
2    a third person to operate the equipment.  The investigators
3    have been instructed not to disclose any comments made by the
4    jury during this process.  And I will admonish you not to
5    speak with them outside of anything -- if you need to see any
6    additional footage, then they have been instructed to make
7    available to you whatever you desire to see.
8         And with at that being said everyone will step outside
9    the courtroom.
10               (Recess taken.)
11               THE COURT:  I just want to put on the record the
12   situation with the alternate.  I don't know if you know what
13   the situation is.
14               MS. HANDLEY:  I think you are going to talk --
15   talking about in terms of transporting her?
16               THE COURT:  Right.  And we are working on that.
17   Why don't you come up here?
18               MS. HANDLEY:  Sure.
19               (Discussion off the record.)
20               THE COURT:  Outside the presence of the jury.
21        Let the record reflect that the alternate juror indicated
22   that she had a death in the family and desire to attend a
23   funeral tomorrow in Pittsburg, Texas.  The Court is having the
24   sheriff's department to look into seeing if she can be
25   escorted by a deputy sheriff to that funeral.  In the event

1    that is not possible, it is the juror's intention to drive to
2    the funeral with her husband and after the funeral return back
3    to the Court pending further orders from the Court.
4         Does either side have an objection to either of those
5    scenarios taking place?
6                MR. BEACH:  None from the State.
7                MR. PARKS:  None from the Defense Your Honor.
8                THE COURT:  Either side have any additional
9    requests -- of course the Court would admonish her with
10   respect to discussing the case with anyone.
11        Either side have any additional requests?
12               MR. PARKS:  Just make sure she understands that
13   anyone means her husband.
14               MR. BRAUCHLE:  Or the car radio, there are a lot
15   of ways she can get information about it.
16               THE COURT:  The Court will admonish her to all
17   of the above.
18               MR. BEACH:  That she can't consume any alcohol.
19               THE COURT:  Off the record.
20               (Discussion off the record.)
21               THE COURT:  Both sides ready for the jury.
22               THE BAILIFF:  All rise.
23               (Jury returned to the courtroom.)
24               THE COURT:  The jury may be seated.
25        You may be seated.

1   Is the presiding juror Mr. Gage?
2           PRESIDING JUROR:   Yes, Your Honor.
3                       **VERDICT**
4           THE COURT:   And sir, with respect to special
5   issue number one, you find from the evidence beyond a
6   reasonable doubt that there is a probability that the
7   defendant, Wesley Lynn Ruiz, will commit criminal acts of
8   violence that will constitute a continuing threat to society,
9   did the jury answer that, "yes"?
10          PRESIDING JUROR:   Yes, Your Honor, we did.
11          THE COURT:   And if that is the verdict of each
12  and every juror, can you indicate by raising your hand.
13          (Jurors comply.)
14          THE COURT:   And with respect to special issue
15  number two, do you find taking into consideration all the
16  evidence including the circumstances of the offense the
17  defendant's character and background the personal, moral
18  culpability of the defendant that there is sufficient
19  mitigating circumstance or circumstances to warrant that a
20  sentence of life imprisonment without parole rather than a
21  death sentence be imposed did the jury answer that "no"?
22          PRESIDING JUROR:   Yes, Your Honor we answered,
23  no.
24          THE COURT:   And if that is the verdict of each
25  and every juror can you indicate by raising your hand.

1   Ladies and gentlemen, your service as jurors is completed
2   at this time.  You are released.
3           MR. BRAUCHLE:   We would ask that they be polled,
4   Your Honor.
5           THE COURT:   With respect to both issues?
6           MR. BRAUCHLE:   (Nods head).
7           THE COURT:   With respect to special issue number
8   one, is that the verdict of each and every individual juror
9   can you indicate by raising your hand.
10          (Jurors comply.)
11          THE COURT:   Let the record reflect that each
12  juror has raised his or her hand.
13          And with respect to special issue number two, for all
14  those jurors that have voted no on that issue, will you
15  indicate by raising your hand.
16          Let the record reflect that each and every juror has
17  raised their hand.
18          MR. BRAUCHLE:   They are not being polled, Your
19  Honor.
20          THE COURT:   Individually with respect to each
21  issue.
22          With respect to special issue number one -- I don't have
23  each and every juror's name, but Mr. Gage, starting with you
24  is that your verdict with respect to special issue number one?
25          PRESIDING JUROR:   Yes, Your Honor.

62

1           THE COURT:   And working down to Mr. Gage's left,
2   sir, is that your verdict?
3           THE JUROR:   Yes, Your Honor.
4           THE COURT:   Ma'am is that your verdict "yes" to
5   special issue number one?
6           THE JUROR:   Yes.
7           THE COURT:   Ma'am?
8           THE JUROR:   Yes.
9           THE JUROR:   Yes.
10          THE COURT:   You, sir?
11          THE JUROR:   Yes.
12          THE COURT:   And the back row?
13          THE JUROR:   Yes.
14          THE JUROR:   Yes.
15          THE JUROR:   Yes.
16          THE JUROR:   Yes.
17          THE JUROR:   Yes.
18          THE JUROR:   Yes.
19          THE COURT:   Okay.  Let the record reflect that
20  each individual juror indicated "yes" with respect to special
21  issue number one.
22          With respect to number two, Mr. Gauge, is "no" your
23  verdict?
24          PRESIDING JUROR:   Yes, Your Honor.
25          THE COURT:   And, sir, next to you?

63

1           THE JUROR:   Yes, Your Honor.
2           THE COURT:   Ma'am?
3           THE JUROR:   Yes.
4           THE COURT:   And ma'am.
5           THE JUROR:   Yes.
6           THE JUROR:   Yes.
7           THE JUROR:   Yes, Your Honor.
8           THE JUROR:   Yes.
9           THE JUROR:   Yes.
10          THE JUROR:   Yes.
11          THE JUROR:   Yes.
12          THE JUROR:   Yes.
13          THE JUROR:   Yes.
14          THE COURT:   Let the record reflect that with
15  respect to special issue number two, each and every juror has
16  indicated that that was their verdict, that being "no" with
17  respect to special issue number two.
18          Ladies and gentlemen, this will include your service as
19  jurors.  You are released from all the admonishments that I
20  gave you earlier.
21          Sheriff, if you will take the jury to the back room.
22          THE BAILIFF:   Yes, Your Honor.
23          All rise.
24          (Jury retired from the courtroom.)
25          THE COURT:   You may be seated.



65

```
 1      Counsel, is there any legal reason why sentence should
 2   not be pronounced at this time?
 3              MR. BRAUCHLE:  No legal reason.
 4                  SENTENCING
 5              THE COURT:  If the Defendant will rise.
 6      It is therefore the order of this Court that the
 7   defendant, Wesley Lynn Ruiz, herein who has been judged to be
 8   guilty of the offense of capital murder and whose punishment
 9   has been assessed by the verdict of death by the jury shall be
10   delivered by the sheriff of Dallas County, Texas immediately
11   to the director of the Institutional Division of the Texas
12   Department of Criminal Justice where any person legally
13   authorized to receive such convict to be confined in said
14   institutional division in accordance with the division of the
15   law, governing the Texas Department of Criminal Justice
16   Institutional Division to a date for your execution is imposed
17   by this court after receiving in this court the mandate of
18   affirmance from the Court of Criminal Appeals of the State of
19   Texas.
20      You may be seated.
21      What says the State?
22              MR. BROOKS:  Call Cheryl Nix.
23      (Victim impact.)
24              THE COURT:  The defendant is remanded to the
25   jail until the date to be announced.
```

(End of proceedings.)

66

```
 1   THE STATE of TEXAS )
 2   COUNTY of DALLAS  )
 3          I, BELINDA G. BARAKA, Official Court Reporter in and
 4   for the 194th Judicial District Court of Dallas County, State
 5   of Texas, do hereby certify that the foregoing contains a true
 6   and accurate transcription of all portions of evidence and
 7   other proceedings requested in writing by counsel for the
 8   parties, to be included in this volume of the Reporter's
 9   Record, in the above-styled and -numbered cause(s), all of
10   which occurred in open court or in chambers and were reported
11   by me.
12          I further certify that this Reporter's Record of the
13   proceedings truly and correctly reflects the exhibits, if any,
14   admitted by the respective parties.
15          I further certify that the total cost for the
16   preparation of this Reporter's Record is $ _____ and was
17   paid by the State/Defense.
18          WITNESS MY OFFICIAL HAND this the 30th day of
19   May , A.D., 2009.
20
21
22              BELINDA G. BARAKA, CSR #5028
23              Official Court Reporter
24              133 N. Industrial
25   Certification Expires:  12-31-09   Dallas County, Texas  75207
```

67

DISCLOSURE

NOTE:          Supreme Court Rule Adopted and Promulgated in Conformity with Chapter 52 of the Government Code, V.T.C.A.

Please be advised that pursuant to Supreme Court Rule IV, B.4 with regards to disclosure, I to the best of my knowledge, have no existing or past financial, business, professional, family, or social relationships with any of the parties of their attorneys which might reasonably create an appearance of partiality, except as follows:  NONE.

BELINDA G. BARAKA, CSR #5028
Official Court Reporter
194th Judicial District Court
133 N. Industrial Blvd.
Dallas County, Texas  75207

*Belinda G. Baraka, Official Court Reporter*
*214.653.5803*