EX PARTE:

CAUSE NO          W07-50318-M (A)

IN THE 194th JUDICIAL DISTRICT

WESLEY LYNN RUIZ

COURT OF DALLAS COUNTY, TEXAS

---

## POST CONVICTION WRIT OF HABEAS CORPUS

### (ART. 11.07, V.A.C.C.P.)

---

ATTORNEY FOR APPLICANT:

Lydia Brandt
The Brandt Law Firm
P.O. Box 850843
Richardson, TX   75085

ATTORNEY FOR STATE:

Honorable Craig Watkins

Frank Crowley Courthouse

Dallas, Texas   75207-4313

GARY FITZSIMMONS
DISTRICT CLERK
Frank Crowley Courthouse
133 N. Riverfront Blvd., LB 12
Dallas, TX   75207-4313



1  EX PARTE:                                    CAUSE NO:       W07-50318-M (A)

2                                               IN THE 194th JUDICIAL DISTRICT

3  WESLEY LYNN RUIZ                             COURT OF DALLAS COUNTY, TEXAS

4  _____

5                          **Death Penalty**

6                              **Index**

7

8   Clerk's Cover Sheet                                      Vol. 1-01

9   Application for a Writ of Habeas Corpus Seeking Relief   Vol. 1-02
    From Final Felony Conviction Under Code of Criminal
10  Procedure, Article 11.07      (06 Dec 10)

11  Supplemental to Application for Post Conviction Writ of  Vol. 1-59
    Habeas Corpus Under Tex. Code Crim. Proc. § 11.071
12  (10 Dec 10)

13  Writ Docket                                              Vol. 1-63

14  Waiver of Service    (22 Dec 10)                         Vol. 1-64

15  State's Original Answer to Application for Writ of       Vol. 1-65
    Habeas Corpus in Death Penalty Case   (05 Apr 11)

16
    State's Original Answer to Application for Writ of       Vol. 1-134
17  Habeas Corpus in Death Penalty Case   (05 Apr 11)

18  Gary Aven - Statement                                    Vol. 1-199

19  Kevin Brooks - Statement                                 Vol. 1-203

20  Cheryle Nix – Statement                                  Vol. 1-207

21  Respondent's Proposed Order Designating the Issues to be Vol. 1-209
    Resolved by Affidavits, Depositions, Interrogatories, or
22  Evidentiary Hearing   (05 Apr 11)

23

1  WESLEY LYNN RUIZ                                                    PAGE    2

2  W07-50318-M (A)

3  ===============================================================  ===========

4  Defendant's Memorandum of Law Supporting Admission of                Vol. 1-212
   Evidence Regarding Reputation and Prior Bad Acts of
5  Mark Nix  - Ground 2

6  Reporter's Record – Volume 46 of 59                                  Vol. 1-218
   Ground 2 – Jury Trial  (Extraneous Conduct of Nix)
7

8  Reporter's Record – Volume 51 of 59                                  Vol. 1-225
   Ground 6 – Punishment Hearing  (Objections to Ct.Rm Security)

9  Reporter's Record – Volume 38 of 59                                  Vol. 1-230
   Ground 7 – Pretrial Hearing  (Motion for Continuance)
10

11 Reporter's Record – Volume 40 of 59                                  Vol. 1-239
   Ground 7 – Pretrial Hearing  (Testimony of Briseno, Richardson & Cody)

12 Reporter's Record – Volume 43 of 59                                  Vol. 1-257
   Ground 7 – Jury Trial  (References to Murder Weapon)
13

14 Motion to Introduce the Testimony of Defendant's Family              Vol. 1-263
   And Friends Regarding Their Feelings on the Prospect of a
15 Death Sentence and the Impact an Execution Would have on
   Them   - Ground 8

16 Ex Parte Sealed Motion for Funding for Fact Investigation/Granted    Vol. 1-273
   Cliff Jenkins    (14 Sep 11)
17

18 Ex Parte Sealed Motion for Funding for Fact Investigation/Granted    Vol. 1-277
   Mary Burdette    (14 Sep 11)

19 Ex Parte Sealed Motion for Funding for Expert (Kessner)              Vol. 1-280
   For Evidentiary Hearing/Granted   (16 Sep 11)
20

21 Stipulation to Errata Sheet for Reporter's Record   (17 Nov 11)      Vol. 1-285

22 Clerk's Certificate                                                  Vol. 1-288

23

**W07-50318-M (A)**

| | |
|---|---|
| **EX PARTE:** | **APPLICATION FOR WRIT OF HABEAS CORPUS** |
| | **IN THE 194th JUDICIAL DISTRICT** |
| **WESLEY LYNN RUIZ** | **COURT OF DALLAS COUNTY, TEXAS** |

**CLERK'S COVER SHEET**

**APPLICANT'S NAME:**     Wesley Lynn Ruiz

**Offense:**     Cap Mur PO

**Sentence:**     Death TDCJ; Fine $-0-; Cost $236.00

**Trial Date:**     July 11, 2008

**Judge's Name:**     Judge Ernest White

**Appeal:**     Yes

**Court of Appeals Cause Number:**   N/A

**Court Reporter:**     N/A

**Hearing Held:**    No

**Findings of Fact & Conclusions Filed:** Yes

**Recommendation:**    Denied
  (Trial Court's recommendation regarding Application)

**Judge's Name:**     Same as Above
(If different from Trial Judge)

1

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
194th JUDICIAL DISTRICT, COLLIN COUNTY, TX

---

**TCCA Cause No.  AP-75,968**
194th Judicial District, Cause No. F07-50318-M

---

**Ex Parte WESLEY LYNN RUIZ**, Petitioner

---

*Application*
For Post Conviction Writ of Habeas Corpus
under TEX. CODE CRIM. PROC. § 11.071

&
*Motion for Evidentiary Hearing*

&
*Exhibits*
in Support Thereof

---

**DEATH-PENALTY CASE**

**ORIGINAL**

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas  75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR WESLEY LYNN RUIZ

2

## AFFIDAVIT OF FACT

STATE OF TEXAS                  §
                                §
COUNTY OF DALLAS                §

BEFORE ME, the undersigned authority, on this day personally appeared Clifton Jenkins,

who being by me duly sworn, did depose and state upon his oath as follows:

1. My name is Clifton Jenkins. I am over twenty-one years of age and am fully competent to make this affidavit.

2. I was appointed as the fact investigator in the state capital habeas litigation styled: Ex parte Wesley Lynn Ruiz, 194th Judicial District Court, Dallas County, TX  No. F07-50318-M, Texas Court of Criminal Appeals No. AP-75,968.

3. I am a private investigator, License No. A05152, under Chapter 1702 of the Texas Occupations Code and rules Approved by the Texas Department of Public Safety. I have been appointed by various state and federal court judges over the past twenty (20) years. I worked with defense attorneys in both capital and non-capital cases.

4. On April 6, 2010, the Honorable Ernest White, Judge of the 194th Judicial District Court, Dallas County, TX appointed me as the Fact Investigator to assist defense counsel in the preparation of the state Application for Writ of Habeas Corpus on behalf of the Applicant, Wesley Lynn Ruiz, who a jury found guilty of capital murder and was sentenced to death.

5. My conclusion below is based on the following document review and chronological investigation:

   a. I began my fact investigation by viewing and noting the Summary and the Conclusion of the Shooting Investigation, Control Number 07-062, August 2, 2007, attached hereto as Exhibit 1. This documentation reflected that the incident started when undercover officers observed a vehicle possibly wanted by homicide detectives in a capital murder case. Shortly after that, two marked police vehicles, and the undercover vehicle followed the suspect vehicle. The lead police vehicle was driven by Senior Corporal Mark Nix. Senior Corporals Todd Haecker and Jeremy Borchardt were in the second police vehicle. The chase ended when the suspect vehicle lost control and Officer Nix stopped his vehicle bumper to bumper with the suspect's vehicle. Officer Nix exited his car and immediately attempted to breach the right front window of the suspect's vehicle with his ASP baton. The suspect fired one round from his weapon, striking Officer Nix's upper chest area. Officers

3

Borchardt, Jarc, Haecker and Starr fired numerous rounds from their weapons. (Shooting Investigation, Control No. 07-062, p.1).

b.    I viewed and noted the remainder of the 29 page report, Control Number 07-062, August 2, 2007. In it, Deputy Chief of Police, Internal Affairs Division wrote in his Conclusion: "At the end of the vehicle pursuit, Senior Corporal Nix immediately engaged the suspect vehicle without having the opportunity to conduct a proper felony traffic stop of a possible murder suspect. (Shooting Investigation, Control No. 07-062, p. 29).

c.    I viewed and noted two CD-R Compact Discs, one from Officer Nix's vehicle, and the other from the Officers Borchardt/Haecker police vehicle. I noted that this data recorded that when Officer Nix could not break the suspect's window, he laid down his weapon and began to swing at ASP baton with both hands. Officer Haecker appeared to be approximately six feet in back of Officer Nix. (Disk One Squad 6065). Yet Officer Haecker stated he observed Officer Nix attempt to gain entry of the suspect's vehicle by smashing the front window with his ASP baton. Officer Haecker also said that he does not know if Officer Nix had his weapon drawn. (Shooting Investigation, Control No. 07-062, p.2).

d.    I then searched for the audio transmissions that complement the video transmissions. I located two discs: Channel 5 and Channel 8. I listened to them and noted the audio transmissions made on March 23, 2007, from 5:36 pm to 6:40 pm. Officer Nix was killed at 5:37 pm. (Compact Disc CD-R 03/23/07, 537-640, Ch. 8, and Compact Disc CD-R, DFD, 03/23/07, 537-640p, Ch. 5).

e.    I reviewed the trial records, which reflect that all other audio transmissions were erased thirty (30) days after the encounter between Officer Nix and Applicant Ruiz. I could not find a subpoena, or a court order from the defense or the prosecution to preserve any and all audio/video recordings within the thirty (30) days from the offense.

f.    I reviewed the trial records, which reflect that the defense did file a Motion to Dismiss or Preclude Imposition of Death Penalty for Failure to Preserve Evidence. The motion was filed on May 23, 2008, and attached to this Affidavit as Exhibit 2. The trial testimony reflects that Officer J.S. Briseno testified that hypothetically, he would expect that there could be sound throughout the video camera's operation in Officer Nix's vehicle. (Reporter's Record, Vol. 40, p. 27).

Clifton Jenkins, Affidavit of Fact #1 – record destruction
Ex parte Wesley Lynn Ruiz, 194ª Judicial District Court, Dallas County, TX  No. F07-50318-M
Texas Court of Criminal Appeals No  AP-75,968

2

4

6.  My investigation revealed that on March 23. 2007 there was an encounter between Applicant Ruiz and Dallas Police Officer Mark Nix on March 23. 2007 that resulted in the death of Mark Nix, the indictment of Applicant Ruiz for capital murder, and ultimately a guilty verdict and sentence of death of Applicant Ruiz. (Clerk's Record, Indictment, p. 2).

7.  On March 23, 2007, there had been a harrowing chase of the car driven by Applicant Ruiz by several marked and unmarked police vehicles, which law enforcement believed was the same make, model and color scheme, as that of a car identified as having been linked to a murder on Southerland street the week before. Applicant Ruiz had no connection to, or knowledge of, this murder. (Reporter's Record Vol. 42, p. 34-40).

8.  The chase ended with Applicant Ruiz's car stopped bumper to bumper with the lead chase police vehicle. (Reporter's Record Vol. 42, p. 56). The vehicle, which Ruiz was driving, had heavily tinted windows. (Reporter's Record Vol. 42. p. 57). In the course of my investigation, I located Dallas Police Academy Lesson Plan Subject: S.O.P. 1200 Barricaded Person. IV. Presentation (Implementation of Instruction), No. 7. Handling Suspects. Letter A). If a barricaded person situation exists, 1. 2. 3. and 4.

9.  Despite the fact that Applicant Ruiz was barricaded inside the vehicle, Officer Mark Nix ran toward the blocked vehicle, yelling at whoever was inside to exit the vehicle. and began vigorously beating on the on the heavily tinted window with his expandable baton according to trial testimony of fellow officers. (Reporter's Record Vol. 42, p. 57). Officer Nix placed his gun on the ground because he wasn't making any headway with the baton and started to use two hands to hit the window with the baton. A shot came from inside the vehicle, and Officer Nix was mortally wounded. (Reporter's Record Vol. 42. p. 58).

10. In the course of my investigation, I located Exhibit 1:Summary and the Conclusion of the Shooting Investigation, Control Number 07-062. August 2, 2007, page 29. In it, Calvin A. Cunigan, Deputy Chief of Police Internal Affairs Division stated in the conclusion of the Shooting Investigation:

    > "Senior Corporal Nix immediately engaged the suspect vehicle without having the opportunity to conduct a proper felony traffic stop of a possible murder suspect."

11. Given that there was no emergency that required the immediate extraction of Applicant Ruiz from the vehicle, the conclusion of Calvin A. Cunigan, Deputy Chief of Police Internal Affairs Division lead me to investigate further to determine whether there was documentation that would reveal why Officer Mark Nix would place himself and fellow officers in danger when all he had to do was to follow the policy and procedure for extracting a barricaded suspect, and call the SWAT Team to remove Applicant Ruiz from the vehicle if it came to that.

Clifton Jenkins, Affidavit of Fact #1 – record destruction
Ex parte Wesley Lynn Ruiz, 194th Judicial District Court, Dallas County, TX No. F07-50318-M
Texas Court of Criminal Appeals No. AP-75,968

3

5

12.   My investigation lead me to consider whether there existed information that could possibly reveal Officer Nix's state of mind at the time of the incident. I began this aspect of the investigation with a review of the trial transcript, Reporter's Record Vol. 47, p. 16, in which Applicant Ruiz testified that Officer Nix jumped out his police vehicle, his gun in hand, yelling:

> "Freeze, you try to run from me motherfucker, I am going to kill you if you try to run."

13.   Based on my prior experience as a private investigator, I searched for the audio transmissions that are generated from police radio traffic from all channels prior to the commission of the offense. I believed that these audio transmission might be the key source of information to resolve the question as to why Office Nix would act so precipitously.

14.   I located an Audio-Recorded Interview of Officer Haecker, conducted by the Internal Affairs Division of the Dallas Police Department. Exhibit 3: Internal Affairs Division Dallas Police Department Headquarters. Audio-recorded Interview of Senior Corporal Todd Haecker, Badge No. 7996. Date of Interview: July 3, 2007. In that Audio-Recorded Interview, Officer Haecker testified that he observed Officer Nix run up to the front portion of the back passenger door giving verbal commands to the suspect. He further stated that Officer Nix had a baton in his hand, but couldn't recall if Officer Nix had his gun drawn.

15.   I then again searched the record, including the trial record and defense counsel files, to locate any and all police audio recordings concerning the incident. I learned that the State of Texas failed to file a motion to preserve the audio recordings made at the time of the incident, March 23, 2007. As a result, the audio recordings of the police radio traffic had been erased 30 days after the encounter between Officer Nix and Applicant Ruiz.

16.   The trial record contained a Defense Motion to Dismiss or Preclude Imposition of Death Penalty for Failure to Preserve Evidence, dated May 23, 2008, at 8:31 am. The defense motion was filed because no request had been made by the State of Texas. It appears that the defense attorneys for Applicant Ruiz took the position that the burden to preserve the audio recordings rested on the State of Texas.

17.   From CD-R Compact Disc #537-640 of Channel 8, retrieved on 03/23/07, and from Compact Disc DFD #537-640 of Channel 5, retrieved on 03/23/07, I was able to retrieve the transmissions from channel 5, which is a main channel of police radio traffic, and also channel 8. I listened to the channel 5 and channel 8 audio transmissions of police radio traffic from the March 23, 2007 incident, from 5:36 pm to 6:40 pm. Officer Nix was mortally wounded at 5:37 pm. All other audio records of police radio traffic had been erased,

Clifton Jenkins, Affidavit of Fact #1 – record destruction
Ex parte Wesley Lynn Ruiz, 194th Judicial District Court, Dallas County, TX No. F07-50318-M
Texas Court of Criminal Appeals No. AP-75,968

4

6

and were unavailable to me to listen to.

18. The Channel 5 and Channel 8 audio transmissions of police radio traffic on March 23, 2007 reflect the audio transmissions from 5:36 pm to 6:40 pm, including the shooting of Officer Nix at 5:37 pm. The transmission records: "officer down." However, these recordings do not contain any radio conversation to or from Officer Nix that may have disclosed his state of mind.

19. Because the channel 5,and channel 8 audio transmissions of police radio traffic from the March 23, 2007 incident were not helpful, I turned my attention to trying to locate any other source that could have preserved the audio of the encounter between Officer Nix and Applicant Ruiz.

20. A possible source that could have preserved the audio of the encounter between Officer Nix and Applicant Ruiz would have been the audio/video equipment in Officer Nix's vehicle. This is confirmed by the trial testimony of Dallas Police Officer J.S. Briseno. Officer Briseno testified that hypothetically, he would expect that there would be sound throughout the video camera's operation in Office Nix's vehicle. (Reporter's Record, Vol. 40, 27).

21. It is my experience as a defense investigator that the performance of the defense attorneys representing Applicant Ruiz was deficient because they failed to immediately issue and deliver a subpoena, or a court order to preserve any and all audio/video recordings to a proper place of custody of the records to prevent the very problem in the Ruiz case – the erasure of the audio communications of what transpired between Officer Nix and Applicant Ruiz on March 23, 2007.

22. It is also my opinion that the deficient performance of the defense attorneys was unfairly prejudicial because the erasure of this audio communication is crucial to Applicant Ruiz's assertion that Officer Mark Nix acted *un*lawfully in the performance of his duties, in turn giving rise to various defenses which were not raised at all or raised inadequately at trial, as for example, that Applicant Ruiz acted in self-defense, and that Officer Mark Nix engaged in official oppression.

23. This information would have been crucial to support the defense assertion through cross examination of Officer Todd Haeckler by defense attorney Johnson that Applicant Ruiz acted in self defense:

Johnson:    Now, hypothetically if – if you pulled me over on your marked squad car, and I jumped out of my car and started running at you with an asp in one hand and a gun in my other hand, I would be coming at you with what would be considered a deadly weapon; is that correct?

Clifton Jenkins, Affidavit of Fact # 1 – record destruction
Ex parte Wesley Lynn Ruiz, 194th Judicial District Court, Dallas County, TX No. F07-50318-M
Texas Court of Criminal Appeals No. AP-75,968

5

7

| | |
|---|---|
| Haeckler: | Yes. |
| Johnson: | and if you thought that I was going to cause serious bodily injury or death as I was coming at you, you would be able to act in self-defense; is that correct? |
| Haeckler: | As a reasonable person making a reasonable assumption, yes. |
| Johnson: | And that's basically what self-defense is? |
| Haeckler: | Yes, it is. |

(Reporter's Record, Vol. 43, pp. 121, 122)(No further questions were asked by the defense).

24. Based on my fact investigation it is my professional opinion and conclusions:

   a. Ruiz was a barricaded suspect: The manner in which the vehicle of Applicant Ruiz was blocked, and the fact that numerous police officers surrounded the vehicle of Applicant Ruiz, made Ruiz a barricaded suspect, as defined by the Dallas Police Department policy and procedures.

   b. Officer Nix violated the law: Officer Mark Nix violated the Dallas Police Department policy and procedure for extracting a barricaded suspect, and failed to call the SWAT team to remove Applicant Ruiz from the vehicle, should it have come to that.

   c. Defense counsel was deficient in failing to preserve crucial evidence of the audio communications between Officer Nix and Applicant Ruiz: The performance of defense counsel at trial was deficient because they failed to take the necessary steps to preserve evidence – the audio transmission of the encounter between Officer Nix and Applicant Ruiz, that was crucial to the defense of Applicant Ruiz; and

   d. Defense counsel's deficient performance unfairly prejudiced Applicant Ruiz: The deficient performance of defense counsel unfairly prejudiced Applicant Ruiz both at trial and now in state habeas. The destruction of this crucial evidence gives rise to problems of proving Ruiz' assertions of constitutional law violations caused by the record destruction.

FURTHER AFFIANT SAYETH NOT.

Clifton Jenkins

Clifton Jenkins, Affidavit of Fact #1 – record destruction
Ex parte Wesley Lynn Ruiz, 194ᵗʰ Judicial District Court, Dallas County, TX  No. F07-50318-M
Texas Court of Criminal Appeals No. AP-75,968

6

8

Private Investigator
License No. A05152
2951 Harlee Drive
Farmers Branch, TX 75234
Cell Phone: 469-438-7959

SUBSCRIBED AND SWORN TO before me this ___04__ day of __November__, 2010.

AGUSTIN CAMPUZANO
My Commission Expires
August 14, 2012

Notary Public

_____

Clifton Jenkins, Affidavit of Fact #1 – record destruction
Ex parte Wesley Lynn Ruiz, 194ᵗʰ Judicial District Court, Dallas County, TX  No. F07-50318-M
Texas Court of Criminal Appeals No. AP-75,968

7

## EXHIBITS

Exhibit 1:     Summary and the Conclusion of the Shooting Investigation, Control Number 07-062, August 2, 2007

Exhibit 2:     Motion to Dismiss or Preclude Imposition of Death Penalty for Failure to Preserve Evidence

Exhibit 3:     Internal Affairs Division Dallas Police Department Headquarters. Audio-recorded Interview of Senior Corporal Todd Haecker, Badge No. 7996. Date of Interview: July 3, 2007



Clifton Jenkins, Affidavit of Fact #1 – record destruction
Ex parte Wesley Lynn Ruiz, 194th Judicial District Court, Dallas County, TX  No. F07-50318-M
Texas Court of Criminal Appeals No  AP-75.968

8

10

Exhibit 1:    Summary and the Conclusion of the Shooting Investigation, Control Number 07-062, August 2, 2007

11

August 2, 2007


David M. Kunkle
Chief of Police


Subject: Shooting Investigation
Control Number 07-062


Sir:


## SUMMARY

On March 23, 2007, at approximately 5:35 p.m., Senior Corporals Patrick Starr, #7420, and Jason Jarc, #7854, Northwest Deployment Unit, were working in an undercover capacity when they observed a vehicle possibly wanted by Homicide detectives in a capital murder case. As the deployment officers followed, they requested marked police elements to conduct a traffic stop. Senior Corporals Todd Haecker, #7996, Jeremy Borchardt, #7800, Operation Disruption, Senior Corporals Mark Nix, #7906, Kimberly Crawford, #5258, and Trainee Police Officer Barry Hogan, #8825, Northwest Patrol Division, all responded to the request.

The suspect vehicle, driven by Mr. Wesley Ruiz, accelerated and attempted to elude the officers. Mr. Ruiz lost control of his vehicle and it came to rest in the front yard of 4023 Bernal Drive. Senior Corporal Nix stopped his vehicle in front of Mr. Ruiz' vehicle, exited the patrol car, and immediately attempted to breach the right front window of the suspect vehicle with his ASP Baton. Mr. Ruiz fired at least one round from an assault weapon through the passenger window, striking Senior Corporal Nix in the left upper chest area. Senior Corporals Borchardt, Jarc, Haecker, and Starr all fired numerous rounds from their weapons.

12

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 2

Senior Corporal Nix was dragged out of the line of fire incapacitated, was transported to Parkland Hospital, and later pronounced dead from his injuries.

SWAT Officers responded to the location and extracted Mr. Ruiz from his vehicle; then DFD transported him to Parkland Hospital for his injuries. As a result, the following investigation was conducted.

## INVESTIGATION

## OFFICERS' TESTIMONY

**Senior Corporal Patrick Starr, #7420, Northwest Patrol Division - (Internal Statement dated July 5, 2007)**

On March 23, 2007, Senior Corporals Starr and Jason Jare, #7854, were working in a plain clothes capacity and assigned to the Northwest Patrol Division's Deployment Unit.

Senior Corporal Starr stated that at approximately 5:30 p.m., he and Senior Corporal Jare were driving a covert vehicle (black 1996 extended cab Chevrolet pickup) southbound Stemmons Freeway at Mockingbird Lane, when they observed a red over gray Chevrolet Caprice.

Senior Corporal Starr stated that he and Senior Corporal Jare had received a bulletin during detail regarding a vehicle matching that description related to a homicide that had occurred in the Southeast Patrol Division. Senior Corporal Starr notified the police dispatcher of their location and asked for a marked unit to assist in a traffic stop. Three marked police vehicles responded to the location. Senior Corporal Nix was the first element (#5148) to arrive. Senior Corporals Haecker and Borchardt were the second element (#3224), and Senior Corporal Crawford and Trainee Police Officer Hogan (element #512) were the third to arrive in the pursuit. Senior Corporal Nix drove in front of their vehicle and turned on his emergency lights in an attempt to stop the suspect vehicle at Westmoreland Road near Bernal Drive

13

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 3

Senior Corporal Starr stated that the suspect vehicle appeared to be occupied by one male (Mr. Wesley Ruiz). Instead of stopping, Mr. Ruiz increased his speed in an effort to evade the marked units. Senior Corporal Nix notified the dispatcher that they were now in pursuit. They slowed down and allowed the other two marked elements to join the pursuit which continued west on Westmoreland Road and then north on Bernal Drive. Senior Corporal Nix then informed the dispatcher that Mr. Ruiz had wrecked out at the 4100 block of Bernal Drive.

When Senior Corporal Starr and Senior Corporal Jarc arrived at 4100 Bernal Drive, they observed Mr. Ruiz' vehicle parked in a residential front yard facing southbound with Officer Nix's vehicle parked directly in front of Mr. Ruiz' vehicle. Senior Corporals Starr and Jarc parked their vehicle approximately thirty yards to the rear of Senior Corporal Nix's vehicle. As they were exiting their vehicle, Senior Corporals Starr and Jarc immediately heard several gunshots being fired, and saw Senior Corporal Nix fall to the ground. Senior Corporal Starr observed Senior Corporal Haecker standing near his patrol vehicle returning fire at Mr. Ruiz. Senior Corporal Starr could see that Mr. Ruiz was still shooting at the officers. Senior Corporal Starr was in fear for his safety and the safety of his fellow officers. With a clear field of fire, Senior Corporal Starr fired several rounds with his AR-15 Patrol rifle at Mr. Ruiz. As he moved in closer to Mr. Ruiz' vehicle, he continued to fire his AR-15 Rifle. Senior Corporal Starr changed his position from his covert vehicle to the rear of Senior Corporal Haecker's vehicle, which was parked to the left of Senior Corporal Nix's vehicle.

Senior Corporal Starr continued to fire rounds at Mr. Ruiz' vehicle while Senior Corporals Jarc and Borchardt pulled Senior Corporal Nix to safety. Senior Corporal Starr said the shooting stopped and other marked vehicles began to arrive at the scene. The SWAT Unit was ordered and a perimeter was set up to handle Mr. Ruiz, who was barricaded in his vehicle

Senior Corporal Starr stated that he only used such force as was necessary in order to protect himself and his fellow police officers from imminent death or serious bodily injury.

14

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 4

**Senior Corporal Jason Jarc, #7854, Northwest Patrol Division - Internal Statement dated July 5, 2007)**

On March 23, 2007, Senior Corporal Jason Jarc, #7854, was working in a covert capacity in plain clothes with Senior Corporal Patrick Starr.  He was driving a black extended cab Chevrolet pick-up truck, a covert vehicle.

Senior Corporal Jarc and Senior Corporal Starr were driving southbound on Interstate-35, just before Mockingbird Lane, when they noticed a late model Chevrolet Caprice with a red over gray paint scheme and 22" wheels traveling the same direction.  The listed vehicle matched the description of a suspect vehicle in a murder investigation from earlier in the week.  Upon noticing the suspect vehicle, Senior Corporal Starr notified the Channel 5 Dispatcher, and requested assistance from marked elements to help perform a traffic stop on the suspect vehicle.  They continued to follow the suspect vehicle (occupied by Mr. Wesley Ruiz) until the marked elements arrived.

Senior Corporal Nix pulled up behind Mr. Ruiz' vehicle and the other two elements arrived shortly thereafter.  Senior Corporal Jarc then let the marked elements take the lead, and started following behind them.  At this time the marked elements turned on their overhead lights to initiate a felony traffic stop.  Mr. Ruiz did not stop when the marked elements attempted a traffic stop, but accelerated his vehicle at a higher rate of speed onto Bernal Drive.  The marked elements then began the pursuit.  While Senior Corporals Jarc and Starr continued to follow the pursuit, they heard over the police radio that Mr. Ruiz' vehicle had wrecked out.

When they arrived on Bernal Drive, Senior Corporal Jarc observed Mr. Ruiz' vehicle surrounded by the marked elements, with Senior Corporal Nix's police vehicle parked directly in front of Mr. Ruiz' vehicle, which had spun-out in a driveway.  Senior Corporal Jarc parked his vehicle approximately 30-40 feet behind Senior Corporal Nix's vehicle.

During this time, Senior Corporal Jarc and Senior Corporal Starr exited their covert vehicle and observed Senior Corporal Nix standing at Mr. Ruiz' back passenger side window.  Senior Corporal Jarc observed the glass burst out from one of the windows of Mr. Ruiz' vehicle, and witnessed Senior Corporal

**15**

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 5

Nix fall to the ground bleeding. Senior Corporal Jarc stated that he also heard gunshots.

Senior Corporal Jarc and Senior Corporal Starr moved closer to Mr. Ruiz' vehicle while taking cover beside a marked element that was parked to the left of Senior Corporal Nix's vehicle. Senior Corporal Jarc observed Mr. Ruiz sitting in the driver's seat of his vehicle and Senior Corporal Nix on the ground bleeding profusely. Senior Corporal Jarc drew his weapon and identified himself as a police officer. Senior Corporal Jarc observed Mr. Ruiz looking in his direction with the fore grip and barrel of a firearm raised and pointed at him. Senior Corporal Jarc was not sure if Mr. Ruiz fired at him. Senior Corporal Jarc then fired his weapon at Mr. Ruiz because he was in fear for his safety and the safety of his fellow officers. Senior Corporal Jarc believed he fired his weapon approximately fourteen times.

Senior Corporal Jarc and Senior Corporal Borchardt pulled Senior Corporal Nix to safety. An ambulance was ordered and Senior Corporal Borchardt began chest compressions. Senior Corporal Jarc stated that Trainee Police Officer Barry Hogan, #8825, drove his marked element up and provided additional cover for them and Senior Corporal Nix. Senior Corporal Jarc said they made a conscious decision to drive Senior Corporal Nix to Parkland Memorial Hospital because of the seriousness of his injuries, and because they did not have an estimated time of arrival from Dallas Fire and Rescue.

Senior Corporal Jarc stated that he, Senior Corporal Borchardt, and Trainee Police Officer Hogan drove Senior Corporal Nix to the hospital.

**Senior Corporal Todd Haecker, #7996, Comp Stat/Crime Analysis/Technology (Operation Disruption) (Internal Statement dated July 3, 2007)**

On March 23, 2007, Senior Corporals Haecker and Borchardt were working Element #3224, when they heard Senior Corporal Starr asking for cover on a possible homicide suspect vehicle. After hearing the request for cover, Senior Corporals Haecker and Borchardt drove to Canada Drive and Mockingbird Lane hoping to avoid the heavy traffic and save time assisting the Deployment element.

16

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 6

Senior Corporal Haecker and Senior Corporal Borchardt entered the procession of vehicles at Mockingbird Lane heading towards Westmoreland Road. They observed the suspect vehicle (occupied by Mr. Wesley Ruiz) with Senior Corporal Mark Nix, #7906, driving directly behind it, and they got in line as the second marked vehicle in the pursuit. Once they drove over the Westmoreland Bridge they attempted to perform a traffic stop. Senior Corporal Haecker said Mr. Ruiz slowed down as if he was going to stop, and then sped off. Someone came over the air and stated that the suspect would not stop and the pursuit began.

Senior Corporal Haecker informed Sergeant James Almy, #5292, that the suspect vehicle was wanted in a homicide investigation. Senior Corporal Haecker said they observed Mr. Ruiz lose control of his vehicle and wreck out in the 4000 block of Bernal Drive. Senior Corporal Haecker stated that they observed Mr. Ruiz' vehicle spin out into a residential front yard near the southeast corner house on Bernal Drive.

Senior Corporal Haecker observed Senior Corporal Nix stop his vehicle directly in front of Mr. Ruiz' vehicle. Senior Corporal Haecker then observed Mr. Ruiz' vehicle roll forward and bump into Senior Corporal Nix's vehicle.

Senior Corporal Nix then exited his vehicle, ran to Mr. Ruiz' rear passenger side window, and attempted to gain entry by smashing the window with his ASP baton. Senior Corporal Haecker said he does not know if Senior Corporal Nix had his weapon drawn.

Senior Corporal Haecker was in the process of moving to a more tactical position when he heard the passenger side window break, and observed Senior Corporal Nix lying on the ground, and bleeding profusely. Senior Corporal Haecker believed the gunshot he heard came from inside Mr. Ruiz' vehicle. As he tried to approach Senior Corporal Nix, Senior Corporal Haecker heard more gunshots and believed that Mr. Ruiz was still shooting. Senior Corporal Haecker observed Mr. Ruiz holding a long barrel automatic rifle, which appeared to be raised up and pointing towards the passenger side window.

Senior Corporal Haecker then began firing at Mr. Ruiz with his duty issued Sig Sauer 9mm weapon. Senior Corporal Haecker had one slide-lock on his

17

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 7

weapon and performed a tactical reload. Senior Corporal Haecker stated that
he does not remember how many rounds he fired.

Senior Corporals Haecker, Jarc and Borchardt pulled Senior Corporal Nix to
safety and attempted to perform Cardiopulmonary resuscitation (CPR) on him.
Senior Corporal Haecker stated that Police Officer Trainee Barry Hogan,
#8825, drove his marked element to the area where the officers were trying to
perform CPR on Senior Corporal Nix to provide additional cover for him and
fellow officers.

Senior Corporal Haecker said they made the decision to take Senior Corporal
Nix to Parkland Hospital in the marked element due to the severity of his
injuries.  Senior Corporal Haecker stated that the incident was now a
barricaded person, so he stayed behind to help guard the perimeter offense
location until the SWAT Unit arrived to relieve him.

**Senior Corporal Jeremy Borchardt, #7800, Comp Stat/Crime
Analysis/Technology (Operation Disruption) (Internal Statement dated
July 3, 2007)**

On March 23, 2007, Senior Corporals Jeremy Borchardt, #7800, and Todd
Haecker, #7996, were assigned to Operation Disruption and working patrol
in the Northwest Division.

Senior Corporal Borchardt and Senior Corporal Haecker heard a Northwest
Deployment Officer request cover over the radio. The deployment officers
were following a suspect vehicle that was possibly used in a murder in the
Southeast Division. The deployment officers gave their location as I-35 and
Mockingbird Lane and gave a description of the suspect vehicle as a red
over silver Chevrolet Caprice.

Senior Corporal Borchardt was driving and wanted to help out since they
were in the general area.  Senior Corporal Borchardt drove to West
Mockingbird Lane and Jane Street to avoid the heavy traffic and waited for
the suspect (Mr. Wesley Ruiz) to pass that intersection. Senior Corporal
Borchardt observed Senior Corporal Nix get behind Mr. Ruiz' vehicle. He
then drove behind Senior Corporal Nix's vehicle. Due to the large volume

18

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 8

of traffic. Senior Corporals Borchardt and Haecker waited until Mr. Ruiz
drove across the Westmoreland Bridge to attempt a traffic stop

Senior Corporal Borchardt said as soon as they passed the traffic light at
North Westmoreland and Canada Drive, they turned on the overhead lights
in order to make the traffic stop at 4000 North Westmoreland. Mr. Ruiz'
vehicle slowed for a brief moment as if he was going to stop, but then
accelerated away from the officers. Senior Corporal Borchardt stated that
they broadcasted over the police radio that they were in chase with a murder
suspect.

Senior Corporals Borchardt and Haecker continued as the second vehicle in
the pursuit and continued south on North Westmoreland until they came to
Bernal Drive where Mr. Ruiz made a right turn. Mr. Ruiz continued to flee
at a high rate of speed westbound, until he got to about 4100 Bernal Drive
where he lost control of the vehicle and hit the curb on the south side of the
road. Senior Corporal Borchardt observed Mr. Ruiz' vehicle spin around,
roll backwards over a deep ditch, and then come to a stop in a residential
front yard.

Senior Corporal Borchardt and Senior Corporal Jarc observed Senior
Corporal Nix pull his police vehicle into the first residential driveway and
park bumper to bumper facing Mr. Ruiz' vehicle. Senior Corporal
Borchardt drove into the second driveway of the offense location in an
attempt to block in Mr. Ruiz' vehicle. Before he could exit his police
vehicle, Senior Corporal Borchardt observed Senior Corporal Nix exit his
police vehicle, and run up to Mr. Ruiz' vehicle on the passenger side. Senior
Corporal Borchardt heard Senior Corporal Nix shout at Mr. Ruiz to open the
door and exit the car. Then Senior Corporal Nix drew his ASP baton and
began to hit Mr. Ruiz' vehicle window. Senior Corporal Borchardt observed
Mr. Ruiz move inside his vehicle and raise a metallic object. Senior
Corporal Borchardt heard a shot come from inside Mr. Ruiz' vehicle and
observed Officer Nix fall to the ground. Senior Corporal Borchardt heard
multiple gunshots that sounded like they came from inside Mr. Ruiz'
vehicle.

19

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 9

Senior Corporal Borchardt fired approximately 12 rounds at Mr. Ruiz from his city-issued 9mm Sig Sauer semi-automatic pistol as he retreated to the rear of his police car. Senior Corporal Borchardt stated that while he was firing at Mr. Ruiz inside the suspect vehicle, he observed Senior Corporal Jason Jare, #7854, (who was actually Senior Corporal Patrick Starr, #7420) positioned at his right side also shooting at Mr. Ruiz with his AR-15.

Senior Corporal Borchardt, with Senior Corporals Haecker and Jare, ran over to Senior Corporal Nix and pulled him to safety. Senior Corporal Nix was moved across the street and out of the line of fire. Senior Corporal Nix's shirt, bulletproof vest and undershirt were removed in order to find out where he had been shot.

Senior Corporal Borchardt said Cardiopulmonary Resuscitation (CPR) was performed on Senior Corporal Nix to sustain his life, but he was unresponsive. Senior Corporal Borchardt helped place Senior Corporal Nix into the backseat of a marked element. He then got into the backseat with Senior Corporal Nix and attempted to keep direct pressure on the wound. Senior Corporal Jare drove the marked vehicle to Parkland Memorial hospital.

**Trainee Police Officer Barry Hogan, #8825, Northwest Patrol Division (Internal Statement dated July 12, 2007)**

On March 23, 2007, Trainee Police Officer Barry Hogan, #8825, and Senior Corporal Kimberly Crawford, #5258, were working as partners and assigned to element 512. Officer Hogan stated that they were just finishing up a call at 3131 Hammerly Street, when they heard a deployment officer come over the radio and request cover for a possible murder suspect vehicle they were following which was going south on Mockingbird Lane.

Officer Hogan stated that they were already in West Dallas and decided to assist the deployment officers by driving to Mockingbird Lane and Canada Drive to wait for the suspect vehicle to pass. When Officer Hogan and Senior Corporal Crawford approached the intersection, they observed the suspect vehicle (occupied by Mr. Wesley Ruiz) being followed by two marked elements and a covert vehicle. Officer Hogan and Senior Corporal

20

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 10

Crawford immediately got in behind the second marked element following Mr. Ruiz southbound on Mockingbird Lane.

Officer Hogan said the lead marked element (Senior Corporal Mark Nix, #7906) attempted to stop the suspect and they all slowed down, then they heard over the radio that Mr. Ruiz refused to stop. At that time Officer Hogan activated their emergency equipment and was the third marked element in the vehicle pursuit. During the pursuit Mr. Ruiz lost control of his vehicle at 4100 Bernal Street, where he spun around out of control and ended up facing the squad cars in a residential front yard. Officer Hogan stated they exited their vehicles, drew their weapons, and moved to the front of his police vehicle. Officer Hogan then observed Senior Corporal Nix standing at the right rear passenger side window of the suspect vehicle, attempting to break out the front right side window. Officer Hogan observed that the vehicle had dark tinted windows.

Officer Hogan heard several gunshots and was not sure where the shots were coming from at that time. After they took cover behind their police vehicle Officer Hogan then noticed Senior Corporal Nix on the ground injured. Officer Hogan could not fire his weapon because there was an officer in his path.

Officer Hogan attempted to move closer to get to Senior Corporal Nix, but due to on-going gunfire he could not. Officer Hogan observed Senior Corporals Jarc and Borchardt run up to Mr. Ruiz' vehicle and grab Senior Corporal Nix and drag him to safety towards Mart Street. Officer Hogan stated that he felt officers were in danger (Jarc, Borchardt and Nix) and drove his marked element in between the suspect and the officers to give them additional cover. Officer Hogan then ordered an ambulance. Officer Hogan and Senior Corporals Jarc and Borchardt then made the decision to transport Senior Corporal Nix to Parkland Hospital. Officer Hogan stated that he rode in the front passenger seat of the marked element, while Senior Corporal Jarc drove to the hospital.

**Senior Corporal Kimberly Crawford, #5258, Northwest Patrol Division (Internal Statement dated July 24, 2007)**

21

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 11

On March 23, 2007, Senior Corporal Crawford, #5258 and Police Officer
Trainee Barry Hogan, #8825, working in patrol had just finished answering a
signal 27 call at 3131 Hammerly Street.

Senior Corporal Crawford and Officer Hogan heard a Northwest Deployment
officer request cover for a possible murder suspect vehicle that they were
following near Mockingbird Lane and Irving Boulevard. Senior Corporal
Crawford heard Senior Corporal Todd Haecker, #7996, over the radio advise
the dispatcher that they were trying to catch up to the suspect vehicle. Senior
Corporal Crawford heard Senior Corporal Haecker advise that he was behind
the suspect vehicle and she headed southbound on the Westmoreland Bridge to
West Dallas.

Senior Corporal Crawford and Officer Hogan drove to Canada Drive and
Westmoreland Road and advised the dispatcher that they would be waiting for
the suspect vehicle.

Senior Corporal Crawford and Officer Hogan observed Mr. Ruiz' vehicle
being followed by two marked elements and a deployment covert vehicle
crossing Westmoreland Bridge headed into West Dallas. Senior Corporal
Crawford advised the dispatcher that they were the third marked element.

Senior Corporal Crawford and Officer Hogan observed Senior Corporal Nix
attempt a traffic stop by turning on his overhead red lights. Mr. Ruiz would
not stop and continued traveling southbound on Westmoreland Road towards
Bernal Drive. One of the elements advised the dispatcher that the suspect
vehicle would not stop. She then heard the element advise the dispatcher that
they were in chase. The first two marked elements were able to keep up with
Mr. Ruiz' vehicle, but they fell behind. Senior Corporal Crawford stated that
they continued to travel westbound on Bernal Drive. Senior Corporal
Crawford and Officer Hogan saw the suspect vehicle lose control and skid into
a gravel/dirt area at the corner of Mart Street and Bernal Drive.

Senior Corporal Crawford heard one of the elements advise the dispatcher that
Mr. Ruiz had just wrecked out. Senior Corporal Crawford also heard one of
the elements advise the dispatcher that they were going to do a felony stop.

22

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 12

Senior Corporal Crawford observed Senior Corporal Nix park his vehicle directly in front of Mr. Ruiz' vehicle facing head on. Senior Corporals Todd Haecker, #7996, and Jeremy Borchardt, #7800, parked to the left of Senior Corporal Nix's marked element. Senior Corporal Crawford and Officer Hogan parked their element on the street near Mart Street and Bernal Drive facing northwest to the left of Senior Corporals Haecker and Borchardt's marked element.

Senior Corporal Crawford then observed Senior Corporal Nix exit his marked element from the driver's side and run up to Mr. Ruiz' vehicle to the front passenger window. She observed Senior Corporal Nix striking Mr. Ruiz' passenger side window with his ASP baton. Senior Corporal Crawford also heard gunshots as she exited the squad car from the passenger side. Senior Corporal Crawford and Officer Hogan ran up to Mr. Ruiz' vehicle with their weapons drawn. Senior Corporal Crawford then observed Deployment Officers Jason Jarc, #7854, and Patrick Starr, #7420, run on the east side of her with their weapons drawn and firing. Senior Corporal Crawford observed Senior Corporal Haecker firing his weapon directly in front of her. Senior Corporal Crawford did not have a clear shot into Mr. Ruiz' vehicle and could not see inside because of the dark tinted windows. Senior Corporal Crawford did not realize that Senior Corporal Nix had been shot until she observed two officers dragging him away from Mr. Ruiz' vehicle. Senior Corporal Crawford observed Senior Corporal Nix was covered in blood

Senior Corporal Crawford heard several more gun shots. Senior Corporal Crawford said Senior Corporal Nix was dragged over to their marked element, which was parked near Mart Street and Bernal Drive and then driven to the hospital by several of the officers. Senior Corporal Crawford remained at the scene.

Senior Corporal Crawford got on the radio and asked for an ambulance and the SWAT Unit to be sent to the scene. Senior Corporal Jerod Honrath, #7645, responded to the scene and she advised him of the situation. Senior Corporal Crawford said after SWAT arrived she was relocated. Senior Corporal Crawford stated that at no time did she fire her weapon.



23

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 13

**Sergeant James W. Almy, #5292, Northwest Patrol Division (Internal Statement dated July 19, 2007)**

On March 23, 2007, Sergeant Almy stated that he was assigned to the Northwest Patrol Division on Third Watch as the Sector Sergeant supervising the 510's Sector.

At about 5:30 p.m., Sergeant Almy heard a Third Watch Deployment covert element on the radio requesting marked patrol elements to stop a suspect vehicle that they were following at North Stemmons Freeway and West Mockingbird Lane. Once the marked elements arrived, they attempted to stop the suspect vehicle (occupied by Mr. Wesley Ruiz) at about 4100 N. Westmoreland Road.

Mr. Ruiz fled at a high rate of speed southbound on North Westmoreland Road, and Senior Corporal Patrick J. Starr, #7420, who was assigned to the covert element, advised that the suspect vehicle was occupied by a murder suspect.  Sergeant Almy authorized the vehicle pursuit as the controlling supervisor.  Sergeant Almy stated that Senior Corporal Mark Nix, #7906, was the lead marked vehicle in Element #553, and Senior Corporals Todd E. Haecker, #7996, and Jeremy C. Borchardt, #7800, of Operation Disruption were the second marked vehicle in a 3200 Element.  Senior Corporal Kimberly M. Crawford, #5258, and Police Officer Barry W. Hogan, #8825, were in Element 512 and responded as the third marked element.

Sergeant Almy said that after roughly a 1-minute pursuit that ended at 5:37 p.m., Mr. Ruiz' vehicle lost control and spun into a front yard at 4023 Bernal Drive, where it became immobilized.

During the vehicle pursuit and its immediate aftermath, Sergeant Almy was responding to the location Code-3 from the Northwest Patrol Division substation. Sergeant Almy heard officers on the radio several times demand an ambulance for an injured officer, and after 2-3 minutes, an officer announced their intention to transport the injured officer to Parkland Memorial Hospital in a police car, as the ambulance had still not arrived. After hearing the officers on the radio mention their intentions to approach Mr. Ruiz' vehicle or stay back, Sergeant Almy broadcasted an order to the

24

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 14

officers at the scene to stay back behind cover. Sergeant Almy told the
officers to treat the situation as a Barricaded Person, and await the arrival of
the SWAT Section.

About 1-2 minutes later, Sergeant Almy arrived at the scene and found
Watch Commander, Lieutenant Mark Vernon, organizing and establishing
the outer perimeter via radio. Sergeant Almy took cover behind a police car
along with several officers who had their weapons trained on the suspect
vehicle. At that time Sergeant Almy was informed by the officers that
Senior Corporal Nix had been shot and seriously wounded by Mr. Ruiz, who
was still inside the parked suspect vehicle.

Sergeant Almy said that approximately 10-12 officers crouched behind two
police cars and a covert pick-up that were parked in the street on Bernal
Drive where Mr. Ruiz' vehicle sat motionless facing the parked police
vehicles. Senior Corporal Haecker informed Sergeant Almy that he, Senior
Corporals Starr, Jarc, and Borchardt had returned gunfire at Mr. Ruiz, who
was inside the suspect vehicle. Mr. Ruiz shot through a passenger window
of the suspect vehicle and struck Senior Corporal Nix, who was attempting
to break out the right passenger window with his ASP Baton.

Sergeant Almy notified Lieutenant Vernon about evacuating the nearby
residences. Lieutenant Vernon ordered a group of officers to evacuate the
residents of the 4-5 homes on the north side of Bernal Drive between Mart
and Leesburg Street by proceeding through the back yards and taking the
residents out through their back doors.

Sergeant Almy used the radio to order officers in the area of Bernal Drive
and Gentry Drive to evacuate the residents of 3-4 homes along the west side
of Mart Street by taking the residents out of their west-facing front doors.
Sergeant Almy stated that once the homes surrounding the scene were
evacuated, they maintained their position until relieved about 20-30 minutes
later by officers of the SWAT Section.

After moving to the outer perimeter, Sergeant Almy spoke with Sergeant
Merlin V. Lofton, #7414, in the Communications Division by telephone.
Sergeant Almy then assembled all of the officers who would be required to

25

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 15

provide written statements to the Crimes Against Persons Section
Detectives, and had them remain in the same area

Senior Corporal Nix had already been transported to the hospital and the
shooting was well over prior to Sergeant Almy's arrival at the scene.
Sergeant Almy stated that at no time did he ever fire his weapon.

**Police Officer Andrew Dilbeck, #8416, Comp Stat/Crime Analysis and
Technology (Operation Disruption) (Internal Statement dated July 26,
2007)**

On March 23, 2007, Police Officers Andrew Dilbeck, #8416, and Larry
Bankston, #8370, responded to an assist officer call involving a murder
suspect who was evading arrest. Prior to their arrival the suspect had
wrecked out and gunshots were fired. They arrived to set up a perimeter
around the scene. Officer Dilbeck deployed his patrol rifle on the northwest
side of the offense location. Officer Dilbeck stated that he never fired his
patrol rifle or duty weapon at the scene.

Officer Dilbeck stated they maintained the perimeter until the SWAT Unit
arrived and placed the suspect into custody. Officer Dilbeck and Senior
Corporal Bankston moved in to help contain the crime scene.

Officer Dilbeck said that the SWAT Doctor, J. Metzger, M.D., Element
#898, attended Mr. Ruiz and gave him Mr. Ruiz' property that was inside his
pockets.

Doctor Metzger located two small clear plastic bags of Methamphetamine
(ICE), $8.00 in cash, a lighter, and two receipts. Officer Dilbeck field-tested
the drugs, which tested positive for Methamphetamine. Officer Dilbeck
placed the drugs in the Baylor Street Property room on tag #146455 and
Service # 204526-T.

**Police Officer Larry Bankston, #8370, Comp Stat/Crime Analysis
/Technology (Operation Disruption) (Internal Statement dated July 26,
2007)**

26

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 16

On March 23, 2007, at approximately 6:00 p.m., Police Officer Bankston and his partner, Officer Andrew Dilbeck, #8416, responded to the Officer Involved Shooting call involving Senior Corporal Mark Nix, #7906.

Officer Bankston and Officer Dilbeck arrived after the shooting and helped to secure the perimeter of the crime scene on Bernal Street in West Dallas. Officer Bankston observed the SWAT Doctor (J. Metzger) remove drugs from the Arrested Person (Wesley L. Ruiz) and hand a clear plastic bag of drugs to Officer Dilbeck. Officer Bankston then witnessed Officer Dilbeck complete a report listing the drugs and transported and placed them in the Baylor Street Property Room.

**Senior Corporal Ricky Holder, #4626, Personnel and Development Division (Pistol Range) (Internal Statement dated May 10, 2007)**

Senior Corporal Holder, Assistant Range Master, stated that on June 21, 2007, he checked the Firearms Training Center Qualification History for Senior Corporal Jason Jarc, #7854, and found no information that he has ever completed a departmental qualification with any Glock handgun. FTC Qualifications records show that Senior Corporal Jarc qualified with a Sig 226 9mm weapon, Serial #UU621058 on May 15, 2007. Senior Corporal Holder stated that there was no documentation at the Firearms Training Center allowing Senior Corporal Jarc to carry a Glock handgun under departmental firearms qualification requirements.

**Sergeant Paul Stanford, #5065, Personnel and Development (Pistol Range) (Internal Stated dated July 17, 2007)**

Sergeant Paul Stanford, #5065, was contacted by Internal Affairs Division Sergeant Warren Mitchell, #5840, regarding the qualification history for Senior Corporal Jason Jarc, #7854. The original qualification history requested by the Internal Affairs Division indicated that Senior Corporal Jarc was not qualified to carry the Glock model 33, Serial #DDD255US that was used during the police shooting at 4300 Bernal Drive. Senior Corporal Jarc insisted that he had qualified with the weapon. After further research, Sergeant Stanford discovered a manual score sheet dated November 14, 2006. This score sheet indicated that Senior Corporal Jarc qualified with a

27

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 19

Officers and the suspect.  They were placed on standby until the Dallas
Police Officers captured the suspect.

They responded to the suspect's location and did a protocol procedure
(which consisted of checking his vital signs, oxygen saturation, backboard,
neck brace, and IV).  They then transported the suspect to Parkland Hospital.

**Mr. Sergio Castillo - (Sworn Affidavit obtained by Detective Jesus
Briseno, #3464, Homicide Unit, dated March 23, 2007)**

Mr. Castillo stated that on Friday afternoon around 5:20 p.m., he was at the
Voice of Hope School at Gentry Drive and Bernal Drive where he was to
meet someone for a basketball game.

Mr. Castillo heard gunfire and saw police officers all around the listed
location and observed the rear end of a Chevrolet Caprice that was parked in
front of the house at Bernal Drive and Mart Street. The Caprice was jammed
in by the police cars; one was right in front of the Caprice. Mr. Castillo
heard several rapid gunshots and saw officers shooting back at the Caprice.

Mr. Castillo stated that the shooting stopped for a little while, and he
observed more police officers coming down Gentry Street and advised the
workers at the Voice of Hope School to lock down the building.

One of the officers told Mr. Castillo that a man who was wanted on a murder
was involved in a shooting with police and it was not safe to go to the scene.

Mr. Castillo said that a little while later, the SWAT officers came and
jammed their vehicle against the Caprice and they were telling him
something, but he could not hear them. Mr. Castillo observed the officers
fire something into the suspect's car and a few minutes later, he heard a loud
bang and observed the officers breaking the suspect's car windows with a
pole.  Mr. Castillo then observed the suspect vehicle's windows all broken
and could see a man inside.

28

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 20

Mr. Castillo then observed the officers drag the man (suspect) out of the Caprice    Mr Casatillo observed the officers surround the suspect and an ambulance arrived shortly afterwards.

**Ms. Veronica Morales - (Sworn Affidavit obtained by Detective Robert Quirk, #5809, Homicide Unit, dated March 23, 2007)**

Ms. Morales stated that on March 23, 2007, she was driving down Bernal Drive in her truck with her children.  Ms. Morales lives at 4011 Bernal Drive.  As Ms. Morales was approaching the intersection of Mart Street and Bernal Drive, she observed two police cars coming in her direction.  Ms. Morales also observed a red and gray car in front of them and it looked like it wanted to make a U-turn.  Ms. Morales said the suspect vehicle was unable to make the U-turn and went in reverse over a curb and a ditch, and stopped in the front yard of a residence.

Ms. Morales observed two police cars block in the suspect car.  Ms. Morales observed the officers exit their vehicles and approach the suspect vehicle. She saw one man (Officer Mark Nix) in black shirt alongside the suspect's vehicle.  Ms. Morales then observed the man inside the red and gray car start shooting, and the man in the black shirt fell to the ground near the back tire of the suspect's vehicle.

Ms. Morales observed the other officers start shooting at the suspect inside the red and gray vehicle.  Ms. Morales got scared and drove to a friend's house until she calmed down and returned to the scene and talked with the police officers.

**Ms. Rachel Romero - (Sworn Affidavit obtained by Detective Linda Crum, #3824, Homicide Unit, dated March 23, 2007)**

Ms Romero stated that at around 5:00 p.m on March 23, 2007,  she was inside her house located at 4023 Bernal Street.

Ms. Romero stated her ex-sister-in-law, Crystal Munson, her mother and nephew were outside in the front yard  Crystal yelled that there was a police chase. Ms  Romero stated she immediately ran outside to see what was

29

Shooting Investigation
Control Number 07 062
August 2, 2007
Page 21

going on and heard the police sirens. Ms. Romero then observed a red and gray car drive into the yard.

Ms. Romero was looking for her niece, Anna, and saw her inside her car parked in the driveway. Ms. Romero got into the car with her and shut the door. Ms. Romero's mother, nephew and Crystal ran into the house. Ms. Romero observed a police car go nose to nose with the suspect's car and another police car stopped on the side of the car. She then observed all of the police officers get out of their cars with their guns. Ms. Romero then put Anna on the floor of the car and got down with her. She then heard several shots. When the shots stopped, Ms. Romero raised up and saw the police officers running to the car. Ms. Romero then observed one of the officers walking to a black truck with blood all over his hands.

Ms. Romero said that she observed more than one person in the red and gray car. She stated that several more police officers came and removed her and her niece from the car to the rear of their house to safety.

Ms. Romero had seen the suspect's vehicle before, but she did not know who was driving it.

**Ms. Caroline Gonzalez - (Sworn Affidavit obtained by Detective M.J. Brady, #5418, Homicide Unit, dated March 23, 2007)**

Ms. Gonzalez stated that on March 23, 2007 at 5:30 p.m., she was mopping the floor in the office of Voice of Hope School when she heard popping noises (gunfire). Ms. Gonzalez thought it was firecrackers at first until someone yelled out, "They are shooting." When she looked in the direction of the gunfire, she observed someone fall to the ground. Ms. Gonzalez observed two police officers grab the fallen officer by the arms and pull him to safety.

Ms. Gonzalez did not know who was shooting or what they were shooting at. Ms. Gonzalez ran inside the school where the after-school children were located, and locked the doors. She observed two guys standing outside of their portable buildings, but could not tell who they were

30

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 22

**Ms. Crystal Munson - (Sworn Affidavit obtained by Detective Linda Crum, #3824, Homicide Unit, dated March 23, 2007)**

Ms. Munson stated that on March 23, 2007, during the time of the incident she was in her front yard, with her children, located at 4023 Bernal Drive. Her ex-mother-in-law, Margaret Romero, was in the front yard and yelled out that there was a police chase. When she looked up, Ms. Munson observed a silver and red vehicle spin out of control, hit an embankment and then stop in their driveway. She then observed several squad cars and a black Chevy pick-up truck.

Ms. Munson ushered her family into the house, but discovered her daughter was still missing. She then saw Ms. Romero with her daughter in their vehicle when she heard the gunshots.

When the gunshots stopped, Ms. Munson went to her window and yelled, trying to get an officer's attention to get her daughter and mother-in-law out of the vehicle. Ms. Munson was unsuccessful, so she dialed 911 and a dispatcher informed the officers at the scene. Ms. Munson and her family were evacuated from the location safely. Ms. Munson had observed the suspect vehicle in the area before, but did not know who was driving.

**Ms. Delecia Hunter - (Sworn Affidavit obtained by Detective M. J. Brady, #5418, Homicide Unit, dated March 23, 2007)**

Ms. Hunter stated on March 23, 2007, a little bit after 4:00 p.m., she was volunteering at the Voice of Hope School in West Dallas. Ms. Hunter went outside to give a little boy his homework and observed the shooting that took place.

Ms. Hunter observed a police officer wearing shorts on the side of his police vehicle with his gun drawn. She could not hear anything, but observed several other officers ducking down beside their police cars. Ms. Hunter then heard gunshots and observed the police officer wearing short pants fall to the ground. She heard something that kept making popping noises. Ms. Hunter said she observed a police officer with a big long gun like you use to shoot a deer or something.

31

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 23

Ms. Hunter saw officers get a Mexican male out of the red and gray Caprice vehicle with red rims, and put him on the ground. Ms. Hunter recognized the Mexican male from North Dallas and South Dallas, and stated that she heard he deals dope.

**Mr. Malcolm Ealum - (Sworn Affidavit obtained by Detective Robert Quirk, #5809, Homicide Unit, dated March 23, 2007)**

Mr. Ealum stated on March 23, 2007, at about 5:15 p.m., he was standing outside his house getting ready to light a cigarette when he heard police sirens.

Mr. Ealum looked down Bernal Drive and observed a police car slide up next to the curb. A police officer exited and ran around to the front of his vehicle, towards the front quarter panel. Mr. Ealum then heard 12-13 gunshots ring out, and he got down for cover. He observed the officer shooting and two more officers ran up and joined him, and also started firing. Mr. Ealum observed all three officers shooting. He ran into his house and told his family to get down and then he ran back outside.

When he returned, Mr. Ealum observed two officers assisting the officer who had been shot. Mr. Ealum believes that the officer who was shot was the first one he described.

Mr. Ealum saw the two officers who were assisting the injured officer pull him to the back of a squad car and pull his shirt off. The officers put the injured officer into a police cruiser and transported him away.

Mr. Ealum was watching the incident through his binoculars. He could tell the injured officer was hurt real bad because he could see the blood on him and the officers assisting him.

Mr. Ealum observed two more officers run up to the injured officer's police cruiser, and more gunshots rang out. He saw more officers arrive and there was a stalemate and everything calmed down. Later the SWAT team

32

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 24



arrived, and he heard a flash grenade go off.  Mr. Ealum observed the officers pull the suspect out of the car and place him on a gurney.

**Ms. Margaret Romero - (Sworn Affidavit obtained by Detective Linda Crum, 3824, Homicide Unit, dated March 23, 2007)**

Ms. M. Romero stated that on March 23, 2007, she was in her daughter-in-law Rachel Romero's front yard with her two grandchildren, Anna and Adam, when she observed a police chase coming towards them.

Ms. M. Romero said that the suspect (Wesley Ruiz) was driving a gray and red vehicle that had red rims.  Ms. M. Romero could see two people inside Mr. Ruiz' vehicle but could not see who was driving.  Mr. Ruiz' vehicle slid into their yard, and she observed two marked police elements pull up in close proximity to Mr. Ruiz' vehicle.  She also observed a black pickup truck drive up to the location.  She became concerned when she could not find her granddaughter.  She then observed her granddaughter and her daughter, Ms. R. Romero, inside their car in their driveway. Ms. M. Romero was inside the house watching through the door when the shooting started.  She observed the people in the suspect vehicle shoot first.   When the shooting stopped, she saw the officers giving Cardiopulmonary Resuscitation (CPR) to one of the officers on the ground. There was a stand-off between the officers and Mr. Ruiz and she and her family members were evacuated from their house and car safely.

## INVESTIGATIVE NOTES

On March 23, 2007, the Northwest Patrol Division's Third Watch Detail Sheet shows Senior Corporals Patrick Starr working one-man, Element #5041, Jason Jarc working one-man, Element #5042 and Mark Nix working one-man, Element 5148.  A copy of the Detail Sheet is attached.

March 23, 2007, Operation Disruption Second Watch Detail Sheet shows Senior Corporals Jeremy Borchardt and Todd Haecker working element #3224, assigned to work 10:00 a.m. to 6:00 p.m.  A copy of the Detail Sheet is attached.

33

Internal Investigation
Control Number 07-062
August 2, 2007
Page 25

The March 23, 2007, Dallas Fire Rescue, #745, Run Sheet shows EMT Paramedics Shannon Deon Hyder and Carlos Aramayo assigned to "C" Shift, received a call at 4100 Bernal Drive at 5:42 p.m., Incident #37648. They had to wait for orders from DFD personnel before going into the shooting scene. They treated and transported capital murder suspect Wesley Ruiz to Parkland Hospital for multiple gunshot wounds. A copy of the DFD Run Sheet is attached.

Senior Corporal Mark Nix, #7906, was working a one-man marked element in full police uniform. He was shot while attempting to break out Mr. Ruiz' right front passenger window. He was pronounced dead at Parkland Memorial Hospital a short time later. A copy of the offense report is attached.

On March 23, 2007, the suspect (Wesley Lynn Ruiz) shot Senior Corporal Nix one time from inside his vehicle, causing his death. Mr. Ruiz was armed with a Carbon 15 Rifle with a 30 round clip holding 29 .223 caliber live rounds found on the front seat. Crime Scene Response Unit's report is attached.

SWAT Doctor J. Metzger treated Mr. Ruiz at the scene after he was extracted from his vehicle. Two plastic baggies containing ICE and Methamphetamine were removed from his pockets. Marijuana was also found inside Mr. Ruiz' vehicle. The listed drugs were tested positive at the scene by Police Officer Dilbeck.

Dallas County Medical Examiner records of Dr. J. K. Townsend-Parchment show that Senior Corporal Nix had one gunshot wound to his upper left chest which broke the left clavicle, tore open the left jugular vein and left common carotid artery. The bullet caused damage to the largest artery and vein. The bullet also broke the first thoracic vertebrae. Dr. Townsend-Parchment also recovered one big fragment which she described as almost being a .22 caliber bullet and smaller fragments. Senior Corporal Nix's body had other cuts, but no other bullet wounds. A copy of the Autopsy Report is attached.

CONFIDENTIAL

34

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 26

On May 3, 2007, this shooting incident involving Senior Corporals Patrick
Starr, Jason Jarc, Todd Haecker, and Jeremy Borchardt was No-Billed by the
Grand Jury. The suspect, Wesley Ruiz, was True-Billed by the Grand Jury.

Mr. Wesley Lynn Ruiz, was arrested and charged with Capital Murder on
Service #203348-T. Mr. Ruiz was charged with four charges of Aggravated
Assault Service #204692-T, 204689-T, 204694-T, and 204696-T. Mr. Ruiz
was also charged with Evading Arrest and Detention and Possession of a
Controlled Substance with the Intent to Deliver. A court date was set for
Mr. Ruiz and charges have been set for January 14, 2008 at 9:00 a.m.

Senior Corporal George Wiley, #4065, Firearms Training Center, received
the Weapons Maintenance Log on May 2, 2007. Senior Corporal Patrick
Starr's Rock River Rifle .223, 16 inch barrel, Serial #CM81243, was
inspected, function checked, and found to be within factory specifications.
Senior Corporal Jason Jarc's weapon a, Glock 33 .357, Serial #DDD 255
US, was inspected, function checked, cleaned and all were within factory
specifications; Senior Corporal Todd Haecker's Sig Sauer 226, 9mm Serial
#UU621081, was inspected, function checked and all were within factory
specifications; Senior Corporal Jeremy Borchardt's Sig Sauer, 9mm, Serial
#UU614704, was inspected, function checked and all were within factory
specifications. A copy of the S.W.I.F.S. Report is attached.

According to the FTC Qualification History, Senior Corporals Starr,
Borchardt, and Haecker were current and authorized to carry the weapons
used during the shooting incident. Copies of the three officers' qualification
histories are attached.

On June 20, 2007, it was discovered that Senior Corporal Jason Jarc, used
his Glock 33, .357, in the shooting incident and was not approved to use this
gun as a secondary/primary weapon. A copy of the Weapons Maintenance
Log and the Firearms Training Qualifications History Sheets are attached.

Sergeant Paul Stanford, #5065, checked the records for Senior Corporal Jarc
and showed that he was qualified with the Glock 33, .357 as a secondary
weapon and not a secondary/primary weapon. No memo was on file to
qualify with this weapon as a secondary/primary. See attached Manual

35

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 27

Entry Form entered November 14, 2006. A copy of the Internal Statement is attached.

On June 26, 2007, Sergeant John Bynum, #7667, stated that he submitted a memo to his chain of command for Senior Corporal Jarc to carry his weapon as a secondary/primary, but was not aware that it was not approved until after the shooting. Sergeant Bynum stated that he did not adequately explain the requirements to Senior Corporal Jarc before he began carrying his Glock 33 as a secondary/primary weapon. Copies of the Internal Statement and Secondary/Primary Memo are attached.

**The following personnel were at the scene: Northwest Patrol Division - Outer Perimeter Officers:** Senior Corporals Strauss, #6668, Bowling, #8285, Crawford, #5258, Gomez, #7588, Torrez, #7789, Scoggins, #7814, Lewis, #4979, Richardson, #6361, Silvestro, #8221, Police Officers Dean, #8682, Loughridge, #8642, Cortes, #8079, Pillas, #8786, Hamm, #8779, Bodwell, #8824, Duane Westerlund, #7972, Hartson, #8795, Lieutenants Vernon, #6528, Stokes, #5802, Sergeants Webb, #5950, and Spila, #5251.

**SWAT -** Lieutenant Cotner, #4646, Sergeants Newton, #4033, Deguire, #6512, Avalos, #7440, Girdler, #7367, Mains, #5854, Senior Corporals Keating, #5038, Smith, #7765, White, #7658, Jones, #6906, Guzman, #5980, Stratman, #6229, Menchaca, #7437, Pippins, #6892, Wellhouse, #5969, Reig, #6809, Braun, #5015, Tell, #7865, Canterbury, #6980, Cockrill, #5958, Lang, #6872, Hertel, #8017, Bedoy, #7928, Deguire, #6512, Villarreal, #8253, McDonnold, #7460, Vancuren, #7696, Curtis, #5947, Webb, #7462, Jackson, #5747, Hamilton, #7546, Police Officers Taylor, #7752, and Gordon, #7164.

**Crime Scene Response Section:** Lieutenant Bull, #4592, Sergeant Garcia, #4817, Detectives Krieter, #4450, Gonzalez, #7589, Zimmer, #4963, Allen, #7644, and Dodge, #3479.

**Crimes Against Persons Division —** Deputy Chief Reyes, #4974, Lieutenants Woodberry, #4437, Bull, #4592, Sergeant Kirkpatrick, #3327, Detectives Jesus Brisceno, #3467, Ellzey, #4197, Sanders, #3686, Ibarra, #6759, and Quirk, #5809.

36

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 28

PIO Lieutenant Hale, #6685

**Internal Affairs Division:** Lieutenant Guevara, #3534, and Sergeant Rivera, #4276.

Respectfully submitted,

Ann T. Robinson, #5573
Sergeant of Police
Internal Affairs Division
Administrative and Support Bureau

37

Shooting Investigation
Control Number 07-062
August 2, 2007
Page 29

## CONCLUSION

Based on the documentary, testimonial, and video evidence gathered during the course of this investigation, it was determined that at the end of the vehicle pursuit, Senior Corporal Nix immediately engaged the suspect vehicle without having the opportunity to conduct a proper felony traffic stop of a possible murder suspect. As a result, Senior Corporals Jarc, Starr, Borchardt, and Haecker left the cover of their squad cars to assist Senior Corporal Nix. After Mr. Ruiz fired his weapon striking Senior Corporal Nix, Senior Corporals Jarc, Starr, Borchardt, and Haecker were in fear for their lives and for the life of Senior Corporal Nix, and returned fire at Mr. Ruiz, striking him multiple times. The officers used available cover at the time of the incident. The actions of Senior Corporals Jarc, Starr, Borchardt, and Haecker are consistent with Chapter 9 of the Texas Penal Code and with the Deadly Force Policy of the Dallas Police Department. Therefore, this investigation is classified as "COMPLETE."


Calvin A. Cunigan
Deputy Chief of Police
Internal Affairs Division
Administrative and Support Bureau

38

Exhibit 2:     Motion to Dismiss or Preclude Imposition of Death Penalty for Failure to Preserve
Evidence

39

NO. F07-50318-M

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| WESLEY LYNN RUIZ | § | DALLAS COUNTY, TEXAS |

## MOTION TO DISMISS OR PRECLUDE IMPOSITION OF DEATH PENALTY FOR FAILURE TO PRESERVE EVIDENCE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, WESLEY LYNN RUIZ, the Defendant in the above entitled and numbered cause and requests that the Court enter its order dismissing the prosecution of Mr. Ruiz, with prejudice, or alternatively, precluding the State of Texas from seeking the death penalty in the above-named and numbered cause, and as grounds therefore would show the Court the following:

I.

Defendant is indicted for the offense of capital murder. The State of Texas is seeking death.

II.

Defendant has requested that the State produce the audio recordings of all police radio traffic from all channels from approximately thirty (30) minutes prior to the commission of the alleged offense until Mr. Ruiz' arrest. At a hearing on May 16, 2008, it was learned that there had been no request made by law enforcement to preserve recordings that are routinely erased after thirty (30) days. Therefore, radio transmissions which could have had a direct bearing upon Mr. Ruiz's claim of self-defense have been

40

destroyed.

### III.

Pursuant to the Due Course of Law provision of Article 1, Section 19 of the Texas

Constitution, and Due Process Clause of the 14th Amendment to the United States

Constitution, the State has a duty to preserve material evidence which may be exculpatory

or that is potentially useful to the defense. *Pena v. State*, 2007 WL 1289426 (Tex. App.–

Waco, May 2, 2007 case # 10-03-00109-CR, *pdr granted*). Other state courts have found

that the loss or destruction of evidence by law enforcement, even in the absence of bad

faith, will be a due process violation if the lost evidence appears to be material. In *State*

*v. Smith*, 600 P.2d 949 (Ore. App. 1979), after remand from the Oregon Supreme Court,

the Oregon Court of Appeals found that the inadvertent destruction of a video depicting

the Defendant's performance of certain physical dexterity tests was a violation of due

process of law that warranted dismissal of the charge. In *Zinsli v. State*, 966 P.2d 1200

(Ore. App. 1998), the Court found that the state's loss of a video tape showing the

Defendant's performance on field sobriety tests violated Defendant's due process rights.

The Court found that this due process violation warranted suppression of all the testimony

from the police regarding the Defendant's performance on the field sobriety tests. A

dozen other states have held that a Defendant's state constitutional due process rights

have been violated by the state's failure to preserve potentially exculpatory evidence,

irrespective of a finding of bad faith on the part of law enforcement. *Deberry v. State*,

457 A.2d 744, 752 (Del. 1983); *State v Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999);

*Gurley v. State*, 639 So.2d 557, 566-67 (Ala. Crim. App. 1993); *State v. Delisle*, 648 A.2d 632, 642-643 (Vt. 1994); *State v. Osakalumi*, 461 S.E.2d 504, 511-512 (W.Va. 1995); *Thorne v. Dep't of Pub Safety*, 774 P.2d 1326, 1331 (Alaska 1989); *State v. Estrella*, 893 A.2d 348, 364 (Conn. 2006); *State v. Montafeo*, 787 P.2d 671, 673 (Haw. 1990); *State v. Fain*, 774 P.2d 252, 265 (Idaho 1989); *Commonwealth v. Phoenix*, 567 N.E.2d 143, 146 (Mass. 1991); *State v. Smagula*, 578 A.2d 1215, 1217 (N.H. 1990); *State v. Hill*, 125 P.3d 1175, 1180 (N.M. Ct. App. 2005).

In *Pena* the Court of Appeals determined that three factors should be weighed to decide whether a Defendant's state constitutional due process are violated by the destruction of potentially useful evidence. These are:

(1) Would the evidence have been subject to discovery or disclosure;

(2) If so, did the State have a duty to preserve the evidence; and

(3) If there was a duty to preserve, was that duty breached, and what consequences should flow from the breach.

*Pena v. State*, supra at * 14.

Defendant would show that if the radio traffic among various police officers had been preserved it would have been evidence of the state of mind of Officer Nix, or other officers, at the time of the alleged offense and would have supported a claim that the police were first aggressors. The failure on the part of the State or its agents to properly preserve the recordings has deprived the Defendant of due process and due course of law.

In addition, Defendant would show the Court that the failure of the State or its agents to properly preserve the recordings has deprived the Defendant of the right to

42

confront and cross-examine the witnesses against him in violation of 6th and 14th Amendments to the United States Constitution, Article I, § 10 of the Texas Constitution, and *Texas Code of Criminal Procedure*, Article 26.052. In the absence of the recordings Defendant's ability to cross-examine and confront the testimony of witnesses who were involved in the apprehension of Mr. Ruiz has been significantly damaged because a key piece of evidence he might use to cross-examine such witnesses no longer exists. *Crawford v. Washington*, 541 U.S. 36 (2004).

WHEREFORE, it is respectfully requested that the Court enter its order dismissing the prosecution of this cause, with prejudice, or alternatively to preclude the State from seeking the death penalty herein.

Respectfully submitted,

PAUL BRAUCHLE
Texas Bar No. 02918000
4131 N. Central Expy., Suite 680
Dallas, Texas 75204-2102
(214) 521-2670

WILLIAM E. "KARO" JOHNSON
Texas Bar No. 10804500
3300 Oak Lawn, Suite 600
Dallas, Texas 75219
(214) 824-9955
(214) 528-6601 - Telefax

43

DOUGLAS H. PARKS
State Bar No. 15520000
321 Calm Water Lane
Holly Lake Ranch, TX 75765
(214) 521-2670
(903) 769-3465 - Telefax

*Counsel to Wesley Lynn Ruiz*

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copy of the foregoing motion was served

upon Kevin Brooks, Assistant District Attorney, by United States mail or by hand

delivery on the 23 day of MAY , 2008.

PAUL BRAUCHLE or
WILLIAM E. "KARO" JOHNSON

44

Exhibit 3:    Internal Affairs Division Dallas Police Department Headquarters.  Audio-recorded
              Interview of Senior Corporal Todd Haecker, Badge No. 7996.  Date of Interview:
              July 3, 2007

45

SENIOR CORPORAL TODD HAECKER                    1



INTERNAL AFFAIRS DIVISION

DALLAS POLICE DEPARTMENT HEADQUARTERS

1400 SOUTH LAMAR STREET

DALLAS, TEXAS

AUDIO-RECORDED INTERVIEW OF:

SENIOR CORPORAL TODD HAECKER, BADGE NO. 7996

DATE OF INTERVIEW:  JULY 3, 2007

ORIGINAL

CONTROL NO.

07 - 0 6 2

1                    A P P E A R A N C E S:

2

   Sergeant A. T. Robinson, Badge No. 5573
3  Internal Affairs Division, Dallas Police Department

4  Sergeant Warren Mitchell, Badge No. 5840
   Internal Affairs Division, Dallas Police Department

5

6  Senior Corporal Todd Haecker, Badge No. 7996

7  Phil Burleson, Jr., Attorney for Officer Haecker

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                    CONTROL NO.

25                                      0 7 - 0 6 2

ATTACHMENT 47

SENIOR CORPORAL TODD HAECKER                                    3

```
 1              P R O C E E D I N G S
 2          SERGEANT ROBINSON:  Today's date is July
 3  3rd, 2007, and the time is approximately 9:50 a.m.  At
 4  this time, I'd like the other persons in the room
 5  present to introduce themselves by giving your name and
 6  your badge numbers.
 7              I'm Sergeant A. T. Robinson, Badge No. 5573,
 8  of the Internal Affairs Division.
 9          OFFICER HAECKER:  I'm Officer Todd Haecker,
10  Badge No. 7996.  Currently I'm with Operation
11  Disruption, and I'm also at Northwest Patrol.
12          MR. BURLESON:  Phil Burleson, Jr., the
13  attorney for Officer Haecker.
14          SERGEANT MITCHELL:  Sergeant Warren
15  Mitchell, 5840, Internal Affairs Division.
16          SERGEANT ROBINSON:  We are conducting a
17  recording and oral interview with Officer Haecker
18  regarding the shooting incident which took place on
19  March 23rd, 2007.  At the termination of this interview,
20  Officer Haecker will be provided an audio-copy of this
21  interview.  Later, a written transcript will be typed,
22  and Officer Haecker will be required to review, correct,
23  and sign the transcript.
24          The transcript will serve as the internal
25  statement and report to the Chief of Police.  Both the
```

ATTACHMENT #7

CONTROL NO.

07 - 062

SENIOR CORPORAL TODD HAECKER                                    4

1    audiotape and the written transcript are an official

2    police report and will become a part of the

3    administrative investigation.  Officer Haecker has read

4    and signed the administrative warning as has -- his

5    attorney -- represents his attorney.

6            Officer Haecker, will you please state in

7    detail your involvement in the incident that occurred on

8    March 23rd, 2007.

9            OFFICER HAECKER:  I, Todd Haecker, Badge No.

10   7996, have been a Dallas police officer for six years.

11   I was transferred to Operation Disruption in March 2007.

12   On March 23rd, 2007, I was working Element 3224 with

13   Senior Corporal Jeremy Borchardt, Badge No. 7800, in the

14   510's, which is West Dallas.

15           At approximately 5:30 p.m., I heard Senior

16   Corporal Pat Starr broadcast over the police radio that

17   he was behind a suspect vehicle that was possibly linked

18   to a homicide.  Senior Corporal Starr stated that they

19   were traveling southbound on I-35 in a covert car

20   directly behind the suspect vehicle.

21           I heard that the suspect's car had exited

22   Mockingbird Lane and was traveling westbound towards

23   West Dallas.  Senior Corporal Borchardt and I drove to

24   Canada Drive and Westmoreland in case the suspect

25   vehicle made it into West Dallas.

CONTROL NO.

07 - 062

ATTACHMENT # 7

1        Senior Corporal Starr stated they were in

2   heavy traffic, so Senior Corporal Borchardt and I drove

3   across Westmoreland bridge to Irving Boulevard and Jane

4   Street.  I believe it was during this time that Senior

5   Corporal Nix got in behind the suspect vehicle.

6        I saw the suspect vehicle drive past us on

7   Mockingbird Lane towards the Westmoreland bridge with

8   Senior Corporal Nix directly behind him.  We pulled out

9   and got directly behind Senior Corporal Nix and

10   continued over the Westmoreland bridge.  Once we crossed

11   over the bridge, we attempted to conduct a traffic stop

12   on the vehicle in the 4000 block of Westmoreland.

13        The suspect vehicle slowed down as if he was

14   going to stop, and then he sped off.  Someone stated

15   over the police radio that the suspect vehicle was not

16   stopping.  I informed Sergeant Almy over the police

17   radio that the vehicle was used in a homicide.

18        The suspect vehicle turned westbound onto

19   Bernal from Westmoreland.  Senior Corporal Nix was

20   directly behind the suspect vehicle, and we were

21   directly behind Senior Corporal Nix as we continued to

22   travel westbound on Bernal with our lights and sirens

23   on.

24        I observed the suspect vehicle begin to lose

25   control in the 4000 block of Bernal.  The suspect

ATTACHMENT

#1

CONTROL NO

1   vehicle wrecked out and spun into the yard of the

2   southeast corner house of Bernal and Mart.  Senior

3   Corporal Nix followed behind and came to a stop in the

4   yard directly in front of the suspect vehicle.  We

5   pulled into the same front yard and positioned ourselves

6   to the southwest of the suspect vehicle.

7          I saw the suspect vehicle roll forward and

8   bump Senior Corporal Nix's car.  Senior Corporal Nix

9   exited his vehicle and ran up to the front portion of

10  the back passenger door giving verbal commands to the

11  suspect.  Senior Corporal Nix had his asp in his hand.

12  I don't know if Senior Corporal Nix had his gun drawn or

13  not.

14         I observed Senior Corporal Nix attempting to

15  gain access to the suspect vehicle by smashing the front

16  passenger window with his asp.  During this time, I was

17  in the process of getting into a more tactical position

18  at the back, passenger portion of the suspect's vehicle.

19         At this time, I heard the passenger window

20  break.  I also heard a gunshot that sounded like it came

21  from inside of the suspect's vehicle.  I then observed

22  Senior Corporal Nix lying on the ground, bleeding

23  profusely.  Senior Corporal Nix was not moving very

24  much.  As I attempted to approach Senior Corporal Nix, I

25  heard some gunshots.  I believed they were coming from

CONTROL NO.

07 - 069

1    inside the suspect's vehicle.  I then observed a long

2    barrel which appeared to be an automatic rifle.

3              I observed the barrel pointing at the

4    passenger window and appeared to be raised up.  I was in

5    fear of my life and the life of my fellow police

6    officers that were at the scene.  I returned fire into

7    the vehicle with my Sig Sauer 9mm.  I had a slide lock

8    on my gun and performed a combat reload.

9              I am not sure how many rounds I fired.  At

10   this time, Senior Corporal Jarc, Senior Corporal

11   Borchardt and myself approached the suspect vehicle and

12   pulled Senior Corporal Nix out of the line of fire.  We

13   got him to the west side of Mart when P.O. Hoogan pulled

14   up his squad car between us and the threat.

15             We attempted to do chest compressions while

16   talking to Senior Corporal Nix, but he was unresponsive.

17   We made the decision to place him in the backseat of a

18   police vehicle and drive him to the hospital due to the

19   severity of his injuries.

20             I then went back and took a position near my

21   vehicle.  When the suspect -- we then set up a perimeter

22   around the suspect's vehicle because we were unable to

23   determine if there were any other suspects inside the

24   vehicle nor did we know the physical condition of the

25   suspect.                              CONTROL NO.

                                          0 7 - 0 6 2

1                  We called for a Tactical element to handle

2       the now barricaded person incident.  We held the

3       perimeter until Tactical elements arrived, and we were

4       relieved by other officers.  I only used such force as

5       was necessary in order to protect myself and other

6       officers from imminent death or serious bodily injury.

7                  SERGEANT ROBINSON:  Okay.  Officer Haecker,

8       were you the passenger in the car or the driver?

9                  OFFICER HAECKER:  I was the passenger.

10                 SERGEANT ROBINSON:  When you exited the

11      vehicle, what did you do?

12                 OFFICER HAECKER:  I ran to the rear of the

13      vehicle, of the suspect vehicle.

14                 SERGEANT ROBINSON:  Okay.  Why did you take

15      that position behind the suspect's vehicle?

16                 OFFICER HAECKER:  Because at that time shots

17      had not been fired yet, and I felt that it would be a

18      more tactical advantage for me to be positioned at the

19      rear since other officers had other portions of the car

20      covered off.

21                 SERGEANT ROBINSON:  Were you in anyone's

22      line of fire when you ran to the back of the car?

23                 OFFICER HAECKER:  At that time, shots had

24      not been fired.  I crossed in between myself -- I

25      crossed in between the two squad cars -- the squad car

CONTROL NO.

07 - 062

1   and the suspect vehicle, ducking underneath Jeremy

2   Borchardt's line of fire.

3            SERGEANT MITCHELL:  And there was no shots

4   fire at that time?

5            OFFICER HAECKER:  At that time, no shots had

6   been fired, no, sir.

7            SERGEANT MITCHELL:  Okay.  When shots had

8   started ringing out, according to the video, you took

9   position at the rear of the suspect vehicle.  Can you

10  explain that again.

11           OFFICER HAECKER:  I took position at the

12  rear of the suspect vehicle prior to shots being fired.

13  When shots started being fire, I looked for any kind of

14  cover or concealment that I could find in the area.  I

15  observed a tree just directly north of my location, went

16  to that tree to take a little bit of cover and returned

17  suppression fire, or returned fire.

18           SERGEANT MITCHELL:  Okay.

19           SERGEANT ROBINSON:  That will conclude this

20  interview.  Do you have any questions?

21           OFFICER HAECKER:  No.

22           MR. BURLESON:  (Nods head).

23           SERGEANT ROBINSON:  If you wish to amend

24  your statement, you have 24 hours in which to contact me

25  and do so.  This will end this recorded and oral

CONTROL NO.

1    interview with Officer Haecker.

2                    (End of interview)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                    CONTROL NO.

25                                    0 7 - 0 6 2

                                      ATTACHMENT

SENIOR CORPORAL TODD HAECKER                                    11

1   STATE OF TEXAS              .

2   COUNTY OF DALLAS            .

3      I, Leslie McDonald Wilkins, Registered Professional

4   Reporter No. 029319, hereby certify that the foregoing

5   transcript of the interview of Senior Corporal Todd

6   Haecker is a true, complete, and correct transcript of

7   the proceedings held before me on the 3rd day of July,

8   2007.

9      GIVEN UNDER MY HAND on this, the 9th day of July,

10  2007.

11      ,

12

13

14

15

16  _Leslie McDonald Wilkins_
    LESLIE MCDONALD WILKINS, RPR #029319
17  Expiration Date:  12/31/07
    ALL-AMERICAN REPORTING #365
18  P.O. Box 520
    Denton, Texas 76202
19  (972) 219-5161
    (940) 320-1992
20

21

22

23

24                              CONTROL NO.

25                              07 - 062
                                ATTACHMENT 7

# AFFIDAVIT IN ANY FACT

THE STATE OF TEXAS       §

COUNTY OF DALLAS         §

BEFORE ME, <u>Gary Kirkpatrick</u>, on this day personally appeared <u>Todd Haecker</u> <u>#7996</u> Who, after being by me duly sworn, on oath deposes and says:

I, Todd Haecker #7996, have been a Dallas Police Officer for 6 years. I was transferred to Operation Disruption in March 2007. On March 23, 2007 I was working element #3224 with S.C. Jeremy Borchardt # 7800 in the 510's. At approximately 5:30 p.m. I heard S.C. Pat Starr broadcast over the police radio that he was behind a suspect vehicle that was possibly linked to a homicide. S.C. Starr stated they were traveling southbound on I-35 in a covert car directly behind the suspect vehicle. I heard that the suspect's car had exited Mockingbird Lane and was traveling westbound towards West Dallas. S.C. Borchardt and I drove to Canada Dr. and Westmoreland in case the suspect vehicle made it into West Dallas. S.C. Starr stated they were in heavy traffic so S.C. Borchardt and I drove across the Westmoreland bridge to Irving Blvd and Jane St. I believe it was during this time that S.C. Nix got in behind the suspect vehicle. I saw the suspect vehicle drive past us on Mockingbird Lane towards the Westmoreland bridge with S.C. Nix directly behind him. We pulled out and got directly behind S.C. Nix and continued over the Westmoreland bridge. Once we crossed over the bridge we attempted to conduct a traffic stop on the vehicle in the 4000 block of Westmoreland. The suspect vehicle slowed down as if he was going to stop, and then he sped off. Someone stated over the police radio that the suspect vehicle was not stopping. I informed Sgt. Almy over the police radio that the vehicle was used in a homicide. The suspect vehicle turned westbound onto Bernal from Westmoreland. S.C. Nix was directly behind the suspect vehicle and we were directly behind S.C. Nix as we continued to travel westbound on Bernal with our lights and sirens on. I observed the suspect vehicle begin to loose control of his vehicle in the 4000 block of Bernal. The suspect vehicle wrecked out and spun into the yard of the southeast corner house of Bernal and Mart. S.C. Nix followed behind and came to a stop in the same yard directly in front of the suspect vehicle. We pulled into the same front yard and positioned ourselves to the southwest of the suspect vehicle. I saw the suspect vehicle roll forward and bump S.C. Nix's car. S.C. Nix exited his vehicle and ran up to the front portion of the back passenger door giving verbal commands to the suspect. S.C. Nix had his asp in his hand. I don't know if S.C. Nix had his gun drawn or not. I observed S.C. Nix attempting to gain access to the suspect vehicle by smashing the front passenger window with his asp. During this time I was in the process of getting into a more tactical position at the back passenger portion of the suspect's vehicle. At this time I heard the passenger window break. I also heard a gunshot that sounded like it came from inside of the suspect's vehicle. I then observed S.C. Nix lying on the ground bleeding profusely. S.C. Nix was not moving very much. As I attempted to approach S.C. Nix I heard more gunshots. I believe they were coming from inside the suspect's vehicle. I then observed a long barrel which appeared to be an automatic rifle. I observed the barrel pointed at the passenger window and appeared to be raised up. I

2

was in fear of my life and the life of my fellow police officers that were at the scene. I returned fire into the vehicle with my Sig Sauer 9mm. I had a slide-lock on my gun and performed a combat reload. I am not sure how many rounds I fired. At this time S.C. Jarc, S.C. Borchardt, and myself approached the suspect vehicle and pulled S.C. Nix out of the line of fire. We got him to the west side of Mart when P.O. Hoogan pulled his squad car between us and the threat. We attempted to do chest compressions while talking to S.C. Nix but he was unresponsive. We made the decision to place him in the back seat of a police vehicle and drive him to the hospital due to the severity of his injuries. I then went back and took position near my vehicle. We then set up a perimeter around the suspect's vehicle because we were unable to determine if there were not any other suspects inside the vehicle nor did we know the physical condition of the suspect. We called for a tactical element to handle the now barricaded person incident. We held the perimeter until tactical elements arrived and we were relieved by other officers. I only used such force as was necessary in order to protect myself and other officers from imminent death or serious bodily injury.

"I, Gary Kirkpatrick a police officer for the Dallas Police Department, as described in Article 2.12(3) of the Texas Code of Criminal Procedure, have administered this oath to the above noted individual while in the performance of my assigned job duties, as authorized by Section 602.002(7) of the Texas Government Code."

SUBSCRIBED AND SWORN TO BEFORE ME THIS 24 DAY OF March A.D. 2007

_____
Officer's Signature

CONTROL NO.

0 7 - 0 6 2

2

58

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
194TH JUDICIAL DISTRICT, DALLIS COUNTY, TX



Ex Parte Wesley Lynn Ruiz,
*Applicant,*

TCCA No. AP 75,968
Trial Court Cause No. F07-50318-M

ORIGINAL

---

SUPPLEMENT TO
APPLICATION FOR POST CONVICTION WRIT OF HABEAS CORPUS
UNDER TEX. CODE CRIM. PROC. § 11.071

Applicant, Wesley Lynn Ruiz, files this supplement to Application for post conviction

Writ of Habeas Corpus pursuant to TEX. CODE CRIM. PROC. § 11.071. With the court-ordered

extension, the due date for the original application was December 8, 2010. The application was filed

December 6, 2010. This supplement is being filed only two (2) days after the initial due date for the

application. Hence, there is no prejudice to the State of Texas by this supplementation.

Applicant, Wesley Lynn Ruiz, supplements Ground Seven in the application as follows:

1.      In Ground Seven, Mr. Ruiz alleged

GROUND SEVEN (IAC FOR FAILURE TO ADEQUATELY INVESTIGATE, DEVELOP,
AND PRESENT EVIDENCE OF SELF-DEFENSE; 6TH & 14 AMENDMENT VIOLATIONS).
The 6th and 14th amendment rights of Mr. Ruiz to effective assistance of counsel
were violated because defense counsel failed to adequately investigate, develop
and present evidence of self-defense

59

Mr. Ruiz was denied his Sixth and Fourteenth amendment rights to effective assistance of counsel. At all stages of the proceeding, trial counsel failed to preserve, investigate, develop and present evidence that would have proved self-defense by Mr. Ruiz, and demonstrated Officer Nix, as first aggressor.   U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Strickland v. Washington*, 466 U.S. 668 (1984).

2.      Within the body of Ground Seven, Mr. Ruiz contended, among other things, that trial counsel failed to investigate, develop and present that certain evidence had been lost, destroyed or was otherwise unavailable, including evidence of the audio-records of the encounter between Officer Nix and Mr. Ruiz, , subsection e., p.65; and mental health evidence pertaining to Officer Nix, subsection d., p.66.

3.      Mr. Ruiz now supplements his ineffective assistance of counsel argument by adding that counsel's performance was deficient not only because they failed to investigate, develop and present that certain evidence had been lost, destroyed or was otherwise unavailable, but also because thereafter, they failed to request a "spoilation jury instruction," to which Mr. Ruiz would have been entitled as part of his federal constitutional law right to a fair defense. The spoilation jury instruction would have further supported the self-defense assertion by Mr. Ruiz, and demonstrated Officer Nix, as first aggressor.   U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Strickland v. Washington*, 466 U.S. 668 (1984).

4.      The spoilation instruction is an instruction to the jury that where evidence is lost or destroyed, the law presumes that the evidence was favorable to the other party (in this case, Mr. Ruiz), and unfavorable to the party responsible for the lost or destroyed evidence (in this case, the State of Texas). The Texas Supreme Court has observed, this procedural remedy (the "spoilation" instruction ) for lost or destroyed evidence "has been a part of Texas jurisprudence for over a

2

century." *Walmart v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003).

This policy has been shared more generally by the Texas Court of Criminal Appeals, which has observed that evidence in the State's custody but unused is a "strong circumstance against the prosecution." *Vasquez v. State*, 167 S.W.2d 1030, 1032 (Tex. Crim. App. 1943) ("Where evidence is available to the State which would give direct and positive statements on [a crucial element of the offense] but the State has failed to use it, its failure is a strong circumstance against the prosecution and, it appears, should be considered a barrier which the State must surmount with more than ordinary diligence.").

4.    In the case at bar, the deficient performance in failing to present that evidence had been lost, destroyed or was otherwise unavailable, and seek a spoilation instruction, resulted in the reasonable probability that the outcome would have been different.

Accordingly, Mr. Ruiz supplements the initial state habeas application with the aforementioned.

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas 75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR WARD

### CERTIFICATE OF SERVICE

I, Lydia M.V. Brandt, certify that on December 10, 2010, I caused a copy of the foregoing

3

**61**

to be hand delivered to:

> Attn: Capital Writs – Appellate Section
> Dallas County District Attorney's Office
> 133 N. Riverfront Blvd., LB 19
> Dallas, TX 75207

and, eleven (11) copies to be sent by U.S. mail to:

> Attn: Betty Hooper
> Clerk of Court
> Texas Court of Criminal Appeals
> Supreme Court Building
> 201 West 14th Street, RM 106
> Austin, TX 78701

Lydia M.V. Brandt

cc: Mr. Wesley Lynn Ruiz
#999-536
Polunsky Unit, TDCJ
3872 FM 350 South
Livingston, TX 77351-8580

4

62

TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

No. WO7.50318.M(A)

63

| BAIL STATUS | STATE OF TEXAS | DATE OF ORDER | ATTORNEYS | OFFENSE | ORDERS OF COURT | DATE OF FILING |
|---|---|---|---|---|---|---|
| | | DEC - 6 2010 | | | POST CONVICTION WRIT OF HABEAS CORPUS FILED; APPLICANT NOTIFIED; COPY OF WRIT TO D.A. | |
| | | 1/7/2010 | | | Court held "Supplement to Application" filed December 10, 2010, as not a subsequent writ | |
| | | 9/2/201 | | | Writ hearing witnesses sworn, Rule invoked, Rules | |
| | | 9/22/2011 | | | Writ hearing (cont'd) hearing concluded | |

Ex Parte:
Wesley Lynn Ruiz

Writ No.:          W07-50318-M (A)

IN THE 194th JUDICIAL DISTRICT

COURT OF DALLAS COUNTY, TEXAS

## WAIVER OF SERVICE

Now comes Craig Watkins, Criminal District Attorney of Dallas County, Texas and hereby acknowledges that he has, this **22nd** day of **December, 2010**, received from the District Clerk, a copy of the Petition for Writ of Habeas Corpus filed in the above entitled and numbered cause and he hereby waives delivery to him of said Petition by certified mail.

It is further acknowledged that the answer to this Petition, if any, will be filed within 15 days from this date.

Craig Watkins
Criminal District Attorney
Dallas County, Texas

By: _____
    Deputy

64

CAUSE NO. W07-50318-M(A)

IN

THE 194TH JUDICIAL DISTRICT COURT

OF DALLAS COUNTY, TEXAS

Trial Court Cause No. F07-50318-M

---

## EX PARTE WESLEY LYNN RUIZ

---

STATE'S ORIGINAL ANSWER
TO APPLICATION FOR WRIT OF HABEAS CORPUS
IN DEATH PENALTY CASE

---

*Counsel of Record:*

Craig Watkins
District Attorney
Dallas County, Texas

Grace E. Shin
Assistant District Attorney
State Bar No. 24033062
133 N. Riverfront Blvd., LB-19
Dallas, Texas  75207-4399
(214) 653-3631
(214) 653-3643 *fax*
gshin@dallascounty.org



65

TO THE HONORABLE COURT:

Respondent, the State of Texas, files this original answer to Wesley Lynn Ruiz's application for writ of habeas corpus filed pursuant to article 11.071 of the Texas Code of Criminal Procedure.

## PROCEDURAL HISTORY

A Dallas County jury found applicant guilty of the capital murder of Dallas Police Officer Mark Nix. (CR2: 545). In accordance with the jury's answers to the special issues, the trial court sentenced applicant to death on July 11, 2008. On March 2, 2011, the Court of Criminal Appeals affirmed applicant's conviction and sentence on direct appeal. *Ruiz v. State*, No. AP-75,968, 2011 Tex. Crim. App. Unpub. LEXIS 137 (Tex. Crim. App. Mar. 2, 2011).

Applicant's deadline for filing his application for writ of habeas corpus was December 8, 2010. On December 6, 2010, he timely filed his application for writ of habeas corpus in this cause. On December 10, 2010, two days after the passage of his deadline, applicant asserted another claim on habeas by filing what he claimed was a "supplement" to his original application for habeas relief. The trial court accepted the additional pleading as a supplemental writ.

The State's response is timely filed on April 5, 2011.

66

# FACTUAL SUMMARY

On a late afternoon on March 23, 2007, applicant was on southbound I-35, driving his friend's Chevy Caprice while sipping liquid codeine through a baby bottle. (RR42: 45; RR47: 9-10, 49-51). Among the items in the car were a loaded rifle; varying quantities of methamphetamine, marijuana, and a drug cutting agent; and scales of the type used for weighing drugs. (RR45: 165-168). Applicant was on probation in Dallas County for a drug-related offense and, since three days prior, considered in violation for failing to report as required. (State's Trial Exhibit 127; RR47: 44-45; RR52: 60).

That same afternoon, undercover officers Jason Jarc and Patrick Starr were driving along I-35 in their covert vehicle when they noticed the Caprice. (RR43: 14-16; RR45: 7-8). They observed that the Caprice fit the description of a vehicle described in a recent bulletin regarding a capital murder, and radioed the information to other officers.[1] (RR43: 16, 18). As they followed the Caprice from a distance, several squad cars began to appear behind the vehicle. (RR43: 18). Directly behind the Caprice was Officer Mark Nix's squad car, followed by another squad car driven by Officer Jeremy Borchardt, whose partner was also in the car with him. (RR42: 49; RR43: 19-20, 72).

Intending to conduct a traffic stop, the squad cars soon turned on their overhead lights. (RR42: 49-50). The Caprice changed lanes and began to slow down, but then suddenly sped off, leading the officers to believe applicant was the capital murder suspect

---

[1] The Caprice driven by applicant was not the vehicle described in the capital murder bulletin, and applicant had no connection to that offense. (RR42: 36-37, 39-40).

they were looking for.  (RR42: 50-51; RR43: 73-74).  A high-speed chase ensued, reaching speeds of up to 50 to 80 miles per hour. (RR42: 51; RR43: 76).

The pursuit finally came to an end in a residential neighborhood after applicant lost control of his car and spun out in the yard of a house.  (RR42: 54).  Officer Nix quickly parked his car in front of the Caprice in a nose-to-nose position and exited his car.  (RR42: 55-56).  In an attempt to "triangulate," Officer Borchardt parked his car facing the side of the Caprice.  (RR42: 55-56; RR43: 77).  Due to the heavy tint of the Caprice's windows, the officers could not see into the vehicle.  (RR42: 57; RR43: 77).

Upon reaching the passenger's side of the Caprice, Officer Nix yelled verbal commands and pulled out his asp baton.  (RR42: 56-57).  Holding his gun in his right hand and the baton in his left hand, Officer Nix struck the passenger-side window with the baton.  (RR42: 57-58).  He then bent down, set his gun on the ground, and holding the baton in both hands, resumed striking the window.  (RR42: 58).  At that moment, a gunshot fired from inside the Caprice, shattered the rear passenger window, and struck Officer Nix on his upper left chest. (RR42: 58; RR43: 77-78; RR46: 14).

When the officers at the scene saw Officer Nix fall to the ground, they immediately began firing into the Caprice.  (RR42: 60-61).  As they fired, some of the officers pulled Officer Nix away from the Caprice and rushed him to the hospital. (RR42: 63-64; RR43: 26-30).  Officer Nix died later that night from the gunshot wound to his chest.  (RR42: 65; RR46: 14, 24).  Applicant suffered two broken bones and several gunshot wounds.  (RR45: 55, 58).  He was treated at the scene and taken to the hospital, where he remained for four days and survived.  (RR45: 47-50, 52-53, 56).

- 4 -

68

Applicant was eventually charged with the capital murder of Officer Mark Nix and the State elected to seek the death penalty. (CR1: 2, 43). *See* TEX. PEN. CODE ANN. § 19.03(a)(1) (Vernon Supp. 2010). At trial, applicant testified for his own defense and admitted fleeing from police because of the drugs and gun in his possession. (RR47: 47). He knew he would return to jail if the police caught him. (RR47: 47). Applicant claimed he shot Officer Nix only in self-defense. (RR47: 22). The jury rejected applicant's defense and found him guilty of capital murder as charged. (RR48: 65).

The evidence at punishment showed the evolution, from an early age, of an increasingly-defiant criminal. Sometime in the early to mid 1990s, while in high school, applicant became a member of a criminal street gang called the Midnight Dreamers, which along with the Latin Violence (its rival gang), were known to be violent gangs in Irving during that period. (RR51: 49-50, 52-53, 74-75, 88-89, 91, 99-100, 117; RR52: 75). Applicant's criminal activities escalated from thereon.

In June 1996, at the age of sixteen, applicant was convicted as a juvenile for a theft he committed in August 1995. (State's Appellate Exhibit 117). In January 1997, applicant committed the misdemeanor offense of burglary of a vehicle and was placed on deferred adjudication probation. (State's Appellate Exhibit 118). On the night of March 8, 1997, applicant participated in shooting at the house of Latin Violence member, Joe Ramos, after another Latin Violence member "shot up" the house of Midnight Dreamers member Raul Toledo. (RR51: 93-97). On the night in question, Toledo, applicant, and four friends arrived at the Ramos house in two cars and opened fire on the house. (RR51: 92, 94-97, 107-108). The house was occupied at that time by Ramos, his girlfriend, his

parents, his three or four-year-old nephew, and his two-year-old nephew. (RR51: 121). The bullets cleared the entire distance of the house, but no one was hit. (RR51: 121-122). Toledo and applicant were subsequently arrested for the offense of deadly conduct. (RR51: 103-104).

In addition to the Midnight Dreamers, the evidence showed applicant's likely membership in two other criminal gangs: Westside Ledbetter 12 and Tango Blast. (RR52: 22-23, 42-45, 49, 91-93, 96; State's Trial Exhibits 132, 139, 146, 147). From the early 1990s, Westside Ledbetter 12 and the Midnight Dreamers were ally gangs in the world of drugs and other criminal activities. (RR52: 43). The evidence showed that Tango Blast originated inside the Texas prison system, but that its current membership likely included those outside the prison system. (RR52: 94-96). At the time of trial, the intelligence on whether membership was limited to the prison system was unsettled and changing every day. (RR52: 77, 88-89, 94, 99-100).

Applicant's criminal activities continued steadily after the March 1997 shooting of the Ramos home. In September 1997, applicant was convicted of misdemeanor theft and sentenced to 100 days' confinement. (State's Trial Exhibit 119). That same date, he was adjudicated guilty of a January 1997 offense of burglary of a vehicle, his probation was revoked, and he was sentenced to 100 days' confinement. (State's Trial Exhibit 118). In August 1997, applicant committed the misdemeanor offense of burglary of a vehicle. (State's Trial Exhibit 120). While in custody for this offense, he escaped. (State's Trial Exhibit 121). In February 1998, applicant was convicted of two offenses in connection with these events: burglary of a vehicle and misdemeanor escape. (State's Trial Exhibits

- 6 -

70

120, 121).

No evidence of further offenses, arrests, or convictions were introduced for the period between 1997 and 2003. However, in 2004, applicant resumed his criminal activities with a vengeance. On November 25, 2004, applicant was involved in a high-speed chase with a police squad car while driving in his vehicle with his then-girlfriend. (RR52: 8-10, 12). The chase ended only after applicant's vehicle hit a light pole at an intersection, rose into the air, "T-boned" another vehicle at the intersection, spun, and finally came to a stop. (RR52: 10-11). However, applicant still refused to give up and ran on foot. (RR52: 11). The officer chasing applicant was able to take him into custody only after applicant eventually gave up running. (RR52: 11-12). A search of applicant's vehicle revealed a .25-caliber gun, containing seven rounds, in the glove compartment. (RR52: 14-15). One of the rounds was in the chamber of the gun, indicating the gun was ready for firing. (RR52: 15). As a result of this incident, applicant was convicted of the felony offense of evading arrest/detention and the felony offense of unlawful carrying of a handgun. (State's Trial Exhibits 123, 124). However, pursuant to plea agreements in both cases, he received a reduced misdemeanor sentence in each cause. (State's Trial Exhibits 123, 124).

These offenses were followed by a series of methamphetamine-related offenses. On or about April 3, 2005, applicant was arrested in Tarrant County for possession of methamphetamine. (State's Trial Exhibit 125). As a result, on April 24, 2006, he was placed on ten years' deferred adjudication probation for possession with intent to deliver between 4 and 200 grams of methamphetamine. (State's Trial Exhibit 125).

- 7 -

71

On April 12, 2005, gang-unit officers went to an apartment complex based on information they received about possible drug activity and arrested applicant at a unit where both drugs and guns were seized. (RR52: 22-26, 31). In connection with this arrest, applicant was convicted in the following November of the state jail offense of possession of methamphetamine but, as a result of another show of mercy by the State, received a reduced misdemeanor sentence. (State's Trial Exhibit 126).

Applicant's friend Hector Martinez, whose Caprice applicant had been driving on the date of this capital murder, testified that in the period between applicant's release from Tarrant County jail in 2006 and Officer Nix's murder, he and applicant saw each other on a weekly basis. (RR52: 77). In one of their many conversations during this time, applicant bragged about stealing from people. (RR52: 78-79). Another time, applicant told Martinez he once "got into some trouble" with some guys at Club Extreme, and shot at them in the club parking lot after they blocked him in. (RR52: 79).

On May 23, 2006, applicant was convicted in Dallas County of possession with intent to deliver methamphetamine, and placed on ten years' probation. (State's Exhibit 127; RR47: 44). Applicant was still on probation in Tarrant County at the time he was placed on probation in this Dallas County case. (RR52: 57). Less than six months into his probationary period for the Dallas County methamphetamine offense, applicant failed to report as required. (RR47: 45). By March 20, 2007, three days prior to the shooting death of Officer Nix, applicant was considered in violation of his probation in the Dallas case. (RR47: 27; RR52: 60).

The evidence showed applicant's disregard for the law and authority had become a

- 8 -

72

normal aspect of his life near the time of Officer Nix's murder. On March 14, nine days before Officer Nix's murder, Hector Martinez discovered applicant's father's car in the alley behind his house. (RR52: 89). When he asked applicant about this, applicant stated he had fled from police by driving off after being pulled over. (RR52: 89).

Carmen Delgadillo, applicant's girlfriend at the time of the capital murder, testified that during the time they were together, he "would say stuff like he wasn't going to go down without a fight," and say that he would not make it easy. (RR42: 55-56). Applicant also told Delgadillo that he was going to "go out like a G." (RR42: 156, 162-163). Delgadillo explained that "G" meant "gangster." (RR42: 164). Similarly, Hector Martinez testified that applicant once told him that the only way he was ever going back to jail was "in a box." (RR52: 79-80).

Based on the foregoing and other evidence before them, the jury answered the special issues in a manner that required the trial court to sentence applicant to death.

## SUMMARY OF ARGUMENT

*Response to Ground One*: Applicant claims the trial court erred in excluding evidence of prior bad conduct by Officer Nix because such evidence would have negated an essential element of the charged offense. Applicant asserts numerous constitutional violations as well as a statutory violation that resulted from the exclusion of this evidence. However, applicant did not raise any of these arguments at trial or later on direct appeal. Further, to the extent this complaint is about the relevance of the evidence to applicant's self-defense claim, it was raised and rejected on direct appeal. Thus, ground one is procedurally barred. Even assuming no procedural bars, applicant's

- 9 -

73

statutory complaint is not cognizable on habeas. Moreover, the trial court's exclusion of the proffered evidence was proper because it had no relevance to the case apart from character conformity.

*Response to Ground Two*:   Applicant claims trial counsel was ineffective for failing to raise the numerous arguments he asserts under ground one of this application. However, the objections applicant contends counsel should have asserted are groundless and frivolous.   Counsel cannot be held ineffective for failing to assert frivolous objections.

*Response to Ground Three*:   Still complaining about the same set of facts as in grounds one and two, applicant offers another reason the trial court's ruling was erroneous: the evidence of Officer Nix's prior acts was relevant to mitigation during punishment. This complaint was not raised at trial or later on direct appeal and is, thus, procedurally barred.   Even without the procedural bars, the proffered evidence had nothing to do with applicant's moral blameworthiness in this case and was, thus, irrelevant to mitigation.

*Response to Ground Four*:   Based on the same set of facts as the first three grounds, applicant claims trial counsel was ineffective for failing to reoffer the evidence of Officer Nix's prior acts during punishment as mitigation evidence.   Because the proffered testimony had no relevance to mitigation, offering it during punishment would have been futile. Counsel cannot be held ineffective for failing to take a futile action.

*Response to Ground Five*: Applicant claims his right to a fair punishment trial was violated by the presence of uniformed police officers in the spectator section of the

- 10 -

74

courtroom, "increased deputies" in the courtroom, a metal detector outside the courtroom, and the disparate treatment of his family by everyone in the courtroom. Applicant did not complain about the uniformed officers at trial and his complaint about the deputies was untimely. Moreover, at trial, applicant did not complain about the numerous ways his family was allegedly mistreated. Further, applicant did not raise any of these complaints on direct appeal. Ground five is, thus, procedurally barred. However, even without the procedural bars, applicant fails to show that any of the complained-of practices violated his right to a fair punishment trial.

*Response to Ground Six*:  Applicant asserts allegations of ineffectiveness against trial counsel for failing to adequately preserve his constitutional complaints about the courtroom practices that allegedly violated his right to a fair punishment trial. The record shows counsel adequately apprised the trial court of applicant's complaint about his constitutional right to a fair trial. To the extent counsel may have failed to make a record of facts related to deputies and officers in the courtroom, doing so would have made no difference in the outcome of this case.

*Response to Ground Seven*:  Applicant contends his counsel was ineffective for failing to bolster his self-defense theory by challenging the evidence pertaining to the firearm he used to shoot Officer Nix, by failing to ensure that the original videos and audio of the police chase and shooting were preserved, and by failing to properly use evidence of the unavailability of Officer Nix's mental health records. The evidence shows counsel competently handled the ballistics evidence at trial and diligently sought to obtain all recordings. Moreover, neither applicant nor the evidence shows anything

- 11 -

75

that counsel could have done with respect to non-existent mental health records. Applicant fails to show that counsel was ineffective in this regard.

*Response to Subsequent Claim under Ground Seven*:  Applicant filed an additional complaint under ground seven after the deadline for his application had expired.  Thus, the additional complaint is barred as a subsequent writ under Code of Criminal Procedure, article 11.071, section five.  Even without the procedural bar, however, he was not entitled to a spoliation jury instruction because no wrongful destruction of relevant evidence was involved.

*Response to Ground Eight*:  Applicant contends counsel was ineffective during punishment for failing to introduce evidence of the impact of a death sentence on his children and of his good character as a father.  Such evidence has no bearing on applicant's moral blameworthiness and had no relevance to any other punishment issue. Counsel cannot be ineffective for failing to introduce irrelevant evidence.

## RESPONSE

### RESPONSE TO GROUND ONE: APPLICANT'S COMPLAINT ABOUT THE EXCLUSION OF EVIDENCE PERTAINING TO PRIOR CONDUCT BY OFFICER NIX IS PROCEDURALLY BARRED. ALTERNATIVELY, THE EVIDENCE WAS PROPERLY EXCLUDED.

In ground one, applicant claims the trial court erred in excluding evidence of prior bad acts by Officer Nix because this evidence would have negated an essential element of the charged offense – specifically, that Officer Nix was acting within the lawful discharge of an official duty at the time he was killed.  *See* TEX. PEN. CODE ANN. § 19.03(a)(1). Applicant claims the evidence would have negated this element by showing that Officer Nix acted as the first aggressor against applicant.  Applicant claims the trial court's ruling

was erroneous for the following reasons: (1) it violated his Sixth and Fourteenth Amendment rights to a fair defense under the United States Constitution; (2) he was wrongfully convicted of capital murder given his "actual innocence" of this offense; (3) his subsequent death sentence violated his Eighth Amendment right to be free from cruel and unusual punishment, since he was actually innocent of capital murder; and (4) his right to evidence under article 38.36(a)[2] of the Texas Code of Criminal Procedure was violated. *See generally* TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (Vernon 2005).

## A.    This Ground is Procedurally Barred

Matters not raised at trial cannot form the basis for habeas relief. *See Ex parte Dutchover*, 779 S.W.2d 76, 77 (Tex. Crim. App. 1989); *Ex parte Crispen*, 777 S.W.2d 103, 105 (Tex. Crim. App. 1989); *Ex parte Bagley*, 509 S.W.2d 332, 333 (Tex. Crim. App. 1974) ("The same rule as to the necessity of an objection to complained of evidence has been applied by this Court in habeas corpus cases."). Additionally, habeas corpus is not to be used as a substitute for appeal. *Ex parte Clore*, 690 S.W.2d 899, 900 (Tex. Crim. App. 1985) (en banc). If a claim could have been raised on appeal, but was not, the applicant is procedurally barred from raising the issue for the first time through habeas. *See Ex parte Cruzata*, 220 S.W.3d 518, 520 (Tex. Crim. App. 2007); *see, e.g., Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998) (holding that because claims concerning the jury charge at punishment should have been raised on direct appeal, the claims will not be addressed on habeas). Finally, habeas corpus is not to be

---

[2] Applicant actually cites to article 38.26, but this appears to be a clerical error.

used to relitigate matters that were addressed on appeal. *See Ex parte Drake*, 883 S.W.2d 213, 215 (Tex. Crim. App. 1994); *see, e.g., Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex. Crim. App. 1984) (holding it need not address, on habeas, matters that were addressed on direct appeal)

During the guilt phase of trial, applicant proffered evidence of prior conduct by Officer Nix through the testimony of Raquel Sosa, Karlous Lake, and Anthony Williams. (RR46: 79-142, RR48: 66-73). He argued that their testimony was necessary to his self-defense theory because it showed Officer Nix was the first aggressor in this case. (RR46: 79-83). The trial court disagreed and excluded their testimony. Applicant made no argument about the relevance of this evidence to negate the "lawful discharge" element of the charged offense and no arguments about any of other violations that he now claims resulted from the trial court's ruling. Further, applicant could have raised any of these arguments on direct appeal, and did not. Finally, to the extent applicant also complains about the relevance of this evidence to his self-defense claim, this issue was raised and rejected on direct appeal.

For the foregoing reasons, ground one is procedurally barred. However, applicant would not be entitled to relief under this ground even without the many procedural bars.

**B.     Applicant's Statutory Claim is Not Cognizable on Habeas**

Habeas corpus is available only to review jurisdictional defects or denials of fundamental or constitutional rights. *See Ex parte Banks*, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989). Claims alleging a violation of a statute are not cognizable in a writ of habeas corpus. *Ex parte Graves*, 70 S.W.3d 103, 109 (Tex. Crim. App. 2002).

Applicant's statutory complaint about article 38.36(a) is not cognizable on habeas and should be denied.

### C.   The Evidence Did not Negate the "Lawful Discharge" Element of the Charged Offense

Further, there is simply no merit to applicant's contention that the proffered testimony negated the "lawful discharge" element of the charged offense.

A conviction under 19.03(a)(1) requires, among other things, evidence that the officer was in the lawful discharge of an official duty at the time of offense. *See* TEX. PEN. CODE ANN. § 19.03(a)(1). It is well established that an officer acts in the lawful discharge of an official duty as long as he is acting while on duty. *See Montoya v. State*, 744 S.W.2d 15, 29-30 (Tex. Crim. App. 1987); *see also Mays v. State*, 318 S.W.3d 368, 388-89 (Tex. Crim. App. 2010) (discussing the holdings in *Montoya* and other cases); *Hall v. State*, 158 S.W.3d 470, 474 (Tex. Crim. App. 2005) (discussing its previous interpretations of "lawful discharge" under 19.03(a)(1)); *Hughes v. State*, 897 S.W.2d 285, 297-98 (Tex. Crim. App. 1994) (following *Montoya* and holding the trial court properly instructed the jury in accordance with the language of 19.03(a)(1)); *Guerra v. State*, 771 S.W.2d 453, 460-61 (Tex. Crim. App. 1988) (following *Montoya* and upholding the sufficiency of evidence to show that the officer-victim was acting in the lawful discharge of his official duty). The fact that the officer might have been effectuating an unconstitutional arrest or a lawful arrest in an improper manner does not mean he was not acting in the lawful discharge of an official duty. *See Hughes*, 897 S.W.2d at 297-98; *Montoya*, 744 S.W.2d at 29-30.

- 15 -

79

At the time of his encounter with applicant, Officer Nix was driving a marked squad car and wearing his police uniform. (RR42: 47-48). Following a high-speed police chase, Officer Nix used his baton to beat the window of applicant's car in an attempt to extricate a person whom he believed was a suspect in a capital murder. (RR42: 48-45). The fact that Officer Nix was on duty at the time he engaged in these actions was undisputed. Evidence of Officer Nix's conduct in any other instance could not have changed this fact. Thus, the testimony proffered by applicant could not have negated the "lawful discharge" element of the charged offense. Ground one fails on the merits.

### D.   The Trial Court Properly Excluded the Proffered Evidence

Finally, the record shows the trial court properly excluded the proffered evidence as inadmissible character-conformity evidence barred by rule 404(b). *See* TEX. R. EVID. 404(b). The record shows no violation of applicant's rights resulting from the exclusion of this evidence.

At trial, in a hearing outside the jury's presence, applicant proffered the evidence in question as evidence relevant to his self-defense claim. A defendant in a homicide prosecution who raises the issue of self-defense may introduce evidence of the victim's prior bad acts to show the reasonableness of the defendant's fear or danger, or to show that the victim was the first aggressor. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002); *Tate v. State*, 981 S.W.3d 189, 192 (Tex. Crim. App. 1998); *Hayes v. State*, 124 S.W.3d 781, 785-86 (Tex. App.—Houston [1st Dist.] 2003), *aff'd*, 161 S.W.3d 507 (Tex. Crim. App. 2005). The prior act need not have been directed against the defendant,

- 16 -

80

and the defendant need not have been aware of the prior act at the time he killed the victim. *See Torres*, 71 S.W.3d at 761-62. However, the prior act must be relevant to the confrontation in question, apart from character conformity. *See* TEX. R. EVID. 404(b); *Torres*, 71 S.W.3d at 761-62. A prior act is relevant if it shows, for instance, the victim's state of mind, intent, or motive in the confrontation that led to his death. *See Torres*, 71 S.W.3d at 761. The key is that the proffered evidence explains the victim's conduct during the confrontation in question. *See id.* at 762.

The proffered testimony of Raquel Sosa, Karlous Lake, and Anthony Williams pertained to three unrelated incidents with no connection to this case. Outside the jury's presence, Sosa testified about an encounter she had with Officer Nix approximately five years prior to his death. On the night of June 21, 2002, Sosa and Jesus Ortiz, a suspect in two aggravated robberies, fled from a police vehicle in Ortiz's car and eventually pulled over at a park. (RR46: 89-96, 111). Once there, they fled on foot down a hill and through a tunnel/drain-passage that led to a creek. (RR46: 95-99). Sosa fell just outside the tunnel and Officer Nix caught up to her. (RR46: 100). Sosa testified that Ortiz was in front of her when Officer Nix, who was behind her, fired eight shots in Ortiz's direction. (RR46: 100-104). Just after the shooting, however, she gave a written statement to police denying either seeing the shooting or knowing who fired the first shot. (RR46: 107-109). Ortiz was apprehended shortly thereafter and transported to a hospital, where he died from a gunshot wound to his left buttock. (RR46: 106-107, 123-124). After Sosa's testimony, the State proffered evidence that Officer Nix's use of force in this incident had been ruled as a justified use of force. (RR46: 125).

- 17 -

81

Karlous Lake was a United States Marine when he encountered Officer Nix on March 13, 2005 in the Deep Ellum area of Dallas. (RR46: 126-27). Lake testified that sometime between 2:15 and 2:45 A.M., he and two friends were walking to their car after leaving a club when he saw six police officers nearby, "standing like in a huddle." (RR46: 127-28). Lake heard one of the officers tell the crowd to hurry home before curfew and asked the officers what time curfew was. (RR46: 128-30). One of the officers responded, "Your curfew is whatever time I tell you to go home." (RR46: 130). Lake replied that he did not have a curfew and continued walking. (RR46: 130). Soon thereafter, he heard footsteps behind him, turned around, and saw Officer Nix approaching him with a taser. (RR46: 130). Lake put his hands in the air and asked Officer Nix if he was going to tase him. (RR46: 130-31). Officer Nix allegedly responded by tasing Lake, causing him to fall to the ground. (RR46: 132). Lake asked one of the officers why they had tased him, and the officer told him it was because Lake did not obey their command to stop walking. (RR46: 132-33). While he was still on the ground, some of the officers, excluding Officer Nix, kicked him. (RR46: 135-36). Lake and his two friends were then taken to jail and charged with public intoxication. (RR46: 136-37). Lake testified that the charge against him was later dismissed. (RR46: 137).

Anthony Williams testified that on August 23, 2006, when he was fourteen, he was running down the street when Officer Nix instructed him to stop. (RR48: 66-67). After Williams got down to the ground, Officer Nix handcuffed him and picked him up by the handcuffs. (RR48: 67). Officer Nix then threw Williams into his squad car and told him to shut up, threatening to knock all of Williams's teeth out. (RR48: 66-67).

- 18 -

82

Officer Nix told Williams he would need "a new grill" if Williams "told anybody." (RR48: 69). Williams was eventually released after police discovered he was not the person they were looking for. (RR48: 71-72). Williams testified that other officers at the scene filed a complaint based on Officer Nix's treatment of him. (RR48: 68). Cross-examination of Williams indicated the complaint may have been related to the force with which Officer Nix picked Williams up from the ground. (RR48: 70-71).

There was no evidence at trial, and applicant presents no evidence on habeas, that he was acquainted with any individual involved in any of the three incidents, or that he had any knowledge of these incidents at the time of his encounter with Officer Nix. In fact, as observed by the Court of Criminal Appeals on direct appeal, the fact that Officer Nix was the first aggressor in this case was undisputed "in the sense that his conduct in rushing to the Caprice and breaking out the window with his baton constitutes an act of aggression that came before applicant's use of deadly force." *See Ruiz*, 2011 Tex. Crim. App. Unpub. LEXIS 137, at *16. The only purpose the proffered testimony served was to portray Officer Nix as a bad person, who acted in conformity with his bad character in his encounter with applicant. *See* TEX. R. EVID. 404(b). The trial court acted properly in excluding this evidence.

Consequently, applicant's arguments regarding the numerous violations caused by the trial court's ruling fail on the merits. For one, applicant's constitutional right to a fair defense was not violated by the exclusion of this evidence. The right to a fair defense does not include a right to attack the character of a murder victim with inadmissible character-conformity evidence. Further, because the prior incidents do not negate the

- 19 -

83

element that Officer Nix was acting in the lawful discharge of an official duty, it does not show that applicant is "actually innocent" of capital murder or that his death sentence is cruel and unusual.

Finally, applicant's reliance on article 38.36(a) is misplaced. Article 38.36(a) states that in all prosecutions for murder, both sides shall be permitted to offer testimony as to "all *relevant* facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all *relevant* facts and circumstances going to show the condition of the mind of the accused at the time of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (emphases added). Evidence that is admissible under article 38.36(a) may nevertheless be excluded under rule 404(b). *See* TEX. R. EVID. 404(b); *Smith v. State*, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999). Since the testimony in question had no relevance to Officer Nix's conduct in this case and only served to show character conformity, its exclusion did not violate article 38.36(a).

Ground one, if not dismissed on procedural grounds, should be denied.

## RESPONSE TO GROUND TWO: COUNSEL CANNOT BE HELD INEFFECTIVE FOR FAILING TO MAKE MERITLESS OBJECTIONS

Ground two is a claim of ineffectiveness based on the same facts underlying ground one: applicant contends his trial counsel's objections to the trial court's exclusion of the testimony of Sosa, Lake, and Williams were inadequate. Applicant contends counsel should have asserted the following objections after the trial court ruled that it would exclude the testimony of the three witnesses: (1) applicant is actually innocent of

capital murder; (2) the ruling violates applicant's sixth and fourteenth amendment rights to a fair defense; (3) the ruling denies applicant of his federal due process right to evidence under article 38.36(a) of the Code of Criminal Procedure; and (4) the ruling violates applicant's eighth amendment right to be free from cruel and unusual punishment.

The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). An applicant asserting a claim of ineffective assistance has the burden to prove, by a preponderance of the evidence, the following: (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) (explaining the standard under *Strickland*).

Effective assistance of counsel does not mean errorless counsel. *See Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993). To prevail on a claim of ineffective assistance, the applicant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and was motivated by sound trial strategy. *See Ex parte McFarland*, 163 S.W.3d 743, 753 (Tex. Crim. App. 2005); *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). This highly deferential review is applied to avoid "the distorting effect of hindsight." *Ex parte*

- 21 -

85

*McFarland*, 163 S.W.3d at 753 (quoting *Strickland*, 466 U.S. at 689).

## A.   Defense Counsel Made the Court Fully Aware of the Basis for its Objection

Applicant contends counsel failed to adequately preserve error on the trial court's exclusion of the proffered testimony because he made only a general objection of "We object." *See* Application at p. 33. Applicant claims this objection was too general and did not apprise the trial court of the basis for its objection. Applicant misreads the record.

The record shows that, per defense counsel's request, the trial court held a hearing outside the jury's presence to determine the admissibility of evidence the defense wanted to introduce. (RR46: 78-79). Counsel informed the court that the defense had at least two witnesses -- Raquel Sosa and Karlous Lake – who would testify regarding previous acts of misconduct by Officer Nix. (RR46: 79). Counsel summarized what these witnesses would testify to and, referring to a previously-filed memorandum, argued that their testimony was relevant to show that Officer Nix had been the first aggressor in this case. (RR46: 79; CR2: 529). The State responded by arguing, among other points, that the prior incidents violated rule 404(b)'s prohibition against character conformity evidence. (RR46: 79-80). After further arguments from both sides, the trial judge called a recess so he could have time to review the applicable caselaw. (RR4: 81-83).

The court and parties later returned on the record and defense counsel offered an alternate theory of admissibility: the prior incidents were relevant to rebut Officer Starr's testimony that Officer Nix was a hero. (RR46: 83-84). Both sides made arguments on this issue and another recess was taken so the court could finish reading the applicable

22

caselaw. (RR46: 86-87). Upon going back on the record, the court denied the defense's request to allow Raquel Sosa and Karlous Lake to testify about the purported prior bad acts by Officer Nix. (RR46: 87).

Contrary to applicant's contention, the record shows that counsel fully apprised the trial court of the reasons for admitting the evidence – that the evidence was relevant to applicant's self-defense claim. Moreover, as soon as the trial court announced its ruling, the following exchange ensued:

| DEFENSE COUNSEL: | *We object.* And we will present testimony in regard to those people's proffer had - - |
|---|---|
| TRIAL COURT: | Very well. |
| DEFENSE COUNSEL: | In addition we will also proffer statements from some other people that we think would be relevant. |
| TRIAL COURT: | Very well. |

(RR46: 87) (emphasis added). Counsel then proffered the testimony of Sosa and Lake, and later Williams,[3] ensuring that this issue was properly preserved for appellate review. (RR46: 89, 126; RR48: 66). *See* TEX. R. EVID. 103(a)(2) (requiring appealing party to make an offer of proof in cases where the complained-of ruling was one excluding evidence).

In his habeas application, applicant focuses solely on this last objection – "We object" – which defense counsel asserted after the parties had already made lengthy

---

[3] The testimony of Anthony Williams was proffered later at trial. (RR48: 65-66).

- 23 -

87

arguments on the record and had received the court's ruling. *See* Habeas Application at p.33. Focusing solely on this one sentence and ignoring the surrounding record, applicant contends this objection was not specific enough to apprise the trial court of the basis for the defense's objection. *See* Application at p. 33. However, given all the arguments that preceded the ruling, counsel did not need to repeat them after the trial court announced its ruling. Applicant's contention regarding the adequacy of defense counsel's objection is without merit.

**B.    Counsel's Decision not to Assert Additional Meritless Objections Did not Render Him Constitutionally Ineffective**

Applicant also fails to show that counsel's decision not to object on grounds of actual innocence, the Sixth and Fourteenth Amendment rights to a fair defense, article 38.36(a), and the prohibition against cruel and unusual punishment rendered him constitutionally ineffective. None of these objections have any merit and and it would have been futile for counsel to assert them.

As discussed in connection with ground one, the evidence in question had no relevance to this case apart from character conformity and was, thus, inadmissible under rule 404(b). *See* TEX. R. EVID. 404(b). The right to a fair defense does not include the right to introduce inadmissible evidence. Moreover, article 38.36 governs the admissibility of *relevant* evidence surrounding the killing; it does not permit the admission of character-conformity evidence that falls under rule 404(b). *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a); *Smith*, 5 S.W.3d at 679 (stating that evidence that is admissible under article 38.36(a) may nevertheless be excluded under evidence rule

- 24 -

88

404(b)). Further, Officer Nix's alleged conduct in his prior encounters with Sosa, Lake, and Williams have no bearing on whether he was acting as an officer on duty in this particular case. *See generally Mays*, 318 S.W.3d at 338-39 (explaining that an officer acts within the lawful discharge of an official duty as long as he is acting as an officer). Thus, it would have been futile for counsel to argue that this evidence was necessary to prove applicant's innocence of capital murder. Finally, the defense sought to introduce this evidence during guilt/innocence and obtained the trial court's ruling during guilt/innocence. The jury had not yet reached its verdict on guilt and punishment was not an issue. It would have been bizarre to object at this time that the trial court's ruling violated applicant's right to be free from cruel and unusual punishment. An objection related to the punishment phase would not have been ripe until the punishment phase.

In sum, none of these objections would have been sustained at trial and raising them in any post-conviction proceeding would have been futile. Thus, counsel's decision not to make these objections did not render him constitutionally ineffective. *See generally Edmond v. State*, 116 S.W.3d 110, 115 (Tex. App. -Houston [14th Dist.] 2002, pet. ref'd) (holding that trial counsel "is not ineffective for failing to make a frivolous objection"). Ground two should be denied.

### RESPONSE TO GROUND THREE: APPLICANT'S COMPLAINT ABOUT THE MITIGATING ASPECTS OF THE EXCLUDED EVIDENCE IS PROCEDURALLY BARRED. ALTERNATIVELY, HIS COMPLAINT FAILS ON THE MERITS.

Ground three is based on the same set of facts as grounds one and two. Applicant claims a capital murder victim's status as the first aggressor is relevant mitigation evidence during punishment and that the trial court effectively excluded relevant

- 25 -

89

mitigation evidence by excluding the testimony of Sosa, Lake, and Williams during guilt/innocence. Applicant claims this exclusion resulted in the violation of his Eighth and Fourteenth amendment rights, as well as article 38.36(a) of the Code of Criminal Procedure.

### A.     This Ground is Procedurally Barred

Matters not raised at trial cannot form the basis for habeas relief. *See Ex parte Dutchover*, 779 S.W.2d at 77; *Ex parte Crispen*, 777 S.W.2d at 105; *Ex parte Bagley*, 509 S.W.2d at 333. Additionally, habeas corpus is not to be used as a substitute for appeal. *Ex parte Clore*, 690 S.W.2d at 900. If a claim could have been raised on appeal, but was not, the applicant is procedurally barred from raising the issue for the first time through habeas. *See Ex parte Cruzata*, 220 S.W.3d at 520.

At trial, applicant sought to introduce this evidence for guilt-innocence purposes only, and the trial court's ruling pertained to the admissibility of this evidence for guilt-innocence purposes. Applicant never made any arguments about mitigation and did not seek to re-introduce this evidence during punishment. Thus, applicant is procedurally barred from complaining about the mitigation value of the excluded evidence. Moreover, because applicant could have raised this issue on direct appeal and did not, the complaint is further barred.

### B.     Applicant's Statutory Claim is Not Cognizable on Habeas

Further, habeas corpus is available only to review jurisdictional defects or denials of fundamental or constitutional rights. *See Ex parte Banks*, 769 S.W.2d at 540. Claims alleging a violation of a statute are not cognizable in a writ of habeas corpus. *Ex parte*

- 26 -

*Graves*, 70 S.W.3d at 109. Applicant's complaint about article 38.36(a) is a statutory claim that is not cognizable on habeas. It should, therefore, be denied.

### C.    The Evidence Has No Relevance to Mitigation

Applicant would not be entitled to relief on this ground even without the procedural bars and the cognizability problem.

"Mitigating evidence" is evidence that a juror might regard as reducing the defendant's moral blameworthiness. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(f)(4) (Vernon Supp. 2010). Mitigating evidence must relate to the defendant's *own* circumstances and personal moral culpability. *See Tennard v. Dretke*, 542 U.S. 274, 284 (2004); *see also Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007); *see, e.g., Saldano v. State*, 232 S.W.3d 77, 100 (Tex. Crim. App. 2007) (holding that evidence of a co-defendant's conviction and punishment is not relevant to mitigation because it does not "relate to the defendant's own circumstances"); *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006) (stating that evidence of the abuse of defendant's family members, as opposed to defendant, is not relevant to mitigation). This requirement is based on the long-held societal belief that "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Rhoades v. State*, 934 S.W.2d 113, 126 (Tex. Crim. App. 1996) (explaining Justice O'Connor's opinions in *Franklyn v. Lynaugh*, 487 U.S. 164 (1988) and *Penry v. Lynaugh*, 492 U.S. 302 (1989)).

The testimony of Sosa, Lake, and Williams pertained to their respective encounters with the victim, Officer Nix. They testified to three unrelated incidents that

- 27 -

91

occurred over a period of five years in Officer Nix's police career, the first occurring approximately five years before Officer Nix's death. (RR46: 89, 126-137; RR48: 66-67). Applicant was not involved in any of these prior incidents, did not know of these prior incidents, and was not acquainted with any of the individuals involved in these incidents. The prior incidents did not relate in any manner to applicant's own circumstances. In other words, the testimony of Sosa, Lake, and Williams showed nothing about applicant's personal moral blameworthiness in this case. Thus, applicant's right to present relevant mitigating evidence was not violated by the exclusion of this evidence.

The authorities relied upon by applicant do not show otherwise. Applicant claims the trial court's ruling violated *Lockett v. Ohio* and article 38.36(a) of the Code of Criminal Procedure. *See Lockett v. Ohio*, 438 U.S. 586 (1978); TEX. CODE CRIM. PROC. ANN. art. 38.36(a). In *Lockett*, the Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencer be permitted to consider, as a mitigating factor, "any aspect of a *defendant's* character or record and any of the circumstances of *the offense* that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis added). The prior incidents in this case pertained to Officer Nix's involvement in three separate arrests during his police career. They did not relate to any aspect of applicant's character or record and had no connection to any aspect of this capital murder offense. Thus, *Lockett* was not violated.

Similarly, article 38.36(a) states that in all murder prosecutions, both sides are permitted to offer testimony as to "all *relevant* facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased,

- 28 -

92

together with all relevant facts and circumstances going to show the condition of the mind of *the accused* at the time of the offense." *See* TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (emphasis added). The prior incidents have no relevance to the killing of Officer Nix and reveal nothing about any previous relationship between applicant and Officer Nix. Moreover, given that applicant had no knowledge of the previous incidents at the time he shot Officer Nix, the incidents show nothing about applicant's state of mind at the time of this offense. Thus, article 38.36(a) was not violated by the trial court's exclusion of this evidence.

Ground three should be denied, if not dismissed.

### RESPONSE TO GROUND FOUR: COUNSEL CANNOT BE INEFFECTIVE FOR FAILING TO OFFER EVIDENCE FOR PUNISHMENT PURPOSES WHEN SUCH EVIDENCE HAD NO RELEVANCE TO PUNISHMENT.

Ground four is based on the same set of facts as ground three. Applicant contends counsel was ineffective for not reoffering the testimony of Sosa, Lake, and Williams during punishment. Applicant claims the evidence of the prior incidents was relevant to mitigation for the following reasons: (1) it refuted Officer Starr's testimony that Officer Nix was a hero; (2) it outweighed the aggravators; (3) it supported applicant's claim of self-defense; and (4) it affirmatively showed that applicant was violence-adverse.[4] Applicant claims he would not have been sentenced to death but for the exclusion of this

---

[4] Applicant also makes references to counsel's failure "to correct misleading and inaccurate ballistics evidence." *See* Applicant's Application at p. 42, 46. However, this allegation is unrelated to applicant's allegations concerning evidence of prior conduct by Officer Nix, and applicant offers no argument in support of this allegation. Moreover, this allegation is reasserted under ground 7. *See* Applicant's Application at p. 63. Accordingly, the State reserves its response on this allegation for ground 7.

- 29 -

93

evidence.

As discussed in connection with ground three, these three incidents had nothing to do with applicant and showed nothing about his own moral blameworthiness in this case. The evidence was simply and solely bad-character evidence. Thus, there was no basis for offering this evidence as mitigating evidence during punishment. *See generally* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(f)(4) (defining "mitigating evidence"); *Rhoades*, 934 S.W.2d at 126 (explaining that if the evidence has no relation to a defendant's moral culpability for the charged crime, it is irrelevant to mitigation).

Applicant's arguments about the mitigating value of this evidence have no merit. For one, showing that Officer Nix was not a hero would only explain Officer Nix's character, not applicant's. Similarly, applicant contends that the prior incidents, in conjunction with the evidence of his past charge for evading arrest, would have shown he is a violence-adverse individual who seeks to "move away from confrontation rather than meet it head on." *See* Application at pp. 44-45. However, it is unclear how three incidents in Officer Nix's past would have explained applicant's character for avoiding violence. In fact, the contention that only a violence-adverse individual would flee from police is nonsensical. Consequently, given that this evidence had no mitigating value, it would not have outweighed any aggravating evidence.

There was no legitimate basis for counsel to reoffer this evidence during punishment, and doing so would have been futile. Ground four should be denied.

-30-

94

## RESPONSE TO GROUND FIVE: APPLICANT'S COMPLAINT ABOUT COURTROOM PRACTICES DURING PUNISHMENT IS PROCEDURALLY BARRED. ALTERNATIVELY, NONE OF THE COMPLAINED-OF PRACTICES VIOLATED APPLICANT'S RIGHT TO A FAIR TRIAL.

In ground five, applicant contends the presence of uniformed police officers in the courtroom, an increase in the number of deputies, the installation of a metal detector outside the courtroom, and the disparate and hostile treatment of his family created an inherently prejudicial atmosphere during the punishment phase and violated his Sixth and Fourteenth Amendment rights to a fair trial.

### A.   This Complaint is Procedurally Barred

Matters not raised at trial cannot form the basis for habeas relief. *See Ex parte Dutchover*, 779 S.W.2d at 77; *Ex parte Crispen*, 777 S.W.2d at 105; *Ex parte Bagley*, 509 S.W.2d at 333. Additionally, habeas corpus is not to be used as a substitute for appeal. *Ex parte Clore*, 690 S.W.2d at 900. If a claim could have been raised on appeal, but was not, the applicant is procedurally barred from raising the issue for the first time through habeas. *See Ex parte Cruzata*, 220 S.W.3d at 520.

Early in the punishment phase, in the middle of the testimony of the State's first witness, defense counsel went on the record and complained about "increased deputies" in the courtroom, the installation of a metal detector outside the courtroom, and the fact that applicant's family was not allowed to sit in the first row of seats in the courtroom. (RR51: 24-25). However, he did not complain about any uniformed police officers in the courtroom or any other form of disparate treatment allegedly suffered by his family during trial. He is, thus, barred from doing so on habeas.

Further, applicant's habeas complaint about the increased number of deputies during punishment does not comport with his objection at trial. *See generally Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003) (explaining that an argument on appeal must comport with the objection at trial). The evidence shows that, rather than the customary two bailiffs, five bailiffs were in the courtroom throughout both phases of applicant's trial. *See* State's Writ Exhibit B. Two were the deputies who serve as the official bailiffs of the 194th Judicial District Court, and three were uniformed civilian employees from the Sheriff's Department's Special Response Team ("SRT"). *See* State's Writ Exhibit B. Contrary to applicant's complaint on habeas, the number of bailiffs in the courtroom never increased during punishment.[5] It appears applicant's trial objection may have been a delayed complaint about the additional three bailiffs who had been present since the beginning of guilt/innocence. To the extent applicant's complaint on habeas can be construed as a complaint about these three bailiffs, applicant's objection was untimely. *See generally* TEX. R. APP. P. 33.1(a).

Finally, applicant could have complained of any of these alleged courtroom practices on direct appeal, but did not. Thus, ground five in its entirety is procedurally barred.

## B. Applicant's Right to a Fair Trial Was Not Violated

Even without the procedural bars, applicant would not be entitled to relief on this

---

[5] At the time counsel made his objection, the only time an increase in the number of deputies occurred was when the verdict in guilt/innocence was announced. *See* State's Writ Exhibit B. This increase was temporary and could not have affected the jury's verdict on guilt, since the jury had already reached its verdict by then.

- 32 -

ground.    The Sixth and Fourteenth Amendments of the United States Constitution guarantee a defendant the right to a fair trial. *See Holbrook v. Flynn*, 475 U.S. 560, 567 (1986). This includes the right to be tried by an impartial jury whose verdict is based on evidence introduced at trial and not on some external influence. *See id.*; *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996). The presumption of innocence is a basic component of the right to a fair trial. *See Estelle v. Williams*, 425 U.S. 501, 503 (1976); *Marx v. State*, 987 S.W.2d 577, 581 (Tex. Crim. App. 1999).    Thus, if a particular practice at trial "tends to brand the defendant with an unmistakable mark of guilt," it impairs the presumption of innocence and the defendant's Fourteenth Amendment right to due process of law. *Marx*, 987 S.W.2d at 581 (explaining *Flynn*); *see, e.g., Estelle*, 425 U.S. at 504-05 (stating that, where a defendant is forced to appear before the jury in prison clothes, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment."); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (noting that the sight of the defendant in shackles and gags might have a significant effect on the jury's feelings about the defendant).    Such practices are deemed inherently prejudicial and will not withstand judicial scrutiny unless they further an essential state interest. *See Flynn*, 475 U.S. at 568-69; *Marx*, 987 S.W.3d at 581 (explaining *Flynn*).

To prevail on a claim that his Sixth and Fourteenth Amendment rights to a fair trial were violated, a defendant must show that the challenged practice was either inherently prejudicial or actually prejudicial. *See Flynn*, 475 U.S. at 572; *Howard*, 941 S.W.2d at 117; *see also Sterling v. State*, 830 S.W.2d 114, 118 (Tex. Crim. App. 1992).

The test for inherent prejudice is whether the challenged practice presents "an unacceptable risk . . . of impermissible factors coming into play." *See Flynn*, 475 U.S. at 570; *see also Howard*, 941 S.W.3d at 117. The test for actual prejudice is whether jurors actually articulated a consciousness of some prejudicial effect. *See Howard*, 941 S.W.3d at 117.

### *Spectators in Police Uniforms*

Applicant complains of the presence of uniformed police officers in the courtroom during punishment, including officers who escorted the Nix family in and out of the courtroom. He claims these officers were obviously portraying "the solidarity of the police brotherhood" against him, and contributed to the oppressive atmosphere in the courtroom during punishment. *See* Application at p. 48, 50; Applicant's Writ Exhibit 7.

The evidence pertaining to officer presence in the courtroom is not entirely clear. Applicant claims an "overwhelming number" of uniformed police officers filled the courtroom throughout the entire punishment phase of trial. *See* Application at p. 47; Applicant's Writ Exhibits 5-8. However, other evidence indicates that officer attendance varied throughout both phases of trial, and was not particularly noticeable until closing arguments in both phases of trial. (RR48: 26).[6] *See* State's Writ Exhibits A, B. In any event, assuming there was a notable police presence in the courtroom during punishment, applicant fails to show any constitutional violation resulting from their presence.

---

[6] Defense counsel argued at the close of guilt/innocence, "You know, it's unfortunate that in some instances we have open court, because these officers have come down here, they are not part and parcel of this case, they are down here for one reason and one reason only, that's to intimidate you, trying to - - "

The evidence shows the police officers in the courtroom were merely spectators who remained in the gallery of the courtroom with other spectators. *See* State's Writ Exhibit A. With respect to the Nix family "escorts," two Dallas police officers accompanied the family throughout both phases of trial. *See* State's Writ Exhibit C. These were the two officers who had assisted the Nix family with funeral arrangements just after Officer Nix's death. *See* State's Writ Exhibit C. During that time, the officers had become close with members of the Nix family and been a source of emotional support for them. *See* State's Writ Exhibit C. Thus, shortly before trial, Officer Nix's mother obtained approval for these officers to attend trial with the family. *See* State's Writ Exhibit C.

The United States Supreme Court's jurisprudence on a defendant's right to a fair trial currently extends only to state-sponsored courtroom practices. *See Carey v. Musladin*, 549 U.S. 70, 76 (2006); *see, e.g., Will v. Thaler*, H-07-CV-1000, 2010 U.S. Dist. LEXIS 51681, at *74 (S.D. Tex. May 25, 2010) (refusing to find inherent prejudice on federal habeas since "the Supreme Court has not yet held that the presence of uniformed officers as spectators inherently violates the Constitution"). In the seminal cases of *Estelle v. Williams* and *Holbrook v. Flynn*, the United States Supreme Court recognized that certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial. *See Holbrook v. Flynn*, 475 U.S. 560, 568 (1986); *Estelle v. Williams*, 425 U.S. 501, 503-06 (1976). However, both decisions addressed the effect of state-sponsored courtroom practices on a defendant's right to a fair trial: *Williams* concerned the effect of compelling an accused to appear before a jury wearing

- 35 -

99

identifiable prison clothing, and *Flynn* concerned the effect of identifiable security personnel in the courtroom. *See Carey,* 549 U.S. at 75 (discussing *Williams* and *Flynn*). The Supreme Court has never applied its test for inherent prejudice, as set out in *Williams* and *Flynn,* to spectator conduct. *See id.* at 76. Thus, the effect of spectator conduct on a defendant's fair-trial rights remains an open question. *See id.* Further, whether or not the Supreme Court will extend this jurisprudence to spectator conduct appears unlikely, as the Court recently observed: "Indeed, part of the legal test of *Williams* and *Flynn* -- asking whether the practice furthered an essential *state* interest -- suggests that those cases apply only to state-sponsored practices." *See id.*

Given the foregoing, applicant's complaint about the spectator officers at his trial lacks clear legal support. However, assuming the Supreme Court's test for inherent prejudice applied to spectators, applicant fails to how their mere presence violated his right to a fair punishment trial.

Because applicant's trial involved the death of a police officer, it would only be natural for some police officers to attend the trial. *See* State's Writ Exhibit A. Any jurors who noticed the officers in the spectator section of the courtroom probably assumed the officers were there to support one of their fallen or out of curiosity about a case involving one of their own. *See generally Davis,* 223 S.W.3d at 474 (noting that defendant's argument that the officers were present solely to pressure and influence the jury disregards the personal interest the officers would naturally have in the murder of another officer); *Will,* 2010 U.S. Dist. LEXIS 51681, at*73 (explaining that unlike shackling that "always sends a message that a defendant is dangerous or prison clothing

- 36 -

**100**

that communicates guilt, law enforcement personnel sitting in the spectator gallery may signal nothing more than fraternal support for a fallen officer's family."). Even if the officers' intent was to portray "the solidarity of the brotherhood" against applicant, as applicant contends, this is something jurors might have reasonably expected in a trial involving the death of a police officer, and not something the jury would have taken as a sign of applicant's dangerousness. Thus, the presence of these officers was not inherently prejudicial to applicant's punishment trial. *See generally Marx*, 987 S.W.2d at 581 (explaining that, if the challenged practice need not be interpreted by jurors as a sign that the defendant is particularly dangerous or culpable, it is not inherently prejudicial).

Further, applicant does not allege any type of conduct on the part of the spectator officers that could have, or did, influence the jury in an improper manner. Applicant neither alleges nor presents evidence that any juror articulated a consciousness of some prejudicial effect. He fails to show any actual prejudice resulting from the presence of the uniformed officers. In sum, applicant fails to show that his right to a fair trial was violated by the uniformed officers who attended his trial.

### *Sheriff's Deputies*

Applicant also complains about an increase in the number of Sheriff's deputies in the courtroom during punishment. As previously discussed, the number of deputies in the courtroom never increased during punishment. Out of the utmost of precaution, however, the State assumes applicant is complaining about the overall number of deputies who were in the courtroom throughout both phases of trial.

The evidence shows five bailiffs remained in the courtroom throughout both

- 37 -

101

phases of trial – two were Sheriff's deputies who serve as the official bailiffs of the 194th Judicial District Court and three were civilian employees of the Sheriff Department's Special Response Team ("SRT"). *See* State's Writ Exhibit B. All five wore security personnel uniforms. *See* State's Writ Exhibit B. The two official bailiffs sat at the bailiffs' table, which when viewed from the judge's bench, is located at the far right side of the courtroom near the defense table. *See* State's Writ Exhibit B. The three SRT bailiffs sat in chairs immediately in front of the bar that separates the gallery from the rest of the courtroom, just behind the defense table. *See* State's Writ Exhibit B.

There is no indication that the jury knew how many bailiffs were normally present during trial. The jury could have reasonably believed this was customary in all trials, or at least in all capital murder trials. *Cf. Flynn*, 475 U.S. at 571 (noting that the four troopers in the courtroom were unlikely to have been a sign of "anything other than a normal official concern for the safety and order of the proceedings"). Applicant fails to show how five bailiffs in the courtroom created an unacceptable risk of impermissible factors coming into play during punishment. *Cf. Sterling*, 830 S.W.2d at 117-18 (finding no inherent prejudice in the presence of seven uniformed deputies at defendant's trial). He fails to show any inherent prejudice in the presence of the five bailiffs in the courtroom.

Further, applicant neither presents nor does the record reveal any evidence of actual prejudice resulting from the bailiffs' presence. There is no indication of how the constant presence of five bailiffs in the courtroom throughout trial somehow improperly influenced the jury during punishment. There is also no evidence of any conduct on the

- 38 -

102

part of the deputies that would have improperly suggested to the jury that applicant was dangerous or otherwise death-worthy.

### A Metal Detector Outside the Courtroom

With respect to the metal detector, the evidence shows the State was listening to applicant's telephone calls to and from jail during trial. *See* State's Writ Exhibit A. In one of those calls, applicant complained to his brother about the trial and his brother assured applicant that he would bring "heavy hitters" with him to court. *See* State's Writ Exhibit A. This raised concerns about courtroom security, especially in light of information that applicant and his brother were both members of the same gang. *See* State's Writ Exhibit A. Accordingly, the State immediately notified both the trial judge and the Sheriff's Department of the call. *See* State's Writ Exhibit A. In response, the Sheriff's Department installed a metal detector outside the courtroom and assigned two deputies to oversee it. *See* State's Writ Exhibit A. Although applicant does not complain on habeas about these two deputies, the State includes them in its response out of precaution.

The evidence of when this metal detector was installed is conflicting. *See* State's Writ Exhibit B. Regardless, the installation of the metal detector, along with the two deputies to oversee it, was a valid response to a potential security threat. *Cf. Flynn*, 475 U.S. at 571-72 (noting that, even if the troopers presence in the courtroom were slightly prejudicial, it was "intimately related to the State's legitimate interest in maintaining custody during the proceedings and thus did not offend the Equal Protection Clause . . . ."); *Sterling*, 830 S.W.2d at 118 (referring to its previous holding that the presence of

- 39 -

103

armed guards is justified when there is a threat to courtroom security).

Moreover, because the metal detector and the two deputies were *outside* the courtroom, they were not something the jury saw or was constantly reminded of during trial. *Cf. Estelle*, 425 U.S. at 504-05 (stating that, where a defendant is forced to appear before the jury in prison clothes, "the constant reminder" of the defendant's condition implicit in such attire may affect a juror's judgment). Jurors did not enter the courtroom through the main entrance where the metal detector was installed, but through another door that was several feet from the main entrance. *See* State's Writ Exhibit B. So the metal detector and deputies were something jurors may have only momentarily glanced at on their way in and out of the courtroom. To the extent the jurors may have given the security measures outside the courtroom any thought, they may have believed this was simply a part of the protocol in a death penalty case. Assuming these additional security measures were implemented in punishment, jurors could have reasonably believed that the gravity of the issues in this phase of trial necessitated such measures. Applicant fails to show that the presence of the metal detector and additional deputies outside the courtroom presented an unacceptable risk of impermissible factors coming into play and, thus, fails to show inherent prejudice.

Applicant also fails to present, nor does the record reveal, any evidence that jurors articulated a consciousness of some prejudicial effect from these measures. Applicant fails to prove that the presence of a metal detector and two deputies outside the courtroom violated his right to a fair punishment trial.

- 40 -

104

### *Alleged Treatment of Applicant's Family*

Applicant claims his family was treated in a disparate and hostile manner by the State, police officers, and generally everyone at trial. Applicant specifically complains of the following treatment during punishment: (1) his family was not allowed inside the courtroom prior to testifying; (2) reporters outside the courtroom turned off the sound to the monitor showing the trial when they realized applicant's family was watching; (3) his family was not allowed to sit in the front row of the courtroom even though the Nix family was; (4) police presence and attitude made his family feel intimidated and feel they were viewed as a dangerous "crime family"; (5) the bailiffs joked outside the jury's presence about applicant's stun belt, causing his family to feel intimidated; and (6) his family felt the metal detector was to show everyone that both applicant and his family posed safety threats. *See* Application at pp. 48-49; Applicant's Exhibits 5, 6, 7. None of these allegations, assuming they are true, show a violation of his right to a fair punishment trial.

The testifying members of applicant's family were not allowed inside the courtroom prior to their testimony because the Rule had been invoked. *See* State's Writ Exhibit A. It is likely for this reason that the reporters and camera crews outside the courtroom shut off the audio to the monitor when they realized the identities of the individuals watching the trial on their television monitor. Assuming any juror even noticed applicant's family's absence from the courtroom at any time, there is no reason they would have interpreted this as a sign of applicant's dangerousness.

With respect to the seating arrangements inside the courtroom, the rows of seats in

the gallery of the 194th Judicial District Court are divided by an aisle. *See* State's Writ Exhibit B. When viewed from the judge's bench, the section to the right of the aisle is significantly wider than the section to the left of the aisle. The right-hand section begins at the right wall and extends well past the center of the courtroom; it is essentially the main section of the gallery. The left-hand section merely fills the small, remaining space of the left side of the courtroom. The front row of the main section is reserved for law enforcement, attorneys, and media; a sign stating this fact was posted by the front row at trial. Thus, the fact that applicant's family was not permitted to sit in this first row had nothing to do with their relation to applicant. It was due to a policy that uniformly applies to all individuals. Contrary to applicant's claim on habeas, the Nix family did not sit in this front row; they sat on the front rows of the left section, which is not subject to such restrictions. *See* State's Writ Exhibit C. In any event, none of this presents a scenario from which the jury, if they even noticed, could infer applicant's dangerousness or deathworthiness.

In fact, nothing about his family's feelings regarding the police presence in the courtroom, the bailiffs' jokes about applicant's stun belt,[7] or the metal detector would have affected the jury's deliberations during punishment. Applicant utterly fails to show that the alleged treatment of his family at trial was either inherently or actually prejudicial to his punishment trial.

---

[7] Applicant wore a stun belt during most, if not all, of the pretrial proceedings and throughout both phases of trial. *See* State's Writ Exhibit B. However, the belt was concealed at all times and never visible to the jury.

- 42 -

106

In sum, none of the complained-of courtroom practices, whether viewed alone or together, impaired applicant's right to a fair punishment trial. Given the serious nature of the offense for which applicant was being tried and the gravity of the punishment the State was seeking, jurors would have reasonably anticipated a certain level of security at trial. *See generally Perez v. Dretke*, 393 F. Supp.2d 443, 450 (N.D. Tex. 2005) (addressing habeas petitioner's complaint about security in the courtroom and noting, "Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry did not suggest particular official concern or alarm."). Moreover, the fact that applicant's family experienced unpleasant or otherwise negative feelings in such proceedings is hardly surprising, and not something that would have affected the jury's verdict. Ground five should be denied.

### RESPONSE TO GROUND SIX: DEFENSE COUNSEL ADEQUATELY PRESERVED APPLICANT'S CONSTITUTIONAL COMPLAINT ABOUT HIS RIGHT TO A FAIR PUNISHMENT TRIAL

In ground six, applicant contends counsel's objection to the "overwhelming presence of fellow police officers" in the courtroom was inadequate because it was not specific enough to apprise the trial court of his complaint about his Sixth and Fourteenth Amendment rights to a fair trial. He also complains that, while counsel objected to "the increased deputies in the courtroom," counsel did not make a record to preserve "how many uniformed Dallas Police Officers were in the room, how many sheriff's deputies were in the room, where law enforcement was situated in relation to the jurors and [applicant], etc." *See* Application at p. 57.

43 -

107

Applicant uses the terms "deputies" and "police officers" interchangeably; he either does not understand or deliberately confuses the difference between the two. Deputies are law enforcement officers employed by the Dallas County Sheriff's Department, who may serve as bailiffs in criminal courts. *See* State's Writ Exhibit B. Police officers are law enforcement officers employed by the City of Dallas's Police Department and do not serve as bailiffs in criminal courts. *See* State's Writ Exhibit B. As discussed in connection with ground five, counsel did not object to the presence of Dallas police officers in the courtroom; he objected only to "increased deputies in the courtroom." Assuming applicant is now complaining that counsel was ineffective for failing to object to the presence of police officers, doing so would not have made a difference in applicant's case. As discussed in connection with ground five, the officers were merely courtroom spectators and their presence did not "brand" applicant with an "unmistakable mark of guilt" before the jury's eyes. *See Flynn*, 475 U.S. at 571.

With respect to the security measures that counsel actually objected to, the record shows counsel adequately informed the trial court of applicant's Sixth and Fourteenth Amendment rights to a fair trial.[8] In the middle of the testimony of the State's first witness in punishment, the court called a recess, retired the jury from the courtroom, and asked defense counsel whether there was an issue he wished to address outside the jury's presence. Counsel responded as follows:

---

[8] As previously discussed, counsel's objection to the bailiffs in the courtroom was untimely. However, applicant does not complain of the timeliness of counsel's objection, only its alleged lack of specificity. Moreover, a timely objection to the five bailiffs in the courtroom would not have made a difference, for the reasons set out in the State's response to ground five.

> There are quite a few. One of them would be that we would object to the metal detectors and the increased security[9] in this it militates against our client's presumption that the State has the burden of proofing [sic.] the punishment phase. I think to put a mental [sic.] detector outside the courtroom, which didn't exist during the guilt or innocence stage . . . somehow tells the jury if not the world that somehow our man is now more dangerous than he was before. And we would object to that, as well as the increased deputies in the courtroom.[10]

(RR51: 24-25). Counsel then complained about the seating in the courtroom and concluded with the following argument:

> And we would ask that we can get a fair shake in the courtroom, because all of these things are obviously prejudicial to our client and it doesn't need to exist. We can start with a level playing field and we would object to those matters.

(RR51: 25).

In order to preserve a complaint for appellate review, a party must state its objection with sufficient specificity to make the trial court aware of its complaint, unless the specific ground was apparent from the context. *See* TEX. R. APP. P. 33.1(a)(1). Preservation requirements are not to be construed by "splitting hairs in the appellate courts." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). To meet the specificity requirement, all a party has to do is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something

---

[9] This reference to "increased security" appears to be a reference to the two deputies who were assigned to oversee the metal detector outside the courtroom.

[10] As discussed in the previous ground, the number of bailiffs who were present in the courtroom never changed, except when the verdict was announced in both phases of trial. *See* State's Writ Exhibit B.

about it. *See id.*

Here, counsel argued that the increased security suggested to the jury that applicant was dangerous and impaired his presumption of innocence for punishment purposes. (RR51: 24-25). This argument clearly informed the trial court of applicant's Sixth and Fourteenth Amendment rights to a fair trial. *See generally Flynn*, 475 U.S. at 569 (noting that, in certain circumstances, it is possible that the sight of a security force within the courtroom might create the impression in the minds of the jury that the defendant is dangerous or untrustworthy); *Marx*, 987 S.W.2d at 581 (explaining that the Fourteenth Amendment right to due process "includes within it the right to a fair trial, and [that] basic to a fair trial is the presumption of the defendant's innocence"); *Howard*, 941 S.W.2d at 117 (explaining that the Fourteenth Amendment incorporates the essence of the Sixth Amendment right to be tried by an impartial jury whose verdict is based on evidence introduced at trial).

With respect to counsel's failure to make a record of facts related to the deputies in the courtroom, doing so would have made no difference in applicant's case. As discussed in the previous ground, five bailiffs remained in the courtroom throughout both phases of trial. Two sat by the bailiff's table, which when viewed from the judge's bench, is located at the far right side of the courtroom near the defense table, and the other three sat in chairs behind the defense table, immediately in front of the bar that separates the courtroom from the gallery. Five uniformed security personnel in the courtroom is not the type of condition that would have violated applicant's right to a fair punishment trial. *Cf. Sterling*, 830 S.W.2d at 117-18 (finding no inherent prejudice in the

- 46 -

110

presence of seven uniformed deputies at defendant's capital murder trial).

For the foregoing reasons, applicant fails to show that counsel was ineffective in preserving his constitutional complaints about the security in the courtroom. Ground six should be denied.

### RESPONSE TO GROUND SEVEN: APPLICANT FAILS TO SHOW THAT COUNSEL WAS INEFFECTIVE IN DEVELOPING A SELF-DEFENSE THEORY

In ground seven, applicant complains about his counsel's handling of his self-defense theory. Referring to ballistics evidence, audio and video recordings, and Officer Nix's mental health records, applicant contends counsel failed to "preserve, investigate, develop and present mitigating evidence that would have proved" Officer Nix was the first aggressor and that he shot Officer Nix in self-defense. *See* Applicant's Application at p. 61. Applicant claims counsel's ineffectiveness in this aspect prejudiced him during both phases of trial.

### A.    Counsel Competently Handled the Ballistics Evidence at Trial

Applicant asserts two complaints in connection with ballistics evidence. First, he contends the State elicited inaccurate testimony that referred to the murder weapon as a "semiautomatic pistol," an "assault pistol," and an "automatic pistol." Applicant claims counsel should have objected to these references as improper, inaccurate, and misleading because they made the weapon appear more "fear provoking" than justified. *See* Application at p. 63. Second, applicant claims counsel should have informed the jury, through cross-examination of the State's ballistics witness and through its own expert, about how and why the weapon jammed and how it would have taken only seconds for

- 47 -

111

applicant to remove the magazine, remove the top bullet, and engage the magazine back into the firearm. *See* Application at pp. 14, 63. From such testimony, the jury would have been able to infer that, after firing the first shot in self-defense, applicant deliberately chose not to fire further even though he could have. This expert testimony would have negated the "intent" element of capital murder. *See* Applicant's Application at p. 63-64.

### References to the Murder Weapon

The complained-of references to the murder weapon occurred during the testimony of Officer Daniel Krieter, who worked in the crime scene section of the Dallas Police Department at the time of this offense. (RR43: 123). Officer Krieter was shown a photograph of a firearm and testified that the weapon in the photograph was the .223-caliber, professional ordinance, "semiautomatic pistol" recovered from applicant's car. (RR43: 132-133; State's Trial Exhibit 45). The other two complained-of references were made by the prosecutor while questioning Officer Krieter. At one point on direct, the prosecutor showed Officer Krieter the actual firearm and asked, "And is that the assault pistol that you seized out of the suspect vehicle back on March 23rd of 2007?" (RR43: 137; State's Trial Exhibit 63). Officer Krieter replied, "Yes, sir, it is." (RR43: 137). Later, the prosecutor showed Officer Krieter the bullets that had been removed from the firearm and asked, "Those are the 29 live rounds that you had removed from your item number 66, the assault pistol; is that correct?" (RR43: 139). Officer Krieter replied, "Yes, sir." (RR43: 139). In arguing that these references to the weapon as a "semiautomatic pistol," an "assault pistol," and an "automatic pistol" were inaccurate,

- 48 -

112

applicant relies on the definitions provided by Wikipedia for each of these terms. *See* Application at pp. 13-14. Relying on the Wikipedia definitions, applicant argues that the three different labels attributed to the weapon created a false impression about the firearm to the jury.

For guilt purposes, the fact that this was the weapon with which applicant shot and killed Officer Nix was the only relevant fact regarding the weapon. The label attributed to the weapon was irrelevant to any guilt issue, and emphasizing the weapon in any way (by differentiating between labels or otherwise) would have only highlighted the fact that applicant fired a semi-automatic weapon. Thus, the varying references to the murder weapon during guilt-innocence could not have contributed to the jury's guilty verdict in any way.

For punishment purposes, the actual weapon was shown to the jury and the jury heard testimony about the weapon's capabilities. (RR43: 137; State's Exhibit 63). Officer Krieter testified that the firearm was a professional ordinance, .233 caliber, semi-automatic pistol. (RR43: 132-133). SWIFS firearm and toolmark examiner Raymond Cooper testified about how the charging rod on the weapon functioned. (RR43: 123-125). Applicant does not challenge the accuracy of this or other evidence at trial regarding the weapon. As lay citizens, the jurors likely had no knowledge of the alleged differences between a semi-automatic pistol, an assault pistol, and an automatic pistol, and no knowledge of the type of information found in Wikipedia for these terms. Thus, counsel's purported failure to object to the labels during punishment was also not prejudicial.

- 49 -

113

## *Explaining the Jamming of the Weapon to the Jury*

With respect to the jamming of the weapon, Officer Krieter testified that, prior to extracting the twenty-nine live rounds from the magazine of the firearm, he examined the clip and the live rounds in the clip and noticed that the next live round in line on top of the clip was askew. (RR43: 133-134). He testified that this was consistent with the firearm malfunctioning or jamming. (RR43: 134). A part of the State's theory at trial was that applicant likely fired only one shot because his weapon jammed. (RR51: 8).

On habeas, applicant complains about counsel's failure to provide more information about this issue to the jury. Specifically, he claims counsel failed to cross-examine Officer Krieter and firearms examiner Raymond Cooper about how the weapon functioned and how and why the gun jammed. *See* Application at p. 14. Applicant claims counsel should have cross-examined Mr. Cooper about the differences between a semi-automatic weapon, an assault pistol, and an automatic pistol. *See* Application at p. 14. Finally, applicant claims counsel should have called its own expert on these matters, including the fact that that it would have taken only seconds to make the weapon functional again. *See* Application at pp. 14, 63. Applicant claims testimony on the foregoing matters would have made a different during guilt-innocence because it would have allowed the jury to infer that applicant lacked the intent to kill, since he could have continued to fire at officers surrounding his vehicle but did not. Rather, he "fired the weapon, only once, and in apparent self-defense." *See* Application at pp. 63-64. Applicant claims this evidence would have also served as mitigating evidence during punishment. *See* Application at p. 65.

- 50 -

**114**

Assuming the jury was presented with evidence that it would have taken only seconds to un-jam the weapon, the jury would not have been compelled to conclude that applicant's first shot was fired in self-defense or that he deliberately chose not to fire additional shots. Given the barrage of gunfire from the surrounding officers after the first shot, the jury could have reasonably concluded that applicant deliberately chose to brace himself from the gunfire rather than adjust his own weapon. Moreover, evidence that the gun could have been quickly un-jammed would not change the following undisputed facts: Applicant led the officers on a high-speed chase that ended only because applicant lost control of his car; when Officer Nix used his baton to beat on the window of applicant's car, applicant responded by fatally shooting Officer Nix. (RR42: 50-59). Under the law of self-defense, a person's use of deadly force is justified when and to the degree the actor reasonably believes such deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. *See* Act of March 27, 2007, 80th Leg., R.S., ch. 1, § 3, sec. 9.32, 2007 Tex. Gen. Laws 1 (former TEX. PEN. CODE § 9.32).[11]   Officer Nix used a baton to hit the window of applicant's car, and applicant responded by shooting Officer Nix. What applicant did or did not do after firing this first fatal shot does not change the fact that his killing of Officer Nix was unjustified.

Finally, applicant does not explain how the jury's consideration of this evidence

---

[11] Penal code section 9.32 was amended in 2007 and applies to offenses committed on or after September 1, 2007. *See* Act of March 27, 2007, 80th Leg., R.S., ch. 1, §§ 5, 6, 2007 Tex. Gen. Laws 2. The former version, which applies to this case, includes language regarding the duty to retreat. The 2007 amendments deleted the duty-to-retreat language.

during punishment would have affected their determination on either special issue, and there is no indication in the record of how this issue would have been relevant to any punishment issue. Applicant fails to show that counsel was ineffective in his handling of evidence pertaining to the gun jamming, and fails to show that counsel's alleged ineffectiveness of this issue harmed him in either phase of trial.

**B.    Counsel Cannot Be Held Responsible For Failing to Preserve Recordings That Did Not Exist**

Applicant also claims counsel was ineffective for failing to ensure that all audio recordings of the car chase and shooting were preserved. Applicant also appears to be complaining about counsel's ineffectiveness in connection with video recordings, but this particular complaint is far from clear. He asserts no allegations about the video recordings in his argument; brief references to video recordings are found only in the affidavit of his criminal investigator. *See* Applicant's Exhibit 1. In any event, the evidence shows counsel diligently did everything he could to obtain all available recordings in this case, but that the recordings he believed were missing simply did not exist.

This offense occurred on March 23, 2007, Paul Brauchle was appointed as applicant's attorney on March 29, 2007, and the indictment was filed on May 10, 2007. (CR1: 2-3, 8). On December 6, 2007, the defense filed a motion for discovery, setting out the numerous types of evidence it sought from the State. (CR1: 62). The trial court granted the motion for discovery and, as requested by the defense, set the discovery deadline for February 15, 2008. (CR1: 74-76).

- 52 -

116

On April 8, 2008, the trial court held a hearing to address, among other matters, the defense's motion for continuance in which the defense complained about the video and audio recordings that had been produced by the State. (RR38: 4; CR2: 472). The motion alleged, among other matters, that the DVDs and audio recordings included gaps in which images or sounds were missing. (CR2: 472). In an effort to demonstrate why court intervention was necessary, defense counsel told the court that, a week before this hearing, he had personally complained about this issue to the First Assistant and the chief investigator without success. (RR38: 8-10).

In response, the prosecutor explained that the State had turned over all audio recordings it had received from the police department. (RR38: 11). The State had repeatedly asked the police department if there were additional recordings, and had been told there were not. (RR38: 12). The prosecutor also noted that the discovery produced by the State so far included, among other items, four broadcast DVDs, seven Dallas Fire Department DVDs, three Dallas Department in-car videos, and two DVDs of the Dallas mobile data transmissions. (RR38: 14). Following discussions about other discovery matters, the court returned to this matter and ordered that a complete copy of the audio recordings be turned over to the defense. (RR38: 18, 20-21). The court then granted the defense's motion for continuance. (RR38: 21).

On May 16, 2008, a hearing was held so the defense could further explore issues related to the recordings. The defense called three witnesses at this hearing: (1) Detective J.S. Briseno, the lead detective on this case; (2) Rock Richardson, a civilian employee and open records custodian for the Dallas Fire Rescue Communication; and (3) Brian

- 53 -

117

Cody, a city employee who handled open records requests for the Dallas Police Communications Division. (RR40: 8, 37, 40, 53). Evidence at this hearing showed there was one main server at City Hall for all police and fire department radio communications. (RR40: 38-39). At the time of this offense, there were two recording systems: One was the older system that had been failing for some time and the other was a newer system called "NICE," which had been installed a month prior to this offense to eventually replace the old system. (RR40: 39-40, 42-43, 53-54). On the morning after the shooting, Rock Richardson received a call from Lieutenant Crawford of Police Communications, stating he was having difficulty locating the information from NICE and asking for Richardson's help. (RR40: 38-39). Richardson arrived shortly thereafter and detected a problem with NICE, but was able to retrieve both radio traffic and the communication between officers on the radio after "pull[ing] it over the older system." (RR40: 40).

After all information had been retrieved, Richardson listened to the recordings and learned that all communications in this case had started on one main channel, then were directed to alternate channels by the dispatcher. (RR40: 41-44). Brian Cody testified that this was typical during major incidents; calls would start tying up air traffic and the dispatcher would direct calls to alternate channels in order to alleviate this problem. (RR40: 54-55, 57). However, Richardson was only able to retrieve information from the main channel. (RR40: 44). A short on the NICE system prevented it from recording communications on the alternate channels, and the older system did not record communications on the alternate channels because of a malfunction. (RR40: 42-43).

Richardson downloaded all main channel communications in this case from both

- 54 -

118

the older and newer systems, and listened to them to compare for accuracy. (RR40: 45-46). He then transferred the recordings onto eight-track cassette tapes, keeping a copy for himself, and making a copy each for Lieutenant Crawford and for Detective Crumb, the officer in charge of officer-involved shootings. (RR40: 47-48, 50-51). This was all completed on the day after the shooting. (RR40: 49-50). Detective Crumb received the audio recordings from Richardson shortly thereafter and gave them to Detective Briseno. (RR40: 8-11, 24).

Thirty days after this offense, all recordings from this case were erased from the Department's server pursuant to policy. (RR40: 51-52, 56). Thus, the source from which the recordings in this case had been retrieved were gone by April 22, less than a month after counsel's appointment to this case.

As for video recordings, Sergeant Guzman downloaded all available videos from this case and gave them to Detective Briseno. (RR40: 12, 16). Retrieving video involved downloading the footage from the patrol vehicle onto a laptop -- typically at the crime scene – and then downloading the footage from the laptop onto a server at the police department. (RR40: 30). The DVD would then be made from the server. (RR40: 30). There was no testimony about any video footage being erased from the department's server.

Detective Briseno had listened to the audio tapes and confirmed that, at around

5:37 P.M.,[12] the dispatcher was heard directing officers to alternate channels. (RR40: 26-27). However, Detective Briseno did not receive recordings from these alternate channels. (RR40: 27). Some of the audio recordings were missing transmissions that occurred before 5:37 P.M. while others recorded only up to 5:37 P.M. (RR40: 32). Detective Briseno had also viewed the video recordings and stated they covered approximately three to four hours of that day, beginning with the officers' initial contact with applicant. (RR40: 17). He acknowledged that the audio on the two videos stops at 5:37 P.M., as the officers are shown trying to effect a traffic stop. (RR40: 18, 20-21). However, he did not know why this occurred and asserted that the videos had not been altered in any way. (RR4: 19-20).

Detective Briseno testified that all available audio and video recordings in this case were in his file within two to three days after the shooting. (RR40: 8-11, 13-14). The only recording not in his file at that time was the video from Officer Nix's car, which he believed was in the District Attorney's possession. (RR40: 13-14).

In sum, the evidence shows counsel diligently did everything he could to obtain the portions of the audio and video he believed were missing. Through his efforts, he was able to learn that the missing portions of the audio were simply never recorded. Thus, preserving the "originals" would have made no difference in this case. Counsel also ascertained that neither the audio nor video recordings had been altered in any way.

---

[12] The defense's motion for continuance alleged that the shooting began at around 5:57 P.M. (CR2: 472-72). Later on direct, Detective Briseno confirmed that the shooting occurred around that time. (RR40: 32).

Any gaps or omissions were due to technical issues at the time of the incident, and preserving any of the "originals" would not have made a difference in the content of the video and audio recordings available to the parties. For the foregoing reasons, applicant fails to show that counsel was ineffective in this regard.

### C.    Counsel Cannot be Responsible for Obtaining Mental Health Records that Did Not Exist

Applicant also complains of counsel's ineffectiveness in connection with alleged mental health evidence pertaining to Officer Nix. Applicant's complaint on this issue is far from clear. Although he alleges that counsel failed to adequately investigate, develop, and present "evidence of the destruction of mental health evidence," he seems to complain only of the prejudice he suffered because the contents of the mental health records were not admitted into evidence. *See* Applicant's Application at p. 66. Applicant never explains how hearing about the destruction of Officer Nix's mental health records would have helped the jury find that he acted in self-defense in this case. It is not entirely clear what applicant contends counsel should have done.

Applicant's complaint about Officer Nix's mental health stems from testimony regarding Officer Nix's six-month tour of duty in Iraq in 2003. *See* Habeas Application at p. 66. Officer Nix's mother, Cheryle Nix, testified during punishment that her son entered the Navy reserves at the age of eighteen or nineteen. (RR52: 145). After finishing his training to become a corpsman and medic, Officer Nix returned home and spent the summer as a cook in a summer camp. (RR52: 145). After the next two-and-a-half years at the Moody Bible Institute in Chicago, Officer Nix returned to Dallas and

- 57 -

**121**

joined the Dallas Police Department. (RR52: 145). Mrs. Nix testified that her son was
called to active duty in 2003, around the time the war in Iraq began. (RR52: 147). He
was in Kuwait as a medic in the Marine unit, and moved to Baghdad with his unit when
the war began. (RR52: 147-148). Mrs. Nix testified that her son's tour of duty lasted
approximately six months. (RR52: 148). Upon returning home, Officer Nix took about a
month-and-a-half leave to decompress, then returned to his duties at the Dallas Police
Department. (RR52: 148).

Applicant contends the foregoing testimony about Officer Nix's tour in Iraq raised
the issue of whether his "aggressive behavior" against applicant could be explained by
post-traumatic stress disorder ("PTSD"). *See* Habeas Application at p. 66. Applicant
claims Officer Nix's mental health records could have shown this diagnosis, and that
defense counsel failed to "investigate, develop, and present evidence that the mental
health records for Officer Nix were lost, destroyed, or otherwise unavailable."

According to the investigations conducted by applicant's investigator on habeas,
the VA Hospital had no mental health records for Officer Nix, and the doctor who
conducted a mental evaluation of Officer Nix upon his return from Iraq did not have
records related to the evaluation. *See* Habeas Application, Exhibit 2 at p. 2. Further,
applicant's investigator learned that the police department's policy was to retain records
of psychological testing for two years. *See* Habeas Application, Exhibit 2 at p. 3. In
accordance with this policy, Officer Nix's records had been destroyed after two years.
Finally, applicant's investigator also found no mental health records related to Officer
Nix at the Texas Commission on Law Enforcement Officer Standards and Education.

- 58 -

122

The only record applicant's investigator was able to find was the L-3 Declaration of Psychological and Emotional Health, which was done in 2000 when Officer Nix first joined the Dallas Police Department. *See* Habeas Application, Exhibit 2 at p. 2.

Given the foregoing, it is difficult to understand, and applicant does not explain, how counsel might have been ineffective with respect to retrieving Officer Nix's mental health records. The records were destroyed prior to this offense, so there was nothing defense counsel could have done to retroactively preserve them. And because no wrongdoing was involved in this routine destruction, counsel could not have presented this issue as one involving any party's attempt to conceal relevant evidence. In fact, it would have been nonsensical for counsel to rely on these non-existent records to support his argument that Officer Nix's alleged PTSD explained his "aberrant" behavior in this case.

An applicant seeking habeas relief must allege and prove facts, which if true, would entitle him to relief. *See Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985). Relief may be denied where the applicant states only conclusions without supporting facts. *See Ex parte McPherson*, 32 S.W.3d 860, 861 (Tex. Crim. App. 2000). Because applicant does not state what counsel actually failed to do in connection with Officer Nix's non-existent mental health records, he fails to meet his habeas burden. Ground seven should be denied.

- 59 -

123

### RESPONSE TO "SUPPLEMENTAL" ISSUE TO GROUND SEVEN: THE SUPPLEMENTAL CLAIM IS A SUBSEQUENT CLAIM THAT IS PROCEDURALLY BARRED

Applicant filed his original application for writ of habeas corpus on December 6, 2010, two days prior to the deadline of December 8, 2010. On December 10, 2010, two days after the expiration of his deadline, applicant filed an additional habeas claim, calling it a "supplement" to his original application. Applicant claimed this new claim was exempt from the procedural bar imposed by article 11.071 because it was only two days late and there was no prejudice to the State.

### A.    Applicant's Subsequent Writ is Procedurally Barred

Section five of article 11.071 bars a court from considering the merits of a subsequent application unless the application contains sufficient specific facts establishing one of the following: (1) the current claims could not have been raised in a previous and timely-filed application because the factual or legal basis for the claim was unavailable at that time; (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution, no rational juror would have answered in the State's favor on one or more of the special issues. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a) (Vernon Supp. 2010). If the convicting court receives a subsequent application, the clerk of the court is required to attach a notation that the application is a subsequent application, assign a cause number that is ancillary to the challenged conviction, and immediately send a copy of the application with the notation to the court of criminal

appeals. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(b) (Vernon Supp. 2010).

Applicant's "supplemental" application neither alleged any claims that could not be raised in the original application due to the unavailability of any factual or legal basis, nor alleged any type of "actual innocence" claim. *See generally* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a) (setting out the exceptions to the procedural bar on subsequent applications). Moreover, there is no legal authority for the proposition that a subsequent application that is "only" two days late or that does not prejudice the State is exempt from the requirements of section five. Nevertheless, the convicting court decided to treat this as a supplemental rather than subsequent writ, and did not follow the requirements set out by section 5(b).

The State objects to the trial court's treatment of applicant's subsequent writ as a supplemental writ, but addresses the merits of this subsequent application.

## B.    Counsel Was Not Ineffective for Failing to Request Jury Instructions That Were Unwarranted

In connection with his complaint about allegedly lost audio/video recordings and mental health records, applicant contends counsel was ineffective for failing to request a spoliation jury instruction. He claims a spoliation instruction would have further supported his self-defense theory by showing that Officer Nix was the first aggressor.

Spoliation instructions, long recognized in civil cases, generally instruct a jury to presume that the missing evidence in question would have been unfavorable to the party that did not produce it. *See generally Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003). However, missing evidence does not automatically entitle the party

seeking the evidence to a spoliation instruction.  In criminal cases, the State is constitutionally required to preserve evidence that might be expected to play a significant role in a defendant's defense. *See Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).  To demonstrate a violation of due process stemming from the State's failure to preserve evidence, the defendant must show one of the following: (1) the evidence was both exculpatory and material; or (2) the evidence was "potentially useful" and the State acted in bad faith in losing or destroying it. *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *California v. Trombetta*, 467 U.S. 479, 489 (1984); *see also Ex parte Napper*, 322 S.W.3d 202, 229 (Tex. Crim. App. 2010).

Here, there is no indication that any evidence was actually destroyed.  The audio recordings that were provided to the defense consisted of everything the Police Department was able to retrieve from its servers. (RR: 38: 11-12; RR40: 25, 28, 45). Any gaps in either the audio or video recordings were due, not to the destruction or omission of any evidence, but to a technical problem with the recording systems. (RR40: 19-20, 42-43).  Assuming any missing audio or video was "potentially useful" to the defense, the alleged loss of such recordings were due to technical glitches at the time of the offense and not to any bad faith on the part of the police department or the State. The same is also true for Officer Nix's mental health records.  Applicant has failed to show that the content of such records would have been exculpatory and material, or that it was potentially useful and the State acted in bad faith in destroying the records.  In fact, the records were destroyed pursuant to police department policy before this capital murder

- 62 -

126

even occurred.

For the foregoing reasons, applicant was not legally entitled to spoliation instructions and the trial court would have properly denied a request for one. Counsel cannot be held ineffective for failing to request unwarranted jury instructions. Applicant's subsequent claim on habeas fails on the merits.

## RESPONSE TO GROUND EIGHT: COUNSEL'S FAILURE TO PRESENT IRRELEVANT EVIDENCE DURING PUNISHMENT DID NOT RENDER HIM INEFFECTIVE

In ground eight, applicant contends counsel was ineffective during punishment for failing to adequately investigate, develop, and present "crucial mitigating evidence" of the adverse impact of his execution on his children. Applicant argues there is a reasonable probability that, had counsel adequately investigated and presented mitigating evidence of his good character as a parent and expert testimony to establish the importance of maintaining the his relationship with his children, the jury would not have assessed a death sentence.

The record shows defense counsel attempted to introduce such evidence by filing a "Motion to Introduce the Testimony of Defendant's Family and Friends Regarding Their Feelings on the Prospect of a Death Sentence and the Impact an Execution Would Have on Them." (CR2: 315). In the motion, counsel specifically asked that the defense be permitted to question applicant's family and friends on two matters: (1) whether they wanted applicant to live or die; and (2) the impact they would suffer if applicant were sentenced to death. (CR2: 315). The trial court denied the motion. (CR2: 324).

To the extent applicant believes that this pretrial motion was inadequate, it would

- 63 -

127

have been futile for counsel to further urge the matter by trying to introduce evidence, expert or lay, related to the impact of his sentence on his children.   As previously explained, "mitigating evidence" is evidence that a juror might regard as reducing the defendant's moral blameworthiness.  *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(f)(4).   Mitigating evidence must relate to the defendant's *own* circumstances and personal moral culpability.  *See Tennard*, 542 U.S. at 284; *see also Joubert*, 235 S.W.3d at 734.   The impact of applicant's death sentence on his children does not relate to applicant's own personal moral culpability.  *See, e.g., Gallo v. State*, 239 S.W.3d 757, 778-79 (Tex. Crim. App. 2007) (holding that evidence of the impact of the defendant's execution on his family and friends is not relevant to mitigation); *Fuller v. State*, 827 S.W.2d 919, 935-36 (Tex. Crim. App. 1992) (rejecting defendant's complaint that character evidence from relatives concerning their love for him and their desire to see him live constitute mitigating evidence).   Counsel rendered neither deficient nor prejudicial performance in deciding not to further urge the introduction of irrelevant evidence.

Ground eight should be denied.

Respectfully submitted,

_____

Grace E. Shin

Craig Watkins
Criminal District Attorney
Dallas County, Texas

Assistant District Attorney
State Bar No. 24033062
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3631
(214) 653-3643 *fax*
gshin@dallascounty.org

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing response has been served on Lydia
M.V. Brandt, attorney for applicant, at THE BRANDT LAW FIRM, P.C., P.O. Box 850843,
Richardson, Texas 75085 by depositing same in the United States mail, postage prepaid,
on April 6, 2011.

_____

Grace E. Shin

- 65 -

129

F07-50318-M

| EX PARTE | § | IN THE 194TH JUDICIAL |
| | § | DISTRICT COURT |
| WESLEY LYNN RUIZ | § | DALLAS COUNTY, TEXAS |

BEFORE ME, the undersigned official, on this day appeared Kevin Brooks, who is personally known to me, and first being duly sworn according to law upon his oath, deposed and said as follows:

My name is Kevin Brooks, I am over eighteen years of age, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

I am an assistant district attorney in Dallas County, Texas, and was the lead prosecutor for the State at the trial of Wesley Lynn Ruiz (applicant), who was charged with the capital murder of Dallas Police Officer Mark Nix. The following facts are to the best of my knowledge and recollection.

### *Police Recordings*

Almost immediately after Officer Nix's death, the police department downloaded all 911 recordings from this case onto tapes. This is something the police department typically does in every homicide case; the State made no such request.

Affidavit of Kevin Brooks

1

130

Later, in the course of preparing for trial, the State requested and obtained all audio and video recordings pertaining to this case from the police department and produced them to applicant's counsel. Despite producing all such recordings to the defense, defense counsel Paul Brauchle repeatedly and persistently complained to the State about recordings he believed were missing. Out of the utmost of precaution, the State repeatedly asked the police department about the existence of additional recordings but was told there were none.

To the best of my knowledge, no audio or video recording pertaining to this case was ever withheld from the defense; all available recordings in this case were provided to the State by the police department and, thereafter, produced to the defense. The original source from which the audio recordings had been downloaded were destroyed early in the case pursuant to police department policy. However, the information that was destroyed was information that had already been provided to both the State and the defense.

### Metal Detector

Throughout trial, the State recorded telephone conversations applicant was having from jail. One day, I listened to a telephone call applicant made to his brother, complaining about the trial. In response, his brother assured applicant he would bring some "heavy hitters" to court the next day. Based on information in the State's possession, I knew applicant and his brother belonged to the same criminal gang. Thus, I was concerned about the possibility of applicant's brother showing up to court with gang members, particularly "heavy-hitter" members. Worried about this potential security threat, I immediately notified

Affidavit of Kevin Brooks

2

131

the judge and the Sheriff's Department of the call. On or about the next day, the Sheriff's

Department installed a metal detector outside the courtroom.

### *Uniformed Police Officers*

I recall seeing uniformed police officers in the courtroom on various days throughout

both phases of trial. Neither the State nor the trial court asked for these officers to be present

in the courtroom. These officers were in the courtroom on their own as spectators. The

number of uniformed officers in the courtroom varied from day to day throughout trial. This

is fairly typical in any trial involving the death of a police officer.

Moreover, I observed no particular conduct on the part of any of these officers that

would have drawn the jury's attention. The officers who attended trial simply sat with other

spectators in the gallery of the courtroom.

### *The Rule*

The Rule was invoked during the punishment phase of trial Thus, the testifying

members of applicant's family would not have been allowed inside the courtroom prior to

testifying. It would also have been a violation of the Rule for any of the testifying family

members to view and listen to the court proceedings from the media's television monitor,

which was positioned outside the courtroom.

Affidavit of Kevin Brooks

3

132

FURTHER AFFIANT SAYETH NOT

_Kevin Brooks_
Kevin Brooks

SUBSCRIBED AND SWORN TO BEFORE ME, on the 4th day of April, 2011,

to certify which witness my hand and official seal.

_Signature_
Signature

SEAL

SHARON I. FULLER
Notary Public
STATE OF TEXAS
My Comm. Exp. May 27, 2012

_SHARON L. FULLER_
Printed Name

Affidavit of Kevin Brooks

4

133

CAUSE NO. W07-50318-M(A)

IN

THE 194TH JUDICIAL DISTRICT COURT

OF DALLAS COUNTY, TEXAS

Trial Court Cause No. F07-50318-M

---

# EX PARTE WESLEY LYNN RUIZ

---

STATE'S ORIGINAL ANSWER
TO APPLICATION FOR WRIT OF HABEAS CORPUS
IN DEATH PENALTY CASE

---

*Counsel of Record:*

Craig Watkins
District Attorney
Dallas County, Texas

Grace E. Shin
Assistant District Attorney
State Bar No. 24033062
133 N. Riverfront Blvd., LB-19
Dallas, Texas  75207-4399
(214) 653-3631
(214) 653-3643 *fax*
gshin@dallascounty.org

FILED
2011 APR -5 AM 10: 06
GARY FITZSIMMONS
DISTRICT CLERK
DALLAS TEXAS
DEPUTY

134

TO THE HONORABLE COURT:

Respondent, the State of Texas, files this original answer to Wesley Lynn Ruiz's application for writ of habeas corpus filed pursuant to article 11.071 of the Texas Code of Criminal Procedure.

## PROCEDURAL HISTORY

A Dallas County jury found applicant guilty of the capital murder of Dallas Police Officer Mark Nix. (CR2: 545). In accordance with the jury's answers to the special issues, the trial court sentenced applicant to death on July 11, 2008. On March 2, 2011, the Court of Criminal Appeals affirmed applicant's conviction and sentence on direct appeal. *Ruiz v. State*, No. AP-75,968, 2011 Tex. Crim. App. Unpub. LEXIS 137 (Tex. Crim. App. Mar. 2, 2011).

Applicant's deadline for filing his application for writ of habeas corpus was December 8, 2010. On December 6, 2010, he timely filed his application for writ of habeas corpus in this cause. On December 10, 2010, two days after the passage of his deadline, applicant asserted another claim on habeas by filing what he claimed was a "supplement" to his original application for habeas relief. The trial court accepted the additional pleading as a supplemental writ.

The State's response is timely filed on April 5, 2011.

135

## FACTUAL SUMMARY

On a late afternoon on March 23, 2007, applicant was on southbound I-35, driving his friend's Chevy Caprice while sipping liquid codeine through a baby bottle. (RR42: 45; RR47: 9-10, 49-51). Among the items in the car were a loaded rifle; varying quantities of methamphetamine, marijuana, and a drug cutting agent; and scales of the type used for weighing drugs. (RR45: 165-168). Applicant was on probation in Dallas County for a drug-related offense and, since three days prior, considered in violation for failing to report as required. (State's Trial Exhibit 127; RR47: 44-45; RR52: 60).

That same afternoon, undercover officers Jason Jarc and Patrick Starr were driving along I-35 in their covert vehicle when they noticed the Caprice. (RR43: 14-16; RR45: 7-8). They observed that the Caprice fit the description of a vehicle described in a recent bulletin regarding a capital murder, and radioed the information to other officers.[1] (RR43: 16, 18). As they followed the Caprice from a distance, several squad cars began to appear behind the vehicle. (RR43: 18). Directly behind the Caprice was Officer Mark Nix's squad car, followed by another squad car driven by Officer Jeremy Borchardt, whose partner was also in the car with him. (RR42: 49; RR43: 19-20, 72).

Intending to conduct a traffic stop, the squad cars soon turned on their overhead lights. (RR42: 49-50). The Caprice changed lanes and began to slow down, but then suddenly sped off, leading the officers to believe applicant was the capital murder suspect

---

[1] The Caprice driven by applicant was not the vehicle described in the capital murder bulletin, and applicant had no connection to that offense. (RR42: 36-37, 39-40).

they were looking for. (RR42: 50-51; RR43: 73-74). A high-speed chase ensued, reaching speeds of up to 50 to 80 miles per hour. (RR42: 51; RR43: 76).

The pursuit finally came to an end in a residential neighborhood after applicant lost control of his car and spun out in the yard of a house. (RR42: 54). Officer Nix quickly parked his car in front of the Caprice in a nose-to-nose position and exited his car. (RR42: 55-56). In an attempt to "triangulate," Officer Borchardt parked his car facing the side of the Caprice. (RR42: 55-56; RR43: 77). Due to the heavy tint of the Caprice's windows, the officers could not see into the vehicle. (RR42: 57; RR43: 77).

Upon reaching the passenger's side of the Caprice, Officer Nix yelled verbal commands and pulled out his asp baton. (RR42: 56-57). Holding his gun in his right hand and the baton in his left hand, Officer Nix struck the passenger-side window with the baton. (RR42: 57-58). He then bent down, set his gun on the ground, and holding the baton in both hands, resumed striking the window. (RR42: 58). At that moment, a gunshot fired from inside the Caprice, shattered the rear passenger window, and struck Officer Nix on his upper left chest. (RR42: 58; RR43: 77-78; RR46: 14).

When the officers at the scene saw Officer Nix fall to the ground, they immediately began firing into the Caprice. (RR42: 60-61). As they fired, some of the officers pulled Officer Nix away from the Caprice and rushed him to the hospital. (RR42: 63-64; RR43: 26-30). Officer Nix died later that night from the gunshot wound to his chest. (RR42: 65; RR46: 14, 24). Applicant suffered two broken bones and several gunshot wounds. (RR45: 55, 58). He was treated at the scene and taken to the hospital, where he remained for four days and survived. (RR45: 47-50, 52-53, 56).

- 4 -

137

Applicant was eventually charged with the capital murder of Officer Mark Nix and the State elected to seek the death penalty. (CR1: 2, 43). *See* TEX. PEN. CODE ANN. § 19.03(a)(1) (Vernon Supp. 2010). At trial, applicant testified for his own defense and admitted fleeing from police because of the drugs and gun in his possession. (RR47: 47). He knew he would return to jail if the police caught him. (RR47: 47). Applicant claimed he shot Officer Nix only in self-defense. (RR47: 22). The jury rejected applicant's defense and found him guilty of capital murder as charged. (RR48: 65).

The evidence at punishment showed the evolution, from an early age, of an increasingly-defiant criminal. Sometime in the early to mid 1990s, while in high school, applicant became a member of a criminal street gang called the Midnight Dreamers, which along with the Latin Violence (its rival gang), were known to be violent gangs in Irving during that period. (RR51: 49-50, 52-53, 74-75, 88-89, 91, 99-100, 117; RR52: 75). Applicant's criminal activities escalated from thereon.

In June 1996, at the age of sixteen, applicant was convicted as a juvenile for a theft he committed in August 1995. (State's Appellate Exhibit 117). In January 1997, applicant committed the misdemeanor offense of burglary of a vehicle and was placed on deferred adjudication probation. (State's Appellate Exhibit 118). On the night of March 8, 1997, applicant participated in shooting at the house of Latin Violence member, Joe Ramos, after another Latin Violence member "shot up" the house of Midnight Dreamers member Raul Toledo. (RR51: 93-97). On the night in question, Toledo, applicant, and four friends arrived at the Ramos house in two cars and opened fire on the house. (RR51: 92, 94-97, 107-108). The house was occupied at that time by Ramos, his girlfriend, his

parents, his three or four-year-old nephew, and his two-year-old nephew. (RR51: 121). The bullets cleared the entire distance of the house, but no one was hit. (RR51: 121-122). Toledo and applicant were subsequently arrested for the offense of deadly conduct. (RR51: 103-104).

In addition to the Midnight Dreamers, the evidence showed applicant's likely membership in two other criminal gangs: Westside Ledbetter 12 and Tango Blast. (RR52: 22-23, 42-45, 49, 91-93, 96; State's Trial Exhibits 132, 139, 146, 147). From the early 1990s, Westside Ledbetter 12 and the Midnight Dreamers were ally gangs in the world of drugs and other criminal activities. (RR52: 43). The evidence showed that Tango Blast originated inside the Texas prison system, but that its current membership likely included those outside the prison system. (RR52: 94-96). At the time of trial, the intelligence on whether membership was limited to the prison system was unsettled and changing every day. (RR52: 77, 88-89, 94, 99-100).

Applicant's criminal activities continued steadily after the March 1997 shooting of the Ramos home. In September 1997, applicant was convicted of misdemeanor theft and sentenced to 100 days' confinement. (State's Trial Exhibit 119). That same date, he was adjudicated guilty of a January 1997 offense of burglary of a vehicle, his probation was revoked, and he was sentenced to 100 days' confinement. (State's Trial Exhibit 118). In August 1997, applicant committed the misdemeanor offense of burglary of a vehicle. (State's Trial Exhibit 120). While in custody for this offense, he escaped. (State's Trial Exhibit 121). In February 1998, applicant was convicted of two offenses in connection with these events: burglary of a vehicle and misdemeanor escape. (State's Trial Exhibits

120, 121).

No evidence of further offenses, arrests, or convictions were introduced for the period between 1997 and 2003.  However, in 2004, applicant resumed his criminal activities with a vengeance.  On November 25, 2004, applicant was involved in a high-speed chase with a police squad car while driving in his vehicle with his then-girlfriend. (RR52: 8-10, 12).  The chase ended only after applicant's vehicle hit a light pole at an intersection, rose into the air, "T-boned" another vehicle at the intersection, spun, and finally came to a stop.  (RR52: 10-11).  However, applicant still refused to give up and ran on foot.  (RR52: 11).  The officer chasing applicant was able to take him into custody only after applicant eventually gave up running.  (RR52: 11-12).  A search of applicant's vehicle revealed a .25-caliber gun, containing seven rounds, in the glove compartment. (RR52: 14-15).  One of the rounds was in the chamber of the gun, indicating the gun was ready for firing.  (RR52: 15).  As a result of this incident, applicant was convicted of the felony offense of evading arrest/detention and the felony offense of unlawful carrying of a handgun.  (State's Trial Exhibits 123, 124).  However, pursuant to plea agreements in both cases, he received a reduced misdemeanor sentence in each cause.  (State's Trial Exhibits 123, 124).

These offenses were followed by a series of methamphetamine-related offenses. On or about April 3, 2005, applicant was arrested in Tarrant County for possession of methamphetamine.  (State's Trial Exhibit 125).  As a result, on April 24, 2006, he was placed on ten years' deferred adjudication probation for possession with intent to deliver between 4 and 200 grams of methamphetamine.  (State's Trial Exhibit 125).

- 7 -

140

On April 12, 2005, gang-unit officers went to an apartment complex based on information they received about possible drug activity and arrested applicant at a unit where both drugs and guns were seized. (RR52: 22-26, 31). In connection with this arrest, applicant was convicted in the following November of the state jail offense of possession of methamphetamine but, as a result of another show of mercy by the State, received a reduced misdemeanor sentence. (State's Trial Exhibit 126).

Applicant's friend Hector Martinez, whose Caprice applicant had been driving on the date of this capital murder, testified that in the period between applicant's release from Tarrant County jail in 2006 and Officer Nix's murder, he and applicant saw each other on a weekly basis. (RR52: 77). In one of their many conversations during this time, applicant bragged about stealing from people. (RR52: 78-79). Another time, applicant told Martinez he once "got into some trouble" with some guys at Club Extreme, and shot at them in the club parking lot after they blocked him in. (RR52: 79).

On May 23, 2006, applicant was convicted in Dallas County of possession with intent to deliver methamphetamine, and placed on ten years' probation. (State's Exhibit 127; RR47: 44). Applicant was still on probation in Tarrant County at the time he was placed on probation in this Dallas County case. (RR52: 57). Less than six months into his probationary period for the Dallas County methamphetamine offense, applicant failed to report as required. (RR47: 45). By March 20, 2007, three days prior to the shooting death of Officer Nix, applicant was considered in violation of his probation in the Dallas case. (RR47: 27; RR52: 60).

The evidence showed applicant's disregard for the law and authority had become a

- 8 -

141

normal aspect of his life near the time of Officer Nix's murder. On March 14, nine days before Officer Nix's murder, Hector Martinez discovered applicant's father's car in the alley behind his house. (RR52: 89). When he asked applicant about this, applicant stated he had fled from police by driving off after being pulled over. (RR52: 89).

Carmen Delgadillo, applicant's girlfriend at the time of the capital murder, testified that during the time they were together, he "would say stuff like he wasn't going to go down without a fight," and say that he would not make it easy. (RR42: 55-56). Applicant also told Delgadillo that he was going to "go out like a G." (RR42: 156, 162-163). Delgadillo explained that "G" meant "gangster." (RR42: 164). Similarly, Hector Martinez testified that applicant once told him that the only way he was ever going back to jail was "in a box." (RR52: 79-80).

Based on the foregoing and other evidence before them, the jury answered the special issues in a manner that required the trial court to sentence applicant to death.

## SUMMARY OF ARGUMENT

*Response to Ground One*:  Applicant claims the trial court erred in excluding evidence of prior bad conduct by Officer Nix because such evidence would have negated an essential element of the charged offense. Applicant asserts numerous constitutional violations as well as a statutory violation that resulted from the exclusion of this evidence. However, applicant did not raise any of these arguments at trial or later on direct appeal. Further, to the extent this complaint is about the relevance of the evidence to applicant's self-defense claim, it was raised and rejected on direct appeal. Thus, ground one is procedurally barred. Even assuming no procedural bars, applicant's

- 9 -

statutory complaint is not cognizable on habeas. Moreover, the trial court's exclusion of the proffered evidence was proper because it had no relevance to the case apart from character conformity.

*Response to Ground Two*: Applicant claims trial counsel was ineffective for failing to raise the numerous arguments he asserts under ground one of this application. However, the objections applicant contends counsel should have asserted are groundless and frivolous.   Counsel cannot be held ineffective for failing to assert frivolous objections.

*Response to Ground Three*: Still complaining about the same set of facts as in grounds one and two, applicant offers another reason the trial court's ruling was erroneous: the evidence of Officer Nix's prior acts was relevant to mitigation during punishment. This complaint was not raised at trial or later on direct appeal and is, thus, procedurally barred.  Even without the procedural bars, the proffered evidence had nothing to do with applicant's moral blameworthiness in this case and was, thus, irrelevant to mitigation.

*Response to Ground Four*: Based on the same set of facts as the first three grounds, applicant claims trial counsel was ineffective for failing to reoffer the evidence of Officer Nix's prior acts during punishment as mitigation evidence.  Because the proffered testimony had no relevance to mitigation, offering it during punishment would have been futile. Counsel cannot be held ineffective for failing to take a futile action.

*Response to Ground Five*: Applicant claims his right to a fair punishment trial was violated by the presence of uniformed police officers in the spectator section of the

- 10 -

143

courtroom, "increased deputies" in the courtroom, a metal detector outside the courtroom, and the disparate treatment of his family by everyone in the courtroom. Applicant did not complain about the uniformed officers at trial and his complaint about the deputies was untimely. Moreover, at trial, applicant did not complain about the numerous ways his family was allegedly mistreated. Further, applicant did not raise any of these complaints on direct appeal. Ground five is, thus, procedurally barred. However, even without the procedural bars, applicant fails to show that any of the complained-of practices violated his right to a fair punishment trial.

*Response to Ground Six*: Applicant asserts allegations of ineffectiveness against trial counsel for failing to adequately preserve his constitutional complaints about the courtroom practices that allegedly violated his right to a fair punishment trial. The record shows counsel adequately apprised the trial court of applicant's complaint about his constitutional right to a fair trial. To the extent counsel may have failed to make a record of facts related to deputies and officers in the courtroom, doing so would have made no difference in the outcome of this case.

*Response to Ground Seven*: Applicant contends his counsel was ineffective for failing to bolster his self-defense theory by challenging the evidence pertaining to the firearm he used to shoot Officer Nix, by failing to ensure that the original videos and audio of the police chase and shooting were preserved, and by failing to properly use evidence of the unavailability of Officer Nix's mental health records. The evidence shows counsel competently handled the ballistics evidence at trial and diligently sought to obtain all recordings. Moreover, neither applicant nor the evidence shows anything

that counsel could have done with respect to non-existent mental health records. Applicant fails to show that counsel was ineffective in this regard.

*Response to Subsequent Claim under Ground Seven*: Applicant filed an additional complaint under ground seven after the deadline for his application had expired. Thus, the additional complaint is barred as a subsequent writ under Code of Criminal Procedure, article 11.071, section five. Even without the procedural bar, however, he was not entitled to a spoliation jury instruction because no wrongful destruction of relevant evidence was involved.

*Response to Ground Eight*: Applicant contends counsel was ineffective during punishment for failing to introduce evidence of the impact of a death sentence on his children and of his good character as a father. Such evidence has no bearing on applicant's moral blameworthiness and had no relevance to any other punishment issue. Counsel cannot be ineffective for failing to introduce irrelevant evidence.

## RESPONSE

### RESPONSE TO GROUND ONE: APPLICANT'S COMPLAINT ABOUT THE EXCLUSION OF EVIDENCE PERTAINING TO PRIOR CONDUCT BY OFFICER NIX IS PROCEDURALLY BARRED. ALTERNATIVELY, THE EVIDENCE WAS PROPERLY EXCLUDED.

In ground one, applicant claims the trial court erred in excluding evidence of prior bad acts by Officer Nix because this evidence would have negated an essential element of the charged offense – specifically, that Officer Nix was acting within the lawful discharge of an official duty at the time he was killed. *See* TEX. PEN. CODE ANN. § 19.03(a)(1). Applicant claims the evidence would have negated this element by showing that Officer Nix acted as the first aggressor against applicant. Applicant claims the trial court's ruling

- 12 -

145

was erroneous for the following reasons: (1) it violated his Sixth and Fourteenth Amendment rights to a fair defense under the United States Constitution; (2) he was wrongfully convicted of capital murder given his "actual innocence" of this offense; (3) his subsequent death sentence violated his Eighth Amendment right to be free from cruel and unusual punishment, since he was actually innocent of capital murder; and (4) his right to evidence under article 38.36(a)[2] of the Texas Code of Criminal Procedure was violated. *See generally* TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (Vernon 2005).

## A.    This Ground is Procedurally Barred

Matters not raised at trial cannot form the basis for habeas relief. *See Ex parte Dutchover*, 779 S.W.2d 76, 77 (Tex. Crim. App. 1989); *Ex parte Crispen*, 777 S.W.2d 103, 105 (Tex. Crim. App. 1989); *Ex parte Bagley*, 509 S.W.2d 332, 333 (Tex. Crim. App. 1974) ("The same rule as to the necessity of an objection to complained of evidence has been applied by this Court in habeas corpus cases."). Additionally, habeas corpus is not to be used as a substitute for appeal. *Ex parte Clore*, 690 S.W.2d 899, 900 (Tex. Crim. App. 1985) (en banc). If a claim could have been raised on appeal, but was not, the applicant is procedurally barred from raising the issue for the first time through habeas. *See Ex parte Cruzata*, 220 S.W.3d 518, 520 (Tex. Crim. App. 2007); *see, e.g., Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998) (holding that because claims concerning the jury charge at punishment should have been raised on direct appeal, the claims will not be addressed on habeas). Finally, habeas corpus is not to be

---

[2] Applicant actually cites to article 38.26, but this appears to be a clerical error.

used to relitigate matters that were addressed on appeal. *See Ex parte Drake*, 883 S.W.2d
213, 215 (Tex. Crim. App. 1994); *see, e.g.. Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex.
Crim. App. 1984) (holding it need not address, on habeas, matters that were addressed on
direct appeal)

During the guilt phase of trial, applicant proffered evidence of prior conduct by
Officer Nix through the testimony of Raquel Sosa, Karlous Lake, and Anthony Williams.
(RR46: 79-142, RR48: 66-73). He argued that their testimony was necessary to his self-
defense theory because it showed Officer Nix was the first aggressor in this case. (RR46:
79-83). The trial court disagreed and excluded their testimony. Applicant made no
argument about the relevance of this evidence to negate the "lawful discharge" element
of the charged offense and no arguments about any of other violations that he now claims
resulted from the trial court's ruling. Further, applicant could have raised any of these
arguments on direct appeal, and did not. Finally, to the extent applicant also complains
about the relevance of this evidence to his self-defense claim, this issue was raised and
rejected on direct appeal.

For the foregoing reasons, ground one is procedurally barred. However, applicant
would not be entitled to relief under this ground even without the many procedural bars.

## B.    Applicant's Statutory Claim is Not Cognizable on Habeas

Habeas corpus is available only to review jurisdictional defects or denials of
fundamental or constitutional rights. *See Ex parte Banks*, 769 S.W.2d 539, 540 (Tex.
Crim. App. 1989). Claims alleging a violation of a statute are not cognizable in a writ of
habeas corpus. *Ex parte Graves*, 70 S.W.3d 103, 109 (Tex. Crim. App. 2002).

- 14 -

147