CAUSE NO. W07-50318-M

ORIGINAL

COA NO.

THE STATE OF TEXAS * IN THE DISTRICT COURT

VS. * 194TH JUDICIAL DISTRICT

WESLEY LYNN RUIZ * DALLAS COUNTY, TEXAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

REPORTER'S RECORD

WRIT HEARING

Volume 2 of 4 Volume(s)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

BE IT REMEMBERED THAT on this the 21st day of September, A.D, 2011, the above-styled and -numbered cause(s) came on for hearing before the HONORABLE ERNEST B. WHITE, III, of the 194th Judicial District Court of Dallas County, State of Texas, the following is a true and correct transcription of the proceedings had, to-wit:

(Proceedings Reported by Computerized Machine Shorthand)

A P P E A R A N C E S

HON. GRACE SHIN
Assistant District Attorney
State Bar No. 24033062

HON. CHRISTI DEAN
Assistant District Attorney
State Bar No. 24004948

FOR THE STATE OF TEXAS

HON. LYDIA BRANDT
Attorney at Law
State Bar No. 00795262

FOR THE DEFENDANT

* * * * *

I N D E X

PAGE/VOL.

Proceedings - 09/21/11 .......................... 5/3

| DEFENSE'S WITNESS | Direct | Cross |
| --- | --- | --- |
| RICHARD ZIEGENHAIN | 9, 18 | 13, 18 |
| | 18 | |
| SUE ZIEGENHAIN | 19 | 23 |
| BARBARA RUIZ | 26, 31 | 30 |
| KEVIN BROOKS | 32, 64 | 61, 67 |
| | 67 | |
| GILDA KESSNER | 69, 93 | 85, 96 |
| PAUL BRAUCHLE | 97 | |
| REX REYNOLDS | 138 | |
| KARO JOHNSON | 143 | |
| DOUG PARKS | 152 | 175 |

Reporter's Certificate .......................... 177

E X H I B I T I N D E X

| DEFENSE'S EXHIBIT(S): | OFFERED: | ADMITTED: | VOL. |
|---|---|---|---|
| 1 Business Affidavit | 5 | 5 | 2 |
| 1A Business Affidavit | 5 | 5 | 2 |
| 2B Business Affidavit | 5 | 5 | 2 |
| 1C Business Affidavit | 5 | 5 | 2 |
| 1D Business Affidavit | 5 | 5 | 2 |
| 1E Business Affidavit | 5 | 5 | 2 |
| 2 Stipulation of Facts | 5 | 5 | 2 |

P R O C E E D I N G S

(September 21, 2011)

(Defendant present in the courtroom.)

THE COURT: This is Cause No. W07-50318, styled the -- rather ex parte Wesley Lynn Ruiz.

Let the record reflect that both sides are present and ready in the courtroom and that the appellant is in the courtroom.

Either side wish to put anything on the record prior to proceeding?

MS. SHIN: No. I think we have done everything, right?

MS. BRANDT: I would like to put something on the record.

THE COURT: Very well. You may proceed.

MS. BRANDT: Just to -- we had agreed as far as the billing records that they would be admitted, so that they have already been marked as an exhibit.

We also have a stipulation of facts as to what the record shows. And if the D.A. wants to add any clarification to it afterwards, these are salient facts that came from the record. Since we only have a day and a half to do this hearing, rather than running back and forth, pulling a lot of paper out, we have agreed to the facts. And they are Exhibit No. 2, I believe,

to the record.

Did you want to...

MS. SHIN: I am stipulating not to the truth of those facts. I am stipulating as to what the record shows. So those are excerpts from the record that I am stipulating to. Also, we would like to invoke the Rule. So if --

MS. BRANDT: Could I add one more thing. We had originally 11 witnesses that we are going to call, the eleventh witness is Mary Debt, who is seated to my right, she has been excused, so she is going to stay in the courtroom. So, yes, we would both like to invoke the Rule.

THE COURT: When you mention excused, you are referring to released from being a witness?

MS. BRANDT: Yes, Your Honor.

I don't see all of my witnesses here, someone had told me that Mr. Parks had checked in with the bailiff. And I also don't see my investigator here who I was going to call, although I did mention to him that he would be called toward the end.

THE COURT: If you could have the witnesses that you anticipate calling that are present in the courtroom, come up and I will swear them in.

MS. BRANDT: Okay. If we could have Mr. and Mrs.

Ziegenhain, Kevin Brooks, Gilda Kessner and Mr. Brauchle, Mr. Johnson.

MS. SHIN: Deputy Avenn might also be a witness.

MS. BRANDT: I don't know, Your Honor, I am not calling him, so I don't know.

THE COURT: If I may have all the witnesses raise their right hand.

(Witnesses were duly sworn.)

THE COURT: Very well. The Rule has been invoked. Meaning that if you are a witness in this matter, you must remain outside the courtroom while you are not testifying. Additionally, you must not discuss your testimony with any other witness.

Ms. Brandt, who will be your first witness?

MS. BRANDT: Richard Ziegenhain.

THE WITNESS: Your Honor, can I be provided with a copy of the agreement?

MS. BRANDT: The stipulation of fact has been marked over by us. I don't know if you have a copy machine or not. We had originally changed a fair amount of stuff on here?

THE WITNESS: Well, what is the final exhibit.

MS. BRANDT: It's the one with the court reporter?

THE WITNESS: May I have excess to that?

THE COURT: Mr. Brauchle, if you may, can you take

that to my coordinator and we will have him make a copy.

THE WITNESS: All right.

MS. BRANDT: If I may also, Your Honor, to give us an outline of where we are going.

THE COURT: Very well.

MS. BRANDT: We have ineffective assistance of counsel that are in dispute. Essentially there are several areas that we are going to get into.

One has to do with the missing audio recording portions of the encounter with Mr. Ruiz and Officer Nix.

Another has to do with the presence of law enforcement in the courtroom during the trial proceedings.

A third has to do with explaining Officer Nix's aberrant behavior, mental health records, testimony as to that, or an absence of testimony as to that.

And finally and the fourth issue has to do with the nomenclature of the weaponry that was referred to during the trial.

And what I would like to do so we are all on the same page, is start with the presence of law enforcement in the courtroom.

THE COURT: Very well.

You may be seated, sir.

MS. BRANDT: Your Honor, I don't know what we do here, in federal court I am required to stand when I do anything.

THE COURT: You may be seated. Only time you are required to stand is when you are addressing the Court.

MS. BRANDT: Thank you, Your Honor.

THE COURT: Certainly.

**RICHARD ZIEGENHAIN**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Could you state your full name for the record, please.

A Richard Ziegenhain.

Q And could you tell me what your relation to Mr. Ruiz is?

A I am his grandfather.

Q Can you hear me?

A Yes.

Q Were you down here at the courthouse during his trial?

A Yes, ma'am.

Q And was there anytime during the trial that you

were present in the courtroom?

A No.

Q You were never present in the courtroom?

A I'm sorry, yes, during the -- yes.

Q And could you tell me when you were present in the courtroom?

A In the sentencing phase.

Q And what was your observation -- how many days were you present during the sentencing phase?

A Just one.

Q And what was your observation when you were in the courtroom during the sentencing phase, what did you see?

A Just a lot of uniformed officers, both Dallas Police and sheriff deputies.

Q Could you tell me where in the courtroom you saw law enforcement?

A Behind us.

Q So you are seated, so that we get an orientation on the record, who is to your right?

A The Judge.

Q Okay. And so we have a wall to your right also. We have the gallery that is behind you?

A Yes.

Q And a wall behind you?

A Yes.

Q Okay. Go ahead. So tell me where you saw law enforcement?

A In the wall behind us.

Q And where else?

A The wall to --

Q To your right?

A To my right, yes.

Q Okay.

A On the other side of the room in the row -- seats.

Q And how do you know they were law enforcement?

A By their uniforms and the insignias on the uniform.

Q Did you see them wearing badges?

A Yes, ma'am.

Q And what else did they have on that you observed?

A Like patch on their arm, guns.

Q So you saw them with weapons?

A Yes, ma'am.

Q When you talked about law enforcement, did you say they were standing along the wall?

A Yes, ma'am.

Q Okay. About how many Dallas Police Officers did you see standing along the wall, do you recall?

A About ten to 15.

Q Along one wall?

A No, no, I'm sorry, across the back and to the side.

Q So you are saying -- so the record is clear, are you saying that at any one time in the courtroom, you observed somewhere between ten to 15 Dallas Police Officers in the courtroom?

A Yes, ma'am.

Q Okay. Let's talk about where they were located in the courtroom. Along the right wall that you had just identified, approximately how many law enforcements did you see, if you recall?

A Maybe three.

Q And to the back wall?

A Five.

Q And the remainder of the ten to 15 of them, where were they located?

A On the -- my left side.

Q So they were seated on the benches?

A Yes, ma'am, yes.

Q Okay. At what period of time did you see all these police officers present, was it during testimony or was it during the attorneys closing statements or when did you observe them in the courtroom?

A Ah, well, at the end right at the beginning of the sentencing phase.

Q When you were seated in the -- watching the testimony?

A Yes, ma'am, the last day of it.

Q So during that, the time that you were observing the testimony is when you saw as many as between ten and 15 law enforcement present?

A Yes, ma'am.

Q Did you see what is called the closing arguments of the attorneys, do you know what that is?

A Ah, yes, I did.

Q Okay. And do you recall how many Dallas Police Officers were in the courtroom at the time that they made their closing arguments, were there more than the ten to 15 or that's the total number that you remember?

A That's the number that I remember.

MS. BRANDT: I have no further questions.

THE COURT: Your witness.

**CROSS-EXAMINATION**

**BY MS. DEAN:**

Q Ms. Ziegenhain my name is Christi Dean. I represent the State of Texas, with Grace Shin. We have never met before?

A No, ma'am.

Q I want to ask you a couple of questions about the testimony you just indicated and a copy of the affidavit you

provided to Ms. Brandt?

A Okay.

Q I think you and the other family members said that you felt intimidated by the officers present?

A Yes.

MS. BRANDT: Objection, Your Honor, this is outside the scope of the direct examination.

THE COURT: Overruled.

Q (By Ms. Dean) Did you expect to have a pleasant experience in a courtroom of a family member of a person on trial for the murder of a police officer?

A No.

Q And did you expect that the police officers might show up for a fallen colleague?

A Yes.

Q And did you expect that they might show up to support the family of a fallen colleague?

A Yes.

Q In each of your affidavits, you have indicated that the hallway outside the courtroom was filled with uniformed police officers and that you felt intimidated; is that correct?

A Yes.

Q Was the jury nearby when you interacted with the police officers in the hallway?

MS. BRANDT: Again, objection, Your Honor, this is irrelevant. We are talking about the testimony with respect to the presence of the police officers.

MS. DEAN: Your Honor, this is in his affidavit that is attached to Lydia's application. And it goes directly to the coercive influence of the police officers in the courtroom.

MS. BRANDT: They can't be coercive if they are not in the courtroom.

MS. DEAN: That's what I am getting at, Your Honor.

THE COURT: Court will overrule the objection.

Q (By Ms. Dean) Did you answer the question, was the jury nearby when you interacted with the police in the hallway?

A Did I what now?

Q Was the jury present when you were interacting with the police officers in the hallway?

A No.

Q You also said that you are upset about the bailiffs joking about the stun belt?

A Yes.

Q Were the jury nearby when the bailiffs were joking about the stun belt?

A No.

Q You also suggested that you were concerned, in your affidavit, about the metal detector out in front of the courtroom; is that correct?

A Yes.

Q Okay. Are you aware that the sheriff's office placed a metal detective outside of the courtroom because of a remarks that Mr. Ruiz's brother made from a phone call from jail?

A No.

Q And are you aware that the sheriff's office often place metal detectives outside the courtroom in death penalty trials?

A No.

Q Does it seem reasonable to you that a death penalty trial would be afforded the heightened security?

A Yes.

Q I believe you indicated in your affidavit that you were concerned about the police officers who escorted you to the parking garage after the sentence was handed down; is that correct?

A Yes.

Q Was it possible they were trying to protect you?

A Yes.

Q Okay. Would you agree that just because you felt that the police presence was overkill, the jury may not have

perceived it that way?

A Excuse me?

Q Just because you felt that the police presence was overkill, do you agree that the jury may not have perceived it that way?

MS. BRANDT: Objection, Your Honor, he has no way of knowing what they perceived.

MS. DEAN: I am just asking for his opinion, Your Honor.

THE COURT: The witness may give an opinion, if he is able to do so.

You may answer the question, sir.

A Okay.

Q (By Ms. Dean) I guess the question is, the jury might think it is reasonable to have a lot of police officers in the courtroom in the death penalty of a trial involving a murdered police officer, do you agree?

A Yes.

Q Okay. You love your grandson, don't you?

A Yes.

Q And that's why you are here being so forthcoming today?

A Yes.

MS. DEAN: That's all I have, thank you.

**REDIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Mr. Ziegenhain, the prosecutor asked you about heightened security in a death penalty trial, the Dallas Police Officers that you saw in the courtroom were not here for security purposes, were they?

A I don't think so.

Q Okay. They were here as spectators?

A Yes.

Q And they were here essentially as a show of force?

A Yes.

Q And --

MS. BRANDT: I have no further questions.

THE COURT: Anything further?

MS. DEAN: Just one more question.

THE COURT: Certainly.

**RECROSS-EXAMINATION**

**BY MS. DEAN:**

Q Mr. Ziegenhain, did the officers do or say anything in the courtroom that the jury could hear?

A I don't know.

Q Okay.

**FURTHER REDIRECT EXAMINATION**

**BY MS. BRANDT:**

Q I have one follow-up. Whether they said anything

or not, the fact is, there were a substantial number of them who were just present; is that correct?

A Yes.

MS. BRANDT: I have nothing else.

MS. DEAN: I have nothing else.

THE COURT: Thank you, sir, you may step down.

MS. BRANDT: My next witness is Sue Ziegenhain.

Your Honor, may we excuse Mr. Ziegenhain so he may stay in the courtroom.

THE COURT: Any objections?

MS. SHIN: No, Your Honor.

THE COURT: Sir, you are released from the Rule. You may remain in the courtroom.

(Witness entered the courtroom.)

THE COURT: You may be come down, ma'am.

(Witness complies.)

THE COURT: You may proceed.

**SUE ZIEGENHAIN**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Good morning, Ms. Ziegenhain. Could you state your name, please.

A Sue Ziegenhain.

Q And are you related to the gentleman seated next to me?

A Yes.

Q And can you tell me who he is, please?

A My grandson.

Q And were you present during your grandson's trial for the death of Officer Nix?

A Yes.

Q And at any time during the trial, were you present in the courtroom?

A Yes.

Q And could you tell me what you saw -- how many days were you present in the courtroom?

A One.

Q And could you tell me what you saw when you were in the courtroom?

A I saw pretty much everything that is right here now.

Q Did you see law enforcement in the courtroom?

A Oh, yes.

Q And how did you know they were law enforcement?

A I could see their badges, uniforms, their weapons, handcuffs.

Q Okay. Okay. And what kind of law enforcement did they appear to be?

A Well, the sheriff's department and Dallas Police Department.

Q Okay. And, too, we are going to look at the courtroom for record purposes, so we are going to talk about who is to your right, up here, who is to your right, the Judge; is to your right?

A Oh, yes.

Q And so there is a wall to your right, also?

A Yes.

Q And there is a wall to the back?

A Yes.

Q And before that back wall, there is a galley; is that correct?

A Yes.

Q Could you tell me where you saw the Dallas Police Officers?

A They were --

Q Just tell me where, first?

A The wall to my right.

Q Okay.

A Back by the gallery.

Q Besides the wall to the right, where else did you see them?

A On the back wall. And there were officers sitting behind the Nix family.

Q Okay. When you talk about the officers, who were -- they were standing along the wall to your right?

A Yes.

Q And they were in the gallery area?

A Yes.

Q And about how many did you see standing along the wall?

A Maybe five, six to eight.

Q Okay. And how many were standing at the back?

A Probably -- I will say probably four.

Q And do you recall how many were seated?

A Oh, there were at least six on the -- the right side of the courtroom -- from here to the left, behind the Nix.

Q You are talking to your left?

A Yes, to my left, here.

Q And they were seated in the pews?

A Yes.

Q Okay. So is it a fair statement to say that at any one point in time, the number, the total number of Dallas Police Officers, if I am adding this up correctly, is about 16, 16 to 20?

A Yeah. I would say closer to 20.

Q Okay.

MS. BRANDT: I have no further questions.

THE COURT: Cross-examination.

**CROSS-EXAMINATION**

**BY MS. DEAN:**

Q Ms. Ziegenhain, my name is Christi Dean. I am representing the State of Texas, with Grace Shin. We have never met before, have we?

A No.

Q I would just like to ask you about your testimony regarding how many police officers were in the courtroom.. Your husband testified that there were ten to 15, you are testifying 20?

A Yes.

Q Is there an inconsistency there?

MS. BRANDT: Objection, Your Honor, this is comparison testimony.

THE COURT: Sustained.

Q (By Ms. Dean) Okay. Ms. Ziegenhain, your testimony is that there were 20 police officers in the courtroom; is that correct?

A Yes.

Q Do you expect that police officers might show up for a fallen colleague of the trial of a police officer?

A Yes.

Q And you expect they might show support of the fallen colleague?

A Yes.

Q Did the police officers do or say anything in the courtroom that appeared inappropriate or that the jury could see or hear?

A Inappropriate?

Q For instance, were there any outbursts?

A No.

Q Could the jury see or hear anything that they were saying?

A I don't know what the jury heard.

MS. DEAN: No further question, Your Honor.

MS. BRANDT: I have one follow up.

**REDIRECT EXAMINATION**

**BY MS. BRANDT:**

Q When she talked about did the police officers do or say anything, the fact is their presence was the conduct; is that correct?

A Their presence was quite evident.

Q Okay. And so they were there as a show of force?

MS. DEAN: Objection, Your Honor, she is asking the witness to draw a conclusion.

THE COURT: State your question again.

Q. (By Ms. Brandt) Why do you believe the police officers were present, what was their purpose for being there?

A They wanted to hear the judgment.

Q Did they also want to send a message to the jury?

MS. DEAN: Objection, Your Honor, that's leading.

THE COURT: I will overrule that objection.

Q. (By Ms. Brandt) Did they want to send a message to the jury?

A By their presence?

Q Yes.

A I believe so, yes.

MS. DEAN: Objection, Your Honor, that's speculation.

THE COURT: Sustained.

MS. BRANDT: I have no further questions.

THE COURT: Any further questions, Ms. Dean?

MS. DEAN: No further questions, Your Honor.

MS. BRANDT: Your Honor, I would like to release this witness, if she could stay in the courtroom.

THE COURT: Any objections?

MS. SHIN: No, Your Honor.

THE COURT: You may step down, ma'am. You are released from the Rule. You may remain in the courtroom.

THE WITNESS: Thank you.

MS. BRANDT: My next witness is Barbara Ruiz.

(Witness entered the courtroom.)

THE COURT: You may take the stand, ma'am.

(Witness complies.)

THE COURT: You may proceed.

**BARBARA RUIZ**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Good morning. Could you state your name for the record, please.

A Barbara Ruiz.

Q And do you know the gentleman who is seated to my left, which is your right?

A My son.

Q Okay. And were you here during the trial of your son? Were you down at the courthouse during the trial of your son?

A Yes.

Q And we're you present in the courtroom at least part of the time that the trial was going on?

A Yes.

Q And could you tell me how many days you were in the courtroom?

A One.

Q Okay. When you were in the courtroom, what did

you observe that you thought maybe was out of the ordinary?

A There was a lot of police officers in the room.

Q How did you know they were police officers?

A They carried -- they had guns, they had badges, uniforms.

Q Okay. And so that we can get oriented to the courtroom, to your right, who is the person who is seated up here?

A The Judge.

Q Okay. And so this wall over here is to your right?

A Right now, yes.

Q Okay. And there is another wall in the back of the courtroom?

A Yes.

Q And before we get to that back wall, there is also the gallery where people can sit down?

A Right.

Q Okay. Tell me of those places, what is the first place that you recall that the police officers were located?

A Down that right wall.

Q When you say down there, the record doesn't know what that mean?

A Along the right wall.

Q Along the right wall. And that was behind this

divider; is that correct?

A Correct.

Q So it was where the gallery area was?

A Yes.

Q And how many police officers did you see along the right wall?

A Ten.

Q And what were they doing?

A Standing there observing.

Q Okay. And did you see any law enforcement along the back wall?

A Correct, yes.

Q And how many did you see?

A Another ten.

Q Did you see any other Dallas Police Officers?

A Yes.

Q And where did you see them?

A Seated on the -- to your left -- to your right, my left.

Q Okay. And about how many law enforcement officers did you see seated?

A I would say another five.

Q Another five. So we are looking at about 25?

A Yes, ma'am.

Q Could be a little more or a little less?

A I would say more, but I would say 25 for sure.

Q And based on your observation -- let me back up a second. At what point in time were they in the courtroom -- did you see all 25 together at one time?

A Yeah.

Q Okay. And were they present in the courtroom, all 25 of them, about the time that testimony was being taken?

A Yeah.

Q And do you know what closing argument is, is when the Judge -- when the attorneys argue before the jury goes out for their verdict?

A Right, right.

Q Okay. Were there 25 police officers present?

A Yes.

Q During their closing argument?

A Yes.

Q When the verdict -- the jury returned its verdict, were there more or less police officers to hear the verdict?

A I would say more had come in by then.

Q Okay.

THE COURT: I'm sorry, could you --

THE WITNESS: I think more had come in by then.

MS. BRANDT: Okay, I have no further questions.

CROSS-EXAMINATION

BY MS. DEAN:

Q Ms. Ruiz, my name is Christi Dean. And I am representing the State of Texas, with Grace Shin. We have never met before, have we?

A No.

Q I want to ask you a couple of questions about your testimony. It is your testimony that there were at least 25 officers in the courtroom on the day that you were here?

A Yes.

Q Okay. Why do you think there were police officers in the courtroom?

A To observe what was going on.

Q You agreed with Ms. Brandt that it was out of the ordinary to be here, why do you say it is out of the ordinary?

A I didn't say it was out of the ordinary.

Q Why did you agree with her it was out of the ordinary?

A I just thought it was -- I have been in the courtrooms before and I hadn't seen it like that.

Q But have you ever been in a courtroom of a death penalty trial where a person is on trial for murdering a police officer?

A No.

Q Do you expect the police officers might show support for a fallen colleague?

A Yes.

Q And that they might show support for the family of a fallen colleague?

A Yes.

Q Did the police officers do or say anything inappropriate that you saw?

A No.

Q Could the jury hear them doing or saying anything?

A I doubt it.

MS. DEAN: No further questions, Your Honor.

**REDIRECT EXAMINATION**

**BY MS. BRANDT:**

Q I have a couple of questions for you, when she talked about did they do or say anything, just their presence was doing something, right, the number of police?

A Yes.

Q And that's why you thought it was out of the ordinary?

A Yeah.

Q And did you perceive that they were trying to send a message to the jury?

A Yes.

Q And what message did you perceive them sending?

A Choose the death penalty.

Q To choose the death penalty.

MS. BRANDT: I have no further questions.

THE COURT: Any further questions?

MS. DEAN: No, Your Honor.

THE COURT: You may step down, ma'am.

MS. BRANDT: Your Honor, if we could also excuse this witness, if she could stay in the courtroom.

THE COURT: Any objections?

MS. SHIN: No, Your Honor.

THE COURT: Ma'am, you are released from the Rule, you may stay in the courtroom.

THE WITNESS: Thank you.

MS. BRANDT: The next witness is Kevin Brooks.

(Witness entered the courtroom.)

THE COURT: You may proceed.

**KEVIN BROOKS**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Would you state your name for the record, please.

A Kevin Brooks.

Q Mr. Brooks, do you know the person who is seated to your right, my left?

A The defendant, Mr. Ruiz.

Q And how do you know him?

A I was the prosecutor in his trial.

Q What level of prosecutor, were the lead or co-counsel?

A I was the lead prosecutor.

Q And could you tell me how long you were a prosecutor in Dallas County?

A Total six years.

Q As lead counsel?

A Well, at the time that I was the lead prosecutor for his trial, I was the felony trial bureau chief.

Q Okay. And approximately how many capital cases had you tried during the six years?

A I need to explain, I was with the D.A.'s office in two stints. The first stint was two years.

Q About when?

A 1990 to '92. And then in 2007, I became the felony trial bureau chief. So that was four, four and a half years. And in that time, in that four-and-a-half-year period of time, I tried one capital murder case which was the defendant's.

Q And are you still working for the Dallas District Attorney's office?

A No.

Q When did you leave?
A June 3rd, 2011.
Q And what are you doing right now?
A I am in private practice as a criminal defense attorney.
Q And are you doing any capital cases as a defense lawyer?
A No.
Q Primarily felonies?
A Primarily felonies.
Q Okay. Did you provide an affidavit at the request of the State of Texas?
A Yes.
Q Do you have a copy it have with you?
A In my briefcase.
Q Do you need a copy to refer to it on the stand?
A Yes.
MS. BRANDT: Do you have any objections if I provide him with a copy?
MS. SHIN: Sure.
MS. BRANDT: Sure what --
MS. SHIN: What was the question?
MS. BRANDT: Do you have any objection if I provide him with a copy of his affidavit?
MS. SHIN: No, I don't.

MS. BRANDT: May I approach?

THE COURT: You may.

Q. (By Ms. Brandt) What I would like to first get into is the issue of law enforcement in the courtroom. Were you present during voir dire?

A Off and on.

Q So voir dire was essentially assigned to other lawyers to select a jury; is that correct?

A That's correct.

Q Were you present during guilt/innocence?

A Yes.

Q And were you present during punishment?

A Yes.

Q Okay. And both in guilt/innocence and punishment, you were the lead attorney in those two phases; is that correct?

A I am primarily the lead attorney during guilt/innocence. Andy Beach was primarily the lead attorney during the punishment phase.

Q Even though Andy Beach was lead during the punishment phase, were you in the courtroom during the entire time of the punishment phase?

A Yes.

Q And the same is true of guilt/innocence, you were present during the entire time?

A Correct.

Q Do you recall seeing law enforcement in the courtroom during the guilt/innocence phase?

A Yes.

Q And could you tell me specifically what type of law enforcement, where were they from, what was their --

A There were Dallas Police Officers. And I recall at times seeing Mesquite Police Officers.

Q Mesquite?

A Irving, I mean there were just police officers in the courtroom.

Q So you recall seeing police officers from different departments or different locales?

A At times.

Q Okay. So the Dallas Police Officers would have been from the City of Dallas, right?

A Yes.

Q And the officers that you refer to as Mesquite, are from the City of Mesquite?

A Correct.

Q And the officers from Irving, are a different city altogether, that's the City of Irving?

A Correct.

Q What other locales did you see officers from?

A Probably Richardson. I mean, I can't give you any

names, I just have recollection of seeing various police officers, police departments at times throughout the trial.

Q Okay. And how did you know that they were from these different locales?

A They were in uniform.

Q And the uniforms for each of these locales was different, they indicated where they were from?

A They would have markings that would have indicated what department they were with, yes.

Q And did you also see law enforcement -- other types of law enforcement -- I am specifically thinking for example the sheriff's department?

A Just the bailiffs that were in the -- present in the courtroom.

Q And how many of them did you see?

A I can't recall.

Q Let's go back to the -- when you talk about law enforcement from Dallas, Mesquite, Irving and Richardson, did you see the law enforcement from these various jurisdictions during the guilt/innocence phase?

A I can't tell you specifically which portion of the trial I would have seen these officers.

Q But you do recall officers from different locales coming in during guilt/innocence --

A Yes.

Q -- is that correct? And you also recall police officers from these various locales coming in during the punishment phase?

A Yes.

Q Do you recall at any one point in time how many officers from the Dallas Police Department there were during the guilt/innocence phase?

A I wouldn't be able to answer that.

Q And how about from Mesquite or Irving?

A I couldn't give you a number.

Q Okay. Altogether at any one time from all of the different branches, do you recall how many?

A No.

Q Would they be more than five?

A Yes, more than five.

Q Would they be more than ten?

A More than ten.

Q Would they be more than 15?

A Perhaps.

Q Could be 20?

A I am not sure I could say there were 20. Are you talking about each day of the trial.

Q I am talking about the number of police officers in the courtroom at any one time in guilt/innocence?

A I wouldn't be able to give you a number, I would

be speculating.

Q But at least you recall 15 police officers?

A That sounds like a fair number.

Q Okay. So it is more than 15, less than 20?

A That's probably about right.

Q Okay. And this is in addition to the individuals from the sheriff's department?

A Yes.

Q And about how many officers from the sheriff's department -- from the sheriff's department at any one time?

A I don't recall.

Q Could it be about five?

A I don't recall how many bailiffs.

Q You don't recall. Okay. When we talked about the number of 15 to 20 of these officers from Dallas or Mesquite or Irving or Richardson, these individuals were not there to provide courtroom security; is that true?

A To my knowledge, no, they were not part of the security, no.

Q And when you saw these officers in the courtroom, where were they located? And let me again see if we can orient the courtroom. To your right, who is up here, please?

A Judge.

Q And so we have got the wall to the right, and we

have got a wall to the back, and between where counsel is and the back wall, there is a railing. And between that railing and the back wall is a galley for spectators; would you agree with that?

A Yes.

Q When you talk you about seeing the police officers in the courtroom, did you see any of them standing along the wall to your right?

A I don't recall seeing any standing, no.

Q Where did you -- where do you recall seeing law enforcement?

A Sitting in the galley.

Q And you recall seeing them during the guilt/innocence, right?

A Sitting in the galley, right.

Q And did you also recall seeing them sitting in the galley during the punishment phase?

A Yes.

Q Do you recall seeing more officers present during closing argument than during testimony?

A No.

Q So you can't remember right now exactly when you saw them, you were busy trying the case?

A Correct.

Q Okay. Did you do any jury selection by any

chance?

A No.

Q Do you recall that there was a dispute between the Defense and the State of Texas concerning the recordings that were made of the encounter between Mr. Ruiz and Officer Nix?

A Okay, can you be more specific. When you say "dispute," what are you referring to?

Q Ah, I am referring to a stipulation of facts -- and Mr. Brauchle did not bring it back --

MS. BRANDT: Could we give that to the witness, would that be all right?

MS. SHIN: Yes.

MS. BRANDT: Thank you, Your Honor.

THE COURT: Certainly.

Q. (By Ms. Brandt) Just to help you out, Mr. Brooks, the District Attorney and I have stipulated to facts as shown in the reporter's record and the clerk's record, because we have a limited amount of time for evidentiary hearing. So if you look at page two, and I don't know if you have any independent recollection of this, would you agree that on March 23rd, 2007, was the date of the offense?

A Yes.

Q Okay. And is it common knowledge that when law enforcement is communicating by radio, for example between

and among themselves, this would be recorded; is that true?

A I don't know that that is common knowledge.

Q Well, defense attorneys would know that; is that true?

A Yes, defense attorneys would know that.

Q And prosecutors would know that?

A Yes.

Q And they would have known that in 2006 (sic)?

A Yes.

Q And so they would have known that on March 23rd, all of these communications were being recorded here in Brock Richardson talks about it on the city server. I am looking at page two?

A When you say all these records, what --

Q Well, the recordings on the various channels where law enforcement is talking to one another, those communications are being recorded?

A Correct.

Q Okay. And is it common knowledge among legal professionals that routinely those recordings are erased or destroyed after 30 days?

A In the legal profession, yes.

Q Okay. And so in 2006, if the recording was made on March 23rd, 2007, of the encounter between Mr. Ruiz and Officer Nix, 30 days thereafter, that original source of

those recordings would have been destroyed is that true?

A I mean, that would be the policy. I don't know if that's what took place in this situation.

Q Well, do you recall that there was a hearing where officer Brock testified that 30 days later the recording was erased from the city server?

A No, I don't. I know it is part of the stipulation, but I don't have an independent recall of that testimony.

Q So you have no independent recollection whatsoever; is that correct?

A That's correct.

MS. BRANDT: Your Honor, could I approach him with the trial transcript to refresh his recollection?

THE COURT: You may.

Q. (By Ms. Brandt) For the record, I am showing Mr. Brooks Volume 40 of the reporter's record, and this is page 51 and 52, if you could look at that, please, right here?

A Okay.

Q Okay. So based on the trial transcript that you just read, the policy is to destroy the original source after 30 days?

A Yes.

Q And that was done in this case?

A That's what he testified to, so I am assuming so.
Q Do you recall when Mr. Brauchle was appointed to represent Mr. Ruiz?
A I don't have any knowledge of the date in which he was appointed.
Q You are familiar with the court file, though, on this case?
A Yes.
Q Okay. And --
MS. BRANDT: Your Honor, if I may approach?
THE COURT: You may.
Q. (By Ms. Brandt) Could you identify what this volume is, please.
A Clerk's record, volume one of two.
Q Okay. And what page are we looking at here?
A I can't make that out.
Q It's an --
A Okay, page eight.
Q And can you tell me what this states up here?
A Initial P. Brauchle, abbreviation for appointment 8/29/07.
Q Is that an eight or is that a three?
A It would have to be a three.
Q It is a three. So based on this court record, Mr. Brauchle was appointed six days after the offense?

A That's what it looks like.

Q Okay. And you had stated that attorneys, defense attorneys would commonly know that the communications between and among law enforcement are taped; is that correct?

A Most attorneys would know that. But -- it is part of a broader base of knowledge in that 911 calls and things of those nature are normally held for 30 days and then erased.

Q And so you would agree that Mr. Brauchle is an experienced criminal defense attorney?

A Yes.

Q And so since this is common knowledge, this is the kind of thing that he would know?

A I would have to think so.

Q Okay. Let me ask you about Brady material. As a prosecutor, you run into Brady requests all the time, don't you?

A I did, yes.

Q Okay. Normally it is up to the -- does the Defense just sit back and the State turn over everything it has to them?

A Most defense attorneys file motion asking for Brady material.

Q Okay. And so they would file motions for

discovery also?

A Yes.

Q And that's essentially how you put that into motion to get Brady material, you would file a motion for discovery?

A You would do that. But in Dallas County, there is an informal practice of turning things over to the Defense, even though they haven't filed a request for Brady. Most defense attorneys do file a request for Brady sort of as a CYA action, but Dallas County for the most part is open-file policy and Brady material is turned over for the most part without the Defense having to first ask for it.

Q Are these audio recordings considered Brady material?

A I wouldn't say I consider them Brady material. I would say they are considered discoverable evidence. I wouldn't say that the recordings by themself, just in and of themselves Brady.

Q This material, these audio recordings, they didn't belong to the State of Texas, right, they weren't the prosecutor's work product?

A No.

Q Okay. And you would have had access to the original source material during the first 30 days that they were in existence; is that correct, if you had wanted to get

them?

A If I had wanted them in the first 30 days, I would think so.

Q Okay. And would the Defense also have access to that within the first 30 days?

A Independent access?

Q Yes.

A No.

Q How would they have gotten it?

A They would have had to file a request for it.

Q They would have had to file a request with the Judge to get an order?

A I mean, if they were seeking the recordings during the first 30 days, anything that had not already been provided for them, they would have filed a motion for it.

Q Or they could have done it by subpoena?

A That I don't know.

Q Okay. There was nothing that you, and when I say you, I am talking about you as the lead prosecutor, did that prevented the Defense from getting access to the original source of the audio recordings during the first 30 days, was there?

A No.

Q And did anybody on the prosecutor's team do anything that prevented the Defense access?

A Not to my knowledge.

Q Did -- do you recall the Defense making a request to you for the original source of those audio recordings during the first 30 days they were in existence?

A I am going to have to say, yes, but I can't give you specific date on when they asked for recordings. I can't give you specific date.

Q So you can't remember if they -- when they asked you, you just remember they asked for the audio recordings?

A Yes.

MS. BRANDT: Your Honor, may I approach?

THE COURT: You may.

Q. (By Ms. Brandt) Let me show you this. And could you identify what that document is for us?

A Motion for Discovery, Production and Inspection of Evidence Number One.

Q Okay. And what is the page on the bottom of that?

A Sixty-two.

Q And could you tell me what that volume is, please.

A Volume one.

Q Of what?

A Of two.

Q Of?

A Clerk's record.

Q Of the clerk's record. And this is what document

is that on page 62?

A Looks like the same one I am looking at.

Q And what is the name of that document, please.

A Motion for Discovery, Production and Inspection of Evidence Number One.

Q And could you turn to the last page on there, please.

A Okay.

Q What is -- who signed that?

A Paul Brauchle.

Q And could you tell me what the date on the certificate of service is?

A December 6th, 2007.

Q So if this is the first written motion for discovery, it is almost eight months later; is that correct?

A Correct.

Q So this would be the first time that he made a written request of you or of the State?

A If this is the first filed motion. I can tell you that they had copies of all the recordings prior to this being filed.

Q But do you know when?

A I can't tell you when, but I know that they had copies of the recordings that we had in our possession well prior to December of '07.

Q But they have access to the original source. They had copies of the recordings, but did they have the original source, what was on the city server?

A No, they had what we had.

Q Okay. So what you had were copies of what law -- what the record custodian had made?

A Yes.

Q Okay. So you didn't have access to the original source of the audio recording, cause that had been destroyed after 30 days?

A In what time frame U mean in December, I didn't have access or.

Q Well, in December of 2007, you did not have access to the original source of the audio recordings, because it had been destroyed?

A No, I would not have had access in December.

Q Okay. Let me clarify something just so that we have got a time frame. If the offense was March 23rd of 2007 and the record -- the original source of those audio recordings are destroyed 30 days later, would you agree with me, 30th day would be April 22nd of 2007?

A April -- say that day again.

Q April 22nd of 2007?

A Sounds about right.

Q Could I show you a calendar so we can verify that?

A Sure.

MS. BRANDT: Your Honor, may I approach?

THE COURT: You may.

Q. (By Ms. Brandt) And so looking at this calendar for 2007, you can see March 23rd, 2007; is that correct?

A Yes.

Q And what date is that?

A That's a Friday.

Q And if we calculate 30 days out, what date is that?

A Your calculation is April 22nd, 2007.

Q And what day of the week is that?

A Sunday.

Q That's a Sunday. So normally law enforcement isn't going to be working in its administrative offices on a Sunday, right?

A I don't know.

Q But if 30 days from March 23rd is when they destroyed the evidence or destroyed the original source, it was destroyed either April 22nd or shortly thereafter?

A According -- yes.

Q So by December 2007, the State would not have had access to the original source of the audio recordings; is that correct?

A That would be correct.

Q And the Defense would not have had access to the original source of those audio recordings?

A No.

Q Okay. There were copies made of some of the original source material; is that correct?

A Yes.

Q Okay. And it's those copies that you provided to the Defense?

A Correct.

Q And the Defense could have had access during the first 30 days had they taken action to preserve or obtain that?

A I would assume so.

Q Okay. Let me ask you, you are familiar with an audio recording is physical evidence; is that true?

A Yes.

Q Okay. Are you an expert in audio?

A No.

Q And so normally if a lawyer isn't an expert in audio or video or DNA or fingerprint, normally, what would they -- what would they do?

A Hire an expert.

Q And what is the point of hiring an expert?

A To assist you and help you interpret evidence or explain evidence to a jury.

Q If original law enforcement had said they could not recover certain portions of whatever the physical evidence is, if the expert had access to the original source, the expert might show that a mistake had been made by, I don't know, law enforcement, that in fact evidence could have been recovered; is that correct?

A I guess in theory, yes.

Q So they can verify the accuracy or the reliability of whoever did the analysis who came before?

A I guess, yes.

Q Okay. And sometimes as the technology progresses, if the original source is not recoverable today, if the technology improves a year from now, or two years from now or three years from now, with that original source, that technology in an expert's hands might be --

MS. SHIN: Your Honor, objection to speculation.

MS. BRANDT: It is not speculation, it is what an expert does.

MS. SHIN: You are asking him what an expert would find.

MS. BRANDT: No, I said that's the point of having an expert.

THE COURT: Overrule the objection.

You may answer the question.

A Actually I can't answer that.

Q. (By Ms. Brandt) As technology improves, it is possible that what was not obtainable from the original source, it might be obtainable later because of the improvement of technology?

A The reason I say I can't answer that, I am not trying to be flip. Anything is possible.

Q Okay. Are you familiar with the capital guidelines for defense?

A I haven't looked at them in sometime.

Q Okay. So essentially as a prosecutor, that's not something that you would be interested in?

A No.

Q Let me ask you this, if I say to you, I want to kill you, what do you hear?

A I hear you say you want to kill me.

Q You hear words?

A Yes.

Q And if I say to you, I want to kill you, and even though the record doesn't reflect that, what do you hear?

A I hear words.

Q And do you hear an emotion behind that?

A I hear words spoken with force, yes.

Q Okay. And sometimes those words can indicate whether or not somebody is angry; is that true?

A True.

Q And the inflection or loudness can tell whether or not someone is joking, if I say, gosh, I am ready to kill you?

A True.

Q So the inflection, the tone, and the words on an audio can indicate someone's state of mind; is that true?

A Yes.

Q And so those audio recordings would have been important to show state of mind?

A What audio recordings?

Q The audio recordings of the encounter between Officer Nix and Wesley Ruiz?

A I am not sure I understand your question. Because my recollection from the trial, there was not an audio recording of a conversation between Mr. Ruiz and Mr. Nix.

Q The encounter between them, what law enforcement was saying during the chase, that at one point should have been -- would have been recorded had the machinery been working; is that true?

A If the machine had been working, yes.

Q Okay. And when Officer Nix jumped out of his vehicle and approached Mr. Ruiz in the car, anything that he said would have been captured also?

A No. My recollection, and again this has been three or four years ago, my recollection in preparing for

trial is that the -- once he exited his vehicle, his personal recording device would not have been active.

Q Well, the -- the -- what law enforcement around in the surrounding vehicles, their communication would have been captured on the city server, wouldn't they?

A That I don't know. Because I don't know -- because my recollection, once he exited his vehicle, it was no recording.

Q You are not answering the question. The question is, the communications between and among other law enforcement -- you had testified before that those communications were recorded on the city server?

A What other officers are saying to each other?

Q Right.

A Yes.

Q And also the dispatcher?

A Yes.

Q Okay. And were there in-car videos going on?

A The only in-car video -- yes, there were in-car videos, yes.

Q And those in-car videos, did not capture what had been said -- did not capture the audio?

A No.

Q But what somebody's words and their inflection and their tone is important because it indicates a state of

mind?

A It can, yes.

Q Okay. If -- do you recall Mr. Ruiz testifying?

A Yes.

Q Okay. And do you recall what he testified that Officer Nix said?

A No.

MS. BRANDT: Your Honor, may I approach?

THE COURT: You may.

Q. (By Ms. Brandt) You have no independent recollection?

A No, ma'am.

Q It has been too long?

A Yes, ma'am.

Q Could you identify what this volume is, please.

A Volume 47 of 59 of the court reporters's record.

Q And it is in?

A State of Texas versus Wesley Lynn Ruiz. And it is Cause No. F07-50318, in the District Court, 194th Judicial District Court.

Q Could you read this to yourself, please. I am looking at page 16?

A (Witness complies.)

Q I am looking at that paragraph.

A Yes.

Q Could I get you to read that into the record so we know what you are talking about. This is Mr. Ruiz talking?

A Yes.

Q Testifying?

A He said, ah --

Q He being Officer Nix?

A That's what he was testifying to, yes.

Q Okay. So go ahead.

A He said, Freeze, then he said -- he said, you tried to run from me mother fucker, I am going to shoot you. He said, You hear me. He said, I am going to kill you if you try to run.

Q Okay. And so would you agree with me that the original source, that audio that contained the audio, would have been relevant to either corroborate or refute what Mr. Ruiz testified to?

A No, I can't agree to that. Because my recollection is that would not have been recorded once he exited his vehicle.

Q Any recordings that were on that channel that were made by Officer Nix would have shown his state of mind, this was before he gets out of the car?

A If there were recordings of him having a conversation, I guess, yes.

Q Okay. And if law enforcement had testified that

all that Nix uttered were police commands, audio recordings would have been relevant facts to either dispute or corroborate that?

A Yes.

Q Okay. Let me change to a different topic. Do you do any appellate work at all?

A No.

Q But as a trial lawyer, you are aware that it is important to develop a record?

A Yes.

Q Okay. And what is the purpose of developing a record?

A Primarily for appellate, for appeals and preserve error.

Q To preserve error. This may be asking you going back to your law school days, but do you recall how to properly object, what are the steps in properly objecting to preserving an error for on appeal?

A Make your objection and make sure it was recorded by the court reporter.

Q And would you agree that it -- objection has to be timely?

A Yes.

Q And it also has to be specific?

A Yes.

Q And also it has to be specific so it puts the Judge on notice?

A Yes.

Q And it gives the Judge an opportunity to correct the error?

A Correct.

Q If he chooses to. Now, if you have an objection that is -- for example, if I say I object to the increased number of deputies in the courtroom, is that a sufficient record?

A I would think so.

Q Well, if you were sitting as an appellate judge, how would you know what the increase was?

MS. SHIN: Objection to speculation.

THE COURT: Sustained.

Q. (By Ms. Brandt) Would you agree that it's important to perhaps have a hearing to develop more facts with respect to some objections?

A Some objections can call for a hearing, yes.

Q And if that record isn't made, then essentially it is not a good objection?

A I don't know that I could say that.

Q Well, it may not preserve the error?

A I don't know the answer to that either.

Q Okay. The objection has to be timely and it has

to be specific in order to preserve error?

A Yes.

Q Okay. And in some instances in order to preserve error, there has to be a more robust fact developed?

A Some objections do call for a hearing, yes.

Q Okay.

MS. BRANDT: I have no further questions.

**CROSS-EXAMINATION**

**BY MS. SHIN:**

Q Hi, Mr. Brooks. My name is Grace Shin; but we know each other, right?

A Yes.

Q This is my co-counsel, Christi Dean. I am going to be asking you some follow-up questions about some of the issues Ms. Brandt brought up. I know you had two stints as a prosecutor for a total of six years. How many years have you been licensed to practice law?

A I have been licensed since 1990.

Q And have you been practicing criminal law ever since you became licensed?

A The entire time, yes.

Q Okay. With respect to the issue of officers in the courtroom, did you ask any of the officers to be there in the courtroom?

A No.

Q Are you aware of anyone who asked on behave of the State for the officers to be there?

A No.

Q Did any of these officers tell you that they were there to intimidate the jury?

A No.

Q Are you aware of the officers telling anyone from the State that that was their purpose in being there?

A No.

Q And given that this case involved the death of an officer, were you surprised to see officers in the courtroom?

A No. I have never seen a case involving the death of a police officer where there were not police officers present in the courtroom.

Q And during your time in the courtroom, did anyone around you indicate surprise to you about the fact that police officers were in the courtroom?

A No.

Q And with respect to the recordings, how did the State come into possession of the recordings?

A They were turned over to us by the detectives who were assigned to the case by DPD.

Q And did they represent to the State that those were all the recordings that they were able to extract from

the server on this case?

A Yes.

Q Did you have any reason to believe that they were lying?

A I didn't have any reason to believe they were lying. I do know that defense insisted that there are recordings that were missing. And we went back several times to DPD to hammer out this issue whether or not there were any further recordings. All the recordings that we had in our possession were turned over to the Defense.

Q And did you have any reason to believe that DPD withheld any recordings that you requested?

A No.

Q And I want to refer to the record stipulations that were submitted by the Defense then, agreed to by me on behalf of the State. Can you look at page two, number 5F, and can you read that out loud.

A Because it was malfunctioning, the old system did not record the police communications of the Nix-Ruiz encounter from alternate channels.

Q And can you read subparagraph G. as well out loud.

A Which one?

Q The next paragraph, g, 5G?

A The NICE system also had defects, so it did not record the police communications of the Nix-Ruiz encounter

from the alternate channels.

Q So do you think it is possible that the recordings that the Defense is looking for in this case was unavailable because it was never recorded?

A Yes.

Q Because sometimes equipments fail?

A Yes.

Q And that will be it.

MS. SHIN: Pass the witness.

**REDIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Mr. Brooks, the District Attorney talked about the individuals testifying that the recordings were not recorded, and she asked you, well, were they lying; is that correct? She asked you whether or not they were lying, when they said they weren't recorded?

A I think she asked me is it --

MS. BRANDT: Can I get the court reporter to read the question back.

THE COURT: If you will read the question back, Ms. Baraka.

(Requested testimony was read back.)

Q. (By Ms. Brandt) These -- what the testimony was, was by these particular law enforcement who were testifying at the time of the trial is that these were all of the

recordings that those individuals, the custodians of the record were the law enforcement themselves, were able to extract; is that correct?

A Yes.

Q And so this isn't a question of them lying, it could be that they may not have had the technical skills to have extracted additional information; is that true? This isn't a question of lying, this is a question of ability.

A I don't know if I can answer that the way you phrased that question, I don't know if I can answer that.

Q That's the whole point of getting an expert is to go back and look at the originals to determine whether or not the expert can find something that -- that these individuals, these record custodians couldn't find. They are not experts in audio; would you agree with that?

A I don't know that.

Q Okay. But you don't necessarily take the word of law enforcement at their words especially for physical evidence?

A I am not sure I understand your question. I don't take them at their word for physical evidence?

Q Yeah. If I make -- if law enforcement makes a tape of something, and they came to you and said Mr. Ruiz is innocent, we are going to dismiss the case, would you dismiss the case or would you perhaps hire an expert to

review the original source of that recording?

A See the premise you are putting in front of me wouldn't work that way. They wouldn't come to me and say we are going to dismiss the case, it's their prerogative to file the charge or not file the charge.

Q My point with physical evidence, if somebody makes a representation, the other side has a right to go back and do an independent investigation; is that true?

A Yes.

Q Okay. And the reason they do that independent investigation is because the opposing side, we don't know if they have an agenda, they could have an agenda, right?

A Yes.

Q They could be mistaken?

A Yes.

Q They may not have the ability?

A Yes.

Q So we want an independent expert from the side of the Defense or the side of the prosecution to review that physical evidence; is that correct?

A I mean in theory, but --

Q That's fine, you just answered my question. So essentially the source for that independent analysis is the original source; is that correct?

A Yes.

Q Okay.

MS. BRANDT: I have no further questions -- let me back up one more.

Q. (By Ms. Brandt) In this particular case, the original source had been destroyed after 30 days, you had testified to that earlier?

A Yes.

MS. BRANDT: I have no further questions.

MS. SHIN: I have a few.

**RECROSS-EXAMINATION**

**BY MS. SHIN:**

Q Did you have any reason to believe that the individuals involved in extracting information from the server were not qualified to do what they do?

A No.

Q (By Ms. Brandt) Or that -- to your knowledge is the standard practice for the police department to retain experts anytime they need to extract information from a server?

A No.

Q Thank you.

MS. SHIN: That's all I have.

**RECROSS-EXAMINATION**

**BY MS. BRANDT:**

Q Mr. Brooks, you have no knowledge one way or the

other what the qualifications of the individual who extracted the information was, do you?

A I don't have their personal qualifications, no.

Q So as a defense lawyer, you wouldn't completely rely on what law enforcement represented, you would do your due diligence and do an independent investigation, wouldn't you?

A I mean again, it is a very broad question.

Q Okay. You would hire an expert to do an independent analysis instead of taking the custodian of the records's word for it as a defense lawyer now?

A It would depend on circumstances, ma'am.

MS. BRANDT: Okay, I have no further questions.

MS. SHIN: I don't have any questions for this witness.

THE COURT: You may step down, sir.

THE WITNESS: Am I excused, Your Honor?

MS. BRANDT: Yes.

THE COURT: You are free to leave, sir.

We will recess for lunch at this time and reconvene at 1:30.

(Lunch recess taken.)

(Defendant present in the courtroom.)

MS. BRANDT: Judge we have some witnesses to be sworn.sworn.

(Witnesses were duly sworn.)

THE COURT: Your next witness.

MS. BRANDT: Dr. Kessner.

THE COURT: You may proceed.

**GILDA KESSNER**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Could you state your name for the record?

A Gilda Kessner.

Q And what is your profession?

A I'm a psychologist, licensed in Texas.

Q And are you -- do I call you doctor?

A Yes.

Q Could you please tell me what your qualifications are to be a licensed psychologist.

A I completed a doctoral degree in clinical psychology from Baylor University in 1996, which included a one-year predoctoral APA internship. After graduation, I took a job with the Texas Youth Commission for about a year, which required that I be supervised by a licensed psychologist in order to be licensed. In late 1997, I qualified for my license in Texas.

Q And have you testified in capital cases?

A Yes.

Q And did you testify in the matter of State of Texas versus Wesley Ruiz?

A Yes.

Q Could you tell me what you were asked to do at the trial, what the point of having you testified?

A I testified on the issue of mitigation.

Q Did you testify at all in guilt/innocence?

A No, I did not.

Q And you testified exclusively in the punishment phase?

A Yes.

Q Could you tell us what mitigation is, please.

A It is my understanding that it is any factor about the individual positive or negative that could weigh on the jury's decision to decide not to give the death penalty.

Q Did trial counsel ask you at all to review material about Officer Nix?

A No.

Q And in fact you did no independent investigation with respect to Officer Nix?

A Correct.

Q Okay. At the trial, were you qualified as an expert?

A Yes.

Q Okay. And so you were recognized in that capacity at trial?

A Yes.

Q Okay.

MS. BRANDT: And, Your Honor, I would ask that Dr. Kessner be recognized also as an expert in this case.

THE COURT: Very well.

MS. DEAN: The State would object. She may be an expert in mitigation, but she is not an expect in what she is about to be asked about. Because of the nature of this proceeding I am not inclined to take her on voir dire, I am inclined to ask for a running objection because --

THE COURT: I guess since you may know what she is going to be asked next, but the Court doesn't.

MS. DEAN: Well, she is not -- I mean, Lydia Brandt attached to her application, Dr. Kessner's affidavit, and I assume Ms. Brandt is about to ask her about what she attested in her affidavit and she is not qualified. She is asking Dr. Kessner to testify ultimately conclusion that have nothing to do with mitigation or frankly anything psychologically related.

THE COURT: And the Court on that basis would sustain the objection.

MS. BRANDT: Your Honor, can I make a record.

THE COURT: You may.

Q. (By Ms. Brandt) Before we get into the issue with respect to Officer Nix, you were a witness at the trial; is that correct?

A Correct.

Q All right. And so -- what are you currently doing right now?

A I am a psychologist at the Dallas V.A. Medical Center.

Q And do you evaluate individuals in a clinical setting?

A Yes, I do.

Q And can you tell me what the context is for those evaluations?

A I work in the compensation and pension clinic where veterans anything from World War II up to the current wars come in for medical violation from anything that may have presented itself during their service or thereafter. So they may include compensation for a pension, and that include depression, post traumatic stress disorder related to combat or non-wartime service or secondary to a medical illness.

Q And was Officer Nix a former veteran?

A Yes.

Q And so you have the expertise to evaluate him if

you have the records concerning PTSD?

A Correct.

Q Can you tell me what the symptoms of PTSD are?

A That's included in the anxiety section of the diagnostic section of medical disorder. And it requires several features to be met. The first is that the individual be exposed to an even that would cause threat to one's life or severe bodily injury or the integrity of yourself or someone else. And those can be -- range from anything like being raped, being in combat, people who were exposed on 911, airplane crash and there is a whole wide variety of types of incidents.

The second thing after exposure is their immediate response has to incorporate either being horrified, feeling helpless, or intense fear for their own life.

Now, once those two things are met, and at veterans administration, we try to document the actual experience because they are seeking compensation, so to document an incident they were exposed to. Once that is done, there is a series of symptoms that they would have to meet in order to qualify for the diagnosis.

Q Can you tell us briefly what some of those symptoms are.

A There is one category called re-experiencing. Typically we think of nightmares, nightmares about the

event. Another re-experiencing symptom is flashback, they think they are reliving the actual experience. Interest of memory and thoughts is another re-experiencing, where those memories kind of periodically randomly come into their conscience awareness and are very disturbing. Or have intense psychological stress to an event that reminds them of that situation, such as if a woman was raped in an elevator. Anytime she sees an elevator, she may start to have a rapid heartbeat and remember the incident.

The second is group of symptoms is what is called avoidance or psychological numbness and that includes one not wanting to talk or think about it or avoid talking and thinking about it. Some people may result to over use of alcohol to numb the memory. Other people relate to people places or things that remind them. Such as war veteran coming back from a different culture may be reminded of the different ethnicities they saw in battle and it may be disturbing to him, or he may I void going to a restaurant. Other symptoms involve withdrawals from close relationships or friendships, lack of interest in activity that you used to enjoy, these are symptoms of depression.

And then the third category is hyperarousal, where individuals have trouble with disturb sleep. Either initiating sleep or maintaining sleep. It can be directly related to nightmares, but it doesn't have to be. The

second one is irritability or unprovoked aggression. Essentially the individual their arousal is heightened all the time. Instead of having a normal relay of response in some instances, they may respond more impulsively in a shorter time frame. A third is, if I can remember all of them off the top of my head, lack of concentration, lack of concentration is usually distracted. Trying to think of the next one. Those are the three primary ones that we see the most, I would have to look at my manual to think of all the others.

And beyond that, it requires that there be some impairment in their functionality either in social, occupational, academic areas, is required for the diagnosis to be provided.

Q Okay. And what were you -- you were asked to provide an opinion here in habeas, were you not?

A Yes.

Q You were also called to act, in addition to being an expert, also to testify as a fact witness as to what happened at the trial, what your scope of assignment was?

A Yes.

Q Okay. Based on -- what was the question that you were asked for purposes of habeas?

A The reasonableness of Officer Nix behavior at the event with Mr. Ruiz.

Q And were you able to formulate a conclusion as to whether or not Officer Nix acted as a reasonably prudent officer?

A Yes.

Q And was your conclusion he did act as a reasonable prudent officer or he did not?

MS. DEAN: Your Honor, the State would object to her giving an ultimately conclusion, she is not remotely qualified to do so.

THE COURT: Sustained.

Q. (By Ms. Brandt) Dr. Kessner, can you provide us with what your qualifications are in term of rendering an opinion in this manner?

A Well, as a psychologist one of the things we are trained to do and called upon to do at various times is to evaluate an individual's behavior after an event, whether it is a violent event or attempted suicide. To understand the behavior, for instance, if they are going to be released from the hospital.

Q In this particular case, there was a violent event, was there not?

A Correct.

Q And based on the list of symptoms that you recited for PTSD, did there appear to be certain symptoms exhibited by Officer Nix?

A There is only one that I can name based on Officer Nix's behavior.

Q And what was that?

A The aggression or impulsive aggression.

Q And were you able to review any records with respect to determining whether or not he had PTSD?

A No.

Q Why is that?

A I was inform that none were available.

Q Who were you informed by?

A Cliff Jenkins, the investigator.

Q Okay. And so you weren't able to tell one way or the other whether or not Officer Nix had PTSD?

A Correct. I would have needed substantial records to examine to determine whether that was the possibility.

Q And so if you could not upon whether or not he did not act as a reasonable prudent officer because of some kind of mental illness or psychological condition, were you able to provide an explanation for Officer Nix's behavior in his encounter with Mr. Ruiz?

A Yes.

Q And what would that explanation be based on?

A Well, as a psychologist whenever we evaluate someone's behavior, we always examine or evaluate the context of that behavior.

Q And were you able to evaluate the context of that behavior here with Officer Nix in his encounter with Mr. Ruiz?

A Yes.

Q And tell me what it is that you looked at?

A The police videos of the pursuit and the encounter with Mr. Ruiz, the police investigation of the incident, the shooting incident, which included all the officer's statements and witness' statements and standard operating procedure for police pursuit and a barricade suspect.

Q And based on that context, in your professional opinion what was your opinion with respect to that, are did he act as a reasonable pursuant officer?

MS. DEAN: Your Honor, again I will object that she cannot make the ultimate conclusion here. She has no legal experience. She has no law enforcement experience that she so far has testified to.

MS. BRANDT: Your Honor, this doesn't have anything to do with law enforcement experience. It has to do with her experience as a clinical psychologist. She works at V.A., based on what she does every single day, she told you or she has told us that her evaluation is based on the context of his behavior. We are going to go into several other incidents that are here, the realm of various records that she had. So

this had nothing to do with being in law enforcement or not. This has to do with her qualifications as a doctor in psychology and she does this evaluation everyday.

MS. DEAN: Your Honor if I may --

THE COURT: I will sustain the objection.

MS. BRANDT: Your Honor, I still like to make a record, if I may?

THE COURT: You may.

MS. BRANDT: Okay.

Q. (By Ms. Brandt) Based on your evaluation, Dr. Kessner, what does Officer Nix's behavior tell us about his encounter with -- his encounter with Mr. Ruiz?

A That it was impulsive.

Q And anything else?

A Well, it wasn't prudent and it did not follow standard operating procedure.

Q And how do you know it didn't follow standard operating procedure?

A I reviewed them and they were very clear.

Q Did you review any other testimony with respect to what other officers did after Officer Nix was shot in terms of approaching the vehicle?

A Included in the summary of the investigation of the shooting was a supervising officer who came to the area

after the initial officers had arrived. And he describes -- and it is described in the summary -- or in his statement that he could hear that an officer had been shot and the other officers on the scene were discussing whether or not they should rush the suspect vehicle. And he told them not to rush the vehicle that they were to treat this as a barricaded person, barricaded suspect incident.

Q And Mr. Ruiz's position hadn't changed any after Officer Nix was shot -- after Officer Nix was shot versus before Officer Nix was shot, was he still a barricaded suspect?

A According to all the statements, he was still in his vehicle.

Q And so that's what led you to the conclusion that Officer Nix did not act as a reasonably prudent officer because he wasn't acting in accordance with the procedure?

MS. DEAN: Your Honor, the State objects to her making ultimately legal conclusion. The officer standard is a legal standard, it is not a psychological standard.

THE COURT: Sustained.

Q. (By Ms. Brandt) Doctor Kessner, did Officer Nix follow the procedures laid out by the law enforcement manual?

A Not according to the descriptions to everyone

present.

Q And when other officers saw the situation after Officer Nix's death, they followed those procedures; is that correct by not approaching, waiting, because he was a barricaded suspect?

A Well, once they were instructed by their superior not to, but the initial arrest --

MS. DEAN: State objects to hearsay. If she wants to draw conclusions from what she has read, that's fine; but we are repeating testimony -- repeating statements by supervising officers. I mean this is all in the record, and it doesn't need to be testified here, and it is hearsay.

THE COURT: Sustained.

Q. (By Ms. Brandt) Did you in the course of doing your evaluation, did you review other encounters between Nix and other individuals?

A There were some reports of other incidents, arrests that Officer Nix had been involved in.

Q And based on your review of the literature, the professional literature that you looked at, could you tell something about the shooting of Mr. Ortiz by Officer Nix?

A That occurred prior to his deployment to Iraq.

Q Whose's Ortiz's?

A Officer Nix deployment to Iraq.

Q To be clear on the record, the shooting of Mr. Ortiz was prior to Mr. Nix going to Iraq?

A Yes.

Q And what did the review of the professional literature tells you.

A It is a study that officers involved in a shooting have a 51 percent chance -- or risk have, a 51 percent chance of being involved in a second shooting within 15 years.

Q And was the encounter between Officer Nix and Mr. Ruiz within that 15 year?

A Fifty-one percent increase chance; and, yes, it was within the 15-year period.

Q Does that tell you anything about the situation?

A Essentially a risk factor. It doesn't tell anything more about his state of mind at the earlier shooting or anything like that.

Q There were several instances or encounters between Officer Nix and other individuals after Officer Nix came back from Iraq; is that true?

A Correct.

Q And could you list those encounters. And we will talk about them individually. Do you recall an encounter with Mr. Williams?

A Yes. That was an adolescent.

Q And could you tell me -- that was after Iraq, that was after Officer Nix returned from Iraq?
A Correct.
Q And is there anything about that incident that is symptomatic of some sort of psychological or emotional condition?
A Well, there was some -- what appears to be impulsive behavior.
Q Which could be linked to PTSD?
A That's correct.
Q And do you have any other symptoms with respect to the encounter with Mr. Williams -- between Mr. Williams and Officer Nix?
A Well, he intervened when Anthony Williams was already under control of other officers.
Q So what we have is another symptom of aggression?
A Impulsive aggression on his part in that incident.
Q Okay. So this could have indicated some type of emotional problem?
MS. DEAN: Your Honor, objection to leading.
THE COURT: Sustained.
Please don't lead the witness.
Q. (By Ms. Brandt) Could you tell us what this could indicate?
A Just a piece of information that without any other

information attached to it necessarily, but it is a piece of information that is a symptom of PTSD.

Q And was there another incident between Officer Nix and Mr. Tobar?

A Yes. That involved him and another officer -- a third officer filed a complaint that they essentially manhandled this individual.

Q So it was excessive use of force complaint by another officer?

A Both of them were, Anthony Williams and the Tobar.

Q The Tobar incident was after Iraq; is that correct?

A Correct.

Q And is there any feature in that encounter between Officer Nix and Mr. Tobar that would indicate any type of possible emotional or psychological problems on the part of Officer Nix?

A Well, just the excessive use of force. And the reason I highlighted those two, because those points were made by other officers rather than other civilians, which I didn't want to put as much weight on.

Q And those features again could be indicative of PTSD?

A It is a symptom.

Q A symptom. And would your testimony, having it

been used -- well, the trial attorneys asserted self-defense on the part of Mr. Ruiz, would your testimony have provided an explanation to the jury about the behavior of Officer Nix?

A I think it would have provided some context.

Q When you say "context", what does that mean?

A Well, to understand behavior, if you know the context, it helps you understand it better.

Q Okay. So rather than blaming Officer Nix for what happened, this would have provided an explanation to the jury of the dynamic of what was going on?

A I believe so.

Q Okay. But the defense attorneys never called you to evaluate this aspect of the case?

A I was never asked, it was never presented to me.

MS. BRANDT: I have no further questions.

THE COURT: Cross-examination.

## CROSS-EXAMINATION

**BY MS. DEAN:**

Q Dr. Kessner, my name is Christi Dean. And I represent the State in these proceedings. We have never met before; is that correct?

A Correct.

Q How many death-penalty cases have you testified in?

A I don't know, 20, 30, maybe more, I am not positive.

Q Do you usually testify for the defendant?

A I am generally called by the Defense.

Q Have you ever testified for the State?

A I have been contacted by the State but never worked on a kiss by the State not in a capital case.

Q You have been contacted by State to work in a capital case?

A Not in a capital case.

Q Haven't your range of testimony usually been mitigation and future dangerousness?

A There are other areas I have testified in.

Q What other areas?

A Mental illness, confession.

Q And these are in capital cases?

A No, not capital cases.

Q Can you tell me what you have testified to in capital cases?

A Primarily mitigation, risk assessment mental retardation.

Q Okay. So, Dr. Kessner, you were a member of the defense team at trial as you stated earlier?

A Well, I was called by them to be an expert.

Q Okay. And you stated that you only served during

the punishment phase?

A Correct.

Q What did you advise Defense Counsel?

MS. BRANDT: Objection, that's work product. That hasn't come out here. She said mitigation. It is a very broad question.

THE COURT: Restate your objection.

MS. BRANDT: It is overbroad.

THE COURT: Overruled.

Q (By Ms. Dean) So --

MS. BRANDT: Objection, worked product.

THE COURT: Overruled.

Q. (By Ms. Dean) You can answer the question. What I want to know is, did you serve in an advisory capacity in the defense team?

A No.

Q You didn't advise them what they should present in mitigation?

A Well, I discussed with them the issues I developed, but did I advised them as to who they should call or what process they should take, that wasn't my role.

Q Okay. Can you explain to me what your role was?

A I interviewed witnesses, looked at records for any theme that might be contained in the information I evaluated, and they asked me to testify on that.

Q Okay. Are you aware that the only issues designated for this hearing is ineffective assistance of defense counsel?

A I don't know that I was aware of that.

Q So effectively you are being asked to give evidence against Defense Counsel; are you aware of that?

A I am asked to testify as to what I was asked to do, but I don't consider that I was part of the defense team as far as strategizing and that type of thing.

Q Okay. Do you have a copy of your affidavit in front of you?

A Yes.

Q I want to ask you what directive Lydia Brandt gave you when she hired you for this proceeding?

A I believe initially in question whether there was PTSD and what influence that might have had on his behavior at the incident with Ruiz.

Q I believe in your affidavit, it says that you were asked to evaluate him under the reasonably prudent officer standard; is that correct?

A Well, that was a component of it and if PTSD had any influence on that.

Q Okay. Would you please read paragraph seven of your affidavit for the Court?

A I have been contacted by Lydia Brandt, Defense

Counsel for Wesley Lynn Ruiz, to determine if Officer Nix acted as a reasonable prudent officer would act, in his encounter with Mr. Ruiz had crashed the vehicle and the vehicle driven by other law enforcement --

THE REPORTER: Ma'am.

A -- who had responded to the scene, if Officer Nix did not act as a reasonably prudent officer, was his reaction in this encounter with Mr. Ruiz because Officer Nix was suffering from post dramatic post disorder. If Officer Nix was not suffering where PTSD, what does the behavior of Officer Nix in this encounter with Mr. Ruiz tell us?

Q What I want to know, have you ever received a similar directive in any other capital case you testified on?

A I don't know, I am not exactly sure what you are talking about. In other words, on the issue of mental retardation is very specific.

Q I mean have you ever received a directive like this one?

A Not that I recall.

Q So this would be your first time testifying to what a reasonably prudent officer would do?

A Using that phraseology, yes.

Q Okay. Are you aware that when a suspect sues a police officer for injury, the Court use the reasonable

prudent test to determine whether the officer had official to immunity?

A No.

Q This is a civil standard not a criminal one; were you aware that have?

A No.

Q Do you work on civil?

A I have worked on civil cases for wrongful death but not involving police officers.

Q Okay. All right. I think she ran through your qualifications., you have a bachelor degree in social work, master in clinical psychology; is that correct?

A Correct.

Q And then I want to go over paragraph three of your affidavit where you indicate that, quote, since becoming licensed, I have provided a wide range of services and agencies settings relating to forensic and clinical psychology with juvenile offenders. Does this mean that your practice over the past 15 years has predominantly focused on juvenile offenders?

A No. That was earlier in my career before I went into private practice, and so I had about 12 or 13 years of private practical and the last 20 months I have been with the Dallas V.A.

Q You did this up -- you primarily focused on

juvenile offenders up until 20 months ago when you started working at the V.A.?

A No. My training and for my doctoral program focused on adult forensic.

Q Okay.

A And then after I graduated, I went with the Texas Youth Commission and then Dallas County Juvenile Probation.

Q Uh-huh?

A Another treatment facility for juveniles before I then went into private practice and where I did evaluation with juveniles and adults, and now I am at the V.A.

Q I am not trying to corner you, it looks like from your affidavit that your primary focus has been on juvenile offenders, since you got your SID in '96, you are saying that isn't accurate?

A That would not be complete, yeah.

Q So you have been working at the V.A. for last 20 months?

A Yeah.

Q Okay. Do you have any law enforcement background?

A No.

Q Okay. So I guess I would ask you how you are qualified to make a determination about police procedure?

A Well, other than evaluating behavior is part of what I do and knowing the context of the behavior that would

be the implication.

Q Did you make any -- did you draw any conclusions from reading all the, you know, police procedure and the articles that you read that a layperson couldn't draw?

A Well, probably not.

Q And you didn't have the opportunity to interview Officer Nix first hand?

A No.

Q Do you usually make posthumous diagnosis?

A I did not diagnose him. I said there wasn't sufficient information to do so. And as far as if I would have qualified the fact that I didn't interview him, I would have said there were symptoms that suggested that based on his records. And if he had been diagnosed, if he had the V.A. records and he had been diagnosed, then I would have mentioned that.

Q Okay. So in a nutshell, you were unable to determine whether he has PTSD; is that correct?

A Insufficient information.

Q And then you also concluded that he did violate the police procedure 1200 regarding barricaded suspects?

A Based on my reading of the procedures.

Q Has that ever been in dispute that he violated that procedure?

A I haven't read anything that said it was.

Q Would you read paragraph 13, subparagraph B1 of your affidavit?

A Senior Corporal Officer Nix was a seasoned police officers, he was not a trainee or a rookie. He had undergone training specific to dangerous traffic stops procedures to follow in the case of a suspect who was barricaded and unwilling to surrender to police.

Q I mean would you agree that Officer Nix's training and experience likely informed the decisions that he made in his encounter with Mr. Ruiz?

A I would say that that would be my expectation and hope that that would be the case.

Q Dr. Kessner, what are your feelings about the death penalty?

A I have mixed feelings about the death penalty.

Q Can you tell me whether you are for or against it?

A I would say I equivocate.

MS. DEAN: Okay. No further questions.

**REDIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Dr. Kessner, you had said that in your review, a thoughtful layperson could have come up with your conclusion. A thoughtful layperson would not know the symptoms of PTSD, would they?

A Correct.

Q They might say this looks impulsive, they wouldn't be able to say that this impulsivity is a symptom of PTSD?

A Correct.

Q When you talk about whether or not Officer Nix is being informed, his behavior, you said that was your expectation, that's what your answer was, it was your expectation; is that correct?

A Correct.

Q Okay. But based on what you saw, in fact, he did not follow the training; is that correct?

A That's correct.

Q And even though we are using a reasonably prudent officer, the thrust of what you were asked to do in this case, habeas proceeding, was, one, to determine if rather than blaming Officer Nix, the Defense could have provided an explanation to the jury as to why Officer Nix acted the way he did; is that true?

A That's my understanding, yes.

Q And so when we are talking about behavior, that is within the scope of your expertise?

A Yes. I evaluate police officers in my job everyday. I evaluated preemployment police officers prior to coming to the V.A. is part of what I do.

Q And how long did you evaluate police officers before coming to the V.A.?

A In my training at Baylor, I had a rotation that that is one of the tasks that we had. In MHMR, I did clinical evaluations. And I have done that in private practice as well.

Q Let's go back. How far back was your training at Baylor?

A I graduated in '96, so that would have been my second year of training there.

Q Okay. And so all of your expertise isn't just with juvenile; is that correct?

A Oh, no.

Q You said you also have eval'd police officers currently?

A Well, it is not unusual for police officers to be veterans, so they come to our clinic as well. But I also have exposure to veterans with PTSD with my training at Baylor.

Q So what you were asked to do is consistent with your training; is that correct?

A Correct.

Q And it is also consistent with what you are actually employed to do right now as a professional psychologist?

A Before and during, I mean, yes.

Q Okay. And the last question that I have got, you

had that same qualification at the time of trial in 2006 to evaluate police officers, because that goes all the way back to the early '90s?

A Correct.

Q And so you could have provided that to the defense counsel had they asked you?

A If they had asked me for, you know additional professional task, I possibly could have provided that.

Q But they did not ask?

A They did not ask.

MS. BRANDT: That's all I have.

RECROSS-EXAMINATION

**BY MS. DEAN:**

Q I just want to ask two things, bottom line, you could determine whether he had PTSD?

A I cannot say, I have insufficient information.

Q And then secondary, you conclude that he breached the police procedure; is that correct?

A Based on my review of the tape and the procedures and the witness statements of his behavior, that's correct.

MS. DEAN: No further questions.

THE COURT: You may step down.

Why don't we take a ten-minute break at this time.

(Recess taken.)

(Defendant present in the courtroom.)

(Witness entered the courtroom.)

THE COURT: You may proceed.

**PAUL BRAUCHLE**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Could you state your name for the record, please.

A Paul Brauchle.

Q Mr. Brauchle, could you tell us how long you have been in practice?

A Forty years.

Q And what type of practice have you been in the last 40 years?

A Criminal.

Q Are you board certified?

A I have been for 36 of -- no, 35 of those.

Q Were you board certified at the time you were representing Mr. Ruiz?

A The trial occurred within the last 35 years, didn't it.

Q The trial occurred in 2006?

A Okay.

Q I'm sorry, 2008, so were you board certified then?

A I think I previously answered I have been board

certified for 35 years.

Q Since when, what date?

A That would have been since 1976.

Q Okay. What type of practice do you do primarily?

A I think I have answered that, but I don't do anything but criminal law.

Q Okay. Let me be more specific, do you do capital work?

A Yes.

Q And you do capital defense work?

A I have never been a D.A.

Q Okay, you have never been a prosecutor. How many capital cases have you had?

A Depends on how you count them, probably between 15 and 30.

Q Over what period of time, your entire career?

A Yeah.

Q Could you tell me who was on the defense -- do you know the person sitting next to me?

A Yes, ma'am.

Q And this is the defendant, Wesley Ruiz; is that correct?

A Yes, ma'am.

Q Could you tell me who was on the defense team in the trial of Mr. Ruiz for the murder of Officer Nix?

A Karo Johnson and Doug Parks.

Q And you were also on the defense team too; is that true?

A I guess so. I wouldn't be up here if I wasn't.

Q Okay. And who were your investigators?

A Rex Reynolds.

Q Did you have another investigator?

A Yeah. We had a Hispanic investigator, his first name is Joe.

Q Vela?

A Yeah, Joe Vela.

Q If I could, do you recall when Mr. Vela was appointed?

A He wasn't appointed once we figured out the fact witnesses for the most part --

Q I'm sorry, somebody was coughing, I didn't hear you?

A He wasn't appointed, we just associated him because we figured out that most, if not all, of the witnesses were Hispanic. And we encountered quite a few of them that didn't speak English, so we needed a Hispanic speaking investigator.

Q And so Mr. Vela's assignment was exclusively was to interact and do the investigation with Spanish-speaking witnesses; is that true?

A Well, are his assignment was basically to do we told him to do and what Rex Reynolds told him to do. But his purposes in being there was if we needed any Hispanic translation or Hispanic interaction with witnesses.

MS. BRANDT: Your Honor, may I approach?

THE COURT: You may.

Q. (By Ms. Brandt) Let me show you the -- this is already admitted into evidence, it is exhibit -- this is Exhibit 1-C, they are the billing records for Mr. Vela, if I could ask if you would take a look at this for a second, you signed this at the bottom, did you not?

A Yes.

Q And this was the billing sheet for Mr. Vela; is that correct?

A The only thing I can tell you about this, is that that's my signature.

Q Okay. And behind it, on this exhibit that has been admitted, this shows a detail list of what he did in the Wesley Ruiz case; is that correct?

A I previously answered, the only thing I know anything about is that's my signature.

Q Let me ask the question a different way. This corroborate what you just said, he was there to investigate -- to investigate and talk to the various Spanish-speaking witnesses, that's all he did for you, and

that was his purpose?

A That's basically what he did. But as far as sitting around and keeping track of their hours and what they do or don't do --

Q That is nonresponsive to the question. This is a list here of what it is that he did?

A And I can't say that it is or isn't.

Q But you did sign is that front pay sheet verifying the truth and correctness to the information stated above; isn't that what you signed? Could you read that paragraph right above your signature, could you read it aloud, please?

A I, the undersigned attorney, am appointed to represent the above-named defendant and am requesting payment in accordance with the laws of the State of Texas. I further affirm to the truth and correctness to the information stated above and that I have not received any monies or other things of value for said services.

Q Okay.

A To be paid directly to the investigator.

I signed that so he could get pay. I don't know what he did or didn't do for them. I know he worked with Rex Reynolds.

Q And the work he did for Rex Reynolds was with your Spanish-speaking witnesses, because we have a Hispanic that

you were representing in this case; is that correct?

A That's correct.

Q Okay. Rex Reynolds provided the bulk of the investigation for non-Hispanic matters; is that correct?

A He ah -- yes, I guess that would be a true statement.

Q Okay. Did you do the voir dire in the Ruiz case?

A I did -- I probably did the greater part of it.

Q Okay. And what about the guilt/innocence phase?

A My recollection is that I probably did over 85 percent of it. You have got the transcript you know what I asked in there.

Q Okay. And so it is true that during the guilt/innocence stage, you were in the courtroom all if not -- almost all of the time; is that correct?

A I guess that would be a logical deduction.

Q The answer is "yes" or "no", were you in the courtroom or not?

A I was in the courtroom.

Q And were you in the courtroom during the punishment phase?

A Yes.

Q Do you recall, Mr. Brauchle, whether or not law enforcement was in the courtroom?

A In what -- what is the question? There is law

enforcement in here right now.

Q Do you remember seeing law enforcement in the courtroom in the guilt/innocence phase?

A And by "law enforcement," what do you mean?

Q Law enforcement, what is law enforcement to you?

A Many different things.

Q Okay. Tell me what you think law enforcement is?

A I guess people that enforce the law.

Q Okay. Would they include the bailiffs that are sitting -- individuals from the sheriff's department that are sitting to your right?

A That's why I answered your previous question in the way that I did, yeah they are law enforcement.

Q Did you see Dallas Police Officers in the courtroom during the guilt/innocence phase?

A Yes.

Q Did you see Mesquite Police Officers during the guilt/innocence phase?

A I don't recall seeing any Mesquite Police Officers.

Q I'm sorry, I didn't hear you?

A I don't recall seeing any Mesquite Police Officers, but I wasn't really there to count or keep track of the various law enforcement agencies.

Q Did you see any Irving Police Officers?

A Not that I recall. Like I say, I wasn't making any effort to distinguish that.

Q But you would have been aware of police officers were present in the courtroom?

A I was very aware of it.

Q And what was the number of police officers you saw in the courtroom during the guilt/innocence phase, the total number on any one time?

A I never counted them, but there were probably -- there were probably at least 50.

Q I'm sorry, one-five or five-zero? I didn't hear you, you had your hand over your mouth.

A Fifty.

Q Five-zero. And that's at one time in the guilt/innocence phase?

A They weren't around much during the guilt/innocence phase.

Q How many all at one time do you recall seeing during the guilt/innocence phase of law enforcement in the courtroom?

A I think I just answered that, probably the most I ever saw was around 50.

Q In the guilt/innocence phase in the courtroom?

A Well, there were more in the punishment, so there were probably less than that at the guilt or innocence. So

it is probably about 30.

Q So there were 30 law enforcement in the courtroom during the guilt/innocence phase at one time?

A Probably for the final arguments. Like I say, there was almost nobody in here except for D.A.s and relatives during the trial.

Q So during the final argument that you made to the jury on whether or not to convict or acquit Mr. Ruiz, while you were giving that final argument to the jurors, there were at least 30 police officers in the courtroom?

A I think that would be a fair statement.

Q Okay. Do you recall where they were located in the courtroom? I mean, were they -- let me position the courtroom for you so it is clear on the record. Over to your right, which is my left, is the Judge. And so this wall on this side is the right side of the courtroom. We have the back wall, and between the railing and the back wall is the galley area for the spectators. Where do you recall the police officers being? Were they standing against the right wall?

A I don't think the Judge let 'em stand. I think everybody that was in here had to be seated.

Q So you believe that there were 30 law enforcement officers in the galley seated during the closing arguments in guilt/innocence?

A That's just a guess.
Q That's an estimate, though?
A Yeah.
Q About 30 of them. And how did you know they were law enforcement?
A Because they were down in their dressed blue.
Q And did they have badges?
A Yes.
Q And did they have weapons on them?
A I don't really think they did, I don't think they were allowed to have weapons in the courtroom. That wasn't up to me, I wasn't in charge of security.
Q Okay. In the punishment phase, how many law enforcement do you think was in the courtroom at one time?
A Well, they emptied up a little after the guilt or innocence. I know the chief of police was here.
Q The chief of police of what, Dallas, the Dallas Chief of Police?
A Yes.
Q Okay. And when did he come?
A I don't know, I think he was probably here for most of the punishment.
Q Okay. And who else, were there any upper level besides the chief of police?
A I don't know who would be more upper level than

the chief.

Q Were any of his assistance there?

A Ma'am, I am not a police officer, so I really don't know the hierarchy of the Dallas Police Officers. Yeah, I think there were probably some captains and lieutenants and whatever else the hell they call themselves. There were a lot of police officers down here.

Q Do you believe that the police officers at one time in punishment phase, it was more than 30 you said?

A Yeah, it was probably around 50.

Q Around 50. And were --

A There were as many of them in here that they can get without trampling the civilians.

Q So the courtroom was packed then; is that a fair statement?

A There wasn't an empty seat.

Q And the majority of those seats were filled by law enforcement?

A That's correct.

Q And why -- what is the significance of having law enforcement in the courtroom when a police officer is killed?

A I am not the one that invited them down here, so I am not sure on that. I am sure they were trying to show some sort of solidarity for Officer Nix.

Q And because they were in the courtroom during closing arguments in the guilt/innocence phase, do you think they were trying to send a message to the jurors?

A Of course. They have no other reason to be down here.

Q Because they weren't here for security purposes; is that correct?

A No, ma'am, they weren't here for security.

Q Okay. And what message do you think they were trying to send to the jurors in guilt/innocence?

A That they were down here to support Officer Nix.

Q And for the jury to come back with a verdict of guilty?

A Well, I think that would be what they would be in favor of, yeah.

Q Okay. And how about in the punishment phase, you said there were 50 law enforcement officers, again was that maximum number on the day of closing argument?

A What do you mean "maximum number"?

Q Well, the total number in the courtroom at one time, the most number of law enforcement during the punishment phase was at the closing arguments, or was it about the same throughout the punishment phase?

A I am not sure I understand the question. Obviously, the majority of them were down here for

punishment arguments. I think it is probably like it was during the guilt or innocence phase, they didn't show up until they thought it was important.

Q It was important to do what, send a message?

A If that was what they were trying to do by coming down here, which I think it was, yeah, that's what I think they considered important.

Q So they were here in the punishment phase to send a message to the jury so that a death verdict would be come out of the punishment phase; is that true?

A I didn't talk to any of them. I didn't invite them down here. I would assume, though, using common sense, which you don't seem to have much of, that's why they were down here.

Q Okay.

A Why would you think they would all converge at a capital murder trial?

Q I am asking the questions, Mr. Brauchle --

A Not very well, thank you.

Q There was a issue that you raised concerning missing audio portions; do you recall that?

A Yes.

Q Could you tell me what you recall about the dispute?

A Could you ask me a specific question.

Q I'm sorry?
A Could you ask me a specific question?
Q Yeah. There was an objection that you had raised concerning the audio transmissions between law enforcement, between and among law enforcement, the dispatchers and all that; do you recall that?
A An objection.
Q Did you file a motion, Mr. Brauchle?
A Probably about 60 or 70 of them. What are you referring to?
Q Do you recall on May 16th that there was a hearing because you alleged that the State had turned over data about the encounter between Officer Nix and Officer Ruiz (sic), but it was missing the audio?
A Well, that was upon a contention from the time that we figured out the police department had destroyed the audio portions of the -- of the incident.
Q When did you figure out that they had destroyed the audio?
A When that discovery was made available to us.
Q Do you recall when you first requested the audio?
A We started requesting items from the State from the first day I was appointed, but the State didn't always comply with our request. When they finally --
Q Well, hang on a second, you made a lot of

requests, didn't you?

A Yes, I did.

Q Okay. So my question to you is when did you first make a request for the audio recordings of the State, if you remember?

A I have no idea.

Q You don't remember. Do you recall the May 16th hearing?

A In regard to what?

Q The missing audio and the allegations about the destruction of the audio?

A If there was one held on that day, I guess I recall it, I think that we probably brought that up on more than one occasion.

Q Okay. And following the hearing, is it -- do you recall filing a Motion to Dismiss or Preclude the Imposition of the Death Penalty?

A I do.

MS. BRANDT: Your Honor, may I approach?

THE COURT: You may.

Q. (By Ms. Brandt) Let me show you this -- let me show you this, please, if you would take a look at it. Is that the motion that you filed to -- after the hearing?

A It would appear to be.

Q Could you take a look at this paragraph to help

you refresh your recollection.

A Okay.

Q Okay. And could you tell us again -- let me ask the question again, what was the dispute about?

A What dispute?

Q I'm sorry, you said what dispute?

A Yeah. You asked me what the dispute was about, and I asked you what dispute.

Q The dispute in this motion?

A The motion doesn't have a dispute. The motion request relief from the Court.

Q Okay. Let's take a look at the first paragraph, could you read that into the record?

A The defendant is indicted for the offense --

Q No, this one right here?

A The one marked two not one?

Q That's correct. Could you read that into the record?

A The document speaks for itself.

Q Well, could you read that into the record so that everyone here is clear as to what we are talking about?

A You can read it to them.

MS: BRANDT: Your Honor, could you ask the witness to please read it into the record.

THE COURT: Mr. Brauchle, if you will please read

the requested paper into the record.

A Defendant has requested that the State produce the audio recordings of all police radio traffic from all channels from approximately 30 minutes prior to the commission of the alleged offense until Mr. Ruiz's arrest.

At a hearing on May 16th, 2008, it was learned that this had been no request made by law enforcement to preserve recording that are routinely erased after 30 days, therefore radio transmission which could have had a direct bearing upon Mr. Ruiz's claim of self-defense has been destroyed.

Q (By Ms. Brandt) And so that was the conflict that was the subject of the hearing; is that correct?

A No. What the hearing was about is, is that once the State finally complied with our request for discovery, and we were given the video and audio recordings of the offense that Mr. Ruiz was on trial for, we figured out that the State -- not the State, but the police department had erased their part of the radio transmission. And that we could not recover it. Although they denied having erased it.

Q Okay. And why were those radio transmissions important to you in the defense of Mr. Ruiz?

A Because it would have given the in-car messages

back and forth between, I think there were five cars in pursuit of Mr. Ruiz. It would have contained the officer's comments, statements, expletives, what have you. And there is a 30-minute gap of silence during the critical part of the events that occurred that day.

Q In --

A Especially from Officer Nix.

Q In -- would that audio have shown what his state of mind was?

A I certainly think it would have.

Q And if law enforcement had testified on the record that Officer Nix was issuing commands, that audio would have corroborated or conflicted with if all he was doing was issuing commands?

A Well, his fellow officers didn't in any way imply that he was being anything other than supercourteous to Mr. Ruiz.

Q If you had had those audios, you could have shown to the jury that Officer Nix was using expletives?

A Well, Mr. Ruiz testified to that. And of course it would have undercut the State's posture that nothing bad out there happened except to Officer Nix.

Q And so essentially without that, Ruiz's testimony was left to look very self-serving; is that true?

A I don't know that it was self-serving, I thought

it was the only testimony that accurately showed what happened out there.

Q Okay. But if you had had those audios, there is nothing more powerful than the actual words of Officer Nix himself; is that true?

A I would think that if we would have had those, this hearing probably wouldn't be being held.

Q Okay. And in addition to showing whether or not Officer Nix used expletives, those audios could have also shown out of the mouth of Officer Nix if he was threatening Mr. Ruiz; isn't that true?

A If he was, yeah, they would have. And I think, I am led to believe that he was.

Q And what those audios could have also have shown was his state of mind in that his tone of voice could have shown whether or not he was angry; is that true?

A I think the silent video shows that Officer Nix isn't out there asking Mr. Ruiz to please roll his window down. It is pretty graphic as to the fact that Officer Nix had lost it at some point.

Q But again the best evidence of Officer Nix's state of mind are the words from Officer Nix?

A If those existed, they would be, yes.

Q They would be very powerful for a jury to hear?

A Well, I assume that they would be, and I certainly

hope that they would be; but since they are not -- since the police --

Q Thank you, Mr. Brauchle, answered the question. What law enforcement had testified to, is that they had turned over all the recordings that they were able to extract from the server. As an experienced criminal defense lawyer, would you have wanted to do an independent analysis of that original source material?

A If it were available.

Q Okay. And so whether you are a prosecutor for the State of Texas or you are a Defense Attorney, if someone from law enforcement says I extracted all the recordings, you are not just going to take their words for it; is that true?

A I believe that we sent our discovery to a sound lab here in Dallas, as well as one in Arlington, trying to find if there was anything there other than silence.

Q But those were based on copies; is that correct?

A I think we were tendered the -- what were allegedly the originals at one time.

Q Well, let me show you -- do you have any independent recollection of the officer saying that the original source was destroyed?

A Well, they came up with two or three different versions. One was is that one of the channels didn't work;

one of the channels was new, and didn't report; and the other was, is that it must have been magic or something. You know.

Q So what you really needed was the original to do the analysis on?

A Well, I think that they tendered us something that they vouched for as being the original. I mean, it would be a video -- a video out of the in-car camera.

Q But as far as the channels of the officers communications back and forth, those were captured on the server at city hall; do you recall that?

A Well, some of the police said that, no that --

Q Do you recall that, Mr. Brauchle?

A You want the answer or do you want to answer with me.

Q I want you to answer the question, do you recall?

A What?

Q That the communications on the channels other than channel five were captured on the server at city hall?

A I don't think anybody ever said that.

Q Okay.

A The ones under the --

Q Thank you, Mr. Brauchle, you answered my question.

MS. BRANDT: Your Honor, may I approach?

THE COURT: You may.

Q. (By Ms. Brandt) Let me show you this volume and ask you if you can identify that, please. What are you looking at?

A Volume 40 of 59 volumes.

Q Of what?

A Pretrial hearing.

Q Of what, this is the reporter's record; is that correct?

A Yeah.

Q And this is in the Ruiz's trial -- in Mr. Ruiz's trial?

A It is captioned that, yes.

Q And what we have here, could you read this aloud for me please. You said you didn't recall it being -- the communications being captured on the server, this is the testimony of Brock Richardson?

A (Witness complies.)

Q Let me point out over here to you, could you read this for me, please, into the record?

A I am not going to read one sentence out of context, I am seeing what was asked before and after.

Q Okay, I will let you take a look at it.

A Thanks.

Q You are welcome.

MS. SHIN: May we ask which page you are reading.

MS. BRANDT: We are looking at page 39 of volume 40.

MS. SHIN: Okay.

A What was the question.

Q (By Ms. Brandt) Okay. On page 39, because you said you didn't remember where the information was being recorded. And so do you recall on page 39 they asked where those audios communications were being recorded? And so do you recall now where those communications between the various officers over their channels, not the main channel but when they switched over to the alternate channel, where were they being recorded?

A Well, they were supposed to be recorded at city hall; but if you read further down, it says that they weren't.

Q If you look on page 39, it asks, they are duel recording systems, and it says one main server that records all of it. Both of us have access to it. And they asked where is it located. So the record does say it was located, server, in city hall; is that correct?

A Yes. But if you read on --

Q All right. Thank you, Mr. Brauchle, that's all I asked?

A And I am going to complete the question.

Q Mr. Brauchle, I have asked you?

A And I am going to complete the answer.

Q You can complete the answer.

A Now, then, Lieutenant Crawford contacted you the next day and told you that they had some problems with retrieving communication.

ANSWER: Retrieving the information, the 911 calls and the radio traffic off the NICE, which is the new recording system which we had just put it had initially been installed a month earlier. So they had implied to you that someone had tried to download that information; is that correct? He had tried to find it?

Yes, sir.

Q Okay. So they are the ones who had tried to download the information, it was those individuals over at city hall, the law enforcement over there, and they weren't able to do it?

A That would be a correct statement.

Q And they may not have been able to do it because they didn't have the training perhaps, we don't know what their training was?

A They might not have been able to do it because it had already been destroyed.

Q Or they may not have been able to do it because they weren't qualified, that's another option; is that true?

A There is a myriad of reasons why it may or may not

have been there.

Q I'm sorry, I didn't understand the answer?

A There is a myriad of reasons why it may or may not have been done.

Q And so what we also see on here is that 30-days after the information was originally made. the encounter between Mr. Ruiz, it was erased. So the information on the original server was no longer available to you; is that correct?

A Were you not listening when I answered your question a while ago. Here on page 349, it said the day after it happened, they didn't have it. So 30 days has nothing to do with it.

Q Well, on page 51 it also says --

A You bring me page 51 and I will see what it says.

Q Okay. On -- on page 51, do we have Brock Richardson testifying, the audio information -- this is your question: The audio information that you retrieved that day, before or after the time of the shooting, does any of that information still exists? You are the one who was doing the questioning in that hearing; isn't that true?

A I am trying to see if in fact this is still Brock Richardson. And what page are you referring to?

Q Fifty-one. And his testimony starts on page 37. And you are Mr. Brauchle that was at that hearing; isn't

that true?

A Go on.

Q So on page 51, you asked Mr. Richardson, the audio information that he retrieved, that's the information that he retrieved that day, before or after the time of the shooting, did any of that information still exist. And his answer was, No, sir, we only keep that information for 30 days.

A Where are you seeing that?

Q At the very bottom, the last question and answer on page 51?

A That's what --

Q That's what he said. You asked that question. And what he said was, after 30 days, the original source was no longer available to you as the defense lawyer; is that what that says?

A Well, previous to that, he says that he didn't make the exhibit that we were talking about. So picking sentences out of it is no --

Q Okay. But what he testifies to here is that --

A In one sentence he testifies to what you said.

Q Okay.

A I think you need to take the testimony completely.

Q Is it true, Mr. Brauchle, that it is general knowledge among individuals who practice law, the defense,

criminal defense, the state attorneys that communications between suspects and law enforcement would be recorded?

A We didn't have that in this case.

Q In 2006 the communications were coming in over the channels, weren't they?

A Not between suspects and police.

Q Well, how about among all the police officers and the dispatchers?

A We had reasons to believe that, yes, they were; but we didn't have anything that showed that they were.

Q So they were being recorded in 2006 during the event of this offense?

A Not according to the Dallas Police Department.

Q Well, not according to the Dallas Police Department, but it is common knowledge that these transmissions between law enforcement officers are recorded; isn't that true?

A In most jurisdictions.

Q And here in Dallas County that is true?

A Well, not in this case.

Q Well, we don't know that, we only know what the officers said. He couldn't retrieve them. So isn't that true, he said he couldn't retrieve them?

A Well, I don't know --

Q That's what his testimony was, that he could not

retrieve them; isn't that true?

A I would like to look at the testimony.

Q Okay. And is it true that these recordings are routinely erased after 30 days?

A I can't speak to that.

Q Well, let me show you -- you have no recollection of that at all?

A You asked me is it true that recordings are destroyed after 30 days. I can't --

Q I said that they are routinely destroyed after 30 days?

A In which jurisdiction are we talking about?

Q We are talking about here in Dallas County?

A Well, that includes about 30 cities.

Q We are talking about in the Ruiz's case; is that true?

A I think Mr. Ruiz's communications were destroyed the day that they were made. I don't think that there is any 30 days B.S. in regard to this.

Q Let me have you take a look, that is the motion that you had just identified previously. In the Motion to Dismiss or Preclude Imposition of Death Penalty for Failure to Preserve Evidence, you identified this as your signature on here; is that correct?

A Yes.

Q And in there on paragraph two that you just read, you said that at a hearing on May 16th, 2008, it was learned that there had been no request made by law enforcement to preserve recordings that are, quote, routinely erased after 30 days, those are your words.

A And that's what -- those aren't my words, those are the words of the police that came down here and testified.

Q This is what you wrote in your pleading, that they are routinely erased after 30 days. So if the recording was made May 23rd of 2007, 30 days after that, they would have been erased in Mr. Ruiz's case; is that true?

A I will repeat what I just got through saying, I think they were erased the day that this happened.

Q But you don't know that for a fact?

A There is somebody somewhere that knows what happened. But I don't think anybody knows what happened.

Q Well, what we have that we know that happened what was testified at the evidentiary hearing, and you just read page 51 that said the recordings were erased after 30 days. So the original source material, that original server that had captured the audio transmissions among the law enforcement officers was erased after 30 days; is that true?

A That's not the answer that I gave previously.

Q Okay.

A And that is not reflected in the record.

Q All right. Could you tell me, Mr. Brauchle, what the date of the offense is?

A I think it was some time in March.

Q March 23rd, 2007, does that sound right?

A That's the date, it sounds right.

Q Okay. And so 30 days after that would be April 22nd, 2007?

A I guess.

Q You guess. Let me show you a calendar.

A Look, if you say it's 30 days, it's 30 days. I don't need to see a calendar.

Q You would agree with me it would be April 22nd would be 30 days?

A If that's significant, yes.

Q Okay. And do you recall when the first written Motion for Discovery, Production, Inspection of Evidence Number One was made by you?

A No.

Q Okay. You have no independent recollection of the date?

A You got to be kidding.

Q Okay. Let me show you -- could you take a look at this, please.

A It's volume one of two.

Q Of the clerk's record of Mr. Ruiz's trial; is that correct?

A Of the what?

Q Of the clerk's record in Mr. Ruiz's trial?

A That's what it says on it.

Q Okay. And that's what it says?

A Uh-huh.

Q Okay. You agree do that. And here we have got a motion that says it is number one. So this is the first written Motion of Discovery, Production and Inspection of Evidence that was filed by you; is that correct? It is listed number one.

A I don't know that the number one denotes any particular sequence. I think the day that they are file stamped, put in the court's record would be most important.

Q But you labeled it as number one as your first motion. The pleadings speak for itself.

A My secretary labeled it number one.

Q But you signed it, didn't you? Let's take a look. On page, ah, on page 71 of the clerk's record, that's your signature, isn't it?

A Yeah.

Q Okay. And that's dated December 6th of 2007; is that correct?

A Yeah.

Q Okay. So we have the first written motion filed December 6th, 2007, that was signed by you, requesting the production of documents in evidence?

A That doesn't mean that that is the first request for discovery.

Q Could you tell me, did -- did you make any requests to preserve that original audio of the State in the first 30 days?

A I don't believe.

Q Okay. So did you instruct your investigator to go down and get ahold of the original source of those audios on the server in the first 30 days from March 23rd to April 22nd of 2007?

A Well, as I told you, I don't think there was any originals left.

Q It doesn't matter. What I am asking you, did you make a request to preserve or obtain the original source of those audio recordings in the first 30 days?

A Not that I know of.

Q So you didn't ask the Judge to enter a court order asking law enforcement to preserve that data; is that correct?

A If there is none in the file, I did not.

Q Okay. And let me -- just to be sure, let me show you a copy of your billing records. This is what you

submitted for payment. You would agree that you were -- you were appointed on March 29, '07 to represent Mr. Ruiz, so that was six days after the offense?

A Actually I was appointed before then.

Q Well, if the --

A Cause I went to see Mr. Ruiz while he was still in the hospital.

Q But if the record indicates that you were appointed 3/29/07, would that be good enough for you?

A Yeah.

Q Okay. And do you see anywhere in the first 30 days, this is a listing of the time and tasks that you did and submitted for payment to the auditors office. And it begins on March 29, of 2007 and it continues all the way into -- it ends July 7 of 2008; would you agree to that, that's what you submitted to the auditors office?

A And your question is?

Q Is this what you submitted to the auditors office for payment?

A I have never seen this before, so I don't know what it is.

Q Well, this is certified by the auditors office, it is a business record affidavit?

A Okay. The question is what now?

Q During the first 30 days, just to confirm, there

is nothing in there where a request was made to preserve or obtain the original source of the audio recording; is that true?

A No, I think that --

Q Do you see anything in there that is written where you are requesting the preservation or access to the original source material of those audio recordings at city hall?

A No, there is conferences on March 29th and April 24th.

Q Well, what conferences are they, do you have any independent recollection?

A Yes, it's appointment conference, Judge, D.A. and coordinator, I would have asked the D.A. for discovery at that point. And then on April 24th, it says conference with D.A. and grand jury subpoena, that would have been conferences, discussion on that date.

Q Could you tell me, did you get a court order from the Judge?

A In regard to what?

Q Obtaining or preserving the original access to the city hall server material?

A Well, I have answered both parts of that.

Q The answer is, no. I think you want --

A You want my answer or your answer.

MS. SHIN: Objection asked and answered.

THE COURT: Overruled.

Q. (By Ms. Brandt) The answer is already, no?

A No, I didn't answer, no.

Q Let me show you the billing records for Rex Reynolds, you said he was your investigator?

A Uh-huh.

Q Do you see anything in there between, from the first 30 days which is March 23rd to April 22nd, where he tried to obtain access of the original source of those audio at city hall. And I am looking at Exhibit 1-B, Mr. Brauchle's billing records that we were just looking at is State's Exhibit 1-A -- Defendant's Exhibit 1-A. Do you see anything in there where Mr. Reynolds was going down with a subpoena or court order?

A You would have to ask Mr. Reynolds about that.

Q Okay. but you signed his pay sheets here, like you did with Mr. Vela?

A And I will answer it the same way. When they present a pay sheet I sign it. I am not the auditor.

Q Okay, but do you instruct the investigator, give them direction on what to do?

A I have already answered that, yes.

Q Okay. Mr. Brauchle, do you go to the continuing legal education seminars for capital defense lawyers?

A Yes.

Q And are you aware of the Texas Capital Guidelines?

A Yes.

Q And do you know what guideline 11.1 concerning trial investigations says?

A Why don't you show it to me.

Q I'm sorry, I didn't hear you?

A Why don't you show it to me, since you seem to know what it is.

Q Let me give you a copy of that.

MS. BRANDT: Judge, do you want a copy?

Q. (By Ms. Brandt) First of all, could you take a look at what the date of adoption of these are at the bottom?

A Uh-huh.

Q That says they were adopted April 21 of 2006; is that correct?

A It would appear so.

Q So those would have been the operatives, guidelines as of the date of the trial of Mr. Ruiz; is that true?

A Of the trial, yeah.

Q Okay. And they would have governed the standard of care that was applicable to you; is that true?

A After April 21st, yes.

Q Okay. So this trial was held in 2008, so it was applicable -- it was the applicable standard of care to your representation of Mr. Ruiz at his trial in 2008?

A In what regard?

Q In regard to what these guidelines set out?

A What's your question?

Q Okay. Take a look with me on guideline 11.1?

A Uh-huh.

Q Are you there?

A Yeah.

Q And if you would look at A-2-B, and let me read this into the record.

It says informal discovery request before a document if possible should be immediately made to law enforcement and the District Attorney for witness statement, police reports, physical evidence, names of codefendants, and so on and so forth.

The audio would have been physical evidence, wouldn't it?

A Yes.

Q Okay. And you have already told us that you did not make any of those requests in the first 30 days?

A No, I told you that I met with the D.A. on at least two different occasions.

Q You told me that met with the D.A. But you didn't

tell me that you in fact came out with a court order or that you even made an actual request; is that true?

A No, I told you that I made request for discovery on those two occasions.

Q But we don't know what that discovery was?

A I do.

Q Okay. But there is nothing in the record here that shows specifically what that discovery is?

A How would there ever be a record of me meeting him in his office.

Q Ah, let me ask you a question, when -- is the District Attorney required to turn over everything to you that isn't work product, you just have to sit there and wait or do you have to do something?

A What do you mean by their work product?

Q Well, if you want physical evidence, do they just turn it over to you or is there something that you have to do in order to trigger them turning it over?

A Once it is brought from the investigating agency, they turn it over to us --

Q Okay.

A -- when they get it.

Q And the State of Texas, or the prosecutors would have access to that city server; is that true?

A Can't speak to the D.A.'s office.

Q That wasn't their work product is my point, that city server wasn't their work product, it wasn't protected by their work product privilege?
A I don't understand the question. Work product --
Q Were you able to get access to that city server, had you asked for it?
A I am certain that I would not have.
Q Would you have needed a court order to get access to it?
A I wouldn't have got access even with that.
Q Would you have subpoenaed it?
A I think we are talking about a rather large computer.
Q But we are talking about access to the server on which the audio was captured?
A And I think if you read the testimony at the trial, it says that it wasn't captured.
Q Well, he said he couldn't retrieve it, that's a different testimony?
A I think being able to --
Q Let me ask you.
A Let me answer the question.
Q Mr. Brauchle, I am asking the question.
A Not very well. And I am not --
Q Could we declare him a hostile witness?

A Please do, I think I have already shown that.

THE COURT: The Court will declare Mr. Brauchle a hostile witness.

Q. (By Ms. Brandt) Would you please just answer the question that I have asked. My question to you is, did the State of Texas do anything to prevent you access from that original source material?

A Did the State?

Q Yes. Did the D.A. do anything to deny you access to that material?

A They didn't know where the material was any more than I did.

Q So the answer to the question is, no, they did nothing to prevent you from having access to that material during the first 30 days?

A Well, once again --

Q The question is, "yes" or "no"?

A No, it is not "yes" or "no". The evidence didn't exist so they couldn't keep me from it.

Q Well, what he testified to is, he couldn't retrieve it?

A And if you can't retrieve it, it is not there.

Q . Well, that's why you hire an independent expert to make that determination, isn't it. Isn't it? That's the point, we don't take law enforcement word for it?

A And I don't.

Q Okay. So that's the reason why you would have needed access to the original source material, because you would not want to have wanted to take law enforcement word for it?

A You are assuming facts not in evidence.

MS. BRANDT: Your Honor, I have no further questions at this time.

THE COURT: Let's take a ten-minute break.

(Recess taken.)

(Defendant present in the courtroom.)

MS. BRANDT: Your Honor, I have one question that I had omitted. It was on my list and I didn't get to it. Could I just ask the witness and pass it over to the D.A.

THE COURT: You may.

Q. (By Ms. Brandt) Mr. Brauchle, my only question, there was no way to find out what the words were by getting a lip reader to find out everything that Officer Nix was saying, or do you recall?

A Well, the people that -- the officers that were inside their cars, their faces weren't visible. And quite possibly a lip reader may or may not have been able to determine what Officer Nix was saying, I really don't know, because the closes camera or the camera that showed Officer

Nix was quite a distance from him.

Q Okay. Thank you. You answered my question.

MS. SHIN: The State has no question.

THE COURT: You may step down, sir.

MS. BRANDT: Your Honor, he is excused from this end.

THE COURT: You are free to leave or remain in the courtroom if you wish.

THE WITNESS: I will be back.

MS. BRANDT: We would like to call Rex Reynolds, please.

(Witness entered the courtroom.)

THE COURT: You may proceed.

**EXCEL REX REYNOLDS**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Could you please state your name for the record?

A Excel Rex Reynolds.

Q Mr. Reynolds, could you tell me what you do for a living?

A I'm a private investigator.

Q And how long have you been doing that?

A Since 1996.

Q And were you the private investigator in the case of the State of Texas versus Wesley Ruiz?

A Yes.

Q And did you take your directions from Paul Brauchle?

A Beg your pardon?

Q Were you directed to do the investigation by Mr. Paul Brauchle?

A Yes, ma'am.

Q Do you recall the dispute over the erased original source of the audio, there was that dispute. This was a hearing and there were motions; do you recall that dispute?

A Would you repeat your question, please.

Q Yeah. There were audio recordings about the communications between and among different law enforcement up to the time of the encounter between Officer Nix and Mr. Ruiz?

A Yes, ma'am, I was somewhat involved in that, yes.

Q Could you tell me what your involvement was?

A I had gone soon after Mr. Brauchle brought me into the case.

Q When did he bring you into the case?

A April 10th of 2008.

Q Could it be perhaps April 4th of 2008 -- go ahead.

A I thought it was April 10th.

Q Of 2008?

A Yes, ma'am.

Q And what did you do in April 10th, 2008?

A I went to, what is his name, Karo Johnson's office and picked up what I call discovery material and started reading.

Q Okay. And was that for the hearing on May -- in May of 2008 on the problem with the missing audiotapes?

A That wasn't my reason for reading, no, it wasn't. I was reading to basically familiarize myself with the case. And then the issue came up about the missing audio portions of the videotapes.

Q And what was the first date that was, please?

A What was the what?

Q What was the first date that that happened?

A That was mentioned?

Q Yeah.

A It would have been some time shortly after that, exact date, I can't tell you.

Q But it wasn't until April of 2008 that this issue of the missing audio, the original source material came up?

A To my knowledge, yes.

Q Okay. Do you recall when you were first appointed by the Judge or first appointed to the case as the investigator?

A Don't remember.

MS. BRANDT: Your Honor, may I approach?

THE COURT: You may.

Q. (By Ms. Brandt) Let me show you your billing records. And this is Exhibit 1-B for the record, this has the business record affidavit to it. Does that look like your signature in what you submit, I will give you a few minutes to take a look at it?

A My signature is not on here but this is me.

Q Okay. And is this your printout of the services that you performed?

A Yes, ma'am.

Q For the investigation in Mr. Ruiz's case?

A Yes, ma'am.

Q And what is the first date that is listed?

A 4/4/07.

Q So as far as you recall the first time you came in was April 4th of 2007?

A I see how this happened, because I looked back through my records and I missed the first portion.

Q Okay.

A So it would have been 4/4/07.

Q Okay. But with respect to the first 30 days that you listed here, you don't see any work that you did as far as trying to preserve or obtain the original source material

for those original audio recordings?

A Can you give me just a moment.

Q Sure, I would be happy to.

A It may have been this 3/12/08 I see that I contacted Sergeant Rick Guzman at DPD.

Q And was that done under the direction of Mr. Brauchle?

A I beg your pardon?

Q And was that done at the direction Mr. Brauchle?

A It would have been done at his direction.

Q And that would have been the first time that you would have been directed to do the inquiry into the missing audio portions?

A Yes, ma'am.

Q And nothing in the first 30 days on this record that you provided to the auditor to collect your bill, there was nothing in there where you did any type of investigation or work on the missing audio?

A No, ma'am.

MS. BRANDT: Thank you, I have no further questions.

THE COURT: Any questions from the State.

MS. DEAN: Your Honor, the State has no questions.

THE COURT: You may step down, sir.

MS. BRANDT: I would like to call Karo Johnson.

THE COURT: Any objections to Mr. Reynolds being released?

MS. BRANDT: I have no objections.

MS. DEAN: None.

THE COURT: You are free to leave, sir.

(Witness entered the courtroom.)

THE COURT: You may proceed.

**WILLIAM E. "KARO" JOHNSON**

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

**DIRECT EXAMINATION**

**BY MS. BRANDT:**

Q Could you please state your name for the record.

A My name is William E. Karo Johnson.

Q Mr. Johnson, do you recognize the person who is seated to my left, your right?

A I do.

Q And how do you know him?

A I represented him in his capital murder trial.

Q Okay. And do you recall --

A I assume you are talking about Wesley Ruiz?

Q Yes.

A Okay.

Q And do you recall the date that you were appointed to come into the case?

A No.

MS. BRANDT: Your Honor may I approach?

THE COURT: You may.

Q. (By Ms. Brandt) Let me show you what has been admitted into evidence as Exhibit 1-D.

A Okay.

Q And can you, based on those records, could you tell me when you were first appointed to represent Mr. Ruiz?

A June 7th 2008.

Q Well, was it 2008 or 2007, if you take a look at the sheets following?

A 2007.

Q So that was a typographical error?

A It was.

Q Were you present in the courtroom during the guilt/innocence phase?

A Yes, I was.

Q And were you present in the courtroom during the punishment phase?

A Yes, ma'am.

Q And do you recall the presence of law enforcement in the courtroom?

A Can you be a little more specific about that.

Q Well, do you know what law enforcement is?

A I'm sorry?

Q Law enforcement, Dallas Police Officers, were they present in the courtroom?

A During what period?

Q The guilt/innocence phase?

A Well, they were in here testifying.

Q Okay. Did you see law enforcement officers in the courtroom as spectators, not as security?

A Yes.

Q Okay. And where did you see them?

A When?

Q Where, where in the location in the --

A Well, there were law enforcement individuals that weren't spectators, that were the bailiffs assigned to the. There were also --

Q How many bailiffs were there?

A It varied. Most of the time there were anywhere from three to five in the courtroom at any one time.

Q And were they identified by uniform?

A Some of them.

Q Okay. And what other law enforcement was in the courtroom during the guilt/innocence phase besides the bailiff?

A Well, there were the witnesses.

Q And besides the witnesses, were there law enforcement that were spectators?

A Occasionally.

Q I'm sorry?

A Occasionally.

Q And on any given day, during the guilt/innocence phase, what was the total number of law enforcement that was present that wasn't a bailiff participating in the trial or an officer there for security purposes?

A I don't know.

Q Would you say more than five?

A Depends on the day, I mean, it varied. There were different amounts of people in here, different days, this trial went on for weeks.

Q What is the fewest number of spectators for law enforcement?

A I have no idea. That was not something I was concentrating on. We made a record about the fact we thought it should be limited. But we were kind of concentrating on things, our concentration was else where.

Q And what about punishment phase, do you recall how many?

A Specific numbers, no. But, yes, there were -- and truthfully there were a lot more in here during final argument on each phase of the trial than there were during the testimony.

Q And when they were here, what was their purpose

for being here for final argument?

A You would have to ask them.

Q What do you think, what do you perceive their purpose for being here, were they trying to send a message to the jury?

A I have no idea. I am not going to speculate on that.

Q Okay. It thank you.

If there is physical evidence that needs to be obtained, how does the Defense go about getting that, what is the procedure?

A You talking about physical evidence in the --

Q In this particular case?

A Are you talking about physical evidence that is in the care, custody, control of the State?

Q Physical evidence that is in the care, custody, control say for example law enforcement, how would you go about getting that?

A Generally we know what it is, and we have the opportunity to inspect it. You are going to have to give me something more specific what you are talking about, that is too general of a question.

Q There was an issue with respect to missing audiotape; is that correct?

A Correct.

Q And normally how would you go about getting access to the original source of the audio recordings? Can you just walk into the department or do you have to go to the D.A. and go through them to get it, or what is the procedure?

A You talking about specifically in this case?

Q Specifically in this case.

A Well, generally if -- my recollection is this, we requested the audiotapes that they had and we got it.

Q When did you request it?

A I don't know specific dates.

Q Okay, 2008?

A Again, I don't know specific dates. But --

Q Did you request it in writing?

A I believe we did.

Q Okay.

A And we were provided what they had. Obviously, you are aware that, I am assuming you have read the transcript, we had some hearings on the fact that we thought there should have been more available to us. That we were told that it was not available, that it was erased.

Q Okay.

A Okay.

Q And what -- if anything had been done to preserve that original source?

A I don't understand your question.

Q Had any member of the defense team gone to the Judge announced for an order to have access to that information at the inception of the case?

A Well, I didn't get on the case at the very beginning.

Q So the answer is you really don't know?

A I have already said that. But I can try to complete my answer, if you like.

Q Okay, go ahead.

A I believe that there were -- we actually made an issue of the fact that we did not get recordings that should have been preserved.

Q And that was in 2008 when y'all had the hearing?

A Yes.

Q Okay. Did -- who was responsible for the jury instructions?

A The Court.

Q No. Among the defense team when they look over the jury instructions before they are submitted to the jury, usually the defense attorneys go over them and make objections or request additional instructions, was any individual on the team a point person for dealing with the jury instructions?

A We all looked at it, we all had suggestions, we

all talked about it.

Q And y'all were aware that the audiotape portions were missing?

A Some of it.

Q And that disadvantaged the Defense?

A Well, I don't know what was on there, so I couldn't say it was a disadvantage or advantage to us.

Q But if it was something that could have been helpful, that's the reason why you needed to find out and do the due diligence, that's the reason why you had the hearing?

A Sure.

Q Did anybody request exfoliation?

MS. SHIN: Objection, Your Honor, that goes outside the scope of the hearing.

MS. BRANDT: No, this is not outside the scope of the hearing, it goes directly back to the audiotape.

MS. SHIN: That was raised in the subsequent application and you never objected to that.

MS. BRANDT: And the Judge ruled that the supplement that I made in the state habeas petition with respect to exfoliation argument was part of the original state habeas.

MS. SHIN: Regardless that issue was not designated for issues of this hearing.

MS. BRANDT: If it is part of the ineffective assistance counsel claim, it goes back to the to the audio tapes.

MS. SHIN: Judge, would you like to see a copy of the O.D.I.?

THE COURT: Yes.

MS. BRANDT: I didn't sign the O.D.I.

MS. SHIN: The Judge did.

MS. BRANDT: I never had any input on that O.D.I.

MS. SHIN: You were served with it.

THE COURT: The Court sustains the objection.

MS. BRANDT: I'm sorry?

THE COURT: Sustains the objection.

MS. BRANDT: I have no further questions of this witness?

MS. SHIN: I don't have any questions, either.

MS. BRANDT: You are dismissed.

THE WITNESS: Thank you, Your Honor. Am I excused?

THE COURT: You are.

MS. BRANDT: We call Doug Parks, please.

(Witness entered the courtroom.)

THE COURT: And you may proceed.

DOUGLAS PARKS

was called as a witness, and having been duly sworn by the Court, testified under oath as follows:

DIRECT EXAMINATION

BY MS. BRANDT:

Q Good afternoon. Could you state your name for the record, please.

A Douglas Parks.

Q And do you know the gentleman who is sitting to my left, your right?

A I do.

Q And who is he, please?

A Wesley Ruiz.

Q And how do you know Mr. Ruiz?

A I represented Mr. Ruiz on his direct appeal.

Q Were you involved at all in the trial proceedings?

A To some extent.

Q And can you tell me what the extent of your involvement was?

A Not specifically, I sat in on the trial, I consulted with the trial attorneys. And if I recall correctly, I might have even cross examined a witness or two. I really don't remember for sure about that. I think I had some minor participation in the trial itself above just advising trial counsel.

Q And do you recall the date on which you were first -- came into the case, you were first appointed?

A No.

MS. BRANDT: Your Honor may I approach?

THE COURT: You may.

Q. (By Ms. Brandt) Mr. Parks, let me show you a copy of your billing records. These have already been admitted into evidence by mutual agreement by both parties. And this is Exhibit 1-E. And let me see if this helps to refresh your recollection as to when you came into the case?

A Well, normally the front page of that says appointment date, but I didn't have that on there.

Q How about if you take a look at the time and task you submitted, would that be close enough?

A It appears May 27, '08 would have been the first -- no, that is not right either -- well, maybe it is right, May 27, '08. Uh-huh, I guess that's right.

Q May 27, '08?

A Appears so.

Q We have a stipulation what appears in the record. So that purports to what your recollection is?

A Yes, that would normally be. Typically on an appeal appointment, I wouldn't have come into the case necessarily until after the case was completely over. But I know that I came in essentially when testimony began.

Q The testimony in punishment?

A Is my recollection.

Q In punishment or guilt/innocence?

A No, in guilt/innocence.

Q Guilt/innocence. Do you recall when the offense was?

A Not off the top of my head.

Q How about March 23rd, 2007, would that --

A Sounds about right.

Q And that again is also part of the stipulation of facts as to what the record shows, which is Exhibit 2, that has been admitted. Tell me a little bit about your background as a criminal defense lawyer, how long have you been doing criminal defense?

A Actively since 1972. I have been board certified in criminal law since 1977 or '78, I can't recall. And I have devoted my practice completely to criminal defense law for the past probably 15 to 20 years.

Q And do you do a substantial amount of capital defense work?

A That is about chiefly what I do.

Q And about how many capital defense cases you have been in?

A Where the State sought death or capital murder cases?

Q Where the State sought death?

A On a trial basis only, somewhere between 15 and 20, and I haven't counted recently.

Q And how about for appeal?

A Roughly ten, I guess, on direct appeal.

Q And how about capital cases that are cap cases but weren't seeking death?

A Probably 50 to 75.

Q Let's talk a little bit about your background, are you on any particular committee with respect to death-penalty cases?

A I'm the defense lawyer appointed to the capital -- and I ought to be embarrass that I don't know the official name of it, it is the committee that is constituted in each administrative district for the approval of capital counsel and I am the defense lawyer in this district and have been since the formation of that committee.

Q And about when was that?

A Ten years ago.

Q Okay. So we are looking --

A I know Pat McDowell was the Administrative Judge at the time.

Q So this goes back to the year 2000 or so?

A Approximately.

Q And so whoever gets on to the appointment list,

they have to come by your committee before they can be approved to be on that appointment?

A That's right. We approve everybody from here north to Oklahoma and Louisiana and down south a ways. I think there are five districts in the State of Texas. That committee is myself, Judge Ovard, Kerry Young, and I think Judge Tinsley at present, the sitting Dallas judge rotates a little bit, but I think Judge Tinsley is still on the committee.

Q And have you been recognized by the capital education group and invited to speak at seminars?

A I have been on faculty for several seminars out at the Center for Irving and International Law Camp in Plano. I have spoken on chiefly capital jury selection. Most recently about two weeks ago I helped present a program on the trial of older cases that have come back for either resentencing or new trials, since I have done a few of those.

Q So you are well recognized in the capital defense community?

A I think so.

Q Okay. Are you familiar with the guidelines and standards for Texas Capital Counsel?

A I have read them, I think I understand them pretty well. I probably couldn't quote from them.

Q Okay. And are you familiar with the guidelines and standards for Texas Capital Counsel that specifically was adopted by the state bar, April 21 of 2006?

A And again, Ms. Brandt, I have read them, but I couldn't quote from them.

Q These are the standard of care that would have governed in the -- for the defense lawyers in Mr. Ruiz's case; isn't that true?

A I think that's true.

Q Okay. And so defense counsel is being told in these guidelines what it is they should or shouldn't be doing; is that correct?

A Certainly those are very strong suggestions.

Q Yeah. And so they become a measure of whether or not someone has either performed effectively or performed efficiently?

A Well, again, they are not statutory. It is not law, as far as I understand, I may be wrong about that. It is just guidelines of the state bar or the ABA and the mitigation standards suggests for capital cases. And I know that courts in dealing with ineffective assistance of counsel issues look to those guidelines as an aid in determining whether or not a person is acting effectively.

Q And in fact one of those courts that have looked at these guidelines in making these kinds of determinations

as to the standard of care that defense counsel is supposed to use is the United States Supreme Court; isn't that true?

A Yes.

Q And they specifically used it in the Wiggins case, among others, that is not the only one?

A Yeah.

Q Let me ask you a question just generally, because you have done this work for such a long time, when there is physical evidence in a case, generally how does Defense Counsel go about getting ahold of that physical evidence? Let's just say it is in the hands of law enforcement, do you as the criminal defense lawyer have to go to the prosecutors and ask them for permission and get it through them?

A Well, you can do it in different ways. Usually at least in Dallas County and in the counties in East Texas where I practice, it is done on an informal basis, essentially, ask the prosecutor whether, you know when would be a convenient time to view all of the evidence. If it is evidence that is not going to be handed over to you, if it is evidence that is going to be admitted in the trial, then that's going to be kept in a central location and you are allowed to view it, photograph it, test it, if it is stuff that needs to be tested. And that generally is done informally. If you can't reach an agreement with the prosecutor or if you have a dispute about some particular

piece of evidence, you go to the Court, file a motion and ask the Court to order that you be allowed to have possession of it, use it, photograph it, or do whatever it is that you want to do.

Q And are you aware when the guidelines talk about when -- when do you first go out and start trying to obtain or preserve that evidence?

A Well, generally you try to do that at the earliest opportunity that you have.

Q So that would be at the inception of your appointment?

A Well, that would certainly be a good standard to use. It is not always practically something that can be done.

Q All right. Let me ask you a question, is it standard knowledge here in Dallas County among both the defense, criminal defense bar and the prosecutors, that the communications between and among different law enforcements are recorded?

A Let me make sure I understand what you are asking, communications between law enforcement.

Q Yes. For example in Mr. Ruiz's case specifically, there was a chase going on and the officers were communicating with each other. They were communicating with the dispatchers, all of that information would have been

recorded on various channels and put on to the city server; is that correct?

A In best of all worlds, yes, that's correct.

Q And that is pretty common knowledge that those communications are recorded?

A Well --

Q Certainly --

A Knowledge might not be the word I use, I would use there. I think it is fairly commonly supposed that that is true.

Q Okay. So that would put a defense lawyer on notice that he would need to go look for that kind of physical evidence at the inception of the case?

A I know what you are getting at, Ms. Brandt, I have read the petition. It would certainly put an attorney on notice that that sort of evidence may well exist and might well be important and useful in the case.

Q Okay. And if it is important in the case, it is true that an attorney would take steps to, at a minimum, obtain or preserve that information?

A Not necessarily.

Q Let me show you the guidelines, you said you haven't --

A I haven't read them in a while. I don't doubt that it is said that that is something you ought to do.

Q I'm sorry, I didn't catch the last part.
A I said I don't doubt it said that that is something that counsel ought to do.
Q Okay. Let's take a look at these guidelines. And specifically I would like to direct you to guideline 11.1, trial investigation?
A I'm sorry, which one?
Q 11.1.
A Oh, yeah, I got it. I just didn't hear you.
Q And if you take a look at guideline 1.1-A 2-A and B?
A Two A and B?
Q Two B. So it is guideline 11.1-A then we go down to 2 and then we drop down to B. And just so we can put on the record that we are in agreement as to what it is that we are looking at, it says here that informal discovery request, and this includes physical evidence --
A Uh-huh.
Q -- should be immediately made to law enforcement and the District Attorney; would you agree that that's what that says?
A Yeah, that's what it says.
Q And what is immediately?
A I guess it is immediately. I mean you need to know who to talk to.

Q Let's take a look at Webster's dictionary, it defines the term immediately --

A Ms. Brandt, I understand what the word immediately mean. It means do it as quickly as possible.

Q Well, without delay, at once, or instantly; would you agree with that?

A Fine.

Q Okay. And when the -- the evidence is in the hands of law enforcement, that evidence is accessible to prosecution where they could go to law enforcement to obtain access to that evidence; isn't that true?

A True.

Q And the Defense could also obtain access to that evidence; isn't that true?

A Not as easily as the State could.

Q But they could --

A They could.

Q They can if they take steps.

A Or at least keep it preserved if they can't get their hands on it.

Q Okay. And so under this guideline when there is access to evidence by the Defense, the standard of care is saying that, quote, informal discovery requests, before indictment, if possible, should be immediately made to law enforcement?

A That's what it says.

Q Okay. Do you know the date of the offense in this case?

A No. You told it to me a while ago, but I don't remember.

Q March 23rd, 2007?

A Okay.

Q And do you know when Mr. Brauchle was appointed?

A I have no idea.

Q Let me show you this for the record, please. You do appellate work from what you said, can you tell me what this thing is that you are looking at?

A Looks like the clerk's record to me.

Q And what does the clerk's record contain?

A All of the written documents in the case, motions, indictments, stuff like that.

Q And this is the clerk's record volume one for Mr. Ruiz in particular?

A Yes.

Q And let me show you in particular what page is that?

A That's the docket sheet.

Q And what page is it for the record purposes?

A It has been marked on, looks like it might be '08.

Q And does that look like Mr. Brauchle was appointed

on March 27 of '07?

A Looks like 29.

Q I'm sorry, March 29 of 2007?

A Yes.

Q So he was in the case six days after the offense occurred?

A Appears so.

Q Okay. Is it common knowledge that audio recordings are routinely destroyed after 30 days?

A I don't think so.

Q Let me show you a motion that was filed in this particular case. If you could identify what that motion is, please.

A Motion to Dismiss or Preclude Imposition of Death Penalty for Failure to Preserve Evidence.

Q And can you tell me who signed that motion?

A Looks like Paul Brauchle and Karo Johnson.

Q And if you look on paragraph two, this is a writing that Mr. Brauchle did, and if you look down here on the one, two, three four, the fifth line of Roman Numeral Two, what does that say?

A Said recordings are routinely erased after 30 days.

Q So it appears from that document that he knew that recordings were routinely erased after 30 days?

A I would assume so.

Q And to the best of your knowledge, and I know you came in later in the case, do you know whether or not Mr. Brauchle made any request to either obtain or preserve the audio recordings in the first 30 days?

A I don't know.

Q Okay. Let me again approach you.

MS. BRANDT: If I may, Your Honor?

THE COURT: You may.

Q. (By Ms. Brandt) Again, this is the clerk's record that we were just looking at. And could you read this for us, what it says at the top?

A Motion for Discovery and Inspection of Evidence Number One.

Q So it is number one. And this is a request for discovery, like audio for example, because that would be physical evidence, and it does say number one. Could you tell me if you looked through this, this begins on what page?

A Sixty-two.

Q And at the end, could you flip to the end of this document, please.

A (Witness complies.)

Q And who has signed this document?

A Brauchle and Karo Johnson.

Q And what is the date of the document?

A Well, date of service says -- certificate of service says it was served on December 7th, 2007.

Q That was eight months after the offense date, which was March 23rd of 2007; is that correct?

A Yes.

Q That would not be immediately, would you agree with that?

A That's right.

Q And so that would not concord with the guidelines set out in 11.1?

A That's right.

Q Let me ask you another question, you are an experienced appellate attorney?

A I do appellate work, yes.

Q And so you know how important it is to preserve the record?

A Yes.

Q Tell me when someone makes an objection, what are the steps that are required to preserve error, what does a defense attorney have to do?

A Keep asking for relieve until you are denied.

Q Okay. But how do they go about doing that?

A Particularly making an objection, if the Court sustains your objection, you ask that the jury be instructed

to disregard whatever it was that was offensive; and if the Judge grants that and instructs the jury, then you ask for a mistrial.

Q Okay. When you talk about objection, they stand up and they say, I object, is that sufficient?

A No. Generally speaking, no. Not unless it is absolutely a perfectly obvious what the objection would be.

Q And so what more is necessary besides saying, I object?

A The objection must be specifically enough identified that the Court can know what it is that you are really objecting about.

Q Okay. So we need to put the Court on notice?

A Sure.

Q And that gives the trial judge an opportunity to correct --

A Make a ruling.

Q -- to make a ruling. If for example we have an objection that just says, Objection, Your Honor, we object to the increased deputies in the courtroom, what is the problem with that objection for if appellate court is looking at it, what more did the trial lawyer need to do?

A Well, it would be preferable as a lawyer to state specifically what the objection was and federalize it by stating what constitutional amendment prohibited whatever

that was if it did or what statute or rule prohibited the activity that they were objecting about in a perfect world.

Q What is the reason for stating a federal constitutional law basis for that objection?

A Something that can be raised in federal court in a federal writ and not defaulted in state court.

Q Okay. And so essentially a trial counsel didn't say, Your Honor, I object based on whatever the federal constitutional grounds is, essentially that error is going to be waived forever and ever?

A In federal court.

Q And the federal court will never get to the merits or review that claim?

A That's right.

Q Even if it is a perfectly, legitimate meritorious claim?

A That's right.

Q Even if it was a claim that had it been preserved, he could have gotten relief and maybe the death penalty would have been reversed?

A That's right.

Q This also is from guideline for 11.2, can you tell me what this is?

A I can tell you what it says.

THE COURT: Court has a copy.

MS. BRANDT: You do have a copy, thank you.

A Guideline 11.2, duty to assert legal claims.

Q (By Ms. Brandt) And in there, this is again a standard of care that is applicable to defense counsel in capital cases?

A Is this state guidelines?

Q I'm sorry?

A Are these state bar guidelines or ABA.

Q Let me give you the full --

A I'm fine.

Q So you got a complete copy of the entire Texas guideline so you can see what I am looking at. That way I am not springing it on you. This is from the guidelines for standards of Texas Capital Chemical and this is the page that you got?

A I just wanted to know which one it was.

Q Okay. What I am asking you, is this is the standard of care that is applied to Defense Counsel in capital cases; is that correct?

A According to the Texas guidelines.

Q Okay. And the Texas guidelines were adopted April 21 of 2006; is that correct?

A Sounds right.

Q And so this guideline would have been applicable to Mr. Ruiz's case?

A Yes.

Q And if Defense Counsel failed to properly object, then their performance would have been deficient under this guideline?

A I am not -- I am having trouble with the word deficient under the guidelines. It would not have been in accordance with guidelines.

Q These are the same guidelines under this 11.2 to assert legal claim. This is a mirror image of the ABA guidelines.

A Okay.

Q And those are the guidelines approved by the U.S. Supreme Court?

A That's right.

Q And this is the standard for performance that measures counsel's performance in capital cases?

A As a guideline.

Q Okay. You said you were present during the guilt phase?

A Yes.

Q Okay. Do you recall the presence of law enforcement in the courtroom?

A Yes.

Q And I am talking about spectator law enforcement?

A Yes.

Q Not security?

A Yeah.

Q During the course of the guilt/innocence phase, what was the greatest number of spectator law enforcement that you recall?

A I didn't count them.

Q More than five?

A Oh, yeah.

Q More than ten?

A You mean at any time, the maximum number?

Q The maximum at any time?

A I would say more than ten, probably more than 20.

Q Maybe more than 30?

A My recollection is there were a lot more at punishment than at guilt/innocence, so I am not real sure.

Q Let's talk about the timing of when those individuals were in the courtroom. Were there more police present during say for example the closing argument?

A Sure, that's when they mostly all came in for final argument.

Q And what is the point for coming in for final argument, are they sending a message to the jury?

MS. SHIN: Objection to speculation.

Q (By Ms. Brandt) In your opinion, Mr. Parks?

A In my experience and I have tried more capital

murder cases with dead police officers than I would like to say, particularly since my niece just passed her sergeant's exam today. I have a great deal of respect for police officers. But in my experience, they do that to show both solidarity with the family of the deceased and to be a presence for the jury to see and feel.

Q (By Ms. Brandt) So essentially they are trying to influence -- their presence, just the fact of their presence, if they do nothing else, the fact of their presence is something that they are doing to influence the outcome of the case?

A Sure. And that's why our courts have indicated that it is inappropriate.

Q Okay. And in this case based on your observation in guilt/innocence and the number of police officers that were there in closing argument, did it appear that they were there to influence the outcome of the case?

A That would have been my judgment of the matter.

Q Okay. And in fact the jury did come back with a verdict of guilty of capital murder --

A Yes.

Q -- for Mr. Ruiz. Let's talk about the punishment phase now, how many individual, police officers, that were not security at on any one day were present during punishment?

A Ms. Brandt, I don't know.

Q Well, let's go back to where we were before. You said that you thought there were how many in guilt/innocence, about 30?

A No, I don't think there was as many as 30, if I did --

Q More than 20?

A More than 20, more than 20. But I don't think that is true of everyday.

Q But that was the maximum?

A Maybe as many of that when guilt/innocence was argued, that would have been when most of them was here.

Q And that was the most crucial time to have all those people present?

A Sure.

Q You said, if I understood you correctly, you said you thought there was even more police who were present during the punishment phase; isn't that true?

A I believe so.

Q If the number of police officers in the courtroom in the closing arguments were more than 20, less than 30, what is your best estimate as far as the number of police officers at closing argument in the punishment phase, was it more than 30?

A I would say probably more than 30.

Q More than 40?

A I don't think so.

Q So it was more than 30, go ahead?

A I would say probably more than 30, maybe less than 40. That sure seems like a lot.

Q But the courtroom was packed?

A It was pretty full.

Q Yeah. And do you recall any law enforcement who was standing along the wall?

A Not specifically, but there may have been.

Q Okay. And so they could have been standing along this right side wall?

A Seems like I remember there were some standing up, maybe six is or eight.

Q Six or eight along the right wall over here to your right wall?

A That's kind of my recollection.

Q How about was there any standing in the back?

A May have been. Beer in mind, Ms. Brandt, my back is to all of that when I am sitting forward. So I don't know.

Q But it certainly made enough of a clear impression on you that you certainly have the perception that the courtroom was packed with law enforcement?

A Well, we saw them coming in and going out.

Q And again, your -- based on your experience as a very experienced criminal defense lawyer, trying cases where police officers have been murdered, in this particular case, the Ruiz case, the law enforcement was there in closing argument for the punishment phase again to send a message?

A That's part of why they are here, I believe, yes.

Q Okay.

MS. BRANDT: I have no further questions.

**CROSS-EXAMINATION**

**BY MS. SHIN:**

Q Hi, Mr. Parks. My name is Grace Shin. We have met before?

A I know you, Grace, yes.

Q I just have a few questions for you. Would you agree that a defendant in a death-penalty trial requires an enormous amount of work?

A Absolutely. I have one starting Monday, and I am watching the clock tick.

Q And the pretrial phase could take months; is that correct?

A Yes.

Q And the trial could take one to two weeks?

A Yeah.

Q With the respect to the guidelines that Ms. Brandt brought up, a violation of one of those guidelines wouldn't

necessarily lead to a conclusion that counsel was constitutionally ineffective, would it?

A I don't believe so.

Q With respect to the issue of the officers in the courtroom, in your professional opinion, do you think the jury would have assessed a life sentence if there were fewer jurors in the courtroom?

A I am not going to speculate on that, I don't know.

Q That's fair?

MS. SHIN: Those are all my questions.

MS. BRANDT: I have no further questions.

Your Honor, is he excused?

THE COURT: Any objections?

MS. SHIN: No objections from the State.

THE COURT: You are excused.

MS. BRANDT: Judge, are we going to reconvene tomorrow? I think I only have Cliff is all that is left.

THE COURT: We will recess and start at 9:00 a.m. tomorrow.

(Court recessed for the day.)

THE STATE of TEXAS )
COUNTY of DALLAS )

I, BELINDA G. BARAKA, Official Court Reporter in and for the 194th Judicial District Court of Dallas County, State of Texas, do hereby certify that the foregoing contains a true and accurate transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties, to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause(s), all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record was paid by the State.

WITNESS MY OFFICIAL HAND this the 23rd day of October, A.D., 2011.

\s\Belinda G. Baraka
BELINDA G. BARAKA, CSR #5028
Official Court Reporter
133 N. Riverfront Blvd.
Dallas County, Texas 75207

Certification Expires: 12-31-11