# CCA Scanning Cover Sheet



2494668

CaseNumber: WR-78,129-01
EventDate: 08/20/2012
Style 1: Ruiz, WESLEY LYNN
Style 2:
Event code: 11.071 ADD'L VOLUME

EventID: 2494668
Applicant first name: WESLEY LYNN
Applicant last name: Ruiz
Offense: 19.03
Offense code: Capital Murder
Trial court case number: F-07-50318-M(A)
Trial court name: 194th District Court
Trial court number: 320570194
County: Dallas
Trial court ID: 323
Event map code: GENERIC
Event description: Habeas Corpus - Capital Death
Event description code: 11.071
Remarks: SUPPLEMENTAL DEATH PENALTY POST
CONVICTION WRIT OF HABEAS CORPUS

| ☐ Document Scanned | | ☐ Created or ☐ Appended |
|---|---|---|
| Scanned by | date | Image ID |
| Comment | | |

EX PARTE:

WESLEY LYNN RUIZ

CAUSE NO.        W07-50318-M (A)

IN THE 194th JUDICIAL DISTRICT

COURT OF DALLAS COUNTY, TEXAS

---

RECEIVED IN
COURT OF CRIMINAL APPEALS

\* \* \* \* \*   S U P P L E M E N T A L   \* \* \* \* \*

DEATH PENALTY

POST CONVICTION WRIT OF HABEAS CORPUS

Louise Pearson, Clerk

(ART. 11.07, V.A.C.C.P.)

---

ATTORNEY FOR APPLICANT:

Lydia M.V. Brandt
The Brandt Law Firm, P.C.
P.O. Box 850843
Richardson, TX   75085-0843

ATTORNEY FOR STATE:

Honorable Craig Watkins

Frank Crowley Courthouse

Dallas, Texas   75207-4313

GARY FITZSIMMONS
DISTRICT CLERK
Frank Crowley Courthouse
133 N. Riverfront Blvd., LB 12
Dallas, TX   75207-4313

1

EX PARTE:                                CAUSE NO:        W07-50318-M (A)

2
                                         IN THE 194th JUDICIAL DISTRICT

3
WESLEY LYNN RUIZ                         COURT OF DALLAS COUNTY, TEXAS

4
_____

5                          **Death Penalty**

6                          **Supplemental**

7                            **Index**

8

9

10   Application for Post Conviction Writ of Habeas Corpus              Vol.1-01
     Under Tex. Code Crim. Proc. § 11.071 & Motion for
11   Evidentiary Hearing & Exhibits In Support Thereof
     (06 Dec 10)

12   Affidavit of Fact – Sue Ann Ziegenham                             Vol. 1-91

13   Evidentiary Summation of Evidentiary Hearing                      Vol. 1-94
14   (Held September 21 & 22, 2011)

15   Clerk's Certificate                                               Vol. 1-160

16

17

18

19

20

21

22

23

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
194th JUDICIAL DISTRICT, COLLIN COUNTY, TX

---

**TCCA Cause No.  AP-75,968**
194th Judicial District, Cause No. F07-50318-M

---

**Ex Parte WESLEY LYNN RUIZ**, Petitioner

---

*Application*
For Post Conviction Writ of Habeas Corpus
under TEX. CODE CRIM. PROC. § 11.071

&
*Motion for Evidentiary Hearing*

&
*Exhibits*
in Support Thereof

---

**DEATH-PENALTY CASE**



Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas  75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR WESLEY LYNN RUIZ

1

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
194th JUDICIAL DISTRICT, COLLIN COUNTY, TX

---

**TCCA Cause No.  AP-75,968**
194th Judicial District, Cause No. F07-50318-M

---

**Ex Parte WESLEY LYNN RUIZ**, Petitioner

---

*Application*
For Post Conviction Writ of Habeas Corpus
under TEX. CODE CRIM. PROC. § 11.071

&
*Motion for Evidentiary Hearing*

&
*Exhibits*
in Support Thereof

---

**DEATH-PENALTY CASE**

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR WESLEY LYNN RUIZ

2

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

TABLE OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   vii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
   1.   Basis of Confinement  . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
   2.   Overview of Procedural History  . . . . . . . . . . . . . . . . . . .   2
      A.   Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
      B.   Jury Trial . . . . . . . . . . . . . . . . . . . . . . . . . . .   2
      C.   Direct Appeal  . . . . . . . . . . . . . . . . . . . . . . .   3
      D.   State Habeas  . . . . . . . . . . . . . . . . . . . . . . . .   3
   3.   Overview of Statement of Facts  . . . . . . . . . . . . . . . . . .   4
      A.   The Dallas Police Department had written procedures for handling barricaded suspects . . . . . . . . . . . . . . . . . . . . . .   5
      B.   The internal investigation conducted by the Dallas Police Department reflected that Officer Nix violated department procedures  . . . . .   7
      C.   Mr. Ruiz asserted that his single gunshot was fired in self-defense .   8
      D.   In support of his self-defense assertion, Mr. Ruiz proffered testimony from civilians, with whom Officer Nix had come in contact, to show Officer Nix as first aggressor – which the court would not admit  .   8
      E.   There was substantial other evidence, either not preserved, or not proffered, that would have been admissible to prove Mr. Ruiz acted in self-defense.  It also had mitigating significance . . . . . . . . . .   12
           1.   Accurate and reliable testimony concerning ballistics would have further supported that Mr. Ruiz acted in self-defense, and that Mr. Ruiz did not intend to murder Officer Nix . . . . . . . . .   12
           2.   The defense failed to act to preserve the audio recordings, which could have revealed Nix's state of mind and supported self-defense . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
      F.   Other documents, which could have aided the self-defense assertion, as they pertained to the state of mind of Officer Nix were lost, destroyed or otherwise unavailable . . . . . . . . . . . . . . . . . . . . .   21
   GROUND ONE (ACTUAL INNOCENCE, RIGHT TO A FAIR DEFENSE, CRUEL AND UNUSUAL PUNISHMENT – *UN*LAWFUL DISCHARGE OF DUTY BY OFFICER NIX, 6th, 8th and 14th amendment violations).  Mr. Ruiz was denied his federal constitutional rights to a fair defense.  The trial judge denied the admission of evidence which negated that Officer Nix was acting "in the lawful discharge of an official duty" – an essential element for enhancement to capital murder . . . . . . . . . . .   25

A.   Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
B.   Argument and Authorities  . . . . . . . . . . . . . . . . . . . . . .   26
   1.   Standard of Review  . . . . . . . . . . . . . . . . . . . . . .   26
   2.   Mr. Ruiz's right to a fair defense included the right to introduce evidence of Officer Nix as first aggressor  . . . . . . . . . . .   27
   3.   Mr. Ruiz is actually innocent of capital murder. The trial judge's ruling violated his federal due process right to introduce relevant facts and circumstances surrounding the killing, pursuant to TEX. CODE CRIM. PROC. Art. 38.36(a)  . . . . . . . . . . . . . . . .   30
   4.   Mr. Ruiz's conviction and death sentence violated his right to be free from cruel and unusual punishment  . . . . . . . . . . . .   31

GROUND TWO (IAC & ACTUAL INNOCENCE, RIGHT TO A FAIR DEFENSE, CRUEL AND UNUSUAL PUNISHMENT – _UN_LAWFUL DISCHARGE OF DUTY BY OFFICER NIX, 6th, 8th and 14th amendment violations).   Mr. Ruiz was denied his federal constitutional rights to effective assistance of counsel, who failed to specifically object on the basis of 6th, 8th, and 14th amendment violations  . . . . . . . . .   32
A.   Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
B.   Argument and Authorities  . . . . . . . . . . . . . . . . . . . . . .   32
   1.   Standard of Review  . . . . . . . . . . . . . . . . . . . . . .   32
   2.   The performance of trial counsel was constitutionally deficient in failing to specifically object on the basis of 6th, 8th, and 14th amendment grounds to the judge's exclusion of evidence of Officer Nix as first aggressor  . . . . . . . . . . . . . . . . . .   33

GROUND THREE (EXCLUSION OF MITIGATING EVIDENCE – _UN_LAWFUL DISCHARGE OF DUTY BY OFFICER NIX – 8TH AMENDMENT RIGHT VIOLATION): Mr. Ruiz was denied his 8th and 14h amendment rights; the trial judge precluded the admission of mitigating evidence of Officer Nix as first aggressor  . . . . .   35
A.   Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
B.   Argument and Authorities  . . . . . . . . . . . . . . . . . . . . . .   35
   1.   Standard of Review  . . . . . . . . . . . . . . . . . . . . . .   35
   2.   Mr. Ruiz's 8th amendment rights were violated when the court excluded evidence of Officer Nix as first aggressor  . . . . . .   37

GROUND FOUR (IAC & ABSENCE OF PROFFER OF MITIGATING EVIDENCE – _UN_LAWFUL DISCHARGE OF DUTY BY OFFICER NIX – 6TH & 14 AMENDMENT VIOLATIONS). Mr. Ruiz was denied his right to effective assistance of counsel.  During punishment, they failed to proffer mitigating evidence of Officer Nix as first aggressor, which outweighed the aggravating evidence  . . . . . . . . . . .   40
A.   Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
B.   Argument and Authorities  . . . . . . . . . . . . . . . . . . . . . .   40
   1.   Standard of Review  . . . . . . . . . . . . . . . . . . . . . .   40

    2.    Trial counsel failed to proffer mitigating evidence of Officer Nix as first aggressor .................................. 42

GROUND FIVE (TRIAL IN A PREJUDICIAL ATMOSPHERE – 6TH & 14 AMENDMENT VIOLATIONS). Mr. Ruiz was denied his Sixth Amendment right to a fair and impartial trial because of the overwhelming presence of law enforcement in the courtroom during the punishment phase of the trial .......................... 47

    A.    Statement of Facts ................................. 47
    B.    Argument and Authorities ........................... 50
        1.    Standard of Review ........................... 50
        2.    The overwhelming number of law enforcement presented an unacceptable risk of prejudice ..................... 51

GROUND SIX (IAC & TRIAL IN A PREJUDICIAL ATMOSPHERE – 6TH & 14 AMENDMENT VIOLATIONS). Mr. Ruiz was denied his right to effective assistance of counsel, who failed to object to, and make a record of, the overwhelming presence of law enforcement ...................................... 54

    A.    Statement of Facts ................................. 54
    B.    Argument and Authorities ........................... 54
        1.    Standard of Review ........................... 54
        2.    Trial counsel was constitutionally ineffective ........ 55
            a.    Counsel's performance was deficient .......... 55
                (1)    Counsel failed to specifically object ....... 56
                (2)    Counsel failed to make a record .......... 57
            b.    The constitutionally deficient performance of defense counsel raised the reasonable probability that the outcome would have been different ..................... 57
                (1)    Brauchle's deficient performance resulted in a failure to prove actual prejudice .......... 58
                (2)    But for Brauchle's deficient performance, there might have been a cure to the prejudicial atmosphere ...................... 59

GROUND SEVEN (IAC FOR FAILURE TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE OF SELF-DEFENSE – 6TH & 14 AMENDMENT VIOLATIONS). The 6th and 14th amendment rights of Mr. Ruiz to effective assistance of counsel were violated because defense counsel failed to adequately investigate, develop and present evidence of self-defense .................. 61

    A.    Statement of Facts ................................. 61
    B.    Argument and Authorities ........................... 62
        1.    Standard of Review ........................... 62
        2.    Trial counsel was constitutionally ineffective ........ 63

a.  The defense failed to appropriately challenge the aggravating ballistics evidence as improper, inaccurate and misleading . . . . . . . . . . . . . . . . . . . . . . . . . 63

b.  The defense failed to take the necessary steps at the inception of their appointment to preserve the audio-recordings of the encounter between Officer Nix and Mr. Ruiz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

c.  The audio-recordings, and an accurate assessment of the ballistics evidence would have had mitigating significance in the punishment phase . . . . . . . . . . . . . . . . . . . . . 65

d.  The defense failed to adequately investigate, develop and present evidence of the destruction of mental health evidence (possibly PTSD), which could have supplied an explanation of Officer Nix's aberrant behavior . . . . 66

e.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

GROUND EIGHT (IAC – MITIGATING EVIDENCE OF MR. RUIZ AS GOOD FATHER): Mr. Ruiz was denied his Sixth and Fourteenth amendment rights because defense counsel failed to adequately investigate, develop, and present crucial mitigating evidence in the punishment phase of the adverse impact of Mr. Ruiz's execution on his children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

A.  Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
B.  Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . 69
    1.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . 69
    2.  Counsel's performance was constitutionally ineffective . . . 71
    3.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

MOTION FOR EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . 77

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
    Exhibit 1:  Affidavit of Cliff Jenkins (audio recordings) . . . . . . . . 81
    Exhibit 2:  Affidavit of Cliff Jenkins (ballistics) . . . . . . . . . . . . . 81
    Exhibit 3:  Affidavit of Cliff Jenkins (documents lost, destroyed) . . . . . . . . 81
    Exhibit 4:  Affidavit of Gilda Kessner, Psy.D. . . . . . . . . . . . . . . . . 81
    Exhibit 5:  Affidavit of Barbara Ruiz . . . . . . . . . . . . . . . . . . . . 81

Exhibit 6:   Affidavit of Sue Ann Ziegenhain . . . . . . . . . . . . . . . . . . . . . . .  81
Exhibit 7:   Affidavit of Richard Ziegenhain  . . . . . . . . . . . . . . . . . . . . . . .  81
Exhibit 8:   Affidavit of Elizabeth Beck, Ph.D., M.S.W.  . . . . . . . . . . . . . . .  81
Exhibit 9:   Shooting Investigation, Control Number 07-062 . . . . . . . . . . . .  81



## TABLE OF ABBREVIATIONS

The following are a list of abbreviations used within the pleading:

CR __:__        CR is the abbreviation for Clerk's Record, as required by TEX. R. APP. PROC. 34.1. It is followed by the volume number before the colon, and the page numbers after the colon.

RR __:__        RR is the abbreviation for Reporter's Record, pursuant to TEX. R. APP. PROC. 34.1, which is the trial transcript testimony recorded by the court reporter. The abbreviation RR is followed by the volume number before the colon, and the page numbers after the colon.



IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
194TH JUDICIAL DISTRICT, COLLIN COUNTY, TX

Ex Parte Wesley Lynn Ruiz,
*Applicant*,

TCCA No. AP 75,968
Trial Court Cause No. F07-50318-M

APPLICATION FOR POST CONVICTION WRIT OF HABEAS CORPUS
UNDER TEX. CODE CRIM. PROC. § 11.071

Wesley Lynn Ruiz (hereinafter also referred to as Applicant) petitions pursuant to TEX.

CODE CRIM. PROC. § 11.071 for a writ of habeas corpus because he is confined by the State

of Texas under a sentence of death, in violation of the laws and constitutions of the State of

Texas and of the United States.  Applicant has never before sought habeas corpus relief for

these convictions and sentences.  This is his first appearance in state court for this purpose.

# INTRODUCTION

### 1. BASIS OF CONFINEMENT.

Wesley Lynn Ruiz , inmate number #999-536, is confined by the Texas Department of Criminal Justice, Institutional Division, by Rick Thaler, Director, Texas Department of Criminal Justice.  Applicant is being denied his liberty and also faces execution under an unconstitutional conviction for capital murder and the concomitant sentence of death.


### 2. OVERVIEW OF PROCEDURAL HISTORY.

**A.     Indictment.**  By indictment filed on April 2, 2007, Mr. Ruiz was charged in trial court cause number F07-50318 with capital murder, because on or about the 23rd day of March, 2007, he did

> unlawfully then and there intentionally and knowingly cause the death of Mark
> Nix, an individual, hereinafter called deceased, by shooting the deceased with
> a firearm, a deadly weapon, and the said deceased was a peace officer, namely:
> a Dallas Police Officer then and there acting in the lawful discharge of an
> official duty, and the said defendant then and there knew the said deceased to
> be a peace officer.

(CR 1:2).


**B.     Jury Trial.**  The defense counsel were Paul Brauchle, lead counsel, and co-counsel William "Karo" Johnson and Douglas Parks.  The guilt/innocence phase of the trial was held before the Honorable Ernest White, III beginning on June 3, 2008.  The jurors returned a verdict of guilty on June 5, 2008 with a deadly weapon finding (firearm).  (CR

---

2:545). The punishment phase began on July 7, 2008.  On July 11, 2008, the jurors answered "yes" to the future dangerousness special issue No. 1, and "no" to the mitigation special issue No. 2. (CR 2:663, 664).  On July 11, 2008, the trial judge sentenced Mr. Ruiz to death.  The Motion for New Trial was denied.  (CR 2:676).

   C.    **Direct Appeal.**  Mr. Ruiz filed his Notice of Appeal on July 23, 2008.  Mr. Douglas Parks was appointed to represent Mr. Ruiz.  The direct appeal raises fourteen (14) points of error.

   D.    **State Habeas.**  On August 12, 2008, undersigned counsel, Lydia Brandt, was appointed to represent Mr. Ruiz in this state habeas.  (Order of Texas Court of Criminal Appeal, dated August 12, 2008).  The State of Texas filed its direct appeal brief on July 26, 2010. Under TEX. CODE CRIM. PROC. 11.071 § 4(a), the application for writ of habeas corpus is due "not later than the 45th day after the date the state's original brief is filed on direct appeal with the court of criminal appeals...." However, TEX. CODE CRIM. PROC. 11.071 § 4(b) permits the trial judge to grant one, ninety (90) day extension for good cause.  Mr. Ruiz requested that ninety (90) day extension, and the trial court granted it, making the application for writ of habeas corpus due on or before December 8, 2010.  Hence, this Application is timely filed.

3.   OVERVIEW OF STATEMENT OF FACTS

The affidavit of Cliff Jenkins, the fact investigator, in this state habeas application summarizes the encounter between Office Nix and Mr. Ruiz:

6.   My investigation revealed that on March 23, 2007 there was an encounter between Applicant Ruiz and Dallas Police Officer Mark Nix on March 23, 2007 that resulted in the death of Mark Nix, the indictment of Applicant Ruiz for capital murder, and ultimately a guilty verdict and sentence of death of Applicant Ruiz. (Clerk's Record, Indictment, p. 2).

7.   On March 23, 2007, there had been a harrowing chase of the car driven by Applicant Ruiz by several marked and unmarked police vehicles, which law enforcement believed was the same make, model and color scheme, as that of a car identified as having been linked to a murder on Southerland street the week before. Applicant Ruiz had no connection to, or knowledge of, this murder. (Reporter's Record Vol. 42, p. 34-40).

8.   The chase ended with Applicant Ruiz's car stopped bumper to bumper with the lead chase police vehicle. (Reporter's Record Vol. 42, p. 56). The vehicle, which Ruiz was driving, had heavily tinted windows. (Reporter's Record Vol. 42, p. 57). In the course of my investigation, I located Dallas Police Academy Lesson Plan Subject: S.O.P. 1200 Barricaded Person, IV. Presentation (Implementation of Instruction), No. 7. Handling Suspects, Letter A). If a barricaded person situation exists, 1. 2. 3. and 4.

9.   Despite the fact that Applicant Ruiz was barricaded inside the vehicle, Officer Mark Nix ran toward the blocked vehicle, yelling at whoever was inside to exit the vehicle, and began vigorously beating on the on the heavily tinted window with his expandable baton according to trial testimony of fellow officers. (Reporter's Record Vol. 42, p. 57). Officer Nix placed his gun on the ground because he wasn't making any headway with the baton and started to use two hands to hit the window with the baton. A shot came from inside the vehicle, and Officer Nix was mortally wounded. (Reporter's Record Vol. 42, p. 58).

Exhibit 1: Affidavit of Cliff Jenkins (audio recordings)

---

### A.    The Dallas Police Department had written procedures for handling barricaded suspects

The Dallas Police Department had a procedure in place for dealing with felony stops and barricaded suspects, such as Mr. Ruiz.  Defense Exhibit 1, titled Traffic Stops – Felony, Procedure 1834 is the policy of the Dallas Police Department, drafted with "office safety" as its goal.  The procedure reads:

1834    Traffic Stops (Felony)

A.    Officer safety requires a different approach for high risk traffic stops, traffic stops, and stops at the end of vehicle pursuits.

    1.    Reasons for use of High Risk Stop procedure.

        a.    By information received or by observation, the officer has reason to believe that persons occupying a vehicle will be a threat to the officer's safety if a traffic stop is made.

            (1)    Recognition of an occupant as a wanted person.
            ....
            (3)    End of vehicle pursuit stops

    ....

    5.    **Removing Occupants from Suspect Vehicle.**

        a.    "DO NOT RUSH THE SUSPECT" –
        This is true for most type of felony stops, whether end of chase, or any other high risk stop.    Remember, circumstances, at specific scene, require different tactics. If the suspect vehicle wrecks, or is on fire, you may approach, but would still not rush the vehicle.  Approach with caution regardless of the circumstances.

            (1)    Use the Public Address System in your vehicle, if necessary for communication.  The initial officer

will use loud, clear, specific verbal directions/commands to occupants of the vehicle.

....

(4)   Have the driver open door and step out keeping hands high above his head.

(f)   On a high risk, or felony stop, visibility – being able to view the suspects from cover, is the *overriding factor*.   Placing the suspect(s) between the vehicles allows the officers to contain the scene. (BS 0730-0732)

....

### 7.   Handcuffing and Controlling Suspects.

c.   (3)   If occupants of the vehicle neither exit the vehicle nor comply with the officer's voice commands, the incident should be handled in the same manner as a Barricaded Person – Procedure 1200. (BS 0733-0734)

(Emphasis in the original) Traffic Stops – Felony, Procedure 1834.

In addition, to the police procedure, the Dallas Police Department teaches its officers not to rush a suspect if a barricaded-person-situation exists. *See* Exhibit 1: Affidavit of Cliff Jenkins (audio recordings), para. 8.

When a barricaded-person-situation exists, the department policy instructs:

## Procedure 1200:  BARRICADED PERSONS

  A.   On persons barricaded in a building, the Patrol Bureau mission will be a containment or a hold action until the Special Operations Bureau personnel arrive to handle the incident.

  B.   Definitions

   1.   Barricaded Person – persons(s) who has secreted himself and possibly other, in an inaccessible place and is threatening to do bodily harm to himself or others or destroy property

    a.   A barricaded person could be mentally ill, alcoholic, drug related, or a fugitive.  (BS 0736)

Exhibit 4: Affidavit of Gilda Kessner, Psy.D., Appendix A.

**B.**   **The internal investigation conducted by the Dallas Police Department reflected that Officer Nix violated department procedures**

Following the death of Officer Nix, the Dallas Police Department conducted an investigation into the shooting. In the documentation of the investigation, Calvin A. Cunigan, Deputy Chief of Police Internal Affairs Division stated in the conclusion of the Shooting Investigation that "Senior Corporal Nix immediately engaged the suspect vehicle without having the opportunity to conduct a proper felony traffic stop of a possible murder suspect."

Because "there was no emergency that required the immediate extraction of Applicant Ruiz from the vehicle, ... Officer Mark Nix ... place[d] himself and fellow officers in danger when all he had to do was to follow the policy and procedure for extracting a barricaded

suspect, and call the SWAT Team to remove Applicant Ruiz from the vehicle if it came to that." Exhibit 1: Affidavit of Cliff Jenkins (audio recordings), and accompanying Exhibit 1: Summary and the Conclusion of the Shooting Investigation, Control Number 07-062, August 2, 2007, page 29 (print format excerpt of Exhibit 8 attached to Jenkins affidavit).

In addition to placing himself, and fellows officers in harm's way, the actions of Officer Nix also endangered civilian bystanders, including children, who were in the vicinity. Exhibit 4: Affidavit of Gilda Kessner, Psy.D., para. 13.B.3 and para. 14.E.

### C.   Mr. Ruiz asserted that his single gunshot was fired in self-defense

Mr. Ruiz asserted that his single gunshot was fired in self-defense, an affirmative defense to the capital murder charge.   Among other things, Mr. Ruiz contended that Officer Nix was not acting in the *lawful* discharge of an official duty.  (CR 1:2) (indictment); (CR 2:537, 539) (self-defense instruction); (RR:46:87).

### D.   In support of his self-defense assertion, Mr. Ruiz proffered testimony from civilians, with whom Officer Nix had come in contact, to show Officer Nix as first aggressor  – which the court would not admit

In support of his self-defense assertion, Mr. Ruiz sought to call civilians, with whom Officer Nix had come in contact, to show Officer Nix as first aggressor.  The trial court denied defense the right to call these witnesses, stating as its reason: "... the Court will deny that under 404(b) and 405." (RR 46:87).

In turn, out of the presence of the jury, defense counsel proffered the testimony of Raquel Sosa, Karlous Lake and Anthony Williams. It is summarized in the direct appeal brief:

> In support of his claim of self-defense, [Ruiz] proffered the testimony of Raquel Sosa, Karlous Lake and Anthony Williams regarding prior acts of violence by Officer Nix against others, showing that he was the first aggressor. The trial court denied those proffers and excluded the evidence from the jury's consideration. (RR 46:87).
>
> Raquel Sosa testified, outside the presence of the jury, that she and Jesus Ortiz were on their way to an Eckard's drug store on June 21, 2002, with Ms. Sosa driving, when a police car pulled behind her car. (RR 46:89-93). A decision was made to try to outrun the police, during which Ms. Sosa switched places with Mr. Ortiz, who was then the driver. When they arrived at a park at Polk and Delaware streets, they abandoned the car and fled on foot. (RR 46:95-96).
>
> Ms. Sosa knew officers were pursuing she and Mr. Ortiz as they ran through a drainage tunnel. When she emerged from the tunnel, she fell. While on her knees, facing Mr. Ortiz, Officer Nix came out of the tunnel and began firing at Mr. Ortiz. Mr. Ortiz turned and ran. (RR 46:97-105). After speaking with police officers, Ms. Sosa was taken to the ambulance in which mr. Ortiz had been placed. (RR 46:107).
>
> The defense proffered Defense Exhibit No. 20, an autopsy report showing that Mr. Ortiz died of a single gunshot wound to the upper left buttock. (RR 46:123).
>
> Karlous Lake encountered Officer Nix on March 13, 2005, as he came out of a club in the Deep Ellum area of Dallas. He was confronted by a group of officers who told him to hurry and go home before his curfew. Mr. Lake was in the Marine Corps at the time and asked what time curfew was because he did not want to get into trouble. (RR 46:126-129). One of the officers responded that it was his curfew whenever he was told to go home. Mr. Lake responded that he did not have a curfew, as he was walking away. He then heard footsteps behind him and when he turned around Officer Nix shot him with a taser. (RR 46:130). Mr. Lake denied resisting or provoking Officer Nix

and testified that his arms were up in a "surrender" position when he was tased. (RR 46:131-133).

Mr. Lake was loaded into a paddy wagon, taken to jail and charged with public intoxication. Those charges were dismissed when he appeared before a magistrate. (RR 46:136-137).

Anthony Williams was 14 years old on August 23, 2006. About 3:00 or 4:00 pm on that date, Anthony was running down the street when Officer Nix told him to stop. Anthony obeyed Officer Nix and got down on the ground and was handcuffed by Nix behind his back. Officer Nix then picked him up by the handcuffs, told him to shut up or he would knock his teeth out and threw him into the police car. (RR 48:66-68). Officer Nix told Anthony if he told anyone he wold "need a new grill," meaning he would knock his teeth out. (RR 48:69). Anthony did not file a complaint against Officer Nix because another officer at the scene did. (RR 48:68). Officer Nix was appealing a sustained finding by the disciplinary board at the time of his death. (RR 48:73).

On cross-examination, Officer Jeremy Borchardt testified that Officer Nix rushed [Ruiz's] vehicle while acknowledging that the police training manual emphasized that officers should not rush a vehicle during a felony stop. (RR 42:98). The training manual referred to was admitted as Defense Exhibit 1. (RR 42:109).

This evidence was relevant, had a nexus to the enhancement to capital murder and was more probative than prejudicial. The absence of this evidence of the facts and circumstances surrounding the killing, admissible under TEX. CODE CRIM. PROC. 38.26(a), prevented Mr. Ruiz from persuading the trier of fact that he acted in self defense. It also prevented Mr. Ruiz from proving that he lacked the intent to commit capital murder, and that if he was guilty, he was guilty of murder, or of a lesser-included-offense of murder, which carried a lesser sentence than death. *See* TEX. CODE CRIM. PROC. 38.26(a) (facts and circumstances to show condition of mind of the accused); *Ruffin v. State*, 270 S.W.3d 586, 596 (Tex. Crim. App.

---

2008) ("We quoted article 38.36 in *Jackson* for the unremarkable proposition that both the State and defendant may offer testimony as to "all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."). U.S. CONST. amend. VI; U.S. CONST. amend. XIV.

E.   **There was substantial other evidence, either not preserved, or not proffered, that would have been admissible to prove Mr. Ruiz acted in self-defense. It also had mitigating significance**

1.   **Accurate and reliable testimony concerning ballistics would have further supported that Mr. Ruiz acted in self-defense, and that Mr. Ruiz did not intend to murder Officer Nix**

The ballistics evidence reveals that Mr. Ruiz initially fired the weapon, only once, and in apparent self-defense. An inference from the ballistics evidence is that Mr. Ruiz did _not_ have the requisite intent to commit capital murder because had he wanted to continue firing at law enforcement who surrounded the vehicle, he could have – but he did not.

State habeas fact investigator, Cliff Jenkins testified as to the misleading and inaccurate impression about ballistics that the defense failed to correct:

7.   My investigation revealed that on March 23, 2007 there was an encounter between Applicant Ruiz and Dallas Police Officer Mark Nix on March 23, 2007, in which Applicant Ruiz fired a weapon that resulted in the death of Mark Nix, the indictment of Applicant Ruiz for capital murder, and ultimately a guilty verdict and sentence of death of Applicant Ruiz. (Clerk's Record, Indictment, p. 2).

8.   SEMIAUTOMATIC PISTOL:   Daniel Krieter, a Dallas Police officer who had been assigned to the crime scene search section and the prosecution's witness, identified the weapon that was fired by Applicant Ruiz. (Reporter's Record Vol. 43, p. 123). Officer Krieter testified that the weapon was a Professional Ordinance _semiautomatic pistol_, and its caliber as a .223. (Reporter's Record Vol. 43, pp. 132-133).   The subsequent testimony of this officer re-labeled the weapon as:

a.   ASSAULT PISTOL:   Officer Krieter characterized the Professional Ordinance semiautomatic pistol as an "_assault pistol_, seized out of the suspect vehicle back on March 23, of 2007." (Reporter's Record, Vol. 43, p. 137).

---

b.   AUTOMATIC PISTOL:   Later in his testimony Officer Krieter characterized the Professional Ordinance semiautomatic pistol as an "*automatic pistol*, seized out of the suspect vehicle back on March 23, of 2007." (Reporter's Record, Vol. 43, p. 137).

9.   Wikipedia defines a semiautomatic pistol as:

A semi-automatic pistol is a type of handgun that can be fired in semi-automatic mode, firing one cartridge for each pull of the trigger. Whereas other types of handguns accomplish this function by using multiple ....

A semi-automatic pistol uses the energy of one shot to reload the chamber for the next. Typically recoil energy from a fired round is harnessed mechanically via either recoil operation or blowback operation; however, larger calibers may also be gas operated (for example, the Desert Eagle). After a round is fired, the pistol will cycle, ejecting the spent casing and chambering a new round from the magazine, allowing another shot to take place immediately. Most types of semi-automatic pistols rely on a removable magazine. It is typically located inside the hand grip.

Exhibit 1:   http://en.wikipedia.org/wiki/Semiautomatic_pistol

10.   Wikipedia states that an "Automatic pistol" could refer to a "Machine" pistol, or to a "Semi-automatic" pistol.  The operation of a "Machine" pistol is very different from a "semi-automatic" pistol.   Exhibit 2: http://en.wikipedia.org/wiki/Automatic_pistol

11.   Wikipedia defines "[a] machine pistol is a handgun-style,[1] magazine-fed and self-loading firearm, capable of fully automatic or burst fire, and normally chambered for pistol cartridges. The term is a literal translation of Maschinenpistole, the German term for a hand-held automatic weapon. While the dividing line between machine pistols and compact submachine guns is hard to draw, the term "submachine gun" usually refers to larger automatic firearms scaled down from a full-sized machine gun, while the term "machine pistol" usually refers to a weapon built up from a semi-automatic pistol design."

Exhibit 3: http://en.wikipedia.org/wiki/Machine_pistol

12. The phase, assault pistol, is more a street term or colloquialism. The phrase, assault pistol, is not a commonly used term in the firearms industry. There is no standard definition for the phase assault pistol.

13. Despite the mis-impression which would have been conveyed by Officer Krieter that the Professional Ordinance semiautomatic pistol, was instead a machine pistol, which is "magazine-fed and self-loading firearm, capable of fully automatic or burst fire," the defense attorneys did not object, and the weapon was admitted as State's Exhibit 63.

14. The defense attorneys did discredited the testimony of Officer Krieter about how he perceived the weapon operated. (Reporter's Record, Vol. 43, pp. 133, 134, 157, 159). However, the defense attorney failed to take steps to affirmatively educate the jury through cross examination of Officer Krieter as to how the Professional Ordinance semiautomatic pistol functioned, and how and why the gun jammed.

15. The prosecution subsequently called Raymond Cooper, a firearms and tool mark examiner from the Southwestern Institute of Forensic Sciences. (Reporter's Record, Vol. 45, p. 106). On cross examination by the defense, Mr. Cooper testified that the weapon was functional, and that Mr. Cooper himself fired it. (Reporter's Record, Vol. 45, p. 130).

16. Despite his expertise, Mr. Cooper was never questioned on direct or cross-examination about the weapon taken from the vehicle driven by Applicant Ruiz as being a semi-automatic pistol, and how a semi-automatic weapon differs from an "assault" pistol and from an "automatic" pistol – terms that had been used earlier by Officer Krieter.

17. Likewise, and despite his expertise, the defense attorneys never used cross examination of Mr. Cooper as a vehicle to educate the jury as to how and why the Professional Ordinance semiautomatic pistol could jam, and what would be required to make it operational again, had Applicant Ruiz wanted to continue to fire at law enforcement.

18. The defense attorneys did not call their own ballistics experts to explain the operation of the Professional Ordinance semiautomatic pistol functioned, and how and why the gun jammed.

19. Based on my fact investigation it is my professional opinion and conclusions that:

a. Defense counsel was deficient because in their cross-examination of Officer Krieter and Mr. Cooper they failed altogether to educate the jury about the Professional Ordinance semiautomatic pistol, the nature of the weapon and its operation and limitations.

b. Similarly, defense counsel was deficient because they failed to call a ballistics expert for the defense to educate the jury about the Professional Ordinance semiautomatic pistol, the nature of the weapon and its operation and limitations.

c. Defense counsel's deficient performance unfairly prejudiced Applicant Ruiz because a qualified expert could have testified that even if the weapon had jammed and become non-functional, it would have taken only a few seconds to remove the magazine, remove the top bullet and then engage the magazine back into the firearm. *From this testimony, the jurors could infer that Applicant Ruiz did not have the requisite intent to commit capital murder because had he wanted to continue firing at law enforcement who surrounded the vehicle, he could have. Instead, Applicant Ruiz initially fired the weapon, only once, and in apparent self-defense.*

(Emphasis supplied) Exhibit 2: Affidavit of Cliff Jenkins (Ballistics).

**2. The defense failed to act to preserve the audio recordings, which could have revealed Nix's state of mind and supported self-defense**

State habeas fact investigator, Cliff Jenkins testified as to the failure to take steps that would have preserved audio recordings – crucial evidence that could have revealed the state of mind of Officer Nix in his encounter with Mr. Ruiz:

5.    ....

c.  I viewed and noted two CD-R Compact Discs, one from Officer Nix's vehicle, and the other from the Officers Borchardt/Haecker police vehicle. I noted that this data recorded that when Officer Nix could not break the suspect's window, he laid down his weapon and began to swing at ASP baton with both hands. Officer Haecker appeared to be approximately six feet in back of Officer Nix. (Disk One Squad 6065). Yet Officer Haecker stated he observed Officer Nix attempt to gain entry of the suspect's vehicle by smashing the front window with his ASP baton. Officer Haecker also said that he does not know if Officer Nix had his weapon drawn. (Shooting Investigation, Control No. 07-062, p.2).

d.  I then searched for the audio transmissions that complement the video transmissions. I located two discs: Channel 5 and Channel 8. I listened to them and noted the audio transmissions made on March 23, 2007, from 5:36 pm to 6:40 pm. Officer Nix was killed at 5:37 pm. (Compact Disc CD-R 03/23/07, 537-640, Ch. 8, and Compact Disc CD-R, DFD, 03/23/07, 537-640p, Ch. 5).

c.  I reviewed the trial records, which reflect that all other audio transmissions were erased thirty (30) days after the encounter between Officer Nix and Applicant Ruiz. I could not find a subpoena, or a court order from the defense or the prosecution to preserve any and all audio/video recordings within the thirty (30) days from the offense.

f.  I reviewed the trial records, which reflect that the defense did file a Motion to Dismiss or Preclude Imposition of Death Penalty for Failure to Preserve Evidence. The motion was filed on May 23, 2008, and attached to this Affidavit as Exhibit 2. The trial testimony reflects that Officer J.S. Briseno testified that hypothetically, he would expect that there could be sound throughout the video camera's operation in Officer Nix's vehicle. (Reporter's Record, Vol. 40, p. 27).

6.  My investigation revealed that on March 23, 2007 there was an encounter between Applicant Ruiz and Dallas Police Officer Mark Nix on March 23, 2007 that resulted in the death of Mark Nix, the indictment

of Applicant Ruiz for capital murder, and ultimately a guilty verdict and sentence of death of Applicant Ruiz. (Clerk's Record, Indictment, p. 2).

7. On March 23, 2007, there had been a harrowing chase of the car driven by Applicant Ruiz by several marked and unmarked police vehicles, which law enforcement believed was the same make, model and color scheme, as that of a car identified as having been linked to a murder on Southerland street the week before. Applicant Ruiz had no connection to, or knowledge of, this murder. (Reporter's Record Vol. 42, p. 34-40).

8. The chase ended with Applicant Ruiz's car stopped bumper to bumper with the lead chase police vehicle. (Reporter's Record Vol. 42, p. 56). The vehicle, which Ruiz was driving, had heavily tinted windows. (Reporter's Record Vol. 42, p. 57). In the course of my investigation, I located Dallas Police Academy Lesson Plan Subject: S.O.P. 1200 Barricaded Person, IV. Presentation (Implementation of Instruction), No. 7. Handling Suspects, Letter.A). If a barricaded person situation exists, 1. 2. 3. and 4.

9. Despite the fact that Applicant Ruiz was barricaded inside the vehicle, Officer Mark Nix ran toward the blocked vehicle, yelling at whoever was inside to exit the vehicle, and began vigorously beating on the on the heavily tinted window with his expandable baton according to trial testimony of fellow officers. (Reporter's Record Vol. 42, p. 57). Officer Nix placed his gun on the ground because he wasn't making any headway with the baton and started to use two hands to hit the window with the baton. A shot came from inside the vehicle, and Officer Nix was mortally wounded. (Reporter's Record Vol. 42, p. 58).

10. In the course of my investigation, I located Exhibit 1:Summary and the Conclusion of the Shooting Investigation, Control Number 07-062, August 2, 2007, page 29. In it, Calvin A. Cunigan, Deputy Chief of Police Internal Affairs Division stated in the conclusion of the Shooting Investigation:

> "Senior Corporal Nix immediately engaged the suspect vehicle without having the opportunity to conduct a proper felony traffic stop of a possible murder suspect."

11. Given that there was no emergency that required the immediate extraction of Applicant Ruiz from the vehicle, the conclusion of Calvin A. Cunigan, Deputy Chief of Police Internal Affairs Division lead me to investigate further to determine whether there was documentation that would reveal why Officer Mark Nix would place himself and fellow officers in danger when all he had to do was to follow the policy and procedure for extracting a barricaded suspect, and call the SWAT Team to remove Applicant Ruiz from the vehicle if it came to that.

12. My investigation lead me to consider whether there existed information that could possibly reveal Officer Nix's state of mind at the time of the incident. I began this aspect of the investigation with a review of the trial transcript, Reporter's Record Vol. 47, p. 16, in which Applicant Ruiz testified that Officer Nix jumped out his police vehicle, his gun in hand, yelling:

> "Freeze, you try to run from me motherfucker, I am going to kill you if you try to run."

13. Based on my prior experience as a private investigator, I searched for the audio transmissions that are generated from police radio traffic from all channels prior to the commission of the offense. I believed that these audio transmission might be the key source of information to resolve the question as to why Office Nix would act so precipitously.

14. I located an Audio-Recorded Interview of Officer Haecker, conducted by the Internal Affairs Division of the Dallas Police Department. Exhibit 3: Internal Affairs Division Dallas Police Department Headquarters. Audio-recorded Interview of Senior Corporal Todd Haecker, Badge No. 7996. Date of Interview: July 3, 2007. In that Audio-Recorded Interview, Officer Haecker testified that he observed Officer Nix run up to the front portion of the back passenger door giving verbal commands to the suspect. He further stated that Officer Nix had a baton in his hand, but couldn't recall if Officer Nix had his gun drawn.

15. I then again searched the record, including the trial record and defense counsel files, to locate any and all police audio recordings concerning the incident. *I learned that the State of Texas failed to file a motion to preserve the audio recordings made at the time of the incident, March 23, 2007. As a result, the audio recordings of the police radio traffic*

---

*had been erased 30 days after the encounter between Officer Nix and Applicant Ruiz.*

16. The trial record contained a Defense Motion to Dismiss or Preclude Imposition of Death Penalty for Failure to Preserve Evidence, dated May 23, 2008, at 8:31 am. The defense motion was filed because no request had been made by the State of Texas. It appears that the defense attorneys for Applicant Ruiz took the position that the burden to preserve the audio recordings rested on the State of Texas.

17. From CD-R Compact Disc #537-640 of Channel 8, retrieved on 03/23/07, and from Compact Disc DFD #537-640 of Channel 5, retrieved on 03/23/07, I was able to retrieve the transmissions from channel 5, which is a main channel of police radio traffic, and also channel 8. I listened to the channel 5 and channel 8 audio transmissions of police radio traffic from the March 23, 2007 incident, from 5:36 pm to 6:40 pm. Officer Nix was mortally wounded at 5:37 pm. All other audio records of police radio traffic had been erased, and were unavailable to me to listen to.

18. The Channel 5 and Channel 8 audio transmissions of police radio traffic on March 23, 2007 reflect the audio transmissions from 5:36 pm to 6:40 pm, including the shooting of Officer Nix at 5:37 pm. The transmission records: "officer down." However, these recordings do not contain any radio conversation to or from Officer Nix that may have disclosed his state of mind.

19. Because the channel 5 and channel 8 audio transmissions of police radio traffic from the March 23, 2007 incident were not helpful, I turned my attention to trying to locate any other source that could have preserved the audio of the encounter between Officer Nix and Applicant Ruiz.

20. *A possible source that could have preserved the audio of the encounter between Officer Nix and Applicant Ruiz would have been the audio/video equipment in Officer Nix's vehicle.* This is confirmed by the trial testimony of Dallas Police Officer J.S. Briseno. Officer Briseno testified that hypothetically, he would expect that there would be sound throughout the video camera's operation in Office Nix's vehicle. (Reporter's Record, Vol. 40, 27).

---

21. *It is my experience as a defense investigator that the performance of the defense attorneys representing Applicant Ruiz was deficient because they failed to immediately issue and deliver a subpoena, or a court order to preserve any and all audio/video recordings to a proper place of custody of the records to prevent the very problem in the Ruiz case – the erasure of the audio communications of what transpired between Officer Nix and Applicant Ruiz on March 23, 2007.*

22. It is also my opinion that the deficient performance of the defense attorneys was unfairly prejudicial because the erasure of this audio communication is crucial to Applicant Ruiz's assertion that Officer Mark Nix acted *un*lawfully in the performance of his duties, in turn giving rise to various defenses which were not raised at all or raised inadequately at trial, as for example, that Applicant Ruiz acted in self-defense, and that Officer Mark Nix engaged in official oppression.

23. *This information would have been crucial to support the defense assertion through cross examination of Officer Todd Haeckler by defense attorney Johnson that Applicant Ruiz acted in self defense*:

Johnson:    Now, hypothetically if – if you pulled me over on your marked squad car, and I jumped out of my car and started running at you with an asp in one hand and a gun in my other hand, I would be coming at you with what would be considered a deadly weapon; is that correct?

Haeckler:    Yes.

Johnson:    and if you thought that I was going to cause serious bodily injury or death as I was coming at you, you would be able to act in self-defense; is that correct?

Haeckler:    As a reasonable person making a reasonable assumption, yes.

Johnson:    And that's basically what self-defense is?

Haeckler:    Yes, it is.

(Reporter's Record, Vol. 43, pp. 121, 122) (No further questions were asked by the defense).

Exhibit 1: Affidavit of Cliff Jenkins (audio recordings).

### F.   Other documents, which could have aided the self-defense assertion, as they pertained to the state of mind of Officer Nix were lost, destroyed or otherwise unavailable

As part of the investigation, state habeas fact investigator, Cliff Jenkins, was asked to search for other documents, and in particular documents which could have revealed the state of mind of Officer Nix, to determine if the aggressive behavior of Officer Nix could be explained by PTSD. This issue was raised by trial testimony that Officer Nix had been called to active duty in 2003 when the Iraq war started.  (RR 52:147).

Such documentation could have provided a realistic explanation to the jurors of Officer Nix as first aggressor.  It would have made the self-defense assertion believable by showing that Mr. Ruiz was not attempting to blame Officer Nix.

Mr. Jenkins attests that despite substantial efforts, the documents were lost, destroyed or otherwise unavailable:

5.    My investigation was as follows:          ....

e.    I did research on Officer Nix's military service records and all other specific data needed in processing a request for the right of access and/or review of veterans records.

f.    I created a request for documents from the Department of Veterans Affairs.  I went to the VA Hospital located at 4500 Lancaster Road and tendered the Records Request to Attorney Joanne Hurdicamp.  Ms.

---

Hurdicamp contacted me and told me that the VA had no Medical/Mental Health Records for Mark Timothy Nix.

g.   I searched Dallasnews.com and found "Some Texas Police Agencies Bolster Efforts to Help Returning Officers." This internet article memorialized that a longtime Dallas psychologist, Al Somodevilla, screened officers returning from active duty in the military, and the article contained comments from Somodevilla.

h.   I issued a subpoena to Dr. Somodevilla asking for all psychological testing, counseling and/or screening for mental health issues for Dallas Police Officer Mark Timothy Nix. I went to the office of Dr. Somodevilla and served him with a subpoena. Dr. Somodevilla stated that it was Dr. Conaway who did the testing on Officer Nix when he returned from the Persian Gulf.

i.   I contacted Dr. Gary Conaway. Dr. Conaway told me he had no records of testing Dallas Police Officer Mark Timothy Nix. Dr. Conaway told me that all records stay with the Dallas Police Department.

j.   I issued a subpoena to the Dallas Police Department, asking for all psychological testing, counseling and/or screening for mental health issues for Dallas Police Officer Mark Timothy Nix. I went to the Dallas Police Station on Lamar and served the subpoena to the Special Research Unit of Personnel, Cressandra McClellan.

k.   Cressandra McClellan provided me with the L-3 Declaration of Psychological and Emotional Health, for Dallas Police Officer Mark Timothy Nix in the year 2000, the year of his initial entry into the Dallas Police Department. The date of examination was July 7, 2000.

l.   However, Special Research Unit of Personnel, Cressandra McClellan stated that it was the policy of the department that after two years, the department destroys psychological testing records, of the type that would have been done on Officer Nix when he returned from the Persian Gulf in 2003. Ms. McClellan stated that she did check to see if the records were destroyed, and she told me that they were destroyed.

m.   I contacted the Texas Commission on Law Enforcement Officer Standards and Education, and I spoke with Clair Allmon, who said that

it has been many years since the police departments have been required to send an L-3 form, Declaration of Psychological and Emotional Health, to the agency, and there was no such form on file for Officer Nix.

n.   I re-contacted the Texas Commission on Law Enforcement Officer Standards and Education, and I spoke with Records Custodian, Laura LaBlanc. Ms. LaBlanc did a records search of the agency's entire file on Officer Nix, She did not find any records on his mental health. Ms. LaBlanc then contacted the Dallas Police Department and they searched their files and located the same two-page L-3 form from the year 2000 that the Dallas Police Department had previously provided to me. The Dallas Police Department forwarded that L-3 year 2000 form to Ms. LaBlanc.

Exhibit 3: Affidavit of Cliff Jenkins (documents lost, destroyed or otherwise unavailable).

In turn, Dr. Kessner attests:

12.   Cliff Jenkins' Affidavit No. 3 (document and records search)

*Mr. Jenkins' affidavit details the steps he took to locate and obtain medical and psychiatric treatment and pre-employment psychological evaluations for Timothy Nix. His efforts have been unsuccessful and there is no documentation of Officer Nix' mental state or overall psychological functioning following his tour in Iraq.*

13.   Answers to Questions at Issue

A.   *Ms. Brandt asked whether Officer Nix's behavior at the time of his fatal interaction with Mr. Ruiz, could be accounted for by a diagnosis of Post Traumatic Stress Disorder (PTSD).* Unfortunately, records that would have been necessary to examine the likelihood that Officer Nix had PTSD from his military service in Iraq in 2003-2004 were not available to reliably address this question. Service medical records, documentation of his military service and psychological evaluation reports from Officer Nix's return to his employment with the Dallas Police Department would be necessary for such an analysis. Dr. Conaway who performed the

psychological evaluation of Officer Nix before he resumed his duties as a Dallas Police Officer, has indicated he conveyed all of his data to the DPD and did not maintained a file of his evaluation or a copy of his report. DPD has stated they do not maintain these records past two years. *Without documentation of Officer Nix's mental status it is not possible to opine on the issue of PTSD and its possible relationship to his behavior in the confrontation with Mr. Ruiz.*

Exhibit 4: Affidavit of Gilda Kessner, Psy.D.

Without crucial documentation, the best explanation Dr. Kessner could provide was:

E.   *Officer Nix's behavior defies logic and reasonableness.* His violation of S.O.P. escalated a police chase into a violent confrontation and a hail of bullets. There was no certainty that the suspect was alone in the vehicle. There may have been a co-actor or a child in the suspect vehicle. Officer Nix's actions in violation of S.O.P. placed innocent children and adults crouched in cars, in their homes, and a nearby school at risk of serious injury or death.

Exhibit 4: Affidavit of Gilda Kessner, Psy.D.



GROUND ONE (ACTUAL INNOCENCE, RIGHT TO A FAIR DEFENSE, CRUEL AND UNUSUAL PUNISHMENT – *UN*LAWFUL DISCHARGE OF DUTY BY OFFICER NIX, 6th, 8th and 14th amendment violations). Mr. Ruiz was denied his federal constitutional rights to a fair defense. The trial judge denied the admission of evidence which negated that Officer Nix was acting "in the lawful discharge of an official duty" – an essential element for enhancement to capital murder

Mr. Ruiz was denied his Sixth (6th) and Fourteenth (14th) amendment rights to a fair defense when the trial judge denied the defense the right to negate that Officer Nix was "acting in the lawful discharge of an official duty," an essential element to enhance murder to capital murder. U.S. CONST. amend. VI; U.S. CONST. amend. XIV. *See also* TEX. CODE CRIM. PROC. 38.26(a).

Hence, the conviction of capital murder of Mr. Ruiz and it concomitant sentence of death resulted in the violation of Mr. Ruiz's due process rights as well as a violation of his right against cruel and unusual punishment. U.S. CONST. amend. VIII; U.S. CONST. amend. XIV.

### A.    Statement of Facts

Grounds One, Two, Three and Four involve a common set of facts.  Accordingly, the statement of facts, as well as all factual and legal allegations, are fully incorporated into each and every ground.

In particular, as recited in 3. Overview of Statement of Facts, the defense proffered the testimony of Raquel Sosa, Karlous Lake and Anthony Williams regarding prior acts of violence of Officer Nix against others, showing that Officer Nix was the first aggressor. The

trial court denied defense the right to call these witnesses, stating as its reason: "... the Court will deny that under 404(b) and 405." (RR 46:87).

**B.    Argument and Authorities.**

1.    **Standard of Review**

In *In re Winship*, 397 U.S. 358, 364 (1970), the United States Supreme Court held that the prosecution must prove beyond a reasonable doubt each and every element of a crime — which includes proof beyond a reasonable doubt of criminal intent.   *Winship* stood for the proposition that this burden and the presumption of innocence are constitutionally-mandated, fundamental rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *United States v. Patterson*, 432 U.S. 197, 202 (1977).

In *Winship*, the United States Supreme Court held:

> It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty... [W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

*Winship*, 397 U.S. 358, 364 (1970).

While the prosecution has the burden of proving each element beyond a reasonable doubt, at the same time the defense has the "right to present a defense," and this right "generally includes the due-process right to the admission of competent, reliable, exculpatory

evidence to rebut any of those elements." *State v. Ruffin*, 270 S.W.3d 586, 594 (Tex. Crim. App. 2008).

### 2. Mr. Ruiz's right to a fair defense included the right to introduce evidence of Officer Nix as first aggressor

TEX. PENAL CODE § 19.03(a)(1) provides that a person commits capital murder if:

> (1)  the person murders a peace officer ... who is acting in the ***lawful*** discharge of an official duty and who the person knows is a peace officer .... (emphasis supplied)

Although the Jury Charge Guilt/Innocence, pp. 537-541 does not define "lawful" discharge, the charge on self-defense does illuminate when it is not lawful. An unlawful discharge occurs when there is "use or attempted use of unlawful force," by the police officer for the purpose of taking life or doing serious bodily injury.

As the Overview of the Statement of Facts above reflects, there is a plethora of evidence that Officer Nix had a history of excessive use of force in his encounters with civilians, and was acting outside the scope of "lawful" discharge of his duties in his encounter with Mr. Ruiz, a barricaded suspect.

The exclusion of evidence of Officer Nix as first aggressor is a violation of Mr. Ruiz's Sixth and Fourteenth amendment rights to a fair defense. U.S. CONST. amend. VI; U.S. CONST. amend. XIV. A defendant has a constitutionally-guaranteed-access-to-evidence right as established in *Trombetta*:

---

EX PARTE WESLEY LYNN RUIZ: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS                    27

Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. *To safeguard that right, the Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence."*

*California v. Trombetta*, 467 U.S. 479, 485 (1984).

A state can not employ evidentiary limitations to deprive a defendant of a fair trial. *See e.g., Crane v. Kentucky*, 476 U.S. 683, 690-691 (1986) ("In the absence of any valid state justification, exclusion of this kind of exculpatory evidence [circumstances of confession] deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing."); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); *Washington v. Texas*, 388 U.S. 14 (1967) (prohibiting the State of Texas from establishing rules to prevent whole categories of witnesses from testifying on the basis of their untrustworthiness).

As Justice O'Connor observed:

These cases [*California v. Trombetta, Chambers v. Mississippi, Crane v. Kentucky, Washington v. Texas*] taken together, illuminate a simple principle: *Due process demands that a criminal defendant be afforded a fair opportunity to defend against the State's accusations. Meaningful adversarial testing of the State's case requires that the defendant not be prevented from raising an effective defense, which must include the right to present relevant, probative evidence*. To be sure, the right to present evidence is not limitless; for example, it does not permit the defendant to introduce any and all evidence he believes might work in his favor, ... nor does it generally invalidate the operation of testimonial privileges, .... Nevertheless, *"an essential component of procedural fairness is an opportunity to be heard. That opportunity would*

> *be an empty one if the State were permitted to exclude competent, reliable evidence" that is essential to the accused's defense.*

(Emphasis supplied)   *Montana v. Egelhoff*, 518 U.S. 37, 63-64 (1996) (O'Connor, J., dissenting).

Allowing the prosecution to prove that Officer was acting in "lawful" discharge of his duty and that Officer Nix was a "hero," (RR 45:35), while, at the same time, prohibiting the defense from presenting evidence to negate this aggravator, which is an essential element of capital murder, assumes all the features of an impermissible presumption of culpability.

Such a rule renders the prosecution's evidence on that issue uncontestable as a matter of law, in derogation of the presumption of innocence and the constitutional requirement of prosecutorial proof of guilt beyond a reasonable doubt.   *See e.g.*, *United States v. Pohlot*, 827 F.2d 889, 900-901 (3ʳᵈ Cir. 1987) ("due process requires that the government prove every element of a criminal offense beyond a reasonable doubt.  The defendant's rights to present a defense to one of those elements generally includes the right to the admission of competent, reliable, exculpatory evidence.... [A] rule barring evidence on the issue of *mens rea* maybe unconstitutional so long as we determine criminal liability in part through subjective states of mind.").

3.   **Mr. Ruiz is actually innocent of capital murder. The trial judge's ruling violated his federal due process right to introduce relevant facts and circumstances surrounding the killing, pursuant to TEX. CODE CRIM. PROC. Art. 38.36(a)**

TEX. CODE CRIM. PROC. ART. 38.36(a) provides

(a)   In all prosecutions for murder, the ... defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing....

Mr. Ruiz is actually innocent of capital murder. The trial judge violated his 6th and 14th amendment rights to due process, in denying the admission of evidence of Officer Nix as first aggressor – evidence which had a direct nexus to the enhancement element of capital murder. The absence of evidence of the "facts and circumstances surrounding the killing," admissible under TEX. CODE CRIM. PROC. 38.26(a), also prevented Mr. Ruiz from persuading the trier of fact that he acted in self defense and did not have the intent necessary for capital murder. Thus, the trial court's ruling also prevented Mr. Ruiz from negating condition of mind, and that if he was guilty, he was guilty of murder, or of a lesser-included-offense of murder, which carried a lesser sentence than death. *See* TEX. CODE CRIM. PROC. 38.26(a) (facts and circumstances to show condition of mind of the accused); *Ruffin v. State*, 270 S.W.3d 586, 596 (Tex. Crim. App. 2008) ("We quoted article 38.36 in *Jackson* for the unremarkable proposition that both the State and defendant may offer testimony as to "all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."). U.S. CONST. amend. VI; U.S. CONST. amend. XIV.

4.    **Mr. Ruiz's conviction and death sentence violated his right to be free from cruel and unusual punishment**

Because the trial judge prevented Mr. Ruiz from introducing evidence that negated the enhancement element ("lawful" discharge), an essential element for a conviction for capital murder, he was prevented from persuading the trier of fact that if he was guilty, he was guilty of murder, or of a lesser-included-offense of murder, which carried a lesser sentence than death. Hence, his conviction of capital murder and it concomitant sentence of death resulted in the violation of Mr. Ruiz's right against cruel and unusual punishment. U.S. CONST. amend. VIII; U.S. CONST. amend. XIV.

As a result, habeas relief should be granted.

GROUND TWO (IAC & ACTUAL INNOCENCE, RIGHT TO A FAIR DEFENSE, CRUEL AND UNUSUAL PUNISHMENT – _UN_LAWFUL DISCHARGE OF DUTY BY OFFICER NIX, 6th, 8th and 14th amendment violations). Mr. Ruiz was denied his federal constitutional rights to effective assistance of counsel, who failed to specifically object on the basis of 6th, 8th, and 14th amendment violations

### A.    Statement of Facts

Grounds One, Two, Three and Four involve a common set of facts.   For purpose of this ground in particular, Mr. Ruiz refers this court to 3. Overview of Statement of Facts, the statement of facts which pertains to the defense proffer of the testimony of Raquel Sosa, Karlous Lake and Anthony Williams to show Officer Nix as first aggressor.

The Overview of Statement of Facts, as well as all factual and legal allegations, are fully incorporated into each and every  ground.

### B.    Argument and Authorities.

#### 1.    Standard of Review

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

---

EX PARTE WESLEY LYNN RUIZ: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995

>   **2.   The performance of trial counsel was constitutionally deficient in failing to specifically object on the basis of 6th, 8th, and 14th amendment grounds to the judge's exclusion of evidence of Officer Nix as first aggressor**

The performance of trial counsel was deficient because they failed to specifically object on the basis of:

- Mr. Ruiz's claim of actual innocence of capital murder,

- denial of his Sixth (6th) and Fourteenth (14th) amendment rights to a fair defense; and

- denial of his federal due process right to this evidence under TEX. CODE CRIM. PROC. 38.26(a) ("facts and circumstances surrounding the killing," as well as "facts and circumstances going to show the condition of the mind of the accused at the time of the offense"); and

- denial of his Eighth Amendment right against cruel and unusual punishment, U.S. Const. amend. VIII; U.S. CONST. amend. XIV.

Instead of this specificity, Mr. Brauchle merely asserted: "We object. And we will present testimony in regard to those people's proffer had --" (RR 46:87). Texas law requires that the objection be specific. "Almost any right, constitutional and statutory, may be waived by the failure to make a timely and specific objection." *Jones v. State,* 825 S.W. 2d 470, 471 (Tex. App. – Corpus Christi,1991), *citing Little v. State,* 758 S.W.2d 551, 563 (Tex. Crim. App. 1988).

The absence of a timely and specific objection resulted in a reasonable probability that, absent the deficient performance of trial counsel, the fact finder would have had a reasonable doubt respecting guilt of capital murder, and its concomitant sentence of death. *Strickland v. Washington*, 466 U.S. 668 (1984).



GROUND THREE (EXCLUSION OF MITIGATING EVIDENCE – UNLAWFUL DISCHARGE OF DUTY BY OFFICER NIX – 8TH AMENDMENT RIGHT VIOLATION): Mr. Ruiz was denied his 8th and 14h amendment rights; the trial judge precluded the admission of mitigating evidence of Officer Nix as first aggressor

Mr. Ruiz was denied his Eighth amendment right to have the jurors consider in the punishment phase all the facts and circumstances surrounding the killing and of the condition of the mind of Mr. Ruiz when the trial judge ruled that the defense could not introduce evidence in guilt/innocence of Officer Nix as first aggressor. This evidence had mitigating significance and "was a constitutionally indispensable part of the process of inflicting the penalty of death," in the punishment phase. *Lockett v. Ohio*, 438 U.S. 586, 601 (1978), *citing Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

## A.   Statement of Facts.

Grounds One, Two, Three and Four involve a common set of facts. Accordingly, the statement of facts, as well as all factual and legal allegations, are fully incorporated into each and every ground.

## B.   Argument and Authorities.

### 1.   Standard of Review.

Under *Lockett*, the "fundamental respect for humanity underlying the Eighth Amendment. . . . [mandates the] consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable

part of the process of inflicting the penalty of death."  *Lockett v. Ohio*, 438 U.S. 586, 601 (1978) *citing Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).   The U.S. Supreme Court wrote:

> In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey v. Kemp*, 481 U.S. 279, 304, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987) (emphasis in original). Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that ***the jury must be allowed to consider and give effect to mitigating evidence relevant to*** a defendant's character or record or ***the circumstances of the offense***. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a " 'reasoned *moral* response to the defendant's background, character, and crime.'

(Emphasis supplied and in the original).  *Penry v. Lynaugh*, 492 U.S. 302, 327-328 (1989), *rev'd other grds*, *Atkins v. Virginia*, 536 U.S. 304 (2002).

Under *Lockett*, the sentencer in a capital case must be permitted to consider any relevant mitigating circumstance.  The definition of "mitigating" is very broad and defined by the U.S. Supreme Court as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

*Lockett* prohibits impediments to the sentencer's full consideration and ability to give effect to mitigating evidence, as by way of example, the use of evidentiary rules, *Green v. Georgia*, 442 U.S. 95 (1979) (State cannot inflexibly apply the hearsay rule to exclude from penalty phase reliable hearsay evidence relevant to capital defendant's relevant culpability),

jury instructions, *Hitchcock v. Dugger*, 481 U.S. 393 (1987); or prosecutorial argument, *Penry*, 492 U.S. at 326.

## 2. Mr. Ruiz's 8th amendment rights were violated when the court excluded evidence of Officer Nix as first aggressor

The trial judge violated Mr. Ruiz's 8th amendment right under *Lockett* in which "the jury must be allowed to consider and give effect to mitigating evidence relevant to... the facts and circumstances of the offense." As the defense contended and preserved by proffer, the history of excessive use of force by Officer Nix was admissible as first aggressor evidence because it was relevant, apart from showing character conformity. It was relevant evidence of "facts and circumstances surrounding the killing." *See* TEX. CODE CRIM. PROC. 38.26(a) It demonstrated the deceased's intent, motive or state of mind. *Torres v. State*, 71 S.W.3d 758, 760-762 (Tex. Crim. App. 2002); *Torres v. State*, 117 S.W.3d 891 (Tex. Crim. App. 2003). The prior history of excessive use of force by Officer Nix "tends to raise the issue of self-defense, which the violent act may then help to clarify." *Torres v. State*, 117 S.W.3d at 895. *See also Wortham v. State*, 2004 WL 212189, *2 (Tex. App. – Tyler, Sept. 30, 2004) (not designated for pub.) (Holding in dicta that specific acts of violence may be introduced to demonstrate reasonableness of defendant's fear of danger or that deceased was first aggressor, where self-defense is raised).

This evidence was also relevant and admissible under TEX. CODE CRIM. PROC. 38.26(a) to show the condition of mind of Mr. Ruiz. Its exclusion prevent Mr. Ruiz from persuading the trier of fact that he acted in self defense and that if he was guilty, he was guilty of murder,

---

or of a lesser-included-offense of murder, which carried a lesser sentence than death. *See* TEX. CODE CRIM. PROC. 38.26(a) (facts and circumstances to show condition of mind of the accused); *Ruffin v. State*, 270 S.W.3d 586, 596 (Tex. Crim. App. 2008) ("We quoted article 38.36 in *Jackson* for the unremarkable proposition that both the State and defendant may offer testimony as to "all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."). U.S. CONST. amend. VI; U.S. CONST. amend. XIV.

Albeit that this evidence would have been adduced in guilt/innocence, evidence in the guilt/innocence phase is nonetheless considered by the jurors in the punishment phase of a capital trial when the jurors answer the special issues of mitigation and future dangerousness. Indeed, in the punishment phase jury instructions specifically instruct the jury:

> ***You shall consider all evidence admitted <u>during the guilt or innocence stage</u> and the punishment stage, including evidence of*** the defendants background or character or ***the circumstances of the offense that*** militates for or ***mitigates against the imposition of the death penalty.***

(CR 2:658).

In *Lane v. State*, 822 S.W.2d 35 (Tex. Crim. App.,1991), the Texas Court of Criminal Appeals was asked whether evidence admitted in the guilt/innocence phase "can be characterized as "mitigating" for Eighth Amendment purposes," under *Lockett v. Ohio*, 438 U.S. 586, 604. In *Lane*, the "Appellant ... [had] offered evidence that the gun with which he killed the victim required little pressure on the trigger to make it fire, and thus could be easily set off by a careless or extremely nervous person, and that the gun did in fact discharge

accidently in his nervous hands. ... The issues of how easily the gun would fire and whether or not it discharged accidentally are addressed at the guilt/innocence phase of the trial." The Texas Court of Criminal Appeals held: "Because the jury was empowered to give full effect to all the mitigating evidence presented at trial, appellant has not been sentenced to death in violation of the Eighth Amendment." *Lane v. State*, 822 S.W.2d 35, 39 (Tex. Crim. App.,1991).

Unlike *Lane*, in the case at bar, the trial judge's ruling excluding evidence of Officer Nix as "first aggressor," where Mr. Ruiz had raised the defense of self defense, prevented the jurors from considering and giving full effect to all the mitigating evidence presented at trial, in violation of the Eighth Amendment. Habeas relief should be granted.

GROUND FOUR  (IAC & ABSENCE OF PROFFER OF MITIGATING EVIDENCE – _UN_LAWFUL DISCHARGE OF DUTY BY OFFICER NIX – 6TH & 14 AMENDMENT VIOLATIONS). **Mr. Ruiz was denied his right to effective assistance of counsel.  During punishment, they failed to proffer mitigating evidence of Officer Nix as first aggressor, which outweighed the aggravating evidence**

Mr. Ruiz was denied his Sixth and Fourteenth amendment rights to effective assistance of counsel, who failed to proffer and seek to have admitted in the punishment phase, mitigating evidence that Officer Nix was not acting in the lawful discharge of his duty, but was, instead, acting as first aggressor – evidence that was a constitutionally indispensable part of the process of inflicting the penalty of death." _Lockett v. Ohio_, 438 U.S. 586, 601 (1978), _citing Woodson v. North Carolina_, 428 U.S. 280, 304 (1976).   As a result, Mr. Ruiz was denied effective assistance of counsel to which he is entitled under the Sixth and Fourteen amendments to the U.S. Constitution.  U.S. CONST. amend. VI; U.S. CONST. amend. XIV.

### A.    Statement of Facts.

Grounds One, Two, Three and Four involve a common set of facts.  Accordingly, the statement of facts, as well as all factual and legal allegations, are fully incorporated into each and every ground.

### B.    Argument and Authorities.

#### 1.    Standard of Review

The Supreme Court in _Strickland_ held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of

---

the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

## The ABA Guidelines

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. *Rompilla v. Beard*, 545 U.S. 374 (2005), *citing Wiggins v. Smith*, 539 U.S. 510, 522 (2003) ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'").

In the case at bar, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, specifically ABA GUIDELINE 10.11 – The Defense Case Concerning Penalty (rev. ed. Feb. 2003) is applicable:

> L.    Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.

---

## 2.   Trial counsel failed to proffer mitigating evidence of Officer Nix as first aggressor

Trial counsel's performance was deficient, because at the inception of the punishment phase, counsel should have again proffered and obtained a ruling from the judge as to the admissibility of evidence of Officer Nix as first aggressor. *Lockett v. Ohio*, 438 U.S. 586, 601 (1978), *citing Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).  They also failed to correct misleading and inaccurate ballistics evidence, which otherwise would have had mitigating significance.

Evidence of Officer Nix as first aggressor would have challenged as improper, inaccurate, and misleading guilt/innocence testimony of Officer Nix as "hero."  It would also have provided the jury with a cogent rationale as to why death was not a suitable punishment for Mr. Ruiz.

*Lockett* prohibits impediments to the sentencer's full consideration and ability to give effect to mitigating evidence, as by way of example, the use of evidentiary rules, *Green v. Georgia*, 442 U.S. 95 (1979) (State cannot inflexibly apply the hearsay rule to exclude from penalty phase reliable hearsay evidence relevant to capital defendant's relevant culpability), jury instructions, *Hitchcock v. Dugger*, 481 U.S. 393 (1987); or prosecutorial argument, *Penry*, 492 U.S. at 326.

Unfair prejudice resulted from the deficient performance of Mr. Brauchle because the evidence of Officer Nix as first aggressor had mitigating significance that outweighed the aggravators introduced at trial.

The prior bad acts attributed to Mr. Ruiz were:

- had been adjudicated a delinquent child with a finding that he had been convicted of theft. He was placed on probation for one year on June 13, 1996. (SX117)

- misdemeanor convictions for:

  - burglary of a vehicle, a Class A misdemeanor, on September 2, 1997, for which he received 100 days confinement in the Dallas County jail (SX118);

  - theft, a Class B misdemeanor, on September 2, 1997, for which he received 100 days confinement in the Dallas County jail (SX119);

  - burglary of a vehicle, a Class A misdemeanor, on August 3, 1997, for which he received 75 days in the Dallas County jail (SX120);

  - escape, a Class A misdemeanor, on February 17, 1998, for which he received 90 days confinement in the Dallas County jail (SX121);

  - assault, family violence, a Class C misdemeanor, on October 23,

- felony convictions for:

  - evading arrest, a state jail felony, reduced to misdemeanor punishment, on November 10, 2005, for which he received one year confinement in the Dallas County jail (SX123);

  - possession of a controlled substance, a state jail felony, reduced to misdemeanor punishment, on November 10, 2005, for which he received one year confinement in the Dallas County jail (SX126);

  - possession of a controlled substance, with intent to deliver, a first degree felony, on May 23, 2006, for which he received 10 years confinement, probated for 8 years (SX127).

- a plea of guilty to the offense of possession of a controlled substance, with intent to deliver, a first degree felony, on April 24, 2006, and was placed on 10 years deferred adjudication probation (SX125).

- Raul Toledo identified Appellant as a member of an Irving street gang, the Midnight Dreamers and as a participant in an incident on March 8, 1997, in which the home of a gang rival, Joe Ramos, was shot up. (RR51: 92-93).

These prior bad acts introduced by the prosecution in the punishment phase are primarily theft and drug offenses. Even the "violent" offenses attributed to Mr. Ruiz are minimal, such as a home (not persons) that had been shot up because of gang involvement, and a misdemeanor Class C, family violence charge. Moreover, police evasion by Mr. Ruiz shows that Ruiz is violence-adverse seeking to move away from confrontation rather than meet it head on.

In contrast, evidence of Officer Nix as first aggressor was mitigating because it would have refuted testimony from Officer Starr that Officer Nix was a "hero." It would have demonstrated that Officer Starr's statement was misleading and inaccurate. The evidence of Officer Nix as first aggressor was mitigating evidence because it supported the self-defense assertion of Mr. Ruiz, particularly given Officer Nix's history of uncontrolled, and unjustified aggression against civilians:

- The autopsy report reflects that Officer Nix shot-to-kill Mr. Ortiz by shooting Ortiz, who was running away, in the buttocks.

- the encounter between Office Nix and Karlous Lake reflects that Officer Nix tasered Lake although Lake's arms had been up in a "surrender" position when he was tased. (RR 46:131-133).

- the encounter between Office Nix and 14 year old Anthony Williams, reflects that Officer Nix picked Williams up by the handcuffs, told Williams to shut up or he would knock his teeth out, threw Williams into the police car, (RR 48:66-68), and threatened Williams with bodily harm, if Williams filed a complaint. (RR 48:69). Anthony did not file a complaint against Officer Nix because another officer at the scene did. (RR 48:68). Officer Nix was appealing a sustained finding by the disciplinary board at the time of his death. (RR 48:73).

- the encounter between Office Nix and Ruiz reflects that Officer Nix rushed Ruiz's vehicle, contrary to police department policy. (RR 42:98, 109; Defense Exhibit 1).

In its consideration of the special issues, evidence of Officer Nix as first aggressor:

1.  Outweighs the bad acts and extraneous offenses committed by Mr. Ruiz which were introduced by the prosecution in the punishment phase, and refutes testimony that Officer Nix was a hero when he rushed Ruiz's vehicle. (RR 45:35).

2.  Supports Mr. Ruiz's assertion of self-defense, as well as the affirmative showing that Mr. Ruiz was violence-adverse (shown by his 2005 evading arrest charge, as well as Mr. Ruiz refusal to confront the police in a volley of gunfire[1] in the capital murder case).

---

[1]  Mr. Jenkins attests:

c.  Defense counsel's deficient performance unfairly prejudiced Applicant Ruiz because a qualified expert could have testified that even if the weapon had jammed and become non-functional, it would have taken only a few seconds to remove the magazine, remove the top bullet and then engage the magazine back into the firearm. *From this testimony, the jurors could infer that Applicant Ruiz did __not__ have the requisite intent to commit capital murder because had he wanted to continue firing at law enforcement who surrounded the vehicle, he could have. Instead, Applicant Ruiz initially fired the weapon, only once, and in apparent self-defense.*

Exhibit 2: Affidavit of Cliff Jenkins (Ballistics).

Hence, the failure of defense counsel to attempt to proffer evidence of Officer Nix as first aggressor, and to correct misleading and inaccurate ballistics evidence is unfairly prejudicial. It raises the probability that the outcome would have been different. U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Strickland v. Washington*, 466 U.S. 668 (1984); *Lamb v. State*, 2005 WL 1771322 (Tex. App. – Houston [14 Dist.] 2005) ("Prejudice is shown where the totality of mitigating evidence (including that which the incomplete investigation did not reveal), when weighed against the evidence in aggravation of punishment, shows a reasonable probability that a different sentence would have resulted if the additional mitigating evidence had been presented.").

As a result, habeas relief should be granted.



GROUND FIVE (TRIAL IN A PREJUDICIAL ATMOSPHERE – 6TH & 14 AMENDMENT VIOLATIONS). Mr. Ruiz was denied his Sixth Amendment right to a fair and impartial trial because of the overwhelming presence of law enforcement in the courtroom during the punishment phase of the trial

Mr. Ruiz was denied his Sixth and Fourteenth amendment rights to a fair and impartial trial because of the overwhelming presence of law enforcement in the courtroom in the punishment phase of the trial. In combination with the installation of a metal detector, the hostile and disparate treatment of the family of Mr. Ruiz who were not allowed to sit in close proximity to their son, this presence of an overwhelming number of uniformed officers who lined the walls, and sat in the galley of the courtroom, resulted in an inherently unfair trial process, and violated the fundamental due process rights of Mr. Ruiz to a fair trial. U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986).

A.    **Statement of Facts.**

Officer Nix had been a member of the Dallas Police Department. During the guilt/innocence and punishment phases of the trial, there were an overwhelming number of uniformed police officers in the courtroom, who lined the walls, and sat in the galley of the courtroom.

Family members attest to the overwhelming presence of law enforcement during the trial.

Barbara Ruiz, Wesley's mother, attests:

4.    I attended the capital murder trial in Dallas County of my son, Wesley Lynn Ruiz, on or about June 5, 2008 through July 11, 2008 when he was

given the death penalty for the shooting death of Dallas Police Officer Mark Nix.

5. Prior to my testimony, I was not allowed inside the courtroom. I sat each day on a bench outside the courtroom with other family members. The hallway was full of news crews and camera equipment. For a while, my family and I watched the monitors but when the reporters realized who we were, they started using headsets so we could not hear the sound from inside the courtroom.

6. The hallway was filled with lots of uniformed police officers who just stood around and stared at us. They did not seem to have any purpose for being there – many did not go inside the courtroom.

7. When I went inside the courtroom to testify, there were 20 or more uniformed police officers, some sitting in the gallery and others standing along the walls.

8. The Nix Family was seated on the front row and surrounded by police officers. Whenever they entered or left the courtroom, the Nix's were escorted by police officers. There were days these officers were in uniforms; other days the same officers were in plain clothes.

Exhibit 5: Affidavit Barbara Ruiz, paras. 4-8.

Sue Ann Ziegenhain, the maternal grandmother of Wesley Ruiz, made the same observations about the "dominant presence of uniformed law enforcement throughout the courtroom." She also attested that she "noticed jurors looking out into the gallery where uniformed officers were lining the walls, standing along the perimeter." Exhibit 6: Affidavit Sue Ann Ziegenhain, paras. 6, 9 10.

The prejudicial atmosphere of the courtroom became even more oppressive with the installation of metal detectors, and with the disparate and hostile treatment of the family of Mr. Ruiz, as the colloquy between defense counsel and the judge shows:

THE COURT:     Mr. Brauchle, was there an issue you wish to address outside the presence of the jury.

MR. BRAUCHLE:  There are quite a few. *One of them would be that we would object to the metal detectors and the increased security in this it militates against our client's presumption that the State has the burden of the punishment phase.* I think to put a mental detector outside the courtroom, which didn't exist during the guilt or innocence stage now put it up in the guilt stage, somehow tells the jury if not the world that somehow our man is now more dangerous than he was before. And we would object to that, *as well as the increased deputies in the courtroom.*

The other thing we would object to is that the State seems to this that this is their courtroom and they can designate who sits where and we are kind of tired of the little signs directing everybody as to where they can sit and what they can and can't do. I think the Court ought to figure out what the rules are and go from there.

I especially object to the fact that *Mr. Ruiz's family is not able to sit on the front row as are other families represented here. I don't see any distinction between the two. I certainly don't think that Mr. Ruiz's family is inherently dangerous by any means.* And *we would ask that we can get a fair shake in the courtroom and in the security in the courtroom, because all of these things are obviously prejudicial to our client and it doesn't need to exist.* We can start with a level playing field and we would object to those matters.

THE COURT:     Both of those matters are overruled. The security of the courtroom is left up to the sheriff's department, the bailiffs. And overrule both of those requests.

MR. BRAUCHLE:  So is the Court saying that anything the bailiffs can dream up is okay.

---

THE COURT:     Court is not saying that.  But at this time the precautions that the sheriff's department have been accurate and will remain in effect.

MR. BRAUCHLE:  Where did these come from.  We just come down here and the place is taken over by people that we don't know that don't even have anything to do with the case.

THE COURT:     They will remain in effect, Mr. Brauchle.

(RR 51:25-27).

Richardon Ziegenhain, the maternal grandfather of Wesley Ruiz, attests to the overwhelming presence of the uniformed police officers during the punishment phase of the trial, a crucial trial phase when the jurors are asked to make decisions on the special issues that result in life or death:

14.   On the last days of the trial, even more uniformed police officers were visible in the courtroom. It was obvious to me that they were portraying to everyone present, including the judge, jury and reporters, the solidarity of the police brotherhood against Wesley.

Exhibit 7: Affidavit Richard Ziegenhain, para. 14.

## B.   Argument and Authorities

### 1.   Standard of Review

In *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986), the Supreme Court held:

Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of impermissible factors coming into play,"

### 2.   The overwhelming number of law enforcement presented an unacceptable risk of prejudice

In *Holbrook v. Flynn*, 475 U.S. 560, 562-563 (1986), Mr. Holbrook and five co-defendants were tried in the same trial.  Mr. Holbrook's defense counsel objected to "the presence of four uniformed state troopers, sitting in the first row of the spectators' section; the officers were not far behind, but were separated by the "bar" from the seats assigned to the defendants for the duration of the trial.... [on the basis that their presence was] ... a display of 'strength' in the presence of the jury."

The Supreme Court noted that it would "not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial." *Holbrook*, 475 U.S. at 570-571.  The Court looked to the inference that a juror could draw, even though the effect might be unconscious and the juror unable to articulate or identify it:

> *Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused.* This will be especially true when jurors are questioned at the very beginning of proceedings; at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial. *Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of impermissible factors coming into play,"*

*Holbrook*, 475 U.S. at 570 (emphasis supplied).

The *Holbrook* Court held that it "[could] not believe that the use of the four troopers tended to brand respondent in their eyes 'with an unmistakable mark of guilt.' .... Four troopers are unlikely to have been taken as a sign of anything other than a normal official

concern for the safety and order of the proceedings. Indeed, any juror who for some other reason believed defendants particularly dangerous might well have wondered why there were only four armed troopers for the six defendants." Accordingly, the Supreme Court determined that the challenged practice was not inherently prejudicial and Mr. Holbrook had failed to show actual prejudice. *Holbrook*, 475 U.S. at 572.

*Holbrook* is in stark contrast to the inherently prejudicial courtroom arrangement in Mr. Ruiz's trial. Unlike Mr. Holbrook, Wesley Ruiz was the only defendant in the capital trial. Unlike Mr. Holbrook, where there were only four (4) uniformed officers in the court room, during Mr. Ruiz's trial, there were "20 or more uniformed police officers, some sitting in the gallery and others standing along the walls." Exhibit 5: Affidavit Barbara Ruiz, para. 7. And the presence of uniformed officers, both from the Dallas Police Department, and from the Sheriff's Department increased during the punishment phase.

Unlike *Holbrook*, jurors sitting in judgment in the Ruiz case, were seen to be looking out into the courtroom and observed the overwhelming and predominant show of force by so many uniformed officers for a single defendant. Exhibit 6: Affidavit Sue Ann Ziegenhain, para. 10.

A coalescence of factors including the predominant presence of uniformed Dallas Police Officers in the courtroom, together with an increase in the number of sheriff's deputies, and the presence of metal detectors, as well as the hostile and disparate treatment of the Ruiz family, who were not allowed to sit next to their son, Wesley Ruiz, gave rise to the inference

that Mr. Ruiz was dangerous, and that the jurors should vote in such a manner that punishment would be death.

Accordingly, in the case at bar, the over all effect created an unacceptable risk that impermissible factors came into play to influence the jury. *Holbrook*, 475 U.S. 560.

Habeas relief should be granted.

GROUND SIX (IAC & TRIAL IN A PREJUDICIAL ATMOSPHERE – 6TH & 14 AMENDMENT VIOLATIONS). Mr. Ruiz was denied his right to effective assistance of counsel, who failed to object to, and make a record of, the overwhelming presence of law enforcement

Mr. Ruiz was denied his Sixth and Fourteenth amendment rights to effective assistance of counsel, who failed to timely and specifically object to, and make a record of, the overwhelming presence of fellow police officers during the punishment phase of the trial, as is required by Texas and federal law in order to show actual prejudice. *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986). As a result, Mr. Ruiz was denied effective assistance of counsel to which he is entitled under the Sixth and Fourteen amendments to the U.S. Constitution. U.S. CONST. amend. VI; U.S. CONST. amend. XIV.

A.      **Statement of Facts.**

Grounds Five and Six involve a common set of facts. Accordingly, the statement of facts, as well as all factual and legal allegations, are fully incorporated into each and every ground.

B.      **Argument and Authorities.**

1.      **Standard of Review**

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

*Strickland v. Washington,* 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

## 2.   Trial counsel was constitutionally ineffective

### a.   Counsel's performance was deficient

"To preserve error for appellate review, the objecting party must object to the trial court's ruling continuously until receiving an adverse ruling. The proper method to pursue an adverse ruling is to: (1) object, (2) request an instruction to disregard, and (3) move for a mistrial." *Jones v. State*, 825 S.W. 2d 470, 471 (Tex. App. – Corpus Christi,1991), *citing Penry v. State*, 691 S.W.2d 636, 649 (Tex. Crim. App.1985); *Fuentes v. State*, 664 S.W.2d 333, 336 (Tex. Crim. App.1984); *Vela v. State*, 771 S.W.2d 659, 662 (Tex. App. – Corpus Christi 1989, pet. ref'd).

Moreover, "[a]lmost any right, constitutional and statutory, may be waived by the failure to make a timely and specific objection. " *Jones v. State*, 825 S.W. 2d 470, 471 (Tex. App. – Corpus Christi,1991), *citing Little v. State*, 758 S.W.2d 551, 563 (Tex. Crim. App. 1988).

## (1)   Counsel failed to specifically object

Trial counsel's performance was deficient because they failed to properly object to a violation of Mr. Ruiz's Sixth and Fourteenth amendment rights to a fair trial under the United States Constitution, and to make a record of the inherently prejudicial atmosphere during the punishment phase.

The record reflects that out of the presence of the jury, the judge had asked Mr. Brauchle if he had an issue he could like to bring up, to which Mr. Brauchle responded:

> There are quite a few. *One of them would be that we would object to the metal detectors and the increased security in this it militates against our client's presumption that the State has the burden of the punishment phase.* I think to put a metal detector outside the courtroom, which didn't exist during the guilt or innocence stage now put it up in the guilt stage, somehow tells the jury if not the world that somehow our man is now more dangerous than he was before. And we would object to that, *as well as the increased deputies in the courtroom.*
>
> ....
>
> I especially object to the fact that *Mr. Ruiz's family is not able to sit on the front row as are other families represented here. I don't see any distinction between the two. I certainly don't think that Mr. Ruiz's family is inherently dangerous by any means. And we would ask that we can get a fair shake in the courtroom and in the security in the courtroom, because all of these things are obviously prejudicial to our client and it doesn't need to exist.* We can start with a level playing field and we would object to those matters.

(RR 51:25-26).

Mr. Brauchle  merely objected on the basis that "all of these things are obviously prejudicial to our client." Texas law required Mr. Brauchle to make a specific objection, to wit: that the overwhelming presence of police officers during the punishment phase of the trial

---

violated Mr. Ruiz's Sixth and Fourteenth amendment rights to a fair trial under the United States Constitution.  U.S. Const. amend. VI & XIV.


### (2)    Counsel failed to make a record

The performance of Mr. Brauchle was also deficient because all he asserted was that "we would object to ... the increased deputies in the courtroom."  Texas law required that Mr. Brauchle  request that he be allowed to, and in fact make, a record to preserve how many uniformed Dallas Police Officers were in the room, how many sheriff's deputies were in the room, where law enforcement was situated in relation to the jurors and to Mr. Ruiz, etc.  Mr. Brauchle did none of these.


### b.    The constitutionally deficient performance of defense counsel raised the reasonable probability that the outcome would have been different

Unfair prejudice resulted from the deficient performance of Mr. Brauchle because he failed to specifically and properly object as is required by Texas law to a violation of Mr. Ruiz's Sixth and Fourteenth amendment rights to a fair trial under the United States Constitution, and to make a record of the inherently prejudicial courtroom atmosphere during the punishment phase.

### (1) Brauchle's deficient performance resulted in a failure to prove actual prejudice

In *Holbrook*, the defense had preserved that there were four uniformed troopers sitting n the first row of the spectator's section" of the courtroom. *Holbrook*, 475 U.S. at 562. The *Holbrook* Court observed that "[t]he chief feature that distinguishes the use of identifiable security officers from courtroom practice we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence." *Holbrook*, 475 U.S. at 569. In *Holbrook*, the Supreme Court held that it could not "find an unacceptable risk of prejudice in the spectacle of four [uniformed and armed] officers quietly sitting in the first row of a courtroom's spectator section.... [A]ny juror who for some other reason believed defendants particularly dangerous might well have wondered why there were only four armed troopers for the six defendants." *Holbrook*, 475 U.S. at 571.

In contrast, Mr. Brauchle was or should have been aware that a "show of force" by Dallas law enforcement at the trial of an accused who killed one of their own is common practice in Dallas County. Given that Mr. Brauchle is an experienced capital defense litigator, the best practice would have been for him to have requested that he be allowed to make a record of the number of uniformed Dallas Police Officers and their location in the courtroom, in addition to the number and location of "the increased deputies in the courtroom." Without this data, Mr. Ruiz has been placed in the untenable position of not being able "to show actual prejudice...." *Holbrook*, 475 U.S. at 572.

### (2)   But for Brauchle's deficient performance, there might have been a cure to the prejudicial atmosphere

Had Mr. Brauchle made a specific objection to the number and location of Dallas Police Officers in the courtroom, it is possible that the inherently prejudicial atmosphere caused by overwhelming police presence could have been cured at that time. For example, in *Hinkle v. State*, 2004 WL 438330 (Tex. App. – Austin 2004, dis. rev. ref'd) (not designated for pub.):

> ... after both sides rested. Defense counsel approached the bench and complained that the courtroom was "packed" with uniformed police officers. *Counsel objected that the "timing and increase in law enforcement presence is such that it creates an intimidating and coercive atmosphere that cannot help but prejudice and influence the jury's verdict in this case." After stating for the record that there were approximately fifty public seats in the courtroom, the court ruled that no more than sixteen uniformed officers would be permitted to remain.* Officers in civilian clothing were also allowed to remain, but were instructed to hide their badges and other police identification. Just before the jury returned to the courtroom to hear final arguments, the court noted for the record that there were thirteen uniformed police officers present, and that "[a] lot of them are dispersed and also in the back of the courtroom."
>
> It is understandable that the deceased officer's comrades on the force were interested in hearing final arguments in this case. At the same time, the trial court was commendably sensitive to the prejudice that could result from an excessive police presence in the courtroom. *See Holbrook v. Flynn*, 475 U.S. 560, 570-71, (1986). *The actions taken by the court appear to have satisfied defense counsel, as he voiced no further objections.* Finding no reversible error, we overrule pro se point of error one.

In conclusion, Mr. Ruiz was denied his Sixth and Fourteenth amendment rights to effective assistance of counsel who failed to timely and repeatedly object to the overwhelming

---

presence of fellow police officers in the courtroom throughout the trial. U.S. CONST. amend.

VI; U.S. CONST. amend. XIV.

GROUND SEVEN  (IAC FOR FAILURE TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE OF SELF-DEFENSE – 6TH & 14 AMENDMENT VIOLATIONS).  The 6th and 14th amendment rights of Mr. Ruiz to effective assistance of counsel were violated because defense counsel failed to adequately investigate, develop and present evidence of self-defense

Mr. Ruiz was denied his Sixth and Fourteenth amendment rights to effective assistance of counsel.  At all stages of the proceeding, trial counsel failed to preserve, investigate, develop and present evidence that would have proved self-defense by Mr. Ruiz, and demonstrated Officer Nix, as first aggressor.  U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Strickland v. Washington*, 466 U.S. 668 (1984).

## A.  Statement of Facts.

As 3. Overview of the Statement of Facts following the Introduction, supra, Mr. Ruiz had asserted self-defense based on his encounter with Officer Nix.   However, there was substantial other evidence (ballistics evidence and audio recordings), which  trial counsel failed to preserve, correct, and/or proffer.  This other evidence would not only have aided the self-defense assertion, but also mitigated the devastating effects of the trial judge's refusal to admit the testimony of various civilian witnesses, whose testimony was proffered as evidence of Officer Nix as first aggressor.

**B.** **Argument and Authorities.**

1.   **Standard of Review**

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

### The ABA Guidelines

In evaluating an ineffective assistance of counsel claim, the United States Supreme Court has looked for guidance to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. *Rompilla v. Beard*, 545 U.S. 374 (2005), *citing Wiggins v. Smith*, 539 U.S. 510, 522 (2003) ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'").

In the case at bar, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, specifically ABA GUIDELINE 10.11 – The Defense Case Concerning Penalty (rev. ed. Feb. 2003) is applicable:

---

I.   Counsel at all stages of the case should carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible; ...

## 2.   Trial counsel was constitutionally ineffective

### a.   The defense failed to appropriately challenge the aggravating ballistics evidence as improper, inaccurate and misleading

Trial counsel's performance was constitutionally deficient because they failed to appropriately challenge the aggravating ballistics evidence as improper, inaccurate and misleading. The prosecution pursued testimony in which witnesses progressively escalated the description of the weapon used by Mr. Ruiz from the accurate "seimiautomatic pistol" to the more fear provoking descriptions of "assault pistol" and "automatic pistol." No effort was made by defense counsel to correct these misconceptions despite the fact that the prosecution was seeking death.

Moreover, as Mr. Jenkins concludes "[d]efense counsel's deficient performance unfairly prejudiced Applicant Ruiz because a qualified expert could have testified that even if the weapon had jammed and become non-functional, it would have taken only a few seconds to remove the magazine, remove the top bullet and then engage the magazine back into the firearm. From this testimony, the jurors could infer that Applicant Ruiz did not have the requisite intent to commit capital murder because had he wanted to continue firing at law enforcement who surrounded the vehicle, he could have. Instead, Applicant Ruiz initially

fired the weapon, only once, and in apparent self-defense." Exhibit 2: Affidavit of Cliff

Jenkins (ballistics).

>    **b.    The defense failed to take the necessary steps at the inception of their appointment to preserve the audio-recordings of the encounter between Officer Nix and Mr. Ruiz**

State investigator, Cliff Jenkins, attests both to the deficient performance of trial

counsel and its prejudicial effect concerning the lack of preservation and ultimate destruction

of audio recordings – evidence that could have demonstrated the state of mind of Officer Nix

in his encounter with Mr. Ruiz:

>    21.    It is my experience as a defense investigator that the performance of the defense attorneys representing Applicant Ruiz was deficient because they failed to immediately issue and deliver a subpoena, or a court order to preserve any and all audio/video recordings to a proper place of custody of the records to prevent the very problem in the Ruiz case – the erasure of the audio communications of what transpired between Officer Nix and Applicant Ruiz on March 23, 2007.

>    22.    It is also my opinion that the deficient performance of the defense attorneys was unfairly prejudicial because the erasure of this audio communication is crucial to Applicant Ruiz's assertion that Officer Mark Nix acted _un_lawfully in the performance of his duties, in turn giving rise to various defenses which were not raised at all or raised inadequately at trial, as for example, that Applicant Ruiz acted in self-defense, and that Officer Mark Nix engaged in official oppression.

>    23.    This information would have been crucial to support the defense assertion through cross examination of Officer Todd Haeckler by defense attorney Johnson that Applicant Ruiz acted in self defense ....

### c.   The audio-recordings, and an accurate assessment of the ballistics evidence would have had mitigating significance in the punishment phase

Both the audio-recordings and an accurate and reliable assessment of the ballistics evidence would have had mitigating significance in the punishment phase of the trial – even if they were addressed in the guilt/innocence phase. This is because they would have demonstrated the intent, motive or state of mind of Officer Nix. *Torres v. State*, 71 S.W.3d 758, 760-762 (Tex. Crim. App. 2002); *Torres v. State*, 117 S.W.3d 891 (Tex. Crim. App. 2003). The prior history of excessive use of force by Officer Nix "tends to raise the issue of self-defense, which the violent act may then help to clarify." *Torres v. State*, 117 S.W.3d at 895. *See also Wortham v. State*, 2004 WL 212189, *2 (Tex. App. – Tyler, Sept. 30, 2004) (not designated for pub.) (Holding in dicta that specific acts of violence may be introduced to demonstrate reasonableness of defendant's fear of danger or that deceased was first aggressor, where self-defense is raised).

Moreover, even had this evidence been adduced in guilt/innocence, it would have nonetheless been considered by the jurors in the punishment phase when deliberating on the special issues of mitigation and future dangerousness. Indeed, in the punishment phase jury instructions specifically instruct the jury:

> You shall consider all evidence admitted <u>during the guilt or innocence stage</u> *and the punishment stage, including evidence of* the defendants background or character or *the circumstances of the offense that* militates for or *mitigates against the imposition of the death penalty*.

(CR 2:658).

---

EX PARTE WESLEY LYNN RUIZ: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS            65

> **d.** **The defense failed to adequately investigate, develop and present evidence of the destruction of mental health evidence (possibly PTSD), which could have supplied an explanation of Officer Nix's aberrant behavior**

The defense failed to adequately investigate, develop and present evidence of the destruction of mental health evidence, which could have possibly supplied an explanation for Officer Nix's aberrant behavior.   As part of the investigation, state habeas fact investigator, Cliff Jenkins, was asked to search for other documents, and in particular documents which could have revealed the state of mind of Officer Nix, to determine if the aggressive behavior of Officer Nix could be explained by PTSD.  This issue was raised by trial testimony that Officer Nix had been called to active duty in 2003 when the Iraq war started.  (RR 52:147).

Such documentation could have provided a realistic explanation to the jurors of Officer Nix as first aggressor.  It would have made the self-defense assertion believable by showing that Mr. Ruiz was not attempting to blame Officer Nix.

Dr. Kessner attests:

12.   Cliff Jenkins' Affidavit No. 3 (document and records search)

> *Mr. Jenkins' affidavit details the steps he took to locate and obtain medical and psychiatric treatment and pre-employment psychological evaluations for Timothy Nix. His efforts have been unsuccessful and there is no documentation of Officer Nix' mental state or overall psychological functioning following his tour in Iraq.*

13.   Answers to Questions at Issue

> A.   *Ms. Brandt asked whether Officer Nix's behavior at the time of his fatal interaction with Mr. Ruiz, could be accounted for by a diagnosis of Post Traumatic Stress Disorder (PTSD).*

Unfortunately, records that would have been necessary to examine the likelihood that Officer Nix had PTSD from his military service in Iraq in 2003-2004 were not available to reliably address this question. Service medical records, documentation of his military service and psychological evaluation reports from Officer Nix's return to his employment with the Dallas Police Department would be necessary for such an analysis. Dr. Conaway who performed the psychological evaluation of Officer Nix before he resumed his duties as a Dallas Police Officer, has indicated he conveyed all of his data to the DPD and did not maintained a file of his evaluation or a copy of his report. DPD has stated they do not maintain these records past two years. *Without documentation of Officer Nix's mental status it is not possible to opine on the issue of PTSD and its possible relationship to his behavior in the confrontation with Mr. Ruiz.*

Exhibit 4: Affidavit of Gilda Kessner, Psy.D.

Without crucial documentation, the best explanation Dr. Kessner could provide was:

E.    *Officer Nix's behavior defies logic and reasonableness.* His violation of S.O.P. escalated a police chase into a violent confrontation and a hail of bullets. There was no certainty that the suspect was alone in the vehicle. There may have been a co-actor or a child in the suspect vehicle. Officer Nix's actions in violation of S.O.P. placed innocent children and adults crouched in cars, in their homes, and a nearby school at risk of serious injury or death.

Exhibit 4: Affidavit of Gilda Kessner, Psy.D.

e.    **Conclusion**

The deficient performance of trial counsel in preserving evidence of the audio-recordings, in failing to correct the misleading and inaccurate testimony pertaining to ballistics, and in failing to investigate, develop, and present evidence that the mental health records for Officer Nix were lost, destroyed or otherwise unavailable, all raise the reasonable

probability that the outcome would have been different. U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Strickland v. Washington*, 466 U.S. 668 (1984); *Lamb v. State*, 2005 WL 1771322 (Tex. App. – Houston [14 Dist.] 2005) ("Prejudice is shown where the totality of mitigating evidence (including that which the incomplete investigation did not reveal), when weighed against the evidence in aggravation of punishment, shows a reasonable probability that a different sentence would have resulted if the additional mitigating evidence had been presented.").

   As a result, habeas relief should be granted.



**GROUND EIGHT (IAC – MITIGATING EVIDENCE OF MR. RUIZ AS GOOD FATHER):** Mr. Ruiz was denied his Sixth and Fourteenth amendment rights because defense counsel failed to adequately investigate, develop, and present crucial mitigating evidence in the punishment phase of the adverse impact of Mr. Ruiz's execution on his children

### A.   Statement of Facts.

Defense counsel presented very limited testimony regarding Wesley Ruiz's role as a father (RR 53:85) (Wesley Ruiz had two children; because he was on the road as a truck driver, he could not be with his family and the children were a factor in his desire to be employed where he could be with them), (RR 53:101) (Ruiz had a son, Joseph; Ruiz was unable to obtain visitation or custody because of the actions of Ruiz's wife, Erica, who was not Joseph's mother); (RR 53:186) (Testimony that Wesley Ruiz babysat a lot and was "good with his children"),  (RR 53:192, 193) (Wesley was a hard worker, took care of, and loved, his kids).

There is a reasonable probability that absent an adequately investigated and developed mitigating evidence of the good character in Wesley's parenting of his children, and expert witness testimony to help the jury understand the importance of maintaining Wesley Ruiz's paternal relationship, the outcome (a death sentence) would have been different.

### B.   Argument and Authorities.

#### 1.   Standard of Review.

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of

---

the adversarial process that the trial cannot be relied on as having produced a just result."

*Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for

judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions
> were outside the wide range of professional competent assistance," and
>
> Second, "whether there is a reasonable probability that, absent the errors, the
> fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 695.

The *Wiggins* Court wrote that "[i]n assessing the reasonableness of an attorney's

investigation ... a court must consider not only the quantum of evidence already known to

counsel, but also whether the known evidence would lead a reasonable attorney to investigate

further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).


### The ABA Guidelines

In evaluating an ineffective assistance of counsel claim, the United States Supreme

Court has looked for guidance to the ABA Guidelines for the Appointment and Performance

of Counsel in Death Penalty Cases. *Rompilla v. Beard*, 545 U.S. 374 (2005), *citing Wiggins

v. Smith*, 539 U.S. 510, 522 (2003) ("[W]e long have referred [to these ABA Standards] as

'guides to determining what is reasonable.'").

In the case at bar, G<small>UIDELINES FOR THE</small> A<small>PPOINTMENT AND</small> P<small>ERFORMANCE OF</small> D<small>EFENSE</small>

C<small>OUNSEL IN</small> D<small>EATH</small> P<small>ENALTY</small> C<small>ASES</small>, specifically ABA G<small>UIDELINE</small> 10.11 – The Defense Case

Concerning Penalty (rev. ed. Feb. 2003) is applicable:

> F.    In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider including the following:
>
> ....
>
> > 4.    Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

### 2.    Counsel's performance was constitutionally ineffective

Defense counsel presented limited testimony regarding Wesley Ruiz's role as a father (RR 53:85) (Wesley Ruiz had two children; because he was on the road as a truck driver, he could not be with his family and the children were a factor in his desire to be employed where he could be with them), (RR 53:101) (Ruiz had a son, Joseph; Ruiz was unable to obtain visitation or custody because of the actions of Ruiz's wife, Erica, who was not Joseph's mother); (RR 53:186) (Testimony that Wesley Ruiz babysat a lot and was "good with his children"), (RR 53:192, 193) (Wesley was a hard worker, took care of, and loved, his kids).

In contrast, Dr. Elizabeth Beck attests:

FINDINGS AND STATEMENTS

> 10.    Had I been asked to provide testimony in 2007, I would have discussed the theory that indicated how Wesley Ruiz's three children would likely be negatively impacted by a death sentence, and I would have integrated that theory with knowledge about his family. In order to provide a thoughtful integration of the theory regarding families and execution with the Ruiz family, I would have read documents including witness

---

testimony. Additionally I would have sought to speak directly with witnesses including the adults active in the lives of the children born to Erica Rivera and Wesley Ruiz. These adults include the children's maternal grandfather David Rivera, and their paternal grandparents Barbara and Tom Ruiz. I would have also interviewed Erica Rivera, and the children, Wesley Ruiz Jr and Eric Ruiz, as well as the defendant, Wesley Ruiz. Additionally I would have read documents pertaining to and sought to interview Wesley Ruiz's oldest son, Joseph Ruiz, and his mother, Crystal Waltman.

11. Had I provided testimony, my testimony would have followed the following themes:

    a)   Grief and the unique aspects of grief associated with a death sentence;

    b)   Empirical data involving a death sentence and family members mental health;

    c)   Implication of a death sentence on children; and

    d)   Implications of the data for Wesley Ruiz's children.

....

## CONCLUSIONS

19. It is my professional opinion that trial counsel were ineffective in their representation of Mr. Ruiz due to their vague, incomplete presentation of mitigating evidence regarding the relationship between Mr. Ruiz and his children and the impact a sentence of death will have on their future lives.

20. In review of information provided to me regarding testimony during Mr. Ruiz's trial, it appears only cursory evidence was offered regarding Mr. Ruiz's relationship with his children and no testimony was provided regarding the risk and resilience factors held by Mr. Ruiz's children in light of the community's response to the death of Officer Nix and Mr. Ruiz's arrest.

21. The literature makes clear that children suffer psychologically from a parent's death sentence and the complications associated with nonfinite loss and disenfranchised grief. Further data collected by myself and

colleagues supports the general conclusion that these psychological effects very negatively impact the trajectory of these children and often in devastating ways. Based on the review of the materials provided to me by Mr. Ruiz's attorney, that the children enjoy a positive relationship with their father which likely supporting promoting positive development for the youth. Both because of the negative effects associated with a death sentence and the positive relationship between Mr. Ruiz and Wesley Jr and Eric Ruiz it is my professional opinion that a death sentence and execution will negatively affect the lives and future opportunities of Wesley and Eric Ruiz.

22. Based on the review of the materials provided to me by Mr. Ruiz's attorney, it is clear that all three of his children are likely to be negatively impacted by the stress and stigma associated with a death sentence.

23. In my professional opinion, trial counsel's performance was deficient in not investigating and developing the above-described mitigating evidence. Had the jury received the benefit of such evidence, it could have made a difference in the outcome of the case, offering life instead of death.

The deficient performance of defense counsel raised a reasonable probability that the outcome would have been different. Adequate investigation, development and presentation of expert testimony from a witness such as Dr. Elizabeth Beck would have educated the jury regarding the impact of the death penalty on blameless children. It would have shown the jury that it is possible to be a good father from inside prison walls which would have benefited society by helping his children grow up into law-abiding, responsible citizens. It would have given the jury the opportunity to move past this tragedy and start the process of restorative justice by giving Wesley's children the security that their father's life would not be taken from them.

Alternatively, even if the court would not have allowed execution impact testimony, adequate mitigation investigation and development would have allowed defense counsel to reframe and present Wesley's parental relationship with his children as part of Wesley Ruiz's good character. *Lockett v. Ohio*, 438 U.S. 586, 601 (1978), *citing Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

ABA Guidelines allow the presentation of testimony regarding a defendant's character which can include the valued role of parenting his children. In Wesley's instance, there is substantial evidence of correspondence to and from Wesley and his sons prior to his conviction and after. Although limited testimony from family members was offered to show the good character in Wesley's parenting of his children, this testimony required adequate investigation, development and presentation by an expert such as Dr. Beck who would have focused her expertise in this field of study to better help the jury understand the importance of maintaining Wesley Ruiz's relationship with his children.

**3.   Conclusion**

In summary, defense counsel failed to adequately investigate, develop and present mitigating evidence of the good character in Wesley's parenting of his children, and expert witness testimony to help the jury understand the importance of maintaining Wesley Ruiz's relationship with his children. *Strickland*, 466 U.S. at 695.

As a result, habeas relief should be granted.

## CONCLUSION

Mr. Ruiz is entitled to habeas relief because of the numerous errors of federal constitutional magnitude, which could not have been raised prior to this habeas proceeding.

WHEREFORE, he prays that this court:

      1.    Issue a writ of habeas corpus to him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

      2.    Grant him discovery permitting him to take depositions, and submit interrogatories, and issue subpoenas duces tecum, so that he may present additional evidence in support of these claims.

      3.    Grant him an evidentiary hearing pursuant to TEX. CODE CRIM. PROC. 11.071, sec. 9 at which he may present any evidence in support of these claims, and allow him a reasonable period of time subsequent to any hearing this court determines to conduct, in which to brief the issues of fact and of law raised by this habeas application, or such hearing, as more fully detailed in the accompanying Motion for Evidentiary Hearing.

Respectfully submitted,

_Lydia M. V. Brandt_ (signature)

_____

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
194TH JUDICIAL DISTRICT, COLLIN COUNTY, TX

Ex Parte Wesley Lynn Ruiz,
*Applicant*,

TCCA No. AP 75,968
Trial Court Cause No. F07-50318-M

## VERIFICATION

I, Lydia M.V. Brandt, pursuant to Tex. Code Crim. Proc. art. 11.14(5), *Johnson v State*, 811 S.W.2d 93, 97 (Tex. Crim. App. 1991), acting on behalf of Applicant, Mr. Ruiz as permitted in *Ex parte Burns*, 635 S.W.2d 744, 745 (Tex. Crim. App. 1982), declare under penalty of perjury that based on information and belief, the foregoing Application for Writ of Habeas Corpus is true and correct.

Lydia M.V. Brandt
Texas Bar No. 00795262

Subscribed and sworn to before me on December 4, 2010

TONI KNOX
Notary Public,
State of Texas
Comm. Exp. 04-22-12

Notary Public

EX PARTE WESLEY LYNN RUIZ: APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

76

84

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
194TH JUDICIAL DISTRICT, COLLIN COUNTY, TX

Ex Parte Wesley Lynn Ruiz,
*Applicant,*

TCCA No. AP 75,968
Trial Court Cause No. F07-50318-M

## MOTION FOR EVIDENTIARY HEARING

Pursuant to TEX. CODE CRIM. PROC. 11.071, sec. 9, Applicant, Wesley Lynn Ruiz, requests that this court set an evidentiary hearing on the ineffective assistance of counsel claims. It is not realistic to impose the burden on the petitioner to obtain an affidavit from trial counsel confessing error. Nor can reliable, accurate and valid findings and conclusions be premised on unconfronted, self-serving assertions of "strategy" in the trial record.

Moreover, when a former client asserts an ineffective assistance of counsel claim (IAC), defense counsel is placed in an inherent conflict of interest situation: represent the client zealously, even to the extent of admitting to errors and omissions, but risk their livelihood if they do so. Indeed, this conflict-of-interest became tangible when in 2005, the

Texas Legislature had passed SB 60, which provided for the removal from the approved list of any capital defense attorney who is found to be ineffective.  In particular, the statute provides:

> TEX. CODE CRIM. PROC. art. 26.052  –   Appointment of counsel in death penalty case; reimbursement of investigative expenses, provides in part:
>
> (a)   Notwithstanding any other provision of this chapter, this article establishes procedures in death penalty cases for appointment and payment of counsel to represent indigent defendants at trial and on direct appeal and to apply for writ of certiorari in the United States Supreme Court
>
> .....
>
> (d)   (1)   The committee shall adopt standards for the qualification of attorneys to be appointed to represent indigent defendants in capital cases in which the death penalty is sought.
>
> (2)   *The standards must require that a trial attorney appointed as lead counsel to a capital case or an* attorney appointed as lead appellate counsel in the direct appeal of a capital case:
>
> (A)   be a member of the State Bar of Texas;
>
> (B)   exhibit proficiency and commitment to providing quality representation to defendants in death penalty cases;
>
> (C)   *have not been found by a federal or state court to have rendered ineffective assistance of counsel during the trial or appeal of any capital case*; ....

Without an evidentiary hearing at which IAC claims are fully and fairly litigated, this court can not make an "intelligent and informed decision" as to these claims.   *Ex parte Murphy*, 917 S.W.2d 28 (Tex. Crim. App. 1996) (Baird, J., dissenting).   Accordingly, Mr. Ruiz requests that this court set an evidentiary hearing as to all of his ineffective assistance of trial counsel claims.

_____
Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax

## CERTIFICATE OF SERVICE

I certify that on December 6, 2010, I caused a copy of the foregoing Application, Verification, and Motion for Evidentiary Hearing, together with the exhibits, to be sent by U.S. mail to:

Attn: Capital Writs – Appellate Section
Dallas County District Attorney's Office
133 N. Riverfront Blvd., LB 19
Dallas, TX 75207

and, eleven (11) copies, together with one copy of the exhibits to be sent by U.S. mail to:

> Attn: Betty Hooper
> Clerk of Court
> Texas Court of Criminal Appeals
> Supreme Court Building
> 201 West 14th Street, RM 106
> Austin, TX   78701

_Lydia M.V. Brandt_

_____
Lydia M.V. Brandt

cc:   Mr. Wesley Lynn Ruiz
      #999-536
      Polunsky Unit, TDCJ
      3872 FM 350 South
      Livingston, TX 77351-8580

# EXHIBITS

Exhibit 1:   Affidavit of Cliff Jenkins (audio recordings)

Exhibit 2:   Affidavit of Cliff Jenkins (ballistics)

Exhibit 3:   Affidavit of Cliff Jenkins (documents lost, destroyed)

Exhibit 4:   Affidavit of Gilda Kessner, Psy.D.

Exhibit 5:   Affidavit of Barbara Ruiz

Exhibit 6:   Affidavit of Sue Ann Ziegenhain

Exhibit 7:   Affidavit of Richard Ziegenhain

Exhibit 8:   Affidavit of Elizabeth Beck, Ph.D., M.S.W.

Exhibit 9:   Shooting Investigation, Control Number 07-062

---

1



AFFIDAVIT OF FACT

STATE OF TEXAS )
)
COUNTY OF DALLAS )

BEFORE ME, the undersigned authority, on this day personally appeared Sue Ann Ziegenhain, who by me duly sworn, did depose and state upon her oath as follows:

1. My name is Sue Ann Ziegenhain. I am over twenty-one years of age and am fully competent to make this affidavit.

2. I reside at 1803 Bradford Street, Irving, Texas 75061.

3. I am Wesley Lynn Ruiz's maternal grandmother.

4. I attended the capital murder trial in Dallas County of my grandson, Wesley Lynn Ruiz, on or about June 5, 2008 through July 11, 2008 when he was given the death penalty for the shooting death of Dallas Police Officer Mark Nix.

5. Prior to my testimony, I was present at the courthouse from the beginning of the trial and waited outside the courtroom on a bench.

6. While waiting outside, I was aware of 20 or more officers, most in uniform with visible badges, and some in plain clothes who looked to me by their appearance and demeanor to also be law enforcement officers since they stood together, associated with and talked to other officers when they entered the courtroom each day. Many other uniformed officers were milling around the hallways while my family and I waited.

7. The hallways were filled with reporters and camera crews with their equipment. Cameras were filming the courtroom from the foyer. Their video was visible to us on monitors in the hallway. However, there was no audio sound being played that we could hear.

8. The reporters were friendly but we did not give interviews. The officers did not speak but would stand aside in groups, staring at us in the hallway.

9. While testifying, I noticed a dominant presence of uniformed law enforcement throughout the courtroom with 20 or more officers present, many standing, seemingly at attention, along the walls.

10. While sitting in the gallery, I noticed jurors looking out into the gallery where uniformed officers were lining the walls, standing along the perimeter. One juror appeared to be napping.

11. After my testimony, I sat with my husband and daughter in the courtroom.

91

12. The courtroom gallery was packed, and in addition to those standing, there also were uniformed police officers sitting on the gallery benches.

13. After testimony, my family and I tried to sit near Wesley to show our support but we were not allowed to do so. We were told to move and sit two rows behind and to the right of Wesley.

14. Wesley was not able to see us and we were told not to attempt to make eye or verbal contact with him or any sign of recognition.

15. Officer Nix's family was allowed to sit in the front row and was surrounded by police officers, both in uniform and others who appeared to me to be law enforcement officers in plain clothes as indicated by their demeanor and authoritative manner in which they treated the Nix family and others surrounding them.

16. When I first was allowed to sit in the courtroom after my testimony, I estimate approximately 20 or more uniformed law enforcement officers were present in the gallery.

17. On one day during trial, the testimony was going late in the day. Wesley's attorneys ordered pizza for my family and we went to a side hall to eat it, away from the courtroom. A bailiff from the court appeared and told us to 'get out of here.'

18. On the last day of the trial, there were even more uniformed officers present, approximately 10 to 15 were lining the walls and additional uniformed officers were seated in the gallery.

19. The overwhelming display of force was intimidating and made me feel that not only was my grandson on trial, but my family as well.

20. The attitude displayed by law enforcement felt to me that my family was viewed as a 'crime family' and dangerous to others.

21. A security metal detector was installed in the courtroom doorway on the last couple of days of the trial.

22. I could not understand why more security was needed at that time than was needed throughout the trial, particularly since there were numerous police officers present throughout.

23. I felt this was part of the 'theatre' being portrayed, particularly when we were screened only the first time we entered and after one time, the machine appeared to have been turned off, but not removed from the courtroom.

Sue Ann Ziegenhain, Affidavit of Fact
Ex parte Wesley Lynn Ruiz, 194th Judicial District Court, Dallas County, TX No. F07-50318 M
Texas Court of Criminal Appeals No. AP-75,968
Page 2 of 3

92

24. On the date Officer Nix was killed, I saw a news report on the television showing footage filmed by a news helicopter at the scene. I was not aware at the time that my grandson was involved. The shootout was ongoing and showed gunfire aimed at the car but did not show gunfire coming from the car. The footage showed the S.W.A.T. team arriving at the scene. Sometime after the shooting ended, I saw, who I later learned was my grandson, Wesley, being dragged out of the car by police officers. They dropped him and he hit the ground with his head and upper body. Subsequently the footage showed an officer kick Wesley in the head while he appeared unconscious on the ground. At the time, I thought the man I saw was dead. The only audio I heard was the news reporter's voice reporting the events he was witnessing.

25. Later when I learned that Wesley was involved and had been taken to Parkland Hospital, my husband and I went to the hospital to check on his condition. A nurse and police officer took us to a room and told us they would not tell us anything and that we must leave and not come back. At that time, we were given a police escort to leave the hospital grounds.

FURTHER AFFIANT SAYETH NOT.

_Sue Ann Ziegenhain_
Sue Ann Ziegenhain

SUBSCRIBED AND SWORN TO before me this 24 day of November, 2010.


MARIAN A. CHILTON
Notary Public
STATE OF TEXAS
My Comm. Exp. 09-10-12

Notary Public

Sue Ann Ziegenhain, Affidavit of Fact
Ex parte Wesley Lynn Ruiz, 194th Judicial District Court, Dallas County, TX No. F07-50318-M
Texas Court of Criminal Appeals No. AP-75,968
Page 3 of 3

93

IN THE
TEXAS COURT OF CRIMINAL APPEALS
and
194TH JUDICIAL DISTRICT, DALLIS COUNTY, TX

Ex Parte Wesley Lynn Ruiz,
*Applicant,*

TCCA No. AP 75,968
Trial Court Cause No. F07-50318-M

**EVIDENTIARY SUMMATION**
**OF**
**EVIDENTIARY HEARING**
(Held September 21 & 22, 2011)

Lydia M.V. Brandt
THE BRANDT LAW FIRM, P.C.
Texas Bar No. 00795262
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice
(972) 699-7030 Fax
COUNSEL FOR APPLICANT

94

## TABLE OF CONTENTS

I.  IAC – Overwhelming Police Presence and Trial in an Inherently Prejudicial Atmosphere (State App. Ground 6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   B.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   C.  CONSTITUTIONALLY DEFICIENT PERFORMANCE . . . . . . . . . . . 5

      1.  Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

         a.  Mr. Ruiz Was Tried in an Inherently Prejudicial Atmosphere . . . 5

           (1)  Multiple Jurisdictions:  Law Enforcement traveled from the cities of Dallas, Irving, Mesquite and Richardson . . . . . . . 7

           (2)  Ranks:  Law Enforcement ranked from the Dallas Chief of Police, to captains, lieutenants, and patrol officers . . . . . . 7

           (3)  Non-Security Reasons: Law Enforcement were not present to provide security or courtroom safety . . . . . . . . . . . . . . . 8

           (4)  Increase in Volume Before Deliberation: The sheer numbers of Law Enforcement swelled immediately before the jurors retired to deliberate . . . . . . . . . . . . . . . . . . . . . . . . 8

           (5)  No harmless error; prejudice is presumed . . . . . . . . . . . 9

         b.  Mr. Brauchle Failed to Preserve the Facts Demonstrating an Inherently Prejudicial Atmosphere . . . . . . . . . . . . . . . . . . . 9

         c.  Mr. Brauchle Failed to "Federalize" the Claim . . . . . . . . . . . 11

      2.  Reasonable Probability of Different Outcome . . . . . . . . . . . . . . . 13

II.  IAC – Failure to Preserve Audio Recordings (State App Ground 7b & c) . . . . . . . . . . 15

   A.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      1.  Mr. Brauchle had _unimpeded_ access to the Original Audio Source (and the Audio Copy(ies)) during the first 30 days of its existence . . . . . . . . . . . 16

      2.  Consistent with the 30 days retention policy, which Mr. Brauchle knew, the Original Audio Source was erased . . . . . . . . . . . . . . . . . . . . . . . . 21

      3.  Despite having unimpeded access, neither Mr. Brauchle, his investigator, nor a forensic expert, reviewed or forensically analyzed the Original Audio Source (or the Audio Copy(ies)) during the 30 days . . . . . . . . . . . . . . 22

      4.  Mr. Brauchle _admitted_ that he did nothing to preserve the Original Audio Source during the 30 days of its existence . . . . . . . . . . . . . . . . . . . . 26

   B.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

   C.  CONSTITUTIONALLY DEFICIENT PERFORMANCE . . . . . . . . . . 28

      1.  Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      2.  Reasonable Probability of Different Outcome . . . . . . . . . . . . . . . 31

         a.  Guilt/Innocence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

           (1)  Prosecution Evidence . . . . . . . . . . . . . . . . . . . . . . . 32

           (2)  Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . . 34

           (3)  Closing Arguments . . . . . . . . . . . . . . . . . . . . . . . . 37

(4)    A Different Outcome – Original Audio Source As: . . . . 38

      (i)    Constitutionally Exculpatory Evidence . . . . . . . . 39

      (ii)    Constitutionally Material Evidence . . . . . . . . . . 41

b.    Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

(1)    Prosecution Evidence . . . . . . . . . . . . . . . . . . . . 42

(2)    Defense Evidence . . . . . . . . . . . . . . . . . . . . . . . . 43

(3)    Reasonable Probability of a Different Outcome . . . . . . . 43

III.    IAC – Failure to Preserve Audio Recordings (State App Ground 7a & d) . . . . . . . . . 45

    A.    FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      1.    Ballistics Nomenclature . . . . . . . . . . . . . . . . . . . . . . . . 45

      2.    Mental Health Records . . . . . . . . . . . . . . . . . . . . . . . . 46

    B.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . 49

    C.    CONSTITUTIONALLY DEFICIENT PERFORMANCE . . . . . . . . . 49

      1.    Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . 49

      2.    Reasonable Probability of Different Outcome . . . . . . . . . 50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . 52

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    Exhibit A:    TEXAS GUIDELINE 11.1 – *Trial Investigation* . . . . . . . . . 53

    Exhibit B:    TEXAS GUIDELINE 11.2 – *The Duty to Assert Legal Claims* . . . . . . . . 53

# TABLE OF AUTHORITIES

## CASES

*California v. Trombetta,* 467 U.S. 479 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Carroll v. Jaques,* 926 F. Supp. 1282 (E.D. Tex. 1996) *aff'd sub nom. Carroll v. Jaques Admiralty Law Firm, P.C.,* 110 F.3d 290 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Coleman v. Kemp,* 778 F.2d 1487 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Daugharty v. Gladden,* 257 F.2d 750 (9th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gentile v. State Bar of Nevada,* 501 U.S. 1030 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Holbrook v. Flynn,* 475 U.S. 560 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

*Howard v. State,* 941 S.W.2d 102 (Tex. Crim. App. 1996 . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Humphrey v. Cady,* 405 U.S. 504 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Winship,* 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kimmelman v. Morrison,* 477 U.S. 365 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 31, 44

*Lamb v. State,* 2005 WL 1771322 (Tex. App. – Houston [14 Dist.] 2005) . . . . . . . . . . . . . 51

*Love v. State Bar of Texas,* 982 S.W.2d 939 (Tex. App. – Hous. [1st Dist.] 1998, no pet.) . . 30

*Matter of Jaques,* 972 F. Supp. 1070 (E.D. Tex. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Picard v. Connor,* 404 U.S. 270 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Smith v. Dretke,* 417 F.3d 438 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*State Bar of Texas v. Moore,* 932 S.W.2d 132 (Tex.App.—El Paso), *vacated,* 938 S.W.2d 717 (Tex.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Strickland v. Washington,* 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . 28, 31, 49, 51

*Tennard v. Dretke,* 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Mulderig*, 120 F.3d 534 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Binker*, 795 F.2d 1218 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . 41

*United States v. Brown*, 628 F.2d 471 (5th Cir.1980) . . . . . . . . . . . . . . . . . . . . . . 29

## SECONDARY AUTHORITIES

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH
PENALTY CASES (rev. ed. Feb. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Commentary*, ABA GUIDELINE 10.7 – Investigation 31 HOFSTRA L. REV. 913 (2003) . . . . . . . 17

GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL (adopted April 21, 2006) . . . . . . . . 17

GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEXAS GUIDELINE 11.1 – *Trial
Investigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEX. GUIDELINE 11.2 – *The Duty to
Assert Legal Claims* (adopted April 21, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 5, 13, 29

HERTZ & LIEBMAN, FED. HAB. CORPUS PRAC. & PROC. (6th ed. 2011) . . . . . . . . . . . . . . 12

TEX. R. PROF. CONDUCT 3.04(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## I.  IAC – Overwhelming Police Presence and Trial in an Inherently Prejudicial Atmosphere (State App. Ground 6)

As will be more fully developed below, Mr. Ruiz proved by a preponderance of the evidence that the overt conduct and expression of Law Enforcement, created an inherently prejudicial atmosphere in which Mr. Ruiz was tried. Law enforcement of every rank – from Chief of Police, to captains, to lieutenants, to patrol – traveled from the cities of Dallas, Irving, Mesquite and Richardson, to be a presence for the jury to see and feel ("Law Enforcement"). There was almost nobody in the courtroom except for the D.A.s and relatives during the trial, itself – until immediately before the jury retired to deliberate. At that time, the number of Law Enforcement swelled. "There were as many of them in here that they can get without trampling the civilians." (Evid. Hg. 2:107). Yet, while he objected to the "increased deputies," Mr. Brauchle failed to make a record of the inherently prejudicial atmosphere, and failed to lodge a proper objection to preserve the issue that there was a violation of Mr. Ruiz's Sixth and Fourteenth amendment rights to a fair trial under the United States Constitution...." State App. p. 56.

### A.  FACTS

At the state habeas hearing, the prosecutor, Kevin Brooks testified that during the Ruiz trial spectator police officers were present. The jurisdictions they work in included Dallas, Mesquite, Irving, and Richardson. (Evid. Hg. 2:36). Prosecutor Brooks identified these Law Enforcement as being from these various locales because of their uniforms. (Evid. Hg. 2:37). Mr. Brooks testified that they were not there to provide courtroom security, and distinguished these Law Enforcement from the bailiffs, who were with the sheriff's department that were in the courtroom for security purposes. (Evid. Hg. 2:37, 39). Mr. Brooks recalled that there were 15 to 20 Law Enforcement in

1

**99**

the courtroom at any one time, and that they were present in both the guilt/innocence and punishment phases of the trial. (Evid. Hg. 2:39, 40).

The Ruiz family members who testified recalled seeing Law Enforcement in the courtroom on the last day of the punishment phase of the trial, which was the only day that the family had been allowed to be present in the courtroom to observe the proceedings. Richard Ziegenhain, Mr. Ruiz's grandfather, remembered that there were 15 to 20 Law Enforcement. (Evid. Hg. 2:39, 40). He knew they were Law Enforcement because of their uniforms, badges on their uniforms, and they were carrying weapons. (Evid. Hg. 2:11). Mr. Ziegenhain testified that these Law Enforcement were in the courtroom as spectators, not for security purposes, and were there as a show of force. (Evid. Hg. 2:18).

Sue Ziegenhain, Mr. Ruiz's grandmother, testified that she saw Law Enforcement from the Dallas Police Department and the sheriff's department in the courtroom. (Evid. Hg. 2:20, 21). She knew they were law enforcement because she could see their badges, uniforms, weapons and handcuffs. (Evid. Hg. 2:20). Mrs. Ziegenhain testified that at any one time, she saw as many as twenty (20) in the courtroom. (Evid. Hg. 2:22). Mrs. Ziegenhain testified that she believed that they were present because they wanted to send a message to the jury by their presence. (Evid. Hg. 2:25).

Barbara Ruiz, Mr. Ruiz's mother, testified that on the last day of the trial "there were a lot of police officers in the room" and she knew they were law enforcement because they had guns, badges, and were in uniform. (Evid. Hg. 2:27). Mrs. Ruiz testified that she "would say more [than 25], but I would say 25 for sure." (Evid. Hg. 2:27). Mrs. Ruiz believed that Law Enforcement were present in the courtroom to send a message to the jury to "choose the death penalty." (Evid. Hg. 2:32).

2

**100**

Paul Brauchle, lead defense counsel, testified that he recalled seeing at one time at least 30 Law Enforcement in the courtroom during the guilt/innocence phase for the final arguments. "[T]here was almost nobody in here except for the D.A.s and relatives during the trial." (Evid. Hg. 2:105). Mr. Brauchle testified that "they didn't show up until they thought it was important." (Evid. Hg. 2:109). Mr Brauchle testified about the various ranks of Law Enforcement, all the way from the chief of police from the City of Dallas, who was in the courtroom for most of the punishment phase, as well as captains and lieutenants, and patrol officers. (Evid. Hg. 2:106, 107). Mr. Brauchle estimated that in the punishment phase the number of Law Enforcement had increased to 50. (Evid. Hg. 2:107). "There were as many of them in here that they can get without trampling the civilians." (Evid. Hg. 2:107). In the state evidentiary hearing, Mr. Brauchle testified they were present to show solidarity for Officer Nix. (Evid. Hg. 2:108). At the trial, he had argued in closing to the jury:

> You know, it's unfortunate that in some instances we have open court, because these officers have come down here, they are not part and parcel of this case, they are down here for one reason and one reason only, that's to intimate you, .... (RR 48:26).

Mr. Parks testified that there were "probably more than 20 [Law Enforcement] in the courtroom, and even then "there were a lot more at punishment than at guilt/innocence,... They mostly all came in for final argument." (Evid. Hg. 2:171). He estimate that there were more than 30 but less than 40 Law Enforcement present during punishment. (Evid. Hg. 2:173).

Ask what the significance of their presence at final argument, Mr. Parks responded:

> Parks: In my experience and I have tried more capital murders cases with dead police officers than I would like to say, particularly since my niece just passed her sergeant's exam today. *I have a great deal of respect for police officers. But in my experience, they do that* to show both solidarity with the family of the deceased and *to be a presence for the jury to see and feel.*

> Q.    So essentially they are trying to influence – their presence, just the fact of

3

**101**

their presence, if they do nothing else, the fact of their presence is something that they are doing to influence the outcome of the case?

Parks: Sure. And that's why our courts have indicated that it is inappropriate.

(Evid. Hg. 2:172).

## B.    STANDARD OF REVIEW

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

TEXAS GUIDELINE 11.2 – The Duty to Assert Legal Claims provides in part:

A.    Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:   ....

   3.    Evaluate each potential claim in light of: ...

      c.    The importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; ....

B.    Counsel who decide to assert a particular legal claim should:

   1.    Present the claim as forcefully as possible, tailoring the presentation

4

102

to the particular facts and circumstances in the client's case and the applicable law; and

2.   Ensure that a full record is made of all legal proceedings in connection with the claim.

GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEX. GUIDELINE 11.2 – *The Duty to Assert Legal Claims* (adopted April 21, 2006).

## C.   CONSTITUTIONALLY DEFICIENT PERFORMANCE

### 1.   Deficient Performance

#### a.   Mr. Ruiz Was Tried in an Inherently Prejudicial Atmosphere

In *Holbrook v. Flynn*, 475 U.S. 560, 562-563 (1986), Mr. Holbrook and five co-defendants were tried in the same trial. Mr. Holbrook's defense counsel objected to "the presence of four uniformed state troopers, sitting in the first row of the spectators' section; the officers were not far behind, but were separated by the "bar" from the seats assigned to the defendants for the duration of the trial.... [on the basis that their presence was] ... a display of 'strength' in the presence of the jury."

The Supreme Court noted that it would "not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial." *Holbrook*, 475 U.S. at 570-571. The Court looked to the inference that a juror could draw, even though the effect might be unconscious and the juror unable to articulate or identify it:

> *Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused.* This will be especially true when jurors are questioned at the very beginning of proceedings; at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial. *Whenever a courtroom*

5

103

> *arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of impermissible factors coming into play."*

*Holbrook*, 475 U.S. at 570 (emphasis supplied).

The *Holbrook* Court held that it "[could] not believe that the use of the four troopers tended to brand respondent in their eyes 'with an unmistakable mark of guilt.' .... Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings.  Indeed, any juror who for some other reason believed defendants particularly dangerous might well have wondered why there were only four armed troopers for the six defendants."   Accordingly, the Supreme Court determined that the challenged practice was not inherently prejudicial and Mr. Holbrook had failed to show actual prejudice.   *Holbrook*, 475 U.S. at 572.

In *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996) *holding modified on other grounds by Simpson v. State*, 119 S.W.3d 262 (Tex. Crim. App. 2003), the Texas Court of Criminal Appeals held that "[t]he Fourteenth Amendment incorporates the essence of the Sixth Amendment right to be tried by impartial, indifferent jurors whose verdict must be based upon the evidence developed at trial. *Holbrook v. Flynn,* 475 U.S. 560 (1986); *Irvin v. Dowd,* 366 U.S. 717, 722 (1961). A defendant, to prevail on an appeal claiming reversible prejudice resulting from external juror influence, must show either actual or inherent prejudice. To determine inherent prejudice, we look to whether "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook v. Flynn,* 475 U.S. at 570."

Arguing inherent prejudice, Mr. Howard did little to make his claim. "The record with respect

to what actually occurred in the trial court is quite sparse. .... [He] objected to the presence of...

twenty uniformed officers ... [who] were spectators and that they were in the back of the courtroom."

*Howard*, 941 S.W.2d at 117.  The Texas Court of Criminal Appeals rejected Howard's claim and

noted: "If the record at bar indicated some overt conduct or expression, or perhaps a higher ratio of

police officers, or even perhaps some indication that the law-enforcement contingency gravitated

toward the jury, then there might be some basis for appellant's argument." *Howard*, 941 S.W.2d at

118.

### (1)   Multiple Jurisdictions:  Law Enforcement traveled from the cities of Dallas, Irving, Mesquite and Richardson

The facts in *Holbrook* and *Howard* are in stark contrast to the facts in *Ruiz*.  The

overwhelming number of Law Enforcement in the courtroom at the Ruiz trial is in stark contrast to

the mere presence of four troopers in the trial of six defendants in *Holbrook*.  Unlike *Holbrook*

Prosecutor Brooks in Ruiz, testified that these Law Enforcement were from several different locales:

Dallas, Irving, Mesquite, and Richardson.  (Evid. Hg. 2:36).

### (2)   Ranks:  Law Enforcement ranked from the Dallas Chief of Police, to captains, lieutenants, and patrol officers

Unlike *Holbrook*, where law enforcement were all of a single rank – troopers – the Ruiz trial

courtroom was littered not only with patrol officers, but the Dallas chief of police and captains and

lieutenants.  (Evid. Hg. 2:106, 107).

7

**105**

(3)     Non-Security Reasons: Law Enforcement were not present to provide security or courtroom safety

Unlike the four troopers in *Holbrook* – whose presence the Supreme Court characterized as "unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings" – every witness, from prosecutor Brooks, (Evid. Hg. 2:37, 39), to defense counsel Braucle and Parks, (RR 48:26;  Evid. Hg. 2:108, 172), to the Ruiz family, (Evid. Hg. 2:18, 25, 32), testified that these officers were not present for purposes of security.

(4)     Increase in Volume Before Deliberation: The sheer numbers of Law Enforcement swelled immediately before the jurors retired to deliberate

Unlike *Howard*, Law Enforcement "gravitated to the jury" by deliberately timing their numbers to swell in the courtroom for final argument, (Evid. Hg. 2:171), a time immediately before the jury retires to deliberate on its verdict.  The uniformed bodies in the courtroom increased from at least twenty 20 to perhaps as many as 50. "[T]here was almost nobody in here except for the D.A.s and relatives during the trial." (Evid. Hg. 2:105).  Yet, at final argument, "[t]here were as many of them in here that they can get without trampling the civilians." (Evid. Hg. 2:107).

Their numbers swelled "to show both solidarity with the family of the deceased and to be a presence for the jury to see and feel." As Mr. Parks testified:

Q.     So essentially they are trying to influence  – their presence, just the fact of their presence, if they do nothing else, the fact of their presence is something that they are doing to influence the outcome of the case?

Parks: Sure.  And that's why our courts have indicated that it is inappropriate.

(Evid. Hg. 2:172).

8

106

(5)     No harmless error; prejudice is presumed

Thus, the presence of Law Enforcement created an inherently prejudicial atmosphere and violated Mr. Ruiz's Sixth and Fourteenth amendment rights to a fair trial. It is *not* necessary, under either *Holbrook* or *Howard*, that the jurors be fully conscious of the effect their presence would have on their attitude toward the accused, and in particular on their deliberations. Rather, prejudice is presumed because it created "an unacceptable risk ... of impermissible factors coming into play," particularly in the death sentence of Mr. Ruiz. *Holbrook*, 475 U.S. at 570. Finally, even where there is overwhelming evidence of guilt, that does not render the violation harmless. *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985).

**b.     Mr. Brauchle Failed to Preserve the Facts Demonstrating an Inherently Prejudicial Atmosphere**

As the aforementioned subsection reflects, Mr. Ruiz was tried in an inherently prejudicial atmosphere. It is obvious both from the trial and state habeas record that Mr. Brauchle was very aware during the trial of the overwhelming presence of Law Enforcement in the courtroom for purposes other than courtroom security.[1] Yet, Mr. Brauchle nonetheless failed to make a record of these facts. *See Humphrey v. Cady*, 405 U.S. 504, 516 n.18 (1972); *Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cir. 1958) (the petitioner must "provide[] [the state] court with all of the facts necessary to give application to the constitutional principle upon which [the petitioner] relies.").

---

[1]     In closing, Brauchle told the jurors:

You know, it's unfortunate that in some instances we have open court, because these officers have come down here, they are not part and parcel of this case, they are down here for one reason and one reason only, that's to intimate you, .... (RR 48:26).

9

107

Mr. Brauchle objected to the "increased deputies in the courtroom,"[2] but did nothing to make a record of the presence, timing, rank and jurisdiction of Law Enforcement in the courtroom. Instead of protecting the record, he was argumentative and disrespectful to the trial judge, as the following colloquy reflects:

Judge:    Mr. Brauchle, was there an issue you wish to address outside the presence of the jury.

Brauchle:    There are quite a few. *One of them would be that we would object to the metal detectors and the increased security in this it militates against our client's presumption that the State has the burden of the punishment phase.* I think to put a mental detector outside the courtroom, which didn't exist during the guilt or innocence stage now put it up in the guilt stage, somehow tells the jury if not the world that somehow our man is now more dangerous than he was before. And we would object to that, *as well as the increased deputies in the courtroom.*

There are quite a few. The other thing we would object to is that the State seems to this that this is their courtroom and they can designate who sits where and we are kind of tired of the little signs directing everybody as to where they can sit and what they can and can't do. I think the Court ought to figure out what the rules are and go from there.

I especially object to the fact that *Mr. Ruiz's family is not able to sit on the front row as are other families represented here. I don't see any distinction between the two. I certainly don't think that Mr. Ruiz's family is inherently dangerous by any means. And we would ask that we can get a fair shake in the courtroom and in the security in the courtroom, because all of these things are obviously prejudicial to our client and it doesn't need to exist.* We can start with a level playing field and we would object to those matters.

Judge:    Both of those matters are overruled. The security of the courtroom is left up to the sheriff's department, the bailiffs. And overrule both of those requests.

---

[2]    Karo Johnson, second chair defense counsel, testified that the number of bailiffs had increased from three to five in the courtroom at any one time. (Evid. Hg. 2:145)

| | |
|---|---|
| Brauchle: | So is the Court saying that anything the bailiffs can dream up is okay. |
| Judge: | Court is not saying that.  But at this time the precautions that the sheriff's department have been accurate and will remain in effect. |
| Brauchle: | Where did these come from. *We just come down here and the place is taken over by people that we don't know that don't even have anything to do with the case.* |
| Judge: | They will remain in effect, Mr. Brauchle.  (RR 51:25-27). |

Hence, Mr. Brauchle's performance was deficient in that he failed to make a record of the factual basis of the claim concerning the presence of Law Enforcement.

### c.   Mr. Brauchle Failed to "Federalize" the Claim

Assuming that Mr. Brauchle's objection to the "increased deputies in the courtroom" included within it not only the bailiffs from the Sheriff's Department, who were providing security, but also the Law Enforcement of various ranks and from multiple jurisdictions when he asserted that "the place is taken over by people that we don't know that don't even have anything to do with the case," Mr. Brauchle's performance was nonetheless deficient. Mr. Brauchle failed to "federalize" the claim[3] by putting the court on notice of a violation of Mr. Ruiz's Sixth and Fourteenth amendment rights to a fair trial under the United States Constitution, based on an inherently prejudicial atmosphere.

The law requires that the petitioner present "the federal claim in a manner that adequately apprised the state courts of the claim and gave them 'an opportunity to apply controlling legal

---

[3]   It appears that Mr. Brauchle argued a 14th amendment violation of proof beyond a reasonable doubt, contended the burden shifted from the State to the defense because of the addition of metal detectors and the increased number of deputies. *See In re Winship*, 397 U.S. 358, 361-62 (1970).

11

109

principles to the facts bearing upon [the] constitutional claim.'" HERTZ & LIEBMAN, FED. HAB.

CORPUS PRAC. & PROC. § 23.3[c], at 1215 (6th ed. 2011), citing Picard v. Connor, 404 U.S. 270, 277

(1971). "[I]t is not necessary to 'cite book and verse on the federal constitution" so long as the

constitutional substance of the claim is evident."

However, both the prosecutor, Mr. Brooks,[4] as well as Mr. Parks[5] testified about the necessity

that the objection be properly made:

Parks:   The objection must be specifically enough identified that the Court can know
         what it is that you are really objecting about. ....

Q.       ... what more did the trial lawyer need to do?

Parks:   Well, it would be preferable as a lawyer to state specifically what the objection
         was and federalize it by stating what constitutional amendment prohibited
         whatever that was if it did or what statute or rule prohibited the activity that
         they were objecting about in a perfect world.

Q.       What is the reason for stating a federal constitutional law basis for that
         objection?

Parks:   Something that can be raised in federal court in a federal writ and not
         defaulted in state court.

---

[4]    Mr. Brooks testified that for there to be a proper objection, it must be timely and specific
in order to preserve the error, and in some instances some objections call for a hearing, to allow
for robust fact development. (Evid. Hg. 2:60-61).

[5]    Mr. Parks was called to testify at the state habeas hearing.  Mr. Parks had been appointed
on May 27, 2008 to represent Mr. Ruiz on direct appeal. (Evid. Hg. 2:153). Mr. Parks has been
a board certified criminal defense lawyer since 1977, and actively in criminal law practice since
1972. His practice is chiefly criminal capital litigation.  He has represented capital defendants in
50 to 75 capital, but non-death cases, and 15 to 20 capital cases in which the prosecution sought
death. (Evid. Hg. 2:155). Since about the year 2000, Mr. Parks has sat on the committee that
appoints capital trial counsel in Dallas and surrounding areas.  He has been invited to speak to
the capital defense bar at continuing legal education seminars, and testified he was familiar with
the capital guidelines that govern capital defense counsel, including the defense counsel in the
Ruiz trial litigation. (Evid. Hg. 2:155-157).

> Q. And so essentially if trial counsel didn't say, Your Honor, I object based on whatever the federal constitutional grounds is, essentially that error is going to be waived forever and ever?
>
> Parks: In federal court.
>
> Q. And the federal court will never get to the merits or review that claim?
>
> Parks: That's right.
>
> Q. Even if it was a claim that had it been preserved, he could have gotten relief and maybe the death penalty would have been reversed?
>
> Parks: That's right.

(Evid. Hg. 2:167-168).

As the aforementioned reflect, Mr. Brauchle failed to both make a record of the salient facts of the overwhelming presence of Law Enforcement in the courtroom immediately prior to the jury deliberations, and to object on the basis of a violation of Mr. Ruiz's Sixth and Fourteenth amendment rights to a fair trial under the United States Constitution. His performance was constitutionally deficient. It failed to comport with GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEX. GUIDELINE 11.2 – *The Duty to Assert Legal Claims* (adopted April 21, 2006) (admonishing defense counsel to ensure that a full record is made in a manner that protects the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited).

### 2.    Reasonable Probability of Different Outcome

There is a reasonable probability but that for Mr. Brauchle's deficient performance the outcome would have been different. Had Mr. Brauchle made a timely and proper objection, the trial

13

**111**

judge would have been put the court on notice, and perhaps have taken steps to remedy the inherently prejudicial atmosphere.  And if not, then Mr. Brauchle's would have at least preserved the issue for further appellate review and remedy.  Because of the omission in failing to raise and preserve this issue, Mr. Brauchle breached his "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986),*citing Strickland v. Washington*, 466 U.S. 668, 686 (1984).

Hence, habeas relief should be granted.

14

112

## II.   IAC – Failure to Preserve Audio Recordings (State App Ground 7b & c)

As will be more fully developed below, Mr. Ruiz proved by a preponderance of the evidence his allegation in the State Writ Application concerning the "deficient performance of trial counsel and its prejudicial effect concerning the *lack of preservation and ultimate destruction* of audio recordings....." State App. p. 64.

### A.   FACTS

On March 23, 2007, a Friday, there was an encounter between law enforcement and Ruiz (Nix/Ruiz Encounter), which culminated in the death of Officer Nix. *See* Indictment (CR 1:2). The initial police communications about the Nix/Ruiz Encounter were broadcast over channel 5, the main police communications channel. (RR 40:42). However, as the Nix/Ruiz Encounter unfolded, the dispatcher directed the officers to use alternate channels to free up channel 5 for police communications about other matters. (RR 40:42; Ans. 54).

On March 23, 2007, one main server in Dallas City Hall had been used to capture all Dallas police, fire and 911 communications. (RR 40:38-40). The open records custodian for the main server in Dallas City Hall on March 23, 2007, was Rock Richardson. (RR 40:9, 37, 40). The main server in Dallas City Hall had captured the original police broadcasts over channel 5, and then the alternate channels, of the Nix/Ruiz Encounter on Friday, March 23, 2007 TX (the "Original Audio Source").[6] (RR 40:38-40).

---

[6]   There are three distinct pieces of physical evidence: the Original Audio Source, the Audio Copy(ies), and the in-car video from the laptop in the police vehicle (*see e.g.,* RR 42:71-73). They are not to be confused with one another as a result of the deliberate obfuscation by Mr. Brauchle at both the pre-trial hearing and at the state habeas evidentiary hearing. *See* RR 38:5;

15

**113**

On Saturday, March 24, 2007, Rock Richardson took it upon himself to make copies ("Audio Copies") of the police broadcasts of the Nix/Ruiz Encounter from the Original Audio Source. (RR 40:9, 11, 30, 41). Kevin Brooks, the lead prosecutor, testified that the audio recordings were physical evidence. (Evid. Hg. 2:52).

    1.    **Mr. Brauchle had <u>un</u>impeded access to the Original Audio Source (and the Audio Copy(ies)) during the first 30 days of its existence**

Mr. Parks[7] was asked at the state habeas hearing how defense counsel would access physical evidence:

> .... Usually at least in Dallas County ... it is done on an informal basis, .... If you can't reach an agreement with the prosecutor or if you have a dispute about

---

RR 40:29-30;  Evid. Hg. 2:116, 117).

Rock Richardson, the custodian testified in a pre-trial hearing that he had made copies ("Audio Copy(ies)") of the recordings that had been captured on the Dallas City server (the Original Audio Source). In the pre-trial hearing, Mr. Brauchle had referred to the copy of Mr. Richardson as: "for want of a better phrase, your original," notwithstanding that it was an Audio Copy. (RR 40:52).

Likewise, the Audio Copy(ies) of the police broadcasts made from the Original Audio Source, is different and distinct from the video original obtained from the laptop in the police vehicle, *see* RR 40:29-30. It is not at issue here.

[7]    Mr. Parks was called to testify at the state habeas hearing.  Mr. Parks had been appointed on May 27, 2008 to represent Mr. Ruiz on direct appeal. (Evid. Hg. 2:153). Mr. Parks has been a board certified criminal defense lawyer since 1977, and actively in criminal law practice since 1972.  His practice is chiefly criminal capital litigation.  He has represented capital defendants in 50 to 75 capital, and non-death cases, and 15 to 20 capital cases in which the prosecution sought death. (Evid. Hg. 2:155).  Since about the year 2000, Mr. Parks has sat on the committee that appoints capital trial counsel in Dallas and surrounding areas.  He has been invited to speak to the capital defense bar at continuing legal education seminars, and testified he was familiar with the capital guidelines that govern capital defense counsel, including the defense counsel in the Ruiz trial litigation. (Evid. Hg. 2:155-157).

some particular piece of evidence, you go to the Court, file a motion and ask the Court to order that you be allowed to have possession of it, use it, photograph it, or do whatever it is that you want to do.

(Evid. Hg. 2:158-159). The prosecutor's testimony was consistent with that of Mr. Parks. (Evid. Hg. 2:47).

The testimony of Mr. Parks concerning this procedure is in keeping with the Texas and ABA Capital Guidelines,[8] which both Mr. Parks and Mr. Brauchle admitted were the governing standard of care in death penalty defense during their representation of Mr. Ruiz. (Evid. Hg. 2:132 (Brauchle), 2:156-158 (Parks)). In particular, TEXAS GUIDELINE 11.1 – Trial Investigation recites that defense counsel should make

> "[i]nformal discovery requests (before indictment if possible) ... *to law enforcement and the district attorney ... to permit commencement of the defense investigation.* After indictment, formal discovery motions should be *immediately* submitted to the Court for resolution and ruling."

The guidelines contemplate that immediately upon access to the evidence, the defense will perform a forensic analysis:

> "With the assistance of appropriate experts, [defense] counsel should *then aggressively re-examine all of the government's forensic evidence,* and conduct appropriate analyses of all other available forensic evidence."

*Commentary,* ABA GUIDELINE 10.7 – Investigation, *reprinted in* 31 HOFSTRA L. REV. 913, 1020 (2003).

*Preservation* of evidence is a crucial aspect of guideline compliance. Mr. Parks testified that

---

[8]    GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL (adopted April 21, 2006); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (rev. ed. Feb. 2003) (hereinafter both the ABA and Texas guidelines are referred to as the "CAPITAL GUIDELINES").

17

**115**

when physical evidence is not readily accessible, the defense can "at least keep it preserved if they can't get their hands on it." (Evid. Hg. 2:162).

On March 29, 2007, six days after the offense conduct, Paul Brauchle ("Brauchle") had been appointed as lead defense counsel (CR 1:8; 2:126; Evid. Hg. 2:164). Mr. Brauchle[9] testified that at a March 29, 2007 meeting with Judge White[10] and the district attorney, he made a "request for discovery"[11] to the DA.[12] (Evid. Hg. 2:133-134). Mr. Ruiz will assume, without conceding, for the

---

[9]   Mr. Ruiz will assume for purposes of argument, but does _not_ concede that Mr. Brauchle made an oral or written request for the audio recordings between March 23, 2009 and April 22, 2007 because other than Brauchle's vague statement that he "made request for discovery," (Evid. Hg. 2:134), nothing in the record supports that this informal request was a specific request for the audio recordings. At the state habeas hearing Mr. Brauchle initially testified "I have no idea," when he first made a specific request to the State for the audio recordings. (Evid. Hg. 2:111).

After he had been shown TEXAS CAPTIAL GUIDELINE 11.1 – Trial Investigation which requires an informal request be made immediately, and his billing sheet, which reflected a meeting among Brauchle, the DA and trial judge, Mr. Brauchle had an "ah-ha" moment and testified that he made a "discovery request" (but not a specific request for the audio recordings) the day he was appointed. _See_ Exhibit 1A, in particular the description sheet for the period staring 3/29/2007 to 4/24/2007. (Evid. Hg. 2:111, 129-130, 133; Exhibit 1A).

[10]   The trial judge characterized the March 29, 2007 meeting as a "scheduling meeting."

Judge White:   "The Court remembers meeting with the attorneys for both sides on the March 29th, as well as other dates. This Court, that was in chamber, it was an informal meeting. The meeting consisted essentially of scheduling purpose for the trial. The Court has no recollection as to whether a discovery request was presented to the Court during that meeting." (Evid. Hg. 3:19).

[11]   The first written request for this evidence was made December 6, 2007, with the filing of the Motion for Discovery, Production and Inspection of Evidence _Number One_. (emphasis supplied) (Evid. Hg. 2:48-49 (Brooks testimony); Evid. Hg. 2:127 (Brauchle testimony)).

[12]   Mr. Brauchle also testified at the state habeas hearing that he had made another discovery request on April 24, 2007, which is irrelevant because it was after the 30 days retention period. (Evid. Hg. 2:130).

18

116.

purpose of this evidentiary summation, that the informal discovery request was a specific request for the audio recordings.

The prosecution fully complied with his request. Mr. Kevin Brooks, the lead prosecutor, at the state habeas hearing testified that the Original Audio Source was not the work product of the District Attorney's office, (Evid. Hg. 2:46), and that the defense also would have had access to the Original Audio Source within the first 30 days of its existence, to the extent they had they taken steps to access it. Mr. Brooks also testified that the defense had been given the Audio Copies. (Evid. Hg. 2:50, 52).

The Original Audio Source was crucial because, as Mr. Brooks testified, the DPD had represented that the Audio Copies were all the recordings that law enforcement had been able to extract from the city server on Mr. Ruiz's case. (Evid. Hg. 2:62-63).   However, Mr. Brauchle admitted that "[t]here may have been a myriad of reasons why [law enforcement would have testified that the audio gaps] may or may not have been there." (Evid. Hg. 2:120-121). This would include mistake, lack of ability to correctly download from the server onto the copies. (Evid. Hg. 2:66, 67). According to Mr. Brauchle: "I don't take law enforcement's word for it [that the material is not there]."(Evid. Hg. 2:136).

Thus, the Original Audio Source was the only source from which an expert could have performed an independent expert forensic analysis, to refute or corroborate what law enforcement had testified to regarding the audio sound gaps.[13] Mr. Brooks admitted that a forensic analysis of the

---

[13] The custodian, Rock Richardson, had testified in the pre-trial hearing that he had not been able to download and copy the audio of the law enforcement communications from the alternate channels because the two recording systems had not recorded them onto the Dallas City server prior to the actual stop of Mr. Ruiz's vehicle and the Nix/Ruiz encounter. (RR 40:45, 49, 52).

19

**117**

Original Audio Source by an expert might result in recovery of the audio that law enforcement who made the copies asserted were missing; verify the accuracy or reliability of law enforcement's audio analysis; and assist an attorney in interpreting the physical evidence or explain that evidence to the jury. (Evid. Hg. 2:53, 66).

Mr. Brooks further testified that neither he, nor anyone on the prosecution team did anything to prevent the Defense access to the Original Audio Source. (Evid. Hg. 2:47-48). Like the testimony of Mr. Parks, Mr. Brooks testified that "if the [defense] were seeking the recordings during the first 30 days, anything that had not already been provided for them, they would have filed a motion for it." (Evid. Hg. 2:47-48).

A review of the clerk's record and the reporter's record[14] for the time frame of March 29, 2007 to April 22, 2007, contains no motion by Mr. Braucle asking the Court to order that he be allowed to access and/or to preserve the Original Audio Source.[15]

---

[14]   *See* Clerk's Record vol. 1 (the first pleading, the indictment, is dated May 10, 2007; the first entry on the Docket Sheet in the Clerk's Record under "Date of Order" is dated 5-11-07). *See also* Reporter's Record Master Index, which memorializes the date of the first in-court proceeding as 11/9/07. It pertains to jury selection.

[15]   The first written discovery request for physical evidence was made on December 6, 2007, approximately eight (8) months after the indictment. (CR 1:62). The tardiness of the formal request violates TEXAS GUIDELINE 11.1 ("After indictment, formal discovery motions should be immediately submitted to the Court for resolution and ruling."). Worse by the time Mr. Brauchle submitted the formal discovery request, which he captioned as request "No. 1," the Original Audio Source had been destroyed.

20

118

### 2. Consistent with the 30 days retention policy, which Mr. Brauchle knew, the Original Audio Source was erased

On or about April 22, 2007,[16] consistent with the 30-days retention policy, the Original Audio Source of the Nix/Ruiz Encounter was destroyed. (RR 40:51; Evid. Hg. 2:67 (Prosecutor Brooks)). It was common knowledge among both prosecutors and criminal defense counsel, including Mr. Brauchle,[17] that the law enforcement communications were recorded on the city server in Dallas County on March 23, 2007, and that the recordings would be erased 30 days[18] from the date they had been made. (Evid. Hg. 2:42 (Brooks, the prosecutor); Evid Hg. 2:160 (Parks, defense counsel).

Law enforcement in the pre-trial hearing testified the Original Audio Source containing the audio recordings of law enforcement communications in Ruiz's case were in fact erased 30 days after they were made:

> Q.   The audio information that you retrieve that day, before or after the time of the shooting, does any of that information still exist?

---

[16]   The remainder of the defense team had been appointed after April 22, 2007. On or about June 7, 2007, Mr. Johnson had been appointed as second chair. (Evid Hg. 2:144). On or about April 10, 2008, Excel R. "Rex" Reynolds ("Reynolds") had been appointed as a fact investigator. (Evid Hg. 2:139-140; Exhibit 1B). On or about May 27, 2008, Mr. Parks had been appointed as appellate counsel, and provided some minimal assistance at the trial. (Evid Hg. 2:153).

[17]   Paul Brauchle was an experienced criminal defense lawyer, having practiced criminal defense for the past 40 years, 35 years of which he had been board certified. He had represented defendants in 15 to 30 capital cases. Mr. Brauchle would have known that the law enforcement communications of the Ruiz policy chase had been recorded, and would be erased 30 days thereafter. (Evid. Hg. 2:42, 45, 97, 165).

[18]   For the first time since his initial appointment on March 29, 2007, Mr. Brauchle testified at the state habeas hearing in 2011 to his personal belief that "I think Mr. Ruiz's communications were destroyed that day that they were made," (Evid Hg. 2:124). The record he developed pre-trial (RR 40:51) — and Mr. Brauchle's own pleading, Motion to Dismiss or Preclude the Impositio of the Death Penalty, Exhibit 3R) — contradicts this assertion.

21

A.    No, sir. We only keep that information for 30 days, then it is erased.

(RR 40:51). Indeed, Mr. Brauchle testified that he had signed and filed the pleading he identified as the Motion to Dismiss or Preclude the Imposition of the Death Penalty. (Evid. Hg. 2:111,127; Exhibit 3R). In it, Mr. Brauchle wrote that the audio "recordings ... are routinely erased after 30 days...." (Evid. Hg. 2:111, 113; Exhibit 3R, para. II).

> 3.    **Despite having unimpeded access, neither Mr. Brauchle, his investigator, nor a forensic expert, reviewed or forensically analyzed the Original Audio Source (or the Audio Copy(ies)) during the 30 days**

Despite having had unimpeded access to the Original Audio Source and the Audio Copy(ies), and despite having known about the 30days-destruction policy, the record reflects that Mr. Brauchle did nothing. The record is completely silent. Neither Brauchle, nor his investigator, Rex Reynolds, nor a defense expert[19] reviewed the Audio Copy(ies), or sought access to the Original Audio Source and performed a forensic analysis within the 30 day time period (March 23, 2007 - April 22, 2007) on any of it.

The billing records of Mr. Brauchel, admitted into evidence as Exhibit 1A in the evidentiary hearing, describe the time and tasks he engaged in from March 29, 2007 to April 22, 2007. The

---

[19]    A review of all of the billing records admitted into evidence (State Hab. Exhibits 1, 1A-1E, and the billing records of Mr. Brauchle in particular (Exhibit 1A), show only one audio expert had been hired.   That expert submitted invoices under the name of Audio Evidence Lab. (State Hab. Evid Hg. Exhibit 1A – Audio Evidence Lab Invoice No. 1-25-080772).

The invoice describes the work as "Video Analysis" for the dates January 22, 2008 and January 23, 2008. As aforementioned in n. 1, supra, the video analysis was done on physical evidence that is separate and distinct from the Audio Copy(ies) and Original Audio Source at issue. The video was obtained from the laptop in the police vehicle, *see* RR 40:29-30.

22

**120**

entries memorialize that Mr. Brauchle made **_no_** effort whatsoever, "[w]ith the assistance of appropriate experts, [to] ... **_then_** aggressively" investigate and forensically analyze the Original Audio Source.

THE STATE OF TEXAS VS. WESLEY LYNN RUIZ
CAPITAL MURDER TIME SHEET - PAUL BRAUCHLE

| DATE | HOURS | DESCRIPTION | AMOUNT |
|------|-------|-------------|--------|
| 3/29/07 | 2 | appt. conf. w/judge, DA, coord. | |
| 3/29/07 | 3 | trip to Parkland/conf.deft/trip to office | |
| 4/2/07 | 2 | conf/w/family | |
| 4/3/07 | 2 | conf/w/family | |
| 4/13/07 | 1 | ex. Trial, reset | |
| 4/19/07 | 3 | ex. Trial,conf w/family | |
| 4/23/07 | 1.5 | prep motions to quash | |
| 4/23/07 | 1 | conf/w/family in re grand jury | |
| 4/24/07 | 1.5 | conf/w/judge &DA on Grand Jury subpoenas | |
| 4/30/07 | 0.75 | reviewing motion to photograph | |

RR Evid. Hg., Exhibit 1A –
Billings Records Breakout Sheets of Paul Brauchle for the first 30 days
(from offense date, 3-22-2007, to Audio-Recording Destruction date, 4-22-2007)

23

**121**

The billing records of Mr. Rex Reynolds,[20] the trial fact-investigator, admitted into evidence as Exhibit 1B in the evidentiary hearing, describe the investigation he did from April 4, 2007 to April 19, 2007.  It memorialized that  he interviewed witnesses, did "research" in the physical locales that were at or proximate to the crime scene (4700 Bernal, Dallas, TX) (RR 42:54, 77), and attended an examining trial with Mr. Brauchle.

| Date | Description | Hours/Miles |
|------|-------------|-------------|
| 04/04/07 | Interviews with Thomas & Barbara Ruiz, David & Joanie Troton, Christina Norton, Richard & Sue Ziegenhain, Michelle Morris, & Erica Rivera at 1824 Garden Oak Dr., Irving, Texas. | 3.0 Hrs/78 Miles |
| 04/05/07 | Witness search at Bernal & Hammerly, Dallas, Texas. | 2.0 Hrs/64 Miles |
| 04/10/07 | Telephone interview with Barbara Ruiz. | 1.0 Hrs/ |
| 04/11/07 | Interview with Wesley Ruiz at the Dallas County jail. | 3.0 Hrs/ |
| 04/11/07 | Research in the 4700 blk. of Bernal, Dallas, Tx. | 1.5 Hrs/73 Miles |
| 04/13/07 | Examining trial stand by (due to jail lockdown) at CCC # 1 & Secured documents from Assistant D.A. Kevin Brooks, Dallas, Tx. | 2.0 Hrs/53 Miles |
| 04/18/07 | Interview with Barbara Ruiz at 7827 Ferguson Rd. # 104 & Interviews with Erica & Ashley Rivera at 2527 Pinebluff, Dallas. | 2.5 Hrs/66 Miles |
| 04/19/07 | Examining trial at CCC # 1 & Conference with Paul Brauchle & Interview with Wesley Ruiz, Dallas, Tx. | 2.5 Hrs/51 Miles |

RR Evid Hg, Exhibit 1B, Reynolds Billing Records
Excerpt for the period March 23, 2007 - April 22, 2007

---

[20]    On April 7, 2007, Rex Reynolds had been appointed as the fact investigator on the Ruiz defense team.  (Evid. Hg. 2:141).

24

122

Although the billing record (above) contains an entry that reflects that Mr. Reynolds "secured documents from Assistant D.A. Kevin Brooks, Dallas, TX," Mr. Reynolds admitted during his state habeas testimony, that this effort had nothing to do with the Original Audio Source. Mr. Reynolds testified that it was not until 2008, that Mr. Brauchle directed him to investigate the missing audio — almost a year after the destruction of the recordings:

Q.          With respect to the first 30 days that you listed here [on his billing sheet, Exhibit 1-B], you don't see any work that you did as far as trying to preserve or obtain the original source material for those original audio recordings? ....

Reynolds:   It may have been this 3/12/2008 I see that I contacted Sergeant Rick Guzman at DPD.

....

Q.          And that would have been the first time that you would have been directed to do the inquiry into the missing audio portions?

Reynolds:   Yes, ma'am.

Q.          And nothing in the first 30 days on this record that you provided to the auditor to collect your bill, there was nothing in there where you did any type of investigation or work on the missing audio?

Reynolds:   No, ma'am.

(Evid. Hg. 2:141-142).

25

123

4.   Mr. Brauchle *admitted* that he did nothing to preserve the Original Audio Source during the 30 days of its existence

Worse, and as Mr. Brauchle himself admitted at the state habeas hearing, he did not make a request *to preserve* the Original Audio Source during the first 30 days of its existence so that it could be forensically analyzed by an expert at a later time.

Q.        ... What I am asking you, did you make a request to preserve or obtain the original source of those audio recordings in the first 30 days?

Brauchle:   Not that I know of.

Q.        So you didn't ask the Judge to enter a court order asking law enforcement to preserve that data; is that correct?

Brauchle:   If there is none in the file, I did not.

(Evid. Hg. 2:128).

Mr. Jenkins, the state habeas investigator, confirmed Mr. Brauchle's admission that he did nothing to preserve the Original Audio Source so that a forensic analysis could be done at a later date:

Q.:       ... you were looking in there [the two plastic containers that had been identified as being trial counsel files] specifically for what?

Jenkins:   I was looking for – first of all, a court order or subpoena to preserve records.

Q.:       To preserve specifically the audio access to the original audio?

Jenkins:   Yes, audio and video.

Q.        And did you find any court orders of subpoenas that had been made out by any member of the defense team?

Jenkins:   No, I did not.

(Evid. Hg. 3:26).

Mr. Jenkins checked the two containers of trial counsel files twice. The second time he spent

26

124

1.4 hours reviewing these files specifically on the issue of the missing audio. (Evid. Hg. 3:27).

Finding nothing to show a request for preservation of the audiotapes, Mr. Jenkins then turned his

investigation to the district clerk's office:

> Jenkins:    I went to the district clerk's office and I had them go on their computer
> to see if there was a subpoena at that time issued for that. Sometimes
> things get lost. And they found no record that anything had been filed
> to preserve those records.
>
> Q.:    So you didn't find any subpoena requesting either access to or
> preservation of the original source of the original audio within the first
> 30 days, by any members of the defense team?
>
> Jenkins:    I did not. Nor did I find a court order.

(Evid. Hg. 3:28, 29).

In April 2008 – approximately a year after his appointment, and a mere month before the

guilt/innocence phase began, and for the first time on the record – Mr. Brauchle complained about

sound-gaps in the Audio Copies where sound of the police broadcasts would have been expected to

be audible to the listener. (RR 40:32-33, 44-45). Deflecting attention away from his own deficient

performance in failing to preserve, investigate and develop evidence (or lack thereof) with respect to

the audio, Mr Brauchle cast blame on law enforcement and the prosecution. *Compare Kimmelman

v. Morrison*, 477 U.S. 365, 385 (1986) ("Viewing counsel's failure to conduct any discovery from his

perspective at the time he decided to forgo that stage of pretrial preparation and applying a "heavy

measure of deference," *ibid.,* to his judgment, we find counsel's decision unreasonable, that is,

contrary to prevailing professional norms. The justifications Morrison's attorney offered for his

omission betray a startling ignorance of the law-or a weak attempt to shift blame for inadequate

preparation.").

Mr. Brauchle argued in the pre-trial hearing:

Brauchle:   That has been well over a year. We are just now finding out about it after the Court has to order that we get the discovery. And they say, Well, we have been complying. How the hell have they been complying with anything? You know they should have given us all of this stuff a long, long time ago.

(RR 38:5).

## B.   STANDARD OF REVIEW

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

## C.   CONSTITUTIONALLY DEFICIENT PERFORMANCE

### 1.   Deficient Performance

Mr. Ruiz showed by a preponderance of the evidence that the performance of Mr. Brauchle was constitutionally deficient when he failed to preserve and investigate the Original Audio Source. The evidence shows that Mr. Brauchle had unimpeded access to the audio recordings – either

28

**126**

because the Audio Copy(ies) had been provided to him by the DA, or because Mr. Brauchle could himself have filed a motion to access/preserve the Original Audio Source (Evid. Hg. 2:47, 158-159). Yet, despite having known about the 30days-destruction policy, the record reflects that Mr. Brauchle failed to exercise reasonable diligence to preserve the evidence. *See United States v. Mulderig*, 120 F.3d 534, 542 (5th Cir. 1997) ("[W]hen information is fully available to a defendant at the time of his trial and his only reason for not obtaining and presenting the evidence to the court is his lack of reasonable diligence, the defendant has no Brady claim."). *See also United States v. Brown*, 628 F.2d 471, 473 (5th Cir.1980) ("When information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim.").

Mr. Brauchle did nothing. Neither he, nor his investigator, Rex Reynolds, nor a defense expert reviewed the Audio Copy(ies) during the first 30 days to learn about the integrity and quality of the recordings. They did not seek access to the Original Audio Source to perform a forensic analysis within the 30 day time period (March 23, 2007 - April 22, 2007) to refute or corroborate the presence or absence of sound, and thereafter take legal action to raise and preserve all legal claims pertaining to how the presence or absence of this physical evidence affected Ruiz's theory of self-defense. (Evid. Hg. 2:141-142; Exhibits 1-A, 1-B). GUIDELINES AND STANDARDS FOR TEX. CAPITAL COUNSEL, TEX. GUIDELINE 11.2 – *The Duty to Assert Legal Claims* (adopted April 21, 2006).

Worse, and as Mr. Brauchle himself admitted at the state habeas hearing, he did not make a request *to preserve* the Original Audio Source during the first 30 days of its existence so that it could be forensically analyzed by an expert at a later time. (Evid. Hg. 2:128; 3:26-29).

29

Mr. Brauchle instead sought to shift blame onto the prosecution, (RR 38:10), disrupting[21] the in-courtroom proceedings at trial and in state habeas with obfuscation,[22] profanity,[23] vulgarity, invective[24] and personal attacks.[25]

---

[21]   This conduct appears to fall within the prohibition of TEX. R. PROF. CONDUCT 3.04(a)(5):

A lawyer shall not: ... (5) engage in conduct intended to disrupt the proceedings.

*See Love v. State Bar of Texas*, 982 S.W.2d 939, 945 (Tex. App. – Hous. [1st Dist.] 1998, no pet.) ("The rules governing lawyer conduct serve many purposes. However, in their most basic form, the rules are designed to insure integrity for the legal system and those who work within that system. "[T]he right to practice law is a very great privilege. With this privilege comes an equal dose of responsibility." *State Bar of Texas v. Moore*, 932 S.W.2d 132, 138 n. 4 (Tex.App.—El Paso), *vacated*, 938 S.W.2d 717 (Tex.1997). As an officer of the court, Love had a responsibility and "duty to protect its integrity." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1076 (1991)."). *See also Carroll v. Jaques*, 926 F. Supp. 1282, 1289 (E.D. Tex. 1996) *aff'd sub nom. Carroll v. Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290 (5th Cir. 1997) (***Jaques disrupted this litigation with his abusive behavior at his deposition. Jaques hurled vulgar and profane words at counsel for the Plaintiff....***"); *Matter of Jaques*, 972 F. Supp. 1070 (E.D. Tex. 1997) ("assaulting opposing counsel in a courtroom during a recess, ***verbally abusing a lawyer during a deposition and disrupting the deposition***, and committing fraud on a client warrant a three-year suspension from practice before district court.").

[22]   In the May 16, 2008 pre-trial hearing, Brauchle's muddled misstatements about the Audio Copies, drew this response from Mr. Brooks, the prosecutor: "Your Honor, excuse me, Judge, I need to object because the process in which he [Brauchle] is describing that the evidence is downloaded, that is incorrect. And I have had previous conversations with Defense Counsel and told them how it is done. ....." (RR 40:29-30).

Likewise Homicide Detective Briseno, a pre-trial hearing witness responded to Brauchle's continued obfuscation: "That has to do with the video, I thought we were talking about the audio." (RR 40:30).

[23]   Pre-Trial Hg: ( "***How the hell*** have they [the prosecutors] been complying with anything?"); ("Well, I think Brady versus Maryland ***damn*** sure says they have to give it to us.") (RR 38:6); State Hab. Evid. Hg: ("... I think there were probably some captains and lieutenants and whatever else ***the hell*** they call themselves....." (Evid. Hg. 2:107.)

[24]   Pre-Trial Hg: ("These people over here [***prosecutors***] are not any better, in fact ***they are worse*** than any of their predecessors"); ("it's rank ***hypocrisy***"); ("It's ***mendacity*** and almost anything else you want to call it"); ("They [prosecutors] have been proven to be ***duplicitous*** in

30

128

Astonishingly, given Mr. Brauchle's blatant failure to investigate and preserve the Original

Audio Source at all, his audacious vulgarity is even more astounding:

> Brauchle:    You [judge] can order them [the prosecutors]. It might get them off
> their dead asses to do something on their cases.

(RR 38:10, April 8, 2008).  It drew a rebuke from the trial judge.  The unprofessional conduct of Mr.

Brauchle continued into state habeas, where the presiding judge declared Mr. Brauchle to be a hostile

witness. (Evid. Hg. 2:136).

 . Hence, as the aforementioned reflect, the performance of Mr. Brauchle was constitutionally

deficient. *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) ("Viewing counsel's failure to conduct

any discovery from his perspective at the time he decided to forgo that stage of pretrial preparation

and applying a "heavy measure of deference," *ibid.,* to his judgment, we find counsel's decision

unreasonable, that is, contrary to prevailing professional norms. The justifications Morrison's attorney

offered for his omission betray a startling ignorance of the law-or a weak attempt to shift blame for

inadequate preparation.").


## 2.    Reasonable Probability of Different Outcome

In *Strickland v. Washington*, 466 U.S. 668, 695-696 (1984), the Court discussed how

the prejudice determination is analyzed:

> In making this determination, a court hearing an ineffectiveness claim must
> consider the totality of the evidence before the judge or jury. Some of the

---

every turn of the wheel.") (RR 38:5, 6)

[25]    Brauchle: "I would assume, though using common sense, which you don't seem to have
much of, that's why they were down here." (Evid. Hg. 2:109).

factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, *a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.*

### a.    Guilt/Innocence

#### (1)    Prosecution Evidence

In guilt/innocence the prosecution's theory was that on March 21, 2007, there had been a capital murder and the suspects had been identified as driving a 1996 Chevy Caprice. (RR 42:33-37). Two days later, while driving an unmarked car, Dallas Police Officers Jarc and Starr called into police dispatch that they had spotted the vehicle, and asked for a marked police unit to join them and pull the Chevy Caprice over to identify the driver. (RR 42:45). According to Officer Jarc, "there is a lot of radio traffic..." that responded. (RR 43:18). Hearing the radio traffic, Officers Borchardt and Haecker, who were in the vicinity in a marked patrol vehicle responded to the call for assistance. (RR 42:45). Officer Nix also in a marked patrol car heard the radio traffic and responded to the radio dispatch. (RR 42:47). The prosecution played portions of the audio recordings concerning the chase to the jury. (RR 43:32, 34, 35).

Officer Nix pulls his marked car directly behind the Chevy Caprice. Officers Borchardt and Haecker pull their police vehicle directly behind that of Officer Nix. (RR 42:48-49). As a result of the police radio dispatch six cars were involved: Car One – the Chevy Caprice; Car Two – Nix's car;

Car Three – the Borchardt police vehicle; Car Four through Six were the police vehicles of Officers Jarc and Starrr.  (RR 42:49).

Officer Borchardt decided to initiate a traffic stop.  (RR 42:49).  Rather than stop, the Chevy Caprice takes off at a high rate of speed.  (RR 42:51).  Officer Haecker "was on the radio ... calling the chase...."  (RR 42:51).  When the chase began, according to Officer Borchardt, law enforcement "g[o]t kind of excited and talk[ed] on the radio, you know telling people we are calling it ...."  (RR 42:54, 101; 43:108).  Officer Borchardt identified Officers Haecker, Nix, and Jarc as the officers who had been talking on the radio.  (RR 42:101).  However, Officer Borchardt testified that he could not remember the content of the conversations.  (RR 42:102).  Officers Borchardt, Haecker, and Nix pursued the Chevy Caprice for approximately a quarter of a mile.  Eventually, the driver of the Chevy Caprice loses control and it spins out.  Officer Nix pulled his car nose-to-nose with the Chevy Caprice.  (RR 42:54-55).  According to Officer Borchardt, Office Nix exited his vehicle, approached the passenger's side door, and "was issuing verbal commands, yelling at whoever was inside to exit the vehicle.  Officers Borchardt did not remember the verbal commands Officer Nix gave to Ruiz. (RR 42:104).  Officer Haecker testified: "We gave clear and concise, loud verbal commands..."  (RR 43:111).  At that point [Nix] pulled out his asp baton and began to strike on the front passenger window."  (RR 42:56-57).   The other officers had exited their vehicles with their weapons drawn. (RR 42:56).

After hitting it twice, Officer Nix put his gun on the ground, stood back up and using both arms, hits the window five more times when a gunshot rings out from inside the vehicle that kills Officer Nix.  (RR 42:58).  Hearing gunfire, the other officers return fire.  (RR 42:60).

Officer Haecker testified that it was after Officer Nix had been mortally wounded and

33

transported, that law enforcement supervisor instructed the officers to treat Ruiz as a barricaded suspect. (RR 43:118). Officer Haecker denied that the encounter with Ruiz was similar to the felony stop situation because the felony stop situation becomes a barricaded suspect situation only after the suspect refuses to leave the vehicle. (RR 43:118-119). Officer Starr testified that Ruiz had been given an opportunity to surrender peacefully during the entire time of his encounter with law enforcement. (RR 45:42-43). Finally, Sergeant Steven Osborn, a supervisor in the Dallas PD, testified that Officer Nix was authorized to proceed in the manner in which he did, and that Nix was acting in the lawful discharge of official duty. (RR 45:82). Sergeant Osborn further testified that the do-not-rush-the-suspect procedure was not applicable in the Ruiz encounter. (RR 45:100).

Ultimately, SWAT pulled Wesley Ruiz out of the Chevy Caprice. (RR 45:13). He had been injured from the return gunfire of the officers shooting into the vehicle. (RR 43:120; 45:32, 51). Law enforcement also recovered a semi-automatic assault pistol with 29 rounds and one spent casing, and a large quantity of methamphetamine and other contraband. (RR 42:28-30; 45:72, 160). Carmen Delgadillo, a prosecution witness who had identified the gun Ruiz used in the shooting, testified that Ruiz had told her "he was afraid for his life to how the officer came up to the car....." (RR 24:150, 154).

### (2)    Defense Evidence

Mr. Ruiz raised self-defense, and alleged that Officer Nix or the other officers were not acting in lawful discharged of his duty. (RR 48:12). The defense team showed several members of law enforcement Defense Exhibit 1, the procedure on traffic and felony stops. Officer Borchardt admitted that Officer Nix had "rush[ed] the vehicle," notwithstanding that police manuals instruct not to do

34

**132**

so. No one turned on the public address system to give Ruiz commands to exit the vehicle. (RR 42:98-99, 109). In response to having been shown Defense Exhibit 1, Officer Jarc testified that Officer Nix was acting in the lawful discharge of official duty in getting Ruiz out of the vehicle. (RR 43:51). Officer Haecker testified that the instruction not-to-rush-the-vehicle is for officer safety. (RR 43:104). Officer Haecker did admit that a reasonable person could make a reasonable assumption that if a police officer pulled him over, jumped out of the car and started running at him with an asp in one hand and gun in the other, that would be considered a deadly weapon, allowing him to act in self defense. (RR 43:121-122).

Carmen Correa, a defense witness, testified that the police started firing when they got out of their cars. (RR 46:70). While allowed to make a record, the defense was denied the right to call Raquel Sosa and Karlous Lake to show that Office Nix had a history of as first-aggressor. The proffered testimony of Sosa showed that in the year 2002, that she and twenty-two (22) year old Jesus Ortiz (a/k/a Chewy), who were not armed, had been running on foot away from law enforcement. (RR 46: 90, 100, 104). As Chewy helped Sosa up after she had fallen, Officer Nix came behind them and shot Ortiz in the buttocks. (RR 46:102). Ortiz died from the injuries. (RR 46:123).

The proffered testimony of Karlous Lake, a former U.S. Marine, showed that in the year 2005, Lake and his friends, who were also U.S. military, had left a club in Deep Ellum. (RR 46:127). Seeing a huddle of police officers, who told them to hurry up and get home before their curfew, Lake asked what time was curfew because he was not from the area. (RR 46:129). As he was walking to his car, Officer Nix tasered him. (RR 46:130). Not able to stand because he had been tasered, the other officers started to kick him, and eventually arrested him and his two friends. The charges for public intoxication were dropped. (RR 46:137).

35

133

Two other incidents, the Williams/Nix and Tovar/Nix encounters, in which fellow officers had complained that Officer Nix acted with excessive force. (Evid. Hg. 2:84; State Hab. Exhibit 4: Affidavit of Kessner, Psy.D., Appendix F – Internal Investigation Control Nos. 05-228 and 06-276). Williams was an adolescent, who had already been under control by other officers, when Officer Nix intervened and acted with "impulsive aggression." (Evid. Hg. 2:83). Likewise, the Tovar incident was an excessive use of force encounter between Mr. Tovar and Officer Nix, that had been reported by a fellow officer. (Evid. Hg. 2:84). They were highlighted in the state habeas evidentiary hearing because the complaints were made by other officers, rather than complaining civilians involved in the incidents themselves, as were the Sosa and Lake encounters. (Evid. Hg. 2:84).

Wesley Ruiz testified about Officer Nix's impulsive aggression toward him:

Ruiz:      He jumped out of his car and, ah, had his gun pulled out and started running at my car.

Q.         And what happened next?

Ruiz:      He started yelling at me, threatening me.

Q.         What did he yell?

Ruiz:      He said, ah, first he said – he said, Freeze, Then he said, ah, he said, You try to run from me, mother fucker, I am going to shoot you. He said, You hear me. He said, I am going to kill you if you try to run.

(RR 48:16).                  ....

Q.         ... were you in fear for your life with this over-all situation of him beating on the window or whatever he was doing in the window is yelling at you that he is going to kill you and the bullets coming into your car?

Ruiz:      Yes, sir.

36

**134**

Q.          What did you do next?

Ruiz:       I reached and grabbed the backseat for the gun.  And I pulled the gun over the seat.  And I pointed it in his direction and I fired the gun.

(RR 48:20).

In rebuttal, the prosecution called Officer Johnson who testified that he went to speak with Ruiz at Parkland Hospital two days after the offense. (47:81). Johnson testified that Ruiz had denied firing his gun at all and that it was in the backseat in a sack. (RR 47:85). Johnson memorialized this conversation in handwritten, which were then typewritten and correct in typewritten format. (RR 47:86).

### (3)    Closing Arguments

In closing argument, countering Ruiz's allegation of Officer Nix as first-aggressor, the prosecutor Handley argued:

> ... you also judge the credibility of the defendant.  We talked about in voir dire that if a defendant doesn't take the stand, you can't hold that against him. But when he does, you absolutely may be presumed innocent, he is not presumed truthful, ladies and gentlemen. ....  I will submit to you the question is not was Wesley Lynn Ruiz lying to you yesterday on the stand.  The question is, why wouldn't he?  This individual has absolutely nothing to gain and everything to lose by being hones with you.

(RR 48:10).

Thereafter Kevin Brooks, the lead prosecutor, asserted:

We perceive things in different ways, and sometimes those perceptions are wrong. Science led us to know the certain things are infallible.  DNA is infallible.  Video recorded events are infallible. ....

*Audio recorded events, accurate.*

37

**135**

(RR 48:49-50).

In closing Mr. Brauchle argued to the jury, the "crux of the case" comes down to whether it was reasonable for Mr. Ruiz to do what he did to resist the unreasonable deadly force or attempted use of deadly force by Officer Nix. (RR 48:24). Mr. Brauchle asserted:

> Officer Nix was in such a state of mind that he completely, completely disregarded his training to the extent that he disarmed himself... put his gun down. .... But his state of mind was so – so incensed, so hyper, that he is out there beating on windows, putting his gun on the ground, and you have seen it all. .... And when all hell broke loose, *what happened to the officers that were out there*..... All hell did break loose But you have to figure out that unfortunately, the blame is on them. *The blame is on them. They are the ones that ultimately created the lawful use of deadly force*. And Mr. Ruiz reacted to it. He thought his actions were reasonable.....

(RR 48:30-31).

### (4)    A Different Outcome – Original Audio Source As:

There is a reasonable probability that had Mr. Brauchle preserved, investigated and presented the missing audio portions from the Original Audio Source, the outcome in guilt/innocence would have been different supporting an outcome other than a verdict of capital murder. At trial, the prosecutor had played the audio recordings to the jury during its case-in-chief, and then argued in closing: "Audio recorded events, accurate." (RR 48:49-50). The audio recorded events were not accurate. They contained audio gaps. The lack of completeness rendered them unreliable. As Mr. Brauchle testified in state habeas: "... there is a 30 minute gap of silence during the critical part of the events that occurred that day. .... Especially from Officer Nix," who had been identified by a fellow officer as having communicated over the radio dispatch. (Evid. Hg. 2:113-115).

38

**136**

Prosecutor Brooks agreed at the state habeas hearing that the audio was crucial because it would have captured inflection, tone, and loudness, which — even more than mere words — show the state of mind of law enforcement. (Evid. Hg. 2:55). Brooks testified that "if there were recordings of him [Nix] having a conversation," they would have shown Nix's state of mind. (Evid. Hg. 2:58).

This audio would have been admissible as excited utterance and/or present sense impressions.[26] In these situations, the availability of the declarant is immaterial. TEX. R. EVID. 803. They would also have been admissible as admissions by a party opponent because Officer Nix had been identified as one of the speakers in the communications among law enforcement.[27] TEX. R. EVID. 801 (e) (2). *See* Brauchle testimony at state evidentiary hearing: "there is a 30 minute gap of silence during the critical part of the events that occurred that day. .... Especially from Officer Nix." (Evid. Hg. 2:113-115).

(i)  **Constitutionally Exculpatory Evidence**

The radio transmission could have been more probative than prejudicial, providing materially exculpatory evidence that could have corroborated Mr. Ruiz's testimony of self defense, and Officer Nix as first aggressor. *See Smith v. Dretke*, 417 F.3d 438 (5th Cir. 2005) (counsel was ineffective in failing to present testimony by witnesses who could have supported self-defense theory by corroborating accused's testimony about decedent's violent nature).

It could also have rebutted the testimony of Officer Osborn that Officer Nix was acting in

---

[26]   *See* (RR 42:54, 101; 43:108) (Officer Borchardt, law enforcement "g[o]t kind of excited and talk[ed] on the radio, you know telling people we are calling it ....")

[27]   *See* (RR 42:101) (Officer Borchardt identified Officers Haecker, Nix, and Jarc as the officers who had been talking on the radio).

39

**137**

lawful discharge of his duty, reflecting further that Nix was first-aggressor:

> Q.        And why were those radio transmissions important to you in the defense of Mr. Ruiz?
>
> Brauchle:  Because it would have given the in-car messages back and forth between, I think there were five cars in pursuit of Mr. Ruiz. It would have contained the officer[s] comments, statements, expletives, what have you. And there is a 30 minute gap of silence during the critical part of the events that occurred that day. .... Especially from Officer Nix.
>
> Q.        – would that audio have shown what his state of mind was?
>
> Brauchle:  I certainly think it would have.
>
> ....
>
> Q.        ... And in addition to showing whether or not Officer Nix used expletives, those audios could have also shown out of the mouth of Officer Nix if he was threatening Mr. Ruiz; isn't that true?
>
> Brauchle:  If he was, yeah, they would have. And I think, I am led to believe that he was.

(Evid. Hg. 2:113-115).

They would have provided powerful contradiction to the mis-impression that Officer Nix was

acting in a professional calm manner, doing little more than merely issuing clear and concise

commands to Mr. Ruiz:

> Q.        And if law enforcement had testified on the record that Officer Nix was issuing commands, that audio would have corroborated or conflicted with if all he was doing was issuing commands?
>
> Brauchle:  Well, his fellow officers didn't in any way imply that he was being anything other than supercourteous to Mr. Ruiz.
>
> Q.        If you had had those audios, you could have shown to the jury that Officer Nix was using expletives?

40

138

| | |
|---|---|
| Brauchle: | Well, Mr. Ruiz testified to that. And of course it would have undercut the State's posture that nothing bad out there happened except to Officer Nix. |

(Evid. Hg. 2:113-115). *Compare* (Officers Borchardt did not remember the verbal commands Officer Nix gave to Ruiz. (RR 42:104). Officer Haecker testified: "We gave clear and concise, loud verbal commands..." (RR 43:111)).

### (ii)   Constitutionally Material Evidence

Thus, the Original Audio Source was constitutionally material evidence because it could have been exculpatory in nature, supporting the defense of self-defense. *United States v. Binker*, 795 F.2d 1218, 1230 (5th Cir. 1986) *citing California v. Trombetta*, 467 U.S. 479 (1984), for the proposition that evidence is *constitutionally material*, "if it possessed an exculpatory value that was apparent before the evidence was destroyed, and if the defendant would be unable to obtain comparable evidence by other reasonably available means."

Further, the Original Audio Source was constitutionally material because Mr. Ruiz was unable to obtain comparable evidence by other reasonably available means. The officers involved in the chase were either deceased (Officer Nix), or did not remember the content of the radio communications. (*See* Brauchle: Do you recall what ya'll were saying in your excitement? Officer Borchardt: "I don't recall exactly, no, sir.") (RR 42:102)). Likewise, Officer Jarc could not testify to the content of the alternate channels he had not heard the content of them. (RR 43:67).

Indeed, the Original Audio Source was the only source from which an expert could have performed an independent expert forensic analysis. That analysis would have refuted or corroborated law enforcement testimony that it was technologically impossible – as opposing to ineptness by law

41

139

enforcement in making copies — to download and copy the communications from the city server because they did not exist on the city server. (Evid. Hg. 2:120).

### b.     Punishment

#### (1)     Prosecution Evidence

The prosecution's evidence as detailed in the direct appeal brief was:

That evidence indicated that Appellant had previously been adjudicated a delinquent child with a finding that he had been convicted of theft. He was placed on probation for one year on June 13, 1996. (SX117) The evidence also showed prior misdemeanor convictions for: burglary of a vehicle, a Class A misdemeanor, on September 2, 1997, for which he received 100 days confinement in the Dallas County jail (SX118); theft, a Class B misdemeanor, on September 2, 1997, for which he received 100 days confinement in the Dallas County jail (SX119); burglary of a vehicle, a Class A misdemeanor, on August 3, 1997, for which he received 75 days in the Dallas County jail (SX120); escape, a Class A misdemeanor, on February 17, 1998, for which he received 90 days confinement in the Dallas County jail (SX121) ; assault, family violence, a Class C misdemeanor,[28] on October 23, 2007, for which he paid a fine and court costs (SX122) ; and UCW Handgun,[29] on November 18, 2005, for which he received 60 days confinement in the Dallas County jail (SX124). The evidence also showed prior felony convictions for: evading arrest, a state jail felony, reduced to misdemeanor punishment, on November 10, 2005, for which he received one year confinement in the Dallas County jail (SX123); possession of a controlled substance, a state jail felony, reduced to misdemeanor punishment, on November 10, 2005, for which he received one year confinement in the Dallas County jail (SX126); and possession of a controlled substance, with intent to deliver, a first degree felony, on May 23, 2006, for which he received 10 years confinement, probated for 8 years (SX127). Finally, Mr. Ruiz entered a plea of guilty to the offense of possession of a controlled substance, with intent to deliver, a first degree felony, on April 24, 2006,

---

[28]   The Information in that case alleged he did "then and there intentionally and knowingly escape from custody, to-wit: did fail to return to custody following temporary leave for a specific purpose and limited period, while under arrest for and convicted of, the penal offense of BURGLARY OF VEHICLE". (SX121)

[29]   The complaint in that case alleges that, on June 1, 2004, Mr. Ruiz "did then and there cause physical contact with ... Erica Rivera ... by pushing [her] with the actor's hand ..." (SX122)

and was placed on 10 years deferred adjudication probation (SX125).

Raul Toledo identified Appellant as a member of an Irving street gang, the Midnight Dreamers and as a participant in an incident on March 8, 1997, in which the home of a gang rival, Joe Ramos, was shot up. (RR51: 92-93).  Direct Appeal Brief, pp. 47-48.

### (2) Defense Evidence

The defense evidence in punishment, as detailed in the direct appeal brief, was:

Dr. Gilda Kessner, a psychologist called by the defense, testified to a history of alcohol and drug abuse, primarily by Mr. Ruiz's mother and her family. (RR53 - 153-54).  This escalated over time to where both Mr. Ruiz's parents were using and occasionally selling drugs. (RR53 - 156).  Ultimately, the family broke apart and Mr. Ruiz's mother lived on the streets for a time. In 1997 she entered rehab while Wesley continued to live with his father. (RR53 - 158-59) Mr. Ruiz began personal relationships at a relatively early age and was a father a month before turning 17. He went to truck driving school after that and was a truck driver for a while. (RR53 - 160-61) It was Dr. Kessner's opinion that the "modeling" Mr. Ruiz received from his parents and his relationship with Erica Rivera were primary causes of his legal troubles. (RR53 - 161-62).

Direct Appeal Brief, p. 53.

### (3) Reasonable Probability of a Different Outcome

Even if the jury had returned a verdict of capital murder, there is a reasonable probability that the jury would have voted no as to future dangerousness had the missing audio been preserved, investigated and presented because it could have been mitigating in nature. *Tennard v. Dretke*, 542 U.S. 274 (2004).  It could have negated the prosecution's closing argument that Officer Nix was a "peace officer who was only trying to do his job," and was "trying to pull him over simply identify – the driver of that car....." (RR 55:6, 7).  It could have corroborated that Mr. Ruiz was acting in self-defense, and therefore, was less culpable than someone who acted with deliberation and calculation.

43

141

Thus, he was not death-worthy.

As recited in the direct appeal brief, "Mr. Ruiz had never been assaultive while incarcerated. His prior convictions were for non- violent misdemeanors or state jail felonies, with the exception of the offenses alleging possession of controlled substances and  the Class C misdemeanor assault." Direct Appeal Brief, p. 53.  The missing audio could have supported self-defense theory by corroborating Mr. Ruiz's testimony about decedent's violent and clearly showing that Mr. Ruiz was reacting to Officer Nix as first-aggressor.

The failure of Mr. Brauchle to file a timely motion to preserve the audio recordings in Mr. Ruiz's situation is comparable to *Kimmelman v. Morrison*, 477 U.S. 365, 384-385 (1986) in which the U.S. Supreme Court found trial counsel's performance deficient for failure to file a timely motion to suppress.  The Supreme Court in *Kimmelman* wrote that "the trial record ... clearly reveal[ed] that Morrison's attorney failed to file a timely suppression motion, not due to strategic considerations, but ... on counsel's mistaken beliefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense...."  As in *Kimmelman*, Mr. Brauchle's "complete lack of pretrial preparation put[] at risk both the defendant's right to an " 'ample opportunity to meet the case of the prosecution,' " *Strickland v. Washington*, 466 U.S. at 685 *(quoting Adams*, 317 U.S., at 275), and the reliability of the adversarial testing process."

Accordingly, this court must grant habeas relief.

44

**142**

III.   **IAC – Failure to Preserve Audio Recordings (State App Ground 7a & d)**

A.   **FACTS**

1.   **Ballistics Nomenclature**

State habeas fact investigator, Cliff Jenkins[30] testified as to the misleading and inaccurate impression created by the prosecution concerning the gun, which the defense failed to correct. "The prosecutor identified it [the weapon found in the vehicle Ruiz had been driving] as a semiautomatic pistol." (Evid. Hg. 3:31). Then "[h]e called it an assault pistol." (Evid. Hg. 3:31). And then referred to it as an "automatic." (Evid. Hg. 3:32). The problem with that reference is that "[t]here is no such thing," as an assault pistol. "It is an automatic rifle in which the difference between a semiautomatic and an automatic, is a semiautomatic chambers rounds, you pull the trigger, it fires, chambers another round, you do that however many you have in the round..... An automatic, you pull the trigger. It is called spray and pray.... [It is a] continuous discharge as long as you hold it." (Evid. Hg. 3:32-33).

Mr. Jenkins testified to the prejudicial effect of the confusion in terminology:

Prosecutor:   Do you think – in your opinion, do you think a layperson would know the difference between a semiautomatic pistol, a pistol, an assault pistol, I am getting all the nomenclature confused myself and an assault pistol?

Jenkins:   I would say the assault pistol is pretty popular subject because you are trying to band the sale of assault rifles. And if you, you know label the

---

[30]   Mr. Jenkins grew up in Montana and was familiar with guns. He was a member of the U.S. Army and learned the nomenclature of weaponry during his military training. Mr. Jenkins continue his military training in weaponry when he volunteered for the 82nd Airborne, where he had been active for two years and in the reserves for an additional four years. Antique guns are his hobby, and he has attended gun shows for the past 30 years. He has repaired guns, bought and sold guns, and taught about guns. As a result he is both familiar with how guns operate and their nomenclature. (Evid. Hg. 3:29-30). He also served as a police officer. (Evid. Hg. 3:41).

|  | pistol an assault pistol, I am sure that might flag, you know it is pretty heavy piece of equipment. |
|---|---|
| Prosecutor | So you think a layperson would detect all of those minors? |
| Jenkins: | I think there has been enough trying to pass laws, to band, you can't – you have to have a license to own an automatic rifle. I think there has been a lot of mostly gun control laws, assault weapons are brought up frequently. |

(Evid. Hg. 3:40-41).

Mr. Jenkins then testified that there was nothing in the record where defense counsel objected to the change in terminology.  (Evid. Hg. 3:33).

### 2.    Mental Health Records

Mr. Jenkins also testified to his efforts to obtain the mental health records of Officer Nix. (Evid. Hg. 3:34-39).  The Veterans Administration (VA) had never generated records for Officer Nix (Evid. Hg. 3:36).  Although the Dallas Police Department had a psychologist do a psychological evaluation of Officer Nix in about the year 2003, those records had been destroyed because of a two-year retention policy.  (Evid. Hg. 3:36-37, 43; Exhibit 4R – the L3 form).  Based on Mr. Jenkins' service as a police officer, he testified that it is unlikely that an officer would go to the VA for mental health treatment for fear of losing his job.  Mr. Jenkins testified that the psychologists he talked to during his search for the Nix records, told him that officers "probably choose their own doctor." (Evid. Hg. 3:41). "If you have health insurance, VA is probably the last place you want to go." (Evid. Hg. 3:41).

Mr. Jenkins testified that there was nothing in the files of trial counsel that reflected any effort whatsoever by defense counsel to investigate or obtain these records, despite the fact that in support

46

**144**

of his self-defense assertion, Mr. Ruiz sought to call civilians, with whom Officer Nix had come in contact, to show Officer Nix as first aggressor. (RR 46:87).   (Evid. Hg. 3:34).

In state habeas, Dr. Kessner had been asked to answer the following:

Did Officer Mark Nix act as a reasonably prudent officer would act in his encounter with Mr. Ruiz, given that Mr. Ruiz had crashed his vehicle, and Mr. Ruiz and his vehicle were blocked in by several law enforcement vehicles and surrounded by multiple police officers who had responded to the scene? If Officer Nix did not act as a reasonably prudent officer would act in his encounter with Mr. Ruiz, was it because Officer Nix was suffering from Posttraumatic Stress Disorder (PTSD)? If Officer Nix was not suffering from PTSD, what does the behavior of Officer Nix in his encounter with Mr. Ruiz tell us?

State Hab. Exhibit 4:  Affidavit of Kessner, Psy.D.,

The court mistakenly sustained an objection to the prosecution's objection that Dr. Kessner was not qualified to testify to an "ultimate conclusion"[31] as to whether Officer Nix acted as a reasonably prudent officer in his encounter with Mr. Ruiz.  The prosecutor objected on the basis that Dr. Kessner had no law enforcement experience. (Evid. Hg. 2:71, 76, 78-79, 80).

The record contradicts the prosecution's repeated objections, and the court's rulings sustaining those objections.  Dr. Kessner testified that after the 2007 Ruiz trial, she had become employed by the VA.   In the course of that employment, Dr. Kessner "evaluate[s] police officers in my job everyday. I evaluated preemployment police officers prior to coming to the VA is part of what I do." (Evid. Hg. 2:94).  Prior to the Ruiz trial, Dr. Kessner had also done law enforcement evaluations as

---

[31]   TEX. R. EVID. 704 allows and expert to testify to an ultimate issue.  The rule provides:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an issue to be decided by the trier of fact."

part of her training rotation at Baylor, in clinical evaluation for MHMR, and in private practice as well. (Evid. Hg. 2:95). She testified that what she had been asked to provide an expert opinion on in the Ruiz state habeas proceeding, was consistent with her training and employment. (Evid. Hg. 2:95).

With respect to answering the question posed, Dr. Kessner testified that as a psychologist she is "trained to do and called upon to do at various times is to evaluate an individual's behavior after an event, whether it is a violent event or attempted suicide..." and that the Nix/Ruiz encounter was a violent event. (Evid. Hg. 2:76). Dr. Kessner testified that she did not diagnose Officer Nix post-humously. (Evid. Hg. 2:92). Although she could not opine as to whether Officer Nix suffered from PTSD, she did testified to the presence of one of its symptoms, the "impulsive aggression" demonstrated by Officer Nix's behavior. (Evid. Hg. 2:77). His behavior was both impulsive and imprudent. (Evid. Hg. 2:79).

In support of her answer, Dr. Kessner described other encounters between Officer Nix and civilians prior to his military deployment to Iraq. (Evid. Hg. 2:81). In particular, she had attested in an affidavit appended to the state habeas application, about a 2002 shooting of Mr. Ortiz. In the state habeas evidentiary hearing, Dr. Kessner discussed a study about officers who had been involved in a shooting, like that of Ortiz. She testified that the results of that study showed that these same officers "have a 51 percent chance of being involved in a second shooting with 15 years" ("51% Second Shooting Study"). Dr. Kessner confirmed that Officer Nix's subsequent encounter with Mr. Ruiz in 2007 fell within that 15 time period. (Evid. Hg. 2:82; State Hab. App. Exhibit 4: Affidavit of Kessner, Psy.D. – Appendix E). Dr. Kessner also testified to the encounters between Officer Nix and Mr. Tovar and Mr. Williams. (Evid. Hg. 2:82-84).

48

Given that the defense raised a defense of self-defense, and pointed to Officer Nix as first aggressor, Dr. Kessner had testified that had the defense called her to testify about it[32] — which they did not — her testimony about Officer Nix's behavior and the aforementioned study could have provided context, helping the jury to understand what happened, rather than cast blame on him. (Evid. Hg. 2:85). It would have supported the self-defense theory. The testimony would have also had mitigating significance.

## B.     STANDARD OF REVIEW

The Supreme Court in *Strickland* held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professional competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt"

*Strickland,* 466 U.S. at 995.

## C.     CONSTITUTIONALLY DEFICIENT PERFORMANCE

### 1.     Deficient Performance

---

[32]    Dr. Kessner had not been hired by the defense at trial to act in an advisory capacity, nor to help them strategize. (Evid. Hg. 2:87).

49

**147**

Mr. Ruiz showed by a preponderance of the evidence that the performance of defense counsel was constitutionally deficient when they failed to investigate, develop and preserve the fact of evidence destruction as to the mental health of Officer Nix, as well as seek an expert to provide a context (not blame) and explanation about the behavior of Officer Nix in his encounter with Mr. Ruiz using the 51% Second Shooting Study.

Their conduct was similarly deficient when they failed to correct the false and misleading nomenclature concerning the weapon creating the impression that it was a spray-and-pray weapon; thus, providing evidence in favor of a future dangerousness verdict. (Evid. Hg. 3:32-33).

### 2.     Reasonable Probability of Different Outcome

The prosecution and defense theories and evidence have been detailed in the issue above (missing audio) and are incorporated by reference herein. There is a reasonable probability that taking due account of the deficient performance recited above, in light of what had been presented and omitted in the guilt/innocence and punishment phases, the jury's decision would reasonably likely have been different.

Accurate and reliable testimony concerning ballistics would have further supported that Mr. Ruiz acted in self-defense, and that Mr. Ruiz did not intend to murder Officer Nix. Likewise, telling the jury that the defense was handicapped because of the missing mental health records of Officer Nix, while showing that Officer Nix had exhibited an "impulsive aggression" in his encounters with civilians, and that Officer Nix's encounter with Ruiz fell within the 51% Second Shooting Study, would have had mitigating significance. This evidence would have provided context and explanation concerning the behaviors of both individuals in their encounter on that fateful day.

As a result, there is a reasonable probability that the outcome would have been different. U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *Strickland v. Washington*, 466 U.S. 668 (1984); *Lamb v. State*, 2005 WL 1771322 (Tex. App. – Houston [14 Dist.] 2005) ("Prejudice is shown where the totality of mitigating evidence (including that which the incomplete investigation did not reveal), when weighed against the evidence in aggravation of punishment, shows a reasonable probability that a different sentence would have resulted if the additional mitigating evidence had been presented.").

As a result, habeas relief should be granted.

51

149

## CONCLUSION

Mr. Ruiz is entitled to habeas relief because of the numerous errors of federal constitutional magnitude, which could not have been raised prior to this habeas proceeding.

_Lydia M.V. Brandt_

_____

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.

## CERTIFICATE OF SERVICE

I, Lydia M.V. Brandt, certify that on November 10, 2011, I hand delivered a copy of the foregoing to:

Attn: Capital Writs – Appellate Section
Dallas County District Attorney's Office
133 N. Riverfront Blvd., LB 19
Dallas, TX 75207

and, sent by U.S. mail eleven (11) copies to:

Attn: Betty Hooper
Clerk of Court
Texas Court of Criminal Appeals
Supreme Court Building
201 West 14th Street, RM 106
Austin, TX   78701

_Lydia M.V. Brandt_

_____

Lydia M.V. Brandt

cc:    Mr. Wesley Lynn Ruiz, #999-536

52

**150**

EXHIBITS

Exhibit A:   TEXAS GUIDELINE 11.1 – *Trial Investigation*

Exhibit B:   TEXAS GUIDELINE 11.2 – *The Duty to Assert Legal Claims*

151

Exhibit A:    TEXAS GUIDELINE 11.1 – *Trial Investigation*



### STATE BAR of TEXAS

# GUIDELINES AND STANDARDS
## *for*
# TEXAS CAPITAL COUNSEL



*Standing Committee on Legal Services to the Poor in Criminal Matters*
*Adopted by the State Bar Board of Directors*
*April 21, 2006*

153

5.   potential agreed-upon dispositions of the case;

6.   litigation deadlines and the projected schedule of case-related events; and

7.   relevant aspects of the client's relationship with correctional, parole or other governmental agents (e.g., prison medical providers or state psychiatrists).

**GUIDELINE 10.3     ADDITIONAL OBLIGATIONS OF COUNSEL REPRESENTING A FOREIGN NATIONAL**

A.   Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.

B.   Counsel representing a foreign national should:

1.   Immediately determine if the client's ability to communicate with counsel, in English, is sufficient to allow counsel and the client to adequately communicate. Counsel must recognize that some foreign nationals speak in dialects of which counsel may be unfamiliar, resulting in unintended miscommunication.

2.   If there are any language conflicts, counsel should immediately request the court to appoint an appropriate interpreter to assist the defense in all stages of the proceeding, or counsel may request permission to withdraw due to language problems. It is highly recommended that both lead and associate counsel have adequate communication with the defendant, rather than just one of counsel.

3.   Immediately advise the client of his or her right to communicate with the relevant consular office; and

4.   Obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest. Counsel who is unable to obtain consent should exercise his or her best professional judgment under the circumstances.

**GUIDELINE 11.1     TRIAL INVESTIGATION**

A.   Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

1.   The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

2.   The investigation for the guilt — innocence phase of the trial should generally encompass the following aspects:

a.   Extensive interviews with the client to determine: the background information in the case; any potential defenses; the identity of any witnesses available for guilt — innocence, or on punishment; the names and addresses of all available family members; medical history; educational history; criminal history; etc.;

b.   Informal discovery requests (before indictment if possible) should be immediately made to law enforcement and the district attorney for witness statements, police reports, witness lists, physical evidence, names of co-defendants (and any deals made with witnesses to testify); search and arrest warrant documents, copies of written or oral statements of the defendant, and any other information immediately available to permit commencement of

154

10

the defense investigation. After indictment, formal discovery motions should be immediately submitted to the Court for resolution and ruling.

   c.   Interviewing as soon as practically possible any potential witnesses relevant to the issues of guilt innocence, properly preserving such witness information by written statement, affidavit or audio/video recording.

   d.   Reviewing the scene of the crime, recording exact locations of relevant events, lighting conditions, physical layout, etc.

   e.   Interviewing family members and other relevant witnesses to the defendant's mental health condition

   f.   Conducting review of client's entire criminal history, including obtaining copies of prior conviction records, arrests, etc.

   g.   Research and preparation of pretrial strategy for suppression motions, motions to quash, discovery requests, both formal and informal, etc.

   h.   Plan trial strategy, including discovery requests, pretrial motion practice, jury selection, cross examination techniques of State witnesses, probable legal issues arising during trial, presentation of defense case (including defendant's possible testimony), possible rebuttal issues, jury charge issues, final argument strategy.

   i.   Conducting a review of the client's possible mental retardation, in view of the decision of *Atkins v. Virginia*, 536 U.S. 304 (2002). Counsel are advised that the issue of mental retardation may not easily be determined from the attorneys' interviews with the client. The client will generally attempt to "mask" such condition. Special expertise in recognizing actual mental retardation is required. Counsel are advised to pursue pretrial hearings to challenge any attempt by the State to seek death, if there is credible evidence of mental retardation, until such time as the Texas Legislature sets a statutory procedure, or the United States Supreme Court determines that pretrial hearings are not constitutionally required on the mental retardation issue.

   j.   In view of the decision of *Roper v. Simmons*, 543 U.S. 551 (2005), especially in cases involving aliens, where the client's date of birth may be difficult to document, a special investigation may be required to ascertain the true "age" of the defendant to ensure that he is "death eligible" and if not, ensure that the prosecution is aware of such evidence. Counsel are advised that it may be necessary to pursue special pretrial hearings to challenge any attempt by the State to seek death, if there is credible evidence that the client is under 18 years of age, or if there is no credible evidence to show his exact birthdate, as it would appear that the State has the burden to prove an accurate date of birth before death is sought.

3.   The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

   a.   Discovery — all efforts should be made to determine, well in advance of trial, the evidence the State intends to use during the punishment phase of the trial, extraneous offenses, prior criminal convictions, and expert witnesses.

   b.   The investigation for the punishment phase of the trial should generally encompass the following aspects:

      (i.)   Development of character witnesses and family background evidence, and where applicable, relevant records and witnesses from additional sources, including military, school, hospital, past employment, etc., to corroborate mitigating evidence theory;

      (ii.)   Development of expert witnesses on mental health issues, if any;

      (iii.)   Development of rebuttal witnesses for State's extraneous offenses, if any;

**155**

(iv.)   Development of the defendant's testimony, if necessary;

(v.)   Planning of cross examination of State witnesses;

(vi.)   Preparation for jury charge issues; or,

(vii.)   Preparation of final argument.

B.   Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.

C.   Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.

## GUIDELINE 11.2       THE DUTY TO ASSERT LEGAL CLAIMS

A.   Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:

1.   Consider all legal claims potentially available; and

2.   Thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted; and

3.   Evaluate each potential claim in light of:

a.   The unique characteristics of death penalty law and practice;

b.   The near certainty that all available avenues of post-conviction relief will be pursued in the event of conviction and imposition of a death sentence;

c.   The importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; and,

d.   Any other professionally appropriate costs and benefits to the assertion of the claim.

B.   Counsel who decide to assert a particular legal claim should:

1.   Present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law; and

2.   Ensure that a full record is made of all legal proceedings in connection with the claim.

C.   Counsel at all stages of the case should keep under consideration the possible advantages to the client of:

1.   Asserting legal claims whose basis has only recently become known or available to counsel; and

2.   Supplementing claims previously made with additional factual or legal information.

**156**

Exhibit B:   TEXAS GUIDELINE 11.2 – *The Duty to Assert Legal Claims*

157



### STATE BAR of TEXAS

# GUIDELINES AND STANDARDS
## *for*
# TEXAS CAPITAL COUNSEL



*Standing Committee on Legal Services to the Poor in Criminal Matters*
*Adopted by the State Bar Board of Directors*
*April 21, 2006*

158

    (iv.)  Development of the defendant's testimony, if necessary;

    (v.)  Planning of cross examination of State witnesses;

    (vi.)  Preparation for jury charge issues; or,

    (vii.)  Preparation of final argument.

B.  Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.

C.  Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.

**GUIDELINE 11.2**   <u>**THE DUTY TO ASSERT LEGAL CLAIMS**</u>

A.  Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:

  1.  Consider all legal claims potentially available; and

  2.  Thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted; and

  3.  Evaluate each potential claim in light of:

    a.  The unique characteristics of death penalty law and practice;

    b.  The near certainty that all available avenues of post-conviction relief will be pursued in the event of conviction and imposition of a death sentence;

    c.  The importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; and,

    d.  Any other professionally appropriate costs and benefits to the assertion of the claim.

B.  Counsel who decide to assert a particular legal claim should:

  1.  Present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law; and

  2.  Ensure that a full record is made of all legal proceedings in connection with the claim.

C.  Counsel at all stages of the case should keep under consideration the possible advantages to the client of:

  1.  Asserting legal claims whose basis has only recently become known or available to counsel; and

  2.  Supplementing claims previously made with additional factual or legal information.

**159**

## C L E R K ' S   C E R T I F I C A T I O N

**THE STATE OF TEXAS**           §
                                 §
**COUNTY OF DALLAS**             §

I, GARY FITZSIMMONS, CLERK OF THE DISTRICT COURTS WITHIN AND FOR THE STATE AND COUNTY AFORESAID, DO HEREBY CERTIFY THAT THE RECORD ON THE APPLICATION FOR WRIT OF HABEAS CORPUS TO THE COURT OF CRIMINAL APPEALS OF TEXAS, AUSTIN, TEXAS IN WRIT NO. **W07-50318-M (A); WESLEY LYNN RUIZ VS THE STATE OF TEXAS.**

AS SHOWN IN **VOLUME 1, PAGES 1-160** INCLUSIVE, TO WHICH THIS CERTIFICATION IS ATTACHED THERETO AND MADE A PART THEREOF, CONTAINS A TRUE AND CORRECT TRANSCRIPT OF ALL THE MATTERS AND PROCEEDINGS HAD AND DONE IN SAID CAUSE.

GIVEN  UNDER  MY  HAND  AND  SEAL  OF  OFFICE  IN  DALLAS  COUNTY, TEXAS, THIS **15th** day of **August, 2012.**

GARY FITZSIMMONS
CLERK OF THE DISTRICT COURTS
DALLAS COUNTY, TEXAS

By: _____
    Deputy Ana McDaniel

160