**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| WESLEY LYNN RUIZ, | : | |
| | : | |
| Petitioner, | : | Cause No. 3:12-cv-05112-N |
| | : | |
| v. | : | |
| | : | |
| BRYAN COLLIER, Executive Director of the Texas Department of Criminal Justice, Institutional Division, | : | THIS IS A CAPITAL CASE **EXECUTION SET FOR FEBRUARY 1, 2023** |
| | : | |
| Respondent. | : | |

**MOTION FOR RELIEF FROM JUDGMENT PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)(6)**

Shawn Nolan
Chief, Capital Habeas Unit
Peter Walker
Assistant Federal Defender
Federal Community Defender Office
  for the Eastern District of Pennsylvania
Curtis Center – Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Shawn_Nolan@fd.org
Peter_Walker@fd.org
*Counsel for Petitioner-Appellant*

Dated: January 25, 2023

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS AND THE CASE ........................................................... 3

    A.    Facts and Procedural History Leading to the Default Ruling ..................................... 3

    B.    New Facts and Circumstances Justifying Reopening of the Judgment ................... 6

ARGUMENT ......................................................................................................... 10

I.      THIS RULE 60(B)(6) MOTION IS NOT SUBJECT TO AEDPA'S RESTRICTIONS AGAINST SUCCESSIVE PETITIONS ......................................................... 10

II.    THIS COURT SHOULD ALLOW MR. RUIZ TO REOPEN THE JUDGMENT PURSUANT TO RULE 60(B)(6) ................................................................... 11

    A.    Application of Rule 60(b)(6) ................................................................ 11

    B.    The Extraordinary Circumstances of This Case Warrant Reopening Pursuant to Rule 60(b)(6) ................................................................... 12

          1.    This Court's Default Ruling was Based on an Incomplete Record Because of The State's Untimely Disclosure .................................... 13

          2.    Merillat's Prejudicial Testimony that Mr. Ruiz Would Have Increased Opportunities to Commit Violence in Prison and Could Escape Exacerbated the Jury's Racial Bias. ...................................... 16

          3.    The Risk of Undermining Public Confidence is High ..................... 18

          4.    The Risk of Injustice to Mr. Ruiz is High. ...................................... 19

          5.    Mr. Ruiz Has Been Diligent; This Motion is Timely Filed. ........... 20

          6.    The Underlying Claim is Meritorious ............................................. 20

    CONCLUSION AND PRAYER FOR RELIEF .......................................................... 21

## TABLE OF AUTHORITIES

**Federal Cases**

*Banks v. Dretke*, 540 U.S. 668 (2004) ........................................................................... 15

*Beatty v. Davis*, 755 F. App'x 343 (5th Cir. 2018) ........................................................ 19

*Buck v. Davis*, 580 U.S. 100 (2017) ..................................................................... *passim*

*Cooper v. Aaron*, 358 U.S. 1 (1958) ............................................................................. 20

*Diaz v. Stephens*, 731 F.3d 370 (5th Cir. 2013) ...................................................... 11, 20

*FirstRepublicBank Fort Worth v. Norglass, Inc.*, 958 F.2d 117 (5th Cir. 1992) ........ 11

*Frost v. Gilbert*, 835 F.3d 883 (9th Cir. 2016) ............................................................. 16

*Giglio v. United States*, 405 U.S. 150 (1972) .............................................................. 15

*Gonzalez v. Crosby*, 545 U.S. 524 (2005) .................................................................... 10

*Hess v. Cockrell*, 281 F.3d 212 (5th Cir. 2002) ........................................................... 11

*Holberg v. Davis*, 2021 WL 3603347 (N.D. Tex. Aug. 13, 2021) ............................... 16

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) ............................ 19

*Mitchell v. Genovese*, 974 F.3d 638 (6th Cir. 2020) ................................................... 19

*Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017) .............................................. *passim*

*Ruiz v. Davis*, 819 F. App'x 238 (5th Cir. 2020) ............................................... 5, 6, 15

*Ruiz v. Davis*, 2018 WL 6591687 (N.D. Tex. Dec. 14, 2018) ............................... 1, 5, 13

*Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007) ..................................................... 10

*Seven Elves v. Eskanazi*, 635 F.2d 396 (5th Cir. 1981) .......................................... 13-14

*Thompson v. Bell*, 580 F.3d 423 (6th Cir. 2009) .......................................................... 10

*United States v. Bagley*, 473 U.S. 667 (1985) ......................................................... 15-16

*United States v. Pelullo*, *Crim.*, 2010 WL 2629080 at *15 (D. N.J. June 25, 2010) ................... 15

*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................................... 7, 13, 15


**Federal Statutes**

28 U.S.C. §2254 (d) ....................................................................................................... 10


**State Cases**

*Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010) ................................ 1, 4, 16, 19

*Ex parte Ruiz*, 2012 WL 4450820 (Tex. Crim. App. Sept. 26, 2012) ........................... 5

*Velez v. State*, 2012 WL 2130890 (Tex. Crim. App. June 13, 2012) .................... 4, 16, 19


**State Statutes**

Tex. Code Crim. Proc. Ann. art. 37.071 (West 2021) ............................................... 3, 4

## INTRODUCTION

The parties agree Wesley Ruiz was unjustly sentenced to death based on false testimony from a "future danger" expert, A. P. Merillat. In a case with false testimony from the same expert, *Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim. App. 2010), the state confessed error after belatedly recognizing that Merillat gave false testimony that misled the jury. But Mr. Ruiz was denied relief because his lawyer failed to raise the claim quickly enough after the error was admitted. Newly available facts, however, show that the State was aware of the error at trial, yet remained silent as the jury relied on the false evidence to render its verdict. And recently it was learned that some jurors harbored racial animus, which further supports the conclusion that the false testimony affected the death verdict. These facts, together with recent Supreme Court decisions condemning reliance on racist tropes, particularly in the context of future dangerousness, render the circumstances of this case truly extraordinary, justifying reopening the judgment.

In Claim I of his 2013 habeas corpus petition, Mr. Ruiz alleged that a due process violation resulted from the State's admission of Merillat's false testimony that a life-without-parole (LWOP) sentence would ultimately result in Mr. Ruiz being housed in a less restrictive prison classification, thus placing everyone at greatly increased risk. Mr. Ruiz had exhausted the claim by filing a successive state habeas petition, which the state court had denied as an abuse of the writ. The State successfully argued that Mr. Ruiz could have raised the claim earlier. This Court declined to reach the merits, ruling that the claim was "procedurally defaulted" because Mr. Ruiz could not show that the State's failure to disclose the falseness of Merillat's testimony caused the default. *Ruiz v. Davis*, No. 3:12-CV-5112-N, 2018 WL 6591687, at *7 (N.D. Tex. Dec. 14, 2018).

1

Mr. Ruiz now seeks to reopen this judgment in light of newly discovered evidence demonstrating that the State *knew the expert's testimony was false when elicited*, and that this testimony had a confirmatory influence on those jurors who viewed Mr. Ruiz as violent-prone because he is Hispanic.

The State remained silent when Merillat testified, relied on his false testimony in closing and permitted a pertinent jury question regarding his testimony to go unanswered. After succeeding in obtaining a death verdict against Mr. Ruiz, the State continued to remain silent during Mr. Ruiz's direct appeal and state habeas proceedings and in habeas proceedings before this Court, which found the Merillat claim defaulted. This new evidence undermines this Court's procedural default ruling. But for that ruling, this claim would have received full and fair review on a well-developed record. Instead, this claim has never received merits review. This case presents the rare circumstance justifying reopening the judgment under Rule 60(b)(6).

## STATEMENT OF FACTS AND THE CASE

### A.     Facts and Procedural History Leading to the Default Ruling

Mr. Ruiz was convicted and sentenced to death for the shooting of Dallas police officer

Mark Nix. The evidence showed that Officer Nix attempted to stop Mr. Ruiz in his vehicle. After

a chase that was joined by other police vehicles, Mr. Ruiz lost control of his car and crashed.

Police cars surrounded the vehicle, which blocked any path to escape. Officer Nix exited his

vehicle, ran to Mr. Ruiz's car, and struck the car window with his police baton. Mr. Ruiz fired

one shot that struck and killed Officer Nix.

There were two ways that the jury could have chosen not to impose a death sentence: by

finding that Mr. Ruiz was not a future danger, which automatically would have resulted in an

LWOP sentence, or by finding that mitigating evidence warranted LWOP rather than death. Tex.

Code Crim. Proc. Ann. art. 37.071 (West 2021). In an effort to meet its burden of proving future

dangerousness at the penalty phase of Mr. Ruiz's trial, the Dallas County prosecutor presented

"future danger" expert A.P. Merillat[1]. ROA.5025.[2]

The State asked Merillat where Mr. Ruiz would be housed if sentenced to death,

ROA.5030, and if sentenced to LWOP. *Id.* at 5027. Merillat testified that if sentenced to death,

Mr. Ruiz would be placed in "ad seg" housing on death row, which was the "most secure, the

most restrictive environment for a prison inmate we have at the time." ROA.5030. If sentenced

to LWOP, by contrast, Mr. Ruiz would be automatically classified to the medium level of

restriction in general population (G-3), *id.* at 5027, where there would be "numerous

---

[1] The transcripts use the spelling Merrillott. The Fifth Circuit spelled his name Merillat. Petitioner uses the Fifth Circuit's spelling.

[2] ROA refers to the electronic record on appeal filed in the Fifth Circuit.

opportunities" to commit violent crimes in the TDCJ against medical staff, teachers, and guards, as well as "venders that come in and service the Coke machines," *id.* at 5028. Merillat explained that if Mr. Ruiz were sentenced to LWOP, his automatic classification to a medium level of restriction in general population could be promoted further downward, leaving the jury with the false impression that Mr. Ruiz could ultimately be classified to the least restrictive level of housing. *Id.*[3]

The State urged the jury to accept Merillat's testimony, arguing that "Wesley Ruiz is going to commit criminal acts of violence that would constitute a criminal threat of whatever society he is in and that doesn't say prison society, folks." ROA.5176. The "only way" the jury could "guarantee and protect everybody down there at that prison system for as long as [Ruiz] is alive is to put him there on death row like A.P. Merillat told you." *Id.* It further argued that if he "escapes" that he "will be back here on the streets" so the jury should remember "how he feels about guards" and "how he feels about you." ROA.5176.

The jury was clearly influenced by this false testimony in its deliberations. During deliberations, it sent the trial judge the following note: "Is a prisoner classified before entering prison to serve their term? If not, how long does it take to be classified by the board?" Ex. 7 (Juror note submitted during deliberations). The jury's question was not answered by the court. Ultimately, the jury answered "yes" to the future dangerousness special issue No. 1, and "no" to the mitigation special issue No. 2, resulting in Mr. Ruiz's death sentence. ROA.5182.

---

[3] Under the TDCJ plan, LWOP prisoners are never classified to a custody less restrictive than G-3. *See* Ex. 4 (TDCJ Classification Plan). *See also Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim. App. 2010) (granting relief based on Merillat's false testimony). *See also Velez v. State*, No. AP-76,051, 2012 WL 2130890, at *32 (Tex. Crim. App. June 13, 2012) (same).

Unaware of the falsity of Merillat's testimony, Mr. Ruiz did not object to his testimony at trial or on his direct appeal to the Texas Court of Criminal Appeals (TCCA), which affirmed his conviction and sentence. Mr. Ruiz then sought habeas corpus relief in the state court, which was also denied relief. *Ex parte Ruiz*, No. WR-78,129-01, WR-78,129-02, 2012 WL 4450820 (Tex. Crim. App. Sept. 26, 2012).

On September 23, 2013, Mr. Ruiz filed his petition for writ of habeas corpus, raising for the first time claims related to Merillat's testimony, including, *inter alia*, that his rights to due process and protection from cruel and unusual punishment were violated by the State's presentation of false expert testimony. Doc. 14, *Petition for Habeas Corpus*. Because those issues had not been raised in state court, Mr. Ruiz moved to stay the federal proceedings so that he could exhaust his Merillat-related claims in state court. The federal district court granted the stay. The TCCA dismissed Mr. Ruiz's second petition as an abuse of the writ, noting that the *Estrada* decision was issued in 2010, a time which would have allowed Mr. Ruiz to pursue the claim during the first habeas proceedings. *Ex parte Ruiz*, No. WR-78,129-03 (Tex. Crim. App. Nov. 19, 2014). Mr. Ruiz resumed his federal habeas proceedings, and on December 14, 2018, this Court found the Merillat-related claims defaulted and denied a certificate of appealability (COA) on all claims. *Ruiz v. Davis*, 2018 WL 6591687, at *6-7, *14.

On July 8, 2020, the Fifth Circuit Court of Appeals found that Mr. Ruiz had not made the showing required to obtain a COA on his Merillat-related claims, affirming this Court's ruling that the claims were defaulted: "[T]he district court concluded Ruiz's Merillat-related federal habeas claims were procedurally barred. This holding is not debatable by reasonable jurists." *Ruiz v. Davis*, 819 F. App'x 238, 242 (5th Cir. 2020). Notably, the Fifth Circuit explained in two footnotes that Mr. Ruiz fit none of the TCCA's statutory exceptions for merits review because

there was no proof that the State knew at the time of trial that Merillat's testimony was false. *Id.* at 243 nn.4 & 5.

On January 22, 2021, the Fifth Circuit denied rehearing on the same grounds, that Mr. Ruiz failed to show "cause to excuse the procedural default" of the Merillat claims, and that the TCCA's abuse-of-the-writ dismissal was "an independent state procedural bar," and acknowledging that any merits analysis in its earlier opinion was "in the context of analyzing whether § 5(a)(2) or (a)(3) applied to Ruiz's application" in state court. Ex. 8 at 3 (5th Cir. Rehearing Denial at 3-4).

Mr. Ruiz has thus never received merits review of his Merillat claim.

### B.    New Facts and Circumstances Justifying Reopening of the Judgment

New facts show the State knew that it was eliciting false testimony from Merillat. A prosecutor's handwritten note from March 25, 2008—during Mr. Ruiz's trial but before the sentencing phase—noted the fact that "since Tex 7,[4] things have changed i.e. new classification system." Ex. 5 (DAO note). Moreover, the State knew of the policy change in light of a TDCJ newsletter addressing the change, dated January/February 2006, more than two years before Mr. Ruiz's trial. Ex. 9 (TDCJ Criminal Connection Newsletter, January/February 2006). Ex. 9. A later note reveals that the expert, A.P. Merillat, also realized his testimony about the classification system was false. Ex. 6 (AP 2009 note) ("1/2009 → AP realized he was wrong."). However, Merillat's false testimony was never corrected at Mr. Ruiz's trial, leaving the jury with

---

[4] The Texas Seven were a group of inmates incarcerated at the TDCJ who escaped in 2001, killed a police officer, and were recaptured and sent to Death Row. https://www.latimes.com/archives/la-xpm-2001-jan-23-mn-15829-story.html

an incorrect understanding of the restriction level he would actually be subjected to if sentenced to LWOP.

Nor did the State ever reveal its awareness (both at trial and shortly thereafter) that Merillat's testimony was false. Indeed, the State affirmatively and falsely denied any knowledge that Merillat's testimony was false in its pleadings before this Court. *See* Doc. 28 at 45, *Answer* (April 16, 2015) ("lack of knowledge by the State is a defense under *Napue* [*v. Illinois*, 360 U.S. 264 (1959)].").

Recent admissions by two jurors establish that Merillat's influence on the jury exacerbated their reliance "on racial stereotypes or animus," *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017), and heightened a "particularly noxious strain of racial prejudice," *Buck v. Davis*, 580 U.S. 100, 121 (2017), into their determination of whether Mr. Ruiz was a future danger.

On August 12, 2022, Jury Foreman J.G. signed an affidavit stating Mr. Ruiz "behaved like an animal. He was a mad dog." Ex. 2 at 3 (Decl. of J.G.). He also described Mr. Ruiz as a "thug & punk." *Id.* at 4. And his open prejudice was not limited to Mr. Ruiz. He presumed Hispanic persons in attendance to be "obviously" supporters of Mr. Ruiz and "gang members." He described the atmosphere among the jury as "scared" of Hispanics in the audience whom the jurors believed to be gang members. *Id.* He also described an incident driving on the highway where he felt threatened by a man who had pulled behind him on the road for no reason other than this man was a "Mexican" driving a "flashy car" ("I was scared"). *Id.* J.G. shared his racially based belief that Mr. Ruiz was a "mad dog" and an "animal" with another juror, explaining that there was a juror "who did not want to give Mr. Ruiz the death penalty," but that

he was able to persuade her (despite her tears) to vote for death because Mr. Ruiz "could be dangerous." *Id.* at 2-3.

On August 11, 2022, Juror B.P signed an affidavit stating that her Oak Cliff neighborhood had "changed" over the years as a result of "integration." She noted Mr. Ruiz was from "West Dallas, which was even worse than Oak Cliff," associating the "demographic change[]" with rising crime. Ex. 1 at 1 (Decl. of Juror B.P.). The source of her bias is clear. Two of her family members were victims of violent crimes under circumstances that dovetailed with those at issue in Mr. Ruiz's trial. Her younger cousin was murdered, and B.P. thought "it probably wouldn't have happened if drugs weren't involved," but the assailant was never apprehended. *Id.* at 1-2. Her sister had been kidnapped, raped, and tortured by a man she "believed [to be] Hispanic and was involved in a business to smuggle in illegal aliens into the country," and similar to Mr. Ruiz, "was apprehended after a high speed chase and fired at officers." *Id.* at 1-2. Harboring these stereotypes rendered her particularly vulnerable to Merillat's false testimony. She explained, "I remember the state's expert A.P. Merillat testified about how Wes would be classified. I thought Wes could escape if he was sentenced to life without parole. Had I known the actual classification rules, I might have changed my mind." *Id.*

On January 12, 2023, linguistic anthropologist Dr. Christina Leza, Ph.D., produced an expert report concluding that:

> There is no question that Foreman J.G.'s declaration reflects racial stereotypes, bias, and negative racial attitudes regarding Hispanic men that would feature in any decision requiring an appraisal of Mr. Ruiz's risk for committing violence, as well as the decision to sentence Mr. Ruiz to death.

Dr. Christina Leza, Ph.D., *Expert Evaluation of Racial Bias in Wesley Ruiz Capital Trial, Juror Declarations* (Jan. 12, 2023), Ex. 3 at 5 (hereinafter "Leza Report"). Dr. Leza further concluded

that B.P.'s declaration "convey[s] racial views that shaped her perception of Ruiz" and "contains overt anti-Hispanic attitudes." *Id.* at 7.

The evidence of the State's knowing presentation of false testimony and failure to disclose its knowledge, together with the declarations recently obtained from two jurors, establish that the judgment should be re-opened on his Merillat claim, in order for this Court to assess anew whether there is cause and prejudice for Mr. Ruiz's failure to raise the claim earlier.

## ARGUMENT

**I.      THIS RULE 60(B)(6) MOTION IS NOT SUBJECT TO AEDPA'S RESTRICTIONS AGAINST SUCCESSIVE PETITIONS**

The claim at issue in this motion was never addressed on its merits by this Court. This motion is properly brought under Rule 60(b)(6) and is not a second or successive habeas petition.

In *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005), the Supreme Court held that a Rule 60(b) motion constitutes a successive petition "if it attacks the federal court's previous resolution of a claim *on the merits*." However, a Rule 60(b)(6) motion is not successive "if it does not assert, or reassert, claims of error in the movant's state conviction" and "challenges only the District Court's failure to reach the merits" of the claim. *Id.* at 538. Rather, upon a showing of extraordinary circumstances, a Rule 60 motion is the proper vehicle where it "attacks, not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Id.* at 532.

Rule 60(b)(6) is appropriate when challenging procedural rulings such as "failure to exhaust, procedural default, or statute-of-limitations bar." *Id.* at 532 n.4; *(Rolando) Ruiz v. Quarterman*, 504 F.3d 523, 526 (5th Cir. 2007) (Rule 60(b)(6) appropriate where prior ruling based on procedural default and failure to exhaust); *Thompson v. Bell*, 580 F.3d 423, 442-44 (6th Cir. 2009) (Rule 60(b)(6) appropriate where state clarified procedural rule on which prior ruling was based). In *Quarterman*, the Fifth Circuit determined that there was no prior "on the merits" denial because "the district court did not rule that there were no grounds entitling [him] to habeas corpus relief under 28 U.S.C. §2254(a) and (d), but rather denied relief based on procedural default and failure to exhaust, two rulings specifically identified by the Court as rulings precluding a merits determination." *Quarterman*, 504 F.3d at 526. Such is the case here.

This motion is the type that *Gonzalez* held to be properly brought under Rule 60(b)(6). Mr. Ruiz brings this motion to attack defects in the federal proceedings—the State's malfeasance in withholding evidence that it actually knew Merillat's testimony was false at trial and misrepresentations in that regard to this Court, the resulting finding by this Court that it could not address the merits of this claim, and newly discovered evidence that the jury room was tainted by racial bias that heightened the prejudice flowing from the false expert testimony (and the State's failure to disclose).

## II.   THIS COURT SHOULD ALLOW MR. RUIZ TO REOPEN THE JUDGMENT PURSUANT TO RULE 60(B)(6)

### A.   Application of Rule 60(b)(6)

Rule 60(b)(6) provides that "[o]n motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for . . . any other reason that justifies relief." FED. R. CIV. PRO. 60(b)(6). Such motions must be made "within a reasonable time" considering "the facts of each case, taking into consideration the interest in finality, the reason for delay, the practical ability of the litigant to learn of the grounds relied upon, and prejudice to other parties." *United States v. $670,706.55 (Six Hundred Seventy Thousand Seven Hundred Six Dollars & Fifty Five Cents)*, 367 F. App'x 532, 535 (5th Cir. 2010); *see also FirstRepublicBank Fort Worth v. Norglass, Inc.*, 958 F.2d 117, 119 (5th Cir. 1992).

Courts are empowered to grant relief and reopen proceedings for Rule 60(b)(6) motions that sufficiently demonstrate "extraordinary circumstances." *Buck*, 580 U.S. at 123; *Hess v. Cockrell*, 281 F.3d 212, 215 (5th Cir. 2002). Changes in decisional law alone do not satisfy the threshold. *Diaz v. Stephens*, 731 F.3d 370, 376 (5th Cir. 2013) (citations omitted). Factors demonstrating extraordinary circumstances include "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Buck*, 580 U.S. at 123

11

(quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)). As the Supreme Court recognized in *Buck*, the fact that a death sentence was rendered because of a defendant's race contravenes the basic premise of racial impartiality in the court system and poisons public confidence in the judiciary, which are precisely those factors that should be considered extraordinary under Rule 60(b)(6). *Buck*, 580 U.S. at 124. *Buck* reinforced that race must play no role in the jury's death calculus, and where it nevertheless did so, the State's interest in finality deserves little weight. *Id.* at 126.

Here, Mr. Ruiz shows extraordinary circumstances; the relevant factors weigh heavily in favor of re-opening the judgment. Newly discovered evidence of the State's misconduct and the prejudice caused by Merillat's false testimony demonstrates the risk of injustice and erosion of public confidence in the judicial process if the judgment is permitted to remain closed.

### B. The Extraordinary Circumstances of This Case Warrant Reopening Pursuant to Rule 60(b)(6).

A number of factors, properly deemed extraordinary circumstances, justify reopening the judgment. In Claim I of the habeas petition, Mr. Ruiz challenged the State's presentation of Merillat's false testimony as violating his due process rights. Doc. 14 at 11, *Petition for Habeas Corpus*. Following his attempt to exhaust the claim in state court, he amended the habeas petition, and explained at the time, "The question in the instant case is whether the State's conduct in either knowingly or unwittingly allowing Mr. Merillat to provide false testimony on the issue of classification and then failing to correct the testimony either in its direct or rebuttal punishment case constitutes the 'external', 'objective' factors, which cannot fairly be attributed to Mr. Ruiz, thus providing the 'cause' for Mr. Ruiz's inability to raise the meritorious claim not previously presented to the state courts." Doc. 23-2 at 4-5, *Petitioner's Brief in Support of the*

12

*Amended Petition for Habeas Corpus*. But that claim was never addressed on the merits. *See Ruiz v. Davis*, 2018 WL 6591687 at *5 ("Because the Court agrees that the claims are procedurally barred, it does not reach the merits.").

This Court reasoned, "Ruiz cannot plausibly claim that the State's failure to disclose or correct Merillat's testimony caused him to omit this claim from his original state habeas petition after publication of *Estrada*. Thus, Ruiz fails to show cause and prejudice, and his first claim is procedurally defaulted." *Id.* at *7 (footnotes omitted).

New evidence undermines that reasoning. Regardless of the publication of *Estrada*, the State knew—at trial, during direct appeal, and during the initial state habeas proceedings—that Merillat's testimony was false. It nevertheless presented his testimony, never disclosed its knowledge that that testimony was false, and indeed defended against the claim on the false basis that "lack of knowledge by the State is a defense under *Napue* [*v. Illinois*, 360 U.S. 264 (1959)]." Doc. 28 at 45, *Answer* (April 16, 2015). In fact, the State actually knew that Merillat's testimony was false since the time of Mr. Ruiz's trial. This fact, combined with recently discovered evidence showing that Mr. Merillat's false testimony aggravated the racial propensities of the jury, provides the "extraordinary circumstances" necessary to reopen the judgement.

### 1.   This Court's Default Ruling was Based on an Incomplete Record Because of The State's Untimely Disclosure.

This Court's analysis of whether cause and prejudice existed to excuse procedural default was based on an incomplete record. Rule 60(b)(6) relief is most appropriate where, as here, the full merits of the case were not previously examined. *See Seven Elves v. Eskanazi*, 635 F.2d 396, 402, 403 (5th Cir. 1981) (If full merits not reviewed, "the equities in such cases will militate

strongly in favor of relief" and "where denial of relief precludes examination of the full merits of the cause, even a slight abuse may justify reversal.').

A contemporaneous notation in the prosecutor's file states, "since Tex 7, things have changed i.e. new classification system." Ex. 1 (DAO note). The note reflects the prosecution's knowledge that by the time of Mr. Ruiz's trial, the revised classification system had eliminated eligibility for the less restrictive designations for LWOP prisoners. A later note reveals that the expert, A.P. Merillat, also realized his error. Ex. 2 (AP 2009 note) ("1/2009 → AP realized he was wrong."). Disclosure of these notations occurred when the State recently made its file available.

Despite its knowledge of these facts, the State averred in its Answer that the claim was defaulted, and that "there is no evidence that the State was aware of any inaccuracy in Merillat's testimony at the time of trial." Doc. 28 at 29, *State's Answer to Petition* (April 16, 2015); *id.* at 44 ("Ruiz cannot prove that the State suppressed evidence or intentionally provided false testimony at trial").[5] As we now know, the State's representation to this Court was false. The trial prosecutor's contemporaneous notes reveal that the State was aware the regulations had changed prior to trial ("since Tex 7, things have changed i.e. new classification system."). Without this evidence, this Court's procedural default analysis of the claim was necessarily based on an incomplete and inaccurate record.

---

[5] *See also id.* at 40 ("Procedural bar aside, the State was unaware of any inaccurate testimony at trial, and regardless, such testimony had no material impact on the outcome of Ruiz's punishment phase"); *id.* at 45 ("lack of knowledge by the State is a defense under *Napue*….At trial, the State was not aware of any false testimony."), 46 ("lack of knowledge by the State is a defense under *Napue*"); *id.* at 46 ("the State did not learn of the inaccurate testimony in Ruiz's case until all state court litigation had concluded"; *id.* at 51 ("Merillat's testimony involved an outdated provision, but was not deliberately deceptive").

Had the State timely disclosed this evidence, Mr. Ruiz would have raised the claim in state court on direct appeal, or in a timely state habeas petition, thereby avoiding the abuse-of-the-writ doctrine in state court that precluded this Court from conducting merits review of the claim. The State's suppression hamstrung Mr. Ruiz's ability to prove what the State actually knew. Indeed, in affirming this Court's decision, the Fifth Circuit emphasized that there was "no evidence the state knew Merillat's testimony was inaccurate when Ruiz was tried." *Ruiz v. Davis*, 819 F. App'x at 243 n.4. Now, however, there is such evidence.

Mr. Ruiz's allegations about the State's misconduct are cognizable under Rule 60(b)(6). *See United States v. Pelullo*, Crim. No. 94–276(DRD), Civ. No. 01–124(DRD), 2010 WL 2629080 at *15 (D. N.J. June 25, 2010) (finding grounds for jurisdiction under Rule 60(b)(6) to consider movant's claim that the Government had falsely denied the involvement of a federal agency in his prosecution, thereby resulting in his inability to obtain discovery from the agency to support his § 2255 claims concerning *Brady* violations).

In light of the new revelations, Mr. Ruiz can demonstrate cause and prejudice. That the state *knowingly* allowed the false Merillat testimony to go uncorrected—a fact the State has previously denied—unquestionably violates *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972), which require the prosecution to correct false testimony. In comparable circumstances, where a *Brady* violation occurred, the Supreme Court found proof of the *Brady* violation of itself establishes cause and prejudice. *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (cause exist when the state suppresses relevant evidence; prejudice exists when the suppressed evidence is "material" for *Brady* purposes). *See also United States v. Bagley*, 473 U.S. 667, 678 (1985) ("The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the

cross-examination."); *Frost v. Gilbert*, 835 F.3d 883, 889 (9th Cir. 2016) ("No doubt, [Frost] would have presented allegations of *Brady* and *Napue* violations in [his initial] petition, had he been aware of the facts supporting those arguments"); *Holberg v. Davis*, 2021 WL 3603347, at *67 (N.D. Tex. Aug. 13, 2021) ("a petitioner who successfully demonstrates cause and prejudice will at the same time establish a *Brady* violation . . . . The same rationale applies to *Giglio/Napue* claims") (citations omitted) (memorandum and order).

This case is no different; had the State fulfilled its obligations under *Brady* and *Napue*, there would have been no default.

### 2. Merillat's Prejudicial Testimony that Mr. Ruiz Would Have Increased Opportunities to Commit Violence in Prison and Could Escape Exacerbated the Jury's Racial Bias.

There is no question that Merillat's false testimony was prejudicial in itself. Indeed, when the state courts have addressed similar claims on the merits they have granted sentencing relief. *Estrada*, 313 S.W.3d at 287; *Velez v. State*, No. AP-76,051, 2012 WL 2130890, at *32 (Tex. Crim. App. June 13, 2012).

The prejudicial impact of the false testimony was enhanced in light of the new revelation about juror racial animus. Mr. Ruiz had argued that "the prosecution's heavy reliance on the opportunity for committing violent acts while in a lower classification in both its punishment case in chief and its final argument was extremely prejudicial to Mr. Ruiz's case." Doc. 23 at 24, *Amended Petition for Habeas Corpus* (Jan. 17, 2015). That argument was made without access to any facts about racial animus on the part of the jurors. We now know that racial prejudice affected the jurors, although race should play no part in a jury's deliberations. *Pena-Rodriguez*, 580 U.S. at 225.

New declarations by two jurors heighten the prejudice flowing from Merillat's testimony (and the State's failure to disclose). The foreman of the jury characterized Mr. Ruiz as an "animal" and a "mad dog," lacking the human conscience that can restrain impulsive behavior, and recalls persuading another juror to vote for death on the strength of his racial type-casting. Ex. 2 (Decl. of Foreman J.G.). Another juror described her neighborhood as being "worse" due to its increasingly Latino demographic. Ex. 1 (Decl. of Juror B.P.). The sentiments of both these jurors draw on the stereotype that men of color are inherently violence-prone, and thus quintessentially a "future danger." These declarations were reviewed by Dr. Leza, an expert in the field of linguist anthropology, who concluded that there was no question of these jurors' racial bias. Ex. 3 at 1 (Leza Report).

Thus, the stereotype that was already in these jurors' minds—that Hispanic men are inherently dangerous--was legitimized by Merillat's false testimony that an LWOP sentence would ultimately result in a less restrictive classification for Mr. Ruiz. Indeed, the jury relied on his testimony during deliberations.[6] This "particularly noxious strain of racial prejudice," *Buck*, 580 U.S. at 121, only magnified the impact of Merillat's false testimony. *See* Ex. 3 at 1. (Decl. of Juror B.P.) ("I remember the state's expert A.P. Merillat testified about how Wes would be classified. I thought Wes could escape if he was sentenced to life without parole. Had I known the actual classification rules, I might have changed my mind.").

In light of the new evidence of juror bias, Merillat's erroneous testimony was likely dispositive. Dr. Leza states that, "in a capital murder case involving interracial violence—a

---

[6] The jury sought clarification regarding Merillat's testimony, asking "Is a prisoner classified before entering prison to serve their term? If not, how long does it take to be classified by board?" Ex. 4 (Juror note submitted during deliberations).

Hispanic defendant and a white police officer victim—accurate information about the security of the defendant's confinement would be critically important in jurors' choice between a sentence of life without parole or execution." Ex. 3 at 9 (Leza Report). Indeed, Juror B.P believed that Mr. Ruiz "could escape if he was sentenced to life without parole." Ex. 3 at 1.

Mr. Ruiz's race was salient to the jury's evaluation of Merillat's testimony. Merillat "might well have been valued by jurors as the opinion" of a future danger expert "bearing the court's imprimatur." *Buck*, 580 U.S. at 121. "Reasonable jurors might well have valued his opinion concerning the central question before them." *Id.* The State explicitly relied on Merillat's testimony in closing, asserting that the "only way" the jury could "guarantee and protect everybody down there at that prison system for as long as [Ruiz] is alive is to put him there on death row like A.P. Merillat told you," ROA.5176; otherwise, if Mr. Ruiz "escapes," he "will be back here on the streets." ROA.5176. Thus, the racialized fear the jury held about Mr. Ruiz because he was Hispanic was legitimized by the State.

### 3.    The Risk of Undermining Public Confidence is High

In *Buck*, the Supreme Court made clear that racial discrimination is a quintessential "extraordinary circumstance" for granting Rule 60(b)(6) motions. There, a defense expert opined that Buck, who is Black, had an increased probability of future violence just on the basis of his race. The Court said it plainly: "Our law punishes people for what they do, not who they are. Dispensing punishment on the basis of an immutable characteristic flatly contravenes this guiding principle." 580 U.S. at 123. It further noted, "Relying on race to impose a criminal sanction 'poisons public confidence' in the judicial process. *Id.* at 124 (citing *Davis v. Ayala*, 576 U.S. 257, 285 (2015)). Accordingly, the Court found extraordinary circumstances warranting

Rule 60(b)(6) relief are sufficiently demonstrated when it can be shown that a defendant "may have been sentenced to death in part because of his race." *Id.* at 123.

Here, the evidence of pervasive racial discrimination is no less extraordinary than in *Buck*. The prosecution's expert witness – A.P. Merrillat – presented knowingly false testimony that played on the fears of racist jury members and significantly impacted their decision to sentence Petitioner to death. Thus, Petitioner here is entitled to relief under Rule 60(b)(6) because he "may have been sentenced to death in part because of his race." *Buck,* 580 U.S. at 123; *see also Beatty v. Davis*, 755 F. App'x 343, 349 (5th Cir. 2018) (concluding that when a defendant is sentenced to death because of their race due to expert testimony, this calls "into account the integrity of the initial judicial proceedings"); *Mitchell v. Genovese*, 974 F.3d 638, 652 (6th Cir. 2020) (granting a Rule 60(b)(6) claim where race discrimination played a significant role in affecting the defendant's death sentence). Failing to reopen this case carries with it the profound risk of "undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 848. Additionally, Merrilat's testimony was not only false, but also stirred the racial prejudices of the jury. "Relying on race to impose a criminal sanction 'poisons public confidence' in the judicial process." *Buck*, 580 U.S. at 124 (quoting *Davis v. Ayala*, 576 U.S. 257, 285)).

### 4.       The Risk of Injustice to Mr. Ruiz is High.

In evaluating a Rule 60(b)(6) motion, courts should also consider the "risk of injustice to the parties." *Buck*, 580 U.S. at 123. That the execution of Mr. Ruiz would be unjust is indisputable. Racial bias and State malfeasance aside, courts have granted relief on identical claims challenging the falsity of Merillat's testimony. *See Estrada*, 313 S.W.3d at 287; *Velez v. State*, No. AP-76,051, 2012 WL 2130890, at *32 (Tex. Crim. App. June 13, 2012). For the courts

to grant relief in *Estrada* and *Velez* but not for Mr. Ruiz – when the state committed even worse error, knowingly failed to correct it, and successfully precluded courts from reviewing the error on the merits – creates the impression that there is not truly "equal justice under law." *Cooper v. Aaron,* 358 U.S. 1, 19 (1958). Mr. Ruiz faces the possibility of execution without having a court reach the merits of his substantial claim for relief. This is the sort of grave injustice that Rule 60(b)(6) exists to help prevent.

### 5.      Mr. Ruiz Has Been Diligent; This Motion is Timely Filed.

This motion is made within a "reasonable time" as required under Rule 60(b)(6). After years of denying it "knowingly" allowed the false testimony, the State finally disclosed the prosecutor's note showing otherwise in April, 2021. The juror declarations were obtained in August, 2022. Mr. Ruiz thus seeks reopening of the judgment within a reasonable time of learning of the new facts.

### 6.      The Underlying Claim is Meritorious

That Mr. Ruiz's underlying claim is meritorious further weighs in favor of granting 60(b)(6) relief. *See Diaz v. Stephens*, 731 F.3d 370, 377 (5th Cir. 2013). The evidence of pervasive racial discrimination is no less extraordinary than in *Buck*. Race "was a significant motivating factor" in the jury's decision to find that Mr. Ruiz was likely to commit violence in prison, and to sentence him to death. *Pena-Rodriguez*, 580 U.S. at 225. Accordingly, the no-impeachment rule must give way to permit this Court to consider the evidence of the jurors' statements.

The jurors' racial bias heightened the effect of the crucial and likely dispositive testimony from Merillat regarding Mr. Ruiz's future dangerousness if sentenced to LWOP. The error here is even greater than in *Estrada*. In Mr. Ruiz's case, the error *was* intentional and only occurred

20

because the State knowingly remained silent in the face of Merillat's false testimony. The State's

failure to correct it, or timely disclose evidence showing that it actually knew Merillat's

testimony was false, precluded Mr. Ruiz from putting all the relevant facts before the Court

when the Merillat claim was raised before this Court.

## CONCLUSION AND PRAYER FOR RELIEF

This Court enjoys broad discretion to remedy injustice. This Court should reinstate

habeas proceedings, address his claims on the merits that show the state knowingly presented

false expert testimony and failed to correct it, and grant habeas relief pursuant to Rules 60(b)(6).

WHEREFORE, Petitioner respectfully requests that this Court:

1.    Direct Respondents to respond to this motion;

2.    Allow Petitioner to submit a reply to the Respondents' response;

3.    Schedule oral argument and a hearing;

4.    Re-open these proceedings under FRCP 60(b); and

5.    Permit further amendments and grant all other and further relief which the Court

       might deem just, proper and equitable.

Respectfully submitted,

*/s/ Shawn Nolan*
Shawn Nolan
Chief, Capital Habeas Unit
Peter Walker
Assistant Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
peter_walker@fd.org
(215) 928-0520

Dated: January 25, 2023                              *Counsel for Wesley Ruiz*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused the foregoing to be served on the following

persons by ECF filing:

Tomee M. Heining
Assistant Attorney General
Office of the Attorney General of Texas
Post Office Box 12548
Austin, Texas 78711-2548

/s/ Shawn Nolan
SHAWN NOLAN

Dated: January 25, 2023