**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

WESLEY LYNN RUIZ,                          :
                                           :
                  Petitioner,              :        Cause  No.  3:12-cv-05112-N:
                                           :
        v.                                 :
                                           :
BRYAN   COLLIER,   Executive   Director,   :        THIS IS A CAPITAL CASE
Texas  Department  of  Criminal  Justice,  :        EXECUTION SET FOR
Institutional Division,                    :        FEBRUARY 1, 2023
                                           :
                  Respondent.              :
_____

**APPENDIX TO MOTION FOR RELIEF FROM JUDGMENT PURSUANT**
**TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)(6)[1]**

Shawn Nolan
Peter Walker
Federal Community Defender Office
for the Eastern District of Pennsylvania
Curtis Center – Suite 545 West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Shawn_nolan@fd.org
Peter_walker@fd.org
*Counsel for Petitioner-Appellant*

Dated: January 25, 2023

---

[1] The addresses and dates of birth in Exhibits 1 and 2 have been redacted. Counsel can file unredacted versions under seal, should this Court request it.

Exhibit 1, Declaration of Juror B.P..................................................................1

Exhibit 2, Declaration of Foreman J.G. ........................................................2

Exhibit 3, Dr. Christina Leza, Ph.D., Report, January 12, 2023, ............................3

Exhibit 4, TDCJ Classification Plan .........................................................4

Exhibit 5, DAO Note ...............................................................................5

Exhibit 6, A.P. Merillat 2009 Note ...........................................................6

Exhibit 7, Juror note submitted during deliberations.................................7

Exhibit 8, Order Denying Rehearing (5th Cir. January 22, 2021)...........................8

Exhibit 9, TDCJ Criminal Connection Newsletter, January/February 2006.............9

1

## DECLARATION of BRENDA POPPER
### PURSUANT TO 28 U.S.C. § 1746 and V.T.C.A. § 132.001

1. I served on Wesley Ruiz's jury. I understand he has an execution date. I think about his case from time to time. Serving on his jury was a duty I took very seriously because of the nature of the tragedy + the gravity of the decision we were entrusted to make.

2. I wanted to be sure of my decision. ~~But~~ My understanding based on what we were told was that if we found him guilty of murder, because the victim was a Corporal police officer, that Wesley should be sentenced to death. In fact, I thought ~~he~~ I had to sentence him to death. I was actually a "holdout" juror when we took the first vote.  B.P.

3. I remember the state's expert AP Merillat testified about how Wes would be classified. ~~I understand~~ I thought Wes could escape if he was sentenced to Life without parole. Had I known the actual classification rules, I might have changed my mind.  B.P.

4. I grew up in Oak Cliff ~~where~~ ~~Wes was from~~. The area started to change when the demographics changed — integration + bussing, which my parents opposed. Wes was from West Dallas, which was even worse than Oak Cliff.  BP

Initials: BP

1

5. My younger cousin was murdered before West's trial. It was drug related. I think it probably wouldn't have happened if drugs weren't involved. They never found the guy who shot my cousin.

BP

6. My sister was raped and kidnapped many years ago, before Wes's trial. It was a carjacking. A group of four men in a car bumped into her car + she got out to exchange insurance information. They tortured her while driving and then left her in MOUNTAIN CREEK where she found a truck driver to help her. The main guy of the 4 men was a Raymond Maya, I believe he's Hispanic + was involved in a business to smuggle in illegal aliens into the country. He I believe was apprehended after a high speed chase and fired at officers, in Cockrell.

BP

My name is Brenda Propper ███████████████

My date of birth is ███████████████████████████

My address is ██████████████████████████████████████ that
I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746 and V.T.C.A. §

the foregoing is true and correct.

Executed in Dallas County, State of Texas,
on the 11 day of August .

Brenda Propper

Declarant Signature

Initials: BP

3

2

**DECLARATION OF** _James Gage_
PURSUANT TO 28 U.S.C. § 1746 and V.T.C.A. § 132.001

1. My name is James Gage. I was the foreman of the jury of Wesley Ruiz's death penalty trial.

2. It was obvious that Mr. Ruiz's defense attorneys didn't do a good job. They seemed like they didn't care, and they didn't give us a plausible alternative argument. If they gave us information on his state of mind, like information from a psychologist, we would have considered it in our decision. It could have made a difference.

3. When we voted in the jury room at the begining of deliberations, the vote was split. Approximately half of the jury voted for death, and the other half wanted to discuss it more before making a decision. I was on the side that wanted to discuss it more.

Initials: _____

1

4. The jury was split into a white-collar-like side and a blue-collar-like side. The blue collar-like side wanted to discuss it.

5. It was our goal that we had to be unanimous when choosing a death verdict. Otherwise, the death penalty would not be in effect.

6. There was one juror, a sweet house-wife, who did not want to give Mr. Ruiz the death penalty. Her concern was a moral dilemna rather than a concern that the criteria for the death penalty had been met. The other jurors and I reminded her that she ~~xxxxxxx~~ ~~xxxxxxxxxx~~ had agreed to impose the death penalty as the law required. She was teary-eyed during this conversation.

7. I explained to her the evidence that he could be dangerous. At first, I did not necessarily think that Mr. Ruiz was a danger. He seemed like (continue to next page)

Initials: _____

7. like a thug & punk but didn't seem like a leader. The other jurors discussed the phone calls & letters as evidence that he was a danger. After listening to their opinions, I took in the evidence and had to agree. Mr. Ruiz behaved like an animal. He was a mad dog.

8. I also felt that the decision in the case was very important. There were a lot of cops in uniform who were there in the courtroom. In the back of my mind, I didn't want to send the message that a person could get life for killing a cop. I didn't want the cops to feel like they weren't going to be protected.

9. There were also a lot of gang members in the courtroom too. They had tattoos, and it was obvious who they were there for - Mr. Ruiz.

Initials: _____

3

10. The women on the jury were scared of the gang members' in the courtroom. They were so scared that they told me the court, and the baliffs walked them to their cars. I was concerned too. When I walked out of the courtroom and to my car, the gang members saw me. I had a red corvette, and they saw me get into it. I should have brought a different car that didn't stick out.

11. Later, I was driving on the highway and saw a Mexican guy in a flashy car on the side of the highway. He pulled out of the side of the road as I passed him, and it seemed like he was following me. I sped up and got off the exit very quickly. I was scared.

Initials: _____

4

12. The other jurors and I made the best decision we could with the information at the time. I did, and still do, believe that our decision was the proper one. However, I would be okay with Mr. Ruiz's death sentence being commuted to life. It would take a weight off my shoulders.

13. Two law school students reached out to me previously. They did not ask me nearly as much as Mr. Ruiz's current legal team. If they would have asked me more about the same information, I would have told them everything in this declaration.

Initials: _____

5

My name is _James Gage_.

My date of birth is ▮▮▮▮▮▮▮▮.

My address is ▮▮▮▮▮▮▮▮

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746 and V.T.C.A. § 132.001, that the foregoing is true and correct.

Executed in _Dallas_ County, State of _Texas_,

on the _12 TH_ day of _AUGUST, 2022_

_____
Declarant Signature

3

TO:         Shawn Nolan, Chief, Capital Habeas Unit
            Federal Community Defender Office
            601 Walnut St., Suite 545 West
            Philadelphia, PA 19106

FROM:       Dr. Christina Leza, Ph.D.,
            Linguistic Anthropologist
            Associate Professor of Anthropology, Colorado College

RE:         Expert Evaluation of Racial Bias in Wesley Ruiz Capital Trial, Juror Declarations
            January 12, 2023


**Introduction**

        I was provided with the declarations of two white jurors who served on the jury that sentenced Mr. Wesley Ruiz to death—J.G., who served as the foreman, and Juror B.P. I have been asked to review the juror declarations to determine if racial bias and negative racial stereotypes influenced jury deliberations. Mr. Ruiz is Hispanic, as is apparent from his last name.[1]

        Foreman J.G. and Juror B.P.'s anti-Hispanic bias is blatant. Foreman J.G. characterized Mr. Ruiz as an "animal" and a "mad dog," and Juror B.P. made inferences about Mr. Ruiz based on the racial demographics of his neighborhood. There is no question that any decision by the jury that required an appraisal of this Hispanic defendant's likelihood to commit acts of violence in the future was tainted by racism. There is also no question that racial bias featured in the jury's decision to sentence Mr. Ruiz to death.

        I have extensive training in the field of linguistic anthropology, an interdisciplinary study that examines how language shapes culture, social relationships, and persons, and the ways in which the use of language is a cultural practice. Linguistic anthropology examines the link between language and culture. It is at the intersection of linguistics and anthropology. I have both a master's degree and a Ph.D. in linguistic anthropology, and am currently employed as an associate professor in the Department of Anthropology at Colorado College. My research areas include linguistic anthropology, racism and language, and the U.S.-Mexico border. The courses I

_____

[1] Mr. Ruiz is Mexican and White. In this report, I use the terminology "Hispanic" to include individuals like Mr. Ruiz.

1

regularly teach include Language and Culture, The Language of Racism, Language Socialization, and Introduction to Linguistics.

I am the author of the book *Divided Peoples* published by the University of Arizona Press in 2019, and I have published my research in academic journals including the language-focused journal *Semiotica* and *Journal of the Southwest*. I have two book publications in progress. The first is *The Everyday Language of White Racism* by Jane H. Hill, Second Edition. Christina Leza, Barbra Meek, and Jacqueline Messing, eds. (Oxford: Wiley Blackwell). The second is *The Language of Racism and Antiracism* (Routledge), which I am currently drafting. In 2020, I conducted a linguistic analysis of political speech: A Linguistic Analysis of Cory Gardner's Speech. *Colorado Times Recorder*, November 1, 2020.[2] I also regularly present at conferences and am invited to deliver lectures, and include here a sampling of relevant topics:

- "Racial Discourses on U.S.-Mexico Region Indigenous Identities and Rights" Hispanic Linguistics Colloquium, Ohio State University Department of Spanish and Portuguese (November 2022, virtual)
- "Racializing Discourses of Indigeneity on the U.S.-Mexico Border" Society for Linguistic Anthropology Spring Conference, Boulder (April 2022)
- "Dangerous 'Aliens' and other Unassimilated Beings: The Discursive Construction of Latino Migrants and Multiculturalism as Terroristic" American Anthropological Association's Annual Meeting, Minneapolis (November 2016)
- "Code-switching and Code-mixing in Borderland Hip Hop Discourse" Explorations in Ethnography, Language and Communication V, Manchester, UK (September 2014)
- "The Representation of Indigenous Lifeways in Grassroots Political Discourse" American Anthropological Association's Annual Meeting, Montreal, QC, Canada (November 2011)
- "Navigating Indigeneity in the U.S.-Mexico Borderlands: Indigenous Activist Discourse and Borderlands Politics" American Anthropological Association's Annual Meeting, New Orleans (November 2010)
- "The Latin American Indigenous Diaspora and Indigenous Rights Discourse" Diaspora in the Hispanic and Luso-Brazilian World: An Interdisciplinary Conference, Oxford, Miami University (November 2010)
- 'Grassroots Indigenous Discourse on "the border," Land, and Self' Conference on Language, Interaction and Culture, Los Angeles, University of California (May 2008); also presented at Arizona Anthropology and Linguistics Symposium, Tucson, University of Arizona (May 2008)

---

[2] https://coloradotimesrecorder.com/2020/11/a-linguistic-analysis-of-cory-gardners-speech/32318/

**Analysis**

My analysis of the declarations in Mr. Ruiz's case begins with the racial demographics of Dallas County. I follow this by discussing relevant negative stereotypes of racial minorities, particularly overtly subhuman stereotypes of Hispanic men. I then analyze the declaration of Foreman J.G., and Juror B.P., and opine on whether racial bias influenced Mr. Ruiz's death verdict. I conclude that racial bias did influence the jury's decision to sentence Mr. Ruiz to death.

1.  *Dallas County is predominantly Hispanic/Latino.*

The racial demographics of Dallas, Texas—where Mr. Ruiz's trial was held and where the jurors resided—helps contextualize Mr. Ruiz's trial. According to demographic reports around the time of Mr. Ruiz's trial, 42% of the Dallas population was Hispanic or Latino.[3] At the same time, non-Hispanic white residents, historically the most populous racial group in the city, comprised only 28.6% of the Dallas population.[4] "[T]he perception that one is in the racial minority of one's neighborhood elevates fear among whites."[5] And one of the predominating fears white people have about demographic change is that an increase in the number of persons of color in their communities—specifically Hispanic people—will lead to an increase in violent crime.[6]

The racial balance in Dallas is similar to Houston. Researchers observe that, "Over recent decades, the immigration of people of color from Latin America, Asia, and the Caribbean has dramatically changed the U.S. demographic makeup in a more diverse direction. Whites have become a statistical minority in large central cities such as New York, Chicago, Los Angeles, and Houston. At current birth and immigration rates, half the population will be Americans of color by the 2040s. Especially among white Americans . . . there is much fearful racist framing of these immigrants of color and related demographic changes."[7] Researchers have also observed that the "Latino population explosion, generated by immigration, has already created a number of visible fractures in the United States that seem to be shifting the racial terrain"[8]

---

[3] https://www.census.gov/quickfacts/fact/dashboard/dallascitytexas/RHI825221#RHI825221
[4] *Id.*
[5] Ted Chiricos et. al., *Racial composition of Neighborhood and Fear of Crime*, 35 Criminology 107, 107 (1997)
[6] https://www.ncbi nlm.nih.gov/pmc/articles/PMC4221266/
[7] Feagin, Joe R. at 175. *The White Racial Frame: Centuries of Racial Framing and Counter-framing.* Third Edition. New York: Routledge (2020).
[8] Bonilla-Silva, Eduardo at 182. *Racism Without Racists: Color-blind Racism and the Persistence of Racial Inequality in America*. Fifth Edition. Lanham: Rowman and Littlefield. (2018).

2. *Negative Stereotypes of racial minorities in American Society*

Overtly subhuman stereotypes are forms of dehumanization.[9] This is because "[a]nimals are said to be wild by nature. Animals can be domesticated, but . . .  they can never be human. When animals are wild, which is to say, uncontrolled by humans, they may be appropriately feared by humans, and are justifiable targets for human hunters."[10] Dehumanization thus plays a critical role in normalizing intergroup violence.[11] Historical scholarship has shown that "associations between humans and nonhuman animals have been used to justify slavery in the United States, the Jewish Holocaust of World War II, and widespread violence against immigrants around the world."[12] When a group is dehumanized, they are morally excluded, and "anything that is done to someone who is morally excluded is permissible, no matter how heinous the action," including the ultimate forms of violence: murder and genocide.[13]

Three archetypal examples help illustrate this point. First, dehumanization was a necessary precursor to the annihilation of Jewish persons by Nazis:

> The Nazis were explicit about the status of their victims. They were Untermenschen — subhumans — and as such were excluded from the system of moral rights and obligations that bind humankind together. It's wrong to kill a person, but permissible to exterminate a rat. To the Nazis, all the Jews, Gypsies and others were rats: dangerous, disease-carrying rats.[14]

Similarly, "extremists who organized the Rwandan genocide called Tutsi cockroaches and snakes."[15] Finally, in America, the association of apes with Black persons is rooted in stereotypes that they are "innately lazy, aggressive, dim, hypersexual, and in need of benevolent

---

[9] Trujillo, Matthew D. at 15. The Interplay Between Prejudice Against Latinos and Policy: A Social Psychological Perspective. Harvard Journal of Hispanic Policy 24 (2012).
[10] Santa Ana, Otto at 203. "Like an animal I was treated": Anti-immigrant Metaphor in U.S. Public Discourse. *Discourse & Society* 10(12):191-224 (1999).
[11] Goff, P.A., J.L. Eberhardt, M.J. Williams, and M.C. Jackson. Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences. *Journal of Personality and Social Psychology* 293 (2008). DOI: 10.1037/0022-3514.94.2.292
[12] *Id.*
[13] *Id.*
[14] David Livingstone Smith, Less than Human: Why We Demean, Enslave, and Exterminate Others (2011); relevant excerpt available at https://www.npr.org/2011/03/29/134956180/criminals-see-their-victims-as-less-than-human
[15] Aliza Luft, Dehumanization and the Normalization of Violence: It's Not What You Think, Social Science Research Counsel, available at https://items.ssrc.org/insights/dehumanization-and-the-normalization-of-violence-its-not-what-you-think/

control."[16] Not only did the dehumanization of Black persons facilitate their enslavement,[17] but "Black defendants who were put to death were more likely to have apelike representations in the press."[18] "Black defendants are more likely to be portrayed as apelike in news coverage than White defendants and . . . this portrayal is associated with a higher probability of state-sponsored executions."[19]

In the case of Hispanic men, researchers have found that anti-Hispanic bias is strongly correlated with a history of Hispanic dehumanization in this country,[20] a desire for Hispanics to be punished by the State,[21] and a history of hostility to Hispanics' presence in this country. [22] One deeply ingrained anti-Hispanic stereotype is that they are animalistic, or subhuman. Since at least the 1930s, Hispanics have been commonly depicted as savage and bloodthirsty.[23] For example, in the 1950s, Hispanics were commonly described by print media as infiltrating the United States in "swarms," moving in "wolf packs," and reproducing like "dogs."[24] And as recently as the 1990s, a close examination of Los Angeles Times articles written between 1993 and 1994 revealed that "animals" was the dominant expression that characterized Hispanics. [25] Researchers found only two examples of a L.A. Times writer referring to someone other than a Hispanic immigrant as an animal, both about Black boxer Mike Tyson.[26]

---

[16] *Id.* at 293.
[17] Reginald Oh, *Black Citizenship, Dehumanization, and the Fourteenth Amendment*, 12 ConLaw NOW 157, 159 (2021)
[18] Goff, P.A., J.L. Eberhardt, M.J. Williams, and M.C. Jackson. Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences. *Journal of Personality and Social Psychology* 293 (2008). DOI: 10.1037/0022-3514.94.2.292
[19] *Id.* at 304.
[20] Trujillo, Matthew D. at 15. The Interplay Between Prejudice Against Latinos and Policy: A Social Psychological Perspective. Harvard Journal of Hispanic Policy 24 (2012).
[21] Marshall, Shantal and Jennifer L. Eberhardt. The Function of Animal Associations: Latinos as Rats and Anti-immigrant Sentiment. Poster presented at the 12th Annual Meeting of the Society for Personality and Social Psychology, San Antonio, Texas; Trujillo, Matthew D. at 15. The Interplay Between Prejudice Against Latinos and Policy: A Social Psychological Perspective. *Harvard Journal of Hispanic Policy* 24 (2012).
[22] Santa Ana, Otto at 203. "Like an animal I was treated": Anti-immigrant Metaphor in U.S. Public Discourse. *Discourse & Society* 10(2):191-224 (1999).
[23] Steven W. Bender, Greasers and Gringos: Latinos, Law, and the American Imagination 118-121 (2003).
[24] *Id.*
[25] Santa Ana, Otto at 203. "Like an animal I was treated": Anti-immigrant Metaphor in U.S. Public Discourse. *Discourse & Society* 10(2):191-224 (1999).
[26] *Id.*

### 3. Analysis of Racial Bias in Declaration Signed by J.G.- Foreman at Ruiz Trial

I reviewed the declaration from J.G., the white foreman at Mr. Ruiz's capital trial. There is no question that Foreman J.G.'s declaration reflects racial stereotypes, bias, and negative racial attitudes regarding Hispanic men that would feature in any decision requiring an appraisal of Mr. Ruiz's risk for committing violence, as well as the decision to sentence Mr. Ruiz to death. Specifically, on page 3 of his declaration, Foreman J.G. notes that he believed that "Mr. Ruiz behaved like an animal. He was a mad dog." These are blatant anti-Hispanic stereotypes and are overtly racist.

Jury foreman J.G.'s declaration also reveals his and other jurors' fearful perceptions of gang members in the courtroom and directly references his fear of an unidentifiable Mexican driver related to these perceptions. He states on pages 3 and 4:

9. There were also a lot of gang members in the courtroom too. They had tattoos, and it was obvious who they were there for – Mr. Ruiz . . .

10. The women on the jury were scared of the gang members in the courtroom. They were so scared that they told the court, and the baliffs [sic] walked them to their cars. I was concerned too. When I walked out of the courtroom and to my car, the gang members saw me. I had a red [C]orvette and they saw me get into it. I should have brought a different car that didn't stick out . . .

11. Later, I was driving on the highway and saw a Mexican guy in a flashy car on the side of the road as I passed him, and it seemed like he was following me. I sped up and got off the exit very quickly. I was scared.

In my opinion, these statements by Foreman J.G. overtly stereotype Hispanic men as violent and dangerous. These statements also reveal how Hispanic racial bias can influence Foreman J.G.'s appraisal of the facts: a flashy car (e.g., a red Corvette) that is driven by someone who is non-Hispanic (that is, Foreman J.G.), is not suspicious to him, but when it is driven by a "Mexican guy," it holds prominence in his mind as a reason that he felt scared.

J.G.'s status as a foreman of the jury, and therefore one who occupied a special status and leadership role among the jury, is of significant note. Foreman J.G. indicated on page 2, that "[t]here was one juror, a sweet house-wife, who did not want to give Mr. Ruiz the death penalty." He indicates that he persuaded her to vote for death, by "explain[ing] to her the evidence that he could be dangerous." This is significant because it illustrates how Foreman J.G.'s personal bias against Hispanic men influenced others on the jury. In other words, Foreman

J.G.'s anti-Hispanic bias, combined with his leadership role, deprived Mr. Ruiz of a fair, impartial jury because his influence tainted jury proceedings with racism.

    *4.   Analysis of Racial Bias in Declaration Signed by Juror B.P.*

     White juror B.P.'s declaration also contains overt anti-Hispanic attitudes. She highlights violent life events that personally affected her family before she served as a juror in Mr. Ruiz's trial. Juror B.P. states:

    3. "I thought Wes could escape if he was sentenced to life without parole."

    5. "My younger cousin was murdered before Wes's trial. It was drug related. I think it probably wouldn't have happened if drugs weren't involved. They never found the guy who shot my cousin.

    6. "My sister was raped and kidnapped many years ago before Wes's trial . . . They tortured her while driving and then left her in Mountain Creek where she found a truck driver to help her. The main guy of the 4 men was a Raymond Maya, I believe he's Hispanic and was involved in a business to smuggle in illegal aliens into the country. He I believe was apprehended after a high speed chase and fired at officers, in Cockrell."

    B.P. draws on shared understandings about the demographics of Dallas neighborhoods like Oak Cliff and Ruiz's neighborhood of West Dallas to convey racial views that shaped her perception of Ruiz.

    4. "I grew up in Oak Cliff. The area started to change when the demographic changed – integration and bussing, which my parents opposed. Wes was from West Dallas, which was even worse than Oak Cliff.

Oak Cliff is now 69.3% Hispanic, 22.2% White, and 6.5% Black.[27] Rising Hispanic populations are assumed to increase the violence of a neighborhood.  Researchers have found that "the relative size of the Hispanic population in a neighborhood is a significant contextual predictor of fear of crime."[28]

    B.P. refers to West Dallas as "even worse," presumably due to the higher number of Black residents and the status of White residents as a minority group in this area. West Dallas is 52.4% Hispanic, 28.2% Black, and 13.4% White.[29] While residents like B.P. may negatively view this demographic shift due to more positive experiences of her home neighborhood prior to

---

[27] https://statisticalatlas.com/neighborhood/Texas/Dallas/Oak-Cliff/Race-and-Ethnicity.
[28] David Eitle & John Taylor, *Are Hispanics the new 'Threat'? Minority group threat and fear of crime in Miami-Dade County*, 37 Soc. Sci. Rsch. 1102, 1112 (2008)
[29] https://www.city-data.com/neighborhood/West-Dallas-Dallas-TX html.

this shift, many White American residents in a city such as Dallas have also observed this demographic shift and been affected by the framing of this shift in news media and everyday discussions about immigration and race in the U.S.[30]

Directly after noting the demographics of Oak Cliff and Ruiz as coming from West Dallas, B.P. then describes significantly violent events affecting close loved ones, taking note of her understanding that the "main guy" who kidnapped and raped her sister was "Hispanic." This is reminiscent of Foreman J.G. invoking racial fears about Hispanics with "tattoos" and "a Mexican guy in a flashy car." In their study of mental healthcare provider perceptions on race in the care of clients, McMaster et al. observe "Multiple providers used geographical terms to refer to black and white clients," such as "inner city," "downtown," and "suburbs."[31]

5. *Impact of Racial Bias on the Juror's Decision-Making at Mr. Ruiz's Trial*

Studies on mock juror decision-making indicate that jurors are more likely to rely on racial stereotypes about defendants of color and judge them more harshly when they lack information about the defendant's characteristics beyond race that enables them to make more judicious decisions.[32] Race is particularly salient under such conditions.[33] Foreman J.G.'s declaration indicates he lacked critical information to make a more informed sentencing decision. He states early in his declaration:

2. It was obvious that Mr. Ruiz's defense attorneys didn't do a good job. They seemed like they didn't care, and they didn't give us a plausible alternative argument. If they gave us information on his state of mind, like information from a psychologist, we would have considered it in our decision. It could have made a difference.

---

[30] Bonilla-Silva, Eduardo. *Racism Without Racists: Color-blind Racism and the Persistence of Racial Inequality in America*. Fifth Edition. Lanham: Rowman and Littlefield. (2018).; Feagin, Joe R. 2020. *The White Racial Frame: Centuries of Racial Framing and Counter-framing*. Third Edition. New York: Routledge.

[31] McMaster, K., Peeples, A., Schaffner, R., & Hack, S. at 7. Mental Healthcare Provider Perceptions of Race and Racial Disparity in the Care of Black and White Clients. *Journal of Behavioral Health Services & Research*. DOI 10.1007/s11414-019-09682-4 (2022).

[32] Pfeifer, J. & Bernstein, D. 2003. Expressions of Modern Racism in Judgments of Others: The Role of Task and Target Specificity on Attributions of Guilt. Social Behavior and Personality. DOI 10.2224/sbp.2003.31.8.749; Mitchell, T.L., Haw, R.M., Pfeiffer, J.E., & Meissner, C.A. Racial Bias in Mock Juror Decision-Making: A Meta-Analytic Review of Defendant Treatment. Law and Human Behavior (2005). DOI: 10.1007/s10979-005-8122-9; Kleider, H.M., Knuycky, L.R., Cavrak, S.E. Deciding the Fate of Others: The Cognitive Underpinnings of Racially Biased Juror Decision Making. The Journal of General Psychology (2012); Maeder, E.M. & Burdett, J. The Combined Effect of Defendant Race and Alleged Gang Affiliation on Mock Juror Decision-Making. *Psychiatry, Psychology, and Law* (2013). http://dx.doi.org/10.1080/13218719/2011/633330

[33] Pfeifer, J. & Bernstein, D. at 3. Expressions of Modern Racism in Judgments of Others: The Role of Task and Target Specificity on Attributions of Guilt. *Social Behavior and Personality*. DOI 10.2224/sbp.2003.31.8.749 (2003).

Moreover, in a capital murder case involving interracial violence—a Hispanic defendant and a white police officer victim—accurate information about the security of the defendant's confinement would be critically important in jurors' choice between a sentence of life without parole or execution.

B.P.'s declaration indicates she was also influenced by testimony from the State's expert A.P. Merillat. B.P. states:

> 3. I remember the state's expert A.P. Merillat testified about how Wes would be classified. I thought Wes could escape if was sentenced to life without parole. Had I known the actual classification rules, I might have changed my mind.

In sum, it is highly probable that racial bias significantly influenced the jury's decision to sentence Mr. Ruiz to death. Characterizing Mr. Ruiz as an "animal" and as a "mad dog" was both blatantly racist and a classic example of the dehumanization that justifies intergroup violence. After reducing Mr. Ruiz to a dangerous, wild animal, the jury logically concluded that it needed to put him down. Thus, it is likely that their overt racial bias directly led to their decision to execute Mr. Ruiz.

*Christina Leza*

_____

Dr. Christina Leza

Date: January 12, 2023

9

4



# UNIT CLASSIFICATION PROCEDURE

SUBJECT:        CUSTODY DESIGNATIONS

AUTHORITY:   TDCJ Classification Plan, revised 10/03

PURPOSE:        The purpose of custody assignment shall be to ensure each offender in TDCJ receives appropriate and adequate supervision and housing commensurate with the changing needs and requirements during his/her incarceration. Custody assignments shall be primarily influenced by institutional adjustment factors and sentence length; however, factors such as prior criminal record, prior institutional adjustment and current offense of record may be considered when making initial classification decisions relating to custody. Custody assignment shall serve to indicate the type of housing required (cell or dormitory), the level of supervision required by the offender, and the appropriate job assignment.

## PROCEDURES:

The principal custody designations for Institutional offenders are General Population Level 1 (G1), General Population Level 2 (G2), General Population Level 3 (G3), General Population Level 4 (G4), General Population Level 5 (G5) and maximum (administrative segregation) custody. Principal custody designations for State Jail offenders are State Jail Level 1 (J1), State Jail Level 2 (J2), State Jail Level 4 (J4) State Jail Level 5 (J5) and Special Management. The diversity of characteristics in the offender population compels that special status categories also be provided which are consistent with special custody or treatment requirements. These special status categories are death sentence status, medical status, mental health (psychiatric) status, mentally retarded offender (MROP) status, physically disabled offender status, safekeeping status and transient status.

Assignment to a special status category may preclude assignment to a principal custody designation (e.g., death sentence status offenders; MROP status offenders in an MROP-Sheltered Facility; psychiatric status offenders in an inpatient facility). Offenders with special medical or mental health needs, intellectual impairments or physical handicaps will generally be referred to as "special needs" offenders. "Special needs" offenders shall be assigned to the appropriate special status category upon recommendation by the appropriate treatment professional(s). Refer to the TDCJ Classification Plan, 10/03 for additional information.

The following reviews are conducted by classification committees regarding custody consideration:

1.   Upon initial assignment to a unit, the offender will be reviewed for custody assignment.

2.   Upon receipt of a major disciplinary case for which major punishment was assessed, the offender will be reviewed for custody consideration to ensure the offender is assigned the custody that best fits his/her security needs.

3.   Once an offender is seen for a major disciplinary, the UCC will set a subsequent review date for promotional consideration. Institutional offenders may be eligible for promotion in custody designation six (6) months from the date of the major disciplinary; however, the offender must be reviewed within twelve (12) months. SJ offenders may be eligible for promotion three (3) months from the date of the major disciplinary, but must be reviewed after six (6) months.

4.  While some custody designations are overrideable, others are mandatory. For instance, offenders with a security precaution designator (SPD) of ES, SA, or HS will not be assigned to a custody less restrictive than G4 (J4 for State Jail offenders). In addition, Institutional offenders serving a 50 year or more sentence who have not completed the 5 year/10 year flat time requirement, will not be assigned to a custody less restrictive than G3. Institutional and SJ offenders with SPD removal codes of NE, NA, and NS will not be assigned to a custody less restrictive than G3 or J2, respectively. (Although State Jail offenders with a removal code can be assigned to J2 custody, they still have the same housing and job restrictions as a G3 offender). Effective 9/1/05, offenders convicted of Capital Murder and sentenced to "life without parole" will not be classified to a custody less restrictive than G3 throughout their incarceration.

Upon assignment of a custody, it is the responsibility of the Classification Committee to assess the need for a custody override. A custody override statement is required when the custody assigned to an offender by the Classification Committee is different than the computer recommended custody. The override will explain what the computer recommends and why, as well as what the committee assigned custody is and why. When an override is required, the Classification Committee shall document the override on the docket and the committee history form. The information on the Docket and the Committee History Form should match the information being entered on the computer.

The following pages include charts depicting the custody designation characteristics (Attachment A), the custody conversion chart (Attachment B) and guidelines the computer uses to assign computer recommended custodies (Attachment C). Refer to the TDCJ Classification Plan, 10/03 for more detailed information regarding custody designations.

## OFFENDER CUSTODY CHARACTERISTICS AND BOUNDARIES
## CORRECTIONAL INSTITUTIONS DIVISION

| GENERAL POPULATION LEVEL 1 (G1/J1) | |
| --- | --- |
| **CHARACTERISTICS** | **BOUNDARIES** |

G1/J1 custody– shall only be assigned to SAT II, Line Class I time-earning status, or State Jail offenders who have all of the following characteristics:

(1) No requirement for a more restrictive custody;
(2) No evidence of current psychological instability, (PULHES psych indicator of 2,3 or 4) based on the recommendation of mental health professional treatment staff, which would negatively impact the offender's ability to successfully function in General Population Level I (G1/J1) custody;
(3) No current or prior convictions for capital murder, murder or voluntary manslaughter; no current or prior convictions of any type where the offender intentionally caused the death of another person; no current or prior convictions of kidnapping, injury to a child, injury to the elderly, escape or stalking.
(4) No major disciplinary convictions resulting in major penalties within the past twenty-four (24) months for offender and/or staff assaults, with or without a weapon; no disciplinary offenses for extortion or sexual abuse.
(5) No placement of security precaution designator for escape (ES), staff assault (SA), hostage (HS); no predator codes of PD or PP.
(6) No placement of security precaution removal code of escape removal (NE), staff assault removal (NA), hostage removal (NS)
(7) No unresolved felony or United States Immigration Service detainers; no blue or white warrants for State Jail offenders
(8) To be promoted to G1/J1, must have a clear conduct record, with no disciplinary convictions resulting in major penalties, for a minimum period of six (6) months, unless a State Jail offender, then three (3) months, (newly-received offenders to TDCJ may be approved for immediate assignment to General Population Level I G1/J1).
(9) No pattern of freeworld convictions for offenses of violence, and no freeworld convictions for offenses of sexual misconduct.
(10) Must be within 24 months of parole eligibility.
(11) No confirmed or suspected STG.

G1/J1 custody - SAT II, Line Class I time-earning status, or State Jail offenders are subject to the following classification boundaries:

(1) Eligible for contact visits with visitors on approved visitation list;
(2) May be eligible for consideration for an emergency absence;
(3) Eligible for consideration to participate in specialized vocational training programs;
(4) Unarmed periodic supervision required on job assignments or activities inside or outside the security perimeter (sight-checked at a minimum of once every two (2) hours);
(5) May be housed in a cell or dormitory, in accordance with the following guidelines;
   a. General Population Level I (G1/J1) - offenders shall be assigned to dormitories on a priority basis.
   b. General Population Level I (G1) – SAT II or Line Class I status offenders may be assigned to the trusty camp adjacent to their assigned unit upon approval by the Warden and medical department. Upon assignment to the trusty camp, the designation of OT will be utilized for custody and housing purposes. (Does not apply to State Jail offenders).
   c. General Population Level 1 (G1/J1) – SAT II, Line Class I time-earning status or State Jail offenders shall only be assigned to housing areas which are specifically designated for General Population (G1/J1) custody offenders. However, General Population 1 (G1/J1) and General Population Level II (G2/J2) offenders may be housed together, in exceptional circumstances, upon prior approval of the housing scheme by the Chairperson of the SCC.
(6) Recreation – Institutional offenders - allowed a minimum of four (4) hours weekdays; seven (7) hours weekends. (Refer to AD 03.40 for specific guidelines).

   State Jail offenders – allowed a minimum of four (4) hours weekdays. At least one (1) hour of this recreation time will be in the gym or outdoors (weather permitting). Seven (7) hours will be allowed on the weekends with at least two (2) hours of this recreation time in the gym or outdoors (weather permitting).
(7) Commissary – allowed to make commissary purchases up to $75 every (2) two weeks.
(8) Property – allowed to keep personal property except items restricted through disciplinary actions or under AD-03.72.
(9) Jobs - may be assigned to any job deemed appropriate by the unit administration.
(10) Education Programs – eligible for consideration to participate in academic programs if specific program criteria are met.

## GENERAL POPULATION LEVEL 2 (G2/J2)

G2/J2 custody – shall primarily be assigned to those SAT III, IV, Line Class I time-earning status, or State Jail offenders who have all of the following characteristics:

(1) No requirement for a more restrictive custody;

(2) No recent pattern of in-prison assaultive behavior (three (3) or more separate disciplinary convictions resulting in major punishment within the past twenty-four (24) months for offender and/or staff assaults, with or without a weapon);

(3) In order to promote to Level II, must have a clear conduct record, with no disciplinary convictions resulting in major penalties for a minimum period of six (6) months, unless State Jail offender, then three (3) months, (newly received TDCJ offenders may be approved for immediate assignment to General Population Level II (G2/J2) custody);

(4) Offenders committed to TDCJ with 3G (murder, capital murder, indecency with a child, aggravated kidnapping, aggravated sexual assault, aggravated robbery, Health and Safety Code, Chapter 481.134 (c), (d), (e), and (f), sexual assault, any offense with affirmative finding – use of a deadly weapon) offenses for sentences of fifty (50) years or more must have served ten (10) years flat time to be eligible for General Population Level II (G2/J2) custody;

(5) Offenders committed to TDCJ-CID with non-3G offenses for sentences of fifty (50) years or more must have served five (5) years flat to be eligible for General Population Level II (G2/J2) custody;

(6) No placement of security precaution designator for escape (ES), staff assault (SA), hostage (HS);

(7) No placement of security precaution removal code of escape removal (NE), staff assault removal (NA), or hostage removal (NS) (unless State Jail offender).

G2/J2 custody – Primarily SAT III, SAT IV, Line Class I time-earning status, or State Jail offenders shall be subject to the following classification boundaries:

(1) Eligible for contact visits with immediate family members;

(2) May be eligible for consideration for an emergency absence;

(3) Requires direct armed supervision on job assignments and activities outside the security perimeter, and requires indirect supervision inside the security perimeter;

(4) May be housed in a cell or dormitory, in accordance with the following guidelines:

  a. General Population Level II (G2/J2) custody offenders may be assigned to a dormitory within the security perimeter; however, a General Population Level II (G2/J2) custody offender shall not be assigned to a trusty camp.

  b. General Population Level II (G2/J2) custody offenders shall only be assigned to housing areas which are specifically designated for General Population Level II (G2/J2) custody offenders. However, in exceptional circumstances, General Population Level II (G2/J2) and General Population Level I (G1/J1) offenders may be housed with General Population Level III (G3) custody offenders the main building of a unit with prior approval of the housing scheme by the Chairperson of the SCC.

(5) Recreation – Institutional offender - allowed four (4) hours weekdays; seven (7) hours weekends. (Refer to AD 03.40 for specific guidelines).

State Jail offender – allowed four (4) hours of recreation each weekday. At least one (1) hour of this recreation time will be in the gym or outdoors (weather permitting). Seven (7) hours will be allowed on the weekends with at least two (2) hours of this recreation time in the gym or outdoors (weather permitting).

(6) Commissary – allowed to make commissary purchases up to $75 every two (2) weeks.

(7) Property – allowed to keep personal property except items restricted through disciplinary actions or under AD-03.72.

(8) Jobs - may be assigned to any job deemed appropriate by the unit administration. (Unless State Jail offender with a NE, NA, NS code). Offender in this category may not be assigned to maintenance work, clerk position, dock worker, or any job where the offender would have access to multiple areas of the unit.

(9) Education Programs - eligible for consideration to participate in academic/vocational programs if specific program criteria are met.

## GENERAL POPULATION LEVEL 3 (G3, Does not apply to State Jail Offenders)

G3 custody – shall be assigned to primarily SAT III, SAT IV, or Line Class I time-earning status offenders. Custody shall only be assigned to offenders who have one or more of the following characteristics;

(1) No requirement for a more restrictive custody;

(2) No recent pattern of in-prison assaultive behavior (three (3) or more separate disciplinary convictions resulting in major punishment within the past twenty-four (24) months for offender and/or staff assaults, with or without a weapon);

(3) In order to promote to General Population Level III (G3), an offender must have a clear conduct record, with no disciplinary convictions resulting in major penalties for a minimum period of six (6) months, (newly received TDCJ offenders may be approved for immediate assignment to General Population Level III (G3) custody);

(4) Offenders committed to TDCJ for sentences of fifty (50) years or more for a 3G offense and have not served ten (10) flat years.

(5) Offenders committed to TDCJ for sentences of fifty (50) years or more for a non-3G offense and have not served five (5) flat years.

(6) No placement of security precaution designator of escape (ES), staff assault (SA) or hostage (HS);

(7) Placement of a security precaution removal code of escape removal (NE), staff assault removal (NA), or hostage removal (NS) will prevent an offender from being assigned to a custody less restrictive than G3.

(8) Offenders convicted of Capital Murder and sentenced to "life without parole".

The codes of escape (ES) and staff assault (SA) must be removed if the incident which caused the placement of the designator occurred more than ten (10) years ago in accordance with AD 04.11 (unless approved by the SPDRC to remain due to extraordinary circumstances).

G3 custody – Primarily SAT III, SAT IV, or Line Class I time-earning status offenders shall be subject to the following classification boundaries:

(1) Eligible for contact visits with immediate family members;

(2) May be eligible for consideration for an emergency absence;

(3) Requires direct armed supervision on job assignments and activities outside the security perimeter, and requires indirect supervision inside the security perimeter;

(4) May be housed in a cell or dormitory, in accordance with the following guidelines:
   a. General Population Level III (G3) custody offenders may be assigned to a dormitory inside the main building of a unit;
   b. General Population Level III (G3) custody offenders shall not be assigned to a dormitory outside of the main building of a unit, inside the security fence.
   c. General Population Level III (G3) custody offenders shall not be assigned to a trusty camp;
   d. General Population Level III (G3) custody offenders shall only be assigned to housing areas that are specifically designated for General Population Level III (G3) custody offenders. However, in exceptional circumstances, General Population Level III (G3) and General Population Level II (G2) offenders may be housed together upon prior approval of the housing scheme by the Chairperson of the SCC.

(5) Recreation – allowed four (4) hours weekdays; seven (7) hours weekends. (Refer to AD 03.40 for specific guidelines).

(6) Commissary – allowed to make commissary purchases up to $75 every two (2) weeks.

(7) Property – allowed to keep personal property except items restricted through disciplinary actions or under AD-03.72.

(8) Jobs - may be assigned to any job except maintenance worker, SSI, any other clerk position, dock worker, or any job where the offender would have access to multiple areas of the unit.

(9) Education Programs - eligible for consideration to participate in academic programs if specific program criteria are met. Access to vocational programs determined by Warden based on location of vocational shops.

## GENERAL POPULATION LEVEL 4 (G4/J4)

G4/J4 custody – shall be primarily assigned to those SAT IV, Line Class I, II, III time-earning status, or State Jail offenders who have one or more of the following characteristics:

(1) No requirement for a more restrictive custody;
(2) Does not qualify for a less restrictive custody assignment;
(3) Has recently demonstrated a positive change in behavior and attitude and was previously in General Population Level V (G5/J5) custody;
(4) Two (2) or more non-assaultive disciplinary convictions resulting in major penalties within the past six (6) months;
(5) One (1) disciplinary conviction resulting in a major penalty for offender or staff assault without a weapon within the past twelve (12) months;
(6) Line Class II, III time-earning status, Institutional offender, if the offender is not assaultive or aggressive in nature. Age, physical size, and the circumstances surrounding any assaultive disciplinary offenses will be taken into consideration when determining appropriate custody assignment.
(7) Placement of a security precaution designator for escape (ES), staff assault (SA), or hostage (HS) will prevent an offender from being assigned to a custody less restrictive than G4/J4. Offenders with ES, SA and HS designators must be assigned to a Level 5 facility.

Note:
General Population Level IV (G4/J4) custody may be assigned to offenders who have the following characteristics:

A newly-received offender, upon transfer to his initial unit of assignment, may be assigned to General Population Level IV (G4/J4) custody by the UCC if the offender's current offense of record is for a violent crime; if the UCC establishes that the offender has a pattern of free-world convictions for offenses of violence; or if the offender has committed an assault on staff or offenders in an adult correctional institution within the past twenty-four (24) months.

G4/J4 custody – Primarily SAT IV, Line Class I, II, III time-earning status, or State Jail offenders shall be subject to the following classification boundaries:

(1) Generally, allowed one (1) visit each weekend; ineligible for contact visits; S3 and S4 Institutional offenders with one (1) year clear major disciplinary shall be allowed to receive contact visits with immediate family members (frequency dependent on time-earning status when applicable);
(2) Ineligible for emergency absence;
(3) Requires direct armed supervision on job assignments and activities outside the security perimeter; requires indirect supervision on jobs inside the security perimeter;
(4) Must be housed in a cell specifically designated for housing General Population Level IV (G4/J4) custody offenders. (Note: Female and State Jail offenders in General Population Level IV (G4/J4) custody may be housed in dormitories specifically designated for housing General Population Level IV (G4/J4) custody offenders.)
(5) Recreation – Institutional offender - allowed four (4) hours weekdays. (Refer to AD 03.40 for specific guidelines).

   State Jail offender – allowed two (2) hours of recreation each weekday. At least one (1) hour of this recreation time will be in the gym or outdoors (weather permitting). Four (4) hours will be allowed on the weekends with at least one (1) hour of this recreation time in the gym or outdoors (weather permitting).
(6) Commissary – generally allowed to make commissary purchases up to $30 every two (2) weeks; however, SAT III, SAT IV, and State Jail offenders with one (1) year clear major disciplinary shall be allowed to make purchases up to $75 every two (2) weeks.
(7) Property – allowed to keep personal property except items restricted through disciplinary actions or under AD-03.72.
(8) Jobs – will generally be assigned to field force and secure jobs inside the perimeter as designated by the Warden. May not be assigned to maintenance worker, SSI, any other clerk position, dock worker, or any job where the offender would have access to multiple areas of the unit.
(9) Education Programs – participation in educational programs will be determined by the Warden on a unit by unit basis and specific program criteria. Access to vocational programs to be determined by the Warden based on location of the vocational shops.

## GENERAL POPULATION LEVEL 5 (G5/J5)

G5/J5 custody – shall be primarily assigned to those Line Class I, II, III time-earning status or State Jail offenders who have one or more of the following characteristics:

(1) One (1) or more disciplinary conviction resulting in major penalty for an assault with a weapon on staff or offenders within the past twenty-four (24) months;

(2) Two (2) or more disciplinary convictions resulting in major penalties for offender or staff assaults without a weapon within the past twelve (12) months;

(3) One (1) or more disciplinary convictions resulting in major penalties for extortion or sexual abuse within the past twenty-four (24) months.

(4) Primarily Line I, II,III time-earning status, or State Jail offender, if the offender is assaultive or aggressive in nature. Age, physical size, and the circumstances surrounding any assaultive disciplinary offenses will be taken into consideration when determining appropriate custody assignment.

(5) Escape from a TDCJ secure adult correctional facility within the past five (5) years will prevent an offender from being assigned to a custody less restrictive than G5/J5.

Note:
General Population Level V (G5/J5) custody may be assigned to offenders who have the following characteristics:

(1) Recent history of escape or attempted escape from an adult correctional institution (within the past ten (10) years).

(2) A newly-arrived offender, upon transfer to his initial unit of assignment, may be assigned to General Population Level V (G5/J5) custody under the following circumstances:

    (a) If the current offense or record is for a violent crime against a person and the UCC does not establish that a pattern of convictions for violent acts exists, the offender may still be considered for (G5/J5) custody. However, the offender may be considered for assignment to a less restrictive custody in light of other classification characteristics.

    (b) If in addition to the offender's current conviction for a violent crime, a pattern of convictions for violent acts can be established by the UCC, then the offender may be assigned to (G5/J5) custody.

    (c) If the offender has committed an assault on staff or offenders in an adult correctional institution within the past twenty-four (24) months, then the offender may be assigned to (G5/J5) custody.

G5/J5 Custody – Primarily Line Class I, II, III time-earning-status, or State Jail offenders shall be subject to the following classification boundaries:

(1) Generally ineligible for SAT status good conduct time credits (does not apply to State Jail offenders);

(2) Ineligible for contact visits;

(3) Ineligible for an emergency absence;

(4) Requires direct armed supervision on job assignments and activities outside the security perimeter, requires direct supervision inside the security perimeter (however, certain positions with limited access to ingress/egress from the position (i.e., dishwasher) may be allowed frequent, indirect supervision with the approval of the Warden);

(5) Must be housed in a cell specifically designated for housing only General Population Level V (G5/J5) custody offenders;

(6) Recreation – Institutional offender - allowed two (2) hours a day; (Refer to AD 03.40 for specific guidelines).

    State Jail offender – allowed one (1) hour a day.

(7) Commissary – allowed to make commissary purchases up to $20 every two (2) weeks;

(8) Property – allowed to keep personal property except items restricted through disciplinary actions or under AD-03.72.

(9) Jobs – primarily assigned to field force. May not be assigned to maintenance worker, SSI, any other clerk position, dock worker, or any job where the offender would have access to multiple areas of the unit.

(10) Education Programs – generally ineligible for participation in educational programs but may be eligible in certain situations such as GRAD process.

5

25 Mr o 8

— Conrum Delgadillo ~ Get him in agreeis the Instr.

Trial Brief re:
① Motive

② Extraneouses

③ Self Serving Stmts.

④ D/C          Raul Toledo "Barney"
                Thu    | 97-2004 Extraneous's |

Xos532924    • POS 51476 - Corcone  POSS meth

▷ Expert     FOS-51472 - Vasud  POSS meth

~ 0972 916.           POSS meth.
              Probation File   ~ Wormley

Bell Co      2006 Blue Backs
State v. Tobler  2006 Probation File violations ——→
ADA Paul McWilliams                        Travis Co DA.
                                            512.854.9400

Perry III    Reiewd letters - Process of
Show 12 Exhibits
93p. 509.7800
Mail your info  Meriletts physical Exhibits 2,3??
                — Transcripts of prior Testmony
Selwyn Davis    — Call re: Transcripts
Sept
Austin TX 2009     Has No Transcripts; will look for actual
State v.        inmate designed weapons; has photos & videos of
will call       a number of Them; photos + videos of prison violence
Transcript      is available if he were to interview; will
Brya ist case   reveal any info collected by his Agency
ADA 2620     opposing experts; ret. wardens; impressive to Jurors; since Tx 7
             Things have changed ie. new classification system but still have access
             to many people; Terry Fitzgerald form Pr. O fronts as an Atty.
                                         Austin

6

**Wesley Ruiz**

*(handwritten: okay, is this correct? - Is it incorrect?)*

Procedural history:   *offense date : 3/23/07*

*(handwritten right margin: 1/2009 ↓ AP realized he was wrong - length of jury deliberation)*

7/11/08          Death sentence

2/16/10          Ruiz's brief on direct appeal filed

*6/16/10*          *Estrada issued*

7/26/10          State's brief on direct appeal filed

*Date — CCA op. issued*

12/6/10          Ruiz's state habeas application filed

Relevant facts of *Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010)

- Defense presented testimony from Fitzgerald on inmate classifications. Fitzgerald testified that the least restrictive status an LWOP inmate could achieve was G3.

- As rebuttal, State presented Merillat, who testified that after 10 years as G3, LWOP inmate could achieve lower status.

- During deliberations on punishment, the jury sent out two notes at different times. The first note asked what would happen if the jury could not come to a decision on the FD special issue. The second note asked, "Based on the testimony of Fitzgerald and Merillat is there a possibility that the defendant would be eligible for a less restrictive status after 10 years (or some other period of time)."

- Complaint on appeal: the State violated D's 5th, 6th, 8th, and 14th amendment constitutional rights by presenting false and misleading testimony on a crucial issue during punishment.

- CCA: "[T]here is a fair probability that appellant's death sentence was based upon Merillat's incorrect testimony as evidenced by the jury's notes."

- Other relevant FACTS:
    - State conceded error, and said D was entitled to a new trial.
    - No discussion of punishment evidence or theory of punishment case.
    - Discussion limited to the conflicting testimony on the classification, the jury's notes, and the actual regulations.

Relevant facts of *Velez v. State*, No. AP-76,051, 2012 Tex. Crim. App. Unpub. LEXIS 607 (Tex. Crim. App. June 13, 2012) (not designated for publication)

- Merillat was the only witness to testify about the TDCJ classification system and prison life:

    "A convicted capital murderer with a life sentence will go in automatically as a G3 right in the middle. In other words, that can be the same as a burglar or thief or a forger, or DWI felon. They could go in as a G3 too or they can be a G3 while in prison. You can promote up to better classification if you behave, you can go down to more strict classification ."

7

(2) Is a prisoner classified before entering prison to serve their term? If not, how long does it take to be classified by the board?

John A. Boyd

FILED

2008 JUL 11 PM 4: 55

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO., TEXAS

DEPUTY

Judge, 194

000667

194TH JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

THE STATE OF TEXAS       *
VS                             *     CAUSE NO. F07-50318-M
WESLEY LYNN RUIZ      *

## COURT'S ANSWER TO JURY NOTE NO. 2

LADIES AND GENTLEMEN OF THE JURY:

     The Court has received the following Jury Note No. 2:

PER ATTACHED

     The Court responds as follows:

        The jury must indicate that there is a dispute and the specific area of the

dispute regarding said requested testimony.

_____
ERNEST B. WHITE, III , Judge Presiding

8

# United States Court of Appeals
# for the Fifth Circuit

———————

No. 19-70003

———————

WESLEY LYNN RUIZ,

*Petitioner—Appellant,*

*versus*

BOBBY LUMPKIN, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

*Respondent—Appellee.*

———————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:12-CV-5112

———————————————

Before OWEN, *Chief Judge*, and WILLETT and OLDHAM, *Circuit Judges.*
PER CURIAM:*

    Wesley Lynn Ruiz seeks panel rehearing of our decision denying a
certificate of appealability (COA) on his claims that (1) the state's
presentation of false expert testimony in the penalty phase violated his due

———————

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this
opinion should not be published and is not precedent except under the limited
circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

Case 3:12-cv-05112-N   Document 50-1   Filed 01/25/23   Page 41 of 49   PageID 6530

process and Eighth Amendment rights, and (2) that his trial, appellate, and initial habeas counsel were ineffective. Ruiz's petition for rehearing is denied.

Ruiz first argues that we failed to analyze whether he showed cause and prejudice to excuse the procedural default of his claims based on the false expert testimony. Ruiz did not argue cause and prejudice in his motion for a COA. Indeed, he did not address the procedural default at all. Instead, he argued the merits that the state's failure to correct the expert's false testimony violated *Brady v. Maryland*. Ruiz, through new counsel, contends that he sufficiently raised cause and prejudice because a *Brady* violation can establish cause for a procedural default. But as we explained, Ruiz's "*Brady* claim falls short."[1] It therefore does not serve as cause to excuse the procedural default.

Ruiz next argues that we contravened precedent in concluding that the Texas Court of Criminal Appeals's (TCCA's) dismissal of his application for relief was clearly independent from the federal claim's merits. The TCCA dismissed his application under Article 11.071 § 5(a) of the Texas Code of Criminal Procedure, which provides:

> (a) If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> > (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
> >
> > (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could

---

[1] *Ruiz v. Davis*, 819 F. App'x 238, 242–43 (5th Cir. 2020).

have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

We concluded that none of the subsections applied, explaining that "[t]he TCCA's holding, based entirely on Article 11.071 § 5(a), is clearly independent from the federal claim's merits and relied on state procedural grounds."[2] Ruiz argues that under our precedent, dismissals under Article 11.071 § 5(a) implicate the merits of the federal claim, and therefore are not based on independent state procedural grounds.

Here, the TCCA dismissed the application "without considering the merits of the claims."[3] That alone establishes that the TCCA's ruling was procedural, meaning we did not need to inquire further into whether any of § 5(a)'s subsections applied. In any event, the TCCA's opinion suggests it dismissed Ruiz's application on the ground that Ruiz could have brought his claims earlier.[4] Ruiz's petition, which focuses only on § 5(a)(1) and does not mention the other subsections, concedes as much. This is an independent state procedural bar.[5]

Ruiz also argues that we wrongly assessed the merits of his expert testimony claims. But we did so in the context of analyzing whether § 5(a)(2) or (a)(3) applied to Ruiz's application. Because the TCCA dismissed the

---

[2] *Id.* at 242–43, 242 n.3.

[3] *Ex parte Ruiz*, No. Wr-78,129-03, 2014 WL 6462553, at *1 (Tex. Crim. App. Nov. 19, 2014).

[4] *Id.*

[5] *See Rocha v. Thaler*, 626 F.3d 815, 835 (5th Cir. 2010) ("If the CCA's decision rests on availability, the procedural bar is intact.").

application based on availability, we did not need to reach these questions. But the unnecessary analysis does not warrant rehearing.

Finally, Ruiz argues that we exceeded the scope of the COA inquiry by analyzing the merits of his ineffective assistance claims, as the Supreme Court cautioned against in *Buck v. Davis*.[6] The district court determined that Ruiz's ineffective assistance claims were procedurally barred and analyzed the merits in the context of determining whether Ruiz could show cause and prejudice to excuse the default.[7] We did the same.[8] Though we could have been more careful to explain the contours of our inquiry into counsel's performance, our imprecision does not warrant rehearing.

IT IS ORDERED that Ruiz's Petition for Panel Rehearing is DENIED.

---

[6] 137 S. Ct. 759, 773 (2017) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 336–37 (2003)).

[7] *Ruiz v. Davis*, No. 3:12-CV-5112, 2018 WL 6591687, at *7–10 (N.D. Tex. Dec. 14, 2018).

[8] *Ruiz*, 819 F. App'x at 243–44.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

January 22, 2021

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

No. 19-70003   Ruiz v. Davis
USDC No. 3:12-CV-5112

Enclosed is an order entered in this case.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Monica R. Washington, Deputy Clerk
504-310-7705

Mrs. Tomee Morgan Heining
Mr. Shawn Nolan
Mr. Peter James Walker

9

Case 3:12-cv-05112-N   Document 50-1   Filed 01/25/23   Page 46 of 49   PageID 6535



Current Issue        Archives        TDCJ Phone &        TDCJ Home        Contact
                                     Address Directory

**IN THIS ISSUE:**

saluting employees | web exclusives | agency news | policies & benefits | features

Effects of Hurricane Rita still felt one month after storm's passage

Texas Board of Criminal Justice experiences transition with appointment of new members

Life without parole offenders face a lifetime of tight supervision

TDCJ reimbursement for Hurricane Katrina expenses tops $73,300

TCA accepting nominations for annual awards presentation

*Fewer restrictions not an option*
Life without parole offenders face a lifetime
of tight supervision



A lifetime of tight supervision awaits offenders sentenced to life without parole in Texas.

In fact, offenders who commit a crime of capital murder after September 1, 2005 and are sentenced to life without parole are not eligible for a less restrictive custody than General Population Level 3 (G3), a level that restricts where they are housed and the jobs they can perform. Specifically, such offenders cannot be assigned to dormitories located outside of the main building and are kept from jobs where they would be allowed access to multiple areas of a unit. But unlike other G3 offenders who can eventually become eligible for promotion to a less restrictive custody, those serving life sentences without the possibility of parole cannot.

"With life without parole, G3 is the highest custody level an offender can receive," said Classification and Records Operations Manager Becky Price.

TDCJ designated G3 as the entry-level custody status for offenders sentenced to life without parole after lawmakers made it a sentencing option in capital murder cases during the last regular legislative session. Previously, jurors could sentence a convicted capital murderer to death by lethal injection or to life in prison, a punishment that required the offender to serve 40 years before becoming eligible for parole consideration. The new legislation replaced life with the sentence of life without parole and is applicable only in capital murder cases.

The agency consulted other states while developing its final approach to classifying offenders sentenced to life without parole.

The G3 custody level is designed primarily for offenders serving sentences of 50 years or more. It falls in the middle of the agency's five general population custody categories and is assigned to long-term offenders who abide by the rules and regulations. The more restrictive G4 custody is often attached to chronic rule violators, while G5 custody offenders generally have histories of assault against staff or other inmates. Thirty-six units across the state are designated to house the

A0910

Case 3:12-cv-05112-N   Document 50-1   Filed 01/25/23   Page 47 of 49   PageID 6536

Response to
Hurricane
Rita
by TDCJ
Maintenance
employees
recounted

more than 4,100 offenders now assigned to the G3 custody level in TDCJ.

As with offenders sentenced to death in capital murder cases, life without parole offenders will be brought into the prison system through two designated units, the Byrd Unit in Huntsville and the Reception Center in Gatesville. They can then be assigned to any of the units designated to house them.

Texas had been one of the only four states that had no life without parole sentencing option. Seven states – California, Florida, Alabama, Illinois, Louisiana, Michigan, and Pennsylvania – have more than 1,000 prisoners each serving sentences of life without parole. With 10 percent, Louisiana leads the nation with the highest percentage of inmates serving life without the possibility of parole. At the end of July, Texas had 8,088 offenders serving life sentences, including 1,756 for capital murder. The state's death row population numbered 411 as of the end of August.

Opponents to the life without parole sentencing option argued prior to its passage that it would make Texas prisons more crowded and dangerous because there would be no incentive for good behavior. But because life without parole is a sentencing option only in capital murder cases, TDCJ officials don't expect it to have an adverse effect on the prison population.

"The life without parole that passed in Texas is strictly for capital murder, whereas a lot of the other states have a lot of different ways to get to life without parole," Price said. "Louisiana has the life without parole sentencing option available for a number of offenses, as does New Jersey and California. In Texas, capital murder is it. So we don't think it's going to have a significant impact here because capital murder offenses are not that frequent."

**back to top**

---

TDCJ reimbursement for Hurricane Katrina
expenses tops $73,300



The Texas Department of Criminal Justice has been refunded $73,312 by the federal government for costs associated with its part in the Hurricane Katrina relief effort.

Under an emergency disaster declaration approved for Texas by President Bush, TDCJ was able to apply for 100 percent reimbursement of eligible costs incurred during the disaster

A0911

Case 3:12-cv-05112-N   Document 50-1   Filed 01/25/23   Page 48 of 49   PageID 6537

Donna Lott organizes food and water provided to Goodman Transfer Facility employees through the Federal Emergency Management Agency a month after Hurricane Rita blew through Jasper.

Photos by David Nunnelee



Administrative Review & Risk Managment employee Wanda Turnbeaugh works on a spreadsheet verifying the number of hours worked by TDCJ employees during Hurricane Rita for possible reimbursement by the Federal Emergency Management Agency.

declaration period running fro
August 31 to October 1.

The agency's projected eligibl
costs for the period included
$21,394 in employee overtime
expenses, and another $54,552
to cover the costs of the
equipment and materials TDC
put into the hurricane relief
effort. The agency is not
eligible for reimbursement fro
the Federal Emergency
Management Agency for
another $31,052 in employee
time contributed to the relief
effort during regular working
hours.

A breakdown of expenses
incurred by the agency include
$33,921 for laundering 45,229
pounds of clothing during the
disaster declaration period. In
all, the cost of materials
provided by the agency totaled
$42,009. Equipment expenses
mostly the use of agency cars
and trucks, added up to

$12,543.

Overtime amounted to 643 hours worked by 140 employees, most of whom wer investigators with the Office of Inspector General who provided security at shelters set up for hurricane victims. Employees involved in the production and delivery of mattresses also put in extra hours on the job in support of the relief effort, as did many unit laundry employees and correctional officers assisting in the daily cleaning of shelters and in the distribution of food from food banks.

More than 240 man-hours went into the compiling and verifying of costs associated with Hurricane Katrina. Agency expenses associated with Hurricane Rita were expected to far exceed those of Katrina.

back to top

TCA accepting nominations for annual awards presentation

A0912

The Texas Corrections Association is accepting nominations for statewide awards to be presented at the association's annual conference in Corpus Christi in June.

The awards recognizing outstanding work among adult and juvenile corrections professionals in Texas include the Dr. George J. Beto Hall of Honor Award and the Ellen Halbert Crime Victims' Advocacy Award. Awards will also recognize the year's outstanding adult corrections line officer, outstanding juvenile corrections line officer, outstanding adult corrections administrator, and the outstanding community services administrator/provider. TCA Star Awards and the Amador Rodriguez Memorial Outstanding Juvenile Corrections Administrator Award will also be presented.

Nominations are due by April 1. While all nominators must be current TCA members, recipients of the Beto, Halbert and Star awards are not required to be members of TCA. Other award recipients must have been active TCA members for the past year.

The awards will be presented during the TCA Conference and Exhibition scheduled June 11-14 in Corpus Christi. For nomination forms and further information online, click on www.txcorrections.org or call TCA at 512-346-582

back to top

For more Agency News, click here.

Saluting Employees | Web Exclusives | Agency News | Policies & Benefits | Features

Current Issue | Archives | TDCJ Directory | TDCJ Home | Contact

A0913